UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          January 3, 2014
                   Debtor.        .          9:00 a.m.
. . . . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  GREGORY SHUMAKER
                            THOMAS CULLEN, JR.
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

APPEARANCES (continued):

| | |
|---|---|
| For the Debtor: | Pepper Hamilton, LLP<br>By:  ROBERT S. HERTZBERG<br>4000 Town Center, Suite 1800<br>Southfield, MI  48075-1505<br>(248) 359-7333 |
| For Ambac<br>Assurance<br>Corporation: | Arent Fox, LLP<br>By:  CAROLINE TURNER ENGLISH<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 857-6178 |
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee,<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By:  WILLIAM E. ARNAULT<br>     RYAN BLAINE BENNETT<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-3062 |
| For Erste<br>Europaische<br>Pfandbrief-und<br>Kommunalkreditbank<br>Aktiengesellschaft<br>in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By:  VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA  19103-7599<br>(215) 864-8236 |
| For Detroit<br>Retirement Systems-<br>General Retirement<br>System of Detroit,<br>Police and Fire<br>Retirement System<br>of the City of<br>Detroit: | Clark Hill, PLC<br>By:  JENNIFER K. GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8300<br><br>Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For Financial<br>Guaranty Insurance<br>Company: | Weil, Gotshal & Manges, LLP<br>By:  ALFREDO R. PEREZ<br>700 Louisiana Street, Suite 1600<br>Houston, TX  77002<br>(713) 546-5040 |
| For David Sole: | Jerome D. Goldberg, PLLC<br>By:  JEROME D. GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI  48207<br>(313) 393-6001 |

APPEARANCES (continued):

```
For FMS              Schiff Hardin, LLP
Wertmanagement:      By:  JEFFREY D. EATON
                     233 South Wacker Drive, Suite 6600
                     Chicago, IL  60606
                     (312) 258-5573


For Detroit Retired  Lippitt O'Keefe, PLLC
City Employees       By:  RYAN C. PLECHA
Association,         370 East Maple Road, 3rd Floor
Retired Detroit     Birmingham, MI  48009
Police and Fire     (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:


For Bank of          Cadwalader Wickersham & Taft, LLP
America and          By:  HOWARD R. HAWKINS
Merrill Lynch        One World Financial Center
Capital Services:   New York, NY  10281
                     (212) 504-6422


For UBS AG:          Bingham McCutchen, LLP
                     By:  JARED R. CLARK
                          EDWIN E. SMITH
                     399 Park Avenue
                     New York, NY  10022-4689
                     (212) 705-7000


For Barclays         Cravath, Swaine & Moore, LLP
Capital, Inc.:       By:  RICHARD LEVIN
                     Worldwide Plaza
                     825 Eighth Avenue
                     New York, NY  10019-7475
                     (212) 474-1978


Court Recorder:      Kristel Trionfi
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068


Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Calling Case Number 13-53846, City of Detroit,

3    Michigan.

4          THE COURT:  Good morning.  One second, please.

5    Well, since it's a new day, let's put our appearances on the

6    record, please.

7          MR. SHUMAKER:  Good morning, your Honor, and happy

8    new year.  Greg Shumaker of Jones Day for the City of

9    Detroit.

10         MS. BALL:  Good morning, your Honor.  Corinne Ball

11   of Jones Day also for the City of Detroit.

12         MR. HERTZBERG:  Good morning, your Honor.  Robert

13   Hertzberg, Pepper Hamilton, on behalf of the City of Detroit.

14         MR. CULLEN:  Good morning, your Honor.  Thomas

15   Cullen of Jones Day on behalf of the City of Detroit.

16         MS. ENGLISH:  Good morning, your Honor.  Caroline

17   English from Arent Fox on behalf of Ambac Assurance

18   Corporation.

19         MR. ARNAULT:  Good morning, your Honor.  Bill

20   Arnault from Kirkland & Ellis on behalf of Syncora.

21         MR. MARRIOTT:  Good morning, your Honor.  Vince

22   Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

23         MS. GREEN:  Good morning, your Honor.  Jennifer

24   Green on behalf of the Retirement Systems for the City of

25   Detroit and Robert Gordon on behalf of the Retirement Systems

1 as well.

2       MR. PEREZ: Good morning, your Honor. Alfredo

3 Perez, Weil Gotshal, on behalf of FGIC.

4       MR. GOLDBERG: Good morning, your Honor. Jerome

5 Goldberg on behalf of interested party David Sole.

6       MR. EATON: Good morning, your Honor. Jeffrey Eaton

7 on behalf of FMS from Schiff Hardin. Thank you.

8       MR. PLECHA: Good morning, your Honor. Ryan Plecha

9 on behalf of the retiree association parties.

10       MR. BENNETT: Good morning, your Honor. Ryan

11 Bennett of Kirkland & Ellis on behalf of Syncora.

12       MR. HAWKINS: Good morning, your Honor. Howard

13 Hawkins from Cadwalader on behalf of Bank of America Merrill

14 Lynch.

15       MR. SMITH: Good morning, your Honor. Edwin Smith,

16 Bingham McCutchen, on behalf of UBS AG.

17       MR. CLARK: And, your Honor, Jared Clark, Bingham

18 McCutchen, on behalf of UBS AG.

19       THE COURT: Are we ready to continue with the

20 witness' testimony?

21       MS. ENGLISH: Good morning, your Honor. Caroline

22 English from Arent Fox. If I could just raise one

23 preliminary matter before we get started this morning -- and

24 by the way, Mr. Hackney is not here regrettably today. He

25 does send his apologies to the Court that he can't be with

1    us.  We, the rest of the objector counsel, will do the best
2    to fill his shoes.  We did take Mr. Orr's deposition on
3    Tuesday, which was replete with a lot of substantive and
4    detailed new information that we received, and we just
5    received that transcript yesterday.  We anticipate that today
6    his direct examination and cross will also contain a lot of
7    substantive and detailed information.  The objectors would
8    like to request that in order to fully synthesize all of this
9    information and incorporate it into our closing argument
10   presentations, that we'd be able to do those presentations on
11   Monday.  That would also give us the opportunity to get
12   organized among us, make sure we don't duplicate, and so
13   forth.
14          THE COURT:  Is there any objection to that?
15          MR. SHUMAKER:  Your Honor, we were hoping to
16   conclude today if that was possible given the time
17   constraints that your Honor had put on both sides'
18   presentation.
19          THE COURT:  Sir, did you want to be heard on this?
20          MR. GOLDBERG:  Your Honor, I also have a witness,
21   Wallace Turbeville, who I believe would be short testimony,
22   but he was not available today.  He did come out and was
23   prepared to testify when the case was adjourned on December
24   18th.  He could not be available today.  He is available
25   Monday, and if it was possible to bring him, I think he

1  speaks to some of the substantive issues relative to whether

2  a factual predicate could be made on the issues of equitable

3  subordination.

4        THE COURT:  Who is he, please?

5        MR. GOLDBERG:  His name is Wallace Turbeville.  He

6  was a former investment banker for Goldman Sachs, worked in

7  the derivative division, and we would ask to -- you know, we

8  would seek to qualify him as an expert and have provided an

9  expert report, and he has been deposed by the other side as

10  well.

11        MR. HERTZBERG:  Your Honor, Robert Hertzberg.  In

12  regard to Mr. Turbeville, we deposed him.  It was a lengthy

13  deposition.  I assume that the cross-examination by myself

14  and by the swap banks is going to be lengthy.  If he is

15  brought in Monday, then we're going to probably need an extra

16  day then.  I would suggest that he didn't show today.  We all

17  made arrangements to be here today and that we planned on

18  concluding today, we're prepared to close, and that the

19  witnesses should not be allowed on Monday.

20        THE COURT:  Let me ask you to step back to the

21  lectern, sir.  I take it none of the other objecting parties

22  have witnesses, or let me just ask.  Do you?

23        MR. PEREZ:  Your Honor, Alfredo Perez.  I don't have

24  any witnesses, but there are several exhibits that are self-

25  authenticating that I would want to put into the record.

1          THE COURT:  Okay.  No other witnesses except for

2     this one.  Well, it really does impose upon everyone here

3     that he's not here today.  As I previously indicated to you

4     or think I may have indicated to you, I'm not available

5     myself beginning on Tuesday of next week, so Monday was going

6     to be the last day.  How long do you think your direct

7     examination of him would be?

8          MR. GOLDBERG:  I don't think my direct would be more

9     than an hour.  I can't speak to what their cross would be.

10    As they did say, I will acknowledge they did a very lengthy

11    deposition of him.  I just was not able to produce him today.

12    I made an effort to, and I'm just asking -- you know, I

13    obviously respect whatever the Court, you know, deems.  If I

14    could have brought him today, I would have.  He did come out

15    previously and was prepared to testify.

16         THE COURT:  Where is he from?

17         MR. GOLDBERG:  New York.

18         THE COURT:  Well, all right.  Let's hold on all of

19    these questions and see what progress we do make here today,

20    and let's begin with the witness' -- or continue with the

21    witness' testimony.

22         MR. GOLDBERG:  Thank you, your Honor.

23         MR. SHUMAKER:  Thank you, your Honor.  Again, Greg

24    Shumaker of Jones Day for the city.  Your Honor, if I might

25    ask as a preliminary matter, does your Honor have a minute

1    tally?

2              THE COURT:  I do.  By my count, the city has 215

3    minutes left and the objecting parties 319.

4              MR. SHUMAKER:  Wonderful.  Thank you.

5              KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

6                        DIRECT EXAMINATION

7    BY MR. SHUMAKER:

8    Q    Good morning, Mr. Orr.

9    A    Good morning, Mr. Shumaker.

10   Q    Mr. Orr, when we were last together on December 18th, you

11   told the Court that you had received legal advice from your

12   lawyers at Jones Day and Pepper Hamilton while you and your

13   team were negotiating the forbearance agreement.  Do you

14   recall that testimony?

15   A    Yes.

16   Q    Did they prepare legal analyses regarding the types of

17   claims that the city had against the swap counterparties or

18   the swap banks for you?

19   A    Yes.

20   Q    Did they prepare memoranda for you?

21   A    Yes.

22   Q    Did they prepare any complaints for you?

23   A    Yes.

24   Q    Were these memoranda and complaints in writing?

25   A    Yes.

1  Q   Did all of the legal advice that you received during the

2  negotiation of the forbearance agreement come in writing?

3  A   No.

4  Q   How else did you get legal advice from your team?

5  A   Via e-mails and through telephone calls.

6  Q   And when was this advice provided to you?

7  A   Advice regarding the potential claims against the swap

8  counterparties was provided to me from the time immediately

9  after I was appointed throughout the time we were negotiating

10  the forbearance agreement.

11  Q   So both before and during the negotiations of the

12  forbearance agreement; is that correct?

13  A   Yes.

14  Q   And in particular, who provided it to you generally?

15  A   Generally, Corinne Ball at Jones Day as well as David

16  Heiman.  I believe there was Joel Telpner in the New York

17  office and later Mr. Hertzberg from the Pepper Hamilton firm.

18  Q   Were there any other firms that gave you advice?

19  A   Jones Day, Pepper -- local -- city's long-time counsel,

20  Miller Canfield, was also involved.

21  Q   Did this advice include the claims that the city might

22  have against the banks that were the swap counterparties?

23  A   Yes.

24  Q   With regard to the swaps and the COPs?

25  A   Yes.

1  Q   How about with regard to the pledge of the casino

2  revenues?

3  A   Yes.

4  Q   Were the claims that they address, that the lawyers

5  address, used to help negotiate the discounts that were found

6  in the original forbearance agreement?

7  A   Yes, I believe so.

8  Q   What were the arguments that the city was using to get

9  the discount percentages in the original forbearance

10 agreement?

11 A   The city's --

12 Q   Let me start with regard to the COPs and the swaps.

13 A   Okay.  The city's arguments generally centered around

14 theories that the underlying agreements, meaning the COPs and

15 the swaps, were void ab initio for a number of different sub-

16 theories and also that they had been fraudulently produced.

17 Q   Let's start with the first there, the void ab initio

18 arguments.  Could you describe for the Court the basis for

19 that claim, the legal basis, if you will, at first?

20 A   Yes.  It was my understanding that the legal basis for

21 the void ab initio claims was that the city did not have the

22 authority to enter into the underlying COPs, 2005 and 2006;

23 that, in fact, state law prohibited the indebtedness as well

24 as the fact that with regard to the swaps itself that they

25 were -- the revenue stream under state law was improperly

1    dedicated to pay them and that under state law these

2    underlying agreements were void ab initio.

3    Q    Okay.  You say state law.  Do you recall which state law

4    was implicated?

5    A    Yes.  There was one argument that the Revised Municipal

6    Finance Act, Act 34 of 2001, was violated because the city's

7    structure in the 2005 and 2006 COPs was an attempt to do an

8    end-around that law by interposing the service corporations

9    and the service contracts.

10   Q    What was the issue with the structure that was used with

11   regard to the COPs and the swaps?

12   A    It was my understanding that Act 34 prohibited the city's

13   borrowing for a number of reasons.  The city had reached its

14   debt limit at that time.  It could not do the direct

15   borrowing because of the revenue stream used to pay, and so

16   the city created a structure whereby the service corporations

17   were put in between the city -- allegedly put in between the

18   city and the borrowing, and that supposedly dealt with the

19   issue under Act 34.

20   Q    And what were the issues that were identified with regard

21   to the service corporations?

22   A    There were issues surrounding the service corporations

23   through creation as independent companies and whether or not

24   that structure actually insulated the city from the

25   restrictions of Act 34, whether or not the service

1  corporations were acting independently or were merely an
2  instrumentality of the city in some fashion, and whether or
3  not they exercise independent judgment.
4  Q   If the service corporations were not legitimate, what did
5  that mean legally?  What was your understanding of what that
6  meant legally?
7  A   It was explained to me, and it was my understanding that
8  if they were not acting legitimately, that the city was
9  essentially the borrower, and, therefore, the whole structure
10  fell, and, consequently, the underlying COPs were
11  inappropriate and unauthorized and they were void, of no
12  effect.
13  Q   Now, did you conduct or have anyone conduct a factual
14  investigation into this claim --
15  A   Yes.
16  Q   -- this potential claim against the banks?
17  A   Yes.
18  Q   And who did you have undertake that investigation?
19  A   Mr. Hertzberg and his team at Pepper Hamilton.
20  Q   Anyone else?
21  A   Jones Day initially was involved in an investigation.  I
22  believe that -- Miller Canfield as well.
23  Q   Now, what were the results of their factual
24  investigation?  What do you recall were the results of that
25  investigation?

1    A    Well, I recall that it was explained to me that there
2    were serious questions regarding the underlying indebtedness
3    and the structure of the transaction for the COPs; that there
4    were potential claims that the city could bring to invalidate
5    them in their entirety; that they could be void, not
6    voidable, and that there was a claim to be made that the
7    entire transaction would fall.
8    Q    Let me ask you, going a little deeper there, what facts
9    did you learn about the service corporations that were
10   helpful or not so helpful?
11   A    Well, it went back and forth.  On the one hand, there
12   were facts that the service corporations were not truly
13   independent.  There were city employees that were on their
14   boards and directors.  It appears that they took instructions
15   from the city in one fashion.  On the other hand, the service
16   corporations had been constructed, as I understood it, based
17   upon advice of counsel from Lewis & Munday.  There were legal
18   opinions that actually analyzed the structure before it went
19   into place that said that it was valid and appropriate, an
20   qualified opinion that said that it would not violate Act 34.
21   The parties had apparently created it very carefully and very
22   meticulously based upon that legal opinion going forward.  In
23   fact, the legal opinion as well as other facts mentioned that
24   service corporations were authorized by the Home Rule City
25   Act.  The city had in place 21 service corporations in other

1   areas.  In fact, throughout the state they had been used by

2   other municipalities, and so there was a balance between

3   whether or not this was an inappropriate use of the service

4   corporations or an entirely appropriate use of the service

5   corporations based upon the legal analysis of counsel back in

6   2004 and 2005.

7   Q   When did you learn about the operations of the service

8   corporations?

9   A   Well, I learned that the service corporations were there

10  principally to facilitate the transaction and that they met

11  all of the legal rules of having by-laws and articles, so on

12  and so forth.  They were a little skinny on the operating

13  rules in terms of having minutes and board minutes and things

14  of that like, so while they were structured appropriately, it

15  was unclear that they were operating appropriately.

16  Q   How about with regard to the City Council?  Did they have

17  any involvement in the service corporations?

18  A   Yes.  There was a strong debate at City Council about the

19  appropriateness of the COPs.  At the time in 2005 and again

20  in 2006 there were briefings.  City Council actually approved

21  and authorized a transaction by City Council ordinance.

22  Despite those debates, the transactions went forward, both

23  2005 and 2006.

24  Q   And after this investigation was conducted, what did you

25  view as the strengths of the void ab initio claim?

1  A   I viewed that there were strong claims that the service

2  corporation structure was designed to circumvent Act 34 as a

3  matter of law and that there were serious questions about the

4  appropriateness of the swaps -- of the COPs and, therefore,

5  the swaps.  I also understood that under the Home Rule City

6  Act, service corporations were specifically authorized.  They

7  had been -- the structure had been created and it tracked

8  fairly closely the advice of counsel that had been given to

9  the city, city's long-time counsel at Lewis & Munday, several

10  opinions, as a matter of fact, that it was appropriate; that

11  the city, in fact, had borrowed $1.44 billion to fund the

12  pensions, so they actually had gotten value in that

13  structure; and that despite some of the concerns about the

14  structure, specifically with the swaps, at least for the 2005

15  series, the city had made a profit.  It made in the span of

16  eight months about $40 million, tens of millions of dollars,

17  so that although the structure was questionable with regard

18  to the swaps, the city actually functioned and the city

19  actually made money.

20  Q   And based upon all that you learned from the fact

21  investigation and from your lawyers, what did you view -- how

22  did you view the chances of success on the void ab initio

23  claim?

24  A   The chances were debatable in that there were strong

25  arguments or arguments to be made that the service

1   corporations were inappropriate, but then there were clear
2   facts that they were authorized.  They were approved by City
3   Council, authorized by state law, approved by City Council,
4   were authorized pursuant to the recommendation of unqualified
5   legal opinion of the attorneys, and the structure itself
6   actually performed, made money for the city.  As a
7   consequence, I viewed the claims as more or less 50/50.
8   There were strong legal arguments, but there were also
9   countervailing factual arguments.
10  Q    Let me ask you about the fraud -- potential fraud claims
11  that you say were identified.  What was your understanding?
12  What was the basis for a potential fraud claim?
13  A    Well, there were a number of legal theories that were
14  discussed under a potential fraud claim, but the general
15  basis was that the counterparties -- excuse me -- to the
16  swaps had superior knowledge than the city, and in designing
17  the transaction and making representations to the city that
18  the transactions were low risk, that they would be beneficial
19  and an adequate hedge against interest rate variability for
20  the city, that they knew or should have known that that was
21  inaccurate; that these were very potentially volatile
22  instruments, could expose the city to a lot of damages both
23  on the interest rates and that they'd designed more or less a
24  ticking time bomb into the structure; that by designing the
25  termination fee to be based upon the interest rate

1    fluctuation, but to also be linked to the potential credit

2    rating of both the COPs and the COPs' insurers, that if that

3    rating went down, it gave the counterparties the option to

4    declare a termination event and saddle the city with a very

5    large termination fee.

6            There was also a concern that the counterparties at

7    some of the times that were related to these transactions had

8    engaged in fairly well-publicized LIBOR price fixing.  UBS,

9    in particular, had admitted impropriety in a multi-country, I

10   believe, settlement with Department of Justice, a U.K.

11   regulator, I believe a Swiss regulator as well; that some of

12   their offices around the world had engaged in inappropriate

13   LIBOR price fixing and that consequently the structure they

14   created -- there is an argument that they fraudulently

15   created it so that they could reap a profit from the city by

16   manipulating the LIBOR rate.

17   Q    Did you have a factual investigation conducted into these

18   kinds of fraud claims?

19   A    Yes.

20   Q    And by whom?

21   A    By the same attorneys, those at Pepper Hamilton, to an

22   extent Jones Day, Miller Canfield.

23   Q    Was there anything specific to the city in terms of the

24   facts that concerned you regarding the city's relationship

25   with the swap banks?

1    A    Yes, on both sides.  On the one hand, here again, the

2    city's then chief financial officer that had very strongly

3    advised for the city to enter into these transactions

4    eventually took a job -- senior level job at one of the

5    counterparties; that some on the City Council had had a

6    strong debate --

7            THE COURT:  Who was that, sir?

8            THE WITNESS:  Pardon me, sir.

9            THE COURT:  Who was that?

10           THE WITNESS:  That was Sean Werdlow, your Honor, had

11   taken that position.  The City Council -- some City Council

12   persons, in particular, had strongly opposed it.  Eventually,

13   I believe, they passed it on a majority vote -- I believe it

14   was six to three -- and, in fact, had enacted two

15   ordinances -- or enacted an ordinance supporting it.

16   BY MR. SHUMAKER:

17   Q    Do you know how the factual investigation was conducted?

18   A    Well, I don't know the exact details of it, but my

19   understanding is that the attorneys pored over a number of

20   documents, went through a number of city records, looked over

21   a number of public filings to both examine the LIBOR scandal,

22   looked over United States filings.  I believe there was some

23   investigation into Federal Reserve reports that compared, for

24   instance, at Bank of America its stated LIBOR rate that it

25   was making overseas as opposed to its Eurodollar rate that

1  was being reported here in the Federal Reserve and that there

2  was a difference.  The two should track, but there was a

3  difference between the two, so my understanding was that the

4  investigation focused principally on a lot of documentation

5  and other federal records as well as the -- I'll call it a

6  plea agreement, but the agreement that was entered into with

7  the Department of Justice and the overseas regulators.

8  Q   Based on what you learned from this investigation, what

9  did you consider the strengths and weaknesses of the fraud

10 claims to be?

11 A   I considered there to be strong -- I say strong, but the

12 LIBOR bid rigging scandal with UBS and what appeared to be

13 involvement by Bank of America based upon the analysis of the

14 interest rate spreads was certainly an indication of a fraud

15 claim.  On the other hand, the fact that the city had

16 approved the transaction, again, the swaps and the COPs

17 transaction; the fact that after their own investigation the

18 city's resistance -- they'd approved it on a six to three

19 vote, majority vote; the fact that here again they had

20 received legal advice as to the appropriateness of the

21 transaction and had passed an ordinance to approve it said

22 that the balance between the two raised serious questions

23 about whether or not you would prevail on a claim.

24 Q   Was there anything that you recall that indicated that

25 the city may have benefitted from the swaps?

1   A    Yes.

2   Q    What was that?

3   A    Well, it appeared that the city, as I said before, made

4   tens of millions of dollars on the swaps initially and, in

5   fact, on the contract it was paying out a great deal of

6   money, but there appeared to be some benefit to the city.

7   Q    And when you say "initially," what time frame are you

8   talking about?

9   A    2005, 2006.

10  Q    And based on all of this, what did you view the chances

11  of success on a fraud claim?

12  A    Here again, I viewed -- while there were certainly

13  arguments that could be made going forward that the fraud

14  claim, unlike the ab initio, also was factually intensive,

15  there were facts, as with any claim, that we did not know and

16  would not know until we pursued litigation, sometimes costly

17  and expensive litigation that would take a long period of

18  time.  There was certainly the risk that we would even have

19  to go overseas to potentially pursue some of the facts if we

20  were to litigate the question and incur the expense of doing

21  that, perhaps millions or tens of millions of dollars in

22  expense, and so on balance the thought was that certainly

23  these questions arose, and the conduct of UBS -- the admitted

24  conduct of UBS, in particular, and the -- what appeared to be

25  the conduct of Bank of America raised serious questions.  The

1  issue of the factual analysis and the city's approval of the
2  transactions, again, raised questions about whether or not we
3  would ultimately prevail.

4  Q   Now, you've testified before to the Court about what
5  we've referred to as the casino revenues.  You recall that
6  testimony?

7  A   Yes.

8  Q   Did your advisors identify any claims relating to the
9  casino revenues?

10  A   Yes.

11  Q   And what were those claims?

12  A   Under the state's Gaming Act, there was an argument that
13  the pledge of the casino revenue in 2009 to -- as collateral
14  for the COPs was inappropriate under Section 12 of the Gaming
15  Act.  It was my understanding there were certain limited uses
16  of the gaming revenue -- approved uses by state law and that
17  there was an argument that to pledge it for collateral was
18  inappropriate.

19  Q   Do you recall why it was inappropriate to pledge the
20  collateral in this manner?

21  A   Yes.  It was my understanding with counsel that there
22  were certain specified uses under the Gaming Act generally
23  for programs, street patrol officers, educational programs,
24  or improve the quality of life in the city; that it did not
25  specify the use of gaming revenue as collateral for an

```
 1   unrelated debt.
 2   Q    Now, did your team conduct a factual investigation into
 3   this particular claim?
 4   A    Yes, they did.
 5   Q    And who conducted that investigation?
 6   A    Here again, principally Pepper Hamilton, but Jones Day
 7   and Miller Canfield were involved as well.
 8   Q    Could you share with us what the factual findings were of
 9   that investigation?
10   A    Yes.  They found that there was questions raised about
11   the pledge of the casino revenue as collateral, but they also
12   found that there were another legal opinion by counsel that
13   it was an appropriate pledge of collateral and that the City
14   Council, I think, passed two ordinances with regard to the
15   2009 pledge, one finding that it was an appropriate use of
16   funds, another finding the legislative history behind it and
17   that, in fact, the pledge was designed to meet one of the
18   requirements under the Gaming Act.  I don't remember the
19   exact section, but that it was an appropriate use to enhance
20   the quality of life for the citizens of the city.
21   Q    Do you recall whether the factual investigation uncovered
22   any evidence that the state was aware of the pledge of the
23   casino revenues?
24   A    Yes.
25   Q    And what was that?
```

1  A    There was a letter from the Gaming Board, state Gaming

2  Board, where the city had sent -- apparently had sent to the

3  state an explanation of the structure of the transaction, and

4  the state had written back saying that they didn't see any

5  problems with the structure or that the parties did not have

6  to apply for a license.

7  Q    Based upon these facts and the legal arguments that you

8  were apprised of, how did you view the strengths and

9  weaknesses of this potential claim under -- relating to the

10  Gaming Act and the pledge of the casino revenues?

11  A    Here again, there were arguments to be made that under

12  the plain language of the Gaming Act the pledge of the casino

13  revenue as collateral was inappropriate and unauthorized, but

14  there were also arguments to be made that based upon advice

15  of counsel, the City Council approving the transaction and

16  adopting two ordinances in connection with the transaction

17  attempting to specify why it met the requirements of the

18  Gaming Act, the state, having had an opportunity to weigh in

19  and point out inappropriateness -- any inappropriateness,

20  actually declined to do so and essentially approved the

21  transaction without the structure of it, without the actual

22  transaction itself, raised serious questions about whether or

23  not you would ultimately prevail.

24  Q    Based on all that you learned, how did you view the

25  chances of success of such a claim?

1   A   I felt that there were arguments to be made clearly that

2   the pledge of the casino revenue was inappropriate and was

3   fraudulently induced perhaps, but, on the other hand, there

4   were all these other factors which appeared to suggest that

5   the city and the organizers of the pledge took great pains to

6   make sure that it was appropriately structured and that

7   parties that had an opportunity to weigh in both at the city

8   and the state level to say that it was unappropriate did not.

9   In fact, they raised no concern.

10  Q   Did you identify or did your team identify any other

11  claims relating to the casino revenues?

12  A   Yeah.  There were potential claims, without going into

13  the actual theories, surrounding the -- whether or not the

14  revenue was appropriately used.

15  Q   Was there anything relating to how the casino revenues

16  might be treated under the Bankruptcy Code?

17  A   Yes.

18  Q   And what was that?

19  A   Well, there was a discussion as to whether or not these

20  revenues would be classified as special revenues, and,

21  therefore, it is my understanding entitled to certain

22  treatment under the Bankruptcy Code as an after-acquired lien

23  and that the interest of the counterparties would continue

24  even after a petition date and have a security interest.  I

25  believe in 1999, even before the current situation, the City

1  Council had passed an ordinance classifying casino revenue as

2  excise taxes, and there was an argument to be made that they

3  would qualify as special revenues.

4  Q   Now, you pointed out that -- what the opinion said.  I

5  take it that you had a factual investigation conducted in

6  connection with this claim; is that right?

7  A   Yes.

8  Q   And who conducted that investigation?

9  A   Here again, that was conducted by the city's attorneys,

10  Pepper Hamilton, Jones Day, and Miller Canfield.

11  Q   And what other facts do you recall relating to the claim?

12  A   Here again, there was another legal opinion from a well-

13  known firm, Orrick, which specifically addressed the

14  bankruptcy question and found that -- I believe the statement

15  in one of the paragraphs of that opinion was that upon

16  briefing, a fact-finder would conclude that these qualified

17  as special revenues entitled to the protection in the

18  Bankruptcy Code.  There was -- there were, as I said, the

19  ordinance before in 1999 and the city's behavior as if they

20  did qualify in that regard as excise taxes.

21  Q   You say 1999.  Could you --

22  A   Um-hmm.

23  Q   Could you be mistaken on the date?

24  A   I think there was one -- I think I saw one City Council

25  ordinance.  I could be mistaken on the date.  I think it

1  was --

2  Q   How about 2009?

3  A   Maybe it was -- maybe it was two -- I'm sorry.  Maybe it

4  was 2009.

5  Q   Just wanted to be clear.

6  A   Thank you.

7  Q   Based on the factual investigation and what you learned,

8  how did you view the strengths and weaknesses of this claim

9  relating to whether the casino revenues qualified as special

10  revenues under the Bankruptcy Code?

11  A   For all the arguments, again, that these casino revenues

12  were not special revenues under the Code, it was a little bit

13  involved, and I relied on counsel to a degree, but here we

14  had the advice of counsel, a legal opinion, strong legal

15  opinion again.  At each of these stages, there were legal

16  opinions supporting the structure that went through the

17  rationale, their analysis that specifically the City Council

18  attempted to treat these casino revenues as excise taxes

19  unrelated to the emergency management or this bankruptcy.

20  This happened prior to that; that the parties appeared to

21  work very hard to try to create a structure that certainly

22  raised questions in everybody's minds, but they did at each

23  stage -- they did it very carefully and meticulously with

24  advice of counsel -- that there was a question whether or not

25  we would prevail.

1  Q    Excuse me.  After considering these strengths and

2  weaknesses and the facts that you were apprised of, how did

3  you view the chances of success of such a claim?

4  A    I tried to balance the probability that on these claims

5  there'd be more factual investigation; that there were

6  certainly arguments that casino revenues did not qualify as

7  special revenues, but weighed against those arguments were my

8  understanding from counsel that excise taxes were

9  specifically included in the definition of special revenues

10 in the Bankruptcy Code and that the intent of the parties was

11 that the lien of the counterparties would continue even if

12 there was a bankruptcy event and that they relied on advice

13 of counsel to create the structure and also secure the

14 alleged security interest.

15 Q    So aside from bringing these claims that you've

16 described, the void ab initio claims or the fraud claims

17 relating to the COPs and the swaps or the pledge or special

18 revenues arguments relating to the casino revenues, did you

19 consider taking any other courses of action in connection

20 with the swaps and the COPs or the casino revenues in the

21 May, June time frame?

22 A    Yes.

23 Q    And what were those?

24 A    We considered, one, doing nothing, continuing the status

25 quo, but our projections showed that that was -- would be

1  fairly catastrophic to the city; that we were running out of

2  money.

3  Q   I wasn't clear.  What projections are you talking about?

4  A   Cash flow projections that we would get from the

5  investment bankers and Ernst & Young.  We considered

6  litigation, had to factor in the potential length of time and

7  the out-of-pocket expense of the city, which could be

8  millions of dollars per year, even tens of millions of

9  dollars in total as the years went on.  I think there was

10 also a provision in the collateral agreement that if we did

11 not prevail we'd be responsible for the attorneys' fees of

12 the other side as well.  We considered whether or not I could

13 exercise my authority under 436.  There's a provision in 436

14 where I can invalidate contracts in and of themselves

15 administratively as the emergency manager and whether that

16 would be appropriate to revoke what were the -- they were

17 called the irrevocable letters of instruction both to the

18 casinos as well as to U.S. Bank as trustee, but the risk of

19 taking that course of action was that we would probably

20 create litigation anyway; that people would not stand by if I

21 sought to revoke those letters and inform the casinos and

22 U.S. Bank to start paying all the revenue directly to the

23 city, and we considered the risk of even some sort of

24 structured litigation just going after initial claims maybe

25 on a summary judgment motion but as well as full-blown

1  litigation going forward.

2  Q   I'm sorry.  You talked about the irrevocable

3  instructions.  Could you elaborate on what the irrevocable

4  instructions were?

5  A   Yes.  It was my understanding in connection with the 2009

6  collateral agreement the city issued -- caused to be issued

7  irrevocable letters of instruction to the casinos that they

8  would pay the casino revenue to the trustee, and there was a

9  mechanism, which may have been discussed earlier -- a

10 mechanism that allowed a certain amount of money to be swept

11 on a daily basis and paid on the 1st to the city, then on the

12 15th paid into an account where the trustee would notify the

13 city typically at the end of the month that it had an

14 obligation to pay a certain sum, about $4 million a month,

15 back into a holdback account, and then the trustee would

16 release the rest of the revenue for that month to the city,

17 and those letters of instruction instructed the casinos how

18 to participate in that mechanism.  And there was another

19 letter -- letters of instruction which instructed the bank

20 that it was to continue this process, this structure,

21 until -- unless and until the counterparties authorized them

22 to stop, so that's why they were called irrevocable letters

23 of instruction.

24 Q   Thank you.  You indicated that you considered litigation.

25 Did you have complaints prepared during this time period?

1    A    Yes, yes.

2    Q    And by whom?

3    A    Pepper Hamilton, Mr. Hertzberg's team.

4    Q    Did you consider at any time talking to other third-

5    parties or agencies about what could be done about the COPs,

6    the swaps, the casino revenues?

7    A    Yes.

8    Q    What was that?

9    A    I actually spoke with the Security and Exchange

10   Commission about the transaction and whether there was -- if

11   we were going to go into litigation, there was an opportunity

12   to have some federal investigation and prosecution.

13   Q    Do you recall when you talked to the SEC?

14   A    I don't.  It was generally in this time frame.  It might

15   have been later.

16   Q    Now, you on the 18th previously testified that the

17   negotiations for the initial forbearance agreement took place

18   in late May through early June until an agreement in

19   principle was hammered out; is that correct?

20   A    Yes.

21   Q    And Mr. Buckfire was the lead negotiator for that effort;

22   is that right?

23   A    Yes.

24   Q    And Ms. Ball and other Jones Day lawyers were the lead on

25   the legal side; is that right?

1   A   Yes.

2   Q   To your knowledge, were the legal claims that you've

3   described this morning for the Court ever communicated to the

4   swap banks during the negotiations of the forbearance

5   agreement?

6   A   Yes.  It was my understanding that while the negotiations

7   had gotten heated in the June 10th through the June 14th time

8   frame on the business side with Mr. Buckfire and myself in

9   those days leading up to the June 14th presentation, that,

10  likewise, on the legal side for some time my attorneys had

11  been in pretty strong negotiations with the attorneys, I

12  believe, at Cadwalader representing -- and other firms

13  representing the counterparties.

14  Q   Which attorneys on your team were doing that?

15  A   Ms. Ball, Corinne Ball; David Heiman; I believe Joel

16  Telpner out of the New York office; and later Mr. Hertzberg.

17  Q   Why did you have them do that --

18  A   Well --

19  Q   -- the claims to the swap banks?

20  A   Well, we wanted to make sure that the counterparties were

21  aware we were prepared, if negotiations broke down, to pursue

22  litigation; that we had thought about the litigation; and

23  that we were not, in a sense, bluffing.  If things did not

24  result in a settlement, we were going to have to pursue

25  litigation.  We didn't have a choice.

1  Q   Were you hoping that those -- the communication of those

2  claims would somehow affect the discount percentages?

3  A   Yes.

4  Q   Why was that?

5  A   Well, my understanding was initially the counterparties

6  took a fairly strong position that they had a secured

7  interest.

8         MS. ENGLISH:  Objection, your Honor.  I believe

9  Mr. Orr is now starting to testify about what his attorneys

10  told swap counterparties in conversations and discussions

11  that he was not present at, so I have an objection on hearsay

12  grounds.

13         THE COURT:  The objection is overruled.  You may

14  proceed, sir.

15         THE WITNESS:  It was my understanding that the swap

16  counterparties felt strongly that they had a secured

17  interest -- certainly that's what I experienced on the

18  business side -- and that this whole structure had been

19  vetted and approved by all parties at the time it was entered

20  into and that parties had been performing for years under it

21  and that they felt they had a strong legal position.  And we

22  wanted to make sure that they understood that we felt,

23  despite the performance of the parties and the legal opinions

24  and approvals before, that we believe there was an

25  opportunity for us to litigate that issue and perhaps

1  undermine the security interest.

2  BY MR. SHUMAKER:

3  Q    Now, if the city had filed those claims, there were

4  significant upsides for the city; correct?

5  A    Yes.

6  Q    What were those upsides?

7  A    The upsides were as great as invalidating the entire

8  transaction, recovering all payments that had been made over

9  those years, particularly under the swap contract going

10  forward and perhaps even recovering damages.

11  Q    And you said invalidating the swaps.  What would that

12  have meant for the city?

13  A    Well, it would have gotten the city out from under the

14  termination fee risk.  It would have released the lien on the

15  casino revenue.  It perhaps would have allowed the city to

16  recover tens of millions or hundreds of millions of dollars

17  in the payments that it made throughout the life of the

18  swaps.

19  Q    Were there downsides to pursuing litigation?

20  A    Yes.

21  Q    What were they?

22  A    The downsides were if we did not prevail that the swap

23  contract, for instance, would have been validated.  The city

24  would have had an obligation and a termination event

25  because -- my point was a termination event -- there are a

1   number of other termination events -- that they would have

2   had an immediate obligation to pay hundreds of millions of

3   dollars to the swap counterparties.  We would have incurred

4   the litigation expense, out-of-pocket expense of that

5   litigation.  We would have had an obligation to pay the

6   litigation expense perhaps of the counterparties as well and

7   that, more importantly, frankly, from the city's perspective,

8   the single largest most secure source of revenue for the city

9   would have been imperiled, and we would have not had

10  stability in the city's finances or an ability to both plan

11  operationally strategically for the city or in any other

12  manner.

13  Q   Did you have any understanding of how long it might take

14  to pursue this kind of litigation?

15  A   Yes, generally.  With most litigation it's -- someone

16  said about war, you know, the best laid plans go to "H" after

17  the first shot, and with litigation you can have strategies

18  and plans in place, but litigation sometimes takes on a life

19  of its own despite what you think you're going to do, so part

20  of the risk that I was trying to assess with the advice of my

21  counsel was if we pursued it, what was the probability that

22  we were going to be able -- the likelihood that we were going

23  to be able to stabilize the city's finances during the course

24  of litigation.

25  Q   You mentioned the potential cost of such litigation.

1   What was your understanding of how much it might cost and

2   based on what?

3   A    Well, suffice it to say that the counterparties are

4   sophisticated counterparties with excellent legal counsel.

5   They have the finances and the wherewithal to fund litigation

6   to defend.  They certainly have the ability to pursue

7   defenses and perhaps claims against the city.  The city would

8   be up against a well-financed adversary or adversaries.  The

9   cost to the city, while they were estimates, could be a

10  million dollars a month on average.  Even half a million a

11  month was somewhere between six to $12 million a year to the

12  city.  If they prevailed, in addition to the termination fee,

13  we'd have an obligation to pay those legal fees.  If it went

14  over for a period of years, those years were years that we

15  would not be able to use a portion or maybe some of that

16  revenue to stabilize the city's finances or to get to the

17  reinvestment and reform that we're trying to get to now.  We

18  certainly would not be able to push out a plan of reinvention

19  for the city during this time if the litigation didn't stay

20  the trap of the casino revenue.

21  Q    Did you consult with your lawyers regarding how much the

22  litigation might cost?

23  A    Yes.

24  Q    How about the duration of litigation?  Did you discuss

25  that with your lawyers?

1    A    Yes.

2    Q    What would happen -- what would the consequences be if

3    the city lost on the legal claims you've described?

4    A    The consequences would be quite severe.  The casino

5    revenue approaches $200 million on a billion dollar budget.

6    Our tax revenue we hope to maintain at a steady state, but 20

7    percent of the city's budget could go away.  If that happened

8    to the city, you could not cut enough services.  The city is

9    down from a high in 2000 of roughly 22,000 FTE's to about

10   9,600.  You can't cut -- you can't cut any more to make up

11   $200 million in losses.

12   Q    Does the forbearance agreement or the agreement that

13   you're asking the Court to approve, does it settle the legal

14   claims that you've described here this morning against the

15   swap banks?

16   A    Yes.

17   Q    If the forbearance agreement is not approved, do you

18   understand what will occur vis-a-vis the parties?  When I say

19   "the parties," I mean the city and the swap banks.

20   A    Well, the parties revert back to the status quo prior to

21   the forbearance agreement, and the city remains at risk of

22   a -- of having to deal with a termination event payment.

23   Q    Now, do you recall when you signed the initial

24   forbearance agreement?

25   A    Yeah.  Approximately back some time ago, in June, I

1  believe.

2  Q   June or July?

3  A   July, yeah.  I believe it was July, yeah.

4  Q   And do you believe that that forbearance agreement was in

5  the best interest of the city?

6  A   Yes.

7  Q   On December 18th, you were initially testifying about

8  that forbearance agreement that was executed in July, and you

9  explained the discount percentages to the Court.  Do you

10  recall that?

11  A   Yes.

12  Q   Do you recall the range of 75 to 82 percent?  Does that

13  sound familiar?

14  A   Yes.

15  Q   At the Court's suggestion, you reopened negotiations with

16  the swap banks in connection with mediation; correct?

17  A   Yes.  We were ordered to mediation.

18  Q   Did you discuss the potential legal claims that the city

19  might have against the swap banks with your counsel before

20  these renegotiations?

21  A   I discussed them before the renegotiations and during the

22  mediation.

23  Q   Did you share or explain these legal claims with the

24  mediators?

25  A   Yes.  Generally, yes.

1  Q   And why did you do that?

2  A   The mediation is confidential, but I did that to relay --

3  we did that in the room to relay to the mediators that we

4  felt, here again, that there were arguments to be made

5  against the swap counterparties and their interest and to

6  make sure they understood that, you know, we -- in these

7  renegotiations there were reasons -- good reasons for us to

8  renegotiate the percentages that we originally agreed to.

9  Q   How were the negotiations conducted in the course of the

10  mediation?

11  A   There was one plenary session for five to ten minutes on

12  the morning of the 23rd.  Then the parties -- each of the

13  groups, the city, the counterparties, I assume -- I didn't

14  see them go into a separate room, but I assume the insurers

15  and some of the creditors went out into separate breakout

16  rooms.  The mediators would shuttle back and forth between

17  the parties during the day.

18  Q   Did you negotiate the new agreement directly, or was that

19  done by the mediators?

20  A   That was done by the mediators.

21  Q   And a new agreement was reached; correct?

22  A   Yes.

23  Q   And what -- if you will, could you share the terms of

24  that new agreement with the Court?

25  A   Yeah.  The substantive terms essentially mean the same.

1    The number for the termination fee payment went down to a
2    whole number of $165 million.
3    Q   Now, I'd like to show you Exhibit 141 if I could.  Well,
4    let me --
5            MR. SHUMAKER:  Before you put it up -- before you
6    put it up -- your Honor, this is the sixth amendment to the
7    forbearance agreement.  It has not been admitted into
8    evidence, so I don't want to show the witness yet.  And I'm
9    not sure whether the objectors have any objection to its
10   being admitted into evidence.
11           THE COURT:  Are you offering it?
12           MR. SHUMAKER:  Yes, your Honor, we are.
13           MS. ENGLISH:  We have no objection.
14           THE COURT:  All right.  Exhibit 141 is admitted.
15           MR. SHUMAKER:  Thank you, your Honor.
16       (City Exhibit 141 received at 9:55 a.m.)
17   BY MR. SHUMAKER:
18   Q   Mr. Orr, could you take a look at Exhibit 141 there and
19   tell us whether you recognize that document?
20   A   Could we --
21           MR. SHUMAKER:  Can you flip to the next page, too,
22   Steve --
23           THE WITNESS:  Next one.
24           MR. SHUMAKER:  -- and the next one?
25           THE WITNESS:  And the next one.

1         THE COURT:  And one more.  Okay.  And there may be
2    another one.
3         THE WITNESS:  Yes.
4         MR. SHUMAKER:  Okay.
5         THE WITNESS:  Okay.  Yes.  I recognize the exhibit.
6    BY MR. SHUMAKER:
7    Q   Okay.  And what is it?
8    A   It's the sixth amendment to the forbearance and optional
9    termination agreement.
10   Q   Okay.  And, again, you talk that -- talked about this
11   agreement having a new number and new terms.  Can you share
12   with the Court or summarize for the Court what the terms are
13   of this sixth amendment?
14   A   Yeah.  Generally the terms remain the same.  It reduces
15   the amount of the termination fee payment by $65 million to a
16   whole number -- set number of $165 million, and it extends
17   the time to execute on the agreement until, I believe,
18   further down, January 31st, 2014.
19   Q   Now, the new number is a fixed number, as you say;
20   correct?
21   A   Yes.
22   Q   Why was a fixed number negotiated when the prior
23   agreement, which is in the original forbearance agreement,
24   that was based on discount percentages?  Was that done?
25   A   The original agreement was negotiated at arm's length

1  bilaterally between the parties, and the general concern was
2  that there be a percentage reduction to allow the interest
3  rate float to occur in the agreement but based on percentages
4  so that the parties at some way were still bound to the
5  benefit of their bargain, what they had negotiated.  During
6  the course of the day in the mediation, we at the city
7  decided that it was best that we were going to try to finally
8  bring this to a close, that we not be subject to market rate
9  fluctuations and that we get to a set number so that that
10 number is firm irrespective of whether interest rates go up
11 or interest rates go down, that we have a firm number that we
12 can plan on and that we can adjust, and the mediators in the
13 afternoon came back to us and said that was the best possible
14 result we could achieve is going to a whole number.
15 Q    Could you -- and the whole number was 165 million?
16 A    Yes.
17 Q    How did you -- could you explain to the Court how that
18 figure was arrived at?
19 A    Yes.  We sat in a room for several hours during the
20 morning.  The mediators came in, Judge Perris, Judge Rosen,
21 late morning, asked us what we thought would be a fair
22 number.  We gave it to them.  Several hours passed.  I think
23 we broke for lunch.  They came back again that afternoon and
24 said that we weren't going to be able to achieve the number
25 that we wanted based upon their discussions with the

1  counterparties and that the best number -- I'm not sure they
2  gave us all the reasons, but the best number we could hope to
3  achieve was roughly $165 million.  There was some discussion
4  about whether or not that would be a fixed number or we would
5  have a percentage.  We called our investment bankers to try
6  to get some idea about what market interest rates were doing
7  and what the trend might be during the course of the coming
8  weeks.  We initially rebuffed that number.  I believe the
9  mediators came back in and strongly suggested that was the
10 best number we were going to achieve in this process or we
11 were headed to perhaps months if not years of litigation.  We
12 counseled amongst ourselves, said we would accept the number
13 but only as a whole number, only as a fixed rate.  Towards
14 eight o'clock at night the mediators called us into a room
15 with the counterparties on the other side to make sure
16 everybody understood that we were dealing with a fixed
17 number, this was going to be a net to the city and that that
18 was the final agreement.
19 Q   And what was your initial proposal to the mediators for
20 the banks?
21 A   Our number?
22 Q   Yeah, the initial range.
23 A   Initial range was 145 to 150 million.
24 Q   And that's the number you did not -- were not able to
25 get?

1  A    Yes.

2  Q    Do you believe that the new agreement is a better

3  agreement for the city?

4  A    Yes.

5  Q    Why?

6  A    It's $65 million less than the original agreement, which

7  is significant to the city.  We will reduce the post-petition

8  financing requests that we have from our -- for our lenders

9  as a consequence.  That's less debt to the city.  It reduces,

10  again, for all the reasons before -- our interest expense is

11  based on an $800 million notional amount in the original

12  document.   It reduces to the actual interest of this amount

13  of the post-petition financing.  It finally resolves this

14  issue, the whole sordid tale of the swaps, once and for all.

15  It relieves us of potential litigation expense as well and

16  actually reduces our interest carry from roughly 50 million a

17  year to somewhere in the neighborhood of 15 to $16 million a

18  year depending upon what eventually we get, and it provides

19  us, more importantly with the city, an opportunity to finally

20  do some reasonable strategic planning based upon a certain

21  revenue stream for years to come so that we can get to the

22  reinvention plan that we're trying to push out.

23  Q    So do you believe this new improved agreement is in the

24  best interest of the city?

25  A    Yes.

1  Q   I want to ask you a few questions about the post-petition

2  financing.  When you signed the forbearance agreement, the

3  initial forbearance agreement, in July, the city did not have

4  the money needed to finance the deal; correct?

5  A   Yes.

6  Q   All right.  And how does the city propose to pay the 165

7  million that you've just described?

8  A   We're going to borrow it.

9  Q   And back in the time that the post-petition financing was

10 being solicited and negotiated, what was your involvement in

11 that process?

12 A   After we entered into the agreement in principle and the

13 first forbearance and optional termination agreement, I

14 instructed our investment bankers to canvass the marketplace

15 to see what terms and availability was out there in the

16 capital markets for a loan to the city.  They'd actually done

17 some of that already.

18 Q   What were your instructions to your team?

19 A   To get the best deal that we could from the capital

20 markets.

21 Q   And who was your team?

22 A   It was principally Ken Buckfire and Jim Doak of Miller

23 Buckfire.

24 Q   And what did you consider to be the most important

25 factors in the financing to you in selecting a lender for the

1  city?

2  A    Lowest rate possible, overall rate under any set of

3  circumstances, certainty of lending, the ability of the

4  lender to actually come through without any ancillary or

5  other risk, pretty straightforward transaction, didn't want

6  any exotics or any significant conditions in the agreement

7  that could create a change in the structure of the

8  transaction, and the ability to close fairly quickly.

9  Q    Did you give any instructions to Mr. Buckfire, Mr. Doak,

10  or anyone on your team regarding whether the financing should

11  be secured or unsecured?

12  A    Yes.

13  Q    And what were those instructions?

14  A    We initially discussed whether we could obtain

15  unsecured -- the financing in an unsecured capacity as a

16  loan.  They had canvassed some of the lenders -- potential

17  lenders in the capital markets and came back with a report

18  that that was unlikely.

19  Q    I'm sorry.  Did you indicate what -- did you tell us

20  what -- why they believed that --

21  A    Yes, yeah.

22  Q    -- your understanding as to why they --

23           MR. MARRIOTT:  Objection, your Honor.  This is

24  hearsay testimony.  Mr. Doak and Mr. Buckfire have already

25  given testimony on precisely this point.  We know what they

1    thought.  We know why they thought it.

2           THE COURT:  The objection is overruled.  Go ahead,

3    sir.

4           THE WITNESS:  Yes, sir.  Mr. Doak and Mr. Buckfire

5    told me that the reality is we're in bankruptcy.  We're a bad

6    credit risk.  We've been defaulting.  Our credit rating has

7    been driven down and that nobody is going to lend to us

8    without some form of security interest.

9    BY MR. SHUMAKER:

10   Q   Did you review any reports from Miller Buckfire during

11   the solicitation process?

12   A   Yes.

13   Q   I'd like to show you a document, Exhibit 88, please, and

14   ask you, Mr. Orr, is that document familiar to you?

15   A   Yes.

16   Q   And what is it?

17   A   This is one of the initial documents regarding post-

18   petition financing discussion that was generated by Miller

19   Buckfire.

20   Q   Was it prepared for your review?

21   A   Yes.  For me and the entire team, yes.

22   Q   I'd like to take you to --

23          MR. SHUMAKER:  This document, your Honor, is already

24   in evidence.

25   BY MR. SHUMAKER:

1  Q  -- page 5, if you will.

2         MR. SHUMAKER:  Steve, if you could go -- page 5 of

3  the document.

4  BY MR. SHUMAKER:

5  Q  Do you see that page, Mr. Orr?

6  A  Yes.

7  Q  And up at the top it says "Post-petition financing all-in

8  cost analysis."  Do you see that?

9  A  Yes.

10  Q  What did that mean to you when you read it?

11  A  This was a comparison of the potential lenders and what

12  all-in costs if you put in the amount of the loan, if you put

13  in any fees, if you put in any variability between the

14  interest costs for the swap termination loan versus the

15  quality of life loan and whatever other fees any of these

16  lenders were proposing, what that total cost could be, the

17  exposure to the city.

18  Q  You see the -- at the top of the columns across the page

19  the names BAML, Barclays, Goldman, CarVal, Fundamental,

20  Jefferies.  What were those -- what were those names?

21  A  These are all the names of the potential lenders that

22  responded to a solicitation, I believe.  The solicitation had

23  gone out previously and had gotten somewhere in the

24  neighborhood -- I think they sent out approximately 50

25  solicitations.  They got roughly close to three dozen

1  responses.  They had gone through the responses and tried to

2  pull out the handful of best responses that they had

3  received.

4  Q   And what did this show you?  What did this page show you?

5  A   This page showed that considering all the potential

6  lending and the various factors that went into lending that

7  Barclays was the cheapest money.

8  Q   Okay.  And at the bottom half of the middle box there,

9  you see two rows.  One, it says difference from lowest all-in

10  rate and difference from lowest all-in expense.  Do you see

11  that?

12  A   Yes.

13  Q   And there are dashes underneath Barclays?

14  A   Yes.

15  Q   What did that indicate to you?

16  A   That there was no difference between the rates.

17  Q   And was Barclays the best lender based upon this

18  analysis?

19  A   Yes.  Overall they were the best lender.

20  Q   Ask you to take a look at Exhibit 89, please, which is

21  also in evidence.  Mr. Orr, do you recognize this document?

22  Turn the page.

23  A   Yes.

24  Q   And what is this document?

25  A   This is a comparison, I believe, of approximately five

1   lenders on the back page, I believe, of the commitment

2   letters that the previous lenders had actually provided to

3   Miller Buckfire.

4   Q   Okay.  Turn your attention to page 5 of the document.

5   A   Yes.

6   Q   Now, there are a smaller number of banks or financial

7   institutions across the top row there of the columns.  Do you

8   see that?

9   A   Yes.  It said five, but it's four.

10   Q   Yeah.  And it says Barclays, CarVal, BAML, and Goldman.

11   Do you see that?

12   A   Yes.

13   Q   Do you recall how they were selected?

14   A   Yes.  I think, based upon -- it was a winnowing down

15   process based upon the responses to the original

16   solicitation.  The analysis that you showed me before that

17   the -- Miller Buckfire did an analysis of the terms under the

18   actual commitment letters that the parties were proposing,

19   and these four potential lenders were selected as the best.

20   Q   And then the shaded box at the bottom of the page, what

21   did that indicate to you?

22   A   This was an analysis of the average all-in cost based

23   upon the various commitment letters from each of the lenders.

24   Q   And did it indicate which lender had proposed the best

25   package for the city?

1   A    Yes.

2   Q    And who was that?

3   A    Barclays.

4        MR. SHUMAKER:  You could take that down.

5   BY MR. SHUMAKER:

6   Q    During this solicitation process for the post-petition

7   financing, Mr. Orr, did anyone ever tell you that there was a

8   bank or a financial institution that was willing to lend to

9   the city on an unsecured basis?

10  A    No.

11  Q    Did you expect anyone to offer the city unsecured money?

12  A    No.

13       MR. MARRIOTT:  Objection.  Relevance.

14       THE COURT:  Overruled.

15  BY MR. SHUMAKER:

16  Q    Why not?

17  A    The city had -- prior to the appointment of an emergency

18  manager, had suffered a number of credit rating downgrades.

19  With the appointment of the emergency manager, that was an

20  event of default under a number of different financial

21  instruments.  Once we declared bankruptcy, it is highly

22  unlikely that anyone is going to loan to a bankrupt entity

23  without a senior secured status.  That would be reckless.

24  Q    Did you believe the post-petition financing process

25  yielded the best deal for the city?

1   A   Yes.

2   Q   Why?

3   A   The city needs to stabilize its finances once and for

4   all.  It needs to get out from under this whole swap contract

5   as soon as possible so it stops the sweep of its casino

6   revenue, the quarterly payments, and the risk that the

7   termination fee and termination event would be declared and

8   the casino revenue would be trapped.  The city cannot plan

9   unless it removes this potential risk from the table so that

10  any plans that it does make both at an operational level or

11  now that we're in bankruptcy for a plan of adjustment level

12  are credible and realistic.  If we don't do that, we are

13  constantly living with the risk that at any given time that

14  we've already suffered a termination event, a termination

15  event can be declared, which would certainly create a risk of

16  a trap of the revenue or a risk of significant full-blown

17  litigation, and that's no way to plan.

18  Q   How about the financial terms of the deal?  Do you

19  believe those are the best that the city can obtain?

20  A   Yes.  My understanding is that we went through a very

21  fulsome and lengthy process with a number of lenders.  There

22  were terms which were worse for the city financially; that

23  Barclays proposed all-in the best terms that the city could

24  achieve at this time.

25  Q   How does the new $165 million agreement affect the city's

1    request for post-petition financing?

2    A    It would appear to make it more attractive because we're

3    going to reduce the request dollar for dollar for the

4    termination loan that we requested originally down to 165

5    million.

6    Q    So how much financing are you looking to obtain for the

7    city?

8    A    165 million for the termination fee and another 120

9    million for the quality of life loan, $285 million total.

10   Q    And how long do you believe that the Barclays commitment

11   is available to the city?

12   A    We believe that the Barclays commitment will remain

13   available through January 2014.

14   Q    Did you have any reporting obligations under state law

15   with respect to obtaining the post-petition financing?

16   A    Yes.

17   Q    And what were those reporting obligations?

18   A    There was a question as to whether or not we had to seek

19   approval from the Treasury Department for the loan.  Given

20   the history of the transaction, we wanted to be very careful,

21   so while there was some debate amongst my team as to whether

22   or not we had to ask Treasury for approval, I decided that in

23   an abundance of caution we should do that.

24   Q    Let me show you Exhibit 96, which is also in evidence.

25   Mr. Orr, do you recognize this document despite its fairly

1    small font size?

2    A    Yeah.  Can you --

3    Q    You see it?

4    A    Yes.  Can you turn --

5    Q    And let's turn to page 2, if you would.

6    A    Yes.

7    Q    Mr. Orr, is that your signature?

8    A    Yes, it is.

9    Q    What is this document?

10   A    This document is a request to the state's Treasury

11   Department that they approve the city's financing with

12   Barclays, including the commitment fee that was to be paid to

13   Barclays.  There's a provision in the emergency manager

14   statute, 436, that I don't have to seek the approval of

15   Treasury if I'm engaging in transactions that are subject to

16   competitive bidding, which this was significantly, but here

17   again, just to be careful, I wanted to make sure that I had

18   Treasury's approval to enter into the commitment fee and the

19   actual transaction.

20   Q    And I'm sorry.  Were there attachments to this letter?

21   A    I believe so.  I believe we attached the commitment

22   letter and the proposal, yes.

23   Q    Okay.

24   A    Yes.

25   Q    And did -- and this was to Treasurer Dillon, correct, the

1  letter?

2  A   Yes.

3  Q   Did Treasurer Dillon approve of the Barclay -- paying the

4  Barclays commitment fee?

5  A   Yes.  Treasurer Dillon responded to this letter and

6  approved the payment of the commitment fee and the Barclays

7  transaction.

8  Q   I'd like to show you Exhibit 97.  Do you recognize this

9  document, Mr. Orr?

10        MR. SHUMAKER:  It's in  evidence, your Honor.

11        THE WITNESS:  Yes, I do.

12  BY MR. SHUMAKER:

13  Q   And what is this document?

14  A   This is Treasurer Dillon's response to me noting that

15  under the 436 I did not have to seek Treasury approval but

16  recognizing that in an abundance of caution it was

17  appropriate for them to approve the transaction, nonetheless.

18  Q   And Mr. Dillon in the third paragraph of this letter --

19        MR. SHUMAKER:  If you could blow that up, please.

20  BY MR. SHUMAKER:

21  Q   -- provided reasons why he believed this was appropriate

22  for the city; correct?

23  A   Yes.

24  Q   And did you agree with the reasons that he sets forth

25  here?

1   A   Yes.  I knew that Treasurer Dillon going back to 2012 in

2   connection with the Detroit Reform Program in November had

3   been concerned about this transaction, the swaps in

4   particular, and that the amount of debt that the city was

5   carrying, the termination fee risk, the interest carried, the

6   multiplier on the notional amount, and I knew he understood

7   what it would mean to the city, and, quite frankly, I was

8   hoping that he would recognize that although I was taking a

9   belt and suspenders approach to the transaction, that I

10   wanted to be sure that for all time both here, in the future,

11   but also for the lender that everyone understood that this

12   was a final transaction to deal with this issue and it was

13   approved by the state.

14   Q   And on the prior Exhibit 96, you indicated that you had

15   attached the commitment -- the Barclays commitment letters;

16   correct?

17   A   Yes.

18   Q   Had you signed the Barclays commitment letters when you

19   sent them to Mr. Dillon?

20   A   No.

21   Q   When did you sign the Barclays commitment letter?

22   A   After receiving this letter from Treasurer Dillon.

23   Q   Mr. Orr, did you submit the Barclays proposal to City

24   Council?

25   A   Yes.

1    Q    Why did you do that?

2    A    City Council's approval is required, we believe, and they

3    have the opportunity to propose an alternative transaction.

4    Q    Is it required under the emergency manager statute?

5    A    I don't think it's the emergency manager statute.

6    Q    Okay.  What statute is it?  Do you recall?

7    A    I think it's the Home Rule City statute.

8    Q    Okay.  What happened after you submitted the Barclays

9    proposal to City Council?

10   A    I instructed our team to go through the transaction with

11   City Council.  I believe there was some discussion that a

12   potential lender had come in after this process, selection

13   process, and was proposing a loan via City Council.  They

14   debated that and vetted it and ultimately decided not to

15   propose it as an alternative transaction.

16   Q    And who made that proposal?  Do you recall?

17   A    I think it was Syncora.

18   Q    Did the City Council approve the Barclays proposal?

19   A    Did they approve it?

20   Q    Yes.

21   A    No.

22   Q    What happened once the City Council disapproved the

23   proposal?

24   A    Well, that's the only proposal that's available, and I

25   believe, under the Home Rule Act, Home Rule City Act, it goes

1   to the Emergency Loan Board.

2   Q   Did the --

3   A   Yeah, the Emergency Loan Board.

4   Q   Did the City Council ever submit an alterative proposal

5   to the one that was reflected in the Barclays proposal?

6   A   No.

7   Q   Did you submit the Barclays proposal to anyone else for

8   their review or approval?

9   A   To the Emergency Loan Board.

10  Q   Okay.  Let me show you Exhibit 100, please.  Mr. Orr,

11  what is this document?

12  A   This is a transmission document from Miller Canfield to

13  the Local Emergency Financial Assistance Loan Board or, as I

14  call it, Emergency Loan Board.

15  Q   And why did you -- did you instruct Miller Canfield to

16  send this letter?

17  A   Yes.

18  Q   Why?

19  A   A question was raised as to whether or not the board

20  would ultimately approve the transaction, and I believe those

21  questions were raised in connection with the approval we're

22  requesting here, and so to remove that question from this

23  process, we submitted it to the board for their approval.

24  Q   Do you know whether the Emergency Financial Assistance

25  Loan Board has approved the Barclays proposal?

1   A   Yes, they have.

2          MR. SHUMAKER:  Your Honor, we would like to -- I'd

3   like to show the witness City Exhibit Number 142.  It has not

4   been moved into evidence.  I would do so now.

5          THE COURT:  Any exhibit -- any objection to Exhibit

6   142?

7          MS. ENGLISH:  No objection, your Honor.

8          THE COURT:  It is admitted.

9        (City Exhibit 142 received at 10:19 a.m.)

10          MR. SHUMAKER:  Would you put that up, please?

11  BY MR. SHUMAKER:

12  Q   Mr. Orr, do you recognize this document?

13  A   Yes.

14  Q   And what is this document?

15  A   This is the loan board's order approving the transaction.

16  Q   And what is your understanding, generally speaking, of

17  what this order provides?

18  A   The order provides -- authorizes the city to enter into a

19  transaction not to exceed 350 million for the purpose of

20  dealing with the swap termination payment as well as the

21  quality of life loan.  The order recognizes that it is

22  subject to the Bankruptcy Court's approval of the transaction

23  to be operative.

24  Q   Now let me turn your attention -- direct your attention

25  to paragraph 7 on page 6 of the document.  Can you see that

1  first sentence there, Mr. Orr?

2  A   Yes.

3  Q   Is that what you're referring to?

4  A   Yes.

5  Q   Could you read it for the record, please?

6  A   "This order of approval is conditioned upon approval by

7  the Bankruptcy Court of the motion by the city for an order

8  approving a post-petition financing, granting liens,

9  providing superpriority claim status, and modifying the

10  automatic stay in the bankruptcy case entitled In re. City of

11  Detroit, Michigan, Debtor, Case Number 13-53846."

12  Q   Is it your understanding, Mr. Orr, that this order would

13  cover the new $165 million agreement that you've described?

14  A   Yes.  The order specifically says that the total

15  aggregate amount of the loan cannot exceed 350 million, and

16  we're asking for less than that.

17          MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I

18  have.

19          THE COURT:  All right.  I think we'll take our

20  morning recess at this time and reconvene, please, at 10:45.

21          THE CLERK:  All rise.  Court is in recess.

22      (Recess at 10:21 a.m., until 10:47 a.m.)

23          THE CLERK:  All rise.  Court is in session.  Please

24  be seated.

25          MS. ENGLISH:  Good morning again, your Honor.  Good

1   morning, Mr. Orr.

2              THE COURT:  Good morning.  You may --

3              THE WITNESS:  Good morning.

4              THE COURT:  -- proceed.

5              MS. ENGLISH:  Before I get into my -- the substance

6   of my cross-examination, there's a preliminary issue we'd

7   like to raise, but to do that we're going to just ask a few

8   foundational questions of Mr. Orr.

9              THE COURT:  Okay.

10                       CROSS-EXAMINATION

11  BY MS. ENGLISH:

12  Q   Mr. Orr, you were testifying during your direct

13  examination as to the assessments that had been made with

14  respect to the claims the city could bring and the strengths

15  and weaknesses of those claims; is that right?

16  A   Yes.

17  Q   Now, isn't it true that you yourself have made no

18  independent assessment of the city's claims and the strengths

19  and weaknesses of those claims apart from what your attorneys

20  have shared with you; is that right?

21  A   Yes.

22  Q   Okay.  In fact, in your August 30th deposition -- do you

23  remember that day?

24  A   To a degree.

25  Q   It's awhile back.  I know.

1   A    Yeah.

2   Q    Okay.  At that time, do you recall that you told us no

3   less than ten times that you had made no independent

4   assessments of the claims at issue whatsoever?

5   A    If you say so.

6   Q    Okay.  And on your December 31st deposition, just a

7   little -- few days ago, earlier this week, you testified

8   again repeatedly -- I think it was six or seven times -- you

9   made no independent analyses on the claims and the strengths

10  and weaknesses; is that right?

11  A    Yes.

12  Q    Okay.  And so you admit you had no independent knowledge

13  or assessment of the various arguments, for example,

14  challenging the validity of the swaps contracts?

15  A    I relied on the advice and suggestions of my attorneys

16  and my investment advisors, yes.

17  Q    Okay.  And you made no independent assessment as to the

18  strength of the claim that the pledge of casino revenues was

19  invalid under the Gaming Act; correct?

20  A    Yes.

21  Q    You made no independent analysis as to whether estoppel

22  was a valid defense to the argument that the casino revenue

23  pledge was invalid; correct?

24  A    Yes.

25  Q    You didn't independently assess whether there were any

1   validity issues with respect to the COPs, did you?

2   A    No.

3   Q    And in terms of the swap counterparties' likelihood of

4   obtaining protections under the Bankruptcy Code, such as

5   through the safe harbor protections, you didn't independently

6   analyze those issues, did you?

7   A    No.

8   Q    Now, while you performed no independent analyses of the

9   various legal claims and defenses, you've testified that you

10  did receive legal analyses from your lawyers on all of these

11  issues; is that right?

12  A    Yes.

13  Q    And many of those analyses took -- were in written form.

14  They were in e-mails and written memoranda and the like; is

15  that right?

16  A    Yes.

17  Q    Okay.  And you reviewed those e-mails and memoranda and

18  considered the communications from your attorneys in forming

19  the knowledge that you've testified about here today;

20  correct?

21  A    Yes.

22  Q    And you are, nevertheless, continuing to claim that the

23  attorney-client privilege protects all of those documents and

24  communications from being disclosed in the course of these

25  proceedings; is that right?

1   A    Yes.

2   Q    Okay.  And, in fact, you have refused to produce any such

3   legal memoranda or similar documents; is that right?

4   A    In consultation with my attorneys, yes.

5   Q    Okay.

6        MS. ENGLISH:  Your Honor, the objectors would like

7   to raise a motion that Mr. Orr, through his testimony today,

8   has waived the privilege.  He has testified that his only

9   information, his only knowledge comes from his attorneys, and

10  he has similarly testified as to what that knowledge is, what

11  those analyses were, all the way down to testifying what his

12  attorneys told him about their discussions with the swap

13  counterparties.  We believe this is a subject matter waiver

14  of the privilege, and we'd like to ask for production of all

15  of the analyses Mr. Orr reviewed and has relied on to come to

16  his testimony today.  We'd like to ask for a continuance so

17  that we can get those documents, review them.  We would be

18  able to do that over the weekend, if necessary, and come back

19  on Monday, but we think there is a subject matter waiver

20  here, and we're entitled to these documents.

21       As a footnote to my motion, I would also add that a

22  privilege log was produced by the city late last night

23  despite the fact that we've been asking for one for months

24  really.  We got it late last night.  It contains only, I

25  believe, 22 documents, just a select number of documents.

1  The city has basically been picking and choosing what

2  information they'll give us, what information they're

3  logging, and they're playing games with the privilege.  That

4  just should not be permissible.  We know for a fact that

5  there are documents that Mr. Orr has relied on that are not

6  logged in this privilege log, so I would like to ask for --

7       THE COURT:  For instance?

8       MS. ENGLISH:  For instance, your Honor, there was

9  actually a document that was claimed to be privileged by the

10  city that was inadvertently produced that goes directly to

11  the assessment of one of these claims that we have seen, and

12  it is not on the log.  Thank you, your Honor.

13       THE COURT:  May I see the log?

14       MR. SHUMAKER:  May I approach, your Honor?

15       THE COURT:  Yes, please.

16       MR. SHUMAKER:  Your Honor, Greg Shumaker, Jones Day,

17  for the City of Detroit.  There's been no waiver and nor is

18  one required in order to proceed.  Mr. Orr has an

19  understanding.  He obviously has legal and financial advisors

20  that he relies upon.  That does not place the advice at

21  issue.  He has an understanding based upon investigations

22  made and theories advanced.  And I'm not certain which

23  inadvertently produced document Ms. English is referring to,

24  although I'm certain that the fact that it was inadvertently

25  produced means that she should have returned it as opposed to

1  now saying it's not on the privilege log.  I don't know which

2  one that is, but this is not all of the privileged documents

3  ever produced by the legal -- Mr. Orr's legal team, but it is

4  the ones that related to the negotiation of the forbearance

5  agreement.

6          THE COURT:  Anything further, sir?

7          MR. SHUMAKER:  No.  That's all, your Honor.

8          THE COURT:  Any reply?

9          MS. ENGLISH:  Just to answer the question about the

10  document that was produced, it was a document that was

11  produced, I believe, to the Retirement Systems, was used in a

12  deposition.  Subsequent to the use of that document in the

13  deposition, the counsel for the city claimed that it was

14  privileged, it was an inadvertent production, and asked for

15  the document back, so --

16          THE COURT:  Does anyone remember what that document

17  was?

18          MS. ENGLISH:  You want to speak to that?

19          THE COURT:  Ms. Green.

20          MS. GREEN:  Yes.  It was a document used during the

21  deposition of Mr. Orr on December 12th, and actually I

22  believe it was also used at his December 9th -- it was a one-

23  page document, and I don't see anything on the list that

24  appears to be the same document --

25          THE COURT:  Do you remember --

1          MS. GREEN:  -- although it's hard to tell.

2          THE COURT:  Do you remember what it was?

3          MS. GREEN:  It was a one-page document.  There was a

4    flow chart on the front.  The second page was a bullet point

5    list of legal issues.  And it was clawed back on the grounds

6    of privilege; however, at his deposition Mr. Orr actually

7    said he did not know who wrote the document.  He'd never seen

8    the document.  And when it was clawed back, they told me that

9    it was because Mr. Orr had reviewed it in a meeting, so --

10         THE COURT:  All right.

11         MS. GREEN:  -- it doesn't make sense.

12         THE COURT:  Ms. English, anything further?

13         MS. ENGLISH:  No, your Honor.

14         THE COURT:  All right.  I'll take this under

15   advisement, and we'll take a break until -- let's see -- the

16   clock runs a little fast, but that's all right -- 11:15.

17         THE CLERK:  All rise.  Court is in recess.

18      (Recess at 10:56 a.m. until 11:27 a.m.)

19         THE CLERK:  All rise.  Court is in session.  Please

20   be seated.

21         THE COURT:  The Court concludes that it must deny

22   the motion to find a general waiver of the attorney-client

23   privilege here and to order the production of attorney-

24   client -- otherwise attorney-client privileged memoranda and

25   other kinds of documents.  It is true, as Ms. English points

1   out, that Mr. Orr has testified here today that the

2   information that he has and about which he has testified

3   concerning the claims and defenses that the city might have

4   in relation to these transactions came largely from, if not

5   entirely from his attorneys.  That observation, of course,

6   could be made in virtually every case in which a trustee in

7   bankruptcy or other proponent of a settlement seeks court

8   approval, and yet it simply cannot be the law that simply by

9   filing and pursuing a motion to approve a settlement, a party

10  is subject to a general waiver of the attorney-client

11  privilege as to all claims and defenses that the party

12  considered in proposing the settlement.  Such a view of the

13  law would, in a very real way, not only discourage

14  settlements, but it would also give an unfair -- grossly

15  unfair advantage to the proposing party's opponents in the

16  litigation should the settlement not be approved, and so that

17  simply can't be the law.  So for these reasons, the motion is

18  denied.  You may proceed with your cross-examination.

19          UNIDENTIFIED SPEAKER:  Judge Rhodes, I speak as a

20  citizen.  It's clear --

21          THE COURT:  All right.  We're going to be in recess.

22      (Recess at 11:30 a.m., until 11:32 a.m.)

23          THE CLERK:  All rise.  Court is in session.  Please

24  be seated.

25          THE COURT:  You may proceed.

1          MS. ENGLISH:  Thank you, your Honor, for the

2   consideration of our motion.  We just have one point of

3   clarification.  Does your ruling allow us to question Mr. Orr

4   as to the substance of the documents listed on the privilege

5   log?

6          THE COURT:  It's very hard for me to answer that

7   question in the abstract.  I would suggest that you ask

8   whatever questions you'd like to ask, and if the city

9   objects, we'll consider it on a case-by-case or question-by-

10  question basis.

11         MS. ENGLISH:  Okay.  We appreciate that.  We may

12  come back to that a little later having just received the

13  privilege log last night.

14         THE COURT:  Okay.

15         MS. ENGLISH:  We'll get to that.  Okay.  Thank you.

16  BY MS. ENGLISH:

17  Q   Hello again, Mr. Orr.

18  A   Good morning.  Good morning.

19  Q   Mr. Orr, you are serving as the emergency manager of the

20  City of Detroit; correct?

21  A   Yes.

22  Q   And before you became the emergency manager, you were a

23  practicing lawyer for about 30 years; isn't that right?

24  A   Yes.

25  Q   And, in fact, you --

 1          THE COURT:  Excuse me one -- excuse me one second.

 2   Mr. Orr, you have my permission, if there are any further

 3   outbursts like this, to exit the courtroom promptly as you

 4   and your security people see fit even through this door back

 5   here.

 6          THE WITNESS:  Thank you.

 7          THE COURT:  All right.  You may proceed.

 8          MS. ENGLISH:  Do we want to move that bookshelf?

 9          THE COURT:  He'll figure it out.

10          MS. ENGLISH:  Okay.  I don't want you tripping over

11   it on your way out.

12   BY MS. ENGLISH:

13   Q   Okay.  Practicing lawyer for about 30 years; correct?

14   A   Yes.

15   Q   And part of that time, you were a partner with Jones Day

16   for about ten years in the litigation and restructuring area;

17   right?

18   A   Yes.

19   Q   Okay.  Jones Day is the law firm that's here representing

20   you and the city today; correct?

21   A   Yes.

22   Q   And it's fair to say, isn't it, that you have substantial

23   experience in the area of restructuring and bankruptcy; isn't

24   that right?

25   A   Yes.

1  Q   Okay.  You've worked on a number of cases pending in

2  Bankruptcy Court where a settlement was presented for

3  approval under Rule 9019, haven't you?

4  A   Yes.

5  Q   So you understand what Rule 9019 requires and the factors

6  that a court needs to evaluate in deciding whether to approve

7  a settlement under that rule?

8  A   Yes.

9  Q   You understand what it means for a debtor to exercise

10  his, quote, "reasonable business judgment" when making

11  decisions in the course of a bankruptcy case, don't you?

12  A   Yes.

13  Q   Now, in past cases, I imagine you probably counseled a

14  number of restructuring clients and debtors in bankruptcy as

15  to when to settle, when to cut a deal, versus when to

16  litigate; is that right?

17  A   Yes.

18  Q   And when you counsel clients in this regard, you

19  generally want them to be fully informed as to what the

20  claims and defenses are that they might either litigate or

21  settle; correct?

22  A   Yes.

23  Q   Okay.  And you want to make sure that your clients

24  understand the strengths and weaknesses of their litigation

25  positions; right?

1  A   Yes.

2  Q   Now, in this matter, you are now the one who's exercising

3  your reasonable business judgment in making decisions for the

4  City of Detroit; correct?

5  A   Yes.

6  Q   Okay.  And you were the one who decided on the city's

7  behalf that this settlement reflected in the forbearance

8  agreement was in the city's best interest; isn't that right?

9  A   Yes.

10  Q   So you're the one exercising your best judgment to

11  determine that the forbearance agreement is a good deal for

12  the city; correct?

13  A   Yes.

14  Q   Now, I want to start with a subject that I think we can

15  agree on.  It's correct, isn't it, that the service

16  corporations have swap contracts with the swap

17  counterparties; right?

18  A   Yes.

19  Q   The city itself does not have a direct swap contract with

20  the swap counterparties; correct?

21  A   Yes.

22  Q   But you do understand that the city has contracts with

23  the service corporations, contracts that we refer to as the

24  service contracts; correct?

25  A   Yes.

1    Q    And you understand that pursuant to those service

2    contracts, the city has hedge-related payments that it has to

3    make to the service corporations, and then the service

4    corporations use that money to make their hedge payments to

5    the swap counterparties; correct?

6    A    Yes.

7    Q    Okay.  So you're aware that the service corporations

8    depend on the city to make payments of their various

9    obligations that they have under the COPs and the swaps;

10   right?

11   A    Yes.

12   Q    And to your knowledge, the service corporations don't

13   have any independent sources of income to pay those

14   obligations; isn't that true?

15   A    Yes.

16   Q    So you recognize and admit that through the service

17   contracts, the city itself took on swap obligations, didn't

18   it?

19   A    That's one of the allegations, yes.

20   Q    Well, in fact, you admit that's the case, that the city

21   has taken on through the service contracts swap obligations;

22   correct?

23   A    Yes.

24   Q    Okay.  Now, I want to talk about the events that led up

25   to your negotiations with the swap counterparties in the

1  summer.  Up until that time, isn't it true that the swap

2  counterparties never actually threatened to terminate the

3  swap contracts?

4  A   They sent a notice of a termination event, but -- they

5  sent a notice of a termination event.  I don't know if that

6  constitutes a threat.

7  Q   Okay.  Do you recall being deposed on August 30th?

8  A   Yes.

9  Q   And do you recall at that time in response to a

10 question -- I believe it was Mr. Hackney that was asking you

11 at the time -- that you said the swap counterparties had

12 never actually threatened to terminate at that time?

13 A   Yes.

14 Q   Okay.  And they never threatened to bring any claims

15 against the city either, had they?

16 A   No.

17 Q   Okay.  And the swap counterparties at that point had

18 never actually trapped the casino revenues in the accounts at

19 U.S. Bank, had they?

20 A   No.

21 Q   Okay.  You believe, nevertheless, that reaching an

22 agreement with the swap counterparties was, to use your

23 words, crucial; isn't that right?

24 A   Yes.

25 Q   Okay.  And you believe that any delay in getting a deal

1  done that might put the casino revenue at risk, in your view,

2  was dangerous for the City of Detroit; isn't that right?

3  A    Yes.

4  Q    Okay.  Now, as the emergency manager for the City of

5  Detroit, you regularly review cash flow forecasts for the

6  city's finances; right?

7  A    Yes.

8  Q    In fact, at times you review them on a daily basis, don't

9  you?

10 A    Yes.

11 Q    Okay.  And as you headed into negotiations with the swap

12 counterparties in the spring and summer of 2013, you were

13 reviewing the city's cash flow projections so that you

14 understood the city's revenue streams and financial

15 condition; correct?

16 A    Yes.

17 Q    And those projections indicated to you that there was a

18 chance that if the city continued in a steady state and took

19 no corrective action, it could run out of cash by the end of

20 the year; correct?

21 A    Yes.

22 Q    Okay.  And yet you called in Mr. Buckfire to negotiate a

23 deal with the swap counterparties in June that took just

24 essentially one week; correct?

25 A    It took a -- started before that, but essentially a week

1    in earnest, yes.

2    Q    Now, isn't it true that as you headed into the

3    negotiations with the swap counterparties, you hadn't

4    formulated a back-up plan in the event you couldn't get a

5    deal with them?

6    A    We would have to sue them.

7    Q    You didn't actually have a back-up plan that you were

8    ready to implement, though, at that time, did you?

9    A    No.

10   Q    And, in fact, you said just now that you would sue them,

11   but isn't it true that you actually didn't know at that time

12   back in June if you were really prepared to sue them or not?

13   A    The June 10th week?

14   Q    Yes.

15   A    No.  We were prepared.

16   Q    Were you?

17   A    Yeah.

18   Q    Okay.  I'm going to have to ask you to look at your

19   deposition transcript, okay --

20   A    Okay.

21   Q    -- because I believe you told me something different in

22   August, so if you could look at your August transcript --

23   it's the August 30th date --

24   A    Um-hmm.

25   Q    -- on page 280 -- okay.  If you look -- so roughly in the

1   middle of the page -- this was me deposing you at this point.

2   I asked you, "If you hadn't gotten a deal, were you prepared

3   to sue them?" meaning the swap counterparties, and there was

4   an intermittent objection, but then you answered me, and you

5   said, "I don't know."  See that?

6   A    Um-hmm.

7   Q    You recall that --

8   A    Um-hmm.

9   Q    -- question and that answer?

10  A    Yes.

11  Q    Okay.

12           THE COURT:  What lines were those, please?

13           MS. ENGLISH:  Oh, I'm sorry, your Honor.  It's lines

14  9 through 14 on page 280.

15  BY MS. ENGLISH:

16  Q    And at this time -- we're back in June 2013 now -- you

17  don't recall ever having seen a draft complaint that was put

18  together at that time, do you?

19  A    I don't recall.

20  Q    Before I get into the sort of nitty gritty of the

21  negotiations, I want to ask you about the assumptions and the

22  goals you had going into the negotiations.  Your assumption

23  going into the negotiations was that there were events of

24  default under the swaps that had occurred such that the swap

25  counterparties could unilaterally terminate the swaps and

1  demand a sizeable termination payment from the service

2  corporations; correct?

3  A   Yes.

4  Q   And another assumption you had was that the swap

5  counterparties could instruct the custodian to trap the cash,

6  trap the casino revenues; right?

7  A   Yes.

8  Q   And so one of your objections -- or one of your

9  objectives, rather, in these negotiations was to make sure

10  that the swap counterparties couldn't trap the casino

11  revenues; correct?

12  A   Yes.

13  Q   And another one of your objectives was to get a discount

14  on the termination liability you were facing?

15  A   Yes.

16  Q   And a third objective you had was you wanted to obtain an

17  option that would allow you to direct when the termination

18  would occur and when you'd have to pay that termination

19  payment; correct?

20  A   Yes.

21  Q   Okay.  Now, prior to the June 4th meeting, which sort of

22  kicked off these negotiations, you discussed these objectives

23  with Mr. Buckfire; right?

24  A   I believe so.

25  Q   Okay.  But you're aware, aren't you, that Mr. Buckfire

1   has said he never discussed any of the legal claims or the
2   strengths of the legal positions of the city with you before
3   he went into those negotiations?
4               MR. SHUMAKER:  Objection, your Honor.  Confronting
5   the witness with another's testimony is improper.
6               THE COURT:  The objection is sustained.
7   BY MS. ENGLISH:
8   Q   All right.  Let's talk now about the negotiations of the
9   forbearance agreement, and I want to zero in on the June
10  negotiations for now.  Okay?
11  A   Yes.
12  Q   Mr. Buckfire was the lead negotiator for the city when it
13  came to negotiating the business terms of the forbearance
14  agreement; correct?
15  A   Yes.
16  Q   And you personally did not participate in any face-to-
17  face meetings that were held with the swap counterparties at
18  that time; right?
19  A   Correct.
20  Q   So basically what happened is is that you authorized
21  Mr. Buckfire to negotiate the best possible deal he could
22  with the swap counterparties, and then that's what he did;
23  right?
24  A   Yes.
25  Q   And so about a week later, he comes out of the

1  negotiations, and he says, "Mr. Orr, this is the best deal

2  I'm able to get out of these swap counterparties, and it's my

3  advice we take it."  Essentially true?

4  A   Essentially, yes.

5  Q   And so that was a week later, so now we're about June

6  11th; correct?

7  A   Yes, approximately.

8  Q   Okay.  I'd like to draw your attention to Syncora Exhibit

9  230.

10         MS. ENGLISH:  Travis, if we could have that pulled

11  up.

12  BY MS. ENGLISH:

13  Q   Can you see it okay?

14  A   Yes, yes.

15  Q   All right.  So you recognize this document, don't you,

16  Mr. Orr?

17         MS. ENGLISH:  Travis, if you can just scroll all the

18  way to the bottom so Mr. Orr can see the whole thing.

19  Thanks.

20         THE WITNESS:  Yes.

21  BY MS. ENGLISH:

22  Q   Okay.  Now, this is an e-mail that you sent to state

23  Treasurer Andy Dillon; correct?

24  A   Yes.

25  Q   And it was sent on June 12th; right?

1   A    Yes.

2   Q    Okay.  Now, your e-mail attaches -- or forwards, rather,

3   an e-mail that's on the lower half of the page that was from

4   Mr. Buckfire to you; is that right?

5   A    Yes.

6   Q    Mr. Buckfire's e-mail to you indicates basically the

7   state of negotiations at this point in time; right?

8   A    Yes.

9   Q    Okay.  And he's telling you in this e-mail that there's

10  just a very narrow gap left between the city's final offer of

11  75 percent and the swap counterparties' final offer of 77

12  percent.  Do you recall that?

13  A    Yes.

14  Q    Okay.  And he tells you in this e-mail that he thinks it

15  is, quote, "now time for you to enter the negotiations to

16  close this very narrow gap"; is that right?

17  A    Yes.

18  Q    And in forwarding this e-mail to Mr. Dillon, you

19  characterize this remaining gap as being, quote, "not

20  material"; correct?

21  A    Yes.

22  Q    And so then if I understand this e-mail, you would have

23  had a conversation later in the day -- it looked like it was

24  scheduled for four o'clock -- with the swap counterparties;

25  is that right?

1  A    I believe so.

2  Q    And then we know that you actually did close the deal at

3  75 percent; correct?

4  A    Yes.

5  Q    Okay.  Now, I understand that your direct involvement

6  face to face with the swap counterparties would have came --

7  was limited and came towards the end, but I do want to ask

8  you about the back and forth you personally had.  Okay?

9  A    Yes.

10  Q    When you were participating in the negotiations, they

11  were only by phone; right?

12  A    Yes.

13  Q    Okay.  And in those phone calls, you don't ever recall

14  articulating the position to the swap counterparties that the

15  swaps were invalid or void, do you?

16  A    No.

17  Q    And you can't recall ever discussing on those calls that

18  the swap counterparties' liens were invalid or not secured;

19  correct?

20  A    Correct.

21  Q    You never debated the validity of the swap

22  counterparties' secured position with any representatives of

23  the swap counterparties, did you?

24  A    Me personally?

25  Q    You personally.

1  A   No.

2  Q   No.  And on those calls, Mr. Buckfire didn't either, did

3  he?

4  A   Not that I recall.

5  Q   In fact, you do not believe that you had any discussions

6  with the swap counterparties about the city's potential legal

7  arguments against them at all, do you?

8  A   No.  I don't recall so.

9  Q   Now, you testified on direct that your attorneys had

10  argued legal claims to the swap counterparties outside of

11  your presence; correct?

12  A   Yes.

13  Q   You weren't on any calls or in any meetings where that

14  type of discussion occurred; right?

15  A   No.

16  Q   And the only reason you know that might have happened is

17  from what your attorneys told you; is that right?

18  A   Yes.

19  Q   Okay.  And you're claiming attorney-client privilege,

20  though, with respect to what your attorneys told you

21  directly, aren't you?

22  A   Yes.

23  Q   None of your attorneys are testifying in this matter, are

24  they, to your knowledge?

25  A   To my -- no, not to the best of my knowledge.

1  Q   Okay.  All right.  Now, the service corporations, there

2  are two entities, you understand, that are service

3  corporations, one called the Detroit General Retirement

4  Systems Service Corporation and one called the Detroit Police

5  and Fire Retirement Systems Service Corporation; is that

6  right?

7  A   Yes.

8  Q   These two service corporations are both parties to the

9  forbearance agreement; isn't that correct?

10  A   Yes.

11  Q   And it's been your position, has it not, that the service

12  corporations are legally separate and distinct entities from

13  the city; is that right?

14  A   Yes.

15  Q   And you assume that there must have been some

16  negotiations with the service corporations in June before

17  they signed onto the forbearance agreement; is that right?

18  A   Yes.

19  Q   But you didn't have any negotiations with the service

20  corporations, did you?

21  A   No.

22  Q   And you're not actually aware of anyone else who did

23  either; right?

24  A   No.

25  Q   And you never directed anybody on your team to negotiate

1   with the service corporations; correct?

2   A   No.  I directed them to close the deal.

3   Q   Did you direct them to negotiate directly with the

4   service corporations?

5   A   No.

6   Q   Okay.  You also aren't aware of any negotiations that

7   would have taken place between the service corporations and

8   the swap counterparties; is that right?

9   A   Yes.

10  Q   Okay.  Now, you understand that the composition of the

11  service corporations' board of directors includes three city

12  officers and at least one City Council member?

13  A   Yes.

14  Q   And, in fact, Ms. Cheryl Johnson is the person who signed

15  the forbearance agreement.  You know that to be true; right?

16  A   Yes.

17  Q   Okay.  And she is the president of the two service

18  corporations; isn't that right?

19  A   I believe so.

20  Q   And she's also the city's finance director; correct?

21  A   I believe she was the city's finance director.

22  Q   At that time?

23  A   Yes.

24  Q   Okay.  And you didn't -- but you didn't speak with her

25  about the forbearance agreement, did you?

1   A   No.

2   Q   And you didn't talk to her about whether or not she

3   should sign it, any conversations like that?

4   A   No.

5   Q   Okay.  You don't know who got her signature on the

6   forbearance agreement, do you?

7   A   No.

8   Q   Okay.  Is she also the one who signed the new amendment,

9   by the way?

10  A   I don't know.  I didn't see her signature.

11  Q   Okay.  All right.  Also, I'm still in June here.  Okay?

12  Going back to when you were negotiating, now, the swaps that

13  were in place operated to hedge against interest rate risk on

14  the COPs; correct?

15  A   Yes.

16  Q   Okay.  And prior to entering into the forbearance

17  agreement, prior to negotiating the forbearance agreement, is

18  it your testimony that the city had evaluated potential

19  future interest rate moves?

20  A   Can you repeat the question?

21  Q   Did the city evaluate potential future interest rate

22  moves and how that would affect your liability on the swaps?

23  A   Yes.

24  Q   And it's true that to the extent any such analysis was

25  done, that was done by Miller Buckfire; correct?

```
 1   A   Yes, I believe it would have been.
 2   Q   Okay.  And your understanding is that this was done and
 3   was something that was considered in entering into the
 4   forbearance agreement; correct?
 5   A   Yes.
 6   Q   Okay.  Would it surprise you to know that Mr. Buckfire
 7   testified they never did any such analysis?
 8   A   Yes.
 9          MR. SHUMAKER:  Objection, your Honor.
10          THE COURT:  Sustained.
11   BY MS. ENGLISH:
12   Q   Now, I want to turn your attention to the original deal
13   that you got in June.  That deal in the original forbearance
14   agreement had the option to terminate the swaps at the city's
15   election for a discounted termination amount; is that right?
16   A   Yes.
17   Q   Okay.  And the discount ranged from 75 percent during an
18   early time period and then graduated up to 82 percent if it
19   was exercised at a later time period; correct?
20   A   Yes.
21   Q   The total termination liability that the city potentially
22   faces fluctuates over time, doesn't it?
23   A   Yes.
24   Q   Okay.  And the amount of the termination payment will
25   depend on what interest rates are on the day the termination
```

1    payment is due; correct?

2    A    Not now.

3    Q    Not now; correct.  Under the swaps contracts, under the

4    city's original obligations before you entered into this

5    deal --

6    A    Yes.

7    Q    -- your termination payment liability at any given point

8    in time would change based on what the interest rates were on

9    any given day; correct?

10   A    Yes.

11   Q    Okay.  So to determine the termination amount, you'd have

12   to peg it on -- peg what it actually was on the day you

13   exercised your option to terminate under the original deal;

14   right?

15   A    Yes.

16   Q    Now, we can agree, can't we, that, generally speaking, as

17   interest rates rise, the total termination liability of the

18   city decreases; correct?

19   A    Yes.

20   Q    And you also have a general understanding, don't you,

21   that the trend over the last several months has been, in

22   fact, that interest rates have been on the rise; correct?

23   A    They've gone up and down, but that may be true about the

24   general trend.

25   Q    In fact, it is true about the general trend.  If we look,

1  say, over the last six months, interest rates have generally

2  risen during that period; isn't that true?

3  A    Generally, yes.

4  Q    And the effect of that rise in interest rates has been

5  that over, say, the last six months the termination payment

6  liability that the city would face has come down; correct?

7  A    Yes.

8  Q    So, for example, at the time you originally negotiated

9  the forbearance agreement in June, the termination liability

10  was estimated to be between 300 and $400 million; is that

11  right?

12  A    Yes.

13  Q    Okay.  And now you're aware, aren't you, that the city

14  has stipulated that as of -- let's take November 29th, the

15  end of November, the total termination liability had dropped

16  from somewhere in the 300 millions down to 278 million,

17  approximately; is that right?

18  A    Approximately.

19  Q    And as of -- if we look as of year end, so December 31st,

20  a few days ago, the total termination liability as of that

21  date has now dropped down to $247 million, approximately; is

22  that right?

23  A    I haven't looked at it as of December 31st, but if that's

24  the trend, I would say that's right.

25  Q    Okay.

1          MS. ENGLISH:  Your Honor, I would note -- I think --

2     did we have a stipulation filed yesterday?  So yesterday the

3     parties filed a stipulation that had three termination

4     liability dates.

5          THE COURT:  I saw that.  Thank you.

6          MS. ENGLISH:  Okay.  Thanks.

7     BY MS. ENGLISH:

8     Q   Now, we all remember all too well we were here two weeks

9     ago.  You were sitting right there, and we were in the middle

10    of the trial on this matter, and the trial halted.  And we

11    took a break for awhile, and you went off and had some

12    renegotiations with the swap counterparties trying to get a

13    better deal; right?

14    A   Yes.  We were ordered to mediation.

15    Q   Right.  You weren't otherwise planning on engaging in

16    reopening negotiations with the swap counterparties; were

17    you?

18    A   No.

19    Q   So just to set the stage, the renegotiations happened on

20    December 23rd and 24th; correct?

21    A   Yes.

22    Q   And those negotiations resulted in a new deal, which is

23    principally, if I can sum up the key points, that the city

24    will pay a fixed amount of 165 million to terminate the swaps

25    on or before January 31st; correct?

1   A   Yes.

2   Q   So gone is the percentage deal we had originally, and now

3   we're looking at a fixed fee; correct?

4   A   Yes.

5   Q   Okay.  It's true, isn't it, that your only goal in going

6   into these negotiations was to reduce the amount of the

7   termination payment and maintain the general structure of the

8   deal you already had in place; correct?

9   A   Yes.

10  Q   Okay.  At the same time, you don't know if you actually

11  determined what the total payment liability was on December

12  23rd when you went into those negotiations.

13  A   During the course of those negotiations, we called Jim

14  Doak and Miller Buckfire and inquired about a range of the

15  potential termination, so we had that call and discussed it.

16  Q   Okay.  Before you went into the negotiations on the 23rd,

17  did you have an analysis done to say, "What's our current

18  termination payment liability as I head into these

19  negotiations?  What's my bottom line I'm working with?"  You

20  didn't do that; right?

21  A   No.  I don't recall analysis.

22  Q   And so during the negotiations, you were working with an

23  understanding that the total termination liability as of that

24  time would have been in the high 200 millions; is that right?

25  A   Yes, approximately.

1   Q   Okay.  And you were also working with the understanding
2   that 75 percent of that termination amount would be
3   equivalent to roughly $230 million; right?
4   A   Approximately, yes.
5   Q   So fair to say that was the benchmark you were working
6   with that you were trying to improve on; correct?
7   A   Yes.
8   Q   Okay.  Now, we know subsequently from the city's
9   stipulation that as of 12-23 the total termination liability
10  was approximately 256 million, which would make a 75-percent
11  payment on that approximately 190 million; is that true?
12  A   I haven't seen the stipulation, but I'll take your math
13  as true, yes.
14  Q   Okay.  And those numbers that I just gave you, you didn't
15  have those on the 23rd; right?
16  A   We had the general numbers but not those specific
17  numbers.
18  Q   Okay.  Also, before going into the negotiations on the
19  23rd, you did not ask Miller Buckfire to run an analysis that
20  looked at trending interest rates and how they might affect
21  your termination payment liability going into the future;
22  correct?
23  A   Yes.
24  Q   You didn't have an updated LIBOR curve analysis, for
25  example, in front of you to inform your negotiations?

1  A   That's correct.

2  Q   And to the extent that LIBOR rates rise, the termination

3  payment is going to come down; right?

4  A   Yes.

5  Q   But you don't know whether it would have affected your

6  settlement decisions if a LIBOR curve analysis had been

7  provided to you that reflected, in fact, that interest rates

8  were going to rise?

9  A   Correct.

10  Q   All right.  Now, the only negotiations that led to this

11  new deal were on December 23rd and 24th; right?

12  A   Yes.

13  Q   After we broke from the trial on the 18th, you didn't

14  have any discussions in that intervening time period between

15  the 18th and the 23rd?

16  A   Me personally?

17  Q   Yeah.

18  A   No.

19  Q   And you don't know that anybody else on behalf of the

20  city did either; right?

21  A   I think there was a conference on that Friday, but I

22  don't know.

23  Q   You're referring to the status conference in front of

24  Judge Rhodes?

25  A   Yes.

1  Q   Okay.

2  A   Um-hmm.

3  Q   And you testified that the mediation basically -- you

4  didn't really get -- you didn't get in a room with the swap

5  counterparties and debate your arguments with them; right?

6  A   Correct.

7  Q   You were basically on a room sort of off on your own, and

8  the mediator went back and forth; is that right?

9  A   Yes.  The mediators went back and forth.

10  Q   Okay.  And did you have -- you didn't have any direct

11  negotiations with any of the other parties that were present

12  at the mediation; correct?

13  A   Correct.

14  Q   In fact, when I asked you about this a couple days ago,

15  you couldn't even remember the names of any other person that

16  was there on behalf of any other party; right?

17  A   Mr. Marriott and Mr. Gordon but not all of them, yes.

18  Q   And that's because Mr. Marriott stopped your deposition

19  and said, "Hey, wait a minute.  Don't you remember me?";

20  right?

21  A   Part of the usual suspects.

22  Q   Usual suspects.  Okay.  All right.  Now, in the course of

23  your negotiations, you testified on direct that your first

24  proposal was a settlement in the range of about 150 million;

25  right?

1  A    Yes.

2  Q    And you were thinking of a percentage number that fell in

3  the range of 50 to 60 percent as your first offer; is that

4  right?

5  A    Yes.

6  Q    You didn't come in with a first offer lower than 50

7  percent?

8  A    No.

9  Q    You didn't make it your goal to get to a 50-percent deal

10 because you started higher than that; right?

11 A    We would have taken a 50-percent, but, correct, yeah.

12 Q    Typically if you offer more than 50 percent, you're not

13 going to get to 50 percent; right?

14 A    Yeah.

15 Q    Now, you consider the new deal that you got to be

16 materially better than the first deal; right?

17 A    Yes.

18 Q    And that's because you think it reduces the optional

19 termination payment by tens of millions of dollars; right?

20 A    Yes.

21 Q    In fact, you testified you think it's a savings of $65

22 million?

23 A    Yes.

24 Q    The reason you went for a fixed rate, you testified, is

25 that you wanted to avoid the risk associated with interest

1  rate fluctuations; correct?

2  A    The reason we went for a whole number.

3  Q    Yes.

4  A    Yes.

5  Q    Okay.  So by way of example, you thought if interest

6  rates went down, your termination fee might go up if you were

7  using a percentage deal; right?

8  A    Yes.

9  Q    And the flip side of that is that if interest rates went

10  up, your termination liability using a percentage deal would

11  have gone down; right?

12  A    Yes.

13  Q    Before agreeing to change the deal to a fixed amount, you

14  didn't ask Miller Buckfire to run an interest rate analysis

15  so you could predict where you'd be at the end of January,

16  did you?

17  A    No.  As I said, we had a conversation with Jim Doak -- a

18  couple of conversations that afternoon, but I wouldn't call

19  it a full-blown analysis.

20  Q    Okay.  And based on those conversations and the city's

21  general understanding, there was a general expectation that

22  in the future interest rates might increase and the

23  termination liability might come down; isn't that true?

24  A    There was a general understanding that they might go up

25  or they might go down.

1   Q   The option to terminate the 165 million expires on

2   January 31st; correct?

3   A   Yes.

4   Q   And you didn't estimate what your total termination

5   liability would be on January 31st, did you?

6   A   No.

7   Q   But you did estimate that if you went back to the date of

8   the original motion to approve your original forbearance

9   agreement, 165 million would be somewhere in the neighborhood

10   of 62, 63 percent of your termination liability; right?

11   A   Yeah.  We didn't estimate.  We calculated that number off

12   of the original motion.

13   Q   Okay.  So you're working with the understanding I think

14   165 million is in the neighborhood of a 62-percent, 63-

15   percent deal; correct?

16   A   Yes.

17   Q   Okay.  And on that basis, you're comparing that 62, 63

18   percent to the original 75 percent, and you're thinking I'm

19   getting a much better deal here; right?

20   A   Yes.

21   Q   Now, as you mentioned, the deal only lasts until January

22   31, but the old deal had a runway period that didn't expire

23   until June 2014; is that correct?

24   A   Yes.

25   Q   You negotiated the shortened expiration date so you could

1 get the deal done as soon as possible and avoid making the

2 swaps payments that would come due in March; right?

3 A   Yes.

4 Q   But you didn't do any analysis that would compare the

5 cost of the swaps payments upcoming versus the savings that

6 you might gain from a decreasing termination payment;

7 correct?

8 A   Yes.

9 Q   Now, during the December negotiations that occurred last

10 week, there weren't any representatives of the service

11 corporations there either; right?

12 A   Not on behalf of the city; correct.

13 Q   On behalf of the city or on behalf of the service

14 corporations?

15 A   No.  There was no one in our room.  I assume there was no

16 one else from the service corporations in any of the other

17 rooms.

18 Q   Did you see any representative of the service

19 corporations at any time during the negotiations on the 23rd

20 or 24th?

21 A   No.

22 Q   Okay.  And did you have any discussions or any

23 negotiations with any representatives of the service

24 corporations last week?

25 A   No.

1  Q   To your knowledge, did anyone on behalf of the city

2  engage in any negotiations with the service corporations?

3  A   Not that I know of.

4  Q   Do you have any knowledge that anyone on behalf of the

5  service corporations negotiated with the swap counterparties

6  at all?

7  A   Not that I know of.

8  Q   Do you even know whether the service corporations have

9  agreed to the sixth amendment to the forbearance agreement?

10  A   I'm not sure.

11  Q   As of Tuesday, you didn't know whether they had agreed to

12  it or not; correct?

13  A   Correct.

14  Q   I want to turn now to talk a little bit about the claims

15  and defenses that are being settled by the forbearance

16  agreement.  You testified on direct that you definitely

17  considered whether the swap obligations were void ab initio

18  under Act 34; correct?

19  A   Yes.

20  Q   Now, do you recall in your August deposition that I asked

21  you questions about that very potential argument?

22  A   I don't recall.

23  Q   You don't recall me asking you if you had considered the

24  argument that the swaps were void under Act 34?

25  A   No.  I don't recall, but I'm happy to look at the

1   deposition.

2   Q   Okay.  Do you not recall that when I asked you about Act

3   34, you couldn't tell me for sure whether it was considered?

4   You just said it was, quote, more likely than not that it had

5   been one of the issues that had been considered.  You don't

6   remember that?

7   A   If you say so.  I just don't recall.

8   Q   Should we look at your testimony to see that?

9   A   Sure.

10  Q   Okay.  So why don't we pull up the 8-30 deposition

11  transcript?  And I'm going to look at page 277, line 12 to

12  18.  And do you see -- admittedly this went on for a couple

13  of pages.  We had some back and forth banter about this, but

14  you'll see starting at line 12 I say, "Sitting here today,

15  you don't have an independent recollection for sure that Act

16  34 was looked at; isn't that correct?"  And you say

17  repeatedly, "It's more likely than not."  You were never able

18  to give me a definitive answer that it was actually something

19  you considered; correct?

20  A   Yes.

21  Q   Okay.  And the same was true of the argument that the

22  pledge of casino revenues was invalid under the Gaming Act,

23  isn't it?

24  A   Yes.

25  Q   You've testified here today that was definitely one of

1  the arguments you looked at and considered; right?

2  A   Yes.

3  Q   But in August you couldn't tell me that for sure.  You

4  said more likely than not that was something that was among

5  the list of things that was considered; correct?

6  A   Yes.

7  Q   When you were deposed on Tuesday of this week and you

8  were pressed to describe the substance of each of these

9  claims that you testified on direct were considered, there

10  were times at which you didn't know the details of the

11  arguments, and you got confused, weren't there?

12  A   Yes.  We talked about that.

13  Q   All right.  So, for example, when I asked you to describe

14  the basis for the claim that the pledge of casino revenue was

15  invalid under the Gaming Act, in the course of your answers,

16  you repeatedly started referencing Act 34, didn't you?

17  A   In that discussion I was talking about Section 18 because

18  I was looking at the 18-percent tax in the Gaming Act as

19  opposed to Section 12, but, yes, we had that discussion about

20  Act 34 versus the Gaming Act.

21  Q   You mixed them up several times, didn't you?

22  A   Yes.

23  Q   Yeah.  And, in fact, you testified that your

24  understanding of the weakness of the casino revenue pledge

25  argument was that the City Council had cited to provisions of

1  Act 34 about tax relief in their ordinance; correct?

2  A   Yes.

3  Q   And when I asked you about the vulnerability of the liens

4  on post-petition casino revenue under the Bankruptcy Code,

5  Section 928, you talked about an Orrick legal opinion

6  blessing the validity of the liens; right?

7  A   Yes.

8  Q   But you seemingly did not understand that the Orrick

9  opinion explicitly expressed no opinion under Section 928;

10 correct?

11 A   Well, there are two paragraphs on page 3 of that opinion,

12 one where they talk about it would be -- classifies as excise

13 taxes and possibly special revenues, and in the paragraph

14 under that they go into but we're not going to comment on

15 928.

16 Q   Right.  They did not express an opinion --

17 A   Right.

18 Q   -- on the applicability of 928; correct?

19 A   Yes.

20 Q   Okay.  When I asked you about the argument that the swaps

21 obligations were void ab initio because the city failed to

22 comply with Act 34, in the context of those discussions, you

23 referred me back and started referencing the Gaming Act,

24 didn't you?

25         MR. SHUMAKER:  Objection, your Honor.  Ms. English

1   is quizzing the witness on what the deposition testimony was.

2   If she has a question for him and then there's an

3   inconsistency, she could confront him with it, but this is an

4   improper line of questioning.

5           MS. ENGLISH:  Your Honor, in lieu of designating 40

6   pages of a deposition transcript that clearly showed Mr. Orr

7   does not understand the substance of these arguments, I am

8   trying to elicit testimony here today just to show the

9   highlights of how he got confused, and he couldn't testify as

10  to what these arguments really entailed.  He started mixing

11  them up.  He was great with the buzz words, but when you

12  asked him questions about what they actually involved, he

13  didn't know.

14          THE COURT:  Well, it's fine to have the witness

15  testify concerning what he previously testified to, but I

16  think the more proper procedure is to ask him if you asked

17  this question and if he gave this answer rather than to try

18  to summarize it for him.

19          MS. ENGLISH:  Okay.  Thank you, your Honor.

20  BY MS. ENGLISH:

21  Q   All right.  Why don't we do exactly that?  We'll look at

22  a couple of references from the deposition transcript.  So I

23  think you have the December 31 transcript in front of you.

24  Okay.  If you look on page 82 of your transcript --

25          MS. ENGLISH:  And, Travis, you could bring this up,

1   too, if you have it handy.

2           MR. SHUMAKER:  Your Honor, same objection.  Running

3   through the deposition testimony is improper.  If she wants

4   to ask this question and she gets a different answer from the

5   witness, she can then bring this up as inconsistent, but just

6   running through all these questions is improper.

7           THE COURT:  Well, it's not hearsay.  He's a

8   representative of the city, so the deposition can be used for

9   any purpose, so I'll permit it.

10          MS. ENGLISH:  Thank you, your Honor.

11  BY MS. ENGLISH:

12  Q   So I just want to run through just a couple of examples.

13  Okay.  So on page 82, do you see starting let's say around

14  line 9 you're being asked about arguments as to voidness or

15  invalidity of the swap obligations?  Do you see that?

16  A   Um-hmm.

17  Q   And then do you see in your answer, lines 12 to 14, that

18  you reference that there could be arguments made that the

19  swap obligations were not properly authorized under the

20  Gaming Act?

21  A   Um-hmm.

22  Q   Okay.  And just another few lines later towards the

23  bottom of that page, line 23, I asked you, "So your

24  understanding is that the Gaming Act imposes conditions on

25  swap obligations?"  And you thought it might.

1  A    Yes.

2  Q    Okay.  Now, as to the Act 34 arguments, you don't even

3  know whether or not the requirements of Act 34 were, in fact,

4  followed; correct?

5  A    Correct.

6  Q    Okay.  You testified on direct that you had a concern

7  about estoppel arguments that could be raised; correct?

8  A    Yes.

9  Q    But you don't have an understanding that the doctrine of

10  estoppel is inapplicable to void ab initio claims?

11  A    That's correct.

12  Q    Another defense that you testified to, I believe, was

13  safe harbor protections; is that right?

14  A    Yes.

15  Q    Okay.  Yet you don't have an understanding as to whether

16  the swap counterparties even meet the definition of, quote,

17  "swap participant" under the Bankruptcy Code; isn't that

18  right?

19  A    That's correct.

20  Q    And, in fact, you testified that the city has not even

21  developed a position with respect to that; correct?

22  A    Yes.

23  Q    Now, you testified -- on your direct examination, Mr.

24  Shumaker asked you a number of questions about evaluating the

25  strengths and weaknesses of all of the claims you looked at

1   and how you assessed your likelihood of success, the city's

2   likelihood of success; right?

3   A    Yes.

4   Q    Okay.  It's true, is it not, that for every single claim

5   you looked at, you assessed the city's odds as 50/50?

6   A    Yes.

7   Q    Not a single claim that you said 75/25?

8   A    No.

9   Q    Not a single claim you said 80/20?

10  A    Correct.

11  Q    Every single claim was just a toss-up in your mind;

12  correct?

13  A    Yes.

14  Q    It's true, isn't it, that back in June 2013 you really

15  wanted to get a deal done with the swap counterparties?  You

16  really didn't want to have to litigate with them; correct?

17  A    Yes.

18  Q    You had -- at that time and subsequently, you've had a

19  lot of cash flow forecasts put together by E&Y showing you

20  various scenarios; correct?

21  A    Yes.

22  Q    Some show with the DIP.  Some show no DIP.  Some show

23  cash trapped.  Some show the settlement payments.  Some show

24  the continued swap monthly payments; correct?

25  A    Yes.

1    Q    All of these options were shown?

2    A    Yes.

3    Q    You never asked for a single cash flow analysis that

4    showed getting post-petition financing and litigating with

5    the swap counterparties as opposed to settling with them, did

6    you?

7    A    Yes.

8    Q    Yes, you did, or, yes, you agree you didn't ask for that?

9    A    We did not get that, yes.

10   Q    Now, if you were successful in a litigation against the

11   swap counterparties, that would mean you could void all of

12   the city's swap obligations and the swap counterparties'

13   liens altogether; correct?

14   A    Potentially, yes.

15   Q    Okay.  It would also mean that the swap counterparties

16   would not have the ability to trap the city's access to

17   casino revenue; correct?

18   A    Certainly, yes.

19   Q    And it's your understanding that if the city were

20   successful on its void ab initio argument, it could then

21   recover potentially all of the swap payments it had made to

22   the swap counterparties; correct?

23   A    Potentially, yes.

24   Q    And given that those swap payments are roughly in the

25   neighborhood of $50 million a year, we're talking about

1  hundreds of millions of dollars, aren't we?

2  A    Potentially, yes.

3          MS. ENGLISH:  That's all I have, Mr. Orr.  Thank you

4  very much.

5          THE WITNESS:  Sure.

6          MS. ENGLISH:  I spoke too soon.

7          THE COURT:  Oh, well --

8          MS. ENGLISH:  I'm reminded --

9          THE COURT:  Go ahead then.

10          MS. ENGLISH:  -- that I referenced -- sorry?

11          THE COURT:  Go ahead then.

12          MS. ENGLISH:  I'm reminded that I referenced Syncora

13  Exhibit 230, and I would like to move that into evidence,

14  please.

15          THE COURT:  Any objection to Exhibit 230?

16          MR. SHUMAKER:  No objection, your Honor.

17          THE COURT:  It is admitted.

18          MS. ENGLISH:  Thank you, your Honor.

19      (Syncora Exhibit 230 received at 12:18 p.m.)

20          THE COURT:  How long will you be, sir?

21          MR. ARNAULT:  Maybe 15 minutes, perhaps less.

22          THE COURT:  Anyone else?  All right.  We're going to

23  take our lunch break now then, and we will reconvene at two

24  o'clock, please.

25          THE CLERK:  All rise.  Court is in recess.

1    (Recess at 12:19 p.m. until 2:02 p.m.)

2         THE CLERK:  All rise.  Court is in session.  Please

3    be seated.

4         THE COURT:  Looks like everyone is here.  You may

5    proceed, sir.

6         MR. ARNAULT:  Thank you, your Honor.  Before we

7    begin, I've been asked by my fellow objectors to obtain a

8    minute count if that's okay.

9         THE COURT:  Yes.  It'll take me a minute to do that.

10   Why don't you proceed, and then when I'm ready to give it to

11   you, I will give it to you?

12        MR. ARNAULT:  Sounds good.  Thank you, your Honor.

13                   CROSS-EXAMINATION

14   BY MR. ARNAULT:

15   Q   Good afternoon, Mr. Orr.  How are you?

16   A   Good afternoon.  I'm fine.

17   Q   My name is Bill Arnault, and I represent Syncora.  We met

18   the other day at your deposition.

19   A   Yes.

20   Q   So to begin, I'd like to just go over a few questions

21   about your understanding of the objectives and some of the

22   effects of the forbearance agreement, and I know Ms. English

23   asked you some of those questions, but I just want to link

24   that with the forbearance agreement and the sixth amendment.

25   A   Yes.

1  Q    So to begin, your understanding is that the forbearance
2  agreement releases all claims that the swap counterparties,
3  the service corporations, and the city may have against one
4  another; right?
5  A    Yes.
6  Q    In addition, it is also your understanding that the
7  forbearance agreement resolves any defaults that exist under
8  the collateral agreement and the amended swaps; right?
9  A    Yes.
10 Q    And the result of the forbearance agreement is that the
11 city and the swap counterparties will be able to perform
12 under the forbearance agreement without being subject to any
13 liability to any third parties; correct?
14 A    With the exception of any possible regulatory or criminal
15 enforcement, yes.
16 Q    Mr. Orr, you took a deposition in this case; correct?
17 A    Yes.
18 Q    And at that deposition you told the truth; correct?
19 A    Yes.
20 Q    All right.  If you could flip to page 141 of your August
21 30th deposition --
22 A    Yes.
23 Q    If you could look at line 14 through 20, please.  Just
24 let me know when you're there.
25 A    Page 131?

1  Q    Page 141.

2  A    141.

3  Q    Line 14.

4  A    Yes.

5  Q         "Question:  Okay.  And the result of the

6              forbearance agreement is that the city will be able

7              to perform under the forbearance agreement without

8              being subject to any liability to any third party?

9              Answer:  That is my understanding.

10             Question:  And so will the swap counterparties;

11             correct?

12             Answer:  That is my understanding."

13         Were you asked those questions, and did you give

14  that response?

15  A    Yes.

16  Q    And so that immunity from liability, that's one of the

17  values of this agreement to both the city and the swap

18  counterparties; right?

19  A    Yes.

20  Q    Now, moving on to some of your objectives as part of the

21  negotiations, as part of the initial negotiations, one of

22  your objectives was to get the swap counterparties to waive

23  their cash strapping rights on an interim basis so that the

24  city could access the casino revenues; right?

25  A    Yes.

1  Q  And that was still an objective in the most recent round

2  of negotiations; right?

3  A  Yes.

4  Q  A second objective was that you wanted to modify the swap

5  to get a discount on the termination amount; right?

6  A  Yes.

7  Q  And a third objective was that you wanted to obtain an

8  option about when you could direct the termination of the

9  swap; correct?

10  A  Yes, generally, yeah.

11  Q  And you achieved these three objectives in the

12  forbearance agreement; right?

13  A  Yes.

14  Q  And you achieved these three objectives in the sixth

15  amendment; right?

16  A  Yes.

17  Q  You would agree with me that another benefit of the

18  forbearance agreement is that from the city -- a benefit from

19  the city's standpoint is that it provides the city with

20  interim access to the casino revenues; right?

21  A  Yes.

22  Q  And your understanding is that during the forbearance

23  period, the swap counterparties have temporarily relinquished

24  the right to direct cash trapping so long as the optional

25  termination period is pending; correct?

1  A    Yes.

2  Q    And you understand that cash passes through the general

3  receipt subaccount on a monthly basis; right?

4  A    Yes.

5  Q    And we can agree that between July 15th and whenever the

6  option is exercised or expires, there is cash that is --

7  either already has or will flow through the cash trap to the

8  city; right?

9  A    The cash trap?

10  Q    Yeah.  It will flow through the cash trap to the city;

11  correct?

12  A    Yes.  The general receipts account, yes.

13  Q    Yeah.  There will be money that will flow to the city;

14  correct?

15  A    Yes.

16  Q    And we can also agree that if the option expires, the

17  city is under no obligation to put the cash that it received

18  in the interim back into the general receipt subaccount;

19  right?

20  A    Yes.

21  Q    Now, you are familiar with the idea that two different

22  contracts can be part of one integrated transaction; right?

23  A    Yes.

24  Q    And your understanding is that the forbearance agreement

25  is part of the same subject matter as the collateral

1  agreement and the swaps agreement; right?

2  A    Same subject matter?

3  Q    Yes.

4  A    Yes.

5  Q    Finally, just a few more questions about the forbearance

6  agreement.  Over the past few weeks, it's been suggested at

7  various times that if the city was not able to reach an

8  agreement with the swap counterparties, that it would instead

9  choose to sue them; right?

10  A    It might.

11  Q    Because the city has various claims against the swap

12  counterparties; right?

13  A    Yes.

14  Q    And these potential claims against the swap

15  counterparties could be considered an asset for purposes of

16  bankruptcy; correct?

17  A    Claims can be considered assets for purposes of

18  bankruptcy, yes.

19  Q    And here the forbearance agreement would resolve those

20  claims; correct?

21  A    Yes.

22  Q    Now, you submitted the terms of the forbearance agreement

23  to the governor for approval; right?

24  A    To the treasurer.

25  Q    But you don't recall ever submitting the forbearance

1  agreement to the City Council for approval; right?

2  A    The forbearance agreement?

3  Q    Yeah, the forbearance agreement.

4  A    No, I don't recall that.

5  Q    And you never submitted the sixth amendment to the City

6  Council for approval; right?

7  A    No, I don't recall that.

8         MR. ARNAULT:  Thank you, Mr. Orr.  No further

9  questions, your Honor.

10                    CROSS-EXAMINATION

11  BY MR. MARRIOTT:

12  Q    Good afternoon, Mr. Orr.

13  A    Good afternoon, Mr. Marriott.

14  Q    Thank you for restoring me to the ranks of the usual

15  suspects.  I am not going to ask you any questions about the

16  forbearance agreement.  I want to focus on the Barclays

17  transaction.

18  A    Um-hmm, yes.

19  Q    Now, Mr. Orr, you made the ultimate decision to accept

20  the Barclays proposal for the post-petition financing that

21  the city is now seeking authorization to borrow; correct?

22  A    Yes.

23  Q    And when you were asked earlier on direct what factors

24  you considered in making the selection, the first factor you

25  indicated was the cost of the various alternatives available

1  to you; correct?

2  A   Yes.

3  Q   And, in fact, the cost of financing is an important

4  factor in deciding whether or not to undertake a financing

5  transaction; correct?

6  A   Yes.

7  Q   And, indeed, it would be imprudent to accept a financing

8  proposal if you did not know what the cost of the financing

9  would be; correct?

10  A   It might be.

11  Q   Well, it might be or it would be?

12  A   Generally, yes.

13       MR. MARRIOTT:  Can we have Exhibit 89?

14  BY MR. MARRIOTT:

15  Q   Mr. Orr, I believe you testified on direct that you used

16  this document as part of your decision-making process in

17  selecting the Barclays commitment over the other commitments

18  the city received; correct?

19  A   Yes.

20  Q   And if we could turn to page 5 of Exhibit 89, we see here

21  that an entire page is devoted to a cost comparison of the

22  four commitments you were considering; correct?

23  A   Yes.

24  Q   Now, for two of the four commitments, including Barclays,

25  there is a reference to market flex; correct?

1    A    Yes.

2    Q    And market flex provides to a lender the flexibility to

3    increase the minimum interest rate on a loan if that is

4    necessary to attract interest from other potential

5    participants in the loan; correct?

6    A    It's a process that allows the potential participant

7    bidders to increase the rate, yes.

8    Q    So that the -- so that Barclays, if it exercised the

9    market flex as necessary to find other interested

10   participants in the transaction, could raise the minimum

11   interest rate; correct?

12   A    Those participants could bid above the minimum rate, yes.

13   Q    Which would result in the loan bearing interest above the

14   original minimum rate; correct?

15   A    Yes.

16   Q    Okay.  And Exhibit 89 informs you of both the existence

17   of a market flex term -- of both the existence of a market

18   flex term in the Barclays and the Goldman commitments and

19   also specifies the scope of the market flex; correct?

20   A    Yes.

21   Q    Okay.  And so looking at the Barclays column, which is

22   the far left, the lowest minimum interest rate on the loan is

23   3.5 percent, but the minimum could rise as high as 6.5

24   percent under the market flex provisions; correct?

25   A    Yes.

1    Q    And, in fact, this chart accurately reflects what the

2    Barclays interest rate range could be under the proposal

3    before the Court today; correct?

4    A    Yes.

5            MR. MARRIOTT:  Could we put up Exhibit 94?

6    BY MR. MARRIOTT:

7    Q    Mr. Orr, if you would look at 94, which has been

8    admitted, this is the Barclays commitment letter.  Do you

9    recognize it?

10           MR. MARRIOTT:  Maybe you could scroll through it.

11           THE WITNESS:  Just to the back page.

12   BY MR. MARRIOTT:

13   Q    You actually have hard copies there if that would be

14   easier for you to --

15   A    I just wanted to check my signature.  That's all.

16   Q    That's fine.

17   A    That's all.  You can just flip to it.

18   Q    Run out of pages?

19   A    Yeah.  Which number?  I'll just --

20   Q    A signature is on page 10.

21   A    Mr. Marriott, if you represent this is a true copy with

22   my signature, that's fine.

23   Q    There it is.  Success.

24   A    Okay.

25   Q    Okay.  Now, although the commitment letter and the term

 1  sheets attached to it mention market flex, I'm correct, am I

 2  not, that the commitment letter does not disclose the scope

 3  of the market flex?

 4  A   I believe that's correct.

 5  Q   Okay.  And, in fact, the scope of the market flex was set

 6  forth in a separate fee letter with Barclays; correct?  Let

 7  me help.

 8  A   Yeah.

 9          MR. MARRIOTT:  Could we put up Exhibit 93?

10          THE WITNESS:  Yeah.  Take me to it.  I believe

11  that's correct.  I just haven't seen the provision recently.

12          MR. MARRIOTT:  Okay.  Maybe we could scroll through.

13  I can tell you when to stop.

14          THE WITNESS:  There you go.

15          MR. MARRIOTT:  Okay.  Stop right there.

16  BY MR. MARRIOTT:

17  Q   This is -- do you recognize this as the fee letter with

18  Barclays?

19  A   I believe so.

20  Q   All right.  And do you see where this is the place where

21  the scope of the market flex is set forth?

22  A   Yes.

23  Q   Okay.  Now, you're familiar with Michigan Public Act 436;

24  correct?

25  A   Yes.

1  Q   And, in fact, that's the statute under which you are
2  appointed; correct?
3  A   Yes.
4  Q   And I think your direct testimony might have been a
5  little ambiguous on this point, but it's under PA 436 that
6  you are required to submit to City Council certain proposed
7  acts that you are considering on behalf of the city; right?
8  A   Yes.
9  Q   And one of those things that requires submission to City
10 Council is a transaction such as the proposed Barclays
11 transaction for the borrowing of money; correct?
12 A   Yes.
13 Q   And, in fact, you made a submission to City Council with
14 respect to the Barclays proposed post-petition financing;
15 correct?
16 A   Yes.
17         MR. MARRIOTT:  Could we bring up Exhibit 98?  Next
18 page.
19 BY MR. MARRIOTT:
20 Q   Now, is this, in fact, that submission under PA 436 to
21 City Council with respect to the Barclays proposal?
22 A   Yes, I believe so.
23 Q   And you can work from memory or you can take time to
24 scroll through it, whichever you prefer.
25 A   Okay.

1  Q   But Exhibit 98, the submission to City Council, did not

2  include a copy of the fee letter that we just reviewed,

3  Exhibit 93; correct?

4  A   I believe that's correct.

5  Q   Just the term sheets that were attached to the commitment

6  letter; correct?

7  A   Can you scroll to the first page, please, just the cover

8  memo, the very first page?  Yes.

9  Q   Okay.  Now, other than this communication to City Council

10 regarding the proposed Barclays financing, which does not

11 include the fee letter which has the substance of the market

12 flex provision, did you personally otherwise communicate to

13 City Council the substance of the market flex provision that

14 was contained in the fee letter?

15 A   No.

16 Q   To your knowledge, did anybody else?

17 A   Not that I know of.

18 Q   Now, City Council ultimately declined to approve the

19 Barclays financing and passed a resolution to that effect;

20 correct?

21 A   I believe so.

22      MR. MARRIOTT:  Could we go to Exhibit 96?

23 BY MR. MARRIOTT:

24 Q   Mr. Orr, you testified on direct regarding this exhibit,

25 which, as I understand it, is a submission you made to the

1  then treasurer of the State of Michigan seeking approval for

2  the proposed Barclays loan; correct?

3  A    Yes.

4  Q    And I think you testified that you weren't sure whether

5  you needed it, but you thought out of an abundance of caution

6  it made sense to ask for it; correct?

7  A    Yes.  We thought we didn't need it, but in an abundance

8  of caution we asked for it, yes.

9  Q    Okay.  And if you would turn to pages -- first page 4 of

10  this exhibit, now, you did include the fee letter in your

11  submission to the treasurer, but you then had redacted the

12  market flex provisions; correct?

13  A    Yes.

14  Q    And to your knowledge, were the -- was the substance of

15  the market flex provisions otherwise communicated to the

16  treasurer?

17  A    Not to my knowledge.

18  Q    Just a couple other quick ones.  I believe you testified

19  on direct that the commitment from Barclays as we sit -- as

20  you understand it, expires 1-31-14.

21  A    I believe so.

22  Q    Okay.  And the loan will be reduced from 350 million to

23  285 million; is that correct?

24  A    Yes.

25  Q    Do you know if Barclays -- well, let me ask the question

1   this way first.  Has there been an amendment to the

2   commitment letter to extend the termination date to 1-31 and

3   to reduce the amount of the loan to 285 million?

4   A   I don't know.

5   Q   Do you know whether in the absence of such an amendment

6   Barclays has otherwise indicated its agreement to those two

7   provisions?

8   A   It is my understanding that they have agreed to those

9   provisions.

10          MR. MARRIOTT:  Okay.  I have nothing further.  Thank

11  you.

12                       CROSS-EXAMINATION

13  BY MS. GREEN:

14  Q   Good afternoon, Mr. Orr.  I'm Jennifer Green on behalf of

15  the Retirement Systems for the City of Detroit.

16  A   Good afternoon, Mrs. Green.

17  Q   I think you previously described the city was in sort of

18  a panic mode when you embarked on the first round of

19  negotiations with the swap counterparties back in June of

20  2013; correct?

21  A   I didn't say it was a panic mode, but I said our

22  financial condition was dire.

23  Q   I think you'd gotten some financial reports that were

24  worse than you expected; correct?

25  A   Yes, um-hmm.

1  Q   I think you used the words cash crisis and a potential

2  payless payday, things of that nature?

3  A   Yes.

4  Q   And so you -- or, rather, Ken Buckfire on the city's

5  behalf called up the swap counterparties, and you started the

6  negotiations at 50 cents on the dollar; correct?

7  A   Not exactly.  It's my understanding that discussions

8  regarding a discount to the potential termination payment had

9  been going on for some time, months before I got here, but

10  they became in earnest in the May through June time frame.

11  Q   Okay.  And the amount that you started the negotiations

12  at was around 50 cents on the dollar; correct?

13  A   I believe generally, yes.

14  Q   And then you ended up at 75, roughly?

15  A   Yes.

16  Q   Now let's fast forward to the present.  The city has

17  filed bankruptcy.  There are some protections in place as a

18  result of that; correct?

19  A   Yes.

20  Q   And you have the forbearance agreement in place, and I

21  think, as you just testified, the casino revenue is not in

22  danger of being trapped currently; correct?

23  A   Not presently.

24  Q   Okay.  And then we have the evidentiary hearing that

25  we're all here for today, and you might recall on the 18th

1    when the judge, Judge Rhodes, stopped the proceedings, and I

2    think at your deposition you used the words and sort of

3    admonished the parties that 75 cents on the dollar is

4    something you might take if you actually have a judgment in

5    your hand.  Do you remember that testimony?

6    A    Yes, I do.

7    Q    Okay.  And you were here, and you were sitting on the

8    witness stand when that happened?

9    A    Yes.

10   Q    And we were ordered to go into mediation?

11   A    Yes.

12   Q    And so you'd gained a little different leverage in

13   negotiating position compared to where you were back in June;

14   correct?

15   A    Yes, I think that's fair.

16   Q    Okay.  And then you started out the mediations on the

17   23rd, and you started at 50 cents on the dollar again; right?

18   A    Roughly, yes.

19   Q    Which was the same amount you started at back in June?

20   A    Roughly, yes.

21   Q    Okay.  I think you testified that you became EM in March

22   of 2013; correct?

23   A    Yes.

24   Q    But you knew before officially commencing your role as

25   emergency manager that the swaps and the access to the casino

1  revenue were both significant issues with respect to the

2  city's financial stability; correct?

3  A    Yes.

4  Q    So you knew coming in that the swap agreements themselves

5  had to be dealt with kind of up front?

6  A    I thought they were a significant issue to be dealt with,

7  yes.

8  Q    But you knew that the swap agreements had been entered

9  into many years earlier in '05 and '06; right?

10  A    Yes.

11  Q    And the collateral agreement was back in '09?

12  A    Yes.

13  Q    And you didn't have any protocol in place for how you

14  would investigate the claims or defenses related to those

15  documents; correct?

16  A    When you say -- well, when you say "protocol," there was

17  an investigation of potential claims related to those

18  documents, but I don't know if I would call it a protocol.

19  Q    Well, I think you said earlier that you looked into the

20  City Council records, you did some legal analysis, and you

21  looked at some other public records; correct?

22  A    Yes.  My team and I looked at a number of different

23  records, yes.

24  Q    Okay.  But you didn't compile a list of, for instance,

25  city employees or officials that were involved in the swap

1  agreements or the collateral agreement itself; correct?

2  A    No.  I think there were records that showed the city

3  employees as well as the City Council people and the

4  discussions they had about those agreements.

5  Q    Fair enough.  You didn't interview any of those people?

6  A    No.

7  Q    Okay.  And you didn't interview any of the financial

8  consultants who may have advised the city in connection with

9  either the swap agreements or the collateral agreements;

10 correct?

11 A    Not that I know of.

12 Q    And you didn't interview any of the City Council staff

13 members or anything of that nature?

14 A    I wouldn't call it an interview, but I did have

15 conversations with at least one staffer, which was more

16 casual, but I wouldn't call it an interview, so, yes, that's

17 correct.

18 Q    Okay.  Did you attempt to gather any of the relevant

19 documents such as internal notes or memorandums relating to

20 the negotiations from '09 or '05 or '06 or anything of that

21 nature?

22 A    I don't know.

23 Q    I believe you testified the biggest weakness to the claim

24 regarding the invalidity of the casino revenue pledge was the

25 opinion letter, the legal opinion letter, the City Council

1 ordinance, the letter from the state gaming board, and at

2 your deposition you called it the acquiescence of the parties

3 to the transaction and the fact that nobody raised

4 objections. Do you recall identifying those things as

5 weaknesses?

6 A   Yes.

7 Q   Okay. But you don't actually know if anyone raised

8 objections back in '09 or '05 or '06; correct? You didn't

9 interview any of the people that were involved?

10 A   No. I think objections were raised to the transaction by

11 City Council people if not others, but they were voted upon

12 and overruled.

13 Q   And I believe you also had stated that the state gaming

14 board letter was something that you looked at in respect to

15 the casino revenue pledge; correct?

16 A   Yes.

17 Q   And I think at your deposition you mentioned it like four

18 or five times that that was something that you had relied

19 upon --

20 A   That was an issue, yes.

21 Q   -- in coming to your conclusion?

22 A   Yes.

23          MS. GREEN: Can we pull up Exhibit 11, please, City

24 Exhibit 11?

25 BY MS. GREEN:

1  Q   And you recognize this as the collateral agreement from

2  2009; correct?

3  A   Yes.

4  Q   And if we scroll to the very end of the collateral

5  agreement, I believe it's page 71.  And this is a copy of the

6  letter that you've been referring to from the state gaming

7  board; correct?

8  A   Yes.

9  Q   And if we could blow that letter up just a little bit --

10 it's dated June 18th, 2009.  The subject line states,

11 "Irrevocable instructions directing the three licensed

12 Detroit casinos to electronically transfer city taxes to a

13 custodial account."  Do you see that, Mr. Orr?

14 A   Yes.

15 Q   And the irrevocable instructions that it references, in

16 the top line it states, "We're in receipt of a letter from

17 the city's outside gaming counsel transmitting to and

18 advising the board of certain irrevocable instructions."  Do

19 you see that?

20 A   Yes.

21 Q   And those irrevocable instructions are the ones, as you

22 understand, that tell the three casinos to wire certain funds

23 to U.S. Bank; correct?

24 A   Yes.

25 Q   And you might recall all of this from your deposition.

1  We went through, and just prior to this letter attached to

2  the collateral agreement there are three separate sets of

3  irrevocable instructions each identifying certain funds to be

4  transferred electronically to U.S. Bank; correct?

5  A    Yes.

6  Q    And after each of those irrevocable instructions, there's

7  a confirmation letter from the casino saying, yes, we got

8  your letter, and, yes, we will do as we are told.

9  A    I believe so.

10 Q    Okay.  So we won't have to go through all of those again.

11 And as the letter states, they received those irrevocable

12 instructions; right?

13 A    Yes.

14 Q    But this letter nowhere states anything about, for

15 instance, signing off on the casino revenue pledge in

16 general; correct?

17 A    Yes.

18 Q    Nowhere does it say that the gaming board has reviewed

19 the validity of the city's pledge of the casino revenue and

20 that for purposes of securing the city's financial

21 obligations under the collateral agreement, that's all well

22 and good under Michigan law.  Doesn't say that; right?

23 A    It does not say that.

24 Q    And it doesn't say that the city is hereby authorized to

25 pledge the casino revenue and that this transaction fully

1  complies with Section 12 of the Gaming Act; right?

2  A   Correct.

3  Q   In fact, it doesn't say anything about Section 12 of the

4  Gaming Act, does it?

5  A   No.  It just mentions the Gaming Act generally.

6  Q   Okay.  We discussed that you did not do interviews with

7  any people that may have been involved in the swap

8  transactions or the collateral agreement; correct?

9        MS. GREEN:  Can we pull up Exhibit 1005?

10  BY MS. GREEN:

11  Q   Mr. Orr, this has been admitted into evidence as Exhibit

12  1005.  Can you take a moment and read the top paragraph of

13  this e-mail and tell me if you have seen this e-mail before?

14  A   Okay.

15  Q   As you can see at the top, it's dated September 4th,

16  2013.  At the top it says, "Thanks.  I'll share with Jones

17  Day."

18  A   Um-hmm.

19  Q   I realize that you're no longer performing as an attorney

20  for Jones Day, but was this ever, indeed, shared with you,

21  this e-mail?

22  A   No.

23  Q   And you read the substance of the e-mail from Thomas

24  Gavin?

25  A   I just read it.

1    Q    Okay.  So Jones Day never forwarded this e-mail to you?

2    A    I don't recall ever seeing this e-mail.

3    Q    So then Miller Buckfire also never forwarded the e-mail

4    to you, to your knowledge?

5    A    I don't recall ever seeing the e-mail.

6    Q    Does it surprise you to learn that the swap

7    counterparties themselves may have thought that the casino

8    pledge wouldn't survive the bankruptcy filing?

9    A    No.

10    Q    Does it surprise you that the first time you're hearing

11    about this is in the evidentiary hearing when maybe you could

12    have used this during the mediation last week?

13    A    No.  At this point, nothing surprises me.

14    Q    Would you have conducted a different factual

15    investigation last week or maybe used it as leverage when you

16    were negotiating your new terms?

17    A    Maybe, maybe not.

18    Q    With respect to the privilege log that was just produced

19    yesterday, I have just a few follow-up questions, and I know

20    your Honor said you'd permit some limited questions.  Since

21    it's a new document, we don't have copies, but I do have an

22    electronic copy that our trial consultant can pull up so you

23    can follow along, Mr. Orr.

24              THE COURT:  Let's put an exhibit number on it.

25              MS. GREEN:  I can move -- I just didn't know if

1  you'd want it moved or not yet.  I wasn't sure if you were

2  going to permit more questions.

3          THE COURT:  It's up to you whether to offer it into

4  evidence or not.  I just want an exhibit number on it since

5  we are displaying it to the witness for identification

6  purposes.

7          MS. GREEN:  Okay.  It would be 1018, I believe, but

8  I can confirm that.  I just wasn't sure if you were going to

9  let me get any questions out before they objected to

10  privilege, so I didn't have a number on it yet.  Wasn't going

11  to assume.

12          THE COURT:  All right.  1018 it is.

13      (Retirement Systems Exhibit 1018 marked at 2:33 p.m.;

14      changed at 2:35 p.m. to Retirement Systems Exhibit 1023)

15  BY MS. GREEN:

16  Q   Do you recognize this document, Mr. Orr?

17  A   No.

18  Q   Do you recognize -- if you look at the substance, does

19  any of that ring a bell as to documents that you would have

20  reviewed in connection with this matter?

21  A   I've never seen the privilege log, but I may have

22  reviewed some of these documents.

23  Q   Okay.  If you could scroll down to entry number eight --

24  and I apologize because I would have asked you this at your

25  deposition a few days ago, but we didn't have this, so

1  there's a draft letter authored by Jones Day requesting

2  attorney general opinion.  Do you see that entry?

3  A    Yes.

4  Q    And this was done back in May of 2013?

5  A    Yes.

6  Q    Which individual at the AG's office did you make this

7  request to?

8  A    I don't recall a request ever being made.

9  Q    So this was a draft letter, but it was never sent?

10  A    As far as I know, yes.

11  Q    Do you know the substance of the letter?  Was it asking

12  an opinion that the pledge was invalid?

13  A    No.  I don't know the substance of the letter.

14  Q    Was it a letter asking the pledge was valid?

15  A    I don't recall seeing --

16  Q    Don't know at all.

17  A    -- the draft letter.

18  Q    Did you have any conversations with the attorney

19  general's office about seeking an opinion about the legality

20  of the casino revenue pledge?

21  A    No.

22  Q    Did someone else from your team investigate this as a

23  potential defense to raise in connection with the swap

24  termination payment amount negotiations?

25  A    I believe they did, but I didn't have any personal

1   involvement with the letter or the draft.

2   Q   So you --

3           THE COURT:  We already have a 1018.  What is the

4   next number?  Do we know?

5           ATTORNEYS:  1023.

6           MS. GREEN:  I guess we've admitted a lot more.

7           THE COURT:  Sorry?

8           MS. GREEN:  1023.

9           THE COURT:  1023.  Okay.

10       (Retirement Systems Exhibit 1023 marked at 2:35 p.m.)

11  BY MS. GREEN:

12  Q   The next one I have a question on is slightly below that

13  at the bottom.  I think it's entry ten.  There's a draft

14  emergency manager order declaring the city's pledge of

15  wagering tax property under the 2009 collateral agreement

16  illegal and void.

17  A   Yes.

18  Q   Now, you're a lawyer, but you haven't been serving as a

19  lawyer in your EM capacity; correct?

20  A   Correct.

21  Q   Did you draft this order?

22  A   No.

23  Q   What was the basis for the draft order?

24  A   I'm not sure.

25           MR. SHUMAKER:  Objection, your Honor.  The witness

1 has said he didn't draft it, and it could call for privileged

2 communications.

3       MS. GREEN:  I'll restate my question.

4 BY MS. GREEN:

5 Q   Have you ever read a draft order on these -- on this

6 topic?

7 A   No.

8 Q   Do you know who did draft an order that would have

9 ostensibly eventually been signed by you?  Do you know who

10 drafted the order?

11 A   No, I don't know.

12 Q   And you have no idea what the basis as to why the

13 collateral agreement would be illegal and void would be in

14 your draft order?

15 A   No.  I think as part of our litigation strategy I'd

16 instructed our attorneys to prepare various lines of attack,

17 but I never saw the actual draft order.

18 Q   In preparing for the legal negotiations -- or I'm

19 sorry -- the negotiations relating to the swap termination

20 payment, you didn't have a debriefing with Ken Buckfire

21 heading into the negotiations where you sat him down and you

22 advised him of all the various legal defenses and claims;

23 correct?

24 A   Not that I recall.

25 Q   Okay.  And would it surprise you to know that your lead

1    negotiator went into the negotiations assuming that all of

2    the liens were valid?

3    A    No.

4    Q    Who is Brent Hartzell?

5    A    Brent Hartzell is a city employee in the budget

6    department.

7    Q    And he reports to you on budget issues; correct?

8    A    Reports through the finance director and CFO to me.

9    Q    Okay.

10   A    He's an indirect report.

11   Q    And you've had opportunities to work with him over the

12   2014 fiscal year budget?

13   A    Yes.

14   Q    Do you recognize --

15          MS. GREEN:  Let's pull up Exhibit 1007, please.

16          MR. SHUMAKER:  Your Honor, there is an objection.

17          MS. GREEN:  Your Honor, I would move --

18          MR. SHUMAKER:  There's an objection standing for

19   this document.

20          MS. GREEN:  Sustained for this?

21          MR. SHUMAKER:  No.

22          ATTORNEY:  Standing.

23          MR. SHUMAKER:  Standing.

24          MS. GREEN:  Yeah.  I would move for its admission,

25   your Honor, and that's why I turned around to look at you to

 1  object, so --

 2         MR. SHUMAKER:  I'm sorry.  The exhibit is Number --

 3         MS. GREEN:  1007.

 4         MR. SHUMAKER:  -- 1007.  Relevance is the objection,

 5  your Honor.

 6         THE COURT:  What is the document?

 7         MS. GREEN:  It's a memo regarding the budget for

 8  2014 from the interim budget director to the emergency

 9  manager.  He signed it.

10         THE COURT:  Are you offering it?

11         MS. GREEN:  I was just going to, and then he

12  objected.

13         THE COURT:  All right.  Why don't you establish the

14  foundation?  Then we'll see if there's -- what the objection

15  is.

16  BY MS. GREEN:

17  Q   And did Mr. Hartzell, indeed, give you a memo on October

18  24th relating to the October -- I'm sorry -- the fiscal year

19  2014 budget for the city?

20  A   Many memos come back.  I don't know if it's October 24th,

21  but he very well may have.

22  Q   Okay.  Do you recall signing a memo where $95 million

23  was moved out of the general fund to a restructuring fund?

24  A   Yes.

25  Q   Okay.

 1          MS. GREEN:  I would move for its admission, your

 2   Honor.

 3          MR. SHUMAKER:  Same objection, your Honor.

 4   Relevance.

 5          THE COURT:  All right.  The objection is overruled.

 6   Exhibit 1004 -- is that the number?

 7          MS. GREEN:  1007.

 8          THE COURT:  1007 is admitted.

 9      (Retirement Systems Exhibit 1007 received at 2:39 p.m.)

10   BY MS. GREEN:

11   Q   And is this the memo that we just discussed, Mr. Orr?

12   A   Yes.

13   Q   Okay.  And on the first page the top sentence says that

14   certain debt service appropriations for the pension

15   obligation certificates and limited tax obligation debt -- do

16   you read that right there in the first paragraph?

17   A   Yes.

18   Q   It says it's being reallocated for general operational

19   restructuring purposes.

20   A   Yes.

21   Q   Okay.  And in the second paragraph it talks about how for

22   fiscal year 2014 there's going to be 95 million shifted from

23   certain appropriations in the general fund to a general

24   restructuring fund.  Do you see that?

25   A   Yes.

1  Q   And if we scroll through the document, there are

2  various -- we'll wait for it to scroll.  There are certain

3  funds being taken away from the police and fire and certain

4  other funds from City Council and recreation department and

5  public lighting and finance department and things of that

6  nature and being moved to a restructuring fund; correct?

7  A   Yes.

8  Q   And then you signed this document on October 25th?

9  A   Yes.

10        MS. GREEN:  I don't have anything further, your

11  Honor.

12        THE COURT:  One second, please, sir.

13        MR. GOLDBERG:  Certainly, if I may.

14        THE COURT:  And I promised you this earlier.  By my

15  count, the city has 143 minutes remaining and the objecting

16  parties 227.

17        MR. GOLDBERG:  Thank you, your Honor.  Jerome

18  Goldberg appearing on behalf of interested party David Sole.

19                      CROSS-EXAMINATION

20  BY MR. GOLDBERG:

21  Q   Good afternoon, Mr. Orr.

22  A   Good afternoon, Mr. Goldberg.

23  Q   Mr. Orr, for the court-ordered mediation for December

24  23rd and December 24th, isn't it true that the order from

25  Judge Rosen mandated that the parties were to have

1  individuals there with settlement authority?

2  A   Yes.

3  Q   And isn't it true that you testified in your deposition

4  that, in fact, Judge Rosen informed you that the banks did

5  not have someone with settlement authority there on December

6  23rd?

7  A   Yes.  At least one of them, yes.

8  Q   And that, in fact, he had to threaten to hold them in

9  contempt of court just to get them to agree to even this

10 settlement.  Is that not true?

11 A   He threatened to enter a default judgment.

12 Q   I'm sorry.  Default judgment.  Now, just to be clear, the

13 $165 million swap termination loan with Barclays, is that

14 subject to similar terms to the previous swap termination

15 loan?

16 A   Yes.

17 Q   So the interest rate would be anywhere from 6.5 to 8.5

18 percent -- 5.5 to 8.5 percent?

19 A   Yes.  Whatever was on the chart, yes.

20 Q   Okay.  I mean it's true that once bankruptcy is over,

21 once the bankruptcy is ended and the loan becomes due, the

22 interest rate goes up an extra two percent; correct?

23 A   Well, there's a mechanism by which the interest rate can

24 go up, yes.

25 Q   So it could go up from anywhere -- depending on what the

1  final interest rate was on the first loan, it could go up --

2  it could be 5.5 percent or up to 8.5 percent; correct?

3  A   If that's the math, yes.

4  Q   And the loan -- the $165 million loan is pledged by a $4

5  million a month pledge secured against income tax revenue?

6  A   Yes.

7  Q   And, in fact, that amounts to $48 million per year, four

8  million times twelve; correct?

9  A   Yes.

10  Q   And do you recall that in the city's motion, it indicated

11  that the city's income tax revenue for this year was

12  approximately $232 million?

13  A   If that was in the motion, I'll stand by it, yes.

14  Q   Okay.  So what we're talking about is for approximately

15  the next four years paying 20 percent of city income tax

16  revenue to pay off Barclays and UBS -- UBS and Bank of

17  America through Barclays.  Is that not correct?

18  A   Roughly, yes.

19  Q   And, in fact, 165 million at 8.5-percent interest would

20  be approximately 30 million in interest.  Does that sound

21  right to you?

22  A   Approximately that range.

23  Q   Okay.  So we'll be paying -- up to $195 million over the

24  next four years from city tax revenues will be diverted to

25  pay off UBS -- to pay off two banks, UBS and Bank of America,

1  through Barclays?

2  A   It could, yes.

3  Q   Okay.  And those payments are going to be going on after

4  you're gone as emergency manager and probably gone from

5  Detroit.  Is that not true?

6  A   There's an expectation that there would be an exit

7  facility financed that they could.

8  Q   But as of this point, there is no exit facility in place?

9  A   That is correct.

10  Q   Okay.  In contrast, the -- I believe the testimony in

11  the -- both depositions was that the swap payments, the

12  hedging payments from 2008 to 2012 totaled -- I believe it

13  was $247 million.  Do you recall that figure?

14  A   Approximately that amount of money.

15  Q   I can show you your deposition, but we're in --

16  A   Yeah.  That's fine, yeah.

17  Q   -- the ballpark; right?

18  A   Yeah, um-hmm.

19  Q   And that in 2013 it would be about another 45 to 50

20  million.  Is that a fair statement?

21  A   That's a fair statement.

22  Q   So we're talking about $300 million having been paid to

23  UBS and Bank of America since 2008 on the hedging

24  derivatives, on the interest rate swaps?

25  A   Since when?

1  Q   Since 2008.

2  A   Roughly that amount.

3  Q   Okay.  And that -- and in addition to that, if the city

4  was successful in its litigation in recovering -- in getting

5  the swaps declared void ab initio, as you testified,

6  potentially that amount could be recovered; correct?

7  A   Yes.

8  Q   And, in fact -- and any amounts moving forward,

9  termination amounts in the neighborhood of 200 million also

10 would be eliminated?

11 A   Yes.

12 Q   So rather than paying $165 million, we could be

13 recovering up to $300 million?

14 A   Yes.

15 Q   I wanted to talk a little bit -- go over a little bit

16 the -- and I won't go into great detail because I thought you

17 testified quite well about what -- the claims that the city

18 is making.  One of them is fraud based on problems with the

19 LIBOR as documented relative to UBS.  Is that not correct?

20 A   Yes.

21 Q   Another one was that the counterparties -- and I'm

22 talking about the equitable claims or claims around fraud,

23 breach of contract based on the implied breach of the fair

24 dealing and also unjust enrichment claims.  One of them --

25 another was that the counterparties had superior knowledge to

1  the city when they entered into this complex financial

2  transaction and had a duty to clearly make the terms of this

3  transaction clear to the city; correct?

4  A    Yes.

5  Q    That they misrepresented that there was a low risk of

6  default or termination in connection with the swaps?

7  A    Yes.

8  Q    That they did not explain to the city that the -- the

9  potential dangers that a termination event could hold to the

10 city, meaning that it would immediately call in potentially

11 tens of millions or hundreds of millions in interest

12 payments; correct?

13 A    Interest payments and the termination fee, yes; correct.

14 Q    Yes, yes.  I'm sorry.  Correct.  And that the city was,

15 as you described it, a ticking bomb for this kind of default

16 based on a lowering of bond rating based on the city's

17 financial history?

18 A    Yes.

19 Q    Are you aware that representatives of Fitch Ratings

20 Service and Standard & Poor's were at the table when the

21 swaps were being voted on or being debated in City Council?

22 A    I didn't know it was Fitch and S&P, but I had heard that

23 ratings agencies were present.

24 Q    And they encouraged the city?  They were supportive of

25 the transaction?

1  A   I don't know that.

2  Q   Okay.  And, in fact, it was these same rating agencies

3  that triggered the default in 2009 by the lowering of the

4  city's bond rating; correct?

5  A   I know the ratings were lowered.  I don't know if it was

6  S&P and Fitch.

7  Q   Okay.  You testified earlier that the chief financial

8  officer of the city, Sean Werdlow, took a job with -- I

9  believe it was with SBS.  Are you aware that he took that job

10  in November of 2005?

11  A   Yes.

12  Q   And that was within five months after the swaps were

13  completed?

14  A   Yes.

15  Q   And you testified that that at least raises a red flag;

16  correct?

17  A   It raises concern, yes.

18  Q   You testified that you spoke with the SEC about their

19  involvement in investigating these matters, and I believe in

20  your deposition you testified that they were willing to have

21  further discussions; is that correct?

22  A   Yes.

23  Q   And I'm not going to try to do a big impeachment here.  I

24  mean you know that I asked you about that issue in -- August

25  30th, and at that point you testified that there hadn't been

1    discussions as of that date.

2    A    Right.

3    Q    So these discussions must have taken place between August

4    30th and the present date?

5    A    I believe that's fair.

6    Q    Okay.  I asked you before in Exhibit 1328, which has been

7    admitted -- I want to clarify the record.  It says in the

8    record it was admitted over objection.  I think the record

9    indicates there wasn't an objection to that, but either way,

10    Exhibit 1328 is the July 31st, 2012, SEC report on municipal

11    securities markets.  You have not -- you're not sure if you

12    read that report or not?

13    A    That's correct.

14    Q    Okay.  Are you aware that that report documents seven

15    enforcement actions by the SEC against municipalities in

16    similar situations to Detroit, including Jefferson County,

17    Alabama, and Orange County, California, both cities that

18    entered bankruptcy?

19    A    As I said, I hadn't read the report.  I'm aware that

20    there were enforcement actions.

21    Q    And are you aware that it all -- that there were five

22    other settled enforcement actions by the SEC against major

23    financial institutions, including Bank of America, UBS,

24    JPMorgan, Wachovia, and GE Funding?

25    A    I'm aware the SEC had settled several other

1  investigations, yes.

2  Q   Okay.  Have you familiarized yourself with the 2011 SEC

3  final judgment against UBS, which actually -- where one of

4  the -- one of the transactions that was raised in that

5  judgment was actually one dealing with the water board?  Have

6  you familiarized yourself with that judgment?  I did raise it

7  to you in your previous deposition.

8  A   Yeah, you did.  Yes, sir, you did.  I'm not aware of that

9  one in particular.

10 Q   Okay.  Are you aware that that judgment specifically

11 raises some of the issues that you raised, the fact that the

12 duty to disclose by a financial institution includes not

13 disclosing relevant information to a municipality in

14 connection with an interest rate swap because of the lack --

15 uneven knowledge of the parties?

16 A   I'm aware of the concept, although not that particular

17 investigation.

18 Q   Fair enough.  Are you aware that pursuant to the

19 Bankruptcy Code, the SEC has a right to intervene in a

20 Chapter 9 bankruptcy?

21 A   Yes.

22 Q   If the SEC was to intervene both in this bankruptcy and

23 in the litigation, that would dramatically lower the cost of

24 litigation on behalf of the city, would it not?

25 A   It might or it might not.

1  Q   Well, the SEC has -- as a government agency, has people

2  with expertise in litigating these areas.  You would agree

3  with that, would you not?

4  A   Yes, but sometimes agencies don't necessarily represent

5  the same interest as a principal litigant.

6  Q   Okay.  And the SEC, just to be clear, could actually

7  intervene not just in a lawsuit but in the bankruptcy

8  proceedings on fairness where the question of equitable

9  subordination could be addressed.  Is that not correct, if

10 you know?

11 A   I believe the SEC has the ability to intervene as an

12 interested party.  I don't know if in particular to your

13 question.

14 Q   Okay.  That's a good answer.  You probably know more than

15 I know about it.  Have you spoken with a representative --

16 strike that.  The Obama administration has people assigned to

17 work with you in terms of lending support in conjunction with

18 the emergency management and getting out of bankruptcy.  Is

19 that not true?

20 A   The federal government has assigned a specific treasury

21 officer as a liaison for the federal government as part of

22 the operational restructuring.  I don't know if his role or

23 specific delegation of authority includes the authority to

24 involve themselves in the bankruptcy.

25 Q   And who is that individual?

1    A    Don Graves.

2    Q    Don Graves?

3    A    Um-hmm.

4    Q    Have you spoken with him about potential federal

5    involvement or SEC involvement in the question of trying to

6    recover on the interest rate swaps?

7    A    Not that particular question.

8    Q    Okay.  You would acknowledge that the gap between the

9    floating interest rate and the fixed interest rate that's the

10   basis for the derivative payment dramatically changed in

11   approximately 2008.  Is that not correct?

12   A    Yes.  2008, 2009, yes.

13   Q    And that was due to a precipitous drop in interest rates?

14   A    Yes.  There are a number of reasons, but, yes, that was

15   why.

16   Q    And, in fact, what happened was the LIBOR rate at that

17   point and since that point has been around .5 percent to --

18   added to a .3-percent and 3.4 -- .34-percent margin, it's the

19   difference between that and the 6.3-percent fixed interest

20   rate that the city pays the banks that leads to the POC --

21   the pension obligation interest rate payment; correct?

22   A    Generally the concept, yes.  The numbers are approximate

23   in terms of where LIBOR was versus the rate of the interest,

24   yes.

25   Q    Right.  I mean and generally the -- are you familiar with

1   interest rate swaps, with the machinations of them?

2   A   I am now, yes.

3   Q   And generally speaking, the idea under the best

4   circumstances would be that the floating rate and the fixed

5   interest rate stay relatively stable so that the -- and the

6   fixed rate so that the parties don't face this calamitous

7   change that occurred in 2008 in the City of Detroit?

8   A   I suppose for stability, but it depends upon which

9   rate -- which side of the swap you're on.

10  Q   No question about it.  And we were on the wrong side of

11  the swap.

12  A   We were on the right side for a little while, and then we

13  were very much on the wrong side.

14  Q   All right.  And would you agree with me that the

15  precipitous drop in interest rates in 2008 was a product of

16  the financial crisis that occurred throughout the U.S. with

17  the collapse of Goldman Sachs, the subprime mortgage crisis,

18  and the -- and just generally the financial crisis that

19  occurred in the country in 2007, 2008?

20  A   Yes.  There was a financial meltdown for a number of

21  reasons that have been written about, including that, I

22  suppose.

23  Q   And, in fact, the reduction of interest rates to near

24  zero was part of the Federal Reserve's bailout of the banks

25  in order to try to stimulate the banks and keep them moving

1  during that period.

2  A    Yes.

3  Q    Would you agree with that?

4  A    In the last few months of '08 and '09 I think the federal

5  government bought back $1.75 trillion of securities, QE1.

6  Q    Exactly.  Are you aware that the City of Detroit

7  experienced 67,000 mortgage foreclosures between 2005 and

8  2007 according to a City of Detroit report?

9  A    I'd read that report somewhere.  I'm not sure where I

10 read it, and I think you and I have discussed it before, too.

11 Q    And, in fact, the report notes that the -- 73 percent of

12 all mortgage loans entered into in the city during that

13 period were subprime loans, meaning they were at least three

14 percent above the prime rate?

15 A    I think that's generally correct.

16 Q    And that, in fact, it was the subprime crisis, the

17 subprime -- the imposition of so many subprime loans that

18 precipitated this foreclosure -- in part precipitated this

19 foreclosure epidemic in Detroit?

20 A    I read reports that demonstrated there were

21 disproportionate foreclosures in the City of Detroit.

22 Q    Okay.  Are you aware that the report noted that of the

23 67,000 properties foreclosed between 2005, 2007, as of

24 January 2009, 65 percent remain vacant?

25 A    I don't know if I know those specific numbers, but I

1  remember hearing that there were -- there are obviously a lot
2  of vacant properties, yes.
3  Q    Have you considered as part of the equitable challenge to
4  UBS and Bank of America in connection with the swaps that
5  the -- that both of them were prime -- had tremendous
6  involvement in the subprime lending crisis, and, in fact,
7  they ended up benefitting from their own misdoings, in
8  essence, by causing the crisis that led to this drop in
9  interest rates from which they now have profited to the tune
10  of $300 million?
11  A    I'm aware of allegations in that regard.
12  Q    Okay.  As emergency manager and especially when you enter
13  into an agreement like this, I believe the way Judge Rhodes
14  put it, it's your duty -- and it's examined to see -- to make
15  sure that it's in the best interest of the estate or of the
16  debtor, which is the City of Detroit.
17  A    Yes.
18  Q    And, of course, the City of Detroit is the residents of
19  Detroit; correct?
20  A    That includes the residents of Detroit.
21  Q    Primarily it includes the residents even over creditors;
22  isn't that --
23  A    The interest of the residents is of grave concern, yes.
24  Q    Don't you think the residents would stand to benefit more
25  from a 500 -- potential $500 million recovery than to see 20

1  percent of their tax dollars turned over to two banks that

2  helped contribute to the destruction of their neighborhoods?

3  A   If the claims were successful and you're able to achieve

4  that kind of result, that would certainly provide a benefit,

5  but in the meantime you might not have the stability and

6  revenue stream that you need to help reinvent and restructure

7  the city.

8  Q   But, in fact, the revenue stream is going to be decreased

9  over the next four years just by paying off the swap

10  termination.

11  A   The revenue stream will be dedicated to pay off some of

12  the debt, the money we borrow to deal with the swap

13  termination, but it will free up other revenue that we can

14  use to go forward.

15  Q   Okay.  Give me one minute.  I'm almost done.  I find it

16  interesting your testimony that under PA 436 at least

17  potentially you would have had authority to abrogate the

18  contracts that let -- with UBS -- that allowed UBS to trap

19  revenue in connection with the interest rate swaps.  Is that

20  what you testified to?

21  A   Yes, the irrevocable letters of instruction.

22  Q   And you indicated that you didn't pursue that or didn't

23  act on that because of your concerns about litigation over

24  it?

25  A   Well, it's part of the overall settlement.  That was one

1  of the issues that we were concerned about.

2  Q   In fact, though, there are numerous contracts that -- as

3  the emergency manager, that you've acted within your power to

4  abrogate.  Is that not correct?

5  A   I've abrogated some, yes.

6  Q   I mean there are union contracts that were abrogated

7  because of the --

8  A   Yes.

9  Q   You've taken the position and won that position in this

10  court that you have the right to even go after pensions in

11  deference to the -- despite the guarantees in the Michigan

12  Constitution.

13  A   I'm not trying to go after pensions.  I'm trying to

14  rationalize the environment so we can pay them on a going

15  forward basis on a reasonable number.

16  Q   No.  I appreciate that, but I'm just saying that there's

17  been a tremendous amount of litigation over that issue, has

18  there not?

19  A   Yes.

20        MR. GOLDBERG:  Okay.  I have no further questions.

21  Thank you, Mr. Orr.

22        THE COURT:  Any other questions on the objectors'

23  side?  Any redirect?

24        MR. SHUMAKER:  No redirect, your Honor.

25        THE COURT:  All right, sir.  You are excused.

1       THE WITNESS:  Thank you, your Honor.

2       (Witness excused at 3:00 p.m.)

3       THE COURT:  Does the city have any further

4   witnesses?

5       MR. SHUMAKER:  We do not, your Honor, but

6   Mr. Hertzberg would like to address you.

7       THE COURT:  Mr. Hertzberg.

8       MR. HERTZBERG:  Yes, your Honor.  During the break

9   this morning, I spoke with Mr. Goldberg -- excuse me -- in

10  regard to Mr. Turbeville, his proposed witness.  I thought we

11  had an understanding that we would counter-designate on the

12  deposition that was taken and submit it in that fashion

13  because Mr. Turbeville was not available to appear today, and

14  based upon that I have someone -- I have had someone in my

15  office doing that.  Mr. Goldberg tells me now that he is

16  confused and that's not what he understood.  We have no

17  further witnesses at this point.  We are in the process of

18  counter-designating the deposition for submission, and I

19  think it's totally unfair and prejudicial to have him bring a

20  witness in on Monday.  We've been aware of this date set by

21  the Court as far back as two weeks ago that this would be the

22  date continued for the hearing on approval of the assumption.

23  The Court has been aware that other people, including myself,

24  have had scheduling issues but has held us to the schedule,

25  and I'd ask that the Court do the same here.

1      THE COURT: Sir.

2      MR. GOLDBERG: First of all, your Honor, I want to

3 make clear that there was a misunderstanding. I was not

4 agreeing to counter-designate. I was just saying that if the

5 Court was not inclined to allow Mr. Turbeville to testify in

6 person, then I would be, you know, open to the idea that we

7 would allow us to bring in his testimony through depositions,

8 and I apologize if there was a misunderstanding with

9 Mr. Hertzberg. We've tried to cooperate with him very much

10 on this issue.

11      As far as his appearance, I feel Mr. Turbeville's

12 appearance would be helpful on the issues that were raised by

13 Mr. Orr in this deposition in terms of creating a factual

14 predicate for the Court to be -- to make the determination as

15 whether or not there's a basis to move these equitable issues

16 forward later on in the bankruptcy in a fuller trial. As I

17 stated, I did -- Mr. Turbeville did come in for the previous

18 hearing. He is not -- he was not available today, as I made

19 clear to them, and was open about it. He is available to

20 come in Monday, and we are prepared to bring him in, you

21 know, and that's all I can say, your Honor. I appreciate the

22 Court's -- whatever ruling the Court makes. That's the

23 situation, and, you know, he's actually doing this based on

24 us paying his airfare without even charging us for the

25 appearance, which is a very -- which is a gesture that we

1  appreciate, but, on the other hand, I appreciate the
2  scheduling concerns of the Court and whatever the Court
3  rules, but I just really want to make clear that there was no
4  intent to mislead Mr. Hertzberg, and if the Court wanted us
5  to do it through deposition, I would be happy to do it that
6  way or however the Court decides.  Thank you.
7          MR. HERTZBERG:  Your Honor, one last thing.
8          THE COURT:  Sir.
9          MR. HERTZBERG:  We were not made aware until
10 yesterday that he would not be here today, so it's not like
11 we were put on notice two weeks ago either, so I think the
12 proper way to proceed is to have the parties designate
13 portions out of the deposition for submission to the Court
14 for review.
15         THE COURT:  All right.  In the circumstances, I
16 agree that submission of the appropriate portions of the
17 transcript of his deposition is the better approach here than
18 to delay these proceedings.  And if there are no other
19 witnesses, we should discuss how to proceed with closing
20 arguments.  Is the city ready to proceed now, or do you want
21 to start afresh on Monday morning?  And just so we have a
22 count again, I'm showing 143 minutes for the city and 207 for
23 the objecting parties.
24         MS. ENGLISH:  Your Honor, just before we start
25 talking about closing arguments, I think we do have a few

1  things on our side of the table to take care of.

2       THE COURT:  Oh, yes.  That was mentioned to me.

3  You're right.

4       MS. ENGLISH:  Okay.  So, first of all, now that the

5  city has rested, the objectors would like to bring a motion

6  for a directed finding that the city has not presented

7  evidence to meet its burden under 9019.  As the Court knows,

8  the Court needs to make an objective evaluation of the claims

9  and defenses that are being settled in order to determine

10  whether this is a fair and equitable settlement.  The Court

11  needs to make an independent analysis.  Based on the evidence

12  that has been presented by the city, the only evidence that

13  is before the Court really on the claims and defenses is

14  Mr. Orr's testimony as to what his attorneys told him, so

15  we've got a hearsay problem, and we've got a privilege

16  problem because they have not produced any of the underlying

17  pieces of paper, the evidence, on privilege grounds, so we

18  think, therefore, that the evidence is not before the Court

19  on which you can actually make a reasoned, objective,

20  independent analysis yourself, and they haven't met their

21  burden under 9019, so we'd move for a directed finding.

22  Thank you.

23       MR. SHUMAKER:  Your Honor, Greg Shumaker of Jones

24  Day for the City of Detroit.  Obviously we disagree

25  wholeheartedly with any motion.  We believe Mr. Orr has laid

1  out in great detail today all of the claims that he

2  considered, the strengths, the weaknesses, the factual bases,

3  and although your Honor can and will make an objective

4  assessment as to whether the settlement of those claims is

5  reasonable, there is no reason to grant a motion for directed

6  verdict because we think there's more than sufficient

7  evidence for the Court to find that the motion can be

8  assumed -- I mean that the forbearance agreement can be

9  assumed and approve it under Bankruptcy Rule 9019.  And we

10  also firmly believe, as I stated before, that the city is not

11  required to waive privilege in order to carry its burden.

12       THE COURT:  All right.  The Court will decline to

13  render judgment at this time under the applicable rule.  Are

14  there any other matters on the objectors' side?

15       MR. PEREZ:  Your Honor, Alfredo Perez on behalf of

16  FGIC.  Your Honor, we would move into evidence FGIC's Exhibit

17  305, which is the rehabilitation order pursuant to which FGIC

18  went into rehabilitation, and FGIC Exhibit 306, which is the

19  order approving the FGIC plan of rehabilitation.  Your Honor,

20  I had been carrying certified copies with me.  I just didn't

21  bring them today, so if I could substitute those on Monday --

22  they're self-authenticating under Rule 90 --

23       THE COURT:  Any objections to 305 and 6?

24       MR. SHUMAKER:  Yes, your Honor.  I have no idea what

25  the relevance might be.

1       MR. PEREZ:  Your Honor, the relevance is as follows.

2  In connection with their argument as it relates to their

3  ability to terminate the swap provision, they rely on Section

4  6 of the swap agreements, and they basically say that FGIC

5  has waived its right to assert its control rights because of

6  the fact that it's defaulted since it has -- since their

7  ratings was decreased, et cetera.  Pursuant to these orders,

8  those defaults are cured, and we don't have -- we're not

9  bound by those things, your Honor, so it's, in essence, a

10  contract amendment to our insurance policy.

11       THE COURT:  All right.  That's arguable.  The Court

12  will admit Exhibits 305 and 306.

13     (FGIC Exhibits 305 and 306 received at 3:08 p.m.)

14       MS. ENGLISH:  I've got one exhibit as well.  You'll

15  recall at the very start of these proceedings, I wanted to

16  address the admissibility of Ambac Exhibit 404, and the

17  objection that was raised by the city at that time was that

18  it -- was to authentication.  This is a document that was

19  produced by the city that was logged in its data room.  It is

20  self-authenticating under both 90 -- Rule 901 and Rule 902 in

21  that it is a public record that was posted on the Municipal

22  Securities Rulemaking Board, which is a site operating in

23  conjunction with the SEC regulating the municipal market.  It

24  is also a book, pamphlet, or other publication purporting to

25  be issued by a public authority, namely the city.

1    THE COURT:  Okay.

2    MR. SHUMAKER:  Your Honor, the city withdraws its

3 objection.

4    THE COURT:  Exhibit 404 is admitted

5      (Ambac Exhibit 404 received at 3:09 p.m.)

6    MR. GOLDBERG:  Your Honor, I also had a number of

7 exhibits to which there were objections that I'd like to

8 address.

9    THE COURT:  Go ahead, sir.

10    MR. GOLDBERG:  Maybe I'll begin with the easiest

11 one.

12    THE COURT:  Actually, if you could go in numerical

13 order, that would be the easiest thing.

14    MR. GOLDBERG:  On, no problem.  Okay.  If you don't

15 mind, your Honor, I just left one document.

16    THE COURT:  Sure.

17    MR. GOLDBERG:  1302 I'll withdraw, your Honor.  1307

18 is a newspaper article, and it along with -- and I cite

19 several newspaper articles throughout this 1307.  I cite an

20 article on 1317 on termination fees, 1318.  I would submit

21 that we are not submitting these articles for the truth of

22 the matter asserted.  The articles are being submitted

23 essentially to give background evidence on the scope of the

24 interest rate swap and LIBOR scandal; in other words, on

25 background articles on this -- issues that go to whether or

1  not a record can be made to move forward on these issues to a

2  trial later on, as I believe is the standard articulated by

3  your Honor in your ruling at the pretrial.

4         In Yarborough versus City of Warren, which is 383 F.

5  Supp. 676, the Court in the Eastern District discussed

6  specifically how newspaper articles, if they're not

7  introduced for the purposes of the truth of the matter

8  asserted but as background evidence, as background to a

9  greater understanding of viewing the concerns that are at the

10  base of the litigation, can be admissible, and that's the

11  basis for the various newspaper articles that we were

12  submitting.  They discuss the LIBOR scandal.  They discuss

13  the ISDAfix articles.  They discuss problems with termination

14  fees, and essentially they're to help the Court get a

15  background and overview on the scope of this problem to put

16  it -- help put it into the context of the particulars.

17  They're not being -- we're not asking for their admission for

18  the truth of the matter asserted, especially relative to

19  whether or not these issues occurred in this case, but they

20  go, again, to whether a record can be made at this point in

21  the proceedings to move forward on these issues to go to

22  trial later on in the bankruptcy, and so that's the basis for

23  the newspaper articles that we cited.

24         THE COURT:  Any others?  Any other exhibits you want

25  to offer now?

1          MR. GOLDBERG:  Sure.  1321 is a final judgment on

2     UBS municipal bond rigging.  We would ask the Court to take

3     judicial notice of that judgment pursuant to 90 -- to the

4     Rules of Evidence 902.

5          1324 is a public report by the U.S. Senate.  It's

6     not an expert report.  It's a public report, published --

7     public report by the U.S. Senate subcommittee on Wall Street

8     and the financial crisis.  You know, it's admissible as a

9     public report under the hearsay exceptions, and your Honor

10     has already declared that -- ruled that the issue of the

11     subprime lending crisis and its impact on the city is at

12     least arguably relevant in this case.

13          1325, again, is a Detroit Retirement Fund lawsuit

14     against UBS.  We, again, would ask the Court to take judicial

15     notice that it fits under the judicial notice requirements of

16     902.

17          1326 is, again, a public report by the City of

18     Detroit Planning & Development Department, Neighborhood

19     Stabilization, on the impact on the housing crisis in

20     Detroit.  They objected on the basis of relevance and

21     completeness.  We have attached the complete report to the --

22     to our exhibits and have provided the complete report to the

23     city prior to this proceeding, not just today, I mean when

24     the exhibits were provided, and we believe that it's clearly

25     a public report under the hearsay exceptions under 803.

1      And the Sean Werdlow biography, again, it's for

2 basically background information, but, you know, we can

3 withdraw that. There's been testimony as to that issue.

4 Those are the exhibits that I request, all the newspaper

5 articles. I would also say that newspaper articles are self-

6 authenticating under FRE 901.

7      MR. HERTZBERG: As to the exhibits -- excuse me --

8 that he's moved into -- or asked the Court to move into

9 evidence, we object on hearsay as to the newspaper articles

10 and on relevancy basis. As to Number 26, which is the

11 Planning & Development Department, Neighborhood Stabilization

12 Program, we object on relevancy grounds. On 1324, which is

13 the "Wall Street and Financial Crisis: The Anatomy of a

14 Financial Collapse," we object on hearsay and relevancy

15 grounds also, your Honor. And going back to the newspaper

16 articles, I'm confused at exactly what Mr. Goldberg was

17 saying when he said that this is for use at future litigation

18 possibly, the articles. I didn't fully understand what he

19 was saying, but they're hearsay, they're not relevant to this

20 proceeding, and they have no evidentiary value for this

21 Court.

22      THE COURT: How about the two court papers, which I

23 think were 1321 and 1325?

24      MR. HERTZBERG: Our objections to those are based

25 upon relevance, your Honor. They're not relevant to the

1  assumption motion and whether it should be approved or not

2  under 9019.

3          THE COURT:  One second.  All right.  The Court will

4  overrule the objections as to 1321, 1324, 1325, and 1326 and

5  conclude that their relevance is arguable, and because in the

6  case of 1324 it is a public document, the hearsay objection

7  is overruled.

8      (Sole Exhibits 1321, 1324, 1325, and 1326 received at

9      3:18 p.m.)

10          THE COURT:  Did you want to address the newspaper

11  articles further in response to Mr. Hertzberg's argument?

12          MR. GOLDBERG:  I just wanted to clarify that I was

13  not suggesting they're for use in future litigation.  I was

14  simply trying to express what I believe was what the Court

15  declared in its pretrial order where it essentially said that

16  this proceeding is not the trial on the substance of these

17  issues.  It's a trial to determine whether a sufficient basis

18  can be laid to move forward on these issues later in the

19  bankruptcy, and it's for that reason that I feel they

20  contribute to the Court's ability to make that kind of a

21  judgment because they are essentially background issues --

22  background articles on the issues that we've been speaking on

23  in here whether it's LIBOR fraud, whether it's SEC

24  intervention, whether it's municipal bond rigging, all these

25  kind of issues that actually Mr. Orr talked about were being

1   considered in the city's litigation, and that's the reason,

2   so they're not being offered for the truth of the matter.  I

3   didn't want to make clear that's future litigation -- I'm

4   talking about that they're relevant to the particular

5   proceeding that we are in right now in order to help the

6   Court make a proper ruling on whether there's enough to have

7   these issues move forward.  Thank you.

8          MR. HERTZBERG:  Your Honor, one last thing.  One,

9   articles of this nature are purely propaganda, and, second, I

10  don't believe the Court needs help through the use of

11  newspaper articles in making its decision on whether to

12  approve this assumption motion.  They're hearsay and

13  shouldn't be admitted.

14         THE COURT:  The Court will sustain the city's

15  objections to 1307, 1317, and 1318 on the grounds of hearsay.

16  Anything further before closing arguments?

17         MR. SHUMAKER:  Your Honor, before closing, with your

18  indulgence, the city has asked counsel for Barclays to

19  address the Court regarding the terms of the -- of Barclays'

20  commitment letter very briefly.

21         THE COURT:  Okay.

22         MR. LEVIN:  Good afternoon, your Honor.  Richard

23  Levin, Cravath, Swaine & Moore, appearing for Barclays

24  Capital, Inc., the lender in the proposed transaction.  Your

25  Honor, I'd like to address what Mr. Shumaker said, but I want

1   to make a preliminary point first, if I may.  There was a

2   colloquy between Mr. Goldberg and Mr. Orr about the terms of

3   the loan.  I'd like to be clear that Barclays will be bound

4   by the documents, not by what happens in a colloquy in the

5   courtroom, and we're not -- I didn't necessarily agree with

6   all of the colloquy.  I don't think they're consistent with

7   the documents.

8           Turning to the amendment based on the events of the

9   last few weeks, Barclays is giving two things and asking the

10  city to give two things, and we have an oral agreement that

11  is currently being documented.  We expect to have it

12  documented by the beginning of the week.  Barclays is

13  extending its commitment date from January 7, 2014, to

14  January 31, 2014, and is clarifying that in the fee letter

15  the definition of successful syndication was syndicating at

16  least $175 million of the loan, which was half of the

17  original 350.  That is going to be changed to 50 percent of

18  the actual loan amount, so it drops it significantly under

19  the circumstances.  The city is agreeing not to borrow more

20  than 285 million, and the city is agreeing that if the swap

21  termination payment is less than 165 million, the swap

22  termination loan will be reduced dollar for dollar so that

23  there will be 120 million on the quality of life loan and

24  then whatever is necessary to pay the swap termination fee up

25  to 165 million.

1          THE COURT:  Thank you, sir.

2          MR. LEVIN:  Thank you, your Honor.

3          THE COURT:  So do we want to proceed with closing

4     argument now or begin Monday morning?

5          MS. BALL:  Your Honor, I'm reminded that in opening

6     we were advised by Mr. Hackney that the objectors deserve

7     three and three quarter hours for their closing, and at that

8     time we asked to reserve our right to respond to their

9     closing given the length of it.  If that accords the Court,

10    that's what we would like to do.

11         THE COURT:  Okay.

12         MS. BALL:  It would be most helpful.

13         THE COURT:  That's fine.  All right.  So let's start

14    with the objectors' closing argument on Monday morning, and I

15    probably gave you this already, but let me give it to you

16    again.  I'm showing 207 minutes left for the objecting

17    parties and 143 for the city.

18         MS. BALL:  Thank you, your Honor.  Are we agreed

19    that the record of evidence is closed as we proceed?

20         THE COURT:  Yes.

21         MR. MARRIOTT:  Your Honor, can I ask for a

22    clarification here?  It's not typical that the party with the

23    burden goes second.  Normally, the party with the burden goes

24    first.  It seems as though the city, if I understood what Ms.

25    Ball just said, is looking to reverse and have the objectors

1  go first.  I think we're entitled to have the city go first,

2  hear their arguments, and address them in response.

3          THE COURT:  Are you concerned that they will make an

4  argument that you are not already aware of?

5          MR. MARRIOTT:  Well, Judge, there's been an awful

6  lot of evidence that has come in, and there are various ways

7  to present that evidence as part of argument.  And we may be

8  in a position, depending upon how they present certain

9  evidence as part of their argument, to rebut it in our

10  argument, and I think it's their burden to go forward, and

11  it's our ability to hear their arguments, make our own, and

12  rebut theirs if necessary.

13          MS. BALL:  Your Honor, Corinne Ball for the record,

14  Jones Day, for the city.  I think that the standard is -- I

15  disagree and would dissent from Mr. Marriott's description.

16  We have a motion, we have an objection, and we have a reply,

17  so if your Honor would prefer, we believe we have the right

18  to ultimately reply.  That is the process.  It certainly is

19  the process of this Court and the rules for submission of

20  papers.  If, however, your Honor is concerned, we could

21  commence closing and then reserve a significant portion of

22  our time to respond to what they may say, which, your Honor,

23  I believe is our right as the movant to have the final reply.

24          THE COURT:  Well, in the absence of agreement, I

25  think we should follow the ordinary trial process and have

1  closing argument with the moving party first, so that would

2  be on the city first, but, like I say, it doesn't matter to

3  me if we do that now or begin first thing Monday morning.

4          MS. BALL:  May I have a moment, your Honor?  If I

5  may, your Honor, I'd like to set out some parameters, but I

6  would also ask the Court if we might reserve some of our time

7  to reply --

8          THE COURT:  Yes, absolutely.

9          MS. BALL:  -- as, in fact, that's why we all had our

10  minutes allocated and tracked.

11          THE COURT:  That's the normal process, so that's

12  what we're going to follow.

13          MS. BALL:  Thank you, your Honor.

14                     CLOSING ARGUMENT

15          MS. BALL:  First of all, I'd like thank your Honor.

16  It has been a lengthy process, and your Honor has played

17  quite a role in reaching what the city regards as a better

18  agreement and a good outcome.  Your Honor, we have before you

19  what is a settlement essentially allowing a secured claim

20  together with a motion to borrow monies to fund the payment

21  of that settled claim and enable the city to move forward

22  with its plans to restore the viability of the City of

23  Detroit.

24          Your Honor, I'm reminded about your statements to

25  us, and I want to set them out for you at the outset.  It is

1  true and you have recognized that any 9019 presents an issue

2  that can be extremely awkward.  Should your Honor not approve

3  it, we would have to litigate it, and we would have to be

4  able to preserve our right to do so, but what should be

5  abundantly clear from these hearings that in this situation

6  that awkwardness is multiplied by a factor of a billion four

7  plus because, your Honor, one of the things the settlement,

8  should you approve it, preserves is the right of the city and

9  interested parties to continue to examine the validity of the

10  COPs and whether or not their claim should be allowed.  All

11  the settlement still preserves those rights, and that is

12  significant in terms of some burden on us in terms of the

13  awkwardness.  As your Honor observed earlier today, if you

14  look at the objectors around the table, should you fail to

15  approve or should you determine not to approve the

16  settlement, the defenders on that litigation are by and large

17  at the objector table.  FGIC, as the insurer, I'm sure would

18  be on the defense, Syncora, the counterparties.  Your Honor,

19  we've already been told since we have indicated that were

20  there to be litigation it makes sense if the settlement is

21  not approved, and your Honor has heard about the voidability,

22  to litigate the COPs and the swaps.  There is a core of

23  common facts that tie those transactions together, and as

24  your Honor has heard, the claims go to the same controlling

25  law, Act 34 and the structure of the transaction.  So, your

1  Honor, the defendants would likely also include the COPs
2  objectors, who have indicated they would involve the pension
3  systems.  So, your Honor, everyone here with the exception of
4  Mr. Goldberg and with the exception of Ms. English's client,
5  does have a real interest in these claims and how they are
6  perceived to go forward.

7          But what I thought was most concerning, your Honor,
8  is that we understand or help -- we should help you
9  understand what is the burden that we movants have to meet.
10 I think we've gone over the Bard factors most recently
11 reaffirmed in Footnote 6 in the Greektown case, Greektown
12 Casino case, this summer, but let's not forget what we also
13 learned in MQVP at the Sixth Circuit, which is that the Court
14 need not make a precise determination of the outcome since an
15 exact judicial determination would defeat the whole purpose
16 of compromising the claim.  Similarly, your Honor, we learned
17 in -- really through Judge Spector's opinions in Dow Corning
18 we know two things -- three things actually.  The Court need
19 only reach a conclusion that the proposed settlement
20 represents even the lowest point in the range of
21 reasonableness more recently cited in In re. Fodale in
22 February of this past year.  The second thing we know is that
23 the law favors compromise, and the third thing that we know,
24 which was actually established in Drexel in New York but
25 relied upon heavily by Judge Spector in Dow Corning, was that

1  a court may approve a settlement even if it believes that the

2  trustee or debtor in possession would ultimately be

3  successful at trial.  Your Honor, that is the burden that we

4  faced.  It was not to put on a mini trial but to provide your

5  Honor with a sense of the claims that were examined, the

6  facts relating to those claims, both good and bad, and the

7  strengths and weaknesses of those claims.

8           Your Honor, in this case, we have two kind of

9  competing issues, which seem to come to rest on the second of

10  the Bard factors.  Your Honor, by that I mean we not only

11  have the probability of success on the merits.  We also have

12  the continuing concern about the viability of the city, the

13  need to get on with it, not having time and not being in a

14  position of asking the residents to wait while we litigate

15  and during the term of that litigation are unable to enter

16  the capital markets and start restoring the viability of the

17  city.  Your Honor, in some respects, it's kind of

18  collectability or the second Bard factor in reverse, and I

19  think it's very important, but what I had also wanted to

20  point out to your Honor, the objectors' argument is -- and we

21  agree with them largely -- that these claims are largely

22  documentary.  We agree with them, but, your Honor, they

23  cannot turn and say these claims are largely documentary, but

24  there is no evidence except for Mr. Orr.  That clearly is

25  erroneous.  The documents -- and I am prepared to go through

1  them on a level that would demonstrate to your Honor the
2  strengths and weaknesses to which Mr. Orr referred -- are
3  also very amply supported by the evidence before you.

4          And what do I have on the other hand, your Honor,
5  before I do that?  Let's see.  We have lawyers who are
6  speculating that there was no threat to the city, that there
7  was no threat to the casino revenues, so why do the
8  settlement, yet, on the other hand, in answer to that
9  speculation, we have the testimony of Mr. Orr that he
10  considered doing nothing, and he determined, due to the cost
11  of this piece of paper and the constant threat of default,
12  that that was not a sustainable course of action for the
13  city; that they had to initiate a new approach.

14         We also, your Honor, have evidence regarding,
15  although they may choose to ignore it, what would the city
16  look like had it chose to litigate?  In fact, Mr. Malhotra
17  talked about a litigation forecast.  He didn't call it that.
18  Your Honor, he called it the no trapping, no DIP scenario or
19  scenario two in his three scenarios.  Your Honor may recall
20  that even on that scenario, which would be the equivalent of
21  obtaining an injunction to maintain the status quo during the
22  pendency of a litigation, we were in below Mr. Orr's hard
23  deck of 50 million by the second week of February, and we
24  were again in critical cash condition before long.  It is
25  true -- it is absolutely true because the city is dedicated

1    to getting on to help the residents of Detroit that those

2    forecasts did include starting the reinvestment during that

3    time period, but, your Honor, the reinvestments during that

4    time period were not substantial.  My understanding of the

5    evidence before you, your Honor, they were layered in over

6    fiscal year 2014 and were roughly 60 million, so we do know

7    what the city would look like with litigation.  We did look,

8    and we did present that evidence to the Court as opposed to

9    not looking at it.

10            Your Honor, there is absolutely no witness and no

11   evidence that litigation was compatible with the post-

12   petition financing.  What do we have instead?  Instead we

13   have the testimony of Mr. Buckfire and Mr. Doak and Mr. Orr

14   that unsecured credit was not available; that the casino

15   revenues were a critical collateral item for going forward

16   with any financing, among others, the letter of JPMorgan,

17   Exhibit 61, your Honor, that they were critical if we were

18   going to get financing, so I think we did put on evidence

19   that litigation was not compatible with a post-petition

20   financing; that, in fact, stability of the city was not

21   achievable if 20 percent of its revenues -- and I think both

22   Mr. Orr and Mr. Malhotra established that casino revenues are

23   the most stable and the largest single component of the city

24   revenues -- would be necessary as collateral.  So, your

25   Honor, so far nothing but speculation.  We have no witness

1   and no evidence from the objectors that any expert or other

2   party would have advised the city in light of all this not to

3   do this deal. In fact, we have contrary evidence. We have

4   many contrary statements regarding the need to move forward,

5   regarding the significance, if you will, your Honor, of

6   restoring stability to the city so that it could be in a

7   position to move forward and to propose a plan of adjustment.

8           Your Honor, we would think we should just stop for a

9   moment. We do not debate that there are clearly litigable

10  claims involved in settling this secured claim. We have

11  acted carefully to actually preserve some of them for going

12  forward so that other intercreditor issues can be fully

13  explored as we move forward in this Chapter 9. Our

14  recognition of the strength of these claims has been

15  reaffirmed by each of the first, second, third, fourth, and

16  fifth amendments to the FOTA's, which are Exhibits -- City

17  Exhibits 50 to 54, in which we at every turn preserve the

18  right of the city to go forth and litigate if the benefits

19  weren't going to be realized and have the opportunity to talk

20  to our creditors and to constantly reevaluate this. In fact,

21  your Honor, those amendments took us through September 23rd,

22  which is a date you may recall. On that date, your Honor, we

23  adjourned to a date to be determined, and with that, your

24  Honor, we acquired another -- I would call it walk right

25  because we had failed to obtain approval of the FOTA within

1   75 days.  So we were constantly aware and constantly

2   reevaluating and pursuing these situations because, as Ms.

3   Green pointed out, June was a very difficult time for the

4   city.  It was.  I don't think it has terrifically improved.

5   I think the financing and getting this casino revenue

6   question behind us is probably groundbreaking insofar as it

7   enables the city to move forward with what it has to do, and

8   to put what has clearly been a nonadvantageous deal behind it

9   would be a good thing, but perhaps we should take some time.

10  What have the objectors pointed out?  Well, on cash they keep

11  pointing out what was June, what was June, what was June, but

12  as I said, your Honor, the evidence in the record established

13  that we continued looking at this throughout and that, in

14  fact, again, the last look at your Honor's insistence earlier

15  this month.

16          They also pointed, your Honor -- and I think it was

17  also Ms. Green -- that in June cash was very low, but, gee,

18  now cash is upwards of roughly a hundred million at the end

19  of October.  And I think, your Honor, it's hovered about that

20  level.  How did it get there?  As your Honor is well aware,

21  11 million a month was from casino revenues.  The banks, in

22  fact, did forbear.  On the do nothing scenario, which

23  Mr. Orr, the emergency manager, in the city's interest

24  thought was terrifically short-sighted if he was going to

25  move the city forward, we got them to forbear.  We did get

1   the casino revenues. We had your Honor's assistance because

2   we clearly had people who would have appreciated a different

3   outcome on the casino revenues, some of whom are here

4   objecting, so, your Honor, we do have some cash, but even so,

5   what do we know from Mr. Malhotra in Exhibits 108 through

6   111? We know that the city's cash, even taking that into

7   account, remains tight without the post-petition financing

8   and remains stressed as long as it's paying interest on an

9   obligation that's measured by 800 million with no

10   countervailing benefit. After 2009, what has the evidence

11   established through documents? It's established that the

12   hedge had zero benefit to the city by virtue of the optional

13   termination which would have enabled the counterparties to

14   terminate the hedge and walk, and the city would never have

15   gotten an asset from this, so it's clearly a one-way street

16   where we were paying 50 million a year where alone for a

17   fraction of that amount, certainly even when we were

18   measuring it at 230, was 17 million a year, and obviously now

19   with the intervention of your Honor in mediation would be

20   even less at 165, but perhaps we should turn to Ambac and

21   their objection. Ambac, as the lead invalidity objector,

22   would have the Court see invalidating the swap under Act 34

23   as a certain and swift outcome in litigation yet even Ambac

24   admits that the key steps to the Act 34 claims -- and they go

25   to both the COPs and the swaps -- focus on the future of the

1  service contract, and they focus on the legitimacy of the

2  service corps themselves.  That seems to me, your Honor, that

3  may not be a judgment on the verdict, and one would

4  inevitably think that we have to look to the contracts, which

5  are also in evidence before you today.

6          Mr. Orr this morning alluded to some of the key

7  evidence.  He told your Honor there were facts suggesting

8  that a claim to invalidate the COPs and swaps because of a

9  failure to comply with Act 34 might succeed were premised on

10  the operation of the service corporation, no meetings, no

11  employees.  In fact, the service corps' address, according to

12  the service contracts, which are in evidence, Exhibits 128

13  and 129, are care of a law firm, Lewis & Munday.  We also

14  have the service contract terms which are in evidence as

15  Exhibits 128 and 129.  It is true that the only service

16  mentioned in the service contract, your Honor, is that the

17  service corp shall fund payments to enable debt service --

18  don't use the word "debt" -- to enable payments required on

19  the certificates of participation.  It also has a very

20  bizarre provision that upon the city bankruptcy, there's an

21  acceleration clause for -- measures the liquidated damages as

22  all amounts due under the COPs, so clearly the strength of

23  the claim -- the evidence of strengths of those claims are

24  before you.  However, there are other facts, and one of which

25  I have to thank Ms. English for putting into evidence just

1  earlier.  Your Honor heard about the city ordinance.  You've

2  heard -- you haven't heard -- and that is in the service

3  contract -- that the amounts payable are subject to annual

4  appropriation.  You saw Ms. Green's reappropriating the

5  appropriations.  Hence, debt limits don't apply, and the

6  service corporations aren't subject to swap limitations or so

7  the structure says, and the offering circular introduced by

8  Ms. English has 12-point huge type in it that this is not

9  debt of the city.  There is no full faith and credit.  This

10  is merely a service contract, and that's in the offering

11  circular which just got admitted.  There are provisions in

12  the service contract which say it's not indebtedness of the

13  city, it's not a general obligation.  The sole remedies of

14  the trust which issued the certificates of participation are

15  to sue on a contract and then seek mandamus for an

16  appropriation, so we have a lot of difficult facts to

17  overcome.  And it's interesting that we have differing views

18  on estoppel.  Maybe, maybe not.  So, your Honor, I think

19  you've seen -- you've had a fair amount of evidence on the

20  validity, the void point, and I guess we saw our first cases

21  from the objectors on void ab initio two days ago, and none

22  of them -- none of them dealt with the derivative, and none

23  of them dealt with this type of situation with a certificates

24  of participation issued by a trust.  It's not as if there

25  were a clear path there that this has been done before, this

1    could be done in short order.

2          Fraud, your Honor.  You've heard what it would take.

3    I think that no one would stand here and tell your Honor that

4    any fraud lawsuit of this magnitude could be commenced and

5    concluded within a matter of weeks.  Certainly that would

6    take a fair bit of time, so I think, your Honor, that

7    evidence has been before you both through Mr. Orr and from

8    Mr. Goldberg's submissions, that it would take a fair bit.

9    UBS clearly had multiple roles here.  The former CFO of the

10   city did join SBS, the predecessor in interest to Bank of

11   America, but, on the other hand, your Honor, the city did

12   raise a billion four on this structure, and the city did --

13   forgive me, but there's no debate that the city at the time

14   thought it had saved the city's pensions and restored their

15   financial viability, so clearly there were benefits, and

16   clearly those benefits would be taken into account.

17          I also am struck by how easily the objectors would

18   have your Honor disregard the trend in bankruptcy on a number

19   of fronts.  Your Honor, I think that I'm referring -- if we

20   went to the special revenue argument, Mr. Orr has testified.

21   Documents were also clear.  The briefs are also clear that

22   when the Gaming Control Act was enacted in the mid- to late

23   '90s, they defined gaming revenues as an excise tax.  That

24   action was totally independent of what happened in 2009.

25   Section 901(2), 902(2)(E), expressly includes excise taxes as

1   a form of special revenue.  What's interesting here is that
2   we heard about the legislative history that was, frankly, the
3   subject of Judge Bennett's opinion in one of the Jefferson
4   County decisions, and what he was really focused on in that
5   decision, your Honor, is what was the extent of the term
6   operating and maintenance expenses, so he did focus on the
7   legislative history that dealt with project debt and what the
8   meaning of operational expenses were, but what no one has
9   brought to your attention, as far as I know, is the
10  legislative history surrounding the evolution of the
11  definition of special revenues in Chapter 9.  In 1988 when
12  Chapter 9 was amended on the special revenues point -- thank
13  you to our sister city, Cleveland, among others, who were in
14  very desperate difficulties at the time -- the legislative
15  history in the Senate report were crystal clear that an
16  excise tax includes a tax on a particular activity such as a
17  motel -- use of a motel or hotel room, sale of alcoholic
18  beverages, and, your Honor, I think it's pretty clear from
19  Collier's at least, in looking at that legislative history,
20  has determined that gaming revenues are certainly likely
21  there, and both the Senate and the House share that same
22  provision.  What is funny is that the vulnerability -- those
23  would be the good facts, your Honor, on the special revenues.
24  It was argued somewhat by my colleagues from Syncora this
25  past summer.  Now, what do we have in the good facts?  City

1    code calls them excise taxes.  We have the plain meaning.

2    The legislative history clearly indicates gaming revenues

3    should be within there.  But your Honor also has the bad

4    facts.  They're documentary as well as testamentary.  The

5    collateral agreement, City's Exhibit 11.  Think about it,

6    your Honor, and I think that's the vulnerability.  It doesn't

7    operate where the special revenues directly pay the debt, and

8    928 doesn't say that has to happen, but, no, that was one of

9    the bad facts, and clearly that's in front of you, and we did

10   think about it, but at the end of the day overcoming the

11   simple plain meaning and a very clear legislative history

12   that gaming revenues should be available, it seems to us

13   gave -- put some hurdles between ourselves and setting aside

14   these liens.

15          When it came to the Gaming Act alone, your Honor, we

16   are overcoming a fair bit of evidence also in front of you in

17   terms of the city ordinances, in terms of the opinion of

18   corporation counsel, the opinion of Lewis & Munday.  What do

19   we have contrary to that evidence, which, in fact, the city

20   had to look at because it was dealing with throughout this

21   whole period what happens to 20 percent of its revenues and

22   how long would it take them to litigate it?  We have a

23   lawsuit that says pledges of gaming taxes are only allowed

24   for its roughly five to six purposes.  They can be used for

25   these permitted purposes, one of which, your Honor, is

program design to enhance quality of life and otherwise
relieve the citizens of a tax burden. Well, we have
everybody finding that paying the pensions for the public
service employees of City of Detroit was a program, was part
of a program to enhance quality of life. Is it black and
white on either side? No. We don't think so. We thought it
was litigable. Were there good facts? Yes. Were there bad
facts? Yes. I think we presented both of those to your
Honor both as a matter of documents, the opinion of Lewis &
Munday. All the elements are of it are in City Exhibit 133,
Schedule A. The opinion of the corporation counsel is in the
same place. The ordinances giving a statutory lien totally
contrary -- totally contrary to what I viewed as an
intermeddler e-mail from someone who was not there and did
not talk to anyone. The counterparties did have a statutory
lien, and they did have the opinion of Orrick, and it speaks
for itself. And that's in front of you as opposed to the
commentary from a former investment banker advisor of the
city.

Finally, your Honor, at least on the big point,
which we view the big point as the void or voidability point,
it's interesting that on this structure that hasn't been used
before, on a source of revenues that haven't been
collateralized before or attacked, that we could so readily
dismiss void or voidable. Let's talk about what that means,

1 and what does that mean in the context of dealing with what,

2 your Honor, are very protected financial contracts in

3 bankruptcy.  We have three circuit decisions within the past

4 24 months that suggest the issue of void versus voidable is

5 not entirely clear.  Moreover, we do have the Eighth Circuit

6 telling us unjust enrichment clearly voidable, clearly can't

7 go near a swap with that.  Somehow the objectors are telling

8 us that we should rely on one Bankruptcy Court opinion from

9 out of district that has been called into question by the

10 same circuit in which that Bankruptcy Court sits and by two

11 other circuits.  Your Honor, can't say it's not litigable,

12 but the concept that it would be a slam dunk in the face of

13 very well-healed adversaries seems to us a bit of an

14 overstatement.  In fact, your Honor heard about the

15 strategies that the city considered to act outside of Chapter

16 9 to sue in the early days when bankruptcy was not upon us.

17 The safe harbors were one of those reasons.

18    Your Honor, to rely on Judge Gonzalez, who I have

19 the utmost respect for, in one of his earliest opinions in

20 Enron when he said the facts surrounding a transaction are

21 critical, and we need to look at them to see if it really is

22 a financial transaction -- in that case, it was a dividend

23 under Oregon law.  He would later try the same thing when

24 holders of commercial paper would seek and pressured and

25 duressed and put a gun to the head of Enron saying redeem our

1 commercial paper because we're hearing all kinds of rumors

2 that Enron is going to fail, and Judge Gonzalez looked at it

3 and said, you know, this isn't an ordinary financial

4 situation. This is gun to the head. This is terrible. And

5 he, in fact, said that they were not protected, and, in fact,

6 the estate should go forth and sue these banks that got paid

7 on their commercial paper, actually redeemed it very, very

8 early.

9 The Second Circuit resoundingly reversed Judge

10 Gonzalez and has taken the point of view which has since been

11 reflected by both the Eighth Circuits and Judge Easterbrook

12 in the Seventh that this is an area that requires almost

13 preemption. I would say the Second Circuit's decision is

14 more on the preemption side of it, and, your Honor, by way of

15 background, that would be -- I will find you the cite, your

16 Honor, the Enron Second Circuit opinion. The Eighth Circuit

17 was in Commercial Industries, which we have cited in our

18 papers, and the Seventh Circuit was Lancelot Industries where

19 Easterbrook affirmed. Again, putting state law labels does

20 not automatically get you around suing to set aside a

21 transaction, but, your Honor, litigable. We don't disagree.

22 We thought it was litigable. We also thought that we had

23 already experienced -- and, fortunately, with your Honor's

24 assistance, we're able to overcome what happens when your

25 casino revenues are trapped because sure enough it happened

 1   when someone got instructions, and that boiled down for us to

 2   how would our swap counterparties be entitled to do that in

 3   this situation?  Are they within the exception to the

 4   automatic stay of 362(b)(17), which applies to two categories

 5   of claimants?  It applies to swap participants and financial

 6   participants.  Your Honor, there's no doubt in my mind the

 7   swap counterparties are financial participants.  Also, your

 8   Honor, there's no doubt, at least for purposes of a swap

 9   definition for bankruptcy only, that any agreement

10   providing -- and that's in 101.53(b)(6) -- anyone providing

11   credit support or enhancement for a swap, that credit

12   enhancement is considered a swap agreement.  In fact, the

13   definition says a swap agreement includes the following, and

14   it gives you a litany, and it includes any credit agreement.

15   So the city's obligations under the collateral agreement as a

16   credit support do make the counterparties at least arguably a

17   swap participant with the city, so I think we do have -- we

18   did have a risk under 362(b)(17).  We countered that.  We

19   went and said, well, what would it look like if we could get

20   an injunction to maintain the status quo and keep getting

21   those revenues?  Your Honor, there was no answer there

22   because we couldn't get a financing or at least we found no

23   ability to get the financing in the face of that.

24          Moreover, your Honor, what if someone were to ask

25   you to issue that injunction or enjoin?  Your Honor, we

thought about the roadblocks that have been erected against
Bankruptcy Courts dealing with certain kinds of contracts
and, in particular, 362(o) and 560. 362(o) basically says
that Bankruptcy Courts cannot issue a stay against swap
participants if they're doing critical actions. Your Honor,
I'm going to be very careful here because if this isn't
approved, you know we will have an answer to this one as
well, but it is a roadblock as is 560, which says as long as
swap participants are liquidating, terminating, or
accelerating by reason of a bankruptcy filing, there are very
strong limitations in what the Bankruptcy Court or the
Bankruptcy Code can do. Is it a closed door? No.
Litigable. But, your Honor, I think we've put evidence
before you regarding that statute, regarding the operation of
the collateral agreement, regarding the history in this case
with Syncora. What would it mean? Your Honor kind of meant
the following. If we were to decide to litigate, I'm going
to ask your Honor, I think, about one other characteristic
here, what the bank's choice is going to be. And to this,
your Honor, I'm turning to the insurers. Had the city
decided to litigate, the insurers could simply for the life
of their swap, much like the COP holders for the life of the
COPs, continue to try to collect payments from Syncora and
FGIC, all interesting for the swap counterparties, and we all
know FGIC, despite its plan, which by the way, your Honor,

we're not conceding those orders were enforceable on the
city, still would have given the bank some recovery, some
recovery which they have given us estimates of, which not
surprisingly are in the 60- to 65-percent range, but, your
Honor, what would we have?  We'd be fighting, so it's not
whether or not the banks are going to terminate.  We would be
fighting with Syncora and with FGIC because under their
insurance policies, they would have to defend.  And, your
Honor, as I said, if we went into the validity issues, we
would likely add all the COPs holders, and I'm sure they
would add the pensions, so, your Honor, the incentive to
settle and the prospects for litigation for the city were
evaluated and extremely so, and I think, your Honor, the
documents -- most of the good facts and bad facts are in the
governing ordinances and the documents that have been put in
evidence before you and, as you've heard from Mr. Orr, were
very much a part of his thinking in approaching and going
forward with the settlement.  All this, your Honor, against
the backdrop of what is our burden.  In the Sixth Circuit,
lowest range of reasonableness, your Honor.  And did we
apprise you of what the claims were, good facts, bad facts,
and that a judgment was made?  Your Honor, that is not the
burden of a trial.  It's not the burden of a mini trial.
Bard tells us that.  Greektown tells us that.  I don't think
there's any doubt, your Honor, that this would be a complex

1   and expensive litigation.  I think you've heard about it.  I
2   think I have shared with you, your Honor, as did the review
3   of the claims and the documents that it would involve many of
4   the constituents in this case if there were to be such a
5   litigation, and it would do it under a circumstance where the
6   city's cash lifeline was in question and under threat.  If
7   this settlement is to be approved -- and we urge the Court to
8   approve it -- that lawsuit, at least as far as it goes to the
9   COPs, remains extant, and many of these issues can still be
10  reconsidered.  We do not mean in proposing the settlement,
11  your Honor, to in any way denigrate the importance of
12  intercreditor issues.  We understand them, and we understand
13  that creditors have different agendas.  We are, however,
14  dedicated to keeping moving forward and deferring to
15  intercreditor issues when they don't defer -- when they don't
16  threaten the stability and viability of the city in terms of
17  its working capital and its finances.  And I think this
18  settlement, your Honor, demonstrates that differing decision
19  matrix.
20          As to the post-petition financing, your Honor, I
21  think that we have met our burden.  Clearly we have
22  established through the testimony of Messrs. Doak and
23  Buckfire that unsecured credit was not available, which was
24  corroborated by their very early market tests.  Your Honor
25  may recall Exhibit 61, the letter from JPMorgan.  In fact,

1  the letter from JPMorgan said the keys to any DIP financing

2  and to the city's ongoing access to capital will be the

3  strength of the security interest in certain of the city's

4  general fund revenues, and it goes on to list specifically

5  the casino revenues.  I think that the evidence has shown

6  that the city followed a robust competitive process

7  contacting over 50 people.  The city solicited 50 traditional

8  alternative sources of financing, received 16 lending

9  proposals, and ultimately negotiated commitment proposals

10 with four parties.  Your Honor, the detail of that is set

11 forth in the city's Exhibits 88 and 89, and you've heard

12 testimony from both Mr. Doak and Mr. Buckfire from Miller

13 Buckfire as well as Mr. Orr.  They also testified that on an

14 all-in cost basis, the Barclays proposal was the most

15 advantageous available to the city.  You've heard evidence on

16 that point from Mr. Buckfire, you've heard evidence on that

17 point from Mr. Doak and again today from Mr. Orr, and that

18 that remains true even if the market flex is fully executed

19 that it is the best available financing.

20       I think the evidence has also shown this morning and

21 through the testimony of Mr. Doak that the city complied with

22 Public Act 436 and the Home Rule City Act.  Both were clearly

23 involved.  PA 436 required the emergency manager to submit

24 the financing proposal to the City Council.  The emergency

25 manager did that.  Not only did he do that, he directed his

1    investment bankers to meet with each individual member of the

2    City Council and give them an opportunity to review the

3    situation and ask questions, and City Exhibit 90, your Honor,

4    clearly shows that the briefing materials did include an all-

5    in cost model and that, in fact, the testimony of Mr. Doak

6    would show that the range used in those materials did include

7    the market flex and that even if it was fully flexed, the

8    resulting range would be well within the materials shared

9    with the council members.  I think that was in Exhibit 90 and

10   in Mr. Doak's testimony.

11          Separately from that, the proposal was officially

12   transmitted to the City Council.  As your Honor knows, they

13   considered briefly an alternative financing and declined the

14   city's proposed financing but never proposed an alterative.

15   Your Honor, I think that satisfied Mr. Orr's burden under

16   436.  He then had to deal with the Home Rule City Act, and in

17   that connection, as your Honor noted back on December 18th,

18   there was an Emergency Loan Board hearing on December 20th,

19   and on that day, as is clear from City Exhibit 141, the

20   Emergency Loan Board did approve of the city's financing

21   proposal, and your Honor was also very correct that Treasurer

22   Clinton is the chair of that body, and, in fact, his

23   designee, Tom Saxton, is one of the signatories on that

24   order.  So with that I think, your Honor, that we have

25   clearly met our burden on the financing.  We are happy to

1 answer any additional questions, but we think we have met the

2 requirements for granting a lien and to enable your Honor to

3 enter the findings regarding the city's good faith.

4     Your Honor, the one point that I would like to make

5 before reserving the remainder of my time to respond is that

6 we've heard a lot of questions today about what documents

7 said and what did you understand them to mean. I think, your

8 Honor, when it comes to the forbearance agreement, it speaks

9 for itself. It is not an amendment or a waiver. It does not

10 modify the swaps. It, in essence, is an agreement strongly

11 supported by New York law to forbear, and the banks have, in

12 fact, been forbearing. Your Honor, it's an agreement that

13 changed radically in 2009. It changed radically in 2009 when

14 the four swap agreements were amended. You may ask why are

15 there four. Well, remember, there are two service corps, two

16 swap providers. Two times two is four, so that when Syncora

17 and FGIC consented to the 2009 deal -- and that consent with

18 its exhibits is also in evidence before you -- they consented

19 not once, but, your Honor, they consented four times, and

20 that amendment added what has been called the optional

21 termination provision. And I think, your Honor, that changed

22 the nature of these transactions, and it is that optional

23 termination -- it is not Section 6 -- which the forbearance

24 agreement operates on, and perhaps it would be helpful -- I

25 know your Honor has already gotten the architecture of the

1  service corps and gotten the architecture of the collateral
2  agreement and the trapping of revenues, but maybe just a
3  minute on the architecture of the swap would be helpful.
4  Swaps usually have three components.  They have the ISDA
5  master agreement which everyone uses.  They then have a
6  schedule, which takes things in or out or adds things to the
7  ISDA master schedule, which actually tailor the deal to what
8  the two counterparties want to do.  And then, thirdly, they
9  have a confirmation.

10         In this circumstance, the insurer provisions are all
11  in the amended schedules as is the optional termination.  The
12  general termination right is Section 6 of the ISDA master,
13  which then keys into these schedules.  What the forbearance
14  agreement is doing, although it is clear at least to us --
15  we're in default, we can't pay -- that should the banks want
16  to declare a termination event under Section 6, they probably
17  could have absent the forbearance agreement, but they didn't.
18  They are forbearing, and, your Honor, they're going to a
19  provision in the amended schedules which says that they can
20  terminate at any time, but they can't get paid anything from
21  the service corps.  That's what it says.

22         By way of understanding contrasts in the insurer
23  role, we turn to the confirmation in the same swaps, the
24  third piece.  The confirmation provides that, gee, you know,
25  the service corps have a termination right, too, an optional

1  termination right, but it says right there with the insurer

2  consent, the service corps may terminate, but then some

3  provisions aren't present in sections in the optional

4  termination provisions of the amended swaps, which for one

5  are 5-X in the UBS swaps and 5-2 for the SBS, now BAML,

6  swaps.

7        Your Honor, I think that the consent issues have

8  been briefed at length.  I think that the law is clear that a

9  forbearance is not an amendment at least under New York law.

10  And if your Honor has questions about how these swap

11  agreements work together, that's fine, but I also would point

12  out to your argument -- your Honor there are two other

13  arguments that I think the briefs have responded to.  One of

14  those is is this really an end run or an amendment.  Is this

15  really an end run to the fact that the service corps aren't

16  supposed to pay anything, and is it really not within the

17  optional termination because it's an impermissible assignment

18  of the right of the banks?  I think that's been briefed very

19  well not only by the banks but by ourselves, and I think the

20  answer to that is, your Honor, it is not a sale or

21  assignment.  The banks retain the rights to exercise whatever

22  they want under their swap agreements.  They only agreed to

23  forbear for a temporary period.  Certainly there has been no

24  assignment, and certainly the city does not have the

25  exclusive right to do anything.

1   Finally, your Honor, it's very interesting, at least

2 from a contractual construction point of view, that certain

3 of the objectors argue that the presence of an integration

4 clause, if you went to law school in the past ten years -- if

5 you went to law school in the past -- earlier twenty years,

6 it would have been a merger clause -- that the presence of an

7 integration clause, which is intended to exclude parol

8 evidence, ties different agreements together and says they're

9 one agreement.  Actually, your Honor, I think we need to look

10 at that one.  Here it was clearly intended to exclude parol

11 evidence.  Moreover, your Honor, forbearance agreement

12 involves the service corporations, the city, and the swap

13 counterparties.  The collateral agreement involves the city,

14 the swap counterparties, and the service corporations.  These

15 other agreements that the objectors would have us say are

16 part of one integrated agreement, different agreements,

17 different parties, different times by design and by consent,

18 so we do think it is a bit of a reach to try to integrate the

19 swap, the collateral agreement, the contract administration

20 agreement into what is merely a forbearance agreement.

21   Your Honor, with that I think that we have met our

22 burden both for the financing and for your Honor's approval

23 of the 9019.  I would be happy to answer any questions, and I

24 would like to reserve time to respond to the objectors.

25   THE COURT:  Thank you.  Stand by, please.

1          MS. BALL:  Your Honor, as a matter of housekeeping,

2     my apologies -- I do have the Enron cite.

3          THE COURT:  Go ahead.

4          MS. BALL:  The Eighth Circuit cite is 913 Fed. 2d

5     846, Contemporary Industries.  No.  That's -- I'm sorry.

6     Contemporary Industries is 564 Fed. 3d at 985, and the Enron

7     decision, your Honor, Enron, too -- oh, this is -- excuse me,

8     your Honor.  Oh, this is the opinion, your Honor.  My

9     apologies.  It's Enron Creditors Recovery versus Alfa at 651

10    Fed. 2d 329, Second Circuit, 2011.  Your Honor, the Lancelot

11    decision is also in our papers, and the Contemporary

12    Industries, as I said, is 564 Fed. 3d, and that's the Eighth

13    Circuit, 2012.

14         THE COURT:  Thank you.  All right.  By my count the

15    city now has 93 minutes remaining.  Anything else for today?

16         MR. HAWKINS:  Your Honor, a point of order.

17         THE COURT:  Sir.

18         MR. HAWKINS:  Howard Hawkins for Merrill Lynch.  We

19    intend to speak briefly on behalf of the motion.  Would your

20    Honor prefer that be Monday morning or right now?

21         THE COURT:  It's your choice, sir.

22         MR. HAWKINS:  We'd prefer Monday morning, your

23    Honor, I think, and my partner, Mark Ellenberg, who couldn't

24    be here today because of the snow, would like to give the

25    closing.  Much as I would enjoy doing it, he's probably

1  better to do it.

2          THE COURT:  All right.  Thank you, sir.  We'll

3  permit that.

4          MR. HAWKINS:  So we would do it first before the

5  objectors on Monday?

6          THE COURT:  Yes, you would.

7          MR. HAWKINS:  Thank you, your Honor.

8          THE COURT:  Anything else for today?  All right.  I

9  will see you all nine o'clock Monday morning in this room.

10         MS. ENGLISH:  Thank you, your Honor.

11         THE CLERK:  All rise.  Court is adjourned.

12      (Proceedings concluded at 4:17 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 9 | 61/109 115/123 140 | | |
| Closing Argument by Ms. Ball | | | 171 | |

| EXHIBITS: | | Marked | Received |
|---|---|---|---|
| City Exhibit 141 | | | 40 |
| City Exhibit 142 | | | 59 |
| Syncora Exhibit 230 | | | 108 |
| FGIC Exhibits 305 and 306 | | | 161 |
| Ambac Exhibit 404 | | | 162 |
| Retirement Systems Exhibit 1007 | | | 139 |
| Retirement Systems Exhibit 1023 | | 135 | |
| Sole Exhibits 1321, 1324, 1325, 1326 | | | 166 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                    January 10, 2014
_____            _____
Lois Garrett