**ITEM NO. 3**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

-------------------------------------------------------x
:
In re                           :     Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :     Case No. 13-53846
:
               Debtor.       :     Hon. _____
:
:
-------------------------------------------------------x

# DECLARATION OF KEVYN D. ORR IN SUPPORT OF CITY OF DETROIT, MICHIGAN'S STATEMENT OF QUALIFICATIONS PURSUANT TO SECTION 109(c) OF THE BANKRUPTCY CODE

# TABLE OF CONTENTS

OVERVIEW ..................................................................................................4

DETROIT'S STEADY, PRECIPITOUS DECLINE ...........................................12

    Population Loss .....................................................................................12

    The Decline of Detroit Manufacturing .....................................................13

    Bleak Employment Prospects..................................................................15

    Eroding Tax Bases & Declining Revenues ................................................16

    No Ability to Ameliorate Cash Losses by Raising Taxes............................20

CURRENT LEVELS OF MUNICIPAL SERVICES ARE INADEQUATE ........21

    High Crime Rates .................................................................................22

    Non-Functioning Street Lights ...............................................................24

    Blight .................................................................................................25

    Aging, Dysfunctional Infrastructure and Equipment:
        Police, Fire & EMS .........................................................................27

    Parks and Recreation ............................................................................29

    Information Technology .........................................................................30

CERTIFICATE OF PARTICIPATION OBLIGATIONS
    & RELATED SWAP AGREEMENTS .......................................................33

GROWING BUDGET DEFICITS ..................................................................36

INSOLVENCY ............................................................................................37

    Debt Service Requirements ....................................................................38

    Negative Cash Flow..............................................................................40

MEASURES TAKEN BY THE CITY TO
    ADDRESS FINANCIAL CHALLENGES .................................................41

    Execution of Consent Agreement/Creation of
        Financial Advisory Board .................................................................42

    Employee Headcount Reductions............................................................46

    Reductions of Labor Costs Through Implementation of CETs....................46

    Increased Corporate Tax Rate ................................................................47

    Enhanced Tax Collection Initiatives .......................................................47

Increased Lighting Rates ...................................................................48

Reductions in Vendor Costs ............................................................48

Reduction in Subsidy to DDOT.......................................................48

Deferred Capital Expenditures ........................................................48

Demolition Initiatives .....................................................................49

APPOINTMENT OF THE EMERGENCY MANAGER ......................................50

PROPOSED FINANCIAL & OPERATIONAL RESTRUCTURING.................52

Negotiations with Swap Counterparties/Insurers .........................57

Meetings with Respect to Employee Legacy Obligations.............59

Meetings with Funded Debt and Pension Representatives ...........64

Establishment of Data Room..........................................................67

BARRIERS TO REACHING AGREEMENT ....................................................68

COMMENCEMENT OF CHAPTER 9 PROCEEDINGS ..................................73

FACTS IN SUPPORT OF FIRST DAY PLEADINGS .....................................74

Motions Regarding Administrative and Procedural Matters.......76

Notice of Commencement of the Case
and Objections to Eligibility ............................................76

Case Management and Noticing Procedures.....................77

Appointment of Claims and Noticing Agent ...................78

Motions Regarding Third Party Relations....................................79

Confirmation of the Protections of the Automatic Stay....................79

Extension of the Automatic Stay to Certain Parties..........................80

Appointment of Official Committee of Retirees...............................81

Authorization of Compromise with Swap Counterparties.................82

CONCLUSION .....................................................................................83

# TABLE OF EXHIBITS

EXHIBIT A - June 14 Creditor Proposal

EXHIBIT B - Executive Summary of June 14 Creditor Proposal

EXHIBIT C - 2011 Treasury Report

EXHIBIT D - 2012 Financial Review Team Report

EXHIBIT E - 2012 Consent Agreement

EXHIBIT F - 2012 Treasury Report

EXHIBIT G - 2013 Financial Review Team Report

EXHIBIT H - Governor's Determination of Financial Emergency

EXHIBIT I - Press Release, Ambac Financial Group, July 8, 2013

EXHIBIT J - Emergency Manager Recommendation of Chapter 9 Filing

EXHIBIT K - Governor's Authorization of Chapter 9 Filing

EXHIBIT L - Emergency Manager Order Directing City to Commence
                  Chapter 9 Proceedings

I, Kevyn D. Orr, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1.  I am the emergency manager ("Emergency Manager") for the City of Detroit ("Detroit" or the "City"), the debtor in the above-captioned chapter 9 case, serving in accordance with Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws ("MCL") §§ 141.1541-141.1575 ("PA 436"). I was appointed "emergency financial manager" for the City by the Local Emergency Financial Assistance Loan Board (the "LEFALB") created under the Emergency Municipal Loan Act, MCL §§ 141.931-141.942, on March 15, 2013, pursuant to Public Act 72 of 1990 of the State of Michigan, also known as the Local Government Fiscal Responsibility Act, MCL §§ 141.1201-141.1291 ("PA 72"). I formally took office as the emergency financial manager for the City under PA 72 on March 25, 2013. On March 28, 2013, the effective date of PA 436, PA 72 was repealed, and I became the Emergency Manager of the City pursuant to sections 2(e) and 31 of PA 436 (MCL §§ 141.1542(e) and 141.1571).

2.  As Emergency Manager, in accordance with PA 436, I act for, and in the place and stead of, the City's elected mayor (the "Mayor") and city council (the "City Council"), and I exercise authority over nearly all aspects of the City's government and management, including, but not limited to, budgeting,

operations, financial affairs, contracts, appropriations, collective bargaining and the use, sale and lease of assets. In the approximately four months since I became Emergency Manager, I have become familiar with the history, day-to-day functions and operations of the City and the financial affairs of the City. My tenure as Emergency Manager may be limited. Pursuant to section 9(6)(c) of PA 436 (MCL § 141.1549(6)(c)), after at least 18 months of service, I may be removed from my position as Emergency Manager by a two-thirds vote of the City Council approved by the Mayor. Accordingly, the City does not intend to tarry in chapter 9. Rather, our objective is to implement a plan of adjustment and conclude this case no later than September 2014.

3.      As I have stated since my appointment, public health and safety is my top priority. Moreover, improving the quality of life of Detroiters is essential to the stabilization and revitalization of the City. Thus, the City's restructuring must provide a foundation for the City to begin to provide basic, essential services to its residents in a reliable fashion. Without this, the City's death spiral I describe herein will continue.

4.      In this vein, where possible, I have already moved quickly to implement necessary reforms. For example, in the short four months since my appointment, I have taken several immediate steps designed to improve public health and safety in the short term, including: (a) undertaking a critical review of

police, fire, ambulance and other emergency medical and safety-related services to develop a comprehensive plan to upgrade outdated or poorly maintained emergency vehicles, equipment and facilities; (b) taking necessary steps to ensure that the City's new command center is operating in a timely fashion; (c) issuing an order accepting the donation of new vehicles for the police, fire and emergency response teams by private sector donors; (d) hiring a new police chief for the City; (e) developing a plan to fix street lights and address the City's power grid as promptly as possible; (f) issuing an order providing for the management and monitoring of the City's Community Development Block Grant and Neighborhood Stabilization programs (among others); and (g) taking substantial steps to streamline the process for demolition of blighted structures. Additional steps are necessary and will follow.

5. Contemporaneously with the filing of its petition and this Declaration, the City has filed its: (a) Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Statement of Qualifications"), certifying that the City satisfies each of the criteria set forth in section 109(c) of title 11 of the United States Code (the "Bankruptcy Code") for determining its eligibility to be a debtor under chapter 9 of the Bankruptcy Code; and (b) Memorandum of Law in Support of Statement of Qualifications (the "Memorandum of Law"). This Declaration (along with other declarations

contemporaneously filed by the City)[1] provides a factual foundation underlying the Statement of Qualifications and the Memorandum of Law.

6.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, my discussions with City personnel and/or the City's advisors,[2] my review of relevant documents and sources and/or my opinion based upon my professional experience and knowledge of the City's history, operations and financial conditions.  If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, review of documents and sources and/or informed opinion.

## Overview

7.    After decades of fiscal mismanagement, plummeting population, employment and revenues, decaying City infrastructure, deteriorating City services and excessive borrowing that provided short term band-aids at the

---

[1]    Contemporaneously with the filing of this Declaration, the City has filed the: (a) Declaration of Gaurav Malhotra in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Malhotra Declaration"); and (b) Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code.

[2]    The City has retained numerous advisors in connection with its restructuring efforts, including:  (a) Miller Buckfire & Co. LLC, as financial advisor and investment banker; (b) Jones Day, as primary restructuring counsel; (c) Ernst & Young LLP, as financial restructuring advisor; (d) Conway MacKenzie, as operational restructuring advisor; (e) Pepper Hamilton LLP, as special litigation counsel; and (f) Miller Canfield P.L.C., as corporation and local counsel.

cost of deepening insolvency, the City of Detroit today is a shadow of the thriving metropolis that it once was.  The City does not provide basic and essential services to the residents who remain in the City.  Crime is endemic.  The City is infested with urban blight, which:  (a) depresses property values; (b) provides a fertile breeding ground for crime and tinder for fires (with the attendant disproportionate devotion of police and firefighting resources to abandoned lots); and (c) compels the City to devote precious resources to demolition.

8.     Significant additional resources are required to improve public safety before the City can begin its rehabilitation.  City operations, policies and procedures must be streamlined and overhauled to implement best practices and eliminate waste and inefficiencies.  Related to this, the City's technology systems are in desperate need of upgrades, as they have been neglected for years, and the City's systems are not integrated.  In short, the City requires substantial investment to allow it to:  (a) provide basic, essential services to current residents; (b) attract new residents and businesses to foster growth and redevelopment; and (c) ultimately begin what will be a long recovery.

9.     The City's current financial obligations prevent this recovery. The City has over $18 billion in accrued obligations – approximately $11.9 billion

in unsecured obligations to lenders and retirees[3] and over $6.4 billion in obligations backed by enterprise revenues or that are otherwise secured (collectively, the "Revenue Bonds").[4] Currently, more than $0.38 of every tax dollar that the City collects goes to service legacy debt and other obligations rather than toward providing services for the City's residents and businesses. If nothing

---

[3]     On June 14, 2013, I, along with my advisors, met with representatives of all creditor groups of the City to present information with respect to the state of the City's finances and operations and a comprehensive proposal to provide needed investment in the City and restructure the City's obligations. See City of Detroit: Proposal for Creditors, dated June 14, 2013 (hereinafter, "June 14 Creditor Proposal," attached hereto as Exhibit A and incorporated herein by reference), at 23-29 (identifying obligations consisting of approximately: (a) $5.7 billion in other post-employment benefit ("OPEB") accounting liabilities ($6.4 billion if the present value of future expected benefits is used); (b) $3.5 billion in underfunding pension liabilities; (c) $650.7 million in unsecured general obligation ("GO") liabilities (consisting of $1.13 billion in total GO debt less $479.3 million in secured GO debt); (d) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (e) $343.6 million in swap liabilities related to the COPs (collectively, the "Swap Obligations"), which liabilities were valued at $296.5 million as June 28, 2013; and (f) $300 million in other liabilities). An executive summary of the June 14 Creditor Proposal (the "Executive Summary"), also presented at the June 14, 2013 meeting with creditors, is attached hereto as Exhibit B and incorporated herein by reference.

[4]     June 14 Creditor Proposal at 23, 27 (consisting of $5.85 billion in enterprise fund debt, $479.3 million in secured GO debt and $87.8 million in miscellaneous notes payable to the federal government).

changes, that number is expected to grow to almost $0.65 of every dollar in less than five years.[5]

10.     For years, the City has spent more than it takes in and has borrowed and deferred paying certain obligations to make ends meet.  The City is insolvent.  Excluding the proceeds of debt issuances, the City has incurred operating deficits for each of the past six years through fiscal year 2013.  As of the end of the City's 2012 fiscal year,[6] the City had an accumulated unrestricted general fund deficit of $326.6 million, an increase of $130.0 million over fiscal year 2011.[7]  Excluding the impact of a recent debt issuance generating approximately $137 million in proceeds for the City, this deficit increased by an additional $47.4 million in fiscal year 2013.[8]

11.     The City also has experienced negative cash flow for years, and that trend is expected to continue and accelerate if not addressed.  The City had negative cash flows of $115.5 million in fiscal year 2012, excluding the impact of

---

[5]     Id. at 34.

[6]     References to the City's fiscal years in this Declaration are references to the 12-month period beginning on July 1st of the previous year and ending on June 30th of the referenced year.  For example, the City's 2013 fiscal year began on July 1, 2012 and ended on June 30, 2013.  The City's fiscal years are expressed herein as "fiscal year [year]" (e.g., the 2013 fiscal year is expressed as "fiscal year 2013").

[7]     June 14 Creditor Proposal at 6.

[8]     Quarterly Report with Respect to the Financial Condition of the City of Detroit, dated July 15, 2013 (the "Quarterly Report"), at 3.

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 12 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 11 of 18

proceeds from short term borrowings.[9]  In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis.[10]  Absent ongoing cash conservation steps (primarily in the form of non-payment or deferral of obligations that are due and payable and cost-cutting), the City would have run out of cash before the end of fiscal year 2013 (i.e., June 30, 2013).[11]

12.    The City had a positive general fund cash balance net of accumulated property tax distributions of $36.0 million as of June 30, 2013, but only as a result of:  (a) deferring approximately $108 million of current and prior year pension contributions (including approximately $37 million in pension contributions for fiscal year 2012 and an estimated $71 million in such contributions for fiscal year 2013); (b) drawing $10 million of the escrowed proceeds of the recent $129.5 million debt issuance; and (c) the City's recent decision not to make the scheduled $39.7 million payments due to certain pension-related service corporations, among other cash conservation measures.[12]  Absent restructuring, the City is projecting cash flows of negative $198.5 million

---

[9]    June 14 Creditor Proposal at 7.

[10]   Id.

[11]   Quarterly Report at 2.

[12]   Id.  In addition, the City for many years has deferred critical reinvestment in the City and its infrastructure due to lack of financial resources.

-8-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 13 of
330
13-53846   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 13 of 18

in the current 2014 fiscal year and negative $260.4 million in fiscal year 2015.[13]

This cash depletion would leave the City in a net cash position (after required

property tax distributions) of negative $11.6 million as early as December 2013.[14]

In the absence of restructuring, the City's net negative cash position (after required

property tax distributions) will continue its downward spiral, reaching negative

$143.3 million as of the end of the current 2014 fiscal year and negative

$404.5 million as of the end of fiscal year 2015.[15]

      13.    As noted above, the City has not been – and currently is not –

paying its debts as they come due. For example, the City has deferred payment of

pension funding contributions to both its General Retirement System ("GRS") and

Police and Fire Retirement System ("PFRS" and, together with the GRS,

the "Pension Systems"), and it accrues interest on such deferrals at a rate of 8%.

As of June 30, 2013, the City had deferred approximately $108 million in

contributions to the Pension Systems in the aggregate. In addition, to conserve

cash for City operations, including payroll, the City did not make the scheduled

---

[13]     June 14 Creditor Proposal at 50.

[14]     Quarterly Report at 3.

[15]     June 14 Creditor Proposal at 50.

$39.7 million payments under certain pension-related service contracts that were due on June 14, 2013.[16]

14.     Faced with several years of expenditures exceeding revenues, the City has taken aggressive steps to address its financial distress.  These measures included:  (a) entering into a consent agreement with the State of Michigan and the resulting creation of a financial advisory board to oversee the City's operations and conduct limited reforms; (b) reducing the number of City employees by more than 22% since fiscal year 2010;[17] (c) implementing revised City employment terms ("CETs") for non-union employees and union employees under expired collective bargaining agreements; (d) increasing certain tax and utility rates; (e) enhancing tax collection initiatives; and (f) reducing other expenditures.  By these reforms, the City estimates that it has been able to realize more than $200 million in annual savings.[18]

15.     Unfortunately, these savings have not been sufficient to balance the City's budget or improve its cash position.  Moreover, as a practical matter, the City cannot meaningfully increase revenues by raising taxes.  Citizens of Detroit already pay significantly more taxes than citizens of surrounding communities.

---

[16]     Id. at 8.

[17]     Id. at 53.

[18]     Id.

-10-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 15 of
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 14 of 15
330

The City's current tax rates are at their statutory maximums and, even if the City could raise taxes, its residents lack the financial wherewithal to bear them. Nor can the City significantly reduce expenditures at this time by further reducing employee headcount or cutting services beyond the skeleton coverage currently provided given the archaic state of the City's technological systems and certain mandates in the City's Charter. Further cuts would only further jeopardize public health, safety and welfare.

16. If left unchecked, the City's deteriorating financial condition will only get worse. The time to stop the downward spiral is now. Along with my team of advisors, I have crafted a plan to permit the City to pay its employees and its bills, live within its means, provide meaningful (but modest relative to the overall need) reinvestment in the City of approximately $125 million annually for the next 10 years,[19] satisfy secured obligations and restructure unsecured obligations. That proposed plan, the negotiations around it, the challenges confronting the City and past attempts to meet them are described in more detail below. Unfortunately, despite good faith efforts by the City to negotiate with its creditors (where such negotiations could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through this chapter 9 case.

---

[19] Id. at 61.

-11-
13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 16 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 16 of 18

## Detroit's Steady, Precipitous Decline

17.     The financial decline that has led Detroit to this debt adjustment case is not of recent origin. Rather, Detroit's decline is the product of a confluence of demographic and economic forces that have been mounting for decades.

18.     In 1952, at the height of its prosperity and prestige, Detroit – rightfully referred to as the cradle of the American automobile industry – had a population of approximately 1.85 million,[20] a 600% increase from the population in 1900.[21] Detroit's population explosion coincided with the rise of the automakers. From 1900 to 1930, Detroit was the fastest-growing city in the world and by 1929 it was the fourth-largest city in America.[22] In 1950, Detroit was building half of the world's cars.[23] During that time, half a million people came to Detroit looking for work.[24]

19.     <u>Population Loss</u>. Since its peak in the 1950s, however, Detroit has been losing both people and jobs. Detroit's population declined by nearly 45%

---

[20]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[21]    Kevin Boyle, The Ruins of Detroit: Exploring the Urban Crisis in the Motor City, 27 Michigan Historical Review 109 (Spring 2001).

[22]    Tom Bethell, Detroit's Fate: Intransigent Unions, Declining Automakers, and Poor Public Policy Have Wrecked Both Michigan and Its Largest City, 2 The American 36 (2008).

[23]    Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[24]    David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic (Mar. 12, 2012).

to just over one million as of June 1990.[25]  In the 23 years since, this population

decline has continued unabated.  Detroit's population stands at 684,799 as of

December of 2012, an astonishing 63% decline from its postwar peak of

1.85 million residents.[26]  Detroit has gone from the fifth largest city in America in

1950 to the eighteenth largest today.[27]  No other American city has experienced a

comparable decline in population over a similar period of time.[28]

      20.    <u>The Decline of Detroit Manufacturing</u>.  A considerable amount

of migration out of the City has been, and continues to be, a result of economic

dislocation.  In particular, changes in the auto industry over the years have had an

outsized impact on Detroit's economy.  Almost immediately after World War II,

Detroit began to lose manufacturing jobs as the auto companies automated their

---

[25]    <u>Compare</u> *Population of the 100 Largest Urban Places: 1950*, U.S. BUREAU OF THE CENSUS tbl.18 (June 15, 1998), http://www.census.gov/population/www/documentation/twps0027/tab18.txt (stating that the City had a population of 1,849,568 in 1950) <u>with</u> *City of Detroit Fast Facts: 1990*, U.S. BUREAU OF THE CENSUS, http://www.census.gov/history/www/through_the_decades/fast_facts/1990_new.html (stating that the City had a population of 1,027,974 in 1990).

[26]    Population and Household Estimates for Southeast Michigan, Southeast Michigan Conference of Governments (December 2012) (available at http://www.semcog.org/uploadedFiles/Population_and_Household_Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[27]    Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal (Mar. 23, 2011), *available at* http://online.wsj.com/article/SB10001424052748704461304576216850733151470.html.

[28]    Bruce Katz & Jennifer Bradley, The Detroit Project:  A Plan for Solving America's Greatest Urban Disaster, The New Republic 29 (Dec. 2, 2009).

facilities and moved their remaining jobs out of the City.[29]  Between 1947 and

1963, Detroit lost approximately 150,000 manufacturing jobs as smaller auto

manufacturers disappeared (e.g., Packard and Studebaker), and the "Big Three"

began to move operations to the suburbs and out of the state.[30]

21.    These trends only accelerated as the Detroit automakers began

to lose ground to international competitors.  Foreign automakers entered the U.S.

market during the 1950s with fuel-efficient vehicles and, when the oil crisis of

1973 hit, U.S. automakers were unprepared.  Automobile production fell nearly

30% in the next two years,[31] and the market share of U.S. automobile companies

declined from 95% in 1955 to 75% in 1980.[32]  By 2008, Detroit's share of

U.S. auto sales had declined to 47%.[33]

22.    The collapse of Detroit's manufacturing industry during the

second half of the 20th century was not limited to the automobile sector.  Non-auto

---

[29]    Kevin Boyle, The Ruins of Detroit:  Exploring the Urban Crisis in the Motor
        City, 27 Michigan Historical Review 114 (Spring 2001).

[30]    Tom Bethell, Detroit's Fate:  Intransigent Unions, Declining Automakers,
        and Poor Public Policy Have Wrecked Both Michigan and Its Largest City,
        2 The American 36 (2008).

[31]    David Lepeska, The Historical Roots of Detroit's Ruin, The Atlantic
        (Mar. 12, 2012).

[32]    Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago,
        Detroit Back from the Brink?  Auto Industry Crisis and Restructuring,
        2008-11, 36 Economic Perspectives 35 (2012).

[33]    Id.

-14-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 19 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 03:32   Page 19 of 18

companies also shuttered operations. In the 1970s and 1980s, companies such as Uniroyal, Vernor's Ginger Ale and Revere Copper closed their plants and left abandoned sites behind.[34] From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments.[35]

23. <u>Bleak Employment Prospects</u>. The demise of Detroit's industrial sector has proven catastrophic for its citizens' employment prospects. The number of jobs in Detroit (for residents and non-residents) declined from 735,104 in 1970, to 562,120 in 1980, to 412,490 in 1990, to 346,545 in 2012.[36] The "Great Recession" of the past decade dealt an especially punishing blow. Detroit's unemployment rate already stood at an alarming 16% as of June 2008.[37] When the recession took hold, the production and sales of automobiles in the U.S. cratered. Combined sales for Detroit's automakers fell from 8.1 million in 2007 to 4.6 million in 2009, with two of the Big Three and numerous parts suppliers filing

---

[34]     Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[35]     Detroit City Government Revenues, Citizens Research Council of Michigan, Report 382 (April 2013) ("<u>CRC Report</u>"), at 19.

[36]     http://library.semcog.org/InmagicGenie/DocumentFolder/ HistoricalPopulationSEMI.pdf.

[37]     City of Detroit Comprehensive Annual Report for the Fiscal Year Ended June 30, 2008, at 23 ("For June 2008, Detroit's jobless rate was 16.5%....").

for bankruptcy in 2009.[38]  The decline in production and restructuring of Detroit's

auto industry resulted in massive job cuts.[39]  Detroit's unemployment rate

skyrocketed to 23.4% as of June 2010 and remained above 18% well into 2012.[40]

The number of employed Detroit residents fell sharply, from approximately

353,000 in 2000 to less than 280,000 in 2012.[41]

      24.    <u>Eroding Tax Bases & Declining Revenues</u>.  Declines in both

population and the economy are mutually reinforcing trends.  As more people

leave the City, there is less economic activity and, thus, a decreased need for

workers.  Less economic activity and fewer jobs induce even more people to leave,

thus further reducing economic activity and exacerbating job losses.  Detroit has

been in the grip of this vicious spiral for decades, and it has taken a tremendous toll

on the City's ability to generate revenue.  Detroit's municipal income tax receipts –

traditionally the City's largest source of revenue – have decreased by

---

[38]    Thomas H. Klier & James Rubenstein, Federal Reserve Bank of Chicago, Detroit Back from the Brink?  Auto Industry Crisis and Restructuring, 2008-11, 36 Economic Perspectives 35 (2012).

[39]    <u>Id.</u>

[40]    Population and Household Estimates for Southeast Michigan, Southeast Michigan Conference of Governments (December 2012) (available at http://www.semcog.org/uploadedFiles/Population_and_Household_ Estimates_for_December_2012.pdf) (last accessed April 30, 2012).

[41]    Bureau of Labor Statistics, Local Area Unemployment Statistics, Data Chart ID: LAUPS26025003, LAUPS26025004, LAUPS26025005, LAUPS26025006.

approximately $95 million (or 30%) since 2002 and by $43 million (or more than 15%) since 2008, driven lower primarily by high unemployment and declining *per capita* income.[42]

25. Detroiters' average *per capita* annual income from 2007 to 2011 was $15,261; the median household income for that same period was $27,862.[43] During that period, an estimated 36% of Detroiters were living below the poverty line.[44] Only 54% of Detroiters owned a home, the median value of which was $71,100.[45] To put these numbers in perspective, the average *per capita* annual income in Michigan from 2007 to 2011 was $25,482,[46] the median household income was $48,669[47] and only 16% of Michigan citizens lived below the poverty

---

[42]    CRC Report, at vi. <u>See</u> June 14 Creditor Proposal at 52 (showing municipal income tax revenue of $276.5 million in fiscal year 2008 and $233 million in fiscal year 2012).

[43]    U.S. Census Bureau, State & County QuickFacts, Detroit, Michigan, http://quickfacts.census.gov/qfd/states/26/2622000.html.

[44]    <u>Id.</u>

[45]    <u>Id.</u>

[46]    <u>Id.</u>  Per capita annual income for residents of the surrounding communities of Dearborn, Livonia and Southfield are $22,816, $31,959 and $29,228, respectively.  <u>Id.</u>

[47]    <u>Id.</u>

line.[48]  The state-wide homeownership rate was 74%, and the median home value was $137,300.[49]

26.     Detroit's property tax receipts likewise have suffered.  Between 1970 and 1990, the real value of the City's property tax base declined by nearly two-thirds.[50]  This trend has reasserted itself in earnest in the wake of the Great Recession.  According to the Citizens' Research Council of Michigan, over the last five years, Detroit's assessed property values have decreased by approximately $1.6 billion.[51]  Property tax revenues for the City's 2013 fiscal year were $134.9 million, a $12.9 million (or approximately 10%) reduction from the prior fiscal year and $23.6 million (or approximately 15%) lower than the average property tax revenue for the preceding five fiscal years.[52]

27.     Ancillary taxes imposed by the City likewise have either declined or are expected to decline on a prospective basis.  Detroit is the only city in Michigan to impose a "utility users' tax" on its citizens.  The City's receipts from this utility users' tax have decreased approximately 28% over the last decade (from approximately $55.3 million in fiscal year 2003 to approximately $39.8 million in

---

[48]     Id.

[49]     Id.

[50]     Julia Vitullo-Martin, Detroit Fights Back, 5 City Journal 55 (Summer 1995).

[51]     CRC Report, at vi.

[52]     June 14 Creditor Proposal at 52, 90; Quarterly Report at Appendix B.

fiscal year 2012).[53]  Detroit is also the only municipality in Michigan authorized to

levy a casino wagering tax.[54]  Although these wagering tax revenues recently have

remained steady, the City estimates that such revenues will decrease in fiscal

year 2013 by approximately 5% and fail to recover to their fiscal year 2012 level

until fiscal year 2023 due to expected loss of market share to casinos opening in

nearby locations (e.g., Toledo and Cleveland, Ohio).[55]

       28.    Detroit receives unrestricted aid from the State of Michigan in

connection with constitutional and statutory sharing of sales tax revenue and

"economic vitality incentive payments."  Due to the City's declining population

and significant cuts by the State, Detroit's share of distributed state revenue for

fiscal year 2012 had decreased by more than $161 million (or approximately 48%)

since fiscal year 2002 and by approximately $76 million (or approximately 31%)

since 2008.[56]  Although higher projected tax revenues collected by the State are

expected to halt the decline in the City's receipt of shared revenue over the coming

fiscal years, revenue sharing payments:  (a) remain at risk of further decrease given

---

[53]     CRC Report, at vi.

[54]     Id.

[55]     June 14 Creditor Proposal at 52, 90.

[56]     CRC Report at vii.

-19-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 24 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 03:32   Page 24 of

the City's declining population; and (b) are projected to remain approximately 20% below fiscal year 2011 levels for the foreseeable future.[57]

      29.   <u>No Ability to Ameliorate Cash Losses by Raising Taxes</u>.  A number of factors render the challenges posed by the City's declining tax revenue essentially intractable.  The *per capita* tax burden on Detroit residents is the highest in Michigan, which burden is made heavier still by the residents' relative inability to pay given their level of *per capita* income.[58]  The City's income tax – 2.4% for residents, 1.2% for non-residents and 2.0% for businesses – is the highest in Michigan,[59] and Detroiters pay the highest total property tax rates of residents of Michigan cities with a population over 50,000 (inclusive of property taxes paid to overlapping jurisdictions (<u>e.g.</u>, the State; Wayne County)).[60]

      30.   In any event, the City is currently levying all taxes at the statutory maximums.[61]  In particular:  (a) Public Act 394 of 2012 of the State of Michigan fixed the City's maximum income tax rates at their current levels;[62]

---

[57]    June 14 Creditor Proposal at 52, 90 (showing state revenue sharing of $239.3 million in 2011 and projected revenue sharing between $184.3 million and $193.0 million through 2023).

[58]    <u>Id.</u> at 4.

[59]    CRC Report, at 21.

[60]    <u>Id.</u> at vi.

[61]    June 14 Creditor Proposal at 4.

[62]    MCL § 141.503(2).

-20-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 03:32   Page 25 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 24 of 48

(b) State law limits municipalities' property tax rates to 20 mills[63] and a constitutionally-required "Headlee rollback" further limits that rate to 19.952 mills (which is the rate charged by the City);[64] and (c) the utility users' tax and casino wagering tax are fixed at their current 5% and 10.9% levels, respectively, by the State statutes authorizing these Detroit-specific taxes.[65] <u>See</u> Exhibit A at 5 (comparing Detroiters' tax burden to comparable local municipalities).

### Current Levels of Municipal Services are Inadequate

31. The severe demands on the City's financial resources have left it unable to render proper services to its citizens over a 139-square mile municipal footprint that is nearly 20% larger than that of Boston, Manhattan and San

---

[63] MCL § 117.3 ("Each city charter shall provide for all of the following:" … (g) The annual laying and collecting taxes in a sum, except as otherwise provided by law, not to exceed 2% of the taxable value of the real and personal property in the city."); MCL § 117.5 ("(1) A city does not have power to do any of the following:  (a) To increase the rate of taxation now fixed by law, unless the authority to do so is given by a majority of the electors of the city voting at the election at which the proposition is submitted, but the increase in any case shall not be in an amount as to cause the rate to exceed 2%, except as provided by law, of the assessed value of the real and personal property in the city.").

[64] CRC Report, at 15.

[65] MCL § 141.1152(1) ("[t]he governing body shall set the rate of tax in increments of 1/4 of 1% that shall not exceed 5%"); MCL § 432.212(4),(6), (7) (providing for an aggregate maximum wagering tax in the amount of 10.9%).

-21-
13-53846-tit   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 17:03:52   Page 26 of
13-53846-tit   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 26 of 48 of
330

Francisco *combined*.[66]  The City's core services (e.g., police; fire; EMS; public

lighting; transportation; parks and recreation) generally are underfunded and

inadequate.  Drastic cost-cutting actions taken over the years (as described in

further detail below) have gutted many City departments, resulting in the deferral

of many necessary investments and decreasing levels of services to Detroiters.

Indeed, departments accounted for in separate funds are not self-sufficient and rely

heavily on subsidies from the general fund (e.g., Department of Transportation

(fiscal year 2013 subsidy estimated to be $60-$70 million); Public Lighting

Department (fiscal year 2013 subsidy estimated to be $20-$30 million)).  Lack of

adequate funding further results in leadership and staff positions within City

departments often going unfilled or under-filled, in part because the compensation

offered by the City often does not allow for the hiring of top talent.

> 32.  High Crime Rates.  During calendar year 2011, approximately

136,000 crimes were reported in the City; 15,245 of these were violent crimes

(e.g., homicide, forcible rape, robbery, aggravated assault).[67]  In 2012, ***the City's***

---

[66]  Financial Advisory Board Discussion Document, June 15, 2012, at 4.  The combined area of Boston, Manhattan and San Francisco is 116.96 square miles.

[67]  United States Department of Justice, Federal Bureau of Investigation, Uniform Crime Report 2011: Master File excerpts - Return A Record Cards for Group 1 and Group 3 cities (provided upon request by Criminal Justice Information Services); June 14 Creditor Proposal at 9.

*violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000.*[68] In 2011, the number of murders, non-negligent manslaughters and aggravated assaults in Detroit exceeded that of Cleveland, Pittsburgh, St. Louis and Milwaukee *combined*.[69] See Exhibit A at 9 (comparing 2011 crime data across major categories of crime for selected national and local municipalities). The City's case clearance rates for violent crimes and all crimes (18.6% and 8.7%, respectively) are substantially below that of comparable municipalities nationally and surrounding local municipalities,[70] and the response times of the Detroit Police Department are far in excess of comparable and surrounding cities.[71] See Exhibit A at 10-11 (comparing clearance rates for comparable national municipalities and certain Michigan municipalities) and 13

---

[68]  United States Department of Justice, Federal Bureau of Investigation, Uniform Crime Report 2011: Master File excerpts - Return A Record Cards for Group 1 and Group 3 cities (provided upon request by Criminal Justice Information Services); "Detroit Tops The 2012 List Of America's Most Dangerous Cities," Forbes, http://www.forbes.com/sites/danielfisher/2012/10/18/detroit-tops-the-2012-list-of-americas-most-dangerous-cities/; June 14 Creditor Proposal at 9.

[69]  United States Department of Justice, Federal Bureau of Investigation, Uniform Crime Report 2011: Master File excerpts - Return A Record Cards for Group 1 and Group 3 cities (provided upon request by Criminal Justice Information Services)**;** June 14 Creditor Proposal at 9.

[70]  City of Detroit, Detroit Police Department – Criminal Investigations Division; June 14 Creditor Proposal at 10-11.

[71]  City of Detroit, Detroit Police Department – Computer Aided Dispatch System; Federal Bureau of Investigation.

(identifying response times for the Detroit Police Department ("DPD") in 2012 and 2013).  Certain business owners have taken the extraordinary step of hiring off-duty police officers and renting police cruisers to patrol certain sections of the City underserved by the DPD.[72]

      33.   <u>Non-Functioning Street Lights</u>.  As of April 2013, about 40% of the approximately 88,000 street lights operated and maintained by the City's Public Lighting Department ("PLD") were not working, primarily due to disrepair and neglect.[73]  Many outages are attributable to burned-out bulbs, but others are the result of the obsolescence of the distribution-only electrical grid maintained by the PLD.[74]  The total of functioning street lights per square mile in Detroit generally is less than half that of comparable national municipalities.[75]  This failure in the provision of basic municipal service – the City is literally struggling to keep the

---

[72]    http://online.wsj.com/article/
SB10001424127887323916304578407662589454102.html (last accessed May 27, 2013).

[73]    June 14 Creditor Proposal at 12.

[74]    <u>Id.</u>

[75]    <u>Id.</u>; <u>see also</u> http://northcity.fox2now.com/content/st-louis-tests-new-street-lighting-option;
http://www.lafollette.wisc.edu/publications/workshops/2009/lights.pdf;
http://www.cmu.edu/rci/images/projects/led-updated-web-report.pdf;
http://www.bloomberg.com/news/2012-05-24/half-of-detroit-s-streetlights-may-go-out-as-city-shrinks.html;
http://www.cleveland.com/cityhall/index.ssf/2013/04/
cleveland_public_power_to_test.html.

lights on – is compounded by the fact that many of the street lights that *are*

working do not meet the residents' actual needs.  Functioning street lights often

serve under-populated sections of the City's historical population footprint, and

there is a backlog of approximately 3,300 complaints related to the City's

lighting.[76]

34.  <u>Blight</u>.  Perhaps no issue is as fundamental to – or emblematic

of – Detroit's decline as urban blight.  The City's long-term population decline and

falling property values have resulted in large numbers of abandoned, forfeited or

foreclosed land and structures within the City.  These decrepit eyesores

dramatically undermine Detroit's efforts to maintain public safety (as they

contribute to the proliferation of crime and arson) and contribute to declines in

property values.

35.  There are approximately 78,000 abandoned and blighted

structures in the City (approximately 20% of the City's housing stock),[77] nearly

half of which are considered dangerous.   This number increases steadily due to

---

[76]   June 14 Creditor Proposal at 12.

[77]   Kate Linebaugh, Detroit's Population Crashes, The Wall Street Journal
       (Mar. 23, 2011), *available at*
       http://online.wsj.com/article/SB100014240527487044613045762168507331
       51470.html; June 14 Creditor Proposal at 15.

-25-

13-53846-tit   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 29 of
13-53846-tit   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51 03:32   Page 29 of 38 of
330

vacancy (particularly foreclosures) and fires, among other things.[78]  Approximately

60% of the 11,000 to 12,000 fires that the City has experienced each year for the

past decade occur in blighted and unoccupied buildings, forcing the Detroit Fire

Department ("DFD") to expend a disproportionate amount of time and resources

fighting fires in vacant structures.[79]  Similarly, there are approximately

66,000 blighted and vacant parcels of real property within the City limits.[80]

36.    Compounding this problem is the fact that removing blight is an

expensive, time-consuming and highly-regulated endeavor.  The average cost to

demolish a residential structure (accounting for surveys and abatements, utility

disconnection costs, administrative costs and the demolition itself) is

---

[78]    As of April 2013, 16,700 structures within the City have been inspected and classified as dangerous, 14,263 have open complaints of being dangerous, 6,657 were scheduled to go before City Council for an order of demolition and 1,159 are considered "emergency demolitions."  See Financial Advisory Board Discussion Document, October 8, 2012, at 57; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013 (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013).

[79]    Financial Advisory Board Discussion Document, November 12, 2012, at 24; Jillian Kay Melchior, Battling Blight in Detroit, National Review Online, March 6, 2013  (available at http://www.nationalreview.com/articles/342267/battling-blight-detroit-jillian-kay-melchior) (last accessed July 16, 2013); June 14 Creditor Proposal at 16.

[80]    June 14 Creditor Proposal at 16.

approximately $8,500.[81]  The current regulatory framework – involving multiple codes and regulations and a number of jurisdictions – increases costs and slows the process.[82]

37.    <u>Aging, Dysfunctional Infrastructure and Equipment:  Police, Fire & EMS</u>.  Numerous City assets are in states of neglect and disrepair.  The infrastructure and equipment for the City's police, fire and EMS departments, in particular, are aged and inadequately maintained.

38.    The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed $1 million annually.[83]  Due to lack of funding, Detroit's firefighters are often forced to make necessary repairs to the fire stations themselves.[84]  The DFD's fire apparatus fleet is plagued with mechanical issues, contains no reserve vehicles and lacks equipment ordinarily regarded as standard.[85]

---

[81]    Financial Advisory Board Discussion Document, October 8, 2012, at 61.  <u>See also</u> Third Quarterly Report on Demolition Projects, February 28, 2013, issued by the Michigan State Housing Development Authority in cooperation with the Department of Human Services (identifying $8,500 as the per-structure cost for demolitions to date); June 14 Creditor Proposal at 17.

[82]    June 14 Creditor Proposal at 27.

[83]    June 14 Creditor Proposal at 18.

[84]    Financial Advisory Board Discussion Document, November 12, 2012, at 28.

[85]    Detroit Public Safety Foundation, Department Needs, http://www.detroitpublicsafetyfoundation.org/dfd-fire/department-needs/ (last visited Apr. 22, 2013).

-27-

13-53846-tjt    Doc 2473-2    Filed 01/14/14    Entered 01/14/14 13:03:32    Page 32 of
13-53846-tjt    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 31 of 38
330

Once staffed with 63 people and now down to 26, the DFD's Apparatus Division has a mechanic to vehicle ratio of 1 to 39, resulting in an inability to complete preventative maintenance on schedule.[86]  Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment.  The City has recently accepted donations towards the inspections of fire ladders on trucks and ground ladders because the City could not afford required inspections.[87]  Indeed, in February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."[88]

   39. The City's EMS vehicles suffer from similar problems.  During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were

---

[86] Financial Advisory Board Discussion Document, November 12, 2012, at 22; June 14 Creditor Proposal at 18.

[87] Detroit Free Press, "Detroit's New Police Chief: 'I've Come Home'", May 15, 2013 (available at http://www.freep.com/article/20130515/NEWS01/305150098/; last accessed May 17, 2013).  These donations fall well short of redressing the City's chronic inability to perform required maintenance.

[88] Elisha Anderson, Detroit Firefighters Ordered Off Ladders on Aerial Trucks; Fleet Hasn't Been Inspected in Years, Detroit Free Press (Feb. 4, 2013), http://www.freep.com/article/20130204/NEWS01/302040035/Detroit-firefighters-ordered-off-ladders-on-aerial-trucks-fleet-hasn-t-been-inspected-in-years; June 14 Creditor Proposal at 18.

-28-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 38 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 32 of

in service.[89]  Some of the City's EMS vehicles have been driven 250,000 to

300,000 miles and break down frequently.[90]  Again, the City has been forced to

accept charitable donations to upgrade its EMS fleet.  In March 2013, a group of

corporations pledged to donate approximately $8 million to the City, a portion of

which will be used to upgrade the city's fleet of EMS vehicles.[91]  Similarly, the

DPD operates with an extremely old fleet of 1,291 vehicles, a majority of which

have reached replacement age and lack modern information technology.[92]

     40.   <u>Parks and Recreation</u>.  The number of City parks is dwindling,

and many are in poor or fair condition due to lack of funding.[93]  The City closed

210 parks during fiscal year 2009, reducing its total by 66% (from 317 to 107), and

---

[89]     Steve Neavling, Major U.S. Automakers Come to the Aid of Destitute Detroit, reuters.com (Mar. 25, 2013, 10:35 AM), http://www.reuters.com/article/2013/03/25/usa-detroit-manager-idUSL2N0CH0ED20130325; June 14 Creditor Proposal at 18.

[90]     Dave LewAllen, Businesses to Donate $8 million for Detroit Police, EMS Vehicle Fleet, wxyz.com (Mar. 25, 2013), http://www.wxyz.com/dpp/news/region/detroit/businesses-to-donate-8-million-for-detroit-police-ems-vehicle-fleet; June 14 Creditor Proposal at 29.

[91]     <u>Id.</u>; June 14 Creditor Proposal at 18.  Again, these donations are not sufficient to fund all needed upgrades to the City's vehicle fleet.

[92]     June 14 Creditor Proposal at 19.

[93]     Detroit Recreation Department Strategic Master Plan, Volume II, May 2006, at 14-15, 17, http://www.detroitmi.gov/Portals/0/docs/recreation/pdf/PDF%20files/Final%20Report/Volume%20II.pdf; Detroit Free Press, Bing to announce parks and recreation cuts, closures following collapse of Belle Isle deal, January 31, 2013; June 14 Creditor Proposal at 15.

recently announced that 50 of its remaining 107 parks would be closed, another 38 would shift to limited maintenance and the already under-served Belle Isle would receive decreased services.[94]

      41.   <u>Information Technology</u>.  Nearly all of the City's departments are saddled with obsolete and non-integrated information technology ("<u>IT</u>") infrastructure and software.  The IT systems employed by the DPD and DFD: (a) are outdated to the point that vendors no longer provide full support; and (b) lack integrated solutions, resulting in redundant data entry, no meaningful reporting and limited query capabilities.[95]  DPD's IT systems, in particular, are highly manual, poorly implemented and non-integrated, resulting in highly inefficient DPD operations; the DPD has no IT systems in place *at all* for such functions as jail management, electronic ticketing and activity logs.[96]

      42.   The City's payroll systems are similarly anachronistic, resulting in massive inefficiencies and excessive costs.  The City currently uses multiple, non-integrated payroll systems that are highly manual and prone to human error

---

[94]    Huffington Post, Detroit Parks Closing: Mayor Dave Bing to Abandon 50 Recreation Areas After Belle Isle Deal Collapses, February 1, 2013, available at http://www.huffingtonpost.com/2013/02/01/detroit-parks-closing-dave-bing_n_2598938.html (last accessed July 15, 2013); June 14 Creditor Proposal at 15.

[95]    City of Detroit, Detroit Police Department Information Technology – Statement of Need, April 10, 2013, at 4.

[96]    June 14 Creditor Proposal at 20.

and erroneous payments. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category.[97] Accordingly, the City's cost of payroll administration is significantly higher than for comparable entities.[98] Current cost to process payroll is $62 per check ($19.2 million per year), which is more than four times more costly than the general average of $15 per paycheck, and almost 3.5 times more costly than other public-sector organizations, which average $18 per paycheck.[99] The payroll process involves 149 full-time employees, 51 of which are uniformed officers – meaning that highly and expensively trained and high cost personnel are performing clerical duties.[100]

43. Similar IT issues handicap the City's tax collection systems. The City's highly manual income tax collection and data management systems are simply outdated (having been purchased in the mid-1990s) with little to no automation capability; in July 2012, they were characterized as "catastrophic" by the IRS.[101] The billing, processing and collection of property taxes are likewise

---

[97] Financial Advisory Board Discussion Document, July 26, 2012, at 17.

[98] Id.

[99] Id. at 18; June 14 Creditor Proposal at 20.

[100] Financial Advisory Board Discussion Document, July 26, 2012, at 18; June 14 Creditor Proposal at 20.

[101] Financial Advisory Board Discussion Document, July 26, 2012, at 21, 23; June 14 Creditor Proposal at 20.

inefficient.  Recommendations recently received from a third-party consultant designed to increase the efficiency of the City's property tax collection process have not been implemented, and the City must rely on Wayne County for funding and the collection of delinquent property taxes.[102]

44.    The City's core financial, accounting and budgeting systems similarly suffer from the lack of modern IT.  The City's financial reporting and budget development systems:  (a) are 10 to 15 years old; (b) require a manual interface (70% of journal entries are booked manually); (c) lack reliable fail-over and back-up systems; and (d) lack a formal, documented IT governance structure, all of which impairs the reporting, efficiency and accuracy of the data and the accountability of the systems.[103]  The City's grant tracking systems are fragmented and unstandardized to the extent that the City is unable to comprehensively track citywide grant funds and status or prevent disallowed costs.[104]  Aged IT infrastructure within the City's Buildings, Safety Engineering and Environmental Department ("BSEED") and the DFD leads to bottlenecks in permit invoicing and

---

[102]    Financial Advisory Board Discussion Document, August 13, 2012, at 12; Financial Advisory Board Discussion Document, October 8, 2012, at 14.

[103]    Financial Advisory Board Discussion Document, October 8, 2012, at 17, 43; June 14 Creditor Proposal at 21.

[104]    Financial Advisory Board Discussion Document, October 8, 2012 at 42; June 14 Creditor Proposal at 21.

-32-

13-53846-tjt    Doc 2473-2    Filed 01/14/14    Entered 01/14/14 17:03:52    Page 37 of
13-53846-tjt    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 36 of 38 of
330

collection.[105] Finally, to improve both service and safety, the Detroit Department of Transportation ("DDOT") requires funding for technology updates (e.g., GPS/bus cameras) both on its buses and at DDOT facilities.[106]

### Certificate of Participation Obligations & Related Swap Agreements

45.    In 2005 and 2006, the City entered into a series of financing transactions to fund the unfunded actuarial accrued liabilities ("UAAL") related to each of the Pension Systems through arranging for the issuance of certificates of participation supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation (together, the "Service Corporations"), i.e., specially created vehicles for each of the Pension Systems.[107]

46.    As of the end of fiscal year 2012, the aggregate outstanding amount of such certificates approximated $1.45 billion and, by series, are as follows:

- Series 2005-A in the aggregate amount of $503,365,000 bearing interest at 4.50 - 4.95% (the "2005 COPs");

---

[105]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 17, 37; June 14 Creditor Proposal at 22.

[106]    Financial Advisory Board Discussion Document, October 8, 2012 at p. 27; June 14 Creditor Proposal at 22.

[107]    Comprehensive Annual Financial Report of the City of Detroit, Michigan for Fiscal Year Ended June 30, 2012 (the "2012 CAFR") at 111.

-33-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 39 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:03:32   Page 38 of

- Series 2006-A in the aggregate amount of $148,540,000 bearing interest at 5.989% (the "2006-A COPs"); and

- Series 2006-B in the aggregate amount of $800,000,000 bearing interest at a floating rate (the "2006-B COPs" and, together with the 2006-A COPs, the "2006 COPs," and the 2006 COPS together with the 2005 COPs, the "COPs").[108]

47.     Concurrently with the issuance of the 2006-B COPs, the Service Corporations entered into various pay-fixed, receive-variable interest rate swap transactions under eight separate 1992 ISDA Master Agreements (Local Currency Single Jurisdiction) (collectively, the "Swap Contracts") with either (a) UBS AG or (b) SBS Financial Products Company LLC ("SBS" and, together with UBS AG, the "Swap Counterparties"), with Merrill Lynch Capital Services, Inc. as credit support provider to SBS, with an aggregate notional amount equal to the outstanding amount of the 2006-B COPS, or $800 million.[109]

48.     The City arranged for insurance policies to guaranty certain of the payments on the Swap Contracts with the Financial Guaranty Insurance Company ("FGIC") and Syncora Guarantee Inc., as successor to XL Capital Assurance Inc. ("Syncora" and, together with FGIC, the "Swap Insurers").[110]  For instance, with respect to the policies issued by Syncora, if the Service Corporations

---

[108]     2012 CAFR at 111; 2005 COPs Offering at cover pages.

[109]     2012 CAFR at 33; June 14 Creditor Proposal at 28.

[110]     See Swap Contracts; 2005 COPs Offering Circular at 16; 2006 COPs Offering Circular at 18.

-34-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 39 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 39 of

fail to perform under the Swap Contracts, Syncora may be called upon to pay most of the quarterly swap payment, which is no more than, and can be significantly less than, $12.6 million.[111]  If the Swap Counterparty elects to terminate, Syncora is either not responsible for such payments or, if such terminations are premised on an additional termination event, then Syncora's total exposure with respect to the Swap Contracts is capped at a predetermined limit of $27 million.[112]

49.     As part of a 2009 restructuring of the City's swap obligations, the City provided collateral to the Swap Counterparties for amounts owed to them under the Swap Contracts pursuant to a Collateral Agreement dated as of June 15, 2009 (the "Collateral Agreement"), among the City, the Service Corporations, the Swap Counterparties and U.S. Bank National Association, as Custodian (the "Custodian").[113]  To secure the obligations to the Swap Counterparties, the City agreed to direct its wagering tax revenues into a lockbox account (the "General Receipts Account") pending payment each month into a

---

[111]    See XL Capital Assurance Financial Guaranty Insurance Policy Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[112]    See XL Capital Assurance Financial Guaranty Insurance Policy Nos. CA03049B, CA03049C, CA03049D and CA03049E.

[113]    City Ordinance No. 18-16; 2012 CAFR at 33; Custodian's Certificate executed by U.S. Bank National Association, dated June 26, 2009.

second lockbox account (the "Holdback Account") of one-third of the quarterly

payment next due to the Swap Counterparties.[114]

## Growing Budget Deficits

50.     The City has run substantial deficits (excluding financing

proceeds) for the last six fiscal years of approximately $128 million (2008),

$124 million (2009), $72 million (2010), $57 million (2011), $122 million (2012)

and $47 million (2013).[115]  Including the effect of recent debt issuances

(e.g., $75 million in fiscal year 2008; $250 million in fiscal year 2010;

$129.5 million in fiscal year 2013) (the "Recent Debt Issuances"), the City's

accumulated general fund deficit stood at approximately $327 million as of the end

of fiscal year 2012 and $237 million as of the end of fiscal year 2013.[116] *Excluding*

the effect of the Recent Debt Issuances (which, as an accounting matter, reduce the

amount of the accumulated deficit by an amount equal to the funds borrowed), the

City's accumulated general fund deficit:  (a) has grown continuously over an

extended period; and (b) would have been over $650 million for fiscal year 2012

and approximately $700 million for fiscal year 2013.[117]  See Exhibit A at 6

(showing the growth of the City's accumulated deficit).  Absent structural changes,

---

[114]     City Ordinance No. 18-16; 2012 CAFR at 33.

[115]     June 14 Creditor Proposal, at 52.

[116]     Quarterly Report, at 3; June 14 Creditor Proposal at 6.

[117]     June 14 Creditor Proposal at 6.

at its current run rate, the City's accumulated deficit could grow to approximately $1.3 billion by fiscal year 2017.[118]

51.     The City has funded its continuing deficits in a variety of ways, including:  (a) deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) issuance of short term and long term debt; (c) deferral of trade payments; and (d) borrowing by the general fund from other funds, deferrals and cash pooling.  As of June 30, 2013, the City's general fund had outstanding deferrals and amounts due to other funds and entities of approximately $274.3 million:  (a) approximately $53.8 million owed to other funds; (b) approximately $77.2 million of other funds' cash held in the general fund's operating account; (c) approximately $35.3 million owed to other taxing authorities; and (d) approximately $108 million in deferred pension contributions owing for the current and prior fiscal years.

### Insolvency

52.     As a result of the City's recurring operating deficits, the City has continued to experience liquidity problems as it has depleted all cash reserves. For years, the City's cash shortfalls have been addressed through the issuance of short term and long term debt.  As noted above, the City's Recent Debt Issuances

---

[118]     Id. at 91.

provided the City with approximately $460 million in proceeds.[119]  To avoid

running out of cash, in March 2012, the City borrowed $80 million on a short term,

secured basis (of which the City spent $50 million in fiscal year 2012).[120]  More

recently, the shortfalls have been addressed with deferrals of payments on current

obligations, wage cuts, employee furloughs/layoffs, cash pooling, borrowings from

other City funds and other working capital tactics.

53.  Further, the City's ability to access the credit markets to satisfy

its cash needs is compromised by its plummeting credit ratings.  The City's credit

ratings have reached historic lows and currently are below investment grade.  No

major U.S. city has a lower credit rating than Detroit.[121]  As of June 17, 2013, S&P

and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively.[122]

54.  <u>Debt Service Requirements</u>.  Debt service for the City's general

fund related to limited tax and unlimited tax GO debt and the COPs was

$225.3 million for fiscal year 2012, and is projected to exceed $247 million in

---

[119]  <u>Id.</u> at 6.

[120]  <u>Id.</u> at 7.

[121]  <u>Id.</u> at 8.

[122]  <u>See</u> Press Release, Standard & Poor's, "Detroit GO Debt Rating Lowered to
'CC' from 'CCC-' on Announced Cessation of Debt Service Payments"
(June 14, 2013); Press Release, Moody's, "Rating Action:  Moody's
Downgrades Detroit's GOULT Rating to Caa3" (June 17, 2013).

-38-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 17:03:32   Page 49 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 42 of 48

fiscal year 2013.[123]  Payments related to the COPs are forecast to increase

substantially over the next two years due to a back-loaded amortization schedule.

As set forth in the following chart, when combined with retiree legacy obligations,

these obligations consumed over 38% of revenues in fiscal year 2012 and are

projected to increase to 65% of revenues by 2017 if not stemmed.

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

See also Exhibit A at p. 52 (chart summarizing growth over time, and projected

levels, of legacy liabilities).

---

[123]  June 14 Creditor Proposal at 52; Quarterly Report at Appendix B.

55.     Going forward, amounts required to service legacy liabilities are expected to more than double.[124]  Required pension contributions are projected to increase in light of:  (a) an increasingly mature population already in pension pay status; (b) the anticipated revision of aggressive and unrealistic actuarial assumptions used in the past; (c) updated actuarial calculations; and (d) past deferrals of contributions.[125]

56.     <u>Negative Cash Flow</u>.  The City had negative cash flows of $115.5 million in fiscal year 2012.[126]  The City's preliminary estimates show positive cash flows of $31.5 million (excluding the impact of borrowings) for fiscal year 2013, but only as a result of, among other things, the deferral of nearly $108 million in pension contributions and the City's recent decision, on June 14, 2013, not to make $39.7 million in payments due and owing to the Service Corporations.[127]  As of June 30, 2013, the City had only $36 million in cash on hand (net of accumulated property tax distributions), but had outstanding deferrals (including the $108 million in deferred pension contributions referenced

---

[124]     June 14 Creditor Proposal at 52.

[125]     <u>Id.</u>

[126]     <u>Id.</u> at 7.

[127]     Quarterly Report at Appendix A**.**

above) and amounts due to other funds and entities of approximately

$274.3 million.[128]

57.     Absent restructuring, the City is projecting cash flows of

negative $198.5 million in the current 2014 fiscal year and negative $260.4 million

in fiscal year 2015.[129]  This cash depletion would leave the City in a net cash

position (after required property tax distributions) of negative $11.6 million as

early as December 2013.[130]  In the absence of restructuring, the City's net negative

cash position (after required property tax distributions) will continue its downward

spiral, reaching negative $143.3 million as of the end of the current 2014 fiscal

year and negative $404.5 million as of the end of fiscal year 2015.[131]  Accordingly,

the City (a) is not paying its debts as they come due and (b) is unlikely to be able to

service its debts in the foreseeable future.  The City is insolvent.

### Measures Taken by the City to Address Financial Challenges

58.     The City already has taken numerous steps prior to

commencing this chapter 9 case to improve its financial position, including the

adoption of various measures to reduce expenses and increase revenues.  These

initiatives save the City an estimated $200 million per year, but they also impose

---

[128]     Quarterly Report at 2, Appendix A.

[129]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 21.

[130]     Quarterly Report at 3.

[131]     June 14 Creditor Proposal at 50; Malhotra Declaration, at 22.

substantial burdens on the City's workforce and residents. The following paragraphs provide detail with respect to certain of the key actions taken by the City to alleviate its liquidity pressures and redress its lopsided balance sheet in the period leading up to the commencement of this chapter 9 case.

59.     Execution of Consent Agreement/Creation of Financial Advisory Board. On December 6, 2011, the Michigan Department of the Treasury (the "Treasury") initiated a preliminary review of the City's financial condition pursuant to former Public Act 4 of 2011 of the State of Michigan, also known as the "Local Government and School District Fiscal Accountability Act," MCL §§ 141.1501-1531 ("PA 4"). On December 21, 2011, having completed its preliminary review, the Treasury reported to the Governor of the State of Michigan (the "Governor") that "probable financial stress" existed in Detroit and recommended the appointment of a "Financial Review Team" pursuant to PA 4. See Treasury Report on Financial Condition of Detroit (the "2011 Treasury Report"), at 1 (copy attached hereto as Exhibit C and incorporated herein by reference).

60.     The Treasury's finding of "probable financial stress" was based upon the following considerations (among others):

- Violation of Uniform Budget and Accounting Act. Detroit arguably had violated Section 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968 of the State of Michigan) by failing to amend the City's general appropriations act when it became apparent that various line

items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58 million (and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97 million).  <u>Id.</u> at 1-2.

- <u>Inadequate Deficit Elimination Efforts</u>.  City officials did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010.  The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "[c]ity officials either had been incapable or unwilling to manage the finances of the City."  <u>Id.</u> at 2.

- <u>Mounting Debt Problems</u>.  The City had a "mounting debt problem" with debt service requirements exceeding $597 million in 2010 and long term debt exceeding $8 billion as of June 2011 (excluding the City's then-estimated $615 million in unfunded actuarial pension liabilities, $4.9 billion in OPEB liability and other "discretely presented component" debt).  The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1.  <u>Id.</u> at 3-4.

- <u>Risk of Termination Payment Under Swap Contracts</u>.  The Treasury identified a significant risk that the City would become subject to a demand for a termination payment (estimated at the time to be in the range of $280 million to $400 million) under its Swap Contracts.  <u>Id.</u> at 4-5.

- <u>Falling Credit Ratings</u>.  The City's long term bond rating had fallen below the BBB category and was considered "junk," speculative or highly speculative.  <u>Id.</u> at 5.

- <u>Cash Flow Shortages</u>.  The City was experiencing significant cash flow shortages.  The City projected that its cash balance of $96.1 million as of October 28, 2011 (which was nearly $20 million lower than the City's previous estimates) would be quickly eroded and that the City would experience a cash shortage of $1.6 million in April 2012 and would end fiscal year 2012 with a cash shortfall of $44.1 million absent remedial action.  <u>Id.</u>

61.    On March 26, 2012, the Financial Review Team appointed by the Governor pursuant to PA 4 submitted its report to the Governor, finding that

-43-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 49 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 48 of

"the City of Detroit is in a condition of severe financial stress … and that a consent

agreement has not been adopted [pursuant to PA 4]."  See Financial Review Team

Report on Financial Condition of Detroit (the "2012 Financial Review Team

Report"), at 1 (attached hereto as Exhibit D and incorporated herein by reference).

      62.    The Financial Review Team's finding of "severe financial

stress" was based upon the following considerations (among others):

- Increasing Budget Deficit.  Owing primarily to transfers to other funds, the City's cumulative general fund deficit for fiscal year 2011 had increased from $91 million to $148 million and the City had not experienced a positive year-end fund balance since 2004.  The City was predicting a $270 million general fund deficit for fiscal year 2012.  Id. at 7.

- Variances from Budgets.  Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures. Id. at 7-9.

- Cash Crisis.  The City was continuing to experience significant cash depletion.  The City had proposed adjustments to collective bargaining agreements ("CBAs") to save $102 million in fiscal year 2012 and $258 million in fiscal year 2013, but the tentative CBAs negotiated as of the date of the report were projected to yield savings of only $219 million.  Id. at 9-10.

- Debt Downgrades.  The City's existing debt had suffered significant downgrades.  Id. at 10.

- Failure to File Adequate Deficit Elimination Plans.  The City had not filed adequate or approvable deficit elimination plans for the 2010 or 2011 fiscal years.  Id. at 12.

63. Contemporaneously with the investigation and review of Detroit's financial condition by the Financial Review Team, in early 2012, the City and the State of Michigan negotiated a "Financial Stability Agreement" (the "Consent Agreement") in an effort to achieve: (a) financial stability for the City; and (b) a stable platform for the City's future growth. The City Council approved the Consent Agreement on April 4, 2012. The Consent Agreement subsequently was executed by the Mayor, the members of the Financial Review Team, the Treasurer of the State of Michigan (the "Treasurer") and the Governor as of April 5, 2012. See Exhibit E attached hereto and incorporated herein by reference (copy of the Consent Agreement). Having negotiated and executed a "consent agreement" within the meaning of PA 4, no emergency manager was appointed for the City despite the Financial Review Team's finding of "severe financial stress."

64. The Consent Agreement created a "Financial Advisory Board" (the "FAB") of nine members selected by the Governor, the Treasurer, the Mayor and City Council.[132] The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities.[133] The FAB has held, and continues to hold, regular public meetings and to exercise its oversight

---

[132] Consent Agreement, at §§ 1.1; 1.2.

[133] Id. at § 1.5.

-45-

13-53846-tjw Doc 2473-2 Filed 01/14/14 Entered 01/14/14 17:03:32 Page 49 of
13-53846-tjw Doc 11 Filed 07/18/13 Entered 07/18/13 21:44:51 Page 49 of
330

functions consistent with the Consent Agreement.  To implement the reform efforts set forth in the Consent Agreement,[134] the positions of "Chief Financial Officer" and "Program Management Director" were established, each reporting to the Mayor.[135]

65.    Employee Headcount Reductions.  Since 2010, the City has reduced its employee headcount by more than 2,700 (from 12,302 employees as of the close of fiscal year 2010 to approximately 9,591 as of June 30, 2013).[136]  The City estimates that its headcount reductions have resulted in annual savings of over $100 million.[137]

66.    Reductions of Labor Costs Through Implementation of CETs.  On July 12, 2012, the Financial Advisory Board approved the CETs[138] for: (a) employees in unions with expired CBAs; and (b) non-union employees, effective as of July 17, 2012.  Among other things, the CETs provide for:  (a) wage

---

[134]    Specific reform efforts are identified on Annex D to the Consent Agreement.

[135]    Consent Agreement, at §§ 2.2; 2.3.

[136]    June 14 Creditor Proposal at 53; Quarterly Report at 3.

[137]    Id.

[138]    The CETs were imposed on union employees with expired CBAs pursuant to the Consent Agreement between the City and State.  Then-in-effect PA 4 suspended the City's obligation to engage in collective bargaining upon entry of the Consent Agreement.  CBAs for approximately 80% of union employees expired as of June 30, 2012; the remaining CBAs were expired as of June 13, 2013.

reductions (implemented through the imposition of furlough days);

(b) caps/reductions on vacation/holiday pay/overtime/sick days; (c) the reduction

of pension multipliers; and (d) changes to healthcare coverage.  The City estimates

that implementation of the CETs has resulted in $102 million in annual savings

($25 million in savings attributable to wage reductions; $59 million in savings

attributable to reduced active and retiree benefits; $9 million in savings attributable

to reduced pension costs; $8 million in savings attributable to changes to work

rules).[139]

67.    <u>Increased Corporate Tax Rate</u>.  In January 2012, the City's

corporate income tax rate was raised to 2.0% from 1.0%.  This increased rate was

projected to generate an estimated $6 million in additional annual revenue for the

City.[140]

68.    <u>Enhanced Tax Collection Initiatives</u>.  The City has

implemented – and continues to implement – initiatives designed to:  (a) improve

collection of past due taxes; and (b) enhance collection efforts on a prospective

basis.  These efforts to enhance collection of taxes are expected to generate an

estimated $13 million in additional annual revenue for the City.[141]

---

[139]    June 14 Creditor Proposal at 53.

[140]    <u>Id.</u> at 54.

[141]    <u>Id.</u>

69. <u>Increased Lighting Rates</u>. In January 2013, the PLD increased its rates to more closely align with market rates and eliminate the practice of charging customers less for power than the City itself was paying. Increased PLD rates are expected to generate an estimated $9 million in additional annual revenue for the City.[142]

70. <u>Reductions in Vendor Costs</u>. The City currently is implementing an initiative to reduce its vendor related costs by 10%. Reductions in vendor costs are expected to save the City an estimated $10 million annually.[143]

71. <u>Reduction in Subsidy to DDOT</u>. In 2012, the City undertook steps to improve the efficiency of DDOT (<u>e.g.</u>, through route rationalization), thereby reducing the subsidy from the City's general fund to the DDOT enterprise fund by approximately $15 million annually.[144]

72. <u>Deferred Capital Expenditures</u>. The City has deferred capital expenditures on a number of its assets (notably its public lighting and its water and sewer system). Compare the City's average aggregate capital outlays for the last five fiscal years 2008 – 2012 ($82.98 million) with the significantly larger average

---

[142]    <u>Id.</u>

[143]    <u>Id.</u>

[144]    <u>Id.</u>

aggregate capital outlays for the five fiscal years preceding that period (2003 to 2007; $151.94 million).[145]

       73.   <u>Demolition Initiatives</u>. In April 2010, the City launched a program to take initial steps towards addressing the critical issue of urban blight within the City limits.[146] This program had the goal of demolishing 10,000 vacant structures (<u>i.e.</u>, approximately 13% of the vacant structures within the City and 26% of such buildings classified as dangerous) within three years.[147] Over 5,000 structures have been demolished, but the City lacks sufficient funding to complete the project by its target date of December 2013.[148] The City has also commenced an ancillary demolition initiative in partnership with the State of Michigan, pursuant to which $10 million has been allocated to the targeted demolition of 1,234 structures located in the vicinity of schools.[149] As of February 28, 2013, 179 structures had been demolished pursuant to this ancillary initiative (and another 56 were under contract to be demolished).[150]

---

[145]    2012 CAFR, at 194-95; June 14 Creditor Proposal at 55.

[146]    June 14 Creditor Proposal at 55.

[147]    <u>Id.</u>

[148]    <u>Id.</u>

[149]    <u>Id.</u>

[150]    <u>Id.</u>

## Appointment of the Emergency Manager

74.     In 1990, the Michigan Legislature enacted PA 72, which empowered the State to intervene with respect to municipalities facing financial crisis through the appointment of an emergency manager who, once appointed, would assume many of the powers ordinarily held by local elected officials. Effective March 16, 2011, the Legislature repealed PA 72 and enacted PA 4. Thereafter, Michigan voters rejected PA 4 by referendum on November 5, 2012, which rejection automatically revived PA 72.

75.     On December 11, 2012, because of the City's diminishing liquidity, the FAB requested that the State initiate a preliminary review of the City's financial condition pursuant to PA 72.  The Treasury reported to the Governor on December 14, 2012 that, based on its preliminary review, a "serious financial problem" existed within the City.  See Treasury Report on Financial Condition of Detroit (the "2012 Treasury Report"), at 1 (copy attached hereto as Exhibit F and incorporated herein by reference).

76.     On December 18, 2012, pursuant to PA 72, the Governor appointed another Financial Review Team to review the City's financial condition. On February 19, 2013, the Financial Review Team submitted its report to the Governor, concluding "in accordance with [PA 72], that a local government financial emergency exists with the City of Detroit because no satisfactory plan

exists to resolve a serious financial problem." <u>See</u> Financial Review Team Report

on Financial Condition of Detroit (together with "Supplemental Documentation of

the Detroit Financial Review Team," also dated February 19, 2013,

the "<u>2013 Financial Review Team Report</u>"), at 1 (attached hereto as <u>Exhibit G</u> and

incorporated herein by reference).

       77.    The Financial Review Team's finding of a "local government

financial emergency" was based primarily upon the following considerations:

- <u>Cash Crisis</u>:  The City continued to experience a significant depletion of its cash, with a projected $100 million cumulative cash deficit as of June 30, 2013.  Cost-cutting measures undertaken by the Mayor and City Council were characterized as too heavily weighted to one-time savings and non-union personnel.  <u>Id.</u>

- <u>General Fund Deficits</u>.  The City's cumulative general fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326.6 million as of June 30, 2012.  If the City had not issued substantial debt to reduce the cumulative fund balance over the last ten years, the accumulated general fund deficit would have been $936.8 million for fiscal year 2012.  <u>Id.</u> at 2.

- <u>Long-Term Liabilities</u>.  The City's long-term liabilities exceeded $14 billion as of June 30, 2013, with approximately $1.9 billion coming due over the next five years.  The City had not devised a satisfactory plan to address these liabilities.  <u>Id.</u>

- <u>Bureaucratic Structure</u>.  The City Charter contains numerous restrictions and structural details that make it extremely difficult to restructure the City's operations in a meaningful or timely manner.  <u>Id.</u>

- <u>Variances from Budgets</u>.  Audits for the City's last six fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of

knowingly overestimating revenues and underestimating expenditures. Id. at pages 5 and 6 of Supplemental Documentation.

- Weaknesses in Internal Controls. The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations. Id. at Attachment 1 to Supplemental Documentation.

78.    On March 1, 2013, in response to the 2013 Financial Review Team Report, the Governor announced his determination that a "financial emergency" existed within the City. See Exhibit H at 1 (Governor's determination of financial emergency, incorporated herein by reference). After a public hearing to consider the City Council's appeal of the Governor's determination, on March 14, 2013, the Governor confirmed his determination of a "financial emergency" within the City and requested that the LEFALB appoint an emergency manager pursuant to PA 72. I was appointed as the emergency financial manager by the LEFALB on March 14, 2013 and formally took office on March 25, 2013. On March 28, 2013, upon the effectiveness of PA 436, I became the Emergency Manager under PA 436.

## Proposed Financial & Operational Restructuring

79.    Immediately upon my appointment as Emergency Manager, I began to focus on developing a comprehensive restructuring plan to: (a) ensure that the City is able to provide or procure governmental services essential to the public health, safety and welfare of its citizens; (b) assure the fiscal accountability

-52-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 17:03:32   Page 57 of 330
13-53846   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 53 of 58

and stability of the City; and (c) promote investment in the City and revitalization of the community in a sustainable fashion. In tandem with my advisors, I have developed such a restructuring proposal, which is reflected in the June 14 Creditor Proposal.

80.     On June 14, 2013 (i.e., less than three months after formally assuming the position of Emergency Manager), at a meeting in the Detroit area, I presented the June 14 Creditor Proposal to approximately 150 invited representatives of the City's creditors, including representatives of:  (a) all of the City's funded debt; (b) the insurers of such debt; (c) all of the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders.

81.     At this meeting, my advisors and I presented the Executive Summary and attendees received the full proposal as they exited.  I also caused the full proposal and the Executive Summary to be posted publicly on the City's website the same day.[151]  The meeting lasted approximately two hours, and my advisors and I answered all questions posed by attendees.  At the conclusion of the meeting, we invited all creditor representatives to meet and engage in a dialogue with the City representatives regarding the proposal.  I indicated that I would

---

[151]     http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20 Detroit%20Proposal%20for%20Creditors1.pdf

-53-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 59 of
13-53846-tjt   Doc 21-1   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 59 of 330
330

welcome proposed modifications and alternative ideas consistent with the City's: (a) urgent need for reinvestment to improve essential City services; and (b) current and projected cash flows.[152]

82.     In addition to describing the economic circumstances and headwinds that resulted in Detroit's current financial condition, the 128-page June 14 Creditor Proposal described a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group.

83.     Among other things, the June 14 Creditor Proposal included and/or identified:

- the City's plans to achieve a sustainable restructuring through investing over $1.25 billion over ten years to improve basic and essential City services to citizens, including:  (a) substantial investment in, and/or the restructuring of, various City departments (e.g., DPD; DFD/EMS; DDOT; the Assessor's office/property tax division; BSEED; and the 36th District Court); (b) substantial investment in the City's blight removal efforts; (c) the transition of the City's electricity transmission business to an alternative provider; (d) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created Public Lighting Authority; (e) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (f) a comprehensive review of the

---

[152]     At the City's meeting with creditors on June 14, 2013, the City also announced its decision:  (a) not to make the scheduled $39.7 million payments due to certain pension related service corporations; and (b) to impose a moratorium on principal and interest payments related to unsecured debt.

City's leases and contracts; and (g) a proposed overhaul of the City's labor costs and related work rules (see June 14 Creditor Proposal, at 61-78);

- the City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates and various initiatives to improve and enhance its tax and fee collection efforts (see June 14 Creditor Proposal, at pp. 79-82);

- the City's intention to potentially realize value from the Detroit Water and Sewer Department ("DWSD") through the creation of a new metropolitan area water and sewer authority that will conduct the operations currently conducted by the DWSD pursuant to the City's concession or lease of the DWSD's assets in exchange for a recurring (and unrestricted) payment in lieu of taxes, lease payment or other form of payment (the "Proposed DWSD Transaction") (see June 14 Creditor Proposal, at pp. 83-86);

- the potential realization of value from City-owned assets currently exhibited and/or housed at the Detroit Institute of Arts (see June 14 Creditor Proposal, at pp. 88);[153]

---

[153] The City has made no decisions regarding the treatment of any particular asset. The City's intentions with respect to the City-owned assets exhibited and/or stored at the Detroit Institute of Arts and managed by the non-profit DIA Corporation has generated a significant amount of controversy and media attention. The Attorney General for the State of Michigan has issued a formal opinion expressing his belief that such assets are held in a public trust for the benefit of the City's residents. The City's creditor constituencies have expressed contrary views, taking the position that all non-essential City assets should be made available for their recoveries. The City reiterates its intention (previously expressed in the June 14 Creditor Proposal) to continue to: (a) engage all interested parties in dialogue regarding the City-owned art collection; (b) attempt to reconcile the competing positions expressed by such parties; and (c) reach a resolution with respect to such assets that will maximize the long term benefits to the City and the prospects for a successful restructuring.

- the City's commitment to evaluate what value may be realized from other City assets (e.g., City-owned real property; municipal parking operations; the Detroit-Windsor Tunnel; and Belle Isle Park) (see June 14 Creditor Proposal, at pp. 87-89);

- the City's projected financial statements over a ten-year period and the assumptions underlying those projections (see June 14 Creditor Proposal, at pp. 90-100); and

- the City's actual and forecasted cash flows for the 2013 and 2014 fiscal years in the absence of restructuring (see June 14 Creditor Proposal, at pp. 49-50).

84.     The June 14 Creditor Proposal further suggested the City's good faith view of stakeholders' recoveries upon their various claims based upon the City's actual and projected financial condition. The City proposed: (a) treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its Revenue Bonds, secured unlimited and limited tax GO bonds, secured installment notes and liabilities arising in connection with the Swap Obligations; and (b) the *pro rata* distribution of $2 billion in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax GO bonds; the Service Corporations (on account of the COPs); the Pension Systems (in account of pension underfunding); retirees (on account of OPEB benefits); miscellaneous other unsecured claimants) with the potential for amortization of the principal of such notes in the event that, e.g., future City

revenues exceeded certain thresholds, certain assets were monetized and/or certain grants were received.  See June 14 Creditor Proposal, at pp. 101-109.

85.     Having provided the facts and strategies contained in the presentation to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the commencement of this case.  At these meetings, further data and legal viewpoints were exchanged and many questions were answered; however, no meaningful progress toward a comprehensive resolution of the City's obligations occurred. Importantly, following the June 14 presentation, the City:  (a) sought a resolution of various issues related to its pension-related Swap Contracts through extensive negotiations with the Swap Counterparties thereto and the insurers of the Swap Obligations; and (b) held several follow-up meetings with various creditor representatives.

86.     Negotiations with Swap Counterparties/Insurers.  In March 2012, the City suffered ratings downgrades with respect to its unlimited tax GO bonds, which again gave rise to the risk that the Swap Counterparties could terminate the Swap Contracts and seek a termination payment from the City. As reported in the 2012 CAFR, the City commenced negotiations with the Swap Counterparties to resolve issues arising in connection with the credit rating downgrade.

-57-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:52   Page 62 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 61 of 68

87.     Following my appointment, discussions with the Swap Counterparties intensified to find a resolution that would enable the City to exit the Swap Contracts with no impact on the Swap Insurers and assure the City continued access to the wagering tax revenues.  The negotiations included:  (a) several in-person and telephonic meetings among the City, Swap Counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.

88.     Despite the significant time and effort devoted to reaching a resolution that would permit the City access to the wagering tax revenues, following the assertion of alleged rights by Syncora, the City's access to funds was blocked, and the negotiations with the Swap Counterparties stalled.  Accordingly, the City acted to protect its interests and preserve its access to its wagering tax revenues – a critical funding source for the City – by commencing litigation against Syncora (among others) in the Circuit Court for Wayne County, Michigan to seek:  (a) the release of revenues held by U.S. Bank as custodian; and (b) the recovery of damages suffered by the City due to Syncora's interference with its banking relationships.  In connection with that proceeding, I submitted an affidavit in support of the City's Verified Complaint for Declaratory and Injunctive Relief, which contains additional factual background concerning the Swap Contracts,

Collateral Agreement and related matters. On July 5, 2013, the City obtained a temporary restraining order against Syncora and U.S. Bank, thus temporarily preserving its access to wagering tax revenues.

89.     Following those activities, the City was able to make timely payment on the Swap Obligations, making the required deposit into the Holdback Account and triggering the release of wagering tax revenues to the City. Concurrently, the City was able to restart negotiations with the Swap Counterparties. Negotiations culminated in the Forbearance and Optional Termination Agreement, dated as of July 15, 2013, by and among the City, the Swap Counterparties and the Service Corporations, which agreement is the subject of a motion, filed contemporaneously with this Declaration, seeking approval to assume such agreement and compromise the issues regarding the validity and enforceability of the pledge and lockbox arrangements with respect to the wagering tax revenues.

90.     <u>Meetings with Respect to Employee Legacy Obligations</u>. Both prior to and after my appointment, many of the City's financial and legal advisors have been analyzing the City's retiree healthcare and pension obligations. These advisors have been developing ideas for restructured programs that would preserve healthcare and retirement benefits for retirees, to the extent feasible, in a structure

that the City will be able to afford in light of its projected cash flows and other critical needs over the next decade.

91.     On June 20, 2013, certain of these advisors met in Detroit with representatives of all of the City's unions and four retiree associations. These meetings were conducted in discrete morning and afternoon sessions (addressing "non-uniformed" and "uniformed" personnel/retirees, respectively) at which the City: (a) presented a more in-depth look at its analysis of its retiree health and pension obligations; and (b) suggested proposals for the modification thereof that the City could fund within its means going forward. Representatives and advisors of the Pension Systems attended both meetings.

92.     Approximately 100 union and retiree representatives attended the two-hour morning session for non-uniformed employees and retirees. Questions were solicited, and the City's advisors answered as many of them as could be answered before the meeting time concluded. Approximately 35 union and retiree representatives attended the afternoon session for uniformed employees and retirees, which lasted approximately 90 minutes. Questions were solicited, and the City's advisors answered all questions posed. The City provided handouts of the presentations at both meetings and, after the meetings, posted such presentations in the Data Room (as such term is defined below) that the City has

-60-

13-53846-tit   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 66 of
330
13-53846-tit   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 65 of 88

established as a repository for information that creditors may find relevant in their evaluation of the City's proposals.

93.     Both at the beginning and at the conclusion of each meeting, the City's advisors stressed that the City welcomed the unions' and retirees' views. Because the modifications proposed by the City are dramatic (albeit necessary), the City clearly expressed its desire to engage in a dialogue regarding the unions' and the retirees' preferred approach to address the required changes that are expected to be severely dislocating for retirees.

94.     Understandably, the employees' and retirees' reactions to these meetings were less than enthusiastic; there were expressions of distress and, in some cases, anger.[154] Certain union representatives publicly called for litigation and swore that they would not countenance discussions over proposals to modify either retiree healthcare or pensions.[155] Others took a more constructive

---

[154]     See, e.g., See, e.g., Detroit Free Press, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting a district clerk for the City's Department of Public Works and a member of the Association of City of Detroit Supervisors; "That was the biggest crock of crap I've ever heard in my life. They're talking about freezing our pensions. I just feel like crying."); Bloomberg News, "Detroit Manager Outlines Pension-Cut Plans for Workers," June 21, 2013 (quoting union official: "People are angry because it's the same old horse crap - it's their way or the highway.").

[155]     See, e.g., Detroit Free Press, "Kevyn Orr orders corruption probe of pensions, benefits; unions vow fight against cuts," June 20, 2013 (quoting the president of Amalgamated Transit Union Local 26: "We'll fight you in

-61-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 66 of
13-53846-tjt   Doc 1173   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 66 of
330

approach.[156]  On June 27, 2013, the City's advisors contacted all union representatives that had attended any prior presentations by, or meetings with, the City and/or its advisors to invite additional requests for information and diligence from such parties.

95.    On July 10, 2013, the City and certain of its advisors held separate meetings with:  (a) representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations; and (b) representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours.  The purposes of each meeting were to:  (a) provide additional information on the City's pension restructuring proposal; and (b) discuss a process for reaching a consensual agreement on (i) pension

---

court.  We'll probably stand a better chance, because one thing about a bankruptcy judge, he's not going to feed into all this nonsense stuff…. If you're going to come, you're going to have to come correct in bankruptcy court"; quoting union official:  "This is not a bargaining session.  We're not bargaining with them at this point.  They really didn't have a legitimate proposal.").

[156]    See, e.g., Bloomberg News, "Detroit Manager Outlines Pension-Cut Plans for Workers," June 21, 2013 (quoting the President of the Detroit Fire Fighters Association:  "We have to go back and deliberate and come back with some form of unified response.  This is reality, we're trying to find the best way, if possible, to work together and come to a solution for the city.").

-62-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 67 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 66 of 58

underfunding issues and (ii) the treatment of any related claims.[157]  At each

meeting, the parties generally discussed:  (a) the actuarial assumptions underlying

the Pension Systems' claims related to underfunding (and that will be used for

funding purposes going forward); (b) the City's prospective ability to make

contributions to the Pension Systems; and (c) adjustments to pension benefit design

necessary to reduce liabilities, and consequent underfunding, to a level that will

allow the City to fund the Pension Systems going forward.

96.     On July 11, 2013, the City and its advisors held separate

follow-up meetings with representatives and advisors for:  (a) select non-uniform

unions and retiree associations and the GRS; and (b) certain uniformed unions and

retiree associations and the PFRS to discuss retiree health issues.  At each of these

meetings, the City's advisors reviewed the proposals for the modification of retiree

health benefits that previously had been presented and discussed at the prior

---

[157]     In light of certain lawsuits recently filed against the Governor and the
Treasurer in which the City has an interest (described in further detail at
paragraph 109 below), the City requested, at each meeting, that any
statements made during the respective meetings, and the conduct of the
parties at such meetings, not be introduced in any court proceeding in
accordance with Rule 408 of the Federal Rules of Evidence ("FRE") and
Rule 408 of the Michigan Rules of Evidence ("MRE").  Representatives of
the United Auto Workers and its counsel – who attended the City's meeting
with the GRS – refused to comply with this request and were asked to, and
did, leave that meeting.  All other attendees at each meeting agreed to adhere
to FRE 408 and MRE 408, but reserved all rights to argue that the meetings
could not be protected from disclosure to a court under those rules.

meetings on June 20, 2013. Further information describing, among other things, the premium costs of proposed replacement health insurance (which costs would be an obligation of the City) and key benefit plan design terms was distributed to all attendees. The meeting with uniformed unions and PFRS personnel involved an extensive (and relatively heated) question and answer session, which session primarily addressed retiree concerns over: (a) the lack of replacement coverage in the City's proposal for retirees under the age of 55; and (b) the vesting of certain pensions in the event the PFRS were frozen.

        97.   <u>Meetings with Funded Debt and Pension Representatives</u>. On June 25, 2013, the City's advisors and my Senior Advisor staff member held meetings in New York for representatives and advisors for: (a) all six of the insurers of the City's funded bond debt (any such insurer, a "<u>Bond Insurer</u>"); (b) the Pension Systems; and (c) U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed: (a) the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal (together with the assumptions and detail underlying those projections and cash flows); (b) the City's contemplated reinvestment initiatives and related costs; and (c) the retiree benefit and pension information and proposals that had been presented to

-64-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 69 of
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 68 of
330

the City's unions and pension representatives on June 20, 2013. All questions asked were answered.

98. Also on June 25, 2013, the City's advisors held a discrete meeting with U.S. Bank and its advisors to discuss: (a) the City's intentions with respect to the DWSD (and the special revenue bond debt related thereto); (b) the City's proposed treatment of its general obligation debt (including the COPs); and (c) various other issues raised by U.S. Bank.

99. In addition, on June 26, 2013, and June 27, 2013, the City's advisors held individual follow-up meetings with each Bond Insurer that requested one.[158] On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation ("Ambac") in a 90-minute meeting. Financial Guaranty Insurance Corporation ("FGIC") had originally requested a meeting for June 26, 2013 but subsequently cancelled. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation ("Assured Guaranty") in a 90-minute meeting.

---

[158] In addition, at the request of National Public Finance Guarantee Corporation ("NPFGC"), the City's restructuring counsel and investment banker met with NPFGC's advisors on June 20, 2013.

100.    At these various meetings with the Bond Insurers, the City's advisors discussed many aspects of the June 14 Creditor Proposal, including but not limited to: (a) the treatment of GO debt; (b) legal issues related to the Swap Contracts; (c) the City's contemplated restructuring and reinvestment initiatives; (d) urban blight; and (e) potential asset dispositions. The City team answered all questions posed by the Bond Insurers. The City team invited counterproposals or alternative views on the June 14 Creditor Proposal that were consistent with the City's current and projected financial condition.

101.    On July 9-10, 2013, the City and its advisors held follow-up diligence sessions in Detroit with representatives and/or advisors of NPFGC, Ambac, FGIC, Assured Guaranty, Syncora and the Pension Systems. At these sessions, the City generally addressed its baseline 10-year business plan and its proposed restructuring and reinvestment initiatives. Key discussion points included: (a) the City's revenue forecasts (and the assumptions and detail underlying the same); (b) alternatives with respect to taxation and increasing the City's attractiveness to private investment; (c) the restructuring of, and reinvestment in, key City departments, the cost of such reinvestment and the assumptions and detail underlying the City's proposal; (d) the City's proposal for addressing its urban blight; (e) the structure of the limited recourse participation notes proposed to be provided to unsecured creditors by the City; (f) the City's

knowledge of the State's position with respect to the City's restructuring; and

(g) logistical matters (u.g., timing; access to information). The City answered all

questions posed by the attendees and invited requests for further diligence and

analyses.

102. On July 12, 2013, the City's advisors met with advisors to the

Pension Systems to discuss: (a) the Proposed DWSD Transaction (and,

particularly, the amount of any recurring payment that would be received by the

City in connection therewith); and (b) the implications of such transaction for the

Pension Systems.

103. On July 17, 2013, the City and its advisors held separate

meetings with representatives and advisors for NPFGC and Assured Guaranty to

discuss: (a) the Proposed DWSD Transaction (and, particularly, the amount of any

recurring payment that would be received by the City in connection therewith);

(b) the City's proposed restructuring of the special revenue debt related to the

DWSD (as set forth at pages 101-102 of the June 14 Creditor Proposal); and (c) the

insurers' response to the foregoing. Each meeting lasted approximately two hours.

104. Establishment of Data Room. In early June 2013, Miller

Buckfire & Co., LLC ("Miller Buckfire"), the City's financial advisor and

investment banker, established an online database (the "Data Room") to facilitate

creditors' timely access to documents containing information relevant to the City's

proposed restructuring actions, as well as the City's past, present and projected financial performance. Shortly thereafter, beginning on June 21, 2013, Miller Buckfire began issuing usernames and passwords to creditors' representatives and advisors so that they could view the documents posted to the Data Room. As of July 15, 2013, the Data Room contained 320 documents and over 68,000 pages of information. Since that time, the City has continued to upload documents that address a range of issues, including information relating to current and former employees and retirees. The City will continue to populate the Data Room as additional documents become available or specific information requests are received.

## Barriers To Reaching Agreement

105.    The City cannot practicably negotiate a consensual restructuring with any of its key constituencies in an out-of-court setting. The pool of potential creditors in this chapter 9 case is vast. The City estimates that the number of employees, retirees, vendors, bondholders, insurers and other parties in interest in this case reaches into the many tens of thousands (and that many of these creditors are presently unknown and unidentified). Collectively, these parties hold claims against the City in the amount of more than $18 billion. Moreover, some of the largest components of the City's debt — including, for example, the City's actuarially accrued $6.4 billion in unfunded other post employment benefit

-68-
13-53846-tit    Doc 2473-2    Filed 01/31/14    Entered 01/31/14 21:44:51    Page 78 of
13-53846-tit    Doc 11    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 73 of 68
330

obligations[159] — are fragmented among numerous individuals as opposed to being centralized with a single entity.

106. With respect to the City's retirees, many of the unions have taken the position that they do not and cannot represent their former members who are current retirees. It is my understanding that, absent their consent, the approximately 20,000 retirees entitled to receive retiree healthcare and pension benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete bargaining units of the 28 unions that might represent these retirees.[160] Moreover, even if such retirees were willing to be bound by the City's negotiations with its various bargaining units (which is unlikely), the majority of those units have expressly refused to represent such retirees.[161] Despite

---

[159]   June 14 Creditor Proposal at 35.

[160]   At least four retiree associations also provide voluntary membership to retirees of the City's unions.

[161]   Prior to the commencement of this chapter 9 case, the City sent letters to each of its unions to determine whether they are willing to represent their respective retirees in connection with the City's restructuring. As of the date hereof, eight unions (comprising ten bargaining units) offered to represent their retirees in restructuring discussions. Thirteen unions (comprising 28 bargaining units) have expressly indicated that they are *unwilling* to represent their retirees. Another seven unions (comprising nine bargaining units) have neither explicitly agreed nor refused to represent their retirees. The City also sent letters to each of the retiree associations to determine whether they are willing to represent union retirees in connection with the City's restructuring. Two associations – the Detroit Retired City Employees Association and the Retired Detroit Police and Fire Fighters Association –

-69-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 74 of
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 74 of
330

the City's best efforts to organize the retirees prior to the commencement of this chapter 9 case, most retirees remained unrepresented in negotiations.  Accordingly, the negotiation of changes to pension and retiree benefits with the City's retiree constituency – changes that are critical to any restructuring of the City given the approximately $9 billion owed to these constituencies – is impracticable (if not impossible) outside of the chapter 9 context.

107.  With respect to the City's bond debt, certain of the City's bond issuances permit a majority of holders to agree to certain amendments to the terms of such bonds.  However, in many, if not all, cases, an extension of the maturity date of the indebtedness or an agreement to reduce its principal amount requires the consent of all outstanding bondholders.  In many instances, the City is unable to negotiate with a single contact with the authority to bind bondholders of a particular series of debt, thus rendering negotiations regarding the out-of-court restructuring of such bonds impracticable.  Either:  (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds (e.g., the City's Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds); (b) the debt is uninsured, such that no Bond Insurer has the right to control an out-of-court restructuring of the debt (e.g., the City's Series 2008A-(1) and 2008

---

offered to represent retirees in these discussions, while the other two associations have expressly indicated that they will not represent retirees.

-70-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 74 of
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 75 of
330

A(2) limited tax bonds); or (c) the debt is insured but the Bond Insurer has no control rights (provided that the Bond Insurer has not made a payment under its respective policy) (e.g., Series 1999-A unlimited tax bonds and Series 2003-A unlimited tax bonds). To date, no bondholder group holding a majority of any of the 60 series of debt issued by the City has organized so that the City could negotiate with it.

108. Although the City could not practicably negotiate with its entire creditor body, as described above, it has nevertheless attempted, in good faith, to negotiate with many key creditors, presenting its proposals to all known constituencies and soliciting feedback and engaging in meetings with all parties willing to come to the table. However, the fragmented and often non-binding nature of these negotiations has frustrated the City's ability to negotiate a consensual restructuring of its debt.

109. Moreover, the City's restructuring proposals have met with resistance from a number of its creditor constituencies. For example, on July 3, 2013, multiple lawsuits were filed by certain of the City's employees (both active and retired) against the Governor and Treasurer seeking, among other things: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 proceedings within which vested pension benefits might be compromised; and (b) an injunction

-71-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:03:32   Page 76 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 76 of

preventing the defendants from authorizing any chapter 9 proceeding for the City within which vested pension benefits might be adjusted.  On July 17, 2013, the Pension Systems commenced a similar lawsuit against me, in my capacity as Emergency Manager, and the Governor, seeking declaratory judgments that PA 436:  (a) does not authorize the defendants to take any action that may result in the compromise of the City's pension obligations; and (b) when read in conjunction with the Michigan Constitution, requires the defendants to refrain from attempting to compromise pension obligations within a chapter 9 proceeding (or, alternatively, that PA 436 violates the Michigan Constitution).[162]

110.   Further, on July 8, 2013, a Bond Insurer serving as surety for approximately $170 million of the City's limited and unlimited tax general obligation debt issued a public statement declaring that the June 14 Creditor Proposal was "harmful to Detroit and the interests of the taxpayers in Michigan" and "necessarily imperiled" the City's access to cost effective financing.  See Press Release, Ambac Financial Group, dated July 8, 2013, attached hereto as <u>Exhibit I</u>.

111.   Although the City believes that  (a) its discussions with its various creditor constituencies were constructive, (b) significant data was

---

[162]     <u>See</u> Complaints filed in:  (a) Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Circuit Court), dated July 3, 2013; (b) Webster v. Snyder, No. 13-734-CZ (Ingham Cnty. Circuit Court), dated July 3, 2013; and (c) General Retirement System of the City of Detroit v. Orr, No. 13-768-CZ (Ingham Cnty. Circuit Court), dated July 17, 2013.

-72-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:31   Page 78 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 03:32   Page 77 of 68

conveyed or made available to such creditors, (c) the negotiations were conducted in good faith on the City's part and (d) the City achieved a limited amount of success (<u>e.g.</u>, the forbearance agreement with the Swap Counterparties and Service Corporations), the City ultimately has not been able to reach a comprehensive agreement for the restructuring of its outstanding obligations. Moreover, the feedback received from creditors has led the City to determine that such a comprehensive agreement is unlikely in the near term or without this filing. Further negotiations with all of the City's various stakeholders is impracticable in light of the City's cash crisis and the urgent need to move forward with its restructuring. The City requires a clear and centralized forum within which parties may negotiate and ultimately be bound.

### Commencement of Chapter 9 Proceedings

112. Unable to negotiate an out-of-court resolution that simultaneously addressed the City's dire financial situation while laying the foundation for a strong and prosperous City going forward (and with no prospect of such a resolution), on July 16, 2013, and in accordance with section 18(1) of PA 436, I recommended to the Governor and the Treasurer in writing that the City file for chapter 9 relief. A copy of my recommendation is attached hereto as <u>Exhibit J</u> and incorporated herein by reference. This recommendation was based on my judgment that no reasonable alternative to rectifying the financial

emergency of the City existed because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency in a timely manner. On July 18, 2013, in accordance with section 18(1) of PA 436, I received the written authorization of the Governor to commence chapter 9 relief. A copy of the Governor's written approval is attached hereto as <u>Exhibit K</u> and incorporated herein by reference. On July 18, 2013, consistent with the Governor's written approval, I issued an order directing the City to commence this chapter 9 case. A copy of this order is attached hereto as <u>Exhibit L</u> and incorporated herein by reference.

## **<u>Facts in Support of First Day Pleadings</u>**

113. To preserve the City's ability to function efficiently within chapter 9 and provide uninterrupted services to its citizens, a number of pleadings (the "<u>First Day Pleadings</u>")[163] designed to achieve a seamless transition into chapter 9 will be filed contemporaneously with this Declaration. Generally, the First Day Pleadings seek to: (a) establish procedures for the smooth and efficient administration of this chapter 9 case (the largest chapter 9 case in history); (b) ensure that the City receives the benefit of certain protections afforded under the Bankruptcy Code; and (c) lay the groundwork for a successful restructuring of

---

[163]  Capitalized terms used below in the descriptions of the First Day Pleadings and not otherwise defined have the meanings given to them in the applicable First Day Pleadings.

-74-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 79 of 330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 03:32   Page 78 of

the City's liabilities. I have reviewed each of the First Day Pleadings with the City's outside counsel, and I believe that the relief sought in each of the First Day Pleadings is tailored to meet the goals described above and, ultimately, will promote the City's ability to complete the chapter 9 process and confirm a plan of adjustment.

114. The City seeks the entry of an order scheduling a hearing to consider the First Day Pleadings on shortened notice (the "First Day Hearing"). I believe that an expedited First Day Hearing is necessary to, among other things: (a) establish procedures for the prompt notification of the tens of thousands of potential creditors and other parties in interest of the commencement of this chapter 9 case and other procedures to promote the efficient administration of the City's case; (b) promptly clarify and confirm certain rights afforded to the City and the Emergency Manager in this chapter 9 case to eliminate potential uncertainty for the City's creditors, vendors, residents and other parties in interest and thereby minimize potential disruptions to the City's operations and restructuring efforts from the outset of this case; and (c) lay the groundwork for other restructuring activities to allow the City to move forward as promptly and efficiently as possible in this case.

*Motions Regarding Administrative and Procedural Matters*

115. <u>Notice of Commencement of the Case and Objections to Eligibility</u>. To provide expedient and effective notice of the commencement of the City's chapter 9 case to known and potential creditors as well as other parties in interest, the City is seeking the entry of an order approving a form of notice that provides due and proper notice of: (a) the commencement of the case; (b) the opportunity for parties in interest to file objections to eligibility and the schedule and procedures for addressing any such objections; (c) the automatic stay, as it applies in chapter 9; and (d) the Emergency Manager's continued authority to act exclusively on behalf of the City pursuant to section 904 of the Bankruptcy Code. In addition to sending such notice to each party identified on the City's list of creditors and as required by section 923 of the Bankruptcy Code, the City proposes to publish such notice for three consecutive weeks in: (a) the *Detroit Free Press*, a newspaper of general circulation in Detroit and surrounding communities; and (b) *The Bond Buyer*, a newspaper of general circulation among bond dealers and bondholders. In addition, the City proposes to post notice of the commencement of the case on the Electronic Municipal Market Access database at www.emma.msrb.com, which will provide further notice to bondholders.

116. The City also requests that the Court fix a deadline of approximately 30 days after the Petition Date for the filing of any objections to

-76-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 13:32:52   Page 80 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 81 of

eligibility (any such objection, an "Eligibility Objection"). Setting a prompt deadline for Eligibility Objections will: (a) promote the efficient administration of the City's case; (b) eliminate any uncertainty created by the absence of an express timing provision in the Bankruptcy Code for such objections in chapter 9 cases; and (c) expedite the Court's consideration of any Eligibility Objections and the entry of an order for relief in this case. Further, the City requests that the Court establish a schedule and certain procedures for the consideration of Eligibility Objections, as described in the motion.

117. Case Management and Noticing Procedures. The City has filed a motion seeking an order providing for certain notice, hearing and other case management procedures in this chapter 9 case. The City has tens of thousands of creditors and expects that numerous other parties in interest will request notice in this chapter 9 case. Requiring that hard copy service of every filing in this chapter 9 case be made upon all notice parties would be a waste of the City's limited resources.

118. The City proposes instead to serve documents filed in this chapter 9 case on most parties by electronic mail while requiring paper service of certain pleadings only upon certain primary parties in interest. The primary parties in interest that the City proposes should receive paper service of all documents includes, among other parties: (a) the City; (b) the City's largest secured and

-77-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 21:44:51   Page 82 of
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 81 of 88
330

unsecured creditors; (c) counsel to the trustee and contract administrator for the COPs; (d) certain significant holders of the COPs; (e) counsel to the Swap Counterparties; (f) counsel to the insurers of the City's bonds, COPs and Swap Contracts; and (g) counsel to the unions and retiree associations representing certain of the City's employees and/or retirees. I believe that authorizing service in this manner will promote efficiency and save the City significant time and expense during this chapter 9 case.

119. In addition, due to the anticipated number of motions and other pleadings that will be filed in this chapter 9 case, the City believes that special hearing procedures should be established to assist in administering the case docket and avoid constant (and unpredictable) hearings before this Court. These procedures will permit the Court, the City and the other primary parties in interest in this chapter 9 case to address groups of motions at regular omnibus hearings, thereby avoiding the substantial time and expense of scheduling separate hearings on each discrete matter. The motion further seeks the establishment of a number of other case management procedures to be utilized in this chapter 9 case for the benefit of the Court, the City and other parties in interest.

120. <u>Appointment of Claims and Noticing Agent</u>. The City recognizes that the large number of creditors and other parties in interest involved in its chapter 9 case may impose heavy administrative and other burdens upon the

-78-

13-53846-tjt Doc 2473-2 Filed 01/14/14 Entered 01/14/14 13:03:32 Page 82 of
13-53846-tjt Doc 11 Filed 07/18/13 Entered 07/18/13 21:44:51 Page 82 of 330

Court and the Clerk's Office. To relieve the Court and the Clerk's Office of these burdens, the City will seek the entry of an order appointing Kurtzman Carson Consultants ("KCC") as the City's claims and noticing agent in its chapter 9 case. KCC may, among other things: (a) serve as the Court's agent to mail notices to creditors of the City and other parties in interest, including notice of the commencement of the case; (b) provide computerized claim and objection database services; and (c) provide expertise, consultation and assistance in claim processing and with other administrative tasks as necessary to conduct the City's chapter 9 case and complete its restructuring expeditiously. The City obtained and reviewed engagement proposals from four claims and noticing agents before selecting KCC based on its capability and experience.

### Motions Regarding Third Party Relations

121. <u>Confirmation of the Protections of the Automatic Stay</u>. The City seeks an order confirming the application of two key protections afforded to the City under the Bankruptcy Code to: (a) aid in the administration of the City's bankruptcy case; (b) protect and preserve the City's property for the benefit of citizens and stakeholders; and (c) ensure that the City has the breathing space it needs to focus on negotiating a plan for adjusting its debts. These bankruptcy protections are: (a) the automatic stay provisions of sections 362 and 922 of the Bankruptcy Code (together, the "<u>Chapter 9 Stay</u>"); and (b) the anti-termination and

anti-modification provisions of section 365 of the Bankruptcy Code (together, the "Contract Protections").

122.    Although the Chapter 9 Stay and Contract Protections are self-executing, the City believes that, due to the historically limited use of chapter 9, some parties may not appreciate the full significance and impact of these provisions or how they apply in chapter 9.  In addition, the City also requests that the Court's order granting the relief requested in the motion confirm the application of the Chapter 9 Stay to:  (a) the Emergency Manager; and (b) city officers in whatever capacity they serve.

123.    Extension of the Automatic Stay to Certain Parties.  The City also requests that the Chapter 9 Stay be extended to stay any actions or proceedings against (a) employees of the City that are neither officers nor inhabitants of the City and (b) the Governor, the Treasurer, the members of the LEFALB and the staff members of these entities (collectively, the "State Entities"), that seek, directly or indirectly, to enforce claims against the City or interfere with the City's activities in this chapter 9 case.  Because the State Entities are closely connected to the City and the Emergency Manager, and because parties in interest already have initiated lawsuits against certain of the State Entities seeking to block the commencement of this chapter 9 case and interfere with the Emergency Manager's administration of the City under PA 436, I believe that this relief is

necessary and appropriate to:  (a) foreclose attempts by creditors to circumvent the

protections of the Chapter 9 Stay through collateral attacks on the State Entities;

and (b) provide the City with the breathing spell it needs at the outset of this case.

124.  <u>Appointment of Official Committee of Retirees</u>.  The City also

requests that the Court direct the United States trustee to appoint an official

committee of retired employees of the City (a "<u>Retiree Committee</u>").  As

previously stated, the City's post-employment obligations are a crushing burden on

the City's financial well being, and a restructuring of these obligations is a critical

component of the City's rehabilitation.  The City expects that most of its

approximately 23,500 retirees are not familiar with chapter 9 and lack the means to

obtain sophisticated representation in this case on an individual basis.  Absent the

appointment of a Retiree Committee, only a minority of the City's retirees stand to

receive any form of collective representation in this chapter 9 case, and, perhaps

more importantly, it appears that the small number of unions and retiree

associations that have offered to represent retirees possess no legal authority to

bind those individuals to restructure pension and retiree health benefits.  In

addition, the appointment of a Retiree Committee will provide the City with a

centralized point of contact, and the retirees with sophisticated representation, to

engage in negotiations regarding the restructuring of the City's retirement benefit

obligations.  I believe, therefore, that the appointment of a Retiree Committee is

necessary to provide adequate representation to these individuals and to facilitate the City's restructuring of its pension and other post-employment benefit liabilities.

125. <u>Authorization of Compromise with Swap Counterparties</u>. The City also requests that the Court authorize the assumption of the City's Forbearance and Optional Termination Agreement with the Swap Counterparties and approve such agreement as a compromise under Rule 9019 of the Federal Rules of Bankruptcy Procedure. As discussed herein, shortly prior to the Petition Date, the City reached a resolution with the Swap Counterparties, whereby: (a) the Swap Counterparties will forbear from seeking a termination of the Swap Contracts and allow the City continued access to its Casino Revenues; and (b) the City is granted an option to terminate the Swap Contracts for a period of time at a favorable discount. In exchange, the City has agreed to, among other things: (a) perform certain of its obligations under the Swap Contracts, Collateral Agreement and other agreements; (b) refrain from challenging the validity of the Swap Contracts, Collateral Agreement and other agreements; and (c) take certain steps to assist the Swap Counterparties in realizing upon the pledged property should the City default on its obligations. I believe that the assumption and approval of the compromise is fair, reasonable, equitable and in the best interests of the City and its creditors. The compromise, if approved, will allow the City access to much needed cash flows, provide for a workable unwind of its unfavorable swap obligations at a

-82-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 17:03:52   Page 87 of
330
13-53846-tjt   Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:31   Page 86 of 88

discounted price and avoid potentially protracted litigation involving the swap transactions.

## **Conclusion**

126.   I respectfully request that all of the relief requested in the First Day Pleadings be granted along with such other relief as is just.

-83-

13-53846-tjt   Doc 2473-2   Filed 01/14/14   Entered 01/14/14 17:03:52   Page 87 of
13-53846    Doc 11   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 87 of 88
330

I, the undersigned, declare under penalty of perjury that the foregoing is true and

correct.

Dated: July 18, 2013        By:   /s/  Kevyn D. Orr

                                        Kevyn D. Orr
                                        Office of Emergency Manager
                                        City of Detroit

# EXHIBIT A



CITY OF DETROIT

# PROPOSAL FOR CREDITORS

JUNE 14, 2013

CITY OF DETROIT

# PROPOSAL FOR CREDITORS

JUNE 14, 2013

This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the city, all of which are beyond the control of the city. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.

# CONTENTS

DETROIT FACES STRONG ECONOMIC HEADWINDS . . . . . . . . . . . . . . . . . . . . . . .1

KEY OBJECTIVES FOR A FINANCIAL RESTRUCTURING AND REHABILITATION OF DETROIT . . . . . . .41

CURRENT FINANCIAL STATUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .43

THE CITY HAS TAKEN ACTION TO ADDRESS ITS FINANCIAL CHALLENGES. . . . . . . . . . . . . . .53

RESTRUCTURING AND REINVESTING IN CITY GOVERNMENT . . . . . . . . . . . . . . . . . . . . .61

REVENUE ADJUSTMENTS AND TAX REFORM. . . . . . . . . . . . . . . . . . . . . . . . . . . .79

REALIZATION OF VALUE OF ASSETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .83

TEN-YEAR PROJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .90

RESTRUCTURING PROPOSAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .101

CEMENTING THE CITY'S RESTRUCTURING: DETROIT AFTER THE EMERGENCY MANAGER . . . . . .111

CALENDAR AND CONTACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .113

# DETROIT FACES STRONG ECONOMIC HEADWINDS

## DETERIORATING MACROECONOMIC CONDITIONS.

During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.

**Declining Population.** The City's population has declined 63% since its postwar peak, including a 26% decline since 2000:

- June 1950: 1,849,600
- June 1990: 1,028,000
- June 2000: 951,270
- June 2010: 713,777
- December 2012: 684,799

**High Unemployment.** Despite some recent improvement, the City's unemployment rate has nearly tripled since 2000:

- June 2000: 6.3%
- June 2010: 23.4%
- June 2012: 18.3%

**Number of Detroit Residents Employed.**

|                   | 2000    | 2010    | 2012    |
|-------------------|---------|---------|---------|
| Labor force       | 381,498 | 361,538 | 343,856 |
| Employment        | 353,813 | 278,063 | 279,960 |
| Unemployment      | 27,685  | 83,475  | 63,896  |
| Unemployment rate | 7.3%    | 23.1%   | 18.6%   |

- The number of employed Detroit residents has dropped more than 53% since 1970.

**EMPLOYMENT IN DETROIT**



**UNEMPLOYMENT RATE IN DETROIT**



13-53846    Doc 11-1    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 9 of 135

2

**Eroding Tax Base and Reductions in State Revenue Sharing.**

- Property Taxes.

  - Property tax revenues have decreased by approximately 19.7% over the past five years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2011).

  - Projected FY 2013 property tax revenues are $135 million, a reduction of $13 million (or approximately 9%) from FY 2012 levels.

- Income Taxes.

  - Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008. The primary cause of these decreases has been high unemployment driving lower taxable income of City residents and non-residents working in the City.

  - Income tax revenues may be showing signs of stabilization. This results from a modest decrease in unemployment, the indefinite deferral of a previously planned decrease of the City's 2.4% resident income tax rate and an increase in the corporate income tax rate from 1% to 2% in January 2012.

  - The income tax rate for residents and non-residents was set to decrease due to criteria set by the City Income Tax Act, but legislation has been put in place to hold the tax rates at the current level (2.4% for residents and 1.2% for non-residents) in order to avoid a loss of income tax revenues.

- Utility Users' Excise Tax.

  - Revenues from the City's utility users' tax have declined from approximately $55.3 million in FY 2003 to approximately $39.8 million in FY 2012 (approximately 28%).

- Wagering Taxes.

  - Annual receipts of wagering taxes have remained steady at about $170–$180 million, but gaming tax receipts are projected to decrease through FY 2015 due to expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

- State Revenue Sharing.

  - State revenue sharing has decreased by $161 million since FY 2002 (approximately 48%) and by $76 million (approximately 30.6%) since 2008 due to the City's declining population and significant reductions in statutory revenue sharing by the State.

  - Revenue sharing is calculated based on population; revenue sharing amounts will decrease further if the City's population continues to decline.

  - **The City is currently levying all taxes at or near statutory maximum rates.**

<span style="color:orange">RESIDENTS AND BUSINESSES ARE LEAVING DETROIT TO ESCAPE HIGH TAXES AND INSURANCE COSTS.</span>

**Comparative Tax Burden.**

- **Per Capita Tax Burden.** Per capita tax burden on City residents is the highest in Michigan. This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

- **Resident Income Tax.** Income tax burden on residents is greater than that of residents in the surrounding area. The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

- **Property Taxes.** Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; *e.g.*, the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000. The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses the total property tax rate is approximately 85.35 mills.

  - At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.

- **Utility Users Tax.** Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).

4

**Comparative Tax Burden.**

| | | | TAX BURDEN | |
|---|---|---|---|---|
| City | Population | Per Capita Income | Per Capita Tax Burden | Resident Income Tax Rates | Resident Property Tax Rates |
| **Detroit** | **684,799** | **$15,261** | **$1,207** | **2.4%** | **67.07 mills** |
| Local Comparison | | | | | |
| Dearborn | 98,153 | $22,816 | $668 | N/A | 60.23 mills |
| Livonia | 96,942 | $31,959 | $590 | N/A | 36.81 mills |
| Southfield | 71,739 | $29,228 | $930 | N/A | 60.70 mills |

**Comparative Insurance Costs.**

| City | Average Cost of Homeowner's Insurance | Average Cost of Automobile Insurance |
|---|---|---|
| **Detroit** | **$1,543** | **$3,993** |
| Local Comparison | | |
| Dearborn | N/A | $2,908 |
| Livonia | N/A | $2,052 |
| Southfield | N/A | $3,108 |

# CONTINUING BUDGET DEFICITS.

Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



**$ in Millions**

LTGO Series 2012C ($130m)
LTGO Series 2010 ($250m)
LTGO Series 2008A ($75m)
Accumulated deficit (unrestricted)

At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.

The City's operating deficit for FY 2013 (which excludes the impact of the $129.5 million debt issuance in August of 2012) is estimated to be approximately $47 million.

If not for the City's recent debt issuances, the accumulated deficit for FY 2013 would have been approximately $700 million.

## THE CITY IS INSOLVENT.

**Liquidity Crisis.** Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amounts due to other funds and entities of approximately $216 million. These are effectively borrowings and must be repaid.

**The City is Not Paying Its Debts as They Come Due.**

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.

**Plummeting Credit Ratings.**

The City's credit ratings have continuously declined during the past decade and are well below investment grade. No major U.S. city has lower credit ratings.

**Ratings on the City's Uninsured General Obligation Bonds**

|  | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| **June 30, 2003** | Baa1 | A- | A |
| **June 30, 2004** | Baa1 | A- | A |
| **June 30, 2005** | Baa1 | BBB+ | BBB+ |
| **June 30, 2006** | Baa2 | BBB | BBB |
| **June 30, 2007** | Baa2 | BBB | BBB |
| **June 30, 2008** | Baa2 | BBB | BBB |
| **June 30, 2009** | Ba2 | BB | BB |
| **June 30, 2010** | Ba3 | BB | BB |
| **June 30, 2011** | Ba3 | BB | BB- |
| **June 30, 2012** | B3 | B | CCC |

8

CURRENT LEVELS OF MUNICIPAL SERVICES TO RESIDENTS AND BUSINESSES ARE SEVERELY INADEQUATE.

**The City Must Reduce High Crime Rates.**

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000 (based on the FBI's Uniform Crime Reports database). The City's violent crime rate is five times the national average.
- All crime, not just violent crime, is prevalent in the City, with more than 136,000 crimes being reported in 2011.
  - See charts on following pages.
- EMS and DFD response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).
- Residents and business owners have been forced to take their safety into their own hands; some relatively well-off sections of the City have created private security forces.

**Comparable Data Regarding Public Safety.**

**Crime Data – National & Local Comparables**

OFFENSES KNOWN TO LAW ENFORCEMENT
by State by City, 2011

| City | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Larceny-theft | Motor vehicle theft | Arson |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Detroit | 713,239 | 15,245 | 344 | 427 | 4,962 | 9,512 | 43,818 | 15,994 | 16,456 | 11,368 | 957 |
| **Local Comparison** | | | | | | | | | | | |
| Dearborn | 98,079 | 359 | 3 | 22 | 104 | 230 | 3,757 | 612 | 2,705 | 440 | 12 |
| Livonia | 96,869 | 168 | 1 | 19 | 40 | 108 | 2,108 | 308 | 1,589 | 211 | 11 |
| Southfield | 71,685 | 377 | 4 | 33 | 116 | 224 | 2,681 | 710 | 1,592 | 379 | 5 |
| **National Comparison** | | | | | | | | | | | |
| Cleveland | 397,106 | 5,426 | 74 | 354 | 3,156 | 1,842 | 25,323 | 10,706 | 10,524 | 4,093 | 319 |
| Pittsburgh | 308,609 | 2,476 | 44 | 67 | 1,126 | 1,239 | 10,063 | 2,686 | 6,897 | 480 | 195 |
| St. Louis | 320,454 | 5,950 | 113 | 188 | 2,127 | 3,522 | 25,669 | 7,015 | 15,285 | 3,369 | 191 |
| Milwaukee | 597,426 | 5,969 | 85 | 194 | 2,963 | 2,727 | 30,097 | 6,669 | 18,890 | 4,538 | 262 |

# Incidents and Case Clearance Rates – National and Local Comparables

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | MV Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | 18.6% | 11.3% | 12.7% | 8.1% | 24.7% | 14.1% | 4.2% | 4.6% | 3.5% | 4.8% | 5.9% | 8.7% |
| **Pittsburgh** | | | | | | | | | | | | |
| Cases Assigned | 2,476 | 44 | 67 | 1,126 | 1,239 | 5,619 | 10,063 | 2,686 | 6,897 | 480 | 195 | 30,892 |
| Cleared | 1,247 | 22 | 61 | 435 | 729 | 3,963 | 1,997 | 498 | 1,312 | 187 | 55 | 10,506 |
| **Clearance Rate** | 50.4% | 50.0% | 91.0% | 38.6% | 58.8% | 70.5% | 19.8% | 18.5% | 19.0% | 39.0% | 28.2% | 34.0% |
| **Milwaukee** | | | | | | | | | | | | |
| Cases Assigned | 6,637 | 86 | 205 | 3,091 | 3,255 | 7,253 | 30,669 | 7,079 | 19,030 | 4,560 | 272 | 82,137 |
| Cleared | 2,465 | 58 | 159 | 764 | 1,484 | 4,701 | 4,718 | 808 | 3,769 | 141 | 34 | 19,101 |
| **Clearance Rate** | 37.1% | 67.4% | 77.6% | 24.7% | 45.6% | 64.8% | 15.4% | 11.4% | 19.8% | 3.1% | 13% | 23.3% |
| **St. Louis** | | | | | | | | | | | | |
| Cases Assigned | 5,950 | 113 | 188 | 2,12w7 | 3,522 | 4,866 | 25,669 | 7,015 | 15,285 | 3,369 | 191 | 68,295 |
| Cleared | 2,835 | 75 | 135 | 619 | 2,006 | 3,745 | 3,296 | 1,109 | 1,987 | 200 | 19 | 16,026 |
| **Clearance Rate** | 47.6% | 66.4% | 71.8% | 29.1% | 57.0% | 77.0% | 12.8% | 15.8% | 13.0% | 5.9% | 9.9% | 23.5% |
| **Cleveland** | | | | | | | | | | | | |
| Cases Assigned | 5,431 | 74 | 356 | 3,157 | 1,844 | 16,257 | 25,418 | 10,724 | 10,598 | 4,096 | 319 | 78,274 |
| Cleared | 1,072 | 26 | 89 | 447 | 510 | 3,346 | 1,685 | 793 | 718 | 174 | 46 | 8,906 |
| **Clearance Rate** | 19.7% | 35.1% | 25.0% | 14.2% | 27.7% | 20.6% | 6.6% | 7.4% | 6.8% | 4.2% | 14.4% | 11.4% |

10

| City | Violent Crime | Murder | Force Rape | Robbery | Aggravated Assault | Simple Assault | Property Crime | Burglary | Larceny Theft | MV Theft | Arson | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Detroit** | | | | | | | | | | | | |
| Cases Assigned | 15,254 | 344 | 426 | 4,976 | 9,508 | 17,240 | 43,759 | 16,032 | 16,500 | 11,227 | 958 | 136,224 |
| Cleared | 2,841 | 39 | 54 | 401 | 2,347 | 2,427 | 1,844 | 730 | 578 | 536 | 57 | 11,854 |
| **Clearance Rate** | **18.6%** | **11.3%** | **12.7%** | **8.1%** | **24.7%** | **14.1%** | **4.2%** | **4.6%** | **3.5%** | **4.8%** | **5.9%** | **8.7%** |
| **Southfield** | | | | | | | | | | | | |
| Cases Assigned | 380 | 4 | 36 | 116 | 224 | 1178 | 2688 | 710 | 1602 | 376 | 5 | 7319 |
| Cleared | 149 | 3 | 8 | 27 | 111 | 276 | 398 | 58 | 312 | 28 | 3 | 1373 |
| **Clearance Rate** | **39.2%** | **75.0%** | **22.2%** | **23.3%** | **49.6%** | **23.4%** | **14.8%** | **8.2%** | **19.5%** | **7.4%** | **60.0%** | **18.8%** |
| **Livonia** | | | | | | | | | | | | |
| Cases Assigned | 168 | 1 | 19 | 40 | 108 | 552 | 2,114 | 309 | 1,595 | 210 | 11 | 5,127 |
| Cleared | 69 | 1 | 1 | 15 | 52 | 201 | 563 | 33 | 505 | 25 | 0 | 1,465 |
| **Clearance Rate** | **41.1%** | **100.0%** | **5.3%** | **37.5%** | **48.1%** | **36.4%** | **26.6%** | **10.7%** | **31.7%** | **11.9%** | **0.0%** | **28.6%** |
| **Dearborn** | | | | | | | | | | | | |
| Cases Assigned | 361 | 3 | 24 | 104 | 230 | 1,346 | 3,756 | 609 | 2,709 | 438 | 12 | 9,592 |
| Cleared | 180 | 3 | 6 | 37 | 134 | 419 | 1,229 | 70 | 1,124 | 35 | 3 | 3,240 |
| Clearance Rate | 49.9% | 100.0% | 25.0% | 35.6% | 58.3% | 31.1% | 32.7% | 11.5% | 41.5% | 8.0% | 25.0% | 33.8% |

# THE CITY MUST PROVIDE FUNCTIONING STREET LIGHTS.

As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across the City's historical population footprint (and thus are not focused to meet the current population's actual needs).

| City | Total Functioning Street Lights | Functioning Lights per square mile |
|---|---|---|
| **Detroit** | **52,800** | **370** |
| | | |
| **Local Comparison** | | |
| Dearborn | 6,500 | 265 |
| Livonia | 5,000 | 204 |
| Southfield | 2,356 | 90 |
| | | |
| **National Comparison** | | |
| Cleveland | 67,000 | 812 |
| Pittsburgh | 39,779 | 682 |
| St. Louis | 52,000 | 785 |
| Milwaukee | 77,000 | 795 |

As of April 2013, the City estimated there was a backlog of approximately 3,300 complaints regarding the City's street lights.

12

# THE CITY MUST OVERHAUL ITS OPERATIONS.

**Police Department.**

- Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

- DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

- Data driven policing has not been fully adopted within DPD. Compstat (i.e., data driven policing) meetings (which would enhance accountability) are not fully implemented.

- DPD receives over 700,000 calls for service annually. DPD response times are extremely high.

**Response Time Data – Detroit Police Department**

CITY OF DETROIT

**Priority One Response Time (In Minutes)**

| Precinct | 2012 | 2013 | % Change |
|---|---|---|---|
| 1 | 23 | 37 | 60.81% |
| 2 | 22 | 40 | 78.42% |
| 4 | 30 | 42 | 41.03% |
| 5 | 39 | 78 | 99.46% |
| 6 | 32 | 55 | 75.19% |
| 7 | 22 | 41 | 89.05% |
| 8 | 40 | 115 | 185.31% |
| 9 | 38 | 68 | 78.95% |
| 10 | 24 | 31 | 31.37% |
| 11 | 24 | 41 | 71.78% |
| 12 | 21 | 34 | 62.58% |
| 13 | 25 | 42 | 73.31% |
| **AGENCY** | **2012** | **2013** | |
| DPD | 30 | 58 | 94.73% |

**Priority Other Response Time (In Minutes)**

| Precinct | 2012 | 2013 | % Change |
|---|---|---|---|
| 1 | 34 | 38 | 11.57% |
| 2 | 48 | 58 | 22.56% |
| 4 | 42 | 47 | 12.19% |
| 5 | 56 | 97 | 75.20% |
| 6 | 44 | 50 | 15.36% |
| 7 | 38 | 60 | 57.05% |
| 8 | 56 | 64 | 15.93% |
| 9 | 54 | 49 | -8.45% |
| 10 | 30 | 43 | 44.28% |
| 11 | 45 | 70 | 54.82% |
| 12 | 37 | 54 | 47.35% |
| 13 | 35 | 61 | 74.89% |
| **AGENCY** | **2012** | **2013** | |
| DPD | 43 | 56 | 30.59% |

- The national average response time is 11 minutes. Police response times for Dearborn and Livonia are approximately nine minutes and 24 minutes, respectively.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

  - Over 450 uniformed DPD employees are eligible for retirement in 2013. An additional 150 officers are eligible for retirement in each of the following five years.

- The DPD has restructured its operations multiple times over the past ten years due to dwindling budgets, severely hampering its operations.

- Employee accountability is limited. Individual employee performance metrics do not exist for either positive or negative police activity. Morale is extremely low. Disciplinary processes are slow and cumbersome, preventing leadership from effectively managing the Department.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD. "Citizens Radio Patrol" participants have lost confidence in the DPD's commitment to this important effort.

**Assessor's Office and Property Tax Division.**

- The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013. Due to inadequate compensation, among other things, there are no available candidates to fill this position.

- The Assessor's Office has approximately 15,000 parcels per employee. The State recommends 4,000 parcels per employee.

- The City has not updated residential property values on a regular basis. Therefore, residential property values are likely overstated. Due to a significant number of complaints, the Michigan Tax Board is investigating Detroit's allegedly inflated property values.

14

**Detroit Department of Transportation.**

- Grant dollars are not maximized. These are typically a significant revenue source for bus transit systems.

- DDOT fares are lower than comparable bus transit systems.

- Maintenance operations are highly inefficient.

- High absenteeism among bus drivers causes inefficiencies and higher costs.

## THE PHYSICAL DETERIORATION OF THE CITY MUST BE ADDRESSED.

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.

- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.

  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.

  - The City announced in February 2013 that 50 of its remaining 107 parks would be closed, another 38 parks would shift to limited maintenance, and Belle Isle (already suffering from a lack of funding) would receive decreased services.

    - Thanks to $14 million in civic donations, the 50 parks slated to be closed will temporarily remain open through the summer of 2013.

- Approximately 70 superfund sites have been established in Detroit.

- The City's electricity grid has not been adequately maintained and is deteriorating.

- The City's fire stations are old and are not adequately maintained.

  - The average age of the City's 35 fire stations is 80 years.

  - Maintenance costs often exceed $1 million annually. Major items requiring constant repairs: apparatus doors, plumbing, electrical, boiler and roof problems.

- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.

15

## THE CITY HAS INCURRED AND CONTINUES TO INCUR ENORMOUS COSTS ASSOCIATED WITH UNOCCUPIED PROPERTY.

**Land and Structures.**

- The City's population decline and declining property values have resulted in large amounts of abandoned, forfeited or foreclosed land and structures within the City.

  - 85% of the City's land area has experienced population decline over the last decade.

- There are approximately 66,000 vacant and blighted lots within the City limits.

- There are approximately 78,000 vacant structures in the City.

  - Approximately 38,000 structures are considered dangerous buildings. The number of dangerous structures is constantly increasing due to vacancy (particularly foreclosures) and house fires.

    - 16,700 have been inspected and classified as dangerous.

    - 14,263 have open complaints of being dangerous.

    - 6,657 to go before City Council for order of demolition.

    - 1,159 are considered emergency demolitions.

- Blight contributes to fire, crime and depressed property values.

  - The City has seen between 11,000 – 12,000 fires each year for the past decade. Approximately 60% of these occur in blighted or unoccupied buildings.

  - The Fire Department spends a disproportionate (and arguably unnecessary) amount of time and money fighting fires in vacant structures. These incidents could be remedied by blight removal.

16

- Average cost to demolish a residential structure is approximately $8,500, with an equalized total cost of $5.74 per square foot.

| Expense | Amount |
| --- | --- |
| Demolition Contract | $5,000 |
| Survey and Abatement | $1,500 |
| Gas Disconnect Fee | $750 |
| Administration Costs | $720 |
| Water Disconnect Fee | $550 |
| *Lis Pendens* (interest in structure) | $15 |
| **Total Cost of Demolition** | **$8,535*** |

* Cost will vary depending on size of unit and construction materials used.

## ADDITIONAL CHALLENGES FACING BLIGHT REMOVAL EFFORTS.

Addressing blight will require the coordination of several state, county and local agencies (*e.g.*, the State Fast Track Land Bank Authority; Wayne County Treasurer and Land Bank; various City departments; the Detroit Land Bank Authority; the Detroit Housing Commission; and NGOs (*e.g.*, the Detroit Economic Growth Corporation and the Blight Authority)).

Blight removal is governed by multiple codes and regulations and a number of overlapping jurisdictions.

- **Code Enforcement and Adjudication** (*e.g.*, State of Michigan Housing Law; Zoning Ordinance, Chapter 61; Property Maintenance Ordinance, Chapter 9; Blight Violations Ordinance, Chapters 8.5 and 22; Sale of 1 and 2-family Ordinance).

- **Condemnation and Demolition** (*e.g.*, State of Michigan Housing Law; City Ordinance 290-H — wrecking structures; Industry Standard Building Officials Code Administration).

- **Foreclosure and Land Disposition** (*e.g.*, State of Michigan PA 123; various City codes addressing non-federal property).

- The current regulatory framework increases demolition costs and slows the process.

Ordinance and regulatory reform are needed to expedite demolition.

## DETROIT HAS ENDURED INADEQUATE INVESTMENT IN INFRASTRUCTURE AND EQUIPMENT FOR YEARS.

**Fire Department.**

- **Fire Apparatus.** The Detroit Fire Department ("*DFD*") fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles with no watering or laddering capacity); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper for use in low-clearance structures such as parking garages) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.

  - The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.

  - Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment; one DFD captain recently called his equipment "junk," and expressed frustration at the lack of working trucks, pumps and other essential equipment across many City neighborhoods.

  - In February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on DFD ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years." On May 15, 2013, AAA Michigan donated $23,500 towards inspections of fire ladders on trucks and ground ladders because the City could not afford required inspections.

- **Fire Stations.** DFD operates 35 fire station buildings (average age = 80 years).

  - DFD has difficulty accommodating the size of modern firefighting equipment in older stations.

- **EMS Fleet.**

  - During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.

  - Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.

  - In March 2013, a group of corporations pledged to donate $8 million to the City, a portion of which will be used to upgrade the city's fleet of EMS vehicles. The donation is expected to add 23 new leased EMS vehicles to the City's fleet as replacements for older vehicles.

18

**Police Department.**

- **Age of Police Cars.**

  - The DPD operates with an "extremely old fleet" of 1,291 vehicles. Most DPD police cruisers lack necessary information technology.

  - A majority of vehicles in the fleet have reached replacement age (a typical replacement cycle is three years). Operating with an aged fleet drives up maintenance costs.

  - The combination of an aging fleet of police cruisers and layoffs of city-employed auto mechanics has resulted in delayed maintenance and a reduction in the number of police cruisers on patrol.

  - As part of the approximately $8 million pledged by a group of corporations in March 2013, DPD expects to receive 100 new leased cruisers in 2013.

- **Facilities.**

  - The DPD has not invested in or maintained its facility infrastructure for many years. DPD has closed or consolidated multiple precincts.

  - The DPD's facility infrastructure has reached a critical level of disrepair and no longer meets its needs, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally**:

  - Old and outdated technology assets and applications must be updated.

  - Information technology infrastructure is not integrated between departments and functions (*e.g.*, there is no integration between core City finance system and Department level systems) or even within Departments (*e.g.*, police precincts and districts cannot share information across their systems).

  - The City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.

  - The City lacks a formal documented IT governance structure (development of structure in process).

- **DPD, DFD and EMS**

  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.

  - DPD, DFD and EMS have non-integrated solutions that result in redundant data entry, no meaningful reporting and limited query capabilities.

    - DPD's IT systems, in particular, are outdated with multiple disparate systems with limited information sharing capability and requiring highly manual processes. The result is highly inefficient DPD operations.

    - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System.**

  - The City currently uses multiple, non-integrated payroll systems. A majority of employees are on an archaic payroll system that has limited reporting capability and no way to clearly track, monitor or report expenditures by category.

  - The cost of payroll administration for the City is significantly higher than for comparable entities. Current cost to process payroll is $62 per check ($19.2 million per year), which is more than 4 times more costly than the overall average of $15 per paycheck, and almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.

    - The primary driver of excess cost is labor, which is more than 70% of the total cost for the City.

    - 149 full-time employees are involved in the payroll process, 51 of which are uniformed officers (*i.e.*, high-cost personnel performing clerical duties).

  - Current process is highly manual (some done by hand) and prone to human error, including erroneous payments to individuals.

- **Income Tax Division**

  - Income tax collection and data management are highly manual.

  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.

20

- Updating the current Income Tax System could (i) increase revenues for the City through improved revenue tax processing, tax compliance and collection and (ii) improve reporting, efficiency and accuracy.
  - A new tax system that allows for automated processing and e-filing capability will free up City resources to focus on compliance.

- **Property Tax Division.**

  - The City's billing, processing and collection of property taxes is inefficient.

  - Recommendations made by consultant in 2011 have not been followed, even though implementation promises to increase efficiency of collection process.

- **Budgeting, Accounting & Financial Reporting Systems.**

  - Oracle-based Financial Reporting system (DRMS) was implemented in 1999. It is not being utilized to its full capabilities and is no longer supported by its manufacturer.

  - Budget Development system (BRASS) is over ten years old and requires a manual interface with DRMS.

  - Approximately 70% of journal entries are booked manually.

  - The City lacks a true fail-over and backup system.

  - The integration of Accounting, Budget Development and Financial Reporting systems into a single process is necessary to provide for improved reporting, efficiency, accuracy and accountability.

- **Grant Management System.**

  - Grant tracking systems are fragmented. Thus, the City is unable to comprehensively track citywide grant funds and status.

  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.

- **Permitting.**

  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.

  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.

  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.

- **Department of Transportation.**

  - To improve service and safety, both on buses and at DDOT facilities, DDOT requires technology updates (*e.g.*, automatic vehicle location systems; bus cameras).

**Electrical Transmission Grid and Fixtures.**

- The City's Public Lighting Department ("*PLD*") is responsible for operating and maintaining 88,000 streetlights and owns and operates a distribution-only electricity grid providing power for lighting and serving 114 customers.

- The City-owned Mistersky power plant has been idle for 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

- Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("*DTE*") and PLD-powered lights.

- Outages affecting DTE-powered lights are primarily bulb-related. Outages on PLD-powered lights are partly bulb-related. Others are caused by problems related to PLD's obsolete grid and wiring.

22

## THE CITY'S DEBT AND LEGACY LIABILITIES HAVE GROWN CONSIDERABLY OVER TIME.

**Balance Sheet Liabilities.**

The City estimates that, as of the close of its 2013 fiscal year (*i.e.*, June 30, 2013), the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including approximately:

- $5.85 billion in special revenue obligations (*e.g.*, Enterprise Fund debt);

- $1.43 billion in pension-related Certificate of Participation ("*COPs*") liabilities;

- $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);

- $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and

- $300 million in other liabilities.

**Off-Balance Sheet Liabilities.**

- **OPEB Liabilities.** Unfunded OPEB liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available).

- **Pension Liabilities.**

  - As described in further detail below, the City's reported pension UAAL (based on 2011 actuarial valuations) of $643,754,109 is substantially understated.

    - Estimated UAAL for FY 2012 was $829.8 million (for the General Retirement System ("GRS")) and $147.2 million (for the Police and Fire Retirement System ("PFRS")), based on 2011 actuarial assumptions.

    - Further analysis by the City using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.

    - UAAL under the GRS and the PFRS increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using the actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.

- For the five years ending with FY 2012, pension payments exceeded contributions and investment income by approximately $1.7 billion for the GRS and $1.6 billion for the PFRS, resulting in liquidation of pension trust principal.

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|---|---|---|---|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |

- **Increasing Legacy Liabilities.** During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities. Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

  - Projected unfunded OPEB liabilities for FY 2013 are currently being evaluated. As of the most recent valuation (June 30, 2011), OPEB unfunded liabilities totaled $5.7 billion and are expected to grow absent restructuring.

  - Required pension contributions are projected to increase in light of (i) an increasingly mature population already in pension pay status, (ii) deferral of recognition of prior losses, (iii) the anticipated revision of actuarial assumptions used in the past and (iv) past deferrals of contributions.

  - In addition, the Governmental Accounting Standards Board has issued a statement (No. 67), effective during the City's 2014 fiscal year, requiring municipalities to recognize their unfunded pension benefit obligation as a liability and to more comprehensively measure the annual costs of pension benefits.

  - Even if the City were not to change prior actuarial assumptions, pension UAAL is projected to grow to nearly $2 billion by 2017. The adoption of realistic actuarial assumptions would result in a significantly higher number for UAAL.

- Debt service for the City's general fund, including payments related to unlimited tax general obligations and COPs, is projected to exceed $240 million in FY 2013.

24

**Obligations Secured by Special Revenues**

- The City estimates that, as of the end of FY 2013 (*i.e.*, June 30, 2013), it will have:

  - $5.34 billion in outstanding principal amount of revenue bonds; and

  - $494 million in related state revolving loans.

- The revenue bonds and the revolving loans are related to the following funds:

  - Sewage Disposal Fund

    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.

    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest. Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.

    - A schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012 is attached hereto as Appendix A.

  - Water Fund

    - $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.

    - $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest. Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

    - A schedule of the water system bonds and related state revolving loans as of June 30, 2012 is attached hereto as Appendix B.

- Automobile Parking Fund

  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2013 through July 1, 2019, as of June 30, 2013.

  - Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.

  - Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.

- A chart setting forth the annual debt service on the foregoing special revenue obligations is attached hereto as Appendix F.

**General Fund Obligations**

- The City estimates that, as of the close of FY 2013 (*i.e.*, June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("*UTGO*") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("*LTGO*") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval. They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid. $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.

26

- The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

    - $87.8 million in notes payable, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

    - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of this issuance were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.

- A schedule of the secured general obligation bonds and secured notes and loans payable as of June 30, 2012 is attached hereto as Appendix D. A schedule of the unsecured general obligation bonds and unsecured loans payable as of June 30, 2012 is attached hereto as Appendix E. A chart setting forth the annual debt service on the foregoing general fund obligations (and other liabilities) is attached hereto as Appendix G.

**Certificates of Participation (Pension).**

- In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

- Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

- The City estimates that, as of the close of FY 2013 (*i.e.*, June 30, 2013), the following amounts were outstanding under the COPs:

    - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

    - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

- The City has allocated portions of the COP liabilities among the transportation, sewage disposal, water and library funds based on each fund's share of the aggregate UAAL determined at the time of issuance of the COPs.

- The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.

- A schedule of the COPs and related swap liabilities as of June 30, 2012 is attached hereto as Appendix C.

**Swap Liabilities Related to Certificates of Participation.**

- In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total notional amount of $800 million.

- Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

- January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

- June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for a termination payment. Pursuant to the amendment:

  - The swap counterparties waived their right to termination payments; and

  - The City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.

- March 2012 — COPs were further downgraded which triggered another Termination Event; City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 — Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

28

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.

- A chart setting forth the annual debt service on the COPs and related swap liabilities is attached hereto as Appendix H.

## UNSUSTAINABLE RETIREE BENEFITS.

**OPEB Liabilities Are Large and Unfunded.**

- The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan.

- As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

- 99.6% of the City's OPEB liabilities are unfunded.

- **Health and Life Insurance Plan**

  - Defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees.

  - City generally pays for 80% to 100% of health care coverage for eligible retirees.

  - $5,718,286,228 in actuarial liabilities as of June 30, 2011. An updated actuarial valuation based on more recent census data is currently being developed by third party professionals.

  - The Health and Life Insurance Plan is 0% funded; financed entirely on a "pay-as-you-go" basis.

  - $177,460,627 cost to the City on account of retiree benefits during FY 2012 provided under the Health and Life Insurance Plan.

  - City's contribution is in addition to $23,516,879 in FY 2012 contributions by retirees.

29

- The City's OPEB costs are expected to increase as a result of the City's growing number, and young age, of retirees (pension and health care plans have no age restrictions and early vesting ages) as well as increases in health care costs, particularly hospitalization costs.

- Health and Life Insurance Plan is secondary to Medicare for eligible employees over the age of 65; however, many retired police/fire employees are *not* eligible to receive free Medicare Part A benefits due to State-regulated social security "opt-out" provisions.

  - **Supplemental Death Benefit Plan**

    - Pre-funded single-employer defined benefit plan providing death benefits based upon years of creditable service.

      - $34,564,960 in actuarially accrued liabilities as of June 30, 2011.

      - 74.3% funded; UAAL of $8.9 million.

## OPEB Obligations Arise Under a Multiplicity of Plans

- The City's OPEB obligations arise under 22 different plans (15 different plans alone for medical/Rx) having varying structures and terms. This creates a high level of complexity and cost in benefit administration.

### *Weiler* Class OPEB Benefits.

- In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees. Retiree Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

- The City and the *Weiler* class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement. The settlement agreement requires the City to provide *Weiler* class members with generous health benefits for as long as class members receive a City pension.

- The *Weiler* plaintiffs are expected to assert that the settlement restricts the ability of the City to alter the benefit provisions included in the settlement.

30

- The *Weiler* class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.

**Pension Liabilities Are Not Fully Funded — Shortfall Has Been Understated.**

**Aggressive Actuarial Assumptions Generate a Perception that Pensions are Modestly Underfunded.**

- GRS: Reported UAAL of $639,871,444 out of $3,720,167,178 in accrued liabilities as of June 30, 2011 (82.8% funded).

- PFRS: Reported UAAL of $3,882,665 out of $3,808,642,553 in accrued liabilities as of June 30, 2011, as a result of awards received under Public Act 312 of 1969 (99.9% funded).

- These funding levels were based on the following assumptions:

| | GRS | PFRS |
|---|---|---|
| Amortization Period | 30 years (refinanced anew each year) | 30 years |
| Asset valuation method | 7-year smoothed market | 7-year smoothed market |
| Investment rate of return (net of expenses) | 7.9% | 8.0% |
| Projected salary increases | 4.0%-8.9% | 5.0%-9.2% |
| Inflation rate | 4.0% | 0% for four years; 4.0% thereafter |
| Cost-of-living pension adjustments | 2.25% | 2.25% |

**More Realistic Assumptions Reveal That Funding Levels Have Been Overstated.**

- The combined reported UAAL of approximately $644 million for the GRS/PFRS (estimated at $977 million as of June 30, 2012) is *substantially* understated.

- Current actuarial valuations project aggressive and unrealistic annual rates of return on investments net of expenses (GRS — 7.9%; PFRS — 8.0%).

- Pension plan funding levels calculated based upon assumed annual rates of return of 7%, or even 7.5%, would further reduce funding levels.

- Smoothing of funding levels over seven years masks funding shortfall — pension plan funding levels calculated based on the current market value of the plans' assets show substantially reduced funding levels (GRS – 65% funded; PFRS – 78% funded).

- A 30-year amortization period for unfunded liabilities — which in GRS is applied anew each year to the full amount of unfunded liability, akin to annually refinancing a 30-year mortgage — allows unfunded liabilities to continue to grow rapidly (due to compounding).

- Although many governmental plans have significant amortization periods for unfunded benefits (*e.g.*, MERS applies a 27-year amortization period with a goal of moving down to 20 years by the December 31, 2017 valuation), 30 years is longer than most and is far too long for these mature plans. Especially in the case of GRS, such a long period has the effect of deferring efforts to meaningfully reduce underfunding into the future.

- The City has consistently deferred payment of its year-end PFRS contributions (and finances such deferrals at a rate of 8%). As of June 30, 2012, the City owed the PFRS its full contribution for FY 2012 in the amount of approximately $50 million. As of May 2013, the City had deferred approximately $58 million in pension contributions owing for FY 2013. Contributions made in the form of notes have been treated as timely funding contributions made to the pension trust during the applicable financial year.

- The City was granted a funding credit by PFRS in the amount of $25 million for each of the fiscal years 2008 through 2010 resulting in under-contributions by the City toward its pension liabilities for each of those years.

**Past Pension Practices.** Certain past trustee practices contributed to the pension plans' significant underfunding (*e.g.*, annuity savings accounts; "13th checks"; ad hoc "sweeteners"; and various changes to eligibility (*e.g.*, lowered years of service, combined years of employment)).

- For example, in both pension plans (and especially GRS), hundreds of millions of dollars contributed by the City and invested to support the defined benefit arrangement have instead been used to fund investment returns selected (but not actually earned) on employee contributions made under a separate defined contribution arrangement known as the Annuity Savings Accounts.

32

**Anticipated Increase in Pension Contributions.** Using current actuarial assumptions, the City's required pension contributions are projected to grow from 25% (for GRS) and 30% (for PFRS) of eligible payroll expenses in FY 2012 to 30% (for GRS) and 60% (for PFRS) of such expenses by FY 2017. Changes in actuarial assumptions would result in further increases to the City's required pension contributions.

## OTHER LIABILITIES

The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

- $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;
- $86.5 million in accrued workers' compensation for which the City is self-insured;
- $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and
- $13.0 million in capital leases and accrued pollution remedies.

| | General Governmental | Sewage Disposal | Transportation | Water | Parking | Other Proprietary | Total |
|---|---|---|---|---|---|---|---|
| Accrued compensated absences | 82,099,713 | 5,502,481 | 3,895,416 | 9,421,311 | 276,814 | 53,442 | $101,249,177 |
| Accrued workers' compensation | 66,231,000 | 3,554,000 | 5,569,812 | 10,339,000 | 667,000 | 92,000 | $86,452,812 |
| Capital leases payable | | | 12,678,358 | | | | $12,678,358 |
| Claims and judgments | 62,003,257 | 1,519,500 | | 286,500 | 110,497 | 2,000 | $63,921,754 |
| Accrued pollution remediation | | 340,613 | | | | | $340,613 |
| **Total** | **$210,333,970** | **$10,916,594** | **$22,143,586** | **$20,046,811** | **$1,054,311** | **$147,442** | **$264,642,714** |

FUND

**Steady State Projection of Legacy Expenditures (assuming no restructuring)**

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $(66.6) | $(106.2) | $(63.5) | $(64.5) | $(62.6) | $(70.8) | $(70.9) | $(61.8) | $(61.8) | $(38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $(414.6) | $(462.0) | $(397.9) | $(486.1) | $(461.6) | $(477.3) | $(587.6) | $(622.4) | $(655.9) | $(672.3) |
| **Total revenues (excl. financing proceeds)** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |

34

13-53846    Doc 11-1    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 41 of 135

## HIGH LABOR COSTS AND RESTRICTIVE EMPLOYMENT TERMS

**High Labor Costs.**

Despite recent headcount reductions, labor costs related to General Fund active employees (*i.e.*, wages, pension and benefits) represent more than 41% of the City's estimated FY 2013 gross revenues. Accordingly, savings related to such costs are a critical component of any restructuring.

- Estimated General Fund FY 2013 Wages: $333.8 million (29.8% of estimated FY 2013 revenues).

- Estimated General Fund FY 2013 Benefit Costs (fringes including health for *active* employees): Approx. $66.5 million (5.9% of estimated FY 2013 revenues).

- Estimated General Fund FY 2013 pension contributions (including normal and UAAL portion): $66.0 million (5.9% of estimated FY 2013 revenues).

  - While pension contributions are based on active payroll, some portion of the contribution is intended to cover the unfunded actuarial accrued liability which technically benefits all participants in the plan, including retirees.

  - Benefit and pension costs per *active* employee have increased from ~$18,000 in FY 2000 to ~$24,000 in FY 2013.

- **Increasing Benefit Costs.** Some of the savings related to medical benefits achieved through the City Employment Terms (the "CETs") will be offset by anticipated medical cost inflation.

**Collective Bargaining Landscape.**

The City's unionized employees are represented by 47 discrete bargaining units. The CBAs covering 44 of those bargaining units were expired as of September 30, 2012, and the majority of the employees represented thereby are subject to the CETs. The CBAs with the three remaining bargaining units expire as of June 30, 2013, at which point the employees represented thereby will become subject to the CETs as well. *See* Appendix I (identifying all City employee bargaining units).

**Restrictive Employment Terms.**

The City's CBAs impose work rules and other restrictions that have impaired the efficient functioning of City government. The CETs provide some relief from work rules and other restrictions (in part through incorporation of a broad management rights clause).

- **"Bumping" Rights.** Employees have been permitted to transfer across departments based solely on seniority (without regard to merit, relevant qualifications or experience for the new position). The City has amended the criteria for transfers and assignments and based them upon experience, attendance, work performance, sick time use and demonstrated ability rather than seniority.

  - The CETs also negated seniority protections in various CBAs by changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications.

- **Limitations on Management Rights.** The City's ability to manage policies, goals and the scope of operations for many City departments (most notably with respect to the right to implement and modify disciplinary policies) have been impaired by limitations on management rights and responsibilities. The CETs have replaced these limitations with a broad management rights clause, granting the City broad discretion with respect to the design and implementation of work rules.

- **Arbitration Rights.** The CETs curtail the ability of arbitrators to uphold future grievances based on expired bargaining agreement provisions or past practice.

- **Lack of Reimbursement Rights.** The unions historically did not (i) reimburse the City for full-time and part-time paid union officials or (ii) pay any fees for the City's collection and remittance of union dues and service fees. Under the CETs, the City is reimbursed for paid officials and collects a 2% administrative fee in connection with efforts related to union dues/service fees.

- In addition to concessions imposed by the CETs, additional concessions have been granted through statutory interest arbitration. These concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures.

- In some cases, changes to the City Charter and the City Code, or other legislative initiatives, may be necessary to support needed operational enhancements and reduce unnecessary bureaucracy.

36

# DETROIT WATER AND SEWERAGE DEPARTMENT MUST BE RESTRUCTURED.

The Detroit Water and Sewerage Department ("*DWSD*") is one of the largest municipal water and sewerage departments in the nation, providing water and wastewater services to the City and many suburban communities in an eight-county area, covering 1,079 square miles.

**DWSD Capital Expenditures.**

- Municipal securities broker/dealers and the City's advisors' analyses suggest that DWSD's cost of capital is inflated due to the DWSD's association with the City (and its financial circumstances). This increased cost of capital, coupled with the inability to raise rates and other factors, has resulted in significant under-spending on capital expenditures.

- DWSD's January 2013 Capital Improvement Program totals approximately $1.2 billion over the next four years with approximately $322.4 million budgeted for water and sewer projects for FY 201314 and $361.8 million budgeted for FY 2014-15.

**The EPA Litigation (E.D. Mich., Judge Cox).**

- In 1977, the United States Environmental Protection Agency sued the City and the DWSD, alleging violations of the Clean Water Act ("*CWA*"). The case remained pending in the United States District Court for the Eastern District of Michigan — and the DWSD operated under federal oversight — for more than 35 years owing to "a recurring cycle" of compliance failures with regard to the CWA and National Pollutant Discharge Elimination System ("*NPDES*") permits required by the Michigan Department of Environmental Quality ("*MDEQ*").

**Administrative Consent Order.**

- In July 2011, the DWSD agreed to undertake remedial measures pursuant to an Administrative Consent Order ("*ACO*") with the MDEQ. The ACO instituted a compliance program with regard to areas of persistent dysfunction (*e.g.*, maintenance; inadequate capital expenditures and related planning; inadequate staffing; restrictive procurement policies).

- Following the dismissal of the EPA Litigation, the ACO is the only order through which the MDEQ maintains oversight of the DWSD.

**Root Cause Committee Plan of Action.**

- Determining that the ACO, by itself, could not guarantee the DWSD's long-term compliance with CWA and NPDES standards, the district court ordered a "Root Cause Committee" comprised of City/DWSD officials to submit a plan addressing the "root causes" of the DWSD's noncompliance.

- The Root Cause Committee drafted – and the district court adopted – a "Plan of Action," which proposed to restructure the DWSD in order to address systemic dysfunction and achieve long-term compliance with federal and state standards (including, but not limited to, the imposition of changes on DWSD employees otherwise forbidden by applicable CBAs).

- A report submitted by the Root Cause Committee in March 2013 recommended an autonomous DWSD. Implementation of the Root Cause Committee's recommendation would require creation of two unique authorities (with one authority owning the assets and the other authority leasing the assets and making recurring payments to the City in lieu of taxes in the estimated annual amount of $50,000,000 in consideration for the transfer of DWSD assets.

**Order Dismissing Case.**

- By an order dated March 27, 2013, the district court closed the case, stating that it was satisfied that the court's orders and the ACO "have been substantially implemented." Closing the case was appropriate, the court said, "because the existing [ACO] is a sufficient mechanism to address any future issues regarding compliance with the DWSD's NPDES permit and the [CWA]."

- The district court did not order the implementation of the DWSD transaction proposed by the Root Cause Committee, citing its lack of authority to do so.

- The City appealed the district court's order dismissing the EPA Litigation on May 22, 2013.

38

# OTHER LITIGATION AFFECTING THE CITY'S FINANCIAL CONDITION

The City generally has been successful in defending against legal challenges to its attempts to restructure its financial affairs, but numerous cases have been filed and remain pending and additional cases may well be filed. Some of these cases could affect the ability of the City to successfully restructure its affairs.

**Litigation Challenging Consent Agreement.**

**Decision Voiding CBA-Related Sections of Consent Agreement Reversed on Procedural Grounds.**

- In September 2012, the Ingham County Circuit Court struck down Sections 4.1 and 4.3 of the Consent Agreement, which provisions (i) granted the Mayor "authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements" (§ 4.1) and (ii) gave the Financial Advisory Board approval rights over CBAs and allowed the Program Management Director to impose CBAs not approved by the City Council (§ 4.3). The Court overturned these provisions on the grounds that they improperly granted powers to Mayor Bing and other officials that are reserved exclusively to emergency managers.

- In October 2012, the Court of Appeals for the State of Michigan reversed the Ingham County court. The Court of Appeals' ruling was based on procedural grounds (*i.e.*, that the Circuit Court had lacked jurisdiction where the plaintiff had failed to establish standing).

**Litigation Regarding Imposition of CETs.**

Over 15 legal challenges and grievances related to the imposition of the CETs have been filed in several state courts and before the Michigan Employment Relations Commission ("*MERC*"). These cases challenge the enforceability of the Financial Stability Agreement and, thus, the legality of the CETs. These challenges generally have not prevented the City's imposition of the CETs.

- **Imposition of CETs on Police Department.** In August of 2012, the Wayne County Circuit Court denied the Detroit Police Officers Association's request for a permanent injunction against imposition of the CETs.

- **Imposition of CETs on DWSD Employees.** In the long-standing EPA Litigation, the United States District Court for the Eastern District of Michigan (i) required that DWSD employees enter into new CBAs with the DWSD (as opposed to with the City) and (ii) clarified that, although its orders did not restrict the DWSD from implementing CETs with respect to DWSD employees prior to negotiation of new CBAs, neither did such orders enjoin employees from challenging the CETs to the extent imposition thereof was inconsistent with applicable law. AFSCME Local 207 – the largest union in the DWSD – has challenged the imposition of the CETs upon DWSD employees before the MERC.

- **Restoration of Certain Pay Cuts.** In *In re City of Detroit and Detroit Police Officers Association*, Case No. D12 D-0354, the Detroit Police Officers Association, among other things, sought the restoration of a 10% across-the-board pay cut imposed upon all City police officers pursuant to the CETs. The City argued that such wage cuts were needed in light of the City's ongoing financial emergency. The MERC panel ordered a 5% restoration of the officers' wages, effective January 1, 2014 (and encouraged the emergency manager, the Mayor and the State Treasurer to consider instituting the 5% salary restoration effective July 1, 2013).

40

# KEY OBJECTIVES FOR A FINANCIAL RESTRUCTURING AND REHABILITATION OF DETROIT

To the fullest extent possible under all of the circumstances:

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.
  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.
  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform to reduce the cost of living in the City to more closely approximate costs of living in nearby areas.

- Maximize recoveries for creditors.
  - Since the City will not generate sufficient cash to pay all liabilities, alternatives have to be considered.

- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.

- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.

- Reform the City government operations to improve efficiency and reduce costs.
  - In many areas, longer term benefits will require immediate increases in capital investment.

- Maximize collection of taxes and fees that are levied or imposed.

- Generate value from City assets where it is appropriate to do so.

42

# CURRENT FINANCIAL STATUS

HISTORICAL REVENUE AND EXPENDITURE TRENDS, INCLUDING PRELIMINARY FY 2013.

**General Fund summary**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | PRELIM. |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Total revenues | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 |
| **Accumulated unrestricted General Fund deficit** | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) |

The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.

Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.

43

**Revenues**

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIM. |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Municipal income tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| **Total revenues** | $1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 |

**Municipal income tax**

- Income tax revenues decreased in FY 2009 and FY 2010 primarily due to lower taxable income of City residents and non-residents working in the City as a result of the economic recession. The recovery in the last 3 years was due to increased taxable income as well as the recent increase in the corporate tax rate.

**State revenue sharing**

- State revenue sharing decreased in FY 2011 primarily due to the 2010 census population decline affecting constitutional revenue sharing payments.

- FY 2009 and FY 2010 include $15 - $20 million payments that were held from the previous year due to late CAFR submission.

- Statutory revenue sharing was replaced by the Economic Vitality Incentive Program funds. The total amount available to be paid to municipalities decreased and the payment method is now based on performance metrics to reward "best practices".

44

13-53846    Doc 11-1    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 51 of 135

**Wagering taxes**

- Wagering tax revenues from Detroit's three casinos have remained steady. Wagering tax receipts are projected to decrease through FY 2015 and beyond due to expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

- Beginning January 2006, the City began receiving an additional 1% of adjusted gross receipts as percentage payment revenues. In addition, the City receives $4 million from each casino when the casino reaches $400 million in adjusted gross receipts during the calendar year.

**Property taxes**

- Property tax revenues have been decreasing primarily due to declining taxable property valuations (~12% since FY 2008) and increasing charge-backs due to delinquency rates (charge-backs have been increasing at a quicker pace than delinquent bills transferred to Wayne County).

- Delinquent property tax bills are transferred to Wayne County and the City receives payment for the full amount submitted, less charge-backs for prior period uncollectible bills, which ultimately the City has to repay.

- Revenues were higher in FY 2011 due to (non-cash) adjustments to property tax distributions and charge-back liabilities that were overstated in prior years.

**Operating expenditures**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | | PRELIM. |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
| Salaries/overtime/fringe | $(509.9) | $(506.6) | $(466.4) | $(454.8) | $(431.5) | $(357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| **Operating expenditures** | $(1,111.1) | $(1,025.3) | $(964.7) | $(887.5) | $(857.1) | $(692.0) |

45

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 52 of 135

**Salary/overtime/fringe**

- The City has significantly reduced its payroll related costs since the peak in FY 2009 based on a variety of cost reduction efforts, including headcount reductions, furlough days, wage reductions, etc.

**Other expenses declining**

- Other expenditures, including expenses covered by grant revenue, claims for self-insurance, professional/ contractual services and purchased electricity and gas/fuel costs have declined by more than $266 million (44%) over the past six years.

**Legacy expenditures**

| ($ in millions) | FISCAL YEAR ENDED ACTUAL | | | | | | PRELIM. |
|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | | 2013 |
| Debt service (LTGO & UTGO) | $(133.8) | $(177.6) | $(135.9) | $(137.3) | $(135.6) | | $(141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | | (151.6) |
| **Legacy expenditures** | **$(414.6)** | **$(462.0)** | **$(397.9)** | **$(486.1)** | **$(461.6)** | | **$(477.3)** |

**Debt service and COP payments**

- COP-related payments include swap interest payments and principal and interest.

- COP-related payments have been increasing due to increasing scheduled maturities and increasing swap interest rates through FY 2010.

- Debt service was higher in FY 2009 due to a balloon payment due in 2009 on debt related to the Greater Detroit Resource Recovery Authority.

- COP-related payments are forecast to increase due to a back-loaded amortization schedule.

46

**Pension contributions**

- The City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement paying 8% interest (~$50 million for FY 2012).

- The City was granted a $25 million credit in each of the years 2008, 2009, and 2010. If not for these credits, the contribution would have been $25 million higher in each of those years, thereby saving the City a cumulative $75 million. Therefore, the contributions for 2008, 2009, and 2010 are effectively understated.

**Health Benefits - Retiree**

- The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.

- The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.

**FY 2013 Cash Flow**

**FY 2013 Forecast.**

- At the end of FY 2012, the City held cash of $29.8 million, subject to accumulated property tax distributions in the amount of $27.9 million, or cash net of distributions of $1.9 million.

- Based upon actual results through May 31, 2013 and forecasted results through the end of FY 2013, the City is projecting positive net cash flow of $4.0 million for FY 2013.

  - However, as of June 30, 2013, the City will have accumulated deferrals of approximately $120 million, primarily related to pension contributions. If not for the deferrals of payments, the City would have already run out of cash.

- In August 2012 (FY 2013), the City issued $129.5 million in self-insurance and capital improvement bonds (proceeds of $137 million) with the assistance of the Michigan Finance Authority; however, $80 million was used to repay a short-term borrowing in FY 2012 and the balance was placed in escrow subject to State Treasury approval of withdrawal.

- In December 2012, the State authorized the City to draw an additional $10 million from the escrowed proceeds.

- The forecast assumes an additional $20 million will be drawn in June 2013.

**Interfund Loans and Other Outstanding Amounts Due.**

- As of May 31, 2013, the City's general fund had outstanding deferrals and amounts due to other funds and entities of approximately $202.6 million. These are effectively borrowings and must be repaid.

  - Cash owed to other funds: As of May 31, 2013, the General Fund owed approximately $41.2 million to other funds (*e.g.*, Risk Management Fund).

  - Cash commingled with General Fund: As of May 31, 2013, the General Fund held $52.6 million of other funds' cash in its operating account (*e.g.*, Major and Local Street Funds).

  - Property tax distributions: As of May 31, 2013, the General Fund owed $55.1 million to other taxing authorities (*e.g.*, Detroit Public Schools and Wayne County).

  - Deferred pension contributions: As of May 31, 2013, the General Fund owed $53.7 million in delinquent pension contributions to the GRS and PFRS systems.

  - On June 30, 2013, the City will owe an additional $50 million (estimated) related to the FY 2013 required PFRS contribution, which will increase the amount of deferred pension contributions to over $100 million.

**Cash conservation measures include:**

- Issuance of short-term (RANs & TANs) and long-term debt.

- General fund borrowing from other funds, deferrals of payments to other funds and cash pooling (as described above).

- Deferral of trade payments and management of accounts payable with reference to available cash. Current accounts payable are approximately aged 60 to 75 days. Issues related to unvouchered accounts payable could increase the aging profile of the City's A/P.

48

# FY 2013 Forecasted Cash Flow to Year End

*$ in millions*

| | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | 567.0 | 34.0 | 198.0 | 14.8 | 6.9 | 4.2 | 24.4 | 139.1 | 42.3 | 5.4 | 1.3 | 3.1 | 58.0 | 531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.5 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 194.3 | 28.5 | - | 28.7 | - | 30.9 | - | 30.4 | - | 30.6 | - | 29.7 | - | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 31.7 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 19.4 | 361.2 |
| Refinancing proceeds | 50.0 | - | - | - | - | - | 10.0 | - | - | - | - | - | 20.0 | 30.0 |
| **Total operating receipts** | 1,765.5 | 124.2 | 283.8 | 108.2 | 67.5 | 110.1 | 103.1 | 225.0 | 143.9 | 96.5 | 73.6 | 121.4 | 125.0 | 1,582.2 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | (0.6) | (11.7) | - | (1.1) | (1.2) | (8.8) | (1.9) | (5.7) | - | - | - | - | (30.8) |
| Subsidy payments | (50.0) | (0.9) | (5.0) | (7.2) | (2.1) | (4.2) | (0.1) | (8.1) | - | (5.0) | (3.9) | (1.6) | - | (40.1) |
| Distributions - tax authorities | (374.4) | - | (110.1) | (34.3) | - | - | - | - | (79.4) | (14.7) | - | - | (44.7) | (283.2) |
| Distributions - UTGO | (8.6) | - | (1.5) | (11.0) | - | - | - | - | (1.3) | (52.1) | - | - | (2.7) | (68.6) |
| Distributions - DDA increment | (16.9) | (1.9) | (3.3) | (0.6) | (1.3) | (1.8) | (1.0) | (0.5) | (0.4) | (0.4) | - | - | - | (11.4) |
| Income tax refunds | - | - | - | (6.2) | - | - | (1.5) | (5.9) | - | - | (3.9) | (1.7) | - | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (32.2) | (405.3) |
| Professional fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sub-total operating disbursements | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.8) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | (1,831.0) | (107.3) | (241.1) | (151.7) | (89.6) | (109.6) | (101.0) | (77.2) | (175.9) | (149.8) | (98.8) | (116.9) | (159.4) | (1,578.2) |
| **Net cash flow** | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| Cumulative net cash flow | (65.5) | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | 4.0 | 4.0 |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 33.8 | 33.8 |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.0) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $1.9 | $(1.4) | $11.5 | $14.0 | $(9.1) | $(7.1) | $(21.5) | $24.4 | $52.6 | $61.9 | $37.6 | $39.7 | $14.1 | $14.1 |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | (64.4) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

# FY 2014 Forecasted Cash Flow to Year End

*$ in millions*

| | Forecast Jul 13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 4.0 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | 7.6 | | | | 4.0 | 4.0 | 1.8 | | | | | | 17.4 |
| State revenue sharing | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | | | | | | | | | | | | | |
| **Total operating receipts** | 139.1 | 236.9 | 100.9 | 91.0 | 97.2 | 83.2 | 255.0 | 81.3 | 99.6 | 80.0 | 94.6 | 111.9 | 1,470.7 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | | (24.0) | (253.1) |
| Distributions - UTGO | | (12.0) | | | | | | | (44.9) | | | | (56.9) |
| Distributions - DDA increment | | | | | | (8.0) | | | | | | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (.06) | (0.3) | (1.5) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| **Sub-total operating disbursements** | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | (129.6) | (191.0) | (138.6) | (123.5) | (102.9) | (114.3) | (173.4) | (110.0) | (160.2) | (166.1) | (100.1) | (159.3) | (1,669.1) |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | (198.5) |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | 81.6 | 63.7 | 34.9 | 25.6 | 111.8 | 117.2 | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | $43.3 | $89.2 | $51.5 | $18.9 | $13.2 | $(17.9) | $63.7 | $34.9 | $(25.6) | $(111.8) | $(117.2) | $(164.7) | $(164.7) |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $13.5 | $33.8 | $27.4 | $(3.8) | $(10.5) | $(56.5) | $(22.8) | $(47.2) | $(52.7) | $(138.2) | $(145.7) | $(184.4) | $(184.4) |
| *Memo:* | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (113.9) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

**IN THE ABSENCE OF A COMPREHENSIVE FINANCIAL RESTRUCTURING, BUDGET DEFICITS WILL CONTINUE FOR THE FORESEEABLE FUTURE.**

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.

# A Look at the Future in the Absence of Restructuring Initiatives

*Note: The following projections were prepared based solely on the City's current levels of operating expenses and capital expenditures and do *not* account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

($ in millions)

| | FISCAL YEAR ENDED ACTUAL | | | | | PRELIMINARY FORECAST | | | | | 5-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $276.5 | $240.8 | $216.5 | $228.3 | $233.0 | $238.7 | $243.4 | $247.3 | $249.0 | $250.7 | $1,229.1 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.0 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO millage & non-General Fund POCs) | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other operating expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| **Net operating surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total surplus (deficit)** | $(52.9) | $(124.1) | $178.3 | $(56.9) | $(121.8) | $89.6 | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(1,021.4) |
| Accumulated unrestricted General Fund deficit | $(219.2) | $(331.9) | $(155.7) | $(196.6) | $(326.6) | $(237.0) | $(427.5) | $(687.9) | $(1,002.0) | $(1,348.0) | |

# THE CITY HAS TAKEN ACTION TO ADDRESS ITS FINANCIAL CHALLENGES

The City has already taken numerous steps to improve its financial position including expense savings and revenue increases. These initiatives save the City an estimated $200 million per year but they also impose substantial burdens on the City's workforce and residents.

**Headcount Reductions.**

- Since 2011, the City has reduced its headcount by more than 2,700 employees (from 12,302 employees as of close of FY 2010 to approximately 9,560 as of May 31, 2013).

- The City's headcount reductions have resulted in annual savings of over $100 million.

**Reductions of Labor Costs through Implementation of City Employment Terms.**

- On July 12, 2012, the Financial Advisory Board approved the CETs for (i) employees in unions with expired CBAs and (ii) nonunion employees, effective as of July 17, 2012.

- Among other things, the CETs provide for (i) wage reductions (implemented through imposition of furlough days); (ii) caps/reductions on vacation/holiday pay/overtime/sick days; (iii) the reduction of pension multipliers; and (iv) changes to healthcare coverage.

- Implementation of the CETs provides for an estimated $102 million in annual savings.

  - $25 million in savings attributable to wage reductions (24% of savings).

  - $59 million in savings attributable to reduced active and retiree benefits (59% of savings).

  - $9 million in savings attributable to reduced pension costs (9% of savings).

  - $8 million in savings attributable to changes to work rules (8% of savings).

53

- **Police Work Rules.** The CETs implement a number of changes to work rules governing the DPD. For example, the CETs implement changes related to (i) the establishment of a joint labor/management committee to determine the assignment of civilians to certain job functions (*i.e.*, "civilianization"); (ii) the ability of the chief of police to hire and deploy personnel; (iii) limitations on court time pay, holiday pay, eligibility for overtime pay, holiday pay and bonus vacation days; (iv) elimination of educational reimbursement programs; (v) elimination of "wage differential" compensation while employees are on roster for promotion; and (vi) delaying separation payments.

- **Other Union Rules.** The CETs also implement a number of changes to work rules governing those unions with contracts that expired on or before June 30, 2012. For example, the CETs implement changes related to (i) freezing sick leave banks and eliminating reserve sick leave accrual; (ii) elimination of sick time cash payouts for future earned time; (iii) reserving the City's right to reinstate furlough days; (iv) elimination of the $3-per-day allowance for daily car usage; (v) elimination of four to six annual bonus vacation days; and (vi) reduced vacation accrual to 160 hours from 320 hours.

**Revenue Generating Initiatives.**

- **Increased Corporate Tax Rate.** In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue.

- **Enhanced Tax Collection Initiatives.** The City has implemented, and is implementing, initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes could generate an estimated $13 million in additional annual revenue.

- **Increased Lighting Rates.** In January 2013, the PLD increased its rates to more closely align with market rates/ eliminate practice of charging customers less for power than the City itself was paying. Increased PLD rates could generate an estimated $9 million in additional annual revenue.

**Significantly Reduced Operating Expenses.**

- **Reductions in Vendor Costs.** The City is implementing an initiative to reduce its vendor-related costs by 10%. Reductions in vendor costs are expected to save an estimated $10 million annually.

- **Reduction in Subsidy to DDOT.** In 2012, the City undertook steps to improve the efficiency of the Detroit Dep't of Transportation (*e.g.*, through route rationalization), thereby reducing the subsidy from the City's General Fund to the DDOT enterprise fund by approximately $15 million annually.

54

**Deferred Capital Expenditures.**

- The City has deferred capital expenditures.

  - Average aggregate capital outlays for the fiscal years 2008 – 2012 were only $82.98 million. Average aggregate capital outlays for the preceding fiscal years 2003 – 2007 were $151.94 million.

  - For fiscal years 2014 – 2023, it is estimated that General Fund necessary capital expenditures will average approximately $145 million.

**Demolition Initiative.**

Program launched in April 2010 with the goal of demolishing 10,000 vacant structures in 3 years.

- Over 5,000 structures have been demolished; the remaining portion of the 10,000 structures in the program are planned to be demolished by December 2013.

- Despite $72 million in committed and expended funds for this initiative, there is a funding gap of $40 million to complete the demolition of 10,000 structures and achieve the program's goal.

- Demolition initiative only addresses 13% of the vacant buildings in the City and 26% of such buildings that are classified as dangerous.

  - Ancillary demolition initiative in partnership with State allocated $10 million related to mortgage-related settlement to targeted demolition of 1,234 structures around schools. 179 structures demolished as of February, 28, 2013 (with another 56 under contract).

**Execution of Consent Agreement/Creation of Financial Advisory Board.**

- **Early 2012:** City and State negotiate a "Financial Stability Agreement" (often referred to as the "Consent Agreement") in an effort to achieve (i) financial stability for the City and (ii) a stable platform for future growth.

- The City Council approved the Consent Agreement on April 4, 2012. The Consent Agreement was executed by the Mayor, the members of a State-appointed Financial Review Team, the State Treasurer and the Governor as of April 5, 2012.

- The Consent Agreement created a "Financial Advisory Board" (the "*FAB*"), of nine members selected by the Governor, the State Treasurer, the Mayor and City Council.

  - Under the Consent Agreement, the FAB had an oversight role and limited powers over certain City reform and budget activities.

  - The FAB has held, and continues to hold, regular public meetings and continues to exercise its oversight functions consistent with the Consent Agreement.

- To implement the reform efforts set forth in the Consent Agreement, the positions of "Chief Financial Officer" and "Program Management Director "were established. Each report to the Mayor.

**Legislation Authorizing Appointment of an Emergency Manager ("*EM*").**

- In 1990, the Michigan Legislature enacted Public Act 72 ("*PA 72*"), which empowered the State to intervene in municipalities facing financial crisis through the appointment of an EM who, once appointed, assumed many of the powers ordinarily held by local elected officials.

- Effective March 16, 2011, the Legislature repealed PA 72 and enacted Public Act 4 ("*PA 4*"). PA 4 enhanced the State's power to intervene in financially troubled municipalities by, for example, giving EMs the authority to unilaterally modify, reject or terminate municipal contracts.

- Michigan voters rejected PA 4 by referendum on November 5, 2012.

- The Michigan Court of Appeals ruled that the rejection of PA 4 automatically revived PA 72.

- Effective March 28, 2013, the Legislature enacted Public Act 436 ("*PA 436*"), which repealed and replaced the revived PA 72.

  - Like PA 4, PA 436 empowers EMs to modify, reject or terminate municipal contracts.

  - PA 436 contains an appropriations provision that immunizes the law from referendum.

56

**Appointment of EM.**

- Pursuant to PA 72, on December 19, 2012, Governor Snyder appointed a Financial Review Team to examine the City's financial situation.

- On February 19, 2013, the Financial Review Team issued a report concluding that Detroit was in a state of financial emergency.

- Based upon the Financial Review Team's findings, on March 1, 2013, the Governor determined that a financial emergency existed in Detroit — a determination that, under PA 72, required the Local Emergency Financial Assistance Loan Board ("LEFALB") to appoint an EM for Detroit.

- On March 14, 2013, the LEFALB appointed Kevyn Orr as EM for Detroit.

- Mr. Orr's first employment contract became effective on March 25, 2013, the day Mr. Orr began work as EM. Three days later, on the date PA 436 repealed and replaced PA 72, Mr. Orr and the State entered into a second contract.

**Litigation Relating to Detroit EM Appointment.**

- In *Davis v. Local Emergency Financial Assistance Loan Board*, pending in the Ingham County Circuit Court, the plaintiff (i) alleges violations of Michigan's Open Meetings Act by the LEFALB in connection with Mr. Orr's appointment as Detroit EM and (ii) requests that the court invalidate that appointment.

  - Case law indicates that the LEFALB is not a public body subject to the Open Meetings Act.

  - Parties are currently engaged in various discovery disputes and dispositive motion practice; answer yet to be filed.

- In *Citizens United Against Corrupt Government v. Local Emergency Financial Assistance Loan Board*, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiff (i) argues that Mr. Orr could not have been appointed under PA 72, because that law could not have been in effect and (ii) asks the court to reverse its previous opinion that voter rejection of PA 4 revived PA 72.

**Litigation Challenging PA 436**

- In *Phillips v. Snyder*, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiffs seek, among other things, (i) declaratory relief that PA 436 violates, among other things, the U.S. Constitution and the Voting Rights Act; and (ii) injunctive relief, among other things, preventing the Defendants and any EMs from exercising rights under PA 436. A hearing on the defendants' motion to dismiss is scheduled for August 21, 2013.

- In Detroit NAACP v. Snyder, pending in the U.S. District Court for the Eastern District of Michigan, the plaintiffs seek an order declaring that PA 436 violates the Due Process and Equal Protection clauses of the U.S. Constitution. The plaintiffs assert that the Michigan Legislature violated the pre-clearance requirement of section 5 of the Voting Rights Act in passing PA 436. The plaintiffs seek injunctive relief against any actions taken pursuant to PA 436, including all actions initiated by EMs.

**Litigation Concerning Actions Taken by Other EMs.**

- Since 1990, EMs have been appointed to restructure the finances of Hamtramck, Highland Park, Flint, Three Oaks, Pontiac, Ecorse, Benton Harbor, Allen Park — and now Detroit. Except for Hamtramck, Highland Park, Ecorse and Three Oaks, each of these municipalities remains under the control of an EM. The school districts of Detroit, Highland Park and Muskegon Heights also are currently operating under EM control.

- Opponents have challenged various EM actions in administrative proceedings, arbitration and lawsuits with mixed results.

  - **Litigation Relating to Actions Affecting CBAs.** Under PA 4, EMs have ordered unilateral modifications to CBA provisions. Plaintiffs have challenged such modifications on federal and state law grounds, including constitutional challenges based on Contracts Clause and Due Process arguments.

    - **Limitation on EM Power to Modify CBAs.** On March 29, 2013, the United States District Court for the Eastern District of Michigan enjoined an EM's unilateral modifications to CBAs with unions representing municipal retirees. The EM had shifted certain health care costs from the municipality to retirees. The court granted the plaintiffs' motion for a preliminary injunction on Contracts Clause and Due Process Clause grounds. An appeal is pending before the Sixth Circuit Court of Appeals.

58

- **Litigation Relating to Changes in Salaries of Local Elected Officials.**

  - EMs have reduced the compensation paid to mayors and city council members, at least on a temporary basis. Courts have held that local elected officials do not have property rights to continued compensation at a pre-existing level, and that an EM can eliminate elected officials' salaries entirely.

- **Litigation in Connection with Termination of Unelected Municipal Employees with "For Cause" Contracts.**

  - While an EM's broad power to hire and terminate at-will municipal employees has not been subject to any legal challenges, the Sixth Circuit Court of Appeals recently affirmed a ruling that, under PA 72, an EM did not have authority to fire a municipal employee who was not a department head, and whose employment contract provided for dismissal only "for cause," without first providing notice and an opportunity to be heard.

- **Litigation in Connection with Modification or Termination of Municipal Contracts.**

  - PA 4 contained a provision authorizing an EM to "[r]eject, modify, or terminate 1 or more terms and conditions of an existing contract." PA 436 contains identical language.

  - Although no ruling to date has invalidated the statutory authority of an EM to modify or reject contracts, a Michigan circuit court recently ruled PA 4's contract-modification provision unconstitutional as applied.

  - The U.S. District Court for the Eastern District of Michigan recently rejected cross-motions for summary judgment and scheduled a bench trial to resolve a claim that an EM's termination of real estate leases violated the Contracts Clause of the U.S. Constitution.

- **Litigation in Connection with Bidding Processes for Municipal Contracts.**

  - Recent litigation regarding the fairness and transparency of a contract bidding process instituted by an EM was settled prior to decision (and after denial of injunctive relief).

- **Litigation Concerning Michigan's Open Meetings Act.**

  - The Michigan Court of Appeals has held that an EM is not subject to the state Open Meetings Act, even when the EM assumes the duties of a body that is subject to the act (*e.g.*, the city council).

- **Litigation Concerning Restructuring a Municipal Pension Board.**

  - In a case that may be particular to PA 72, displaced pension board members and others obtained an injunction staying an EM's decision to restructure a city's largest pension board (reducing its membership from 11 to 5) in Michigan circuit court. The defendants have moved for leave to appeal in the Michigan Court of Appeals.

13-53846    Doc 11-1    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 66 of 135

**Continuing Role of Mayor and City Council.**

- Under PA 436, Mr. Orr acts for and in the place of the Detroit mayor and city council.

- PA 436 prohibits Detroit's local elected officials from exercising any powers except as expressly authorized by PA 436 or as authorized in writing by Mr. Orr and subject to any conditions he may impose.

- Nevertheless, both the Mayor and the City Council have continuing legal roles and rights under PA 436. Maintaining such offices should help ensure that the executive and legislative branches of City government can resume full functioning upon the City's transition out of receivership.

- On March 25, 2013, Mr. Orr issued an order restoring the full salaries and benefits of the mayor and city council, which compensation otherwise would have been automatically eliminated on PA 436's effective date of March 28, 2013.

- On April 11, 2013, Mr. Orr issued an order authorizing the mayor and city council to continue conducting the day-to-day business of the City, subject to limitations imposed by PA 436 and Mr. Orr's ultimate approval.

- Since Mr. Orr's appointment, the FAB continues to serve, but its responsibilities and powers remain subject to modification.

60

# RESTRUCTURING AND REINVESTING IN CITY GOVERNMENT

To address the crises confronting the City and remedy the deficiencies in services addressed above (including, in particular, deficiencies in services relating to public safety), and to achieve a sustainable restructuring that promotes the longterm health, safety and growth of the City, the City must aggressively pursue – and devote substantial resources to – the objectives described below.

The City proposes to spend approximately $1.25 billion over the next ten years to, among other things, (i) improve the performance and infrastructure of its Police, Fire, EMS and Transportation Departments, (ii) comprehensively address and remediate urban blight, (iii) modernize its information technology systems on a City-wide basis and (iv) address lingering issues plaguing the City's electrical grid and lighting.

A detailed summary of the reinvestments to be made in the City — and the associated costs — is attached hereto as Appendix J.

## PUBLIC SAFETY

**Police.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Exceedingly high crime rates.
  - Outdated and obsolete information technology.
  - Poor quantitative performance (*e.g.*, low response times; low case closure rates)
  - Inadequate staffing, low employee morale and lack of employee accountability.
  - Aging infrastructure (*e.g.*, fleet and facilities).

61

- **Measurable Objectives.**
  - Reduce response times to the national average.
  - Improve closure rates and first responder investigations.
  - Update and overhaul police fleet and facilities.
  - Modernize the Department's information technology.
  - Achieve compliance with federal consent decrees.
  - Refine structure, staffing and organization of department to better serve citizens; hold all members (sworn and civilian) of the department accountable to effectively maintain core responsibilities of policing.

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward**
  *(numbers in brackets represent increases in expenditures)*:

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (5.7) | (5.5) | (4.3) | (3.4) | (3.9) |
| Fleet Update - Repairs & Maintenance | (11.6) | (11.0) | (10.7) | (10.6) | (9.8) |
| Technology/Other | (9.0) | (6.2) | (1.1) | (1.1) | (1.1) |
| Total | (26.3) | (22.7) | (16.1) | (15.1) | (14.8) |

62

- **Initiatives To Be Undertaken to Achieve Objectives.**

  - Hiring of new police chief to drive DPD restructuring (in process).

  - Implement Compstat (*i.e.*, data-driven policing) model to increase accountability of command staff; evaluate outsourcing crime analysis to a third party with deep statistical analysis capabilities; implement key performance metrics driven by crime data.

  - Restructure department and streamline cumbersome processes to improve operational efficiency; evaluate precincts, districts and special units; utilize accountability metrics and IT systems to eliminate non-productive policing time.

  - Enhance DPD collaboration with all facets of community (*e.g.*, individuals, neighborhood groups, clergy, schools, private social service agencies); facilitate relationships with all facets of government.

  - Expand "Citizens Radio Patrol" to serve as extended eyes and ears of the DPD, thereby increasing law enforcement effectiveness; deploy to all areas of Detroit. A recently-implemented "Broken Windows" pilot project has achieved positive results in the 8th Precinct's Rosedale Park neighborhood. This pilot project could be expanded City-wide.

  - Restructured operations and deficient sworn staffing levels will be addressed by a comprehensive workload analysis and crime statistics trends; redeploy sworn members based on data-driven approach.

  - Civilianize eligible administrative functions and redeploy sworn officers.

  - Hold all members (sworn and civilian) of the department accountable; redesign disciplinary process and ensure it is transparent, consistent and effective.

  - Develop strategy to address low employee morale.

  - Provide adequate operational and technological resources to officers (*e.g.*, uniforms, vests, tasers, vehicles, IT, etc.).

  - Better utilize police reserves.

  - Develop detailed recruiting strategy (with respect to both new recruits and experienced hires); explore outsourcing all or a portion of Police Academy training to local MCOLES certified academic institutions; continue to provide training courses on DPD rules, regulations, policies, and City ordinances; develop overall training plans for metrics, financials and operations.

63

- Evaluate location, number and condition of facilities (owned and leased); refresh vehicle fleet; increase facility and fleet maintenance expenditures to appropriate levels.

- Select and implement a fully integrated IT system; implement Jail Management System.

- Develop contracts and memoranda of understanding with neighboring law enforcement agencies for the sharing of resources (police, fire and EMS); enhance regional public safety with local and state public safety community cooperation.

- Increase fees for service ($2-3 million potential opportunity); expedite Eticketing implementation; identify additional grant funding to support public safety initiatives; pursue opportunities for donations; evaluate improving/outsourcing collections efforts.

- Restructure budget process to eliminate silos; implement budget to actual process; transfer budget and actual financial ownership to Command officers.

- Implement outsourcing contract with the Michigan Department of Corrections ("MDOC") to consolidate all DPD pre-arraignment jail operations into one centralized jail.

### Fire and EMS.

- **Key Issues and Deficiencies to Be Addressed.**

  - Aging infrastructure (*e.g.*, fleet and facilities).

    - Inadequate maintenance and faulty equipment.

    - Outdated and obsolete information technology.

  - **Measurable Objectives.**

    - Modernize fleet and facilities to ensure that DFD has adequate and reliable infrastructure and equipment to perform its duties.

    - Modernize information technology.

    - Improve operating efficiency and cost structure.

64

- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward** (*numbers in brackets represent increases in expenditures*):

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (4.5) | (4.0) | (4.1) | (18.4) | (1.1) |
| Fleet Update - Repairs & Maintenance | (0.6) | (1.9) | (2.0) | (2.0) | (2.1) |
| Technology/Other | (1.3) | (0.2) | (0.2) | (0.2) | (0.2) |
| Total | (6.3) | (6.1) | (6.2) | (20.6) | (3.4) |

- **Initiatives To Be Undertaken to Achieve Objectives.**

  - Substantial investments in assets and new information technology are required to improve delivery of services.

  - Evaluate and implement revenue enhancements to improve and streamline billing and collections processes, increase charges and fees and enhance grant identification and management.

  - Take steps to improve operating efficiency and cost structure, including:

    - Implementing flexible labor work rules and employment terms;

    - Evaluating opportunities to more fully integrate fire-fighting and EMS;

    - Civilianizing administrative functions;

    - Transferring apparatus maintenance to General Services Department in an effort to more efficiently manage the fleet; and

    - Increasing the use of technology to drive efficiencies.

  - Seek assistance from independent experts to assist with designing and vetting DFD-specific restructuring plan.

  - Evaluate opportunities to share administrative costs within public safety structure.

  - Evaluate opportunities to combine fire and/or EMS services with other local municipalities.

**Blight Removal.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Large numbers of abandoned and blighted structures.
  - Contribution of blight to high fire and crime levels and depressed property values.
  - High cost of demolition of blighted structures.
  - Cumbersome statutes and regulations governing blight removal efforts.
- **Measurable Objectives.**
  - Stabilize and revitalize neighborhoods and communities within the City and improve quality of life.
  - Decrease incidence of crime and fire in blighted buildings and areas.
  - Increase property values and property taxes.
  - Improvement in appearance of City.
  - Reduce migration from City.
- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward**
  - Costs associated with blight removal include demolition, brush removal, recycling centers, disposal of debris, logistics, administration, and legal costs associated with clearing title and preserving the City's right to reimbursement of costs.

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Blight Costs | 50.0 | 50.0 | 100.0 | 100.0 | 100.0 |

66

- **Initiatives to Be Undertaken to Achieve Objectives.**

  - The City has begun and will continue to remediate blight within the City by partnering with public and private initiatives and utilizing a mix of Federal, State, municipal and private (commercial and non-profit) resources.

  - The City's will participate in broader State initiatives coordinated by the Michigan State Housing Development Authority (MSHDA) and focus on collaboration across public entities holding underutilized lands; effective and appropriate blight removal policies and regulation; efficient and safe demolition and clearing activities from publicly owned properties; and returning properties to the private tax base to create value.

  - To the extent that resources become available to remediate blight within the City, the City may be able to accelerate its residential, commercial and industrial blight remediation, or reallocate budgeted resources to other initiatives or spending items, including supporting its liabilities.

  - Pursue grant funds to pay for the demolition of abandoned structures.

  - Review and, where appropriate, revise ordinances and regulations to speed and reduce the cost of the demolition process.

  - Support construction of recycling centers for local demolition materials via volume or other commitments.

  - Consolidate and integrate Police and Fire activity data to use strategic demolition activities as a means to reduce crime and arson.

**Electrical Transmission Grid.**

- **Key Issues and Deficiencies to Be Addressed.**
  - Inadequate maintenance and deterioration of grid.
  - Need to de-commission segments of the grid, sub-stations and the Mistersky power plant.
  - Inefficient billing and collection efforts.

- **Measurable Objectives.**
  - Improvement in performance of grid and services to citizens.
  - Decommissioning of grid, sub-stations and power plant.
  - Increased revenue collection from customers.

- **Initiatives to Be Undertaken to Achieve Objectives.**
  - The City is considering alternatives to exit the electricity business.
  - An alternative being considered consists of migrating customers to an alternative provider over a five- to seven-year period with the alternative provider providing reimbursement to the City to maintain the distribution grid on the provider's behalf.
    - Five- to seven-year build-out:
      - i. Year 1 — meters changed to alternative provider's system and customers transitioned. PLD continues to operate and maintain the system during the transition period.
      - ii. Years 2-7 — customers migrate to alternative provider's grid on a substation by substation basis as the PLD operation is simultaneously scaled down.
  - Customers (including City) would pay alternative provider's rate book (which could be higher than the current rate charged/incurred by City).
  - PLD workers and/or third party contractors will operate and maintain City grid until build-out is finished (cost reimbursed by alternative provider subject to negotiation). Requires regulatory approval.

68

**Street lights**

- **Key Issues and Deficiencies to Be Addressed.**
  - High percentage of non-functioning streetlights.
  - Working lights not adequately serving current population footprint.
  - Dated infrastructure requiring upgrade and modernization.
- **Measurable Objectives.**
  - Implementation current population-based streetlight footprint.
  - Outsource operations and maintenance to the newly-created Public Lighting Authority structure (in consultation with the City).
  - Improved service to citizens and better cost management.
- **Initiatives to Be Undertaken to Achieve Objectives.**
  - Short term: address outages systematically in an effort to restore light and facilitate the transition of streetlights to the new structure.
  - Long term: newly-established authority to upgrade, operate and maintain streetlights, resulting in an approximately 46,000-55,000 light footprint servicing today's Detroit.
    - Three year build-out (1/3 of lights each year).
    - Alternative provider will potentially manage project for Authority (subject to competitive bid).
    - Authority or City will negotiate special rate for operations and maintenance/electricity of lights as no regulated rate exists for operations and maintenance of municipal-owned system.
- **Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward.**
  - Under the proposed structure, the PLD's net tax cost is expected to be approximately $12 million annually.
  - The $12.5 million of utility users' tax will be directed to the Authority as per statute. The Authority may seek to issue debt of $160 million secured by tax receipts to fund its activities.

**Information Systems Upgrades**

- Investment by the City in upgraded information technology is an indispensable aspect of the restructuring and reinvestment proposals and is critical to achieving almost all of the objectives described herein.

- **Key Issues and Deficiencies to Be Addressed.**

  - Old and outdated technology assets and applications.

  - Lack of integration of IT infrastructure between departments and functions.

  - Deficiencies in IT infrastructure present throughout City government.

- **Measurable Objectives.**

  - Enhance City-wide IT infrastructure to assist with effectuating change and augmenting workflows.

  - Increase integration between finance and operational systems City-wide resulting in lower labor costs and improved efficiencies.

  - Improve financial and operational reporting, resulting in:

    - Ability to monitor and improve operating performance.

    - More timely and accurate financial reporting to interested parties.

    - Improve revenue and collection efforts as a result of streamlined processes.

- **Initiatives to Be Undertaken to Achieve Objectives.**

  - **DPD, DFD & EMS.**

    - DPD has identified a fully integrated public safety solution (SunGard/OSSI) that can provide DPD, DFD and EMS (all of which support the solution) with integrated computer aided dispatch, records management and reporting.

    - Regional solution that integrates the City of Detroit with Wayne County, Detroit Public Schools, Wayne State University, Down River communities, etc.

    - Costs to implement Public Safety IT solution: approximately $5 million.

    - An integrated product will allow for much-needed data exchanges between agencies and will improve efficiency and operations.

70

- **Payroll System Upgrade.**
  - In November 2012, the City contracted to transition its payroll (and benefits and human resources) operations to ADP Payroll Services. The transition is expected to be complete in March 2014.
  - Benefits of payroll system upgrade:
    - Approximately $10 million annual reduction in payroll processing costs.
    - Approximately $10 million annual reduction to payroll inflation from errors.
    - Improved reporting, efficiency and accuracy.
    - Approximately 50+ uniformed policemen to be re-deployed.

- **Overhaul and Centralize Grant Management System.**
  - City receives approximately $293 million in grants related to its services each year.
  - City may invest in an overhaul of the administration of its grant management system, including centralizing oversight and support and standardizing information technology.
  - City may appoint an auditor general to screen for potential mismanagement of grant funding.
  - Benefits:
    - Implementing a centralized and standardized grant IT system is expected to result in the City receiving more grant funds with better compliance at a lower cost.
    - Ability to comprehensively track Citywide grant funds and status.
    - Citywide accountability structure to prevent disallowed costs and improve service delivery.
    - Improved relations with federal, state and private funders.
    - Ability to discover and apply for more grant opportunities.

- Costs:
  - Training modules to migrate system (cost TBD).
  - Implementation of grants IT module and related training.
  - Potential operating costs for grants management operating unit are approximately $700,000.

- **Assessor's Office and Property Tax Division.**
  - Recommendations made by consultant in 2011 have not been followed, even though implementation promises to increase efficiency of collection process.
  - A consultant is currently engaged to identify issues and make recommendations at Assessor's Office Division. The consultant's Property Tax Transformation Project engagement includes a review and assessment of operations and related recommendations, assistance with the Property Tax software upgrade and assistance with the preparation of the Summer Tax Bill for mail and distribution on July 1, 2013.
  - Preliminary recommendations to improve the Assessor's Office functionality include additional resources to create a more robust valuation function, additional employee training and updated technology to increase efficiency and improve customer service.

- **Integrate Budgeting, Accounting & Financial Reporting Systems.**
  - Integration of Accounting, Budget Development and Financial Reporting systems into a single process would provide for improved reporting, efficiency, accuracy and accountability.
  - Costs to implement such an integration initiative are not currently known.

72

- **Permitting.**
  - Implement "Enterprise Resource Planning" system to replace the two systems currently being utilized.
  - Total costs to implement Enterprise Resource Planning system: approximately $3 million.
- **36th District Court.**
  - State legislature is currently evaluating ability of all courts to go paperless; if accepted, paperless solution would provide many advantages to 36th District Court.
  - Transition to paperless court requires substantial investments in assets and new information technology.
  - Perform process mapping to determine workflow improvements and implement full use of JIS.
- **Income Tax Division.**
  - Update the current Income Tax System, which will result in (i) increased revenues for the City through improved revenue tax processing, tax compliance and collection; and (ii) improved reporting, efficiency and accuracy.
    - A new tax system that allows for automated processing and e-filing capability will free up City resources to focus on compliance.

**Detroit Department of Transportation.**

- **Key Issues and Deficiencies to Be Addressed.**

  - Grant dollars not maximized.

  - Poor maintenance.

  - Relatively low rate for fares.

  - High employee absenteeism.

- **Measurable Objectives.**

  - Reduce general fund subsidy through increased revenue and reduced costs.

  - Determine best strategic direction for DDOT.

- **Initiatives to Be Undertaken to Achieve Objectives**

  - A consultant is currently identifying short and long-term efficiencies. Preliminary identified efficiencies include:

    - Grants for preventative maintenance (Summer 2013).

    - Increased fares (long-term potential).

    - Less overtime in vehicle maintenance (long-term potential).

    - Less bus operator overtime (long-term potential).

  - City could transition DDOT to new Regional Transit Authority ("RTA") at some point in the future.

  - No change in DDOT's status is currently included in restructuring plan or budget; foregoing discussion contemplates restructuring of DDOT as a continuing Department within the City.

  - DDOT could be merged with SMART or another private carrier prior to potential transition into RTA.

  - Outsourcing certain portions or all of DDOT operations:

    - Would likely require certain regulatory approvals.

    - City of Detroit would have to subsidize third party operations, which subsidy may be less than current general fund subsidy.

74

- Outsourcing could assist in creating appropriate incentive structure to discourage status quo operations.

- Some City employees would still be required to oversee transferred bus operations.

- Allow for easier potential transition to RTA.

- Limited labor and financial resources could be deployed to other city core services.

- Bus service could improve for residents (*e.g.*, on-time; safety) at lower cost to the City.

- Expected impact on restructuring/reinvestment expenses in FY 2014 and going forward – not including outsourcing of operations or transition to a regional authority (*numbers in brackets represent increases in expenditures*):

| ($ in millions) | FY 2014 | FY 2015 | FY 2016 | FY 2017 | FY 2018 |
|---|---|---|---|---|---|
| Total Restructuring/Reinvestment | | | | | |
| Facility Costs | (6.3) | (8.0) | (1.5) | (2.0) | |
| Fleet Update - Repairs & Maintenance | (1.0) | (1.0) | (1.0) | | |
| Technology/Other | (3.5) | | | | |
| Total | (10.8) | (9.0) | (2.5) | (2.0) | – |

**Leases and Contracts.**

- The City's restructuring will entail a comprehensive review of the City's contracts (vendor; employee; construction; financial) and recommendations regarding modification/termination in various restructuring contexts.

- The City will review its key leases and contracts to determine if such agreements are the most cost-effective approach to managing Detroit's infrastructure

  - City currently working to assemble database of unexpired contracts and leases.

  - City to analyze and overhaul procurement process to ensure ability to acquire goods and services necessary to restructuring initiatives.

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 82 of 135

**Labor Costs and Terms and Conditions.**

As part of the City's overall financial restructuring, reductions in costs associated with represented and unrepresented workers will be necessary. The adoption of modifications to wages and work rules similar to those imposed pursuant to the CETs will serve as a baseline position for the City in its union negotiations (although the City may seek (i) cuts/ changes beyond those included in the CETs and (ii) different language that used in the CETs). Key elements of the strategy for making these modifications include the following:

- **Collective Bargaining Agreements.**

  - Significant modifications to CBAs and labor-related obligations will be necessary to optimize staffing and reduce employment costs.

  - The City currently does not have agreements with the majority of labor unions representing its employees. Instead, most employees are working under the CETs. As part of its restructuring effort, the City will work cooperatively with organized labor to improve existing relationships and, where possible, reach agreements to implement changes in terms and conditions of employment that mirror the changes included in the CETs.

  - The City will attempt to structure all new labor agreements using a common form of agreement that will promote ease of administration and enable a known, measurable basis for cost evaluation and comparison.

  - If it is not possible to reach agreements with labor representatives to restructure employment liabilities, the City will retain the authority to unilaterally implement restructuring initiatives pursuant to the emergency manager powers established under PA 436.

  - Pursuant to Section 13(c) of the Federal Transit Act, the City is required to engage in collective bargaining with labor unions representing transportation workers and has certain limitations in terms of its rights to make unilateral changes to employment terms. The City will work within the framework established by the FTA to achieve any labor cost reductions for these workers through collective bargaining.

76

- **Salaries and Wages.**

  - The City must reduce employment costs for both represented and unrepresented workers as part of its restructuring. However, the potential for reductions in wages and salaries must be balanced against likely reductions in benefits and the City's need to attract and retain skilled workers.

  - Both represented and unrepresented City workers have already been subjected to salary and wage reductions; most City workers covered by CETs already have taken 5-10% salary and/or wage reductions. As a result, the City will need to carefully evaluate the utility of any additional reductions.

  - Reductions in non-wage compensation, overtime and premium payments may be achievable.

  - Other areas where the City is evaluating potential cost reductions include: (i) attendance policies; (ii) leaves of absence; (iii) vacation days; (iv) holidays; (v) union reimbursement of City costs associated with paid union time and dues check off; (vi) tuition reimbursement and other loan programs; (vii) overtime; (viii) shift scheduling; (ix) shift premiums; (x) creation of new positions (and establishment of wage scale for new positions); and (xi) temporary assignments.

- **Operational Efficiencies/Work Rules.**

  - Significant labor cost reductions may be possible by restructuring jobs and streamlining work rules for both represented and unrepresented workers using the work rule changes implemented pursuant to the CETs as a template.

  - The City will work with labor representatives to make these improvements, including restructuring the Police Department, Fire Department, and other groups to improve operating efficiency and effectiveness.

  - Dispute resolution procedures under the City's CBAs will be simplified and expedited to achieve predictability for both sides. Further, the City will attempt to eliminate undesirable practices and assure that these practices cannot be revived through dispute resolution procedures.

  - The City will attempt to restructure CBAs so that employment decisions including promotions, transfers and assignments will be based upon the quality of the employee (*e.g.*, performance, attendance, experience, skill, ability, etc.) rather than by seniority.

- The City will attempt to (i) reduce lateral transfers by limiting bumping rights in its CBAs to job classifications that an employee currently holds or held within the prior year and (ii) increase flexibility to assign employees to work out of classification.

- Joint labor-management committees, if any, will be patterned in structure and role after the committees included in the State's CBAs.

- **Staffing Levels and Headcount.**

- Significant labor cost savings may be achievable by rationalizing staffing levels and reducing employee headcounts. Consolidation of departments and elimination of redundant functions will be implemented where service improvements or cost savings can be achieved.

- If necessary, the City will retain the right to reduce salary and wage costs by implementing unpaid furlough days.

- The City will work with labor representatives to minimize the effects of any headcount reductions and enter into effects bargaining agreements in connection with headcount reductions when appropriate.

- **Outsourcing.**

- Where cost savings or service improvements can be achieved, the City will explore potential outsourcing of functions.

- The City will provide unions with advance notice of competitive bids and allow the unions to bid on the work.

- The City will work with labor representatives to minimize the effects of any headcount reductions resulting from outsourcing initiatives and enter into effects bargaining agreements when appropriate.

78

# REVENUE ADJUSTMENTS AND TAX REFORM

## EXPANDING THE TAX BASE.

- The personal income tax base can be increased through economic growth, for example, more people working, higher wages, or both.

- Expansion of the property tax base results from appreciation in the value of existing real estate, adding newly constructed buildings to the tax rolls, or expanding the universe of property included in the base (*e.g.*, parcels that are currently exempt, such as churches and public schools).

## RATIONALIZING NOMINAL TAX RATES.

- The City's already high tax rates are widely believed to have contributed to its population loss and economic decline. For a number of reasons, higher tax rates could have a negative effect on revenue.

- The City is currently levying taxes at or near the statutory maximums.

- The City believes that lowering selected tax rates – primarily income and property tax rates – to levels that are at least competitive with surrounding jurisdictions is critical to reversing the City's crippling population and job losses.

- Although tax rate reform will likely lead to decreased revenue in the short term (which decreases may be partially offset by improved collection efforts), the City anticipates that the long term benefits promise to render such reform at least revenue neutral over a reasonable time frame.

- The City's analysis of necessary tax reforms is ongoing.

# INCREASING COLLECTION RATES.

- The City is implementing and will continue to implement initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis.

- **Income Tax Collection Initiatives:**

  - **Efforts to Improve Collection of Past Due Taxes**

    - Compuware has identified historical non-filers with outstanding tax obligations totaling approximately $250 million. The City is pursuing the collection of these taxes.

    - The City loses approximately $30 million to $45 million of income tax revenue annually (approximately 15% to 20% of the total tax collected) from reverse commuter non-filers.

    - As of March 2013, approximately 50,000 letters were sent to individual and business nonfilers. Goal is to send 100,000 letters total by the end of FY 2013.

    - As of January 31, 2013, the City had received approximately $870,000 in collections as a result of letters sent to non-filers.

    - Income Tax Amnesty Program: between January 22, 2013 and March 2, 2013, parties with outstanding income tax balances for tax years 2011 and prior could pay their back taxes without penalty.

      - Expected to result in $3 million in collections and $1.5 million in payment agreements as of March 2013.

  - **Efforts to Enhance Collection Going Forward**

    - Tax Compliance & Enforcement Unit created in October 2012.

    - Business on-line registration initiative to electronically capture W-2 data from employers launched in January 2013.

    - City considering purchasing a new tax system and moving to a common form.

      - Purchase of new income tax system — $2 million to $3 million one-time cost — would improve reporting, efficiency and accuracy.

80

- 19 of 22 cities in Michigan that collect taxes currently are using the "common form." Moving to the common form could result in a potentially smoother transition to a new income tax system, although the cost of such a move presently is unknown.

- City also intends to pass legislation to require withholding of City income taxes for reverse commuters.

- **Property Tax Collection Initiatives:**

  - Only 53% of City property owners paid their 2011 property taxes. Approximately $246.5 million in taxes and fees went uncollected for 2011, of which $131 million was due to the City.

  - Treasury Department received recommendations for process improvements from an outside consultant and the City's own audit department in 2011.

  - Subsequently, the City engaged a consultant to conduct a four-week *pro bono* review of the City's property tax process. The consultant recommended that the City create an actionable work place using existing recommendations supplemented with the consultant's recommendations.

  - As described above, in December 2012, the City engaged a different consultant to implement improvements in the Property Tax and Assessors Offices.

- **Permitting and Licensing Collection Initiatives:**

  - **Efforts to Collect on Past Due Invoices**

    - City is developing a structured collection effort for the $50 million outstanding accounts receivable owed to the Buildings, Safety Engineering and Environmental Department (BSEED).

    - City has identified, and is seeking payment of, approximately $8 million due from Wayne County for past due bills for permits and licenses (among other similar fees).

    - Updates to information technology systems (discussed earlier) should alleviate bottlenecks in invoicing and collections for permitting and licensing.

  - **Efforts to Improve Going Forward**

    - The goal is to increase the revenues derived from permits and licenses issued by the City.

      - City ceased waiving permit fees in March 2012.

    - City is developing recommendations for action, including a possible survey of businesses operating in the City and their outstanding permit and license requirements.

      - Currently, only 30% of businesses operating in the City have valid licenses. As of July 26, 2012, approximately 2,000 businesses were identified as being without a proper license.

# REALIZATION OF VALUE OF ASSETS

## DETROIT WATER AND SEWERAGE DEPARTMENT.

*The form of transaction described herein is based upon the form of transaction contemplated in the Root Cause Committee report. Any transaction would be contingent upon the City and relevant third parties reaching agreement on many matters, including, but not limited to, governance, amounts to be paid to the City, and the form and terms and conditions of such transaction. Thus, all of the terms and conditions of the transaction described below may change and it is possible that the current structure will not change.*

**Creation of New Metropolitan Area Water and Sewer Authority.** The City may form an authority (the Metropolitan Area Water and Sewer Authority, or "*MAWSA*") to conduct the operations currently conducted by the Detroit Water and Sewerage Department ("*DWSD*").

- MAWSA would operate as a standalone public authority and, depending on the form of any transaction, may be the employer of the employees engaged in operating the water/sewer systems who are employed by DWSD as of the effective date of any DWSD Transaction (defined below).

- MAWSA would be governed by a Board of Commissioners. The Mayor would have the authority to appoint four of the Board's members in accordance with the provisions of the February 2011 stipulated order entered in the EPA Litigation (the "*February Order*"), except that one of the four mayoral appointments would be made from a list of three names presented by the Detroit City Council. The other three Board members would be appointed as set forth in the February Order. The bylaws of MAWSA would include provisions to allow major customers to appoint additional Board members upon a super-majority vote of MAWSA's Board.

- MAWSA would have all of the powers of a public body corporate in Michigan including, but not limited to, the power to:

  - Hold property in its own name;

  - Contract in its own name;

  - Collect water and sewer fees;

  - Issue taxable and tax exempt revenue bonds or incur other indebtedness;

- Apply for and receive loans from local, private, State and/or Federal sources including SRF loans;

- Sue and be sued in its own name;

- Subject to applicable approvals, apply for NPDES and any and all other permits required to operate the water and sewer systems;

- Subject to applicable approvals, if any, implement the powers delegated by prior Court orders; and

- Act on its own with respect to local ordinances and regulations that impact MAWSA operations (*i.e.*, downspout disconnects, etc.).

- All other powers granted or reserved to the City, the Mayor or the City Council with respect to DWSD under the State constitution, State statutes, the City's Charter (as it may be revised as part of the City's comprehensive restructuring) or Court orders that are not expressly continued would be eliminated for as long as MAWSA continues to operate.

- The Detroit City Council would have the authority to appoint each year an individual to serve as a customer advocate for Detroit retail customers. The advocate's compensation would be set by the director of MAWSA or MAWSA's Board of Commissioners in accordance with MAWSA's procurement policy.

**Benefits and Legacy Liability Treatment** (*applicable where MAWSA is the employer of persons operating the water and sewer system*).

- From and after the effective date of the City's comprehensive restructuring plan, for new hires and current employees, MAWSA would establish and serve as its own plan sponsor and administrator with respect to the establishment of a new, separate pension or retirement plan. The new pension or retirement arrangement would govern the future pension or retirement rights of current DWSD employees and the pension or retirement rights of future MAWSA employees, consistent with applicable future CBAs and/or other terms and conditions of employment.

- From and after the effective date of the City's comprehensive restructuring plan, for new hires and current employees, MAWSA would determine whether to provide healthcare to future retirees, and at what level.

84

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 91 of 135

- From and after the effective date of the City's comprehensive restructuring plan, current DWSD retirees and beneficiaries who have vested benefits in the City's General Retirement System would remain in GRS and receive the same treatment afforded to all other retirees in the GRS as part of the City's comprehensive restructuring plan. Current DWSD active employees who have accrued vested pensions in GRS would, as to those accrued pensions, receive the same treatment afforded to all other active participants in the GRS as part of the City's comprehensive restructuring plan. GRS would continue to be liable for pension benefits accrued as of the date of the effective date of the City's comprehensive restructuring plan, consistent with that restructuring plan.

- From and after the effective date of the City's comprehensive restructuring plan, current DWSD retirees and beneficiaries who are receiving, or entitled to receive in the future, retiree healthcare benefits from the City would receive the treatment afforded to all other similarly-situated participants as part of the City's comprehensive restructuring plan. Current DWSD employees who are entitled to receive in the future retiree healthcare benefits from the City would no longer be entitled to such healthcare as of the Effective Date of the comprehensive restructuring plan, and would receive whatever retiree healthcare program is established by MAWSA from and after the effective date of the City's comprehensive restructuring plan.

- As indicated above, the City would retain DWSD's accrued pension liabilities and retiree healthcare liabilities as of the effective date of the City's restructuring plan, as both will be modified by such plan (collectively with DWSD's allocable portion of the COP payments, "*DWSD Legacy Benefits Obligations*"). As consideration for being relieved of those obligations, from and after the effective date of the City's comprehensive restructuring plan, MAWSA would include an amount attributable to the value of such relief from the DWSD Legacy Benefits Obligations as part of the Transaction Payment (as defined below).

**Potential Asset Transaction.**

- The City would either permit MAWSA to operate the DWSD assets through a concession agreement or lease the assets of DWSD to MAWSA pursuant to a lease agreement (either form of agreement for purposes of this document will be referred to as the "*City/MAWSA Agreement*"). If a transaction were effected pursuant to a lease agreement rather than a concession agreement, the City/MAWSA Agreement would be structured as a capital lease, and the initial term of the City/MAWSA Agreement would (i) be tied to the length of MAWSA's bonded indebtedness (but would not exceed 40 years) and (ii) automatically be extended as new bonds are issued by MAWSA as long as MAWSA remains in compliance with the terms of the City/MAWSA Agreement. To the extent that additional value may be obtained for the City, MAWSA could accept the sewer or water assets of other governmental entities. All of the foregoing is collectively referred to herein as the "*DWSD Transaction*."

- In exchange for the concession for/lease of the DWSD assets in favor of MAWSA and for the relief from DWSD Legacy Benefits Obligations, MAWSA would pay to the City a monthly PILOT, lease or other form of payment (the "*Transaction Payment*").

- The Transaction Payment would be paid to the City monthly and would be an amount equal to the sum of (i) an amount calculated on either the basis of the value of the DWSD assets or a percentage of water and sewer rates plus (ii) an amount calculated by reference to the value of the relief from DWSD Legacy Benefits Obligations plus (iii) any other amount based on relevant factors as agreed to by the parties in connection with the negotiation of the DWSD Transaction.

- The City would have customary market remedies in the event that MAWSA fails to make payment or otherwise defaults under the City/MAWSA Agreement.

- The City's use of the new payment stream from the Transaction Payment would be unrestricted, and the City could encumber or otherwise monetize all or a portion of that revenue stream.

- The effective date of the DWSD Transaction would be the effective date of the City's comprehensive restructuring plan.

- On the effective date of the DWSD Transaction, the existing bond debt of the DWSD would either be refinanced and redeemed or holders of the existing bond debt would receive new or restructured tax-exempt bonds. *See* Section IX (Restructuring Proposal) *infra*.

## COLEMAN A. YOUNG AIRPORT.

- Coleman A. Young International Airport is a two-runway general aviation airport located within and operated by the City. It includes approximately 263 acres.

- The airport has not offered commercial passenger service since 2000 (runways are too short to serve standard economic carrier traffic; approximately 225 corporate and private flights originate from, or terminate at, the airport daily.

- The airport's 2012-13 annual budget was $275,000.

86

- In November 2012, a consultant prepared a 10-year capital improvement program for the airport which included several rehabilitation plans, ranging from approximately $55 million (for upgrades to facilities other than runways) to $273 million (for a rehabilitation including a replacement runway funded in part by federal grants).

- Revitalization of the airport is a long-term project that will be addressed at a later date. The City will continue to subsidize operations as closing of airport would terminate certain federal subsidies and require the repayment of certain FAA grant monies previously received.

## DETROIT-WINDSOR TUNNEL.

- The 83-year-old Detroit-Windsor Tunnel is an automotive tunnel (*i.e.*, cars only; no trucks) connecting Detroit and Windsor, Ontario. Approximately 2 million vehicles pass through the tunnel annually.

- The City of Detroit owns the U.S. portion of the tunnel; the City of Windsor owns the portion located in Canada.

- Detroit Windsor Tunnel LLC leases the City's portion of the tunnel for an annual rental payment equal to 20% of the average annual revenue derived from the operations of the Detroit side of the tunnel over the most recent five years, which recently has been less than $1 million per year. Operating revenue for the Detroit side of the tunnel is less than $5 million per year. The lease runs through 2020.

## BELLE ISLE PARK.

- The City owns Belle Isle Park, a 982-acre park on an island in the Detroit River featuring a museum, a conservatory, golf courses and other attractions. The Detroit Recreation Department manages Belle Isle Park at a cost of approximately $6 million per year in maintenance and operating expenses.

- In January 2013, Governor Snyder proposed that the City lease Belle Isle Park to the State of Michigan, turning it into a state park and charging an admission fee to cover maintenance costs. Mayor Bing supported the proposal, but the offer was rescinded after the Detroit City Council failed to vote on the proposal.

- The City intends to enter into lease transaction with State on generally the same terms as the State's prior proposal.

## DETROIT INSTITUTE OF ARTS.

- As has been widely reported, representatives of the Emergency Manager met with representatives of the nonprofit corporation ("*DIA Corp.*") that currently operates the Detroit Institute of Arts to discuss the art collection exhibited there.

- It has also been reported that DIA Corp. contends that the collection is held by a public trust and cannot be used for any purpose other than exhibition or to maintain and enhance the collection itself.

- Further dialogue is anticipated.

## CITY OWNED LAND.

- An estimated 22 square miles of land within City limits is government-owned, including parcels owned by the City, Wayne County and the State of Michigan. The vast majority of this property has limited current commercial value.

- The City will continue to participate in broader initiatives consistent with the Consent Agreement, focusing on collaboration across public and private entities, blight removal and returning properties to the private tax base to create value.

## PARKING OPERATIONS.

**Parking Garages/Lots.**

- The City's Municipal Parking Department ("MPD") manages nine parking garages containing a total of 8,688 spaces, and two public parking lots together containing 1,240 spaces.

- The City owns certain of these parking facilities; others are owned by the Detroit Building Authority.

**Parking Meters.**

- MPD also operates 3,404 on-street metered parking spaces; tickets collected through a private vendor.

88

- MPD's projected revenue for 2012-13 is $12,900,314. Expenses are projected to be approximately $19 million (with the General Fund's portion being approximately $6 million).

- The City intends to market its parking related assets to private operators through a sale, long term lease or concession arrangements (and shutter the related departments) and use any proceeds that may be received to pay down $10 million in related special revenue debt.

- Transaction involving parking assets could potentially be consummated within six months of commencement of marketing process.

## JOE LOUIS ARENA.

- Joe Louis Arena is an indoor arena located in downtown Detroit, Michigan and is the home to the Detroit Red Wings of the National Hockey League. Completed in 1979, the 20,058 seat arena is Detroit's largest indoor venue and regularly hosts professional sports, college hockey, concerts, ice shows, circuses and other entertainment.

- It has been reported that the Illitch Holdings, owner of the Detroit Red Wings, is looking to build a new downtown arena for the team.

- The City is evaluating alternatives for Joe Louis Arena.

# TEN-YEAR PROJECTIONS

**(General Fund Only)**

($ in millions)

| | | | | | PRELIMINARY FORECAST | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $243.4 | $247.3 | $249.0 | $250.7 | $252.4 | $254.0 | $255.6 | $257.8 | $260.9 | $264.0 | $2,535.0 |
| State revenue sharing | 184.3 | 186.1 | 187.9 | 189.5 | 191.2 | 193.0 | 194.8 | 188.3 | 190.0 | 191.7 | 1,896.4 |
| Wagering taxes | 170.0 | 168.3 | 170.0 | 171.7 | 173.4 | 175.1 | 176.9 | 178.7 | 180.4 | 182.2 | 1,746.7 |
| Sales and charges for services | 124.8 | 119.4 | 118.2 | 117.0 | 115.7 | 114.5 | 113.4 | 112.3 | 113.2 | 114.2 | 1,162.6 |
| Property taxes | 118.4 | 110.2 | 105.7 | 100.8 | 100.5 | 99.6 | 99.7 | 100.2 | 100.8 | 102.1 | 1,038.0 |
| Utility users' and other taxes | 47.2 | 40.9 | 40.9 | 41.3 | 41.7 | 42.1 | 42.5 | 43.0 | 43.4 | 43.8 | 426.8 |
| Other revenue | 75.6 | 55.8 | 55.8 | 55.9 | 55.9 | 56.0 | 56.0 | 56.0 | 56.1 | 56.1 | 579.2 |
| General Fund reimbursements | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 302.6 |
| Transfers in (UTGO millage & non-General Fund POCs) | 89.0 | 87.9 | 83.8 | 84.4 | 83.9 | 81.2 | 80.6 | 80.0 | 65.0 | 61.2 | 797.1 |
| **Total revenues** | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 1,045.0 | 1,045.7 | 1,049.8 | 1,046.3 | 1,040.1 | 1,045.7 | 10,484.5 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (341.5) | (341.9) | (346.4) | (352.5) | (358.8) | (365.1) | (371.4) | (378.4) | (386.0) | (393.7) | (3,635.7) |
| Health benefits - active | (51.2) | (54.0) | (57.4) | (61.0) | (64.5) | (67.9) | (71.2) | (74.6) | (78.4) | (82.3) | (662.5) |
| Other operating expenses | (292.9) | (288.2) | (295.9) | (301.5) | (309.7) | (313.5) | (320.0) | (326.5) | (335.3) | (339.7) | (3,123.2) |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| **Net operating surplus** | 397.2 | 362.0 | 341.8 | 326.3 | 311.9 | 299.2 | 287.2 | 266.8 | 240.5 | 230.0 | 3,063.0 |

90

# Ten-Year Projections – Continued

($ in millions)

| | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| Debt service (LTGO & UTGO) | (135.9) | (124.4) | (119.4) | (96.1) | (95.0) | (92.5) | (91.8) | (91.5) | (74.8) | (70.9) | (992.4) |
| POC - principal and interest | (61.0) | (63.2) | (65.4) | (67.6) | (69.9) | (68.1) | (69.0) | (69.9) | (70.7) | (71.4) | (676.3) |
| POC swaps | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Pension contributions | (199.5) | (233.1) | (258.9) | (285.9) | (314.7) | (321.4) | (331.5) | (337.2) | (339.5) | (343.0) | (2,964.8) |
| Health benefits - retiree | (140.7) | (151.1) | (161.6) | (172.0) | (182.3) | (192.3) | (201.9) | (212.0) | (222.6) | (233.7) | (1,870.0) |
| Legacy expenditures | (587.6) | (622.4) | (655.9) | (672.3) | (712.6) | (725.0) | (744.0) | (759.5) | (755.8) | (766.4) | (7,001.5) |
| **Deficit (excl. financing proceeds)** | (190.5) | (260.4) | (314.1) | (346.0) | (400.7) | (425.8) | (456.8) | (492.6) | (515.3) | (536.4) | (3,938.5) |
| Financing proceeds | - | - | - | - | - | - | - | - | - | - | - |
| **Total surplus (deficit)** | $(190.5) | $(260.4) | $(314.1) | $(346.0) | $(400.7) | $(425.8) | $(456.8) | $(492.6) | $(515.3) | $(536.4) | $(3,938.5) |
| Accumulated unrestricted General Fund deficit | (427.5) | (687.9) | (1,002.0) | (1,348.0) | (1,748.7) | (2,174.5) | (2,631.3) | (3,123.9) | (3,639.2) | (4,175.6) | |
| **Reinvestment in the City** | | | | | | | | | | | |
| Department revenue initiatives | $22.9 | $22.1 | $24.4 | $24.2 | $24.5 | $24.7 | $25.0 | $25.3 | $25.6 | $25.9 | $244.6 |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Capital investments | (107.7) | (74.5) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (452.3) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Total reinvestment in the City | (188.5) | (139.3) | (135.7) | (149.7) | (130.5) | (128.8) | (32.8) | (33.4) | (32.6) | (33.8) | (1,005.2) |
| **Adjusted surplus (deficit)** | $(379.0) | $(399.7) | $(449.8) | $(495.6) | $(531.2) | $(554.6) | $(489.6) | $(526.1) | $(547.9) | $(570.2) | $(4,943.7) |
| Adj. accumulated unrestricted General Fund deficit | (615.9) | (1,015.6) | (1,465.4) | (1,961.0) | (2,492.2) | (3,046.8) | (3,536.4) | (4,062.5) | (4,610.4) | (5,180.6) | |

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 98 of 135

# ASSUMPTIONS IN TEN-YEAR PROJECTIONS

**Revenues**

- Municipal Income Tax.

  - Based on State employment, wage and corporate income tax growth estimates adjusted for Detroit specific trends; population estimates considered as well. Increases due to improved employment outlook. Income tax policy is under review and income tax rate could be reduced as a part of the final restructuring plan.

- State Revenue Sharing.

  - Increases due to anticipation of higher taxes collected/distributed by State; based on estimates provided by the State.

- Wagering Taxes.

  - Decreases through FY 2015 due to competition from Ohio casinos and recovers thereafter due to improved economic outlook.

- Sales and Charges for Services.

  - Primarily consists of court fees, public safety service charges, electrical and personal service fees. Declines primarily due to transition of Health and Wellness and Public Lighting Department Distribution business.

- Property Taxes.

  - Based on Michigan home sales, new construction and population data adjusted for Detroit specific trends. Decreases through FY 2017 due to declining values and collection rate with modest increases beginning FY 2021.

- Utility Users' & Other Taxes.

  - Decreases beginning FY 2014 due to the annual allocation of $12.5 million to the Public Lighting Authority (half-year impact in FY 14). 1% annual increase beginning FY 2017 due to assumed increase in utility usage and inflation.

92

- Other revenue.

- **Licenses/Permits/Inspection Charges.** Primarily consists of business licenses, street use permits and fire marshal and construction inspections charges. Based on recent trends. FY 2013 includes one-time permit and inspection revenues from utility providers.

- **Revenue from Use/Sale Assets.** FY 2012 includes loss from sale of asset. FY 2014 includes proceeds from sale of Veteran's building.

- **Parking/Court Fines & Other Revenue.** Primarily consists of traffic, criminal and parking fines. Based on recent trends.

- **Grant Revenue.** Decreases in FY 2014 due to transition of Health and Wellness department and expiration of certain public safety grants.

- **General Fund reimbursements.** Reflects reimbursements from other departments for expenses incurred by the General Fund. FY 2012 includes $16 million one-time contribution from DDOT.

- **UTGO Property Tax Millage.** Property tax millage for UTGO debt service. Revenues and associated expenses offset.

- **COP Allocation (Governmental).** Transfer from general City, non General Fund for allocated COP debt service. Revenues and associated expenses offset.

- **COP Allocation (Enterprise Funds (excl. DDOT)).** Transfer from enterprise funds for allocated COP debt service. Revenues and associated expenses offset.

**Operating Expenditures**

- Salaries & Wages.
  - Includes CET changes implemented in FY 2013 and continuing through the projection period. 10% wage reduction for uniformed employees beginning FY 2014 for contracts expiring FY 2013; 2% wage inflation assumed for all City employees beginning FY 2015. Headcount changes in projection period primarily due to PLD transaction and transition to ADP payroll and benefits administration services.
- Overtime.
  - Decreases due to wage cuts and FY 2013 run rates. Increases beginning FY 2015 due to wage inflation.
- Health Benefits (Actives).
  - Includes CET changes implemented in FY 2013 and continuing during the projection period. Average 6% inflation assumed annually for hospitalization costs.
- Other operating expenses
  - **Other Benefits.** Based on recent trends.
  - **Professional/Contractual Services.** Assumes higher costs in election years (FY 2014 and every four years thereafter).
  - **Materials/Supplies.** Decreases due to transition of PLD distribution business. 1% cost inflation assumed beginning in FY 2015.
  - **Utilities.** Based on recent trends with minimal changes with 1% cost inflation assumed beginning in FY 2015.
  - **Purchased Services.** Increases beginning in FY 2014 due to costs associated with payroll processing management and prisoner pre-arraignment functions. 1% cost inflation assumed beginning in FY 2015.
  - **Risk Management/Insurance.** Includes costs related to worker's compensation, litigation and other claims. 1% cost inflation assumed beginning in FY 2015.
  - **Maintenance Capital (current run rate).** Represents the General Fund payment for capital expenditures based on recent spend levels. 1% cost inflation assumed beginning in FY 2015.

94

- **Other Expenses.** Primarily includes printing, rental and other operating costs. 1.0% cost inflation assumed to certain costs beginning FY 2015.

- **Contributions to Non-Enterprise Funds.** Represents General Fund transfers to Municipal parking, the vehicle fund, Museum of African American History, etc. Increases beginning FY 2014 primarily due to contributions to operations to the Public Lighting Authority.

- **DDOT Subsidy.** Reflects the General Fund contribution to cover the DDOT deficit. Excludes DDOT related legacy expenditures shown below the line. Increases primarily due to personnel and operating cost inflation.

- **Grant-Related Expenses.** Decreases in FY 2014 due to transition of Health and Wellness Department. Increases primarily due to wage and operating cost inflation.

**Legacy Expenditures**

- Debt Service (UTGO & LTGO).

  - Reflects currently scheduled principal and interest payments.

- COPs (Principal, Interest & Swaps).

  - Reflects principal, interest and swap payments as currently scheduled.

- Pension.

  - Per preliminary actuarial analysis. Subject to further analysis. Starting in FY 2014, significant increases attributable to use of more realistic actuarial assumptions and use of closed, 15-year amortization period for PFRS and closed, 18-year period for GRS rather than current open 30-year amortization period.

- Retiree Health Benefits.

  - Includes impact of CET changes implemented in FY 2013 and continuing during the projection period. Average 6% inflation assumed annually for hospitalization costs.

**Financing Proceeds.**

- FY 2013 includes $137 million in refunding bond proceeds.

**Operational Restructuring Initiatives/Reinvestment in the City.**

- Department revenues initiatives.
  - Reflects increases to fees, improved billing and collection efforts and collection of past due receivables.
- Additional Operating Expenditures.
  - Primarily reflects increases to headcount in order to improve and provide adequate level of City services. Potential efficiencies not reflected.
- Capital investments (Technology).
  - Reflects costs associated with information systems upgrades and maintenance.
- Capital investments (Capital Expenditures).
  - Primarily reflects City's capital improvement plan to invest in facilities and vehicles.
- Capital investments (Implementation Costs).
  - Primarily reflects non-recurring costs associated with implementing technology initiatives.
- Blight.
  - Reflects costs associated with demolition and clean-up efforts of residential and light commercial. Heavy commercial blight removal would require significant additional funding.

# RESTRUCTURING SCENARIO.

($ in millions)

| | PRELIMINARY FORECAST | | | | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| Total revenues | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 | $1,045.0 | $1,045.7 | $1,049.8 | $1,046.3 | $1,040.1 | $1,045.7 | $10,484.5 |
| Department revenue initiatives | 22.9 | 22.1 | 24.4 | 24.2 | 24.5 | 24.7 | 25.0 | 25.3 | 25.6 | 25.9 | 244.6 |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| **Net operating surplus** | **$366.4** | **$347.2** | **$344.9** | **$328.5** | **$314.6** | **$301.2** | **$282.9** | **$262.9** | **$236.4** | **$225.2** | **$3,010.2** |
| **Reinvestment expenditures/adjustments** | | | | | | | | | | | |
| Reorganization (Capital investments & Professional fees) | (167.0) | (111.7) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (548.8) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| DC Pension contribution (10% Police/Fire, 5% other) | (25.4) | (25.7) | (26.2) | (26.6) | (27.2) | (27.7) | (28.2) | (28.7) | (29.3) | (29.9) | (274.8) |
| POC reimbursements | (24.1) | (25.4) | (26.2) | (26.8) | (27.5) | (27.1) | (27.3) | (27.4) | (27.4) | (27.4) | (266.7) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased tax revenues | 7.4 | 12.2 | 16.4 | 23.8 | 28.3 | 36.0 | 42.0 | 48.5 | 56.3 | 63.8 | 334.5 |
| Total restructuring | (259.1) | (225.6) | (199.8) | (206.6) | (159.6) | (149.6) | (42.0) | (37.1) | (29.0) | (22.6) | (1,330.9) |
| **Funds available for legacy liabilities** | 107.3 | 121.6 | 145.2 | 122.0 | 155.0 | 151.6 | 240.9 | 225.7 | 207.4 | 202.6 | 1,679.3 |

97

# Restructuring Scenario – Continued

($ in millions)

| | | | | PRELIMINARY FORECAST | | | | | | | 10-YEAR TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Payments to secured claims (subject to review/negotiation)** | | | | | | | | | | | |
| LTGO - secured | (18.7) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (281.6) |
| UTGO - secured | (8.0) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (96.4) |
| POC swaps[1] | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Notes/loans payable | - | - | - | - | - | - | - | - | - | - | - |
| **Total payments to secured claims** | (77.3) | (89.7) | (89.7) | (89.7) | (89.7) | (89.7) | (88.9) | (88.0) | (87.2) | (86.4) | (876.0) |
| Funds available for unsecured claims | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |
| Asset monetization / revenue opportunities | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | - |
| Funds available for unsecured claims w/opportunities | $30.0 | $31.9 | $55.5 | $32.3 | $65.4 | $62.0 | $152.1 | $137.7 | $120.2 | $116.2 | $803.3 |

**Estimated unsecured claims**

| | |
|---|---|
| Unsecured debt | |
|   Unsecured debt | |
|   LTGO - unsecured | $161.0 |
|   UTGO - unsecured | 369.1 |
|   POC principal balance | 1,428.8 |
|   Notes/loans payable | 33.6 |
|   Sub-total: Unsecured debt | 1,992.5 |
| **Unsecured pension & OPEB** | |
|   OPEB liability | 5,718.3 |
|   Pension unfunded liability (PFRS) | 1,437.0 |
|   Pension unfunded liability (DGRS) | 2,037.0 |
|   Sub-total: Pension & OPEB | 9,192.3 |
| **Other unsecured items** | |
|   Other liabilities (FY 2012 CAFR) | 264.6 |
|   Other potential claims | tbd |
|   Sub-total: Other | 264.6 |
| **Estimated total unsecured claims** | $11,449.4 |

Footnote:
(1) Assumes continued payments as scheduled. Treatment to be determined.

98

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 105 of 135

- Reorganization (capital investment and professional fees).
  - Consistent with above Technology, Capital Expenditures, and Implementation Costs.
- Blight.
  - Consistent with above.
- DC Pension contribution.
  - Preliminary estimates to be further refined by additional analysis. Assumes new DC plans with employer contributions equal to 10% of wages for uniformed employed and 5% of wages for non-uniform employed.
- POC reimbursements.
  - Represents reversal of revenue received from enterprise and other Non-General Fund agencies.
- PLD decommission.
  - Represents preliminary estimate of cost required to decommission existing substations and Mistersky Plant (to be further refined by additional analysis).
- Increased Tax Revenues.
  - Represents potential revenue opportunities primarily due to increased property values and employment conditions resulting from restructuring efforts.
- Payments on Secured Claims.
  - Includes the unaltered payment schedules of secured debt, COP related swaps and other notes payable. There are no scheduled payments on secured notes payable.

## CONCLUSIONS BASED UPON PROJECTIONS.

- The City acknowledges that it must exert reasonable efforts to maximize recoveries for all creditors.

- As demonstrated by the 10-year projections, however, the City's expected revenues will fall significantly short of the levels required to fund the City's operations and fully satisfy its liabilities.

- Given the City's (i) substantial debt levels (LTGO; UTGO; COPs; Swaps), (ii) significant labor related liabilities and (iii) continuing operating expenses, shared sacrifice will be required from all stakeholders to achieve the City's dual (and complementary) goals of maximizing returns for its stakeholder constituencies while simultaneously establishing the framework for a healthy and growing Detroit moving forward.

- All of the City's stakeholders can benefit from a restructured and revitalized Detroit.

100

# RESTRUCTURING PROPOSAL

<span style="color:orange">SUMMARY OF TREATMENT OF DEBT.</span>

**Secured Debt.**

**DWSD Debt.** The existing DWSD water and sewer bond debt may be divided into two classes, if applicable:

- **DWSD Class A Debt Claims.**

  - DWSD Class A Debt Claims shall consist of claims under or evidenced by certain debt that may be paid prior to the effective date of the City's comprehensive restructuring plan without incurring a material premium or penalty.

  - On the effective date of the City's comprehensive restructuring plan, accrued principal and interest for DWSD Class A Debt Claims accrued through the restructuring plan's effective date will either (i) be repaid in full in cash or (ii) receive such treatment as may be agreed upon by the parties.

  - **Source of funds for repayment:** New longterm bond issuances with MAWSA as the issuer.

    - **New Series A Bond Principal:** An amount equal to the sum of the principal of the outstanding debt that was issued to redeem the DWSD Class A Debt Bonds plus interest thereon accrued through the restructuring plan effective date and fees incurred in connection with the new financings.

    - **New Series A Bond Collateral:** Lien on net revenues generated by MAWSA assets with the same priorities as the DWSD Class A Debt, but subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    - **New Series A Bond Interest Rate:** Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    - **New Series A Bond Maturities:** The various series of new municipal bonds would have long-term maturities determined at the time of issuance on the basis of then-existing market conditions.

- **DWSD Class B Debt Claims.**

  - DWSD Class B Debt Claims shall consist of all claims under or evidenced by each series of existing water or sewer bond debt (whether callable or not) that are not DWSD Class A Debt Claims.

  - On the effective date of the City's comprehensive restructuring plan, holders of DWSD Class B Debt Claims shall receive Series B Restructured Bonds or such treatment as may be agreed upon by the parties.

  - **Series B Restructured Bond Terms:** Series B Restructured Bonds would be issued by MAWSA to holders of outstanding DWSD Class B Debt Claims.

  - **Series B Restructured Bond Principal:** For each series of Series B Restructured Bonds, an amount equal to the sum of the principal of the outstanding DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged plus interest thereon accrued through the restructuring plan Effective Date.

  - **Series B Restructured Bond Collateral:** Lien on net revenues generated by MAWSA assets in the same priorities as currently exist for the DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged, subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

  - **Series B Restructured Bond Interest Rate:** Prevailing market rate for similar long-term municipal bonds at the time of issuance.

  - **Series B Restructured Bond Maturities:** The same maturity dates as the DWSD Class B Debt Bonds for which the Series B Restructured Bonds will be exchanged.

**Secured General Obligation Debt.**

- There are six series of secured General Obligation Debt:

  • $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment).

  • $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

  • $38,865,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2).

  • $30,730,000 original principal amount Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2).

  • $6,405,000 original principal amount General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B).

  • $53,520,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2-B).

- Total annual debt service is approximately $39 million per year from FY 2015 through FY 2033.

**$ in millions**

| | FISCAL YEAR | | | | | | Total for Period |
|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 - 2033 | 2034 | 2035 | 2036 | |
| $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable - Recovery Zone Economic Development Bonds-Direct Payment) | 4.0 | 8.0 | 9.8 | 9.8 | 9.8 | 9.8 | 228.2 |
| $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 | 6.3 | 12.6 | 18.9 | 18.8 | 18.8 | 18.8 | 433.5 |
| $129,520,000 aggregate original principal amount of Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2), (A2-B), (B) & (B)(2) (Combined) | 4.2 | 6.1 | 10.4 | | | | 207.2 |
| **Annual Total** | 14.5 | 26.7 | 39.0 | 28.7 | 28.7 | 28.7 | 868.9 |

- Treatment: Subject to negotiation with holders.

104

**Secured Claims Arising in Connection with Installment Notes Payable.**

- The City has issued $87.8 million in installment notes related to various public improvement projects, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

- Treatment: Subject to negotiation with holders.

**Secured Claims Arising under Service Agreements Related to COP-Related Interest Rate Swaps.**

- Eight interest rate swaps (the "COP Swaps") were entered into by the Service Corporations in reference to the COPs.

- The City entered into Service Contracts with the Service Corporations that purport to obligate the City to pay the Service Corporations, among other things, amounts equal to the amounts the Service Corporations are obligated to pay under the COP Swaps.

- The following table shows the estimated amounts due annually under the COP Swaps to maturity:

$ in millions

| | | | | | FISCAL YEAR(S) | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2013 | 2014 | 2015 | 2016 | 2017 | 2018-2022 | 2023-2027 | 2028-2032 | 2033-2035 | Total |
| 50.7 | 50.6 | 50.6 | 50.6 | 50.6 | 248.0 | 226.9 | 135.6 | 15.1 | 878.7 |

- Treatment: Subject to negotiation with holders.

**Secured Automobile Parking Fund Claims.**

- $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A are secured by a pledge of all revenues of the parking system, net of operating expenses.

- Treatment: In the event that the City executes a sale of its parking-related assets, principal and interest accrued through the effective date will be paid in full in cash using proceeds of sales of City's parking-related assets. In the event that sales are not negotiated and consummated prior to the effective date, treatment of such claims will be subject to negotiations with holders.

**Unsecured Debt.**

**Consideration for Unsecured Claims.**

- Limited Recourse Participation Notes (the "*Notes*").

- **Relevant Definitions:**

  - "Adjusted Base Covered Revenues" means for a Fiscal Year following the Initial Revenue Participation Year, Base Covered Revenues adjusted for inflation for the period beginning on the first day of the Initial Revenue Participation Year and ending on the first day of the Fiscal Year using the positive change, if any, in the Consumer Price Index during such period.

  - "Base Covered Revenues" means one half of the sum of Covered Revenues for the first two Fiscal Years beginning after the Effective Date.

  - "Covered Revenues" means amounts actually collected by the City's General Fund in a Fiscal Year on account of (a) Property Taxes, Income Taxes and Gaming Taxes levied for such Fiscal Year and (b) Revenue Sharing Payments, determined based upon the City's audited financial statements.

  - "Dutch Auction" means a method for pricing the Notes whereby the price of the Notes offered by the City is the lowest price (the "Auction Price") at which there are bids to sell Notes for an aggregate purchase price equal to the amount the City is required to pay in respect of Revenue Participation Payments and/or Asset Disposition Proceeds then due and payable. During bidding, each Noteholder will indicate how many Notes it is willing to sell to the City and the price such Noteholder is willing to accept. All Notes offered at the Auction Price or at a lower price will be sold to the City at the Auction Price.

106

- "Effective Date" means the closing date of a comprehensive restructuring of the City's finances on which the Notes shall be issued.

- "Final Participation Year" means the Fiscal Year beginning on the 20th anniversary of the first day of the Initial Participation Year.

- "Fiscal Year" means a period commencing on July 1 of a year and ending on June 30 of the following year. For greater certainty, the Fiscal Year beginning on July 1, 2014 and ending on June 30, 2015 is the 2015 Fiscal Year.

- "Initial Participation Year" means the second full Fiscal Year following the Effective Date.

- "Trustee" means an indenture trustee or other agent for the Noteholders as defined in definitive documentation for the Notes.

- **Terms:**

- Initial Principal Amount: $2,000,000,000.00.

- Interest Rate: 1.5% per annum on the outstanding principal amount of the Notes, payable semiannually. No interest shall be paid or accrued for any period following the end of the Final Participation Year.

- Maturity Date: The first September 30 following the Final Participation Year. The City shall have no obligation to pay any amounts other than the Revenue Participation Payment in respect of the Final Participation Year on the maturity date. The Notes may be prepaid in whole or in part at any time without premium or penalty.

- Revenue Participation Payments: On the September 30 after the end of each Fiscal Year beginning with the Initial Participation Year, an amount equal to the product of (a) 30% (0.30), multiplied by (b) (i) the amount by which Covered Revenues for such Fiscal Year exceed (ii) Adjusted Base Covered Revenues shall be applied to reduce the principal amount of the Notes. No Revenue Participation Payments shall be made for any Fiscal Year after the Final Participation Year.

- Grants and Other Amounts Received to Offset Costs of Addressing Blight: If the City receives any cash grants or other cash payments after the Effective Date and before the Maturity Date from the State of Michigan, the Federal government, or any other government or nonprofit entity not affiliated in any way with the City for the purpose of funding programs or activities to address blight that are included in the 10 Year Plan ("Blight Revenues") and that can be utilized in place of the General Fund sums in the 10 Year Plan projections, an amount equal to 75% of the General Fund revenues that would otherwise be spent on blight but for the outside funds shall be applied to reduce the principal amount of the Notes.

- Asset Disposition Proceeds: If the City receives cash consideration in connection with the transfer of Specified Assets after the Effective Date and before the Maturity Date, an amount equal to 75% of such cash shall be applied to reduce the principal amount of the Notes. For greater certainty, the assumption of indebtedness shall not constitute cash consideration.

- The City shall make distributions of Blight Revenues and Asset Disposition Proceeds when the amount of such payments that are due equal or exceed $50 million or at the time a Revenue Participation Payment is due, whichever is sooner.

- **Dutch Auctions.** Any Revenue Participation Payment, Blight Revenues, Asset Disposition Proceeds and other amount made available by the City may be used to fund offers to purchase Notes through a Dutch Auction process. The City shall give notice of its intent to conduct a Dutch Auction using a Revenue Participation Payment on or before the July 15th following the end of the pertinent Fiscal Year and shall conclude the auction and purchase notes offered and accepted in the auction no later than the 90 days following the date such notice is given. The City shall give notice of its intent to conduct such a Dutch Auction using Asset Disposition Proceeds or Blight Revenues on or before the 30 days following the date when the City becomes obligated to make apply Asset Distribution Proceeds and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City may give notice of its intent to conduct a Dutch Auction using funds provided by the City which are not otherwise required to be applied to repayment of the Notes at any time.

- **Limited Recourse.** The City's obligation to pay interest on the Notes shall be a general obligation of the City. The City shall have no obligation to pay the principal amount of the Notes except to the extent that Revenue Participation Payments, Blight Revenues, or Asset Disposition Proceeds become due in accordance with the terms hereof.

- **Requirements of Law.** The terms of the Notes may be revised to conform with requirements of law.

108

**Claims Under Unsecured General Obligation Bonds/Notes.**

- Aggregate amount: Approximately $650 million.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

**Claims of Service Corporations (or affiliated trusts) on Account of COPs.**

- Aggregate amount: Approximately $1.4 billion.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes

**Claims for Unfunded OPEB Liabilities.**

- Current retirees will receive modified medical benefits plans utilizing either the exchanges to be created by January 1, 2014 under the Patient Protection and Affordable Care Act or Medicare, as applicable. The proposed replacement program is preliminarily estimated to have a cost to the City of between $27.5 million and $40 million annually depending on choices to be made.

- Claims will result from the modification of benefits. The amount of such claims has not been finally determined.

- Treatment for Allowed Claim: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

**Claims for Unfunded Pension Liabilities.**

- As set forth above, preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion. At this level of underfunding, the City would have to contribute approximately $200 million to $350 million annually to fully fund currently accrued, vested benefits. Such contributions will not be made under the plan.

- Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

- Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons.

**Claims on account of Other Liabilities.**

- Aggregate Amount: Approximately $300 million.

- Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

13-53846   Doc 11-1   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 116 of 135

110

# CEMENTING THE CITY'S RESTRUCTURING: DETROIT AFTER THE EMERGENCY MANAGER

In accordance with PA 436 – and similar to post-receivership governance structures established in other municipalities (*e.g.*, New York) – Emergency Manager Orr intends to adopt various measures and impose certain requirements to ensure that the restructuring achieved by the City is sustainable.

## APPOINTMENT OF "TRANSITION ADVISORY BOARD"

In accordance with Section 23(1) of PA 436, the Emergency Manager may recommend that the Governor appoint a "receivership transition advisory board" (a "*Transition Advisory Board*") to monitor the affairs of the City prior to removing it from receivership.

- The Transition Advisory Board would consist of (i) the State Treasurer (or his/her designee), (ii) the director of the Department of Technology, Management and Budget (or his/her designee) and (iii) in the Governor's discretion, one or more individuals with relevant professional experience.

- The Transition Advisory Board would be empowered to do any of the following:

  - Require the City to annually convene a consensus revenue estimating conference for the ensuing fiscal year;

  - Require the City to provide monthly cash flow projections and a comparison of actual and budgeted revenues and expenditures;

  - Review and approve the City's proposed and amended budgets;

  - Review requests by the City to issue debt under applicable law;

  - Review and approve proposed CBAs negotiated under applicable law;.

  - Review the City's compliance with any deficit elimination plan; and

  - Perform any other duties assigned by the Governor at the time the Transition Advisory Board is appointed.

**Revisions to Model Charter.**

- Consistent with Section 22(4)(b) of PA 436, the Emergency Manager may recommend that the Governor require the City to adopt a model City Charter or model charter provisions developed by the Emergency Manager.

**Development of Two-Year Budget.**

- Pursuant to Section 21 of PA 436, before the conclusion of the Emergency Manager's term (or before the appointment of a Transition Advisory Board), the Emergency Manager must adopt and implement a two-year budget (including all contractual and employment agreements) for the City, which budget commences upon the termination of the City's receivership.

- The City Council is prohibited by Section 21(2) of PA 436 from

  - amending the Emergency Manager's two-year budget (absent the approval of the State Treasurer); and

  - revising any order or ordinance implemented by the Emergency Manager prior to one year after termination of the receivership.

**Potential Appointment of New Emergency Manager.**

- Pursuant to Section 24 of PA 436, the Governor may, at his own initiative or at the recommendation of a Transition Advisory Board, determine that the City's financial condition has not been corrected in a sustainable fashion and appoint a new emergency manager.

112

# CALENDAR AND CONTACTS

**Requests for additional information:** June 17, 2013 - June 24, 2013

**Initial round of discussions with stake holders:** June 17, 2013 - July 12, 2013

**Evaluation:** July 15, 2013 - July 19, 2013.

## CONTACTS

MILLER BUCKFIRE & CO., LLC

601 Lexington Avenue, 22nd Floor
New York, NY 10022
(212) 895-1800

Kenneth Buckfire
Co-President & Managing Director

James Doak
Managing Director

JONES DAY

David G. Heiman, Esq.
901 Lakeside Avenue
North Point
Cleveland, Ohio 44114-1190
(216) 586-3939

Bruce Bennett, Esq.
555 South Flower Street,
50th Floor
Los Angeles, CA 90071
(213) 489-3939

Heather Lennox, Esq.
222 East 41st Street
New York, NY 10017
(212) 326-3939

Appendix A — Schedule of the sewage disposal system bonds and related state revolving loans as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| **Sewage Disposal System Revenue Bonds:** | | | | | | | |
| Series 1998-A | 12-14-06 | $18,540,000 | 5.50 % | 7/1/12-17 | $ 16,440,000 | MBIA | |
| Series 1998-A | 12-14-06 | 49,075,000 | 5.25 | 7/1/18-23 | 49,075,000 | MBIA | b |
| Series 1998-B | 12-14-06 | 18,750,000 | 5.50 | 7/1/12-17 | 16,510,000 | MBIA | |
| Series 1998-B | 12-14-06 | 48,770,000 | 5.25 | 7/1/18-23 | 48,770,000 | MBIA | b |
| Series 1999-A ( * ) | 12-1-99 | 33,510,118 | 0.00 | 7/1/12-21 | 69,931,075 | FGIC | |
| Series 2001-B | 9-15-01 | 110,550,000 | 5.50 | 7/1/23-29 | 110,550,000 | FGIC | |
| Series 2001-C (1) | 6-5-09 | 6,360,000 | 5.25 | 7/1/12-19 | 4,930,000 | Assured Guaranty | |
| Series 2001-C (1) | 6-5-09 | 148,510,000 | 6.50 to 7.00 | 7/1/20-27 | 148,510,000 | Assured Guaranty | b |
| Series 2001-C (2) | 5-8-08 | 3,275,000 | 3.50 to 4.00 | 7/1/12-18 | 2,305,000 | FGIC/Berkshire Hathaway | b |
| Series 2001-C (2) | 5-8-08 | 119,630,000 | 4.00 to 5.25 | 7/1/19-29 | 119,630,000 | FGIC/Berkshire Hathaway | b |
| Series 2001-D | 9-23-01 | 92,450,000 | Variable (a) | 7/1/32 | 21,315,000 | MBIA | b |
| Series 2001-E | 5-8-08 | 136,150,000 | 5.75 | 7/1/24-31 | 136,150,000 | FGIC/Berkshire Hathaway | b |
| Series 2003-A | 5-22-03 | 158,000,000 | 3.30 to 5.00 | 7/1/12-13 | 84,125,000 | Assured Guaranty | |
| Series 2003-A | 5-22-03 | 441,380,000 | 3.50 to 5.50 | 7/1/14-32 | 128,940,000 | Assured Guaranty | b |
| Series 2003-B | 6-5-09 | 150,000,000 | 7.50 | 7/1/32-33 | 150,000,000 | Assured Guaranty | b |
| Series 2004-A | 1-09-04 | 101,435,000 | 5.00 to 5.25 | 7/1/12-24 | 74,380,000 | Assured Guaranty | |
| Series 2005-A | 3-17-05 | 3,765,000 | 3.40 to 3.70 | 7/1/12-15 | 2,495,000 | MBIA | |
| Series 2005-A | 3-17-05 | 269,590,000 | 3.75 to 5.125 | 7/1/16-35 | 236,770,000 | MBIA | b |
| Series 2005-B | 3-17-05 | 40,215,000 | 3.40 to 5.50 | 7/1/12-22 | 40,215,000 | MBIA | |
| Series 2005-C | 3-17-05 | 22,065,000 | 5.00 | 7/1/12-15 | 16,185,000 | MBIA | |
| Series 2005-C | 3-17-05 | 41,095,000 | 5.00 | 7/1/16-25 | 41,095,000 | MBIA | b |
| Series 2006-A | 5-8-08 | 123,655,000 | 5.50 | 7/1/34-36 | 123,655,000 | FGIC/Berkshire Hathaway | b |
| Series 2006-B | 8-10-06 | 11,850,000 | 4.00 to 5.00 | 7/1/12-16 | 7,960,000 | FGIC | |
| Series 2006-B | 8-10-06 | 238,150,000 | 4.25 to 5.00 | 7/1/17-36 | 238,150,000 | FGIC | b |
| Series 2006-C | 8-10-06 | 8,495,000 | 5.25 | 7/1/16 | 8,495,000 | FGIC | |
| Series 2006-C | 8-10-06 | 18,065,000 | 5.00 | 7/1/17-18 | 18,065,000 | FGIC | b |
| Series 2006-D | 12-14-06 | 370,000,000 | Variable (a) | 7/1/12-32 | 289,430,000 | Assured Guaranty/FSA | b |
| Series 2012-A | 6-26-12 | 95,445,000 | 5.00 | 7/1/14-22 | 95,445,000 | Assured Guaranty | |
| Series 2012-A | 6-26-12 | 564,335,000 | 5.00 to 5.50 | 7/1/23-39 | 564,335,000 | Assured Guaranty | b |

**Total Sewage Disposal System Revenue Bonds**     $ 2,863,856,075

* - Capital Appreciation Bonds
a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

114

## Appendix A – Continued

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 |
|---|---|---|---|---|---|
| **State Revolving Loans:** | | | | | |
| Series 1992-A-SRF | 6-25-92 | $ 4,360,000 | 2.00% | 4/1/13 | $ 260,000 |
| Series 1992-B-SRF | 9-10-92 | 1,915,000 | 2.00 | 10/1/12-13 | 230,000 |
| Series 1993-B-SRF | 9-30-93 | 6,603,996 | 2.00 | 10/1/12-14 | 1,150,000 |
| Series 1997-B-SRF | 9-30-97 | 5,430,174 | 2.25 | 10/1/12-18 | 2,160,000 |
| Series 1999-SRF-1 | 6-24-99 | 21,475,000 | 2.50 | 4/1/13-20 | 9,880,000 |
| Series 1999-SRF-2 | 9-30-99 | 46,000,000 | 2.50 | 10/1/12-22 | 28,110,000 |
| Series 1999-SRF-3 | 9-30-99 | 31,030,000 | 2.50 | 10/1/12-20 | 15,890,000 |
| Series 1999-SRF-4 | 9-30-99 | 40,655,000 | 2.50 | 10/1/12-20 | 20,815,000 |
| Series 2000-SRF-1 | 3-30-00 | 44,197,995 | 2.50 | 10/1/12-22 | 23,947,995 |
| Series 2000-SRF-2 | 9-28-00 | 64,401,066 | 2.50 | 10/1/12-22 | 39,191,066 |
| Series 2001-SRF-1 | 6-28-01 | 82,200,000 | 2.50 | 10/1/12-24 | 57,965,000 |
| Series 2001-SRF-2 | 12-20-01 | 59,850,000 | 2.50 | 10/1/12-24 | 42,210,000 |
| Series 2002-SRF-1 | 6-27-02 | 18,985,000 | 2.50 | 4/1/13-23 | 11,590,000 |
| Series 2002-SRF-2 | 6-27-02 | 1,545,369 | 2.50 | 4/1/13-23 | 935,369 |
| Series 2002-SRF-3 | 12-19-02 | 31,549,466 | 2.50 | 10/1/12-24 | 20,554,466 |
| Series 2003-SRF-1 | 6-28-03 | 48,520,000 | 2.50 | 10/1/12-25 | 36,415,000 |
| Series 2003-SRF-2 | 9-25-03 | 25,055,370 | 2.50 | 4/1/13-25 | 17,550,370 |
| Series 2004-SRF-1 | 6-24-04 | 2,910,000 | 2.125 | 10/1/12-24 | 2,025,000 |
| Series 2004-SRF-2 | 6-24-04 | 18,353,459 | 2.125 | 4/1/13-25 | 12,748,459 |
| Series 2004-SRF-3 | 6-24-04 | 12,722,575 | 2.125 | 4/1/13-25 | 8,832,575 |
| Series 2007-SRF-1 | 9-20-07 | 156,687,777 | 1.625 | 10/1/12-29 | 142,272,777 |
| Series 2009-SRF-1 | 4-17-09 | 22,684,557 | 2.50 | 4/1/13-30 | 10,164,557 |
| Series 2010-SRF-1 | 1-22-10 | 6,793,631 | 2.50 | 4/1/13-31 | 3,338,631 |
| **Total State Revolving Loans Payable** | | | | | **$ 508,236,265** |

## Appendix B — Schedule of water system bonds and related state revolving loans as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| **Water Supply System Revenue Bonds:** | | | | | | | |
| Series 1993 | 10-15-93 | $ 38,225,000 | 6.50% | 7/1/14-15 | $ 24,725,000 | FGIC | |
| Series 1995-B | 10-15-95 | 60,485,000 | 5.55 | 7/1/12 | 8,480,000 | MBIA | |
| Series 1997-A | 8-01-97 | 186,220,000 | 6.00 | 7/1/14-15 | 13,430,000 | MBIA | |
| Series 2001-A | 5-01-01 | 301,165,000 | 5.00 | 7/1/29-30 | 73,790,000 | FGIC | b |
| Series 2001-C | 5-08-08 | 4,055,000 | 3.50 to 4.25 | 7/1/12-18 | 2,565,000 | FGIC | |
| Series 2001-C | 5-08-08 | 186,350,000 | 4.50 to 5.75 | 7/1/19-29 | 186,350,000 | FGIC | b |
| Series 2003-A | 1-28-03 | 234,805,000 | 4.50 to 5.00 | 7/1/19-34 | 178,785,000 | MBIA | b |
| Series 2003-B | 1-28-03 | 41,770,000 | 5.00 | 7/1/34 | 41,770,000 | MBIA | b |
| Series 2003-C | 1-28-03 | 4,335,000 | Variable(a) | 7/1/13-14 | 4,335,000 | MBIA | |
| Series 2003-C | 1-28-03 | 25,325,000 | 4.25 to 5.25 | 7/1/15-22 | 25,325,000 | MBIA | b |
| Series 2003-D | 8-14-06 | 3,180,000 | 4.00 to 4.20 | 7/1/12-16 | 1,625,000 | MBIA | |
| Series 2003-D | 8-14-06 | 139,575,000 | 4.25 to 5.00 | 7/1/17-33 | 139,575,000 | MBIA | b |
| Series 2004-A | 8-14-06 | 17,600,000 | 3.75 to 5.25 | 7/1/12-16 | 17,580,000 | MBIA | |
| Series 2004-A | 8-14-06 | 55,165,000 | 4.50 to 5.25 | 7/1/17-25 | 55,165,000 | MBIA | b |
| Series 2004-B | 8-14-06 | 52,840,000 | 4.00 to 5.00 | 7/1/12-16 | 35,740,000 | MBIA | |
| Series 2004-B | 8-14-06 | 100,990,000 | 4.25 to 5.00 | 7/1/17-23 | 100,990,000 | MBIA | b |
| Series 2005-A | 3-11-05 | 20,965,000 | 3.40 to 5.00 | 7/1/12-15 | 8,445,000 | FGIC | |
| Series 2005-A | 3-11-05 | 84,035,000 | 3.90 to 5.00 | 7/1/16-35 | 84,035,000 | FGIC | b |
| Series 2005-B | 5-08-08 | 19,070,000 | 4.00 to 5.50 | 7/1/12-18 | 15,465,000 | FGIC | |
| Series 2005-B | 5-08-08 | 175,830,000 | 4.75 to 5.50 | 7/1/19-35 | 175,830,000 | FGIC | b |
| Series 2005-C | 3-11-05 | 36,405,000 | 5.00 | 7/1/12-15 | 23,175,000 | FGIC | |
| Series 2005-C | 3-11-05 | 90,200,000 | 5.00 | 7/1/16-22 | 90,200,000 | FGIC | b |
| Series 2006-A | 8-14-06 | 42,795,000 | 5.00 | 7/1/13-16 | 26,900,000 | Assured Guaranty/FSA | |
| Series 2006-A | 8-14-06 | 237,205,000 | 5.00 | 7/1/17-34 | 237,205,000 | Assured Guaranty/FSA | b |
| Series 2006-B | 4-1-09 | 900,000 | 3.00 to 5.00 | 7/1/12-19 | 800,000 | Assured Guaranty/FSA | |
| Series 2006-B | 4-1-09 | 119,100,000 | 5.50 to 7.00 | 7/1/20-36 | 119,100,000 | Assured Guaranty/FSA | b |
| Series 2006-C | 8-14-06 | 12,585,000 | 4.00 to 5.00 | 7/1/12-16 | 10,650,000 | Assured Guaranty/FSA | |
| Series 2006-C | 8-14-06 | 208,060,000 | 5.00 | 7/1/17-33 | 208,060,000 | Assured Guaranty/FSA | b |

116

## Appendix B — Continued

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 2006-D | 8-14-06 | 4,430,000 | 4.00 to 5.00 | 7/1/12-16 | 3,465,000 | Assured Guaranty/FSA | b |
| Series 2006-D | 8-14-06 | 142,160,000 | 4.25 to 5.00 | 7/1/17-32 | 142,160,000 | Assured Guaranty/FSA | |
| Series 2011-A | 12-22-11 | 37,880,000 | 3.00 to 5.00 | 7/1/12-21 | 37,880,000 | N/A | b |
| Series 2011-A | 12-22-11 | 341,710,000 | 5.00 to 5.75 | 7/1/22-41 | 341,710,000 | N/A | |
| Series 2011-B | 12-22-11 | 7,455,000 | 2.496 to 5.00 | 7/1/12-21 | 7,455,000 | N/A | |
| Series 2011-B | 12-22-11 | 9,740,000 | 6.00 | 7/1/22-33 | 9,740,000 | N/A | b |
| Series 2011-C | 12-22-11 | 3,925,000 | 3.00 to 5.00 | 7/1/12-21 | 3,925,000 | N/A | |
| Series 2011-C | 12-22-11 | 99,965,000 | 4.50 to 5.25 | 7/1/23-41 | 99,965,000 | N/A | b |

**Total Water Supply System Revenue Bonds**    **$ 2,556,395,000**

**State Revolving Loans:**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Series 2005 SRF-1 | 9-22-05 | $ 13,805,164 | 2.125% | 10/1/12-26 | $ 10,575,164 | | |
| Series 2005 SRF-2 | 9-22-05 | 8,891,730 | 2.125 | 10/1/12-26 | 6,621,730 | | |
| Series 2006 SRF-1 | 9-21-06 | 5,180,926 | 2.125 | 10/1/12-26 | 3,945,926 | | |
| Series 2008 SRF-1 | 9-29-08 | 2,590,941 | 2.500 | 10/1/12-26 | 1,810,941 | | |

**Total State Revolving Loans Payable**    **$ 22,953,761**

a - Interest rates are set periodically at the stated current market interest rate.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

# Appendix C — Schedule of COPs and related swap liabilities as of June 30, 2012

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer |
|---|---|---|---|---|---|---|
| **Pension Obligation Certificates:** | | | | | | |
| Series 2005-A | 6/2/05 | $ 640,000,000 | 4.00 to 4.95% | 6/15/13-25 | $ 503,365,000 | FGIC/Syncora |
| Series 2006-A | 6/12/06 | 148,540,000 | 5.989% | 6/15/34-35 | 148,540,000 | FGIC |
| Series 2006-B | 6/12/06 | 800,000,000 | Variable | 6/15/19-34 | 800,000,000 | FGIC/Syncora |
| **Total Pension Obligation Certificates** | | | | | $ 1,451,905,000 | |

| Cash-Flow Hedges, Pay-Fixed Interest Rate Swaps | Notional Amount | Effective Date | Fixed Rate Paid | Rate Received | Fair Value | Swap Termination Date | Final Maturity of Bonds |
|---|---|---|---|---|---|---|---|
| **Taxable Certificate of Participation:** | | | | | | | |
| SBSFPC-0009 | $ 96,621,000 | 6/12/06 | 6.36% | 3mth LIBOR + .34% | (57,173,124) | 6/15/2034 | 6/15/2034 |
| SBSFPC-0012 | 45,252,000 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | (23,055,836) | 6/15/2029 | 6/15/2029 |
| 37380341 | 96,621,000 | 6/12/06 | 6.36 | 3mth LIBOR + .34% | (57,181,711) | 6/15/2034 | 6/15/2034 |
| 37380291 | 45,252,000 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | (23,056,802) | 6/15/2029 | 6/15/2029 |
| SBSFPC-0010 | 153,801,500 | 6/12/06 | 6.35 | 3mth LIBOR + .34% | (91,309,463) | 6/15/2034 | 6/15/2034 |
| SBSFPC-0011 | 104,325,500 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | (48,098,696) | 6/15/2029 | 6/15/2029 |
| 37380313 | 153,801,500 | 6/12/06 | 6.35 | 3mth LIBOR + .34% | (91,322,376) | 6/15/2034 | 6/15/2034 |
| 37380351 | 104,325,500 | 6/12/06 | 6.32 | 3mth LIBOR + .30% | (48,104,661) | 6/15/2029 | 6/15/2029 |
| **Total** | $ 800,000,000 | | | | (439,302,669) | | |

# Appendix D — Schedule of secured general obligation liabilities as of June 30, 2012

| | Issue Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer |
|---|---|---|---|---|---|---|
| **General Obligation Bonds -** | | | | | | |
| Unlimited Tax Series 2010-E | 12/16/10 | 100,000,000 | 5.129 to 8.369 | 11/1/14-35 | 100,000,000 | N/A |
| Limited Tax Distributable State Aid 2010 | 3/18/10 | 249,790,000 | 4.25 to 5.25 | 11/1/14-35 | 249,790,000 | N/A |
| **Total General Obligation Bonds** | | | | | **349,790,000** | |
| | | | | | | |
| Notes and Loans - | | | | | | |
| Ferry Street Project | 6/12/08 | | 2.62 to 4.62 | 8/1/12-18 | 2,041,000 | N/A |
| Garfield Project | 6/12/08 | | 2.62 to 4.62 | 8/1/13-15 | 750,000 | N/A |
| Stuberstone Project | 6/12/08 | | 2.62 to 4.62 | 8/1/13-16 | 120,000 | N/A |
| Vernon Lawndale Project | 9/14/06 | | 5.05 to 5.74 | 8/1/13-25 | 1,800,000 | N/A |
| New Amsterdam Project | 8/1/02 | | 4.67 to 6.12 | 8/1/12-22 | 8,480,000 | N/A |
| Mexicantown Welcome Center Project | 9/14/06 | | 5.03 to 5.70 | 8/1/13-24 | 3,600,000 | N/A |
| Book Cadillac Project | 9/14/06 | | 5.07 to 5.77 | 8/1/14-26 | 7,300,000 | N/A |
| Book Cadillac Project Note 1 | 6/12/08 | | 4.00 to 5.38 | 8/1/13-29 | 10,700,000 | N/A |
| Garfield II Note 1 | 9/14/06 | | 3.44 to 5.30 | 8/1/13-25 | 6,422,000 | N/A |
| Garfield II Note 2 | 9/14/06 | | 5.07 to 5.77 | 8/1/14-26 | 2,058,000 | N/A |
| Garfield II Note 3 | 9/16/09 | | LIBOR + 0.2 | 8/1/12-29 | 1,723,000 | N/A |
| Garfield II Note 4 | 9/16/09 | | LIBOR + 0.2 | 8/1/17-29 | 6,697,000 | N/A |
| Fort Shelby Project | 6/12/08 | | 3.82 to 5.34 | 8/1/12-26 | 18,700,000 | N/A |
| Woodward Garden Project 1 | 6/12/08 | | 4.48 to 5.05 | 8/1/16-21 | 7,050,000 | N/A |
| Woodward Garden Project 2 | 12/9/08 | | LIBOR + 0.2 | 8/1/16-28 | 6,197,000 | N/A |
| Woodward Garden Project 3 | 4/20/12 | | LIBOR + 0.2 | 8/1/16-31 | 5,753,000 | N/A |
| Loan Payable GE Capital Schedule –013 | 4/9/04 | | 4.07 | 7/1/12-6/1/14 | 248,289 | |
| Loan Payable GE Capital Schedule – 030 | 4/30/08 | | 4.57 | 8/1/12 | 358,928 | |
| **Total Notes and Loans** | | | | | **89,998,217** | |
| **Total Secured General Obligation Liabilities** | | | | | **$439,788,217** | |

## Appendix E — Schedule of unsecured general obligation liabilities as of June 30, 2012

### GOVERNMENTAL ACTIVITIES

**General Obligation Bonds –**

Unlimited Tax:

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 1999-A | 4-1-99 | $ 28,020,000 | 5.00 to 5.25% | 4/1/13-19 | $ 21,040,000 | Assured Guaranty | b |
| Series 2001-A(1) | 7-15-01 | 83,200,000 | 5.0 to 5.375 | 4/1/13-21 | 80,400,000 | MBIA | b |
| Series 2001-B | 7-15-01 | 23,235,000 | 5.375 | 4/1/13-14 | 13,680,000 | MBIA | b |
| Series 2002 | 8-2-02 | 29,205,000 | 4.00 to 5.13 | 4/1/13-22 | 6,645,000 | MBIA | b |
| Series 2003-A | 10-21-03 | 9,640,000 | 3.70 to 5.00 | 4/1/2013 | 2,575,000 | Syncora | b |
| Series 2003-A | 10-21-03 | 34,380,000 | 4.00 to 5.25 | 4/1/14-23 | 34,380,000 | Syncora | b |
| Series 2004-A(1) | 9-9-04 | 39,270,000 | 4.25 to 5.25 | 4/1/19-24 | 39,270,000 | Ambac | b |
| Series 2004-B(1) | 9-9-04 | 23,720,000 | 3.75 to 5.00 | 4/1/13-14 | 16,175,000 | Ambac | |
| Series 2004-B(1) | 9-9-04 | 29,365,000 | 4.0 to 5.25 | 4/1/15-18 | 29,365,000 | Ambac | b |
| Series 2004-B(2) | 9-9-04 | 17,270,000 | 4.16 to 5.24 | 4/1/13-18 | 865,000 | Ambac | |
| Series 2005-B | 12-1-05 | 13,840,000 | 4.00 to 5.00 | 4/1/13-16 | 8,955,000 | Assured Guaranty | b |
| Series 2005-B | 12-1-05 | 37,920,000 | 4.30 to 5.00 | 4/1/17-25 | 37,920,000 | Assured Guaranty | b |
| Series 2005-C | 12-1-05 | 20,010,000 | 4.00 to 5.00 | 4/1/13-16 | 12,230,000 | Assured Guaranty | a |
| Series 2005-C | 12-1-05 | 10,795,000 | 4.30 to 5.25 | 4/1/17-20 | 10,795,000 | Assured Guaranty | b |
| Series 2008-A | 6-9-08 | 15,120,000 | 5.00 | 4/1/14-18 | 15,120,000 | Assured Guaranty | |
| Series 2008-A | 6-9-08 | 43,510,000 | 4.00 to 5.00 | 4/1/19-28 | 43,510,000 | Assured Guaranty | b |
| Series 2008-B(1) | 6-9-08 | 66,475,000 | 5.00 | 4/1/13-18 | 37,905,000 | Assured Guaranty | |

**Total General Obligation Bonds - Unlimited Tax** $ 410,830,000

120

# Appendix E — Continued

## GOVERNMENTAL ACTIVITIES (continued)

### General Obligation Bonds –

Limited Tax:

Self-Insurance Bonds:

| | Bond Date | Amount Issued | Range of Interest Rates | Maturity Date | Balance June 30, 2012 | Insurer | |
|---|---|---|---|---|---|---|---|
| Series 2003 | 10-2-03 | $ 98,895,000 | 4.32 to 4.97% | 5/1/2013 | $ 17,770,000 | Assured Guaranty | |
| Series 2004 | 9-9-04 | 62,285,000 | 4.16 to 4.85 | 4/1/13-14 | 25,405,000 | Ambac | |
| General Obligation: | | | | | | | |
| Series 2005-A(1) | 6-24-05 | 21,325,000 | 4.27 to 4.53 | 4/1/13-15 | 11,320,000 | Ambac | |
| Series 2005-A(1) | 6-24-05 | 52,175,000 | 4.61 to 5.15 | 4/1/16-25 | 52,175,000 | Ambac | b |
| Series 2005-A(2) | 6-24-05 | 4,055,000 | 3.50 to 4.50 | 4/1/12-15 | 2,145,000 | Ambac | |
| Series 2005-A(2) | 6-24-05 | 9,475,000 | 4.00 to 5.00 | 4/1/16-25 | 9,475,000 | Ambac | b |
| Series 2005-B | 6-24-05 | 4,845,000 | 3.50 to 5.00 | 4/1/13-15 | 2,835,000 | Ambac | |
| Series 2005-B | 6-24-05 | 6,940,000 | 5.00 | 4/1/16-21 | 6,940,000 | Ambac | b |
| Series 2008-A(1) | 6-9-08 | 43,443,278 | 5.00 | 4/1/13-16 | 43,443,278 | N/A | |
| Series 2008-A(2) | 6-9-08 | 25,000,000 | 8.00 | 4/1/2014 | 25,000,000 | N/A | |
| **Total General Obligation Bonds - Limited Tax** | | | | | **196,508,278** | | |
| Loans - Downtown Development Authority | 1991-1997 | | | | 33,600,000 | | |
| **Total Unsecured General Obligation Liabilities** | | | | | **$ 640,938,278** | | |

a - Indicates interest rates are reset periodically at the stated market interest rates.
b - Indicates bonds are callable under terms specified in the indenture; all other bonds are noncallable.

**Appendix F – Annual Debt Service on Special Revenue Obligations ($ in millions).**

| Fiscal Year | Sewage Disposal Fund | | Water Fund | | Parking Fund | | Total Special Revenue |
|---|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest | |
| 2013 | 76.58 | 123.42 | 33.20 | 120.25 | 1.17 | 0.50 | $355.12 |
| 2014 | 78.39 | 143.45 | 41.46 | 131.24 | 1.22 | 0.44 | $396.20 |
| 2015 | 86.66 | 140.42 | 53.43 | 129.31 | 1.29 | 0.38 | $411.49 |
| 2016 | 89.28 | 137.53 | 58.75 | 126.49 | 1.35 | 0.31 | $413.71 |
| 2017 | 91.58 | 134.41 | 61.81 | 123.38 | 1.42 | 0.24 | $412.84 |
| 2018-22 | 503.05 | 621.32 | 353.35 | 568.23 | 4.03 | 0.30 | $2,050.28 |
| 2023-27 | 584.93 | 515.60 | 447.03 | 468.72 | | | $2,016.28 |
| 2028-32 | 733.64 | 380.44 | 555.24 | 344.23 | | | $2,013.55 |
| 2033-37 | 810.06 | 220.48 | 656.86 | 193.56 | | | $1,880.96 |
| 2037-42 | 338.56 | 35.90 | 318.25 | 51.62 | | | $744.33 |
| **Total** | **$3,392.73** | **$2,452.97** | **$2,579.38** | **$2,257.03** | **$10.48** | **$2.17** | **$10,694.76** |

122

**Appendix G – Annual Debt Service on General Obligation Debt & Other Liabilities ($ in millions).**

| Fiscal Year | General Obligation Bonds | | Notes and Loans Payable | | Transportation Fund Liabilities | | Total |
|---|---|---|---|---|---|---|---|
| | Principal | Interest | Principal | Interest | Principal | Interest | |
| 2013 | $82.71 | $51.81 | $1.56 | $3.85 | $0.81 | $0.31 | $141.07 |
| 2014 | $81.63 | $47.73 | $3.25 | $3.76 | $0.00 | $0.27 | $136.64 |
| 2015 | $68.36 | $42.72 | $3.38 | $3.62 | $2.66 | $0.27 | $121.02 |
| 2016 | $66.87 | $39.27 | $3.65 | $3.46 | $2.80 | $0.14 | $116.19 |
| 2017 | $49.89 | $35.87 | $6.09 | $3.24 | $0.00 | $0.00 | $95.10 |
| 2018-22 | $254.12 | $139.73 | $31.33 | $12.03 | $0.00 | $0.00 | $437.21 |
| 2023-27 | $150.59 | $81.99 | $30.46 | $4.61 | $0.00 | $0.00 | $267.65 |
| 2028-32 | $101.54 | $47.46 | $10.26 | $0.24 | $0.00 | $0.00 | $159.50 |
| 2033-37 | $101.43 | $13.26 | $33.60 | $0.00 | $0.00 | $0.00 | $148.29 |
| Total | $957.13 | $499.84 | $123.60 | $34.83 | $6.27 | $1.00 | $1,622.67 |

Figures above do NOT include $129.5 million in general fund refunding bonds issued in FY 2013, which have increased outstanding debt balance further from FY 2012 balances.

**Appendix H – Annual Debt Service on Pension Obligation Certificates and Related Swap Liabilities ($ in millions).**

| Fiscal Year | Principal | Interest | Swap Liability | Total |
|---|---|---|---|---|
| 2013 | 23.1 | 39.6 | 50.7 | 113.4 |
| 2014 | 29.6 | 38.5 | 50.6 | 118.8 |
| 2015 | 33.3 | 37.2 | 50.6 | 121.1 |
| 2016 | 37.0 | 35.7 | 50.6 | 123.2 |
| 2017 | 41.0 | 33.9 | 50.6 | 125.4 |
| 2018-22 | 242.8 | 140.5 | 248.0 | 631.3 |
| 2023-27 | 311.2 | 88.3 | 226.9 | 626.5 |
| 2028-32 | 416.3 | 61.8 | 135.6 | 613.7 |
| 2033-35 | 317.6 | 26.4 | 15.1 | 359.1 |
| **Total** | **1,451.9** | **501.9** | **878.7** | **2,832.5** |

124

## APPENDIX I — City Bargaining Units

| Category | Name of Bargaining Unit | Active CBA? | CBA Expiration | Subject to CETS? | No. of Employees Represented |
|---|---|---|---|---|---|
| Uniform | AFSCME - ESOs | Yes | 6/30/13 | No | 93 |
| | Detroit Fire Fighters Ass'n | Yes | 6/30/13 | No | 927 |
| | Detroit Police Command Officers Ass'n | | As of 9/30/12 | Yes | 24 |
| | Detroit Police Lieutenants and Sergeants Ass'n | Yes | 6/30/13 | No | 530 |
| | Detroit Police Officers Ass'n | | 6/30/12 | Yes | 1,991 |
| | Emergency Medical Service Officers Ass'n (EMS) | | As of 9/30/12 | Yes | 10 |
| | Police Officers Ass'n of Michigan (EMS) | | As of 9/30/12 | Yes | 187 |
| Coalition and other nonuniform | AFSCME Crossing Guards | | 6/30/12 | Yes | 157 |
| | AFSCME Forestry and Landscape Foreman | | 6/30/12 | Yes | 4 |
| | AFSCME Motor City Seasonals | | 6/30/12 | Yes | 240 |
| | AFSCME Non-Supervisory | | 6/30/12 | No | 1,656 |
| | AFSCME Paving Foreperson's | | 6/30/12 | Yes | 9 |
| | AFSCME Supervisory, Local 2394 | | 6/30/12 | Yes | 47 |
| | Assist. Supervisors of Street Maint. & Constr. | | 6/30/12 | Yes | 4 |
| | Ass'n of Munic. Engineers (Supervisors of ADE) | | 6/30/12 | Yes | 15 |
| | Ass'n of City of Detroit Supervisors | | 6/30/12 | Yes | 35 |
| | Ass'n of Detroit Engineers | | As of 9/30/12 | Yes | 82 |
| | Ass'n of Municipal Inspectors | | 6/30/12 | Yes | 12 |
| | Ass'n of Prof. & Technical Employees | | As of 9/30/12 | Yes | 102 |
| | Ass'n of Prof. Construction Inspectors | | 6/30/12 | Yes | 37 |
| | Building Construction Trades – Foreman | | 6/30/12 | Yes | 14 |
| | Building Construction Trades - Non-Supervisory | | 6/30/12 | Yes | 172 |
| | Building Construction Trades - Special Service | | 6/30/12 | Yes | 26 |
| | Buildings and Safety Inspectors – Tripartite | | 6/30/12 | Yes | 19 |
| | Detroit Income Tax Investigators Ass'n | | 6/30/12 | Yes | 15 |
| | Detroit License Investigators Ass'n | | 6/30/12 | Yes | 0 |
| | Field Engineers Ass'n | | 6/30/12 | Yes | 2 |

**Appendix I — Continued**

| Category | Name of Bargaining Unit | Active CBA? | CBA Expiration | Subject to CETS? | No. of Employees Represented |
|---|---|---|---|---|---|
| | International Union of Op. Engineers - Local 324 | | 9/30/12 | Yes | 27 |
| | Local 324 Park Management Ass'n | | 6/30/12 | Yes | 7 |
| | Local 324 Principal Clerks Unit | | 6/30/12 | Yes | 64 |
| | Police Officers Labor Council (Detroit Fac. Officers) | | 6/30/12 | Yes | 9 |
| | Police Officers Labor Council (Health Department) | | 6/30/12 | Yes | 1 |
| | SEIU Local 517M - Non-Supervisory | | 6/30/12 | Yes | 5 |
| | SEIU Local 517M – Prof. & Tech. Unit | | 6/30/12 | Yes | 22 |
| | SEIU Local 517M - Supervisory | | 6/30/12 | Yes | 11 |
| | Senior Accountants, Analysts & Appraisers | | 6/30/12 | Yes | 141 |
| | Teamsters, Local 214 | | 6/30/12 | Yes | 430 |
| | UAW Local 212 (Civilian Police Investigators) | | 6/30/12 | Yes | 14 |
| | UAW Local 2211 (Public Attorneys Ass'n) | | 6/30/12 | Yes | 37 |
| | UAW Local 412-Unit 86 (Law Dep't Paralegals) | | 6/30/12 | Yes | 8 |
| 13(c) protected employees | AFSCME Non-supervisory Locals 214 & 312 | | 6/30/12 | No | 317 |
| | Amalgamated Transit Union (ATU) | | 6/30/12 | No | 622 |
| | Building Construction Trades – Non-supervisory | | 6/30/12 | No | 4 |
| | DOT Foreman's Ass'n | | 6/30/12 | No | 6 |
| | International Union of Op. Engineers | | 9/30/12 | No | 2 |
| | Supervisor Chapter of DOT Foreman's Ass'n | | 6/30/12 | No | 24 |
| | Teamsters, Local 214 | | 6/30/12 | No | 9 |
| **Total** | | | | | **8,270** |

126

# Appendix J – Summary of Capital Improvements in 10-Year Plan

| Department / Category | Project | Total Budget Impact | Start Date | Duration |
|---|---|---|---|---|
| Non-Departmental / Citywide (Included in GSD) | Elevator Improvements Program | $3,503,911 | FY 2014 | 10 years |
| | Space Consolidation Improvements | $16,118,541 | FY 2014 | 10 years |
| | Other | $1,517,528 | FY 2014 | 10 years |
| | **Subtotal** | **$21,139,980** | | |
| Manoogian Mansion | Roof Replacement | $114,643 | FY 2020 | 2 years |
| | **Subtotal** | **$114,643** | | |
| Police | Police Academy Improvements | $1,255,932 | FY 2014 | 4 years |
| | Existing District/Precinct Improvements | $2,896,861 | FY 2014 | 9 years |
| | New PCT #1 & 2 | $6,000,000 | FY 2014 | 2 years |
| | New PCT #3 & 4 | $6,000,000 | FY 2016 | 2 years |
| | New PCT #5 & 6 | $6,000,000 | FY 2018 | 2 years |
| | Electrical Improvements | $2,000,000 | FY 2014 | 2 years |
| | Contingent Projects | $14,000,000 | FY 2014 | 10 years |
| | Other | $2,027,887 | FY 2014 | 9 years |
| | **Subtotal** | **$40,180,681** | | |
| Fire | Fire Training Building Replacement | $17,010,540 | FY 2016 | 2 years |
| | Fire Apparatus | $543,525 | FY 2014 | 5 years |
| | Engine House Improvements | $2,022,077 | FY 2014 | 10 years |
| | Structural Improvements | $6,000,000 | FY 2014 | 6 years |
| | Electrical Improvements | $4,000,000 | FY 2014 | 2 years |
| | Exhaust System Improvements | $4,500,000 | FY 2014 | 10 years |
| | Contingent Projects | $17,300,000 | FY 2016 | 8 years |
| | **Subtotal** | **$51,376,142** | | |
| DDOT | Facility Improvements | $20,800,000 | FY 2014 | 4 years |
| | **Subtotal** | **$20,800,000** | | |
| Airport | Facility Improvements/Expansion | $13,264,808 | FY 2014 | 10 years |
| | **Subtotal** | **$13,264,808** | | |
| Public Lighting | PLD HQ HVAC System Replacement | $1,500,000 | FY 2015 | 1 year |
| | Other | $243,432 | FY 2014 | 10 years |
| | **Subtotal** | **$1,743,432** | | |
| Municipal Parking | Facility Improvements | $382,698 | FY 2014 | 5 years |
| | **Subtotal** | **$382,698** | | |
| Health (transferred to DPD) | Animal Control Building Replacement | $10,899,020 | FY 2014 | 2 years |
| | **Subtotal** | **$10,899,020** | | |

## Appendix J — Continued

| Department / Category | Project | Total Budget Impact | Start Date | Duration |
|---|---|---|---|---|
| Elections | Facility Improvements | $1,275,000 | FY 2014 | 1 year |
| | Contingent Projects | $2,000,000 | FY 2020 | 4 years |
| | **Subtotal** | **$3,275,000** | | |
| Fleet Purchases | Police Fleet Purchases | $102,597,588 | FY 2014 | 10 years |
| | Fire Fleet Purchases | $19,059,144 | FY 2014 | 10 years |
| | Grounds Maintenance Fleet Purchases | $11,872,447 | FY 2014 | 10 years |
| | Municipal Parking Fleet Purchases | $3,532,245 | FY 2015 | 9 years |
| | **Subtotal** | **$137,061,424** | | |
| Information Technology | Administrative Hearings | $500,000 | FY 2014 | 1 year |
| | Finance / Budget | $50,500,000 | FY 2014 | 10 years |
| | Fire | $1,800,000 | FY 2014 | 10 years |
| | Grants | $400,000 | FY 2014 | 10 years |
| | Human Resources | $300,000 | FY 2014 | 1 year |
| | Law | $100,000 | FY 2014 | 1 year |
| | Police | $19,900,000 | FY 2013 | 11 years |
| | Ombudsperson | $7,900,000 | FY 2014 | 10 years |
| | 36th District Court | $2,200,000 | FY 2014 | 10 years |
| | **Subtotal** | **$83,600,000** | | |
| General Services | Facility Improvements | $3,420,151 | FY 2014 | 8 years |
| | Contingent Projects | $17,500,000 | FY 2015 | 9 years |
| | **Subtotal** | **$20,920,151** | | |
| **General Fund Capital Improvement Project Total** | | **$404,757,979** | | |
| Reorganization Costs | | $45,800,000 | | |
| Training Costs | HR Training (catch-up costs) | $1,300,000 | | |
| | DDOT Training | $500,000 | | |
| Total Including Reorganization and Training Costs | | **$452,357,979** | | |
| Blight | | $500,000,000 | FY 2014 | 6 years |
| Additional Operating Expenditures | | $297,400,000 | | |
| **GRAND TOTAL** | | **$1,249,757,979** | | |

128

# EXHIBIT B



CITY OF DETROIT

# PROPOSAL FOR CREDITORS

EXECUTIVE SUMMARY

JUNE 14, 2013

This proposal is based on numerous projections and assumptions concerning future uncertain events including estimates of tax revenues and forecasts of future business and economic conditions in the City, all of which are beyond the control of the City. Actual results may differ from the assumptions and projections presented herein, and such differences could be material.

Additional data are being gathered or developed, and various critical financial and operational analyses remain in process. Thus, this proposal remains subject to material change.



# Table of Contents

I. Detroit Faces Strong Economic Headwinds ....... 3

II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit ....... 33

III. Current Financial Status ....... 34

IV. The City Has Taken Action to Address Its Financial Challenges ....... 39

V. Restructuring and Reinvesting in City Government ....... 41

VI. Realization of Value of Assets ....... 46

VII. Ten Year Projections (General Fund Only) ....... 47

VIII. Restructuring Proposal ....... 50

IX. Calendar and Contacts ....... 61



# I. Detroit Faces Strong Economic Headwinds.

**Deteriorating Macroeconomic Conditions.** During the past several decades, the City of Detroit (the "City") has experienced changes that have adversely affected the economic circumstances of the City and its residents.



**Employment in Detroit**



# I. Detroit Faces Strong Economic Headwinds.



**Unemployment Rate in Detroit**



## I. Detroit Faces Strong Economic Headwinds.

- *Eroding Tax Base and Reductions in State Revenue Sharing.*

  - **Property Taxes.** Property tax revenues have decreased by approximately 19.7% over the past six years as a result of declining assessed values ($1.6 billion from 2008 to 2012) and lower collection rates (from 76.6% in 2008 to 68.3% in 2012).

  - **Income Taxes.** Income tax revenues have decreased by $91 million since 2002 (approximately 30%) and by $44 million (approximately 15%) since 2008. The primary cause of these decreases has been high unemployment.

  - **The City is currently levying all taxes at or near statutory maximum rates.**



# I. Detroit Faces Strong Economic Headwinds.

**Residents and businesses are leaving Detroit to escape High Taxes and Insurance Costs.**

- *Comparative Tax Burden.*

  - **Per Capita Tax Burden.** Detroit's per capita tax burden on City residents is the highest in Michigan. This tax burden is particularly severe because it is imposed on a population that has relatively low levels of per capita income.

  - **Resident Income Tax.** The income tax burden on Detroit residents is greater than that of residents in the surrounding area. The City's income tax — 2.4% for residents, 1.2% for nonresidents and 2.0% for businesses — is the highest in Michigan.

  - **Property Taxes.** Detroit residents pay the highest total property tax rates (inclusive of property taxes paid to all overlapping jurisdictions; e.g., the City, the State, Wayne County) of those paid by residents of Michigan cities having a population over 50,000. The total property tax rate (including property taxes assessed by the City, the State and various special authorities) imposed on Detroit homeowners is approximately 67.07 mills; for businesses, the total property tax rate is approximately 85.35 mills.

    - **At more than 19.95 mills, the City's property tax rate for general operations is close to the statutory maximum of 20.00 mills.**

  - Utility Users Tax. Detroit is the only city in Michigan that levies an excise tax on utility users (at a rate of 5%).



# I. Detroit Faces Strong Economic Headwinds.

## The City is Insolvent

### Continuing Budget Deficits.

- Excluding the effect of recent debt issuances (e.g., $75 million in FY 2008, $250 million in FY 2010 and $129.5 million in FY 2013) that funded the City's operating deficits, the City's accumulated general fund deficit has grown continuously over an extended period.



- At the end of FY 2012, the City's accumulated general fund deficit was $326.6 million.

- If not for the City's recent debt issuances, the projected accumulated deficit for FY 2013 would have been approximately $700 million.



## I. Detroit Faces Strong Economic Headwinds.

**Liquidity Crisis.** The City is insolvent. Absent ongoing cash intervention (primarily in the form of payment deferrals and cost cutting), the City would have run out of cash before the end of FY 2013.

- The City had negative cash flows of $115.5 million in FY 2012, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80 million on a secured basis (of which the City spent $50 million in FY 2012).

- The City is projecting to have positive cash flows of $4.0 million in FY 2013 after deferring approximately $120 million of current and prior year pension contributions and other payments.

- Absent intervention and/or restructuring, the City is projecting to have negative cash flows of $198.5 million in FY 2014.

- As of the end of May 2013, the City had $68 million of cash before property tax distributions, but had outstanding deferrals and amount due to other funds and entities of approximately $216 million. These are effectively borrowings and must be repaid.



# I. Detroit Faces Strong Economic Headwinds.

## The City is Not Paying Its Debts as They Come Due

- The City is not making its pension contributions as they come due. The City has deferred payment of its year-end Police and Fire Retirement System ("PFRS") contributions (and finances such deferrals at a rate of 8%). As of May 2013, the City had deferred approximately $54 million in pension contributions related to current and prior periods and will defer approximately $50 million on June 30, 2013 for current year PFRS pension contributions. Therefore, by fiscal year end, the City will have deferred over $100 million of pension contributions.

- The City will not make the scheduled $39.7 million payments due on its pension-related certificates of participation on June 14, 2013.



OFFICE OF THE EMERGENCY MANAGER

# I. Detroit Faces Strong Economic Headwinds.

## FY 2013 Forecasted Cashflow to Year End

*$ in millions*

| | Actual FY 2012 | Actual Jul-12 | Actual Aug-12 | Actual Sep-12 | Actual Oct-12 | Actual Nov-12 | Actual Dec-12 | Actual Jan-13 | Actual Feb-13 | Actual Mar-13 | Actual Apr-13 | Actual May-13 | Forecast Jun-13 | 11A + 1F FY 2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | |
| Property taxes | $567.0 | $34.0 | $198.0 | $14.8 | $6.9 | $4.2 | $24.4 | $139.1 | $42.3 | $5.4 | $1.3 | $3.1 | $58.0 | $531.6 |
| Income & utility taxes | 276.2 | 23.1 | 25.1 | 21.5 | 25.8 | 23.6 | 21.9 | 25.4 | 23.9 | 20.4 | 30.2 | 30.8 | 18.4 | 290.1 |
| Gaming taxes | 177.5 | 12.4 | 15.2 | 17.2 | 12.4 | 20.8 | 11.0 | 11.5 | 19.6 | 14.4 | 12.8 | 16.5 | 9.2 | 173.0 |
| Municipal service fee to casinos | 19.8 | - | 7.6 | - | - | 4.0 | 4.0 | 1.8 | - | - | - | - | - | 17.4 |
| State revenue sharing | 194.3 | 28.5 | - | 28.7 | - | 30.9 | 31.7 | 30.4 | - | 30.6 | - | 29.7 | 19.4 | 178.9 |
| Other receipts | 480.8 | 26.1 | 37.8 | 26.0 | 22.5 | 26.6 | 10.0 | 16.7 | 58.0 | 25.6 | 29.3 | 41.4 | 20.0 | 381.2 |
| Refinancing proceeds | 50.0 | - | - | - | - | - | - | - | - | - | - | - | - | 30.0 |
| **Total operating receipts** | 1,765.5 | 124.2 | 283.8 | 108.2 | 67.5 | 110.1 | 103.1 | 225.0 | 143.9 | 96.5 | 73.6 | 121.4 | 125.0 | 1,582.2 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (454.2) | (37.5) | (35.0) | (32.5) | (28.0) | (41.1) | (30.1) | (23.6) | (30.1) | (25.9) | (26.3) | (36.2) | (27.2) | (373.6) |
| Benefits | (203.4) | (18.3) | (21.0) | (20.4) | (16.7) | (16.2) | (19.5) | (9.7) | (15.8) | (17.7) | (4.7) | (14.9) | (16.0) | (191.0) |
| Pension contributions | (103.9) | (0.6) | (11.7) | (7.2) | - | - | (8.8) | - | - | - | - | - | - | (30.8) |
| Subsidy payments | (50.0) | (4.9) | - | - | - | - | - | - | (5.7) | (5.0) | (3.9) | - | - | (40.1) |
| Distributions - tax authorities | (374.4) | - | (110.1) | (34.3) | - | - | - | - | (79.4) | - | - | - | (34.5) | (283.2) |
| Distributions - UTGO | (8.6) | - | - | - | - | - | - | - | - | (52.1) | - | - | - | (68.6) |
| Distributions - DDA increment | - | - | - | - | - | - | - | (5.9) | - | - | - | - | (5.5) | (11.4) |
| Income tax refunds | (16.9) | (1.9) | - | (1.0) | (1.8) | (1.0) | (0.5) | (0.5) | (0.4) | (0.4) | (1.9) | (1.6) | (3.8) | (17.2) |
| A/P and other disbursements | (477.5) | (43.8) | (48.1) | (34.5) | (31.4) | (37.1) | (25.2) | (24.3) | (34.7) | (29.3) | (27.7) | (36.9) | (32.2) | (405.3) |
| Professional fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sub-total operating disbursements | (1,688.9) | (103.1) | (235.7) | (146.8) | (80.6) | (101.7) | (86.1) | (74.1) | (167.4) | (145.0) | (66.5) | (91.3) | (122.6) | (1,421.1) |
| POC and debt related payments | (142.1) | (4.2) | (5.4) | (4.9) | (9.0) | (7.9) | (14.9) | (3.1) | (8.5) | (4.8) | (32.2) | (25.6) | (36.6) | (157.1) |
| **Total disbursements** | (1,831.0) | (107.3) | (241.1) | (151.7) | (89.6) | (109.6) | (101.0) | (77.2) | (175.9) | (149.8) | (98.8) | (116.9) | (159.4) | (1,578.2) |
| **Net cash flow** | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| Cumulative net cash flow | | 16.9 | 59.5 | 16.0 | (6.0) | (5.5) | (3.4) | 144.4 | 112.3 | 59.0 | 33.9 | 38.4 | | 4.0 |
| Beginning cash balance | 95.3 | 29.8 | 46.7 | 89.3 | 45.8 | 23.8 | 24.3 | 26.4 | 174.2 | 142.1 | 88.8 | 63.7 | 68.2 | 29.8 |
| Net cash flow | (65.5) | 16.9 | 42.6 | (43.5) | (22.0) | 0.5 | 2.1 | 147.8 | (32.1) | (53.3) | (25.2) | 4.6 | (34.4) | 4.0 |
| **Cash before required distributions** | $29.8 | $46.7 | $89.3 | $45.8 | $23.8 | $24.3 | $26.4 | $174.2 | $142.1 | $88.8 | $63.7 | $68.2 | $33.8 | $33.8 |
| Accumulated property tax distributions | (27.9) | (48.1) | (77.8) | (31.8) | (32.9) | (31.5) | (48.0) | (149.8) | (89.5) | (26.9) | (26.0) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | $1.9 | $(1.4) | $11.5 | $14.0 | $(9.1) | $(7.1) | $(21.5) | $24.4 | $52.6 | $61.9 | $37.6 | $39.7 | $14.1 | $14.1 |
| *Memo:* | | | | | | | | | | | | | | |
| Accumulated deferrals | (64.4) | (66.2) | (56.3) | (50.9) | (52.7) | (53.2) | (46.3) | (44.2) | (53.9) | (57.7) | (61.5) | (65.8) | (118.7) | (118.7) |
| Refunding bond proceeds in escrow | 28.6 | 28.6 | 81.7 | 81.7 | 81.7 | 81.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 71.7 | 51.7 | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

## I. Detroit Faces Strong Economic Headwinds.

# FY 2014 Forecasted Cash Flow to Year End

*$ in millions*

| | Forecast Jul 13 | Forecast Aug-13 | Forecast Sep-13 | Forecast Oct-13 | Forecast Nov-13 | Forecast Dec-13 | Forecast Jan-14 | Forecast Feb-14 | Forecast Mar-14 | Forecast Apr-14 | Forecast May-14 | Forecast Jun-14 | Forecast FY 2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | |
| Property taxes | $37.8 | $166.6 | $13.0 | $6.6 | $3.1 | $21.5 | $139.1 | $20.8 | $4.8 | $1.3 | $2.5 | $51.1 | $468.4 |
| Income & utility taxes | 28.7 | 22.7 | 22.3 | 28.3 | 22.7 | 22.3 | 28.3 | 23.5 | 22.7 | 28.3 | 22.3 | 22.7 | 294.7 |
| Gaming taxes | 14.6 | 14.1 | 8.9 | 23.1 | 10.4 | 4.0 | 22.1 | 9.9 | 15.1 | 17.4 | 13.2 | 11.8 | 170.0 |
| Municipal service fee to casinos | | | | | 4.0 | | 1.8 | | | | | | 17.4 |
| State revenue sharing | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 30.7 | | 184.3 |
| Other receipts | 27.2 | 25.8 | 25.9 | 32.9 | 26.3 | 25.9 | 32.9 | 27.1 | 26.3 | 32.9 | 25.9 | 26.3 | 335.9 |
| Refinancing proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total operating receipts** | 139.1 | 236.9 | 100.9 | 91.0 | 97.2 | 83.2 | 255.0 | 81.3 | 99.6 | 80.0 | 94.6 | 111.9 | 1,470.7 |
| **Operating Disbursements** | | | | | | | | | | | | | |
| Payroll, taxes, & deductions | (31.0) | (26.6) | (26.6) | (26.6) | (26.6) | (26.6) | (31.0) | (26.6) | (26.6) | (35.5) | (26.6) | (26.6) | (345.6) |
| Benefits | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (15.5) | (14.0) | (14.0) | (14.0) | (14.0) | (14.0) | (178.6) |
| Pension contributions | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (14.7) | (175.9) |
| Subsidy payments | (7.6) | (5.0) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (6.3) | (75.6) |
| Distributions - tax authorities | (14.8) | (72.4) | (40.0) | (5.7) | (1.0) | (1.3) | (57.3) | (20.9) | (14.0) | (1.7) | - | (24.0) | (253.1) |
| Distributions - UTGO | | (12.0) | | | | | | | (44.9) | | | | (56.9) |
| Distributions - DDA increment | | | | | | (8.0) | | | | | | (1.0) | (9.0) |
| Income tax refunds | (2.5) | (2.7) | (.06) | (1.5) | (1.0) | (1.0) | (0.6) | (0.3) | (0.4) | (2.3) | (1.2) | (3.7) | (17.0) |
| A/P and other disbursements | (36.3) | (37.9) | (29.3) | (37.1) | (30.1) | (25.6) | (40.8) | (23.0) | (33.5) | (39.7) | (30.0) | (30.0) | (393.2) |
| Sub-total operating disbursements | (122.3) | (186.7) | (132.8) | (115.1) | (95.6) | (98.9) | (166.0) | (105.8) | (154.4) | (114.3) | (92.8) | (120.3) | (1,504.9) |
| POC and debt related payments | (7.4) | (4.2) | (5.8) | (8.5) | (7.3) | (15.4) | (7.3) | (4.2) | (5.7) | (51.9) | (7.3) | (39.1) | (164.2) |
| **Total disbursements** | (129.6) | (191.0) | (138.6) | (123.5) | (102.9) | (114.3) | (173.4) | (110.0) | (160.2) | (166.1) | (100.1) | (159.3) | (1,669.1) |
| **Net cash flow** | **9.5** | **45.9** | **(37.7)** | **(32.6)** | **(5.7)** | **(31.1)** | **81.6** | **(28.7)** | **(60.6)** | **(86.1)** | **(5.5)** | **(47.4)** | **(198.5)** |
| Cumulative net cash flow | 9.5 | 55.4 | 17.7 | (14.9) | (20.6) | (51.7) | 29.9 | 1.1 | (59.4) | (145.6) | (151.0) | (198.5) | |
| Beginning cash balance | 33.8 | 43.3 | 89.2 | 51.5 | 18.9 | 13.2 | (17.9) | 63.7 | 34.9 | (25.6) | (111.8) | (117.2) | 33.8 |
| Net cash flow | 9.5 | 45.9 | (37.7) | (32.6) | (5.7) | (31.1) | 81.6 | (28.7) | (60.6) | (86.1) | (5.5) | (47.4) | (198.5) |
| **Cash before required distributions** | **$43.3** | **$89.2** | **$51.5** | **$18.9** | **$13.2** | **$(17.9)** | **$63.7** | **$34.9** | **$(25.6)** | **$(111.8)** | **$(117.2)** | **$(164.7)** | **$(164.7)** |
| Accumulated property tax distributions | (29.8) | (55.4) | (24.0) | (22.7) | (23.7) | (38.6) | (86.5) | (82.2) | (27.1) | (26.5) | (28.5) | (19.7) | (19.7) |
| **Cash net of distributions** | **$13.5** | **$33.8** | **$27.4** | **$(3.8)** | **$(10.5)** | **$(56.5)** | **$(22.8)** | **$(47.2)** | **$(52.7)** | **$(138.2)** | **$(145.7)** | **$(184.4)** | **$(184.4)** |
| *memo:* | | | | | | | | | | | | | |
| Accumulated deferrals | (119.3) | (112.4) | (112.8) | (113.5) | (114.4) | (115.0) | (115.5) | (116.0) | (116.6) | (117.1) | (117.6) | | (117.6) |
| Refunding bond proceeds in escrow | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | 51.7 | | 51.7 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd |

13-53846   Doc 11-2   Entered 07/18/13 21:44:51   Page 13 of 66

# I. Detroit Faces Strong Economic Headwinds.

## Current Levels of Municipal Services to Residents and Businesses are Severely Inadequate.

### The City Must Reduce Its High Crime Rates.

- In 2012, the City had the highest rate of violent crime of any U.S. city having a population over 200,000. The City's violent crime rate is five times the national average.

- EMS and Detroit Fire Department ("DFD") response times are extremely slow when compared to other cities (15 minutes and 7 minutes, respectively).

### The City Must Provide Functioning Street Lights.

- As of April 2013, approximately 40% of the City's street lights were not functioning. The lights that are functioning are scattered across an outdated population footprint (and thus are not focused to meet the current population's actual needs).

### The City Must Overhaul Its Dysfunctional Operations.

- Police Department ("DPD").

  - Over the last five years, the DPD has had five different police chiefs, all having varying approaches to DPD's operations.

  - DPD's efficiency (response times), effectiveness (case closure rate, crime reduction) and employee morale are extremely low.

  - Data driven policing has not been fully adopted within DPD.



# I. Detroit Faces Strong Economic Headwinds.

- DPD receives over 700,000 calls for service annually. DPD response times are extremely high.

- The DPD's extremely low 8.7% case clearance rate is driven by the DPD's lack of a case management system, lack of accountability for detectives, unfavorable work rules imposed by collective bargaining agreements and a high attrition rate in the investigative operations unit.

- The DPD's manpower has been reduced by approximately 40% over the last 10 years causing constant strain on the organization; the DPD needs to evaluate appropriate uniform staffing levels.

- Community policing efforts are underfunded, uncoordinated and have been deemphasized by the DPD.

- **Assessor's Office and Property Tax Division.**

  - The City lacks a state-required Level IV Assessor and currently has a former employee contractor in the position, whose contract expires in June 2013. Due to inadequate compensation, among other things, there are no available candidates to fill this position.

  - The Assessor's Office has approximately 15,000 parcels per employee. The State recommends 4,000 parcels per employee.

- **Other Departments.**

  - Many other City departments function suboptimally and inefficiently.



# I. Detroit Faces Strong Economic Headwinds.

## The Physical Deterioration of the City Must be Addressed.

- There are approximately (i) 78,000 abandoned and blighted structures in the City, nearly half of which are considered "dangerous" and (ii) 66,000 blighted and vacant lots within the City limits.

- The number of City parks is dwindling, and many are in poor or fair condition as a result of neglect due to lack of funding.

  - The closure of 210 parks in the 2008-09 fiscal year reduced the City's park portfolio by 66% — from 317 parks to 107 parks.

- Approximately 70 superfund sites have been established in Detroit.

- The City's electricity grid has not been adequately maintained and is deteriorating.

- The City's fire stations are old and are not adequately maintained.

- The vehicles and equipment employed by the City's police, fire, EMS and transportation personnel are aging, poorly maintained and lack adequate information technology.



# I. Detroit Faces Strong Economic Headwinds.

## Detroit Has Endured Inadequate Investment in Infrastructure and Equipment for Years.

### Fire Department.

- **Fire Apparatus.** The DFD fleet includes (i) 26 engines; (ii) 15 ladder trucks; (iii) six squads (specialized rescue vehicles); (iv) one hazardous material apparatus; (v) one TAC unit (a mini-pumper) and (vi) 36 ambulances and other light vehicles.

- DFD's fleet has "many mechanical issues," contains no reserve vehicles and lacks equipment ordinarily regarded as standard.

  - The Apparatus Division's mechanic to vehicle ratio of 1:39 (once staffed with 63 people; currently 26) results in an inability to complete preventative maintenance on schedule.

  - Detroit firefighters frequently operate shorthanded due to a lack of serviceable equipment.

- **EMS Fleet.**

  - During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service.

  - Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles, and break down frequently.



# I. Detroit Faces Strong Economic Headwinds.

**Police Department.**

- **Age of Police Cars**

  - The DPD operates with an "extremely old fleet" of 1,291 vehicles. Most DPD police cruisers lack necessary information technology.

  - A majority of vehicles in the fleet remain in service beyond a normal three-year replacement cycle. Operating with an aged fleet drives up maintenance costs.

- **Facilities**

  - The DPD has not invested in or maintained its facility infrastructure for many years, contributing to low employee and citizen morale.

**Information Systems**

- **Challenges generally:**

  - Old and obsolete technology assets and applications must be upgraded.

  - IT infrastructure is not integrated within Departments (e.g., police precincts and districts cannot share information across IT systems) or between departments and functions (e.g., little to no integration between core City finance system and Department level systems).

  - City *urgently* needs to upgrade or replace the following IT systems, among others: payroll; financial; budget development; property information and assessment; income tax; and DPD operating system.



# I. Detroit Faces Strong Economic Headwinds.

- **DPD, DFD and EMS**

  - DPD, DFD and EMS information technology systems are obsolete; vendors do not provide full support; core functions are sporadic.

  - DPD has no IT systems for jail management, electronic ticketing and activity logs. DPD vehicles lack necessary IT infrastructure.

- **Payroll System**

  - The City uses multiple, non-integrated payroll systems. A majority of employees are on an archaic payroll system that has limited reporting capability and no ability to clearly track, monitor or report expenditures by category.

  - The cost of payroll administration for the City is significantly higher than for comparable entities – almost 3.5 times more costly than other public sector organizations, which average $18 per paycheck.

- **Income Tax Division**

  - Income tax collection and data management are highly manual.

  - The City's Income Tax System is outdated (purchased in the mid-1990s), has little to no automation capability and is "catastrophic" per an IRS audit completed in July 2012.



# I. Detroit Faces Strong Economic Headwinds.

- **Budgeting, Accounting & Financial Reporting Systems**

  - Oracle-based Financial Reporting system was implemented in 1999. It is not being utilized to its full capabilities and is no longer supported by its manufacturer.

  - Approximately 70% of journal entries are booked manually.

- **Grant Management System**

  - Grant tracking systems are fragmented. Thus, the City is unable to comprehensively track citywide grant funds and status.

  - Grant reporting is not standardized, such that the City is unable to prevent disallowed costs.

- **Permitting**

  - The Buildings, Safety Engineering and Environmental Department's system for licensing and permitting is more than ten years old and needs to be upgraded.

  - The Fire Marshall Division's system for inspections and permitting is more than 20 years old and needs to be replaced.

  - Current information technology system deficiencies lead to bottlenecks in permit invoicing and collection of fees.

- **Department of Transportation.** DDOT fleet is aged and maintenance is consistently deferred; approximately one-third of DDOT fleet is out of service.



# I. Detroit Faces Strong Economic Headwinds.

### Electrical Transmission Grid and Fixtures

- The City owned Mistersky power plant has been idle for approximately 2-3 years, but has not been decommissioned. In addition, the City has 31 sub-stations that would need to be decommissioned. The City is in the process of obtaining estimates for decommissioning costs.

- Approximately 40% of Detroit's 88,000 streetlights are not functioning due, in large part, to disrepair and neglect; outages exist on both DTE Energy Company ("DTE") and PLD-powered lights.



## I. Detroit Faces Strong Economic Headwinds.

## The City's Debt and Legacy Liabilities Have Grown Considerably Over Time.

**Balance Sheet Liabilities**

- The City estimates that, as of the close of its 2013 fiscal year, the City will have liabilities reflected on its balance sheet of approximately $9.05 billion, including:

  - $5.85 billion in special revenue obligations;

  - $1.43 billion in pension-related Certificate of Participation ("COPs") liabilities;

  - $343.6 million in marked-to-market swap liabilities related to COPs (as of May 31, 2013 valuation);

  - $1.13 billion in unlimited and limited tax general obligation bond liabilities and notes and loans payable; and

  - $300 million in other liabilities.



# I. Detroit Faces Strong Economic Headwinds.

**Off-Balance Sheet Liabilities**

- OPEB Liabilities.

  - Unfunded other post-employment benefit ("OPEB") liabilities increased from $4.8 billion to $5.7 billion from June 30, 2007 through June 30, 2011 (the most recent actuarial data available). 99.6% of the City's OPEB liabilities are unfunded.

  - As of June 30, 2011 (the most recently published actuarial valuation), there were 19,389 retirees eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

  - *Weiler Class OPEB Benefits.*

  - In July 2006, the City made a number of unilateral changes to the healthcare benefits for unionized police and firefighter retirees. Alan Weiler filed a class action lawsuit on behalf of approximately 7,000 retirees alleging violations of collective bargaining agreements.

  - The City and the Weiler class settled before trial, and the court entered a Consent Judgment approving the parties' settlement agreement.

  - The Weiler class retirees/beneficiaries currently cost the City approximately $75 million per year, representing over 40% of retiree benefits costs under the Health and Life Insurance Plan.



# I. Detroit Faces Strong Economic Headwinds.

- **Pension Liabilities**

  - The City's reported pension UAAL (based on 2011 actuarial valuations) of $639,871,444 is **substantially** understated. Further analysis using more realistic assumptions (including by reducing the discount rate by one percentage point) suggests that pension UAAL will be approximately $3.5 billion as of June 30, 2013.

  - UAAL under the City's two pension systems — the General Retirement System ("GRS") and the PFRS — increased by over $1 billion between June 30, 2007 and June 30, 2011, even (i) using actuarial assumptions used to calculate 2011 UAAL and (ii) after consideration of the contribution of the COPs proceeds in 2005 and 2006.

  - **For the five-year period ending on June 30, 2012, pension payments and costs of administration have exceeded contributions and investment income, resulting in liquidation of pension trust principal. Continuing on this path will eventually lead to the pension plans' insolvency.**

| System | Benefit Payments | Contribution / Investment Income | Net Trust Loss |
|---|---|---|---|
| GRS | $1,601,193,045 | ($60,113,101) | $1,661,306,146 |
| PFRS | $1,445,581,026 | ($127,803,339) | $1,573,384,365 |



OFFICE OF THE EMERGENCY MANAGER

# I. Detroit Faces Strong Economic Headwinds.

- **Increasing Legacy Liabilities as a Percentage of General Fund Revenue.** During FY 2012, more than 38% of the City's actual revenue was consumed servicing legacy liabilities. Going forward, legacy liabilities are expected to consume increasing portions of City revenues.

## Legacy Expenditures (Assuming No Restructuring)

($ in millions)

| | Fiscal year ended actual | | | | | Preliminary forecast | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 |
| **Legacy expenditures** | | | | | | | | | | |
| Debt service (LTGO) | $ (66.6) | $ (106.2) | $ (63.5) | $ (64.5) | $ (62.6) | $ (70.8) | $ (70.9) | $ (61.8) | $ (61.8) | $ (38.5) |
| Debt service (UTGO) | (67.2) | (71.5) | (72.4) | (72.8) | (73.0) | (70.6) | (64.9) | (62.5) | (57.6) | (57.6) |
| POC - principal and interest (GF) | (24.6) | (20.9) | (23.6) | (33.5) | (33.0) | (46.8) | (51.4) | (53.3) | (55.0) | (56.9) |
| POC - principal and interest (EF, excl. DDOT) | (1.8) | (1.4) | (1.5) | (1.8) | (2.0) | (5.3) | (5.9) | (6.1) | (6.4) | (6.6) |
| POC - principal and interest (DDOT) | (3.5) | (2.8) | (3.0) | (3.6) | (4.0) | (3.3) | (3.7) | (3.8) | (3.9) | (4.1) |
| POC - swaps (GF) | (38.6) | (43.9) | (44.7) | (44.7) | (44.8) | (42.9) | (42.8) | (42.8) | (42.7) | (42.7) |
| POC - swaps (EF, excl. DDOT) | (2.3) | (2.0) | (2.0) | (2.0) | (2.0) | (4.8) | (4.8) | (4.8) | (4.9) | (4.9) |
| POC - swaps (DDOT) | (4.5) | (4.0) | (4.0) | (4.0) | (4.0) | (3.0) | (3.0) | (3.0) | (3.0) | (3.0) |
| Pension contributions - Public Safety | (58.9) | (31.4) | (32.8) | (81.6) | (49.8) | (46.1) | (139.0) | (163.0) | (180.0) | (198.0) |
| Pension contributions - Non-Public Safety | (10.6) | (27.0) | (11.1) | (28.3) | (25.4) | (19.9) | (36.9) | (42.5) | (47.7) | (53.1) |
| Pension contributions - DDOT | (6.8) | (7.3) | (6.9) | (9.5) | (10.9) | (12.3) | (23.6) | (27.7) | (31.2) | (34.8) |
| Health benefits - retiree - Public Safety | (73.7) | (80.2) | (70.4) | (79.6) | (90.6) | (91.5) | (88.6) | (95.2) | (101.7) | (108.0) |
| Health benefits - retiree - Non-Public Safety | (47.4) | (51.6) | (50.6) | (49.0) | (49.2) | (49.7) | (38.8) | (41.5) | (44.6) | (47.7) |
| Health benefits - retiree - DDOT | (8.2) | (11.8) | (11.2) | (11.1) | (10.3) | (10.4) | (13.3) | (14.3) | (15.3) | (16.3) |
| **Total legacy expenditures** | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (461.6) | $ (477.3) | $ (587.6) | $ (622.4) | $ (655.9) | $ (672.3) |
| | | | | | | | | | | |
| **Total revenues (excl. financing proceeds)** | $ 1,397.7 | $1,363.3 | $1,291.0 | $1,316.8 | $1,196.9 | $1,121.9 | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 |
| | | | | | | | | | | |
| **Total legacy expenditures as a % of total revenues** | 29.7% | 33.9% | 30.8% | 36.9% | 38.6% | 42.5% | 54.3% | 59.5% | 63.0% | 64.6% |



# I. Detroit Faces Strong Economic Headwinds.

## Obligations Secured by Special Revenues

- **The City estimates that, as of the end of FY 2013, it will have:**

  - $5.34 billion in outstanding principal amount of revenue bonds; and

  - $494 million in related state revolving loans.

- **The revenue bonds and the revolving loans are related to the following funds:**

  - **Sewage Disposal Fund**

    - $2.82 billion in outstanding principal amount of notes maturing July 1, 2013 through July 1, 2039, as of June 30, 2013.

    - $472.8 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

    - Substantially all revenues of the sewage disposal system, net of operating expenses, pledged to secure payment of principal and interest.

    - Net system revenues of $227,447,337 versus debt service requirements of $199,990,125 in FY 2012.



# I. Detroit Faces Strong Economic Headwinds.

**- Water Fund**

- $2.52 billion in outstanding principal amount of various series of notes maturing July 1, 2013 through July 1, 2041, as of June 30, 2013.

- $21.4 million in outstanding principal amount of state revolving loans, as of June 30, 2013.

- Substantially all of the revenues of the City's water system, net of operating expenses, pledged to secure payment of principal and interest.

- Net system revenues of $178,842,057 versus debt service requirements of $153,441,666 in FY 2012.

**- Automobile Parking Fund**

- $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A maturing July 1, 2010 through July 1, 2019, as of June 30, 2013.

- Substantially all revenues of the parking system, net of operating expenses, pledged to secure payments of principal and interest.

- Net system revenues of $2,708,223 versus debt service requirements of $2,923,454 in FY 2012.



# I. Detroit Faces Strong Economic Headwinds.

## General Fund Obligations

- **GO Bonds.** The City estimates that, as of the close of FY 2013 (<u>i.e.</u>, June 30, 2013), it will have $1.01 billion in outstanding principal amount of limited and unlimited tax general obligation bonds, consisting of:

  - $469.1 million in outstanding principal amount of unlimited tax general obligation ("UTGO") bonds maturing from April 1, 2013 through November 1, 2035.

    - $100 million of the foregoing bonds are secured by a second lien on distributable state aid.

  - $540.3 million in outstanding principal amount of limited tax general obligation ("LTGO") bonds maturing April 1, 2013 through November 1, 2035.

    - Issuance of LTGO bonds do not require voter approval. They are payable from general non-restricted funds.

    - $249.8 million of the LTGO bonds are secured by a first lien on distributable state aid. $129.5 million of the LTGO bonds are secured by a third lien on distributable state aid.



## I. Detroit Faces Strong Economic Headwinds.

- **Notes and Loans Payable.** The City estimates that, as of June 30, 2013, the City will have $121.5 million in other outstanding installment notes and loans payable related to various public improvement projects.

  - $87.8 million in notes payable (which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues).

  - $33.7 million in loans payable ($33.6 million of which is a non-interest bearing unsecured loan payable to the Downtown Development Authority as general operating funds become available).

- On August 23, 2012, the City issued $129.5 million of LTGO bonds at a $9.1 million premium (generating $137 million in proceeds after issuance costs) in part to defease short term bonds issued March 2012. The remaining proceeds of these issuances were set aside with a trustee bank in an escrow account to provide funds for reforms and liquidity in FY 2013. The current amount of the escrow is approximately $80 million.



OFFICE OF THE EMERGENCY MANAGER

13-53846   Doc 11-2   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 29 of 66

# I. Detroit Faces Strong Economic Headwinds.

- **Certificates of Participation (Pension)**

  - In 2005, service corporations established by the GRS and PFRS created a trust that issued the COPs. The proceeds of the COPs were contributed to the City's pension trusts.

  - Principal and interest on the COPs is payable solely from payments made by the City to the service corporations pursuant to service contracts.

  - The City estimates that, as of the close of FY 2013, the following amounts were outstanding under the COPs:

    - $480.3 million in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

    - $948.54 million in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

  - The City has identified certain issues related to the validity and/or enforceability of the COPs that may warrant further investigation.



# I. Detroit Faces Strong Economic Headwinds.

- **Swap Liabilities Related to Certificates of Participation.**

  - In connection with the COPs, the City entered into eight pay-fixed, receive-variable interest rate swaps effective as of June 12, 2006 having a total notional amount of $800 million.

  - Recent valuations establish the negative fair value of the swaps at approximately $343.6 million (as of May 31, 2013).

  - January 2009 — The City received notice from the swap contract counterparties that downgrading of the COPs and certain swap insurers would constitute an "Additional Termination Event" under the swap contracts if not cured.

  - June 2009 — The City and the swap contract counterparties agreed on an amendment to the swap agreements, eliminating the Additional Termination Event and the potential for an immediate demand for payment. Pursuant to the amendment, the swap counterparties waived their right to termination payments, and the City agreed to:

    - direct certain wagering tax revenues to a trust as collateral for the quarterly payments owing to the swap counterparties;

    - increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010; and

    - include new termination events, including if COP ratings were withdrawn, suspended or downgraded.

OFFICE OF THE EMERGENCY MANAGER

13-53846    Doc 11-2    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 31 of 66



## I. Detroit Faces Strong Economic Headwinds.

- March 2012 — COPs were further downgraded which triggered another Termination Event; the City and the swap counterparties are in negotiations regarding the Termination Event.

- March 2013 – Appointment of Emergency Manager constitutes an event of default triggering another Termination Event.

- Although this proposal reflects treating the swap obligations as special revenue debt secured by the wagering tax revenues, that treatment is still being reviewed by the Emergency Manager.



## I. Detroit Faces Strong Economic Headwinds.

**Other Liabilities.**

- The City estimates that, as of the end of FY 2013, the City will have $300 million in other liabilities outstanding.

- As of June 30, 2012, the City owed at least $264.6 million in other liabilities, consisting primarily of:

  - $101.2 million in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances;

  - $86.5 million in accrued workers' compensation for which the City is self-insured;

  - $63.9 million in claims and judgments, including lawsuits and claims other than workers' compensation claims; and

  - $13.0 million in capital leases and accrued pollution remediation.



# I. Detroit Faces Strong Economic Headwinds.

## Labor Costs and Restrictive Employment Terms

- The City is or was a party to 48 collective bargaining agreements ("CBAs") and has made great strides under the Consent Agreement in reducing costs imposed by its numerous active and expired CBAs between the City and various labor organizations representing City employees, many of which had been amended by interest arbitration awards issued by arbitrators appointed pursuant to Public Act 312. Under the Consent Agreement, the City has unilaterally implemented City Employment Terms ("CETs"), which were approved by the Financial Advisory Board (the "FAB") appointed by the Governor, the Treasurer, the Mayor and City Council under former Public Act 4 (now repealed). Currently, a substantial percentage of the City's employees are not governed by current CBAs, and many are working under CET terms and conditions of employment and/or those terms and conditions implemented or established through statutory interest arbitrations.

- During the last three years, the City has implemented compensation reductions to its work force in the form of budget-required furlough days ("BRF"), wage reductions and reductions in other wage related items, such as vacation days, sick days, longevity payments and overtime rules. The City implemented BRFs equivalent to 10% of wages (one furlough day every other week) to non-uniform employees in September 2009. In August 2012, as part of the CET implementation, BRFs were eliminated for non-uniform employees and replaced with a permanent 10% wage reduction. Additional BRFs were implemented in February 2013 affecting certain non-uniformed employees.



## I. Detroit Faces Strong Economic Headwinds.

- The CETs also imposed a 10% wage reduction on Detroit Police Officer Association ("DPOA") members in August 2012. DPOA challenged the CETs as part of an Act 312 arbitration process; a decision in that arbitration reduces the 10% wage reduction to 5% effective January 2014.

- The CETs, implemented on all unions with contracts expired on or before June 30, 2012, also included compensation reductions, as follows:

  - Freezing sick leave banks and eliminating reserve sick leave accrual;

  - Eliminating sick time cash payouts for future earned time;

  - Eliminating the ability to reinstate furlough days;

  - Eliminating the $3-per-day allowance for daily car usage;

  - Eliminating four to six annual bonus vacation days; and

  - Reducing vacation accrual to 160 hours from 320 hours.

- The following additional CET changes were implemented on DPOA members:

  - Limiting paid time for court if less than two hours;

  - Eliminating educational reimbursement;

  - Requiring 80 hours to be worked in the prior work period to be eligible for overtime;

  - Changing payment of holiday earnings;



# I. Detroit Faces Strong Economic Headwinds.

- Suspending the 2% wage differential while on promotional roster;

- Eliminating the option to receive pay for court and returning to banking the first 60 hours of court time;

- Eliminating bonus vacation days; and

- Delaying separation payments.

• Unilaterally implemented CETs imposed numerous concessions on City employees, including freezing, reducing or eliminating active employee benefits, reducing or eliminating pension and retiree medical benefits and reducing wages by 10%. The CETs also negated seniority protections in various CBAs by expanding management rights, modifying methods and processes by which work is performed, changing shifts, hours of operation and overtime procedures; and revising or eliminating job classifications. In addition to concessions imposed by the CETs, in some cases and as noted above, concessions have been granted through statutory interest arbitration processes.

• These labor cost concessions have not been uniformly applied to all bargaining units, and some City employees have not been affected by these measures. The restructuring plan seeks to ensure that any concessions are equitably distributed across all bargaining units (as well as across unrepresented employees) and that the impact of these concessions on employees are mitigated to the extent possible.



## II. Key Objectives for a Financial Restructuring and Rehabilitation of Detroit

**To the fullest extent possible under all of the circumstances:**

- Provide incentives (and eliminate disincentives) for businesses and residents to locate and/or remain in the City.
  - The City cannot stabilize or pay creditors meaningful recoveries if it continues to shrink.
  - Achieving this goal requires improvements in City services, particularly in the area of public safety and tax reform, to reduce the cost of living in the city to more closely approximate costs of living in nearby areas.
- Maximize recoveries for creditors.
  - Since the City will not generate sufficient cash to pay all liabilities, alternatives will have to be considered.
- Provide affordable pension and health insurance benefits, and restructure governance of pension arrangements.
- Eliminate blight to assist in stabilizing and revitalizing neighborhoods and communities within the City.
- Reform the City government operations to improve efficiency and reduce costs.
  - In many areas, longer term benefits will require immediate increases in capital investment.
- Maximize collection of taxes and fees that are levied or imposed.
- Generate value from City assets where it is appropriate to do so.



OFFICE OF THE EMERGENCY MANAGER

# III. Current Financial Status

## General Fund Summary

($ in millions)

| | 2008 | 2009 | 2010 | 2011 | 2012 | Prelim. 2013 |
|---|---|---|---|---|---|---|
| | | | Fiscal year ended actual | | | |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) |
| Deficit (excl. financing proceeds) | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 |
| Total surplus (deficit) | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 |
| | | | | | | |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) |

- The City has made significant progress decreasing operating costs; however, revenues have declined more quickly and legacy costs have increased.

- Excluding proceeds from debt issuances, the City's expenditures have exceeded revenues from FY 2008 to FY 2012 by an average of $100 million annually.



# III. Current Financial Status

## Revenues
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 |
| Other | 271.8 | 281.0 | 265.6 | 269.8 | 258.8 | 217.4 |
| Total revenues | $ 1,397.7 | $ 1,363.3 | $ 1,291.0 | $ 1,316.8 | $ 1,196.9 | $ 1,121.9 |

## Operating expenditures
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Salaries/overtime/fringe | $ (509.9) | $ (506.6) | $ (466.4) | $ (454.8) | $ (431.5) | $ (357.3) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) |
| Professional and contractual services | (66.9) | (73.5) | (54.2) | (48.5) | (43.1) | (42.7) |
| Materials & supplies | (85.8) | (70.9) | (60.1) | (67.1) | (62.2) | (63.6) |
| Utilities | (35.6) | (38.6) | (27.8) | (30.1) | (27.1) | (25.5) |
| Other | (362.9) | (281.2) | (285.4) | (222.4) | (238.9) | (159.8) |
| Operating expenditures | $ (1,111.1) | $ (1,025.3) | $ (964.7) | $ (887.5) | $ (857.1) | $ (692.0) |

## Legacy expenditures
($ in millions)

| | Fiscal year ended actual | | | | | Prelim. |
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|
| Debt service (LTGO & UTGO) | $ (133.8) | $ (177.6) | $ (135.9) | $ (137.3) | $ (135.6) | $ (141.4) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) |
| Legacy expenditures | $ (414.6) | $ (462.0) | $ (397.9) | $ (486.1) | $ (477.3) | $ (477.3) |



# III. Current Financial Status

- **Pension contributions.**

  - City has consistently deferred year-end PFRS contributions by using a payment plan financing arrangement including accrual of 8% interest (~$50 million for FY 2012)

- **Health Benefits - Retiree.**

  - The total cost of healthcare benefits City-wide in FY 2012 was approximately $275 million, of which approximately $177 million related to retirees.

  - The General Fund's portion of healthcare costs in FY 2012 was approximately $204 million, of which approximately $150 million related to retirees.



## III. Current Financial Status

**In the Absence of a Comprehensive Financial Restructuring, Budget Deficits Will Continue for the Foreseeable Future.**

**The City Has Limited Options for Further Revenue Generation and, in the Absence of a Comprehensive Financial Restructuring, Cost-Saving Measures.**

- Legacy obligations continue to increase;
- Limited or no access to debt capital markets;
- Diminishing, if any, returns from further tax increases; and
- Minimal potential for further payroll related reductions.

**Absent Structural Changes, the City's Accumulated Deficit is Expected to Grow to Unprecedented Levels.**

- At the City's current run rate, its accumulated deficit could grow to 3-4 times its current level of $326.6 million to over $1.35 billion by FY 2017.



# III. Current Financial Status

## A Look at the Future in the Absence of Restructuring Initiatives

*Note: The following projections were prepared based solely on the City's current levels of operating expenses and capital expenditures and do not account for (i) increases in expenditures necessary to restore City services to adequate levels, (ii) additional investment by the City in services, assets or infrastructure or (iii) any changes to legacy liabilities.

| ($ in millions) | Fiscal year ended actual | | | | | Preliminary forecast | | | | | 5-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 276.5 | $ 240.8 | $ 216.5 | $ 228.3 | $ 233.0 | $ 238.7 | $ 243.4 | $ 247.3 | $ 249.0 | $ 250.7 | $ 1,229.1 |
| State revenue sharing | 249.6 | 266.6 | 263.6 | 239.3 | 173.3 | 182.8 | 184.3 | 186.1 | 187.9 | 189.5 | 930.4 |
| Wagering taxes | 180.4 | 173.0 | 183.3 | 176.9 | 181.4 | 173.0 | 170.0 | 168.3 | 170.0 | 171.7 | 853.0 |
| Sales and charges for services | 191.3 | 166.7 | 154.1 | 155.0 | 145.4 | 120.4 | 124.8 | 119.4 | 118.2 | 117.0 | 599.7 |
| Property taxes | 155.2 | 163.7 | 143.0 | 182.7 | 147.8 | 134.9 | 118.4 | 110.2 | 105.7 | 100.8 | 570.0 |
| Utility users' and other taxes | 73.0 | 71.5 | 64.8 | 64.8 | 57.1 | 54.8 | 47.2 | 40.9 | 40.9 | 41.3 | 225.0 |
| Other revenue | 156.9 | 142.7 | 134.2 | 152.4 | 125.5 | 93.4 | 75.6 | 55.8 | 55.8 | 55.9 | 336.4 |
| General Fund reimbursements | 34.7 | 55.7 | 47.6 | 32.3 | 47.6 | 31.2 | 30.3 | 30.3 | 30.3 | 30.3 | 152.2 |
| Transfers in (UTGO millage & non-General Fund | 80.1 | 82.5 | 83.8 | 85.1 | 85.8 | 92.8 | 89.0 | 87.9 | 83.8 | 84.4 | 438.0 |
| **Total revenues** | 1,397.7 | 1,363.3 | 1,291.0 | 1,316.8 | 1,196.9 | 1,121.9 | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 5,333.8 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (509.9) | (506.6) | (466.4) | (454.8) | (431.5) | (357.3) | (341.5) | (341.9) | (346.4) | (352.5) | (1,739.7) |
| Health benefits - active | (49.9) | (54.4) | (70.8) | (64.6) | (54.3) | (43.1) | (51.2) | (54.0) | (57.4) | (61.0) | (266.7) |
| Other operating expenses | (551.2) | (464.3) | (427.5) | (368.2) | (371.3) | (291.6) | (292.9) | (288.2) | (295.9) | (301.5) | (1,470.2) |
| Operating expenditures | (1,111.1) | (1,025.3) | (964.7) | (887.5) | (857.1) | (692.0) | (685.7) | (684.1) | (699.7) | (715.0) | (3,476.6) |
| **Net operating surplus** | 286.7 | 338.0 | 326.3 | 429.2 | 339.8 | 429.9 | 397.2 | 362.0 | 341.8 | 326.3 | 1,857.2 |
| Debt service (LTGO & UTGO) | (133.8) | (177.6) | (135.9) | (137.3) | (135.6) | (141.4) | (135.9) | (124.4) | (119.4) | (96.1) | (617.2) |
| POC - principal and interest | (29.8) | (25.1) | (28.1) | (38.9) | (39.0) | (55.4) | (61.0) | (63.2) | (65.4) | (67.6) | (312.6) |
| POC swaps | (45.3) | (49.9) | (50.7) | (50.7) | (50.7) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (253.1) |
| Pension contributions | (76.3) | (65.7) | (50.8) | (119.5) | (86.1) | (78.3) | (199.5) | (233.1) | (258.9) | (285.9) | (1,055.8) |
| Health benefits - retiree | (129.3) | (143.7) | (132.3) | (139.7) | (150.1) | (151.6) | (140.7) | (151.1) | (161.6) | (172.0) | (776.9) |
| Legacy expenditures | (414.6) | (462.0) | (397.9) | (486.1) | (461.6) | (477.3) | (587.6) | (622.4) | (655.9) | (672.3) | (3,015.6) |
| **Deficit (excl. financing proceeds)** | (127.9) | (124.1) | (71.7) | (56.9) | (121.8) | (47.4) | (190.5) | (260.4) | (314.1) | (346.0) | (1,158.4) |
| Financing proceeds | 75.0 | - | 250.0 | - | - | 137.0 | - | - | - | - | 137.0 |
| **Total surplus (deficit)** | $ (52.9) | $ (124.1) | $ 178.3 | $ (56.9) | $ (121.8) | $ 89.6 | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (1,021.4) |
| Accumulated unrestricted General Fund deficit | $ (219.2) | $ (331.9) | $ (155.7) | $ (196.6) | $ (326.6) | $ (237.0) | $ (427.5) | $ (687.9) | $ (1,002.0) | $ (1,348.0) | |

## IV. The City Has Taken Action to Address Its Financial Challenges

**Headcount Reductions**

- Since 2011, the City has reduced its headcount by more than 2,700 employees (from 12,302 employees as of close of FY 2010 to approximately 9,560 as of May 31, 2013).

- The City's headcount reductions have resulted in *annual savings of over $100 million*.

**Reductions of Labor Costs through Implementation of City Employment Terms ("CETs")**

- Implementation of the CETs provides for an *estimated $102 million in annual savings*.

**Revenue Generating Initiatives**

- **Increased Corporate Tax Rate.** In January 2012, the City's corporate income tax rate was raised to 2.0% from 1.0%. This increased rate was projected to generate an estimated $6 million in additional annual revenue.

- **Enhanced Tax Collection Initiatives.** The City has implemented, and is implementing, initiatives designed to (i) improve collection of past due taxes and (ii) enhance collection efforts on a prospective basis. These efforts to enhance collection of taxes could generate an estimated $13 million in additional annual revenue.

- **Increased Lighting Rates.** In January 2013, the City's Public Lighting Department increased its rates to more closely align with market rates/eliminate practice of charging customers less for power than the City itself was paying. Increased PLD rates could generate an estimated $9 million in additional annual revenue.



# IV. The City Has Taken Action to Address Its Financial Challenges

## Significantly Reduced Operating Expenses

- **Reductions in Vendor Costs.** The City is implementing an initiative to reduce its vendor-related costs by 10%. Reductions in vendor costs are expected to save an estimated $10 million annually.

- **Reduction in Subsidy to DDOT.** In 2012, the City undertook steps to improve the efficiency of the Detroit Dep't of Transportation (e.g., through route rationalization), thereby reducing the subsidy from the City's General Fund to the DDOT enterprise fund by approximately $15 million annually.

## Deferred Capital Expenditures

- **The City has deferred capital expenditures.**

  - Average aggregate capital outlays for the fiscal years 2008 – 2012 were only $82.98 million. Average aggregate capital outlays for the preceding fiscal years 2003 – 2007 were $151.94 million.

  - For fiscal years 2014 – 2023, it is estimated that General Fund necessary capital expenditures will average approximately $145 million.

**Demolition Initiative.** Program launched in April 2010 with the goal of demolishing 10,000 vacant structures in three years.

- Over 5,000 structures have been demolished; the remaining portion of the 10,000 structures in the program are planned to be demolished by December 2013.



# V. Restructuring and Reinvesting in City Government

- To address the crises confronting the City and remedy the deficiencies in services addressed above (including, in particular, deficiencies in services relating to public safety), and to achieve a sustainable restructuring that promotes the long term health, safety and growth of the City, the City must aggressively pursue – and devote substantial resources to – the objectives described below.

- The City proposes to spend approximately $1.25 billion over the next ten years to, among other things, (i) improve the performance and infrastructure of its Police, Fire, EMS and Transportation Departments, (ii) comprehensively address and remediate urban blight, (iii) modernize its information technology systems on a City-wide basis and (iv) address lingering issues plaguing the City's electrical grid and lighting.



# V. Restructuring and Reinvesting in City Government

**Public Safety**

- **Police**
  - **Objectives**
    - Reduce response times to the national average.
    - Improve closure rates and first responder investigations.
    - Update and overhaul police fleet and facilities.
    - Modernize the Department's information technology.
    - Achieve compliance with federal consent decrees.
    - Refine structure, staffing and organization of department to better serve citizens; hold all members (sworn and civilian) of the department accountable to effectively maintain core responsibilities of policing.

- **Fire/EMS**
  - **Objectives**
    - Modernize fleet and facilities to ensure that DFD has adequate and reliable infrastructure and equipment to perform its duties.
    - Modernize information technology.
    - Improve operating efficiency and cost structure.



# V. Restructuring and Reinvesting in City Government

- **Street lights**
  - **Objectives**
    - Implement current population-based streetlight footprint.
    - Outsource operations and maintenance to the newly-created Public Lighting Authority structure (with oversight from the City).
    - Improve service to citizens and better cost management.

**Blight Removal.**
- **Objectives**
  - Stabilize and revitalize neighborhoods and communities within the City and improve quality of life.
  - Decrease incidence of crime and fire in blighted buildings and areas.
  - Increase property values.
  - Improvement in appearance of City.



# V. Restructuring and Reinvesting in City Government

**Electrical Transmission Grid**

- **Objectives**

  - Improvement in performance of grid and services to citizens.
  - Decommissioning of grid, sub-stations and idled power plant.
  - Increase revenue collection from customers.

**Information Systems Upgrades**

- Investment by the City in upgraded information technology is an indispensable aspect of the restructuring and reinvestment proposals and is critical to achieving almost all of the objectives described herein.

- **Objectives**

  - Enhance City-wide IT infrastructure to assist with effectuating change and augmenting workflows.

  - Increase integration between finance and operational systems City-wide resulting in lower labor costs and improved efficiencies.

  - Improve financial and operational reporting, resulting in:

    - Ability to monitor and improve operating performance.

    - More timely and accurate financial reporting to interested parties.

    - Improved revenue and collection efforts as a result of streamlined processes.



# V. Restructuring and Reinvesting in City Government

**Detroit Department of Transportation.**

- **Objectives**
  - Reduce general fund subsidy through increased revenue and reduced costs.
  - Determine best strategic direction for DDOT.



## VI. Realization of Value of Assets

- The Emergency Manager currently is evaluating the City's assets to determine the most advantageous course of action to preserve or maximize the value of such assets for the long-term benefit of the City. The City will evaluate all options, including preserving the status quo, entering into partnerships with other public entities, outsourcing of operations and transferring non-core assets to other private or public entities in sale, lease or other transactions.

- No decisions have been made regarding any particular asset, and the Emergency Manager will continue to evaluate options for inclusion in his comprehensive restructuring plan.



# VII. Ten Year Projections (General Fund Only) (Steady State)

| ($ in millions) | Preliminary forecast | | | | | | | | | | 10-year total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | |
| **Revenues** | | | | | | | | | | | |
| Municipal income tax | $ 243.4 | $ 247.3 | $ 249.0 | $ 250.7 | $ 252.4 | $ 254.0 | $ 255.6 | $ 257.8 | $ 260.9 | $ 264.0 | $ 2,535.0 |
| State revenue sharing | 184.3 | 186.1 | 187.9 | 189.5 | 191.2 | 193.0 | 194.8 | 188.3 | 190.0 | 191.7 | 1,896.4 |
| Wagering taxes | 170.0 | 168.3 | 170.0 | 171.7 | 173.4 | 175.1 | 176.9 | 178.7 | 180.4 | 182.2 | 1,746.7 |
| Sales and charges for services | 124.8 | 119.4 | 118.2 | 117.0 | 115.7 | 114.5 | 113.4 | 112.3 | 113.2 | 114.2 | 1,162.6 |
| Property taxes | 118.4 | 110.2 | 105.7 | 100.8 | 100.5 | 99.6 | 99.7 | 100.2 | 100.8 | 102.1 | 1,038.0 |
| Utility users' and other taxes | 47.2 | 40.9 | 40.9 | 41.3 | 41.7 | 42.1 | 42.5 | 43.0 | 43.4 | 43.8 | 426.8 |
| Other revenue | 75.6 | 55.8 | 55.8 | 55.9 | 55.9 | 56.0 | 56.0 | 56.0 | 56.1 | 56.1 | 579.2 |
| General Fund reimbursements | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 30.3 | 302.6 |
| Transfers in (UTGO millage & non-General Fund | 89.0 | 87.9 | 83.8 | 84.4 | 83.9 | 81.2 | 80.6 | 80.0 | 65.0 | 61.2 | 797.1 |
| **Total revenues** | 1,082.8 | 1,046.2 | 1,041.5 | 1,041.4 | 1,045.0 | 1,045.7 | 1,049.8 | 1,046.3 | 1,040.1 | 1,045.7 | 10,484.5 |
| **Expenditures** | | | | | | | | | | | |
| Salaries/overtime/fringe | (341.5) | (341.9) | (346.4) | (352.5) | (358.8) | (365.1) | (371.4) | (378.4) | (386.0) | (393.7) | (3,635.7) |
| Health benefits - active | (51.2) | (54.0) | (57.4) | (61.0) | (64.5) | (67.9) | (71.2) | (74.6) | (78.4) | (82.3) | (662.5) |
| Other operating expenses | (292.9) | (288.2) | (295.9) | (301.5) | (309.7) | (313.5) | (320.0) | (326.5) | (335.3) | (339.7) | (3,123.2) |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Net operating surplus | 397.2 | 362.0 | 341.8 | 326.3 | 311.9 | 299.2 | 287.2 | 266.8 | 240.5 | 230.0 | 3,063.0 |
| Debt service (LTGO & UTGO) | (135.9) | (124.4) | (119.4) | (96.1) | (95.0) | (92.5) | (91.8) | (91.5) | (74.8) | (70.9) | (992.4) |
| POC - principal and interest | (61.0) | (63.2) | (65.4) | (67.6) | (69.9) | (68.1) | (69.0) | (69.9) | (70.7) | (71.4) | (676.3) |
| POC swaps | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Pension contributions | (199.5) | (233.1) | (258.9) | (285.9) | (314.7) | (321.4) | (331.5) | (337.2) | (339.5) | (343.0) | (2,964.8) |
| Health benefits - retiree | (140.7) | (151.1) | (161.6) | (172.0) | (182.3) | (192.3) | (201.9) | (212.0) | (222.6) | (233.7) | (1,870.0) |
| Legacy expenditures) | (587.6) | (622.4) | (655.9) | (672.3) | (712.6) | (725.0) | (744.0) | (759.5) | (755.8) | (766.4) | (7,001.5) |
| Deficit (excl. financing proceeds) | (190.5) | (260.4) | (314.1) | (346.0) | (400.7) | (425.8) | (456.8) | (492.6) | (515.3) | (536.4) | (3,938.5) |
| Financing proceeds | - | - | - | - | - | - | - | - | - | - | - |
| Total surplus (deficit) | $ (190.5) | $ (260.4) | $ (314.1) | $ (346.0) | $ (400.7) | $ (425.8) | $ (456.8) | $ (492.6) | $ (515.3) | $ (536.4) | $ (3,938.5) |
| Accumulated unrestricted General Fund deficit | (427.5) | (687.9) | (1,002.0) | (1,348.0) | (1,748.7) | (2,174.5) | (2,631.3) | (3,123.9) | (3,639.2) | (4,175.6) | |
| **Reinvestment in the City** | | | | | | | | | | | |
| Department revenue initiatives | $ 22.9 | $ 22.1 | $ 24.4 | $ 24.2 | $ 24.5 | $ 24.7 | $ 25.0 | $ 25.3 | $ 25.6 | $ 25.9 | $ 244.6 |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.7) | (30.7) | (297.4) |
| Capital investments | (107.7) | (74.5) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (452.3) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| Total reinvestment in the City) | (188.5) | (139.3) | (135.7) | (149.7) | (130.5) | (128.8) | (32.8) | (33.4) | (32.6) | (33.8) | (1,005.2) |
| **Adjusted surplus (deficit)** | $ (379.0) | $ (399.7) | $ (449.8) | $ (495.6) | $ (531.2) | $ (554.6) | $ (489.6) | $ (526.1) | $ (547.9) | $ (570.2) | $ (4,943.7) |
| Adj. accumulated unrestricted General Fund deficit | (615.9) | (1,015.6) | (1,465.4) | (1,961.0) | (2,492.2) | (3,046.8) | (3,536.4) | (4,062.5) | (4,610.4) | (5,180.6) | |

# VII. Ten Year Projections (General Fund Only)

## Restructuring Scenario.

($ in millions)

| | 2014 | 2015 | 2016 | 2017 | Preliminary forecast 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 10-year total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total revenues | $1,082.8 | $1,046.2 | $1,041.5 | $1,041.4 | $1,045.0 | $1,045.7 | $1,049.8 | $1,046.3 | $1,040.1 | $1,045.7 | $10,484.5 |
| Department revenue initiatives | 22.9 | 22.1 | 24.4 | 24.2 | 24.5 | 24.7 | 25.0 | 25.3 | 25.6 | 25.9 | 244.6 |
| Operating expenditures | (685.7) | (684.1) | (699.7) | (715.0) | (733.1) | (746.5) | (762.5) | (779.5) | (799.6) | (815.7) | (7,421.5) |
| Additional operating expenditures | (53.7) | (37.0) | (21.3) | (22.0) | (21.7) | (22.7) | (29.3) | (29.3) | (29.6) | (30.7) | (297.4) |
| **Net operating surplus** | **$ 366.4** | **$ 347.2** | **$ 344.9** | **$ 328.5** | **$ 314.6** | **$ 301.2** | **$ 282.9** | **$ 262.9** | **$ 236.4** | **$ 225.2** | **$ 3,010.2** |
| *Reinvestment expenditures /adjustments* | | | | | | | | | | | |
| Reorganization (Capital investments & Professional fees) | (167.0) | (111.7) | (38.8) | (51.9) | (33.3) | (30.8) | (28.4) | (29.5) | (28.5) | (29.0) | (548.8) |
| Blight (excludes heavy commercial) | (50.0) | (50.0) | (100.0) | (100.0) | (100.0) | (100.0) | - | - | - | - | (500.0) |
| DC Pension contribution (10% Police/Fire, 5% other) | (25.4) | (25.7) | (26.2) | (26.6) | (27.2) | (27.7) | (28.2) | (28.7) | (29.3) | (29.9) | (274.8) |
| POC reimbursements | (24.1) | (25.4) | (26.2) | (26.8) | (27.5) | (27.1) | (27.3) | (27.4) | (27.4) | (27.4) | (266.7) |
| PLD decommission | - | (25.0) | (25.0) | (25.0) | - | - | - | - | - | - | (75.0) |
| Increased tax revenues | 7.4 | 12.2 | 16.4 | 23.8 | 28.3 | 36.0 | 42.0 | 48.5 | 56.3 | 63.8 | 334.5 |
| Total restructuring | (259.1) | (225.6) | (199.8) | (206.6) | (159.6) | (149.6) | (42.0) | (37.1) | (29.0) | (22.6) | (1,330.9) |
| **Funds available for legacy liabilities** | **107.3** | **121.6** | **145.2** | **122.0** | **155.0** | **151.6** | **240.9** | **225.7** | **207.4** | **202.6** | **1,679.3** |
| Payments to secured claims | | | | | | | | | | | |
| (subject to review/negotiation) | | | | | | | | | | | |
| LTGO - secured | (18.7) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (29.2) | (281.6) |
| UTGO - secured | (8.0) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (9.8) | (96.4) |
| POC swaps (1) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (50.6) | (49.8) | (48.9) | (48.1) | (47.4) | (498.0) |
| Notes/loans payable | - | - | - | - | - | - | - | - | - | - | - |
| Total payments to secured claims | (77.3) | (89.7) | (89.7) | (89.7) | (89.7) | (89.7) | (88.9) | (88.0) | (87.2) | (86.4) | (876.0) |
| **Funds available for unsecured claims** | **$ 30.0** | **$ 31.9** | **$ 55.5** | **$ 32.3** | **$ 65.4** | **$ 62.0** | **$ 152.1** | **$ 137.7** | **$ 120.2** | **$ 116.2** | **$ 803.3** |
| Asset monetization / revenue opportunities | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | tbd | |
| **Funds available for unsecured claims w/opportunities** | **$ 30.0** | **$ 31.9** | **$ 55.5** | **$ 32.3** | **$ 65.4** | **$ 62.0** | **$ 152.1** | **$ 137.7** | **$ 120.2** | **$ 116.2** | **$ 803.3** |

**Estimated unsecured claims**

| Unsecured debt | |
|---|---|
| LTGO - unsecured | $ 161.0 |
| UTGO - unsecured | 369.1 |
| POC principal balance | 1,428.8 |
| Notes/loans payable | 33.6 |
| Sub-total: Unsecured debt | 1,992.5 |
| **Unsecured pension & OPEB** | |
| OPEB liability | 5,718.3 |
| Pension unfunded liability (PFRS) | 1,437.0 |
| Pension unfunded liability (DGRS) | 2,037.0 |
| Sub-total: Pension & OPEB | 9,192.3 |
| **Other unsecured items** | |
| Other liabilities (FY 2012 CAFR) | 264.6 |
| Other potential claims | tbd |
| Sub-total: Other | 264.6 |
| **Estimated total unsecured claims** | **$11,449.4** |

Footnote:
(1) Assumes continued payments as scheduled. Treatment to be determined.



OFFICE OF THE EMERGENCY MANAGER

13-53846     Doc 11-2     Filed 07/18/13     Entered 07/18/13 21:44:51     Page 52 of 66

# VII. Ten Year Projections (General Fund Only)

## Conclusions Based Upon Projections

- The City acknowledges that it must exert reasonable efforts to maximize recoveries for all creditors.

- As demonstrated by the 10-year projections, however, the City's expected revenues will fall significantly short of the levels required to fund the City's operations and fully satisfy its liabilities.

- Given the City's (i) substantial debt levels (LTGO; UTGO; COPs; Swaps), (ii) significant labor related liabilities and (iii) continuing operating expenses, shared sacrifice will be required from all stakeholders to achieve the City's dual (and complementary) goals of maximizing returns for its stakeholder constituencies while simultaneously establishing the framework for a healthy and growing Detroit moving forward.

- All of the City's stakeholders can benefit from a restructured and revitalized Detroit.



# VIII. Restructuring Proposal

## Summary of Treatment of Debt

- **Secured Debt**

  - **DWSD Debt.** The existing DWSD water and sewer bond debt may be divided into two classes, *if applicable*:

    - **DWSD Class A Debt Claims**

      - DWSD Class A Debt Claims shall consist of claims under or evidenced by certain debt that may be paid prior to the effective date of the City's comprehensive restructuring plan without incurring a material premium or penalty.
      - On the effective date of the City's comprehensive restructuring plan, accrued principal and interest for DWSD Class A Debt Claims accrued through the restructuring plan's effective date will either (i) be repaid in full in cash or (ii) receive such treatment as may be agreed upon by the parties.



# VIII. Restructuring Proposal

- *Source of funds for repayment*:  New long-term bond issuances with a newly-formed Metropolitan Area Water and Sewer Authority, or "MAWSA," as the issuer.

    i.  <u>New Series A Bond Principal</u>:  An amount equal to the sum of the principal of the outstanding debt that was issued to redeem the DWSD Class A Debt Bonds plus interest thereon accrued through the restructuring plan's effective date and fees incurred in connection with the new financings.

    ii.  <u>New Series A Bond Collateral</u>:  Lien on net revenues generated by MAWSA assets with the same priorities as the DWSD Class A Debt, but subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

    iii.  <u>New Series A Bond Interest Rate</u>:  Prevailing market rate for similar long-term municipal bonds at the time of issuance.

    iv.  <u>New Series A Bond Maturities</u>:  The various series of new municipal bonds would have long-term maturities determined at the time of issuance on the basis of then-existing market conditions.

- **DWSD Class B Debt Claims.**
- DWSD Class B Debt Claims shall consist of all claims under or evidenced by each series of existing water or sewer bond debt (whether callable or not) that are not DWSD Class A Debt Claims.



# VIII. Restructuring Proposal

i. On the effective date of the City's comprehensive restructuring plan, holders of DWSD Class B Debt Claims shall receive Series B Restructured Bonds or such treatment as may be agreed upon by the parties.

- ***Series B Restructured Bond Terms:*** Series B Restructured Bonds would be issued by MAWSA to holders of outstanding DWSD Class B Debt Claims.

  i. Series B Restructured Bond Principal: For each series of Series B Restructured Bonds, an amount equal to the sum of the principal of the outstanding DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged plus interest thereon accrued through the restructuring plan Effective Date.

  ii. Series B Restructured Bond Collateral: Lien on net revenues generated by MAWSA assets in the same priorities as currently exist for the DWSD Class B Debt Bonds for which such Series B Restructured Bonds are to be exchanged, subordinate to the operating and maintenance costs of the system, including the Transaction Payment.

  iii. Series B Restructured Bond Interest Rate: Prevailing market rate for similar long-term municipal bonds at the time of issuance.

  iv. Series B Restructured Bond Maturities: The same maturity dates as the DWSD Class B Debt Bonds for which the Series B Restructured Bonds will be exchanged.

OFFICE OF THE EMERGENCY MANAGER

13-53846   Doc 11-2   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 56 of 66



# VIII. Restructuring Proposal

- **Secured General Obligation Debt**

  - There are six series of secured General Obligation Debt:

    - $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment).

    - $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

    - $38,865,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A)(2).

    - $30,730,000 original principal amount Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2).

    - $6,405,000 original principal amount General Obligation Distributable State Aid Third Lien Capital Improvement Refunding Bonds (Limited Tax General Obligation), Series 2012(B).

    - $53,520,000 original principal amount Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2-B).

  - Total annual debt service is approximately $39 million per year from FY 2015 through FY 2033.

  - Treatment: Subject to negotiation with holders.



# VIII. Restructuring Proposal

- <u>Secured Claims Arising in Connection with Installment Notes Payable</u>

  - The City has $87.8 million outstanding in connection with notes payable related to various public improvement projects, which notes were issued in connection with the "Section 108" HUD Loan Guarantee Program and are secured by future "Block Grant" revenues.

  - Treatment: Subject to negotiation with holders.

- <u>Secured Claims Arising under Service Agreements Related to COP-Related Interest Rate Swaps</u>

  - Treatment: Subject to negotiation with holders.

- <u>Secured Automobile Parking Fund Claims</u>

  - $9.3 million in outstanding principal amount of Detroit Building Authority Revenue Refunding Bonds: Parking System, Series 1998-A are secured by a pledge of all revenues of the parking system, net of operating expenses.

  - Treatment: Principal and interest accrued through the effective date will be paid in full in cash using proceeds of sales of City's parking-related assets. In the event that sales are not negotiated and consummated prior to the effective date, claims will be subject to negotiations with holders.



# VIII. Restructuring Proposal

- **Consideration for Unsecured Claims:** Holders of general unsecured claims will receive limited recourse participation notes (the "Notes").

  - Claims Under Unsecured General Obligation Bonds/Notes.

    - Aggregate amount: Approximately $650 million.

    - Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Claims of Service Corporations (or affiliated trusts) on Account of COPs.

    - Aggregate amount: Approximately $1.4 billion.

    - Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Claims for Unfunded OPEB Liabilities.

    - Current retirees will receive modified medical benefits plans utilizing either the exchanges to be created by January 1, 2014 under the Patient Protection and Affordable Care Act or Medicare, as applicable. The proposed replacement program is preliminarily estimated to have a cost to the City of between $27.5 million and $40 million annually depending on choices to be made.

    - Claims will result from the modification of benefits. The amount of such claims has not been finally determined.

    - Treatment for Allowed Claims: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.



# VIII. Restructuring Proposal

- <u>Claims for Unfunded Pension Liabilities.</u>

  - As set forth above, preliminary analysis indicates that the underfunding in the GRS and the PFRS is approximately $3.5 billion. At this level of underfunding, the City would have to contribute approximately $200 million - $350 million annually to fully fund currently accrued, vested benefits. Such contributions will not be made under the plan.

  - Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.

  - Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be **significant** cuts in accrued, vested pension amounts for **both active and currently retired** persons.

- <u>Claims on account of Other Liabilities.</u>

  - Aggregate Amount: Approximately $300 million.

  - Treatment: Exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes.



# VIII. Restructuring Proposal

- **Description of Limited Recourse Participation Notes.**

  - **Relevant Definitions:**

    - "Adjusted Base Covered Revenues" means for a Fiscal Year following the Initial Revenue Participation Year, Base Covered Revenues adjusted for inflation for the period beginning on the first day of the Initial Revenue Participation Year and ending on the first day of the Fiscal Year using the positive change, if any, in the Consumer Price Index during such period.

    - "Base Covered Revenues" means one half of the sum of Covered Revenues for the first two Fiscal Years beginning after the Effective Date.

    - "Covered Revenues" means amounts actually collected by the City's General Fund in a Fiscal Year on account of (a) Property Taxes, Income Taxes and Gaming Taxes levied for such Fiscal Year and (b) Revenue Sharing Payments, determined based upon the City's audited financial statements.

    - "Dutch Auction" means a method for pricing the Notes whereby the price of the Notes offered by the City is the lowest price (the "Auction Price") at which there are bids to sell Notes for an aggregate purchase price equal to the amount the City is required to pay in respect of Revenue Participation Payments and/or Asset Disposition Proceeds then due and payable.  During bidding, each Noteholder will indicate how many Notes it is willing to sell to the City and the price such Noteholder is willing to accept.  All Notes offered at the Auction Price or at a lower price will be sold to the City at the Auction Price.



# VIII. Restructuring Proposal

- "Effective Date" means the closing date of a comprehensive restructuring of the City's finances on which the Notes shall be issued.

- "Final Participation Year" means the Fiscal Year beginning on the 20th anniversary of the first day of the Initial Participation Year.

- "Fiscal Year" means a period commencing on July 1 of a year and ending on June 30 of the following year. For greater certainty, the Fiscal Year beginning on July 1, 2014 and ending on June 30, 2015 is the 2015 Fiscal Year.

- "Initial Participation Year" means the second full Fiscal Year following the Effective Date.

- "Trustee" means an indenture trustee or other agent for the Noteholders as defined in definitive documentation for the Notes.

- **Terms:**

- Initial Principal Amount: $2,000,000,000.00.

- Interest Rate: 1.5% per annum on the outstanding principal amount of the Notes, payable semiannually. No interest shall be paid or accrued for any period following the end of the Final Participation Year.

- Maturity Date: The first September 30 following the Final Participation Year. The City shall have no obligation to pay any amounts other than the Revenue Participation Payment in respect of the Final Participation Year on the maturity date. The Notes may be prepaid in whole or in part at any time without premium or penalty.



# VIII. Restructuring Proposal

- On the September 30 after the end of each Fiscal Year beginning with the Initial Participation Year, an amount equal to the product of (a) 30% (0.30), multiplied by (b) (i) the amount by which Covered Revenues for such Fiscal Year exceed (ii) Adjusted Base Covered Revenues shall be applied to reduce the principal amount of the Notes. No Revenue Participation Payments shall be made for any Fiscal Year after the Final Participation Year.

- Grants and Other Amounts Received to Offset Costs of Addressing Blight: If the City receives any cash grants or other cash payments after the Effective Date and before the Maturity Date from the State of Michigan, the Federal government, or any other government or nonprofit entity not affiliated in any way with the City for the purpose of funding programs or activities to address blight that are included in the 10 Year Plan ("Blight Revenues") and that can be utilized in place of the General Fund sums in the 10 Year Plan projections, an amount equal to 75% of the General Fund revenues that would otherwise be spent on blight but for the outside funds shall be applied to reduce the principal amount of the Notes.

- Asset Disposition Proceeds: If the City receives cash consideration in connection with the transfer of Specified Assets after the Effective Date and before the Maturity Date, an amount equal to 75% of such cash shall be applied to reduce the principal amount of the Notes. For greater certainty, the assumption of indebtedness shall not constitute cash consideration.

- The City shall make distributions of Blight Revenues and Asset Disposition Proceeds when the amount of such payments that are due equal or exceed $50 million or at the time a Revenue Participation Payment is due, whichever is sooner.



# VIII. Restructuring Proposal

- **Dutch Auctions:** Any Revenue Participation Payment, Blight Revenues, Asset Disposition Proceeds and other amounts made available by the City may be used to fund offers to purchase Notes through a Dutch Auction process. The City shall give notice of its intent to conduct such a Dutch Auction using a Revenue Participation Payment on or before the July 15th following the end of the pertinent Fiscal Year and shall conclude the auction and purchase notes offered and accepted in the auction no later than the 90 days following the date such notice is given. The City shall give notice of its intent to conduct such a Dutch Auction using Asset Disposition Proceeds or Blight Revenues on or before the 30 days following the date when the City becomes obligated to apply Asset Disposition Proceeds and shall conclude the auction and purchase notes offered and accepted in the auction no later than 90 days following the date such notice is given. The City may give notice of its intent to conduct a Dutch Auction using funds provided by the City which are not otherwise required to be applied to repayment of the Notes at any time.

- **Limited Recourse:** The City's obligation to pay interest on the Notes shall be a general obligation of the City. The City shall have no obligation to pay the principal amount of the Notes except to the extent that Revenue Participation Payments, Blight Revenues or Asset Disposition Proceeds become due in accordance with the terms hereof.

- **Requirements of Law.** The terms of the Notes may be revised to conform with requirements of law.



## IX. Calendar and Contacts

- Requests for additional information: June 17, 2013 - June 24, 2013.
- Initial round of discussions with stake holders: June 17, 2013 - July 12, 2013.
- Evaluation: July 15, 2013 - July 19, 2013.

OFFICE OF THE EMERGENCY MANAGER

13-53846    Doc 11-2    Filed 07/18/13    Entered 07/18/13 21:44:51    Page 65 of 66



# IX. Calendar and Contacts

- **Contacts:**

  - MILLER BUCKFIRE & CO., LLC
    601 Lexington Avenue, 22nd Floor
    New York, NY 10022
    (212) 895-1800

    - Kenneth Buckfire
      Co-President & Managing Director.

    - James Doak
      Managing Director.

  - JONES DAY

    David G. Heiman, Esq.
    901 Lakeside Avenue
    North Point
    Cleveland, Ohio 44114-1190
    (216) 586-3939

    Bruce Bennett, Esq.
    555 South Flower Street, 50th Floor
    Los Angeles, CA 90071
    (213) 489-3939

    Heather Lennox, Esq.
    222 East 41st Street
    New York, NY 10017
    (212) 326-3939



# EXHIBIT C

# CITY OF DETROIT, MICHIGAN
# NOTICE OF PRELIMINARY FINANCIAL REVIEW FINDINGS
# AND
# APPOINTMENT OF A FINANCIAL REVIEW TEAM

The following information is provided by the City of Detroit, Michigan (the "City") pursuant to certain Continuing Disclosure Agreements executed and delivered by the City in connection with the issuance of certain obligations (the "Obligations"), in compliance with Securities and Exchange Commission Rule 15c2-12.

Since 2008, the City has been experiencing significant financial problems caused by the loss of residents, the financial challenges of the automobile industry, the disruptions in the financial markets and the overall economic issues faced by the country. In early December 2011, Governor Rick Snyder (the "Governor") directed State Treasurer Andy Dillon (the "Treasurer") to conduct a preliminary review of the City's finances pursuant to Public Act 4 of 2011, the Local Government and School District Financial Accountability Act ("Act 4"). On December 21, 2011, the Treasurer, after completing his preliminary review, issued a report in which he made a determination that the City was in a state of "probable financial stress" under Act 4 based on a number of factors set forth in the Treasurer's report.

In accordance with Act 4, upon a finding of "probable financial stress," the Governor is required to appoint a financial review team to undertake a more extensive financial management review of the City. On December 27, 2011, the Governor announced the appointments of a 10 member financial review team. Under Act 4, the financial review team must report its findings to the Governor within 60 days, unless a 30-day extension is requested and granted or the Governor requests that the review team report to him in less than 60 days. Under Act 4, the review team must reach one of the following conclusions in its report: (i) no or mild financial stress exists in the City; (ii) severe financial stress exists in the City but a consent agreement containing a plan to resolve the problem has been adopted; (iii) severe financial stress exists in the City and a consent agreement has not been adopted; or (iv) a financial emergency exists in the City and no satisfactory plan exists to resolve the emergency.

Attached to this Notice as Exhibit A is a copy of the December 21, 2011 report of the Treasurer.

Dated: January 13, 2012



STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:** December 21, 2011

**TO:** Rick Snyder, Governor

**FROM:** Andy Dillon, State Treasurer

**SUBJECT:** Preliminary Review of the City of Detroit

### I. Background

On December 6, 2011, the Department of Treasury commenced a preliminary review of the finances of the City of Detroit to determine whether or not a local government financial problem existed. Section 12(1) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, permits a preliminary review to be conducted if one or more of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivision (j), (m), (o), (q) and (r) of Section 12(1) having occurred within the City. [1]

As summarized below, based upon information received and considered as part of the preliminary review -- including the inability of the City to avoid fund deficits, recurrent accumulated deficit spending, severe projected cash flow shortages resulting in an improper reliance on inter-fund and external borrowing, the lack of funding of the City's other post-retirement benefits, and the increasing debt of the City -- I conclude that probable financial stress exists in the City of Detroit and recommend appointment of a financial review team. Appointment of a financial review team is a prerequisite step in the Act 4 process to the appointment of an emergency manager.

### II. Preliminary Review Findings

The preliminary review found the following:

- The City has violated requirements of section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, as amended, which states that the "the legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation

---

[1] Subsection (j) provides that "[t]he local government has violated a requirement of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440. Subsection (m) provides that "[a] local government is in breach of its obligations under a deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan." Subsection (o) provides that "[a] municipal government has ended a fiscal year in a deficit condition." Subsection (q) provides that [a] local government has been assigned a long-term debt rating within or below the BBB category or its equivalent by 1 or more nationally recognized credit rating agencies." Subsection (r) provides that "[t]he existence of other facts or circumstances that in the state treasurer's sole discretion for a municipal government are indicative of municipal financial stress."

can be determined." For example for the year ending June 30, 2010, the Human Resources - Apprentice Training program went over budget by over $2.3 million, the Insurance Premium line item exceeded its budget by over $12 million and the Police Operations line item went over budget by $15.8 million. Consequently, the general fund had line items that exceeded its budget by almost $58 million. Unaudited 2011 figures indicated that line items amounting to $97 million exceeded their budget including an excess of $25 million over budget for fire and $44 million for police.

- City officials have not filed an adequate or approved deficit elimination plan with the Department of Treasury for the fiscal year ending June 30, 2010. On December 20, 2010, City officials filed an audit report that reflected a $155 million cumulative deficit in the general fund, a $1.4 million cumulative deficit in the airport fund, and a $3.5 million cumulative deficit in the local street fund. As of December 2011, City officials have not filed a plan that would reduce the general fund deficit. In fact, new data estimate the general fund's deficit increasing to $196 million for 2011 (the 2011 audit report has not yet been filed). The deficits in the airport and local street funds have been eliminated in 2011.

There have been deficits in the general fund that exceed $100 million dating back to 2005. These deficits have fluctuated between over $155 million and over $300 million. One of the primary methods the City has used to reduce the deficits has been to issue more debt. Total general fund debt and other long term liability proceeds for the years between 2005 and 2010 was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

General Fund Deficits and Debt Proceeds:

| Year | Deficit | Debt Proceeds |
|------|---------|---------------|
| 2005 | (155,404,035) | 248,440,183 |
| 2006 | (173,678,707) | 34,892,659 |
| 2007 | (155,575,800) | |
| 2008 | (219,158,138) | 75,210,007 |
| 2009 | (331,925,012) | |
| 2010 | (155,692,159) | 251,663,225 |
| 2011 | (196,577,910) | |

For the City on a whole (excluding component units), there was a 2010 unrestricted net assets deficit of over $1.6 billion and a similar amount for the unaudited 2011 fiscal year[2].

---

[2] Net Assets are calculated on the government-wide financial statements that use the accrual basis of accounting and include such items as capital assets and long-term debt. The unrestricted amount measures the net assets that are appropriable for expenditure and are not legally segregated for a specific future use.

- The City's deficit elimination plans and budget proposals have proven to be unrealistic. City officials are either incapable or unwilling to manage its own finances. For example, the 2008 deficit elimination plan reported $58 million in expenditure reductions in the general fund and $69 million (excluding debt proceeds and revenue sharing) in revenue enhancements for 2010. However, the 2010 general fund balance ended in a deficit condition of over $155 million and would have been much greater if not for $250 million in new debt. Again, the 2009 deficit elimination plan certified in November of 2010 projected a 2011 surplus while the actual fund balance for the general fund ended with a deficit estimated at close to $200 million. The City had promised restructuring and consolidation including hiring freezes and improved tax collection. Finally in mid-2011, City officials submitted a deficit elimination plan for the 2010 deficit which included revenue initiatives of over $200 million and expenditure reductions of over $300 million, most of which would take place in future periods and were questionable, such as the $10 million to sell tunnel rights and $50 million in better income tax collection. One version of the plan estimated that the City would be able to obtain an additional $154 million each year from the collection of income taxes from residents who work outside the City. Projected expenditure reductions rely heavily on union concessions which have not historically materialized.

- The City has a mounting debt problem. In 2010, annual debt service requirements exceeded $597 million. As of June of 2011, the long-term debt of the City exceeded $8 billion excluding unfunded actuarial pension and other postemployment benefit (OPEB) liabilities and discretely presented component units such as the Library and Downtown Development Authority. However, if one includes the unfunded actuarial pension liability of $615 million (offset by an almost $1.4 billion pension asset) and the unfunded other postemployment benefit liability of over $4.9 billion, the City's total long-term liabilities are over $12 billion, which does not include substantial sums of interest which are over $4.9 billion. In comparison if one took the total long-term debt of the City compared to total net assets, the City would have a 2010[3] factor of 32.64 debt to 1 in net assets or 32.64[4]. Other major cities in Michigan have factors of less than 1 such as Flint with a factor of 0.59, Lansing with a factor of 0.67 and Grand Rapids with a factor of 0.39. Major Cities around the United States have smaller factors such as the City of Los Angeles with a factor of 1.13 and Indianapolis with a factor of 4.67.[5]

---

[3] The factor for Detroit's 2011 fiscal year is not meaningful since total net assets declined by $281 million and are in a deficit condition.

[4] Less than 1 is considered good.

[5] Chicago was the only City compared that was in poor shape comparably with a factor that was not meaningful because of a negative total net assets balance.

| | General Obligation | Revenue | POC | Other |
|---|---|---|---|---|
| Governmental | $ 1,033,233,278 | $ 125,520,622 | $ 1,194,003,260 | $ 284,276,052 |
| Sewage | | 2,894,198,302 | 90,114,924 | 15,046,961 |
| Transportation | 6,271,722 | | 105,143,913 | 28,238,095 |
| Water | | 2,159,831,662 | 79,517,902 | 25,979,109 |
| Automobile | | 11,341,382 | | 10,225,829 |
| Other | | | | 162,187 |
| Unallocable | | | | |
| | $ 1,039,505,000 | $ 5,190,891,968 | $ 1,468,779,999 | $ 363,928,233 |

| | OPEB | Pension Liability | Pension Asset* | Total |
|---|---|---|---|---|
| Governmental | | | | $ 2,637,033,212 |
| Sewage | | | | 2,999,360,187 |
| Transportation | | | | 139,653,730 |
| Water | | | | 2,265,328,673 |
| Automobile | | | | 21,567,211 |
| Other | | | | 162,187 |
| Unallocable | $ 4,982,355,243 | $ 615,701,032 | $ (1,371,848,955) | 4,226,207,320 |
| | $ 4,982,355,243 | $ 615,701,032 | $ (1,371,848,955) | $ 12,289,312,520 |

Pension Obligation Certificates (POC); Other Postemployment Benefits (OPEB)
*Pension asset may already be factored into actuarially determined pension liability

- Prior to 2008, in order to obtain better interest rates and reduce debt related costs, the City entered into interest rate swaps and swaptions where two or more parties enter into an agreement to exchange interest cash flows. Switching or "swapping" a variable interest rate for a fixed rate would benefit the City if market interest rates increased. However, rates subsequently fell impacting the City negatively. Because the fall in interest rates was not predicted, ramifications of increased annual payments resulted. In addition to principal and interest payments, the City must pay amounts called "hedging derivatives", which over the life of the debt is an additional $1,136,007,248.

The City is in risk of a termination event which would occur if the City's credit is downgraded below Baa3 or its equivalent. On January 8, 2009, such an event occurred. However, the City avoided the immediate demand for payment by entering into another agreement that would allocate wagering tax revenues to a Trust to be used as collateral for future payments thus reducing the benefits of those cash flows to the City. New termination events include the agreement that the Trust will maintain a certain level of funds, further downgrades in the City's credit rating, and the appointment of an emergency manager. As stated by the City's auditors, "[s]hould such Termination Events occur in connection with the Swap Agreements, and not be cured, there presently exists significant risk in connection with the City's ability to meet the cash demands under the terms of the amended Swap Agreements." According to estimates if an "event" occurred, the City would be facing a $280 million to $400 million termination pay-

ment. According to recent reports, the City intends to sell water and sewer bonds to unwind a portion of the swaps. The notional amount, or face value, of these outstanding hedging derivatives in 2011 was over $3.8 billion and had a market value of ($560 million).

- The City's long-term bond rating fell below the BBB category and is considered "junk", speculative or highly speculative. According to a Thomson Reuters June 24, 2011 article, "Fitch downgraded the rating on about $453 million of Detroit's unlimited-tax general obligation bonds to BB-minus from BB-plus, and dropped the rating on the City's approximately $486 million of limited-tax GO bonds to B-plus from BB. The rating on about $1.5 billion of pension bonds was cut to BB-minus from BB-plus. The lower unlimited-tax GO rating from Fitch matches the Ba3 rating with a negative outlook from Moody's Investors Service. Standard & Poor's Ratings Services rates Detroit's GO bonds BB with a stable outlook."

- Not only does the City have large external debts, but it also has large debts due to itself in the form of interfund loans. As of June 30, 2010, the City had interfund balances amounting to over $447 million and unaudited 2011 balances of $334 million. Concurrently, the City has been able to have net operating surpluses in its general fund for most of the more recent fiscal years. However, the City incurs substantial deficits in the fund because of the subsidies it pays to other funds such as $72 million to the transportation fund. However, most of the transfers ($133 million) were made for debt service and pension funds. The total amount transferred from the general fund according to 2011 draft figures is $215 million.

- The City is experiencing significant cash flow shortages. In 2010, the City received $250 million in fiscal stabilization bonds. The City has also received $55 million in delinquent property tax receipts from the county and $20 million from the DTE Escrow account. However despite these inflows of substantial amounts of cash, the City is projecting a cash shortage.

  Based on recent projections made available by the City, the general fund had a forecasted ending cash balance of $115,500,000 as of October 28, 2011. The actual cash balance as of that date was $96,100,000, an overestimation of $19,400,000. The City revised its cash forecast based on a series of new assumptions and it is projected that the City will experience a cash shortage starting in April 2012, of ($1,600,000) and will end its fiscal year in June 2012 with a cash shortage of ($44,100,000).

- The City has had trouble making its required payments to its pension plans. Years of exceptional pension benefits have increased the costs to the City. Current police and fire employees enjoy multipliers of 2.5 for 25 years of service and 2.1 thereafter[6]. However, a newer one-year agreement was approved to limit the factor for earnings after September 2011 to

---

[6] Multipliers are used in calculating retirement pay in defined benefit plans. For example, a 2.5 multiplier would be used by calculating 2.5% of the years of service times the final average compensation to calculate the yearly pension. For example, an employee working 30 years and making $50,000 per year before retiring would receive $37,500 in retirement (.025x30x50,000). Compare that to a factor of 1.5 and the annual retirement would be $22,500, a $15,000 difference annually.

2.1. General employees have negotiated a tiered system of 1.6 for the first 10 years, 1.8 for the next 10 years, 2.0 for the next five years, and 2.2 for the remaining years.

In June of 2005, the City issued $1.44 billion of new debt in the form of Pension Obligation Certificates (POC) to fund its two retirement systems with a renegotiated repayment schedule of 30 years. More recently, the City contemplated not making required payments to the plans to save money. However, subsequent negotiations with representatives of the plans resulted in a "smoothing" that would allow them to make five-year pension payments over a seven-year period. Annual required payments as of the last audit report filed, not including debt payments related to the POCs, is $110 million which is an increase of $41 million from 2010.

Other legacy costs include growing unfunded pension and other postemployment benefits that have already been noted, but also include the current salary and benefit structure. Others have calculated the fringe benefit costs to the City in addition to salaries and benefits at almost $1 billion annually. However, this amount has not been verified.

- There are questionable balances in the 2010 audit report of the City's pension plans. The auditors were unable to obtain sufficient evidence supporting approximately $216 million of the retirement plans' alternative investments.

- Audit reports for the fiscal year ending June 30, 2010 show that the City's poor financial management impacts the City's administration of Federal grant programs and poses likely threats to the City's continued receipt of Federal funds for social service programs. Eighty pages of a KPMG audit site numerous findings and offer the following examples of questioned and potentially disallowed costs:

  o Nutrition for Women, Infants and Children – Approximately $1.0 million in questioned costs in addition to accounting, eligibility and fund reconciliation issues.
  o Community Development Block Grant – Approximately $12.7 million in questioned salary costs.
  o HOME (Home investment partnership program) – Approximately $846,000 in salary costs; $273,000 in questioned indirect planning costs.

cc: Roger Fraser, Deputy State Treasurer
Frederick Headen, Director, Bureau of Local Government Services

# **EXHIBIT D**

3500 (Rev. 01-11)



STATE OF MICHIGAN
### DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**     March 26, 2012

**TO:**      Governor Snyder

**FROM:**    Detroit Financial Review Team:
Andy Dillon
Frederick Headen
Jack Martin
Conrad Mallet, Jr.
Isaiah McKinnon
Glenda D. Price
Irvin D. Reid
Doug Ringler
Shirley R. Stancato
Brom Stibitz

**SUBJECT:**   Report of the Detroit Financial Review Team

On January 10th, 17th, 19th, 24th, and 31st; February 28th; and March 13th, 21st, and 26th 2012, Detroit Financial Review Team members met and reviewed information relevant to the financial condition of the City. Based upon those reviews, the Review Team concludes, in accordance with Section 13(4)(c) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, that the City of Detroit is in a condition of severe financial stress as provided in Section 14 of the Act, and that a consent agreement has not been adopted pursuant to Section 13(1)(c) of the Act.

I. Background

A. Preliminary Review

On December 6th through December 21st, 2011, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not probable financial stress existed. Section 12(1) of the Act provides that a preliminary review may be conducted if one or more of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j), (m), (o), (q) and (r) of Section 12(1) having occurred within the City. [1]

---

[1] Subsection (j) provides that "[t]he local government has violated a requirement of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440. Subsection (m) provides that "[a] local government is in breach of its obligations under a deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan." Subsection (o) provides that "[a] municipal government has ended a fiscal year in a deficit condition." Subsection (q) provides that [a] local government has been assigned a long-term debt rating within or below the BBB category or its equivalent by 1 or more nationally recognized credit rating agencies." Subsection (r) provides that

Governor Snyder
March 26, 2012
Page Two

The preliminary review found, or confirmed, the following:

- The City had violated requirements of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act. Section 17 of the Act provides that "[t]he legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined."[2]

  For example, for the year ending June 30, 2010, the human resources apprentice training program exceeded its budget by over $2.3 million, the insurance premium line item exceeded its budget by over $12 million, and the police operations line item exceeded its budget by $15.8 million. Consequently, the general fund had line items that exceeded budgeted amounts, in the aggregate, by almost $58 million. Unaudited 2011 figures indicated that line items amounting to $97 million exceeded their budget, including an excess of $25 million for fire and $44 million for police.

---

"[t]he existence of other facts or circumstances that in the state treasurer's sole discretion for a municipal government are indicative of municipal financial stress."

[2] The Review Team was advised by a member of the City Council that the implication of the preliminary review (i.e., that the City Council had failed to amend budgets to prevent over expenditures) was incorrect in that the City Council is not authorized to initiate budget amendments. The point made by the City Councilmember is well taken.

Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, reads, in part, as follows:

> (1) Except as otherwise provided in section 19, a deviation from the original general appropriations act shall not be made without amending the general appropriations act. Subject to section 16(2), the legislative body of the local unit shall amend the general appropriations act as soon as it becomes apparent that a deviation from the original general appropriations act is necessary and the amount of the deviation can be determined. An amendment shall indicate each intended alteration in the purpose of each appropriation item affected by the amendment. The legislative body may require that the chief administrative officer or fiscal officer provide it with periodic reports on the financial condition of the local unit.

> (2) If, during a fiscal year, it appears to the chief administrative officer or to the legislative body that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and the proceeds from bonds or other obligations issued under the fiscal stabilization act, 1981 PA 80, MCL 141.1001 to 141.1011, or the balance of the principal of these bonds or other obligations, *the chief administrative officer or fiscal officer shall present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year.* Emphasis supplied.

We would read the obligation of a legislative body to amend a budget under subsection (1) of Section 17 of the Act to apply only upon receipt of a recommendation from the chief administrative officer or fiscal officer pursuant to subsection (2) of the Act.

- City officials had not filed an adequate or approved deficit elimination plan with the Department of Treasury for the 2010 fiscal year. On December 20, 2010, City officials filed an audit report that reflected a $155 million cumulative deficit in the general fund, a $1.4 million cumulative deficit in the airport fund, and a $3.5 million cumulative deficit in the local street fund. As of December 2011, City officials had not filed a plan that would reduce the general fund deficit. In fact, new data estimated the general fund's deficit increasing to $196 million for 2011. The deficits in the airport and local street funds were eliminated in 2011.

There had been deficits in the general fund exceeding $100 million dating back to 2005. These deficits had fluctuated between over $155 million and over $300 million. One of the primary methods the City had used to reduce the deficits had been to issue more debt. Total general fund debt, and other long term liability proceeds for the years between 2005 and 2010, was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

General Fund (Unrestricted) Deficits and Debt Proceeds

| Year | Deficit | Debt Proceeds |
|------|---------|---------------|
| 2005 | ($155,404,035) | $248,440,183 |
| 2006 | ($173,678,707) | $34,892,659 |
| 2007 | ($155,575,800) | -- |
| 2008 | ($219,158,138) | $75,210,007 |
| 2009 | ($331,925,012) | -- |
| 2010 | ($155,692,159 | $251,663,225 |
| 2011 | ($196,577,910) | -- |

- The City's deficit elimination plans and proposed budgets proved to be unrealistic. City officials either had been incapable or unwilling to manage the finances of the City. For example, the 2008 fiscal year deficit elimination plan reported $58 million in expenditure reductions in the general fund and $69 million (excluding debt proceeds and revenue sharing) in revenue enhancements for 2010. However, the 2010 general fund balance ended in a deficit condition of over $155 million and would have been much greater if not for $250 million in new debt. Again, the 2009 deficit elimination plan certified in November of 2010 projected a 2011 surplus while the actual fund balance for the general fund ended with a deficit estimated at close to $200 million.

City officials had promised restructuring and consolidation, including hiring freezes and improved tax collection. Finally in mid-2011, City officials submitted a deficit elimination plan for the 2010 deficit which included revenue initiatives of over $200 million and expenditure reductions of over $300 million, most of which were to take place in future periods and were questionable, such $10 million from selling Windsor tunnel rights and $50 million in improved income tax collections. One version of the deficit elimination plan estimated that the City would

be able to realize an additional $154 million annually from collecting income taxes from residents who work outside the City. Projected expenditure reductions relied heavily upon union concessions which had not historically materialized.

- The City had a mounting debt problem. In 2010, annual debt service requirements exceeded $597 million. As of June of 2011, the long-term debt of the City exceeded $8 billion, excluding unfunded actuarial pension, other postemployment benefit liabilities, and discretely presented component units such as the library and downtown development authority. However, if one included the unfunded actuarial pension liability of $615 million (offset by an almost $1.4 billion pension asset) and the other postemployment benefit liability of over $4.9 billion, the City's total long-term liabilities were more than $12 billion. (See table below.) The latter amount did not include substantial sums of interest which were over $4.9 billion. In comparison, if one took the total long-term debt of the City compared to total net assets, the City would have had for 2010 a debt to net assets ratio of 32.64 to 1.

| | General Obligations | Revenue Bonds | Pension Obligation Certificates | Other |
|---|---|---|---|---|
| Governmental | $1,033,233,278 | $125,520,622 | $,1,194,003,260 | $284,276,052 |
| Sewage | | $2,894,198,302 | $90,114,924 | $15,046,961 |
| Transportation | $6,271,722 | | $105,143,913 | $28,238,095 |
| Water | | $2,159,831,662 | $79,517,902 | $25,979,109 |
| Automobile | | $11,341,382 | | $10,225,829 |
| Other | | | | $162,187 |
| Unallocable | | | | |
| | $1,039,505,000 | $5,190,891,968 | $1,468,799,999 | $363,928,233 |

| | Other Post Employment Benefits | Pension Liability | Pension Asset* | Total |
|---|---|---|---|---|
| Governmental | | | | $2,637,033,212 |
| Sewage | | | | $2,999,360,187 |
| Transportation | | | | $139,653,730 |
| Water | | | | $2,265,328,673 |
| Automobile | | | | $21,567,211 |
| Other | | | | $162,187 |
| Unallocable | $4,982,355,243 | $615,701,032 | ($1,371,848,955) | $4,226,207,320 |
| Total | $4,982,355,243 | $615,701,032 | ($1,371,848,955) | $12,289,312,520 |

*Pension asset may already be factored into actuarially determined pension liability

- Prior to 2008, in order to obtain better interest rates and reduce debt related costs, the City entered into interest rate swaps and swap options (i.e., where two or more parties enter into an agreement to exchange interest cash flows). Exchanging, or "swapping," a variable interest rate for a fixed rate would have benefited the City had market interest rates increased. However, rates subsequently decreased, impacting the City negatively. Because the fall in interest rates was not predicted, ramifications of increased annual payments resulted. In addition to principal and interest payments, the City must pay amounts called "hedging derivatives", which over the life of the debt is an additional $1,136,007,248.

  The preliminary review found the City to be at risk of a termination event which would occur if the City's credit rating were downgraded below Baa3 or its equivalent. On January 8, 2009, such an event occurred. However, the City avoided the immediate demand for payment by entering into another agreement which allocated wagering tax revenues to a trust to be used as collateral for future payments thus reducing the benefits of those cash flows to the City. New termination events included the failure to maintain a certain level of funds in the trust, further downgrades in the City's credit rating, or appointment of an emergency manager.

  As stated by the City's auditors, "[s]hould such Termination Events occur in connection with the Swap Agreements, and not be cured, there presently exists significant risk in connection with the City's ability to meet the cash demands under the terms of the amended Swap Agreements." According to estimates, if an "event" occurred, the City would face a $280 million to $400 million termination payment. According to the preliminary review, City officials intended to sell water and sewer bonds to unwind a portion of the swaps. The notional amount, or face value, of these outstanding hedging derivatives in 2011 was over $3.8 billion and had a market value of ($560 million).

- The City's long-term bond rating fell below the BBB category and is considered "junk", speculative, or highly speculative. According to a Thomson Reuters June 24, 2011 article, "Fitch downgraded the rating on about $453 million of Detroit's unlimited-tax general obligation bonds to BB-minus from BB-plus, and dropped the rating on the City's approximately $486 million of limited-tax GO bonds to B-plus from BB. The rating on about $1.5 billion of pension bonds was cut to BB-minus from BB-plus. The lower unlimited-tax general obligation rating from Fitch matches the Ba3 rating with a negative outlook from Moody's Investors Service. Standard & Poor's Ratings Services rates Detroit's GO bonds BB with a stable outlook."

- Not only did the City have large external debts, but it also had large debts owed to itself in the form of inter-fund loans. As of June 30, 2010, the City had inter-fund balances amounting to over $447 million and unaudited 2011 balances of $334 million. Concurrently, the City had operating surpluses in its general fund for most of the more recent fiscal years. However, the general fund incurred substantial deficits because of the subsidies it paid to other funds, such as $72 million to the transportation fund. However, most of the outgoing transfers $133 million

Governor Snyder
March 26, 2012
Page Six

were made for debt service and pension funds. The total amount transferred from the general fund according to 2011 draft figures was $215 million.

- The City experienced significant cash-flow shortages. In 2010, the City received $250 million in fiscal stabilization bond proceeds. The City also received $55 million in delinquent property tax receipts from Wayne County and $20 million from a DTE Energy escrow account. However, despite these inflows of substantial amounts of cash, City officials were projecting a cash shortage.

  Based upon projections made available by the City at the time of preliminary review, the general fund had a forecasted ending cash balance of $115.5 million as of October 28, 2011. However, the actual cash balance as of that date was $96.1 million, an overestimation of $19.4 million. The City revised its cash forecast based on a series of new assumptions which projected that the City would experience a cash shortage starting in April 2012, of $1.6 million and would end its fiscal year in June 2012 with a cash shortage of $44.1 million absent remedial action.

- The City experienced difficulty making its required payments to its pension systems. Years of exceptional pension benefits had increased costs to the City. The preliminary review found that current police and fire employees enjoy multipliers of 2.5 percent for 25 years of service and 2.1 percent thereafter.[3] However, a newer one-year agreement was approved to limit to 2.1 percent the multiplier for earnings after September 2011. General employees (i.e., non-police and fire) had negotiated a tiered system of 1.6 percent for the first 10 years, 1.8 percent for the next 10 years, 2.0 percent for the next five years, and 2.2 percent for any remaining years.

  In June of 2005, City officials issued $1.44 billion of pension obligation certificates to fund the City's two retirement systems with a renegotiated payment schedule of 30 years. More recently, City officials contemplated not making required payments to pension systems as a cost-savings measure. However, subsequent negotiations with representatives of the pension systems resulted in a "smoothing" that allowed City officials to make five years of pension payments over a seven-year period. Annual required payments reflected in the 2011 fiscal year financial audit, excluding debt payments related to the certificates, was $110 million, an increase of $41 million from the 2010 fiscal year.

- There were questionable balances in the 2010 audit report of the City's pension systems. The auditors were unable to obtain sufficient evidence supporting approximately $216 million of the retirement systems' alternative investments.

---

[3] Multipliers are used in calculating retirement pay in defined benefit plans. For example, for an employee with 30 years of service who was making $50,000 at retirement, a 2.5 percent multiplier would yield $37,500 in annual retirement benefits (0.025x30x50,000). By comparison, a 1.5 percent multiplier would yield an annual retirement benefit of $22,500, a difference of $15,000 annually.

Governor Snyder
March 26, 2012
Page Seven

- The financial audit report for the 2010 fiscal year indicated that the City's poor financial management impacted the City's administration of various federal grant programs and posed potential threats to the City's continued receipt of such grants. The audit report cited numerous findings and offered the following examples of questioned and potentially disallowed costs:

  -- Nutrition for Women, Infants and Children (approximately $1.0 million in questioned costs in addition to accounting, eligibility and fund reconciliation issues).

  -- Community Development Block Grant (approximately $12.7 million in questioned salary costs).

  -- HOME, a home investment partnership program, (approximately $846,000 in salary costs; $273,000 in questioned indirect planning costs).

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to the Governor on December 21, 2011, that probable financial stress existed in the City of Detroit and recommended the appointment of a financial review team.

B. Review Team Findings

On December 27, 2011, the Governor appointed a ten-member Financial Review Team. The Review Team convened on January 10th, 17th, 19th, 24th, and 31st; February 28th; and March 13th, 21st, and 26th 2012.

1. Conditions Indicative of a Financial Emergency

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials, or the City's audit firm, or other relevant sources:

- According to the City's fiscal year 2011 financial audit, the cumulative general fund deficit increased by 62.5 percent, from $91,094,688 as of June 30, 2010 to $148,071,674 as of June 30, 2011. While the general fund had an operating surplus (i.e., revenues in excess of expenditures) of $150,077,184, net transfers out of the general fund of $206,947,605 resulted in a negative net change in the general fund balance of $56,870,421.

- Financial audit reports for the City for its last nine fiscal years reflect significant variances between general fund revenues and expenditures, as initially budgeted and as amended, versus general fund revenues and expenditures actually realized. These variances, which are depicted on the next two pages, are reflective of the practice of which the Review Team was informed, of City officials adopting budgets that knowingly overestimated revenues. However, the overestimates of revenue largely were offset by corresponding overestimates in general fund expenditures.

General Fund (Amended) Budget to Actual Variances
Fiscal Years 2003-11

| | **2002-03** | **%** | **2003-04** | **%** | **2004-05** | **%** |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,411,438,181 | | $1,491,324,664 | | $1,411,559,555 | |
| Amended | $1,455,091,091 | | $1,557,611,152 | | $1,573,240,100 | |
| Actual | $1,379,940,668 | | $1,375,067,276 | | $1,357,023,161 | |
| Variance | ($75,150,423) | (5.16) | ($ 182,543,876) | (11.71) | ($ 216,216,939) | (13.74) |
| **Expenditures** | | | | | | |
| Budgeted | $1,500,934,902 | | $1,645,328,307 | | $1,486,784,830 | |
| Amended | $1,603,280,231 | | $1,849,483,383 | | $1,733,451,270 | |
| Actual | $1,463,658,564 | | $1,577,561,963 | | $1,492,451,332 | |
| Variance | $ 139,621,667 | 8.71 | $ 271,921,420 | 14.70 | $ 240,999,938 | 13.90 |

| | **2005-06** | **%** | **2006-07** | **%** | **2007-08** | **%** |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,446,899,263 | | $1,460,450,319 | | $1,511,369,289 | |
| Amended | $1,716,282,293 | | $1,685,082,568 | | $1,711,079,894 | |
| Actual | $1,400,871,987 | | $1,487,435,488 | | $1,303,429,698 | |
| Variance | ($315,410,306) | (18.37) | ($ 197,647,080) | (11.73) | ($ 407,650,196) | (23.82) |
| **Expenditures** | | | | | | |
| Budgeted | $1,484,834,179 | | $1,466,705,687 | | $1,580,231,599 | |
| Amended | $1,631,152,256 | | $1,702,154,178 | | $1,696,476,581 | |
| Actual | $1,410,081,217 | | $1,278,109,169 | | $1,181,358,285 | |
| Variance | $ 221,071,039 | 13.55 | $ 424,045,009 | 24.91 | $ 515,118,296 | 30.36 |

Governor Snyder
March 26, 2012
Page Nine

General Fund (Amended) Budget to Actual Variances
Fiscal Years 2003-11
(Continued)

| | 2008-09 | % | 2009-10 | % | 2010-11 | % |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,424,125,131 | | $1,651,938,137 | | $1,361,741,809 | |
| Amended | $1,755,335,605 | | $1,695,653,435 | | $1,650,138,387 | |
| Actual | $1,268,371,151 | | $1,187,977,093 | | $1,220,258,093 | |
| Variance | ($ 486,964,454) | (27.74) | ($ 507,676,342) | (29.93) | ($ 429,880,294) | (26.05) |
| **Expenditures** | | | | | | |
| Budgeted | $1,557,486,518 | | $1,644,170,276 | | $1,374,762,769 | |
| Amended | $1,798,321,382 | | $1,834,191,680 | | $1,558,893,986 | |
| Actual | $1,155,896,702 | | $1,068,938,078 | | $1,070,180,909 | |
| Variance | $ 642,424,680 | 35.72 | $ 765,253,602 | 41.72 | $ 448,713,077 | 31.35 |

- The general fund of the City has not experienced a positive year-end fund balance since the 2004 fiscal year, when the year end balance was $69,216,269. (See Table 1.) Beginning with the 2005 fiscal year, the general fund has had a negative year-end balance that has ranged from $33,594,434 for the 2005 fiscal year to 266,733,641 for the 2009 fiscal year. During a number of these years, general fund revenues actually exceeded general fund expenditures. However, there were sizable transfers out of the general fund to support other City operations, such as transportation, that resulted in negative year end balances in the general fund.

- The City has experienced, and continues to experience, a significant depletion of its cash.[4] Early in 2012, City officials had estimated that the City would deplete its cash by spring and have a negative cash balance of $44.0 million by June 30, 202. In an effort to address this situation,

---

[4] Confirmation by the Review team of the City's ongoing cash shortages is consistent with the conclusion reached by other financial assessments. For example, the report of the Mayor's Crisis Turnaround Team, that was commissioned by the current City administration, noted the following:

> The City is critically short of cash as a result of a $280 million estimated accumulated deficit and a growing structural deficit in the current fiscal year as projected revenues decline. The new administration must act quickly to realize substantial improvements in selected revenues and cost categories in the $2.1 billion General City Agency Budget. The [Crisis Turnaround] team recommends that the new administration establish a financial recovery strategy based on the projected deficit

City officials had proposed adjustments to collective bargaining agreements projected to save $102.0 million for fiscal year 2012 and $258.0 million for fiscal year 2013. However, the tentative collective bargaining agreements negotiated to date are projected to yield, at best, savings of only $47.0 million and $172.0 million for fiscal years 2012 and 2013, respectively.

- On March 20, 2012, Moody's Investor Service downgraded approximately $2.5 billion of the City's existing debt, some of it to five to six levels below investment grade. Among the reasons cited by Moody's Investor Service for the downgrade were the City's "weakened financial position, as evidenced by its narrow cash position, its reliance upon debt financing, and ongoing negotiations with its labor unions regarding contract concessions." On March 22, 2012, Fitch Ratings also downgraded approximately $2.5 billion of the City's existing debt for substantially similar reasons.

2. Review Team Meetings

At its initial meeting on January 10, 2012, the Review Team met with Joseph A. Kowalski of the certified public accounting firm KPMG.

On January 17, 2012, Review Team members conducted a series of meetings in the City of Detroit with Dave Bing, Mayor; Kirk Lewis, Chief of Staff; Chris Brown, Chief Operating Officer; Charles Pugh, City Council President; Gary Brown, City Council President Pro Tem; Ralph Godbee, Jr., Police Chief; Donald Austin, Fire Commissioner; Cheryl Johnson, Finance Director and City Treasurer; Alfred Jordan, Group Executive, Utilities; Ed McNeil, Special Assistant to the President of AFSCME, Council 25; and John Mack, Assistant to Ed McNeil.

On January 19, 2012, Review Team members conducted a series of meetings in the City of Detroit with Patrick Aquart, Human Resources Director; Joseph Martinico, Labor Relations Director; Karla Henderson, Group Executive, Planning and Facilities; Charles Dodd, Information Technology Services Director; Pamela Scales, Budget Director; Linda Bade, City Assessor; Joseph Duncan, President, Detroit Police Officers Association; James Moore, Vice-President, Detroit Police Command Officers Association; Junetta Wynn, President, Detroit Police Lieutenants and Sergeants Association; Daniel F. McNamara, President, Detroit Fire Fighters Association; Jeffrey Pegg, Vice President, Detroit Fire Fighters Association; Teresa Sanderfer, Secretary, Detroit Fire Fighters Association; and Robert Shinske, Treasurer, Detroit Fire Fighters Association.

On January 24, 2012, Review Team members conducted a series of meetings in the City of Detroit with Dave Bing, Mayor; Kirk Lewis, Chief of Staff; Chris Brown, Chief Operating Officer; Gaurav Malhotra, of the certified public accounting firm Ernst & Young; Charles Pugh, City Council

---

for the 2010-2011 fiscal year and repayment of ad hoc funding actions. This would require a target of $250 million to $300 million in ongoing annual revenue increases and cost savings.

Governor Snyder
March 26, 2012
Page Eleven

President; Gary Brown, City Council President Pro Tem; Andre Spivey, Councilmember; and Joe Harris, Former City of Detroit Auditor General.

On January 31, 2012, Review Team members conducted a series of meetings in the City of Detroit with Kenneth V. Cockrel, Jr., Councilmember; Robert Anderson, Planning and Development Director; George Jackson, Jr., President and Chief Executive Officer, Detroit Economic Growth Corporation; Brian Holdwick, Executive Vice President, Detroit Economic Growth Corporation; Waymon Guillebeaux, Executive Vice President, Detroit Economic Growth Corporation; and Glenn Long, Vice President and Chief Operating Officer, Detroit Economic Growth Corporation; James Tate, Councilmember; Saunteel Jenkins, Councilmember; Brenda Jones, Councilmember; Irvin Corley, City Council Fiscal Analyst; Jerry Pokorski, City Council Financial Analyst; and Deputy City Treasurer Mike Bridges.

The Review Team also conducted public meetings in the City on February 28th, and March 13th, 21st, and 26th. At these public meetings, the Review Team received public comment and considered the options afforded to the Review Team by statute.

## C. Conclusion

Based upon the foregoing information, meetings and review, the Review Team confirms the findings of the preliminary review, concludes in accordance with Section 13(4)(c) of Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, that the City of Detroit is in a condition of severe financial stress as provided in Section 14 of the Act, and that a consent agreement has not been adopted pursuant to Section 13(1)(c) of the Act.

## II. Section 13(3) Requirements

Section 13(3) of the Act requires that this report include the existence or an indication of the likely occurrence of any of the conditions set forth in subdivisions (a) through (l).[5] The conditions in subdivisions (e), (f), and (g) of Section 13(3) exist or are likely to occur, as follows:

---

[5] Subdivisions (a) through (l) of Section 13(3) of the Act provide as follows:

(a) A default in the payment of principal or interest upon bonded obligations, notes, or other municipal securities for which no funds or insufficient funds are on hand and, if required, segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(*i*) Taxes withheld on the income of employees.

(*ii*) For a municipal government, taxes collected by the municipal government as agent for another governmental unit, school district, or other entity or taxing authority.

Governor Snyder
March 26, 2012
Page Twelve

- The City had a general fund deficit of $148,071,674 as of June 30, 2011, which was not eliminated within the two-year period preceding the end of the fiscal year of the City during which this Review Team report is received. (Section 13(3)(e)).

- As of January 31, 2012, the City Council's Fiscal Analysis Division was projecting a general fund deficit of $270.0 million for the current fiscal year ending June 30, 2012, which would exceed five percent of the $1.2 billion budgeted revenues for the general fund. (Section 13(3)(f)).

- As previously noted, City officials did not filed an adequate or approvable deficit elimination plan with the Department of Treasury for the 2010 fiscal year. Nor did City officials do so for the 2011 fiscal year. Furthermore, past deficit elimination plans have proven to be unrealistic. For example, the 2009 fiscal year deficit elimination plan projected a 2011 fiscal year general fund surplus, but the general fund ended with an actual deficit of $148,071,674. (Section 13(3)(g)).

---

(*iii*) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 7 days or more after the scheduled date of payment to pay wages and salaries or other compensation owed to employees or benefits owed to retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state financial authority's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 5% of the budgeted revenues for the general fund.

(g) Failure to comply in all material respects with the terms of an approved deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan.

(h) Existence of material loans to the general fund from other local government funds that are not regularly settled between the funds or that are increasing in scope.

(i) Existence after the close of the fiscal year of material recurring unbudgeted subsidies from the general fund to other major funds as defined under government accounting standards board principles.

(j) Existence of a structural operating deficit.

(k) Use of restricted revenues for purposes not authorized by law.

(l) Any other facts and circumstances indicative of local government financial stress or financial emergency.

Governor Snyder
March 26, 2012
Page Thirteen

### III. Review Team Report Transmittal Requirements

Section 13(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.


cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader

**Table 1**

**City of Detroit
General Fund Revenues, Expenditures,
And Change in Fund Balance**

| | 2002-03 | 2003-04 | 2004-05 |
|---|---|---|---|
| Revenue | $1,379,940,668 | $1,375,067,276 | $1,357,023,161 |
| Expenditures | $1,463,658,564 | $1,577,561,963 | $1,492,451,332 |
| Current Surplus/(Deficit) | ($83,717,896) | ($202,494,687) | ($135,428,171) |
| Other Financing Sources | ($32,790,755) | $86,278,519 | 47,986,831 |
| Net Change in Fund Balance | ($52,758,651) | ($77,966,168) | (487,441,340) |
| Beginning Fund Balance | $206,220,362 | $140,304,407 | $69,216,269 |
| Change in Inventories | ($13,157,304) | $6,878,030 | ($15,369,363) |
| Ending Fund Balance | $140,304,407 | $69,216,269 | ($33,594,434) |

| | 2005-06 | 2006-07 | 2007-08 |
|---|---|---|---|
| Revenue | $1,400,871,987 | $1,487,435,488 | $1,303,429,698 |
| Expenditures | $1,410,081,217 | $1,278,109,169 | $1,181,358,285 |
| Current Surplus/(Deficit) | ($9,209,230) | $209,326,319 | $122,071,413 |
| Other Financing Sources | ($54,277,434) | ($194,233,601) | ($175,016,228) |
| Net Change in Fund Balance | ($63,486,664) | 15,092,718 | ($52,944,815) |
| Beginning Fund Balance | ($33,594,434) | ($107,176,088) | ($91,406,096) |
| Change in Inventories | ($10,094,990) | $677,274 | $2,665,757 |
| Ending Fund Balance | ($107,176,088) | ($91,406,096) | ($141,685,154) |

**Table 1**
**(Continued)**

**City of Detroit**
**General Fund Revenues, Expenditures,**
**And Change in Fund Balance**

|  | __2008-09__ | __2009-10__ | __2010-11__ |
|---|---|---|---|
| Revenues | $1,268,371,151 | $1,187,977,093 | 1,220,258,093 |
| Expenditures | $1,155,896,702 | $1,068,938,078 | 1,070,180,909 |
| Current Surplus/ (Deficit) | $112,474,449 | $119,039,015 | $150,077,184 |
| Other Financing Sources | ($236,535,259) | ($209,943,411) | ($206,947,605) |
| Net Change in Fund Balance | ($124,060,810 | $178,349,536 | ($56,870,421) |
| Beginning Fund Balance | ($141,685,154) | ($266,733,641) | ($91,094,688) |
| Change in Inventories | ($987,677) | ($2,710,583) | ($106,565) |
| Ending Fund Balance | ($266,733,641) | ($91,094,688) | ($148,071,674) |

Source: City of Detroit Annual Financial Audits

# EXHIBIT E

# FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

-3-

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

## 1.    FINANCIAL ADVISORY BOARD

### 1.1.  Establishment and Purpose.

(a)    Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement. The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

(b)    The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects"). In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

1.2. Composition. The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "Governor"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "Appointing Entity") as follows:

(a)     Three individuals appointed by the Governor;

(b)     Two individuals appointed by the Mayor;

(c)     Two individuals appointed by the City Council;

(d)     One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

(e)     One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "Member") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

-6-

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, provided that of the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; and provided further that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

1.3    Compensation. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, provided that (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

. All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

1.3a Standards of Conduct, Conflicts of Interest and Ethics

(a)    Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

(b)    Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("Act 317"), pertaining to contracts of public servants with public entities.

(c)    Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("Policy"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

-9-

(i)     Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)    Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)   A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)    A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)     A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi)    A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii)    Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix)    Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x)    Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi)    Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)  A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

-12-

(xiii)  The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv)  By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4  <u>Board Organizational Matters</u>.  The Financial Advisory Board may:

(a)  Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b)  Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c)  Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d)  Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5  <u>Board Authority</u>. Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a)  Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

(b)     Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions. Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c)     Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d)     With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e)     Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget. The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f)     As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g)     Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i)     Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j)    Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k)    Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l)    Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m)    Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6    Quorum and Voting. A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, provided that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7    Meetings. The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.    Procurement. The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices. As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies. The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

-15-