not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

1.9. <u>Taxes and Incurring Debt</u>. The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2. THE MAYOR AND CITY COUNCIL

2.1 <u>Powers and Authority</u>. The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law. The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

2.2 <u>Chief Financial Officer</u>.

(a) Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor. The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

-16-

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget. The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency. The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer. The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

(b)  Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have substantial experience with at least 2 of the following disciplines: (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer. In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

-17-

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3 Program Management Office; Director.

(a) Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

-19-

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d) The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4    Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

(b)   By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation. The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.   Support of Phase I Reform.   Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)   Cash stabilization transaction:  The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012.  The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses.  Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)   Technical and financial assistance:  The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)   Completion of a payroll system upgrade.

(2)   Integration of budgeting, accounting and financial reporting systems.

(3)   Implementation of a new grants management system.

(c)   Income tax collection:  The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d) <u>Legislative assistance</u>: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

    (1)    Enabling PLD changes;

    (2)    Enabling Bus Rapid Transit legislation;

    (3)    If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

    (4)    Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6    <u>Implementation of Phase II Reform—Following Actions</u>. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "<u>Phase II Reform</u>"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

    2.7   <u>Support of Phase II Reform</u>.  Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

    (a)   <u>Legislative assistance</u>:  The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation.  The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

    (b)   <u>Health plan and post-employment benefits</u>:  The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

    (c)   <u>Demolition of structures</u>:  The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

    (d)   <u>Real estate management</u>:  The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

    2.8   <u>Reporting Requirements</u>.

    (a)   In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

Triennial Budget. Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b)　　In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects. Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c)　　Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date. For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d)　　Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget. The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month. A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9 Appropriation; Limitation. The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

## 3. FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET

3.1 Revenue Conferences; Conduct.

(a) Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("Revenue Conference") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "Revenue Estimation"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

(b)     At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

(c)     The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

(d)     The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)    For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2    Revenue Conferences; Limitation on Adjournment.    A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter. If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3    Limitation on Mayor's Budget Proposal. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.4    <u>Limitation on City Council's Budget Approval</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.5.    <u>Budget Proceedings and Adoption</u>. The Budget adopted for each fiscal year for the City shall comply with the following requirements:

    (a)    Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("<u>Act 2</u>"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time. The milestones for annual Budget adoption, including Revenue Conferences, are set forth on <u>Annex C</u> hereto.

    (b)    Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

(c)     During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget.   No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d)     Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e)     If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f)     During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g)     If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6    Budget Reductions; Ordinance; Impasse.  Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion.  The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7    Triennial Budget.    (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b)     The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on Annex A-1 hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as Annex A-2 hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c)     Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4.    COLLECTIVE BARGAINING AGREEMENTS

4.1     Authority. The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2     Collective Bargaining Agreements; Restriction. The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of Annex D as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

4.3    Collective Bargaining Agreements; Approval.    The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director.   Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

4.4.    Duty to Bargain.  It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

## 5. PENDING LITIGATION REPORT

5.1 <u>Report; Filing</u>. Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "<u>Pending Litigation Report</u>") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "<u>Pending Action</u>"). Each Pending Litigation Report shall identify, with respect to each Pending Action: (a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action. The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer. For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

## 6. DEFAULTS AND REMEDIES

6.1   Obligations of the parties.  (a)  The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement.  Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement.  The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement.  During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof.  The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

(b)    The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2    Material Breach; Default. (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives. Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)    If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department. The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3 Default; Remedies. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, e.g., Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4    Program Management Director; Board; Reform Initiative Remedies. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a)    If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "Reform Default Condition"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b)    Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

-38-

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)     In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

-39-

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated.  The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     Additional Forbearance by Treasury Department.     Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

6.6     Obligation Not Discharged by Contingencies.  The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders.  If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

6.7     Transitional Provisions.

(a)  The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement.  The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "Transitional Period"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

(b)     The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

-41-

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

## 7.    AMENDMENT; WAIVER OF PROVISIONS

7.1    Amendment; Waiver. This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

-42-

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

## 8. DURATION OF AGREEMENT; RELEASE

8.1 Duration of Agreement; Termination; City's Release from Obligations. This Agreement shall remain in effect until both of the following occur ("Financial Stability"):

    (a) The date of the earlier of:

        (i) the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

-43-

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

(ii) the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

(b) The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

(c) The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

(d) Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

-44-

## 9. CONTINUING EFFECT; EMPLOYEES; SEVERABILITY

9.1  Continuing Effect. This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2  Joint Exercise of Power; Transfer. While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board. Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536. The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3  Employees. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement. The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

-45-

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4 <u>Management and Direction</u>. The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement. The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5 <u>Severability</u>. If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law. On account of the urgent public purpose and the protection of the

-46-

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10. COUNTERPARTS

10.1 <u>Counterparts; Signatures</u>. This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (<u>e.g.</u>, by facsimile or email).

## 11. EFFECTIVE DATE

11.1 <u>Effective Date.</u> The effective date ("<u>Effective Date</u>") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this 4th day of April, 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)

Dave Bing, Mayor

**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.

Dated: 4/5/12

_____
Richard D. Snyder, Governor

# CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:27 , p.m.

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a)   A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b)   A cash flow projection for the budget period.

(c)   An operating plan for the budget period.

(d)   A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e)   An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f)   A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b) upon approval following appointment of CFO]*

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;
2. Lighting Department Changes;
3. DDOT Changes;
4. Income tax collection;
5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;
6. Implementation of new grants management system to streamline requisition and monitoring process of grants;
7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;
8. Demolition of structures;
9. Implementation of medical and pension changes;
10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;
11. Health and Wellness Department changes;
12. Human Services Department changes;
13. Real estate management;
14. Workers Compensation Reform;
15. Employee Training;
16. Bank Project to improve AR and AP process;
17. Fire Authority review;
18. Permits;
19. Planning and Development to DEGC;
20. Claim/Risk Management for reducing claims costs;
21. Long-Term Liability Restructuring;

## Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation. <br><br> The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council. <br><br> The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

* Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

-7-

## ANNEX D

### Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1.    Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2.    Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3.    Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4.    Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5.    There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6.    New hires will have a defined contribution retirement health care benefit.

7.    Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8.    Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9.    Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10.    Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11.    Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12.    The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

-8-

## ANNEX E

# SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

### Introduction
The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

### Improve Quality of Life and Safety for Detroiters
- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

### Enhance Education
- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

-9-

## Invest in Transportation Infrastructure

- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

## Invest in Physical Assets and Economic Drivers

- *Citywide* –
  - Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market* – Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront* – Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle* – Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds* – Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center* – Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

## Improve Detroit's Capacity to Collect Tax Revenues
- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

## Municipal Assistance/Services Authority
- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

# EXHIBIT F

3500 (Rev. 01-11)



**STATE OF MICHIGAN**
**DEPARTMENT OF TREASURY**

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**     December 14, 2012

**TO:**       Rick Snyder, Governor

**FROM:**     Andy Dillon, State Treasurer

**SUBJECT:** Preliminary Review of the City of Detroit

## I. Background

On December 11, 2012, the Department of Treasury commenced a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, requires that a preliminary review be conducted if one or more of the conditions enumerated therein occurs.[1] The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivision (j) and (k) of Section 12(1) having occurred within the City.[2]

As summarized below, based upon information received and considered as part of the preliminary review, I conclude that a serious financial problem does exist in the City of Detroit and recommend appointment of a financial review team. Appointment of a financial review team is a prerequisite step in the Act 72 process to the appointment of an emergency financial manager.

## II. Preliminary Review Findings

The preliminary review found the following:

- The City has violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, as amended, which provides that local officials monitor and

---

[1] The City presently is subject to a consent agreement in the form of the Financial Stability Agreement which was executed on April 4, 2012. The Financial Stability Agreement was executed pursuant to Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act, and various other Acts. Subsequently, Act 4 was disapproved by voters at the November 2012 general election. The Attorney General's Office concluded in Opinion No. 7267 that, as a result of the disapproval of Act 4, Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, was revived. Various Michigan courts have concurred in this conclusion. Therefore, it is under Act 72 that this preliminary review was conducted.

[2] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

promptly amend an adopted budget to the extent necessary to prevent deficit spending. For example in the General Fund for the year ending June 30, 2011, the insurance premium line item exceeded its budget by more than $6.7 million, the adjustment and undistributed costs line item exceeded its budget by more than $8.0 million, and the fire fighting operations line item exceeded its budget by more than $21.0 million. As a result of these, and other, line items, the General Fund had line items that exceeded its budget by more than $97 million.

- As has been shown above, City officials have violated requirements of Section 18 of Public Act 2 of 1968, as amended, which states that "[a]n administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body. The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." City officials have also violated requirements of Section 19 of Public Act 2 of 1968, as amended, which states that "[a] member of the legislative body, the chief administrative officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act. An expenditure shall not be incurred except in pursuance of the authority and appropriations of the legislative body of the local unit."

- The City has also experienced cash flow problems throughout the 2010 and 2011 fiscal years some of which have been alleviated by the issuing or refinancing of debt. The City has projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However because of inherent problems within the reporting function of the City, the projections continue to change from month to month making it difficult to make informed decisions regarding its fiscal health. For example, a cash flow estimate in August projected a June 2013 cash deficit of $62 million while estimates for October and November projected deficits of $84 million and $122 million respectively. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In turn, such compliance requires the ability to produce timely and accurate financial information which City officials have not been able to produce.

- The City has incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41 million from a June 30, 2010 amount of $155 million to a June 30, 2011 amount of $196 million and is projected to increase even further for 2012, which would not have happened if the City had complied with its budgets.

City officials have not filed an adequate or approved deficit elimination plan with the Department of Treasury for the fiscal year ending June 30, 2011. On December 27, 2011, City officials filed an audit report that reflected a $196 million cumulative deficit in the General Fund, a $97 million cumulative deficit in the Transportation Fund, and a $17 million cumulative deficit in the Automobile Parking Fund.

As can be seen in Table 1 on the following page, the City has experienced cumulative General Fund deficits that have exceeded $100 million dating back to 2005. These deficits have fluctuated between $155.4 million and $331.9 million. One of the primary methods the City

has used to reduce the deficits has been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 was over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

Table 1
General Fund Deficits and Debt Proceeds

| Year | Actual Deficit | Debt Proceeds | Approximate Cummulative Deficit Without Debt Proceeds* |
|------|----------------|---------------|--------------------------------------------------------|
| 2005 | $(155,404,035) | $ 248,440,183 | $(403,844,218) |
| 2006 | (173,678,707)  | 34,892,659    | (457,011,549)  |
| 2007 | (155,575,800)  |               | (438,908,642)  |
| 2008 | (219,158,138)  | 75,210,007    | (577,700,987)  |
| 2009 | (331,925,012)  |               | (690,467,861)  |
| 2010 | (155,692,159)  | 251,663,225   | (765,898,233)  |
| 2011 | (196,577,910)  |               | (806,783,984)  |

* Represents what the deficit would have been without the issuance of additional debt. The approximate amount would be reduced if subsequent debt service payments were added back in.

For the City on a whole (excluding component units), there was a 2011 unrestricted net assets deficit of almost $1.6 billion.[3]

---

[3] Net Assets are calculated on the government-wide financial statements that use the accrual basis of accounting and include such items as capital assets and long-term debt. The unrestricted amount measures the net assets that are appropriable for expenditure and are not legally segregated for a specific future use.

**EXHIBIT G**

3500 (Rev. 4-06)



STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:**  February 19, 2013[1]

**TO:**  Governor Snyder

**FROM:**  Detroit Financial Review Team:
Andy Dillon
Darrell Burks
Ronald E. Goldsberry
Frederick Headen
Thomas H. McTavish
Kenneth Whipple

**SUBJECT:**  Report of the Detroit Financial Review Team

The Detroit Financial Review Team met on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, and February 1st, 14th, and 15th 2013, to review information relevant to the financial condition of the City of Detroit. Based upon those reviews, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Accompanying this report is supplemental documentation in support of our conclusion.

Our conclusion is based primarily upon the following considerations:

1. <u>Cash Crisis</u>. The City continues to experience a significant depletion of its cash. Projections have estimated a cumulative cash deficit in excess of $100.0 million by June 30, 2013, absent implementation of financial countermeasures. While the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

---

[1] Pursuant to Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, a Review Team is required to report its findings to the Governor within 60 days of its appointment, unless the Governor specifies an earlier date or grants a one-time 30-day extension. This Review Team was appointed on December 18, 2012, and in accordance with statutory convention, 60 days thereafter was February 16, 2013, a Saturday.

However, Section 6 of the Revised Statutes of 1846, which applies to statutes and administrative rules, provides that "[i]n computing a period of days, the first day is excluded and the last day is included. If the last day of any period or a fixed or final day is a Saturday, Sunday or legal holiday, the period or day is extended to include the next day which is not a Saturday, Sunday or legal holiday." Therefore, this Review Team report is due on February 19, 2013.

2.  <u>General Fund Deficits</u>. The City's General Fund has not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund has had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012. The primary methods by which City officials have sought to address these deficits has been by issuing long-term debt. While such an approach reduces the deficit in the year in which the debt is issued, it also reduces fund balance over time as debt service payments increase. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

3.  <u>Long-Term Liabilities</u>. As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials have not yet devised a satisfactory plan to address the long-term liability issue.

4.  <u>Bureaucratic Structure</u>. The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

Based upon the foregoing, the Review Team concludes, in accordance with Section 14(3)(c) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem. Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.


cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader



3500 (Rev. 01-11)

STATE OF MICHIGAN
## DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

**DATE:** February 19, 2013

**TO:** Governor Snyder

**FROM:** Detroit Financial Review Team:
Andy Dillon
Darrell Burks
Ronald E. Goldsberry
Frederick Headen
Thomas H. McTavish
Kenneth Whipple

**SUBJECT:** Supplemental Documentation of the Detroit Financial Review Team

This document is supplemental to our report of February 19, 2013, and is intended to constitute competent, material, and substantial evidence upon the whole record in support of the conclusion that a financial emergency exists within the City of Detroit.

## I. Background

### A. Preliminary Review

On December 11th through December 14th, 2012, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of the Act provides that a preliminary review may be conducted if one, or more, of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j) and (k) of Section 12(1) having occurred within the City.[1] The preliminary review found, or confirmed, the following:

- The City violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting

---

[1] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

Governor Snyder
February 19, 2013
Page Two

and Accounting Act, which requires that local officials monitor and promptly amend an adopted budget as necessary to prevent deficit spending. For example, in the General Fund for the year ending June 30, 2011, the insurance premium line item exceeded its budget by more than $6.7 million, the adjustment and undistributed costs line item exceeded its budget by more than $8 million, and the fire fighting operations line item exceeded its budget by more than $21 million. As a result of these and other line items, the General Fund had line items that exceeded its budget by more than $97 million.

- In addition, City officials violated requirements of Section 18 of the Uniform Budgeting and Accounting Act providing that "[a]n administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body. The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." City officials also violated requirements of Section 19 of the Act providing that "[a] member of the legislative body, the chief administrative officer, an administrative officer, or an employee of a local unit shall not authorize or participate in the expenditure of funds except as authorized by a general appropriations act."

- The City experienced cash flow problems throughout the 2010 and 2011 fiscal years, some of which had been alleviated by the issuing or refinancing of debt. The City projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However, because of inherent problems within the reporting function of the City, the projections continued to change from month to month making it difficult to make informed decisions regarding its fiscal health. For example, a cash flow estimate in August projected a June 2013 cash deficit of $62 million, while estimates for October and November projected deficits of $84 million and $122 million, respectively. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In turn, such compliance requires the ability to produce timely and accurate financial information which City officials have not been able to produce.

- The City incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41 million from a June 30, 2010 amount of $155.7 million to a June 30, 2011 amount of $196.6 million and was projected to increase even further for 2012, which would not have happened if the City had complied with its budgets.

As depicted in Table 1 on the next page, the City has experienced cumulative General Fund deficits that have exceeded $100 million dating back to 2005. These deficits have fluctuated between $155.4 million and $331.9 million. One of the primary methods the City has used to reduce the deficits has been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 were over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduce the deficit in the year the debt is issued, but reduce fund balance over time as debt service payments increase.

**Table 1**

**General Fund Deficits, Debt Proceeds, and Effect Of**
**(In Millions)**

| Year | Actual Deficit | Debt Proceeds | Approximate Cumulative Deficit without Debt Proceeds* |
|------|---------------|---------------|------------------------------------------------------|
| 2005 | ($155.4) | $248.4 | ($403.8) |
| 2006 | ($173.7) | $34.9 | ($457.0) |
| 2007 | ($155.6) | -- | ($438.9) |
| 2008 | ($219.2) | $75.2 | ($577.7) |
| 2009 | ($331.9) | -- | ($690.5) |
| 2010 | ($155.7) | $251.7 | ($765.9) |
| 2011 | ($196.6) | -- | ($806.8) |
| 2012 | ($326.6) | | ($936.8) |

Source: City of Detroit Annual Financial Audits, 2005 through 2012. * Represents what the deficit would have been if additional debt had not been issued. The approximate amount would be reduced if subsequent debt service payments were added back in.

- On December 27, 2011, City officials filed an audit report that reflected a $196.6 million cumulative deficit in the General Fund, a $97.2 million cumulative deficit in the Transportation Fund, and a $17.1 million cumulative deficit in the Automobile Parking Fund. However, City officials did file, as legally required, an adequate or approved deficit elimination plan with the Department of Treasury.

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to the Governor on December 14, 2012, that a serious financial problem existed in the City of Detroit and recommended the appointment of a financial review team.

B. Review Team Findings

On December 18, 2012, the Governor appointed a six-member Financial Review Team. The Review Team convened on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, February 1st, 14th, and 15th 2013.

1. Conditions Indicative of a Serious Financial Problem

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials or other relevant sources:

Governor Snyder
February 19, 2013
Page Four

- According to the City's fiscal year 2012 financial audit, the cumulative General Fund deficit increased by 82 percent, from $148.1 million as of June 30, 2011 to $269.5 million as of June 30, 2012. (The unrestricted General Fund deficit increased by 66.1 percent, from $196.6 million to $326.6 million.) While the General Fund had an operating surplus (i.e., recurring revenues in excess of recurring expenditures) of $105.8 million, net transfers out of the General Fund of $227.5 million resulted in a negative net change in the General Fund balance of $121.7 million.

- The City continues to experience a significant depletion of its cash. As noted in the preliminary review, cash flow projections provided by City officials have been inconsistent with the precise magnitude of the problem varying somewhat from one projection to another. However, in general, the most recent projections have estimated a cumulative cash deficit in excess of $100 million by June 30, 2013, absent implementation of financial countermeasures. During its review, the Review Team expressed the position that City officials would need to either increase revenues, or decrease expenditures, or both, by roughly $15 million per month during the three-month period January through March 2013 to remain financially viable.

- The City has substantial long-term debt. As of June 30, 2012, such debt, exclusive of unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $8.6 billion. However, upon inclusion of those other obligations, the City's total long-term debt was $13.6 billion. (Total long-term debt is $14.99 billion depending upon whether $1.4 billion in pension system assets is, or is not, factored in the unfunded actuarial accrued liabilities.) The City's long-term liabilities as of June 30, 2012, are summarized by category in Table 2.

**Table 2**

**Long-Term Liabilities by Category**
**As of June 30, 2012**
**(In Millions)**

| Category | Amount |
|---|---|
| Non-General Obligation | $6,106.1 |
| Other Post Employment Benefits Unfunded Actuarial Accrued Liability | $5,727.2 |
| Pension Certificates of Participation | $1,451.9 |
| General Obligation | $963.4 |
| General Retirement System Unfunded Actuarial Accrued Liability | $639.9 |
| Other | $101.9 |
| Police and Fire Retirement System | $3.9 |
| Total | $14,994.2 |

Source: City of Detroit Annual Financial Audit 2012

Governor Snyder
February 19, 2013
Page Five

- According to information provided to the Michigan Legislative Auditor General's Office by the State Court Administrative Office, as of June 30, 2012, the City's 36th District Court had $279.3 million in outstanding accounts receivables. Of that amount, it is estimated that $199 million is owed to the City of Detroit, $76 million is owed to the State of Michigan, and $100.9 million has been outstanding for more than seven years. The accounts receivables were comprised of fines, fees, and other costs related to parking violations, civil infractions, misdemeanor traffic and drunken driving violations, and other misdemeanor violations. As of June 30, 2012, the 36th District Court's collection rate for accounts receivables was only 7.7 percent compared to an average collection rate of 60 percent for other courts within the seven county region of Genesee, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne.

  In addition, as of January of 2013, 36th District Court officials had taken no actions to reduce expenditures in light of a $6 million reduction in its appropriation. In fact, the Court's current budget funds 285 employees, but the Court presently has 350 employees, excluding judges.

- The December 28, 2012, management letter which accompanied the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations. These are recited in Attachment 1.

- Financial audit reports for the City reflect significant variances between General Fund revenues and expenditures, both as initially budgeted and amended, versus General Fund revenues and expenditures actually realized. Variances over the last six fiscal years are depicted in Table 3 on the next page. The variances show that City officials consistently have overestimated fund revenues and expenditures and call into question the ability of City officials to adopt and effectively monitor budgets, or to estimate revenues and expenditures upon which those budgets are built.[2]

---

[2] Various provisions of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, govern the budget adoption and implementation process for units of local government in Michigan. For example, Section 16 of the Act requires, unless another method is provided for by charter, that the local legislative body adopt a general appropriations act which shall set forth "the amounts appropriated by the legislative body to defray the expenditures and meet the liabilities of the local unit for the ensuing fiscal year, and shall set forth a statement of estimated revenues, by source, in each fund for the ensuing fiscal year." Section 17 requires, among other things, that if during a fiscal year, it appears to the chief administrative officer or to the legislative body that actual and probable revenues are less than estimated revenues, the chief administrative officer or fiscal officer must present to the legislative body recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year.

Finally, Section 18 requires, among other things that, "[e]xcept as otherwise provided in section 19, *an administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body.* The chief administrative officer, an administrative officer, or an employee of the local unit shall not apply or divert money of the local unit for purposes inconsistent with those specified in the appropriations of the legislative body." Emphasis supplied. The sum of the foregoing statutory provisions is not an aspirational goal, but a legal requirement that officials in units of local government annually adopt a balanced budget, monitor throughout the course of the fiscal year the revenues and expenditures contained in that adopted budget, and adjust the budget to the extent necessary to maintain it in balance.

**Table 3**

**General Fund (Amended) Budget to Actual Variances
(In Millions)**

| | 2006-07 | % | 2007-08 | % | 2008-09 | % |
|---|---|---|---|---|---|---|
| **Revenues** | | | | | | |
| Budgeted | $1,460.5 | | $1,511,4 | | $1,424.1 | |
| Amended | $1,685.1 | | $1,711.1 | | $1,755.3 | |
| Actual | $1,487.4 | | $1,303.4 | | $1,268.4 | |
| Variance | ($197.6) | (11.73) | ($407.6) | (23.82) | ($487.0) | (27.74) |
| **Expenditures** | | | | | | |
| Budgeted | $1,466.7 | | $1,580.2 | | $1,557.5 | |
| Amended | $1,702.2 | | $1,696.5 | | $1,798.3 | |
| Actual | $1,278.1 | | $1,181.4 | | $1,155.9 | |
| Variance | $ 424.0 | 24.91 | $ 515.1 | 30.36 | $642.4 | 35.72 |
| | **2009-10** | **%** | **2010-11** | **%** | **2011-12** | **%** |
| **Revenues** | | | | | | |
| Budgeted | $1,651.9 | | $1,361.7 | | $1,275.5 | |
| Amended | $1,695.7 | | $1,650.1 | | $1,564.0 | |
| Actual | $1,188.0 | | $1,220.3 | | $1,102.3 | |
| Variance | ($507.7) | (29.93) | ($429.9) | (26.05) | ($461.8) | (29.53) |
| **Expenditures** | | | | | | |
| Budgeted | $1,644.2 | | $1,374.8 | | $1,289.8 | |
| Amended | $1,834.2 | | $1,558.9 | | $1,473.0 | |
| Actual | $1,068.9 | | $1,070.2 | | $996.4 | |
| Variance | $765.3 | 41.72 | $488.7 | 31.35 | $476.6 | 32.36 |

Source: City of Detroit Annual Financial Audits, 2007 through 2012

13-53846-tjt   Doc 1473-3   Filed 07/18/13   Entered 07/18/13 21:44:51   Page 9 of 74
13-53846-swr   Doc 2473-3   Filed 01/14/14   Entered 01/14/14 17:08:32   Page 57 of
107

Governor Snyder
February 19, 2013
Page Seven

- The City's General Fund has not experienced a positive year-end fund balance within recent years. As depicted in Table 4, the General Fund had negative year-end balances that ranged from $91.1 million in the 2010 fiscal year to $269.5 million in the 2012 fiscal year.

**Table 4**

**General Fund Revenues, Expenditures, and Change in Fund Balance
(In Millions)**

|  | **2006-07** | **2007-08** | **2008-09** |
|---|---|---|---|
| Revenue | $1,487.4 | $1,303.4 | $1,268.4 |
| Expenditures | $1,278.1 | $1,181.4 | $1,155.9 |
| Current Surplus/ (Deficit) | $209.3 | $122.1 | $112.5 |
| Other Financing Sources | ($194.2) | ($175.0) | ($236.5) |
| Net Change in Fund Balance | 15.1 | ($52.9) | ($124.1) |
| Beginning Fund Balance | ($107.2) | ($91.4) | ($141.7) |
| Change in Inventories | $0.7 | $2.7 | ($0.9) |
| Ending Fund Balance | ($91.4) | ($141.7) | ($266.7) |
|  | **2009-10** | **2010-11** | **2011-12** |
| Revenue | $1,188.0 | $1,220.3 | $1,102.2 |
| Expenditures | $1,068.9 | $1,070.2 | $996.4 |
| Current Surplus/ (Deficit) | $119.0 | $150.1 | $105.8 |
| Other Financing Sources | $59.3 | ($206.9) | ($227.5) |
| Net Change in Fund Balance | $178.3 | ($56.9) | ($121.7) |
| Beginning Fund Balance | ($266.7) | ($91.1) | ($148.1) |
| Change in Inventories | ($2.7) | ($0.1) | $0.2 |
| Ending Fund Balance | ($91.1) | ($148.2) | ($269.5) |

Source: City of Detroit Annual Financial Audits, 2007 through 2012

13-53846-tjt Doc 2473-3 Filed 07/18/13 Entered 07/18/13 21:44:51 Page 10 of 24
13-53846-tjt Doc 1247-3 Filed 07/18/13 Entered 07/18/13 03:32 Page 58 of
107

Governor Snyder
February 19, 2013
Page Eight

- Operational dysfunction contributes to the City's serious financial problem. For example, the Police Department has approximately 2,030 employees. However, the views of City officials differ significantly as to how many of those employees are engaged in police work as opposed to ancillary administrative functions such as payroll. Some City officials asserted to the Review Team that only a third of the Police Department employees are engaged in patrolling the City, while Police Department officials indicated that approximately 68 percent of employees are engaged in patrol work and another 15 percent are engaged in investigations. The Review Team could not resolve this discrepancy because the City's administration has no reliable information concerning what staffing levels are, or should be, within the Police Department.

2. Review Team Meetings

On December 20, 2012, Review Team members Andy Dillon, Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Thomas H. McTavish conducted a series of meetings in the City of Detroit with Linda Bade, City Assessor; Charles Pugh, City Council President; Gary Brown, City Council President Pro Tem (by conference telephone); Kenneth V. Cockrel, Jr., Councilmember; Irvin Corley, Jr., Fiscal Analyst, Fiscal Analysis Division (City Council); Mary Anne Langan, Deputy Fiscal Analyst, Fiscal Analysis Division (City Council); Mark Lockridge, Deputy Auditor General; David Whitaker, Director, Research and Analysis Division (City Council); Jerry Pokorski, Financial Consultant; Jack Martin, Chief Financial Officer; William Andrews, Program Management Director; Cheryl Johnson, Finance Director and City Treasurer; Gaurav Malhotra and Daniel Jerneycic, of the certified public accounting firm Ernst & Young; Donald Austin, Fire Commissioner; Edsel Jenkins, Deputy Fire Commissioner; Chester Logan, Interim Police Chief; Charles Wilson, Chief of Staff; Todd Bettison, Commander, Communications Operations; Scott Hayes, Director, Technology Services Bureau; Tina Tolliver, Second Deputy Chief, Budget Operations; Patrick Aquart, Human Resources Director; and Lamont Satchel, Labor Relations Director; Dave Bing, Mayor; and Kirk Lewis, Deputy Mayor and Chief of Staff.

On January 3, 2013, Review Team members Andy Dillon, Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Kenneth Whipple (by conference telephone) met with Mark Diaz, President, Detroit Police Officers Association; Steven Dolunt, President, Detroit Police Command Officers Association; Brian E. Harris, Secretary-Treasurer, Detroit Police Lieutenants and Sergeants Association; John F. Kennedy, Sergeant at Arms, Detroit Police Lieutenants and Sergeants Association; Donna Latouf, Secretary-Treasurer, Detroit Police Officers Association; James Moore, Vice-President, Detroit Police Command Officers Association; Teresa Sanderfer, Secretary, Detroit Fire Fighters Association; Rodney Sizemore, Vice-President, Detroit Police Lieutenants and Sergeants Association; Junetta Wynn, Past President, Detroit Police Lieutenants and Sergeants Association; and Mark Young, President, President, Detroit Police Lieutenants and Sergeants Association.

On January 7, 2013, Review Team members Andy Dillon (by conference telephone), Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Kenneth Whipple (by conference telephone) met with

William Andrews, Program Management Director; Jack Martin, Chief Financial Officer; Gaurav Malhotra and Daniel Jerneycic, of the certified public accounting firm Ernst & Young; Irvin Corley, Jr., Fiscal Analyst, Fiscal Analysis Division (City Council); Mary Anne Langan, Deputy Fiscal Analyst, Fiscal Analysis Division (City Council); and Jerry Pokorski, Financial Consultant.

On January 16, 2013, Review Team members Andy Dillon (by conference telephone), Darrell Burks, Ronald E. Goldsberry, Frederick Headen, and Thomas McTavish (by conference telephone), met with William Andrews, Program Management Director; Jack Martin, Chief Financial Officer; David Brayshaw, of First Southwest Company; Lamont Satchel, Labor Relations Director; Suzanne Taranto, Milliman Company; Cheryl Johnson, Finance Director and City Treasurer; Donita Crumpler, Manager, Debt Management Division; Gaurav Malhotra, of the certified public accounting firm Ernst & Young; and Kenneth A. Buckfire, of Miller Buckfire and Company.

On February 1, 2013, Review Team members Andy Dillon, Ronald E. Goldsberry, Frederick Headen, Thomas McTavish (by conference telephone), and Kenneth Whipple met with Lamont Satchel, Labor Relations Director; William Andrews, Program Management Director; Jan Anderson, Program Management Deputy Director; Jack Martin, Chief Financial Officer; Gaurav Malhotra, Daniel Jerneycic, and Juan Santambrogio, of the certified public accounting firm Ernst & Young, and James Doak, of Miller Buckfire and Company.

C. Statutory Conclusions

Section 14(3) of the Local Government Fiscal Responsibility Act requires a review team to include in its report to the Governor one of three conclusions. Those conclusions are: that a serious financial problem does not exist in the unit of local government, or that a serious financial problem exists but that a consent agreement containing a plan to resolve the problem has been adopted, or that a financial emergency exists because no satisfactory plan exists to resolve a serious financial problem.

1. Serious Financial Problem

The findings of the preliminary review and of this Review Team have been set out above. Given those findings, the Review Team could not reasonably conclude that a serious financial problem does not exist within the City of Detroit. To the contrary, those findings, when assessed as a whole, clearly constitute competent, material, and substantial evidence upon the whole record to support the conclusion that a serious financial problem does exist within the City of Detroit. Therefore, we turn next to the option of a consent agreement.

2. Consent Agreement

This State has executed consent agreements with various units of local government under three successive emergency financial management statutes dating back to 1988. That experience has shown consent agreements to be most effective in circumstances in which serious financial problems have

Governor Snyder
February 19, 2013
Page Ten

remained unresolved despite diligent attempts at resolution by local officials. In such circumstances, consent agreements have provided cooperative local officials with beneficial guidance and a structural framework within which to resolve the financial difficulties confronting them.[3]

Given the City of Detroit's financial condition, and the uneven manner in which City officials have dealt with it, the Review Team could not conclude that another consent agreement would provide a satisfactory resolution of the City of Detroit's serious financial problem. We say *another* consent agreement because the existing Financial Stability Agreement is in the nature of a consent agreement. The Financial Stability Agreement was executed on April 4, 2012, between City officials and the previous Detroit Financial Review Team that was appointed on December 27, 2011, pursuant to former Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act.

The Financial Stability Agreement established a detailed framework within which, among other things, City officials were to restructure the City's financial and operational activities. A component of this detailed framework was a nine-member Financial Advisory Board established to assist City officials in achieving the objectives of the Financial Stability Agreement. In particular, Annex B of the Financial Stability Agreement enumerated 21 specific operational reforms which were to be implemented in the priority and timing as mutually agreed upon by City officials and the Financial Advisory Board.

Candor compels the conclusion that City officials have made limited progress in respect to the financial and operational reforms and restructuring contemplated by the Financial Stability Agreement in the ten months since it was executed.[4] This conclusion is unaltered by whether the lack of progress lies in the complexity of the City's financial and operational activities, subsequent litigation initiated by

---

[3] Among these have been the Detroit School District, 2008; and the cities of Highland Park, 1996-99; Hamtramck, 2000; Pontiac, 2008-09; River Rouge, 2009-present; Inkster, 2012-present; and the City of Detroit, 2012-present.

[4] In fact, the initial work upon a number of the financial and operational reforms did not commence until the fall of 2012, some five months after the Financial Stability Agreement was executed. For example:

- Integration of Budgeting, Accounting, and Financial Reporting System: The initial organizational meeting was not held until September 24, 2012, at which time a steering committee and work groups were established. The identification of system needs was ongoing as of December 20, 2012.

- Bank Project to improve Accounts Payable and Accounts Receivables Processes: The initial organizational meeting was not held until September 12, 2012, at which time an external consultant was engaged. The prioritization and implementation of short-term recommendation was to commence in December of 2012.

- Transfer of Planning and Development Department Functions to the Detroit Economic Growth Corporation: A baseline inventory of Planning and Development Department services was compiled in October 1, 2012.

- Long-Term Liability Restructuring: This initiative was not assigned to the City's Chief Financial Officer and Program Management Director until September 15, 2012.

- Workers Compensation Reform: The initial meeting with the City's risk manager was not held until September 12, 2012, and City officials selected a consultant on December 11, 2012.

Governor Snyder
February 19, 2013
Page Eleven

City officials to challenge the legal validity of the Financial Stability Agreement, or other considerations.

Among those other considerations would be the City's Charter. That document contains numerous restrictions and structural details that make it extremely difficult for City officials to restructure the City's operations in any meaningful manner even were one to conclude that they have been consistently committed to such reforms.  For example, various provisions of the City Charter significantly hamper the ability of City officials to provide municipal services in a more efficient and cost effective manner through alternative means.[5]

In addition, the City Charter provides for cumbersome organizational structure consisting of 16 departments, nine of which are headed by boards, commissions, or advisory commissions with at least 76 members in total. [6] While the City Charter provides that the City may increase the number of departments beyond the number contemplated by the City Charter, there is no provision authorizing a reduction in the number of departments.

---

[5] For example, before any determination or action regarding privatization can take place, the City Charter requires that all of the following actions must occur :

(1) A comprehensive report must be prepared that details the need for privatization.

(2) Comprehensive written estimates must be prepared of the total cost to the City if the City agency currently providing the service did so in the most cost efficient manner.

(3) The City Council is required to approve the solicitation bids, but only after the City Council reviews items (1) and (2).

(4) Any affected City employees must be given an opportunity to organize and prepare a bid.

(5) A comprehensive written cost analysis of all bids must be prepared.

(6) Other factors must be considered such as the effect of transferring service delivery to the private sector, the reduction in employment levels of City residents, and differences in work rules and management practices in the private sector.

(7) The City Council is required to approve any final recommendation by a two-thirds vote, but only after making certain certifications.

[6] The City Charter establishes three types of departments: Staff; Programs, Services, and Activities; and Independent Departments and Offices. Staff Departments are: Budget, Planning and Development, Finance, Human Resources, and Buildings, Safety Engineering, and Environmental. The Programs, Services, and Activities Departments are: Arts, Public Works, Fire, Historical, Human Rights, Police, Public Lighting, Recreation, Transportation, Water and Sewerage, and Zoological Parks. The Independent Departments and Offices are: Auditor General, Corporation Counsel, Inspector General, and Ombudsperson. The latter have the potential to function essentially as separate and independent branches of City government.

Governor Snyder
February 19, 2013
Page Twelve

In an apparent effort to increase accountability, various provisions of the City Charter have dispersed decision-making authority, particularly away from the mayoral office. While increased accountability is a salutary goal, one consequence has been to lessen the ability of City officials to decide important matters with appropriate dispatch. For example, whether one agrees or disagrees with specific Annex B operational reforms, their implementation has been too long in coming. In resolving the City's serious financial problem, such delays would be disastrous.

Similarly, the City Charter requires that before any final action may be taken regarding any proposed change in future retirement benefits, the City Council first must obtain from an independent actuary a report regarding the immediate and long-term costs of the change. Even then, final action still may not be taken until at least three months after the actuarial report is made public at a City Council meeting. Because retirement healthcare is the City's single largest liability (estimated to be $7 billion), any restructuring would require certainty with respect to this liability, and any uncertainties and delays relating to adjusting this obligation would greatly impede the ability of City officials to negotiate with other creditors of the City.

3. Financial Emergency

As noted, the Review Team could not conclude that a serious financial problem does not exist within the City of Detroit and, likewise, could not conclude that a consent agreement has been adopted that will resolve the City's serious financial problem.  Having found those two conclusions to be inapplicable, the only remaining conclusion allowed by the Act is that a financial emergency exists because no satisfactory plan exists to resolve a serious financial problem. [7]

The Review Team acknowledges that, since its appointment, City officials have advanced various proposals intended to address the City's serious financial problem. However, in arriving at the conclusion that a financial emergency exists within the City, the dispositive consideration is not whether City officials have advanced various proposals, nor whether those proposals when taken as whole constitute a plan. Rather, the only dispositive consideration is whether there exists a *satisfactory* plan as required by the Act.

We begin with the City's cash crisis.  It was noted on Page Four of this report that cash flow projections provided by City officials had estimated a cumulative cash deficit of more than $100 million

---

[7] We note that the three statutory conclusions available to this Review Team under Section 14(3) of Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, differ in both number and substance from the four statutory conclusions which were available to the previous Detroit Financial Review Team under Section 13(4) of the former Public Act 4 of 2011, the Local Government and School District Fiscal Accountability Act.  The previous Detroit Financial Review Team reached the conclusion that the City of Detroit was in a condition of severe financial stress as provided in Act 4 and that a consent agreement had *not* been adopted pursuant to the Act.  However, Act 72 affords this Review Team no such middle ground; if, in this case, a serious financial problem is found to exist and a consent agreement containing a plan to resolve the problem has not been adopted, then we must conclude that a financial emergency exists.

Governor Snyder
February 19, 2013
Page Thirteen

by June 30, 2013, absent the implementation of what City officials have referred to as financial coun-termeasures. Furthermore, it was noted that Review Team members had expressed the position that City officials would need to either increase revenues, or decrease expenditures, or both, by roughly $15 million per month during the three-month period January through March 2013 to remain finan-cially viable.

However, City officials concluded that a $15 million per month adjustment during the three-month period January through March 2013 was not realistic. As an alternative, they proposed a series of structural and short-term countermeasures the financial impact of which is summarized in Table 5.

**Table 5**

**City's Proposal to Address Cash Deficiency[8]**
**(In Millions)**

|  | Jan. | Feb. | Mar. | April | May | June | Total* |
|---|---|---|---|---|---|---|---|
| Structural Changes | $0.1 | $3.1 | $4.7 | $5.4 | $9.8 | $10.2 | $33.3 |
| Short-Term Changes | $6.4 | $14.1 | $5.3 | $11.5 | $6.0 | $20.2 | $63.5 |
| Total | $6.5 | $17.2 | $10.0 | $16.9 | $15.8 | $30.4 | $96.8 |

Source: City of Detroit Document (January 2013). *The $96.8 million total does not in-clude $30.0 million in escrowed bond proceeds held by the State, the release of which was conditioned upon achievement by the City of certain milestones for the months of December 2012 ($10.0 million) and January 2013 ($20.0 million).

The Review Team recognizes the difficulty of City officials having to make significant budgetary adjustments in the middle of a given fiscal year and commends them for their efforts in attempting to devise a proposal. While the Mayor and City Council deserve credit for considering and, in some instances, adopting difficult financial reforms, those reforms are too heavily weighted toward one-time savings and apply only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

Likewise, City officials have yet to propose a satisfactory plan to address the City's $13.6 billion in long-term liabilities. The City has a longstanding practice of overspending. As a result, a substantial

---

[8] Among the structural changes are: employee furloughs; a one-year suspension of pension accruals; reducing the per-centage ratio of employer-employee healthcare contributions from 80-20 to 70-30; and reducing the City's employ-ment headcount by approximately 400 positions by June 30, 2013. Among the short-term changes are: deferral of certain pension payments and the selective sale of certain City assets.

Governor Snyder
February 19, 2013
Page Fourteen

portion of current long-term liabilities consists of debt that City officials issued to address General Fund expenditures in excess of General Fund revenues. For example, according to City documents, General Fund expenditures exceeded General Fund revenues by an average of $100 million annually during the five fiscal-year period 2008 through 2012. The response of City officials was to issue $75 million of debt in fiscal year 2008; $250 million of debt in fiscal year 2010; and $137 million of debt during the current fiscal year. By issuing this debt, City officials improvidently converted an annual overspending problem into a long-term liability.

City officials have projected that over the five-year period 2013 through 2017, expenditures for healthcare benefits for active employees, healthcare benefits for retirees, pension benefits, principal and interest for pension certificates, and debt service, will total approximately $1.9 billion. See Chart 1. Therefore, these long-term liabilities will pose an ongoing challenge to the City's financial condition.

**Chart 1**

**Projected Expenditures for Certain Long-term Liabilities
Fiscal Years 2013-17
(In Millions)**



Source: City of Detroit Documents (February 2013)

Governor Snyder
February 19, 2013
Page Fifteen

### D. Conclusion

Based upon the foregoing information, meetings, and review, the Review Team confirms the findings of the preliminary review, and concludes that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

### II. Section 14(2) Requirements

Section 14(2) of the Act requires that this report include the existence or an indication of the likely occurrence of any of the conditions set forth in subdivisions (a) through (f).[9] The conditions in subdivisions (b) (iii), (e) and (f) of Section 14(2) exist or are likely to occur, as follows:

- The City did not meet its minimum contribution requirement to its Health and Life Insurance Benefit Plan for the last several years. As of June 30, 2012, the City owed $804.7 million to the system. (Section 14(2)(b)(iii).)

---

[9] Subdivisions (a) through (f) of Section 14(2) of the Act provide as follows:

(a) A default in the payment of principal or interest upon bonded obligations or notes for which no funds or insufficient funds are on hand and segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(i) Taxes withheld on the income of employees.

(ii) Taxes collected by the government as agent for another governmental unit, school district, or other entity or taxing authority.

(iii) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 30 days or more to pay wages and salaries or other compensation owed to employees or retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state treasurer's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 10% of the budgeted revenues for the general fund.

Governor Snyder
February 19, 2013
Page Sixteen

- The City had a General Fund deficit of $269.5 million (and an unrestricted General Fund deficit of $326.6 million) as of June 30, 2012, which was not eliminated within the two-year period preceding the end of the fiscal year of the City during which this Review Team report is received. (Section 14(2)(e).)

- The projected General Fund deficit of $385.6 million as of June 30, 2013, exceeds 10 percent of the $1.0 billion in General Fund revenues which the City has budgeted for the 2013 fiscal year as reported in the 2012-13 Executive Budget Summary. (Section 14(2)(f).)

III. Review Team Report Transmittal Requirements

Section 14(3) of the Act also requires that a copy of this report be transmitted to Mayor Dave Bing, Detroit City Councilmembers, the Speaker of the House of Representatives, and the Senate Majority Leader.

cc: Dave Bing, Mayor
    Detroit City Councilmembers
    James Bolger, Speaker of the House of Representatives
    Randy Richardville, Senate Majority Leader

Attachment 1

1. Material Weaknesses

The December 28, 2012, management letter which accompanied the City of Detroit's fiscal year 2012 financial audit report identified a number of material weaknesses in the City's financial operations. The management letter defined a "material weakness" as "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the City's financial statements will not be prevented, or detected and corrected on a timely basis." The material weaknesses, contained in findings 2012-01, 2012-02, and 2012-03, are recited verbatim:

Finding 2012-01, Financial Closing and Reporting

"Although the City of Detroit (City) has made incremental improvement in their financial closing and reporting processes, deficiencies still exist in the processes to evaluate accounts, and timely record entries into the general ledger in a complete and accurate manner. These deficiencies include the following:

"The process to prepare closing entries and financial statements relies partly upon decentralized accounting staff and software applications other than the City's DRMS general ledger. The process requires a significant amount of manual intervention in order to get information from these other systems in to DRMS.

"The process to identify significant transactions throughout the City's fiscal year to determine the appropriate accounting treatment does not result in timely consideration of how to record or report such transactions. These transactions often are not identified until the end of the fiscal year during the financial reporting process. There is inadequate communication between various City departments on transactions and on how they affect the individual stand-alone financial reports and the Comprehensive Annual Financial Report (CAFR). Information necessary to effectuate a timely and accurate closing of the books is sometimes not communicated between certain departments and agencies of the City.

"The process to close the books and prepare financial statements includes the recording of a significant number of manual post-closing entries. For the year ended June 30, 2012, there were approximately 350 manual journal entries that were made after the books were closed for the year (i.e., after frozen trial balance).

"The process to close the books and evaluate accounts occurs only on an annual basis instead of monthly or quarterly. As a result, certain key account reconciliations and account evaluations are not performed timely and require an extended amount of time to complete during the year-end closing process.

"The established internal control procedures for tracking and recording capital asset activities are not consistently followed. Physical inventories of capital assets are not being performed annually as required by City policy."

1

<u>Finding 2012-02, Reconciliations, Transaction Processing, Account Analysis, and Document Retention</u>

"Operations of the City are carried out by numerous City departments utilizing a variety of people, processes, and systems. This type of environment requires diligence in ensuring accurate information is processed and shared with others in the City. Performing reconciliations of data reported from different systems and sources and account analysis are an integral part of ensuring transactional data integrity and accurate financial reporting. During our audit, we noted deficiencies in the areas of transaction processing, account analysis, data integrity, reconciliation performance, and document retention. Those deficiencies include the following:

"The City's process to identify accrued expenses is not adequate. Our audit procedures identified expenditures related to fiscal year 2012 that were not appropriately recorded as expenditures in fiscal year 2012.

"Certain date related information regarding terminations and new hires in the human resources system did not match information in the personnel files.

"Reconciliations of subsidiary ledgers to general ledgers and other IT systems to DRMS are either not being completed, not completed timely, or contain unsupported or unreconciled items.

"A listing of internal controls employed by service organizations is not prepared and evaluated for adequacy by the City. The City uses various service organizations to process significant transactions such as health and dental claims and payroll. The City does not review the service organization auditor reports (SAS 70 Reports) to ensure that the service organization has effective internal controls. Further, the City does not evaluate the user controls outlined in the SAS 70 reports to ensure that the City has these controls in place to ensure complete and accurate processing of transactions between the City and the Service Organization.

"Bank, investment, and imprest cash reconciliations are not prepared timely and contain unreasonably aged reconciling items.

"The calculation of inventory reserves used data from the prior year that contained errors and is not reviewed by a member of management.

"Interfund and inter-departmental transactions are not reconciled throughout the year on a timely basis or reviewed for proper financial statement classification.

"A physical inventory count of fixed assets is not routinely completed by all agencies, as indicated in the City's asset management policies.

"The calculation of average weekly wage as a basis for weekly payment of workers compensation is a manual calculation that contained errors and was not reviewed or verified by a member of management.

"The City of Detroit does not maintain individual claim data typically maintained as insurance statistics for self-insurance programs for its workers compensation program. Therefore, only actual payment data is available for the actuary's analysis.

"Data provided to the actuaries that assist in estimating workers' compensation liabilities is not reviewed by the City for accuracy nor reconciled by the City to supporting data prior to submission.

"Certain invoices and receipts of goods and services were not matched against purchase orders in the correct period.

"The City's process to follow up with audit findings is not effectively designed.

"The calculation of grant accounts receivables is inappropriate as the beginning balances being carried forward were not originally performed on a grant by grant basis. The calculation contained errors and was not reviewed by management.

"Manual journal entries are not consistently and accurately reviewed and approved.

"The City of Detroit does not perform a sufficient review of open Accounts Receivable items and their related collectability.

"Certain money market fund investments were incorrectly classified as cash and management review process was not performed at a level to detect the misstatement.

"Certain cash accounts were inappropriately excluded from the trial balance.

"The City's Accounts Receivable write off policy is not specific enough to explain when and how amounts determined to be uncollectable should be written off. In addition, the City is not following their current policy to write off balances.

"Legal reserve documents are not updated in a timely manner when facts pertaining to the status of cases arise. As such, the City had over accrued claims and judgments.

"The City does not have a process for anonymous reporting of ethical or fraud violations to the City Board of Ethics.

"Supporting documentation is not consistently retained in accordance with the City's record retention policies."

Finding 2012-03, Information Technology

"General controls and application controls work together to ensure the completeness, accuracy, and validity of financial and other information in the systems. Deficiencies exist in the areas of general and application controls. Those deficiencies include the following for some or all systems:

"Administrative access is granted to unauthorized accounts.

"Segregation of duties conflicts exist between the database administration function and the backend database administration function.

"Adequate procedures are not in place to remove and review segregation of duties conflicts.

"Automated methods are not in place for tracking of the changes and customizations made to certain applications.

"Program developers have access to move program changes into production for certain applications."

2. Significant Deficiencies

The management letter also identified three significant deficiencies which did not rise to the level of material weaknesses. The significant deficiencies, contained in findings 2012-04, 2012-05, and 2012-06, are recited verbatim:

Finding 2012-04, Escheats Law

"The City filed the required annual report of unclaimed property to the State of Michigan; however, it was inaccurate as it did not include property tax overpayments. Additionally, the City has not remitted escheatable property to the State. In discussing this with City officials, the stated changes in personnel combined with the lack of written City policies and procedures regarding the monitoring and calculating of escheatment rules caused the City to fail to comply with the rules.

"The Uniform Unclaimed Property Act (Public Act 29 of 1995) requires the Michigan Holder Transmittal Annual Report of Unclaimed Property be submitted annually by July 1.

"Any holder of unclaimed property who fails to file a report of unclaimed property is subject to fines and penalties as prescribed in Public Act 29 of 1995."

Finding 2012-05, Act 51

"The City of Detroit's Major and Local Street funds were not in compliance with the State of Michigan Public Act 51. The General Fund borrowed cash and investments from the Street funds, which are restricted for a specific purpose, as stated in Act 51. In discussing this with City officials, because multiple funds, including the General and Street funds, share the same bank account as well as the lack of general awareness of the Street funds' restricted use caused the City to be noncompliant with Act 51.

"Public Act 51 Section 247.663 states what the Street funds can be used for. Failure to comply with the Act will result in forfeiture of funds to which it may have been entitled for a period of 1 year from and after the failure to apply the money appropriately as prescribed in Act 51 247.666."

Finding 2012-06, Uniform Budgeting and Accounting Act

"The City was not in compliance with Michigan Compiled Laws Act 2 of 1968, Uniform Budgeting and Accounting Act. For certain appropriations stated in footnote 2(d),[10] the City's actual expenditures were more than budgeted expenditures. City Council passed an amendment on November 20, 2012 to remove negative balances in various General Fund appropriations by redirecting unused authority within the total budgets of affected departments.  However, because the amendment was passed after the fiscal year end, the City was still considered noncompliant as of June 30, 2012.

"Per Act 2 of 1968, Section 141.438 (3), 'Except as otherwise provided in section 19, an administrative officer of the local unit shall not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body.'"

---

[10] Footnote 2(d) refers to Note II of the City's fiscal year 2012 financial audit report entitled "Stewardship, Compliance, and Accountability." Subsection (d) of Note II, entitled "Excess of Expenditures Over General Fund Appropriations," listed expenditures that exceeded their corresponding appropriation for the year ended June 30, 2012.

**EXHIBIT H**

**RICK SNYDER**
GOVERNOR

## EXECUTIVE OFFICE
LANSING

**BRIAN CALLEY**
LT. GOVERNOR

March 1, 2013

Dave Bing, Mayor
City of Detroit
2 Woodward Avenue
Detroit, Michigan 48226

Detroit City Council
2 Woodward Avenue
Detroit, Michigan 48226

Dear Mayor Bing and Detroit City Councilmembers:

Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, requires that I, as Governor, reach one of the following three conclusions within 30 days of receiving a financial review team report:

    (a) A serious financial problem does not exist in the local government.

    (b) A serious financial problem does exist in the local government, but a consent agreement containing a plan to resolve the problem has been adopted pursuant to Section 14(1)(c) of the Act.

    (c) A local government financial emergency exists because no satisfactory plan to resolve a serious financial problem exists.

I have reviewed in detail the report and supplemental documentation submitted to me on February 19, 2013, by the Detroit Financial Review Team. I agree with the conclusion of the report, which was that a financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

Therefore, I wish to inform you that, pursuant to Section 15(1)(c) of the Local Government Fiscal Responsibility Act, I have determined that a local government financial emergency exists within the City of Detroit because no satisfactory plan to resolve a serious financial problem exists.

**Findings of Fact**

Section 15(2) of the Act requires that, upon a determination by me of a financial emergency, I provide you with findings of fact utilized as the basis upon which this determination was made, and a concise and explicit statement of the underlying facts supporting the factual findings.

Dave Bing, Mayor
Detroit City Council
March 1, 2013
Page 2

**Preliminary Review**

On December 11th through December 14th, 2012, the Department of Treasury conducted a preliminary review of the finances of the City of Detroit to determine whether or not a serious financial problem existed. Section 12(1) of the Act provides that a preliminary review must be conducted if one, or more, of the conditions enumerated therein occurs. The preliminary review of the City of Detroit resulted from the conditions enumerated in subdivisions (j) and (k) of Section 12(1) having occurred within the City.[1] The preliminary review found, or confirmed, the following:

- The City violated requirements of Section 17 of Public Act 2 of 1968, the Uniform Budgeting and Accounting Act, which requires that local officials monitor and promptly amend an adopted budget as necessary to prevent deficit spending. In addition, City officials violated requirements of Sections 18 and 19 of the Act providing, respectively, that local officials not incur expenditures against an appropriation account in excess of the amount appropriated by the legislative body and that local officials not authorize or participate in the expenditure of funds except as authorized by a general appropriations act.

- The City experienced cash flow problems throughout the 2010 and 2011 fiscal years, some of which had been alleviated by the issuing or refinancing of debt. The City projected possibly depleting its cash prior to its June 30, 2013 fiscal year end. However, because of inherent problems within the reporting function of the City, the projections continued to change from month to month making it difficult to make informed decisions regarding its fiscal health. The City would not have experienced significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed.

- The City incurred overall deficits in various funds, including the General Fund. In fact, the City experienced cumulative General Fund deficits that had exceeded $100 million dating back to 2005. These deficits had fluctuated between $155.4 million and $331.9 million. One of the primary methods City officials had used to reduce the deficits had been to issue more debt. Total General Fund debt and other long-term liability proceeds for the years between 2005 and 2011 were over $600 million, temporarily reducing the deficits by an equal amount. Debt proceeds reduced the deficit in the year the debt was issued, but reduced fund balance over time as debt service payments increased.

Based upon the foregoing preliminary review, the State Treasurer concluded, and reported to me on December 14, 2012, that a serious financial problem existed in the City of Detroit and recommended the appointment of a financial review team.

---

[1] Subsection (j) provides that "[t]he local government has violated the requirements of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440, and the state treasurer has forwarded a report of this violation to the attorney general." Subsection (k) provides that "[t]he local government has failed to comply with the requirements of section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, for filing or instituting a deficit recovery plan."

13-53846-tjt    Doc 2173-3    Filed 07/18/13    Entered 07/18/13 14:03:32    Page 75 of
13-53846-swr    Doc 21-8    Filed 07/18/13    Entered 07/18/13 11:44:04    Page 76 of
107

Dave Bing, Mayor
Detroit City Council
March 1, 2013
Page 3

**Review Team Findings**

On December 18, 2012, I appointed a six-member Financial Review Team. The Review Team convened on December 19th and 20th 2012, and January 3rd, 7th, 9th, 16th, 25th, February 1st, 14th, and 15th 2013.

The Review Team found, or confirmed, the existence of the following conditions based upon information provided by City officials, or the City's audit firm, or other relevant sources:

- The City continues to experience a significant depletion of its cash. Projections estimated a cumulative cash deficit in excess of $100.0 million by June 30, 2013, absent implementation of financial countermeasures. The Review Team noted that while City officials deserved credit for considering and, in some instances, adopting difficult financial reforms, those reforms were too heavily weighted toward one-time savings and applied only to non-union employees who represent only a small portion of the City's overall wage and benefit burden.

- The City's General Fund had not experienced a positive year-end fund balance since fiscal year 2004. Since that time, the General Fund had cumulative deficits ranging from $155.4 million in fiscal year 2005, to $331.9 million in fiscal year 2009. The General Fund deficit was $326.6 million in fiscal year 2012. The primary method by which City officials had sought to address these deficits had been by issuing long-term debt. While such an approach reduced the deficit in the year in which the debt was issued, it also reduced fund balance over time as debt service payments increased. Had City officials not issued debt, the City's accumulated General Fund deficit would have been $936.8 million in fiscal year 2012.

- As of June 30, 2012, the City's long-term liabilities, including unfunded actuarial accrued pension liabilities and other post-employment benefits, exceeded $14 billion. City officials have projected that over the next five years, the expenditures needed to fund certain long-term liabilities will total approximately $1.9 billion. However, City officials had not yet devised a satisfactory plan to address the long-term liability issue.

- The City Charter contains numerous restrictions and structural details which make it extremely difficult for City officials to restructure the City's operations in any meaningful and timely manner. These restrictions include numerous steps and time periods which must be observed before certain proposed changes may be implemented and provisions which make it all but impossible to restructure municipal services.

In addition to the foregoing information, the Review Team found that:

- According to the City's fiscal year 2012 financial audit, the cumulative General Fund deficit increased by 82 percent, from $148.1 million as of June 30, 2011 to $269.5 million as of June 30, 2012. (The unrestricted General Fund deficit increased by 66.1 percent, from $196.6 million

to $326.6 million.) While the General Fund had an operating surplus (i.e., recurring revenues in excess of recurring expenditures) of $105.8 million, net transfers out of the General Fund of $227.5 million resulted in a negative net change in the General Fund balance of $121.7 million.

- According to information provided to the Michigan Legislative Auditor General's Office by the State Court Administrative Office, as of June 30, 2012, the City's 36th District Court had $279.3 million in outstanding accounts receivables. Of that amount, it is estimated that $199 million is owed to the City of Detroit, $76 million is owed to the State of Michigan, and $100.9 million has been outstanding for more than seven years. The accounts receivables were comprised of fines, fees, and other costs related to parking violations, civil infractions, misdemeanor traffic and drunken driving violations, and other misdemeanor violations. As of June 30, 2012, the 36th District Court's collection rate for accounts receivables was only 7.7 percent compared to an average collection rate of 60 percent for other courts within the seven county region of Genesee, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne.

  In addition, as of January 2013, 36th District Court officials had taken no actions to reduce expenditures in light of a $6 million reduction in its appropriation. In fact, the Court's current budget funds 285 employees, but the Court presently has 350 employees, excluding judges.

- The December 28, 2012, management letter which accompanied the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

- Financial audit reports for the City reflected significant variances between General Fund revenues and expenditures, both as initially budgeted and amended, versus General Fund revenues and expenditures actually realized. The variances showed that City officials consistently had overestimated fund revenues and expenditures and called into question the ability of City officials to adopt and effectively monitor budgets, or to estimate revenues and expenditures upon which those budgets are built.

- Operational dysfunction contributed to the City's serious financial problem. For example, the Police Department has approximately 2,030 employees. However, the views of City officials differed significantly as to how many of those employees are engaged in police work as opposed to ancillary administrative functions such as payroll. Some City officials asserted to the Review Team that only a third of the Police Department employees are engaged in patrolling the City, while Police Department officials indicated that approximately 68 percent of employees are engaged in patrol work and another 15 percent are engaged in investigations. The Review Team could not resolve this discrepancy because the City's administration has no reliable information concerning what staffing levels are, or should be, within the Police Department.

Dave Bing, Mayor
Detroit City Council
March 1, 2013
Page 5

## Conclusion

Based upon the foregoing information, the Review Team confirmed the findings of the preliminary review, and concluded that a financial emergency existed within the City because no satisfactory plan existed to resolve a serious financial problem. After thoroughly reviewing the report and supplemental documentation of the Review Team, I concur with their conclusion. Therefore, pursuant to Section 15(1)(c) of the Act, I have determined that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem.

## Notice of Hearing

Pursuant to Section 15(2) of the Local Government Fiscal Responsibility Act, the chief administrative officer or governing body may within 10 days request a hearing upon the determination of a financial emergency. The deadline for requesting a hearing is 5:00 P.M., Monday March 11, 2013. In the event that a hearing is requested, it will be convened on Tuesday March 12, 2013, at 10:00 A.M., at the Richard H. Austin (Treasury) Building before Mary G. MacDowell, Chief Deputy Treasurer.

It should be noted that the hearing would not be an original fact finding proceeding. Its purpose would be to afford City officials an opportunity to indicate whether the findings of the Review Team report were supported by competent, material, and substantial evidence on the whole record. Therefore, any information which City officials may wish to present that was not available to the Review Team, or that concerns actions taken by City officials since the Review Team filed its report, or that concerns actions City officials anticipate taking in the future to address the financial emergency in the City, will be considered beyond the scope of the hearing.

Sincerely,

Rick Snyder
Governor

# EXHIBIT I



July 8, 2013

## Ambac Comments on Detroit

NEW YORK, July 8, 2013 (GLOBE NEWSWIRE) -- **Ambac Assurance Corporation** (Ambac) believes that the proposal put forth by the City of Detroit's state-appointed emergency manager, as well as the failure on the part of the State of Michigan to protect the status of General Obligation bonds, is harmful to Detroit and the interests of taxpayers in Michigan. A successful revitalization of the City will be dependent upon its ability to access cost-effective financing in the future, including General Obligation funding. Such access will be needlessly imperiled as a result of the emergency manager's approach and the State's apparent support thereof.

Ambac has hired Harrison J. Goldin of Goldin Associates, LLC to help advise Ambac on Detroit. Mr. Goldin helped lead New York City through its fiscal crisis and revitalization as the elected Comptroller of The City of New York. Mr. Goldin commented: "The State of Michigan is making a grave error in its support for the proposed treatment of the General Obligation bonds previously issued by the City of Detroit that are backed by a pledge of the City's full faith and credit. The revitalization of Detroit depends on its ability to re-access the credit markets in order to finance critical improvements to its infrastructure. It is short-sighted to signal to lenders that they cannot trust the City's unconditional pledge to repay its general obligation debts, especially given that the General Obligation bonds in question comprise less than 3% of the City's estimate of its liabilities."

Additionally, in response to investor inquiries on the matter, Ambac confirms that the liabilities associated with its Detroit insured exposure are obligations of Ambac's general account. Ambac honors general account claims with full, timely payments in accordance with the terms of such policies. Ambac's current insured exposure is summarized below:

| Type of Exposure | Outstanding Net Par |
| --- | --- |
| Detroit Limited Tax GO | $92.7 million |
| Detroit Unlimited Tax GO | $77.6 million |

### About Ambac

Ambac Financial Group, Inc., headquartered in New York City, is a holding company whose subsidiaries, including its principal operating subsidiary, Ambac Assurance Corporation ("Ambac Assurance"), Everspan Financial Guarantee Corporation, and Ambac Assurance UK Limited, provided financial guarantees and other financial services to clients in both the public and private sectors globally. Ambac Assurance, including the Segregated Account of Ambac Assurance (in rehabilitation), is a guarantor of public finance and structured finance obligations. Ambac Financial Group, Inc. is also exploring opportunities involving the development or acquisition of new financial services businesses. Ambac Financial Group Inc.'s common stock trades on the NASDAQ Global Select Market (Nasdaq:AMBC).

CONTACT: Michael Fitzgerald

(212) 208-3222

mfitzgerald@ambac.com



Source: Ambac Financial Group, Inc.

News Provided by Acquire Media

13-53846-tjt   Doc 2473-3   Filed 01/14/14   Entered 01/14/14 17:03:32   Page 80 of
13-53846-tjt   Doc 21-5   Filed 07/18/13   Entered 07/18/13 21:44:03   Page 2 of 2
107

**EXHIBIT J**

13-53846-tjt Doc 2473-3 Filed 01/14/14 Entered 01/14/14 17:03:32 Page 81 of
13-53846-tjt Doc 12470-3 Filed 07/18/19 Entered 07/18/19 21:44:03 Page 81 of
107



CITY OF DETROIT
EMERGENCY MANAGER'S OFFICE

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3400
FAX 313•224•4433
WWW.DETROITMI.GOV

July 16, 2013

**VIA HAND DELIVERY**

The Honorable Richard D. Snyder
Governor, State of Michigan
Executive Office of the Governor
111 South Capitol Avenue
P.O. Box 30013
Lansing, Michigan  48909

The Honorable Andrew Dillon
Treasurer, State of Michigan
Michigan Department of Treasury
4th Floor Treasury Building
430 West Allegan Street
Lansing, Michigan  48992

Re:     Recommendation Pursuant to Section 18(1) of PA 436

Dear Governor Snyder and Treasurer Dillon:

I write as the emergency manager ("Emergency Manager") for the City of Detroit, Michigan ("Detroit" or the "City"), serving in accordance with Public Act 436 of 2012 of the State of Michigan, also known as the Local Financial Stability and Choice Act, Michigan Compiled Laws §§ 141.1541-141.1575  ("PA 436").  Pursuant to section 18(1) of PA 436 and for the reasons set forth in detail below, I hereby recommend that the City be authorized immediately to file a case, and proceed to adjust its debts, under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

Since my appointment as Emergency Manager, I have endeavored to keep you informed of all of my activities to address the financial emergency faced by the City.  In addition to providing the reports required by PA 436, I have maintained open lines of communication with both of you and the members of your staffs relating to the progress of my restructuring efforts and the challenges I have faced in that process.  I believe that both of you have been well informed of the City's financial condition and its restructuring activities and negotiations that have been pursued to date, including those efforts that began before my appointment. Nevertheless, to support my recommendation, this letter:  (a) provides a brief background on the

dire situation faced by the City; (b) summarizes certain of the efforts taken to date to rectify the City's financial emergency; and (c) concludes by discussing the need for chapter 9.

Based on the current facts and circumstances, I have concluded that no reasonable alternative to rectifying the City's financial emergency exists other than the confirmation of a plan of adjustment for the City's debts pursuant to chapter 9 of the Bankruptcy Code because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency outside of a chapter 9 process in a timely manner.

## Situational Overview

### *Inadequate City Services and Infrastructure Impacting Quality of Life*

The City is in the midst of a severe financial emergency. After decades of fiscal mismanagement; plummeting population, employment and revenues; decaying City infrastructure; and deteriorating City services, Detroit today is a shell of the thriving metropolis that it once was. Basic infrastructure is failing, such as the City's streetlights, many of which do not work. Crime is endemic. The City is plagued by blight and a diminishing quality of life. City operations, ordinances, policies and procedures must be streamlined and overhauled to implement best practices and eliminate waste and inefficiencies. Related to this, the City's technology systems, none of which are integrated, are in desperate need of upgrades, as they have been neglected for years. The lack of modern systems undermines many of the initiatives to establish essential improvements to City services and reduce operational costs.

For an extended period of time, the City has simply failed to make the investments required to provide its residents with an adequate quality of life, as limited resources have been diverted elsewhere. The City's urgent need to address large and growing legacy liabilities, and other substantial debts, is self-evident. Failure to address these liabilities will prevent the City from devoting sufficient resources to providing basic and essential services to its residents. Indeed, significant additional resources are required to improve public health and safety. The City must devote a larger share of its revenues to: (a) effectively provide basic, essential services to current residents; (b) attract new residents and businesses to foster growth and redevelopment; and (c) ultimately begin what will be a long process of rehabilitation and revitalization for the City. The City's debt and legacy liabilities must be significantly reduced to permit this reinvestment. Failure to do so directly endangers the health, safety and welfare of all residents of the City.

### *Growing Debt and Legacy Liabilities*

The City's current obligations are unsustainable and prevent the investments needed to revitalize the City and promote public health and safety. The City has over $18 billion in accrued obligations, including: (a) $3.5 billion in underfunding pension liabilities based on the most recent actuarial analysis; (b) $5.7 billion in other post-employment benefit ("OPEB")

liabilities ($6.4 billion if the present value of future expected benefits is used); (c) $1.13 billion in general obligation ("GO") liabilities (consisting of $650.7 million in unsecured GO debt, plus $479.3 million in secured GO debt); (d) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (e) $343.6 million in swap liabilities related to the COPs; (f) approximately $6.4 billion in obligations backed by enterprise revenues or that are otherwise secured; and (g) $300 million in other liabilities.

The City's substantial long-term obligations and legacy liabilities impede its ability to operate within its budget. Debt service for the City's general fund related to limited tax and unlimited tax GO debt and the COPs was $225.3 million for fiscal year 2012, and is projected to exceed $247 million in fiscal year 2013 and to increase further in the future. Currently, more than $0.38 of every tax dollar that the City collects goes to service legacy costs, debt and other obligations rather than toward providing services for the City's residents and businesses. Without adjustment, that number is expected to grow to almost $0.65 of every dollar by 2017.

This level of debt is simply unsustainable. This situation has been managed to date only by deferring other obligations, cutting services to the bone and ignoring the substantial and obvious need for reinvestment in the City. Residents have paid for this approach with a diminishing quality of life in a City that, over time, has increasingly struggled to protect the health, safety and welfare of its citizens.

### *Growing Budget Deficits*

For many years, the City's expenditures have exceeded its revenues, and the City has deferred paying certain obligations just to make ends meet. Excluding the proceeds of debt issuances (e.g., $75 million in fiscal year 2008; $250 million in fiscal year 2010; $129.5 million in fiscal year 2013), the City has incurred operating deficits for each of the past six years (through fiscal year 2013), and the City's accumulated deficit continues to grow. As of the end of fiscal year 2012, the City had an accumulated unrestricted general fund deficit of $326.6 million, an increase of $130 million over fiscal year 2011. This deficit increased by an additional $47.4 million in fiscal year 2013 (excluding the impact of a recent debt issuance generating approximately $137 million in proceeds for the City). In the absence of the recent debt issuances, the City's accumulated deficit would have been over $650 million for fiscal year 2012 and approximately $700 million of fiscal year 2013. Absent structural changes, at its current run rate, the City's accumulated deficit could grow to over $1.3 billion by fiscal year 2017.

The City has funded its continuing deficits in a variety of unorthodox and financially imprudent ways, including: (a) the deferral of pension contributions (resulting in larger funding deficits and requirements for additional contributions in later periods); (b) the issuance of both short-term and long-term debt; (c) the deferral of trade payments; (d) borrowing by the City's general fund from other funds, deferrals and cash pooling; and (e) significant furloughs and reductions-in-force. As of June 30, 2013, the City's general fund had outstanding deferrals and

amounts due to other funds and entities of approximately $272 million. Instead of solving the City's financial troubles, these tactics mask the City's true financial condition and continue to bury the City in an ever deepening financial crisis that exacerbates the City's already precarious condition.

### *Continued Liquidity Problems and Negative Cash Flows*

The City also has experienced continued liquidity problems and year after year of negative cash flows, which trends are expected to continue absent intervention. All of the borrowing and cash conservation tactics — including the deferrals described above, as well as wage cuts, employee furloughs/layoffs and other operational cuts — have not stemmed the losses.

With respect to the City's cash flows, the City had negative cash flows of $115.5 million in fiscal year 2012, excluding the impact of proceeds from short-term borrowings. The City had positive net cash flows of $41.5 million in fiscal year 2013, but only as a result of deferring approximately $119 million of current and prior year pension contributions and other payments, among other cash conservation measures. Absent intervention and/or restructuring, the City: (a) is projecting negative cash flows of $198.5 million in the current fiscal year 2014; and (b) will be left in a net cash position (after required property tax distributions) of negative $11.6 million as early as December 2013.

The City has not been — and currently is not — paying debts as they come due. The City has deferred payment of certain of its General Retirement System ("GRS") and Police and Fire Retirement System ("PFRS") pension funding contributions, and it accrues interest on such deferrals at a rate of 8%. As of June 30, 2013, the City had deferred approximately $106 million in GRS and PFRS pension contributions in the aggregate. Moreover, the City's estimated liability with respect to OPEBs is $6.4 billion, which is almost entirely unfunded. To conserve cash for City operations, including payroll, the City did not make the scheduled $39.7 million in payments on its pension-related COPs that were due on June 14, 2013. The City is insolvent.

### *Measures Already Taken by the City to Address Financial Challenges*

Faced with several years of expenditures exceeding revenues, the City has taken aggressive steps to cut costs from its operations. These measures included, by way of example: (a) entering into a financial stability agreement with the State of Michigan and the resulting creation of a financial advisory board to oversee the City's operations and conduct limited reforms; (b) reducing the number of City employees by more than 22% since fiscal year 2010; (c) implementing revised City employment terms ("CETs") for non-union employees and union employees under expired collective bargaining agreements; (d) increasing certain tax and utility rates; (e) enhancing tax collection initiatives; and (f) reducing other expenditures. By these

reforms, the City estimates that it has been able to realize more than $200 million in annual savings.

Unfortunately, these savings are insufficient to stem the bleeding. Raising new revenues is not a viable option. The City cannot access funds in the capital markets given its financial status at this time, and doing so would only exacerbate its unsustainable debt load. Both as a legal and practical matter, the City cannot increase revenues by raising taxes. The City's current tax rates are at their current statutory maximums. Even if the City somehow could raise taxes, the vast majority of its residents lack the financial wherewithal to bear them. For example, a study earlier this year showed that 47 percent of the City's taxable parcels were delinquent on their 2011 property taxes. In any event, Detroit cannot survive and grow if it remains a high tax, low service city.

Just as the City lacks new revenue sources, it lacks any further leeway to address its financial emergency through operational cuts. The City cannot significantly reduce expenditures by further reducing employee headcount or cutting services beyond the skeleton coverage currently provided, particularly given the archaic state of the City's technological systems and certain mandates in the City's Charter. As just one example, the City's police force already is being paid below market salaries, and is required to combat extraordinary crime rates using outdated and/or inadequate equipment. In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000. Further cuts would only exacerbate this safety crisis in the City.

### The City's Circumstances Constitute an Ongoing Financial Emergency

The City's circumstances have been well documented. On February 19, 2013, a financial review team appointed by Governor Snyder (the "Financial Review Team") submitted its report, concluding "that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem." See http://www.freep.com/assets/freep/pdf/C4201116219.PDF. The Financial Review Team's report details many of the issues described above, which led the Governor to make a finding of a financial emergency within the City, and in turn led to my appointment as Emergency Manager. I have further detailed these issues in (among other places) my Financial and Operating Plan and my June 14 Creditor Proposal (both as defined and described below).

## The Efforts of the Emergency Manager to Address the City's Financial Emergency

### Initial Evaluations and Development of Financial and Operating Plan

Upon my appointment as Emergency Manager in March of this year, we immediately began the process of developing a comprehensive restructuring plan for the City, as well as addressing the City's other urgent needs. At the outset of my term, we met with scores of interested parties, government officials and professional advisors to gather information about the

City's restructuring needs and priorities and participated in interviews and press conferences with local, regional and national news outlets to provide information to the public and promote transparency. I established the Emergency Manager's office and hired limited support staff.

Notably, from day one, I have spent significant time working with the City's financial and legal advisors to cast a critical eye on all of the City's financial obligations and operational issues to develop a realistic assessment of the City's problems, obstacles, needs and opportunities. In particular, I directed these advisors to help me develop the terms of a comprehensive plan to: (a) ensure that the City is able to provide or procure governmental services essential to the health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote private investment in the City and revitalization of the community in a sustainable fashion.

As a first step in this process, I worked with the City's advisors to develop a financial and operating plan for the City (the "Financial and Operating Plan"), which placed the City's challenges in context and defined a series of key restructuring goals and initiatives. The Financial and Operating Plan, dated May 12, 2013, was submitted to Treasurer Dillon as required by section 11(2) of PA 436 and is available on the City's website at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20Detroit%20-%20Final%20Financial%20&%20Operational%20Plan%20_45%20Day%20Pl.pdf. The Financial and Operating Plan, by its terms, was a "preliminary report based on the Emergency Manager's work [as of that] date and remain[ed] subject to material change as this work progresses."

### *Development of Creditor Proposal and Negotiations with Creditors*

In the month following the submission of the Financial and Operating Plan, I worked with the City's advisors to complete a comprehensive plan to rectify the City's financial emergency, assure the City's financial accountability and revitalize the City's operations. Developing such a plan required substantial efforts to: (a) evaluate the true financial state of the City (including by developing a more realistic assessment of legacy liabilities and likely revenue streams); and (b) analyze the specific operational and reinvestment needs of the City. The outcome of this work is reflected in the Proposal for Creditors, dated June 14, 2013, a copy of which is enclosed with this letter and is available on the City's website at http://www.detroitmi.gov/Portals/0/docs/EM/Reports/City%20of%20Detroit%20Proposal%20for%20Creditors1.pdf (the "June 14 Creditor Proposal").

The June 14 Creditor Proposal contains extensive information regarding the state of the City's finances and operations and a comprehensive proposal to restructure the City's obligations. In addition to describing Detroit's current economic circumstances, the 128-page June 14 Creditor Proposal describes a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group.

The June 14 Creditor Proposal is based on revised ten-year financial projections that provide a realistic basis for evaluating the City's financial wherewithal to address creditor claims and achieve its restructuring goals.

### Meeting to Discuss June 14 Creditor Proposal

On June 14, 2013, at an approximately two-hour meeting, I presented an Executive Summary of the June 14 Creditor Proposal to approximately 150 invited representatives of the City's creditors, including representatives of: (a) the City's funded debt; (b) the insurers of such debt; (c) all of the City's unions (representing over 45 bargaining units); (d) certain retiree associations; (e) the GRS and the PFRS; and (f) many bondholders. Attendees received copies of both the Executive Summary and the full June 14 Creditor Proposal. At the conclusion of the meeting, my advisors and I invited all creditor representatives to meet and engage in a dialogue with City representatives regarding the proposal. I indicated that I would welcome modifications and alternative ideas consistent with the City's (a) urgent need for reinvestment to improve essential City services and (b) current and projected cash flows.

### Individual Follow-Up Meetings

Having provided the facts and proposals contained in the June 14 Creditor Proposal to its creditor body *en masse*, the City followed up with individual meetings with attendees during the period between June 14, 2013 and the date hereof. The City offered to meet with as many creditor representatives as were interested in doing do.

These negotiations and follow-up meetings with creditors included the following:

- On June 20, 2013, the City's advisors conducted meetings with representatives of all of the City's unions and four retiree associations to: (a) present a more in-depth look at the City's analysis of its retiree health and pension obligations; (b) suggest proposals for the modification thereof that the City could fund within its means going forward; and (c) solicit the unions' and retirees' views on their preferred way to address the dramatic, but necessary, benefit modifications.

- On June 25, 2013, City advisors met with representatives and advisors for (a) all six insurers of the City's funded bond debt, (b) the GRS and the PFRS and (c) U.S. Bank, National Association ("U.S. Bank"), the trustee or paying agent for the bulk of the City's bond issuances. At this meeting, the City provided a detailed, comprehensive review of the City's finances and its financial and operating plan. In addition, from June 25, 2013 to June 27, 2013, the City's advisors held individual follow-up meetings with each insurer that requested such a meeting.

- On July 9, 2013 and July 10, 2013, the City held extensive follow-up diligence sessions with business people and financial advisors for the GRS, PFRS and debt insurers focused on the City's ten-year projections, operating plan and restructuring initiatives.

- On July 10, 2013, the City held follow-up diligence sessions with representatives and advisors of the GRS and PFRS and the unions related to the City's ability to continue to provide for the underfunded GRS and PFRS pensions and the ramifications to the pensions.

- On July 11, 2013, the City held follow-up diligence sessions with business people and advisors for the unions to engage in discussions on retiree benefit issues.

- The City's negotiations with the counterparties to its pension-related swap contracts (which have been ongoing since 2012) intensified in recent weeks and included: (a) several in-person and telephonic meetings among the City, swap counterparties and their respective advisors; (b) the exchange of various economic offers between the parties; and (c) the generation of numerous draft agreements memorializing such offers.

### Barriers to Reaching Agreement

Although these creditor meetings generally were constructive and were conducted by the City in good faith, the City has been unable through this process to achieve both: (a) sufficient consensual savings from its major creditor constituencies to ameliorate its cash crisis; and (b) sufficient contract amendments to successfully restructure its finances. Likewise, there is no realistic prospect of reaching agreements with all affected constituencies in a timely fashion (or at all). Given the vast and fragmented pool of potential creditors, the City cannot practicably negotiate a consensual restructuring with all of its creditors outside of a court process.

For example, the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention because: (a) the approximately 20,000 retirees entitled to receive retiree benefits from the City cannot be bound by out-of-court negotiations between the City and the 47 discrete union bargaining units that might or might not represent these retirees; and (b) in any event, the majority of those units have expressly refused to represent such retirees.

Moreover, the City generally is unable to negotiate with bargaining representatives with the authority to bind the City's bondholders. Either (a) U.S. Bank acts solely as a paying agent (and not as a trustee) with respect to a given series of bonds; (b) the debt is uninsured, such that no insurer of the City's funded bond debt (any such insurer, a "Bond Insurer") has the right to control an out-of-court restructuring of the debt; or (c) the debt is insured but the Bond Insurer

has no control rights (provided that the Bond Insurer has not made a payment under its respective policy).  In addition, to date, no bondholder group holding a majority of any of the 60 series of debt has organized so that the City could negotiate with them.  Under these circumstances, negotiations regarding the out-of-court restructuring of the City's bonds is impracticable because in many instances the City is unable to negotiate with a single contact with the authority and willingness to bind its bondholders.

Despite these impediments to achieving an out-of-court resolution with creditors, as set forth above, the City nevertheless attempted, in good faith, to negotiate with many key creditors, presenting its proposals to all known constituencies, soliciting feedback and engaging in meetings with all parties willing to come to the table.  The City responded to all requests for additional information and to all questions it received in these negotiations.  The fragmented and often non-binding nature of these negotiations has frustrated the City's ability to achieve a consensual restructuring of its debt.  Certain parties rejected the City's proposals altogether. In other cases, creditors made untenable "counterproposals" suggesting that they should not be materially impaired or should not be impaired at all.  These proposals were made notwithstanding explicit or implicit agreement that the City's debt and other legacy liabilities must be reduced.

Even in the face of numerous obstacles, the City was able to make some progress in creditor negotiations.  For example, the City's good faith attempts to negotiate with the counterparties to its swap contracts have been productive.  These discussions were temporarily sidetracked when a certain swap insurer blocked the City's access to wagering tax revenues (which were pledged in 2009 as collateral to resolve a prior termination event under the swap contracts).  The insurer's actions stalled negotiations and forced the City to protect its interests by commencing litigation, seeking, among other things:  (a) the recovery of damages suffered by the City; and (b) the release of revenues held by U.S. Bank, as custodian.  The City obtained a temporary restraining order in this matter, but litigation with the swap insurer remains in progress.  After the initial flurry of litigation activity, negotiations with the swap counterparties continued, leading to an agreement in principle to resolve the significant swap claims and related issues potentially impacting the City's liquidity.  This agreement with the swap counterparties is beneficial to the City, but, by itself, it falls far short of addressing all of the City's restructuring needs.

In light of the overall inability or failure of many stakeholders to respond to the negotiations and the limited successes in creditor negotiations to date, and considering the urgency of the City's situation, a global consensual resolution will not be achieved in a timely fashion.  We have evaluated other alternatives to address the City's financial emergency, but none of these alternatives would resolve the critical problems faced by the City and its residents.

**Recommendation to Seek Relief under Chapter 9**

Unable to negotiate an out-of-court resolution that simultaneously addresses the City's dire financial situation while laying the foundation for a strong and prosperous City going forward, and having exhausted all other available options, I hereby recommended, in accordance with section 18(1) of PA 436, that the City be authorized to file for relief under chapter 9 of the Bankruptcy Code. This recommendation is based on my determination that, without such a filing, no reasonable alternative to rectifying the financial emergency of the City exists because the City cannot adopt a feasible financial plan that can satisfactorily rectify the financial emergency in a timely manner, as described herein.

I believe that chapter 9 provides a framework that will permit the City to rectify its financial emergency. Chapter 9 will enable the City to negotiate with and bind creditors in a way that has proven to be impossible outside of chapter 9. For example, the City intends to seek the appointment of an official committee of retirees that can negotiate for and bind retirees. The plan of adjustment process set forth in the Bankruptcy Code likewise creates a mechanism by which the City may bind all of its creditors, even if all creditors do not assent to the City's restructuring plan. Given the impracticability of negotiating with the City's various stakeholders outside of chapter 9, and in light of the City's cash crisis and the urgent need to move forward with its restructuring, the time to seek chapter 9 relief is now.

Based on my discussions with the City's advisors, I believe that, if authorized to proceed under chapter 9 as requested herein, the City will have satisfied all five of the chapter 9 eligibility requirements and will be in a strong position to address any eligibility issues in court as necessary. In particular, the five elements of chapter 9 eligibility are the following:

- The City must be a municipality, which it is.

- The City must be specifically authorized, in its capacity as a municipality or by name, to be a debtor under chapter 9 by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under chapter 9. PA 436 authorizes the commencement of a chapter 9 case by the Emergency Manager upon the Governor's authorization.

- The City must be insolvent. As described herein, it is.

- The City must desire to effect a plan to adjust its debts. As described herein, the City desires to, and must, adjust its debts in chapter 9 to alleviate its financial emergency and to implement its restructuring plan.

- The City also must meet one of four remaining alternate requirements, two of which are particularly relevant here. First, the City is unable to negotiate with creditors

13-53846-tjt Doc 2473-3 Filed 01/13/14 Entered 01/13/14 47:03:32 Page 91 of
13-53846-tjt Doc 11-10 Filed 07/18/13 Entered 07/18/13 21:44:91:32 Page 91 of
107

because such negotiation is impracticable for the various reasons described above.  In addition, despite the impracticability, the City has negotiated in good faith with the creditors willing to engage in a discussion, but has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that the City intends to impair under a chapter 9 plan.  For both of these reasons, the City satisfies the final element of eligibility for chapter 9.

If the City is authorized to proceed under chapter 9, I intend to move the chapter 9 case along as expeditiously as possible.  A focused effort on pursuing a chapter 9 plan will provide the City with the opportunity to achieve a reasonably prompt path out of bankruptcy and towards the bright and prosperous future that it deserves.

Please note that, if the City is authorized to proceed under chapter 9, I will continue to serve as the Emergency Manager with the powers afforded by PA 436.  In addition, under section 18(1) of PA 436, I will act exclusively on the City's behalf in a chapter 9 case.  In that capacity, I will continue to provide regular updates to you, to other stakeholders and to the public as necessary or appropriate.  Indeed, given that after 18 months I may be removed from my position as Emergency Manager under PA 436, my goal is to implement a plan of adjustment and conclude the City's chapter 9 case no later than September 2014.  I also intend to pursue ongoing operational and performance reforms within this timeframe.

~ ~ ~

In sum, despite aggressive cost cutting measures already implemented by the City and despite good faith negotiations (where they could be had), no reasonable alternative for the restructuring of the City's operations and obligations exists other than through chapter 9.  Without chapter 9 relief, there is no clear path for rectifying the City's financial emergency and the City's deteriorating financial cycle will not only continue, but accelerate.  As such, I respectfully recommend that the City be authorized to proceed under chapter 9 so that we may, at last, stop the City's downward spiral and correct the City's financial condition in a sustainable fashion.

July 16, 2013
Page 12

     I am available at your convenience to discuss the content of this letter with both of you and your staffs and to answer any questions you may have. I recognize that the recommendation made in this letter is somewhat unprecedented, but it is my firmly held finding, as Emergency Manager, that a chapter 9 bankruptcy filing is the only available means to comprehensively rectify the City's unsustainable financial condition. I look forward to your response with respect to this matter of utmost importance to the City of Detroit and to the great State of Michigan.

                            Sincerely,

                            Kevyn D. Orr
                            Emergency Manager

Enclosure

# EXHIBIT K



RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

VIA HAND AND ELECTRONIC DELIVERY

July 18, 2013

Kevyn D. Orr
Emergency Manager
City of Detroit
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1126
Detroit, MI 48226

Andrew Dillon
State Treasurer
Michigan Department of Treasury
4th Floor Treasury Building
430 W. Allegan Street
Lansing, MI 48992

Re: Authorization to Commence Chapter 9 Bankruptcy Proceeding

Dear Mr. Orr and Mr. Dillon,

I have reviewed Mr. Orr's letter of July 16, 2013, requesting my approval of his recommendation to commence a bankruptcy proceeding for the City of Detroit under Chapter 9 of title 11 of the United States Code. As you know, state law requires that any such recommendation must first be approved by the Governor before the emergency manager may take that step. MCL 141.1558. For the reasons discussed below, I hereby approve that recommendation and authorize Mr. Orr to make such a filing.

### Current Financial Emergency

In reviewing Mr. Orr's letter, his Financial and Operating Plan, and his report to creditors, it is clear that the financial emergency in Detroit cannot be successfully addressed outside of such a filing, and it is the only reasonable alternative that is available. In other words, the City's financial emergency cannot be satisfactorily rectified in a reasonable period of time absent this filing.

I have reached the conclusion that this step is necessary after a thorough review of all the available alternatives, and I authorize this necessary step as a last resort to return this great City to financial and civic health for its residents and taxpayers. This decision comes in the wake of 60 years of decline for the City, a period in which reality was often

13-53846-tjt Doc 2472-3 Filed 07/18/14 Entered 07/18/14 21:47:03 Page 95 of
107
www.michigan.gov

ignored. I know many will see this as a low point in the City's history. If so, I think it will also be the foundation of the City's future – a statement I cannot make in confidence absent giving the City a chance for a fresh start, without burdens of debt it cannot hope to fully pay. Without this decision, the City's condition would only worsen. With this decision, we begin to provide a foundation to rebuild and grow Detroit.

Both before and after the appointment of an emergency manager, many talented individuals have put enormous energy into attempting to avoid this outcome. I knew from the outset that it would be difficult to reverse 60 years of decline in which promises were made that did not reflect the reality of the ability to deliver on those promises. I very much hoped those efforts would succeed without resorting to bankruptcy. Unfortunately, they have not. We must face the fact that the City cannot and is not paying its debts as they become due, and is insolvent.

After reading Mr. Orr's letter, the Financial and Operating Plan, and the report to creditors, I have come to four conclusions.

1. Right now, the City cannot meet its basic obligations to its citizens.

2. Right now, the City cannot meet its basic obligations to its creditors.

3. The failure of the City to meet its obligations to its citizens is the primary cause of its inability to meet its obligations to its creditors.

4. The only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring via the bankruptcy process that recognizes the fundamental importance of ensuring the City can meet its basic obligations to its citizens.

I will explain how I came to each conclusion.

**Inability to Meet Obligations to Its Citizens.** As Mr. Orr's Financial and Operating Plan and the June 14 Creditor Proposal have noted, the scale and depth of Detroit's problems are unique. The City's unemployment rate has nearly tripled since 2000 and is more than double the national average. Detroit's homicide rate is at the highest level in nearly 40 years, and it has been named as one of the most dangerous cities in America for more than 20 years. Its citizens wait an average of 58 minutes for the police to respond to their calls, compared to a national average of 11 minutes. Only 8.7% of cases are solved, compared to a statewide average of 30.5%. The City's police cars, fire trucks, and ambulances are so old that breakdowns make it impossible to keep up the fleet or properly carry out their roles. For instance, only a third of the City's ambulances were in service in the first quarter of 2013. Similarly, approximately 40% of the City's street lights were not functioning in that quarter and the backlog of complaints is more than 3,300 long. Having large swaths of largely abandoned structures -- approximately 78,000 -- creates additional public safety problems and reduces the quality of life in the City. Mr. Orr is correct that meeting the obligations the City has to

its citizens to provide basic services requires more revenue devoted to services, not less.

**Inability to Meet Obligations to Its Creditors.** The City has more than $18 billion in accrued obligations. A vital point in Mr. Orr's letter is that Detroit tax rates are at their current legal limits, and that even if the City was legally able to raise taxes, its residents cannot afford to pay additional taxes. Detroiters already have a higher tax rate than anywhere in Michigan, and even with that revenue the City has not been able to keep up with its basic obligations, both to its citizens and creditors. Detroit simply cannot raise enough revenue to meet its current obligations, and that is a situation that is only projected to get worse absent a bankruptcy filing.

**Failure to Meet Obligations to Citizens Creates Failure to Meet Obligations to Creditors.** Mr. Orr's letter and prior report put in stark reality the dramatic impact of the City's plummeting population. While many who love Detroit still live there, many other Detroiters at heart could not justify the sacrifice of adequate services. The City's population has declined 63% from its peak, including a 28% decline since 2000. That exodus has brought Detroit to the point that it cannot satisfy promises it made in the past. A decreasing tax base has made meeting obligations to creditors impossible. Mr. Orr is correct when he says the City cannot raise the necessary revenue through tax increases, and it cannot save the necessary revenue through reducing spending on basic services. Attempts to do so would only decrease the population and tax base further, making a new round of promises unfulfillable.

**Only One Feasible Path Offers a Way Out.** The citizens of Detroit need and deserve a clear road out of the cycle of ever-decreasing services. The City's creditors, as well as its many dedicated public servants, deserve to know what promises the City can and will keep. The only way to do those things is to radically restructure the City and allow it to reinvent itself without the burden of impossible obligations. Despite Mr. Orr's best efforts, he has been unable to reach a restructuring plan with the City's creditors. I therefore agree that the only feasible path to a stable and solid Detroit is to file for bankruptcy protection.

The past weeks have reaffirmed my confidence that Mr. Orr has the right priorities when it comes to the City of Detroit. I am reassured to see his prioritization of the needs of citizens to have improved services. I know we share a concern for the public employees who gave years of service to the City and now fear for their financial future in retirement, and I am confident that all of the City's creditors will be treated fairly in this process. We all believe that the City's future must allow it to make the investment it needs in talent and in infrastructure, all while making only the promises it can keep. Let us remain in close communication regarding measures Mr. Orr might take so we can discuss the possible impacts that might occur both within and outside of the City.

## Contingencies

2012 PA 436 provides that my approval of the recommendation to commence a Chapter 9 proceeding may place contingencies on such a filing. MCL 141.1558(1). I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency – a requirement that the plan be legally executable. 11 USC 943(b)(4).

## Conclusion

In conclusion, I find Mr. Orr's Recommendation Letter to be persuasive, especially in conjunction with his prior reports laying out the level of services the City can provide and its financial ability to meet its obligations to creditors. I am also convinced that Mr. Orr has exercised his best efforts to arrive at a restructuring plan with the City's creditors outside of bankruptcy, to no avail. Given these facts, the only feasible path to sustainability for the City of Detroit is a filing under chapter 9 of the bankruptcy code. Therefore, I hereby approve Mr. Orr's recommendation and authorize the emergency manager to make such a filing on behalf of the City of Detroit and to take all actions that are necessary and appropriate toward that end.

Sincerely,

Richard D. Snyder
Governor
State of Michigan

# **EXHIBIT L**



# EMERGENCY MANAGER
# CITY OF DETROIT

## ORDER No. 13

## FILING OF A PETITION UNDER CHAPTER 9
## OF TITLE 11 OF THE UNITED STATES CODE

By the Authority Vested in the Emergency Manager
For the City of Detroit
Pursuant to Michigan's Public Act 436 of 2012,
Kevyn D. Orr, the Emergency Manager,
Issues the Following Order:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 18(1) of PA 436 provides that "[i]f, in the judgment of the [EM], no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the [EM] may recommend to the governor and the

state treasurer that the local government be authorized to proceed under chapter 9" of title 11 of the United States Code (the "Bankruptcy Code"); and

Section 18(1) of PA 436 further provides that "[i]f the governor approves of the [EM's] recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision…. Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9 [of the Bankruptcy Code]. This section empowers the local government for which an emergency manager has been appointed to become a debtor under [the Bankruptcy Code], as required by section 109 of [the Bankruptcy Code], and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9" of the Bankruptcy Code; and

In accordance with section 18 of PA 436, the EM has recommended to the Governor of Michigan (the "Governor") and the Michigan State Treasurer (the "State Treasurer") that the City be authorized to proceed under chapter 9 of the Bankruptcy Code (the "Recommendation"); and

The Governor has provided the State Treasurer and the EM with his written approval of the Recommendation, a true and correct copy of which is attached hereto as Exhibit A, thereby authorizing the City to proceed under chapter 9.

**It is hereby ordered that:**

1.  The City shall file a petition for relief under chapter 9 of the Bankruptcy Code (the "Petition") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

2.  The City's Corporation Counsel, financial advisors, outside legal advisors and other officers and employees of the City, as applicable, are hereby authorized and directed, on behalf of and in the name of the City, to execute and verify the Petition and related Bankruptcy Court filings and perform any and all such acts as are reasonable, appropriate, advisable, expedient, convenient, proper or necessary to carry out this Order, as and to the extent directed by the EM or his designee.

3.  If any component of this Order is declared illegal, unenforceable or ineffective in a legal or other forum or proceeding such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

4.  This Order is effective immediately upon the date of execution below.

5.  This Order shall be distributed to the Mayor, City Council members and all department heads.

6. The EM may modify, rescind, or replace this Order at any time.

Dated: July 18, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
       Mayor David Bing
       Members of Detroit City Council

# EXHIBIT A

## Governor's Written Approval of Recommendation



STATE OF MICHIGAN
EXECUTIVE OFFICE
LANSING

RICK SNYDER
GOVERNOR

BRIAN CALLEY
LT. GOVERNOR

VIA HAND AND ELECTRONIC DELIVERY

July 18, 2013

Kevyn D. Orr
Emergency Manager
City of Detroit
Coleman A. Young Municipal Center
2 Woodward Ave., Suite 1126
Detroit, MI 48226

Andrew Dillon
State Treasurer
Michigan Department of Treasury
4th Floor Treasury Building
430 W. Allegan Street
Lansing, MI 48992

Re: Authorization to Commence Chapter 9 Bankruptcy Proceeding

Dear Mr. Orr and Mr. Dillon,

I have reviewed Mr. Orr's letter of July 16, 2013, requesting my approval of his recommendation to commence a bankruptcy proceeding for the City of Detroit under Chapter 9 of title 11 of the United States Code. As you know, state law requires that any such recommendation must first be approved by the Governor before the emergency manager may take that step. MCL 141.1558. For the reasons discussed below, I hereby approve that recommendation and authorize Mr. Orr to make such a filing.

## Current Financial Emergency

In reviewing Mr. Orr's letter, his Financial and Operating Plan, and his report to creditors, it is clear that the financial emergency in Detroit cannot be successfully addressed outside of such a filing, and it is the only reasonable alternative that is available. In other words, the City's financial emergency cannot be satisfactorily rectified in a reasonable period of time absent this filing.

I have reached the conclusion that this step is necessary after a thorough review of all the available alternatives, and I authorize this necessary step as a last resort to return this great City to financial and civic health for its residents and taxpayers. This decision comes in the wake of 60 years of decline for the City, a period in which reality was often

GEORGE W. ROMNEY BUILDING • 111 SOUTH CAPITOL AVENUE • LANSING, MICHIGAN 48909
www.michigan.gov

13-53846  Doc 21-73  Filed 09/14/14  Entered 09/14/14 11:23:32  Page 104 of
107

ignored. I know many will see this as a low point in the City's history. If so, I think it will also be the foundation of the City's future – a statement I cannot make in confidence absent giving the City a chance for a fresh start, without burdens of debt it cannot hope to fully pay. Without this decision, the City's condition would only worsen. With this decision, we begin to provide a foundation to rebuild and grow Detroit.

Both before and after the appointment of an emergency manager, many talented individuals have put enormous energy into attempting to avoid this outcome. I knew from the outset that it would be difficult to reverse 60 years of decline in which promises were made that did not reflect the reality of the ability to deliver on those promises. I very much hoped those efforts would succeed without resorting to bankruptcy. Unfortunately, they have not. We must face the fact that the City cannot and is not paying its debts as they become due, and is insolvent.

After reading Mr. Orr's letter, the Financial and Operating Plan, and the report to creditors, I have come to four conclusions.

1. Right now, the City cannot meet its basic obligations to its citizens.

2. Right now, the City cannot meet its basic obligations to its creditors.

3. The failure of the City to meet its obligations to its citizens is the primary cause of its inability to meet its obligations to its creditors.

4. The only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring via the bankruptcy process that recognizes the fundamental importance of ensuring the City can meet its basic obligations to its citizens.

I will explain how I came to each conclusion.

**Inability to Meet Obligations to Its Citizens.** As Mr. Orr's Financial and Operating Plan and the June 14 Creditor Proposal have noted, the scale and depth of Detroit's problems are unique. The City's unemployment rate has nearly tripled since 2000 and is more than double the national average. Detroit's homicide rate is at the highest level in nearly 40 years, and it has been named as one of the most dangerous cities in America for more than 20 years. Its citizens wait an average of 58 minutes for the police to respond to their calls, compared to a national average of 11 minutes. Only 8.7% of cases are solved, compared to a statewide average of 30.5%. The City's police cars, fire trucks, and ambulances are so old that breakdowns make it impossible to keep up the fleet or properly carry out their roles. For instance, only a third of the City's ambulances were in service in the first quarter of 2013. Similarly, approximately 40% of the City's street lights were not functioning in that quarter and the backlog of complaints is more than 3,300 long. Having large swaths of largely abandoned structures -- approximately 78,000 -- creates additional public safety problems and reduces the quality of life in the City. Mr. Orr is correct that meeting the obligations the City has to

its citizens to provide basic services requires more revenue devoted to services, not less.

**Inability to Meet Obligations to Its Creditors.** The City has more than $18 billion in accrued obligations. A vital point in Mr. Orr's letter is that Detroit tax rates are at their current legal limits, and that even if the City was legally able to raise taxes, its residents cannot afford to pay additional taxes. Detroiters already have a higher tax rate than anywhere in Michigan, and even with that revenue the City has not been able to keep up with its basic obligations, both to its citizens and creditors. Detroit simply cannot raise enough revenue to meet its current obligations, and that is a situation that is only projected to get worse absent a bankruptcy filing.

**Failure to Meet Obligations to Citizens Creates Failure to Meet Obligations to Creditors.** Mr. Orr's letter and prior report put in stark reality the dramatic impact of the City's plummeting population. While many who love Detroit still live there, many other Detroiters at heart could not justify the sacrifice of adequate services. The City's population has declined 63% from its peak, including a 28% decline since 2000. That exodus has brought Detroit to the point that it cannot satisfy promises it made in the past. A decreasing tax base has made meeting obligations to creditors impossible. Mr. Orr is correct when he says the City cannot raise the necessary revenue through tax increases, and it cannot save the necessary revenue through reducing spending on basic services. Attempts to do so would only decrease the population and tax base further, making a new round of promises unfulfillable.

**Only One Feasible Path Offers a Way Out.** The citizens of Detroit need and deserve a clear road out of the cycle of ever-decreasing services. The City's creditors, as well as its many dedicated public servants, deserve to know what promises the City can and will keep. The only way to do those things is to radically restructure the City and allow it to reinvent itself without the burden of impossible obligations. Despite Mr. Orr's best efforts, he has been unable to reach a restructuring plan with the City's creditors. I therefore agree that the only feasible path to a stable and solid Detroit is to file for bankruptcy protection.

The past weeks have reaffirmed my confidence that Mr. Orr has the right priorities when it comes to the City of Detroit. I am reassured to see his prioritization of the needs of citizens to have improved services. I know we share a concern for the public employees who gave years of service to the City and now fear for their financial future in retirement, and I am confident that all of the City's creditors will be treated fairly in this process. We all believe that the City's future must allow it to make the investment it needs in talent and in infrastructure, all while making only the promises it can keep. Let us remain in close communication regarding measures Mr. Orr might take so we can discuss the possible impacts that might occur both within and outside of the City.

## Contingencies

2012 PA 436 provides that my approval of the recommendation to commence a Chapter 9 proceeding may place contingencies on such a filing. MCL 141.1558(1). I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency – a requirement that the plan be legally executable. 11 USC 943(b)(4).

## Conclusion

In conclusion, I find Mr. Orr's Recommendation Letter to be persuasive, especially in conjunction with his prior reports laying out the level of services the City can provide and its financial ability to meet its obligations to creditors. I am also convinced that Mr. Orr has exercised his best efforts to arrive at a restructuring plan with the City's creditors outside of bankruptcy, to no avail. Given these facts, the only feasible path to sustainability for the City of Detroit is a filing under chapter 9 of the bankruptcy code. Therefore, I hereby approve Mr. Orr's recommendation and authorize the emergency manager to make such a filing on behalf of the City of Detroit and to take all actions that are necessary and appropriate toward that end.

Sincerely,

Richard D. Snyder
Governor
State of Michigan