**ITEM NO. 11**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

City of Detroit, Michigan,
    Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

### Order Regarding Eligibility Objections
### Notices of Hearings
### And
### Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)

> *This order includes a special notice of hearing*
> *to individuals who filed eligibility objections.*
> *Please see part VIII, page 6.*

## I. Introduction

One hundred nine parties filed timely objections to the City's eligibility to file this bankruptcy case under § 109 of the Bankruptcy Code.[1] The Court appreciates the effort of each of the parties in this process.

The Court has thoroughly reviewed each of the filed objections, as well as the Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit that Michigan Attorney General Bill Schuette filed. (Dkt. #481) Some objections raise only legal issues, while others require the Court to resolve factual issues. The Court will address each in an appropriate manner.

## II. Eligibility Objections Raising Only Legal Issues

The following objections raise only legal issues:

1. Chapter 9 of the Bankruptcy Code violates the United States constitution.
    Asserted by:
    484  Local 324, International Union of Operating Engineers
    486  Local 517M, Service Employees International Union

---

[1] The Court previously allowed the Retiree Committee 14 days from the retention of its counsel to file eligibility objections. The Court anticipates that in light of the thorough objections that parties have already filed, including some objections by members of the Retiree Committee, this amount of time is sufficient. The Court also anticipates that the Retiree Committee will promptly retain counsel. The Court will give full consideration to any request by the Committee for relief from any established deadlines upon a showing that relief is necessary to protect its interests or to present its position to the Court.

505 Michigan Council 25 of The American Federation of State, County
& Municipal Employees, AFL-CIO and Sub-Chapter 98, City of
Detroit Retirees

2. The Bankruptcy Court does not have the authority to determine the constitutionality
of Chapter 9 of the Bankruptcy Code.
Asserted by:
484 Local 324, International Union of Operating Engineers
486 Local 517M, Service Employees International Union
505 Michigan Council 25 Of The American Federation of State, County
& Municipal Employees, AFL-CIO and Sub-Chapter 98, City of
Detroit Retirees

3. Michigan Public Act 436 of 2012 violates the Michigan constitution and therefore the
City was not validly authorized to file this bankruptcy case as required for eligibility
by 11 U.S.C. § 109(c)(2).
Asserted by:
484 Local 324, International Union of Operating Engineers
486 Local 517M, Service Employees International Union
504 Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington
and Bruce Goldman
505 Michigan Council 25 of The American Federation of State, County
& Municipal Employees, AFL-CIO and Sub-Chapter 98, City of
Detroit Retirees
506 International Union, United Automobile, Aerospace and Agricultural
Implement Workers of America
519 General Retirement System of the City of Detroit, Police and Fire
Retirement System of the City of Detroit
520 Retired Detroit Police Members Association

4. The Bankruptcy Court does not have the authority and jurisdiction to determine the
constitutionality of Michigan Public Act 436 of 2012.
Asserted by:
384 Krystal Crittendon

5. Detroit's Emergency Manager is not an elected official and therefore did not have
valid authority to file this bankruptcy case as required for eligibility by 11 U.S.C.
§ 109(c)(2).
Asserted by:
384 Krystal Crittendon

6. Because the Governor's authorization to file this bankruptcy case did not prohibit the
City from impairing the pension rights of its employees and retirees, the authorization
was not valid under the Michigan constitution, as required for eligibility by 11 U.S.C.
§ 109(c)(2).
Asserted by:
484 Local 324, International Union of Operating Engineers
486 Local 517M, Service Employees International Union
495 David Sole

2

502 Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey

504 Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman

505 Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees

506 International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

512 The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association

514 Center for Community Justice and Advocacy

519 General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit

520 Retired Detroit Police Members Association

7. Because of the proceedings and judgment in *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the Governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

Asserted by:

495 David Sole

519 General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit

## III. Notice of Hearing on Eligibility Objections That Raise Only Legal Issues

The Court further concludes that a prompt oral argument on these legal issues will promote just, speedy, and efficient determination of the City's eligibility to be a debtor in Chapter 9 under § 109(c) of the Bankruptcy Code. Accordingly, the Court will hear oral argument on these legal issues on **September 18, 2013 at 10:00 a.m.**, in Courtroom 716, Theodore Levin U.S. Courthouse, 231 West Lafayette Blvd., Detroit, Michigan.

## IV. Procedures Regarding Eligibility Objections That Raise Only Legal Issues

At the oral argument, the objecting parties shall proceed first and share 120 minutes for their opening arguments and 30 minutes for their rebuttal arguments. The City and the Attorney General shall then share 120 minutes for their opening arguments and 30 minutes for their surrebuttal arguments.

On the objecting parties' side, the parties that are identified above are requested to confer in advance of the oral argument for the purpose of agreeing on the allocation of time among them (within the time limits established in this order) and on the order of their presentations. Attorney Robert Gordon is requested to organize and supervise these discussions.

Designates of the City, the Michigan Attorney General, the Attorney General of the United States, and the United States Attorney for the Eastern District of Michigan are requested to confer in advance of the oral argument for the purpose of agreeing on the allocation of time

among them (within the time limits established in this order) and on the order of their presentations. Attorney David Heiman (or his designate) is requested to organize and supervise these discussions.

By the day before the argument, each side shall file its agreement, if any, regarding the allocation of time and the order of presentation. If either side is unable to agree, the Court will determine the allocation of time among the parties and the order of their presentations, and will announce its determination at the beginning of the argument.

## V. Eligibility Objections That Require the Resolution of Genuine Issues of Material Fact

The Court further concludes that the following specific objections require the resolution of genuine issues of material fact at the trial that the Court previously scheduled for October 23, 2013:

8. The City was not "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C).
   Asserted by:
   - 484  Local 324, International Union of Operating Engineers
   - 486  Local 517M, Service Employees International Union
   - 502  Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
   - 505  Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
   - 520  Retired Detroit Police Members Association

9. The City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).
   Asserted by:
   - 484  Local 324, International Union of Operating Engineers
   - 486  Local 517M, Service Employees International Union
   - 504  Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
   - 506  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
   - 520  Retired Detroit Police Members Association

10. The City did not negotiate in good faith with creditors, as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(B).
    Asserted by:
    - 484  Local 324, International Union of Operating Engineers
    - 486  Local 517M, Service Employees International Union
    - 502  Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
    - 504  Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman

4

<div style="margin-left: 2em;">

505　Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees

506　International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

512　The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association

517　Michigan Auto Recovery Service

519　General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit

520　Retired Detroit Police Members Association

</div>

11. The City was not "unable to negotiate with creditors because such negotiation is impracticable," as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(C).

<div style="margin-left: 2em;">

Asserted by:

484　Local 324, International Union of Operating Engineers

486　Local 517M, Service Employees International Union

502　Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey

504　Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman

505　Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees

506　International Union, United Automobile, Aerospace and Agricultural Implement Workers of America

512　The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association

519　General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit

</div>

12. The City's bankruptcy petition should be dismissed because it was filed in bad faith under 11 U.S.C. § 921(c).

<div style="margin-left: 2em;">

Asserted by:

484　Local 324, International Union of Operating Engineers

486　Local 517M, Service Employees International Union

505　Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees

519　The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association

520　Retired Detroit Police Members Association

</div>

## VI. Order Regarding the Eligibility Objection in Paragraph 9

As identified in paragraph 9, among the matters for trial will be the objection that the City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4). More specifically, these objections assert that the Emergency Manager intends to propose a plan that that would impair the pension rights of employees and retirees in violation of the Michigan constitution and that such a plan cannot be confirmed. These objections further assert that therefore the City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).

The Court fully recognizes and appreciates the extraordinary importance of the pension rights of the City's employees and retirees in this case and of how the City will ultimately propose to treat those rights. It is an important question not only to the City's employees, retirees and unions, but also to all of the parties in the case.

However, the requirement of eligibility that the City desires "to effect a plan to adjust such debts" under 11 U.S.C. § 109(c)(4) does not obligate the City to prove that any particular plan that it might later propose is confirmable. Accordingly, the Court will not consider the issue of the treatment of pension rights when considering the eligibility objection in paragraph 9. The Court fully preserves the opportunity of all parties to present their positions relating to the City's treatment of pension rights when the debtor requests confirmation of a plan, or, perhaps, in some other appropriate context. To meet the requirement of 11 U.S.C. § 109(c)(4), the City need only prove more generally that it desires "to effect a plan to adjust such debts."

## VII. Order Regarding Discovery Related to Eligibility Objections

The Court concludes that the following limitations on discovery are appropriate:

1. Discovery related to eligibility objections is limited to the objections that raise factual issues, identified in paragraphs 8-12 above.

2. On the objecting parties' side, discovery may be propounded only by those parties who filed the eligibility objections that the Court identified in those paragraphs.

## VIII. Notice of Hearing to Individuals Who Filed Eligibility Objections

The Court recognizes that many individuals (other than those listed in paragraphs 1-12 above), most without counsel, also filed timely objections. The Court offers these individuals an opportunity to be heard on their objections. This hearing will be on **September 19, 2013, at 10:00 a.m.** in Courtroom 242, Theodore Levin U.S. Courthouse, 231 West Lafayette Blvd., Detroit, Michigan. *This opportunity is only for individuals that filed timely objections.* These parties are identified on the attached Exhibit A.

Just as the Court imposed time limits on the attorneys identified above, the Court must also impose a time limit on these individuals as well, due to the number of these individuals. Therefore, each individual who filed a timely objection may address the Court for 3 minutes regarding the objection. The City shall have 30 minutes to respond. No rebuttal will be permitted.

Due to security screening, the Court encourages the individuals that accept this opportunity to address the Court regarding their eligibility objections to arrive at the courthouse at least 60 minutes before the scheduled start time of the hearing. At 9:00 a.m., the court staff

will begin to check in these individuals and will give each party a number establishing the order of speaking.

## IX. Certifications Pursuant to 28 U.S.C. § 2403(a) and (b)

Pursuant to 28 U.S.C. § 2403(a), the Court hereby certifies to the Attorney General of the United States that the constitutionality of Chapter 9 of Title 11 of the United States Code under the United States constitution is drawn in question in this case. The Court permits the United States to intervene for argument on the question of the constitutionality of Chapter 9 of the Bankruptcy Code and shall, subject to the applicable provisions of law, have all the rights of a party.

Pursuant to 28 U.S.C. § 2403(b), the Court hereby certifies to the Attorney General of the State of Michigan that the constitutionality of Michigan Public Act 436 of 2012 under the Michigan constitution is drawn in question in this case. The Court permits the State of Michigan to intervene for argument on the question of the constitutionality Michigan Public Act 436 of 2012 under the Michigan constitution and shall, subject to the applicable provisions of law, have all the rights of a party.

## X. Untimely Objections

All untimely objections, identified on the attached Exhibit B, are overruled.

## XI. Opportunity to Comment or Object

Parties may file objections to or comments on this order by September 6, 2013.

## XII. Service

The clerk shall serve copies of this "Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)" upon all parties who filed eligibility objections, the City, and the Attorney General of the State of Michigan. It is not necessary to serve the objections asserting the unconstitutionality of Michigan Public Act 436 of 2012 upon the Michigan Attorney General because his counsel was already served with those objections through electronic notice by ECF.

Pursuant to Rule 4(i) Federal Rules of Civil Procedure (applicable to the eligibility objections in this case under Rules 4(a)(1) and 9014(b) of the Federal Rules of Bankruptcy Procedure), the clerk shall also serve copies of this "Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)", together with copies of the objections identified in paragraph 1 above, by registered or certified mail, upon both the Attorney General of the United States at Washington, D.C. and the civil process clerk at the United States Attorney's office in the Eastern District of Michigan.

It is so ordered.

_____/s/ Steven Rhodes_____
Steven Rhodes
United States Bankruptcy Judge

August 26, 2013

# EXHIBIT A

## Individuals Who Are Invited to Address the Court Regarding
## Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.

| NAME | Docket # |
| --- | --- |
| Michael Abbott | 385 |
| Association of Professional and Technical Employee (APTE) | 482 |
| Linda Bain | 474 |
| Randy Beard | 480 |
| Russell Bellant | 402,405 |
| Michael G. Benson | 388 |
| Cynthia Blair | 492 |
| Dwight Boyd | 412 |
| Charles D. Brown | 460, 491 |
| Lorene Brown | 403 |
| Paulette Brown | 431 |
| Rakiba Brown | 467 |
| Regina Bryant | 338, 339 |
| Mary Diane Bukowski | 440 |
| David Bullock | 393 |
| Claudette Campbell | 408 |
| Johnnie R. Carr | 413 |
| Sandra Carver | 469 |
| Raleigh Chambers | 409 |
| Alma Cozart | 400 |
| Leola Regina Crittendon | 454 |
| Angela Crockett | 455 |
| Lucinda J. Darrah | 447, 477 |
| Joyce Davis | 392 |
| Sylvester Davis | 435 |
| William Davis | 430 |
| Elmarie Dixon | 414 |
| Mary Dugans | 415 |
| Lewis Dukens | 394 |
| David Dye | 448 |
| Jacqueline Esters | 416 |
| Arthur Evans | 463 |
| Jerry Ford | 432 |
| William D. Ford | 417 |
| Ulysses Freeman | 429 |
| Olivia Gillon | 401 |
| Donald Glass | 386 |

# EXHIBIT A

## Individuals Who Are Invited to Address the Court Regarding
## Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.

| | |
|---|---|
| Lavarre W. Greene | 465 |
| William Hickey | 442 |
| LaVern Holloway | 397 |
| William J. Howard | 433 |
| Joanne Jackson | 437 |
| Ailene Jeter | 457 |
| Sheilah Johnson | 451 |
| Stephen Johnson | 418 |
| Joseph H. Jones | 389 |
| Sallie M. Jones | 419 |
| Aleta Atchinson-Jorgan | 462 |
| Zelma Kinchloe | 396 |
| Timothy King | 489 |
| Keetha R. Kittrell | 427 |
| Michael Joseph Karwoski | 510 |
| Roosevelt Lee | 468 |
| Althea Long | 399 |
| Edward Lowe | 425 |
| Lorna Lee Mason | 428 |
| Deborah Moore | 470 |
| Deborah Pollard | 421 |
| Larene Parrish | 420 |
| Lou Ann Pelletier | 335 |
| Michael K. Pelletier | 337 |
| Heidi Peterson | 513 |
| Helen Powers | 404 |
| Alice Pruitt | 472 |
| Samuel L. Riddle | 422 |
| Kwabena Shabu | 426 |
| Michael D. Shane | 443 |
| Karl Shaw | 398 |
| Frank Sloan, Jr. | 436 |
| Gretchen R. Smith | 494 |
| Horace E. Stallings | 464 |
| Thomas Stephens | 461 |
| Dennis Taubitz | 446 |
| Charles Taylor | 423 |
| Marzelia Taylor | 475 |
| The Chair of St. Peter | 493 |

**Individuals Who Are Invited to Address the Court Regarding
Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.**

| | |
|---|---|
| Dolores A. Thomas | 456 |
| Shirley Tollivel | 395 |
| Tracey Tresvant | 390 |
| Calvin Turner | 387 |
| Jean Vortkamp | 439 |
| William Curtis Walton | 411 |
| Jo Ann Watson | 490 |
| Judith West | 444 |
| Preston West | 407 |
| Cheryl Smith Williams | 458 |
| Charles Williams, II | 391 |
| Floreen Williams | 496 |
| Fraustin Williams | 479 |
| Leonard Wilson | 466 |
| Phebe Lee Woodberry | 459 |
| Anthony G. Wright, Jr. | 485 |

# EXHIBIT B

## Eligibility Objections Overruled Because They Were Untimely

| NAME | Docket # |
|------|---------:|
| Hassan Aleem and Carl Williams | 565 |
| Charles Chatman | 539 |
| Andrea Edwards | 532 |
| Richard Johnson El-Bey | 536 |
| Xylia Hall | 541 |
| Diane Hutchersun | 530 |
| Michael Jones | 549 |
| Nettie Reeves | 534 |
| Donald Richardson | 633 |

# ITEM NO. 12

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                    Chapter 9
CITY OF DETROIT, MICHIGAN.                 No. 13-53846

     Debtor.                            HON. STEVEN W. RHODES

_____

**THE STATE OF MICHIGAN'S RESPONSE TO ELIGIBILITY
OBJECTIONS RAISING ONLY LEGAL ISSUES**

Matthew Schneider (P62190)
Chief Legal Counsel

Aaron D. Lindstrom(P72916)
Assistant Solicitor General

Margaret A. Nelson (P30342)
Steven B. Flancher (P47894)
Assistant Attorneys General
P.O. Box 30758
Lansing, MI 48909
517.373.6434

Steven G. Howell (P28982)
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226-3425

Attorneys for the State of Michigan
Michigan Dep't of Attorney General

Dated:  September 6, 2013

# TABLE OF CONTENTS

Page

Table of Contents......................................................................................ii

Index of Authorities................................................................................iv

Concise Statement of Issues Presented...................................................ix

Introduction ..............................................................................................1

Argument ...................................................................................................3

I.  Public Act 436 does not violate the Michigan Constitution
    (Objection No. 3)...............................................................................3

    A.  Section 18(1) of Public Act 436 is constitutional and
        does not render the City ineligible to file this
        bankruptcy case. ......................................................................4

    B.  Public Act 436 does not violate Home Rule Provisions
        of Article VII of Michigan's Constitution. ...........................10

        1.  Public Act 436 does not violate the "charter"
            provisions of article VII, § 22. ......................................10

        2.  Public Act 436 also does not violate other
            provisions of the Michigan Constitution by
            allowing an emergency manager to assume the
            authority of a local government unit. ...........................13

        3.  PA 436 is not a local act as contemplated by
            article IV, § 29, of Michigan's Constitution. ...............17

        4.  Public Act 436 is not an unconstitutional
            delegation of authority to the Emergency
            Manager. ........................................................................18

II.  The Bankruptcy Court has the authority and jurisdiction to
     determine the constitutionality of Michigan Public Act 436
     (Objection No. 4)............................................................................22

ii

13-53846-tjt   Doc 2475   Filed 09/06/14   Entered 09/06/14 16:20:32   Page 15 of 44
13-53846-swr   Doc 756-5   Filed 09/06/13   Entered 09/06/13 16:20:31   Page 15 of 44
313

III.    Detroit's Emergency Manager had valid authority to file this
        bankruptcy case (Objection No. 5). ...............................................27

IV.     The Governor's authorization to file this bankruptcy case did
        not impair any pension rights (Objection No. 6)............................28

V.      The trial court's order in *Webster* did not deprive the
        Governor of authority to file the bankruptcy petition
        (Objection No. 7). .............................................................................30

Conclusion and Relief Requested............................................................33

13-53846-tjt  Doc 2478-5  Filed 09/06/14  Entered 09/06/14 16:20:32  Page 16 of 44
13-53846-swr  Doc 756  Filed 09/06/13  Entered 09/06/13 16:20:31  Page 16 of
313

# INDEX OF AUTHORITIES

## Cases

*American Axle & Manufacturing, Inc. v. City of Hamtramck,*
  461 Mich. 352 (2000) ............................................................. 12

*Bivens v. Grand Rapids,*
  443 Mich. 391 (1993) ............................................................. 11

*Blue Cross & Blue Shield of Mich. v. Governor,*
  422 Mich. 1 (1985) ................................................................. 19

*Brimmer v. Elk Rapids,*
  365 Mich. 6 (1961) ................................................................. 12

*City of Ecorse v. Peoples Community Hosp. Auth.,*
  336 Mich. 490 (1953) ............................................................. 12

*City of Taylor v. Detroit Edison,*
  475 Mich. 109 (2006) ............................................................. 15

*Field v. Clark,*
  143 U.S. 649 (1892) ............................................................... 18

*Gracie Webster, et al. v. The State of Michigan, et al.,*
  Case No. 13-734-CZ (Ingham County Circuit Court) ........ix, 30, 31, 33

*Harsha v. City of Detroit,*
  261 Mich. 586 (1933) ............................................................. 12

*Hart v. Wayne Co,*
  396 Mich. 259 (1976) ............................................................. 12

*Home Bldg. & Loan Ass'n v. Blaisdell,*
  290 U.S. 398 (1934) ............................................................... 13

*In re City of Harrisburg, PA,*
  465 B.R. 744 (Bankr. M.D. Pa. 2011) ................................. 7, 8

iv

13-53846-tjt  Doc 2473-5  Filed 09/06/13  Entered 09/06/13 16:20:32  Page 17 of 44
13-53846-swr  Doc 756-5  Filed 09/06/13  Entered 09/06/13 16:20:32  Page 4 of 44
313

*In re City of Stockton, California,*
   493 B.R. 772 (Bankr. E.D. Ca. 2013) ................................................... 7

*In re City of Vallejo,*
   403 B.R. 72 (Bankr. E.D. Cal. 2009) ................................................... 20

*In re Forfeiture of Bail Bond,*
   276 Mich. App. 482 (2007) ................................................................. 29

*In re Moon,*
   116 B.R. 75 (Bankr. E.D. Mich. 1990) .............................................. 32

*In re Rice,*
   2001 WL 34076613, (Bankr. N.D. Ohio 2001) ................................. 25

*Lemon v. Kurtzman,*
   411 U.S. 192 (1973) ............................................................................ 9

*Mack v. Detroit,*
   467 Mich. 186 (2002) ................................................................ 11, 15

*Marrese v. American Academy of Orthopedic Surgeons,*
   470 U.S. 373 (1985) .......................................................................... 32

*Marxer v. City of Saginaw,*
   270 Mich. 256 (1935) ........................................................................ 11

*Monat v. State Farm Ins. Co.,*
   469 Mich. 679; (2004) ....................................................................... 32

*NAACP v. Snyder,*
   No. 13-12098 (E.D. Mich.) ................................................................ 23

*Phillips v. Snyder,*
   No. 13-11370 (E.D. Mich.) ................................................................ 23

*Rental Property Owners Ass'n of Kent Co v. City of Grand Rapids,*
   455 Mich. 246 (1997) ........................................................................ 12

*Reynolds v. Sims,*
   377 U.S. 533 (1964) .......................................................................... 15

v

13-53846-tjt  Doc 2473-5  Filed 09/06/13  Entered 09/06/13 16:20:32  Page 18 of 44
13-53846-swr  Doc 758-5  Filed 09/06/13  Entered 09/06/13 16:20:32  Page 18 of 44
313

*Sailors v. Bd. of Ed. of Kent County,*
  387 U.S. 105 (1967) ............................................................... 15

*State of Michigan v. Wayne Co Clerk,*
  466 Mich. 640 (2002) ............................................................. 17

*Stern v. Marshall,*
  131 S. Ct. 2594 (2011) ....................................................... 25, 26

*Storey v. Meijer, Inc.,*
  431 Mich. 368; (1988) ........................................................... 32

*Taunt v. General Retirement System (In re Wilcox),*
  233 F.3d 899 (6th Cir. 2000) ................................................... 12

*Taylor v. Smithline Beecham Corp.,*
  468 Mich. 1 (2003) ......................................................... 15, 18

*Vale v. Gary National Bank,*
  406 F.2d 39 (7th Cir. 1969) .................................................... 25

**Statutes**

11 U.S.C. § 109................................................................ passim

11 U.S.C. § 301................................................................... 30

11 U.S.C. § 362............................................................... 22, 30

11 U.S.C. § 365............................................................... 12, 22

11 U.S.C. § 901................................................................... 30

11 U.S.C. § 903............................................................... 20, 21

11 U.S.C. § 922............................................................... 22, 30

11 U.S.C. § 941................................................................... 27

11 U.S.C. § 943(b) ............................................................ 2, 7

28 U.S.C. § 157................................................................... 24

28 U.S.C. § 1332 .................................................................................. 24

28 U.S.C. § 1334(b) ............................................................................. 24

28 U.S.C. § 1738 .................................................................................. 32

2012 Mich. Pub. Act 436 ............................................................ passim

2012 Mich. Pub. Act 436 §18 (1) ...................................................ii, 4

Mich. Comp. Laws § 78.27 ................................................................ 11

Mich. Comp. Laws § 117.1 *et. seq* ................................................. 11

Mich. Comp. Laws § 117.4j(3) .......................................................... 11

Mich. Comp. Laws § 117.36 ........................................................ 11, 15

Mich. Comp. Laws § 141.1528m(1) .................................................. 14

Mich. Comp. Laws § 141.1528m(1) (x) ........................................... 14

Mich. Comp. Laws § 141.1541(k) ...................................................... 17

Mich. Comp. Laws § 141.1543 ........................................................... 13

Mich. Comp. Laws § 141.1549(2) ........................................... 18, 21, 27

Mich. Comp. Laws § 141.1558 ..................................................... passim

Mich. Comp. Laws § 141.1588(1) ........................................ 6, 10, 28, 33

**Other Authorities**

Black's Law Dictionary 363 (8th ed. 2004) .................................... 24

**Constitutional Provisions**

Mich. Const. Art. III, § 2 .................................................................. 18

Mich. Const. Art. IV, § 29 ........................................................... 16, 17

Mich. Const. Art. V, § 8 ..................................................................... 19

vii

Mich. Const. Art. VII ......................................................... 3, 13, 15

Mich. Const. Art. VII, § 22 .......................................... 10, 11, 13

Mich. Const. Art. VII, § 21 ................................................ 13, 14

Mich. Const. Art. VII, § 34 ................................................ 13, 14

Mich. Const. Art. IX, § 24 ................................................. 3, 6, 28

# CONCISE STATEMENT OF ISSUES PRESENTED

This Court identified seven legal objections to eligibility in its order regarding eligibility. (Doc. # 642, 8/26/13 Order, at 1–3.) The State of Michigan will address issue Nos. 3 through 7:

3. Whether Michigan Public Act 436 of 2012 violates the Michigan constitution and therefore the City was not validly authorized to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).

4. Whether the Bankruptcy Court has the authority and jurisdiction to determine the constitutionality of Michigan Public Act 436 of 2012.

5. Whether Detroit's Emergency Manager is not an elected official and therefore did not have valid authority to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).

6. Whether because the Governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

7. Whether because of the proceedings and judgment in *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the Governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

## INTRODUCTION

The State of Michigan believes that the City of Detroit meets all the requirements of 11 U.S.C. § 109(c) and is eligible to be a debtor. In particular, the State agrees that the City is, as § 109(c)(2) requires, specifically authorized under state law to file for chapter 9 bankruptcy. Accordingly, the State submits this brief to address eligibility objections 3 through 7, which relate to state law and § 109(c)(2).

Some of the parties who filed objections have asserted that the Governor violated state law, including Michigan's Constitution, by authorizing the bankruptcy filing, even suggesting that he violated his oath of office. To the contrary, the Governor remained faithful to all applicable law—from the supreme law of the land, the United States Constitution, to the Michigan Constitution, to Michigan's emergency-manager statute—and properly exercised the authority given to him by the Legislature and the people of Michigan to address the grave financial problems of the City of Detroit.

Authorizing Detroit's bankruptcy was not a step taken lightly. Two different financial reviews conducted one year apart confirmed the existence of Detroit's financial emergency. After his own review, the

1

Emergency Manager determined that no reasonable alternative existed to rectify the financial emergency.

With this context in mind, the eligibility question before the Court is a discrete and narrow one; it presents threshold questions of authority only, and not the ultimate merits of the yet-to-be-created plan for adjustment—a determination reserved for confirmation.  11 U.S.C. § 943(b).

But eligibility for bankruptcy is an exceptionally important question for the people of Michigan, and especially the people of Detroit.  Indeed, the health, safety, and welfare of the citizens of Detroit and the people who work in and visit Detroit depend on all of our efforts in this case.  This bankruptcy presents the only opportunity to change the City's direction.  Rather than allowing Detroit's increasing debt burden to choke off the City's ability to protect the lives and well-being of its residents, chapter 9 provides a forum designed to address the types of financial problems Detroit faces, and to confront these problems through a systematic, open process.

Some want to maintain the status quo, rather than addressing Detroit's challenges.  But the status quo is neither sustainable nor

13-53846-swr   Doc 2478-5   Filed 09/06/13   Entered 09/06/13 16:26:31   Page 24 of 44
13-53846-swr   Doc 756   Filed 09/06/13   Entered 09/06/13 16:17:03   Page 24 of 44
313

acceptable. A finding of eligibility is not only the correct legal result, it is also in the best interests of *all* of the constituent groups interested in the success and future of the City of Detroit. Having been properly authorized to file its petition, Detroit is eligible for relief under chapter 9 and should be allowed to address its problems under the protections and authority of the Bankruptcy Code.

## ARGUMENT

### I. Public Act 436 does not violate the Michigan Constitution (Objection No. 3).

The objections allege that Public Act 436 violates Michigan's Constitution in four ways:

- by failing to protect public pensions from inclusion in bankruptcy proceedings initiated by the local government, assertedly in violation of the Pension Clause, Mich. Const. art. IX, § 24;

- by violating the Home Rule Provisions, Mich. Const. art. VII;

- by improperly delegating authority to an emergency manager; and

- by lacking adequate standards to guide an emergency manager's action in bankruptcy.

None of these arguments is persuasive.

**A.    Section 18(1) of Public Act 436 is constitutional and does not render the City ineligible to file this bankruptcy case.**

The sole issue relevant to eligibility under § 109(c)(2) of the Bankruptcy Code is whether the City has satisfied § 109(c)(2)'s mandate either that the State "specifically authorize" the City to proceed, or that a "government officer or organization empowered by State law to authorize" the City to be a chapter 9 debtor has been given such authorization.  11 U.S.C. § 109(c)(2).  Section 109(c)(2) does not require analyzing a city's home rule powers, or the scope of an emergency manager's authority to act on behalf of the City in receivership; it only requires analyzing whether the conditions—if any—for the State's authorization have been satisfied.

The State set forth its conditions for authorization in Section 18 of the Act.  Mich. Comp. Laws § 141.1558.  Section 18(1) provides, in relevant part, as follows:

> If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9.  If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the

4

decision . . . . The governor may place contingencies on a
local government in order to proceed under chapter 9. Upon
receipt of written approval, the emergency manager is
authorized to proceed under chapter 9. This section
empowers the local government for which an emergency
manager has been appointed to become a debtor under title
11 of the United States Code, 11 USC 101 to 1532, as
required by section 109 of title 11 of the United States Code,
11 USC 109, and empowers the emergency manager to act
exclusively on the local government's behalf in any such case
under chapter 9. [Mich. Comp. Laws § 141.1558(1).]

Each of the conditions has been satisfied. On July 16, 2013, the

Emergency manager recommended to the Governor and the State

Treasurer that the City be authorized to proceed as a chapter 9 debtor.

He did so in accordance with § 18(2), which requires him to

communicate his determination that "no feasible financial plan can be

adopted that can satisfactorily rectify the financial emergency of the

local government in a timely manner." Mich. Comp. Laws

§ 141.1558(2). On July 18, the Governor issued his approval for the City

to proceed. At that time, the City became "specifically authorized" to

proceed as a chapter 9 debtor. All the requirements of § 109(c)(2) had

been satisfied.

Nothing in the Act requires the Governor to include conditions

along with his authorization; instead, § 18 expressly states that "[t]he

governor *may* place contingencies on a local government in order to proceed under chapter 9." Mich. Comp. Laws § 141.1588(1) (emphasis added). Nonetheless, many objections argue that the Governor's authorization was unconstitutional because the Governor did not condition the City's chapter 9 authorization on the protection of accrued pension benefits in the filing of the City's ultimate plan of adjustment. (See, e.g., Doc. # 505, AFSCME Obj., ¶ 79.) This objection relies on Michigan's Pension Clause, which provides that pensions are "contractual obligation[s]" that "shall not be diminished or impaired" by the government entity providing the pension. Mich. Const. art. IX, §24.

Even aside from the fact that § 18(1) does not require the Governor to impose any conditions, this argument fails for two additional reasons.

First, simply authorizing the filing under chapter 9 does not diminish or impair a single pension. By providing the governor authority to "authorize" a local government to proceed in chapter 9, the Act does not impair accrued benefits or even address (much less approve) the inclusion of accrued pension benefits in a subsequently filed plan. State law simply provides for the authorization to begin the

6

13-53846-swr    Doc 2456-5   Filed 09/06/14   Entered 09/06/14 16:26:31   Page 28 of 44
13-53846-swr    Doc 756   Filed 09/06/13   Entered 09/06/13 16:17:03   Page 28 of 44
313

chapter 9 process; once the bankruptcy is underway, the Bankruptcy Code controls the filing of a specific plan and ultimately its confirmation.  11 U.S.C. § 943(b).  The City's contractual obligations can thus be impaired, if at all, only under a confirmed plan of adjustment. *See In re City of Stockton, California,* 493 B.R. 772, 776 (Bankr. E.D. Ca. 2013) ("Without a confirmed plan, a municipality lacks constitutional authority to compel impairment of contracts.").  Indeed, this Court recognized this very point in its order reserving the pension issue until a plan is proposed.  (Doc. # 642 at 6 ("[T]he requirement of eligibility . . . does not obligate the City to prove that any particular plan that it might later propose is confirmable.").)

Certain objectors cite *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011), for the precept that other state law must be considered in determining whether substantive, as opposed to technical, authorization has been secured.  In *City of Harrisburg,* the city argued that it was specifically authorized to proceed under chapter 9 by Pennsylvania law, which authorized cities meeting key conditions to seek bankruptcy protection.  But another state law specifically precluded class 3 cities, including Harrisburg, from such relief.  *Id.* at

7

754-55.  The court in *City of Harrisburg* held that the class-3 cities

prohibition both was constitutional and applied to the municipal debtor

such that Harrisburg lacked the required "specific authorization" of

§ 109(c)(2).  That *In re Harrisburg* is inapplicable to the instant case is

plain: Pennsylvania law expressly *precluded* the City of Harrisburg

from being a chapter 9 debtor; Michigan law expressly *permits* the City

of Detroit to proceed.

Second, the objector's view (e.g., Doc. # 505, AFSCME Obj., ¶ 80;

Doc. # 519, Detroit Retirement Systems Obj., at 36–37) that the Act is

unconstitutional and that the Governor violated the Pension Clause

simply because the statute and his authorization did not expressly

require protection of unfunded pension obligations is wrong.  Because

the Michigan Legislature cannot enact laws that authorize local

governments or the Governor to violate the Michigan Constitution,

there is no need for statutes to repeat restrictions found in the

Constitution.  Under this theory, a statute complies with the

Constitution only if the statute incorporates the language of the

Constitution.  This is not the case.  Statutes and the constitution exist

in tandem.  A validly enacted statute is presumed constitutional and is

invalid only if in conflict with the language of the Constitution.  E.g.,

*Lemon v. Kurtzman*, 411 U.S. 192 (1973) (plurality) (explaining that

"the basic presumption of the constitutional validity of a duly enacted

state or federal law" is "one of the first principles of constitutional

adjudication") (quotation marks omitted)  The authorization to file for

bankruptcy protection is valid even though § 18 does not mention the

Pension Clause because the Pension Clause (assuming for the moment

that it applies in bankruptcy) exists independent of Public Act 436 and

does not need to be referenced in the Act to remain part of the law.

The remaining objections to eligibility seek either (1) to insert into

the eligibility stage issues that relate to and can only be addressed at

the confirmation stage or (2) to raise issues relating to Michigan's

emergency manager laws wholly unrelated to whether the City *itself* is

eligible to file a petition under chapter 9.  Because various objections

have raised those issues, they are addressed below.  But in the final

analysis, all that matters is that § 18 has been satisfied.  The City has

thus met the conditions necessary to proceed.

**B.** **Public Act 436 does not violate Home Rule Provisions of Article VII of Michigan's Constitution.**

**1.** **Public Act 436 does not violate the "charter" provisions of article VII, § 22.**

Certain objectors argue that Public Act 436 violates article VII, § 22 of Michigan's Constitution, which vests exclusive power in local residents to frame, adopt, and amend their charters. As a result, AFSCME concludes, the Act is unconstitutional in its entirety, voiding § 18(1)'s bankruptcy-authorization provision, and the City is thus ineligible to file for bankruptcy. This argument is without merit.

First, the article VII, § 22 power is *not* exclusive as asserted. Rather, § 22's plain terms explain that cities remain subject to constitutional limitations and state laws:

> *Under general laws* the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law.* No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section. [Emphasis added.]

10

Thus, although article VII, § 22 grants broad authority to municipalities, it subjects their authority to constitutional and statutory limitations. *Mack v. Detroit*, 467 Mich. 186,194 (2002).

The Home Rule City Act (HRCA), 1909 P.A. 279, as amended, Mich. Comp. Laws § 117.1 *et. seq.*, reiterates this constitutional limitation on a municipality's authority. Section 117.36 prohibits city charter provisions from "conflict[ing] with or contraven[ing] the provisions of any general law of the state." Mich. Comp. Laws § 117.36. Similarly, § 117.4j(3) provides that municipal laws are "subject to the constitution and general laws of the state." Mich. Comp. Laws § 117.4j(3). Section 27 of the Home Rule Village Act (HRVA) likewise prohibits village charters from conflicting with or contravening state law. Mich. Comp. Laws § 78.27. In sum, local government units have never had the "exclusive" power on which the objection is based.

That reality is unsurprising. Cities and villages are not sovereign entities, but rather creations of the State that derive their power and authority from the State. *Bivens v. Grand Rapids*, 443 Mich. 391, 397 (1993) (citing *Marxer v. City of Saginaw*, 270 Mich. 256, 259 (1935)). State courts have historically and regularly concluded that state law

controls over local enactments. *See Taunt v. General Retirement System* (*In re Wilcox*), 233 F.3d 899, 906 (6th Cir. 2000) (citing *Rental Property Owners Ass'n of Kent Co v. City of Grand Rapids*, 455 Mich. 246 (1997)).

Further, although the power to amend a charter is vested in the local electors in purely local matters, the Legislature has amendatory powers as to matters of general concern. *Brimmer v. Elk Rapids*, 365 Mich 6, 12–13 (1961); *Hart v. Wayne Co.*, 396 Mich. 259 (1976) (citing *City of Ecorse v. Peoples Community Hosp. Auth.*, 336 Mich. 490 (1953)). More recently, in *American Axle & Manufacturing, Inc. v. City of Hamtramck*, Michigan's Supreme Court held "the legislature might modify the charters of municipal corporations *at will* and that the State still retained authority to amend charters and enlarge and diminish their powers." 461 Mich 352, 377 (2000) (citing *Harsha v. City of Detroit*, 261 Mich 586 (1933)) (emphasis added).

Finally, even if other parts of Public Act 436 were unconstitutional (which they are not), that would not affect the validity of § 18 (which does not involve the power to amend a city charter) in view of Michigan's statutory severability rule. *See* MCL 8.5.

Public Act 436 is an enactment necessary to protect local governments, the State of Michigan, and its citizens as a whole. Its purpose is to assure the financial accountability of local governments and thereby preserve their ability to "provide or cause to be provided necessary services essential to the public health, safety, and welfare." 2013 P.A. 436, Title. The legislature recognized that the financial distress of local governments ultimately affects the entire State and all its citizens. Mich. Comp. Laws § 141.1543(a), (b), (c). Thus, Public Act 436 is related to matters of general concern to the State and is a valid exercise of the State's police power and authority. *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 437 (1934) (a state may exercise its police power to promote general welfare).

> **2. Public Act 436 also does not violate other provisions of the Michigan Constitution by allowing an emergency manager to assume the authority of a local government unit.**

Certain objectors also assert that Public Act 436 violates article VII, §§ 21 and 34. But like § 22, these articles recognize the State's power to limit and control the authority of its local governments.

Section 21, provides that:

> The legislature shall provide by *general laws* for the incorporation of cities and villages. *Such laws shall limit* their rate of ad valorem property taxation for municipal purposes, and restrict the powers of cities and villages to borrow money and contract debts. Each city and village is granted power to levy other taxes for public purposes, subject to limitations and prohibitions provided by this constitution or by law. [Mich. Const. art. VII, § 21 (emphasis added).]

Section 21's plain language thus makes clear that the "general laws for the incorporation of cities and villages" "shall limit" the authority of the local government to tax, borrow money, and contract debts—these matters remain subject to State authority and control. Public Act 436 recognizes and imposes these same limitations on the Emergency Manager and provides state oversight and control over these matters for the local government under a financial emergency. See Mich. Comp. Laws § 141.1528m(1) (t), (u), (v), (w), (x). The Act simply transfers authority to perform these duties and responsibilities to the Emergency Manager, an oversight properly imposed under the State's police power. In short, article VII, § 21 imposes no limitation of the State's authority to transfer that authority during a local government's financial emergency.

Article VII, § 34 also does not limit the State's power to change, transfer, or limit the authority granted to local governments. It provides:

> The provisions of this constitution and law concerning counties, townships, cities and villages shall be liberally construed in their favor. Powers granted to counties and townships by this constitution and by law shall include those fairly implied and not prohibited by this constitution. [Mich. Const. art. VII, § 34.]

This provision simply establishes the standard for interpreting the authority that is granted by constitution and state law; it does not make it absolute. Nor does it limit the State's power to change that authority provided by law. The authority to regulate matters of local concern remains limited in manner and degree by state law. *City of Taylor v. Detroit Edison*, 475 Mich 109, 118 (2006). The Michigan Legislature retains the authority to define and modify the powers, duties, and obligations of its local governments, which are derived from the State in the first instance. Mich. Const. art. VII, §§ 1–34; *Mack,* 467 Mich. at 194; Mich. Comp. Laws § 117.36.

This analysis is also consistent with that given by the federal courts in the same context. Political subdivisions of the State have never "been considered as sovereign entities." *Sailors v. Bd. of Ed. of*

*Kent County,* 387 U.S. 105, 107 (1967) (quoting *Reynolds v. Sims*, 377 U.S. 533, 575 (1964)). To the contrary, they are "traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental function." *Sailors,* 387 U.S. at 107–08 (quoting *Reynolds*, 377 U.S. at 575). Significantly, the Supreme Court recognizes that local governments may need innovations to remain viable, and that nothing in the federal Constitution prevents such experimentation. *Id.*

The application of Public Act 436 and its predecessor laws comport with the State's sovereign powers to reshape local government to address changing urban conditions and related fiscal distress. It is rationally related to a legitimate government purpose—the health, safety, and welfare of citizens through the preservation of the fiscal integrity of local governments. The Act is narrowly tailored to achieve this purpose with as little disruption to the government unit and the provision of services as possible. It prescribes specific guidelines, requirements, standards, and procedures governing official decision making in every application. It is a valid exercise of the State's police power and constitutional on its face.

### 3. PA 436 is not a local act as contemplated by article IV, § 29, of Michigan's Constitution.

Another challenge to Public Act 436's constitutionality is the asserted violation of article IV, § 29 of Michigan's Constitution. (Doc. # 505, ¶ 95.) This provision prohibits the Legislature from passing a "local act." The objection contends Public Act 436 is a local act and thus an improper delegation of authority. Like the other facial challenges, this too is without merit.

A local act is one that applies specifically and exclusively to a particular locality and is prohibited "in any case where a general act can be made applicable" and until approved by a two-thirds majority of each house and by "a majority of the electors voting thereon in the district affected." Mich. Const. art. IV, § 29; *State of Michigan v. Wayne Co. Clerk*, 466 Mich. 640, 642, 643 (2002). The test to determine the local or general nature of a statute, then, is whether it can "apply to other units of government." If yes, the statute is a general act. *Id.* at 642–43.

Public Act 436 is a general act because it applies to all local governments. Mich. Comp. Laws § 141.1541(k). While a specific emergency manager uses the authority delegated under the Act locally,

17

the statute provides that authority to all emergency managers.  This is no different from the authority generally granted by law to local elected officials but exercised locally.  This objection is without merit.

> **4.   Public Act 436 is not an unconstitutional delegation of authority to the Emergency Manager.**

The final challenge to the constitutionality of Public Act 436 is a challenge to the delegation of authority to the Emergency Manager.  The objection asserts that Public Act 436 lacks adequate standards to guide the Emergency Manager's action in bankruptcy and, therefore, is unconstitutional.

Michigan's "separation of powers" provision, Mich. Const. art. III, § 2, has "led to the constitutional discipline that is described as the nondelegation doctrine."  *Taylor v. Smithline Beecham Corp.,* 468 Mich. 1, 7 (2003).  This doctrine recognizes the "integrity and maintenance of the system of government ordained by the Constitution. . . ."  *Id.* (citing *Field v. Clark,* 143 U.S. 649, 692 (1892)).

This objection fails at the outset because the Act does not implicate this separation-of-powers doctrine—it does not delegate legislative power to the executive branch.  To the contrary, the powers

18

an emergency manager receives under the Act are executive powers—
the power to "govern[]" and to act as the "chief administrative officer of
the local government." MCL 141.1549(2). His power "to rectify the
financial emergency" and "to assure" both "the fiscal accountability of
the local government" and that necessary services are provided, *id.*, are
executive powers just like those the Michigan Constitution gives to the
Governor. *E.g.*, Mich. Const. art. V, § 8 (empowering the Governor to
"transact all necessary business with the officers of government" and to
supervise the principal departments). In short, the powers the
Emergency Manager is exercising when deciding who to hire and fire,
which contracts to enter, what property to buy and sell, and how to
administer the City's finances are executive powers. Just as the
Legislature is not exercising judicial power when it approves pay for the
judiciary, the Emergency Manager is not exercising legislative powers
when he manages the City's finances. Further, any authority the
Emergency Manager has to pass "local" ordinances is not part of the
state legislative power in the first place. Mich. Const. art. IV, § 29.

In any event, even if the delegation were a delegation of legislative
authority, it would nonetheless be proper. A delegation is valid if it is

accompanied by adequate standards for the exercise of that authority,

*Blue Cross & Blue Shield of Mich. v. Governor,* 422 Mich. 1, 55 (1985),

and here adequate standards exist to guide the Emergency Manager's

actions.

First, the Michigan Legislature has set forth well-defined

standards for the Emergency Manager to guide the authorization

determination. These include not only requiring the Governor's

independent approval, but a finding by the Emergency Manager that

"no feasible financial plan can be adopted that can satisfactorily rectify

the financial emergency . . . in a timely manner." M.C.L.

§ 141.1558(2)(a).

Second, the objection assumes that the Legislature has the

authority to determine how the City's debts will be addressed under

chapter 9 independent of the Bankruptcy Code itself. But once the

order for relief is entered, the Bankruptcy Court has sole authority to

approve or reject the settlement of individual claims included in the

bankruptcy case. *See* 11 U.S.C. § 903(1) ("[A] State law prescribing a

method of composition of indebtedness of such municipality may not

bind any creditor that does not consent to such composition."); *see also*

*In re City of Vallejo*, 403 B.R. 72, 76 (Bankr. E.D. Cal. 2009) ("'[B]y authorizing the use of chapter 9 by its municipalities, California must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest.'"). By authorizing the City to proceed in chapter 9, the State recognizes and accepts the Bankruptcy Court's authority to resolve local governments' claims that are included in the case. It is not a matter of delegation of authority but rather of recognizing the exclusive jurisdiction of the Bankruptcy Court over these matters.

Third, for those matters not included in the bankruptcy case, the Emergency Manager proceeds as before the filing. *See* 11 U.S.C. § 903 ("This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the *political or governmental* powers of such municipality, including expenditures for such exercise,") (emphasis added). He employs the same standards that apply to the local government officials because he operates in their place and stead. Mich. Comp. Laws § 141.1549(2). The objection does not assert an absence of standards by which the local government officials operated—those same adequate standards apply to all non-bankruptcy related matters.

Finally, the objection argues in the alternative that none of the Emergency Manager's actions are subject to judicial review now because of the automatic stay applicable with the chapter 9 filing. As a result, the objection asserts, challenges to the Emergency Manager's actions may be raised only in this Court. That is not correct— challengers may seek relief from the automatic-stay provision from this Court. Indeed, the Court recently granted such relief to a plaintiff asserting challenges under the State's Open Meetings Act to proceed in state court. (Doc. # 645, 8/27/2013 Order.) Because controlling law governs the Emergency Manager's actions both within and outside of the bankruptcy, sufficient legal standards exist to guide his discretion, and there is therefore no delegation problem.

## II.    The Bankruptcy Court has the authority and jurisdiction to determine the constitutionality of Michigan Public Act 436 (Objection No. 4).

Another objection (Doc. # 384, Crittendon Obj.) asserts that the bankruptcy court lacks the authority and jurisdiction to resolve whether Public Act 436 is constitutional. Based on this assertion, the objection seeks to turn the automatic stay upside down: it asks that the "bankruptcy proceedings . . . be stayed" and that "all pending litigation

22

raising legal and constitutional challenges" to the authority of state and local officials to file the bankruptcy be resolved first. (*Id.* ¶ 7.) Not only does this suggestion run counter to the process established by the Bankruptcy Code, 11 U.S.C. §§ 362, 365, & 922, it also seeks to invert this Court's prior orders staying other litigation so that the bankruptcy could proceed. (Doc. ## 166 & 167.)

Although asserting that the Act is unconstitutional, the objection does not identify what defect supposedly violates the constitution (or even which constitution, state or federal); it does not cite any constitutional provisions or even any cases addressing constitutional rights. The closest the objection comes to identifying some constitutional provision is to refer to constitutional grounds raised in "several civil matters pending in the United States District Court." (Crittendon Obj. ¶ 6.) Based on the cases that fit this description— *NAACP v. Snyder*, No. 13-12098 (E.D. Mich.), and *Phillips v. Snyder*, No. 13-11370 (E.D. Mich.)—it appears the objection relates to federal constitutional issues, not state ones. Compl., *NAACP*, ECF No. 1 ¶¶ 1, 75–91; Compl., *Phillips*, ECF No. 1, ¶¶ 1, 105–186, 198–245.

In any event, this objection asks this Court to conclude that it does not have the jurisdiction to decide the essential question currently before the Court—whether the City of Detroit is eligible for bankruptcy—because that question implicates questions of state law. But it is axiomatic that federal courts have the authority to decide questions of state law; if that were not true, diversity jurisdiction could not exist independent of a federal question. *But see* 28 U.S.C. § 1332.

This Court has jurisdiction to decide these questions relating to eligibility. It has statutory jurisdiction over this case because it is a case "arising under" and "arising in" title 11. 28 U.S.C. § 157(a) & (b); 28 U.S.C. § 1334(b). Indeed, in title 11 Congress necessarily contemplated that bankruptcy courts would determine whether a municipality seeking to file for bankruptcy satisfies the eligibility requirements set out in the Bankruptcy Code, including the precise question whether state law authorized the bankruptcy. 11 U.S.C. § 109(c)(2). If it were not Congress's intent to allow bankruptcy courts to decide this question, § 109(c)(2) would make no sense, and no municipal bankruptcy could be referred to a bankruptcy court.

24

Further, determining whether a municipality is eligible for
bankruptcy is a fundamental question for a chapter 9 bankruptcy—it is
a "core proceeding" within the plain meaning of that term, because it is
a "proceeding involving claims that substantially affect the debtor-
creditor relationship."  BLACK'S LAW DICTIONARY 363 (8th ed. 2004)
(defining "core proceeding"); *see also* 28 U.S.C. § 157(b)(2)(O) (listing as
an illustrative example of a core proceeding "other proceedings affecting
. . . the adjustment of the debtor-creditor or the equity security holder
relationship"); *Vale v. Gary Nat'l Bank,* 406 F.2d 39, 44 (7th Cir. 1969)
(finding bankruptcy court had power to declare Indiana law invalid
under Indiana's state constitution, since the "constitutional question
was necessarily involved in determining the issues presented in the
trustee's suit"); *In re Rice,* 2001 WL 34076613, *5  (Bankr. N.D. Ohio
2001) ("A federal court should refrain from holding a state statute
unconstitutional under its applicable state constitution *unless no other
remedy is available to the moving party*.") (emphasis added).  The
eligibility proceedings before the Court, proceedings which will
culminate in a multi-day trial on the eligibility objections, will
substantially affect the relationship between Detroit and its creditors—

it can safely be said that deciding whether those relationships will be resolved through bankruptcy or outside bankruptcy will "substantially affect" those relationships.

This Court also has constitutional authority to resolve the eligibility issue. In *Stern v. Marshall*, 131 S. Ct. 2594 (2011), the Supreme Court considered whether a state tort action that "in no way derived from or [was] dependent upon bankruptcy law" was within the authority of an Article I bankruptcy judge to decide. *Id.* at 2618. The Court concluded that it was not: "There [ ] was never reason to believe that the process of ruling on [creditor] Pierce's proof of claim would necessarily result in the resolution of [debtor] Vickie's counterclaim." *Id.* at 2617–18. The Court thus concluded "that Congress, in one isolated respect, exceeded" its authority by allowing bankruptcy courts to "enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620.

The eligibility question before this Court, in contrast, is dependent on bankruptcy law and must be resolved in the process of reaching and ruling on the creditors' proofs of claim and the adjustment of the debtor-

26

creditor relationship in this bankruptcy. It is an issue that, unlike the

claim at issue in *Stern*, must "*necessarily be resolved* in the claims

allowance process," *id.* at 2618 (emphasis added), because this Court

will be able to rule on proofs of claim only if it first decides that the City

was eligible to be a debtor, 11 U.S.C. § 109(c), a determination that in

turn includes verifying that the entity was "specifically authorized" to

be a debtor by state law, 11 U.S.C. § 109(c)(2). Since the legal question

the objection raises must necessarily be resolved in the process of

deciding if the City is eligible for bankruptcy and therefore whether any

claims will be allowed in the bankruptcy, this Court has the authority

and jurisdiction to answer it.

## III. Detroit's Emergency Manager had valid authority to file this bankruptcy case (Objection No. 5).

The Emergency Manager represents the City in this bankruptcy

case. Mich. Comp. Laws §§ 141.1549(2); 1558(1). The Emergency

Manager is the only party with authority to propose a plan of

adjustment—he controls the plan process. 11 U.S.C. § 941. Nothing in

the Bankruptcy Code limits authority to file chapter 9 proceedings to an

elected official. 11 U.S.C. §§ 109(c)(2) & 941. To the contrary,

§ 109(c)(2) requires only that the bankruptcy be authorized by a "governmental officer" who is "empowered by State law," without making any reference to whether that "governmental officer" is elected or not. This is consistent with the fact that many appointed officers in both state and federal agencies (such as members of the Civil Rights Commission, the Michigan Public Service Commission, and the U.S. Environmental Protection Agency) have the authority to initiate suits.

State law does not limit authority to file chapter 9 proceedings to an elected official either. In fact, state law expressly provides that "upon receipt of the written approval [from the governor], the *emergency manager* is authorized to proceed under chapter 9." Mich. Comp. Laws § 141.1558(1) (emphasis added).

## IV. The Governor's authorization to file this bankruptcy case did not impair any pension rights (Objection No. 6).

This objection raises a challenge similar to Objection No. 3 discussed above, and it fails for many of the same reasons. The Governor's approval of the Emergency Manager's recommendation that the City be authorized to proceed in chapter 9 did not approve a specific plan. It merely approved "a filing under chapter 9 of the bankruptcy

code." (Doc. # 1, Ex. A, at 4.) The fact that § 18(1) of Public Act 436, Mich. Comp. Laws § 141.1558(1), leaves the imposition of "contingencies" to the governor's discretion does not violate article IX.

The objection alleges that the Governor violated article IX, § 24 when he approved the City proceeding in chapter 9 without contingencies. Mich. Comp. Laws § 141.1558(1). Even though the imposition of contingencies is discretionary, *In re Forfeiture of Bail Bond*, 276 Mich. App. 482, 492 (2007), the objection asserts the Governor abuses that discretion by not "carving out" the City's pension benefits. The objection conflates authorization with confirmation, and further conflates the Governor's discretionary act of not including contingencies with this Court's ultimate determination as to the terms and confirmation of the yet-to-be-devised plan of adjustment.

After reviewing the documents submitted in support of the Emergency Manager's recommendation, the Governor reached four conclusions: the City cannot meet its basic obligations to its citizens; the City cannot meet its basic obligations to its creditors; the failure of the City to meet its obligations to its citizens is the primary cause of its inability to meet its obligations to is creditors; and the only feasible

path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring vial the bankruptcy process. (Doc. # 1, Ex. A, at 2.). For these reasons, the Governor found chapter 9 relief to be in the City's best interest and authorized the City to so proceed. That is all; he properly left to this Court the question of ultimate confirmation of a plan of adjustment. He neither exceeded his statutory power nor failed to exercise his discretion in a reasonable manner.

## V. The trial court's order in *Webster* did not deprive the Governor of authority to file the bankruptcy petition (Objection No. 7).

The order entered in *Webster* does not preclude the City from asserting in this proceeding that the Governor's authorization to file the bankruptcy petition was valid for a number of reasons: (1) because the automatic stay took effect before the order, (2) because the declaratory-judgment order was not yet final and enforceable (it was still within the appeal period, *see* MCR 2.614(1),(3)) because the Michigan Court of Appeals separately stayed the order, (4) because this Court's July 25 order (Doc. # 166) also confirmed and extended the stay of the *Webster* order, and (5) because the requirements for collateral estoppel are not met.

30

Section 362 of the Bankruptcy Code provides an automatic stay of all actions against the debtor and its property upon the filing of a petition under section 301. The section is made applicable in its entirety in cases under chapter 9. 11 U.S.C. §§ 901, 922. The automatic stay was applicable to this case because it impacted fundamental proceedings before the Bankruptcy Court. This bankruptcy case was filed at 4:06 p.m., July 18, 2013, and none of the state trial court's orders were issued or entered until after the filing, when the automatic stay had already automatically taken effect, by operation of the statute, as a result of the chapter 9 filing. The objection does not even attempt to address this crucial fact.

Also on July 19, 2013, Governor Snyder and Treasurer Dillon responded to the trial court's order by filing with the Michigan Court of Appeals motions for immediate consideration, for leave to appeal, and for a stay of proceedings. A few days later, on July 23, 2013, the Michigan Court of Appeals granted the motions for immediate consideration and for stay pending appeal, and ordered that the trial court's July 18, 2013 temporary restraining order, the July 19, 2013 declaratory judgment, and all further proceedings be stayed pending

resolution of the appeal.  (Ex. 1.)  Subsequently, this Court granted the City's motion to extend the automatic stay to the certain "state entities" including the Governor and Treasurer, including the *Webster* case. (Doc. # 166, July 25, 2013 Order.)  In an order dated August 1, 2013, the Michigan Court of Appeals closed the case without prejudice, noting the existence of the chapter 9 stay.  (Ex.  2.)

The case also fails to meet the requirements of Michigan law concerning collateral estoppel.  Michigan law governs because 28 U.S.C. § 1738 requires a federal court to give a state court judgment the same full faith and credit as the judgment would be given by the courts of the rendering state.  With respect to issues actually litigated in state court proceedings, a federal court must give such proceedings the same preclusive effect as they would be given by the courts of the rendering state, whether such issues are federal, general, or local.  *Marrese v. American Academy of Orthopedic Surgeons,* 470 U.S. 373, 380 (1985). *See also In re Moon,* 116 B.R. 75, 78 (Bankr. E.D. Mich. 1990).

An attempt to collaterally estop the chapter 9 proceedings must fail.  The following elements are required for the application of the doctrine of collateral estoppel under Michigan law:  "'(1) a question of

32

fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full [and fair] opportunity to litigate the issue; and (3) there must be mutuality of estoppel.'" *Monat v. State Farm Ins. Co.*, 469 Mich. 679, 684 (2004) (quoting *Storey v. Meijer, Inc.,* 431 Mich. 368, 373 n. 3 (1988).)

None of the necessary elements for collateral estoppel is satisfied here. There was no question of fact essential to the judgment actually litigated. There was no full and fair opportunity to litigate these issues. There is no final judgment, as the matter was stayed by the Michigan Court of Appeals. The parties are not the same, as the *Webster* decision applied only to the pre-petition actions of defendants Governor Snyder and Treasurer Dillon in authorizing the filing; the City of Detroit and the Emergency Manager were not parties to the action. In short, the Ingham Circuit Court order in *Webster* is simply not binding on other circuit courts, and not binding on a federal court.

## CONCLUSION AND RELIEF REQUESTED

The issue before the Court is a narrow one: was the City of Detroit specifically authorized under state law to be a chapter 9 debtor?

33

A straightforward application of the § 18(1)'s requirements shows that the answer to that question is yes. The Emergency Manager recommended the chapter 9 filing, having determined that no feasible financial plan could be adopted that could satisfactorily rectify Detroit's financial emergency in a timely manner. The Governor then approved the filing. Detroit thus received the specific authorization under state law that § 109(c)(2) requires. None of the numerous objections overcome this basic point.

For these reasons, the State urges the Court to conclude that Detroit is eligible to proceed in chapter 9 bankruptcy.

Respectfully submitted,

*/s/ Steven B. Flancher*
Steven B. Flancher (P47894)
Assistant Attorney General

Matthew Schneider (P62190)
Chief Legal Counsel

Aaron D. Lindstrom (P72916)
Assistant Solicitor General

Margaret A. Nelson (P30342)
Assistant Attorneys General
P.O. Box 30758
Lansing, MI 48909
517.373.6434

Steven G. Howell (P28982)
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226-3425

Attorneys for the State of Michigan
Michigan Dep't of Attorney General



# Court of Appeals, State of Michigan

## ORDER

Gracie Webster v State of Michigan

Docket No.  317286

LC No.  13-000734-CZ

Michael J. Kelly
Presiding Judge

Patrick M. Meter

Stephen L. Borrello
Judges

---

The Court orders that the motion for immediate consideration is GRANTED.

The motion for stay pending appeal is GRANTED. The circuit court's July 18, 2013 temporary restraining order and all further proceedings are STAYED pending resolution of this appeal or further order of this Court.

The Court orders that any answers to the pending application for leave to appeal are due by 5:00 p.m. on Friday, July 26, 2013.

Meter, J. would additionally grant leave to appeal.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 2 3 2013
Date

Chief Clerk



EXHIBIT

2

# Court of Appeals, State of Michigan

## ORDER

Gracie Webster v State of Michigan

Docket No.    317286

LC No.    13-000734-CZ

Michael J. Kelly
Presiding Judge

Patrick M. Meter

Stephen L. Borrello
Judges

Upon notification of a pending bankruptcy proceeding that deprives this Court of the authority to continue its review of this case, 11 USC 105(a), the Court orders that the case is CLOSED without prejudice. The closure does not constitute a dismissal or a decision on the merits. When the bankruptcy stay has been removed, the case may be reopened on motion.



A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 2 9 2013
_____
Date

_____
Chief Clerk

# ITEM NO. 13

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-----------------------------------------------------x
                                        :

| | | |
|---|---|---|
| In re | : | Chapter 9 |
| | : | |
| CITY OF DETROIT, MICHIGAN, | : | Case No. 13-53846 |
| | : | |
| Debtor. | : | Hon. Steven W. Rhodes |
| | : | |
| | : | |

-----------------------------------------------------x


**CITY OF DETROIT'S CONSOLIDATED REPLY TO**
**<u>OBJECTIONS TO THE ENTRY OF AN ORDER FOR RELIEF</u>**

# TABLE OF CONTENTS

I.      Preliminary Statement ...................................................................................1

II.     The Court Has Authority and Jurisdiction to Determine the
        Constitutionality of Chapter 9 and PA 436 ....................................................5

III.    Chapter 9 is Constitutional Under Longstanding Supreme Court
        Precedent ........................................................................................................9

        A.      The Supreme Court's Decision in <u>Bekins</u> Remains
                Binding Precedent .............................................................................10

        B.      Subsequent Legal Developments Have Not Undermined the
                Soundness of <u>Bekins</u> and the Constitutionality of Chapter 9 ...........13

IV.     The City Was Properly Authorized to Commence This
        Chapter 9 Case ..............................................................................................19

V.      The State's Authorization of Chapter 9 Did Not Violate the
        Pensions Clause .............................................................................................21

        A.      The Authorization of Chapter 9 Does Not "Diminish or
                Impair" Pension Benefits ...................................................................21

        B.      The Pensions Clause Simply Extends the Protection of the
                Federal and State Contracts Clauses to Cover Public
                Pensions .............................................................................................22

        C.      The Pensions Clause Does Not Require Chapter 9
                Authorization to Be Conditioned on the Non-Impairment
                of Pensions .........................................................................................28

VI.     Collateral Estoppel Does Not Preclude This Court from
        Determining the City's Eligibility for Chapter 9 ...........................................32

VII.    PA 436 is Constitutional .................................................................................38

        A.      PA 436 Does Not Conflict with Home Rule and
                Reflects the State Legislature's Power to Address Local
                Fiscal Emergencies. ...........................................................................38

        B.      PA 436 Does Not Delegate Power to Pass Local Legislation ...........41

      C.      PA 436 Does Not Violate the Non-Delegation Doctrine..................42

VIII.   The City Satisfies Section 109(c)(5) of the Bankruptcy Code
       Because It Was Impracticable to Bargain with Thousands of
       Bondholders and Over 20,000 Retirees..........................................45

IX.    The City's Good Faith Negotiations with Its Creditors Satisfy
       Section 109(c)(5) of the Bankruptcy Code ...................................53

X.     The City is Insolvent ....................................................................59

XI.    The City Desires to Effect a Plan to Adjust Its Debts..................61

XII.   The City Filed Its Petition in Good Faith.....................................62

XIII.  Notice of the Deadline for Objections to Eligibility Was
       Proper and Sufficient...................................................................69

XIV.  Conclusion...................................................................................71

## EXHIBITS

Exhibit A:   Non-Individual Objections to Eligibility, Summary of
              Arguments Set Forth Therein & City's Responses

Exhibit B:   Individual Objections to Eligibility, Summary of Arguments
              Set Forth Therein & City's Responses

Exhibit C:   Letters from various union representatives to Brian Easley

Exhibit D:   Letter from Brian Easley to James Williams, President,
              AFSCME, dated June 27, 2013

Exhibit E:   Letter from Evan Miller to Dennis McNamara, President,
              Detroit Fire Fighters Association, *et al.*, dated July 17, 2013

Exhibit F:   Letter from Steven Kreisberg, Director of Collective Bargaining
              and Health Care Policy, AFSCME, to Brian Easley, dated
              July 2, 2013

# TABLE OF AUTHORITIES

**CASES**

Agostini v. Felton,
   521 U.S. 203 (1997)......................................................................12

Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.
   (In re Nat'l Century Fin. Enters., Inc.),
   423 F.3d 567 (6th Cir. 2005) ......................................................35

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
   298 U.S. 513 (1936)......................................................................10

Ass'n of Retired Emps. v. City of Stockton
   (In re City of Stockton),
   478 B.R. 8 (Bankr. E.D. Cal. 2012)......................................17, 30, 31

Blue Cross & Blue Shield of Mich. v. Demlow,
   270 N.W.2d 845 (Mich. 1978)...........................................................43

Blue Cross & Blue Shield of Mich. v. Milliken,
   367 N.W.2d 1 (Mich. 1985).........................................................42, 43

Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,
   575 N.W.2d 751 (Mich. 1998)...........................................................40

Bd. of Trs. v. Cary,
   373 So.2d 841 (Ala. 1979)................................................................27

Bd. of Trs. v. City of Detroit,
   373 N.W.2d 173 (Mich. Ct. App. 1985)............................................39

Brimmer v. Vill. of Elk Rapids,
   112 N.W.2d 222 (Mich. 1961)...........................................................40

City of Pontiac Retired Emps. Ass'n v. Schimmel,
   No. 12-2087, 2013 WL 4038582 (6th Cir. Aug. 9, 2013)....................2

Control Module, Inc. v. Morello (In re Morello),
   No. 07-02052, 2012 WL 1945509
   (Bankr. D. Conn. May 30, 2012) ................................................. 35-36

Cnty. of Orange v. Merrill Lynch & Co., Inc.
    (In re Cnty. of Orange),
    191 B.R. 1005 (Bankr. C.D. Cal. 1996) ...................................................... 30-31

Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA,
    592 N.W.2d 408 (Mich. Ct. App. 1998) ............................................................37

Detroit City Council v. Mayor of Detroit,
    770 N.W.2d 117 (Mich. Ct. App. 2009) ............................................................39

Easley v. Pettibone Mich. Corp.,
    990 F.2d 905 (6th Cir. 1993) .............................................................................35

Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,
    459 U.S. 400 (1983) ....................................................................................13, 15

Faitoute Iron & Steel Co. v. City of Asbury Park,
    316 U.S. 502 (1942) ............................................................................ 12, 14-15

First Horizon Home Loan Corp. v. Apostle (In re Apostle),
    467 B.R. 433 (Bankr. W.D. Mich. 2012) ...........................................................8

Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question),
    527 N.W.2d 468 (Mich. 1994) .........................................................................23

Hanover Nat'l Bank v. Moyses,
    186 U.S. 181 (1902) ................................................................................... 18-19

Houston v. Governor,
    810 N.W.2d 255 (Mich. 2012) .........................................................................40

In re City of Prichard,
    No. 99-13465 (Bankr. S.D. Ala. Oct. 6, 2000) .................................................27

In re City of Stockton,
    486 B.R. 194 (Bankr. E.D. Cal. 2013) ........................................................11, 44

In re City of Stockton,
    493 B.R. 772 (Bankr. E.D. Cal. 2013) ........................................... 22, 27, 64-65

In re City of Vallejo,
    403 B.R. 72 (Bankr. E.D. Cal. 2009) ...............................................................30

In re Constitutionality of 2011 PA 38,
806 N.W.2d 683 (Mich. 2011).............................................................. 23, 25-26

In re Cottonwood Water & Sanitation Dist.,
138 B.R. 973 (Bankr. D. Colo. 1992)......................................................... 58-59

In re Cnty. of Orange,
183 B.R. 594 (Bankr. C.D. Cal. 1995) ......................................................64, 65

In re Ellicott Sch. Bldg. Auth.,
150 B.R. 261 (Bankr. D. Colo. 1992)......................................................... 56-57

In re Enrolled Senate Bill
(Advisory Opinion re Constitutionality of 1972 PA 258),
209 N.W.2d 200 (Mich. 1973) ...........................................................................23

In re Jefferson Cnty.,
474 B.R. 228 (Bankr. N.D. Ala. 2012) ...............................................................14

In re McCurtain Mun. Auth.,
No. 07-80363, 2007 WL 4287604
(Bankr. E.D. Okla. Dec. 4, 2007) ................................................................. 66-67

In re Sanitary & Improvement Dist., No. 7,
98 B.R. 970 (Bankr. D. Neb. 1989)............................................................25, 59

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
165 B.R. 60 (Bankr. D.N.H. 1994)............................................................58, 64

In re Valley Health Sys.,
383 B.R. 156 (Bankr. C.D. Cal. 2008) ..............................................................52

In re Vasko,
6 B.R. 317 (Bankr. N.D. Ohio 1980)..................................................................19

In re Vills. at Castle Rock Metro. Dist. No. 4,
145 B.R. 76 (Bankr. D. Colo. 1990)............................................................47, 64

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
(In re City of Vallejo),
408 B.R. 280 (B.A.P. 9th Cir. 2009) ...................................................... 27, 46-47

Int'l Bhd. of Elec. Workers, Local 2376 v. City of Vallejo
    (In re City of Vallejo),
    432 B.R. 262 (E.D. Cal. 2010) ....................................................30, 31

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980)..........................................................24

Licensing by Paolo, Inc. v. Sinatra (In re Gucci),
    126 F.3d 380 (2d Cir. 1997) .............................................................35

Mascio v. Pub. Emps. Ret. Sys. of Ohio,
    160 F.3d 310 (6th Cir. 1998) ............................................................15

Mich. State Highway Comm'n v. Vanderkloot,
    220 N.W.2d 416 (Mich. 1974)..........................................................43

Mission Indep. Sch. Dist. v. Texas,
    116 F.2d 175 (5th Cir. 1940) ............................................................31

Monat v. State Farm Ins. Co.,
    677 N.W.2d 843 (Mich. 2004)....................................................32, 36

Murray v. Charleston,
    96 U.S. 432 (1877)............................................................................15

Murray's Lessee v. Hoboken Land & Improvement Co.,
    59 U.S. 272 (1856).............................................................................5

Nat'l Fed'n of Indep. Bus. v. Sebelius,
    132 S. Ct. 2566 (2012)......................................................................17

New York v. United States,
    505 U.S. 144 (1992)..........................................................................16

Olson v. Cory,
    636 P.2d 532 (Cal. 1980) ............................................................ 26-27

People ex rel. Le Roy v. Hurlbut,
    24 Mich. 44 (1871) ..................................................................38, 40-41

Printz v. United States,
    521 U.S. 898 (1997)..........................................................................16

Richardson v. Schafer (In re Schafer),
    689 F.3d 601 (6th Cir. 2012) ........................................................19, 31

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
    490 U.S. 477 (1989)................................................................................12

Sloan v. City of Madison Heights,
    389 N.W.2d 418 (Mich. 1986)................................................................37

South Dakota v. Dole,
    483 U.S. 203 (1987)................................................................................17

Stern v. Marshall,
    131 S. Ct. 2594 (2011)......................................................................... 5-8

Twin City Fire Ins. Co. v. Adkins,
    400 F.3d 293 (6th Cir. 2005) .................................................................34

United States v. Bekins,
    304 U.S. 27 (1938)................................................9-13, 15-16, 24

United States Trust Co. of N.Y. v. New Jersey,
    431 U.S. 1 (1977) ............................................................................ 13-15

W.B. Worthen Co. v. Kavanaugh,
    295 U.S. 56 (1935)................................................................................15

Webster v. Michigan,
    No. 13-734-CZ (Ingham Cnty. Cir. Ct.) ...................................... 32-38

Weisberg v. Powell,
    417 F.2d 388 (7th Cir. 1969) .................................................................32

## FEDERAL CONSTITUTION AND STATUTES

U.S. Const. art. I, § 8, cl. 4................................................................18, 29

U.S. Const. art. I, § 10................................................................................9

U.S. Const. art. VI, cl. 2 ...........................................................................30

11 U.S.C. § 101(32)(C) ...................................................................... 59-60

11 U.S.C. § 109(c) ....................................................................passim

11 U.S.C. § 362 ..............................................................................34

11 U.S.C. § 903 ..............................................................................18

11 U.S.C. § 904 ..............................................................................44

11 U.S.C. § 921 ........................................5, 6, 33, 53, 62-64, 66

11 U.S.C. § 943 ..............................................................................58

11 U.S.C. § 1129 ............................................................................44

28 U.S.C. § 157 ..............................................................................33

28 U.S.C. § 1334 .......................................................................32-33

28 U.S.C. § 2403 ..............................................................................2

## STATE CONSTITUTION AND STATUTES

Mich. Const. art. IV, § 29 ........................................................ 41-42

Mich. Const. art. VII, § 21 .............................................................40

Mich. Const. art. VII, § 22 .............................................................37

Mich. Const. art. IX, § 24 ...............................................21, 23, 25

Public Act 72 of 1939 - MCL § 141.201(1) ...........................26

Public Act 279 of 1909 - MCL § 117.36 ................................39

Public Act 336 of 1947 - MCL § 423.215 ..............................56

Public Act 436 of 2012 - MCL § 141.1543 .............................40

Public Act 436 of 2012 - MCL § 141.1549 ........................41, 43

Public Act 436 of 2012 - MCL § 141.1551 ............................54

Public Act 436 of 2012 - MCL § 141.1552 ........................ 41-42

Public Act 436 of 2012 - MCL § 141.1558 ............................................. 3, 19-21, 43

Public Act 436 of 2012 - MCL § 141.1567(3) ........................................................56

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 921.04[2]
    (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013) ................................69

DETROIT CITY CHARTER § 1-102 ..............................................................39

1 RESTATEMENT (SECOND) OF JUDGMENTS § 28 (1982) ..........................................36

-ix-

13-53846-swr    Doc 7453-5    Filed 09/06/14    Entered 09/06/14 14:57:03    Page 70 of 135
13-53846-swr    Doc 2453-5    Filed 01/14/14    Entered 01/14/14 15:03:32    Page 70 of
313

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection")[1] to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I. PRELIMINARY STATEMENT

Confronting a state-declared "financial emergency" that includes approximately $18 billion in debt, over 100,000 creditors, over 100 discrete bond issuances and related loans (as well as multiple insurers of such bonds) and nearly 50 union bargaining units representing the City's employees – all of which rendered any out of court solution impracticable – the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition").  The financial condition of the City is detailed in the Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum") and the City's first-day declarations.[2]  These documents demonstrate the City's overwhelming need for debt relief.

---

[1]  Attached hereto as Exhibit A and Exhibit B, and incorporated herein by reference, are charts specifying, for Objections filed by non-individual entities and individuals, respectively, on an Objection-by-Objection basis: (a) each Objection's docket number; (b) the arguments set forth therein (identified by category where appropriate); and (c) the City's response thereto.

[2]  Capitalized terms not otherwise defined herein have the meanings given to them in the Declaration of Kevyn D. Orr in Support of City of Detroit,

13-53846-swr   Doc 2453-5   Filed 09/14/14   Entered 09/14/14 17:03:32   Page 71 of 135
313
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 91 of 135

Despite these realities, over 100 persons and entities objected to the City's eligibility for relief under chapter 9 and to the entry of an Order for Relief. Most Objectors rely on anticipated treatments of their claims as a platform to argue that the City is not authorized to be a chapter 9 debtor. However, as this Court has observed,[3] neither the determination of claim amounts nor the potential treatment of claims in a plan of adjustment are before the Court at this time.

Notwithstanding the Objectors' arguments, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. First, the City is authorized to be a chapter 9 debtor because:

- After the fulfillment of certain conditions, PA 436 – which was validly passed by the Michigan legislature[4] – "empowers the local government for which an emergency manager has been appointed to become a debtor

------

(continued…)

Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on the Petition Date.

[3] Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 642) (the "Eligibility Scheduling Order"), entered on August 26, 2013.

[4] Recently, the Sixth Circuit questioned the validity of PA 4 (the predecessor statute to PA 436) on the grounds that the Michigan legislature may have violated the Michigan Constitution when it declared PA 4 immediately effective. City of Pontiac Retired Emps. Ass'n v. Schimmel, No. 12-2087, 2013 WL 4038582, at *5-6 (6th Cir. Aug. 9, 2013). No such potential constitutional infirmity afflicts PA 436, which became effective on March 28, 2013, more than 90 days after its enactment on December 27, 2012.

-2-

13-53846-tjt   Doc 2453-5   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 92 of 135
13-53846-swr   Doc 1165-3   Filed 09/19/14   Entered 09/19/14 17:03:32   Page 72 of 313
313

under title 11 of the United States Code ... as required by section 109 of title 11 of the United States Code" (see MCL § 141.1558(1));

- Each of the requirements of PA 436 relating to the authorization of the commencement of the City's chapter 9 case – i.e., a recommendation by the Emergency Manager to the Governor and Treasurer that the City be authorized to proceed under chapter 9 and the written approval of that recommendation by the Governor – were satisfied prior to the filing of the Petition;

- Following the satisfaction of the foregoing conditions, PA 436 specifically authorizes emergency managers to commence chapter 9 cases (see MCL § 141.1558(1));

- The actual text of the Michigan Constitution does not prohibit the commencement of chapter 9 cases by municipalities or condition the steps that might be taken by any State or municipal official in connection with authorizing or effecting such a filing;

- The actual text of the Michigan Constitution does not create or require the imposition of any condition on actions the City might take in this chapter 9 case; and

- No statute passed by the Michigan legislature prohibits the commencement of chapter 9 cases by municipalities.

None of the Objections contest any of the foregoing points. Instead, the Objectors invent additional requirements, not found in the Michigan Constitution, and then allege that these additional requirements have not been met. We demonstrate below that there are no conditions to the City's becoming a debtor under chapter 9 other than those identified above. Accordingly, the City satisfied section 109(c)(2) of the Bankruptcy Code prior to the commencement of this case.

Moreover, objections contending that the City does not desire to adjust its debts, that the City may not be insolvent, that negotiations to adjust debts owed to

-3-
13-53846-swr Doc 2453-5 Filed 09/06/14 Entered 09/06/14 17:03:32 Page 73 of 135
313
13-53846-swr Doc 765 Filed 09/06/13 Entered 09/06/13 19:50:03 Page 73 of 135

more than 100,000 holders were practicable and that the City did not file the

Petition in good faith likewise fall short. The Objections:

- do not include any evidence contradicting or undermining the extensive showing of the City's insolvency included in the Eligibility Memorandum (indeed, the majority of relevant Objectors do not actually state a cognizable objection on the issue, thereby conceding that no information available to them as of the objection deadline supports their Objection);

- (A) implicitly admit that none of the Objectors represent all of the City's more than 20,000 retirees in prepetition negotiations and some Objectors that claim to represent retirees do not represent any of the active employees who have vested pension benefits, (B) ignore certain Objectors' prepetition *refusal* to represent retirees in negotiations concerning pension and retiree healthcare benefits and (C) ignore the impracticability of negotiations with the City's bondholders altogether, all of which are facts that demonstrate that it was impracticable for the City to negotiate an out of court settlement of its debts and other legacy liabilities;

- mischaracterize and omit inconvenient facts relevant to the City's demonstrated efforts to negotiate in good faith a restructuring of its debts with its creditors; and

- misapply the standards governing whether the Petition was filed in good faith to side-step the demonstrated reality that the City intends to file a chapter 9 plan to adjust the City's unsustainable $18 billion debt burden.

Accordingly, as set forth in the Statement of Qualifications, the Eligibility

Memorandum and herein, the City is eligible to be a debtor under chapter 9, and

the Court should promptly enter an Order for Relief.

## II.   THE COURT HAS AUTHORITY AND JURISDICTION TO DETERMINE THE CONSTITUTIONALITY OF CHAPTER 9 AND PA 436

There is no doubt that this Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. Eligibility is a question of federal law, governed by section 109(c) of the Bankruptcy Code, relevant only for purposes of accessing the federal bankruptcy scheme and the determination of which is specifically committed to the bankruptcy court by section 921(c) of the Bankruptcy Code. As the United States Supreme Court (the "Supreme Court") made clear in Stern v. Marshall, 131 S. Ct. 2594 (2011), non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights," which are matters "susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper." Stern, 131 S. Ct. at 2612 (quoting Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. 272, 284 (1856)). Included within this category are cases that "can be pursued only by grace of the other branches" of the federal government (id. at 2614) because "[i]n those cases 'it depends upon the will of congress whether a remedy in the courts shall be allowed at all,' so Congress could limit the extent to which a judicial forum was available." Id. at 2612 (quoting Murray's Lessee, 59 U.S. at 284).

The eligibility proceeding fits squarely within this category of "public rights" cases recognized by the Supreme Court. The City's ability to adjust its debts in a federal bankruptcy case is, of course, only possible because Congress enacted the Bankruptcy Code. Because a chapter 9 case "can be pursued only by grace" of Congress (Stern, 131 S. Ct. at 2614), Congress can control access to chapter 9 by tasking a non-Article III judge with determining a municipality's eligibility, as it has done. 11 U.S.C. §§ 109(c), 921(c). Stern, therefore, poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9.

Indeed, no Objector has challenged the Court's ability to make a final determination regarding the City's eligibility for chapter 9. However, by selective quotation to Stern, some Objectors argue that this Court is powerless to rule on certain *objections* to the City's eligibility for chapter 9 that involve federal or state constitutional questions. See AFSCME Objection, at ¶ 70 (substituting Stern's actual reference to "common law counterclaims such as Vickie's" with "constitutional questions such as this one; misleadingly quoting Stern's actual language "on a common law cause of action" as "on a [constitutional] cause of action").[5] Such a radical expansion of Stern is unsupported by that case or any subsequent authority.

_____

[5]    See Stern, 131 S. Ct. at 2615 ("The 'experts' in the federal system at resolving *common law counterclaims such as Vickie's* are the Article III

Stern involved a statutorily core, state common law counterclaim asserted by the debtor against a creditor.  Stern, 131 S. Ct. at 2620.  The Supreme Court contrasted this "state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy" with claims "that were themselves federal claims under bankruptcy law, which would be completely resolved in the bankruptcy process of allowing or disallowing claims."  Id. at 2611.  While the former required the bankruptcy court to impermissibly exercise the judicial power of the United States, the latter "stem[med] from the bankruptcy itself" and could, as a result, be resolved by the bankruptcy court.  Id. at 2618; see also id. ("Vickie's claim, in contrast, is in no way derived from or dependent upon bankruptcy law; it is a state tort action that exists without regard to any bankruptcy proceeding.").[6]

_____

(continued…)

courts, and it is with those courts that her claim must stay…. What is plain here is that this case involves the most prototypical exercise of judicial power: the entry of a final, binding judgment by a court with broad substantive jurisdiction, on a *common law* cause of action….") (emphasis added).  See also Crittendon Objection at ¶¶ 9-10.

[6] The Supreme Court was careful to clarify that its holding should be interpreted narrowly.  Stern, 131 S. Ct. at 2620 ("We do not think the removal of counterclaims such as Vickie's from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute; we agree with the United States that the question presented here is a 'narrow' one."); id. (noting that Congress had exceeded constitutional limitations "in one isolated respect").

-7-
313
13-53846-swr    Doc 2453-5    Filed 09/06/14    Entered 09/06/14 17:03:32    Page 77 of 135
13-53846-swr    Doc 4651    Filed 09/06/14    Entered 09/06/14 19:50:03    Page 97 of 125

Stern poses no obstacle for the Court in this case because there are no state or federal constitutional *claims* before the Court on which it could even purport to enter a final judgment. What is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself."[7] Id. at 2618. That this determination requires the Court to consider federal and state constitutional questions does not implicate Stern. Even if the Court were to conclude that chapter 9 or PA 436 is unconstitutional, it has not been called upon – indeed, it would not be permitted – to issue any relief based on those arguments beyond declaring that the City is ineligible for chapter 9 and dismissing the Petition.

For the foregoing reasons, Stern is simply not implicated by the Objectors' constitutional arguments against eligibility. See First Horizon Home Loan Corp. v. Apostle (In re Apostle), 467 B.R. 433, 436 (Bankr. W.D. Mich. 2012) ("[T]he Stern decision is extremely narrow; except for the types of counterclaims addressed in Stern v. Marshall, a bankruptcy judge remains empowered to enter final orders in all core proceedings.").

---

[7]     Even if federal or state constitutional *claims* were before the Court, Stern would still pose no obstacle to this Court's ability to resolve the City's eligibility for chapter 9 in the first instance because the constitutionality of PA 436 is a pure legal issue, which will be reviewed *de novo* on appeal. Thus, none of the concerns regarding deferential review of bankruptcy court judgments animating Stern would be present (see Stern, 131 S. Ct. at 2611), and any error would be harmless after appellate review.

III.    **CHAPTER 9 IS CONSTITUTIONAL UNDER LONGSTANDING SUPREME COURT PRECEDENT**

The constitutionality of chapter 9 has been settled for more than 70 years.  In United States v. Bekins, 304 U.S. 27 (1938), the Supreme Court upheld against constitutional challenge the municipal bankruptcy provisions of the Bankruptcy Act of 1937, the predecessor of the current chapter 9.  Although the relevant statutory provisions have remained substantially unchanged since then, the Objectors argue nevertheless that intervening developments in the Supreme Court's jurisprudence on both the Contracts Clause of the United States Constitution (the "Contracts Clause")[8] and federalism have "*effectively* overruled" Bekins and that chapter 9 is no longer constitutional.[9]  The Objectors' argument is wrong for two reasons.  First, because the Supreme Court does not overrule binding precedents by mere implication, Bekins remains good law.  Second, nothing in the Supreme Court's developing jurisprudence on either the Contracts Clause or federalism casts even the slightest doubt on the fundamental soundness of Bekins and the constitutionality of chapter 9.

_____

[8]      U.S. Const., art. I, § 10 ("No State shall … pass any … Law impairing the Obligation of Contracts").

[9]      See AFSCME Objection, at ¶¶ 44-46 (emphasis added).

A.     The Supreme Court's Decision in
       *Bekins* Remains Binding Precedent

AFSCME contends that chapter 9 is unconstitutional in light of federalism

principles because it "allows Congress to set rules controlling State fiscal

self-management – an area of exclusive state sovereignty."[10]  This argument is

nothing short of an attempt to relitigate an issue that the Supreme Court resolved

over seven decades ago.

In Bekins, the Supreme Court specifically addressed "whether the exercise

of the federal bankruptcy power in dealing with a composition of the debts of [a

municipality], upon its voluntary application and with the State's consent, must be

deemed to be an unconstitutional interference with the essential independence of

the State as preserved by the Constitution."  Bekins, 304 U.S. at 49.  Two years

earlier, in Ashton v. Cameron County Water Improvement District Number One,

298 U.S. 513 (1936), the Supreme Court had held that municipal bankruptcy was

unconstitutional because it "might materially restrict [the subdivision's] control

over its fiscal affairs," such that it would "no longer [be] free to manage [its] own

affairs."  Ashton, 298 U.S. at 530-31.  Responding to the Supreme Court's

concerns, Congress enacted a slightly revised version of the municipal bankruptcy

---

[10]     AFSCME Objection, ¶¶ at 40.

statute.  <u>Bekins</u>, 304 U.S. at 50; <u>In re City of Stockton</u>, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013).

This revised statute was challenged and upheld in <u>Bekins</u>.  The Supreme Court concluded that the revised statute was "carefully drawn so as not to impinge upon the sovereignty of the State."  <u>Bekins</u>, 304 U.S. at 51.  Specifically, the Court explained that the "State retains control of its fiscal affairs" and that the "bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the [political subdivision] in carrying out a plan of composition approved by the bankruptcy court is authorized by state law." <u>Id.</u>

Central to the Court's reasoning was its observation that "the essence of sovereignty" is the ability to "give consents bearing upon the exertion of governmental power."  <u>Id.</u> at 51-52.  Because the adjustment of debts "was not available under state law by reason of the [Contracts Clause]," the Court held that the "bankruptcy power [was] competent to give relief," and "if there [was] any obstacle to its exercise … it [was] in the right of the State to oppose federal interference."  <u>Id.</u> at 54.

The Objectors do not point to any subsequent change in the text of chapter 9 that would warrant a different outcome than Bekins.[11]  None of the cases cited by the Objectors addresses the constitutionality of chapter 9 or casts doubt on Bekins.[12]  Nevertheless, the Objectors invite this Court to treat Bekins as having been implicitly overruled.  To do so, however, would violate the fundamental and well-established precept that "[i]f a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [courts] should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."  Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989); see also Agostini v. Felton, 521 U.S. 203, 237 (1997) (same).  Because Bekins directly controls the Objectors' constitutional challenge to chapter 9, the Court must follow it and hold that chapter 9 is constitutional.

---

[11]    See AFSCME Objection, at ¶¶ 44-46.

[12]    Indeed, only one of the cases cited by the Objectors – Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942) – so much as mentions Bekins.

B.    Subsequent Legal Developments
      Have Not Undermined the Soundness of
      *Bekins* and the Constitutionality of Chapter 9

Although Bekins is dispositive of the Objectors' constitutional claim, it is

also evident that legal developments since Bekins do not undermine the Bekins

decision, the soundness of its reasoning or the constitutionality of chapter 9.

First, contrary to the Objectors' contention,[13] States are not generally free to

adjust municipal debts by unilateral state action.  If the Objectors were correct, the

Contracts Clause would be a dead letter, but the Supreme Court has made clear that

"[w]hen a State itself enters into a contract, it cannot simply walk away from its

financial obligations."  Energy Reserves Grp., Inc. v. Kansas Power & Light Co.,

459 U.S. 400, 412 n.14 (1983).  When a State seeks to impair its own contracts,

"complete deference to a legislative assessment of [the] reasonableness and

necessity [of the impairment] is not appropriate because the State's self-interest is

at stake."  United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 26 (1977).

For that reason, "a state is not completely free to consider impairing the obligations

of its own contracts on a par with other policy alternatives."  Id. at 30-31.

In chapter 9, by contrast, there is no risk of state self-interest because the

impairment can be carried out only by an impartial federal judge.  Indeed, as one

bankruptcy court put it:  "A financially prostrate municipal government has one

_____

[13]      See AFSCME Objection, at ¶¶ 44-45.

viable option to resolve debts in a non-consensual manner. It is in a bankruptcy case. Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible." In re Jefferson Cnty., 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), aff'd, No. CV-12-J-2203-5, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

It comes as no surprise, therefore, that Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942), the case so prominently relied upon by the Objectors, is the *only* case "in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case." In re Jefferson Cnty., 474 B.R. at 279 n.21; see also United States Trust Co., 431 U.S. at 27. In Asbury Park, the Court rejected a Depression-era Contracts Clause challenge to a state-law-approved plan of adjustment pursuant to which certain defaulted bonds could only be converted into new bonds with the same principal amount but bearing a lower interest rate. Asbury Park, 316 U.S. at 504-07. Clarifying that "[w]e do not go beyond the case before us" and that "[d]ifferent considerations may come into play in different situations" (Asbury Park, 316 U.S. at 516), the Court was careful not to extend its holding beyond the facts of the case.

Therefore, far from being an authoritative pronouncement of the States' sweeping authority to adjust municipal debts, Asbury Park is an outlier and stands

only for the unremarkable point that States may adjust municipal debts in very limited ways under extraordinary circumstances without violating the Contracts Clause. "In almost every case," however, "the Court has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing United States Trust Co., 431 U.S. at 25-28; W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56 (1935); Murray v. Charleston, 96 U.S. 432 (1877)); see also, e.g., Mascio v. Public Emps. Ret. Sys. of Ohio, 160 F.3d 310, 313-15 (6th Cir. 1998) (barring the enforcement of a State law impairing vested pension benefits).

States must seek the aid of federal bankruptcy courts under chapter 9 precisely because they are *not* at liberty under the Contracts Clause to impair their own contracts. See Bekins, 304 U.S. at 54. For this reason, the Objectors' next contention – that a State unconstitutionally relinquishes its sovereignty to the Federal Government by authorizing chapter 9[14] – is also fundamentally flawed. As the Bekins Court explained: when a State authorizes chapter 9, it "acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of

---

[14]     See AFSCME Objection, at ¶¶ 46-57.

state sovereignty, has reduced both sovereigns to helplessness in such a case."
Bekins, 304 U.S. at 54. The irony of the Objectors' argument is that it would actually impede, rather than protect, the States' sovereignty.

The Objectors also rely on the Supreme Court's anti-commandeering cases – New York v. United States, 505 U.S. 144 (1992), and Printz v. United States, 521 U.S. 898 (1997) – which involved involuntary federal regulatory regimes that "commandeered" State legislative processes or officials. In New York, the challenged statute required States either to take title to low-level radioactive waste or to enact legislation regulating the waste pursuant to Congress's direction. New York, 505 U.S. at 174-75. In Printz, the challenged statute required State law enforcement officers to participate in the administration of a federal regulatory scheme. Printz, 521 U.S. at 903-04. The Supreme Court invalidated both statutes because "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." Id. at 933 (quoting New York, 505 U.S. at 188).

Chapter 9, by contrast, does not *compel* the States to enact, administer or otherwise participate in the federal bankruptcy scheme. Most fundamentally, chapter 9 is "administered" by the federal bankruptcy court, not by States. Moreover, States cannot be "forced" to participate in chapter 9 because their participation is completely voluntary. By extending the benefits of bankruptcy to

consenting States, chapter 9 operates much like federal programs that extend the benefits of federal money to States that voluntarily submit to federal requirements. E.g., South Dakota v. Dole, 483 U.S. 203, 205-06 (1987) (conditioning federal transportation funds on the States' adoption of a national minimum drinking age). Such programs are not constitutionally problematic where the "State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." Nat'l Fed'n of Indep. Bus. v. Sebelius, 132 S. Ct. 2566, 2602-03 (2012) (plurality opinion).

Because States have a "legitimate choice" whether to allow their municipalities to invoke chapter 9, chapter 9 is not an unconstitutional infringement of State sovereignty. Nor is there any danger of misplaced political accountability.[15] Where, as here, the State has a "legitimate choice" whether to participate in the federal scheme, "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." Nat'l Fed'n of Indep. Bus., 132 S. Ct. at 2603 (plurality opinion).

Indeed, even after a State authorizes its municipalities to proceed under chapter 9, the bankruptcy court's powers are designed "to preserve the niceties of the state-federal relationship." Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). For that reason, the

---

[15]     See AFSCME Objection, at ¶¶ 47-57.

Objectors are wrong to suggest that State consent to chapter 9 is a futile effort to cure "an otherwise unconstitutional infringement of state sovereignty."[16] Even if there is some non-delegable core of sovereign state functions that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions. 11 U.S.C. § 903 (prohibiting the bankruptcy court from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality").

Finally, the Objectors also argue that chapter 9 violates the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution.[17] "[B]y ceding to each state the ability to define its own qualifications for a municipality to declare bankruptcy," argue the Objectors, "Chapter 9 permits the promulgation of non-uniform bankruptcies within states." Id. The very case that the Objectors cite, Hanover National Bank v. Moyses, 186 U.S. 181 (1902), proves otherwise. In Hanover National Bank, the Supreme Court approved federal bankruptcy provisions that relied on state law for determining exempt property. Id. at 188-90. The Supreme Court held that such a system was, "in the constitutional sense, uniform throughout the United States," even though "it may result in certain

---

[16]    AFSCME Objection, at ¶¶ 60-62.

[17]    AFSCME Objection, at ¶ 58.

particulars differently in different States." Id. at 190. Insofar as the Objectors

contend that chapter 9 is unconstitutional because PA 436 is non-uniform within

Michigan, that argument is erroneous because the uniformity requirement is "only

controlling as to the congressional exercise of power," not as to the underlying

state law. In re Vasko, 6 B.R. 317, 320 (Bankr. N.D. Ohio 1980). In any event,

the process set forth in PA 436 is plainly uniform because it applies to all local

governments. E.g., MCL § 141.1558. Notwithstanding the Objectors' speculation

that PA 436 might have "wildly divergent effects on different cities" (AFSCME

Objection, at ¶ 58), "it is not the outcome that determines the uniformity, but the

uniform process" by which a defined class of debtors is treated. Richardson v.

Schafer (In re Schafer), 689 F.3d 601, 611 (6th Cir. 2012).

## IV.  THE CITY WAS PROPERLY AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE

On July 16, 2013, consistent with MCL § 141.1558, the Emergency

Manager provided the Governor and Treasurer with his written recommendation

that the City be authorized to file for chapter 9 relief.[18]  The recommendation was

predicated upon, among other things, the Emergency Manager's:

---

[18]     Orr Declaration, at Exhibit J (copy of Emergency Manager's written
         recommendation); MCL § 141.1558(1) ("If, in the judgment of the
         emergency manager, no reasonable alternative to rectifying the financial
         emergency of the local government which is in receivership exists, then the
         emergency manager may recommend to the governor and the state treasurer
         that the local government be authorized to proceed under chapter 9.").

(A) determination that the City could not adopt a feasible financial plan that can satisfactorily rectify its financial emergency in a timely manner; and (B) judgment that no reasonable alternative to chapter 9 would allow him to rectify the City's financial emergency in a timely manner.[19]

On July 18, 2013, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case.[20] Finally, also on July 18, 2013, consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case.[21] Accordingly, under applicable State law and pursuant to the specific approval of the Governor in accordance with MCL § 141.1558(1), the City has

---

[19] MCL § 141.1558(2)(a) (requiring that an emergency manager's recommendation include, among other things, "[a] determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.").

[20] Orr Declaration, at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation); MCL § 141.1558(1) ("the governor shall inform the state treasurer and the emergency manager in writing of the decision [to approve]….").

[21] Orr Declaration, at Exhibit L (copy of Emergency Manager's order directing commencement); MCL § 141.1558(1) (providing that, "[u]pon receipt of the written approval [of the Governor], the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.").

-20-
313
13-53846-swr   Doc 2453-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 90 of 135
13-53846-swr   Doc 765   Filed 09/06/14   Entered 09/06/14 15:50:03   Page 90 of 135

been specifically authorized to be a debtor under chapter 9 of the Bankruptcy
Code.

## V. THE STATE'S AUTHORIZATION OF CHAPTER 9 DID NOT VIOLATE THE PENSIONS CLAUSE

Several of the Objectors claim, in one form or another,[22] that the State's
authorization of the City's chapter 9 filing violated Article IX, Section 24 of the
Michigan Constitution (the "Pensions Clause").[23]  They are mistaken.  As
explained below, the Pensions Clause itself makes no mention of bankruptcy or
chapter 9 authorization.  Nor does the State's authorization of a chapter 9 filing, or
even the City's becoming a chapter 9 debtor, "diminish[ ] or impair[ ]" any pension.
These are simply steps that begin the bankruptcy process, where pensions *may* be
impaired by order of a federal bankruptcy court at some later date.

### A. The Authorization of Chapter 9 Does Not "Diminish or Impair" Pension Benefits

In authorizing the City to file for chapter 9, the State did not violate the
Pensions Clause because it did not "diminish[ ] or impair[ ]" any pension.
The authorization was merely one of several conditions to the City's becoming a

---

[22]  See, e.g., AFSCME Objection, at ¶¶ 76-81; Retiree Associations Objection,
at ¶¶ 35-50; UAW Objection, at ¶¶ 27-40; Detroit Retirement Systems
Objection, at pp. 30-43.

[23]  Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension
plan and retirement system of the state and its political subdivisions shall be
a contractual obligation thereof which shall not be diminished or impaired
thereby.").

chapter 9 debtor. After the Governor authorized the City to file this case, and even after the City filed the Petition, the City's pension obligations have remained unimpaired. The Objectors frame their argument as if nothing stands between authorization and the confirmation of a plan that may reduce pension benefits. The only way pensions could be impaired without the consent of the pertinent beneficiaries, however, is by an order of this Court at some future date. As another court has recently indicated, the "main event" of pension impairment is not properly addressed until well after the eligibility stage – at the time of plan confirmation. In re City of Stockton, 493 B.R. 772, 797 (Bankr. E.D. Cal. 2013).

For the same reason, there is no merit to the Objectors' argument that the enactment of PA 436 violated the Pensions Clause (and, thus, that PA 436 is unconstitutional as a threshold matter)[24]. The enactment of the underlying statute empowering the Governor to authorize (and the Emergency Manager to file) a chapter 9 case is even further removed from any possible impairment of pensions than the Governor's authorization itself.

B.    The Pensions Clause Simply Extends the Protection of the Federal and State Contracts Clauses to Cover Public Pensions

The unmistakable function of the Pensions Clause is to extend the protection of the federal and state contracts clauses to cover public pensions by treating them

---

[24]    See, e.g., Detroit Retirement Systems Objection, at p. 43.

as contractual obligations.[25]  The text of the Pensions Clause states that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions *shall be a contractual obligation thereof* which shall not be diminished or impaired thereby."  Mich. Const. art. IX, § 24 (emphasis added).  As the Michigan Supreme Court has recognized, "*[t]he obvious intent* of § 24 … was to ensure that public pensions *be treated as contractual obligations* that, once earned, could not be diminished."  In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011) (emphasis added).

It is important to note that prior to the adoption of the Pensions Clause in 1963, "[i]t had long been the general rule that pensions granted by public authorities were not contractual obligations but gratuitous allowances which could be revoked at will by the authority because the pensioner was not deemed to have had any vested right in their continuation."  In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973).  Against this backdrop, public employees in Michigan sought "[t]o gain protection of their pension rights," and thus "effectively lobbied for a constitutional

---

[25]  The contracts clause contained in the Michigan Constitution (the "State Contracts Clause") is indistinguishable from the federal version, and the Michigan courts have accordingly interpreted the two as having the same effect.  See Fun 'N Sun RV, Inc. v. Michigan (In re Certified Question), 527 N.W.2d 468, 473-74 (Mich. 1994) (noting "virtually identical" language of state and federal contracts clauses, and relying on federal case law to apply state clause).

amendment *granting contractual status* to retirement benefits." Kosa v. State

Treasurer, 292 N.W.2d 452, 454-55 (Mich. 1980) (emphasis added). The result

was the Pensions Clause, which elevated public pensions to the same level of

constitutional protection that applied to "obligations of contract" under the

Contracts Clause.

While the Contracts Clause prohibits States from impairing contracts, it does

not pose any obstacle to chapter 9. As the Supreme Court has recognized, a State's

authorization of municipal bankruptcy does not itself constitute an impairment of

contracts but merely "invites the intervention of the bankruptcy power to save its

agency which the State itself is powerless to rescue. " Bekins, 304 U.S. at 54.

Consequently, Bekins makes clear that the Contracts Clause is perfectly consistent

with chapter 9 proceedings from start to finish. This is true for two reasons. First,

a State does not impair contracts merely by authorizing a municipality to file for

bankruptcy, because no contracts are impaired at the time of authorization. Second,

any impairment of contracts that occurs in chapter 9 does not implicate the

Contracts Clause, because the Contracts Clause only prohibits impairment *by the*

*State*, while chapter 9 only allows impairment by the federal bankruptcy court. As

one court has observed, "the Bankruptcy Code … permits *the federal courts*

*through confirmation of a Chapter 9 plan* to impair contract rights … and such

impairment is not a violation by the state or the municipality of [the Contracts

Clause] which prohibits a state from impairing such contract rights." In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 973 (Bankr. D. Neb. 1989) (emphasis added). Indeed, if chapter 9 truly involved an impairment of contractual obligations by the State, then the Contracts Clause would prevent the impairment of any contract in municipal bankruptcy (or at least require a stringent Contracts Clause analysis for every contractual impairment).

Like the Contracts Clause, the Pensions Clause applies only to impairments that are imposed "[ ]by" the State and its political subdivisions. Mich. Const. art. IX, § 24. Thus, as with the Contracts Clause, chapter 9 is not limited by the Pensions Clause because the impairment of pensions and other contractual obligations in chapter 9 can only occur by order of a federal bankruptcy court.

The framework of chapter 9, including the role of States in authorizing municipal bankruptcy, was well established when the Pensions Clause was ratified in 1963. Nevertheless, the Pensions Clause does not include any restriction on the authorization or filing of municipal bankruptcy cases. Given the absence of any language regarding bankruptcy in the Pensions Clause, and the well-established principle that constitutional protection for "contractual obligations" is not a bar to chapter 9, there is no basis for concluding that the Pensions Clause was intended to give pensioners a right to block municipal bankruptcy. Cf. In re Constitutionality of 2011 PA 38, 806 N.W.2d at 697, n.24 ("Given that neither the actual language

-25-
313
13-53846-tjt   Doc 2453-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 95 of
13-53846-swr   Doc 4453-3   Filed 09/15/14   Entered 09/15/14 15:50:03   Page 96 of 135

of § 24 nor the Address to the People mentions [a right to tax-free pension benefits], the ratifiers would have had absolutely no reason to suppose that, by adopting § 24, they would be creating" such a right).

Indeed, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898.  See Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982) ("Any … instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] … may proceed under the terms and conditions of such acts to secure a composition of its debts….  The governing authority of any such … instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress ….").  It seems extremely unlikely that, by enacting the Pensions Clause, the framers of the Michigan Constitution intended to overrule Public Act 72 of 1939, which remained on the books for another 20 years, without so much as mentioning the Act's existence.

No court has ever held that a State's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor.  For example, in California, the state Constitution prohibits the diminishment or impairment of pension benefits unless some "new comparable or offsetting benefit

appear[s] in the modified plan." Olson v. Cory, 636 P.2d 532, 541 (Cal. 1980).

Nonetheless, California courts have found municipalities eligible to be chapter 9

debtors in several recent cases where pensions might be vulnerable to impairment

in the bankruptcy process. E.g., Stockton, 493 B.R. 772; Int'l Ass'n of Firefighters,

Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280 (B.A.P.

9th Cir. 2009). Similar constitutional protection for pensions applies in Alabama

(see Bd. of Trs. v. Cary, 373 So.2d 841 (Ala. 1979)), where chapter 9 has not only

been authorized but, consistent with constitutional protections for contracts, has

also been used to reduce pensions (see In re City of Prichard, No. 99-13465 (Bankr.

S.D. Ala. Oct. 6, 2000) (Docket No. 123), at pp. 6-7 (order confirming plan of

adjustment reducing all existing and future pension benefits payments by 8.5%)).

As in these cases, the Pensions Clause does not prohibit the State from authorizing

the City to be a debtor under chapter 9.

    Indeed, if the mere prospect of impairing pensions in bankruptcy were

enough to violate the Pensions Clause, then the same prospect of impairing

contracts in bankruptcy would be enough to violate the State Contracts Clause (and,

for that matter, the federal Contracts Clause). If that were true, no Michigan

municipality (or any municipality in any other State throughout the nation) could

ever enter chapter 9, where the impairment of contracts is always on the table.

-27-
313
13-53846-tjt    Doc 2453-5    Filed 09/06/14    Entered 09/06/14 17:03:32    Page 97 of 135
13-53846-swr    Doc 4553    Filed 09/06/14    Entered 09/06/14 19:50:03    Page 97 of 135

That absurd result proves that the authorization of a chapter 9 case does not equate to an impermissible impairment under the Pensions Clause.

C.   The Pensions Clause Does Not
     Require Chapter 9 Authorization to
     Be Conditioned on the Non-Impairment of Pensions

The Objectors fare no better in their argument that the Pensions Clause allows the State to authorize chapter 9 only on the condition that pensions not be impaired.[26]  Once again, the Objectors cite no authority in support of this novel argument, which has no basis in text or precedent.

To begin,  the only relevant question at the eligibility stage is whether the State has specifically authorized the City "to be a debtor under … chapter [9]." 11 U.S.C. § 109(c)(2).  If the State has granted authorization, it is entirely irrelevant for eligibility purposes whether the State has also purported to impose some further conditions.

Perhaps conceding this point, the Objectors appear to argue that the State has not validly authorized the City to become a chapter 9 debtor because the State violated the Pensions Clause by failing to make the non-impairment of pensions a condition of authorization.[27]  This argument, too, is incorrect.  As we have already seen, the Pensions Clause nowhere mentions bankruptcy in general or chapter 9

---

[26]   See AFSCME Objection, at ¶ 82; UAW Objection, at ¶ 30; Detroit Retirement Systems Objection, at pp. 43-44.

[27]   See AFSCME Objection, at ¶ 82-84; UAW Objection, at ¶ 30.

authorization in particular.  It also does not say anything about conditions that must be imposed on the authorization of chapter 9.  As discussed above, the Pensions Clause simply has the same effect as the Contracts Clause, which has never been interpreted by any Court to require any conditions on the authorization of chapter 9.

Apparently dissatisfied with the actual wording of the Michigan Constitution, the Objectors base their argument on a constitutional provision of their own imagining.  Instead of adhering to the plain terms of the Pensions Clause that require the State to *refrain* from impairing pensions, the Objectors contend that the Pensions Clause should be read to require State officials to take *affirmative steps* to prevent even the possibility of the federal bankruptcy court from impairing pensions in chapter 9.  This is not an interpretation of the Pensions Clause but a complete rewriting of it.

Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's *use* of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.  The Bankruptcy Clause of the United States Constitution empowers Congress to "establish … uniform Laws on the subject of Bankruptcies throughout the United States."  U.S. Const. art. I, § 8, cl. 4.  Pursuant to that authority, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy, including

various powers that a municipal debtor may invoke to adjust its debts.  Under the

Supremacy Clause of the United States Constitution,[28] this comprehensive federal

scheme displaces any contrary state-law provisions that purport to alter or impair a

debtor's powers under the Bankruptcy Code.  "The federal bankruptcy power … by

operation of the Supremacy Clause, trumps the … state constitution." Stockton,

478 B.R. at 16.  Thus, while the State may act as a gatekeeper in determining

whether to authorize a chapter 9 filing, State law cannot alter or override the

federal scheme for determining the tools of debt adjustment that a municipal debtor

may use once it is in bankruptcy.

In light of the comprehensive scheme that Congress has enacted,

"[i]ncorporating state substantive law into chapter 9 to amend, modify or negate

substantive provisions of chapter 9 would violate Congress' ability to enact

uniform bankruptcy laws." In re City of Vallejo, 403 B.R. 72, 76-77 (Bankr. E.D.

Cal. 2009), aff'd sub nom. Int'l Bhd. Of Elec. Workers, Local 2376 v. City of

Vallejo (In re City of Vallejo), 432 B.R. 262 (E.D. Cal. 2010); see also Cnty. of

Orange v. Merrill Lynch & Co. (In re Cnty. of Orange), 191 B.R. 1005, 1020

(Bankr. C.D. Cal. 1996) (deviating from federal scheme would "violate the

constitutional mandate for uniform bankruptcy laws" by determining creditor

---

[28]     U.S. Const. art. VI, cl. 2 ("[T]he Laws of the United States … shall be the
         supreme Law of the Land … any Thing in the Constitution or Laws of any
         State to the Contrary notwithstanding.").

priorities based on factors that vary from state to state).[29]  Thus, a State "must

accept chapter 9 in its totality; it cannot cherry pick what it likes while

disregarding the rest."  Cnty. of Orange, 191 B.R. at 1021; see also Stockton,

478 B.R. at 16 (holding that "[a] state cannot … condition or [ ] qualify, i.e. to

'cherry pick,' the application of the Bankruptcy Code provisions that apply in

chapter 9 cases after such a case has been filed"); Vallejo, 432 B.R. at 267-68

(same); Mission Indep. Sch. Dist. v. Texas, 116 F.2d 175, 178 (5th Cir. 1940)

(same).

For these reasons, the Pensions Clause by its plain terms did not require the

Governor to impose any of the conditions sought by the Objectors, and in any

event, such conditions would be prohibited by federal law.[30]

---

[29]     In establishing uniform bankruptcy laws, it is for Congress to determine how
and whether State law will be incorporated.  See In re Schafer, 689 F.3d
at 611 (noting that Congress "may" incorporate state law in bankruptcy).  In
chapter 9, Congress has chosen to allow state law to govern the question of
whether a municipality is authorized to become a debtor but not to govern
the powers that debtors may invoke to adjust their debts.

[30]     The City raises these arguments not to seek the Court's determination today
whether pension benefits can or should be modified in this case but merely
to respond to the Objectors' argument that the Governor's authorization of
this case must necessarily have placed a condition on the filing.  It need not
have.  It could not have.

In this vein, the Court – consistent with its findings at Section VI of the
Eligibility Scheduling Order – should reject the request that any Order for
Relief require that all actions taken by the Emergency Manager, including
the eventual proposal of a plan of adjustment, "comply with the State

## VI. COLLATERAL ESTOPPEL DOES NOT PRECLUDE THIS COURT FROM DETERMINING THE CITY'S ELIGIBILITY FOR CHAPTER 9

Pointing to the declaratory judgment entered in <u>Webster v. Michigan</u>,

No. 13-734-CZ (Ingham Cnty. Cir. Ct.), certain of the Objectors contend that the

City is barred by collateral estoppel from litigating whether the City's authorization

to file for chapter 9 bankruptcy was valid under the Michigan Constitution.[31]  The

Objectors' collateral estoppel argument fails for numerous reasons.

Collateral estoppel applies only to issues that have been "actually litigated

and determined by a valid and final judgment."  <u>Monat v. State Farm Ins. Co.</u>,

677 N.W.2d 843, 845 (Mich. 2004).  But the judgment in <u>Webster</u> was not "valid"

because the state court lacked jurisdiction at the time the judgment was entered.

Under 28 U.S.C. § 1334(a), federal district courts have "exclusive" jurisdiction

over "all cases under title 11."  An essential component of that exclusive

_____

(continued…)

> Constitution."  <u>See</u> AFSCME Objection, at ¶¶ 82-84.  Such amorphous and
> premature requests, including requests that the Court decide questions
> related to section 943 of the Bankruptcy Code months in advance of the
> filing of a plan of adjustment, are wholly unrelated to eligibility and
> unwarranted at this stage.

[31]  <u>See</u> Retirement Systems Objection, at pp. 44-58.   The Objectors' resort to
collateral estoppel is necessary, of course, because a state trial court's
interpretation of state law is not binding on this Court.  <u>See</u> <u>Weisberg v.
Powell</u>, 417 F.2d 388, 393 (7th Cir. 1969) ("We are not necessarily bound
by the decision of a state trial court on a point of state law where the highest
court of the state has not spoken on it.").

jurisdiction is to determine whether a municipality was "specifically authorized …
to be a debtor under [chapter 9] by State law." 11 U.S.C. § 109(c)(2); see also
11 U.S.C. § 921(c) (instructing the court, as part of the bankruptcy case, to
determine whether "the petition … meet[s] the requirements of this title");
Transcript of Hearing, dated July 24, 2013, at pp. 71-72 ("The Court concludes that
the issue of eligibility and each of the elements relating to eligibility are within this
Court's exclusive jurisdiction under 28 U.S.C., Section 1334(a). Under that statute,
United States District Courts have original and exclusive jurisdiction of all cases
under Title 11, that original and exclusive jurisdiction referred to the Bankruptcy
Courts of each jurisdiction under 28 U.S.C., Section 157. Our District Court has
referred all matters relating to bankruptcy jurisdiction to the Bankruptcy Court
under Local Rule 83.30. This is not a proceeding within 28 U.S.C., Section 1334,
over which Bankruptcy Courts would have concurrent jurisdiction with the state
courts.").

In Webster, after the City had already filed the Petition, the state court
purported to determine that the City was not validly authorized to be a debtor
under State law. See Order of Declaratory Judgment, at 2, Webster,
No. 13-734-CZ (July 19, 2013) (declaring that the State could not "authoriz[e] an
emergency manager … to proceed under Chapter 9 in a manner which threatens to
diminish or impair accrued pension benefits"). By passing judgment on the

validity of the City's authorization to proceed under chapter 9, the <u>Webster</u> court purported to adjudicate an issue that fell squarely within this Court's exclusive jurisdiction. Because the <u>Webster</u> court lacked jurisdiction, the judgment is void. <u>See</u> <u>Twin City Fire Ins. Co. v. Adkins</u>, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.").

Even if the <u>Webster</u> court had been able to exercise jurisdiction over eligibility questions (which it was not), the declaratory judgment in <u>Webster</u> would still be invalid because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code as of the time of the filing of the Petition. The Objectors argue that the automatic stay did not apply to suits against the <u>Webster</u> defendants – the State of Michigan, the Governor, and the Treasurer – until the stay was extended to those defendants on July 25, 2013.[32]

As the City made clear in its motion to extend the automatic stay, certain prepetition lawsuits – including <u>Webster</u> – violated the automatic stay imposed as of the Petition Date to the extent that such suits sought "directly or indirectly to

---

[32] <u>See</u> Order Extending the Chapter 9 Stay (Docket No. 166); Retirement Systems Objection, at p. 51.

enforce the plaintiffs' claims against the City or to exercise control over the City's property rights, including its powers and rights under chapter 9." Motion of Debtor for Entry of Order Extending the Chapter 9 Stay (Docket No. 56) at p. 15 n.4; see Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Fin. Enters., Inc.), 423 F.3d 567, 578 (6th Cir. 2005) (holding that "[a]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision") (quoting Licensing by Paolo, Inc. v. Sinatra (In re Gucci), 126 F.3d 380, 392 (2d Cir. 1997)). By entering judgment – a day after the Petition Date – declaring that the City's bankruptcy filing was not properly authorized under the Michigan Constitution, the Webster court sought to exercise control over the City's legal and property rights in violation of the automatic stay. Such a judgment is likely void *ab initio* (see Easley v. Pettibone Mich. Corp., 990 F.2d 905, 911 (6th Cir. 1993) (holding that "actions taken in violation of the [automatic] stay are invalid and voidable and shall be voided absent limited equitable circumstances")) and, thus, would be invalid for purposes of collateral estoppel. See Control Module, Inc. v. Morello (In re Morello), No. 07-02052, 2012 WL 1945509, at *18 (Bankr. D. Conn. May 30, 2012) (holding, where a state court entered a postpetition "supplemental judgment" against a debtor, that "because the Supplemental Judgment was issued after the filing of the Debtor's bankruptcy, the judgment of

the [state] court is void and neither side may claim that the [state] court's finding[s] are entitled to collateral estoppel….").

Collateral estoppel further fails because the City did not have "a full and fair opportunity to litigate the issue." Monat, 677 N.W.2d at 845 (quotation marks and alteration omitted). "A new determination of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts…." Id. at 845 n.2 (quoting 1 RESTATEMENT (SECOND) OF JUDGMENTS § 28, at 273 (1982)). The state court in Webster took the unusual step of issuing a final declaratory judgment on an expedited basis after the Petition had already been filed and without the benefit of full briefing on the merits. At the time of the declaratory judgment, the Webster case was little more than two weeks old, and the defendants' briefs had focused mainly on justiciability issues and the preliminary injunction standard rather than the merits of the plaintiffs' arguments. Indeed, the Webster court's failure to provide a well-reasoned explanation for its decision attests to the gross inadequacy of the process afforded to the defendants. Thus, even if (somehow) collateral estoppel otherwise could apply, the abbreviated nature of the proceedings in the state court would warrant a fresh determination of the issue by this Court.

Finally, even if (A) the Michigan state court's postpetition exercise of jurisdiction over Webster had been proper (which it was not), (B) the automatic

stay did not apply to the <u>Webster</u> litigation (which it did) and (C) the City had a full and fair opportunity to litigate (which it did not), collateral estoppel *still* would not apply because the City was not a party to the <u>Webster</u> lawsuit and was not otherwise in privity with the <u>Webster</u> defendants. Collateral estoppel "precludes relitigation of an issue in a different, subsequent action between the same parties or their privies…." <u>Dearborn Heights Sch. Dist. No. 7 v. Wayne Cnty. MEA/NEA</u>, 592 N.W.2d 408, 411 (Mich. Ct. App. 1998). "In its broadest sense, privity has been defined as mutual or successive relationships to the same right of property, or such an identification of interest of one person with another as to represent the same legal right." <u>Sloan v. City of Madison Heights</u>, 389 N.W.2d 418, 422 (Mich. 1986) (internal quotation marks omitted).

The Objectors contend that, although the City was not a party to the <u>Webster</u> litigation, the City was in sufficient privity with the <u>Webster</u> defendants to trigger collateral estoppel,[33] but the Objectors cannot have it both ways. They cannot maintain that there is an *insufficient* identity of interest between the <u>Webster</u> defendants and the City for purposes of the automatic stay but a *sufficient* identity of interest between the two for purposes of collateral estoppel. If there was

---

[33]    The two plaintiffs in <u>Webster</u> are potentially in privity only with the General Retirement System of the City of Detroit, in which they were participants, not with any other Objector. <u>See</u> Complaint, at ¶¶ 2-3, <u>Webster</u>, No. 13-734-CZ (July 3, 2013).

sufficient privity between the City and the <u>Webster</u> defendants for collateral estoppel to apply, then, by necessity, that privity would have triggered the protections of the automatic stay.

## VII.  PA 436 IS CONSTITUTIONAL

The Objectors also claim that PA 436 violates the Michigan Constitution because:  (A) the enactment of PA 436 violated the Pensions Clause by authorizing a chapter 9 filing without prohibiting the impairment of pension obligations therein; (B) PA 436 violates Michigan's home rule doctrine; and (C) PA 436 unconstitutionally delegates power to the Emergency Manager.  PA 436's consistency with the Pensions Clause is addressed at Section V.A *supra*.  The remaining objections to PA 436's constitutionality generally have nothing to do with eligibility, and, where they might, are baseless.

### A.    PA 436 Does Not Conflict with Home Rule and Reflects the State Legislature's Power To Address Local Fiscal Emergencies

The home rule provisions of Michigan law give municipalities and their residents rights of self governance by empowering residents to elect their own officials (<u>e.g.</u>, <u>People ex rel. Le Roy v. Hurlbut</u>, 24 Mich. 44, 46-47 (1871)), and by according "the electors of each city" with "the power and authority to frame, adopt and amend [the municipality's] charter."  Mich. Const. art. VII, § 22. The Objectors contend that PA 436 violates home rule provisions by placing the

Emergency Manager in the shoes of local officials and allowing the Emergency

Manager to take actions that are arguably inconsistent with the city's charter.[34]

The Objectors are mistaken.  As an initial matter, most of the Objectors'

challenges – such as their concerns about the Emergency Manager's ability to set

budgets and pass ordinances – have nothing to do with the Emergency Manager's

authority to file for chapter 9 and thus need not be addressed here.  Moreover, there

is, in fact, no conflict because Detroit's charter recognizes that its provisions are

"subject … to the limitations … imposed by statute."  DETROIT CITY

CHARTER § 1-102; see Detroit City Council v. Mayor of Detroit, 770 N.W.2d 117,

124 (Mich. Ct. App. 2009) (recognizing that by its own terms Detroit's Charter

gives way to statutes).

Even if there were a conflict between PA 436 and Detroit's Charter

regarding the Emergency Manager's authority to commence this chapter 9 case,

PA 436 would prevail.  "Where a city charter provision conflicts with general

statutory law, the statute controls in all matters which are not of purely local

character."  Bd. of Trs. v. City of Detroit, 373 N.W.2d 173, 175 (Mich. Ct.

App. 1985); see also Public Act 279 of 1909, the Home Rule City Act,

MCL § 117.36 ("No provision of any city charter shall conflict with or contravene

the provisions of any general law of the state.").  General laws are those capable of

---

[34]     See AFSCME Objection, at ¶¶ 85-94.

covering new localities over time.  See, e.g., Houston v. Governor,

810 N.W.2d 255, 257 (Mich. 2012).

PA 436, including its authorization to file for chapter 9, is most certainly a

general state law.  As the Michigan legislature's findings with respect to the impact

of local financial emergencies on the rest of the State make clear

(MCL § 141.1543), how financially distressed local governments overcome their

situation is decidedly not a matter of "purely local" character or concern.

See, e.g., Brimmer v. Village of Elk Rapids, 112 N.W.2d 222, 226 (Mich. 1961)

(statutes involving municipal utility rates, municipal debt limitations and municipal

tax rates are general rather than purely local).  Indeed, the Michigan Constitution

itself instructs the State legislature to pass "general laws … restrict[ing] the powers

of cities and villages to borrow money and contract debts."  Mich. Const. art. VII,

§ 21.

Nor does temporarily substituting the Emergency Manager for Detroit's

elected officials violate home rule by eliminating Detroit's residents' right to

choose their officials.  "[A] municipal corporation['s] … existence is entirely

dependent on the legislation that created it, and the Legislature that may also

destroy it."  Bd. of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,

575 N.W.2d 751, 760 (Mich. 1998).  Accordingly, the Michigan Supreme Court

has long recognized that the legislature must have authority to temporarily replace

local officials when exercising its undisputed power to "supervis[e] and control in matters of municipal regulation." Hurlbut, 24 Mich. at 111 (opinion of Cooley, J.). That is all PA 436 does:  it authorizes the Governor to appoint an emergency manager in a fiscal crisis (MCL § 141.1549(1)), but the emergency manager's term ends once the crisis ends or, if he has been in office more than 18 months, if an elected local government votes him out (MCL §§ 141.1549(6)(b), (c)).

B.    PA 436 Does Not Delegate Power to Pass Local Legislation

Article IV, Section 29 of the Michigan Constitution provides that "[t]he legislature shall pass no local or special act in any case where a general act can be made applicable" and that "[n]o local or special act shall take effect until approved by two-thirds of the members elected to and serving in each house and by a majority of the electors voting thereon in the district affected."  Because PA 436 grants the Emergency Manager authority to adopt local ordinances (MCL § 141.1552(1)(dd)), the Objectors contend it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the State legislature could pass.[35]

Once again, this objection has nothing to do with the City's eligibility for bankruptcy:  filing a chapter 9 case is not passing legislation, the only conduct covered by Article IV, Section 29.  In any event, Article IV, Section 29 restricts

---

[35]    AFSCME Objection, at ¶¶ 95-97.

only the State *legislature*; municipalities are free to enact "local" laws as they see fit. When the Emergency Manager acts, he exercises the *local government's* powers, not the State legislature's, so the legislature did not (and could not) violate Article IV, Section 29 when it enacted PA 436. <u>See</u>, <u>e.g.</u>, MCL § 141.1552(1)(dd); <u>see</u> <u>also</u> MCL § 141.1552(2) (allowing local leaders to repeal the Emergency Manager's ordinances after his term ends).

C.    <u>PA 436 Does Not Violate the Non-Delegation Doctrine</u>

Under Michigan's non-delegation doctrine, the legislature may not task executive officials with formulating "legislative policy" unless the legislature provides "sufficient standards and safeguards" to "check[ ] the exercise of delegated power." <u>Blue Cross & Blue Shield of Mich. v. Milliken</u>, 367 N.W.2d 1, 27 (Mich. 1985). The Objectors argue that PA 436 runs afoul of this rule by giving the Emergency Manager authority to act for the City in chapter 9 without providing guidance as to what he should do.[36]

The Objectors are again mistaken. First, as explained above, the Emergency Manager exercises the local government's authority, not powers of the State legislature's. The Emergency Manager acts for the City, not the State. Thus the anti-delegation principles that govern when the State legislature delegates the State legislature's powers do not apply here.

---

[36]    <u>See</u> AFSCME Objection, at ¶¶ 98-99.

Second, when deciding whether the legislature has provided "reasonably precise" standards (Blue Cross, 367 N.W.2d at 27) in delegating its powers, Michigan courts have emphasized that the statute "must be read as a whole" and "carries a presumption of constitutionality." Id. As a result, the "reasonably precise" test is easy to satisfy (see, e.g., Blue Cross & Blue Shield of Mich. v. Demlow, 270 N.W.2d 845, 854 (Mich. 1978) (approving delegation using a "fair and reasonable" standard)); Mich. State Highway Comm'n v. Vanderkloot, 220 N.W.2d 416, 419 (Mich. 1974) (approving use of eminent domain upon an executive finding of "necessity")).

PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection. It clearly tells the Emergency Manager to look at various possibilities for fixing the City's financial problems and instructs him to recommend bankruptcy only if "no reasonable alternative to rectifying the financial emergency … exists." MCL § 141.1558(1). PA 436 also instructs the Emergency Manager to ameliorate those problems while "assur[ing] the fiscal accountability of the local government and the local government's capacity to provide … necessary governmental services essential to the public health, safety, and welfare." MCL § 141.1549(2).

The Objectors also contend that PA 436 unconstitutionally delegates authority by not providing for judicial review of the Emergency Manager's actions

in bankruptcy.[37]  The Objectors, however, ignore the fact that, in many circumstances, this Court will review actions of the Emergency Manager.[38]  The Objectors argue that the Emergency Manager can escape judicial review because, under 11 U.S.C. § 904, municipalities need not seek court approval of settlements. Yet, if the City does not seek this Court's approval of a particular settlement, that settlement does not escape scrutiny forever:  "the day of reckoning comes at the plan confirmation hearing," where any "untoward settlements" would shed considerable light on whether a cram-down plan "discriminate[s] unfairly," is "fair and equitable," and has been "proposed in good faith."  <u>Stockton</u>, 486 B.R. at 199-200 (quoting 11 U.S.C. § 1129(a)(2), (b)(1)).

In sum, PA 436 neither violates Michigan's home rule doctrine nor unconstitutionally delegates authority to the Emergency Manager.  To the extent, if any, that such claims have anything to do with eligibility, the Objectors' arguments in support of these claims lack merit, and this Court should determine that PA 436 is constitutional.

---

[37]   <u>See</u> AFSCME Objection, at ¶100.

[38]   Whether or not <u>Stern</u> prohibits this Court from considering "freestanding state-law claims," it does not impact this Court's role in implementing provisions of the Bankruptcy Code that may involve determination of state law issues.  <u>See</u> Section II *supra*.

-44-

13-53846-swr   Doc 2473-5   Filed 09/06/13   Entered 09/06/13 19:59:53   Page 44 of 195
313

# VIII. THE CITY SATISFIES SECTION 109(c)(5) OF THE BANKRUPTCY CODE BECAUSE IT WAS IMPRACTICABLE TO BARGAIN WITH THOUSANDS OF BONDHOLDERS AND OVER 20,000 RETIREES

In the Eligibility Memorandum, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor negotiations. See Eligibility Memorandum, at pp. 40-53. None of the Objectors succeeds in undermining any of the foregoing.

As a threshold matter, certain facts that, by themselves, establish impracticability under section 109(c)(5)(C) of the Bankruptcy Code are ignored by the Objectors. Thousands of separate entities hold the City's billions of dollars in bond debt. For the reasons set forth in the Eligibility Memorandum (i.e., the inability to restructure key terms of the City's bond debt absent unanimous bondholder consent and the lack of any representatives with authority to bind all

such bondholders) (Eligibility Memorandum, at pp. 46-47), negotiations with the City's bondholders were impracticable. No Objection disputes this. Moreover, no holder of bonds has objected to the City's eligibility on the ground that negotiations with bondholders were practicable. These realities demonstrate that the requirements of section 109(c)(5)(C) of the Bankruptcy Code have been met.

Many of the Objectors explicitly or implicitly assert that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied if negotiations with *any* creditor constituency (specifically, the City's retirees) were potentially practicable. This cannot possibly be the law. It would be an absurdity to interpret the phrase "is unable to negotiate with creditors" to mean "[can negotiate with some creditors but] is unable to negotiate with [other] creditors" as there will always be *some* creditor with which a municipality could negotiate.[39] Thus, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with any significant creditor constituency is impracticable. See Vallejo, 408 B.R. at 298 (holding that the impracticability of debtor's negotiations with its unions satisfied section 109(c)(5)(C) of the Bankruptcy Code because "labor costs comprised the

---

[39] For example, if such an interpretation were credited, a municipality would be required to delay filing its chapter 9 petition while it engaged those creditors with whom it could negotiate despite the facts that (a) negotiations with other creditors were impracticable and (b) the municipality ultimately would have to file and effectively restart the negotiation process.

largest slice of Vallejo's budget [and] it would have been futile to negotiate with other creditors without an agreement with the Unions"); In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one third of the debtor's total bond debt would have been futile).

In any event, the Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, the RDPFFA and the DRCEA characterize themselves as "the natural representative capable of bargaining on [the retirees'] behalf" and argue that the City's alleged failure to engage the RDPFFA/DRCEA in negotiations forecloses the City's ability to argue that negotiations with its retiree constituency were impracticable. See Retiree Association Objection, at ¶¶ 64-74. The premise that the RDPFFA and the DRCEA are the natural representatives of retirees is not self evidently correct. First, the RDPFFA and the DRCEA are but two of at least five associations purporting to represent City retirees.[40] Neither the RDPFFA nor the DRCEA have any greater claim to being the natural representative of the retirees than any other

---

[40] The Detroit Firemen's Fund Association, the Detroit Police Benefit and Protective Association and the recently-formed Retired Detroit Police Members Association also purport to represent the interests of at least some percentage of the City's retirees.

informal retiree association (and the Retiree Association Objection offers no such reason). Second, neither the RDPFFA nor the DRCEA are "the" anything. They are two separate organizations, and there is no reason to believe that the RDPFFA and the DRCEA will agree on every – or any – relevant issue. Third, the RDPFFA and the DRCEA are not the only entities claiming to be natural bargaining representatives for the City's retirees. The City's unions now claim to be appropriate bargaining representatives for their retirees as well.[41] These competing claims to bargaining authority undermine the RDPFFA/DRCEA's assertion that they are "the natural bargaining representatives" for retirees. Fourth, the Retiree Association Objection concedes that the RDPFFA and the DRCEA lacked – and still lack – the authority to bind the City's retirees. See Retiree Association Objection, at *14 (noting that the RDPFFA and the DRCEA are just now in the process of obtaining proxy forms from their retiree members and have collected only 5,000 such proxies to date (there are over 20,000 retirees and active employees that have vested pension benefits)). RDPFFA/DRCEA's assertion that

---

[41]   See AFSCME Objection, at ¶ 123 (stating that "creditors such as AFSCME and similar union representatives … could have negotiated regarding the largest portion of the City's unsecured debt"); Objection (Docket No. 506) filed by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (the "UAW"), at ¶ 9 (stating that the "UAW is representing the interests of active and retired employees in this case."). As set forth below, these claims are directly at odds with these Objectors' prepetition refusal to negotiate on behalf of retirees.

they are the "natural representative[s] capable of bargaining on [the retirees']

behalf" cannot be reconciled with their recognition of a lack of legal authority to

bind retirees absent express authorization.  Fifth, even if the RDPFFA and the

DRCEA had been able to bind their retiree members (which they could not), the

associations themselves only purport to represent "approximately 70% of all City

retirees."  Retiree Association Objection, at ¶ 9.  Accordingly, there was no

possibility that negotiations with the RDPFFA and the DRCEA – or, for much the

same reasons, any other party – could have bound the more than 20,000 City

retirees to a proposed restructuring, thus rendering the City's good faith attempt at

such negotiations impracticable.[42]  Finally, even if there were a "natural bargaining

representative" of all retirees, that would still not make negotiations concerning

pension benefits practicable; approximately 8,225 active employees have vested

pension benefits too.  Neither the RDPFFA nor the DRCEA even purports to

represent the interests of these people and it is not clear that active employees

would rely on such representation even if the RDPFFA and DRCEA both declared

that they were "natural representatives of active employees having vested

benefits."

---

[42]      Moreover, the RDPFFA and the DRCEA attended multiple meetings at
         which the City set forth its restructuring proposals and solicited
         counter-proposals and other feedback.  Neither the RDPFFA nor the
         DRCEA responded to any proposals made by the City.

The AFSCME Objection's similar argument that negotiations with "creditors such as AFSCME and similar union representatives that could have negotiated regarding the largest portion of the City's unsecured debt" (AFSCME Objection, at ¶ 123) would have been practicable rewrites the history of those negotiations. In fact, the City *did* reach out to AFSCME and the City's other Unions regarding their willingness to represent the interests of their respective retirees in negotiations over the City's restructuring proposal.

As set forth in the Eligibility Memorandum, *the majority of the Unions either expressly indicated unwillingness or legal inability to represent retirees or neither agreed nor refused to represent retirees*. Only eight Unions (comprising 10 of the City's 47 bargaining units) agreed to represent retirees in connection with the City's restructuring. See Eligibility Memorandum, at p. 51. Notably, both AFSCME and the UAW – each of which filed Objections challenging the impracticability of negotiations with retirees – *expressly declined* to represent retirees.[43] It is difficult to see how it would be practicable for the City to conduct

---

[43] Letter from Edward L. MacNeil, Special Assistant to the President of AFSCME to Brian Easley of Jones Day, dated May 24, 2013 (advising that AFSCME "has no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive." ); Letter from Laurie Townsend Stuart, President of UAW Local 2200, to Brain Easley of Jones Day, dated May 23, 2013 (stating that the UAW would represent the interests only of "current employees" of the local Union); Letter from Robyn Brooks, President of UAW Local 2211, to Brian Easley of Jones Day, dated

negotiations with AFSCME and other Unions that refused to negotiate with the City on retirees' behalf.

Both the AFSCME and the UAW argue that, because the City allegedly made no effort to negotiate with creditors in good faith, the City should not be able to claim that such negotiations were impracticable.[44]  Thus, AFSCME and the UAW essentially argue that, if the City cannot satisfy section 109(c)(5)(B) of the Bankruptcy Code (which requires good faith negotiations with creditor constituencies), then the City cannot satisfy the disjunctive requirement for eligibility set forth in section 109(c)(5)(C) of the Bankruptcy Code either.  Neither the UAW nor AFSCME offer any precedent or citation for this reading of the Bankruptcy Code and the plain meaning of the statute (which connects the clauses of section 109(c)(5) with the word "or") contradicts such a reading.  Indeed, the courts that have considered section 109(c)(5) of the Bankruptcy Code have

---

(continued…)

> May 22, 2013 (stating that "[t]his Union does not… represent current retirees and has no authority to negotiate on their behalf"); Letter from John Cunningham, International Representative, UAW Region 1, to Brian Easley of Jones Day, dated May 22, 2013 (stating that UAW Local 412 and UAW Local 212 "do not … represent current retirees and have no authority to negotiate on their behalf"), attached hereto, collectively, as Exhibit C.

[44]  AFSCME Objection, at ¶¶ 121-123; UAW Objection, at ¶ 46, n.19 and Public Safety Unions Objection (Docket No. 512), at p. 17 ("It should also be axiomatic that an entity should not be able to claim that it is impracticable to negotiate if, as here, there is no sincere intent to negotiate….").

-51-

313

13-53846-swr   Doc 2473-5  Filed 09/06/13  Entered 09/06/13 19:59:53  Page 121 of 195

determined that it is sufficient for a chapter 9 debtor to demonstrate the existence of one of the four alternatives included in that section.  In re Valley Health Sys., 383 B.R. 156, 162, 163 (Bankr. C.D. Cal. 2008) (noting that "§ 109(c)(5) is written in the disjunctive" and, as such, must be construed "as setting out separate and distinct alternatives;" holding that "[t]here is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case.").

Finally, the argument that the City "manufactured" impracticability through the imposition of artificial time constraints is just false.[45]  If anything, the fact that the City could not delay filing its Petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments.  See Valley Health Sys., 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets.").  That the City's cash was rapidly dwindling and public health and

---

[45]    See Public Safety Unions Objection, at pp. 16-17 ("The difficulty in the negotiation process is the result of an artificial time constraint…. The Court should not find that negotiations were impracticable, because the City created the impediment to continued negotiations based on the artificial time constraint created by the filing.").

safety would have been threatened by any further delay in the filing of the Petition (Eligibility Memorandum, at pp. 52-53), (A) mandated a shorter time frame for determining if good faith negotiations with creditors could generate an agreement capable of implementation outside chapter 9 and (B) is a separate ground showing satisfaction of section 109(c)(5) of the Bankruptcy Code. They are not reasons for reading that section *out* of the Bankruptcy Code.

For all of the foregoing reasons (and those set forth in the Eligibility Memorandum), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

## IX. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5) OF THE BANKRUPTCY CODE

Numerous objections assert that the City failed to negotiate in good faith with its creditors within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.[46] The Objections generally sound a common theme: that the City's restructuring proposals were presented to creditor constituencies at non-interactive

---

[46] E.g., AFSCME Objection, at ¶¶ 101-114; UAW Objection, at ¶¶ 44-46; Joinder of Local 324, International Union of Operating Engineers as Interested Party to Objections to Detroit's Eligibility for Relief Under Sections 109(c) and 921(c) of the Bankruptcy Code (Docket No. 484) (stating, without reference to or inclusion of supporting affidavits, that "the City consistently and continuously refused to engage in any bargaining with representatives of Local 324, and presented its proposals only on a 'take it or leave it' basis.").

meetings on a "take it or leave it" basis that precluded any prospect of actual

"negotiation."[47]  The Objections' characterization of the discussions initiated by the

City and the multiple meetings that the City conducted with its creditors is false

and misleading.  The City did *not* present its restructuring proposal as an

immutable, "take it or leave it" proposition with respect to which the City had no

intention of honestly engaging its creditors.  Rather, the evidence demonstrates that

the City (A) actively sought continuing dialogue with, *and counter-proposals from*,

its counterparties but (B) received no concrete proposal or comprehensive

feedback from any Objector prior to the commencement of this case.[48]

---

[47]  See id.

[48]  Also false and misleading is the attempt by certain Objectors to characterize
statements made by the Emergency Manager in connection with the issuance
of his "Financial and Operating Plan," dated May 12, 2013, as having been
made within the context of negotiations with creditors over the restructuring
of their claims.  See, e.g., AFSCME Objection, at p.2 (quoting the
Emergency Manager as having stated, on May 12, 2013, that "The public
can comment [on the City's proposed financial restructuring plan], but it is
under the statute, it is my plan and it's within my discretion and obligation to
do it.  This isn't a plebiscite, we are not, like, negotiating the terms of the
plan.  It's what I'm obligated to do.") (bracketed text in original; emphasis
removed from original).  As the Objectors know, the "proposed financial
restructuring plan" addressed by the foregoing quote is not the June 14
Creditor Proposal (i.e., the starting point for creditor negotiations), but a
discrete "Financial and Operating Plan" issued *a month earlier* (which plan
did *not* address the specific treatment of creditors' claims against the City).
As the Objectors also know, the "statute" referenced in the foregoing quote
is not section 109(c)(5)(B) of the Bankruptcy Code, but section 11 of
PA 436.  See MCL § 141.1551(2) (requiring an emergency manager to
submit a financial and operating plan 45 days after appointment).  Put

As set forth at pages 55-59 of the Eligibility Memorandum, in addition to the June 14 Creditor Meeting (at which the City initially presented its restructuring proposal to all creditors in attendance and answered every question asked), the City held numerous additional meetings with creditors in the weeks prior to the Petition Date. At these meetings (including the City's meetings with its unions and four retiree associations), the City repeatedly stated that it welcomed its creditors' feedback with respect to its proposed restructuring and invited counter-proposals from all parties. E.g., Letter from Brian Easley to James Williams, President, AFSCME, dated June 27, 2013) (the "June 27 Easley Letter") (noting the City's appreciation of questions and input received from AFSCME at the June 20 Union/Retiree Meeting; offering access to City data room; requesting feedback and additional ideas with respect to the City's restructuring proposal), attached hereto as Exhibit D.[49] The City urged that any feedback and/or counter-proposals be

_____

(continued…)

simply, the foregoing quote is *completely unrelated* to the City's negotiations with creditors over the treatment of their claims. The Objectors' flagrant misuse of the Emergency Manager's words out of context speaks volumes about the sincerity of their protests that the City refused to negotiate in good faith.

[49] The complaint that the City refrained from characterizing its discussions with its unions as "negotiations" is a red herring. The City has generally avoided characterizing its meetings and discussions with its unions as formal "bargaining negotiations" to avoid any argument that it has triggered obligations to collectively bargain under Michigan law that are currently

consistent with the City's financial condition but otherwise placed no restrictions on the form or substance of any counter-proposal.  See, e.g., id. (requesting "additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations"; offering access to the Data Room and assistance acquiring any additional information); Letter from Evan Miller to Dennis McNamara, President Detroit Fire Fighters Association, *et al.*, dated July 17, 2013 ("We are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze."), attached hereto as Exhibit E.

Accordingly, comparisons between the City's good faith negotiation efforts and the facts of In re Ellicott School Building Authority, 150 B.R. 261 (Bankr. D. Colo. 1992), are inapposite.  The Ellicott court held that, in addition to its failure to satisfy sections 109(c)(1), 109(c)(2), 109(c)(3) and 109(c)(5)(C) of the Bankruptcy Code, the putative debtor failed to satisfy section 109(c)(5)(B) of the Bankruptcy

---

(continued…)

suspended by PA 436.  See MCL § 141.1567(3) ("A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first.").  The City's reticence to jeopardize its legal rights under PA 436, however, does not alter the fundamental character of the meetings conducted by the City (as described herein), nor the fact that its requests for feedback and counter-proposals were unanswered.

Code where (A) its efforts at prepetition negotiation were limited to three public meetings and (B) the debtor conceded that it had presented its proposed plan of restructuring as non-negotiable. Ellicott, 150 B.R. at 266. In this case, however, (A) in addition to the public June 14 Creditor Meeting (i.e., the analogue to the three public meetings held by the Ellicott debtor), the City held numerous, non-public meetings with representatives of creditors, and (B) the City never presented its restructuring proposal as "non-negotiable." Indeed, the City solicited responses and counter-proposals from other parties.

Moreover, it is especially significant that no Objector transmitted a written counter-proposal on any aspect of the City's restructuring proposal. Some of the City's invitations for further dialogue were essentially rebuffed (and in a manner that seemed designed to support a future objection to eligibility rather than actually engage in discussions with the City). See Letter from Steven Kreisberg, Director of Collective Bargaining and Health Care Policy, AFSCME, to Brian Easley, dated July 2, 2013 (meeting the City's request for feedback with respect to its restructuring proposal with a request for further meetings and statements that the City "has not provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these issues"), attached hereto as Exhibit F.

Of course, good faith negotiation is a two-way street. All of the City's creditors – including each of the Objectors – had more than a month to provide the

-57-
313
13-53846-swr Doc 2473-5 Filed 05/06/14 Entered 05/06/14 19:59:33 Page 127 of 195
13-53846-swr Doc 763 Filed 09/06/13 Entered 09/06/13 19:59:33 Page 127 of 195

City with counter-proposals to, or other ideas concerning, the restructuring plan set out and supported in the June 14 Creditor Proposal. All of those entities had multiple opportunities to meet with the City's representatives to discuss the restructuring proposal and access to the information necessary to formulate an informed response. That none of the Objectors chose to respond to any aspect of the June 14 Creditor Proposal does not render the City's efforts to engage and negotiate with its creditors as having been undertaken in anything other than good faith.

Finally, the Court should reject the argument that the City is unable to satisfy section 109(c)(5)(B) of the Bankruptcy Code unless it can demonstrate that the terms of its restructuring proposal constitute a confirmable plan of adjustment under section 943(b) of the Bankruptcy Code. No Objector cites to any authority that supports this proposition in any way.[50] Consistent with Section VI of the

---

[50]  AFSCME's citation to In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60 (Bankr. D.N.H. 1994), and In re Cottonwood Water & Sanitation District, 138 B.R. 973 (Bankr. D. Colo. 1992), in support of this argument is misleading. Neither of those cases addresses the confirmability of the debtors' proposed restructuring plan within the context of section 109(c)(5)(B) of the Bankruptcy Code at all. Rather, each case requires only that negotiations be based on "some sort of comprehensive plan." Sullivan Cnty., 165 B.R. at 78 (noting that the debtor need not even propose a "formal plan," but finding that debtor's failure to propose *any* plan could not satisfy section 109(c)(5)(B) of the Bankruptcy Code); Cottonwood, 138 B.R. at 978 (addressing the requirements of section 109(c)(5)(B) of the Bankruptcy Code with no reference to whether a proposed plan must satisfy

Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the

Bankruptcy Code simply do not oblige the City to demonstrate that the

as-yet-undetermined terms of whatever plan of adjustment it may ultimately

propose will be confirmable.

For the reasons set forth above and in the Eligibility Memorandum, the City

has satisfied the requirements of section 109(c)(5)(B) of the Bankruptcy Code.

## X.    THE CITY IS INSOLVENT

The Eligibility Memorandum demonstrates that, unfortunately, the City

meets all of the disjunctive tests for municipal insolvency contained in

section 101(32)(C) of the Bankruptcy Code.  Specifically, the City demonstrated

that:  (A) it was not paying its debts as they came due; (B) it was "cash insolvent,"

"budget insolvent" and "service delivery insolvent;" (C) applicable law does not

require it to exhaust all possible opportunities for revenue generation or adopt

every conceivable cost-cutting measure prior to seeking relief under chapter 9;

(D) it has experienced and, absent restructuring, will continue to experience

negative cash flows for years; (E) its revenues cannot be meaningfully increased;

and (F) its expenditures cannot be further reduced.  Eligibility Memorandum,

_____

(continued…)

confirmation standards).  In re Sanitary & Improvement District, Number 7,
98 B.R. 970 (Bankr. D. Neb. 1989), cited by multiple Objectors on this point,
does not address the standards governing eligibility at all.

at pp. 12-35.  All of the foregoing is supported by evidence, including the

extensive data contained in or accompanying the Orr Declaration and Malhotra

Declaration.

No Objector challenges any of this with evidence.  Indeed, the Objections

offer little more than innuendo and supposition.[51]

For example, multiple Objectors accuse the City of having "deliberately

budgeted and spent itself into insolvency (so as to qualify under § 101(32)(C)(ii)),

when other realistic avenues and scenarios were possible."  AFSCME Objection,

at ¶ 137; RDPMA Objection, at p. 22.  Of course, no Objection offers any

---

[51]     The City notes that, despite a wealth of financial information having been
available to all interested parties for months (e.g., the City's cash flow
projections and other financial data were set forth in the June 14 Creditor
Proposal and contained in the Data Room (which was accessible to and
accessed by many of the Objectors, including AFSCME and the Retirement
Systems), none of the Objectors cite any facts already known to support their
Objections to insolvency.  Although the City is aware that, pursuant to
Section VII of the Eligibility Scheduling Order, the Court has permitted
discovery with respect to the matter of the City's insolvency, the filing of
placeholder objections to insolvency is inconsistent with the direction
provided by the Court during a colloquy with the City's counsel at a hearing
on August 2, 2013.  See Transcript of Hearing, dated August 2, 2013,
at pp. 26-27 ("Mr. Bennett:  …. We fully understand that facts currently
unknown could conceivably surface later, and we would certainly not object
if a fact unknown today found its way into a subsequent brief, but we think
the August 19th deadline should require and call for an objection – all
grounds stated and facts then known to support the objection…. The Court:
I agree, counsel. There certainly are circumstances in which the law permits
amendments to pleadings. They are limited. They apply here, but as a
general matter, the Court wants to set a firm deadline for the filing of
objections to eligibility.").

examples of "realistic avenues and scenarios" that might have allowed the City to have avoided insolvency. The AFSCME Objection essentially recommends a more aggressive approach to the collection of unspecified accounts receivable, and the RDPMA Objection does no more than cite to examples of revenue generation applicable *in an entirely different case*. There is no suggestion how these "realistic avenues and scenarios" might eliminate the negative cash flows identified in the Orr and Malhotra Declarations.

Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. Thus, the data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence.

All Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.

## XI. THE CITY DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

At Section VI of the Eligibility Scheduling Order, this Court determined that, despite the "extraordinary importance of the pension rights of the City's employees and retirees in this case and of how the City will ultimately propose to treat those rights," (A) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and

-61-
313
13-53846-swr Doc 2473-5 Filed 05/06/14 Entered 05/06/14 19:59:33 Page 131 of 195

(B) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4) of the Bankruptcy Code.  Eligibility Scheduling Order, at § VI.

Only two objections – the UAW Objection and the RDPMA Objection – argue that the City does not satisfy section 109(c)(4) of the Bankruptcy Code.[52] Each of these Objections, however, is based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits.  Thus, in light of Section VI of the Eligibility Scheduling Order, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) of the Bankruptcy Code on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum.

## XII.  THE CITY FILED ITS PETITION IN GOOD FAITH

Certain Objectors have challenged the City's Petition on the grounds that it was not filed in "good faith" within the meaning of section 921(c) of the

---

[52]     Three other Objectors – (a) Local 324, International Union of Operating Engineers (Docket No. 484); (b) Local 517M, Service Employees International Union (Docket No. 486); and (c) Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (Docket No. 504) – filed joinders in the UAW Objection, but their Objections do not contain any additional facts related to section 109(c)(4) of the Bankruptcy Code.

Bankruptcy Code.[53]  These challenges generally rely on the following arguments:
(A) the filing of the Petition in advance of a hearing in Michigan state court
requesting a temporary restraining order is evidence of the City's hasty decision to
file the Petition and, thus, of its bad faith (AFSCME Objection, at ¶ 130; RDPMA
Objection, at p.13); and (B) the City never investigated alternatives that might have
avoided the need to file the Petition (AFSCME Objection, at ¶ 131; RDPMA
Objection, at p.13).  Even if taken at face value (which they should not be), neither
of these arguments demonstrate any lack of good faith on the part of the City in
filing the Petition.

---

[53]    The brief attached to the Public Safety Unions Objection (the "Public Safety
Unions Brief") states that "[t]his Objection focuses on the requirements of
§ 109(c)(2) and (5) and the good faith requirement of Section 921(c)."
Public Safety Unions Brief, at p. 2.  However, at no point in the Public
Safety Unions Objection or the Public Safety Unions Brief is any standard
for "good faith" identified or applied to the City's conduct or Petition.
Rather, the Public Safety Unions Objection appears to regard an analysis of
"good faith" within the meaning of section 921(c) of the Bankruptcy Code as
co-extensive with the determination of whether the City has satisfied the
eligibility requirements set forth in section 109(c) of the Bankruptcy Code.
The Retirement Systems Objection also incorrectly equates these differing
standards.  See Retirement Systems Objection, at p.16, n.10 ("While the
arguments in this Objection focus on the City's inability to satisfy the
eligibility requirements under sections 109(c)(2) and (5) of the Bankruptcy
Code, the same arguments support a dismissal of the City's petition for lack
of good faith."). Because the Public Safety Unions Objection and the
Retirement Systems Objection rely on the City's alleged failure to satisfy
such requirements as evidence of the City's lack of good faith in filing the
Petition, those Objections should be overruled.

The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. Stockton, 493 B.R. at 794 (observing that the good faith requirement "serves a policy objective of assuring that the chapter 9 process is being used in a manner consistent with the reorganization purposes of the Bankruptcy Code."); In re Cnty. of Orange, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) ("[T]he purpose of the filing must be to achieve objectives within the legitimate scope of the bankruptcy laws."); Sullivan Cnty., 165 B.R. at 80 (looking to chapter 11 case law for guidance and stating that "[t]he primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its protection to those situations for which it was intended."); Vills. at Castle Rock, 145 B.R. at 81 (good faith "prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes").

A municipality's good faith "is assessed on a case-by-case basis in light of all the facts, which must be balanced against the broad remedial purpose of chapter 9." Stockton, 493 B.R. at 794. "Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing

are consistent with chapter 9, the extent of the City's prepetition efforts to address

the issues, the extent that alternatives to chapter 9 were considered, and whether

the City's residents would be prejudiced by denying chapter 9 relief."  Id.;[54]

see also Cnty. of Orange, 183 B.R. at 608 (applying chapter 11 case law and

finding the debtor's financial condition and motives, local financial realities and

whether the debtor was seeking to "unreasonably deter and harass its creditors or

attempting to effect a speedy, efficient reorganization on a feasible basis" as

relevant factors).

 In light of the foregoing, the City's good faith in filing the Petition is

manifest.  The City's reasons for filing – to adjust its debts and resolve its liquidity

crises – are perfectly congruent with the rehabilitative purposes of chapter 9.[55]

The Objectors' suggestion that the City's Petition was prompted not by its financial

collapse, but rather by the hurried and urgent need to evade an adverse ruling from

a Michigan state court is wrong as a matter of fact.  As the Objectors are aware, the

Emergency Manager had always indicated that the commencement of a chapter 9

---

[54] Both the AFSCME Objection (at ¶ 128) and the RDPMA Objection (at p.12)
cite the factors set forth by the Stockton court as the relevant considerations
under the "good faith" analysis.

[55] Moreover, the City's financial problems – $18 billion in debt, cash
insolvency, budget insolvency, service delivery insolvency and the inability
to either materially increase revenues or slash expenditures – are clearly
problems of the sort contemplated by chapter 9.

case was an option for the City if its negotiations with creditors regarding an out-of-court restructuring proved impracticable or fruitless. Once the City determined that it was impracticable for the City to negotiate with all of its creditors and achieve a settlement that could be implemented outside of chapter 9 and that some creditors were unwilling to either accept the necessary adjustments to the City's debts or to engage the City at all, a chapter 9 filing became the City's only feasible option. Moreover, the process for authorizing the City's chapter 9 filing had been set in motion in advance of the state court hearing that ostensibly prompted the City's actions. The Emergency Manager sent his written recommendation that the City be authorized to file for chapter 9 relief to the Governor and the Treasurer on July 16, 2013 – two days in advance of the emergency, *ex parte* hearing before the Michigan state court.[56]

Finally, even if the state court hearing were a factor in the timing of the City's Petition, that fact would not render the filing as having been made in bad faith. In re McCurtain Municipal Authority, No. 07-80363, 2007 WL 4287604 (Bankr. E.D. Okla. Dec. 4, 2007), is instructive on this point. In McCurtain, a creditor sought the dismissal of the debtor's petition under section 921(c) of the Bankruptcy Code on the grounds that "the Debtor demonstrated a lack of good

---

[56] Indeed, it seems far more likely that the state court's hearing was prompted by the City's preparations for bankruptcy (which had been reported based upon rumors and anonymous sources in advance of the Petition Date).

faith because its purpose in filing for bankruptcy relief was to avoid the appointment of a receiver." <u>McCurtain</u>, 2007 WL 4287604, at *5. An application for the appointment of a receiver for the debtor had been filed the day before a previously-noticed meeting at which the debtor's board of trustees voted to retain a bankruptcy attorney. <u>Id.</u> The <u>McCurtain</u> court determined that "[w]hile the appointment of a receiver certainly was a concern to the Debtor, it was not the only reason for filing bankruptcy," citing testimony from the chairman of the debtor's board of trustees that the motivation for the filing of the debtor's petition was its economic circumstances (specifically, its inability to pay a large judgment). <u>Id.</u>

The reasoning of the <u>McCurtain</u> court translates to the City's circumstances. Even if the state court hearing were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either (A) the city's primary motivation for commencing this case in light of the City's well-established financial crisis or (B) evidence of any bad faith on the part of the City.

The Objectors' remaining argument – that the City did not adequately explore alternatives to bankruptcy prior to the filing of the Petition – is easily dispatched. The Orr Declaration is filled with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. <u>See</u> Orr Declaration, at ¶¶ 58-73 (describing various measures taken by the City over the past 16 months to address its financial challenges and avoid bankruptcy, including,

but not limited to: the execution of a consent agreement with the State of Michigan and creation of a financial advisory board; employee headcount reductions; reduction of labor costs through the implementation of CETs; the increase of corporate tax rates; and the implementation of tax collection initiatives). The Objections, on the other hand, fail to identify even one unexplored alternative that might demonstrate a lack of good faith on the part of the City.

Finally, there can be no question that the residents of the City would be prejudiced by the dismissal of the Petition. As set forth in the Orr Declaration and the Eligibility Memorandum, the City's ability to provide even the most basic municipal services to its citizens has been crippled by its dire financial circumstances. See Orr Declaration, at ¶¶ 31-44 (describing how acute underfunding of the City's core services has contributed to a violent crime rate that is the highest of any large U.S. city and five times the national average, compromised EMS and fire-fighting capabilities, resulted in a lack of adequate lighting and prevented the city from adequately addressing blight); Eligibility Memorandum, at pp. 2-3, 23-26 (describing how massive debt and other legacy liabilities have prevented the City from adequately addressing shortfalls in its provision of basic services for years, and establishing that the City is "service delivery insolvent").

This chapter 9 case is the City's sole remaining option to address its financial condition and enhance its ability to provide its citizens with core municipal services. As COLLIER ON BANKRUPTCY states:

> For the financially distressed municipality, chapter 9 may be the only forum for protecting the long-term interests of the municipality and its residents…. A finding that a municipality did not file its chapter 9 petition in good faith will result in the municipality's not being able to impair its contractual obligations, and may result in considerable prejudice to the residents of the municipality. Accordingly, a finding that a municipality did not file in good faith should be reserved for those situations in which the evidence is compelling.

6 COLLIER ON BANKRUPTCY ¶ 921.04[2] (Alan N. Resnick & Henry J. Sommer eds. 16th ed. 2013). Here, the evidence that the City filed the Petition in anything other than good faith is not only not compelling, it is non-existent. The arguments that the City did not file its Petition in good faith should be rejected.

## XIII. NOTICE OF THE DEADLINE FOR OBJECTIONS TO ELIGIBILITY WAS PROPER AND SUFFICIENT

Numerous Objections argue that the notice of the deadline for objections to the Petition and the Statement of Qualifications (the "Eligibility Objection Deadline") – i.e., August 19, 2013 – was inadequate. See, e.g., Objection (Docket No. 384) filed by Krystal Crittendon, at ¶ 8 ("This Notice provides inadequate notice and opportunity to be heard by the date of August 19, 2013 when objections

may be filed, as the Notice was received less than two (2) weeks before the date by which Objections must be filed.").

All Objections related to the alleged inadequacy of notice of these proceedings should be overruled.  A motion setting forth a preliminary timeline for eligibility issues – which schedule proposed a deadline for objections to eligibility that was consistent with the Eligibility Objection Deadline ultimately adopted by the Court – was filed by the City on the day after the Petition Date, and all interested parties had ample opportunity to object.  <u>See</u> Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration (Docket No. 18).  The order granting that motion (Docket No. 296) (the "<u>Case Commencement Order</u>") established the form of the notice of commencement of this chapter 9 case, which notice (A) conspicuously identified the Eligibility Objection Deadline and (B) was served on all interested parties within three business days of its entry.  Certificate of Service re: Documents Served on August 6, 2013 (Docket No. 325).

The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the number and substance of the Objections received.  Over 100 parties filed Objections to the Petition and Statement of Qualifications, many

of which are elaborately argued (as indicated above). Accordingly, all interested parties were provided sufficient notice of the Eligibility Objection Deadline, and Objections to any alleged inadequacy of notice should be overruled.

## XIV. CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for Relief in this case.

Dated: September 6, 2013          Respectfully submitted,


  /s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT A

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Federal Structure Violation | Chapter 9 of the Bankruptcy Code is an unconstitutional violation of federalism because chapter 9 allows Congress to set rules controlling state fiscal self-management, which is an area of exclusive state sovereignty.<br><br>The Supreme Court's justifications for upholding a municipal bankruptcy statute in United States v. Bekins, 304 U.S. 27 (1938), are no longer valid because: (i) a federal municipal bankruptcy statute is no longer necessary to accomplish an adjustment of municipal debts, where states are permitted to pass their own municipal debt adjustment legislation; and (ii) the Supreme Court's development of constitutional federalism doctrine has effectively overruled Bekins.<br><br>Chapter 9 eviscerates the accountability of Michigan to its citizens and creditors.<br><br>Chapter 9's requirement of state consent cannot cure its violation of individual constitutional rights under the Tenth Amendment. | The Supreme Court's decision in Bekins — to uphold the constitutionality of a municipal bankruptcy statute that (i) provided for states to retain control of their fiscal affairs and (ii) constrained the bankruptcy power to cases authorized by state law — remains binding precedent. The Objecting Parties do not point to any change in statutory text that would warrant a different outcome than Bekins, and binding Supreme Court precedent cannot be overruled by mere implication. See Reply, at § III.A.<br><br>Subsequent legal developments have not undermined the Bekins decision, the soundness of its reasoning or the constitutionality of chapter 9. States are not at liberty under the Contracts Clause of the United States Constitution to impair their own contracts. States must seek the aid of federal bankruptcy courts to impair contracts by authorizing chapter 9. In making the decision to do so, states exercise their sovereignty rather than relinquish it. Once a state authorizes a municipality to proceed under chapter 9, the bankruptcy court's powers are designed to preserve the state-federal relationship and prohibit intrusion on the state's core functions. See Reply, at § III.B.<br><br>Chapter 9 relies on state law for determining which municipalities are authorized to seek bankruptcy protection. Although this rule may result in differences in and among states, the rule itself is "uniform throughout the United States," such that chapter 9 does not violate the uniformity requirement of Article I, § 8, clause 4 of the United States Constitution. See Reply, at § III.B. |

| Term | Description | City's Response |
|---|---|---|
| Lack of Jurisdiction: <u>Stern</u> | The Bankruptcy Court lacks jurisdiction to decide whether chapter 9 violates the United States Constitution as a result of <u>Stern v. Marshall</u>. | The Court has the authority and jurisdiction to determine whether the City is eligible to be a debtor under chapter 9. As the Supreme Court made clear in <u>Stern</u>, non-Article III courts, such as bankruptcy courts, have traditionally been permitted to enter judgment in cases involving "public rights." Included within the category of "public rights" are cases that "can be pursued only by grace of the other branches" of the federal government. Here, the City's ability to adjust its debts in a federal bankruptcy case is only possible because Congress enacted the Bankruptcy Code and, thus, this case involves "public rights." As such, <u>Stern</u> poses no obstacle to bankruptcy court resolution of the City's eligibility to access chapter 9. <u>See</u> Reply, at § II.<br><br>The argument that the Court is powerless to rule on certain *objections* to the City's eligibility that involve federal or state constitutional questions would constitute a radical expansion of <u>Stern</u> that is unsupported by that case or any subsequent authority. Under <u>Stern</u>, while state law actions independent of the federal bankruptcy law cannot be decided by the bankruptcy courts, federal claims stemming from the bankruptcy itself can be. Here, there are no state or federal constitutional *claims* before the Court; what is before the Court is a determination regarding the eligibility of the City of Detroit to be a chapter 9 debtor – a question that unquestionably "stems from the bankruptcy itself." Thus, <u>Stern</u> simply is not implicated by the Objectors' constitutional arguments against eligibility. <u>See</u> Reply, at § II. |

# Non-Individual Objections to Eligibility, Summary of Arguments Set Forth Therein and City's Responses

| Term | Description | City's Response |
|---|---|---|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(2)** | | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."<br><br>This includes arguments that:<br><br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights;<br><br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly;<br><br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and<br><br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that:<br><br>    ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law;<br><br>    ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. See Reply, at § V.B.<br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. See Reply, at § V.B.<br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. See Reply, at § V.C. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
| --- | --- | --- |
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br>• The Governor's authorization was invalid, for the reasons discussed above;<br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This include arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of chapter 9 would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. See Reply, at § V.C. |

-5-

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it:  (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension.  The only way pensions can be impaired is by an order of the Court at some future date.  For the same reason, the enactment of PA 436 did not violate the Pensions Clause.  See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls.  Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation.  See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manager to enact local legislation that not even the state legislature could pass, fails.  Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility.  See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine.  The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority.  Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers.  In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review.  See Reply, at § VII.C. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|------|-------------|-----------------|
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent. The City could have taken steps that would have avoided insolvency. Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled. The Objections offer little more than innuendo and bald supposition. For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency. Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date. See Reply, at § X. |
| **THE CITY HAS NOT SATISFIED 11 U.S.C. § 109(C)(4)** | | |
| Desires to Effect a Plan to Adjust Debts | The City has not satisfied section 109(c)(4) of the Bankruptcy Code — which requires the debtor to desire to effect a plan to adjust its debts — because the City has proposed a restructuring plan that cannot be confirmed under section 943(b)(4) of the Bankruptcy Code, which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." | At Section VI of the Eligibility Scheduling Order, the Court determined that (i) section 109(c)(4) of the Bankruptcy Code does not "obligate the City to prove that any particular plan that it might later propose is confirmable" and (ii) "the Court will not consider the issue of the treatment of pension rights" when considering objections to eligibility based on the City's alleged failure to satisfy section 109(c)(4). The Objections that argue that the City does not satisfy section 109(c)(4) are based on the contention that the City will not be able to confirm a plan that impairs vested pension benefits. Thus, no Objection challenges the City's eligibility to be a debtor under section 109(c)(4) on grounds that the Court will consider, and the Court should find that eligibility requirement satisfied for the reasons set forth in the Eligibility Memorandum. See Reply, at § XI. |

CLI-2134971v8

| Term | Description | City's Response |
|---|---|---|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case. The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable. It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed. See Reply, at § IX. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Negotiations Not Impracticable | The City has not satisfied section 109(c)(5)(C) of the Bankruptcy Code because the City has not proven that it was unable to negotiate with creditors because such negotiation is impracticable.<br><br>This includes arguments that:<br><br>• The proper standard is whether there is a "natural representative capable of bargaining" on a creditor's behalf (not whether a party can bind creditors); that the City's retiree associations are such natural representatives; and that the City cannot argue that it would have caused extreme and unreasonable difficulty to engage in negotiations with such associations;<br><br>• The City predetermined that negotiations would fail and should not be able to claim that negotiations were impracticable where it had no sincere intent to negotiate and the time for negotiations was limited;<br><br>• The City has in the past negotiated for retiree health and pension benefits outside of a chapter 9 proceeding; and<br><br>• The City created an impediment to negotiations based on the artificial time constraint created by the filing on July 18. | The Objectors have not succeeded in undermining the City's showing that it has satisfied section 109(c)(5)(C) of the Bankruptcy Code.<br><br>The Objections fail to rebut the City's showing that negotiations with its pension beneficiaries were impracticable. For example, even if the City's retiree associations are the "natural representatives of retirees" (which is incorrect), they cannot bind the City's 20,000 plus retirees, rendering the City's good faith attempt at such negotiations impracticable.<br><br>The City could not have conducted practicable negotiations with its unions where only 8 unions (comprising 10 of the City's 47 bargaining units) agreed to represent their retirees in connection with the City's restructuring and many unions expressly declined to represent their retirees.<br><br>Section 109(c)(5) is written in the disjunctive, such that section 109(c)(5)(C) (regarding impracticability) can be satisfied even if section 109(c)(5)(B) (regarding good faith negotiations) is not. Section 109(c)(5)(C) can be satisfied even if negotiations with certain creditors, such as retirees, are potentially practicable.<br><br>The argument that the City manufactured impracticability through the imposition of artificial time constraints also fails. To the contrary, the fact that the City could not delay filing its petition in light of its financial and operational crises – and thus extend its opportunity for negotiation – *supports* the City's impracticability arguments. See Reply, at § VIII. |

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. See Reply, at § XII. |
| **ARGUMENTS RELATING TO 11 U.S.C. § 943** | | |
| Best Interests of Creditors | The City's proposed restructuring plan could not be confirmed pursuant to the "best interests of creditors" test set forth at section 943(b)(7) of the Bankruptcy Code and, thus, the City has failed to satisfy section 109(c)(5)(B). | No Objector cites to any authority that supports this proposition in any way. Consistent with Section VI of the Eligibility Scheduling Order, the eligibility requirements of section 109(c) of the Bankruptcy Code simply do not oblige the City to demonstrate that the as-yet-undetermined terms of whatever plan of adjustment it may ultimately propose will be confirmable. See Reply, at § IX. |

# NON-INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN AND CITY'S RESPONSES

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Unconfirmable Plan | The City's proposed restructuring plan cannot be confirmed under section 943(b)(4) of the Bankruptcy Code — which provides that a plan can be confirmed only if "the debtor is not prohibited by law from taking any action necessary to carry out the plan" — such that the City has failed to satisfy either section 109(c)(2) or (c)(5) of the Bankruptcy Code. | Requests that the Court decide questions related to section 943 of the Bankruptcy Code months in advance of the filing of a plan of adjustment, are wholly unrelated to eligibility and unwarranted at this stage.  See Reply, at § V.C. |
| **OTHER ARGUMENTS** | | |
| Collateral Estoppel | Collateral estoppel precludes the City from relitigating the issue of whether the City received valid authorization from the Governor to commence the chapter 9 case because that issue has already been litigated and a declaratory judgment rendered.<br><br>This includes arguments that (a) the declaratory judgment entered in the state court Webster litigation is entitled to full faith and credit; (b) the preclusive effect of the declaratory judgment is governed by Michigan law; and (c) the elements for collateral estoppel under Michigan law are satisfied. | Collateral estoppel applies only to issues that have been "actually litigated and determined by a valid and final judgment."  The Webster court exceeded its jurisdiction by entering its declaratory judgment after the commencement of the City's case because the Bankruptcy Court has original and exclusive jurisdiction over the case, including questions related to eligibility.  As such, the declaratory judgment is void and not "valid" for purposes of collateral estoppel.<br><br>In any event, the declaratory judgment in Webster is void *ab initio* and not "valid" for purposes of collateral estoppel because it was entered in violation of the automatic stay imposed by section 362 of the Bankruptcy Code.<br><br>In addition, other elements of collateral estoppel are not satisfied.  The City did not have a full and fair opportunity to litigate the issue where the declaratory judgment was issued on an expedited basis, and the City was not a party to the Webster lawsuit and was not otherwise in privity with the Webster defendants.  See Reply, at § VI. |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| Objection Docket No(s) | Objector(s) | Summary Of Arguments | City Response |
|---|---|---|---|
| 438; 453 (Notice of Constitutional Challenges); 505 (Corrected Motion); 509 (Corrected Kreisburg Declaration) | Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("AFSCME") | • Federal Structure Violation (¶¶ 40-62).<br>• Lack of Jurisdiction (¶¶ 67-71).<br>• Governor's Authorization Invalid (¶¶ 75-84).<br>• PA 436 Unconstitutional (¶¶ 85-100).<br>• No Good Faith Negotiations (¶¶ 101-108).<br>• Unconfirmable Plan (¶¶ 109-110).<br>• Best Interests of Creditors (¶ 111).<br>• Negotiations Not Impracticable (¶¶ 115-123).<br>• Filing Not in Good Faith (¶¶ 124-131).<br>• Reserves the right to argue Insolvency (¶¶ 132-140). | • See Reply, at §§ III (Federal Structure Violation); II (Lack of Jurisdiction); V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Unconfirmable Plan); IX (Best Interests of Creditors); VIII (Negotiations Not Impracticable); XII (Filing Not in Good Faith). |
| 481 | Attorney General Bill Schuette | • Concedes that the City is eligible to be a chapter 9 debtor, but argues that the City remains subject to the Michigan Constitution (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 5-19). | • See Reply, at § V.C (Michigan Law Not Preempted). |
| 482 | Association of Professional and Technical Employees | • PA 436 Unconstitutional.<br>• Insolvency.<br>• Michigan Law Not Preempted.<br>• Wages and fringe benefits are subject to collective bargaining according to state and federal labor laws. | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); X (Insolvency); V.C (Michigan Law Not Preempted). |

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 484 | Local 324, International Union of Operating Engineers | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • <u>See</u> Response to UAW's Objection; AFSCME's Objection. |
| 486 | Local 517M, Service Employees International Union | • Joinder to UAW's Objection (Docket No. 506) and AFSCME's Objection (Docket No. 505). | • <u>See</u> Response to UAW's Objection; AFSCME's Objection. |
| 497; 502 (502 appears to be duplicative of 497) | Retired Detroit Police & Fire Fighters Association ("<u>RDPFFA</u>"); Donald Taylor, individually and as President of RDPFFA; Detroit Retired City Employees Association ("<u>DRCEA</u>"); Shirley V. Lightsey, individually and as President of DRCEA | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 31-50).<br>• Insolvency (¶¶ 51-57).<br>• No Good Faith Negotiations (¶¶ 58-63).<br>• Negotiations Not Impracticable (¶¶ 63-74). | • <u>See</u> Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 506 | International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("<u>UAW</u>") | • Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (¶¶ 16-34, 40).<br>• Michigan Law Not Preempted (¶¶ 35-39).<br>• Desires to Effect a Plan to Adjust Debts (¶¶ 41-42).<br>• Filing Not in Good Faith/No Good Faith Negotiations (¶¶ 43-47).<br>• Negotiations Not Impracticable (¶ 46, n.19). | • <u>See</u> Reply, at §§ V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); XII (Filing Not in Good Faith); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

| Objection Docket No(s) | Objector(s) | Summary Of Arguments | City Response |
|---|---|---|---|
| 512 | Detroit Fire Fighters Association; Detroit Police Officers Association; Detroit Police Lieutenants & Sergeants Association; Detroit Police Command Officers Association | • Emergency Manager's Commencement Invalid (Brief at pp. 3-8).<br>• Filing Not in Good Faith (Brief at pp. 4-5, 18).<br>• Unconfirmable Plan (Brief at pp. 4-6).<br>• No Good Faith Negotiations (Brief at pp. 8-16).<br>• Negotiations Not Impracticable (Brief at pp. 16-18). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); XII (Filing Not in Good Faith); V.C (Unconfirmable Plan); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |
| 514 | Center for Community Justice and Advocacy | • Emergency Manager's Commencement Invalid (¶¶ 13-14).<br>• Michigan Law Not Preempted (pp. 7-12).<br>• Alternatively, PA 436 Unconstitutional (pp. 12-13). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); V.A, VII (PA 436 Unconstitutional). |
| 517 | Michigan Auto Recovery, Inc. | • No Good Faith Negotiations (¶¶ 3-5). | • <u>See</u> Reply, at § IX (No Good Faith Negotiations). |
| 519 | Police and Fire Retirement System of the City of Detroit; General Retirement System of the City of Detroit | • Michigan Law Not Preempted (pp. 19-25).<br>• Governor's Authorization Invalid / Emergency Manager's Commencement Invalid (pp. 27-43).<br>• Alternatively, PA 436 Unconstitutional (pp. 43-44).<br>• Collateral Estoppel (pp. 44-58).<br>• No Good Faith Negotiations/Negotiations Not Impracticable (pp. 59-61). | • <u>See</u> Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid); V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional); VI (Collateral Estoppel); IX (No Good Faith Negotiations); VIII (Negotiations Not Impracticable). |

CLI-2134971v8

| OBJECTION DOCKET NO(S) | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY RESPONSE |
|---|---|---|---|
| 520 | Retired Detroit Police Members Association | • PA 436 Unconstitutional (pp. 9-10).<br>• Emergency Manager's Commencement Invalid (pp. 10-11).<br>• Governor's Authorization Invalid (pp. 11-12).<br>• Filing Not in Good Faith (pp. 12-13).<br>• Michigan Law Not Preempted (pp. 14-19).<br>• Desires to Effect a Plan to Adjust Debts (pp. 18-19).<br>• No Good Faith Negotiations (pp. 13, 19-22).<br>• Insolvency (pp. 22-23). | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); V, VII.A (Emergency Manager's Commencement Invalid); V (Governor's Authorization Invalid); XII (Filing Not in Good Faith); V.C (Michigan Law Not Preempted); XI (Desires to Effect a Plan to Adjust Debts); IX (No Good Faith Negotiations); X (Insolvency). |
| 660 | St. Martins Cooperative | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 665). |

# **EXHIBIT B**

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| | **ARGUMENTS THAT CHAPTER 9 VIOLATES THE UNITED STATES CONSTITUTION** | |
| Due Process | The notice of the commencement of the City's bankruptcy case (the "Case Commencement Notice") did not provide adequate notice or opportunity to be heard. | The Case Commencement Notice conspicuously identified the Eligibility Objection Deadline and, consistent with the Case Commencement Order, was served on all interested parties within three business days of its entry. The adequacy of notice of the Eligibility Objection Deadline is further demonstrated by the fact that over 100 parties filed Objections to the Petition and Statement of Qualifications, many of which are elaborately argued. <u>See</u> Reply, at § XIII. |

| Term | Description | City's Response |
|---|---|---|
| | **The City Has Not Satisfied 11 U.S.C. § 109(c)(2)** | |
| Governor's Authorization Invalid | The Governor's authorization of the City's chapter 9 filing violated Article IX, Section 24 of the Michigan Constitution, which provides that the "accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." This includes arguments that: <br>• The authorization violated the Michigan Constitution by failing to condition the City's chapter 9 petition on the complete preservation of vested pension rights; <br>• The Governor is required to uphold the Michigan Constitution and cannot abrogate provisions of the Michigan Constitution directly or indirectly; <br>• The Governor's unconditional authorization of the City's bankruptcy was *ultra vires* and *void ab initio*; and <br>• The power of the Bankruptcy Court to entertain a municipal bankruptcy is constrained by the dual sovereignty principles embodied in the Tenth Amendment and, as such, chapter 9 petitions should be scrutinized. This includes arguments that: <br>   ○ Chapter 9 requires strict adherence to principles of state sovereignty such that the Court must (a) find that the filing of the petition was authorized by, and consistent with, the Michigan Constitution and applicable state law; and (b) find that the debtor's plan of adjustment is consistent with state law; <br>   ○ Section 903 of the Bankruptcy Code makes clear that nothing in chapter 9 should be construed to limit a state's power to control its municipalities. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. *See* Reply, at § V.A. <br><br>The function of the Pensions Clause is to extend the protection of the federal Contracts Clause to cover public pensions by treating them as contractual obligations, where they had previously been treated as "gratuitous allowances" that could be revoked at will by the authority. While the Contracts Clause prohibits *states* from impairing contracts, it does not pose any obstacle to chapter 9, as made clear by Bekins: a state does not impair contracts merely by authorizing a municipality to file for bankruptcy, and any impairment of contracts that occurs in chapter 9 is imposed by the federal bankruptcy court, *not* the state. *See* Reply, at § V.B. <br><br>When the Pensions Clause was ratified in 1963, (i) the framework of chapter 9, including the role of states in authorizing municipal bankruptcy, was well established and (ii) Michigan law specifically authorized instrumentalities of the State to commence cases under the Bankruptcy Act of 1898. Nevertheless, the Pensions Clause includes no restrictions on the authorization or filing of municipal bankruptcy cases. Moreover, no court has ever held that a state's constitutional protection of pensions poses any obstacle to a municipality's eligibility to be a chapter 9 debtor. *See* Reply, at § V.B. <br><br>The Pensions Clause does not require chapter 9 authorization to be conditioned on the non-impairment of pensions. If the State has specifically authorized the City to be a debtor under chapter 9, it is irrelevant for eligibility whether the State also has purported to impose further conditions, and the Pensions Clause says nothing about conditions that must be imposed on the authorization of chapter 9. *See* Reply, at § V.C. |

CLI-2136816v4

13-53846-swr   Doc 2463-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 161 of 135
13-53846-swr    Doc 765    Filed 09/13/13   Entered 09/13/13 15:59:03   Page 101 of 135
313

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Emergency Manager's Commencement Invalid | The Emergency Manager's commencement of the City's chapter 9 case was invalid / violated Article IX, Section 24 of the Michigan Constitution because:<br><br>• The Governor's authorization was invalid, for the reasons discussed above;<br><br>• The Emergency Manager is required to uphold the Michigan Constitution, but has stated that he intends to modify pension benefits, notwithstanding Article IX, Section 24 of the Michigan Constitution; and/or<br><br>• The Emergency Manager's authorization of the City's bankruptcy without imposing conditions prohibiting the diminishment or impairment of accrued pension benefits violated the Municipal Code of the City of Detroit. | As discussed above, the State's authorization of the City's chapter 9 filing was valid; as such, the Emergency Manager's commencement of the City's chapter 9 case also was valid. See Reply, at § V.<br><br>Consistent with its findings at Section VI of the Eligibility Scheduling Order, the Court should reject the request that any Order for Relief require that all actions taken by the Emergency Manager, including the eventual proposal of a plan of adjustment, comply with the State Constitution. Such requests are unrelated to eligibility and unwarranted at this stage. See Reply, at § V.C.<br><br>Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute. Even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because, where a city charter provision conflicts with general statutory law, the statute controls. PA 436, including its authorization to file for chapter 9, is a general state law. As the Michigan legislature's findings with respect to the impact of local financial emergencies on the rest of the State make clear, how financially distressed local governments overcome their situation is not a matter of "purely local" character or concern. See Reply, at § VII.A. |

-3-

CLI-2136816v4

13-53846-swr    Doc 2453-5    Filed 06/14/14    Entered 06/14/14 17:03:32    Page 162 of 185
13-53846-swr    Doc 4663    Filed 09/06/14    Entered 09/06/14 19:55:03    Page 162 of 135
313

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| Michigan Law Not Preempted | Explicit and implicit arguments that the Supremacy Clause of the United States Constitution and concepts of preemption do not apply because Congress gave the states the authority to regulate their municipalities' access to chapter 9, such that compliance with the Michigan Constitution and other Michigan law is required.<br><br>This includes arguments that:<br><br>• Section 109(c)(2) expressly reserves the question of eligibility to state law, and where the Bankruptcy Code reserves authority to the states, the Supremacy Clause and preemption do not apply;<br><br>• *Even if* the City is eligible to proceed under chapter 9 pursuant to PA 436, the City remains subject to applicable state laws and the Michigan Constitution, in particular its prohibition on the impairment of accrued pension benefits;<br><br>• The continued application of state constitutional law during a chapter 9 case is consistent with state sovereignty principles;<br><br>• Pensioners have a contractual right to their pensions;<br><br>• Pensions should not be considered a debt;<br><br>• Pension benefits should not be modified;<br><br>• Michigan's constitutional protection of pensions is broader than that afforded to ordinary contracts; and<br><br>• The Bankruptcy Code (sections 903 and 904) recognizes the state's constitutional limits on municipalities in chapter 9. | Even if the Pensions Clause could be interpreted so broadly as to require that limits be placed on the authorization of a chapter 9 case in order to restrict a municipality's use of various provisions of the Bankruptcy Code once in chapter 9, any such limits would be both prohibited and preempted by federal law.<br><br>Pursuant to the Bankruptcy Clause of the United States Constitution, Congress has enacted chapter 9 as a comprehensive scheme for municipal bankruptcy. Under the Supremacy Clause of the United States Constitution, this comprehensive federal scheme displaces any contrary state-law provisions that purport to alter or impair a debtor's powers under the Bankruptcy Code. Thus, while the State may act as a gatekeeper in determining whether to authorize a chapter 9 filing, State law cannot alter or override the federal scheme for determining the tools of debt adjustment that a municipal debtor may use once it is in bankruptcy.<br><br>In light of the comprehensive scheme that Congress has enacted, "[i]ncorporating state substantive law into chapter 9 to amend, modify or negate substantive provisions of a debtor's powers would violate Congress' ability to enact uniform bankruptcy laws." Thus, the Objectors' arguments that compliance with the Michigan Constitution and other Michigan law is required in chapter 9 fail. See Reply, at § V.C. |

13-53846-swr    Doc 2453-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 163 of 135
13-53846-swr    Doc 765-5   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 103 of 125
313

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| PA 436 Unconstitutional | PA 436 itself is unconstitutional.<br><br>This includes arguments that:<br><br>• If PA 436 permits the impairment of accrued pension benefits, PA 436 is unconstitutional and the Governor's authorization thereunder was, therefore, *ultra vires* and *void ab initio*; and<br><br>• PA 436 violates the strong "home rule" provisions of the Michigan Constitution because it: (a) violates the right of Detroiters to select their own local officers and to structure their own government via the City Charter; (b) purports to delegate authority to the Emergency Manager in excess of that possessed by the Legislature; and (c) unconstitutionally delegates legislative authority to the Emergency Manager because it lacks adequate standards to guide the Emergency Manager's actions in bankruptcy, which are not subject to judicial review. | The State's authorization of the City's chapter 9 filing did not violate the Pensions Clause because it did not "diminish[] or impair[]" any pension. The only way pensions can be impaired is by an order of the Court at some future date. For the same reason, the enactment of PA 436 did not violate the Pensions Clause. See Reply, at § V.A.<br><br>PA 436 does not conflict with the home rule provisions of Michigan law because (i) Detroit's Charter recognizes that its provisions are subject to the limitations imposed by statute, and (ii) even if there were a conflict between PA 436 and Detroit's Charter, PA 436 would prevail because where a city charter provision conflicts with general statutory law, such as PA 436, the statute controls. Temporarily substituting the Emergency Manager for Detroit's elected officials also does not violate the home rule because the legislature has the authority to temporarily replace local officials when exercising its undisputed power to supervise and control matters of municipal regulation. See Reply, at § VII.A.<br><br>The argument that because PA 436 grants the Emergency Manager the authority to adopt local ordinances, it unconstitutionally authorizes the Emergency Manger to enact local legislation that not even the state legislature could pass, fails. Filing a chapter 9 case is not passing legislation, and this argument has nothing to do with the City's eligibility. See Reply, at § VII.B.<br><br>PA 436 does not violate Michigan's non-delegation doctrine. The anti-delegation principles that govern when the *State* legislature delegates its powers do not apply here because the Emergency Manager exercises the *local* government's authority. Moreover, PA 436 contains sufficient standards to guide the Emergency Manager in seeking bankruptcy protection to satisfy the requirement that "reasonably precise" standards be provided when the legislature delegates it powers. In addition, because the Court will review many actions of the Emergency Manager, he cannot escape judicial review. See Reply, at § VII.C. |

# Individual Objections to Eligibility, Summary of Arguments Set Forth Therein & City's Response

| Term | Description | City's Response |
|------|-------------|-----------------|
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(3)** | | |
| Insolvency | The City has not satisfied section 109(c)(3) of the Bankruptcy Code because the City has not demonstrated that it is insolvent.<br><br>The City could have taken steps that would have avoided insolvency.<br><br>Most Objecting Parties either (a) reserved their right to argue Insolvency after discovery or (b) raised general questions about whether the City has satisfied section 109(c)(3). | The data presented by the City demonstrating its insolvency within the meaning of section 109(c)(3) of the Bankruptcy Code stands unrebutted by any evidence, and all Objections to the City's eligibility based on speculation that the City may be solvent should be overruled.  The Objections offer little more than innuendo and bald supposition.  For example, several Objectors accuse the City of having "deliberately budgeted and spent itself into insolvency," but offer no examples of how the City might have avoided insolvency.  Moreover, none of the Objections contests the City's financial data beyond the citation of press reports and references to old financial data irrelevant to the determination of insolvency as of the Petition Date.  See Reply, at § X. |
| **The City Has Not Satisfied 11 U.S.C. § 109(c)(5)** | | |
| No Good Faith Negotiations | The City did not negotiate with creditors in good faith as required by section 109(c)(5)(B) of the Bankruptcy Code because the prepetition meetings were not truly negotiations involving collaboration and concessions from both sides, but rather discussions regarding the City's "take it or leave it" proposal. | The evidence demonstrates that the City actively sought continuing dialogue with, and counter-proposals from, the various parties to its multi-faceted negotiations, but received no concrete proposal or comprehensive feedback from any Objector prior to the commencement of the case.  The Ellicott case relied upon by the Objectors is distinguishable, where the City held numerous non-public meetings with representatives of creditor constituencies and never presented its restructuring proposal as non-negotiable.  It is also important to note that no Objectors transmitted a written counter-proposal on any aspect of the City's restructuring proposal, and, in certain circumstances, the City's invitations for further dialogue were rebuffed.  See Reply, at § IX. |

-6-

CLI-2136816v4

13-53846-swr    Doc 2453-5   Filed 06/14/14   Entered 06/14/14 17:03:32   Page 165 of 313
13-53846-swr    Doc 765   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 105 of 135

| TERM | DESCRIPTION | CITY'S RESPONSE |
|---|---|---|
| **ARGUMENTS RELATING TO 11 U.S.C. § 921(C)** | | |
| Filing Not in Good Faith | The City's petition should be dismissed pursuant to section 921(c) of the Bankruptcy Code because the City did not file the petition in good faith.<br><br>This includes arguments that:<br><br>• The City rushed to file its petition to avoid the impending temporary restraining orders that ultimately were entered in various prepetition lawsuits;<br><br>• The prepetition actions of the Emergency Manager indicate that, at all times since his appointment, the City was planning on commencing a chapter 9 case; and<br><br>• The filing was in bad faith for the same reasons that the City failed to satisfy section 109(c)(5)(B) (failure to negotiate in good faith). | The purpose of the "good faith" requirement set forth in section 921(c) of the Bankruptcy Code is to ensure that debtors are seeking relief under chapter 9 for purposes consistent with the Bankruptcy Code. The City's reasons for filing – to adjust its debts and resolve its perennial liquidity crises – are perfectly congruent with the rehabilitative purposes of chapter 9.<br><br>Even if the state court hearing on the request for a temporary restraining order were a factor in the timing of the City's decision to file its Petition, it could scarcely be considered either the city's primary motivation for commencing its case in light of the City's well established financial crisis. The argument that the City did not adequately explore alternatives to bankruptcy prior to commencing its case also fails, where the Orr Declaration is replete with examples of actions taken by the City to stave off insolvency and avoid the need for bankruptcy protection. Lastly, there is no evidence – much less the compelling evidence that is required – that the City filed its petition in anything other than good faith, and the City's residents would be prejudiced by the dismissal of the petition. <u>See</u> Reply, at § XII. |
| **OTHER ARGUMENTS** | | |
| Joinder | An indication that this Objecting Party has joined in one or more other Objections. | N/A |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 335 | Lou Ann Pelletier | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 337 | Michael K. Pelletier | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 338 | Regina G. Bryant | • As a property owner, objects to changes in tax status, any property value changes, and any deterioration or privatizing of City services. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 339 | Regina G. Bryant | • Seeks reinstatement of position with DWSD and full salary restoration, with sick and vacation time, for the period March 1, 2010 to August 31, 2013. | • Objection does not address eligibility of City to be a chapter 9 debtor. |
| 388 | Michael G. Benson | • Insolvency.<br>• Michigan Law Not Preempted.<br>• Asserts that bankruptcy case illegal and morally wrong. | • See Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted).<br>• Objection that chapter 9 filing morally wrong does not address eligibility of City to be a chapter 9 debtor. |
| 398 | Karl E. Shaw | • Insolvency.<br>• Michigan Law Not Preempted. | • See Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |
| 401 | Olivia Gillon | • Insolvency.<br>• Michigan Law Not Preempted. | • See Reply, at §§ X (Insolvency); V.C (Michigan Law Not Preempted). |

CLI-2136816v4

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 402 | Russ Bellant | • Objects to the transfer of the Public Lighting Department to a private party.<br>• Due Process. | • Objection to transfer of PLD does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 405 | Russ Bellant | • Objects to the outsourcing of the City's waste removal services.<br>• Due Process. | • Objection to outsourcing of waste removal services does not address eligibility of City to be a chapter 9 debtor.<br>• See Reply, at § XIII (Due Process). |
| 411 | William Curtis Walton | • Michigan Law Not Preempted (¶¶ 1-5).<br>• No Good Faith Negotiations (¶ 6).<br>• Emergency Manager's Commencement Invalid (¶ 7). | • See Reply, at §§ V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations); V, VII.A (Emergency Manager's Commencement Invalid). |
| 412 | Dwight Boyd | • Insolvency. | • See Reply, at § X. |
| 415 | Mary W. Dugans | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 417 | William D. Ford | • Michigan Law Not Preempted. | • See Reply, at § V.C. |
| 418 | Stephen Johnson | • Michigan Law Not Preempted.. | • See Reply, at § V.C. |
| 426 | Kwabena Shabu | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• See also Response to all other Objections. |

**INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE**

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 435 | Sylvester Davis | • Emergency Manager's Commencement Invalid. | • <u>See</u> Reply, at § V, VII.A. |
| 446 | Dennis Taubitz | • Due Process (pp. 1-3).<br>• Insolvency (pp. 3-4).<br>• No Good Faith Negotiations (pp. 4-5). | • <u>See</u> Reply, at §§ XIII (Due Process); X (Insolvency); IX (No Good Faith Negotiations). |
| 448 | David Dye | • Insolvency (pp. 1-2).<br>• Swap contracts not valid (p. 2).<br>• PA 436 Unconstitutional (p. 3).<br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City (p. 3).<br>• Michigan Law Not Preempted (pp. 3-4).<br>• No Good Faith Negotiations (p. 4). | • <u>See</u> Reply, at §§ X (Insolvency); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted); IX (No Good Faith Negotiations).<br>• Allegations of fraud related to interest rate swap contracts (which fraud allegedly renders such contracts invalid) are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br>• The Emergency Manager's alleged conflict of interest is (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 459 | Phebe Lee Woodberry | • Michigan Law Not Preempted.<br>• Asserts that City holds in escrow an undisclosed amount of money for its taking of her apartment using its power of eminent domain. | • <u>See</u> Reply, at § V.C (Michigan Law Not Preempted).<br>• Issues related to funds allegedly held by City in connection with alleged eminent domain proceeding are unrelated to the City's eligibility to be a chapter 9 debtor. |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 460; 491 (Corrected) | Charles D. Brown | • Emergency Manager's Commencement Invalid (p. 2).<br>• Michigan Law Not Preempted (p. 2).<br>• Joinder in all other Objections (p. 2). | • <u>See</u> Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted).<br>• <u>See</u> <u>also</u> Response to all other Objections. |

CLI-2136816v4

13-53846-swr    Doc 2453-5    Filed 09/06/14    Entered 09/06/14 17:03:32    Page 170 of 185
13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:50:03    Page 170 of 185
313

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 461 | Thomas Stephens | • Due Process (¶ 2).<br><br>• Seeks a stay of the bankruptcy case and suggests that the Court formally request expedited consideration of all pending litigation raising legal and constitutional challenges to PA 436 (¶¶ 3-6).<br><br>• Emergency Manager has conflicts of interest due to his affiliations with Jones Day and due to the fact that Jones Day has clients that are creditors of the City. Emergency Manager and Jones Day are acting in their private interests rather than the interest of the City (¶¶ 8, 12).<br><br>• City and its professionals have violated the First Amendment in connection with public informational meetings held in April and June of 2013 (¶ 9).<br><br>• PA 436 Unconstitutional (¶¶ 10-12, 14).<br><br>• PA 436 abridges citizens' rights to engage in core First Amendment activities (¶ 13).<br><br>• Michigan Law Not Preempted (¶ 10).<br><br>• This court lacks jurisdiction to enter final orders implicating constitutionality of PA 436 (¶ 14). | • Argument that chapter 9 case should be stayed pending the resolution of state court litigation challenging authority of Governor and Emergency Manager should be overruled. Only state court litigation identified by Objector (a) is subject to the automatic stay pursuant to (i) sections 362 and 922 of the Bankruptcy Code and (ii) this Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities and (b) has been administratively closed by the relevant state court. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility.<br><br>• The Emergency Manager's/Jones Day's alleged conflicts of interest and alleged actions in their private interests are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor.<br><br>• Allegations of violations of First Amendment rights are framed generically and are not supported by any specific instance of such a violation.<br><br>• See Reply, at §§ XIII (Due Process); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 472 | Alice R. Pruitt | • PA 436 Unconstitutional.<br>• No Good Faith Negotiations.<br>• Michigan Law Not Preempted.<br>• Emergency Manager's Commencement Invalid.<br>• Insolvency. | • See Reply, at §§ V.A, VII (PA 436 Unconstitutional); IX (No Good Faith Negotiations); V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid); X (Insolvency). |
| 474 | Linda Bain | • Asserts that (a) the Emergency Manager's priority will be to sell Detroit's "precious and valuable assets" to stakeholders who have "illegally set up the emergency management operations"; and (b) the Emergency Manager is not going to address the inadequacy of the various City services in the bankruptcy case. | • Objector's allegations of bad faith and illegality on the part of the Emergency Manager, the Governor and the Treasurer are (a) unsupported by evidence and (b) unrelated to the City's eligibility to be a chapter 9 debtor. |
| 477 | Lucinda J. Darrah | • Objects to alleged secured status of "predatory and criminal acting" banks (p. 1).<br>• Michigan Law Not Preempted (p. 2).<br>• Objects to potential privatization of PLD (p. 3). | • Secured status of institutional creditors and potential privatization of PLD unrelated to City's eligibility to be a chapter 9 debtor.<br>• See Reply, at § V.C (Michigan Law Not Preempted). |
| 489 | Timothy King | • Emergency Manager's Commencement Invalid.<br>• PA 436 Unconstitutional. | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.A, VII (PA 436 Unconstitutional). |

-13-

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 490 | Jo Ann Watson | • Governor's Authorization Invalid. <br> • PA 436 Unconstitutional. <br> • Michigan Law Not Preempted. <br> • Reserves the right to join in "the objections raised by others which are relevant to my specific objection or this matter in general." | • Objector's unsupported argument that the Bankruptcy Code requires that "local elected officials" commence any municipal bankruptcy is contrary to the plain language of section 109(c)(2) of the Bankruptcy Code and applicable case law. <br> • Objector's argument that PA 72 was invalid at the time of the Emergency Manager's appointment is false, unsupported and contrary to applicable case law. <br> • See Reply, at §§ V (Governor's Authorization Invalid); V.A, VII (PA 436 Unconstitutional); V.C (Michigan Law Not Preempted). |
| 492 | Cynthia Blair | • Due Process. <br> • Emergency Manager's Commencement Invalid. <br> • Michigan Law Not Preempted. <br> • Objects to the assertion that pensions are underfunded. <br> • Insolvency. <br> • No Good Faith Negotiations. | • See Reply, at §§ XIII (Due Process); V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted); X (Insolvency); IX (No Good Faith Negotiations). <br> • Challenge to underfunding amount of pensions unrelated to City's eligibility to be a chapter 9 debtor. |

CLI-2136816v4

13-53846-swr   Doc 2453-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 173 of 185
13-53846-swr   Doc 765   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 113 of 135
313

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 493 | James Thomas McBride, filing as The Chair of Saint Peter | • Insolvency.<br>• Asserts that: (a) the 300 year old "City of Detroit" is solvent, but the 80 year old legal fiction "The City of Detroit" is intentionally insolvent; (b) the "petition" is "intentionally confusing and misleading" and contains words with "diabolically opposed meanings;" (c) the City has tricked people into pledging their property as collateral, which has fraudulently converted the "true Creditors" into debtors, reducing the creditors to the status of insolvent paupers with no rights; and (d) the City holds "private matching funds" and refuses to execute the set off of debt for the settlement and closure of the accounts to return the City to solvency. | • See Reply, at § X (Insolvency).<br>• Allegation that "petition" is "intentionally confusing and misleading" unrelated to City's eligibility to be a chapter 9 debtor. Objector also fails to (a) specify which document filed by the debtor is "confusing and misleading;" and (b) comprehensibly explain how certain words in the referenced document have "diabolically opposed meanings."<br>• Allegations that (a) the City has tricked people into pledging their property as collateral; and (b) the City refuses to apply "private matching funds" to set off its debts are non-specific, factually unfounded and unrelated to the City's eligibility to be a chapter 9 debtor. |
| 494 | Gretchen R. Smith | • Emergency Manager's Commencement Invalid.<br>• No Good Faith Negotiations. | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); IX (No Good Faith Negotiations). |
| 495 | David Sole | • Emergency Manager's Commencement Invalid (pp. 5-8).<br>• Michigan Law Not Preempted (pp. 8-11). | • See Reply, at §§ V, VII.A (Emergency Manager's Commencement Invalid); V.C (Michigan Law Not Preempted). |
| 496 | Floreen Williams | • PA 436 Unconstitutional. | • See Reply, at §§ V.A, VII. |

-15-

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 504 | Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman | • Joinder in UAW's Objection (Docket No. 506) (¶¶ 9-10).<br>• Michigan Law Not Preempted / Governor's Authorization Invalid (¶¶ 11-18). | • See Response to UAW's Objection.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V (Governor's Authorization Invalid). |
| 510 | Michael Joseph Karwoski | • Objects to the "inclusion" of GRS in these proceedings without an objective determination of the extent to which GRS is underfunded (¶ 1).<br>• Michigan Law Not Preempted (¶ 2).<br>• Emergency Manager's Commencement Invalid (¶¶ 3-11). | • Extent to which GRS is underfunded is unrelated to City's eligibility to be a chapter 9 debtor.<br>• See Reply, at §§ V.C (Michigan Law Not Preempted); V, VII.A (Emergency Manager's Commencement Invalid). |
| 513 | Heidi Peterson | • No Good Faith Negotiations (¶ 11(a), (c)).<br>• The City's dealings with Ms. Peterson with respect to her pending lawsuit were fraudulent (¶ 11(b)).<br>• The City allowed itself to become overburdened with debt "by virtue of down right idiotic business practices" (i.e., policies regarding the assessment and collection of property taxes) (¶ 12). | • See Reply, at § IX (No Good Faith Negotiations).<br>• Objector fails to substantiate vague allegation that the City's failure to negotiate with the Objector prior to filing for bankruptcy protection constituted fraud. Challenged City actions were the result of the imposition of the automatic stay.<br>• City policies relating to the assessment and collection of property taxes unrelated to City's eligibility to be a chapter 9 debtor. |
| 530 | Diane Hutchersun | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 532 | Andrea Edwards | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 534 | Nettie Reeves | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 536; 568 (Order Denying Motion for Extension of Time) | Richard Johnson El-Bey | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 539 | Charles E. Chatman | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 541 | Xylia Hall | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 549 | Michael D. Jones | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 565 | Hassan Aleem; Carl Williams | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 633 | Donald Richardson | | • Overruled as untimely per order entered on August 26, 2013 (Docket No. 642). |
| 650 | Alma Armstrong | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 672). |
| 651 | Brenda Taylor | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 664). |

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 667 | Josué Zizi | | • Overruled as untimely per order entered on August 28, 2013 (Docket No. 674). |

**INDIVIDUAL OBJECTIONS TO ELIGIBILITY, SUMMARY OF ARGUMENTS SET FORTH THEREIN & CITY'S RESPONSE**

| OBJECTION DOCKET NO(S). | OBJECTOR(S) | SUMMARY OF ARGUMENTS | CITY'S RESPONSE |
|---|---|---|---|
| 384; 385; 386; 387; 389; 390; 391; 392; 393; 394; 395; 396; 397; 399; 400; 403; 404; 407; 408; 409; 413; 414; 416; 419; 420; 421; 422; 423; 425; 427; 428; 429; 430; 431; 432; 433; 436; 437; 439; 440; 442; 443; 444; 447; 451; 454; 455; 456; 457; 458; 462; 463; 464; 465; 466; 467; 468; 469; 470; 475; 479; 480; 485 | Krystal A. Crittendon; Michael J. Abbott; Donald Glass; Calvin Turner; Joseph H. Jones; Tracey Tresvant; Charles Williams II; Joyce Davis; David Bullock; Lewis M. Dukens; Shirley Tolliver; Zelma Kinchloe; LaVern Holloway; Althea Long; Alma Cozart; Lorene Brown; Helen Powers; Preston West; Claudette Campbell; Raleigh Chambers; Johnnie R. Carr; Elmarie Dixon; Jacqueline Esters; Sallie M. Jones; Larene Parrish; Deborah Pollard; Samuel L. Riddle; Charles Taylor; Edward Lowe; Keetha R. Kittrell; Lorna Lee Mason; Ulysses Freeman; William Davis; Paulette Brown; Jerry Ford; William L. Howard; Frank M. Sloan, Jr.; Joann Jackson; Jean Vortcamp; Mary Diane Bukowski; William Hickey; Michael D. Shane; Judith West; Lucinda J. Darrah; Sheilah Johnson; Leola Regina Crittendon; Angela Crockett; Dolores A. Thomas; Ailene Jeter; Cheryl Smith Williams; Aleta Atchison-Jorgan; Arthur Evans; Horace E. Stallings; Lavarre W. Greene; Leonard Wilson; Rakiba Brown; Roosevelt Lee Sr.; Sandra Caven; Deborah Lela Moore; Marzelia Taylor; Fraustine Williams; Randy R. Beard; Anthony G. Wright, Jr. | • "Form" objections entitled "Objections to the Petition Filed by One Kevyn D. Orr Seeking to Commence a Case Under Chapter 9 of Title 11 of the United States Code on Behalf of the City of Detroit, Michigan," into which creditors insert their name and date of birth and the date on which they received the Case Commencement Notice.<br><br>• Due Process.<br><br>• Seek a stay of the bankruptcy case pending the resolution of all litigation raising legal and constitutional challenges to PA 436. | • See Reply at § XIII (Due Process).<br><br>• Argument that chapter 9 case should be stayed pending the resolution of all litigation raising legal and constitutional challenges to PA 436 should be overruled. The state court lawsuits referenced by Objectors are subject to the automatic stay pursuant to (a) sections 362 and 922 of the Bankruptcy Code and (b) the Court's orders (Docket Nos. 166, 167) entered on July 25, 2013, confirming the application of, and extending, the automatic stay to certain entities. Objectors' argument is a procedurally improper attempt to obtain reconsideration of previous Court orders rather than an objection to eligibility. |

-19-

CLI-2136816v4

13-53846-swr Doc 2463-5 Filed 09/06/14 Entered 09/06/14 17:03:32 Page 178 of 185
13-53846-swr Doc 765 Filed 09/15/13 Entered 09/15/13 19:55:03 Page 178 of 185
313

# **EXHIBIT C**

13-53846-tjt   Doc 7465-5   Filed 09/06/14   Entered 09/06/14 19:50:03   Page 1 of 15
13-53846-swr   Doc 2473-5   Filed 01/14/14   Entered 01/14/14 17:03:32   Page 179 of
313



# MICHIGAN COUNCIL 25

American Federation of State, County, and Municipal Employees, AFL-CIO
Detroit Office • 600 W. Lafayette, Ste. 500 • Detroit, Michigan 48226
Phone: 313.964.1711 • 1.800.AFSCME25 • Fax: 313.964.0230 • www.miafscme.org

**Albert Garrett**
*President*

**Lawrence A. Roehrig**
*Secretary-Treasurer*

**Executive Board**

Sylvester Austin
*Region 2*

Carlos Bass
*Region 3*

David Brandt
*Region 9*

Donna Cangemi
*Region 3*

Susan Christensen
*Region 11*

Sandra Crayton
*Region 6*

Barbara Dauble
*Region 3*

Lorna Davison
*Region 2*

Jonathan Drake
*Region 2*

Caryette Fenner
*Region 4*

Michael Harris
*Region 1*

Bennette Henley
*Region 1*

Lorraine Jacobson
*Region 10*

Keith January
*Region 1*

Laura Kinch
*Region 6*

Arlean King
*Region 1*

J. Phil McGuire
*Region 2*

Phyllis McMillon
*Region 1*

Dennis Moore
*Region 7*

Sam Muma
*Region 6*

Doug Murch
*Region 5*

Lois Murray
*Region 3*

Stephanie Nahas
*Region 3*

Dennis Overmyer
*Region 7*

Gloria Peterson
*Region 4*

Patricia Ramirez
*Region 6*

James Rhodes, Jr.
*Region 5*

Roger Rice
*Region 1*

Ronnie Skorupski
*Region 8*

Cindy Spurlock
*Region 2*

Chris Vandenbussche
*Region 3*

Russell Williams
*Region 11*

Sam Zettner
*Region 3*

*Advanced copy via facsimile*
*(312) 782-8585*

May 24, 2013

Brian West Easley, Esq.
Jones Day
77 West Wacker
Chicago, IL 60601-1692

**Re:     Letter from Brian West Easley Dated 5/20/13 Entitled** *"City of Detroit Restructuring"*

Dear Mr. Easley:

This communication is sent in response to your letter concerning the above stated matter, in which you requested to meet concerning restructuring of Pension and Retiree Medical Benefit liabilities. Please be advised that in accordance with Michigan law, we have no authority in which to renegotiate the Pension or Medical Benefits that members of our Union currently receive. However, we are willing to meet with you per your request. Please propose several alternative dates in which you are available.

Further you should be aware that for the first time in history, over 30 Unions came together in negotiating concessions. The cost-savings and revenues within this proposed Coalition Contract reached **hundreds of millions of dollars annually**. The Contract also contained many restructuring ideas for the City to engage. Ernst & Young participated during every facet of the negotiations and approved the final deal on behalf of the State. The Unions then ratified the concessions. The Coalition and the City celebrated the Ratification.

Unfortunately, the City did not execute the Coalition Contract. The Mayor claimed the State ordered him not to do so. City Council was not permitted to vote to ratify the Contract. By doing this, the City lost **tens of millions of dollars** in actual savings that the City should have realized from these concessions. This has been acknowledged by the City's financial expert.

Indeed, the Milliman Company being used by the City now, acknowledged that the City could have saved well over **50 million dollars** by the healthcare package called for in the Tentative Agreement. Given that the changes were not implemented as of

13-53846-tjt    Doc 2453-5  Filed 09/06/14  Entered 09/06/14 17:03:32  Page 180 of 185
13-53846-swr    Doc 2463-5  Filed 09/06/14  Entered 09/06/14 19:59:03:32  Page 120 of 135
313

July 1, 2012, as called for in the Contract, the City lost the savings. Even when the City did unilaterally impose a healthcare plan, it botched the implementation with an excessive amount of plans and problematic rollouts.

We have repeatedly asked the reason why the Governor ordered the City not to execute and implement the Tentative Agreement. Indeed, during a hearing in Federal Judge, Arthur Tarnow's courtroom, he asked the City and State attorneys the same question, as well as what were the work rule changes they were seeking. The lawyers could give no answer.

You should know that we stand ready to meet and negotiate in an effort to save the City. We have been doing so for decades. We hope; however, that the City takes a look at the concessions our Unions already offered in lengthy negotiations last February. The Governor and the Mayor have talked frequently about **"shared sacrifices."** However, employees are the only ones who have "**truly sacrificed**."

I look forward to hearing from you in the near future.

Sincerely yours,

Edward L. McNeil
Special Assistant to the President

cc:     LaMont Satchel, Labor Relations, City of Detroit

dat/324iuoeaflcio



# UAW LOCAL 2211
## (Public Attorneys Association)
CAYMC                          • Detroit, Michigan 48226
2 Woodward. Ave., Ste. 500



May 22, 2013

Brian West Easley
Jones Day
77 West Wacker
Chicago, IL 60601-1692

      *Re:*    City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts. I write to confirm that this Union – Local No. 2211 of the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") – represents active employees, and thus future retirees, within its bargaining unit. This Union does not, however, represent current retirees and has no authority to negotiate on their behalf. On behalf of the active employees it does represent, I accept your invitation to participate in the discussions concerning health care and pension benefits. Because these issues are so vital to members, this Union requests bargaining with respect to any changes which the Emergency Manager (or City) might propose to make in those benefits. The Union requests the earliest possible dates for meeting, and proposes that the meetings be held at the Office of Labor Relations, on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.

Please advise me of possible dates and location for our meeting at your earliest convenience.

Also, if the City has developed any proposals, potential options, or possible modifications to health care or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting. Also in advance of our meeting, please provide documents showing any calculations relating to health care costs and pension costs (both present and future) as well as the assumptions upon which the calculations are based.

                                   Sincerely,

                                   Robyn Brooks
                                   President

cc:    Jack Dietrich
       Lamont Satchel

13-53846-swr    Doc 2453-5   Filed 09/06/14   Entered 09/06/14 19:59:03   Page 182 of 185
13-53846-swr    Doc 2453-5   Filed 09/06/14   Entered 09/06/14 17:03:32   Page 122 of 135
313

# Metropolitan Detroit Professionals

UAW-Local 2200
5201 Woodward Avenue
Detroit, Michigan 48202



May 23, 2013

Brian West Easley
Attorney
Jones Day
77 West Wacker
Chicago, IL 60601

Dear Mr. Easley:

I am in receipt of your letter dated May 20, 2013 regarding City of Detroit Restructuring.

Today I spoke with Ms. Ms. Samantha Woo in your office. I gave her my verbal reply that UAW LU 2200 will participate in discussions and represent the interests of current employees at the Detroit Water and Sewerage Department's Wastewater Treatment Plant who are members of this Local Union.

Please contact me at your earliest convenience with proposed dates and times for the discussions. Telephone: 313-706-0081 or email: mimilaurie@yahoo.com.

Sincerely,

Laurie Townsend Stuart
President, UAW LU 2200


cc:     Gloria Morgan, International Representative, UAW Region 1
        Tiffani Simon, Vice President, UAW LU 2200
        DeShawn Benson, Unit Chair,
        Wastewater Treatment Plant Supervisors, UAW LU 2200
        Samantha Woo, Jones Day



PAGE 1/1 * RCVD AT 5/29/2013 12:14:39 PM [Eastern Daylight Time] * SVR:NAFX02MS/22 * DNIS:60572 * CSID:3138335012 * DURATION (mm-ss):00-55

13-53846-tjt    Doc 2653-5  Filed 09/06/14  Entered 09/06/14 19:55:03  Page 183 of 185
313

**INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE & AGRICULTURAL IMPLEMENT WORKERS OF AMERICA–UAW**

BOB KING, *PRESIDENT*                DENNIS D. WILLIAMS, *SECRETARY-TREASURER*

VICE-PRESIDENTS:  JOE ASHTON  •  CINDY ESTRADA  •  GENERAL HOLIEFIELD  •  JIMMY SETTLES

CHARLES E. HALL
DIRECTOR, UAW REGION 1

May 22, 2013

Mr. Brian West Easley
Jones Day
77 W. Wacker
Chicago, IL  60601-1692

RE: City of Detroit

Dear Mr. Easley:

Thank you for your letter of May 20, 2013, regarding the City of Detroit's restructuring efforts.  I am writing to confirm that Local No. 412 and Local No. 212 of the International Union, United Automobile, Aerospace and Agricultural Implement workers of America ("UAW") represent active employees, and thus future retirees, within their bargaining units.  These locals do not, however, represent current retirees and have no authority to negotiate on their behalf.  On behalf of the active employees we do represent, I accept your invitation to participate in discussions concerning healthcare and pension benefits.  Because these issues are so vital to members, the locals request bargaining with respect to any changes which the Emergency Manager (or city) might propose to make in those benefits.  We request the earliest possible dates for meeting, and propose that the meetings be held at the Office of Labor Relations on the third floor of the Coleman A. Young Municipal Center, where bargaining has taken place to date.*

Please advise me of possible dates and location of our meeting at your earliest convenience.

Also, if the city has developed any proposals, potential options or possible modifications to healthcare or pension plans applicable to this bargaining unit, please advise and provide me with a copy of same in advance of our meeting.  Any calculations regarding healthcare and pension costs (both present and future) are likewise requested.

Sincerely,

John Cunningham
International Representative
UAW Region 1

JC:ja/opeiu494
cc:     Tony Feyers, UAW Region 1
        Jeff Hagler, UAW Local 412
        Jeff Jarema, UAW Local 212
        Gloria Morgan, UAW Region 1
        Frank Stuglin, UAW Region 1

*Your letter made reference to UAW Local 414 – apparently a typographical error.  Please be advised that it is Local No. 412 which represents legal assistants.

13-53846-tjt   Doc 2475-5   Filed 06/14/14   Entered 06/14/14 17:03:32   Page 184 of 185
13-53846-swr   Doc 765-5   Filed 09/06/13   Entered 09/06/13 19:59:03   Page 124 of 135
313

# EXHIBIT D

13-53846-tjt    Doc 2473-5    Filed 06/14/14    Entered 06/14/14 17:03:32    Page 185 of 135
13-53846-swr    Doc 765-5    Filed 09/06/13    Entered 09/06/13 19:50:03    Page 125 of 135
313

# JONES DAY

77 WEST WACKER • CHICAGO, ILLINOIS 60601-1692
TELEPHONE: 312-782-3939 • FACSIMILE: 312-782-8585

June 27, 2013

**VIA E-MAIL**

James Williams
President
AFSCME, Local 207 – Non-Supervisory Unit
600 W. Lafayette, Ste. L-106
Detroit, MI 48226
afscme207@sbcglobal.net

                    Re:    <u>City of Detroit Restructuring</u>

Dear Mr. Williams:

      Thank you for participating in the June 20, 2013 informational meetings pertaining to the City of Detroit's (the "City's") proposals to restructure the City's retiree medical and pension obligations. We appreciated your questions and input and look forward to discussing these issues with the American Federation of State, County and Municipal Employees, Local 207 – Non-Supervisory Unit in the coming weeks.

      The City recognizes that representatives of active and retired employees will need access to additional information to analyze the restructuring proposals outlined in the June 20 meetings. Information relevant to these proposals will be made available in the on-line data room established for creditors and other stakeholders. If you do not yet have access to the data room, please contact Dan Merrett (dmerrett@jonesday.com/ (404) 581-8476), who will provide you with further instructions.

      To the extent you will need additional information beyond that provided in the data room to analyze and provide input with respect to the City's retiree benefits restructuring proposals, please forward requests for such information directly to my attention. We will make every effort to make responsive and relevant information available in a timely manner.

      The City is very much looking forward to the unions' feedback with respect to the City's retiree benefits restructuring proposal. As we repeatedly stated during the meeting, to the extent that your organization has additional ideas about restructuring retiree benefits in a manner consistent with the City's financial limitations, the City will consider any such ideas. Please let me know if you would like to set up a time to further discuss these issues.

      Sincerely,

      Brian West Easley

cc:    Kevyn Orr, Esq.
       Mr. Lamont Satchel

ATLANTA • BEIJING • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI • FRANKFURT • HONG KONG • HOUSTON
IRVINE • LONDON • LOS ANGELES • MADRID • MEXICO CITY • MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS
PITTSBURGH • SAN DIEGO • SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

13-53846-swr    Doc 765    Filed 09/06/13    Entered 09/06/13 19:59:03    Page 186 of 313

# EXHIBIT E

13-53846-tjt    Doc 2463-5   Filed 06/14/14   Entered 01/14/14 17:03:32   Page 187 of
13-53846-swr    Doc 765   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 127 of 135
313

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113

TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

DIRECT NUMBER: (202) 879-3840
EMILLER@JONESDAY.COM

July 17, 2013

Mr. Daniel F. McNamara
President
Detroit Fire Fighters Association
Suite 644
243 West Congress
Detroit, Michigan 48226-3217

Mr. Steve Dolunt
President
Detroit Police Command Officers Association
Post Office Box 2625
Detroit, Michigan 48202

Mr. Mark Young
President
Detroit Police Lieutenants
   & Sergeants Association
Suite 700
28 West Adams
Detroit, Michigan 48226

Mr. Mark Diaz
President
Detroit Police Officers Association
1938 East Jefferson Street
Detroit, Michigan 48207

Re:   City of Detroit Pension Restructuring

Gentlemen:

Thank you for your letter of July 12, 2013, and thank you further for continuing to discuss in good faith the difficult issue of pension restructuring. The Office of the Emergency Manager appreciates your strong cooperation.

Consistent with the position Dave Heiman and I expressed at the meeting, we still think it makes sense to first try to reach common ground with key unions and association leaders on actuarial assumptions and methods, and the amount of PFRS underfunding, and then tackle contributions and attendant benefit changes. Nonetheless, we are interested in hearing any pension benefit redesign thinking and proposals that come from key union leadership, including ideas to avoid a freeze. We stand ready to meet to discuss such ideas.

We also took seriously the concern expressed at our meeting last Thursday on two issues: (1) that the City's retiree health proposal for uniform retirees should include amounts for pre-age 55 early retirees and not begin at age 55; and (2) if there were to be a hard freeze at PFRS, active employees who do not have sufficient service at the freeze date to obtain a vested pension be given an opportunity to earn such service and not lose their entire pensions. The City's advisors are looking hard at those issues and we intend to report back to you shortly.

WAI-3135350v1

ALKHOBAR • AMSTERDAM • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS
DUBAI • DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MIAMI • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

Mr. Daniel F. McNamara
Mr. Steve Dolunt
Mr. Mark Young
Mr. Mark Diaz
July 17, 2013
Page 2

Thank you for your letter and please keep the lines of communication open.

Sincerely,

Evan Miller

cc:     David G. Heiman, Esq.

# EXHIBIT F

13-53846-tjt    Doc 2473-5   Filed 06/14/14   Entered 06/14/14 17:03:32   Page 190 of 135
13-53846-swr    Doc 765-5   Filed 09/06/13   Entered 09/06/13 19:50:03   Page 190 of 135
313



1625 L Street, NW
Washington, DC 20036
Phone: 202-429-1215, Fax: 202-223-3255
Website: www.afscme.org



AFSCME

# Fax



## Department of Research and Collective Bargaining Services

To: *Brian West Easterly*  From: *Steve Kreisberg*

Fax: *312 - 782 - 8585*  Pages: *4*, including cover

Phone:                                     Date: *7-2-2013*

Re:                                          CC:

☐ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle



PAGE 1/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-tjt   Doc 2453-5   Filed 09/06/13   Entered 09/06/13 17:03:32   Page 191 of
313



Lee Saunders
*President*

Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J. Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

July 2, 2013

Mr. Brian West Easterly
Jones Day
77 West Wacker
Chicago, IL 60601

Via Fax: (312) 782-8585

Dear Mr. Easterly:

You have contacted a number of Local unions affiliated with AFSCME for the purpose of offering information and inviting "feedback" on the Emergency Financial Manager's (EFM) proposal to "restructure" retiree benefits. The undersigned, in conjunction with AFSCME Council 25 President Albert Garrett and Council 25's Assistant to the President Ed McNeil will be representing our affiliated Locals in these matters. We are not representing current retirees.

I have followed the procedures and have been provided access to the on-line data room established by the EFM. I have also been in touch with Kyle Herman from Miller Buckfire as instructed by the EFM in his "Proposal to Creditors" on June 14. As I stated in an e-mail message to Mr. Herman, the electronic data room does not have all of the information I have requested of the EFM in a letter dated June 17, 2013 (copy enclosed). To reiterate, I have requested the following:

1.  A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll. Subsequent to June 17, I have been given access to Milliman analysis of the pension system which is partially responsive to my request.

2.  The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3.  A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

**American Federation of State, County and Municipal Employees, AFL-CIO**

TEL (202) 429-1000    FAX (202) 429-1293    TDD (202) 659-0446    WEB www.afscme.org    1625 L Street, NW, Washington, DC 20036-5687

PAGE 2/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr   Doc 2453-5   Filed 09/06/14   Entered 09/06/14 15:50:32   Page 192 of 135
313

Brian West Easterly
July 2, 2013
Page 2 of 2

4.      A description of all assumptions, data, and documents relied upon to support the
        following revenue projections:
        a.      Municipal income tax
        b.      Wagering taxes
        c.      Property taxes
        d.      State revenue sharing
        e.      Utility users' and other taxes
        f.      "Other revenue" (page 52 of the Proposal to Creditors)

5.      A description of all projected services and investments included in the
        "Reorganization (Capital investments and Professional fees)" budget line item in the
        ten year Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related
        to the development of major initiatives (for example, investments on technology)
        should be provided as well. Documents and other supporting data that support the
        cost projections should be provided as well.  If the identity of vendors has been
        established, please provide that information.

      To clarify, we are seeking the data relied upon by the EFM as he developed his retiree
benefits restructuring proposal.  Detailed information related to reorganization and restructuring
initiatives consists of a one page financial summary.  I am seeking the data relied upon to
develop that summary, especially and including, the back-up data associated with estimated
expenditures addressing "blight."

      In response to your offer to provide "feedback" on the proposed restructuring of retirement
benefits, we hereby request to meet with authorized representatives of the EFM on July 10, 2013
at 10:00 a.m.  To date, your representatives have provided presentations, and scheduled an
additional presentation on pension benefits for the afternoon of July 10, but the EFM has not
provided AFSCME with a meaningful opportunity to engage in a good faith negotiation of these
issues.  That process should start as soon as possible. We suggest we meet at our offices in
Detroit, 600 West Lafayette.  It would be extremely helpful if you could provide the requested
information in advance of the meeting.

      Please contact me at (202)429-1237 or skreisberg@afscme.org to discuss these matters, if
necessary, and to confirm our proposed meeting.

                                        Sincerely,

                                        Steven Kreisberg
                                        Director of Collective Bargaining and
                                        Health Care Policy

SK/dd

cc:     Albert Garrett, AFSCME Council 25 President
        Kevyn Orr, Emergency Financial Manager



Lee Saunders
*President*
Laura Reyes
*Secretary-Treasurer*

**Vice Presidents**

Ken Allen
*Portland, OR*

Henry L. Bayer
*Chicago, IL*

Ken Deitz, RN
*San Dimas, CA*

Greg Devereux
*Olympia, WA*

Danny Donohue
*Albany, NY*

David R. Fillman
*Harrisburg, PA*

Michael Fox
*Harrisburg, PA*

Kathleen Garrison
*Latham, NY*

Raglan George Jr.
*New York, NY*

Mattie Harrell
*Williamstown, NJ*

Johanna Puno Hester
*San Diego, CA*

Danny J Homan
*Des Moines, IA*

Salvatore Luciano
*New Britain, CT*

John A. Lyall
*Worthington, OH*

Kathryn Lybarger
*Oakland, CA*

Roberta Lynch
*Chicago, IL*

Christopher Mabe
*Westerville, OH*

Glenard S. Middleton Sr.
*Baltimore, MD*

Ralph Miller
*Los Angeles, CA*

Gary Mitchell
*Madison, WI*

Douglas Moore Jr.
*San Diego, CA*

Frank Moroney
*Boston, MA*

Henry Nicholas
*Philadelphia, PA*

Randy Perreira
*Honolulu, HI*

Greg Powell
*Austin, TX*

Lillian Roberts
*New York, NY*

Eddie Rodriguez
*New York, NY*

Lawrence A. Roehrig
*Lansing, MI*

Joseph P. Rugola
*Columbus, OH*

Eliot Seide
*South St. Paul, MN*

Mary E. Sullivan
*Albany, NY*

Braulio Torres
*San Juan, PR*

David Warrick
*Indianapolis, IN*

Jeanette D. Wynn
*Tallahassee, FL*

June 17, 2013

Mr. Kyle Herman
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, NY 10022
kyle.herman@millerbuckfire.com

Dear Mr. Herman:

In accordance with the instructions of the Detroit Office of the Emergency Financial Manager (EFM), I request the following information:

1. A copy of the preliminary actuarial analysis, to include a full description of all assumptions relied upon, used to support the revised cost estimates and funding condition of the PFRS and GRS pension systems. Data should show projected normal cost for each plan and the proposed UAAL amortization payment as a percent of payroll.

2. The basis for the cost estimates of retiree health care (OPEB) including a description of all assumptions relied upon (including eligibility for benefits under the plan and benefits under the plan), the annual net OPEB obligation, and projected pay-as-you-go funding requirements for the next ten years.

3. A description of the proposed retiree health care plan that will rely upon Medicare Advantage and the Exchange Marketplace under the Affordable Care Act and the basis for the estimated annual City cost of between $27.5 million and $40 million. To the extent eligibility for benefits is revised from the assumption in item 2 above, please describe the new eligibility criteria.

4. A description of all assumptions, data, and documents relied upon to support the following revenue projections:
   a. Municipal income tax
   b. Wagering taxes
   c. Property taxes
   d. State revenue sharing
   e. Utility users' and other taxes
   f. "Other revenue" (page 52 of the Proposal to Creditors)

**American Federation of State, County and Municipal Employees, AFL-CIO**
TEL (202) 429-1000     FAX (202) 429-1293     TDD (202) 659-0446     WEB www.afscme.org     1625 L Street, NW, Washington, DC 20036-5687

PAGE 4/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2453-5  Filed 09/06/14  Entered 09/06/14 19:50:03:32  Page 194 of 195
313

Mr. Kyle Herman
June 17, 2013
Page 2

5.  A description of all projected services and investments included in the "Reorganization
    (Capital investments and Professional fees)" budget line item in the ten year
    Restructuring Scenario (page 97 of the Proposal to Creditors). Detail related to the
    development of major initiatives (for example, investments on technology) should be
    provided as well. Documents and other supporting data that support the cost projections
    should be provided as well.  If the identity of vendors has been established, please
    provide that information.

    I am assisting AFSCME locals and AFSCME Council 25 with issues related to the
Proposal.  We have been asked to meet with the EFM's representatives on Thursday.
Accordingly, information related to items 1 through 3 should be provided prior to our meeting
and the remaining information as soon as possible.  I appreciate your cooperation.  Feel free to
call me at (202)429-1237 or email skreisberg@afscme.org if you have any questions or are in
need of clarification.

                              Sincerely,



                              Steven Kreisberg
                              Director of Collective Bargaining and
                              Health Care Policy


SK:tem

PAGE 5/5 * RCVD AT 7/2/2013 11:49:42 AM [Eastern Daylight Time] * SVR:NAFX02MS/20 * DNIS:60572 * CSID:202 223 3255 * DURATION (mm-ss):01-37

13-53846-swr    Doc 2463-5    Filed 09/06/14    Entered 09/06/14 17:03:32    Page 195 of 135
313

**ITEM NO. 14**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                              Chapter 9
                                                    Case No. 13-53846
City of Detroit, Michigan,                          Hon. Steven W. Rhodes
        Debtor.
_____/

**FIRST AMENDED**
**Order Regarding Eligibility Objections**
**Notices of Hearings**
**and**
**Certifications Pursuant to 28 U.S.C. § 2403(a) & (b)**

> *This order includes a special notice of hearing*
> *to individuals who filed eligibility objections,*
> *and includes provisions of interest to:*
> *Dennis Taubitz,*
> *Heidi Peterson*
> *Hassan Aleem,*
> *and Carl Williams.*
> *Please see Part VIII, page 6.*

**I. Introduction**

One hundred ten parties filed timely objections to the City's eligibility to file this bankruptcy case under § 109 of the Bankruptcy Code.

The Court appreciates the effort of each of the parties in this process.

The Court has thoroughly reviewed each of the filed objections, as well as the Statement Regarding the Michigan Constitution and the Bankruptcy of the City of Detroit that Michigan Attorney General Bill Schuette filed. (Dkt. #481) Some objections raise only legal issues, while others require the Court to resolve factual issues. The Court will address each in an appropriate manner.

**II. Eligibility Objections Raising Only Legal Issues**

On a preliminary basis, the following objections appear to raise only legal issues:[1]

---

[1] This summary of the parties' objections in Parts II & V is intended to capture in a shorthand form the substance of the parties' objections for identification purposes only and is not intended to limit, diminish or restate those objections.

1353846130912000000000002

1. Chapter 9 of the Bankruptcy Code violates the United States constitution.
    Asserted by:
       484   Local 324, International Union of Operating Engineers
       486   Local 517M, Service Employees International Union
       505   Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
       805   Official Committee of Retirees

2. The Bankruptcy Court does not have the jurisdiction to determine the constitutionality of Chapter 9 of the Bankruptcy Code.
    Asserted by:
       484   Local 324, International Union of Operating Engineers
       486   Local 517M, Service Employees International Union
       505   Michigan Council 25 Of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
       805   Official Committee of Retirees

3. Michigan Public Act 436 of 2012 violates the Michigan constitution and therefore the City was not validly authorized to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).
    Asserted by:
       484   Local 324, International Union of Operating Engineers
       486   Local 517M, Service Employees International Union
       504   Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
       505   Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
       506   International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
       519   General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit
       520   Retired Detroit Police Members Association
       805   Official Committee of Retirees

4. The Bankruptcy Court does not have the jurisdiction to determine the constitutionality of Michigan Public Act 436 of 2012.
    Asserted by:
       384   Krystal Crittendon
       805   Official Committee of Retirees

5. Detroit's Emergency Manager is not an elected official and therefore did not have valid authority to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).
    Asserted by:
       384   Krystal Crittendon

2

13-53846-tjt   Doc 2472-5   Filed 01/24/14   Entered 01/24/14 11:03:32   Page 198 of
13-53846-swr   Doc 4321   Filed 09/12/13   Entered 09/12/13 11:03:57   Page 2 of 12
313

505   Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
805   Official Committee of Retirees

6.  Because the Governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

    Asserted by:

    484   Local 324, International Union of Operating Engineers
    486   Local 517M, Service Employees International Union
    495   David Sole
    502   Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
    504   Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
    505   Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
    506   International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
    512   The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association
    514   Center for Community Justice and Advocacy
    519   General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit
    520   Retired Detroit Police Members Association
    805   Official Committee of Retirees

7.  Because of the proceedings and judgment in *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the Governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

    Asserted by:

    495   David Sole
    519   General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit

## III. Notice of Hearing on Eligibility Objections That Raise Only Legal Issues

The Court further concludes that a prompt oral argument on these legal issues will promote a just, speedy, and efficient determination of the City's eligibility to be a debtor in Chapter 9 under § 109(c) of the Bankruptcy Code. Accordingly, the Court will hear oral argument on these legal issues on **October 15, 2013 at 10:00 a.m.** and **October 16, 2013 at**

**10:00 a.m.** in Courtroom 716, Theodore Levin U.S. Courthouse, 231 West Lafayette Blvd., Detroit, Michigan.

At the conclusion of the opening arguments, the Court will offer the objecting parties an opportunity to confer for the purpose of allocating and organizing their rebuttal arguments.

At the conclusion of the oral argument, the Court will not rule on legal issues, but will announce its determination as to which of the objections raise only legal issues and which require the resolution of genuine issues of material fact at the eligibility hearing previously set for October 23, 2013.

## IV. Procedures Regarding Hearing on Eligibility Objections That Appear to Raise Only Legal Issues

At the oral argument, the objecting parties shall proceed first and share 210 minutes for their opening arguments and 60 minutes for their rebuttal arguments. The City and the Attorney General shall then share 210 minutes for their opening arguments and 60 minutes for their surrebuttal arguments.

On the objecting parties' side, the parties that are identified above are requested to confer in advance of the oral argument for the purpose of agreeing on the allocation of time among them (within the time limits established in this order) and on the order of their presentations. Attorney Robert Gordon is requested to organize and supervise these discussions.

Designates of the City, the Michigan Attorney General, the Attorney General of the United States, and the United States Attorney for the Eastern District of Michigan are requested to confer in advance of the oral argument for the purpose of agreeing on the allocation of time among them (within the time limits established in this order) and on the order of their presentations. Attorney David Heiman (or his designate) is requested to organize and supervise these discussions.

By the day before the argument, each side shall file its agreement, if any, regarding the allocation of time and the order of presentation. If either side is unable to agree, the Court will determine the allocation of time among the parties and the order of their presentations, and will announce its determination at the beginning of the argument.

Because the objecting parties as a group are required to comply with the time limits for the oral argument established in this order, some of the objecting parties may be limited in their oral argument on particular legal objections. Therefore, the fact that an objecting party did not present oral argument on a particular legal objection does not constitute a waiver of any written objection made by that party.

## V. Eligibility Objections That Require the Resolution of Genuine Issues of Material Fact

The Court further concludes that the following specific objections require the resolution of genuine issues of material fact at the trial that the Court previously scheduled for October 23, 2013:

8. The City was not "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C).

4
13-53846-tjt Doc 2472-5 Filed 01/14/14 Entered 01/14/14 11:03:32 Page 200 of
13-53846-swr Doc 1321 Filed 07/11/13 Entered 07/11/13 17:13:57 Page 4 of 12
313

Asserted by:
    484  Local 324, International Union of Operating Engineers
    486  Local 517M, Service Employees International Union
    502  Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
    505  Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
    520  Retired Detroit Police Members Association

9. The City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).

Asserted by:
    484  Local 324, International Union of Operating Engineers
    486  Local 517M, Service Employees International Union
    504  Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
    506  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
    520  Retired Detroit Police Members Association

10. The City did not negotiate in good faith with creditors, as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(B).

Asserted by:
    484  Local 324, International Union of Operating Engineers
    486  Local 517M, Service Employees International Union
    502  Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
    504  Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
    505  Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
    506  International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
    512  The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association
    517  Michigan Auto Recovery Service
    519  General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit
    520  Retired Detroit Police Members Association
    805  Official Committee of Retirees

5
313

13-53846-tjt  Doc 2472-5  Filed 01/24/14  Entered 01/24/14 17:03:32  Page 52 of 112
13-53846-swr  Doc 4321  Filed 09/11/14  Entered 09/11/14 17:19:57  Page 201 of

11. The City was not "unable to negotiate with creditors because such negotiation is impracticable," as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(C).

   Asserted by:
   - 484 Local 324, International Union of Operating Engineers
   - 486 Local 517M, Service Employees International Union
   - 502 Retired Detroit Police & Fire Fighters Association, Donald Taylor, the Detroit Retired City Employees Association, and Shirley V. Lightsey
   - 504 Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman
   - 505 Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
   - 506 International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
   - 512 The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association
   - 519 General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit
   - 805 Official Committee of Retirees

12. The City's bankruptcy petition should be dismissed because it was filed in bad faith under 11 U.S.C. § 921(c).

   Asserted by:
   - 484 Local 324, International Union of Operating Engineers
   - 486 Local 517M, Service Employees International Union
   - 505 Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees
   - 506 International Union, United Automobile, Aerospace and Agricultural Implement Workers of America
   - 512 The Detroit Fire Fighters Association, the Detroit Police Officers Association, the Detroit Police Lieutenants & Sergeants Association, and the Detroit Police Command Officers Association
   - 519 General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit
   - 520 Retired Detroit Police Members Association
   - 805 Official Committee of Retirees

## VI. Order Regarding the Eligibility Objection in Paragraph 9

[The Court concludes that Part VI of the original order was imprudent and it is therefore abrogated.]

## VII. Order Regarding Discovery Related to Eligibility Objections and Amendments to Filed Objections

The Court concludes that the following limitations on discovery are appropriate:

1. [The Court concludes that the limitation on discovery in this sentence of the original order was imprudent and it is therefore abrogated.]

2. On the objecting parties' side, discovery may be propounded only by those parties who filed eligibility objections.

Based on evidence obtained during discovery, any objecting party may file an amended objection by October 11, 2013. Any such amended objection shall supersede the party's original objection.

## VIII. Notice of Hearing to Individuals Who Filed Eligibility Objections

The Court recognizes that many individuals (other than those listed in paragraphs 1-12 above), most without counsel, also filed timely objections. The Court offers these individuals an opportunity to be heard on their objections. This hearing will be on **September 19, 2013, at 10:00 a.m.** in Courtroom 716, Theodore Levin U.S. Courthouse, 231 West Lafayette Blvd., Detroit, Michigan. *Except as ordered in the next paragraph, this opportunity is only for individuals that filed timely objections.* These parties are identified on the attached Exhibit A.

The Court has determined to add the objection filed by Hassan Aleem and Carl Williams (Dkt. #565) to Exhibit A even though their objection was untimely.

Just as the Court imposed time limits on the attorneys identified above, the Court must also impose a time limit on these individuals as well, due to the number of these individuals. Therefore, each individual who filed a timely objection may address the Court for 3 minutes regarding the objection. However, upon their requests, Dennis Taubitz and Heidi Peterson may address the Court for 15 minutes each.

The City shall have 30 minutes to respond. No rebuttal will be permitted.

Due to security screening, the Court encourages the individuals that accept this opportunity to address the Court regarding their eligibility objections to arrive at the courthouse at least 60 minutes before the scheduled start time of the hearing. At 9:00 a.m., the court staff will begin to check in these individuals and will give each party a number establishing the order of speaking.

## IX. Certifications Pursuant to 28 U.S.C. § 2403(a) and (b)

Pursuant to 28 U.S.C. § 2403(a), the Court hereby certifies to the Attorney General of the United States that the constitutionality of Chapter 9 of Title 11 of the United States Code under the United States constitution is drawn in question in this case. The Court permits the United States to intervene for argument on the question of the constitutionality of Chapter 9 of the Bankruptcy Code and shall, subject to the applicable provisions of law, have all the rights of a party.

Pursuant to 28 U.S.C. § 2403(b), the Court hereby certifies to the Attorney General of the State of Michigan that the constitutionality of Michigan Public Act 436 of 2012 under the Michigan constitution is drawn in question in this case. The Court permits the State of Michigan

7

313

13-53846-tjt  Doc 2473-5  Filed 01/24/14  Entered 01/24/14 11:03:32  Page 203 of
13-53846-swr  Doc 4215  Filed 09/12/13  Entered 09/12/13 11:10:57  Page 7 of 12

to intervene for argument on the question of the constitutionality of Michigan Public Act 436 of 2012 under the Michigan constitution and shall, subject to the applicable provisions of law, have all the rights of a party.

## X. Untimely Objections

All untimely objections, identified on the attached Exhibit B, are overruled.

## XI. Opportunity to Comment or Object

[This part of the original order is no longer necessary and it is therefore abrogated.]

## XII. Service

Pursuant to Rule 4(i) Federal Rules of Civil Procedure (applicable to the eligibility objections in this case under Rules 4(a)(1) and 9014(b) of the Federal Rules of Bankruptcy Procedure), the clerk shall also serve copies of the eligibility objections filed by the Official Committee of Retirees, by registered or certified mail, upon both the Attorney General of the United States at Washington, D.C. and the civil process clerk at the United States Attorney's office in the Eastern District of Michigan. Service of this paper upon the Michigan Attorney General has already be accomplished though ECF.

The clerk shall serve this amended order upon Dennis Taubitz, Heidi Peterson, Hassan Aleem, and Carl Williams.

This order supersedes this Court's Order Regarding Eligibility Objections entered on August 26, 2013. (Dkt #642)

It is so ordered.

_____/s/ Steven Rhodes_____
Steven Rhodes
United States Bankruptcy Judge

September 12, 2013

8

13-53846-tjt   Doc 2472   Filed 01/24/14   Entered 01/24/14 11:19:57   Page 204 of 313
13-53846-swr   Doc 1015   Filed 09/12/13   Entered 09/12/13 11:10:32   Page 8 of 12

# EXHIBIT A

## Individuals Who Are Invited to Address the Court Regarding
## Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.

| NAME | Docket # |
|---|---|
| | |
| Michael Abbott | 385 |
| Hassan Aleem | 565 |
| Association of Professional and Technical Employee (APTE) | 482 |
| Aleta Atchinson-Jorgan | 462 |
| Linda Bain | 474 |
| Randy Beard | 480 |
| Russell Bellant | 402,405 |
| Michael G. Benson | 388 |
| Cynthia Blair | 492 |
| Dwight Boyd | 412 |
| Charles D. Brown | 460, 491 |
| Lorene Brown | 403 |
| Paulette Brown | 431 |
| Rakiba Brown | 467 |
| Regina Bryant | 338, 339 |
| Mary Diane Bukowski | 440 |
| David Bullock | 393 |
| Claudette Campbell | 408 |
| Johnnie R. Carr | 413 |
| Sandra Carver | 469 |
| Raleigh Chambers | 409 |
| Alma Cozart | 400 |
| Leola Regina Crittendon | 454 |
| Angela Crockett | 455 |
| Lucinda J. Darrah | 447, 477 |
| Joyce Davis | 392 |
| Sylvester Davis | 435 |
| William Davis | 430 |
| Elmarie Dixon | 414 |
| Mary Dugans | 415 |
| Lewis Dukens | 394 |
| David Dye | 448 |
| Jacqueline Esters | 416 |
| Arthur Evans | 463 |
| Jerry Ford | 432 |
| William D. Ford | 417 |
| Ulysses Freeman | 429 |

13-53846-tjt Doc 2472-5 Filed 01/24/14 Entered 01/24/14 17:03:32 Page 205 of
13-53846-swr Doc 4321 Filed 01/24/14 Entered 01/24/14 11:10:57 Page 9 of 12
313

**EXHIBIT A**

**Individuals Who Are Invited to Address the Court Regarding
Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.**

| | |
|---|---:|
| Olivia Gillon | 401 |
| Donald Glass | 386 |
| Lavarre W. Greene | 465 |
| William Hickey | 442 |
| LaVern Holloway | 397 |
| William J. Howard | 433 |
| Joanne Jackson | 437 |
| Ailene Jeter | 457 |
| Sheilah Johnson | 451 |
| Stephen Johnson | 418 |
| Joseph H. Jones | 389 |
| Sallie M. Jones | 419 |
| Michael Joseph Karwoski | 510 |
| Zelma Kinchloe | 396 |
| Timothy King | 489 |
| Keetha R. Kittrell | 427 |
| Roosevelt Lee | 468 |
| Althea Long | 399 |
| Edward Lowe | 425 |
| Lorna Lee Mason | 428 |
| Deborah Moore | 470 |
| Larene Parrish | 420 |
| Lou Ann Pelletier | 335 |
| Michael K. Pelletier | 337 |
| Heidi Peterson | 513 |
| Deborah Pollard | 421 |
| Helen Powers | 404 |
| Alice Pruitt | 472 |
| Samuel L. Riddle | 422 |
| Kwabena Shabu | 426 |
| Michael D. Shane | 443 |
| Karl Shaw | 398 |
| Frank Sloan, Jr. | 436 |
| Gretchen R. Smith | 494 |
| Cheryl Smith Williams | 458 |
| Horace E. Stallings | 464 |
| Thomas Stephens | 461 |
| Dennis Taubitz | 446 |
| Charles Taylor | 423 |

13-53846-tjt  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 11:08:32  Page 206 of
313
13-53846-swr  Doc 823-1  Filed 09/12/13  Entered 09/12/13 11:13:17  Page 10 of 12

**EXHIBIT A**

**Individuals Who Are Invited to Address the Court Regarding
Their Objections to Eligibility at a Hearing on September 19, 2013 at 10:00 a.m.**

| | |
|---|---|
| Marzelia Taylor | 475 |
| The Chair of St. Peter | 493 |
| Dolores A. Thomas | 456 |
| Shirley Tollivel | 395 |
| Tracey Tresvant | 390 |
| Calvin Turner | 387 |
| Jean Vortkamp | 439 |
| William Curtis Walton | 411 |
| Jo Ann Watson | 490 |
| Judith West | 444 |
| Preston West | 407 |
| Carl Williams | 565 |
| Charles Williams, II | 391 |
| Floreen Williams | 496 |
| Fraustin Williams | 479 |
| Leonard Wilson | 466 |
| Phebe Lee Woodberry | 459 |
| Anthony G. Wright, Jr. | 485 |

**EXHIBIT B**

**Eligibility Objections Overruled Because They Were Untimely**

| NAME | Docket # |
|------|----------|
|  |  |
| Charles Chatman | 539 |
| Andrea Edwards | 532 |
| Richard Johnson El-Bey | 536 |
| Xylia Hall | 541 |
| Diane Hutchersun | 530 |
| Michael Jones | 549 |
| Nettie Reeves | 534 |
| Donald Richardson | 633 |

13-53846-tjt Doc 2473-5 Filed 01/14/14 Entered 01/14/14 17:08:22 Page 208 of
313
13-53846-swr Doc 821-1 Filed 09/12/13 Entered 09/12/13 11:13:7 Page 12 of 12

**ITEM NO. 15**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------x

                                         :

In re                                 :        Chapter 9

                                           :

CITY OF DETROIT, MICHIGAN,     :        Case No. 13-53846

                                           :

                   Debtor.        :        Hon. Steven W. Rhodes

                                           :

                                           :

-------------------------------------------------------x

## CITY OF DETROIT'S REPLY TO THE OBJECTION OF THE OFFICIAL COMMITTEE OF <u>RETIREES TO THE ENTRY OF AN ORDER FOR RELIEF</u>

313

1353846130917000000000024

# TABLE OF CONTENTS

I.    Preliminary Statement .................................................................1

II.   The Pensions Clause Does Not Invalidate the City's
Clear Authorization to Be a Debtor Under Chapter 9...................3

    A.    No Pensions Have Been Diminished or Impaired .............................3

    B.    The Pensions Clause Does Not Preclude a Michigan
Municipality from Commencing a Chapter 9 Case ...........................5

        1.    By Its Plain Terms, the Pensions Clause
Does Not Affect Actions in Chapter 9 .......................................5

        2.    Pensions Are Entitled to No More
Protection Than Contractual Obligations ..................................7

        3.    On the City's Reading, No Part
of the Pensions Clause Is Superfluous ......................................9

III.  Chapter 9 Is Not Unconstitutional....................................................13

IV.  The City Has Satisfied Sections 109(c)(5)
and 921(c) of the Bankruptcy Code ...........................................16

    A.    The City's Petition Was Filed in Good Faith .....................................17

    B.    The City Negotiated with Its Creditors in Good Faith .......................18

    C.    Negotiations with the City's Creditors Were Impracticable .............20

V.    Conclusion...................................................................................22

# TABLE OF AUTHORITIES

<small>CASES</small>

Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,
    548 U.S. 291 (2006)............................................................................11

Ass'n of Prof'l & Technical Emps. v. City of Detroit,
    398 N.W.2d 436 (Mich. Ct. App. 1986)..............................................8

Ass'n of Retired Emps. v. City of Stockton
    (In re City of Stockton),
    478 B.R. 8 (Bankr. E.D. Cal. 2012)...................................................15

Bond v. United States,
    131 S. Ct. 2355 (2011).......................................................................15

Bruesewitz v. Wyeth LLC,
    131 S. Ct. 1068 (2011).......................................................................13

Coca-Cola Bottling Co. of N.Y., Inc. v.
    Soft Drink & Brewery Workers Union Local 812,
    242 F.3d 52 (2d Cir. 2001) ......................................................... 10-11

Conn. Nat'l Bank v. Germain,
    503 U.S. 249 (1992)...........................................................................11

In re Constitutionality of 2011 PA 38,
    806 N.W.2d 683 (Mich. 2011).............................................................7

In re Enrolled Senate Bill
    (Advisory Opinion re Constitutionality of 1972 PA 258),
    209 N.W.2d 200 (Mich. 1973) .............................................................7

In re Sullivan Cnty. Reg'l Refuse Disposal Dist.,
    165 B.R. 60 (Bankr. D.N.H. 1994).....................................................19

Kosa v. State Treasurer,
    292 N.W.2d 452 (Mich. 1980).............................................................7

Krause v. Titleserv, Inc.,
    402 F.3d 119 (2d Cir. 2005) ..............................................................11

Lamie v. U.S. Tr.,
    540 U.S. 526 (2004)................................................................11

Microsoft Corp. v. i4i Ltd. P'ship,
    131 S. Ct. 2238 (2011).............................................................12

Musselman v. Governor of Mich.,
    533 N.W.2d 237 (Mich. 1995)...................................................8

New York v. United States,
    505 U.S. 144 (1992)................................................................14

Printz v. United States,
    521 U.S. 898 (1997)................................................................14

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
    490 U.S. 477 (1989)................................................................13

Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth.,
    132 F.3d 775 (D.C. Cir. 1998)..................................................10

United States v. Bekins,
    304 U.S. 27 (1938)..........................................................4-5, 13-14

United States v. Hansen,
    772 F.2d 940 (D.C. Cir. 1985)..................................................11

## CONSTITUTIONS

Mich. Const. art. IX, § 24 .............................................................*passim*

## STATUTES

11 U.S.C. § 109 ...................................................................... 16-21

11 U.S.C. § 903 ...........................................................................15

11 U.S.C. § 921 ...................................................................... 16-21

11 U.S.C. § 943 .............................................................................6

11 U.S.C. § 944 .............................................................................6

**OTHER AUTHORITIES**

STATE OF MICH., CONSTITUTIONAL CONVENTION OF 1961: OFFICIAL RECORD
    (Austin C. Knapp ed., 1964)..................................................................................7

The City of Detroit (the "City" or the "Debtor") respectfully submits this reply to the objection (Docket No. 805) (the "Retiree Committee Objection") of the official committee of retirees appointed in this chapter 9 case (the "Retiree Committee") to the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief").

## I. PRELIMINARY STATEMENT

As set forth in the City's (A) Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum"), (B) first-day declarations and (C) Consolidated Reply to Objections to the Entry of an Order for Relief (Docket No. 765) (the "Consolidated Reply"),[1] the City has exhaustively documented – through argument and supporting evidence – its overwhelming need for debt relief and its eligibility to be a debtor under chapter 9 of the Bankruptcy Code.

The Retiree Committee Objection offers little to no argument that the City has not already addressed at length in its previous submissions to the Court. Rather, the Retiree Committee Objection limits itself to rehearsing and re-casting arguments made by other objectors (and already addressed by the City in its Consolidated Reply), while positioning the Retiree Committee for procedural

---

[1]    Capitalized terms not otherwise defined herein shall have the meaning given to them in the Consolidated Reply, which is incorporated herein in its entirety.

13-53846-tjt  Doc 2478-5  Filed 01/14/14  Entered 01/14/14 17:30:32  Page 21 of
13-53846-swr  Doc 931  Filed 09/14/13  Entered 09/14/13 17:03:02  Page 6 of 29
313

maneuvering and delaying tactics in other fora.[2]  This Reply addresses each of the

Retiree Committee's arguments in turn (with citation to the City's prior

submissions where appropriate) and again demonstrates (A) the consonance of the

City's chapter 9 filing with both the Federal and Michigan Constitutions, (B) the

City's satisfaction of the eligibility requirements set forth at section 109(c) of the

Bankruptcy Code and (C) the City's good faith in filing its chapter 9 petition.

Accordingly, for the reasons set forth herein and in the City's prior filings,

the City is eligible to be a debtor under chapter 9, and the Court should promptly

enter an Order for Relief.

---

[2]    See Retiree Committee Objection, at p.14, n.10 (stating the Retiree
Committee's intention to file a motion to withdraw the reference of "the
eligibility dispute"); The Official Committee of Retirees' Motion to
Withdraw the Reference (Docket No. 806), filed on September 11, 2013
(subsequently referred to the United States District Court for the Eastern
District of Michigan, Case No. 2:13-cv-13873-BAF-PJK); Motion by
Official Committee of Retirees to Stay Deadlines and the Hearings
Concerning a Determination of Eligibility Pending Decision on Motion to
Withdraw the Reference (Docket No. 837), filed on September 13, 2013.

## II. THE PENSIONS CLAUSE DOES NOT INVALIDATE THE CITY'S CLEAR AUTHORIZATION TO BE A DEBTOR UNDER CHAPTER 9

The Retiree Committee joins various other Objectors in arguing that the State's authorization of the City to become a debtor under chapter 9 violated the Pensions Clause.[3]  It is mistaken.

### A. No Pensions Have Been Diminished or Impaired

As the City has explained, the mere authorization and filing of the City's chapter 9 petition did not violate the Pensions Clause because it did not "diminish or impair" any pension.[4]  The City's pension obligations remain unimpaired, and they cannot be impaired in chapter 9 unless and until this Court enters an order, likely in connection with a plan of adjustment, to that effect.

Nonetheless, according to the Retiree Committee, "the mere act of authorization is properly considered an impairment [of pensions]" because "unilateral impairment of pension rights is not possible without authorization of a bankruptcy petition."[5]  This argument fails for several reasons.  *First*, chapter 9 does not allow for any "unilateral" impairment by the City.  The only ways

---

[3]     Mich. Const. art. IX, § 24 ("The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.").

[4]     Consolidated Reply, at pp. 21-22.

[5]     Retiree Committee Objection, at ¶ 64.

-3-

13-53846-tjt  Doc 2478  Filed 01/14/14  Entered 01/14/14 17:30:32  Page 3 of 29
13-53846-swr  Doc 4316  Filed 01/14/14  Entered 01/14/14 17:30:32  Page 217 of 313

impairment can occur in chapter 9 are (a) if the relevant parties agree to modify benefits or (b) by order of the bankruptcy court after a full and fair hearing where creditors can raise objections. *Second*, the fact that impairment of pensions may not be possible absent the authorization of a chapter 9 case does *not* mean that authorization equals impairment. Obtaining a passport may be necessary to travel abroad, but the two are hardly the same, nor does the former mandate the latter. So, too, here.

*Finally*, in equating "the mere act of authorization" with the impairment of pensions, the Retiree Committee's argument is squarely at odds with United States v. Bekins, 304 U.S. 27 (1938). In Bekins, the Supreme Court indicated that a state's authorization of municipal bankruptcy does not impair the state's obligations but merely "invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue." Id. at 54. In other words, even where states are themselves "powerless" to impair their own obligations, they are not powerless to authorize bankruptcy, where obligations may be impaired under federal law. Indeed, as the City has already noted, if the mere act of authorizing municipal bankruptcy were equivalent to impairment, then every authorization of municipal bankruptcy would trigger the protection of the Contracts Clause and every authorization of municipal bankruptcy in Michigan would similarly

implicate the State Contracts Clause.[6]  That cannot be correct, as no court since

Bekins has found it necessary to conduct a Contracts Clause analysis to determine

the validity of a chapter 9 authorization and we are not aware that any court has

found it necessary to consider the constitutional protection of contracts by

Michigan or other states in considering a chapter 9 authorization by statute or

executive action.  The Retiree Committee makes no attempt to respond to this

point.

B.     The Pensions Clause Does Not Preclude
       A Michigan Municipality From Commencing a Chapter 9 Case

The Retiree Committee spends multiple pages arguing that the Pensions

Clause provides such "special" and "absolute" protection that it not only prohibits

the impairment of pensions in chapter 9, it also prohibits the State from authorizing

any chapter 9 case where pensions might be impaired.[7]  The Retiree Committee is

incorrect.

1.     By Its Plain Terms, the Pensions Clause
       Does Not Affect Actions in Chapter 9

The Retiree Committee simply fails to engage the City's argument

demonstrating that the Pensions Clause has no bearing on actions that might occur

---

[6]     Consolidated Reply, at pp. 24-25.

[7]     Retiree Committee Objection, at ¶¶ 26-30.

-5-

13-53846-tjt  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:30:42  Page 21 of 28
13-53846-swr  Doc 913  Filed 09/11/13  Entered 09/11/13 17:30:34  Page 219 of
313

in chapter 9.[8]  By its plain terms, the Pensions Clause applies only to impairments "[ ]by" the State or its political subdivisions.  The text expressly states that pensions are contractual obligations "of the state and its political subdivisions … which may not be diminished or impaired *thereby*."  Mich. Const. art. IX, § 24 (emphasis added).  This language could not be any clearer:  the Pensions Clause prohibits impairments "[ ]by" the State and its political subdivisions.  It does not speak to, much less prohibit, impairments "[ ]by" any other lawful authority.  This limitation is crucial, because non-consensual impairment of pensions in chapter 9 can occur only by order of a federal bankruptcy court pursuant to federal law.[9]  Consequently, the Pensions Clause is consistent with any impairment that might take place in chapter 9.  For that reason alone, there is no need to accept the Retiree Committee's claims that the bankruptcy process somehow "suspend[s] the Pensions Clause," or is otherwise inconsistent with the Michigan Constitution.[10]

By ignoring the relevant text of the Pensions Clause, the Retiree Committee overlooks the key similarity between the Pensions Clause and the

---

[8]    Consolidated Reply, at pp. 24-25.

[9]    See 11 U.S.C. § 943(b) ("*The court* shall confirm the plan …") (emphasis added); 11 U.S.C. § 944(b)(1) ("[T]he debtor is discharged from all debts" only "as of the time when … the plan is confirmed.").

[10]   Retiree Committee Objection, at ¶ 33.

Contracts Clause. Both clauses apply only *against impairments by the State*. Neither clause purports to restrict any impairment *by federal law*. For that reason, it is beside the point (and also incorrect) to assert that the protection for pensions is in some sense more "absolute" than the protection of contracts. What matters is that the provision has no bearing on actions taken in a chapter 9 case.

2.    *Pensions Are Entitled to No More
Protection than Contractual Obligations*

In any event, the Retiree Committee is mistaken in asserting that the protection of pensions under the Pensions Clause is in any way different from the protection of contracts under the Contracts Clause. As the Michigan courts have recognized, the Pensions Clause was enacted for the clear purpose of overturning previous state-court decisions holding that pensions were not contractual in nature and were, thus, revocable at will by public employers.[11] Given that historical purpose, there is no reason to think that the Pensions Clause was intended to grant some "special and greater protection" for pensions.[12]

---

[11]    See In re Constitutionality of 2011 PA 38, 806 N.W.2d 683, 694 (Mich. 2011); Kosa v. State Treasurer, 292 N.W.2d 452, 454-55 (Mich. 1980); In re Enrolled Senate Bill (Advisory Opinion re Constitutionality of 1972 PA 258), 209 N.W.2d 200, 202 (Mich. 1973); STATE OF MICH., CONSTITUTIONAL CONVENTION OF 1961: OFFICIAL RECORD 770-74, 2659, 3402 (Austin C. Knapp ed., 1964).

[12]    Retiree Committee Objection, at ¶ 28.

The cases that the Retiree Committee cites as evidence of the "absolute" protection of the Pensions Clause are completely inapposite.[13] Nowhere do these cases say that protection for pensions is "absolute," or even different from the protection for contracts generally. Indeed, the two main cases cited by the Retiree Committee strongly undermine the Retiree Committee's argument.[14] One case finds that the purpose of the Pensions Clause "was to obviate the harsh rule that pensions granted by public authorities were not contractual obligations, but gratuitous allowances ...."[15] The other case cited by the Retiree Committee states repeatedly that pension benefits must be treated as "contractual right[s]" and "contractual obligations," because "[m]any delegates to the 1961 Constitutional Convention perceived as unfair the rule that pensions granted by public authorities were not contractual obligations, but rather gratuitous allowances that could be revoked at will."[16]

Moreover, because none of the cases cited by the Retiree Committee has anything to do with bankruptcy, these cases do not even begin to support the Retiree Committee's remarkable claim that that the Pensions Clause implicitly

---

[13]   See Musselman v. Governor of Mich., 533 N.W.2d 237, 244-45 (Mich. 1995); Ass'n of Prof'l & Technical Emps. v. City of Detroit, 398 N.W.2d 436, 439 (Mich. Ct. App. 1986).

[14]   Retiree Committee Objection, at ¶¶ 29, 67-68.

[15]   Ass'n of Prof'l and Technical Emps., 398 N.W.2d at 438.

[16]   Musselman, 533 N.W.2d at 241 n.8, 243 n.12.

-8-

13-53846-tjt   Doc 2473-5   Filed 01/14/14   Entered 01/14/14 17:30:42   Page 32 of 28
13-53846-swr   Doc 918   Filed 09/17/13   Entered 09/17/13 17:30:34   Page 13 of 26
313

prohibits the State from authorizing a chapter 9 case. Indeed, as the City has noted, the Pensions Clause was ratified at a time when Michigan law expressly authorized municipal bankruptcy, without eliciting any concern of a conflict.[17] The Retiree Committee does not respond to this reality.

Finally, contrary to the Retiree Committee's argument, there is no significance to the fact that Michigan has deemed pensions to be contractual obligations via an express constitutional provision, while other states such as California and Alabama have reached the same result through judicial decisions interpreting the Contracts Clause.[18] The salient point is that, in all of these states, pensions are protected as contractual obligations, and in none of these states does that protection pose any obstacle to the authorization of the filing of a case under chapter 9.

3. *On the City's Reading,*
*No Part of the Pensions Clause Is Superfluous*

The Retiree Committee argues that granting pensions the same level of protection as contracts would render some of the text of the Pensions Clause superfluous.[19] According to the Retiree Committee, if the drafters had intended to treat pensions and contracts equally, they would have simply stated that pensions

---

[17]    Consolidated Reply, at p. 26.

[18]    Retiree Committee Objection, at ¶ 30.

[19]    Retiree Committee Objection, at ¶¶ 26-29.

-9-

13-53846-swr   Doc 2473-5   Filed 09/14/14   Entered 09/14/14 17:30:42   Page 223 of 313
13-53846-tjt   Doc 4718   Filed 09/11/14   Entered 09/11/14 17:30:34   Page 12 of 28

are "contractual obligations" of the State, without going on to say that such obligations "shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24.

The Retiree Committee is incorrect. In fact, the drafters of the Pensions Clause had good reason to emphasize the point that treating pensions as contractual obligations would mean that they could not "be diminished or impaired." By expressly stating this prohibition, the drafters made explicit both the purpose and the real-world effect of granting contractual status to pensions – namely, to prevent them from being revoked at will by public employers. With this explanatory language, the drafters sent a very clear signal, both to potential ratifiers and to the public at large, as to what the consequence of adopting the Pensions Clause would be. If the drafters had omitted this language, the legal effect of the provision would have been far less clear. In light of this clarifying purpose, the canon against superfluity relied upon by the Retiree Committee does not apply.

It is not uncommon for a legislature to "draft[ ] provisions that appear duplicative of others – simply, in Macbeth's words, 'to make assurance double sure.'" Shook v. D.C. Fin. Responsibility & Mgmt. Assistance Auth., 132 F.3d 775, 782 (D.C. Cir. 1998). "While the impermissibility of [a] procedure may have been implicit absent the new limiting phrase ... it would not have been explicit, and the phrase is therefore not superfluous." Coca-Cola Bottling Co. of N.Y., Inc. v. Soft

<u>Drink & Brewery Workers Union Local 812</u>, 242 F.3d 52, 57 (2d Cir. 2001).

Aside from benefitting the public, redundant language can serve "as a means of clarifying for its own Members who voted upon [a law] the consequences of their action." <u>United States v. Hansen</u>, 772 F.2d 940, 946 (D.C. Cir. 1985). Accordingly, there is "no reason to ascribe specialized meaning to [a] phrase simply for the sake of avoiding slight repetition in the statutory text. Some repetition can help clarify the meaning of a statute, and [courts] are reluctant to endorse an awkward reading of its words for no better reason than to satisfy the canon [against superfluity]." <u>Krause v. Titleserv, Inc.</u>, 402 F.3d 119, 127-28 (2d Cir. 2005). As the U.S. Supreme Court has recognized, "[r]edundancies across statutes are not unusual events in drafting," <u>Connecticut National Bank v. Germain</u>, 503 U.S. 249, 253 (1992), and the "preference for avoiding surplusage constructions is not absolute," <u>Lamie v. United States Trustee</u>, 540 U.S. 526, 536 (2004). <u>See</u> <u>also</u> <u>Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy</u>, 548 U.S. 291, 299 n.1 (2006) (rejecting the notion that "costs" and "expenses" must be given independent meaning, and noting that "[w]hile it is generally presumed that statutes do not contain surplusage, instances of surplusage are not unknown").

In addition, by stating that pensions are contractual obligations of "the State and its political subdivisions" that "shall not be diminished or impaired *thereby*," the drafters of the Pensions Clause accomplished another important purpose. They

made clear that the prohibition applies only to the State and its political subdivisions, and does not restrict the impairment of pensions "[ ]by" operation of federal law and by order of a federal bankruptcy court.

Ironically, the canon against superfluity cuts strongly *against* the Retiree Committee's reading of the Pensions Clause. If the drafters had really intended to treat pensions and contracts differently, they would have had no reason to refer to pensions as "contractual obligation[s]." Instead, they could have simply drafted the provision to say, "Pensions shall not be diminished or impaired." Because the Retiree Committee's own reading renders the "contractual obligation" language superfluous, the Retiree Committee cannot invoke the superfluity canon in its favor. See Microsoft Corp. v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2248 (2011) ("[T]he canon against superfluity assists only where a competing interpretation gives effect to every clause and word of a statute.") (internal quotation marks omitted).

Indeed, on the Retiree Committee's reading, the language of the Pensions Clause would be worse than superfluous – it would be affirmatively confusing. According to the Retiree Committee, the drafters went out of their way to deem pensions to be "contractual obligation[s]," and then in the very next breath decreed that pensions are entitled to a completely unique protection that is entirely different from the protection that applies to contractual obligations. Such an interpretation places the Pensions Clause at odds with itself and is entirely unwarranted.

"[T]he rule against giving a portion of text an interpretation which renders it superfluous does not prescribe that a passage which could have been more terse does not mean what it says. The rule applies only if verbosity and prolixity can be eliminated by giving the offending passage, or the remainder of the text, a competing interpretation." Bruesewitz v. Wyeth LLC, 131 S. Ct. 1068, 1078 (2011).

## III.   CHAPTER 9 IS NOT UNCONSTITUTIONAL

Like other Objectors, the Retiree Committee also contends that, "in light of recent Supreme Court precedent," the Supreme Court has surreptitiously invalidated chapter 9 by "weaken[ing] if not reject[ing] the entire foundation of Bekins."[20]  Remarkably, however, the Retiree Committee concedes that there is a "compelling reason" not to hold chapter 9 unconstitutional:  the Supreme Court upheld a substantially identical municipal bankruptcy statute over 70 years ago in Bekins.[21]  Because Bekins has "direct application" in this case and has never been overruled by the Supreme Court, this Court must follow it, even if it "appears to rest on reasons rejected in some other line of decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989).

---

[20]   Retiree Committee Objection, at ¶¶ 35, 37

[21]   Retiree Committee Objection, at ¶ 35 n.16.

It also clear that, contrary to the Retiree Committee's claim, none of the Supreme Court's federalism cases since <u>Bekins</u> casts even the slightest doubt on the ongoing constitutional validity of chapter 9. Perhaps recognizing the weakness of its case, the Retiree Committee makes no effort to respond to any of the City's arguments in the Consolidated Reply.[22] Instead, the Retiree Committee merely restates the same argument advanced by the other Objectors: chapter 9's infringement of state sovereignty cannot be cured by State consent. Retiree Committee Objection, at ¶¶ 42-45.

Conspicuously absent from the Retiree Committee Objection, however, is any explanation of how chapter 9 actually effects such an infringement. The Retiree Committee, like the other Objectors, relies on <u>New York v. United States</u>, 505 U.S. 144 (1992), and <u>Printz v. United States</u>, 521 U.S. 898 (1997), in support of its argument. Those cases, however, stand only for the proposition that "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." <u>Printz</u>, 521 U.S. at 933 (quoting <u>New York</u>, 505 U.S. at 188). Chapter 9, by contrast, does not compel States to enact, administer or otherwise

---

[22]    Consolidated Reply, at pp. 9-19.

-14-
13-53846-tjt  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:00:42  Page 23 of 28
13-53846-swr  Doc 913  Filed 09/11/13  Entered 09/11/13 17:30:34  Page 23 of 28
313

participate in any federal bankruptcy scheme. To the contrary, State participation is wholly voluntary.[23]

Not only is chapter 9 non-coercive, it is carefully crafted "to preserve the niceties of the state-federal relationship" for those States that voluntarily authorize their municipalities to seek bankruptcy relief. Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012). Under 11 U.S.C. § 903, a bankruptcy court is prohibited from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality." Therefore, even if there is some core of sovereign State functions that cannot be ceded to the Federal Government by State consent, chapter 9 expressly prohibits the bankruptcy court from intruding on those core functions. The impairment of municipal obligations by a bankruptcy court does not prevent the State from controlling the municipality's political or governmental powers or in any other way intrude on the State's sovereignty. If it did, the Supreme Court would not have upheld the municipal bankruptcy structure embodied in chapter 9.

---

[23] The other case relied upon by the Retiree Committee, and by the other Objectors as well, is Bond v. United States, 131 S. Ct. 2355 (2011). Retiree Committee Objection, at ¶ 40. Bond, however, does not delineate the line between federal and state power; it merely holds that an individual who is a party to an otherwise justiciable case or controversy has standing to challenge a federal statute on grounds that it intrudes on powers reserved to the States. Bond, 131 S. Ct. at 2366-67.

Accordingly, for all of the foregoing reasons, the Retiree Committee's objection that the City was not specifically authorized to commence this chapter 9 case – and, thus, that section 109(c)(2) of the Bankruptcy Code was not satisfied – should be overruled.

## IV. THE CITY HAS SATISFIED SECTIONS 109(C)(5) AND 921(C) OF THE BANKRUPTCY CODE

Having devoted nearly its entirety to the various constitutional-based arguments addressed above, the Retiree Committee Objection devotes less than three pages to the following issues:  (A) whether the City negotiated in good faith with its creditors as required by section 109(c)(5)(B) of the Bankruptcy Code; (B) whether such negotiations were "impracticable" as a threshold matter within the meaning of section 109(c)(5)(C) of the Bankruptcy Code; and (C) whether the City filed its petition for relief (the "Petition") in "good faith" within the meaning of section 921(c) of the Bankruptcy Code.[24]   The Retiree Committee Objection with respect to the foregoing issues is rife with legal and factual errors and should be overruled.

---

[24]    The Retiree Committee Objection does not specifically address either of the requirements for eligibility set forth at section 109(c)(3) of the Bankruptcy Code (insolvency) and section 109(c)(4) of the Bankruptcy Code (the City's desire to effect a plan to adjust its debts).

-16-
13-53846-tjt  Doc 2473-5  Filed 09/11/14  Entered 09/11/14 17:30:42  Page 23 of 28
13-53846-swr  Doc 913  Filed 09/11/14  Entered 09/11/14 17:30:42  Page 22 of 26
313

A. The City's Petition Was Filed in Good Faith

The Retiree Committee contests the good faith filing of the City's Petition

under section 921(c) of the Bankruptcy Code. Retiree Committee Objection,

at ¶ 74. The Retiree Committee Objection, however, improperly conflates the

separate tests of sections 109(c)(5)(B) (good faith negotiations) and 921(c) (filing

of case in good faith) of the Bankruptcy Code by suggesting that an alleged failure

by the City to negotiate in good faith with its creditors also leads to the conclusion

that the Petition was not filed in good faith. The Retiree Committee cites no

authority in support of this proposition.

Indeed, the Retiree Committee cites to the proper standard for

determinations of "good faith" under section 921(c) of the Bankruptcy Code but

then fails to even attempt to apply that standard. This is understandable. As the

City demonstrated in the Consolidated Reply, application of the standards

governing section 921(c) of the Bankruptcy Code to the relevant facts clearly

demonstrates the City's good faith in filing the Petition. Consolidated Reply,

at pp. 62-69. Even if the City had not negotiated in good faith with its creditors

(which it did), that would not lead to a conclusion that its Petition had been filed in

bad faith.

Accordingly, because the Retiree Committee (A) misconstrues the standard

applicable to the section 921(c) inquiry into good faith and (B) offers no argument

or evidence with respect to the proper standard, the Retiree Committee's objection that the Petition was filed in bad faith must be overruled.[25]

B.     The City Negotiated With Its Creditors in Good Faith

The Retiree Committee argues that, because the Emergency Manager and the Governor allegedly (and in some unspecified context) "ignored 'clear, unambiguous' contractual rights protected by the Pension clause," the City cannot be found to have negotiated in good faith with its creditors. Retiree Committee Objection, at ¶¶ 75-76. There is, of course, no evidence that any representative of the City or State "ignored" the existence of any contractual right to pension benefits at any time. Rather, the Retiree Committee's complaint is with the potential *treatment* of those rights. Indeed, the Retiree Committee appears to argue that, because the City has contemplated the impairment of pension benefits or proposed that the City and its retirees agree to a proposed treatment of claims arising from the underfunding of pension benefits, the City is incapable of satisfying section 109(c)(5)(B) of the Bankruptcy Code. Yet, the proposed impairment of a class of creditors' claims cannot be fatal to a debtor's satisfaction of section 109(c)(5)(B) of the Bankruptcy Code, *which expressly contemplates*

---

[25]     The Retiree Committee's argument that "[t]here is no evidence that the City investigated other alternatives to chapter 9" is simply false. As set forth in the Consolidated Reply, the Orr Declaration contains a wealth of evidence demonstrating this very fact. See Consolidated Reply, at pp. 67-68; Orr Declaration, at ¶¶ 58-73.

-18-

13-53846-tjt   Doc 2473-5   Filed 09/14/14   Entered 09/14/14 17:30:42   Page 232 of 313
13-53846-swr   Doc 918   Filed 09/11/13   Entered 09/11/13 17:50:34   Page 23 of 28
313

*such impairment*. See 11 U.S.C. § 109(c)(5)(B) (requiring that the debtor must

have "negotiated in good faith with creditors and … failed to obtain the agreement

of creditors holding at least a majority in amount of the claims of each class *that*

*such entity intends to impair under a plan in a case under such chapter*")

(emphasis added). The Retiree Committee Objection must be overruled on this

point.[26]

Moreover, the factual allegations contained in the Retiree Committee

Objection that allegedly demonstrate a failure to engage in good faith negotiations

– to the extent such allegations are not already addressed in the Eligibility

Memorandum and Consolidated Reply[27] – are easily dismissed as unsupported,

misleading or false.

- The Retiree Committee alleges that "[b]oth the Governor and
  Emergency [M]anager evidenced a desire to achieve a result that they
  knew was unconstitutional as a matter of Michigan law." Retiree

---

[26]    In re Sullivan County Regional Refuse Disposal District, 165 B.R. 60
        (Bankr. D.N.H. 1994), cited by the Retiree Committee in support of its
        argument, is easily distinguishable. In Sullivan County, the debtor invented
        its own contractual right to set off valid debts in clear derogation of express
        contractual language to the contrary, and negotiated from that standpoint.
        The bankruptcy court found that this tactic constituted bad faith. Id. at 78.
        No such invention of contractual rights was at work here.

[27]    For example, the charges that the City (a) presented its creditors with a "take
        it or leave it" proposal and (b) refused to negotiate with its creditors
        (see Retiree Committee Objection, at ¶ 77) are addressed in depth at
        pages 54-59 of the Consolidated Reply and pages 55-59 of the Eligibility
        Memorandum.

-19-

13-53846-tjt   Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:03:42  Page 23 of 28
13-53846-swr   Doc 913  Filed 09/11/13  Entered 09/11/13 17:30:34  Page 22 of 28
313

Committee Objection, at ¶ 76. The Retiree Committee offers no evidence to support this false statement.

- The Retiree Committee alleges that the Emergency Manager believed that "the planning for a chapter 9 was a 'run around' the Michigan Constitution and the repeal of PA 4." Id. The Emergency Manager has never said anything of the sort, and the Retiree Committee, again, offers no evidence in support of its claim.

- The Retiree Committee criticizes the Emergency Manager for allegedly waiting "more than fifteen months after a financial review team issued its initial report advising that the City was 'in a condition of severe financial distress'" before submitting the June 14 Creditor Proposal to the public. Id. Of course, the Emergency Manager did not assume his office until March of 2013 and submitted his comprehensive, 128-page June 14 Creditor Proposal to the public a scant three months later.

Accordingly, the Retiree Committee Objection does nothing to undermine the City's showing that it has satisfied section 109(c)(5)(B) of the Bankruptcy Code, and its objections related thereto should be overruled.

C.  Negotiations with the City's Creditors Were Impracticable

The Retiree Committee's argument that negotiations with all of the City's creditors were practicable runs the length of one clause and one footnote. Specifically, the Retiree Committee contends that, because (1) certain entities indicated a willingness to engage the City in negotiations and (2) the City might have bound its retiree constituency to a restructuring through class action litigation, negotiations with all of the City's creditor constituencies were not "impracticable" within the meaning of section 109(c)(5)(C) of the Bankruptcy Code. Retiree Committee Objection, at ¶ 77, n.23.

These "toss-in" arguments cannot be regarded as serious. First, the plain language of section 109(c)(5)(C) of the Bankruptcy Code requires an inquiry into the impracticability of "negotiation." 11 U.S.C. § 109(c)(5)(C). Even assuming that the City might have been able to bind its entire retiree constituency to the June 14 Creditor Proposal through (presumably mandatory non-opt out) class action litigation, such an attempt would have borne little resemblance to "negotiation." The asserted availability of such an alternative is, thus, completely irrelevant to an inquiry under section 109(c)(5)(C) of the Bankruptcy Code. Second, as set forth in detail in the Eligibility Memorandum and the Consolidated Reply, the alleged willingness of "retiree associations, the Retirement System[s] and various unions" (Retiree Committee Objection, at ¶ 77) to engage the City in negotiations does not render the City's negotiations with its creditors practicable where, among other things, (1) the City was unable to practicably negotiate with the holders of billions of dollars in bond debt, (2) no natural bargaining representative for all of the City's retirees exists and (3) contrary to the Retiree Committee's suggestion, many unions expressly indicated either unwillingness or legal inability to represent their retirees in negotiations with the City.

Accordingly, the Retiree Committee's suggestion that negotiations with the City's creditors were practicable should be rejected, and its objections related to section 109(c)(5)(C) of the Bankruptcy Code overruled.

## V.    CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for

Relief in this case.

-22-

13-53846-tjr  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:00:32  Page 23 of 26
13-53846-swr  Doc 913  Filed 09/11/13  Entered 09/11/13 17:30:04  Page 23 of 26
313

Dated: September 17, 2013          Respectfully submitted,


 /s/  Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

-23-

13-53846-tjt  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:30:32  Page 237 of 28
13-53846-swr  Doc 913  Filed 09/17/13  Entered 09/17/13 18:00:42  Page 23 of 23
313

**<u>ITEM NO. 16</u>**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

-------------------------------------------------------x
                                    :
In re                               : Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          : Case No. 13-53846
                                    :
                  Debtor.           : Hon. Steven W. Rhodes
                                    :
-------------------------------------------------------x

## CITY OF DETROIT'S OBJECTION TO MOTION
## OF OFFICIAL RETIREE COMMITTEE TO STAY DEADLINES
## AND HEARINGS RELATED TO ELIGIBILITY PROCEEDINGS

# TABLE OF CONTENTS

Preliminary Statement ................................................................................1

Objection ....................................................................................................3

    *The Motion to Withdraw Is Unlikely to Succeed on Its Merits* .....................5

    *A Determination of Eligibility Causes No Harm to Retirees* .......................18

    *The City Would Be Harmed by the Imposition of a Stay* ............................20

    *The Public Interest Would Be Harmed by the Imposition of a Stay* ............23

# TABLE OF AUTHORITIES

CASES

Anderson v. Prisoner Health Servs.,
   No. 10-15154, 2011 WL 2144205 (E.D. Mich. Apr. 27, 2011) .................. 14-15

Antioch Co. Litig. Trust v. Morgan (In re Antioch Co.),
   435 B.R. 493 (Bankr. S.D. Ohio 2010) ........................................................... 4-5

Citizens for Rational Coastal Dev. v. Fed. Highway Admin.,
   No. 07-4551, 2008 WL 508666 (D.N.J. Feb. 21, 2008) ....................................25

Cooey v. Strickland,
   604 F.3d 939 (6th Cir. 2010) ..............................................................................14

Dearborn Lodging, Inc. v. City of Dearborn,
   No. 11-10057, 2012 WL 1658684 (E.D. Mich. May 11, 2012) .................. 24-25

Hassett v. FDIC (In re CIS Corp.),
   140 B.R. 351 (S.D.N.Y. 1992) ...........................................................................11

In re Chrysler LLC,
   No. 09-50002, 2009 WL 7386569 (Bankr. S.D.N.Y. May 20, 2009) ..........4, 5, 7

In re Dana Corp.,
   No. 06-10354, 2007 WL 2908221 (Bankr. S.D.N.Y. Oct. 3, 2007) ...................20

In re Level Propane Gases, Inc.,
   No. 06-00119, 2006 WL 3499916 (N.D. Ohio Dec. 5, 2006) ............................17

In re Motions to Withdraw Reference in Various Cases,
   Nos. 12-11556 to 60, 63 to 65, 2012 WL 5381208
   (E.D. Mich. Oct. 31, 2012) ................................................................................13

Lewis v. Negri Bossi USA, Inc. (In re Mathson Indus., Inc.),
   408 B.R. 888 (E.D. Mich. 2009) ........................................................................16

LTV Steel Co. v. Union Carbide Corp. (In re Chateaugay Corp.),
   193 B.R. 669 (S.D.N.Y. 1996) ...........................................................................14

Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog,
   945 F.2d 150 (6th Cir. 1991) ................................................................5-6, 19-20

Moltan Co. v. Eagle-Picher Indus., Inc.,
    55 F.3d 1171 (6th Cir. 1995) ...............................................................2

Moyer v. Koloseik (In re Sutton),
    470 B.R. 462 (Bankr. W.D. Mich. 2012) .................................... 11-12

N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,
    458 U.S. 50 (1982).............................................................................9

Omega Tool Corp. v. Alix Partners, LLP,
    416 B.R. 315 (E.D. Mich. 2009).......................................................16

Onkyo Europe Elecs. GMBH v. Global Technovations Inc.
    (In re Global Technovations Inc.),
    694 F.3d 705 (6th Cir. 2012) ...........................................................10

Priest v. Interco, Inc. (In re Interco, Inc.),
    135 B.R. 359 (Bankr. E.D. Mo. 1991)................................................5

Rhinehart v. Scutt,
    509 Fed. App'x 510 (6th Cir. 2013)..................................................14

Satyam Computer Servs., Ltd. v. Venture Global Eng'g, LLC,
    No. 06-CV-50351, 2006 WL 2571581 (E.D. Mich. Sept. 5, 2006) ................. 6-7

Stern v. Marshall,
    131 S. Ct. 2594 (2011)................................................................ 7-16

Stevenson v. State & Local Police Agencies,
    42 F. Supp. 2d 229 (W.D.N.Y. 1999)...............................................25

TJN, Inc. v. Superior Container Corp. (In re TJN, Inc.),
    207 B.R. 499 (Bankr. D.S.C. 1996)...................................................3

United of Omaha Life Ins. Co. v. Solomon,
    960 F.2d 31 (6th Cir. 1992) ...............................................................6

United States v. Detroit Int'l Bridge Co.,
    7 F.3d 497 (6th Cir. 1993) .................................................................6

Valenti v. Snyder,
    853 F. Supp. 2d 691 (E.D. Mich. 2012) ...........................................14

Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P.
   (In re Extended Stay, Inc.),
   466 B.R. 188 (S.D.N.Y. 2011) ........................................................ 9-10, 11, 15

## FEDERAL STATUTES AND RULES

11 U.S.C. § 109 ...................................................................................................8

11 U.S.C. § 921 ............................................................................... 8, 9, 22-23

28 U.S.C. § 157 ................................................................................. 9, 12-15

Fed. R. Bankr. P. 5011(c) ..............................................................................*passim*

## MICHIGAN STATUTES

Public Act 436 of 2012 – MCL § 141.1549 ..........................................................21

## OTHER AUTHORITIES

6 COLLIER ON BANKRUPTCY ¶ 921.05 (Alan N. Resnick &
   Henry J. Sommer eds., 16th ed. 2013)................................................................23

The City of Detroit (the "City" or the "Debtor") objects to the Motion by Official Committee of Retirees to Stay Deadlines and the Hearings Concerning a Determination of Eligibility Pending Decision on Motion to Withdraw the Reference (Docket No. 837) (the "Stay Motion") filed by the official committee of retirees appointed in this case (the "Retiree Committee") and respectfully represents as follows:

## Preliminary Statement

1.      As the City has consistently maintained throughout this chapter 9 case, in light of its State-declared financial emergency and its urgent need for restructuring, the City intends to complete the chapter 9 process as promptly as possible for the benefit of all parties in interest.  The sooner the City can demonstrate its eligibility for chapter 9, the sooner it can complete other restructuring steps and ultimately confirm and implement a plan of adjustment. A prompt exit from chapter 9 will facilitate the long process of rebuilding the City. Understanding that a determination of its eligibility to be a chapter 9 debtor is a threshold condition to achieving these goals, the City has requested – and the Court has established – a reasonable schedule for addressing objections to the City's eligibility which preserves the rights of all interested parties to be heard.

2.     Neither the Stay Motion nor the Retiree Committee's Motion to Withdraw the Reference (Docket No. 806) (the "Motion to Withdraw")[1] establish any legal or practical reason why any proceedings before this Court relating to the City's eligibility for chapter 9 (the "Eligibility Proceedings") – proceedings that are already well underway – should be stayed (the "Stay") while the Retiree Committee pursues a groundless procedural gambit in the District Court. Certainly, the Stay Motion fails to overcome the presumption, established by Rule 5011(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), that the Eligibility Proceedings should proceed unstayed notwithstanding the filing of a motion to withdraw the reference.

3.     Moreover, *none* of the standards for granting a preliminary injunction that the Court should consider in disposing of the Stay Motion[2] weigh in favor of the relief sought by the Retiree Committee where (a) the Motion to Withdraw is unlikely to succeed, (b) the City and its residents will be harmed by

---

[1]     The Motion to Withdraw is pending in the United States District Court for the Eastern District of Michigan (the "District Court") as Case No. 2:13-cv-13873-BAF-PJK (E.D. Mich.).

[2]     E.g., Moltan Co. v. Eagle-Picher Indus., Inc., 55 F.3d 1171, 1175 (6th Cir. 1995) (setting forth common factors considered in connection with requests for preliminary injunctions:  "1) the likelihood of [movant]'s success on the merits; 2) whether the injunction will save [movant] from irreparable injury; 3) whether the injunction would harm others; and 4) whether the public interest would be served.").

unwarranted delay in this chapter 9 case and (c) the Retiree Committee's constituents will not suffer *any* harm – much less irreparable harm – by continuing progress of the Eligibility Proceedings as scheduled by this Court. Indeed, implicitly conceding the weakness of its request for relief, the Retiree Committee seems to ignore the relief it requests in the instant motion – i.e., a stay of Eligibility Proceedings – when applying three of the four applicable injunction factors.

4.     Accordingly, the Court should deny the Stay Motion.

## Objection

5.     Bankruptcy Rule 5011(c) expressly provides that proceedings pending before a bankruptcy court are *not* stayed upon the filing of a motion to withdraw the reference to the applicable district court. "The filing of a motion for withdrawal of a case or proceeding … shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion." Fed. R. Bankr. P. 5011(c); see TJN, Inc. v. Superior Container Corp. (In re TJN, Inc.), 207 B.R. 499, 500 (Bankr. D.S.C. 1996) (noting "no stay is created simply as a result of the filing of a Motion for Withdrawal of Reference").

6.     The plain language of Bankruptcy Rule 5011(c) effectively establishes a presumption in favor of the continuation of proceedings before the

CLI-2141675v5
-3-
13-53846-tjt  Doc 2472-5  Filed 01/18/14  Entered 01/18/14 17:03:02  Page 8 of 32
13-53846-swr  Doc 2325  Filed 01/14/14  Entered 01/14/14 14:40:42  Page 246 of 313

Court during the pendency of a motion to withdraw the reference. See Antioch Co.
Litig. Trust v. Morgan (In re Antioch Co.), 435 B.R. 493, 496, 502 (Bankr. S.D.
Ohio 2010) (noting the "apparent presumption in favor of not staying …
proceedings that arises out of the plain language of the Rule;" stating that "it is
clear from the plain language of the Rule that the granting of a stay should be the
exception – not the general rule"). The burden of demonstrating need for a stay
despite this presumption rests with the movant. In re Chrysler LLC, No. 09-50002
(AJG), 2009 WL 7386569, at *1 (Bankr. S.D.N.Y. May 20, 2009) ("The moving
party bears the burden of proof in demonstrating that a stay of proceedings pending
a determination of a motion to withdraw the reference would be proper."); Antioch,
435 B.R. at 496 (same).

7.     Courts regard motions to stay proceedings pending the
disposition of a motion to withdraw the reference essentially as requests for
preliminary injunctions. Antioch, 435 B.R. at 497 ("While the term 'may' in the
Rule appears to grant the bankruptcy court broad discretion in determining such a
motion, the case law applying the Rule has limited the circumstances under which
a stay may be granted to essentially the circumstances under which a preliminary
injunction would be appropriate under Federal Rule of Civil Procedure 65.").
Specifically, a party seeking a stay of proceedings must demonstrate: "(1) the

CLI-2141675v5
-4-
13-53846-tjt wr Doc 2472-5 Filed 01/18/14 Entered 01/18/14 17:03:02 Page 2 of
13-53846-swr Doc 4325 Filed 09/18/14 Entered 09/18/14 14:40:48 Page 9 of 32
313

likelihood that the pending motion to withdraw will be granted (i.e. likelihood of success on the merits); (2) that the movant will suffer irreparable harm if the stay is denied; (3) that the non-movants will not be substantially harmed by the stay; and (4) the public interest will be served by granting the stay." Id. (citing Moltan, 55 F.3d at 1175, for applicable injunction factors); Chrysler, 2009 WL 7386569, at *1 (same); Priest v. Interco, Inc. (In re Interco, Inc.), 135 B.R. 359, 361 (Bankr. E.D. Mo. 1991) (same). The Retiree Committee has failed to meet its burden on *any* of the four factors identified above (each, an "Injunction Factor").

### *The Motion to Withdraw is Unlikely to Succeed on Its Merits*

8.    No Stay should be imposed because the Retiree Committee is unable to demonstrate that the Motion to Withdraw is substantially likely to succeed on its merits.

9.    As a threshold matter, the Retiree Committee's citation to Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150 (6th Cir. 1991), for the proposition that "a stay may issue so long as 'more than the mere 'possibility' of success on the merits' is shown" (Stay Motion, at ¶ 11), thoroughly misrepresents Griepentrog – and Sixth Circuit law generally – regarding a movant's burden with respect to the first Injunction Factor.

10.    In Griepentrog, the Sixth Circuit indeed recognized that courts are required to balance the Injunction Factors, but it did not hold that the showing

of "a mere possibility of success on the merits" will ever be sufficient to satisfy the first of those factors. In fact, the Griepentrog court reached precisely the opposite result:

> Simply stated, more of one excuses less of the other. This relationship, however, is not without its limits; *the movant is always required to demonstrate more than the mere 'possibility' of success on the merits*. For example, even if a movant demonstrates irreparable harm that decidedly outweighs any potential harm to the defendant if a stay is granted, he is still required to show, at a minimum, serious questions going to the merits.

Griepentrog, 945 F.2d at 153-54 (emphasis added).

      11.    Griepentrog is consistent with other Sixth Circuit law on this point: movants are required to show a "strong or substantial" likelihood of success on the merits – not just a mere "possibility" of success in order to reach the other Injunction Factors. E.g., United States v. Detroit Int'l Bridge Co., 7 F.3d 497, 503 (6th Cir. 1993) ("In determining whether the district court abused its discretion in denying [the plaintiffs'] motion for preliminary injunction we must consider … [w]hether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits."); United of Omaha Life Ins. Co. v. Solomon, 960 F.2d 31, 35 (6th Cir. 1992) ("To obtain a preliminary injunction, a plaintiff must demonstrate, among other things, a strong or substantial likelihood or probability of success on the merits."); Satyam Computer Servs., Ltd. v. Venture

Global Eng'g, LLC, No. 06-CV-50351, 2006 WL 2571581, at *3 (E.D. Mich. Sept. 5, 2006) ("In determining whether to use its discretion to grant a stay, a court should consider … [w]hether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits."); Chrysler, 2009 WL 7386569, at *3 (where movant sought a stay pending decision on movant's motion to withdraw the reference, holding that "the movant must … clearly demonstrate that it has a substantial likelihood of succeeding on the withdrawal motion").

12.     The Retiree Committee does not satisfy its burden of showing a "strong or substantial likelihood" that the Motion to Withdraw will be successful. The gravamen of the Motion to Withdraw is that Stern v. Marshall, 131 S. Ct. 2594 (2011), stripped this Court of constitutional authority to determine the City's eligibility to be a debtor and, thus, the Eligibility Proceedings must or should be withdrawn to an Article III court.  This proposition, however, is wrong, and Movant's error rests upon a mischaracterization of the precise issue before the District Court in the Motion to Withdraw.

13.     The Motion to Withdraw labors strenuously to cast an issue that can only arise in a chapter 9 bankruptcy case as being completely unrelated to this chapter 9 case.  Motion to Withdraw, at ¶ 29 (stating that the Eligibility Proceedings exist "wholly apart from and independently of any bankruptcy

-7-
CLI-2141675v5
13-53846-swr   Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:03:02  Page 250 of 313
13-53846-tjt   Doc 923  Filed 09/13/13  Entered 09/13/13 14:47:02  Page 12 of 31

proceedings.").  But the Retiree Committee may not remove objections to

eligibility that rely upon state and federal constitutional law from the actual context

of the Eligibility Proceedings.  The question of whether or not the City is eligible

for chapter 9 stems from the bankruptcy itself, and a bankruptcy court has

jurisdiction to determine this issue.

14.     Thus, the Court is *not* being called upon to render final

judgment on any state claims that might fall within the ambit of <u>Stern</u>.  Rather, the

matter before the Court is *eligibility*:  <u>i.e.</u>, a question of federal law, governed by

section 109(c) of the Bankruptcy Code, specifically assigned to this court by

section 921(c) of the Bankruptcy Code and relevant only for purposes of assessing

the applicability of a federal scheme.[3]  That this determination may require the

Court to *consider* federal and state constitutional questions does not implicate

<u>Stern</u> or give rise to any jurisdictional infirmity.

15.     Even if the Court were to conclude that chapter 9 or PA 436 is

unconstitutional, it would not be called upon to issue any relief based on such

constitutional arguments.  The disposition of the Eligibility Proceedings would be

limited to a determination that the City is ineligible for chapter 9 and dismissal of

---

[3]     <u>See</u> 11 U.S.C. § 921(c) ("After any objection to the petition, the court, after
notice and a hearing, may dismiss the petition if the debtor did not file the
petition in good faith or if the petition does not meet the requirements of this
title.").

the City's petition.  Thus, the Eligibility Proceedings do not implicate <u>Stern</u>, the

Court's jurisdiction to enter judgment in the Eligibility Proceedings is

uncompromised and withdrawal of the reference of the Eligibility Proceedings is

completely unwarranted.

16.     In any event, even if this Court lost constitutional authority to

decide the matter assigned to it under section 921(c) of the Bankruptcy Code under

<u>Stern</u>, withdrawal of the reference would not be the proper result.  The Retiree

Committee's suggestion to the contrary would work a dramatic upheaval of the

division of labor between district courts and bankruptcy courts.  Indeed, if

withdrawal were mandated whenever the bankruptcy court's authority to enter final

orders were in question, bankruptcy courts would be required to channel all

arguably non-core proceedings through the district courts, and the procedures for

adjudication of non-core claims established in the wake of <u>Northern Pipeline</u>

<u>Construction Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50 (1982), and codified at

section 157(c)(1) of the Judicial Code would be wholly subverted.

17.     <u>Stern</u> does not contemplate any such upheaval.  <u>Stern</u>,

131 S. Ct. at 2620 (stating that the Court did not anticipate that its decision would

have a profound effect on the division of labor between the district and bankruptcy

courts); <u>see</u> <u>also</u> <u>Walker, Truesdell, Roth & Assocs. v. Blackstone Grp., L.P. (In re</u>

CLI-2141675v5
-9-
13-53846-swr   Doc 473-5   Filed 09/13/13   Entered 09/13/13 14:47:02   Page 252 of
13-53846-tjt   Doc 923   Filed 09/14/14   Entered 09/14/14 17:03:02   Page 25 of 31
313

Extended Stay, Inc.), 466 B.R. 188, 202 (S.D.N.Y. 2011) (rejecting argument that

withdrawal of the reference was constitutionally mandated in the event that the

bankruptcy court lacked authority to enter final orders under Stern).

> Plaintiffs' request, if granted, would dramatically
> restructure the division of labor between district courts
> and bankruptcy courts by requiring that district courts
> hear a substantial percentage of adversary proceedings….
> Requiring withdrawal of such actions would be contrary
> to the language of Stern, which categorizes itself as a
> "narrow" decision that does not "meaningfully change[ ]
> the division of labor" between bankruptcy courts and
> district courts.

Id.

18.     Thus, the invocation of Stern does *not* mandate withdrawal of

the reference.  Rather, as the Sixth Circuit has rightly held, where a matter falls

within the category of proceedings identified by the Supreme Court in Stern, the

bankruptcy court should enter proposed findings of fact and conclusions of law for

consideration by the district court.  Onkyo Europe Elecs. GMBH v. Global

Technovations Inc. (In re Global Technovations Inc.), 694 F.3d 705, 722

(6th Cir. 2012) (stating that a bankruptcy court may enter findings of fact and

conclusions of law when it lacks authority to enter a final judgment under Stern).

This Court can and should decide whether it should enter an Order for Relief or a

CLI-2141675v5
-10-
13-53846-swr  Doc 2473-5  Filed 09/13/13  Entered 09/13/13 14:17:03  Page 253 of
313
13-53846-tjt  Doc 923  Filed 09/18/13  Entered 09/18/13 14:47:40  Page 253 of 31

report and recommendation to the District Court accompanying a proposed form of

Order for Relief.  There is no need for the withdrawal of the reference.[4]

19.  Citing to <u>Moyer v. Koloseik (In re Sutton)</u>, 470 B.R. 462

(Bankr. W.D. Mich. 2012), the Retiree Committee also argues that mandatory

withdrawal is required where "fundamental due process" considerations are

implicated (with the due process rights in question being the right of retirees not to

have their "pension rights dispute" determined by a non-Article III court).  Motion

to Withdraw, at ¶¶ 34, 39.  First, the due process concerns raised by the <u>Sutton</u>

court arose solely because the matter before it implicated <u>Stern</u>.  As demonstrated

immediately above, <u>Stern</u> is not implicated by the Eligibility Proceedings.  Second,

the <u>Sutton</u> court took pains to clarify that many core aspects of the bankruptcy

process – including the potential compromise of claims that troubles the Retiree

Committee – "do not … require invocation of a 'public right' exception because no

---

[4]     Citing decisions from the <u>Madoff</u> line of cases, the Retiree Committee
argues that a bankruptcy court is powerless even to determine whether <u>Stern</u>
is implicated (and that this alleged lack of power thus mandates withdrawal).
Motion to Withdraw, at ¶ 42.  This is incorrect.  "It is familiar law that a
court always has jurisdiction to determine its own jurisdiction."  <u>Hassett v.
FDIC (In re CIS Corp.)</u>, 140 B.R. 351, 353 (S.D.N.Y. 1992) (citing <u>United
States v. United Mine Workers of Am.</u>, 330 U.S. 258, 291-95 (1947));
<u>see</u> <u>also</u> <u>Extended Stay</u>, 466 B.R. at 201 (denying withdrawal of the
reference to consider the argument that the bankruptcy court's
post-confirmation retention of jurisdiction was constitutionally improper
because "the bankruptcy court has jurisdiction to determine its own
jurisdiction").

-11-

CLI-2141675v5
13-53846-swr   Doc 2473-5   Filed 01/14/14   Entered 01/14/14 17:02:02   Page 254 of
313
13-53846-tjt   Doc 923-5   Filed 09/18/13   Entered 09/18/13 14:41:03   Page 26 of 32

unconstitutional taking of property is at risk.  For example, no Article III judge is needed when … the question is simply … which of the estate's creditors will be paid and which will not."  Sutton, 470 B.R. at 473.  Consistent with Sutton (and for all the reasons previously stated), the determination of the City's eligibility to be a debtor under chapter 9 does not implicate due process rights of retirees.  The Retiree Committee's due process argument, thus, fails.[5]

20.    For much the same reason, the Retiree Committee's argument that principles of "federalism" require withdrawal of the reference lacks merit. Motion to Withdraw, at ¶¶ 36-40.  The state and federal constitutional challenges that have been raised in the Eligibility Proceedings consist of arguments that chapter 9 or PA 436 are unconstitutional to the extent the City ultimately may seek to impair pension claims.  No such considerations, however, are implicated by the Eligibility Proceedings, and the Court is *not* being asked to enter any relief with respect to these issues.

21.    The Retiree Committee devotes barely four pages of the Motion to Withdraw to application of the standards for mandatory and permissive withdrawal set forth in section 157(d) of the Judicial Code.  Mandatory withdrawal

---

[5]    Moreover, to the extent that the Retiree Committee cites to Sutton in support of its argument that the Eligibility Proceedings implicate the Tenth Amendment to the United States Constitution, the citation is misplaced. Sutton is grounded entirely in consideration of the Fifth Amendment.

CLI-2141675v5
-12-
13-53846-swr  Doc 473-5  Filed 09/13/13  Entered 09/13/13 14:47:02  Page 25 of 31
13-53846-tjt  Doc 928  Filed 09/16/13  Entered 09/16/13 14:17:30  Page 255 of 313

under section 157(d) of the Judicial Code requires a determination "that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).  It is implicated only where the bankruptcy court is required "to make a significant interpretation, as opposed to a simple application, of federal non-bankruptcy statutes."  In re Motions to Withdraw Reference in Various Cases, Nos. 12-11556 to 60, 63 to 65, 2012 WL 5381208, at *6 (E.D. Mich. Oct. 31, 2012).

22.     The Retiree Committee argues that the potential impairment of retiree claims in chapter 9 mandates withdrawal under section 157(d) of the Judicial Code since such impairment is contrary to Michigan law.  Motion to Withdraw, at ¶¶ 41-43.  Because arguments based upon Michigan law do not trigger application of section 157(d) of the Judicial Code, the Retiree Committee attempts to convert an issue that might involve the intersection of state law and the Bankruptcy Code into one implicating mandatory statutory withdrawal by invoking the Tenth Amendment of the federal Constitution.  Alleging a "constitutional" basis for a request for withdrawal, however, does not suffice to bring that request within section 157(d) of the Judicial Code.  If it were otherwise, such an argument would be available to almost any party that lacked specific federal grounds for

CLI-2141675v5
13-53846-tjt   Doc 2473-5   Filed 01/14/14   Entered 01/14/14 17:03:02   Page 256 of
313
13-53846-swr   Doc 923   Filed 09/18/13   Entered 09/18/13 14:47:40   Page 25 of 31

mandatory withdrawal.  See LTV Steel Co. v. Union Carbide Corp. (In re Chateaugay Corp.), 193 B.R. 669, 674 (S.D.N.Y. 1996) ("[T]he particular constitutional issue here [i.e., due process concerns arising in connection with the propriety of notice] is one that could almost always be raised by a party seeking withdrawal of the reference.  Holding that that issue mandates withdrawal would defeat Congress's purpose when it created the bankruptcy courts, and would transform § 157(d) into an escape hatch through which numerous cases would fall.").[6]

---

[6]     Courts require persuasive factual and legal substantiation of constitutional arguments – substantiation that is absent from the Retiree Committee's papers – before finding that a substantial likelihood of success on the merits exists.  E.g., Rhinehart v. Scutt, 509 Fed. App'x 510, 513-14 (6th Cir. 2013) (affirming denial of a prisoner's motion for a preliminary injunction based on Eighth Amendment constitutional claims where the prisoner failed to show, legally and factually, that he was likely to succeed on the merits); Cooey v. Strickland, 604 F.3d 939, 944-46 (6th Cir. 2010) (same); Valenti v. Snyder, 853 F. Supp. 2d 691, 694, 695, 697 (E.D. Mich. 2012) (finding no likelihood of success on the merits and denying plaintiffs' motion for a temporary restraining order where plaintiffs claimed, among other things, that their federal Contracts Clause and Due Process rights would be threatened absent such an order, because plaintiffs (a) failed to provide sufficient factual support for their Contracts Clause claim; and (b) "have not cited clear precedent that supports their position" regarding their Due Process claim, meaning that "Plaintiffs' arguments fall short on the critical factor of whether any of Plaintiffs' … claims have a strong likelihood of success on the merits"); Anderson v. Prisoner Health Servs., No. 10-15154, 2011 WL 2144205, at **2-4 (E.D. Mich. Apr. 27, 2011) (report recommending denial of a motion for a preliminary injunction and temporary restraining order based upon Eighth Amendment claims because

23.     In any event, contrary to the Retiree Committee's arguments,

the determination of whether a bankruptcy court possesses authority to finally

adjudicate a matter in light of <u>Stern</u> does not implicate interstate commerce

(<u>i.e.</u>, a requirement for mandatory withdrawal under section 157(d) of the Judicial

Code).

> The holding of <u>Stern</u> does not mandate withdrawal under section 157(d) in these five actions because the question of whether the bankruptcy court has authority to enter a final judgment does not implicate the regulation of organizations or activities affecting interstate commerce. Although Congress could have provided for mandatory withdrawal where resolution of claims requires consideration of constitutional issues, it did not do so.

<u>Extended Stay</u>, 466 B.R. at 200-01.

24.     The Retiree Committee's argument that the Court should

exercise its discretion to withdraw the reference for "cause" under section 157(d)

of the Judicial Code – <u>i.e.</u>, in favor of "permissive withdrawal" – is likewise

unlikely to succeed.  In this District and elsewhere, the following factors are

relevant to the determination of the existence of sufficient "cause" to support

---

the plaintiff failed to supply adequate factual and legal support for his position; rejecting conclusory constitutional allegations as insufficient under the Sixth Circuit's four-factor framework; "Plaintiff is, in effect, seeking relief as if he has already prevailed on the merits …."), <u>order adopting recommendation</u>, No. 10-15154, 2011 WL 2143514 (E.D. Mich. May 31, 2011).

withdrawal: "(1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors." E.g., Lewis v. Negri Bossi USA, Inc. (In re Mathson Indus., Inc.), 408 B.R. 888, 892 (E.D. Mich. 2009); Omega Tool Corp. v. Alix Partners, LLP, 416 B.R. 315, 322 (E.D. Mich. 2009).

25.     The Retiree Committee does not argue that a determination of eligibility is not a core proceeding.  Rather, it argues that this Court lacks authority to finally adjudicate the Eligibility Proceedings under Stern.  Motion to Withdraw, at ¶ 45.  Since the Eligibility Proceedings are indeed core and exist solely because they are part of a chapter 9 case, Stern is not implicated and the Committee, thus, fails to satisfy the first prong of the inquiry for permissive withdrawal.

26.     The only other factor that the Retiree Committee even attempts to satisfy is the second, i.e., the interests of judicial economy.  The Retiree Committee argues that, because it intends to seek an interlocutory appeal of any ruling by this Court in favor of the City, the interests of judicial economy benefit from permissive withdrawal of the reference.  A movant's declared intent to appeal an adverse decision, however, does not constitute cause to withdraw a proceeding.

Indeed, if this were the case, all movants could satisfy the judicial economy factor of the permissive withdrawal analysis by simply declaring such an intent. This argument is likely to be rejected by the District Court as little more than thinly-disguised "forum shopping."

> The only justification put forth by [the movant] is that the bankruptcy judge is somehow unfit to rule on the instant motion, and that allowing the bankruptcy judge to rule would create the need for an otherwise unnecessary appeal, while this court, by agreeing with [the movant], would eliminate the need for such an appeal.
>
> Such "justification" is no more than "forum shopping", and counsels strongly against withdrawing the reference. Furthermore, as the motion is properly before the bankruptcy court, which possesses greater familiarity with the parties, the underlying case, and the instant motion itself, this court finds that withdrawal would not promote efficient use of judicial resources or prevent delay or costs to the parties.

In re Level Propane Gases, Inc., No. 06-00119, 2006 WL 3499916, at *1 (N.D. Ohio Dec. 5, 2006).

27.     By the Eligibility Proceedings, the City is not attempting to impair the constitutional rights of any party, and including arguments based upon the federal or Michigan constitutions does not automatically entitle the Retiree Committee to withdrawal of the reference. Accordingly, the Retiree Committee is unlikely to convince the District Court that withdrawal of the reference is appropriate under any statutory or constitutional theory.

* * *

28.     Because the Motion to Withdraw is unlikely to be granted, the
Stay Motion should be denied.

### *A Determination of Eligibility Causes No Harm to Retirees*

29.     The Retiree Committee utterly fails to demonstrate that the
second Injunction Factor – whether the failure to stay Eligibility Proceedings will
cause irreparable harm to retirees – weighs in favor of the imposition of the Stay.
Indeed, the Retiree Committee *does not even attempt* to apply the second
Injunction Factor to the matter before the Court.  Rather than apply the second
Injunction Factor to the Stay (i.e., the subject matter of the Retiree Committee's
motion) – and, thus, demonstrate how unstayed Eligibility Proceedings might
result in irreparable harm to retirees – the Retiree Committee chooses to dwell
instead on issues that are tangentially related, at best, to its requested relief.  Such
misdirected argument is insufficient to satisfy the Retiree Committee's burden of
proof.

30.     The Retiree Committee argues that irreparable harm to its
constituents is established by an alleged violation of retirees' constitutional rights.
Stay Motion, at ¶ 21.  But, the question before the Court is whether retirees would
suffer irreparable harm *from a denial of the Stay*.  There is simply no suggestion in
the Stay Motion that continuing Eligibility Proceedings will harm any retiree in

-18-
CLI-2141675v5
13-53846-tjt  Doc 2473-5  Filed 09/13/14  Entered 09/13/14 14:17:02  Page 261 of
313
13-53846-swr  Doc 923  Filed 09/18/13  Entered 09/18/13 14:47:40  Page 261 of
313

any way.  Indeed, there is no suggestion that a *determination of eligibility* will harm any retiree in any way.  The Retiree Committee's focus on the prejudice to its members' alleged rights and the potential harm that might result from the impairment of benefits at some later date is entirely misplaced.

31.     The Stay Motion presents the Court with a list of consequences that might result from an impairment of retirees' pension and other benefits. Retiree Committee, at ¶¶ 23-25.  None of these things, however, will arise from a finding that the City is eligible to be a debtor under chapter 9.  A denial of a stay of the Eligibility Proceedings will not cause these results either.  The Stay Motion conspicuously avoids this reality, which conclusively demonstrates that, not only will retirees not suffer irreparable harm from unstayed Eligibility Proceedings, they will not suffer *any harm at all*.

32.     The Retiree Committee's failure to demonstrate the existence of any injury resulting directly from a denial of the Stay Motion (as opposed to some speculative injury that may occur at some later date) dooms its attempt to satisfy the second Injunction Factor under Sixth Circuit law.  Griepentrog, 945 F.2d at 154 ("In evaluating the harm that will occur depending upon whether or not the stay is granted, we generally look to three factors:  (1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof

provided…. [T]he harm alleged must be both certain and immediate, rather than speculative or theoretical.") (internal citations and quotation marks omitted).

33. Because the Stay Motion completely fails to confront the second Injunction Factor, the Retiree Committee fails to satisfy its burden of demonstrating that it will suffer irreparable harm from the lack of a Stay.

### *The City Would Be Harmed by the Imposition of a Stay*

34. Because the City and its residents will be injured by any delay in the administration of this chapter 9 case, the third Injunction Factor – whether non-movants would be substantially harmed by a stay – weighs in favor of denying the Stay Motion.[7]

35. The City seeks the administration of this chapter 9 case on as expeditious a schedule as possible. This is so not because the City is interested in speed for speed's sake, but because every day of delay in the administration of this case inflicts injury on the City and its residents through continuation of intolerably low levels of municipal services and public health and safety and the deferral of any opportunity that the City may have to revitalize itself. As set forth in the

---

[7] In the bankruptcy context, a court must concern itself not only with harm to the non-movant from a stay, but harm to the interests of the entire bankruptcy estate. In re Dana Corp., No. 06-10354, 2007 WL 2908221, at *1 (Bankr. S.D.N.Y. Oct. 3, 2007). Although the filing of a chapter 9 petition does not create an "estate" *per se*, harm to the City's residents is analogous to the harm to the estate contemplated by the Dana court.

-20-
CLI-2141675v5
13-53846-tjt  Doc 2473-5  Filed 09/13/14  Entered 09/13/14 14:47:03  Page 26 of 31
13-53846-swr  Doc 928  Filed 09/18/13  Entered 09/18/13 14:47:03  Page 25 of 31
313

Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration"), filed on July 18, 2013, the City is (a) currently unable to make investments critical to the health and safety of its residents, (b) plagued by shockingly high crime rates and low police response times, (c) struggling to keep the lights on (with 40% of the City's street lights inoperative as of April 2013), (d) ravaged by extensive and intractable urban blight and (e) saddled with obsolete and decaying infrastructure and equipment. Orr Declaration, at ¶¶ 31-44. Moreover, the City will only be able to attract residents and businesses and prevent existing residents and businesses from leaving when it can demonstrate that it has solved its financial problems and is in a position to finance a recovery. The imposition of the Stay would do nothing but defer progress on all of these fronts.

36. The substantial delay in this case sought by the Stay Motion also jeopardizes the City's best opportunity to effect a plan of adjustment in this matter. The tenure of the Emergency Manager – and, thus, the opportunity to improve public safety and implement a sustainable restructuring of the City that he represents – may be limited. See MCL § 141.1549(6)(c) (providing that the Emergency Manager may be removed from his position by a two-thirds vote of the City Council approved by the Mayor after 18 months of service). Imposition of a

-21-

CLI-2141675v5

13-53846-tjt  Doc 2473-5  Filed 01/14/14  Entered 01/14/14 17:03:32  Page 26 of
313
13-53846-swr  Doc 923  Filed 09/18/13  Entered 09/18/13 14:47:40  Page 26 of 31

Stay – which could last for months – will significantly reduce the time Mr. Orr will have to achieve his objectives for the City.

37. Instead of confronting the obvious and substantial harm to the City that would result from the relief requested, the Retiree Committee argues that "the only injury [to the City] is the choice of forum to decide issues such as the constitutionality of PA 436 in light of the legislative desire to override the Michigan's [sic] constitutional protections for retirement benefits as found in Article IX, § 24" and that "the City does not lose any constitutional rights and protections."  Stay Motion, at ¶ 27.  Arguments related to the relative injury to the parties' respective constitutional rights, however, are completely unrelated to the harms inflicted upon the parties by the Stay (which is the matter before the Court). As demonstrated above, substantial and identifiable harm would befall the City in the event of a Stay while retirees suffer no injury at all if such a Stay is denied.

38. Moreover, the Court should refuse to stay proceedings prior to the entry of an order for relief for the same reason that Congress has prohibited a stay of proceedings once an order for relief is entered:  the threat of harm to the debtor.  Section 921(e) of the Bankruptcy Code provides that "[t]he court may not, on account of an appeal from an order for relief, delay any proceeding under this chapter in the case in which the appeal is being taken; nor shall any court order a

CLI-2141675v5
-22-
13-53846-tjt   Doc 2478-5   Filed 01/14/14   Entered 01/14/14 14:10:32   Page 265 of
313
13-53846-swr   Doc 923   Filed 09/18/13   Entered 09/18/13 14:47:03   Page 26 of 31

stay of such proceeding pending such appeal." 11 U.S.C. § 921(e). COLLIER ON

BANKRUPTCY describes the purpose of section 921(e) of the Bankruptcy Code as

follows:

> To require a municipality to halt all action in a chapter 9
> case pending [an appeal of an order for relief] would
> defeat the purpose of chapter 9 to enable a municipality
> to obtain expeditious relief and to confirm a plan of
> adjustment quickly so that the municipality does not
> remain under the court's jurisdiction for so long a period
> as to increase the danger of the court's interference in the
> municipality's internal affairs.

6 COLLIER ON BANKRUPTCY ¶ 921.05 (Alan N. Resnick & Henry J. Sommer eds.,

16th ed. 2013). This same danger would arise if the Stay sought by the Retiree

Committee is granted.

39.     Because the City has demonstrated that substantial harm would

be inflicted upon it by the imposition of the Stay, the third Injunction Factor

weighs in favor of denying the Stay Motion.

### *The Public Interest Would Be Harmed by the Imposition of a Stay*

40.     The Retiree Committee argues that the fourth Injunction Factor

– whether the public interest would be served by granting the Stay – weighs in

favor of granting the Stay Motion because "[u]pholding federal constitutional

CLI-2141675v5
-23-
13-53846-tjt   Doc 2473-5   Filed 01/14/14   Entered 01/14/14 17:03:32   Page 266 of
313
13-53846-swr   Doc 923   Filed 09/18/13   Entered 09/18/13 14:47:30   Page 28 of 31

rights by assuring that local government authorities do not act beyond the scope of their authority undoubtedly serves the public interest." Stay Motion, at ¶ 29.[8]

41.     Again, however, the Retiree Committee argues questions that are not before the Court and ignores matters that are. Whether enforcing a public servant's proper sphere of action, or defending constitutional rights, promotes the public interest is not the issue before the Court. The Court is called upon to determine whether the imposition of the Stay benefits the public interest. As demonstrated with respect to the third Injunction Factor, the public interest would only be undermined by a stay of Eligibility Proceedings. Unnecessary delay in the administration of these cases would impair, among other things, public health and safety and the City's ability to provide municipal services to its residents. Courts commonly find that impairment of these and similar municipal functions works to the detriment of the public interest. See Dearborn Lodging, Inc. v. City of Dearborn, No. 11-10057, 2012 WL 1658684, at *3 (E.D. Mich. May 11, 2012) (denying motion to stay order granting summary judgment to city in proceeding commenced to prevent city from demolishing dangerous structures; finding, among

---

[8]     The Retiree Committee's other argument that granting a Stay serves the public interest – that "the public interest weighs decidedly in favor of Constitutional protections afforded by Article IX, § 24 of the Michigan Constitution" (Stay Motion, at ¶ 30) – is a bromide at best, and meaningless at worst.

other things, that granting the stay would harm the public interest where a stay would (a) pose a threat to public safety and (b) unnecessarily drain public resources; explaining that time was of the essence because "[a]ny delay in the planned demolition would only cause an accumulation of … harms to the City and to the public interest."); <u>Stevenson v. State & Local Police Agencies</u>, 42 F. Supp. 2d 229, 232 (W.D.N.Y. 1999) (noting, while analyzing the "public interest" factor that, "[a]mong the factors that the court can take into account is the effect that issuance of an injunction might have on public safety"); <u>Citizens for Rational Coastal Dev. v. Fed. Highway Admin.</u>, No. 07-4551, 2008 WL 508666, at **10-11 (D.N.J. Feb. 21, 2008) (denying plaintiffs' motion to enjoin the replacement of a deteriorating bridge; holding, among other things, that the public interest analysis weighed in favor of denying injunctive relief because (a) "the Court considers these safety issues to be paramount;" (b) "safety issues resulting from the bridge's deficiencies will only continue to increase over time;" and (c) "[g]iven these safety issues, an injunction that may delay the [bridge] project could have serious public safety consequences").

42.     Because a Stay would not be in the public interest, the fourth Injunction Factor weighs in favor of denying the Stay Motion.

WHEREFORE, for the reasons set forth herein, the City respectfully requests that this Court deny the Stay Motion.

CLI-2141675v5
-26-

13-53846-tw Doc 2473-5 Filed 01/14/14 Entered 01/14/14 17:03:32 Page 26 of 31
13-53846-swr Doc 923 Filed 09/19/13 Entered 09/19/13 14:47:40 Page 81 of 313

Dated: September 18, 2013          Respectfully submitted,


                                   /s/ Bruce Bennett
                                   Bruce Bennett (CA 105430)
                                   JONES DAY
                                   555 South Flower Street
                                   Fiftieth Floor
                                   Los Angeles, California  90071
                                   Telephone:  (213) 243-2382
                                   Facsimile:  (213) 243-2539
                                   bbennett@jonesday.com

                                   David G. Heiman (OH 0038271)
                                   Heather Lennox (OH 0059649)
                                   JONES DAY
                                   North Point
                                   901 Lakeside Avenue
                                   Cleveland, Ohio  44114
                                   Telephone:  (216) 586-3939
                                   Facsimile:  (216) 579-0212
                                   dgheiman@jonesday.com
                                   hlennox@jonesday.com

                                   Jonathan S. Green (MI P33140)
                                   Stephen S. LaPlante (MI P48063)
                                   MILLER, CANFIELD, PADDOCK AND
                                       STONE, P.L.C.
                                   150 West Jefferson, Suite 2500
                                   Detroit, Michigan  48226
                                   Telephone:  (313) 963-6420
                                   Facsimile:  (313) 496-7500
                                   green@millercanfield.com
                                   laplante@millercanfield.com

                                   ATTORNEYS FOR THE CITY OF DETROIT

**ITEM NO. 17**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

## Opinion and Order Denying Motion to Stay Proceedings
## Pending Determination of Motion to Withdraw the Reference

On September 11, 2013, the Official Committee of Retirees filed a motion to withdraw the reference on its objection to eligibility. (Dkt. #806) On September 13, 2013, the Committee filed a motion to stay this Court's deadlines and hearings concerning the determination of eligibility, pending the district court's decision on the motion to withdraw the reference. (Dkt. #837) Several parties, including Detroit Retired City Employees and Retired Detroit Police and Fire Fighters Association, filed a joint concurrence. (Dkt. #922)

On September 18, 2013, the City filed an objection to the motion for stay. (Dkt. #925)

The Court heard argument on the motion on September 19, 2013, and took the matter under advisement.

## I. Summary of Decision

The Court finds that none of the four factors to be considered on the Committee's motion for stay weigh in favor of granting the motion. Specifically, the Court finds that:

1. The Committee is not likely to succeed on the merits of its motion to withdraw the reference.

2. The Committee will not suffer any harm, let alone irreparable harm, if the stay is denied.

3.  The City will suffer substantial harm if the stay is granted.

4.  The public interest would not be served by granting the stay.

For these reasons, the motion for stay is denied.

## II. The Law Applicable to the Committee's Motion for Stay

Bankruptcy Rule 5011(c) governs a motion for a stay of proceedings pending the determination of a motion to withdraw the reference.

> The filing of a motion for withdrawal of a case or proceeding or for abstention pursuant to 28 U.S.C. § 1334(c) shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion.

Fed. R. Bankr. P. 5011(c).

"Although BR 5011(c) provides little guidance as to the circumstances under which a bankruptcy court should stay a proceeding, it is clear from the plain language of the Rule that the granting of a stay should be the exception—not the general rule." *In re The Antioch Co.*, 435 B.R. 493, 496 (Bankr. S.D. Ohio 2010). The *Antioch* court further observed:

> While the term "may" in the Rule appears to grant the bankruptcy court broad discretion in determining such a motion, the case law applying the Rule has limited the circumstances under which a stay may be granted to essentially the circumstances under which a preliminary injunction would be appropriate under Federal Rule of Civil Procedure 65.

*Id.* at 497.

Accordingly, when considering the Committee's motion for a stay, the Court considers whether "(1) [the Committee] is likely to prevail on the merits of the withdrawal motion; (2) [the Committee] is likely to suffer irreparable harm if the motion is denied; (3) the debtor [or other parties] will not be harmed by a stay; and (4) the public interest will be served by granting a

2

stay." *F.D.I.C. v. Imperial Capital Bancorp, Inc.*, 2011 WL 5600542, at *1 (S.D. Cal. Nov. 17, 2011).[1] The parties agree that these are the factors to be considered.

This statement of the factors to consider on the Committee's motion for stay is consistent with the factors that the Sixth Circuit has approved when considering a motion for a preliminary injunction. *See, e.g., Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1175 (6th Cir. 1995). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

The Committee bears the burden of establishing that a stay is appropriate. *See, e.g., In re New Energy Corp.*, 2013 WL 1192774, at *10 (Bankr. N.D. Ind. Mar. 14, 2013).[2]

Ultimately, the issue of whether to grant a stay is left to the court's discretion. *See, e.g., In re Chrysler LLC*, 2009 WL 7386569, at *1 (Bankr. S.D.N.Y. May 20, 2009).[3]

---

[1] *See also Beach First Nat'l Bancshares, Inc. v. Anderson* (*In re Beach First Nat'l Bancshares, Inc.*), 2011 WL 2441501, at *1 (Bankr. D.S.C. Jan. 21, 2011); *Hecny Transp. Ltd. v. Summit Global Logistics, Inc.* (*In re Summit Global Logistics, Inc.*), 2008 WL 5953690, at *2 (Bankr. D.N.J. Dec. 1, 2008); *Env't Litig. Grp., P.C. v. Crawford* (*In re Price*), 2007 WL 1125639, at *7 (Bankr. N.D. Ala. Apr. 16, 2007); *Miller v. Vigilant Ins. Co.* (*In re Eagle Enters. Inc.*), 259 B.R. 83, 86 (Bankr. E.D. Pa. 2001); *Northwestern Inst. of Psychiatry, Inc. v. Travelers Indem. Co.* (*In re Northwestern Inst. of Psychiatry, Inc.*), 268 B.R. 79, 83 (Bankr. E.D. Pa. 2001).

[2] *See also In re Dana Corp.*, 2007 WL 2908221, at *1 (Bankr. S.D.N.Y. Oct. 3, 2007); *In re Eagle Enters. Inc.*, 259 B.R. at 86; *In re Matterhorn Grp., Inc.*, 2010 WL 4628119, at *2 (E.D. Cal. Nov. 5, 2010); *TJN, Inc. v. Superior Container Corp.* (*In re TJN, Inc.*), 207 B.R. 499, 500 (Bankr. D.S.C. 1996).

[3] *In re Ionosphere Clubs, Inc.*, 1996 WL 361531, at *1 (S.D.N.Y. June 28, 1996); *Antioch*, 435 B.R. at 497, 502; *Finger v. County of Sullivan Indus. Dev. Agency* (*In re Paramount Hotel Corp.*), 319 B.R. 350, 357 (Bankr. S.D.N.Y. 2005).

3

### III. Whether the Committee Is Likely to Succeed
### on Its Motion to Withdraw the Reference

The parties agree, and the Court concurs, that the issue here is the Committee's likelihood of success on the motion to withdraw the reference, not the likelihood of success on the Committee's eligibility objections.

The Committee's motion to withdraw the reference asserts three grounds:[4]

> A. *Stern v. Marshall* requires withdrawal of the reference of the eligibility objection independently of 28 U.S.C. § 157(d).
>
> B. Withdrawal of the reference is mandatory under 28 U.S.C. § 157(d).
>
> C. Withdrawal for "cause" is warranted under 28 U.S.C. § 157(d).

The Court will review the likelihood of success of each of these three grounds.[5]

#### A. *Stern v. Marshall*

The Committee's eligibility objection challenges the constitutionality of both chapter 9 of the bankruptcy code under the Federal Constitution and Michigan PA 436 (2012) under the Michigan Constitution. It asserts that therefore the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), requires the district court to withdraw the reference.[6]

---

[4] For convenience, this statement of the Committee's grounds for withdrawal of the reference is quoted and adapted from the table of contents in its memorandum in support of its motion to withdraw the reference filed September 11, 2013. (Dkt. #806)

[5] In its opposition to the motion for stay and at the oral argument on the motion for stay, the City made clear its opposition to the motion to withdraw the reference and the grounds for it.

[6] Specifically, the Committee's objection to eligibility under 11 U.S.C. § 109(c) asserts:
I. Acceptance of the city's authorization to file its petition would render chapter 9 unconstitutional.
A. If chapter 9 permits the city to ignore the pension clause, chapter 9 grants authorization not available under the Michigan Constitution.

4

In *Stern v. Marshall*, the Supreme Court held that the "judicial power of the United States" can only be exercised by an Article III court and "that in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 131 S. Ct. at 2608-12. The Court held that a bankruptcy court therefore lacks the constitutional authority to enter a final judgment on a debtor's counterclaim that is based on a private right when resolution of the counterclaim is not

---

B. If chapter 9 permits Michigan's executive branch to consent to a limitation on its sovereignty not authorized by its people, the federal statute is unconstitutional.

II. It is not necessary for the court to review the constitutionality of chapter 9 because the emergency manager's petition for the City of Detroit does not meet the bankruptcy code requirements for eligibility.

A. The burden is on the debtors to show compliance with sections 109(c) and 921(c).

B. The authorizations relied upon by the emergency manager were flawed under the Michigan Constitution.

1. PA 436 is squarely at odds with the pension clause of Michigan's constitution and therefore unconstitutional.

2. The conflict between PA 436 and the pension clause of the Michigan Constitution cannot be reconciled.

a. The Attorney General's position should not be adopted.

b. The City of Detroit cannot rescue the unconditional authorizations.

c. The governor's authorization pursuant to PA 436 is not valid and void *ab initio* under Michigan's Constitution, and so is that of the emergency manager.

d. The City cannot satisfy bankruptcy code 109(c)(5) and is subject to dismissal under bankruptcy code 921(c).

For convenience, this expanded statement of the Committee's arguments in support of its objection to eligibility is quoted and adapted from its table of contents in its objection to eligibility filed September 10, 2013. (Dkt. #805)

5

necessary to fix the creditor's claim. 131 S. Ct. at 2611-19. The Court described the issue before it as "narrow."[7] 131 S. Ct. at 2620.

The Sixth Circuit has adhered to a narrow reading of *Stern* in the two cases that have addressed the issue: *Onkyo Europe Elect. GMBH v. Global Technovations Inc. (In re Global Technovations Inc.)*, 694 F.3d 705 (6th Cir. 2012), and *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

In *Global Technovations*, the Sixth Circuit summarized *Stern* as follows:

> *Stern's* limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id.* at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid.*

694 F.3d at 722. Based on this view of *Stern*, the *Global Technovations* court held that the bankruptcy court did have the authority to rule on the debtor's fraudulent transfer counterclaim against a creditor that had filed a proof of claim. *Id.*

In *Waldman*, the Sixth Circuit summarized the holding of *Stern* as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate—as in *Katchen* [*v. Landy*, 382 U.S. 323, 86 S. Ct. 467 (1966)]—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline* [*v.*

---

[7] Outside of the Sixth Circuit, the scope of *Stern* has been somewhat controversial. *See generally* Joshua D. Talicska, *Jurisdictional Game Changer or Narrow Holding? Discussing the Potential Effects of Stern v. Marshall and Offering a Roadmap Through the Milieu*, 9 SETON HALL CIRCUIT REV. 31 (Spring 2013); Michael Fillingame, *Through a Glass, Darkly: Predicting Bankruptcy Jurisdiction Post-Stern*, 50 HOUS. L. REV. 1189 (Symposium 2013); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627 (Fall 2012); Hon. Joan N. Feeney, *Statement to the House of Representatives Judiciary Committee on the Impact of Stern v. Marshall*, 86 AM. BANKR. L.J. 357 (Summer 2012).

6

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 6 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 277 of 313

> *Marathon Pipe Line Co.* 458 U.S. 50, 102 S. Ct. 2858 (1982)]; or
> when the debtor pleads an action that would augment the bankrupt
> estate, but not "necessarily be resolved in the claims allowance
> process[,]" 131 S. Ct. at 2618; then the bankruptcy court is
> constitutionally prohibited from entering final judgment. *Id.* at
> 2614.

698 F.3d at 919. Based on this view of *Stern*, the *Waldman* court held that the bankruptcy court

lacked authority to enter a final judgment on the debtor's prepetition fraud claim against a

creditor that was not necessary to resolve in adjudicating the creditor's claim.

These cases recognize the crucial difference to which *Stern* adhered. A bankruptcy court

may determine matters that arise directly under the bankruptcy code, such as fixing a creditor's

claim in the claims allowance process. However, a bankruptcy court may not determine more

tangential matters, such as a state law claim for relief asserted by a debtor or the estate that arises

outside of the bankruptcy process, unless it is necessary to resolve that claim as part of the claims

allowance process. *See City of Cent. Falls, R.I. v. Central Falls Teachers' Union (In re City of*

*Cent. Falls), R.I.*, 468 B.R. 36, 52 (Bankr. D.R.I. 2012) ("[A]lthough the counterclaim at issue in

*Stern* arose under state law, the determinative feature of that counterclaim was that it did not

arise under the Bankruptcy Code.").

The matter on which the Committee has moved for withdrawal of the reference is the

debtor's eligibility to file this chapter 9 case. A debtor's eligibility to file bankruptcy stems

directly from rights established by the bankruptcy code. As quoted above, *Waldman* expressly

held, "When a debtor pleads an action under federal bankruptcy law," the bankruptcy court's

authority is constitutional. 698 F.3d at 919. In this case, the debtor has done precisely that. In

seeking relief under chapter 9, it has pled "an action under federal bankruptcy law."

The Committee's federal and state constitutional challenges are simply legal arguments

in support of its objection to the debtor's request for bankruptcy relief. Nothing in *Stern*,

7

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 7 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 278 of
313

*Waldman*, or *Global Technovations* suggests any limitation on the authority of a bankruptcy court to consider and decide any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it. More specifically, those cases explicitly state that a bankruptcy court can constitutionally determine all of the issues that are raised in the context of resolving an objection to a proof of claim, even those involving state law.[8] For the

---

[8] The Supreme Court has never squarely held that claims allowance, which is at the heart of the bankruptcy process, falls within the permissible scope of authority for a non-Article III court as a "public right" or any other long-standing historical exception to the requirement of Article III adjudication. *Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, n.11, 109 S. Ct. 2782 (1989). However, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871 (1982) (plurality opinion), the Court came tantalizingly close when it stated, "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . [and] may well be a 'public right'[.]"

No court has ever held otherwise. On the contrary, the cases have uniformly concluded that the public rights doctrine is the basis of a bankruptcy court's authority to adjudicate issues that arise under the bankruptcy code. For example, in *Carpenters Pension Trust Fund for Northern California v. Moxley*, 2013 WL 4417594, at \*4 (9th Cir. Aug. 20, 2013), the Ninth Circuit held:

> [T]he dischargeability determination is central to federal bankruptcy proceedings. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L.Ed.2d 945 (2006). The dischargeability determination is necessarily resolved during the process of allowing or disallowing claims against the estate, and therefore constitutes a public rights dispute that the bankruptcy court may decide.

Similarly, in *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 n.11 (3d Cir. 1999), the Third Circuit held, "The protections afforded a debtor under the Bankruptcy Code are congressionally created public rights."

In *Kirschner v. Agoglia*, 476 B.R. 75, 79 (S.D.N.Y. 2012), the court stated, "[After *Stern*,] bankruptcy courts still have the ability to finally decide so-called 'public rights' claims that assert rights derived from a federal regulatory scheme and are therefore not the 'stuff of traditional actions,' as well as claims that are necessarily resolved in ruling on a creditor's proof of claim (e.g., a voidable preference claim)[.]"

Other cases also conclude that various matters arising within a bankruptcy case are within the public rights doctrine. *See., e.g., In re Bataa/Kierland LLC*, 2013 WL 3805143, at \*3 (D. Ariz. July 22, 2013) (scope of Chapter 11 debtor's rights under easement); *Hamilton v. Try Us, LLC*, 491 B.R. 561 (W.D. Mo. 2013) (validity and amount of common law claim against Chapter 7 debtor); *In re Prosser*, 2013 WL 996367 (D.V.I. 2013) (trustee's claim for turnover of property); *White v. Kubotek Corp.*, 2012 WL 4753310 (D. Mass. Oct. 2, 2012) (creditor's successor liability claim against purchaser of assets from bankruptcy estate); *United States v.*

8

same reasons, a bankruptcy court can also constitutionally determine all issues that are raised in the context of resolving an objection to eligibility.

No cases address *Stern* in the context of eligibility for bankruptcy. Nevertheless, several cases do address *Stern* in the context of similar matters - conversion and dismissal of a case. Each readily concludes that *Stern's* limitation on the authority of a bankruptcy court is inapplicable. For example, in *In re USA Baby, Inc.*, 674 F.3d 882, 884 (7th Cir. 2012), the Seventh Circuit held that nothing in *Stern* precludes a bankruptcy court from converting a chapter 11 case to chapter 7, stating, "we cannot fathom what bearing that principle might have on the present case."[9] In *Mahanna v. Bynum*, 465 B.R. 436 (W.D. Tex. 2011), the court held that *Stern* does not prohibit the bankruptcy court from dismissing the debtors' chapter 11 case. The court concluded, "[T]his appeal is entirely frivolous, and constitutes an unjustifiable waste of judicial resources[.]" *Id.* at 442. In *In re Thalmann*, 469 B.R. 677, 680 (Bankr. S.D. Tex. 2012), the court held that *Stern* does not prohibit a bankruptcy court from determining a motion to

---

*Bond*, 2012 WL 4089648 (E.D.N.Y. Sept. 17, 2012) (trustee's claims for tax refund); *Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214 (Bankr. S.D. Tex. 2011) (violation of the automatic stay); *In re Whitley*, 2011 WL 5855242 (Bankr. S.D. Tex. Nov. 21, 2011) (reasonableness of fees of debtor's attorney); *In re Carlew*, 469 B.R. 666 (Bankr. S.D. Tex. 2012) (homestead exemption objection); *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care-Katy, L.P.)*, 465 B.R. 452, 458 (Bankr. S.D. Tex. 2011) (addressing preference actions, stating, "This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine."); *Sigillito v. Hollander (In re Hollander)*, 2011 WL 6819022 (Bankr. E.D. La. Dec. 28, 2011) (nondischargeability for fraud).

In light of the unanimous holdings of these cases, the Court must conclude that its determination regarding the City's eligibility will likely be found to be within the public rights doctrine and therefore that the Court does have the authority to decide the issue, including all of the arguments that the Committee makes in its objection.

[9] *See also In re Gow Ming Chao*, 2011 WL 5855276 (Bankr. S.D. Tex. Nov. 21, 2011).

9

dismiss a case on the grounds of bad faith.[10] This line of cases strongly suggests that *Stern* likewise does not preclude a bankruptcy court from determining eligibility.

Implicitly recognizing how far its motion to withdraw the reference stretches *Stern*, the Committee argues that two aspects of its objection alter the analysis of *Stern* and its application here. The first is that its objection raises important issues under both the Federal and Michigan Constitutions. The second is that strong federalism considerations warrant resolution of its objection by an Article III court. Neither consideration, however, is sufficient to justify the expansion of *Stern* that the Committee argues.

First, since *Stern* was decided, non-Article III courts have considered constitutional issues, always without objection.

Both bankruptcy courts and bankruptcy appellate panels have done so.[11] More specifically, and perhaps more on point, in two recent chapter 9 cases, bankruptcy courts

---

[10] *See also In re McMahan*, 2012 WL 5267017 (Bankr. S.D. Tex. Oct. 25, 2012); *In re Watts*, 2012 WL 3400820 (Bankr. S.D. Tex. Aug. 9, 2012).

[11] *See, e.g., Williams v. Westby (In re Westby)*, 486 B.R. 509 (10th Cir. BAP 2013) (upholding the constitutionality of the Kansas bankruptcy-only state law exemptions); *Res. Funding, Inc. v. Pacific Continental Bank (In re Washington Coast I, L.L.C.)*, 485 B.R. 393 (9th Cir. BAP 2012) (upholding the constitutionality of the final order entered by the bankruptcy court); *Richardson v. Schafer (In re Schafer)*, 455 B.R. 590 (6th Cir. BAP 2011), *rev'd on other grounds*, 689 F.3d 601 (6th Cir. 2012) (addressing the constitutionality of the Michigan bankruptcy-only state law exemptions); *Old Cutters, Inc. v. City of Hailey (In re Old Cutters, Inc.)*, 488 B.R. 130 (Bankr. D. Idaho 2012) (invalidating a city's annexation fee and community housing requirements); *In re Washington Mut., Inc.*, 485 B.R. 510 (Bankr. D. Del. 2012) (holding Oregon's corporate excise tax unconstitutional under the Commerce Clause); *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012) (upholding Georgia's bankruptcy-specific exemption scheme); *In re Fowler*, 493 B.R. 148 (Bankr. E.D. Cal. 2012) (upholding the constitutionality of California's statute fixing the interest rate on tax claims); *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (upholding the constitutionality of 11 U.S.C. § 707(b)); *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709, 717 (Bankr. D. Del. 2012) (upholding the constitutionality of 11 U.S.C. § 106(a)); *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683 (Bankr. N.D. Ga. 2012) (upholding the constitutionality of 11 U.S.C. § 706(a)); *South Bay Expressway, L.P. v. County of San Diego (In re South Bay Expressway, L.P.)*, 455

10

addressed constitutional issues without objection. *Association of Retired Employees v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8 (Bankr. E.D. Cal. 2012) (holding that retirees' contracts could be impaired in the chapter 9 case without offending the constitution); *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (upholding the constitutionality of a Pennsylvania statute barring financially distressed third class cities from filing bankruptcy).

In addition, the Tax Court, a non-Article III court, has also examined constitutional issues, without objection.[12] Likewise, the Court of Federal Claims, also a non-Article III court, has considered constitutional claims, without objection. This was done perhaps most famously in *Beer v. United States*, 111 Fed. Cl. 592 (Fed. Cl. 2013), which is a suit by Article III judges under the Compensation Clause of the Constitution.

*Stern* does not change this status quo, and nothing about the constitutional dimension of the Committee's eligibility objection warrants the expansion of *Stern* that the Committee asserts. As *Stern* itself reaffirmed, "We do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute[.]" 131 S. Ct. at 2620. Expanding *Stern* to the point where it would prohibit bankruptcy

---

B.R. 732 (Bankr. S.D. Cal. 2011) (holding unconstitutional California's public property tax exemption for privately-owned leases of public transportation demonstration facilities).

[12] *See, e.g., Field v. C.I.R.*, 2013 WL 1688028 (Tax Ct. 2013) (holding that the tax classification on the basis of marital status that was imposed by requirement that taxpayer file joint income-tax return in order to be eligible for tax credit for adoption expenses did not violate Equal Protection clause); *Begay v. C.I.R.*, 2013 WL 173362 (Tax Ct. 2013) (holding that the relationship classification for child tax credit did not violate Free Exercise Clause); *Byers v. C.I.R.*, 2012 WL 265883 (Tax Ct. 2012) (rejecting the taxpayer's challenge to the authority of an IRS office under the Appointments Clause).

11

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 11 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 282 of
313

courts from considering issues of state or federal constitutional law would certainly significantly change the division of labor between the bankruptcy courts and the district courts.[13]

The Committee's federalism argument is even more perplexing and troubling. Certainly the Committee is correct that a ruling on whether the City was properly authorized to file this bankruptcy case, as required for eligibility under 11 U.S.C. § 109(c)(2), will require the interpretation of state law, including the Michigan Constitution.

However, ruling on state law issues is required in addressing many issues in bankruptcy cases. As the Supreme Court has observed, "[B]ankruptcy courts [] consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007). Concisely summarizing the reality

---

[13] Only one case, cited extensively by the Committee, suggests otherwise. *Picard v. Flinn Invs., LLC*, 463 B.R. 280 (S.D.N.Y. 2011). (Committee's Motion to Stay, ¶12, p. 6) That case did state in dicta in a footnote, "If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, *a fortiori*, litigants' interest in having the Article III courts interpret the Constitution." *Id.* at 288 n.3.

This single sentence cannot be given much weight. First, it is only dicta. Second, it is against the manifest weight of the case authorities. Third, the quote assumes, without analysis, that the litigants do have an interest in having Article III courts interpret the Constitution, and thus bootstraps its own conclusion. Fourth, nothing in the *Flinn Investments* case states or even suggests that *Stern* itself prohibits a bankruptcy court from ruling on a constitutional issue where it otherwise has the authority to rule on the claim before it. Finally, the district court that issued *Flinn Investments* has now entered an amended standing order of reference in bankruptcy cases to provide that its bankruptcy court should first consider objections to its authority that parties raise under *Stern v. Marshall*. Apparently, that district court's position now is that *Stern* does not preclude the bankruptcy court from determining constitutional issues, including the constitutional issue of its own authority. The order is available at http://www.nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.

The Committee cited two other cases in support of its position that only an Article III court can determine a constitutional issue: *TTOD Liquidation, Inc. v. Lim* (*In re Dott Acquisition, LLC*), 2012 WL 3257882 (E.D. Mich. July 25, 2012), and *Picard v. Schneiderman* (*In re Madoff Secs.*), 492 B.R. 133 (S.D.N.Y. 2013). Both are irrelevant to the issue. *Dott Acquisition* did discuss *Stern* but only in the unremarkable context of withdrawing the reference on a fraudulent transfer action. *Schneiderman* did not address a *Stern* issue at all, or even cite the case.

12

of the bankruptcy process and the impact of *Stern* on it, the court in *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011), concluded:

> [*Stern*] certainly did not hold that a Bankruptcy Judge cannot ever decide a state law issue. Indeed, a large portion of the work of a Bankruptcy Judge involves actions in which non-bankruptcy issues must be decided and that 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process,' [131 S. Ct.] at 2618, for example, claims disputes, actions to bar dischargeability, motions for stay relief, and others. Those issues are likely within the 'public rights' exception as defined in *Stern*.

Other cases also illustrate the point.[14]

The distinction is clear. While in some narrow circumstances *Stern* prohibits a non-Article III court from adjudicating a state law claim for relief, a non-Article III court may consider and apply state law as necessary to resolve claims over which it does have authority under *Stern*. The mere fact that state law must be applied does not by itself mean that *Stern* prohibits a non-Article III court from determining the matter.

Moreover, nothing about a chapter 9 case suggests a different result. In *City of Cent. Falls, R.I.*, 468 B.R. at 52, the court stated, "Nor did [*Stern*] address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy."

---

[14] *See, e.g.*, *Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) (quoting *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011)) ("It is clear" from *Stern v. Marshall* and other Supreme Court precedent that "the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim."); *Anderson v. Bleckner* (*In re Batt*), 2012 WL 4324930, at *2 (W.D. Ky. Sept. 20, 2012) ("*Stern* does not bar the exercise of the Bankruptcy Court's jurisdiction in any and all circumstances where a party to an adversary proceeding has not filed a proof of claim, or where the issue in an adversary proceeding is a matter of state law.").

13

The troubling aspect of the Committee's federalism argument is that it does not attempt to define, even vaguely, what interest of federalism is at stake here or how that interest requires withdrawal of the reference to the district court. Its motion does little more than just drop the word in here and there, and argue that federalism requires this or that.

In *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012), the Supreme Court stated, "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Accordingly, federalism is about the federal and state governments respecting each other's sovereignty. It has nothing to do with the requirements of Article III or, to use the phraseology of *Stern*, with the "division of labor" between the district courts and the bankruptcy courts.[15] 131 S. Ct. at 2620. *See also City of Cent. Falls, R.I.*, 468 B.R. at 52, quoted above.

Beyond that, the Committee's motion does not address why principles of federalism suggest that the district court rather than the bankruptcy court should first review the constitutional issues, especially since any decision by this Court is subject to *de novo* review by the district court on appeal.

For these reasons, the Court concludes that the Committee is not likely to prevail on the merits of its withdrawal motion as it pertains to its *Stern* argument.

**B. Mandatory Withdrawal Under 28 U.S.C. § 157(d)**

The Committee also asserts that it is likely to succeed on the merits of its withdrawal motion because withdrawal of the reference is mandatory under 28 U.S.C. § 157(d). Under this statute, withdrawal of the reference is mandatory if the "resolution of the proceeding requires

---

[15] Genuine federalism concerns are fully respected in bankruptcy through the process of permissive abstention under 28 U.S.C. § 1334(c)(1).

14

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 14 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 285 of
313

consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Most courts agree that "[mandatory] withdrawal should be granted only if the current proceeding could not be resolved without 'substantial and material consideration'" of the federal law regulating interstate commerce.[16] *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 952 (7th Cir. 1996) (citations omitted).

Mandatory withdrawal of the reference is granted only when "resolution of the proceeding must require consideration of non-bankruptcy federal statutes regulating interstate

---

[16] "This 'substantial and material' gloss has been accepted as an appropriate reading of the statute and effectuation of Congress' intent by most courts[.]" *Vicars Ins. Agency, Inc.*, 96 F.3d at 952 (citations omitted). *See also Security Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) (holding that 28 U.S.C. § 157(d) "mandates withdrawal in cases requiring material consideration of non-bankruptcy federal law."); *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) ("This mandatory withdrawal provision has been interpreted to require withdrawal to the district court of cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes."); *Sweet v. Chambers* (*In re Chambers*), 2012 WL 933199, at *1 (E.D. Mich. Mar. 20, 2012) (Hood, J.) ("Two prongs must be met for requiring mandatory withdrawal of the reference: 1) consideration of the Bankruptcy Code; and 2) substantial and material consideration of a nonbankruptcy federal law affecting interstate commerce."); *Stevenson v. Polymerica, Ltd, d/b/a Global Enters. Inc. & Fabribond, LLC.*, (*In re Snooks*), 2009 WL 230598, at *2-3 (E.D. Mich. Jan. 29, 2009) (Fiekens, J.) ("The 'substantial and material consideration' standard is the one adopted by the latest court in this district to consider the question. This standard is also the one gaining most acceptance by courts of late. Therefore, this Court will follow this standard.").

A small minority of courts reject the "substantial and material consideration" test in favor of applying the literal language of 28 U.S.C. § 157(d). *See, e.g., Laborers' Pension Trust Fund – Det. & Vicinity v. Kiefer* (*In re Kiefer*), 276 B.R. 196, 200 (E.D. Mich. 2002) (Gadola, J.) ("Instead, literal interpretation of § 157(d) would preclude bankruptcy court jurisdiction only when (1) consideration of a federal law that regulates commerce and is outside of the Bankruptcy Code were required to resolve the case and (2) a party moved for withdrawal of the proceeding.").

It does not matter which approach is applied here. As noted in the text, the Committee's objections to eligibility do not require consideration of any federal statute other than the bankruptcy code, let alone "substantial and material" consideration.

15

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 15 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 286 of 313

commerce."[17] *In re Texaco Inc.*, 84 B.R. 911, 919 (S.D.N.Y. 1988). These laws are "rooted in the commerce clause."[18] *In re Ziviello-Howell*, 2011 WL 2144417, at *2 (E.D. Cal. May 31, 2011) (collecting cases).

"[Section 157(d)] has been construed narrowly." *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990). "By misinterpreting the mandatory withdrawal provision, courts risk encouraging delay tactics, forum shopping, and ultimately, dissipation of the bankrupt's estate through costly litigation by the parties." Erich D. Andersen, *Closing the Escape Hatch in the Mandatory Withdrawal Provision of 28 U.S.C. § 157(d)*, 36 UCLA L. REV. 417, 418 (December 1988) (footnotes omitted).

This basis for withdrawal of the reference that the Committee asserts is likely to fail for one simple reason. Resolution of the Committee's eligibility objection does not require consideration of any "laws of the United States regulating organizations or activities affecting interstate commerce." The Committee has not cited any such laws to be considered in connection with its eligibility objection and the Court sees none.

Instead, the Committee argues that restructuring the fiscal activities among a state and its employees affects interstate commerce. It cites *United States v. Darby*, 312 U.S. 100, 61 S. Ct 451 (1941), for the proposition that the regulation of employees affects interstate commerce.

---

[17] It must be noted that some cases loosely state that this section applies when consideration of a "non-bankruptcy federal law" is required. *See., e.g., Vicars Ins. Agency, Inc.*, 96 F.3d at 952. Given the specificity of the statute, this shorthand language should be understood to refer to "other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

[18] The reference in *Texaco* to "federal statutes regulating interstate commerce" includes, for example, the federal antitrust laws, securities laws, environmental laws, labor laws, RICO, truth in lending laws, the Federal Aviation Act, and the Occupational Safety and Health Act. *See generally, Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.*, 107 B.R. 34, 38 (D. Del. 1989).

16

This is weak. The question here is not whether the bankruptcy filing of the City of Detroit will affect interstate commerce. It probably will, but the Committee cites no cases holding that 28 U.S.C. § 157(d) requires withdrawal of the reference whenever a debtor's bankruptcy affects interstate commerce. It would stretch § 157(d) beyond recognition to reach that result.

It would also stretch 28 U.S.C. § 157(d) beyond recognition to conclude that it covers all federal laws, including the Constitution, as the Committee apparently contends. Although the Commerce Clause of the Constitution, Art. 1, § 8, cl. 3, gives Congress the power to enact laws "to regulate Commerce . . . among the several States," the Constitution itself is simply not a law "regulating organizations or activities affecting interstate commerce," as required for mandatory withdrawal of the reference under 28 U.S.C. § 157(d). Beyond that, if Congress had intended for mandatory withdrawal of the reference to apply to matters that involve constitutional issues, it could easily have so provided. It did not.

Simply stated, the Committee's objections to eligibility do not require any consideration of a federal law "regulating organizations or activities affecting interstate commerce," let alone any "substantial and material" consideration of such a law. For that reason, the Court concludes that the Committee has not established that it is likely to prevail on the merits of the withdrawal motion as it pertains to its mandatory withdrawal argument.

### C. Permissive Withdrawal Under 28 U.S.C. § 157(d)

In its motion to withdraw the reference, the Committee also argues for permissive withdrawal under § 157(d). This ground allows the district court to withdraw the reference whenever it concludes that there is "cause shown." 28 U.S.C. § 157(d).

Curiously however, the Committee did not assert in its motion for stay that it is likely to succeed on its claim for permissive withdrawal of the reference. As noted in Part II above, the

17

Committee has the burden to establish that it is likely to succeed on its motion. In these circumstances, it is hard to find that the Committee has met its burden.

Nevertheless, in the interest of justice, the Court will review the specific grounds for permissive withdrawal that the Committee argued in its motion to withdraw the reference. In summary, the Committee asserts cause for withdrawal of the reference based on the following factors:

1. "Post-*Stern*, the most relevant factor is whether a bankruptcy court can enter final judgment on the matter." Committee's Motion to Withdraw the Reference at ¶45, p. 26. (Dkt. #806)

2. "Withdrawal will promote judicial and party efficiency." Committee's Motion to Withdraw the Reference at ¶46, p. 27. (Dkt. #806)

3. "The federalism concerns implicated by the Committee's constitutional challenges to Chapter 9 also counsel in favor of resolution in an Article III court." Committee's Motion to Withdraw the Reference at ¶47, p. 27-8. (Dkt. #806)

4. "Finally, the Bankruptcy Court has no special legal expertise to determine the Eligibility Objection based on novel issues of state and federal constitutional law and related to a newly-enacted state statute." Committee's Motion to Withdraw the Reference at ¶48, p. 28. (Dkt. #806)

"[I]n determining whether cause exist[s] a district court should consider such goals as advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process." *Dionne v. Simmons (In re Simmons)*, 200 F.3d 738, 742 (11th Cir. 2000) (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998 (5th Cir. 1985)).[19]

---

[19] *See also Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) ("In determining whether cause exists, a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors."); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1101 (2d Cir. 1993).

18

The factors argued in the Committee's motion to withdraw the reference that are summarized in paragraphs 1, 3 and 4 above are not among the factors suggested in *Simmons* or in other cases on point. Still, the district court has wide discretion and may consider them.

The Committee argues that the most relevant factor is its *Stern* argument. The Court has already explained why that argument is not likely to succeed.

The Committee also asserts that withdrawal of the reference on its eligibility objection will promote efficiency. This too is unlikely to succeed. If the motion to withdraw the reference is granted, then one of the eligibility objections that have been filed in the case will be in the district court (the Committee's objections) and all of the others will be in the bankruptcy court, including the other parties' constitutional objections. This leaves the City litigating eligibility, and to some extent the same issues on eligibility, in two different courts, simultaneously. This does not promote judicial or party efficiency; it is its antithesis. The most efficient way to litigate eligibility in this case is in one court - the bankruptcy court - and then on appeal in the next.

The Committee also argues that considerations of federalism suggest that constitutional issues should be resolved in the district court. However, as demonstrated above in connection with the Committee's *Stern* argument, there is nothing about principles of federalism that suggest that the Committee's constitutional challenge to chapter 9 of the bankruptcy code or to PA 436 should be determined in the district court.

Finally, the Committee argues that this Court has no special legal expertise to determine novel issues of state and federal constitutional law. The self-contradiction of this argument makes it the most puzzling of all. Almost by definition, no court will have "special legal expertise" to review an issue of law that is "novel." Still, both this Court and the district court do

19

have the *necessary* legal expertise to deal with all of the legal arguments raised in the eligibility objections, even if that expertise is not "special."

The Court concludes that each of the factors in the appellate decisions cited above - advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process - weigh against withdrawing the reference. Accordingly, the Court finds that the Committee is not likely to succeed on its motion to withdraw the reference.

### IV. Whether the Committee Will Suffer
### Irreparable Injury If the Stay Is Not Granted

The second consideration in the determination of whether to grant the request for a stay is whether the moving party will suffer irreparable injury if the stay is not granted. The Committee argues that even a threat to a constitutional right mandates a finding of irreparable injury. The Committee cites *Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 900 (E.D. Mich. 2003), for the proposition, "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Id.* (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673 (1976))).

The difficulty with the Committee's argument here is that in *Hillside Productions*, the court had already found a substantial likelihood of success on the merits of the plaintiffs' constitutional claims. Specifically, the court found, "Based on the evidence presented, this Court finds that Plaintiffs are likely to succeed on the merits of the selective enforcement and First Amendment retaliation claims. Rarely does one hear such compelling and unrebutted evidence of the vindictive retaliatory action such as that taken[.]" 249 F. Supp. 2d at 898.

20

However, the mere argument that a constitutional right might be impaired is not sufficient for a finding of irreparable injury in the absence of a substantial showing of likelihood of success on the merits of the underlying claim. As determined in Part III above, the Committee has not established a likelihood of success on the merits of its argument that *Stern* requires withdrawal of the reference.

As the court stated in *In re The Antioch Co.*, 435 B.R. 493, 502 (Bankr. S.D. Ohio 2010):

> Finally, a decision to stay this litigation cannot be premised on the mere possibility this court might interpret its jurisdiction in too broad a fashion. If Congress intended for the bankruptcy courts to stay proceedings upon the filing of a motion to withdraw the reference or to abstain, it would have so provided. Movants' argument regarding the risk of the Bankruptcy Court overstepping its jurisdictional and constitutional authority would not only remove the discretion accorded the bankruptcy courts under BR 5011(c), but also would flip the apparent presumption in favor of not staying such proceedings that arises out of the plain language of the Rule.

The Committee also asserts that its constituency will suffer a loss of constitutional rights if the stay is not granted because their pensions will be diminished. Its brief states, "Ultimately, the risk is the loss of life-preserving or even life-enhancing retirement compensation[.]" Committee's Motion to Stay at ¶23, p. 12. (Dkt.#837)

At this point, however, the retirees have not suffered a loss of any retirement benefits, and more importantly, nothing suggests that denying the motion for stay would create *any* risk to their retirement benefits pending the district court's determination of whether to withdraw the reference.

The City argues, with merit, that even in the Committee's worst-case scenario, its right to have the district court determine its constitutional challenges will still not be lost. Even if the stay is denied, *and* the motion to withdraw the reference is denied, *and* this Court determines that *Stern* does not preclude this Court from entering a final judgment on the Committee's

21

constitutional objections to eligibility, the Committee can still have both its *Stern* objection and its constitutional challenges to eligibility heard by the district court, *de novo*, on appeal.

Accordingly, the Court concludes that the Committee has not established any harm, let alone irreparable harm, if the stay is denied.

## V. Whether the City Will Be Harmed If a Stay Is Granted

In this motion, the Committee requests a stay of this Court's consideration of all of the one hundred ten objections to eligibility, pending the district court's determination of its motion to withdraw the reference on its one eligibility objection.

The Committee argues that the City will only suffer "minimal inconvenience" if the stay is granted. Committee's Motion to Stay at p. 13. (Dkt. #837) It argues that the only injury to the City would be the loss of its choice of forum to decide issues. Committee's Motion to Stay at ¶27, p. 13. (Dkt. #837)

In response, the City states, "The sooner the City can demonstrate its eligibility for chapter 9, the sooner it can complete other restructuring steps and ultimately confirm and implement a plan of adjustment. A prompt exit from chapter 9 will facilitate the long process of rebuilding the City." City's Brief in Opposition to Motion to Stay at ¶1, p. 1. (Dkt. #925)

It further states, "[E]very day of delay in the administration of this case inflicts injury on the City and its residents through continuation of intolerably low levels of municipal services and public health and safety and the deferral of any opportunity that the City may have to revitalize itself." City's Brief in Opposition to Motion to Stay at ¶35, p. 20. (Dkt. #925)

Finally, the City relies on the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, filed on July 18, 2013, which states that the City is (a) currently unable to make investments critical to

22

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 22 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 293 of 313

the health and safety of its residents, (b) plagued by shockingly high crime rates and low police response times, (c) struggling to keep the lights on (with 40% of the City's street lights inoperative as of April 2013), (d) ravaged by extensive and intractable urban blight and (e) saddled with obsolete and decaying infrastructure and equipment. Orr Declaration at ¶¶ 31-44, pp. 21-5. (Dkt. #11)

The Court agrees with the City that the real injury to it if a stay is granted will be the consequences resulting from the inevitable delay in resolving the case. The record in this case firmly establishes the necessity that this case move promptly through the process of determining the City's eligibility for chapter 9 relief. If the City is found to be eligible, it will then need to move promptly through the process of plan negotiation and confirmation. If the City is found not to be eligible, it will then need to promptly evaluate its post-bankruptcy options. In the meantime, however, the creditors' many eligibility objections create substantial uncertainty regarding the City's ability to achieve its goal of adjusting its debt through chapter 9. Until that uncertainty is removed, the City's progress in recovering its financial, civic, commercial, and cultural life and in revitalizing itself will likely be slowed, if not stalled entirely.

Orr's declaration further establishes that also at stake in this motion is the City's ability to provide basic services to its residents and to remediate a host of unsafe living conditions. At the hearing on the individual objecting parties' objections to eligibility on September 19, 2013, the Court heard truly disturbing accounts of the consequences of the City's inability to provide basic services. These accounts were undoubtedly just a microscopic sample of the full truth regarding the inadequacy of basic services in the City of Detroit.

23

In these circumstances, the consequences of extending the eligibility process by granting the requested stay are not a "minimal inconvenience." They are much more than that. They are truly beyond irreparable and bordering on the incomprehensible.

## VI. Whether the Public Interest
## Will be Served by Granting the Stay

The Committee asserts that "the public interest is best served by preventing [a] prohibited act." Committee's Motion to Stay at ¶27, p. 13. (Dkt. #837) It further asserts that the prohibited act is the impairment of pensions. However, whatever the merits of that claim, granting a stay pending the determination of the motion to withdraw the reference does not preserve pension rights any more than denying the stay impairs them.

The Committee also asserts that the public interest is served by granting the stay because it would avoid the constitutional violation that would occur under *Stern* if this Court were to rule on the Committee's constitutional challenges to the City's eligibility. However, as the Court concluded in Part III above, the Committee is unlikely to succeed on its argument that *Stern* prohibits this Court from ruling on the City's eligibility.

The Committee has not stated any other public interest in support of granting the stay.

There is, however, a strong public interest in denying it, because to a great extent, the public's interest and the City's interest in the prompt resolution of this case coalesce. Accordingly, for the same reasons and to the same extent that granting the stay would harm the City, it would also harm the public interest.

## VII. Conclusion

The Court concludes that the Committee has failed to establish any of the factors to be considered in connection with its request for a stay. Accordingly, it is hereby ordered that the

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 24 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 295 of
313

Committee's motion for a stay pending the district court's determination of the motion to withdraw the reference is denied.

For Publication

.

**Signed on September 26, 2013**

<div style="text-align:right">

_____/s/ Steven Rhodes_____
**Steven Rhodes**
**United States Bankruptcy Judge**

</div>

25

13-53846-swr    Doc 1039    Filed 09/26/13    Entered 09/26/13 14:56:43    Page 25 of 25
13-53846-tjt    Doc 2473-5    Filed 01/14/14    Entered 01/14/14 17:03:32    Page 296 of 313

**ITEM NO. 18**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                    Chapter 9

CITY OF DETROIT, MICHIGAN,               No. 13-53846

          Debtor.                         HON. STEVEN W. RHODES

---

## THE STATE OF MICHIGAN'S SUPPLEMENTAL RESPONSE TO ELIGIBILITY OBJECTIONS RAISING ONLY LEGAL ISSUES

Matthew Schneider
Chief Legal Counsel

Aaron D. Lindstrom
Assistant Solicitor General

Margaret A. Nelson
Assistant Attorney General
P.O. Box 30754, Lansing, MI 48909
(517) 373-3203

Steven G. Howell
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan  48226-3425

Attorneys for the State of Michigan
Michigan Dep't of Attorney General

Dated:  October 4, 2013

# TABLE OF CONTENTS

Page

Table of Contents..................................................................................ii

Index of Authorities............................................................................ iii

Concise Statement of Issues Presented.....................................iv

Introduction ............................................................................................1

Argument ..................................................................................................3

I.      Recognizing that Detroit is eligible to be a chapter 9 debtor
        will not impair a single contract.....................................................3

II.     If authorizing a bankruptcy with the expectation that the
        bankruptcy will result in contracts being impaired violates
        either a state or federal contracts clause, then no chapter 9
        bankruptcy could ever be filed..........................................................4

Conclusion and Relief Requested..............................................8

Certificate of Service ...........................................................................10

# INDEX OF AUTHORITIES

Page

**Cases**

*Louisville Joint Stock Land Bank v. Radford,*
 295 U.S. 555 (1935) ......................................................................... 6

*United States v. Bekins,*
 304 U.S. 27 (1938) ....................................................................... 2, 7

**Statutes**

11 U.S.C. § 109(c)(2) ...................................................................... iv

11 U.S.C. § 943(b) .......................................................................... 3

**Constitutional Provisions**

Mich. Const. art. I, § 10 ............................................................... 5, 6

Mich. Const. art. IX, § 24 ...................................................... passim

U.S. Const. art. I, § 10, cl. 1 ................................................... 2, 5, 7

U.S. Const. art. I, § 10, cl. 2 ........................................................ 6

# CONCISE STATEMENT OF ISSUES PRESENTED

This Court identified seven legal objections to eligibility in its first order regarding eligibility. (Doc. # 642, 8/26/13 Order, at 1–3.) In light of this Court's second order regarding eligibility (Doc. # 821, 9/12/13, at 1–3), which expanded the scope of issue No. 6, this response will supplement the State's prior discussion of that issue:

    6.    Whether because the Governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

## INTRODUCTION

The mere filing of a chapter 9 petition does not impair a single contract. This is evidenced by the fact that not a single one of the numerous objections has attached an affidavit or cited other evidence showing that a single pension has been reduced by the filing.

Declaring that the City is eligible to be a debtor also will not impair a single contract. To the contrary, if any impairment of pension contracts is going to occur—which is an open question, as no plan of adjustment has yet been proposed—that hypothetical impairment would not occur until entry of a confirmation order. Parties that have staked out opposite positions on the effect of Michigan's Pension Clause, Mich. Const. art. IX, § 24, in bankruptcy agree with this point. (*Compare, e.g.*, Doc. # 481, Attorney General's Stmt., at 16 & 19 (arguing the Pension Clause bars "even proposing" any plan of adjustment that would impair pension benefits, yet agreeing that the City is eligible to be a debtor), *and* Doc. # 519, Detroit Ret. Sys. Obj., at 24 (also arguing the Pension Clause applies, but is not an eligibility issue), *with* Doc. # 765, Detroit's Reply, at 30 & 21 (arguing that the

1

Pension Clause does not apply in a bankruptcy, and agreeing the City is eligible to be a debtor).)

Accordingly, all of the eligibility objections relating to the City's unfunded pension obligations are premature. It is a confirmation issue.

To avoid this timing issue, some objections assert that simply filing the bankruptcy *does* impair the pension contracts. Others argue, in the same vein, that the filing should be deemed to impair contracts because some statements by the Emergency Manager suggest that he intends to propose a plan of adjustment that will reduce pension benefits. Under this theory, the Pension Clause acts as a barrier to the bankruptcy, effectively barring the doors of the bankruptcy court.

This argument, if correct, would bar *all* chapter 9 bankruptcies: if a state impairs contractual obligations by applying a law that authorizes a chapter 9 filing, then the state would violate the *federal* Contracts Clause, let alone any state contracts clause, if it allowed a bankruptcy. U.S. Const. art. I, § 10, cl. 1 ("No state shall . . . pass any . . . law impairing the obligation of contracts."). The Supreme Court rejected this theory in 1938. *United States v. Bekins*, 304 U.S. 27, 54 (1938).

# ARGUMENT

## I. Recognizing that Detroit is eligible to be a chapter 9 debtor will not impair a single contract.

As the State has already explained, simply entering the bankruptcy process by filing a petition and by being deemed eligible to be a debtor does not impair a single contract. (Doc. # 756, State's Resp., at 6.) To the contrary, the Bankruptcy Code makes clear that the City's contractual obligations can be impaired, if at all, only if two events both occur: first, the debtor proposes a plan that includes a reduction of benefits under a pension contract, and second, this Court enters an order confirming such plan. 11 U.S.C. § 943(b). These rules explain why it will be impossible for objectors to provide proof—regardless of what may emerge in discovery—that anyone's pension contract has already been impaired. Indeed, as admitted even by certain parties that have already concluded that accrued pension obligations cannot be impaired in the bankruptcy, the Pension Clause issue is not before the Court now, at the eligibility stage. (*E.g.*, Doc. # 481, Attorney General's Stmt., at 19; Doc. # 519, Detroit Ret. Sys. Obj., at 24 (stating that "whether accrued public pension benefits protected by state

constitutional law can be diminished or impaired" is "not before the

Court at this juncture").)

## II. If authorizing a bankruptcy with the expectation that the bankruptcy will result in contracts being impaired violates either a state or federal contracts clause, then no chapter 9 bankruptcy could ever be filed.

Because pension contracts are not actually being impaired, a

number of objections suggest pensions should nonetheless be considered

to be impaired on the theory that the state knew that the Emergency

Manager *intends* to reduce pension benefits via the bankruptcy.  For

example, AFSCME contends that the Governor violated the Pension

Clause "when he failed to condition the City's chapter 9 petition on the

complete preservation of vested pension rights despite the clearly

available public information that the Emergency Manager intended to

use the Governor's authorization to diminish constitutionally sacrosanct

pension benefits." (Doc. # 35, AFSCME Obj., at 35.)  The UAW

similarly argues that the Governor lacked the authority to "authorize

such a filing to any extent the bankruptcy was intended to impair

accrued pension benefits protected by state law." (Doc. # 506, UAW

Obj., at 4.)  Other objections raise this same argument.  (*E.g.*, Doc.

# 504, Flowers Obj., at 3 ("By authorizing the Chapter 9 filing, Governor Synder has intentionally diminished and impaired the accrued financial benefits of Michigan citizens."); Doc. # 495, Sole Obj., at 5; Doc. # 519, Detroit Ret. Sys. Obj., at 1.)

If this intent-based argument—that an intent to allow a future impairment should be considered a present impairment—were correct, then any chapter 9 filing would violate not just state-level contracts clauses, but the federal Contracts Clause as well. After all, just as contracts clauses found in state constitutions prohibit the states from enacting "law[s] impairing the obligation of contract," *e.g.*, Mich. Const. art. I, § 10, the federal Constitution prohibits states from passing any law "impairing the obligation of contracts," U.S. Const. art. I, § 10, cl. 1. This prohibition on impairing contracts extends, unlike Michigan's Pension Clause, to all contracts, not just to contracts involving pensions. Thus, any state authorizing a municipal bankruptcy under state law would be exhibiting an intent to impair contracts—for every bankruptcy impairs contracts—and therefore, according to this theory, would be barred by the Contracts Clause from authorizing a bankruptcy. *Louisville Joint Stock Land Bank v. Radford*, 295 U.S.

5

555, 589–90 (1935) ("Under the bankruptcy power Congress may discharge the debtor's personal obligation, because, unlike the states, it is not prohibited from impairing the obligations of contracts.").

In other words, just as the UAW (to take one example) argues that the Governor lacked the authority to authorize a bankruptcy "intended to impair accrued pension benefits protected by state law" (Doc. # 506, UAW Obj., at 4), the UAW could equally argue that every state lacks the authority to authorize a filing "intended to impair [contractual obligations] protected by [federal] law." This theory would mean that contracts clauses, federal as well as state, would close the doors of the bankruptcy courts for all municipalities.

Fortunately, this intent-equals-impairment argument is not correct. For one, contracts clauses, both federal and state, focus on actual impairment, not possible future impairment. None of them, including the Pension Clause, makes any mention of intent. Instead, each prohibits only "impairing" contractual obligations. U.S. Const. art. I, § 10, cl. 2 ("impairing the obligation of contracts"); Mich. Const. art. I, § 10 ("impairing the obligation of contracts"); Mich. Const. art. IX, § 24 (stating that "accrued financial benefits of each pension plan . . . shall

6

be a contractual obligation . . . which shall not be diminished or impaired").

For another, the U.S. Supreme Court has upheld the constitutionality of chapter 9 of the Bankruptcy Code after directly addressing the federal Contracts Clause.  In *Bekins*, the Supreme Court recognized that the federal Contracts Clause prevented states from impairing contracts:  "The natural and reasonable remedy through composition of the debts of the district was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation."  304 U.S. at 54. But that federal restriction did not invalidate chapter 9.  To the contrary, the Court recognized that states may authorize bankruptcies that will result in the impairment of contracts:  "The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference."  *Id*. The state "acts in aid, and not in derogation, of its sovereign powers" when it "invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue."  *Id*.  There is

7

simply "no ground for the conclusion that the Federal Constitution,"

including its contracts clause, "has reduced both sovereigns to

helplessness" in the event of a municipality in need of bankruptcy.  *Id.*

### CONCLUSION AND RELIEF REQUESTED

The Bankruptcy Code expressly contemplates that eligibility will

be determined *before* any plan of adjustment is proposed or confirmed.

Deciding eligibility will not impair any contracts, so it would be

premature to reach the pension issue at this stage, especially under

theories that conflict with Supreme Court precedent.

For these reasons and the reasons in the State's initial response,

the State urges the Court to conclude that Detroit is eligible to proceed

in chapter 9 bankruptcy.

Respectfully submitted,

*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan  48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Aaron D. Lindstrom
Assistant Solicitor General

8

Margaret A. Nelson
Assistant Attorney General

Steven G. Howell
Special Assistant Attorney
General
Dickinson Wright PLLC
500 Woodward Avenue, Suite
4000
Detroit, Michigan  48226-3425

Attorneys for the State of
Michigan
Michigan Dep't of Attorney
General

Dated: October 4, 2013

9

# CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2013, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan  48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Attorney for the State of
Michigan
Michigan Department of
Attorney General

# ITEM NO. 19

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 9 |
| | Case No. 13-53846 |
| City of Detroit, Michigan, | Hon. Steven W. Rhodes |
| Debtor. | |

_____/

## Order Regarding Further Briefing on Eligibility

For the reasons stated on the record in open Court on October 16, 2013, it is hereby ordered that the objecting parties may file supplemental briefs by October 30, 2013, and the City, the State Attorney General and the United States Attorney General may file supplemental briefs by November 6, 2013. Such supplemental briefs may be no more than 10 pages in length, which page limit will not be extended. Counsel are requested not to address issues that their briefs have already addressed.

.

**Signed on October 17, 2013**

_/s/ Steven Rhodes_
**Steven Rhodes**
**United States Bankruptcy Judge**