**ITEM NO. 26**

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

```
-------------------------------------------------------x
                                    :
In re                               :     Chapter 9
                                    :
CITY OF DETROIT, MICHIGAN,          :     Case No. 13-53846
                                    :
                 Debtor.            :     Hon. Steven W. Rhodes
                                    :
                                    :
-------------------------------------------------------x
```

## DEBTOR'S OMNIBUS OPPOSITION TO THE INTERNATIONAL UNION, UAW'S  MOTION (A) TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON GROUNDS OF PRIVILEGE AND (B) FOR RECONSIDERATION OF  THIS COURT'S SEPTEMBER 19 ORDER ON PRIVILEGE ISSUES AND THE DETROIT RETIREMENT SYSTEMS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD <u>ON THE GROUNDS OF PRIVILEGE</u>

The City of Detroit (the "City"), debtor in the above captioned case,

hereby opposes the International Union, UAW's motion (A) to compel production

of documents withheld on grounds of privilege and (B) for reconsideration of this

Court's September 19 order on privilege issues ("UAW Mot."). (ECF No. 1234.)

The City also opposes the Detroit Retirement Systems' motion to compel

production of documents withheld on the grounds of privilege ("Systems Mot.").

(ECF No. 1269.)

Jones Day's opinion work product from 2011 and 2012 is protected

from disclosure by work product privilege because this privilege properly extends

to work product created in anticipation of litigation for a prospective client.

Moreover, this privilege has not been waived because the City did not disclose the

work product to gain an unfair advantage in this proceeding.

In addition, UAW's motion for reconsideration of this Court's

September 19 order concluding that the common interest privilege applies to

communications between the State and the Emergency Manager ("EM") should be

denied. It is untimely under this Court's rules and, in any event, lacks merit.

## <u>ANALYSIS</u>

**A.** **The Work Product Privilege Protects from Disclosure Jones Day's Internal Work Product Created for the City as a Prospective Client in Anticipation of Litigation.**

1. Beginning in 2011, Jones Day sought to be retained by the City

to provide legal services related to restructuring issues. (Ellman Decl. at 1 (Exh.

A).) At this time, it was widely reported that the City faced serious financial

instability. (*Id.*) In fact, in April of 2012, the State of Michigan and the City

entered into a Financial Stability Agreement. (Exh. B). This Agreement

recognized that the "City currently confronts daunting challenges characterized by

persistent and systemic fiscal imbalances and deficit conditions." (*Id.*)

2. To prepare to advise the City on various legal matters related to

restructuring, Jones Day performed legal analyses and created memoranda on legal

strategies. (Ellman Decl. at 2.) In the time before Jones Day was retained by the

-2-

13-53846-tjt Doc 2473-4 Filed 01/24/14 Entered 01/24/14 17:03:32 Page 3 of 94
13-53846-swr Doc 1320 Filed 10/22/13 Entered 10/22/13 17:27:54 Page 2 of 93

City, it devoted over 1,000 hours to studying relevant statutes, evaluating regulations and court rulings in Michigan, and developing an understanding of the City's financial and operational circumstance.  (*See* Sys. Mot, Exh. 6-F at 98.)

3.     In this proceeding, the objectors filed document requests related to their eligibility objection in mid-August.  (Sys. Mot. at 8.)  The City responded to this request and disclosed documents approximately one month later on September 16, 2013.  (*Id*. at 9.)  UAW then sent a letter on October 2, 2013, requesting that the City produce many hundreds of documents, including work product created in 2011 and 2012 before the City retained Jones Day.  UAW demanded the documents no later than October 7th.  (UAW Mot., Exh. A at 1.)  On October 5th, counsel for the Systems emailed Jones Day, requesting additional documents and threatening motion practice if the firm did not give "a satisfactory response by October 7."  (Sys. Mot., Exh. 6-N at 1.)  The City responded by the October 7th deadline, but noted that "you have asked us to investigate 423 documents in just a few days and we have done our best to oblige, but require additional time for certain documents."  (UAW Mot., Exh. B at 1.)  The City then informed the Systems, in an email on October 15th, that some of the documents that had been produced were protected by privilege.  (Sys. Mot., Exh. 6-R at 1.)

-3-

13-53846-tjt  Doc 2473-4  Filed 01/24/14  Entered 01/24/14 17:03:32  Page 3 of 93
13-53846-swr  Doc 1320  Filed 10/22/13  Entered 10/22/13 17:27:52  Page 4 of 94

4. Jones Day and the City[1] are ***not seeking*** to "claw back" as inadvertently disclosed the documents produced on October 8 in response to the UAW's October 2nd request and the Systems' October 5th request, or the documents introduced at former State Treasurer Andy Dillon's deposition. (*See* Sys. Mot. at 22-24 (arguing that work product privilege was waived by disclosure).) Nor are Jones Day and the City claiming that the work product from 2011 or 2012 is protected by attorney-client privilege. (*See* Sys. Mot. at 14-18 (arguing that documents not protected by attorney-client privilege).) Instead, Jones Day and the City are asserting work product privilege only over a narrow category of materials: **Jones Day's *internal* legal memoranda and strategic correspondence from 2011 and 2012 that have not already been disclosed to the objectors or to third parties**.[2]

5. UAW and the Systems seek to compel this opinion work product. Both UAW and the Systems argue (1) that work product privilege does not apply to any of Jones Day's work product from 2011 and 2012 because Jones

---

[1] The work product privilege belongs to both the attorney and the client. *United States v. Under Seal (In re Grand Jury Proceedings # 5)*, 401 F.3d 247, 250 (4th Cir. 2005). Accordingly, both Jones Day and the City are asserting work product privilege over the materials at issue here.

[2] As a note, disclosure of the work product to the State or Miller Buckfire would not waive work product privilege because the privilege is waived only where the disclosure is to an adversary. *See In re Columbia/HCA Healthcare Corp. Billing Practices Litigation*, 293 F.3d 289, 306 & n.29 (6th Cir. 2002).

-4-

13-53846-tjt swr Doc 2473-1 Filed 01/24/14 Entered 01/24/14 17:03:32 Page 5 of 94
13-53846-swr Doc 1320 Filed 10/22/13 Entered 10/22/13 17:27:52 Page 5 of 94

Day was not formally retained as the City's counsel at the time.  (*See* UAW Mot. at 8-9; Sys. Mot. at 18-20.)  In addition, the Systems argue that (2) even if work product privilege could apply, any protection has been waived by selective disclosure of the work product.  (Sys. Mot. at 22-23.)  These arguments fail.

6.  ***First,* Jones Day's opinion work product from 2011 and 2012 is privileged.**  The work product privilege is "distinct from and broader than the attorney-client privilege."  *In re Green Grand Jury Proceedings*, 492 F.3d 976, 980 (8th Cir. 2007) (citation omitted).  The privilege "as set forth in Federal Rule of Civil Procedure 26(b)(3), protects from discovery documents and tangible things prepared in anticipation of litigation by or for a party or by or for that party's representative."  *United States v. Roxworthy*, 457 F.3d 590, 593 (6th Cir. 2006).

7.  Work product is created "in anticipation of litigation" where the party asserting privilege "had a subjective belief that litigation was a real possibility, and that belief [was] objectively reasonable."  *Id.* at 593-94.  Work product need not be prepared because of a specific claim or suit.  It is enough that a party faces "a potential claim following an actual event or series of events that reasonably *could result* in litigation."  *Id.* at 600 (emphasis added); *see also In re Sealed Case*, 146 F.3d 881, 886 (D.C. Cir. 1998) (lawyer's notes made two years prior to grand jury investigation constituted privileged work product because they were prepared on a matter that was "feared could lead to litigation").

8.     In addition, "[b]ecause the work product privilege protects not just the attorney-client relationship but the interests of attorneys to their own work product, the attorney, as well as the client, hold the privilege." *Under Seal (In re Grand Jury Proceedings # 5)*, 401 F.3d at 250.  Thus, an attorney may *independently* assert work product privilege over documents prepared in anticipation of litigation for a party "based on the attorney's interest in protecting his opinions and thought processes from disclosure." *In re Green*, 492 F.3d at 980.

9.     There is no additional requirement that the attorney have been formally retained at the time the work product was created for the privilege to apply.  *See In re Adiguzelli*, Adv. No.: 11-2289, 2012 BL 131819, at *2 (Bankr. D.N.J. May 29, 2012) (concluding work product privilege applied because document was created "in anticipation of either litigation on behalf of the Estate or [another party] or litigation in conjunction with the Trustee and against the Debtors"); *SEC v. Chesnoff*, No. 4:05-MC-043-Y, 2006 BL 143577, at *4 (N.D. Tex. July 18, 2006) (concluding that work product privilege applied even though attorney "prepared the affidavits before he was formally retained").  Nor would such a requirement be consistent with the protections afforded to communications between attorneys and potential clients.  Attorneys regularly research legal issues and create work product to advise potential clients on their legal rights.  Initial communications between attorneys and potential clients are protected by attorney-

client privilege. *See State Farm Mut. Auto. Ins. Co. v. Hawkins*, No. 08-10367, 2010 BL 125273, at *4 (E.D. Mich. June 4, 2010) ("the privilege is not limited to fully consummated attorney-client relationships; it applies also to communications between a prospective client consulting with an attorney."). So too, attorney work product created for potential clients is entitled to protection. *See Chesnoff*, 2006 BL 143577, at *4.

10. A rule that limited the work product privilege only to materials created after an attorney is formally retained would not aid the interests of justice. The content of work product, "particularly so-called opinion work product . . . is almost certainly of no legitimate use to an opponent" because "a competent adversary will never need access to such information in order to prepare and present his or her case effectively." *Fleet Nat'l Bank v. Tonneson & Co.*, 150 F.R.D. 10, 14-15 (D. Mass. 1993).

11. Here, Jones Day's work product from 2011 and 2012 is protected by work product privilege. The work product was created "for a party." *Roxworthy*, 457 F.3d at 593. Specifically, one of the purposes of the work product was to prepare Jones Day to advise the City if and when the firm was retained. (Ellman Decl. at 2; *see also* Sys. Mot., Exh. 6-F at 98 ("Jones Day has devoted over 1,000 hours studying these statutes, evaluating related regulations and court rulings in Michigan, and developing an understanding of the City's financial and

operational circumstances to be prepared if Jones Day is fortunate enough to assist the City in its restructuring.").)

12.     And, the work product was created in "anticipation of litigation," and not for some other purpose. *Roxworthy*, 457 F.3d at 593. The work product addressed restructuring issues related to the City's "serious financial instability." (Ellman Decl. at 2.) At this time, the City was "confront[ing] daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions." (Financial Stability Agreement; Ellman Decl. at 2.) These fiscal imbalances and deficit conditions "reasonably *could result* in litigation" including, but not limited to, a chapter 9 filing or litigation with the City's creditors. *See Roxworthy*, 457 F.3d at 600 (emphasis added).

13.     Contrary to the Systems' contention, (Sys. Mot. at 19-20), these are not mere marketing materials, but *internal* memoranda and strategic correspondence specifically prepared to enable Jones Day to understand its prospective client's legal issues, *see* Ellman Decl. at 2; *EEOC v. CRST Van Expedited, Inc.*, No. 007-0095, 2009 U.S. Dist. LEXIS 3621, at *11 (D. Iowa Jan. 20, 2009) (concluding that even solicitation letters sent to prospective clients are work product that may be protected by privilege).[3] Accordingly, they are protected

---

[3] The Systems contend that the work product is not protected by privilege because it was produced in the "ordinary course of soliciting restructuring business." (Sys.

-8-

13-53846-tjt  Doc 2473-4  Filed 01/24/14  Entered 01/24/14 17:03:32  Page 9 of 94
13-53846-swr  Doc 1320  Filed 10/22/13  Entered 10/22/13 17:27:52  Page 8 of 93

"opinion work product" which is of "no legitimate use to an opponent." *Fleet Nat'l Bank*, 150 F.R.D. at 14-15.

14. ***Second,* this work product privilege has not been waived by any "selective disclosure."** (*See* Sys. Mot. at 22-23.) "[S]elective disclosure" of work product, "even in some circumstances to an adversary" does not necessarily result in waiver. *In re Sealed Case*, 676 F.2d 793, 818 (D.C. Cir. 1982). Rather, selective disclosure of work product waives privilege where its purpose is to "gain an advantage in litigation." *Zino v. Whirlpool Corp.*, No. 5:11CV1676, 2012 BL 274389, at *3-4 (N.D. Ohio Oct. 19, 2012); *see also United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) (per curiam) (selective disclosure of work product "for tactical purposes" waives the privilege). That is not what happened here. As discussed above, Jones Day and the City are not asserting work product privilege over materials that have been disclosed. Nor is the City seeking to gain a tactical litigation advantage by relying on the work product as evidence to advance its position in this proceeding. Thus, the privilege over the work product from 2011 and 2012 has not been waived.

---

Mot. at 20.) The authority Systems rely on to support this argument is unpersuasive. In particular, it addresses the scope of *attorney-client privilege* and whether materials were confidential, not work-product privilege. *See Village of Rosemont v. Priceline.com Inc.*, No. 09 C04438, 2010 U.S. Dist. LEXIS 124559, at *10-11 (N.D. Ill. Nov. 22, 2010) (marketing materials not protected by attorney client privilege).

## B. Reconsideration of the Court's Order on the Common Interest Privilege is Not Warranted.

15. In addition, UAW also seeks reconsideration of this Court's September 19th Order finding that the common interest privilege applied to confidential communications with the State, the EM, and their counsel. (UAW Mot. 9-22.) This motion is untimely and, in any event, fails on the merits.

16. UAW premises its motion for reconsideration of the Court's September 19 Order on E.D. Mich. Local Bankr. R. 9024-1(a)(3), which provides that a party may move for reconsideration based on a "palpable defect" in the Court's decision. However, despite citing to its neighbor, UAW omits any reference to E.D. Mich. Local Bankr. R. 9024-1(a)(1). Under that provision, "[t]he deadline to file a motion for reconsideration of an order or judgment on the grounds that it was erroneous in fact or law is 14 days after the entry of the order or judgment." UAW's motion falls within this category: it contends that the Court's September 19 Order incorrectly applied the law regarding the common interest privilege. (*See* UAW Mot. 9-22; *see also* UAW Mot. 3 ("[T]he Court's September 19 Order was error and should be reconsidered.").) Accordingly, UAW had until October 3, 2013 to file its motion for reconsideration. *See* Fed. R. Civ. P. 6(a)(1). Instead, it waited until October 17 to file its motion for reconsideration, with no acknowledgment of or explanation for its delay.

17.     Courts routinely refuse to consider untimely requests for reconsideration.  *See, e.g.*, *Perry v. Velsico Chem. Corp.*, No. 2:13-cv-11826, 2013 BL 253584 (E.D. Mich. Sept. 20, 2013) (noting that under E.D. Mich. Local R. 7.1(h)(1) motions for reconsideration must be filed within 14 days and holding that the plaintiff's motion was "untimely and must be denied"); *Christopher v. Ownit Mortg. Solutions, Inc.*, No. 12-11872, 2013 BL 165739, at *1 (E.D. Mich. June 24, 2013) (same).  For good reason, too:  without the 14-day time limit, the Court's orders would remain perpetually subject to attack, gumming up the process and preventing the case from proceeding.  Because UAW has provided no acceptable excuse for its tardiness, its motion for reconsideration should be denied.  *Cf.  In re Harvey Goldman & Co.*, No. 10-62501, 2010 BL 285358, at *3 (Bankr. E.D. Mich. Dec. 2, 2010) (considering an untimely motion for reconsideration only because "the Court's ECF system was inaccessible when the Debtor attempted to file the motion" and instead filed it one day later).

18.     Even if the motion for reconsideration had been timely filed, UAW's arguments as to why the common interest privilege does not apply to pre-filing communications between the State, the EM on behalf of the City, and their counsel fail on the merits.  UAW argues that the Court's order on the common interest privilege was "palpabl[y] defective" and "a clear error of law" for three reasons: (1) the EM as a governmental entity may not assert attorney-client

privilege under Michigan law, (UAW Mot. at 21); (2) the common interest privilege could not apply to communications between the State and the EM because Michigan's Open Meetings Act ("OMA") required these "deliberations" to be made in public, (*id.* at 13-16); (3) even if the privilege could apply, the State and EM's interests were not "identical" until the EM "recommended and the governor approved the filing," (*id.* at 13, 17-19). Each of these arguments is addressed in turn.

19. ***First*, the EM, as a governmental entity, may assert attorney-client privilege.** The federal common law of privilege—and not Michigan law as the UAW argues, (*id.* at 21)—applies to this bankruptcy proceeding, Fed. R. Evid. 501, 1101; Fed. R. Bankr. P. 9017. UAW contends that in *Reed v. Baxter*, 134 F.3d 351 (6th Cir. 1998), the court left open the question of whether government entities could seek the protections of the privilege. (UAW Mot. at 20). Since *Reed*, however, the Sixth Circuit has explicitly held that "a government entity can assert attorney-client privilege in the civil context." *Ross v. City of Memphis*, 423 F.3d 596, 601 (6th Cir. 2005); *see also In re Lindsey*, 158 F.3d 1263, 1268 (D.C. Cir. 1998) (per curiam) ("Courts, commentators, and government lawyers have long recognized a government attorney-client privilege . . ."). For good reason, too: "Governments must not only follow the laws, but are under additional constitutional and ethical obligations to their citizens. The

privilege helps insure that conversations between municipal officials and attorneys will be honest and complete.  In so doing, it encourages and facilitates the fulfillment of those obligations." *Ross*, 423 F.3d at 602.

20.     UAW also claims that, even if government entities may claim the privilege, they face heightened scrutiny when doing so.  (*See* UAW Mot. at 19-22.)  Again, UAW is mistaken.  The "attorney-client privilege extends to a communication of a governmental organization *as it would to a private organization*."  *In re Grand Jury Investigation*, 399 F.3d 527, 532 (2d Cir. 2005) (emphasis added, internal quotation marks and citation omitted); *see also* Paul R. Rice, Attorney-Client Privilege in the United States § 4-164 ("[T]he scope of the privilege is generally thought to be the same in the private and governmental context . . . .").

21.     To be sure, as the UAW discusses, (*see* UAW Mot. 20-21), some courts have held that, unlike private parties, government officials may not assert attorney-client privilege to shield their communications from a criminal grand jury investigation, *see, e.g.*, *In re a Witness Before the Special Grand Jury 2000-2*, 288 F.3d 289 (7th Cir. 2002); *In re Lindsey*, 158 F.3d 1263; *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910 (8th Cir. 1997).  *But see In re Grand Jury Investigation*, 399 F.3d 527 (the privilege applies even in grand jury proceedings).  These decisions have no relevance here.  "[M]uch of the reasoning

-13-

deployed against recognizing a governmental attorney-client privilege in grand

jury proceedings supports its recognition in the civil context":  while government

entities cannot be held criminally liable (and thus awarding them the privilege

before grand juries serves little purpose), they are often held civilly liable, so

recognizing the privilege in civil cases "allows them to investigate potential

wrongdoing more fully and, equally important, pursue remedial options." *Ross*,

423 F.3d at 602-03.  Unsurprisingly, then, the courts that have rejected the

privilege before grand juries have limited their holdings to that context, *see, e.g.*,

*Witness Before the Special Grand Jury 2000-2*, 288 F.3d at 291-94, and they have

generally acknowledged or assumed that in ordinary civil litigation the government

had the same right to privilege as any other litigant, *see, e.g.*, *id.* at 291 ("[B]oth

parties here concede that, at least in the civil and regulatory context, the

government is entitled to the same attorney-client privilege as any other client.").

Because this case involves only civil litigation, Detroit faces no higher burden than

any other litigant in establishing its right to attorney-client privilege.

   22.   ***Second***, **the OMA does not require the EM to deliberate in**

**"public" and thus he had an expectation that his communications with the**

**State would remain confidential.**  Under the OMA, "[a]ll deliberations of a

public body . . . shall take place at a meeting open to the public."  Mich. Comp.

Laws § 15.263(3).  But, the EM is not a "public body" for purposes of the OMA.

As the Michigan Supreme Court has explained, "[a]s used in the OMA, the term 'public *body*' connotes a collective entity." *Herald Co. v. City of Bay City*, 614 N.W.2d 873, 882 (Mich. 2000) (emphasis in original). It could hardly be otherwise; "consider how odd a concept it would be to require an individual to 'deliberate' in an open meeting." *Id.* at 883. Accordingly, because the EM is not a "public body," he is not covered by the OMA. *See Muma v. City of Flint Fin. Review Team*, No. 309260, 2012 BL 377883, at *3-*4 (Mich. Ct. App. May 21, 2012) (per curiam) (holding that "Emergency Manager Brown" [appointed under 2011 PA 4] is . . . not subject to the [OMA]" in light of *Herald*).

23. Without acknowledging any of this authority, UAW contends that the EM is subject to the OMA because he exercises the Detroit City Council's powers. (*See* UAW Mot. at 14-15.) To be sure, in *Booth Newspapers, Inc. v. University of Michigan Board of Regents*, 507 N.W.2d 422, 429 (Mich. 1993), the court stated that "delegating the task of choosing a public university president to a one-man committee . . . would warrant the finding that this one-man task force was in fact a public body" for OMA purposes. But the Michigan courts have only applied *Booth* to situations in which, like *Booth*, a "public body [sought] to evade the OMA . . . by delegating its authority." *Herald*, 614 N.W.2d at 884. Where an individual exercises a public body's powers pursuant to a state statute rather than a devious delegation, however, *Herald* controls. Thus, in *Craig v. Detroit Public*

*Schools Chief Executive Officer*, 697 N.W.2d 529, 532 (Mich. Ct. App. 2005) (per curiam), the court held that the CEO of the Detroit Public Schools was not a "public body" under the OMA even though, by virtue of the Michigan School Reform Act, he "essentially st[ood] in the shoes of the former school board." Similarly, in *Muma*, the court held that an EM appointed under PA 436's predecessor (PA 4) was not a "public body" under the OMA even though he "assum[ed] what had been duties of the Flint City Council." 2012 BL 377883, at *3.

24. Because the EM is not a "public body" for purposes of the OMA, the OMA does not destroy the EM's expectation of confidentiality for purposes of the common interest privilege.

25. ***Third*, the common interest privilege applies to communications between the State, the EM, and their counsel because the EM and the State shared the same legal interest.** As an initial matter, UAW again mistakes which law applies to privilege claims in this proceeding. It argues that "common-interest doctrine is anything but 'well-established' in Michigan." (UAW Mot. at 16.) But, federal common law of privilege applies to this proceeding, Fed. R. Evid. 501, and the common-interest privilege *is* well-established under federal law, *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364-65 (3d Cir. 2007); (City Opp. to AFSCME Mot. at 5-6).

26.     In addition, as the City addressed at length in its initial response to AFSCME's motion to compel, pursuant to PA 436, the State and the EM shared the same legal interest in "'rectify[ing] the financial emergency' and 'assur[ing] the fiscal accountability' of the City during the Emergency Manager's term of service.'" (City Opp. to AFSCME Mot. at 7-8 & n.2 (ECF No. 940.))[4]  Under PA 436, the EM's powers to restructure the City's legal obligations prior to any chapter 9 filing and to enter chapter 9 proceedings are conferred by the State.  (*Id.*)  Thus, the State and EM have the same legal interest in ensuring that the EM exercises this authority effectively to restructure the City's financial obligations and rectify the its financial emergency.  (*Id.*)

27.     There is no rule (nor does UAW cite any authority for its position, (UAW Mot. at 12)), that the parties must have identical roles for the common interest privilege to apply.  Such "an absolute congruence" of the parties' positions is unnecessary.  *Travelers Cas. & Sur. Co. v. Excess Ins. Co., Ltd.*, 197 F.R.D. 601, 607 (S.D. Ohio 2000); *see also Official Comm. of Admin. Claimants v. Bricker*, No. 1:05cv2158, 2011 WL 1770113, at *3 (N.D. Ohio May 9, 2011) ("Although the interests of the UCC and the ACC differ in some respects, the

---

[4] UAW argues that the "City is simply wrong" that the common interest privilege applies where the parties' legal interests are substantially similar.  (UAW Mot. at 17.)  As discussed, the State's and EM's relevant legal interests are identical (they are the same) and so it does not matter which standard the Court applies.

monetary pursuit of recovery for the debtor's estate is a position common to both entities"). Thus, the mere fact that the State and the EM played different roles with respect to the decision to file chapter 9 does not show that the common interest privilege does not apply to the pre-filing communications. There was no conflict between the State and the EM at this juncture (City Opp. to AFSCME Mot. at 7). Rather, as the Court recognized in its analogy to the corporate context, the parties shared the same legal interest in evaluating whether a chapter 9 filing was warranted. (*See* Sept. 19, 2013 Tr. at 79-80 (Exh. C).)

28. In addition, the State and the EM's legal interest in ensuring that the EM exercises his authority effectively to rectify the City's financial emergency is not "too broad," nor is it shared by "[a]ll parties." (UAW Mot. at 18.) The objectors—unlike the State—had no oversight power over the EM's restructuring efforts prior to the chapter 9 filing nor did they have any power to authorize (or reject) the EM's request to file chapter 9 proceedings. Their legal interests were distinct.

29. Accordingly, the Court's September 19 Order concluding that the common interest privilege applies to communications with the State, the EM, and their counsel does not suffer from a "palpable defect," and reconsideration should be denied. E.D. Mich. Local Bankr. R. 9024-1(a)(3).

WHEREFORE, the City respectfully requests that this Court deny the UAW's motion to compel and for reconsideration and the Systems' motion to compel.

Dated: October 22, 2013                         Respectfully submitted,


                                                /s/  Bruce Bennett
                                                Bruce Bennett (CA 105430)
                                                JONES DAY
                                                555 South Flower Street
                                                Fiftieth Floor
                                                Los Angeles, California  90071
                                                Telephone:  (213) 243-2382
                                                Facsimile:  (213) 243-2539
                                                bbennett@jonesday.com

                                                Geoffrey Irwin (DC 465754)
                                                JONES DAY
                                                Jones Day
                                                51 Louisiana Avenue NW
                                                Washington, D.C. 20001
                                                Telephone:  202-879-3939
                                                Facsimile:   202-626-1700
                                                gsirwin@jonesday.com

                                                David G. Heiman (OH 0038271)
                                                Heather Lennox (OH 0059649)
                                                JONES DAY
                                                North Point
                                                901 Lakeside Avenue
                                                Cleveland, Ohio  44114
                                                Telephone:  (216) 586-3939
                                                Facsimile:  (216) 579-0212
                                                dgheiman@jonesday.com
                                                hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE DEBTOR

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------x
                     :

In re                   :     Chapter 9

CITY OF DETROIT, MICHIGAN,  :     Case No. 13-53846

          Debtor.     :     Hon. Steven W. Rhodes

                     :
-------------------------------------------------x

## <u>DECLARATION OF JEFFREY B. ELLMAN</u>

JEFFREY B. ELLMAN declares pursuant to 28 U.S.C. § 1746:

    1.     I am a partner in the law firm Jones Day, which represents the City of
Detroit (the "City") in the above-captioned chapter 9 case. I submit this
Declaration in connection with the City's opposition to: (A) the motion of
International Union, UAW to (i) compel production of documents withheld on
grounds of privilege and (ii) for reconsideration of this Court's September 19 order
on privilege issues (D.I. 1234) and (B) the motion of the Detroit Retirement
Systems to compel production of documents withheld on the grounds of privilege
(D.I. 1269).

    2.     Beginning in 2011 and continuing until it was retained in March 2013,
Jones Day sought to be retained by the City to provide legal services related to
restructuring issues.

3.     During this time, it was widely reported that the City faced serious financial instability, including fiscal imbalances and deficit conditions.

4.     These serious fiscal imbalances and deficit conditions made it likely that in the future the City would be involved in litigation or other legal proceedings or disputes related to its financial instability.

5.     To be prepared to advise the City on various legal matters if and when retained, Jones Day performed legal analyses and prepared legal memoranda on potential legal strategies.

6.     I affirm under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Executed in Atlanta, Georgia on October 22, 2013.


Jeffrey B. Ellman

**EXHIBIT B**

# Financial Stability Agreement

between

## the State of Michigan and the City of Detroit

This landmark agreement was jointly developed by my administration, members of the Detroit City Council and the State of Michigan.

Of critical importance to Detroiters, this agreement preserves City Charter, Executive and Legislative powers. It also provides necessary financial mechanisms to execute a process that will ensure the City's fiscal stability over time.

We believe this Financial Stability Agreement puts us on track to restructure our City financially and reestablish an economic infrastructure to make sure Detroit never faces these financial conditions again.

*— Dave Bing, Mayor*

STATE OF MICHIGAN

| | |
|---|---|
| In the matter of the City of Detroit, the Financial Review Team for the City of Detroit the Michigan Department of Treasury and Governor of the State of Michigan | CONSENT AGREEMENT |

_____

### AFFIDAVIT OF PERSONAL SERVICE

STATE OF MICHIGAN )
                     ) ss.
COUNTY OF INGHAM )

     Caleb Buhs, being duly sworn, deposes and says that on April _10_ , 2012, he personally served a copy of the **Financial Stability Agreement** with the **The Office of the Great Seal**, Michigan Department of State by personally handing said document to:
_Bev Vogt_  _Bev Vogt_  _4/10/2012_ .

_Caleb Buhs_

Caleb Buhs, Office of Communications
Michigan Department of Treasury

Subscribed and sworn to before me
this _11th_ day of April, 2012

_Karyn Howd_

Karyn Howd, Notary Public
County of Ingham, Michigan
Acting in Ingham County
My commission expires: 02-14-2013

KARYN HOWD
NOTARY PUBLIC, STATE OF MI
COUNTY OF INGHAM
MY COMMISSION EXPIRES Feb 14, 2013

# FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

-2-

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

-3-

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

## 1. FINANCIAL ADVISORY BOARD

### 1.1. Establishment and Purpose.

(a)   Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement. The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

(b)   The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects"). In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

1.2. Composition. The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "Governor"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "Appointing Entity") as follows:

(a) Three individuals appointed by the Governor;

(b) Two individuals appointed by the Mayor;

(c) Two individuals appointed by the City Council;

(d) One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

(e) One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "Member") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

-6-

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, provided that of the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; and provided further that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

-7-

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

    1.3    <u>Compensation</u>. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, <u>provided that</u> (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

    . All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

-8-

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

1.3a  Standards of Conduct, Conflicts of Interest and Ethics

(a)  Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

(b)  Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("Act 317"), pertaining to contracts of public servants with public entities.

(c)  Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("Policy"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

-9-

(i)     Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)     Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)     A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)     A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)     A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi)   A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii)   Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix)   Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x)   Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi)   Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)    A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

-12-

(xiii) The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv) By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4 <u>Board Organizational Matters</u>. The Financial Advisory Board may:

(a) Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b) Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c) Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d) Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5 <u>Board Authority</u>. Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a) Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

(b)    Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions. Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c)    Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d)    With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e)    Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget. The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f)    As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g)    Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h)    Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i)    Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j)   Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k)   Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l)   Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m)   Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6   Quorum and Voting.  A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, provided that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7   Meetings.  The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.   Procurement.   The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices. As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies. The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

-15-

not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

1.9. <u>Taxes and Incurring Debt</u>. The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2. THE MAYOR AND CITY COUNCIL

2.1 <u>Powers and Authority</u>. The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law. The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

2.2 <u>Chief Financial Officer</u>.

(a) Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor. The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

-16-

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget. The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency. The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer. The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

(b)    Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have substantial experience with at least 2 of the following disciplines: (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer. In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

-17-

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3    Program Management Office; Director.

(a)    Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

-19-

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d)     The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4     Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

(b)     By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation. The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.    Support of Phase I Reform.   Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)     Cash stabilization transaction: The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012. The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses. Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)     Technical and financial assistance: The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)     Completion of a payroll system upgrade.

(2)     Integration of budgeting, accounting and financial reporting systems.

(3)     Implementation of a new grants management system.

(c)     Income tax collection: The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

-21-

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d) <u>Legislative assistance</u>: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

    (1)    Enabling PLD changes;

    (2)    Enabling Bus Rapid Transit legislation;

    (3)    If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

    (4)    Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6    <u>Implementation of Phase II Reform—Following Actions</u>. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "<u>Phase II Reform</u>"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

-22-

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

2.7 Support of Phase II Reform. Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

(a) Legislative assistance: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation. The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

(b) Health plan and post-employment benefits: The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

(c) Demolition of structures: The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

(d) Real estate management: The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

2.8 Reporting Requirements.

(a) In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

-23-

Triennial Budget. Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b)   In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects. Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c)   Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date. For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d)   Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget. The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month. A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9    Appropriation; Limitation.    The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

## 3.    FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET

3.1    Revenue Conferences; Conduct.

(a)  Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("Revenue Conference") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "Revenue Estimation"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

-25-

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

(b) At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

(c) The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

(d) The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)    For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2    <u>Revenue Conferences; Limitation on Adjournment</u>.    A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter. If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3    <u>Limitation on Mayor's Budget Proposal</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.4    <u>Limitation on City Council's Budget Approval</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

    3.5.    <u>Budget Proceedings and Adoption</u>. The Budget adopted for each fiscal year for the City shall comply with the following requirements:

    (a)    Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("<u>Act 2</u>"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time. The milestones for annual Budget adoption, including Revenue Conferences, are set forth on <u>Annex C</u> hereto.

    (b)    Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

-28-

(c)     During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget. No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d)     Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e)     If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f)     During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g)     If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6   Budget Reductions; Ordinance; Impasse.  Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion.  The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7   Triennial Budget.   (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

-30-

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b) The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on Annex A-1 hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as Annex A-2 hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c)     Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4.     COLLECTIVE BARGAINING AGREEMENTS

4.1     Authority. The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2     Collective Bargaining Agreements; Restriction. The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of Annex D as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

-32-

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

4.3     Collective Bargaining Agreements; Approval.     The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director.   Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

4.4.     Duty to Bargain.     It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

-33-

## 5. PENDING LITIGATION REPORT

5.1    Report; Filing.  Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "Pending Litigation Report") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "Pending Action").  Each Pending Litigation Report shall identify, with respect to each Pending Action:  (a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action.  The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer.  For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

-34-

## 6. DEFAULTS AND REMEDIES

6.1 <u>Obligations of the parties.</u> (a) The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement. Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement. The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement. During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof. The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

-35-

(b)    The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2    _Material Breach; Default._ (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives.  Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)    If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.  The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

-36-

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3 Default; Remedies. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, e.g., Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4 Program Management Director; Board; Reform Initiative Remedies. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a) If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "Reform Default Condition"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b) Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

-38-

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)    In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated.  The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     <u>Additional Forbearance by Treasury Department</u>.   Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

6.6 <u>Obligation Not Discharged by Contingencies</u>. The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders. If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

6.7 <u>Transitional Provisions</u>.

(a) The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement. The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "<u>Transitional Period</u>"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

(b) The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

-41-

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

## 7. AMENDMENT; WAIVER OF PROVISIONS

7.1 _Amendment; Waiver._ This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

-42-

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

## 8. DURATION OF AGREEMENT; RELEASE

8.1 <u>Duration of Agreement; Termination; City's Release from Obligations</u>. This Agreement shall remain in effect until both of the following occur ("<u>Financial Stability</u>"):

    (a)    The date of the earlier of:

        (i)    the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

-43-

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

(ii)    the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

(b)    The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

(c)    The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

(d)    Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

## 9. CONTINUING EFFECT; EMPLOYEES; SEVERABILITY

9.1 <u>Continuing Effect</u>. This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2 <u>Joint Exercise of Power; Transfer</u>. While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board. Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536. The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3 <u>Employees</u>. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement. The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

-45-

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4 <u>Management and Direction</u>. The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement. The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5 <u>Severability</u>. If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law. On account of the urgent public purpose and the protection of the

-46-

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10. COUNTERPARTS

10.1 <u>Counterparts; Signatures</u>. This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (<u>e.g.</u>, by facsimile or email).

## 11. EFFECTIVE DATE

11.1 <u>Effective Date.</u> The effective date ("<u>Effective Date</u>") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this 4th day of April, 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)

Dave Bing, Mayor

**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.

Dated: 4/5/12

Richard D. Snyder, Governor

# CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:27 , p.m.

-2-

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a)    A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b)    A cash flow projection for the budget period.

(c)    An operating plan for the budget period.

(d)    A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e)    An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f)    A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b)*
*upon approval following appointment of CFO]*

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;

2. Lighting Department Changes;

3. DDOT Changes;

4. Income tax collection;

5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;

6. Implementation of new grants management system to streamline requisition and monitoring process of grants;

7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;

8. Demolition of structures;

9. Implementation of medical and pension changes;

10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;

11. Health and Wellness Department changes;

12. Human Services Department changes;

13. Real estate management;

14. Workers Compensation Reform;

15. Employee Training;

16. Bank Project to improve AR and AP process;

17. Fire Authority review;

18. Permits;

19. Planning and Development to DEGC;

20. Claim/Risk Management for reducing claims costs;

21. Long-Term Liability Restructuring;

## ANNEX C

### Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation.<br><br>The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council.<br><br>The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

\* Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

## ANNEX D

### Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1.  Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2.  Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3.  Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4.  Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5.  There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6.  New hires will have a defined contribution retirement health care benefit.

7.  Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8.  Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9.  Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10. Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11. Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12. The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

-8-

# SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

## Introduction

The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

## Improve Quality of Life and Safety for Detroiters

- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

## Enhance Education

- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

-9-

**Invest in Transportation Infrastructure**

- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

**Invest in Physical Assets and Economic Drivers**

- *Citywide –*
  - Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market* – Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront* – Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle* – Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds* – Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center* – Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

## Improve Detroit's Capacity to Collect Tax Revenues
- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

## Municipal Assistance/Services Authority
- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

**EXHIBIT C**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                             .      Detroit, Michigan
                             .      September 19, 2013
                 Debtor.     .      3:00 p.m.
. . . . . . . . . . . . . . . . .

HEARING RE. MOTION BY OFFICIAL COMMITTEE OF RETIREES TO
STAY DEADLINES AND THE HEARINGS CONCERNING A DETERMINATION
OF ELIGIBILITY PENDING DECISION ON MOTION TO WITHDRAW THE
REFERENCE; MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF
STATE, COUNTY AND MUNICIPAL EMPLOYEES, AFL-CIO, AND
SUB-CHAPTER 98, CITY OF DETROIT RETIREES' MOTION TO COMPEL
TESTIMONY OF KEVYN ORR AND ALL OTHER CITY AND STATE WITNESSES
REGARDING CITY-STATE COMMUNICATIONS PRIOR TO JULY 17, 2013
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

For the State of       Dickinson Wright, PLLC
Michigan:              By:  STEVEN G. HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

For Official           Dentons
Committee of           By:  CLAUDE D. MONTGOMERY
Retirees:              620 Fifth Avenue
                       New York, NY  10020
                       (212) 632-8390

For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City       65 Livingston Avenue
of Detroit             Roseland, NJ  07068
Retirees:              (973) 597-2374

APPEARANCES (continued):

For UAW:            Cohen, Weiss & Simon, LLP
                    By:  THOMAS N. CIANTRA
                    330 W. 42nd Street
                    New York, NY  10036-6979
                    (212) 356-0228

For General and     Clark Hill
Police and Fire     By:  JENNIFER K. GREEN
Retirement Systems: 500 Woodward Avenue, Suite 3500
                    Detroit, MI  48226
                    (313) 965-8300


Court Recorder:     Letrice Calloway
                    United States Bankruptcy Court
                    211 West Fort Street
                    21st Floor
                    Detroit, MI  48226-3211
                    (313) 234-0068

Transcribed By:     Lois Garrett
                    1290 West Barnes Road
                    Leslie, MI  49251
                    (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1           THE COURT:  All right.

2           MS. GREEN:  Thank you, your Honor.

3           THE COURT:  All right.  I'm going to take this under

4     advisement and come back into court at 5:15 with a decision.

5           THE CLERK:  All rise.  Court is in recess.

6        (Recess at 4:54 p.m., until 5:31 p.m.)

7           THE CLERK:  Court is in session.  Please be seated.

8           THE COURT:  The record should reflect that counsel

9     are present.  The Court concludes that the common interest

10    doctrine does apply in these circumstances.  The Court so

11    concludes based on this analogous hypothetical.  As we all

12    know, when a corporation files bankruptcy, its board of

13    directors must give its consent, must authorize the filing.

14    Ordinarily, of course, the corporation itself would have its

15    own counsel giving it advice on whether to file bankruptcy,

16    what the ramifications would be, what possible reasons there

17    might be not to file bankruptcy, et cetera, et cetera.

18    Ordinarily the board of directors would not have its own

19    separate counsel in that process.  It would rely on corporate

20    counsel, but it could.  A board of directors could hire

21    special counsel to advise it on whether to authorize the

22    filing or not.  Assume for a moment it did, and then the

23    board or members of the board, its lawyer, the corporation's

24    lawyer and corporate management all met together.  It seems

25    clear enough to this Court that the common interest doctrine

1   would shield those conversations even though technically the

2   corporate attorney does not represent the board and the

3   board's attorney does not represent the corporation.  The

4   Court cannot identify any way to distinguish that case from

5   our case.

6          Now, having come to that conclusion, that does not

7   mean that every question that Ms. Levine or others want to

8   ask of Mr. Orr in this case is protected by the attorney-

9   client privilege, and here it becomes hard for -- really

10  impossible for the Court to rule specifically.  I can give

11  you some general guidance, and I'm willing to do that, but

12  the application of the attorney-client privilege can only be

13  adjudged on a question-by-question basis.

14         Here's the general guidance I'm willing to give to

15  you, for what it's worth, and then an offer.  If the

16  conversations among the governor, the governor's lawyers,

17  Mr. Orr, and/or Mr. Orr's lawyers were for the purpose of

18  seeking legal advice from the lawyers about the bankruptcy,

19  then it's protected.  If the conversations were, for example,

20  between Mr. Orr and Mr. Snyder for other purposes, for

21  example, to discuss the political ramifications of the

22  bankruptcy or for other purposes I'm too naive to fathom,

23  then it would, it seems to the Court, not be protected by the

24  attorney-client privilege.  And I don't know what more to

25  tell you at this point except to make to you the offer I

 1   think I made to you before, which is when you're sitting in a

 2   deposition and you come to a disagreement about whether the

 3   privilege applies to a specific question, you can get me on

 4   the phone, and I will resolve it on the spot if I at all can,

 5   but I make that offer with the caveat that the guidance that

 6   I just gave you is probably the guidance I'm going to follow,

 7   and you can figure it out as well as I can, so I don't know

 8   what more to say except that sort of technically the motion

 9   to compel that's before the Court is granted in part and

10   denied in part.  I will allow a further opportunity with the

11   guidance that I've given you for Mr. Orr's deposition.  I'm

12   sure you'll be able to find a mutually convenient time for

13   that.

14          Is there anything else I can help you with here

15   today?

16          MS. LEVINE:  Thank you, your Honor.

17          THE COURT:  All right.  We'll be in recess then.

18          THE CLERK:  All rise.  Court is adjourned.

19      (Proceedings concluded at 5:36 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    September 26, 2013
_____             _____
Lois Garrett