**ITEM NO. 50**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

111 First Street
Bay City, MI 48708

211 W. Fort Street
17th Floor
Detroit, MI 48226

226 W. Second Street
Flint, MI 48502

**Order Party: Name, Address and Telephone Number**

Name    Robin Wysocki

Firm    Miller, Canfield, Paddock and Stone, P.L.C.

Address    150 West Jefferson Avenue, Suite 2500

City, State, Zip    Detroit, Michigan 48226

Phone    313-496-7631

Email    wysocki@millercanfield.com

**Case/Debtor Name:**

**Case Number:**    13-53846

**Chapter:**    9

**Hearing Judge**  Hon. Steven Rhodes

◉ **Bankruptcy**    ◯ **Adversary**

◯ **Appeal    Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/15/2013    **Time of Hearing:** 10 am    **Title of Hearing:** Objections to Eligibility

Please specify portion of hearing requested: ◉ **Original/Unredacted**  ◯ Redacted  ◯ Copy (2nd Party)

◉ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85 per page (7 working days)

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____  Date  By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ Robin Wysocki    Date: 10/15/2013

By signing, I certify that I will pay all charges upon completion of the transcript request.

# ITEM NO. 51

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
**TRANSCRIPT ORDER FORM**

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name    **Robin Wysocki**

Firm    **Miller, Canfield, Paddock and Stone, P.L.C.**

Address    **150 West Jefferson Avenue, Suite 2500**

City, State, Zip    **Detroit, Michigan 48226**

Phone    **313-496-7631**

Email    **wysocki@millercanfield.com**

**Case/Debtor Name:**

**Case Number:**    **13-53846**

**Chapter:**    **9**

**Hearing Judge**  **Hon. Steven Rhodes**

◉ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:**

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/16/2013   **Time of Hearing:** 10 am   **Title of Hearing:** Continue Eligibility Objections

Please specify portion of hearing requested:  ◉ **Original/Unredacted**  ○ Redacted  ○ Copy (2nd Party)

◉ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions:

**Type of Request:**

[X] Expedited Transcript - $4.85 per page (7 working days)

**FOR COURT USE ONLY**

Transcript To Be Prepared By

                                               Date       By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ Robin Wysocki        Date: 10/16/2013

By signing, I certify that I will pay all charges upon completion
of the transcript request.

13-53846-tjt  Doc 1206  Filed 10/16/13  Entered 10/16/13

1353846131016000000000007

# ITEM NO. 52

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,      .       Docket No. 13-53846
        MICHIGAN,             .
                             .       Detroit, Michigan
                             .       October 15, 2013
                Debtor.      .       10:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
          BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:     Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

For the State of    Michigan Department of Attorney General
Michigan:           By:  MARGARET A. NELSON
                    P.O. Box 30758
                    Lansing, MI  48909
                    (517) 373-1124

For AFSCME,         Lowenstein Sandler, LLP
AFL-CIO, and Sub-   By:  SHARON L. LEVINE
Chapter 98, City    65 Livingston Avenue
of Detroit          Roseland, NJ  07068
Retirees:           (973) 597-2374

For Detroit         Clark Hill, PLC
Retirement Systems- By:  ROBERT GORDON
General Retirement  151 South Old Woodward, Suite 200
System of Detroit,  Birmingham, MI  48009
Police and Fire     (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

```
For the Official        Dentons
Committee of            By:  CLAUDE D. MONTGOMERY
Retirees:               620 Fifth Avenue
                        New York, NY  10020
                        (212) 632-8390

For the Inter-          Cohen, Weiss & Simon, LLP
national Union,         By:  BABETTE A. CECCOTTI
UAW:                         PETER D. DECHIARA
                        330 West 42nd Street, 25th Floor
                        New York, NY  10036-6976
                        (212) 356-0227

For the Flowers         Law Offices of William A. Wertheimer
Plaintiffs:             By:  WILLIAM WERTHEIMER
                        30515 Timberbrook Lane
                        Bingham Farms, MI  48025
                        (248) 644-9200

For the Detroit         Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police          400 Galleria Officentre, Suite 444
Officers Associa-       Southfield, MI  48034
tion and the            (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

Interested              KRYSTAL CRITTENDON
Party:                  19737 Chesterfield
                        Detroit, MI  48221

For Retired             Strobl & Sharp, PC
Detroit Police          By:  LYNN M. BRIMER
Members                 300 East Long Lake Road, Suite 200
Association:            Bloomfield Hills, MI  48304-2376
                        (248) 540-2300

For Detroit             Silverman & Morris, PLLC
Retired City            By:  THOMAS R. MORRIS
Employees               30500 Northwestern Highway, Suite 200
Association,            Farmington Hills, MI  48334
Retired Detroit         (248) 539-1330
Police and Fire
Fighters Association,
Shirley V. Lightsey,
and Donald Taylor:
```

APPEARANCES (continued):

| | |
|---|---|
| For David Sole: | Jerome D. Goldberg, PLLC<br>By:  JEROME GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI  48207<br>(313) 393-6001 |
| For the United<br>States: | U.S. Department of Justice<br>Civil Division<br>By:  MATTHEW J. TROY<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, D.C.  20044<br>(202) 514-9038 |
| For Center for<br>Community Justice<br>and Advocacy: | Vanessa G. Fluker, Esq., PLLC<br>By:  VANESSA G. FLUKER<br>2921 East Jefferson, Suite 200<br>Detroit, MI  48207<br>(313) 393-6005 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1        THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3        THE COURT:  Good morning, everybody.  I'd like to

4    take appearances from the attorneys who will be speaking here

5    today first.  Can we do that?

6        MR. BENNETT:  Thank you, your Honor.  Bruce Bennett,

7    Jones Day, on behalf of the city.

8        MS. NELSON:  Good morning, your Honor.  Assistant

9    Attorney General Margaret A. Nelson on behalf of the State of

10   Michigan.

11       MS. LEVINE:  Good morning, your Honor.  Sharon

12   Levine, Lowenstein Sandler, for AFSCME.

13       MR. GORDON:  Good morning, your Honor.  Robert

14   Gordon of Clark Hill on behalf of the Detroit Retirement

15   Systems.

16       MR. MONTGOMERY:  Good morning, your Honor.  Claude

17   Montgomery, Dentons U.S., for the Official Committee of

18   Retirees.

19       MS. CECCOTTI:  Good morning, your Honor.  Babette

20   Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.

21       MR. WERTHEIMER:  Good morning, your Honor.  William

22   Wertheimer on behalf of the Flowers plaintiffs.

23       MS. PATEK:  Good morning, your Honor.  Barbara Patek

24   of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

25   Detroit Public Safety Unions.

1    MS. CRITTENDON:  Good morning, your Honor.  Krystal

2    Crittendon, interested party.

3         MS. BRIMER:  Good morning, your Honor.  Lynn M.

4    Brimer appearing on behalf of the Retired Detroit Police

5    Members Association.

6         MR. MORRIS:  Good morning, your Honor.  Thomas

7    Morris of Silverman & Morris on behalf of the Retiree

8    Association parties.

9         MR. GOLDBERG:  Good morning, your Honor.  Jerome

10   Goldberg on behalf of interested party David Sole.

11        MR. TROY:  Good morning, your Honor.  Matthew Troy,

12   Department of Justice, Civil Division, on behalf of the

13   United States.  It is not my intention to speak this morning,

14   your Honor, unless you have specific questions regarding our

15   filing from Friday.

16        THE COURT:  Thank you, sir.  Mr. Gordon.

17        MR. GORDON:  Thank you, your Honor.  I just wanted

18   to provide the introduction relative to our proposed

19   allocation of the time and order of presentation here this

20   morning.  As your Honor can see from the document that was

21   filed, there are 11 objectors who wish to speak, and, of

22   course, they all have important points to make, but -- and we

23   very much appreciate the cooperation amongst all of them.  It

24   was a good and constructive process.  Not only was that easy,

25   but everyone has been very cooperative, and we've allocated

1    the time accordingly to various parties to have the

2    opportunity to speak today.

3         You will note, your Honor, a couple things.  One, we

4    did not allocate the full 120 minutes in the morning.

5    There's a few minutes left over.  Similarly, in the afternoon

6    there's about five minutes left over of the 90 minutes.

7    That, of course, is not intended to necessarily waive our

8    opportunity to have the full time, but we thought that would

9    build in some flexibility and some error margin as people

10   stand up and sit down to make sure that we fit within the

11   time frame.

12        Also, as footnote one indicates, the presentation

13   order does not necessarily tie -- correspond discretely with

14   each of the issues as listed in your scheduling order, your

15   Honor.  There is some correlation, but various parties, as

16   the Court, I'm sure, can understand, have a number of issues

17   that they would like to address.  There will be some overlap.

18   The parties are going to try to overlap as little as

19   possible, but it was not really feasible to try to identify

20   discrete issues that each party was going to take on, so

21   instead the hope is that as each party comes to the podium,

22   they'll try to give you a little bit of a road map as to the

23   particular issues that they're going to touch upon.

24        THE COURT:  Thank you, and thank you for your

25   extraordinary effort in coordinating this.  I'm sure it was a

 1  challenge.  And I also want to thank all of the attorneys for

 2  cooperating with Mr. Gordon and with the Court in trying to

 3  organize this as best we can.  So we're going to start then

 4  with AFSCME's counsel, and we're going to try to run the

 5  timing mechanism for your convenience.  Kelli, have we got

 6  that available?  I'm sorry.

 7       MS. LEVINE:  They were teasing me that if I'm

 8  nervous, it'll take 20 minutes, but if I remember to speak

 9  slowly, it'll take 35.

10       THE COURT:  Okay.  So for 35 minutes you may

11  proceed.

12       MS. LEVINE:  Thank you, your Honor.  First, we

13  appreciate the opportunity.  We think these issues are

14  extremely important, and we're glad that we have the

15  opportunity to speak.  Second, as Mr. Gordon correctly noted,

16  the parties who are speaking here today have made a concerted

17  effort to divide up the time and to try not to duplicate our

18  comments, so in that regard we're reserving the right to rely

19  on the filed objections along with the other arguments of

20  other counsel simply because we won't have time to do it all

21  ourselves.

22       With that, your Honor, we started this endeavor by

23  looking at PA 436 specifically concerned, as you might

24  imagine, with the pension issues and with the fact that we

25  believe that the Michigan Constitution provides for

1    protections for vested pension benefits, and then that

2    potentially conflicted with PA 436, and, therefore, we

3    started looking at the issue of whether PA 436 was, in

4    fact -- was, in fact, unconstitutional in that it allowed a

5    Chapter 9 filing in light of the pensions -- in light of the

6    pension restriction in the Constitution.

7            In addition to that, we were looking at the

8    governor's authorization in allowing the Chapter 9 filing in

9    light of PA 436 and in light of the Michigan Constitution and

10   grappling with the issue of whether or not that authorization

11   without any contingencies caused this Chapter 9 filing to be

12   unconstitutional as applied.

13           In addition to that, we grappled with the ripeness

14   issue as to whether or not all of these issues should be

15   raised now or whether they should be raised in connection

16   with a plan of adjustment, specifically, your Honor,

17   grappling with the issue as it was presented to us by our

18   members where we have folks literally sitting at their

19   kitchen table deciding whether or not they can take medicine

20   today or do they have to start taking it every other day, do

21   they feed themselves, do they feed their children, do they

22   pay rent, so we came to this Court anxious to have some of

23   these issues decided quickly.

24           On top of that, as it turns out, involved in the

25   mediations and the other efforts with regard to the serious

 1  issues that are confronting Detroit, we do think

 2  understanding your Honor's views of the rules of the game

 3  could be useful for the parties in that process, but that's

 4  really by way of introduction because what we've done, your

 5  Honor, in addition to that, is we started researching how we

 6  thought PA 436 fit in the overall scheme of Chapter 9 and, in

 7  looking at those issues, delving into whether or not Chapter

 8  9 itself was, in fact, unconstitutional, which is what we

 9  will address before your Honor this morning.  And I'd like

10  to, with the Court's permission, set the table a little bit

11  but promise to get into Bekins and some of the cases that are

12  cited by folks who disagree with our views later on in the

13  comments.

14          So I'd ask you, your Honor, to come back with me, if

15  you will, to elementary and high school when we first started

16  talking about what the Constitution is and what it means,

17  and, respectfully, when we go back, we remember that the

18  framers of the Constitution were fleeing an oppressive,

19  overbearing, centralized government.  So when we started

20  looking at how we framed our Constitution, we were very

21  careful to make sure that there was a federal Constitution

22  that was extremely limited only to specific rights that we

23  believed should transcend every single state in the union,

24  and we've come to call those the unalienable rights, and they

25  refer to things like freedom of speech and freedom of

1  religion.  And under the Tenth Amendment, your Honor,
2  everything else is reserved for the states, so specifically
3  reserved for the states are the state municipal governments'
4  rights to handle their own financial management.  And this is
5  done, your Honor, not to protect the states, which would have
6  been as suggested by the New Jersey plan, but was actually
7  done to protect the individual citizens, as suggested by the
8  Virginia plan, and the specific rationale behind protecting
9  the individual citizens was in order to have accountability
10  from our government and particularly, more importantly, from
11  our local governments, which were viewed as being more
12  accessible to the citizens that they were -- that they were
13  supposed to be taking care of.  So, for example, if somebody
14  infringes on my right of free speech or my right of freedom
15  of religion, I know I point my finger to D.C., and I look at
16  the federal government, and I say to the federal government,
17  who is accountable for those federally protected rights,
18  "Make them stop," but if somebody says to me that there's an
19  inappropriate use of the power over the financial management
20  of a state municipality, of, for example, Detroit, I look to
21  my local government.  I look to my local politicians and my
22  local leaders, and I say, "I'm holding you accountable," and
23  we saw that working well very recently with the mayor of
24  Detroit -- with the prior -- apologies -- prior mayor of
25  Detroit, so this direct accountability, which is a

1    cornerstone of how we -- of how we run our country and how we

2    run this democracy, is there for a reason, and it's not there

3    to protect the states.  It's there to protect the citizens.

4    The Constitution doesn't start "We the states."  It doesn't

5    say, "I the general federal government."  It starts, "We the

6    People."  So now, as we indicated in our brief, we believe

7    there is what we've called this unholy alliance between the

8    state giving authorization to the federal government to run

9    this Chapter 9 process.  And what we said there, your Honor,

10   is that the states are, in essence, ceding the responsibility

11   and the accountability for their own financial management, so

12   by turning over under Chapter 9 to the federal government and

13   being able to hide behind the bankruptcy process and this

14   Court, we lose that accountability that's a cornerstone of

15   what our Constitution requires of us, and we've seen that

16   already.  We saw that debtor's counsel correctly noted in an

17   internal e-mail exchange back in January of 2013 that making

18   this a federal issue provides political cover, and we've seen

19   it in the depositions where we're talking to the EM and the

20   governor, and they are talking about the fact that they're

21   not exactly sure what's going to happen with the pensions.

22   The bankruptcy process takes care of that.  And we would

23   respectfully submit, your Honor, that we're seeing play out

24   in real time and real life the exact loss of accountability

25   that the Constitution was designed to protect, so --

1      THE COURT:  Well, but hasn't state consent been a

2  cornerstone of the Supreme Court's Tenth Amendment

3  jurisprudence?

4      MS. LEVINE:  Your Honor, we'll talk about the

5  consent in Bekins, and we don't believe that what we're

6  saying here today is inconsistent with state consent.  And if

7  your Honor will give me a little bit more leeway, we'll reach

8  that point --

9      THE COURT:  Sure.

10     MS. LEVINE:  -- because we understand the issue.  So

11 one of the comments that's being made is that in order for

12 there to be -- that the reason why we can't do it at the

13 state level, the reason why the state municipal governments

14 can't do it is because it violates the contract clause, and

15 by violating the contract clause, you can't do a plan of

16 adjustment unless you have a hundred percent consent.

17     Now, we would respectfully submit, your Honor, that

18 there's two responses to that, and they are -- and I'll admit

19 they're diametrically opposed, but under either response you

20 don't get to the place where you get to take it away from the

21 states.  Number one, if you believe, as suggested, that you

22 need a hundred percent consent at the state level because of

23 the contract clause, then we would respectfully submit that

24 the states can't cede control to the federal government and

25 then suddenly it becomes legal to do a plan of adjustment

 1 without a hundred percent consent.  And, your Honor, in doing
 2 that, we're actually just reading from the Constitution
 3 itself.  The contract clause is in Section 10 of Article I of
 4 the Constitution.  Section 10, Article I, of the Constitution
 5 has three subsections, one, two, and three.  In the first
 6 section, it talks about no state shall enter into treaties
 7 with foreign countries, print money, and it's the contract
 8 clause.  Under sections two and three, not where the contract
 9 clause sits, it says, "No State shall without the consent of
10 Congress," so by the plain reading of the Constitution, if
11 "no state shall" means no state shall, then no state shall do
12 it with or without the consent of Congress, and the framers
13 clearly understood that if they wanted the states to be able
14 to do it with the consent of Congress, they could have done
15 what they did in the two other subsections and basically
16 said, okay, instead we'll do it -- we'll do it with a federal
17 municipal bankruptcy statute where the federal government
18 will consent, and, therefore, you can violate the contract
19 clause.  So our first point is under the contract clause, "no
20 state shall" means no state shall, and if we're going to be
21 intellectually honest with ourselves, that applies regardless
22 of whether or not Congress consents because it's not, as in
23 Section 10, the second and the third paragraph, "No State
24 shall without the consent of Congress."
25           THE COURT:  What Supreme Court case law supports

1  this interpretation?

2        MS. LEVINE:  Your Honor, we respectfully submit that

3  it's Ashton.

4        THE COURT:  The case that Bekins overruled?

5        MS. LEVINE:  Well, we don't believe that Bekins

6  overruled it, and if I can keep going, the alternative

7  approach -- and, frankly, the plain meaning of the statute we

8  don't believe yet -- or I'll admit we haven't found yet a

9  constitutional case that comes right out and says it is or it

10 isn't done this way, but it is the plain reading of the

11 Constitution, which we thought was --

12        THE COURT:  Okay.

13        MS. LEVINE:  -- a good place to start.  But moving

14 past that, let's assume -- and we believe the better answer

15 is that there has to be a way to adjust debts.  Then we go

16 back to where we started, your Honor, which is this is

17 absolutely a state municipal right.  What Bekins was looking

18 at -- and remember Bekins was decided in -- right in the

19 middle of the Great Depression.  Okay.  And so up until

20 the -- up until just before Bekins was decided, there was no

21 municipal federal bankruptcy law at all.  It wasn't really

22 contemplated by the framers, and I'll get into that a little

23 bit more in a minute, but what Bekins found was we now have

24 this new federal municipal bankruptcy law.  There is no state

25 counterpart, so the only option that's available to the state

1   and the only way that the state can be accountable to its

2   citizens to fix this problem if there is no other option

3   available is to then consent to the federal court stepping in

4   and doing this.  Consistent with that, your Honor, we

5   believe, is Asbury Park, and we would respectfully submit

6   that Asbury Park was decided after Bekins.  It was decided --

7   it wasn't a unanimous decision, but there was only one

8   concurrence, so there was no dissent.  It was drafted by

9   Judge Frankfurter, hardly, you know, a slouch, and it

10  specifically upheld Bekins but further found that a state --

11  in that case, New Jersey -- could correctly under its state

12  municipal authority do a plan of adjustment that did not

13  require 100 percent of consent, and in dealing with this

14  issue, it found that to be consistent with Bekins because

15  Bekins was looking at a situation where there was no state

16  alternative for the state to choose, and the state only had

17  one alternative, and it made the alternative to rely on the

18  federal statute.  And it further found -- and I'm going to

19  quote just for a moment, Judge, but in dealing with this

20  issue, the Court posed and then answered this very question.

21  "Can it be that a power that was not recognized until 1938,"

22  which is a federal municipal bankruptcy law, "when so

23  recognized, was carefully circumscribed to reserve full

24  freedom" -- that's how Bekins interprets it -- "to the States

25  has now been completely absorbed by the Federal Government -

1   that a State which, as in the case of New Jersey, has after

2   long study devised elaborate machinery for the autonomous

3   regulation of problems as peculiarly local as the fiscal

4   management of its own household, is powerless in this field?

5   We think not."  And we think that's very telling, your Honor.

6   And by the way, Asbury Park is still good law.  Like Bekins,

7   which it is consistent with, it has not been overruled, so

8   the -- then we were grappling with, well, why hasn't anybody

9   looked at this issue.  What happened after Asbury Park was

10  that the Bankruptcy Act incorporated a federal municipal

11  bankruptcy statute, which is a predecessor to 903, which

12  specifically includes a provision that provides, like 903,

13  that no state can enter into a plan of adjustment unless

14  there is a hundred percent consent.  We find that interesting

15  that it's the federal statute.  Basically, that's Article --

16  that's Chapter 9 saying Chapter 9 is constitutional, and the

17  states can't enter into an alternate separate plan of

18  adjustment with less than a hundred percent because Chapter 9

19  says so.  It's a circular argument, we would submit, your

20  Honor, that can't possibly be the reason why the states can't

21  enter into a plan of adjustment, especially in light of

22  Asbury Park, with less than a hundred percent consent.

23        In addition to that, the other telling conclusion in

24  Asbury Park was when they addressed head on the issue of the

25  contract clause, they determined that the contract clause is

1    not violated when you don't actually violate the underlying

2    contract.  They were analogizing it to like the property

3    rights, so while you have a contract right and that can't go

4    away or you have a property right and that can't go away,

5    what they were talking about in Asbury Park was what's the

6    remedy, and the remedy in a Chapter 9 -- and we would

7    respectfully submit the remedy in a state -- appropriate

8    state plan of adjustment is to take what is now a valueless

9    right -- contract right because the state municipality is

10   insolvent and create a plan of adjustment that, like in the

11   corporate bankruptcy setting, creates value for a right that

12   had no value.  We're not doing away with the contract, and a

13   lot of the cases that come after that -- for example, United

14   Trust that talks about taking away the bonds or changing the

15   bonds -- Asbury Park says you're not taking away the

16   contract, you're not taking away the bonds, you're not taking

17   away our retiree benefits.  All you're doing is you're

18   saying, "Look, there's not enough money here to pay for it.

19   We can't get it through taxation.  We need to -- we need to

20   fashion a remedy."  And that, your Honor, we would

21   respectfully submit is consistent with Bekins, with Asbury

22   Park, and with an appropriate reading of the contract clause.

23         Turning now to the bankruptcy clause, there is a --

24   there is a provision that provides for a national bankruptcy

25   statute.  How can Chapter 9 be unconstitutional if we have

1    a -- if we have a bankruptcy clause that says there's a

2    national uniform bankruptcy statute?  Number one, we're

3    directing our comments specifically at Chapter 9.  We're not

4    saying there is no statute that could be -- that could fit

5    within the parameters.  But that said, one of the things we

6    would observe about the bankruptcy clause is when the framers

7    framed the Constitution, it was inconceivable to them that

8    there would be a national municipal bankruptcy law.  To this

9    day there is no national municipal bankruptcy law in the EU.

10   And while Chapter 11 provides a very viable way to enable

11   commerce and Chapter 7 provides a very viable way for there

12   to be a fresh start -- and we've avoided debtor's prison and

13   all of the things that the framers were focused on at the

14   time -- there was no -- and there wasn't until the Great

15   Depression a national municipal bankruptcy law.

16          Second, we think there's a problem with Chapter 9

17   specifically because the requirement of the national

18   bankruptcy law is that it be uniform, so whether I'm here in

19   Detroit or in any other state or city in the country, I know

20   what the -- I know what the criteria is to be a corporate

21   debtor.  It's right in the Code.  I know what the criteria is

22   to be a Chapter 7 debtor.  It's right in the Code.  But

23   because Chapter 9 is struggling with the difference of the

24   separation of what's a federal power and what's a state

25   power -- and we respectfully submit struggling in a way that

1   didn't work -- Chapter 9 is not a uniform statute.  There are

2   some states that have objective standards so that everybody

3   in their particular state has to meet a certain criteria in

4   order to be a Chapter 9 debtor.  There are some states that

5   don't even have the ability to be a Chapter 9 debtor, and

6   then there are some states, like Michigan, where even though

7   there's a statute that purports to authorize Chapter 9

8   filings, it is completely and totally subjective with regard

9   to who qualifies, whether they get authorization to file, and

10  whether or not there are any contingencies that are attached

11  to what they do when they're in that filing.

12          THE COURT:  Okay.  So how do you distinguish the

13  cases that uphold the nonuniformity of exemptions in Chapter

14  7?

15          MS. LEVINE:  Your Honor, one of the -- two responses

16  to that.  First of all, we understand the case law that says

17  that you can have conformity in a geographic location, so we

18  understand, for example, that if every state had an objective

19  standard the way every state has its own exemptions in

20  Chapter 7, that that could meet the criteria for uniform

21  standards, but we're saying something different.  In Chapter

22  9 we don't know that every state has a standard or that

23  they -- and if they don't have a -- and if they don't have a

24  standard for becoming a Chapter 9 debtor, there is no default

25  back to that which is provided under the Code.  In other

1    words, in Chapter 7, if I like Detroit's exemptions, I use

2    Detroit's exemptions.  If I like the federal exemptions, I

3    use the federal exemptions.  But there is no place where I

4    don't get to be a debtor or I don't get exemptions.

5         THE COURT:  Well, but still the question remains how

6    does a nonuniformity among states in authorizing or not

7    authorizing Chapter 9 or in having different standards for

8    seeking Chapter 9 protection make the federal law nonuniform?

9         MS. LEVINE:  Well, your Honor, if you take that to

10   its natural conclusion, you can say that I have a federal law

11   that basically says you can do whatever you want, but because

12   I'm saying you can do whatever you want to everybody, it's

13   uniform.  We would respectfully submit that that doesn't --

14        THE COURT:  Isn't that just about what the Chapter 7

15   exemption cases say?  Beyond that, federal law outside of

16   Chapter 9 applies state property law, generally speaking,

17   and, of course, the property law differs from state to state

18   to state.

19        MS. LEVINE:  Yes.  And that goes back to the line of

20   cases that talk about geographic, that they can be -- that

21   they can be uniform within a geographic area.  The difference

22   between all of those cases -- and then I'll let the point

23   rest because you are the Judge, and we may have to agree to

24   disagree --

25        THE COURT:  I'm just asking questions.

1      MS. LEVINE:  But the -- but we view that, as I said

2  earlier, that those exemptions, those criteria are published.

3  Okay.  So even if I know that I'm not going to follow -- that

4  if I'm going to follow state law with regard to UCC

5  priorities or if I'm going to follow state law with regard to

6  exemptions, in a specific geographic area I know exactly what

7  that is.  In the states that have the subjective test with

8  regard to whether or not to file a Chapter 9, Detroit has a

9  different standard than Lansing and has a different standard

10 than other cities, and that's the issue, and the issue -- and

11 not only that, but none of those cities know what that

12 standard is.  And I'll leave it there.

13      THE COURT:  Okay.

14      MS. LEVINE:  Your Honor, the other argument that's

15 out there is, well, doesn't the state have -- doesn't the

16 state have the ability to cede control if there's federal

17 aid.  Your Honor, we would respectfully submit that's a very

18 different situation.  If you're looking at a situation, for

19 example, like Sandy or like Katrina where the federal

20 government is saying we're going to give you money under

21 specific terms and conditions, that's different.  Nobody is

22 saying to Detroit or nobody is saying to every single Chapter

23 9 debtor if you file Chapter 9, you get "X" amount of money

24 from the United States of America, and in exchange for that,

25 you have to follow these certain rules.  There's a difference

1   between entering into a contract for money and for support

2   than ceding control just to do the plan of adjustment with no

3   financial support.

4        THE COURT:  Well, but the cases in which the Supreme

5   Court has held the Tenth Amendment is violated by the federal

6   government or the federal government's legislation involve

7   what's called commandeering.  Is there any of that here?

8        MS. LEVINE:  Well, your Honor, we think that's -- we

9   think that is, in part, what is happening here.  The

10  commandeering is they're taking away the state's right or

11  the -- to do their own financial management.

12       THE COURT:  But only because the state showed up.

13       MS. LEVINE:  But that's not true, and this is where

14  we go back to the Bekins --

15       THE COURT:  Is there anything in Chapter 9 that

16  compelled the state to authorize the city to file this case?

17       MS. LEVINE:  Yes, and this is -- and this is where

18  the argument comes.  Okay.  In Bekins there was no state

19  alternative at all.  In Asbury Park -- so, therefore, the

20  Bekins Supreme Court made the decision that the state had no

21  choice if it wanted to adjust its debt but to come to the --

22  but to come to the federal court.  In Asbury Park there was a

23  state alternative to the federal statute that was -- and that

24  was permitted by both the federal statute and the state

25  statute, so the arguments outside of the federal statute that

1  said you can't go to federal -- you can't do it statewide,

2  you have to go to federal court under the commerce clause and

3  otherwise, were rejected for some of the reasons that we're

4  discussing here today.  In Chapter 9 four year -- or the

5  predecessor to Chapter 9, four years after <u>Asbury Park</u>, the

6  Bankruptcy Code in its municipal statute said we can adjust

7  debts at the federal level if you use the Bankruptcy Act, now

8  the Bankruptcy Code, but you, states, cannot because of how

9  we read the commerce clause only -- state municipal

10  governments cannot adjust debt except with a hundred percent

11  consent, so what the -- so what Chapter 9 says to the

12  governor is if you want to do a plan of adjustment without a

13  hundred percent consent, you must come to the federal

14  government, number one.  Number two, your Honor --

15      THE COURT:  Well, but the commandeering cases

16  address situations where the state and -- the federal

17  government imposes on the state to carry out some federal

18  program, some federal policy.  How does that work here?  So,

19  for example, in the New York case, which involved the waste,

20  right, nuclear waste or whatever, the state was forced to

21  take title to it under certain circumstances, and the Court

22  held that the state couldn't be imposed upon to do that to

23  carry out the federal policy of how to dispose of this waste.

24  How is that analogous here?

25      MS. LEVINE:  Well, your Honor, the reason why we

1  believe it's analogous is because in order to do a plan of

2  adjustment, arguably there's no other way to do that without

3  using Chapter 9 unless you have a hundred percent consent,

4  and that's the commandeering.  The requirement that there be

5  a hundred percent consent unless you're the federal

6  government means that the state has no ability to do a plan

7  of adjustment unless it cedes control to the federal

8  government and to the bankruptcy process.

9          Your Honor, I'm coming up on time.  If I -- unless

10 your Honor has more questions, if I could just close briefly.

11         THE COURT:  Well, the other question I have for you

12 is what about the cases that hold that the lower courts are

13 to apply Supreme Court precedent until the Supreme Court

14 itself overrules it, and this is, of course, the Bekins case?

15         MS. LEVINE:  Well, your Honor, our -- we would

16 respectfully submit that Asbury Park was decided after

17 Bekins.  Right now where the Supreme Court sits is that

18 Bekins stands for the proposition that in the face of no

19 state alternative, which is what existed there, you can turn

20 to the federal statute.  Asbury Park stands for the

21 proposition that side by side an appropriate municipal

22 bankruptcy law and an appropriate state law, that's where the

23 state gets to choose, and if the state, as it did in Asbury

24 Park, chooses an appropriate state law that does permit for

25 the adjustment of debt, then the state is accountable to its

1   citizens.  If the state chooses the municipal law, then the

2   state is accountable to its citizens.  But either way, it's a

3   true state decision.  Consistent with both of those cases, we

4   find ourselves here in Detroit with a situation where there

5   is prohibited by Chapter 9, we believe unconstitutionally, no

6   ability to have that second state decision.

7           THE COURT:  Just so I understand, your argument is

8   that the current Chapter 9 is different enough from Bekins

9   because of its exclusivity that Bekins is not binding on this

10  Court.

11          MS. LEVINE:  Correct, and secondarily that Bekins

12  never reached the issue because regardless of whether or not

13  Bekins had an inappropriate -- the Bekins statute had an

14  inappropriate clause, the state wasn't looking to have a

15  separate -- you know, here we have PA 436 looking to try and

16  pigeonhole itself into the strictures of Chapter 9 reviewing

17  Chapter 9 as unconstitutional.

18          Your Honor, we believe your Honor is faced with a

19  difficult decision here.  We understand that Detroit is --

20  all that's happening here is difficult.  Detroit is in dire

21  financial straits, and it's not lost on any of us that the

22  decisions that you make with regard to the criteria for

23  eligibility, particularly with regard to Chapter 9, will have

24  implications for blighted cities throughout the United

25  States.  We also understand that constitutional issues are

1    difficult issues.  We heard -- you know, we've been grappling

2    since 9/11, for example, with the balancing between homeland

3    security and individual privacy rights.  We started talking

4    earlier about the First Amendment, and as a society we

5    grapple between where does First Amendment end and where does

6    a hate crime, for example, begin.  This is no less an

7    important constitutional issue because of the impact this

8    will have on state sovereignty and the ability of its

9    citizens to hold its own municipal leaders accountable.

10          Your Honor spent a long time listening to a lot of

11   individual objectors here in this courtroom talk about how

12   bad they felt things were in Detroit trying to deal with the

13   fact that their firemen were using garden hoses, you know,

14   street lights are out, all of these things, and your Honor

15   was clearly sympathetic.  And it was -- and concluded that

16   hearing, we believe correctly so, by saying that this was a

17   great day for democracy, but we would also add, your Honor,

18   that despite the fact that these things are at the forefront

19   of your mind and you want to do what's right, that doesn't

20   necessarily mean that you can do what's expedious -- what's

21   expedient.  Democracy is hard, and we would respectfully ask

22   that your Honor consider these issues with the same depth and

23   consideration that you've considered everything in this case

24   to date.  Thank you.

25          THE COURT:  Thank you.  Mr. Montgomery also for 35

1    minutes.

2              MR. MONTGOMERY:  Yes, sir.  Thank you.

3              THE COURT:  You may begin.

4              MR. MONTGOMERY:  Good morning.  Your Honor, my task

5    today is to discuss with you constitutionality as applied,

6    the standing and ripeness issue that the U.S. government has

7    posed to our constitutionality as applied to argument, and to

8    identify for you the predicate of that unconstitutionality as

9    applied, which, of course, we believe is the unconstitutional

10   behavior of Emergency Manager Orr and the governor in the

11   context of PA 436.

12             I'd like to set the stage briefly for you, your

13   Honor, on the question of standing by setting up two lines

14   of -- view of history here.  One is that in 1963 the State of

15   Michigan amended its Constitution to protect the pensions of

16   municipal workers.  Partly in reliance on that protection, a

17   small minority of the millions of people who have lived and

18   worked in the city went to work directly for the city.  Of

19   those, thousands of people who worked, about 23,000 people

20   are alive today who are retirees of the City of Detroit,

21   their beneficiaries and surviving spouses.

22             Now, those 23,000 people have been, in our view,

23   stalked by the emergency manager, who, with the blessing and

24   support of his advisors, has proposed to eliminate pensions

25   through a Chapter 9 process.  On July 16th the emergency

1   manager sought permission from the governor to file a Chapter

2   9.  On July 18 the governor, with full knowledge of the plans

3   of his emergency manager, gave unconditional permission to

4   the emergency manager to file that Chapter 9 petition.  And

5   the first overt harm has, in fact, now been announced.  On

6   October 11, the city mailed its books to the retirees

7   announcing the termination of the retiree health insurance

8   program for those same 23,000 people.

9         Now, the committee that I represent, your Honor,

10  consists of nine individuals, including retirees, deferred

11  vested, retirement eligible, surviving spouses and

12  beneficiaries, all of whom are protected by the pension

13  clause, all of whom are adversely affected by the harm that

14  was just announced by the city.  Each has or represents

15  vested accrued pension benefits, and they are participants in

16  the city's retirement health system.

17        The retiree committee consists of creditors

18  appointed by the U.S. Trustee to act in connection with the

19  case under 1102 and we think, therefore, have standing under

20  1109.  Now, the 1109 standing of being an interested party

21  may not be sufficient for either standing or ripeness on a

22  constitutionality issue, but we say to you -- we ask your

23  Honor to look at the current situation in the following

24  analogy.  When can somebody turn and defend themselves when

25  they are being threatened with harm?  We think that you don't

1  actually have to wait until the harm has befallen you if the
2  threat is imminent, if the threat is capable of redress by
3  the Court, and it is identifiable.  The redress by the Court
4  is, of course, denial of eligibility to the city.  The threat
5  is loss of pensions as announced by the emergency manager.
6         THE COURT:  Of course, if eligibility is denied, the
7  city is also denied its right to deal with all of its other
8  debts, isn't it?
9         MR. MONTGOMERY:  Your Honor, that may be a temporary
10  delay because if your Honor holds that the current
11  authorization papers are not constitutional or if accepted,
12  despite their lack of constitutionality, the challenge to
13  Chapter 9 becomes insurmountable, we think that the
14  reasonable thing this Court could do if it were so inclined
15  would be to deny the city its eligibility for the reasons of
16  the challenge to the pension clause and then invite the city
17  to come back with either a conditional acceptance by the
18  governor or otherwise correct their manifest intent to
19  violate Article IX, Section 24.
20         THE COURT:  Well, what do I do if in Detroit two, as
21  you propose, the bondholders come in waving the state
22  contracts clause?
23         MR. MONTGOMERY:  Well, your Honor, first, we think
24  that there is a difference between Article IX, Section 24,
25  and both the federal contracts impairments clause and the

1  state's own contracts impairment clause.  We think that can

2  be found in two places.  First, there are extra words that

3  can be found in Article IX, Section 24.  In its entirety,

4  Article IX, Section 24, has a phrase that appears at the end,

5  which says "shall not be diminished or impaired thereby," the

6  entire phrase, if I may, your Honor, "The accrued financial

7  benefits of each pension plan and retirement system of the

8  state and its political subdivisions shall be a contractual

9  obligation thereof which shall not be diminished or impaired

10  thereby," and, of course, your Honor, the second funding

11  clause, which is, "Financial benefits arising on account of

12  service rendered in each fiscal year shall be funded during

13  such year and such funding shall not be used for financing

14  unfunded accrued liabilities."  Your Honor, that is, to my

15  mind, certainly textually quite different than the state's

16  own simple contract impairment clause, and we think

17  meaningfully it's different.  What Section -- Article IX,

18  Section 24, does for -- in our view, your Honor, is tell the

19  state that no matter what you are doing, you cannot take a

20  step to adversely affect those accrued financial benefits,

21  and we cite, of course, the Seitz case, which is the judicial

22  probate case in which judges in the State of Michigan asked

23  for protection of their pensions, and the Michigan Supreme

24  Court agreed.  We think it's also consistent with the

25  Musselman case, which the Michigan Supreme Court said that,

1  again, the funding of retirement benefits that were otherwise

2  protected or protectable had to be done, and the state could

3  not take any action to not do that.  Now, of course, that's a

4  mandamus case in which the Court denied mandamus, but the

5  legal proposition was squarely stated.

6          We also think the advisory opinions that the Court

7  entered with respect to the tax exempt nature of retirement

8  benefits clearly show that the Michigan Supreme Court looks

9  to see if the state is doing something to impair the actual

10 benefit.  And that particular advisory opinion dealing with

11 the tax exempt nature of retirement benefits, the Michigan

12 Supreme Court said, no, merely taxing you or removing the

13 special exemption is not an impairment of the financial

14 benefit itself, so we step back and we ask your Honor to say,

15 okay, is a plan proffered by the emergency manager with the

16 knowledge and support or blessing of the governor authorized

17 by a statute an unconstitutional series of events?  Is the

18 emergency manager's action unconstitutional, is the

19 governor's action unconstitutional, or is the statute itself?

20 Knowing that there is a judicial predilection for the

21 narrowest possible reading of major problems, we submit to

22 you that your Honor can start with the emergency manager's

23 plan.  Stop it.  No eligibility if the emergency manager's

24 plan is to be put forward.  If that isn't enough because the

25 governor authorized it, then you have to challenge the

1    governor.

2            THE COURT:  Let me rewind the clock here just --

3            MR. MONTGOMERY:  Sure.

4            THE COURT:  -- a couple of minutes and ask you about

5    this nonimpairment provision in the Constitution.  The

6    question we all are struggling with is what is the meaning,

7    the substantive meaning of that provision in the context of a

8    political subdivision that doesn't have the money to comply

9    with it?  What's the meaning of it?

10           MR. MONTGOMERY:  First, I think this might be a good

11   opportunity to agree with your Honor that impairment in the

12   classic sense is something the Bankruptcy Code, of course,

13   has dealt with for many years by saying the allocation of

14   assets is not all by itself impairment.  I think we -- I

15   think it's fairly well established that just because a

16   creditor gets less than a hundred cents does not mean that

17   their contract is impaired.  On the other hand --

18           THE COURT:  I thought that's exactly what it meant.

19           MR. MONTGOMERY:  That's if the state does it, but

20   that's not that the -- remember the -- it was not a taking of

21   property by the federal government to authorize the

22   Bankruptcy Code.  It was --

23           THE COURT:  Oh, if that's what you mean --

24           MR. MONTGOMERY:  Yes.

25           THE COURT:  Absolutely.

1        MR. MONTGOMERY:  Totally.

2        THE COURT:  Absolutely, sure.

3        MR. MONTGOMERY:  But it is a taking of property if

4   the emergency manager says to its retirees, "I, either by

5   virtue of a plan I put in or otherwise, am taking your right

6   to receive pension benefits in the future," which is what he

7   is proposing.  He is not merely proposing to alter the

8   funding system in violation of Article IX, Section 24.  He is

9   proposing to actually eliminate or reduce already accrued

10  financial benefits.

11       THE COURT:  Right, so what's -- how do we give

12  meaning to nonimpairment, as you propose is constitutionally

13  required, if the city doesn't have the money to pay?  What

14  does it -- what's the meaning of that requirement?

15       MR. MONTGOMERY:  Well, your Honor, I think that if

16  there is to be some allocation -- let's back up for half a

17  moment.  Let us assume for the moment that, in fact, the city

18  has proposed to utilize all of its assets to deal with it, so

19  we're not talking about a situation in which the city has

20  capacity on its balance sheet or cash flows to deal with

21  something that it just refuses to do.  We think that the

22  proper answer is not for the federal government to invite the

23  state to violate its own Constitution but to have the state

24  adjust its own laws, have the state, using its people, its

25  either constitutional ratification process or the state

1    through its legislative process create the system for

2    adjustments that Asbury Park tells us is still at least

3    viable.  Putting that aside, whether or not Asbury Park is or

4    is not still --

5            THE COURT:  Well, but hang on, Mr. Montgomery.  If

6    the pension right is as inviolate as you say it is, the

7    legislature can't adjust the pensions either.

8            MR. MONTGOMERY:  No, but it can adjust other

9    people's assets, other people's entitlements.  It can make

10   the accommodations to its Constitution that may be required.

11   It has the capacity to levy.  It has the capacity to change

12   property rights.  The state legislature has those property --

13   and the only thing we are asking this Court to consider --

14           THE COURT:  Well, let me ask this question then.

15           MR. MONTGOMERY:  Yes, sir.

16           THE COURT:  Is it your position that because of this

17   nonimpairment requirement in the Michigan Constitution, the

18   State of Michigan is a guarantor of retirees' pension rights?

19           MR. MONTGOMERY:  We have not garnered nor do we

20   propose to express a view today whether or not the state is a

21   guarantor.  What we are proposing to express a view today is

22   that no state actor can do something in violation of the

23   state Constitution and have that act be other than void ab

24   initio.  And if those acts are void ab initio, the requisite

25   authorizations either don't exist or, if this Court has the

1  power to accept those authorizations notwithstanding their

2  unconstitutionality under Michigan law, then your Honor is

3  engaged not in aiding the sovereignty of the state, as

4  suggested was required by Bekins, but you are aiding -- you

5  are going in the direction of derogation of the sovereignty

6  of the state.  And why do I say that?  Because you are

7  telling the people of Michigan they can't control their own

8  Constitution, they can't control their own legislature, they

9  can't control their own executive officers, and we think that

10 is a pure Tenth Amendment problem.

11        You mentioned earlier in discussion with Ms. Levine

12 the commandeering issue.  It is absolutely true, as you have

13 identified, that first states must act in aid, not in

14 derogation of sovereignty.  That's the Bekins.  Under Printz

15 they can't compel a state official to do something that is

16 otherwise the subject of a federal program.  They can invite,

17 they can entice, but they can't commandeer.  That's the

18 Printz -- that's the Brady Bill decision.  And in the New

19 York versus United States case, which, again, your Honor

20 identified, you can't compel ownership of radioactive waste.

21 Again, you can create programs, you can create enticements,

22 you can create an exhaustive federal regulatory scheme that

23 keeps the states out of regulating the business, but here the

24 federal government can't, by virtue of the Tenth Amendment,

25 keep the states out of regulating the financial obligations

1   of its citizens. It can't keep the states out of the

2   business of deciding when their elected officials can or

3   cannot do something, and it is that issue that causes the as

4   applied problem as opposed to the facial and validity issues

5   that were raised by AFSCME in the arguments of Ms. Levine.

6   We think it --

7         THE COURT: I want to -- well, I want you to focus

8   on why the mere filing of this case resulted in an imminent

9   threat to the pension rights of the retirees of the city

10   because the filing itself didn't result in anyone's payments

11   being reduced; right?

12         MR. MONTGOMERY: Well, I will note for you they --

13   on the healthcare side, they apparently are.

14         THE COURT: Well, but that's not a result of the

15   Chapter 9.

16         MR. MONTGOMERY: Well, actually, I don't think that

17   could be done under state law because these are all

18   collectively bargained -- or mostly collectively bargained,

19   and to the extent they were collectively bargained,

20   they're --

21         THE COURT: Well, but with or without the Chapter 9,

22   Mr. Orr was free to do that or not under state law.

23         MR. MONTGOMERY: Or not under state law.

24         THE COURT: There's nothing about Chapter 9 that

25   impacts his decision to do that. He hasn't asked, at least

1  as far as I know, the Court's permission to do that.

2       MR. MONTGOMERY:  No.  As far as we know, he hasn't

3  asked either.  So if I may answer the question, which, if I

4  understood it correctly, was why is the mere filing --

5       THE COURT:  An imminent injury.

6       MR. MONTGOMERY:  -- an imminent threat, first, I go

7  back to the factual predicate that I think underlays this,

8  that the mere threat of filing -- excuse me -- the mere

9  threat of a filing is not the harm all by itself, but it was

10  preceded by an announced plan, the June 14 proposal, and a

11  series of other events that the emergency manager undertook

12  and statements made, which evidenced -- evidenced -- a desire

13  to violate the state Constitution.  Now, the only way in the

14  emergency manager's own mind that he can do that is if he has

15  access to the Bankruptcy Court because he believes it will

16  trump the state constitution with respect to pension

17  protections.  Now, right or wrong, it is the -- it is the

18  threat that those pension benefits will be eliminated as part

19  of a plan, a series of steps of which have already been

20  undertaken, the most recent of which was the filing of the

21  Chapter 9 petition.  The problem we face, at least in my

22  view, your Honor, is that the world that you face today for

23  deciding whether or not the emergency manager's actions are

24  or are not constitutional under Michigan law is different in

25  the eligibility context than we think you're going to be

 1   faced with at a plan confirmation context.  Once you're
 2   inside the box of bankruptcy -- excuse me -- everyone,
 3   putting aside whether -- how vigorously we will try to get
 4   state law to say something different, but everyone seems to
 5   suggest that the priority schemes and the allocation schemes
 6   of the Bankruptcy Code preclude a contrary result that would
 7   be allowable under state law.
 8           THE COURT:  Oh, but you're going to fight that.
 9           MR. MONTGOMERY:  But, your Honor, I've lost before,
10   and I might lose again.  The issue of --
11           THE COURT:  Well, but if you lose, it will be on
12   legal grounds.
13           MR. MONTGOMERY:  But, your Honor, it will be.  If we
14   are fighting this issue at the back end of the case and we
15   are arguing, as we will if we are required to, that
16   notwithstanding 109, that the emergency manager can't propose
17   a plan in good faith in which he violates his constitutional
18   rights for --
19           THE COURT:  Constitutional obligations, yeah.
20           MR. MONTGOMERY:  Constitutional obligations.  I
21   apologize.  For that to be a viable argument, in effect, you
22   have to rule today, your Honor, that it would be a violation
23   of his constitutional obligations because if it's not a
24   violation in the context of adhering to the Bankruptcy Code
25   provisions, which some cases say only provide with respect to

1    prospective obligations -- that is, a new pension plan would

2    be subject to the protections -- well, we're not talking

3    about a new pension plan, your Honor.  We're talking about

4    one that's been around for 60 or 70 years now, and we're

5    talking about a retirement plan that has people who are a

6    hundred years old.

7        THE COURT:  Suppose the plan is confirmable because

8    it results in the consent of those impaired after

9    negotiation.

10       MR. MONTGOMERY:  Your Honor, if our understanding of

11   the law is correct, it's going to be very hard for a state

12   official to agree in good faith to propose a plan that

13   impairs financial benefits without a hundred percent of the

14   retirees consenting either under 109 or under state law, and

15   so the -- in order to get to the point where a less than 100-

16   percent majority of the retirees are accepting the plan, you

17   have to have decided that state law doesn't control the

18   exercise of those rights.

19       THE COURT:  Suppose you or one of your objecting

20   colleagues decides to assert that the Michigan Constitution

21   requires the state to guarantee the federal -- the retirees'

22   pension.

23       MR. MONTGOMERY:  Well, your Honor, the -- again, you

24   are asking for advisory hypotheticals here, but --

25       THE COURT:  Well, but that's what looking at

1  ripeness is all about.

2          MR. MONTGOMERY:  The issue will be then not whether

3  or not the bankruptcy process has harmed the retirees because

4  it will have -- if the state is a guarantor or arguably a

5  guarantor, it must be sued, query whether or not that lawsuit

6  can be brought in the Bankruptcy Court or some other place,

7  and, secondly, the -- under the <u>Sittler</u> case, I believe,

8  there is a question of whether or not there's a cause of

9  action for damages for unconstitutional behavior.  There may

10  be a remedy, an injunction against unconstitutional behavior,

11  but the Michigan Supreme Court has not yet adopted a per se

12  rule that says if there is a violation of the state

13  Constitution --

14          THE COURT:  Suppose the state agrees that the

15  Constitution obligates it to guarantee the city's pension

16  obligations.

17          MR. MONTGOMERY:  Then the state will have remedied

18  the harm caused by the bankruptcy, your Honor, but the harm

19  was still being caused by the bankruptcy.

20          THE COURT:  What harm?

21          MR. MONTGOMERY:  The harm was the diminution of

22  pension benefits.

23          THE COURT:  Well, but if the state backs it up,

24  there's no diminution.

25          MR. MONTGOMERY:  Yeah.  If, as part of a plan of

1    arrangement, the state backstops -- you're right, your

2    Honor -- then the -- this is like a situation --

3         THE COURT:  Okay.  Okay.  If I'm right about that,

4    then why is the issue ripe now as opposed to then?

5         MR. MONTGOMERY:  This is like the landlord case, if

6    I may, your Honor, in which the -- I think it's Bennett

7    versus City of San Jose, which, if I may, your Honor, since

8    we didn't brief this issue, I can give you the cite for, but

9    as I'm looking for the citation, I believe that case stands

10   for the proposition that a landlord need not await the actual

11   failure to collect more rent than he could under the new

12   ordinance.  He's allowed to challenge the ordinance when it's

13   being passed.  All right.  We think this situation is very

14   similar to that.  We have a situation in which the emergency

15   manager has undertaken an act, has sought the aid of this

16   Court, and the question is do we have to wait for this Court

17   to, in effect, put it to us before --

18        THE COURT:  No, no.  The question isn't that.  The

19   question is do you have to wait for the emergency manager to

20   actually propose a plan that impairs pensions -- that's the

21   question -- and then object to that on constitutional

22   grounds.

23        MR. MONTGOMERY:  In the Thomas More Law Center case,

24   your Honor, the -- which is the commerce clause challenge to

25   minimum coverage provisions under the Affordable Care Act,

1 three and a half years in advance, the Sixth Circuit found

2 standing because notwithstanding the fact that it was a long

3 way off and many things could occur, including Congress

4 changing the law, different rules being applied, that was

5 enough because there was nothing the party asserting the

6 claim had to do in order to become injured. Now, yes, there

7 were things that any member of the law center group could do

8 that could escape the harm, but the fact that they had to

9 undertake affirmative steps to escape the harm was enough.

10      Here the only thing we can do to escape the harm

11 which the emergency manager has announced he will undertake

12 is to escape, and the only way to escape is through the gates

13 that your Honor is standing at the door of. You are the

14 keeper of the protection for the retirees. You are the one

15 who can stop the emergency manager from doing what is

16 unconstitutional under Michigan law. And apparently, by the

17 way, both the state and the city are inviting you to rule on

18 constitutionality issues, you know. They are perfectly

19 comfortable with your going down that road, your Honor, and

20 notwithstanding our hesitancy --

21      THE COURT: Does that make an otherwise not ripe

22 issue ripe?

23      MR. MONTGOMERY: No, obviously not, your Honor, but

24 we do think that where there's -- where the voluntary

25 cessation by the city or the temporary cessation or the

1 temporary abandonment of its statements that, oh, we are

2 going to impair the pensions does not create a situation that

3 moots the controversy nor do we think it eliminates the

4 ripeness of the controversy because your Honor can still see

5 the identifiable harm and can still issue an order that

6 redresses that identifiable harm by telling the city it may

7 not enter the portals of your courtroom.

8          Now, your Honor, I think we have, in effect,

9 distinguished the Barnwell case, which is cited by, I

10 believe, the U.S. government, because that was an ad hoc

11 committee of citizens instead of an 1102 committee.  Here

12 we're clearly creditors.  Here 1109 grants us statutory

13 standing as parties of interest, and I think we have

14 indicated to you that the harm is factual, imminent, and you

15 are at the gates.

16          One other thing I might want to sort of identify in

17 this ripeness issue, why now as opposed to what, why later,

18 of course, your Honor is familiar with the City of Stockton

19 case, and we are not urging you to adopt that case obviously,

20 but it does suggest that once in Chapter 11, the State of

21 California couldn't decide which rules it was going to

22 follow.

23          THE COURT:  Chapter 9?

24          MR. MONTGOMERY:  Right, in Chapter 9, the same thing

25 your Honor might decide here; that is, once inside Chapter 9,

1  the city is not free to do whatever it wants to do except
2  with respect to its own property and its own future
3  governance.  That you cannot touch in any way, shape, or
4  form, but that doesn't mean that you have to approve a plan
5  that violates what your Honor thinks are the rules of the
6  road.  And it is that danger that you would be called upon to
7  make a ruling inconsistent with Michigan law at the back end
8  of the case that has us asking you at the front end of the
9  case to prevent the city from engaging in that dialogue.
10         Now, the -- I think worth making as a final, if you
11  will, point -- and, again, later this afternoon you will hear
12  a more fulsome discussion, I believe, on all of the issues
13  associated with PA 436, but I think the void ab initio issue
14  is important to our constitutionality position; that is, were
15  it not for the fact that under Michigan law an
16  unconstitutional act is considered void ab initio, we think
17  you might be able to go down the road of accepting the
18  authorization papers as having been legitimately delivered to
19  your Honor without fear of violating our view of how Chapter
20  9 would be unconstitutional as applied; that is, if Michigan
21  law did not regard unconstitutional acts as void ab initio,
22  then all you would be faced with is a remediable situation
23  rather than an absence of action or an absence of
24  authorization action.  And with respect to the void ab initio
25  cases, we have cited those in our brief, your Honor, and we

think that you should accept as a truism, if you will, the
simple words actually uttered by Attorney General Schuette in
his paper that the city lacks authority under Michigan law to
propose a plan that diminishes accrued pension rights.  It
similarly lacks power to consent to any proposed action that
would violate the Michigan Constitution.  The proposed action
was the petition.  The proposed action was the petition as
part of a plan to eliminate the pension rights induced -- the
emergency manager got the governor to say yes to an act that
was unquestionably contrary to the pension clause.  As a void
ab initio act, that means that the legitimacy of the filing
is called into question, pure question of state law for your
Honor to rule upon, pure question of whether or not, in fact,
the city has obtained valid authorization papers -- pretty
hard to be valid if the underlying actions are void ab
initio, which is the norm under Michigan law, and we think,
therefore, your Honor has two ways to go down the path of
blocking eligibility independently of the factual disputes
under 109.  One is to hold that it's unconstitutional, the
authorization was unconstitutional because it was part of a
scheme to eliminate the pension rights or to say even if it
wasn't void ab initio, the acceptance of those actions by
this Court raise a huge constitutional challenge under the
Tenth Amendment to Chapter 9 itself.  Obviously the principle
of limiting federal constitutionality challenges would favor

 1    finding that the narrower ground would be that the emergency

 2    manager couldn't have filed his papers.  And I think, your

 3    Honor, just because I must, I just want to argue we are not

 4    arguing -- we are not rearguing today all those issues which

 5    we were in front of your Honor before several weeks ago about

 6    Stern v. Marshall and whether or not the Court should do

 7    that.  We are in front of you.  You have determined that you

 8    have the power to decide issues of state and federal

 9    constitutionality.  We are asking you to exercise that power

10    and to preclude the city's eligibility.

11            THE COURT:  So if you don't -- we have a little time

12    left.  I have some more questions for you.

13            MR. MONTGOMERY:  Sure.  Happy to engage, your Honor.

14            THE COURT:  One is sort of a procedural one.  You

15    mentioned that you didn't brief the ripeness issue.  Would

16    you like an opportunity to do that?

17            MR. MONTGOMERY:  That would be fine, your Honor.

18            THE COURT:  I'd leave it to your discretion.

19            MR. MONTGOMERY:  Yes, yes.

20            THE COURT:  How much time --

21            MR. MONTGOMERY:  We'd be happy to do that, your

22    Honor.

23            THE COURT:  How much time would you like?

24            MR. MONTGOMERY:  Give us a week, your Honor.

25            THE COURT:  Okay.  You have a --

 1          MR. MONTGOMERY:  Yeah.  Give us a week.  It'll be --

 2     if you don't mind, we'll submit it to you on the first day of

 3     the trial.

 4          THE COURT:  Okay.  I want to ask you about a couple

 5     of entries in the brief that you did file.

 6          MR. MONTGOMERY:  Okay.

 7          THE COURT:  On page 27, you say -- and I want to

 8     quote here.  This is the brief you filed at Docket Number

 9     805.

10          MR. MONTGOMERY:  Yes.

11          THE COURT:  You say, "As noted by the Sixth Circuit

12     in City of Pontiac Retired Employees Association, 213 Westlaw

13     4038528 at *1-2, the Michigan legislature evidenced an

14     unconstitutional, and undemocratic purpose in crafting PA

15     436," close quote.  Similarly, on page 29 of that brief you

16     say, "The Michigan legislature, the Governor, and the

17     Emergency Manager have each made clear that abrogation of

18     municipal retirement compensation rights was the legislative

19     intent of the Act," referring to PA 436, "and is a central

20     purpose of this bankruptcy.  That intent also was recently

21     recognized by the 6th Circuit in City of Pontiac Retired

22     Employees Association," same cite at *3.  I have to say, Mr.

23     Montgomery, that I have studied that opinion by the Sixth

24     Circuit several times, and I cannot find these references.  I

25     cannot find where the Sixth Circuit addressed or even

1    suggested anything about the constitutionality of PA 436.  Am

2    I missing something or was this a mistake?

3              MR. MONTGOMERY:  Well, unless my memory fails me,

4    your Honor, I think what we're referring to is the fact that

5    the Sixth Circuit said that PA 4, which was the immediate

6    predecessor of 436, had each of those purposes, your Honor,

7    and that, therefore, by extension --

8              THE COURT:  Perhaps so, but the Court didn't say

9    anything about PA 436.

10             MR. MONTGOMERY:  Well, other than that it was

11   adopted despite the fact that the referendum had overruled PA

12   4 and that it was virtually the same but for -- I believe the

13   phrase was an add-on for --

14             THE COURT:  The Sixth Circuit did not say anything

15   about the purpose or intent of PA 436.

16             MR. MONTGOMERY:  But it did as to 4, your Honor.

17             THE COURT:  It did.

18             MR. MONTGOMERY:  And it says 4 -- 436 is the same as

19   4.  That's how we got there.  Rightly or wrongly, that is how

20   we got there, your Honor.  We say if the Sixth Circuit

21   identified a purpose of PA 4 as being the impairment of

22   pension --

23             THE COURT:  Well, since you're going to file an

24   amended brief --

25             MR. MONTGOMERY:  Yes, sir.

1        THE COURT:  -- I want you to tell me very

2   specifically where in this City of Pontiac case the Court

3   said anything or suggested anything about the

4   constitutionality of PA 436.

5        MR. MONTGOMERY:  All right.  Your Honor, we will --

6        THE COURT:  I agree with you it addressed it at

7   length with regard to PA 4 and expressed grave concerns about

8   it, but that's not the act before this Court today, so I

9   invite you to do that in your --

10       MR. MONTGOMERY:  Of course.

11       THE COURT:  -- new brief.

12       MR. MONTGOMERY:  We'll add that discussion to our

13  ripeness supplemental brief.

14       THE COURT:  All right.  Thank you.

15       MR. MONTGOMERY:  Thank you, your Honor.

16       THE COURT:  Ms. Brimer, you may proceed for ten

17  minutes, please.

18       MS. BRIMER:  Thank you, your Honor.  Lynn M. Brimer

19  appearing on behalf of the Retired Detroit Police Members

20  Association.  Your Honor, your concluding arguments or

21  discussion with Mr. Montgomery leads directly into the

22  discussion that I will have with you this morning, and that

23  has to do with the constitutionality of PA 436 under the

24  Michigan Constitution, your Honor.  And first and foremost,

25  your Honor, I'd like to point out that in our brief we

1   noted -- and we cited the _Schimmel_ case -- we noted that PA
2   436 was passed in what we believe is derogation of the
3   Michigan referendum provision in Article II, Section 9, of
4   the Michigan Constitution.  It is well worth noting at the
5   outset of this discussion, your Honor, that that issue was
6   not addressed by either the city or the State of Michigan in
7   the pleadings they have filed.
8           With that, your Honor -- and I'll address that a bit
9   briefly later, your Honor.  Article I, Section 1, of the
10  Michigan Constitution specifically provides that, "All
11  political power is inherent in the people.  Government is
12  instituted for their equal benefit, security and protection."
13  Consistent with that maxim, Article II, Section 9, of the
14  Constitution specifically provides -- and it's a lengthy
15  provision, your Honor, so I'll read the relevant
16  provisions -- "The people reserve to themselves the power to
17  propose laws and to enact and reject laws, called the
18  initiative, and the power to approve or reject laws enacted
19  by the legislature, called the referendum.  The power of the
20  referendum does not extend to acts making appropriations for
21  state institutions or to meet deficiencies in state funds."
22  As has been noted, your Honor, in a handful of cases that we
23  can find that address this case, this provision of referendum
24  is so significant and vital to our Constitution that Article
25  II, Section 9, further provides that, "No law as to which the

1    power of referendum properly has been invoked shall be

2    effective thereafter unless approved by a majority of the

3    electors voting thereon at the next general election."

4         As this Court is aware, I'm sure, on November 6,

5    2012, by referendum, the people of the State of Michigan

6    rejected Public Act 4 on a vote of 52 to 48 percent.  That

7    was the Local Government and School District Act --

8    Accountability Act.  On December 26, Governor Snyder approved

9    Public Act 436, the Local Financial Stability and Choice Act,

10   a virtually identical law to Public Act 4.

11        In order to avoid subjecting Public Act 436 to

12   referendum, two very minor spending provisions were tacked on

13   at the back end.  Section 34 of the Act provides that for the

14   fiscal year ending 9-30, 2013, $780,000 is appropriated to

15   administer the Act, in essence, to pay the salaries of the

16   emergency managers appointed thereunder, and Section 35

17   provides that $5 million is appropriated for the same time

18   frame for the professionals such as lawyers and financial

19   consultants that are engaged under the Act.  The spending

20   provision was not at all a general spending provision for the

21   State of Michigan but a very limited provision relating

22   directly to the Act.

23        We have researched, your Honor, and cannot find a

24   single instance where the voters of Michigan have

25   specifically rejected a law and shortly thereafter the

1   governor passes a very similar law, if not identical, and

2   tacked on a spending provision in an effort to remove it from

3   the otherwise democratic process of the State of Michigan.

4          There are a handful of cases in Michigan that do

5   address the referendum.  In the case of Kuhn v. Department of

6   Treasury at 384 Mich. 378, 1971, the Michigan Supreme Court

7   specifically provided or held that the phrase in the preamble

8   of that -- the Income Tax Act of 1967, which provides that

9   the Act is for the purpose of meeting deficiencies in state

10   funds was not, in fact, sufficient when at the time the state

11   did not have any state deficiencies in its funding, and,

12   therefore, that provision in the preamble did not, in fact,

13   remove the Income Tax Act of 1967 from the power of

14   referendum.  Unfortunately, in that case the plaintiff had

15   not complied with the requirements for referring the matter

16   to the -- or the law to the referendum, and so the Court was

17   not able to render any further opinion regarding that

18   language and its impact on the -- whether or not that case

19   had -- that law had it been brought to referendum.  However,

20   it's instructive to this Court.  The law at issue in that

21   case had not previously been rejected on referendum, so,

22   therefore, it does have some influence in how this Court

23   should interpret how the Michigan Supreme Court may view the

24   two spending provisions tacked onto Public Act 436.  Public

25   Act 4 had, in fact, been rejected by the state through a

1    proper referendum.  The spending provisions were added on in
2    an effort to remove the case -- the law from the referendum
3    in derogation of the provision in Article II, Section 9,
4    which provides specifically that no law to which the power of
5    referendum had been properly applied shall be effective
6    thereafter unless approved by a majority of the electors
7    voting thereon at the next general election.
8            THE COURT:  Okay.  So I have this question for you
9    regarding this argument, and it's, again, a ripeness question
10   and a standing question.  How does any party have standing to
11   challenge the constitutionality of PA 436 on this ground or
12   why is it ripe until such a party has complied with all of
13   the legal requirements to have a referendum regarding that
14   put on the ballot and it being rejected because the law isn't
15   subject to a referendum because of this appropriations
16   provision?
17           MS. BRIMER:  I don't believe, your Honor, that by
18   adding on the spending provision, which on its face took
19   Public Act 436 out of the referendum provision of the
20   statute -- if that is the case, your Honor, then you have
21   read out the referendum from the Michigan Constitution.  I
22   think this is precisely the mechanism by which the
23   constitutionality of the law now should be challenged.  When
24   that law was then relied upon for purposes of the appointment
25   of an emergency manager, that is precisely, I believe, your

1  Honor, how this would come to a court for review.  On its
2  face, the governor attempted to remove this from the
3  referendum.  It was removed from the referendum, but you
4  can't read that out of the law and read out of the
5  Constitution the second provision, which requires that any
6  law that has been rejected by referendum be resubmitted to
7  the electorate.

8          I see I'm running out of time, your Honor.  What I
9  would like to note, your Honor, is that while you are correct
10 that the Sixth Circuit did not specifically rule on 436 --
11 I've read that case closely several times -- 436 was not
12 before the Court, and, as you'll recall, some of the matters
13 at issue in that case were what precisely is before the Court
14 because some of the arguments had not even been preserved on
15 appeal.  However, I think the tone of the Sixth Circuit when
16 it said, "Apparently unaffected that voters had just rejected
17 Public Act 4, the Michigan Legislature enacted, and the
18 Michigan governor signed, Public Act 436.  Act 436 largely
19 reenacted the provisions of Public Act 4, the law the
20 Michigan citizens had just revoked.  In enacting 436, the
21 Michigan Legislature included a minor appropriations
22 provision, apparently" -- they didn't say "in fact," but
23 "apparently to stop Michigan voters from putting Public Act
24 436 to a referendum."  I think that gives us a tone, and I
25 also think it's noteworthy, your Honor, that despite the fact

1  that the city noted on page 15 of Exhibit A to their
2  consolidated response to the objections that we had raised
3  this specific issue, it is not addressed.  It is not
4  responded to by either the state or the city.  It stands
5  unrefuted at this point, your Honor.

6          THE COURT:  Thank you.

7          MR. GOLDBERG:  Good morning, your Honor.  Jerome
8  Goldberg appearing on behalf of interested party David Sole,
9  who is a city retiree, as is his wife, Joyce Sole.

10         THE COURT:  And you may proceed for ten minutes,
11 sir.

12         MR. GOLDBERG:  Thank you, your Honor.  While I
13 certainly concur with many of the eloquent arguments put
14 forth by counsel prior to myself, I want to approach the
15 issue from a somewhat narrower point of view from the prism
16 of Michigan state law and specifically from the Michigan --
17 how Michigan state law views the issue of statutory
18 construction.

19         As we know, 11 U.S.C. 109 states that a local
20 municipality must be specifically authorized by state law to
21 file a Chapter 9 bankruptcy.  The phrase "authorized by law"
22 refers to the law of the state, and I cited <u>Bekins</u> for that
23 principle.  States act as gatekeepers to their municipalities
24 and access to relief under the Bankruptcy Code.

25         As we all know, the basis for the state law

1   authorizing the filing of this Chapter 9 is Public Act 436,

2   and Public Act 436 has several different provisions that I

3   think it's worth looking at to get an understanding for why

4   we believe the failure to include a contingency to bar the

5   impairment of pensions is violative of state law.  It

6   provides the emergency -- Section 1551(c) provides the

7   emergency manager with the power to carry out the

8   modification, rejection, termination, and renegotiation of

9   contracts.  Section 1552 provides the emergency manager again

10  with the power to reject, modify, or terminate, one, terms of

11  an existing contract.  Section K gives the emergency manager

12  the power to reject, modify, or terminate an existing

13  collective bargaining agreement.  Section 12 contains

14  provisions for the renegotiation of debt, and it's laid out

15  in Section 12.  But what Section 1552(m) -- Section 12(m),

16  when it deals with the question of pensions, it explicitly

17  includes within the section, within the statute, the --

18  states that the emergency manager must fully comply with

19  Article IX, Section 24, of the Michigan Constitution, which

20  is the constitutional prohibition on diminishing or impairing

21  contract.  In addition, Section 1558 states that the governor

22  may place contingencies on a local government in order to

23  proceed.

24          When you view the statute -- the authorizing statute

25  from the prism of the Michigan rules on statutory

1    construction -- and I cited the <u>Pohutski</u> case, which many --

2    is the seminal case on statutory construction in the State of

3    Michigan, <u>Pohutski</u> -- the Michigan Supreme Court in <u>Pohutski</u>

4    stated, "When parsing a statute, we presume every word is

5    used for a purpose.  As far as possible, we give effect to

6    every clause and sentence.  'The Court may not assume that

7    the Legislature inadvertently made use of one word or phrase

8    instead of another.'  Similarly, we would take care to avoid

9    a construction that renders any part of the statute

10   surplusage or nugatory."  And, in addition, Michigan courts

11   follow the doctrine of expression unius exclusion alterius,

12   the expression of one thing is the exclusion of another.

13        We would submit that in construing Public Act 436 as

14   a whole, in construing it as a whole, any -- you can't allow

15   for the filing of a Chapter 9 unless the Chapter 9 includes

16   the contingency for not impairing the pension rights under

17   Article 24.  Otherwise it would negate that section or

18   declare that section void, and that would be an express

19   violation of the Michigan Rules of Statutory Construction,

20   which the Court is bound to follow at this stage in the

21   proceeding because in the eligibility proceeding, it is state

22   law, state law that is dominant.  We believe, based on --

23        THE COURT:  But aren't there many, many, many

24   conditions that the governor could have put on the filing in

25   order to assure the emergency manager's compliance with state

1  law?

2          MR. GOLDBERG:  There are certainly different --

3          THE COURT:  Equal protection, due process of law,

4  freedom of speech.

5          MR. GOLDBERG:  But what I'm submitting, your

6  Honor --

7          THE COURT:  There are lots of constitutional rights.

8          MR. GOLDBERG:  Certainly.  But what I'm submitting

9  is we have to look at the statute as it is written.  That's

10  what the Michigan courts rule over and over again.  Those are

11  the fundamental rules of statutory construction enunciated by

12  the Michigan Supreme Court in case after case.  In this case,

13  we look at the words of the statute.  We don't read into the

14  statute.  We look at the words of the statute.  This statute

15  contains an explicit guarantee of pensions, a guarantee --

16          THE COURT:  Well, and the governor says --

17          MR. GOLDBERG:  It includes Article IX.

18          THE COURT:  The governor says the filing will comply

19  with state law, doesn't he?

20          MR. GOLDBERG:  Well, the governor may say it, but

21  the governor is not the final arbiter, your Honor.  That's

22  what the Court is for, and what we -- and the governor is not

23  above the law.

24          THE COURT:  Why isn't that a sufficient protection?

25          MR. GOLDBERG:  I'm sorry.

1          THE COURT:  Why isn't that a specific -- a
2    sufficient protection?

3          MR. GOLDBERG:  Why isn't what the governor says a --
4          THE COURT:  No.  Why isn't the fact that this Court
5    will apply state law a sufficient protection?

6          MR. GOLDBERG:  Well, we would submit, your Honor,
7    that state law at this stage of the proceeding, at the
8    authorization stage, is the determinative factor.  Once we go
9    into the -- once you make the eligibility determination, as
10   Mr. Montgomery indicated and as the case law as I've read it
11   indicates as well, that's where federal law -- there's a
12   question of federal supremacy over state law, but at this
13   stage it's state law that is determinative, and the state law
14   in this case explicitly mandates a contingency for the
15   guaranteeing of pensions.  Otherwise we've written that
16   section --

17          THE COURT:  If we're going --

18          MR. GOLDBERG:  -- out of the authorization
19   statute --

20          THE COURT:  If we're going to look at --

21          MR. GOLDBERG:  -- and that's an explicit violation
22   of statutory construction.

23          THE COURT:  If we're going to look at statutory law
24   and every word of it, how do you deal with the city's
25   argument that the word "thereby" in the constitutional

1  provision only prohibits the impairment of pensions by the
2  state or its political subdivisions; it does not prohibit the
3  impairment of pensions by a United States Bankruptcy Court?
4        MR. GOLDBERG:  That's exactly the point, your Honor.
5  That's exactly the point.  At this stage of the proceeding,
6  according to Bekins, according to Harrisburg, and according
7  to every case I've read, according to Collier's, it's state
8  law that is determinative.  That's why --
9        THE COURT:  And that's what I'm asking.
10       MR. GOLDBERG:  That's why the question --
11       THE COURT:  And that's exactly what I'm asking you
12  about.  If we're going to read every word of the statute and
13  apply every word of the statute, including the word
14  "thereby," why doesn't state law permit the Bankruptcy Court
15  to impair pensions?
16       MR. GOLDBERG:  Because the authorization statute
17  that this Court is relying upon, which it has to rely upon
18  because otherwise there would be no Chapter 9 filing, there
19  has to be a specific authorization under state law; correct?
20  I mean there are 20 -- many states don't have one.  You have
21  to rely on the state law.  That state law contains an
22  explicit clause that impair -- pensions cannot be impaired.
23  It's not just written in one place actually.  It's written in
24  two places in that statute.  Again, I'm submitting that down
25  the road, if we get past this eligibility question on this,

1     perhaps what you said is correct. At that point federal

2     law -- you make the determination based on federal law, but

3     right now you are duty bound to make that determination based

4     on your examination of state law and by applying the state

5     law --

6            THE COURT: What is the --

7            MR. GOLDBERG: -- principles of statutory

8     construction.

9            THE COURT: What is the exact state law language in

10    PA 436 that you rely on?

11           MR. GOLDBERG: I rely on the language -- here, let

12    me find it right here.

13           THE COURT: Okay.

14           MR. GOLDBERG: "The emergency manager shall fully

15    comply with the public employee retirement system investment

16    act and Section 24 of Article IX of the state Constitution,

17    and any actions taken shall be consistent with the pension's

18    qualified status"; that he's -- this emergency manager has to

19    abide by the constitutional impairment.

20           THE COURT: So my question for you remains if this

21    Bankruptcy Court were to approve a plan -- and I want to say

22    here I have no predisposition on this issue at all. This is

23    strictly hypothetical legal talk to figure out where we are.

24    If this Court were to approve a plan that impairs pensions --

25    again, not presuming at all that it will -- but if it did, is

1   that the city impairing pensions, or is that the Bankruptcy

2   Court impairing pensions because --

3          MR. GOLDBERG:  That would be impairing --

4          THE COURT:  -- the law prohibits the city from doing

5   it?  There's a question about whether it prohibits the

6   Bankruptcy Court from doing it.

7          MR. GOLDBERG:  That's precisely why I'm making the

8   argument, your Honor.  There is a -- there is a question as

9   to whether -- once we get past the eligibility and this Court

10  is looking at the plan, whether this Court then has the

11  authority under federal law to ignore the state law and state

12  constitutional protection.  I'm not saying it does, but

13  there's at least a question, and a lot of the case law

14  indicates that, but we're not at that stage right now.  We're

15  at the eligibility stage, and clearly at the eligibility

16  stage it's state law that predominates.  It's state law

17  that's determinative, and it's state law that this Court has

18  to look at, not federal law but state law that this Court has

19  to look at in making its determination as to whether the

20  authorization meets the muster.  And what I would submit,

21  that under state law principles, as I indicated, we look at

22  the authorization statute, we look at the plain language of

23  the statute, and we look at the Michigan rules on statutory

24  construction as a -- and there's no way to allow for a filing

25  that would not have a contingency that bars the impairment of

1  pensions.  It's interesting to me you raised before to Mr.

2  Montgomery --

3          THE COURT:  Actually, your time has expired, so I do

4  have to ask you to wrap up.

5          MR. GOLDBERG:  Okay.  Well, I'll make one last

6  point.  You raised very briefly to Mr. Montgomery why not

7  every contract, but, as I indicated, other contracts are

8  provided for the impairment of those contracts under the PA

9  436.  It's the impairment of pensions that's explicitly taken

10 away from the authority of the emergency manager, and I

11 submit because of that that any authorization that doesn't

12 include a contingency barring the impairment of pensions

13 would violate Michigan state law and violate the Bankruptcy

14 Code, in essence, itself.  Thank you.

15         THE COURT:  Thank you.

16         MS. CRITTENDON:  Good morning, your Honor.  Krystal

17 Crittendon, and I want to thank the Court for giving me the

18 opportunity to speak this morning.

19         THE COURT:  Welcome, and you may proceed for five

20 minutes.

21         MS. CRITTENDON:  Thank you, your Honor.  Before the

22 Court goes any further, I would just ask that the Court step

23 back and look at the process and how we got to where we are

24 from a legal foundational standpoint, and to that end, I make

25 three objections, your Honor.

1          First, the City of Detroit does not have a duly
2     appointed emergency manager because there was no EM or EFM
3     law in place at the time that appointment was made.  As the
4     Court knows, in 2011, Public Act 4, commonly known as the
5     Emergency Manager Act, repealed Public Act 72.  In November
6     of 2012, the people of the State of Michigan repealed Public
7     Act 4 by referendum.  Pursuant to Michigan law -- and this is
8     at MCL, Michigan Compiled Law, 8.4 -- "Whenever a statute, or
9     any part thereof shall be repealed by a subsequent statute,
10    such statute, or any part thereof, so repealed, shall not be
11    revived by the repeal of such subsequent repealing statute."
12    In short, that is saying that when PA 4 repealed Public Act
13    72 and PA 4 was then repealed by referendum, PA 72 was not
14    revived.  It did not spring back to life.

15         On March 14, 2013, a contract was purportedly
16    entered into between the State of Michigan and Kevyn Orr
17    appointing him EFM for the City of Detroit.  However -- under
18    PA 72.  However, because PA 72 was not alive at that time,
19    that appointment was not legal and is defective, and for that
20    reason, Mr. Orr is not a duly appointed emergency manager for
21    the City of Detroit.

22         The second argument, even had there been an
23    emergency manager law in place, Mr. Orr would not have been
24    an EFM at the time PA 436 came into place because his
25    contract, the contract between he and the state, was expired

1   on the day that PA 436 came into place, so he would not have

2   been grandfathered in under PA 436.

3           Finally, under Chapter 9 of the Bankruptcy Code,

4   there is no ability for there to be an involuntary

5   bankruptcy, and because the municipality would had to have

6   filed the petition, and in this case the municipality, being

7   the mayor and City Council, did not file the petition, the

8   petition filed by Mr. Orr was defective, and the filing

9   should be dismissed.

10          For those reasons -- and I see that my yellow light

11  is on -- time goes really really quickly when you have five

12  minutes, but I'd answer any questions the Court has.

13          THE COURT:  Hoe much time is left when the yellow

14  goes on, Kelli?  Do you know?

15          THE CLERK:  Three minutes.

16          THE COURT:  It's three minutes, so you only --

17          MS. CRITTENDON:  Okay.

18          THE COURT:  -- had two under green and three under

19  the yellow, so --

20          MS. CRITTENDON:  Okay.  Thank you, your Honor.

21          THE COURT:  -- you may proceed.

22          MS. CRITTENDON:  Mr. Orr's contract at Section 2.2

23  of that contract provides that his contract was effective on

24  Monday, March 25th, and terminated at midnight on Wednesday,

25  March 27th.  Midnight March 27th was a Wednesday morning at

1    12 o'clock a.m.  The new emergency manager law, PA 436, did

2    not take place -- did not become effective until Thursday,

3    March 28th.  Under 14 -- MCL 141.1572, it provides that an

4    emergency manager or emergency financial manager appointed

5    and serving under state law immediately prior to the

6    effective date of this Act shall continue under this Act as

7    an emergency manager for the local government.  Because the

8    City of Detroit was without an emergency manager or emergency

9    financial manager for one full day before the Emergency

10   Manager Act, PA 436, became effective, Mr. Orr could not

11   continue in that capacity, as used in this section, because

12   he was without a contract.

13          Finally, I would just say there are a number of

14   cases under the federal Bankruptcy Court law that talk about

15   involuntary bankruptcies.  This is akin to an involuntary

16   bankruptcy when someone other than the City of Detroit, which

17   is its mayor and City Council, filed the petition.  And for

18   those reasons, the petition was defective.  Section 109 of

19   the Bankruptcy Code talks to the authorization of the state

20   to approve a bankruptcy if filed by a municipality.  In this

21   case, that is not what happened.  It was the state

22   effectively filing the petition and approving the petition

23   being that the emergency financial manager, assuming that we

24   had one, would be an operative of the state and not an

25   operative of the City of Detroit.  Thank you, your Honor.

1          THE COURT:  Is the contract on which you rely in the

2     record of the case?

3          MS. CRITTENDON:  I don't believe it is.  I do have a

4     copy of the contract with me if the Court would like to see

5     it.  I'm assuming that one of the parties --

6          THE COURT:  If you'd like me to consider it, you

7     should --

8          MS. CRITTENDON:  I will file it.

9          THE COURT:  -- file it.

10         MS. CRITTENDON:  I will, and I will file a brief

11    that memorializes everything that was said today.

12         THE COURT:  All right.

13         MS. CRITTENDON:  Thank you, your Honor.

14         MR. MORRIS:  Good morning, your Honor.  Thomas

15    Morris on behalf of the Retiree Association parties.  The

16    Retiree Association parties who I represent include two

17    individuals.  There was some discussion about the committee's

18    standing to raise certain objections.  The committee argued

19    those objections very ably.  We concur in those objections,

20    and that includes the concurrence of those individuals.  We

21    trust that would take care of any standing issue if there

22    were one.  And the comments that preceded us -- preceded me

23    were very ably made, so I'm just going to address a very few

24    points.

25              One is a point the Court -- a question the Court had

1    raised about the "thereby" language in the pensions clause.
2    It's important for the Court to note that it's the city that
3    files any plan, the city that proposes any plan, negotiates
4    any plan.  Chapter 9 precludes the Court from appointing a
5    trustee, from converting the case, from interfering with the
6    city's ability to manage its fiscal affairs.  A case cannot
7    be filed involuntarily under Chapter 9.  As the Bekins court
8    said, quoting from the legislative history on page 51, "The
9    taxing agency itself is the only instrumentality which can
10   seek the benefits of the proposed legislation."  We think
11   it's clear that any action to impair the pensions by the city
12   would, first of all, be improper, but, second of all, it
13   would be the city's action.
14           Now, the city has taken the position that somehow
15   the pensions clause of the Michigan Constitution is
16   preempted, and we disagree with that, but the city can't have
17   it both ways.  They have a theory -- they've made a number of
18   multiple arguments, but they have a theory that once they got
19   into Bankruptcy Court -- or if they get -- are found
20   eligible, then the pensions clause is off.  Well, if that's
21   the case -- and it's not the case, but if that were the case,
22   then it would be the action of the authorization of the
23   filing and the action of the city in filing the case which
24   would be impairing the pensions.  What happens if the city is
25   found ineligible?

1       THE COURT:  Well, but that's true only if as part of

2  eligibility the Court ruled on the issue of pension rights

3  and ruled in the city's favor.

4       MR. MORRIS:  This ties in with arguments that were

5  made by other counsel, and if Public Act 436 enables the city

6  to impair the pensions, then Public Act 436 in that respect

7  is unconstitutional.  It's inconsistent with the pensions

8  clause.  Of course, the pensions clause is part of the

9  Michigan Constitution, the supreme law of our state, and the

10  Public Act 436 must comply with it.  Public Act 436, in fact,

11  gives recognition to the pension clause and acknowledges it,

12  and it even authorizes the governor to make compliance with

13  the pension clause a precondition.  However, that didn't

14  happen in this case, and that's one of the -- one of the

15  issues that has been raised by other counsel.

16       Your Honor, if the city is found to be ineligible,

17  from the standpoint of the retirees, the city will have to

18  make a choice.  It can choose to comply with the pensions

19  clause and not impair pensions, just say we're going to

20  comply with the Michigan Constitution, or it can negotiate

21  with the retirees through their associations.  That process

22  was shortcut here, and that will be one of the factual issues

23  we've raised.

24       Now, if the city goes forward with a plan that does

25  not impair pensions, one of the Court -- one of the questions

1  the Court had was what happens then, what happens if the city

2  just doesn't have the money.  Well, there's an issue of

3  whether the state is liable.  There's the potential issue.

4  But those are all issues apart from -- they're nonlegal

5  issues.  The most the retirees can ask for is that the city

6  doesn't impair the pensions.  The ultimate solution for the

7  retirees comes elsewhere.  Will the city have -- will the

8  state have to step in to help the city?  Will the city have

9  to do other things to raise money?  I don't know, but those

10  are beyond our legal issues.

11         Your Honor, the city holds the key on this issue of

12  eligibility.  It can agree to comply with the Michigan

13  Constitution or it can negotiate with the retirees and reach

14  a resolution.  The proper outcome here is for the city to go

15  back -- as Section 109 intends, go back and either not impair

16  the pensions, which is our preference, or negotiate with the

17  retirees.  Thank you.

18         THE COURT:  Thank you.

19         MS. FLUKER:  Good morning, your Honor.  Vanessa

20  Fluker on behalf of Center for Community Justice and

21  Advocacy.

22         THE COURT:  Would you repeat your name for me,

23  please?

24         MS. FLUKER:  Vanessa Fluker.

25         THE COURT:  Okay.  Thank you.

1    MS. FLUKER:  F-l-u-k-e-r.  Your Honor, the issue I'm

2  raising today before this Court with respect to eligibility

3  is a failure of the emergency manager to comply with the

4  statutory mandates under PA 436, Section 16, which is

5  actually Section 1556.  That section specifically mandates,

6  and I quote, "an emergency manager shall," not "may," not

7  "might, "shall, on his own -- his or her own or upon the

8  advice of the local inspector if a local inspector has been

9  retained, make a determination as to whether possible

10  criminal conduct contributed to the financial situation

11  resulting in the local government's receivership status.  If

12  the emergency manager determines that there is a reason to

13  believe criminal conduct has occurred, the manager shall

14  refer the matter to the attorney general or local prosecuting

15  attorney for investigation."  There has been some extensive

16  arguments about the tenets of statutory construction, so I

17  won't go through Pohutski step by step, but we're all aware

18  that you must adhere to the plain unambiguous language of the

19  statute.

20    In this particular instance, two of the city's

21  largest creditors, UBS and Bank of America, have been found

22  convicted -- criminally convicted in UBS's case of criminal

23  conduct involving municipal bonds.  In fact, the SEC fined

24  UBS $47,207,180 in Case Number 11-2539, U.S. District Court,

25  New Jersey.  Three UBS executives were indicted and convicted

of fraud related to municipal bond rigging, and that was in
New York, Southern Division, Case Number 10-1217.  A Bank of
America executive was indicted July 19th, 2012, for bid
rigging of fraud municipal bonds.  And what's so significant
about this, in the criminal conviction with the SEC case, the
civil penancy case, it involved a Detroit bond.  This
provision cannot be ignored, and the mere fact that it's
mandatory because it indicates "shall" is very significant.
In fact, it is common knowledge at this point that the
emergency manager had knowledge of this information and did
not act on it.  In his deposition on August 30th, 2013, he
was specifically asked on these issues,

     "Are you aware of issues that have come out with
     regard to the LIBOR specifically with UBS and Bank
     of America in the setting of using the LIBOR as a
     standard?

     Answer:  I am aware.

     Question:  Are you aware that UBS has been sued
     by the Securities and Exchange Commission for
     rigging in regard to municipal bonds?

     In past years?

     There was a final judgment -- yes, in past
     years.

     Answer:  Yes.  I've heard that.  I have not read
     the final judgment.

1        Question:  Are you aware that Bank of America

2        has been investigated for potential bond rigging

3        with regard to the municipal bond market?

4        Answer:  I am aware that Bank of America has

5        been investigated.  The exact specifics of the

6        investigation I am not aware of."

7     This clearly shows that there is not just a

8   noncompliance with 1556, there's a knowing noncompliance with

9   1556.  There should have been a criminal investigation, which

10  is mandated by the statute, and, in essence, is necessary to

11  even get to the point of making a recommendation for a

12  bankruptcy.  How can you say that we need bankruptcy when you

13  don't know whether there is going to be fraud determined and

14  there may be funds that may be necessary to be paid back to

15  the city that can offset any debt, which also goes to the

16  issue of how are you saying that you're eligible for

17  bankruptcy when you really don't know what the debt is based

18  on the potentiality of fraud in these municipal bond

19  transactions, who are also standing --

20        THE COURT:  Are you saying that the emergency

21  manager, whose term in office is limited by law, was required

22  to await what could be years of litigation to determine these

23  issues and UBS's liability before filing bankruptcy?

24        MS. FLUKER:  I don't think he had to determine years

25  of litigation, but I think that it would be very evident that

1  you would look at least at the debt that you're alleging that

2  the city owes, and if there is common knowledge of such

3  information, which this is -- this is not something that you

4  have to wait years in litigation.  This has been all over the

5  news, the Internet, and everything else.  And as he admitted

6  in his deposition, he was aware of it, and that being the

7  case, that actually heightens the duty, in addition to the

8  mandatory language of Section 1556, which says "shall."

9           THE COURT:  Shall do what?

10          MS. FLUKER:  The statute specifically says the

11  emergency manager shall, on his or her own or upon the advice

12  of a local inspector, make a determination -- there had to be

13  a determination made -- whether there was criminal conduct

14  that affected the financial situation of the city.  Even if

15  he didn't know all this, say for some reason this

16  information -- I see my time is up.  I'll just complete this

17  sentence.  Say this information he had no knowledge of.

18  There was -- we just don't know about it.  He still had a

19  duty to make a determination.  Well, in my estimation,

20  there's been no criminal conduct that contributed to the

21  financial situation of the city.  This provision was not

22  complied with at all, and you cannot try to exercise one part

23  of the statute by totally ignoring and having noncompliance

24  with another.  Therefore, I would request that this Honorable

25  Court deny eligibility for the reasons set forth by all the

1  objectors.

2         THE COURT:  Thank you.

3         MS. FLUKER:  Thank you.

4         THE COURT:  Mr. Gordon, may I have your attention,

5  please?

6         MR. GORDON:  Yes, your Honor.

7         THE COURT:  Are you up next?

8         MR. GORDON:  I am.

9         THE COURT:  Okay.  Do you want to give part of your

10  argument now, or do you want to take a lunch break now and

11  then do your entire argument after lunch?  I leave it to you.

12         MR. GORDON:  If it's okay with the Court, I would

13  prefer the latter, to just start after lunch.

14         THE COURT:  Okay.  All right.  We will take our

15  lunch break now, and we will reconvene in an hour and a half,

16  so that'll be 1:20, please.  Twenty after one we'll

17  reconvene.

18         MR. GORDON:  Thank you, your Honor.

19         THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:48 a.m., until 1:20 p.m.)

21         THE CLERK:  Court is in session.  Please be seated.

22  Recalling Case Number 13-53846, City of Detroit, Michigan.

23         THE COURT:  Good afternoon, everyone.  It looks like

24  everybody is here.  Actually, Mr. Gordon, with your

25  permission, before I hear from you, I have a follow-up

1  question for one of your colleagues.

2        MR. GORDON:  By all means, your Honor.

3        THE COURT:  Ms. Brimer, would you resume the

4  lectern, please?

5        MS. BRIMER:  Should I bring something with me, your

6  Honor?

7        THE COURT:  Possibly.

8        MS. BRIMER:  I didn't know I was going to the

9  principal's office.

10       THE COURT:  No, no, no.  It's nothing like that.

11 You argued that the enactment of PA 436 violated the people's

12 referendum rights because PA 436 was so similar to PA 4.

13       MS. BRIMER:  Yes, your Honor.

14       THE COURT:  That was your argument.  Was there a

15 statutory basis for that argument, or was it just based on

16 the people's right of referendum?

17       MS. BRIMER:  It's based on the constitutional right

18 of referendum, your Honor.

19       THE COURT:  Okay.  So there's not a statute we

20 should be looking for on that.

21       MS. BRIMER:  Not that I'm aware of, your Honor.

22       THE COURT:  All right.  That was it.

23       MS. BRIMER:  Thank you, your Honor.

24       THE COURT:  That was it.  Okay.  Mr. Gordon.

25       MR. GORDON:  Thank you, your Honor.  Just to give

1    your Honor a little bit of a road map of the things that I

2    want to touch upon, if that's of help, I thought I would

3    touch upon some of the issues regarding the state law

4    consent, some of the issues that have been raised this

5    morning, then move on to a discussion of some other

6    considerations relevant to the difference between the

7    pensions clause and the contract clause, and then address the

8    issue of what would happen if the Court ruled in our favor

9    that the accrued pension benefits cannot be impaired and what

10   that means for the restructuring, and I think I can add some

11   important information there.  And then finally, if there's

12   still time, I would touch upon the collateral estoppel

13   Webster issue, which is in our papers.

14          So, your Honor, we will start with the consent

15   issues under 109(c)(2), and to be clear, in our papers, while

16   we talk -- touch upon the possibility of PA 436 being

17   unconstitutional as applied, the thrust of our papers is that

18   PA 436 needs to be read and can be read in a way that's

19   consistent with the pensions clause and so forth so that

20   there's no need to get to issues of constitutionality.

21   109(c)(2) clearly is an issue that is an issue purely of

22   state law.  It is a threshold issue.  It is an eligibility

23   issue, and we want to emphasize that it stands on its own,

24   and it can't be conflated with plan confirmation issues.

25          THE COURT:  And with apologies, I have to stop you

1    there with this question.  There seems to be a general thread

2    of assumption that whether a state has given authorization

3    under 109(c)(2) is a question of state law, as you just said.

4    I have to say that's not altogether clear to me.  It seems to

5    me there might very well be an argument that the standard as

6    to whether the state has given proper authorization is a

7    federal standard, not a state standard.  Why?  Because in

8    addressing cases in the amendment right next door to Article

9    X -- that is, Article XI -- sorry -- Amendment XI, the 11th

10   Amendment, when we talk about sovereign immunity, the issue

11   of whether a state has given its consent or its waiver of

12   sovereign immunity is a question to be determined by federal

13   law, not state law.

14        MR. GORDON:  Your Honor, in that regard, I think

15   that the Tenth Amendment is different, and it looks first to

16   respect the contours of what is reserved to the states in the

17   first instance, so here I think you have to start with

18   whether there is valid -- I think, at a minimum, the question

19   is is there valid state authorization for submitting a

20   political subdivision of the state to the jurisdiction of the

21   federal government and the federal courts.  I would at least

22   put it that way.  And so that does turn on state law, and we

23   would submit that all portions of state law need to be looked

24   to and harmonized in that regard, and that's sort of the

25   holding of Harrisburg, which we submit is instructive here

1    and which has not been really in any way refuted by the city.

2    And even the United States Attorney has stated that Congress

3    reserved to the state the right to regulate, and I quote,

4    "under what terms," end quote, its political subdivisions may

5    avail themselves of Chapter 9, so it really is a matter, I

6    believe, of state sovereignty, and it's up to the state to

7    determine how and when a political subdivision can avail

8    itself, and how it does that is in part expressed by the will

9    of the people, as embodied in the pension clause, and it

10   needs to be respected.

11        The response of the city and the state is on two

12   levels.  One, first of all, it is asserted that the actions

13   of the governor in authorizing do not conflict with the

14   pensions clause because the authorization itself didn't

15   create any impairment and that it's unclear whether the city

16   will ultimately seek to impair, and if such impairment

17   occurs, it won't be the city or the state that has done it.

18   It'll be the Bankruptcy Court.  Respectfully, we say that

19   those arguments are all unavailing.  First of all, one of the

20   things that I think has not been made clear this morning is

21   some of the things that have come out in discovery.  I don't

22   actually think these things are relevant, but I'll get to why

23   I think they're not relevant in a minute, but I think it's

24   important for the Court to know that in discovery propounded

25   by the Retirement Systems or conducted by the Retirement

1  Systems, the city has admitted that it was an explicit intent

2  in the restructuring plan proposed in June and in the

3  bankruptcy recommendation letter submitted on July 16th by

4  Mr. Orr that accrued pension benefits needed to be impaired.

5  The city has also admitted in admissions that its intent in

6  the Chapter 9 case is to impair and diminish accrued pension

7  benefits, so there is absolutely nothing speculative about

8  that.  The governor has also testified that he was aware that

9  accrued pension benefits may be impaired.  He also testified

10 that he understood that he could put conditions on the

11 consent and authorization and that he chose not to.  Mr. Orr

12 also testified that he could not guarantee that if a

13 consensual plan couldn't be achieved, that he would not

14 resort to cramdown provisions in order to cram down upon the

15 retirees.  So there really is nothing speculative here, and

16 for anyone to say that it is speculative is really -- I mean

17 it just is not -- it's just not factual.

18          THE COURT:  Well, but what would be the --

19          MR. GORDON:  The other thing is that --

20          THE COURT:  What would be the impact on that

21 argument if the state, under this Constitution, does have a

22 legal constitutional obligation to guarantee the pension

23 payments, an issue not yet determined?  And I don't mean to

24 suggest the outcome of that by raising this possibility.

25          MR. GORDON:  Your Honor, I mean if the -- the

1  problem is that today is the day for eligibility, and we

2  don't know that today.  If the state came forward today and

3  said that they would backstop, you know, the full accrued

4  pension benefits, that might be a different situation, but it

5  not being here today, that isn't --

6          THE COURT:  And you're not prepared to say here

7  today that you're not going to request that conclusion, are

8  you?

9          MR. GORDON:  No.  I will not say that, but that's --

10         THE COURT:  That would not be in your client's best

11  interest.

12         MR. GORDON:  Of course not.  Of course not, but that

13  has not been determined today.  The state is not coming

14  forward today.  And eligibility goes to whether this Court

15  even has jurisdiction, and what the city is asking is for the

16  Court to essentially suspend the issue of whether it even has

17  jurisdiction in order to get everybody together, and really

18  you're putting the will of the people and the protections of

19  the Michigan Constitution in jeopardy or being held in the

20  hold while the city wants to move forward with its proposals

21  and bring people to the table, and I would submit that that's

22  inappropriate.  This is an eligibility hearing, and the

23  governor's responsibility is an affirmative responsibility to

24  uphold the Constitution.  To suggest that we don't know

25  what's going to happen down the road reduces his obligation

 1   to sort of a wink and nod type of standard, and we submit
 2   that that is just inappropriate.  He is to uphold the
 3   people's will.
 4          THE COURT:  Well, he's to uphold the law.
 5          MR. GORDON:  The other thing is, your Honor, that to
 6   say that someone other than the state or the emergency
 7   manager would be the one impairing the benefits is just not
 8   correct.  As the Court well knows, the city is the one that
 9   would have to propose the plan.  The Court would not propose
10   the plan.  Essentially what is happening here would be that
11   the governor, through the authorization, is delegating
12   authority that he does not have.  He does not have the
13   authority to abrogate the state Constitution.  By authorizing
14   the emergency manager to pursue the bankruptcy -- again,
15   we're at the eligibility stage -- he cannot give authority to
16   the emergency manager that he does not have, so the question
17   becomes --
18          THE COURT:  The argument is he doesn't have the
19   authority to impair the pensions.
20          MR. GORDON:  That's correct.  If he wanted to do
21   that, he'd have to go get a constitutional amendment.
22          THE COURT:  And -- okay.
23          MR. GORDON:  So he does not have the authority to
24   delegate or to bestow upon anybody else the ability to
25   impair, so the question really is why wouldn't we put a

1    condition today saying that you can move forward in the

2    Chapter 9, but you can't impair the accrued pension benefits?

3    That to us complies with the requirements of the state

4    structure, and there has absolutely been no explanation of

5    why that wouldn't be done today.  We think that's the real

6    question is why wouldn't you -- why wouldn't the governor put

7    that condition in or why can't the Court imply that as a

8    matter of law?

9         If I may, your Honor, I'd like to move on to the

10   pensions versus contracts issue.

11        THE COURT:  Well, hold on one second.  The Sixth

12   Circuit has actually addressed -- I know you're concerned

13   about time --

14        MR. GORDON:  Okay.

15        THE COURT:  -- the issue of how to determine

16   eligibility in bankruptcy, now not in Chapter 9, but it did

17   so in Chapter 13 because there is a factual eligibility issue

18   there, has to do with debt limits, and there are times when

19   creditors say that the debtor's debts are above the debt

20   limits, and, therefore, the debtor is not eligible, so the

21   Sixth Circuit -- the case is Pearson if you're familiar with

22   it.  It says -- it recognizes that at the eligibility stage

23   of a bankruptcy, you don't want to go through the process of

24   fixing claims, but there is this law that sets debt limits,

25   so we have to give it some respect.  So the solution it came

1   up with in that context was we're just going to look at

2   whether the debtor in good faith asserts that its debts are

3   below the debt limit.  And for those of you who want it, it's

4   773 F.2d 751, 773 F.2d 751, a 1985 case from the Sixth

5   Circuit.  Pearson is P-e-a-r-s-o-n.  Why not apply a similar

6   standard to eligibility here?

7         MR. GORDON:  Because there's no good faith issue

8   here.  The question is very simple and can be solved today.

9   Are you going to impair pension -- accrued pension

10  obligations?  You can't.  The law says so.  So put the

11  condition on it today, and we move forward.

12        THE COURT:  So your assertion is that it wouldn't

13  even be a good faith argument by the city.

14        MR. GORDON:  Doesn't matter what their intention

15  actually is.  The condition should be applied today because

16  that is how -- that is the only way a --

17        THE COURT:  It wouldn't be a good faith --

18        MR. GORDON:  -- political subdivision can avail

19  itself --

20        THE COURT:  It wouldn't be a good faith argument for

21  the city to assert that although the Michigan Constitution

22  prohibits it from impairing pensions, it does not prohibit

23  the Bankruptcy Court from impairing pensions.  That would not

24  be a good faith argument?

25        MR. GORDON:  No, your Honor.  I think that that's

1   something that can and should be dealt with today.  Let me

2   give an example.  What if the only debts of the city today --

3   as we stand here today were pension obligations?  Would you

4   say then we should wait and see what happens?  We know what

5   would happen.  Is it any different because there's other

6   creditors in the room?

7            THE COURT:  Well, do we know --

8            MR. GORDON:  I haven't --

9            THE COURT:  Do we know -- do we know what would

10  happen?  Do we know, for example, that there would be no

11  agreed upon negotiation?  Do we know, for example, that the

12  state won't fill in the gap?

13           MR. GORDON:  Well, let's -- I can talk about that.

14           THE COURT:  Now would be the time.

15           MR. GORDON:  If you want to talk about that, I'll

16  skip to that.  I'll skip to that since that seems to be

17  something that is troubling your Honor or at least on your

18  mind.  We have emphasized --

19           THE COURT:  A question.

20           MR. GORDON:  We have emphasized that the Retirement

21  Systems aren't saying the city can't proceed with a Chapter 9

22  case.  It simply must condition the case upon the

23  preservation of the pensions clause.  And certainly in some

24  people's minds this begs the question of whether in the event

25  the Court agreed and ruled that accrued pension benefits may

1    not be impaired, could the city still effectively reorganize

2    and restore itself to financial health through a bankruptcy,

3    and while we've indicated that there is still information

4    that we need -- and it's material information -- we continue

5    to do so -- I believe I can stand here today and say that

6    based upon the information that we do have, it is clear that

7    the city can effectively reorganize even if accrued pension

8    benefits cannot be impaired.

9        Just some thoughts and facts for your Honor.  The

10   city talks about $18 billion in debt, but $6 billion of that

11   $18 billion is special revenues that are supported by the

12   Detroit Water and Sewer System, so now you really have $12

13   billion of debt that needs to be supported by the general

14   fund and other cash flows from the enterprise funds and so

15   forth.  Of that $12 billion of debt, roughly half, six

16   billion, is OPEB healthcare actuarially calculated.  Another

17   two billion is unsecured bond debt.  So fully two-thirds of

18   the $12 billion of debt is very much subject to restructuring

19   and compromise in bankruptcy.  Those are unsecured claims.

20   That's two-thirds of the $12 billion of debt right there.  So

21   there's a tremendous opportunity to unburden the city of the

22   debt obligations -- of these debt obligations and the demands

23   on its cash flow.

24       In addition, although not critical to this position,

25   above the line in the emergency manager's restructuring plan

1    proposed in June is the swap periodic payment, which is

2    soaking up $50 million a year in casino tax revenues.  And as

3    the Court knows -- and, again, I'm not going to argue it

4    here, but, as the Court knows, the Retirement Systems have

5    objected to the treatment of the swaps as secured in those

6    revenues both because the lien is not valid and, even if

7    valid, it does not reach the post-petition revenues.  Also --

8    and if it was determined to be an unsecured claim, then you

9    have a $300 million claim now that is given unsecured status

10   and can also be a compromise in the bankruptcy.

11        Also, it should be kept in mind that we're talking

12   about accrued benefits that need to not be impaired.  There

13   are obviously prospective benefits that could be impaired, so

14   there are a number of different ways that the city can

15   achieve real relief from its debts.  Obviously it spreads the

16   pain in different directions, but we've -- but by looking at

17   it, your Honor, there is absolutely an opportunity to do

18   something.  And when they --

19        THE COURT:  Isn't there also a question of fact as

20   to what the underfunded liability is for pensions?

21        MR. GORDON:  And let me get to that.  It's also

22   critical for the Court to understand that if the Court ruled

23   in our favor and said that there cannot be an impairment of

24   the accrued benefits, that does not mean the Retirement

25   Systems walk away from the table.  The Retirement Systems has

1   said that they are committed to working with the city to be
2   part of the solution here.  That means a number of things.
3   The city has indicated that it needs to devote significant
4   cash flows in the next five years, according to the proposal
5   in June, $1.25 billion in the next five years for
6   reinvestment in the city.  The Retirement Systems don't
7   object to the concept and understand that the city needs to
8   reinvest, but after that five years, that reinvestment is
9   done.  The cash flows of the city become much larger again,
10  and they will improve at five years and the next five years
11  and the next five years.  And the Retirement Systems can be
12  flexible because the Retirement Systems issues, the pension
13  issues, are long-term issues.  They're not short-term issues.
14  So if there are cash flow issues, the Retirement Systems can
15  work with that.  The $3-1/2 billion number that's been thrown
16  out there is not an amount that is due today if the pension
17  systems are not frozen and closed.  That is an actuarial
18  calculation of what will be due over the next 30 years to
19  bring the funding level up to what it needs to be.  That's
20  not the amount that is due on a cash flow basis tomorrow or
21  the next day, so there is flexibility there.

22          Also, it should be understood that over time if the
23  economy improves or interest rates rise, and/or, the
24  underfunding level may go up or down, so there's a lot of
25  things in play there, and when you take that all together,

1  we --

2        THE COURT:  And I certainly appreciate and commend

3  your clients' willingness to work with the city, but

4  prudentially from the standpoint of ripeness apart from

5  constitutional issues, doesn't that suggest putting off until

6  plan confirmation the issue of the constitutional right?

7        MR. GORDON:  Your Honor, again, I would submit that

8  that is conflating eligibility, which is one question, with

9  what can be done under a plan.  If this Court does not have

10  jurisdiction because the authorization was not appropriate,

11  if you're putting -- what you're suggesting -- or the city is

12  suggesting is you're putting the uncertainty -- you're

13  putting at risk a state protected benefit in order to

14  leverage people to get in a room and negotiate.  And I

15  suggest, as a matter of jurisprudence, that is inappropriate.

16        I wanted to also mention, your Honor, other benefits

17  of a ruling in favor of the concept that the pension benefits

18  cannot be impaired.  It, in fact, would help the city in its

19  restructuring in other ways.  Absent a ruling on this issue

20  in favor of the nonimpairment of pension benefits, the

21  parties will struggle to negotiate in the shadows of this

22  unresolved issue.  What will happen is that the parties will

23  have to negotiate on a dual path against the backdrop of

24  still having these arguments under the pensions clause, under

25  Section 943, and so forth that are all or nothing arguments

 1  that would -- if ruled on in a certain way, would come to the
 2  conclusion that you can't impair us at all.  So it makes the
 3  negotiations very difficult, and it also obviously -- as long
 4  as that matter is not resolved or if it's not resolved in
 5  favor of the pension systems, it becomes -- it makes the case
 6  much more litigious and encumbers the entire process.  If the
 7  Court rules in our favor -- and, again, these are just, you
 8  know, some additional thoughts for the Court because I
 9  understand the struggle.  If the Court rules in our favor,
10  there will be less moving parts for the city to deal with and
11  for the parties to deal with, and it makes the negotiation
12  process much more streamlined.  And if at some point in time
13  that decision were reversed and there was a decision that
14  said that the pension clause can be abrogated or impaired in
15  some fashion, having to revise the negotiations at that point
16  and spread the pain around a different way is a lot easier
17  than starting from the other end.  If you start from the end
18  that we're at now, it's very hard, again, for the parties to
19  negotiate.  And if the -- and if it's determined ultimately
20  that you can't abrogate the pension clause, then you're
21  really going back to square one, and we've lost a ton of time
22  in the negotiation process.  We submit that it's much easier
23  to negotiate against a backdrop that says that the pension
24  clause must be upheld.
25          Moreover, a ruling in our favor in that regard helps

1    the city in other ways.  It calms the workforce knowing the

2    accrued and prospective accrued pension benefits will be

3    protected.  This will enable the city to retain its most

4    talented personnel.  In addition, the ultimate commitment of

5    funds to the Retirement Systems as opposed to financial

6    creditors benefits the city because the systems will also

7    invest in the city, as they always have done.  And a majority

8    of the pensioners live within the city and pay taxes and

9    consume goods and services in the city, so the Retirement

10    Systems are an economic engine that really is part of the

11    solution for the city, so I want to address all those.

12          THE COURT:  Well, but so were the bondholders and

13    the bond investors.

14          MR. GORDON:  They don't live in the city, and they

15    aren't putting money back into the city, your Honor.  They

16    are not part of that economic engine, and if they get paid

17    their debt service, there's no --

18          THE COURT:  Hang on.

19          MR. GORDON:  -- guarantee that they're going to

20    reinvest in the city.

21          THE COURT:  Didn't I read in the newspaper that the

22    city just got $350 million?

23          MR. GORDON:  I'm sorry.

24          THE COURT:  Didn't I just read in the newspaper that

25    the city just got $350 million to help with its reinvestment?

 1          MR. GORDON:  No, your Honor.  What we read was that

 2     there's a proposal to secure unidentified assets at this

 3     point but probably to encumber all sorts of assets of the

 4     city in order to get $350 million of which 200 million would

 5     immediately go out to pay swap participants who don't deserve

 6     to get paid anything as a secured creditor, and then the

 7     other 150 million is going to be used in some ways that's

 8     been unidentified, so basically you're encumbering assets of

 9     the city for purposes that don't benefit the city in any

10     demonstrable way at this time, so I would disagree with that

11     characterization.

12          THE COURT:  Okay.

13          MR. GORDON:  So, your Honor, for all those reasons,

14     I think that if the Court were to rule, again, as a pragmatic

15     matter, in favor of finding that this case should not move

16     forward without the condition that there cannot be an

17     impairment and that the pension clause must be upheld, it

18     does not mean this case comes to an end by a long -- quite

19     the opposite.  In our opinion, it makes this case much more

20     manageable.  It makes the negotiations easier.  And it, in

21     our minds, provides a much clearer path to a consensual

22     resolution.

23          THE COURT:  So you think I can find them eligible

24     and find that pensions can't be impaired?  How do I do that

25     because the issue is yes or no, the city is eligible.

1          MR. GORDON:  That's correct, your Honor.  You would

2     have to -- it would be up to the city to either -- and the

3     state to either agree to -- well, there's a couple different

4     ways.

5          THE COURT:  This is the refiling scenario?

6          MR. GORDON:  You could either -- you could either

7     rule that the obligation to uphold the pension clause is

8     implied by law because otherwise you don't have valid

9     authorization, there isn't valid state authorization, or you

10    can provide the option to the state and the city to

11    explicitly confirm that process.

12         THE COURT:  Oh, I see.  So you're saying I can read

13    into the authorization the nonimpairment of pensions even

14    though the governor explicitly rejected that.

15         MR. GORDON:  The governor actually didn't.  The

16    governor testified that he didn't know whether he had to

17    uphold that, and he decided to choose not to put the

18    condition on it and leave it to the courts, which we suggest

19    is not necessarily appropriate but is --

20         THE COURT:  So he rejected the concept of

21    conditioning his authorization on nonimpairment of pensions.

22         MR. GORDON:  He did, but he also said he was

23    basically deferring to the courts as to how that should play

24    out, which is ironic because the Webster court has already

25    ruled on that issue.

1    Your Honor, I'll turn to the pensions clause, which

2   is the contracts clause, if I may.

3         THE COURT:  Sure.

4         MR. GORDON:  The concept that the pensions clause is

5   the same thing as the contracts clause just applying to

6   pensions does violence to the language of the pensions

7   clause, as has already been discussed.

8         THE COURT:  Right.

9         MR. GORDON:  I won't get into that.  Obviously we've

10  pointed out that the pensions clause is more specific and

11  that it was enacted long after the contracts clause and that

12  those things together, as a matter of the canons of

13  construction, would indicate that the pension clause must

14  mean something more and something different from the

15  contracts clause.

16        THE COURT:  Right.  So what more and what different?

17        MR. GORDON:  Well, it starts with looking at why and

18  the environment in which these things were done and looking

19  at the actual language of the two clauses.  The contracts

20  clause was adopted back when the government was being formed,

21  and it helps sort of support the structure of the government

22  as it's being developed in terms of federalism and making

23  sure that states don't impair their -- pass laws that impair

24  their own contracts or pass laws that favor their citizens

25  over other citizens.  That was the general nature of it.  And

1    it's directed, you'll note, to the legislature of the state.

2    The state shall not pass laws that will impair contracts.  So

3    that's the contracts clause.  Now you fast forward --

4              THE COURT:  That's the federal contracts clause.

5              MR. GORDON:  And the state, as well as the state

6    contracts clause.  So then you fast forward -- I don't know

7    how long -- 150 years to 1963, and you're talking about the

8    constitutional convention and the pensions clause, and what's

9    going on at that point in time?  Well, pensions are not being

10   funded.  They're underfunded across the state I'm told to the

11   tune of maybe $600 million, and guess what?  Front and center

12   is the City of Detroit that was not paying pensions for its

13   teachers' pensions funds.  So the convention decided it

14   needed to do two things.

15             THE COURT:  Well, at that point they were also not

16   being treated as contracts; right?  They were being treated

17   as gifts I think was the phraseology.

18             MR. GORDON:  As gratuities.  That's correct, your

19   Honor.  So the convention decided it needed to do two things.

20   The convention decided, first of all, to avoid municipalities

21   digging a deeper hole, they were going to put a provision in

22   the Constitution that said that local governmental units will

23   fund their current year's employer contributions in that year

24   to help avoid digging a deeper hole.  Secondly, to protect

25   the accrued and unfunded liabilities and to move away from

1  the concept that they are a gratuity, the convention said

2  we're going to call it a contract but not a contract in the

3  sense of a contract but subject to the bankruptcy. I mean

4  there was no -- there was no talk about bankruptcy, nor was

5  there any talk about the contracts clause in this regard.

6  They talked about this is going to be a contract that's in

7  the concept of a solemn binding obligation that will be paid

8  over time, so it is a contract. There's a contractual right,

9  and it shall not be diminished or impaired, meaning it will

10  be paid over time by the state and its political

11  subdivisions. It is absolute. There is no -- there is no --

12  as the attorney general's papers say themselves, there is --

13  it's impermeable unlike the contracts clause, which has

14  developed over time to say otherwise. Now, the difference is

15  in part --

16      THE COURT: But how can the -- how can the state

17  contract -- how can the state promise that given that under

18  the federal Constitution it can't print money?

19      MR. GORDON: It's a matter of insuring that what

20  dollars are available are devoted where they need to be

21  devoted.

22      THE COURT: Suppose there's not enough then.

23      MR. GORDON: I don't know the answer to that

24  question, your Honor, but that's not the issue we have here

25  today. As I've told you, I think that there is enough money

1  here.

2          THE COURT:  It's an important issue.

3          MR. GORDON:  There is -- I'm sorry.

4          THE COURT:  It is an important issue.

5          MR. GORDON:  It's an important issue, but --

6          THE COURT:  It demonstrates that there's a

7  constitutional right there.  It is stated there, but what's

8  it worth?  What's it worth?  I mean Ms. Levine posed that

9  question.  What's it worth if the entity that has the

10 obligation doesn't have the means?

11         MR. GORDON:  First of all, I mean every situation is

12 different.

13         THE COURT:  Yeah.

14         MR. GORDON:  Does it have the means today or will it

15 have the means tomorrow, over time?  Musselman, a state

16 Supreme Court case, says, though, that the pension clause

17 cannot be abrogated in the face of financial exigency.

18 That's what it says.  If there's a need to amend the state

19 Constitution, then it needs to be amended, but it can't be

20 abrogated by one branch of the government.  The will of the

21 people has spoken.  The Constitution is a limit, and it

22 circumscribes the power of the government.  The government

23 can't say, "Gee, we've got an exigency here.  I guess we're

24 going to ignore the state Constitution."  It cannot do that.

25 The contracts clause is different, and this is the point --

1   part of the point is there are contracts and then there are

2   contracts.

3           THE COURT:  Is there any other constitutional right,

4   state or federal, that is that absolute, any other?

5           MR. GORDON:  Sure.

6           THE COURT:  And even freedom of the press has its

7   exceptions.

8           MR. GORDON:  Well, you know, if you look at even the

9   attorney general's papers, you couldn't -- the legislature

10  can't pass laws that would abrogate freedom of religion,

11  freedom of speech, things of that nature, and it puts the

12  pension clause on the same level.  It is absolute in that

13  regard.  There are contracts, and there are --

14          THE COURT:  We have laws that limit speech.  Can't

15  threaten the President; can't yell "fire" in a crowded

16  theater.  You can't commit libel.

17          MR. GORDON:  So that maybe there's some regulation

18  on the federal level, but this is a state issue.  It is an

19  issue that has been -- it is the will of the people of the

20  state.

21          THE COURT:  Even the contracts clause has its

22  limits; right?

23          MR. GORDON:  Contracts clause does.  The reason is

24  different, though.  There are contracts, and then there are

25  contracts.  And if you look at, for example, you know, some

1    contracts fall under the contracts clause, but the pensions

2    were determined to be different, and that's why you have a

3    pensions clause.  That's the whole point of it.  The

4    contracts clause recognizes that when you contract with the

5    government, there is an inherent reserve police power to act

6    in the public's welfare, and, therefore, to the extent

7    necessary, in certain situations they can impair contracts.

8    That's the contracts clause.  Then you have the pensions

9    clause.  It doesn't say that it is subject to the contracts

10   clause.  It elevates pensions to a different level, and the

11   reason is fairly clear.  If you look at the Musselman case,

12   in particular, again, Musselman says that Michigan

13   governmental -- and I quote.  This is from 448 Mich. 503

14   where it talks about the pension clause being absolute and

15   that it -- and it recognizes that the pension clause protects

16   pensions for work performed, so I quote, "Michigan

17   governmental units do not have the option, however, of not

18   paying retirement benefits.  Unlike highway construction or

19   police protection, which a governmental unit can choose to

20   receive less of, it is impossible to receive less service

21   from the pensioner.  The pension payment is payment for work

22   already completed, or deferred compensation," end quote.

23   What's being referenced there is the complete difference --

24   the relationship between the public employer and labor is

25   different than the relationship between the public employer

1  and a bondholder.  A bondholder makes an investment.  There's

2  risk involved.  That is understood, and that risk is factored

3  into the pricing of the bond.  A laborer has -- the

4  relationship with the employer is different.  The laborer

5  works.  The employer pays.  And to the extent that part of it

6  is deferred compensation in the form of a pension, so be it,

7  but it's for -- but what the pension clause protects is

8  accrued benefits.

9         THE COURT:  Isn't there an argument that labor takes

10 risks with its employer, too?

11         MR. GORDON:  Not in the State of Michigan, your

12 Honor, and I want to emphasize that.  Michigan is only one of

13 seven or eight states in the country that has this clause.

14 This is unique to Michigan and the seven or eight other

15 states involved.

16         THE COURT:  Excuse me one second.  I want you to

17 ignore --

18         MR. GORDON:  Oh.

19         THE COURT:  No.  I want you to ignore that yellow.

20 My staff advises me that Ms. Levine didn't use seven of her

21 minutes, so I'm going to yield them to you.

22         MR. GORDON:  Thanks, Sharon.

23         THE COURT:  So reset the clock at ten.  I assume

24 that's okay with you.

25         MR. GORDON:  Yes, absolutely, your Honor.  I can't

1    even remember where we were now.  Where were we?

2           THE COURT:  Oh, I'm sorry.  I interrupted your train

3    of thought.  Well, take another minute to recollect --

4           MR. GORDON:  Oh, yes.  I think I finished that

5    point, I suppose.  It really is that, you know, some contract

6    rights are just contract rights, and other contract rights do

7    rise to the level of property rights, and that's in the

8    United States Trust Company of New York versus New Jersey,

9    the Supreme Court case, 431 U.S. 1.  In Michigan AFT Michigan

10   versus Michigan, 297 Mich. App. 597, the Court held that

11   withheld salary of public school employees constituted the

12   taking of property in violation of substantive due process

13   and the takings clause, so there are relationships,

14   contractual relationships relative to accrued benefits for

15   labor, pension obligations, that are treated as property.

16          THE COURT:  Is there a State of Michigan case that

17   holds that pension rights are property rights?

18          MR. GORDON:  Well, this relates to salary of public

19   school employees.  I don't know --

20          THE COURT:  Right.  So I was asking you about

21   pensions.

22          MR. GORDON:  About pension obligations specifically?

23   I would have to check on that, your Honor, but I believe that

24   there are pension cases in the state that talk about pension

25   rights as property, including in such a situation, as you can

1  imagine, as divorce settlements.  There are pension

2  obligations that become property that get part of a property

3  settlement even, but that's just one example, but I can get

4  you --

5       THE COURT:  Well, we have to be careful here because

6  a contract right is in the bundle of property rights.  Every

7  contract is property of the parties to the contract; right?

8       MR. GORDON:  Yes, your Honor.  I'm not sure that all

9  contract rights rise to the level if they're abrogated of a

10  taking, but here vis-a-vis the pension --

11       THE COURT:  Right.  That's exactly the point.

12       MR. GORDON:  That's right, but the pension clause --

13       THE COURT:  So when the federal, you know,

14  Bankruptcy Court discharges creditors' contract rights

15  against debtors, which we do all day every day, we're not

16  taking the creditors' property rights even though we are

17  discharging those contracts or if we are it's not a Fifth

18  Amendment violation; right?

19       MR. GORDON:  True.  By the same token, there are

20  other property rights that are determined under state law

21  that -- cases such as Butner and Travelers respect the state

22  law property interest, and it flows through the bankruptcy.

23       THE COURT:  Right, but the point is that it has to

24  be a property right under state law over and above what would

25  be the contract right, like, for example, a security

1    interest.

2           MR. GORDON:  Or a state constitutionally protected

3    right that is impermeable we would submit, your Honor.

4           THE COURT:  Okay.

5           MR. GORDON:  It's like a nondischargeable debt, your

6    Honor, and it doesn't mean that it can't be dealt with in a

7    way that doesn't impair it but gets dealt with in a way that

8    is -- you know, provides some flexibility for the

9    reorganizing entity, but it's a nondischargeable debt.

10          THE COURT:  Well, nothing in Chapter 9 provides for

11   any nondischargeable debts, is there?

12          MR. GORDON:  I'm stating it by analogy, your Honor,

13   obviously.

14          THE COURT:  Okay.  All right.

15          MR. GORDON:  By putting the condition on that you

16   can't impair, it becomes a nondischargeable debt essentially,

17   and the state has that authority to place the appropriate

18   conditions on the filing of the bankruptcy to protect the

19   statutory structure.  And it's not just statute.  I mean this

20   is -- the difference here again, this is really unique.  It's

21   not like California or Alabama.

22          THE COURT:  Hypothetically, a state legislature

23   passes a law authorizing municipalities to file Chapter 9 so

24   long as the plan provide -- the municipality's plan provides

25   for a priority of payment, and it turns out that that

1   priority of payment legislatively required by the state

2   legislature is different from the Bankruptcy Code.  Let's

3   assume that.  Would it be your position that no municipality

4   could file Chapter 9 in that case because the state law

5   contravenes the superior -- or the supreme federal law?

6           MR. GORDON:  Well, that's an interesting question

7   because it sounds more like one of those situations where

8   once you're in bankruptcy, you have to accept the structure

9   of the Bankruptcy Code itself, and that highlights --

10          THE COURT:  That's exactly what the city is arguing

11  here.

12          MR. GORDON:  And that highlights the point here that

13  eligibility has to be dealt with at the eligibility stage and

14  that -- and to put off the question of whether you can impair

15  the pension clause leads to those vagaries of questions

16  about, "Well, now we're in bankruptcy.  Does the Bankruptcy

17  Code have vitality and in what regard?"  No.  You don't get

18  to those questions unless you have valid state authorization.

19  You don't have valid state authorization unless you've taken

20  into account what provisions need to be there to protect the

21  state Constitution and other statutes, and that's sort of

22  what Harrisburg talks about.  You may have facial authority

23  under one statute, but you got to look at the other statutes.

24  And in here in this case it's --

25          THE COURT:  So in my hypothetical you would say

1   there's no valid authorization.

2           MR. GORDON:  I would say that the state may be very

3   disappointed if it authorizes and allows the debtor into

4   bankruptcy only to find that the -- that part of the

5   protection goes away.

6           THE COURT:  It's hard for me to be concerned about

7   how the state feels.  Is it your position that there would be

8   no authorization, no proper authorization in that case?

9           MR. GORDON:  Let me understand the hypothetical

10  then.  I know time is short.  The hypothetical is that the

11  state would pass a statute that says that you can file

12  Chapter 9, but the priority of payments is going to be --

13          THE COURT:  But here are the priorities.  Here are

14  the priorities.  You got to pay bonds first, and, you know,

15  you got to pay --

16          MR. GORDON:  Perish the thought.

17          THE COURT:  Sorry?

18          MR. GORDON:  Perish the thought, but go ahead.

19          THE COURT:  Okay.  Perish the thought all you like,

20  but this is the hypo.

21          MR. GORDON:  Yes.

22          THE COURT:  You got to -- you pay the bonds first,

23  and you got to pay trades, and then you got to pay employees'

24  wages, and then you pay pensioners last, and understand,

25  everyone who's listening to this, this is strictly

1  hypothetical.  It's inconsistent with the Bankruptcy Code.

2  I'm sorry.

3          MR. GORDON:  I forgot about the overflow.  Sorry.

4          THE COURT:  Well, and this is being recorded.

5  Anyway, it's inconsistent with the Bankruptcy Code.  However,

6  whatever hypothetical you create, and the governor says, you

7  know, "We've got to comply with state law.  I'm authorizing

8  this bankruptcy, but the municipality's plan has to comply

9  with the state law that sets forth these priorities."  Is

10 that a proper authorization or not?

11         MR. GORDON:  I would say not.

12         THE COURT:  Okay.

13         MR. GORDON:  Well, it's --

14         THE COURT:  Now you're saying that when state law

15 says the priority has to be given to pensions --

16         MR. GORDON:  Well, let me back up.

17         THE COURT:  -- that's not proper if it's

18 inconsistent with the Bankruptcy Code.

19         MR. GORDON:  Actually, I would say -- no.  I would

20 say that the authorization is proper, but, again, a portion

21 of that authorization is actually going to come into conflict

22 with the Bankruptcy Code itself, so I think it's just a

23 flawed concept.  So if you had that provision in there, I --

24 you know what?  The difference is -- let me think about this.

25 I think the difference is the cases such as Vallejo and

1   others dealt with situations where someone tried to cherry

2   pick various provisions of the Bankruptcy Code after they got

3   into bankruptcy.  It didn't involve the actual state

4   authorization.  So here I think if you were presented with

5   that, you would have two choices.  You would either have to

6   acknowledge that state authorization as is and agree to that

7   structure and say that will supersede the Bankruptcy Code

8   because that's the only way the state is allowing you to get

9   into bankruptcy, or you would have to dismiss the case.

10          THE COURT:  Which should I do?

11          MR. GORDON:  In that situation, I think you would

12   give the state the opportunity to decide, but in the first

13   instance, if the state doesn't do anything, you would have to

14   dismiss that case because you don't have the authority to

15   amend the Bankruptcy Code.

16          THE COURT:  I would have to give them the

17   opportunity to revise the authorization?

18          MR. GORDON:  That's correct, your Honor.  They'd

19   either have to amend the --

20          THE COURT:  How could --

21          MR. GORDON:  -- authorization or understand that if

22   they go into --

23          THE COURT:  How could the governor provide an

24   authorization that's inconsistent with the state statute?

25          MR. GORDON:  He couldn't.  He would either have to

1    go back and --

2           THE COURT:  What's there to revise?

3           MR. GORDON:  -- change the statute -- he'd either --

4    he has two choices.

5           THE COURT:  Oh, go back and change the statute.

6           MR. GORDON:  There are two choices.  Either the

7    Court agrees to allow the case to go forward with that

8    structure because that's the only way the state will

9    authorize it and that's what 109(c)(2) talks about, or if

10   this Court for some reason believes that that is in conflict

11   with the Bankruptcy Code, then this -- I guess I don't know.

12   The state could either -- the state would have to go back and

13   amend its statute in some fashion.  I don't really know, but

14   I think that if the state --

15          THE COURT:  Or if it's constitutional, amend its

16   Constitution?

17          MR. GORDON:  Wait.  What couldn't be done is that

18   this Court could not accept the authorization and then say,

19   "I'm cherry picking.  I'm not allowing that part of the state

20   statute to stand because that is the only way that they got

21   into bankruptcy in the first place."  That's my answer, your

22   Honor.  All right.  Can I move on?

23          THE COURT:  You can.

24          MR. GORDON:  We're really out of time here probably,

25   I notice, in a minute, but I just wanted to touch upon

1   collateral estoppel because I promised I would unless your

2   Honor has a different --

3           THE COURT:  No, no.  You argue what you like.

4           MR. GORDON:  As far as collateral estoppel is

5   concerned, your Honor, the city and the state have argued

6   that there was not a full fair opportunity to litigate in the

7   Webster matter.  We've addressed that in our papers.  We

8   believe that that is not accurate.  There was full briefing.

9   Both sides filed cross-motions for summary disposition, so

10  they addressed the merits of the matter.  The Court

11  acknowledged that there had been briefing and oral argument

12  before it entered its order.  The city and the state also

13  argued that there was no privity between the city and the

14  defendants in Webster, but on September 19th, your Honor, the

15  city argued in this court that there was a common interest

16  agreement between the city and the state and that there was

17  common interest with respect to the financial situation of

18  the city and the bankruptcy, so privity is certainly there.

19  And then finally the city and the state argued that the state

20  court doesn't have authority or jurisdiction to rule on

21  eligibility issues.  The Webster court didn't rule on

22  eligibility issues.  It doesn't mention 109(c)(2) of the

23  Bankruptcy Code.  It merely ruled on the interplay between

24  two state statutes, PA 436 and the pensions clause, and ruled

25  that those two had to be harmonized and that, therefore, any

1 authorization of a bankruptcy under PA 436 must comport with

2 the pensions clause or otherwise it was unconstitutional, so

3 it did not infringe on this Court's jurisdiction in that

4 regard.  So we think that collateral estoppel is valid and

5 applies here under the <u>Webster</u> judgment.

6          THE COURT:  Thank you.

7          MR. GORDON:  Thank you, your Honor.

8          MS. CECCOTTI:  Good afternoon, your Honor.  Babette

9 Ceccotti for the UAW.

10          THE COURT:  Good afternoon.

11          MS. CECCOTTI:  And with admittedly some trepidation,

12 I am also going to cover the authorization under state law,

13 and I think -- I guess I'd like to start with just a couple

14 of threshold comments.  First, I think the exchange that

15 you've had with Mr. Gordon and perhaps with others -- and I'm

16 sure it's not going to be limited there -- will probably lead

17 you to conclude that at least some of the issues that you've

18 slated as purely legal will -- are better served awaiting the

19 outcome of the trial.  I'm just -- you know, Mr. Gordon took

20 you through a series of numbers.  There are all kinds of

21 facts and information that are probably best developed

22 through the evidentiary record, and that may well inform your

23 Honor's views of a number of the questions that you've asked

24 here today so far, so I'll just start with that observation.

25 I'd like to just, if I might, also --

1    THE COURT:  Well, just so the record is clear -- and
2  I may have indicated this before even perhaps in writing --
3  it's certainly not the Court's intention to rule on these
4  issues before the trial, and to the extent any of the facts
5  that come out at trial bear on these, sure, they'll be taken
6  into account.
7    MS. CECCOTTI:  Thank you, your Honor.
8    THE COURT:  But I did hold out to all of you that
9  one of the purposes of today's hearing was to see whether
10  there are any genuine issues of material fact in advance of
11  the trial so that you can address those at the trial, and I
12  intend to do that.
13    MS. CECCOTTI:  Thank you, your Honor.  I guess
14  the -- let me just interject another thought into the
15  exchange that you had with Mr. Gordon on your hypothetical, a
16  couple of thoughts.  First, the -- and I will -- I'm going to
17  start and go through this in a little more organized way, but
18  I just wanted to make sure I get this point out.  It's
19  important to keep in mind that as inviolable and as absolute
20  and as definitive as those of us on the objectors' side
21  believe the pension clause is and as much as we believe that
22  it was the right of the citizens of the Michigan -- of
23  Michigan to so provide in adopting it, remember that we are
24  here in the public sector.  We are not in the private sector
25  where there is a federally regulated and federally

1    established pension insurance system so that when plans get

2    underfunded, when plan sponsors are overburdened, there is a

3    system that takes over.  And I would have to say all --

4    certainly the lion's share of the decisions that have come

5    down on this topic arise because of the -- because of the way

6    that that system is constructed.  There's a federal agency

7    that provides a safety net.  You know, there are moral hazard

8    issues.  There's a whole balancing that goes on in that

9    system.  We don't have that here.  Michigan pensioners have

10   Article IX, Section 24.  That's it.  That's what they have.

11   So as, you know, perhaps a -- it might take a bit of a leap

12   to see that that section means what it says and really,

13   really, really means what it says, I think it's important to

14   bear in mind that that is a safety net for pensions for

15   Michigan pensioners.  Okay.

16           So, now, to try to get back a little bit towards

17   more of an organized progression here on the 109(c)(2)

18   issues, the governor, as we've been discussing, had issued

19   the letter of authorization -- the letter of authorization

20   without any contingencies, so I think it's in -- and your

21   Honor asked the question this morning -- a couple of

22   questions this morning that have to do with, you know,

23   where's the impairment and where's the harm and questions of

24   that nature, and why wasn't the governor's reference to 943

25   sufficient.  So I think what's important to do first is take

1  a look at -- briefly just take a look at the authorization

2  letters.  And, again, this is without reference to any

3  testimony or anything else that you're going to hear next

4  week.  You know, just looking at the letters that were

5  attached to Mr. Orr's declaration, the July 16th

6  authorization makes quite plain in his situational

7  overview -- he says for an extended period of time, the city

8  has simply failed to make the investments required to provide

9  its residents with an adequate quality of life as limited

10  resources have been diverted elsewhere.  He says the city's

11  urgent need to address large and growing legacy liabilities

12  and other substantial debts is self-evident.  Failure to

13  address these liabilities will prevent -- excuse me --

14  prevent the city from devoting sufficient resources to

15  providing basic and essential services to its residents.

16  Indeed, significant additional resources are required to

17  improve health and safety.  And he goes on to say that the

18  city must devote a larger share of its revenues to

19  effectively providing basic essential services to current

20  residents, attract new residents and businesses to foster

21  growth and redevelopment, ultimately begin -- and ultimately

22  begin what will be a long process of rehabilitation and

23  revitalization for the city.  The city's debt and legacy

24  liabilities must be significantly reduced to permit this

25  reinvestment.  Plain as day in Mr. Orr's letter.  He

1    incorporates his entire proposal, the -- I don't have the

2    whole thing here. I've just got some of it. This is the

3    June 14th proposal. Goes to the governor, and the governor

4    writes back again providing the authorization and saying in

5    part that he's reaffirming his confidence that Mr. Orr has

6    the right priorities when it comes to the City of Detroit. I

7    am reassured to see his prioritization of the needs of

8    citizens to have improved services. I know we share a

9    concern for the public's -- for the public employees who gave

10   years of service to the city and now fear for their financial

11   future in retirement, and I'm confident that all of the

12   city's creditors will be treated fairly in this process. We

13   all believe that the city's future must allow it to make the

14   investment it needs in talent and infrastructure all while

15   making only promises it can keep. So I think it's very clear

16   from these letters -- excuse me -- as it is abundantly clear

17   from the proposal that the city is proposing to take

18   resources from what it's calling the legacy liabilities or,

19   fill in the blank, accrued pensions, and divert those

20   resources to the list that Mr. Orr has laid out here,

21   reinvestment and services and the like, so when we talk about

22   not impairing the pensions and who took what action and when

23   does the impairment happen, the governor's letter, we submit,

24   in fact, is the impairment because it has -- the governor is

25   stating that he is acknowledging Mr. Orr's priorities,

including the priorities to take money from the pensions and
use them to pay other things. And so when the pension clause
talks about -- excuse me. I'm sorry. I just lost my brief.
I apologize, your Honor. I think I -- I have it. So when we
talk about the text of Article IX, Section 24, "The accrued
financial benefits of each pension plan and retirement system
of the state and its political subdivisions shall be a
contractual obligation thereof which shall not be diminished
or impaired thereby," and we look and we are -- we see that
among the records in the constitutional convention is the
explanation that Article IX, Section 24, quote, "requires
that accrued financial benefits of each pension plan and
retirement system of the state and its political subdivisions
be a contractual obligation which cannot be diminished or
impaired by the actions of its officials or governing body,"
the impairment occurs when the governor signs this
authorization with no contingencies. That's when it happens.
So not impairing thereby, meaning -- means very specifically
this document, and the "this" I'm holding up here now is the
governor's consent. Now, why is --

      THE COURT: Oh, but this raises two questions.

      MS. CECCOTTI: Sure.

      THE COURT: Is there a scenario in which the city
would have the ability to meet its pension obligations in the
very long term unless it makes the kind of investments that

1    Mr. Orr and Mr. Snyder have suggested should be part of the

2    city's priorities?  That's question number one.  Question

3    number two is actually a much more important question, and

4    that is is question number one a question for now, or is it a

5    question for plan confirmation?

6              MS. CECCOTTI:  It is absolutely a question for now

7    because --

8              THE COURT:  What's the answer then?  How can the

9    city maximize its chance of paying its pension obligations

10   unless it makes the kind of investments that Mr. Orr and Mr.

11   Snyder are talking about?

12             MS. CECCOTTI:  It may be that the investments

13   themselves or the idea for the investments is fine.  The

14   question is can it get there lawfully by taking money from

15   pensioners?  That is the question that the state Constitution

16   answers by saying no.  Now, as Mr. Gordon pointed out or as I

17   think is evident from his presentation, there's a lot of

18   numbers here, Judge.  There were numbers in Mr. Orr's

19   request, his July 16th request.  You're going to hear an

20   awful lot about those numbers and what they are and what they

21   are not, so I would suggest that the notion that we somehow

22   have already today, quote, no reasonable alternative in the

23   words of PA 436 I would suggest very much should await your

24   Honor's review of the evidence on all of that, so --

25             THE COURT:  Okay.

1    MS. CECCOTTI:  I realize it's a question that has

2    been on your mind all day, but I really think unless you

3    really want us up here freelancing numbers -- and you really

4    don't -- that it is best to simply --

5        THE COURT:  I'll grant you that one.

6        MS. CECCOTTI:  Right; right.  But I guess my point

7    is the answer cannot be because the problem seems hard, we're

8    just going to try to find a way to say perhaps that this

9    language doesn't mean what it says because I think once you

10   start down that road, you run into all kinds of problems.

11   You run into the Chapter 9 dual sovereignty problems.  You

12   run into problems of who gets to decide what, right, whether

13   this Court gets to construe Article IX, 24, to, in fact, say

14   it can be invaded.  These are problems that are simply too

15   thorny -- certainly too thorny to start with, and maybe we'll

16   see where your Honor is after the evidence.

17       Okay.  So why isn't the reference to 943(b) enough,

18   and I think -- and I think you've heard it, but just to say

19   it again and hopefully crystalize it a bit, I think the

20   governor assumed in wording the letter the way that he did

21   that somehow this all gets sorted out, and I think that seems

22   to be a lot of the presumption here, and I must say I am not

23   in full company with those who say that once you cross the

24   threshold of 109(c) using state law that somehow you can

25   start, you know, running around employing federal supremacy.

1  I think that that -- we'd probably have a lot more
2  conversations about that with a lot more time with a lot more
3  specificity before we get there.  We think -- and we spent a
4  bunch of time on this in our brief, Judge, and given your
5  handling of the Addison case you probably didn't need all of
6  this, but our view is that you must look -- in order for
7  Chapter 9 to be constitutional, you have to look at all of
8  these pieces that import or give recognition to the state
9  law.  Just to take you back to another colloquy that you had
10 with Mr. Gordon and why I think maybe that the Chapter 13
11 example isn't a good fit here, 109(c) says that an entity may
12 be a debtor under Chapter 9 if and only if such entity is
13 specifically authorized to be a debtor under such chapter by
14 state law.  So while we're all here today obviously under
15 109(c) and 109(c) is in the Bankruptcy Code and so you're
16 right -- the law that must be applied is state law, and the
17 Court decides whether -- you, the Court, you, the Bankruptcy
18 Court, decide under 109(c) whether, in fact, the municipality
19 is specifically authorized to be a debtor under Chapter 9 by
20 state law or by a governmental officer empowered by state
21 law.  And so I think that that may help to distinguish the
22 Sixth Circuit case that you discussed with Mr. Gordon, but it
23 also points out that getting through the door is a state law
24 question.  903 and 904 are obvious limitations on the Court's
25 authority.  943 is a limitation on the plan.  All of these

1  things work together, and I think your Honor's opinion

2  actually in the Addison case on the motion to intervene was

3  exactly right in recognizing the limitations not only of the

4  Court's caution in addressing the questions precisely because

5  of the questions that 903 -- the issues that 903 and 904

6  import into the bankruptcy process, but another observation

7  which takes me back to the letters and the taking of the

8  money from the pensioners and putting it towards something

9  else, which is, I think, your court -- your observation in

10  that case that Chapter 9 is about debt adjustment and should

11  not be overburdened I think applies very well here, too, and

12  I think, again, when we get to the trial and the full array

13  of the plan and everything else comes out and we start

14  talking about that in the evidentiary context, I think that

15  it is at least a question as to whether or not this issue

16  that we're all talking about here is in a narrow sense debt

17  adjustment or whether it is more than debt adjustment and

18  whether that shouldn't inform the Court's caution in ensuring

19  that the state law is being adhered to.

20        And I guess -- and I don't often get to the point of

21  imploring at the podium.  It's not always pretty, but I'm

22  going to break my rule on this whole subject of where is the

23  impairment.  To me it's like a shell game.  Okay.  Under

24  which of these cups is the impairment; right?  Is the

25  impairment -- I've told you where I think the impairment is;

1  right?  I don't think the Court impairs.  The debtor proposes

2  the plan.  Under Chapter 9 only the debtor can propose the

3  plan.  The debtor was supposed to have come up with something

4  that passes muster to meet the 109(c) criteria in advance of

5  getting to this point, and they --

6          THE COURT:  Well, but the proposal of a plan, the

7  filing of a plan which proposes to impair pensions doesn't

8  result in the reduction of anyone's pension check any more

9  than the filing of the case did.

10          MS. CECCOTTI:  Your Honor, I --

11          THE COURT:  That doesn't happen until the Court

12  confirms it under law.

13          MS. CECCOTTI:  And, your Honor, then why are we

14  talking about it?  Why are we talking about it?

15          THE COURT:  Answer that question.

16          MS. CECCOTTI:  If it hadn't been --

17          THE COURT:  I'm having my issues with that very

18  question.  Why are we talking about it?

19          MS. CECCOTTI:  We're talking about it because it's

20  in their proposal.  We're talking about it because it was in

21  the authorization that went to the governor.  We're talking

22  about it because the governor clearly recognized it or at

23  least recognized it sufficiently to draft the letter that he

24  did.  We're talking about it because despite weeks and weeks

25  and weeks, no one has disabused the pensioners of the notion

1  that their pension rights are -- that they are intending to

2  impair their pension rights.  That's why we're talking about

3  it.  It simply does not -- here they are in Chapter 9; right?

4  They're in Chapter 9.  They've got the benefit of the

5  automatic stay.  They've gotten their stay against the pre-

6  petition lawsuits.  They want to have a bar date motion.

7  They're getting all of the -- you know, all of the features,

8  right, of Chapter 9.  And the threshold question that has to

9  be asked is can they be here, and the threshold question can

10  only relate to the form in which they show up on the court's

11  doorstep.  And the form in which they show up on the court's

12  doorstep is the June 14th proposal, which is abundantly clear

13  on the subject of invading -- impairing accrued pensions.

14  What else would the Court -- what else would we be dealing

15  with?  What else would your Honor be dealing with if not for

16  the fact that they evidenced their plan?

17         THE COURT:  I think the answer to that question may

18  be the governor's authorization.  He says we are here to

19  adjust the city's debts in conformity with law.

20         MS. CECCOTTI:  He says that at that end we do that,

21  but what does it mean -- what is supposed to go on before we

22  get there?  It can't be that we have a sort of quasi eligible

23  debtor going through all of the -- you know, using all of the

24  processes I just described and then we have a big

25  conflagration at the end.  I mean it just --

1          THE COURT:  Why not?

2          MS. CECCOTTI:  Chapter 9 presupposes through the

3     front door under state law, specially authorized under -- by

4     state law.  That is what 109(c) says.  It is plain as day.

5     And state law means state law, and it requires giving -- if

6     they hadn't put in this -- the pages --

7          THE COURT:  So in response to my question to Mr.

8     Gordon, you would say that if state law requires a different

9     priority scheme than the Bankruptcy Code, the municipality is

10    eligible only if the Court is willing to enforce that state

11    law priority scheme rather than the Bankruptcy Code priority

12    scheme?

13         MS. CECCOTTI:  I think that I would say that if a

14    state legislature -- we're not talking about the Constitution

15    here.  You're just talking about, in effect, the PA 436 of

16    whatever that state is.  I would say that those are the

17    terms.  We have -- we allow the states -- states have a

18    variety of authorization.  Some of them have no

19    authorization.  It is a state-by-state --

20         THE COURT:  Every bankruptcy case that has addressed

21    that question has held the other way, hasn't it?

22         MS. CECCOTTI:  Well, I don't know the answer to

23    that, your Honor.  In the Chapter 9 context?

24         THE COURT:  Yes, in the Chapter 9 context.

25         MS. CECCOTTI:  Okay.  Well, I --

1          THE COURT:  Every Bankruptcy Court has held once

2     you're in the door, it's the Bankruptcy Code priorities that

3     apply, not the state law priorities --

4          MS. CECCOTTI:  Right.  Well, right.  And now we're

5     getting into the --

6          THE COURT:  -- because the state consents to the

7     Bankruptcy Code or it doesn't.

8          MS. CECCOTTI:  Well, and I would say that a state

9     that passes a law such as your Honor proposed maybe, in fact,

10    looked at those cases and said, no, we don't really want to

11    go there.  We want to -- you know, we'll let you go if it's

12    this other way.  I think the through the door -- once we're

13    in the door -- I know what Harrisburg says.  You know, I have

14    a lot of trouble with it just because I think that the

15    doctrine has not evolved in a sufficiently precise manner.

16    You don't always see what the conflict is.  You have to come

17    up with notions of what the purpose is.  Remember the ancient

18    Supreme Court cases here said bankruptcy is about discharge;

19    right?  So can states have discharge laws?  So we're way, way

20    far away from that now, so I think -- again, I think we'd

21    have to have a lot more conversations about what happens

22    through the door.  Right now we're talking about you're at

23    the door, and you're at the door, and you're presenting

24    yourself, and what you're wearing, right, is something that

25    says we are going to violate Article IX, Section 24.

1     Just want to see if there is anything -- see if I've
2   left anything out here that I wanted to cover.  I have some
3   minutes here.  I guess I could barter away my minutes, Judge,
4   or I could give them to you to barter them away.  Let me just
5   take a quick moment here.  I think -- I mean, again, I think
6   we're going to get to the point of duplication if I continue
7   unless, your Honor, you'd like to ask me anything else.  I
8   think I've hit the points I wanted to hit.

9           THE COURT:  Okay.  Thank you.

10          MR. WERTHEIMER:  William Wertheimer, your Honor, on
11  behalf of the Flowers plaintiffs.  As I'm sure your Honor
12  will recall, although it seems like ages ago now, the Flowers
13  plaintiffs were plaintiffs in one of the state court cases
14  that preceded the bankruptcy, a state court case in which we
15  were making the claim that under state law the governor was
16  required to recognize Article IX, Section 24, if and when he
17  authorized a bankruptcy.  I'm not here to speak on bankruptcy
18  law.  When I heard the reference to Asbury Park, I thought of
19  the street in northwest Detroit.  I'm not a bankruptcy
20  lawyer.

21          THE COURT:  Okay.

22          MR. WERTHEIMER:  I just want to speak briefly on the
23  state law, which it was my understanding at the stay
24  proceedings everybody kind of understood, including the city
25  attorneys, that although our claim was being delayed, it was

1   not being changed in terms of its nature; that is, that this

2   Court would decide as a matter of state law whether this

3   bankruptcy was properly authorized.  It was just that the

4   forum was changing.

5         And I'd just like to make three points as to that

6   state law, three areas where I think this Court can look to

7   what it should do in deciding what I believe is that state

8   law issue; that is, the basic eligibility issue.  If you look

9   at the equivalent of legislative history of Article IX,

10   Section 24 -- that is, the constitutional convention

11   record -- there is certainly references to the fact that has

12   been mentioned here today that it was meant in part to deal

13   with the fact that pensions had been considered not to be a

14   matter of contract, but the only specific reference that I

15   found in that record -- and no one has cited anything to the

16   contrary -- is the comment of Mr. Van Dusen, which I -- with

17   the Court's permission, I'll take the liberty to quote.  It's

18   not long.  "An employee who continues in the service of the

19   public employer in reliance upon the benefits which the plan

20   says he would receive would have the contractual right to

21   receive those benefits" -- he didn't stop there -- "and" --

22   he didn't say "meaning" -- he said "and," in addition -- and

23   I think this goes to what Mr. Gordon was getting at, "and

24   would have the entire assets of the employer at his disposal

25   from which to realize those benefits."  That was the

1   understanding of Mr. Van Dusen.  There's no contrary

2   understanding on the record as to what the idea was on behalf

3   of the people who were writing Article IX, Section 24.

4   That's point number one, and I think if you look at what

5   Emergency Manager Orr did in his June 14th proposal, Mr. Van

6   Dusen, were he alive to take a look at it, would say, "That's

7   not what I meant," because on June 14th what Mr. Orr proposed

8   and he continues to propose is the retirees get treated like

9   any other creditor.  He didn't say words to the effect of

10  "all the assets of the employer," so that's the first piece

11  of state law in the broad sense of the term that I think you

12  can look to.

13          The second piece is the Webster and the Flowers

14  cases and the retirement case.  And I'm not repeating

15  Mr. Gordon's argument relative to collateral estoppel or the

16  res judicata argument.  I'm simply pointing out that as --

17  excuse me -- as Mr. Gordon indicated, that case was fully

18  briefed, and a state court judge looked at the exact issue --

19  well, maybe not exact but very close to the issue that is in

20  front of you, and that state court judge, after full

21  briefing, decided that in a manner consistent with our

22  position.  And I would point out there is no contrary law

23  anywhere.  I recognize this Court -- the cases that say you

24  look to the definitive ruling from the highest state court

25  and all that, but Judge Aquilina's decision -- decisions,

1  well-reasoned, are all that's out there.  She's a state court
2  judge deciding this issue.  That's the second piece of state
3  court law that, as far as I can tell, is out there.

4         There's one other, and that is we have the state
5  attorney general.  This isn't law, but the state attorney
6  general enters an appearance a little late in the game.  The
7  governor has already authorized the bankruptcy.  However, the
8  state attorney general, as an officer of the state, as the
9  chief legal officer of the state, tells this Court that
10 Article IX, Section 24, binds the emergency manager in
11 bankruptcy.  Now, we all know that that gets into the issue
12 of is it at the eligibility stage or the plan stage, and I --
13 that's been dealt with.  My point is simply that a state
14 officer, the attorney general of the state, saying that the
15 emergency manager in bankruptcy is bound by Article IX,
16 Section 24, is consistent and supports our position that the
17 governor, when he goes to authorize that bankruptcy, is also
18 bound by Article IX, Section 24.  And with all due respect to
19 the governor, we think it's up to this Court to hold the
20 governor to that.

21         THE COURT:  All right.  Thank you, sir.

22         MR. WERTHEIMER:  Thank you.

23         MS. PATEK:  Good afternoon, your Honor.  Barbara
24 Patek on behalf of the Detroit Police Command Officers
25 Association, the Detroit Police Lieutenants & Sergeants

1  Association, the Detroit Police Officers Association, and the
2  Detroit Fire Fighters Association defined in this case as the
3  Detroit Public Safety Unions.  As the Court is aware, these
4  are the men and women who provide the police and fire
5  protection that are essential to the survival of the city,
6  and these are exactly the essential services that Chapter 9
7  was designed to preserve and protect.
8       I want to use my time this afternoon to talk a
9  little bit about ripeness, talk very briefly about the
10  supremacy clause and the tension between the supremacy clause
11  and the Tenth Amendment, and then to try to answer some of
12  the questions that the Court has raised with some of the
13  other objectors today.
14       On the issue of ripeness and why this is a question
15  for eligibility, I think that goes to the very nature of
16  Chapter 9, which precisely because of the sovereign immunity
17  and the sovereignty of the State of Michigan, this Court, as
18  it's recognized in so many hearings, is limited in what it
19  can order the city to do.  In that respect, this -- not that
20  every bankruptcy isn't a consensual process and not that
21  every bankruptcy doesn't involve a lot of negotiating.
22  Chapter 9 is unique because it incorporates -- it's a largely
23  consensual process at some level precisely because this Court
24  cannot trump the state's sovereignty in particular
25  situations.  And in that regard, if one talks about imminent

1 harm, there is -- you know, it's in the record.  Mr. Gordon

2 alluded to the fact that the stay authorized the city to come

3 in this court for a very public purpose, and that purpose was

4 to impair the accrued vested pension rights of its public

5 servants.  That question, as the city points out in its

6 papers, no court has ever said they can't do it, and no court

7 has ever said they can.  It's an unanswered question.  We're

8 entitled to know what our rights are, and to suggest that by

9 knowing what our rights are in the door that is to knowing

10 what -- to know what the proper authority is here would

11 somehow skew the process or cause people to walk away from

12 the table I think is wrong.  This is a hard question that the

13 Court has to answer, but the Court is here to follow the law.

14 I think this is -- there is imminent harm to these

15 individuals here, and there's a second piece of that by

16 virtue of the vacuum in which there's no legal precedent on

17 this issue, and that is -- I'm just going to throw out to the

18 Court the idea that this is one of those issues where it's

19 capable of repetition but evading review.  If every time this

20 gets kicked down the road to confirmation, nobody is ever

21 going to know what their rights are when this issue comes up.

22 I submit that Michigan is a little bit unique, but I think

23 that there are plenty of reasons that this issue is ripe for

24 adjudication today.

25         I'd like to take a crack at some of the questions

1  that the Court raised.  You raised the issue of what if the
2  state law requires a different scheme of priorities than is
3  authorized by the Bankruptcy Court.  I think if you step out
4  of the weeds on that question and I think you look at what
5  the Code says here, the state has to give its consent to come
6  into Chapter 9.  And in giving its consent, the state agrees
7  to certain provisions of Chapter 9.  I think a state that
8  authorizes such a scheme simply can't give its consent to
9  come into Chapter 9.  I think that's the simple answer to
10  that question.

11       THE COURT:  So your answer then in that hypo would
12  be not eligible?

13       MS. PATEK:  Correct.  I also think -- the Court
14  asked the question and raised the 11th Amendment, and I'm
15  going to go out on a limb here on this and the question of
16  sovereign immunity because I think the answer to a lot of the
17  issues before the Court and whether or not, in fact, the city
18  can impair these rights or use the Court to impair those
19  rights is in some ways answered by the Code.  Section 106 of
20  the Code addresses the sections of the Code under which the
21  state waives its sovereign immunity.  109 is not one of them,
22  and I think that makes the eligibility issue as it's framed
23  by 109 a question of state law.  And the other place, if
24  we're going to jump ahead to where we'll be down the road,
25  where the state does not waive its sovereign immunity is

1  under Section 943.  We know there are some places where to

2  consent to come into this Court and get relief the state has

3  to agree to conform to the rules.  365 is one of those that

4  you've got <u>Bildisco</u>.  If you're going to come in and you look

5  at -- that's a place where the state has to agree, consent to

6  be governed by the federal rules.  The other place is the

7  automatic stay.  But when you get down the road to the plan

8  that only the city can propose, the state does not waive its

9  immunity, and that --

10  THE COURT:  I think you might be overanalyzing my

11  question about sovereign immunity.  I was only analogizing to

12  the 11th Amendment cases that hold that the issue of whether

13  sovereign immunity is waived is a federal issue, not a state

14  issue.  I didn't mean to suggest, as you appear to understand

15  here, that there is -- that there are 11th Amendment issues

16  in this case.

17  MS. PATEK:  I'm not suggesting that you are, your

18  Honor, but I'm suggesting that -- and this sort of brings us

19  back to where Ms. Levine started out this morning with this

20  concept of -- this very basic concept, and one of the things

21  that makes this case so hard and one of the things that all

22  the commentators agree makes Chapter 9 so hard is this

23  tension.  We have a federalist system.  There are rules of

24  the road that were set up by the founders.  We have a limited

25  system of federal government.  All the other powers are

 1  reserved to the states and the individuals.  And there's no
 2  question that wasn't done so that we could have big and
 3  powerful states.  That was done by the founders so that the
 4  individuals close to the ground would have their rights
 5  preserved, and I think within the structure of Chapter 9 and
 6  within the limits of the Tenth Amendment, that the state
 7  simply cannot use Chapter 9 to impair an express
 8  constitutional promise.  And I want to talk about that issue
 9  for just one moment.  This pensions clause is in a very
10  unusual place.  Okay.  This is -- I think it's fair to say --
11  you talk about there is a contracts clause in the state
12  Constitution just like there's a free speech clause and there
13  are a lot of things that mirror the Bill of Rights, but, as
14  Ms. Levine told us this morning, if somebody is violating my
15  free speech rights, I'm not in state Circuit Court.  I'm
16  looking to the federal courts and the federal government to
17  protect those rights.  If you're talking about fiscal
18  management, then that's a state issue, and in this case this
19  state and the people of this state chose to enshrine that
20  right to vested accrued -- this isn't all pension benefits,
21  this isn't future benefits, just what people have already
22  earned -- in its state Constitution and say those cannot be
23  impaired.
24          The Court asked the question about what if there's
25  not enough money, which sort of brings me back to the first

1   issue I was talking about.  This Court has to rule on the

2   legal issue that's before it, and if there's not enough money

3   just like if you're in a Chapter 11 that you don't want to

4   see liquidation, that's a hard question that the creditors,

5   including the pensioners, including my clients, have to

6   answer along with the city and try to solve this problem

7   within the limits of Chapter 9 because if we don't solve the

8   problem, the only remedy is a dismissal.

9       THE COURT:  Well, I guess even that answer troubles

10  me because if the Court holds here that there is this pension

11  right that cannot be impaired and because the governor didn't

12  condition this filing on the city recognizing that right in

13  the bankruptcy, what would happen upon dismissal?  There'd be

14  this court holding that there's this unconditional absolute

15  right not to have pensions impaired.  On behalf of your

16  retirees, you couldn't negotiate that, could you?  How could

17  you?

18      MS. PATEK:  I can't negotiate that upon my retirees,

19  but I suggest to the Court there is a solution to this

20  problem, and the solution is for the city to come back again

21  and to authorize -- have the state authorize the filing

22  within the confines of the Constitution, and we move forward

23  on that basis.  I don't -- I understand that this has -- you

24  know, we talk about the elephant in the room, but the larger

25  part, the healthcare benefits, are not protected, and the

1  city has already said effective yesterday -- and these aren't

2  my clients, but -- we're done providing that.  It's a

3  significant claim.  I don't want to minimize that, but I

4  think it is something, given our constitutional structure,

5  that has to be dealt with in the confines of these

6  proceedings, and there are negotiations.  There's a huge

7  consensual component to this, and that doesn't stop if the

8  Court rules the way that we've asked to rule.

9          I see my time is up.  I just want to wrap up very

10  quickly, and I guess I would say we came into court on the

11  first day, and we supported the city, and we've supported the

12  city in many respects throughout this.  We agree that there

13  should be the stay.  There has been the breathing space.  But

14  I think this is a hard, difficult question.  As Ms. Levine

15  said, democracy is hard.  This restructuring plan has to be

16  devised in accordance with applicable law, and the city on

17  the front end has to agree that it's going to -- it's going

18  to do so, and in the absence of that, I think they're not

19  eligible.  Thank you, your Honor.

20          THE COURT:  All right.  Thanks to each of you.

21  We'll take our afternoon break now and reconvene at 3:20, a

22  half an hour from now, for the city's arguments.

23          THE CLERK:  All rise.  Court is in recess.

24      (Recess at 2:50 p.m., until 3:20 p.m.)

25          THE CLERK:  Court is in session.  Please be seated.

1    Recalling Case Number 13-53846, City of Detroit, Michigan.

2         THE COURT:  And it looks like everyone is here.

3         MR. BENNETT:  Good afternoon, your Honor.

4         THE COURT:  Mr. Bennett, you may proceed.

5         MR. BENNETT:  Good afternoon, your Honor.  Bruce

6    Bennett of Jones Day on behalf of the city.

7         THE COURT:  The only thing I would ask of you, sir,

8    is to leave enough time before our closing time today for me

9    to ask some questions of Mr. Todd.  Doesn't need to be now.

10   It can be whenever it's convenient for all of you.

11        MR. BENNETT:  Okay.

12        MR. TROY:  Mr. Troy, your Honor.

13        THE COURT:  Mr. Troy.  I'm so sorry, sir.  And so I

14   want to do that today because I'm not sure what his travel

15   plans are.

16        MR. BENNETT:  Okay.  Your Honor should feel free to

17   interrupt me if you think I'm getting too close to the end.

18   And I actually have one procedural question that I'd like to

19   get settled, too, which really has to do with whether you're

20   expecting or would benefit from oral argument at the

21   beginning of the next -- opening argument at the beginning of

22   the next phase because that's -- so I don't know if --

23        THE COURT:  You mean tomorrow?

24        MR. BENNETT:  No.  On the evidentiary phase

25   beginning next week.

 1          THE COURT:  Oh, well not so much oral arguments as

 2   opening statements.

 3          MR. BENNETT:  Opening statements is what I mean.

 4          THE COURT:  Yes.

 5          MR. BENNETT:  Okay.  Great.

 6          THE COURT:  Yes.  I think opening statements are

 7   very important.

 8          MR. BENNETT:  Okay.  I want to start with some

 9   general comments, some of which are designed to respond to

10   things that came up this morning and some of which I think

11   just help, I think, set the stage for what at least the city

12   believes is happening in this Chapter 9 case.  And I want to

13   start by saying that the purpose of the Chapter 9 case is to

14   adjust the city's debts, and that means all of their debts,

15   obligations evidenced by bonds, obligations under other

16   contracts, obligations to provide healthcare, and pension

17   obligations.  And so that there isn't any confusion, there's

18   been a lot of reference to statements that were made.  I

19   think the statement most cited and the one that I think is --

20   it's the same as all the other ones that have been made -- is

21   that there must be -- the statement was there must be

22   significant cuts in accrued vested benefits.  It's been cited

23   often, and it's true.

24          I want to make a couple of clarifications.  I don't

25   think anyone for the city ever said we were going to

1  eliminate pensions.  This has been about the underfunding

2  amounts.  It is the underfunding amounts that are problems.

3  I think your Honor understands that, but I think it's

4  important to remind everybody else that we've never said that

5  the objective is to eliminate pensions.  The objective is to

6  address the underfunding situation.

7      Now, why did we make that statement?  The

8  statement --

9      THE COURT:  Well, let me just put it right to you.

10  Is it your intent to propose a plan to reduce pensioners'

11  monthly checks?

12      MR. BENNETT:  To be very technical about it, what we

13  have -- what we have -- what we have noted is that it is

14  impossible for the city to fill the underfunding gap in the

15  existing pension trusts, and we have also said that likely

16  requires changing the amounts of pension benefits.  Now --

17      THE COURT:  By "changing," you mean reducing?

18      MR. BENNETT:  Reducing.  Now, I do want to -- I'm

19  going to skip a couple points and then come back.

20  Notwithstanding the fact that the Chapter 11 case has been

21  filed, it remains the city's hope that these adjustments will

22  be achieved on a consensual basis pursuant to agreements

23  reached with the holders of the obligations.  That is still

24  the objective.  And, of course, we are participating in

25  mediation that's intended to facilitate that goal, and,

1  frankly, we'll meet with anyone anyplace anytime to try to

2  achieve that goal.  And we're going to discuss at certain

3  points certain statements that have been made by others in

4  this case about this problem which may suggest that those

5  discussions are going to be particularly difficult, but I

6  want there to be absolutely no confusion about where the

7  city -- where the city stands on this.

8         And by the way, the filing doesn't say how

9  ultimately this case is going to end, whether it's going

10  to -- whether we're going to have a consensual plan, whether

11  we're going to have a nonconsensual plan, whether it'll be

12  partly a consensual plan or partly a nonconsensual plan.  And

13  although the city did make a proposal that certainly

14  contemplated cuts to the underfunding obligation and

15  ultimately to benefits that absolutely is a part of the June

16  14th proposal, it was a proposal in an out-of-court

17  negotiation, and I want to submit -- and we're going to come

18  back to this point later -- it can't possibly be

19  impermissible to ask to reduce benefits, particularly when

20  you can demonstrate a need to do so.  And so far, frankly,

21  that's what the city did pre-petition, and so far that's what

22  the city has done post-petition.  We haven't filed a plan

23  yet.  It will come soon.  And there has not been a request

24  for cramdown, so -- and I think as we get into other parts of

25  the argument -- the fact that we don't quite know what's

1   coming later may have some bearing on some of the legal

2   points that your Honor has talked about and that others have

3   talked about earlier today.

4           THE COURT:  Is it the city's position that the State

5   of Michigan does not have the obligation under the Michigan

6   Constitution to guarantee the city's underfunding?

7           MR. BENNETT:  I don't know if the city has a

8   position.  I will tell you that I have read all of the

9   materials probably more than anyone else in the city's team,

10  and I don't think the state has an obligation to guarantee

11  the pension obligations of a municipality.  I think actually

12  when you look at the --

13          THE COURT:  Isn't it in the city's best interest to

14  say that -- or to assert that the state does have that

15  obligation?

16          MR. BENNETT:  I don't know whether it is or is not

17  in the city's best interest to even take a position on that

18  point, and that's why I said I don't think the city has a

19  position on that point, but I have done a lot of the work,

20  and I think I've made up my own mind as to what I think is

21  there.  I do think it's in the city's position that if we

22  could get money from the state, we would want it, and it

23  would be a great thing, and I'm reasonably certain that that

24  sentiment has been expressed on more than one occasion.

25          THE COURT:  Well, is there any reasonable prospect

1  that the state will comply with that request in the absence

2  of a legal obligation -- a determined legal obligation?

3          MR. BENNETT:  I don't know the answer to that

4  question.  Thus far the state has been of the view that the

5  city has to reorganize based upon its own financial

6  resources.

7          Okay.  The next point I wanted to touch on is the

8  fact that there are a large array of state and federal

9  statutes that say in all kinds of different ways that the

10 city is obligated to pay its debts.  In fact, they say that

11 the city is obligated to pay its debts in all kinds of

12 different ways.  And the city itself and the state has no --

13 and we'll get into this in much more detail -- no ability in

14 order to overcome those laws or very, very, very limited

15 ability to overcome those laws.  One important point about

16 them that didn't --

17         THE COURT:  You mean comply with those laws?

18         MR. BENNETT:  No.  To overcome them to get past them

19 if they can't pay all of their obligations.  And, again, it's

20 a situation that the city is going to prove it's in, but

21 that's for another hearing.  The point I wanted to make here

22 that I don't think was made earlier today was that a lot of

23 these priorities collide with each other in all kinds of

24 different ways.  We heard, by the way, about the all assets

25 at their disposal comment that was, I guess, from the

constitutional convention.  Assuming for a second that that
is what was intended, the problem is is that the legislature
has also passed a law that describes certain debts -- the
obligation to pay certain debts as a, quote, "first budget
item," close quote.  I don't remember the rest of the
sentence, but those words are there.  There's also other
state statutes that don't actually grant a lien but that say
proceeds of certain things must be used in certain orders to
pay.  And when you sit down and try to figure out in any
environment where you don't have enough, how do you fit all
these different things together, you run into a problem very,
very, very quickly.  And these are the provisions, by the
way, that are protected by the federal contracts clause and
also by the Michigan contracts clause because many of these
provisions are in ordinances or resolutions that form part of
bond contracts, and others are in ordinances and resolutions
that form part of employment contracts.  So you wind up -- if
you look at the world before you even start talking about
bankruptcy, you don't just have coherent commands, this is
how you pay and this is how you go about doing it and
everything works, you have a whole bunch of priorities that
actually don't work, and this, frankly, is --

          THE COURT:  Well, but the objecting parties say all
of those contract obligations that have protection merely
under the contracts clause, federal or state, can be adjusted

1 consistent with state and federal law, but the pension

2 obligation under the state Constitution is inviolate.

3      MR. BENNETT:  And we'll get to that if you'll give

4 me a chance.  I will explain why --

5      THE COURT:  Okay.

6      MR. BENNETT:  -- they are, in fact, no different,

7 but I guess my point here is that outside of bankruptcy, you

8 have a -- you don't have coherence, and this is really to the

9 whole point of does it really make any sense to have a rule

10 that says if the state conditions its filing a proceeding

11 based upon complying with its priorities, what do you even

12 have.  And in many circumstances, you have something that is

13 just not meaningful in the context of where there's not

14 enough to go around.  I think that's the narrow point for the

15 time being.  We will generalize when we get to the whole

16 issue of how the --

17      THE COURT:  Okay.

18      MR. BENNETT:  -- different clauses work.  I also

19 want to say that contrary to the papers that were filed --

20 and I'm now referring to the UAW's papers -- the June 14th

21 proposal didn't take broad aim at the city's workers and

22 retirees.  It was very, very carefully drafted to try to

23 treat as many classes of creditors the same as we possibly

24 could denying preferences to any except in cases where we

25 were legally compelled to provide them.  We thought and the

1   emergency manager thought that that was the best way to go

2   about the problem that confronted us, and, of course, we're

3   not under any illusion that that's going to be the last word

4   on this question.  There will be negotiations.  There will be

5   a plan filed, which I'm certain will differ from the proposal

6   that was issued on June 14th in part to respond to creditor

7   input, and it will be subjected to enormous and exacting

8   procedures by this Court before it is ever confirmed.

9          I also want to spend just a second about the point

10  that was made using some of the letters, the letters that

11  were exchanged between the emergency manager and the

12  governor.  If your Honor hasn't already, I commend you to

13  read all of them, not just the parts that were quoted.  I

14  think it's -- I think to fairly summarize the points made in

15  both letters, the city has been -- the city services, city

16  residents, the ability of the City of Detroit to be a city

17  that provides adequate services to its residents has

18  gradually been lost as a result of the constant and

19  consistent diversion of current tax revenue paid by current

20  tax revenue to legacy liabilities, including but not limited

21  to pension claims.  That is the problem.  It is not as if

22  everything is fine, let's take some money from pensioners and

23  put it to the benefit of residents to make things better.

24  The diversion already occurred.  State law has been followed.

25  Pensions have not been impaired or diminished.  A consequence

 1  has been that the resources available for services, that the
 2  resources available for investment have, in fact, been
 3  significantly impaired and significantly diminished to the
 4  point that lots of the city's infrastructure is no longer
 5  serviceable, thus the reference to need for investment.  It's
 6  not for the new and wonderful.  It's to put back things that
 7  really need to be updated and, in fact, replaced because
 8  they're worn out, and it's to restore budgetary items,
 9  budgets that have, in fact, been cut too great.  And I think
10  that sense -- if you read the entire document, you will see
11  that that is the historical view of the current situation.
12  Again, it will be proved next week.  And the solution is in
13  part a reinvestment program.  Again, just to be technically
14  correct, it's 1.25 billion over ten years, not over five
15  years.  Five years would be better.  I don't think anyone
16  thinks we can afford it.
17          I think the next point and the last point I'm going
18  to make by way of introduction is really to address one of
19  your Honor's questions, which is what happens if the city
20  can't adjust its debts.  I think we have to start with the
21  following.  Most business owners and residents are smart
22  enough and sophisticated enough to figure out that it's a
23  problem to be the highest -- residents of the highest taxed
24  jurisdiction in the State of Michigan where somewhere between
25  42 and 65 cents of every dollar is spent on something other

1   than services to current residents.  That is not a stable
2   situation.  That is just not going to work out well.  The
3   consequence will be continuing declines in revenue.  It may
4   be that debts of all kinds would be paid for awhile, but
5   ultimately debts of all kinds will not be paid, and no
6   provision of any Constitution will change this.  Thus, the
7   stakes are very high not just for the city but also for its
8   residents and its creditors, and I think that puts a very
9   sharp point on your Honor's question about what is a
10  constitutional provision worth when you're confronting an
11  economic crisis such as this.
12          Unless your Honor wants to hear much about it, I was
13  next going to talk about your jurisdiction to decide the
14  eligibility question, but no one else raised it on oral
15  argument, and since it wasn't raised on oral argument, I'll
16  leave it to the papers unless your Honor has any particular
17  questions with respect to that point.
18          THE COURT:  No.
19          MR. BENNETT:  And I'd like to take the same
20  prerogative that if I intentionally pass over a topic because
21  it wasn't covered today, if it's in our papers, we still care
22  about it.
23          THE COURT:  Of course.
24          MR. BENNETT:  I'm just going to try to use time
25  wisely.  So the first place I'm going to spend some time is

1   on the constitutionality of Chapter 9, and I'm going to do it
2   a little bit differently because I think, frankly, if we do a
3   really careful look at Bekins -- and I'm going to call it
4   Bekins because it's a really big company in California that
5   has -- the name is spelled B-e-k-i-n-s, and everybody calls
6   it Bekins, but I don't know what the correct pronunciation in
7   this particular case is concerned.  A very careful analysis
8   of Bekins -- and believe it or not, the Cardozo dissent in
9   Ashton is going to provide us with the guidepost to answer a
10  lot of the questions that may not be constitutional questions
11  but that ultimately are resolved by those cases.  First, I
12  have to say because it's important that it isn't this Court's
13  place to overrule Bekins.  Bekins has been the law for lots
14  of years.  And as the U.S. Attorney pointed out, it's not
15  only that Bekins hasn't been overruled, it's actually never
16  been challenged or questioned or otherwise suggested to be
17  worthy of reconsideration by anything that the Supreme Court
18  has done.  And, moreover, in all of the discussion that your
19  Honor heard about why Bekins should not be regarded as good
20  law anymore, no one actually said that the -- that Chapter 9
21  has been changed in any material way from the law that was
22  before the Court in Bekins, and that's because in all the
23  ways that mattered it really hasn't changed, not just -- not
24  by a little but really not at all.  However, we don't want
25  the Court to write an opinion that says, well, you feel

1  constrained not to overrule Bekins.  You think it should be

2  overruled.  So I'm going to spend some time talking about why

3  Bekins is absolutely right and why Asbury Park and anything

4  else didn't change anything.

5       Let me start with just a quick word on Asbury Park.

6  Even to the Supreme Court, if you read their own words,

7  Asbury Park is kind of considered an outlier.  It has -- the

8  Supreme Court has never since approved a municipality's

9  modification of its own contract on the basis of emergency or

10 anything else.  Every time it's been asked to, it's basically

11 talked about Asbury as being, number one, confined to its

12 facts and extraordinary situation and not reflective of a

13 broad doctrine.  This same argument was made to Judge Bennett

14 in the Jefferson County case, and he commented on it.  I

15 think we've cited to that case in our papers.  He does an

16 even better job than I just did of explaining why Asbury is

17 an outlier.  It doesn't provide much comfort to any

18 municipality thinking it's going to modify its debts without

19 the help of the Bankruptcy Code and is no good reason to

20 reconsider Bekins.

21       Now, the next thing I want to talk about is what

22 Bekins really does, and the -- a reality that you can find in

23 Bekins if you're looking really hard, but unfortunately you

24 have to look really hard, is that there were two

25 constitutional provisions at stake when the Chapter 9's

1    predecessor was subject to Supreme Court review.  One was the

2    Tenth Amendment, and some people have talked about that.  And

3    the second part was the contracts clause.  And when you read

4    Bekins, the Court kind of touches on all the different

5    features that matter but isn't particularly careful about

6    matching up which features were needed to overcome which

7    constitutional problem.  And, frankly, in there we're going

8    to find the answers to a lot of the -- a lot of the other

9    questions that come up in this case.

10        So let's start with the Tenth Amendment.  Of course,

11    the Tenth Amendment, if you quote the whole thing -- and when

12    your Honor confronted earlier, I'm not sure the first six or

13    so words were quoted, "powers not delegated to the United

14    States by the Constitution, nor prohibited by it to the

15    states are reserved to the states respectively, or to the

16    people."  For starting purposes, "powers not delegated to the

17    United States" are important words, and one of the things

18    Bekins very clearly says is uniform laws on the subject of

19    bankruptcies are delegated to the United States and that laws

20    on the subject of bankruptcies include municipal debt, and I

21    think they used "composition" as opposed to "adjustment," but

22    composition statutes.  So it's actually not a close call that

23    the -- at least as far as the Supreme Court is concerned --

24    and I think that's all that matters for this purpose is that

25    we're going to have a municipal Bankruptcy Code that at least

1   covers subjects of bankruptcy and that those are clearly

2   federal functions.  Where a Bankruptcy Code applicable to

3   municipalities --

4         THE COURT:  Well, but we know from several Supreme

5   Court cases that the mere fact that Congress legislates

6   within its authority does not necessarily by itself mean that

7   it's consistent with the Tenth Amendment.

8         MR. BENNETT:  Well, actually I think --

9         THE COURT:  Right?  You've got _Printz_ --

10        MR. BENNETT:  Well --

11        THE COURT:  -- in New York at a minimum that hold

12  that.

13        MR. BENNETT:  Well, that was the commandeering

14  point.  We'll get to commandeering.  There's no commandeering

15  in the Bankruptcy Code.

16        THE COURT:  Well, I don't mean to suggest that there

17  is, but in the laws that Congress passed that the Supreme

18  Court held unconstitutional there, they were legislating

19  within their commerce clause or other enumerated power.

20        MR. BENNETT:  Okay.  In the radioactive waste case,

21  the New York case, it was because they used means that were

22  inappropriate that offended the solvency -- excuse me --

23  offended the sovereignty of the states.  In the Bankruptcy

24  Code -- in the context of the _Bekins_ case, I think when you

25  read the case, they were worried about something different.

1   They were worried about the -- in <u>Ashton</u> the majority was

2   clearly worried about the bankruptcy parts going too far and

3   intruding on insolvent -- on sovereignty issues that weren't

4   actually close enough to the core bankruptcy problem.  That's

5   where we got the governmental and political powers type

6   exception that we have today, and so -- but I don't think

7   there is -- your Honor is correct.  If the way that the --

8   that Congress chose to legislate on the subject of

9   bankruptcies affecting municipalities was to tell state

10   courts what state courts had to do, then you would

11   conceivably have a problem, but there's nothing about the

12   Bankruptcy Court that tells -- state any things what states

13   have to do.  What the Bankruptcy Code tells courts, what it

14   tells federal courts what they should do when confronted with

15   a municipality that petitions for relief and petitions for

16   relief with proper authorization.  And so I don't think that

17   is -- that doesn't implicate the second half of the Tenth

18   Amendment.  It only implicates the first half of the Tenth

19   Amendment, and, quite frankly, it's protected by it.

20          And this is going to come up with something later.

21   When we think about the issue of priorities -- and that's a

22   word that encompasses lots of different things, and we can

23   break it down further if we need to -- priorities are at the

24   core of the subject of bankruptcy, absolutely solidly in the

25   core, so a point I want to make and we'll come back to is

1  that we're not really dealing with the part of the Bankruptcy

2  Code that gets closest to offending sovereignty.  We are

3  really dealing with -- when we talk about where pension

4  claims stand in the world and where they can be impaired, we

5  are dealing something that is core to the subject of

6  bankruptcies.  It's not at the edge of the things that made

7  the difference between the constitutionality and

8  nonconstitutionality of the Bankruptcy Code under the Tenth

9  Amendment.

10      THE COURT:  Well, I think possibly your colleagues

11  on the other side might take issue with that because they

12  analogize the pension right to a property right, which is a

13  matter of state law, at least under our present Bankruptcy

14  Code.  It probably doesn't need to be, as a matter of

15  constitutional law, but it is.

16      MR. BENNETT:  We will come later, and believe it or

17  not, it's going to be implicated in other aspects of the

18  Chapter 9 case not having anything to do with pensions to

19  where the line is between a priority and a property right.

20  When we talk later -- I'll get to it later.  I have a whole

21  section on why in this instance a pension is an unsecured

22  claim and not a property right.

23      THE COURT:  Okay.

24      MR. BENNETT:  If we -- just to take a short part

25  about it now, as I read the cases, there are some cases that

1  talk about an entitlement to money being a property right,

2  but in every single one of those cases the money was there,

3  so, for example, it was in a bank account and the balance was

4  there.  In another circumstance, you were dealing with a --

5  an entity was reducing the amount of money that was supposed

6  to be paid to an employee, but there was a hundred cent

7  dollars there, and the three percent that was going to be

8  carved out was going someplace else.  There is no

9  constitutional case that deals with a promise that there -- a

10  promise that might or might not be satisfied because there's

11  not enough money and say that kind of a promise is a property

12  right.  So I think that if you -- if we apply carefully the

13  Supreme Court cases -- and when I get to them, I'll remember

14  the citations -- we are going to find that an unsecured

15  promise where the actual sum of money can't be pointed to

16  because it's not there yet, that's not a property right and

17  never has been, and so the Fifth Amendment is not implicated

18  here.  This is absolutely a contracts clause case, and we'll

19  get to the contracts clause -- clauses in a second.

20        Okay.  So I want to -- last point with respect to

21  the Tenth Amendment, of course, Bekins says it's

22  constitutional under the Tenth Amendment.  The Bankruptcy

23  Code, in particular, its part relating to municipalities,

24  it's constitutional under the Tenth Amendment.  It finds that

25  the combination -- that apart from the fact that it's subject

1    to bankruptcies, it finds that the fact that the Code, then

2    the Act, had carefully carved out governmental and political

3    powers, kind of the -- that is, the relationship between a

4    municipality and its subjects -- it's carved that out.  It

5    says that is an appropriate safeguard to states retaining

6    sovereignty, and they say, "And, oh, by the way, there's a

7    consent requirement."  So those two things, the consent

8    requirement, the -- what I'll call the 903-904 carveout, and

9    the fact that the uniform laws on the subject of bankruptcies

10   are fair game for the federal government, those three things

11   are the three points that the <u>Bekins</u> court says it's okay for

12   Tenth Amendment purposes.

13          Now, it's time to work about -- talk about the

14   contracts clause problem.  Your Honor is clearly familiar

15   with what the contracts clause problem is.  You have a

16   contracts clause -- and I have a cheat sheet for everyone.

17   I've provided my colleagues on my left with a copy during the

18   break.  If your Honor --

19          THE COURT:  Sure.

20          MR. BENNETT:  -- will, I'd like to pass up --

21          THE COURT:  If you'd like me to look at it, sure.

22          MR. BENNETT:  -- copies.  And here we have the three

23   clauses that we need to talk about, the federal contracts

24   clause, the state contracts clause, and the pensions clause.

25   As far as the <u>Bekins</u> court is concerned, it's talking only

1   about the federal contracts clause, and where I'm going is

2   it's not going to make any difference.  And what the

3   Bekins -- the Bekins court doesn't think that consent of the

4   state has anything to do with getting beyond this clause

5   probably because it knows that there's no consent out to the

6   contracts clause.  Instead, it finds that the reason why that

7   the municipal bankruptcy act is constitutional is because the

8   entity that is actually impairing or changing contracts is

9   not the state.  It's not the municipality acting by the

10  state.  It is the court itself.  And the key quote is the

11  state invites the intervention of the federal, my word,

12  bankruptcy power to save its agency -- that's really a

13  synonym for municipality -- which the state itself is

14  powerless to rescue.  And the reason the state is powerless

15  to rescue it is because of the contracts clause.  Through its

16  cooperation with the national government, the needed relief

17  is given.  So under -- so as far as Bekins is concerned,

18  under Chapter 9 the federal government, through its courts,

19  is the pertinent actor.

20        Now, you could write this more elegantly, and it

21  wasn't in our briefs because I actually didn't find it until

22  last night, and that is Ashton.  You know, I have to

23  confess --

24        THE COURT:  That is what, sir?

25        MR. BENNETT:  Pardon?

1          THE COURT:  What did you say it was?

2          MR. BENNETT:  <u>Ashton</u>.  Until yesterday I'd never

3     read <u>Ashton</u>.  After all, everybody knew it had been overruled

4     by <u>Bekins</u>.  But I read it last night, and I got to the end,

5     and I realized there was a dissent by Cardozo.  And I read it

6     because it was by Cardozo because he writes really well.  And

7     he took this particular issue head on, and so I'm going to

8     read a lot of sentences from it.  It's on page 142.  And

9     here's what he says.  He, of course, is dissenting, so he's

10    finding the last version constitutional, and he gets to the

11    contract clause problem.  And by the way, one of the things

12    about Cardozo's dissent is that he's also much better about

13    dividing the Tenth Amendment analysis from the contracts

14    clause analysis.  He kind of does it explicitly separately.

15    And he says this.  This is about the contracts clause.  "The

16    act does not authorize the states to impair through their own

17    laws the obligation of existing contracts.  Any interference

18    by the states is remote and indirect."  I'm going to skip

19    some things, some citations and some things that aren't that

20    important, and get to something that's more important.  "If

21    contracts are impaired, the tie is cut or loosened through

22    the action of the court of bankruptcy approving a plan of

23    composition under the authority of federal law.  There, and

24    not beyond in an ascending train of antecedents" -- it's an

25    amazing sentence -- "is the cause of the impairment to which

1  the law will have regard," skipping some citations.

2  "Impairment by the central government through laws concerning

3  bankruptcies is not forbidden by the Constitution.

4  Impairment is not forbidden unless effected by the states

5  themselves.  No change in obligation results from the filing

6  of a petition by one seeking a discharge, whether a public or

7  a private corporation invokes the jurisdiction."  We're going

8  to use that sentence again when we talk about whether -- how

9  much we have to decide today.  "The court, not the

10  petitioner, is the efficient cause of the release."

11       For some reason Cardozo didn't participate in

12  Bekins.  The Bekins court, I think, said the same thing.  I

13  just think they said it a lot less clearly and a lot less

14  elegantly.

15       So I think this is very informative about the right

16  way to think about who is doing what and will become

17  important when we get to the authorization problem, which

18  we're going to be at very soon, but I want to --

19       THE COURT:  Where do you think in Bekins the

20  majority of the court or the court itself said the same

21  thing?

22       MR. BENNETT:  The words I read at the -- I'm sorry.

23  I got to find the back pages.  The words I started with,

24  the -- it's at page 54.  The state invites the intervention

25  of the federal bankruptcy power to save its agency -- means

1  municipality -- which the state itself is powerless to

2  rescue -- that's the reference to the contracts clause.

3  Through its cooperation with the national government, the

4  needed relief is given. I think the -- I think they're doing

5  exactly the same thing and just managed to do it in a lot

6  fewer words but with -- losing a teeny bit of precision in

7  the process, but it is the same thing. They are basically

8  adopting the Cardozo view of why the bankruptcy law is

9  constitutional under the contracts clause, the federal

10  contracts clause.

11        And, you know, I quoted these words, but there are

12  words before it and words after it that basically zeroes in

13  on that they're dealing with this particular issue at this

14  particular point in time. This is just as much as they say.

15        The Bekins court, of course, there's no dissenting

16  opinions. There's two judges that say they dissent for the

17  reasons expressed by the majority in Ashton. That's all they

18  do. And so that may well be one of the reasons why the court

19  was a little bit less careful. Of course, what Cardozo said

20  isn't precedent. It's just very, very clear thinking,

21  elegantly written about exactly the problem we have in this

22  courtroom today, and I think it's awfully persuasive, and I

23  think it is reflective, although certainly done better, than

24  the work that was done by the Bekins court.

25        A couple of other constitutional issues before we

move on to the authority points and the different contracts clauses. AFSCME does take the position in their papers that the contracts clause continues to constrain all municipal bankruptcies. Of course, the federal contracts clause we know from the Supreme Court does not. We'll talk about whether there's any difference in the state courts soon. But why AFSCME takes that position is they know full well that if the contracts clause is easily bypassed by a municipal bankruptcy case -- and we think that it is for precisely the reasoning of Judge -- Justice Cardozo -- then this is over because the contracts clauses, as we're about to get to, are very, very similar. They're almost identical to each other, and they're identical in all the ways that matter. We will go through it very carefully.

There was next the point that was made about accountability. I don't think there's any confusion about accountability. I think, again, I appeal to Cardozo's language but also to <u>Bekins</u> on this point. If you don't like the powers that a court has in Chapter 9, write your Congressman. If you don't like the way Detroit was managed so that it wound up in Chapter 9, don't let the people who used to be in office be in office again in Detroit. If you don't like the emergency manager and don't think he was qualified and don't like what he was doing, write the governor or your state legislator. There is no

1  accountability question if you break it down in the way that
2  Cardozo broke it down.  And by the way, the other thing
3  Cardozo says and I think also <u>Bekins</u> says, there's nothing
4  wrong with asking.  You have to ask if you're going to do
5  this consensually.  The emergency manager on behalf of the
6  city had to ask the retirement funds directly, retirees more
7  indirectly, to reduce or change benefits in order to
8  accommodate the needs of current city residents and the
9  ability of the city to survive.  They could also ask the
10  Court to exercise its authority to help, too.  That doesn't
11  mean they are the one loosening the knot or cutting the knot.
12          We talked about <u>Asbury Park</u>.  Anti-commandeering
13  cases.  Again, I think -- well, the federal government's
14  brief does a much nicer job on this than I ever could in
15  pointing out that the essence of the commandeering cases are
16  the federal direction to state actors -- in this case, maybe
17  it would be state judges or the emergency manager or the
18  governor -- to do something in a particular way.  And, in
19  fact, the -- that's not what happens.  That is not the
20  structure of Chapter 9 at all.  The structure of Chapter 9 is
21  that there is certain power that is vested in this Court, and
22  that power can be used in certain ways.  Frankly, your Honor
23  can't tell the city what kind of plan to file, but your Honor
24  can say whether or not you will approve a plan that is filed,
25  so the request has to be made by the city, and the power has

1  to be exercised by your Honor.  Again, the city itself is

2  powerless to escape the contracts clause, but it does not --

3  at no point does the federal government say I have a policy

4  that I am going to ask the states or demands that the states

5  implement for me.  That doesn't happen anywhere in Chapter 9,

6  and, frankly --

7      THE COURT:  Well, but Ms. Ceccotti doesn't agree

8  with that.  What she says is Congress says if you want to

9  adjust your debts, we prescribe the priority scheme to the

10  exclusion of the state.  The state can't come in with its own

11  notion of what the priorities should be so that the division

12  of sovereignty that results violates the Tenth Amendment.

13      MR. BENNETT:  Well, first, there's a logical failure

14  there, and it has to do with Asbury Park.  The UAW starts

15  with the proposition that there is some kind of viable state

16  restructuring process that can actually work and that the

17  federal government took it away from them and made the

18  bankruptcy -- the Chapter 9 exclusive.  That isn't reality.

19  Asbury Park, as we've seen, first of all, is an unbelievably

20  exceptional case, which, by the way, the end holding is that

21  that restructuring was done for bonds and made bonds better.

22  That is the holding at the end of the day or the key facts at

23  the end of the day in Asbury Park.  Asbury Park is not and

24  never has been construed to be -- and no one cited any case

25  to your Honor showing that in the period of time before

1 Congress claimed the field for itself that there was any

2 viable municipal debt adjustment opportunity created by what

3 we have to call the <u>Asbury Park</u> exception to the contracts

4 clause.  And if you believe everything in the UAW's belief --

5 brief and believe their interpretation of the pensions

6 clause, it gets even worse, that even if there were -- was

7 <u>Asbury Park</u> wiggle room and then in the absence of the

8 Bankruptcy Code the pensions clause is absolute, you have

9 worse than nothing.  You have worse than the almost

10 meaningless <u>Asbury Park</u> exception.  So I don't think it's

11 coercion for the -- for Congress to say you can't do

12 something that you can't do.  And I think the prohibition on

13 competing state municipal schemes is, frankly, recognition

14 that they're not possible or workable, and, again, no one has

15 been able to show you either before or after that provision

16 of the Bankruptcy Code what this wonderful municipal scheme

17 is out there that would have been a choice.  Cardozo doesn't

18 think there's any choice.  <u>Bekins</u> doesn't think there's any

19 choice.  And that's the same court that decided <u>Ashton</u>, so

20 I -- about the same time actually or <u>Blaisdell</u> was about the

21 same time.  <u>Ashton</u> may have been later.  This is a -- I

22 think -- I don't think Congress coerced anybody.  I don't

23 think that's possible on the facts.

24   Okay.  So to summarize, we've shown that Chapter 9

25 is constitutional and that, in particular, it does not offend

1  the contracts clause in the United States Constitution.  I

2  think along the way we've demonstrated that the state's

3  authorization of a municipality's resort to Chapter 9 for

4  relief from contracts generally does not constitute a state

5  impairment of contract because otherwise no -- not a single

6  Chapter 9 would work.  We have also along the way noted that

7  the filing of a petition itself doesn't constitute impairment

8  of anything in any event and that if there is an impairment,

9  it's by the federal Bankruptcy Court, so now let's look at

10  our contracts clause cheat sheet and try to find out whether

11  there's any difference because of the fact that there's a

12  state contracts clause or because there's a pensions clause.

13        First, with respect to the state contracts clause, I

14  don't think anyone has suggested to the Court that this is

15  any different than the federal contracts clause, and, in

16  fact, there isn't.  There's no difference, and no one

17  suggested it, so -- but, by the way, Justice Cardozo, again,

18  as -- more elegantly and more precisely but -- and the Bekins

19  court both would believe that the state contracts clause --

20  okay -- is also focused on the state.  It doesn't bind the

21  federal government.  And since the federal government is the

22  relevant actor, the state contracts clause does not impose

23  any obstacle at all to a municipality invoking Chapter 9

24  relief.

25        The only thing I want to pause to say is it couldn't

1   be otherwise because if it were otherwise -- I skipped a
2   step.  Every state -- at least every state I looked at, so
3   there may be an exception, but every state has a state
4   contracts clause.  It's not surprising.  Copied it from the
5   federal Constitution.  So if it were the case that the
6   state's contracts clause was different than the federal
7   contracts clause and that it was a barrier to invoking
8   Chapter 9 relief, then every single bondholder in every
9   single -- I should say every single lawyer for every single
10  bondholder in every prior Chapter 9 case has probably been
11  guilty of malpractice because they might have been able to
12  escape their prior Chapter 9 cases -- and there are now
13  hundreds on the books -- on this basis alone.  But, again,
14  for the reasons expressed in _Bekins_ and more elegantly by
15  Judge -- Justice Cardozo, they can't.

16          So now we finally get -- we reach the pensions
17  clause also quoted in front of you, and we say, okay, is this
18  pensions clause any different than --

19          THE COURT:  But hang on.  Isn't there a difference
20  between reconciling the bankruptcy clause with the federal
21  contracts clause on the one hand and trying to reconcile how
22  a state that prohibits itself from impairing contracts with
23  taking advantage of the bankruptcy power that the federal
24  court has enabled -- or that the federal Congress has enabled
25  because of the sovereignty of the state?

1          MR. BENNETT:  No difference.  Why?  Let's remember.

2     The reason why I spent so much time talking about why was the

3     Debt Adjustment Act under the Bankruptcy Act constitutional

4     as far as the federal contracts clause was concerned -- it

5     wasn't about the language of the federal contracts clause.

6     It was because the state isn't an actor.  The federal

7     contracts clause acts only on states.  The relevant actor is

8     the federal government.  It's the Bankruptcy Court.  That was

9     the reason why there was no federal contracts clause problem

10    with the Bankruptcy Act in Bekins, and it was the only

11    reason -- the only part of the opinion that had to do with

12    the federal contracts clause part of the problem.  The state

13    contracts clause acts again only on the state, not on the

14    federal government.  Accordingly, if you believe -- and the

15    Supreme Court has held that the relevant actor for purposes

16    of untying or cutting the knot is the federal Bankruptcy

17    Court and not the state, then the state contracts clause

18    forms no additional barrier to the use of the Bankruptcy Code

19    than the federal contracts clause did.  They are the same,

20    and they are both not relevant for the same reason.

21          THE COURT:  And your position is that it's a matter

22    of federal law that the pertinent actor is the federal court,

23    not the state entity that's in bankruptcy?

24          MR. BENNETT:  The Supreme Court told us along the

25    way to approving the Bankruptcy Act the first -- for

1    municipalities the first time that it's --

2            THE COURT:  So even if the state law were to say

3    it's the city that's the pertinent actor, that's not relevant

4    because it's a federal law question.

5            MR. BENNETT:  Correct.  So for purposes of federal

6    law, the Supreme Court has told us it's the federal

7    Bankruptcy Court that is the relevant actor.

8            So now we get to the pensions clause, and we've got

9    to find that there's a difference.  And I think I want to

10   start here.  This is going to be somewhat repetitive of the

11   brief.  There's nothing in the pensions clause that says

12   anything like, quote, "and the state shall not authorize any

13   municipality to commence a bankruptcy case that would allow a

14   federal court to impair or diminish pension claims."  It just

15   doesn't say that.  And, of course, it is words like that that

16   the objectors are saying have to be imported into the

17   pensions clause.

18           It's hard, I think, because at the end of the day,

19   apart from the fact that the pensions clause is, quote, "more

20   specific," and it's, of course, more specific because they

21   were looking at pensions because the law in Michigan at the

22   time they were looking at the pensions clause was that

23   pensions weren't a contract.  That's the only reason it's

24   more specific.  It wasn't because -- there's no other

25   evidence for why it was more specific.  The only

1  difference -- the only words that are different are the

2  words, quote, "be diminished." Excuse me. Quote,

3  "diminished or." That's the only difference. "Impaired" is

4  used in all of them. "Prohibition of impairment" is used in

5  all of them. All of them are absolute about prohibitions of

6  impairment.

7        And I'm going to take this in two steps. First of

8  all, the objectors say --

9        THE COURT: Well, but hang on. There's the next

10 sentence, which you didn't include on here, the next sentence

11 of the pension clause.

12       MR. BENNETT: Okay. The funding sentence?

13       THE COURT: Yes.

14       MR. BENNETT: Okay. Well, frankly, that's not

15 focusing on today, and it sounds like it's a --

16       THE COURT: Well, but the objectors argue that this

17 additional consideration that the Michigan Constitution gave

18 to pensions which it didn't give to contracts elevates it,

19 makes it, if not absolute, more absolute than contracts.

20       MR. BENNETT: Well, let's talk about -- I

21 specifically wanted to talk about that because --

22       THE COURT: Okay.

23       MR. BENNETT: -- first of all, why is it -- we

24 should ask ourselves question number one. Why is it that the

25 federal contracts clause and the state contracts clause

became less than absolutely binding?  It wasn't because of
the inadequacies of the language.  It was -- in fact, what
the courts have done is they put the word "substantial" in
front of the word "contract," so an insubstantial impairment
doesn't count, and a substantial impairment has some extra
hurdles that you have to go over before you can make it.  So,
frankly, if what they were trying to do was to tighten the
pensions clause and make it more distinctive -- and if they
went to the books because, of course, all of the cases, you
know, Worthen versus Thomas, Home Building & Loan Association
versus Blaisdell, these are like cases from the mid-'30s, so
they were all on the books in 1961 through 1963, so they knew
that, and they knew that the problem was the incorporation of
the substantialness concept.  So if they were really after
solving that problem, why didn't they just put the words
right before "impairment" "substantial or insubstantial
impairment"?  And they could have tightened it up in the way
that it had been loosened.  They could have prohibited
substantial and insubstantial impairments.  That would have
dealt with -- if they were trying to say we're opting the
pensions out of the judge-made doctrines and exceptions that
have burdened the federal contracts clause and the state
contracts clause, that's how they might do it.

Now, by the way, it would be irrelevant to this
argument because remember the pensions clause, just like the

1  state contracts clause, just like the federal contracts

2  clause, acts on states and municipalities.  It doesn't act on

3  the Bankruptcy Court.  It doesn't act on the federal

4  government.  And once again, if the right actor -- if the

5  actor that unties the knot or cuts the knot is the federal

6  Bankruptcy Court and the federal government and not the state

7  and not the municipalities, as the Supreme Court says, then

8  the pensions clause, even with the words "substantial or

9  insubstantial" in front of it, doesn't get you all the way

10 home.  What they next needed to do in the pensions clause is

11 to say by enacting the pensions clause and giving it -- and

12 making pensions special, we now want to do something else.

13 We really want to say -- objectors thinks the Constitution --

14 that the convention -- that the conventioneers really wanted

15 to say, well, in a municipality that has material pension

16 claims, they can't resort to a federal court to seek relief.

17 That's what they really want us to find in the pensions

18 clause.  But, frankly --

19      THE COURT:  No, no.  I don't hear that at all.  What

20 I hear is you are welcome to come in that door so long as the

21 city's assets, according to Mr. Dusen, are first allocated to

22 pensions.

23      MR. BENNETT:  Well, if there was a lawyer around

24 there at the constitutional convention who was doing

25 research -- and I suspect that there was -- they should be

 1   charged with figuring out that the only way to stop the

 2   federal courts -- if there is even a way, but the only way to

 3   stop federal courts from having the power to impair contracts

 4   that maybe a state can't impair is to cut off the -- is to

 5   basically say the state cannot ever go to a federal court for

 6   a federal -- then it was called composition, you know,

 7   federal debt composition case.

 8            And the other point that your Honor should note is

 9   that -- and we say this in our papers -- during the entire

10   constitutional convention, for years before and almost

11   continuously thereafter, the State of Michigan had authorized

12   the municipalities to file Chapter 9 cases, so if they were

13   really elevating pensions in the way of taking them --

14   distancing themselves from the federal power to impair them

15   and they knew, open paren, one, that the federal debt

16   composition scheme had been determined to be constitutional

17   by the Supreme Court in part because the federal court was

18   doing the work of impairing contracts and they knew -- they

19   have to be presumed to know that Michigan had opted in and

20   had continuously all through the period -- in fact, I think

21   in our papers we say when they repealed it.  I think they

22   repealed it around 1980 when general authorization was all

23   that was necessary, so they kind of covered the entire

24   period.  No one ever said, gee, we better as hell change

25   this.  And in all of the legislative history of the

1  constitutional convention, you don't have a word about

2  bankruptcy and pensions, and the words that you do have --

3  the words that were quoted to you in the papers just filed --

4  I have to find it. Okay. Here's AFSCME's best quote from

5  the official record of the constitutional convention, 2

6  Official Record, page 3402. This is a new section that

7  requires that accrued financial benefits of each pension plan

8  and retirement system of the state and its political

9  subdivisions be a contractual obligation which cannot be

10  diminished or impaired by the action of its officials or

11  governing body. It's in AFSCME's papers, paragraph -- the

12  new ones, the supplemental papers. Actually, those are

13  amended and restated, paragraph 19, page 11. Same brief,

14  paragraph 142, page 71. Pension benefits constitute, quote,

15  "deferred compensation for work performed which should not be

16  diminished by the employing unit after the service has been

17  performed," close quote. Those are the quotes that you were

18  offered by AFSCME about the seriousness and importance of the

19  work done in the constitutional convention from 1961 to 1963,

20  this against the background where it's been the law of the

21  land, at least as far as the Supreme Court is concerned,

22  since 1930 -- I can't remember exactly.

23        THE COURT: So is it your view that the only

24  effective way that the Michigan Constitution could have

25  provided the protection for pensions that the objectors seek

1  here is by the Constitution prohibiting a Chapter 9 filing?

2       MR. BENNETT:  Prohibiting authorization of a Chapter

3  9 filing or -- yes, your Honor.  That's exactly what they

4  would have had to do, and that's not the kind of thing that

5  they can do by implication.

6       I want to talk a little bit more because I think

7  there's a lot of stress that's put on the words "diminished

8  or," and there is the assertion that "diminished or" has to

9  be given some meaning, but, frankly, the only meaning it

10  could be given is to somehow expand "impaired."  I don't

11  personally think it does expand "impaired," and there's -- I

12  want to point out before moving on with a whole bunch of

13  authority to that effect that it's really dangerous for a

14  court to decide that "diminished or" added anything to

15  "impaired" because if the Court decides that "diminished or"

16  filled some gap that's related to the word "diminished and

17  impaired," then in the next case someone is going to come to

18  your Honor and say, "You know that state contracts clause?

19  There's no 'diminished' there, and 'impaired' has to mean

20  less than 'diminished or impaired' in the pensions clause."

21  So it's actually a good thing that there's law out there on

22  this subject -- we had it in our brief -- that basically says

23  that if you run into one of these problems where you've got a

24  list and you want to say that they all have an independent

25  and separate meaning, you've got to propose an independent

1   and separate meaning for the terms on the list that actually

2   solve the problem.  And in this case, trying to find an extra

3   meaning for "diminished or" -- again, it's consistent with

4   its place in the sentence -- does -- creates a mess in the

5   state contracts clause in Article I, Section 10.

6          Apart from that, it turns out that when you go look

7   at the books -- and this is not in our papers because this

8   was an issue raised in the responsive papers -- is that every

9   time we found the definition of "impair" in the cases or in

10  dictionaries, it includes diminishment, which should not be

11  terribly surprising.  It's a very common sense answer.  But

12  if you want a list -- and you might need them in connection

13  with putting together an opinion -- you could start with the

14  Bank of Minden case, which is a Supreme Court case, 256 U.S.

15  126 at 128.  Then if you want to go to the Sixth Circuit,

16  Riverview Health Institute, 601 Fed. 3d 505.  Black's Law

17  Dictionary, Webster's Third, and then there's a bunch of

18  state courses -- state cases from other states that all say

19  the same thing.  I could read the quotes, but I'll save the

20  time because it really is kind of a commonsensical -- a

21  common -- it's common sense that "impaired" has to include

22  "diminished."  "Impaired" is much broader than "diminished,"

23  and every so often this is either a -- there's a rhetorical

24  flourish that works its way in, and this may well be what

25  that is, and that's all it can be.

1          Okay.  Moving on to the issue of whether or not the

2     authorization to file Chapter 9 is ineffective because the

3     emergency manager or the governor recognized that impairment

4     of pension benefits may be necessary.  I don't want to add

5     additional arguments to the constitutional provisions.

6     That's not the purpose of this section.  The purpose of this

7     section is to deal with the point made, I think, by only one

8     or two of the objectors that the -- that there's an

9     instruction to the emergency manager to comply with the

10    pension statute, and that should apply to the filing of a

11    Chapter 9 case as well.  I'm sure your Honor has your own

12    copy of the Local Financial Stability and Choice Act, Act

13    436, and when you look at the -- most importantly, when you

14    look at the Chapter 9 authorization section, there is no

15    instruction that the emergency manager comply with the

16    protections affecting pensions.  By the way, that may well

17    make sense.  There are a whole bunch of other provisions that

18    talk about what the emergency manager is supposed to do out

19    of court, and not surprisingly it talks about him having to

20    comply with many laws and to pay many debts and to do many

21    things.  He resorts to Chapter 9 when he can't accomplish

22    those things out of court.  And if one thought that anything

23    about the emergency manager law meant to say that the

24    emergency manager had to in Chapter 9 continue to not impair

25    pensions, you would think it would belong in the section that

1    is applicable when the emergency manager files Chapter 9.

2            In addition, I think the part that was read to your

3    Honor earlier this morning has a lead-in clause that didn't

4    make it into the record.  It reads, "If the emergency manager

5    serves as sole trustee of the local pension board, all of the

6    following should apply," and that's where the provision that

7    was located was read to you, so there is nothing in the

8    emergency manager law -- and, in fact, the structure of the

9    emergency manager law itself suggests that a lot of bets are

10   off in a Chapter 9 context that may not be -- including

11   things that the emergency manager is supposed to try to

12   accomplish if he's in an out-of-court world.

13           Next argument, failing to condition authorization on

14   nonimpairment of --

15           THE COURT:  One second.  Does that suggest that in

16   order to accomplish what Mr. Orr thinks is necessary to

17   accomplish with regard to pensions, he needs to be a trustee

18   of the plan?

19           MR. BENNETT:  No.  It's that -- no.  He has the

20   right to remove trustees of the plan for other purposes, and

21   these are these extra requirements that are imposed upon him

22   just in those circumstances that it -- I think when your

23   Honor gets a chance to look at it -- what did I do with it?

24   I had it here a second ago, so I'll give you -- let me give

25   the exact section referenced so it's easy to find.

1          THE COURT:  Okay.

2          MR. BENNETT:  The part I read from is in Section

3   12(m), and it is confined to that relatively narrow

4   circumstance.

5          Okay.  First of all, on the issue of whether or not

6   the governor's failure to put conditions on authorization

7   makes the authorization invalid, we indicate in our brief

8   that we don't think that conditions on authorization could be

9   valid, that -- and as I think -- I think I got ahead of

10  myself earlier, so I don't want to take too much time in

11  covering it again now, but we're talking here about one of

12  the core subjects of bankruptcy, which is priorities, who

13  gets paid when there's not enough to go around.  If that's

14  not a core subject of bankruptcy -- not in the core versus

15  related, but if that's not the absolute center of the subject

16  of bankruptcies, I don't know what it is.  And we've cited a

17  lot of law, and your Honor has pointed out there are many

18  cases, none decided the other way, that say particularly in

19  the context of things touching on priorities and who gets

20  paid first and who gets paid second, who doesn't get paid at

21  all, that the -- that you buy the Bankruptcy Code as a whole.

22  You buy the scheme as a whole.  You don't buy parts of it.

23  And in this sense federal law is supreme because once there

24  is a proper bankruptcy case before the Court, it is the

25  federal priority scheme that applies.  It is legitimate that

1   the federal priority scheme applies because it's legislation

2   on the subject of bankruptcies, and because it's legislation

3   on the subject of bankruptcies, it is absolutely supreme,

4   period, end of story.

5          So, as to your Honor's hypothetical, if anyone walks

6   into the federal court and says, "I want federal judicial

7   relief.  I want to use that federal power to untie and cut

8   knots, but I want the ultimate distribution or really any

9   part of the distribution to be conducted in accordance with

10  my terms," whether they're found in a statute or in a state

11  Constitution, it doesn't matter.  The federal law on this

12  issue is supreme, and it's supreme over Constitutions and

13  over statutes, period, end of story.

14         It seems kind of small when done with that to point

15  out that 436 permits but doesn't require conditioning.  We

16  can imagine a whole bunch of conditions that might have been

17  very sensible and that might not offend federal jurisdiction

18  like it could have been -- there could have been suggestions

19  or requirements as to exactly how the emergency manager

20  should interact with other elected representatives or with

21  other people.  Actually, the governor does have one -- it's

22  not quite a condition.  It's a suggestion, but I think he'd

23  be offended if it wasn't followed, which is he wants Mr. Orr

24  to continue to communicate with the governor and the

25  treasurer relating to what he's doing.  So I think we can

1    think of several things that could be -- that you could use

2    for the PA 436 conditioning power that would be perfectly

3    okay, but going in and saying, "Gee, as a matter of this

4    particular state law" -- and, by the way, it's -- the

5    governor would -- to do that, he's got to ignore the

6    conflicts that I discussed earlier between a law that says

7    thou shall not impair this one with another law that says

8    you're the first money out.  It's mind-boggling what he'd

9    have to reconcile, but the instruction would be, yeah, this

10   one we really meant and the others we didn't really mean,

11   follow that one first.  I think that that would be an invalid

12   authorization.  I think the Court would have to say that

13   authorization isn't okay for federal court purposes.  I think

14   as a prudential matter, the federal court should not get

15   involved in a case where the authorization is conditioned in

16   a way that would offend the federal scheme, but understanding

17   that there may be very extreme and difficult circumstances

18   involved, a creative federal court might want to give people

19   some time to kind of take a couple steps back and figure out

20   how to do it better.

21          THE COURT:  Let me ask about Section 943.

22          MR. BENNETT:  I need to get a case if you're going

23   to do that because I -- from the --

24          THE COURT:  This is the Bankruptcy Code.

25          MR. BENNETT:  Yeah.

1        THE COURT:  943(b)(4).

2        MR. BENNETT:  Right.  There's actually one case

3   that's dealt with that previously, and I think it's --

4        THE COURT:  Let me just get my question out.

5        MR. BENNETT:  Okay.

6        THE COURT:  Thank you.  So the question is what does

7   this section mean if it doesn't mean that the state can

8   dictate the priorities?

9        MR. BENNETT:  Because it says "from taking any

10  action necessary to carry out the plan," and I --

11       THE COURT:  What does that -- what does that

12  language mean?  What meaning does it have?  How does it come

13  into effect?

14       MR. BENNETT:  Okay.  I think the best way to work

15  through that is the Sanitary Improvement District Number 7

16  case, 98 B.R. 970, and this is a really fascinating case

17  because the facts gave you every conceivable issue under the

18  sun in terms of the interpretation of this section.  What

19  happened in Sanitary Improvement District is that the debtor

20  had -- you know, had claims against it.  Let's call them a

21  hundred.  I'm using representative numbers, not the actual

22  numbers.  As a result of the bankruptcy case, they issued

23  paper, and I think it was like 60.  Okay.  And the -- but the

24  paper that was 60 had in it a provision that said that if the

25  debtor paid it in full within a certain number -- within a

1　certain number of months -- I think it was 18 months -- after

2　the bankruptcy case is over, it only had to pay 95 cents on

3　the dollar or something like that, and so the creditors came

4　in, and they attacked the whole plan, pointed to a state law

5　that says thou shall pay your bonds.  By the way, there are

6　laws like that in Michigan, too.  And the court decides very

7　easily that the takedown from a hundred to 60, well, that's

8　supremacy clause bankruptcy.  You can do that notwithstanding

9　state law.  What you can't do, though, is because state law

10　says you have to pay bonds at a hundred percent of principal,

11　you can't have the five-percent discount feature because

12　that's -- after the bankruptcy, you issued this new bond, you

13　know, with 60 being the new hundred, but you've said that you

14　can still pay that off at a discount.  That violates

15　943(b)(4).  So what this case illustrates is that this looks

16　at the obligations after they've been restructured and says

17　that the Bankruptcy Court does the restructuring.  By the

18　way, very consistent with the Cardozo and the Bekins view of

19　the world, you -- and you're finished.  The bankruptcy --

20　there's a confirmation order.  New instruments are issued.

21　Those instruments, the ones that you walk out of Bankruptcy

22　Court with, have to be instruments that you can perform in

23　accordance with state law.

24　　　　　THE COURT:  So this provision, in your view, says

25　nothing about the requirement of the plan itself or the order

1  confirming plan to comply with state law.

2       MR. BENNETT:  I don't know if there's any case that

3  says that.  There may be.  I think Sanitary and Improvement

4  District Number 7 has got it right, that it does not say

5  anything about the Bankruptcy Code restructuring process.  It

6  only acts on the debt that is issued after the case is over.

7       I don't think I have to spend time on it, so I'm

8  going to skip over -- again, it's in our papers.  There's an

9  assertion in the papers that the Tenth Amendment is not

10  reserved -- that the Tenth Amendment reserves every issue

11  relating to municipal pensions to the states.  I think we've

12  dealt with that enough in the constitutional section, and I

13  don't have to deal with -- this really is the -- an argument

14  was built, constructed based upon the fact that in the case

15  of ERISA the federal government didn't make ERISA -- didn't

16  make states or municipalities applicable to ERISA, didn't

17  create the insurance program, PBGC, and the assertion is made

18  because the federal government chose not to go into those

19  areas, they must have done that because they were absolutely

20  precluded from doing so, ergo they are precluded from using

21  the bankruptcy power to modify pensions.  I think that fails

22  logically in a lot of places, but most importantly maybe to

23  start with is that it's not clear that there is no possible

24  way for the federal government to apply the ERISA statute or

25  the PBG statute to state municipalities, maybe to states but

 1  not to municipalities, and -- at all, by the way, and that

 2  Congress didn't may have reflected political realities at the

 3  time and not actual constitutional limitations, so I think

 4  the starting point of that argument just fails, and I think

 5  we've seen that federal -- that a federal bankruptcy power

 6  can be applied by the federal court to obligations.  Pensions

 7  are clearly within the federal bankruptcy power, no dispute

 8  in the private context.  There's nothing different about

 9  Chapter 9 context.  And so there is no such part of the Tenth

10  Amendment that constrains this aspect of the subject of

11  bankruptcies.

12          The next point is a really important one, and I

13  could easily have started with it, and I know your Honor has

14  been concerned with it throughout, which is whether or not

15  your Honor really has to deal with the -- whether or not

16  pensions can be impaired in bankruptcy in the context of

17  authorization.  I hope it's clear to your Honor that the city

18  is perfectly comfortable with you dealing with it now or

19  perfectly comfortable with dealing with it later.  We don't

20  think that this is -- some of these things may be a little

21  bit conceptually difficult and complex, but the

22  constitutional law on the subject is really pretty clear, and

23  so we're prepared to have it decided.  We think that there's

24  only one way to decide it.  There is, though, a way for your

25  Honor to decide not to decide it, which is to find -- and the

 1   next to the last sentence I read from Justice Cardozo in his

 2   dissent where he says, "just the filing is not doing

 3   anything," we say that, too.  It is starting a bankruptcy

 4   case.  I have said at the beginning -- I mean it -- there is

 5   nothing inevitable.  A cramdown of revisions to pension

 6   benefits, a cramdown of a particular treatment of the

 7   underfunded portion of the pension obligation is not

 8   necessarily the way this case is going to end, and it's not

 9   necessarily the next step in this case.  We just don't know.

10   The next -- obviously right now mediation is an important

11   milestone.  The next important milestone is the plan, and

12   since your Honor has been around the Bankruptcy Courts for a

13   good long time, you know that the plan that we file before

14   the end of this year is not likely to be the plan that we

15   ultimately confirm.  It would be actually a good exercise for

16   different people to figure which amended plan is going to be

17   the plan.  The bottom line is nobody really knows.  And so it

18   is possible to adopt Justice Cardozo's view that no change in

19   obligation results from the filing of a petition by one

20   seeking a discharge whether a public or private corporation

21   invokes the jurisdiction and basically say since nobody has

22   done anything yet, we're not going to decide anything more.

23   You could do that.  I will say that the -- I think that the

24   assertion that there is an imminence that -- an imminence of

25   harm represented by the filing of the Chapter 9 case that

1   requires this Court to act is, frankly, not a fair statement

2   of the law.  I think one of the more important cases is

3   Donohue.  It's been cited by objectors.  The most important

4   part -- Donohue is the Nassau County financial restructuring

5   case, and the most important part of Donohue that led the

6   Court to act I think is mentioned by the Court.  It's kind of

7   near the end of the opinion.  The Court says the law, the

8   ordinance that gave the county executive all the powers,

9   "provides expansive and seemingly limitless power to the

10  County Executive without any reasonable restraints other than

11  the procedural mechanism of an executive order."  This case

12  would be a lot simpler if all Kevyn Orr had to do to

13  reorganize the debts of Detroit was to say how he wanted to

14  do it and sign it as an order.  He doesn't think he has that

15  power.  I don't think he has that power.  No one in this room

16  thinks he has this power.  We've talked about the fact that

17  to get to a debt adjustment plan that is nonconsensually

18  confirmed, it has to be filed.  There has to be disclosure

19  statement approved.  There has to be voting.  There has to be

20  more discovery.  There has to be a confirmation hearing, and

21  there has to be an order of this Court.  That is a very

22  different procedure or array of protections than was

23  available in the Donohue case, which is, frankly, the closest

24  case to this one in terms of the kinds of things that we're

25  talking about here.  If your Honor goes through the other

1  cases that have been cited for the proposition of imminent

2  harm, you will find that in all of them there was no judicial

3  step going to occur before the harm might be inflicted.  In

4  all of --

5          THE COURT:  Let me ask that question here.  Can

6  you -- are you willing to identify here on the record or can

7  you identify here on the record any conceivable circumstance

8  in which retiree benefits, pensions won't be impaired by a

9  plan?

10          MR. BENNETT:  You know, your Honor, at this point

11  there are a number of major things that I don't know, and I

12  will say I don't know that there won't be money from outside,

13  although I tend to doubt it.  I don't know that.  I do not

14  know whether there will be -- whether certain other assets

15  will, in fact, be available to the city to address its debts,

16  and I will point out in this regard that while the objectors

17  have cited over and over and over again a pleading filed by

18  the attorney general asserting the primacy of pension claims,

19  they've all managed to have forgotten a formal opinion he's

20  given concerning the accessibility of certain assets in this

21  bankruptcy case, particularly the art, and -- but I have no

22  idea, number one, what's going to happen with that, and I

23  have no idea what the -- whether or not there will, in fact,

24  be a transaction involving the departments of water and

25  sewerage and whether those transactions will deliver material

1  dollars.  So while I'd be kidding myself and kidding the

2  Court and kidding everyone here if I said that I thought it

3  was anything but likely that there would be some impairment

4  of the underfunding claims in this case, it's not fair to ask

5  me and I don't think I could say that there's no scenario

6  where impairment will not be necessary.  I just don't think I

7  can even say that today.

8       THE COURT:  Okay.  Even with that much of a

9  disclosure here, why isn't that enough to say there's an

10  impairment here?

11      MR. BENNETT:  I'm sorry.

12      THE COURT:  Why isn't that enough to say at this

13  point in time there's an impairment?

14      MR. BENNETT:  Well --

15      THE COURT:  There's a sufficient impairment to get

16  past ripeness anyway.

17      MR. BENNETT:  You know, I don't think you can say

18  there's impairment because the Supreme Court has told us

19  there is not.  There won't be impairment, your Honor, until

20  you say so.  Is there a risk of impairment?  There's a risk

21  of impairment.  Is the risk of impairment enough to make this

22  ripe?  And the answer is is that -- I think this is the

23  answer when -- I mean the Donohue case is a good example, but

24  I think it ripples through all the others, which is that if a

25  court is presented with a situation where there's a risk of

 1  impairment and the impairment can occur before there's

 2  another opportunity or requirement that people show up in

 3  front of a judge, then they start thinking about whether

 4  there's interim harm, but there's not a single case that has

 5  been cited to you that says there is imminent harm in

 6  circumstances where no one is going to suffer anything until

 7  and unless a court enters an order after notice,

 8  opportunities for discovery, opportunities for hearing, and

 9  all the other protections that are available in connection

10  with a plan confirmation process in a Bankruptcy Court.  It's

11  just totally different.  The cases are dealing with a totally

12  different situation, particularly the <u>Donohue</u> case.

13          Do you have -- we're 20 minutes to.

14          THE COURT:  Twenty till five.

15          MR. BENNETT:  Do you want to save time for your

16  questions or --

17          THE COURT:  If you want to stop now, and we'll pick

18  it up with the government's attorney, that's fine with me,

19  and then we'll pick up the balance of your argument tomorrow.

20  Is that what you're --

21          MR. BENNETT:  I think it's a good break point.

22          THE COURT:  Okay.

23          MR. BENNETT:  I have very minor things left.

24          THE COURT:  Good.

25          MR. TROY:  Matthew Troy, your Honor, Department of

1  Justice, Civil Division, on behalf of the United States.  If

2  it makes any difference to your Honor or the other parties, I

3  am here for tonight and can be available tomorrow as well.

4       THE COURT:  I appreciate that, but since you're

5  here, let's have at it.

6       MR. TROY:  Fair enough.

7       THE COURT:  Well, my primary questions relate to how

8  you address the arguments here that the objecting parties

9  made in response to your brief regarding ripeness.

10       MR. TROY:  To be honest with you, your Honor, I've

11  only reviewed those very quickly because I filed the brief on

12  Friday and then went back to furlough status.  And on

13  Monday --

14       THE COURT:  That.

15       MR. TROY:  And on Monday --

16       THE COURT:  Well, would it be your preference to

17  have overnight to think about how to respond to the

18  objectors' concerns regarding ripeness?

19       MR. TROY:  Sure.  I can do that.

20       THE COURT:  Would that be your preference?

21       MR. TROY:  That would be, yeah, a more fulsome

22  discussion, I think.

23       THE COURT:  All right.  Then you are excused, and I

24  will hear from you tomorrow regarding that.  Do you want to

25  stop for the day now and pick it up tomorrow?

1    MR. BENNETT:  Your pleasure, your Honor.  I can keep

2  going, but I can also stop.  I'm not going to -- I don't

3  have -- less than 30 minutes left, in fact, significantly

4  less than 30 minutes left.

5    THE COURT:  Well, do you think you can finish in the

6  20 minutes that are left before five?

7    MR. BENNETT:  I'll try.

8    THE COURT:  All right.  Then I would invite you to

9  try.

10    MR. BENNETT:  Let me just get a little bit

11  reorganized.  Okay.  The next topic on my list is collateral

12  estoppel, and, your Honor, I think with respect to collateral

13  estoppel, a couple of points are worth focusing on.  First of

14  all, our very, very first point on this -- and I think it's

15  dispositive -- is that when this case was filed, this Court

16  had the most exclusive jurisdiction it ever gets about

17  anything, absolutely exclusive interest -- exclusive

18  jurisdiction under 1334(a) to decide matters in the case, and

19  eligibility is a matter in the case.  And the assertion by

20  the objectors is that the Webster court really didn't decide

21  eligibility.  The Webster court was deciding some abstract

22  issues of state law.  And, your Honor, two things.  Number

23  one, the objectors can't even say that without mentioning the

24  eligibility determination, and here I'm looking at the

25  funds -- Mr. Gordon's brief at page 32.  The Webster judgment

1   rules squarely on the constitutionality of PA 436 and the
2   governor's authorization of the emergency manager to proceed
3   under Chapter 9 in light of the pensions clause of the
4   Michigan Constitution.  There was absolutely no confusion in
5   the judge's mind or anyone around that courtroom's mind that
6   what they were trying to do was to get an early determination
7   of eligibility.  It might have succeeded, but this case was
8   actually filed first.  And by the way, although the attorney
9   general will probably have more to say about this, there was
10  no adjournment sought for purposes of filing the Chapter 9
11  case, and the transcript shows no such thing.  And they know
12  more about the circumstances than I do, and they can address
13  it tomorrow when it's their turn.
14         But there's an even more important point, which is
15  that the order that was entered by the judge purports to
16  enjoin the emergency manager directing him to have the case
17  dismissed and not file another one, so I just -- I can't
18  abide the assertion and the record does not support the
19  assertion that what happened in that court was not an effort
20  at an eligibility determination, so, number one, that was
21  within the exclusive jurisdiction of this Court.  If it was
22  within the exclusive jurisdiction of this Court, it wasn't
23  within the jurisdiction of that Court to do anything about
24  it, and, therefore, any judgment that was entered after the
25  filing for that reason alone is void.

1          Now, second point we make is that the automatic stay
2     applied as well because the entire event, even though the
3     city was not a party, was an effort to gain control over the
4     city's assets and an effort to enhance collection of the
5     debt.  Again, there can't be much dispute about that, open
6     paren, one, partly because of the way the whole proceeding
7     evolved and how everyone understood it, but more importantly,
8     here again we have the judge explicitly talking about the
9     Chapter 9 case and attempting to stop the Chapter 9 case
10    because of the perception that the Chapter 9 case might
11    impair pensions, and those kinds of acts are clearly within
12    the automatic stay.  Again, I think that the --
13         THE COURT:  Just to be clear, you're talking about
14    the automatic stay of Section 362 --
15         MR. BENNETT:  Yes.
16         THE COURT:  -- the Bankruptcy Code.
17         MR. BENNETT:  Correct, the Bankruptcy Code's
18    automatic stay, or 942.  The other half of it is in the -- is
19    in Chapter 9 as well.
20         Full and fair opportunity to litigate.  Again, I
21    would ask the Court to look at the record in that case.
22    There had been -- it is certainly true that a whole bunch of
23    briefs that were filed -- I don't think the hearing where
24    this all occurred had previously been calendared and noticed
25    to anybody.  The hearing was set on an emergency basis, and

1   someone got on the phone and called for the attorney

2   general's office because they thought it might be a good idea

3   to tell him about it about an hour before the hearing.

4   That's actually not the way things are fully and fairly

5   litigated in any courts I visit, and I don't think that when

6   your Honor ticks through the procedural elements of what

7   happened in that case in Lansing is going to be convinced

8   that there was a full and fair opportunity to litigate.

9           THE COURT:  Let me ask you just a sort of

10  administrative question regarding this.  Do we have in our

11  record here all of the pleadings and papers and dockets and

12  transcripts from that case?

13          MR. BENNETT:  I don't know if they're there yet.

14          MS. NELSON:  I believe I can answer that, your

15  Honor.  Assistant Attorney General Margaret Nelson.  It's my

16  understanding, no, those have not been submitted.  I do have

17  all of the transcripts, which I was prepared to present to

18  the Court when I make my argument, which now appears to be

19  tomorrow.  If the Court would like the submission of the

20  pleadings, we'll be happy to do that, although it's --

21          THE COURT:  Well, my understanding is that some of

22  the pleadings have been attached to various briefs, but I'm

23  just not sure if it's everything.

24          MS. NELSON:  There was only a -- there was --

25          THE COURT:  Just to --

1          MR. BENNETT:  We'll get it in.

2          THE COURT:  Yeah, exactly.  Just to be complete --

3          MS. NELSON:  Yes.

4          THE COURT:  -- let me make my request to you that

5  our record here include everything from that case, including

6  the docket.

7          MS. NELSON:  There's three cases, your Honor.

8          THE COURT:  Okay.

9          MS. NELSON:  And so -- that were filed separately --

10         THE COURT:  Well, but I think the --

11         MS. NELSON:  -- so I will submit everything --

12         THE COURT:  I think the one that's at issue here is

13  the one in which a judgment was entered.

14         MS. NELSON:  Correct.

15         THE COURT:  That's the one I need.

16         MS. NELSON:  So you want everything in the case in

17  which the judgment was entered the next day, including the

18  docket entries.

19         THE COURT:  Thank you.

20         MS. NELSON:  Would you also like the Court of

21  Appeals materials --

22         THE COURT:  Yes.

23         MS. NELSON:  -- because the Court of Appeals

24  materials were --

25         THE COURT:  Yes.

```
 1          MS. NELSON:  -- filed and a stay order entered
 2   thereto?
 3          THE COURT:  Just for --
 4          MS. NELSON:  Webster?
 5          THE COURT:  For completeness, yeah.  All right.  I
 6   have to -- I have to pause here.  I've been advised that the
 7   people in our overflow room couldn't hear this exchange, so I
 8   will just restate it for the record.  The attorney general's
 9   representative has agreed to provide to the Court in this
10   case the complete record from the Webster litigation not only
11   at the trial court level but at the Court of Appeals level,
12   including all pleadings and papers, transcripts, and docket
13   entries, the docket itself.  You may proceed, sir.
14          MR. BENNETT:  Okay.  Lastly, the last factor with
15   respect to collateral estoppel, your Honor, is the issue of
16   whether or not the judgment would be binding on the city in
17   any event.  Of course, the city was not a party to those
18   proceedings.  The assertion is made that the -- that there is
19   privity between the city and the state because they have a
20   common legal interest in some matters in connection with this
21   Chapter 9 case.  Frankly, I don't think those are the same
22   standard, and I think we covered that in our papers, but I
23   will say one other thing is that to the extent that there --
24   that the plaintiffs in those cases believed that the city was
25   in privity with the state with respect to those cases is an
```

1    additional reason why the automatic stay applied from the

2    very beginning because if they thought that they were in a

3    case with the state really trying to bind the city, then it

4    is perfectly clear that they violated the automatic stay.

5        I don't think I have any other material topics that

6    I think we need to cover based upon the argument by others.

7    If I've missed something or if your Honor has any questions,

8    I'd be happy to take them.  Otherwise I'll allow the attorney

9    general to take the floor tomorrow.

10        THE COURT:  Um-hmm.

11        MR. BENNETT:  We'll be done early.

12        THE COURT:  Okay.  Good.  We'll be in recess now

13    until 10 a.m. tomorrow morning.

14        MS. NELSON:  Your Honor, before you leave the bench,

15    may I just ask do you want those pleading -- do you want

16    everything submitted electronically?

17        THE COURT:  Yes, yes, in the record of this case.

18    Thank you.

19        THE CLERK:  All rise.  Court is adjourned.

20      (Proceedings concluded at 4:51 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett           October 20, 2013
_____    _____
Lois Garrett

**ITEM NO. 53**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,     .       Docket No. 13-53846
       MICHIGAN,          .
                         .       Detroit, Michigan
                         .       October 16, 2013
            Debtor.   .       10:00 a.m.
. . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

For the State of   Michigan Department of Attorney General
Michigan:          By:  MARGARET A. NELSON
                    P.O. Box 30758
                    Lansing, MI  48909
                    (517) 373-1124

For Detroit        Clark Hill, PLC
Retirement Systems- By:  ROBERT GORDON
General Retirement  151 South Old Woodward, Suite 200
System of Detroit,  Birmingham, MI  48009
Police and Fire    (248) 988-5882
Retirement System
of the City of
Detroit:

For the Inter-     Cohen, Weiss & Simon, LLP
national Union,    By:  BABETTE A. CECCOTTI
UAW:             330 West 42nd Street, 25th Floor
                    New York, NY  10036-6976
                    (212) 356-0227

APPEARANCES (continued):

| | |
|---|---|
| For the United States: | U.S. Department of Justice<br>Civil Division<br>By: MATTHEW J. TROY<br>P.O. Box 875<br>Ben Franklin Station<br>Washington, D.C. 20044<br>(202) 514-9038 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI 48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI 49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1       THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3       THE COURT:  Good morning, everybody.

4       ATTORNEYS:  Good morning, your Honor.

5       THE COURT:  Okay.  Who's up?

6       MS. NELSON:  Good morning, your Honor.  Assistant

7   Attorney General Margaret Nelson on behalf of the State of

8   Michigan in response to the objections that are currently

9   pending legal issues before the Court.  Before I begin, if I

10  may approach, I would like to present the Court with two

11  cases -- well, actually an order and a case decision that I

12  will be referring to later in my arguments --

13      THE COURT:  Okay.

14      MS. NELSON:  -- the state's rebuttal or response to

15  arguments that were raised yesterday.  The state's focus with

16  respect to the legal objections raised to the City of

17  Detroit's eligibility focused principally on the

18  constitutionality of Public Act 436 and the lawfulness of the

19  governor's authorization thereunder to the city and the

20  emergency manager to proceed in bankruptcy under Chapter 9.

21  The objectors essentially identified four principal bases for

22  contending that Public Act 436 is unconstitutional.  The

23  first is in the context of Section 18(1) when they allege

24  that it fails to protect public pensions from inclusion in

25  the bankruptcy proceedings initiated by the local government

1   as authorized by the state.  Second, they allege that Public

2   Act 436 violates the home rule provisions of Michigan's

3   Constitution under Article VII.  Third, they allege that 436

4   improperly delegates authority to the emergency manager and

5   thereby violates the separation of powers provisions within

6   Michigan's Constitution.  And, fourth, they argue that Public

7   Act 436 lacks adequate standards to guide the emergency

8   manager's actions in bankruptcy, thereby creating, I'm

9   assuming, a due process violation, although they aren't

10  specifically clear with respect to that.  Principally, the

11  arguments presented yesterday addressed Sections 18(1), and

12  that will essentially be the focus of my response this

13  morning, your Honor.

14          THE COURT:  Excuse me for just one second.  I meant

15  to say this at the beginning of our session here this

16  morning.  Ms. Levine, due to time constraints, you did not

17  address your home rule argument yesterday.  I hope you'll

18  give that a priority when you do get the microphone again.

19          MS. NELSON:  Thank you, your Honor.  In addressing

20  the constitutionality of this provision and, in fact, the

21  overall statute -- state statute itself, the Court must be

22  guided by specific principles of state law in addressing

23  constitutionality of statutes.  First -- the first principle

24  that the Court must be guided by is that statutes are

25  presumed to be constitutional, and courts have a duty to

1 construe a statute as constitutional unless its

2 unconstitutionality is clearly apparent on its face, and for

3 that proposition, your Honor, I cite you to a case relied on

4 by principally all of the objectors, and it's also cited by

5 the City of Detroit, <u>In re. Request for Advisory Opinion of</u>

6 <u>the Constitutionality of 2011 Public Act 238</u>, and that's

7 found at 490 Mich. 295.

8        THE COURT:  Of course, that's not exactly the

9 standard when the challenge is that the law was enacted in

10 some unconstitutional manner.

11        MS. NELSON:  Correct, your Honor, and that's the

12 next principle.

13        THE COURT:  Okay.

14        MS. NELSON:  So when you're construing the statute

15 itself in a facial challenge to the statute which is

16 presented here initially, the unconstitutionality must first

17 be apparent on its face.  And the reason the <u>In re. Request</u>

18 opinion is so significant is because it is a direct analysis

19 of the very constitutional provision that's at issue here,

20 and it directs the Court to the second principle of

21 construction that's applicable to this analysis, and that is

22 the principle of construction given to constitutional

23 provisions under Michigan law.  The objective in reviewing a

24 constitutional provision is to effectuate the intent of the

25 ratifiers who adopted the constitution, not the drafters but

1  the ratifiers.  And the lodestar principle, for purposes of

2  this review, is that of common understanding, so, in other

3  words, the Court must determine the common understanding of

4  the terms and give sense to the words used that would have

5  been most obvious to those who voted to adopt that particular

6  constitutional provision.  That, again, is emphasized in the

7  In re. Advisory Opinion with respect to 2011 Public Act 38 at

8  page 308.  And it's significant here, your Honor, for two

9  purposes, for the two reasons that are essential to the

10  analysis here.  The Michigan Supreme Court has already done

11  this principle analysis in the context of Article IX, Section

12  24, with respect to the impairment of pensions and squarely

13  addresses the issue that the objectors have been arguing to

14  this Court is created or is significant here.  In this

15  advisory opinion, the Michigan Supreme Court concluded that

16  Article IX, Section 24, does essentially four things.  It was

17  the obvious intent of the provision to ensure public pensions

18  be treated as contractual obligations that once earned could

19  not be diminished.  There's no question of that.  Second, the

20  provision is designed to say that when an employee benefit

21  comes due, a pension -- when the employee's pension benefit

22  comes due, he or she has a contractual right to receive it.

23  Third, the accrued financial benefit of a pension is the

24  pension income itself, and, fourth, diminishing or impairing

25  the accrued financial benefit means the actual reduction of

1  pension income.  In other words, the loss -- the actual loss
2  of pension income is the impairment.  That's significant to
3  the issue raised by the objectors in the context of the
4  facial challenge to 436 and as this Court has addressed
5  questions on yesterday.  Clearly 18(1) of 436 does not on its
6  face cause or commit an actual reduction of pension income,
7  and that is the definition, and that is the application of
8  impairment this Court must apply because that is the
9  determination of the Michigan Supreme Court's common
10 understanding of impairment or diminishment in the context of
11 Article IX, Section 24.

12        So what does that mean to this discussion?  Going
13 back to the statutory interpretation principles, the Court
14 must look at the language of the statute and determine if
15 it's ambiguous or not, the clear meaning, and construe it in
16 a way that gives meaning to the legislature's intent.  Here
17 the legislature clearly did not intend to impair public
18 pensions through the use of the bankruptcy process in terms
19 of its authorization.  So 18(1), by authorizing the
20 bankruptcy filing or authorizing the government to -- or the
21 governor to authorize the bankruptcy filing and ultimately
22 making that filing does not commit an impairment because it
23 does not cause an actual diminishment in pension benefits as
24 defined by the Michigan Supreme Court.  So on its face, 436
25 is constitutional and in accord with Article IX, Section 24.

1    Need there be any further discussion with respect to

2    that?  Actually not.  And there is additional case law, your

3    Honor, that's cited within that advisory opinion which

4    confirms that.  The Court relies very heavily on the Studier

5    versus Michigan Public School Retirement Board case from a

6    few years prior to that, and I have the cite for the Court if

7    it cares for that because essentially the same analysis was

8    done in that case.  Studier is found at 472 Mich. 642, and

9    the discussion of the interpretation of Article IX, Section

10   24, begins at page 6 -- let me make sure I have the right

11   page here -- 656, so it's consistent.  And, in fact, that

12   court, the Studier court, criticizes Musselman and the

13   analysis made in the Musselman decisions as to what the

14   intent of the drafters and the ratifiers was in the context

15   of adopting Article IX, Section 24.

16   So with respect to that first issue on which the

17   constitutionality of 436 hinges in terms of the arguments

18   raised by the objector, the Michigan Supreme Court has

19   addressed that.  This Court is obligated to apply the

20   definition of Article IX, Section 24, identified and applied

21   by the Michigan Supreme Court, and so in that context,

22   Section 18, Sub 1, does not impair -- actually impair and,

23   therefore, does not violate Article IX, Section 24, by

24   failing to carve out any protections for those pensions.

25   Similar analysis is required then of the

authorization provided by the governor.  As we've argued, as
the Court has noted, essentially in the context of the
ripeness arguments that have been made and the questions that
it has been asked, the authorization clearly applying that
application made by the Michigan Supreme Court does not cause
an actual impairment of pension benefits.  Doesn't matter
what the intent might be.  Doesn't matter if the governor
chose not to impose contingencies.  In order for the legal
process to operate in the context of the Bankruptcy Code, as
this Court noted, there is no actual impairment worked or
caused by the authorization; therefore, the authorization is
in total compliance with Article IX, Section 24, and allows
this matter to proceed through the appropriate legal
processes established under the Bankruptcy Code.

With respect to the home rules provisions analysis,
your Honor, Article VII, Section 22, of Michigan's
Constitution recognizes that there are obligations and
responsibilities imposed on local governments separate and
apart from the state; however, the constitutional provision
also recognizes that these duties, obligations,
responsibilities, and authorities of the local governments
are subject to the control and change by state law.  Very
clearly, this constitutional limitation on the powers and
authorities of municipalities has been recognized in
legislation, specifically the Home Rule Act, which we cite in

1  our brief, at MCL 171.1 et seq. and particularly at Section

2  MCL 117.36, which is -- which essentially codifies the

3  limitations of Article VII, Section 22.

4        What the objectors' argument fails to recognize is,

5  first, local governments are not sovereign.  Second, they are

6  creatures of the state.  Third, the federal government and

7  the federal courts have long recognized those limitations on

8  local governments, and, fourth, they are subject to control

9  by the state legislature in that the state may change the

10  laws, authorities, powers of local governments at any given

11  time.  And the federal courts have consistently recognized

12  that most recently in the Sailors decision that's cited in

13  our brief, which is exactly what has occurred here.  Because

14  the local governments derive their power and authority from

15  the state and are, in fact, creatures of the state, the state

16  has the power to change that authority and to change the

17  course, the shape, and the force and authority of their

18  governments.  This statute, Public Act 436, is just such a

19  law, and it has that purpose.

20        THE COURT:  Well, but to what extent are the home

21  rule powers of a city derived from the Michigan Constitution

22  as opposed to statute?

23        MS. NELSON:  The Michigan Constitution has limited

24  recognition of home rule authority, and in the language of

25  Article VII, Section 22, it recognizes that all resolutions

1  and ordinances of the local governments are subject to the

2  Constitution and laws of the state, so, in other words, case

3  law has recognized, as does the codification of these

4  limitations in the Constitution, that the legislature may

5  impact and affect any municipality's ordinances, any

6  municipality's laws, forms of government, funding, or any

7  other aspect of authority granted it directly from the state,

8  so to the extent that 436 has the purpose of addressing

9  emergency financial crises in local communities, that is

10  exactly the type and purpose of the law recognized under

11  Article VII, Section 22, an authority that is given to the

12  legislature over its local communities.

13        THE COURT:  So is there any limitation in the

14  Michigan Constitution on the legislature's power and

15  authority to control the form of government for the City of

16  Detroit?

17        MS. NELSON:  In the form of adopting their charter

18  provisions, yes.  The city can in its charter, which is then

19  submitted to the voters for approval, identify its form of

20  government, how its officials will be elected, and allocate

21  the power and authority granted to those officials through

22  the Constitution and the laws of the State of Michigan, and

23  that's what has occurred.  However, the legislature retains

24  authority through the Home Rule Act to even alter or amend

25  ordinances and charter provisions; in other words, the

1  legislature can pass a law that in its application and effect
2  would render a charter provision or a city ordinance
3  unconstitutional.  For example, with respect to taxation, the
4  state can cap the amount of tax -- or the level of taxation
5  that a community might be able to impose, mills or things
6  like that.  If a charter provision had been adopted that
7  established a higher level, it would be subordinate to the
8  state law, so in the same -- in that context, because the
9  legislature retains authority under Article II to promulgate
10 legislation and does not commit to any specific type or form
11 or purpose of legislation with respect to cities, that can
12 change.  It recognizes the legislature's continuing authority
13 to change the law and the effect that those changes in law
14 will have on the operations of its local communities vis-a-
15 vis its ordinances and its charters.  So the two, yes, work
16 in tandem.  The communities do have the authority to identify
17 their forms of government, how their officials will be
18 elected, and how that will be implemented, but at the same
19 time, the legislature, for example, controls the election
20 laws, identifies how elections will be handled, taxation.

21        THE COURT:  But the question the objection raises
22 here is doesn't the state's appointment and imposition of an
23 emergency manager on the City of Detroit change its form of
24 government by abrogating the powers of the City Council and
25 the mayor to the emergency manager?

1    MS. NELSON:  Absolutely, it does, and the

2  legislature clearly, as we've identified in our brief, has

3  the authority to do that under both the Home Rule Cities Act

4  and under the various provisions of the Constitution that

5  control forms of government and the authority of the state

6  over its local communities.  The local communities --

7    THE COURT:  So is it too simplistic to say that the

8  city sets its own form of government through its charter

9  unless the state dictates otherwise through its legislation?

10    MS. NELSON:  Absolutely, and that's the whole point

11  of the home rule --

12    THE COURT:  It's not too simplistic --

13    MS. NELSON:  It's not too simplistic.

14    THE COURT:  -- to put it just that way.

15    MS. NELSON:  It's just that way, and it's clear in

16  both the constitutional provision, and it's clear under the

17  Home Rules Cities Act, which implements those limitations

18  that are imposed on local governments vis-a-vis Article VII,

19  Section 22.  The federal courts have recognized that as --

20  and, again, I cite the Court to the Sailors decision from the

21  United States Supreme Court, which recognizes the overarching

22  authority of the state.  Because local governments are

23  creatures of the state, the state can determine what it's --

24  what authority it's going to give, what its local officials

25  will look like, what its forms of government will look like.

1          Second, I would also point out, your Honor, that
2   this is essentially a temporary situation, so this isn't the
3   state dictating that this is how the city is going to be
4   operating forever.  There are limits on this, and there are
5   authorities in Public -- authority in Public Act 436 given to
6   the local officials to petition the state to remove the
7   emergency manager, so there is --
8          THE COURT:  Right, but none of that is
9   constitutionally required.  If I understand you correctly,
10  the legislation could say the governor picks the mayor of the
11  City of Detroit.
12         MS. NELSON:  Well, potentially it could, yes, but it
13  doesn't.  It doesn't have to.  They chose not to.
14         THE COURT:  So but bottom line, your position is
15  that in no sense is the city charter supreme or preemptive
16  over state legislation.
17         MS. NELSON:  Absolutely not, or over the state's
18  Constitution.  In fact, it's the reverse, and that's very
19  clearly the relationship established in Article VII, Section
20  22, and in the Home Rules Act statute itself that codifies
21  those provisions.
22         The next challenge -- and I might also point out, as
23  we did in our brief, your Honor, there is a parallel example
24  in the Home Rule Village Act itself which does essentially
25  the same thing, so we're not just talking about cities, but

1    we're talking about all local governments.  The Home Rule
2    Cities Act, the Home Rule Village Act, all operate in the
3    same way.  Now, the forms of government where there might be
4    some differences are principally townships and school
5    districts, although they, too, are creatures of the state.
6    While the Court -- or the -- I'm sorry -- while the
7    legislature gives them some different authorities, it still
8    gives them those authorities and those powers in the same way
9    that it does its cities and villages and other local forms of
10   government.

11          The objectors also challenge the constitutionality
12   of 436 with respect to Article VII, Section 21, and Section
13   34.  Section 21 is a taxation essentially provision, and it
14   limits the authority of local governments to tax, borrow
15   money, and contract debts, so this is another example of the
16   authority that the state exercises over its local
17   communities.  436 recognizes and imposes these same
18   limitations on the emergency manager that the law imposes on
19   its public officials who are operating their local
20   governments, and it provides the state oversight and control
21   of these matters in the same way that it does its local
22   government officials, especially when they are under a
23   financial emergency.  So, in effect, 436 treats the emergency
24   manager no differently than it does local officials in the
25   context of the local government's authority to tax, to borrow

1   money, or to contract debts, so there is no unconstitutional

2   actions at work here merely because the emergency manager is

3   now the one operating the city making those decisions as

4   opposed to the elected officials.

5              Similarly, Article VII, Section 34, merely

6   establishes the standard for interpreting the authority

7   granted by Constitution and state law, so, in other words, it

8   says the Michigan legislature retains authority to define and

9   modify the powers, duties, and obligations of its local

10  governments, which are derived from the state in the first

11  instance.  It says that those powers given to the local

12  governments must be construed with deference to the local

13  government, but it still recognizes that those powers come

14  from the state, from the legislature, and can be changed in

15  any instance where the legislature believes that it's

16  appropriate to do so.

17             Finally, your Honor, as we've argued in our brief --

18  and there were no arguments presented to the Court

19  yesterday -- 436 is not an unconstitutional delegation of

20  authority under Article III, Section 2.  It's not delegating

21  legislative power to the emergency manager.  It allows the

22  emergency manager to simply execute the same executive powers

23  that the elected officials of the community would have within

24  the context of authority granted it under 436, principally in

25  Section 12(1), which identifies all of the various powers and

1    authorities.  There are controls.  There are restraints.
2    There are reviews required, approvals from the treasurer for
3    many of these at the state level or approval from the
4    governor for some of these actions that have to be done, and
5    there are also limitations on the emergency manager's
6    authority to make actions without the approval of the local
7    government, a significant difference between Public Act 4.
8    For example, with respect to the sale of assets or the
9    distribution of assets, the value of the assets will
10   determine the extent to which the local government must also
11   be involved in many of these decisions, so it is not -- and
12   to the extent that the objectors are arguing that there are
13   insufficient standards by which to guide the emergency
14   manager, I would submit the emergency manager is guided by
15   the same standards that would have applied to the local
16   officials when they were exercising that power, and there's
17   no argument from the objectors that those standards applied
18   to and by the local elected officials are inadequate for
19   their exercise of that authority, and those are the standards
20   that guide the emergency manager's actions as well.  So not
21   only is this an appropriate delegation of authority by the
22   state under its constitutional and statutory authority and
23   its role in relation to its local governments, it is also
24   sufficient for purposes of guiding the emergency manager's
25   actions both as to -- under the law and in relation to the

1    oversight provided by the State of Michigan.

2              Yesterday, your Honor, there was an argument made by

3    Krystal Crittendon with respect to the Court's -- the

4    jurisdiction and the authority essentially of the emergency

5    manager to file this action.  I have provided the Court a

6    copy of an order issued by the Michigan Court of Appeals on

7    November 16th, 2012 -- I brought a copy for Ms. Crittendon,

8    but she's not here today -- which squarely resolves that

9    issue.  And if I'm understanding her -- following her

10   argument correctly, her argument is that because the

11   emergency manager was appointed under Public Act 72, that

12   that was an improper appointment because the repeal of Public

13   Act 4 did not revive Public Act 72 under the state's repealer

14   statute.  That was --

15             THE COURT:  That was part of her argument.

16             MS. NELSON:  Right.  That has been an issue, and

17   that's the part that I'm addressing with respect to this

18   order, your Honor.  That particular issue has been raised in

19   at least four different cases challenging the appointment of

20   various emergency managers after the suspension of Public Act

21   4 under the referendum process and subsequently under its

22   rejection.  And the order that I have provided to you is in

23   the case of Robert Davis versus Roy Roberts.  It's Court of

24   Appeals Docket Number 313297, and it squarely rejects that

25   argument.  Quite frankly, this was a quo warranto action, so

1  it directly attacked the authority of the emergency manager,

2  Roy Roberts, who is the emergency manager for the Detroit

3  Public School System, to hold that position because of his

4  appointment under Public Act 4 and then subsequently under

5  72.  The Court of Appeals indicated the plain language of MCL

6  8.4, which is the repealer statute, includes no reference to

7  statutes that have been rejected by referendum.  The

8  statutory language refers only to statutes subject to repeal,

9  and judicial construction is not permitted here because this

10 language is clearly unambiguous.  Accordingly, under the

11 clear terms of the statute, MCL 8.4 does not apply to the

12 voters' rejection of referendum of Public Act 4.  Even if the

13 rejection of Public Act 4 is deemed to operate as a repeal

14 subject to 8.4, the voters rejected Public Act 4 in its

15 entirety by way of the referendum, and this, in fact, revived

16 Public Act 72.  So I think -- I believe that addresses Ms.

17 Crittendon's objection with respect to jurisdiction, and I

18 just wanted the Court to have that authority for when she

19 submits her supplemental brief.

20      Finally, your Honor, the other issue that I would

21 like to address relates to the Retired Detroit Police Member

22 Association's argument with respect to the referendum process

23 and the validity of 436 as a result of the referendum

24 process.  I first take exception to the representation that

25 an appropriation of $5,780,000 total is an insubstantial or

1    insignificant appropriation with respect to the state, but I

2    would point out to the Court the argument fails for two

3    principal purposes or reasons.  First, Public Act 436 is

4    significantly different than Public Act 4, so Ms. Brimer's

5    argument that it's identical fails on that ground alone, and

6    the very example that she provides in terms of the

7    appropriation is one of the major differences.  Public Act

8    436 imposes the requirement on the State of Michigan to pay

9    the salaries of the emergency managers.  Neither Public Act 4

10   nor Public Act 72 had that requirement.  So it, in fact,

11   required an appropriation in order to have -- so that the

12   state agency -- in this case, Treasury -- that's

13   administering that aspect of the statute would be able to

14   make that expenditure.  Under state law a state agency must

15   have an appropriation in order to be able to make an

16   expenditure, and that's exactly what happened in this

17   instance.  In addition, the $5 million that was appropriated,

18   as was pointed out yesterday, is for the purpose of paying

19   for consultants, attorneys, and others that are going to be

20   assisting the local communities that are in a financial

21   emergency with their restructuring.  That was not part of

22   Public Act 4 or Public Act 72 either, so on those two

23   grounds, that is a difference.  There are many other

24   substantial and significant differences between these two

25   statutes, but even without any difference, your Honor, the

1  case that I have handed you, <u>Reynolds</u> versus the <u>Bureau of</u>

2  <u>State Lottery</u>, resolves this issue, and I would point the

3  Court to page 604 and 605 of that opinion.  In this case --

4  although somewhat factually different, in this case a 1994

5  act that controlled fund-raising abilities of political

6  campaigns to use bingo and other types of gaming to raise

7  monies was being challenged by referendum.  There was a

8  challenge to the signature process that went to the Court of

9  Appeals and then back down to the Board of Canvassers.  The

10  Board of Canvassers split and didn't certify the statute, so

11  it went back up -- or the referendum -- excuse me -- back up

12  to the Court of Appeals.  While that process was in play, the

13  legislature adopted a new act that was identical, word for

14  word identical to the challenged 1994 act, and the governor

15  signed it, and it went into effect.  The 1994 act then was

16  ultimately certified on the ballot, went through the

17  referendum and was rejected by the voters.  The parties that

18  had moved for that referendum then dismissed their appeal

19  case, applied for a bingo license to raise money, were

20  rejected under the new law, and then brought this challenge,

21  a declaratory challenge, arguing that the new statute was

22  invalid because it violated the referendum process.  In

23  addressing that issue, the Court of Appeals analyzed and

24  interpreted the referendum provision, and that is the portion

25  of the opinion that I refer the Court to.  It begins at page

1   604 and continues onto 605.  And in there the Court very
2   clearly said the referendum provision and the purpose for the
3   referendum in terms of its definition and use of the term
4   "enacted law" means only the particular law supported by a
5   majority of legislators and signed by the governor and no
6   more.  They went on to hold that when a law enacted by the
7   legislature is referred to the people, the reference to a
8   particular definite act and not by implication the general
9   principle or subject matter at issue.  So, in other words, it
10  is the act itself, not the general purpose or the particular
11  purpose of the act, that is subject to the referendum.  And
12  because it is the specific act that is the subject of the
13  referendum, the legislature is not precluded from
14  subsequently adopting a new law that is either identical to
15  or dealing with the same subject matter or purpose.  The
16  Court continued, "nothing in the Michigan Constitution
17  suggests that the referendum had a broader effect than
18  nullification of the 1994 Public Act 118," the act at issue
19  in that case.  We cannot read into our Constitution a general
20  preemption of the field that would prevent further
21  legislative action on the issues raised by the referendum.
22  The legislature remained in full possession of all its other
23  ordinary constitutional powers, including legislative power
24  over the subject matter addressed in 1994 Public Act 118.
25          THE COURT:  Well, how do you or how does this case

     1   deal with the argument that that kind of very strict

     2   interpretation of the referendum power of the people makes a

     3   mockery of it?

     4          MS. NELSON:  I disagree that it makes a mockery of

     5   it, your Honor, because prior to this analysis, the Court of

     6   Appeals went through the very same review and applied the

     7   very same review standards in terms of the common

     8   understanding of the provisions of the constitutional act or

     9   provision that was in play as the Supreme Court did in the In

    10   re. Advisory Opinion and in Studier and in all of those cases

    11   dealing with the interpretation of the Constitution.  And the

    12   Court very clearly said that the common understanding of the

    13   terms in that provision require this outcome, so any other

    14   alternative would have been contrary to both the

    15   constitutional standard of review that the Supreme Court

    16   requires, and a different outcome would have been contrary to

    17   the very meaning and common understanding of that provision,

    18   so --

    19          THE COURT:  Well, but what --

    20          MS. NELSON:  I'm sorry.  Go ahead.

    21          THE COURT:  What's the point of giving the people

    22   the right of referendum to reject a statute if the same

    23   Constitution is read to give the legislature the authority to

    24   reenact word for word the same statute that the voters just

    25   rejected?  What's the point?

 1              MS. NELSON:  Well, the point is that that then

 2    becomes a political issue in and of itself, and do the people

 3    then want to continue to keep those legislators in office.

 4    That makes it a different question than the referendum of the

 5    actual law.  That then makes it a political question and a

 6    question of political will, which I think is a different

 7    analysis than what is required here for purposes of our case.

 8              THE COURT:  Well, but why put the people to that?

 9              MS. NELSON:  Well --

10              THE COURT:  The people spoke.

11              MS. NELSON:  The people spoke in the context of

12    Public Act 4.  I will agree, and --

13              THE COURT:  Okay.  But the position you're arguing

14    for is a much broader one, which is even if law number two is

15    word for word the same as law number one, law two prevails --

16              MS. NELSON:  That's what the case --

17              THE COURT:  -- or it remains in effect.

18              MS. NELSON:  That's correct.  That's what the case

19    law says, but I'm also pointing out that in this instance law

20    number two --

21              THE COURT:  Doesn't the --

22              MS. NELSON:  -- is not word for word the same --

23              THE COURT:  Okay.

24              MS. NELSON:  -- and addresses --

25              THE COURT:  Hold that argument for just a moment

1  because --

2            MS. NELSON:  Sure.

3            THE COURT:  -- I am interested in that, but where is

4  the substance of the right of referendum that the

5  Constitution gives the people if the legislature has the

6  authority to thumb its nose at it like that?

7            MS. NELSON:  Well, the right of referendum remains

8  because the people could initiate a referendum with respect

9  to the next bill.  I know that's not --

10           THE COURT:  To which the question remains why put

11  the people to that?

12           MS. NELSON:  It certainly does beg the question,

13  your Honor, and that's why my response to you and the only

14  response I think that's applicable is that it becomes a

15  matter of political will, and there are other ways for the

16  people to address that issue, and that is elect --

17           THE COURT:  Well, they've already expressed their

18  political will.  Why do they have to do it twice, three

19  times, an infinite number of times?

20           MS. NELSON:  Well, that's -- because that's how the

21  Court has interpreted that particular referendum.

22           THE COURT:  This is the Court of Appeals, not the --

23           MS. NELSON:  This is --

24           THE COURT:  -- Michigan Supreme Court.

25           MS. NELSON:  Yes, but leave to appeal was denied by

1   the Supreme Court.  Now --

2          THE COURT:  Means nothing.

3          MS. NELSON:  It means nothing other than it wasn't

4   interested in taking this particular issue at that particular

5   time, so I'm referring the Court, yes, to a Court of Appeals

6   decision, which is the last court decision on this particular

7   issue.  I'm not saying that I agree with that or that many --

8   that everybody agrees with it.  I'm just simply saying that

9   is the law, the most current law applicable on this

10  particular issue.  This is how the Court of Appeals has

11  interpreted, and the Supreme Court allowed that

12  interpretation to stand, and so this is the interpretation

13  that has to be applied in the context of the argument raised

14  by the Retired Detroit Police Members Association.

15         THE COURT:  Am I bound by this decision?

16         MS. NELSON:  I'm sorry.  What?

17         THE COURT:  Am I bound by this decision?

18         MS. NELSON:  I believe that you are because it's the

19  last highest court decision on this particular issue, and

20  leave to appeal was denied by the Supreme Court.

21         THE COURT:  What are the three or five most

22  significant differences then between PA 4 and PA 436?

23         MS. NELSON:  The first one is one that we've already

24  discussed in terms of the transfer of authority to fund this

25  proposition.  The second one is -- the second most critical

1   one is the options that are made available to the local

2   governments that didn't exist under 4 or 72.  Public Act 436

3   creates four choices for the local governments once a

4   determination of a financial emergency has been identified.

5   They can choose either the appointment of an emergency

6   manager, the negotiation of a consent decree.  They can

7   submit to neutral mediation, which, if unsuccessful, then

8   they must proceed in Chapter 9, or they can opt to go right

9   into Chapter 9, of course, with the approval of the governor.

10  There are several options -- or changes within the context of

11  the authority that's set out in Section 12(1) for the

12  emergency manager, particularly with respect to the assets of

13  the city and who has to be involved in the process in terms

14  of if there's going to be a lease or sale of assets of over a

15  certain value.  I believe it's 50,000.  The local officials

16  have to be involved in that process as well.  A third

17  significant difference that didn't exist under either prior

18  laws is the ability of the local government to present

19  alternative plans, and an example is what's going on with

20  Belle Isle.  Under 436 the local government can object to or

21  reject a proposal made by the emergency manager, and they

22  have the opportunity to present an alternative plan.  I

23  believe it's to the emergency financial loan board.  It's

24  either to the emergency manager financial loan board or the

25  treasurer -- an alternative proposal that could achieve the

1    same amount of savings, so they have the authority and the

2    ability to object and present their own proposal for

3    clarification.

4          Another significant change is the limitation on the

5    term of the emergency manager.  Under Public Act 436, the

6    term is limited to 18 months.  Additionally, another change

7    is the fact that the local government may petition for

8    removal of the emergency manager anytime before the

9    expiration of that 18 months.  So those are some of the more

10   significant differences.

11         Another major -- excuse me.  Another major

12   difference is the creation of the transition advisory board

13   that will participate with the local community or the local

14   government once the emergency manager is -- emergency is

15   deemed resolved and the emergency manager steps down, and

16   that, for example, is a process that's taking place in

17   Pontiac at the moment.  The emergency manager there has

18   stepped down, and so there are certain relationships that

19   have been established to assist the local government with

20   transition back into control of its financial operations and

21   obligations.  And one of the reasons for that was to address

22   the criticisms that the emergency managers have never proved

23   successful.  Many of these communities, once the emergency

24   manager steps down, find themselves within a year or two

25   struggling again and back into the same circle, same process,

1  and so that's a very significant and substantial change as

2  well.

3         Those are the some of the major highlights.  There

4  are a number of other ones in the process of how you initiate

5  the financial review, the factors that are to be considered

6  by the financial review team as they evaluate the cities.

7  There are also some differences in terms of the authority of

8  the emergency manager with respect to removing officials from

9  office or appointing officials to take their place.  That's

10  been an issue in Detroit as well with respect to certain of

11  the city council members.  So there are some major -- but

12  those are the major ones that come to my mind right off the

13  top of my head.

14         THE COURT:  If the Court rejects your arguments and

15  holds that to the extent that PA 436 authorizes the

16  appointment of an emergency manager that is unconstitutional,

17  is there enough left of PA 436 for this bankruptcy to

18  continue or not?

19         MS. NELSON:  At this point, I don't believe there

20  would be, your Honor, because the mechanisms or the way that

21  the statute is designed right now, the emergency manager is

22  acting on behalf of the city, and he is the one who made the

23  recommendation, and he is the one that's specifically been

24  approved.  If you conclude --

25         THE COURT:  Approved?

1          MS. NELSON:  I'm sorry.

2          THE COURT:  Approved for what?

3          MS. NELSON:  Approved to file.  The authorization

4    was given to him to file, and he was doing it in the place

5    and stead of the elected officials.  So if the determination

6    is that 436 is unconstitutional and his appointment,

7    therefore, is void --

8          THE COURT:  That was not exactly my hypo.

9          MS. NELSON:  Okay.

10         THE COURT:  My hypo was that holding that his

11   appointment was unconstitutional or that so much of PA 436

12   that allowed the governor to appoint him was

13   unconstitutional.

14         MS. NELSON:  Well, first of all --

15         THE COURT:  I mean I guess it's partially a

16   severability question.

17         MS. NELSON:  That's correct.  There's a severability

18   provision within 436 itself, and there's also a general

19   severability question.  And the first issue or the first

20   question that would have to be decided is whatever you

21   conclude -- whatever provisions you conclude to be

22   unconstitutional, when they are severed, does that leave a

23   substantial or significant amount of the Act in place so that

24   it can be reasonably carried out.  I would submit that if you

25   conclude the appointment of the emergency manager is

1   unconstitutional, that goes right to the heart of the
2   authority to proceed or the authorization to proceed in
3   bankruptcy because he was acting on behalf of the city.  If
4   the appointment is deemed unconstitutional, then that would
5   restore the local elected officials, the mayor and the
6   council, as the representatives of the city, and they would
7   have to then take the action to continue this bankruptcy.
8           THE COURT:  I think your colleague represented the
9   last time she was here in court -- and forgive me for not
10  remembering her name.  Who was it?
11          MS. NELSON:  In what context?  Michelle Brya?
12          THE COURT:  A couple weeks back.
13          MS. NELSON:  Is that who you might be thinking of?
14          THE COURT:  Anyway, she --
15          MS. NELSON:  Nicole Grimm.
16          THE COURT:  -- referred to the statute, and there's
17  a provision that authorizes the emergency manager to conduct
18  the case.
19          MS. NELSON:  Correct.  That's Subsection 2.  That's
20  18 -- Section 18, Subsection 2, which specifically
21  authorizes -- once he receives the authorization from the
22  governor, it specifically authorizes the emergency -- we're
23  using "authorization" a lot or I am anyway --
24          THE COURT:  Right.
25          MS. NELSON:  -- but it specifically authorizes the

1 emergency manager to file the bankruptcy petition, so that's

2 Subsection 2, so -- Section 18, Sub 2.

3          THE COURT:  But it wasn't just file.  It was file

4 and conduct the case.

5          MS. NELSON:  And conduct it.  That's correct.  And

6 so if, in fact, he is removed from office by virtue of a

7 ruling that his appointment was unconstitutional, that would

8 necessarily terminate the case because it would revert back

9 to the local officials, and they would then have to either

10 reinitiate the process or somehow decide to continue the case

11 without having -- if they could without reinitiating.

12          THE COURT:  There's nothing else besides PA 436 that

13 provides the necessary basis for authorization or consent for

14 a municipality to be in bankruptcy?

15          MS. NELSON:  Correct.  Does the Court have any other

16 questions?

17          THE COURT:  No.

18          MS. NELSON:  Thank you.

19          THE COURT:  Thank you.  Who's up next?

20          MR. BENNETT:  I think our side.  We relinquish our

21 remaining time.

22          THE COURT:  I did have a few questions for Mr. Troy.

23 Stand by one second.

24          MR. TROY:  Good morning, your Honor.  Matthew Troy,

25 Department of Justice, Civil Division, on behalf of the

1  United States.  Your Honor, I want to clarify that we're on

2  the same page with respect to the question that you had

3  yesterday, which was, I think, how does the government

4  respond to the objectors' reply regarding the ripeness issue.

5  I went back last night and looked at what was filed on Friday

6  by the various objectors.  I think I found it, but I want to

7  make sure we're talking about the same thing.  I saw it in

8  AFSCME's amended objection filed Friday wherein they talk

9  about the harm that their members are suffering right now.

10        THE COURT:  Right now, precisely.

11        MR. TROY:  Okay.  From the potential --

12        THE COURT:  Ms. Ceccotti mentioned that in her

13  argument yesterday as well.

14        MR. TROY:  Okay.  And, in fact, I mean I guess if I

15  could read what I understood that Governor Snyder's

16  authorization has itself unconstitutionally caused an

17  immediate concrete injury to Council 25's members by creating

18  a contingent liability that their inviolable rights will be

19  disregarded causing them to reorder their financial affairs.

20  It's articulated in different ways elsewhere in the brief,

21  but I think that kind of encapsulates it.

22        THE COURT:  Yes.

23        MR. TROY:  I'll answer your Honor's question, but I

24  do want to clarify one point before doing so.  That

25  contention, your Honor, is made in the context or in response

1  to the debtor's reply regarding the argument of whether or

2  not there was proper authorization under 109(c)(2).  That's

3  not an argument made in the context of their constitutional

4  challenge to Chapter 9, but I can see where it also falls

5  over into that analysis.

6           THE COURT:  Okay.

7           MR. TROY:  But I want to make clear that on the

8  109(c)(2) issue the United States government is not taking a

9  position on that issue.

10          THE COURT:  Right.

11          MR. TROY:  Okay.  And that's where that argument

12 arose, but I can see where your Honor thinks that has

13 applicability to the constitutional challenge as well, and

14 that's why I'll address that.

15          THE COURT:  Well, I think we have to consider it and

16 deal with it.

17          MR. TROY:  Right.  Your Honor, that articulation or

18 that argument goes to whether or not they have standing.  Is

19 there a concrete actual injury?  And when I read that

20 description of the harm, the injury that they're suffering,

21 to me, as a bankruptcy lawyer, that strikes me as a dynamic

22 that occurs, frankly, every day in bankruptcy.  A small

23 business owner is faced with a debtor who wishes to assume

24 and assign its lease or executory contract and says, "Consent

25 or I'll reject it," or a nondebtor party that is faced with

1    the threat of a turnover action by a debtor in possession or

2    trustee, and the nondebtor party says, "No, it's not property

3    of the estate.  It's held in a validly state law created

4    trust or escrow account."  Going back to my prior

5    hypothetical, I left out that point as well saying the

6    nondebtor party, small business owner, to the executory

7    contract or lease says, "Wait a minute.  I've got state law

8    nonassignability rights.  You can't do that."  And the debtor

9    says, "Yes, I can.  Bankruptcy Code says I can."

10   Preferential actions, your Honor, where seemingly innocent

11   defendants are faced with a trustee or debtor in possession

12   saying, "Pay or else I'm filing the action," particularly

13   perhaps pointing at our seemingly innocent investors in what

14   turns out to be a Ponzi scheme facing clawback suits.  Some

15   are less sympathetic than others, but there are some that are

16   very sympathetic.  They face the same dynamic that AFSCME

17   poses here, and, unfortunately, that's just a dynamic that

18   exists in bankruptcy.

19          THE COURT:  Well, but to carry those hypos to the

20   next step that may make it analogous here, couldn't any of

21   those parties who you have identified file something in court

22   asking for a court ruling sustaining their position, whatever

23   it is, there was no preference, there was no fraudulent

24   transfer, whatever their position is on the executory

25   contract?

1           MR. TROY:  That is true, your Honor, but that's

2   an -- that's either an affirmative defense or an argument

3   that the debtor or trustee has failed to satisfy one of the

4   elements of even bringing the claim.  That's not what's being

5   posed here.  What's being posed here is that the whole

6   statute is unconstitutional, and for a party to come in and

7   say that and to assert that, they have to meet a high hurdle,

8   and that hurdle is in part -- some of the hurdles they have

9   to meet -- and the two that are relevant here are standing

10  and ripeness.  And that hurdle, I would submit, is not met

11  here with the argument that they have posed as being their

12  injury in fact.  It's a commonplace dynamic in bankruptcy.

13  It's unfortunate -- and I'll take the objectors at their

14  word, and it might very well have tragic consequences, but

15  that's, unfortunately, what can happen in bankruptcy given

16  the powers afforded a debtor.

17          THE COURT:  Well, but I can hear the response now.

18  The response is we retirees don't know what to do about our

19  financial futures because of the uncertainty that this

20  bankruptcy has created for us about the security of our

21  retirement pensions.  That uncertainty will be resolved or

22  would be resolved if the Court were to take head on right now

23  in the eligibility context the issue of whether this

24  bankruptcy can impair pensions.

25          MR. TROY:  And my response, your Honor, is that that

1  asserted injury in fact is not sufficient to vest them with

2  standing to ask you to make that reach at this stage of the

3  case.

4          THE COURT:  Okay.  So why not?

5          MR. TROY:  Because it is -- what they're asking for

6  is a significant remedy, which is the invalidation of the

7  entire statute, at this stage of the case.

8          THE COURT:  Right.

9          MR. TROY:  To do that, they have to meet a much

10 higher standard for their injury in fact.

11          THE COURT:  So what's the -- what's, in your view,

12 the most pertinent Supreme Court case that says that this

13 kind of contingent concern, just to put a legal label on it,

14 is insufficient?

15          MR. TROY:  I don't have one to say that it is

16 insufficient.  I can explain to you why I think the one that

17 they cite as evidencing it is inapplicable here.

18          THE COURT:  Okay.

19          MR. TROY:  I think they're principally relying on

20 Clinton v. United States to say that this contingent

21 liability is sufficient to constitute an injury in fact

22 imbuing them with standing.  My response, your Honor, is that

23 that case is significantly different and distinguishable from

24 this.  In that case, your Honor, HHS went to the State of New

25 York and its various municipalities, I guess, subsidiaries,

 1  that administered Medicaid and said, "Look, you receive

 2  federal subsidies from us.  You have to pay some of those

 3  back if you tax the healthcare providers providing those

 4  healthcare services."  And so HHS issued a notice and demand

 5  to New York and said, "Pay.  You've been imposing these taxes

 6  in the past.  Those have to be reimbursed to us as basically

 7  a recoupment of the federal subsidies you've been receiving."

 8  They issued a demand saying pay.

 9        THE COURT:  Um-hmm.

10        MR. TROY:  Well, some members in Congress,

11  presumably from -- representing New York, said, "We don't

12  like that so much, so we're going to put a section in the

13  federal -- in the Balanced Budget Act of 1997 that says that

14  liability is zapped out of existence."  So New York and

15  others then went and filed suit and said, "No, they can't do

16  that."  Ultimately the Court said, "No, you don't have

17  standing.  It hasn't happened yet."  Then President Clinton

18  actually exercised his line item veto power and excised that

19  provision that said that liability is now zapped out of

20  existence.  The only reason it was contingent is because

21  after the State of New York got the notice saying pay, they

22  exercised apparently a valid right to request HHS to waive

23  it, and HHS hadn't acted on it yet, but there was an explicit

24  demand to pay from the federal government to the State of New

25  York.  It's not quite as contingent as what we're dealing

1    with here, your Honor, is my basic submission.  There was an

2    explicit demand to pay, and the ripeness -- or the standing,

3    rather, was cured when President Clinton excised that

4    specific section that had eliminated the liability.  The

5    liability rearose, and it was very real.  The only thing that

6    the City of New York, I guess, as the appellee in that case,

7    had left was, well, we have a waiver request pending with HHS

8    that hasn't been acted on, but HHS had already made the clear

9    demand and said pay.  That's why I think it's a different

10   case than this, your Honor.

11          THE COURT:  All right.  One final question for you,

12   and it goes to the issue of the constitutionality of Chapter

13   9, and it addresses some language in one of the commandeering

14   cases, the New York case.  There's some broad language in

15   here that I think we have to deal with somehow, and so I'm

16   asking for your help in how you think it should be dealt

17   with.  In that case, the Supreme Court said -- and I want to

18   quote it to you.  It's at 182.  "The constitutional authority

19   of Congress cannot be expanded by the 'consent' of the

20   governmental unit whose domain is thereby narrowed, whether

21   that unit is the Executive Branch or the States."  How do we

22   reconcile that language with the constitutionality of Chapter

23   9?

24          MR. TROY:  Because I don't -- I would submit that,

25   as set forth in our brief, I think, that Chapter 9 does not

1  so narrowly proscribe the powers of the state, if I am

2  recalling the quote correctly, your Honor.  Chapter 9 --

3      THE COURT:  Constitutional authority of Congress

4  cannot be expanded by the consent of the governmental unit

5  whose domain is thereby narrowed.

6      MR. TROY:  I would submit, your Honor, that Chapter

7  9 does not -- it gives the states the consent to decide

8  whether or not its municipalities can file Chapter 9 and

9  under what terms and conditions, but I would submit also

10  that, having done so -- having given states that right to

11  consent, Chapter 9 does not then narrow impermissibly and

12  unconstitutionally the state's sovereign powers to control

13  and regulate its municipalities.

14      THE COURT:  Well, but the objectors argue that it

15  does because it imposes federal priorities on creditors that

16  may be different from the priorities the state has.

17      MR. TROY:  Right.  And this all goes back, your

18  Honor --

19      THE COURT:  So its sovereign powers says we want

20  priority scheme A, and, you know, the federal government has

21  got its priority scheme B, so by filing bankruptcy, there's

22  this narrowing of the state's sovereignty and this expansion

23  of the federal government's sovereignty.

24      MR. TROY:  Right.  And, your Honor, I think this all

25  goes back to the --

1      THE COURT: And New York says that can't be done by

2  consent.

3      MR. TROY: Right. And I think all that is hinged

4  upon and was subject to a lengthy colloquy between you and

5  Mr. Bennett about Bekins or Bekins, take your pick, and

6  Asbury Park. It's all -- that whole hypothetical that you're

7  posing, your Honor, is -- again, it's dependent upon what did

8  Asbury Park do and what did it imbue the states with.

9      THE COURT: Well, but what do I do with this

10  language?

11      MR. TROY: Well, again, your Honor, that language --

12  I think when you then take that language and say, "Well, what

13  about this hypothetical?" that hypothetical to me that you

14  just posed raises the issue of why can't states then just

15  impose their own municipal debt adjustment schemes because

16  Asbury Park says we can, and --

17      THE COURT: Is the answer nothing more than if the

18  state doesn't want to use the federal priority scheme, it

19  just doesn't authorize bankruptcies?

20      MR. TROY: I think that might be --

21      THE COURT: Is that the answer to this?

22      MR. TROY: I think that might be the answer, yes,

23  and that's the ultimate control that the state has. And that

24  goes back to the language that Mr. Bennett was quoting from,

25  I believe, Bekins and somewhat in a parallel sense in the

1    dissent from Ashton.  It's the state's decision.  It's the

2    state's control.  And as your Honor has pointed out in

3    subsequent more recent cases involving Chapter 9, that's how

4    the courts have viewed the issue.  Once in, you're in.

5          THE COURT:  All right.  Thank you, sir.

6          MR. TROY:  If I may, your Honor, if I just address

7    one point --

8          THE COURT:  Yes.

9          MR. TROY:  There's standing, and there's ripeness.

10   They're distinct, and they're different.  Admittedly, if you

11   look at the requirements for each, they arguably bleed into

12   one another, but there is an element of ripeness here, your

13   Honor, that I think is important for you to consider in

14   determining whether or not to take up the objectors on their

15   challenge to the constitutionality of Chapter 9, and it's

16   principally judicial discretion, your Honor.  Do you really

17   have to do this now?  Should you make this reach in declaring

18   the statute that effectively has been upheld for 75 years and

19   say it's unconstitutional right now at this stage of the

20   proceeding?  As articulated in our brief, we don't think you

21   have to.

22         THE COURT:  Well, since you raise standing, it was

23   pointed out by one of the attorneys that under the Bankruptcy

24   Code, creditors have standing to raise any issue that affects

25   them in the bankruptcy.  Does that provision in the

1  Bankruptcy Code answer the standing question?  If not, why

2  not?

3          MR. TROY:  Because it's different than

4  constitutional standing, which is what we're talking about

5  here.  We're talking about a constitutional standing to

6  invalidate an entire statute.

7          THE COURT:  Are the considerations on constitutional

8  standing any different than the constitutional considerations

9  on ripeness in any substantial way or significant way?  Can

10 you have one without the other?

11         MR. TROY:  Can you have standing without --

12         THE COURT:  Do they walk hand in hand down the same

13 path?

14         MR. TROY:  I'm sorry, your Honor.  Are you referring

15 to standing and ripeness?

16         THE COURT:  That's what I meant, standing and

17 ripeness.

18         MR. TROY:  As I understand the doctrines, your

19 Honor -- again, principally I'm a bankruptcy lawyer, not a

20 constitutional lawyer, but as I understand the doctrines,

21 your Honor, I would submit you could have one without the

22 other.  They are -- while similar, they are distinct.  You

23 could have standing but not have ripeness.

24         THE COURT:  You argue neither here.

25         MR. TROY:  Correct.

1      THE COURT:  All right.  I sense a certain eagerness

2   on Mr. Bennett's part, so let's yield the lectern to him.

3      MR. TROY:  Thank you, your Honor.

4      MR. BENNETT:  Your Honor, I want to return to your

5   question about whether or not the constitutional authority of

6   Congress is being expanded here at all.  From the very, very

7   beginning of my argument we talked about why the Chapter 9 or

8   the Chapter 9 -- whoops -- or the Chapter 9 equivalent from

9   back in the '30s, what did not run afoul of the Tenth

10  Amendment.  And remember there was -- the first part of it

11  was because there are -- uniform laws on the subject of

12  bankruptcies are the domain of Congress, and the Supreme

13  Court has told us that uniform laws on the subject of

14  bankruptcies, as they apply to -- does apply to municipal

15  credits.

16     THE COURT:  Yeah.  I get all that, and in the New

17  York case the Congress was legislating within its commerce

18  powers; right?

19     MR. BENNETT:  But the problem with New York was it

20  chose means; i.e., the only part that it didn't like was

21  directing the states to buy or to take possession of nuclear

22  waste.  That was it.  It was that part.  It was the state's

23  direction.

24     THE COURT:  Well, okay.  So do we read this language

25  simply to say that the state cannot consent to a

1  Congressional enactment that goes beyond its commerce powers?

2          MR. BENNETT:  I think --

3          THE COURT:  If that's what they mean, that's sort --

4          MR. BENNETT:  I think that the --

5          THE COURT:  -- of like, "Well, duh."

6          MR. BENNETT:  Well, that they can't consent to

7  the -- also to the commandeering aspect of it.  They can't

8  consent to the direction to the states to do something the

9  states can't be directed to do.

10          THE COURT:  Okay.  Pause there.  If that

11  commandeering in the statute were directed to a private

12  party, would that have been within Congress' commerce power?

13          MR. BENNETT:  It actually would have been because

14  they talk about --

15          THE COURT:  Okay.

16          MR. BENNETT:  -- nuclear waste.  And I also want to

17  come back to the point, though, that --

18          THE COURT:  But, okay, if that's true -- I have to

19  pin this down with you.

20          MR. BENNETT:  That's okay.

21          THE COURT:  If that's true, what is the Court

22  talking about in this language in New York when it says the

23  constitutional authority of Congress cannot be expanded?

24          MR. BENNETT:  That New York, by having participated

25  in negotiations and been part of the group that pulled

1  together the statute at issue, can't have consented -- can't

2  consent to the part that requires the state to buy nuclear

3  waste, the part that was unconstitutional in the New York

4  case.

5        THE COURT:  Okay.  But what authority -- what

6  constitutional authority of Congress is being expanded by

7  that?

8        MR. BENNETT:  The Congress doesn't have the

9  authority to direct the states to do things that it -- to buy

10  things.  It doesn't have that authority.  That's the part

11  that was the problem.

12        THE COURT:  That's the Tenth Amendment --

13        MR. BENNETT:  Correct.

14        THE COURT:  -- limitation on the commerce power.

15        MR. BENNETT:  Correct.  But here I want to come back

16  and say in the bankruptcy realm, because the Congress has the

17  power to pass uniform laws on the subject of bankruptcies,

18  because the subject of bankruptcies include municipal debt

19  adjustment, of all the things that are clearly within

20  Congress' power and is not an expansion, it's priorities when

21  there's not enough to go around.

22        THE COURT:  So your argument is that in order for

23  this comment by the Supreme Court in New York to impact this

24  case, the Court would have to find that the bankruptcy power

25  of Congress does not include the power to include municipal

1 | bankruptcies?

2 |         MR. BENNETT: Yes, your Honor.

3 |         THE COURT: Okay.

4 |         MR. BENNETT: Or that the subject of municipal --

5 | the subject of bankruptcies does not include priorities.

6 |         THE COURT: Okay.

7 |         MR. BENNETT: And I would -- just to round out the

8 | answer to the rest of the points, there was also a

9 | recognition that Chapter 9 might creep up to the edges.

10 | That's where we have the 903 and 904 focus on governmental

11 | and political powers, and there there was a recognition that

12 | consent might not be enough. That's why we have 903 and 904

13 | that people aren't requiring consent to too much.

14 |         MS. NELSON: Your Honor, may I just quickly make a

15 | brief statement to the Court?

16 |         THE COURT: Sure.

17 |         MS. NELSON: Margaret Nelson again on behalf of the

18 | state. I just wanted to let the Court know you requested

19 | yesterday that we file all of the Webster documents, and I

20 | just wanted to let you know that that likely will happen this

21 | afternoon or tomorrow morning --

22 |         THE COURT: Okay.

23 |         MS. NELSON: -- including all of the transcripts. I

24 | know I didn't discuss it during my oral, and I just wanted to

25 | ask the Court if it had any questions specific to the

1  collateral estoppel argument for the state.

2          THE COURT:  No.

3          MS. NELSON:  All right.  Thank you.

4          THE COURT:  All right.  Mr. Gordon, may I have your

5  attention, please?  I had promised you and your colleagues on

6  the objecting side here an opportunity before your rebuttal

7  to organize.  Would you like that opportunity now, or are you

8  and your group prepared to proceed?

9          MR. GORDON:  Your Honor, in that regard, a couple of

10  things.  One, in discussing these matters last night with the

11  group on the objectors' side, it is the sort of universal

12  view that there were issues that were raised and arguments

13  that were made by Mr. Bennett yesterday that, frankly,

14  weren't in the city's papers prior to yesterday.  And in

15  light of the importance of these issues, we would

16  respectfully ask that there be perhaps an adjournment of the

17  rebuttal argument and an opportunity to brief this with the

18  idea that we would strive to coordinate so as to minimize the

19  burden on the Court in terms of the amount of paper that gets

20  filed and so forth, but it is our request in the first

21  instance, your Honor, that there be essentially an

22  adjournment of the rebuttal.

23          Also, as you can imagine, just trying to coordinate

24  who would address what in rebuttal is something that was

25  difficult to do at the end of a very long day yesterday, and

 1   so there are some logistical issues, but, again, from a

 2   substantive standpoint, we were desirous of asking the Court

 3   if we could have two weeks to submit briefs on these issues

 4   and have rebuttal argument in the course of the --

 5           THE COURT:  Okay.

 6           MR. GORDON:  -- the Court's conducting of the

 7   evidentiary hearing at some point.

 8           THE COURT:  I fully intended to offer you the

 9   opportunity to file supplemental briefs, and that was just a

10   question of how much time you needed, so for me that's not an

11   issue.  Much more problematic is the issue of adjourning the

12   rebuttal arguments.  Mr. Bennett, do you have a position on

13   this?

14           MR. GORDON:  And by the way, just for the record, I

15   did at least reach out to Mr. Bennett last --

16           THE COURT:  Um-hmm.  Okay.

17           MR. GORDON:  -- night about this, and he has his

18   opinions, of course.

19           THE COURT:  That was very civil and courteous of

20   you.

21           MR. GORDON:  Thank you.  I try.

22           THE COURT:  Yes, you do.

23           MR. BENNETT:  Yes.  That's true.  I did receive

24   this -- the notice of the possibility that this request would

25   be made.  First of all, we did not cite any new cases.  We

1   certainly read cases that they had cited perhaps more closely
2   than they did, and that was all within the fair game of the
3   party who speaks not having filed the last set of papers.
4   The last set of papers were, of course, filed by the
5   objectors, so there's been no impropriety, nothing unfair,
6   nothing unusual.  And the fact that they had overnight to
7   prepare is a courtesy that, quite frankly, I don't always get
8   when I have to deal with an oral argument after full sets of
9   papers.

10          Adjourning the hearing will create another time
11  burden and expense.  We're getting enough complaints in the
12  press about how much this case is costing.  I'm prepared and
13  the city has invested in that preparation, and we're ready to
14  go.  If we put this off, we're going to get to do that all
15  over again.  The request for two weeks, quite frankly, may
16  well be okay depending upon the length of the trial, but we
17  would need an opportunity to respond, and that would push the
18  response beyond the trial.  And we have business we need to
19  conduct.  We have a DIP financing that we're going to need to
20  get approved, and that won't fund until there's a
21  determination on eligibility.  So there's all kinds of
22  calendar difficulties if your Honor chooses to adjourn, and,
23  frankly, there's calendar difficulties if we have to do
24  another set of briefs.  The ultimate objective is to give
25  your Honor the help you need to decide, and so with the

1  understanding that there will be incremental additional

2  expense if there's an adjournment -- and we're ready to go

3  today -- I believe there's nothing unfair about that -- it's

4  ultimately what works for you, and we'll accommodate whatever

5  your Honor decides.  I have no problem with a short break if

6  people want to get organized.  That's perfectly okay

7  obviously.

8          THE COURT:  All right.  Stand by one moment, please.

9  All right.  Mr. Gordon, may I have your attention again,

10  please?  In the circumstances, I can't justify putting off

11  rebuttal for any substantial period of time.  I can offer you

12  the choice of proceeding after lunch at one o'clock today or

13  proceeding this Friday.  We do have another motion hearing on

14  an unrelated matter at ten, and we could go in this matter at

15  11 on Friday.

16          MR. BENNETT:  Your Honor, I'm not available.  I'm

17  not available on Friday.  It's mid-semester break for one of

18  my sons, and I'm planning to be away this weekend, including

19  Friday.

20          THE COURT:  Well, hold on one more second.

21          MR. GORDON:  Your Honor, I can perhaps short-circuit

22  the issue.  I think, from what I'm hearing, we're comfortable

23  then under the circumstances with coming back at one o'clock

24  today and presenting our rebuttal.

25          THE COURT:  Your other choice would be to do this on

1  Monday either before or after or as part of the pretrial

2  conference that's scheduled for that date.  Do you have any

3  objection to that?

4          MR. BENNETT:  I'll have to take a red-eye unless it

5  starts really late like at about -- I can make a 3:30, I

6  think.

7          THE COURT:  I can't do that myself.

8          MR. BENNETT:  Look, I'll take a red-eye.

9          THE COURT:  I have to be done by three.

10         MR. BENNETT:  I'll take a red-eye, and someone will

11  nudge me if I fall asleep.  As long as it's in the afternoon,

12  it's okay.

13         THE COURT:  Well, hopefully their arguments will not

14  have that impact on you.

15         MR. BENNETT:  Okay.  If it's in the afternoon, it'll

16  work.  It'll be okay.

17         THE COURT:  Okay.  If I understand our time

18  constraints correctly, there's an hour on each side left,

19  right, for rebuttals?  So if we start at one, then I can

20  leave by three, which is what I need to do.  Does that help

21  you?

22         MR. BENNETT:  I'll make it work.

23         THE COURT:  So you were not going to be at the

24  pretrial conference at ten.

25         MR. BENNETT:  That's correct.

1          THE COURT:  Somebody else was covering that for you.

2   That's fine with me, one o'clock Monday for the rebuttal

3   arguments.  Did you want to say something?  Go ahead.

4          MS. CECCOTTI:  Yes.  One o'clock is fine actually.

5   That's helpful to me.  I wonder, though, in terms of the

6   pretrial, I was actually going to ask as a housekeeping

7   matter, again, just due to flights and so forth, it may not

8   be one of my team, but if we had some -- a UAW designee,

9   would that be sufficient, a lawyer for our side here?

10  Otherwise --

11         THE COURT:  That's up to you.

12         MS. CECCOTTI:  Okay.  You don't --

13         THE COURT:  No.

14         MS. CECCOTTI:  I just wondered if the Court had

15  any --

16         THE COURT:  I mean generally speaking, we want at

17  the final pretrial conference whoever is going to conduct the

18  trial.

19         MS. CECCOTTI:  Yeah.

20         THE COURT:  Is that -- is there that disconnect for

21  you?

22         MS. CECCOTTI:  There is.  There are four lawyers on

23  my side and all handling different aspects --

24         THE COURT:  Um-hmm.

25         MS. CECCOTTI:  -- so -- and they're all busy.

1      THE COURT:  Well, all right.  So long as the person

2  is familiar enough, you know, to conduct the sort of

3  administrative stuff we do at a final pretrial conference,

4  including dealing with exhibits, that's fine.

5      MS. CECCOTTI:  I see.  Okay.  All right.  That's

6  helpful, your Honor.  We'll be --

7      THE COURT:  All right.

8      MS. CECCOTTI:  -- guided accordingly.

9      THE COURT:  All right.  So -- all right.  I guess

10  the point is we're adjourning for today to reconvene in this

11  matter at one o'clock on Monday for the final two hours.

12      MR. TROY:  Apologies, your Honor.  Matthew Troy

13  again.  I'm not sure if my presence here was helpful or not,

14  but I will not be here on Monday --

15      THE COURT:  That's fine.

16      MR. TROY:  -- unless you request it or ask of it,

17  and then --

18      THE COURT:  But please accept my assurance that your

19  appearance here today and your argument was helpful.

20      MR. TROY:  Thank you, your Honor.  If your Honor

21  wants me here for that hearing, I can start making inquiries.

22      THE COURT:  You know, if that arises, we do have the

23  option of a telephonic appearance as well.

24      MR. TROY:  Okay.

25      THE COURT:  In fact, you have that option regardless

1   to listen in, so, you know, in terms of whether you, on

2   behalf of your client, feel the need to make any further oral

3   argument, I leave that to your discretion.  And if you want

4   to, we'll do it by telephone.

5            MR. TROY:  Thank you, your Honor.

6            THE COURT:  Just let us know in advance.

7            MR. TROY:  Yes, sir.

8            THE COURT:  All right.  Anything further for today,

9   anyone?  No.  All right.  That's it then.

10            THE CLERK:  All rise.  Court is adjourned.

11        (Proceedings concluded at 4:21 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett          October 20, 2013
_____     _____
Lois Garrett

# ITEM NO. 54

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ___ **Miller, Canfield, Paddock and Stone, P.L.C.** ___

Address ___ **150 West Jefferson Avenue, Suite 2500** ___

City, State, Zip _____ **Detroit, Michigan 48226** _____

Phone _____ **313-496-7631** _____

Email _____ **wysocki@millercanfield.com** _____

**Case/Debtor Name:**

**Case Number:**     **13-53846**

**Chapter:**          **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'⦿**Bankruptcy**   ◯**Adversary**

◯ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/21_    **Time of Hearing:** _1:00 pm_   **Title of Hearing:** Pre-Trial Hearing _____

Please specify portion of hearing requested:  ⦿**Original/Unredacted** "◯ **Redacted** """◯**Copy** *2nd Party)

⦿Entire Hearing       ◯ Ruling/Opinion of Judge       ◯ Testimony of Witness       ◯ Other

Special Instructions: _____

---

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki _____ Date: _10/21/2013_
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
                         Date        By

Order Received:

Transcript Ordered

Transcript Received

# ITEM NO. 55

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

111 First Street                     211 W. Fort Street              226 W. Second Street
Bay City, MI 48708                   17th Floor                      Flint, MI 48502
                                     Detroit, MI 48226

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ___ **Miller, Canfield, Paddock and Stone, P.L.C.** ___

Address ___ **150 West Jefferson Avenue, Suite 2500** ___

City, State, Zip ___ **Detroit, Michigan 48226** ___

Phone ___ **313-496-7631** ___

Email ___ **wysocki@millercanfield.com** ___

**Case/Debtor Name:**

**Case Number:**     **13-53846**

**Chapter:**     **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'◉**Bankruptcy**   ○**Adversary**

○ **Appeal**   **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/21_   **Time of Hearing:** _10 am_   **Title of Hearing:** _Pre-Trial Hearing_

Please specify portion of hearing requested:  ◉**Original/Unredacted** "○**Redacted** """○**Copy** *2nd Party)

○ Entire Hearing   ○ Ruling/Opinion of Judge   ○ Testimony of Witness   ○ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki _____ Date: _10/21/2013_
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____ Date     By

Order Received:

Transcript Ordered

Transcript Received

13-53846   Doc 1290   135384613102100000000000021

**ITEM NO. 56**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## **TRANSCRIPT ORDER FORM**

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ____ **Miller, Canfield, Paddock and Stone, P.L.C.** ____

Address _____ **150 West Jefferson Avenue, Suite 2500** _____

City, State, Zip _____ **Detroit, Michigan 48226** _____

Phone _____ **313-496-7631** _____

Email _____ **wysocki@millercanfield.com** _____

**Case/Debtor Name:**

**Case Number:**     **13-53846**

**Chapter:**          **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'◉**Bankruptcy**   ◯**Adversary**

◯ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/23/2013_   **Time of Hearing:** _9 am_   **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested:  ◉**Original/Unredacted** "◯ **Redacted** """◯**Copy** *2ⁿᵈ Party)

◉Entire Hearing     ◯ Ruling/Opinion of Judge     ◯ Testimony of Witness     ◯ Other

Special Instructions: _____

---

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki                    Date: **10/23/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____     Date     By

Order Received:

Transcript Ordered

Transcript Received

13538461310230000000000028

# ITEM NO. 57

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        October 21, 2013
                    Debtor.     .        10:00 a.m.
. . . . . . . . . . . . . . . .


        HEARING RE. PRETRIAL CONFERENCE RE. ELIGIBILITY
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  BRUCE BENNETT
                        555 South Flower Street
                        Fiftieth Floor
                        Los Angeles, CA  90071-2452
                        (213) 243-2382

                        Jones Day
                        By:  GEOFFREY S. IRWIN
                        51 Louisiana Avenue, N.W.
                        Washington, D.C.  20001-2113
                        (202) 879-3768

                        Pepper Hamilton, LLP
                        By:  ROBERT S. HERTZBERG
                        4000 Town Center, Suite 1800
                        Southfield, MI  48075-1505
                        (248) 359-7333

For the State of        State of Michigan
Michigan:               Michigan Department of Attorney General
                        By:  MATTHEW SCHNEIDER
                        P.O. Box 30754
                        Lansing, MI  48909
                        (517) 241-8403

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>    Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>      PETER D. DECHIARA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>        ANTHONY B. ULLMAN<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390 |
| | Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1        THE CLERK: All rise. Court is in session. Please

2  be seated. Case Number 13-53846, City of Detroit, Michigan.

3        THE COURT: Good morning. Our first order of

4  business is to admit a new attorney to the Bar of the Court.

5        MR. WILKINS: Good morning, Judge Rhodes. Matthew

6  Wilkins for the Retiree Committee. Please meet Anthony

7  Ullman from the Dentons office in New York.

8        THE COURT: Mr. Ullman.

9        MR. ULLMAN: Good morning, your Honor.

10        THE COURT: Welcome. Are you prepared to take the

11  oath of admission to the Bar of the Court?

12        MR. ULLMAN: I am, your Honor.

13        THE COURT: All right. Please raise your right

14  hand. Do you affirm that you will conduct yourself as an

15  attorney and counselor of this Court with integrity and

16  respect for the law; that you have read and will abide by the

17  civility principles approved by the Court; and that you will

18  support and defend the Constitution and laws of the United

19  States?

20        MR. ULLMAN: I do.

21        THE COURT: Welcome again.

22        MR. ULLMAN: Thank you, your Honor.

23        THE COURT: We'll take care of your paperwork for

24  you. You're all set.

25        MR. ULLMAN: Thank you very much, your Honor.

 1          MR. MONTGOMERY:  Your Honor, matter of personal

 2    privilege, I'd like to yield my seat at the pretrial

 3    discussion to Mr. Ullman.

 4          THE COURT:  Okay.  That's fine.  I think we should

 5    begin with appearances for this pretrial conferences.

 6    Counsel, please.

 7          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin

 8    from Jones Day on behalf of the city.

 9          THE COURT:  Okay.

10          MR. HERTZBERG:  Your Honor, Robert Hertzberg, Pepper

11    Hamilton, on behalf of the city.

12          MR. BENNETT:  Bruce Bennett, Jones Day, on behalf of

13    the city.

14          MS. LEVINE:  Good morning, your Honor.  Sharon

15    Levine, Lowenstein Sandler for AFSCME.  Thank you.

16          MR. ULLMAN:  Your Honor, Anthony Ullman for the

17    Retiree Committee from Dentons.

18          MR. GORDON:  Good morning, your Honor.  Robert

19    Gordon of Clark Hill on behalf of the Detroit Retirement

20    Systems.  Also in attendance with me is Ron King from Clark

21    Hill, Shannon Deeby, and I believe Jennifer Green is going to

22    be here.  She's stuck in security right now.

23          THE COURT:  Okay.

24          MR. GORDON:  Thank you.

25          MS. PATEK:  Your Honor, Barbara Patek and Julie

1  Teicher of Erman Teicher for the Detroit Public Safety

2  Unions.

3       MR. DECHIARA:  Good morning, your Honor.  Peter

4  DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

5  the International Union UAW.

6       MR. MORRIS:  Good morning, your Honor.  Thomas

7  Morris of Silverman & Morris, also Ryan Plecha of Lippitt

8  O'Keefe for the Retiree Association parties.

9       MR. MONTGOMERY:  Your Honor, Claude Montgomery from

10  Dentons US, LLP, rounding out the appearances for the Retiree

11  Committee.

12       MS. BRIMER:  Good morning, your Honor.  Lynn M.

13  Brimer appearing on behalf of the Retired Detroit Police

14  Members Association.

15       MR. WERTHEIMER:  Good morning, your Honor.  William

16  Wertheimer on behalf of the Flowers plaintiffs.

17       MR. SCHNEIDER:  Good morning.  Matthew Schneider,

18  Michigan Department of Attorney General, on behalf of the

19  state.

20       MR. WEINER:  Good morning, your Honor.  Dan Weiner,

21  Schafer & Weiner, counsel for Ambac.

22       THE COURT:  Thank you, counsel.  The Court reviewed

23  the joint final pretrial order.  Thank you very much for your

24  cooperation in preparing that.  It looks perfectly acceptable

25  to me with the exception of the exhibit numbering.  Is that

1   being taken care of by somebody?

2          MR. IRWIN:  Yes, your Honor.  We intend to submit a

3   modified pretrial order, and we will take care of that and a

4   number of other administrative or other nits that have been

5   pointed out to me.  This came together very quickly, and

6   so --

7          THE COURT:  Okay.

8          MR. IRWIN:  -- we'll try to fix as much as we can.

9   I think we'll try to do that today.  It would certainly be no

10  later than tomorrow.

11         THE COURT:  Okay.  That's fine.  So what I would

12  like to discuss with you is how long this trial might take.

13  Anybody have any thoughts on that question?  It's important

14  because, as you all know, we are visitors here in this

15  courthouse, and so we need to make arrangements for

16  courtrooms to the extent we can foresee the need.

17         MR. IRWIN:  Certainly, your Honor.  This is

18  something that we have not yet engaged objectors on and had a

19  discussion that I can really use to predict how long it will

20  take.  I will tell you that we will try to put in a tight

21  case.  We can't control cross-examination.  I would think

22  that in order to put on the city's case, we would expect to

23  be done on Friday at the latest.  If crosses are crisp and we

24  can get through issues and there are a lead cross-examiner

25  and perhaps some follow-ups, then I think that we could

1  probably get our case in by the end of the day Friday, again,
2  at the latest.
3           THE COURT:  Anyone else have any thoughts on this
4  question, please?
5           MS. LEVINE:  Your Honor, for the objectors, we've
6  had some conversations along similar lines, so the city's
7  timeline for getting its case on makes sense.  Each of the
8  objectors probably has one, maybe two witnesses, but they
9  would be short depending upon whether or not your Honor
10  accepts declarations and/or quick direct.  Then it would be
11  subject to cross.  In addition to that, there will be some
12  videotape depositions, which are still under discussion but
13  we believe would likely come in at the end of the case, so
14  whether and to what extent your Honor needs a full courtroom
15  for that would be up to the Court.  Thank you.
16          THE COURT:  Since you raise the issue of
17  declarations, I suppose if you all agree to it I would accept
18  it.  I am not, however, a fan of that process.  My preference
19  is for live testimony of direct examination, but, like I say,
20  if you all stipulate to it and insist upon it, I won't stand
21  in the way.
22          MR. IRWIN:  Your Honor, it is our intent to bring
23  all of our witnesses live.  The witnesses who submitted
24  declarations in connection with the opening motion will all
25  be here.  They will all give fulsome direct testimony.  I

1  believe it will be consistent with the declarations that were

2  submitted, and if there is some utility to admitting

3  declarations in addition to the live testimony, particularly

4  insofar as perhaps shortening some of the witnesses who

5  objectors might call and the cross that's needed on them, we

6  would certainly be willing to consider that, and we'll work

7  with objectors on that, but our witnesses are coming live.

8          THE COURT:  Okay.

9          MR. ULLMAN:  Your Honor, one question we had is how

10 you wanted to handle things in terms of the playing of video

11 depositions and transcripts.  Did you want that played live

12 in the courtroom and, to the extent there are transcripts,

13 read with question and answers as opposed to a submission to

14 you?

15         THE COURT:  No.  My preference on both of those is

16 for you all to allow me to do that privately in chambers.

17         MR. ULLMAN:  Very good.  Thank you.

18         MR. SCHNEIDER:  Your Honor, on behalf of the State

19 of Michigan, we're still having some discussions because it

20 does go to the issue of timing as to whether the governor's

21 testimony is actually necessary.  As you know, both the

22 governor and the treasurer, they gave videotape depositions.

23 We do not believe the governor should testify because it's

24 unnecessary, so if he is not testifying, it would speed up

25 the trial.

1          THE COURT:  Okay.  Have the objectors made any

2     decision on this issue, anybody?

3          MR. DECHIARA:  Peter DeChiara for the UAW, your

4     Honor.  The UAW and the Flowers plaintiffs have issued trial

5     subpoenas upon Governor Snyder, Treasurer Dillon, and Richard

6     Baird.  We have not heard back from the state as to whether

7     the state is going to -- and we have not received any motion

8     from the state opposing the subpoenas or resisting the

9     subpoenas, so our plan is to go ahead and have them testify

10    live at trial.

11         THE COURT:  Okay.  So did anyone actually sit down

12    and count up the number of witnesses on the objectors' side,

13    an approximate count?  Anybody?

14         MR. ULLMAN:  I think we -- the answer is we don't

15    know, but what we can do is do a count and promptly inform

16    the Court.

17         THE COURT:  Let's just take a brief pause and ask

18    one of you to just total it up as best you can, you know,

19    give or take a few.  And I'm not going to hold you to a

20    number.  I just want to get an approximate number of

21    witnesses that you're talking about.

22         MR. IRWIN:  Your Honor, if I may, while --

23         THE COURT:  Hang on.

24         MR. IRWIN:  Yeah.

25         THE COURT:  I want to get this number and have them

1  focus on that, and then I'll hear from you.  Sir?

2         MR. ULLMAN:  Your Honor, for the live witnesses, the

3  count I came up with is 16, possibly 15.  That includes the

4  state witnesses.  Some of them will be short.  And this

5  excludes deposition or witnesses who come in by transcript.

6         THE COURT:  Okay.  Thank you very much.  Sir?

7         MR. IRWIN:  Your Honor, I was simply going to add at

8  the end of Mr. DeChiara's statement about the state witnesses

9  and the need for live testimony, the city has offered to have

10  the entire depositions of each of those three witnesses

11  admitted without objection, and we are still willing to do

12  that.  I don't know if there's an opportunity to do that, but

13  we'd work with objectors to get that accomplished.

14         MR. SCHNEIDER:  Just to be clear, your Honor, for

15  the record, the state is now making an oral motion to make

16  sure that the depositions are the ones that are played of the

17  governor, of the treasurer, and Mr. Baird.  We can supplement

18  that in writing, but I thought since we were all here, I

19  would make that motion now.

20         THE COURT:  You mean in lieu of live testimony?

21         MR. SCHNEIDER:  That's correct, your Honor.

22         THE COURT:  That's not exactly what the Federal

23  Rules of Civil Procedure or of Evidence contemplate, is it?

24         MR. SCHNEIDER:  I'd be happy to put it in writing,

25  but I wanted to -- just because I was here, the parties are

1    here, I wanted to bring that to the Court's attention.

2         THE COURT:  The rules contemplate the use of

3    deposition testimony when witnesses are not available, so why

4    should there be a different process here?

5         MR. SCHNEIDER:  Well, one thing we would like to

6    know is if the objectors want the governor as a witness, we

7    would --

8         THE COURT:  I asked that question and thought I

9    heard the answer was yes.

10        MR. SCHNEIDER:  I'm sorry.  If the governor -- if

11   the objectors want the governor as a witness, then we would

12   want direction as to when would we be doing this in the trial

13   because --

14        THE COURT:  Okay.  That's a fair question.

15        MR. SCHNEIDER:  Yes.

16        THE COURT:  Yeah.  Can anyone address that?

17        MR. DECHIARA:  Peter DeChiara, your Honor.  We

18   recognize that the governor is a very busy man, as are Mr.

19   Dillon and Mr. Baird, and we would be perfectly happy to

20   accommodate their schedule so that they testify during the

21   trial at a time that is convenient to them and makes sense to

22   the Court, so we're certainly not going to make any

23   unreasonable demands to, for example, have the governor of

24   the state sit here for the duration of the trial.

25        THE COURT:  All right.  Let me just ask the two of

1  you to try to work this out in a way that makes sense.  I'm

2  sure you'll be able to.

3        MR. DECHIARA:  Okay.  Your Honor, if the state is

4  making a motion to oppose having the governor and the

5  treasurer and Mr. Baird appear live at trial, we would ask

6  that that motion be in writing, we'd be given proper time to

7  respond in writing, and that it be done according to the

8  court rules.  Thank you.

9        THE COURT:  All right.  The only other issue I

10  wanted to raise is whether or not to impose time limits on

11  the presentation of evidence by each side, so let me ask you

12  what your views on that should be and if it is decided to do

13  that, how much time is appropriate on each side.

14        MR. IRWIN:  Your Honor, we have given this a little

15  bit of thought, and consistent with what I indicated when you

16  asked for a preview of how long our case would take to put

17  in, it would be our hope and expectation that the entire case

18  could be completed by Tuesday of the next week, that we would

19  not need to spill into the additional time that the Court had

20  allocated.  I think we have a three-day break after Tuesday

21  and then we return the following week.  I suspect we could

22  probably, if we had that type of time constraint, work out

23  among ourselves a good allocation of time.  I think we would

24  be done, as I indicated, by Friday, which I think, based on

25  what I know of the nature of the testimony that will come in

1   from the witnesses, even though it's a dozen or more, I think

2   that those can be accomplished in a very short period of

3   time.  The crosses would be very short, very tight.  I

4   suspect that there be some cumulative testimony that we

5   will need to work through but that the parties could work

6   through it and may need the Court's intervention at some

7   point, but I believe, based on what I understand the response

8   case to be in its entirety, even with the state witnesses

9   coming live, we should be able to get this done in the five

10  days that don't spill over into the second week.

11          MR. ULLMAN:  Your Honor, speaking for the committee,

12  when I heard the estimate that the city's case would take

13  through the end of Friday, my reaction was that was longer

14  than I had expected, so for the committee, I think we'd be

15  interested in talking about reasonable time lines, reasonable

16  time frame for the testimony.  To do that, we'd really have

17  to first confer with the city and understand exactly how long

18  they intended to put witnesses on, but I certainly would have

19  thought that we would have been done with the city's case

20  before the end of Friday.

21          THE COURT:  Um-hmm.  Okay.

22          MR. IRWIN:  If I may, just to be -- we would be done

23  much sooner than Friday.  I'm trying to allow for what I

24  can't control.  I have no idea how long cross will be on

25  someone like Mr. Orr.  If it -- if we are talking about the

1   city's affirmative case, we could probably be done in a day.

2   We might take some of Thursday.  We would be done very

3   quickly, but I just don't know what I don't know.

4           THE COURT:  Right.  One of the things I want to

5   control by imposing a time limit is the concern about

6   duplicate questioning on cross-examination.  Have you all

7   thought about how to deal with that question other than by

8   time limits, for example?

9           MS. LEVINE:  Your Honor, the objectors have started

10   coordinating and have put together an order where, for

11   example, AFSCME has agreed to go last so that if the

12   questions have already been asked, we don't have to ask

13   anything.  And the goal is -- and I think you've seen this in

14   the oral argument -- that we parse it together carefully

15   and --

16           THE COURT:  Um-hmm.

17           MS. LEVINE:  -- we don't overstep, so with the

18   Court's permission, we'd like to let that try without

19   imposing potentially artificial time limits that stop actual

20   questions from being asked once.

21           THE COURT:  And when you say "an order," you mean an

22   order of questioning?  That's what you mean?

23           MS. LEVINE:  Yes.

24           THE COURT:  Yeah.

25           MS. LEVINE:  Sequencing.

1      THE COURT:  All right.  Okay.  Well, I am pleased to

2   hear that everyone, at least at the outset, has the intent to

3   proceed here efficiently and crisply.  I commend you for

4   that.  It will, of course, remain to be seen whether this

5   intent actually gets executed or not, but in the

6   circumstances I'm feeling less inclined to impose actual

7   hours of time limits, so let me ask you to continue your

8   efforts to try to make this as efficient a process as

9   possible.  So that's really all that I thought was necessary

10  to discuss this morning, but I would like to turn the agenda

11  over to anyone to address any issues that you'd like to bring

12  up at this time.

13      MR. ULLMAN:  Your Honor, I just wanted to apprise

14  the Court that we have either filed or are in the process of

15  filing a motion in limine seeking to exclude any purported

16  expert evidence to the effect that the unfunded pension

17  liability is 3.5 billion, and I just wanted to let you know

18  that that either has been done or is in the works so that the

19  Court is aware of that, your Honor.

20      THE COURT:  Well, okay.  Thank you for that notice.

21  I will say for your -- that's okay.

22      MR. ULLMAN:  Apologize, your Honor.

23      THE COURT:  If you need to consult, I'll pause here.

24      MR. ULLMAN:  No, no.  I'm not sure if it's been

25  done, but it's being -- it's in process.

1       THE COURT:  Okay.  Obviously I can't control what

2  you file, so you file what you'd like to file.  I will tell

3  you, however, that I am not a fan of motions in limine.  Most

4  of the time when they are filed, in my experience, the

5  resolution of the motion has to await the trial process, and

6  it's more often than not not something that the Court can

7  clearly rule on in advance of the trial, but, like I say, if

8  this is something you feel the need to file, you file it.

9       MR. ULLMAN:  We did, your Honor, and I appreciate

10  that.  And one virtue is it's short.

11       THE COURT:  Okay.  That would be a virtue.  Is there

12  anything else that anyone would like to bring up today this

13  morning?

14       MR. GORDON:  I just want to ask a question, and I

15  apologize --

16       THE COURT:  Sir.

17       MR. GORDON:  -- your Honor.  Robert Gordon again.

18  Is there an agreed upon order for the witnesses that the city

19  is going to put on?  I'm not sure if that was clear from the

20  pretrial order.

21       THE COURT:  Um-hmm.  Can you share with everyone

22  here what the order of your witnesses will be?

23       MR. IRWIN:  I can, your Honor, and I appreciate from

24  Mr. -- the order of witnesses was slightly impacted by some

25  discussions we were having on a few exhibits, and so we don't

1   need to call a couple of custodial witnesses, which I think

2   is in everyone's interest.  Yes.  Our order of witnesses will

3   be -- we will start with Mr. Malhotra from Ernst & Young.  He

4   submitted a declaration, and I think the Court is familiar

5   with Mr. Malhotra.  He will be followed by Mr. Moore, who

6   also submitted a declaration, who will be followed by Mr.

7   Buckfire, Ken Buckfire.  Then he will be followed by Police

8   Chief Craig, and he will be followed by Mr. Orr, the

9   emergency manager, and that's the order that we're planning

10  to call.

11          THE COURT:  All right.  Thank you.

12          MR. IRWIN:  The other -- your Honor, just a few

13  housekeeping matters and just some direction from the Court

14  perhaps.  As I indicated, we will be submitting a modified

15  pretrial order consistent with the Court's request for

16  exhibit ranges from the objectors and other clean-up that we

17  needed to do from last week.  There are -- and I wanted to

18  alert the Court to this.  There are ongoing depositions.

19  There are still a few to be concluded, but there were

20  depositions that took place either in the middle or through

21  the end of last week and even over the weekend that the

22  designations or import of which could not have been

23  incorporated into the pretrial order --

24          THE COURT:  Um-hmm.

25          MR. IRWIN:  -- on Thursday, so there may be

1  additions to the pretrial order as a consequence, and there

2  may even need to be some further supplementation in the form

3  of --

4          THE COURT:  Um-hmm.

5          MR. IRWIN:  -- supplemental dep designations and the

6  like that just could not have been done before these things

7  were required to have been submitted.  And I think that may

8  be true on both sides.

9          THE COURT:  Um-hmm.

10          MR. IRWIN:  And we'll work together on that.

11          THE COURT:  Can I suggest that on that issue that

12  you hold up the filing of any such supplementation until the

13  end of the trial so that it only has to be done once?

14          MR. IRWIN:  Thank you, your Honor.

15          THE COURT:  Is that okay?

16          MR. IRWIN:  Yes.  As a matter of procedure, your

17  Honor, we have made disclosures to each other in advance of

18  the pretrial order, particularly on exhibits and witnesses.

19  There are a number of exhibits on both sides to which there

20  are no objections.  Does the Court have a preference as to

21  how those objections -- or how those exhibits can be moved

22  into the record?

23          THE COURT:  Oh, I meant to mention this before, and

24  thank you for bringing it up.  It is the Court's practice to

25  enter an order admitting into evidence today or tomorrow

1  those exhibits as to which your joint final pretrial

2  statement shows there's no objection, and we will identify

3  those by number in the order.

4          MR. IRWIN:  Thank you, your Honor.

5          THE COURT:  It is not my usual practice to rule on

6  objections in advance of trial and to just deal with them

7  when and if there is a motion to admit the document and an

8  objection stated at that time.

9          MR. IRWIN:  Your Honor, in that regard, in terms of

10 just the mechanics of witness examination -- and we've had

11 people into court and we've talked about technology, and I

12 think we're pretty set up in that regard.  It is our

13 expectation that we will have complete exhibit books for the

14 witnesses.  We do not intend to hold the witness books.

15 That's cumbersome in --

16         THE COURT:  Right.

17         MR. IRWIN:  -- this case, and so many of the

18 documents are not objected to.

19         THE COURT:  Right.

20         MR. IRWIN:  We'll have books ready for everyone

21 there.

22         THE COURT:  Good.

23         MR. IRWIN:  Does the Court have a preference in

24 terms of once a final set of deposition designations is

25 agreed upon, how those are submitted?  We can submit, you

 1 | know, with color-coded designations or counter-designations

 2 | from the two sides. Does the Court have a preference in that

 3 | regard, or would the Court just prefer that we work that out

 4 | together?

 5 |         THE COURT: Again, whatever you work out and

 6 | whatever you all think will be the most efficient way to do

 7 | that is fine with me.

 8 |         MR. IRWIN: Okay.

 9 |         THE COURT: I'm completely flexible on that issue.

10 |         MR. IRWIN: Okay. The last point, your Honor, the

11 | city is prepared -- and we had made exhibit exchanges. The

12 | city is prepared to provide its now premarked set of trial

13 | exhibits to objectors. I think the Retiree Committee has --

14 | we have not -- we have not provided anyone copies yet, but we

15 | have them. The Retiree Committee provided us with theirs

16 | last night. We still need those from other objectors and

17 | something that we'll work through today, but we are at a

18 | little bit of a disadvantage not having a full set of trial

19 | exhibits from a number of the objectors yet, so we'll work on

20 | that, but we really need those today because the disclosures

21 | that were made early last week were sufficient for that

22 | purpose, but we have to have -- we have to know exactly what

23 | their exhibits correspond to in connection with putting the

24 | final pretrial order in today.

25 |         THE COURT: Does anyone object to providing sets of

1  exhibits to the city by, say, noon tomorrow?

2          MS. LEVINE:  Your Honor, that'll be fine because in

3  conferring with the Retirement System, it's our understanding

4  actually that all of the objectors forwarded their exhibits

5  to the Retirement System, who's just got better technology

6  than some of the rest of us, and that they have actually

7  shared a global list with the city's counsel.

8          THE COURT:  Okay.

9          MR. ULLMAN:  Your Honor, I was asked to find out

10  whether there's a secure spot in the courtroom where the

11  exhibits can be stored.

12          THE COURT:  You mean like for overnight and --

13          MR. ULLMAN:  Yeah.

14          THE COURT:  -- breaks?

15          MR. ULLMAN:  Yeah, in terms of making sure

16  everything is kept in place and nothing happens.  We all know

17  where everything is.

18          THE COURT:  Well, is it your concern that locking

19  the courtroom overnight is not sufficient for security --

20          MR. ULLMAN:  Actually --

21          THE COURT:  -- because that is what happens?

22          MR. ULLMAN:  Having seen the security people in

23  place here, I think that would actually work very well

24  because --

25          THE COURT:  All right.

1          MR. ULLMAN:  -- they're extremely vigilant.

2          THE COURT:  All right.

3          MR. ULLMAN:  And then the last question --

4          THE COURT:  If you discover at some point that you

5     need more security than that for whatever reason, please let

6     me know, but at this point my preference would be to say that

7     locking the courtroom is what we can provide for you.

8          MR. ULLMAN:  Okay.  Thank you.  And then the last

9     question I had, at least as I recall the pretrial order, each

10    objector is going to have a separate number series of

11    designations, and I was just wondering because it occurs to

12    me that a lot of the objectors may designate as an exhibit

13    the same document, so we'd have the same document potentially

14    coming in with six different numbers, whether we should try

15    to find some way for common documents.

16         THE COURT:  I'd sure like to see you minimize that.

17         MR. ULLMAN:  Okay.  So perhaps the objectors -- we

18    can work amongst ourselves to have like a common Objectors'

19    Exhibit 1, Exhibit 2, et cetera.

20         THE COURT:  Please.

21         MR. ULLMAN:  Okay.  We'll try, your Honor.  Thank

22    you.

23         THE COURT:  Yes.

24         MR. IRWIN:  One other question occurs to us in terms

25    of what the Court might expect in the form of openings and

1  closings.

2      THE COURT:  Well, I do like opening statements.  I

3  think they are a very important part of the trial process as

4  are closing arguments.  It is not my intention, so that you

5  can prepare properly for closing, to ask for post-trial

6  briefs, so you should focus the full thrust of your arguments

7  that you want to make to the Court that are based on the

8  evidence on your closing argument and not on any written work

9  product.

10      MR. IRWIN:  Okay.  Would we expect or anticipate

11  some break between when the last witness finishes his or her

12  testimony and the closings, or should we expect the closings

13  to occur promptly thereafter?

14      THE COURT:  If you have been as efficient at

15  presenting your testimony as you all are holding out you will

16  be, I am willing to be flexible on that, absolutely.

17      MR. IRWIN:  All right.

18      THE COURT:  We can work with that.

19      MR. IRWIN:  And my last question, your Honor, we've

20  talked about the city's witness sequence, which we just --

21  which I just described, but we haven't talked about a process

22  whereby the objectors would give us proper notice of the

23  sequence of their witnesses.  It would be great if they could

24  tell us now what the witnesses -- the identities and the

25  sequence of the witnesses are.  I'm not sure if they could,

1  but at a minimum there needs to be some process whereby we

2  can get the resources in place for cross-examination with

3  some notice.

4         THE COURT:  Is there any objection to this request?

5         MS. LEVINE:  No objection, your Honor.  The

6  logistical issue that we've been discussing over the weekend

7  and trying to grapple with is that a lot of our witnesses are

8  really just going to be here for an hour, maybe two, and they

9  have a lot of other things on their plate and travel

10  schedules, so we were hoping for a little bit of flexibility

11  just in terms of getting them here and back, but other than

12  that, we have no objection.

13         THE COURT:  Okay.  When can city's counsel expect

14  you to give them your best estimate of what the order of your

15  witnesses will be?

16         MS. LEVINE:  Maybe we can consult after this,

17  especially now that we have an understanding of what they

18  think their direct case will take.

19         THE COURT:  Okay.

20         MS. LEVINE:  Thank you.

21         THE COURT:  So I think they're willing to work with

22  you yet here today after court.  I have been asked to remind

23  you that in order for us to make a proper audio recording of

24  this, people who speak need to speak near microphones.  Now,

25  at this time, as you can see, we only have one per table, and

1   that's a problem.  I have asked that we get a second

2   microphone for each table, and we're still going to try to do

3   that, I think, but when you, for example, object in the heat

4   of the moment to some trial testimony that you don't think is

5   admissible, please try to be cognizant of this concern, as

6   challenging as it may be.  Anything further from anyone here

7   this morning?

8            Okay.  One more thing that I do need to bring to

9   your attention.  We have been requested to enforce certain

10  procedures for getting you all into the courtroom and out of

11  the courtroom that will minimize the disruption of other

12  trial proceedings on this floor, so I am requesting of you

13  and actually really instructing you to come up to the court

14  here on the 7th floor and to leave the court using the

15  Lafayette Street side elevators, not the Fort Street side

16  elevators, not to linger in the hall either before, after, or

17  during court at all, and while you are in the court to

18  maintain that same decorum of silence that you would if you

19  were in court and to try to hold your discussions among

20  yourselves till you get either into the elevator or all the

21  way down to the 1st floor.  And we will be in this courtroom

22  for this afternoon's oral arguments as well as all of court

23  on Wednesday, Thursday, and Friday.  Okay.  Anything further?

24            MR. GORDON:  Your Honor --

25            THE COURT:  Mr. Gordon.

1          MR. GORDON:  -- I just wanted to ask -- last night

2     the Retirement Systems did file a motion to compel, and I

3     believe there were other motions to compel that have been

4     filed over the weekend.  Do you anticipate addressing those

5     on Wednesday of this week?

6          THE COURT:  We entered an order granting your motion

7     for an expedited hearing.  You probably just didn't see it

8     yet.  It is scheduled for Wednesday first thing along with

9     the UAW.  Are there any others that I don't know about?  As

10    far as I know, there's just those two, and then if there's a

11    motion in limine, we'll probably set that for Wednesday

12    morning as well.

13         MR. GORDON:  All right.  Thank you, your Honor.

14         MR. WERTHEIMER:  Your Honor, the UAW and the Flowers

15    plaintiffs will be filing a motion today dealing with the

16    executive -- or excuse me -- the attorney-client privilege

17    issue relative to the state documents, so that'll be filed

18    today, and I just notify the Court of that because the Court

19    may want to schedule that.

20         THE COURT:  You'll be requesting an expedited

21    hearing --

22         MR. WERTHEIMER:  Yes, we will.

23         THE COURT:  -- on that as well, sir?

24         MR. WERTHEIMER:  Yes.

25         THE COURT:  All right.  Well, if you do get it in

1  today before the close of business at five, I will likely
2  grant an expedited hearing for Wednesday, but, you know, I do
3  have to be sensitive to the issue of adequate notice.

4          MR. WERTHEIMER:  And it does have to do with the
5  state witnesses, which are not going to come up from our
6  perspective until our case, so --

7          THE COURT:  All right.  Thank you.

8          MR. WERTHEIMER:  Thank you.

9          THE COURT:  Anyone have anything else?  Apparently
10 not.  All right.  We'll be in recess until one o'clock.

11         THE CLERK:  All rise.  Court is in recess.

12      (Proceedings concluded at 10:34 a.m.)

INDEX

<u>WITNESSES:</u>

None

<u>EXHIBITS:</u>

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    October 23, 2013

_____            _____
Lois Garrett

**ITEM NO. 58**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,           .        Docket No. 13-53846
        MICHIGAN,                  .
                         .        Detroit, Michigan
                         .        October 21, 2013
             Debtor.     .        1:00 p.m.
.  .  .  .  .  .  .  .  .  .  .  .  .  .  .

HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9
PETITION (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  GEOFFREY S. IRWIN
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       State of Michigan
Michigan:              Michigan Department of Attorney General
                       By:  MATTHEW SCHNEIDER
                       P.O. Box 30754
                       Lansing, MI  48909
                       (517) 241-8403

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP By: SHARON L. LEVINE 65 Livingston Avenue Roseland, NJ 07068 (973) 597-2374 |

For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5882
Retirement System
of the City of
Detroit:

For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters           Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police       400 Galleria Officentre, Suite 444
Officers Associa-    Southfield, MI  48034
tion and the         (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

For the Inter-       Cohen, Weiss & Simon, LLP
national Union,      By:  BABETTE A. CECCOTTI
UAW:                      PETER D. DECHIARA
                     330 West 42nd Street, 25th Floor
                     New York, NY  10036-6976
                     (212) 356-0227

For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292

APPEARANCES (continued):

| | |
|---|---|
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>        ANTHONY B. ULLMAN<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390 |
| | Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |
| Court Recorder: | Letrice Calloway<br>United States Bankruptcy Court<br>211 West Fort Street<br>21st Floor<br>Detroit, MI  48226-3211<br>(313) 234-0068 |
| Transcribed By: | Lois Garrett<br>1290 West Barnes Road<br>Leslie, MI  49251<br>(517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1        THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Recalling Case Number 13-53846, City of Detroit,

3    Michigan.

4        THE COURT:  And you may proceed.

5        MR. GORDON:  Thank you, your Honor.  Good afternoon.

6    For the record, Robert Gordon of Clark Hill on behalf of the

7    Detroit Retirement Systems.  Your Honor, we did not submit a

8    proposed line-up to the Court as we did for the October 15th

9    hearing; however, the objectors have all conferred with one

10   another over the weekend and have come up with an informal

11   line-up, if you will, and have discussed amongst themselves

12   sort of loosely how much time each party would need.  And so

13   rather than inform the Court of the time slots, we'll just

14   sort of try to self-police ourselves and inform the Court if

15   that's okay.

16       THE COURT:  Okay.

17       MR. GORDON:  Again, as with the October 15th

18   hearing, each party will try its best to identify before it

19   starts its rebuttal argument -- apprise the Court of what

20   issues it plans to touch upon.  Unlike the October 15th

21   hearing, of course, because time is short, various parties

22   will be trying to touch upon discrete issues and not overlap

23   with one another, so while each party may support the

24   arguments that are being made, for the record, I just need to

25   state that each party obviously reserves its right to make

1  similar arguments or diverge from those arguments in its

2  supplemental briefing.  Thank you.

3  With that, your Honor, just so the Court has an

4  understanding of the order in which we are proposing the

5  objectors rise, first would be Ms. Levine on behalf of

6  AFSCME, then Ms. Brimer on behalf of the Retired Detroit

7  Police Members Association, then myself on behalf of the

8  Retirement Systems, then Mr. Morris on behalf of the Retiree

9  Associations, then Ms. Patek on behalf of the Public Safety

10  Unions, then Ms. Crittendon as an interested party, and then

11  Mr. Montgomery on behalf of the Retiree Committee.

12  THE COURT:  All right.

13  MR. GORDON:  Oh, my goodness.  I'm sorry.  After --

14  I'm sorry.  After Mr. Morris, Ms. Ceccotti would be next on

15  behalf of the UAW.

16  THE COURT:  Thank you.  It's fine with me not to

17  keep track of your time individually if that's your request,

18  but I do have to cut off all rebuttal argument in one hour.

19  MR. GORDON:  Very well, your Honor.  Thank you.

20  THE COURT:  And one more thing.  You will notice

21  that on your tables we now have three microphones instead of

22  one.  I have been asked to advise you that this makes it much

23  more likely that our record will pick up your private

24  conversations, and you should be concerned about that because

25  we do post the audio unedited on our website every night.

1  And I should say if there is a private conversation that you

2  want to have at any point today or during the trial and

3  you're concerned about it getting on the microphone, just

4  request a brief pause from the recording.  We'll turn the

5  recording off.  You can have your conversation, and we'll

6  continue.

7          MS. LEVINE:  Good afternoon, your Honor.  Sharon

8  Levine, Lowenstein Sandler, for AFSCME.  Your Honor, I've

9  been given ten or twelve minutes and will address, per the

10  Court's suggestion, home rule and then perhaps if there's

11  time a sentence on Chapter 9 again.

12          THE COURT:  Okay.

13          MS. LEVINE:  Thank you, your Honor.  Your Honor,

14  similar to the arguments or the statements in the

15  conversation we had with the Court with regard to Chapter 9

16  and the interplay between the federal Constitution and the

17  state municipal governments under the Tenth Amendment, we

18  would respectfully submit that under the Cooley Doctrine and

19  the cases that have been decided here in Michigan that the

20  Michigan Constitution in Chapter 7 also reflects a very

21  strong view towards home rule, and what we mean by home rule,

22  your Honor, is that the local governments -- in this case,

23  Detroit -- are given a lot of respect by the state government

24  in order to manage and run their own local governments.  And

25  we would respectfully submit that the way that either 439 is

written or as applied in this case, that the grant of power

given the emergency manager here in Detroit violates the

state Constitution.

So, first, your Honor, we would note that the

emergency manager has been appointed by the state.  He was

not elected by the local electorate.  He was not elected the

way, for example, the mayor and the City Council were

elected.  He has supplanted them, and he was -- and he didn't

supplant them by a vote of the citizens, and he didn't even

supplant them with the consent of the locally elected

officials.  So first point is that we believe that the

emergency manager and 436 is inappropriate here because he's

not an elected official.

Two, your Honor, we would note that the breadth of

the powers granted the emergency manager even if the

appointment of the emergency manager were appropriate is

inappropriate here both as a matter of constitutional law and

as applied in this particular case because the governor

failed to appoint the emergency manager with any appropriate

contingencies in the letter of appointment, and that's

because of the scope of the power that the emergency manager

wields is well in excess of that which the Constitution --

the Michigan Constitution would permit.  So, for example,

even if the scope of the powers were not subject to -- sorry.

Let me say it differently.  Even if the Michigan Constitution

1    does allow, for example, taxation or even debt adjustment, it

2    doesn't allow the wholesale taking over of the local

3    government by the emergency manager. So, for example, not

4    allowing there to be replacements to the City Council, day-

5    to-day negotiation of vendor contracts, labor contracts,

6    grievances, de minimis asset sales, these are the types of

7    things that are not necessarily --

8            THE COURT: Well, but let me ask you to -- let me

9    ask you to pause there with this question. Is the

10   constitution -- or would the constitutionality of PA 436, as

11   it pertains to those kinds of issues, be before this Court?

12   Are they necessary to decide in the context of eligibility?

13           MS. LEVINE: They are, your Honor, because the way

14   this appointment has taken place, all of those individual

15   acts that the emergency manager has been allowed to engage in

16   ahead of a plan of adjustment which might deal with just the

17   debt makes the very decision that the emergency manager made

18   with regard to filing the Chapter 9 petition itself

19   unconstitutional or unconstitutional as applied to the facts

20   of this case because there was no limitation on what the

21   scope of his authority was just dealing with that one issue.

22   And that scope -- the unfettered scope, your Honor, is not

23   just related to the day-to-day business operations, and we've

24   seen that play out in the deposition of Mayor Bing and in

25   others who talk about the fact that they're bottlenecked with

1    regard to decision-making and that ordinary types of

2    decision-making is now deferred to the emergency manager or

3    his counsel, but we've seen that, your Honor, in the

4    unfettered scope that provides for no judicial review of

5    those decisions as well.  So, for example, if, in fact,

6    there's a dispute under a Chapter 11 or a Chapter 7 where you

7    have a debtor in possession or a trustee, a debtor in

8    possession, for example, a corporate debtor, has fiduciary

9    obligations under the direct language of the Bankruptcy Code

10   and has fiduciary obligations under state law.  A Chapter 7

11   or a Chapter 11 trustee similarly has fiduciary obligations,

12   and they are not allowed to take actions either outside the

13   ordinary course of business or under the course of a Chapter

14   7 without coming to this Court for approval, sales,

15   settlements, ultimate plans of reorganization.  Under Chapter

16   9, because we're dealing with the fact -- and we believe it's

17   the unconstitutional fact -- that there's a tension between

18   what the state can do and what the federal government can do,

19   we don't have that same access to judicial review, so under

20   904, 362, and even Stern's there are a lot of decisions that

21   get made on the day-to-day basis.  And I'm not dealing with

22   the global jurisdictional issues, just the day-to-day basis

23   of tort claims, of contract disputes, of settlements with

24   individual creditors that don't ever see the light of day in

25   this court, and to the extent that there was a grievance or a

1   dispute about that under 362 in this Court's stay extension

2   orders, there's no other court where those disputes can be

3   taken.

4         So we have an unelected emergency manager who's in

5   place now because he's a contractor with the state

6   government, and we have unfettered rights where basically our

7   view is it's tantamount to all of the rights that were

8   granted to the city under Chapter -- under Article VII of the

9   Constitution are now within the power of the EM in this

10   particular case. And we'd respectfully submit that that is

11   just not what the Cooley Doctrine or the state Constitution

12   envisioned even if it did envision in appropriate

13   circumstances debt restructuring.

14         Nine minutes. With that, your Honor, I would just

15   close briefly on Chapter 9. We would respectfully submit

16   that similar -- well, I'll --

17         THE COURT: I'm not sure you've quite addressed the

18   central home rule question that at least I see. The city and

19   the state argue that to whatever extent home rule powers

20   apply to the City of Detroit under the Michigan statutes,

21   they are effectively modified by PA 436 and that that

22   modification is not inconsistent with whatever the Michigan

23   Constitution says about home rule. How do you deal with

24   that?

25         MS. LEVINE: Your Honor, we understand the statement

1    has been made along those lines.  We don't see those

2    modifications in PA 436.  In other words, either in the

3    statute itself or in the authorization as granted under the

4    statute here, there is no limitation that we can see, and, in

5    fact, we've seen the opposite through the emergency manager's

6    orders and the emergency manager's right to run unfettered

7    the City of Detroit.  And in addition to that, one of the

8    issues that they talk about in terms of limiting his ability

9    is that his term is only 18 months, but that also is not

10   supported if you take a look at the statute and you take a

11   look at the statute in practice without any limitation in the

12   authorization because at the end of 18 months, the state has

13   the absolute right to continue the term.  The City Council

14   can only stop that by a two-thirds vote, but since the EM has

15   effectively taken over the City Council, we don't even have

16   the checks and balances that appear facially on the statute,

17   so we're saying two things.  We're saying they can say that

18   it's a limitation, but as far as we can tell, PA 436

19   virtually gives away to the emergency manager everything that

20   was referred to the states under Chapter 7 of the

21   Constitution, and not only that, there is no redress for

22   addressing violations of that unfettered right or stopping

23   the time line pursuant to which the EM can stay in office.

24   Thank you.

25            MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

 1  Brimer appearing on behalf of the Retired Detroit Police

 2  Members Association.  Your Honor, to begin with, I have

 3  approximately ten to twelve minutes of the allotted time for

 4  the objectors.  I am going to discuss, your Honor, the narrow

 5  issue of whether or not PA 436 is constitutional under the

 6  referendum provision of the Michigan Constitution.  As your

 7  Honor will recall, Article II, Section 9, of the Michigan

 8  Constitution specifically reserves to the people of Michigan

 9  the right of referendum with respect to any law other than

10  those that contain a spending or appropriation provision.

11       When we were here on Tuesday, your Honor, last week,

12  I advised the Court that at that time the city and the state

13  neither had responded to the arguments that had been raised

14  by the RDPMA in its opening objection and, moreover, that at

15  that point in time we had not been able to find a case that

16  was factually similar to this case.  Today, we do have the

17  oral arguments that were presented by Ms. Nelson in response

18  to this argument during the state's opening arguments.  The

19  city has still not responded to this discussion, and we

20  still, your Honor, do not have a case that is even closely

21  factually similar to this case.

22       As the Court may recall, Ms. Nelson cited the case

23  of Reynolds v. Martin for the proposition that the governor

24  and the state legislature can completely disregard the will

25  of the people and thwart the people's constitutional right to

1    a referendum by placing an insignificant spending provision

2    at the tail end of an act that had previously been defeated

3    on referendum, pass such act during a lame duck session, and

4    consider it to be constitutional.  Reynolds v. Martin is so

5    factually distinguishable, your Honor, as to be of little or

6    no actual application to this case, and ultimately we would

7    conclude that its holding, in fact, supports the argument of

8    the RDPMA.  And I think it's very important to very briefly

9    discuss that case.  In Reynolds in 1994 the legislature

10   passed an act amending the state's Bingo Act.  That act was

11   referred for referendum.  However, before it was placed on

12   the 1994 ballot, certain of its signatures were questioned.

13   Therefore, it did not make the 1994 ballot.  The general

14   election was held in November of '94.  A new legislation --

15   legislators were elected.  They were seated in 1995.  In 1995

16   with the new legislation in -- legislative body in place, a

17   new act was passed.  Subsequently, in 1996 the 1994 act was

18   certified for the referendum, and it was, in fact, voted down

19   in the referendum.

20          A party challenged the denial of a license under the

21   1995 act on the grounds that it could not have been passed in

22   contravention of the referral of the 1994 act to the

23   referendum process under Article II, Section 9.  However,

24   your Honor -- and ultimately the 1995 act was upheld as

25   constitutional.

1    The state would argue that that case is factually

2  applicable and the holding consistent with their position

3  that PA 436 is constitutional.  However, there are two

4  significant distinctions between the holding and the facts in

5  Reynolds and the matter before this Court with respect to

6  436.  One, there was a general election after the matter had

7  been referred to referendum.  A new legislative body was in

8  place, and it was the new legislative body that had been, in

9  fact -- that passed the new act.  But more significantly,

10  your Honor, the 1995 act did not contain a spending

11  provision, and it was not, therefore, removed from the

12  referendum provisions of the Michigan Constitution.  In fact,

13  in Reynolds the appellate court relied on the Michigan

14  Supreme Court holding in Michigan Farm Bureau versus

15  Secretary of State at 379 Mich. 387, 1997, and noted that

16  should the legislators not be responsive to the will of the

17  people expressed at the referendum vote, the second

18  legislation itself is subject to the same right of referendum

19  as the original act.  That is simply not what we have with

20  respect to 436.

21    The question, your Honor, is why wasn't 436 subject

22  to the referendum vote?  It was not subject to the referendum

23  vote because the governor, the Michigan Department of

24  Treasury, and their consultants devised a scheme in the event

25  that PA 4 was defeated on referendum, that would remove a new

1  law from the referendum.  And how do we know that there was a
2  scheme that was devised?  We have communications that have
3  been produced during discovery that confirm that the spending
4  provisions in Section 34 and 35 were included in order to
5  avoid the referendum vote.  For example, as early as March
6  2nd, 2012, in communications between Mr. Ellman at Jones Day
7  and Ms. Ball at Jones Day, Mr. Ellman was discussing the
8  possibility that PA 4 would be defeated on referendum and
9  what the options would be in the event it was rejected by the
10  people.  He states in discussing the options, your Honor,
11  "The cleanest way to do all of this probably is new
12  legislation that establishes the board and its powers and" --
13  with the "and" in capital letters, your Honor -- "includes an
14  appropriation for the state institution.  If an appropriation
15  is attached to, parenthetical, included in the statute to
16  fund a state institution, parenthetical, which is broadly
17  defined, then the statute is not subject to repeal by the
18  referendum process."
19      In fact, Mr. Orr himself has acknowledged this
20  concern with respect to PA 436.  On January 31st, 2013, he e-
21  mailed Ms. Ball stating the following:  "Michigan's new EM
22  law is a clear end-around the prior initiative that was
23  rejected by the voters in November."  He then discusses some
24  of the provisions of PA 436 and concludes with the following
25  statement:  "So although the new law provides the thin veneer

1    of a revision, it is essentially a redo of the prior rejected

2    law."  Your Honor --

3            THE COURT:  What was the date of that?

4            MS. BRIMER:  That, your Honor, was January 31st,

5    2013.  So, your Honor, despite Ms. Nelson's contention that

6    the spending provisions were not added in an effort to avoid

7    the referendum vote, we would suggest that the evidence and

8    the discovery proves otherwise.

9            Ms. Nelson also argued that the $5,780,000 spending

10   provisions were meaning provisions not designed to avoid the

11   referendum.  First, I would suggest quite to the contrary,

12   your Honor.  A review of the state's financial statements for

13   the fiscal year ending 9-30, 2012, suggests that $5,780,000

14   represents approximately .011 percent of the state's

15   expenditures for the prior fiscal year.  With respect to the

16   pensioners that are before this Court making an average of

17   $18,000 in their pension, that would represent $1.98.  I

18   would suggest that's hardly a meaningful spending provision.

19           But second and more significant is that we have the

20   words of the debtor's attorney in the e-mails that I read to

21   you that the spending provisions were added with the intent

22   of avoiding the referendum.  We also have testimony from the

23   state's 30(b)(6) witness, Howard Ryan, the legislative

24   liaison for the Department of Treasury during the period for

25   the drafting of 436, in which he testified in his deposition

1  on October 14th that the spending provisions were added to

2  avoid the referendum.

3  "Question:  Based on your conversations with the

4  people at the time, was it your understanding that

5  one or more of the reasons to put the appropriation

6  language in there was to make sure it could not --

7  that the new act could not be defeated by

8  referendum?

9  Answer:  Yes.

10  Question:  Where did you get that knowledge

11  from?

12  Answer:  Well, having watched the entire process

13  unfold over the past two years.

14  Question:  The governor's office knew that that

15  was the point of it?

16  Answer:  Yes."

17  Your Honor, we would suggest that those spending

18  provisions were, one, de minimis, and, two, added solely for

19  the purpose of removing this act from the constitutional

20  right of the people to a referendum vote.

21  I'm uncomfortable with the amount of time I have

22  left here, your Honor.  Two more points.  Ms. Nelson argued

23  that PA 436 has substantially changed PA 4.  We prepared a

24  comparative analysis, your Honor, of the relevant provisions,

25  those with respect to the appointment of an emergency manager

1  and those with respect to the authorization for the filing of

2  a Chapter 9.  Those provisions are virtually identical.  Our

3  comparative analysis has been attached and submitted to the

4  Court as Exhibit B to our pretrial brief.  Those provisions

5  were, in fact, your Honor, subject to the provision in the

6  Constitution which provides that no law as to which the power

7  of referendum properly has been invoked shall be effective

8  thereafter unless approved by a majority of the electors

9  voting thereon in the next general election.

10         Your Honor, the Michigan Supreme Court, which should

11  be our controlling court here, has, in fact, suggested that

12  the right of referendum is so important to this state and so

13  important to our constitutional rights that in <u>Kuhn</u> -- I'm

14  trying so hard to get through my time -- that in the matter

15  of <u>Kuhn</u> v. <u>Department of Treasury</u> the Court said that this is

16  a reserved right to the people which must be liberally

17  construed.  This Court must liberally construe the right of

18  the people to the referendum, find that the Michigan Supreme

19  Court would, in fact, determine that PA 436 violates Article

20  II, Section 9, of the Michigan Constitution, and, therefore,

21  cannot have been a proper basis for authorization of the

22  filing of this Chapter 9 under Section 109(c) of the

23  Bankruptcy Code.

24         THE COURT:  Thank you.

25         MR. GORDON:  Again, for the record, Robert Gordon of

1   Clark Hill.  Your Honor, I want to touch upon, if I may, an

2   issue that was raised on the 15th regarding who is

3   essentially the impairer of contracts in a Chapter 9 process

4   and then touch upon one other small matter that came up in

5   colloquy on that day.

6        Your Honor, during the oral argument, city's counsel

7   argued that in a Chapter 9 case, the law  views the federal

8   government as the sole relevant actor impairing contracts of

9   the debtor municipality and that, therefore, the prohibition

10  in the pensions clause against the state and its subdivisions

11  impairing accrued pension benefits is of no moment in this

12  matter because it will be the federal government and not the

13  state or the city that is doing the impairing.

14       In making the argument, the city's counsel relies on

15  the language of a dissenting opinion of Justice Cardozo in

16  the Ashton case and then suggests that the viewpoint

17  expressed therein is adopted by the Bekins court, which

18  overruled Ashton.  We submit that the analysis is incorrect.

19  First, it is not entirely clear that the expansive

20  interpretation of Justice Cardozo's opinion suggested by the

21  city comports with his intended meaning.  However, even if

22  that interpretation is accurate, there is no indication that

23  his views were adopted in Bekins, a decision in which Justice

24  Cardozo did not even participate.

25       Contrary to the city's argument, as we've pointed

1 out in our papers, it is the municipality alone that can file

2 a plan and propose the impairment of claims, and it is the

3 municipality alone that can solicit votes and ask the Court

4 to approve such a plan. Indeed, your Honor, the reality of

5 the active role played by the debtor is reflected clearly in

6 Section 109 itself. 109(c)(5) provides, and I quote, "(a) An

7 entity may" -- excuse me. It provides under 109(c), I quote,

8 "An entity may be a debtor under Chapter 9 of this title if

9 and only if such entity," and then under (5)(A) it says, "has

10 obtained the agreement of creditors holding at least a

11 majority in amount of the claims of each class that such

12 entity intends to impair under a plan in a case under such

13 chapter," and there's similar language under 109(c)(5)(B).

14 Both of those provisions talk about the municipal debtor

15 being the one who intends to impair under the plan. It

16 doesn't say that the municipal entity intends to ask the

17 Court to impair. So 109(c)(5) reflects the reality that we

18 just discussed.

19 Moreover, contrary to the city's argument, your

20 Honor, Chapter 9 jurisdiction turns on the basic concept that

21 the state can consent to subjecting a political subdivision

22 to federal bankruptcy law. Having thus consented, federal

23 law will then apply, but it is still the state and its local

24 governmental unit that is actively availing itself of the

25 Bankruptcy Code in the Bankruptcy Court. The city has not

1  and we submit cannot cite to any case law that describes a

2  Chapter 9 debtor as standing mute and passive in the

3  Bankruptcy Court during the plan process and simply accepting

4  whatever impairment of contracts the Court may mete out.

5  It's an unsupportable and unsupported proposition, we submit.

6  Since the state and its political subdivision is

7  clearly the impairer of contracts in the Chapter 9, then

8  absent the relief that's been requested by the Retirement

9  Systems and other objectors, the state or the city in this

10  case would be directly breaching the pensions clause, which

11  it cannot do.  To the extent it is asking the federal court

12  to assist, it cannot do so since the state government and its

13  subdivisions are bound by the pensions clause and cannot

14  delegate to another entity authority that they do not have to

15  abrogate Michigan's Constitution.  And we've cited several

16  cases in our reply brief at page 15 for the axiom that the

17  state and its various branches cannot do indirectly what they

18  cannot do directly.

19  Since the state and the city cannot violate the

20  Michigan Constitution and specifically the pensions clause

21  outside of the Chapter 9 process, they can no more do so in

22  Chapter 9, and the requirement that the Retirement Systems

23  and other objectors have advocated for -- i.e., an explicit

24  conditioning of the bankruptcy upon the protection of the

25  pensions clause -- is absolutely proper and mandated by

1    Section 109(c)(2)'s respect for state law.  Any other

2    conclusion we submit eviscerates 109(c)(2) and its

3    requirement to uphold the Tenth Amendment and the sovereignty

4    of state law.  Moreover, your Honor, there was --

5         THE COURT:  So is the end result of that argument

6    that no municipality in Michigan can file a Chapter 9?

7         MR. GORDON:  The end result would be that they

8    cannot file a Chapter 9 without the explicit understanding

9    that they will not impair accrued pension benefits in

10   violation of the pension clause.

11        THE COURT:  Well, but that violates the Bankruptcy

12   Code.

13        MR. GORDON:  How so, your Honor?

14        THE COURT:  Well, it gives a priority to one

15   unsecured creditor over all the others, or one group of

16   unsecured creditor over all the others.

17        MR. GORDON:  We disagree, but the priority issue I'm

18   going to defer to Mr. Morris on.  He was going to speak about

19   that issue, but we disagree that it can be characterized as a

20   priority issue, your Honor.  I just don't want to steal his

21   portion.

22        THE COURT:  Okay.

23        MR. GORDON:  But it is not a priority --

24        THE COURT:  No pressure, Mr. Morris.

25        MR. GORDON:  It is not a priority issue, your Honor.

1   Moreover, your Honor, the city's counsel had suggested, I

2   believe, on October 15th that Section 943(b) may not contain

3   any bar to adjusting debts but only technical restrictions on

4   how debt adjustment may be implemented.  If he is correct --

5   and we think not -- then all the more reason why the

6   protection of pension benefits under the pensions clause must

7   be addressed at the eligibility stage.

8         The only other thing, your Honor, I wanted to touch

9   upon was at, I think, page 103 of the written transcript of

10   the hearing on the 15th we had a discussion in which I

11   likened the accrued pension benefits to a nondischargeable

12   debt, and the Court questioned whether that concept was truly

13   applicable in a Chapter 9.  I wish to simply note to the

14   Court that while Section 523 of the Bankruptcy Code was not

15   incorporated into Chapter 9, Section 944(c) provides that the

16   debtor is not discharged under Subsection (b) of this section

17   from any debt excepted from discharge by the plan or order

18   confirming the plan.  So, indeed, concepts of

19   nondischargeable debt do exist under Chapter 9 of the

20   Bankruptcy Code, and because it is not governed by Section

21   523 of the Bankruptcy Code, it must be assumed -- because

22   there's no other basis identified in the Bankruptcy Code

23   itself, it must assumed that the bases for

24   nondischargeability would arise under state law such as the

25   absolute and impermeable protection of accrued pension

1    benefits under the state's Constitution.

2            THE COURT:  Why isn't it safer to assume that that

3    provision is in there to facilitate parties' negotiations

4    regarding how to treat debts?

5            MR. GORDON:  I don't know that it's mutually

6    exclusive.  It could be nondischargeability.  It could be as

7    a matter of law --

8            THE COURT:  Okay.

9            MR. GORDON:  -- or by negotiation, your Honor.

10           THE COURT:  Okay.

11           MR. GORDON:  We would simply submit that with

12   respect to a state constitutional protection, it can't be the

13   subject of negotiation.  Thank you, your Honor.

14           THE COURT:  Okay.

15           MR. MORRIS:  Good afternoon, your Honor.  Thomas

16   Morris on behalf of the Retiree Association parties.  There

17   was discussion last week and, in fact, this morning, today,

18   this afternoon, regarding the manner in which the pensions

19   clause operates.  Specifically, there were comments by Mr.

20   Bennett which characterize the pensions clause as

21   establishing a payment priority.  Mr. Bennett would have the

22   Court view the pensions clause as the equivalent of a state

23   law which designates a public pension obligation as a

24   priority claim in bankruptcy.  This is an incorrect

25   characterization of the pensions clause.

1        The pensions clause is a state law which controls

2   the city in the exercise of its political or governmental

3   power.  The pensions clause establishes a constitutional and,

4   therefore, fundamental rule addressing the authority of a

5   municipality to reduce or impair its pension obligations.  It

6   is an essential definition of the state -- of the duties of

7   the state and its subdivisions.  The pensions clause simply

8   doesn't provide for a priority payment.  The usual way for a

9   state to provide for a priority is to specify that the debt

10  is entitled to priority.  An example is found in the Worker's

11  Compensation Disability Act, MCL 418.821, which provides that

12  liability of an employer for Worker's Compensation claims or

13  Worker's Compensation payments shall be paramount to other

14  claims except for wages and taxes.  Another way to ensure a

15  priority is to provide for a statutory lien, so we've got

16  lien -- a lien under Section 211.40 of the Michigan Compiled

17  Laws for property taxes that are secured by a first lien,

18  prior, superior, and paramount.  And MCL 324.3115 provides

19  that certain fines for environmental liabilities constitute a

20  lien on all property of any kind or nature owned by the

21  defendant.  And a construction lien is entitled to priority

22  under state law.

23        In Orange County -- in the case if Orange County

24  found at 151 B.R., there's a quote on page 1017.  In Orange

25  County there was a statute at issue, a California statute

1  that was found by the Orange County court to be preempted by
2  the Bankruptcy Code.  Now, that statute provided that --
3  provided for certain funds to be treated as trust funds, and
4  that statute, as interpreted by the Court, apparently or was
5  argued to provide for there to be no tracing requirement, so
6  the Court in that case found that statute to effectively
7  establish a priority in bankruptcy and found it to be
8  preempted.  That case is distinguishable.  The Michigan
9  pensions clause provides for no priority of payment.  It
10 simply provides an ongoing indestructible duty of the
11 municipality or the state to not impair and not reduce
12 pensions.
13         Now, the priorities provided for in Section 507 are
14 applicable in Chapter 7 cases, for example, because Chapter 7
15 is a process of liquidation, liquidation of assets and the
16 distribution of those assets, so you need to determine who's
17 going to get the assets.  Who gets paid first?  That's the
18 priority.  Those priorities are also applicable in Chapter 11
19 because in every Chapter 11 case, liquidation is an
20 alternative.  Liquidation is the implied alternative, and
21 it's a standard by which a plan of reorganization in a
22 Chapter 11 case is measured.  Liquidation is not provided for
23 in Chapter 9.  Therefore, priorities are not provided for in
24 Chapter 9 with one exception.  That one exception is
25 507(a)(2), which provides for administrative expense

1  priorities.  That's a --

2        THE COURT:  But doesn't the best interest test of

3  943(b)(7) implicate the priorities of the Bankruptcy Code?

4        MR. MORRIS:  It doesn't.  It doesn't implicate the

5  priorities of a liquidation as an alterative unlike in

6  Chapter 11.  That's what's done -- in a Chapter 11 you look

7  at the unsecured creditors.  What would they get in

8  liquidation?

9        THE COURT:  Your position is that there's nothing in

10  a municipal bankruptcy case that would prohibit one group of

11  unsecured creditors from insisting on payment before or in

12  full while other unsecured creditors are paid later or not in

13  full.

14        MR. MORRIS:  Well, in confirmation of a case where

15  the pensions are unimpaired, you have a possible

16  discrimination claim by other creditors.  The bondholders

17  might claim that it's unfair discrimination, and I think the

18  response would be any bondholders who purchased their bonds

19  prior to 1963 when the Michigan Constitution was adopted,

20  you've got a different argument, but those bondholders who

21  purchased their bonds after 1963, which is all of them, don't

22  have an argument.  They're aware of the political climate.

23  They're aware of the Constitution.  They're aware that the

24  municipality cannot --

25        THE COURT:  Right, but the city's response to that

1  is the people who lobbied for and got the pensions clause in

2  the Constitution were aware of the Chapter 9 possibility.

3  How do I deal with that, or how do you deal with that?

4  MR. MORRIS: Mr. Gordon dealt with that.

5  THE COURT: Okay. I will look at what he said.

6  MR. MORRIS: But I don't want to -- I don't want to

7  repeat it, but the city is not permitted to restrict or

8  impair the pensions. They are an inviolate obligation that

9  the city will live with even if it reorganizes under Chapter

10  9. That's just a fact. If the City of Detroit were to cease

11  to exist, if there were to be some horrendous natural

12  catastrophe that wiped the city off the state -- wiped the

13  city off the map, then we believe the city would still owe

14  that obligation, and it might cause a constitutional crisis.

15  Maybe the state would have to -- let's say the city remained

16  with only one resident, and that one resident couldn't

17  possibly pay the taxes to pay this. It would cause a

18  constitutional crisis. There'd have to be a resolution.

19  Maybe the state would step in. I don't know. That's beyond

20  conjecture.

21  THE COURT: The city says we're there now. I'm

22  sensing from Ms. Ceccotti having risen that your time may be

23  up.

24  MR. MORRIS: Yes, it is. Thank you.

25  MS. CECCOTTI: Your Honor, I actually rose because I

1  was planning to address the question that you just asked --

2          THE COURT:  Okay.

3          MS. CECCOTTI:  -- about -- and I was going to

4  actually spend less time on it, but I think I'll just

5  dispense with -- I was going to -- first of all, for the

6  record, Babette Ceccotti, Cohen, Weiss & Simon, LLP, for the

7  UAW, and good afternoon again.

8          I was going to spend some time on talking about the

9  pension clause, the language of the pension clause, and how

10 the courts in Michigan address constitutional provisions when

11 called upon to review them and the principles that they

12 apply, but I'm going to move actually right to your Honor's

13 question because I do think that a lot of -- some of the

14 questions that your Honor has asked, particularly this

15 afternoon, really do go to what I think is going to be the

16 crux of this.

17         First of all, on the city's point that the pension

18 clause doesn't seem to make any -- doesn't, in fact, make any

19 reference to the possibility of municipal bankruptcy, I think

20 we have to go and ask ourselves a couple of questions.

21 First, what did municipal bankruptcy mean at the time, and

22 what did pension rights mean at the time?  And so we have to,

23 you know, sort of bring ourselves back in the legal regime --

24 in two legal regimes to 1963.  First, the city's brief cites

25 to a law that was on the books in Michigan, PA 72, dating

1    from 1939, and the law refers to the 1898 Bankruptcy Act and

2    basically says that any taxing agency or instrumentality as

3    defined in the bankruptcy law may proceed to do something

4    called secure a composition of its debts, and the law then

5    goes on to describe rules about who can file the petition and

6    who can agree to the plan of composition and what kinds of

7    things can be in the plan of composition and also provides

8    that the composition is binding on the instrumentality.

9            In 1963 -- okay.  So that's the law that's on the

10   books.  In 1963 as well the municipal bankruptcy law that is

11   being referenced looks a lot more like the '37 law than it

12   does the law that we have today.  On the sort of time line of

13   Chapter 9 changes starting with the law that was declared

14   constitutional by the Supreme Court in '37, while there are

15   some changes that take effect in 1946, you really don't get a

16   major overhaul until 1976 and the events surrounding the New

17   York City fiscal crisis, so from that point forward -- from

18   that amendment forward, Chapter 9 looks a lot closer to the

19   Chapter 9 that we're dealing with today, but in 1963 it

20   really didn't look like that.  And, frankly, the notion

21   that -- and this is where we get to the pension regime part

22   of my answer.  The notion that the pension clause coming in

23   as it did to take a situation where employees working for the

24   state had, in effect, no vested right to deferred

25   compensation they had earned with services that they provided

1  to the state, that was -- that's the gratuity and the gift --
2  that changes with the pension clause, which then provides the
3  protection for accrued financial benefits.  This is a new
4  thing under the state Constitution.  So it's not -- to me
5  it's not surprising at all that you wouldn't find a reference
6  to the plan of composition or municipal bankruptcy because we
7  have really these arcane terms that it is very unlikely
8  anyone would have applied to vested pension rights.  It's not
9  until 11 years later that ERISA is enacted in the federal
10  regime.  ERISA, of course, has language -- sets forth a
11  comprehensive scheme to protect pensions and uses words like
12  "nonforfeitable benefits" and "vested pensions" and "accrued
13  pensions" and the like.  And as we talked about last week,
14  that regime includes the pension termination system, and you
15  get then developing in the private sector bankruptcy world,
16  the Chapter 11 world, the Chapter 7 world, where the
17  priorities do function, what is the status of a pension
18  contribution given the fact that it is based on services that
19  were rendered to the debtor pre-petition?  All of that law
20  comes up after 1963.  There just simply wouldn't be a way to
21  think about a pension benefit in the context of a debt
22  composition, or at least that is -- that seems very likely to
23  me because you just don't get this law -- all of this law
24  coming up until you get to ERISA and the concept of plan
25  termination and the priorities that apply in Chapter 11 and

1    Chapter 7 years and years later.  And now, you know, to my

2    way of thinking about it, unfortunately, we have seen a lot

3    of pension terminations, and so there's a lot of law on that

4    subject now, but it didn't exist in 1963, and it couldn't

5    possibly have been fairly contemplated.  So I think that

6    we're then left with a section, which is the pension clause,

7    Article -- of the pension clause of the Michigan Constitution

8    that is very much standing on its own without reference to

9    any exception, and we can see why, I think, no -- in

10    particular no reference to the concept of municipal

11    bankruptcy working very much, in effect, each word being

12    given effect by the courts of Michigan who have construed it

13    a number of times to protect accrued pensions.  And it's

14    standing on its own effectively against impairment or

15    diminishment by, as we spoke about last week, the state, the

16    state officials, or governance -- government and political

17    subdivisions to which it applies, so I think the --

18          THE COURT:  I have to interrupt you and ask this

19    question about bankruptcy.  Is there anywhere else in the

20    Bankruptcy Code where a party's nonbankruptcy law right to

21    payment is given an absolute status in the bankruptcy?

22          MS. CECCOTTI:  Well, your Honor, I think that there

23    are a number of places in the Bankruptcy Code where state law

24    is referenced, and we had a reference to the effect given to

25    certain types of liens, which are given effect, but I think

1  the --

2          THE COURT:  Well, but even there there are many

3  circumstances in which security interests are not given

4  absolute effect in bankruptcy.

5          MS. CECCOTTI:  Your Honor, here's --

6          THE COURT:  Cramdown, of course, is a perfect

7  example of that.

8          MS. CECCOTTI:  Here's where I think the crux of this

9  is.  We have a regime in Chapter 9 that must operate by

10  maintaining the state's sovereign control over the political

11  and governmental affairs, including the expenditures

12  therewith under 903.  Chapter 9 is not Chapter 11, and so,

13  therefore, the question to start with is what is the -- what

14  limited things can be done in Chapter 9, not necessarily

15  let's look at the whole of the Bankruptcy Code and try to

16  sort of plug in examples that are going to cross between a

17  Chapter 9 debtor and a Chapter 11 debtor.

18          THE COURT:  I understand that argument, but isn't

19  the end result of that argument that a state like Michigan

20  that has this clause, if it is to be given absolute impact,

21  cannot authorize its municipalities to file bankruptcy?

22          MS. CECCOTTI:  Cannot authorize its municipalities

23  to file for bankruptcy if a purpose is to diminish or impair

24  accrued pensions.  That's correct, and that is --

25          THE COURT:  But what you're not saying there is that

1  if there is the intent not to diminish pensions, they can

2  file municipal bankruptcy?

3       MS. CECCOTTI:  In this case, your Honor, the intent

4  was made abundantly clear going in.  If they had hidden the

5  intent, we might --

6       THE COURT:  No.  I understand that.  I'm trying

7  to --

8       MS. CECCOTTI:  -- we might not be standing here

9  today.

10      THE COURT:  I'm trying to figure out where your

11  argument goes because there are two possible outcomes here.

12  One is when a municipality is subject to the state

13  constitutional provision, it can file bankruptcy and still

14  impair, or it can file bankruptcy without the intent to

15  impair, or I suppose there's a third alternative, which is

16  the one I'm asking about, which is they can't file bankruptcy

17  because bankruptcy doesn't permit that kind of

18  discrimination.

19      MS. CECCOTTI:  I think -- your Honor, I think it's a

20  false choice, frankly.  I really do.  And we've seen some --

21  we've seen enough instances, I guess, of the more modern use

22  of Chapter 9, particularly the cases out in California,

23  where -- and this is -- and CalPERS has been just on the

24  forefront of this, as I'm sure you know -- where they're not

25  touched.  I just -- I don't see what is so accepted or that

1    it's a black and white choice between filing for bankruptcy

2    and not filing for bankruptcy simply based on the pension

3    question.  I mean this is a -- this is a very -- this is a

4    large, large municipality to be seeking Chapter 9 relief.

5    There is a lot going on.  This very much reminds me, Judge,

6    of going from the very small Chapter 11's at the beginning of

7    the '78 Code and then all of a sudden finding companies like

8    LTV Steel filing for bankruptcy and suddenly declaring that

9    retiree health was a general unsecured claim, someone no one

10   had thought of before.  This very much feels to me like that

11   type of a moment where the size of this city and the

12   magnitude of what it's trying to accomplish simply cannot be

13   easily fit within the rules that might otherwise apply in a

14   smaller -- in a smaller context or with less going on or with

15   less money available for fewer options.  It's very much a

16   moment, I think, where -- it's one of those moments that I

17   think we will look back on and say this is where Chapter 9

18   changed.  And we are very much hoping it does not change in

19   the direction of violating what we believe are legitimate --

20   a legitimate basis for a municipality to say, "I need to

21   adjust my debt, but I am going to adhere to a state law, a

22   state constitutional provision like the pension clause, and I

23   can accomplish both."  I very much think that those things

24   are possible, and if we don't have a bankruptcy system that

25   allows for that duality -- the dual sovereignty to have play

1   like that, then we are simply wiping aside centuries of

2   constitutional law.  And I'm really -- my colleagues are

3   going to be very upset with me.

4           THE COURT:  Eleven minutes left.

5           MS. CECCOTTI:  I'm sorry.

6           MS. PATEK:  Your Honor, given the time

7   limitations -- again, Barbara Patek on behalf of the Detroit

8   Public Safety Unions -- I want to address for the moment the

9   Court's question about whether there's anywhere else in the

10  Code, and I don't -- I believe the answer to that question is

11  no, but I think also the Tenth Amendment answers that

12  question.  And I think even if you assume for the sake of

13  argument that there are -- that what the -- what is being

14  said here, that this is just a priority issue, that this

15  constitutional promise that was made to these public servants

16  is to be treated like general unsecured debt as if it were

17  credit card debt, I think a careful look at the Code answers

18  that question to the contrary, and I think you can start with

19  the Orange County versus Merrill Lynch case, which talks

20  about 507 and the reason for the exclusion of (a)(1) and

21  (a)(3) through (9) from the Code.  And in a footnote it talks

22  about what were then (a)(3) and (a)(4) being excluded because

23  they had to do with employment rights and collective

24  bargaining agreement rights potentially of employees which

25  could affect the ability of the municipality to continue its

 1   operation.  I suggest it's no accident that those two

 2   sections were excluded.  I suggest that it's no accident --

 3   we heard a lot about electoral will or political will last

 4   week -- that this provision is tucked away in the Michigan

 5   Constitution so it's difficult to change.  This is a promise

 6   that's made to people as part of the sovereignty of the State

 7   of Michigan to the people who are necessary in this case,

 8   talking about my clients, the Public -- the members of the

 9   Public Safety Unions, and I would suggest that it would be a

10   violation of the Tenth Amendment to read the Code otherwise.

11   Thank you, your Honor.

12          MR. MONTGOMERY:  Your Honor, Claude Montgomery for

13   the Retiree Committee.  I had four things that I was going to

14   try to address today in my seven minutes.  One was ripeness.

15   One was whether or not there is an issue, despite the Cardozo

16   dissent, and, three, I'd like to answer the question of

17   whether or not intent matters for the governor and the

18   emergency manager, a question raised by the state, and,

19   finally, if I have any time left, that Studier does not

20   undercut Seitz v. Probate Judges System.

21          But I'd also like to take the opportunity to answer

22   the last question or at least offer a thought -- whether or

23   not it's considered useful or not, I will, of course, leave

24   to the Court -- and that Bekins itself tells us what the best

25   interest question was, and it wasn't relative treatment of

1  creditors.  It was whether or not bondholders could get tax

2  people to actually levy on property that was either worthless

3  among the municipalities or couldn't be sold for the amount

4  or tax levy marshals and whatnot were running away from

5  creditors.  So the best interest of creditors that Bekins saw

6  being made possible by the plan of adjustment was better than

7  zero, not a relative priority vis-a-vis other creditors but

8  an ability to get paid where the state was actively, through

9  its minor officials, resisting paying anything.  And so I

10  think that is the best interest of creditors that 943(7) is

11  looking to, and I have further statutory construction for

12  that.  At least I offer it.  One is that neither 1129(a)(7)

13  nor 1129(a)(11) are actually adopted by Chapter 9, and so

14  the -- what is the best interest of creditors as in feasible

15  is not necessarily identical to those statutory -- those two

16  statutory provisions to which no reference is made.

17       So now I'd like, if you will, turn my attention to

18  the Cardozo dissent, which I must say I thought Mr. Bennett

19  made a very interesting offer to the Court as a foundation

20  for Bekins, but I would like to suggest and only suggest,

21  your Honor, that there is a key -- two key parts to the

22  Cardozo consent that the Court may wish to pay attention to.

23  One is that the Court action on which Mr. Bennett relies was

24  the discharge of the debt.  It wasn't what happened inside

25  the plan process.  It was the actual discharge, which

1    couldn't be accomplished without court intervention. The
2    second thing that was critical to Justice Cardozo's thinking
3    and, according to Mr. Bennett, ultimately adopted by the
4    Bekins court, which was this concept of consent. Well,
5    Justice Cardozo characterized it as a waiver of a privilege,
6    right, but here what controls how the state exercises the
7    waiver of the privilege? Well, obviously that has to be a
8    question of state law. It can't be transformed into a
9    question of federal law. And what is the state law that
10   controls the exercise of the waiver of the privilege? Well,
11   it's this Michigan state Constitution. So if the Michigan
12   state Constitution is the bedrock on which the waiver takes
13   place and the Michigan Constitution says, according to the
14   Seitz case and according to the Musselman case, no act can be
15   taken that results in a diminishment of pensions, not affects
16   the value of those pensions but actually diminishes the
17   amount of those pensions, then the state actors cannot do
18   anything in that regard. And I would further answer the
19   question your Honor asked earlier, was if the Michigan
20   Constitution is a proscription on the behavior designed to
21   undercut the Constitution, does that mean that no city can
22   file a Chapter 9? Well, obviously ones that don't have
23   pension issues don't even have to ask the question, so 436
24   and the Michigan Constitution are clearly not a bar where
25   there's no desire to impair pensions because they don't have

1  pensions, but if they do have pensions --

2          THE COURT:  Well, I'm not sure that's so.

3          MR. MONTGOMERY:  Well, as your Honor -- forgive me.

4          THE COURT:  I mean my question would be in that

5  case -- I mean you can construct a hypothetical in which the

6  city proposes to impair bonds and the bondholders are saying,

7  "Wait a minute.  There's this other asset over here, the

8  pension assets, you know.  We have to impair everybody, not

9  just us."

10          MR. MONTGOMERY:  I presume your Honor meant pension

11  obligations.

12          THE COURT:  Pension, yeah.  Thank you.

13          MR. MONTGOMERY:  The one difference between the

14  state constitutional provision on impairment of contracts and

15  Article IX, Section 24, is that Article I, Section 8, of the

16  Michigan Constitution speaks of legislation whereas Article

17  IX, Section 24 --

18          THE COURT:  And I don't mean to frame this in terms

19  of a constitutional protection for bonds because that's not

20  the point of it.  The point of it is that the bondholders

21  could argue that under the Bankruptcy Code, pension holders

22  do have to be impaired, even if the municipality doesn't want

23  to, to achieve fairness in treatment.

24          MR. MONTGOMERY:  Well, first, they would have to, of

25  course, start on a class basis because obviously --

1          THE COURT:  Right.

2          MR. MONTGOMERY:  -- the unfair discrimination starts

3     there, but, secondly, the key issue here for whether or not

4     there is an unfair discrimination is whether or not there are

5     differences in the protections afforded each claim.  It is

6     well-established that you can make distinctions between

7     creditors based on the nature of the obligation and that you

8     can make differences in treatment based on the nature of the

9     obligation, so the only question is whether or not it's

10    unfair, and how could it be unfair to let the pension rights

11    of the City of Detroit retirees pass through a Chapter 9 case

12    if the Michigan Constitution says it's unconstitutional to

13    try to impair them?

14         THE COURT:  The bondholders say protected by

15    Constitution or not, in bankruptcy they are unsecured claims.

16         MR. MONTGOMERY:  Right.  And so if, your Honor, the

17    only possibility of dealing with a pension obligation is that

18    it has to be done in a Chapter 9 and it is unconstitutional

19    for the actor, the state actors to ask for Chapter 9, I think

20    you're blocked.  You can't ask for the Chapter 9 position.

21    And we find nothing inconsistent with that roadblock because

22    the people of Michigan retain the right and the ability to

23    change the law if they wish to give their municipalities

24    greater access to Chapter 9.  If, in fact, Article IX,

25    Section 24, is a roadblock -- and we assert it is a

1   roadblock -- the people of Michigan, not the federal

2   government, but the people of Michigan retain the right to

3   make that change.

4           THE COURT:  One more minute.

5           MR. MONTGOMERY:  Yes, sir.

6           THE COURT:  Ripeness.  I would simply commend your

7   attention to U.S. Postal Service v. National Association of

8   Letter Carriers, which your Honor no doubt has read and which

9   ripeness focuses on the timing of the action rather than the

10  party that brings the action, and the key question there for

11  the Court was whether or not there was a reasonable threat of

12  liability if compliance with the arbitration order violated

13  the CSRA, which was the relevant statute, and we say the

14  analogy to that is whether or not there's a reasonable threat

15  of harm to the pensioners as a result of the city's action.

16          THE COURT:  Um-hmm.

17          MR. MONTGOMERY:  And I think that's -- at least we

18  would offer to your Court that is a difficult thing to

19  dispute.  And I think that exhausts my ten minutes, your

20  Honor.

21          THE COURT:  Thank you.

22          MR. SCHNEIDER:  Your Honor, Matthew Schneider, chief

23  legal counsel, Michigan Department of Attorney General, on

24  behalf of the state.  Your Honor, I'd only like to discuss

25  two topics here.  One is home rule and then, secondly, the

1  referendum issues regarding PA 436.

2       So if we start with the home rule argument, if we

3  look at Article VII, Section 22, just setting aside the text,

4  we have to look at the text and ask what does this do.  What

5  does this provision of the Constitution do?  It gives local

6  citizens the power to adopt their own governing structure and

7  ordinances.  And what it allows citizens to do is gives them

8  a City Council.  The City Council can adopt ordinances and

9  resolutions.  And the citizens have a right to that power.

10       In this case, what did the citizens do with that

11  power?  Look at Detroit City Charter, Section 1-102.  They

12  enacted as part of that charter a provision that reads,

13  quote, "The City has the comprehensive home rule power

14  conferred upon it by the Michigan Constitution, subject only

15  to the limitations on the exercise of that power contained in

16  the Constitution or this Charter or imposed by statute."  So

17  the charter itself states that the home rule power is limited

18  to what is imposed by statute.

19       But even if it didn't say that, if the charter

20  didn't say that, we know that when the citizens of Detroit go

21  to the ballot box and they elect their City Council members,

22  those same members, those same citizens, have an opportunity

23  to vote for their state senator and their state

24  representative and their governor, and those representatives

25  in Lansing, who the city has an ability to vote for, pass

1    laws that govern those city residents as well.  Those

2    representatives passed PA 436.

3         This cannot possibly violate the home rule concept.

4    Let's look at what those representatives did.  They passed

5    the Home Rule City's Act, MCL 117.36.  Quote, "No provision

6    of any city charter shall conflict with or contravene the

7    provisions of any general law of the state," unquote.

8         And we have to look at this through another third

9    and final prism.  In 1963 the residents of this city had an

10   opportunity to vote another time, and they voted to ratify

11   the state Constitution.  Article VII, Section 22, contains a

12   very important line that now binds those city residents.  A

13   city, quote, "shall have the power to adopt resolutions and

14   ordinances related to its municipal concerns, property and

15   government, subject to the Constitution and law," unquote.

16   The law is passed by the legislature.  In other words, you

17   can only pass local laws that are subject to the Constitution

18   and the laws passed by the legislature, and this is all about

19   representative government.  This is how it works in our

20   constitutional republic.  The city residents still govern

21   themselves.  They voted for the people enacting the city

22   charter.  The city residents voted for a legislature that

23   enacted PA 436, and the city residents had a hand in the

24   Michigan Constitution as well.

25         If you look at the legal priority here, we know, as

 1   I've stated, that the acts of the legislature can take

 2   priority over local acts.  The Michigan Supreme Court in <u>Mack</u>

 3   v. <u>City of Detroit</u>, 467 Mich. 186, a 2002 case, explained

 4   this.  There was a Detroit city charter provision that

 5   created a private cause of action for discrimination.  A city

 6   police officer brought a discrimination suit under the

 7   charter, but in this case the legislature had already passed

 8   a governmental immunity statute that prevented these actions

 9   against the city.  And the Michigan Supreme Court held that

10   the charter provision conflicted with the law as passed by

11   the legislature, and so the legislation took priority over

12   the charter.

13        PA 436 is not a local act.  It can be applied to any

14   other city, and we can see in the newspapers today about the

15   issue of PA 436 being raised in other cities or

16   municipalities.  So there's a much larger point here, your

17   Honor.  The objectors, I think, are incorrect in the overall

18   approach to the home rule argument.  They're arguing that PA

19   436 trumps home rule and ignores the will of the voters and

20   that the legislature somehow just wanted to overrule the

21   citizens of Detroit, but we have to look at PA 436 and know

22   that there were incredibly compelling reasons for PA 436.

23   The point of that, as spelled out in the Act, was to help

24   distressed cities and school districts.  The evidence showed

25   that this was a problem that was not going away.  It was true

1   before PA 4, after PA 4, before PA 436, and after it.  And
2   the language of PA 436 shows that the legislature wanted to
3   fix it, but it also responded to the voters' rejection of PA
4   436.  If we look at the governor's testimony in his
5   deposition, he indicates as such.
6        THE COURT:  Well, but the fact that there may have
7   been compelling reasons for 436 wouldn't justify it if it's
8   otherwise unconstitutional, would it?
9        MR. SCHNEIDER:  No, but there's no -- it's not
10  unconstitutional.  That's my point.
11       THE COURT:  I'm just wondering why you're arguing
12  that it was compelling.  What's the point?
13       MR. SCHNEIDER:  It's a point because -- just to say,
14  your Honor, there's a much larger point here, and the point
15  is is this wasn't done arbitrarily.  This was done for a very
16  specific purpose.
17       Secondly, your Honor, I want to respond to the issue
18  regarding the right to referendum.  I believe Assistant
19  Attorney General Margaret Nelson explained this quite
20  adequately yesterday, but I do want to address the fact that,
21  you know, there's been argument raised here that there were
22  documents produced in discovery that lawyers at Jones Day
23  discussed how PA 436 would be, you know, going around the
24  referendum power.  Well, neither of these people were members
25  of the legislature.  If we look at the governor's position

1    itself, the state has produced discovery in this case

2    explaining the governor's position, and it was not to go

3    around the legislature.  The governor had directed -- I

4    believe it was Dick Posthumus, the former lieutenant

5    governor, and his legislative director, how are we going to

6    craft -- how would PA 436 be crafted?  It would be crafted

7    not to ignore the will of the voters.  It would be crafted in

8    order to make sure that different changes were made to make

9    it better.  And, you know, as to --

10        THE COURT:  But how does anyone know whether the

11   changes that 436 incorporated over the rejected law, PA 4,

12   responded to the will of the voters or not?  How does anyone

13   know that?

14        MR. SCHNEIDER:  Well --

15        THE COURT:  I mean all we know is PA 436 was

16   repeal -- PA 4 was repealed.

17        MR. SCHNEIDER:  Folks aren't blind, I think, to the

18   media coverage as well.  When an act is --

19        THE COURT:  Rely on media coverage?

20        MR. SCHNEIDER:  Well, they have constituents.  Laws

21   are passed only through the regular process of legislators

22   responding to their constituents, and that is the will of the

23   voters.  And when the governor wants a new structure, PA 436,

24   or the members of the legislature want that, their

25   constituents will go to the media as well or will speak

1  directly to them, so it was in direct response to fixing the

2  problems that the will of the voters pointed out.

3        If you have any other questions on these topics, I'd

4  be happy to answer them or I could defer to Mr. Bennett on

5  the other issues.

6        THE COURT:  Thank you, sir.

7        MR. SCHNEIDER:  Thank you.

8        MR. BENNETT:  Good afternoon, your Honor.  Bruce

9  Bennett of Jones Day on behalf of the city.  I got a little

10  bit of an organizational challenge here.  One comment with

11  respect to the last point concerning the right of referendum,

12  if the defect in 436 is that there was a right -- there

13  should have been a right to referendum anyway,

14  notwithstanding what the statute says, well, I suppose the

15  remedy is for someone to try to mount a referendum, not to

16  wait till you come to a Bankruptcy Court and ask the

17  Bankruptcy Court to decide there should have been a

18  referendum.  If there had been a referendum, it would have

19  been rejected, and, therefore, we're going to hold it

20  unconstitutional.  It seems that there's a whole -- there's a

21  few steps that are being skipped in the relief that's been

22  requested of you here.

23        There's a number of topics, and I can only refer to

24  the other Mr. Bennett to cover all the different questions,

25  so I'm going to try to organize it, but if it falls apart a

1    little bit, I apologize.

2         First, there was an appeal to the other California

3    cases, which has to refer to <u>Vallejo</u>, where, of course,

4    pension claims were not impaired, debt claims were impaired,

5    in what was a largely consensual plan.  I think I said in

6    another appearance before this Court that today <u>Vallejo</u> may

7    well be in trouble again and perhaps because it did not get

8    enough relief from its debt generally, but that's not the

9    reason I refer to it this time because I think you can't

10   refer to <u>Vallejo</u> without referring to <u>Central Falls</u> in Rhode

11   Island.  And in <u>Central Falls</u> in Rhode Island, what happened

12   was was that the pension claims, pension and benefit claims,

13   took haircuts and the debt did not, again, a consensual

14   outcome.

15        If the economics were a little different, perhaps we

16   could have a consensual outcome one way or another in

17   Detroit's case, but I'm pretty sure that the bondholders, who

18   I think are listening on the phone and not here today, would

19   say that they are not in a position and would not consent to

20   allowing pension claims in this case to be unimpaired, and

21   I've certainly heard the various representatives of those

22   holding pension and other retiree benefit claims here and

23   indicating that they're not in a position or willing to let

24   bondholders leave unimpaired.  And it may well be that this

25   is the first case where irrespective of consent from one side

1  or another, we could not achieve that result, so I think

2  the -- that a consensual outcome could come out differently

3  and could come out with only part of a capital structure

4  being impaired unfortunately says nothing about the

5  controversy we have today.

6       The second point I want to cover is the point about

7  the discharge language in Bankruptcy Code Section 944.  It's,

8  of course, important whenever reading a provision in a

9  statute to figure out where it is in the statute, and the

10  provision relating to discharge is in the effect of a

11  confirmation order.  And the line is that the discharge

12  applies -- excuse me -- the debtor is not discharged --

13  there's a broader discharge provision that comes ahead --

14  from any debt exempted from discharge by the plan or order

15  confirming the plan.  This is not a claim that has some

16  inherent nondischargeability.  This is a reference to a plan

17  exempting from the provision before it, and I suppose that

18  what this is intended to do is to say that obligations as

19  modified will continue if the plan or the order confirming

20  the plan says so.  Otherwise, if you go up and look at the

21  discharge, it covers all claims, period, and so I think this

22  is a provision that makes a plan that partially and does not

23  fully discharge claims work, and I think that's all it is.

24  It's not a recognition --

25       THE COURT:  Well, but what Mr. Gordon argues, if I

1  understand it correctly, is that this provision of the Code
2  allows a municipal debtor to waive the discharge of the
3  claims of a class, and, therefore, this city can pursue a
4  Chapter 9 case that addresses all of the debt other than the
5  pension debt which can't be pursued or at least impaired
6  because of the Michigan Constitution.

7         MR. BENNETT:  Well, once again, this provision is
8  one section in a Bankruptcy Code that contains lots of other
9  sections, and a couple of them were touched upon by your
10  Honor and other people addressing you just a few minutes ago.

11         First, there was a discussion about whether it
12  creates a priority or not.  I don't think that's terribly
13  relevant.  The issue that the Bankruptcy Code sets up is that
14  it has a distribution scheme imbedded in it.  The
15  distribution scheme in some places is given effect through a
16  combination of a declaration that a particular claim has
17  priority and then a treatment requirement that you would find
18  in 1129.  In others there's no explicit priority, but there's
19  a treatment -- there's a treatment requirement in 1129, and
20  that treatment requirement works two ways, and I think this
21  came out in the discussion.  One, there's the ranking, which
22  is basically what 1129(b) does between secured claims,
23  unsecured claims, subordinated claims, and not in Chapter 9
24  equity.  But it also has the nondiscrimination provisions,
25  and I actually think that counsel for the retiree committee

1   slightly misspoke when he said, well, nondiscrimination,

2   that's an issue between classes, and it is, but within

3   classes there's actually a stronger nondiscrimination

4   provision.  The treatment within a class has to be the same.

5   Between classes the rule is unreasonable discrimination.  And

6   so the discharge -- the provision in 944, the ability to have

7   an exception in the confirmation order from discharging all

8   claims that existed on the petition date and leaving some

9   around to some extent, I don't think is a license to confirm

10  a plan that doesn't meet with the requirements of 1129, both

11  the priority -- what I called priority, but the

12  distributional entitlement requirements and the creditor

13  justice requirements, whether they are unlawful

14  discrimination or same treatment within a class.  And so you

15  get to the point where your Honor was, I think, which is that

16  these claims are --

17          THE COURT:  Well, but Mr. Morris pointed out

18  astutely that Chapter 9 itself prohibits -- or I should say

19  requires that a plan be fair and equitable.  Yes?

20          MR. BENNETT:  It has a different meaning than the

21  provision in the Chapter 11 --

22          THE COURT:  Right.

23          MR. BENNETT:  -- for -- yes.

24          THE COURT:  Right.

25          MR. BENNETT:  But he referred to best interest, but,

1  yes, it has a fair and equitable provision.

2          THE COURT:  So he argues how can a provision that

3  impairs pensions be fair and equitable in the face of the

4  constitutional protection of them?

5          MR. BENNETT:  I think you go back to the -- again,

6  what came up when we were last here, which is that you can

7  say as a constitutional matter these cannot be impaired for

8  one -- by the municipality, but the reality is at the end of

9  the day there isn't enough money.  And when the reality is

10 there isn't enough money to pay them, then if you went

11 through all and exhausted all of the nonbankruptcy procedures

12 for enforcing a debt, where would you be?  That is the --

13 that is essentially the best interest benchmark.  And we've

14 got a lot of law on this.  Bekins, which was referenced, is

15 one of them.  The fact pattern that you see in cases

16 involving very distressed municipalities in the cases, which

17 a lot of them are from the depression era, of course, is

18 situations where the municipality, notwithstanding an

19 obligation to raise taxes, just can't collect any more money

20 no matter what it does.  Sadly, that fact situation, albeit

21 with more modern features, presents itself in Detroit.  And I

22 think it would be what the city will have to prove, open

23 paren, one, in the event it does not achieve a consensual

24 plan, which it still hopes to and that the -- that it is

25 object -- the plan is objected to by relevant constituents

1  representing retirees, the city will ultimately have to prove

2  that the distributions on account of underfunding claims

3  offered by the plan are better than the contributions that

4  could be achieved if there wasn't a Chapter 9 case and if the

5  creditors were free to pursue their remedies, all creditors

6  were free to pursue their remedies, and if the residents

7  reacted as we can predict residents would react because they

8  have been doing so for the past several decades.  And if the

9  city -- if the retiree -- committees represented by the

10  retiree groups are able to prove that the environment for

11  them outside of Chapter 9 is better than the results we are

12  able to achieve in this Chapter 9 case, they may get a chance

13  to prove to themselves whether they were right or wrong

14  because that's where we'll be.  We'll be in a dismissed case.

15  There will be lots of unsatisfied bond debt.  There will be

16  lots of unsatisfied pension debt.  There will be lots of

17  unsatisfied OPEB debt, and we'll see how it turns out.  I

18  think that will not be a good outcome.

19       So this kind of brings me back to how the system

20  works, and I think, frankly, why don't I start with really

21  Justice Cardozo's reasoning?  And first I wanted to spend a

22  minute to take away some of the mystery that seems to be

23  surrounding who was where in 1936 and 1938.  It was mentioned

24  that Judge Cardozo for some reason didn't participate in the

25  decision in Bekins.  Unfortunately, that's because Justice

1   Cardozo had a heart attack at the end of 1937, a stroke at

2   the beginning of 1938, and he died in early July 1938, about

3   ten weeks after the decision in <u>Bekins</u>.  The reality was is

4   Justice Cardozo was too sick to participate.  His opinion was

5   joined by, quote, the chief justice, Justices Brandeis and

6   Justice Stone -- excuse me -- Justices Brandeis and Stone.  I

7   actually didn't know when we were here last for certain that

8   the chief justice at the time of the dissent was the same

9   Chief Justice Hughes who wrote the opinion in <u>Bekins</u>.  It

10  turns out he was.  I was able to verify that during the

11  break.  And I think I offer what Justice Cardozo had to say

12  because its logic is irrefutable.  By the way, its reasoning

13  wasn't assailed by any of the retiree representatives.  It's

14  joined by a very distinguished group of justices, and all of

15  them except for Cardozo participated in the ultimate reversal

16  of <u>Ashton</u> in <u>Bekins</u>.  The opinion, of course, was written by

17  Hughes, who joined the dissent, and I think, therefore, it's

18  an excellent aid to interpretation.

19          I admitted last time that <u>Bekins</u> is a little hard to

20  interpret because it's dealing actually with three specific

21  constitutional challenges.  It spends most of its column

22  inches on the Article X problem.  It spends exactly one

23  column inch on the Fifth Amendment problem and really only

24  talks about the commerce clause problem because the

25  legislative history that it quotes for the changes made

1  between <u>Ashton</u> and <u>Bekins</u> touches on the commerce clause

2  issue, and the Court basically is agreeing with the treatment

3  that accompanied it -- accompanied the statute in the

4  legislative history.

5      It turns out that Cardozo didn't write on a clean

6  slate.  He cited a case, <u>Imperial Irrigation District</u>, 10

7  Fed. Supp. 832, which is probably where he borrowed the

8  concept, and I quote from that case, "The impairment of

9  contracts is brought about by the national law, and not by

10  the state measure, and local consent similar in effect to

11  that sanctioned by the California statute."  The judge in

12  that case -- so it's obviously a district judge -- it's not

13  even an appellate judge -- is dealing with the same problem

14  that you would have if you tried to ground the

15  constitutionality of the Bankruptcy Court -- Bankruptcy Code

16  as against the contracts clause on anything other than the

17  reality that it is the federal power that is impairing

18  contracts.  You wind up with a situation that you have

19  basically destroyed Chapter 9 and maybe parts of Chapter 11

20  as an avenue for impairing contracts in many circumstances,

21  not just pensions.

22      In short, you've proven too much.  You've proven

23  that contracts clauses in every state -- and I said last time

24  I think there's a contracts clause in every state

25  Constitution, but I could be off by one or two -- that would

1  prevent the impairment of bonds.  That would prevent the
2  impairment of trade claims.  In fact, you would have
3  effectively preempted all impairments, and Chapter 9 would be
4  completely a dead letter.  And so we have to look for other
5  interpretations or we should be looking very hard for other
6  interpretations, and we don't have to look very far.  And as
7  I said before, I think while Bekins says -- crunches it into
8  a couple of sentences, Justice Cardozo's reasoning joined by
9  Hughes, Stone, and Brandeis explains to us why,
10  notwithstanding the federal contracts clause, notwithstanding
11  state contracts -- state Constitution contracts clauses, and
12  notwithstanding the pension clause, we still have an
13  effective bankruptcy power to implement debt restructurings
14  and debt impairments in cases where there are necessary --
15  where they are necessary.  Nothing about eligibility is
16  dealing with the question that your Honor sensibly asked,
17  which is, "Don't you have to show that a plan is in the best
18  interest of creditors?"  Clearly we do.  Is there anybody
19  going to use Chapter 9 as a method for impairing contracts if
20  they're not in financial extremis?  No, they should not, and,
21  no, they will not.  It is in those circumstances where the
22  federal government comes to the aid of states and
23  municipalities that can't on their own restructure their
24  financial affairs.
25          And by the way, a nice corollary of looking at it

this way is that it dovetails precisely with one of your

Honor's observations, which is the last word -- I think it's

the last word of the relevant sentence of the pensions

clause, the words "thereby," which relate back to the state,

relate back to the municipality, but don't say that they

can't be impaired by anybody, just says the pension --

accrued pension benefits cannot be diminished or impaired

thereby, "thereby" being the state and the municipality.  So

adopting the language and approach in the California case

just cited, in the Cardozo dissent joined by the other

justices, and in Bekins itself, albeit not quite as

precisely, you wind up with federal law that happens to fit

nicely with the actual language of the state law with a

bankruptcy system that does still work and has not been

crippled and made unable to deal with every financial --

every municipality in financial distress and a Bankruptcy

Code that is constitutional, as Bekins said it was.

I don't think I have many more points.  First, I

wanted to make clear -- someone mentioned that the city had

not in oral argument taken positions on certain points

relating to PA 436.  We've been relying and join in the

arguments of the attorney general.  I think I dealt with

that.  Oh, there was an assertion that the 1963 bankruptcy

law was somehow different than the fact that throughout --

beginning in the '30s but all the way through '61, '63, all

the way up until the Bankruptcy Code made specific
authorization unnecessary for awhile, Michigan authorized all
of its municipalities to resort to the composition law.  This
1963 law still had impairment of contracts as one of its
central elements.  In fact, if you look at <u>Bekins</u>, which
stands, of course, for many things, <u>Bekins</u> is a case where
it's a 60-percent -- it's a 60-cent distribution on account
of debt, and it was a mercifully simple case.  There was one
class, so we didn't have to deal with discrimination and all
those other things.  But <u>Bekins</u> is a debt impairment case.
It turned out to be that 86 percent of the creditors by
amount approved it, and it's the 14 percent who are
complaining.  And so it really isn't fair to say that the
bankruptcy laws as they apply to municipalities were vastly
different than the laws that -- the laws that are here now.
They're probably a little bit more advanced in certain
respects, informed by the New York experience, but the idea
that contracts between a municipality or obligations of a
municipality because very often they're not just in the form
of contracts, they're in the form of ordinances, and its
creditors can be -- could be -- could have been in 1963 and
in 1961 impaired as a matter of federal bankruptcy law.  It's
the absence of any mention at all of this issue or problem
anywhere in -- specifically in the pensions clause itself,
but also in the convention history leads to the conclusion

1  that people weren't thinking or it's hard to find any

2  evidence that anyone was thinking that anything that happened

3  in the structuring of the pensions clause was intended to

4  take Chapter 9 relief away from a municipality, period, in

5  any circumstances. And we think, again, that even if it did

6  or tried to -- and I think this is important -- even if it

7  did or tried to, the Justice Cardozo, Hughes, Stone, and

8  Brandeis reasoning would say it doesn't matter, that at the

9  end of the day, the -- unless there's an explicit direction

10  not to file Chapter 9, the state can only protect pension

11  claims so much. They can't protect them ultimately from

12  federal power.

13        I think those are all the points I need to cover.

14  If your Honor has any questions that I could answer --

15        THE COURT: No. Thank you.

16        MR. BENNETT: Thank you.

17        THE COURT: All right. Ladies and gentlemen, I

18  promised you one deliverable at the conclusion of these

19  arguments, which was a decision on whether or not there are

20  any genuine issues of material fact that should be addressed

21  at the upcoming trial relating to these issues which I had

22  preliminarily determined were strictly legal issues. I'm

23  going to take ten more minutes to just think about that. I

24  think there might actually be one. So we'll reconvene at

25  2:45. In the meantime, I want to remind you, please, that

1  when you are in the hallway, you must remain absolutely

2  silent, no talking in the halls.  If you want to talk, you

3  can talk in here or down on the first floor.

4        One other housekeeping matter, which, again, I want

5  to bring up just in case I forget later.  It was requested of

6  the Court permission to have in the courtroom a transcriber

7  to provide -- I guess it's called realtime transcripts, and

8  that's fine with the Court so long as we all understand that

9  that transcript is not the official transcript of the court

10  and may not be used in lieu of what would otherwise be

11  required to be used, the official transcript.  So 2:45 we'll

12  reconvene.

13        THE CLERK:  All rise.  Court is in recess.

14     (Recess at 2:34 p.m., until 2:46 p.m.)

15        THE CLERK:  Court is in session.  Please be seated.

16  Recalling Case Number 13-53846, City of Detroit, Michigan.

17        THE COURT:  Counsel are present.  I want to

18  emphasize again what I think I stated the other day, that the

19  Court certainly will take into account in deciding these

20  issues which I have preliminarily determined are legal issues

21  any facts that come out in the trial that bear upon them.

22  Having said that, though, there is one issue of fact that

23  needs to be identified because the parties do disagree about

24  it, and it might have a bearing on one of these legal issues,

25  and that specific factual issue is what was the purpose of

1  adding the spending provision to PA 436.

2         Anything further for today?  All right.  We will

3  begin our trial at nine o'clock Wednesday morning in this

4  room.  Oh, I urge you to get here early because the security

5  lines are longer at that hour in the morning than they are at

6  the times we've been starting.

7         THE CLERK:  All rise.  Court is adjourned.

8      (Proceedings concluded at 2:48 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None

       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett            October 23, 2013
_____      _____
Lois Garrett

**ITEM NO. 59**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm _____ **Miller, Canfield, Paddock and Stone, P.L.C.** _____

Address _____ **150 West Jefferson Avenue, Suite 2500** _____

City, State, Zip _____ **Detroit, Michigan 48226** _____

Phone _____ **313-496-7631** _____

Email _____ **wysocki@millercanfield.com** _____

**Case/Debtor Name:**

**Case Number:**     **13-53846**

**Chapter:**     **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'◉ **Bankruptcy**     ◯ **Adversary**

◯ **Appeal**     **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **10/24/2013**     **Time of Hearing:** **9 am**     **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested:  ◉**Original/Unredacted** "◯ **Redacted** """◯**Copy** *2ⁿᵈ Party)

◉ Entire Hearing     ◯ Ruling/Opinion of Judge     ◯ Testimony of Witness     ◯ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____

                                    Date          By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ Robin Wysocki     Date: **10/25/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**ITEM NO. 60**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name **Robin Wysocki**

Firm **Miller, Canfield, Paddock and Stone, P.L.C.**

Address **150 West Jefferson Avenue, Suite 2500**

City, State, Zip **Detroit, Michigan 48226**

Phone **313-496-7631**

Email **wysocki@millercanfield.com**

**Case/Debtor Name:**

**Case Number:** **13-53846**

**Chapter:** **9**

**Hearing Judge** **Hon. Steven Rhodes**

◉ **Bankruptcy**    ○ **Adversary**

○ **Appeal**    **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 10/24/2013    **Time of Hearing:** 1:45 pm    **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested: ◉ **Original/Unredacted** ○ **Redacted** ○ **Copy** *2ⁿᵈ Party)

◉ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85 rgt'r ci g (7 working days)

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
Date        By

Order Received:

Transcript Ordered

Transcript Received

**Signature of Ordering Party:**

/s/ Robin Wysocki    Date: 10/25/2013

By signing, I certify that I will pay all charges upon completion of the transcript request.

1353846131025000000000015

**ITEM NO. 61**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
         MICHIGAN,            .
                              .      Detroit, Michigan
                              .      October 23, 2013
                   Debtor.    .      9:00 a.m.
. . . . . . . . . . . . . . .
```

HEARING RE. ELIGIBILITY TRIAL
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  GEOFFREY S. IRWIN
                            GEOFFREY S. STEWART
                            MIGUEL F. EATON
                       51 Louisiana Avenue, N.W.
                       Washington, D.C.  20001-2113
                       (202) 879-3768

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       State of Michigan
Michigan:              Michigan Department of Attorney General
                       By:  MATTHEW SCHNEIDER
                       P.O. Box 30754
                       Lansing, MI  48909
                       (517) 241-8403

                       Dickinson Wright, PLLC
                       By:  STEVEN G. HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>     JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>     JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882<br><br><br>Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker & Freedman, P.C.<br>By:  BARBARA A. PATEK<br>     JULIE BETH TEICHER<br>     DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>     PETER D. DECHIARA<br>     THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

```
For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292

For the Official     Dentons
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:                 ANTHONY B. ULLMAN
                          ARTHUR H. RUEGGER
                     1121 Avenue of the Americas
                     New York, NY  10020-1089
                     (212) 632-8390

                     Brooks, Wilkins, Sharkey & Turco, PLLC
                     By:  MATTHEW E. WILKINS
                     401 South Old Woodward, Suite 400
                     Birmingham, MI  48009
                     (248) 971-1711

For Retired          Strobl & Sharp, PC
Detroit Police       By:  LYNN M. BRIMER
Members                   MEREDITH E. TAUNT
Association:              MALLORY A. FIELD
                     300 East Long Lake Road, Suite 200
                     Bloomfield Hills, MI  48304-2376
                     (248) 540-2300

For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340
```

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Court is in session.  Please be seated.

2     Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.  Excuse me.  We have an

4     attorney to admit to the Bar of the Court, Miguel Eaton.

5          MR. EATON:  Good morning, your Honor.

6          THE COURT:  Are you Mr. Eaton?

7          MR. EATON:  Yes, sir.

8          THE COURT:  Okay.  Are you prepared to take the oath

9     of admission to the Bar of the Court?

10          MR. EATON:  Yes, your Honor.

11          THE COURT:  Please raise your right hand.  Do you

12     affirm that you will conduct yourself as an attorney and

13     counselor of the Court with integrity and respect for the

14     law; that you have read and will abide by the civility

15     principles approved by the Court; and that you will support

16     and defend the Constitution and laws of the United States?

17          MR. EATON:  I will.

18          THE COURT:  Welcome, sir.

19          MR. EATON:  Thank you, your Honor.

20          THE COURT:  We will take care of your paperwork for

21     you.  And we should go ahead and have appearances entered,

22     please.

23          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin

24     from Jones Day on behalf of the city.

25          MR. STEWART:  Geoffrey Stewart, Jones Day, also on

1  behalf of the city, your Honor.

2          MS. LEVINE:  Good morning, your Honor.  Sharon

3  Levine, and if I could introduce to the Court my partner,

4  Jack Sherwood, Lowenstein Sandler, for AFSCME.  Thank you.

5          THE COURT:  Welcome, sir.

6          MR. MONTGOMERY:  Good morning, your Honor.  Claude

7  Montgomery, Dentons US, for the retiree committee, and with

8  me in the courtroom today with possible speaking roles are

9  Anthony Ullman, partner in Dentons, and Arthur Ruegger back

10  there.  Thank you, your Honor.

11          MR. SCHNEIDER:  Good morning, your Honor.  Matthew

12  Schneider, chief legal counsel, Michigan Department of

13  Attorney General, on behalf of the State of Michigan, and

14  with me is Steven Howell, special assistant attorney general.

15          MS. CECCOTTI:  Good morning, your Honor.  Babette

16  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  I would

17  also like to introduce my partners, Tom Ciantra sitting here

18  at counsel table, Peter DeChiara over in the corner, both of

19  whom you will see predominantly at the trial.

20          THE COURT:  Thank you.

21          MR. WERTHEIMER:  William Wertheimer, your Honor, on

22  behalf of the Flowers plaintiffs.

23          MS. GREEN:  Good morning.  Jennifer Green on behalf

24  of the General and Police and Fire Retirement Systems, and I

25  have with me my colleagues Ron King and Bob Gordon.

1            THE COURT:  I'm sorry.

2            MS. GREEN:  Ronald King and Bob Gordon.

3            THE COURT:  Mr. King.  Okay.

4            MR. MORRIS:  Good morning, your Honor.  Thomas

5    Morris of Silverman & Morris on behalf of the Retiree

6    Association parties.  Also here representing those parties is

7    Ryan Plecha of Lippitt O'Keefe.

8            MS. PATEK:  Good morning, your Honor.  Barbara Patek

9    of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

10   Detroit Public Safety Unions, and with me this morning are

11   Julie Teicher and David Eisenberg.

12           MS. BRIMER:  Good morning, your Honor.  Lynn M.

13   Brimer appearing on behalf of the Retired Detroit Police

14   Officers Association.  Also with me this morning as trial

15   counsel are Meredith Taunt and Mallory Field from the firm

16   Strobl & Sharp, PC.

17           THE COURT:  Thank you.

18           MR. BENNETT:  Bruce Bennett of Jones Day on behalf

19   of the city, your Honor.

20           THE COURT:  Okay.  Then in terms of our order of

21   proceeding this morning, I'd first like to deal with the

22   motion in limine and then the three remaining discovery

23   motions, then the joint final pretrial order, and then we'll

24   begin the trial.  Is that order of proceeding okay with

25   everyone?  Okay.

1          Actually, first, dealing with the motion in limine,

2     I'm going to waive further oral argument on that and rely on

3     your papers and conclude, as I suggested I might the other

4     day, the Court must conclude that it is challenging, if not

5     difficult, if not impossible, to resolve this motion before

6     trial and before Mr. Moore is actually testifying.  Before

7     the Court can determine the admissibility of his proffered

8     testimony, the Court must have before it the questions that

9     the proponent of the witness asks of him, so in the

10    circumstances, I will deny the motion but without prejudice,

11    of course, to the right of any party to object to any of Mr.

12    Moore's testimony on any appropriate ground.

13         So let's turn our attention then to the three

14    discovery motions.  Who will argue those?

15         MR. CIANTRA:  I will start off, your Honor.  Thomas

16    Ciantra, Cohen, Weiss & Simon, for the UAW.

17         THE COURT:  Go ahead, sir.

18         MR. CIANTRA:  Your Honor, first I want to thank the

19    Court for its indulgence.  Obviously we have been under a lot

20    of strain and effort to complete discovery in this matter so

21    that the trial can take place on an expedited basis, and we

22    appreciate the Court's hearing these issues on an expedited

23    basis.  I'm not going to go over the papers extensively.  The

24    Court has seen the issues and I'm sure has read the papers,

25    but I will make a presentation, and it's going to be divided

1    basically chronologically.

2         The first part I want to discuss are the documents

3    and testimony concerning matters which antedate the retention

4    of Jones Day or the emergency manager's retention, and then

5    the second part of the argument deals with matters that come

6    after that point in time and that are really taken up with

7    our request that the Court revisit the issues that it ruled

8    upon back in September.

9         So let me begin then with the first part, the

10   matters that antedate Jones Day's retention, and the issue

11   has been crystallized by the position that counsel for the

12   city took in the October 15th e-mail that is attached as

13   Exhibit 6(d) to the UAW's motion papers with respect to the

14   city.  And what it involves are a series of memoranda that

15   Jones Day prepared in 2012, approximately at least a year

16   before the firm was retained to represent the city in this

17   matter, and these e-mails -- these memoranda are referenced

18   in an e-mail that discusses a meeting between partner Jones

19   Day that had been scheduled with Governor Snyder for June

20   5th, I believe, of 2012, and they're very specific e-mails,

21   your Honor.  They are identified there, and they go to

22   obviously issues that are at the heart of UAW and other

23   objectors' issues that they would raise here, the

24   constitutional protection of the retirees' pensions being the

25   most salient.  And obviously we are seeking production of

1    those documents as well as anything else that may be being

2    withheld that antedates the retention of Jones Day.

3            Now, the city has sort of taken a selective approach

4    with respect to these types of materials.  Obviously Jones

5    Day spent a lot of time and a lot of effort to get itself in

6    a position to impress the state and get hired to represent

7    the city in connection with this case.  There's a very

8    detailed pitch book that we have marked as an exhibit that

9    will be discussed throughout this proceeding.  They have

10   produced that.  They have withheld these e-mails -- these

11   memoranda that are attached to the e-mail.  And the principal

12   basis for that decision at this point is the work product

13   doctrine.  They have withdrawn attorney-client privilege.

14   They weren't retained by the state at any point.  And now

15   they are focusing on work product.

16           And, of course, going back to first principles, the

17   work product doctrine, as it developed, intended to preserve

18   a party's lawyer's work on developing the theories and facts

19   of a case.  I mean this is Hickman v. Taylor, the classic

20   example of an attorney who was interviewing witnesses to an

21   accident to assist his client's defense of that case.  That's

22   not what's involved here, of course.  Jones Day wasn't

23   retained by the state at any point, and they weren't retained

24   by the city in 2012.

25           THE COURT:  What do you contend was the relevance or

1  would be the relevance of these memoranda in this eligibility

2  trial?

3           MR. CIANTRA:  I think, your Honor, it gets to the

4  central question of what were the motivations and intent of

5  the decision-makers here.  We know from discovery -- and it's

6  going to be crystal clear -- that the governor and the state

7  were well-aware of the constitutional protections that apply

8  to retiree pensions.  They knew that.  They were well-aware

9  of what the position was with respect to the creditor

10  proposal that the emergency manager made in June.  The filing

11  was authorized without any conditions.  We all know that.

12  These memos we believe will get beyond that, get into the

13  question of the specifics of knowledge, the specifics of the

14  intent of the parties to do that, and that's why we're

15  looking to get them.

16           THE COURT:  Okay.  Doesn't that statement of

17  relevance prove more conclusively perhaps than the city could

18  even on its own that these memoranda are prepared in

19  anticipation of litigation?

20           MR. CIANTRA:  They weren't, your Honor.  They were

21  prepared more than a year in advance of any litigation and by

22  a firm that was not representing anyone.  These were like the

23  pitch book.  They were prepared to market, to develop

24  theories and to market services.  All right.  There's no case

25  law that they cite that would support the assertion of work

1   product privilege for documents that are prepared in this

2   context.  They have selectively produced the pitch book.

3   It's the same type of material.  So for them at this point to

4   demand work product protection with respect to this we think

5   is just baseless.  I mean this is not a case where maybe a

6   memo is prepared, the client comes in to meet with the

7   attorney and reveals confidences, and those are protected.

8   We all know that.  That's basic attorney-client privilege

9   law, but this is not that situation.  This is their marketing

10  effort to the state to be retained, and we think it is not

11  entitled to --

12          THE COURT:  To be retained for what?

13          MR. CIANTRA:  To apparently be retained at some

14  point.  Who knows?  At that point there was no emergency

15  manager.  There obviously was no Chapter 9 case.  This is

16  devoid of a litigation context where you could claim work

17  product.  They're not representing a party at this point.

18  They're pitching.

19          THE COURT:  Well, I'm just struggling with what the

20  relevance of the fact that Jones Day was pitching the

21  governor a year before would be to this eligibility trial if

22  that's all you assert it was.

23          MR. CIANTRA:  Well, we know that.  We know that they

24  were pitching that.  That's clear.  They've admitted that.

25  What's relevant is --

1          THE COURT:  My question is relevance.

2          MR. CIANTRA:  Well, what's relevant is potentially

3    the content of the documents, which, of course, we haven't

4    seen.  That we think --

5          THE COURT:  To prove what, though?

6          MR. CIANTRA:  To prove what these people knew and

7    what they were intending to do.

8          THE COURT:  Regarding what, though?

9          MR. CIANTRA:  We think it would be relevant to

10   assess the conduct that we know occurred in 2013.

11         THE COURT:  Which was to file this Chapter 9 case?

12         MR. CIANTRA:  Which was to authorize the filing in

13   the face of the constitutional protections for the pension

14   benefits.

15         THE COURT:  Okay.  But doesn't that establish that

16   these memoranda were in anticipation of litigation?

17         MR. CIANTRA:  It can't, your Honor, because of the

18   simple distance in time.  They have not provided any

19   indication that the memoranda were demanded by the state;

20   that there was any retention that existed at that point in

21   time.  It's an effort like the pitch book, which is a very

22   detailed document, to get work.  They spent a thousand hours

23   to get work.  That's what law firms do, and that's what's

24   involved here.

25         Now, obviously we haven't been able -- we don't have

1  the memos.  I have the titles of the memos that are revealed

2  in the e-mail.  We don't have them.  I can't argue the

3  specific relevance of the content.  I would suggest at this

4  point --

5          THE COURT:  Do you have any case law that

6  specifically says that pre-retention work by a lawyer cannot

7  be the subject of the work product privilege?

8          MR. CIANTRA:  Well, your Honor, to be honest with

9  you, I have -- we have done the research.  I haven't been

10  able to find a case that has recognized work product in this

11  instance.  The text of the rule talks about --

12          THE COURT:  But you haven't found any that

13  specifically denies it either, huh?

14          MR. CIANTRA:  No, but the --

15          THE COURT:  Okay.

16          MR. CIANTRA:  But the purpose of work product and

17  the wording of Rule 26 contemplates a representation.  It

18  contemplates that the lawyer is working for a client

19  developing facts, developing theories.  It does not

20  contemplate a relationship between parties who never

21  consummated an attorney-client relationship.  Remember, of

22  course, Jones Day is not working for the State of Michigan

23  here.  That's who these discussions were with.  It wasn't

24  with the City of Detroit.  It was with the State of Michigan.

25  But as I said, your Honor, you know, we haven't had access to

1    the memos.  I would suggest --

2              THE COURT:  We know, don't we, that as a matter of

3    law the attorney-client privilege can extend to pre-retention

4    discussions; isn't that right?

5              MR. CIANTRA:  Well, of course.  It can extend if the

6    client -- if the prospective client reveals confidences, but

7    that's not what's involved here.  They're not claiming to

8    shield the confidences of the State of Michigan.

9              THE COURT:  No.  My question went to the next

10   question.  If the attorney-client privilege can extend pre-

11   retention, why not the work product doctrine, too, if it

12   would -- if it's otherwise in anticipation of litigation?

13             MR. CIANTRA:  Well, I think if there were notes of a

14   meeting that took place where client confidences would be

15   revealed, that would be -- that would be privileged, but I

16   don't believe --

17             THE COURT:  That's not what we're talking about.

18             MR. CIANTRA:  That's not what we're talking about,

19   at least -- I mean I haven't seen the memos, so I --

20             THE COURT:  Let's boil it down to a simple hypo.

21   Okay.  Client calls up attorney and says, "I'm thinking of

22   retaining you to pursue this claim I have against a potential

23   defendant.  When I interview you, I want to know what your

24   strategy will be."  They have a further conversation about

25   the facts.  The attorney prepares a memo.  They have their

1    meeting.  Client decides to retain that attorney.

2              MR. CIANTRA:  Right.

3              THE COURT:  Is that memo protected by work product

4    or not?

5              MR. CIANTRA:  I don't believe it's protected by work

6    product.  I believe parts of it would be protected by

7    attorney-client in terms of the --

8              THE COURT:  Okay.  But I'm talking about work

9    product.  You're talking about work product here.

10             MR. CIANTRA:  I am talking about work --

11             THE COURT:  Not protected by work product.  So the

12   defendant in that case could subpoena that memorandum from

13   that attorney?

14             MR. CIANTRA:  Subject to the client confidences that

15   were revealed in it cannot be -- would be attorney-client.

16   We're not challenging --

17             THE COURT:  Okay.  But otherwise it's disclosable.

18             MR. CIANTRA:  Otherwise I think it is.

19             THE COURT:  Discoverable.

20             MR. CIANTRA:  Yeah.  Otherwise I think it is until

21   there's a retention, especially if there's never been a

22   retention, which is the case here.  This is something that

23   happened a year before between parties that never had an

24   attorney-client relationship.

25             THE COURT:  Um-hmm.  Um-hmm.

1      MR. CIANTRA:  As I said, your Honor, we haven't

2  looked at the memos.  I don't know what's in them.  I would

3  suggest and we would request that the Court consider in

4  camera review of the documents and then make a ruling.

5      THE COURT:  Is it just these -- I think you said six

6  memoranda that are the subject of this dispute?

7      MR. CIANTRA:  At this point, that's what it's boiled

8  down to, your Honor, but we feel that we're entitled to a

9  decision with respect to this that if there's anything else

10 out there that we're not aware of -- and, frankly, your

11 Honor, there's been a lot of documents that have been

12 produced in a very exigent period of time -- we would like

13 the city to produce those.

14     THE COURT:  All right.  Well, we'll inquire -- we'll

15 inquire about that.

16     MR. CIANTRA:  Okay.  Now, let me turn to the

17 second -- let me turn to the second point, and this concerns

18 the issue that was litigated back in September, September

19 19th, on the joint --

20     THE COURT:  Well, on that one I need you to begin

21 with a response to the city's assertion that this motion is

22 late --

23     MR. CIANTRA:  It is --

24     THE COURT:  -- untimely.

25     MR. CIANTRA:  It is late, your Honor.  It is late.

1        THE COURT:  So why should it be considered?

2        MR. CIANTRA:  Well, I think it should be considered

3   because of the particular facts and circumstances that are

4   involved here.  Back in September as this issue was framed

5   and as the Court ruled, it was rather narrowly focused with

6   respect to the question of authorization.  That was the

7   hypothetical that the Court developed to support its

8   reasoning.

9        THE COURT:  Right.  I recall that.

10        MR. CIANTRA:  And what has happened since then --

11   and this, I think, is most clearly brought out in the

12   excerpts from Governor Snyder's deposition that are attached

13   to both of the motions that UAW filed -- is that that common

14   interest has moved and morphed well beyond the issue of

15   authorization that was presented in September to basically

16   every element of -- every material element with respect to

17   the case, the development of the creditors' proposal, the

18   discussion of Article IX, Section 24, and its protections

19   here, consideration to be provided to creditors under the

20   proposed plan, consideration to be provided to the pensioners

21   under the proposed plan.  It has just morphed into

22   essentially a cloak with respect to -- and excuse me; it's

23   very dry -- with respect to all of the deliberations

24   involving the emergency manager and the state, and while, you

25   know, we concede the city is correct, there is an attorney-

1    client privilege that they have, the -- it should be

2    construed narrowly in light of the public interest that's

3    involved here.  The emergency manager by law is the governing

4    body of the City of Detroit.  He has executive and

5    legislative authority rolled into one.  His actions obviously

6    affect the 700,000 residents of the city, and people have a

7    right, we submit, to know what his deliberations are, how

8    policy is being formulated, and it shouldn't be cloaked under

9    a very broad and we would submit legally unsupported

10   construction of the attorney-client privilege.  Discovery has

11   been curtailed, and it has put us in a position where now we

12   are facing trial, and we have not been able to -- because of

13   the extensive theory of privilege that the state and the city

14   have adhered to, to develop facts fully in deposition and

15   otherwise.

16          We would submit that the assertion of the privilege

17   that the governor has made, as revealed in the deposition

18   transcripts that has been taken throughout the discovery, is

19   extensive beyond what was considered in the Court's September

20   19th ruling, and we would ask the Court to -- respectfully to

21   reconsider it because otherwise we have secrecy.  We have

22   public actors here, your Honor.  The public has to be able to

23   hold political representatives accountable for their actions.

24   They have to know what policy decisions are being made, and

25   right now this privilege ruling has cloaked that in secrecy.

1          I don't have anything else, your Honor, to state.

2          THE COURT:  Thank you.

3          MR. CIANTRA:  I don't know if Mr. Wertheimer, who

4     has joined the motions for the Flowers plaintiffs, has

5     anything he would like to add.

6          THE COURT:  Okay.

7          MR. CIANTRA:  Thank you for your consideration.

8          MR. WERTHEIMER:  William Wertheimer, your Honor.

9     First, I would like to join in the UAW's motion vis-v-vis the

10    city.  I did formally join on the papers the motion vis-a-vis

11    the state.

12         I just have two points in addition to what Mr.

13    Ciantra just argued.  One relates to the Snyder deposition,

14    which I participated in, and kind of what it revealed about

15    the scope of the privilege arguments now being made and how

16    far we are from the day in court where you made it a point of

17    indicating to the state that transparency was necessary here.

18    At the governor's deposition essentially privilege was

19    invoked as to the entire content of weekly meetings that the

20    governor had with the emergency manager for months as to the

21    entire scope of those meetings making it virtually impossible

22    to examine the governor as to any of that.  That's point

23    number one.

24         And just one other point, and that is that in the

25    normal case -- well, let me back up.  Per the agreement the

1  parties made and given the position of the governor, we

2  agreed to limit our discovery deposition to three hours.  In

3  the normal case where privileges are alleged on privilege

4  logs like what we have here, you have an opportunity to go

5  beyond the privilege log and the cursory explanation for why

6  the privilege is being invoked by at deposition asking

7  witnesses questions, detailed questions about the particular

8  meeting at which they're claiming a privilege, you know, what

9  the other subjects were, how long the meeting took, did the

10  lawyer do anything at the meeting, et cetera, as to key

11  documents.  We have not had that opportunity here just given

12  the time, and I'm not -- no one is at fault for that.  It's

13  going too fast.  We had three hours with the governor.  We

14  did appropriate examinations.  But I think in this

15  circumstance that it would make sense for this Court to

16  examine certain of the documents in camera in order to assure

17  that the Court's desire and everybody's desire for

18  transparency is met.  I think this is a special case.  I

19  don't think --

20        THE COURT:  Are you referring to documents other

21  than these six memoranda attached to the e-mail?

22        MR. WERTHEIMER:  I am, your Honor.  I'm referring

23  specifically to documents that are in dispute that are in the

24  state's possession.

25        THE COURT:  Can you identify them any more

1  particularly for me or the record?

2          MR. WERTHEIMER:  We've attempted to identify them to

3  the state by indicating in logs documents that covered a

4  particular -- what we believe to be a key time period was.

5  We've also attempted to limit the request in terms of those

6  in which Mr. Orr and Mr. Snyder were directly involved, but I

7  must admit to the Court it still involves, at least at this

8  point, in terms of our back and forth, a fairly large number

9  of documents that I would respectfully suggest that the best

10  way to proceed -- given the fact that the governor is going

11  to be testifying on Monday at trial, the best way to proceed

12  may be for the Court to get involved in terms of in camera

13  review.

14          THE COURT:  And these are documents which you claim

15  were improperly withheld pursuant to the common interest

16  exception?

17          MR. WERTHEIMER:  Not just common interest, your

18  Honor, also just documents where they claimed attorney-

19  client.  And we're not claiming -- we don't know whether

20  they're improperly withheld I guess is what I'm trying to

21  say.  We're claiming that they may be --

22          THE COURT:  You're concerned.  Okay.

23          MR. WERTHEIMER:  -- and that we should not have to

24  rely upon the cursory description of counsel given --

25          THE COURT:  Well, but in order for me to accede to

1  your request to look at documents, we have to have identified

2  what documents you want me to look at and what documents you

3  want the city or the governor or the state -- excuse me -- to

4  produce to me.

5          MR. WERTHEIMER:  What I'm -- I agree, your Honor,

6  and what I'm suggesting is we did make such an effort on a

7  preliminary basis with the state in trying to resolve it, but

8  I'm acknowledging that that effort would still -- if we stop

9  there, would still leave your Honor with a large number of

10 documents.  We could continue that effort.  I agree that that

11 would be necessary, but I still think that it calls for in

12 camera review of relevant documents or potentially relevant

13 documents.  And we're happy to work with the state to try and

14 limit what that -- what the documents would be.

15         THE COURT:  Well, when are you going to do that

16 given that we're in trial all day today, tomorrow, and

17 Friday?

18         MR. WERTHEIMER:  Well, if we can't, we can't, and

19 then I would suggest to the Court that the limitation which

20 we did communicate to the state should be the one the state

21 should use -- or that we should use.  And as I recall, there

22 were at least two attempts to limit the documents.  One

23 related to time; that is, we said we think that the judge

24 should be able to take an in camera look at documents between

25 key players from date A to date B, and I don't have in front

1    of me exactly what those dates were.  And, second, we

2    indicated that the documents directly between the governor

3    and the emergency manager over a broader period of time

4    should be subject to in camera review.  If there's no time to

5    do anything else, our position would be that the Court should

6    examine those documents in camera.

7              THE COURT:  All right.  Thank you, sir.

8              MR. WERTHEIMER:  Yes, your Honor.

9              THE COURT:  While you're sitting down, I would

10   suggest you try to figure out what those dates are.  That

11   would be helpful.

12             MR. SCHNEIDER:  Your Honor, Matthew Schneider on

13   behalf of the state.  Mr. Wertheimer has raised some issues

14   that relate to this and also to the other motion, so in

15   expediency here I can kind of respond to both.

16             THE COURT:  Please.

17             MR. SCHNEIDER:  The first issue here that Mr.

18   Wertheimer's -- or the UAW and Flowers objectors raised

19   relates to a March 12 e-mail, and the objection was that it

20   should have been produced without redactions.  Now, the state

21   disagrees, but we want to resolve this dispute, and we have

22   produced that anyway, so we're not waiving the attorney-

23   client privilege or altering the common interest agreement or

24   anything by doing that, but I wanted to let you know at least

25   one issue has been resolved.  Secondly --

1    THE COURT:  When you say "has been resolved," you

2  say you have or are willing to turn over the memos?

3    MR. SCHNEIDER:  We have.  This is related to the

4  March 12 e-mail.

5    THE COURT:  March 12 --

6    MR. SCHNEIDER:  It's an e-mail from Richard Baird to

7  Kevyn Orr, and this was at issue.

8    THE COURT:  -- 2012?

9    MR. SCHNEIDER:  2013.

10    THE COURT:  Okay.

11    MR. SCHNEIDER:  Okay.  Secondly, there's another

12  argument that the state hasn't been specific on its privilege

13  log, and I think that's why this is kind of bleeding

14  together.  Again, the state disagrees.  We think the logs are

15  sufficient, but we've revised these anyway, and we've -- you

16  know, we're giving them to Mr. Wertheimer.  So, again, we're

17  not waiving anything, but we want to let the Court know that

18  we are working with them and are happy to do so.  But,

19  finally, third --

20    THE COURT:  It was a little frustrating that your

21  log didn't provide any identifying information regarding the

22  people involved other than their names.

23    MR. SCHNEIDER:  Well, we've corrected that.

24    THE COURT:  Where?  How?

25    MR. SCHNEIDER:  Well, Mr. Wertheimer asked for

1    additional information that's more specific on the privilege

2    log, and I believe we've done that, and --

3            THE COURT:  In the log itself because we looked at

4    the revised log -- at least I did, and all I saw were names?

5    Now, it's possible that I missed a page where the names were

6    identified, whether they're attorneys or officers of the

7    state or associated with the emergency manager.  I couldn't

8    tell who was who.

9            MR. SCHNEIDER:  My understanding is there's more

10   description about what actually is in there, but I will --

11   you know, I will continue to work with Mr. Wertheimer on this

12   so as to not -- not to delay.

13           The third issue here is relating to the common

14   interest agreement, and I think that's where the Flowers and

15   the UAW objectors are really going here.  The state's

16   position ultimately at the end of the day -- the state's

17   position is is that your order, your Honor, that you entered

18   on September 19 was correct, and we believe that it was

19   correct then and it's correct today.  And the new position

20   that the objectors are raising is essentially that there's no

21   common interest privilege before the filing.  This is -- as

22   the Court is aware, this has been brought to your attention

23   literally -- literally -- on the eve of trial.  There was a

24   deposition in which the Court invited the parties to contact

25   the Court in case there were concerns.  They never did that.

1   They never raised a written objection after the deposition.

2   It's beyond the 14-day rule, and there's no defect or no

3   error shown, so I think there's a waiver here, and,

4   therefore, it should be denied on that ground.

5           In addition, the common interest agreement here as

6   to the argument that the objectors are trying to find

7   information that antedate the appointment of the emergency

8   manager, if you look at the common interest agreement itself,

9   it states that this isn't just about the appointment of the

10  emergency manager.  It states that the parties have a common

11  interest in relation to the city's financial emergency and

12  the bankruptcy case and the emergency manager, so this goes

13  to a lot more than just the Chapter 9 filing.  It goes to the

14  financial emergency and things in connection with the policy

15  issues and the legal discussions related to that.  Thank you.

16          THE COURT:  Thank you.

17          MR. IRWIN:  Thank you, your Honor.  I will address

18  the motion to compel the Jones Day materials first and then

19  the motion for reconsideration.  The request that has been

20  made as it relates to core Jones Day internal research

21  memoranda it seems to us is antithetical to the work product

22  privilege, and we think the Court's analogy is exactly right.

23  If a client prepares a legal -- if a lawyer prepares a legal

24  memoranda to assist him or her or a team of lawyers in order

25  to deliver legal advice to a potential client -- a client or

1  a potential client, even before there is an attorney-client

2  relationship, that is wholly protected by work product if it

3  reflects the attorney's mental impressions and it puts him or

4  her in a position where they can deliver appropriate legal

5  advice.  And it shouldn't matter if that attorney-client

6  relationship is ultimately consummated or not.  It is an

7  inviolable attorney work product that is -- belongs to the

8  lawyer who prepared it and puts them in a position where they

9  can effectually do their jobs and deliver legal advice.

10        Now, what happened in this particular situation,

11  just to put a finer point on it, is I think not the subject

12  of any real debate.  Everyone knew that Detroit was in

13  trouble in late 2011 and that there were people working this

14  problem, and that included people from the state.  It

15  included people from the city.  It included numerous advisors

16  and consultants.  It involved numerous law firms, and there

17  were lots of people who wanted to get involved.  And Jones

18  Day had the opportunity to do just that, and we --

19        THE COURT:  So why doesn't it matter that the work

20  product was for the state, for the governor or state

21  officials, and the ultimate client wound up being none of

22  those but the city?

23        MR. IRWIN:  Well, I think it was all part of the

24  same problem.  I think that the entity that had the problem

25  here was the city, and I think the law firms like Jones

1    Day -- and I think that the papers that we submit support
2    that -- were hoping and expecting to be retained and engaged
3    by the city. And it's not -- it shouldn't surprise anyone
4    that Jones Day would have been doing legal research in order
5    to put itself in a position to assist the city in that
6    regard, and so it really didn't matter which of the entities
7    was -- not engaging in the sense of an attorney-client
8    representation, but was discussing these matters with Jones
9    Day. Jones Day had to put itself in a position where it was
10   able to represent the city effectively, and in order to do
11   that, it had to investigate this entire situation. There was
12   a legal analysis that you would expect to have been done on a
13   number of levels, and we have, you know, memoranda that came
14   about as a result. And if the Court would be --
15        THE COURT: Well, okay, but what's the foundational
16   basis for the work product privilege that shields otherwise
17   relevant facts from discovery and suggests that that basis
18   should apply to memoranda such as you claim privilege for
19   here?
20        MR. IRWIN: Well, it's if they're prepared in
21   anticipation of litigation, and as we've indicated in the
22   papers, that's a broad standard. You don't have to
23   anticipate a specific piece of litigation. You can
24   anticipate litigation broadly. You can anticipate that this
25   is a city in financial crisis and that they are going to need

1   assistance moving forward.  It might take the path of a

2   Chapter 9.  It might not.  It might take the form of numerous

3   private lawsuits against individual stakeholders in all of

4   this.  And a law firm has to be able to explore those various

5   options to put itself in a position where it can ably

6   represent the ultimate client here, which turned out to be

7   the city.

8           We also -- your Honor, the -- we're having a hard

9   time understanding the relevance here of the memoranda as

10  well.  We are happy to provide them to the Court in camera.

11  If the Court would like to see the memoranda, we have the

12  memoranda.  We can easily provide them, and the Court could

13  determine for itself if, in fact, it finds these memoranda

14  either surprising or relevant in some way.  And what we have

15  done here, your Honor, is we've proposed a structure or a

16  framework that I would submit is reasonably conservative

17  under the circumstances in terms of the number of privileges

18  and the nature of privileges that we could assert.  What we

19  have done here is we have, in fact, already released the --

20  many of the e-mails that reflect the conversations between

21  Jones Day lawyers and the folks in 2012 who were working on

22  this problem.  This, again, is before there's any attorney-

23  client relationship with anyone.  We've released those, and

24  we're not claiming those back.  We are seeking an order from

25  the Court is to protect our wholly internal memoranda or

1    internal deliberations, which conversations are not --

2            THE COURT:  Now, when you say "wholly internal" --

3            MR. IRWIN:  Yes.

4            THE COURT:  -- do you mean that these memoranda were

5    not shared even with the state officials?

6            MR. IRWIN:  We will make that determination, but we

7    believe there are memoranda at issue here that were not

8    shared with anyone from the state, so our -- we are asking to

9    be able to withhold our internal research memoranda even

10   though work product would protect that.  The work product,

11   because there's no waiver of work product, unlike attorney-

12   client, as long as you share it with someone who is in a

13   nonadversarial -- you share it in a nonadversarial way.  It's

14   not like attorney work -- it's not like attorney-client in

15   that regard.  We believe that we would still have work

16   product protection over those materials, and so we are asking

17   for the Jones Day research materials and the Jones Day

18   internal conversations about how to proceed here and how to

19   deliver advice should be protected.

20           Now, there comes a point in time later in 2012 when

21   a specific client opportunity presents itself in the form of

22   being hired by the city, in the form of this RFP process, and

23   the public document that is the pitch material that is in the

24   record already and that we not seeking to disclose, but

25   insofar as documents relating --

1        THE COURT:  You mean not seeking not to disclose?

2        MR. IRWIN:  I'm sorry, your Honor.  Yes.  It's in

3   the record right now.  We are not seeking to clawback or

4   anything like that.  That's not an issue here.  But we are --

5   we do believe that -- as the Court referenced, because pre-

6   engagement conversations between a lawyer and a potential

7   client are still protected by the attorney-client privilege,

8   we are seeking -- we are seeking protection for those

9   communications, communications -- outbound communications

10  from Jones Day in the retention period where we are receiving

11  confidential information and acting upon it.  We do think at

12  that period of time, attorney-client protection would attach

13  as well as attorney work product.  But in the 2012 time

14  period, which is what the UAW's motion is directed towards,

15  we are simply asserting work product for the Jones Day legal

16  research that was conducted to put ourselves in a position to

17  ultimately be hired in to assist the city.

18       THE COURT:  So are you telling the Court that you

19  don't have any objection to disclosing and don't claim work

20  product privilege as to any memoranda that was shared with

21  one or more state officials?

22       MR. IRWIN:  That's right.

23       THE COURT:  And have you already turned over all

24  such memoranda and communications that were given to state

25  officials?

1    MR. IRWIN:  No.  The answer is no, but we are

2  prepared to do that.  We are not standing on that.

3    THE COURT:  Okay.  Thank you, sir.

4    MR. IRWIN:  Yeah.  Does the Court wish to hear on

5  the motion for reconsideration?

6    THE COURT:  Yes.  Yes, I do.

7    MR. IRWIN:  Yes.

8    THE COURT:  If you'd like to address that, I'd like

9  to hear from you, of course.

10    MR. IRWIN:  I would, your Honor.  As we indicated,

11  we think this is late.  This is -- there is no -- there's

12  nothing in the papers that have been submitted that indicate

13  a good reason for reopening this.  There is no palpable

14  defect in the ruling, and there is nothing new.  There's no

15  new evidence.  There's no -- despite the fact that they occur

16  in the same motion, there's no linking of these two issues,

17  and so there's, therefore, no good reason -- and I haven't

18  heard one offered -- as to why this matter should be

19  reopened.  And the parties have, in fact, been relying on

20  this ruling in connection with all of the discovery

21  proceedings that have taken place since then.  We think the

22  ruling was sound.  The objectors have not indicated why there

23  is any reason to disturb the Court's analogy of a board of

24  directors and corporation counsel and the fact that they

25  should be permitted and need to talk to each other in order

1    to reach a sound conclusion as to whether to do something

2    like file for bankruptcy.  We think that's analogous here.

3    The governor and his legal team and the emergency manager and

4    his legal team need to be able to talk.  They need to be able

5    to talk in confidence with regard to the common interest,

6    which, again, this is counsel to what -- contrary to what we

7    heard, broader than simply a Chapter 9 filing.  The common

8    interest related to the city's financial -- the city's

9    financial crisis more broadly and the right legal path

10   forward.  And insofar as the communications related to a

11   legal path forward, that privilege was properly invoked.  And

12   I do recall that the Court -- I read -- I was not here, but I

13   understand that the Court made itself available to the

14   parties if, in fact, there were specific questions because

15   it's very difficult to know exactly what form these questions

16   will take in making a ruling, and I believe the Court offered

17   its services to the parties if, in fact, there was any

18   impasse at the depositions, and I don't believe any objectors

19   took advantage of that, and so we believe that under the

20   circumstances, given that the ruling was fundamentally

21   correct, that there was no attempt at the time to seek

22   further court intervention and that we've been relying on

23   these rulings going forward, that there is no reason to

24   overturn them at this time.

25              THE COURT:  Thank you, sir.

1    MR. IRWIN:  Yeah.

2    THE COURT:  Brief rebuttal.

3    MR. CIANTRA:  Just very briefly, your Honor.  I just

4 want to draw the Court's attention to a couple of matters.

5 First, with respect to the Jones Day memos, to the extent the

6 Court determines to review the memoranda in camera, we'd

7 request that the Court also review the cover e-mail that

8 enclosed the memoranda.  And I'm not --

9    THE COURT:  This was an e-mail from who to whom?

10    MR. CIANTRA:  This was an e-mail from Heather Lennox

11 of Jones Day to certain of her partners at Jones Day that

12 references the meeting with the governor, and I'm not going

13 to read the e-mail because they've claimed in the October

14 15th correspondence to myself that it's privileged, but it

15 goes to the -- I think goes to the issue that the Court was

16 addressing with respect to --

17    THE COURT:  So these memoranda are internal in the

18 sense that they were not shared with any officials of the

19 state or the city?

20    MR. CIANTRA:  It is unclear to me that that can be

21 said with any degree of assurance, and it seems entirely --

22    THE COURT:  Well, but Mr. Irwin states it here on

23 the record.  Do we doubt it?

24    MR. CIANTRA:  I did not hear that.  I did not hear

25 him say definitively that those memos were not shared with

1  anyone at the state, and from the --

2         THE COURT:  Well, let's just ask to be sure.  Mr.

3  Irwin.

4         MR. IRWIN:  We will -- I will absolutely

5  investigate.  That's part of what we're saying.  We will

6  investigate that, and we'll have a clear answer.

7         THE COURT:  Oh, all right.

8         MR. CIANTRA:  So we don't have --

9         THE COURT:  So there you go.

10        MR. CIANTRA:  So we don't have a clear answer, but I

11 would suggest that if you -- if the Court reviews the e-mail

12 that they are claiming privilege with respect to, the

13 conclusion can be drawn that the substance of those memos was

14 surely shared in that meeting, and it would seem, at a

15 minimum, that would arguably constitute a waiver along with

16 the production of the pitch materials, which go into

17 considerable detail with respect to the legal theories that

18 were involved here.

19        THE COURT:  All right.

20        MR. CIANTRA:  The second issue I just wanted to just

21 very -- just brief clarification with respect to the

22 privilege logs.  We filed -- we requested that the state

23 supplement the privilege logs, and that is in the

24 correspondence that is attached to the motion that we filed

25 with respect to the state because there was no specification

 1  in certain cases of who was involved in the communications,

 2  who authored them, who received them, or the subject matter

 3  of many of the -- of all of the communications, so we had no

 4  way to assess the assertion of privilege based on the logs.

 5  In response to that correspondence, they revised the logs, so

 6  this is what the Court referred to, but we only received

 7  those within the past day or two --

 8          THE COURT:  Right.  I know.

 9          MR. CIANTRA:  -- so we haven't had the opportunity

10  to, you know, line that --

11          THE COURT:  Right.

12          MR. CIANTRA:  -- up, but I just wanted the record to

13  be clear with respect to that.

14          THE COURT:  No.  I appreciate that very much.

15          MR. CIANTRA:  Yeah, yeah.  Obviously with respect to

16  the -- having not filed this within 14 days, your Honor,

17  obviously the discovery here was enfolding well past the

18  deadline for the production, and we have not -- we've done

19  the best we could.  This was not an intentional delay on our

20  part.  As these issues developed, it became clear to us that

21  the scope of what was being withheld we felt was inconsistent

22  with what the Court had permitted.

23          THE COURT:  All right.  I'm going to take this under

24  advisement until ten o'clock, and I'll give you a decision

25  then.

1        THE CLERK:  All rise.  Court is in recess.

2        (Recess at 9:49 a.m., until 10:00 a.m.)

3        THE CLERK:  All rise.  Court is in session.  Please

4    be seated.  Recalling Case Number 13-53846, City of Detroit,

5    Michigan.

6        THE COURT:  All counsel are present.  Ma'am.

7        MS. GREEN:  Good morning, your Honor.  I apologize.

8    I think our motion got lost in the shuffle.  The Retirement

9    Systems filed a similar motion to the UAW's.  I just have a

10   few --

11       THE COURT:  I was actually going to hear it after,

12   but if you'd like to be heard now, that's fine.

13       MR. GREEN:  Oh, you know, I just -- it dovetailed

14   with what they were arguing, so I just had a few points --

15       THE COURT:  Okay.  Go ahead.

16       MS. GREEN:  -- to raise.  The first thing I wanted

17   to add is that at the time we drafted our motion, we thought

18   that the June 5th, 2012, e-mail was being reasserted as

19   privileged.  Mr. Irwin in his argument this morning has said

20   that they are not waiving privilege -- or they are now

21   waiving privilege to that.  It is back in the record.  So to

22   clarify, the e-mail does say that the memos were shared with

23   the treasurer.  It says they were memos that we did for Andy.

24   I presume that means they were shared with him.  I don't know

25   if that's actually true or not, but the memo does seem to

1  indicate that they were shared with a third party.

2         As far as the work product analysis, in our brief we

3  went through the relevant standard in the Sixth Circuit, your

4  Honor, and I don't believe that we talked about that yet

5  today.  There's a two-part test.  The first part of that test

6  is whether the document was prepared, quote, "because of the

7  party's subjective anticipation of litigation, as contrasted

8  with ordinary business purpose, and (2) whether that

9  subjective anticipation was objectively reasonable."  And,

10  furthermore, the driving force behind the preparation of the

11  document is what is key, and we assert that the "because of"

12  part fails.  They did it because of the fact that they were

13  trying to prepare themselves for the prospect of being hired,

14  not because of the fact that there was actually anticipated

15  litigation.  And, moreover, it's very attenuated that in 2011

16  they had some kind of crystal ball that they knew two years

17  from now they were going to be in this courtroom arguing

18  about eligibility under Chapter 9.  And we did cite case law

19  in our brief.  You had asked counsel this morning if there

20  was any case law regarding some kind of temporal factor, and

21  we cited two cases.  One states, "the mere fact that

22  litigation does eventually ensue does not, by itself, cloak

23  materials with work product immunity," so between that and

24  the next case that we cited, "The abstract possibility that

25  an event might be the subject of future litigation will not

1  support the claim of privilege," I think those are
2  dispositive.  This was two years before any of this even
3  arose.

4         Furthermore, I think that goes to whether or not the
5  anticipation of litigation could be objectively reasonable.
6  I don't know how two years prior to the litigation it could
7  be objectively reasonable that, number one, PA 4 still had to
8  get past the referendum.  Number two, it was ten months
9  before the EM was hired even if you assume that these were
10 prepared in June of 2012 when the memo -- memos were shared
11 with the governor or with Andy Dillon.  They may have been
12 prepared prior to that.  We don't know.  Moreover, the EM had
13 to be appointed.  PA 436 had to become effective.  All of
14 these things had to happen before we could be here today, and
15 Jones Day had to be retained.  So there are like at least
16 five or six major contingencies that had to occur before the
17 actual litigation would ensue.

18        Furthermore, even if they can establish the work
19 product, which we don't think they can, they still have to
20 overcome the waiver issue, and I don't -- I think that today
21 is a further example that they have selectively waived.  They
22 waived the memo itself but not the attachments.  Today the
23 state stood up and said, you know, "We have an e-mail from
24 March 3rd, 2013, between Kevyn Orr.  There are two attorneys
25 on it from the State of Michigan.  But to be cooperative, we

 1  will give you that e-mail."  Well, if they're saying it's

 2  privileged but they're giving it to us, to me, again, that's

 3  a selective waiver.  They just give us what they want when

 4  they want it, but they keep what they want as well, and I

 5  don't see how they get past that.

 6         In addition, my last point would be it's still not

 7  clear who the client is that Jones Day is claiming they've

 8  been representing.  No city official, to my knowledge,

 9  through any of my review of these documents or the e-mails --

10  there is not a single city official that is ever cc'd, bcc'd,

11  you know, sent the memos.  It's purely between Jones Day

12  attorneys, Miller Buckfire, Huron Consulting, all of these

13  advisors that, again, when I think it comes to waiver,

14  clearly these are third parties and not the potential client.

15         The last point I will make because I want to be

16  brief -- I know you are ready to rule, I think -- is that I

17  think the wrong standard was stated earlier by the city.  He

18  said that there's a different standard for waiver of the

19  attorney-client privilege versus work product, and that is

20  not true in the Sixth Circuit.  We cited two cases in our

21  brief.  The first one is New Phoenix Sunrise, and it says,

22  "Both the attorney-client privilege and work product

23  protection are waived by voluntary disclosure of private

24  communications to third parties."  We also cited the In re.

25  Columbia case also --

1          THE COURT:  I'm sorry.  Are waived by what?  I just

2     didn't hear what you said.

3          MS. GREEN:  Disclosure of private communications to

4     third parties.  And he had said that some sort of different

5     standard applied when it was work product versus attorney-

6     client, and we also cited the In re. Columbia case that said

7     the same thing.  There's no compelling reason for

8     differentiating waiver of work product from waiver of the

9     attorney-client privilege, so to me it's a distinction

10    without a difference to say, "Well, we gave it to," and I

11    think the quote he said a minute ago was, "numerous

12    consultants and advisors as well as the state."  And to me

13    that is disclosing it to third parties; therefore, it was

14    waived when it was created a year or two ago, not to mention

15    the fact that as part of this litigation, they have

16    selectively waived certain e-mails that somewhat have to do

17    with this subject matter in that they relate to, for

18    instance, reviewing the consent agreement or reviewing and

19    commenting on PA 4 and the analysis related to PA 4.  And we

20    cited case law in our brief stating that if you waive the

21    privilege on selected pieces, you, therefore, waive it as to

22    the entire subject matter, and, therefore, you can't

23    selectively say, "Well, you can have the e-mail, but you

24    can't have the attachments," or, "You can have this e-mail,

25    but you can't have this e-mail."  So we would say that the

1  entire privilege has been waived by selectively waiving it as

2  to a few e-mails here and there.  Those are my comments.

3       THE COURT:  Thank you.

4       MS. GREEN:  Thank you.

5       MR. IRWIN:  I'll simply respond to those few points

6  that counsel made.  The first, in connection with whether the

7  timing of all of this should make a difference, I would

8  submit that that is arbitrary.  There are lots of things that

9  could have happened in the middle of 2012 that would have

10  been litigation events.  Maybe they didn't, but that doesn't

11  mean that at the time that all of this was being considered,

12  when legal advice -- or when Jones Day was considering some

13  of these issues, they weren't anticipating litigation.  It is

14  fortuitous that this happened two years later, actually, a

15  year and a half later or one year later, but that doesn't

16  mean that either potential clients or Jones Day were not

17  working in anticipation of litigation, which, as we indicated

18  in our brief, does not need to be a specific litigation

19  event.  You can anticipate litigation broadly.  You never

20  know what form it will take.  You know there are going to be

21  fights.  You know there will be disputes.  You don't know if

22  it'll be a private -- private lawsuits.  You don't know if

23  it'll be a Chapter 9 filing, but you can anticipate the need

24  for legal advice in an adversarial proceeding in some form

25  and meet the standard.

1       In terms of select -- whether there's been selective

2  waiver or subject matter waiver, as counsel suggests, this is

3  I think fundamentally incorrect.  The standard for subject

4  matter waiver is whether documents have been disclosed.  It's

5  the shield and sword problem.  It's if documents have been

6  disclosed and counsel intends to rely on them affirmatively

7  and yet withholds the balance of the documents that, in

8  fairness, should be considered, and I think this is codified

9  pretty clearly in the advisory committee notes to Federal

10  Rule 502 where they say, "Thus, subject matter waiver is

11  limited to situations in which a party intentionally puts

12  protected information into the litigation in a selective,

13  misleading and unfair manner.  Under both Rules, a party that

14  makes a selective, misleading presentation that is unfair to

15  the adversary opens itself to a more complete and accurate

16  presentation."  We are not -- we, the city, are not using any

17  of these materials affirmatively.  They are not on our

18  exhibit lists.  We are not introducing them through

19  witnesses.  We are not using them to our advantage that

20  should open us to some sort of claim of subject matter waiver

21  or selective disclosure under the rules.

22       And then lastly, I think fundamentally there is --

23  and I believe this is black letter law -- there are different

24  standards for whether there is waiver by disclosure under

25  attorney work product as opposed to attorney client.  If you

1  disclose attorney-client communications to a third party, you

2  are much more likely to be deemed to have waived that

3  privilege, but with attorney work product, you can make

4  disclosures.  And as long as they are disclosures to parties

5  who are nonadversarial, then you can still enjoy that

6  protection.  And that is a fundamental difference between the

7  two privileges.  It is not something where they are -- where

8  disclosures to folks who are within the potential group of

9  clients or advisors who are working these problems operates

10  to waive the privilege.  And I think we've demonstrated that,

11  your Honor.

12          THE COURT:  I want to -- I want to be sure the

13  record accurately reflects your position regarding what's to

14  be disclosed and what isn't.  Is it correct that to the

15  extent any of these memoranda that were attached to this June

16  2012 e-mail from Ms. Lennox were disclosed to state

17  officials, you are willing to make them available to counsel

18  here?

19          MR. IRWIN:  Yes, your Honor, but the e-mail itself

20  suggests -- if memoranda was prepared to prepare a Jones Day

21  lawyer for a meeting with counsel, that would not be.  It's

22  not my understanding of what we're talking about.

23          THE COURT:  Okay.  But you don't know which of the

24  several memoranda were shared and which weren't?

25          MR. IRWIN:  We'll do that.

1          THE COURT:  How will you determine that or --

2          MR. IRWIN:  Because we have the -- the Jones Day

3   lawyers are accessible, and we can figure that out.

4          THE COURT:  All right.  Thank you.

5          MS. GREEN:  I have a brief rebuttal.

6          THE COURT:  Yes, of course.

7          MS. GREEN:  I think the hypo that you stated earlier

8   compared to what he just said -- you know, these were memos

9   preparing a Jones Day lawyer to go seek work -- is different

10  than the hypo that you stated earlier, which was you meet

11  with a client who wants to meet with you for the purpose of

12  retaining you, and you may make notes.  That's different to

13  me than, "I did memos to prepare myself to go pitch a

14  client."  To me those are two different scenarios, and

15  there's a distinction, I think, between did the state ask for

16  this work, or was Jones Day just doing it internally, again,

17  to prepare.  I think those are two distinct scenarios.

18          One other thing that occurred yesterday, you made a

19  note on the record about PA 4 and that perhaps the intent

20  behind the appropriation -- the inclusion of the

21  appropriation was a factual issue for this trial, and I think

22  that some of the e-mail correspondence may go to that issue,

23  quite frankly, because the PA 4 appropriation was extensively

24  discussed in all these e-mails, and for that reason I think

25  there is a possibility that it would become relevant to a

1   separate issue than what Mr. Ciantra stated this morning,

2   which was the good faith and the bad faith issues and things

3   like that.

4          The last thing I would offer is our Exhibits 31

5   through 65 have a lot of the e-mail correspondence that has

6   been produced by the city, and there is a lot of, I guess,

7   internal -- what they would consider their internal work

8   product in those e-mails.  I don't concede it's work product,

9   but according to what they are defining as work product, it's

10  in those e-mails, and it's already been produced, and it's

11  been waived.  So if you'd like to look at those e-mails to

12  sort of familiarize yourself with what we're talking about,

13  I've produced a copy of our binder for your clerk this

14  morning if you'd like to look at those.  Thank you, your

15  Honor.

16          THE COURT:  All right.

17          MS. BRIMER:  Your Honor, I'll be very brief.

18          THE COURT:  Why should I hear you?  You're not a

19  party to these motions.

20          MS. BRIMER:  I understand that, your Honor.  I want

21  to clarify one matter on the record that Ms. Green made,

22  and --

23          THE COURT:  I will let you clarify a statement on

24  the record, but I can't let you argue on one side or the

25  other of these motions.

 1         MS. BRIMER:  That's fine, your Honor.  And Ms. Green

 2    raised the issue of your ruling on Monday with respect to the

 3    intent of the appropriation in PA 4, and I want to be sure

 4    the record is very clear that it's the appropriation in PA

 5    436 that your Honor ruled may be a factual issue that prior

 6    to that was not considered a factual issue.  I want to be

 7    sure the record is very clear on that, which law we are

 8    addressing, your Honor.  It may have an impact on the memos.

 9    Thank you.

10         THE COURT:  Thank you, I guess.  All right.  On the

11    issue -- on the first issue, which is the motion for

12    reconsideration of the Court's previous ruling on the common

13    interest doctrine, the Court concludes that the record does

14    not establish cause to consider that motion out of time, and,

15    accordingly, for that reason alone, the motion is denied.

16         But having said that, I want the record to be clear

17    and the parties to understand that to the extent a question

18    is asked of a witness and either a witness or counsel on the

19    witness' behalf claims attorney-client privilege and asserts

20    the common interest doctrine or any other privilege, for that

21    matter, the Court will take a fresh look at that and consider

22    counsel's arguments relating to that.

23         On the motions to compel, the Court appreciates the

24    city's willingness to disclose to counsel for the objecting

25    parties whatever memoranda it shared -- the city's counsel,

1  Jones Day, shared with state officials and would request that

2  that disclosure be accomplished as promptly as possible.

3       To the extent, however, that the moving parties seek

4  a ruling from the Court that the mere fact that memoranda or

5  other documents that would otherwise be protected by the work

6  product doctrine were prepared pre-retention means that they

7  are not protected by that doctrine, the Court must reject and

8  overrule that position.

9       Accordingly, to the extent that the city is

10 maintaining this privilege as to any of these memoranda that

11 were attached to Ms. Lennox's e-mail or any other memoranda,

12 for that matter, the Court will look at them in camera and

13 ask the city to produce them for that purpose, again, as

14 promptly as possible.

15      As to the documents that Mr. Wertheimer suggests

16 were improperly withheld in discovery, this presents a more

17 challenging request if only because the documents that are

18 the subject of Mr. Wertheimer's request are not identified,

19 and so, Mr. Wertheimer, all I can do in that regard is ask

20 you to identify, again, as promptly as possible, what

21 documents or range of documents you seek the city to be

22 compelled to disclose, review that with the city, and to the

23 extent you can't work it out, we will take a break from our

24 trial whenever you are ready and work our way through it.

25      MR. WERTHEIMER:  Yes, your Honor.  I believe you

1  meant the state.

2          THE COURT:  The state.  I did.

3          MR. WERTHEIMER:  Yes.

4          THE COURT:  Thank you.

5          MR. WERTHEIMER:  Thank you, your Honor.

6          THE COURT:  All right.  So are there any other

7  issues still open before we begin our opening statements?

8          MR. SCHNEIDER:  Your Honor, there is one, and that

9  is because there has been discussion about the trial

10 subpoenas that were issued to the governor, the treasurer,

11 Mr. Baird, and Mr. Ryan.  The last time I appeared before

12 you, I argued -- I opposed that.  I want the Court to know I

13 am not going to file a motion to quash.  The governor, in the

14 spirit of cooperation and because he wants to move this

15 proceeding along, is willing to testify, and we have made --

16 we will make all of those state witnesses available.  And we

17 believe that Monday between 1 p.m. and 3 p.m. the governor

18 would be available, and we think the other witnesses -- well,

19 the other witnesses will be available on Monday or Tuesday.

20         THE COURT:  Thank you.

21         MR. DECHIARA:  Good morning, your Honor.  Peter

22 DeChiara from the law firm of Cohen, Weiss & Simon for the

23 UAW.  The UAW and the Flowers plaintiffs appreciate the

24 state's decision to change its position and to produce the

25 state witnesses.  We just want to be careful to note for the

1   record that there's been no agreement that there should be

2   any set time for the testimony of the state witnesses,

3   including the governor.  While we realize the governor has a

4   busy schedule, it is also our view that the governor, perhaps

5   with the exception of Mr. Orr, is maybe the most important

6   witness in this case, and given the significance of his

7   testimony and given the significance of the fact that there

8   may be documents we may have to examine him on which we have

9   not yet seen, we would just want to note for the record that

10  there's been no agreement that his testimony would be limited

11  to two hours.  Thank you.

12          THE COURT:  Thank you.  Mr. Schneider.

13          MR. SCHNEIDER:  As of this point, your Honor, I fail

14  to see the reason for the objector's argument that the

15  governor would require to testify for a lengthy period of

16  time.  This Court is well aware of the governor's situation

17  and who he is in the state.  He is willing to do this, but I

18  think we will have to work with the objectors as to timing.

19          THE COURT:  Well, I would certainly encourage that,

20  but it's not for a witness who appears in any court to

21  condition his appearance on a specific time limit.

22          MR. SCHNEIDER:  He's certainly not doing that.

23  That's certainly not the case.

24          THE COURT:  The UAW certainly interpreted it that

25  way, and, frankly, I did, too.

1          MR. SCHNEIDER:  Well, I'm sorry about that, your

2    Honor, but I can tell you, as I indicated before, the

3    governor wants to be cooperative --

4          THE COURT:  All right.

5          MR. SCHNEIDER:  -- as possible.

6          THE COURT:  Good.  Thank you.  All right.  We do

7    have to get to the issue of the amended joint final pretrial

8    order.  If I read it correctly, one or more of the objecting

9    parties decided after our final pretrial conference to object

10   to a certain small number of exhibits, and the state was --

11   or excuse me -- the city was not willing to allow for a

12   statement of such a late asserted objection.  Is that what

13   this is about?

14         MR. ULLMAN:  Not really, your Honor.

15         THE COURT:  Not really?

16         MR. ULLMAN:  Not really, not in our view.

17         THE COURT:  Oh, so you're withdrawing your

18   objections?

19         MR. ULLMAN:  No.  Should I -- may I speak?

20         THE COURT:  Please.

21         MR. ULLMAN:  No.  The issue is not that we're trying

22   to add new objections.  This whole --

23         THE COURT:  So you're not trying to add new

24   objections --

25         MR. ULLMAN:  We are maintaining the same --

1        THE COURT:  -- so to the extent there are new

2    objections, we can strike them.

3        MR. ULLMAN:  No, your Honor.  Let me try to explain.

4    We had always told the state -- the city that for this subset

5    of documents -- I believe there are six of them -- that we

6    were not opposing admissibility in general, but we believe

7    that they were admissible for limited purposes only to show

8    that these documents were said, that they were, you know,

9    created, that they were given to people.  We weren't

10   contesting that they're authentic documents, but we spoke

11   with Mr. Irwin and told him but at the same time -- that's

12   why we're not contesting admissibility in general -- we do

13   not agree that they're admissible for the truth of what they

14   say.  Some of these documents have forward-looking

15   projections that we don't think there's been an adequate

16   foundation for, and in our discussions with Mr. Irwin, he

17   said, "Yeah, we understand that.  We're not asking you to

18   concede to the truth of what's in there."  And we said,

19   "Fine.  On that basis" --

20       THE COURT:  Well, but hang on.  The admission of a

21   document into evidence or the agreement of the admission of a

22   document into evidence is not a stipulation to the truth or

23   credibility of the document.  It just means that it meets the

24   criteria for admissibility under the rules.

25       MR. ULLMAN:  And that may be all that's going on

1  here.  The reason this came up is because I had heard -- I

2  was not here at the legal argument yesterday, but I had been

3  told that your Honor had indicated that if a document did not

4  have a note on it saying there was some sort of objection, it

5  would be admitted for any and all purposes, at which point I

6  said to Mr. Irwin, "Wait a minute.  There's a couple of

7  documents here that we know from our discussions" -- you

8  know, they're limited for -- we agree they're admissible for

9  limited purposes only, and we have the right --

10      THE COURT:  Well, but what -- for what purpose do

11  you assert these six documents are not admissible for?

12      MR. ULLMAN:  Just for the truth of what's in them,

13  the hearsay, expert opinion, and then lack of foundation.

14  Some of these have forward-looking numbers or values in them

15  as to the amount of the unfunded pension liability, and for

16  those we're saying we don't disagree that you gave these

17  documents out, but we're not agreeing that the numbers that

18  are in there are necessarily true numbers.  That's all we're

19  saying.  That was understood from day one with discussions

20  with Mr. Irwin, and we just wanted to make sure that your

21  Honor -- that if the document came in, that your Honor would

22  not assume that everything that was in it on these -- on

23  these six documents was true.  That's all that we cared

24  about.  We don't deny that they were either created, that

25  they were given to people, and for that purpose we have no

1    problem with admission.  And it may have been that we

2    misinterpreted what your Honor said.

3              THE COURT:  I'm having a hard time comprehending

4    what you're saying, frankly.  If a piece of evidence has

5    hearsay within hearsay --

6              MR. ULLMAN:  Um-hmm.

7              THE COURT:  -- which I think is what you're talking

8    about here; right?  The document itself is hearsay.

9              MR. ULLMAN:  Okay.

10             THE COURT:  And it contains hearsay statements.

11             MR. ULLMAN:  Yes.

12             THE COURT:  Okay.  If the document is admitted,

13   opposing parties waive -- if they agree to the admission,

14   they waive both hearsay objections.  That does not mean that

15   that party is stipulating to the truth of any of that

16   hearsay.  It just doesn't mean that.  All it means is it's

17   evidence.

18             MR. ULLMAN:  Okay.  And if, you know, I had been

19   given a misinterpretation or a misapplication of what your

20   Honor indicated the other day, then you're right.  This is a

21   moot issue, and there is no problem based on what your Honor

22   said.  I think that's true.

23             THE COURT:  Okay.  All right.  Then in that event,

24   the Court will enter the amended final pretrial order, and

25   based on the list of documents that are shown as having no

1  objections, the Court will prepare an order admitting all of

2  those documents into evidence.  Okay.  Opening statements.

3         MR. BENNETT:  One second, your Honor.  Good morning,

4  your Honor.  I'm assuming that you want to hear from us

5  first, notwithstanding that the order was different in the

6  other -- in the legal issues proceedings, but, in any

7  event --

8         THE COURT:  Well, you have the burden of proof;

9  right?

10        MR. BENNETT:  Correct.

11                     OPENING STATEMENT

12        MR. BENNETT:  First of all, I want to make crystal

13  clear -- many people have in different environments -- that

14  I'm not going to speak about any arguments that came up in

15  the context of the legal argument part of the proceedings.

16        THE COURT:  Thank you.

17        MR. BENNETT:  I appreciate that part, too.  And I'm

18  going to confine myself to the issues -- or the parts of the

19  eligibility standard and the part of 521(c) that have some

20  factual disputes that have been identified in connection with

21  them.  And toward the end I do want to spend a minute on the

22  materiality of facts relating to legislators' or governors'

23  intent relating to statutes because I think it was not

24  something that we did cover when we were here before.

25        So, first of all, I'm going to start with the issue

1  of insolvency, and what I'm going to say about that because I

2  could stand here for hours describing the evidence that is

3  going to come in on that subject, but I'm not going to do

4  that -- I'm going to say simply that the witnesses that we

5  will present on the subject are going to present a mountain

6  of evidence showing insolvency of the city.  Sadly, that

7  evidence will show that the city is insolvent on every

8  relevant standard.  And, your Honor, there's been at least

9  intimated in a lot of the papers about the significance that

10  no expert report has been submitted.  Quite frankly, that is

11  because no expert report is required.  This is one of those

12  cases where the data speaks very clearly and persuasively on

13  its own -- it needs no gloss -- and that only AFSCME is

14  objecting on the insolvency point, at least as I read the

15  papers, itself speaks volumes.

16        I want to say that from the near term perspective,

17  the city did not run out of cash because -- only because

18  actions were taken to prevent that from happening.  The

19  evidence will show that if the city just kept on paying debts

20  as and when they were becoming due, cash would have run out.

21  The fact that the city stopped doing that is the only reason

22  why there are positive cash balances.  As I said before,

23  there's no question that if the actions were not taken, cash

24  would have run out.

25        I will also say that the steps that the city took

1   during past years to pay many of its debts as they become due

2   didn't turn out particularly well.  One of the consequences

3   you'll see in the evidence and, in fact, a good document to

4   keep around at all times is the proposal for creditors dated

5   June 14th.  There's a section there that deals with this.  It

6   shows that there were numerous secured borrowings made to

7   create liquidity in the city in past years when there were

8   similar cash flow problems.  Each and every one of those

9   borrowings were done on a secured basis, and so the

10   consequence that we face today is that those borrowings

11   consume a very significant amount of cash otherwise available

12   for creditors generally, so that was -- so avoiding a

13   liquidity problem in the prior periods didn't exactly work

14   out well from the perspective of many other creditors.

15       Also, as will come into evidence, pension

16   contributions were deferred during at least the past two

17   fiscal years with the effect that the underfunding under

18   anyone's measure -- we don't have to worry about the fight

19   between the different measures of pension underfunding.  It's

20   greater than it might otherwise have been.

21       Finally, on the insolvency point, you are going to

22   hear from several witnesses, but most importantly perhaps

23   Chief Craig, about the fact that the city is failing to

24   provide basic services to its residents.  We don't think

25   about that as another one of the creditor claims or

1  obligations, but the reality is it's as important as anything

2  else.  As we've indicated before and as the witnesses will

3  indicate, without solving that problem, there may not be a

4  city to reorganize.

5      Now, AFSCME makes a few points that are worth

6  discussing how the evidence will deal with them.  First, much

7  is made over the dispute about the underfunding amount, and

8  it is asserted that because there's a dispute of the

9  underfunding amount, the city can't demonstrate it's

10  insolvent.  Well, as your Honor knows, the insolvency test

11  focuses on cash flow.  It focuses on near term and longer

12  term cash flow type measures, and in that connection, there

13  are cash flows that will be put into evidence.  There's also

14  a convenient place to find them in the proposal for

15  creditors.  There's different versions with different levels

16  of updates and different assumptions that are baked into

17  them, but the line items that talk about pension

18  contributions your Honor is going to learn don't change very

19  much whether you use the city's assumptions as to

20  underfunding amount or the city's calculation of underfunding

21  amount or the Gabriel, Roeder calculation of underfunding

22  amount, Gabriel, Roeder, of course, being the actuaries

23  retained by the pension funds, the pension fund management

24  themselves, to give them advice.  And so your Honor will be

25  taken through the numbers, and you will find that the

1  contribution amounts, which are the relevant numbers in the

2  insolvency calculation, don't move around very much

3  notwithstanding the very different calculations of

4  underfunding amounts, and the reason for that will be

5  explained.  Mr. Moore of Conway MacKenzie will be the witness

6  that will cover that area.

7          There's also a little bit of numerical confusion

8  concerning the percentage of the city's contribution to the

9  GRS Pension Fund that is attributable to DWSD employees.  You

10  will see in the papers a number bandied around, 62 percent.

11  Well, actually, the number is the reverse of that.  It's 38

12  to 39 percent.  Mr. Orr got that wrong in his deposition.  He

13  corrected it at the end, but, of course, the correction

14  wasn't cited in the papers.  There will be evidence on the

15  point so there won't be confusion on the point as we go

16  forward with the numbers.

17          Then AFSCME says that the city deferred sales of

18  assets, and they talk about two examples.  We will

19  demonstrate, of course, that that is not true.  First of all,

20  the Belle Isle deal, Belle Isle leased to the state in

21  exchange for the state taking over the maintenance and CAPX

22  requirements with respect to Belle Isle, never involved the

23  generation of incremental spendable cash.  It did and always

24  has involved a reduction of the cost on the city to maintain

25  Belle Isle.  And what the evidence will show is that those

anticipated savings were included in the projections that were the basis for insolvency calculations, and they are in the projections.  They're the basis for the proposal for creditors or at least the lead-up to the proposal for creditors in the June 14th presentation.

It's also very hard for us to understand how anyone can say that art sales were deferred.  It is common knowledge -- and I suspect we'll figure out a way to get this into evidence as well -- that there's an attorney general opinion out there that basically says that the art can't be sold for creditors.  We, unfortunately -- in the absence of some form of an agreement, there are no sales possible without a significant change in current management of the museum or litigation and -- maybe and/or litigation relating to some of the points made in the attorney general's opinion.  There were no pre-filing opportunities to liquidate art.

Next, AFSCME talks about the swap deal, which, of course, your Honor is familiar with because it's before you in still another adversary setting in this case.  The swap deal itself, you will hear, does not provide adequate cash relief, but the transaction hasn't been approved yet.  And there is, unfortunately, no assurance as we stand here today and certainly as we stood here several months ago, that it will be done.  It turns out that some of the objectors in this proceeding are also objectors in that one, and so I'm

1   not sure how we're supposed to even count the anticipated

2   cash flow relief attributable to the swap transaction as

3   something that could have even affected the city's insolvency

4   calculations.

5          And lastly, there is the assertion -- and I'm

6   anxious to hear what the evidence will be to support this

7   one -- that the appointment of the emergency manager

8   prevented the city from taking actions designed to raise

9   revenue and avoid insolvency.  Of course, in the briefs that

10  have been filed, there is no suggestion about exactly what

11  steps those are that the City Council or the mayor or whoever

12  else has been displaced in the view of AFSCME have been

13  planning and anxious to implement that would solve the city's

14  financial problem.  No such actions have ever been specified.

15  We have no idea where that evidence is coming from.  It will

16  be quite a surprise if there is any.

17         It was for these reasons, the insolvency and the

18  fact that there really weren't anything left, that the city

19  or the state could think of to do to address the problems

20  that the June 14th presentation was put together, and it

21  proposes a plan that includes significant reductions in the

22  city's obligations, including bonds, including other post-

23  employment benefits, including other unsecured claims, and

24  including pension underfunding claims.  Whatever the law

25  turns out to be concerning protections to be afforded to

1   various claims, there is no law prohibiting the city from

2   trying to commence negotiations to resolve its financial

3   problems, and that's what we were trying to do.

4           Now, while we're near this subject, there is an

5   issue that ripples through actually several of the standards,

6   which is whether or not the proposal that's included in the

7   proposal to creditors -- and I'm referring to the materials

8   that are, I think, between pages 101 and 109 or thereabouts

9   of that document -- whether that proposal was a -- was close

10  enough to a confirmable plan of adjustment to qualify for the

11  purposes of, open paren, one, demonstrating that the city

12  desires to implement a plan; open paren, two, that the city

13  was in good faith as part of the good faith negotiations

14  because they had to be talking about a certain kind of plan

15  that is asserted; and, three, whether the city was acting in

16  good faith generally.  And I think the proposal for

17  creditors, that June 14th document, has been admitted into

18  evidence, again, for all purposes, but very clearly for the

19  purpose of showing this is what the proposal was that the

20  city presented as its initial presentation to creditors, and

21  so it speaks for itself.  We can look at it.  We don't need

22  testimony.  It's reasonably detailed.  In fact, I would

23  argue your Honor sees disclosure statements, summaries of

24  plans all the time, and you will see this measures up quite

25  nicely to the standard that's applicable even in disclosure

 1    statements to what a plan should look like.  It is -- it has

 2    a classification scheme.  It defines treatment for all

 3    classes.  It includes a very extensive term sheet for notes

 4    that are proposed to be distributed to creditors, and it is a

 5    plan, your Honor, that for that reason is a plan that could

 6    be confirmable.

 7         Now, there is clearly disputes over what law should

 8    be applied by this Court in determining whether or not it

 9    would confirm that plan if it was fleshed out, put into plan

10    form, and presented to your Honor.  I told your Honor in

11    prior hearings that I doubt that's the way this case is going

12    to come out, but that's the relevant standard for today.

13         And the reality is is that on the city's very

14    reasonable view of the law, there is no question that it

15    could be confirmed.  I understand that with respect to the

16    retiree constituents' views of the law, they say it can't be,

17    but that doesn't render the proposal inappropriate for

18    purposes of a Chapter 9 case.  We are dealing with issues

19    that your Honor has heard argument about, is going to

20    ultimately decide, but the plan hangs together as an

21    appropriate expression of the kind of debt relief the city

22    should be able to get based upon one very reasonable view of

23    the law.  We think it's absolutely the right view.

24         The other assertion as to why the plan isn't an

25    appropriate plan is that it doesn't adequately liquidate

1    claims, and here again they're talking about the pension
2    underfunding amount.  But I think we know both from the
3    structure of the Bankruptcy Code itself and from many, many,
4    many other cases that the liquidation of claims is not a
5    prerequisite to confirmation of a plan.  Plans are confirmed
6    all the time with the treatment specified as the treatment is
7    specified in the plan in the proposal for creditors that is
8    not claim size dependent.  It's by plan.  It makes
9    distributions based upon pro rata interests in the overall
10   claims pool.  It was designed that way because there is, in
11   fact, uncertainty concerning the aggregate amount of certain
12   claims.  Frankly, the city believes there's more questions
13   relating to the size of the OPEB, or other post-employment
14   benefit, claim pool than there is with respect to the pension
15   claim pool, but there's uncertainty on these issues.  It is
16   acknowledged there is uncertainty of issues.  Those are not
17   confirmation problems.  At least they're not confirmation
18   problems with some plan structures, and they're certainly not
19   confirmation problems with the plan structure that was
20   offered by the city.
21           So for these reasons, that is a plan that is
22   sufficiently detailed, more detailed than it has been in many
23   other of the other reported Chapter 9 cases, and it is
24   appropriate for all purposes as a starting point for good
25   faith negotiations, demonstration of the city's intent to

1    implement a plan in Chapter 9, and demonstration of the
2    city's overall good faith in commencing its Chapter 9 case.
3    And so I think we've dispensed of that component of the
4    different standards.

5         We now turn to impracticability.  Can I have a
6    second for a glass of water?  Thank you, your Honor.  Moving
7    to impracticability, the record shows in numerous places that
8    the city has many, many issues of bonds outstanding, and
9    another reason to keep the proposal for creditors nearby is
10   that toward the back of it -- and I think it's between pages
11   like 115 and 130, thereabouts -- there is an extensive list
12   in a type size not so good for people who wear bifocals.  I
13   think you will hear in the evidence, if it's not already
14   clear from the record, that most of the individual bond
15   issues do not have indenture trustees as we think of them in
16   the commercial context or any other equivalent holder
17   representative.  In fact, holders reserve more rights in most
18   muni structures or assign them to their insurers, to bond
19   insurers if insurers are involved.  And so what you have here
20   is that in order to compromise principal or interest as well
21   as many other terms of debt that have to be addressed in
22   connection with resolving the city's financial problems
23   either under the proposed plan that was in the proposal for
24   creditors or in any other plan, there is going to have to be
25   extensive solicitation, efforts to find relevant bondholders

1　to get the right consents.  The bankruptcy process is going

2　to make it a little bit easier because, of course, it will be

3　majorities of those who vote, and the solicitation rules are

4　clearer.  Outside of a proceeding you might have to get

5　everybody in order to implement changes.  In fact, you do

6　have to get everybody with respect to most of the issues.

7　There are a couple where there might be an exception if the

8　insurer exercises certain extensive levels of control.  The

9　bottom line is it is an awful mess.  There is many, many,

10　many, many issues, many, many, many holders, and this, of

11　course, is the definition of impracticability in a lot of

12　ways in the Bankruptcy Code because the whole reason we have

13　impracticability was because of New York's case back in the

14　'70s.  New York back then -- the numbers were different;

15　times have changed -- didn't have materially more and may

16　have had less bond issues and bondholders than Detroit has

17　today.  And the purpose of the impracticability standard was

18　to recognize the fact that with that kind of a debt

19　structure, having good faith negotiations with creditors in

20　advance of a proceeding in an effort to have an out-of-court

21　workout were, frankly, pointless or would have been

22　pointless.

23　　　　　　And, frankly, for the most part, the objectors don't

24　disagree with anything I've just said.  It's hard to.  What

25　they say instead is that whether -- however negotiations

1   might have been practicable with bondholders, negotiations
2   were practicable with them, with the -- in some senses, self-
3   appointed or appointed representatives of particular labor
4   groups or retirees, and we're going to talk about that in
5   detail in a second, but we have a point first, which is if
6   you have a situation where it's admitted or almost
7   admitted -- and the Court may have to decide -- that
8   negotiations are impracticable with a huge universe of
9   creditors but they might be practicable with respect to
10  another universe of creditors, what do you do?  And the
11  Retiree Committee actually is good about admitting there's
12  law on this in one of their footnotes, and the law is that if
13  you've got an impracticability problem, you have an
14  impracticability problem; that negotiating with the groups
15  you can groups with are kind of pointless.  I think that if
16  we think about it a little bit, that has to be right because,
17  of course, if -- let's take a hypothetical that you've got,
18  you know, a group over here not organized, and then you've
19  got one bank debt piece, which is clearly organized and you
20  can clearly negotiate it.  Well, you try to do everything you
21  can with the bank, but at some point the bank is going to say
22  what's going to happen with them, all those people that you
23  can negotiate with, because no one ever makes a deal in a
24  vacuum.  And even if you could get all the way to conclusion
25  with a bank and you still have to file a Chapter 9 case,

1   doesn't that make you start -- effectively start all over

2   again with the one that was easy to negotiate with?  And even

3   if it doesn't, even if it's possible to negotiate a deal with

4   both the bank and the city decides this is it, we're going to

5   make this deal no matter what happens in the Chapter 9 case

6   that you need for everybody else, you still have to go

7   through the Chapter 9 case.  And waiting to file a Chapter 9

8   case while you work with the bank and finally reach the deal

9   that you're going to have with the bank that's going to be

10  permanent, you've wasted a lot of time because you have to

11  start a Chapter 11 case and go through that process anyway.

12  So I submit that the couple of cases that have focused on

13  this that we cite in our papers and that the Retiree

14  Committee cites in a footnote have got it exactly right.  If

15  you have an impracticability with respect to a material part

16  of your capital structure, you have an impracticability

17  problem, period, so I think by looking at this -- and by the

18  way, before we go off, I want to say there's one paragraph of

19  the AFSCME brief that I think is just terribly important on

20  this.  They argue this point a lot, but then they have

21  paragraph 102 at page 46, and it's only two sentences, so I'm

22  going to -- three sentences, so I'm going to read the whole

23  thing.  "AFSCME is not suggesting that pre-petition

24  negotiations could have bound everyone" -- hold that

25  thought -- "or must have involved all of the city's thousands

 1  of creditors."  I don't under -- I think that sentence means
 2  we're done because if the pre-petition negotiations couldn't
 3  have bound everyone, how would you get a plan done?  And if
 4  it didn't involve all the city's thousands of creditors, how
 5  would you get a plan done?  So I think they're conceding that
 6  our situation has to be regarded as impracticable, but they
 7  go on.  They say, "Some level of negotiation with principal
 8  creditors could have led the city to a nonbankruptcy
 9  solution."  I think that's a non sequitur.  If you're not
10  talking to everyone, you can't possibly have a solution.  But
11  then they go on further, "By way of analogy, Section
12  109(c)(5)(B) of the Bankruptcy Code contemplates pre-
13  bankruptcy negotiations with creditors that the
14  municipality" -- there's a "the" missing -- "intends to
15  impair, not all creditors."  Well, one of the complaints of
16  AFSCME is that the city intends to impair substantially all
17  of its material creditors.  It has no other choice.  So I
18  suppose there's a circumstance if the city was arguing that
19  we have a huge group of creditors as to which negotiations
20  are impracticable, but we're not going to impair them, and we
21  have another group of creditors that we really can talk to,
22  and we're going to impair them, if the city said no
23  discussions, that would be a rather extreme and silly
24  position.  It's just not our case.  We need impairment pretty
25  much across the board.  We have proposed impairment pretty

1  much across the board.  And in that circumstance, the fact

2  that huge chunks of the relevant constituencies are not

3  organized, can't be organized, can't be found, that is to me

4  the end of the impracticability discussion.

5          But maybe we should go on.  Maybe we should try to

6  figure out whether it was really impracticable to negotiate

7  with the unions themselves.  And, your Honor, I think the

8  answer to whether or not it was impracticable to negotiate

9  with the unions themselves -- and I include here the unions

10 and the other retiree groups -- is, frankly, what happened

11 when we asked the unions whether or not they could represent

12 retirees and the other groups or they could represent

13 retirees, and we have a demonstrative that we'll come back to

14 and put into evidence later on, but I think it's useful to

15 pause on, and I think it can go up on -- oh, you have a --

16 oh, okay.  Okay.  We have a big one there, and I have a few

17 that I can hand out to people, so with the Court's

18 permission --

19          THE COURT:  Yes, sir.

20          MR. BENNETT:  I think it's also in the -- I think

21 it's also in the binders.  Now, there's a lot of information

22 on this chart, and I'm not going to try to take us all the

23 way through it, but I want to zero in on the fourth line of

24 data, which is the -- which is -- well, first of all, the

25 third line of data, which says, "Was a letter sent to a

1  creditor?"  What that is is a letter that basically asked,
2  "Are you in a position to represent retirees and which ones?"
3  You'll see it.  It'll be in evidence.  And then the next line
4  is, "Respondent is able to represent retirees," and I'll give
5  you the key.  "X" means they said no, the green check means
6  they said yes, and the question mark is there was no response
7  or it's not clear, and your Honor is going to hear some
8  evidence on that.  And so look across the line.  I have a
9  number of your most vigorous objectors who said, "No, we
10  can't represent retirees," so I'm going to come back to this
11  in the context of good faith, but let's -- we can start
12  thinking about it now.  What is -- what do you expect of the
13  city having made a proposal heavily supported, certainly,
14  again, as standards go in this -- in similar circumstances,
15  had lots of meetings to explain, answered every question,
16  every question that was asked at the meetings -- there will
17  be evidence on that, too -- and your negotiating partner says
18  to you, in many instances in writing, "We actually can't
19  represent the people who are impaired by your proposal"?  To
20  say that anything that happened afterwards is not in good
21  faith, you've got to have a good answer as to what do you do.
22  What's the next sentence in the dialogue?  You're getting
23  feedback from someone who doesn't have authority to give
24  feedback if they give you any feedback.  By the way, the
25  bottom line is feedback.  "X" means no.  There's no other

1  term we need to define.  If they say -- if they said --
2  responded otherwise constructively, which was either "No, but
3  I might do this," or "Yes, if you make the following
4  changes," that's okay, but that just came from somebody who
5  said they don't represent the person who's going to be
6  affected.  What is the next step in a negotiation where the
7  person who said they're here to negotiate says to you, "We
8  really don't represent the person who's affected by the plan
9  we're discussing"?  None of the objectors say how that
10  question is supposed to be answered.
11        The reality is is the city said, "Tell us your
12  suggestions anyway."  And if we got suggestions, feedback, we
13  would have had to then figure out what to do with it in that
14  very unusual circumstance that I, frankly, haven't confronted
15  very often in my career, but we weren't even put to that hard
16  question because what the other part says is is that -- and
17  this is more toward the good faith negotiation part than this
18  one, but as long as I've got the chart up, as the bottom line
19  indicates, the evidence will show that from this creditor
20  constituency, not from others -- I'll get to that in a
21  second -- we received no concrete proposal or comprehensive
22  feedback.  We got a lot of "no," but I'll come to that later.
23        With respect to this part, again, impracticability,
24  AFSCME cites results of past collective bargaining as an
25  example of negotiations with unions that have succeeded.

1    That doesn't surprise me in the slightest, but there's also

2    no evidence and I don't think there will be any that those

3    past discussions began with unions disclaiming power to

4    bargain on behalf of the relevant constituency.  As the

5    evidence will demonstrate, that's how these discussions did.

6           So the bottom line, again, with respect to this

7    part, is even if -- and it's not -- the standard for

8    impracticability of negotiations is impracticability with

9    every major constituency, I think the fourth line of this

10   chart demonstrates that negotiations were impracticable with

11   the retiree side, and they were impracticable with the

12   bondholder side.

13          Good faith negotiations.  Again, this is a question

14   I don't think we have to reach because I think we've

15   demonstrated that those kinds of negotiations were

16   impracticable, but we tried really hard anyway.  The evidence

17   will show that we presented the June 14th plan.  Mr. Buckfire

18   of Miller Buckfire, who was integral to all the negotiations,

19   but others, Mr. Moore, Mr. Malhotra, people

20     you will hear from, they also extensively participated

21   and will testify about what happened in the rooms.  The city

22   told the creditors essentially the following.  The city would

23   have discussions with all parties willing to speak for the

24   city for about a month after the June 14th presentation so

25   that the city could listen to people and figure out if there

1  was an out-of-court solution possible for this enormously

2  complex and dire circumstance.  The city representatives

3  asked for feedback, including proposals that the creditors

4  would accept if they weren't going to accept the city's

5  proposal.  And the city said in writing and separate -- and

6  verbally that it would evaluate what it heard during the

7  following month, during the week beginning July 15th, 2013,

8  and decide what came next.  It's conceivable -- I think

9  people would say they doubted it would happen -- that one of

10  the things that would have come next were consensual

11  negotiations on the effort to build some kind of plan.  That

12  could have commenced.

13          THE COURT:  You said July.  Did you mean June?

14          MR. BENNETT:  No.  July 15th was the evaluation

15  week.

16          THE COURT:  Oh, okay.

17          MR. BENNETT:  The June 14th proposal and July 15th

18  evaluation week, meetings in the middle.  I'll have a

19  timeline at some point, and you'll see how this fits

20  together.

21          THE COURT:  Okay.

22          MR. BENNETT:  So one of the things that might have

23  happened next would have been negotiations on a consensual

24  plan, but if the -- after the month of discussions and after

25  the evaluation week the city could not see a path to an out-

 1   of-court restructuring that could be implemented outside of

 2   court, a Chapter 9 case was absolutely a possibility.  No one

 3   was shy about that.  And, frankly, it should not be

 4   surprising to anyone that the evidence shows that work on

 5   both contingencies was proceeding throughout this entire

 6   period.  Much is made of the fact that there's contingency

 7   planning going on for a Chapter 9 case.  Absolutely there

 8   was.  It would have been irresponsible not to.  By the way,

 9   nothing in the Jones Day pitch is inconsistent with this way

10   of organizing a case.  And there's a lot of complaints about,

11   well, people thought they had to keep a record, make a

12   record.  Absolutely they have to keep a record and make a

13   record.  Making a record of out-of-court steps taken in a

14   Chapter 9 negotiating process is just sensible when everybody

15   knows, based upon the play book executed in the last six or

16   seven major cases have involved vigorous objections to

17   eligibility by bondholders and labor unions, depending upon

18   the case which, sometimes both, and in every single one of

19   those cases, the judge has to go through pages and pages and

20   pages about what happened during the out-of-court phase to

21   determine whether people were in good faith.  So courts

22   through their opinions have sent a message to people who are

23   serious about Chapter 9 restructurings.  Keep records, and we

24   did.

25           There is a lot of criticism in the papers that there

1  were instances where the city said these are not negotiations
2  or particular meetings were not negotiations.  I confess that
3  this implicates an area of law that I'm not tremendously
4  familiar with.  It has to do with collective bargaining.  As
5  the evidence will show, the collective bargaining was
6  suspended as a result of a statute passed, and there was a
7  clear concern by the city that they were not going to waive
8  the -- or reverse the suspension of collective bargaining and
9  all of the baggage that came with that.  However, we don't
10 really have to deter ourselves much over that incident
11 because it's admitted by the objectors that the city sought
12 feedback.  The evidence will show that.  It's admitted that
13 there were, quote, discussions, close quote, and by the way,
14 the leading case that people cite as the -- I think it's
15 Endicott Schools case that is cited for the proposition of,
16 you know, what is a nonnegotiated process or absence of
17 negotiations.  That case talks about absence of discussions.
18 That's the actual quote if you go back to the case itself.
19        So, in any event, there is no dispute that dialogue
20 was something that was encouraged and not discouraged.
21 Nobody said we don't care what you think.  Never happens;
22 evidence will show never happens.
23        Now, again, assuming for a second that what the city
24 did in the negotiations has any relevance at all given the
25 clear impracticability in this case, what is required of the

1  city in good faith negotiations -- and I intimated that when
2  we started talking about the chart -- is informed what
3  creditors -- by what creditors said and did.  Okay.  Mr.
4  Buckfire will testify about some of that being especially
5  careful not to talk about proposals that other people made
6  because they were made with an intent that they be kept
7  confidential, but we got permission at least in one instance
8  to talk about the fact that a proposal was made.  And what
9  Mr. Buckfire is going to tell the Court is that the proposals
10 that the city got back were proposals that basically said,
11 "Our position is better than everybody else.  We should do
12 better than everybody else," and they were, frankly,
13 completely insensitive to the overall problems that the city
14 faced.  Again, the fact that we did get proposals from people
15 other than the labor negotiators is going to be --
16 Mr. Buckfire will testify to it, but there's a letter in
17 evidence, and I don't have the number.  I forgot to put it on
18 this morning.  There's a letter in evidence -- a cover letter
19 to a proposal that came from three major insurers in the pre-
20 filing period.  And, your Honor, that demonstrates that a
21 party that's represented by qualified professionals, as a
22 number of the labor/retiree constituents were, knew exactly
23 what you're supposed to do when you receive a proposal and
24 you don't like it.  The way you -- the way you respond to a
25 proposal and you don't like it is you send back something

1    that you do like, and that's how a negotiation gets started.

2    Whether it would have worked or not is a different question.

3    The point is is that it wasn't a mystery to anybody how to

4    start a negotiation if someone really wanted to start one.

5           What did labor do besides respond maybe we're not

6    the right person to talk to, which is a problem in and of

7    itself?  Well, here the UAW's papers are particularly

8    instructive, and in many places in their papers, particularly

9    their supplemental objection -- I think it's also in the

10    pretrial brief; I'm just not remembering that as clearly

11    today -- the UAW says, "Well, of course we weren't going to

12    say yes to any modifications of retiree benefits or pension

13    benefits in the pre-filing scenario because we had a

14    constitutional guarantee.  Any proposal that doesn't pay

15    these in full and does not impair retiree benefits is a

16    proposal we cannot accept," or, "we will not accept."  I

17    think it says both those things in different places.

18           So, again, I think we have to ask the most crucial

19    question in evaluating the city's good faith.  When you get

20    back a response that says, "We're never going to agree to

21    anything but nonimpairment," what exactly is the city

22    supposed to do next?  What's the next step in that

23    negotiations?  "Gee, we were just kidding.  We found the

24    money in a mattress.  We'll do that"?  I don't think that's

25    the right response.  I don't think there is a right response.

1  I think at that point you can determine that negotiations
2  have failed and they're not going to succeed.

3       The Retiree Committee goes even further in their
4  papers, their pretrial brief.  They say that negotiations
5  were not in good faith because they included an impairment,
6  meaning the city wasn't in good faith because we didn't agree
7  with them from day one.  Okay.  Again, I ask the question,
8  what exactly -- if anyone is going to contend that the city
9  was in bad faith negotiations and got that response, what
10  exactly were they supposed to do next in the negotiations
11  that would have helped matters?

12       And as I said before, many retiree groups said,
13  "We'd love to talk to you, but we don't represent the
14  relevant people."

15       Clearly, your Honor, we received many requests for
16  additional information.  You will see some interesting charts
17  that show what was in the data room, at least in terms of
18  volumes, how the data room is populated.  The evidence will
19  show that the city did its best to comply with information
20  requests.  I'm absolutely certain that no one was completely
21  satisfied with what the city gave them.  In some instances,
22  that's because the city doesn't always have everything that
23  people want.  In some instances, I suspect it's -- we will
24  find that -- to the end of this case we will not find -- we
25  will find certain people who will never agree that they've

1  gotten everything that they want or they're satisfied with

2  the information they received.  It's a hard problem, but the

3  evidence will show that the city created a database, worked

4  really hard to populate it, populated it with enormous

5  amounts of information, and did not withhold information as a

6  basis to obtain a negotiating advantage.

7          Final point with respect to this section.  In almost

8  all the papers -- and I want to -- it could be all -- there

9  is a statement quoted by Kevyn Orr concerning the financial

10 and operating plan at a meeting to discuss the financial and

11 operating plan, which is not the proposal for creditors.  The

12 financial and operating plan is a document required by

13 statute to be filed 40 days -- 45 days after his appointment.

14 It's about facts, and he's reporting facts.  And someone

15 asked him about negotiating the financial and operating plan,

16 and he said, "This is not something to negotiate.  This isn't

17 a plebiscite.  This is a report.  I'm supposed to file it."

18 So that quote, which I think the objectors would have you

19 think applied to the restructuring plan, and it does not, did

20 not, and it applies to something completely different, and I

21 think the evidence will show that.

22          For the foregoing reasons, I think the city did act

23 in good faith in all of the negotiations that it conducted.

24 Those negotiations were unsuccessful and, thus, that

25 prerequisite for filing a Chapter 9 case and being eligible

 1    for relief has been met.

 2          I'm now going to turn to good faith generally, spend

 3    a little time on it, 921(c).  Here again, I want to borrow

 4    AFSCME's papers because they're just very instructive and

 5    really help us with this.  Paragraph 109 on page 48, "The

 6    relevant considerations regarding good faith under Chapter 9

 7    include," and they point to five points out of the Stockton

 8    case.  I'll accept them.  Number one, whether the city's

 9    financial problems are of a nature contemplated by Chapter 9.

10    The evidence will show that if Detroit's financial problems

11    are not the financial problems of the nature contemplated by

12    Chapter 9, I don't know what city's is, so we think we will

13    satisfy that one very easily.  Number two, whether the

14    reasons for filing are consistent with Chapter 9.  I think

15    the form and substance of the plan that was proposed and,

16    frankly, everything that the city has been saying about it

17    are indicative that the city is trying very hard to use the

18    powers subject to the limitations included in Chapter 9 to

19    effectuate a financial restructuring for the city.  I don't

20    think we'll have any difficulty demonstrating that with the

21    evidence.  Number three, the extent of the city's pre-

22    petition efforts to address the issues.  Here I want to pause

23    and put on a timeline, and there's -- it's really long, so

24    there's two pieces, but for this purpose it's the first piece

25    that's the most relevant.

1    THE COURT:  Let me ask you to pause for just a

2  second.  We should have the record reflect what exhibit

3  number that chart is.

4        UNIDENTIFIED SPEAKER:  It's Exhibit Number 36.

5        MR. BENNETT:  I have better.  They'll try and put it

6  up, but I also have some copies of it.  Here's what I'm going

7  to do.  I'm going to distribute the first piece now, with the

8  Court's permission, and the second piece in a minute, so --

9  after I get through this, so here's the first piece.  Again,

10  I think everyone has seen this already.  If you don't have

11  it, it's okay.  Everyone else is going to have it in a

12  second.  Obviously in a bunch of ways this chart summarizes

13  lots and lots of evidence that is going to go into the

14  record, but what is going to be seen in the record was that

15  it wasn't a bunch of people up at night on June 13th working

16  on a presentation of a plan for June 14th.  The efforts to

17  address the -- the pre-petition efforts to address the issues

18  stretch probably before December 21, '11, but I think at

19  least, as I understand the history and as the evidence will

20  certainly show, no later -- excuse me -- no later than

21  December 21, 2011, December 2011, a number of people within

22  state government and city government started focusing on the

23  fact that the Detroit financial situation was very serious

24  and had to be addressed.  And there were a number of efforts

25  that were attempted all through 2012 to try to grapple this

 1  problem -- with this problem short of requiring concessions

 2  from creditors, short of Chapter 9.  Kind of everything else

 3  you might think of doing was done by a large number of really

 4  devoted and qualified people.  Regrettably, it all failed,

 5  and -- but the part about -- you know, this first chart,

 6  which covers almost a year and a half on one page -- it was a

 7  lot of time and a lot of effort in a search for alternative

 8  solutions.  So forgetting the near-in -- what happened in the

 9  June and July time frame, which we'll get to in a second,

10  the -- it is clear that there was a tremendous amount of time

11  and effort considering the issues.

12       Next is the fourth item in the AFSCME list, the

13  Stockton list, the extent that alternatives to Chapter 9 were

14  considered.  I think alternatives broadly construed include

15  all of this, but then we'll turn to the time frame -- and all

16  of a sudden -- we just got this one up -- the time frame of

17  June and July, which we've blown up because so much happened,

18  onto its own separate chart, so let me pass this one out.

19       THE COURT:  So, ma'am, what's the number of that one

20  that you're just now taking down?

21       UNIDENTIFIED SPEAKER:  They're both Exhibit 104.

22       THE COURT:  Oh, both 104.  Okay.

23       MR. BENNETT:  And because so much more happened, at

24  least in terms of dates and places, in the June and July time

25  frame, we've blown that one up so that the last two months

 1    are their separate page.  And June was devoted to heavily

 2    trying to figure out whether the last round of possible

 3    alternatives, any conceivable kinds of out-of-court

 4    restructuring, could work, and what the evidence will show is

 5    that on this page, which shows all kinds of meetings and all

 6    kinds of different interactions with creditors, a concerted

 7    decision was made to exclude meetings with individual

 8    creditors or individual creditor representatives because it

 9    wouldn't be readable anymore, so this is just organized

10    meetings with different groups for different specific

11    purposes.  The other key to interpretation is when it says

12    "nonunion," it means the bonds, so the union -- for

13    purposes --

14            THE COURT:  Means what, sir?  Pardon?  It means

15    what?

16            MR. BENNETT:  The bonds.  "Nonunion" means --

17            THE COURT:  Bonds.

18            MR. BENNETT:  -- the bonds and other borrowed money

19    because there is a collection of notes involved in that side

20    of the case as well.  Where it says "union," it's really the

21    retiree representatives, which at the time were predominantly

22    union.  And so what this demonstrates -- again, it may be

23    part of the good faith piece, too, but for purposes of the

24    fourth prong of the Stockton test, I would say both of these

25    are relevant, both the long-term assessment of alternatives

1  that were short of debt restructuring, then the close-in

2  effort to figure out whether there was any conceivable way to

3  get something accomplished out of court.  It is perfectly

4  clear that there was an extensive effort to evaluate every

5  conceivable alternative that anyone could think of.

6        And then the last factor, factor five, whether the

7  city residents would be prejudiced by Chapter 9 relief.  As

8  we said in argument last week -- and the Court will hear

9  through extensive evidence -- and it's a really important

10  part of the case both for purposes of eligibility and for

11  everything that will follow -- the residents are dramatically

12  prejudiced by denying Chapter 9 relief.  Many of the problems

13  the city confronts in providing services to its residents is

14  because so many of its tax dollars are devoted to dealing

15  with bonds and other legacy liabilities.  That's the problem.

16  The taxpayer in Detroit puts up a dollar and gets back --

17  right now the number is something -- right now the number is

18  something like 58 cents, and the projections show it could be

19  some day 35 cents.  That's an unstable situation.  It's not

20  working now, it's not going to work in the future, and it has

21  to be changed.

22        The other side of the coin.  Very often the first

23  reaction in cases like this is raise taxes.  The evidence

24  will show -- it's summarized, by the way, in the June 14th

25  proposal -- that the taxes in Detroit are already the highest

1  in any municipality in Michigan; that we're already having

2  enforcement problems.  The city is already having enforcement

3  problems with respect to property taxes; that the property

4  tax assessments may be too high, not too low, indicating that

5  that revenue source is stressed as well.  There's nothing

6  left to do here.  There is no revenue solution.  So we have

7  come to a case, which is not necessarily like other Chapter 9

8  cases, where we have a very finite revenue pool, and it just

9  isn't enough to provide services and to pay debt, and, thus,

10  Chapter 9 is more needed here than in any other scenario you

11  can possibly think of.  The evidence will show that.

12       Last topic, and this gets a lot more technical, but

13  this is responsive to your Honor's suggestion that we had to

14  deal with a disputed issue of fact, and that was the

15  motivation for the inclusion of appropriations provisions in

16  PA 436.  Your Honor, I think the following is intended to

17  really indicate that that question isn't material, but I

18  think it's also -- when we did the research, we found that

19  it's also not a legitimate question for judicial review, so

20  I'm going to give you some citations, and I'm going to read a

21  very few quotes, and your Honor is clearly going to find more

22  when you look at this question.

23       In the State of Michigan, frankly, I think in other

24  places, et al. -- other places as well, the judiciary is not

25  supposed to engage in guessing about the legislature's

 1    intent.  The leading case about this turns out to be a

 2    referendum case in Michigan.  It's called Michigan United

 3    Conservation Clubs versus Secretary of State.  It's found at

 4    630 N.W. 2d 297.  Michigan United involved a review of a

 5    Court of Appeals decision -- I think it's called the Court of

 6    Appeals here -- a Court of Appeals decision that held, in

 7    fact, that the -- that an appropriations provision in gun

 8    control legislation was not going to prevent that legislation

 9    from being subject to a referendum, and the Supreme Court

10    reverses and says that that -- that the inclusion of that

11    provision is going to insulate that statute from the

12    referendum process.  And along the way, the Court was not

13    fractured in result but was fractured a little bit in

14    reasoning.  There's a collection of -- I think it's three

15    concurring opinions.  There's one judge who writes a

16    dissenting opinion.  I think it's just one, but I'm not a

17    hundred percent positive about that.  And so the lead -- the

18    first concurring opinion has this to say.  "This court has

19    repeatedly held that courts must not be concerned with the

20    alleged motives of a legislative body in enacting a law, but

21    only with the end result - the actual language of the

22    legislation."  And then there's a whole series of cases that

23    are cited to support that proposition that I won't read the

24    citations in the record unless your Honor wants them.

25          The next concurring opinion, Judge Corrigan's,

quotes from Justice Cooley's constitutional law thesis or textbook.  It looks like it may be a textbook.  And the quote, I think, is also instructive.  It's a little bit longer.  It says the following:  "to make legislation depend upon motives would render all statute law uncertain, and the rule which should allow it could not logically stop short of permitting a similar inquiry into the motives of those who passed judgment.  Therefore, the courts do not permit a question of improper legislative motives to be raised, but they will in every instance assume that the motives were public and benefitting (sic) the station.  They will also assume that the legislature had before it any evidence necessary to enable it to take the action it did take."

Then, your Honor, the next case you would find if you looked at this is Houston versus Governor, which is a 2012 case.  There's a longer -- 491 Michigan 876, 810 N.W. 2d 255.  And right near the front of the opinion there's a paragraph.  I'm only going to read two parts of the paragraph to save time.  "There is nothing that is relevant in this regard" -- that's in terms of interpreting a statute -- "that can be drawn from the political or partisan motivations of the parties."  I'm going to skip a sentence.  "Moreover, this court possesses no special capacity and there are no legal standards by which to assess the political propriety of actions undertaken by the legislative branch."

1          Now, of course, much of this makes sense because one

2   of the problems we scratched our heads about when we got back

3   to think about how we would address your Honor's question is

4   there are a whole bunch of legislators in two Houses that

5   conceivably had all kinds of different reasons for supporting

6   the appropriations.  It could well be that most of them put

7   the appropriations there because they really thought they

8   needed the money even if some thought they were putting it

9   there because it was a problem relating to the referendum

10  process.  I will tell you a very, very persuasive example of

11  the hazards of trying to figure out the intent of statutes

12  was impressed upon me by a law school, an example I learned

13  in law school, which was about the age 55 -- or the 55-mile-

14  per-hour speed limit, and it -- research turns out to show

15  that the purpose of that speed limit was to save fuel, and

16  the reason that it wasn't increased for a long time is

17  because it saved lives.  And so also the purpose of

18  legislation actually can change over time or the reason why

19  it stays there, so I think it's a hazardous inquiry.  I don't

20  think we know where to start.  I don't think we can drag all

21  the legislators in here and ask them all, and I think the

22  only other evidence you're going to see about this is,

23  frankly, inadmissible hearsay.

24          Maybe more importantly than this, I think I

25  indicated to your Honor in argument last week that I didn't

think there was any consequence to a determination by this

Court that the appropriation provisions might prevent a

referendum.  I said that the statute wouldn't be

unconstitutional.  It just would be subject to referendum.

Well, it turns out in the Michigan United case, one of the

concurrences goes back and gives everybody the history of

what happened in that case, and so how did that case wind up

in court to begin with?  And it wound up in court because the

persons, the group that wanted to have a referendum went out

and got the required number of signatures, went to the

appropriate office where the election is going to be held,

and the first response was no referendum because of the

provisions, and then they went to court to test it.  So I

think we're in a situation where, frankly, the only

circumstance where this issue of whether or not the

appropriate -- whether or not the appropriation provisions

are in there for an appropriate purpose would conceivably

come up is when a person or organization desiring a

referendum within the time specified by the statute -- and it

could conceivably have run; I couldn't figure that out --

actually collects the signatures, goes down to the

appropriate place and tries.  That never happened.

It also appears that even if a group or person

doesn't do that, there is an initiative process, which is

different from a referendum process, which they could have

1    triggered, and that process is not dependent in any way on

2    whether or not there's an appropriation provision in the

3    relevant statute.

4         And, finally, I think it was pointed out when we

5    were together last that the PA 436 contains a severability

6    clause, so what's left to have happen at this point is if

7    that provision is somehow inappropriate and has to be

8    stricken for some legally cognizable reason, the rest of the

9    statute is still there.  So I would say, again, summarizing

10   from where I started, there's two points here.  One is is

11   that I think your Honor has asked for an inquiry that is not

12   only impractical, it's not one for courts, but, in any event,

13   it's not material to anything because it doesn't lead us

14   anywhere that would change the result that we have PA 436 or

15   at least every single one of its provisions with or without

16   the appropriation provision to apply, and it's not upset by

17   reason of the possibility that a referendum could have been

18   attempted in some circumstances where one never apparently

19   has been attempted.

20        With that, if you have no more questions, I think

21   I'm done.

22        THE COURT:  Thank you.

23        MR. BENNETT:  Thank you.  I've been asked to offer

24   104 for demonstrable purposes only because it would not be on

25   the relevant lists.

1          THE COURT:  Is there any objection to 104 for

2    demonstrative purposes only?  All right.  The Court will

3    admit it for that purpose.

4          (Debtor's Exhibit 104 received at 11:25 a.m.)

5          MS. LEVINE:  Good morning, your Honor.  Sharon

6    Levine, Lowenstein Sandler.

7          THE COURT:  Let's just have the record clearly state

8    this.  Does the State of Michigan wish to make an opening

9    statement on the issue of the city's eligibility?

10          MR. SCHNEIDER:  No, your Honor.  However, we may

11    wish to make a closing statement.

12          THE COURT:  Thank you.  You may proceed.

13          MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

14    Lowenstein Sandler, for AFSCME.  I'm actually here in the

15    role of emcee.  As with the oral arguments, we have agreed to

16    work together to try and not duplicate efforts and to make a

17    cohesive presentation, so just to give your Honor a little

18    bit of an understanding, the Retirement System is going to,

19    in essence, go first, spend about 20 minutes going through

20    the timeline as we see it.  Following that, the Retired

21    Detroit Police Members Association will react to the city's

22    final portion of their statement and also to their particular

23    issues as reflected in the timeline and apply it to the

24    facts.  The UAW, the Public Safety Unions, the Retired

25    Association Parties, and AFSCME will each spend just a few

1  minutes indicating how we see any additional facts or how the

2  facts apply to our particular situations, and then the

3  Retiree Committee probably for 20 or 30 minutes will give a

4  global overview of applying the facts that came out in the

5  timeline to the law.  Thank you.

6          THE COURT:  Okay.  Well, do you think it's okay with

7  your group if at a convenient break around noon we take our

8  lunch break?

9          MS. LEVINE:  That would be great.

10         THE COURT:  Okay.

11         MS. GREEN:  Your Honor, can I move the -- oh, I'm

12 sorry.

13         THE COURT:  Yes.  Can we arrange to move that easel,

14 please?  You can try.

15         MS. GREEN:  Your Honor, Jennifer Green on behalf of

16 the Retirement Systems.

17         THE COURT:  Be sure you speak right into the

18 microphone even though you've angled the lectern there.

19                    OPENING STATEMENT

20         MS. GREEN:  As Sharon mentioned, we have put

21 together a slideshow presentation of the timeline.  We

22 believe that these facts will later be used to support

23 certain legal arguments that we will be raising throughout

24 trial regarding the fact that Chapter 9 was a foregone

25 conclusion well before any creditor negotiations occurred;

1  that Chapter 9 was filed in bad faith to circumvent the

2  pension clause, and we submit, respectfully, we disagree with

3  the city's assertion a moment ago that Chapter 9 was a mere

4  contingency, and our assertion is that it really was a

5  foregone conclusion before any of the creditor negotiations

6  ever occurred, and with that I will begin.

7         You may ask why we're going back this far to 2011,

8  but at his deposition, your Honor, Governor Snyder testified

9  that this has been a highly structured process for close to

10 three years, so we begin in January 2011 when Richard Snyder

11 takes office as the governor of the State of Michigan.

12        Shortly thereafter, just three months later, the

13 governor signs into law what we now refer to as PA 4.  The

14 legislation makes its way through both Houses within just 34

15 days.  February 2012, Stand Up for Democracy files with the

16 Secretary of State a petition to invoke a referendum on PA 4.

17 Just days later, within -- actually, within three days of

18 Stand Up for Democracy's petition, discussions begin

19 regarding ways to insulate PA 436 -- or what will become PA

20 436 eventually from referendum.  There are notations that

21 discussions were had with Andy Dillon, the treasurer of the

22 State of Michigan's office, and there are notes about Miller

23 Buckfire are going to follow up with Andy directly about the

24 process for getting this to the governor and a notation that

25 the cleanest way to do all of this is new legislation that

1    establishes a board and includes an appropriation for a state

2    institution.  If an appropriation is attached, it concludes,

3    then the statute is not subject to repeal by the referendum

4    process.

5           In April of 2012, the city enters into the consent

6    agreement with the State of Michigan.  Shortly thereafter,

7    Heather Lennox of Jones Day and Ken Buckfire of Miller

8    Buckfire purportedly meet with Governor Snyder on June 6th,

9    2012, to discuss the Detroit -- the City of Detroit's

10   financial crisis and issues related to potential 9 Chapter --

11   or Chapter 9 bankruptcy.

12          Prior to the meeting, in the e-mail that we

13   discussed earlier and that I quoted for you earlier during

14   oral arguments, there is a notation that Mr. Buckfire

15   suggested that all the memos be put together, the ones that

16   were done for Andy.  A list of those memos were compiled, and

17   three of those we think are pertinent to some of the issues

18   at trial in this case.  One of the memos was regarding a

19   summary and comparison of PA 4 and Chapter 9.  One was a

20   memoranda on constitutional protections for pension and OPEB

21   liabilities, and a third memo was analysis of filing

22   requirements of Section 109(c)(5) of the Bankruptcy Code, in

23   particular, negotiation being impracticable and negotiating

24   in good faith.

25          Two weeks after the meeting with Governor Snyder,

 1  Miller Buckfire is engaged by the State of Michigan to

 2  perform an analysis and review of the city's financial

 3  condition.  Shortly thereafter, Ken Buckfire testified that

 4  after he got this engagement, he started receiving phone

 5  calls from law firms seeing if he would be interested in

 6  helping them get inserted in --

 7          THE COURT:  I need to interrupt you for a second.

 8          MS. GREEN:  Am I going too fast?

 9          THE COURT:  Yes.

10          MS. GREEN:  I was trying to get done by noon.  I was

11  trying to get done by noon because you said you wanted to

12  break at noon.

13          THE COURT:  I really want to follow what you say,

14  so --

15          MS. GREEN:  I will slow down.

16          THE COURT:  -- I need you to slow down.

17          MS. GREEN:  I knew I only had 30 minutes, so I was

18  trying hard.

19          THE COURT:  Well, we don't have to stop right at

20  noon.

21          MS. GREEN:  Okay.  I will slow down.

22          THE COURT:  But slow down for me by about 50

23  percent.

24          MS. GREEN:  Wonderful.  I get this a lot, so I know

25  I'm a fast talker.  The discussion continues.  Mr. Buckfire

1   testified that Corrine Ball had wanted him to meet one of her

2   partners, who was successful in a Chapter 9 case.  This is in

3   2012.  In October of 2012, PA -- before PA 4 is even rejected

4   by the voters, the Treasury Department and the Governor's

5   Office begin discussing creation of a new emergency manager

6   statute just in case the referendum is passed.  Howard Ryan,

7   who is the 30(b)(6) witness for the State of Michigan, will

8   testify to that.  Shortly thereafter, November 6th of 2012,

9   the Michigan electorate rejected PA 4.

10        In December Senate Bill 865, which would eventually

11   become PA 436, was introduced in the Michigan legislature.

12   The final version is adopted by both Houses just 14 days

13   later on December 15th, and around that same time the

14   treasurer commences a preliminary review of the city's

15   finances under PA 72 and determines that a serious financial

16   problem exists in the City of Detroit.

17        At the end of December, the governor of Michigan

18   signs PA 436 into law, submits it to the Secretary of State.

19   The entire process for PA 436 took only 26 days, and it is

20   insulated from public referendum because it contains what the

21   objecting parties submit is a minor appropriation of $5.8

22   million, which is less than .009 of the state budget, and

23   below we have the citation from the exhibit that sets forth

24   the amount of the state budget.

25        In connection with the PA 436 appropriation, the

1  state 30(b)(6) witness testified at his deposition that he

2  was aware that the appropriation was included for the purpose

3  of insulating it from referendum.  He was asked the question,

4           "Do you recall when that provision of the

5           legislation was added to the draft bill?"

6           Pretty early on, I believe.  It was quite early,

7           maybe from the inception."

8           He was then asked,  "Based on your conversations

9  with the people at the time, was it your understanding that

10  one or more of the reasons to put the appropriation language

11  in there was to make sure it could not -- the new act could

12  not be defended by a referendum?"  He answered, "Yes."

13           "Where did you get that knowledge from?

14           Well, having watched the entire process unfold

15           over the two -- past two years.

16           The governor's office knew that was the point of

17           it?

18           Yes.

19           That your department" -- his is the treasury --

20           "knew that was the point of it?

21           Yes."

22           In January of 2013, Miller Buckfire was reengaged,

23  this time by the City of Detroit, to continue its evaluation

24  of the city's financial condition.  Mr. Buckfire was then

25  asked by Treasurer Dillon to make arrangements for the city

1   and state officials to meet and interview Jones Day and seven

2   other law firms that were interested in serving as

3   restructuring counsel.

4           The day before the pitch presentation with the City

5   of Detroit, Kevyn Orr, who attends the pitch, receives an e-

6   mail recounting conversations with Mr. Buckfire -- Mr.

7   Buckfire will be testifying live during this trial -- and

8   listed are the questions that will be asked the following day

9   at the pitch.  They all relate to Chapter 9.  "Given the

10  issues that Detroit faces, how can they address them outside

11  of Chapter 9?" is the first, but all the rest are, "Under

12  what circumstances should Chapter 9 be used?"  "How would one

13  execute a low-cost fast Chapter 9?"  "Given Chapter 9

14  experience, what went wrong with JeffCo and Orange County?"

15  And at the bottom, "If Miller Buckfire finds a way to

16  monetize assets and create liquidity, how would that impact

17  eligibility?"

18          The next day on January 29th, Jones Day presents its

19  restructuring strategy to the city and state officials, and

20  it explains that while out-of-court solutions are preferred,

21  they conclude they are extremely difficult to achieve in

22  practice.  They note that Chapter 9 can create negotiating

23  leverage negotiating with the backdrop of bankruptcy, which

24  we submit is not good faith.

25          They further conclude in their strategy that an out-

1   of-court plan should contemplate the possibility of Chapter 9
2   because it creates leverage, you can negotiate in the shadow
3   of Chapter 9, and it helps bolster your eligibility and your
4   success in a Chapter 9 by establishing a record of seeking
5   creditor consensus.

6           There are notes on the slide that state, "A good
7   faith effort to pursue an out-of-court restructuring plan
8   will establish that clear record and will deflect any
9   eligibility complaints based on alleged failure to negotiate
10  or bad faith.  If needed, though, Chapter 9 could be used as
11  a means to further cut back or compromise, quote, 'accrued
12  financial benefits otherwise protected under the Michigan
13  Constitution.'"

14          The next day Richard Baird, who's Governor Snyder's
15  consultant, reaches out to Jones Day to inquire about hiring
16  Kevyn Orr as the emergency manager.  The following day,
17  Mr. Orr calls PA 436 a clear end-run around the prior
18  initiative that was rejected by the voters in November and
19  also comments, "So although the new law, PA 436, provides the
20  thin veneer of a revision, it is essentially a redo of the
21  prior rejected law and appears to merely adopt the conditions
22  necessary for a Chapter 9 filing."

23          THE COURT:  What do those statements appear in?

24          MS. GREEN:  It's Orr Exhibit 4, JDRD0000295.  It's
25  an e-mail.

1          THE COURT:  Right, but what is that?

2          MS. GREEN:  An exhibit.  It's an e-mail.

3          THE COURT:  An e-mail.  Thank you.

4          MS. GREEN:  E-mail.  I'm sorry.  In February of

5     2013, Mayor Bing was approached by Mr. Baird regarding Kevyn

6     Orr as the candidate for the emergency manager position, and

7     Mayor Bing recalls that the only salient qualifications he

8     was offered about Mr. Orr was his bankruptcy experience.  Mr.

9     Baird told him about Kevyn Orr's experience in part of the

10    Chrysler bankruptcy team, and Mr. Orr -- Mayor Bing was

11    asked, "Did you ask Mr. Baird anything else about Mr. Orr's

12    qualifications to serve as emergency financial manager?"  And

13    then he answers, "He -- yes, I did, and he felt that not only

14    was he a lawyer that dealt with bankruptcy for over 30 years,

15    but he also had some qualification as it related to

16    restructuring."  "And did Mr. Baird indicate that Orr had

17    qualifications concerning restructuring outside the context

18    of bankruptcy?"  "That would be no" was his response.

19          In March the governor declared that a local

20    government financial emergency existed in the City of

21    Detroit.  At the end of March, Kevyn Orr was appointed

22    emergency manager of the City of Detroit.  On March 28th PA

23    436 becomes effective, and in April of 2013 Jones Day is

24    engaged as legal counsel for the City of Detroit.

25          After being appointed emergency manager, Kevyn Orr

1  is quoted on May 12th, 2013 -- we've all heard this quote,

2  but I'll say it again -- that the public can comment on the

3  city's financial and operating plan, but we are not, like,

4  negotiating the terms of the plan.

5       The day before presenting its proposal to the

6  creditors, Mr. Orr gives an interview with the <u>Detroit Free</u>

7  <u>Press</u> and expresses his intent to evade the pensions clause

8  through a federal Chapter 9 bankruptcy proceeding, and we

9  have quoted for you the portion of that interview and

10  highlighted it in yellow.  He states, "If you think your

11  state-vested pension rights, either as an employee or

12  retiree -- that's not going to protect you.  If we don't

13  reach an agreement one way or the other, we feel fairly

14  confident that the state federal law, federalism, will trump

15  state law."

16       On June 14th, the emergency manager held a meeting

17  at the Detroit Metropolitan Airport and presented the city's

18  proposal for the creditors.  The evidence will show that the

19  city proposed to fully -- fully intended to impair or

20  diminish accrued financial benefits.  This is an excerpt from

21  the proposal for creditors, and it clearly states that with

22  respect to unfunded pension liabilities, quote, "such

23  contributions will not be made under the plan."  And it

24  further states there must be, quote, "significant cuts in

25  accrued vested pension amounts for both active and currently

1  retired persons."

2       On June 20th, the emergency manager undertook a

3  presentation regarding the city's finances and plan

4  restructuring to both uniform and nonuniformed retirees.

5  Numerous witnesses who attended this meeting, several of

6  which will be testifying at trial, will testify that they did

7  not observe or participate in any negotiations regarding the

8  city's financials and that these meetings were purely

9  informational.

10      On June 27th following this presentation that I just

11  spoke of, the city sends a letter to the UAW thanking them

12  for their time in participating in the meeting, and in that

13  letter even the city acknowledged that the unions would need

14  more information moving forward.  The letter here is quoted,

15  "The city recognizes that representatives of active and

16  retired employees will need access to additional information

17  to analyze the restructuring proposals outlined in the June

18  20 meetings.  Information relevant to these proposals will be

19  made available in the on line data room," but at this time on

20  June 27th, that information, as they were saying, was not yet

21  available.

22      Five days later on July 23rd Gracie Webster and

23  Veronica Thomas commenced lawsuits against the State of

24  Michigan, the governor, and the treasurer seeking a

25  declaratory judgment that PA 436 violated the pensions

1   clause, and they also sought an injunction.

2          In July when several of the creditor meetings took

3   place, the evidence will show that the city had no intention

4   of actually negotiating with its creditors.  By July 8th you

5   will see an e-mail with an attachment of a timeline and a

6   communications roll-out demonstrating that the city had

7   already determined that its Chapter 9 petition was going to

8   be filed on July 19th.  There's a timeline crafted by the

9   State of Michigan that identifies July 19th as a filing date

10  despite the fact that the creditor meetings had not yet

11  occurred.  Therefore, the objecting parties submit that

12  Chapter 9 was already a foregone conclusion before the city

13  met with its creditors on July 10th and 11th.  In fact, here

14  is a copy of that Chapter 9 roll-out, communications roll-out

15  that I spoke of.  In an e-mail from Kevyn Orr's press

16  secretary, Bill Nowling, to certain state officials, he lays

17  out the communications plan.  And if you go down to the

18  yellow portion, it starts with, "We negotiated in good faith

19  with all of Detroit's creditors."  Mind you, several of the

20  meetings had not yet even occurred.  "We presented a

21  comprehensive restructuring plan to creditors in June.  At

22  this point, it would be impractical to continue discussions

23  out of court because it is clear that we will be able to

24  reach agreement with some creditors only through a court-

25  supervised process, and the State of Michigan has authorized

1  the emergency manager to take this step."  This is on July

2  8th.

3          The timeline attached to that communications roll-

4  out on Thursday, July 18th, states that, "Last minute

5  revisions will be made to all the key documents," and on

6  Friday, July 19th, which is in bold and capital letters

7  called "The Filing Day," at nine o'clock the Governor's

8  Office is supposed to transmit the authorization letter to

9  the emergency manager, and at ten o'clock on the 19th the

10  necessary paperwork is supposed to be filed with the court

11  system, and then a series of press conferences are to be

12  held.

13          The following day, on July 9th, an e-mail from

14  Treasurer Dillon to the governor of the State of Michigan

15  states that, "We are still in the informational mode."  This

16  e-mail is interesting for several reasons.  First, it states

17  that Kevyn will meet the Detroit pensions the following day,

18  on July 10th.  It says there will be no exchange of documents

19  and that he will not translate that -- the information that

20  he gives into an impact on retiree or employees' vested

21  rights.  Treasurer Dillon continues and says that there are a

22  lot of creative options that we can explore to address how

23  they will be treated in restructuring with respect to the

24  pensions, but at his deposition when he was -- when he was

25  asked whether these creative options were ever explored

1    directly with the Retirement Systems, Dillon said no.  And

2    it's not up there, but he also was asked if they were ever --

3    these creative options were put into written reports or

4    formal proposals, and he also said, no, they were not.

5         Further in the e-mail he says to the governor,

6    "Tomorrow's meeting could lead to questions directed to you

7    about your view on this topic.  In my view, it's too early in

8    the process to respond to hypothetical questions.  We remain

9    in many ways in the -- at the informational stage."  This was

10   just one week before the filing.  And Mr. Dillon admitted at

11   his deposition that nothing changed between July 9th and the

12   filing date of July 18th that would take them out of this

13   informational stage, as he called it.

14        On July 10th and 11th, there were a series of

15   creditor negotiations -- alleged creditor negotiations that

16   took place.  The emergency manager himself did not even

17   attend, but witnesses who did attend the meeting will testify

18   that they did not observe or participate in any negotiations

19   regarding the city's finances and that, again, these meetings

20   were purely informational.  And this is consistent with the

21   state treasurer's report to the governor that as of July 8th,

22   we are still in the informational mode.  It's also consistent

23   with Mr. Orr's admission at his deposition when he was

24   questioned, "There were no actual negotiations at the June

25   14th meeting, were they?"  And he answers, "No, not as it's

1   generally understood."

2          Lastly, the fact that there were no negotiations on

3   July 10th and 11th is consistent with the city's and the

4   state's communications roll-out, which already adopted the

5   excuse that negotiations were going to be impractical.

6          On July 12th, following those meetings, the Detroit

7   Fire Fighters Association sends a letter to the emergency

8   manager asking for more information and stating, "It would be

9   productive if the city could provide us with its specific

10  proposals on pension benefit restructuring as soon as

11  possible.  We have two meetings with the city where pension

12  benefits were addressed and still have only the city's

13  general observation that pension benefits must be reduced."

14  At trial Mark Diaz, the president of the Detroit Police

15  Officers Association, and Dan McNamara, president of the

16  Detroit Fire Fighters Association, will testify that no

17  specific proposals were ever given by the city after this

18  letter, and instead the city filed bankruptcy just six days

19  later.

20         On July 15th the Webster defendants filed a response

21  brief and a motion for summary disposition.  In that court

22  paper, the state asserted that a bankruptcy filing by the

23  City of Detroit is, quote, "only a possibility that

24  plaintiff's claims were, quote, 'unripe, premature, and based

25  on a speculative threat of future injury.'"  And mind you,

1  this position is taken in open court, which conflicts with

2  the timeline that had already been circulated within the

3  Governor's Office that slated the filing date as just four

4  days later.

5      On July 16th Mr. Orr submitted the bankruptcy

6  recommendation letter to Governor Snyder and Treasurer

7  Dillon.  In that letter he stated that dramatic but necessary

8  benefit modifications must be made.  The governor

9  acknowledged that he read that letter before authorizing the

10  filing and that he knew that the city's request for

11  authorization that dramatic cuts be given would be part of

12  any Chapter 9 process.  He also testified that he knew,

13  quote, "based on the facts going into it, there was a

14  likelihood accrued pension benefits would be reduced in the

15  Chapter 9 case."

16      The next day, the Detroit Public Safety Unions

17  received correspondence from the city thanking them on behalf

18  of the emergency manager for their, quote, "strong

19  cooperation regarding the City of Detroit pension

20  restructuring."  Later that same day, the Retirement Systems

21  filed their lawsuit against the governor and the emergency

22  manager in Ingham County Circuit Court seeking declaratory

23  relief.  That same night at 6:23 p.m. the governor's press

24  secretary, Sara Wurfel, circulates an updated timeline that

25  still shows the bankruptcy filing date of Friday, July 19th.

1  This is July 17th at 6:23 p.m.  The following day, the

2  Retirement Systems filed a motion for a TRO seeking an

3  injunction.  At 3:05 p.m. that afternoon, Margaret Nelson of

4  the Attorney General's Office received a telephone call

5  informing her that Retirement Systems were in court seeking a

6  TRO.  At 3:47 the governor e-mailed his authorization letter

7  to Orr and to Treasurer Dillon, and at 4:06 Orr changes the

8  date on the filing papers from July 18th, crosses out the 19

9  because it was supposed to be filed the 19th, handwrites in

10 an 18 and files the petition one hour and one minute after

11 finding out that the Retirement Systems were in court seeking

12 a TRO, which is inconsistent with the timeline sent at 6:30

13 the night before saying it was going to be on Friday.

14       And at 4:10 p.m. the attorney general appears for

15 the TRO hearing in Ingham County.  This is reflected in the

16 papers filed by the state, the docket history and the hearing

17 transcripts.  Orr later admitted that he was being counseled

18 that it would be, quote, irresponsible not to file the

19 petition sooner rather than later given all the lawsuits that

20 were popping up.

21       On July 19th, the following day, the declaratory

22 judgment was entered against the governor, the treasurer, and

23 the State of Michigan and that declaratory judgment states PA

24 436 is unconstitutional and in violation of Article IX,

25 Section 24, of the Michigan Constitution, and it further

1  states the governor is prohibited from authorizing an

2  emergency manager to proceed under Chapter 9, yet the city

3  filed its Chapter 9 petition despite the fact that each of

4  its advisors uniformly testified at their depositions that

5  the city's financial information was still incomplete as of

6  the filing, and, in fact, today it is still incomplete.

7          Charles Moore, senior managing director at Conway

8  MacKenzie, testified that quote, when he was asked, "Has

9  there been a specification of those level of cuts that the

10  city contends must occur?"  He says, "I mean have you put a

11  dollar amount on it?"  He answers, "No.  Our analysis of this

12  continues.  Right now we still don't know what assets could

13  be available to put toward the pensions.  We still have not

14  had the type of dialogue that we would like to have related

15  to the calculation of the unfunded amount, so because of

16  those two uncertainties, among others, we don't know what

17  cuts, if any, there may need to be."

18          The state treasurer also agreed that as of July 8th,

19  just a week before the filing, "I thought that the situation

20  was not understood enough for the governor to go on record

21  yet because I couldn't even tell him with any degree of

22  confidence what level of funding the pension funds had, so

23  why should he get in the middle of a debate about this?"

24          In addition, as of the petition date -- and I

25  believe the city's witnesses will testify consistent with

1   their depositions -- that to date the city still -- the city

2   still does not know the value of two of its primary assets,

3   including the Water and Sewage Department and the city-owned

4   artwork at the Detroit Institute of Arts.  Because the city

5   still does not know what assets are available to satisfy

6   liabilities, does not know the scope of the liabilities, it

7   is the objecting parties' position that the Chapter 9 filing

8   was premature and not made in good faith.  Thank you.  I

9   believe Mr. Ullman may be following me.

10          THE COURT:  Okay.

11          MS. GREEN:  I apologize.  It's Lynn Brimer.

12          THE COURT:  Okay.  Perhaps we should move that

13   lectern back to center, huh?

14          MS. BRIMER:  I can do that.

15          THE COURT:  Okay.  Thank you.

16          MS. BRIMER:  Is this good, your Honor?

17          THE COURT:  That's great.  Let me just ask will

18   there be other uses of the projector during openings?

19          ATTORNEY:  Yes, your Honor.

20          THE COURT:  Okay.

21                    OPENING STATEMENT

22          MS. BRIMER:  Good morning, your Honor.  And, your

23   Honor, I thank Mr. Bennett for raising the legal issues with

24   respect to the spending provision because it at least makes

25   me more comfortable as to why I thought it's so important we

 1  clarify the record on the discovery matters with respect to

 2  which law had a spending provision added onto it.

 3          THE COURT:  Okay.

 4          MS. BRIMER:  So rather than address my opening issue

 5  to begin with, would the Court like me to address the legal

 6  issues raised by Mr. Bennett, or would you like the legal

 7  issue -- I am prepared to briefly discuss those.  I don't

 8  have a written preparation, but I do think it's important for

 9  the Court to understand I did look at the case that

10  Mr. Bennett cited.  I didn't disregard any case law when

11  coming to this Court and believing that there was a factual

12  issue.

13          With respect to the Michigan United case, I think

14  it's factually distinguishable again.  That case did not

15  involve an original law that did not have a spending

16  provision that was overturned on referendum and then a new

17  law presented.  In that case, your Honor, the issue was

18  whether or not the spending provision itself added in the

19  original law such that it was not subject to referendum was,

20  in fact, an appropriate provision taking it out of the

21  referendum provision.  You know, under -- your Honor, that is

22  not the facts that we have before us today.

23          In addition, your Honor, I have reviewed Justice

24  Corrigan's opinion, which, by the way, was a concurring

25  opinion, not the Court's majority opinion, but she addressed

1   the issue of intent and that, generally speaking, we do not
2   look to the motive or intent of the legislature --
3   legislative body when passing a law, but she said this is
4   because -- and she notes this in a footnote -- this is
5   because, generally speaking, we do not have any testimonial
6   record regarding motive or intent.  That would be, your
7   Honor, in her concurring opinion.  There is no testimonial
8   record in the -- in this original action regarding the motive
9   or intent.  Well, your Honor, that is simply not the case in
10  this matter.  As Ms. Green read to you and as I quoted from
11  the state's own 30(b)(6) witness, we have evidence regarding
12  the motive of the inclusion of the spending provisions on an
13  act that had previously been rejected on referendum.  We
14  believe that factual issue is important to this Court in
15  determining that whether or not some or all of PA 436 should
16  have been subject to the second provision that everyone seems
17  to gloss over in Article II, Section 9, of the Constitution,
18  which states specifically that no law that has properly been
19  submitted to referendum can then -- and rejected can then be
20  passed without a referral back to the general electorate.

21          Your Honor, the cases cited by the state, Ms.
22  Nelson, of Reynolds v. Martin and the case cited this morning
23  just simply are not factually similar enough to PA 436 to be
24  controlling, and we do -- and, you know, my closing -- my
25  opening can be as simple as, your Honor, the evidence will

1   show that the motive of including the spending provisions was

2   to, in fact, take an act that had previously been overturned

3   on referendum and disregard the will of the people, and it's

4   very clear.  The state's attorney argued yesterday that we

5   knew what the people's will was because we have the media.

6   Well, we know what the people's will was.  The people's will

7   was that we not have an emergency manager who would supplant

8   the democratically elected officials in the City of Detroit,

9   and that was very clear, and yet we now have PA 436, which

10  disregarded that, which added a spending provision to it, and

11  the facts will demonstrate that we can establish what the

12  motive was in adding those spending provisions.  And,

13  moreover, we can establish that the emergency manager,

14  Mr. Orr, was fully aware of that at the time he accepted his

15  appointment as the emergency manager.  I'll conclude --

16      THE COURT:  Well, how do you -- how do you deal with

17  Mr. Bennett's argument that if the issue is ever appropriate

18  for court review, it is not appropriate until petition

19  signatures are collected on the bill that has the spending

20  provision in it and the petitions are rejected because it's

21  not the kind of a law that can be subject to a referendum?

22      MS. BRIMER:  Well, certainly I don't think there's

23  any case law that would suggest that the people be required

24  to take an act which on its face would be rejected.  I'm not

25  sure I'm aware of any case law that would suggest that the

1  people had to refer that case -- the law to a referendum and

2  have it denied because of the failure -- or the inclusion of

3  the spending provision.  At issue here, your Honor, is

4  whether or not the act is sufficiently similar enough, not

5  that it had to go back to referendum, but whether it's

6  sufficiently similar enough that the second provision would

7  require that it be deemed to be unconstitutional because it

8  was not presented to the people again.

9  THE COURT:  Okay.  All right.  Let's take our lunch

10  break now.  Before we do, I want to remind everyone that we

11  are guests here in this building, and we need to maintain

12  decorum and silence while we are in the hallways.  Please

13  don't linger in the halls.  You can have your conversations

14  here in the courtroom over lunch if you'd like to do that, or

15  in the elevator or on the 1st floor, but please maintain

16  silence in the hall.  Let's see.  It's noon.  We'll reconvene

17  at 1:30, please, and that's it.

18  THE CLERK:  All rise.  Court is in recess.

19  (Recess at 11:59 a.m., until 1:30 p.m.)

20  THE CLERK:  Court is in session.  Please be seated.

21  THE COURT:  Counsel are present.  We have a couple

22  of housekeeping matters that we need to address before we

23  continue with our opening statements, please.  The first is

24  that in the amended final pretrial order that was submitted

25  through our order processing program, on Attachment G, which

1   is the attachment from the Retirement Systems, the exhibit

2   numbers were omitted.  I'm sure that was inadvertent, so

3   please fix that and resubmit it as soon as possible so that

4   we can get it entered.  Okay?

5          ATTORNEY:  Of course, your Honor.

6          THE COURT:  And then a second brief housekeeping

7   matter is -- is Ms. Green still here?

8          ATTORNEY:  She's not here yet, your Honor.

9          THE COURT:  Okay.  Mr. Gordon, just to keep the

10  record a hundred percent clean, we need to put an exhibit

11  number on a paper version of the slide presentation so that

12  for the record that is identified, whatever exhibit number

13  you want to put on it.

14         MR. GORDON:  All right.  Very well, your Honor.

15         THE COURT:  Okay.

16         MR. IRWIN:  Your Honor, will counsel be provided a

17  copy of that when it's done in that way?

18         THE COURT:  Can you do that?

19         MR. GORDON:  Yes, absolutely.

20         THE COURT:  Okay.  All right.  We are ready to

21  proceed.

22                    OPENING STATEMENT

23         MR. WERTHEIMER:  William Wertheimer, your Honor, on

24  behalf of the Flowers plaintiffs.  I'll be very brief, and I

25  just want to add a couple of points relevant to the timeline

1    that Ms. Green was showing you.  I do not have a clicker, but

2    I'll just state them.

3                THE COURT:  Okay.

4                MR. WERTHEIMER:  That is, first, on July 3rd the

5    Flowers lawsuit was actually filed before the Webster

6    lawsuit.  They were both filed on July 3rd, so they were both

7    filed that day.  Second, on the same day, both Flowers and

8    Webster cases, Judge Aquilina signed orders to show cause

9    setting a hearing for the preliminary injunction that we were

10   seeking for July 22nd so that -- and those were served on the

11   governor and the treasurer on July 3rd so that at the point

12   in time on the timeline a few days later when they're setting

13   the putative bankruptcy for July 19th, Friday, they know that

14   the state court preliminary injunction hearing is being

15   scheduled for July 22nd, the following Monday.  That's it.

16   Thank you.

17                THE COURT:  Okay.

18                     OPENING STATEMENT

19                MS. CECCOTTI:  Good afternoon, your Honor.  Babette

20   Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  Ms.

21   Green's timeline was very complete and detailed.  I do want

22   to just -- because I don't think this particular slide was up

23   there, so I would like to mention the pitch book again.  Ms.

24   Green had a slide from the Jones Day pitch book from January

25   20, 2013, and one thing that -- when your Honor goes through

1 the pitch book you'll notice that there are, you know, a

2 few -- quite a few, I would say, or certainly more than one

3 or two references to the use of Chapter 9 either itself or

4 the shadow of Chapter 9 as leverage vis-a-vis creditors, vis-

5 a-vis specific proposals and claims related to labor costs,

6 and I think Ms. Green showed the slide with the quote on

7 there about using Chapter 9 to reduce accrued financial

8 benefits.

9 The other thing that I'd like to mention about the

10 pitch book, which really does become something of a

11 blueprint, I think, for what follows, is at page 57 there's a

12 slide that reads, "Any Chapter 9 process should be

13 comprehensive," and it starts with the bullet, "plans of

14 adjustment address narrow range of economic compromises."

15 And then it talks -- and then there are other bullets that

16 follow, "other fundamental changes must occur outside the

17 plan context," "any Chapter 9 process should pursue as many

18 revitalization initiatives as possible," "negotiating in

19 Chapter 9 or its shadow is a powerful tool for

20 revitalization," and, finally, "the city should take

21 advantage of its opportunity for long-term comprehensive

22 solutions."

23 So that's actually a good segue to June 14th

24 proposal because, as we've talked about before in the other

25 arguments that we've had, this is really a massive

comprehensive revitalization proposal that really has
elements of more or less what that slide that I just read you
is talking about. It's got -- the plans include a $1.25
billion spending program going out over ten years. There are
many detailed wide-ranging initiatives that have to do with
improvement of services, upgrades, reinvestment, and the
like, and there is also a restructuring proposal. There's a
section called "restructuring proposal." I don't have to
take you through that because we've been through it a number
of times. You know what the pension proposal -- what the
pension proposal is, but the point being that the -- just the
four corners of the proposal itself, what that reflects in
terms of what it is that the city is trying to pursue through
Chapter 9.

In terms of the events following the launch of that
proposal on June 14th, I think that we see a number of
things, and the evidence will show this. As we saw actually
from Mr. Bennett's slide, the number of meetings that
actually occur on this proposal -- regarding this proposal
are relatively few. It's a limited number of sessions.
Regardless of how we're characterizing them, there's at least
one document that refers to one of the meetings as
informational, in fact.

We have the data room issue. Ms. Green read the
letter or showed the letter to the UAW regarding the fact

that the data room wasn't quite up and running yet, but what
is also true about the data room, as your Honor knows from
the early days of this case, is that in order to access the
data room, one had to sign a confidentiality agreement and an
additional release to get the Milliman pension materials, and
my client, at least, took issue with that prior to the
bankruptcy, and others may -- other groups may have as well,
so you had this quite massive proposal, a series of really a
handful of meetings being held with the data that the city
was loading into the data room about the proposal not readily
available.

In addition, as I mentioned, these were not -- there
were just a few of these meetings, and I think the evidence
will show that they wouldn't really constitute labor
negotiations. The unions, you know, have various ways that
they talk about that in the evidence. They are fairly
well -- I guess I'll just use the word "highly organized" or
the phrase "high organized" by the city, including one
meeting where -- at least one meeting where if there were
questions about the proposal, those in attendance were
required to submit them on cards, and the cards would be read
as opposed to any sort of free flowing give and take that one
might associate with a meeting with stakeholders that we
might think about in terms of going over a restructuring
proposal or even a labor proposal.

 1          So now I'd like to get to Mr. Bennett's comments
 2   about the UAW because I think this really does -- that this
 3   is really a very important point.  Yes, it is true that, as
 4   we know, the proposal included the cessation of funding to
 5   the Retirement System and the statement about -- the
 6   statement that significant cuts to accrued vested pension
 7   benefits would be necessary, so, yes, on its -- the UAW's
 8   position is, yes, on its face, looking at that on page 109,
 9   if that's the right page, that is a proposal that violates
10   the Michigan state Constitution, and the immediate questions
11   that arises on its face just looking at it like that is how
12   could it be accepted.  How could it be accepted by a labor
13   union?  How could it be accepted by anyone purporting to
14   speak for or represent actives or retirees?  So, yes, on its
15   face the proposal was not acceptable, and we believe that
16   that has legal consequences as distinct from fact
17   consequences, so I do want to make that point about the --
18   about our objection -- our amended objection in that regard.
19   We very much believe that that has legal consequences.
20          As a factual matter, however, and notwithstanding
21   the fact that the proposal on its face could not be accepted,
22   you couldn't simply hand it to the union with a signature
23   line and say, "Here, sign," the UAW, through its general
24   counsel, contacted Jones Day on July 9th, and we'll have a
25   witness to this effect, and we have an exhibit on it as well,

1  to raise a couple of points, one regarding the data room and

2  the confidentiality issue that I mentioned already.  Then in

3  response to the letter that Mr. Bennett's chart showed trying

4  to ask the labor organizations and the retiree groups if they

5  would be representing their retirees, the e-mail to Jones Day

6  reads as follows:  "Further to its reservation of rights, the

7  UAW continues to seek an answer from Mr. Orr and your firm as

8  to the following:  Please cite the basis for any claim that

9  the UAW has the authority to compromise the vested benefits

10  of active and/or retired UAW or former UAW members employed

11  or formerly employed by the City of Detroit and its

12  affiliates.  As I presume you know, Article IX, Section 24,

13  of the Michigan Constitution provides in pertinent part that,

14  quote, 'the accrued financial benefits of each pension plan

15  and Retirement System of the state and its political

16  subdivisions shall be a contractual obligation thereof which

17  shall not be diminished or impaired thereby,' unquote.

18  Please tell me what authority your firm and/or Mr. Orr

19  believe gives the UAW the right to compromise vested pension

20  benefits despite the contrary provisions of Article IX,

21  Section 24.  Please tell us -- please also tell us whether

22  Mr. Orr and/or your firm take the position that Article IX,

23  Section 24, of the Michigan Constitution is not or may not be

24  binding on the City of Detroit, the State of Michigan,

25  Governor Snyder, Mr. Orr, or the UAW and state, if that is

1  the case, under what circumstances you believe that Article

2  IX, Section 24, would not bind some or all of these persons

3  or entities.  We also seek the answer to the same question

4  with regard to vested post-retirement insurance benefits,"

5  and then there's a reference to the Supreme Court's decision

6  in the Pittsburgh Plate Glass case.  And the letter makes it

7  clear that, again, from the UAW's perspective, "We do not

8  understand the July 10 and 11 multiple stakeholder meetings

9  to which we have been invited to be a forum for negotiations

10  of your proposed pension and retiree healthcare changes but

11  are willing to attend and obtain for our union whatever

12  information may be provided at those meetings," and then --

13  and, finally, "Your full answers to the questions posed in

14  the foregoing paragraphs of this message will help the UAW

15  determine the scope of any such negotiations and the UAW's

16  decisions regarding its representative capacity in them about

17  which your firm has inquired."  So we very much have a

18  factual case as well as a legal case regarding the

19  implications of the proposal, and I did want to make that

20  clear for the record, the point being that what is in this e-

21  mail represents some fairly fundamental questions about the

22  ground rules upon which discussions or negotiations with the

23  city regarding its proposal can proceed.

24        I should note that -- and we'll have testimony to

25  this effect -- that no answer was forthcoming from the city

1   and, as far as I know, has not been forthcoming regarding the

2   questions posed other than obviously when we got into

3   bankruptcy, your Honor solved the problem of the data room.

4           Time frame.  Putting aside the lawsuits and all of

5   the activity surrounding all of that, it does appear that the

6   city set out a timeline for itself that only had about a 30-

7   day period for this launch notwithstanding everything that's

8   in that proposal and everything that was expected apparently

9   to be accomplished by it.  I think I heard Mr. Bennett refer

10  to something like evaluation week, which was supposed to

11  occur on or which probably did occur -- I gather it did occur

12  on July 15th.  That's really a month later.  So one -- now,

13  Mr. Bennett's timeline, of course, goes way back -- I think

14  it was to 2011 and the various initiatives to deal with

15  Detroit's problems, and we are certainly not denying any of

16  those or -- and I'm sure everyone is fully cognizant of --

17  particularly those who live here are fully cognizant of all

18  of those efforts, but we think, as a legal matter, that those

19  efforts really don't legally count.  They obviously count to

20  the citizens of Detroit, but for purposes of eligibility, the

21  relevant time frame, from our perspective, is the proposal is

22  launched on June 14th and then apparently evaluated -- the

23  response or reaction apparently evaluated merely -- a mere

24  four weeks later.

25          So during this time, again, the evidence, we

believe, will show that during the same sort of compressed
time period, we know that the governor and the emergency
manager are meeting on a fairly regular basis.  We know that
the governor had seen the June 14th proposal.  He had a draft
of it before it was launched.  He knew about the pension
proposal.  He knew that there was an issue -- a legal issue
with respect to Article IX, Section 24, of the Michigan
Constitution and the effect, if any, of the Bankruptcy Code
and federal law on the continued enforcement of that section.
He knew it was a serious issue.

        We know, again, since we've discussed it most
recently last week at the argument that we then march through
the timeline to get to Mr. Orr's July 16th request and the
governor's July 18th response.  We know that the governor
obviously from the dates signed it only two days later
apparently with a review of all of the material that was
contained in Mr. Orr's letter, I think could probably best be
characterized as limited.  It does not appear that there was
an independent evaluation that the governor conducted
regarding many of the sort of predicate items that Mr. Orr
laid out in his letter.  The governor was also aware, as we
know from the slides that Ms. Green showed, that the pension
numbers were very much still up in the air and in question.
Nevertheless, both the July 16th and the July 8th -- the July
16th letter from Mr. Orr and the July 18th approval letter

1  from the governor lay out the -- what I will characterize as

2  the shift in spending priorities.  This is the part of the

3  proposal that relates to revitalization, and we know that the

4  governor in his letter approves of the manner in which

5  Mr. Orr has proposed to proceed in that regard, and so he

6  signs the letter, and, of course, the bankruptcy petition is

7  filed on the 18th.

8         So what all of this adds up to we think at the end

9  of the day in terms of the legal cases -- in terms of our

10  legal objections is a fairly deliberate plan to use Chapter

11  9.  We think that really knitting -- connecting all of the

12  dots here, that the plan was to use Chapter 9.  We've saved

13  for another day all of the legal issues associated with that,

14  the state's authorization.  There's really -- well, we won't

15  get into those because we'll have closing, and we've had --

16  and we'll have other briefs on all of that, but the sort of

17  deliberate plan, which starts whenever you'd like to start it

18  on the timeline but certainly from the governor's appointment

19  of Mr. Orr leaving his -- leaving the Jones Day firm, the

20  Jones Day retention by the city, this really several month

21  timeline leading from the end of March to the middle of July,

22  we believe the evidence establishes this as a deliberate plan

23  to use Chapter 9 to, in effect, find a way to undermine the

24  Michigan state Constitution through the use of bankruptcy.

25  We believe that that is evidence of a lack of bad faith under

1  921(c), a lack of bad faith in connection with --

2        THE COURT:  You mean a lack of good faith?

3        MS. CECCOTTI:  I'm sorry.  A lack of -- yes.

4  Apologies, your Honor.  Not enough sleep, once again, I'm

5  afraid.

6        THE COURT:  Okay.

7        MS. CECCOTTI:  Now I'm afraid to open my mouth.  No

8  good faith --

9        THE COURT:  I'll help you.

10        MS. CECCOTTI:  Yes.  All right.

11        THE COURT:  I'll help you.

12        MS. CECCOTTI:  No good faith, a lack of good faith

13  negotiations under 109(c)(5), and not a valid plan of

14  adjustment for Chapter 9 purposes.  Thank you.

15                    OPENING STATEMENT

16        MS. PATEK:  Good afternoon, your Honor.  Barbara

17  Patek again on behalf of the Detroit Fire Fighters

18  Association, the Detroit Police Officers Association, the

19  Detroit Police Lieutenants & Sergeants Association, and the

20  Detroit Police Command Officers Association, who have been

21  collectively referred to in these proceedings as the Detroit

22  Public Safety Unions or the Public Safety Unions.

23        As the evidence in this case will show, the public

24  safety unions are the recognized collective bargaining

25  representatives of the nearly 3,200 men and women employed by

the Detroit Fire Department and the Detroit Police

Department.  I'm sure we'll hear from Chief Craig either

today, tomorrow, or sometime this week about the very

daunting and difficult conditions in which they work to

provide -- excuse me -- police and fire services to -- that

are so essential to the survival and the revival of the City

of Detroit.

          The public safety unions piece of this in terms of

the evidence is a small but important part of the timeline

that was gone over this morning by Ms. Green and also by

Mr. Bennett.  First, I think I want to say at the outset that

the public safety unions have never in these proceedings

disputed that the city was in severe financial distress

beginning in the time period where I believe both Mr. Bennett

and Ms. Green's timelines began.  The public safety unions do

not, however, believe that the city can meet its burden of

showing that it is eligible for these Chapter 9 proceedings

because of the issue of the good faith negotiations, what we

believe was a -- as Ms. Ceccotti referred to, a deliberate

effort to sort of create a record of impracticality where

they set themselves up for failure, and we also believe that

the evidence will show, based upon the same set of facts,

that the petition was not filed in good faith as required by

Section 921(c).

          While we acknowledge the legal nature of the

 1    constitutional questions that this Court must wrestle with,

 2    we also believe that the evidence that this Court will hear

 3    in this eligibility trial may help inform those decisions by

 4    providing the Court with a practical and very real platform

 5    in which those questions can be applied.

 6           Because the public safety unions will rely on and

 7    adopt certain proofs submitted by the other objectors, I'm

 8    going to try to avoid repeating what was said this morning,

 9    but I do want to briefly address where our proofs will fit in

10    the chronology the Retirement Systems put up this morning.

11    And for ease of the Court's reference -- and I apologize in

12    advance.  This will also have to be marked, and we'll get a

13    paper copy, and I believe --

14           THE COURT:  Okay.

15           MS. PATEK:  -- it'll be Exhibit 720.  Our facts --

16           THE COURT:  And I'll have to ask you to understand

17    that I'm going to be looking at what's there on this little

18    screen here just because it's easier for me.  It's not that

19    I'm not paying attention to you.  I'm looking at it here.

20           MS. PATEK:  That's okay.  That's okay.  The public

21    safety unions' piece of it are in red, and the portions in

22    black are portions from Ms. Green's timeline, and we did that

23    so the Court could see where they fit in.  And we start in

24    December of 2011 and January of 2012, but before we start

25    talking about that time period, I do want to take a moment

1    because I think it's important to this negotiations issue,
2    and I think it's also important to some of the state labor
3    law issues that inform how we ended up in Chapter 9 to take
4    the Court back about 44 years ago.  In the fall of 1969,
5    again, not long after the city had been through some very,
6    very trying times, then Governor Milliken, a Republican
7    governor, signed into law an act found beginning at MCL
8    423.231 that has become -- come to be known as Act 312.  Act
9    312 is, as the Court may be aware, the platform on which
10   public safety unions negotiate their labor agreements under
11   the auspices of the Michigan Employment Relations Commission.
12   Before the emergency manager, terms and conditions of
13   employment were negotiated pursuant to this process.  That
14   process, which will be described by one of our witnesses, the
15   Detroit Police Command Officers' labor attorney, Mary Ellen
16   Gurewitz, is designed to provide for a period of mediation
17   followed by, if the mediation fails, compulsory arbitration,
18   including the opportunity to send the parties back to
19   mediation, and it's designed to be expeditious and to keep
20   labor peace and, if might say, might be a tool that if it
21   could be applied to everybody in this proceedings, some of
22   the mediators working so hard to try to resolve our
23   differences might find useful.  Ms. Gurewitz will explain
24   much better than I can the mechanics of the Act 312 process
25   and also her experience in negotiating with the city and the

1  DPCOA in the relevant time period.

2         We start with 2011 and two thousand -- December 2011

3  and January of 2012, and I believe that was also on

4  Mr. Bennett's initial timeline.  Interestingly, at that time,

5  there were negotiations between the city, recognizing the

6  financial difficulties that were present, and each of the

7  Detroit public safety unions of concessionary agreements or

8  tentative agreements.  These agreements were never adopted,

9  but our purpose in offering them is to show that where

10  there's a will, it could be done.  Our intention is not to

11  suggest in this setting that such negotiations would be easy,

12  and that's precisely taking up on Ms. Ceccotti's point why

13  that 30-day period that the city gave itself was doomed to

14  fail.

15         During the same time period as the various acts were

16  being repealed and reenacted and shortly after the governor

17  signed PA 436 into effect, Mark Diaz, the president of the

18  Detroit Police Officers Association, will tell the Court that

19  pursuant to Act 312 proceeding, there was an award that

20  became the contract for the Police Officers Association

21  through June of 2014.  This is important because, as I'm

22  going to talk about continuing along this timeline to the

23  period after the appointment of the emergency manager, which

24  takes us to our second slide, there were acts that the city

25  took to specifically remove this tool from the tool kit of

the city and its labor unions, and I'm not suggesting that
that removal was not perhaps authorized, although the unions
dispute that as a matter of labor law under Public Act 436,
but I think that it's important to suggest that in light of
the concept that there was a plan and design going back a
long way, it was no accident that, you know, the city filed
an emergency motion on April 18th of 2013, and on June 14th,
2013, the very same day it rolled out its proposal, it
obtained an opinion from MERC blocking the Police Lieutenants
& Sergeants Association, the Police Command Officers
Association, and the fire fighters from resorting to Act 312
arbitration finding that Public Act 436 had divested MERC of
jurisdiction to address those disputes. And that becomes
important because if you consider that there's a plan on June
30th, 2013, the collective bargaining agreements between the
city, the DFFA, and the DPLSA all expired just two and a half
weeks before the Chapter 9 petition was filed.

       The president of the Fire Fighters Association, Dan
McNamara, the president of the Lieutenants & Sergeants, Mark
Young, and the president of the DPOA, Mr. Diaz, as previously
referred to, will each tell the Court that very quickly after
the emergency manager's appointment on March 28th, they were
each informed by the city that it was exercising its right
under Public Act 436 not to bargain. I know we've heard
through some of the testimony that that was done to somehow

1  not waive their rights not to bargain, but the Court will

2  have to consider whether it accepts that as a credible

3  explanation for what happened next.

4          Following the June 14th presentation, again, as

5  Ms. Ceccotti referred to, things moved very quickly.  There

6  was a presentation by the city the week of July 10th, and on

7  July 12th -- and it was up on the screen earlier today in Ms.

8  Green's presentation, and I believe it is in the record as

9  Exhibit -- give you the right number here -- I'm not seeing

10  it, but it's a letter from each of the presidents of each of

11  the Detroit public safety unions addressed to Jones Day

12  indicating in response that they were, in fact, interested in

13  making a counter-proposal.  They were seeking more

14  information and a concrete proposal from the city in that

15  regard.  Four days later, on June -- or July 16th, the

16  governor -- or I'm sorry -- Mr. Orr sent his letter to the

17  governor seeking authorization.  The following day Jones Day

18  sent correspondence back to the four public safety unions

19  thanking them on behalf of the emergency manager for their

20  strong cooperation in the City of Detroit's pension

21  restructuring efforts.  The next day the petition was filed.

22          Your Honor, we believe that when the Court has heard

23  all the evidence, that it will be difficult for the Court not

24  to conclude that in this case that there was, in fact, a

25  calculated effort by the city going back over an extended

1  period of time to use Chapter 9 to both, in Mr. Orr's words,

2  trump that constitutional provision but also, as suggested in

3  some of the arguments last week, to obtain the political

4  cover that would be provided by this Court to do so.  That's

5  all I have to say.

6          THE COURT:  Thank you.

7          MS. PATEK:  Thank you very much.

8                  OPENING STATEMENT

9          MR. MORRIS:  Good afternoon, your Honor.  Thomas

10  Morris of Silverman & Morris on behalf of the Retiree

11  Association parties.  Your Honor, the Court heard a

12  comprehensive opening statement from the Retirement Systems

13  and opening statements from other opponents of the city's

14  eligibility.  Those statements chronicle the voluminous

15  evidence weighing against eligibility.  In our pretrial

16  brief, we focused on the evidence which we will offer through

17  Shirley Lightsey, president of the DRCEA -- that's the

18  Detroit Retired City Employees Association -- and Donald

19  Taylor, the president of the RDPFFA.  That's the Retired

20  Detroit Police & Fire Fighters Association.  My opening

21  statement will, likewise, address that evidence.

22          Mr. Taylor and Ms. Lightsey will testify that their

23  associations have a long and active history.  They're not

24  organizations which came into being just to respond to the

25  present situation, but they are and were prepared to deal

with it. The police and fire fighters have had a retiree association since 1946. The DRCEA was formed in 1960. The elected leadership of these associations includes persons who, had they been working for the city, would be the ones responsible for helping resolve the city's problems. Members and management of the associations include a past chief of police, a deputy chief, city budget director, personnel managers, a Retirement Systems trustee, and city financial and legal staff. These are people who were leaders during their active service for the city, and they continue to be leaders for the retirees.

More than 12,000 retired nonuniform city employees are members of the DRCEA, and more than 8,000 retired Detroit police officers and fire fighters are members of their organization. Both of these organizations serve city retirees in a number of ways, but they have particular expertise in the pension and benefits areas. Although the associations do not have the power of a governmental body to enter into agreements that bind their members, the elected leadership is responsible to the membership and responsive to the membership. They communicate with the retirees. The associations go beyond service to their members. Together they represent the class of retired Detroit employees, all Detroit retirees, not just the members who send in their dues. The associations have appeared before City Council.

1   They have lobbied the state legislature.  They have been
2   party to the lawsuits involving pension and benefit issues.
3   The evidence will show that the associations are the natural
4   representatives of the retirees capable of negotiating on
5   their behalf.
6           Upon the emergency manager's appointment, each of
7   the associations contacted the emergency manager in writing,
8   sent him a letter.  Mr. Orr did not respond to the letters,
9   but he did invite the association -- associations to
10  informational sessions which they conducted, the city
11  conducted, in April, June, and July.  Both Ms. Lightsey and
12  Mr. Taylor attended those meetings.
13          The evidence will show that the city in its meetings
14  never got beyond the first step of presenting information.
15  The city never offered to meet with the retirees to discuss
16  the city's proposal or to negotiate.  The retiree
17  representatives were relegated to being members of the large
18  audience.  The associations had their attorney contact the
19  city's attorneys, Jones Day, to request the opportunity to
20  specifically address retiree issues, but nothing came of
21  that.  Instead, on July 18, in a tactical rush, the city
22  filed its petition.
23          The evidence will show that negotiations with the
24  retirees was possible.  The membership of the associations is
25  more than a majority of the retirees.  Overall it's

1    considerably more than two-thirds.  By working with the

2    membership, the city had the opportunity to make an agreement

3    with a majority of the retirees and thereby satisfy Section

4    109(c)(5)(A) either by not impairing the class or by reaching

5    an agreement.

6         The evidence will show that negotiation was not

7    impracticable, certainly not with the retirees who, prior to

8    the appointment of the emergency manager, had already elected

9    their leaders.  The retirees had built and maintained through

10   the work of generations of dedicated volunteers organizations

11   which were prepared to work on behalf of the retirees for the

12   best outcome of Detroit -- for Detroit.  The evidence will

13   show that the emergency manager and his advisors rejected the

14   opportunity to attempt to resolve matters as to the retirees.

15   The city, therefore, does not satisfy the eligibility

16   requirements of Section 109(c)(5).  Thank you.

17        THE COURT:  Thank you.

18                  OPENING STATEMENT

19        MS. LEVINE:  Good afternoon, your Honor.  Sharon

20   Levine, Lowenstein Sandler, for AFSCME.  Very briefly and not

21   to be repetitive, with regard to solvency, the city addressed

22   AFSCME's brief with regard to our request that there should

23   actually be expert testimony in order to meet the burden of

24   proof with regard to this issue, and the city's response is

25   basically what we've seen in some smaller debtor cases, which

is the debtor can testify to its own numbers.  And we're not
necessarily disputing that line of cases.  What we're saying
here, Judge, is that this is not the debtor that's testifying
to its own numbers.  We don't have anybody from the budget
department.  We don't have any of the elected officials.
What we have are hired experts who are being offered as fact
witnesses, so we're bringing in experts like Ernst & Young,
Conway MacKenzie, Miller Buckfire, being paid millions of
dollars, who routinely appear as expert witnesses and, for
reasons that we submit are not appropriate here, are just
simply being offered without having to give their expert
testimony with regard to solvency.

With regard to impracticality and the issue of good
faith, we would respectfully submit that the argument that
there are simply too many classes of bondholders doesn't make
a lot of sense.  The June 14 date that the proposal was
presented and the filing date of July 18th was only one month
and three days.  Even if we went by the city's own originally
projected timeline, the filing date was projected to be July
19th.  That's only one month and four days.  It takes more
months than that to negotiate out-of-court workouts in simple
small single level of debt Chapter 11 cases.  We respectfully
submit that the timeline that the city set for itself was a
timeline that was designed not to allow an out-of-court
negotiation to fully take place.

1    The city also looks to the fact that there are too

2  many bondholders and, therefore, it was impractical to

3  negotiate with bondholders, and they cited to a New York

4  case.  The only New York case we were able to find that

5  addressed the issue was the Off-Track Betting case, which

6  dealt with a six-month period before that case, which wasn't

7  even an entire city, said that there wasn't enough -- there

8  wasn't an ability to get it done out of court, and they had

9  run out of time.

10    The other issue there is too many bondholders means

11  that you've met the impracticality standard means that what

12  you're doing is you're writing the need to respond to labor

13  out of the Code.  If you have too many bondholders, it's

14  impractical, and, therefore, you don't even have to go

15  further.  We would respectfully submit that that would be a

16  sad day for Detroit if we're actually writing the need to

17  negotiate with labor out of the Code.

18    The June 14 meeting is the meeting where the

19  proposal was presented.  We've heard the city say that at

20  that meeting, they invited questions.  Okay.  So we have a

21  meeting that lasts a couple of hours.  We have a proposal

22  that's in excess of 110 pages.  The amount of time it takes

23  to even read the slides takes up the lion's share of that

24  meeting, and in addition to that, the questions which were

25  permitted were in a very controlled environment and under the

1  guise that the city was, quote, unquote, begging for

2  feedback.  All right.  The city announced at that meeting

3  that these are not negotiations.  Now, whether that

4  announcement was made to preserve a technical reservation of

5  rights under PA 436, they invited a room full of labor

6  negotiators, and they held a meeting that was basically a

7  classroom type instruction meeting, and then they announced

8  after a brief Q&A period these are not negotiations.  And

9  somehow or other this room full of labor negotiators was

10  supposed to understand that, well, while they're not

11  technically legally negotiations per PA 436, we really are

12  asking for negotiations to meet the good faith requirement

13  under the Bankruptcy Code.  That's not a -- that's not a

14  realistic or fair interpretation of the facts here coupled

15  with the fact that we have sophisticated bankruptcy counsel

16  and all of these sophisticated outside consultants who

17  apparently, when receiving a letter from these same labor

18  negotiators that assert in response to the June 14 proposal,

19  well, we have factual and legal reasons why we think we can't

20  negotiate with you, that causes them to immediately think

21  negotiations are impossible.  That's not an -- that's not a

22  fair reaction either.  I've never walked into a labor

23  negotiation where the company said to the union, "Here's your

24  1113 proposal.  What do you think?" and the union has said,

25  "Oh, good idea."  It takes a little bit more than that, your

1    Honor.  In addition to that --

2         THE COURT:  Well, you raise an interesting point

3    here that has been on my mind, and that is the extent to

4    which the standard of good faith negotiation in 1113 is

5    related to or overlaps with the standard of good faith

6    negotiation in Section 109 or even, for that matter, the

7    extent to which it overlaps with whatever the law of good

8    faith negotiation is in labor law outside of bankruptcy.  I

9    think it would help me if anyone would be interested in

10   briefing that subject.  I'm not surprised.  And there are

11   really two distinct questions there.  The one is is there

12   this overlap, should there be this overlap, and, second, how

13   might the law in those other circumstances, 1113 and labor

14   law more generally, help to resolve the issue here of whether

15   there was good faith negotiation.

16        MS. CECCOTTI:  Your Honor, may we join with that

17   effort as well?

18        THE COURT:  Yes.  The invitation is an open

19   invitation.

20        MS. LEVINE:  Thank you, your Honor.  We accept the

21   invitation, and if your Honor sets a deadline by which you'd

22   like that brief, we will --

23        THE COURT:  Oh, a deadline.  I don't know.  What's

24   convenient for you all?

25        MS. CECCOTTI:  After the 30th.

1        MS. LEVINE:  Busy this week.

2        THE COURT:  Got that.

3        MS. LEVINE:  Two weeks?  Is that sufficient, or is

4    that too long?

5        THE COURT:  Two weeks is fine with me.

6        MS. LEVINE:  Thank you, your Honor.

7        THE COURT:  All right.  Two weeks from today then.

8    I'll enter an order just so the record has it there.

9        MS. LEVINE:  Your Honor, but moving past that, okay,

10   so we have the -- we have the city saying that these are not

11   negotiations and labor negotiators are supposed to glean that

12   they are negotiations, and then we have labor negotiators

13   taking a hard line at the initial proposal and the city

14   accepting that then there can't be any negotiation and

15   somehow or other this proves that the city acted in good

16   faith or that the negotiations were impractical.  We

17   respectfully submit that's false.  And not only is it false,

18   but for the reasons that you've heard from some of the other

19   folks already, we, too, sent requests to the city for

20   additional information to understand what the ask was, what

21   the savings -- what the proposed savings were, and for better

22   information to understand, while it was a long slideshow, a

23   little bit more about what the assumptions behind the

24   proposal or the alleged proposal were so that we could, in

25   fact, like in an 1113 context, truly engage in a meaningful

1   negotiation.  And AFSCME itself, your Honor, just a mere 18

2   months prior to the bankruptcy filing, on behalf of itself

3   and with a coalition of 30 unions, did agree to a tentative

4   agreement which resulted in substantial savings for active

5   and retirees' benefits, and those were ratified by all of

6   those respective unions but not implemented by the city.  So

7   I'd respectfully submit that not only was there an ability to

8   negotiate in good faith over a period of just a couple of

9   months, but there's a proven track record that on this side

10  of the table, we have been able to actually do those

11  negotiations and accomplish results, so if --

12          THE COURT:  Why not implemented?

13          MS. LEVINE:  You'd have to ask the city and the

14  state, your Honor.

15          THE COURT:  Okay.

16          MS. LEVINE:  It does remain a mystery to us because

17  it also included, for example, changes to the pension

18  benefits on a go-forward basis, and to the extent that there

19  are other or different issues that they needed to address

20  now, those, too, should have been addressed through

21  negotiations.  What we seem to be hearing and what is also a

22  very important point for the City of Detroit and for Chapter

23  9 on a go-forward basis is that if you have legacy

24  liabilities and you have to deal with retiree benefits, then

25  you automatically get to say it's impractical, and I don't

1  have to show good faith at all.  And we would respectfully

2  submit that that would be a very sad place for the City of

3  Detroit to take Chapter 9 and all cases on a go-forward

4  basis.

5          We respectfully submit, your Honor, that the city

6  can't meet its burden of proof and that it's not eligible in

7  this case at this time to be a Chapter 9 debtor.  Thank you.

8          THE COURT:  Thank you.

9                  OPENING STATEMENT

10         MR. ULLMAN:  Good afternoon, your Honor.  Anthony

11 Ullman from Dentons.  I'll be speaking for the Retiree

12 Committee.  But first Ms. Patek asked me to tell you that

13 Exhibit 704 was the number of the joint public union --

14 safety union's letter that she couldn't find previously --

15         THE COURT:  Okay.

16         MR. ULLMAN:  -- so I've done that.  Your Honor, of

17 course, we're here today on what the Court has identified as

18 factual issues which arise in the context of eligibility,

19 which the city has the burden of proof on.  And you've heard

20 an overview of a lot of the evidence that the objectors

21 expect to bring to the hearing, much of it in chronological

22 order.  And what I'm going to try to do is put that in the

23 framework of the legal issues that relate to eligibility and

24 try to explain how the evidence that we expect to come out at

25 the hearing fits in with those legal issues.  I'm going to be

1   focusing, of course, on the issues that the Retiree Committee

2   is advancing, which I think are common to most, if not all,

3   of the objectors.

4         Now, it's the committee -- it's the committee's

5   contention and the contention of the objectors in general

6   that the city has failed to meet its burden of proof on a

7   number of specific elements that it has to meet to be

8   eligible for Chapter 9 and that it also has failed to meet

9   its burden of showing that its filing has been made in good

10  faith, and so what I'd like to do is kind of go through those

11  elements serially and put into context our view of how the

12  evidence falls into that and how the evidence should shape

13  your view of the law and application of the law, and

14  basically our points are as follows.

15        The committee itself, of course, doesn't contest

16  that Detroit is a municipality, and the committee is not

17  contesting insolvency, although AFSCME, of course, is, but we

18  do contest that other necessary elements have been met.  I

19  mean specifically it's our contention that the city can't

20  show that the emergency manager, first of all, was

21  specifically authorized to make this Chapter 9 filing.  We

22  also contend that the city has failed to meet the eligibility

23  criteria that are set out in 109(c)(5), and there are, of

24  course, two prongs of that.  We say the city has not shown

25  that it negotiated in good faith, which was required under

1   Subprong (c)(5)(B).  And we say the city can't show that the

2   good faith negotiations were impracticable, which is a prong

3   under Sub (c)(5)(C), and, finally, the committee says that

4   the city cannot show that it filed its petition in good

5   faith, which is required under 921(c).

6          So taking that from the top, this is, first of all,

7   what Section 109(c)(2) requires, and it requires specifically

8   that the city be specifically authorized or the person acting

9   for the city be specifically authorized to be a debtor under

10  state law, and we don't think the city can show this as a

11  factual matter because in filing the Chapter 9 petition, the

12  emergency manager did so with the specific intent of taking

13  actions and achieving results that are prohibited by the

14  Michigan state Constitution, namely the pension clause,

15  Article IX, Section 24.  And we believe that that renders the

16  filing ultra vires, ineffective, and void, and this point

17  also obviously ties in with the view that in filing the

18  Chapter 9 petition, the emergency manager didn't act in good

19  faith under Section 921(c), so what I'm going to do is review

20  the evidence on the intent in filing, particularly relative

21  to the pension clause, for both purposes of the specific

22  authorization and good faith under 921(c) together.

23          Now, as the Court may recall, there's also another

24  aspect that we've raised with respect to Section 921(c) and

25  good faith, and that is what we contend are the misleading

1  statements and omissions that were made in connection with

2  the Chapter 9 filing, and I'll deal with those later in the

3  presentation.

4       So turning now to the emergency manager's intentions

5  as regards the pension clause, we think that the evidence is

6  very clear, and I'll summarize some of the key points.  First

7  of all, we know that Mr. Orr was made the emergency manager

8  under PA 436, and that, of course, as you've heard, was the

9  replacement law for PA 4, the prior emergency manager law

10 which had given the emergency manager very broad powers and

11 then was repealed by voter referendum, and PA 436 was passed

12 in its place.  And as we know, it was passed with a minor

13 appropriation provision, and we believe that the evidence

14 will show that that was intended to immunize the law from

15 Michigan voter review and, in fact, was a strategy that had

16 been devised and suggested by the Jones Day law firm itself.

17      Now, PA 436 was enacted in November 2002 with an

18 effective date of March 2013, and it was against this

19 background that the emergency manager, Mr. Orr, was selected

20 for his post.  Now, Kevyn Orr we know is a bankruptcy lawyer

21 by trade.  That, of course, in and of itself, doesn't prove

22 anything, but the evidence will show that before becoming the

23 emergency manager, he was a bankruptcy lawyer at Jones Day,

24 and, as I believe the Court has heard, he participated in the

25 pitch that Jones Day made to the city and to the state to get

 1    its current assignment as restructuring counsel.

 2            Now, we've already seen from Ms. Green's

 3    presentation that prior to the pitch that Jones Day made,

 4    which was in late January 2013, Mr. Orr was specifically

 5    asked about the availability and use of Chapter 9

 6    specifically relative to the City of Detroit, and the

 7    evidence will show that in connection with that pitch, the

 8    Jones Day team was not only focused on Chapter 9 but was also

 9    specifically aware of the Michigan state pension clause and

10    had already thought of using Chapter 9 as a means to try to

11    get around it.

12            Now, this is the cover of the Jones Day pitch book,

13    and here's a slide from it which we're blowing up, and what

14    it says specifically is that if needed, Chapter 9 could be

15    used as a means to further cut back or compromise, quote,

16    "accrued financial benefits," close quote, otherwise

17    protected under the Michigan Constitution.  And that

18    quotation, "accrued financial benefits," I believe, are words

19    that are lifted right out of the pension clause itself.  So

20    this is from the pitch book that Jones Day prepared, and, as

21    we've said, Mr. Orr himself was a major player and part of

22    the pitch book -- the Jones Day pitch team.

23            And the evidence further is that from his own review

24    of the circumstances of PA 436 and PA 4, Mr. Orr concluded

25    that the new law, PA 436, in reality, was nothing more than a

1    thin veneer -- those are Mr. Orr's words -- a thin veneer of

2    a revision that's essentially a redo of the prior PA 4 that

3    the voters had rejected and an end-run around the voter

4    rejection.  This is from an e-mail that Mr. Orr wrote, and I

5    believe -- it's a little hard to read because we didn't blow

6    that top part up, but I believe it's January 31 of 2013.  And

7    this is from one of the exhibits that was gone over with

8    Mr. Orr in his deposition.

9           Now, central to the issue of bad faith and

10   authorization is the Michigan Constitution's pension clause.

11   I'll just put a copy of that up on the screen.  And as we

12   see, the same word, the financial -- accrued financial

13   benefits, the same words that appeared in the Jones Day pitch

14   book, are right there in the Constitution.

15          Now, the evidence will show that Mr. Orr was

16   personally aware of the pension clause, and the evidence will

17   also show that when he became the emergency manager, Mr. Orr

18   took an oath requiring him to uphold the pension clause --

19   the state Constitution, of which the pension clause is part.

20   And this is from Mr. Orr's testimony where he acknowledged

21   that, yes, he took the oath of office, and he solemnly swore

22   to support the Constitution of the United States and the

23   Constitution of this state; that is, of the State of

24   Michigan.  But the evidence will show that instead of

25   adhering to the strictures of the pension clause, Mr. Orr

1    decided, contrary to his sworn oath, to engage in a course of

2    action that was deliberately designed to thwart it through

3    the vehicle of a Chapter 9 filing, and what I'm going to go

4    through now are some highlights of what I think the evidence

5    will show, some of which you've seen before, some of which

6    you may not have.

7          Now, the evidence will show that as early as May

8    2013, which was less than two months after he became the

9    emergency manager, Mr. Orr made the decision to cut pension

10   benefits that were owed to -- excuse me -- to retirees, and

11   it will show that he understood that he was unable to

12   identify any viable way to achieve that end just under state

13   law.  And the evidence will show that the emergency manager,

14   therefore, decided to try to accomplish that end through the

15   means of a Chapter 9 filing.  And even more specifically, the

16   evidence will show that the emergency manager decided to try

17   to use Chapter 9, the Chapter 9 filing, as a vehicle

18   specifically to, quote, "trump" the pension clause of the

19   Michigan Constitution.

20         Now, this all came together in the proposal to

21   creditors that the emergency manager made on June 14th of

22   2013, and in his proposal the emergency manager made no

23   pretense that he was intending to protect accrued financial

24   benefits as is required and provided for in the Michigan

25   Constitution.  For example, here's an excerpt from page 109

1    where he specifically says that under this proposal, there

2    must be significant cuts in accrued vested pension amounts

3    for both active and currently retired persons.

4         And under this June 14th proposal, the emergency

5    manager, in fact, said that the city would not make any

6    further pension contributions on account of retirees.  For

7    retirees the defined pension benefits were to be cut entirely

8    from the forecast of the city's expenses going forward as

9    were the retiree healthcare benefits.  And for active

10   employees, they were being shown as switched from a defined

11   benefit plan to a defined contribution plan with the level of

12   the city's funding of the contributions slashed dramatically

13   from the present levels.  Now, for the actives, this is a new

14   plan, and the contributions are being made only on a going-

15   forward basis, so for the active employees' vested pensions

16   under this proposal, no further contributions would be made

17   for those either.

18        Now, the June 14 proposal, although it was very

19   lengthy, well over a hundred pages, didn't mention anywhere

20   in it the prospect or even the potentiality of a Chapter 9

21   filing, but the evidence will show very clearly that the

22   emergency manager understood that his proposal could not be

23   implemented outside of the context of Chapter 9 specifically

24   because of the pension clause and that he, therefore,

25   intended to use Chapter 9 as a vehicle to, again, in his

1   words, trump that very clause, the Constitution's pension

2   clause.  And he's freely admitted that it's the state

3   Constitution -- the pension clause and no other provision of

4   the Michigan Constitution that the emergency manager was

5   trying to trump.  This is an excerpt from his deposition.  I

6   think you may have seen parts of this before, but he says --

7   he goes on to say that -- he answers, "We don't believe

8   there's an obligation under the state Constitution to pay

9   pensions."  He says, "Yes, that's right."  He says, "No.

10  I've made that statement many times."  And then we go on to

11  ask him, "And the state law that you were referring to as

12  being trumped was Article IX, Section 24; isn't that right?"

13  He says, "Yes.  That's right."  We asked, "Is there any other

14  state law that you viewed as relevant to the pension -- to

15  the pension issue that you were trying to trump?"  He says,

16  "No," there's no other state law that he's trying to trump.

17  It's specific, the pension clause.  This Chapter 9 filing was

18  done specifically to try to get around the pension clause of

19  the Constitution, and there's no other way to read the

20  evidence on that.  And these admissions also confirm the

21  city's recognition that the pension clause, in fact, applies

22  directly to what the city is trying to do through this

23  Chapter 9 proceeding and that the pension clause is in direct

24  conflict with what the emergency manager is trying to do here

25  as regards pensions.  There's no question about it.  They are

1  trying to do something that they acknowledge is in conflict

2  with the pension clause.  If that weren't the case, there'd

3  be no context in which the federal law could trump anything.

4  There would be nothing to trump.  There's a direct --

5          THE COURT:  I don't mean to cut you off, but haven't

6  we been through this?

7          MR. ULLMAN:  To some extent, your Honor, and I'm

8  trying not to repeat exactly --

9          THE COURT:  Any extent to which we haven't?

10         MR. ULLMAN:  Yes, I believe there is, your Honor.

11  I'm trying to -- I'm trying to bring additional evidence to

12  make the -- largely the same points but in a more summary

13  fashion and then move on to the eligibility issues.

14         Now, the emergency manager did all this in

15  circumstances where he himself has admitted that he was not

16  aware of any court decision that allowed the use of a federal

17  bankruptcy proceeding to trump a provision of the state law

18  Constitution.  And the emergency manager did this in

19  circumstances where the Jones Day law firm itself had

20  previously advised that the emergency manager's ability to

21  cut pensions through Chapter 9 was, at best, uncertain.  That

22  comes from the Jones Day pitch book itself.  They said it was

23  uncertain.  And he did this in circumstances where the

24  emergency manager had been advised by the state attorney

25  general that the pensions were protected under Michigan state

1    law and that what the emergency manager was doing in terms of

2    trying to cut them was contrary to the Michigan Constitution.

3         And, finally, on this point, we think that the

4    timing of the filing itself is very significant.  You've seen

5    already that there were -- there was state court litigation

6    that was pending, and you've heard that there was a TRO

7    hearing that was scheduled and that the hearing on the TRO

8    was scheduled to take place on the 18th.  And what the

9    evidence shows -- I'm sorry.  Yeah.  It was on the 18th, and

10   the evidence shows, as you've seen already, that the

11   bankruptcy filing had been originally scheduled for the 19th

12   and then had been moved up to go -- to coincide on the 18th

13   immediately prior to when the TRO hearing was supposed to

14   take place, and the evidence on that is as follows, and I'll

15   just skip to this particular slide.

16        Mr. Orr was asked specifically about the timing of

17   the filing of the bankruptcy petition and, in particular,

18   about the timing relative to the TRO proceeding, he was

19   asked, "Is there a particular reason why the filing was made

20   when it was, at the time it was, other than to try to get a

21   jump on the state court decision?"  And the emergency manager

22   answered that, to the best of his knowledge, there was no

23   such reason.

24        So to sum up on all this, we think that it boils

25   down to the simple proposition that a state actor who takes

1    actions that are intentionally designed to achieve results

2    that are in plain violation and in direct odds with the state

3    Constitution is not acting within the scope of his authority

4    and is not acting in good faith, and we believe the evidence

5    will show that that's the situation here.

6         I'm going to turn now to the issues of eligibility,

7    and there are -- as we've said, there are two prongs here.

8    The city can prove by -- the good faith negotiation or the

9    impracticability issue either by showing that it engaged in

10   good faith negotiations or by showing that those were

11   impracticable.

12        Now, on the good faith negotiation prong, we believe

13   the evidence is going to show two things.  First of all, the

14   emergency manager has argued that the presentations and

15   discussions that followed his June 14th proposal to creditors

16   constituted attempts at good faith negotiations.  However,

17   the evidence will show that at the time of the presentations

18   and meetings, the emergency manager did not have what he

19   believed was a plan of adjustment and specifically that the

20   emergency manager himself viewed the June 14th proposal only

21   as a proposal and not as a plan of adjustment.  Now, we've

22   heard this morning from Mr. Bennett that the city is

23   apparently trying to backtrack on this now, but when Mr. Orr

24   was questioned at his deposition, he not only acknowledged

25   but was adamant that what he presented on June 14th, which

 1  was the subject of the following discussions and meetings,
 2  was not a plan but merely a proposal that he had put out to
 3  seek the general creditor feedback.  He said this very
 4  specifically.  "We never called this a plan.  We never called
 5  it a deal.  We always called it a proposal."  So it was never
 6  considered -- whatever the city is saying now, at the time
 7  that the proposal was made, which, of course, was well before
 8  we filed our pretrial brief, which is at the same period when
 9  Mr. Orr testified prior to the filing of our pre-trial brief,
10  Mr. Orr was quite clear that what they put on the table on
11  June 14th was not a plan of adjustment, was not intended as a
12  plan of adjustment.  It was just intended as a proposal,
13  something to be discussed.  And we believe this is important
14  because under the clear -- what we believe is the clear
15  weight of the law, in order for the negotiations that are
16  referred to in Subpart (c)(5)(B) --
17          THE COURT:  One second.  I have been asked to ask
18  you to move back from the mike just a bit.
19          MR. ULLMAN:  Okay.  Is that better?
20          THE COURT:  Maybe a little bit more.
21          MR. ULLMAN:  Little bit more?
22          THE COURT:  There you go.
23          MR. ULLMAN:  Okay.  The reason this is important is
24  because under Subpart 109(c)(5)(B), the negotiations that are
25  referred to in that subpart have to be negotiations over what

1  is a plan of adjustment as that term is used in the

2  Bankruptcy Code.  The legal analysis on that, the authorities

3  we cite are all in our brief, and I'm not going to repeat

4  that here, but the point is that for the good faith

5  negotiation prong to be met, the negotiations that have to

6  be -- at issue have to take place over a plan of adjustment,

7  and the evidence shows that per the emergency manager's own

8  testimony in this case, no plan of adjustment was ever

9  presented to the creditors, and so a fortiori the

10 negotiations required under Subprong (c)(5)(B) never took

11 place.

12       And so there's no confusion on this, I want to be

13 clear that the question of whether the city presented the

14 creditors with a plan of adjustment is a very different

15 question from whether the city intended to impair or diminish

16 protected pension payments.  On the one hand, as I've gone

17 through, the evidence will show that the city never presented

18 creditors with anything that they considered a plan of

19 adjustment, and on the other hand, as I've gone through and

20 Ms. Green has summarized, the evidence will show that the

21 emergency manager did intend to impair the protected pension

22 benefits.  In fact, this latter point is not even subject to

23 question.  The city has actually admitted in an RFA in this

24 proceeding that's binding on it that it, in fact, intends to

25 impair the pension rights as part of this proceeding, and

1    that's from the city's answer to the RFA that was served on

2    it, Number 12, where they admit that the city intends to seek

3    to diminish or impair accrued financial benefits.  That,

4    again, is the term that's used in the pension clause of the

5    Constitution.  So that's what the evidence will show on the

6    existence of a plan of adjustment.

7          Now, we also believe and you've heard before that

8    even if there were a plan of adjustment, even if there had

9    been one presented, there were no good faith negotiations.

10    For example, there was no way to know from the evidence --

11    or, rather, from the information that was provided at the

12    June 14 meeting how in actual monetary terms the individuals

13    that the city sought to affect under the June 14 proposal

14    would be impacted, and specifically in terms of both the

15    proposed pension cuts and the OPEB where the city was saying

16    that the retirees would instead get some share of notes,

17    there was no way for the retirees to know what the cash value

18    was of what the city was proposing.  And, in fact, the

19    evidence will show that for -- at least for retirees at the

20    time of the discussions over the June 14 proposal, the time

21    those discussions were proceeding, the city itself did not

22    even know what the real size of the unfunded pension

23    liability was.  In other words, there was no way to know what

24    the parties were even negotiating over.  And here's some of

25    the evidence quickly on the negotiations.  First of all, the

1    emergency manager has admitted -- this is a question asked as

2    regards to the June 14 meeting.  We asked him, "Were there

3    negotiations there?"  His answer, "No.  There were not

4    negotiations.  I'm going to be careful how I use the word,

5    but no.  As we generally use the word, there were none."

6              There were other meetings that then took place.  The

7    next meeting, as I recall, took place on June 20, and this is

8    from a letter that Jones Day wrote, and it called them

9    informational meetings and acknowledged that actives and

10   retired employees will need access to additional information

11   to analyze the proposals that are being -- that are proposed

12   in the June 14th document.  And here's another letter from

13   Jones Day.  This is dated, I believe, July 17th, and what it

14   says is, "We think it first makes sense to try to reach

15   common ground with the unions and associations on actuarial

16   assumptions and methods and the amount of the underfunding."

17   First we got to figure out what the amount of the

18   underfunding is and then tackle the contributions and

19   attendant benefit changes.  You have to know what the size of

20   the underfunding is before discussions can even take place,

21   so, again, there wasn't even anything concrete to negotiate

22   over.

23             And, finally, on this point, we believe the evidence

24   will show the city never really intended to engage in good

25   faith negotiations.  I'm going to put this document up

1    briefly.  I think we've gone through this before.  This is a
2    document from Bill Nowling of the emergency manager's office,
3    and what he's basically saying -- this is as of July 8th --
4    that they've already concluded what their key filing messages
5    would be.  July 8th they're saying it's impracticable.  This
6    is before the meetings that took -- that were scheduled for
7    July 10th and 11 even took place.  So what we can see is that
8    even as the city was telling the world that it wanted to have
9    more meetings, it had already internally and secretly decided
10   that it would claim impracticability.  So the meetings that
11   were followed were really nothing more than an effort to
12   create a record that would allow the city to claim good faith
13   negotiations when, in truth, there were no real negotiations
14   and the city wasn't negotiating, we believe, in good faith.

15          With respect to the impracticability prong, we
16   believe the situation is similar.  At the outset, as we've
17   explained in our pretrial brief, the committee believes that
18   the requirement that there be a plan of adjustment applies
19   equally to the impracticability test, and this only makes
20   sense because without an actual plan identifying who the city
21   intends to impair and how, there's no way to assess whether
22   negotiations would be practicable.  And specifically, as
23   we've said, the only document that was on the table was the
24   June 14 proposal, and that was a proposal, not a plan.

25          And further, as we've set out, we believe and the

1   law is that to show impracticability, the city has to show

2   impracticability with respect to each class of creditors.  It

3   has to try to negotiate with those with whom negotiations are

4   possible, and, as you've heard, the evidence will show that

5   we believe there were certainly a number of classes of

6   creditors with whom that was possible.  And as we saw from

7   the last slide, the evidence indicates that the city really

8   never intended to try to negotiate but really just tried to

9   use impracticability as a tool to get out of it.  So from a

10  factual viewpoint, we believe the impracticability prong will

11  not be met either.

12          Now, finally, I want to talk briefly about Section

13  921(c), which is the good faith requirement.  I've already

14  addressed one aspect of the good faith, the emergency

15  manager's pursuit of a course of action that's contrary to

16  the pension clause of the Constitution, but there's also

17  another aspect to it, and that is this, that we believe that

18  in connection with his filing of the petition, the emergency

19  manager made a number of misrepresentation -- or of

20  representations that we believe the evidence will show were

21  at minimum misleading and incomplete, and I'll give you some

22  examples.

23          First of all, in his declaration -- this is the

24  declaration that the emergency manager filed with the

25  petition -- he stated that the city has over 18 billion in

1    accrued liabilities and including specifically over 6.4

2    billion in bonds that are backed by enterprise revenues or

3    otherwise secured.  Now, that, of course, sounds like a huge

4    liability for the struggling City of Detroit to bear, but the

5    evidence will show that what's not stated in this is that the

6    vast majority of these bonds that we see referred to here,

7    the 6.4 billion, are bonds that are issued by the Detroit

8    Water and Sewerage Department, which is operated as a

9    separate authority and is fully responsible for the payment

10   of those bonds.  And the evidence will show that the

11   Department of Water and Sewers itself has the financial

12   wherewithal to make those payments.  We put this question to

13   the emergency manager in his deposition.  He said, yes, the

14   Department of Water and Sewers, it generates its own

15   revenues, and it pays its debts as they come due.  So right

16   off the bat, the total liabilities that, according to the

17   emergency manager, he has to struggle to meet are effectively

18   reduced by at least a third.

19          Now, also in his declaration the emergency manager

20   stated that in terms of the unfunded pension liability, that

21   the unfunded pension liability is $3.5 billion, and this is

22   stated here as a fact, not subject to qualification, and as

23   we all know, the unfunded pension liability -- how big it is

24   and what, if anything, will be done about it, those are

25   central issues that will have to be addressed if this action

1   proceeds, but for present purposes, the evidence will show

2   that this $3.5 billion number that Mr. Orr stated in his

3   declaration is not a fact.  We think the evidence will show

4   that the fact is that at the time the petition was filed, the

5   city did not know the actual size of the unfunded pension

6   liability as its analysis on that was ongoing and hadn't been

7   completed and, indeed, still hasn't been completed today.

8   And this, for example, is from the deposition testimony of

9   Charles Moore, who is the city's -- from Conway MacKenzie,

10  which is the city's operational restructuring advisor.  Mr.

11  Moore also put in a declaration addressing unfunded pension

12  liabilities, and at his deposition Mr. Moore candidly

13  admitted that, in fact, the city didn't know what the actual

14  amount of the unfunded liability was and that work was going

15  on to try to make that determination.  He says specifically,

16  most importantly, the city's actuary has not completed its

17  analysis on the unfunded position, and until that work is

18  done, no one really knows what the unfunded liability is.

19  And, indeed, we believe the evidence will show that the last

20  full actuarial evaluation of the unfunded liability was done

21  around June of 2011, and the unfunded amount that was shown

22  in that evaluation was about 643, 644 million.  And the

23  evidence is also going to show that of that total amount, the

24  644 or so, only about 250 million is allocable to the general

25  fund, which is the fund that the city is most concerned

1    about, which it pays most of its bills.  That is not a charge

2    on the general fund.  The evidence will show that a very

3    large chunk of that is, in fact, allocable to other

4    departments such as the Department of Water and Sewerage,

5    which, again, is responsible for that and pays its own bills.

6            Now, during the -- Mr. Bennett's arguments, he

7    suggested that we had somehow misstated what Mr. Orr said at

8    his deposition, failed to cite all the appropriate parts.

9    That's not accurate.  At his deposition Mr. Orr was put

10   through the numbers, and there was an initial error.  He then

11   corrected that arithmetic error.  At the end of the

12   deposition, Mr. Orr said that it appeared to his knowledge at

13   that time the portion of the unfunded pension liability that

14   was allocable to the Department of Water and Sewerage was

15   about 68 percent.  Mr. Bennett is suggesting that maybe 68

16   percent isn't the right number, and the right number should

17   be 38 percent.  Be that as it may, 38 percent is still in

18   this context a huge chunk of the unfunded pension liability,

19   which is something that's borne by Department of Water and

20   Sewerage and payable from those funds without any strain on

21   the general fund.  And the evidence will show that the

22   emergency manager has acknowledged that even if the unfunded

23   pension liability were ultimately found to be greater than

24   the $644 million number, even if it were found to be --

25   excuse me -- as high as the $3.5 billion number that you've

1  heard, that same principle would hold true, that there's a

2  significant portion of it that is not allocable to the

3  general fund but is borne entirely and payable by and fully

4  funded by the Department of Water and Sewers.  And as I said,

5  the evidence will show that that department is solvent and

6  capable of meeting its obligations, and, indeed, the Water

7  and Sewerage pension payments even have priority over secured

8  claims in that they're included in net operating expenses.

9         So we believe the evidence will show that the amount

10 of the underfunding on the pension liability is not nearly as

11 severe as -- still substantial -- we're not denying that, but

12 not nearly as severe as was portrayed in the emergency

13 manager's declaration.

14        And finally, related to all this, the evidence will

15 show that the city does, we believe, have substantial assets

16 that can be monetized.  Chiefly but not alone among them is

17 the art that's owned by the city that's maintained at the

18 Detroit Institute of Arts, and we're talking about art that's

19 owned outright by the city, not art that's subject to any

20 charitable trust.  And the evidence will show that there's

21 that asset, and also the Department of Waters and Sewers is a

22 valuable asset that could be monetized.  The city may well be

23 in a position to obtain substantial cash inflows from these

24 assets and we understand is actively pursuing these

25 opportunities.  Those assets, those cash flows could

1    obviously be used to fund other obligations as well, yet none

2    of that was factored in any way into the Orr declaration even

3    though that could dramatically change the mix of what happens

4    in terms of paying not only pension obligations but other

5    obligations as well.

6          So that, your Honor, is what we believe the evidence

7    will show.  Based on that, we believe the city cannot meet

8    its burdens of proving eligibility or good faith, and we look

9    forward to proceeding.  Thank you, your Honor.

10          THE COURT:  Thank you.

11          MR. ULLMAN:  Oh, and I do -- we will have a bound

12    copy of the slides that I used for you marked.  Thank you.

13          THE COURT:  All right.  Thank you.

14          MS. LEVINE:  Your Honor, I apologize, but I got a

15    flurry of e-mails after I stepped away from the podium saying

16    two weeks, what are you, crazy?

17          THE COURT:  What was your answer to that question?

18          MS. LEVINE:  I have to ask the judge if I'm crazy or

19    not.  I guess --

20          THE COURT:  I take it you're asking for more time.

21          MS. LEVINE:  If we could have another week, your

22    Honor, that would be --

23          THE COURT:  Sure.  Three weeks.  Absolutely.  Okay.

24    So does that conclude your opening statements?  All right.

25    We'll take a recess now until ten after three, and we'll

1  begin with the evidence at that time.

2        THE CLERK:  All rise.  Court is in recess.

3     (Recess at 2:51 p.m. until 3:10 p.m.)

4        THE CLERK:  Court is in session.  Please be seated.

5        THE COURT:  Okay.  It appears everyone is here.  You

6  may proceed.

7        MR. STEWART:  Thank you, your Honor.  Geoffrey

8  Stewart, Jones Day, for the city.  Our first witness will be

9  Gaurav Malhotra, but before we call him, I wanted to put on

10 the record a stipulation that the parties have reached with

11 regard to the sequestration of witnesses.  We've agreed that

12 witnesses should be sequestered with the exception of those

13 who, by definition, are representatives of a party.

14       THE COURT:  That's fine.  I ask counsel, please, to

15 supervise this sequestration because you know who your

16 witnesses are.

17       ATTORNEY:  Thank you, your Honor.  We will.

18       THE COURT:  Okay.

19       MR. STEWART:  May we call Mr. Malhotra to the stand?

20       THE COURT:  Yes, yes, of course.  Step forward,

21 please, sir.  Before you sit down, please raise your right

22 hand.

23        GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

24       THE COURT:  Please sit down.  You may proceed, sir.

25                    DIRECT EXAMINATION

1  BY MR. STEWART:

2  Q    Good afternoon.  Mr. Malhotra, could you please, for the

3  record, give us your full name and your home address?

4  A    Gaurav Malhotra, and I live in Chicago, Illinois.

5  Q    And are you presently employed?

6  A    Yes.

7  Q    Who are you employed by?

8  A    Ernst & Young.

9  Q    And what is Ernst & Young?

10 A    Ernst & Young is a Big Four accounting firm.

11 Q    And how long have you worked for Ernst & Young?

12 A    For close to four years since I recently joined.

13 Q    In what part of Ernst & Young's practice do you work?

14 A    Restructuring specifically.

15 Q    And just for the record, tell us what that means when you

16 say "restructuring"?

17 A    Our practice predominantly represents corporations and

18 public sector clients in order to assist with business plan

19 assessments, liquidity analyses, as well as developing

20 restructuring proposals.

21 Q    Tell us, if you could, about your college education and

22 any post-graduate education that you had.

23 A    I went to college in New Delhi, India, and I did my MBA

24 in Finance and Business Policy from Case Western, and I'm

25 also a CFA.

1  Q  Certified financial analyst?

2  A  That is correct.

3  Q  After you left Case Western, what was the first job that

4  you had?

5  A  I joined Ernst & Young.

6  Q  And how long were you at EY at that point?

7  A  At EY, I joined in May of 2000, and EY's restructuring

8  practice was, I believe, in 2004, sold to Giuliani Capital

9  Advisors.  I transitioned with that team.  That team was

10  subsequently sold to Macquarie, an Australian investment

11  bank, and I transitioned with that team and came full circle

12  back to EY about four years ago.

13  Q  And what is your title at EY now?

14  A  I'm a principal.

15  Q  And what does that mean?

16  A  It's a non-CPA partner of the firm.

17  Q  So you're an equity partner of EY?

18  A  I am an equity partner of EY.

19  Q  Could you tell us some of the clients you have worked for

20  as part of your work in restructuring?

21  A  I worked for Delta Airlines.  I did work for Detroit

22  Public Schools, doing work for Liberty Medical right now,

23  worked at Collins & Aikman, and those are some of the clients

24  that I've worked with in addition to others.

25  Q  Did there come a time when EY was retained by the City of

1  Detroit to perform work for the city?

2  A   Yes.  We started our work in about the May, June of 2011

3  time frame.

4  Q   So over two years ago?

5  A   That's right.

6  Q   At the time the city approached you or at any time since,

7  was EI -- EY -- sorry -- retained to serve as an expert for

8  the city in any litigation, including Chapter 9 litigation?

9  A   No.  In fact, it's very clear in our letter that we will

10 not serve as an expert.

11 Q   What were you hired to do in May of 2011?

12 A   Generally, it was to get a handle on the city's liquidity

13 position and try and get our arms around in terms of the

14 city's short-term liquidity forecast over the next 12 months

15 or so.

16 Q   And this was back in 2011.  That was what you were asked

17 to do?

18 A   That is correct.

19 Q   Did there come a time earlier this year when the scope of

20 work the city asked of EY was expanded?

21 A   Yes.  In the front end of this calendar year, our role

22 was expanded to look at a ten-year forecast for the city,

23 predominantly on the general fund, and to ascertain what the

24 deficit as well as cash projections would be over a longer

25 time frame versus a shorter time frame.

1  Q   Now, you just used the term "general fund."

2  A   Yes.

3  Q   What is the general fund?

4  A   The general fund is basically where the day-to-day

5  activities for a municipality are recorded. i.e., collection

6  of taxes, payment of operating expenses and administrative

7  expenses as well as debt service that is not related to an

8  enterprise fund.

9  Q   Why is the general fund a logical place to look when

10  you're analyzing the city's financial position?

11  A   Because that's where the tax revenues or the fees are

12  recorded, so the enterprise funds specifically charge their

13  own fees for that specific service, but the general fund is

14  where the core operating deficit of a city is recorded in

15  municipal accounting across the country.

16  Q   Now, you've used the term a couple of times "enterprise

17  funds."  For the record, what are the enterprise funds?  What

18  are examples of the enterprise funds?

19  A   Enterprise funds generally are -- have a specific fees

20  that is charged for the services that are provided by that

21  fund.  It's generally break-even.  For example, the Water and

22  Sewer department is an enterprise fund of the city.  The

23  Detroit Department of Transportation is an enterprise fund of

24  the city, although the Department of Transportation requires

25  a subsidy from general fund, so it's not break-even.

1  Q   Now, in your analysis of the city's financial position

2  and of the general fund, did you take into account the

3  enterprise funds?

4  A   We looked at some of the cash activity of the enterprise

5  funds back in 2011 but focused majority of our efforts on the

6  general fund and those enterprise funds that require a

7  subsidy from the general fund like DDOT, which is the

8  Department of Transportation.

9  Q   Now, in the course of your work, what materials or

10  information from the city did you rely upon?

11  A   We looked at a CAFR.

12  Q   I'm going to stop you right there.

13         MR. STEWART:  Can we put up Exhibit 6?  And I

14  believe, your Honor, the CAFR, which is Exhibit 6, has been

15  stipulated into evidence.

16  BY MR. STEWART:

17  Q   Is this the CAFR?

18  A   Yes.  That's the CAFR for 2012.  It's the Comprehensive

19  Annual Financial Report, which is the city's audited

20  financial statements.

21  Q   Those were audited?

22  A   Yes.

23  Q   By Ernst & Young?

24  A   No.

25  Q   And what does the CAFR tell you?

1   A    It gives you a detailed snapshot of revenues and expenses

2    as well as the deficit position of the general fund as well

3    as some activity of the enterprise funds.

4   Q    Is this a public document?

5   A    Yes, it is.

6   Q    What else did you look at in the course of your work to

7    learn about the details of the finances of the city?

8   A    We looked at the city's budgets. We looked at internal

9    financial reports that we had access to from the city.

10   Q    What kind of financial reports?

11   A    They were generally department-specific revenues and

12    expenses as we had available. We also looked at receipts and

13    disbursements activity for different bank accounts to try and

14    get our arms around the financial position of the city.

15   Q    Now, were these materials you looked at records -- the

16    financial records that the city had kept in the ordinary

17    course of its business?

18   A    Yes.

19   Q    And in your experience, is it in the ordinary course of

20    an enterprise or city's business to keep records such as the

21    ones you were looking at?

22   A    Yes.

23   Q    And did the records appear to you to be accurate?

24   A    Generally, yes. I mean there were always questions about

25    assumptions like specifically on budgets, but we did not find

1    any material discrepancies at least in the information that

2    we were trying to get our arms around specifically like the

3    CAFR.

4    Q   Well, what did you do to check the reliability of the

5    information the city gave you?

6    A   What we did is we looked at the information that was made

7    available.  We spoke to various members of the city's

8    management team, the finance department at the city, various

9    department heads.  We looked at the receipts and

10   disbursements activity as generally cash was a telling

11   barometer in terms of the quality of information we were

12   receiving, so we went through and tried to scrub the data to

13   the best of our ability.

14   Q   You just used the term "we."  I should have asked you

15   earlier how many people from EY worked with you on this

16   project?

17   A   On the front end of this engagement, we had a team of

18   about four or five, and that team is larger now.

19   Q   What deliverables were expected of E&Y as a result of its

20   work?

21   A   It was generally cash flow updates, whether they be short

22   term or medium term, generally going out on a monthly basis,

23   variance reports in terms of how the city was performing in

24   context of those cash flows.  As time progressed, our work

25   expanded to helping develop the long-term projections in

1    conjunction with other members of the city, so we also helped

2    in terms of updating the financial advisory board on a

3    monthly basis in terms of where some of the cash position of

4    the city was.

5    Q    And in terms of organizing and presenting your data, what

6    methods did you use?

7    A    It was generally Excel spreadsheets or PowerPoint

8    presentations.

9    Q    Okay.  And an Excel spreadsheet is what?

10   A    It's a software that allows you to compile, organize, or

11   make calculations in terms of the data that we have

12   available.

13   Q    And the calculations are arithmetical calculations?

14   A    Yes.

15   Q    Now, let me ask you this.  Did there come a time when you

16   learned that an emergency manager had been appointed for the

17   City of Detroit?

18   A    Yes.

19   Q    And do you remember when you learned of it?

20   A    Right around March.

21   Q    And when did you meet Kevyn Orr for the first time?

22   A    The first time I met Kevyn Orr was during the interview

23   process of various law firms where Jones Day was one of the

24   firms that was presenting its credentials to represent the

25   city.

1  Q   And after Mr. Orr was appointed as emergency manager, how

2  often did you meet with him?

3  A   Generally weekly.

4  Q   And has that continued to this day?

5  A   Yes, either meetings or phone conversations.

6  Q   Okay.  Are you aware of something called a 45-day report?

7  A   Yes.

8  Q   What is a 45-day report?

9  A   It's a report that an emergency manager has to present 45

10  days after his or her appointment to provide a snapshot of

11  the financial and operating condition of the city.

12  Q   Now, we put up on the monitor before you Exhibit -- I

13  think it's 75 for identification.  Is that the 45-day report?

14  A   Yes, it is.

15  Q   And you've seen this before?

16  A   I have.

17  Q   And do you understand why it was Mr. Orr was required to

18  submit a 45-day report?

19  A   I believe it's per statute under PA 436.

20  Q   Did you yourself contribute any part of the content of

21  the 45-day report?

22  A   We did.  We helped work on the financial section of the

23  document as well as some short-term liquidity projections

24  that were available as of that point in time.

25  Q   Let me ask if we could go to page 40 of the --

 1          MR. STEWART:  And if we blow it up for the monitor,

 2     please, Lauren, so we can see it better --

 3     BY MR. STEWART:

 4     Q   Mr. Malhotra, do you have that before you, page 40 of the

 5     report?

 6     A   Yes, I do.

 7     Q   And what is that?

 8     A   That is a snapshot of the monthly receipts and

 9     disbursements activity of the general fund and the cash

10     balance available for the general fund along with any

11     deferrals that we were able to identify as of that --

12     Q   And is this a spreadsheet that you or someone at E&Y

13     working at your direction prepared?

14     A   Yes.

15     Q   Without going --

16          MR. SHERWOOD:  Your Honor, I'd just like to

17     interpose an objection at this time.

18          THE COURT:  Would you identify yourself, sir?

19          MR. SHERWOOD:  I'm sorry, your Honor.  I was

20     introduced this morning.  I'm Jack Sherwood from Lowenstein,

21     counsel for AFSCME.  I'm Ms. Levine's partner.

22          THE COURT:  Okay.  Go ahead, sir.

23          MR. SHERWOOD:  I believe that this testimony in

24     terms of forecasts of future performance by the city is

25     improper lay opinion testimony and should be disallowed.  We

1  submit that this testimony is in the nature of financial

2  projections, requires special expertise, training, and so

3  forth and under Federal Rule of Evidence 701(c) should be

4  excluded.  Thank you.

5        MR. STEWART:  Well, your Honor, two responses.

6        THE COURT:  Excuse me one second.

7        MR. STEWART:  Yes.  I'm sorry.

8        THE COURT:  Is it the exhibit you object to or the

9  testimony about it?

10        MR. SHERWOOD:  Both, your Honor.

11        THE COURT:  The exhibit is already in evidence;

12  right?

13        MR. SHERWOOD:  Well, then the testimony about it.  I

14  think it has been stipulated into evidence.  I think this

15  document is in evidence, but I do believe that any testimony

16  about these projections is expert testimony and should be

17  disregarded.

18        THE COURT:  Sir.

19        MR. STEWART:  Well, first of all, I don't believe

20  the witness is going to be asked any opinion about this, and

21  he has testified earlier he has not been hired as an expert.

22  More fundamentally, I think the rule is clear that to the

23  extent a witness, even one who has expertise, is simply

24  performing arithmetic or similar calculations on voluminous

25  data, it is not expert testimony, and I think the leading

1    Sixth Circuit case on that, your Honor, is -- I think it's

2    the Madison case, 226 Federal Appendix 535, which is a 2007

3    case, and it cites at length an Eleventh Circuit case that

4    says that in greater detail and on the different facts, and

5    so that is why I asked the questions I asked a few minutes

6    ago about the source of the data, were they business records,

7    what did he do with them.  They went into a spreadsheet.

8    What does a spreadsheet do?  And at this stage I'm still

9    trying to explain how he went about compiling his

10   spreadsheets, but counsel is correct.  I'm going to ask him

11   at some point what were the results or the calculations.  I'm

12   not going to ask him his opinion on what anything ought to

13   be.  It is simply going to be, "After you compiled the

14   information, as you testified, what did the number turn out

15   to be?"

16          MR. SHERWOOD:  Just briefly, your Honor.  Anything

17   that projects future revenues or forecasts is opinion.  It's

18   not fact.  It's not adding numbers that exist.  I understand

19   that a fact witness can testify what our expenses and

20   payments were on a given month or even that are due this

21   month, but this is forecasting into the future in terms of

22   not only expenses but also receipts, things like property

23   taxes, utility taxes, various types of revenues going out

24   through the end of this year, and I think that by definition

25   that requires some type of expertise, specialized training,

1  certainly not something that anyone can do, is properly the

2  subject of expert testimony and shouldn't be allowed.

3       MR. STEWART:  And I think what the Sixth Circuit

4  wrote, your Honor, was that there are many things that

5  require expertise.  For example, it requires expertise to

6  read the records and know what part of the city's records are

7  important.  But where the calculations themself do not

8  require expertise beyond simple mathematics, it's not expert

9  testimony.  They distinguish being an expert and expert

10  testimony.

11       THE COURT:  What was the specific last question that

12  you asked?

13       MR. STEWART:  I believe it was how he went about

14  preparing -- or his staff went about preparing the

15  spreadsheet we see before us on the screen.

16       THE COURT:  I'll permit that question.

17  BY MR. STEWART:

18  Q   You may answer.

19  A   The way we helped pull this spreadsheet together or any

20  of the spreadsheets on the cash flows were we looked at the

21  information that was available in the different budgets.  We

22  were able to look at the different receipts and disbursements

23  on an actual basis in terms of what was actually coming into

24  the city and break that down into the different categories

25  and then, based on the assumptions that we had collectively

1  in conjunction with the city, forecast what the monthly

2  receipts and disbursements could be over this forecast

3  period.

4  Q    And you populated the spreadsheet with those numbers?

5  A    That is correct.

6  Q    And you performed addition and subtraction on them to

7  reach the conclusions that are shown here; is that correct?

8  A    Yes.

9  Q    And now may I ask you just as to this, what did you

10 conclude the short-term cash flow forecast would yield to in

11 terms of the city's available cash as of the end of calendar

12 year 2013?

13          MR. SHERWOOD:  I'd renew the same objection, your

14 Honor.

15          THE COURT:  That objection is sustained.

16          MR. STEWART:  Okay.

17 BY MR. STEWART:

18 Q    Mr. Malhotra, let me also ask you to look at -- actually,

19 I'll come back to that in just one minute.  Okay.  Did there

20 come a time, Mr. Malhotra, that you learned that the

21 emergency manager had scheduled a meeting with creditors of

22 the city for June 14 of this year?

23 A    Yes.

24 Q    And when did you learn of the meeting?

25 A    It was right around, I think, in that June time frame.

1   Q   And did you attend the meeting?

2   A   I did.

3   Q   Where was it held?

4   A   At the Westin at the airport.

5   Q   And how many people attended?

6   A   I would say about a couple of hundred.

7   Q   How long did it last?

8   A   Four, five hours.

9   Q   Did you speak or present anything at the meeting?

10  A   I did.

11  Q   Let me -- and were materials passed out at the June 14

12  meeting?

13  A   Yes.

14  Q   Let me first put up on the screen Exhibit 43.  You see

15  Exhibit 43?

16  A   I do.

17  Q   Is that a document entitled "Proposal for Creditors" that

18  was distributed on June 14?

19  A   It was.

20  Q   And let's put up Exhibit 44.  Is that an executive

21  summary of the proposal that was also distributed that day?

22  A   That is correct.

23  Q   Now, at that meeting -- this is entitled "Proposal for

24  Creditors."

25  A   Yes.

1  Q    That's the title of it.  What's being proposed?

2  A    What the city was proposing was a framework for

3  restructuring of its long-term liabilities showing that the

4  city was going to be unable to meet its obligations as they

5  came due.

6  Q    Now, I think you testified that you prepared certain

7  parts of this document?

8  A    That is correct.

9  Q    Okay.  And let me direct your attention, if I could, to

10  page 8 of the document.

11        MR. STEWART:  Can that be blown up, Lauren?

12  BY MR. STEWART:

13  Q    Is this a spreadsheet that you or others at E&Y prepared?

14  A    Yes, it was.

15  Q    And what does it purport to show?

16  A    The first column on that spreadsheet --

17  Q    Well, first of all, what's the title of the spreadsheet?

18  A    It says "Fiscal Year 2013 Forecasted Cash Flow to Year-

19  End."

20  Q    Now, it uses the term "fiscal year '13."  What is the

21  fiscal year of the City of Detroit?

22  A    July 1 to June 30th.

23  Q    So at the time of this meeting, the fiscal year '13 had

24  about 16 days to go?

25  A    Yes.  June -- the month of June 2013 was still a

1  forecast.

2  Q   So let's -- before we go further, let's look at our

3  spreadsheet here.  How many months of this spreadsheet are

4  actual numbers?

5  A   The first column has 12 months of fiscal year 2012, and

6  subsequent to that 11 of the 12 months are actuals, and

7  there's a month of forecast.

8  Q   And that information you obtained from where?

9  A   It was compiled from the information that was given to us

10  by the city.

11  Q   Okay.  And what I'd like to do because we're going to be

12  dealing with some of these issues later is to go over some of

13  the elements of operating receipts and operating

14  disbursements that we see here on the spreadsheet.

15         MR. STEWART:  And I don't know if that can be blown

16  up to be even larger or not, Lauren.  I don't know if

17  everyone can see them.  Let's just blow up operating receipts

18  if we could.  There.

19  BY MR. STEWART:

20  Q   I've asked the technical assistant here to blow these up

21  so we can all see them better, and let me ask you about some

22  of the operating receipts.  Property taxes and income and

23  utility taxes are just what they say they are?

24  A   That's right.  That's what they contain.

25  Q   And gaming taxes, what are gaming taxes?

1  A   Those are the taxes the city receives from the three

2  casinos.

3  Q   Next is municipal service fee to casinos.

4  A   Those are generally additional fees that the city

5  collects from the casinos for additional services that are

6  provided.

7  Q   And then our next line is state revenue sharing?

8  A   That's state aid that the city receives every other

9  month.

10  Q   And below that we have other receipts.  Could you tell us

11  what the other receipts are?

12  A   Sure.  Those are a combination of fees from the different

13  departments.  It has grant revenue in there as well as any

14  other one-time items that are also captured in there.

15  Q   And the final item is called refinancing proceeds?

16  A   Yes.  Those generally reflect the monies that the city

17  was borrowing from the escrow account that was set up with

18  the state, so it was essentially additional debt borrowings.

19  Q   Okay.

20        MR. STEWART:  Let's go back if we could, Lauren, to

21  the -- if you could just then expand for us the part of our

22  chart that says "Operating Receipts."  "Operating Receipts."

23  That would still be the top part, I think.  Now, "Operating

24  Receipts," that would be the rows there entitled "Operating

25  Receipts."  Okay?

1  BY MR. STEWART:

2  Q   Now, your spreadsheet purported to tabulate what the

3  operating receipts were.  I think the first column is actual

4  for fiscal year '12.  What did you determine the city's

5  operating receipts had been for that fiscal year?

6  A   For the general fund predominantly the operating -- total

7  operating receipts were 1.765 billion of which 50 million was

8  related to so-called proceeds from debt issuance or

9  borrowings from the escrow fund.

10 Q   And then for fiscal year 2013, you had 11 months actual

11 and 1 month forecast; is that right?

12 A   That is correct.

13 Q   Okay.  And can you tell me what your forecast was with

14 those 11 actual and 1 forecasted month for --

15          MR. SHERWOOD:  Object.  I'm sorry.

16 BY MR. STEWART:

17 Q   -- the operating receipts for fiscal year '13?

18          MR. SHERWOOD:  Your Honor, I object to testimony

19 based on forecasts.

20          MR. STEWART:  Your Honor, what we have -- he spoke

21 not only about the actual -- the city's actual receipts.  He

22 also spoke about the city's budgets not as a forecast he made

23 but as a budget the city had, which was itself a factual

24 document.  To the extent he's talking about what the city has

25 budgeted, especially when he tests it against actual

1  experience for reliability, I believe he can talk about what

2  the forecast result is to look like.  I would add that this

3  is one where 11/12ths of the data is actuals that had, in

4  fact, already come to pass.

5        THE COURT:  Sir, is the number for the column

6  forecast June 13 of 125 your number or the city's number?

7        THE WITNESS:  It was generally a collaborative

8  effort in which we used the numbers that were, your Honor,

9  developed by the city originally.  We scrubbed them along

10  with the city.

11        THE COURT:  What does "scrub" mean?

12        THE WITNESS:  So we looked at, your Honor, the

13  historical actuals in terms of how the amount of collections

14  that were received in that particular month in conjunction

15  and comparison with the overall tax row, so it was -- you

16  know, actually, you are looking through the historical

17  information that we had available as well as the best

18  forecast information we had available to demonstrate what the

19  one month of forecast would have looked like.

20        THE COURT:  Well, all right.  I'll permit the

21  testimony as to the full year for actual and forecast but

22  subject to credible admissible evidence regarding June '13.

23        MR. STEWART:  Your Honor, we will provide that.

24  BY MR. STEWART:

25  Q   And then, Mr. Malhotra, as to the full year operating

1  receipts for 2012, what did you calculate?

2  A   For the full year of fiscal year 2013, the total

3  operating receipts were -- with 11 months of actual and 1

4  month of forecast were 1.582 billion, which included roughly

5  $30 million of borrowings from the escrow account as shown in

6  the line item up above.

7  Q   Okay.  And so the line you're referring to is the line

8  that says "refinancing proceeds"?

9  A   That is correct.

10 Q   And you better tell us what the escrow account is.

11 A   It's an account -- escrow account that's set up that's

12 subject to an escrow agreement between the city and the state

13 where there are roughly about $70 million of cash that is

14 sitting in that escrow account today.  It was projected that

15 $20 million of that 70 would have been collected, your Honor,

16 in June of 2013, but that has not happened.  We are

17 anticipating to collect that $20 million from the escrow

18 account in the subsequent months going forward, but it is

19 subject to -- the amount in there is subject to an escrow

20 agreement between the city and the state.

21 Q   Okay.  Thank you.  Lets, if we could, now --

22         THE COURT:  Excuse me one second.  So the 20 billion

23 you're talking about is the 20 that's shown in forecast June

24 '13?

25         THE WITNESS:  Yes, your Honor.  That's the 20

1  million.

2          THE COURT:  That didn't happen.

3          THE WITNESS:  That did not happen.  That is correct,

4  your Honor.

5  BY MR. STEWART:

6  Q   At the time you wrote it, you expected that it would

7  happen?

8  A   That is correct.

9          MR. STEWART:  Could we now expand the segment of the

10 chart that talks about operating disbursements, just the

11 title so we can see them all?  No.  That's fine.

12 BY MR. STEWART:

13 Q   Now, we've now expanded on the screen, Mr. Malhotra, the

14 segment of the spreadsheet that speaks of operating

15 disbursements.  Let me ask you if we could go through this.

16 The first line is payroll taxes and deductions, and I assume

17 that's self-explanatory.  That's what it says.

18 A   Yes.

19 Q   Next is benefits.  What are benefits?

20 A   Those are generally health benefits.

21 Q   Okay.  Below that is something called pension

22 contributions?

23 A   That is correct.

24 Q   And those are pension contributions to who?

25 A   To either the police Retirement System or the General

1    Retirement System.

2    Q   And those are both defined benefit plans?

3    A   Those are defined benefit plans, yes.

4    Q   Now, I understand that some portion of the benefits from

5    the General Retirement System goes to city employees who work

6    for the Department of Water and Sewer?

7    A   That is correct.

8    Q   And how do you account for that in this spreadsheet?

9    A   Those are not accounted for here because this shows the

10   activity predominantly of the general fund.  The

11   contributions that the Water and Sewer Department makes for

12   pension go directly to the Retirement System and --

13            THE COURT:  Excuse me, sir.  You need to lean back

14   away from the microphone a little bit because when you get

15   too close, it cuts out.

16            THE WITNESS:  All right.

17            THE COURT:  And while we have a break here, I think

18   your tech person needs to redo that chart because her effort

19   to line up the headings isn't working very well separately.

20            MR. STEWART:  Okay.  Thank you.

21            THE COURT:  That's better.

22            MR. STEWART:  That's better.  A little to the left,

23   yes.

24            THE COURT:  Thank you.

25   BY MR. STEWART:

1  Q   We were talking, I guess, about pension contributions.

2  Next we have -- and for actual year 2012, those had amounted

3  to how much?

4  A   For actual fiscal year '12, there were pension

5  contributions of 103.9 million made by the general fund.

6  Q   And for fiscal year 2013, what is the number?

7  A   That reflects 11 months of actuals and 1 month of

8  forecast, but about $30.8 million of pension contributions

9  that were made.

10 Q   Why is that so much lower than the pension contributions

11 that had been made in 2012?

12 A   Because the city was trying its best to preserve

13 liquidity during this time frame where liquidity was

14 extremely tight and was deferring pension contributions.

15 Q   Now, let's -- let me ask you about this.  When you say

16 "deferring pension contributions," what do you mean?

17 A   It's essentially not making the scheduled payments as

18 they came due and as were laid out by the city's other

19 systems actuaries, so I would say it was more or less

20 borrowing money from the pension system to fund ongoing

21 operations.

22 Q   So just to be clear, the money was owed to the pension

23 systems; correct?

24 A   That is correct.

25 Q   But the city did not pay the pension systems the money it

1  owed them?

2  A   That is correct.

3  Q   And that is called deferral?

4  A   Yes.  That's what we are calling deferral.

5  Q   And do you know looking at this what the amount of

6  deferrals were for fiscal year 2013?

7  A   For fiscal year 2013, I would say compared to the

8  beginning of fiscal year 2012 there was probably another 70-

9  odd million dollars that was deferred compared to the

10  beginning of fiscal year 2012, an additional 70 million.

11  Q   Okay.

12          THE COURT:  And may I interrupt for one moment?

13  Just so the record is clear and everyone understands, would

14  you describe in more plain English what you mean by the

15  concept of "liquidity was tight"?

16          THE WITNESS:  Sure, your Honor.  The city was during

17  this time frame paying very close attention to its cash

18  position, and in order to ensure that the city did not have a

19  payless payday or run out of complete cash in its bank

20  account, the amount of cash available for the city's general

21  fund to continue to operate was dwindling.  And in order to

22  make sure that the cash position did not get to an

23  unsustainable level where the core operations of the city

24  were put at peril, that's what, your Honor, I meant by

25  liquidity being extremely tight.  It's the cash that was

1  available to run the operations of the general fund.

2          MR. STEWART:  If we can go back to the full chart

3  for just a minute, please.

4  BY MR. STEWART:

5  Q   And before we go further, just on this same point, this

6  chart is a projection of cash flow for the city for the past

7  year and for fiscal year 2013; correct?

8  A   It's actuals for --

9  Q   Actuals and then -- okay.  Now, you just talked about

10  deferrals as something the city did to preserve cash.  Is

11  there something called pooled funds?

12         THE COURT:  I'm sorry.  Something called what?

13         MR. STEWART:  Pooled funds.  And I'm going to ask

14  him what they are.

15  BY MR. STEWART:

16  Q   Can you tell us what pooled funds are?

17  A   The pooled funds are cash that has been available in

18  other accounts for specific purposes such as the solid waste

19  fund or the street fund or the risk management fund that has

20  been pooled with the general fund cash so that the general

21  fund cash is higher because of the result of the pooling of

22  cash from these other accounts.

23  Q   Now, these other accounts are not -- well, first of all,

24  you better tell us what these other accounts are.

25  A   As highlighted in the city's CAFR, the city had roughly

1    $92 million of pooled cash from the solid waste fund, the

2    street fund, and the risk management fund, cash that was

3    combined with the general fund, that is currently reflected

4    in the cash balances reported for the general fund.

5    Q   And so that I understand, so because of the liquidity

6    problems the city faced, it took the $90 million out of the

7    street fund, the solid waste fund, and the public safety or

8    emergency fund and commingled it with money in the general

9    fund?

10   A   I don't know when it was done, but that would generally

11   be yes.  The commingling has probably happened some time ago,

12   but the answer would be yes.  It would be to further

13   supplement the cash available for the general fund.

14   Q   And if the city had not done that, what would have been

15   the effect on its liquidity position?

16   A   Well, at the end of fiscal year '12 where the cash net of

17   distributions was shown as 1.9 million, if the city had to go

18   ahead and segregate or unpool almost $92 million, that cash

19   net of distributions or cash available to the general fund

20   would have been significantly lower dollar for dollar.

21   Q   It would have been $92 million lower?

22   A   Yes.  That is my understanding.

23   Q   Let's go back now to our operating disbursements that we

24   were talking about.  All right.  The next item there is

25   something called subsidy payments.  What are subsidy

1  payments?

2  A    Subsidy payments are the cash payments that the general

3  fund fund makes to DDOT, which is the Department of

4  Transportation, because the Department of Transportation

5  requires an annual subsidy every year from the general fund.

6  Q    And below that we have distributions, and there are three

7  different lines.  There's distributions, tax authorities,

8  then distributions, UTGO, and then distributions, DDA.

9  Please tell us what those items are.

10  A    Those are distributions to other taxing authorities.  In

11  the first line when we saw property tax collections, the city

12  collects property taxes not only for itself but also on

13  behalf of other taxing authorities like Detroit Public

14  Schools, Wayne County, and what the city does then is once

15  the gross property taxes are collected, it distributes to

16  these other entities on behalf of whom the cash has come in.

17  Q    So, in other words, it's cash the city has but that it

18  has to turn over to someone else?

19  A    Yes.  That is correct.

20  Q    And below that we have income tax refunds, account

21  payables, and other disbursements and professional fees.

22          MR. STEWART:  Now let's go back to the full chart if

23  we could, and for purposes of simplicity, why don't we simply

24  expand actual fiscal year '12 along with the descriptions of

25  items that would help us walk through them?  All the way to

1    the bottom.  Thank you.  Okay.

2    BY MR. STEWART:

3    Q    Now, our next line has total disbursements.  Do you see

4    that?

5    A    Yes.

6    Q    And that's just the sum of all the operating

7    disbursements?

8    A    That is correct.

9    Q    And below that there's something called net cash flow.

10   What is net cash flow?

11   A    That's the total operating receipts less the total

12   disbursements.

13   Q    And what was it for fiscal year 2012?

14   A    It was negative $65.5 million after including $50 of

15   proceeds from the escrow fund.

16   Q    And why were those excluded?

17   A    Those were already a part of the negative 65.5.  Had they

18   been excluded, the net cash flow would have been negative

19   115.5.

20   Q    I see.  And then the next line is beginning cash balance,

21   and what is that?

22   A    That would be reflective of the cash balance the city's

23   general fund had in its account including the pooled cash.

24   Q    And you subtract from that the net cash flow that we just

25   talked about; correct?

1  A    Yes.

2  Q    And we end up with cash before required distributions of

3  $29.8 million?

4  A    That is correct.

5  Q    And then there's something subtracted from that, and what

6  is subtracted?

7  A    Those are the accumulated property tax distributions, so

8  when the city collects its property taxes, makes the

9  distributions to the different taxing authorities -- excuse

10  me -- there still is a holdback in terms of amounts that are

11  being reconciled where the city and the different taxing

12  authorities are going back and forth in terms of what the

13  final amount is that is due to those authorities.  That is

14  the estimate that the city has available at that point of

15  time in terms of additional monies that were due to these

16  other taxing authorities but had not been paid yet, so we

17  reserved for that cash that it will eventually be paid out.

18  Q    Okay.  What's an example of one of these other

19  authorities that is owed to which the money has to be paid

20  out by the city?

21  A    It would include the Detroit Public Schools.  It would

22  include Wayne County.  It would include the library.  Those

23  would be some of those examples.

24  Q    And so our last line here says cash net of distributions,

25  and that's $1.9 million?

1  A   That is correct.

2  Q   And what does that represent?

3  A   That would be the net cash available for the general

4  fund, including pooled cash, that was available for the

5  general fund's operations at that point of time.

6  Q   At the end of --

7  A   Fiscal year 2012.

8  Q   -- 2012, which would be June 30th, 2012; correct?

9  A   Yes.

10 Q   And below you have something that says "memo," and the

11 first line is accumulated deferrals?

12 A   Yes.

13 Q   Is that what you told us about earlier which were pension

14 contributions the city owed but had not paid?

15 A   That is correct, about 64.4 million.

16 Q   And below that refunding bond proceeds in escrow, what

17 are those?

18 A   Those are the escrow account's amounts that were still in

19 escrow and had not been drawn upon that were still subject to

20 this escrow agreement with the state.

21 Q   From the refunding financing that you told us about

22 earlier?

23 A   Yes.

24 Q   And finally reimbursements owed to other funds, what is

25 that?

1  A   That is where we've highlighted the amounts -- or we

2  haven't put an amount in off the funds that would subject --

3  be subject to the unpooling of the cash that is shown in the

4  general fund, but the city did not have a specific view in

5  terms of when and how the unpooling of some of that cash

6  would take place.

7          MR. STEWART:  Now, if we could now highlight the far

8  right column, which is the fiscal year 2013, it says 11(a)

9  plus 1(f), and let's look at that.  And then, Lauren, if you

10 could put the categories next to it so he could --

11 BY MR. STEWART:

12 Q   I'm going to ask you the same questions, but I'm going to

13 be quicker when it comes to the fiscal year 2013.  You

14 already told us, I think, that the operating receipts were

15 thought to be 1.52 -- 582.2 billion.  What were the total

16 disbursements expected to be?

17 A   1.5 --

18          MR. SHERWOOD:  Objection.

19          MR. STEWART:  This is the same point I think we

20 argued earlier.

21          THE COURT:  What is the objection, please?

22          MR. SHERWOOD:  The objection --

23          THE COURT:  Excuse me one second.  And I've been

24 asked to ask you to pull that microphone closer to you when

25 you speak.  Closer, closer, closer.

```
 1          MR. SHERWOOD:  I object --
 2          THE COURT:  Closer yet, please, sir.  There you go.
 3          MR. SHERWOOD:  Okay.  I object based on the fact
 4   that the disbursements include projections for June of 2013,
 5   and that requires expert testimony.  That's improper lay
 6   opinion testimony.
 7          THE COURT:  All right.  Subject to the same
 8   condition I indicated earlier, the Court will permit this.
 9   Go ahead.
10   BY MR. STEWART:
11   Q    And to repeat the question then, the total disbursements
12   for fiscal year 2013 are shown to be what here?
13   A    1.578.2 billion.
14   Q    And so the net cash flow for the city in fiscal 2013 was
15   how much?
16   A    $4 million positive.
17   Q    And then we had cash before required distributions of how
18   much?
19   A    Before required distributions, $33.8 million.
20   Q    And then cash net of those distributions for fiscal year
21   2013 came to what?
22   A    $14.1 million.
23   Q    And by then, what was the accumulated -- was the amount
24   of accumulated deferrals, and what was owed to the pension
25   funds?
```

1 A    By then the amount of accumulated deferrals predominantly

2 due to the pension funds had increased from roughly $65

3 million at the end of fiscal year 2012 all the way to $118.7

4 million at the end of fiscal year 2013.

5 Q    And where did the number come from in terms of what was

6 owed to the pension funds?

7 A    The amount of funding that would have been scheduled for

8 the General Retirement System and the Police and Fire

9 Retirement System would have come from the payments that the

10 actuaries of the systems had suggested to be made but had not

11 been made over the course of this time frame.  That was

12 predominantly what -- where those numbers came from.

13 Q    So the numbers came from the pension plans themselves or

14 their actuaries.

15 A    The schedule came --

16          MR. SHERWOOD: Objection.  Hearsay.  Move to strike.

17          MR. STEWART:  He can know this.

18          THE COURT:  The objection is overruled.  It was,

19 however, a leading question.

20          MR. STEWART:  It was, your Honor.  I was trying to

21 clarify, but let me ask it again.

22 BY MR. STEWART:

23 Q    Where, if anywhere, did these numbers come from?

24 A    The accumulated deferral number, which predominantly is

25 made up of the pension deferrals, would have been a sum of

1    the pension payments that were not made during the course of

2    fiscal year 2013 and it would have been in the amount of the

3    scheduled payments the systems actuaries had suggested that

4    should have been made on a monthly basis but were not.

5    Q   So who is it who tells the city how much the pension

6    payments ought to be?

7    A   It's the system's actuaries.

8    Q   The system being the General Retirement System and the

9    Police and Fire Retirement System; correct?

10   A   That is correct.

11   Q   Did there come a time when you spoke with Mr. Orr about

12   what you had found in the course of this analysis?

13   A   We showed Kevyn Orr in terms of what the actual activity

14   was and the magnitude of the deferrals that were taking place

15   to sustain the city's cash position on a monthly basis.

16   Q   Do you remember what you said to him and what he said to

17   you?

18   A   Not specifically, but it was generally showing as to what

19   the magnitude of the -- what the magnitude of the dire

20   liquidity position of the city.

21              THE COURT:  I'm sorry.  What?  The magnitude what?

22              THE WITNESS:  How dire the --

23              THE COURT:  I didn't hear what you said.  What did

24   you say?

25              THE WITNESS:  Your Honor, I said the dire liquidity

1  situation of the city.

2  BY MR. STEWART:

3  Q   Let me -- let's now go to page 9 of this same exhibit,

4  and the control number on this, if that makes it easier, ends

5  with 7289.  And could you just tell us what this is?

6  A   This is the fiscal year 2014 forecasted cash flow to

7  year-end on a monthly basis.

8  Q   And is this a document you or others at Ernst & Young

9  prepared?

10 A   Yes, it is.

11 Q   Did you show it to Mr. Orr?

12 A   Yes, we did.

13 Q   Did you discuss it with Mr. Orr?

14 A   Yes.  We discussed the receipts and disbursements

15 activity, yes.

16 Q   As shown in this document?

17 A   That is correct.

18 Q   And do you remember what you said to him and he said to

19 you?

20      MR. SHERWOOD:  Your Honor, object to the extent that

21 the question calls for testimony about these forecasts.  This

22 document -- this particular page relates to 2014, which is

23 all projections.

24      MR. STEWART:  And that's why I'm asking the

25 questions I'm asking, only was this shown to Mr. Orr and did

1  he discuss it with him, and I won't go any deeper into it

2  right now.

3        MR. SHERWOOD:  I didn't object to those questions.

4        THE COURT:  No.  I believe the witness can testify

5  as to what he said to Mr. Orr about these documents.  It goes

6  to what Mr. Orr knew or at least what he was advised of at

7  the time, so just tell us what you said to him about these

8  documents or this document.

9        THE WITNESS:  Your Honor, my recollection what I

10  would have said on this particular document would have been

11  that the fiscal year two thousand --

12        THE COURT:  Well, hold on.  Are you reconstructing

13  what you would have said, or are you remembering what you did

14  say?

15        THE WITNESS:  Your Honor, I am trying to recall what

16  I would have said.  I do not remember specifically what I

17  would have said.

18        THE COURT:  All right.  If you don't know the answer

19  to a question, just say that.  Don't guess or try to

20  reconstruct.

21        THE WITNESS:  Yes, your Honor.

22        THE COURT:  Okay.

23  BY MR. STEWART:

24  Q    Did you provide this document to Mr. Orr?

25  A    I did.

1  Q   Did there come a time that he raised it with you?

2          THE COURT:  I'm sorry.  Was there what?

3  BY MR. STEWART:

4  Q   Did there come a time when Mr. Orr raised this document

5  with you?  Did he call you up or ask to have a conversation

6  with you about it that you can remember?

7  A   We had several discussions about this particular document

8  and the overall contents of the numbers, yes.

9  Q   And my only question to you is going to be, if you

10  remember, what did you say to him, and what did he say to

11  you, just that?

12  A   What I would have said on this particular document --

13  Q   Not would have said, what you did say if you remember,

14  and if you don't remember, just tell me you don't remember.

15          THE COURT:  If you don't remember, just say that.

16          THE WITNESS:  I don't remember specifically what I

17  would have said to Mr. Orr on this particular page in a

18  specific conversation around that, but --

19  BY MR. STEWART:

20  Q   Then let me ask the question a different way.  In the

21  time frame around June 14, did you have discussions with

22  Kevyn Orr about the liquidity situation of the city?

23  A   I did.

24  Q   And do you remember what you said to him about the

25  liquidity situation of the city?

1  A    I do.

2  Q    And will you tell us what you told him?

3  A    The point -- what I said is that the fiscal year '14 cash

4  receipts could fall short of cash disbursements to the tune

5  of $185 million.

6  Q    What did he say to you?

7  A    I do not remember specifically about what he said to me

8  directly.

9  Q    Let's go, if we could, now to another page of this, page

10  47, which has control number 227327.  Could you just tell us

11  the -- what this document is?  What's the title of this

12  document?

13  A    "Ten Year Projections for the General Fund Only on the

14  Steady State."

15  Q    And what is a steady state?

16  A    The steady state would have reflected no restructuring of

17  the city's long-term obligations or legacy liabilities.

18  Q    I'm not going to ask you about the content of this, but

19  I'm going to ask you to tell us how you prepared it.

20  A    The way we prepared this is through different line items

21  in terms of the revenue assumptions.  We looked into

22  specifically the overall State of Michigan forecast.  We

23  looked at the historical information with respect to the City

24  of Detroit.  We also went ahead and looked at analyses in

25  terms of what the property taxes recently were for the city

1  and what the -- where the City of Detroit was faring in

2  conjunction with the State of Michigan to come up with a

3  forecast in terms of what the assumptions were for the

4  revenue and property tax and income tax assumptions over the

5  next ten years.  We did it in conjunction with the management

6  team of the city.  We went through income taxes in a great

7  level of detail between residents and nonresidents,

8  corporations, to build up assumptions from the standpoint of

9  what the revenues would look like over the next ten years.

10  We looked at the casino taxes with respect to all three

11  casinos, what their growth had been historically, where they

12  were projected to be in the future, state aid.  We got those

13  numbers directly from the budget department of the State of

14  Michigan in terms of where they saw the overall sales taxes

15  that were due to the city were projected to be over the next

16  ten years.  That's generally how we came up with the revenue

17  forecast, and I can highlight how we went through the

18  expenses as well.

19  Q   Well, yes, if you could, the expense and, finally, the

20  legacy cost without getting into what the numbers actually

21  are, just what your methodology was.

22  A   With respect to the salaries, wages, and overtime, we

23  started with what the current wage levels and the headcount

24  was.  It was built up by department to try and ascertain what

25  the exact headcount was by department.  From there on we had

1  fairly simplistic assumptions with respect to wage level

2  increases of two percent on a year-over-year basis over the

3  forecast period.  For the health benefits for the active

4  employees, we used assumptions that the city's health

5  actuaries have developed on a per head basis, which is what

6  we used based on a per headcount basis to extrapolate over

7  the next ten years.  On the other operating expenses, it was

8  developed by individual department to look at every single

9  department, their budgets, to help ascertain what were the

10 ongoing operating expenses of each one of those departments

11 on a ongoing basis.

12         MR. DECHIARA:  Objection, your Honor.  Peter

13 DeChiara of Cohen, Weiss & Simon for the UAW.  We object to

14 this.

15         THE COURT:  Are you pulling your microphone nice and

16 close for me, please?

17         MR. DECHIARA:  Objection based on relevance.  The

18 only relevance it would have to how this witness performed

19 these numbers would be if the numbers were coming in for the

20 truth of the matter.  Otherwise it has no relevance.

21         THE COURT:  I'm concerned about that, Mr. Stewart.

22 First of all, just so the record is clear, what exhibit

23 number is this page 47 of?

24         MR. STEWART:  It is Exhibit 44.

25         THE COURT:  All right.  So the --

1     MR. STEWART:  44 is in evidence.

2     THE COURT:  Right.  So the question is what weight

3 is page 47 of this exhibit entitled to --

4     MR. STEWART:  Correct.  It goes to weight.

5     THE COURT:  -- if the witness has not been qualified

6 as an expert?

7     MR. STEWART:  Well, Judge, what I was going to do

8 was lay a greater foundation for how it was put together, and

9 then I was going to simply ask the witness this question,

10 which I will ask him now.

11 BY MR. STEWART:

12 Q   Where in here, Mr. Malhotra, did you insert your own

13 personal assumptions?

14 A   All of the assumptions were done in collaboration with

15 the city.

16 Q   Well, where did the numbers come from?

17 A   The numbers came from either the actuaries that we were

18 working with with the city or the city's debt documents with

19 respect to the long-term liabilities of the city or, in terms

20 of the revenues, it was assumptions that we worked on in

21 conjunction with the city.

22     MR. DECHIARA:  Your Honor --

23     MR. STEWART:  And so, your Honor, my point on this

24 is the following.  The fact something is a future projection

25 does not make it an opinion in the sense of being an expert

 1  opinion.  If one is relying on numbers from another source --

 2  in this case, all the sources Mr. Malhotra told us about --

 3  it is their numbers, not his numbers but their numbers, and

 4  what he is doing is tabulating them and calculating them.

 5          THE COURT:  I heard him say that at least some

 6  portion of this, which he didn't specify, was done in

 7  collaboration.

 8          MR. STEWART:  Well, let me -- but that's why I asked

 9  him this other question about which of these --

10  collaboration, and I will ask him this --

11          MR. DECHIARA:  Your Honor, may I be heard?

12          THE COURT:  One second.

13          MR. STEWART:  It sounded from his testimony he met

14  with him and worked with him to learn the numbers.  When I

15  asked him which assumptions were his assumptions, not the

16  assumptions of the people who gave him the numbers, the

17  answer were they're not his assumptions.

18          THE COURT:  His answer was, "We collaborated."

19          MR. STEWART:  Well, I thought -- maybe I heard

20  him -- I must have heard him differently than your Honor

21  heard him.  I thought the answer -- well, should we ask him

22  again?

23  BY MR. STEWART:

24  Q   Mr. Malhotra, of these numbers, which ones are your

25  assumptions?

1  A   EY has made no assumptions that these are EY's numbers.

2  I want to make that -- that's what I'm making clear.

3  Q   So these numbers came to you from who?

4  A   The numbers with respect to -- there are a lot of numbers

5  on this page.  The numbers with respect to all of the debt

6  service would have been picked up from the city's CAFR.  The

7  numbers on the health benefits or pension retiree

8  contributions would have come from the city's actuaries.  The

9  numbers for the actual headcount for all of the departments

10  and the associated costs would have come from the city and

11  its departments.  The numbers with respect to the health

12  costs for the active employees on a per head basis would have

13  come from the city's actuaries.  The numbers with respect to

14  state revenue sharing would have come from the state

15  directly.  The numbers for property taxes, income taxes, and

16  wagering taxes, those numbers, in terms of the assumptions,

17  were validated, collaborated, between our team and the city

18  in terms of the assumptions behind the revenue assumptions.

19  Q   When you say "assumptions," you mean --

20          THE COURT:  One second.

21  BY MR. STEWART:

22  Q   -- the number that's there?

23          THE COURT:  I need to hear from counsel at this

24  point.

25          MR. STEWART:  Okay.  Go ahead.

1    MR. DECHIARA:  Your Honor, to the extent the
2  information in this exhibit comes from actuaries who are not
3  on the witness stand, those numbers are hearsay and should
4  not come in.
5    THE COURT:  Well, but the document is already in
6  evidence.
7    MR. DECHIARA:  Your Honor, and also I would say,
8  too, the witness is testifying about a process that took a
9  high degree of expertise.  I don't think I or most of the
10  people in this room, let alone the man on the street, would
11  be able to take these raw data and convert them into ten-year
12  projections.  It took the sophisticated work of an Ernst &
13  Young team to put it together.  This is in the nature -- this
14  is the very essence of expert testimony.
15    THE COURT:  I agree.  I do.
16    MR. STEWART:  All right.  Your Honor, what we may
17  ask leave to do is to submit perhaps a memoranda raising this
18  with your Honor later on so we can move on now.
19    THE COURT:  You may, of course.
20    MR. STEWART:  Yeah.  Okay.  Your Honor, since --
21    UNIDENTIFIED SPEAKER:  May I ask you --
22    MR. STEWART:  Yes.  Your Honor, one other thing.
23  Since it's in evidence, I assume I am allowed to at least ask
24  the witness what it says, and objections go to weight.
25    THE COURT:  Well, it's duplicative to do that, but I

1  suppose to make a point you could ask briefly for the witness

2  to review what it says.

3          MR. STEWART:  Well, I'm going to just ask him to

4  look at the far right column, and then I'm going to -- pardon

5  me, your Honor.  I'll move on to my next question.

6          MR. RUEGGER:  Excuse me.  Objection.  Arthur Ruegger

7  from Dentons on behalf --

8          THE COURT:  I need you to move that microphone

9  closer, sir.

10          MR. RUEGGER:  I'll try, Judge.  Is this better?

11          THE COURT:  Hold the base closer.

12          MR. RUEGGER:  Don't spill the water.

13          THE COURT:  There you go.  Much better.  Much

14  better.  Thank you.

15          MR. RUEGGER:  Your Honor, we submit the document

16  speaks for itself.  Any further narrative from this witness

17  is in the nature of asking for his expertise on that.

18          THE COURT:  Well, it doesn't take an expert to read

19  it, so I'll permit it.

20          MR. RUEGGER:  Very well, your Honor.

21          MR. STEWART:  Could we simply blow up the far right

22  column?

23  BY MR. STEWART:

24  Q   As a result of your calculations, Mr. Malhotra, what did

25  your spreadsheet conclude was the ten-year adjusted deficit

1    the city was facing?

2    A    The spreadsheet would have said that revenues would be

3    10.4 billion, operating expenditures would be 7.4 billion,

4    and legacy expenditures would be 7 billion over this ten-year

5    time frame for a surplus/deficit of almost $4 billion, a

6    negative $3.93 billion.

7    Q    All right.  So did there come a time when you sat down

8    with the emergency manager to talk about these projections?

9    A    Yes.

10   Q    Now, in preparing the projections, what did you do to

11   make them as accurate as you knew how to make them accurate?

12          MR. SHERWOOD:  Objection.  Calls for analysis of

13   projections that have been --

14          THE COURT:  I'm sorry, sir.  I can't hear you.

15          MR. SHERWOOD:  Objection.  Calls for improper

16   opinion testimony.  These are -- he's being asked to testify

17   about projections that are properly the subject of expert

18   testimony.

19          MR. STEWART:  I think I asked him what he did to try

20   to be accurate.

21          THE COURT:  No.  The objection is sustained.

22          MR. STEWART:  Okay.

23   BY MR. STEWART:

24   Q    In your conversations with Mr. Orr, what did you say to

25   him about your ten-year projections?

1      MR. SHERWOOD:  Same objection.

2      THE COURT:  That objection is overruled.  Please

3  answer.

4      THE WITNESS:  What we said is that if you look at

5  simply the operating --

6      THE COURT:  You said --

7      THE WITNESS:  I said.

8      THE COURT:  You said, "we said."

9      THE WITNESS:  What I said is if you look at the

10  total operating revenues and the total operating

11  expenditures, the city still has a surplus of roughly $3

12  billion.  However, when you layer in the legacy costs of

13  roughly $7 billion over the next ten years, the city has a

14  deficit of almost $4 billion over that ten-year time frame.

15  BY MR. STEWART:

16  Q   And what did he say to you?

17  A   I don't remember specifically about what he said back to

18  me.

19  Q   Now, June 14 was the date of a meeting we've been -- I've

20  been asking you about, I believe.  This document was a

21  document passed out that day; correct?

22  A   Yes.

23  Q   Before moving on from the meeting, let me ask you this.

24  Were questions asked by anyone at that meeting on June 14?

25  A   Yes.  There were questions asked.

1  Q   Do you remember any of the questions that were asked or

2  who asked them?

3  A   I don't know who asked them, but there were questions

4  about the assumptions and the liquidity position of the city.

5  Q   And am I correct in understanding that when you addressed

6  the people attending that meeting that day, you were speaking

7  about the spreadsheets I've asked you about this afternoon?

8  A   That is correct.

9  Q   And were questions asked of you then about those

10  spreadsheets?

11  A   There were -- yes, there were questions about it.

12  Q   Okay.  Let me move to another subject.  You're aware of a

13  security called the certificates of participation --

14  A   Yes.

15  Q   -- or sometimes called pension obligation certificates?

16  A   Yes, I am aware.

17  Q   For the record, can you tell us what those are?

18  A   Those are -- certificates of pension are the funds that

19  the city borrowed back in about 2005 to help fund the

20  underfunding on the two pension systems.

21  Q   And did the city have obligations to service the interest

22  or principal of those securities?

23  A   Yes.

24  Q   And do you know what the city's obligation was?

25  A   As of June of 2013, the city had a $40 million payment

1   that was due to those -- on behalf of those POC's.

2   Q   And what did the city do with respect to that payment?

3   A   The city did not make that payment.

4   Q   The city defaulted on it?

5   A   Yes.  That is correct.

6   Q   What effect did that default have upon the city's cash

7   position?

8   A   It improved the cash position by $40 million at the end

9   of -- June 30, 2012.

10  Q   What conversations, if any, did you have with the

11  emergency manager or his advisors on the subject of the

12  decision to default on the COPs?

13  A   I do not recall of a specific discussion with Kevyn Orr

14  on defaulting on the swaps.

15  Q   Let's move on to another set of meetings.  Did you attend

16  meetings held on June 20th, 2013, with representatives of the

17  pension plans?

18  A   I do.

19  Q   And am I correct in remembering there were two meetings

20  that day?

21  A   That is correct.

22  Q   The morning meeting was with the nonuniformed pension

23  plan, the GRS?

24  A   Yes.

25  Q   And the afternoon meeting was with who?

1   A   With police and fire.

2   Q   Okay.  And we have put up the first exhibit -- I believe

3   this is in evidence -- Exhibit 48.  Can you tell me what

4   Exhibit 48 is?

5   A   It's the presentation that was used for the meeting with

6   the nonuniform retirees on June 20th.

7   Q   And let's go back.  Just ask you a question.  Towards the

8   back of this, are there projections that were included in

9   here that you or Ernst & Young had prepared?  Let's look at

10  page 4 and page 5.  Are these projections you prepared?

11  A   Page 4 was a summary of the legacy expenditures,

12  historical, actual, and forecast.  That would have been

13  information on the pension and health benefits we received

14  from the city's actuaries.

15  Q   Okay.  And the next page?

16  A   Page 5 was the ten-year projections for the general fund

17  only under a restructuring scenario that highlighted claims

18  or amounts that were available to service unsecured claims.

19  Q   Now let's go back to the meeting itself.  How long did

20  the morning meeting last?

21  A   Probably about three hours.

22  Q   And who was there?

23  A   It was the city's advisors along with the members from

24  the -- some retirees and some of the members from the

25  Retirement System.

1  Q   Were questions asked?

2  A   There were some questions asked.

3  Q   Do you remember the questions?

4  A   They were questions about the cash position of the city.

5  They were questions about the city's ability to make any

6  changes to specific legacy liabilities.

7  Q   Do you remember any questions being directed to you?

8  A   They were -- yes.  I remember questions that came up with

9  respect to the cash flows of the city.

10 Q   And do you recall who in particular asked you those

11 questions --

12 A   No, I don't.

13 Q   -- or what you said in response to them?

14 A   No, I don't.

15 Q   Was Mr. Orr there that day?

16 A   He was not.

17 Q   Let's go to the next exhibit, if we could, which is

18 Exhibit 49.  Is this the handout that was given in the

19 afternoon meeting?

20 A   Yes, it was.

21 Q   And tell me about the afternoon meeting.  First of all, I

22 should have asked where these meetings were held.

23 A   These meetings were held at City Hall.

24 Q   And how long did the afternoon meeting last?

25 A   About two or three hours.

1    Q    Who attended?

2    A    It was the city's advisors along with some

3    representatives from the Retirement Systems as well as I

4    thought some active employees.

5    Q    And, once again, if you look towards the back, are there

6    portions of this document that was prepared by you or someone

7    else at E&Y?

8    A    Yes.  We helped pull together pages 4 and 5 for this

9    particular presentation.

10    Q    Okay.  Now, page 4, which we have, has legacy

11    liabilities, some for fiscal years that have already ended --

12    A    That is correct.

13    Q    -- and others that are projected?

14    A    Yes.

15    Q    And where did your numbers come from for these?

16    A    The debt service numbers, the scheduled debt service, as

17    the amortization tables exist today, the POC principal and

18    interest payments were, again, based on the current

19    amortization schedules.  The POC swaps payments were based on

20    the existing swap schedule.  The pension contributions and

21    the health benefits for retirees would have come based on the

22    assumptions that were provided to us by the city's actuaries.

23    Q    Now, let me ask you about the substance of the meeting.

24    Did you make any part of the presentation that afternoon?

25    A    I did.

1    Q    What parts of the presentation did you make?

2    A    I would have focused on pages 4 and 5 in terms of laying

3    out what the financial position of the city was.

4    Q    Were questions asked of you that day, that afternoon?

5    A    I don't remember specific questions that afternoon.

6    Q    Where were matters left at the end of the morning

7    meeting?

8    A    They were generally left to have an open dialogue and

9    communication flow between the city's advisors and the

10   participants in the meeting.

11   Q    And at the end of the afternoon meeting?

12   A    It was the same.

13   Q    Let's look at the next exhibit, Exhibit 51.  Can you tell

14   us what Exhibit 51 is?

15   A    Exhibit 51 is the ten-year plan in terms of the forecast

16   that was available at that point of time as of June 21st.

17   Q    Did you attend a meeting on June 25th with

18   representatives of the bondholders?

19   A    I did.

20   Q    And where was that meeting held?

21   A    That meeting was held in New York.

22   Q    Who attended?

23   A    It was bondholders and bond insurers and their financial

24   advisors.

25   Q    Was Exhibit 51 a document given to them that day?

1  A   Yes.  That was the document that we went through on that

2  particular day.

3  Q   Do you remember which bond insurers you met with or

4  bondholders you met with on the 25th?

5  A   Yes.  Ambac was there.  I think Assured was there.

6  National, advisors from FGIC, advisors from Syncora.  Those

7  are actually some of the ones that I remember specifically.

8  It was a pretty big meeting.

9  Q   And I apologize if I asked you this.  How long did you

10  meet with them?

11  A   We met with them for at least four to five hours.

12  Q   What was the purpose of that meeting?

13  A   The purpose of the meeting was to have a subsequent

14  discussion and Q&A on the assumptions behind the information

15  that was shared as of June 20th.

16  Q   Do you remember any questions you were asked?

17  A   There were a lot of questions with respect to the

18  assumptions underlying the ten-year projections and the

19  details in terms of how those numbers were built up.

20  Q   And once again, where were matters left at the end of the

21  June 25th meeting?

22  A   They were left to have follow-up meetings on an

23  individual basis with certain bondholders or the insurers to

24  have more specific discussions around the business plan.

25  Q   Let me direct your attention to July 9.  Were there

1    meetings that day with bondholders or insurers for

2    bondholders?

3    A    Yes.

4    Q    And where were those meetings?

5    A    Those meetings were held in Detroit.

6    Q    And did you attend them?

7    A    Yes.

8    Q    How long did they last?

9    A    The morning meeting lasted about four or five hours.

10   Q    And then I assume there was an afternoon meeting as well?

11   A    Yeah.  There was an afternoon meeting.  My recollection

12   is with the pension systems, I believe.  There were a lot of

13   meetings during this time frame.

14   Q    How long was your meeting with the pension systems?

15   A    I think we had a meeting for about two or three hours.

16   Q    What was the purpose of the morning meeting?

17   A    The morning meeting was generally to have additional

18   dialogue and discussions around the assumptions of the

19   business plan.

20   Q    Do you remember who you met with in particular that

21   morning?

22   A    I remember it was the financial advisors for National.

23   It was the financial advisors for FGIC, Assured were the some

24   of the names that at least come to mind.

25   Q    In this period, did the city, to your knowledge, make any

1  proposals to the bondholders to resolve their claims?

2  A    The city made a proposal or a framework for a proposal in

3  its June 14th presentation.

4  Q    Did the bondholders at any point or any subgroup of

5  bondholders make a proposal to the city at some point?

6  A    My understanding is yes.  I have not reviewed a proposal

7  from the bondholders in detail.

8  Q    Do you remember when that proposal was made?

9  A    My recollection is it was prior to the city filing.

10  Q    Okay.  Now, in the afternoon meeting, what was the reason

11  for meeting with the two pensions on the afternoon of July 9?

12  A    It was to have additional discussions around the

13  assumptions that the city's actuaries were using with respect

14  to not only the size of the claim but also to ascertain the

15  contribution levels required over the next ten years for the

16  pension systems.

17  Q    And I apologize if I've asked you this before.  At the

18  end of that afternoon meeting with the pensions, what was

19  supposed to happen next, if anything?

20  A    There was supposed to be a process to try and understand

21  the assumptions, the actuarial assumptions, and thereby

22  derive -- have an understanding of the amount of the claim

23  and then have subsequent discussions around the amount of

24  funding that the city may or may not able to afford over the

25  long term.

1   Q   Okay.  Now, let's now go to July 18.

2           THE COURT:  Excuse me, Mr. Stewart.

3           MR. STEWART:  Yes.

4           THE COURT:  I'm sorry to be such a nuisance about

5   this, but please try not to wander so far from the

6   microphone.

7           MR. STEWART:  Oh, sorry, Judge.

8           THE COURT:  Part of our issue here is that we have

9   overflow courtrooms where people are trying to hear what we

10  say, so it's not just a question of the recording, which is

11  important, but other people are listening in as well.

12          MR. STEWART:  I'll do better, your Honor.  Sorry.

13  BY MR. STEWART:

14  Q   Let me direct your attention, if I could, now to July 18.

15  Were you asked on or about July 18 to execute a declaration

16  in connection with Detroit's bankruptcy filing?

17  A   Yes, I was.

18  Q   How many days before July 18 did you start working on

19  your declaration?

20  A   I don't recall the specific number of days.  It was

21  sometime in June.  Late June is I think where we started it.

22  Q   And do you -- how much of your declaration did you write,

23  and how much of it was written by others for you?

24  A   A majority of it -- of the declaration was written by me

25  in conjunction with counsel.

1  Q   Now, your declaration has a number of attachments to it,

2  and I'm going to put them up before I question you about

3  them.  And let's start with Exhibit -- Attachment A, which is

4  Exhibit 9.  And is that one of the exhibits to your

5  declaration?

6  A   It is.

7  Q   And is this a document you or someone else at E&Y

8  prepared?

9  A   Yes.

10 Q   And what is it?

11         MR. RUEGGER:  Your Honor, objection.  We objected to

12 this document.  It is forecasts, which we think would require

13 expert testimony.  We believe any testimony related to it

14 should be excluded on that grounds.

15         THE COURT:  The document is in evidence?

16         MR. RUEGGER:  No, your Honor.

17         THE COURT:  It's not?

18         MR. STEWART:  It's not, Judge.  I'm going to ask him

19 now about his dealings with Mr. Orr on the document; however,

20 we also designated this document and the next two as

21 summaries under Federal Rule of Evidence 1006 since they

22 accumulate voluminous evidence which we made available to the

23 objectors.

24         THE COURT:  What does this document purport to do or

25 to be without telling me what its contents are?

 1          THE WITNESS:  It was meant to be to show the two

 2     years of actual cash activity for the general fund and what

 3     the city's cash position was at the end of fiscal year 2013

 4     and fiscal year 2012, the magnitude of the deferrals over

 5     that time frame, your Honor, and then the two-year forecast

 6     beyond that time frame.

 7          THE COURT:  And so how was the document compiled?

 8          THE WITNESS:  Your Honor, the actuals for the first

 9     two years were compiled based on the receipts and

10     disbursements activity that we were able to ascertain for the

11     bank accounts.  Your Honor, for the next two years, with

12     respect to the different line items, I can walk through the

13     assumptions, but --

14          THE COURT:  By "the next two years," you mean fiscal

15     year '14 and '15?

16          THE WITNESS:  That is right, your Honor.

17          THE COURT:  No need.  I'll admit the document as to

18     actual and preliminary for 2012 and 2013, but the objection

19     is sustained as to the forecasts.

20          MR. STEWART:  Thank you, your Honor.

21        (Debtor's Exhibit 9 received at 4:33 p.m.)

22     BY MR. STEWART:

23     Q    Is this a document you discussed with the emergency

24     manager or his advisors, Mr. Malhotra, on or before the date

25     you executed your declaration?

1    A    Yes.

2    Q    And why did you discuss it with them?

3    A    Because it showed the status of the city's liquidity

4    position right around that time frame and in the subsequent

5    few months.

6    Q    And what did you say to the emergency manager or his

7    advisors about the city's liquidity position at that time or

8    in the coming periods?

9    A    What I said is that the city's liquidity position at the

10   end of fiscal year 2013 had improved by roughly $40 million

11   because the city did not make the POC payment that was due in

12   June -- on June 15, 2013.  And what I said is that over the

13   next two years the city was going to have a significant cash

14   burn for each particular year based on the disbursements

15   significantly exceeding receipts.

16   Q    What did you tell Mr. Orr --

17            THE COURT:  Excuse me one second.  Again, we have to

18   clarify your language.  You used the phrase P-O-C.  What does

19   that mean?

20            THE WITNESS:  Your Honor, I was referring to the

21   pension obligation certificate --

22            THE COURT:  Okay.

23            THE WITNESS:  -- and the payment that was due on

24   June 15th.

25            THE COURT:  And then you used the phrase "cash

1   burn."  What does that refer to?

2        THE WITNESS:  Your Honor, that refers to the city's

3   operating disbursements exceeding its receipts or its --

4   city's total disbursements exceeding its receipts thereby

5   reducing the cash over a specified time frame.

6   BY MR. STEWART:

7   Q   And so you've told us what you said to Mr. Orr.  Did you

8   tell him what the cash position was going to be at this rate

9   in the coming years?

10  A   Yes, I did.

11  Q   And what did you tell him?

12  A   I would have -- what I said is that the city's cash

13  position net of deferrals could be approximately $143 million

14  negative at the end of fiscal year 2014 not making -- while

15  not repaying any of the deferrals that had already been made

16  as of that point of time or without unpooling any of the cash

17  that the city had -- has currently pooled.

18  Q   And if the city had unpooled the cash or paid up the

19  deferrals, what did you tell him the cash position was going

20  to be?

21  A   What I said is that the city's cash position for -- would

22  have been almost $150 million worse off if the pension

23  contributions that had been deferred till that time frame

24  were made as well as if the deferred POC payment had been

25  made.  If the pooled cash had to be unpooled, that amount

1    would be roughly an additional $90 million based on what was

2    in the CAFR.

3    Q    For a total cash shortfall of how much?

4    A    Before the --

5              MR. DECHIARA:  Objection.

6              THE WITNESS:  -- unpooling of cash, it would --

7              MR. DECHIARA:  Objection.  Your Honor, I just am

8    objecting to the extent that this -- what the witness is

9    recounting he's saying to Mr. Orr, I just want to make clear

10   that that's not coming into the record as the truth of the

11   matter -- of the statements he's making to Mr. Orr.  If

12   that's clear, I have no objection, but the line is getting

13   pretty blurred, and I think it's getting pretty close to the

14   line.

15             THE COURT:  I'm concerned about that.  I share your

16   concern.  You used a phrase again that needs clarification,

17   "unpool."

18             MR. STEWART:  We were talking about the pooled

19   funds, your Honor.  Those were the --

20             THE COURT:  I'm asking the witness.

21             MR. STEWART:  Thanks.

22             THE COURT:  What does "unpool the cash" mean?

23             THE WITNESS:  Your Honor, what I was -- what I meant

24   to say is if the pooled cash had to be restricted or

25   segregated out of the general fund, that's what I was

1  referring to the unpooling of cash.

2        THE COURT:  Okay.

3  BY MR. STEWART:

4  Q   What did Mr. Orr say to you?

5  A   On this particular document, the discussions with Mr. Orr

6  or specifically also the other advisors was the magnitude --

7        MR. RUEGGER:  Your Honor, I'm sorry to interrupt the

8  witness, but I thought the question was what did Mr. -- what

9  was the conversation with Mr. Orr.

10        MR. STEWART:  Or his advisors.

11        MR. RUEGGER:  And I thought the witness was just

12  describing a conversation that might not have been with

13  Mr. Orr but might have been with the advisors.  If I

14  misheard, then I apologize.

15        MR. STEWART:  I thought I said Mr. Orr or his

16  advisors, but if not I'll reask the question.

17        MR. RUEGGER:  Thank you.

18        THE COURT:  Okay.

19  BY MR. STEWART:

20  Q   What did Mr. Orr or his advisors say to you?

21  A   The specific discussions on this particular page were

22  around the magnitude of the city's cash disbursements

23  exceeding its cash receipts in terms of how dire the

24  situation was with respect to the general fund's cash

25  position.

1    Q   Page 2 of our exhibit is -- let's put it up there, and
2    let me ask you just what this is.
3            MR. RUEGGER:  Your Honor, objection.  It's a
4    forecast.  I'd rather not have any testimony on this.
5            THE COURT:  I'm sorry.  Did you say you'd rather not
6    have any testimony about it?
7            MR. RUEGGER:  And I'll rephrase my objection with
8    all due respect, your Honor.  Objection.  It's a forecast,
9    your Honor.
10           MR. STEWART:  My question is what is this document?
11           THE COURT:  Yeah.  I think we can get at least that
12   much in.
13           MR. STEWART:  Yeah.
14   BY MR. STEWART:
15   Q   What is this document?
16   A   It's the monthly cash flow forecast for fiscal year 2014
17   under base case.
18           THE COURT:  I'm sorry.  Under what?
19           THE WITNESS:  Under base case.
20           THE COURT:  Base case, which means --
21           THE WITNESS:  So, your Honor, on this it means the
22   city continuing to make its payments for both all unsecured
23   claims per schedule and no restructuring initiatives such as
24   any benefits from the bankruptcy protection may avail.  It
25   was the city paying its payments as they came due based on

1  the information that we had, including information from the

2  actuaries.

3          THE COURT:  Like steady state before?

4          THE WITNESS:  That is correct, your Honor.

5  BY MR. STEWART:

6  Q   And did you discuss your conclusions with Mr. Orr or his

7  advisors?

8  A   Yes.

9  Q   Let's put up the next exhibit, 10, for identification.

10  Mr. Malhotra, I think we have Exhibit 10 for identification,

11  which is Exhibit B to your declaration.  Is this a ten-year

12  financial projection?

13  A   Yes, it is.

14  Q   Did you discuss this with Mr. Orr or his advisors?

15  A   Yes, I did.

16  Q   And what did you say to him, and what did he say to you

17  or his advisors say to you about the ten-year projections?

18  A   What the --

19          MR. RUEGGER:  Objection.  Your Honor, this is the

20  same issue that Mr. DeChiara raised.  A discussion of

21  forecasts is essentially I think a back door around your

22  ruling, so we'd object to the question and the answer.

23          THE COURT:  Well, I'll permit the witness to answer

24  this question with the understanding that the document is not

25  in evidence and the witness' testimony about what the

1  document says is only for the purpose of the truth of what he
2  told Mr. Orr, not for the truth of the statements themselves.
3         MR. RUEGGER:  Thank you, your Honor.
4  BY MR. STEWART:
5  Q   And what did you say to Mr. Orr about the conclusions you
6  had reached in the document?
7  A   What I said is that the city's revenues over the ten
8  years, approximately $10-1/2 billion, and the city's
9  operating expenditures over these next ten years,
10  approximately $7-1/2 billion, for roughly a $3 billion
11  operating surplus.  What I said specifically around the
12  legacy liabilities was based on the current amortization
13  schedule and the information that we have received from the
14  actuaries, the legacy costs could be in excess $7 billion
15  over the ten years, which would result in a potential
16  operating -- a potential deficit to the tune of $4 billion
17  over the next ten years.
18         MR. STEWART:  Let's put up Exhibit 11 if we could.
19  BY MR. STEWART:
20  Q   Can you tell us what Exhibit 11 is?
21  A   Exhibit 11 is the five years of actual legacy
22  expenditures and five years of a forecast on the scheduled
23  debt service as it exists today or the pension and health --
24  retiree healthcare information we received from the
25  actuaries.

1       MR. STEWART:  Let's blow up, if we could, the part

2  that deals with the fiscal years ended between 2008 and 2012.

3  BY MR. STEWART:

4  Q   Are those numbers numbers relating to years that had

5  already -- where the books had already been closed?

6  A   That is correct.

7  Q   Where did your numbers come from?

8  A   The numbers would have come from -- for the debt service,

9  the POC's, would have come from the city.  The pension

10  contributions and the health benefits, the retirees -- for

11  the retirees would have also come from the city in

12  conjunction with the city's actuaries on the allocation of

13  what was for public safety versus nonpublic safety or DDOT.

14       MR. STEWART:  Your Honor, I would move this portion

15  of the document into evidence since it reflects only

16  historical data.

17       THE COURT:  Any objections?  All right.  The Court

18  will admit this document.  What was the exhibit number again

19  just so we're clear?

20       MR. STEWART:  11, I believe, Judge.

21       THE COURT:  All right.  Admitted Exhibit 11, 2008

22  through '12 only.

23       (Debtor's Exhibit 11 received at 4:45 p.m.)

24  BY MR. STEWART:

25  Q   And then go back to the full document if you could, and

1 as to the overall document, Mr. Malhotra, did you have

2 discussions with the emergency manager or his advisors about

3 it?

4 A    Yes, I did.

5 Q    And why did you discuss it with them?

6 A    We discussed it in the context of the legacy expenditures

7 continuing to have an increasing percentage of the overall

8 general fund revenues compared to where the city was five

9 years ago, compared to where the city was headed by 2017,

10 that the weight of the legacy expenditures was almost going

11 to close to double based on the projections that we had been

12 given.

13 Q    And what did the -- Mr. Orr or his advisors say to you in

14 response to the points that you made?

15 A    Specifically, they were surprised in terms of the

16 magnitude of the increase in pension and retiree healthcare

17 costs over the next five years.

18         MR. DECHIARA:  Objection.  Lack of foundation.

19 Testifying to the state of mind of the --

20         THE COURT:  It actually wasn't the question.  The

21 question was what did they say.

22         THE WITNESS:  They basically said that the costs

23 going up from where they were five years ago to where they

24 were ten years ago -- I specifically remember that it was

25 almost going to double -- was the response that I got back on

1  this particular page.

2       THE COURT:  Okay.  Can you try to specify for us

3  when these conversations were that Mr. Stewart has been

4  asking you about?

5       THE WITNESS:  Sure.  On this particular document we

6  would have had -- which was also as a part of the June 14th

7  proposal, your Honor, so we would have had meetings with

8  Mr. Orr and the other advisors all through the June time

9  frame and even in some of the May time frame, so there were a

10  series of meetings that we had.

11       THE COURT:  At which these documents were discussed?

12       THE WITNESS:  Yes.  The June 14th proposal, your

13  Honor, was pulled together over a period of time, so there

14  were specific documents that were discussed in those

15  meetings.

16       MR. STEWART:  Your Honor, I have a demonstrative

17  exhibit I would like to use, but before putting it up on the

18  screen, since there have been objections, it's Exhibit 38.

19  Why don't we put it up on the screen?  Judge, this is a

20  graphic representation of what the witness already has

21  testified to that he told Mr. Orr was the city's cash

22  position as the witness had seen it, and what I would like to

23  ask the witness is does this represent what you told Mr. Orr

24  or his advisors about what you believe the city's cash

25  position was going to look like in the coming year?

1          MR. RUEGGER:  Objection.  Leading, and it's also a

2     forecast.

3          MR. STEWART:  I can ask it in a nonleading way,

4     Judge, but --

5          MR. RUEGGER:  Then just forecast.

6          THE COURT:  Yeah.  You can fix the question.  No.

7     The objection is sustained.

8          MR. STEWART:  Okay.  Now, your Honor, as to these

9     last three exhibits and actually also this chart, I'd like to

10    move them into evidence on another ground.  And as I

11    mentioned, we identified these to the objectors as documents

12    that qualified as summaries over Federal -- under Federal

13    Rule of Evidence 1006.  In other words, they compiled and

14    pulled together voluminous records that could not

15    conveniently or easily otherwise be made into proofs.  That

16    was done with proper notice.  As the rule requires, we

17    notified the objectors of this.  We told them we have the

18    underlying records available for your examination.  If you

19    wish to see them, please come and do so.  One person did call

20    to say they'd like to see them but never, in fact, came.  I

21    would submit that we have actually satisfied the requirements

22    of Rule 1006 by doing this and that as simple summaries of

23    voluminous information they qualify for admission.

24         MR. RUEGGER:  Your Honor, I think Mr. Stewart

25    misunderstands our objection.  It's not that there's a lot of

1    data underlying any of these documents.  That might very well

2    be, but they are forecasts, which require, in our view,

3    expert testimony, which is not in the courtroom, so we're not

4    objecting due to the volume of the underlying data.  It's

5    because they are forecasts.

6              THE COURT:  I do agree with that.  The motion is

7    denied.

8              MR. STEWART:  Well, your Honor, could I be heard

9    just one more --

10             THE COURT:  All right.

11             MR. STEWART:  -- one more moment on this?  The fact

12   they are forecasts doesn't, per se, change anything.  They

13   would have to be opinions before they're excludable.  It's

14   been testified he --

15             THE COURT:  But why isn't the forecast an opinion

16   about what's being forecast?

17             MR. STEWART:  Well, it's possible to have forecasts

18   that are factual, that are extrapolations, that are not

19   really opinions, and there are forecasts rendered many times

20   that don't involve experts.  In fact, the two decisions I

21   cited earlier involved financial analysts much like

22   Mr. Malhotra who pulled together documents from which then

23   conclusions could be reached about the probability of

24   something happening or not happening.  The fact --

25             THE COURT:  They involve forecasts?

1       MR. STEWART:  These did not.

2       THE COURT:  Financial forecasts?

3       MR. STEWART:  These involved complicated personal

4    financial records, but they did involve an ultimate issue

5    such as could this person have possibly afforded this item

6    based on his or her income or --

7       THE COURT:  In the past.

8       MR. STEWART:  Well, it's past, but if a forecast is

9    based on information that is either historical or is made

10   available as information about a forecast --

11      THE COURT:  I have to say I'm not persuaded, but if

12   you can find me a case which says that a forecast does not

13   involve expertise, I'll certainly consider it.

14      MR. STEWART:  Okay, your Honor.  We will do that.

15      THE COURT:  We'll leave it open to that extent.

16      MR. STEWART:  Thank you.  That's all I have of this

17   witness, your Honor.

18      THE COURT:  All right.  Well, we won't press on with

19   cross-examination now.  We will break for the day and

20   reconvene at nine o'clock tomorrow morning.  Before we go --

21   ah, Ms. Patek has something, and then I have something.

22      MS. PATEK:  Your Honor, this is just a brief

23   housekeeping matter about a matter of a summary exhibit that

24   came in at the beginning of the day, and this was something

25   Mr. Irwin and I had talked about, and there was an error on

1  it.  It was to be corrected, and it didn't get corrected, but

2  it's going to be corrected on the --

3           THE COURT:  All right.  Let me ask the two of you to

4  consult about that and get back to me first thing in the

5  morning.  I have been asked to remind you that although this

6  courtroom will be locked overnight, there may and probably

7  will be people in here doing what they regularly do, the IT

8  staff, court staff, cleaning staff, so you are free to leave

9  your equipment and property here with that understanding or,

10  of course, you can take it with you.  And I remind you once

11  again please be quiet, perfectly quiet in the hallways.  And

12  we'll reconvene at nine o'clock tomorrow morning.

13           THE CLERK:  All rise.  Court is adjourned.

14       (Proceedings concluded at 4:53 p.m.)

INDEX

                                                    Page

Opening Statement by Mr. Bennett                     56
Opening Statement by Ms. Green                       94
Opening Statement by Ms. Brimer                     112
Opening Statement by Mr. Wertheimer                 117
Opening Statement by Ms. Ceccotti                   118
Opening Statement by Ms. Patek                      128
Opening Statement by Mr. Morris                     135
Opening Statement by Ms. Levine                     138
Opening Statement by Mr. Ullman                     145

WITNESSES:              Direct   Cross   Redirect   Recross

Gaurav Malhotra           168


EXHIBITS:                                        Received

Debtor's Exhibit 9                                 228
Debtor's Exhibit 11                                236
Debtor's Exhibit 104                                93

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.




/s/ Lois Garrett                October 27, 2013
_____         _____
Lois Garrett

**ITEM NO. 62**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name    **Robin Wysocki**

Firm    **Miller, Canfield, Paddock and Stone, P.L.C.**

Address    **150 West Jefferson Avenue, Suite 2500**

City, State, Zip    **Detroit, Michigan 48226**

Phone    **313-496-7631**

Email    **wysocki@millercanfield.com**

**Case/Debtor Name:**

**Case Number:**    **13-53846**

**Chapter:**    **9**

**Hearing Judge**   **Hon. Steven Rhodes**

◉ **Bankruptcy**    ◯ **Adversary**

◯ **Appeal**    **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **10/25/2013**   **Time of Hearing:** **9 am**   **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested: ◉ **Original/Unredacted** ◯ **Redacted** ◯ **Copy** *2nd Party)

◉ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: **Please include morning and afternoon sessions.**

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki    Date: **10/28/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____ Date    By

Order Received:

Transcript Ordered

Transcript Received

## ITEM NO. 63

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ____ **Miller, Canfield, Paddock and Stone, P.L.C.** ____

Address ____ **150 West Jefferson Avenue, Suite 2500** ____

City, State, Zip ____ **Detroit, Michigan 48226** ____

Phone ____ **313-496-7631** ____

Email ____ **wysocki@millercanfield.com** ____

**Case/Debtor Name:**

**Case Number:**   **13-53846**

**Chapter:**   **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

◉ **Bankruptcy**   ◯ **Adversary**

◯ **Appeal**   **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **10/28/2013**   **Time of Hearing:** **9 am**   **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested:   ◉ **Original/Unredacted**   ◯ **Redacted**   ◯ **Copy** (2nd Party)

◉ Entire Hearing   ◯ Ruling/Opinion of Judge   ◯ Testimony of Witness   ◯ Other

Special Instructions: **Please include morning and afternoon sessions.**

**Type of Request:**

[X] Expedited Transcript - $4.85 per page (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki   Date: **10/28/2013**

By signing, I certify that I will pay all charges upon completion of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____   Date   By

Order Received:

Transcript Ordered

Transcript Received

# ITEM NO. 64

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
**TRANSCRIPT ORDER FORM**

111 First Street                 211 W. Fort Street              226 W. Second Street
Bay City, MI 48708               17th Floor                      Flint, MI 48502
                                 Detroit, MI 48226

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ____ **Miller, Canfield, Paddock and Stone, P.L.C.** ____

Address ____ **150 West Jefferson Avenue, Suite 2500** ____

City, State, Zip _____ **Detroit, Michigan 48226** _____

Phone _____ **313-496-7631** _____

Email _____ **wysocki@millercanfield.com** _____

**Case/Debtor Name:**

**Case Number:**    **13-53846**

**Chapter:**    **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'○● **Bankruptcy**    ○ **Adversary**

○ **Appeal    Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _10/29/2013_    **Time of Hearing:** _9 am_    **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested: ◉**Original/Unredacted** "○ **Redacted** """○**Copy** *2nd Party)

◉ Entire Hearing    ○ Ruling/Opinion of Judge    ○ Testimony of Witness    ○ Other

Special Instructions: **Please include morning and afternoon sessions.** _____

**Type of Request:**

[X] Expedited Transcript - $4.85'r̕ gt'r̕ ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki _____ Date: **10/29/2013** _____
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
                    Date        By

Order Received:

Transcript Ordered

Transcript Received

**ITEM NO. 65**

```
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        October 24, 2013
    _____/ 9:05 a.m.
 5
                  IN RE:  ELIGIBILITY TRIAL
 6         BEFORE THE HONORABLE STEVEN W. RHODES
            TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   THOMAS CULLEN, JR., ESQ.
10                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
11                                 Washington, D.C. 20001-2113
                                   202-879-3939
12
                                   BRUCE BENNETT, ESQ.
13                                 Jones, Day
                                   555 South Flower Street
14                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
15                                 213-243-2382

16                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   Pepper, Hamilton
17                                 4000 Town Center
                                   Suite 1800
18                                 Southfield, MI 48075-1505
                                   248-359-7333
19
    For State of Michigan:         MATTHEW SCHNEIDER, ESQ.
20                                 (P62190)
                                   Chief Legal Counsel
21                                 Attorney for State of Michigan
                                   Michigan Department of
22                                 Attorney General
                                   P.O. Box 30754
23                                 Lansing, MI 48909
                                   517-373-0126
24

25
```

```
 1                              STEVEN HOWELL, ESQ. (P28982)
                                Special Assistant Attorney
 2                              General
                                Dickinson, Wright
 3                              500 Woodward Avenue
                                Suite 4000
 4                              Detroit, MI  48226-3425
                                313-223-3033
 5
    For Michigan Council 25 of   SHARON L. LEVINE, ESQ.
 6  the American Federation of   JOHN SHERWOOD, ESQ.
    State, County and Municipal  Lowenstein, Sandler, LLP
 7  Employees (AFSCME), AFL-CIO  65 Livingston Avenue
    and Sub-Chapter 98, City of  Roseland, NJ 07068
 8  Detroit Retirees:            973-597-2500

 9  For Detroit Retirement       ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement JENNIFER GREEN, ESQ.
10  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of    151 S. Old Woodward Avenue
11  the City of Detroit:         Suite 200
                                 Birmingham, MI 48009
12                               248-988-5882

13                               RONALD KING, ESQ. (P45088)
                                 Clark, Hill
14                               212 East Grand River Avenue
                                 Lansing, MI 48906
15                               517-318-3015

16  For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit      JULIE BETH TEICHER, ESQ.
17  Police Officers Association   (P34300)
    and the Detroit Police        DAVID EISENBERG, ESQ. (P68678)
18  Lieutenants and Sergeants     Erman, Teicher, Miller, Zucker
    Association:                  & Freedman
19                                400 Galleria Officentre
                                  Suite 444
20                                Southfield, MI 48034

21  For International Union, UAW: BABETTE A. CECCOTTI, ESQ.
                                  PETER D. DECHIARA, ESQ.
22                                THOMAS CIANTRA, ESQ.
                                  Cohen, Weiss, and Simon, LLP
23                                330 West 42nd Street
                                  New York, NY 10036-6976
24                                212-356-0227

25
```

| | | |
|---|---|---|
| 1 | For the Detroit Retired | THOMAS MORRIS, ESQ. (P39141) |
| | City Employees Association, | Silverman & Morris |
| 2 | Retired Detroit Police and | 30500 Northwestern Highway |
| | Fire Fighters Association, | Suite 200 |
| 3 | Shirley V. Lightsey, and | Farmington Hills, MI 48334 |
| | Donald Taylor (Retiree | 248-539-1330 |
| 4 | Association Parties): | |
| | | RYAN PLECHA, ESQ. (P71957) |
| 5 | | Lippitt, O'Keefe |
| | | 370 East Maple Road |
| 6 | | 3rd Floor |
| | | Birmingham, MI 48009 |
| 7 | | 248-646-8292 |
| 8 | For the Official Committee of | MATTHEW E. WILKINS, ESQ. |
| | Retirees: | (P56697) |
| 9 | | Brooks, Wilkins, Sharkey & |
| | | Turco, PLLC |
| 10 | | 401 S. Old Woodward Avenue |
| | | Suite 400 |
| 11 | | Birmingham, MI 48009 |
| | | 248-971-1711 |
| 12 | | |
| | | CLAUDE D. MONTGOMERY, ESQ. |
| 13 | | ANTHONY ULLMAN, ESQ. |
| | | ARTHUR RUEGGER, ESQ. |
| 14 | | Dentons |
| | | 1221 Avenue of the Americas |
| 15 | | New York, NY 10020-1089 |
| | | 212-768-6700 |
| 16 | | |
| | For the Retired Detroit | LYNN M. BRIMER, ESQ. (P43291) |
| 17 | Police Members Association: | MEREDITH TAUNT, ESQ. (P69698) |
| | | MALLORY FIELD, ESQ. (P75289) |
| 18 | | Strobl & Sharp, P.C. |
| | | 300 East Long Lake Road |
| 19 | | Suite 200 |
| | | Bloomfield Hills, MI 48304-2376 |
| 20 | | 248-540-2300 |
| 21 | For the Flowers Plaintiffs – | WILLIAM A. WERTHEIMER, ESQ. |
| | Robert Flowers, Michael Wells, | (P26275) |
| 22 | Janet Whitson, Mary Washington | 30515 Timberbrook Lane |
| | and Bruce Goldman: | Bingham Farms, MI 48025 |
| 23 | | 248-644-9200 |
| 24 | | |
| 25 | | |

```
 1   For Ambac Assurance        DANIEL WEINER, ESQ. (P32010)
     Corporation:               Schafer & Weiner
 2                              40950 Woodward Avenue
                                Suite 100
 3                              Bloomfield Hills, MI 48304
                                248-540-3340
 4
     Court Recorder:            Letrice Calloway
 5
     Transcriber:               Deborah L. Kremlick
 6

 7

 8

 9   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

| WITNESSES FOR THE CITY: | Direct | Cross | Redirect |
|---|---|---|---|
| GAURAV MALHOTRA | | 8,56,67,82 | 85 |
| CHARLES MOORE | 90 | 128,143,148,151 | |
| KENNETH BUCKFIRE | 154 | | |

| EXHIBITS: | | ID | ADM |
|---|---|---|---|
| CX69 | Draft Actuarial Evaluation Report | 119 | 123 |
| CX70 | Actuarial Evaluation Report | 126 | 127 |
| CX75 | Financial Operating Plan | 182 | 184 |

1      (Court in Session)

2           THE CLERK: All rise. Court is in session. Please

3   be seated. Case number 13-53846, City of Detroit, Michigan.

4           THE COURT: Is anybody not here? All right. Well,

5   then let's assume everyone's here and we don't have to repeat

6   appearances.

7      A couple of housekeeping matters. Mr. Stewart, I

8   received and actually read the memorandum that was filed a few

9   minutes ago on this issue of allowing the witness to testify

10  about projections. Thank you to whoever on your staff stayed

11  up all night doing that.

12          MR. STEWART: Unfortunately Mr. DiPompeo did, Your

13  Honor.

14          THE COURT: Well, thanks to him. As a matter of

15  process, however, before we have any further argument on it,

16  it is appropriate to -- to take some time not only for us, but

17  for the objecting parties to study it and look at the cases

18  that have been cited and prepare.

19     So I think we'll proceed with his cross examination. And

20  perhaps reconsider the issue after lunch.

21     The second housekeeping item is in regard to the

22  Governor's testimony. Is Mr. Schneider here? Mr. Howell is

23  here. Is it -- is it --

24          MR. HOWELL: Dickinson, Wright. Special Assistant

25  Attorney General appearing on behalf of the state.

1          THE COURT:  Thank you, sir.  Is it the parties'

2  agreement and the Governor's intention to appear at 1:00 on

3  Monday?

4          MR. HOWELL:  I don't know if that -- I believe

5  that's the plan without the limitations suggested.

6          THE COURT:  Okay.  I --

7          MR. DECHIARA:  I'm sorry, Your Honor, I was

8  distracted for a moment.

9          MR. HOWELL:  If I may, Your Honor, I -- I believe

10  the -- there is ongoing discussions between Matthew.  He's

11  meeting today with the Governor to work those details out.

12  But I thought the offer was 1:00 on Monday.

13          MR. DECHIARA:  Yes.  The state offered to produce

14  the Governor at 1:00 on Monday and there's no agreement as to

15  any limitation on the time of his testimony.

16          MR. HOWELL:  Okay.  That is correct, Your Honor.

17          THE COURT:  Okay.  Then in -- in that circumstance,

18  the Court will change its plans and we will run Court until

19  5:00 instead of our previously scheduled time of 3:00 because

20  I don't want to have to require the Governor to come back a

21  second day on account of my schedule.  So we'll plan on going

22  until at least 5:00 on Monday to try to get all of his

23  testimony in in one -- one day.

24          MR. DECHIARA:  Thank you, Your Honor.  We appreciate

25  it.

1       MR. HOWELL:  Thank you, Your Honor.  We appreciate

2  the accommodation.

3       THE COURT:  Okay.

4       MR. HOWELL:  Thank you very much.

5       THE COURT:  All right.  Let's proceed with the

6  testimony then.

7       MR. RUEGGER:  Your Honor, excuse me.  Art Ruegger

8  for Dentons on behalf of the Retiree Committee.

9     We respectfully request a little more time to read the

10  memo from Jones, Day and -- and respond.

11       THE COURT:  Do what you can over lunch and then

12  we'll see if we need any more time.

13       MR. RUEGGER:  Very well, Your Honor.

14       THE COURT:  Sir, would you resume the witness stand?

15  And you're still under oath so you may just have a seat and

16  we'll continue with the examination.

17     (WITNESS GAURAV MALHOTRA WAS PREVIOUSLY SWORN)

18       MR. SHERWOOD:  Good morning, Your Honor.  Jack

19  Sherwood, Lowenstein, Sandler for the record for AFSCME.

20                     CROSS EXAMINATION

21  BY MR. SHERWOOD:

22  Q    Mr. Malhotra, good morning.

23  A    Good morning.

24  Q    You were engaged by the City of Detroit in May of 2011,

25  isn't that right?

1  A    That's correct.

2  Q    So as of now you've been on the job for the city for over

3  two years, is that fair to say?

4  A    That is correct.

5  Q    And when you were initially engaged in May of 2011

6  through the appointment of Mr. Orr as the emergency manager,

7  you reported to officials, city officials, is that right?

8  A    That is correct.

9  Q    And some of those city officials include Kirk Lewis,

10  correct?

11  A    Yes.

12  Q    And who is Kirk Lewis?

13  A    Kirk Lewis was the former Chief of Staff for Mayor Bing.

14  Q    And Chris Brown, do you know that name?

15  A    I do.

16  Q    And who was Chris Brown?

17  A    He was the former Chief Operating Officer for the city.

18  Q    And when you say -- when you say former or -- or Mr.

19  Lewis and/or Mr. Brown, are they still employed by the City of

20  Detroit?

21  A    No, they are not.

22  Q    And -- and when were they -- when were they terminated by

23  the city?

24  A    I don't know if they were terminated and I don't know the

25  exact date they left.

1  Q    Okay.  But you know that as of now they're -- they're not

2  -- they're not working for the city, correct?

3  A    That's what I said earlier, yes.

4  Q    And -- and -- and you're not -- you're not reporting to

5  them any -- you're not reporting to any city officials at this

6  point in time, is that fair to say?

7  A    We report to Kevyn Orr.  We have been reporting to Gary

8  Brown.  We have been reporting to Jim Bonsall, was a former

9  Chief Financial Officer.  And those were the folks we were at

10 least reporting our day to day activities on.

11 Q    I just want to get this straight in terms of time, okay?

12 The -- I'm talking about since March of this year, are you

13 reporting to the Mayor or the Mayor's office since March of

14 this year when Mr. Orr was appointed?

15 A    No.  Our general updates are with Mr. Orr.

16 Q    And since March of this year, you're not reporting to the

17 city council of the City of Detroit, isn't that right, since

18 March of this year when Mr. Orr was appointed?

19 A    Not -- not specifically, no.

20 Q    Now Mr. Orr was -- was appointed in -- in March of this

21 year so at the time of his appointment you have been on the

22 job with Ernst and Young for about a year and ten months,

23 correct?

24 A    Sounds about right.

25 Q    And in -- in -- yesterday you testified on direct about

1  various conversations, things that you told Mr. Orr and the

2  other professionals for the city, correct?  Do you remember

3  that testimony from yesterday?

4  A    Yes.

5  Q    So I assume that when you were updating Mr. Orr and the

6  rest of the city's professionals, you drew on your year and

7  ten months worth of experience that you had working for the

8  city up to that point?

9  A    For certain aspects of those updates, yes.

10  Q    Do you recall in the course of your services for the

11  city, before the appointment of the emergency manager in March

12  2013, providing services in connection with the response of

13  the city to the report of the financial review team?

14  A    You -- can you shorten the question so -- and which

15  financial relating --

16  Q    Do -- do you recall in -- in late 2012, early 2013,

17  working with people from the city concerning the financial

18  review team's report?

19  A    We were working during that time frame on the specific

20  improving -- mechanisms for improving the cash flows of the

21  city, yes.

22  Q    Okay.  And -- and as you just testified one of the -- one

23  of the topics that you were working on during that period was

24  improving cash flows, correct?

25  A    That's right.  We were looking at different alternatives

1  how the city could improve its cash flow position.

2  Q    And -- and you were doing that work for the city and its

3  officials, correct?  Before Mr. Orr got involved.

4  A    That is correct.

5  Q    Did you attend meetings in December of 2012 where the

6  issue of the city's cash flows was discussed?

7  A    Meetings with who?

8  Q    Members of the city's -- members of the city council,

9  members of the Mayor's staff?

10  A    Yes.

11  Q    All right.  I'd like to refer you to a document it's

12  AFSCME 551, document 551.

13        MR. SHERWOOD:  And, Your Honor, I believe there

14  are --

15  Q    Are you okay with the -- with the screen or -- because I

16  think there might be some hard copies there too.

17  A    I'm okay.

18  Q    Okay.

19  A    Thank you.

20  Q    Now this letter is -- is dated February 22nd, 2013,

21  correct?

22  A    That is correct.

23  Q    And I'd like you to scroll down to the bottom of the

24  letter, the -- the paragraph marked cash crisis.  Do you see

25  that?

1  A    Yes.

2  Q    And there is a reference to Ernst and Young in that

3  paragraph.  And the administration, council President Pugh,

4  council President Brown, council member Cockrel, fiscal staff,

5  Ernst and Young consultant, along with Miller, Canfield met

6  over the December holiday break to come up with a cash plan

7  with counter measures to get the city through June 30th, 2013.

8  Do you recall participating in those meetings?

9  A    Yes, I do.

10  Q    And you see that in this letter the -- the authors

11  conclude on the first sentence that a satisfactory plan exists

12  to resolve the city's cash crisis.  Do you see that?

13  A    I see it.  I didn't write this, but I see it.

14  Q    You do see it?  And but that -- this was written after

15  your -- your lengthy meetings over the holiday break, correct?

16  A    I -- this was written on February 22nd.  We met during the

17  December time frame to come up with different ideas how the

18  city could preserve cash which included a significant amount

19  of deferrals, yes.

20  Q    Okay.  But -- and as -- as a result of those meetings --

21        THE COURT:  One second, counsel.  Have you seen this

22  letter before?

23  A    Your Honor, this letter was handed to me --

24        THE COURT:  That would be a yes or a no.

25  A    No.

1          THE COURT:  You've never seen this letter before?

2   A    It -- I have seen it, I have not read it is my answer.  I

3   was given it during my deposition.

4          THE COURT:  Is this letter in evidence?

5          MR. SHERWOOD:  I believe it is not, Your Honor.  I

6   was just asking him -- using it to refresh his recollection in

7   terms of things that happened.

8          THE COURT:  Well, it's proper to refresh a witness'

9   recollection when he says he doesn't have a recollection.  I

10  haven't heard that yet.

11         MR. SHERWOOD:  Okay.

12  Q    Did you believe in February of -- February 22nd, 2013,

13  that a satisfactory plan existed to address the city's cash

14  crisis?

15  A    What a satisfactory plan means is -- is subjective.  What

16  I can say is, during the December time frame we had a lot of

17  meetings with the city officials to see how the city could

18  preserve cash to -- to increase the cash position over the

19  next few months.

20       And that predominantly resulted in the city coming up

21  with a plan that said most of these would have to come through

22  deferrals because what the city could actually impact in terms

23  of permanent cost reductions, those options were very limited.

24  So the -- the majority of any savings that would come or any

25  cash increase would come, would come through the deferral of

1  either pension related costs or additional health care related

2  costs.  That -- that's at least the -- what -- what I view as

3  what the plan was at that point in time.

4  Q    Did you ever criticize the city or the council with

5  respect to their plans to address cash flow issues during the

6  February 2013 time period?

7  A    Criticize -- indirectly criticize in terms of what the

8  satisfactory plan was?

9  Q    Did you ever go to the city council or -- or the city

10  professionals and say, I disagree with your cash management,

11  cash flow plan, do something else?

12  A    During this time frame I made very clear that the --

13  based on the experience that I had over the past 18 months

14  working with the city, that the options that the city was

15  undertaking to preserve cash were predominantly based on

16  deferrals and not actual structural cost savings.  That's what

17  I -- I clearly highlighted.

18  Q    Let me ask you about additional revenue collection during

19  the period of early 2013.  Do you recall whether the city was

20  concerned about revenue collection from the 36th District Court

21  citations which the city -- where the city's share would be

22  $199,000,000?

23  A    No, I do not.

24  Q    You don't recall -- do you recall that that was an issue?

25  A    No, I do not.

1  Q    Do you recall being asked to look into the level of

2  collections from the 36th District Court in the amount of

3  $199,000,000?

4  A    No, I do not.

5  Q    Do you know what -- do you know whether the 36th District

6  Court is a source of revenue for the City of Detroit?

7  A    I think there are some collections, yes, that come

8  through the 36th District Court.  I am not exactly sure of the

9  amount off the 36th District Court collections.

10  Q    You don't -- you can't even estimate what the amount of

11  the collections are from the 36th District Court for 2013?

12  A    No, I cannot off the top of my head.

13  Q    So Ernst and Young didn't look into those collections or

14  whether they were slower than they should be, is that fair to

15  say?

16  A    That is fair.  Ernst and Young did not go into any

17  specific analysis on 36th District Court on their collections.

18  Q    Now you discussed a little bit yesterday about the -- the

19  general fund and the -- is all of the city's debt attributable

20  to the general fund?

21  A    No.

22  Q    Is -- does -- does the -- the total amount of debt that

23  the city has, does the number 14.9 billion, does that sound in

24  -- in the ballpark?

25  A    The amount of debt of 14,000,000,000 sounds a little high

1  because in my mind I remember the $18,000,000,000 of long term

2  liabilities as a total number of which.  And so that sounds a

3  little high to me.  If you could break it down for me, it will

4  -- it will refresh my recollection.

5  Q    Let me -- let me -- can we put the letter up again and

6  turn to Page 3?  Under long term liabilities there --

7              MR. STEWART:  Your Honor, I object.  We've been over

8  this.  He's not testifying to a lack of recollection.  He

9  hasn't seen the letter.  Unless there's a better --

10             THE COURT:  Well, no.  The -- the witness did

11 indicate some uncertainty about this question, so if this

12 refreshes his recollection, I'll permit it.  Does this refresh

13 your recollection about the debt of the city?

14 A    Yes, Your Honor, it's the long term liabilities of the

15 city which as noted here it's 14.9 billion dollars.  So, yes.

16             THE COURT:  Well, but the question for you is not

17 what this letter says because the letter is not in evidence.

18 The question is what do you remember after having seen this

19 letter?

20 A    Your Honor, I can at least frame up what was being asked

21 of me in terms of the total indebtedness.  Because when I look

22 at debt I consider this pure debt versus other long term

23 liabilities.  Yes, it does at least give me a frame of

24 reference to what the question was.

25             THE COURT:  Okay.

1  Q    And does this document -- do you agree with the statement

2  in this document that only 15% or 7.36 billion is attributable

3  to the general fund?  Does that -- does that sound right to

4  you?

5  A    That -- that could be an approximation based on the

6  existing assumptions with respect to unfunded liabilities from

7  a pension and -- and OPEB standpoint.

8  Q    And -- and the -- the city has other business type

9  activity funds, Department of Water and Sewage, Department of

10 Transportation and Municipal Parking.  And those funds are --

11 are not part of the general fund, correct?

12 A    That is correct.  They're -- they're enterprise funds.

13 Q    And do you know whether -- whether the -- the total

14 pension -- pension obligation of the city, is that all

15 attributable to the general fund, or is some of that

16 attributable to the enterprise funds?

17 A    The -- the pension liability is due to the two systems,

18 the general retirement system and the police and fire system.

19 The general retirement system is comprised of the general fund

20 employees, as well as water and sewer employees, as well as

21 Department of Transportation employees.

22 Q    So is it fair to say that some of the pension obligation

23 is -- is the responsibility of -- of water and sewer?

24 A    The -- yes, that would be -- that would be -- that would

25 be a fair assumption in terms of what they have been doing.

1  Q     Now in -- in again early 2013, are you aware that the

2  City of Detroit was in the process and had been in the process

3  of trying to achieve certain cost saving initiatives?

4  A     I don't recall of specific initiatives in of early 2013.

5  But the city has been in a constant effort to reduce costs and

6  looking for cost savings initiatives.

7  Q     And would you agree that by March of 2013, $150,000,000

8  of cost saving initiatives have been achieved by the City of

9  Detroit?

10 A     Compared to what time frame?

11 Q     Simply do you agree that $150,000,000 of cost savings

12 have been achieved prior to March 2013?

13 A     It's -- it's difficult for me to answer a question on

14 cost savings achieved by a particular date unless you can

15 frame for me over what course of time your question is related

16 to.

17          MR. SHERWOOD:  Can you -- can you put up Exhibit

18 419, please?  Your Honor, I think this is in evidence.

19          THE COURT:  Thank you.

20          MR. STEWART:  It is.

21 Q     Have you seen this report dated March of 2013, Mr.

22 Malhotra?

23 A     I -- I think so.  I -- I would have to see the contents,

24 Your Honor, to make sure that I understand what's in the

25 report or what the contents were.

1          THE COURT:  Is it on the table over there?  Is it on

2     the table over there?

3          MR. SHERWOOD:  Yes, it's 419.  May I approach and

4     help him, or -- or --

5          THE COURT:  He can do it.

6          MR. SHERWOOD:  Okay.

7          THE COURT:  And while he's doing that, Mr. Stewart,

8     I have to ask you as I did the objecting attorneys yesterday,

9     to pull the microphone closer to you so that when you do speak

10    or object, the -- the microphone will pick it up.

11         MR. STEWART:  Thank you, Your Honor.  Will do.

12    A    I'm sorry, did you say 419?

13         MR. SHERWOOD:  419, yeah.

14    A    I don't see a 419.

15         THE COURT:  Which binder is that in?  Are they

16    labeled?

17         MR. SHERWOOD:  I -- I think that would be in the

18    Retiree Committee's binder.

19         THE COURT:  So you couldn't find it, sir?

20    A    Your Honor, I could not see it in this particular binder

21    or these three binders.  There is no number 419.

22         THE COURT:  Okay.  Can someone produce a copy for

23    the witness, please?

24         MR. SHERWOOD:  Your Honor, I'm sure we have it in

25    our binder which is up there, I've just got to get the right

1  number.

2          THE COURT:  Okay.  All right.

3  Q    Can you try 522, Mr. Malhotra?  It's in the -- I think

4  it's one of the black ones, probably to your right there.

5          THE COURT:  It's not there -- not there either?

6  A    No.

7          MR. SHERWOOD:  Can I hand the witness a copy, Your

8  Honor?

9          THE COURT:  Yes, please.

10          MR. SHERWOOD:  May I approach?

11          THE COURT:  Yes.

12  Q    Have you -- you don't have to read the whole thing, but

13  are you generally familiar with -- with this document?

14  A    Very briefly.  I don't think we had any major part of

15  putting this document together.

16  Q    And this is called the -- the City of Detroit

17  restructuring plan.  It's -- it's dated March of 2013.  And by

18  this time Ernst and Young had, you know, been on the job for a

19  year and ten months.  Are you saying you had no input into the

20  Mayor's restructuring plan?

21  A    We had a lot of things put into the Mayor's restructuring

22  plan.  What you're referring to is this particular report on

23  March 2013.  And what I'm saying is we did not have a

24  significant amount of input that was put into this particular

25  report.

1  Q    Okay.  Can you turn to Page 5 of the report?  Getting

2  back to the cost saving initiatives.  And if you look at the

3  -- the title of that page and -- and the first part there, it

4  says many revenue and cost saving initiatives have been

5  implemented and others have been identified to address the

6  $150,000,000 annual structural deficit.

7       And then if you look at sub paragraph (b) below that, it

8  says achieved cost saving initiatives approximately

9  $150,000,000.  Do you see that?

10 A    That's what's written on this page, yes.

11 Q    Okay.  And do you have any reason to -- to agree with --

12 with that conclusion -- or disagree with -- with that

13 conclusion in this document?

14 A    Your Honor, it's tough for me to make a -- I -- I cannot

15 make an agreement or disagreement until I understand the

16 context of the time frame where a statement is being referred

17 to.  Achieve cost savings of 150,000,000, but it's over three

18 years, two years, one year, it's -- it's -- I can't put any

19 sort of reference to it.

20 Q    Okay.  Let me try it this way.  You started in May 2011,

21 right?

22 A    That is correct.

23 Q    And this document was done around March of 2013.  During

24 that period, did you see achieved cost savings of

25 $150,000,000?

1  A     We -- we saw a lot of cost savings.  I do not know if

2  they aggregated to 150,000,000 or not.  I -- I would have to

3  go back and check.

4  Q     Okay.  Now what about -- what about reduction in debt

5  obligations of the general fund?  Would you agree that the

6  debt obligations of the general fund in March of 2013 were

7  $400,000,000 lower than five years prior to that?

8  A     You're referring to the outstanding debt obligations, I

9  assume.  I do not know what the outstanding debt balance was

10  five years ago to be able to draw inference to a five -- or a

11  $400,000,000 number.

12  Q     And I think we've -- we've covered this already.  But --

13  but if you look at -- would you agree that as of -- of March

14  2013, approximately $6,000,000,000 of city debt was owed by

15  the Water and Sewer Department and does not have an impact on

16  the general fund?

17  A     I -- I agree with the first part of that statement that

18  there's roughly about $6,000,000,000 of revenue bonds

19  outstanding for the Water and Sewer Department, yes.

20  Q     Now, again in March 2013, you had no idea that the

21  emergency manager was -- was going to be appointed, isn't that

22  right?

23  A     That is correct.

24  Q     Okay.  And certainly in March 2013, the -- the recovery

25  plan for the City of Detroit was not finished, correct?

1  A    Sorry, what recovery plan are you referring to?

2  Q    Well, were there other -- were there other cost saving

3  initiatives that the city and its advisors including yourself,

4  had planned?

5  A    Going back to December of 2012.

6  Q    Not --

7  A    I'll just finish the answer.

8  Q    Go ahead, I'm sorry, I'm sorry.

9  A    And I'll answer your question.  As I testified earlier,

10  in December of 2012, the city with -- along with us and some

11  of the other advisors, went through a detailed process to

12  figure out how to improve the city's cash position as I

13  testified earlier.  Majority of those were related to

14  predominantly deferrals off bills that the city had due, not

15  paying them on time.

16        MR. SHERWOOD:  Your Honor, I'm sorry to interrupt.

17  I -- I asked a specific question.  The specific question was,

18  in March of 2013, were there future initiatives that the city

19  had planned.

20     I -- and with -- with due respect, I -- I thought the

21  answer was non-responsive.  I think he was going back to 2012.

22  So I -- I'd you just to answer that question.

23  A    I do not recall of specific initiatives.  As of March

24  2013 from a cost savings standpoint, that were either not in

25  progress, or had not been achieved that were of significance

 1  -- that were of significance in my mind that stand out, that

 2  were of significance as of March of 2013.

 3  Q    Okay.  Thank you.  As of March 2013, and again this is

 4  before the appointment of Mr. Orr, the city had not only

 5  retained you, but it also had retained the Miller, Buckfire

 6  firm and it had retained Conway, MacKenzie, isn't that right?

 7  A    Yes, that's correct.

 8  Q    So they were on the scene in March 2013 before the

 9  emergency manager was appointed, correct?

10  A    Yes.

11  Q    And it was -- it was yourself and Mr. Moore and Mr.

12  Buckfire, it's basically the same team of professionals were

13  advising the city in their restructuring effort before Mr. Orr

14  was appointed, and those same restructuring advisors are

15  advising Mr. Orr now, true?

16  A    We were all collectively advising the city from a

17  restructuring standpoint, yes.

18  Q    Okay.  So those advisors and yourself had been retained.

19  And if you look at -- at the document, Page 5 again going down

20  to Paragraph C.

21      Again we talked about future cost saving initiatives.

22  You said you didn't recall anything specific, but scrolling

23  through those items in C, would you agree that those had been

24  identified by the city and its professionals as potential

25  future cost saving initiatives that were in process?

1  A     Yes.

2  Q     Now the last one there is asset monetization strategies.

3  Do you see that?

4  A     I do.

5  Q     Who was the person that was involved from the

6  professional side in the asset monetization strategy?

7  A     It would have been Miller, Buckfire.

8  Q     And what is your -- asset monetization strategies, that

9  means taking city's assets and either financing them, or

10 selling them to raise cash to pay liabilities.  Would you --

11 can we agree with that?  Agree on that?

12 A     Or any other -- I would say any other monetization

13 strategy to create cash for the city.  That's the way I would

14 frame it.

15 Q     And to the extent that assets were monetized in -- in

16 2013, those -- those monetized assets would -- would enhance

17 the cash profile, the actual cash collections during that

18 period for the general fund, let me just add that.

19 A     If you sell something you would intuitively have more

20 cash.  However, to answer the second part of your question,

21 which is to improve the cash profile, my personal experience

22 is, selling assets to improve cash versus -- and not

23 addressing the operational structural imbalance that exists.

24 I don't know if that improves -- improves the cash profile as

25 you put it, but if you sell assets that -- that generate cash,

1  you will have more cash, yes.

2  Q    And you can use that cash to satisfy your liabilities,

3  correct?

4  A    Cash is cash.  So if you have more cash, you have more

5  cash.

6  Q    Now, let's stay in the period of time before the

7  appointment of Mr. Orr.  Were there discussions among the

8  professionals and the -- the city concerning asset

9  monetization strategies?

10 A    Not that I was specifically a part of, so I do not know.

11 Q    And do you recall any conversations with Miller, Buckfire

12 concerning asset monetization strategies?

13 A    Yes.

14 Q    Was Miller, Buckfire concerned that asset monetization in

15 March 2013 or thereabouts, would have a negative impact on the

16 City of Detroit's ability to prove that it was eligible for

17 Chapter 9 bankruptcy?

18 A    That's a long question.  It's -- and you asked if Miller,

19 Buckfire was concerned?

20 Q    Right.

21 A    I can't answer the question if Miller, Buckfire was

22 concerned or not.  You would have to ask Miller, Buckfire.

23 Q    Did Miller, Buckfire say anything to you?  And I'm -- you

24 know, Mr. Buckfire or any of his colleagues, did he say

25 anything to you or in your presence where he or they suggested

1  that they were concerned that if the City of Detroit monetized

2  assets in 2013, early 2013, March, February, January, that

3  that would have a negative impact on the City of Detroit's

4  ability to prove that it was eligible for Chapter 9

5  bankruptcy?

6  A    I do not recall of a conversation like that.

7  Q    Did Miller, Buckfire express any opposition in your

8  presence to strategies that would call for short term

9  monetization of assets in early 2013?

10  A    I do not recall.

11  Q    You were at the Jones, Day meeting at the airport on

12  January 29th -- I'm sorry, not the Jones, Day meeting, that's

13  not fair.

14       The -- the council interview meeting on January 29th, 2013

15  at the airport, yes?

16  A    Yes.  I was at that meeting.

17  Q    And -- and were you there when Jones, Day gave the

18  presentation?

19  A    I was.

20  Q    And is it safe to assume that when Jones, Day or any

21  other attorneys that were giving their presentation, were

22  presenting, you were particularly interested in statements

23  that they had to make about liquidity, and cash flow, and

24  such, yes?

25  A    Yes, absolutely.

1  Q    Can -- can you put up 418, please?   This is a pretty

2  lengthy document.

3       If -- if you need a hard copy we can get it for you, but

4  let's -- let's try it without because the -- the statements

5  are -- I'm not going to go through the whole thing.

6            MR. SHERWOOD:  Is that okay, Your Honor?  It is in

7  evidence.

8            THE COURT:  Sure, try it.

9  Q    Was -- was this presentation handed out during the -- the

10 meeting at the airport?

11 A    Yes.

12 Q    And just to be clear, this presentation was given not

13 only by Jones, Day, but Mr. Orr was also giving this

14 presentation to the group?

15 A    He was part of the team that presented, yes.

16 Q    Can we turn to -- let's start with Page 30 of the

17 presentation.

18            THE COURT:  Excuse me, sir.  Has the Court been

19 given copies of these exhibits?

20            MR. SHERWOOD:  Yes, Your Honor.  I -- I think we

21 gave two to the law clerks and --

22            THE COURT:  Are there up here somewhere?

23            MR. SHERWOOD:  I believe so.  This is marked in the

24 -- in the -- the Retiree Committee's exhibits as Exhibit 418.

25 It might also be an AFSCME exhibit.  I think everybody offered

1  this one.

2          THE COURT:  Okay.  So the tabs in the binder don't

3  correspond to the numbers of the exhibits.

4          MR. SHERWOOD:  I think, Your Honor, that's because

5  we didn't decide on the prefix.  I think --

6          THE COURT:  Okay.  And we're -- and we're looking at

7  what exhibit number now?

8          MR. SHERWOOD:  It's 418, Your Honor.

9          THE COURT:  I have it.  We're all set.  Thank you.

10          MR. SHERWOOD:  You're welcome.  A lot of documents.

11 Q    Turning to Page 30, Mr. Malhotra, and if you look at the

12 third line down it says asset sales pose challenges to

13 generating substantial revenue.  Do you see that?

14 A    I see that line, yes.

15 Q    And do you recall whether this slide was presented at the

16 meeting?

17 A    I don't recall.

18 Q    You don't recall?

19 A    No, I do not.

20 Q    Do you recall any discussion about the next line, sale of

21 assets to pay creditors may not promote revitalization.  Do

22 you recall that being presented by Mr. Orr or anyone else at

23 Jones, Day?

24 A    Not specifically.

25 Q    Okay.  Now if you turn to the next page, Page 31.  And

1  these are -- these are the speaker notes for the slide.  And

2  if you go right to the middle, there's a thing called --

3  there's a line called note.  And it says asset monetization

4  outside of bankruptcy may implicate eligibility requirement

5  that the city be insolvent, e.g. measured by short term cash.

6      During the presentation, did anyone from Jones, Day

7  suggest to the group that it was not a good idea to engage in

8  asset monetization outside of bankruptcy because it could hurt

9  the city's case on insolvency?

10 A    I do not recall that.  We had five presentations as for

11 every presenting group.

12 Q    Let's look at Page 62 and 63 of this presentation.  I

13 know it's a long presentation, but Mr. Malhotra, did you

14 recall any discussion by Mr. Orr or the rest of the team at

15 Jones, Day about evaluating the impact of any asset sale on

16 Chapter 9 eligibility?  Do you recall -- recall anything about

17 that -- that day?  Does this -- this slide refresh your

18 recollection at all?

19 A    It does not.  No, I do not recall.

20 Q    And let me -- let me just -- let me just ask one more

21 question about -- on this topic.  If you turn to the next

22 page.  Maybe this will help you.

23      If you look at the speaker notes at the top under asset

24 sales, again we talk -- it says concerns regarding eligibility

25 for Chapter 9 may be implicated.  Any transactions should be

1  reviewed and restructured to address any eligibility issues,

2  e.g. earmarking of funds.

3      Do you recall any discussions by Jones, Day during this

4  presentation where they suggested that funds that come from

5  asset monetization be earmarked so that they don't end up in

6  the general fund and thereby jeopardize the Chapter 9

7  eligibility?

8  A    No.  I do not recall.

9  Q    Do you recall any discussions during that or with -- with

10 Mr. Buckfire where the idea was to the extent that we monetize

11 any assets, let's make sure they don't -- that the proceeds

12 don't end up in the general fund.  Anything like that?

13 A    I do not remember of any specific conversation of

14 earmarking or -- or highlighting assets like this.  I mean

15 during our general discussions were always -- asset sales were

16 one time sources and -- but we needed to continue to work to

17 fix the ongoing operating deficit debt and the cash deficit

18 that's been existing at the city for a long time.

19 Q    Let me ask you one more question about that meeting.  And

20 do you recall any suggestions by Mr. Orr or Jones, Day during

21 that presentation that the city's policy should be to defend

22 against approaches that focus on monetization of assets to pay

23 creditors?

24 A    No.

25 Q    Can you turn to Page 26?  Does that refresh your

1 | recollection?  Fourth bullet point down, defend against calls

2 | for expenses and monetizing assets to pay creditors?

3 | A    No, I do not recall of a specific conversation like that.

4 | Q    Now just -- just to -- just so I understand your

5 | testimony from yesterday when you talked about the revenues

6 | that you knew about through May of 2013.  To the extent that

7 | there was any type of asset monetization before May of 2013,

8 | the proceeds of asset monetization would -- could have

9 | enhanced the general fund, is that fair to say?

10 | A    Yes.  If you sell assets that generate cash you have --

11 | you get more cash.

12 | Q    All right.  I'd like -- let me switch topics real quick.

13 | And can we -- 408.

14 | MR. SHERWOOD:  Your Honor, 408 and Mr. Malhotra, is

15 | the proposal for creditors.

16 | Q    I think you talked about this yesterday on direct and

17 | again we'll give you a copy if you need it, but we'll try to

18 | make do with -- with the screen.

19 | A    Okay.

20 | Q    Okay.  If you look at Pages 54 and 55 of 408.  I'm

21 | looking for 54 and -- well, hold on.  Let's try 83 and 84.

22 | MR. SHERWOOD:  I'm -- I'm sorry, Your Honor.

23 | There's kind of two sets of numbers on this one.  Let's do 83

24 | and 84.  There we go.  That's 83.  Eighty-three or 135

25 | depending on which number you're looking at, or 134.

1  Q    You testified that -- that we talked about realization

2  value of asset -- assets and I'm not going to spend a lot of

3  time on this, but -- but some of the -- there's a reference to

4  the Detroit Water and Sewer Department.  And if you scroll

5  down a few -- in the following pages, there's a Coleman Young

6  Airport, Detroit Windsor Tunnel, Belle Isle Park, Detroit

7  Institute of Arts, city owned land, parking operations, Joe

8  Louis Arena.

9       And I guess the question is, were -- when -- at this

10 presentation, were these assets that are described on these

11 pages, assets that -- that could be monetized in order to help

12 the city's cash flow situation?

13 A    I think these were generally all the assets that were

14 listed.  This is -- Miller, Buckfire is the investment bank

15 for the city in connection with asset monetization.  And so I

16 can't answer questions specifically on asset monetizations

17 because it includes eight or ten different assets, all of

18 which may have different reactions to each one.

19 Q    Let's talk -- let's talk about taxes for a minute.  And

20 -- and if we could stay with the same exhibit, I think there

21 is a discussion about taxes.

22      Do you know what the outstanding tax obligations of the

23 City of Detroit were in in or about say June of this year?

24 A    I do not recall, no.

25 Q    Well, I think that the presentation, if you turn to Page

1  87.  Let me make sure I'm using the right numbers here.

2  That's not 87.  Page -- Page 79, please.  Actually Page 80,

3  I'm sorry.

4      Do you recognize this page of the presentation?  It talks

5  about taxes.

6  A    It does talk about taxes.

7  Q    And if you look at about the fourth bullet point down, it

8  says Compuware has identified historical non-filers with

9  outstanding tax obligations totaling approximately

10  $250,000,000, correct?

11  A    That's what the sentence says.

12  Q    And have you -- have you heard numbers substantially in

13  excess of 250,000,000 in terms of the outstanding obligations

14  of taxpayers to the City of Detroit?

15  A    I have heard numbers like this and I've been hearing

16  numbers like this for the last two years despite which the

17  city's property taxes and income taxes keep going down every

18  year.

19  Q    But there are a lot of outstanding taxes and they're in

20  the hundreds of millions of dollars, fair?

21  A    I cannot -- I cannot say that.

22  Q    Okay.  And you can't say that because you didn't look

23  into the issue of -- of outstanding taxes in -- in your two

24  years plus, is that --

25  A    That is correct.  We were not going out looking for

1  delinquent taxes especially of numbers that were highlighted

2  of this magnitude, that's correct.

3  Q    Do you know who from the city or on behalf of -- well,

4  let's start with the city.  Who from the city was in charge of

5  improving tax collection efforts?

6  A     Yeah.  It was Cheryl Johnson who is the city's Treasurer

7  was working, I believe, with Compuware to try and get their

8  arms around what taxes were outstanding.  I believe that

9  project has been going on for a long time.  That's -- that's

10  what I know about it.

11  Q    And you'd agree that if -- if the -- the tax collection

12  efforts of the city in late -- in fiscal year 2013 which ends

13  June of 2013, correct?  If -- if those tax collection efforts

14  were better, that would have enhanced the general fund, is

15  that fair to say?

16  A    And the city has already implemented if -- if not two, at

17  least one amnesty program for sure.  And I think that yielded

18  probably single digit millions of dollars in the 3,000,000,

19  $5,000,000 range in terms of its amnesty program.

20      So the city has repeatedly done a efforts in order to

21  maximize the collections on taxes that they could at least

22  identified from their records.

23  Q    And who -- who from the city is involved in that -- in

24  that effort?

25  A    Specifically on the amnesty it was, I'm sure the -- the

1  tax department that has been involved, I think with respect to

2  any past due of these outstanding obligations.  I would say

3  that you would have to talk to Cheryl Johnson who is the

4  Treasurer in the context of this Compuware discussion.

5  Q    But -- but you -- you were not charged at Ernst and Young

6  in doing an analysis of the effectiveness of the city's

7  efforts prior to May, June of 2013 to collect taxes from

8  taxpayers, is that fair to say?

9  A    Yes, that is.

10 Q    What about abatements?  Do you know anything about

11 abatements?

12 A    No, I do not.

13 Q    Do you know that the city has a program for industrial

14 tax abatements?

15 A    I do not.

16 Q    Do you know anything about renaissance zone abatements

17 here in the city in terms of property taxes?

18 A    Not specifically.  I know it is a component of the

19 property tax for tax build up, but not specifically on

20 renaissance zone and the abatements.

21 Q    Do you know if -- if the city has taken any effort to

22 review the existing tax abatements that are enjoyed by certain

23 of the property owners here in the City of Detroit to make

24 sure that they are fair and up to speed and -- and current?

25 A    I do not know of a specific effort on reviewing the

1  abatements.

2  Q    Do you know -- do you know who the -- who -- who the tax

3  assessor is for the City of Detroit?

4  A    It used to be Linda Bade.  She has recently retired.  I'm

5  blacking out on the name of the new assessor.  I think it's

6  Alvin.

7  Q    I'm sorry.  Do you know has -- has Ernst and Young been

8  charged with trying to figure out how the assessment, the tax

9  assessment process works here in the -- in the City of

10 Detroit?

11 A    No, Ernst and Young has not been.  But what I do know is

12 that there are several reviews that are happening to assess --

13 ascertain better the assessed values are too high.  Currently

14 a lot in terms of the city's property taxes.

15 Q    What about too low?

16 A    From what I understand the general view is that the

17 assessments are too high.

18 Q    But are there -- so there's not a single property in the

19 City of Detroit that where -- where the assessment is -- is

20 too low?

21 A    I cannot answer that question.  I do not know.

22 Q    And you haven't been asked to audit that or anything like

23 that?

24 A    That is correct.

25 Q    Let me turn -- I just have one or two more topics.  But

1  let me turn to negotiations before the filing.  I think you

2  said yesterday that you were at the -- the meeting -- I'm

3  sorry, was it June 13th?  I'm trying to remember off the top --

4  A     June 14th.

5  Q     June 14th, thank you.  You were at that meeting?

6  A     Yes, I was.

7  Q     That June -- June 14th meeting.  And I think you said you

8  were at meetings between June 14th and July 11th as well,

9  correct?

10 A     That is correct.

11 Q     And how many -- there was a June 14th meeting, a June 20th

12 meeting, July 10th, July 11th.  Have I got them all?

13 A     I don't know.  There were -- there were several meetings

14 we had during those weeks and those are the ones I can

15 remember.  So there were several meetings that we had during

16 that time frame with -- with all of the creditors in some

17 fashion or the other.

18 Q     But June 14th was the first.  And -- and during that June

19 14th meeting, this -- the proposal was handed out and

20 presented, right?

21 A     That is correct.

22 Q     During all the meetings from June 14th to July 11th,

23 whatever.  After all of those meetings, are you aware of a

24 single change to the June 14th proposal by the city?

25 A     Not specific -- not specifically that I recall whether we

1   were making changes or not to the June 14th proposal.

2   Q    You can't cite to a single specific change to the

3   proposal that was made on -- on June 14th, correct?

4   A    Not that I can recall off the top of my head, yes.

5   Q    Now, were any of those meetings with union

6   representatives or retiree representatives?

7   A    I think both were present on June 14th.

8   Q    And you were at that meeting?

9   A    I was.

10   Q    And let me ask you this.  In terms of dealing with the

11   employee issues, when Mr. Orr was appointed, did you tell him

12   about your personal experience with dealing with the city's

13   unions?

14   A    Yes.

15   Q    And you -- and you had been involved on behalf of the

16   city before the arrival of Mr. Orr in some pretty substantial

17   negotiations between the city and many many of its unions,

18   true?

19   A    I -- I was -- but I was involved in those meetings from

20   the standpoint of helping ascertain the financial

21   implications, yes.

22   Q    Okay.  And in February of 2012, and I know this -- we're

23   going -- we're going way back now.  So if you started May --

24   May 2011, you're only on the job about seven months at this

25   time.  There were negotiations between the city and a number

1  of unions.  And those negotiations were successful, correct?

2  A    I don't understand the meaning of successful or not.

3  There were negotiations that -- that were held.

4  Q    And they -- but they led to an agreement between the city

5  and the unions, correct?

6  A    They led to tentative agreements.

7  Q    Okay.  Let's -- let's look at Exhibit 505, please, 505.

8  Actually before I ask any questions about this.  You said they

9  led -- well, let me ask you about 505.  Is this a copy of the

10 -- the tentative agreement between the city and the coalition

11 of unions of the City of Detroit?

12 A    Yes.

13 Q    And if you -- if we turn to the --

14        MR. STEWART:  Well, Your Honor, may I interpose a

15 foundation objection.  This has been objected to.  If counsel

16 is laying a foundation for admissibility, I have no objection

17 if that's all you're doing.  But if he's going to question the

18 witness about it, I would have an objection.

19        MR. SHERWOOD:  I'm going to try to lay a foundation,

20 Your Honor, with this and maybe other witnesses.

21        THE COURT:  Okay.  Go ahead.

22        MR. SHERWOOD:  But I'd like to get his understanding

23 of this document, and some testimony -- what he knows about

24 this document on the record so that when we move it into

25 evidence later, you have the benefit of that

1          THE COURT:  I'll permit that subject to its ultimate

2  admission.

3  Q    Page 17, please of -- of the agreement.  City of Detroit,

4  do you recognize that as Chris Brown's signature by any

5  chance?

6  A    I do think that is Chris Brown's signature.

7  Q    And that's dated February 1st, 2012.  CO -- and he was the

8  chief -- Chief Operating Officer for the City of Detroit,

9  correct?

10 A    That is correct.

11 Q    And just if you can take -- take that down.  Let's look

12 at the signatures on the right.  Now I don't -- I don't -- I'm

13 not going to ask you identify those signatures.

14      But the -- the parties to the right, you know, you see

15 IOU, SAA, are -- are these -- do you understand this to be

16 like various union representatives that signed on to this

17 agreement?

18 A    Yes.

19 Q    And it was the union coalition, right?

20 A    That is correct.

21 Q    Now did you -- did you participate with any of the

22 members of the union during the negotiation of this tentative

23 agreement?

24 A    I was present in those negotiations from -- to ascertain

25 the financial impact as I said earlier

1  Q    And -- and you were working for the city at that point,

2  correct?

3  A    That is correct.

4  Q    And -- and Chris Brown from the city signed this

5  agreement and agreed to it, correct?

6  A    Yes.

7  Q    During those negotiations, did you -- did you talk about

8  any wage concessions by the employees of the city?

9  A    I think there were discussions around wage concessions,

10 yes.

11 Q    And in fact there were wage concessions.  Do you recall

12 that?

13 A    Are you referring specifically to this tentative

14 agreement, or are you referring to --

15 Q    Yes.

16 A    -- broadly?

17 Q    This tentative agreement in February of 2012.

18 A    I would have to go back and look because whether it was

19 new wage concessions or it was a continuance of the wage

20 concessions that had already been provided in the past.

21 Q    Was -- was there a discussion about giving back some of

22 the wage concessions to the extent that the -- there was --

23 there was net surplus for 2012, 2013, and 2014?

24 A    Yes, there were discussions around how to give back wage

25 concessions that the active employees were giving.  If the --

1  the city can get back on its footing from a financial

2  standpoint, yes.

3  Q    And in -- in the -- and you were involved in that part of

4  the discussion, correct?

5  A    I was involved in at least trying to ascertain how to

6  insure either asset sales or refinancings were not considered

7  as an operational fix.  So not one time --

8  Q    Well, I just asked -- I just asked if you were involved

9  in that part of the discussions.

10  A    And I was giving you a context of how I was involved,

11  yes.

12  Q    And -- and -- but during those -- during those

13  discussions, weren't you saying to the union members that

14  based on the work of you and other people in the city that the

15  city was going to get back into the black in -- in 2013 and

16  2014?  Was that -- was that part of your pitch with respect to

17  this?

18  A    The -- the discussions that the city was having with its

19  unions was to try and come up with cash to try and deal with

20  the cash shortfall issues that were forthcoming, especially

21  after fiscal year '12 where the city continued to borrow and

22  defer.

23      And the city was -- and after discussions with its active

24  employees, how to try and address some of the oncoming fiscal

25  year '13 cash issues, yes.

1  Q    No, the -- the question was obviously you've got labor

2  representatives sitting on the other side of the table.  And

3  one of -- one of the terms was these -- these give backs,

4  right?  Give backs of -- of wage concessions, right?

5       Certainly the -- the labor people that were talking to

6  you wanted to know what's the likelihood of my people getting

7  these give backs, right?

8            MR. STEWART:  Objection.

9  Q    Did that happen?

10           MR. STEWART:  Sorry, I object.  He's asking for

11  speculation unless the last part of his sentence was asking

12  what they said to him.  I think his question --

13           THE COURT:  I agree, rephrase the question, please.

14  Q    During those -- the negotiations, was it your perception

15  based on things said to you by the labor representatives that

16  they were -- they were concerned about -- or they wanted to

17  know what the likelihood was that they would get their give

18  backs in terms of salary -- wage concessions.

19  A    Sorry, can you rephrase that question?  It's too long a

20  question.

21  Q    During the negotiations concerning the tentative

22  agreement, did anyone on the labor side ask you to tell them

23  if the wage concessions would happen?  Or -- or the give backs

24  on the wage concessions would happen, yes or no?

25  A    I don't recall specifically.

1  Q    Let me ask you this about those discussions.  There were

2  -- there were negotiations that surrounded health care,

3  correct?

4  A    Yes.

5  Q    And one of the objectives in the health care part of the

6  negotiation was to attain $60,000,000 in health care savings,

7  is that right?

8  A    That sounds right.

9  Q    Okay.  And those health care savings were going to come

10  from not only the existing employees of the City of Detroit,

11  but also the retired employees, isn't that right?

12  A    I'm not sure about that.  I think the majority of those

13  savings were coming from the active employees.  I don't recall

14  of a specific amount from the retirees.

15  Q    Well, you said the majority.  So some of the savings were

16  coming from the retired employees, isn't that right?

17  A    I do not recall that.

18          MR. SHERWOOD:  Your Honor, I'd like to mark a -- a

19  document that has not been marked before to try to refresh the

20  witness' recollection.

21          MR. STEWART:  Your Honor, in view of the fact this

22  wasn't identified to us, wasn't subject to the objection

23  process, before he uses it, I'd like to frame very carefully

24  exactly what the failure of recollection this is intended to

25  address.

1              MR. SHERWOOD:  Yes.  This is a document that talks

2   about cost savings in fiscal year 2012.  And there is a line

3   that talks about --

4              THE COURT:  Well, let's not say what the document

5   says because it's not in evidence.  But the document can be

6   used to refresh the witness' recollection if it -- if it has

7   that effect.

8              MR. STEWART:  May I also ask the parties where it

9   comes from.  Because I mean I understand it for pure purpose

10  of refreshing recollection, Your Honor, what -- what is

11  allowed.  On the other hand is this part of a larger document.

12  What is this?

13             MR. SHERWOOD:  I believe it was part of a

14  presentation that was made during the course of the

15  negotiations in 2012 with respect to the tentative agreement.

16             MR. STEWART:  Okay.  We have an objection to its use

17  generally, but --

18             THE COURT:  All right.  To the extent there's an

19  objection to the use of the document to refresh the witness'

20  recollection, it is overruled.  You may present it to the

21  witness.

22             MR. STEWART:  Once again could we -- what frame

23  exactly which failure of recollection this is intended --

24             THE COURT:  I think the record is clear enough on

25  that point.  Let's proceed.

 1         MR. SHERWOOD:  May I approach the witness and hand

 2  him the document, Your Honor?

 3         THE COURT:  Please.

 4         MR. SHERWOOD:  And for the record can I -- can we

 5  mark this as 505A?

 6         THE COURT:  Sure.  Whatever is convenient for you is

 7  fine.

 8         MR. SHERWOOD:  Your Honor, may I hand a copy to the

 9  Court?

10         THE COURT:  Not if it's use is for refreshing

11  recollection.

12         MR. SHERWOOD:  Fair -- okay.

13  Q    So Mr. Malhotra, I've showed you what I will mark as

14  505A.  And -- and if you would look at the box to the left

15  relating -- that's -- that's called retirees.  And then the

16  data to the right of that.  Does that reflect your -- you

17  testified that the majority of the savings related to current

18  employees and you didn't know about whether -- whether any of

19  these savings also impacted retirees.  Do you remember that

20  testimony?

21  A    I testified that the tentative agreements as reached, if

22  they had any impact on retiree medical or not.  That's what I

23  testified to, yes.

24  Q    Okay.  And having reviewed this document, does this

25  refresh your recollection that in fact there were certain

1  savings projected to be achieved from retirees for fiscal year

2  2012 and 2013?

3          THE COURT:  All right.  Now here I want to caution

4  you, this does not ask you what that document says.  In fact

5  turn it over.  Do you have a recollection now having reviewed

6  that document of what the answer to counsel's question is?

7  A    Okay.  Your Honor, my answer is the same as it was

8  earlier.

9  Q    Do you recognize 505A?  Have you ever seen it before?

10          MR. SHERWOOD:  Can he look at it for that purpose?

11          THE COURT:  Yes, yes.

12  A    Yes, I recall seeing this in that 2012 time frame, yes.

13  Q    And can you describe what it is?

14  A    It is trying to describe the projected or ask of the --

15  the targeted savings the city was looking to get for fiscal

16  year '13.

17  Q    So this was prepared by the city and -- and these were

18  part of the requests by the city to the labor representatives

19  in -- in 2012, correct?

20  A    This could have framed some of those discussions, yes.

21  Q    And were you present when this document was discussed

22  with representatives of the unions in -- in 2012?

23  A    I do not recall the specific meeting, but I would have

24  generally been having some of the discussions in terms of the

25  qualification of some of these numbers.

1   Q    Let's go back to 505.  Now this agreement, this tentative

2   agreement, although it was -- was executed by the city and --

3   and various union representatives, was it implemented for the

4   City of Detroit?

5   A    I do not think this exact tentative agreement was

6   implemented.

7   Q    Do you know why this tentative agreement was not

8   implemented for the City of Detroit?

9   A    I think the city employment terms were implemented

10  instead.

11  Q    Isn't it true that the state refused to authorize the

12  city to implement this agreement?

13  A    I was not a part of those discussions with the state.

14  Q    And this agreement -- well, scratch that.  Let me just

15  ask a few more -- more random questions and then I'll be done.

16       This is the first Chapter 9 bankruptcy case that you've

17  ever worked on, correct?

18  A    That is correct.

19  Q    And neither you nor Ernst and Young have ever prepared a

20  balance sheet for the City of Detroit, correct?

21  A    That is correct.

22  Q    You began to prepare the schedules for the filing of this

23  bankruptcy case in May of 2013, isn't that right?

24  A    It was May, June time frame.  I do not remember the

25  specific date.

 1  Q    But it could have been May -- May 2013?  May, June time

 2  frame?

 3  A    Like I said, May, June time frame, yes, that is right.

 4  Q    Okay.  Now, in early July, your opinion was not solicited

 5  by anyone before the bankruptcy filing about the decision to

 6  file bankruptcy, isn't that right?

 7  A    That is correct.

 8  Q    So you and Ernst and Young, you didn't have any input

 9  whatsoever on whether or not Chapter 9 was the only

10  alternative for the City of Detroit, isn't that right?

11  A    That is correct.

12          MR. SHERWOOD:  Your Honor, can I have a two minute

13  -- a 30 second break just to consult with a colleague a

14  minute?

15          THE COURT:  Yes.  We'll sit here while you do that.

16          MR. SHERWOOD:  Your Honor, I'd like to mark another

17  document to -- which addresses the issue of impact on retiree

18  benefits.  And just see if the witness recognizes -- not to

19  refresh recollection, just to see if he recognize it and can

20  authenticate it.

21          MR. STEWART:  This is a new exhibit?

22          MR. SHERWOOD:  I believe it is.

23          MR. STEWART:  We would object to it, Your Honor, for

24  any use other than refreshing recollection.  It was not

25  identified.

1          THE COURT:  Well, let's -- let's get it marked and

2    when it's offered into evidence I'll hear your objection.

3    What number would you propose?

4          MR. SHERWOOD:  505B.

5          THE COURT:  Are we out of numbers?

6          MR. SHERWOOD:  I just think we're in the five's and

7    I don't know what we're up to.

8          THE COURT:  Okay.  Well, let me see if I can help

9    you.

10          MR. SHERWOOD:  505B, I think.

11          THE COURT:  Hold -- hold on one second.  Ah, we have

12    used every number from 500 to 599.  All right, fine, 505B it

13    is.

14          MR. SHERWOOD:  May I approach, Your Honor?

15          THE COURT:  Yes.  Are you asking the witness if he

16    recognizes this?

17          MR. SHERWOOD:  Yes.

18          THE COURT:  Do you recognize that document, sir?

19    A    Yes, Your Honor, I do.

20    Q    And can you describe it for us?

21    A    It's a discussion document dated July 16th, 2012.

22    Q    And did you -- were you involved in the preparation of

23    this document?

24    A    Yes, we were.

25    Q    And was this document presented to -- who was this

1  document presented to?

2  A    I don't recall.

3  Q    For what purpose was this document prepared?

4  A    It would have been to -- for -- trying to ascertain the

5  tentative agreements and the savings that would have come from

6  some of the tentative agreements.

7  Q    And does this document refresh your recollection as to

8  the savings that could be achieved from retiree health care?

9  A    I would have to go to that specific section.

10  Q    Yes, please do.

11        THE COURT:  Well, hold on.  It's not proper to ask

12  the witness a question about the contents of the document

13  until it's admitted into evidence.

14        MR. SHERWOOD:  Well, I move it into evidence, Your

15  Honor.

16        MR. STEWART:  We object, Your Honor.  For the --

17  well, first of all, I'm not sure what its relevance is, but

18  more to the point it wasn't identified as part of the

19  pre-trial process we engaged in to identify, have timely

20  objections, and have an opportunity to review documents.

21        MR. SHERWOOD:  I -- I agree that it wasn't

22  identified pre-trial, Your Honor.  We did identify the -- the

23  tentative agreement, however.  We have maintained in this case

24  that on the impracticability issue, that indeed it was and is

25  possible to negotiate with a large number of unions for the

1   city and to negotiate with respect to the rights of retirees

2   in the context of those negotiations.

3       Our -- I was at the deposition of -- of one of our

4   clients in Washington where this issue was raised and -- and

5   probed.  We were -- we believed that this witness having been

6   involved in those negotiations would testify that indeed some

7   of the give backs in this tentative agreement impacted

8   retirees.

9       And he hasn't clearly done that.  So I'm using this to

10  refresh recollection.  Your Honor, there are a lot of

11  documents in this case.  This is a fast track case with a lot

12  of document review and production that has been done.  This is

13  a City of Detroit document that certainly this witness, and I

14  assume the other professionals, are -- are intimately familiar

15  with.

16      And I do not think that the failure to put it on our

17  exhibit list in this case and on this track should prevent the

18  admission into evidence.  It's otherwise relevant for the

19  reasons that I've set forth.  And I don't see any prejudice

20  whatsoever to the city.

21          MR. STEWART:  Your Honor, I think it is prejudicial.

22  We see this for the first time while the witness is on the

23  stand.  In fact so fresh is it we don't even know how to

24  number it as an exhibit.

25          And to the point that he didn't get the answer from the

1  witness he wanted.  If he fails in trying to refresh

2  recollection, the answer is for him to call his own witness,

3  not to bring in documents outside of the normal structure that

4  we had all agreed upon.

5          THE COURT:  I agree that this record does not

6  establish cause to add an exhibit to the established witness

7  list.  Accordingly, the objection is sustained.  The document

8  may be used to refresh recollection.

9          MR. SHERWOOD:  Excuse me one second, Your Honor.

10  Q   I'm going to try to use this to refresh your

11  recollection.  Can you turn to Page 7, please?  Now again

12  we're on the topic of whether this negotiation involved

13  savings on benefits that impacted retirees.  If you look at

14  the -- the second block down on the left, have you read that

15  block?

16  A   Yes.

17  Q   And have you -- and does that block and the -- the

18  numbers to the right of it, refresh your recollection as to

19  whether or not in the context of these negotiations, the city

20  was -- or -- or the union reps were negotiating with respect

21  to rights of retirees?

22  A   No.  In fact on my --

23          THE COURT:  The only question is, does that document

24  refresh your recollection on that question.

25  A   Sorry, Your Honor.  No.

1  Q    And it -- and just -- just to be clear on this point,

2  it's your -- you don't recall during these negotiations

3  whether the city and the representatives of the union

4  negotiated and reached an agreement that impacted the rights

5  of the city's retirees, is that your testimony?

6  A    That is my testimony, yes.

7  Q    But you don't recall?

8  A    That's what I just said.

9         MR. SHERWOOD:  Okay.  Thank you, Your Honor.  Thank

10  you, Mr. Malhotra.  I have nothing further.

11         THE COURT:  All right.  At this time we'll take our

12  morning 15 minute recess.

13         (WITNESS GAURAV MALHOTRA WAS TEMPORARILY EXCUSED AT 10:37

14  A.M.)

15         THE CLERK:  All rise.  Court is in recess.

16         (Court in Recess at 10:37 a.m.; Resume at 10:59 a.m.)

17         THE CLERK:  Court is in session.  Please be seated.

18         MR. DECHIARA:  Good morning, Your Honor.  Peter

19  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

20  the UAW International Union.

21         (WITNESS GAURAV MALHOTRA RESUMED THE STAND AT 10:59 A.M.)

22                     CROSS EXAMINATION

23  BY MR. DECHIARA:

24  Q    Good morning, Mr. Malhotra.

25  A    Good morning.

1 | Q    One preliminary question, Mr. Malhotra.  Between the time

2 | that you completed your direct testimony at the end of the day

3 | yesterday and when you began your cross examination today, did

4 | you consult with counsel about the subject of your testimony?

5 | A    No, I did not.

6 | Q    You're not and never have been an officer of the City of

7 | Detroit, correct?

8 | A    That is correct.

9 | Q    Okay.  And you've never -- and you don't currently and

10 | you never have held any elected or appointed position with the

11 | city, correct?

12 | A    That is right.

13 | Q    And you don't -- you're not involved in the direct

14 | running of the city, the direct operation of the city,

15 | correct?

16 | A    Yes.

17 | Q    Yes, I'm correct?

18 | A    Yes, you're correct.

19 | Q    Let me ask you about the June 14th, 2013 meeting at which

20 | the emergency manager made his presentation of the creditor

21 | proposal.  Do you remember your testimony about that meeting

22 | yesterday?

23 | A    Yes.

24 | Q    And I believe you testified on direct that there were

25 | questions that were asked by the people who were in attendance

1  at that meeting, correct?

2  A    Yes.

3  Q    Okay.  Am I correct that the procedure at that meeting

4  was that if an attendee wanted to ask a question or make a

5  comment, they had to write it down on a card which would then

6  be passed up to the front and then it would be read out by

7  someone in the front of the room?  Wasn't that the procedure?

8  A    As I recall I think, yes.

9  Q    And let me now draw your attention to the June 20th

10  meeting.  Do you recall your testimony about the June 20th

11  meeting?

12  A    Yes.

13  Q    And the emergency manager was not present, correct?

14  A    That is correct.

15  Q    And the people who were presenting at the meeting were

16  city advisors, including yourself, correct?

17  A    Yes.

18  Q    Did anyone from the city tell you that you had authority

19  to negotiate for the city at that meeting?

20  A    I was presenting at that meeting.

21  Q    Is the answer to my question no?

22  A    That is correct.

23  Q    Okay.  And it was not your understanding, was it, that

24  you had authority to negotiate on -- for the city at that

25  meeting, am I correct?

1  A    I was not negotiating for the city at that meeting, that

2  is correct.

3  Q    Okay.  And is it -- do you have any knowledge that any of

4  the other advisors who were attending that meeting on behalf

5  of the city had authority to negotiate for the city?

6  A    I can't say what the authority was of the other advisors,

7  you would have to ask them.

8  Q    So you have no knowledge -- you have no affirmative

9  knowledge that the -- any of the other advisors were

10 authorized to negotiate on behalf of the city, is that

11 correct?

12 A    I have no knowledge one way or the other, that is

13 correct.

14 Q    Okay.  Were there any other meetings besides the June 14th

15 and June 20th meeting that you -- that you attended where there

16 were presentations made to labor or retiree groups?

17 A    I don't recall specifically.

18 Q    As you sit here today you don't recall any others?

19 A    I do not recall any others, no.

20 Q    Okay.  You testified I believe on direct about a July 9th

21 meeting.  Do you recall that testimony?

22 A    Yes.

23 Q    And who -- who were the -- what category of attendees

24 attended the July 9th meeting?

25 A    My recollection is that it was the city's advisors and

1  members of the retirement systems or advisors for the

2  retirement systems and other retirees.

3  Q    So the -- the -- so I'm going to distinguish between the

4  presenters and the attendees.  The attendees were advisors to

5  the retirees and the retirees?

6  A    That's my recollection, yes.

7  Q    Okay.  And were there -- were there negotiations -- did

8  you engage in negotiations on behalf of the city at that

9  meeting?

10  A   We had discussions about the city's financial profile as

11  well as discussions around pensions as I recall.

12  Q    And I believe your direct testimony was that the purpose

13  of that meeting was to discuss actuarial assumptions, is that

14  correct?

15  A    No.  What I said on my testimony is that at the end of

16  the meeting there was a discussion or dialogue about trying to

17  get the retirement system and the city's advisors on the same

18  page with respect to the actuarial assumptions.

19  Q    And -- and the reason -- and you were involved in that

20  effort, is that correct?

21  A    Not really.  I -- I was not directly involved with the

22  actuarial assumptions at all.

23  Q    Okay.  Did you have an understanding about what -- did --

24  did the city advisors want to achieve an understanding with

25  the retiree system advisors as to actuarial assumptions?

1  A    Yes.

2  Q    And did -- did you have an understanding about why the

3  city advisors wanted to obtain that understanding?

4  A    I do.  It was generally to try and ascertain the amount

5  of the under funding in the -- in the two pension systems,

6  yes.

7  Q    Okay.  Would it be fair to say that as a predicate for

8  meaningful negotiations, it's often helpful to have shared

9  assumptions between the -- the parties?

10  A    Yes.

11  Q    Did anyone tell you that -- from the city -- did -- did

12  anyone from the city tell you that you were -- you were

13  authorized at the July 19th -- I'm sorry, the July 9th meeting

14  to negotiate on behalf of the city?

15  A    No.

16  Q    You testified about certain meetings you had with the

17  emergency manager Mr. Orr at which you orally presented to him

18  certain findings or analysis that you had prepared.  Do you

19  recall that testimony on direct?

20  A    Yes.

21  Q    Okay.  And how many of those meetings were there?

22  A    I cannot count the number of meetings or conference calls

23  that we had, there were numerous.

24  Q    Okay.  So there were numerous face to face meetings and

25  also numerous conference calls?

1  A    Can you clarify what time frame is your question related

2  to?

3  Q    Well, you tell me.  I'm just asking about the -- the

4  meetings that you had -- well, okay.  I -- I can do this.

5  From the time the emergency manager became the emergency

6  manager until the bankruptcy filing, let's say that's the time

7  frame.  How many face to face meetings did you have with the

8  emergency manager at which you presented conclusions, or

9  findings, or analysis?

10  A    I can't recall the specific number, but there were

11  several.

12  Q    Okay.  And were these one on one meetings that you had

13  with the emergency manager?

14  A    We may have had -- yes, there were a couple of one on one

15  meetings I thought and as I recall and there were meetings

16  with -- in a broader group setting with the city's other

17  advisors.

18  Q    Okay.  And the ones that took place in a broader group

19  setting with the city's other advisors, those were

20  pre-scheduled meetings?

21  A    Generally yes.

22  Q    Okay.  And who -- who were the other city advisors who

23  attended those meetings?

24  A    It would have been representatives from Jones, Day, from

25  Miller, Buckfire, Conway, MacKenzie, our team.  But there were

1  several meetings and there wasn't a set schedule that

2  everybody was at a particular meeting.

3  Q    Okay.  But --

4  A    Is my recollection.

5  Q    Okay.  But some of the meetings where there were other

6  advisors were present, were you presented conclusions, or

7  findings, or analysis to the emergency manager were meetings

8  where Jones, Day attorneys were present, correct?

9  A    Yes.

10        MR. DECHIARA:  Okay.  Your Honor, I -- I don't have

11  anything further on that line of questioning.  I would note

12  for the record that the city has on the direct of Mr.

13  Malhotra, had Mr. Malhotra testified on direct about meetings

14  he had with Mr. Orr in the presence of counsel.

15  Q    You -- you testified about a meeting that you attended in

16  New York, I believe with the bond holders and the insurers of

17  the bond holders, is that correct?

18  A    Yes.

19  Q    Okay.  And when was that meeting?

20  A    I think it was June 25th maybe is my recollection.

21  Q    I'd like now to direct your attention to the proposal to

22  creditors which is Exhibit 43.  Do you have the exhibit book

23  or could somebody call up Exhibit 43, please?

24  A    I'm happy to get it if you just tell me what folder it is

25  though.

1  Q    Okay.  Yeah, you can get it.  Excuse me?

2  A    What folder, 43?

3  Q    I don't know what folder it is, but it's -- oh, I'm

4  sorry.  I -- no -- no, I'm correct.  It's -- it's City Exhibit

5  43.

6            THE COURT:  Can you help the witness find it,

7  please?

8            MR. DECHIARA:  Absolutely.

9  Q    Do you have it?

10  A    I got it.  Thank you.

11  Q    Okay.  Mr. Malhotra, if I could ask you to turn to Page

12  114 of Exhibit 43.  Are you on Page 114?

13  A    Yes.

14  Q    Okay.  Let me direct your attention to the last column on

15  the right.  It says insurer.  Do you see that?

16  A    I do.

17  Q    And do you see there's a list of insurers there?

18  A    Yes.

19  Q    And those are the insurers for the bond holders?

20  A    Yes.

21  Q    And were representatives of those insurers present at the

22  June 25th meeting?

23  A    I can't recall if all of them were there, but there were

24  representatives from the bond insurers at that meeting, yes.

25  Q    Okay.  Do you remember specifically which ones were there

1  and which ones were not?

2  A    No, I do not.

3  Q    Can you testify whether they were all there, or they were

4  not all there?

5  A    No, I cannot.

6  Q    Okay.  So they -- they may all have been there, is that

7  correct?

8  A    It could be, yes.

9  Q    Okay.  Let me turn your attention to Page 120.  It's

10  Appendix E.  There's a similar column, the right column it

11  says insurers and let me ask -- just ask you the same

12  question.

13      Were representatives from those insurers at that -- at

14  the June 25th meeting?

15  A    I cannot recall specifically if all of them were there.

16  On my -- I think most of them were there, or their advisors.

17  But I do not recall specifically if each and every one of

18  these were there or not.

19  Q    Okay.  Do you have a understanding of what percentage of

20  the bond holders of the city -- of the unsecured bond holders

21  of the City of Detroit are -- were insured by the -- by the

22  insurers that were listed in Appendix A through E of Exhibit

23  43?

24  A    No, I do not.

25  Q    It's the majority, isn't it?

1  A    I would assume, but I'm not sure.  I haven't done the

2  percentage of all of the unsecured notes what percentage are

3  insured versus not.  I haven't done that calculation.

4  Q    Okay.  Am I correct if -- if we wanted to, or someone

5  wanted to determine that, one could add up the -- the numbers

6  on the appendices under the balance column and -- and

7  determine the percentage that are insured?

8  A    Presumably if the -- if they're still in short at that

9  particular time frame or not.  Presumably yes.

10  Q    Okay.  Thank you.  And just so I understand correctly,

11  when a bond holder is insured that means that if -- if the

12  municipality defaults on the bond, the bond holder has

13  recourse against the insurer?

14  A    That is my understanding, yes.

15          MR. DECHIARA:  No further questions.

16          THE COURT:  Anyone else have any cross examination

17  questions for the witness?

18          MR. RUEGGER:  Yes, Your Honor.

19          MR. DECHIARA:  Your Honor, I would just ask to

20  reserve the right to -- to ask additional cross examination

21  question if the Court decides to reverse its prior ruling.

22          THE COURT:  Yes, yes.  That -- that right is

23  reserved for everyone.

24      On that point, and just so I don't forget later, I have

25  reconsidered my suggestion that we revisit this after lunch

1 and to give both you all and us time to review the memorandum

2 and the issue, we'll take it up again tomorrow morning.

3          MR. RUEGGER:  Thank you, Your Honor.

4          THE COURT:  You're welcome.

5          MR. RUEGGER:  May I -- may I proceed?

6          THE COURT:  Yes.

7          MR. RUEGGER:  Thank you.

8                    CROSS EXAMINATION

9 BY MR. RUEGGER:

10 Q    Good morning, Mr. Malhotra.  My name is Arthur Ruegger

11 from the Dentons firm.  We haven't met before.  I represent

12 the retirees committee here.

13      And I don't have a lot to ask you.  But I -- I do want to

14 talk to you a little bit about a document that Mr. Stewart

15 raised yesterday.  It was City Exhibit 44.  It's -- it's, I

16 believe, the executive version of the June 14th proposal.  Is

17 it on your screen?

18 A    It is, yes.

19 Q    Okay.  And specifically if we could look at Page 8.  And

20 I'm going to ask you some questions about the fiscal year 2012

21 figures that are on that page.  So if Kathy, you could expand

22 that, it would probably make it easier for us to see.  Great.

23      First, Mr. Malhotra, when were the -- these figures, and

24 specifically the fiscal year 2012 figure, when were they

25 finalized?

1  A    This is cash activity so it's -- it would have been right

2  around the end of fiscal year 2012.  So July 2012.  This is

3  cash activity.

4  Q    And how large was the E & Y team at that time?

5  A    At what time?

6  Q    When these figures were finalized.

7  A    Probably four or five.

8  Q    And did they have specialized roles?

9  A    Yes.  Our team was -- was focused, very focused on

10  looking at all of the cash activity, yes.

11  Q    Okay.  So can you tell us what the individuals roles were

12  on your team?

13  A    They were to ascertain what receipts were timing versus

14  permanent, any variances.  Looking at all of the property

15  taxes, looking at the income taxes.

16      The city generally receives a lot of its collections in

17  certain lock boxes.  We had to try and ascertain what part of

18  those collections were related to property taxes versus not.

19  It was to track the monthly gaming taxes.  It was to look at

20  the activity and the other receipts.  It was to highlight any

21  sort of one time bond related or escrow related proceeds that

22  were coming in that were further augmenting the general fund's

23  cash.

24  Q    And did you assign any of your team members any of those

25  particular matters to be their responsibility?

1   A    No, they were generally a team effort.

2   Q    Can you tell us beyond what you've just answered, in

3   general what was the process of compiling those figures?

4   A    Our team tracks the pretty much daily cash activity of

5   the city to ascertain what receipts are coming in, what

6   disbursements are going out to at least help be able to

7   quantify where that activity is going on a day in day out

8   basis.  And because we had wanted to try our best to insure

9   that the city did not run out of cash.

10      And that's the reason we had our team working

11  specifically on the receipts and disbursements activity,

12  looking at the bank accounts, looking at bank statements to

13  insure that we -- we could forecast where the movement was so

14  that the city would not run out of cash as it had to rely on

15  refinancing proceeds to keep going.

16  Q    Did you do any of that tracking personally, or was that

17  your team's responsibility?

18  A    It was a combination.  I was intimately involved.

19  Q    Okay.  Tell me what part you were intimately involved and

20  what part your team did.

21  A    I don't think there's -- there's a specific delineation

22  of what part I did versus what my team did.  It was a team

23  effort and I was intimately involved with the team.

24  Q    All right.  If you could look at that part of Exhibit 44.

25  I think you testified yesterday that your team, or someone

1  from your team, contacted the city individual responsible for

2  the property taxes is that -- is that correct?

3  A   I don't recall that specific part of my testimony.

4  Q   Okay.  All right.  Forgive me.  I don't mean to misstate

5  your testimony.

6      How -- did your team attempt to verify for example the

7  property tax figure that's on -- on that document for fiscal

8  year 2012?

9  A   This would have represented to verify, I don't know if

10 you mean audits.  I just want to make sure --

11 Q   Don't mean audit.

12 A   We, in terms of all the cash that comes in, in gross tax

13 collections, our team is to try our best ability to segregate

14 what collections were for property taxes, and what taxes were

15 due to the city, and versus what property taxes were related

16 to distributions that the city had to make to other taxing

17 authorities.

18 Q   All right.  With all respect, sir, I'm not sure that was

19 responsive.  I'm trying to determine to what extent anyone on

20 your team verified the figures and specifically the property

21 tax figure there.

22 A   This would have been the number that we had for the -- to

23 the best of our ability.

24 Q   And you had it from what source, sir?

25 A   It would have been from a -- for fiscal year 2012 from a

1   combination of the bank accounts, or the city's internal

2   reports.

3   Q    The -- I'm sorry, I didn't hear you.  The city's what

4   reports?

5   A    Internal reports.

6   Q    Internal reports.

7   A    Yes.

8   Q    Did you consider the -- the CAFR for this analysis at

9   all?

10  A    This is fiscal year 2012 cash activity.  The CAFR, the

11  CAFR doesn't come out for months after that.

12  Q    I thought yesterday you testified, and correct me if I'm

13  wrong, that someone from your team contacted the city to -- to

14  check the property tax figures, is that not correct?

15  A    You can go back to my testimony.  I don't remember that

16  specific piece.  We looked at the cash activity of city in --

17  in a considerable amount of detail.

18  Q    Dropping down to the next item, income -- income and

19  utility taxes.  How were -- how was that figure derived?

20  A    That figure was derived from the information we had from

21  the bank accounts as well as the city's internal reports.

22  Q    And when you say city's internal reports, what kind of

23  reports were those?

24  A    They are various internal reports that the city tries its

25  best ability to track this cash activity.

1  Q    Did -- did anyone on your team ever try to get behind any

2  of those figures?

3  A    In order to --

4  Q    To check their accuracy.

5  A    Cash is generally cash.  If you are trying to ask the

6  classification of those receipts, there is -- there is always

7  classification issues, but cash is generally cash.  I don't

8  know what verification you do of cash.  This is not audited

9  statements.

10 Q    Your team didn't have the cash, right?

11 A    We tracked cash.

12 Q    Your team was not counting the cash?  It was looking at

13 reports from the city, correct?

14 A    That is accurate.  We were not counting dollar bills if

15 that is your question.

16 Q    No, that was true for both the bank reports and the

17 internal city reports?

18 A    We were tracking cash to the best of our ability.

19 Q    Based on the city's reports?

20 A    Based on our review of the city's reports and our review

21 of the bank statements.

22 Q    Sure.  And I don't mean to belabor the issue, but you

23 didn't check the city's reports, did you?  You reviewed them

24 and accepted them.

25 A    We subtract cash compared to the bank activity.  So we

1  used to check them.  We used to review them.  We used to ask

2  questions.  But generally tracking cash was not going to

3  approves or anything that.  It was -- it was tracking cash.

4  Q    All right.  So back to my question about the income and

5  utility taxes.  How did you derive that figure?

6  A    This will be a combination as I already testified based

7  on the city's internal reports and their bank accounts.  And

8  even out of discussions we may have had with the city

9  personnel.

10  Q    Did you have any personal conversations with city

11  personnel related to that item?

12  A    I may have, I don't recall specifically.  This is going

13  back to fiscal year 2012.

14  Q    Do you recall having any personal conversations with

15  anyone at the city related to the property tax item?

16  A    I don't remember a specific conversation.  We used to

17  track these daily, or actually on the fiscal year 2012 at

18  least weekly to -- to get our arms around the cash activity.

19  Q    You and your team?

20  A    That is correct.

21  Q    What about the gaming taxes?  Do you recall where that

22  figure came from?

23  A    I think it comes from the city's bank activity.

24  Q    The city's bank activity?

25  A    Its bank statements.

 1  Q    Bank statements.  And how often did you receive the

 2  city's bank statements?

 3  A    It has varied from time to time, but we are receiving

 4  statements right now on a weekly basis if not on a daily

 5  basis --

 6  Q    And in back --

 7  A    That's --

 8  Q    I'm sorry.  I didn't mean to speak over you.  And back in

 9  2012, do you recall how often you were receiving those

10  statements?

11  A    I do not recall, but we -- we started getting the bank

12  statements on a regular basis as soon as we -- we got engaged

13  because that was the best proxy to track cash.

14  Q    And that would have been 2011, correct?

15  A    Calendar year 2011, that's right.

16  Q    Okay.  But I'm asking now about 2012.  Do you recall how

17  often you got statements related to gaming taxes?

18  A    Talking about fiscal year 2012.  I just want to make

19  clear that includes a part of 2011.  We would have received

20  activity on a regular basis that's what I would say.

21  Q    And you can't recall now whether that was weekly, or

22  twice a month, or monthly?

23  A    That is correct, I can't recall.

24  Q    How about the municipal service fee to casinos?

25  A    Consistent with how we received the gaming taxes

1  information.

2  Q    Reports from the city?

3  A    Reports, bank activity, discussions with -- with -- with

4  -- from the city's management team.

5  Q    I'm sorry?  Reports -- discussions with who at the city?

6  A    The city's management team.

7  Q    Okay.  Do you recall having any personal conversations

8  with the city's management team related to that line item?

9  A    No, I do not.

10  Q    So any -- any conversations would have been between your

11  team and -- and the people at the city?

12  A    No, that's not right.

13  Q    Okay.  What would -- who would be -- who was part of

14  those conversations to your knowledge?

15  A    Like I said earlier, I was intimately involved with the

16  tracking of cash activity of the city given how precarious the

17  cash position was.  I had several discussions with members of

18  the city's management team with respect to cash.

19       Your question was if I had a specific conversation on

20  this particular line item, I do not recall.  I had specific

21  conversations on the cash activity with various members of the

22  city's management team.

23  Q    Over what period of time?

24  A    Since the time we got engaged.

25  Q    And how frequently?

1    A    I cannot recall, it was very frequent.

2    Q    Just so we're clear, you don't recall having any

3    conversations specifically related to the municipal service

4    fee to casinos, is that correct?

5    A    I do not recall of a specific conversation, you're

6    correct.

7    Q    How about the state revenue sharing?  I think you talked

8    about that yesterday.  Did you have any personal involvement

9    in any conversations with the state relating to the revenue

10   sharing figure that's reflected in this exhibit?

11   A    It's -- no, it's -- the cash that's received every second

12   month pretty regular.

13   Q    I thought you testified yesterday, and I don't want to

14   put words in your mouth, that -- that there was a conversation

15   with the state related to what -- the revenues that came from

16   the state to the city.  Is that wrong?

17   A    No, you're correct.  But my testimony was related to the

18   forecast specifically and I'm happy to talk about it, and also

19   the ten year forecast in terms of the assumptions behind it.

20   Q    I understand you might be happy about that.  But let's

21   talk -- let's talk to these figures now.

22   A    I was just clarifying your -- your question and my

23   testimony.  This is for fiscal year 2012.

24   Q    Correct.

25   A    I did not have specific discussions with the state.  We

1  subtract this cash activity through a combination of the

2  city's reports, the bank activity, and discussions with the

3  management team on a regular basis.

4  Q    How about the last item there?  It's a fairly large one,

5  other receipts.  What -- what goes into that?

6  A    That includes grant receipts, it includes any sort of

7  fines that are collected, it includes any sort of fees that

8  are charged by the different departments.  It also includes

9  some of the utility charges that come through.  So it's --

10  it's a variety of items that makes up that line item.

11  Q    And did your team -- what was the source for your team's

12  collection of that data?

13  A    It was the same as I highlighted before.

14  Q    Reports from the city?

15  A    Bank statements, reports from the city, and discussions

16  with the management team.

17  Q    Do the bank statements that come in, do they break out

18  these line items as set forth in Exhibit 44 on this page?

19  A    Some of those items are -- are broken out, I believe.

20  But that -- that was part of the process in which we used to

21  look at that activity and try and ascertain where those

22  dollars belong so that we could be updating our forecast based

23  on the run rates more accurately based on the information we

24  received.

25  Q    For 2012, the figure on the -- on this exhibit is -- is

1  that $1,765,000,000, is that correct?

2  A    That is correct, including 50,000,000 of refinancing.

3  Q    Any -- and is it correct that that's simply cash, that's

4  not something that -- that it could be the subject of -- of

5  discussion or adjustment?

6  A    That's correct, it's -- it's cash.

7  Q    Did you have any conversations or did your team to your

8  knowledge have any conversations with anybody from Conway,

9  MacKenzie relating to the fiscal year 2012 figures?

10  A   We had discussions around the fiscal year 2012 figures

11  with all of the advisors in terms of what the cash activity

12  for fiscal year 2012 was.

13  Q   So in essence your team or you just relayed to Conway,

14  MacKenzie what the cash figures were?

15  A   We related to the cash activity of fiscal year 2012 as

16  shown on this page was discussed with Conway, MacKenzie and

17  all of the other advisors.

18  Q   Now these -- this is the general fund figure, is that

19  correct?

20  A   Predominantly, yes.  It does not include the activity for

21  Water and Sewer Department, all the receipts for DDOT.

22  Q   Or receipts for --

23  A   I'm sorry.  The Department of Transportation.

24  Q   It -- it -- it does not, or it does include Department of

25  Transportation?

1    A    It does not include the receipts of the Department of

2    Transportation.  The subsidy that's given to the Department of

3    Transportation from the general fund is shown on other

4    disbursement section.

5    Q    And -- and tell -- tell us why those enterprise funds

6    receipts are not included in -- in these figures.

7    A    The -- the Department of Transportation receipts are not

8    included because it's the net subsidy that the general fund

9    sends to the Department of Transportation after they go

10   through their own receipts and disbursements activity.  The

11   net subsidy that the general fund sends to the Department of

12   Transportation are included here.  With respect to the Water

13   and Sewer Department, they are receipts saying disbursements

14   activity are not included in here.

15   Q    And you said, I think earlier, that the department of --

16   Departments of Water and Sewer are self sustaining or break

17   even, correct?

18   A    That's generally correct.

19   Q    So that they can generally handle their own debts and

20   take care of their own business?

21   A    Yes.

22   Q    I would like to ask the help to put up Exhibit 6 which is

23   also in evidence.  And on this instance I believe it's the

24   CAFR for 2012.

25        And if you could turn to Page 20 of that -- that exhibit.

1  If you could highlight, please, just the 2012 total receipts.

2  And -- and compare it with, if you could, Exhibit 44 which we

3  were just looking at.

4       Okay.  I believe on the top we have an -- an excerpt from

5  Exhibit 6 which is the 2012 CAFR.  You're familiar with that

6  document, Mr. Malhotra?

7  A    Yes, I am.

8  Q    And at the bottom is the year -- well, we were actually

9  looking on the left hand column, but that's the figure from

10  Exhibit 44, am I correct?

11  A    That is correct.

12  Q    You will note there is a discrepancy between the -- the

13  total operating receipts figure which we were talking about in

14  the bottom and total revenues figure that's recorded in the

15  top.  Can you explain for us, please, what the differences are

16  between those two figures?

17  A    Sure.  I'll focus on your top table which is for

18  governmental activities of total revenues of 1,537,000,000

19  compared to the total operating receipts of 1,765,000,000.

20  Q    Right.

21  A    The 1,765,000,000 includes cash receipts that the city

22  collects in its property taxes line for distribution to other

23  taxing authorities.  If you go back to the cash flows you will

24  see there's a DDOT off a significant amount of disbursements

25  going to other taxing authorities for collections that have

1  come.

2      So again, I just want to clarify, you're tracking cash.

3  The city receives the gross tax collections then distributes

4  the taxes it has collected on behalf of other entities for a

5  net tax number.  Generally that net tax number is what's

6  reported in the coffer as property tax revenue.

7  Q    So the one five figure reflects a net figure for the

8  taxes that you just described, is that correct?

9  A    That is correct.

10 Q    Okay.  And -- and that's reflected below the revenue

11 line, or it should be above -- oh, forgive me.  It's -- it's

12 reflected in the tax figure itself.

13 A    You are correct.

14 Q    And if you could drop the Exhibit 44 and just stay with

15 -- yes, that page.  Just so I'm sure I understand it.  The --

16 the figures on the top, again this is from CAFR not your

17 document, show that the -- the governmental activities column,

18 the 1.5 is really just a -- it's far short of the -- no, you

19 don't need to do that.  The total operational receipts for the

20 City of Detroit, correct?

21 A    For the reasons that I described, yes.

22 Q    That's the business type activities, those are -- that's

23 water, sewer, transportation?

24 A    I believe so.  I -- I have not focused on the business

25 type activity, I believe so.  I'm not sure.

1  Q    Isn't it true that when you -- your engagement began in

2  2011, the business type activities were part of the financial

3  review that your team undertook, correct?

4  A    We were looking at the -- the receipts and disbursements

5  activity of some of the enterprise funds, that is correct.

6            MR. RUEGGER:  No further questions, Your Honor.

7            THE COURT:  Thank you, sir.

8            MR. RUEGGER:  Thank you, Mr. Malhotra.

9            THE COURT:  Any other questions for the witness?

10                    CROSS EXAMINATION

11 BY MS. PATEK:

12 Q    Good morning, Mr. Malhotra, Barbara Patek.  I represent

13 the Detroit Fire Fighters, the Detroit Police Officers

14 Association, and the Detroit Police Command Officers

15 Association, and the Detroit Police Lieutenant and Sergeants

16 Association.  I have just a few questions for you this

17 morning.

18        Mr. Stewart asked you some questions about negotiations

19 with various city unions in late 2011 and 2012.  Were you

20 involved in similar negotiations with the Detroit Fire

21 Fighters Association during that same time period?

22 A    Yes.  Me or my team members were involved, yes.

23 Q    Okay.  And was Chris Brown a member of that team?

24 A    Chris Brown was representing the city.

25 Q    And do you recall whether or not, let's start with the

1  Detroit Fire Fighters.  Whether or not you were able to --

2  your team negotiate an agreement with the fire fighters that

3  resulted in some cost savings?

4  A    Yes.  We did not negotiate it.  We helped ascertain the

5  financial impact, but I believe there was a tentative

6  agreement that was reached with Detroit Fire Fighters

7  Association and the city.

8  Q    Can I have 714, please?  Mr. Malhotra, can -- do you

9  recognize Exhibit 714?

10  A    It's the tentative agreement to --

11  Q    And -- and can you tell the Court going down to the first

12  -- the first full paragraph in the -- the agreement with whom

13  that appears to be?

14        MR. STEWART:  Your Honor, we've objected to this.

15  It is not in evidence.  If she's laying a foundation, no

16  objection.  But if she's going to question the witness about

17  the substance, we do object.

18        MS. PATEK:  I am just laying a foundation, Your

19  Honor.

20        THE COURT:  Well, the question you asked was not

21  exactly a question to establish foundation.

22        MS. PATEK:  Let me --

23  Q    Can you tell us what Exhibit 714 is?

24  A    It's the tentative -- tentative agreement entered the 23rd

25  of March between the City of Detroit and the Detroit Fire

1  Fighters Association.

2  Q    And can we flip to Page 6 of that agreement, please?  Oh,

3  I'm sorry, 7.  Do you recognize in the upper left hand corner

4  of that the -- the signature that appears?

5  A    I think that is the signature of Chris Brown.

6  Q    And Chris Brown was at that time the Chief Operating

7  Officer of the City of Detroit?

8  A    That is correct.

9  Q    Can we bring up 717?  Did you have similar discussions

10  with the Detroit Police Command Officers Association during

11  the same time period, 2011 and 2012?

12  A    We have ascertained some of the financial impact of those

13  discussions.

14  Q    And you participated and were there in those

15  negotiations?

16  A    I was participating from a financial standpoint, yes.

17  Q    Do you recall whether or not the agreement negotiated

18  with the Detroit Police Command -- well, strike that.  If we

19  can jump ahead to the signature page which I believe on this

20  one is Page 5.

21      And same question here.  If you look on the left hand

22  side of the page about a little better than halfway down on

23  Exhibit 717.  Do you recognize that signature?

24  A    I think that is the signature of Chris Brown.

25  Q    And again he was the Chief Operating Officer of the City

1  of Detroit at that time?

2  A     Yes.

3  Q     Do you recall whether or not as a result of the

4  negotiation of the tentative agreement, the agreement that

5  resulted provided for some cost savings to the City of

6  Detroit?

7  A     It was a combination of cost savings and deferrals, yes.

8              MS. PATEK:  I have nothing further at this time.

9              THE COURT:  Any other questions for the witness?

10  Any redirect?

11             MR. STEWART:  Not very much, Your Honor.

12                       REDIRECT EXAMINATION

13  BY MR. STEWART:

14  Q     Mr. Malhotra, and when you were questioned you mentioned

15  something called structural cash flow problems?

16  A     Yes.

17  Q     What are structural cash flow problems?

18  A     As shown on the city's cash flow activity for fiscal year

19  '12 and 2013, the disbursements continue to exceed receipts

20  for both of those years which in my mind are structural cash

21  flow issues especially given the fact that the city had

22  already made -- or had gotten a lot of concessions from some

23  of the active employees that -- but yet other than borrowing

24  new cash, or pooling new -- pooling accounts, or deferrals,

25  the core structural problems were -- or cash flow problems

1 where that the disbursements continued to exceed the receipts.

2 Q    Now when you used that term, it was in connection with

3 the questions you were asked about the monetization of city

4 assets.  What effect if any would the monetization of city

5 assets have upon the city's structural cash flow problems?

6 A    None.

7 Q    Why not?

8 A    Because in -- in my view those are one time proceeds from

9 asset sales that do not address the issues with respect to the

10 ongoing operating disbursements and the legacy cost

11 disbursements, the combination of which continue to exceed the

12 receipts that the city generates from its operations.

13 Q    Now you also were asked at various times about cost

14 savings that had been negotiated or realized or what have you

15 in previous years.  To the extent cost savings had been

16 achieved by the city, what if anything did you do in your

17 financial analyses with respect to those savings?

18 A    Those savings were clearly reflected in the cash activity

19 on a monthly basis all through fiscal year 2013.  So the

20 fiscal year 2013 would already reflect those cash savings that

21 had occurred during that time frame.

22      We also adjusted for additional cost savings from a

23 forecast basis over the forecast time frame which were already

24 incorporated in the cash flow assumptions.

25      MR. STEWART:  Thank you.  I have no further

1  questions.

2      THE COURT:  All right.  Sir, you may step down.

3  Thank you very much.  I will ask you to be here again tomorrow

4  morning in case we have more questions for you.

5  A    Yes, Your Honor.

6      (WITNESS GAURAV MALHOTRA WAS EXCUSED AT 11:43 A.M.)

7      THE COURT:  All right.  Your next witness, sir.

8      MR. STEWART:  Charles Moore.  Your Honor, before Mr.

9  Moore comes into the courtroom, as a foreseeable evidentiary

10  point, I think it might be best just to raise outside of the

11  presence of the witness.

12      THE COURT:  Okay.

13      MR. STEWART:  And here is what it is.  Yesterday in

14  the opening, I believe it was Mr. Oldman and if I'm wrong, I

15  apologize to Mr. Oldman who in the course of his opening about

16  the alleged bad faith of the emergency manager said, and we

17  have the imperfect transcript here with us, that Mr. Orr did

18  not have a factual basis to state in his declaration that the

19  pension claims were about 3.5 million dollars.

20    Because he opened on it, that is squarely now an issue in

21  our case.  And I intend to ask Mr. Moore about that.  And in

22  particular where that number came from.  I'm going to ask him

23  did he give that number to Mr. -- Mr. Orr and where did he get

24  it from and what made him believe that was a reliable number.

25      His answer is going to be that it was based upon reports

1  given to him by the pension plans actuaries.  And he has those

2  reports with him.  There have been -- they're exhibits here in

3  our case.  So I intend to ask him about that.

4      I'm not certain there will be an objection to it, but if

5  there is, I thought it would be more orderly to deal with it

6  now instead of while he was testifying.

7          THE COURT:  Any objections?

8          MR. RUEGGER:  On behalf of the committee yes, Your

9  Honor.  I believe that that's just an effort to introduce

10 opinion testimony, expert testimony through a witness who is

11 supposed to be a lay witness.  And I don't believe Mr.

12 Oldman's opening relating to that figure opened any doors to

13 allow that kind of expert testimony.  I would take it on a

14 question by -- I'm sorry, Your Honor.

15         MR. MONTGOMERY:  I didn't mean to interrupt you.

16         THE COURT:  I actually meant for him to remain quiet

17 so you could finish.  All right.

18         MR. RUEGGER:  I'm sorry, Your Honor.  I wasn't sure

19 who was where.

20         MR. MONTGOMERY:  We would simply object, Your Honor,

21 for the -- for the reasons that I think we've -- we've raised

22 with you in the past.

23         THE COURT:  Okay.  And please recall to speak right

24 into the microphone.  Any other objections before I get back

25 to Mr. Stewart?  Sir?

1         MR. SHERWOOD:  Yeah, on behalf of AFSCME, Jack

2   Sherwood.  We would join in the objection.  We would submit

3   that any testimony by Mr. Moore about pension under funding is

4   clearly, I don't think there's any dispute that that type of

5   testimony involves extremely specialized knowledge, training,

6   and is way beyond the understanding of the average person.

7         It is without a doubt the subject of what should be

8   expert testimony.  And for the city to try to use that

9   testimony in this proceeding by a witness who has not been

10  qualified as an expert, who has not rendered an expert report,

11  is improper.

12        And only experts can rely on -- on hearsay.  And that is

13  what this witness would be doing.  So on behalf of AFSCME, we

14  would also oppose any testimony by ths witness concerning the

15  -- the value of the -- the pension under funding.  Thank you,

16  Your Honor.

17        MR. CIANTRA:  Thomas Ciantra for the UAW, Your

18  Honor.  We would join in those objections and note that Mr.

19  Moore is not an actuary and has not been proffered, we

20  understand, as a -- as an expert qualified to provide

21  actuarial testimony.

22        THE COURT:  All right.  Thank you.  The -- go ahead,

23  I didn't mean to cut you off.

24        MR. STEWART:  I think there may be some confusion.

25  We're not offering it for the truth, we're offering it for the

1  good faith basis of Mr. Orr who has been accused of bad faith.

2  So that -- that is the nature of the proffer and there is a

3  hearsay exception for that.

4          THE COURT:  Yes.  The Court will admit the evidence

5  but for the limited purpose of addressing the challenge to Mr.

6  Orr's credibility and good faith.

7          MR. STEWART:  Mr. Moore is being brought to the

8  courtroom from the hall because of the sequestration --

9          THE COURT:  Yes.

10          MR. STEWART:  -- agreement, Your Honor.

11          THE COURT:  Step forward please, sir.  And before

12  you sit down, please raise your right hand.

13      (WITNESS CHARLES MOORE WAS SWORN)

14          THE COURT:  All right.  Please sit down.

15                      DIRECT EXAMINATION

16  BY MR. STEWART:

17  Q    Good morning, Mr. Moore.

18  A    Good morning.

19  Q    Could you please give the Court your full name and your

20  home address?

21  A    Charles Moore, M-o-o-r-e.  And I am out of Birmingham,

22  Michigan.

23  Q    And are you employed, Mr. Moore?

24  A    Yes, sir.

25  Q    And where do you work?

1  A    Conway, MacKenzie, Inc.

2  Q    And tell us if you could what Conway, MacKenzie, Inc. is.

3  A    We are primarily a turnaround and restructuring firm.

4  Q    How long have you worked for Conway, MacKenzie?

5  A    For approximately 12 years.

6  Q    Tell us if you could about your education, college and

7  after college if you have post graduate work.

8  A    I have a Bachelor's Degree in Accounting from Michigan

9  State University.  I have a Master's of Business

10 Administration from Michigan State University in Professional

11 Accounting.  And I have various certifications as well.

12 Q    Well, first of all, if you could give me the dates of

13 your degrees from Michigan State.

14 A    Sure.  I completed both degrees in 1994.  It was a

15 combined degree program and both degrees are granted at the

16 same time.

17 Q    And then you mentioned your professional certifications.

18 Could you tell us what those are?

19 A    Yes, sir.  I am a Certified Public Accountant, a

20 Certified Turnaround Professional, and I'm certified in

21 Financial Forensics.

22 Q    And who does the certifications for those qualifications?

23 A    The American Institute of Certified Public Accountants is

24 the CPA body.  The Turnaround Management Association is the

25 body for the Certified Turnaround Professional designation.

1  And then the AICPA, the American Institute of Certified Public

2  Accountants, also does the financial forensics certification.

3  Q    Tell us if you could about your employment since your

4  graduation from Michigan State.

5  A    My first job was with Deloitte and Touche.  I was

6  employed there for approximately five and a half years.  After

7  that I was at a company by the name of Horizon Technology

8  where I was Chief Financial Officer and then I joined Conway,

9  MacKenzie.

10 Q    And you told us you've been there 12 years.

11 A    Yes, sir.

12 Q    Where is Conway, MacKenzie headquartered?

13 A    We are headquartered in Birmingham, Michigan.

14 Q    And what Conway, MacKenzie office do you work out of?

15 A    I work out of the Birmingham, Michigan office.

16 Q    What title do you hold at Conway, MacKenzie?

17 A    I'm Senior Managing Director and shareholder.

18 Q    Okay.  And tell us if you could what kind of practice you

19 have at the firm.

20 A    My work primarily involves turnaround and restructuring

21 services.  I also perform services in other areas of our firm

22 such as investment banking and litigation support.

23 Q    Could you -- to the extent they're probably discloseable,

24 could you tell us some of the clients you have worked for

25 while at Conway, MacKenzie?

1  A    Certainly.  As you mentioned, there are client

2  confidentiality restrictions, but publicly known clients

3  recently would include the City of Detroit, Detroit Public

4  Schools, the Commonwealth of Puerto Rico, Jefferson County,

5  Alabama, Greektown Casino and Hotel.

6  Q    Have your clients included unions?

7  A    Yes, sir.

8  Q    Which unions?

9  A    I have done work on behalf of AFSCME and UAW.

10  Q    And what project was that on if you can tell us?

11  A    Yes.  I was engaged jointly by AFSCME and the UAW related

12  to the Commonwealth of Puerto Rico.

13  Q    Now in 2007, did you sit on a commission appointed by the

14  Michigan government?

15  A    Yes, sir.

16  Q    Please tell us what that work involved.

17  A    The commission was the legislative commission on

18  government efficiency.  It was a nine person panel appointed

19  by legislators from the State of Michigan.

20  Q    And how long did you work with that commission?

21  A    It was approximately a two year assignment.

22  Q    And what did you do in those two years?

23  A    The primary objective of the commission was to find

24  operational efficiencies for the state government.

25  Q    Did there come a time in 2012 you began working for the

1  City of Detroit?

2  A    Yes.

3  Q    And tell us about that work.

4  A    In late 2012, Conway, MacKenzie did some pro bono work

5  for the City of Detroit.

6  Q    And what was -- what work -- what work -- sorry, what

7  work did you do?

8  A    Conway, MacKenzie was asked to perform analysis on

9  certain areas related to cashiering operations for the city.

10 Q    And you'd better tell us what a cashiering operation is.

11 A    Cashiering generally means areas where cash is coming

12 into the city.

13 Q    Okay.  And then what areas did you look into?

14 A    There were, as I mentioned, about five areas.  Some were

15 more of a focus than others.  Municipal parking was a primary

16 area of focus.  We also looked at fire operations including

17 the fire marshal where fees are generated.  We also looked at

18 aspects of building safety and engineering.

19 Q    Did there come a time earlier this year when Conway,

20 MacKenzie was hired by the City of Detroit to -- on a non-pro

21 bono basis to do work for the city?

22 A    Yes, sir.

23 Q    And how did that come about?

24 A    The City of Detroit issued an RFP, a request for proposal

25 in November of 2012 for restructuring services.  Conway,

 1 MacKenzie was one of the firms that responded to that RFP and

 2 was eventually engaged in January of 2013.

 3 Q    And by restructuring services, what are you referring to?

 4 A    Restructuring services is not really a defined term, but

 5 because of the financial distress that the city was

 6 experiencing, there was a desire to bring in outside expertise

 7 to help the city deal with that financial distress.

 8 Q    And so Conway, MacKenzie became a operational

 9 restructuring advisor to the city?

10 A    Yes, sir.

11 Q    What areas did you look at?

12 A    We've looked at pretty much every area of the city's

13 operations.

14 Q    Okay.  Let me ask about some in particular.  What if

15 anything were you asked to do in terms of looking at the

16 city's operations in the area of public safety?

17 A    Public safety involves multiple areas.  It includes

18 police, fire, EMS, and Department of Homeland Security.  We

19 spent quite a bit of time understanding how those departments

20 function currently, what are the major impediments to

21 improving their performance, and working with individuals in

22 those departments to develop a plan for improving performance.

23 Q    Tell me if you could how did you go about doing this

24 work?

25 A    The city has had multiple consultants performing work

1  over the last several years.  And so one of the items that

2  Conway, MacKenzie did was to first understand work that has

3  been done in the past by outsider organizations so that we

4  could leverage that work.

5      In addition to that we worked very closely with the

6  people within the departments as well as outside organizations

7  to not only gather facts in terms of how the department is

8  performing currently, but also to benchmark as to how the

9  department stacks up compared to other areas that would be

10 relevant.

11 Q    Did there come a time when you made recommendations to

12 the city relating to public safety?

13 A    Yes, sir.

14 Q    And what did you recommend?

15 A    In the June time period of this year there was a document

16 that was put together.  A creditor proposal which incorporated

17 our work and specifically had initiatives related to public

18 safety in both restructuring expenses as well as capital

19 expenditures.

20 Q    And if we could, let's put up exhibit -- if we could,

21 let's put up Exhibit 43.  Mr. Moore, is this the creditor

22 proposal that you -- you referred to a few minutes ago?

23 A    This appears to be the title so, yes.

24 Q    And could you direct us to the portion of this that

25 contains the recommendations and analysis you told us about

1  just a few minutes ago?

2  A    If I recall correctly, this document is about 130 pages.

3  There are multiple areas where recommendations related to

4  public safety would exist.  If -- if we're able to scroll

5  through it, I could get you those pages.

6      I can tell you at the very end of the document that has a

7  summary listing of capital expenditures which you would be

8  able to look at from the standpoint of public safety.

9  Q    We will -- and we will do that once we've covered all

10  these areas.  And then what did you do if anything with regard

11  to the Water and Sewer Department?

12  A    Conway, MacKenzie was asked to prepare a long term, long

13  term being defined as ten year business plan for both the

14  water and sewer funds.

15  Q    And what do you mean when you say business plan?

16  A    A business plan essentially involves how the department

17  will operate over a period of time.  Anticipated revenues,

18  expenses, as well as other cash needs such as capital

19  improvements.

20  Q    And did there come a time when you made a recommendation

21  to the city or to the emergency manager based on the work that

22  you had done?

23  A    Yes.

24  Q    And when did you make that recommendation?

25  A    At the end of September of 2013 we delivered that ten

1 | year business plan for the water and sewer funds.

2 | Q    Now have you also been asked to look into the

3 | monetization of the Water and Sewer Department?

4 | A    Yes, sir.

5 | Q    When did you begin your work looking into the

6 | monetization of that department?

7 | A    The business plan which our work began in July of 2013,

8 | the development of the business plan for the water and sewer

9 | funds was to be used as a basis for evaluating strategic

10 | alternatives for the water and sewer funds.  And among those

11 | strategic alternatives was the potential creation of a

12 | regional water authority.  And that was one area that this

13 | business plan is currently being used.

14 | Q    And how, if you can disclose to us, how would the

15 | creation of a regional water and sewer authority lead to its

16 | monetization?

17 | A    What is currently being discussed, and -- and this is a

18 | publicly available aspect.  And I -- and I have to be careful

19 | because the negotiations are ongoing and they are

20 | confidential.

21 | But what has been publicly discussed is the formation of

22 | a regional authority would potentially involve the City of

23 | Detroit leasing the water and sewer assets to a regional

24 | authority and then receiving a payment in return.

25 | Q    So the monetization would take the form of lease

1 | payments?

2 | A    Yes, sir.

3 | Q    And did I hear you correctly this is under discussion as

4 | we speak?

5 | A    Yes, sir.

6 | Q    Let me direct your attention to the Detroit -- Detroit

7 | Department of Transportation.  What if anything was Conway,

8 | MacKenzie asked to do with regard to DDOT?

9 | A    DDOT as you mentioned, the Department of Transportation

10 | is another department that we looked at and there are both

11 | short term as well as longer term items that we evaluated

12 | there.

13 |     In the short term, we looked at ways of potentially

14 | improving the operation perhaps through as an example fare

15 | increases to try to get more revenue into the department.

16 | Identify ways that the -- that the department could operate

17 | more efficiently.

18 |     As an example getting more buses on the road, maintenance

19 | tends to be an issue in that department.  And also the

20 | management of the department.  The longer term is still a

21 | question and that could involve eventually merging into more a

22 | regional transportation authority.

23 | Q    And that merger would be done for what reason?

24 | A    If the authority, if a regional authority could provide

25 | better service to residents and it could also save the city

1  money, then that certainly is something that we would look at.

2  Q    Were you also asked to look at the Detroit Lighting

3  Authority?

4  A    Yes.

5  Q    What if anything did you do with regard to the Detroit

6  Lighting Authority?

7  A    Mr. Stewart, I'll just clarify.  You're referring to the

8  Public Lighting Authority.

9  Q    Public Lighting.

10 A    Yes.

11 Q    I'm sorry.  Thank you.

12 A    The -- the Public Lighting Authority was an authority

13 established within the past year and the primary purpose of

14 that lighting authority is to improve the lighting within the

15 city.  That needs to be funded.  And then the efforts to

16 replace lights will occur.

17     And so we worked with the city and the state as it

18 relates to the initial financing for the Public Lighting

19 Authority which is ongoing right now.  As well as we were

20 involved with a request for proposal related to the management

21 of the Public Lighting Department.

22 Q    What were you asked to do if anything with regard to tax

23 and revenue collection operations for the city?

24 A    The city takes in a variety of taxes.  The primary items

25 for taxes are property taxes, income taxes, and utility taxes

1 among others.

2      And we looked at those operations as to how they could be

3 made more efficient as well as potentially increase the amount

4 of revenue that was coming in.

5 Q    What did you find in the course of your investigation

6 into the operations of the city's tax and revenue functions?

7 A    As it relates to property taxes, there have been efforts

8 that were underway for the last few years where the city had

9 been using some outside assistance to try to improve that

10 area.

11      The city, its ability to operate in the property tax

12 area, was very broken.  Simple things such as getting bills

13 out on time and to the right addresses, as well as having the

14 right number of resources available to accept payment were

15 both significant deficiencies.

16 Q    Were -- were measures implemented to correct those

17 deficiencies?

18 A    Yes, sir.

19 Q    Tell us if you could what those measures were or are?

20 A    There are a number of things as it relates to property

21 tax collections that are underway.  First of all, the property

22 tax billing process has been improved significantly and so the

23 bills have gone out on time.

24      In addition to that, a number of additional resources

25 were brought in in July and August of this year in order to be

1   able to process the receipts, the -- the payments that

2   residents and others would make.

3       We also changed some of the bank information so that

4   payments would be received quicker as well as larger amounts

5   for property tax payments could actually be received.

6   Q    And do I understand correctly you're continuing to work

7   in the area?

8   A    Yes, sir.

9   Q    What did you do with regard to investigating the problem

10  of housing blight here in the City of Detroit?

11  A    Blight which is the term that most people use for

12  structures as well as non-structural areas that are -- could

13  be abandoned, burned out buildings, overgrowth of brush,

14  certainly was an area that we kept running into in a number of

15  the departments that would drive department activity.

16      As an example within the fire department, approximately

17  60% of the fire department's runs relate to abandoned

18  buildings.  We also noticed on the property tax side that

19  areas where there was significant amounts of blight, both

20  structural and non-structural, that property taxes -- or

21  property tax values would deteriorate very quickly.

22      And so there was an initiative identified as part of the

23  plan that was put together to eliminate the residential blight

24  within the City of Detroit.

25                  THE COURT:  Excuse me.  You used the phrase

1  non-structural blight?

2  A    Yes, Your Honor.

3         THE COURT:  What is that?

4  A    If you think of a lot, a residential lot, some of these

5  lots don't have a structure on them anymore, however, there is

6  tremendous overgrowth.  And so it hides what activity may be

7  going on in that lot.  And that also can be a -- an area that

8  breeds crime.

9  Q    Now, have you heard the terms restructuring and

10 reinvestment as used with respect to the work of the emergency

11 manager?

12 A    Yes, sir.

13 Q    In fact was that not something also discussed in the June

14 14 presentation?

15 A    Yes, sir.

16 Q    Could you tell us please, what is meant by those terms?

17 And let's start with restructuring.

18 A    Restructuring refers to how the departments operate.  And

19 when Conway, MacKenzie first began its efforts with the

20 departments, very often we find that there are areas where

21 costs can be reduced and so that is a big focus in the

22 turnaround industry in general is reducing expenses.

23        What we found within the departments is that a number of

24 the -- the departments were severely broken.  The -- as a

25 result of a number of cost cuts that have happened over the

1  years, many departments couldn't perform the most basic

2  functions I referred to earlier, just the inability to get

3  property tax bills out.

4       And so when we use the word restructuring we're talking

5  about changing how the department operates.  And in many

6  instances what that actually revolved around was adding

7  expenses so that departments could function and services could

8  be performed.

9  Q    Were you able to determine whether the benefit from

10 adding these employees would outweigh the expense of hiring

11 them?

12 A    In addition to the expenses that we identified, we also

13 identified a number of revenue initiatives as well.

14 Q    If you could, just explain to us what the revenue

15 initiatives were?  Actually I should first ask what were the

16 amount of the expenses?

17 A    The amount of expenses, added expenses over the ten year

18 period which is the period that we developed for the

19 restructuring and reinvestment plan, was approximately

20 $250,000,000.

21 Q    And what did you calculate the benefits would be

22 financially from the restructuring?

23 A    We had other revenue initiatives where revenue

24 initiatives would revolve around areas where the city could

25 receive additional cash in flows revenue of approximately

1   $280,000,000.  There were some offsets to that as well as we

2   looked at changing some departments it would result in some

3   lower revenue as well.  And so as a result there was net

4   revenue improvements of about $250,000,000 as well.

5   Q    Now then the term was used reinvestment.

6   A    Yes, sir.

7   Q    Tell me -- or tell the Court what you mean -- or meant

8   when you used the term reinvestment.

9   A    Reinvestment is referred to as the category of planned

10   expenditures that would relate to the infrastructure of the

11   city.  As an example whether that is facility improvements,

12   vehicle fleet, information technology, or even in the case of

13   blight, spending on blight elimination.

14   Q    And why is reinvestment -- this was something you

15   recommended?

16   A    Yes, sir.

17   Q    Why did you recommend it?

18   A    What became very clear is that over the years as the

19   city's finances suffered and deteriorated that there was not

20   the necessary reinvestment made in the structural assets.  As

21   an example, there are parking garages where large portions of

22   the parking garages are actually blocked off because the

23   structures themselves are in disrepair.  And that's a source

24   of revenue for the city.

25        And that unless those items are fixed, the city will have

1  continued issues with just performing functions.  And so what

2  became very clear to Conway, MacKenzie and formed the basis of

3  our recommendations, is that without spending money on the

4  infrastructure, the ability to perform services and actually

5  have hard assets where those services are performed, would

6  continue to be challenged.

7  Q    Now is the removal of blighted structures part of

8  reinvestment?

9  A    Yes, sir.

10  Q    Okay.  And why as a matter of economics, is removal of

11  blighted properties -- well, you did recommend removal of

12  blighted properties, correct?

13  A    Blighted residential properties, yes.

14  Q    Why is that economically sensible to do?

15  A    As I mentioned before, blight seems to touch on a number

16  of the areas that we've looked at whether it is public safety,

17  property taxes, or even appearance.  And so by spending money

18  on eliminating that, you change the dynamics of where people's

19  time gets spent as well as the basis for how the city receives

20  revenue.

21  Q    Did you have an estimate of what it would cost to remove

22  the blighted residential properties?

23  A    Yes, sir.

24  Q    And what was your estimate?

25  A    Five hundred million dollars during this time period.

1  Q    And the time period for removal was how many years?

2  A    We forecasted $500,000,000 over six years.

3  Q    And where did the number 500,000,000 come from?

4  A    This was an estimate based on discussions with people

5  that have been involved with blight removal in the past within

6  the city.  The city has been undertaking blight removal

7  efforts for some time as well as outside parties that have

8  been involved with blight removal as well.

9  Q    Now --

10        MR. RUEGGER:  I'm sorry, Mr. Stewart.

11        MR. STEWART:  Sure.

12        MR. RUEGGER:  I would object to the last testimony

13  as -- as hearsay, Your Honor.

14        THE COURT:  Would you speak into the microphone,

15  please?

16        MR. RUEGGER:  Objection to the last question and

17  answer as it called for hearsay and his answer was hearsay.  I

18  also want to object.  I believe this is bordering into expert

19  testimony and the witness is supposed to be a lay witness.

20        MR. STEWART:  Your Honor, he made recommendations

21  that resulted in a number for restructuring the reinvestment

22  during the openings yesterday.  That number too is challenged.

23  In particular I remember one of the openings saying how could

24  the city in good faith budget for this when it is not going to

25  be able to pay others.

1    So as a matter of dealing with the good faith issue and

2  the reliability of the data, I wanted to adduce testimony of

3  where these numbers came from.

4         THE COURT:  Is that the sole purpose that you're

5  offering this for?

6         MR. STEWART:  At this point, yes.

7         THE COURT:  All right.  With that limited purpose,

8  the Court will overrule the objection.

9  Q    I have one further question in this area which is

10  including the $500,000,000 for blight removal, what was the

11  total number you developed for reinvestment and restructuring

12  for the city?

13  A    It was approximately $1,000,000,000.

14  Q    Over ten years?

15  A    Over ten years, yes.  Excuse me, Mr. Stewart.  In your

16  question, did you ask restructuring and reinvestment?

17  Q    I did.

18  A    Okay.  The total with both of those would be

19  approximately 1.25 billion dollars.  A billion on the

20  reinvestment.

21  Q    Let me move to another area.  As part of your work for

22  the city or the emergency manager, were you asked to do

23  something called tax benchmarking?

24  A    Yes, sir.

25  Q    Could you tell us what tax benchmarking is?

1   A    As part of the -- our initial efforts when we were

2   looking at potential sources of cash, we looked at the current

3   level of taxation for residents and businesses within the City

4   of Detroit to understand whether that -- whether those could

5   be increased as a potential source of cash.  And so we looked

6   at the City of Detroit's taxation and we compared that to a

7   few of the surrounding communities.

8   Q    And what did you conclude?

9   A    That the City of Detroit residents were taxed far more

10  than surrounding communities.  And in fact had the highest

11  taxation within the State of Michigan.

12          MR. STEWART:  Your Honor, this is a good breaking

13  point for me, but I'm prepared to continue if the Court --

14          THE COURT:  No.  No, let's -- let's stop now for

15  lunch and reconvene at 1:45, please.

16      (WITNESS CHARLES MOORE WAS TEMPORARILY EXCUSED AT 12:15

17  P.M.)

18          THE CLERK:  All rise.  Court is in recess.

19      (Court in Recess at 12:15 p.m.; Resume at 1:45 p.m.)

20          THE CLERK:  Court is in session.  Please be seated.

21  Recalling case number 13-53846, City of Detroit, Michigan.

22          MR. IRWIN:  Good afternoon, Your Honor.  Geoff Irwin

23  from Jones, Day.  Might we return to a brief housekeeping

24  matter from yesterday morning just to update the Court?

25          THE COURT:  Sure, go ahead.

1          MR. IRWIN:  In regard to the -- the UAW motion to

2  compel, and I've -- I've conferred with Mr. Ciantra on this.

3  That you may recall that there were some Jones, Day research

4  memoranda that were the subject of the motion to compel.

5      And I indicated that we would do our very best to

6  investigate whether these memoranda were in fact shared with

7  the state.  And that if they were we would in fact disclose

8  them to -- to objectors here.

9      We have done our very best and it is proving too

10  difficult to know.  People just don't recall as they look at

11  individual memoranda whether they did or didn't.

12      So I -- I have conferred with Mr. Ciantra.  I am

13  perfectly prepared to share them with the Court.  I think the

14  Court invited for us to submit them in camera for the Court to

15  consider before deciding what -- what to do and I'm prepared

16  to do that.

17          THE COURT:  Okay.  I will accept that and give you a

18  decision tomorrow morning.

19          MR. CIANTRA:  Thank you, Your Honor.  In -- in

20  connection with that, I would just ask that the Court focus

21  with respect to the cover email that was -- that described --

22          THE COURT:  Is that there too, or is that in

23  evidence?

24          MR. CIANTRA:  I believe -- I believe it is -- is it

25  there?

1          MR. IRWIN:  It's not in -- it's not in here.

2          MR. CIANTRA:  But it was -- it was read into the

3   record yesterday by Ms. Green.

4          THE COURT:  Okay.  So I think I have -- so it's in

5   here?  Objecting parties opening statement, RSC867?

6          MR. CIANTRA:  I don't -- Your Honor, I don't believe

7   -- I don't believe it is in there.  I believe Ms. Green read

8   -- read it into the record in connection with her argument on

9   -- on the retirement systems motion.

10          THE COURT:  Oh, oh, okay, all right.  So we'll have

11   to get it from -- from the transcript.

12          MR. CIANTRA:  If -- I don't have it right --

13          THE COURT:  Ms. Green, can you help us?

14          MS. GREEN:  The date of the email is listed in the

15   PowerPoint presentation.  And it's June 5th, 2012.  The whole

16   email I don't believe is in it.  I think it's maybe a piece of

17   it perhaps, but --

18          THE COURT:  Well, let me just ask.  Does anyone have

19   the email?

20          MS. GREEN:  I do.  It is in our exhibit binders that

21   we gave to the Court.

22          THE COURT:  Can you -- can you give me a number?

23          MS. GREEN:  I will give you the number in one

24   second.  I will look it up.  I have my binder back here.

25          MR. CIANTRA:  Thank you for the Court's patience

1  with this, Your Honor.

2          THE COURT:  Well, Ms. Green, why don't you take your

3  time and look for that, or do you have it right at hand there?

4          MS. GREEN:  I have it, yeah.

5          THE COURT:  Oh, all right.

6          MS. GREEN:  I believe it is 844 -- it's 844 in the

7  retirement systems binder.

8          THE COURT:  Okay.  We are all set.  Thank you.  And

9  we got the envelope so we're all set.  May we proceed?  You

10  may proceed, sir.

11          MR. STEWART:  Thank you, Your Honor.

12      (WITNESS CHARLES MOORE RESUMED THE STAND AT 1:49 P.M.)

13  BY MR. STEWART:

14  Q   Mr. Moore, let me direct your attention to June 14, 2013.

15  Did -- did you have occasion that day to attend a meeting

16  given by the emergency manager?

17  A   Yes, sir.

18  Q   What was the purpose of that meeting?

19  A   The purpose of that meeting was to present what is

20  referred to as the proposal to creditors, to various creditors

21  of the City of Detroit.

22  Q   Can we put up Exhibit 43, please?  And do you see on the

23  monitor in front of you, Mr. Moore, a document Exhibit 43?

24  A   Yes.

25  Q   What is that?

1  A    This appears to be the title of that presentation.

2  Q    And that was a presentation made that day?

3  A    Yes, sir.

4  Q    What role if any did you have in making the presentation?

5  A    I spoke to a couple of parts in that presentation.

6  Q    How long was your part of the meeting?

7  A    I would estimate about 15 minutes or so.

8  Q    And what was the general reason for the meeting if you

9  know?

10 A    The general reason for the meeting as I indicated was to

11 present the current situation that the city found itself in.

12 And the plan that the city wanted to pursue regarding

13 restructuring and reinvestment.  As well as to lay out a

14 proposal as to how various classes of creditors would be

15 treated.

16 Q    Were particular questions asked of you that day?

17 A    Not that I recall.

18 Q    Let me ask you if you could, to go to -- and let's also

19 ask the -- Ms. Lori, to go to Page 98 of the document which

20 you can see on your monitor.  And is this -- actually let's go

21 one page earlier, just so the witness has his attention

22 focused on it.

23     Just one -- one -- one page before.  Do you see the page

24 that's before you?

25 A    Yes.

1  Q    Then go -- then go back to the page we just had.  And

2  this page as well?

3  A    Yes.

4  Q    Do you understand what these pages depict?

5  A    Yes.

6  Q    And what do they depict?

7  A    This is a ten year financial forecast indicating the

8  approximate amount of cash that was anticipated to be

9  available for unsecured claims.

10 Q    And that was --

11             MR. SHERWOOD:  Your Honor, I -- I object to this

12 testimony.

13             THE COURT:  All right.  First of all, pull the mike

14 closer.  Second of all, please talk louder.

15             MR. SHERWOOD:  I object on the grounds that this is

16 improper opinion testimony from a non-expert.

17             THE COURT:  Well, the last question certainly didn't

18 ask him an opinion, so to that extent it's overruled.  When

19 you think there is an opinion being given I invite your

20 objection at that time.

21             MR. SHERWOOD:  Thank you, Your Honor.

22 Q    And now, Lori, could be blow up the box?  There.  Do you

23 see the part of that page which has now been expanded to fill

24 the monitor screen?

25 A    Yes.

1  Q     What -- what is this?

2  A     This is a listing of the estimated unsecured claims as of

3  June 14th, 2013.

4  Q     And when you use the phrase unsecured claims, what are

5  you referring to?

6  A     This is based on claims for which there did not appear to

7  be a specific security interest.

8  Q     Claims by who?

9  A     Creditors of the City of Detroit.

10  Q     And claims against who?

11  A     Against the City of Detroit.

12  Q     Let me ask you to direct your attention to the line that

13  says unsecured pension and OPOB.  Do you see that?

14  A     Yes.

15  Q     And then do you see the area that has now just been

16  highlighted for you?

17  A     Yes.

18  Q     And what is that?

19  A     These are the estimated unfunded amounts related to the

20  two pension systems of the City of Detroit.

21  Q     Unfunded in what sense?

22  A     The liability for the pension system in excess of the

23  plan assets of the pension system.

24  Q     And those two numbers add up to about 3.474 billion

25  dollars?

1  A    Yes, sir.

2  Q    Do you know where that number came from?

3  A    Yes.

4  Q    Where did it come from?

5  A    From me.

6  Q    And why did -- who did you give it to?

7  A    I gave it to Mr. Malhotra.

8  Q    And anyone else?

9  A    I gave it to the other restructuring advisors that would

10 have put it into the document.

11 Q    And did you also share it with Mr. Orr?

12 A    Yes, sir.

13 Q    And where did you get it from?

14 A    I got it from Milliman.

15 Q    And for the record who is Milliman?

16 A    Milliman is the actuary engaged by the City of Detroit.

17 Q    Do you know how Milliman derived those numbers?

18 A    Yes.

19 Q    And could you tell us briefly how they did it and then

20 I'm going to show you some -- some exhibits.

21        MR. RUEGGER:  With respect, Mr. Stewart, objection.

22 I believe --

23        THE COURT:  And into the microphone, please.

24        MR. RUEGGER:  This is getting into expert opinion

25 testimony, Your Honor.

1              THE COURT:  The objection is overruled.

2   A    Would you please restate the question?

3   Q    Could you tell us how you -- how Milliman to your

4   knowledge came up with these numbers?

5   A    Yes.  The restructuring team has a task force

6   specifically --

7              THE COURT:  Excuse me one second.  How do you know

8   how Milliman came up with these numbers?

9   A    Your Honor, I lead a task force for the City of Detroit

10  on pensions and I specifically received this information from

11  Milliman.

12             THE COURT:  Okay.  You may answer the question.

13  A    The task force that I indicated that is specifically

14  focused on pensions asked Milliman to run a variety of

15  scenarios.

16  Q    Now let me -- and do you understand how Milliman in these

17  scenarios came up with its numbers?

18  A    Yes, sir.

19  Q    And how did they come up with their numbers?

20  A    Milliman used the Gabrielle Roeder actuarial evaluation.

21  Q    Stop you there.  Who is Gabrielle Roeder?

22  A    Gabrielle Roeder is the actuary that is used by each

23  pension system.

24  Q    Okay.  Sorry to have interrupted your answer.

25             MR. SHERWOOD:  Your Honor, I'm going to pose a

1  hearsay objection to this.  I think this is just -- he is

2  testifying to out of Court statements by -- presumably by

3  actuaries at Milliman as to how they derived numbers.  It's --

4  it's rank hearsay.

5          THE COURT:  And who was Milliman retained by?

6          MR. SHERWOOD:  Milliman was retained by the City of

7  Detroit.

8          MR. STEWART:  No, I think it was retained by the

9  pension --

10          THE COURT:  Who was Milliman retained by?

11  A    The City of Detroit.

12          MR. STEWART:  And, Your Honor --

13          THE COURT:  And you --

14          MR. STEWART:  Yes.  It's being offered for state of

15  mind.  As we -- as I -- before he took the stand I raised this

16  saying, we're not offering these for the truth, we're offering

17  these numbers to rebut the argument that has been made that

18  Mr. Orr did not have a good faith basis in this document and

19  other documents for representing that the pension claims would

20  be 3.5 million dollars.

21          THE COURT:  Did you tell Milliman -- I'm sorry, did

22  you tell Mr. Orr how Milliman came up with these numbers?

23  A    Yes, sir.

24          THE COURT:  All right.  Tell us what you told Mr.

25  Orr.

1  A    I told Mr. Orr that Milliman had taken the Gabrielle

2  Roeder actuarial evaluation and modified a couple of

3  assumptions based on that actuarial valuation.

4        THE COURT:  All right.  The Court will receive that

5  testimony again only for purposes of -- of demonstrating what

6  Mr. Orr was told, not for the truth of it.

7  Q    And did you have reason to believe that Milliman's

8  conclusions were reliable?

9        MR. CIANTRA:  I would object.  I'm going to again

10 object to this.  He's not an actuary.  He's not being

11 proffered for actuarial expertise.  I don't know what the

12 basis of him offering that opinion would be.

13       MR. STEWART:  Foundational question, Your Honor, but

14 also once again, since what we're talking about is good faith

15 reliance an element of reliance is reliance --

16       THE COURT:  All right.  Well, here's a better

17 question.  Did you express to Mr. Orr any doubt about the

18 reliability of the information that you had given him?

19 A    No, Your Honor.

20 Q    Let me put up, let's put up Page 1 of Exhibit 69, please.

21 Can you tell me what Exhibit 69 is?

22 A    This is the draft actuarial evaluation report from

23 Gabrielle Roeder for the general retirement system of the City

24 of Detroit as of June 30th, 2012.

25       (City's Exhibit 69 was identified)

1   Q    And the general retirement system is the system

2   representing non-uniformed employees of the City of Detroit?

3   A    Yes, sir.

4   Q    Do you know what percentage of those non-uniformed

5   employees work for the Department of Water and Sewer?

6   A    Approximately 40% of the contributions that typically are

7   made relate to water and sewer employees.

8   Q    Now let me ask if we could please put up Page 3 of this

9   document.

10        THE COURT:  Is this in evidence?

11        MR. STEWART:  It is in evidence.  Yes, Your Honor.

12   It has not been objected to.

13   Q    And in particular could I ask the Court technician to

14   expand the box at the bottom?  First of all, have you seen

15   this document before, Mr. Moore?

16   A    Yes.

17   Q    And tell us what it is.

18   A    This is the actuarial evaluation as of June 30th of 2012

19   in draft.  And this indicates what the estimated unfunded

20   actuarial accrued liability is as of that date and the

21   previous year.

22   Q    And how does one get from the information you see here

23   for the -- for the GRS, in other words the general retirement

24   system, to the amount of the unsecured claim the GRS would

25   have?

1  A     Focusing on the column on the left which is as of June

2  30th of 2012, the eight hundred, approximately $830,000,000 --

3  Q     Go back, the same box we need to keep that up.  There we

4  go.

5           THE COURT:  Okay.

6  A     The approximately $830,000,000 in the column on the left

7  is the UAAL, unfunded actuarial accrued liabilities.

8  Q     And may I stop you there and ask you to explain to us

9  what a UAAL is?

10 A     A UAAL is based on an actuarial calculation for

11 liabilities and assets.  So the first item in terms of the

12 unsecured claim amount was to look at the market value of the

13 assets rather than the actuarial value of the assets.

14      The actuarial value of the assets at that date was

15 approximately 2.8 million dollars.  The actual market value so

16 the -- the value of the assets at that point in time was

17 actually approximately $650,000,000 lower than what was showed

18 for actuarial purposes.

19      In addition to that, the top line, the actuarial accrued

20 liabilities is based on a discount rate and the discount rate

21 that is used here is 7.9% and in the claim, unsecured claim

22 calculation, a discount rate of 7% was used.

23 Q     And so how using those numbers do you come up with the

24 amount of the claim, the unsecured claim of this pension plan

25 against the city?

1 A    Yes, sir.

2 Q    So tell me how you then take those numbers and turn it

3 into a figure.

4 A    The accrued asset number, 2.8 million.

5         MR. RUEGGER:  Your Honor, I apologize for the

6 tardiness on this, but I believe Mr. Stewart was misinformed.

7 Sixty-nine was objected to on hearsay and expert opinion and

8 foundation grounds.

9         MR. STEWART:  I stand corrected.  I had been told it

10 had not been objected to.

11        MR. RUEGGER:  We would press those objections, Your

12 Honor.

13        MR. STEWART:  That's confirmed, it was indeed

14 objected to.  Your Honor, I believe the witness has laid a

15 foundation for it as a document he has seen, has worked with.

16 Let me ask two more questions, then I'm going to move it into

17 evidence so then it can be --

18        MR. RUEGGER:  Well, I object to the testimony.  Is

19 it foundation testimony?

20        THE COURT:  I'll let the witness testify or be asked

21 about foundational questions to see if it's admissible and

22 then we'll move on from there.

23 Q    So let's put up the cover page of the document again.

24 This is a document you've seen before, Mr. Moore?

25 A    Yes, sir.

1  Q    How did it come to you?

2  A    I received this as part of my role on the pension task

3  force.

4  Q    And you received it from who?

5  A    We received these -- this report from the retirement

6  system itself.

7  Q    And Gabrielle Roeder is employed by the retirement

8  system?

9  A    Yes, sir.

10  Q    And what use did you make of the document?

11  A    I reviewed this document for actuarial information

12  related to the general retirement system.

13         MR. STEWART:  I'd move it into evidence, Your Honor,

14  on the grounds it is, if nothing else, an admission of a party

15  opponent since the GRS is an objector here and this is an

16  agent of an objector.

17         MR. RUEGGER:  It's hearsay and it's expert opinion

18  and it's coming in through a lay witness, Your Honor.  We

19  press the objection.

20         THE COURT:  The objection is overruled.  The

21  document 69 is admitted in evidence.

22         (City's Exhibit 69 was admitted)

23  Q    Now let's please go back to Page 3.  So Mr. Moore, let's

24  go back to our calculation.  We have at the bottom unfunded

25  actuarial accrued liabilities and then two numbers above it.

1  From the numbers you have described -- described to us --

2        THE COURT:  I want to be -- I want to be sure what

3  we're doing here again.

4        MR. STEWART:  Yes.

5        THE COURT:  This evidence is solely in relation to

6  the representation that Mr. Orr made to the Court regarding

7  the unfunded pension liability.

8        MR. STEWART:  Yes.

9        THE COURT:  Well, in that regard again, I'm much

10  more interested in what the witness told Mr. Orr than how he

11  did his calculations or really anything else.  Because

12  otherwise it sounds too much like him testifying as an expert.

13        MR. STEWART:  Let's take the document down.  I think

14  Your Honor already asked that question of the witness, but --

15        THE COURT:  Well, let's just be sure.

16        MR. STEWART:  Yes.

17        THE COURT:  Did you tell Mr. Orr anything about how

18  you made the adjustments that you made?

19  A    Yes, sir.

20        THE COURT:  What did you tell him?

21  A    I told Mr. Orr that two variables were adjusted based on

22  the Gabrielle Roeder actuarial evaluation.  And that included

23  the -- using the market value of the assets as well as using a

24  different discount rate.

25        THE COURT:  Uh-huh.  And did you disclose anything

 1  more specific about those two adjustments than just that much?

 2  A    No, sir.

 3         THE COURT:  All right.  That's it.

 4         MR. STEWART:  Let me then wrap up very quickly with

 5  this witness, Your Honor.

 6  Q    Did you attend other meetings with -- held on behalf of

 7  the emergency manager with creditors of the city?

 8  A    During what time period?

 9  Q    After June 14th?

10  A    Yes, sir.

11  Q    Okay.  And let me direct your attention in particular to

12  a meeting held on June 20th.  Do you remember two meetings held

13  that day?

14  A    Yes, sir.

15  Q    One in the morning and one in the afternoon?

16  A    Yes.

17  Q    Let me ask you about the afternoon meeting.  Was that a

18  meeting with representatives of the non-uniformed employees of

19  the city?

20  A    I can't recall.  I -- I think that the non-uniform was

21  the first meeting and then uniform was the second meeting.

22  Q    And what was the purpose of those meetings?

23  A    The purpose of those meetings was to lay out information

24  more information from the June 14th presentation regarding the

25  financial situation that the city was in.  And then specific

1  information related to health care and pension obligations.

2  Q    Do you remember any questions being asked at either of

3  those two meetings?

4  A    Yes.

5  Q    And what do you remember?

6  A    I recall one question from an attorney representing the

7  UAW questioning how we -- we being the City of Detroit would

8  be able to accomplish some of what was in the proposal outside

9  of bankruptcy.

10  Q    And do you remember what answer was given to that person?

11  A    I believe that the answer that was given by counsel to

12  the city was we want to move forward with these discussions

13  and determine whether or not something could actually occur

14  with all the parties outside of Court.

15  Q    Thank you.  Could we put Exhibit 70 on the screen,

16  please?  Mr. Moore, Exhibit 70 has been -- for identification

17  has been placed on the screen before you.  Have you seen this

18  document before?

19  A    Yes, sir.

20  Q    What is it?

21  A    This is the actuarial evaluation report as of June 30th of

22  2012 for the police and fire retirement system.

23        (City's Exhibit 70 was identified)

24  Q    And who was it prepared by?

25  A    By Gabrielle Roeder.

1  Q    How did it come to you?

2  A    Through my role on the task force, pension task force.

3  Q    And what use did you make of the document?

4  A    I used this document to obtain actuarial and other

5  information on the pension system.

6        MR. STEWART:  Your Honor, I would move Exhibit 70

7  into evidence on the same grounds as recited in moving Exhibit

8  69 into evidence.

9        MR. RUEGGER:  Your Honor, I object based on the

10  statements Your Honor just explained on the limited use of

11  this -- these documents and this testimony.  I don't see how

12  this document moves it along.

13      It's -- it's hearsay and expert opinion just as 69 is.

14  But as Your Honor said, if -- if the issue is really what Mr.

15  Moore said to Mr. Orr, I'm not sure how this document adds to

16  the -- the evidence.  So we object on that ground.

17        THE COURT:  All right.  The objection is overruled.

18  Exhibit 70 is admitted into evidence for all purposes.

19      (City's Exhibit 70 was admitted)

20        MR. STEWART:  Thank you.  No further questions, Your

21  Honor.

22        MR. CIANTRA:  The first thing I want to do is make

23  sure that this microphone is positioned correctly.

24        THE COURT:  It sounds good, yes.

25        MR. CIANTRA:  Before I even say my name for the

1  record, I want to make sure.

2          THE COURT:  I appreciate that very much, sir.

3                    CROSS EXAMINATION

4  BY MR. CIANTRA:

5  Q    Good afternoon, Mr. Moore.  I'm Thomas Ciantra as you

6  know.  I'm the lawyer for the UAW.

7  A    Yes, sir.

8  Q    Now you had mentioned in your direct examination that you

9  formed part of a pension task force, is that correct?

10  A    Yes, sir.

11  Q    And that task force was created when?

12  A    In February or March of this year.

13  Q    So around the time the emergency manager was -- was

14  appointed, would that be correct?

15  A    Prior to the emergency manager being appointed.

16  Q    All right.  Let's focus on from the time the emergency

17  manager was appointed.  You remained on the task force

18  obviously?

19  A    Yes, sir.

20  Q    There were also individuals from the Milliman actuarial

21  consulting firm who were on the task force?

22  A    Yes, sir.

23  Q    And there were lawyers from the Jones, Day law firm that

24  were on the task force?

25  A    Yes.

1  Q     All right.  And that task force met on a regular basis?

2  A     Met or had calls, yes.

3  Q     Okay.  And on -- on some of those occasions was Mr. Orr

4  included in -- in those task force meetings?

5  A     Not that I recall.

6  Q     Now you testified that there was a meeting with Mr. Orr

7  where you reviewed with him the approximately 3 -- 3.5 billion

8  dollar number with respect to the pension plan under funding,

9  is that correct?

10 A     Yes, sir.

11 Q     There was -- there was one meeting, or was that multiple

12 meetings?

13 A     There were multiple meetings where we discussed this

14 number in combination with other numbers.

15 Q     Okay.  And at the meeting where you discussed how the --

16 how the number -- how the known -- let me step back.  The

17 number was actually -- you didn't actually do those

18 calculations, the Milliman Actuarial Firm did those

19 calculations, correct?

20 A     Correct.

21 Q     So you were relaying to Mr. Orr what the results of the

22 work of the Milliman firm had been?

23 A     Yes.

24 Q     And you did that at a -- an in person meeting?

25 A     There were both in person meetings and calls with Mr.

1  Orr.

2  Q    Okay.  Let's focus on the in person meetings.  Were the

3  other members of the task force present at that in person

4  meeting?

5  A    Well, there were multiple in person meetings.  I can't

6  recall if anyone else from the task force was in the in person

7  meetings or not.

8  Q    Okay.  Were -- were lawyers from Jones, Day in those

9  meetings with Mr. Orr?

10  A    Yes.

11          MR. CIANTRA:  I'm going to move, Your Honor, that --

12  that his testimony with respect to those meetings be struck

13  because it -- it is in effect a selective waiver of

14  attorney/client privilege that they are engaging in here.  We

15  have had multiple deposition questions cut off on the grounds

16  of attorney/client privilege with respect to the workings of

17  this task force in other areas and they are obviously now

18  making selective use of this to get in those figures.

19      He has just testified that counsel for Jones, Day was

20  present in the meeting.  He testified about it in direct.  We

21  would request that it be struck.

22          THE COURT:  Can you give me an example of such an

23  assertion?

24          MR. CIANTRA:  From prior testimony?

25          THE COURT:  You said that attorney/client privilege

1  had been asserted in relation to that meeting.  I'm asking you

2  for an example.

3          MR. CIANTRA:  Well, in relation to the workings of

4  the pension task force, that had --

5          THE COURT:   That's circled.

6          MR. CIANTRA:  I -- I questioned Mr. Moore in his

7  deposition with respect to deliberations of that pension task

8  force concerning the provisions of the Michigan Constitution

9  that protect pension obligations and the inquiry was stopped

10  on the grounds of attorney/client privilege.

11          THE COURT:  Have you got it?  Can you show me?

12          MR. CIANTRA:  If this had an index it would be

13  easier.  If you could give me a moment, Your Honor.

14          THE COURT:  Sure.  Well, let me ask you to pause

15  from that and ask you a slightly different question, or a very

16  question, sir.

17      Why wouldn't the remedy here be based on the testimony

18  that was given that privilege is waived as of now?  And that

19  -- and that -- and that therefore you can ask any questions

20  without fear of privilege being asserted, or at least a

21  privilege claim sustained.

22          MR. CIANTRA:  Well, Your Honor, the -- the problem

23  with that is that there's been weeks of discovery and

24  deposition testimony that's been taken where we have had

25  questions cut off on the grounds of privilege.  So I don't --

1  I can't do a redo of that at this point.

2         THE COURT:  He's right here.  Redo all you like.

3         MR. CIANTRA:  Well, though not -- with respect to

4  this question I can, but not with respect to questions or

5  documents that weren't produced during the course of this

6  litigation, I can't.

7         THE COURT:  Can you identify a document that wasn't

8  produced that related to this pension task force?

9         MR. CIANTRA:  There are multiple documents that --

10        THE COURT:  Can you identify one?

11        MR. CIANTRA:  Well, I can find the -- the log of

12  their production.  There are multiple documents that were

13  withheld.  I don't have it right with me.

14        THE COURT:  It doesn't sound to me like you're quite

15  ready to deal with the questions relating to your request

16  here, so let's move on and I will consider your request to

17  strike the testimony when you are ready to argue it.

18        MR. CIANTRA:  Thank you, Your Honor.

19  Q    I want to ask you some questions, Mr. Moore, with respect

20  to the city proposal for its creditors, the June 14th proposal.

21  Now with -- with respect to that proposal, I understand an

22  important component of it is reinvestment in the

23  infrastructure and operations of the City of Detroit.

24  A    Yes, sir.

25  Q    And we're projecting approximately a $1,000,000,000 price

1  tag for that -- for that program over the next ten years?

2  A    One billion on the reinvestment, if you will, the capital

3  expenditures, yes.

4  Q    And then there's an additional quarter of a billion

5  dollars with respect to other restructuring initiatives?

6  A    There are -- there is -- yes, that's correct, about a

7  quarter of a billion dollars for expenses.  There are also

8  about a quarter of a billion in revenue initiatives.

9  Q    Okay.  And you also indicated that the emergency manager

10  is of the view that there is no possibility for material

11  increases in the -- the tax revenues that are coming into the

12  city, is that correct?

13  A    I testified that we looked into that and that was our

14  conclusion, yes.

15  Q    You -- you can't raise taxes to -- to pay for that?

16  A    Yes.

17  Q    And it's also correct, isn't it, that -- well, over the

18  past ten years there's been a substantial reduction in the

19  amount of revenue sharing that's come to the City of Detroit

20  from the State of Michigan?

21  A    That's correct.  The revenue sharing has decreased, yes.

22  Q    And that is discussed in the proposal for creditors,

23  correct?

24  A    Yes.

25  Q    And let's just for the record do you have it?  It's

1  Exhibit 43, City Exhibit 43.  Do you have it there?

2  A    Nothing is up yet.

3            THE COURT:  Is it on the table there?

4  A    Yes, sir, I have it.

5  Q    If we turn to Page 4 of the document, the bullet point at

6  the top of that page is state revenue sharing.  Do you see

7  that?

8  A    Yes.

9  Q    And so that quantifies that you've seen approximately a

10 48% reduction in -- the city has seen approximately 48%

11 reduction in the amount of revenue sharing it's received from

12 the State of Michigan since fiscal year 2002?

13 A    Yes.

14 Q    And you're off -- they're approximately 30.6% since 2008?

15 A    There's been a reduction of 30.6% since 2008, yes, that's

16 correct.

17 Q    And would you agree those amounts are material?

18 A    They certainly have been -- had a significant impact on

19 the city's revenue, yes.

20 Q    And part of the projection that is included in the

21 proposal for creditors to the exhibit, Exhibit 43, are

22 projections with respect to the amount of the revenue sharing

23 going forward, is that -- is that correct?

24 A    Yes.

25 Q    And that is -- if you would turn to Page 90 of that

1  document.

2  A    Yes, sir.

3  Q    Towards the top of the page you list the preliminary

4  forecast revenues.  And the revenue sharing is the -- I guess

5  the second item there, correct?

6  A    Yes.

7  Q    So would I be correct that -- that year over year you're

8  projecting an increase in that of it looks like a little over

9  1%?

10 A    That's about right, yes.

11 Q    Is that a number that you calculated as a part of your

12 contribution to this report?

13 A    No, sir, I did not calculate that.

14 Q    But that's -- that was the assumption that the -- the

15 increase in the revenue sharing would be approximately 1% year

16 over year?

17 A    I can't speak to the assumption, but the number looks

18 like about 1% per year.

19 Q    Yeah, it's the arithemetic.

20 A    Yes.

21 Q    And the revenues of the city are -- other revenues of the

22 city are also projected there, correct?

23 A    Yes, sir.

24 Q    And you have there on the first line the municipal income

25 tax?

1  A    Yes.

2  Q    Right.  And the income tax in the City of Detroit now is

3  the highest in the State of Michigan?

4  A    Yes, for individuals the income tax rate for residents is

5  the highest in the State of Michigan.

6  Q    Okay.  So you're seeing -- I'm looking there at increases

7  in the order of a couple of percent per year?

8  A    Yes, sir.

9  Q    So that's -- those two items are staying -- well, one

10 would agree that probably not exceeding the rate of inflation,

11 correct?

12 A    I'm not sure because I did not put together an assumption

13 regarding inflation.

14 Q    Okay.  But 1 or 2% increases year over year?

15 A    That's what appears to be the math, yes.

16 Q    So sort of putting it together, it would be correct,

17 isn't it, that the -- the source of the funding for the -- the

18 reinvestment and restructuring that the city would like to

19 undertake here, is -- is basically going to come from a

20 reduction in the legacy costs, the bond debt and the -- the

21 accrued pension and other post retirement benefits?

22 A    I don't think that's the case.

23 Q    Where is the money coming from if the revenues are

24 staying the same and you're coming up with an extra billion

25 dollars, where is the revenue -- where is the money coming

 1 | from other than from cutting in those areas?

 2 | A    The -- the projections show approximately $250,000,000 in

 3 | additional revenue that I indicated as well as $350,000,000 in

 4 | also other categories of additional revenue which total about

 5 | $600,000,000 in new revenue during this ten year period.

 6 | Q    Okay.  So you got 600,000,000 new, and you've got the

 7 | rest of that 1.25.  And that's coming from reductions in the

 8 | legacy costs?

 9 | A    Could you define legacy costs?

10 | Q    Sure.  The -- the -- the pensions that are owed to the

11 | people I represent, their post retirement benefits, and the

12 | bond holders, the debt on the existing bonds.

13 | A    Yes.  Those three categories that is what the proposal

14 | indicates is an adjustment to those categories.

15 | Q    Now let me go back to Exhibit 43 just for a moment and

16 | ask you to turn to Page 109 of that document.  And there's a

17 | bullet point on that page, a little more than halfway down

18 | claims for unfunded pension liabilities.

19 | A    Yes, sir.

20 | Q    And in the first bullet point it indicates that because

21 | of the preliminary analysis with respect to the under funding,

22 | that the city will not be making future contributions to the

23 | retirement plans for its employees, is that correct?

24 | A    Yes, sir.

25 | Q    And that on account of that, in the third bullet point it

1  says there must be significant cuts in accrued vested pension

2  amounts for both active and currently retired persons.  Do you

3  see that?

4  A    Yes.

5  Q    And you were at the -- the June 14th meeting where this

6  was presented to -- well, among others, labor unions and other

7  organizations representing retirees, correct?

8  A    Yes.

9  Q    And I am correct that there was no number that was put on

10 the level of cuts that were -- that the -- the city believed

11 were necessary under this plan, correct?

12 A    Correct.

13 Q    And in fact as you sit here today, there has been no

14 number that has been put on that, correct?

15 A    Correct.

16      MR. CIANTRA:  I have no further questions.  Thank

17 you.

18      THE COURT:  Thank you, sir.

19      MR. CIANTRA:  Your Honor, if I could just address

20 that privilege issue.  And this is at Mr. Moore's deposition

21 that was taken on the 18th of September.  And I can read from

22 the transcript if Your Honor would --

23      THE COURT:  Go ahead.

24      MR. STEWART:  What page, please?

25      MR. CIANTRA:  Oh, certainly.  This begins -- I'm

1 | looking at the minuscript of the transcript, Page 154,

2 | beginning the bottom of -- of the page.

3 |          THE COURT:  Is there a line number?

4 |          MR. CIANTRA:  Yeah, I'm looking just let me see

5 | where to start here.

6 |          THE COURT:  Ah, here we have it on the screen.

7 |          MR. CIANTRA:  We're beginning on Page 153.  We'll

8 | see at page -- Line 14.  Actually I'm asking the questions.

9 |          You indicated earlier that you were part of a pension

10 | task force that has been considering pension issues since I

11 | guess the spring of this year.  My question is, during those

12 | -- during the discussion, the meetings of that task force have

13 | you -- has that provision of the Michigan State Constitution,

14 | and that obviously is Article 9, Section 24, been a subject of

15 | discussion?  The witness answers, yes.

16 |          And he goes on and then continuing on to Page 155 at the

17 | top, Line 1.  And was there more than one such discussion or

18 | did that come up on just one occasion?  It probably came up

19 | more than -- I seem to recall more than one occasion where a

20 | discussion about whether the city would have to file for

21 | Chapter 9 took place and the pension element was discussed.

22 |          And what was the -- was the consensus that was developed

23 | with respect to that issue?  And Mr. Miller, counsel for the

24 | city responds.  I'm going to object and ask the witness before

25 | he answers that question, whether in connection with any

1  discussion that might have led to a consensus, that discussion

2  included lawyers and counsel.

3      Mr. Ciantra, I'm not asking him -- and counsel that was

4  provided by those lawyers.  I'm not asking about discussion

5  with counsel, I'm asking whether this task force that was

6  looking at the pension issues reached a consensus.  And it

7  continues.

8      But the task force included counsel, he's testified to

9  that.  And then he goes -- then I interject, I'm interested in

10 whether there was a discussion not necessarily what your

11 counsel might have advised.  But to the extent that the

12 consensus was reached and that consensus was based on legal

13 advice, that consensus would be in my judgment privileged.

14     So that's why I asked him.  And he goes on and then at

15 the end, and so I would instruct you, Mr. Moore, not to

16 expound.

17     So our inquiry with respect to the consensus that was

18 developed by this pension task force was cut off by

19 attorney/client privilege assertions.  If the witness has

20 testified with respect to conversations in the -- in the

21 presence of lawyers for the city with respect to where these

22 -- these actuarial numbers came from, it -- it seems to be

23 just a -- a selective use of the privilege, depending on

24 circumstance, and it's put -- it's put us in a difficult

25 position, Your Honor, because I -- you know, as I said before,

1   I can't turn back the time -- the hands of time and, you know,

2   re-take Mr. Moore's deposition.  Go back and look at the, you

3   know, re -- review the tens of thousands of documents that

4   have been produced to deal with it.

5           THE COURT:  All right.  Thank you.

6           MR. CIANTRA:  It just seems unfair.

7           THE COURT:  Mr. Stewart.

8           MR. STEWART:  Perhaps, Your Honor, I'm -- I'm just

9   confused.  But -- and let's put that transcript back up on the

10  screen.

11      Mr. Ciantra paraphrased parts of it, but the fact of the

12  matter is, there was no instruction and his question got

13  answered.  And if we could blow up the bottom quadrant of our

14  document there.

15      And there's this colloquy between Mr. Miller and Mr.

16  Ciantra.  And Mr. Miller makes an objection.  Are you asking

17  -- and Mr. Ciantra, I am not asking him that.  And if so, I

18  would ask you not to expound.

19      So let me ask the question again.  Let's make the record

20  straight.  Question, did the task force you were a part of

21  reach a consensus on the question of what effect the provision

22  of the Michigan State Constitution that protects accrued

23  pension benefits would have on a Chapter 9 filing?  He

24  answered it, no.

25      Question, there was no consensus?  No.

1    And if we went to the following page with a follow up

2  question, there is none of those instructions either.

3          THE COURT:  Let's do that.  Can we go to the next

4  page, please?

5          MR. STEWART:  And you'll have to blow those up so we

6  can all see them, please.

7          THE COURT:  Yeah.

8          MR. STEWART:  So are we on the same page?

9          THE COURT:  Is this -- is this the next page that we

10 have now?

11         MR. STEWART:  Okay.  So I can keep reading, Judge,

12 but as I go down this, I don't see an instruction not to

13 answer the question.  I don't see what was withheld.

14    And then I could go further.  I have other reasons too,

15 but this to me seems to be the most important one.  And

16 perhaps I just misunderstood it, and we're on the wrong page.

17 And why don't I sit down and Mr. Ciantra can -- can stand up

18 and guide us to where maybe I should have looked.

19         THE COURT:  Mr. Ciantra, this is -- this is an

20 important motion that you have made to strike.

21         MR. CIANTRA:  Yes.

22         THE COURT:  So I don't want to press you for a

23 response to my question.  So let's take our time and -- and

24 you can research this properly and -- and -- and present your

25 best case to the Court as to maybe even more than one example

1  of situations in which you assert that the privilege claim was

2  selectively advanced.  So there's no need to rush through

3  this.

4          MR. CIANTRA:  Thank you, Your Honor.  I appreciate

5  it.

6          THE COURT:  All right.

7          MR. CIANTRA:  I will -- I will review the transcript

8  and I will respond.

9          THE COURT:  Okay.  All right.  Does anyone else have

10  any questions for Mr. Moore?  Yes, sir.

11          MR. SHERWOOD:  Your Honor, just -- on the last

12  point.  Before -- before I -- this privilege was also asserted

13  at the deposition of Mr. Bowen from Milliman.

14          THE COURT:  Okay.  Well, let's -- let's add that one

15  to the -- the group that you'll put together together and

16  we'll -- we'll deal with it in -- in due course.

17                          CROSS EXAMINATION

18  BY MR. SHERWOOD:

19  Q    Good afternoon, Mr. Moore.  Jack Sherwood on behalf of

20  AFSCME.

21  A    Good afternoon, Mr. Sherwood.

22  Q    Let me ask you about some of your conversations with Mr.

23  Orr about the under funding of the position of -- of the

24  pensions.  Do you recall that testimony?

25  A    Yes, sir.

1  Q    Okay.  And during those conversations between you and Mr.

2  Orr, did you advise him that the analysis of the unfunded

3  position had not yet been completed?

4  A    Could you be more clear on which conversations?

5  Q    In any of -- any conversations that you had with Mr. Orr

6  before the bankruptcy was filed, did you advise him that the

7  city's analysis with respect to the unfunded position on the

8  pension had not been completed?

9  A    I spoke with Mr. Orr regularly as to the status of all

10 analyses and what the sources of where numbers were coming

11 from.

12 Q    Okay.  But I'm just asking specifically if you remember

13 telling Mr. Orr that the city's analysis of -- and its

14 actuaries' analysis of the unfunded position had not been

15 completed.  Do you recall that?

16 A    I recall specifically telling him the source that we were

17 using for numbers as well as additional activities that the

18 pension task force would undertake or other analyses.

19 Q    So that means that additional analysis was in process, is

20 that fair to say?

21 A    Yes.  And to this day additional analysis is in process.

22 Q    Do you recall telling Mr. Orr that the city was trying to

23 undertake a process to develop a more concrete valuation model

24 to analyze the amount of the unfunded position?

25 A    I did tell Mr. Orr that the analyses that we were giving

1  him were based on Gabrielle Roeder's valuation and that

2  Milliman would be developing its own valuation model as well.

3  Q    And did you also tell Mr. Orr that -- that because the

4  analysis of the unfunded position was still in process, that

5  it was hard to negotiate with respect to that number because

6  there wasn't a common assumption with respect to what the

7  number should be?

8  A    No, I never told Mr. Orr that it was hard to negotiate.

9  Q    Did you tell him that it was difficult to negotiate with

10  respect to a pension under funding amount when that amount was

11  still in process of being developed?

12  A    No, I never told him that.

13  Q    Was that your belief in September of this year?

14  A    My belief in September of this year certainly was not

15  that it was difficult to have a discussion or a negotiation

16  over these numbers.

17  Q    Did you say it was premature -- would you say it was

18  premature to negotiate over the pension under funding if the

19  -- if the number was not known?

20  A    No.

21  Q    So it's your view that you -- you can negotiate --

22  negotiate with respect to a pension under funding amount even

23  though you don't know exactly what that amount is?

24  A    Any pension under funding amount is an estimate.  And we

25  have an estimate.  There are other estimates out there and

1  certainly you can engage in discussions around those

2  estimates.

3  Q    You testified earlier that the City of Detroit's

4  individual taxes are -- are the highest in Michigan, right?

5  A    Yes, sir.

6  Q    What about taxes on -- on people or entities other than

7  individuals?

8  A    There is a corporate tax rate as well, corporate income

9  tax rate.

10  Q    Are they the highest in the -- in the State of Michigan?

11  A    I believe that's the case, yes.

12  Q    Have -- have you investigated the operations of the tax

13  people in Michigan -- or the tax department?

14  A    Could you define tax people?

15  Q    The tax department.

16  A    The tax department of the State of Michigan?

17  Q    No, of the City of Detroit.

18  A    Which tax are you referring to?

19  Q    Any.

20  A    Yes, sir.

21  Q    And have you analyzed -- have you -- have you looked into

22  rebates, tax rebates for corporations in the State of

23  Michigan?  I'm sorry, in the City of Detroit?

24  A    Corporate taxes are only approximately $6,000,000 per

25  year, so we have not spent a whole lot of time on corporate

1 | income taxes.

2 | Q    And what about tax rebates?  Have you spent a lot of time

3 | on that?

4 | A    No, sir.

5 | Q    At the -- at the meeting on June 14th, you were present,

6 | correct?

7 | A    Yes, sir.

8 | Q    And then you testified about a meeting on June 20th also,

9 | correct?

10 | A    Yes.

11 | Q    Were you present at -- were you present at that meeting?

12 | A    There were two meetings on the 20th and yes, I was present

13 | for both.

14 | Q    Was Mr. Orr at either of those meetings?

15 | A    No.

16 | Q    And at either of those meetings did you have authority to

17 | negotiate with the parties at that meeting -- at those

18 | meetings?  Did you have authority to negotiate with the

19 | parties at those meetings on behalf of the city?

20 | A    Could you define what you mean by authority?

21 | Q    Just the general understanding of authority that you --

22 | you would have.  You don't understand what authority means?

23 | A    Mr. Sherwood, I certainly was authorized to go to those

24 | meetings, to present information, and to receive information

25 | back.  So yes, I was authorized.

1  Q    You were authorized to go to the meeting, to present

2  information, and to receive information back, correct?

3  A    Yes, sir.

4  Q    And -- and is it your testimony that that constitutes

5  grounds to negotiate?

6  A    If you're talking --

7  Q    A party to negotiate, I'm sorry.

8  A    Yes, sir.  My understanding not in the context of the

9  collective bargaining agreements, but in the context of

10 negotiations where there's give and take, yes.

11 Q    Were you consulted by Mr. Orr in connection with the

12 decision of the city to file Chapter 9?

13 A    No, I was not.

14         MR. SHERWOOD:  I have nothing further.  Thank you.

15         THE COURT:  Any other questions?  Sir.

16         MR. KING:  Good afternoon, Your Honor.  Ron King

17 with Clark, Hill.  I'm a colleague of Ms. Green and Mr.

18 Gordon's.  Pleasure to be in front of you today.

19                      CROSS EXAMINATION

20 BY MR. KING:

21 Q    Mr. Moore, I just have a handful of questions and I'll

22 try -- I'm going to jump around a little bit just because I

23 don't want to be cumulative.

24 A    Okay, Mr. King.

25 Q    As we sit here today, is it true that the city and its

1  actuaries have not completed their analysis on the unfunded

2  pension liabilities?

3  A    The city has completed its analysis from the standpoint

4  of coming up with the 3.5 billion.  The city desires to

5  undertake additional analysis.

6  Q    So it's not completed the -- the analysis yet?

7  A    The city would like to continue to refine that avenue.

8  Q    So there's additional work that needs to be done before

9  they'll complete their analysis?

10 A    Not that needs to be done, but that we would like to do.

11 Q    And so I understand your earlier testimony, to date the

12 city hasn't proposed any specific restructuring of the pension

13 plans or a cut in pension benefits to any retiree, is that

14 correct?

15 A    The city has proposed a process, a couple of times with

16 which to undertake, but there have not been specifics as to

17 any cuts if you will in a pension.

18 Q    Now let me refer you back to Exhibit 43 if we could have

19 that put back on the screen, please.  And specifically Page

20 101, please.  And this is -- yeah, can we go -- next page,

21 please.  Now I'm -- I'm looking for the page relating to the

22 pension plan.  109, I'm sorry.  Thank you.

23      And referring you to a provision that you testified on

24 previously related to the claims for the unfunded pension

25 liabilities.  Do you see that section?

1    A    Yes, sir.

2    Q    Outside of this presentation, have there been any other

3    presentations or proposals presented to any of the objectors

4    with respect to the treatment of the unfunded pension

5    liabilities?

6    A    Yes, sir.

7    Q    And which ones are those?

8    A    The two meetings on June 20th.  There were documents that

9    were handed out that had specifics as it relates to pension in

10   those documents.

11   Q    What specifically?

12   A    There were some specific thoughts as to ideas for

13   modifying benefits of the pensions.

14   Q    But again no specific numbers in terms of no specific

15   numbers that reflect a cut to a pension benefit?

16   A    There were a lot of numbers in the June 20th document

17   regarding the pensions, yes.

18   Q    But my question is pretty simple.  There wasn't any

19   specific proposal that would say that the pension benefit of a

20   particular retiree is going to be cut by X percent?

21   A    Correct.

22   Q    And was there ever an effort undertaken by you or the

23   city to develop a plan or a proposal that didn't contemplate

24   an impairment or of accrued pension benefits?

25   A    Yes.

1  Q    And was that plan presented to any of the objectors?

2  A    Similar to what I indicated before.  I don't believe that

3  there is anything specifically that has been presented in

4  terms of pension benefits.

5  Q    So you're saying -- and I should be clear.  Pre-petition,

6  so prior to July 18th, was there ever a plan presented to any

7  of the objectors that contemplated not impairing or

8  diminishing pension benefits?

9  A    Yes, sir.  The June 14th presentation, the financial

10 projections, the base line show what we anticipate the

11 contributions would be without any cuts to pension plans.

12 Q    But that same June 14 proposal specifically states that

13 there will be significant cuts in accrued vested pension

14 amounts, correct?

15 A    It indicates that, yes.

16       MR. KING:  I don't have any further questions.

17       THE COURT:  Thank you, sir.  Other questions for the

18 witness?

19       MR. RUEGGER:  I do, Your Honor.

20                      CROSS EXAMINATION

21 BY MR. RUEGGER:

22 Q    Good afternoon, Mr. Moore.

23 A    Good afternoon.

24 Q    We met -- we met a month ago.

25 A    Yes, sir.

1  Q    I just have a couple of questions.  The first relates to

2  the June 20 meeting.  You testified about that on direct, do

3  you remember?

4  A    Yes, sir.

5  Q    At that meeting did you have authority to accept any

6  counter proposals from any of the participants?

7  A    Except from the standpoint I'd receive and then bring it

8  back to city officials?  Yes.

9  Q    Okay.  So you could have -- you could have informed Mr.

10 Orr and the other city officials, but you couldn't have agreed

11 to anything at that meeting that had been countered, is that

12 correct?

13 A    I think it would be highly unlikely that anything like

14 that would happen at that meeting.

15 Q    Okay.  Just answer my question though.  You couldn't have

16 agreed to anything that might have been proposed by any of the

17 participants, correct?

18 A    No, sir.

19 Q    Only a couple of questions.  Switching subjects.  On your

20 conversations with Mr. Orr relating to the alleged under

21 funding figure, did any of those occur prior to the June 14th

22 proposal that was just mentioned?

23 A    Yes, sir.

24 Q    Approximately how many?

25 A    This is a guess, but perhaps five to seven meetings or

1  conversations.

2  Q    On that -- on that issue before that meeting?

3  A    Yes, sir.

4  Q    Okay.  And approximately how many conversations with Mr.

5  Orr on that figure occurred between the June 14th proposal and

6  the July 18th petition filing?

7  A    I would guess maybe two.

8  Q    Did your information relating to that figure change at

9  all between the June 14th proposal and the July 18th filing?

10  A    No, sir.

11         MR. RUEGGER:  Thank you.  No further questions.

12  Thank you, Your Honor.

13         THE COURT:  Thank you.  Any redirect?

14         MR. STEWART:  No, Your Honor.

15         THE COURT:  You may step down.  Thank you very much

16  for coming today.

17  A    Thank you, Your Honor.

18         THE COURT:  I will have to really maintain your

19  status as a witness here until we resolve the earlier issue

20  that was raised about the privilege.  So your sequestration

21  still applies.  Okay, sir?

22  A    Understood.  Thank you, Your Honor.

23         THE COURT:  All right.

24         (WITNESS CHARLES MOORE WAS EXCUSED AT 2:48 P.M.)

25         MR. CULLEN:  Good afternoon, Your Honor.  My name is

1 | Thomas Cullen of Jones, Day and I'm going to be presenting the

2 | next witness, Ken Buckfire.

3 |          THE COURT:  All right.  What is your last name, sir?

4 |          MR. CULLEN:  Cullen, C-u-l-l-e-n.  We're going into

5 | the hall to get him.  Sorry, Your Honor.  He's in the men's

6 | room.

7 |          THE COURT:  While we're waiting, Ms. Patek, may I

8 | have your attention, please?  Do you have one or two extra

9 | copies of your exhibits or your exhibit book that we can have

10 | for my law clerk or law clerks.

11 |     We'll start with your offer of one.  If we can have yet

12 | one more at a -- at a later time, that would be great.  Okay?

13 | Can you get through there?  Thank you so much.

14 |     Raise your right hand, please.

15 |     (WITNESS KENNETH BUCKFIRE WAS SWORN)

16 |          THE COURT:  Please sit down.

17 |                    DIRECT EXAMINATION

18 | BY MR. CULLEN:

19 | Q    Good afternoon, Mr. Buckfire.  Could you state your full

20 | name and address for the record, please?

21 | A    Kenneth Buckfire.  I reside at 1175 Park Avenue, New

22 | York, New York.

23 | Q    And where are you from originally?

24 | A    Detroit, Michigan.

25 | Q    Born and raised?

1  A    Born and raised in Detroit and its suburbs.  Then went to

2  the University of Michigan where I graduated in 1980.  And

3  then I went to New York.

4  Q    Can you tell me something -- you're employed now?

5  A    I am.

6  Q    And where are you employed?

7  A    I am the co-founder and co-President of Miller, Buckfire

8  and Company.  An investment banking firm based in New York

9  City.

10 Q    And prior to that, what was your employment experience?

11 A    Prior to that I began my career as a restructuring banker

12 in 1987 with Dillon, Reed and Company.  After several years

13 with that firm, I joined Lehman Brothers where I was a senior

14 restructuring banker.  In 1996, I joined Wasserstein, Perella

15 to help them found their financial restructuring practice

16 which my partner Henry Miller and I then bought in 2002 to

17 form Miller, Buckfire.

18 Q    And what does it mean -- what -- explain exactly what

19 Miller, Buckfire does.

20 A    Miller, Buckfire is an investment bank specializing in

21 restructuring advisory services to governments and companies.

22 Our mission is to work with those entities when they have

23 financial difficulties either paying their debts when due, or

24 need specific skills in negotiating with their creditors and

25 other stakeholders.

1   Q    Unpack that for me a little bit if you would, Mr.

2   Buckfire.  Restructuring advisory services.  What does -- what

3   does that mean?

4   A    Our typical engagement is with a company or government

5   which is experiencing financial difficulty and does not quite

6   know what to do about it.  So our first mission would be to

7   help them with a diagnosis, to identify the causes of their

8   financial pressures, to identify what can be done about those

9   in terms of the diagnostic, and then to make recommendations

10  on how to solve the problem which normally means for a company

11  making sure they have adequate liquidity to operate in the

12  ordinary course and maximize the value for their stakeholders.

13       In the case of the government, making sure they have

14  adequate access to capital markets and the ability to provide

15  an adequate level of public services.

16  Q    And in these engagements, what is your personal role?

17  A    My personal role is to manage our team of bankers in

18  working with our clients to do our diagnosis.  And then once

19  instructed by the client as to what they wish us to do, help

20  them formulate strategy and the next -- whatever transactions

21  are required, to implement that strategy.  My job is general

22  financial strategy and oversight.

23  Q    And could you give the Court some idea of specific

24  engagements you've worked on which are public?

25  A    Well, over the years we've worked on many well known and

1  complex restructurings.  Some of the more notable ones would

2  include Niagara Mohawk Power Company, Calpine Corporation,

3  General Growth Properties, K-Mart Corporation, Lehr, Dana.

4      We've also been involved in several well known municipal

5  restructurings including Stockton, California.  And we are

6  currently advising a -- a large sovereign country with its

7  financial issues.

8  Q    How did you first become familiar with Detroit's

9  financial and operational issues?

10 A    Well, being from here, I have always paid close attention

11 to what's been going on in Detroit.  Certainly in 2009 in

12 financial crisis when it became well known that Detroit had

13 lost access to the capital markets due to its downgrade, I

14 started paying more attention to the problems here trying to

15 figure out if there's some way that my firm could be helpful.

16 And obviously given my personal connection to the area, it was

17 of personal interest to me to try to find a way to contribute

18 to the revitalization of the city.

19 Q    And so what did you do?

20 A    We paid close attention to it.  We tried to figure out

21 where there was a way to form some relationships locally that

22 might eventually introduce us to Mayor Bing and to other

23 people in the administration who might find our particular

24 expertise of help.  And that just began a general program of

25 building those relationships.

1  Q    How did you first become engaged by the city?

2  A    We had done a very brief financial review of the city on

3  behalf of the state in March or April of 2012.  It was a 60

4  day process of just looking at the public information and

5  trying to identify what the financial --

6  Q    If you could just slow down and speak up, just a little.

7  A    All right.  We first were engaged by the state in March

8  or April of 2012 for a 60 day review.

9       They wanted us to review the public information of the

10  city to try to ascertain what their financial challenges were

11  and to put that in a format that could be useful for decision

12  makers to understand the situation more accurately.

13      That put us in contact with members of the Mayor's

14  administration, Jack Martin and Chris Andrews in particular.

15  So I began a relationship with them.

16  Q    Did there come a time in the fall of 2012 when the city

17  issued a request for proposal for certain financial services?

18  A    Yes.

19  Q    Could you describe that for me, please?

20  A    Well, the city had entered into a consent decree with the

21  state in March of 2012 pursuant to which the state promised to

22  provide financing to the city and support their restructuring

23  efforts as long as the city was meeting certain milestones

24  that were incorporated in that agreement.

25      I wasn't paying that much attention at the time.  But

1  then in the fall Jack Martin called me and said, you know,

2  we're probably going to have to put out a request for a

3  financial advisor because we're about to enter into a new

4  agreement with the state and they're going to require us to

5  hire advisors to help implement the restructuring program that

6  we first had described in the March 2012 consent agreement.

7  So we were invited to submit our qualifications to the city at

8  that time.

9  Q    Now, did you become familiar in the course of your work

10  with the consent agreement?

11  A    Yes, I did.

12  Q    And does the term milestone agreement mean anything to

13  you?

14  A    Yes.

15  Q    Let me show you Exhibit 23.  In the book beside you,

16  there's a book Exhibit 6 through 50.  And we'll throw it up on

17  the screen as well.  And it will be on the screen in front of

18  you.  Do you see it, sir?

19  A    I do.

20  Q    Is that the consent agreement to which you referred?

21  A    Yes.

22  Q    What understanding did you derive of the concept and

23  purpose of this consent agreement?

24  A    Well, the consent agreement as I reviewed it, describes a

25  transaction really between the state and the city in which the

1  state agreed to help the city raise funding to support its

2  liquidity while it began a reform program which was very

3  clearly delineated in -- in Section 2.4 and more fully

4  described in Annex B of this agreement.

5  Q    Could I direct your attention to I believe it's section

6  -- well, let's look at 2.4 and 2.5.  Do you see that, sir?

7  A    I do.

8  Q    Is that the reform program and the quid pro quo if you

9  will for the -- by the treasury?

10  A    Yes.

11  Q    And why did the state want the reform agreement in your

12  understanding?

13  A    Well, the city as I understood it had asked for financial

14  assistance from the state.  The city was under liquidity

15  stress.  They didn't have sufficient cash.  They needed to

16  find cash somewhere and the state agreed to facilitate the

17  city's sale of -- of bonds, a portion of which would be given

18  to the city and any consideration for that assistance, my

19  understanding is, the city agreed to implement the reform

20  program.

21           THE COURT:  Excuse me one second.  It turns out you

22  are now too close to the microphone and as a result our

23  overflow rooms are getting static.  So move it just a bit

24  further away.

25           MR. CULLEN:  Is that better, Your Honor?

1          THE COURT:  Yes.

2          MR. CULLEN:  Okay.  Thank you.  You should have a

3   training program, Your Honor.

4          THE COURT:  No.

5          MR. CULLEN:  Or -- or a ruler, either way.

6          THE COURT:  Yeah.  Or a better audio system.

7   Q    In terms of the division of responsibility between the

8   state and the city reflected in this agreement, did you have

9   an understanding of that?

10  A    I did.

11  Q    Could you tell me what that understanding was?

12  A    Well, my understanding was that the responsibility for

13  designing and the implementing the reform program was really

14  entirely the city's.  The state agreed to provide the funding

15  the city required to sustain its operations while doing the

16  formulation of the plan and executing it.  And that the state

17  also asked for a reasonable amount of oversight to make sure

18  the city in fact did what they said they were going to do.

19  Q    Was the state -- would it be fair to say therefore that

20  the state aid was conditional on progress on that reform

21  program?

22  A    Yes.

23  Q    If I could direct your attention to Exhibit B of Exhibit

24  23 -- Annex B, I'm sorry.  What's this, sir?

25  A    Well, this was the reform program goals and subjects that

1  had been agreed to by the city with the state.

2  Q    Just looking up at the top there, first is something

3  prioritization and timing to be mutually agreed upon by Mayor

4  and council and approved by financial advisory board as

5  provided in the agreement.  What was your understanding of

6  what the financial advisory board was and what its role was?

7  A    Well, the financial advisory board my understanding was

8  created to make sure that the city had appropriate level of

9  oversight in terms of developing accurate financial

10 information, reporting it to the stakeholders, and then making

11 sure that the -- once the operation of the program had been

12 designed, that it would be approved by the financial advisory

13 board as consistent with the goals of the agreement.

14 Q    Did this strike you as a fairly comprehensive set of

15 reform initiatives?

16 A    Yes.

17 Q    If I could direct your attention to Exhibit 7.  Is this

18 the agreement we've referred to as the milestone agreement?

19 A    Yes.

20 Q    What was your understanding of the concept and purpose of

21 this agreement?

22 A    Well, my understanding was that by November of last year,

23 the city had not been able to achieve many -- many of the

24 milestones or requirements of the original consent agreement.

25 And this was entered into between the state and city as a

1  condition of further disbursements of funds from the escrow

2  account that had been established by the state on behalf of

3  the city in March of 2012.

4  Q    And if you look at the bottom of the first page, and

5  going on to the top of the next.  Where it says joint

6  restructuring expenses and restructuring assistance.  And

7  because I'm closer, I'll read it.

8      The city will as expeditiously as possible, select and

9  retain a restructuring firm or teams to advise the city's

10 program management office upon and implement the city's reform

11 program, including but not limited to -- the next page as

12 well.  Could you blow that up, the top of that?

13     And was -- was it your under -- let me ask it in an open

14 ended way.  What impact did this milestone agreement have on

15 your hiring?

16 A    Well, this is what led to our retention.  We had stayed

17 in touch with Chris Andrews who was the corporate managing

18 director and Jack Martin, the CFO all during this period even

19 though we had no role.  And they had called me in November

20 after this was signed and said, we decided we really need

21 expert outside help to implement our reform program and look

22 forward to getting an RFP.

23 Q    Now, was there any borrowing in connection with the

24 milestone agreement?

25 A    Well, the original consent agreement had contemplated a

1  financing, I believe it was $130,000,000 of which I believe it

2  was 50,000,000 or 60,000,000 was released to the city upon

3  that funding and the rest was retained in an escrow account

4  which was still in effect as of the date of this agreement.

5  Q    And so was there some relation between progress on the

6  agreement and draws from the escrow account?

7  A    Yes.  The state was requiring the city to execute its

8  milestones in order for further cash to be released to it

9  pursuant to this agreement.

10  Q    At -- at what point were you actually hired by the city

11  in '12?

12  A    Well, as I recall, we submitted to the RFP process in --

13  it might have been late November.  We were told we had won in

14  December and we signed our agreement with the city, I believe,

15  on January the 5th of 2013.

16  Q    When you first came into your responsibilities as the

17  restructuring firm for the city, did you undertake an

18  assessment of the city's finances and operations?

19  A    Yes, we did.  And we already were familiar with that

20  because of the review we had done seven months before for the

21  state.

22  Q    Now in terms of the -- this consent agreement and the

23  milestone agreement, did you come to an understanding of the

24  degree to which those agreements had been a success in

25  promoting or helping the city to -- to achieve the identified

1  reforms?

2  A     Yes.

3  Q     What was that view?

4  A     That it had been a very mixed outcome.  The city had been

5  successful in delivering really for the first time good

6  financial information on a monthly basis to the FAB which had

7  been a responsibility required of it as part of the original

8  consent agreement.

9       But they had had very limited success in implementing any

10  other objectives of that March agreement.  And that's why this

11  milestone agreement goes into such specificity about what is

12  now required of the city to do in order for the state to

13  continue to release money from the escrow account.

14  Q     But -- but let's -- let me be clear.  Or let me allow you

15  to be clear.  Did the division of responsibility or authority

16  for these reforms remain the same under the milestone

17  agreement, or was it changed?

18  A     No, it was still with the city.

19  Q     And ultimately as of the date that the emergency

20  financial manager was named, had the city made substantial

21  progress on this reform program?

22  A     No.

23  Q     And why do you say that?

24  A     Because they hadn't.  I mean they -- they simply had

25  failed to address any of the major items first identified in

1 March of 2012, in particular on blight removal, restoration of

2 public safety.  There had been no initiatives made, no money

3 spent.  Simply nothing had happened.

4 Q    Let me direct your attention to Exhibit 7 at II VIII C.

5 It says, any future draws to be negotiated between the

6 administration of the estate are contingent on the following

7 provided that the escrow account will maintain a minimum

8 balance of $50,000,000 at all times.  First, what was the

9 escrow account?

10 A    Well, the escrow account had been created with some of

11 the proceeds from the $130,000,000 bond offering that had been

12 done in the late -- early spring of 2012.

13 Q    Speak up again, please.

14 A    I'm sorry.  Of the $130,000,000 bond offering that had

15 been done a year prior, that was the money that had been put

16 into escrow by the state on behalf of the city.

17 Q    And what was the significance -- did you attain an

18 understanding of the significance of the minimum balance of

19 $50,000,000 and its importance?

20 A    Well, the city has in aggregate $1,000,000,000 plus

21 budget.  It has nearly 10,000 employees and $50,000,000

22 represents approximately three weeks of expenditure on the

23 part of the city.

24      And that's relevant because the city's revenues come in

25 in a fairly lumpy way from a variety of different sources.

1  So to make sure they have adequate liquidity to meet their

2  obligations, particularly payroll, the state felt it

3  appropriate to make sure there was always $50,000,000 in

4  reserve if it turned out that the city had misestimated its

5  cash reserves, the state could step in and help.

6  Q    Pardon me, but what was --

7  A    The state could step in and release this money in an

8  emergency.

9  Q    You say that revenues came in in a lumpy way.  What does

10 that mean?

11 A    Well, the city -- well, the city relies on four primary

12 streams of revenue.  Gaming tax revenue, state revenue share,

13 property tax, and income tax.

14     Property tax income in particular comes in on a round

15 about quarterly basis because that's when assessments are

16 made.  Income taxes come in likewise in a fairly irregular

17 fashion.  The only revenue that is predictable and coherent is

18 gaming revenue.  Because it is being collected by the casinos

19 on behalf of the city and remitted to the city pursuant to a

20 fairly complex set of accounts on a monthly basis.

21 Q    And so there will be times when the city is more flush

22 than others?

23 A    Correct.

24 Q    Or more importantly less flush?

25          MR. MONTGOMERY:  Objection, leading.  I believe

1  that's a leading question that is necessary.

2       THE COURT:  The objection is sustained.

3  Q   What were the terms of your engagement for the city at

4  that time?  What were you asked to do, what did you set out to

5  do?

6  A   We agreed to provide general financial advisory services.

7  There were no transactions contemplated or built into our

8  engagement.  We were providing corporate financial advice only

9  for $150,000 a month.

10 Q   When you say that -- when you distinguish between general

11 financial service and no transactional fees built in, what

12 difference does that make to an engagement for a firm such as

13 yours?

14 A   Well, when we begin an engagement for a government or a

15 company and we don't know what we might have to do, we

16 normally agree to provide general financial advice, just

17 diagnosis, a set of recommendations with no presumption that

18 we are going be hired to do any transactions as a result of

19 that because not only does it protect the client from knowing

20 that our advice is in any way biased, it protects our firm.

21 Because we don't want to agree to provide a transaction

22 service unless we really believe A, we can execute it, and B,

23 it's actually needed.

24 Q   So upon your appointment, what did you first do to get

25 your arms around the problem?

1  A      Well, the first thing we did was refresh our

2  understanding of the city's financial condition and having

3  worked with Jack and Chris nine months earlier, we had a very

4  strong understanding of their condition.  We wanted to revisit

5  that which we did.

6        We then sat down with the other advisors to the city at

7  that time, Ernst and Young and Conway, MacKenzie, and reviewed

8  together the city's reform program and quickly agreed on a

9  number of different projects that had to be done collectively

10  so we could form a coherent understanding of the city's short

11  term and long term financial condition.

12  Q    From that point forward, what was the working

13  relationship between you and the other advisors, Ernst and

14  Young and Conway, MacKenzie?

15  A    Very collaborative and close.  We were on the phone with

16  them probably on a daily basis, either myself or my team.

17  Because it's a very integrated advisory challenge.

18        We as the financial strategists can't do our job unless

19  we have good information from the city which has to focus on

20  two primary areas.  One, the short term liquidity position of

21  the city.  We have to make sure that at all times the city can

22  operate in the ordinary course because it is pointless to try

23  to address the long term issues unless you have the cash to

24  give you the time to do so.  That was a primary responsibility

25  of Ernst and Young.

1      Secondly, and also related again to the March 2012

2  agreement, we needed to understand exactly the costs and

3  timing of implementing the reform program.  There had been no

4  budget created by the city during that period of time to

5  address any of the issues in Annex B.

6      And therefore in order to form a long term financial

7  strategy for the city, we needed to know how much capital we

8  would need to raise from whatever source for the city to

9  implement that program.  And that was Conway, MacKenzie's

10 primary responsibility.

11 Q    Were you the -- were you personally the leader of this

12 integrated team of restructuring professionals?

13 A    Yes.

14 Q    And you said before that this is a complex task and you

15 need specialized help.  Did you come to a conclusion in their

16 respective fields as to whether you had the right help, in

17 E & Y, and Conway, MacKenzie?

18 A    From a financial perspective, I thought we had an

19 excellent team that could adequately address all the financial

20 and operational issues of the city.

21 Q    And as you went forward to make judgments and to give

22 strategic advice to the city, were you relying on the advice

23 and the work of Conway, MacKenzie and E & Y?

24 A    Yes.

25 Q    In terms of analyzing the finances of the city at that

1  time, what preliminary conclusions did you draw?

2  A    Well, we were very concerned about the city's ability to

3  operate in the ordinary course for a number of reasons.  The

4  first one which I was aware of because of my earlier work for

5  the city, was the default to the swap counter parties.

6      The city in 2009 had entered into a agreement with the

7  swap providers that were giving interest rate swap protection

8  to the certificate of participation bonds that had gone

9  against the city.  That is the present value of those swap

10 contracts was a significant cost to the city, not a benefit.

11     In 2009, because of a default at that time, the city

12 settled that default by granting a collateral interest in the

13 gaming revenues to UBS and Bank of America, and Merrill Lynch.

14 However, because of another credit downgrade in March of 2012,

15 the city was again in default to those banks.  I was very --

16          MS. GREEN:  To the extent that he is testifying to

17 the legal conclusion of what was a benefit --

18          THE COURT:  Speak into the mike.

19          MS. GREEN:  I object to -- to the extent that he's

20 testifying to a legal conclusion of what constitutes an event

21 of default under the swap contracts.

22          THE COURT:  Okay.  I don't understand him to be

23 testifying to that, so the objection is overruled.

24          MS. GREEN:  Thank you, Your Honor.

25          THE COURT:  You may continue, sir

1  A    Thank you.  I was very concerned about this uncured

2  default and the threat that at any moment the swap counter

3  parties could exercise their remedies and block the city's

4  access to its gaming revenues which was and still is the

5  highest quality source of revenue the city has.  Approximately

6  $180,000,000 a year which represents close to 20% of its

7  annual budget.

8       And that was an immediate issue that we addressed and we

9  had to deal with in order to preserve the city's ability to

10 operate while we were trying to figure out what the long term

11 strategy should be.

12 Q    Now, did you go about -- did you do anything to evaluate

13 the assets of the city?

14 A    We did.  Together with the city and again we had a lot of

15 familiarity with the city because of our earlier work.

16 Q    I'm just talking about this -- in this initial phase.

17 A    Oh, yeah.

18 Q    When you were first getting yourself oriented.

19 A    We had begun to do what we always do is to address the

20 city's assets and liabilities to understand what value did we

21 have to work with to settle with the city's creditors and

22 perhaps monetized to create incremental liquidity for the city

23 to operate.

24      So we began to examine all of the city's assets to

25 determine whether any of them were in our words non-core, not

 1  essential for city operations, and could be available for

 2  sale.  And if they were available for sale, how much could be

 3  realized.

 4  Q    Okay.  Did you at that point evaluate the time necessary

 5  to effectuate a sale and turn an asset into cash?

 6  A    Yes.

 7  Q    Now at the time you came into your responsibilities as

 8  head of this restructuring effort for the City of Detroit, was

 9  there talk about the possibility of Chapter 9?

10  A    Yes.

11  Q    Could you describe that for me?

12  A    Well, when a company or government is in default the

13  threat of bankruptcy is always real.  The lack of cash is

14  normally what would push a company into a Chapter 11.  In the

15  case of a government it's more complex.

16      But clearly we had to be concerned about that being a --

17  a necessary way of protecting the city given this uncured

18  default of the swap banks.  And in January of this year that

19  was our primary concern.

20  Q    What was your primary concern?

21  A    That the swap banks could take unilateral action to

22  deprive of us of access to the gaming revenues and that would

23  cause the city incredible damage because it would immediately

24  have to make massive cut backs to services.  And we weren't

25  sure what we would do about it.  So we had to consider Chapter

1  9 as an alterative to protect the city.

2  Q    As a result of your initial review of the city's

3  position, what was your first set of advice to the city about

4  what more they should do or what more you should do?

5  A    Well, in addition to accelerating our analysis of the

6  city's financial condition, which we obviously had undertaken

7  to do, we recommended that the city consider bringing in a law

8  firm with the multi-disciplinary skills and experience to help

9  the city with contingency planning for whatever might occur.

10  Q    And did you give specific instructions to either E & Y or

11  Conway, MacKenzie in terms of what they should try to

12  accomplish in the short term?

13  A    I did.

14  Q    Let's start with E & Y.

15  A    With E & Y, I suggested to them even though their RFP had

16  only required them to do a five year forecast, that really we

17  should extend that to ten years.  For a city or a government

18  to look at a long term financial picture, the longer you can

19  look out the safer you are in terms of understanding what you

20  need to do.  Five years is simply too short a period for any

21  realistic appraisal of its performance.

22      And they agreed to extend out their analysis to ten years

23  even though that did impose a significantly higher burden on

24  them.  And we also recommended to both Conway and E & Y that

25  we collectively try to form our conclusions about the

1  financial condition of the city as soon as possible given its

2  continued financial stress and the uncured nature of this

3  default.  We needed to move as fast as we could to figure out

4  what the true picture of Detroit's condition was.

5  Q    And to get a ten year picture of Detroit's condition,

6  what options were available to you at that time in terms of

7  resources in addition to or besides E & Y?

8  A    Well, we had access to the city of course and they were

9  very cooperative in giving us information about their cost

10 structure in particular.  But there really were no good

11 projections of revenues.

12      We had to go and do the best we could with information

13 that was available to us.  In particular and it turned our

14 fortuitously Ernst and Young has a group in Washington which

15 is probably the country's leading experts in revenue, policy,

16 and tax analysis for municipalities and states.

17      So we were able to avail ourselves of that resource as

18 well in terms of developing a revenue forecast for the city,

19 particularly with respect to property and income tax

20 collections.

21 Q    And did you feel that you had a competent team in E & Y

22 to do this?

23 A    Yes.

24 Q    Did you tell them what you were going to use it for?

25 A    Yes.

1  Q     Did you intend to rely on it?

2  A     I did.

3  Q     And did you rely on it?

4  A     I did.

5  Q     And do you, as you sit here now, feel justified in your

6  reliance upon it?

7  A     Yes.

8  Q     Did there come a time when Detroit turned its attention

9  to hiring legal counsel?

10 A     Yes.

11 Q     What was your involvement in that process?

12 A     Well, about a week after we had been officially retained,

13 I met with the city and we concluded that at a minimum the

14 city needed to focus on strategies, particularly legal

15 strategies to protect itself from the swap banks in terms of

16 any actions they might take to take the gaming revenues away.

17       It was their conclusion that bringing in another law

18 firm, at least considering bringing another law firm in to

19 supplement other attorneys already working for the city was a

20 sensible thing to consider.  They asked me to recommend firms

21 that might meet the qualifications required.

22       So we basically gave them a list of law firms that we

23 felt had all the qualifications to provide the full range of

24 services the city might require under any scenario.

25 Q     And how many law firms were there?

1  A    Well, I think we ended up with about 14 or 15 law firms.

2  Many of them were well known to the city having done work for

3  them before.  The rest were so-called national law firms that

4  had had very little exposure to the city but did have the

5  experience in complex reorganizations, has had some experience

6  with Chapter 9's, had a lot of experience with out of Court

7  restructurings.

8       In addition to that had sufficient familiarity with

9  health care regulation and pension reform to deal with those

10  issues as well.

11  Q    Was there a meeting at which these law firms presented

12  themselves?

13  A    Yes.

14  Q    Were you at that meeting?

15  A    I was.

16  Q    Who else was at that meeting?

17  A    Well, we had a large group from both the state and the

18  city represented there for the purpose of interviewing the law

19  firms they did not know.

20       As I testified earlier, the city already knew quite a few

21  law firms, especially in Detroit that it was quite comfortable

22  with.  They did not feel they needed to interview those firms

23  again.  So they interviewed the firms they did not know.

24       And I was present at that meeting with Andrew Dillon,

25  State Treasurer, Tom Saxton, who I believe his title is Senior

1  Deputy Treasurer, Braum Stibitz, which is S-t-i-b-i-t-z who

2  was a Senior Advisor to the Treasurer.  And Richard Baird who

3  my understanding at the time was he was the Governor's aid for

4  Human Resources and things like that.

5      And from the city we had Chris Andrews, Program Managing

6  Director, Jack Martin, CFO, and I believe we had somebody from

7  the legal department, but I can't recall their name.  Oh, I

8  apologize, we had two members also from the financial advisory

9  board, Sandy Pierce and Ken Whipple.

10 Q    In your understanding, who was to make the decision?

11 A    The city.

12 Q    And what was your input into this decision?

13 A    After the interviews were over, the city asked us to put

14 together a comparison sheet laying out the qualifications of

15 all the law firms that have interviewed, and giving them for

16 lack of a better word, a qualitative assessment of their

17 relatives strengths and weaknesses which we did provide.

18 Q    And was there another meeting after that at which the

19 actual selection was made?

20 A    The initial presentations were on a Friday.  I believe it

21 was January 29th.  And then the selection meeting was the

22 following Friday.

23 Q    Were you at that meeting?

24 A    No.  My plane was stuck on the ground at LaGuardia and

25 even though I had been invited, I didn't attend.

1  Q    And do you know who -- do you know who was at that

2  meeting?

3  A    I believe it was largely the same group that had done the

4  interviews.

5  Q    And were you informed of the result?

6  A    I was told that the city had selected Jones, Day.

7  Q    Did you have any role in selecting or suggesting the

8  emergency manager?

9  A    No.

10        THE COURT:  All right, sir.  Let's pause now for our

11  afternoon recess.  It's 3:30, we'll resume at 3:45 please.

12      (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT 3:28

13  P.M.)

14        THE CLERK:  All rise.  Court is in recess.

15      (Court in Recess at 3:29 p.m.; Resume at 3:45 p.m.)

16        THE CLERK:  Court is in session.  Please be seated.

17        MR. CULLEN:  Mr. Buckfire.

18        THE COURT:  One second, please.

19        MR. CULLEN:  I'm sorry.

20        THE COURT:  It appears everyone's present.  You may

21  proceed.

22        MR. CULLEN:  Thank you.

23      (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 3:45 P.M.)

24  BY MR. CULLEN:

25  Q    Mr. Buckfire, as Ernst and Young worked on these cash

1  projections, did they keep you informed of their progress?

2  A    Yes, they did.

3  Q    Was there any particular one of these projections that

4  stands out in your mind as having significance to this matter?

5  A    Yes.  In early May of this year they showed me a draft 12

6  month cash flow forecast.

7  Q    And what did that cash flow forecast indicate to you?

8  A    Well, it indicated to me that the city's cash position

9  was far worse than I had ever feared.  That the city would

10 effectively be operating with no cash by the end of that

11 period of time even on the current projections which

12 incorporated certain deferrals of expenses that in the

13 ordinary course they should not be making.

14     And I was very alarmed about this because I was acutely

15 aware of the fact we still had no solution to the default

16 under the swap agreements.  And that at any moment the city's

17 ability to provide services could be eliminated.

18 Q    How -- how would you describe the city's cash situation

19 at that time as presented in those projections?

20 A    The city had minimal cash.  They had a few tens of

21 millions of dollars.  It was erratic.  They had no real

22 ability to project because as I testified earlier cash would

23 come in in a somewhat lumpy and unpredictable manner.  And so

24 at any given time the city could find itself with no cash.

25 Q    Were those cash flow projections memorialized in a -- any

1  of the documents in this case?

2  A    Yes.

3  Q    If I could show you Exhibit 75 at Page 40.  If you could

4  blow up the numbers there, please.  And you could put the

5  thing below too.  Are these the numbers that you just

6  testified to?

7  A    Yes, they are.

8  Q    Could you tell us what your understanding was at the time

9  based upon these numbers?

10        MR. SHERWOOD:  Your Honor, I -- I object to this

11  witness' testifying about forecasted receipts for the period

12  set forth there.  That is the -- the proper subject for expert

13  testimony and this is a lay witness.

14        MR. CULLEN:  May I lay some foundational questions,

15  Your Honor?

16        THE COURT:  Okay.

17  Q    In your work as a restructuring analyst, do you normally

18  commission cash flow forecasts?

19  A    Routinely.

20  Q    Is it one of the ordinary tools of your trade?

21  A    Yes.

22  Q    Do you make decisions based on those cash flow forecasts?

23  A    I make recommendations based on these forecasts, yes.

24  Q    And when you make those forecasts, what kind of people do

25  you use to do them?

1  A    We use -- well, we rely upon outside professionals such

2  as Ernst and Young and Conway, MacKenzie as well as the

3  finance staff of our client.

4  Q    In this situation, did you think that a cash flow

5  forecast of this type was necessary for the city to have?

6  A    Yes.

7  Q    Was it necessary for you to make informed

8  recommendations?

9  A    Yes.

10 Q    And based upon these forecasts, did you indeed make

11 recommendations to the city about its strategy in the

12 restructuring?

13 A    I did.

14 Q    And did you have any other -- any better options

15 available to you at that time to make this kind of a cash flow

16 forecast which you said was necessary to your job on behalf of

17 the city?

18 A    No.

19        MR. CULLEN:  I'd -- I'd move the admission of this

20 cash flow forecast, Your Honor.

21        THE COURT:  What's the exhibit number?

22        MR. CULLEN:  The exhibit number is 75, Page 40.

23 It's the financial operating plan, Page 40 of -- of same.

24     (City's Exhibit 75 was identified)

25        MR. SHERWOOD:  Your Honor, Rule 702 of evidence is

1  specifically designed so that when a party offers testimony

2  requiring expertise, knowledge, tools of the trade, the trade

3  of this witness is not a simple trade.  It requires expertise,

4  experience and so forth.

5      And just because he relied on these and he does, it does

6  not take this outside of the scope of -- of Rule 702 and --

7  and frankly I just think this is sort of an end run around the

8  Court's decision to deny the -- the testimony or not give

9  weight to the testimony with respect to the projections of

10 Ernst and Young.

11         MR. MONTGOMERY:  Your Honor, could I join for a

12 moment if I might?  May I join in the objection?

13         THE COURT:  Of course you may.  I'm not sure why you

14 think you need to do that, but okay.

15         MR. MONTGOMERY:  I just wanted to point out one --

16 one foundation that was --

17         THE COURT:  Oh, there's an additional argument you

18 want to make, okay.

19         MR. MONTGOMERY:  -- missing, Your Honor.  Very

20 simply that to the extent that the city was going to try to

21 rely on an officer, director, or owner type exception,

22 obviously this witness does not fall within that category.

23         THE COURT:  Yeah, I don't -- I don't hear that quite

24 at issue here, but thank you.  And just so the record is clear

25 and I'm clear too, this was prepared by Ernst and Young?

1  A    That's correct.

2           MR. CULLEN:  Your Honor, if -- if I might.

3           THE COURT:  And it's not otherwise in evidence at

4  this point?

5           MR. CULLEN:  It is otherwise in evidence.  The

6  Exhibit 75 as a whole is in evidence subject to the fight

7  about these parts of the exhibit and what they're in for and

8  what they're not in for.

9           THE COURT:  All right.  I -- I will admit the

10  document but for the limited purpose of establishing what this

11  witness relied upon for his work and not for purposes of

12  establishing the truth of anything in it.

13       (City's Exhibit 75 was admitted)

14           MR. CULLEN:  I -- I take it, Your Honor, just to be

15  -- to be clear, that when we close up this matter depending on

16  how you rule on the motions tomorrow, that it is some

17  evidence, weight or not, of the state of the city that Mr.

18  Buckfire will testify that he believed this was the state of

19  the city.  Mr. Orr will testify that he believed this was the

20  state of the city.  And that they had a reasonable basis so to

21  believe.  The reasonableness of their reliance on these

22  numbers is a separate issue from their -- their --

23           THE COURT:  Well, it might -- it might go to good

24  faith, but on the substance of the issue for example of these

25  projections, it's not evidence of that

1        MR. CULLEN:  All right, Your Honor.

2        THE COURT:  I don't know how more clear to be.

3  Q    What -- what conclusions did you --

4        THE COURT:  I will comment I have refrained from

5  making this comment till now, but I will make it now that

6  you've asked the question.  It's actually hard for me to

7  comprehend why you didn't offer the Ernst and Young witnesses

8  who prepared these projections as experts.  You may proceed.

9        MR. CULLEN:  Thank you, Your Honor.

10 Q    What impact did these numbers have upon your forward

11 planning and advise with respect to the Detroit restructuring?

12 A    Well, we were extremely alarmed by these numbers.

13 Remember, we received these numbers in early May.  We knew how

14 unpredictable the city's ability to collect property income

15 taxes were.

16      We immediately realized that in June of 2013, which was

17 only a month away from this forecast date, that the city was

18 operating on a razor's edge.  If it were to make the

19 $40,000,000 bond payment on June 15th to the TOC bond holders,

20 that would only make sense if it indeed collected all of its

21 anticipated tax revenues on schedule in the amounts stipulated

22 here.

23      A $7,000,000 cushion on a budget of this magnitude is

24 almost effectively nothing.  That also alarmed me because I

25 knew we still had a continuing problem with the swap banks,

1  Bank of America and UBS.

2      We knew we would have to negotiate some kind of agreement

3  with them to retain our access to the gaming revenues which

4  you'll see here for this short period of time is $105,000,000.

5  You'll notice how regularly it's projected to come in.  And

6  that is a matter of historical record and is quite accurate.

7      The city has always been able to rely on those revenues

8  in the absence of anything else because they're collected by

9  the gaming casinos themselves.  We realized that if it turned

10  out that our recommendation to the city in order to reserve --

11  to preserve cash was to not make the $40,000,000 bond payment,

12  that would be another default to the swap counter parties.

13      At that point we already had two defaults to them.  The

14  original ratings downgrade of March of 2012 which had not been

15  cured, and indeed the appointment of Kevyn Orr as emergency

16  manager also in and of itself constituted an event of default.

17      The swap banks which were continuing to get paid, had not

18  shown any indication that they might change their minds.

19  Nonetheless it was a significant risk to the city.  So we

20  immediately turned our attention in early May to deciding what

21  should we do about this in order to make sure the city

22  continued to have adequate cash to operate and provide

23  services.

24  Q    Was there a -- were there any payments in the near future

25  that you had to decide whether to make or not?

1  A    Yes.  If you look at the schedule you'll notice under

2  June of '13 column -- second column to the left, there's a

3  line in the middle of the page called POC and debt related

4  payments.  There's approximately a $40,000,000 payment due by

5  the city on June 15th.

6  Q    And was there a decision to be made with respect to that

7  payment?

8  A    There was.  Given how tight the city's cash position was,

9  they only had even on the projections, 70,000,000 of cash if

10 they made that payment.  We had to consider the necessity of

11 not making it in order to preserve liquidity.

12 Q    Were there any other ways that you haven't discussed to

13 preserve or enhance the city's cash position in May of 2013?

14 A    Well, as I testified earlier, we had looked at all of the

15 city's assets to find out if any of them could be marshaled to

16 create significant cash for the city.  And that began in

17 January.

18      We revisited that in early May.  We unfortunately came to

19 the same conclusion we came to in January that really there

20 was nothing that was readily convertible into cash.  The city

21 effectively had mortgaged all of its real assets years before.

22      The city did have potentially $60,000,000 left in the

23 escrow account established with the state in 2012.  I called

24 Senior Deputy Treasurer Saxton to ask whether that might be

25 available to the state if we really found ourselves in an

1  emergency.  And he said that it would really depend on our

2  overall recommendation in dealing with the city's long term

3  financial problems.

4  Q    Did you and the advisors ever come to a conclusion, a

5  consensus at any point as to whether or not the city was

6  insolvent?

7  A    Yes.

8          MR. SHERWOOD:  Objection.  I -- I object to any

9  testimony about insolvency.  This is not an expert witness and

10  it calls for a legal conclusion.

11  Q    In the course of your work do you -- are you always or

12  often called upon to address that question and advise on that

13  issue?

14  A    Yes.

15  Q    What is your understanding of insolvency?

16          MR. SHERWOOD:  Your Honor, I -- I renew the

17  objection.  I assume that when this witness is called upon to

18  testify in other matters concerning insolvency, he's qualified

19  as an expert witness.

20          THE COURT:  Hold on one second.

21          MR. CULLEN:  Pardon me?

22          THE COURT:  Hold on one second for me, please.

23          MR. CULLEN:  Sure.

24          THE COURT:  I do think it is appropriate to ask the

25  witness about the -- the facts that constitute insolvency

1  under 10132(c) of the Bankruptcy Code.

2  Q    Did you come to the conclusion that the city was unable

3  to pay its debts as they came due?

4  A    Yes.

5  Q    What was the basis for that conclusion?

6  A    Well, there were two sets of facts that we relied upon.

7  One was this schedule which was very short term in nature and

8  therefore we felt had to be relied upon because it wasn't very

9  long dated.  And it clearly showed that the city was operating

10 on a razor's edge of liquidity.

11     Secondly, we knew because we were in constant

12 communication with the city's finance staff, that they were

13 routinely stretching out payables in an attempt to conserve

14 cash.  They were not paying their trade creditors when due,

15 even at the date of the May 13 report.

16 Q    In your view as of -- as of May of 19, '13, was the city

17 able to pay its debts as they came due?

18 A    No.  In fact they were continuing to stretch out and

19 defer payments wherever possible to conserve cash.

20 Q    Was there any probability in your view of the city's

21 operations and cash flow of its remedying either of those

22 situations without aid in the foreseeable future?

23 A    We didn't see a possibility of that.  The city had

24 lost --

25          MR. SHERWOOD:  Sorry to interrupt again, Your Honor.

1  I object, calls for a lay opinion.  Again, talking about that

2  what --

3          THE COURT:  The objection is overruled.  Go ahead,

4  sir.

5  A    Well, as a banker the first thing we always evaluate is

6  whether a company or a government can borrow to cover a short

7  term financing requirement.  And in the case of Detroit, its

8  access to the capital markets had been cut off long before.

9  The most recent downgrade made it impossible for the city to

10 borrow in the ordinary course on the markets.

11      And it in fact had nothing left to pledge to gain access

12 to capital markets.  So that source of financing was closed.

13 And that's why indeed the prior year the state had to step in

14 and assist the city in raising even the 130,000,000 it did

15 raise because without that it would never have been able to do

16 it.

17      We then looked again at all of the so-called non-core

18 assets of the city and determined again whether any of those

19 could be readily converted to cash.  We again came to the

20 conclusion that there was nothing of any significance that

21 could be converted to cash in the time frame required to avert

22 a cash crisis in June or July to this year.

23 Q    Turning your attention now to the June 14th proposal to

24 creditors, did you have input into the strategy and concept of

25 that document?

1  A    I did.

2  Q    Could you tell me what your understanding of what that

3  proposal was meant to achieve was?

4  A    Well, going back to the --

5  Q    If it's an understandable sentence.

6       THE COURT:  It's close enough.

7  A    Well, going back to the consent decree of 2012 between

8  the city and the state, Annex B clearly -- the state expected

9  the city and the city agreed to review comprehensively all of

10 its operations and its long term financial stability in order

11 to come up with a strategy that would if implemented, result

12 in the rebirth and rejuvenation of the city as well as paying

13 its creditors what they were owed.

14      We were specifically tasked with working on that list of

15 activities, especially with regard to the long term

16 obligations.  And when we got re-hired by the city in January

17 this year to assist with that project, we explained to the

18 city that the only way in which we could establish a proper

19 foundation to negotiate with our stakeholders, whenever that

20 deemed necessary to take advantage of, would require us to

21 give our stakeholders as much information about the city's

22 financial condition as we could.

23      And until they had as much information as we could

24 reasonably develop about the short term forecast as well as

25 the long term condition of the city, they could not be in a

1  position to properly evaluate whatever restructuring proposal

2  we ultimately made to them in consideration of their claims.

3      So in January when we first sat down with Ernst and Young

4  and Conway, MacKenzie, we all agreed that that would be the

5  goal toward which we would work.  Would be to develop a set of

6  information that all policy makers and our stakeholders could

7  rely upon to evaluate whatever we deemed our strategy to be.

8  And that was our goal and that was our objective from January

9  until May of this year.

10 Q    In terms of putting out all of the proposal and informing

11 the stakeholders of the state of the city, can you tell me

12 what your input was into the structure of the offer itself,

13 the structure of the plan?

14 A    Well, the structure of the -- the restructuring proposal

15 being made in the June 14th document that was publicly made

16 available on that date, really relied upon the ten year

17 forecast that Ernst and Young had put together to show what a

18 realistic view of the city's revenues would be and that would

19 be assuming the impact of the reinvestment plan of over

20 $1,000,000,000 over the next ten years would allow the city to

21 stop its decline and set a foundation for renewal.

22     Based on the financial implications of that program, we

23 then were able to calculate what was available to give to our

24 stakeholders in consideration of their claims which in and of

25 itself was a very complicated analytical challenge because

1   until Ernst and Conway had really examined the off balance

2   sheet liabilities of the city, we really didn't know what the

3   real liabilities of the city were.

4        In our original review of 2012 we relied on publicly

5   available information which was accurate insofar as the funded

6   debt went, but we really did not know whether the projections

7   and liabilities associated with other liabilities, particular

8   health care and pension were accurate or could be relied upon.

9        And that was a very important focus of our analytical

10  work this year until the release of the June 14th plan.  So our

11  role was after we received the information was to then review

12  with counsel the appropriate way to construct a offer to all

13  of our stakeholders which recognized what the city's true debt

14  capacity was and then decide what would be an appropriate way

15  of allocating that across our stakeholders.

16  Q    Now, you talked about a level of services consistent with

17  sustaining the population and the tax flow revenues of the

18  city, did you not?

19  A    I did.

20  Q    How did you go about identifying that level of services?

21  A    Well, again, going back to March of 2012, the city itself

22  had identified a long list of areas in which it felt it needed

23  to restore or invest services.  Blight removal, police, fire,

24  lighting, there's a whole list of things.

25        But there was no budget against them.  We didn't know

1  what it would cost, nor did we know how long it would take to

2  implement any of those potential program areas.

3      And that was the primary focus of Conway, MacKenzie's

4  work together with the city's own staff was to identify

5  precisely how much it might cost to implement all of those

6  objectives.

7  Q    And in terms of your previous discussions of time and

8  cash, how do they play into this June 14th proposal?

9  A    Well, we had discussed with the city back in January of

10  this year what we would do once we came to a conclusion about

11  what the city really could afford in terms of its obligations

12  while reinvesting in rehabilitation.  Then we explained to the

13  city that as long as we had cash, as long as we had liquidity,

14  we would be able to construct an out of Court negotiating

15  strategy that would with enough time, allow us to negotiate

16  with all of our creditors and not have to result in

17  immediately a Chapter 9 filing, although that would always

18  have to be considered if for no other reason that when

19  negotiating with creditors, if you don't let them know that

20  that's a possibility, it's hard to get them to take you

21  seriously in a negotiation to keep a country, or a city, or a

22  company out of Bankruptcy Court.

23  Q    So could you make that concrete for me?  How much cash

24  equals how much time?

25  A    Well, normally you'd want to have enough cash to operate

 1  without interruption from the negotiations for at least six

 2  months to a year.

 3  Q    All right.  And how much money would that be in this

 4  case?

 5  A    Several hundred million dollars.

 6  Q    Did the city have that?

 7  A    No.

 8  Q    If I could direct your attention to Page 41 of the --

 9  A    May I correct one thing?  I apologize.  The city did not

10  have the money, and the only way it could get the cash would

11  be not paying its unsecured obligations such as the POC bonds.

12       But that would have created another level of defaults

13  which would have brought us right back to the problem I had

14  with the swap counter parties which is they had the right

15  through their remedies to block our access to gaming revenues,

16  so if we did try to solve our liquidity problem by not paying

17  our unsecured creditors, we might immediately lose it because

18  we'd lose the gaming revenues.

19  Q    Forty-one of this exhibit, Exhibit 43, Page 41.

20  A    Sorry, I've lost you.  What tab -- what exhibit are you

21  on?

22  Q    I haven't -- I haven't asked a question yet.

23  A    Oh.

24  Q    All right.

25            THE COURT:  It's on your screen there.

1  Q    It's on your screen.

2  A    Oh, yes.

3  Q    Does this accurately reflect what it purports to reflect,

4  the key objectives for the financial rehabilitation and

5  restructuring?

6  A    Yes.  These are the objectives set out to us by the city.

7  Q    Were these objectives new in this report?

8  A    No.  These were all reflected in the consent agreement of

9  March of 2012.

10 Q    Had substantial progress been made on any of these?

11 A    No.

12 Q    In terms of the discussions internally within the -- the

13 brain trust of the city, as I might call it that.  The Mayor

14 and his advisors.  What was the -- was there an intention to

15 make this proposal a take it or leave it proposition?

16 A    No.

17 Q    What was the intention?

18 A    Well, the intention was to provide our stakeholders with

19 the best possible information about the city's true condition

20 that we could develop and we'd been working around the clock

21 on this for months.

22      We also wanted to make sure that when we did begin

23 discussing with stakeholders they would see what we thought

24 made sense for all of our stakeholders at the same time so

25 there would be no doubt the city was approaching this in the

1  most even handed and fair way possible.

2  Q    And when you say even handed and fair, what aspect of the

3  proposal can you point to that reflects that determination or

4  that principle?

5  A    Well, just to pick out one example.  We felt it important

6  to start out by delineating our creditors into whether they

7  were secured or unsecured.  And we proposed that our secured

8  creditors would receive 100 cent recoveries, our unsecured

9  creditors would share pro rata in what we believed was the

10  value available to them pursuant to our restructuring plan

11  which is $2,000,000,000 in notes.

12        THE COURT:  Which was what?

13  A    Two billion dollars of notes.  That was all we calculated

14  the city could afford post this restructuring in terms of debt

15  capacity.

16  Q    And have -- have you used the words in the past, pari

17  passu to explain that?

18  A    Yes.

19  Q    Model as well.  Now, there's been a lot of discussion in

20  the case about asset sales.  And you've discussed it some

21  today.  But I would like to direct your attention to Pages 83

22  to 89 of Exhibit 43.

23        And take you through this list of assets so that you can

24  talk about, and I apologize for the nature of this question,

25  but I think it will move things along.  So you can talk about

1  the nature of the consideration and effort given to each

2  asset, the values available, and the -- and the hurdles to be

3  overcome or -- or to be avoided in getting -- turning the

4  asset into money.

5          MR. CULLEN:  If I can proceed that way, Your Honor,

6  with respect to each of the assets.

7          THE COURT:  Yes, go ahead.

8  Q    Detroit water and sewage.

9  A    Well, Detroit -- the Detroit Water and Sewer Department

10  is a very complicated situation, had been operating under

11  Federal Court order for a very long time.

12      At the time of our engagement in January, it was still

13  operating under the supervision of the so-called Root Cause

14  Committee which was really effectively the governance body,

15  although the assets were owned by the city and are still owned

16  by the city.  The city has never received any cash flow from

17  it's ownership stake.

18      The department has operated on the basis of zero profit.

19  It is allowed to recover its operating, maintenance, and debt

20  service costs from rate payers and that's all.  So it's never

21  been a source of cash flow to the city.

22      And furthermore, in addition to that, we had no ability

23  to raise rates to generate cash.  That would not be allowed

24  under the utilities laws of the State of Michigan.

25      And we also had no ability to pick up and sell it

 1  overnight because as I mentioned before it was under a Court

 2  order until March of this year.  So we began to evaluate after

 3  that Court order was, I guess, dismissed is the correct

 4  phrase, whether or not we could in fact realize cash from the

 5  system, but because of its public nature we recognized it

 6  would be extremely complicated to do.

 7      And that the only ways to do it really would be to either

 8  sell it to its customers in exchange for a lease payment or a

 9  pilot payment, or consider some version of a privatization.

10  We've been contacted by a number of private equity firms which

11  have expressed an interest in buying it if they could, but

12  only if they could charge higher rates to recover their own

13  costs as capital.

14      So we recognize even though this would be potentially a

15  source of great value to the city, it would be a long and

16  complex process with a low probability of success.

17  Q    The Coleman Young Airport, next page.  Keep going.

18  Coleman Young Airport.

19  A    The airport is currently not being used for commercial

20  services.  It's being used for so-called general aviation

21  only.  It's a very small airport.  Its runways are too -- too

22  short to allow regular commercial service by major carriers.

23      The airport itself is dilapidated and would require

24  reinvestment to bring it up to commercial standard.  It's

25  effectively worth nothing.  And likely not be worth anything

1  unless these reinvestments are made.

2      And we did explore it actively with one of my partners

3  who is an airlines expert.  We came to the conclusion that,

4  you know, we'd have to pay someone to take it.

5  Q    Move on to the Belle Isle Park if you would, please.  Oh,

6  I'm sorry, Detroit Windsor Tunnel.

7  A    Well, the city owns half the tunnel, Windsor owns the

8  other half.  Under a prior administration, Detroit leased its

9  portion of the tunnel in exchange for a rent to equal 20% of

10 the annual revenues.

11     Last year, I believe, it collected $750,000.  The city

12 has no ability to vacate the lease which runs through 2020.

13 There is no ready buyer for it.  Given the lease which

14 encumbers the asset, there was no value to be realized there.

15 Indeed we recommended instead that the city audit the

16 operations of the operator to find out whether we'd be getting

17 a fair allocation of revenue.  And that audit is still

18 ongoing.

19 Q    Belle Isle Park.

20 A    Belle Isle Park is a major park of the city.  And we did

21 not believe that it would have any material value as any other

22 -- in any other application.

23     First of all, it would require re-zoning.  Re-zonings

24 typically are long and complex undertakings.  It is an

25 important social asset of the city.

1    Converting it into any kind of private use would again be

2   a long and contentious process.  We did not believe it could

3   be converted into any form of cash at any time soon.

4   Q    Next page, please.  The Detroit Institute of the Arts.

5   The number of words understates the interest in the problem.

6   Could you tell us what investigations and efforts have been

7   done with respect to the Detroit Institute of Arts?

8   A    Well, back in January when we first began our engagement,

9   we discovered, we had not known this before, that the City of

10  Detroit actually does own the building and the art collection

11  of the Detroit Institute of Arts which is operated on the

12  city's behalf by the DIA Corp. which is the founder society as

13  a contractor to the city.

14    We obviously were concerned about this and had to decide

15  whether or not this might be a source of value for the city.

16  I did meet with trustees and managers of the DIA in May and

17  explained to them that they should be concerned about the fact

18  that in the worst scenario the collection and the art might

19  need to be dealt with as part of a restructuring.  And it

20  would be in their interest as trustees of the operator to try

21  to secure funding from whatever source they could to give to

22  the city in exchange for a protective covenant.

23    I thought that would be a clever way of realizing short

24  term cash for the city which would not necessarily require the

25  arduous process of trying to take the art and selling it on a

 1  fire sale basis.

 2  Q    And what was the response?

 3  A    They told me that would be impossible, that no money was

 4  available from anybody that they knew, and that it was not

 5  something they would consider.

 6  Q    And subsequently did any office of the state weigh in on

 7  this issue?

 8  A    Yes.  The Attorney General issued an opinion that the art

 9  was in a public trust and could not be used for any other

10  purpose despite the fact that a significant part of the

11  collection had been paid for by tax revenues of the City of

12  Detroit.

13  Q    Has that progressed any further?

14  A    Somewhat.

15  Q    Has there been an attempt to value it?

16  A    In our recommendation to the emergency manager,

17  Christie's, which is an internationally known auction house

18  with expertise in these matters, has been engaged in a

19  appraisal of that portion of the collection paid for by the

20  city.  I expect to get a preliminary estimate from them in a

21  matter of weeks.

22  Q    City owned land.

23  A    Well, we originally hoped that this land could be quite

24  valuable.  It's not everyday that 22 square miles within a

25  massive urban area becomes available for re-development.  We

1  thought that should be of interest to some set of developers.

2      But again the land is in disparate parcels.  It's held in

3  disparate hands.  There are at last count five different

4  government entities that control different parts of the

5  property represented by this 22 square miles.

6      There is no coherent strategy for disposal, marshaling,

7  or re-development of this property.  In addition, much of the

8  land is still encumbered with blight.  It would require

9  significant investment to remove that blight.

10      And lastly, a lot of the land is subject to liens which

11  has not has been cleared.  And the cost of clearing those

12  liens, it would not be insubstantial here.  Again even though

13  individual parcels might be available for cash, there is no

14  substantial value to be realized from this today.

15  Q    Parking operations.

16  A    Again the city owns nine garages, many of which are being

17  operated by others.  We actually are in the process of putting

18  together an auction to sell the rights to use those parking

19  garages to others.

20      I would note that many of the garages are in such a

21  dilapidated condition they are unsafe.  Ironically enough the

22  garage supporting the DIA has been condemned.  It has not been

23  used for any commercial purpose for a number of years because

24  it's in such bad condition.  I'm not sure that anyone would

25  pay us for that.

1  Q    Next one.  The Joe Louis Arena.

2  A    Again, you know, it's an old facility, currently

3  obsolete.  We're entertaining alternatives for it, but we

4  haven't received any.

5  Q    And with respect to all of these assets sale

6  possibilities, or asset monetization possibilities, had they

7  all to your knowledge been the subject of discussion before

8  they appeared in this report?

9  A    Well, prior to our involvement, I can't testify to that.

10 But as we were engaged we immediately began to systemically

11 look at all these assets to find out whether any of them could

12 be turned into cash.  And it was the subject of intensive

13 analysis by my firm beginning in January of this year.

14 Q    All right.  And --

15        MR. CULLEN:  Pardon me, Your Honor.

16 Q    In the -- in the proposal itself, was there any

17 discussion of what would happen to further unsecured payments

18 of debt going forward?

19 A    Well, on June 14th we told the creditors, we had over 100

20 people show up at that meeting, that we had taken the decision

21 because of the city's dire cash position to not make the

22 $40,000,000 bond payment due on June 15th and that we would be

23 suspending all other unsecured debt payments for the

24 forseeable future in order to conserve cash.

25 Q    And did you view that as necessary in light of the

1 circumstances of the city?

2 A    We did, but we also felt we could take that step because

3 we were able to negotiate an agreement in principal just prior

4 to that date with the swap banks which we felt would allow us

5 to continue to have access to our gaming revenues which is an

6 essential condition to allowing the city sufficient time to

7 negotiate with the stakeholders.

8 Q    So again what was the relationship between the settlement

9 with the swap banks and the ability to negotiate?

10 A    Well, the swap banks already had one uncured default, the

11 ratings downgrade, the appointment of Kevyn Orr was in and of

12 itself a default.  And we knew that once we took the decision

13 to not make the bond payment, that would be another default.

14      At some point especially after the swap banks saw the

15 financial condition of the city, they might feel they had no

16 option but to be defensive in protecting their own position,

17 even if they didn't want to and block our access to gaming

18 revenues.  So having an agreement with them in place prior to

19 taking a decision to not make that bond payment was crucial.

20 Q    After the June 14th proposal in the public meeting at

21 which it was presented, did you make further efforts -- did

22 you make any efforts to generate counter proposals,

23 discussions, other -- other -- other interests?

24 A    Yes.

25 Q    What were -- could you describe generally those efforts?

1  First, let me put up a -- on the screen Exhibit 44, the full

2  version of the creditor's proposal.  Well, Pages 61 and 62.

3  Yeah, 61 and 62.

4      And is this the calendar that you set forth for your

5  efforts in the proposal?

6  A    Yes.

7  Q    Now what -- what did you personally do to try to talk to

8  contact various stakeholders?

9  A    Well, we were fortunate in one respect.  We had had a

10  very robust response to our invitation to the meeting on June

11  14.  We had been able to identify all of the bond trustees and

12  all of the bond insurers that insured much of the city's debt.

13      They effectively could be relied upon to speak for if not

14  actually vote the interests of their underlying bond holders.

15  And so we were very happy that they all agreed to come and

16  hear our proposal because we knew we could begin our

17  discussions with them.  They already were organized.

18      We also knew who could speak for the pension trusts and

19  they were invited.  And we also invited union representatives

20  who we hoped could speak for both the active and retired

21  employees of the city.  So they were all present on the 14th of

22  June.

23  Q    And was it -- was it your desire to promote discussions

24  and counter proposals?

25  A    That was the whole intent of the meeting.  We had spent

1  months developing the financial information.  We felt our

2  stakeholders deserved to be able to evaluate not only their

3  current conditions relative to the city, but evaluate the

4  proposal that we made to them at that meeting.

5      We wanted them to have exactly the same information that

6  we did.  We wanted to make sure they could rely upon it to be

7  accurate.  We wanted them to also understand that despite all

8  the promises had been made to both bond holders and others,

9  the city did not have the resources and likely would never

10  have the resources to honor those promises.

11      We felt they had to have information in order to

12  understand what we were asking them to do in terms of

13  compromising their claims to allow fair treatment for

14  everybody.

15  Q    In the discussions you had with any of the stakeholders,

16  did you encounter any resistance to the idea of compromising

17  their claims at less than 100%?

18  A    Nobody was willing to consider any proposal in which they

19  compromised their claims.

20  Q    And you're saying nobody, who do you mean?

21  A    Well, I was primary responsible for discussions with the

22  bond holders and other funded debt holders of the city.  And I

23  would further break that down between the Detroit water and

24  sewer revenue bond holders and the general obligation and comp

25  the bond holders of the city.

1     Given our expertise as investment bankers and the fact we

2   had relationships with most of these people, that made sense.

3   So I took primary responsibility for those discussions.

4     The discussions with our other claim holders, primarily

5   the pension funds, and retirees, and active employees were led

6   by Conway, MacKenzie and Jones, Day as well as some of my

7   partners at Miller, Buckfire.

8   Q   And what kind of a response did you get in those

9   discussions?

10  A   Well, in speaking with the bond holders, and again I'm

11  using that between both the secured bond holders and the

12  unsecured bond holders, nobody was willing to consider any

13  compromise of their claims whatsoever.

14    In fact even the secured bond holders, that is those bond

15  holders who held debt of the Water and Sewer Department were

16  very unhappy because our plan contemplated that if we were to

17  create a new authority controlled by the customers of it, that

18  we would want to take advantage of the fact that that

19  authority could borrow at a much higher credit rating than

20  Detroit could, and even though we were going to give them 100

21  cent recovery, it would not be in the form of new bonds that

22  would have the same old interest rates.

23    In other words they wanted to have the benefit of a

24  strong investment grade rating, but retain bonds that were

25  giving them interest at double B costs.  So even they didn't

1  like the proposal.  I was not surprised by that, but I hoped

2  that they would at least counter with something else which

3  they did not do.

4          THE COURT:  What -- what does the phrase double B

5  cost mean?

6  A    It refers, Your Honor, to a credit rating.  Cities as do

7  companies, borrow in the markets at a spread over the

8  so-called risk free rate, although some could argue to say,

9  I'm not sure what that is, but let's assume for the moment

10 that that's the treasury yield curve.

11        The double B cost would be perhaps a spread of 400 or 500

12 basis points over the treasury cost, whereas a single A cost

13 to borrowing might be only 100 basis points over.  So the

14 difference would be obviously reflecting the risk of a lower

15 rate of credit.

16 Q    Did -- did you receive any indications in your

17 discussions with any of these bond holders, that some of the

18 considerations in their negotiations or non-negotiations with

19 you, had to do with considerations that extended beyond the

20 City of Detroit?

21 A    Yes.  In discussions with the bond insurers who insured

22 the water and sewer debt, about five and a half billion

23 dollars of that, several of them also insured GO debt, general

24 obligation bonds of the city.

25        And they made it very clear to me that they were not

1  willing to consider any impairment of the GO bonds because

2  they believed that the GO pledge was so much more valuable in

3  every other jurisdiction of which they insured bonds, that

4  creating a precedent of impairment here would damage their

5  businesses elsewhere.

6  Q   And when you say GO bonds, explain to the Court what you

7  mean.

8  A   The city up until recent times, had been able to issue

9  unsecured debt that is not secured by a specific revenue

10 pledge, but secured instead by the full faith and credit

11 obligation to raise taxes sufficient to pay that debt when

12 due.

13     And there are two different kinds.  Unlimited tax and

14 limited tax general obligation bonds, both of which have been

15 considered for many years to be of higher credit and less risk

16 than revenue bonds because a revenue bond is specifically

17 secured only by the revenues of a project or an authority or a

18 utility.  Whereas bonds secured by taxing authority are

19 considered to be much safer because the city is required to

20 raise taxes in the ordinary course until that bond can be

21 repaid.

22     Now in the case of Detroit, of course, that's -- they've

23 come to the end of the road because on the property tax side

24 for a moment, we know that the property tax mileage that the

25 city is already assessing is already at the state maximum.  So

1  the city would have no ability to raise taxes or tax rates to

2  pay this debt.

3      That was anathema to the bond insurers because they had

4  operated, as does the municipal bond market, on the theory

5  that general obligation debts are higher -- higher credit and

6  less risky than revenue bonds.

7      We, on the other hand, when we did the math, recognized

8  the city could never begin to satisfy its unsecured

9  obligations which would include the general obligation bonds

10  and we had classified those bonds pari passu with the other

11  unsecured obligations of the city, in this case are under

12  funded pension claims and health care claims.

13  Q    If I could have you take a look at Exhibit 37.  Could you

14  blow that up a little bit, please?  This is a set of meetings

15  that I won't go through completely.  But if you'll just look

16  down the -- the left hand side and -- and across the top.

17      Can you tell me did you or representatives of Miller,

18  Buckfire participate in virtually all of these meetings?

19  A    Yes.

20  Q    Did the city ever receive a proposal from anybody?

21  A    We did.

22  Q    How many?

23  A    We received I would say one and a half.  One that was

24  actually written out and then to be responsive, the second was

25  really just a letter saying they'd like to come talk to us

1  again about something, but only if we would stipulate they'd

2  get 100 cent recovery.

3  Q    And was that the one or the one and a half proposal that

4  was attractive enough to follow up on?

5  A    No.  Because they were linking any willingness to

6  negotiate on water and sewer debt to our treatment of the GO

7  bonds that they also insured.

8  Q    What in your view is the alternative for the city if the

9  plan set forth in the June 14th proposal is not achieved?

10  A    Well, first, the city will not be able to execute is

11  reinvestment program.  It would simply not have the money.

12  That would mean the city would continue to be liquidated for

13  the benefit of its stakeholders.  Revenues are likely to

14  continue to decline.  Services will continue to deteriorate.

15  That would be the condition of the city in -- in the absence

16  of this plan.

17  Q    Is that a long term sustainable future for Detroit?

18  A    From a financial perspective, no.  Because I don't

19  believe if you want to measure sustainable future as having

20  access to the capital markets, that under that scenario

21  Detroit would ever have access to capital markets.  They would

22  have no credit.

23          MR. CULLEN:  That's all I have, Your Honor.

24          MR. MONTGOMERY:  If I may at this point.  I would

25  like to strike from the testimony the -- all of the opinion

1  testimony given by the witness for the last several questions

2  starting with how the capital markets are reacting, not

3  through conversations with the witness, but in general.

4      And I think this witness has given classic, wonderfully

5  prepared, rather wonderfully delivered, expert witness

6  testimony relying on hearsay, relying on specialized

7  knowledge, relying on years of accumulated talent and

8  education that this gentleman clearly has, but none of which

9  was offered prior to the pre-trial, or offered to Your Honor

10 as expert witness testimony.  I believe it should be stricken.

11          MR. CIANTRA:  UAW would join in that motion.

12          THE COURT:  I wish you had objected at the time.

13          MR. CULLEN:  Your Honor, part of our job here is to

14 set forth before the Court the story of the decisions that

15 were made and the reasons that they were made on behalf of the

16 City of Detroit.

17     This witness has done that.  He was an operative figure

18 in real time.  He has testified candidly as to the bases on

19 which his decisions were made, the things he looked at, the

20 advice he gave to the city as it faced these difficult

21 decisions.

22     The story cannot be -- this is a factual story.  It may

23 need a man of rare experience to tell it, but it is

24 nonetheless a factual story about things that were done in

25 real time, not about a piece of paper that was given to an

1  independent person to look at and -- a set of assumptions from

2  which to draw opinions.

3      This is the actor.  This is the actor at the heart of the

4  story and he is telling his story.  And as such, it has to be

5  admissible, if that as nothing else.

6      He is the man who made the recommendations.  He is the

7  man who presided over the analyses.  He has told that story

8  and told of the basis for making these.  Because it's -- it's

9  somewhat upside down, a -- an expert witness is qualified by

10  his expertise and nothing else.  That's why we let expert

11  witnesses testify only rarely and under certain circumstances,

12  but we let percipient witnesses testify all the time, all the

13  time to their experience, to what they saw and did, decided.

14      This man tells the story.  And that story is a factual

15  story by a percipient witness of rare gifts, but a percipient

16  witness.

17          THE COURT:  What -- what you say is good as far as

18  it goes, but it doesn't really meet the objection.  Because

19  the objection is that beyond explaining what the witness did

20  and why he did it, is the question of whether that constitutes

21  proof of the truth of the facts on which he relied to -- to

22  make the decisions that he made.

23          MR. CULLEN:  And -- and I would submit, Your Honor,

24  that the judgment of a sophisticated person in real time is

25  some proof of the truth of what they relied on.  I think that

1  that happens in -- in virtually every -- every case.

2        THE COURT:  Well, it strikes me that --

3        MR. CULLEN:  Some level.

4        THE COURT:  That this issue overlaps largely, if not

5  entirely, with the issue that you and your firm briefed here

6  this morning and that we're going to argue tomorrow morning.

7  So I would suggest that we hold the resolution of this until

8  then.  Do you have any further questions of the witness?

9        MR. CULLEN:  I -- I do not, Your Honor, at this

10 point.

11       THE COURT:  All right.  Counsel, do you want to

12 press ahead with cross examination at this time, or would you

13 prefer to break now and -- and resume in the morning?

14       MR. MONTGOMERY:  Your Honor, my colleagues had

15 suggested that we should break until tomorrow.

16       MR. RUEGGER:  Shocker.

17       THE COURT:  Yeah.  Apparently -- apparently there

18 was no vote for you in that, was there?

19 A   I didn't want to suggest that.

20       THE COURT:  Okay.  Well, we will -- we will break

21 for now.  It's fine.  We're close enough to 5:00 and so we'll

22 reconvene at 9:00 tomorrow morning.

23    Regarding our argument tomorrow morning on the issues

24 raised here just now and by the -- the memorandum that was

25 filed this morning, I certainly do not request that you take

1  your time to file a brief.  If you want to, obviously I can't

2  prevent it.  The sooner you file it, the more likely it is

3  we'll be able to read it and actually comprehend it.

4      So I would ask that if you do file something you do not

5  file it at ten minutes till 9:00 tomorrow morning, please.

6  But if there are authorities you want me to consider, feel

7  free to just bring them to Court tomorrow and we will deal as

8  best we can given the expedited nature of this.

9          MR. STEWART:  Thank you, Your Honor.

10         THE COURT:  All right.  So we'll be in recess.

11         MR. SHERWOOD:  Thank you, Your Honor.

12         MR. CULLEN:  Thank you, Your Honor.

13         THE CLERK:  All rise.  Court is adjourned.

14      (Court Adjourned at 4:42 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-1-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ITEM NO. 66**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          October 25, 2013
                 Debtor.          .          9:00 a.m.
. . . . . . . . . . . . . . . .

            HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
             BEFORE THE HONORABLE STEVEN W. RHODES
             UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:       Jones Day
                      By:  BRUCE BENNETT
                      555 South Flower Street
                      Fiftieth Floor
                      Los Angeles, CA  90071-2452
                      (213) 243-2382

                      Jones Day
                      By:  GEOFFREY S. IRWIN
                           GEOFFREY S. STEWART
                           GREGORY SHUMAKER
                           THOMAS CULLEN, JR.
                           MIGUEL F. EATON
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (202) 879-3768

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For the State of      State of Michigan
Michigan:             Michigan Department of Attorney General
                      By:  MATTHEW SCHNEIDER
                      P.O. Box 30754
                      Lansing, MI  48909
                      (517) 241-8403

                      Dickinson Wright, PLLC
                      By:  STEVEN G. HOWELL
                      500 Woodward Avenue, Suite 4000
                      Detroit, MI  48226-3425
                      (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP By:  SHARON L. LEVINE       JOHN K. SHERWOOD 65 Livingston Avenue Roseland, NJ  07068 (973) 597-2374 |
| For Detroit Retirement Systems-General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC By:  ROBERT D. GORDON       JENNIFER K. GREEN 151 South Old Woodward, Suite 200 Birmingham, MI  48009 (248) 988-5882 |
| | Clark Hill, PLC By:  RONALD A. KING 212 East Grand River Avenue Lansing, MI  48096 (517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &    Freedman, P.C. By:  BARBARA A. PATEK       JULIE BETH TEICHER       DAVID EISENBERG 400 Galleria Officentre, Suite 444 Southfield, MI  48034 (248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP By:  BABETTE A. CECCOTTI       PETER D. DECHIARA       THOMAS N. CIANTRA 330 West 42nd Street, 25th Floor New York, NY  10036-6976 (212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit<br>Retired City<br>Employees<br>Association,<br>Retired Detroit<br>Police and Fire<br>Fighters Associa-<br>tion, Shirley V.<br>Lightsey, and<br>Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |

```
For Detroit          Silverman & Morris, PLLC
Retired City         By:  THOMAS R. MORRIS
Employees            30500 Northwestern Highway, Suite 200
Association,         Farmington Hills, MI  48334
Retired Detroit      (248) 539-1330
Police and Fire
Fighters Associa-    Lippitt O'Keefe, PLLC
tion, Shirley V.     By:  RYAN C. PLECHA
Lightsey, and        370 East Maple Road, Fl. 3
Donald Taylor:       Birmingham, MI  48009
                     (248) 646-8292

For the Official     Dentons
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:                 ANTHONY B. ULLMAN
                          ARTHUR H. RUEGGER
                     1121 Avenue of the Americas
                     New York, NY  10020-1089
                     (212) 632-8390

                     Brooks, Wilkins, Sharkey & Turco, PLLC
                     By:  MATTHEW E. WILKINS
                     401 South Old Woodward, Suite 400
                     Birmingham, MI  48009
                     (248) 971-1711

For Retired          Strobl & Sharp, PC
Detroit Police       By:  LYNN M. BRIMER
Members                   MEREDITH E. TAUNT
Association:              MALLORY A. FIELD
                     300 East Long Lake Road, Suite 200
                     Bloomfield Hills, MI  48304-2376
                     (248) 540-2300

For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340
```

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.

4          ATTORNEYS:  Good morning, your Honor.

5          THE COURT:  I understand that the security lines

6    were long.  Does anyone know of anyone we need to wait for

7    here this morning, or can we get underway?

8          MS. BRIMER:  Your Honor, Ms. Patek is not here this

9    morning.  I don't know if anyone --

10          THE COURT:  Okay.  She probably is intending to be

11    here.  Let's see.  She's not directly involved in this

12    evidentiary issue we were going to start with here this

13    morning, so maybe we can proceed with that.  Okay.  So let's

14    do that.

15          The first thing I want to place on the record is

16    that the Court did review, as necessary, the Jones Day

17    memoranda that were submitted to it in camera.  The Court's

18    review of that material establishes really quite conclusively

19    that the material is attorney work product and that,

20    therefore, is not required to be disclosed by the city or its

21    counsel, and so the Court will so order.

22          In this regard, the Court will state for the record

23    that its review of that material was only cursory.  That was

24    really all that was necessary, and certainly the Court will

25    not take into account anything it saw in those memoranda in

1  deciding the issue of eligibility.  So, for the record, we

2  are going to return those materials to you, Mr. Stewart,

3  right now.  Will you come forward and accept them from us?

4          MR. STEWART:  Thank you.

5          THE COURT:  Thank you.  So the next order of

6  business will be for the Court to hear from counsel for the

7  objecting parties on the issue of lay versus expert testimony

8  here.  And, once again, before I forget, I want to again

9  request, counsel, that -- to remind counsel really that the

10  so-called rough transcript that you all have arranged for is

11  not the official transcript.  It is under no circumstances to

12  be cited in any pleading before the Court.  You may cite the

13  official transcript when and if it's produced, but the rough

14  transcript is for your purposes only and is not to be cited.

15  And as a result, I'm going to ask each of you to file amended

16  memoranda that strike your references to the rough

17  transcript.

18          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

19  on behalf of the Retiree Association parties from Lippitt

20  O'Keefe.  I just wanted to make clear on the record that

21  those objecting parties that are not making live objections

22  on the record or filing papers are relying on the evidentiary

23  objections made by those parties making those live

24  objections, and I just wanted to clarify that on the record.

25          THE COURT:  Absolutely.

1          MR. PLECHA:  Thank you, your Honor.

2          THE COURT:  And for the record, Ms. Patek has

3    arrived, so we can proceed.  Who would like to proceed?

4          MR. MONTGOMERY:  Good morning.  Claude Montgomery

5    for the Retiree Committee.  I am rising first, your Honor,

6    because I believe today's motions -- two part.  The city has

7    asked to reconsider your Honor's ruling with respect to the

8    exclusion of forecast testimony with respect to Mr. Malhotra,

9    and we have moved to strike the testimony of Mr. Buckfire as

10   having been unqualified expert testimony.  And so if I may,

11   first, I would like to point out to the Court I think you

12   will -- you may remember that the -- Mr. Malhotra testified

13   that he both examined and relied on a team of people to

14   examine both bank records and relied upon departments of the

15   city within which he was not employed in order to determine

16   what cash levels were.  Two, your Honor may recall that he

17   testified that he was not an officer or director,

18   shareholder, or owner of the city.  Of course, he couldn't a

19   shareholder.  Second -- third, your Honor may recall that

20   Mr. Buckfire, I believe, testified yesterday that they had

21   recourse to expert revenue and tax policy individuals that

22   were part of the forecasting team and that they -- I think

23   Mr. Buckfire testified yesterday that he was fortunate to

24   have had access to such people and that those individuals

25   participated in the generating of the forecasts.  Fourth,

1  your Honor, I think intuitively, at least intuitively for me,

2  the mere notion that using an Excel spreadsheet somehow

3  transforms the compilation of thousands of lines and

4  different kinds of formulas from being simple arithmetic into

5  something that a layperson can do by looking at their own

6  checkbook or bank accounts, quite the contrary.  I am not an

7  expert in using Excel.  It took me some training to be able

8  to do it, and I know from multiple efforts with my

9  secretaries that it is not something that the ordinary

10  layperson can do with a high school education.  And I, by the

11  way, think my secretaries are quite good.  And so, your

12  Honor, I think this falls squarely within the Sixth Circuit's

13  JGR Industries decision and which the debtor, the city,

14  acknowledges holds against them, excludes testimony, and does

15  so because there was no basis absent the -- in effect, the

16  owner being a part of the business exception and absent

17  individual effort at verification and absent simple

18  mathematics to allow the testimony to go forward.  And

19  perhaps, most importantly of all, there are cases where

20  historical records are allowed to be testified about.  I

21  believe the Sixth Circuit has a decision along those same

22  lines, your Honor, but this is a forecast.  This is

23  projecting into the future.  This is using assumptions,

24  assumptions that had to be created and referenced to some

25  specialized knowledge or understanding of not only how the

 1    cash got into the city but how it will get into the city in

 2    the future and what would be a reasonable basis to make an

 3    assumption for a going-forward prospect, so we think under

 4    those circumstances the cases, in particular, that the city

 5    seems to rely on just don't help it, and I think both Sixth

 6    Circuit cases are either squarely against it -- that is, the

 7    JGR case -- or clearly distinguishable on the ownership

 8    basis, which is the Lativafter Liquidating Trust, and that we

 9    suggest to you is the controlling authority.

10           We would note that the recitation by the city of

11    United States versus Madison, another Sixth Circuit case,

12    again, did not offer or involve a future forecast.  The

13    analysis that was allowed in that case was retrospective

14    only.  And, secondly, it was -- there were no complex

15    formulas and no assumptions, no assumptions applied in using

16    the work.  It was purely, if you will, large scale

17    ministerial effort, and I think the Court allowed it in.  And

18    interestingly I find and perhaps your Honor might that that

19    particular case also cites the DIJO versus Hilton Hotels case

20    and JGR as authority to support its holding where in the DIJO

21    case it was complex formulas that -- appraising economic

22    values of a lost contract that were excluded, so the Sixth

23    Circuit in the Madison case cites the boundaries of what

24    should be excluded, finds that it's retrospective only, it's

25    ministerial in its efforts and, therefore, says it's not an

1   abuse of discretion.  It's permitted in.  And I think here,

2   your Honor, this is clearly being addressed to your

3   discretion.  It is well within the bounds and even the

4   directions under 701 to exclude such testimony, and,

5   therefore, we would ask you to adhere to your Honor's earlier

6   ruling and not permit the forecast testimony of Mr. Malhotra.

7           Now, if I may turn to Mr. Buckfire, yesterday at the

8   conclusion or near the conclusion --

9           THE COURT:  One second.

10          MR. STEWART:  Your Honor, I don't wish to interrupt

11  Mr. Montgomery; however, this motion on Mr. Buckfire is brand

12  new.  It came to us this morning.  I got it at 6:52 this

13  morning.  I would suggest, no, that was not part of the

14  original motion.  The original motion was made only by AFSCME

15  with respect to Mr. Malhotra.  The Buckfire motion is new.

16  We would ask leave to just put in a paper on it lest we be

17  pulled into something we've not had time to prepare on.

18          THE COURT:  There was a motion to strike at the

19  conclusion of the proceedings yesterday, and I --

20          MR. STEWART:  A motion was --

21          THE COURT:  -- and I deliberately deferred it to

22  this morning.

23          MR. STEWART:  Right.  I withdraw my --

24          THE COURT:  All right.

25          MR. STEWART:  Then I'll sit down.

1          THE COURT:  Go ahead, sir.

2          MR. MONTGOMERY:  Successfully thrown off my --

3          MR. STEWART:  I'm sorry.  I apologize.  I apologize.

4          MR. MONTGOMERY:  -- my game, your Honor.

5          THE COURT:  I'm sure that was not the intent, but

6    you were about to talk about Mr. Buckfire.

7          MR. MONTGOMERY:  I was.  Now, although we do not

8    have a transcript on which we can rely, I would ask your

9    Honor to look at the -- your Honor's memory of the questions

10   beginning with an explanation of the GO bonds, the general

11   obligation bonds.  You may recall that Mr. Buckfire then

12   launched into a fairly intriguing explanation of GO bonds and

13   matters that he tied to the marketplace and the nature of

14   risk and the nature of interest rate costs associated with

15   risk and the differences between interest rates for taxing

16   authorities and nontaxing authorities and how that all played

17   a role.  And he concluded at the end of his testimony, if I

18   remember correctly, that -- with an opinion on long-term

19   sustainability for the future of New York, again, pure expert

20   testimony regarding access to capital markets, a subject in

21   which he was clearly an expert, clearly had gained knowledge

22   over time, and it was -- it is something that is quite often

23   the subject of admissible expert testimony.  I think we

24   pointed out, your Honor, orally yesterday that this

25   individual was not identified as an expert in the pretrial.

1    In fact -- and I think the city made a quite conscious choice

2    that they weren't going to use experts at all in this case

3    and Mr. Buckfire just being the last and final manifestation

4    of that strategic or tactical decision, and we think that in

5    the case of Mr. Buckfire, while he put in a lot of factual

6    and historical information, those last questions that were

7    asked and answered beginning with the discussion of the GO

8    bonds are pure opinion, rely entirely on expert

9    understanding, rely entirely on information gathered that

10   would have been or is hearsay insofar as this Court is

11   concerned, and under 702, since he was not a qualified

12   expert, was not identified as an expert to be -- to testify,

13   that his testimony should be stricken.

14           THE COURT:  Thank you.

15           MR. DECHIARA:  Good morning, your Honor.  Peter

16   DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

17   the UAW International Union.  I'll begin with the Malhotra

18   piece of this issue.  We agree entirely with the city's

19   reliance on the key case of JGR, a Sixth Circuit 2004 case.

20   And that case, we agree with the city, is squarely on point,

21   and it's squarely on point in our favor.  The holding of that

22   case was remarkably similar to the facts here.  In that case,

23   the Court held that the admission of lay opinion by an

24   accountant about the company's lost profits was not

25   admissible, not admissible, when two things:  the accountant

 1    was not the owner, officer, or director of the business, and,

 2    two, relied for information principally on the business

 3    itself.  Here what do we have?  We have Mr. Malhotra, who, as

 4    I asked him at the very outset of my cross-examination

 5    yesterday, I asked him whether he was an officer or whether

 6    he had any elected or appointed position with the city, and

 7    he indicated he was not, but then I went further, your Honor,

 8    and I asked him was he directly involved in running the

 9    business of the city, and Mr. Malhotra clearly indicated that

10    he was not directly involved in running the business of the

11    city.

12         Then the question becomes where did he get the

13    information he relied on.  Well, let's look at Mr. Malhotra's

14    declaration.  It's Exhibit 8 in the record, paragraph 14.

15    I'm going to start reading from the second sentence.  His

16    declaration says, quote, "EY used the city's publicly

17    available historical financial data," and then I'll skip over

18    the piece of it that just refers to the 2012 CFR, and then

19    the sentence continues, "and other information provided by

20    the city and its other advisors.  EY did not audit the city's

21    historical financial data.  Rather, EY relied upon the raw

22    data provided by the city, including the underlying data that

23    the city used to prepare 2012 CAFR and previous financial

24    reports."  So this case, the case of Malhotra, on this issue

25    is squarely on point with the binding decision and the

 1   holding of the Sixth Circuit in the JGR case, and we think,

 2   your Honor, that that is dispositive on the issue that

 3   Mr. Malhotra's forecasts are inadmissible lay testimony.

 4        There were a couple other points.  I think they were

 5   sort of tangential points that the city made in its brief,

 6   and I'd just like to address those.  In paragraph 7 of the

 7   city's brief, it says that -- the city's brief says, "In any

 8   event, even if the Court does not permit Mr. Malhotra to

 9   provide lay testimony on the cash flow forecast he prepared

10   for the city, the economic projections offered in

11   Mr. Malhotra's testimony will still be probative of the

12   city's financial condition."  Well, that's -- what the city

13   is arguing there is that his -- Mr. Malhotra's forecasts

14   should come in for the truth of the matter as to what the

15   city's financial condition is.  That's exactly what it should

16   not be allowed to come in for.  And I think your Honor made

17   that clear in your prior rulings, and we think that should be

18   upheld.

19        And then one last point on Mr. Malhotra.  In

20   paragraph 8 of its brief the city argues that Mr. Malhotra's

21   forecasts were not prepared in anticipation of litigation.

22   Well, whether that's true or not is irrelevant.  The guiding

23   Sixth Circuit precedent, the JGR case, doesn't incorporate

24   that as an issue or a deciding factor, but -- and I think

25   this is interesting, your Honor.  It was interesting that in

 1   arguing that Jones Day's memos were work product, the city

 2   argued that going back months and months and months before

 3   the bankruptcy filing that Jones Day was preparing these

 4   memos because they knew something was going to happen.  The

 5   financial condition of Detroit meant there was going to be

 6   some legal proceedings or lawsuits.  So why is it consistent

 7   for the city to argue that what Jones Day was doing was

 8   somehow in anticipation of something related to litigation,

 9   but Mr. Malhotra's forecasts, which were prepared in this

10   exact same time frame, why are those not in anticipation of

11   some legal proceedings?  But be that as it may, whether or

12   not it's prepared for litigation is irrelevant.  The key

13   points are he was -- it was inadmissible lay testimony by

14   someone who was not an officer or owner of the entity and who

15   relied on information obtained from the entity itself.

16           Let me now move to Mr. Buckfire.  Mr. Buckfire was

17   asked questions such as -- and I'm relying on my notes.  He

18   was asked during his direct whether it was economically

19   sensible, economically sensible, for the city to remove

20   blight.  He was asked what, in his view, was the alternative

21   for the city if the June 14th creditors' proposal was not

22   accepted, what was the long-term sustainable -- whether the

23   city's current finances were sustainable in the long term.

24   Now, your Honor, those are all expert questions, and the

25   thing is it seemed natural to all of us when we were

1　listening to Mr. Buckfire answer those questions -- it seemed

2　natural to hear his opinion because the truth of the matter

3　is -- the real fact is he is an expert.  He's an expert

4　investment banker who has a lot of experience in this area,

5　but for some unfathomable reason, the city has made a

6　decision not to use him and not to qualify him as an expert,

7　so for purposes of this proceeding, Mr. Buckfire's testimony

8　in response to those questions was no more deemed worthy of

9　credit than if we had taken a random person off the street.

10　If instead of putting on Mr. Buckfire the city had put on the

11　taxi driver who drove Mr. Buckfire here from the airport and

12　asked the taxi driver what is the -- is the city's finances

13　sustainable in the long term, does it make economic sense

14　to -- the Court would not have allowed the taxi driver to

15　answer those questions.  For purposes of this proceeding,

16　because the city made that strategic decision, Mr. Buckfire

17　is no more qualified to answer those questions than the taxi

18　driver.  Thank you.

19　　　MS. LEVINE:  Good morning, your Honor.  Sharon

20　Levine, Lowenstein Sandler, for AFSCME.  Trying not to

21　duplicate but making similar arguments, with regard to both

22　E&Y and Miller Buckfire, these are expert witnesses.  They're

23　relying on financial assumptions.  They're scrubbing numbers.

24　They're getting in hearsay evidence that would not otherwise

25　be admissible before this Court in the form of publicly

1  available financial information prepared by the city to

2  audited financial statements prepared by other experts not

3  called upon to testify before your Honor.  We would

4  respectfully suggest that it would be telling just to go back

5  to the statute itself.  If you take a look at Rule 401, if a

6  witness is not testifying as an expert, testimony in the form

7  of an opinion is limited to one that is rationally based on

8  the witness' perception, helpful to clearly understand the

9  witness' testimony or determining facts in issue, and not

10  based on scientific, technical, or other specialized

11  knowledge within the scope of Rule 2002.

12          So then we turn to Rule 2002.  A witness who is

13  qualified as an expert by knowledge, skill, experience,

14  training, education may testify to opinion.  That's exactly

15  what we have here, your Honor.  If you take a look at the

16  paragraph --

17          THE COURT:  I think you're referring to Rules 701

18  and --

19          MS. LEVINE:  702.

20          THE COURT:  -- 702.

21          MS. LEVINE:  Right.  To further assist in projecting

22  future economic trends -- and this is paragraph 16 of the E&Y

23  declaration; it's Docket Number 12 -- E&Y sought the advice

24  and input of its own internal team members with experience in

25  economic forecasts impacting the likely future property and

1   income tax revenues.  The testimony on the stand, your Honor,

2   similarly relies on input from Milliman, input from audited

3   financial statements.  In addition to that and with regard to

4   Ken Buckfire, same -- and I won't go through the examples.

5   Your Honor already has them.  But it is not simply putting

6   somebody on the stand with a factual understanding of the

7   city's financial issues and giving testimony that any other

8   layperson could give.  And more than that, your Honor,

9   neither of these are elected officials or city employees,

10  which means not only is it not a business owner exception,

11  but it's not a hearsay exception.  In other words, there's

12  nobody who looks at these.  Neither E&Y nor Miller Buckfire

13  review the City of Detroit's books and records in the

14  ordinary course of business.  The way they come into every

15  single situation where they're an expert witness -- they're

16  brought in as an expert witness for that very purposes.

17  They're allowed to rely on the books and records of their

18  client, but this is not a business record exception.  It's

19  not a business owner exception.  It's not a hearsay

20  exception.  What it is, your Honor, is disguised expert

21  testimony.  If it's truly simple math, why do we have to hire

22  E&Y, Conway MacKenzie, and Miller Buckfire to do it for us?

23  Thank you.

24          THE COURT:  Anyone else?

25          MR. STEWART:  Thank you, your Honor.  It's going to

1  take me a minute to get organized.  So I submit that actually
2  this is a fairly easy question, not easy to resolve but easy
3  to analyze, and let me do so this way.  We're talking about
4  what does Rule 701 mean and how is it to be applied.  We
5  don't need to guess because the people that wrote it told us,
6  so let's put up the advisory committee -- while that's being
7  put up, I just want to deal with one issue in passing as to
8  Mr. Buckfire and also Mr. Malhotra.  The suggestion was made
9  that because they have all this expertise, they could only
10  testify as expert witnesses.  The paragraph -- keep that up,
11  if you'd like, Lauren.  The advisory committee actually
12  answered that, too.  This is not what's up on the screen.
13  It's the advisory committee comments to the 2000 amendments,
14  and I know these books come out every year, but mine is on
15  page 460.  And the committee wrote, "The amendment does not
16  distinguish between expert and lay witnesses but, rather,
17  expert and lay testimony.  Certainly it is possible for the
18  same witness to provide both lay and expert testimony in a
19  single case."  And I said I'm just really dealing with that
20  in passing because I want to put to one side the proposition
21  that the fact that these witnesses have expertise means that
22  they were precluded from giving lay testimony, but the reason
23  now I put this up is this is what the advisory committee that
24  wrote the rule said.  Although many cases have interpreted
25  it, what is useful about this is they told us what they

1  meant, and it says, "For example, most courts have permitted

2  the owner or officer of a business to testify to the value or

3  projected profits of the business, without the necessity of

4  qualifying the witness as an accountant, appraiser, or other

5  similar expert," and they cite a case called Lightning Lube,

6  Inc., which was from the Third Circuit.  So what I think we

7  ought to do is go to Lightning Lube since the authors of this

8  looked at that case and obviously were -- thought it was what

9  they wished to implement here.  Now, Lightning Lube -- and I

10  think I have copies of all -- of many of these, Judge, and if

11  you'd like I may pass them up.  I have a copy also for

12  counsel.  However --

13         THE COURT:  It's not necessary, sir.

14         MR. STEWART:  Okay.  Thank you, your Honor.

15         THE COURT:  If others would like them, that's fine,

16  but it's not necessary for me.

17         MR. STEWART:  So what happened in Lightning Lube?

18  Lightning Lube involved a man named Venuto, and he was

19  starting a chain of -- I don't know what you call them --

20  centers like a Jiffy Lube.  And he had a deal with one of the

21  lubricant oil companies, and the deal fell apart, and it

22  ended up in a large business failure case.  And one of the

23  interesting facts about the Third Circuit opinion is just

24  the -- all the lawyers that appeared in it, but the Court

25  said Mr. Venuto could testify about the projected profits

from his business.  It didn't say no forecast.  It didn't say

you can't have projections.  It said he was allowed to.  And

by the way, not only was he allowed to testify about the

projected profits from his business, the Court also said it

was not a problem in affirming the admissibility of this

evidence that he had relied on -- in part on a report that

came from a third party, so it's not required that it be only

his knowledge.  And, similarly, let me dispense with another

point.  The advisory committee made a distinction in this

rule and carved out what other courts have sometimes called

the owner-officer exception to the rule, and so there's a

sub-body of a case law on this.  There are other cases

involving criminal law and so on, but there's a line of cases

on owner-officers.  Few things are clearer than the fact that

is a label, not a requirement, and any number of the cases

allow people who are not owners or officers to testify as lay

experts under Rule -- I mean lay -- give lay opinion under

Rule 701.  The Sixth Circuit not long ago in a case I have

trouble pronouncing, but it seems to be something like

Lativafter, allowed an outside investor to do so, so I don't

think we should be confused by the name of the exception

since we know what it means.

So let's go back to Mr. Venuto, and Mr. Venuto --

this is -- I'm going to paraphrase or I could read from what

the Third Circuit said in Lightning Lube.  It says Mr. Venuto

1　calculated future profits, so we're not talking about
2　historical; we're talking about future profits -- in two
3　ways.  First, he calculated the profits he would have earned
4　on the 117 franchise contracts that he actually sold.  Venuto
5　predicted that after four years in business, each center
6　would have been generating $28,000 in royalty fees.  Given
7　this calculation plus the money the franchisees would have
8　earned in the first four years, Venuto predicted that he
9　would have earned $27,729,000 in future profits from the 117
10　existing contracts through 1996.

11　　　　　Next, Venuto calculated the lost profits on
12　franchises he expected to have sold based on projections he
13　developed with an accounting firm when he planned to take the
14　company public.  Venuto predicted that he would have sold 370
15　more franchises over the ten-year period; that all of them
16　would have opened, parens, 37 each year, close parens, and
17　that he would have earned $43,821,000 from these franchises
18　using the formula discussed above.

19　　　　　Now, if this were simply one of the various cases
20　that go back and forth on the subject, we'd say, well, that's
21　an interesting case, let's look at the others, and we will
22　look at others, but to make the obvious point, this is the
23　case the advisory committee cited, and it is the only case
24　the advisory committee cited.

25　　　　　So now let's go to the cases that have been cited by

the objectors, and let's start with the one that they began

with, JGR, a Sixth Circuit opinion from 2004.  In JGR there

was a lay witness who was put on the stand.  His name was, I

think, Gornik.  And his lay testimony was going to be about

the value of the business.  He was excluded.  The reason he

was excluded was not that a lay witness can't talk about

future events at a company.  He was excluded because he

didn't know about it from firsthand knowledge.  He didn't

happen to be an officer or employee of the company, but more

to the point, his information was cobbled together at the

last minute, and he failed the leg of this that he had to

prove, that he had particularized knowledge of it.  And as is

so often the case, the footnotes tell us a lot about this,

and this is what the Court wrote in footnote three.  It said,

"The district court's apparent assumption that Gornik was a

'factual witness'" -- that was in quotes -- "who, quote,

'does JGR's books,' unquote, is false.  In fact, Gornik was

never an accountant for JGR and never did its books.  His

first experience with JGR was in March 1999 when he was

contacted by JGR's trial counsel for the purpose of, quote,

'putting down on paper what the financial statements of

Gerald's Furniture would have looked like had Thomasville

support to the business continued and had the owners been

able to carry through on how they planned to operate the

business.'"  So JGR does not stand for any broader principle

1   than this, and I would suggest, your Honor, that there are

2   two steps to our analysis.  Step number one, does the witness

3   have personal particularized knowledge of the facts in

4   question?  Two, is he using that personal particularized

5   knowledge to give his testimony?

6          Now, I'm going to come back to that, but I also want

7   to deal with the DIJO case -- D-I-J-O, and I'm pronouncing it

8   as DIJO, and I think various lawyers mentioned it.  DIJO was

9   a hotel case of some sort, and there was -- this is a Fifth

10  Circuit case, but it's cited in the other cases.  And there

11  there were two witnesses.  There was a man named Skinner, and

12  Skinner didn't really work for the company, didn't know very

13  much.  They were offering him, once again, to testify about

14  projections, and they said he doesn't have the particularized

15  knowledge that's necessary, so they didn't let him testify.

16  Stuck in the back of the opinion, though, is something else.

17  It turns out in DIJO there were two witnesses.  There was a

18  man named Turner.  Quoting from the Fifth Circuit opinion,

19  "The Defendants also contend that the District Court erred

20  when it permitted Turner to testify about DIJO's lost

21  profits.  Turner testified that the proposed hotel would have

22  generated a net income of $633,000 a year.  Based on that

23  projection, he offered his opinion that the business would

24  have been worth 5.45 million if sold in its fifth year.

25  Turner was one of DIJO's two principals, and his estimates

were based on his own involvement in developing the Project.
In light of the foregoing discussion of the boundaries of
Rule 701, we cannot conclude that the district court abused
its discretion in admitting Turner's lost profit testimony."

So these cases do not stand for a hard-and-fast rule
about ownership. They stand instead for the two steps that I
mentioned earlier.

Now, as to step one, did Mr. Malhotra have personal
and particularized knowledge of the city's finances and the
numbers that came out of the city's books and records? I
think his testimony establishes that. I had actually
excerpted all of it, but I did so from the transcript we are
not using, so I'm not going to go further in terms of
citations, but I think it was quite clear what his knowledge
was. He was hired in May of 2011, about 30 months ago if my
counting is right. He wasn't hired because of lawsuits nor
of impending bankruptcy. His retention preceded, I think,
even the financial stability board. It appears he was hired
because the city had laid off so many of its workers it
couldn't do this job itself, and so for the past two and a
half years Mr. Malhotra has accumulated information, he has
analyzed it, and that's where his work comes from. I think
it's apparent -- and I don't think anyone is challenging
seriously that he has the level of personal and
particularized knowledge that's required by Rule 701.

1          So then the question becomes the second leg of it,

2 and that is is he using that particularized knowledge in

3 giving his opinion.  There was a case, for example, in the

4 Bankruptcy Court in New York, and it's cited, I believe, in

5 the objector's brief, called MarketXT.  Like all these cases,

6 they all -- since they're fact-based, are all illuminating no

7 matter where they come out.  And in MarketXT, there was a

8 witness -- and I don't remember his name, but I have the case

9 here, but it's not important -- who is a principal of -- I

10 guess it must have been the debtor.  And he was there to

11 testify about the things we talked -- projections, future

12 profits, current value, all of the things that we see in this

13 line of cases.  What they did, though, with this expert --

14 and I actually should dig it out because it's such an

15 interesting case -- they said, "You can't testify about that.

16 This model you've got has discounted cash flow values.  It's

17 got all kinds of theoretical economic elements to it.  And

18 that's not who you are, Mr. Witness, you are just the fellow

19 who worked for the company.  So they said, "We're not going

20 to let you talk about it," but then the Court gratuitously

21 said, "You know, if they'd offered him as a 701 witness, we

22 would have received his testimony," because then he would

23 have been talking about what he knew and he could have used

24 the standard types of approaches that the other 701 cases

25 have talked about.

1          So when you look at where these cases fall out --
2     and I think in the end it becomes something like a question
3     of fact -- what you find, I think, is this.  There's no hard-
4     and-fast rule that you have to be an owner or officer.  There
5     are cases where that's not the case.  There's no prohibition
6     on relying from information that comes from other people, and
7     there are any number of cases that certainly permit that to
8     be done.  LTV is one.  This case, Lativafter is one.
9     Lightning Lube itself was one.  There's no prohibition on a
10    lay witness having specialized technical information provided
11    that's not what he's using or that's not what he's talking
12    about.  He's not giving an expert opinion in that sense.
13    Instead, it is how does it relate to what he knows?  And in
14    cases like the one I just mentioned, MarketXT -- there's
15    another one, I think, called Lifewise where a 701 witness was
16    asked to testify about a complicated econometric model, and
17    the Court didn't accept it for that reason.  Where that's the
18    case, although the witness meets leg one, he or she doesn't
19    meet leg two.  However, one thing is quite clear.  Where the
20    witness is working from and has the particularized personal
21    knowledge and is using that to provide projections,
22    forecasts, and similar, the courts do allow it.
23         Now, I think one of the main objections we run into
24    here is, yes, that's true, but this is just a heck of a lot
25    of information, and it is a lot of information.  I think when

1  we're dealing with an enterprise the size of Detroit, there's

2  no getting around that.  The courts, though, never say this

3  rule only applies in narrow circumstances and when you're

4  dealing with a narrow data set.  The rule is instead do you

5  have the knowledge, and is that what you're using.  The fact

6  assumptions are used makes no difference.  Every single one

7  of the cases I recited and the rest, the witness uses

8  assumptions.  He or she has to.  They're forecasting future

9  profits, and every one of these cases is a case about future

10  profits or future value or future this or future that, so

11  that is not a disability.

12         What it comes down to then is how then did he use

13  his particularized knowledge to prepare his analysis, so

14  let's start with what the particularized knowledge was.  What

15  his particularized knowledge was -- hang on; I wrote it down

16  for myself so I wouldn't forget it -- the historical data

17  about the city, which he said in his declaration came from

18  the CAFR and many other publicly available sources; the

19  city's bank records; internal reports that he got from the

20  city; factual matters.  And by the way, this is not hearsay.

21  I established a business record exception for that when I

22  asked him at the beginning of his testimony, "Were these

23  materials that the city prepared in the ordinary course of

24  its business?  In your experience, do cities and other

25  enterprises prepare materials like these in the ordinary

course of their business?" And he said, "Yes," and that was
never challenged, and so he's not being used to get in
hearsay on that basis. These are business records, and I
don't think anyone ever contended otherwise.

What else did he add? He added known changes coming
in the future, the city's budgets, which are predictions;
cost of living clauses in contracts; information he did
receive from actuaries about changes in pensions. However,
the actuary in question was their actuary, Gabriel, Roeder.
Information about state revenue sharing, changes in tax
rates. What about assumptions given to him by others or that
he made, rate of growth or rate of decay in tax -- property
tax receipts, rate of growth or rate of decay in income tax
receipts, assumed rates of inflation, changes in population
of the city. Now, those are assumptions, but they are no
different qualitatively than what Mr. Venuto did when he
predicted how many franchises he thought he would be selling
in the next four years and how those franchises would do in
the next ten years. And the Court not only thought that it
was fine, so, too, did the advisory committee. What about
other things that went in? And let's, if we could, put up
Exhibit 9 I think it is, page 2. This is one of the
exhibits, your Honor, obviously we spent a lot of time on,
but it's illustrative. That tells you what is his
particularized knowledge, and there is a list of it on the

1  left-hand side, and we spent a lot of time going over what is

2  each of these things, but he has knowledge about things like

3  lumpiness of revenue receipts. They don't come in a smooth

4  way. Remember the testimony is you get a bunch and then

5  nothing happens for awhile. When is it that the city

6  receives -- it's every other month -- its revenue sharing so

7  he could put in the spreadsheet when that arrives? What is

8  the expected availability of the escrowed funds that came

9  from the state-sponsored financing that the city floated?

10 And perhaps also which of the numbers he gets from the city

11 are the most reliable? Maybe it's a personal judgment which

12 ones he finds most materially useful to him. So these are

13 all things that he gets as a result of his work.

14      Now, I think it was Mr. Montgomery raised the point

15 about using an Excel spreadsheet, so let me spend a minute on

16 that. I think if you're above a certain age, maybe it's

17 not -- I think you're younger than me -- it may be more of a

18 challenge. It comes preinstalled on every computer in this

19 courtroom. It is the way business is now run. It is the

20 standard method used not by experts but by everybody to

21 organize financial information. There's nothing suspect

22 about taking the city's information and putting it into a

23 spreadsheet.

24      Now, what does a spreadsheet do and the real

25 question, does using a spreadsheet convert Mr. Malhotra's

1  approach into one that used scientific or other technical or
2  specialized knowledge, which was the test under 702, and 702
3  gets imported into 701 by dint of 701(c), which is the very
4  thing -- added in 2000, which is the very thing the advisory
5  committee was talking about in the text we had on the screen.
6  So what does he bring into it?  He brings in labels, which
7  tells us what information he's talking about.  He brings in
8  dates, what period he is forecasting.  He puts in the numbers
9  that he has, and they repeat either verbatim or they repeat
10 based on knowledge he has such as when does the revenue
11 sharing money come in, or they repeat because he's using some
12 kind of a metric to increase or decrease them over time.

13     Now, what he's doing here is addition and
14 subtraction, maybe division, probably multiplication.  There
15 was no evidence and no one asked him this, that behind this
16 stood some kind of complicated econometric model of the sort
17 that other courts have rejected.  He was there to be
18 examined.  No one asked him that.  In fact, I asked him how
19 he calculated, and he said it was arithmetic.

20     Now, there is in the tone of the papers -- and I'm
21 not criticizing counsel at all -- the suggestion that this
22 was some sort of stealth means of springing a surprise on the
23 objectors.  The fact of the matter is that document was in
24 Mr. Malhotra's declaration, which the objectors have read
25 from this morning and has been in the public domain since

1  July 18.  Ernst & Young, who we don't control, wrote a letter

2  to the objectors saying, "If you wish our back-up papers,

3  you'll have to subpoena them, but serve a subpoena on us, and

4  we will produce them."  No subpoena was ever served.  We

5  identified this document as a back-up for hearsay purposes as

6  a compilation under Federal Rule of Evidence 1006, and we

7  sent a letter to the objectors saying, "If you want to see

8  the back-up materials, they're available for examination.

9  Please call Ernst & Young."  One objector called.  No one

10  ever came.

11      Mr. Malhotra was deposed not once but twice.  I was

12  there both times.  The first time especially he was examined

13  at no small length about his spreadsheets.  It went on for a

14  long time.  He answered every single question put of him.  If

15  after that first deposition there had been uncertainty, there

16  was a second deposition coming and an opportunity in the

17  meantime to go get any documents they might need if they

18  wanted to dig deeper with Mr. Malhotra.  That did not happen.

19  So this is not a case where there was surprise.  It's not a

20  case where this was concealment.  It is, instead, I think, a

21  fairly classic case of everything was available.

22      Is this complex?  Yes, it is.  I don't deny it.

23  Does that mean that it can only be addressed by an expert

24  witness under Rule 702?  The cases do not say that.  Now, the

25  advisory committee rule and the cases that speak about it are

1  quite clear. A lay witness who has personal particularized

2  knowledge about facts may offer his opinion -- his opinion --

3  the rule says "opinion." He can offer his opinion about

4  future profits, forecasted value, and those other things that

5  go off into the future, and it is admissible. The issue

6  here, I think, is one only of magnitude when it comes to

7  Mr. Malhotra, but that was something we've all known from day

8  one. It was disclosed on day one. He's been deposed two

9  times. There's been opportunity for other discovery, and he

10  was here and cross-examined. I thank you, your Honor, for

11  your patience.

12          THE COURT: You want to turn your attention to the

13  Buckfire issue?

14          MR. STEWART: I will, your Honor. I think a lot of

15  that is the -- it's the same basic analysis, so I -- with the

16  rule, and so I won't repeat any of that. Mr. Buckfire

17  testified -- by the way, one other minor point here. Cases

18  also say just because someone has scientific, technical, or

19  other specialized knowledge and that makes it easier -- we

20  can keep that up if you'd like because I was going to point

21  to that in a moment -- and that makes it easier for them to

22  do things like pull all this together, it doesn't convert

23  them into a 702 witness. And they spoke at one -- it was one

24  of the cases, and I'm not sure I know it off the top of my

25  head, which spoke about a witness' computer knowledge making

1   it easier for that witness to put his or her projections

2   together, and there were others as well.  So the fact

3   somebody has a lot of expertise doesn't disqualify them or

4   change things.

5        Now, with Mr. Buckfire, one thing was apparent.

6   He's a highly skilled, very experienced, highly intelligent

7   investment banker who's been in the business a long time and

8   has done restructurings a long time and knows an immense

9   amount about it.  No question about that.  And he -- that

10  came out in his background and otherwise.  It's also clear

11  that when he was hired by the city, he began working very

12  hard to learn everything he could about the city, and he

13  relied, among other things, on Mr. Malhotra's work.

14       His subsequent testimony was about what that -- what

15  those -- how those projections fit into his other work and

16  what it was he did or felt he had to do based on the state of

17  the facts that he found when he came to this job.  And as I

18  understand the particular objections that we're facing to his

19  testimony, one had to do with his statement about GO bonds

20  and the accessibility of the credit market to the city.  I

21  think that somebody with his level of knowledge of the city

22  can say, "I'm looking at what their numbers are, and these

23  numbers will not allow you to borrow money on the bond market

24  because the numbers are negative."  And there were other

25  parts of the testimony as well, your Honor, but I think, as

1    Mr. Cullen said, at the end of Mr. Buckfire's testimony, much

2    of what he was talking about and asked about and testified

3    was about his own conduct and that his conduct and

4    conclusions were in and of themselves operative facts in the

5    lead-up to the city's decision to file for bankruptcy, and

6    they were certainly probative of good faith, but I assume

7    that's not what we're here to talk about.  And as a result,

8    Buckfire's testimony on the subject is also qualified lay

9    testimony because he was taking the facts that he had, which

10   were particularized and personal, and he was -- pardon me --

11   applying those looking forward as a projection as how this

12   affected the city's ability to borrow money, which is no

13   different than projecting an enterprise's ability to earn a

14   profit, and the city's ability to do other things.

15        One last point that troubled us on this -- and

16   actually on both, but I'll focus on Mr. Buckfire -- that

17   objection also came in a little late at the very end of his

18   testimony, and had it been made in a timely way, perhaps the

19   questioning could have taken a different course to avoid

20   this.  I'm not trying to impugn motives of anyone, but, as a

21   practical matter, it did change how the examination of

22   Mr. Buckfire went and I think may have led to some of the

23   very issues that they now raise, and it would have been

24   easier for us all perhaps had the objection been made at the

25   time.  And if the Court has no questions --

1    THE COURT:  No.  Thank you.  Excuse me.  Any brief

2  rebuttals, please?

3    MR. DECHIARA:  Your Honor, I find it interesting

4  that the city begins its legal analysis by reliance on the

5  advisory committee notes to the rule as if the advisory

6  committee notes to the rule were somehow in opposition to the

7  JGR case, the governing Sixth Circuit case.  Well, JGR quotes

8  from and discusses the advisory committee notes before it

9  reaches the holding that it does, so there's nothing

10  inconsistent between the advisory committee notes and the

11  Sixth Circuit's holding in the JGR case.  It's the JGR case

12  which is -- which governs here.

13    It's also curious counsel cited in his oral argument

14  just now the JGR case, and I think he said it's something

15  that we cited, we, the objectors, but that is the lead case

16  in the city's papers.  It's block quoted in paragraph 2 and

17  then cited throughout, so there's -- I don't think there's

18  any dispute between the parties here that JGR is the case

19  that's relevant here and that governs.  We're not -- there

20  was lengthy discussion by counsel about a Third Circuit case,

21  and if this courtroom were in New Jersey or Pennsylvania,

22  that would probably be more interesting, but this is a

23  courtroom in Michigan in the Sixth Circuit, and we're bound

24  by Sixth Circuit law, the JGR case.

25    Then, having cited it as its lead case, the city now

1    tries to run away and distinguish the case, and how does it

2    try to distinguish the case?  By citing facts in the

3    footnotes.  Well, there's a reason a court puts facts in the

4    footnotes, and it's because they're marginal.  The key facts,

5    the holding, is in the body of the decision, and let me just

6    read it.  It says very simply -- and this is 370 F.3d 256,

7    quote, "Gornik has never been an owner, officer or director

8    of JGR.  Additionally, the information upon which he relied

9    in making his calculations of lost profits and lost business

10   value came primarily from Yasowitz," who was someone -- a

11   principal of the company, "and Gornik admitted he did not

12   independently verify much of that information.  Therefore --

13   therefore, Gornik has no basis upon which to offer lay

14   opinion testimony about JGR's lost profits or lost business

15   value, and the district court abused its discretion in

16   admitting that testimony."  That's the holding of the case.

17   Counsel for the city comes up with his own formulation based

18   on his reading of a lot of case law, and he calors his own

19   standard.  We don't need to do that here.  We have the Sixth

20   Circuit telling us what the standard is and what the holding

21   is.  It's the JGR case, and it's squarely on point.

22        MS. LEVINE:  Your Honor, counsel spent some time

23   discussing the MarketX Holdings Corp. case.  Respectfully,

24   that case specifically cites to Rule 701 as -- and to the

25   advisory committee note with regard to 701 and specifically

1  points out that Rule 701 allows the admission of nonexpert
2  opinion testimony from a witness within limitations designed
3  to prevent the simple expedient of proffering an expert in
4  lay witness clothing and then goes on from there to conclude
5  an analysis based on specialized knowledge is excludable
6  where the witness has not been qualified as an expert and
7  then goes on to cite the exception when somebody is actually
8  a business owner, won't rehash that, but specifically
9  provides that even if a person is a business owner, if you
10 still go outside what that business owner's area of expertise
11 could be, then you exclude that as well.  Thank you.
12       MR. MONTGOMERY:  Your Honor, just a couple of final
13 points, not on the law because I think there's no possibility
14 in my mind that your Honor has any doubt as to the law and
15 the scope of this Court's discretion, so instead I'd like to
16 simply remind -- ask the Court to remember that Mr. Buckfire
17 testified that the forecasts were prepared by a team of
18 experts in revenue and tax policy.  Those are the same
19 forecasts that Mr. Malhotra said "we" many times.  I remember
20 the Court even asked Mr. Malhotra to say please speak in the
21 personal, not in the collective, but Mr. Malhotra repeatedly
22 discussed collective, and I think the reason is
23 straightforward.  We learned from Mr. Buckfire that, in fact,
24 a team was involved.  The second -- the notion raised by
25 counsel that Mr. Malhotra could testify on the -- or use

 1    reasonable assumptions on city population growth when he

 2    wasn't an economist, he was not a population forecaster, he

 3    had no -- didn't say anything about having skills in that

 4    particular environment, sort of cuts back from the notion

 5    that all he's doing is math, taking specific numbers, putting

 6    them in cells on a spreadsheet and simply putting auto sum

 7    for each column of the numbers.

 8            And last but not least, in his own detailed work, he

 9    repeatedly said he both looked at bank accounts and he looked

10    at documents prepared by others, which were the city

11    department budgets, in trying to assess whether identified

12    cash belonged in one column or another.  Your Honor, that is

13    not ordinary math.  It's not lay testimony.  Thank you.

14            THE COURT:  Thank you all.  The Court will take this

15    under advisement until 10:15 and return with a decision at

16    that time.

17            THE CLERK:  All rise.  Court is in recess.

18        (Recess at 10:00 a.m. until 10:15 a.m.)

19            THE CLERK:  Court is in session.  Please be seated.

20            THE COURT:  The matter is before the Court on the

21    city's request for reconsideration of the Court's previous

22    exclusion of so much of its exhibits and its witnesses'

23    testimony, especially from Mr. Malhotra, that dealt with the

24    cash flow projections which have been excluded from evidence

25    and also the motion to strike so much of Mr. Buckfire's

1  testimony as appeared to present opinion testimony based on

2  his expertise.

3        The Court concludes that the motion for

4  reconsideration should be granted and that the motion to

5  strike Mr. Buckfire's testimony should be denied.  These

6  decisions are controlled, as the parties suggest, by Rule 701

7  of the Federal Rules of Evidence, which provides that a lay

8  witness -- that is, one who is not testifying as an expert --

9  may only testify to, quote, "opinions or inferences which are

10  (a) rationally based on the perception of the witness; (b)

11  helpful to a clear understanding of the witness' testimony or

12  the determination of a fact in issue; and (c) not based on

13  scientific, technical, or other specialized knowledge within

14  the scope of Rule 7002 (sic)," close quote.

15        As has been noted here, Subsection (c) of Rule 701

16  was added to the rule in the year 2000 to eliminate the risk

17  that the reliability requirement set forth in Rule 702 would

18  be evaded through the simple expedient of proffering an

19  expert in lay witness clothing.  The advisory committee note

20  suggests a second reason as well, which was to prevent

21  litigants from evading the mandatory prediscovery disclosure

22  requirements for expert testimony as set out in Rule 26 of

23  the Federal Rules of Civil Procedure.

24        However, most significantly, the advisory committee

25  note for the 2000 amendment does further explain, quote,

 1    "Most courts have permitted the owner or officer of a
 2    business to testify to the value or projected profits of the
 3    business, without the necessity of qualifying the witness as
 4    an accountant, appraiser, or similar expert."  And here the
 5    note cites Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153,
 6    Third Circuit, 1993, and the Court notes parenthetically that
 7    that case held that there was no abuse of discretion in
 8    permitting the plaintiff's owner to give lay opinion
 9    testimony as to damages as it was based on his knowledge and
10    participation in the day-to-day affairs of the business.  The
11    advisory committee note goes on to state, quote, "Such
12    opinion testimony is admitted not because of the experience,
13    training, or specialized knowledge within the realm of an
14    expert, but because of the particularized knowledge that the
15    witness has by virtue of his or her position in the business.
16    The amendment does not purport to change this analysis,"
17    close quote.
18            There are obviously a wide range of circumstances in
19    which the issue of whether lay opinion testimony will be
20    admitted arises, and it is certainly an appropriate
21    observation that ultimately the Court's decision on whether
22    to permit such testimony is highly fact-specific.  The
23    parties here largely have argued this issue in the context of
24    lay opinion testimony on lost profits or projected profits,
25    and the Court agrees that those are the most pertinent cases.

1   Accordingly, the Court will review some of those.

2        Perhaps the most controlling case is that which the

3   parties have argued here, JGR, Inc. v. Thomasville Furniture

4   Industries, Inc., 370 F.3d 519, Sixth Circuit, 2004.  In that

5   case, the Court stated, quote, "The primary issue in this

6   case concerns the admissibility of testimony by JGR witness

7   James Gornik, a certified public accountant and lawyer who

8   testified about the amount of lost profits and lost business

9   value that JGR allegedly suffered as a result of

10  Thomasville's breach of contract."

11       In the course -- close quote.  In the course of the

12  opinion, the Sixth Circuit relied heavily on a prior decision

13  by the Fifth Circuit in DIJO, Inc. v. Hilton Hotels Corp.,

14  351 F.3d 679, Fifth Circuit, 2003.  The JGR court held that

15  was a strikingly similar case to the one before it, and the

16  Sixth Circuit stated in regard to DIJO, quote, "In DIJO, the

17  Fifth Circuit held that the district court abused its

18  discretion in permitting a, quote, 'financial consultant,'

19  close quote, to testify as a lay witness regarding the

20  company's lost profits.  Although the witness was the

21  plaintiff's primary contact at a commercial lending facility

22  with which the plaintiff had a business relationship, he had

23  not served as an owner or officer of the plaintiff company.

24  Additionally, the witness's opinion was based primarily" --

25  excuse me -- preliminary -- "was based on preliminary income

figures and other information that he had received from the plaintiff's founder, and his appraisal was not based upon his own independent knowledge or observations."

And the Court further quoted from DIJO, "It is telling that DIJO responds, not with evidence of the witness's involvement with the plaintiff or the Project, but only emphasizing his substantial business experience. Such generic industry experience does not pass Rule 701 scrutiny. The plaintiff never attempted to qualify the witness as an expert, and a lay witness who was never employed by or directly involved in a business is unlikely to have the type of first-hand knowledge necessary to provide reliable forecasts of future profits. The further removed a layman is from a company's day-to-day operations, the less likely it is that his opinion testimony will be admissible under Rule 701." And that's the Sixth Circuit's quote from DIJO, 351 F.3d at 686.

So the Sixth Circuit noted that in light of the witness' lack of the requisite firsthand personal knowledge of the company about which he testified, the Fifth Circuit held that the District Court abused its discretion in permitting the witness to give lay witness -- lay opinion testimony under Rule 701.

In the JGR case, the Court of Appeals noted that the District Court's apparent assumption that Gornik was a

1  factual witness who does JGR's books was false.  The Court
2  noted that, in fact, Gornik was never an accountant of JGR
3  and never did its books.  His first experience with JGR was
4  in March of 1999 when he was contacted by JGR's trial counsel
5  for the purpose of putting down on paper what the financial
6  statements of Gerald's Furniture would have looked like had
7  Thomasville -- had the Thomasville support to the business
8  continued and had the owners been able to carry through on
9  how they planned to operate the business.

10         Now, it is true, as has been pointed out here, that
11  this observation by the Court of Appeals is in a footnote.
12  Nevertheless, the Court cannot conclude that it is,
13  therefore, a marginal fact.  It plainly formed a substantial
14  basis for the Court's ultimate disposition in the case.

15         And since the Sixth Circuit in JGR relied so heavily
16  on DIGO (sic) from the Fifth Circuit, the Court concludes
17  that it's appropriate to look further into what the Fifth
18  Circuit said in that case, so, for example, at 351 F.3d at
19  686 the Fifth Circuit stated -- the Fifth Circuit discussed
20  two other cases, these two from the Third Circuit, In re.
21  Merritt Logan, Inc., 901 F.2d 349, Third Circuit, 1990, as
22  well as Teen-Ed, Inc., v. Kimball International, Inc., 620
23  F.2d 399, F.3d, 1980.  And so in regard to these two cases,
24  the Fifth Circuit stated, quote, "In In re. Merritt Logan,
25  Inc. the plaintiff's company -- the plaintiff company's

1    principal shareholder, Logan, was permitted to testify about

2    the company's lost profits.  The facts recited in that

3    opinion demonstrate that Logan was not a passive outside

4    shareholder.  He was intimately involved with the investments

5    and management of the business.  Thus, the Third Circuit

6    correctly concluded that Logan could provide lay opinion

7    testimony given his personal knowledge of the enterprise.

8    Likewise, in Teen-Ed, Inc. v. Kimball International, the

9    Third Circuit decided that the appellant, Teen-Ed's, licensed

10   public accountant, Zeitz or Zeitz, could provide lost profits

11   opinion testimony.  Zeitz's testimony was based on the

12   personal knowledge of Teen-Ed's balance sheets, which Zeitz

13   had acquired firsthand as Teen-Ed's accountant and

14   bookkeeper.  Thus, the Court concluded -- this, the Court

15   concluded, qualified Zeitz as a witness eligible under Rule

16   701 to testify to his opinion of how lost profits could be

17   calculated and to inferences he could draw from his

18   perception of Teen-Ed's books.

19          Further supporting the Court's decisions on these

20   two matters is the Sixth Circuit's decision in Lativafter

21   Liquidating Trust v. Clear Channel Communications, Inc., 345

22   Federal Appendix 46, Sixth Circuit, 2009.  In that case, the

23   Court stated, quote, "Grady Vanderhoofven is a venture

24   capitalist, the Executive Vice-President of Southern

25   Appalachian Fund, which invested in Eon, and was a member of

Eon's board.  Vanderhoofven testified that Eon's value would
have been $57 million with the Clear Channel contract,
instead of the $17 million it sold for in 2006.  As an
investor in Eon, Vanderhoofven in 2005 investigated Eon's
financials, retaining a market research firm to verify Eon's
market potential.  When he became a member of Eon's board in
March 2005, he received Eon's monthly financial reports,
including income statements, balance sheets, and cash flow
statements.  Vanderhoofven testified that between June 2004
and June 2005, the number of stations Eon was streaming
increased by over 500 percent.  After June 2005, however, the
revenue from Clear Channel began to dwindle, and
Vanderhoofven determined that Clear Channel was moving its
streaming business to another company.  Vanderhoofven based
his $57 million valuation on the revenue Clear Channel had
been generating for Eon prior to the discontinuation of their
business, and the projection for the 12-month period prior to
Eon's sale.  As an investor who researched Eon's financial
condition, and later as a member of Eon's board,
Vanderhoofven had personal, particularized knowledge of Eon's
value.  The district court did not abuse its discretion in
permitting him to testify about Eon's projected value if it
had retained Clear Channel's business.  Moreover, contrary to
Clear Channel's assertions, Vanderhoofven's testimony rested
on a sufficient foundation - his personal research into Eon's

1  financial reports."

2      The Court's decision today is also consistent with

3  and supported by a Third Circuit decision in <u>Donlin</u> v.

4  <u>Philips Lighting North American Corp.</u>, 581 F.3d 73, Third

5  Circuit, 2009.  In that case, the Court stated that Rule 7001

6  (sic), quote, "does not mean that an expert is always

7  necessary whenever the testimony is of a specialized or

8  technical nature.  When a lay witness has particularized

9  knowledge by virtue of her experience, she may testify - even

10 if the subject matter is specialized or technical - because

11 the testimony is based on the layperson's personal knowledge

12 rather than on specialized knowledge within the scope of Rule

13 702.  At the same time, we have consistently required that

14 lay testimony requiring future projections of business or

15 operation come from someone who has intimate and thorough

16 knowledge of the business gathered from either a lengthy

17 tenure or a position of authority," close quote.

18     Most tellingly, the Court in <u>Donlin</u> stated, quote,

19 "A trial judge must rigorously examine the reliability of a

20 layperson's opinion by ensuring that the witness possesses

21 sufficient specialized knowledge or experience which is

22 germane to the opinion offered," close quote.

23     And, finally, just to cite some other opinions or

24 decisions that support this, <u>Van der Ruhr</u> v. <u>Immtech</u>

25 <u>International</u>, 570 F.3d 858, Seventh Circuit, 2009;

1    <u>Securitron Magnalock Corp.</u> versus <u>Schnabolk</u>, 65 F.3d 256,

2    Second Circuit, 1995; <u>United States</u> versus <u>Valencia</u>, 600 F.3d

3    389, Fifth Circuit, 2010; and <u>MCI Telecommunications Corp.</u> v.

4    <u>Wanzer</u>, 897 F.2d 703, Fourth Circuit, 1990.

5            Ultimately, it is for the Court to determine whether

6    the proffered testimony carries with it sufficient indicia of

7    reliability arising from the witness' personal relationship

8    with the proponent of the evidence.  Accordingly, it is

9    certainly true that, as argued here, a taxicab driver would

10   not be permitted to testify to these matters, but that does

11   not mean that neither Mr. Malhotra nor Mr. Buckfire can

12   testify -- can't testify to the matters that they testified

13   to because of their personal knowledge of the city's

14   financial affairs, and in this regard, the Court will find

15   that both Mr. Malhotra and Mr. Buckfire had extensive

16   personal knowledge of the city's affairs that they acquired

17   during their -- the course of their consulting work with the

18   city and that formed the basis of their opinions and

19   conclusions.

20           Perhaps more fundamentally than any of this is this

21   key consideration in the Court's ultimate resolution of these

22   matters.  What both Mr. Malhotra did and what Mr. Buckfire

23   did are a substantial part of the facts and circumstances

24   that led to the filing of this case and that are, therefore,

25   highly relevant to the issues of eligibility that are before

 1    the Court at this time.  Accordingly, not only what they did

 2    but why they did what they did, as explained through the

 3    documents and in the testimony that they have proffered, is,

 4    in the Court's view, entirely admissible.  Accordingly, the

 5    motion to reconsider is granted.  The documents that the

 6    Court had previously admitted on a limited basis are now

 7    admitted for all purposes, and the motion to strike is

 8    denied.

 9         We were about to begin the cross-examination of

10    Mr. Buckfire, I believe, so let's do that.

11         MR. STEWART:  Yes.

12         THE COURT:  Step forward, please, sir, and resume

13    the witness stand.  And, sir, you understand you are still

14    under oath.

15         MR. BUCKFIRE:  I do.

16         THE COURT:  You may proceed.

17      KENNETH A. BUCKFIRE, DEBTOR'S WITNESS, PREVIOUSLY SWORN

18                      CROSS-EXAMINATION

19    BY MR. MONTGOMERY:

20    Q   Good morning, Mr. Buckfire.

21    A   Good morning.

22    Q   My name is Claude Montgomery.  I believe we've met before

23    in connection with your deposition in this matter --

24    A   Yes.

25    Q   -- is that correct?

1  A    That's right.

2  Q    Good morning.  Now, Mr. Buckfire, if for any reason I

3  speak too quickly or you do not understand my question, I

4  would ask that you let me know.

5  A    Thank you.

6  Q    Now, do you recall the date of your deposition that I

7  took of you in connection with this matter?

8  A    Not specifically, no.

9  Q    It was September 20 of this year, was it not?

10  A    Okay.

11  Q    Okay.  Do you recall where the deposition took place?

12  A    New York City.

13  Q    Okay.  Do you recall what time it started?

14  A    I believe it was in the morning.

15  Q    Would 8:30 be right?

16        THE COURT:  You believe it was what, sir?

17        THE WITNESS:  In the morning.

18  BY MR. MONTGOMERY:

19  Q    Now, I believe you testified to the Court yesterday that

20  you're from this area or a native I think is the word you

21  used.

22  A    Yes.

23  Q    Okay.  And what did you mean by "native," sir?

24  A    I was born in Detroit.  My family lived here until 1965.

25  They moved to Southfield, Michigan.  Then I attended

1   Southfield-Lathrup Senior High School.  My family still lives

2   in the area as does my wife's.  Attended the University of

3   Michigan, and I come back here frequently.

4   Q   You're quite connected to the Detroit area; is that

5   correct?

6   A   Yes, I am.

7   Q   Okay.  Do you know Andy Dillon personally?

8   A   Not personally, no.

9   Q   Have you ever met him?

10  A   Yes.

11  Q   And when did you first meet him?

12  A   I met him for the first time in January or February of

13  2010.

14  Q   And in what connection?

15  A   I had been introduced to him by a gentleman from the

16  Business Leaders for Michigan.  I'd asked him to introduce me

17  to Treasurer Dillon in the ordinary course of my duties

18  trying to make sure he knew about our firm and that that

19  might be helpful sometime with respect to Detroit.

20  Q   I believe you told the Court yesterday that starting in

21  about 2009 you engaged in an effort to make sure that your

22  firm's resources were known to potential players in the City

23  of Detroit drama; is that correct?

24  A   No.  We simply started paying attention to Detroit after

25  it was downgraded.

1  Q   Okay.  And was your introduction to Mr. Dillon part of

2  that paying attention to the City of Detroit after it was

3  downgraded?

4  A   Yes.

5  Q   Okay.  Now, by any chance do you know the current

6  governor, Rick Snyder?

7  A   I met him a few times.

8  Q   Okay.  And in what connection, sir?

9  A   During the course of our discussions with the state and

10 the financial advisory board in 2012, I met with him once or

11 twice to present really on an educational basis, you know, a

12 description of what restructuring was and how it might be

13 employed in a corporate and governmental setting.

14 Q   Okay.  And do you recall when that was, sir?

15 A   It might have been in the spring.

16 Q   Of which year?

17 A   April 2012.

18 Q   And can you be more specific in what information you gave

19 to Governor Snyder at that time?

20 A   We had put together a very brief presentation really

21 describing the techniques of restructuring, how we go about

22 analyzing the problems of a company or a government, and

23 describing the various techniques that could be employed to

24 deal with those issues in the course of creating a

25 comprehensive long-term financial strategy.

1    Q    And among the information that you gave to the governor

2    at that time, did it specifically relate to municipal

3    restructurings as well as corporate restructuring?

4    A    Yes.

5    Q    Okay.  And did it include in any -- a discussion of

6    Chapter 9 as a vehicle for a municipal restructuring?

7    A    Only as one of many alternative techniques.

8    Q    And what other alternative techniques did you tell the

9    governor existed in the spring of 2012?

10   A    I told him the same thing I tell all of my clients, that

11   bankruptcy is to be avoided at all costs, but it's always

12   required to be studied as a last resort.

13   Q    Okay.  You are the city's financial strategist, are you

14   not?

15   A    Yes.

16   Q    Okay.  Are you its chief financial strategist?

17   A    I don't understand that question.

18   Q    Okay.  But you are its financial strategist?

19   A    Miller Buckfire is the city's investment bank, and part

20   of our responsibilities is to formulate and develop and

21   execute financial strategy.

22   Q    All right.  And for Miller Buckfire, you are managing

23   this engagement?

24   A    I am.

25   Q    Okay.  Now, is the June 14 proposal a public

1  manifestation of the city's financial strategies developed by

2  you, sir?

3  A    Yes, it is.

4  Q    Okay.  Now, is the June 14 proposal something you were --

5  in which you had input into the strategy and concept of that

6  document?

7  A    Yes.

8  Q    I believe you told that to Mr. Cullen in response to a

9  question yesterday; is that correct?

10 A    Yes.

11 Q    Okay.  In fact, the Court should expect you to have input

12 in strategy if you are the chief strategist; is that correct?

13 A    Yes.

14 Q    Okay.  Why did you tell me you had no involvement in the

15 production of the June 14 proposal when I asked you that

16 question at the deposition?

17 A    You asked me whether we had worked on or drafted or

18 formulated any part of that document, and I told you we had

19 not except for the portion that related specifically to the

20 restructuring plan and the development of the limited

21 recourse participation notes, so we did not develop that as a

22 work product of Miller Buckfire.  It was a manifestation of

23 the overall strategy that we had formulated in conjunction

24 with the city's other advisors beginning in January of this

25 year.

1    Q    But am I not correct, sir, that with respect to the June

2    14th proposal itself you told me that you did not participate

3    in its preparation?

4    A    I just answered that question.

5             MR. STEWART:  Objection, your Honor.  If he wants to

6    read a question and answer, that would be the appropriate way

7    to proceed.

8             THE COURT:  The objection is sustained.

9    BY MR. MONTGOMERY:

10   Q    Mr. Buckfire, I'm going to ask you if on the 20th of

11   September of this year during your deposition I asked you a

12   question which began at page 37, line 22,  "Mr. Buckfire,

13   I've handed you what has been marked as Buckfire Exhibit

14   Number 2.  Have you seen this before?"  Do you recall me

15   asking you that question?

16   A    No.

17   Q    Okay.  Do you recall that at line 25 you said, "Yes"?

18   A    No.

19   Q    All right.  That Mr. Buckfire said -- "Question:  What is

20   it, sir?"  Your answer at line 3 was, "It is the June 14

21   report and proposal to creditors."  My question to you at

22   line 5 was, "Did you participate in its preparation?"  And

23   your answer at line 7 was, "No."  Do you remember giving that

24   answer, sir?

25   A    No.

1  Q   Is it true that you had no involvement in the

2  preparation?

3  A   Neither myself or my firm drafted this presentation.  The

4  entire effort to restructure Detroit has been since January a

5  multi-disciplinary, multi-firm effort.  The financial

6  strategy incorporated in the June 14th plan was one that we

7  had helped to formulate.  We didn't draft the June 14th

8  document except to participate in the drafting of the

9  description of the plan for the creditors and the description

10  of the limited recourse participation notes.

11  Q   So your input into the June 14 proposal is the limited

12  participation notes?

13  A   I didn't say that.

14  Q   Okay.  Tell me again, sir.

15  A   It's a very lengthy document reflecting the work of five

16  months by many firms.  It does, of course, rely upon and is

17  meant to address the financial strategy that we helped the

18  city formulate beginning in January from an informational

19  perspective.  My firm did participate, as I testified

20  earlier, in the creation of the restructuring plan itself;

21  that is, the portion of the document reflecting proposed

22  treatment for the claims of the creditors of the City of

23  Detroit, and, in particular, the formulation of the terms of

24  the $2 billion of notes that we have identified as being

25  available for resolution of those claims.

1  Q   So it's your testimony today that the treatment of
2  creditors was essentially your idea?
3  A   As I said, it was a collaborative effort by multiple
4  firms.  We participated actively in that portion of the plan.
5          THE COURT:  Excuse me one second.  Again, we're
6  having a slight difficulty with our audio, so pull your
7  microphone two inches closer but no more.
8          THE WITNESS:  Yesterday it was too far.
9          THE COURT:  Go ahead.  Pull it closer.  There.
10         THE WITNESS:  Thank you, your Honor.
11         THE COURT:  Try that.
12 BY MR. MONTGOMERY:
13 Q   So, Mr. Buckfire, I take it you share all of the
14 recommendations that appear in the June 14 proposal.
15 A   I don't understand that question.
16 Q   I think you just told me it was a collaborative effort,
17 not necessarily your idea.
18 A   That's correct.
19 Q   Okay.  And so I'm asking you, as you are sitting here
20 today advising the Court, do you share all of the
21 recommendations that -- in the treatment of creditors that
22 appears in the June 14 proposal?
23 A   You're referring specifically to the proposed treatment
24 of creditors?
25 Q   Yes, sir.

1  A    Yes, I do.

2  Q    Okay.  Now, does that include the recommendation that

3  retiree pension and healthcare benefits must be significantly

4  reduced?

5  A    I do.

6  Q    Okay.  And did you ever personally make that

7  recommendation to the emergency manager?

8  A    No.

9  Q    Since this was a collaborative effort, who made that

10  recommendation to the emergency manager?

11  A    Well, it was a function of the city's insolvency and lack

12  of cash.  There was no way for the city to satisfy its

13  unsecured creditors to the extent that their claims indicated

14  because the claims of the pension fund and healthcare

15  retirees are unsecured claims, therefore, pari passu with

16  those of the general obligation and COP bondholders, clearly

17  there wasn't enough value to satisfy them all, and they would

18  have to be reduced.

19  Q    Mr. Buckfire, I believe the question I asked required

20  identification of a person.  Who made the recommendation

21  since you didn't make it?

22  A    Well, it was a function of the mathematics.  I'm not sure

23  that there was any particular recommendation made.  The math

24  and the financial condition of the city simply didn't support

25  continued satisfaction of all of its unsecured obligations as

1  previously promised.

2  Q   Are you suggesting it was so self-evident no one had to

3  say it?

4  A   Yes.

5  Q   So, in fact, you didn't say it?

6  A   I didn't have to.  The mathematics indicates that was the

7  unfortunate result.

8  Q   Did Conway MacKenzie say it?

9  A   I don't know.

10  Q   Did Ernst say it?

11  A   I don't know.

12  Q   Did Jones Day say it?

13  A   I don't know.

14  Q   So let's turn to the topic of how this no one had to say

15  it aspect of the proposal came to be pursued.  When, sir, is

16  the first time you recall you and Mr. Orr discussing the

17  reduction of pension benefits and healthcare benefits if

18  ever?

19  A   I don't recall.

20  Q   Okay.  It never happened?

21  A   I said I don't recall.

22  Q   Did it ever happen?

23  A   I don't recall.

24  Q   Okay.  Change the topic.  You were involved in the

25  negotiations -- strike that.  What role, if any, did you have

1  in discussions or presentations to creditors following the

2  June 14 proposal?

3  A   I was delegated by Mr. Orr with the responsibility of

4  negotiating and discussing with the funded debt creditors of

5  the city the June 14th proposal.

6  Q   Did you, sir, personally have any involvement with any

7  current or former employee groupings of creditors?

8  A   I was present at at least one or two meetings here in

9  Detroit with representatives of retirees, but I was not

10  taking a lead role in those discussions.

11  Q   When you say "present," were you talking about the June

12  14th meeting itself?

13  A   No, afterwards.

14  Q   Afterwards.  Are you talking about the June 20th meeting

15  that may have occurred?

16  A   It may have been that week, but I know I was present at

17  at least one or two.

18  Q   Okay.  Are there any others other than that one that may

19  have occurred on June 20?

20  A   Well, it was a very, very busy time for me.  I was trying

21  to get the forbearance agreement done with the swap

22  counterparties, so after that initial set of meetings I

23  didn't directly participate.  Other members of my firm, I

24  believe, did.

25  Q   So you were not involved in a June 25 meeting; correct?

1   A    I may have been.  I just don't recall the dates.

2   Q    Okay.  And you were not involved in a July 10 meeting; is

3   that correct?

4   A    I just don't recall.

5   Q    And, again, same question with respect to July 11?

6   A    I don't recall.

7   Q    And July 12?

8   A    I don't recall.

9   Q    Okay.  But do you recall participating in meetings with

10  funded debt creditors?

11  A    Yes, I do.

12  Q    Okay.  And which days do you remember for that?

13  A    I can't put specific dates to it.  After the June 14th

14  presentation in which I participated, we gave all of the

15  city's creditors a week to study the plan and supporting

16  information, which obviously made sense because it was a

17  bombshell for them, and we immediately began discussions with

18  as many creditors as was willing to meet with us the week

19  after that, so that would be, I guess, the 20th or 21st.  And

20  we began meeting with groups of the creditors primarily in

21  New York City all that week, and that extended into the week

22  following.  At the same time, I was meeting or having

23  discussions almost every day with the swap counterparties.

24  Q    Should I understand that you had a determination,

25  Mr. Buckfire, that it was more important for you to meet with

1   the funded debt creditors than with the retiree and employee

2   creditors?

3   A    No.  It was just a division of labor.  The bondholders

4   and the bond insurers were organized.  They told us that they

5   could rely upon them to represent the interests of the

6   underlying creditors, so because of the fact that we're an

7   investment bank and have long experience in managing creditor

8   relationships of that kind, it was determined that we should

9   take the lead in those discussions while the lead in

10  discussions with the retirees and other claim holders would

11  be taken by others.

12  Q    And you participated in making that decision as the chief

13  financial strategist for the city; is that correct?

14  A    Well, you keep saying I'm the chief financial strategist.

15  I am a financial strategist, and the city asked my opinion,

16  and that was my recommendation.

17  Q    Okay.  Thank you.  Now, do you recall yesterday in

18  response to a question by Mr. Cullen indicating that you

19  regarded the June 14 proposal as even-handed and fair?

20  A    Yes.

21  Q    Okay.  And as you sit here today, do you still think it

22  is even-handed and fair?

23  A    Yes.

24  Q    Now, I'm correct, am I not, that the June 14 proposal

25  provides for no cash payments to the Retirement Systems on

1  account of the city's promised pensions; is that correct?

2  A   I'm not sure I understand what you're saying.

3  Q   Are -- it's a simple question.  Retiree creditors for

4  pensions, are there any cash payments at confirmation or

5  shortly thereafter that the June 14 proposal plans to be made

6  to the Retirement Systems?

7  A   Yes.

8  Q   Okay.  And what are those, sir?

9  A   They would receive their share on a pro rata basis with

10  the other unsecured creditors of the proposed $2 billion of

11  notes that would be provided upon exit from bankruptcy.

12  Q   All right.  But those are notes in which there is no

13  mandatory payment of principal required; is that correct?

14  A   There's a mandatory payment of interest, and there's an

15  optional payment of principal if the city can afford it.

16  Q   But my question was no mandatory requirement.

17  A   That's correct.

18  Q   Okay.  And with respect to interest, it's one and a half

19  percent; is that correct?

20  A   That's all the city can afford.  That's correct.

21  Q   But that's what it proposes, one and half percent?

22  A   That's correct.

23  Q   Okay.  So no cash at confirmation, one and a half percent

24  interest over time, and no mandatory principal repayments; is

25  that correct?

1  A    That's correct.

2  Q    Now, the same is true for the healthcare creditors; is

3  that correct?

4  A    No.  The plan did propose a continued payment of

5  healthcare benefits to actives and retirees.  I don't have

6  the plan in front of me, but I think you'll see a line item

7  in the financials that do assume continued payment of

8  healthcare premiums.

9  Q    That's for actives, is it not?

10 A    I don't recall exactly the distinction, but it's in the

11 plan.

12 Q    In fact, the plan proposes for active employees defined

13 contribution payments for future pension accruals; is that

14 correct?

15 A    Are you talking about healthcare or pension now?

16 Q    Right now I switched back to pension because you

17 mentioned both.

18 A    Okay.

19 Q    It is correct that insofar as past pension entitlements

20 are concerned, the only recovery proposed under the plan is a

21 share of a note; is that correct?

22 A    Yes.

23 Q    Okay.  And but for what the city may or may not be doing

24 right now, the only proposal for retiree -- existing retiree

25 healthcare is whatever funding is provided by the note; is

1  that correct?

2  A   Well, the healthcare benefits for retirees would be

3  provided to an insurance exchange, and some of that would be

4  supplemented by payments made by the city.

5  Q   The insurance -- okay.  Insurance exchanges is not the

6  city, though, is it?

7  A   No.

8  Q   Okay.  And there is no vehicle proposed in the plan for

9  delivering cash to retirees to participate in the exchange,

10 is there?

11 A   Not to my knowledge, no.

12 Q   All right.  Now, are you familiar with the term "Dutch

13 auction"?

14 A   Yes.

15 Q   Would you tell the Court what a Dutch auction is?

16 A   A Dutch auction is a technique used in the financial

17 markets to ensure that a company or a government when issuing

18 securities will always get the most favorable price for

19 itself.  In other words, you don't want to have a situation

20 where you sell a bond or a note or a share of stock and it

21 turns out that after you've done so, the price has doubled

22 because you mispriced the security because you misjudged the

23 demand for that security, so a Dutch auction is intended to

24 allow interested buyers of securities to, in effect, make an

25 offer to sell into the tender securities at whatever price

1  they deem fair, and then the city or the government in that

2  case would look at the total tally of bids or offers and

3  decide what is the lowest price that will clear the entire

4  market.  So anybody who made the mistake of offering to sell

5  a security for too high a price would not have its offer

6  accepted.

7  Q   So, sir, it's basically creditors fight to see who can

8  make the lowest bid in order to get the greatest amount of

9  whatever distribution or security is being offered; is that

10 correct?

11 A   Yes.

12 Q   Okay.  So in this particular context, your plan proposes

13 that pension creditors and healthcare creditors should

14 compete for the lowest possible price in order to be entitled

15 to a distribution under your notes; is that correct?

16 A   It's an option.  They don't have to take it if they don't

17 want to.

18 Q   But if they don't take it, if any creditor offers to sell

19 their note for a distribution, that creditor will get it, and

20 the retiree creditors will get nothing; is that correct?

21 A   It sets up a very interesting situation.  If a creditor

22 offers to sell his note back to the city at too low a price,

23 then a rational other buyer -- for example, a well-advised

24 pension fund in this case -- would probably decide not to

25 sell.  They would retain their notes.  And as the pool of

1   other noteholders shrinks, having sold at too low a price,

2   they would benefit by a higher price later.

3   Q   But in the context of this plan, if you needed cash

4   sooner rather than later, you'd have to bid rather than wait;

5   is that correct?

6   A   No.  You would have the option of selling your note into

7   the open market to presumably people who understand this

8   mechanic, who understand the city's credit, and they would be

9   offering you what they would deem is a fair market determined

10  price.

11  Q   But the bottom line, sir, is basically creditors under

12  your proposal have to compete for the lowest price --

13  A   No.  They don't have to --

14  Q   -- offered to the city?

15  A   They don't have to sell.  They can keep it and sell into

16  the market as an alternative to selling into a sinking fund

17  process run by the city.  No mandatory requirement to do so

18  and no coercion.

19  Q   But you can't get cash without participating in the bid?

20  A   Or selling in the open market.

21  Q   Can't get cash from the city, sir, without participating

22  in the bid?

23  A   That's true.

24  Q   And that's even-handed and fair insofar as retirees are

25  concerned?

1  A   They are being treated no worse or no better than any

2  other unsecured creditor of the city.

3  Q   Now, the note is -- that the June 14 proposal puts

4  forward is a $2 billion nominal value note; is that correct?

5  A   Correct.

6  Q   Okay.  And it is proposed to be distributed among

7  unsecured creditors on a pro rata basis; is that correct?

8  A   Yes.

9  Q   So that if a creditor had a billion dollar note and there

10 were $11 billion of unsecured claims, that billion dollar

11 note would be 1/11th; is that correct?

12 A   That's right.

13 Q   Okay.  Now --

14        MR. STEWART:  Your Honor, if I may, I think we are

15 straying a little bit into plan as opposed to eligibility

16 issues.

17        THE COURT:  I think the objection is relevance.

18        MR. MONTGOMERY:  Your Honor, in order for the

19 debtor's proposal to have been made in good faith, it must be

20 one that manifests both subjective and objective standards

21 with respect to good faith, and how creditors are proposed to

22 be treated I think is quite relevant to whether or not, "A,"

23 a plan has been proposed, and, "B," whether or not it's in

24 good faith.

25        THE COURT:  I agree.  The objection is overruled.

1    BY MR. MONTGOMERY:

2    Q    If a creditor -- if the city -- strike that.  Under the

3    note proposal, asset sales by the city play a role in the

4    funding of that note; is that correct?

5    A    Yes.

6    Q    And it's on a formula basis; is that correct?

7    A    Yes.

8    Q    And with respect to asset dispositions, it's 75 percent

9    goes into the note pool, and 25 percent goes to the city?

10   A    Yes.

11   Q    But it's capped at an aggregate distribution of $2

12   billion; is that correct?

13   A    That's correct.

14   Q    So that if the city were to sell $2-1/2 billion worth of

15   assets, you would completely defease the $2 billion note and

16   the city would get a half a billion dollars; is that correct?

17   A    That's correct.

18   Q    If the city were to sell $5 billion of assets, the

19   creditors would get $2 billion and the city would get 3; is

20   that correct?

21   A    After the bankruptcy, that's correct.

22   Q    Is that fair and even-handed, sir?

23   A    It was an opening offer.  There are obvious things we

24   expected our creditors to come back and object to or ask to

25   negotiate.

1    Q    Okay.

2    A    But to answer your question, it was fair because it

3    treated our unsecured creditors exactly the same.

4    Q    And for you that's the key indicia in fairness?

5    A    Starting out a process like this, it's complicated, and

6    one must be very sensitive to the competing interests of all

7    of our creditors.  Other cites that have tried to do

8    consensual out-of-court restructurings have tended to favor

9    one group of creditors over the other.  That has not proven

10    to be a very successful strategy.  We elected to treat

11    everyone exactly the same, and we obviously expected there to

12    be vigorous negotiation among all of our unsecured creditors

13    because clearly everybody wanted to be treated more specially

14    than everybody else.  We decided because we didn't know where

15    this would go that the city should be viewed as being

16    impartial in how it would treat it's unsecured creditors.

17    Q    And treating -- in your mind, sir, treating the pension

18    obligations of the city for accrued financial benefits or --

19    strike that -- for pension benefits, in your mind, it's fair

20    to treat those exactly the same as general unsecured

21    creditors, trade creditors?

22    A    They're unsecured claims.

23    Q    Okay.  Isn't the city actually paying trade creditors

24    now, sir?

25    A    They are.

1  Q   The June 14 proposal that you made, there's some missing

2  information from it, is there not, if -- strike that.  Let me

3  rephrase the question.  Assume I'm a creditor, a hypothetical

4  creditor, and I want to make a decision on whether or not to

5  vote for your plan or not.  If I was just looking at the June

6  14 proposal, there would be some missing information;

7  correct?

8  A   I don't know what you're referring to.

9  Q   Are there any asset values listed in the June 14

10 proposal?

11 A   No.

12 Q   There's absolutely no balance sheet information of any

13 kind anywhere in that document; is that correct?

14 A   That's correct.

15 Q   Is there any information regarding major disputes that

16 the city has that might yield future cash or assets?

17 A   I don't understand your question.

18 Q   Is there any information regarding disputes over

19 collection of past due contract debts?

20 A   I believe we did make some references to that.

21 Q   And do you recall what those references were?

22 A   Well, the city has historically had a very difficult time

23 collecting delinquent property tax revenues.  I believe the

24 past due on that particular line item is several hundred

25 million dollars.  The city, from an administrative

1  perspective, has never been very good at collecting taxes,

2  and that's a potentially significant asset, but, again, the

3  ability of the city to collect on that has always been very,

4  very doubtful.

5  Q   But the June 14 proposal doesn't actually say anything

6  like several hundred million dollars, does it?

7  A   No.  I think there's a reference to it -- I don't have it

8  in front of me -- to the past due income taxes the city has

9  not been able to collect, but I'd have to have it in front of

10  me to find the reference to it.

11  Q   Understood.  Now, as part of your information provision

12  strategies for creditors, you created a data room; is that

13  correct?

14  A   My firm did organize one, yes.

15  Q   Okay.  And basically all creditor information is supposed

16  to show up there?

17  A   Yes.

18  Q   Okay.  Is there any information in that data room

19  regarding the value of art?

20  A   Not that I'm aware of.

21  Q   Is there any information in that data room regarding the

22  value of the Department of Water and Sewer?

23  A   Not that I'm aware of.

24  Q   Okay.  And there's no information on the value of either

25  of those two in the actual June 14 proposal, is there?

1  A    It was not available at the time.

2  Q    Okay.  Is it available today?

3  A    Well, they're both ongoing asset evaluations that the

4  city is managing.  I've already testified that the city did

5  retain Christie's to do an evaluation of city-owned art, and

6  the results of that hopefully will be available soon.

7  Q    Could you pause there for a second, sir?  Have there been

8  any preliminary reports by Christie's?

9  A    No.

10  Q    Nothing of any kind?

11  A    No.

12  Q    Are you in the information trail between Christie and the

13  city, sir, meaning are -- strike that.  What role, if any,

14  did you have in the selection of Christie's?

15  A    I recommended that the city interview them for the role

16  of appraising the city-owned art.

17  Q    And when did you make that recommendation?

18  A    I believe it was in late May, early June of this year.

19  Q    Would it have been before or after May 7?

20  A    Oh, after.

21  Q    Going back to information that's in the data room or in

22  the June 14 proposal itself, I asked you if there was any

23  information regarding the Department of Water and Sewer

24  there, and you said no.

25  A    No.  I didn't say -- I said I don't know.

1   Q   Oh, you don't know?

2   A   I don't have a record of every scrap of information

3   that's in the data room in my head.

4   Q   Okay.

5   A   I apologize.

6   Q   But is there any in the June 14 proposal itself?

7   A   We made reference to it as we've already testified to the

8   fact that we were working on it as potential source of value

9   to the city, but as is well-known, it is operated on a

10  nonprofit basis.  The city has never received any cash from

11  the Water and Sewer Department through which it provides

12  services to the customers all through southeastern Michigan,

13  and there has been no business plan up until the time we

14  commissioned one on that department in order to determine

15  what the value could be.

16  Q   Two follow-up questions perhaps.  One, it's true, isn't

17  it, that the Department of Water and Sewer makes

18  contributions to the Retirement System -- the General

19  Retirement System on behalf of its employees and retirees; is

20  that correct?

21  A   Yes.

22  Q   And that's actually a substantial number, isn't it?

23  A   I believe so.

24  Q   Now, it's also true that the Department of Water and

25  Sewer pays retiree healthcare benefits for its former

1  employees; is that correct?

2  A   With respect to its former employees?

3  Q   Well, retirees.

4  A   I don't know.

5  Q   And those payments -- strike.  Let me rephrase that.

6  You're familiar with the bonds that are secured by the

7  revenues of the Department of Water and Sewer, are you not?

8  A   I am.

9  Q   All right.  That's actually part of your firm's special

10  charge here is to understand those values; is that correct?

11  A   Yes.

12  Q   Okay.  And you understand that -- are you familiar with

13  the concept of a waterfall?

14  A   Lower case or upper case?  Yes.

15  Q   Okay.  In the context of a secured creditor's entitlement

16  to money, could you tell the Court what a waterfall is?

17  A   In our technical vocabulary, a waterfall describes the

18  application of cash flows in terms of priority of creditor

19  claims, so if a creditor has a lien against revenues, that

20  lien is supposed to be satisfied before any money may be paid

21  to any other creditor who has an interest subordinate to that

22  lien.

23  Q   So in the waterfall for the bonds secured by the

24  Department -- the assets belonging to the Department of Water

25  and Sewer, net operating expenses are paid first before the

1  bonds, are they not?  Is that not correct?

2  A   You know, it's a good question.  The way the rate

3  agreement works in that context, it's not clear that it's a

4  strict waterfall in the context used in creditor documents.

5  It is -- we are allowed to seek reimbursement for operating,

6  maintenance, and debt service costs from our rate payers, but

7  I don't know whether it specifically says those costs are

8  senior to the payments made to the secured creditors.

9  Q   Sir, isn't it true that the bondholders are entitled to

10  the revenues after payment of net operating expenses?

11  A   Again, I'd have to read the agreement.

12  Q   Sir, you understand this asset perhaps better than

13  anybody in this room.  Are you telling me you don't know the

14  answer to the question?

15  A   I'm saying I'd have to read specific language to give you

16  an accurate answer.

17  Q   But as you're sitting here today, you don't know the

18  answer?

19  A   I'd have to read the language to give you an accurate

20  answer.

21  Q   Does that mean as you're sitting here today, you do not

22  know the answer without reading the document?

23  A   It's a very technical provision, and I would want to make

24  completely sure I gave you an accurate answer by rereading

25  that language.

1    Q    Okay.  Are you familiar with the size of the operating

2    revenues that either the sewer fund or the water fund

3    receive?

4    A    Yes.

5    Q    Okay.  And, sir, is it -- am I correct that the sewage

6    disposal fund had revenues in excess of $430 million a year?

7    A    In fiscal 2012, that seems correct.

8    Q    Okay.  And same question with respect to the water fund,

9    in excess of $350 million a year?

10   A    That sounds right.

11   Q    Would you regard those numbers as being material?

12   A    Yes.

13   Q    Okay.  But they are not mentioned in the June 14

14   proposal?

15   A    No.

16   Q    When thinking about asset values for purposes of being a

17   hypothetical creditor, is an understanding of the future

18   value of -- strike that.  Is the understanding of a fair

19   market value of that asset something that a creditor would

20   like to know?

21   A    Yes.

22   Q    Is there any fair market value information anywhere in

23   the June 14 proposal?

24   A    No.

25   Q    Okay.  Another way of understanding value for a creditor

1   is to understand historical costs; is that true?

2   A   Yes.

3   Q   Is there any historical cost information in the June 14

4   proposal?

5   A   No.

6   Q   And, lastly, another way is third-party appraisals.  As

7   of June 14th, are there any third-party appraisals in the --

8   mentioned or described in the June 14 proposal?

9   A   No.

10  Q   As the city's financial strategist, has the city

11  commissioned any appraisals other than Christie's?

12  A   Well, let's see.  I testified yesterday we have requested

13  an audit be done of the Detroit-Windsor Tunnel.

14  Q   I think I said appraisals, sir.

15  A   No.

16  Q   We'll get to audits.  Appraisals.

17  A   No.

18  Q   No.  Okay.  So let's turn to audits.  Is there any

19  information in the June 14 proposal with respect to audits of

20  any of the assets?

21  A   Not as of that time.

22  Q   And if I could for the purpose of this question consider

23  valuations, appraisals, and historical cost being asset value

24  information -- can I just use that as asset value

25  information?

```
 1   A   If you wish.

 2   Q   Okay.  So there's no asset value information regarding

 3   the City Airport in the June 14 proposal, is there?

 4   A   No outside appraisal?  No.

 5   Q   No.  The three buckets, appraisals, valuation, or

 6   historical cost.  I'm calling it asset value information.

 7   A   No.

 8   Q   Okay.  Is there any on noncore real estate?

 9   A   No.

10   Q   Is there any on the municipal parking system?

11   A   No.

12   Q   And I think you already testified there was nothing on

13   the Detroit-Windsor Tunnel; correct?

14   A   Correct.

15   Q   And you've also told me that there was no information on

16   potentially past due tax receivables; correct?

17   A   Well, we identified, I believe, how large a number it

18   was.  That's a matter of accounting entry.

19   Q   But nothing else?

20   A   That's right.

21   Q   Okay.  Has a business plan been developed by you or

22   somebody working with you for the Department of Water and

23   Sewer?

24   A   Yes.

25   Q   Okay.  And what role, if any, did Miller Buckfire play in
```

1    the development of that business plan?

2    A    None.

3    Q    You did not give any assumptions or make any

4    recommendations with respect to how that business plan should

5    be developed?

6    A    No.

7    Q    Okay.  So it's entirely the work of Conway MacKenzie?

8    A    And other consultants who were brought in to review the

9    Water and Sewer Department's capital improvement plan.

10   Q    Okay.  And who were those consultants, sir?

11   A    There was five or six firms involved.  I don't have all

12   their names.

13   Q    Are you speaking of engineering firms?

14   A    Yes.

15   Q    Oh, okay.  Now, have you read the business plan?

16   A    Yes.

17   Q    Have you made it part of a proposal that you have made to

18   anyone?

19   A    I don't understand.

20   Q    Have you made any proposals since the presentation to you

21   of the Conway MacKenzie business plan for the Department of

22   Water and Sewer to any third parties?

23   A    No.

24   Q    Have you made a -- have you made a proposal to the

25   emergency manager?

1  A    I don't understand what you mean by "proposal."

2  Q    Let's try again.  Have you been involved in any

3  negotiations regarding Department of Water and Sewer with

4  anybody not employed by the city or the emergency manager

5  since the Conway MacKenzie business plan was produced?

6  A    Yes.

7  Q    Okay.  And can you tell me what you have done in that

8  regard?

9         MR. STEWART:  I beg your pardon.  Could I hear the

10  question again?

11  BY MR. MONTGOMERY:

12  Q    The question was what have you done in that regard?  Do

13  you understand the question, sir?

14  A    Well --

15  Q    Obviously not.  Your eyes are wrinkling, and you can't

16  understand, so let me -- may I rephrase?

17  A    Of course.

18  Q    Thank you.  You were in charge of monetization of the

19  Department of Water and Sewer as an asset of the city, were

20  you not?

21  A    Yes.

22  Q    Okay.  And you've actually taken steps since the

23  production of the business plan to achieve that goal; is that

24  correct?

25  A    Yes.

1  Q   Okay.  And that has involved formulating a proposal to

2  third parties; is that correct?

3  A   Well, it's a very --

4  Q   Is that a "yes" or a "no" you're about to give me and

5  then answer?

6  A   Can you rephrase -- can you repeat the question?

7  Q   Sure.  I asked you if you had made a proposal to third

8  parties.

9          THE COURT:  And I would only ask you to specify,

10  counsel, a time period.

11         MR. MONTGOMERY:  Since the production of the Conway

12  MacKenzie business plan.

13         THE COURT:  To today?

14         MR. MONTGOMERY:  To today.

15         THE WITNESS:  No.

16  BY MR. MONTGOMERY:

17  Q   You've had no meetings with the regional water customers

18  of the city making a proposal to them?

19  A   I have not made a proposal on behalf of the city yet.

20  Q   Okay.  Did you have a meeting with the regional water

21  customers for the Department of Water and Sewer after

22  production of the Conway MacKenzie business plan?

23  A   We had a presentation of that plan after we met with our

24  creditors and presented the same information.

25  Q   Okay.  So you presented --

1    THE COURT:  I have to ask for a pause here.  I'm

2  concerned about the relevance of any of this information as

3  it may apply to work the witness has done since the case was

4  filed.

5    MR. MONTGOMERY:  Your Honor, if I may, this is a

6  line of inquiry that's actually designed to show that there

7  was potentially disclosable value in the June 14 proposal

8  that simply was not.

9    THE COURT:  Okay.  You can certainly ask about that,

10  but I don't think it's appropriate to ask the witness about

11  specific activities that he has undertaken to monetize

12  property since the case was filed.  The issue is was the --

13    MR. MONTGOMERY:  I understand, your Honor.

14    THE COURT:  -- city eligible on the date it filed.

15    MR. MONTGOMERY:  Okay.  Thank you, your Honor.

16  BY MR. MONTGOMERY:

17  Q   Mr. Buckfire, a central part of the June 14 proposal is

18  to free the Department of Water and Sewer from the legacy

19  pension and healthcare costs.  Is that not correct?

20  A   No.

21  Q   It's not correct, so --

22  A   It's not correct.

23  Q   Under the June 14 proposal, the city contemplates the

24  Department of Water and Sewer continuing to pay past pension

25  and healthcare obligations?

1   A   That wasn't what you asked me.  You asked me if we

2   contemplated freeing the department from legacy pension

3   liabilities.  That was not contemplated.  What was

4   contemplated was attempting to create a transaction that

5   might create value for the city but only if there was a buyer

6   on the other side willing to pay value for it.

7   Q   So two questions.  Does the June 14 proposal contemplate

8   that the retirees of the Department of Water and Sewer will

9   continue to have payments made by the city for either

10   pensions or healthcare?

11   A   Well, there are two scenarios.  In one case, the city

12   would continue to own the Department of Water and Sewer,

13   which is currently the most likely situation the city has,

14   and in that case the retirees would be treated exactly as we

15   identified in the plan with respect to their unsecured

16   claims --

17   Q   No.

18   A   -- in that scenario.  In the scenario in which we are

19   successful in selling Water and Sewer to its customers, which

20   would only be done if it created value back to the city, then

21   the use of that value would be up to the plan.

22   Q   When you say the use would be up to the plan, you mean

23   would be resolved as part of the plan of adjustment?

24   A   It would be a very fortunate outcome if we, in fact, are

25   able to get our customers to pay something for the use of

1   these assets.  What we do with that stream of value would

2   obviously be the subject of negotiation with our creditors

3   for whom benefit this is being done.

4   Q   Okay.  And am I not correct that the Conway MacKenzie

5   business plan identifies fairly significant streams of value

6   that are capable of being discussed?

7   A   In theory, yes.

8        MR. STEWART:  Objection, your Honor.  The plan was

9   provided and its detail was provided in the -- under the

10  confidentiality order in connection with the mediation

11  ordered by the Court.  I would object to any questioning

12  based upon that plan.

13       THE COURT:  Was that the question?

14       MR. MONTGOMERY:  No.  That was not actually the

15  question, but --

16       THE COURT:  All right.  Let's rephrase the question,

17  and we'll see if there's still an objection.

18  BY MR. MONTGOMERY:

19  Q   I think I asked you whether or not the Conway MacKenzie

20  business plan identified material streams of value.

21       MR. STEWART:  Same objection, your Honor.

22       THE COURT:  Was this Conway MacKenzie business plan

23  proffered to creditors or attorneys for creditors as part of

24  the mediation process?

25       MR. MONTGOMERY:  I believe we and others received

1    it.  That's why I was asking the question earlier whether or
2    not the witness had met with third parties.
3             THE COURT:  It was proffered as -- and you've seen
4    it as part of the mediation process?
5             MR. MONTGOMERY:  I have not asked -- yes.
6             THE COURT:  Is that right?
7             MR. MONTGOMERY:  Yes.
8             THE COURT:  Then the objection is sustained.
9             MR. MONTGOMERY:  Thank you.
10   BY MR. MONTGOMERY:
11   Q   Change of topic, sir.  You've been engaged twice in
12   connection with the City of Detroit; is that correct?
13   A   Yes.
14   Q   Okay.  And the first time was in 2012?
15   A   Yes.
16   Q   I believe you told Mr. Cullen yesterday that your first
17   engagement started around March; is that correct?
18   A   That's my recollection.
19   Q   That's March of 2012.  Do you recall telling me that your
20   first engagement was in July of 2012?
21   A   Yes.  I think I was wrong.
22   Q   So the July -- what you referred to in your deposition
23   transcript as July you now mean as March?
24   A   That's right.
25   Q   Thank you.  Were you involved with matters relating to

1  the city prior to March of 2012?

2  A    Only in a very limited sense.  We had tried to build a

3  relationship with the city and with the state obviously, as I

4  testified earlier, for about a year.  In the context of that,

5  at some point in early 2012 -- I can't recall when -- I was

6  contacted by Treasurer Dillon, who asked me if there was any

7  relevant experience that he could look at that might guide

8  him in constructing a agreement with the city to provide

9  future funding, so we did a little research, and I sent him

10  some documents related to the creation of the New York City

11  Financial Control Board and Municipal Assistance Corporation,

12  both of which were done in the 1970s, and answered a few of

13  his questions about that.

14  Q    Did you transmit to him any form of consent agreement?

15  A    No.

16  Q    Did you discuss these matters with Jones Day?

17  A    I recall asking someone at Jones Day what they thought

18  about this example as a structure that could be used by the

19  State of Michigan and the City of Detroit.

20  Q    And was that before or around March of 2012?

21  A    It was sometime in early 2012.  I can't recall the date.

22  Q    Okay.  Do you recall creating a model for use by

23  Treasurer Dillon?

24  A    A financial model?

25  Q    A model for a consent agreement?

1  A   I might have given him a model in the strict sense of an

2  outline, but that's all.

3  Q   Okay.  And did you share that outline with anybody else?

4  A   I don't recall.

5  Q   Did you share it with Jones Day?

6  A   I might have.

7  Q   Specifically Corrine Ball?

8  A   I might have.

9  Q   You communicate a lot with Corrine Ball, do you not?

10  A   I communicate with many attorneys.

11  Q   Did you not tell me in your deposition that you have had

12  almost daily contact with her as a result of a totally

13  different case?

14  A   That's true.

15  Q   Okay.  And were you having extensive contact with her in

16  March of 2012?

17  A   On another matter, that's correct.

18  Q   Okay.  But you also did talk with her or communicate with

19  her regarding this matter, did you not?

20  A   I did.

21  Q   Okay.  Do you recall communicating with Treasurer Dillon

22  about the possibility of repeal of PA 4?

23  A   No.

24  Q   No.  Do you recall communicating with Jones Day about the

25  possibility that the voters in the State of Michigan might

1   repeal PA 4?

2   A    No.

3   Q    Sir, do you remember telling me that -- in 2013 that the

4   city's information was not reliable?

5   A    That's correct.

6   Q    Do you recall participating in a meeting with E&Y and the

7   emergency manager on or about May 7?

8   A    Yes.

9   Q    Okay.  Do you recall telling me that that is the moment

10  in time in which you concluded the city was not solvent?

11          MR. STEWART:  Your Honor, if I may, if he could

12  answer the question -- ask the question directly, and then if

13  he doesn't recall, he can refresh his recollection or impeach

14  him with the deposition.  Asking whether he recalls the

15  deposition without the deposition in front of him is just an

16  improper way to proceed.

17          THE COURT:  The objection is sustained.  Just ask

18  the question.

19  BY MR. MONTGOMERY:

20  Q    When did you decide that the city was insolvent?

21  A    I didn't decide the city was insolvent.

22  Q    When did you conclude in your own mind that the city was

23  insolvent?

24  A    Well, if you use the definition of insolvency as the

25  inability to continue to pay debts when due, which I think is

1 relevant here, that's when it became, I think, factually

2 pretty evident to me that that would be a serious problem for

3 the city.  The city could not, therefore, make the

4 representation that it could pay its debts when due in the

5 short term, and, therefore, if you want to call that

6 insolvency, I would agree with you.

7           THE COURT:  The question was when did you come to

8 that conclusion?

9           THE WITNESS:  Around May 7th when I first saw the

10 projection from Ernst & Young.

11 BY MR. MONTGOMERY:

12 Q   That was the projection from Ernst & Young that --

13 A   The short-term cash flow forecast, yes.

14 Q   Okay.  Sir, I'm going to change topics, if you don't

15 mind.  I'd like to draw you back to a meeting that took place

16 at the City Airport, the law firm retention meetings, which I

17 believe you were in attendance at; is that correct?

18 A   I think you mean Metropolitan Airport.

19 Q   Metropolitan.  Did I say City Airport?

20 A   You did.  No one would have a meeting there if they could

21 avoid it.

22 Q   My apologies.  My apologies.  Even I know the difference

23 between the City Airport and the Metro Airport.  At the Metro

24 Airport?

25 A   Yes.

1   Q   Okay.  And were you in the room when Jones Day made its

2   presentation?

3   A   I was in the room for all the presentations, including

4   Jones Day's.

5   Q   Okay.  Do you recall anyone at Jones Day during that

6   presentation making a statement to the effect that asset

7   monetization outside of a bankruptcy may implicate

8   eligibility requirement that city be insolvent?

9   A   No.

10  Q   Sir, do you recall anybody at Jones Day making a

11  statement that statutes, codes, case law may require that

12  funds received from disposition be allocated?

13  A   No.

14  Q   Do you recall anyone at Jones Day making a statement that

15  any transaction should be reviewed and structured to address

16  any eligibility issues by earmarking of funds?

17  A   No.

18  Q   Was there any conversation during that meeting regarding

19  asset dispositions?

20  A   As I recall, the topic was addressed by all the law firms

21  that made presentations.  I can't recall what specifically

22  any one law firm said about it.

23  Q   In your experience as a financial strategist, leading up

24  to a Chapter 9, is asset monetization an issue that needs to

25  be watched closely for eligibility purposes?

1  A   I think you're asking me for a legal conclusion.  My

2  focus is purely and simply on cash, and we looked at all the

3  assets of the city with the objective of determining whether

4  any of the assets of the city could be converted into cash on

5  a fast basis because we needed the cash.  I really wasn't

6  worried about eligibility implications of that.

7  Q   Do you recall having any conversations with Emergency

8  Manager Moore (sic) regarding the timing of asset

9  monetizations prior to June 14, 2014 (sic)?

10  A   Yes.

11  Q   And when did that conversation -- first, was it one

12  conversation or more than one conversation?

13  A   That was multiple conversation over many months.

14  Q   Okay.  And so when was the first time you discussed the

15  impact of asset monetization?

16  A   Well, after he was appointed emergency manager -- I

17  believe it was close to the end of March.  We had already

18  been engaged for several months before that.  We briefed him

19  on our preliminary assessment of the situation, including

20  whether or not any assets were available for rapid conversion

21  to cash.  I believe it was that time we went through our list

22  of what I would call non-core assets and helped him

23  understand what any of them might be worth in a sale

24  transaction.

25  Q   But your conclusion was that nothing could be done in the

1   short term?

2   A   Correct.

3   Q   Okay.  And did the emergency manager charge you to begin

4   the long-term effort as a result of those conversations?

5   A   We continued to evaluate all of the city's assets after

6   that conversation as we have continued to do so to try to

7   maximize value for the city.

8   Q   So did the emergency manager change your work plan with

9   respect to asset monetization in any way?

10  A   No.

11         MR. MONTGOMERY:  Your Honor, subject to conferring

12  with my colleagues, I believe I'm done with this witness.

13         THE COURT:  All right.  I'll give you a moment to do

14  that.

15         MR. MONTGOMERY:  Your Honor, the Retiree Committee

16  has finished with Mr. Buckfire.  Thank you.

17         THE COURT:  All right.  Thank you.

18         MR. MONTGOMERY:  It'll take a moment to move my

19  papers from underneath the podium.

20                         CROSS-EXAMINATION

21  BY MR. CIANTRA:

22  Q   Good afternoon, Mr. Buckfire.  Thomas Ciantra, Cohen,

23  Weiss & Simon.  We're counsel for the UAW.  I don't have a

24  lot, but I do want do -- did want to ask you about one of the

25  topics that you testified about in your direct examination,

1    and that was, as I understand it, you were tasked to

2    negotiate with the city's bondholders and specifically the

3    bond insurers.  Is that correct?

4    A    That we took the lead role in those negotiations, yes.

5    Q    Okay.  And just by way of -- just by way of background,

6    would it be correct that some of the city's debt, both the

7    secured debt and the unsecured debt, is insured by municipal

8    bond insurers?

9    A    Substantially all of it is.

10   Q    Substantially all of it, so can you put a percentage on

11   that?

12   A    Well, there is approximately $6 billion of water and

13   sewer debt, and of that total about 5-1/2 billion, I believe,

14   is insured.

15   Q    Okay.

16   A    And of the city's general obligation debt, which includes

17   the certificate of pension payment debt, substantially all of

18   that is insured as well.

19   Q    Okay.  So how the insurance works -- would it be correct

20   that the insurers for the cost of the premium take on an

21   obligation to pay both interest payments when due and

22   repayment of principal in the event of a default?

23   A    Yes.

24   Q    So the bondholder, by purchasing the insurance,

25   essentially is reducing the credit risk of the underlying

1  bond?

2  A    That's the theory, yes.

3  Q    Right.  And the theory would be the way the market would

4  function is the issuer then is able to charge a lower

5  interest rate for the underlying bond obligation because of

6  the insurance?

7  A    The issuer, if it's done correctly, is supposed to be

8  able to borrow at a lower cost.

9  Q    Got it.  So in the proposal for creditors, there are

10  appendices that specify the various bond issues that are

11  outstanding?

12  A    Yes.

13  Q    And they identify the -- with respect to each bond issue,

14  the identity of the relevant insurer?

15  A    I believe that information is in the document, yes.

16  Q    Okay.  And would I be correct that there are -- it looks

17  to me as though there are six bond insurers that are

18  identified?

19  A    Yes.

20  Q    MBIA, Assured Guaranty, FGIC -- looks like Berkshire

21  Hathaway might be involved with some of the FGIC issues --

22  Syncora and something called Ambac?

23  A    That's correct.

24  Q    Did I miss any?

25  A    No.

1   Q  So in terms of the city's negotiation with respect to the

2   bond debt, those negotiations could really effectively be

3   done by those six bond insurers?

4   A  Well, it's not clear what would have ultimately happened

5   and what will happen in this case.  Certainly we began with

6   them, but we did not expect to end with them.

7   Q  Okay.  But it would be correct that from your perspective

8   in terms of handling the negotiation, the bond debt was --

9   debt holders were organized through the insurers; correct?

10   A  We could start there, yes.

11   Q  Right.  And the insurers could be effectively relied upon

12   to speak for the bondholders?

13   A  Well, again, we were opening what we expected to be a

14   long series of negotiations.  The bond insurers represented

15   themselves as holding the economic risk of these bonds

16   because of their insurance.  Therefore, we began our

17   discussions with them.

18   Q  Okay.  And as we said, that's six entities --

19   A  Correct.

20   Q  -- that cover the substantial majority of the city's

21   outstanding secured and unsecured debt; correct?

22   A  That's right.

23   Q  Do you know whether the city's unsecured pension

24   liabilities are insured?

25   A  I don't know.

1  Q   Okay.  So if I'm a bondholder -- let's say I'm a little
2  old lady in Pasadena who's relying on insured municipal bonds
3  from the City of Detroit for my retirement income.  I would
4  have recourse with respect to that income to the bond
5  insurer; correct?
6  A   Only if the bond insurer itself is solvent.
7  Q   Okay.  Assuming that they're solvent, is that --
8  A   Can't make that assumption here because some of them
9  aren't.
10  Q   I understand that some of them are having financial
11  difficulties, but at least it's possible.  It was possible
12  for the bondholder to purchase an insured product; correct?
13  A   In theory.
14        MR. CIANTRA:  No further questions.
15        THE COURT:  You may proceed, sir.
16        MR. SHERWOOD:  Hello, your Honor.
17                    CROSS-EXAMINATION
18  BY MR. SHERWOOD:
19  Q   Mr. Buckfire, Jack Sherwood, Lowenstein Sandler.  I'd
20  like to ask the technician to put up City Exhibit 7, which I
21  think you discussed yesterday on your direct.  Do you
22  remember discussing this agreement yesterday, Mr. Buckfire?
23  A   I do.
24  Q   And this agreement was executed before you were retained.
25  Is that fair to say?

1  A    Yes.

2  Q    And one of the parties to this agreement is the

3  Department of Treasury of the State of Michigan; correct?

4  A    Yes.

5  Q    And the other is the City of Detroit.  And I'd like to

6  ask you to clarify some of your testimony yesterday for me

7  about this agreement.  I thought I heard you say that it was

8  pursuant to this agreement that -- or that there was

9  something about this agreement that led to your engagement.

10  Is that accurate?

11  A    Yes, paragraph 1.

12  Q    Paragraph 1.  Is that the paragraph that talks about

13  restructuring assistance; correct?

14  A    Correct.

15  Q    And would you call yourself part of that restructuring

16  assistance that was agreed to for the city pursuant to this

17  agreement?

18  A    Well, my firm was selected pursuant to this paragraph 1

19  requirement.

20  Q    Okay.  And is it your understanding that, in addition to

21  your firm, Ernst & Young and Conway were also selected

22  pursuant to this paragraph 1 to provide restructuring

23  assistance?

24  A    No.  Ernst & Young had already been working for the city

25  pursuant to the March 2012 consent agreement.  I believe

1  paragraph 2 of this memorandum is the entry point for Conway

2  MacKenzie being awarded the contract to provide operational

3  assistance.

4  Q   Okay.  So you were engaged pursuant to paragraph 1,

5  Conway MacKenzie pursuant to paragraph 2, and Ernst & Young

6  was already on the scene; correct?

7  A   Correct.

8  Q   And did you -- so when was the exact date that you

9  actually got selected pursuant to this agreement?  It was

10 January of 2013; right?

11 A   Well, we signed our contract with the city on January the

12 5th, but we had been told we had won the award, as it were,

13 in December.

14 Q   Okay.  So you started work in earnest pursuant to this

15 agreement in January of 2013; is that right?

16 A   Yes.

17 Q   And same for Conway?

18 A   I don't know when they began, but it was -- certainly the

19 first time I met with them was in January.

20 Q   Okay.  And do you know whether Conway began their

21 services in January?  Maybe you just answered the question.

22 I'm sorry for asking it again.  Just to be clear, you don't

23 know whether Conway actually began their work in January of

24 2013?

25 A   I don't.  That's just when I first met them.

1  Q   Okay.  But you met them in the context of you're both
2  working on your engagement for the City of Detroit; isn't
3  that right?
4  A   Yes, because we both reported to the same city officers.
5  Q   Now, if you turn to paragraph 8 of this agreement -- I
6  think it's on page 5.  Can you -- it talks about milestones
7  for draws, and I think you testified a little bit yesterday
8  about -- and there has been some testimony over this money
9  that was loaned by the state and held in escrow.  Do you
10  recall that testimony?  Is that accurate?
11  A   No, it's not accurate.  I testified that the city had
12  been assisted by the state in raising $130 million on the
13  capital markets.  I think it was in March or April of 2012.
14  Q   Okay.  And you understood that to be the case when you
15  came on board in January of 2013?
16  A   Yes.  I knew there was still some money in escrow from
17  that bond financing.
18  Q   Okay.  And do you know what the amount in escrow was
19  in -- I just heard yesterday numbers like 30 million, 80
20  million, 50 million.  Do you know how -- let's see if we can
21  go date by date.  Do you know how much was in escrow in
22  November of 2012, the date of this agreement?
23  A   Well, paragraph 8 says there was $80 million, so I assume
24  it --
25  Q   Okay.

1  A    -- was $80 million.

2  Q    And do you know how much was in escrow on the date that

3  the bankruptcy petition was filed?

4  A    I believe it was around 60 million.

5  Q    Okay.  And do you know -- so at least 20 million was

6  distributed from that escrow between the period of November

7  2012 and July 2013; right?

8  A    Yes.

9  Q    And is this -- was it sort of like an advance and then a

10  repayment, or do you know how that worked?

11  A    Well, it was meant to be a release from the escrow.  I

12  don't really recall what the mechanism was.  I don't recall

13  there being any requirement for the city to put it back

14  because the city would not have the ability to do that once

15  the money was spent.

16  Q    Okay.  So you don't know whether it was 80 and then it

17  was below 60 and then -- you don't know whether the city ever

18  paid any of that money back?

19  A    I don't.

20  Q    Okay.  Do you know whether the city pays interest on that

21  money?

22  A    I don't.

23  Q    And is it true that that escrow money is releasable to

24  the city in the discretion of the state treasurer?

25  A    That's my understanding.

1    Q   So if the state treasurer wanted to release that money to

2    the City of Detroit, it could in the exercise of its

3    discretion?

4    A   I assume so.

5    Q   Now, the release of this -- would you agree that your

6    engagement and the engagement of Conway pursuant to this

7    agreement was sort of a condition of the city having access

8    to this escrow money?

9    A   Well, that was part of the paragraph 1 and 2 requirements

10    of this agreement.

11    Q   Right.  So if the city didn't retain -- and I'm not

12    saying you personally, but a financial advisor and a business

13    advisor, then they couldn't get access to this money.  Is

14    that your understanding?

15    A   Yes.

16    Q   Now, when this -- the date of this agreement was November

17    2012.  That was the same time that PA 4 was repealed by the

18    voters of the State of Michigan; isn't that right?

19    A   I don't know.

20    Q   And in your conversations with the state concerning this

21    agreement, do you know whether there was any connection

22    between this agreement and the referendum with respect to PA

23    4?

24    A   No.

25    Q   Now, after you were engaged in January of this year along

1  with Miller Buckfire, your understanding is you were working

2  for the City of Detroit; isn't that right?

3  A   That's who our contract is with.  That's correct.

4  Q   Okay.  But you reported to a board which include

5  representatives from the state, for the State of Michigan?

6  A   No.  We reported to Kriss Andrews and Jack Martin.

7  Q   Just the city?

8  A   That's correct.

9  Q   Okay.  And I assume you tried to fulfill your duties as a

10  professional, and I'm sure, based on your observations, the

11  folks at Conway MacKenzie were doing what they could to

12  provide financial advice and restructuring advice and to

13  implement initiatives for the City of Detroit from January

14  2013 through the appointment of the emergency manager;

15  correct?

16  A   As directed by the city.  That's correct.

17  Q   Let me just jump to your discussion earlier about your

18  communications with Jones Day.  You talked about March 2012

19  being your engagement date.  You made a mistake at your

20  deposition, so it was March 2012.  So your initial engagement

21  by the city ended, because I think it was a 60-day

22  engagement, so did it end in May of 2012?

23  A   I can't remember.  It was only 60 days, and it was a very

24  limited scope, so it was around that time.

25  Q   So just running the math -- and we don't have to be exact

 1   here, but, generally speaking, you were really not -- you

 2   were kind of on the sidelines during the period from, say,

 3   May of 2012 through the end of the year when you were engaged

 4   pursuant to this new deal; right?

 5   A   That's right.  We had developed a relationship with the

 6   city which we maintained during that period.

 7   Q   Now, during that period of time, you continued to

 8   maintain contact with Jones Day and continued to exchange

 9   information with Jones Day about the City of Detroit and

10   their financial issues; isn't that right?

11   A   And other law firms.  That's correct.

12   Q   Let me stay on this topic because I want to try to do

13   this in some type of logical order.  Let me jump now to the

14   meeting of the law firms at the airport on January 29th.

15   Isn't it true that you had a telephone conversation with the

16   Jones Day law firm on the day before that meeting?

17   A   I did, along with all the other law firms.

18   Q   You had a telephone conversation with all of the 14 or 15

19   law firms on the day before that meeting?

20   A   Many of them called looking for last-minute advice and

21   guidance on how to conduct themselves in the presentation.

22   Q   Okay.  Do you recall in your conversation with Jones Day

23   in particular advising Jones Day to address the issue if

24   Miller Buckfire finds a way to monetize assets, how will that

25   affect eligibility?

1  A    No.

2  Q    You don't recall that, any discussions with Jones Day

3  about that particular topic?

4  A    No.

5  Q    Do you recall what you said to Jones Day in advance of

6  the meeting to help them prepare to give their pitch?

7  A    I recall telling them the same thing I told all the other

8  law firms.  In general, make sure that they presented as

9  thoughtful a range of alternatives to the city and the state

10  as they could; to emphasize, to the extent they could, their

11  deep connections to the City of Detroit and the State of

12  Michigan; if they could speak to it, their midwestern roots

13  and any other things that would indicate that they cared

14  about this assignment.

15  Q    And just to be clear for the record, your testimony is

16  that you don't recall any discussions with Jones Day on

17  January 28th, 2013, asking them to address asset monetization

18  and the impact of that on eligibility under Chapter 9?  Is

19  that your testimony here today?

20  A    We might have talked about how we would handle an asset

21  monetization, but I don't recall any other implications of

22  that.  Asset monetizations always have to be considered in

23  any restructuring process as a source of cash and recovery

24  for creditors.

25  Q    Do you know discussing with them the impact of asset

1   monetization on eligibility for Chapter 9?

2   A    No.

3          MR. SHERWOOD:  Can I have one second, your Honor?

4          THE COURT:  Yes, sir.

5          MR. SHERWOOD:  Can we have Exhibit 860, please?

6   Your Honor, I don't think that this exhibit is in evidence.

7   I'm trying to use it to refresh the witness' recollection.

8          THE COURT:  Well, if that's so, I would ask you to

9   take it off the screen and just hand him a paper copy.

10         MR. SHERWOOD:  I'm sorry, your Honor.  I don't have

11  a paper copy.

12         MS. GREEN:  It's in the binder.

13         THE COURT:  Did you say 860?

14         MR. SHERWOOD:  Yes, sir.

15         THE COURT:  My order says that it is admitted into

16  evidence.

17         MR. SHERWOOD:  Then we can put it on the screen,

18  your Honor.

19         MR. STEWART:  No.  I think the -- don't we have the

20  objection on attorney privilege and on attorney work product

21  on that?

22         ATTORNEY:  We had one, yes.

23         MR. STEWART:  Did we recede from it?

24         ATTORNEY:  Yes, we did.

25         MR. STEWART:  Okay.  I'm sorry.  We receded from our

1    objection.

2          MR. SHERWOOD:  All right.  So can I put it back up,

3    your Honor?

4          THE COURT:  Okay.

5          MR. SHERWOOD:  I'm sorry.  Nw, if you can -- can I

6    ask that we go down to the text and sort of the line that

7    starts "Miller Buckfire" and blow that part up, please?

8    BY MR. SHERWOOD:

9    Q    Bottom sentence in the block that says, "If MB finds a

10   way to monetize assets to create liquidity, how would that

11   impact eligibility?"  And just for the -- just so we're

12   clear, Mr. Buckfire, you're not on this e-mail.  This is an

13   e-mail in evidence, and it -- and take your time reading the

14   whole thing, but basically it describes, I think, a

15   conversation at Jones Day describing their conversation with

16   you, and, you know, the last question is, "If MB" -- I assume

17   that means Miller Buckfire -- "finds a way to monetize

18   assets, how would that impact eligibility?"  Does that

19   refresh your recollection as to the content of your

20   conversation with Jones Day that day?

21   A    This is not an e-mail that I'm part of.

22   Q    Fair.

23   A    May I read the whole thing?  You're showing me one little

24   paragraph.

25   Q    Yeah.

1  A   This is an internal e-mail from Jones Day?

2  Q   Yes, it is, sir.

3  A   Yeah.  I'm sorry.  It's -- okay.  Can you blow this up?

4  I can't even read it.  Thank you.

5  Q   Is that better?

6  A   Thank you.  Okay.

7  Q   Does that refresh your recollection as to whether -- when

8  you had your conversation with Ms. Ball from Jones Day on the

9  28th, whether you told her to address the issue at the

10 meeting the next day if Miller Buckfire finds a way to

11 monetize assets, how would that impact eligibility?

12 A   I simply pointed out to her, as I did to everybody else,

13 that we were looking at ways of creating value, and we needed

14 to consider whether that could be done inside or outside of a

15 bankruptcy.  Obviously in the course of a normal bankruptcy,

16 Chapter 11 in particular, selling an asset prior to a

17 bankruptcy proceeding may often be challenged in hindsight by

18 creditors.  If we did find a source of value, we'd want to

19 make sure it didn't happen that way.

20 Q   So are you saying now that you recall the -- you

21 specifically --

22 A   No.

23 Q   -- recall the conversation, or are you just speculating

24 as to what you might have --

25 A   I'm speculating as to what this means and what she

1  thought she was writing about.

2  Q   All right.  We can take that down now.

3         MR. STEWART:  I'd move to strike the testimony, your

4  Honor.

5         THE COURT:  I'm sorry.  On what grounds, sir?

6         MR. STEWART:  Speculation.

7         MR. SHERWOOD:  I don't mind.

8         THE COURT:  All right.  It is so ordered.

9  BY MR. SHERWOOD:

10 Q   Now, in your previous cross -- I don't want to take too

11 much time with this because you've been up there a long time

12 and everybody is (inaudible) to lunch, but -- and just so the

13 record is clear, you were asked about whether Jones Day at --

14 whether you recall at the meeting on the 28th whether Jones

15 Day actually made part of their pitch with Mr. Orr a

16 statement about the impacts of asset monetization and

17 eligibility, and just so we're clear, you don't recall any

18 such statements being made by Jones Day during the course of

19 their presentation, or do you?

20 A   I don't.

21 Q   Let me try to pick up on the whole even-handed and fair

22 discussion.  I think you testified -- I'm sorry.  Is it your

23 understanding that at $12 billion of total liabilities the

24 projected recovery for unsecured claims under the proposal

25 was 16 cents on the dollar?

1  A    That's correct.

2  Q    And in concluding that the plan, as presented, is even-

3  handed and fair, did you consider the argument that the

4  vested pension claims are protected by the Constitution of

5  the State of Michigan?

6  A    I am aware of that argument.

7  Q    Did you incorporate that argument into the proposal?

8  A    No.

9  Q    And do you consider that argument -- you don't give that

10  argument much value, do you, when you conclude that the

11  proposal made on June 14th is even-handed and fair; isn't

12  that right?

13  A    We didn't give any weight to the obligation -- the

14  statement of the general obligation bondholders that their

15  tax pledge was important either.  We regarded them both as

16  covenants that the city could not honor.

17  Q    I'm sorry.  I just asked you about the vested pension

18  benefits and their mention in the Constitution.

19  A    They don't have --

20  Q    I asked you -- I asked you whether you give the

21  constitutional protection any value in either the proposal --

22  A    Um-hmm.

23  Q    -- or your statement that the proposal was even-handed

24  and fair.

25  A    They don't have a security interest, and, therefore, we

1    did give it weight, but we did not regard it as relevant to

2    our claims classification.

3    Q    They didn't have a security interest, but -- so, in your

4    view, a security interest is more valuable than

5    constitutional protection?

6    A    If a creditor has a security interest in an asset or

7    revenue stream, that gives them a claim on that revenue

8    stream or asset.  What is a covenant?

9    Q    Let me -- staying with the proposal, do you remember

10   looking at a page of the proposal that had a -- sort of a

11   timeline?  Would you like to see that again?

12   A    Yes, to make sure I understand which page --

13   Q    Yeah.  Can we pull up --

14   A    Which exhibit is that?

15   Q    It's 408, among others.  We're going to pull it up.

16   A    Are you referring to Exhibit 43?

17   Q    Yeah.  That's your number, yeah.  The city's number is

18   403.  That works.

19   A    Okay.

20   Q    Now, if you turn to page 113 of that -- and I believe

21   that is the page 113 that was on the original document.  Yes.

22   That's it.  Now, when this proposal -- I think you testified

23   yesterday that this was not a take it or leave it proposal;

24   correct?

25   A    Correct.

1    Q   And you and counsel referred to this calendar of contacts

2    and this page.  Was this calendar and contacts information --

3    was that highlighted at the end of the meeting on June 14th?

4    A   Yes, it was.

5    Q   Okay.  So there was a period for requests for additional

6    information June 17th to June 24th, and then initial round of

7    discussions.  The initial round of discussions ends on July

8    2nd; correct?

9              ATTORNEY:  July 12th?

10             THE WITNESS:  July 2nd?

11             MR. SHERWOOD:  July 12th.  Thank you.

12             THE WITNESS:  That was the plan, yes.

13   BY MR. SHERWOOD:

14   Q   Right.  And that was just to be the initial round of

15   discussions; correct?

16   A   We had to start someplace.

17   Q   Correct.  And then there's an evaluation period July 15th

18   through July 19th.  Do you see that?

19   A   I do.

20   Q   And the city filed bankruptcy on July 18th; isn't that

21   right?

22   A   I believe that's right.

23   Q   On this calendar and contacts, it doesn't say anything

24   like if we don't reach an agreement we're going to file on

25   July 18th, 2013; isn't that right?

1   A   It doesn't say that.

2   Q   And that wasn't said at the meeting, July 18th we're

3   going to file.  Nobody said that?

4   A   We hoped we didn't have to.

5   Q   One of the big concerns from your perspective in the --

6   in regard to the swaps counterparties -- we can put that down

7   there.  I think it was your testimony that you were really

8   concerned about these negotiations with the swaps.  You were

9   involved in that.

10  A   That's right.

11  Q   And your big concern was that absent a deal with these

12  guys, the city could lose the casino revenue, and that's a

13  big part of the city's revenue; right?

14  A   And then it got worse.  That's correct.

15  Q   Okay.  Isn't it true that -- though, that on July 17th a

16  forbearance agreement was executed with the swap

17  counterparties?

18  A   That's true.

19          MR. SHERWOOD:  Can we put up Exhibit 558, please?

20  It's AFSCME 558.  I'll move on to something else and see if I

21  can get back to that, your Honor.

22          THE COURT:  I'm feeling like this is a good time to

23  break for lunch.

24          MR. SHERWOOD:  Your Honor, I was hoping to get done

25  before lunch, which is -- I'm sorry about that, but --

1     THE COURT:  I'd like to actually conduct a

2   referendum among counsel here.  One hour, one hour and 15

3   minutes, or one hour and 30 minutes for lunch?  How many vote

4   for one hour?  Nobody.  How many vote for an hour and 15

5   minutes?  A couple people.  How many an hour and 30?

6   Everybody else.  All right.  Fine.  An hour and 30 it is.

7   We'll reconvene at 1:45.

8           MR. SHERWOOD:  Your Honor, just --

9           THE COURT:  Sir.

10          MR. SHERWOOD:  -- for everybody's benefit, I'm 15

11  minutes from --

12          THE COURT:  Okay.

13          MR. SHERWOOD:  Just so everybody can plan.

14          THE COURT:  We'll pick it up then.

15          MR. STEWART:  Another question now?

16          THE COURT:  Sir.

17          MR. STEWART:  I would like to ask the Court's

18  guidance.  We have Mr. Malhotra here, and I assume that for

19  fairness sake, since those exhibits are now in for the truth,

20  that there will be additional cross-examination of

21  Mr. Malhotra and probably brief additional direct.

22          THE COURT:  Well, let's take this up at 1:45.

23          MR. STEWART:  Okay.

24          THE COURT:  Counsel, I want you to think about the

25  question whether you need further examination of Mr. Malhotra

1   or whether he can be excused as a witness.

2           THE CLERK:  All rise.  Court is in recess.

3       (Recess at 12:15 p.m. until 1:45 p.m.)

4           THE CLERK:  Court is back in session.  Please be

5   seated.  Recalling Case Number 13-53846, City of Detroit,

6   Michigan.

7           THE COURT:  Looks like everyone is here.  You may

8   proceed, sir.

9   BY MR. SHERWOOD:

10  Q   Mr. Buckfire, before lunch I was trying to get ahold of

11  this exhibit that we've marked as 588.  Can you see it on the

12  screen, or would you like a hard copy?

13  A   If you could blow up the one I have here, that would be

14  helpful.  Yes, I see it.  There's only half the document.  Do

15  you have a hard copy just if you don't mind?

16          MR. SHERWOOD:  May I approach, your Honor?

17          THE COURT:  Yes.

18          MR. SHERWOOD:  Would the Court like a hard copy,

19  too?

20          THE COURT:  No.  That's all right.

21          THE WITNESS:  Thank you.

22          THE COURT:  Do you have a question for the witness?

23          MR. SHERWOOD:  Oh, I'm sorry.

24  BY MR. SHERWOOD:

25  Q   Have you reviewed the document?  Do you recognize it?

1    A    I do.

2    Q    And did you write this e-mail to the governor, Treasurer

3    Dillon, and others on July 17th, 2013?

4    A    I did.

5    Q    And does it accurately describe the state of affairs with

6    respect to negotiations -- the negotiation of a forbearance

7    agreement with the swap counterparties?

8    A    Yes.

9    Q    Okay.

10            MR. SHERWOOD:  Your Honor, I would move this

11    evidence into evidence.  I don't think it's been stipulated

12    in.  I think we've laid a proper foundation.

13            MR. STEWART:  No objection, your Honor.

14            THE COURT:  All right.  The exhibit was 588, did you

15    say?

16            MR. SHERWOOD:  Yes, sir.

17            THE COURT:  Exhibit 588 is admitted.

18        (Exhibit 588 received at 1:47 p.m.)

19    BY MR. SHERWOOD:

20    Q    Mr. Buckfire, just before lunch, just to follow up on

21    something I asked you, you indicated that one of the people

22    at the city that you reported to before the appointment of

23    the EM was a person by the name Jack Martin.  Do you remember

24    that?

25    A    Yes.

1  Q   And isn't it true that Mr. Martin was hired pursuant to a
2  consent decree and appointed by Governor Snyder?
3  A   Well, I know he was hired as chief financial officer
4  after the consent agreement was signed in March of 2012,
5  chief financial officer of the City of Detroit.  I don't
6  recall him being appointed by the governor.
7  Q   Isn't it true that he's now the EM for the Detroit Public
8  Schools?
9  A   Yes.
10 Q   And in that post, was he appointed by the governor?  Do
11 you know?
12 A   I don't know.
13 Q   Let me ask you just about the artwork and the Christie's
14 appraisal.  I think you said that you engaged them in either
15 May or June.  Do you remember that?
16 A   May.
17 Q   Was it May?
18 A   May 15th or so.
19 Q   May 15th.  Okay.  So they've had all of June, July,
20 August, and September, and I mean it's been like five months
21 since their engagement.
22 A   No.  I didn't say that.  I said I met with the DIA May
23 15th --
24 Q   When were they --
25 A   -- and I recommended to the emergency manager that an

1    appraisal be conducted sometime in June, and I contacted

2    Christie's on behalf of the city to find out if they had an

3    interest in taking on this assignment. As I recall, the

4    emergency manager did not sign their agreement until sometime

5    in August.

6    Q    August. Okay. So they've only had August, September,

7    October to do their appraisal work. Is that what you're

8    saying?

9    A    I believe they actually started in early September.

10   Q    Okay. And in that time they haven't even produced a

11   preliminary report on valuation?

12   A    No.

13   Q    You testified yesterday about -- in connection with the

14   Coleman Young Airport. I think you said something about

15   consulting with one of your colleagues at Miller Buckfire who

16   had expertise in matters concerning to airports and financing

17   and so forth. Do you recall that?

18   A    I do.

19   Q    And what was the name of that individual?

20   A    John McKenna. He's a managing director at Miller

21   Buckfire, a lot of experience with airlines. Among other

22   things, he had been a director of U.S. Airways at one point.

23          THE COURT:  The question simply was who was that.

24          THE WITNESS:  John McKenna.

25   BY MR. SHERWOOD:

1  Q   And at Miller Buckfire, you guys have over 30

2  professionals.  Do the professionals within your firm -- do

3  they specialize in specific industries?

4  A   They don't set out to do so, but after you've worked with

5  one company and one industry, you tend to do others, so they

6  do acquire industry expertise.

7  Q   And what other types of industry expertise would you say

8  that Miller Buckfire has as a strong part of their practice?

9  A   Sovereign restructuring.  We have one large country,

10  which has been a client of ours now for several years.  We've

11  done other work for other municipalities in the United

12  States.  In terms of private sector work, airlines, electric

13  utilities, merchant power companies, retailers, steel

14  companies, telecommunications companies, yeah.  I could go

15  on, but those are the primary ones.

16  Q   And in connection with your firm's work, do you testify

17  in court on behalf of your clients?

18  A   Yes.

19  Q   And in your experience testifying in court, have you been

20  qualified as an expert before?

21  A   Yes.

22  Q   Was it your decision to be a nonexpert witness in this

23  case?

24  A   No.

25  Q   Do you know whose it was?

1    A    No.

2         MR. SHERWOOD:  Thank you, Mr. Buckfire.  Thank you,

3    your Honor.  I have no further questions.

4         THE COURT:  Anyone else have questions for the

5    witness?

6         THE WITNESS:  You want this exhibit?

7         THE COURT:  I guess just set it down there.

8                    CROSS-EXAMINATION

9    BY MS. GREEN:

10   Q    Good afternoon, Mr. Buckfire.  My name is Jennifer Green.

11   I represent the General and Police and Fire Retirement

12   Systems for the City of Detroit.  We've actually met before.

13   I was at your deposition.  I just wanted to get the timeline

14   straight that you just testified about.  You were initially

15   engaged by the State of Michigan in 2012; correct?

16   A    Correct.

17   Q    And at that time, your engagement was limited to the time

18   frame of March to April?

19   A    It was 60 days.

20   Q    And at that time, it was your job to identify assets of

21   the City of Detroit; correct?

22   A    No.  I didn't testify to that.  I testified we were asked

23   to do a general financial review of the city's financial

24   condition based on public information.

25   Q    Okay.  And then in 2013 when you were reengaged, you

1  discovered that the artwork could be a potential asset?

2  A   Among other things, yes.

3  Q   And you did not know that during your engagement in 2012;

4  correct?

5  A   No.

6  Q   You met with Christie's in May of 2013?

7  A   I first called them late May, and I believe I met with

8  them either late May or early June to ascertain whether they

9  might have an interest in appraising the art at the DIA.

10  Q   And were you told by Christie's at that time how long it

11  would take to perform the valuation?

12  A   They told me it would take several months.

13  Q   You knew even if you started in May that it would not be

14  done until the end of summer; correct?

15  A   Correct.

16  Q   The meeting with the DIA, what date in May was that?

17  A   May 15th.

18  Q   Was that the only meeting you had with the DIA?

19  A   No. It was the first meeting I had with the DIA.

20  Q   What other meetings did you have with the DIA?

21  A   Well, I met with representatives of the DIA and the

22  chairman of the trustees several times after that meeting to

23  again reiterate the city's position that the city owned the

24  art and the building and that it would be useful to everybody

25  to arrive at a consensual resolution that would create value

1    for the city.  Those discussions did not prove fruitful.

2    Q    And who is the chairman that you just mentioned?

3    A    Gene Gargaro.

4    Q    And who is Richard Manoogian?  Is he also involved with

5    the DIA?

6    A    I don't know.  I assume he -- I've heard the name, but I

7    never met him.

8    Q    And David Meador, how is he involved with the DIA?

9    A    He's a trustee.

10   Q    And did you meet with him as well in May or June?

11   A    I did.  I met him when DTE was working with the city on

12   the formation of the public lighting authority.

13   Q    And when you met with Mr. Meador, did you discuss the

14   potential of a Chapter 9 filing on behalf of the City of

15   Detroit?

16   A    I told him that it was certainly a risk given the city's

17   financial position.

18   Q    Did you identify a particular date that the city may file

19   Chapter 9?

20   A    No.

21   Q    Did you share with any of the other trustees of the DIA

22   that there was a particular date or month that a Chapter 9

23   might be filed on behalf of the city?

24   A    No.

25   Q    Mr. Buckfire, do you remember receiving an e-mail from

 1    David Meador, the Mr. Meador that we just spoke about, on

 2    July 11th of 2013?

 3    A    I recall getting numerous e-mails from him.  That sounds

 4    like I might have gotten one on that date.

 5    Q    We'll pull up a copy of it for you to look at.  Do you

 6    recognize this as being the e-mail that you received from Mr.

 7    Meador in July of 2013?

 8    A    Yes.

 9    Q    I'd like to direct your attention to the top of the e-

10    mail where it says "Ken, here's the outline that I provided

11    Gene."  Is that Gene Gargaro, who we just spoke of?

12    A    Yes.

13    Q    "As a pre-read to our call, I don't think any action is

14    needed on your part.  I just wanted you to be aware of what I

15    had shared with him."

16    A    I see that.

17    Q    Okay.  The e-mail below has a date of, if you look down,

18    June 22nd.  And if you scroll to the last page of the e-mail,

19    there's a bullet point list of topics that were discussed.

20    Bullet point number --

21            MR. CULLEN:  Before we get into the topics, unless

22    we're going to refresh his recollection, I would like to have

23    a proper foundation for the rest of the e-mail or for his

24    ability to discuss the substance of this.

25            MS. GREEN:  Your Honor, it's actually going to be

1  impeachment because he just said that he didn't tell them

2  something, and that's all I'm using it for.

3        THE COURT:  Well, let's just get the record

4  straight.  Is this e-mail an exhibit?

5        MS. GREEN:  It is not yet an exhibit, your Honor.

6        THE COURT:  Okay.  Well, for identification

7  purposes, let's just put a number on it, and you'll tell me

8  what that number is.

9        MS. GREEN:  It would be Exhibit 868.

10        THE COURT:  868.  Okay.  We'll put that number on

11  it.

12     (Exhibit 868 marked at 1:57 p.m.)

13        THE COURT:  Is this an e-mail that the witness

14  received in the ordinary course?

15        MS. GREEN:  I believe he just testified that he

16  generally recalls receiving an e-mail from Mr. Meador

17  following their meeting.

18        THE COURT:  Did you receive this e-mail?

19        THE WITNESS:  I did.

20        THE COURT:  All right.  You may proceed.

21  BY MS. GREEN:

22  Q   Bullet point number five states the EFM has to have a

23  plan in place by mid-July.

24  A   Um-hmm.

25  Q   The second line states, "A bankruptcy filing will likely

1    be in July.  The team would like to include a conceptual

2    framework for the DIA assets in that filing.  A formal plan

3    will be submitted in the fall, November or earlier, and a

4    hearing next May."  And as you recall, an e-mail that you

5    received stated, "I just wanted you to be aware of what I had

6    shared with him."  Had you shared this information with a

7    board member of the DIA?

8    A    Well, this is his e-mail to Gene Gargaro.  It's not from

9    me to him.

10   Q    I understand that.  I'm asking if it's -- if it is your

11   testimony that you did not share at your meeting that a

12   bankruptcy filing will likely be in July.

13   A    I never shared with anybody at DIA that a bankruptcy

14   filing was likely in mid-July, but at this point -- and this

15   is dated -- when was this dated again?  When was it sent?

16   Q    June 22nd.

17   A    Okay.  We had already had our meeting with creditors on

18   June 14th.  All right.  We were already in the middle of

19   discussions with them.  He had called me to find out where

20   this left DIA, and I explained to him that, you know, given

21   where we were with the cash position of the city -- and this

22   is an important point -- we still didn't have a forbearance

23   agreement in place -- that that raised the risks of a

24   bankruptcy to a high level, and, therefore, it would be nice

25   to have something in place as soon as possible.

1  Q   Did you respond to his e-mail and deny that you ever told

2  him a bankruptcy filing would be coming in July?

3  A   I never said it was coming in July.

4  Q   His e-mail --

5  A   This is his e-mail.

6  Q   I understand that.  His e-mail says that a bankruptcy

7  filing will likely be in July, and you had just met with him.

8  And the e-mail to you said, "I wanted you to be aware of what

9  I had shared with him."  Did you respond and say, "I didn't

10  share any information of this nature with you"?

11  A   I'm confused.  This is what he wrote to his colleagues

12  about what he believed would be the state of play.

13  Q   Can we go back to the initial e-mail to Mr. Buckfire,

14  please?

15  A   Can you hand me a hard copy because it's actually hard to

16  follow this from the screen?

17  Q   Mine has writing, so --

18  A   What?

19  Q   Mine has writing.

20       MR. CULLEN:  Don't you have a --

21       THE COURT:  Do you have a clean copy?

22       MR. CULLEN:  You don't have a clean copy?

23       MS. GREEN:  Don't have a clean copy.

24       MR. CULLEN:  Well, it's more important that he have

25  it than I do, your Honor.

1          THE COURT:  Okay.  Thank you, sir.

2     BY MS. GREEN:

3     Q   I just wanted to direct your attention again to the

4     sentence that says -- it's an e-mail from Mr. Meador to you

5     saying, "I wanted you to be aware of what I had shared with

6     him."

7     A   Um-hmm.

8     Q   Had you shared that information?

9     A   Well, he's referring to what he had shared with Gene, not

10    what I had shared with him.  That's what it says.

11    Q   My question to you was are you denying that you were the

12    one that told them that a bankruptcy filing would be coming

13    in July?

14    A   I never told him that.  I did, however, tell them that

15    the city was at great risk of action because we didn't have a

16    forbearance agreement.  We just had our meeting with

17    creditors.  I didn't know what was going to happen, and,

18    therefore, they should be concerned about doing something

19    about DIA as soon as possible.

20    Q   Did the emergency manager himself have a meeting with Mr.

21    Meador or Gene Gargaro?

22    A   Not to my knowledge.

23    Q   Who all was in the meeting in May of 2013 with you and

24    Mr. Meador?

25    A   Let's see.  It was Mr. Gargaro, Richard Levin from

1  Cravath, Alan Schwartz from Honigman Miller, Bruce Bennett
2  from Jones Day, and myself.
3  Q   Do you think it's possible that one of the other people
4  at that meeting shared with the representatives from the DIA
5  that a bankruptcy filing would be coming in July?
6  A   Well, all the people at that meeting were from the DIA
7  except for Mr. Bennett and myself.
8  Q   That's what I'm asking you.  Did someone else at the
9  meeting, perhaps Mr. Bennett, share with the DIA
10  representatives that the emergency -- or I'm sorry -- that a
11  bankruptcy filing would be coming in July?
12  A   I have no idea.
13  Q   Do you recall any discussion about a formal plan that
14  would be submitted in November as the e-mail states?  Do you
15  recall any discussions of that nature in your meeting?
16  A   Yes.  I explained to Mr. Meador that in the ordinary
17  course, if we were successful in crafting a plan with our
18  creditors, we would move this along as rapidly as we could,
19  and the earliest we could potentially file a plan would be
20  end of this year with a goal of having an exit from
21  bankruptcy, if necessary, by the end of next year.
22  Q   And the portions regarding having a plan in place by July
23  or bankruptcy filing in July never came up?
24  A   No.  We were referring to having a plan with our
25  creditors.

1   Q    And you never corrected this what you now say is an

2   inaccurate recollection or an inaccurate summary of your

3   meeting?

4   A    This is not my meeting, and it's not my e-mail, so I

5   don't know what you're talking about.

6   Q    You didn't correct his understanding that there was not

7   to be a bankruptcy filing in July?

8   A    I didn't feel it necessary to respond to every e-mail I

9   receive because he's not an employee or officer --

10          THE COURT:  "Yes" or "no," sir?

11          THE WITNESS:  No.

12  BY MS. GREEN:

13  Q    Thank you.  I believe you testified earlier when Mr.

14  Montgomery was questioning you whether you had any

15  communications with Jones Day regarding the possibility of a

16  repeal of PA 4, and you answered, "No."

17  A    Okay.

18  Q    Do you consider e-mails a form of communication?

19  A    Yes.

20  Q    I'd like to direct your attention to Exhibit 842.  Do you

21  recognize this document?

22  A    No.

23  Q    Do you recognize your e-mail address at the top of it?

24  A    I do.  It was sent to me.  That's correct.

25  Q    Correct.  So you -- do you recall receiving it generally?

1  A    No.

2  Q    When it says at the top, "FYI ahead of your meeting,"

3  what meeting is that relating to in June of 2012?

4  A    I can't recall which meeting that might be referring to.

5  Q    Did you meet with the governor of the State of Michigan

6  in June of 2012?

7  A    I may have, yes.

8  Q    Who all was at the meeting with the governor in June of

9  2012?

10  A    It was a meeting where we briefed him about restructuring

11  alternatives in general.  I believe it was attended by

12  Treasurer Dillon, one of his aides, Brom Stibitz.  Dennis

13  Muchmore, chief of staff, was there.

14  Q    What was the substance of the conversations during this

15  meeting on June -- I think it would be June 6th?  If it's the

16  following day, it would be June 6th.

17  A    Yeah.  Well, as I testified, they were interested in the

18  application of restructuring technique to the problems of the

19  City of Detroit, how these issues could be resolved, and they

20  asked me to come up and brief them about those things, which

21  I did.

22  Q    Were any representatives of Jones Day at the meeting on

23  June 6th?

24  A    I don't recall.

25  Q    I'd like to draw your attention to another exhibit.  It

1   is an e-mail dated June 5th, 2012.  I believe it's 845, 844.

2   A    This is dated March 24th?

3   Q    Yeah.  I think it's off one.  It should be 844.  Okay.

4   The next page of that e-mail -- I'll direct your attention to

5   the top line, and it says, "Guys, I'm going with Ken Buckfire

6   to talk to the governor in Michigan tomorrow," and it's an e-

7   mail from Heather Lennox.  Does that refresh your

8   recollection at all about whether someone from Jones Day

9   joined you at the meeting?

10  A    Yes.

11  Q    Was Heather Lennox, indeed, there?

12  A    She was.

13  Q    Were there any other representatives of Jones Day at the

14  meeting?

15  A    Not that I recall.

16  Q    Do you recall if there were any discussions relating to a

17  Chapter 9 filing at that meeting?

18  A    I'm sure we talked about it.  It's something you have to

19  consider when you have a high level of insolvency.

20  Q    Did you discuss Chapter 9 filing specifically in

21  connection with any particular sorts of liabilities such as

22  the pension liabilities of the City of Detroit?

23  A    I don't recall that either.

24  Q    Do you remember if there were any memos or reports

25  relating to constitutional protections of the pension

1  liabilities discussed at this meeting?

2  A    No.

3  Q    Do you recall if any -- do you recall being given at any

4  time memos from Jones Day relating to Chapter 9 filing issues

5  vis-a-vis the City of Detroit?

6  A    In general, yes, but not specifically with respect to

7  Detroit.

8  Q    I couldn't -- I didn't hear the last --

9  A    Not specifically with respect to Detroit but in general,

10  yes.

11  Q    Do you remember any discussion at the meeting with the

12  governor relating to the bankruptcy filing requirements under

13  109(c)(5) and negotiations and the good faith requirements --

14  A    No.

15  Q    -- listed thereunder?  No?  Do you remember any

16  memorandums being shared with the governor on that topic?

17  A    No.

18  Q    Do you remember, as stated in the e-mail, suggesting that

19  Jones Day put together all the memos that they had done for

20  Andy?

21  A    I don't recall any of those memos.

22  Q    No.  Do you recall suggesting to them that they compile

23  the memos in advance of the meeting?

24  A    Yes.

25  Q    And what prompted you to do that?

1  A   I thought that the state would find it helpful to see

2  their research.

3  Q   And when it says "the memos we did for Andy," is that for

4  Andy Dillon?

5  A   Yes.

6  Q   And do you remember specifically what types of memos had

7  been requested by Mr. Dillon prior to this meeting?

8  A   He didn't request any specific memo.  He just wanted to

9  get an education on the issues.

10  Q   So they prepared the memos on their own volition?

11  A   Yes.

12  Q   I'd like to go back to what I believe is Exhibit 843.  We

13  talked a little while ago about your denial of any

14  communications relating to the repeal of PA 4.  Do you

15  recognize this e-mail?

16  A   No.

17  Q   Do you see your name at the top as a recipient?

18  A   I see my name as a recipient, but I don't recall reading

19  it.

20  Q   So you just ignored the e-mail or you just --

21  A   I guess.

22  Q   -- generally don't recall getting it?

23  A   I get a lot of e-mails.  I don't recall reading this one

24  at the time.

25  Q   Okay.  Well, let's look at the context, and maybe that

1  will remind you whether or not you read it.  The first bullet

2  point talks about the appeals court should soon rule on the

3  repeal efforts related to Public Act 4.  Does that ring a

4  bell to you?

5  A   Yes.

6  Q   And the second paragraph talks about a separate challenge

7  to the state unrelated to the efforts to repeal PA 4.

8  A   Yes.

9  Q   Do you now remember getting the e-mail and having

10  communications about the repeal of PA 4?

11  A   No.

12  Q   What about Exhibit Number 846?  Oh, these are all off

13  one.  You know, it must be 8 -- I think it's 845.

14        MR. CULLEN:  Is it copied on 846, counsel?

15        MS. GREEN:  No.  It's 845.  They're all off by one

16  for some strange reason.  There we go.

17  BY MS. GREEN:

18  Q   Do you see this e-mail, and do you recognize it?

19  A   I see the e-mail.  I don't recall it, but I'm sure I

20  received it.

21  Q   And you see your name at the top of the e-mail?

22  A   I do.

23  Q   And you see a discussion in paragraph 1 about the state

24  and city were concerned that PA 4 may not survive the

25  petition challenge?

1  A   I do.

2  Q   I direct your attention to the second page of this e-mail

3  where it states, "The state was likely looking at declaring

4  at emergency and appointing and EFM with a likely subsequent

5  step of a Chapter 9."

6  A   Sorry.  You lost me.  Where are you reading from?  Oh,

7  okay.  Okay.

8  Q   And then the following paragraph where it talks about if

9  PA 4 is pulled back at the end of April, is this another

10 example of communications relating to the repeal of PA 4?

11 A   It seems to be.

12 Q   I have several more, but I would -- I don't need to go

13 over them.  Do you have a reason why you said before you had

14 no communications relating to the PA 4 repeal?

15 A   I didn't send this e-mail.

16 Q   You didn't what?

17 A   I didn't send this e-mail.

18 Q   But you received it.

19 A   I don't remember it.

20 Q   As part of your position with the team of E&Y, Conway

21 MacKenzie, and Miller Buckfire Advisors, were you privy to

22 any timelines or communication rollout plans prepared by

23 Kevyn Orr's staff?

24 A   Are you referring to a public communication strategy?

25 Q   I'm referring to any kind of timeline or communications

1   rollout plan that would have been shared with you in your

2   role as the lead advisor for the financial team.

3   A   I might have received a document from his communications

4   director at some point this year laying out a proposed time

5   schedule for public communications, but I can't recall

6   specifically.

7   Q   Do you recall when that would have been?

8   A   No.

9   Q   And his press secretary is Mr. Nowling?

10  A   Yes.

11  Q   Do you recall the substance of that timeline and what the

12  date was for the bankruptcy filing?

13  A   No.

14  Q   Did you not review the e-mail from Mr. Nowling for its

15  substance?

16  A   I just don't remember it.

17  Q   You were the lead advisor of the financial team, and you

18  don't remember an e-mail with the date for the bankruptcy

19  filing?

20  A   No.

21  Q   Do you think that would have been an important thing for

22  you to know as the lead negotiator on the swap transaction

23  and negotiating with the creditors?

24  A   I had advised Mr. Orr that if he were to decide to seek

25  protection, he shouldn't do it until we had a forbearance

1  agreement executed.

2  Q   And at the time leading up to the negotiation of the

3  forbearance agreement, you and Mr. Orr were in daily contact;

4  correct?

5  A   Yes, up until the time we got the forbearance agreement

6  executed.

7  Q   And that was executed on July 15th; correct?

8  A   I think it was the 16th.

9  Q   July 16th?

10 A   July 16th.  That's right.

11 Q   Is it your testimony that as of July 16th, you didn't

12 know what the filing date, if any, would be for the City of

13 Detroit?

14 A   That's correct.

15 Q   How far in advance did you know that the bankruptcy was

16 going to be filed?

17 A   Well, I knew after the forbearance agreement was executed

18 that the decision to seek a filing was being discussed

19 between Mr. Orr and the state.  I was not part of any of

20 those discussions.

21 Q   So as of the date of the forbearance agreement, you had

22 no idea that the bankruptcy petition would be filed two days

23 later?

24 A   No.

25 Q   Were you shared any -- I'm sorry.  Were any timelines or

1   communications rollouts shared with you that were prepared by

2   the governor's staff?

3   A   Not that I recall.

4   Q   Was the one that was shared with you by Mr. Nowling by

5   any chance dated July 8th of 2013?

6   A   I don't know.

7   Q   Why don't we pull it up, and we'll see if you recognize

8   it?  It would be Exhibit 831.  And if you scroll to the next

9   page, there's a communications rollout plan.  Can you tell me

10  if it looks like the one that you think you saw?  There's a

11  document checklist, and the next --

12  A   It looks familiar.

13          MR. CULLEN:  Do you have a hard copy for the

14  witness, counsel?

15          MS. GREEN:  There's a binder up there if you want me

16  to --

17          MR. CULLEN:  Allow me.

18          MS. GREEN:  I can give him the binder.

19          MR. CULLEN:  May I, your Honor?

20          THE COURT:  What are you doing?

21          MR. CULLEN:  Giving him the exhibit, the hard copy

22  of the exhibit.

23          THE COURT:  Okay.

24  BY MS. GREEN:

25  Q   Have you reviewed it?  Does that look like the one that

1  was shared with you?

2  A   Yes.  This was the contingency planning documents I knew

3  they were working on.

4  Q   I think you have to speak into the microphone.

5  A   I'm sorry.  This is the contingency planning document

6  that they'd been working on.  That's correct.

7  Q   Okay.  And on the next page, if you scroll through to the

8  timeline itself, the end, all the way to the end -- there we

9  go.  There are various dates and there are various milestones

10 that are listed there.

11 A   Okay.

12 Q   And as of on the Friday, July 19th, date -- is that what

13 you're looking at?

14 A   I'm sorry.  You're at July 19th?

15 Q   Yes.

16 A   Yes, yes.

17 Q   Okay.  And do you see where it says "filing day" in big

18 capital letters?

19 A   Yes.

20 Q   And this is the document that you think you saw on July

21 8th?

22 A   Yes.  It's a contingency plan.

23 Q   On the 18th, it talks about document preparation.

24       MS. GREEN:  Your Honor, I'd ask to strike that last

25 part.  I had no question pending when he offered that last --

1        THE COURT:  The motion is granted.

2    BY MS. GREEN:

3    Q    And it says, "make last-minute revisions to all key

4    documents."  I don't see the words "contingency."  Do you see

5    the words "contingency"?

6    A    The whole thing is a contingency plan.

7    Q    And the date -- the following date on the 19th says

8    "filing date, July 19th."  Does it say "contingency"?

9    A    No, but this document is dated July the 8th.

10   Q    Are the words "contingency" anywhere on the document?

11   A    No, but it says "draft document."

12   Q    As of July 8th?

13   A    Right.

14   Q    Do you recall seeing an updated timeline shared with you

15   after that?

16   A    No.

17   Q    Were you ever told that the filing date of July 19th was

18   going to be changed?

19   A    No.

20   Q    When the filing came on the 18th, did it surprise you?

21   A    Yes.

22   Q    Do you know if the members of the Conway MacKenzie team

23   were also shared the timeline?

24   A    I don't know.

25   Q    What about the members of the Ernst & Young team?

1    A    I don't know.

2    Q    Do you know?  I believe you testified at your deposition

3    that in May of 2013 you received a Milliman report?

4    A    No.  It was in April.

5    Q    April.  And at that time, you discovered that according

6    to Milliman, at least, the underfunding level was $3.5

7    billion?

8    A    That's right.

9    Q    And I believe you testified that you did not investigate

10   the Milliman report for accuracy or ask anyone else to verify

11   those numbers; correct?

12   A    Correct.

13   Q    And you testified that you just assumed they were true

14   based on Milliman's expertise.

15   A    That was their job.  I relied on their work.

16   Q    What about all the caveats listed on the face of the

17   Milliman report?  Did you read those?

18   A    I believe I did.

19   Q    Do you recall being cautioned that a more robust

20   projection model could vary the results?

21   A    Yes.

22   Q    You testified at your deposition that you thought before

23   the Milliman report came out that the underfunding might be

24   at a modest enough level where we could deal with it in a

25   different way.  What other different options did you have in

1  mind prior to the Milliman report?

2  A   Well, we thought if we had sufficient time to monetize

3  some of the city's assets, in particular, the Water and Sewer

4  Department, maybe we could use that as a funding source to

5  fully fund the pension underfunding.

6  Q   Were any of these different options explored with the

7  Retirement Systems or any of the unions or retirees?

8  A   At that time?

9  Q   At any time.

10  A   Well, they were well-aware of the fact that we were

11  exploring monetization of Water and Sewer as of the June 14th

12  report, but we hadn't been able to make any progress on it at

13  that point.

14  Q   That wasn't my question.  I asked you if you shared with

15  them your different options.

16  A   Not on June 14th, no.

17  Q   The data room that you put together, I believe you said

18  that you had been developing it for about five months prior

19  to its launch in June?

20  A   I didn't say that.

21  Q   How many months did it take you to put the data together?

22  A   Well, the data began to be assembled by Ernst & Young,

23  Conway, and ourselves probably in early February because that

24  was part of our engagement.  I can't recall exactly when we

25  set up the data room specifically, but I do know all the data

1   that went into it had been created by either our respective

2   firms or by the city itself.

3   Q   My question was how long did it take?

4   A   To do what?

5   Q   To put the data together for the data room.

6   A   Months.

7   Q   Months.  Can you give me a rough estimate of how many

8   months?

9   A   Well, we began working in January.  It took until June.

10  Q   So six months?

11  A   That's correct.

12  Q   A little longer?

13  A   Yes.

14  Q   Because it was up on June 20th; correct?

15  A   That sounds right.

16  Q   And when it was initially launched, it was not fully

17  populated with all of the data; correct?

18  A   I don't recall what was not in there at the time.  I know

19  our intent was to put everything in there we could.

20  Q   And the proposal for creditors was laid out on June 14th.

21  A   Correct.

22  Q   And then in June you were tasked with assisting in the

23  negotiation process; correct?

24  A   That's right.

25  Q   And you did not attempt to form a subgroup of any

1  retirees that you could negotiate with directly at that time,

2  did you?

3  A   Well, no.  We did meet with all of the representatives

4  that we could find, including the unions, pension trustees,

5  and the bond and note trustees and bond insurers.

6  Q   My question was you did not attempt to form a subgroup of

7  retirees that you could negotiate with directly; correct?

8  A   No.

9  Q   And do you recall testifying that it was discussed but it

10 was reported back to you that it was impractical to do so?

11 A   Yes.

12 Q   And who was it that reported back to you that it would be

13 impractical to attempt to directly negotiate with smaller

14 groups of people?

15 A   Jones Day.

16 Q   So after being told that it would be impractical to

17 divide the constituencies into smaller subgroups, you did not

18 attempt do so; correct?

19 A   I personally did not, no.

20 Q   During these negotiations, you didn't even have authority

21 to actually bind the city; correct?

22 A   Well, as the lead negotiator for the city, my

23 responsibility was to negotiate with our creditors.  I don't

24 have any decision-making authority.  I'm not an executive of

25 the city.  I would take back whatever came to the city and

1 | make a recommendation.

2 | Q   So your answer is, yes, you did not have authority to

3 | bind the city?

4 | A   I wasn't given that authority, but I was authorized to

5 | negotiate on behalf of the city.

6 |         THE COURT:  All right.  One second.  Mr. Buckfire,

7 | with all due respect, probably less than half the questions

8 | that have been asked of you have you given a straight answer

9 | that doesn't volunteer all kinds of information that wasn't

10 | asked.  In order for us to get through this, I'm going to ask

11 | you from now on just to answer the questions and not

12 | volunteer any information.  Okay?

13 |         THE WITNESS:  Thank you, your Honor.

14 |         MS. GREEN:  I was actually done, but I appreciate --

15 |         THE COURT:  Well, okay, but --

16 |         MS. GREEN:  I appreciate the --

17 |         THE COURT:  That's great, but are there going to be

18 | any more?

19 |         MS. GREEN:  Yes.

20 |         THE COURT:  Who else?  Three more?  Three more?  Can

21 | I give you ten minutes each?

22 |         MR. WERTHEIMER:  Fine.

23 |         THE COURT:  Ten minutes.  Start the clock.

24 |         MR. WERTHEIMER:  Okay.

25 |                         CROSS-EXAMINATION

1   BY MR. WERTHEIMER:

2   Q   Mr. Buckfire, my name is Bill Wertheimer.  I represent

3   what's been called the Flowers plaintiffs.  Those are five

4   retirees or employees who filed a lawsuit against the state

5   before the bankruptcy was filed, and I've got a few

6   questions.  You had mentioned, I believe, that in June of

7   2012 you were involved in some discussions with state

8   officials having to do with the possibility of restructuring

9   the city or the city's finances; is that correct?

10  A   Yes.

11  Q   Did the governor participate in those discussions?

12  A   Yes.

13  Q   You indicated that in at least one of those discussions

14  you thought the possibility of a Chapter 9 filing came up; is

15  that correct?

16  A   Yes.

17  Q   Do you recall the governor being present at that

18  discussion?

19  A   Yes.

20  Q   And what, if anything, did he say about that?

21  A   I don't recall him saying anything.

22  Q   Do you recall who brought it up?

23  A   I believe it was Treasurer Dillon.

24  Q   I'm sorry.

25  A   I believe it was Treasurer Dillon.

1  Q   And what do you remember him saying, as best you recall?

2  A   What does Chapter 9 mean?

3  Q   Simple as that?

4  A   Yes.

5  Q   And someone explained what Chapter 9 meant?

6  A   That's correct.

7  Q   Okay.  Was it -- that was about it?

8  A   Yes.

9  Q   Okay.  You indicated that you had seen a document which

10 showed a rollout which was going to -- at least at one point

11 in the rollout there was going to be a bankruptcy filing

12 scheduled for the 19th.  Do you recall?

13 A   Yes.

14 Q   And then we know, in fact, that the bankruptcy was filed

15 on the 18th; correct?

16 A   Yes.

17 Q   And you indicated in your testimony that you were

18 surprised by that change.

19 A   Yes.

20 Q   Would I be correct in understanding that the reason for

21 your surprise was that normally when you have a rollout as

22 detailed as this, you stick with it, particularly such a key

23 event as the filing itself?

24 A   Yes.

25 Q   Would that be fair?

1  A   That's fair.

2  Q   And did you talk to anyone after the filing to learn --

3  to try to learn why it was that the date had been changed

4  from the 19th to the 18th?

5  A   No.

6  Q   So you were surprised on the 18th; correct?

7  A   Yes.

8  Q   You never talked to Mr. Orr about why it was switched?

9  A   No.

10  Q   Never talked to anybody?

11  A   I did later, but it just wasn't very important.

12  Q   All right.  Well, to you.  Who did you talk to later?

13  A   Counsel at Jones Day and my own colleagues.

14  Q   And what did you learn?

15          MR. CULLEN:  Objection, your Honor, to the extent it

16  calls for legal work of Jones Day.

17          MR. WERTHEIMER:  Your Honor, that's hardly legal

18  advice after the fact if he's learning why something was

19  done.  I don't think the privilege covers that.

20          THE COURT:  Well, first, who did you speak to about

21  this question?

22          THE WITNESS:  Mr. Heiman.

23          THE COURT:  Anyone else?

24          THE WITNESS:  Ms. Ball and Ms. Lennox.

25          THE COURT:  Anyone who's not an attorney with Jones

1  Day?

2         THE WITNESS:  I spoke with Mr. Orr at some point a

3  week later about this.

4         THE COURT:  What did Mr. Orr tell you about that?

5         THE WITNESS:  All he told me was that the decision

6  had been made to expedite the filing because they were

7  concerned about losing control of the process, and that's

8  what he told me.

9         THE COURT:  In the circumstances, I will hold that

10 the witness' conversations with attorneys from Jones Day on

11 the subject are protected conversations.

12 BY MR. WERTHEIMER:

13 Q   The conversation you had with Mr. Orr when he talked

14 about losing -- the possibility of losing control of the

15 process, did he identify part of the reason for that

16 possibility of losing control being the fact that there were

17 lawsuits out there in state court dealing with the bankruptcy

18 issue?

19 A   Yes.

20 Q   Did he identify them as the lawsuits in front of Judge

21 Aquilina in Lansing or in any way pinpoint the lawsuits he

22 was talking about?

23 A   If that judge is in Ingham County, then the answer is

24 yes.

25 Q   She is in Ingham County.

1  A   Then that's correct.

2  Q   Okay.  So Orr told you that one of the reasons for moving

3  up the filing was because of the litigation that was pending

4  in Ingham County?

5  A   Yes.

6  Q   Did he indicate that that litigation was in part an

7  effort to assure that if, in fact, the city filed bankruptcy,

8  that it would be done in a way that would protect the pension

9  rights under the state Constitution even generally?  In other

10  words, I understand he wouldn't have necessarily used those

11  words.

12         MR. CULLEN:  I'll object to the form of the

13  question.

14         THE COURT:  Please rephrase.

15         MR. WERTHEIMER:  Okay.

16  BY MR. WERTHEIMER:

17  Q   When you talked to Mr. -- well, just tell us.  What

18  did -- how did Mr. Orr characterize those Ingham County

19  lawsuits?

20  A   I don't recall he did.  He simply said there were

21  lawsuits pending that might have made it very difficult for

22  us to move forward, and they had to expedite the filing.

23  Q   In Ingham County?  In other words, he at least gave you

24  that?

25  A   Well, I knew they were in Ingham County, but that's --

1   Q   Okay.

2   A   But it was only because of the impact on the timetable.

3   Q   What did you know about those lawsuits?

4   A   Very little.

5   Q   Did you know at least generally that they were efforts to

6   in some way protect the pensions of city employees based on

7   state law?

8   A   I knew they had something to do with it, yes.

9   Q   Okay.  I believe you indicated it was on July 8 that you

10  saw the rollout or maybe that's the date of the rollout

11  document.

12  A   Yes.

13  Q   Okay.  And the rollout anticipated a bankruptcy filing on

14  the 19th; correct?

15  A   That's right.

16  Q   Which was a Friday; correct?

17  A   That's right.

18  Q   I'll state to you that these Ingham County lawsuits were

19  filed on July 3rd.  Do you recall on July 8 knowing about the

20  existence of those lawsuits at that time?

21  A   No.

22  Q   Do you recall knowing on July 8 that the Ingham County

23  judge had hearings already scheduled for July 22nd -- that

24  is, the Monday after the 19th -- in order to determine

25  whether she should issue injunctive relief?

1  A    No.

2  Q    Did you know anything about that as of July 8?

3  A    No.

4         MR. WERTHEIMER:  That's all I have, Mr. Buckfire.

5  Thank you.

6         THE COURT:  Mr. Wertheimer, will you yield the

7  balance of your time to Ms. Brimer, who seems to think she

8  needs more than ten minutes?

9         MR. WERTHEIMER:  I will.

10         THE COURT:  All right.

11                        CROSS-EXAMINATION

12  BY MS. PATEK:

13  Q    Good afternoon, Mr. Buckfire.  Barbara Patek.  I

14  represent the Detroit Police Officers Association, the

15  Detroit Police Lieutenants & Sergeants Association, the

16  Detroit Police Command Officers Association, and the Detroit

17  Fire Fighters Association.  You and I have not met before; is

18  that right?

19  A    That's correct.

20  Q    You told us in your testimony that becoming involved in

21  this case was somewhat personal for you; isn't that right?

22  A    Yes.

23  Q    And that was because you're from here, being Detroit, and

24  you care about the city?

25  A    That's right.

1  Q   And you have, in the course of your successful

2  professional career, been an expert in many bankruptcy

3  situations; is that right?

4  A   Yes.

5  Q   Most of those were probably Chapter 11 proceedings?

6  A   Yes.

7  Q   And some of them were Chapter 9; correct?

8  A   Never in Chapter 9.

9  Q   Never in Chapter 9.  Have you -- you served as a

10  consultant in <u>Stockton</u> in Chapter -- in that Chapter 9

11  proceeding?

12  A   Yes.

13  Q   And as a restructuring expert, you certainly understand

14  that there are different rules that govern Chapter 9 and

15  Chapter 11 proceedings; isn't that right?

16  A   Yes.

17  Q   And one of the differences, you would agree with me,

18  between Chapter 11 and Chapter 9 is that there can't be a

19  liquidation in a Chapter 9; that is, that the City of Detroit

20  in these proceedings must continue to provide its core and

21  essential services; isn't that right?

22  A   Yes.

23  Q   You also told us -- and I'm going to condense, so you can

24  tell me if anything about my statement is inaccurate -- that

25  what drove the city's July 18th, 2013, filing was the need --

1    or the concern that it would run out of cash it needed to pay

2    for its core and essential services.  Is that an accurate

3    summary?

4    A    Yes.

5    Q    And among those core and essential services you would

6    agree with me are police and fire protection?

7    A    Yes.

8    Q    And you would agree with me that the work of providing

9    police and fire protection in the City of Detroit is a

10   difficult and dangerous job?

11   A    Yes, I would.

12   Q    And, in fact, probably much more difficult and dangerous

13   than what you do or what I do for a living?

14   A    Certainly.

15   Q    And you told us -- well, strike that.  In terms of the

16   June 14th proposal, that proposal lumped together in terms of

17   how it was going to treat the accrued vested constitutionally

18   protected pension benefits of Detroit workers and retirees;

19   isn't that right?

20   A    Yes.

21   Q    And that would include those active police and fire

22   fighters?

23   A    That's correct.

24   Q    And it's your testimony here today that it is fair to

25   treat the city's unsecured obligation, including the accrued

1  vested pension benefits of those active police and fire

2  fighters, the same as it is the other unsecured creditors,

3  including the bondholders?

4  A   Yes.

5          MS. PATEK:  That's all I have, your Honor.

6          THE COURT:  Nineteen.

7          MS. PATEK:  Thank you, your Honor.  I will be as

8  quick as I can.

9                     CROSS-EXAMINATION

10  BY MS. BRIMER:

11  Q   Good afternoon, Mr. Buckfire.  My name is Lynn Brimer.  I

12  represent the Retired Detroit Police Members Association.

13  You and I have never met before; is that correct?

14  A   That's correct.

15  Q   And I did not attend either of your depositions; is that

16  correct?

17  A   That's correct.

18  Q   So with my limited time, I would like to step back a bit

19  and go back to some of the history of your relationship with

20  the City of Detroit and the State of Michigan in connection

21  with the City of Detroit.  Now, sometime in -- you testified

22  earlier that sometime in the spring of 2012 you had some

23  discussions with the treasurer, Dillon, regarding the

24  financial condition of the City of Detroit; is that correct?

25  A   Yes.

1  Q   Okay.  Was that before or after your engagement by the

2  city to perform a financial review?

3  A   It was around the same time.

4  Q   So your engagement in connection with the financial

5  review that you performed, was that pursuant to an RFP that

6  was issued by the state?

7  A   Yes, it was.

8  Q   Okay.  And was it by a particular department of the

9  state?  Was it Treasury or the Governor's Office, if you

10  recall?

11  A   I believe it was Treasury.

12  Q   Okay.  And you testified that the scope of your work in

13  connection with the financial -- 60-day financial review was

14  limited.  Can you identify or describe what the scope of your

15  work was?

16  A   We had been asked actually together with another firm,

17  Huron Consulting, which was part of the same RFP, to review

18  the city's financial results and come up with a coherent

19  evaluation of the balance sheet and the city's ability to

20  sustain its obligations, which we did, based on public

21  information.

22  Q   So in connection with that, you reviewed historical

23  public information of the city's financial records; correct?

24  A   Correct.

25  Q   Was there a particular time frame of records that you

1  reviewed?

2  A   We went back and looked at the last five years as well as

3  the city's current budget, which was made available to us by

4  the city.

5  Q   So you reviewed the records from approximately 2007

6  through 20 --

7  A   '11.

8  Q   -- 11?

9  A   And then the current fiscal year budget.

10  Q   Okay.  And did you issue a written report in connection

11  with that review?

12  A   We did.

13  Q   Did you draw any conclusions in that report?

14  A   Well, I'd have to go back and read it again.  I think we

15  pointed out that the city continued to spend more than it was

16  taking in from revenues; that it had limited ability to raise

17  capital in the capital markets; and that without a long-term

18  financial forecast it would be hard to understand that the

19  city had the ability to continue to pay its obligations.

20  Q   So at that point in time, you had already concluded that

21  the city could not pay its obligations on an ongoing basis;

22  is that correct?

23  A   No, no.  I didn't say that.

24  Q   What was your conclusion?

25  A   It was concluded that we didn't have enough information

1   to make that evaluation, but certainly it was a risk.

2   Q   What additional information would you have needed in

3   order to reach that conclusion?

4   A   Well, we would have needed a five- or ten-year financial

5   forecast that would accurately reflect the city's potential

6   revenues, and we'd also have to have an accurate

7   understanding of the city's long-term claims and requirements

8   to pay on those claims.

9   Q   So at that point in time, you did not have an

10  understanding of the city's long-term obligations?

11  A   We had an understanding of those obligations as publicly

12  reported.

13  Q   Okay.  And you performed that review with the -- with

14  Huron Consulting?

15  A   Correct.

16  Q   Were there any other consultants or advisors that were

17  engaged in connection with that review?

18  A   No.

19  Q   At any time was the scope of your engagement expanded?

20  A   No.

21  Q   Was your engagement ever expanded to include a review of

22  the consent agreement with the City of Detroit?

23  A   No.

24  Q   Did you have any role in connection with the drafting of

25  the consent agreement that was entered into with the City of

1  Detroit?

2  A    I was asked for some comments on it, yes.

3  Q    Who asked for comments?

4  A    Brom Stibitz.

5  Q    And who's that?

6  A    A senior advisor to Treasurer Dillon.

7  Q    Now, during the time frame that you were drafting the

8  financial report, do you know whether or not Jones Day had

9  been retained by the State of Michigan in any -- in

10 connection with any of the City of Detroit's financial

11 issues?

12 A    They had not been retained, to my knowledge.

13 Q    So did you work with anyone at Jones Day in connection

14 with the drafting of the consent agreement that was executed

15 by the City of Detroit?

16 A    No.

17        MS. BRIMER:  Your Honor, I'd like to show the

18 witness an exhibit that has not been entered into evidence.

19 If he has our binder, I could identify -- direct him to where

20 it is in the binder or, given the time frame, I could hand

21 him a copy.

22        THE COURT:  Yeah.  Why don't you just hand it to

23 him?  What exhibit is it?

24        MS. BRIMER:  I believe it's 202, your Honor.

25        THE COURT:  Okay.

1  BY MS. BRIMER:

2  Q   Do you see on that exhibit, Mr. Buckfire, your e-mail as

3  a carbon copy recipient of the e-mail?  Do you see that?

4  A   I do.

5  Q   And have you had an opportunity to review the e-mail?

6  A   Just now, yes.

7  Q   Does it refresh your recollection with respect to whether

8  or not you had any involvement with the Jones Day law firm in

9  the drafting of the consent agreement that was provided to

10  the City of Detroit?

11  A   They'd asked me for some comments.  I knew they were

12  talking to the state and trying to find a role for

13  themselves.  I apologize for going on about this, but, you

14  know, they had given them some comments, and I'd reviewed

15  them.

16  Q   So that would be a "yes."  You were --

17  A   That's a "yes."

18  Q   You had provided some comments to Jones Day in connection

19  with the consent agreement that was provided to the City of

20  Detroit?

21  A   Yes.

22  Q   And then you were aware that that consent agreement was

23  then provided to Treasurer Dillon for presentation to the

24  City of Detroit; correct?

25  A   No.

1   Q   Do you recall receiving this e-mail?

2   A   Not specifically.

3   Q   Have you reviewed the consent agreement that was

4   ultimately executed by the City of Detroit?

5   A   Yes.

6   Q   Is it the consent agreement that you had commented on

7   with the Jones Day law firm?

8   A   No.

9   Q   How is it different from the --

10   A   I recall the one that I was shown by Jones Day as being

11   materially different from the one the state ultimately signed

12   with the city.

13   Q   Can you identify some of the terms that were materially

14   different?

15   A   I'd have to go back and look at it.  I don't recall, but

16   I know it wasn't the same one.

17   Q   But sitting here today, you can identify that it wasn't

18   the agreement you had worked with Jones Day on, and yet you

19   can't recall any of the specifics on why it was not the same

20   agreement?

21   A   It wasn't the same agreement.

22   Q   Okay.  Just yes.  You are sitting here today.  You know

23   it was not, but you cannot recall any of the specifics?

24   A   That's correct.

25   Q   Okay.  Now, you've also indicated that at some point in

1  time you became aware that the State of Michigan and Jones

2  Day -- and maybe -- I don't want to put words in your mouth,

3  but at some point in time you became aware that the State of

4  Michigan and the City of Detroit -- Jones Day had addressed

5  issues in connection with the filing of a Chapter 9 by the

6  City of Detroit; is that correct?

7  A   I'm sorry.  I don't understand the question.

8  Q   Okay.  So when did you first learn that the State of

9  Michigan was considering a Chapter 9 bankruptcy filing for

10 the City of Detroit?

11 A   Well, it was on the table at all times really after June

12 14th.  I don't know when specifically they began to discuss

13 it.  It was always an option.

14 Q   Was it on the table in 2012?

15 A   Not that I recall.

16     MS. BRIMER:  Your Honor, I think this exhibit is in

17 evidence.  I believe it's 845.

18 BY MS. BRIMER:

19 Q   Do you recall discussing this exhibit with Ms. Green just

20 a few minutes ago?

21 A   Yes.

22 Q   I'd like to direct your attention to the second page

23 perhaps midway down, the paragraph that begins, "The state

24 believes."  And you were a recipient of this e-mail; correct?

25 A   Yes.

1  Q   And that paragraph reads, "The state believes it needs PA

2  4 or worst case PA 72 to file a Chapter 9 case based on law.

3  As such, state legal counsel and Jones Day provided guidance

4  on whether a Chapter 9 filing in April could be upheld if PA

5  4 is pulled back at the end of April."  Is that what that

6  says?

7  A   Yes, it does.

8  Q   You were a recipient of this e-mail; correct?

9  A   I am.

10 Q   So is it fair to say that at least as early as March of

11 2012, the state and Jones Day were discussing a Chapter 9

12 filing for the City of Detroit?

13 A   Yes.

14         THE COURT:  What exhibit number did you say that

15 was?

16         MS. BRIMER:  846, your Honor.

17         ATTORNEYS:  845.

18         MS. BRIMER:  Oh, 845.

19 BY MS. BRIMER:

20 Q   So, now, later in 2012, in November of 2012 an RFP was

21 issued by the City of Detroit in connection with the consent

22 agreement; is that correct?

23 A   Yes.

24 Q   And you completed that RFP?

25 A   We did.

1  Q   And then you were ultimately engaged by the city in

2  December; correct?

3  A   January of 2013.

4  Q   But in December you were aware that you would --

5  A   We'd been chosen, yes.

6  Q   -- receive the contract?

7  A   Right.

8  Q   Do you recall the questions that were asked on that

9  request for production -- request for an offer?

10 A   No.

11 Q   Do you recall whether or not specifically you disclosed

12 to either Mayor Bing or the City Council that you were aware

13 that at least as early as March of 2012 the state and Jones

14 Day had been contemplating a bankruptcy filing on behalf of

15 the city?

16 A   I don't understand that question.

17 Q   Well, we just went over -- you were aware that at least

18 as early as March of 2012 --

19 A   Um-hmm.

20 Q   -- the State of Michigan and the law firm, Jones Day, had

21 been discussing a Chapter 9 filing on behalf of the city;

22 correct?  We just went over that.  Your answer was, "Yes."

23 A   Yes.

24 Q   So I'm asking you at the time you completed your RFP or

25 prior to executing a contract, did you ever disclose to the

1   City Council or Mayor Bing that you were aware that at least

2   as early as March 2012 the State of Michigan along with Jones

3   Day had discussed and were contemplating a Chapter 9 filing

4   on behalf of the city?  It's a "yes" or "no" question.

5   A    No.

6   Q    Now, you were also involved in the interview process

7   sometime in January for the law firms that were selected by

8   the city; correct?

9   A    Yes.

10  Q    And it was the City Council and the mayor at that point

11  in time that were in place; is that correct?

12  A    That's correct.

13  Q    So Mr. Orr had not yet been selected at that point in

14  time; correct?

15  A    Correct.

16  Q    And one of those law firms was Jones Day; is that

17  correct?

18  A    Correct.

19  Q    At any point in time during the interview process for the

20  law firms, did you disclose to the mayor or the City Council

21  that you were aware that at least one of the law firms they

22  were interviewing had been discussing with the state and

23  providing guidance on the filing of a Chapter 9 by the City

24  of Detroit?

25  A    No.

1  Q   So now I want to go over a few issues in connection with

2  the fair and even-handed treatment of the bondholders vis-a-

3  vis the pension beneficiaries.  And it's been your testimony

4  all along, if I understand correctly, that you think it is

5  fair and even-handed treatment to treat the bondholders, who

6  have insurance, in the same class or category as the pension

7  beneficiaries on the grounds that they're all unsecured

8  creditors; is that correct?

9  A   Yes.

10 Q   So isn't it true that when bondholders determine that

11 they will issue a bond or extend credit to the City of

12 Detroit, when they made that determination they had the

13 opportunity to review the financial data of the city and

14 evaluate the risk?  Is that accurate?

15 A   I hope so.

16 Q   To the best of your knowledge, if you have any, do you

17 believe any of the pension beneficiaries have had an

18 opportunity prior to accepting employment to review the

19 financial data of the City of Detroit and evaluate the risk

20 of whether or not their pensions would be honored?

21 A   Is that calling for a "yes" or "no"?

22          THE COURT:  Yes.

23          THE WITNESS:  No, I don't know.

24 BY MS. BRIMER:

25 Q   Do you believe they would have been provided that

1  opportunity?

2  A    I don't know.

3  Q    Now, I believe you testified earlier that in connection

4  with the June 14th proposal the obligations owed to

5  pensioners that were employees of the Department of Water and

6  Sewage, their obligations were included in the $3.5 billion

7  underfunding and that their -- they were included in the

8  restructuring proposal for the underfunded pensions; is that

9  correct?

10 A    Yes.

11 Q    You also testified, though, that the revenue stream

12 generated by Department of Water and Sewage was not included

13 in the revenue that was reflected in the July -- the June 14

14 proposal; is that correct?

15 A    It's a nomenclature issue.  The Water and Sewer

16 Department collects revenues, but there is no net cash flow

17 to the city from those revenues.

18 Q    But isn't it true that those revenues represent

19 contributions on behalf of their employees into the pension

20 fund?  They use their own revenues.  The Department of Water

21 and Sewage pays -- makes contributions to the pension fund on

22 behalf of its employees; correct?

23 A    Yes.

24 Q    And it uses the revenues it generates to make those

25 contributions; correct?

1  A   Yes.

2  Q   Now, you also talked about, I believe --

3          THE COURT:  Your time is up.  You're looking at me

4  like you want more time.

5          MS. BRIMER:  Perhaps just a few questions, your

6  Honor.  I have two brief areas I want to ask, and I'll be

7  brief.

8          THE COURT:  Does that mean two questions?  It's just

9  a question.

10          MS. BRIMER:  Just a handful, your Honor.  It may

11  depend on how he answers.

12          THE COURT:  Five questions.  Go ahead.

13          MS. BRIMER:  Okay.  All right.  Let me think then.

14  BY MS. BRIMER:

15  Q   So you testified yesterday that -- in connection with

16  reviewing Water and Sewage again, that one avenue of

17  generating additional revenue could not be increasing water

18  rates because -- well, let me stop there.  Is that correct?

19  Do you recall?  You testified that the city could not

20  increase water and sewage rates because of utility laws, that

21  it's a regulated industry, and so it just could not

22  arbitrarily increase rates; correct?

23  A   Correct.

24  Q   Okay.  So at the time the June 14th proposal was put

25  together, did you take into consideration the fact that the

1  city did not have any authority under the Michigan

2  Constitution to impair the pension benefits?

3  A    I don't understand the question.

4  Q    So on the one hand, you certainly took into consideration

5  the legal -- the authority of the city to raise the utility

6  rates in connection with Water and Sewage; correct?

7  A    Correct, not a source of cash.

8  Q    But you did not take into consideration any constraints

9  on the city's ability to impair the pension rights?

10  A    That's correct.

11  Q    One other brief area.  You also discussed that you did

12  not consider it a viable option, for example, to look at

13  avenues for increasing collection on the taxes as generating

14  a significant amount of -- or any amount of additional

15  revenue; is that correct?

16  A    That's not what I testified to.

17  Q    So what did you testify to in connection with the unpaid

18  tax obligation?

19  A    That the city had been very ineffective in collecting its

20  unpaid taxes, and we didn't believe they would change anytime

21  soon and collect those taxes.

22  Q    Was that in connection with both income taxes as well as

23  property taxes?

24  A    Primarily property taxes.

25  Q    Do you know or have -- can you estimate what the unpaid

1    income taxes are that are due to the city?

2  A    No.

3              MS. BRIMER:  I have nothing further, your Honor.

4              THE COURT:  All right.  We'll take our afternoon

5  break at this time.  Well, let me just ask first will there

6  be any redirect?

7              MR. CULLEN:  Three or four questions.

8              THE COURT:  All right.

9              MR. CULLEN:  Do you want to do it now, or do you

10 want to --

11             THE COURT:  No.  We'll take our recess now and

12 reconvene at 3:15.

13             THE CLERK:  All rise.  Court is in recess.

14      (Recess at 3:01 p.m. until 3:16 p.m.)

15             THE CLERK:  All rise.  Court is in session.  Please

16 be seated.

17             THE COURT:  It appears that everyone is here.  You

18 may proceed, sir.

19             MR. CULLEN:  Good afternoon, your Honor.

20                       REDIRECT EXAMINATION

21 BY MR. CULLEN:

22 Q    Very briefly, Mr. Buckfire, you talked about beginning

23 with the bond insurers, and you mentioned it was the

24 beginning and not the end.  What would the end be?

25 A    The end would have been an active negotiation with all

1   the bondholders and all the other unsecured creditors of the

2   city.

3   Q   And what would have been the steps between the beginning

4   and the end?

5   A   Well I would have expected after making our initial offer

6   we would have received responses that would have formed

7   effectively the counter-bid.

8   Q   And when you said you'd have to go to all of the

9   individual bondholders, what does that mean?

10  A   We would have to frame an offer supported by the bond

11  insurers that they would hopefully recommend to the bond

12  insurers and get their support for.

13  Q   The bondholders, you mean?

14  A   The bondholders themselves, yes.

15  Q   Did the bond insurers have authority to either bind

16  the -- did the bond insurers have the authority to either

17  bind the bondholders or to change the terms of the bond?

18  A   No.

19          MR. CULLEN:  That's all I have, your Honor.

20          THE COURT:  All right, sir.  You may step down.

21          THE WITNESS:  Thank you.

22          THE COURT:  Thank you.

23      (Witness excused at 3:17 p.m.)

24          THE COURT:  Sir.

25          MR. SCHNEIDER:  Your Honor, Matthew Schneider on

1  behalf of the State of Michigan.  When we earlier discussed

2  this in the last few days, we had planned on the governor

3  coming at 1 p.m. on Monday, and because of the pace of the

4  proceedings here, I want to just confirm with the Court that

5  that is still the case no matter what stage we're at.

6           THE COURT:  A good question.  Anyone object if the

7  governor appears at one o'clock on Monday regardless of where

8  we are otherwise in the case?

9           MR. WERTHEIMER:  No, your Honor.

10          THE COURT:  Hearing no objection, you may count on

11  it.

12          MR. SCHNEIDER:  Thank you.

13          THE COURT:  Sir.

14          MR. STEWART:  Your Honor, Geoffrey Stewart, Jones

15  Day, for the city.  Two matters.  One is we would at this

16  stage ordinarily call Mr. Malhotra back in connection with

17  the matters that were resolved by your ruling; however, I was

18  only going to call him for the purpose of getting four

19  documents into evidence.  Counsel for the objectors and I

20  have agreed that they'll stipulate to the admissibility of

21  those while retaining any objections they may have to your

22  ruling, but rather than me put words in their mouth, let me

23  have them put that on the record themselves.

24          THE COURT:  What are the numbers of those four?

25          MR. STEWART:  Number 9, 10, 11, and 38.

1          THE COURT:  All right.  Sir.

2          MR. RUEGGER:  Arthur Ruegger from Dentons on behalf

3    of the Retiree Committee.  Yes, your Honor, that is correct.

4    We've consulted with the other counsel for the objectors, and

5    we believe that those four exhibits fall within your Honor's

6    ruling.  We want to preserve for the sake of the record our

7    objection and rights related to that ruling, but we --

8          THE COURT:  Yes.

9          MR. RUEGGER:  -- feel that is a fair interpretation,

10   and on that basis we have no objection to that admission.

11         THE COURT:  All right.  Thank you.  The admission of

12   those four into evidence is granted.

13     (Debtor's Exhibits 9, 10, 11, and 38 received at 3:19

14     p.m.)

15         MR. STEWART:  That being the case, your Honor,

16   unless there are questions the Court has or anyone else has,

17   I would suggest we excuse Mr. Malhotra as a witness.

18         THE COURT:  Anyone have any questions for the

19   witness, or may we excuse him?

20         ATTORNEY:  No questions for the witness, your Honor.

21         THE COURT:  All right.  He is excused.

22     (Mr. Malhotra excused at 3:19 p.m.)

23         MR. STEWART:  A second housekeeping matter is Mr.

24   Ciantra had mentioned the other day that he would have a

25   motion to strike or similar vis-a-vis Mr. Moore.  That motion

1  has not yet been made.  Mr. Moore then has been kept on the

2  status of an active witness.  We have been physically

3  sequestering witnesses --

4           THE COURT:  Yes.

5           MR. STEWART:  -- while they're on the stand.  I

6  spoke earlier with counsel.  He said he's still studying his

7  motion.  I don't mean to put words in his mouth, but he has

8  no objection to us unsequestering Mr. Moore.  However, we

9  will instruct Mr. Moore to not discuss his testimony with

10 anyone pending the filing and adjudication of Mr. Ciantra's

11 motion.

12          MR. CIANTRA:  Yes, your Honor.  I would intend to

13 bring that issue to the Court Monday morning --

14          THE COURT:  Okay.

15          MR. CIANTRA:  -- if that's acceptable.

16          THE COURT:  Absolutely.

17          MR. CIANTRA:  And I would have no objection to

18 releasing --

19          THE COURT:  All right.

20          MR. CIANTRA:  -- Mr. Moore.

21          MR. STEWART:  Thank you, your Honor.

22          THE COURT:  We'll unlock the doors to Mr. Moore's

23 confinement.  I have one more housekeeping matter.  Hold on

24 there.  Based on some confusion that has been stated here on

25 the record about exhibits and exhibit numbers, I am concerned

1  about whether everyone's versions of the exhibit books

2  correspond with the exhibits and exhibit numbers in the

3  attachments to the joint final pretrial order, so I would

4  like to task someone with the responsibility of checking all

5  of the exhibit books and all of the lists and numbers of

6  exhibits that are attached to the joint final pretrial order.

7  Any volunteers?

8          MR. MONTGOMERY:  Dentons will do so for the Retiree

9  Committee for the objectors, your Honor.

10          THE COURT:  For all the objectors?

11          MR. MONTGOMERY:  For all the objectors.

12          MR. IRWIN:  Geoff Irwin, your Honor.  We have the --

13  the city had the pleasure of putting together the 130- or 40-

14  page pretrial order, and we worked with the Dentons firm.  I

15  would be happy to do that personally.

16          THE COURT:  All right.  So I'd like a report from

17  you Monday that this has been accomplished, please.

18          MR. MONTGOMERY:  Yes, sir.

19          MR. IRWIN:  Yes, your Honor.

20          THE COURT:  And this task includes checking our

21  exhibits book up -- exhibit books up here as well, please.

22          MR. IRWIN:  Of course.

23          MS. PATEK:  While we're on housekeeping, Barbara

24  Patek for the Public Safety Unions.  The Court asked and we

25  did provide the additional books, and in those additional

1    books is a marked version of the display, the demonstrative.

2    I've given copies to Jones Day, and we'll --

3              THE COURT:  Good.

4              MS. PATEK:  -- send them, so I just wanted to make

5    that clear for the record.

6              THE COURT:  Thank you.  Okay.  Next witness.

7              MR. HERTZBERG:  Yes, your Honor.  Robert Hertzberg,

8    Pepper Hamilton.  I'm going to call Chief Craig to the stand.

9              THE COURT:  Okay.

10             MR. HERTZBERG:  May I turn the podium a little bit?

11             THE COURT:  If you'd like.

12             MR. HERTZBERG:  Thank you.

13             THE COURT:  Step forward, please, sir.

14             MR. CRAIG:  Thank you.

15             THE COURT:  And before you sit down, would you

16   please raise your right hand?

17             JAMES CRAIG, DEBTOR'S WITNESS, SWORN

18             THE COURT:  Please sit down.  And you may proceed.

19                      DIRECT EXAMINATION

20   BY MR. HERTZBERG:

21   Q    Could you state your name for the record, please?

22   A    James Craig.  Last name is spelled C-r-a-i-g.

23   Q    And where do you reside currently?

24   A    City of Detroit.

25   Q    And are you employed by the City of Detroit?

1    A    I am.

2    Q    In what position are you employed?

3    A    Police chief for the Detroit Police Department.

4    Q    And when did you first commence your position as police

5    chief?

6    A    July 1st, 2013.

7              THE COURT:  Excuse me one second.  Could you do me a

8    favor?  If you're going to sit back like that, that's fine.

9    Just pull the microphone a little bit closer.

10             THE WITNESS:  Okay.

11             THE COURT:  That's good right there.

12             THE WITNESS:  Okay.

13             THE COURT:  Not too close, but that's good right

14   there.  That's good.

15   BY MR. HERTZBERG:

16   Q    Chief Craig, did you grow up in Detroit?

17   A    I did.

18   Q    Were you born in the city?

19   A    I was.

20   Q    And how long did you stay in the city?

21   A    Twenty-four years.

22   Q    Did you go to school at Cass Tech High School?

23   A    I did.

24   Q    Do you have any parents or siblings that live in the

25   city?

1    A    I do.

2    Q    And how many?

3    A    Five siblings and both parents still alive.

4    Q    Okay.  Let's spend a minute and go over your educational

5    background.  Where did you go to college?

6    A    West Coast University in Los Angeles, but prior to that

7    Lawrence Institute of Technology here in -- I think it's

8    Dearborn.  Also attended University -- well, Mercy College,

9    which is now U of D Mercy, while employed as a Detroit -- as

10   a Detroit police officer.  Then later, after attending West

11   Coast University in Los Angeles, I attended the University of

12   Phoenix.

13   Q    Before we get to that, when did you graduate from West

14   Coast University?

15   A    I'm not absolutely certain on the date.  I'd have to --

16   Q    Approximately the year.

17   A    Probably in the late '90s.

18   Q    And did you receive a degree?

19   A    I did.

20   Q    And what type of degree?

21   A    Business management.

22   Q    And did you go to the FBI National Academy at Quantico?

23   A    I did.

24   Q    And when did you do that?

25   A    At the rank of lieutenant, once again, probably late

1    '90s, early 2000s.

2    Q    And you graduated from there?

3    A    I did.

4    Q    Have you ever received a master's degree?

5    A    I did.

6    Q    From where?

7    A    University of Phoenix.

8    Q    And when did you receive that degree?

9    A    Possibly -- oh, 2010.

10   Q    Have you ever studied for a doctoral degree?

11   A    I did.

12   Q    And what's the status of that?

13   A    It's on hold right now.  When I accepted the job with the

14   Detroit Police Department, that is when I placed the work on

15   hold.

16   Q    How far along were you?

17   A    I immediately entered after my -- obtaining my master's,

18   so a couple years, three years.

19   Q    Was your first job as a police officer with the City of

20   Detroit?

21   A    It was not my first job.

22   Q    What was your first job?

23   A    Delivering papers in high school.

24   Q    No, but as a police officer, was that your first --

25   A    Oh, my first police job was, yes, 1977 in the City of

1   Detroit.

2   Q   And how long did you work for the City of Detroit?

3   A   Roughly two and a half years until I was laid off in

4   1980.

5   Q   And what position did you hold with the City of Detroit?

6   A   Police officer.

7   Q   After you were laid off by the City of Detroit, where did

8   you next seek employment?

9   A   City of Los Angeles.

10  Q   And were you employed there?

11  A   Yes, as a police officer.

12  Q   For what period of time did you work as a police officer

13  in Los Angeles?

14  A   For 28 years starting in 1981 until the date I retired in

15  2009 after being selected as a police chief for Portland,

16  Maine.

17  Q   I assume you held numerous positions while you were with

18  the police department in Los Angeles?

19  A   I did.

20  Q   Could you describe some of those positions that you held?

21  A   Ranged from both administration, field.  I, as a police

22  officer, worked in community relations, worked in a gang

23  unit, promoted to sergeant, worked as an internal affairs

24  investigator, also as an advocate, a grievance investigator

25  and advocate for the police chief, promoted to lieutenant,

1    ran a defense rep unit with the unit -- with the union.  From

2    that I became an adjutant to the chief of police and after

3    that promoted into captain.  I worked several positions as a

4    command level officer from juvenile division, specialized

5    division, then the Wilshire area, also southwest area twice

6    as a captain, later as the area commanding officer, and then

7    at that time I retired.  Well, for one month prior to

8    retirement I was a commanding officer of West Los Angeles

9    area.

10   Q    And you said you retired from Los Angeles when?

11   A    In 2009.

12   Q    And did you take a job after that?

13   A    I did.

14   Q    And where did you take a job?

15   A    Portland, Maine, as the police chief.

16   Q    And what were your duties as police chief of Portland,

17   Maine?

18   A    Overall management, leadership of the police department.

19   Q    And how big of a staff was that?

20   A    Sworn and civilian staff of about 215.

21   Q    And how long did you act as police chief of Portland,

22   Maine?

23   A    Roughly two years.

24   Q    And after that, did you take another job?

25   A    I did.

1    Q    And where was that?

2    A    Cincinnati, Ohio, police chief.

3    Q    And what was your start date, approximately, for that

4    job?

5    A    2010, August, I think.  Stayed there two years.

6    Q    August of 2010?

7    A    Right, if my memory serves me correct.

8    Q    And what was the general description of your duties as

9    police chief of Cincinnati?

10   A    Basically the same, overall management, leadership of the

11   Cincinnati Police Department.

12   Q    How big of a police force was Cincinnati?

13   A    Sworn and civilian, roughly 1,700 employees.

14   Q    What was the residential size, the people in City of

15   Cincinnati?

16   A    The actual residential population was about 300,000, but

17   what makes unique -- a unique characteristic of Cincinnati is

18   it had a metropolitan statistical area of 2.2 million, which

19   is the largest in the State of Ohio.

20   Q    When you talk about the metropolitan statistical area, do

21   you consider that part of your jurisdiction as the police

22   chief of Cincinnati?

23   A    Yes, because of the people that will work, attend school

24   that live in the city represent that population.

25   Q    How did you become the police chief of the City of

1    Detroit?

2    A    A recruiter contacted me.

3    Q    And when was that?

4    A    Probably February, March, roughly, early part of the

5    year, of this year.

6    Q    2013?

7    A    Yes.

8    Q    And what did you do once you were contacted by the

9    recruiter?  Did you meet with anyone at the City of Detroit?

10   A    I did.

11   Q    And who did you meet with?

12   A    I met with a number of people through a series of

13   interviews.  I met with the recruiter, of course, initially,

14   and from that I met with city officials, the mayor, the

15   emergency manager.

16   Q    Being Kevyn Orr?

17   A    Kevyn Orr.

18   Q    Met with the monitor, federal monitor, at some point

19   during the process, Mr. Baird out -- who works for the

20   Governor's Office, State of Michigan, and that was it.

21   A    At some point you were offered a job as the police chief

22   of Detroit?

23   Q    I was.

24   Q    And when was that?

25   A    Started in July, possibly June.

1   Q   And when did you actually -- when was your first day of

2   work?

3   A   June -- I mean July 1st.

4   Q   Why were you interested in taking the job as police chief

5   of Detroit when you were already police chief in Cincinnati?

6   A   It was a great opportunity.  I knew that the city was

7   facing a myriad of challenges.  This was home, certainly the

8   place I started my policing career, so certainly when I look

9   across at -- this now is my third job as a police chief -- to

10  come back here was very significant to my career.

11  Q   When you started as the new police chief of the City of

12  Detroit, what steps did you take to familiarize yourself with

13  the police department?

14  A   As I do in the past in other departments that I held the

15  chief's position, I certainly tried to meet as many people as

16  I could, both internal and external to the police department.

17  As it relates to inside, certainly I met with a cross-section

18  of rank and file prior to starting, had a chance to attend a

19  union meeting, so I got to meet the union president from the

20  DPOA, met some of the members at that meeting.  From that,

21  after I actually started, I continued to meet with the union

22  president, and I began to make my rounds, if you will, and

23  talking to a cross-section of people inside the department.

24  Q   And what was that -- what did the cross-section consist

25  of, the people you met with inside of the department?

1   A    I met with the executive management team.  I met with

2   rank and file.  I physically visited some of the stations,

3   some of the work locations where the specialized units were

4   housed.

5   Q    When you said you met with the executive management team,

6   who consists or who was part of the executive management team

7   at the time you took the job?

8   A    The deputy chiefs, assistant chiefs, commanders, then

9   inspectors.  I've also met with the civilian counterparts,

10  the civilian deputy chiefs that held several positions in the

11  police department.

12  Q    How many meetings do you figure you had when you first

13  took the job as police chief?

14  A    Virtually met every day, still meet every day, many

15  meetings.  I would be making a guess at how many meetings,

16  but depends on what time period.

17  Q    Did you --

18  A    From the beginning until now -- that's a difficult one --

19  in excess of 50 meetings.

20  Q    Okay.  Did you meet with any city officials after you

21  took the position as police chief?

22  A    I have.

23  Q    And who did you meet with?

24  A    I have had a meeting or two with the mayor, certainly --

25  Q    Mayor Bing?

1  A   Mayor Bing.  Certainly met and have been continuing to
2  meet with the emergency manager, Kevyn Orr, on a number of
3  occasions.  I've met with several on the council, in
4  particular, the council president, Saunteel Jenkins.  I have
5  met with the now president and former president of the police
6  commission.
7  Q   Did you meet with any community business leaders before
8  or after you took the position as police chief?
9  A   I did.
10  Q   And what did you do to meet with the community business
11  leaders?
12  A   There were several meet-and-greets, met business leaders.
13  There was a meet-and-greet at Comerica Park early during my
14  arrival, maybe within the first month, so I had a chance to
15  meet a variety of business leaders as well as community
16  stakeholders, Wayne County prosecutor, which I left out, had
17  a chance to meet with her.  And then there's been several
18  other smaller meet-and-greets, one at Detroit Athletic Club
19  where, once again, I met with local business leaders.
20  Q   Who's the Bratton Group?
21  A   The Bratton Group is a consultant firm.  Bratton is a
22  former police chief of Los Angeles, also former commissioner
23  of New York, Boston, and Boston Transit.
24  Q   Were they providing -- when you started as police chief,
25  were they providing consulting services to the Detroit Police

1    Department?

2    A    Yes, they were.

3    Q    And what kind of services did you understand that they

4    were providing?

5    A    Looking at the organizational structure, for the most

6    part, there were actually several consulting firms working

7    with the Detroit Police Department, but I actually had a

8    conversation with Bill Bratton prior to being selected.

9    Q    Is he the CEO of the Bratton Group?

10         MS. LEVINE:  Your Honor, objection.  We don't have a

11   certification or a declaration from the police chief.  I was

12   just wondering if we could get some understanding as to how

13   this is relevant to eligibility.

14         MR. HERTZBERG:  Sure, your Honor.  First, your

15   Honor, I'm laying a foundation for the witness, but, second,

16   one of the aspects, as cited in the brief that the city

17   filed, is one of the tests is service delivery insolvency.

18   And the chief is here to testify as to the public safety and

19   whether the services are being provided to the community,

20   being the --

21         THE COURT:  Is this foundation for that?

22         MR. HERTZBERG:  Yes.  This is foundation.

23         THE COURT:  All right.  I'll permit it.  Go ahead.

24         MR. HERTZBERG:  Thank you.

25   BY MR. HERTZBERG:

1    Q    So you met with the Bratton Group; correct?

2    A    I did.

3    Q    And what did they tell you about the state of the Detroit

4    Police Department?

5    A    That -- if I just might summarize it in a very short way,

6    that everything is broken, deplorable conditions, crime is

7    extremely high, morale is low, the absence of leadership.

8    Q    And after you took the job as police chief, did you meet

9    with anyone from Conway MacKenzie?

10   A    I did.

11   Q    And who did you meet with?

12   A    Chris Gannon, one of the consultants.

13   Q    What did you talk to -- or what subject did you cover

14   with him?

15   A    Essentially the same as I did with the Bratton Group, the

16   staff, low morale, working conditions.

17   Q    Did you review any reports that have been prepared or any

18   information when you joined the force as police chief?

19   A    I had reviewed different reports, some in more detail

20   than others.  I don't recall which.  There was a lot written,

21   but there were no real reports from the consultants as it

22   related to the state of the department.

23   Q    After you became police chief, did you -- you said you

24   went and saw some of the police stations.  Did you go out at

25   crime scenes?  Did you go out and meet officers in the field,

1  anything of that nature?

2  A   I have, and I did.

3  Q   Can you describe that please?

4  A   I've had a chance to go by all of the precincts, and

5  certainly in most, if not all, the conditions of the stations

6  were in some instances deplorable.  One comes to mind.

7  During a visit I had with one of our leased facilities where

8  our crime lab technicians work out of, a location where I'm

9  told by the staff the heat sometimes works, it's dirty,

10 deplorable working conditions, not a lot of space.  Certainly

11 as I made my rounds, that was consistent.  In fact, even as

12 recently as yesterday at a community meeting, community

13 members brought up the deplorable state of the police

14 stations and asked what I plan to do about that.

15 Q   Let's talk about crime in the City of Detroit at the time

16 you took over as police chief and what we call clearance

17 rates.  What is clearance rates on crime?

18 A   Solving the crime basically.  I knew coming in that the

19 homicide clearance rate for Detroit was roughly 11 percent.

20 Q   Before we go there, let me ask you a few additional

21 questions.  Do police departments ordinarily maintain

22 statistics on crime?

23 A   Yes.

24 Q   And where are those reported to?

25 A   Reported to the FBI.

1  Q   And does Detroit maintain these type of reports and

2  statistics?

3  A   They do now.

4  Q   When you started as police chief, did you consider

5  Detroit -- after you met with your commanders, met with

6  people, citizens, and moved around and looked at the

7  different police stations, met with people on your staff, did

8  you consider Detroit a violent city?

9  A   I did.

10 Q   How violent?

11 A   Extremely violent.  In comparison to cities I've worked,

12 primarily Los Angeles and Cincinnati, it was the most violent

13 city I've ever worked, so I knew that I would be facing a

14 significant challenge in focusing on reducing crime, violent

15 crime in particular.

16 Q   You started to talk about the homicides in Detroit.  How

17 many homicides were there in the city from the beginning of

18 the year until the time you took your job in June?

19 A   I'm not certain what the exact number was at that time.

20 Q   Were you aware of what it was in 2012?

21 A   I was aware that it was, I think, 384.  It was ranked,

22 according to a recent report by the FBI, as the second most

23 violent city in America only exceeded by Flint, so I was

24 aware of the homicide rate.

25 Q   You started to talk about clearance rate, solving of

1    crimes.  What was the clearance rate on the homicides in

2    Detroit?

3    A    The information that I received was around 11 percent.

4    Q    Is that a good clearance rate?

5    A    It's deplorable.

6    Q    What did you see as the clearance rate when you were

7    working in Los Angeles?

8    A    Sixty-five to seventy percent.  Cincinnati, 70 percent.

9    Q    Seventy-percent clearance rate on homicides?

10   A    Kind of fluctuates between 60 and 70.

11   Q    Was the clearance rate similar on other violent crimes in

12   the City of Detroit?

13   A    As low or lower.  In fact, if my memory serves me, I

14   think like for using the crime of robbery, I think the crime

15   of robbery, the clearance rate was about eight percent.

16   Q    Is that low?

17   A    Extremely low.

18   Q    What was the clearance rate, approximately, in Los

19   Angeles when were you employed there?

20   A    As I recall, just looking at the one station, it would go

21   between 25-, 35-percent clearance rate.

22   Q    In Cincinnati when you were chief?

23   A    About the same.  Robbery clearances tend not to be as

24   high.  There are more reported crimes, but roughly about the

25   same, 25 to 35 percent.

1  Q   You said -- you testified earlier that the police

2  department was having extreme problems.  Was there problems

3  of accountability with police officers?

4  A   Accountability was for the most part, in my judgment,

5  absent.  The one thing that I acknowledge the department did

6  well in terms of -- and when I talk about accountability, I'm

7  talking about at the executive and management levels.  I'm

8  not referring to the rank and file police officer.  There was

9  an absence of accountability, but the department certainly

10  could be lauded for its success just recently two years ago

11  where the consent judgment -- they were at about 24-percent

12  compliant, and they rose to about 91, 92 percent over a two-

13  year period.  But when you look at the other areas of the

14  department, it didn't seem to be that certainly the executive

15  and managers were being held accountable.

16  Q   Was there an urgency, in your mind, to drive down violent

17  crime?

18  A   Both violent crime and raise morale of the police

19  officers.

20  Q   What was the morale like for the everyday police officer

21  in the City of Detroit when you took over as chief?

22  A   In my judgment, it was the lowest I have seen of any

23  police department I've ever worked, including when I worked

24  here in the '70s.

25  Q   Do you have any idea what caused that?

1    A    A number of factors.  Certainly the fact that they had

2    lost ten percent pay; that they were forced into a 12-hour

3    work schedule.  They had no real voice in the department, no

4    real decision-making, and as I met with officers through my

5    visits to different operational entities, the thing I heard

6    most was they just wanted to be police officers again, and

7    they felt that they didn't have leadership that would allow

8    them to do that.

9    Q    Were police officers, in your mind, when you took over as

10   police chief being deployed in the correct way?

11   A    They were not.

12   Q    Can you explain that, please?

13   A    It appeared and later found out that Detroit police

14   management had taken what I call a cookie cutter approach to

15   staffing or deployment, and there was no real science behind

16   how police officers were deployed.  And specifically what I'm

17   talking about is looking at issues of calls for service,

18   crime, and population.  And so it was after my staff started

19   to take a good look at -- we made some adjustments in

20   staffing because one indicator was the fact that not only was

21   the response time a big issue, but when officers came to

22   start their 12-hour work schedule, there were anywhere

23   between 40 and 60 calls being held to be answered.

24   Q    Let's talk about response time.  What is the average

25   response time on a call to a police station right at the time

1  you took over as police chief, approximately?

2  A    What was reported out to me was roughly 50 minutes to an

3  emergency call.

4  Q    And when you were in L.A. as a captain, what was the

5  normal response time you saw there?

6  A    It was an average response time of seven minutes.

7  Q    How about when you were chief in Portland, Maine?

8  A    Three to four minutes.

9  Q    And when you were chief in Cincinnati?

10 A    Five to six minutes.

11 Q    Do you think this 50-minute response time put residents

12 at risk of their safety?

13 A    I did.

14 Q    Why is that?

15 A    Because if a community member is calling for police

16 services in an emergency situation, certainly the expectation

17 that police will get there as soon as possible, so what I

18 heard coming in from community members, what I heard before I

19 got here, is the fact that there were times when Detroit

20 police officers were called, and no one would ever show up.

21 In fact, we have two dispatchers now facing criminal charges

22 based on the allegation of not sending police officers to a

23 call for service, one where the allegations involving a woman

24 who died as a result of a domestic situation, and the other

25 one I think was a stabbing.

1  Q   And the dispatchers never dispatched police officers to

2  the --

3  A   It's a pending matter, but that's the allegation, yes.

4  Q   Okay.  Let's talk about where police officers were

5  working when you took over as police chief.  Were some of

6  them working in non -- or jobs that were not on the street

7  policing crimes and stuff?

8  A   It was very odd to me when I came in.  First, I took a

9  look at my office, and, for example, one officer -- a full

10  duty officer was -- sole assignment was to gas and wash my

11  car.

12  Q   And this was a police officer?

13  A   A police officer.  Then there were several other police

14  officers in my office that were performing clerical duties,

15  and so those individuals -- I took action to move them out,

16  and then we started to look at the rest of the department.

17  Q   Well, before you go there, when you say "move them out,"

18  do you mean place them on the street patrolling?

19  A   In a more -- in an operational assignment, which doesn't

20  necessarily mean they went back to a uniform patrol, but in

21  another operational, something where a police officer would

22  be assigned.

23  Q   Let's talk about the mayor's personal protection force.

24  When you took over as the police chief in the City of

25  Detroit, was protection provided by the Detroit Police

1  Department to Mayor Bing?

2  A   Yes, it was.

3  Q   And how many police officers were used for that

4  protection?

5  A   Twenty-three.

6          MS. LEVINE:  Your Honor, objection, again, with

7  regard to relevance.  I'm just not sure where this fits into

8  109.

9          MR. HERTZBERG:  It's, as I said, service insolvency.

10 We're going to show that there were police officers not being

11 used correctly on the street, which jeopardized the safety of

12 the residents, and when he took over as chief the residents

13 were at risk because of this, and we were showing service

14 insolvency.

15         THE COURT:  The relevance is arguable, so I'll

16 permit it.

17         MR. HERTZBERG:  Thank you.

18         MS. LEVINE:  Your Honor, just for the record --

19         THE COURT:  Yes.

20         MS. LEVINE:  -- our understanding is that solvency

21 we've determined here is whether or not the city can pay its

22 debts as they come due, and that's a financial mathematical

23 problem.  So while this is sympathetic testimony, we would

24 respectfully submit it doesn't go to the issue of whether or

25 not this debtor is eligible.

1            MR. HERTZBERG:  As I indicated to the Court, and

2    I'll just repeat --

3            THE COURT:  You may proceed, Mr. Hertzberg.

4            MR. HERTZBERG:  Okay.  Thank you, your Honor.

5    BY MR. HERTZBERG:

6    Q   You were telling us about the personal protection staff

7    on Mayor Bing.  How many officers was it?

8    A   Twenty-three officers.

9    Q   And how many now are being used?

10   A   Six.

11   Q   And are you the one who reduced the staff?

12   A   I was.

13   Q   And where are those officers deployed now?

14   A   They went back to operational assignments.  Six remain

15   working for the mayor in executive protection, one was de-

16   appointed, and the remaining were sent out to a variety of

17   assignments.

18   Q   How many police officers were there when you took over as

19   police chief?

20   A   Roughly 2,400.

21   Q   In order for the city, in your mind, to be safe, how many

22   police officers do you need?

23   A   In my estimation, if we had 3,000 police officers today,

24   that would help tremendously, but before I could put a hard

25   number to it, I need to make an evaluation on how we are

1  deploying current officers, and so when you talk about moving

2  staff from the mayor's executive protection detail, there's

3  also a move to civilianize some of the positions now held by

4  police officers, and one key example is our dispatch.

5  Dispatchers in the Detroit Police Department are sworn police

6  officers, and so I wanted to make sure that we were

7  effectively deploying sworn officers the best that we could

8  so I would have an idea of how many officers we actually

9  need.

10  Q   Okay.  Let's turn to the equipment.  Do the officers get

11  as part of their -- or as police officers, are they given

12  bullet-proof vests?

13  A   They are.

14  Q   And what's the state of the bullet-proof vests when you

15  took over as police chief?

16  A   Deplorable.  There were roughly 350-plus vests, and I

17  think it's up now to roughly 400 -- it might even be higher;

18  I think it's 500 when we include our narcotics unit -- that

19  are expired.  Even the police chief does not have a vest

20  except the one I brought with me from Cincinnati.

21  Q   When you say "expired," bullet-proof vests have

22  expiration dates on them?

23  A   Yes.  Five years.

24  Q   And after that they're not safe to wear?

25  A   That's correct.

1   Q   Let's talk about the vehicle, police vehicles.  What

2   condition were the police vehicles in when you took over?

3   A   I saw vehicles with obvious damage.  I saw vehicles that

4   appeared to be unsafe.  In fact, when I stopped one officer,

5   there was one vehicle that had -- the right front brake

6   wasn't working properly, so I directed him to turn the

7   vehicle in.  Paint peeling off the vehicle.  In fact, in the

8   field on one call where it was an officer needs help, a back-

9   up car that I responded to in the eastern district where they

10  were looking for a wanted suspect, which we ultimately

11  identified and arrested, as the officers were preparing to

12  leave, one of the police vehicles would not start up.  The

13  officer proceeded to climb underneath the vehicle and jump-

14  started the vehicle to get it running.  When I asked the

15  question, "Is this the norm?" several of the officers said

16  for the most case it is the norm, and either they jump it

17  that way or they push the car to get it started, not all

18  vehicles but some.

19  Q   And what was the mileage on the vehicles?  Was it normal

20  mileage for the year of the vehicle?

21  A   I'm not certain on the mileage, but I am told that 66-

22  percent of our fleet has excessive wear, is well beyond the

23  normal -- I guess it's three years that police cars are

24  deployed.

25  Q   The condition of the police cars, does this put citizens

1  at risk?

2  A    It does.

3  Q    Does it put visitors to the city at risk?

4  A    It does.

5  Q    And does it put the safety of people who work in the city

6  at risk?

7  A    It does, including the police officers.

8  Q    You received some new police cruisers once you took over

9  as police chief; is that correct?

10  A    That's correct.

11  Q    And where did you receive those from?

12  A    Penske Corporation and a group of other local businesses

13  that were part of this effort to bring a hundred new police

14  cruisers.

15  Q    So you received -- have you taken possession of the

16  hundred new police cruisers?

17  A    We have.

18  Q    Are all of them operating on the street right now?

19  A    No, they're not.

20  Q    How many are actually operating on the street?

21  A    Roughly 20 or so.  I'm not actually certain.  I check

22  weekly.  Some of them are still being outfitted by the

23  outfitter, and they're being pushed out, but we do have

24  possession of the 100 police vehicles.

25  Q    Let's spend a minute and talk about the fire department

1  and EMS.  You don't oversee those departments, do you?

2  A    I do not.

3  Q    Have you had an opportunity to observe as police chief

4  those departments and how they're operating?

5  A    I have.

6  Q    And what have you seen?

7  A    The thing I've seen -- two things that would have been

8  most notable is the fact that Detroit police officers on a

9  routine basis I'm told transport injured victims to the

10  hospital and in all cases children.

11  Q    Is this a normal function for the police department?

12  A    Not anyplace I've worked.

13  Q    And why is the police department in Detroit doing that?

14  A    I'm told because EMS did not have vehicles or staff that

15  could respond in a timely manner, and so the decision was to

16  transport.  And when I asked how long this has been going on,

17  it's certainly been more acute in the last five years, but

18  one of my staff as recent as this morning said that they've

19  been doing it since the '80s.  Now, to what degree I am not

20  certain, but it is routine that Detroit police officers

21  transport injured youth victims of crimes or that have been

22  injured.

23  Q    And do you work closely with the fire department?

24  A    Work in the same building.  We have communication.  We

25  talk about a variety of issues.

1   Q   Have you seen any issues that have caught your attention

2   with the fire department?

3   A   Yes, one notable issue.

4   Q   And what's that?

5   A   The fact that there have been since I've been here two

6   occasions but this year four occasions where fire fighters

7   have responded to a fire and put out the fire, left the

8   location, and a deceased person was found in the location

9   later.

10  Q   By the police department?

11  A   By the police -- well, someone would call us and say

12  there was a dead body in the location.  Police department

13  would respond out and start its investigation only to find

14  out that the fire department had been at the location and put

15  out the fire.

16  Q   One more area I want to cover with you, blight.  What is

17  blight in the city?

18  A   Abandoned homes, streetlights out, traffic signals not

19  working, overgrown shrubbery.

20  Q   Is that a safety issue?

21  A   It is.

22  Q   In which way?

23  A   It affords someone who wants to engage in criminal

24  behavior to do it under the cloak of darkness.  Certainly

25  abandoned homes are a key location where violent crimes take

1  place. And using the broken windows concept, certainly when

2  an area is deplorable or broken, it tends to attract criminal

3  behavior. So if an area is clean, it's well-lit, people take

4  pride in the neighborhood, crime seems to be lower.

5  Q  Did you -- when you took over as police chief, did you

6  notice blight in the City of Detroit?

7  A  I have.

8  Q  And how bad was it, in your mind?

9  A  Significant.

10  Q  When you say "significant," could you describe it?

11  A  Well, just blocks where it may be only one home, home

12  could be partially burned, certainly streetlights that were

13  not working, which certainly contribute to a safety issue

14  both for pedestrians and certainly a place where crime takes

15  place, traffic signals not working, which certainly puts

16  motorists at harm as they travel through the City of Detroit.

17  Q  When you arrived as police chief and took over, do you

18  think that the residents, visitors, people who worked in the

19  city were at risk of violent crime?

20  A  I did and do.

21       MR. HERTZBERG:  I have no further questions, your

22  Honor.

23       THE COURT:  Any questions for the witness?

24                    CROSS-EXAMINATION

25  BY MS. PATEK:

1  Q   Good afternoon, Chief Craig.  Welcome back to Detroit --

2  A   Thank you so much.

3  Q   -- right in the eye of the storm.  In spite of all the

4  challenges you've described, we can agree for those of us who

5  grew up here and have families here that this is a place with

6  some rich history and some wonderful things to offer; isn't

7  that right?

8  A   Absolutely.  I agree with that.

9  Q   I want to start with your comments about the DFFA.  I

10 take it you have no firsthand knowledge as to whether or not

11 the DFFA faces some of the same undermanning or morale

12 problems that are present in the Detroit Police Department?

13 A   Only what I've heard from police officers and -- but I

14 have not firsthand, not like I have in the police department.

15 Q   Is it your understanding that they're in a similar

16 situation as the Detroit Police --

17 A   Yes.

18 Q   -- Department?  And in that respect, I heard you say, I

19 think, that the Detroit Police Department is currently

20 undermanned; correct?

21 A   I would say so, yes.

22 Q   And the individual officers are in many cases underpaid?

23 A   Yes.

24 Q   And the working conditions, as you described them,

25 were -- are deplorable?

1  A    Yes.

2  Q    And they -- as a consequence, when you came here in July,

3  you found a department in very low morale?

4  A    Yes.

5  Q    And I don't know how much research or how much you were

6  paying attention, but is it your understanding that there was

7  a series of chiefs before you that stepped down in a variety

8  of less than -- let's say less than auspicious circumstances?

9  A    Yes.  I'm aware.

10 Q    And is it your understanding that that was, in large

11 part, what left the department leaderless?

12 A    Yes.  That certainly was a significant contributing

13 factor.

14 Q    And as I understand it, since you've been here, you've

15 brought on new deputy and assistant chiefs?

16 A    A new executive and management team with maybe one or two

17 exceptions.

18 Q    Okay.  And some of that executive management team has

19 been pulled directly from the command staff; that is, people

20 who are members of the Detroit Police Command Officers

21 Association?

22 A    That's correct.

23 Q    Because when you came here, in spite of the difficulty of

24 the situation, you found that there were dedicated

25 professional men and women there who you wanted to elevate to

1  be part of your new leadership team?

2  A   Yes.

3  Q   And with respect to the lieutenants and sergeants, some

4  of those who had actually been acting as inspectors have now

5  been formally appointed as inspectors?

6  A   Yes, now called captains, yes.

7  Q   And you also mentioned meeting with on a number of

8  occasions the president of the Detroit Police Officers

9  Association, Mark Diaz?

10  A   Yes.

11  Q   And in your meetings -- and I don't know if he's still

12  here.  He was here earlier in the courtroom today.  In your

13  meetings with Mr. Diaz, have you found him to be interested

14  in the restructuring and revitalization of the Detroit Police

15  Department?

16  A   I have, yes.

17  Q   And willing to be flexible with you in terms of trying to

18  try new things to better deployment, better strategy in terms

19  of getting more officers out on the street?

20  A   Yes, in every instance.

21  Q   And obviously I think it goes without saying from what

22  you described the work these officers do every day out on the

23  street is very dangerous work?

24  A   Yes, it is.

25  Q   And they're literally putting their lives at risk?

1  A   Yes, they are.

2  Q   And would it be fair to say that that would go for

3  probably the police and the fire fighters as well?

4  A   Yes, it would.

5  Q   And do you -- and if you don't know, it's a fair answer.

6  Do you know anything about the restructuring proposal that

7  has been made by the City of Detroit with respect to what is

8  to occur with the accrued vested pension benefits of the

9  active and retired Detroit police and fire fighters?

10 A   I've heard.  I don't have intimate understanding of it.

11 Q   And would it be -- do you believe sitting there and even

12 understanding the financial challenges that it would be fair,

13 given what these officers face every day, to impair those

14 accrued vested and previously earned pension benefits?

15 A   I do support the public service workers having their

16 pension, but I also understand the necessity to take some

17 very bold action as it relates to addressing this fiscal

18 crisis in the City of Detroit.  I'm certainly not the expert

19 on what should happen or what the balancing would be to that,

20 but I am certainly concerned about pensions.  I have the good

21 fortune of having served 28 years with the Los Angeles Police

22 Department, and I have my pension, so that certainly does

23 concern me.

24 Q   And when you went to work for the Los Angeles Police

25 Department and you did the very hard work that you did for 28

1  years, you understood that you were earning that pension?

2  A   That's correct.

3  Q   And you had an expectation that at the end of the day it

4  would be paid to you?

5  A   That's correct.

6          MR. HERTZBERG:  Objection, your Honor.  This is --

7          MS. PATEK:  I have nothing further.

8          MR. HERTZBERG:  Okay.  I'll withdraw the objection

9  then.  Let her testify.

10                     CROSS-EXAMINATION

11  BY MS. LEVINE:

12  Q   Good afternoon.

13  A   Good afternoon.

14  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.

15  A   Yes.

16  Q   You mentioned there was a morale issue with regard to

17  lost pay, increased schedule, and a lack of leadership, I

18  believe; correct?

19  A   All kind of combined in one.

20  Q   Combined?

21  A   All played varying roles in morale.

22  Q   Isn't it true that reducing pensions and reducing health

23  benefits would also contribute to further morale loss?

24  A   I am certain.

25  Q   The city actually produced a lot of documents for us in

1 discovery in connection with this case. I don't recall --

2 and I may have just missed it -- a proposed budget with

3 regard to fixing the Detroit Police Department. Have you

4 provided that kind of a budget to the city?

5 A   I have not.

6 Q   Would you be -- would you be supportive of using existing

7 vested pension benefits to fund that kind of a budget?

8        MR. HERTZBERG:  Objection, your Honor.  Way beyond

9 the scope of direct examination.

10        THE COURT:  Overruled.  Please answer the question,

11 sir.

12        THE WITNESS:  I would have to take a look at the

13 full picture.  I mean there have been some steps I've taken

14 to reduce the fiscal liability.  One such action I took was

15 dramatically reducing the command and executive team, thereby

16 resulting in a $1 million annual savings in salaries, so we

17 are in budget discussions talk right now, so I'm not prepared

18 to answer the question to the level of detail you're asking.

19 BY MS. LEVINE:

20 Q   You mentioned using civilians for certain job functions,

21 including, for example, dispatchers.  Just so I understand,

22 is that outsourcing those jobs?  Is that what you're talking

23 about?

24 A   Not outsource -- not outsourcing but redeploying sworn

25 officers that hold those jobs back into traditional policing

1  functions.  Most police agencies across America use civilians

2  as dispatchers, and Detroit has used sworn dispatchers from

3  the time I was here now over 36 years ago, and so this was an

4  effort to more equitably deploy police officers back into the

5  field.

6  Q   So it would either be hiring the citizens of Detroit at

7  probably a lower pay scale and/or outsourcing those jobs?  Is

8  that -- do I --

9  A   That's probably a strategy that could be used, but it

10  would definitely be hiring people from the city.

11  Q   And from your time with the Los Angeles Police

12  Department, in addition to a pension, do you enjoy health

13  benefits?

14        MR. HERTZBERG:  Objection, your Honor.  It's

15  irrelevant.

16        THE COURT:  No.  I'll permit it.  Go ahead, sir.

17        THE WITNESS:  I do.

18        MS. LEVINE:  Thank you.

19        THE COURT:  Other questions for the witness?

20        MR. KING:  Please, your Honor.  Ron King on behalf

21  of the Pension Systems.  I just didn't want to displace Ms.

22  Green.  Sorry.

23                    CROSS-EXAMINATION

24  BY MR. KING:

25  Q   Thank you for your service.

1    A    Thank you.

2    Q    Chief Craig, are you aware that there are approximately

3    400 active duty officers that have less than ten years of

4    service in the department?

5    A    I didn't know it was that few.

6    Q    Are you concerned at all that if their pension benefits

7    are not vested, that you will have a difficult time retaining

8    those people?

9    A    I am concerned about retention and hiring.

10   Q    Do you think that impairing or diminishing pension

11   benefits will have an impact on your ability to recruit and

12   retain police officers?

13   A    It could.

14            MR. KING:  I don't have anything further.

15            THE COURT:  Thank you.

16                         CROSS-EXAMINATION

17   BY MS. BRIMER:

18   Q    Good afternoon.  My name is Lynn Brimer.  I represent the

19   Retired Detroit Police Members Association.  It's an

20   association of approximately 350 retired Detroit police

21   personnel, officers through chiefs.  Now, I'm going to try

22   not to repeat anything that's already been put in the record,

23   but you did indicate you do receive a pension, and you do

24   receive healthcare benefits; is that correct?

25   A    I do.

1   Q   And when you accepted your position as a police officer

2   in Los Angeles, you considered those benefits, both the

3   pension and your healthcare benefits, to be part of your

4   compensation package; is that correct?

5   A   That's correct.

6   Q   Now, you indicated that there were a number of what

7   appear to be management problems with the police department

8   when you took over.  For example, you indicated that the

9   mayor's personal protection at the time you took over

10  consisted of 23 officers; is that correct?

11  A   That's correct.

12  Q   And you've reduced that to six?

13  A   Yes.

14          THE COURT:  All right.  Ms. Brimer, I am going to

15  ask you not --

16          MS. BRIMER:  Okay.

17          THE COURT:  -- to ask any more duplicative

18  questions.

19          MS. BRIMER:  Okay.

20  BY MS. BRIMER:

21  Q   Do you know --

22          THE COURT:  Any question that begins with "you

23  testified that" --

24          MS. BRIMER:  Okay.

25          THE COURT:  -- is going to be a duplicative

1    question.

2    BY MS. BRIMER:

3    Q    Do you know whether or not the decision to put -- well,

4    let me think of how I want to ask this.  So the decision to

5    put 23 officers on the mayor's protection order was a

6    management decision, not a financial decision.  Would you

7    agree with that?  It was driven by management rather than the

8    amount of resources available to the department?

9    A    It's both.

10   Q    Okay.  Why is it a financial decision?

11   A    Police officers cost money.  It's a financial resource.

12   So if you decide to put 23 officers on an executive

13   protection detail, that's the equivalent to a shift in a

14   Detroit police station, the precinct.  So it's like me saying

15   I'm going to close the Tenth Precinct on the midnights.

16   That's why it's important.

17   Q    So now you've freed up 18 to go back to shifts at a

18   precinct; correct?

19   A    Not all went back to a precinct.  Some did.

20   Q    Okay.

21        MS. BRIMER:  And I think, your Honor, I -- I will

22   say that everything else I was going to ask has been asked.

23   Thank you.

24                    CROSS-EXAMINATION

25   BY MR. MONTGOMERY:

1  Q   I'm Claude Montgomery from the law firm of Dentons.  We

2  are representing the Official Committee of Retirees in this

3  case, so I have just a couple of quick questions.  I think I

4  heard you say that you believe that bold action is required

5  on many levels?

6  A   I may have said that, and I do agree that bold action has

7  to happen.

8  Q   And you have a huge job in front of you to try to protect

9  700,000 people from what you found to be an incredibly

10  violent situation; is that correct?

11  A   Absolutely.

12  Q   All right.  Do you think the governor should be playing a

13  role in that, in helping you tackle that job?

14  A   I think that I don't see a problem or an issue with that.

15  Q   Okay.  Do you think that there should be any assets that

16  the City of Detroit has that should be blocked off from your

17  access to help the citizens of the City of Detroit?

18  A   I'm not understanding your question.

19  Q   Do you think there are any -- if the City of Detroit has

20  an asset that can be sold to help you, do you think it should

21  be sold to help you?

22  A   It depends on the asset.

23  Q   So there are some assets you think are less available to

24  you than others?

25          MR. HERTZBERG:  Your Honor, I'm going to object.

1  This is beyond the scope of direct examination and far

2  afield.  Asking the chief of --

3          THE COURT:  It is that, but in the Court's

4  discretion, the Court will permit it, nonetheless.  Go ahead,

5  sir.

6          THE WITNESS:  Again, as I indicated, possibly some

7  assets could be sold to support, say, public safety.

8  BY MR. MONTGOMERY:

9  Q    Thank you.  And anything in that regard from your vantage

10 point has to be directed towards helping you keep people

11 alive inside the City of Detroit?

12 A    Public safety is critical.

13 Q    Okay.  And, again, I think you said earlier that having a

14 police force of men and women that are dedicated and have

15 high morale is part of that?

16 A    Absolutely.

17 Q    Okay.  And part of that is how their promise -- the

18 promises made to them are kept; is that correct?

19 A    Promises are important, but also how they're treated is

20 important.

21 Q    It's got to be fair?

22 A    Fairness is important.  Transparency is important.

23          MR. MONTGOMERY:  No further questions.

24          THE COURT:  Any others?

25                        CROSS-EXAMINATION

1    BY MR. PLECHA:

2    Q   Good afternoon, Chief Craig.  I represent the Retiree

3    Association parties, which includes the Retired Detroit

4    Police and Fire Fighters Association.

5            THE COURT:  Could you back off of the mike a bit,

6    please?

7            MR. PLECHA:  Oh, I'm sorry.

8    BY MR. PLECHA:

9    Q   I will be very brief.  Would you support any plan or

10   initiative that could potentially increase blight?

11   A   An initiative to increase blight?  I wouldn't support an

12   initiative to increase blight.  Did you say decrease blight?

13   Q   No.  I said increase blight.

14   A   No.  I wouldn't be supportive of it.  I can't -- I don't

15   understand an initiative that would do that.

16   Q   So if retirees were financially forced to leave their

17   home, vacating those homes, increasing blight, you would not

18   be in favor of that?

19   A   I would not like to see retirees leave their homes.  I

20   don't -- it's not my call, but I don't like the question.

21   Q   Well, I appreciate that, but thank you.  Would you agree

22   that the retiree community is a stable part of the Detroit

23   community?

24   A   I would say that there are many retirees that offer

25   stability to the Detroit community.  My dad is one.

1          MR. PLECHA:  Thank you very much.  No further

2     questions.

3          THE COURT:  All right.  Anything further for the

4     chief?  Redirect?

5          MR. HERTZBERG:  None, your Honor.

6          THE COURT:  All right.  Thank you very much for

7     coming today, sir, and also thank you for your service.

8          THE WITNESS:  Thank you very much.

9        (Witness excused at 4:18 p.m.)

10          MR. IRWIN:  Move this, your Honor?

11          THE COURT:  Yes, sir.

12          MR. IRWIN:  Your Honor, our next witness is Mr. Orr.

13     He is in the building.  We would need to locate him, but

14     given the hour, we just didn't know how the Court wished to

15     proceed.  We can --

16          THE COURT:  I wish to proceed.

17          MR. IRWIN:  That's fine.  We will get him.

18          THE COURT:  We'll wait here for him.

19          MR. IRWIN:  He'll be here as soon as we can get him.

20          THE COURT:  All right.  Would everyone take their

21     seats as promptly as possible, please?  One second, please.

22     Everyone sit down, please.  Mr. Orr, would you raise your

23     right hand?

24               KEVYN ORR, DEBTOR'S WITNESS, SWORN

25          THE COURT:  Please sit down.

1           THE WITNESS:  Thank you.

2           MR. SHUMAKER:  Good afternoon, your Honor.  Greg

3     Shumaker of Jones Day for the City of Detroit.

4                         DIRECT EXAMINATION

5     BY MR. SHUMAKER:

6     Q    Good afternoon.

7     A    Good afternoon, Mr. Shumaker.

8     Q    Would you state your full name for the record?

9     A    Kevyn Duane Orr.

10    Q    Mr. Orr, what is your current occupation?

11    A    My current occupation is the emergency manager for the

12    City of Detroit.

13    Q    Where did you go to college, sir?

14    A    The University of Michigan, Ann Arbor.

15    Q    When did you graduate from there?

16    A    December 1979.

17    Q    And after college, did you proceed to employment or to

18    another post-graduate school?

19    A    I took a little time off and went out west to do some

20    skiing but eventually went to graduate school.

21    Q    And where did you go to graduate school?

22    A    The University of Michigan Law School, Ann Arbor.

23    Q    And when did you graduate from there?

24    A    I graduated from law school in May 1983.

25    Q    And for the Court, where did you grow up?

1  A    I was born and grew upon Fort Lauderdale, Florida,

2  Broward County.

3  Q    Your parents are from Florida?

4  A    Yes.

5  Q    Have any -- do they have any involvement with the State

6  of Michigan?

7  A    My mother went to the University of Michigan graduate

8  school in education.

9  Q    Could you give us a brief summary of your professional

10  background?

11  A    Sure.  After graduation from law school, I went back to

12  Florida in private practice with the law firm of Arky Fried,

13  which eventually became Stearns, Weaver, Miller, Weissler,

14  Alhadeff & Sitterson, where I specialized in litigation,

15  eventually became a bankruptcy trial practitioner with who is

16  now Chief Judge Robert Mark at that law firm.  After five

17  years, I was voted into the partnership of that law firm in

18  1988.

19        I eventually took what I thought was going to be a

20  two-year leave of absence from that law firm in 1991 to go

21  into federal government first in the FDIC, Federal Deposit

22  Insurance Corporation, then into the Resolution Trust

23  Corporation in 1992.  While at the RTC, I had a specialty

24  first as a line attorney, as a counsel, then a senior

25  counsel, in litigation and bankruptcy-related matters.  I was

1 | eventually promoted to assistant general counsel of complex
2 | litigation and bankruptcy under then Deputy General Counsel
3 | Jerry Patchan. I stayed there from '92 to '95.
4 | Q Can I just stop you one second? You said you started at
5 | the FDIC; is that correct?
6 | A Yes.
7 | Q What was your position there at the FDIC?
8 | A At the FDIC I was counsel in the legal division.
9 | Q Okay. And then you went to the Resolution Trust
10 | Corporation?
11 | A Yes. The Resolution Trust Corporation was originally
12 | staffed by attorneys at FDIC, and then it got its own
13 | independent hiring authority, and we were assigned there
14 | permanently.
15 | Q Did you have any particular responsibilities at the RTC?
16 | A Yes.
17 | Q What were they?
18 | A While at the RTC, I not only had line responsibilities
19 | for litigation and litigation-related matters, I also had
20 | responsibilities as a liaison from the legal division with
21 | the agencies, Office of Minority and Women Owned Business and
22 | Women Owned Law Firms called MWOLF's and MWOB's. I was also,
23 | during the course of that, assigned as the chief
24 | restructuring officer of a bank holding company in New
25 | Orleans for a period of time and eventually became

1    responsible for the agency's supervision and management of

2    all cases implicating federal preemption and the primacy of

3    the Financial Institutions Reform, Recovery and Enforcement

4    Act of 1989 over various state laws.

5    Q    I'm sorry.  You went on from the RTC to where?

6    A    After the RTC, I was going to return to private practice

7    to my old firm in Miami.  The supervisor that I had at the

8    RTC had moved on to become director of the Executive Office

9    for United States Trustees at the Department of Justice, a

10   retired bankruptcy judge by the name of Jerry Patchan.  He

11   asked me to come over for what was then going to be a year or

12   two as his deputy, and I ended up staying there for

13   approximately six years.

14   Q    And what did you do, if you could tell us, at the United

15   States Trustee program?

16   A    I was initially the deputy director of the U.S. Trustee's

17   program where I was responsible as the -- more or less the

18   chief operating officer for the agency at the director of

19   the -- at the direction of the director.  The EOUST and the

20   U.S. Trustee's program is one of 36 ranking components within

21   the United States Department of Justice.  It is responsible

22   for the administration and oversight regarding the integrity

23   of the bankruptcy practice in all 50 states with the

24   exception of North Carolina and Alabama.

25   Q    Were there any specific duties that you had in that

1  position that you think translates into your role as the

2  emergency manager of the City of Detroit?

3  A   Yes.  I mean we had over 1,100 employees throughout the

4  United States, 93 offices throughout the United States.  I

5  think our budget at that time was somewhere in the

6  neighborhood of over a hundred million dollars, which we

7  administered.  In that capacity, we also had reporting

8  requirements for the -- to the Department of Justice through

9  the associate attorney general to the then Attorney General

10 Reno for most of the time that we were there.  We also had

11 supervisory, administrative, and operational responsibility

12 for the 21 United States Trustees Offices.  I was also

13 responsible for both preparing and giving oversight testimony

14 to the various oversight committees in Congress both on the

15 House side and the Senate side and coordinating budget

16 reviews on a regular basis during the regular budget season

17 but oftentimes one-offs as well with House Majority, House

18 Minority, and the U.S. House, Senate Majority, Senate

19 Minority, budgeting with the White House as well as budgeting

20 issues with respect to the Department of Justice's overall

21 annual budget.

22 Q   During your time in the federal government from your

23 position at the FDIC, the RTC, and the United States Trustee

24 program, did you have any restructuring experiences?

25 A   Yes.

1  Q   And what were those?

2  A   Well, because I'd had some experience as a bankruptcy

3  practitioner in South Florida, then in the Southern District

4  of Florida, principally in front of Judge Cristol but others,

5  I was initially selected to participate as the chief legal

6  officer with the Savings & Loan because a subsidiary down in

7  Atlanta was -- down in New Orleans was a -- had a large

8  holding company called the Landmark Land Company.  At that

9  time, the Landmark Land Company held a series of golf courses

10  and country clubs, five of which were some of the most well-

11  regarded country clubs, highly rated ones in the nation at

12  the time, such as Kiowa, Mission Hills, PGA West, Oak Tree --

13  trying to think of the other ones -- Palm Beach Polo and

14  Country Club, places I typically couldn't have gone to, but

15  very significant clubs at that time, high-end properties, and

16  I initially became responsible for supervision of the

17  restructuring of the holding company, but I also ended up

18  becoming responsible for asset disposition during that

19  process.

20  Q   After you left the federal government, where did you go?

21  A   In 2000 I was selected by the Attorney General to

22  become -- go from being the deputy director to becoming the

23  director, and that went from being a career position to a

24  political appointee after White House vetting and approval

25  during President Clinton's administration.  As a political

 1   appointee -- most of the agency heads are -- it is typical
 2   for the President of the United States, upon a new
 3   election -- that was Bush v. Gore first election -- to put in
 4   his own people, and I think the President gets, on average,
 5   somewhere in the neighborhood of 60,000 appointments, U.S.
 6   Attorneys, others, ambassadors, so on and so forth.  So it
 7   became clear that I was at the end of my tenure as a
 8   political appointment in an agency, and I was going back to
 9   my old law firm in Miami.  I was approached by Jones, Day,
10   Reavis & Pogue to consider an overture to join them, and I
11   pursued that overture, and, much to my surprise, I ended up
12   staying with Jones Day in Washington, D.C., office.
13   Q    Why did you select Jones Day?
14   A    Jones Day had been an opponent when I was at the
15   Trustee's Office on the other side.  We had met with a number
16   of different law firms in that capacity, as you might
17   imagine.  In federal government you handle a number of
18   different matters, a number of law firms.  We had always been
19   pretty strong adversaries but never enemies.  They conducted
20   themselves in a very professional and honorable manner.  I
21   could not have said the same for some of the firms that we
22   interfaced with.  I felt that even though we had been
23   adversaries, we had a very professional relationship, and I
24   admired the way they conducted business.  I felt that I could
25   do business with them on a handshake in any particular

1    litigation.  They would keep their word.  And, frankly, I was

2    somewhat surprised by the approach because I'd already hired

3    movers to go back to Miami, but after spending some time with

4    them, my initial impressions of the firm were borne out after

5    meeting with some of their leadership.

6    Q    And you joined Jones Day in what year?

7    A    I joined Jones Day May 2001.

8    Q    And you said you had your bags packed for Miami, but you

9    didn't get to Miami?

10   A    No, no.  I had already gone back to my old firm and had

11   hired movers, and I was ready to go, but I changed my plans

12   and joined the firm, joined Jones Day.

13   Q    Okay.  And which office were you in?

14   A    I was in the Washington, D.C., office.

15   Q    And what practice area?

16   A    I initially joined in the litigation practice of the firm

17   and within a year or two was assigned to the restructuring

18   practice.

19   Q    And what kind of restructuring practice does Jones Day

20   have or did it have when you joined?

21   A    Jones Day had and still has principally a fairly well-

22   regarded restructuring practice.  The firm has usually been

23   rated in the top tier, if not the top, one, two, three, or

24   four of restructuring practices as well as the firm overall

25   consistently.  Its practice focused largely on large

1    corporate matters, oftentimes precedent-setting, and

2    typically debtor side representations as opposed to creditor

3    representations.

4    Q    Could you share with the Court some of the more

5    significant representations that you worked on?

6    A    Sure.  At the firm, the Laidlaw bankruptcy at that time

7    concerned one of the largest transportation companies, both

8    ambulances, busses.  I think they owned both Trailways and

9    Greyhound.  The Dana case.  Renaissance Cruise Lines

10   concerned a series of seven cruise ships in Tahiti concerning

11   a cash security agreement which was negotiated in Paris,

12   France, as an economic development process with the EU, and

13   we had to negotiate the almost $7 billion in debt for that

14   one.  I've handled very obviously the Chrysler case, which I

15   think everybody is fairly familiar with.  I was the team

16   leader on the dealer team having to reject dealer franchise

17   state agreements as well as dealing with throughput and

18   rationalizing the dealer network and a number of other fairly

19   large cases.

20   Q    You talked a little bit about the dealer network.  What

21   did you do with regard to the dealer network in Chrysler?

22   A    The company had been considering rationalizing -- that

23   is, downsizing its dealer network -- for the better part of a

24   decade.  And with the advent of the financial crisis come to

25   bear full-borne in 2008, the company had to begin -- had

1  begun considering how it was going to rationalize the dealer

2  network so it could increase what was then called throughput;

3  that is, the ability to sell more vehicles through its dealer

4  network and increase profitability while at the same time

5  downsizing its dealer network so that it did not create

6  inefficiencies because of a very wide footprint, which is

7  very hard to maintain. The company took that project, and we

8  originally were in the company September 2008 discussing

9  alternative solutions, both out-of-court and in-court

10 solutions, with the company, including how we would

11 rationalize the dealer network in a very analytical and

12 scientific process. As you might recall, two of the auto

13 companies, GM and Chrysler, were both considering this

14 process. GM had a little bit more of a blanket process. I

15 think they established a certain line of profitability, and

16 all dealers below that line were cut. Chrysler examined a

17 fairly complex formula, almost a logarithm, to make that

18 determination as to which dealers would be candidates for

19 rejection.

20 Q   Did you have to review financial records, statements, in

21 connection with that role on the Chrysler team?

22 A   Yes. The Chrysler analysis was quite complex. They had

23 a spreadsheet, dealer spreadsheet, which was over three dozen

24 factors, a dealer location footprint; whether the dealer was

25 dueled, which is with other dealers; multi-dealer with other

1  brands and makes; the dealers' seasonal, annual, daily sales;

2  the dealers' longevity; notes a number of a different

3  factors.  They knew their network quite well.  And also for

4  each of those dealers, they had the financial information

5  both in regard to retail financing, wholesale financing,

6  operational costs, parts and servicing requirements, warranty

7  service under the dealer, everything you would think that

8  would go into a dealer, fleet sales, the percentage of sales

9  compared to their other dealers within their region,

10  everything that you would think would go into a fairly

11  complex and sophisticated analysis of a business vis-a-vis

12  its ability to put more vehicles out into the public and

13  increase profitability both for the dealer but as well as for

14  the manufacturer, which was the company.

15  Q   At Jones Day, did you have any nonlegal, say,

16  administrative roles?

17  A   Yes.

18  Q   And what were they?

19  A   I initially came into the firm not knowing anyone from

20  Adam's off ox but was eventually admitted to the partnership,

21  I believe, within two and a half, three years later.  I was

22  asked to become initially the administrative partner for the

23  Washington, D.C., office, which is sort of chief operational

24  function for the entire office, which at that time had 200 --

25  approximately 220, 230 attorneys and 500 or so support

 1   personnel.  I then went on and was asked to become the

 2   firmwide diversity partner for all of the firms.  I think

 3   there are 2,500 attorneys in 37 offices, and I performed that

 4   firm -- that function for a number of years, and eventually I

 5   was elected to be the firmwide hiring and diversity partner

 6   responsible for all recruiting, hiring for the firm

 7   throughout the firm's system both here and internationally.

 8   Q   And I'd like to ask you a few questions about how you

 9   became the emergency manager of Detroit.

10   A   Yes.

11   Q   What indication did you have that you were being

12   considered as the emergency manager?

13   A   We originally came out to pitch the restructuring --

14   legal restructuring work for the city in late January.  I

15   believe it was January the 29th.  And I think either later

16   that day or the next day I was informed by the firm's

17   managing partner, Steve Brogan, that he had received a call

18   from one of the review team members at the pitch who wanted

19   to talk to me about potentially pursuing the position of

20   emergency manager.

21   Q   And what was your reaction to Mr. Brogan's call?

22   A   I was surprised, flattered, but was very firmly resistant

23   and against taking the position.

24   Q   Why was that?

25   A   I was involved in several significant matters with the

1  firm, in the midst, as a matter of fact, of a very large case

2  that we were mediating with one of the largest private

3  investment banks in the world at the time.  It appeared that

4  we were going to resolve that case quite successfully for the

5  firm.  I was also very concerned about walking away from

6  other clients.  I had been selected earlier that year to be

7  the new partner in charge -- to be the partner in charge of

8  the firm's new Miami, Florida, office, which was an

9  opportunity to go home, and we were in the midst of lease

10  negotiations and operation negotiations with several

11  landlords in Miami.  There were also some fairly significant

12  personal hardships.  My wife is a professional.  She's a

13  surgeon, perinatology, high-risk obstetrics, at Johns

14  Hopkins.  She has a very active practice and takes call at

15  night.  We have two young children, seven and six, who are

16  the apples of my eye.  I very much enjoy spending time with

17  my family, and the thought of being away from them for

18  extended periods of time was not attractive to me.  And,

19  frankly, I was at a very good place both personally and with

20  my career, and I'd done secondments, if you will, or long-

21  term assignments away.  They're quite trying, and they would

22  take me away from both family and my existing position for a

23  long period of time, which wasn't something I was either

24  asking for or expecting.

25  Q    What made you change your mind?

1  A    There was an initial overture that I -- when Steve

2  brought me into his office, said Mr. Baird has called, Rich

3  Baird, who had been one of the team members.  There were six

4  of us during the pitch.  There was me, Steve Brogan -- we

5  were the only firm to bring our managing partner -- Corrine

6  Ball, who is a fairly well-known bankruptcy practitioner.

7  Heather Lennox was in that group; Aaron Agenbroad, partner in

8  charge of the San Francisco office; and Bruce Bennett.  And

9  we had given a fairly robust presentation of what we thought

10  were our credentials for the firm, and Steve called me in the

11  office and said, "We think we did a nice presentation, but

12  they want to talk to you about being the EM -- EFM" at that

13  time, emergency financial manager.  And I said, "Steve, as

14  you know, I'm very excited about what we're doing in Miami,"

15  and, you know, I was also -- had just come back from Sao

16  Paulo.  We were opening the Sao Paulo office, and we'd gone

17  to Rio.  We had also -- I was also a member of the Jones Day

18  Foundation.  It's a charitable foundation that does good

19  works throughout the world, and we had come back from Haiti,

20  both Cite du Soleil and Port-au-Prince.  In Cite du Soleil,

21  which is one of the most poverty ridden areas certainly on

22  the face of the world if not the western hemisphere, the firm

23  was sponsoring two schools and a hospital, health facility

24  there, and I wanted to see that through.  And so I told Steve

25  I'm not interested in becoming -- leaving the firm, becoming

1    emergency financial manager.  I will talk to Rich and try to

2    explain to him that I'm very flattered, but I'm very dug in

3    here, would certainly be more than willing to work side by

4    side with anyone they wanted selected as the firm's -- as the

5    city's attorneys, but that I would respectfully decline.

6    Q    So is Rich -- you may have identified him, but --

7    A    Yes.

8    Q    -- who is Rich?

9    A    Rich Baird was the governor's -- I think his title was

10   transformation manager, and he was one of the members on the

11   review team on the 29th at the Detroit Westin Hotel at the

12   airport that was reviewing -- I think there were 12 to almost

13   20 law firms presenting their credentials that day.

14   Q    And so you said that you would help Detroit find a

15   emergency financial manager?

16   A    No, not so much help them find it, but that I would work

17   with whoever they -- I assumed they had a number of different

18   candidates they were looking at, and I would work with

19   whoever that person would -- in a legal capacity, but because

20   I had these other issues, family, professionally,

21   administratively, and commitments I had made, I was quite

22   happy in my position and had expected a different course for

23   this year.

24   Q    So it sounds like you still haven't changed your mind.

25   What made you change your mind?

1    A    After the initial entry, Mr. Baird said he understood.

2    Rich said, "Look, you know, we looked at your credentials,

3    your background and what you've done.  Would you at least

4    talk to us?  We have other candidates that we're looking at,

5    but we'd like to have the ability to speak with you."  And I

6    said, "Well, let me give it some thought.  I have to go talk

7    to my boss lady, my wife, and sort of get some feedback

8    there, and let me talk with my partners, and maybe we'll talk

9    again."  I think I said in a day or two.

10   Q    And I take it you did --

11   A    Yes.

12   Q    -- talk to Detroit?

13   A    Yes.  As part of this process, we've been through some e-

14   mails that show me having conversations I think on the 30th

15   and in early February about that process and that I was going

16   to take it under consideration.

17   Q    And so you took it under consideration.  What time frame

18   is that?

19   A    That's January 30th into early February.

20   Q    Okay.  So what did you do next in the progression to

21   becoming the emergency financial manager?

22   A    I went on and talked to my wife and said, "Hey, honey,

23   I've been approached about this crazy idea about me working

24   full-time, leaving the firm and working full-time in

25   Detroit," and I thought she would shut it down fairly

1  quickly.

2  Q   She did not?

3  A   She did not.

4  Q   What did she say to you?

5  A   Well, somewhat to my surprise, she said, "Honey, we

6  were" -- our first year of marriage she was doing a

7  fellowship in New Haven, and I was in D.C., so we spent our

8  first year of marriage actually apart.  And she said, "Look,

9  this is a career opportunity for you.  If you want to do

10  it -- you've done public service before."  I left my law firm

11  in Miami for what I thought was going to be two years, and

12  that turned into ten years.  And she said, "You know, you sit

13  around here Sunday morning like I suspect a lot of husbands

14  browsing about the Sunday morning talk shows and why doesn't

15  somebody do something about things," and she said this was a

16  call to action; that I had to look inside my own soul and

17  make a decision as far as if you're called to do something

18  and you turn it down, how are you going to feel later.  And

19  she said we would be able to work it out, and she would find

20  a way to make the family obligations get met no matter what I

21  did.

22  Q   So what was your next step then?

23  A   I then came back and talked to Steve, Steve Brogan, the

24  managing partner, and said, "You know, I talked to my wife,

25  and, you know, she more or less has given me the green light

1  for me to make a decision."

2  Q   And did you get back in touch with Mr. Baird?

3  A   Yes.  After talking to Steve, who essentially said

4  something very similar, that, "Kevyn, this is a call to

5  action.  Yes, you'll have to step out of, you know, what

6  we're doing in the firm, but, you know, sometimes you have to

7  ask yourself and the question you have to answer is not how

8  you feel right now but in a year, five, ten years from now

9  when you're asked again what's going to be your response,

10  that you didn't step up," and that whatever happened he would

11  support me in whatever decision I decided to do, decided to

12  make, so I called Mr. Baird back.

13  Q   And what did Mr. Baird ask you to do?

14  A   You know, just generally summarizing, Mr. Baird said

15  great, why don't we have further talks.  I think in -- he

16  started sending me some information.  I started doing some

17  research on the emergency manager process and the history

18  behind the crisis that was going on in Detroit.  I'd

19  obviously been aware of it, some of the criminal

20  investigations and what not, as well as the city's slide for

21  a period of time.  I have a great deal of affinity having

22  gone -- gotten both degrees here, and I think I've come back

23  to the state or the city every year since I graduated in 1983

24  either recruiting for my law firm, a visit while I was in

25  federal government, or recruiting for my new law firm at

1   Jones Day, so I'd been coming to the city for the better part

2   of 33 years.  And I told him, "Well, let's start talking

3   about what the job entails."

4   Q   And did you do that over the phone?  Did you visit

5   Detroit?  What steps did you take?

6   A   We initially had an e-mail exchange, and then he said,

7   "Well, I think the next step is for you to come and visit

8   with some of the executive members of the state, including

9   Andy Dillon; Brom Stibitz; Tom Saxton, who's deputy

10  treasurer; as well as the governor and Rich Baird and the

11  governor's chief of staff and his deputy chief of staff.

12  Q   And did you do that?

13  A   Yes, we did that in mid-February.

14  Q   In those meetings, did you talk about Chapter 9?

15  A   No.

16  Q   At what point in time did you decide "I would be okay

17  with being a candidate"?

18  A   I think at some point either just before or after those

19  meetings, I decided that I'd throw my hat into the ring, and

20  I think I sent out an e-mail to the firm and the rest of the

21  team recusing myself from the firm's consideration process as

22  a law -- I think I sent out two e-mails.  I sent out an e-

23  mail to the immediate core team that was doing the pitch and

24  working on the analysis of the city, and then an associate

25  inadvertently sent me some more information, and I sent an e-

1  mail back to him just saying, "You may not have heard, but

2  I've recused myself from any involvement in the firm's pitch

3  and potential retention by the city because I'm being

4  considered for emergency financial manager."

5  Q   Okay.  And when was that about?

6  A   Mid-February.

7  Q   When did you learn that you were a finalist?

8  A   I think there was a series of e-mail exchange with Rich,

9  and after the meeting with the governor I think the governor

10 would send me attaboy e-mails, "Hey, glad to meet you.  Hope

11 you take this seriously.  We're still looking at some other

12 candidates, but it seems like you're the odds-on favorite."

13 I think that was towards the end of February, maybe early

14 March.

15 Q   When were you, in fact, appointed emergency manager or

16 emergency financial manager?

17 A   I was appointed emergency financial manager effective

18 March 25th, 2013.

19 Q   Was there any connection between your being considered as

20 emergency financial manager and Jones Day being retained as

21 Detroit's restructuring counsel?

22 A   No.

23         ATTORNEY:  Your Honor -- sorry.  I was going to

24 object.  That calls for speculation.  Lack of foundation.

25         THE COURT:  You understand that this question asks

1   you of your own knowledge and not speculation.

2           THE WITNESS:  Yes, your Honor.

3           THE COURT:  So to your own knowledge, was there any

4   such connection as counsel described?

5           THE WITNESS:  No, your Honor.  In fact, I think I

6   made it fairly clear.  I think even in e-mails I said now

7   that I'm a candidate, I don't want this -- my candidacy to

8   either hurt or help the firm.  In fact, if it would -- if it

9   would have hurt the firm, then I probably wouldn't consider,

10  but the firm will stand on its own.

11  BY MR. SHUMAKER:

12  Q   Who did you tell that to?

13  A   I think I told that to Mr. Dillon.  I think I told that

14  to Rich Baird.  I may have said that in my meeting with the

15  governor.

16  Q   Did you accept the appointment of emergency financial

17  manager for the money?

18  A   No.  It's a -- no, no.

19  Q   Was there ever any understanding between you and the

20  governor or any member of his staff that you met or anyone

21  that you ever came across that you would file for Chapter 9

22  on the city's behalf if you were named emergency manager?

23  A   Not at all.

24  Q   What was the first thing you did upon being appointed

25  emergency financial manager?

1  A   Well, there were several things.  One of the first things

2  I did -- the week before I was appointed, there was what

3  people called a rollout, which was a series of press events

4  and stakeholder meetings throughout that week.  I think the

5  week prior to me actually taking office on the 25th I engaged

6  in somewhere in excess of five dozen meetings and pressers,

7  as I've come to know them, but immediately upon coming into

8  the office on the 25th, I went to City Hall, and I started

9  asking the various consultants and experts who had been hired

10  before I got there -- a number of them had been hired as a

11  result of a consent agreement that was entered into in March

12  2012 and then a memorandum of understanding that was entered

13  into with the city in November 2012, so they were already on

14  the ground.  In fact, I think Ernst & Young had been on the

15  ground for a year prior to that.  And so I began meeting with

16  them to try to get a sense of the city's financial condition

17  and operational --

18  Q   Did you -- I'm sorry.  Did you meet with anyone other

19  than the advisors, Ernst & Young and --

20  A   Oh, yeah.  Prior to taking office, I had met with Mayor

21  Bing a couple of times in D.C., and I met with stakeholders

22  throughout the city and with members of -- I believe I met

23  with members of Treasury during that first week, too.

24  Q   Did you meet with any union members?

25  A   Yes.  I set up a series of stakeholder meetings in that

1  first week.  I met with each councilperson individually.  I

2  met with members of the various uniform unions, some

3  nonuniform, while I was there.  And I think the first thing I

4  did was to issue an order under the statute 72, which was due

5  to be overtaken by statute 436, Public Act 436 -- the

6  compensation and benefits of the City Council and the mayor

7  were going to be extinguished, so I think the first order I

8  did was restore their compensation and benefits by EM Order

9  1.

10  Q   Did you meet with any of the city's pension boards?

11  A   I think -- not that first week, but I think I met with

12  both pension boards at some point later that month.

13  Q   Did you meet with any citizens?

14  A   Oh, God -- oh, yes.  Oh, good, yes, met with lots of

15  citizens, numerous stakeholders, civic leaders, faith

16  community ministers, business leaders, CEO's, many of the

17  pedagogical institutes, the presidents of some of the

18  universities, a lot of stakeholder meetings.

19  Q   Now, you mentioned that you reviewed a couple of

20  agreements.  Did you -- were there generally financial

21  records that you took a look at?

22  A   There were financial and restructuring agreements.  After

23  my initial approach in January, I went and reviewed several

24  press reports that had made various statements about the

25  upcoming law, but then after I decided to throw my hat in the

1   ring and become a serious candidate, I started pulling down

2   the actual public documents, and there are a lot of them.

3   The city had been in some form of financial review or

4   financial crisis from at least 2009.  It had taken out $250

5   million in addition to the 1.4 billion in 2005 and 2006.  In

6   2009 it had taken out another -- 2010 it had taken out

7   another 250 million.  In 2011 there was a Detroit review team

8   that was commissioned in December that issued a report the

9   following -- I believe the following January.  The governor

10  issued another report, a lot of correspondence with Treasury.

11  I believe they entered into an escrow agreement in March of

12  2012, and then in -- later in April of 2012 they entered into

13  the financial stability agreement, also called the consent

14  agreement.  There was a lot of correspondence going back and

15  forth since then.  Subsequently, in November 2012, there was

16  a memorandum of understanding regarding the Detroit Reform

17  Program that was contained in the consent agreement.  After

18  that in December 2012 another Detroit review team was

19  commissioned.  They issued their report in 2013, I believe

20  February, and the governor issued his findings of fact in

21  March declaring a financial emergency.  I hadn't looked at

22  all those -- the March document prior to taking the job, but

23  I looked at it -- I think maybe immediately prior to taking

24  the job, but my due diligence regarding the other documents

25  occurred between the January through early March time frame.

1  Q   It sounds like you looked at a lot.

2  A   I looked at a lot of documents.  I found in each of those

3  documents there were two -- at least two review teams, and

4  each of them concluded that the review team process was a

5  precursor to the appointment of an emergency manager.

6  Q   I'd like to ask you a few questions about those documents

7  in a little bit, but --

8  A   Sure.

9  Q   -- first I wanted to ask you, did you -- when you took

10  over the position, did you go out and visit the city when you

11  got here?

12  A   Oh, yeah.  I still do.  I mean we -- there is quite a

13  robust outreach effort under the state's aegis and the MEDC

14  or others, Cadillac.  Harvey Hollins in Urban Affairs helps

15  run that, and I would have meetings, sometimes two or three a

16  week, with various community groups and stakeholders.

17  Q   And you went out and saw parts of the city?

18  A   Yeah.  Usually after work I'd ask to be driven around the

19  city.  I sort of -- when I studied, the city had over 184

20  neighborhoods, in some of my briefing materials, and some of

21  the neighborhoods are very notable, Boston-Edison, East

22  Indian Village, Marina District, Milwaukee Junction.  But the

23  city has a spoke system that goes out, Michigan, Grand River,

24  Woodward, Gratiot, and others, and I would sort of -- I've

25  done this when I've gone to other cities.  I would sort of

1   methodically try to go through each neighborhood to get a
2   sense for the difference of the various neighborhoods and
3   their relationship to the city overall.
4   Q   Based on those visits and the records that you were
5   looking at and your due diligence generally, what did you
6   come to learn about the services that the city was providing
7   to its residents?
8   A   I had read that the services were substandard.  As part
9   of my due diligence, if you'll call it, I had -- having been
10  an ex-federal government official, I went immediately to the
11  federal government resources, Bureau of Justice Statistics,
12  Department of Labor Statistics, Department of Commerce, the
13  census stats, some of which -- Michigan CRC or the State
14  Research Council, and it sort of compiled in my mind
15  academically a composite of the city and statistics about the
16  quality of service in addition to meeting with various
17  members, and the services reflected quite broadly in looking
18  at them what I had heard.  They were substandard.  Lights
19  were off in the city.  I since came to know that almost half,
20  38,000 of 78,000 or so are off.  Twenty percent of the city's
21  housing stock is in some form of blight, 78,000 dwellings out
22  of 390 roughly; that between the year 2000 and 2010 the city
23  lost 238,000 residents.  That's the equivalent of a city the
24  size of Romulus, Allen Park, or Wyandotte leaving the city
25  every year.  That was driving down tax revenue.  That the

 1   infrastructure not only appeared broken, but actually I'd

 2   gone back and looked at some of the -- some of the press

 3   reports about how the lights would go out, some during the

 4   election in 2005, but other things along those lines.

 5   Q   I'm sorry.  I didn't mean to interrupt, Mr. Orr, but what

 6   did you -- what did you learn about the police department?

 7   A   Well, I'd known that the police department, like many,

 8   New Orleans, L.A., and others, was under a consent decree --

 9   actually, two, I think -- with the Department of Justice that

10   had spanned 12 years by the time I got here.  I knew that

11   their fleet, roughly 1,300 vehicles, the majority of which

12   were quite old -- I had looked at BJ -- Bureau of Justice

13   Statistics stats, and typically a service vehicle runs three

14   years, 90,000 miles.  Typically most police forces -- not

15   most but some lease those vehicles.  Our fleet in some cases

16   had over 200,000 miles on them.  Bumpers were literally

17   falling off.  Paint was delaminating.  They didn't have the

18   high tech that modern vehicles have.  Our call rates -- our

19   response rates were low for a city that had been rated by

20   BJS, Bureau of Justice Statistics, as well as such sites like

21   Quizzle, which is an Internet neighborhood site, as being a

22   highly dangerous city subject to carjacking, violent crime in

23   the city and a highly armed populous.  Basically everything

24   that I had read was substantiated in very stark relief once

25   you get out into the city.  The call rates -- our officers

1    were on 12-hour shifts.  When I met with the officers, DPLSA,

2    DPOA union, they explained to me how, you know, if you want

3    people to have court time to get at some of the perpetrators

4    and you keep them on a 12-hour shift, 24-hour day, they

5    barely have time to get home, take a shower, go to court, see

6    their families, and they're back on shift and that, as a

7    consequence, sometimes they miss shifts and that the

8    perpetrators, in addition to laughing at them as they drive

9    down the street, know that more than likely they're not going

10   to get the testimony they need and they're going to get off,

11   and they'll end up actually suing the city for false arrest

12   and recovering because the city settles many of its claims.

13   We don't have a very robust defense process in the city.

14   Q    And how about the -- how about the fire department?  Can

15   you give us some examples of what you learned there?

16   A    Sure.  I knew academically that the fire department had

17   an old fleet, but I've learned at 88 departments the

18   foundations were very poor.  Our firemen were oftentimes

19   flowing the fires with inadequate equipment, equipment that

20   was broken, pumps on pumper trucks that didn't work, leaky

21   tanks in pumper trucks.  Our ladders hadn't been certified

22   for a number of years because we didn't have the money to do

23   it.  Since I was here, the mayor managed to get -- I think it

24   was State Farm to give us a donation to get our ladders

25   certified because otherwise you can't go to high-rise fires.

1  Many of our firemen had not been trained on the equipment, so
2  they were injuring themselves, such as standing on the ladder
3  as it went up and you cut your foot.  Many of our firemen
4  were very frustrated both by lack of equipment and inadequate
5  training.  In addition, they, too, were quite fatigued
6  because of the number of fire calls.  I think it was 18,000
7  or so.  Sixty percent are unnecessary.  They're either to
8  abandon structures or blight or arson, so our firemen -- the
9  majority of our calls for our fire department are actually
10 false calls, but they're real because the buildings are
11 either on fire either through abandoned structure or through
12 intentional arson.
13 Q   How about the --
14      THE COURT:  Mr. Shumaker, we do have to stop now.
15 We're going to take a recess in a minute.  I'm going to ask
16 everyone to remain seated while Mr. Orr leaves the courtroom,
17 so let's just sit here while he takes his leave, and we'll
18 see you Monday morning, sir.  Stand by another moment,
19 please.
20      All right.  So I'm going to take my leave now.  Good
21 weekend, everyone.  We'll see you Monday morning, 9 a.m.
22 until 5.  I'm going to ask you to stay until our CSO's do
23 excuse you.  I'm going to let you all go first, and my staff
24 and I will remain in chambers while you take your leave.
25      THE CLERK:  All rise.

1          MR. SHUMAKER:  Thank you, your Honor.

2          THE CLERK:  Court is adjourned.

3      (Proceedings concluded at 5:03 p.m.)

4                          * * *


INDEX


WITNESSES:              Direct  Cross  Redirect  Recross

Kenneth A. Buckfire            49/93/97   170
                               120/145
                               152/155

James Craig             176    203/208
                               210/211
                               213/215

Kevyn Orr               218

EXHIBITS:                       Marked        Received

Debtor's Exhibits 9, 10, 11, 38                173

Exhibit 588                                    116
Exhibit 868                      124


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                November 2, 2013
_____        _____
Lois Garrett

**ITEM NO. 67**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                             .      Detroit, Michigan
                             .      October 28, 2013
                Debtor.       .      9:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By:  SHARON L. LEVINE<br>     JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ  07068<br>(973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>     JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882<br><br>Clark Hill, PLC<br>By:  RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI  48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>  Freedman, P.C.<br>By:  BARBARA A. PATEK<br>     JULIE BETH TEICHER<br>     DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>     PETER D. DECHIARA<br>     THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By: THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI 48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By: RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI 48009<br>(248) 646-8292 |

For Detroit
Retired City
Employees
Association,
Retired Detroit
Police and Fire
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

Silverman & Morris, PLLC
By:  THOMAS R. MORRIS
30500 Northwestern Highway, Suite 200
Farmington Hills, MI  48334
(248) 539-1330

Lippitt O'Keefe, PLLC
By:  RYAN C. PLECHA
370 East Maple Road, Fl. 3
Birmingham, MI  48009
(248) 646-8292

For the Official
Committee of
Retirees:

Dentons
By:  CLAUDE D. MONTGOMERY
     ANTHONY B. ULLMAN
     ARTHUR H. RUEGGER
1121 Avenue of the Americas
New York, NY  10020-1089
(212) 632-8390

Brooks, Wilkins, Sharkey & Turco, PLLC
By:  MATTHEW E. WILKINS
401 South Old Woodward, Suite 400
Birmingham, MI  48009
(248) 971-1711

For Retired
Detroit Police
Members
Association:

Strobl & Sharp, PC
By:  LYNN M. BRIMER
     MEREDITH E. TAUNT
     MALLORY A. FIELD
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI  48304-2376
(248) 540-2300

For the Flowers
Plaintiffs:

Law Offices of William A. Wertheimer
By:  WILLIAM WERTHEIMER
30515 Timberbrook Lane
Bingham Farms, MI  48025
(248) 644-9200

For Ambac
Assurance Corp.:

Schafer and Weiner, PLLC
By:  DANIEL J. WEINER
40950 Woodward Avenue, Suite 100
Bloomfield Hills, MI  48304
(248) 540-3340

4

Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Looks like everybody is here.  Sir.

4      MR. CIANTRA:  Good morning, your Honor.  Thomas

5  Ciantra, Cohen, Weiss & Simon, LLP, for the UAW.  Before

6  bringing the evidentiary motion that I would like to present,

7  I just have one or two housekeeping matters.  We will be

8  providing the Court with binders with the separate UAW

9  exhibits tomorrow morning, with the Court's indulgence.  We

10  haven't been able to get that pulled together as of yet.

11      THE COURT:  Okay.

12      MR. CIANTRA:  And I would also indicate that I guess

13  there are one or two additional exhibits that will be

14  included, short documents, in the binder from what the Court

15  has presently in the stack.  So with the Court's indulgence

16  then, I would like to discuss the motion that I presented

17  during Mr. Moore's testimony and provide some additional

18  argument and record citation with respect to that.

19      THE COURT:  I wonder if, in light of our schedule

20  today, it would be okay with you if we considered this

21  tomorrow morning.

22      MR. CIANTRA:  That would be fine, your Honor.

23      THE COURT:  Thank you very much.  I just need an

24  assurance from someone that the work that I requested

25  regarding the exhibits has all been taken care of and we're

 1  all -- we all have the same exhibit books with reconciled

 2  exhibits and exhibit numbers.

 3          MR. IRWIN:  Good morning, your Honor.  Ms. Ramirez

 4  and I were in the courtroom yesterday, and we did our best to

 5  reconcile exhibits with the materials we had, and my

 6  understanding is that other objectors have brought new books

 7  this morning.  I won't speak for them, but as of yesterday I

 8  thought that we had moved this along as best we could.

 9          THE COURT:  Okay.  Sir.

10          MR. ULLMAN:  Yes, your Honor.  For the Retiree

11  Committee, our understanding is that everything has been

12  done.  Either we did it on behalf of other objectors or some

13  of them have come in themselves and done it with the

14  exception of the UAW, which Mr. Ciantra explained.

15          THE COURT:  Okay.  Good.  Okay.  You may proceed

16  with the direct examination of Mr. Orr.

17          MR. ORR:  Good morning, your Honor.

18          THE COURT:  Good morning.

19          MR. SHUMAKER:  Good morning, your Honor.  Greg

20  Shumaker of Jones Day for the City of Detroit.

21          KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

22              DIRECT EXAMINATION (CONTINUING)

23  BY MR. SHUMAKER:

24  Q   Good morning, Mr. Orr.

25  A   Good morning, Mr. Shumaker.

1  Q   Mr. Orr, on Friday afternoon when we last were here, I

2  believe you were sharing with the Court what you had

3  experienced regarding the city's provision of services upon

4  your arrival as the emergency manager.  Do you recall that?

5  A   Yes.

6  Q   I believe I interrupted you, and you were sharing what

7  you had experienced in the area of emergency medical

8  services.

9  A   Yes.  I believe I was talking about an event at City Hall

10  where the president of one of the unions was late to a

11  meeting because since all of our ambulances were out

12  typically by 7:30, a citizen woman had a seizure in the 1st

13  floor, and he was the only one available to administer her.

14  That's anecdotal, but, more importantly, I think it's been

15  fairly well-reported that the EMS services have substandard

16  equipment.  They are typically on a significant number of

17  calls every day.  The policy of the unit is that if they're

18  called to an event, they are to transport the patient to a

19  medical facility.  Oftentimes patients will call for things

20  such as, "I fell asleep, and my wrist is" -- "I feel asleep

21  on the couch, and my wrist is asleep," or, "I slipped, and I

22  hurt my ankle," to more serious injuries that are fairly

23  widely reported such as shootings and stabbings.

24  Q   Thank you.  What was the -- what did you learn about the

25  city's streetlight situation?

1   A   Here again, as has been widely reported, as in our June
2   14th presentation, roughly 40 percent plus of our lights are
3   out, 38,000 over some 78,000 roughly.  Large sloughs of the
4   city are unlighted.  More importantly, it's not just that the
5   lights are out.  The city infrastructure is somewhat
6   destroying it, I've been informed.  There are lights that are
7   either above ground -- there are switches that are below
8   ground.  To replace the switches sometimes below ground
9   requires excavation and a plan.  It is significant.  A lot of
10  our deferred maintenance has caused us to be, shall we say,
11  very much behind the technology curve in terms of the quality
12  of our lightings, whether they're still 1970s vintage
13  gaslights as opposed to LED, which provide more lights and
14  last for up to 15 years, for instance, therefore, reduce your
15  replacement cost.  Our grid and our lighting is so old that
16  typically PLD is very -- Public Lighting Department is very
17  overworked, and, in fact, many private contractors' insurance
18  companies and policies won't allow them to work in our
19  lighting grid.
20  Q   And how does that compare to other municipalities?
21  A   We've done some analysis to other municipalities.  I
22  don't think there's any other municipality considered a large
23  city, generally over 500,000 or so, that has as -- is as
24  unlit as we are citywide.
25  Q   What were your observations about blight in the city?

1  A    Blight is endemic.  It's apparent.  If you drive in on
2  94, take out the Lodge or go to any street in the city, it's
3  very clear, commercial and residential.  We have 78,000
4  buildings.  That's roughly 20 percent.  390,000 I think is
5  our total housing stock.  That's roughly 20 percent of our
6  housing stock.  No other city has that footprint.  Our lots
7  are about 66,000, which are quite significant, and it's not
8  just the fact that there's blight.  It's that the blight has
9  been here -- working its way here for 60 years but more
10  acutely in the past 15 to 20 years.  There are trees growing
11  out, growing on top of roofs, growing out of roofs.  They are
12  an attractive nuisance in the old language.  Crime, rapes,
13  dead bodies, and not to mention the impact it has on our
14  residents and particularly our children.  The Skillman
15  Foundation did a study of our schoolchildren and asked them
16  how they felt.  Fifty percent responded they were afraid.
17  And when it asked them what they're afraid of, they said
18  everything.  When they asked them how they coped with it,
19  they said they usually picked up a stick or a rod on their
20  way to school and on the way back because that's the way they
21  could protect themselves given what they had to walk through
22  to public school busses to get to school.
23          MR. DECHIARA:  Objection.  Hearsay.
24          THE COURT:  Overruled.  Go ahead, sir.
25          THE WITNESS:  That's what they had to walk through

1    to get to the bus stop for school.  It's been widely

2    reported.

3    BY MR. SHUMAKER:

4    Q   Your impression of any of the other city services that

5    made an impact on you?

6    A   Well, virtually all city services are generally

7    considered not where they should be.  Our city workers work

8    very hard for the most part to try to work through the

9    substandard level of services, whether it's in tax

10   collection, assessments, blight remediation, lighting.  Our

11   power grid -- we have a power grid that costs the city about

12   $30 million a year.  There are 115 customers on that grid.

13   Only five of those customers are residential, so we subsidize

14   power for about a hundred commercial and institutional uses.

15   Our grid -- in fact, the grid in City Hall is so old that

16   most providers, such as DTE, will not allow their workers --

17   because of various pernicious effluent that's down there,

18   asbestos and the like, will not allow them to go down into

19   the grid because it's too dangerous.  We have 38 stations and

20   one power factory, Mistersky, which is obsolete.  Our

21   stations are sorely in need of repair.  Our grid is a

22   patchwork of repairs that we tried even earlier this year --

23   the grid went out for a period of time, which was not

24   necessarily the grid.  It was that we were running a test,

25   and the test tripped the grid because it is so sensitive that

1  it turned off the lights for two and a half days.

2  Q    During this time, as you were becoming familiar with the

3  city's services, did anyone ever come up to you and say that

4  the services were adequate?

5  A    No one has ever said that the services are adequate for

6  the City of Detroit.

7  Q    Have you done anything to address the problems you've

8  described?

9  A    Yes.

10  Q    What are they?  What are they?

11  A    When we came in, we did an assessment in the first 30

12  days to try to get to the real meaning of things.  I sat

13  down, as I said before, with a number of stakeholders,

14  including all the City Council people.  I tried to restore a

15  sense of normalcy in the city by restoring compensation to

16  the mayor and the City Council and then delegating authority

17  to them to do most of the business of the city in the

18  ordinary course, and then we began our assessment of the city

19  operations.  Many of the contractors -- in fact, all of them

20  with the exception of Jones Day, the principal restructuring

21  contractors -- Milliman, Ernst & Young, Conway MacKenzie, and

22  Miller Buckfire were hired before 2013 to start assessing the

23  city's needs and restructuring, and they were already well

24  along their way of preparing reports.  I started reviewing

25  those reports and discussions, and I found out that much of

 1  the city's structure needed to be reinvented, so we started
 2  out looking at lighting.  We have since authorized the Public
 3  Lighting Authority.  We found some money after the June 14th
 4  default on the COPs payment.  We have created a $12 million
 5  fund to get the Lighting Authority stood up with cash.  We
 6  also found $1.8 million for them to have an operational
 7  budget so they could run -- they are due to have two
 8  demonstration projects up and running in terms of relighting
 9  the city by the end of this year.  We are going through the
10  process of a bond issuance to get them additional tranches of
11  money to provide a lighting plan for the entire city.  We
12  stood up a Detroit Land Bank Authority and in conjunction
13  with MSHDA, the Michigan State Housing & Development
14  Authority, created a fast-track authority so that we could
15  deal with blight.  One of the things we found was that on the
16  City Code for the better part of 30 years there was the
17  ability to declare a blight emergency in addition to the
18  powers that I have under 436, so under that existing
19  authority we put those two together, and we abolished for a
20  time, being through the rest of this year, the requirement
21  for Class B licenses -- that is, the demolition of structures
22  35 feet or lower -- so that we could get at residential
23  blight in an expedited basis, expedited process, and allow
24  other contractors who are licensed by the state, although not
25  licensed by the city, to come into the city to help us with

1  blight remediation as quickly as possible.

2         We also began looking at the same process for Class

3  A licenses -- that is usually commercial or higher

4  structures, 35 feet or higher -- so that we could fast-track

5  the blight.  And most recently we appointed a chief land

6  officer in conjunction with the federal government to try to

7  use some of the hardest hit funds, which are funds designated

8  directly for blight, to get to blight.

9         We began looking at city services, and particularly

10  the revenue drivers, for tax collection.  For instance,

11  cities like Albion, Michigan, have a memorandum of

12  understanding with the Department of Treasury whereby they

13  will assist the city to collect some of its taxes.  That's

14  been in existence since 1997.  One of the things in the

15  financial stability agreement and the MOU that the city

16  agreed to was that they would look at that.  We've assigned a

17  taskforce to find ways to enter a similar situation so that

18  we can have enhanced tax collection.

19         We hired a new police chief, went through a fairly

20  long and competitive process to get him here.  He has opened

21  up -- he may have testified -- I'm not sure, but I suspect he

22  testified that he's opened up eight precincts that were

23  closed.  We had these virtual precincts where citizens after

24  dark would have to go to a blue phone in order to get

25  service.  If there was an incident on the east side, for

1  instance, they may have to go as far as ten miles to file a
2  report in the dead of night, oftentimes a victim being chased
3  by a perpetrator or alleged perpetrator.  We've opened up
4  those.  We flowed new money to the police force in addition
5  to the hundred cars that the philanthropic and civic
6  community donated on March 25th, the day I started.  We have
7  since purchased another 50 cars and have another 50 on order
8  for a total of a hundred, so we get new vehicles going to the
9  street.  We recently restructured the police department so
10  that you have more line authority pushed down as opposed to a
11  third of the department being involved in clerical work.
12  We're getting more officers on the street.
13       We've looked at a number of remediation plans also
14  for city-owned property, city-owned land, parking lots.  We
15  also issued a number of orders focused on dealing with
16  efficiency within the city and have a number of different
17  things in the works as we speak.
18  Q    What level of services are you trying to get to with
19  these efforts?
20  A    We're under no illusion that given the long term that
21  it's taken the city to get here and the fact that the
22  specifics of what's required by the city have been discussed
23  in detail since 2010, that we're going to get to an A+ or
24  honors level of services.  We're trying to get to an average
25  level of services, one that's acceptable, a C, C+.

1  Q   Okay.  On Friday you shared with the Court your efforts

2  to get on top of the financial condition of the city and --

3  A   Yes.

4  Q   -- review of certain financial records.  I want to ask

5  you is it fair to say that part of your job responsibilities

6  as the emergency manager is to understand the city's

7  financial condition?

8  A   Yes.

9  Q   And have you become familiar with the city's records --

10  A   Yes.

11  Q   -- financial records?

12  A   Yes.

13  Q   You understand how they operate?

14  A   Yes.

15  Q   You're in charge of implementing them?

16  A   Yes.

17  Q   One of the agreements that you referred to was something

18  called the consent agreement.  Do you recall that?

19  A   Yes.

20  Q   I'd like to show you what is the consent agreement, which

21  is Exhibit 23, and it has been admitted into evidence.   It

22  should appear on your screen there.

23  A   Yeah.  It's quite small.

24  Q   Allow you to get your glasses on.  Is that what you're

25  trying --

1   A    Yeah.  Okay.

2   Q    And is that -- that document is entitled the "Financial

3   Stability Agreement"; correct?

4   A    Yes.

5   Q    And is that the agreement you understand as the consent

6   agreement that you've testified about?

7   A    I'm assuming this is the May 4th, 2012, financial

8   stability agreement.

9   Q    We can get you a copy.

10  A    No.  If that's the document, yes.

11  Q    You recognize it?

12  A    Yes, I do.

13  Q    What was your understanding of the consent agreement?

14  A    The city, starting with the 2009 collateral pledge

15  agreement, June 15th, 2009, had experienced a number of

16  financial upheavals, if you will, consistently throughout

17  2009 and 2010.  The city again borrowed almost a quarter of a

18  billion dollars to try to stem those upheavals in addition to

19  the $1.4 billion that was borrowed in 2005 and 2006 and the

20  $250 million that was borrowed in 2006 in addition to the

21  1.4.  And this document was a result of a financial review

22  team examination of the city that was begun in December 2011

23  and I believe in January or February 2012 found that the city

24  was in financial distress.  That finding by the financial

25  review team also found that -- I think that finding or the

1　governor's recommendation in 2011 found that that finding was

2　a precursor to the appointment of an emergency manager. This

3　document grew out of the requirement that the city, as a

4　result of the finding by the financial review team, engage in

5　certain specified things to correct the endemic and

6　widespread problems -- financial problems of the city --

7　would be required to agree to certain metrics to correct

8　those on a very short time frame as embodied in this

9　document, and I think it has five appendices as well.

10　Q　Let me ask you about that, but who signed this agreement?

11　A　This agreement was signed by four parties. It was signed

12　by Deputy Mayor Kirk Lewis; the mayor, Dave Bing. It was

13　signed by the governor and the treasurer.

14　Q　And do you have -- and when was this? When was that

15　signed?

16　A　This was April 2012, April 5th, 2012, I believe. I think

17　it's on the document somewhere.

18　Q　And what did you understand the state's obligations to be

19　under the consent agreement?

20　A　In one of the appendices, it spells out -- I think the

21　last one maybe, the fifth one, DRE -- it spells out certain

22　specified obligations that the state is going to do in

23　consideration for the city meeting certain metrics, fairly

24　widespread, regarding both finances, revenue projections,

25　estimation and metrics, operations, and long-term

1  liabilities.

2  Q    And what were the city's obligations under that

3  agreement?

4  A    The city, in a series of appendices to the document,

5  undertook about 40 obligations.  Oftentimes when this

6  document is referred to, people refer to the 21 obligations

7  in Appendix B, but that's incomplete.  The city, in Appendix

8  C and D as well, I believe, undertook certain specified

9  obligations in detail.  In Appendix B, for instance, for the

10  operational reforms, there were 21 specific requirements,

11  some having to do with payroll, having to do with collective

12  bargaining agreements, having to do with revenue estimation,

13  having to do with the Water Department, and then in the other

14  appendices there were obligations having to do with finance

15  and metrics and so on and so forth.

16  Q    What was your understanding of whether the city complied

17  with those obligations specified in the appendices you

18  referred to?

19  A    When I got here, the city had undertaken one of them.  I

20  believe in November 2012 they entered into a four-year, $32

21  million, ADP contract.  And I think there were one or two

22  more in Appendix B that were ongoing.

23  Q    And those are the only ones that were complied with?

24  A    Essentially, those were the only ones in any demonstrable

25  form that were ongoing, yes.

1          MR. SHUMAKER:  Can you put up -- Laurie, can you put

2     up Annex B at the back of that exhibit?

3     BY MR. SHUMAKER:

4     Q    Are these the obligations of the city that you were

5     referring to, Mr. Orr?

6     A    Yes, they are.

7     Q    And you indicated that the city had made progress on one

8     or two of these?

9     A    Yes.  I believe there were demonstrable ones.  There was

10    a demolition effort.  There was health and wellness

11    department changes.  I believe a privatization effort was

12    ongoing.  There was -- I believe I also said payroll was

13    involved.  Those were the ones that were ongoing at the time.

14    Q    Now, you -- and then you also were referred to Annex D.

15    Can you put that up?

16    A    Yes.  I would also say on Annex B there was an effort to

17    procure technical assistance from the federal Department of

18    Housing & Urban Development regarding grants management.

19    Q    Here's Annex D.

20    A    Yes.

21    Q    These are some of the additional obligations of the city?

22    A    Yes.  Those are the ones I referred to about collective

23    bargaining agreements.

24    Q    Now, you also testified on Friday about another

25    agreement.  I believe you referred to it as the milestone

1    agreement.

2    A    Yeah.  That agreement is called the milestone agreement

3    or the memorandum of understanding regarding the Detroit

4    Reform Program.

5    Q    And how did the milestone agreement and the consent

6    agreement relate?

7    A    The consent agreement, which was entered into in April

8    2012, also had two phases for Detroit Reform and certain

9    specified metrics that the city was to undertake.  Phase one

10   of Detroit Reform was specified in some of the appendices to

11   that agreement.  Throughout that year apparently -- I wasn't

12   here, but as I understood through reading through the

13   documents and talking to people, the city had failed to meet

14   some of those requirements within six or seven months of

15   entering into the consent agreement, so the memorandum of

16   understanding was negotiated and designed as a consideration

17   for the city to get access to another $137 million in

18   financial stabilization bonds later that year, and that's

19   commonly referred -- I believe that was in November 2012, and

20   that's commonly referred to as the memorandum of

21   understanding.

22   Q    I'd like to show you another document that's in evidence,

23   which is Exhibit 7, and ask you if you recognize -- that's

24   the cover page.

25   A    Yes.

1  Q   Do you recognize that document?

2  A   Yeah.  November 13th, 2012.

3  Q   Is that the milestone agreement you referred to?

4  A   Memorandum of understanding or milestone agreement.

5  Q   And who signed the milestone agreement?

6  A   Well, the milestone agreement had the signatures of the

7  treasurer, Andy Dillon; and then the finance director for the

8  city, Cheryl Johnson; the program director at that time for

9  Detroit Reform, Kriss Andrews; and the chief financial

10 officer, Jack Martin.

11 Q   Did the Detroit City Council have anything to do with

12 this document?

13 A   Yes.  The Detroit City Council approved aspects of this

14 agreement in two resolutions, one by a vote of 6-0, and one

15 says by a vote of 9-0, but I noticed that there's no check --

16 I thought there was no check for the president pro tem.

17 Q   And what was your understanding as to whether the city

18 had met its obligations under the milestone agreement?

19 A   When I came on board on March 25th it had not.  The city,

20 however -- all the understandings -- as a component for this

21 agreement, my understanding that is from 2010, 2011, and then

22 in stark relief starting in December 2011, it became apparent

23 that the city was in severe financial distress.  This

24 agreement, I believe, was a result of the city failing to

25 comply with some of its obligations in the appendices to the

1  MOU.  At this time, the city needed additional cash for

2  operations, so the state used some of its authority to

3  support the city in a bond issuance for 137 million.  I

4  believe from time to time it's referred to as a net of 129

5  million or so less fees and costs.  In order for the city to

6  have access to that cash, that cash was supposed to both fund

7  operations but also assist the city in going forward with

8  some of the reform that was specified in the MOU -- not MOU,

9  in the consent agreement.  This agreement also had certain

10  specified obligations of the city to change some of its

11  procurement obligations but also to retain financial

12  professionals to assist the city and to use the proceeds of

13  that bond issuance in part, after the retention of those

14  professionals, as a condition to using the money.

15  Q    And the city was unable to comply with the conditions of

16  this agreement?

17  A    The city was able to comply with the conditions of the

18  agreement for the retention of an actuary, Milliman; for

19  Ernst & Young, who had already been doing work as a city --

20  as its accountant but also for a restructuring effort; for

21  Conway MacKenzie for operational restructuring; and, although

22  not specified by name, I believe by December of this year the

23  return of the Miller Buckfire firm.  And it also retained

24  local counsel in the guise of Miller Canfield to assist with

25  the restructuring.

1  Q   How about with regard to the rest of the agreement?  How

2  is the city's compliance?

3  A   The city had not complied with more or less the

4  balance -- as I understood it from reading the documents, the

5  balance of the rest of the agreement.

6  Q   Did this lead to any consequences for the city?

7  A   Yes.  Less than approximately a month later, another

8  Detroit review team two was commissioned after finding the

9  city was in financial -- I think it went from financial

10  distress to severe financial crisis.  That review team spent

11  the holiday season, I believe, December and January,

12  reviewing the city's restructuring efforts, and in February

13  2013 I think it issued a report to the governor finding that

14  the city was in a financial emergency.

15  Q   And is it that financial emergency that led to your

16  appointment as emergency manager?

17  A   Well, that February 2013 Detroit review team report,

18  again, as in the prior Detroit review team, report number

19  one, in 2012, specifies that the finding of that emergency is

20  a precursor to the appointment of an emergency manager.

21  Q   Is that financial emergency still in effect?

22  A   Yes.

23  Q   I want to ask you about a couple of other things about

24  the city's finances aside from the consent agreement and the

25  milestone agreement. upon your arrival as emergency manager.

1  What did you learn about the city's cash situation when you

2  got here?  When did you arrive?  Let's start there.

3  A   As I said, I took office March 25th under Public Act 72

4  as the emergency financial manager, and then effective March

5  28th I became the emergency manager under Public Act 436.

6  Q   And on March 25th, March 28th, that time period, what did

7  you learn about the city's cash situation?

8  A   The cash situation was dire.  The city was on a billion

9  dollar budget roughly.  The city was by, I believe, the

10  middle of June -- it gets a little bump in the year from cash

11  collections that it holds onto, but by the middle of June,

12  the city was going to have on hand somewhere in the

13  neighborhood of only $7 million.

14  Q   How about the revenue situation upon your arrival?

15  A   Revenue situation was, likewise, trying.  The city's

16  revenues had seen a period of decline in the past ten years.

17  That's well-documented.  I think it's in my June 14th report.

18  And, likewise, the revenue collections were still

19  challenging, and so there was no hope that the revenues were

20  going to in some fashion make up for the shortfall in terms

21  of the cash flow.

22  Q   How about the city's liabilities at that time?

23  A   The city's liabilities were significant.  I had read as

24  part of my due diligence before taking the job that the

25  various statements of liability began in 2011 as all-in

1    liability, meaning both legacy costs and bond debt.  At 12

2    billion in 2012, that grew to 14 billion.  Between my

3    appointment and within a few weeks after that, it became that

4    the liability was approximately $4 billion larger than that,

5    about $18.5 billion total.  That's the long-term capital

6    liabilities, but also the city's operational liabilities were

7    quite significant, and we were not taking in enough cash to

8    meet operational obligations.

9    Q    Do you recall your general reaction upon learning all

10   this about the cash and the liabilities and the revenue?

11   A    Yeah.  I knew things were bad.  It was somewhat shocking

12   just how dire it was.  In fact, I think within a few weeks of

13   coming on board or just prior to the June 14th presentation,

14   I was informed that several of our employees had their checks

15   bounce.  They negotiated them later that day, but our cash

16   flow on any given day was so tight that it was unclear we'd

17   have sufficient cash on hand to meet payroll; that some of

18   our obligations with regard to our contractors as well as our

19   other suppliers were routinely pushed out beyond what should

20   be an average 30-day or 45-day net period between the

21   invoicing to the payment, oftentimes 180 days or greater;

22   that there was no plan in place to remediate the situation

23   and that the city was bumping along in the ordinary course in

24   a very dire set of circumstances.

25   Q    During this initial time frame, did the emergency manager

1   statute require anything of you?

2   A    Yes.   The emergency manager statute imposes upon me

3   certain obligations with regard to reporting.   I think the

4   first report I had due was the 45-day report, and then I was

5   obligated to have a public meeting within 30 days of issuing

6   that report.

7   Q    Let me show you an exhibit, which is Exhibit 75.   It's in

8   evidence.

9   A    Yes.

10  Q    And you see that document, sir?

11  A    Yes.

12  Q    And is that the 45-day plan that you just referred to?

13  A    Here again, assuming -- without reviewing the entire

14  document, yes, that's the May 12, 2013, financial and

15  operating plan.

16  Q    Okay.   Did you have anyone help you in putting together

17  that plan?

18  A    Yes, absolutely.

19  Q    And who was that?

20  A    My entire team, restructuring team, as well as members of

21  the city staff working with them, so that would be the

22  accountants, the operational consultants, the investment

23  bankers, the attorneys, as well as people in the finance

24  department and operational departments of the city.

25  Q    And this is a public document; correct?

1  A   Yes, it is.

2  Q   And obviously the document speaks for itself, but could

3  you summarize generally what you concluded in this initial

4  45-day plan?

5  A   Generally, we gave a snapshot of what we thought was the

6  city's true financial condition.  We both spoke to it in

7  terms of spreadsheets but also a series of charts as far as

8  demographic changes, crime rate, financial collections,

9  expenditures, a number of debt issuances over and above the

10 operational revenue collection in the document, and some of

11 the key operational issues such as public health, safety, and

12 welfare dealing with police, fire, EMS, and city operations.

13 Q   And do you recall this plan containing cash flow

14 projections?

15 A   Yes.

16 Q   Who put those together for you?

17 A   Those would have been put together by a combination of

18 the finance team and restructuring team, Ernst & Young,

19 probably Miller Buckfire to a degree, attorneys probably

20 lesser.

21 Q   Okay.  And were those put together at your direction?

22 A   Yes.

23 Q   Okay.  I'd like to show you page 40 of this exhibit.

24         MR. SHUMAKER:  If you could blow up the chart,

25 Laurie.

1          THE WITNESS:  Thank you.

2   BY MR. SHUMAKER:

3   Q   Mr. Orr, could you tell the Court what this is?

4   A   Yes.  This is a document that shows monthly cash flow as

5   a forecast -- that is, not actual numbers -- based upon

6   anticipated revenue collections and projections, property

7   tax, income tax, gaming revenue, municipal service fees from

8   casinos, state revenue share, other receipts and refinancing

9   proceeds.  It also shows disbursements, which include

10  payroll, benefit costs, other distributions, summarizes total

11  disbursements.  It shows what our net cash flow -- that is,

12  disbursements over revenue -- and then it shows what our cash

13  balances are going forward.

14  Q   And that line near the bottom, cash net of distributions,

15  what is that?

16  A   That line shows what cash we would have after all the

17  distributions were made.  And as a forecast issue, it shows

18  what cash we would have at the end of the year, December

19  2013.

20  Q   And your reaction upon receiving these cash flow

21  projections?

22  A   A high degree of concern.  Essentially, this document in

23  our analysis showed that we would have $900,000 at the end of

24  the year, which is below a margin of error for a billion

25  dollar budget, so it essentially showed that we either would

1  have no money or would be negative in terms of cash flow.

2  Q   And this plan, again, was issued on May 12th; is that

3  right?

4  A   On May 12th.  It's my financial and operating plan on May

5  12th.

6  Q   I'd ask you to turn -- I want to show you page 2 of that

7  plan.  There's a paragraph right at the bottom that carries

8  over to page 3.

9  A   Yes.

10       MR. SHUMAKER:  And I'd ask if you'd put that up,

11  too, Laurie.  If you could blow up that paragraph, please.

12       THE WITNESS:  Thank you.

13  BY MR. SHUMAKER:

14  Q   Mr. Orr, I'd like you to read that --

15  A   Yes.

16  Q   -- for the Court.  This was your conclusion, correct, one

17  of --

18  A   Yes.

19  Q   -- your observations?

20  A   Yes.  As of --

21  Q   What was that?

22  A   Well, it says as of April 20 -- would you like me to

23  summarize it or --

24  Q   Please do.

25  A   -- actually read it?

1  Q    You can read it.

2  A    Okay.  Okay.  As of April 26, 2013, the city had actual

3  cash on hand of 64 million but had current obligations of 226

4  million to other funds and entities in the form of loans,

5  property tax distributions, and deferred pension

6  contributions and other payments.  Therefore, the city's net

7  cash position was a negative $162 million as of April 26,

8  2013.  The city has been deferring and will need to continue

9  to defer payments of its current obligations in order to

10  avoid running out of cash.

11  Q    Is that an accurate summary of the city's cash flow

12  situation at that time?

13  A    Yes.

14         MR. SHUMAKER:  Let me ask you, Laurie, to put up

15  page 26, and that paragraph, if you could blow it up for

16  Mr. Orr, please.

17  BY MR. SHUMAKER:

18  Q    Mr. Orr, do you recall this entry into the -- in the

19  plan?

20  A    Yes.

21  Q    Would you read that for the Court?

22  A    The City of Detroit continues to incur expenditures in

23  excess of revenue despite cost reductions and proceeds from

24  long-term debt issuances.  In other words, Detroit spends

25  more than it takes in.  It is clearly insolvent on a cash

1  flow basis.

2  Q   Was this your view as of May 12th of the city's cash

3  situation?

4  A   Yes, it was.

5  Q   And you indicated that this document was publicly

6  released.  Did anyone after you released it come up to you in

7  any forum at any time and dispute whether the city was

8  insolvent?

9  A   No one on a serious basis has ever disputed to me that

10 the city was insolvent.

11 Q   Mr. Orr, do you recall giving an interview at or about

12 the time that this plan was released?

13 A   I gave several interviews.

14 Q   There was an interview by WWJ News Radio.  Do you recall

15 talking to them?

16 A   Yes.

17 Q   I'm going to read you a quote that -- you were asked a

18 question, and you were quoted as saying, quote, "The public

19 can comment, but it is under the statute.  It is my plan and

20 it is within my discretion and obligation to do it.  This

21 isn't a plebiscite.  We are not, like, negotiating the terms

22 of the plan.  It's what I'm obligated to do," unquote.  Do

23 you recall giving that quote?

24 A   On May 12th?

25 Q   On May 12th.

1  A    Yes.

2  Q    What plan were you referring to when you were saying that

3  it was a plebiscite?

4  A    There's only been one plan.  It's the financial and

5  operating plan.

6  Q    The plan you issued on May 12th?

7  A    Yes, the May 12th financial and operating plan.  That's

8  the only document I've referred to as a plan.

9  Q    And what did you mean when you said that?

10  A    That it was my statutory obligation to issue the

11  financial and operating plan and that this wasn't a document

12  to be negotiated.  It was supposed to be a true summary and

13  public disclosure of the city's true state of affairs.

14  Q    You indicated that after releasing the 45-day plan that

15  the emergency manager statute obligated you to have a public

16  informational meeting; is that correct?

17  A    Yes.

18  Q    And how soon after the plan came out were you supposed to

19  do that?

20  A    I was obligated to have that meeting within 30 days of

21  the publication of the financial and operating plan.

22  Q    Did you conduct such a meeting?

23  A    Yes.

24  Q    When did you have that meeting?

25  A    June 10th, 2013.

1    Q    Where was it held?

2    A    Wayne State University auditorium.

3    Q    Who was in -- I'm sorry.

4    A    The exact name of the auditorium escapes me, but it was a

5    large auditorium at Wayne State.

6    Q    Who was invited?

7    A    The public was invited.

8    Q    And how many people attended?

9    A    I believe it was perhaps 200.  I know there was an

10   overflow crowd, and some people couldn't get in, but the

11   auditorium was full.

12   Q    What was the thrust of your message at that meeting?

13   A    The thrust of my message -- I think I took some of the

14   slides from the May 12th financial and operating plan and

15   used them as a slide deck in a presentation of the meeting to

16   take the community through the financial and operating plan

17   on a graphic basis as opposed to having to slough through the

18   narrative and the spreadsheets.  But it was basically a

19   graphic depiction of the information we had contained in the

20   financial summary of the information we had contained in the

21   financial and operating plan.  I also said that we would have

22   to be making some very difficult decisions within the next 30

23   to 60 days.  I think I mentioned that there were some

24   powerful tools at my disposal, both the Public Act 436 as

25   well as Chapter 9, but I would prefer not to use Chapter 9;

1  that I was certainly making an overture -- I think I even

2  said an open hand -- for proposals from interested parties,

3  but that time was moving quite quickly, and I was going to

4  have to make some decisions because the city had been going

5  through this process in one form or another for the prior

6  almost two years.

7  Q    You mentioned you showed some slides at that meeting; is

8  that correct?

9  A    Yes.

10 Q    Okay.  I'd like to show you a document that is not in

11 evidence yet, so I don't want it to be shown on the screen,

12 but I would refer you to the book of the city's exhibits,

13 Exhibit 41.

14 A    One marked "City"?

15 Q    Yes, sir.

16 A    Okay.

17 Q    Again, that's 41.

18 A    Okay.  Yes, sir.

19 Q    You have it?

20 A    Yes, I do.

21 Q    If you'd take a look at it, are you familiar with that

22 document?

23 A    Yes.

24 Q    Did you prepare it?

25 A    Yes, with my team, yes.

1    Q    Is that the one you showed at the meeting?

2    A    Yes.

3              MR. SHUMAKER:  Your Honor, we would move to

4    introduce Exhibit 41 into evidence.

5              THE COURT:  Any objections?

6              MR. ULLMAN:  Your Honor, to the extent that it

7    contains the projections, we have the same objections as

8    previously.  I don't believe they were prepared by Mr. Orr

9    personally.

10             THE COURT:  Right.  I wonder, counsel, if you would

11   have any objection to me giving the objecting parties a

12   continuing objection on that issue so that they don't have to

13   rise and restate that every time.

14             MR. SHUMAKER:  Certainly.

15             THE COURT:  Is that all right with you, sir?

16             MR. ULLMAN:  Thank you, your Honor.

17             THE COURT:  All right.  That objection is overruled.

18   This document is admitted into evidence.

19       (Debtor's Exhibit 41 received at 9:40 a.m.)

20             THE COURT:  You may proceed.

21             MR. SHUMAKER:  Thank you.  Laurie, if you could put

22   41 up -- you've done that.  Thank you.

23   BY MR. SHUMAKER:

24   Q    Mr. Orr, what is the -- are there any differences between

25   this slide presentation and the 45-day plan that you were

1  just discussing?

2  A   No.  These graphs were generally contained in the 45-day

3  financial and operating plan with the exception of the graph

4  contained at page 8, which is a graphic depiction of the cash

5  flow projections we went over in the financial and operating

6  plan.

7          MR. SHUMAKER:  Laurie, could you put up page 8,

8  please?

9  BY MR. SHUMAKER:

10  Q   And could you tell the Court what this is, Mr. Orr?

11  A   Yes.  This is a graphic depiction of the short-term cash

12  flow projections from January 13 through December 13.

13  Actually, by the time this document was prepared, the ones

14  through approximately April, May, were actual numbers, and

15  the projections went forward as they did on the spreadsheet

16  on the financial and operating plan.  The dark blue line

17  shows the cash balance with deferrals -- that is, the

18  payments we weren't making for either long-term liabilities

19  or pension contributions -- and the light blue line shows

20  what it would have been like -- the city's financial

21  condition would have been like if we had not made those

22  deferrals.

23  Q   Okay.  And when you say "deferrals," what do you mean?

24  A   We weren't paying the money.  When we say "deferral,"

25  it's just another way of saying we weren't making the

1    payments.

2    Q   And what weren't you paying?

3    A   We weren't paying a hundred million dollars of pension

4    payments that year.  I think there were some deferrals with

5    regard to some reimbursable accounts that we weren't paying.

6    There are a number of different things that we weren't paying

7    at that time.

8            MR. SHUMAKER:  Laurie, could you put up page 1,

9    please?

10   BY MR. SHUMAKER:

11   Q   Mr. Orr, could I ask you to take a look at -- this is

12   page 1.

13   A   Yes, um-hmm.

14   Q   Could you read that slide for the Court?

15   A   Yes.  Detroit spends more than it takes in.  It is

16   insolvent.  It has borrowed hundreds of millions of dollars

17   and has deferred just as much in obligations in order to

18   support city operations.  This path is not sustainable.

19   Q   Do you believe that statement was true and accurate when

20   made?

21   A   Yeah.  I think actually this was one of the slides that I

22   personally worked on, yes.

23   Q   Okay.

24           MR. SHUMAKER:  Can we go to page 13 of that, Laurie?

25   BY MR. SHUMAKER:

1   Q   Do you recognize this page, Mr. Orr?

2   A   Yes.

3   Q   Could you tell us what that is --

4   A   Well --

5   Q   -- what you were intending to convey with that?

6   A   What we were -- we were trying to say that we are

7   currently evaluating options to adjust -- in other words, to

8   either not pay or adjust our funded debt obligations to

9   better fit our cash flow projections, which include a number

10  of arrangements, such as rescheduling principal amortization

11  without reduction in principal; that is, how you would pay

12  the obligations that you owe without actually reducing the

13  total amount, permanently reducing the principal amount of

14  debt outstanding.  That means giving someone a haircut.

15  We're not going to pay.  If we owe you a dollar, we're not

16  paying a dollar.  Reducing interest rates.  If we owe you a

17  dollar at credit card interest rates of 23 percent, we're not

18  going to pay that to achieve cost savings or compensate for

19  loss, extended principal, and issuing debt to provide for

20  certain cash recoveries to other creditors; that is,

21  refinancing high-cost debt with lower-cost debt to reduce our

22  obligations.

23  Q   And you presented each of these slides at the meeting?

24  A   Yes, yes.

25  Q   Was there an opportunity at the end of that meeting on

1    June 10th for the audience members to ask questions?

2    A    Yes.

3    Q    Did you answer them?

4    A    Yes.

5    Q    Did anyone at that time or any subsequent time come up to

6    you after the meeting or at the meeting and say that the city

7    wasn't insolvent?

8    A    No.  Most of the people who came up to me after the

9    meeting expressed a level of shock.  They hadn't -- some of

10   them hadn't seen this before, and some actually expressed

11   some gratitude for finally disclosing the true state of

12   affairs.  I think some of those comments I saw on video feeds

13   either in newspapers or on You Tube.

14   Q    You had another meeting a few days later; correct?

15   A    Yes.

16   Q    June 14th?

17   A    Friday, June -- yes.  This meeting was Monday, June 10th,

18   and then we had the June 14th meeting for creditors.

19   Q    Okay.  I'd like to refer you to two documents in

20   evidence.  One is Exhibit 43, and if you could refer to that

21   in your binder.

22   A    Yes.

23   Q    And then also 44, so one is entitled "City of Detroit

24   Proposal for Creditors," and the other one is entitled "City

25   of Detroit Proposal for Creditors Executive Summary."

1   A   Yes.

2   Q   Could you share with the Court what the difference is

3   between those documents?

4   A   The substance of the documents is essentially the same.

5   44, the executive summary, is basically a shortened or

6   truncated version of Exhibit 43.  We'd refer to them as the

7   small slide deck and the large slide deck, but they're both

8   the proposal for creditors that was presented to creditors on

9   Friday, June 14th.  I believe we gave the executive summary

10  out either at or during the meeting and then gave the larger

11  deck out at the conclusion of the meeting.

12  Q   Okay.  And so during the meeting, the executive summary

13  slides is what was shown to the audience?

14  A   Yes, I believe so.

15  Q   Okay.

16  A   Yes.  I'm trying to think.  Did we show the slides?  I

17  think so.

18  Q   Okay.  What were the differences between the 45-day

19  report issued in May and the June 14th proposal to creditors?

20  A   Yeah.  What we were trying to do with the 45-day report

21  was to give a true report on the condition of the city

22  without any cant or any gloss.  What we were trying to do

23  with the June 14th report, which is essentially a month

24  later, was to try to say, well, based upon this document, the

25  true state of the city, this is what we can offer you in the

1   nature of a proposal.  This was not a plan.  It's what we

2   were saying to creditors we would propose to deal with all

3   these obligations that we reported in the May 12th report.

4   Q   Was there any update on cash flows?

5   A   I believe so, yes.

6   Q   Okay.  Who was invited to the June 14th meeting?

7   A   We tried to invite all record debt holders of the city,

8   according to their documents.  We tried to invite all of the

9   labor partners for the city or representatives of the labor

10  partners.  Occasionally there were parties who would call in

11  who also wanted to be invited or wanted their

12  representatives, either attorneys or financial advisors, to

13  attend the meeting, and we tried to accommodate them as well.

14  Q   Okay.  Do you know how they were invited?

15  A   We invited them through a number of ways.  We followed

16  the notice provisions of the actual debt instruments and

17  documents.  I think we did e-mails.  I think we did mail as

18  well, as well as phone calls.

19  Q   I'm sorry.  How many showed up?

20  A   Oh, there were several hundred in the room.

21  Q   Did this represent the entire universe of the city's

22  creditors?

23  A   No.

24  Q   Why do you say that?

25  A   Well, there are individual bondholders in terms of the

1　city creditors as well as trade creditors as well as labor

2　unions as well as individual employees, both current active

3　employees and retirees.  The potential creditor core of the

4　city probably numbers into the thousands, if not tens of

5　thousands.

6　Q　Who presented at the meeting?

7　A　Me and my team.  There was a panel on a DS.  I believe it

8　was David Heiman, who was a lead attorney, bankruptcy

9　attorney, at Jones Day; Ken Buckfire, our investment banker

10　at Miller Buckfire; Gaurav Malhotra at Ernst & Young.  I

11　believe Chuck Moore for Conway MacKenzie was there, and I

12　also believe Bruce Bennett from the Jones Day law firm was

13　there.

14　Q　And they all contributed to the presentation?

15　A　Yes.

16　Q　What were the highlights of the presentation to the

17　audience, as you recall?

18　A　Well, generally, the presentation was designed to sort of

19　take all the parties through a summary of the city's

20　financial and operational condition, operational both health,

21　safety, and welfare, police, fire, EMS, operations,

22　obligations.  Then we went through an analysis of more or

23　less the city's various buckets of assets, the bridge, the

24　tunnel, city-owned parking, city-owned land, DWSD, DIA,

25　whatever.  I think there were approximately 12 to 15 buckets

1    of assets that we discussed.  And then we went through an

2    explanation of how we were going to classify the various

3    creditor cores.  Generally the way you do in any

4    restructuring is secured parties are treated in a different

5    way than unsecured parties are.  That's just like your -- the

6    mortgage on your house has a different value to a lender as

7    opposed to your credit card as a secured party.  And then we

8    concluded by both putting forward a proposal in exchange for

9    downsizing or not paying the unsecured portion of the debt

10   that we would create a note that all the parties in that pool

11   of unsecured, whether it was a creditor or labor or a GO

12   bond, whatever it was, would share in the note.  And I think

13   on the last page of the document we set out a timetable for

14   both negotiations, evaluations, and decision-making.

15   Q    Did you indicate anything about the city's payment plans

16   with regard to various creditors?

17   A    Yes.

18   Q    What were they?

19   A    Well, we announced that going forward that we would

20   continue to pay our secured debt, the $6 billion or so, at

21   DWSD, but that we were not going to be paying our unsecured

22   debt, and some of the deferrals that had already been made on

23   the year, we would continue with those.  And, in fact, that

24   day we were defaulting on our certificate of participation

25   payment.

1  Q   And why were you doing that?

2  A   We needed the money.

3  Q   Now, the title of this document is a proposal for

4  creditors.  Why did you call it a proposal?

5  A   As we said at the meeting, and we tried to be quite clear

6  both on June 10th and June 14th, we had some difficult

7  decisions that we were going to have to make in a very short

8  time frame; that we wanted to see responses from creditors

9  quickly; that as we spelled out at the back of the document,

10 we were going to be making some decisions based upon those

11 responses.  I think I said on June 10th and again on June

12 14th that if we saw proposals coming forward in the nature of

13 term sheets or agreements in principle or something

14 substantive and the like, we might extend our evaluation time

15 frame a little longer beyond the July 15th, July 19th time

16 frame, but if we did not, we were going to be making some

17 very difficult decisions.

18 Q   Did you tell the audience that the proposal was not

19 negotiable?

20 A   No.

21 Q   Now, did you say anything about a reinvestment plan in

22 this document?

23 A   Yes.  We mentioned the fact that one of the reasons we

24 needed to go through this process quickly was to prepare for

25 a reinvestments plan into the city to deal with the critical

1   issues we had discussed in the proposal, blight remediation,

2   lighting, public safety, health and welfare, so on and so

3   forth, along those lines.

4   Q   How much was that reinvestment plan going to cost the

5   city?

6   A   Over the ten-year projection -- and the reason we indexed

7   at the ten years is under 436 I'm obligated upon exit to

8   provide a two-year budget and then a ten-year projection, so

9   we indexed it to that period of time.  And all-in on average

10  over the ten years, it's $1.25 billion.

11  Q   And how much of that was going to be spent on remediating

12  blight?

13  A   Almost $500 million in the first five and a half years.

14  I think 50, 2014; 50, 2015; and then a hundred million

15  dollars or so for the next four years.

16  Q   How did you, as emergency manager, come to decide on what

17  reinvestments were needed for the city?

18  A   Well, it's been apparent for a long period of time, and

19  it's been memorialized in the consent agreement that all

20  parties on behalf of the city and the state agree to and the

21  memorandum of understanding that these priorities were key

22  priorities for the city.  It's just that the city had not

23  gotten at them in a meaningful way during that time, but we

24  tracked what had already been agreed to by the city and the

25  state.

1   Q   Did any of your advisors focus on that area?

2   A   On blight?

3   Q   No.  On the reinvestments for the city.

4   A   Oh, sure.  Oh, yeah, absolutely, yeah.

5   Q   And who was that?

6   A   Oh, all of our advisors in some capacity.  I mean Conway

7   MacKenzie had been hired at the end of 2012 to examine the

8   city's operations.  They had been doing that before I came on

9   board.  Ernst & Young I think had been on board prior in

10  2012.  Milliman was doing its analysis based upon information

11  obtained from the pension fund's regular actuary, Gabriel,

12  Roeder, so they were examining obligations in that regard,

13  and Miller Buckfire, which I believe was retained in 2012,

14  began work almost -- I think they had been working informally

15  prior, but they began work in earnest around that time, so

16  all of them participated in some fashion on what we needed to

17  do.

18  Q   Do you recall what Conway MacKenzie did with regard to

19  investigating reinvestment needs?

20  A   Yes.  There's another component in the financial

21  stability agreement is that the financial stability agreement

22  created what's called the FAB, Financial Advisory Board, and

23  they were supervising Conway's insertion of itself in all

24  operations of the city to examine ways to increase the

25  efficiency of the city, which they had been doing.

1   Q   Why do you believe this reinvestment is necessary?

2   A   Well, I think some of it is apparent.  As I said before,

3   if you drive around the city -- this is not the way any major

4   city or any city in America, for that matter, should operate

5   or should look.  The blight, while it has been tolerated for

6   a long time, is unacceptable.  Our police response rates by

7   any objective measure, whether it's Bureau of Labor

8   Statistics, Department of Justice, BJS, Bureau of Justice

9   Statistics, or whether it's Quizzle on the Internet, show a

10  low level of services.  Our violence is apparent.  I don't

11  think any serious person -- I've heard no one say that this

12  is the way the city should operate or that the city is not in

13  need in some form of remediation.

14  Q   Was the audience allowed to ask questions at this

15  meeting?

16  A   Yes.

17  Q   Did they?

18  A   Yes.

19  Q   Did you answer their questions?

20  A   Yes.

21  Q   All of them?

22  A   Yes.

23  Q   When you made that quote about the plan being a

24  plebiscite, were you talking about this one, the June 14th

25  proposal?

1   A    Absolutely not.  Anybody who says that is taking the

2   quote out of context.

3   Q    Did you tell the audience that you would not negotiate

4   the proposal?

5   A    Absolutely not.  We said it was a proposal.  We were

6   looking forward to having a series of meetings the next week.

7   We were looking forward to counterproposals or suggestions.

8   Quite frankly, given the fact that the city had been working

9   through two Detroit review teams, three findings of financial

10  distress, financial crisis, until March 1st, 2013, a full-

11  blown financial emergency, all interested parties certainly

12  had opportunity to all of those documents for over two years,

13  to all of the metrics and timetables contained in both the

14  MOU and the consent decree, and what was required in all

15  aspects, both debt and labor.  We anticipated that certainly

16  very sophisticated and interested parties that were in that

17  room had already had over two years to consider the condition

18  of the city and would be coming forward to us with proposals.

19          MR. SHUMAKER:  Laurie, could you put up page 61 of

20  the summary?  Could you blow that up, please?

21  BY MR. SHUMAKER:

22  Q    Mr. Orr, do you recognize this slide?

23  A    Yes.

24  Q    What is it?

25  A    This is the page 61, Section 9, of the proposal, whether

1    it's the full deck or the executive summary, and it sets out

2    a timetable, as I said before, for how we're going to handle

3    requests for additional information; that we wanted to have

4    discussions with stakeholders throughout this time,

5    essentially a month; and that we were going to evaluate those

6    discussions following mid-July or so.

7    Q    How much time did you say you had?

8    A    I said I didn't have any time; that I felt at that point

9    that I was running out of time both under Public Act 436;

10    that my term and the powers that come with the emergency

11    manager expire in September 2014; that some of the work we

12    needed to get at, given that it had been discussed in detail

13    on a number of different documents with specificity -- and I

14    can only guess that it had been published throughout that

15    time quite apparently throughout the city; that anyone paying

16    attention knew that we had been working our way here

17    certainly throughout 2012 and 2011 and that the time had come

18    to make some very difficult decisions, to not delay, and that

19    the regular order of things, whether it was delay, whether it

20    was collective bargaining, whatever it was, that the regular

21    order of things was suspended, and we were in a financial

22    emergency and were going to have to move very quickly.

23    Q    At this time, on June 14th, 2013, did you think that the

24    city had to file for Chapter 9?

25    A    No.

1   Q    Why not?

2   A    No.  I thought that given the state of affairs in the

3   city, given the amount of publicity surrounding the Financial

4   Advisory Board, the agreements we discussed, the apparent

5   condition of the city -- you know, if you live in a city

6   where the bumpers on your police cars are falling off and

7   every neighborhood, even the good ones, have some level of

8   blight, you cannot possibly reasonably think that something

9   doesn't need to be done, so I thought parties were going to

10  be coming in with a discussion.  In addition, we were already

11  in discussions with other parties and had reached an

12  agreement in principle on the swap agreement with Bank of

13  America, Merrill Lynch.

14  Q    I want to return to this time frame, but around this

15  time, which is mid-June, you were involved in the city's

16  budgeting process; is that correct?

17  A    Yes.  The budget is due June 30th.  Yes.

18  Q    Okay.  And this is for the fiscal year budget; correct?

19  A    Yes.  July 1 through June 30 of each fiscal year.

20  Q    Okay.  Could you describe for the Court what the process

21  was in coming up with the city's budget?

22  A    Sure.  There's a budget estimation process.  There's a

23  review of all the costs done by -- the city has 44

24  departments.  Cost is done by departments, what the revenue

25  is.  The budget director and finance director get to go --

1    get together and discuss it, look at possible collections.

2    The City Council then undertakes the mayor's budget.  As he

3    puts that together, that's sent to the council.  The council

4    makes recommendations and adjustment.  The mayor gets to

5    review it.  And ultimately under 436 I have to approve or

6    disapprove the budget.

7    Q    Okay.  So PA 436 requires you to look at the budget after

8    the City Council passes it; is that correct?

9    A    Yeah.  I don't think -- I don't know if I have to look at

10   it afterwards.  I mean I could take it up, but I had

11   delegated to the mayor and the council the authority to

12   operate generally the city in the ordinary course, and that

13   was part of the process.

14   Q    Okay.  I'd like to show you an exhibit that's in

15   evidence.  It's Exhibit 74.  Take a look at that first page.

16   And that's your signature, Mr. Orr?

17   A    Yes, it is.

18   Q    Okay.  And what is this document?

19   A    This document is the quarterly report that's necessary

20   under 436 to the Treasury.

21   Q    And does it include the city's fiscal year 2014 budget?

22   A    I believe so, yes, a summary of it, not the entire budget

23   but a summary --

24   Q    Right.

25   A    -- of the budget, yes.

1    Q    Right.  I'd like to show you Appendix D of this report.

2            MR. SHUMAKER:  Laurie, if you could blow up the

3    first three sentences maybe up at the top?

4    BY MR. SHUMAKER:

5    Q    And is this what you were describing, Mr. Orr, about the

6    process?

7    A    Yes, more or less.  I mean we summarized it here, but I

8    have an obligation to approve the budget.  The budget is

9    apprised -- comprised of input from the City Council as well

10   as their review of the mayor's cut and that to reconcile

11   those figures with new ten-year projections under our

12   projections and that this is the budget we're going to adopt.

13   Q    Okay.  If I could direct your attention to the middle of

14   that page with the revenues.  Obviously we know what the

15   revenues are, but what were the total revenues at that point

16   in time?

17   A    Well, the total revenues, if you look at the general fund

18   amount, are 988 million.  If you include other funds, the

19   total goes down in the bottom right-hand corner about 2.4

20   billion.

21   Q    How about below that, the expenditures?  Could you

22   summarize that for us?

23   A    Yes, yeah.  Under the general fund it shows there are

24   expenditures of about $380 million above revenues in the

25   general fund.

1   Q    Below there on the line under -- well, it says "total

2   expenditures before concessions."

3   A    Yes.

4   Q    What -- and then concessions below that of 379; is that

5   correct?

6   A    Yes.

7   Q    What are concessions?

8   A    Well, concessions can mean both agreed to or unilaterally

9   imposed adjustments to obligations, things you're supposed to

10  pay.

11  Q    And when you made the reference to concessions, what did

12  that -- what did that mean?

13  A    That meant both payments perhaps to -- for deferred

14  obligations -- we knew we weren't paying a hundred million

15  that year to the pension funds -- payments to creditors that

16  we may not make, generally concessions we needed in that

17  amount in order to balance the budget, the 988 over and above

18  the 1.367.

19  Q    Those are the payments that the city wouldn't be able to

20  make in fiscal year 2014?

21  A    Those are payments that the city would not be able to

22  make as well as borrowings that the city was not going to

23  engage in again.

24  Q    Are you aware of any payments that the city has not been

25  able to make in fiscal year 2014?

1  A    Yes.

2  Q    What are those?

3  A    Oh, they're payments to trade creditors.  We are still

4  behind on our payments, for instance, to parts supplies that

5  we have not made in several millions of dollars.  There are

6  creditors that we have not paid in connection with supply

7  contracts, some of them in connection with the new police

8  station, for instance.  There are a number of different

9  payments we have not made this year.

10  Q    Let me return to --

11        MR. SHUMAKER:  You can take that down, Laurie.

12  BY MR. SHUMAKER:

13  Q    Let me return to the time frame after -- immediately

14  after the June 14th creditors' meeting, if you will.

15  A    Yes.

16  Q    At that meeting, I believe you indicated that one of the

17  topics discussed was the city's cash situation; correct?

18  A    Yes.

19  Q    Is one of the sources of the city's revenues or cash

20  referred to as the casino revenues?

21  A    Yes.  Casino and developer fees, casino revenue and

22  developer fees.

23  Q    Now, what are the casino revenues as you understand them

24  to be?

25  A    There are three casinos in the city, and in consideration

1   for some time ago passing legislation for the casinos, they

2   remit to us a portion of a tax that comes into the city in

3   the sum of approximately $180 million a year total.  A

4   portion of that is used to pay certain creditors, and then a

5   portion of that comes back to the city.

6   Q   Is that an important revenue source for the city?

7   A   That is probably -- yes, and it's probably the most

8   stable source of revenue for the city.

9   Q   Now, are those casino revenues freely available to the

10  city?  Are there any restrictions on the casino revenues?

11  A   In 2009 the city entered into a collateral pledge because

12  it was in default under the swap agreement.  That collateral

13  pledge gave a security interest to the swap counterparties.

14  Under that collateral pledge, those counterparties, upon an

15  event of default, had the option to execute on the totality

16  of those payments, so they were not freely available to the

17  city until we entered into the Bank of America, Merrill Lynch

18  forbearance and optional termination agreement, which I

19  believe we announced in principle on June 14th.

20  Q   Okay.  Let me ask you, you referred to swap

21  counterparties.

22  A   Yes.

23  Q   Who were the swap counterparties?

24  A   Bank of America, Merrill Lynch, and then U.S. Bank as

25  trustee generally.

1 Q  So there was some restriction in the ability of the city

2 to get those revenues directly from the casinos?

3 A  Yes.  There was a mechanism by which the revenue was

4 paid.  I think the revenue is paid on a daily basis, about

5 $500 million, into a holdback account.  Then there's another

6 distribution account when it reaches a certain level that

7 that money is then -- about 4.2 million a month is then taken

8 away and put into another account for the counterparties, and

9 then every quarter that money, roughly a million or so, is

10 then paid over to the counterparties.

11 Q  I think you said 500 million a day.

12 A  500,000 a day, roughly --

13 Q  Okay.

14 A  -- somewhere in that --

15 Q  I wish it would be 500 million.

16 A  I wish it were 500 million a day.

17 Q  So -- and this arrangement, does it have a name, a

18 commonly referred to name?

19 A  You mean the holdback account --

20 Q  Yeah, the holdback account.

21 A  -- or the swap?  It's generally called a swap.

22 Q  Have you heard of the phrase "lockbox arrangement"?

23 A  Sure, yeah.  That's a common term in financing, holdback

24 account, lockbox, and the like.

25 Q  After the June 14th meeting, did anything happen with

1  regard to the casino revenues?

2  A   Yes.

3  Q   What was that?

4  A   On the following Monday, one of the parties that was a

5  monoline insurer -- that is, insurer for some of these

6  obligations -- called Syncora claimed that they had an

7  interest in the swap agreement, which we very strongly

8  disputed, and sent a letter to counterparties alleging that

9  their interest prohibited them from performing on the

10  agreement in principle that we had announced on Friday, the

11  14th.

12  Q   So they sent a letter to UBS and Bank of America, Merrill

13  Lynch?

14  A   I think it was U.S. Bank --

15  Q   Okay.

16  A   -- and Bank of America, Merrill Lynch.

17  Q   Okay.  U.S. Bank, was U.S. Bank a swap counterparty, or

18  were they something else?

19  A   They were like a trustee.

20  Q   A trustee.  Okay.

21  A   Yeah.  They were a trustee for the counterparties.

22  Q   So you had the swap counterparties, which are UBS and --

23  A   And Merrill Lynch.

24  Q   -- Merrill Lynch?

25  A   Then you have U.S. Bank, which is a trustee.

1  Q   Okay.

2  A   Um-hmm.

3  Q   And why would they send a letter to U.S. Bank?

4  A   Well, we didn't know.  We interpreted them -- our

5  understanding was they had made a payment based upon our

6  default under the certificate of participation as an insurer

7  for the COPs, which is a separate structure.  Under the

8  swaps, which they did not have an agreement in the collateral

9  pledge agreement, it appeared to us that they were trying to

10  assert some interest under the swaps to bolster their

11  position under the COPs.  We thought that was inappropriate

12  and unfounded.

13  Q   What did U.S. Bank do in response to the letter it

14  received from Syncora?

15  A   Understandably, as a trustee, U.S. Bank more or less

16  froze, and they froze the account.

17  Q   What did that freezing of the account mean for the city?

18  A   Well, it actually meant the city was in worse condition

19  than it was on June 14th because not only were we getting

20  that -- not getting that portion of the revenue,

21  approximately $132 million that should come to us in the

22  course of a year, but we weren't getting the benefits of the

23  swap agreement that we had reached with them just that

24  Friday.

25  Q   Had you been counting on the money, the casino revenues?

1   A    Yes, absolutely.

2   Q    What did you do in response to Syncora's actions?

3   A    I think I instructed our legal team to reach out to them.

4   There was a letter.  I think I wrote -- there was a series of

5   letter exchanges over the next couple of weeks.  I think I

6   wrote back saying your position is unfounded to a -- to one

7   of the principals, I think a Mr. LeBlanc at Syncora.  I think

8   he then wrote back to me, and this went on for about two

9   weeks, and then I wrote another letter or two back to him,

10  but there were a series of what we used to call nastygrams

11  going back and forth about the parties' respective interest

12  and how we felt they were unfounded and how they felt that

13  they had a right to assert them.

14  Q    Were you asking Syncora to change its position?

15  A    Yes.  We were very -- we were telling Syncora they did

16  not have a position, that they were causing damage to the

17  city, and they needed to cease and desist immediately.

18  Q    Did your letters or meetings with Syncora work?

19  A    No.

20  Q    What was the next step that you took --

21  A    Well --

22  Q    -- with regard to the casino revenues?

23  A    Well, we were relying on the casino revenue strongly to

24  relieve the cash flow pressures that we were under from March

25  to June because we -- mid-June we were going flow pretty

1    skinny cash flow negative.  They refused apparently to reach

2    some sort of accommodation.  We told them if they didn't, we

3    would have to pursue our legal remedies, and I think in this

4    time frame we were also going through the discussion with the

5    counterparties, certainly in the next week -- we spent that

6    following week, the 17th through the 22nd -- 17th, 18th,

7    19th, 20th, 21st, 22nd -- yeah -- 17th through the 22nd

8    having plenary meetings with a number of interested parties.

9    We were writing these letters to Syncora.  After several

10   weeks of this, we eventually decided that we were going to

11   have to sue them to stop, get a preliminary injunction -- or

12   TRO, temporary restraining order.

13   Q    Was what Syncora was doing affecting your negotiations

14   with the swap counterparties --

15   A    Yes.

16   Q    -- the agreement you were talking about?

17   A    Yes.  It interfered with those negotiations quite

18   severely.

19   Q    So you decided to pursue legal action?

20   A    Yes.

21   Q    And when you say "legal action," what do you -- what do

22   you mean?

23   A    Well, after discussion with our team, we decided to sue

24   Syncora.

25   Q    Okay.  And how did you go about doing that?

1    A    We filed a complaint for a temporary restraining order in

2    early July, July 5th, I believe.

3    Q    Were you successful in obtaining the TRO?

4    A    Yes, we were.

5    Q    And what did that mean for the city?

6    A    Well, that mean that Syncora had to cease and desist from

7    interfering with the settlement agreement we had reached with

8    Bank of America and Merrill Lynch and UBS; that the casino

9    revenue begin to flow again so we had some relief from the

10   financial pressures that we were feeling in terms of cash

11   flow and that we could refocus quite clearly with that relief

12   on trying to reach some agreements with other parties.

13   Q    If the city hadn't gotten that TRO, what would it have

14   meant to the city?

15   A    It would have been pretty catastrophic.  Without the

16   casino revenue, even our projections for cash flow would not

17   have flowed.  We would have been short, in addition to the

18   money we saw -- we lost on that blue graph that we discussed

19   on the June 10th presentation, we have lost another $132

20   million a year, which would have put the city in dire

21   straits.  You could not cut enough city services to make up

22   for that difference.  We couldn't go back to the financial

23   markets because we had exposed the true state of the city

24   affairs, and any lending at that time perceivably without

25   this revenue stream would have been very high.  It would have

1   been very dire.

2   Q   And you got this TRO on July 5th, you said?

3   A   I believe it was July 5th.

4   Q   Do you know how long a TRO typically lasts?

5   A   In federal court it can last for a period of time, but I

6   think this was in state court, and it had a 14-day life, I

7   believe.

8   Q   Mr. Orr, while you were dealing with the Syncora

9   situation after the June 14th meeting, were there subsequent

10  meetings between representatives of the city and its

11  creditors?

12  A   Yes, throughout that week, the following week.

13  Q   I'd like to show you Exhibit 104, which has been admitted

14  for demonstrative purposes.  Do you see that, Mr. Orr?

15  A   Yes.

16  Q   And you see June 14th over on the left side of that

17  document?

18  A   Yes.

19  Q   Could you walk us through any meetings that you

20  participated in during this time period?

21  A   Yes.  I was at the June 10th meeting on the bottom, June

22  14th meeting, June 20th meeting.  I believe -- I think at one

23  other meeting or one other one-off meeting at some point the

24  week after that, which would have been July 25th or so,

25  thereabouts.

1    Q    Or June 25th?

2    A    Yeah.  June.  I'm sorry.  June 25th.

3    Q    Now, at these meetings, Mr. Orr, what did you tell those

4    who came to them?

5    A    I think at the June 20th meeting it was the afternoon

6    session that I attended.  I told them that we were -- same

7    thing I said at June 14th essentially.  We were working hard

8    to try to get some concessions; that we were fighting very

9    hard from a concession that we had obtained from Bank of

10   America, Merrill Lynch; that we were looking -- we thought

11   that that settlement as well as our willingness to default on

12   the COPs payment would have told all interested parties that

13   we were serious about trying to get some negotiations done

14   fairly quickly; that we were working on a very tight time

15   frame; and that we meant what we said in our June 14th

16   proposal for creditors; that that was the time frame we were

17   going to stick to.

18   Q    Let me focus your attention on the meeting on June 20th

19   with the nonuniformed union and retiree representatives.

20   A    Um-hmm.

21   Q    At that meeting, did you tell them that you would not

22   negotiate with them?

23   A    No.  What I said was that we would not waive our rights

24   under 436; that collective bargaining was suspended for five

25   years under the statute, but that as long as everybody

1  understood we weren't engaging in collective bargaining, we'd

2  be willing to have discussions and other negotiations short

3  of calling it collective bargaining.

4  Q   Did you tell the meeting participants in the afternoon

5  session with the uniformed union and retiree representatives

6  the same thing?

7  A   Yes.

8  Q   How about the meeting on June 25th with the nonunion

9  creditors and representatives from the Retirement System?

10  A   You know, I don't -- I'm trying to see if I meant at that

11  meeting or if I had a separate one-off, but I think either

12  way I was trying to tell everyone that we were meeting with

13  the same message.  We want to have discussions.  We want to

14  have proposals.  We want to have negotiations, but we are not

15  waiving our rights under the statute.

16  Q   Did you tell the meeting participants that you -- the

17  city would not accept proposals or counterproposals to what

18  you had exhibited at the June 14th meeting?

19  A   No.  If anything, we kept telling people that we would

20  accept counterproposals and we were looking for them.

21  Q   Now, you didn't go to all the meetings; correct?

22  A   No, I did not.

23  Q   How did you stay informed as to what was happening at

24  those meetings?

25  A   My team kept me regularly informed.  Typically either

1  during or after -- immediately after those meetings, they

2  would stop by my office.  We would have daily telephone

3  calls.  We have a number of standing calls called work in

4  progress calls beginning of the week.  At the end of the week

5  we have team calls.  During the middle of the week we have

6  various operational calls and other calls with all the

7  consultants.  We have regular meetings and calls on a daily

8  basis.  In addition, lead counsel, David Heiman, as well as

9  our investment banker, Ken Buckfire, speak to me essentially

10  almost daily, maybe Ken not as much daily, but David

11  certainly does on a regular basis.  And any particular

12  taskforce like the pension taskforce with Evan Miller, Jones

13  Day, or Conway MacKenzie through Chuck Moore or Ernst & Young

14  or any of their other partners would meet with me daily.

15  Q    Do you think that any important developments at those

16  meetings would have been reported to you?

17  A    Without a doubt.

18  Q    What was -- who was your team of -- who was the team that

19  you had that went to the meetings you did not attend?

20  A    Well, we had various teams for different obligations.

21  For instance, on labor, we had a team headed up by Jones Day

22  attorneys on pension and benefits.  We had a team with Jones

23  Day's attorneys, Conway MacKenzie, Ernst & Young on debt.  We

24  had a team with various attorneys as well as our investment

25  bankers.  Each sort of group between debt, labor, benefits,

1    employees would have members assigned to it who would attend

2    those meetings, have follow-up calls, exchange e-mails, come

3    back and forth with proposals.  There were a number of

4    letters that were exchanged which would routinely be shared

5    with me.

6    Q    Did you tell any of the members of your team not to

7    negotiate with those who came to the meetings?

8    A    Absolutely not.  What I said is if there any serious

9    proposals, I'm a phone call away.  Typically what would

10   happen, they would relay those proposals to me, and we'd make

11   a consensual decision about how to respond or whether or not

12   they were proposals that we thought were moving us forward,

13   but, no, I was involved at every stage of that process.

14   Q    Did you participate in these meetings in good faith?

15   A    Yes, absolutely.

16   Q    Do you believe your team did?

17   A    Yes, I do.

18   Q    Aside from the meetings that are set forth on Exhibit

19   104, were there other contacts with the city's creditors --

20   A    Yes.

21   Q    -- that you had?

22   A    Yes.

23   Q    What kinds of contacts?

24   A    Various parties would routinely stop by my office, ask

25   for meetings, either drop by when they were in other meetings

1  or we'd have set-up meetings.  To this day, I routinely meet

2  with various interested groups on behalf of the city.  I

3  don't think there's a point at which I have turned down a

4  request for a meeting.  Maybe if I'm busy, not immediately at

5  that moment, but I generally will try to make myself

6  available for any reasonable request for a meeting.

7  Q    You believe you were available during this time?

8  A    Yes.

9  Q    Did any creditors submit proposals or counterproposals to

10  you after the June 14th meeting and before July 18th?

11  A    Yes.

12  Q    Who did?

13  A    I think a group of creditors led by Ambac, I believe,

14  submitted a proposal, and then there was another sort of

15  proposal, a single-page letter that was admitted --

16  submitted.

17  Q    Let me show you Exhibit 102 and ask you, if you could, to

18  identify it for the Court.

19  A    I believe this was a letter that was submitted by Ambac

20  and NPF, National Public Finance Guarantee Corporation.

21  Q    And it was a proposal made to you after the June 14th

22  meeting?

23  A    Yes.  I believe it was made roughly on the day that's

24  referenced, July 15th, Monday, July 15th.

25  Q    Okay.  Aside from this proposal and the other one that

1  you referenced, did you receive any proposals between June

2  14th and July 18th from the unions?

3  A   Nothing I would call a proposal.  I think there was

4  reference to -- may have been reference to a letter that

5  requested collective bargaining but not a proposal.

6  Q   How about the bondholders?

7  A   No.

8  Q   The retirees?

9  A   No.

10  Q   Pension funds?

11  A   No.

12  Q   Any other stakeholders?

13  A   No.

14  Q   At some point after the June 14th meeting, did you

15  authorize your team to start preparing for a Chapter 9

16  filing?

17  A   Yes.

18  Q   When did you do that?

19      (Phone interruption at 10:24 a.m.)

20          THE COURT:  I guess we have to pause our proceedings

21  for a second to address this.  Okay.  Hold on one second.

22  Letrice -- we're going to just pause in place here for a

23  moment while we get the phone working again.

24          MR. SHUMAKER:  Your Honor, this is somewhat of a

25  breaking point if you would like to, or --

 1          THE COURT:  Ah, let's talk about that.  Okay.  Just

 2   let me know when you're ready again, Letrice.  Okay.  On the

 3   issue of a break, because of our commitment to hear the

 4   governor's testimony beginning at one, it was my intent to

 5   call for lunch at 11:30 since the vote was to have an hour-

 6   and-a-half lunch, so in light of that, it was my intent to

 7   just plow ahead until 11:30.

 8          MR. SHUMAKER:  Fine.  That's wonderful.

 9          THE COURT:  Okay.  And you may proceed.

10          MR. SHUMAKER:  Thank you, your Honor.

11   BY MR. SHUMAKER:

12   Q   Mr. Orr, I forget the question.

13   A   Okay.

14   Q   You indicated that at some point after the June 14th

15   meeting you authorized your team to start preparing a

16   potential Chapter 9 filing.  I believe I'd asked you when you

17   thought that occurred.

18   A   I think approximately late June, early July.

19   Q   Okay.

20   A   Maybe -- yeah, yeah.

21   Q   Well, why did you need to start planning for a Chapter 9

22   filing at that point at the same time you were negotiating?

23   A   It's basically contingency plan filing.  I mean, you

24   know, pray for peace, prepare for war.  Any prudent person

25   always prepares for the contingency that what you hope for

1    doesn't occur.  To do so -- not do so would be irresponsible.

2    Q    Do you believe these preparations for a possible Chapter

3    9 filing affected your ability to negotiate in good faith?

4    A    Absolutely not.

5    Q    How about your team?

6    A    Absolutely not.  We were willing to accept any agreement

7    that came over the transom.

8    Q    About this time -- I'm talking now July -- July 5th was

9    the TRO.

10   A    Yes.

11   Q    And the negotiations that were on Exhibit 104 were -- the

12   meetings that were taking place were going on.  Did you

13   become aware of any lawsuits filed around that time regarding

14   the emergency manager statute?

15   A    Yeah.  There had been filed prior to this whole time

16   frame lawsuits seeking to invalidate the statute.  We were in

17   a running gun battle with Syncora with the exchange of

18   correspondence.  We were trying to negotiate with a number of

19   parties, I think 48 or so, 49 bargaining units, 44 or so bond

20   issuers, 9 bond insurers.  And also I believe that week, the

21   first week of July, just before the July 4th holiday -- I

22   think it was July 3rd -- two lawsuits -- two or three were

23   filed against us, not against me personally at that time.  I

24   think they were filed against the state, the governor, and

25   the treasurer, the Flowers and Webster's lawsuits, and then

1  we went to court. July 4th, I think, was a Thursday, and
2  then we went to court to enjoin Syncora on the 5th, which I
3  believe was a Friday.
4  Q   Okay. So you believe that the Flowers and the Webster
5  lawsuits were filed on July 3rd?
6  A   Yes, I believe so.
7  Q   Okay. What was your understanding of what these suits
8  were alleging?
9  A   There had been a lot of discussion prior to filing the
10 suits as to whether or not the constitutional requirements of
11 the Michigan state Constitution prohibited the adjustment of
12 vested pension rights, and I thought these lawsuits were
13 seeking to prohibit a Chapter 9 filing if it would include
14 adjusting vested pension rights.
15 Q   How did the filing of these lawsuits affect you in your
16 role as emergency manager?
17 A   They initially didn't really concern me. I assumed that
18 parties were pursuing their legal rights. We were trying to
19 negotiate. Frankly, I ignored them when they were initially
20 filed and continued to try to reach some sort of negotiated
21 solution with our interested parties and labor partners.
22 Q   Did they tell you anything about the negotiations?
23 A   Well, they suggested to me that parties were pursuing a
24 litigation role or option as opposed to a sincere good faith
25 negotiation option when we had already said that time was

1  running out.  We were coming to the end of our 30 days; that

2  they thought for whatever reason it was in their best

3  interest to pursue litigation as opposed to coming --

4  proposing some sort of agreement.

5  Q   Did this concern you?

6  A   Yes.  It wasn't -- it certainly wasn't showing of a

7  willingness to enter into some sort of concessions or

8  agreements.  It said they wanted to sue.

9  Q   Now, there was another lawsuit filed after the Flowers

10 and Webster lawsuits; correct?

11 A   Yes.

12 Q   And when was that?

13 A   I think that was the following week.

14 Q   How did these lawsuits affect your negotiating posture?

15 A   Well, from our perspective, we continued to say that we

16 would negotiate even in the sort of litigious -- what I mean,

17 we had been in a situation of opposition and some level of

18 conflict from the beginning.  We expected that, and that

19 wasn't going to change our willingness to try to reach some

20 sort of agreement.  In fact, even in the face of litigation

21 and some very contentious negotiations and statements, we

22 continued to try to move forward.

23 Q   Now, you indicated that in the Flowers and Webster

24 lawsuits the governor and the treasurer were named as

25 defendants.

1  A    Yes.

2  Q    In the pension fund lawsuit that you referenced --

3  A    Yes.

4  Q    -- on July 15th --

5  A    Yes.

6  Q    -- were those the same defendants?

7  A    No.  In the pension lawsuit, GRS, I believe, sued me

8  along with some other parties, and they named me and the

9  governor, I believe.

10 Q    Did you continue to meet with the pension funds after

11 they sued you?

12 A    Yeah.  We continue to meet with them now.  We'll continue

13 to meet with them, yes.

14 Q    Did these lawsuits affect your decision to seek the

15 governor's authorization to file for Chapter 9 bankruptcy?

16 A    Yes, to some degree.  It appeared --

17 Q    How so?

18 A    Well, between the Syncora litigation, that injunction was

19 only going to last for two weeks, I believe, through the 19th

20 or so, Friday, the 19th, I think it was -- the Webster and

21 Flowers litigation suggested to me that an agreement was not

22 going to be forthcoming.  There was a lot of publicity

23 regarding those lawsuits and what I viewed to be chest

24 thumping, people saying what they were going to do and they

25 weren't going to make any movement until we agreed as a

```
 1   condition -- it appeared to be as a condition to going
 2   forward that we had to observe these sort of philosophical
 3   differences, these sort of philosophical positions that you
 4   couldn't touch vested pension rights.  There was a lot of
 5   discussion in the general obligation bond community that
 6   unless we agreed to observe the implied full faith and credit
 7   of the city beyond our GO bond debt, that they weren't going
 8   to make any concessions.  We had tried to tell them we could
 9   not comply with the $12 billion of unfunded -- unsecured
10   liability, and the situation seemed to be growing more and
11   more precarious and somewhat out of control.
12   Q   Let me show you Exhibit 28, which is in evidence.
13   Mr. Orr, do you recognize this document?
14   A   Yes, I do.
15   Q   And what is it?
16   A   This is my recommendation to the governor, copying the
17   treasurer, that I be given authority to file Chapter 9.
18   Q   And it's dated as of July 16th; is that correct?
19   A   Yes, it is.  I believe that was a Tuesday.
20   Q   Why did you send the governor this letter on that date?
21   A   Well, as I said, I believe at that time there was a
22   mounting level of conflict.  There were a number of pieces of
23   litigation going on.  There were a number of what appeared to
24   be conditions all parties were setting before we'd have
25   discussions that we'd have to agree to.  I was running out of
```

1    time.  I meant what I said on June 14th that we were going to

2    have to go through an evaluation period, and that was coming

3    to a close.  We hadn't received any real counterproposals

4    from any parties.  The only one actually we received in

5    writing was from Ambac Assured and National Public Finance.

6    We hadn't received any from the other parties, and time was

7    running out that we said we'd have to do an evaluation, and I

8    wanted to get the authority in hand to file Chapter 9 if we

9    weren't receiving any proposals.

10   Q    And is that what you told the governor in this letter?

11   A    Yes.  I told him about the condition of the city, the

12   budget deficits, the growing liabilities, the ongoing

13   financial emergency that he had declared now back in March, I

14   believe March 1, 2013.  We discussed our meeting with

15   creditors and why there were certain barriers to reaching

16   agreement and that it was time to make a decision.

17   Q    Why did you recommend Chapter 9 bankruptcy for the city

18   at this time?

19   A    Well, it seemed to me that after going through a series

20   of negotiations in the time frame that we said we would,

21   after standing by and suffering a number of different

22   lawsuits aimed at denuding us of the authority to make

23   decisions under 436, after parties taking strong

24   philosophical positions about what they would or wouldn't do

25   based upon our position; that I had made a pledge of the time

1    I was going to keep open; that nobody was coming forward --

2    and I said it was approximate within that time frame -- and

3    that I was running out of time.  We had said for some of the

4    things that we needed to accomplish we had to make some

5    decisions, and, furthermore, given the amount of litigation,

6    it was clear to me that there was going to be no other way to

7    pursue a comprehensive and orderly resolution of the city's

8    problems in an expeditious way.

9    Q    On July 16th when you sent this letter, were you aware of

10   any hearings in the Flowers or Webster or pension fund

11   lawsuits that were upcoming?

12   A    There were hearings that were scheduled at that time for

13   the 22nd, I believe, the following week.

14   Q    Were you aware of any other hearings on July 16th?

15   A    Not on July 16th.

16   Q    How long between concluding that bankruptcy was

17   appropriate and sending this letter to Governor Snyder?

18   A    Well, I think I reached the final conclusion the prior

19   week, so drafts of the letter were probably prepared over the

20   weekend and that Monday, and when I sent it, I was prepared

21   to file.

22   Q    Prior to sending this letter to the governor, did you

23   have any agreement with the governor regarding what his

24   response might be?

25   A    No.

1    Q    Did the governor respond to this letter?

2    A    Yes.

3    Q    I show you Exhibit 29, please.  Do you recognize this

4    document, Mr. Orr?

5    A    Yes, I do.

6    Q    It's in evidence.  Could you give an overview of what the

7    governor told you in this letter?

8    A    The governor said that he had reviewed my recommendation;

9    that he looked at the obligation of the city first and

10   foremost to provide basic needs, basic obligations to its

11   citizens, which were not being met; that it could not meet

12   its basic obligations to creditors; that its failure to meet

13   these obligations prohibited it from providing basic needs to

14   the citizens and to its creditors; and that the only

15   reasonable path to resolving this would be the filing of a

16   bankruptcy.

17   Q    And did he authorize you to file for a Chapter 9 --

18   A    Yes.

19   Q    -- bankruptcy?

20   A    Yes, he did.

21   Q    When on July 18th -- that's the date you received this

22   letter; correct?

23   A    Yes, it is.

24   Q    When on July 18th did you receive this letter?

25   A    I believe I received this letter late morning, maybe

1   early afternoon.

2   Q    How did you receive it?

3   A    I think someone on my staff brought it to me at first.

4   Q    Hard copy?

5   A    Yeah.  I think it was either e-mail or fax, yeah.

6   Q    What did you do upon receiving this letter?

7   A    I called the attorneys and instructed them to prepare to

8   file the bankruptcy case.

9   Q    Why do you believe this Chapter 9 filing was in the best

10  interest of the citizens of Detroit?

11  A    I believe that the city had been dealing with the issues,

12  as I said before, both on the creditors' side and some of its

13  city operations and work rules for a long time.  I believe

14  that they had been agreed -- the city and the state and then

15  the city officers and the state had agreed over a long period

16  of time to resolve some of these issues.  They had spelled

17  them out in detail; that for whatever reason they were not

18  being addressed in a timely fashion; that there are a number

19  of efforts and safeguards that the parties had agreed to to

20  redouble those efforts in specificity in the financial

21  stability agreement, Detroit Reform 1 and Detroit Reform 2;

22  that they failed to meet those obligations, so they started

23  to put milestones in place to try to achieve those

24  obligations.  Those were not met; that the city had gone

25  through between 2012 and 2013 essentially three different

1  reviews that had all gone from financial distress to
2  financial crisis to financial emergency; that upon my
3  appointment we were trying to look at some of those very same
4  issues.  We had specified to people that given this length of
5  time that those issues had been discussed, that after our
6  June 14th presentation we were going to take a certain period
7  of time to do evaluation for counterproposals, which we
8  thought were forthcoming; that they were not forthcoming;
9  that we were running out of time both in terms of what was
10 required in the statute and any reasonable period of time to
11 get through a bankruptcy filing; that I had to make a
12 difficult decision to try to resolve these issues once and
13 for all in a comprehensive and orderly way under the guise of
14 federal law so that they could be all resolved finally and
15 the city could move forward to deal with some of the
16 amazingly necessary reforms that have been agreed to by
17 everyone in the city for two years.
18 Q   Do you still believe that this bankruptcy filing is in
19 the best interest of the citizens of Detroit?
20 A   Yes.
21 Q   If the city isn't eligible for Chapter 9, what's next?
22 A   If the city isn't eligible for Chapter 9, there's either
23 free-fall crisis -- I mean this city -- and I'm certainly --
24 the people that live here have seen this.  This city for ten
25 years, from 2000 to 2010, lost a city the size of Romulus or

1   Wyandotte every year, 24,000 people on average.  That is

2   free-fall flight out of the city.  The services have degraded

3   to a point that they are severely substandard, and they are

4   apparent.  To put the city either back in the status quo,

5   which is clearly unacceptable -- and nobody of any serious

6   note disagrees with that.  No one says that we should go back

7   to the way it is.  No one says that our ability to meet our

8   creditors should continue to be deferred or we should borrow

9   more debt upon debt that for ten years averaged over a

10  hundred million dollars deficit; that we have $1.4 billion

11  that was supposed to resolve our pension obligations in 2005

12  and 2006.  No one says that's an adequate way to proceed.  If

13  we do not go through Chapter 9, this city --

14          MR. DECHIARA:  Objection, your Honor.

15          THE WITNESS:  -- will continue to fail.

16          MR. DECHIARA:  I would just object.

17          THE COURT:  What is your objection, sir?

18          MR. DECHIARA:  Speculation.  He's speculating about

19  events that are counterfactual and about the future.

20          THE COURT:  The objection is overruled.

21          MR. SHUMAKER:  Thank you, Mr. Orr.  That's all I

22  have.

23          THE WITNESS:  Yes, sir.

24          THE COURT:  All right.  Cross-examination.  Okay.

25          MR. ULLMAN:  Your Honor, may I tilt the lectern so

1  I'm more facing the witness?

2                          CROSS-EXAMINATION

3  BY MR. ULLMAN:

4  Q   Good morning, Mr. Orr.

5  A   Good morning, Mr. Ullman.

6  Q   Now, we've met before, haven't we?

7  A   Yes.  Yes, we have, several times.

8  Q   Twice, I think.  I'm going to -- just preliminarily let

9  me ask you a few questions.  Now, apart from a college

10 degree, do you have any degree other than a law degree?

11 A   No.

12 Q   You're not a CPA?

13 A   No.

14 Q   You're not an actuary?

15 A   No.

16 Q   Okay.  I believe you testified that you've been with

17 Jones Day since 2001; is that right?

18 A   2001 until March 15th, 2013.

19 Q   Okay.  So you were --

20         THE COURT:  Excuse me.  Would you point the

21 microphone more towards you?

22         MR. ULLMAN:  Is this better?

23         THE COURT:  Yes.

24         MR. ULLMAN:  Sorry.

25         THE COURT:  Thank you, sir.

```
 1              MR. ULLMAN:  Okay.

 2    BY MR. ULLMAN:

 3    Q    So you were a practicing attorney at Jones Day for about

 4    12 years prior to becoming the emergency manager; is that

 5    right?

 6    A    Yes.

 7    Q    And I think you indicated you were primarily in the

 8    bankruptcy and restructuring group?

 9    A    Yes, litigation at first and then bankruptcy and

10    restructuring.

11    Q    Right.  Now, you also mentioned that you'd been at the

12    U.S. Trustee's Office; is that right?

13    A    Yes.

14    Q    And that was from around 1995 through 2001, if I recall?

15    A    Yes.

16    Q    Okay.  And while you were there, did you ever serve as an

17    actual trustee in a bankruptcy case?

18    A    No.

19    Q    And prior to the U.S. Trustee's Office, I believe you

20    indicated you were at the RTC?

21    A    Yes.

22    Q    Okay.  And that would have been from about '92 to '95 if

23    I got the dateline right?

24    A    Yeah.  We originally came in as attorneys at FDIC.  We

25    were then assigned to RTC.  RTC then got authority to hire
```

1    its own attorneys, and I became an attorney at the RTC

2    proper.

3    Q    Okay.  So that's the general time frame, '92 to '95, that

4    you were there?

5    A    Yes.  '91 through '95.

6    Q    Okay.  And I believe you mentioned that while you were at

7    the RTC you served as the chief legal officer for a savings

8    and loan company that had a sub-subsidiary or holding company

9    called Landmark Land?

10   A    Yes.

11   Q    And you indicated that you ended up being responsible for

12   the disposition of the assets of that company?

13   A    Yes.

14   Q    Okay.  And those, I think you said, were golf courses and

15   country clubs?

16   A    There were a number -- golf courses, country clubs,

17   vacant land, financial assets, yes, number of assets.

18   Q    Okay.  And the golf courses and country clubs, of course,

19   are relatively high-value assets or --

20   A    Yeah.  They were at the time.

21   Q    And that was all around 18 years ago; is that right?

22   A    Whatever the math works out to, Mr. Ullman.

23   Q    Okay.  I think that's it.

24   A    Um-hmm.

25   Q    And is it correct that prior to becoming the emergency

1  manager, you never ran a city?

2  A    No.  Most governors haven't --

3  Q    Okay.

4  A    -- nor mayors.

5  Q    Okay.  And prior to becoming emergency manager, you never

6  had responsibility for budgeting all of the various

7  departments that are involved in running a city or a state;

8  is that right?

9  A    That is correct.

10  Q    And you've never been employed by a corporation, have

11  you, putting aside governmental like the RTC, in a private

12  company?

13  A    Well, there were times in college jobs that I was

14  employed by corporations, but do you mean --

15  Q    Well, after.

16  A    -- during my professional career?

17  Q    Yeah, in your professional career.

18  A    I've been an attorney, then in government, and then an

19  attorney again, yes.

20  Q    Okay.  And is it fair to say that other than being a

21  bankruptcy and restructuring attorney, you have no particular

22  expertise in finance?

23  A    Well, I've been either a litigator or a regulator, a

24  banking regulator, at FDIC, RTC, or an investigator when I

25  handled the Whitewater investigation on behalf of the RTC for

1   six years.  Whatever that amounts to is what it amounts to.

2   Q   Okay.

3   A   But are you saying do I have any particularized degrees

4   or certifications?

5   Q   I'm asking if you could answer my question, Mr. Orr,

6   because --

7   A   Sure.

8   Q   -- I really don't believe you did, and it was -- the

9   question was simply whether it's fair to say that other than

10  being a bankruptcy and restructuring attorney, you have no

11  particular expertise in finance?

12  A   That's a broad question, but I'll grant you this.  That's

13  what I've been throughout the balance of my career.

14          THE COURT:  Excuse me one second.  I need you to

15  move back from the microphone just a bit.

16          MR. ULLMAN:  Okay.

17          THE COURT:  Maybe not that much.

18          MR. ULLMAN:  Okay.

19          THE COURT:  Go ahead.

20  BY MR. ULLMAN:

21  Q   Okay.  So is the simple answer to my question "yes," that

22  what I said is true?  That would be a fair statement?

23  A   If that's your characterization -- and I don't mean to

24  joust with you, Mr. Ullman, but I think that accomplishes a

25  number of things, but to move forward, I'll say your question

1   a fair representation.

2   Q    Thank you.  Let's go back to your time at Jones Day.

3   Now, you indicated you were there as of 2012.  Yes?

4   A    Yes.

5   Q    Okay.  And Jones Day, of course, is the restructuring and

6   bankruptcy counsel to the city, of course; right?

7   A    Yes.

8   Q    And we know that Jones Day got that work following a

9   pitch that it made to various representatives of the city and

10  the State of Michigan in January 2013; is that right?

11  A    That is correct.

12  Q    And you were part of the Jones Day pitch team at that

13  time?

14  A    Yes, I was.

15  Q    And is it correct that one of the things that Jones Day

16  was pitching at that meeting, at that presentation was its

17  expertise and experience in municipal bankruptcy work?

18  A    I think that's a fair statement.

19  Q    And Jones Day prepared a pitch book, did it not?

20  A    Yes, we did.

21          MR. ULLMAN:  Can we put Exhibit 418 on the screen,

22  which is the common exhibit 418?

23  BY MR. ULLMAN:

24  Q    And what we have here is the cover of that pitch book;

25  correct?

1   A   I believe so.

2   Q   And you were engaged in -- or you participated and took

3   part in the preparation of this pitch book; right?

4   A   Yes, to some degree.

5   Q   And among other things, this pitch book laid out Jones

6   Day's thoughts and insights on subjects, including municipal

7   bankruptcy; is that right?

8   A   Yes, I believe so.

9   Q   Okay.  And it also addressed issues relating to the

10   appointment of an emergency manager; is that true?

11   A   Yes, I believe it did.

12   Q   Okay.  And is it correct that the thoughts and insights

13   prepared by the Jones Day pitch team and addressed in this

14   pitch book included the possibility of a Chapter 9 bankruptcy

15   filing made by the emergency manager?

16   A   Yes, I believe it did.

17   Q   Okay.  And is it also the case that the Jones Day

18   thoughts and insights specifically included using the

19   backdrop of a bankruptcy filing, a Chapter 9 filing, as a

20   tool for gaining leverage with creditors?

21   A   I think it certainly contained -- if you're talking about

22   the presentation, it certainly contained the potential pros

23   and cons of Chapter 9, yes.

24   Q   Okay.

25          MR. ULLMAN:  And could we put up page 15?

1  BY MR. ULLMAN:

2  Q   Okay.  And so there's no question that it talked about

3  that specifically.  This is page 15.  The heading you see is

4  "Impact of Possible Emergency Manager Appointment."  Do you

5  see that?

6  A   Yes.  Thank you for putting up the page.  If that's what

7  you're talking about, that's what it says.

8  Q   And the third bullet talks about the ability to commence

9  a Chapter 9 filing quickly if warranted?

10  A   If warranted, yes.

11  Q   And the next bullet point talks about how that can create

12  negotiating leverage, as they phrased it here, negotiating

13  with the backdrop of bankruptcy; is that right?

14  A   Yes.

15  Q   Okay.  And that's one of the points that the Jones Day

16  team was making to the city and the state at this January

17  presentation; correct?

18  A   Yes.  That's a point I echoed during my June 10th

19  presentation.

20  Q   Okay.  And the Jones Day team also referred to this as,

21  quote, "negotiating in the shadow of Chapter 9."  Is that

22  another phrase that you recall being used?

23  A   It may have been used.  This says "negotiating with the

24  backdrop of bankruptcy," but "shadow," "backdrop,"

25  essentially the same.

1  Q   Okay.  And if we turn to page 17 of this presentation, we

2  see right down there in the arrows that are following the

3  third bullet, "negotiating in the shadow of Chapter 9";

4  right?

5  A   Yes.  It's essentially the same.

6  Q   That's spelled out expressly, isn't it?

7  A   Yes.  Shadow, backdrop.

8  Q   And is it fair to say that Jones Day was recommending the

9  use of Chapter 9 as a threat in dealing with creditors?

10  A   Your question implicates a threat.  We will stand by --

11  or, rather, we were trying to say here that this was an

12  alternative, as I said at June 10th.

13  Q   Okay.  So you'd rather stand by what's said in the pitch

14  book; is that right?

15  A   Sure.

16  Q   Okay.  Well, let's go to page 18 of the pitch book.

17  Okay.  And I'd like you to focus on the third paragraph, if

18  we can highlight, and it says, "Creditors understand that a

19  troubled municipality has greater leverage in a Chapter 9

20  case.  Accordingly, developing an out-of-court restructuring

21  plan that can later be implemented in Chapter 9, if

22  necessary, can create leverage in favor of a negotiated

23  deal."  It goes on and then says, "This is particularly the

24  case if an emergency manager is appointed because the threat

25  of a Chapter 9 filing -- threat of a Chapter 9 filing,

1  including potential moratorium on payments, will be more

2  tangible and possibly even more imminent."  Did I read that

3  correctly?

4  A   Yes, you did.

5  Q   Okay.  And didn't Jones Day, in fact, say that having a

6  viable threat of Chapter 9 was critical to Detroit's being

7  able to restructure its debt?

8  A   If that's in the document, yes, that's what we said.

9  Q   Okay.  And just so we can confirm whether it is or not,

10 let's look at page 46.  And if we look at the first bullet

11 point right on the top, that's exactly what it says, isn't

12 it?

13 A   Yes.

14 Q   So there's no question this is what Jones Day was telling

15 the city and state in January of 2013?

16 A   Yes.  It's in the document.

17 Q   And is it correct that Jones Day was also specifically

18 recommending Chapter 9 as a way for Detroit to avoid payment

19 of vested pension benefits?

20 A   I believe we were recommending possibly filing a Chapter

21 9 as a way to avoid a number of things, included pension

22 rights.

23 Q   Okay.  And isn't it correct that the Jones Day team

24 specifically told the city that, in their view, Chapter 9

25 could, in fact, be potentially used to get out of accrued

1   financial benefits that were otherwise protected under the

2   Michigan Constitution?

3   A    You mean in the document?

4   Q    The document.

5   A    Yeah, I believe so.

6   Q    And just so we can see whether that's right or not, can

7   we look at page 41?  And, in fact, that language appears

8   there in what I've just highlighted; isn't that right?

9   A    Yes.  I said so.

10  Q    Okay.  Now, is it correct that the reference that we've

11  just seen here that's still on the screen where it says

12  cutting back or compromising the phrase "accrued financial

13  benefits otherwise protected under the Michigan

14  Constitution," that that's referring to accrued financial

15  benefits that are protected under what's known as the pension

16  clause of the Michigan Constitution?

17  A    I believe so.

18  Q    Okay.  And were you aware of the -- and just for clarity,

19  the pension clause is Article IX, Section 24, of the Michigan

20  Constitution?

21  A    I believe that's the appropriate section.

22  Q    Okay.  And were you aware of the pension clause prior to

23  becoming the emergency manager?

24  A    Yes.

25  Q    Okay.  And on becoming emergency manager, you took an

1  oath, didn't you?

2  A   Yes, I did.

3  Q   Okay.  And I'm going to read you something.  I'd like you

4  to tell me whether it's correct that this is the oath you

5  gave.  Quote, "I do solemnly swear that I will support the

6  Constitution of the United States and the Constitution of

7  this state and that I will faithfully discharge the duties of

8  the Office of Emergency Financial Manager, City of Detroit,

9  according to the best of my ability."

10  A   I believe that's the oath I took, yes.

11  Q   And were you speaking truthfully when you gave that oath?

12  A   Yes.

13  Q   And I believe you've previously indicated that you

14  understood that that same oath applied to your conduct as

15  emergency manager as well; is that right?

16  A   I believe so.

17  Q   And I believe you've testified that upon becoming the

18  emergency manager, you set about formulating a restructuring

19  plan -- let me withdraw that.  I guess on becoming emergency

20  manager, you first put together a plan that showed the

21  financial situation of Detroit and also made some

22  observations or recommendations as to what you believe needed

23  to be done; is that right?

24  A   Yes.

25  Q   Okay.  And that's the May 12th document that we looked at

1  earlier.

2  A    The May 12th financial and operating plan.

3  Q    Right.

4         MR. ULLMAN:  And let's put the first page of that on

5  the screen.

6  BY MR. ULLMAN:

7  Q    Okay.  I'm just going to ask you a few questions about

8  this.  If we can go to page 21 -- and just to give the

9  context, I think you've already testified this morning that a

10  lot of this document was spent detailing what you perceived

11  to be the financial situation of Detroit as it stood after

12  you assumed your post as emergency manager; right?

13  A    Yes.  I believe that's correct.

14  Q    Okay.  And is it correct that as part of the initial

15  review that you did, which was -- which culminated in the

16  document that we have on the screen, which is Exhibit 407,

17  that you made a determination that, in your view, accrued

18  rights to pensions -- to pension benefits had to be cut?

19  A    I think it's fair to say that we came to that conclusion,

20  yes.

21  Q    Okay.  And you had come to that as of May 12th, 2013, the

22  date of this operating plan and proposal; is that right?

23  A    I think as of May 12th we made a representation that all

24  stakeholders would have to be adjusted, yes.

25  Q    Okay.  So that we're clear, that at this point in time

1    you had made the determination that, in your view, vested

2    pension benefits of Detroit's retirees had to be cut back; is

3    that right?

4    A    I think that's a fair characterization of what we're

5    saying.

6    Q    Okay.  And at the time that you made that determination,

7    you said you were aware of the pension clause in the Michigan

8    Constitution?

9    A    I think I said -- yes.

10   Q    Okay.  So you were aware at the same time that you made

11   that determination that the pension clause specifically

12   provided against the diminution or impairment of accrued

13   financial benefits?

14   A    Well, that's a conclusion.  I think you'll remember, Mr.

15   Ullman, during my deposition I said that, you know, we might

16   either have concessions or we might have to go Chapter 9, but

17   I think your characterization is fair one way or the other.

18   Q    Let's turn now to the proposal that you made to

19   creditors.  That's the June 14 proposal.

20             MR. ULLMAN:  Let's put the first page on the screen.

21   BY MR. ULLMAN:

22   Q    And this is -- what we have here is common Exhibit 408.

23   It's just a different -- I think you were shown this earlier

24   today.  I think the city used its exhibit number.  We have

25   the same document, just a different exhibit number --

1    Q    Yeah.

2    A    -- but it's the same.

3    A    If you tell me it's the same thing, that's fine.

4    Q    It's the same. Okay. Now, this, of course, is the

5 proposal that you made to creditors in June -- on June 14,

6 2013.

7    A    Yes.

8    Q    And I believe it states expressly in here that, in your

9 view, there have to be significant cuts to vested pensions;

10 is that right?

11    A    I believe so.

12    Q    Okay. And just so we can see that, if we look at page

13 109 -- right -- we see the phrase that there must be

14 significant cuts in accrued vested pension amounts for both

15 active and currently retired persons; correct?

16    A    Yes.

17    Q    Okay. And is it correct that under this proposal, it

18 shows current employees being switched to a defined

19 contribution plan?

20    A    That was our suggestion, yes.

21    Q    Okay. And that would be a totally new plan from the one

22 that had been in effect up to this point in time; is that

23 right?

24    A    We would be going from a defined benefit plan to a new

25 defined contribution plan, yes.

1  Q   And is it correct that under the June 14 proposal there

2  would be some ongoing pension contributions for active

3  employees under the new defined contribution plan but no

4  pension contributions for active employees on account of

5  pension benefits that were already vested?

6  A   I think so.  In other words, you're talking about closing

7  the plan --

8  Q   Yeah.

9  A   -- the current plan?  Yes.

10  Q   Okay.  So for the vested pension benefits, the

11  contributions for those would be cut entirely for actives; is

12  that right?

13  A   I think the plan would be closed.  I don't know if they'd

14  be cut in the entirety, but what you mean -- there would be

15  benefits under the existing plan that would continue to be

16  paid out in some portion.

17  Q   Well, what I meant is that under this proposal, it shows

18  the city not making any more pension contributions for active

19  employees for vested pension rights; is that true?

20  A   Yeah.  I think we switched to a different plan and would

21  make contributions for a defined contribution plan as opposed

22  to defined benefit plan.

23  Q   All right.  And under the defined benefit plan, the

24  vested benefits, no more contributions being made by the

25  city?

1    A    It would be a different plan.  That is correct.

2    Q    And is it correct that under the June 14 proposal the

3    pension contributions for retirees would be cut in their

4    entirety?

5    A    You know, Mr. Ullman, you keep saying "cut in their

6    entirety."  I don't want to give the wrong impression that

7    somehow there'd be no pensions under the prior plan.  When

8    you say "cut in the entirety" --

9    Q    Let me --

10   A    -- if you mean -- let me finish my thought -- if you say

11   "cut in their entirety," you mean that that plan would no

12   longer continue, then your statement is accurate.

13   Q    Well, I think what I was asking about was the pension

14   contributions which are made by the city.  The city would

15   stop making pension contributions for retirees; correct?

16   A    For retirees?

17   Q    For retirees.

18   A    Yes.

19   Q    I've turned -- I'm asking about retirees now.

20   A    Yes.

21   Q    So what I said is true, that the pension contributions

22   that had previously been made by the city on account of

23   retirees are shown under this proposal as being cut in their

24   entirety; right?

25   A    The city would no longer make contributions.  Here again,

1  for purposes of public concession, I don't want to say there

2  are not going to be pensions for retirees.  That's the only

3  difference.

4  Q   Okay.  So we're clear, I am not saying that there would

5  not be some ongoing pension amounts paid because of funds

6  that were already there.  I'm talking about contributions for

7  vested pensions being made by the city.  Under this proposal,

8  those are over; right?

9  A   With that clarification, yes.

10  Q   Okay.  And is it also correct that this proposal is

11  showing health benefits for retirees being cut entirely; in

12  other words, under the financials that are shown in this

13  proposal, there's no more line item showing that the city is

14  going to be paying out health benefits for retirees?

15  A   Well, it shows that the current benefit plan will be cut.

16  There will be payments made to some retirees with a stipend,

17  either 120 or $125 a month, but that plan will be cut, yes.

18  Q   Okay.  I was asking specifically about this document.  Is

19  there anything in this document that shows anything other

20  than the health benefit payments to retirees being cut?

21  A   No, but I want to be clear on the record and also clear

22  for the public.  The fact that it's not in this document

23  doesn't mean that that hasn't evolved, so let's not give a

24  bad impression.

25  Q   Mr. Orr --

1  A    The reality -- let me finish my thought.  The reality is

2  your statement is correct under this plan, but that has

3  evolved, and you know that.

4  Q    Mr. Orr, I would request that you confine your answer to

5  asking -- your answer to responding directly to my

6  question --

7  A    Um-hmm.

8  Q    -- as opposed to volunteering information or providing

9  extraneous information.

10        MR. ULLMAN:  Your Honor, if you could ask the

11  witness simply to respond, things would go more quickly.

12        THE COURT:  Please just respond to the question.

13        THE WITNESS:  Yes, your Honor.

14        MR. ULLMAN:  Thank you, your Honor.

15  BY MR. ULLMAN:

16  Q    So my question was that what's shown in this June 14

17  proposal shows healthcare payments that otherwise or in the

18  past had been made by the city to retirees being cut

19  completely; true?

20  A    Yes.  We would close a defined plan and change to a

21  different plan, yes.

22  Q    We're talking about healthcare.

23  A    Yeah, I understand.

24  Q    Okay.

25  A    I'm just saying -- I'm using those terms, yes.

1   Q   And so we're really clear, does this -- this specific
2   document, this June 14 proposal, actually show the city in
3   the future making any payments to retirees on account of
4   healthcare?
5   A   I don't believe it's contained in this document.
6   Q   Thank you.  And is it correct that under this proposal,
7   the June 14 proposal, that all the retirees would get is some
8   share of the notes that the -- the $2 billion or so in notes
9   that the City of Detroit would be issuing?
10  A   Yes.   That was the proposal.
11  Q   And is it correct that under the June 14 proposal,
12  there's no way to tell how much in cash value any retiree
13  would actually get if this proposal were accepted or
14  otherwise went through?
15  A   No.  The proposal was a proposal, and we asked for
16  responses, so, no --
17  Q   Again --
18  A   -- in the proposal there's no way to tell.
19  Q   Yeah.  If you could just answer the question, Mr. Orr,
20  I'd appreciate it.
21  A   I was doing that.  Under the proposal the answer is yes.
22  Q   Okay.  "Yes" in the sense that there is no way that
23  anyone would know -- there's no way to tell how much the
24  retirees would get in cash value; is that correct?
25  A   I think that's fair.

1  Q   Okay.  Now, this is June of 2013 that we're talking,

2  right, this proposal?

3  A   Yes, June 14th, 2013.

4  Q   And at this point in time, did you have any ability as

5  the emergency manager to actually impose the cuts on pension

6  benefits that we've shown are reflected in this proposal if

7  the retirees did not agree to it?

8  A   Unilaterally?

9  Q   Yes.

10  A   I want to be responsive.  I think it's fair to say --

11          THE COURT:  If you can't answer the question "yes"

12  or "no," just say that.

13          THE WITNESS:  Okay.  Please repeat your question.

14  BY MR. ULLMAN:

15  Q   As of this point in time -- and we're talking June 14,

16  June 2013 -- did you have any ability as the emergency

17  manager to actually impose the cuts on pension benefits that

18  are reflected in this proposal that we've discussed if the

19  retirees did not agree to it?

20          THE WITNESS:  Your Honor, that may call for a legal

21  conclusion, and I don't want to be evasive.

22          MR. ULLMAN:  I'm not --

23          THE WITNESS:  Pardon me.

24          MR. ULLMAN:  I'm not asking for his legal

25  conclusion.  I asked him what he believed, what he understood

1  his authority to be as emergency manager.

2          THE WITNESS:  Let me say this, Mr. Ullman.  I

3  believe that my authority under 436 by itself would not give

4  me that authority.

5  BY MR. ULLMAN:

6  Q   Is the answer to my question then "no"?  It's not that

7  tough.

8  A   No, it's not, but it implicates other things, but I'll

9  give a "no" --

10          THE COURT:  Well, I would say it's an extremely

11  tough question.

12          THE WITNESS:  Yeah.  I mean it --

13          MR. ULLMAN:  I never argue with the Court, your

14  Honor.

15          THE COURT:  I've got mountains of briefs to prove

16  it.

17          THE WITNESS:  Yeah.

18  BY MR. ULLMAN:

19  Q   But, again, Mr. Orr, we're just talking as of June 2013.

20  A   I understand the time frame we're talking, Mr. Ullman,

21  but the reason I'm -- I'm not trying to joust with you here.

22  The reason I'm trying to not follow your question with a

23  simple "yes" or "no" answer is because that's a large debate

24  as to what's required under 436, whether or not the

25  provisions of 436 somehow can be trumped or implicated by the

1  Constitution, and whether or not there's a federal law
2  overlay, so I want to be very careful.  I understand what
3  you're trying to ask me --
4  Q   Let me --
5  A   -- but -- let me finish my thought, please.  I understand
6  what you're trying to ask me, but I'm trying to relay to you
7  that it's a much more complex question.
8  Q   Okay.  And I'm specifically asking as of the June 2013
9  time frame because at this point in time the Chapter 9
10  petition had not been filed.
11  A   Yes.
12  Q   Okay.  So at this point in time, when the Chapter 9
13  petition had not yet been filed, did you have the ability, as
14  you understood it, as emergency manager, to actually impose
15  the cuts on the pension benefits that are reflected in this
16  proposal if the retirees did not agree to it?
17  A   I don't know.
18      MR. SHUMAKER:  I'm going to object.  Calls for a
19  legal conclusion.
20      THE COURT:  That objection is overruled.
21      THE WITNESS:  Yeah.  I don't know.
22  BY MR. ULLMAN:
23  Q   And did you address that question?  Did you analyze it?
24  A   Yes.
25  Q   Okay.  And did you take into account in your analysis the

1  pension clause?

2  A   Yes.

3  Q   Okay.  And isn't it correct that you understood that as

4  of June '13, again, prior to the Chapter 9 filing, that you,

5  as emergency manager, during that time frame, did not have

6  the ability to actually impose the cuts on pension benefits

7  if the retirees didn't agree?

8  A   I don't know.

9  Q   Okay.  Did you obtain legal advice on that from Jones

10  Day?

11  A   Yes, from a number of different sources, yes.

12  Q   Okay.  And what did Jones Day tell you?

13         MR. SHUMAKER:  Objection, your Honor.  Calls for

14  attorney-client communications.

15         MR. ULLMAN:  Fair enough.

16         THE COURT:  All right.  The objection is sustained.

17  BY MR. ULLMAN:

18  Q   Isn't it correct, Mr. Orr, that absent a consensual

19  resolution, the only way that the proposal set out in the

20  June 14 document could be implemented, if at all, was in the

21  context of a Chapter 9 filing?

22  A   No.  I don't know if that's correct.

23  Q   Okay.  And what other avenues did you think were

24  available to you, if any, again, putting aside a consensual

25  resolution or a Chapter 9 filing?

1  A   A court might conclude that under 436 I would have the

2  authority to achieve those results.

3  Q   Okay.  So was it your contention that under PA 436 you

4  were authorized without a Chapter 9 filing to take actions

5  that were in contravention of the pension clause of the

6  Michigan state Constitution?

7  A   Mr. Ullman, you're trying to get at this a different way.

8  Here again, there are a number of different potential legal

9  outcomes, and I want to be very careful.  Let me help you, if

10 I can, to try to move along.  Okay.  A bland reading of the

11 statute might get to your conclusion, but that ignores a

12 number of different factors that have to be analyzed and

13 concluded possibly by a court.

14 Q   I'm just asking your position, Mr. Orr.  Was it your

15 position, again, in the June 2013 time frame, that you had

16 some -- that the authorization that you had, the powers you

17 had under PA 436 enabled you to take actions that were in

18 contravention of the pension clause of the Michigan state

19 Constitution?

20 A   It's my position that 436 might have given me that

21 authority.

22 Q   Okay.  And is it -- was it your position that the state

23 legislature could amend the state Constitution simply by

24 enacting legislature -- or legislation that authorized state

25 actors to do things in contravention of the pension clause?

1  A    I don't know the answer to that question, Mr. Ullman.

2  That's a legal issue.

3  Q    Okay.  Now, nothing in -- but it was, nonetheless, your

4  position that you thought you could do things that were

5  specifically prohibited by the pension clause of the Michigan

6  Constitution; is that right?

7  A    That's a conclusion that you're making.  What I'm trying

8  to say to you is those were a number of legal issues that

9  were being analyzed, and sitting here today, I don't know

10 what the exact answer is.

11 Q    Okay.  Now, nothing in this document, this June 14

12 proposal, acknowledges -- well, let me ask you this question.

13 In the course of your analysis on that issue, did you

14 identify any case law that indicated to you that the

15 emergency manager had powers under PA 436 to take actions

16 that were prohibited by the Michigan Constitution?

17 A    Mr. Ullman, I'm not acting as an attorney in this job,

18 so, no, I did not identify any case law.

19 Q    Okay.  Is there any other authority that you can identify

20 that you recall having looked at?

21 A    Without getting into the content of the discussions,

22 there are discussions that I had with attorneys, but I would

23 not have done that research.

24 Q    Okay.  So I take it then at this point in time, the

25 implications and the restrictions of the pension clause in

1   the Michigan Constitution were something that you were

2   specifically focused on; is that right?

3   A   I was aware of it, yes.

4   Q   And you were aware that that was something that,

5   depending on how things ultimately turned out, could be

6   interpreted to prohibit your taking action that diminished or

7   impaired accrued financial benefits that were due to

8   retirees?

9   A   Yes.  I think that's a fair statement.

10  Q   Now, there's nothing -- going back to the June 14

11  proposal, is there -- we've talked about the effect that the

12  restructuring that's shown in here would have on the

13  pensions.  Is there anything in this June 14 proposal that

14  acknowledges that accrued pension benefits are protected

15  under the Michigan state Constitution?

16  A   I don't think so.

17  Q   Okay.  Now, I think you made some reference in your

18  testimony to how potentially there could be, you know,

19  thousands of individual retirees that might be affected by

20  this?

21  A   I think there are thousands of individual retirees.

22  Q   And you said that in theory -- at least in theory they

23  could come and make proposals or talk to you about this June

24  14 proposal; is that right?

25  A   Well, what we said was any party could come and make a

1    proposal, but we asked the unions early on would they

2    represent retirees.  They declined to do so, and so we said

3    we needed a Retiree Committee.

4    Q    Mr. Orr, you're really going well beyond what I asked

5    you, so I would just appreciate if you'd focus on my question

6    and answer it.  If you think my question is confusing, let me

7    know, and I'll be glad to rephrase it.

8    A    No.  I'm just trying to give you a complete answer.

9    Q    Okay.  And I just -- I would appreciate if you'd give me

10   an answer to the direct question.

11   A    I will.

12   Q    So, now, with respect to the retirees, you understood

13   that this was a document the retirees themselves,

14   individuals, might well have access to and look at?

15   A    We put it on the website, yes.

16   Q    Okay.  And you understand that retirees -- individual

17   retirees are not necessarily fully aware of all of the legal

18   provisions that exist in the State of Michigan?

19   A    Some may be; some may not be.

20   Q    Okay.  And given that you envisioned that this document

21   might be read by individual retirees, you still didn't see

22   fit anywhere in here to mention that one of the things this

23   proposal was doing, if it went through, is taking away

24   pension rights that were protected under the Michigan

25   Constitution?

1   A   I think we made a proposal and were offering solutions.

2   The proposal is what it is.

3   Q   Um-hmm.

4   A   I think the issue of retiree benefits had been fairly

5   widely discussed in a number of different forums.

6   Q   Um-hmm.

7   A   I think anybody could have come in with a

8   counterproposal.

9   Q   Okay.  And so in the interest of complete disclosure and

10  putting all the things on the table, you still didn't feel it

11  either necessary or appropriate to mention anywhere in

12  this -- is it a hundred-some-odd-page document that one of

13  the things that the proposal was proposing to take away were

14  pension rights that were specifically protected under the

15  Michigan Constitution?

16  A   I think we said that in the highlighted portion.

17  Q   That the pension rights were protected under the Michigan

18  Constitution?

19  A   No.  I think there must be significant cuts in accrued

20  vested pension rights.

21  Q   That wasn't my question.

22  A   If you're trying to get to the point as whether or not we

23  should have -- we should have said Michigan Constitution, I

24  think that was discussed quite broadly throughout this time

25  period.

1  Q   You're really still not answering my question, Mr. Orr.

2  Given the fact that in this document, this some -- hundred-

3  some-odd-page document that you said could be, you know, seen

4  and reviewed by retirees, and given that this document -- the

5  proposal, if it went through, would be taking away protected

6  pension benefits, you didn't see fit anywhere in here to

7  mention at all, even in passing, that the pension rights that

8  this proposal shows as being cut in their entirety were

9  specifically protected under the Michigan Constitution?

10 A   The protections of the Michigan Constitution are not

11 contained in this document.

12 Q   And you didn't think that's something that ought to be

13 mentioned, did you?

14 A   I think everybody knew that, Mr. Ullman.

15 Q   Okay.  So you didn't believe that that was something you

16 thought you needed or felt appropriate to mention in this

17 document; correct?

18 A   Mr. Ullman, it was quite public at that time that the

19 attorney general had taken a position on that point.  I think

20 everybody was aware of it.

21 Q   Okay.  And in light of that, is that the only reason you

22 didn't see fit to mention it?

23 A   No.  I think we mentioned what our proposal was, and

24 whether or not the intent to include the Constitution was a

25 decision that we made.

1    Q    Now, Chapter 9 isn't mentioned anywhere in this June 14
2    proposal either, is it?
3    A    I don't believe so.
4    Q    And isn't it correct that this proposal was made against
5    the context that if an agreement on the proposal wasn't
6    reached, the city would, in fact, be filing for Chapter 9?
7    A    I think I said on June 10th that I had a powerful
8    statute; that we have another powerful tool called Chapter 9,
9    but I don't want to use it, but we're going to have to make
10   some difficult decisions.
11   Q    So to go back to my question, is it correct that this
12   proposal was made against the context that if agreement on
13   the proposal wasn't reached, the city would file for Chapter
14   9?
15   A    No.
16   Q    Okay.
17   A    What we said was that the proposal was a proposal, and we
18   were looking for counteroffers and that we were going to have
19   to make some evaluations within the next 30 days; if we had
20   received agreements in principle and the like, we perhaps
21   might extend that, but the proposal does not say that if we
22   don't receive those agreements, we're going to file Chapter
23   9.
24   Q    Well, hadn't you publicly stated around this time that
25   the June 14 proposal -- around the time the June 14 proposal

1    was made that you intended to try to use Chapter 9 to try to
2    trump the state Constitution?
3    A    I think what I said at that time was that we had powerful
4    tools, as I said before on June 10th.  Chapter 9 was one of
5    them, but I didn't want to use it.
6    Q    Okay.  And didn't you state that one of the -- that the
7    state Constitution provision that you were trying to trump
8    was the pension clause?
9    A    I think I may have said at some point, either that time
10   or before, that I felt federal law would trump state law.
11   Q    Yeah.  Do you remember at your deposition I asked you
12   some questions about an interview you gave on June 14?
13   A    Yes, I believe you did.
14   Q    Okay.
15   A    I don't remember exact -- if you want to refresh my
16   recollection.
17   Q    Were you testifying truthfully when you gave your
18   testimony?
19   A    Yes.
20   Q    Okay.  And do you recall giving the following testimony
21   when I deposed you about one of the -- some of the things you
22   said on June 14?
23           MR. ULLMAN:  Do we have the clip?  It's around lines
24   113.
25           (Videotape of deposition at 11:19 a.m. as follows:)

1  BY MR. ULLMAN:

2           "You gave an interview that I'm sure you're

3           familiar with with the <u>Detroit Free Press</u> on or

4           around June 14th.  Do you remember?  I'll just tell

5           you what I believe you said, and you can tell me --

6           I'm sure you remember this one, and you can tell

7           me -- if not, I have the quote.

8           Yeah.  You can give me the quote.  There's so

9           many interviews, but I'll trust your quote.

10          Okay.  This is the quotation.

11          'Question:  You said in this report, referring

12          to the June 14th proposal, that you don't believe

13          there is an obligation under our state Constitution

14          to pay pensions if the city can't afford it.

15          Answer:  The reason we said it that way is to

16          quantify the bankruptcy question.  We think federal

17          supremacy trumps state law.'

18          Yes.

19          Okay.  You don't deny making that statement?

20          No.  I think I've said that several times.

21          Okay.  And the state law you were referring to

22          that you referred to as being trumped was Article

23          IX, Section 24, of the state Constitution; is that

24          right?

25          I believe so."

1       (Videotape concluded at 11:20 a.m.)

2   Q   Do you recall that testimony, Mr. Orr?

3   A   Yes, I do.

4   Q   Now, we're talking here -- this is June 14, the date of

5   your proposal.  Now, can you tell me -- refresh my

6   recollection.  I think you mentioned, but when exactly was it

7   that you had given your oath to uphold the Michigan

8   Constitution?

9   A   I think it was March 25th.

10  Q   Okay.  So that was within 90 days of June 14th; is that

11  right?

12  A   Yes.

13  Q   Now, prior to the June 14 proposal, did you make any

14  inquiries as to the size of the unfunded pension liability?

15  A   Yeah, I believe we did.

16  Q   Okay.  And who did you ask?

17  A   I believe I asked our consultants, principally Conway,

18  Ernst & Young, the entire crowd.

19  Q   Okay.  And who from Conway?

20  A   There are a number of people from Conway.  That team is

21  led by Chuck Moore, but I may have talked with Chris Gannon

22  and others.  We had regular conversations.

23  Q   Okay.  And the amount of the -- the size of the unfunded

24  pension liability isn't something that you have any personal

25  knowledge of, is it?

1  A    No.  Those calculations are made both by Gabriel, Roeder

2  and Milliman's review of Gabriel, Roeder's information, and

3  since Milliman has made an independent calculation.

4  Q    Okay.  Mr. Orr -- and I believe my question really called

5  for a "yes" or "no."  I simply asked whether the unfunded

6  pension liability was something you had personal knowledge

7  of.

8  A    Okay.

9          MR. SHUMAKER:  Again, your Honor, if he --

10         THE WITNESS:  Well --

11         MR. SHUMAKER:  -- could just say "yes" or "no" where

12  appropriate.

13         THE WITNESS:  But to the extent I've read the

14  reports, I have personal knowledge.

15         THE COURT:  Hold on.  I've been --

16         THE WITNESS:  Oh, I'm sorry.

17         THE COURT:  I've been asked to do something here.

18  The question is ambiguous, and I'm going to ask you to

19  rephrase it.

20         MR. ULLMAN:  Okay.

21  BY MR. ULLMAN:

22  Q    Did you have personal knowledge, based on work that you

23  yourself had done, analysis you yourself had done, as to the

24  size of the unfunded pension liability?

25  A    No.

1  Q   And, now, you indicated that you made inquiries as to the

2  size of the unfunded pension liability prior to making the

3  June 14 proposal; right?

4  A   Yes, I believe so.

5  Q   Okay.  And was there any further work on the actuarial

6  analysis that you recall being brought to your attention

7  between June 14th and the date of the Chapter 9 filing?

8  A   Yes.

9  Q   And what was the subsequent work that you recall being

10  done?

11  A   I don't remember the exact dates, but the basic

12  chronology was that Gabriel, Roeder, as part of the 2012

13  report, had done an analysis; that Milliman had done an

14  analysis of Gabriel, Roeder's work, and that Milliman either

15  was in the process of doing its own independent analysis or

16  had completed that.

17  Q   Okay.  Do you recall -- do you recall hearing a figure

18  for the unfunded pension liability of 3.5 billion at any

19  point in time?

20  A   Yes.

21  Q   When do you recall first hearing that?

22  A   I don't recall the exact date that I first heard that,

23  but I remember we had discussions in May, I believe.

24  Q   I'm sorry.

25  A   In May.

1  Q    In May.  Okay.  And was that prior to the filing of the

2  May 12th report that we looked at previously?

3  A    Yes, I believe so.

4  Q    Okay.  And as of May then -- that May report, based on

5  what you were told, did you believe that the 3.5 billion was

6  an accurate figure for the unfunded pension liability?

7  A    Yes.

8  Q    And did anything change on that between May and June 14?

9  A    No, I don't think so.

10 Q    Okay.  And did you -- did what you wrote in the May 12th

11 report accurately reflect the state of your knowledge as of

12 that date regarding the size of the unfunded pension

13 liability?

14 A    Yes.

15 Q    Okay.  So if we can turn back to Exhibit 407 -- okay.

16 Now, do you recall at the time that this proposal -- or this

17 report was written, do you recall whether this 3.5 billion

18 figure was being reported to you as something that was

19 preliminary in nature and not yet final or something that was

20 hard-fast and accurate?

21 A    I think we felt at this time that that was an accurate

22 analysis of the amount of the unfunded pension liability, but

23 we certainly had said throughout that time that there were

24 factors that went into that calculation that would be subject

25 to discussion.

1  Q   Um-hmm.  So at this point in time, was it your

2  understanding that as a fact the liability -- the unfunded

3  liability was $3.5 billion and has been determined to be that

4  figure by the Milliman actuarial firm?

5  A   Yes.  Based upon reasonable calculations, yes.

6  Q   Okay.  So if we look at page 3 of this document -- okay.

7  In the first full paragraph I'd like you to focus on the last

8  sentence.

9  A   Yes.

10  Q   Okay.  It goes on.  It says, "In addition, the city's

11  pensions are underfunded by at least 0.6 billion and perhaps

12  significantly more once appropriate actuarial assumptions and

13  current data are considered."

14  A   Yes.

15  Q   Was that an accurate reflection of the state of how you

16  understood things to be regarding the unfunded pension

17  liability as of the date this document was written?

18  A   Yes.  I think at that time we thought it was at least 600

19  million but probably more once you consider certain factors.

20  Q   Okay.  And, in fact, this one says "perhaps significantly

21  more"; correct?

22  A   Yes.  As I said, I don't remember the exact dates that we

23  were getting the calculations in, but we were looking over

24  the reports that had been made by Gabriel, Roeder and doing

25  our own analysis.

1    Q    Um-hmm.  And if we look at page 37 -- okay.  And if we

2    look at the top paragraph, there's a sentence that begins,

3    "As of June 30."  Do you see that?  We can pull that out,

4    just the "As of June 30" sentence.

5    A    Yes.

6    Q    All right.  And what that says is, "As of June, 30, 2011,

7    the most recent actuarial reports provided to the city by the

8    pension funds showed the pension UAAL" -- that's unfunded

9    actuarially accrued liabilities; right?

10   A    Yes.  And to be accurate, I think you have to read the

11   sentence right after that as well.

12   Q    I haven't -- I'm planning to.

13   A    Good.

14   Q    I just wanted to clarify what UAAL meant.

15   A    Yes.  That's what it means.

16   Q    Okay.  So it says the -- it showed the pension UAAL at

17   646 million.  Then it continues -- and please highlight the

18   next sentence as well -- "Using more current data and/or more

19   conservative assumptions could cause that deficiency to rise

20   into the billions of dollars."  You see that?

21   A    Yes.

22   Q    And does that also accurately reflect the state of your

23   knowledge as of the date that Exhibit 407 was prepared, which

24   is May 2003 (sic)?

25   A    Yes.  As I said before, I don't understand -- I don't

1  remember the specific dates that we were receiving data from

2  Milliman based upon Gabriel, Roeder or Milliman by itself,

3  but I think this is a fair characterization because that work

4  was ongoing.

5  Q   Okay.  And did -- what is --

6        MR. ULLMAN:  By the way, I would like to move to

7  strike everything in his last answer after the word "yes,"

8  your Honor, because I think --

9        THE COURT:  Any objections?

10        MR. SHUMAKER:  Your Honor, I think he was clarifying

11  his answer.

12        THE COURT:  The motion is granted.  If you are

13  unable, Mr. Orr, to answer a question "yes" or "no," please

14  say that.

15        THE WITNESS:  Okay.

16        THE COURT:  Otherwise, if it's a yes/no question,

17  just answer "yes" or "no" or "I don't know."

18        THE WITNESS:  Yes, your Honor.

19        THE COURT:  All right.  We're going to take our

20  break now for lunch, but before we do, please, I have to ask

21  you a question about your line of questioning of the witness

22  regarding the Michigan Constitution.  Is it your position

23  that the Michigan Constitution prohibits a city from even

24  asking its retirees to negotiate its retirement benefits in

25  such a way that might work an impairment?

1    MR. ULLMAN:  Subject to what my co-counsel says, no.

2  I don't --

3    THE COURT:  The answer to that question is no?

4    MR. ULLMAN:  No.  If they can ask?

5    THE COURT:  All right.

6    MR. ULLMAN:  No.

7    THE COURT:  We will break for lunch now.  We are

8  going to remain in place for a few moments so that Mr. Orr

9  can make his exit, and then we'll all go, so we'll be in

10  recess now, and you may go, sir.

11    THE WITNESS:  Thank you, your Honor.

12    THE CLERK:  All rise.  Court is in recess.

13      (Recess at 11:30 a.m. until 1:00 p.m.)

14    THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Case Number 13-53846, City of Detroit, Michigan.

16    THE COURT:  All right.  It appears that everyone is

17  here.  Sir, would you please stand and raise your right hand?

18        GOVERNOR RICK SNYDER, WITNESS, SWORN

19    THE COURT:  Please sit down.  And just so the record

20  is clear, we are interrupting the city's case to allow the

21  objecting parties to call this witness.

22    MR. WERTHEIMER:  Yes, your Honor.

23    THE COURT:  And you may proceed, sir.

24    MR. WERTHEIMER:  Thank you.  William Wertheimer,

25  your Honor, appearing on behalf of the Flowers plaintiffs.

1    Your Honor, before I begin questioning the governor, I would

2    request permission of the Court to examine him under Federal

3    Rule of Evidence 611(c)(2) -- that is, to ask leading

4    questions -- as I believe he is clearly a party -- a

5    witness -- excuse me -- a witness identified with an adverse

6    party.

7              THE COURT:  Any objections?

8              MR. SCHNEIDER:  No objections.

9              MR. SHUMAKER:  No objections, your Honor.

10             THE COURT:  All right.  Your motion is granted, sir.

11                       DIRECT EXAMINATION

12   BY MR. WERTHEIMER:

13   Q    Good afternoon, Governor.

14   A    Good afternoon.

15   Q    Thank you for appearing here this afternoon.  You are

16   appearing here pursuant to a subpoena that was issued by the

17   UAW, are you not?

18   A    I believe so.

19   Q    When were you elected governor?

20   A    January 1st, 2011.

21   Q    And when were you sworn in as governor?

22   A    Oh, I'm sorry.  I was sworn in January 1st, 2011.

23   Q    Okay.

24   A    I was actually elected in November of 2010.

25   Q    Okay.  And I've got in front of me the oath that I think

1  you swore.  I'm going to read it to you and ask you if you
2  recall swearing to that oath.  "I do solemnly swear that I
3  will support the constitution of the United States and the
4  constitution of this state, and that I will faithfully
5  discharge the duties of the office of governor according to
6  the best of my ability."  Do you recall that as being the
7  oath you swore to?
8  A    Yes.
9  Q    Did you know anything about Article IX, Section 24, of
10 the Constitution, the one that we've now all heard so much
11 about, relating to pension benefits of municipal employees at
12 the time you were sworn in as governor?
13 A    Yes.
14 Q    Do you have an understanding, Governor, as to how a
15 constitutional provision like that could be amended just
16 generally?  It's not a civics lesson, but -- and I'm --
17 A    Yes.
18 Q    Just generally.  Would you tell us?
19 A    Yeah.  It could go to a vote of the people.  It could be
20 an item that would be proposed as an amendment to the
21 Constitution and changed that way.  It could be put on the
22 ballot either by petition or by vote of the legislature.
23 Q    But you would agree with me that you do not have the
24 power to amend the state Constitution?
25 A    That's correct.

1  Q   Would it be fair to say, Governor, that at your

2  deposition and actually for some time before then, you have

3  taken the position publicly and at your deposition that while

4  you've been supportive of -- you've been supportive of

5  improved services for the citizens of the City of Detroit,

6  you have not been supportive of the notion of the repayment

7  of debts of the city, including any debt created by the

8  pension; is that correct?

9  A   Yes.

10 Q   And have you taken that position throughout your time as

11 governor?

12 A   Yes.

13 Q   And you've done so publicly?

14 A   Yes.

15 Q   Have you told Mr. Orr that that's your position in one

16 way, shape, or form?  In other words, does he know that

17 that's your position?

18 A   I couldn't speak to him -- I couldn't speak to his

19 presumption, but I had publicly made those statements.

20 Q   Did you ever make them in the presence of Mr. Orr?

21 A   I don't recall.

22 Q   How many times have you met with Mr. Orr since he became

23 emergency manager either one on one or in groups?

24 A   I would have to speculate.  It would be a reasonably

25 significant number.

1  Q   Well, let's try it this way.  How often -- from the time

2  he became emergency manager, how often would you regularly

3  see him?  Every week or two, every month?  Can you

4  characterize it like that?

5  A   Yeah.  Typically weekly.

6  Q   Weekly.

7  A   In terms of not necessarily in person but on the phone or

8  in person.

9  Q   Either on the phone or in person weekly?

10  A   Yes.

11  Q   Okay.  In any of those conversations, did the subject

12  come up of your position being that you did not want the

13  state to be obligated to pay any of the pension benefits at

14  issue in this case?

15  A   That would be a different question than my other

16  statements in the sense that I view that as a legal matter in

17  terms of if the court was deciding that we had a

18  constitutional obligation, then we would pay it.

19  Q   My question, Governor, was whether you had ever

20  communicated that to Mr. Orr in any of these meetings that

21  you've had with him weekly since he became emergency manager.

22  A   Those meetings would have had our legal counsel present,

23  where I was asking for their advice on topics such as that.

24  Q   So do I take that to mean that you're asserting the

25  attorney-client privilege as to that question?

```
 1        MR. SCHNEIDER:  And I'm objecting on the grounds
 2   that this question might implicate the attorney-client
 3   privilege.
 4        MR. SHUMAKER:  The city joins the objection.
 5        THE COURT:  Well, no.  I think the witness can
 6   testify to what he told Mr. Orr on this question.  Did you
 7   ever tell Mr. Orr what your position was on whether the State
 8   of Michigan has an obligation to pay the city's pension
 9   obligations?
10        THE WITNESS:  What I told him was is I viewed that
11   as a legal question that I thought best left to the courts to
12   decide because anything else on my part would have been
13   speculative in the fact if I had an opinion, it would get
14   reviewed anyway, and I would rather have the most competent
15   people make that decision to start with.
16   BY MR. WERTHEIMER:
17   Q    Fair enough.  While we're on the issue of your
18   conversations with Mr. Orr during the period that he was
19   emergency manager, these weekly or so conversations, at your
20   deposition you refused to answer any questions related to
21   whether you discussed the specifics of Article IX, Section
22   24, of the Constitution in those meetings.  Does that remain
23   your position?
24   A    I think I made mention that it was an attorney-client
25   issue.
```

1   Q   Again, Governor -- I'm getting confused, Judge,

2   Governor -- I just need to know whether you can -- I don't

3   want to go through all those questions if that remains your

4   position.

5   A   It does, so the answer, yes.

6   Q   All right.  I believe you also asserted the attorney-

7   client privilege or your attorneys did at your deposition as

8   to those weekly meetings as it related to any discussions

9   between you and Mr. Orr relating to the potential filing of a

10  Chapter 9 proceeding; is that correct?

11  A   Yes.

12  Q   And that remains your position; that is, that because

13  attorneys were present either on the phone or in the room at

14  each of those meetings, as you recall, you are asserting the

15  attorney-client privilege?

16  A   Yes.

17  Q   Thank you.  I'd like to ask you a couple of questions

18  about other -- well, let me start with your involvement.  I

19  think we all know you have been involved since you became

20  governor with the financial problems that relate to the City

21  of Detroit.  You inherited that as an issue.  Would that be

22  fair?

23  A   Yes.

24  Q   And it was a big issue?

25  A   I'd describe it as the largest issue in our country.

1  Q  From day -- well, leaving aside the largest in our

2  country, it's been a big issue for you from day one.

3  A  This has been a large issue for 60 years.

4  Q  Okay.  When did -- and I think we all know that then

5  Treasurer Dillon has been involved in assisting you on that

6  issue; is that correct?

7  A  Yes.

8  Q  When did his involvement begin --

9  A  It would have --

10  Q  -- approximately?

11  A  It would have began when he became treasurer.

12  Q  Which was?

13  A  It would have been about the same time I took office or

14  shortly thereafter.

15  Q  Early 2011?

16  A  Yes.

17  Q  Would that be fair?  Okay.  We also heard some testimony

18  here that a Mr. Buckfire, an investment person, has been

19  involved in this issue on your behalf; is that -- or on the

20  state's behalf; is that correct?

21  A  I don't -- I wouldn't characterize it as on the state's

22  behalf.  Mr. Buckfire came several times and presented

23  information, and in some of those cases I didn't ask for him

24  to come, and I'm not sure of all the grounds, whether it was

25  with the treasurer or not, that they made the decision to

1    come.

2    Q   Who was he being compensated for for the work he was

3    doing at this early point, as far as you understood?

4    A   My understanding is he wasn't necessarily getting

5    compensated.

6    Q   He was just doing it?

7    A   There were a number of parties that during the course of

8    this -- that first year, in particular, that offered

9    unsolicited advice on Detroit.

10   Q   Okay.  Without going further with that, would it be fair

11   to say that Mr. Buckfire and the people who work for his

12   company were offering advice to the state?

13   A   They were presenting information to the state, yes.

14   Q   Not to the city.  As far as you knew, they were trying to

15   get your ear and Treasurer Dillon's ear.  Would that be fair?

16   A   I couldn't speak to that.  I also know -- I also believe

17   they were potentially talking to the city also.

18   Q   Well, but didn't you understand that they were talking to

19   the city as part of their efforts to help you out for the

20   state as opposed to being an independent actor for the city?

21   A   The way I would perceive it at that point in time, I

22   perceived it as they were more presenting information to

23   potentially get themselves hired for an engagement most

24   likely --

25   Q   Well, that's what I was getting to.

1   A    -- but not necessarily by the state or by the city.  I'm

2   not going to speculate on who.

3   Q    Okay.  Fair enough.  The Jones Day law firm, when did

4   they first get involved in assisting the state in dealing

5   with the problems relating to Detroit?

6   A    Again, you're making the statement in the same fashion

7   you did before.  I believe they were presenting information

8   to the state.  I don't believe -- they were not hired by the

9   state --

10  Q    Well --

11  A    -- to my knowledge.

12  Q    So you would assume that they were looking for business

13  also?

14  A    Yes.

15  Q    Okay.  And don't you think, as sophisticated as they

16  were, that they recognized, given all that was going on, that

17  it would be you or people at your end who would be calling

18  the shots relative to how the city's financial restructuring

19  ultimately took place?

20          MR. SCHNEIDER:  Objection.  Calls for speculation.

21          MR. WERTHEIMER:  I don't think it does.  It seems --

22          THE COURT:  If you can answer that question from

23  your personal knowledge, I'll permit it.

24          THE WITNESS:  I didn't believe that to be the case

25  because, in fact, the city ended up hiring Jones Day without

1  me making a statement.

2  BY MR. WERTHEIMER:

3  Q   You met with Jones Day and with Ken Buckfire in June of

4  2002 (sic), did you not?

5  A   I don't recall the specific meeting.

6        MR. WERTHEIMER:  Could you put up -- it's Retirement

7  Systems' Exhibit 844, the second page.

8  BY MR. WERTHEIMER:

9  Q   You should see this on your screen if it works, you know.

10  That's a letter that's in evidence in this case from Heather

11  Lennox at Jones Day to someone at her end where she's saying

12  that she's going with Ken Buckfire to talk to the governor in

13  Michigan tomorrow, and it's an e-mail dated June 5, 2012.  Do

14  you recall meeting with Heather Lennox and Ken Buckfire in

15  June of 2012?

16  A   I recall meeting with Mr. Buckfire.  I apologize to Ms.

17  Lennox, but I literally do thousands of meetings, so I don't

18  recall the specific meeting.

19  Q   Okay.  I won't get into identifications.  It's not that

20  kind of case.  Do you recall there being one or more Jones

21  Day lawyers there with Mr. Buckfire?

22  A   Yes.

23  Q   And they were together talking to you about ways that the

24  state could deal with the problem that you, as the governor,

25  faced vis-a-vis the City of Detroit.  Would that be fair?

1    A    Yes.

2    Q    If you look at that same document on the bottom where it

3    lists the attachments, there's an attachment -- a listing of

4    an attachment.  I'll skip the numbers, but it says, "City of

5    Detroit - Memo on Michigan Constitutional Pension Plan

6    Protections.DOC."  Do you see that?

7    A    Yes.

8    Q    Do you recall the Jones Day people or Buckfire at that

9    meeting talking to you about that issue?

10   A    No.

11   Q    That is, the constitutional pension plan protection?

12   A    No.

13   Q    You're not saying it didn't happen.  You're saying you

14   don't recall one way or the other whether it did?

15   A    Yeah.  I believe that's how you stated your question.

16   Q    It is.  It is.  It is.  Do you recall whether or not the

17   Jones Day attorneys provided you or any of your -- let me

18   back up.  Do you recall who was at this meeting?

19   A    I don't recall all the participants.  Generally the

20   treasurer, I believe --

21   Q    Okay.

22   A    -- and Ken Buckfire.

23   Q    Okay.  So Treasurer Dillon.  Would any of -- either of

24   your aides have attended in the normal course?

25   A    It would have been likely.

1    Q    Likely.  Okay.  Do you recall whether the Jones Day
2    lawyers -- excuse me -- provided either you or any of your
3    people there with any legal documents?  Did they share any
4    legal documents with you?
5    A    I don't recall legal documents.  I recall a PowerPoint
6    kind of presentation.
7    Q    Made by Jones Day?
8    A    No.  More Ken Buckfire.
9    Q    Okay.  Do you recall whether in the PowerPoint
10   presentation Mr. Buckfire referenced the constitutional --
11   the state constitutional provision relating to pensions in
12   any way, shape, or form?
13   A    Don't recall.
14   Q    Okay.  Again, you don't recall one way or the other?
15   A    That's correct.
16   Q    Sometimes my questions aren't as clean as they should be,
17   and I'm just trying to make sure that --
18   A    Okay.
19   Q    You were involved in the selection of Mr. Orr as
20   emergency manager, were you not?
21   A    Yes.
22   Q    Can you approximate when the process began that ended up
23   with the hiring of Mr. Orr?
24   A    The process generally would have started late '12, early
25   '13 in terms of looking for potential emergency manager

1  candidates as a contingency plan.

2  Q   Did you interview Mr. Orr?

3  A   Yes.

4  Q   Did you interview him more than once?

5  A   I believe so.

6  Q   How many times?

7  A   I recall a couple.

8  Q   Okay.  Did you interview anybody else?

9  A   Yes.

10  Q   How many people?

11  A   At least one.

12  Q   Okay.  During the interview process with Mr. Orr -- when

13  I mean process, I mean not just the interviews but any

14  communications you had with him up to the point he became

15  emergency manager -- did you discuss whether vested pension

16  benefits could be reduced or modified in a Chapter 9

17  proceeding?

18  A   I don't --

19  Q   Did you discuss that issue?

20  A   I don't recall.

21  Q   Do you recall discussing -- or do you recall discussing

22  with Mr. Orr in any of these preliminary discussions before

23  he became emergency manager anything regarding vested pension

24  benefits?

25  A   No.

1  Q   No, or "I don't recall"?

2  A   Again, I thought you --

3  Q   Well, again, I'm trying to fine-tune my question, and now

4  I confused you.  I'm sorry.

5  A   Well, I thought you started, as I recall --

6  Q   You don't recall any such conversations?

7  A   I was trying to get better and just do "yes" or "no" --

8  Q   Me, too.

9  A   -- to show I was a good listener.

10 Q   No.  You were.  Me, too, but we missed each other, you

11 know.

12 A   Okay.

13 Q   I switched, and you switched to say --

14 A   "I don't recall" would be the summary answer.

15 Q   Okay.  Thank you.  As part of the hiring of Mr. Orr, it's

16 true, is it not, that parts of his expenses are being

17 reimbursed by the NERD Fund, N-E-R-D Fund?

18 A   Yes.

19 Q   And what parts of his expenses?

20      MR. SCHNEIDER:  Objection as to relevance.

21      THE COURT:  What is the relevance?

22      MR. WERTHEIMER:  I think it goes to the potential

23 conflict issue; that is, I think that Mr. Orr is in a

24 position where he has the state paying expenses for him and

25 at the same time he has to make decisions relative to the

1   position he should take as to whether or not the state should

2   be obligated to do something relative to the city's pension

3   problems under Article IX, Section 24, of the Constitution.

4           THE COURT:  Is this fund a state fund?

5           THE WITNESS:  No.  It's a separate nonprofit that

6   was organized to help offset the cost of government.

7           THE COURT:  The objection is sustained.

8   BY MR. WERTHEIMER:

9   Q   I'm going to direct your attention now, Governor, to June

10  of 2013, the point in time when Mr. Orr was -- specifically

11  June 14th when he made a proposal.  You're familiar with the

12  June 14th proposal?

13  A   Yes.

14  Q   And I know you were asked about it at your deposition, so

15  you know what I'm talking about.

16  A   Yes.

17  Q   Okay.  Did you participate in the development of that

18  proposal?

19  A   I reviewed drafts of it.

20  Q   And suggested -- either you or one of your people

21  suggested changes in it, I would assume?

22  A   I don't recall.

23  Q   Okay.  But you do recall reviewing drafts of it?

24  A   At least one draft.

25  Q   And do you recall that that proposal included -- I'll

1   read from it -- apologize, Governor -- "Because the amounts

2   realized on the unfunding claims will be substantially less

3   than the underfunding amount, there must be significant cuts

4   in accrued vested pension amounts for both active and current

5   retired persons"?  Do you recall that as being part of his

6   June 14th proposal?

7   A   Yes.

8   Q   And in your review, did you suggest any changes in that?

9   A   No, because it was to be a mutual negotiation.  It was a

10  preliminary proposal.

11          MR. WERTHEIMER:  Your Honor, I would ask the witness

12  to simply respond to the question.

13          THE COURT:  You may.

14          MR. WERTHEIMER:  I didn't ask why.  I don't mean to

15  make a big deal, but I think it would go smoother.

16          THE COURT:  You may ask the witness that.

17          MR. WERTHEIMER:  Thank you.

18  BY MR. WERTHEIMER:

19  Q   Do you understand -- did you understand, Governor, that

20  at the time this proposal was being made, that the

21  retirees -- the proposal was that the retirees would get

22  treated as the other unsecured creditors in the language --

23  in the legal language would, including bondholders?  They'd

24  be treated the same way.  Would that be fair?

25  A   Yes.

1   Q    Did you understand at the time you looked at -- or

2   reviewed this proposal that the guarantees of pension

3   benefits that there are in this country relate to private

4   employees only under the Pension Benefit Guarantee

5   Corporation?  Did you understand that at the time?

6   A    Yes.

7   Q    In other words, you knew these people weren't being

8   protected by any federal program --

9   A    Yes.

10  Q    -- "these people" being the retirees and those with

11  vested benefits?

12  A    Yes.

13  Q    Did you also understand that the bondholders at least had

14  insurance, at least many of them did?  They were insured

15  bonds?

16  A    I was not clear on who had insurance and who did not.

17  Q    Well, you were clear on the fact that the individual

18  retirees didn't have insurance, weren't you?

19  A    Yes.

20  Q    Did you have any sense as to the impact these cuts might

21  have on individual retirees at the time you reviewed the

22  proposal?

23          MR. SCHNEIDER:  Objection.  Calls for speculation.

24  It's also not relevant.

25          MR. WERTHEIMER:  I'm just asking if he did or not,

1    your Honor.

2          THE COURT:  Again, if you can speak from personal

3    knowledge, I will accept your answer.

4          THE WITNESS:  I viewed that as speculation at that

5    point in time, in particular, that my understanding is the

6    funded part of the pension plan would not be involved, but

7    the unfunded was the part at issue.

8    BY MR. WERTHEIMER:

9    Q    Okay.

10   A    And that was a matter still to be determined.

11   Q    Did you understand what the range of the pensions were of

12   City of Detroit retirees; that is, how much money they would

13   receive if they were getting a full pension?

14   A    Not specifically.

15   Q    How did you understand it?  How generally, if you could

16   just identify it in any way that is consistent with what you

17   understood?

18   A    Well, they would get a monthly payment of so much per

19   month.

20   Q    Did you have a sense as to whether there were many of

21   them who were getting monthly payments of $10,000 or anything

22   like that amount?

23   A    That would be at the very high end.

24   Q    Okay.  Fair enough.  I'll drop it.  Did you know at

25   around this time -- I think it was before it, but I don't

1   have the time line in front of me. You recall Mr. Orr making

2   a statement to the Detroit Free Press that got publicized

3   pretty widely that federal law would trump Article IX,

4   Section 24, of the Constitution. Do you recall that being in

5   the papers?

6   A   I recall that from the questions that you and your

7   colleagues asked me from the deposition.

8   Q   Do you recall knowing that Orr had made a statement like

9   that at the point you were reviewing his -- what became his

10  June 14th proposal?

11  A   I accepted the fact you were making a truthful assertion

12  when you told me that.

13  Q   No, but did you know at the time?

14  A   I don't recall.

15  Q   You know, as you sit here, I suspect, that the Attorney

16  General has weighed in on this issue of the relationship

17  between the state constitutional provision and the bankruptcy

18  proceedings?

19  A   Yes.

20  Q   And you know that he has taken the position that in

21  bankruptcy Mr. Orr is obligated to honor Article IX, Section

22  24, in proposing a plan of adjustment, do you not?

23  A   Yes.

24  Q   And you know that Mr. Orr in no way, shape, or form has

25  indicated that he would be proposing any such plan of

1  adjustment, do you not?

2  A   Well, no plan of adjustment has been presented, so that

3  would be just speculative.

4  Q   Has Mr. Orr ever said anything either in your

5  conversations with him or that you've heard about secondhand

6  that would indicate that he has any intent to honor the state

7  constitutional provision when he proposes a plan?

8           MR. SCHNEIDER:  I would object to the extent that

9  this calls for secondhand conversation.  The governor would

10  not have firsthand knowledge of that.

11           THE COURT:  The objection is overruled.  What is

12  your answer, sir?

13           THE WITNESS:  Could we repeat the question?

14           MR. WERTHEIMER:  Can you repeat the question,

15  whoever is --

16           THE COURT:  We don't have that ability.

17           MR. WERTHEIMER:  Oh, I'm sorry.  I'll ask it another

18  way.

19  BY MR. WERTHEIMER:

20  Q   Has Mr. Orr ever communicated anything to you either

21  directly or indirectly that would indicate to you that at the

22  point he is going to propose a plan, that he is going to

23  propose a plan which would not adversely impact the retirees?

24  A   I have not discussed a specific plan with Mr. Orr in any

25  regard.

1    Q    Let me ask it another way.  Has Mr. Orr ever said

2    anything to you inconsistent with what he said to the Detroit

3    Free Press to the effect that he was going to use the federal

4    bankruptcy law to trump Article IX, Section 24, of the state

5    Constitution?

6    A    The question is those discussions would have been with

7    counsel present.

8    Q    So you're asserting the attorney-client privilege?

9    A    The way you stated that, yes.

10   Q    Okay.

11             MR. SCHNEIDER:  I'm objecting on privilege grounds

12   as well.

13             MR. SHUMAKER:  The city joins the objection.

14   BY MR. WERTHEIMER:

15   Q    When did you first learn that the attorney general was

16   going to take the position that he did?

17   A    On a phone call a couple days --

18   Q    And what --

19   A    -- a day or so ahead.

20   Q    A day or so ahead of his --

21   A    Filing.

22   Q    -- filing?  Okay.  And by "filing," to make sure we're

23   talking about the same thing, the filing he made in federal

24   court relative to his position at least on this issue?

25   A    Yes.

1  Q   Did you consult with the attorney general on this issue

2  of the interrelationship of Article IX, Section 24, of the

3  Constitution and bankruptcy anytime before this phone call?

4  A   I did not personally.

5  Q   Did you ask anybody on your behalf to do that?

6  A   No.

7  Q   Would it be fair to say that the call that he made to you

8  a day or two before was a courtesy call?

9  A   Yes.

10 Q   He was letting you know one politician to another that

11 I'm taking this position that may be adverse to you?

12 A   I wouldn't describe it as one politician to the other.  I

13 would describe it as the chief --

14 Q   I knew you wouldn't, and I apologize for framing it that

15 way.

16         THE COURT:  All right.  So restate your question,

17 sir.

18 BY MR. WERTHEIMER:

19 Q   Why don't just tell us what was said between you and

20 Attorney General Schuette --

21 A   Yeah.  The chief legal officer of the state called the

22 chief executive of the state to --

23 Q   Okay.

24 A   -- let me know he was --

25 Q   I accept your amendment.

1   A   -- he was going to file a brief or a position on this

2   issue, and I appreciated that, that he had his constitutional

3   responsibilities, as did I, and we respect other and are good

4   working colleagues.

5   Q   I'd like to move you now to a different subject, and that

6   is the Flowers and Webster lawsuits.  Do you recall being

7   asked about that at your deposition?

8   A   Yes.

9   Q   I'm going to ask you hopefully fewer questions than at

10  your deposition about that.

11  A   Thank you.

12  Q   You're welcome.  You learned of those lawsuits within a

13  day or so after they would -- let me back up.  I'll state for

14  the record that they were filed on July 3rd.  You learned

15  about their filings within a day or two, did you not?

16  A   I would assume so.  I know it was relative -- yes.

17  Q   Okay.  And you also learned at the same time or shortly

18  thereafter that the court had scheduled a hearing on

19  preliminary injunction requests in both of those two cases

20  for Monday, July 22nd, did you not?

21  A   I didn't recognize it as simply about preliminary

22  injunctions.  I believed it was simply a hearing on the

23  lawsuits, which could include preliminary injunctions.

24  Q   Let me read to you a question and answer from your

25  deposition and see if it's accurate, and I'm at page 125,

1  line 21.  "You did know" -- and I'm asking the question.

2  "You did know, did you not, shortly after those suits were

3  filed -- it was all over the papers -- that Judge Aquilina

4  was going to hold a hearing on whether to issue an injunction

5  Monday, July 22nd, did you not?"  Your answer was, "Yes."

6  A    No.  I was simply stating I believed it included that.  I

7  wasn't sure what else might have been in that hearing.

8  Q    Okay.  Fair enough.  And I believe your counsel -- do you

9  recall at your deposition we asked for the transmission --

10  the e-mail transmission of your authorization to Mr. Orr, and

11  there were a bunch of questions because the only transmission

12  that we had at the time was late in the evening or like seven

13  something p.m.?  Do you recall that?

14  A    Yes.

15  Q    And then later your counsel found the correct e-mail and

16  provided it to us.  Do you recall that --

17  A    I actually found it.

18  Q    -- learning that?  Oh, I'm sorry.  You found it?

19  A    Yes.

20  Q    Okay.  And at the end of the deposition, you said you

21  would, correct, that you would find it?

22  A    Yes.

23  Q    And you did?

24  A    Took me about 30 seconds once I got on my computer.

25  Q    Okay.  And your counsel sent them to us or you instructed

1  your counsel, I assume, to do that?

2  A   Yes.

3  Q   And do you recall that that transmission occurred at 3:47

4  p.m.?

5  A   Yes.

6  Q   So it was not until 3:47 p.m. that Mr. Orr got written

7  authorization from you to file the bankruptcy; correct?

8  A   Yes.

9  Q   Okay.  When did you first learn that Mr. Orr was

10  seriously considering filing Chapter 9?  When I say

11  "seriously," I mean to the point of preparing papers as

12  opposed to just generally having it out there as a

13  possibility.

14  A   It probably would have been about a week, in the time

15  frame of two or three to seven days or so before he sent his

16  letter to me.

17  Q   And he sent his letter to you on the 16th, so sometime

18  maybe between July 6 and the 16th, somewhere in there?

19  A   I couldn't speak to what specific day, but it was --

20  Q   I understand.

21  A   -- generally that time frame.

22  Q   Okay.  To your knowledge, did the state play any role in

23  drafting the request that Mr. Orr made?

24  A   Not to my knowledge.

25  Q   Do you know one way or another whether Mr. Orr sent a

1   draft of his request to somebody on your team to take a look

2   at and for input?

3   A   That would have been at meetings that would have had

4   counsel present.

5   Q   So you're asserting attorney-client privilege?

6   A   Yes.

7           MR. SCHNEIDER:  Objection based on attorney-client

8   privilege.

9           MR. SHUMAKER:  The city joins the objection.

10          MR. WERTHEIMER:  Your Honor, for the record, I

11  believe the privilege has been waived as to that based on a

12  document that the state voluntarily produced and waived the

13  privilege as to, but it is not a document to or from the

14  governor, so I'll delay examination relative to it.

15          THE COURT:  Okay.

16          MR. SCHNEIDER:  Of course, we object that there's

17  been no waiver.

18          MR. WERTHEIMER:  Understood.

19  BY MR. WERTHEIMER:

20  Q   And I think we know from your deposition that as late as

21  July 7th -- and let me back up.  I apologize.  If we're in

22  this week that ends up the 19th, let's say earlier that week,

23  if I can put you back there -- 15th is Monday, if I'm doing

24  it right.  You know that Judge Aquilina is going to hold a

25  hearing on an injunction request the following Monday, the

1  22nd; correct?

2  A    Yes.

3  Q    And you know -- without getting into all the legalese,

4  you know that the requests to Judge Aquilina are that she in

5  one way or another make sure that if you authorize a

6  bankruptcy, it will only be with a contingency that Article

7  IX, Section 24, be honored.  Would that be fair as to your

8  knowledge?

9  A    No, because I wouldn't speculate on what a judge is going

10  to do in doing the order or not doing the order or what they

11  might say in the order.

12  Q    Well, you had been -- you were served on July 3rd with

13  the complaint, the motion for preliminary injunction, the

14  brief in support, and the order to show cause, were you not?

15  A    I didn't personally receive all those documents.

16  Q    Fair enough, but your office was served on that day.  You

17  don't dispute that.

18  A    Again, I can't confirm nor dispute.  You have better

19  information on that than I do.

20  Q    Okay.  I mean for the record, we have documents showing

21  that that's the day, and we didn't serve you personally.  It

22  was served at --

23  A    My office.

24  Q    -- the Romney Building at your office where you kindly

25  always accept service.  Let me ask you this.  Did you at

1   least look at the complaint or talk to somebody about the

2   contents of these complaints generally to get an idea what

3   they were about?

4   A   That would have been subject to attorney-client

5   privilege.

6   Q   Okay.  Back to the beginning of the week.  We're at

7   Monday, the 15th.  If we move to Wednesday, the 17th, there's

8   a communications rollout document that we showed you at your

9   deposition.  Do you recall that?

10  A   Yes.

11  Q   Three- or four-page document showing a rollout of the

12  bankruptcy filing that went into a lot of events that would

13  occur before the filing; correct?

14  A   Yes.

15  Q   A bunch of events that would occur after it; correct?

16  A   Correct.

17  Q   Down to, you know, who you were interviewing with the

18  following Monday and stuff like that.  Am I -- is that

19  correct?

20  A   Yes.

21  Q   Okay.  And that document that we showed you that was

22  dated -- was dated the 17th, do you recall that?

23  A   Yes.

24  Q   So that's Wednesday, and on Wednesday the rollout listed

25  that the filing would occur on the 19th; is that correct?

1   A   Yes.

2   Q   And it didn't occur on the 19th, did it?

3   A   No.

4   Q   And we know, do we not, that the filing -- the actual

5   physical paper filing the bankruptcy had a typed in nine that

6   Mr. Orr at his deposition indicated he switched to an eight.

7   A   That's what you explained to me in the deposition.

8   Q   And you have no reason to dispute it, but you don't know

9   it of your own knowledge?

10  A   Yes.

11  Q   Would it be fair to say that the fact that you, Mr. Orr,

12  and others knew that a state court judge would be considering

13  whether she should be imposing conditions on you authorizing

14  a bankruptcy played a role in when you transmitted your okay

15  to Mr. Orr at 3:47 on the 18th?

16  A   I believe I explained this in my deposition that it was

17  more the filing of the lawsuits and the fact that bankruptcy

18  is a very last resort and that these actions showed that

19  there wasn't a meeting of the minds; that there was not going

20  to be a mutual understanding here to resolve this short of

21  bankruptcy.  And that was part of my decision-making process

22  to say when I was comfortable to sign a letter authorizing

23  bankruptcy, which was a tremendously difficult decision to

24  make but the right one given the circumstances.

25  Q   Fair enough.  Just one other question, I think, related

1  to that.  When you said "lawsuits" in that answer, would you

2  have been referring to the Flowers lawsuit, the Webster

3  lawsuit, and by that time the third lawsuit filed by the

4  Retirement System?

5  A   Yes, and an expectation that there could be many other

6  lawsuits from debt holders and many other parties.

7  Q   Okay.  Fair enough.  But no other specific lawsuits other

8  than the three I identified?

9  A   Correct.

10 Q   I'm going to have you identify some documents, and then

11 I've got some questions as to one, and then we're done,

12 Governor.

13        MR. WERTHEIMER:  Could you put UAW 616 up?

14 BY MR. WERTHEIMER:

15 Q   Governor, can you confirm that this is an e-mail that you

16 received from Andy Dillon?

17 A   Yes.

18 Q   And that you read it on or around July 8?

19 A   Yes.

20 Q   And that it's part of the communications that went on

21 between you and your people relative to this issue of the

22 bankruptcy filing?

23 A   I'm not sure.  That last question, me and my people --

24 Q   Well, I'm sorry.  I apologize.  It's an e-mail that

25 involves Mr. Dillon's role in helping you with the Detroit

1    problem.

2    A    Yes.

3           MR. WERTHEIMER:  Move for its admission.  I believe

4    that was not admitted.

5           MR. SHUMAKER:  Your Honor, the city objects on

6    hearsay grounds.

7           MR. WERTHEIMER:  It goes to the state of mind of the

8    state officers, the back and forth.  It's not being offered

9    for its truth as to any of the statements.  It's being

10   offered as to their state of mind.  Good faith is an issue.

11          MR. SHUMAKER:  Your Honor, state of mind is not at

12   issue.  This is for hearsay purposes.

13          THE COURT:  Well, technically what's it --

14          MR. WERTHEIMER:  I have one other point, your Honor,

15   and that is it's an admission.  We have a common interest

16   privilege asserted when they want to keep documents from us,

17   but they are not agents of each other for purposes of the

18   hearsay rule, so it's -- not only is it offered as state of

19   mind, not for its truth, but even were it offered for its

20   truth, it should come in as an admission.

21          THE COURT:  Well, what's at issue here in the

22   eligibility trial is the good faith of the city in filing the

23   case, so I would question how the good faith of the governor

24   is an issue at all.

25          MR. WERTHEIMER:  Your Honor, we will present

1  through --

2      THE COURT:  Could you do me a favor and pull that

3  microphone back closer to you?  I think it got knocked

4  somewhere in the meantime.

5      MR. WERTHEIMER:  Yeah.  I'm sorry.  We'll be

6  providing evidence indicating -- establishing that the state

7  helped Mr. Orr draft the July 16th request, so the idea that

8  we're going to in any way separate out state of minds here I

9  think just is counterfactual.

10     THE COURT:  Well, but how does this memo bear upon

11 the city's good faith at all?  That's the question.

12     MR. WERTHEIMER:  Well, I think that the city, with

13 all due respect to Mr. Orr, was acting at the behest of the

14 state.  I think that there is all kinds of evidence of that,

15 and there will be further evidence of it.  And given that, we

16 think that if -- pulling the strings may be a little strong,

17 but if the state is involved in that decision-making, the

18 state of mind of the two principal state actors, by the

19 way -- we're not offering, you know, someone at Department of

20 Treasury whose name we've got to look up.  This is Dillon to

21 Snyder.

22     THE COURT:  All right.  This is arguable.  I'll

23 permit it.

24     MR. WERTHEIMER:  Thank you.

25     MR. SCHNEIDER:  Your Honor, I have an objection,

1  however.  If this is to go to state of mind, this can't

2  possibly go to the governor's state of mind because this is

3  not a message sent from the governor.  This is sent from the

4  treasurer.  Not only that, but no one from the city is --

5          THE COURT:  Well, but who received it?

6          MR. SCHNEIDER:  The governor.  He received --

7          THE COURT:  Yeah.  That objection is overruled.

8          MR. WERTHEIMER:  Thank you.

9          THE COURT:  The document is admitted.  What's the

10  number again?  616?

11          MR. WERTHEIMER:  616, UAW 616.

12          THE COURT:  616 is admitted.

13      (Exhibit 616 received at 1:46 p.m.)

14          MR. WERTHEIMER:  Would you now show 615?

15          MR. SCHNEIDER:  Same objection, your Honor, on

16  hearsay grounds.

17          THE COURT:  You're objecting to 615?

18          MR. SCHNEIDER:  615.

19          THE COURT:  Okay.  Hold that until it's actually

20  offered.

21          MR. SCHNEIDER:  I'm sorry, your Honor.

22          MR. WERTHEIMER:  Can you blow up that a little bit

23  at the top?  Yeah, just there.  That's great.  Thank you.

24  BY MR. WERTHEIMER:

25  Q   Is that on your screen now, governor, the July 9 e-mail?

1 A    Yes.

2 Q    Okay.  And this is Andy Dillon to you, a response to

3 the -- or a follow-up to the e-mail of the day before?

4 A    Yes.

5         MR. WERTHEIMER:  Move for its admission again for

6 the same reason, your Honor.

7         MR. SHUMAKER:  Objection, your Honor.  Hearsay.  I'd

8 also like to ask if counsel is going to attempt to introduce

9 documents not in evidence already that they not be displayed

10 to you prior to you making a ruling as to their introduction.

11        THE COURT:  Well, that's interesting because

12 sometimes I actually need to see the document to see if it's

13 relevant, so I will not ask him to make that request.  And

14 you have your same objection, counsel?

15        MR. SCHNEIDER:  Yes, your Honor.

16        THE COURT:  All right.  Both objections are

17 overruled, and this document -- 615, did you say --

18        MR. WERTHEIMER:  Yes, your Honor.

19        THE COURT:  -- is admitted.

20        MR. WERTHEIMER:  Thanks.

21     (Exhibit 615 received at 1:47 p.m.)

22 BY MR. WERTHEIMER:

23 Q    I have just one other document to ask you about, and it's

24 not in evidence yet, so I'm going to -- we're going to do it

25 the old way.  I'm going to show you a hard copy, and then

1    I'll come back here and ask you some questions about it.  Do

2    you have that document in front of you, Governor?

3    A    Yes, 625.

4    Q    And who's Dennis Muchmore?

5    A    He's my chief of staff.

6    Q    And was he your chief of staff in July?

7    A    Yes.

8    Q    Okay.  And who is Mike Gadola?

9    A    He's the legal counsel to the governor.

10   Q    And who is John Roberts?

11   A    Deputy chief of staff.

12   Q    And Greg Tedder?

13   A    He's the state liaison to Kevyn Orr.

14   Q    And do I read this document right that this is an e-mail

15   that Mr. Gadola sent to Mr. Muchmore and Roberts and that

16   Muchmore then sent on to you?

17   A    Yes.

18   Q    And you received it on July 12th?

19   A    Yes.

20   Q    And you read it?

21   A    Yes.

22   Q    Both Mr. Muchmore's message and the underlying message

23   from Mr. Gadola?

24   A    Yes.

25   Q    And it does relate to your decision-making relative to

1  the decision to authorize?

2  A   I'm not sure I understand your question.

3  Q   Well, I'll stop at this point.

4         MR. WERTHEIMER:  I'd move for its admission at this

5  point, your Honor.

6         MR. SHUMAKER:  Objection.  Hearsay, your Honor.

7         THE COURT:  And that's number what?

8         MR. WERTHEIMER:  625.  And, again, I think we've got

9  the same arguments we had before, identical; that is --

10         MR. SCHNEIDER:  Same objection.

11         MR. WERTHEIMER:  Well, I won't repeat them, your

12  Honor, and I'd like to -- I mean obviously I'll be examining

13  the governor as to their content, but I thought it made sense

14  to move for their admission first.  I'm happy to answer --

15  ask any follow-up questions the Court thinks it needs.  And I

16  would also indicate for the record, your Honor, that --

17         THE COURT:  One second.

18         MR. WERTHEIMER:  I'm sorry.

19         THE COURT:  So, Governor, have you seen this e-mail

20  before?

21         THE WITNESS:  I've seen it before.  I'd like time to

22  read it again --

23         THE COURT:  Go ahead.

24         THE WITNESS:  -- if possible.

25         THE COURT:  Sure.  Go ahead.

1          THE WITNESS:  Thank you.

2          MR. WERTHEIMER:  Your Honor, while he's doing that,

3    if I could inform the Court this was a document that was

4    withheld based on attorney-client privilege.  It was

5    privilege log Number 6 of the state's log.  It was produced

6    as part of the agreement that the state and I ended up making

7    relative to those privilege logs that we argued in front of

8    this Court a couple days ago, and in producing it, they

9    specifically waived in writing the attorney-client privilege.

10          THE COURT:  Thank you, sir.

11          MR. WERTHEIMER:  Yes.

12          THE COURT:  Did you receive this e-mail?

13          THE WITNESS:  Yes.

14          THE COURT:  All right.  The objections are

15    overruled, and Exhibit 625 is admitted into evidence.

16      (Exhibit 625 received at 1:52 p.m.)

17          THE COURT:  Can we get a couple more copies of this,

18    please?  Do you have --

19          MR. WERTHEIMER:  Yes.

20          THE COURT:  -- extras to provide?

21          MR. WERTHEIMER:  Yes, you can.  I've got a couple

22    here that are not marked 625.

23          THE COURT:  All right.  We'll take care of the

24    marking.  Don't worry about that.

25          MR. DECHIARA:  Your Honor, we're going to -- UAW is

1  going to submit binders tomorrow that will have multiple

2  copies of that exhibit.

3         THE COURT:  Okay.  That'll work, too.  Thank you,

4  sir.

5  BY MR. WERTHEIMER:

6  Q   All right, Governor.  My last round of questions is I'd

7  like to go through the contents of this e-mail, specifically

8  that part of it from Mr. Gadola ultimately to you, but

9  indirectly to you.

10 A   Um-hmm.

11 Q   Okay.  On the third line he indicates, Mr. Gadola does,

12 that he spoke to Rich this morning.  In context, would I be

13 right in suspecting that that would be Rich Baird?

14 A   I would assume so.

15 Q   Okay.  And Andy would be Andy Dillon?

16 A   Yes.

17 Q   And LG would be the lieutenant governor?

18 A   Yes.

19 Q   And who is the lieutenant governor, for the record?

20 A   Brian Calley.

21 Q   And one of the things that Mr. Gadola is communicating to

22 you is that Baird is now in favor of a more deliberative

23 approach at your end; correct?

24 A   He's stating what Rich Baird's view is.

25 Q   Yes.

1  A   Yes.

2  Q   Fair enough.  By the way, would it be correct -- if I

3  could move you off the document for just a minute, would I be

4  correct in recalling from your deposition that the only

5  investigation you did of the -- Orr's request on the 16th

6  related to assessing the lawsuits and taking his word for

7  some of the content of that letter; is that right?

8          MR. SCHNEIDER:  Objection, your Honor.  That's not a

9  correct statement, I believe, of what was taken at the

10 deposition.

11         MR. WERTHEIMER:  Well, it may not be, your Honor.

12 If I can go back, I'll get the correct statement.  I don't

13 want to -- I have no intention of misrepresenting.

14 BY MR. WERTHEIMER:

15 Q   I think I'm going to have to read a couple of questions

16 and answers to get this in context, if you'll bear with me,

17 because I want to make sure I'm accurate.  There was a

18 question, and this is on page 77, line 20.  "And did you

19 undertake any independent investigation or cause to be

20 undertaken any independent investigation to determine

21 whether, in fact, Mr. Orr's representation to you that there

22 had been" --

23         MR. SCHNEIDER:  Your Honor, I object.  There's no

24 foundation for this.  If he wants to ask the governor a

25 question, that's fine, but that's not what's going on here.

1    THE COURT:  The objection is sustained.  Just ask

2  the governor a question.

3    MR. WERTHEIMER:  All right.

4  BY MR. WERTHEIMER:

5  Q   Tell me what investigation you took between July 16th

6  when you received the Orr request and July 18 when you sent

7  the authorization back?

8  A   I actually asked and built in additional time to think

9  about it because of the consequence of this in terms of

10  decision-making process, so I had them expand the calendar

11  originally through that process to give me an extra night or

12  so to sleep on something like this and to go through my

13  process.  And I went back -- and I know you didn't care for

14  this last time, but literally I went back to since the time I

15  became governor walking through the entire process with Mayor

16  Bing about the prior review cycle at the end of 2011, 2012,

17  about the consent agreement.  I reviewed the other financial

18  review team reports.  I reviewed his 45-day report.  I

19  reviewed his proposal to creditors.  So I didn't go out and

20  find independent parties to do this, but I reviewed the file

21  and went back through the decision-making process to

22  recognize this was two and a half years of effort, and

23  basically then I made a decision.

24  Q   Fair enough.  And in fairness to you, I think I broadened

25  in my question what you were asked.

1  A   Yeah.

2  Q   And let me go down to the next question and answer, and I

3  think that --

4  A   Um-hmm.

5  Q   -- where we're only talking about -- or the question only

6  relates to the good faith negotiations, and I apologize for

7  being broader than I should have been.  At page 78, line 14,

8  this is --

9          MR. SCHNEIDER:  Same objection, your Honor.  He's

10  just reading the transcript.

11          THE COURT:  If you're trying to impeach the witness,

12  that's fine, but otherwise just ask a question.

13          MR. WERTHEIMER:  Okay.  Fair enough.

14  BY MR. WERTHEIMER:

15  Q   Would it be true, Governor, that the only thing you did

16  to check out the assertion that there had been -- there had

17  been good faith negotiations was to take a look at the

18  lawsuits or that issue and accept what Mr. Orr had in his

19  July 16th letter?  Did you do anything else relative to the

20  assertion that there had been good faith negotiations?

21  A   Well, I'd gone through multiple meetings where attorneys

22  were present where I would get updates on how meetings had

23  gone, and it wasn't just Mr. Orr.  Mr. Dillon was present and

24  those -- and other people that were monitoring this process.

25          MR. WERTHEIMER:  Well, your Honor, then I would

 1   offer two questions and answers to impeach, and this is page

 2   78, line 14, through 78, line 21.

 3   BY MR. WERTHEIMER:

 4   Q   "Question:  So just so I understand your answer, your

 5   acceptance of the truth of the assertion that there had been

 6   good faith negotiations were based on what you read in the

 7   July 16th letter" -- "Uh-huh" -- that was the answer --

 8   "Question:  -- and also the fact that certain lawsuits had

 9   been filed?"  "Answer:  Yes."  "Question:  Was there anything

10   else that you relied on to conclude that there had been good

11   faith negotiations?"  "Answer:  No."  Were those answers

12   truthful?

13   A   Well, I don't see the difference because in the letter --

14   Q   I'm not suggesting there is.

15   A   Okay.

16   Q   I'm just asking the question whether those answers were

17   truthful, Governor.

18   A   Yeah, in the context of he cited meeting dates that were

19   during the process where we had other meetings going on, and

20   I got updates.

21   Q   Fair enough.  Let's go back to 625.  The next sentence,

22   "Am I right in understanding that it's not just Baird, but

23   it's now Dillon and the lieutenant governor who are on board

24   with a more deliberative approach?"

25   A   That's what this e-mail says.

1  Q   And then what they suggest is you writing a letter back

2  to Mr. Orr and then the process continuing from there; is

3  that correct?

4  A   That's, again, what this e-mail says.

5  Q   Let's go to the next paragraph of the letter -- or I'm

6  sorry -- of the e-mail.  Mr. Gadola then says, "I favor this

7  approach for a number of reasons, but primarily because I

8  think we should exercise the governor's ability under PA 436

9  to include conditions upon his authorization for a bankruptcy

10  filing."  Do you recall receiving that opinion from your

11  attorney, Mr. Gadola, through this e-mail?

12  A   I saw it through this e-mail, and I had other

13  confirmation of that.

14  Q   In fact, it was your office that was instrumental in

15  getting the contingency language put into 436; isn't that

16  true?  That is, the Governor's Office.  I'm jumping around,

17  and I apologize.  We took a -- we took a deposition of the

18  state official from Treasury, who was authorized to speak for

19  the state about the issue of who was doing what relative to

20  the passage of 436.

21          THE COURT:  Counsel, it's not appropriate to advise

22  one witness of what another witness has said --

23          MR. WERTHEIMER:  I'm just trying --

24          THE COURT:  -- when they are sequestered.

25          MR. WERTHEIMER:  I understand, your Honor.  I'll

1    drop it.

2    BY MR. WERTHEIMER:

3    Q    Mr. Gadola specifically mentions vested pension benefits,

4    does he not?

5    A    Yes.

6    Q    And it's in the context of talking or recommending to you

7    that you put contingencies on a bankruptcy filing; correct?

8    A    I'm not sure what sentence you're looking at.  The one

9    I'm looking at said "could also include."

10   Q    Yes.

11   A    So it doesn't imply he's saying it has to but could

12   include.

13   Q    That's right, could include, but what -- the overall --

14   A    And it talks --

15   Q    -- subject of this paragraph is the contingency issue;

16   isn't that right?

17   A    It talks about vested pension benefits, GO debt,

18   disposition of assets, and assets greater than a certain

19   amount.

20   Q    Fair enough.  I didn't ask about those, but it does say

21   other things; correct?

22   A    Yes.

23   Q    Okay.

24        MR. WERTHEIMER:  I have nothing further subject to

25   checking with my co-counsel.  I have no further questions,

1  Governor.  Again, thank you for your time.

2          MR. DECHIARA:  Good afternoon, your Honor.  Peter

3  DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for

4  the UAW International Union.

5                          DIRECT EXAMINATION

6  BY MR. DECHIARA:

7  Q    Good afternoon, Governor.

8  A    Good afternoon.

9  Q    Governor, did Mr. Orr send a draft of his July 16th

10  letter to you before he sent the actual letter on July 16th?

11  A    I don't recall that.

12  Q    Do you know whether he sent a draft of the letter to your

13  staff?

14  A    I don't recall.

15  Q    Do you know whether he sent a draft of the letter to Mr.

16  Dillon?

17  A    I don't recall.

18  Q    Do you know if he sent a draft of the letter to Mr.

19  Dillon's staff?

20  A    I don't recall.

21  Q    Okay.  Now, it's true that you were sent a draft of the

22  June 14th proposal to creditors; correct?

23  A    Yes.

24  Q    And you reviewed it?

25  A    Yes.

1  Q   And you gave feedback on it; correct?

2  A   I don't recall much feedback on it.

3  Q   Well, do you recall giving feedback?

4  A   No.  I don't recall specific feedback.

5  Q   I'm not asking you whether you recall specific feedback.

6  Do you recall giving any feedback?

7  A   I recall letting him know I read through it.

8  Q   But no feedback?

9  A   No.

10  Q   Do you recall giving a deposition on October 9th, 2013,

11  in this proceeding?

12  A   Yes.

13  Q   And did you testify truthfully at that deposition?

14  A   Yes.

15  Q   I'd like to refer you to page 61 of the deposition, line

16  1.

17          "Question:  Okay.  Did you comment on the draft?

18          Answer:  I generally reviewed it and just gave

19      general feedback."

20      Does that refresh your recollection about whether

21  you gave feedback on the draft?

22  A   Yeah.

23  Q   Did you give feedback on the draft?

24  A   Well, again, just general comments, thanks for sending me

25  the draft.

1  Q   And you saw in the proposal, did you not, that there was

2  language that said that there must be significant cuts to

3  accrued pension liabilities?

4  A   Yes.

5  Q   Okay.  Did you raise any -- did you comment on that

6  language?

7  A   No.

8  Q   Okay.  So by that answer, I assume you did not say to

9  Mr. Orr or to his staff that you opposed that position;

10 correct?

11 A   In their presentation in the draft in the way they

12 described it to me, this was just the opening to describe the

13 factual situation to start a dialogue with creditors.

14 Q   That's not my question.  Let me ask this question.  Did

15 you say to Mr. Orr or his staff that you opposed the position

16 that was laid out in the proposal that said that there must

17 be significant cuts to accrued pension liabilities?

18         MR. SCHNEIDER:  I object to any question that might

19 be leading us into the area of attorney-client privilege,

20 which I believe this may be.

21         MR. DECHIARA:  Your Honor, there's been absolutely

22 no testimony that there are any lawyers involved, and even if

23 there were, the governor commenting on the proposal --

24 there's already been testimony on it.  And in any event, it's

25 not -- doesn't go to attorney-client privilege.

1        THE COURT:  The objection is overruled, but having

2   said that, counsel, I would ask you and caution you not to

3   ask the very same questions that Mr. Wertheimer asked.

4        MR. DECHIARA:  Your Honor, I'll try my best.  I

5   really will.

6        THE COURT:  I must insist on it.

7        MR. DECHIARA:  I will try my best.  Let me ask the

8   same question.

9        THE COURT:  Okay.  I'm going to assume you didn't

10  mean that.

11       MR. DECHIARA:  Oh, your Honor, I don't believe there

12  was any -- this was asked on the prior examination, and I

13  think this is -- I don't recall --

14       THE COURT:  Okay.  I'll give you --

15       MR. DECHIARA:  -- this being asked on the prior

16  examination.

17       THE COURT:  I'll give you one more shot.  Go ahead.

18       MR. DECHIARA:  Okay.  Thank you.

19  BY MR. DECHIARA:

20  Q   Governor, did you say anything to Mr. Orr after you

21  reviewed the June 14th creditors' proposal that you objected

22  to the position that was set out there, namely that there

23  must be significant cuts to accrued pension liabilities?

24  A   Again, there would have been attorneys present, but I'm

25  confused enough now where --

1        THE COURT:  Well, if you are claiming the privilege,

2   we will deal with that.  Is that your claim, sir?

3        MR. DECHIARA:  Your Honor, I believe you overruled

4   counsel's attorney-client objection, so is -- are you

5   sustaining the governor's objection?

6        MR. SCHNEIDER:  Renewing my objection, your Honor.

7        MR. DECHIARA:  You're withdrawing it?

8        THE COURT:  Okay.

9        MR. SCHNEIDER:  I'll renew it.

10       THE COURT:  Hang on.  Hang on.  All right.  So I

11  already permitted testimony on this, and, if so, why are we

12  asking the question again?

13       MR. DECHIARA:  The question has not been answered.

14  My recollection of the sequence of events was I asked the

15  question, counsel objected, you overruled the objection.  I

16  asked the question again.  The witness objected.  So I think

17  that's where we are.

18       THE COURT:  No, but when Mr. Wertheimer was

19  questioning, wasn't this exact question asked?  In fact,

20  after the attorney-client privilege was overruled, I asked

21  the question.  Let's move on here.

22       MR. DECHIARA:  Should I not ask the question, your

23  Honor?

24       THE COURT:  Let's move on.

25       MR. DECHIARA:  Okay.

```
 1   BY MR. DECHIARA:

 2   Q    Governor, do you support -- at the time you read that

 3   language in the proposal, did you support -- do you agree

 4   with that position that there must be significant cuts in

 5   accrued pension liabilities?

 6   A    No.

 7   Q    You do not agree with that position?

 8   A    Again, I think it's speculation at this point in time.

 9   Q    I'm asking you at the time that you read the proposal,

10   did you agree with what was set out in the document?

11   A    It used the word "must," and it was to go through a

12   negotiation process, so good faith parties could come up with

13   any arrangement they wanted to.  Again, the numbers could be

14   difficult to get there, but to say it's impossible, I

15   couldn't say that.

16   Q    Let me try to simplify it.  Do you agree with the

17   position that there must be -- as you sit here today, do you

18   agree with the position that there must be significant cuts

19   to accrued pension liabilities?

20   A    Again, that's one of the issues in Chapter 9.  I view

21   this as not a matter of speculation.  It depends on the plan

22   and the judge's approval.

23   Q    I'm not asking for any speculation.  I'm asking if you

24   agree with that position.

25   A    Well, again, there's no plan been submitted yet.
```

1  Q   I'm asking if you agree with that position, Governor.

2  A   I don't necessarily know there have to be, and, again,

3  it's not my decision to make that call.

4  Q   Did you believe -- when you received the July 16th

5  request by Mr. Orr for permission to file for bankruptcy,

6  there was reference to the June 14th creditors' proposal in

7  it, was there not?

8  A   Yes.

9  Q   Okay.  And you approved the request to file for

10 bankruptcy; correct?

11 A   Yes.

12 Q   Okay.  Did you undertake any investigation before you

13 approved the filing for bankruptcy of what impact that

14 proposal would have on the retirees of the City of Detroit?

15 A   Yes.

16 Q   What investigation did you undertake?

17 A   Well, not investigation, but understanding from the

18 creditors' proposal it would have a dramatic impact, but also

19 the points in Mr. Orr's letter -- he pointed out why the

20 creditors' proposal didn't appear to be feasible.

21 Q   Did you know the -- when you approved the bankruptcy

22 filing, did you know the extent of the cuts to pension

23 liabilities that were being proposed by Mr. Orr?

24 A   Again, they were contingent, so it could have been any

25 amount of numbers, and it was subject to negotiation.

1   Q   So you didn't know how much Mr. Orr -- when Mr. Orr said

2   there must be significant cuts, you didn't know what he had

3   in mind in terms of the extent of the cuts, if he had

4   anything in mind.  Is that a fair statement?

5   A   Yes.

6   Q   Did you ask Mr. Orr before you approved the bankruptcy

7   filing how much he intended to cut people's -- retirees'

8   pensions?

9   A   Those would have been in meetings subject to attorney-

10  client privilege.

11  Q   So are you refusing to answer the question on attorney-

12  client privilege?

13          MR. SCHNEIDER:  Objection based on attorney-client

14  privilege.

15          MR. DECHIARA:  Your Honor, are you sustaining the

16  objection?

17          THE COURT:  Would you like to be heard on whether

18  it's an appropriate claim of privilege?

19          MR. DECHIARA:  Yes.  I don't think just the fact

20  that there were attorneys present makes the communication

21  between the governor and the emergency manager privileged.

22  It doesn't deal with a legal issue.  It's just a question

23  about whether he inquired of Mr. Orr.  It goes directly to

24  the question of authorization.

25          THE COURT:  Well, I assume it's relevant, but that

1   doesn't make it any less protected by the attorney-client

2   privilege.  If there were attorneys there, I will sustain the

3   claim of privilege.

4   BY MR. DECHIARA:

5   Q   Before you approved the bankruptcy filing, apart from

6   the --

7              THE COURT:  By the way, as a matter of procedure,

8   counsel, when the witness claims privilege, there's no need

9   to object on the grounds of privilege.  If counsel wishes the

10  witness to be compelled to answer in the face of the claim of

11  privilege, he will make such a motion, and then you'll be

12  heard.

13             MR. SCHNEIDER:  That's fine, your Honor.  Thank you.

14  BY MR. DECHIARA:

15  Q   Did you understand that the proposal provided that in

16  exchange for the cuts in accrued pension liabilities the

17  retirees would get certain notes?

18  A   Yes.

19  Q   Okay.  And did you know what the value of those notes

20  would be that the retirees would get?

21  A   I knew the principal amount of the notes.

22  Q   But did you know how much the value of the notes would be

23  that the retirees would get?

24  A   Not to a specific number.

25  Q   Okay.  Did you have any idea?

1  A    It would be a significant discount for the unfunded part

2  of the obligation.

3  Q    Was it your understanding that the notes would be

4  interest only; in other words, that the retirees would not

5  have an entitlement to receive principal on the notes?

6  A    I don't recall.

7  Q    You didn't know that?

8  A    That's different than "I don't recall."

9  Q    Okay.  So let me clarify the question.  Did you know at

10  the time that you approved the bankruptcy filing whether or

11  not the notes would be interest only?

12  A    Again, that's where I don't recall.

13  Q    You don't recall whether you knew or not?  Is that your

14  answer?

15  A    I don't recall what the notes said specifically in terms

16  of their terms other than understanding there was a

17  contingent note.

18  Q    Did you, before you approve the bankruptcy filing,

19  undertake -- apart from anything you said to Mr. Orr,

20  undertake any investigation or have any investigation

21  undertaken for you to assess how much the cuts in pension

22  liabilities would impact the retirees?

23          THE COURT:  Asked and answered, your Honor, and I

24  believe Mr. Wertheimer also went into this area.

25          MR. DECHIARA:  I'll strike that question.

1   BY MR. DECHIARA:

2   Q   Did you investigate how much an average retiree of the

3   City of Detroit receives annually in retirement benefits?

4           MR. SCHNEIDER:  Again, your Honor, asked and

5   answered.  We're covering the same ground.

6           MR. DECHIARA:  I don't believe it was, your Honor.

7           THE COURT:  I'll permit this one.  Go ahead, sir.

8   Please answer.  Did you do such an investigation?

9           THE WITNESS:  I had seen accounts in the press of

10  what pension benefits were for a number of the retirees.

11  BY MR. DECHIARA:

12  Q   And did you rely on those accounts in the press?

13  A   Some of them, yes.

14  Q   Okay.  Did you undertake any investigation -- given the

15  powers of your office and the resources at your disposal, did

16  you undertake or have an investigation undertaken to

17  determine the annual average pension benefits received by

18  retirees?

19  A   No.

20  Q   You just -- whatever -- you just read about it in the

21  newspaper.  Is that your testimony?

22  A   Again, there would have been meetings subject to

23  attorney-client privilege.

24  Q   I'm not asking anything about meetings or attorney-client

25  privilege.  I'm asking you did you rely on what you read in

1  the newspaper?

2  A   I had other information that would have been in meetings

3  provided to me where attorneys were present.

4  Q   And what was your understanding of the average annual

5  pension benefit received by a retiree?

6  A   Again, it would have been in the thousand to $2,000-a-

7  month range.

8  Q   Okay.  So about 12,000 to 24,000 annually; is that -- am

9  I doing the math right?

10  A   Sounds like it.

11  Q   Okay.  Did you do any investigation or cause any

12  investigation to be undertaken whether a retiree whose

13  pension is between 12 and $24,000 a year, if significant

14  amounts of that income was cut, whether the retirees would be

15  able to pay their mortgages or pay their rent necessary to

16  stay in their homes?

17           MR. SCHNEIDER:  Objection.  Relevance.

18           MR. DECHIARA:  Your Honor, the governor approved the

19  bankruptcy filing based on -- he said he read the proposal --

20  based on the proposal.  I'm trying to inquire into the state

21  of the governor's knowledge when he approved the bankruptcy

22  filing.  I think to say -- let me just say this.  To say

23  that -- these questions all go to the impact that these cuts

24  that Mr. Orr has proposed and that the governor knew about

25  and that the governor approved -- to say that the impact of

1  these cuts are going to have on the retirees and whether

2  they're going to be able to put food on the table and pay

3  their rent --

4          MR. SCHNEIDER:  Objection, your Honor, to --

5          MR. DECHIARA:  To say that's irrelevant to this

6  proceeding --

7          MR. SCHNEIDER:  -- not only --

8          THE COURT:  I need to hear the response to your

9  objection, sir.

10          MR. SCHNEIDER:  I believe he's testified --

11          MR. DECHIARA:  To say that's irrelevant to this

12  proceeding I think is incorrect.

13          THE COURT:  Well, but your objection to eligibility

14  is that this bankruptcy will impair the pensions regardless

15  of their impact; right?

16          MR. DECHIARA:  I'm sorry, your Honor.

17          THE COURT:  Your objection to eligibility here is

18  that pensions will be impaired regardless of their impact.

19  Yes?  Yes?

20          MR. DECHIARA:  We object to any impairment of

21  accrued pension liabilities.  That's correct.

22          THE COURT:  All right.  So it's not on the grounds

23  of impact.  Its on the grounds of the Constitution.  Yes?

24          MR. DECHIARA:  Correct, but that's not our only --

25          THE COURT:  All right.  So the objection is

1    sustained.

2    BY MR. DECHIARA:

3    Q    You testified earlier that since Mr. Orr has been

4    emergency manager, you've had regular meetings with him;

5    correct?

6    A    Yes.

7    Q    And those are both meetings in formal settings without

8    other advisors present, other staff and advisors present, and

9    also one-on-one meetings; correct?

10   A    Yes.

11   Q    In Mr. Orr's July 16th letter to you requesting

12   permission to file bankruptcy, he asserted, did he not, that

13   there were $3.5 billion in accrued pension liabilities that

14   the city had?

15   A    Yes.

16   Q    Okay.  And you accepted that number as true?

17   A    I --

18   Q    It's a "yes" or "no" question.

19   A    I took that as a number that he was presenting in his

20   letter.  There's a variety of numbers out there.

21   Q    My question is did you take that number that he presented

22   as true?

23   A    I believed he was presenting a number he believed was a

24   true estimate.

25   Q    And did you agree that it was true?

1  A   I believe that there could be some reasonable range on

2  that, but it was within the reasonable range.

3  Q   And when you received the July 16th letter, you knew that

4  the emergency manager had not completed an analysis of what

5  assets of the city could monetized; correct?

6  A   Correct.

7  Q   And when you approved the bankruptcy filing, you were

8  aware or were -- let me ask you.  When you approved the

9  bankruptcy filing in your July 18th letter, were you aware

10  that a significant portion of the underfunded pension

11  liability of the City of Detroit was allocable to the Water

12  and Sewer Department?

13  A   I didn't know what percentage, but there would be some

14  portion --

15  Q   Did you know --

16  A   -- to Water and Sewer.

17  Q   Did you know that there was some percentage that was

18  allocatable?

19  A   Yes.

20  Q   Okay.  Let me refer you back to your deposition.  I'm

21  referring to page 59, line 2.

22          "Question:  Do you know whether a significant

23          portion of Detroit's unfunded pension liability is

24          allocable to the city's Water and Sewer Department?

25          Answer:  I'm not aware of that relationship."

1          Was that true at your deposition when you said you

2    were not aware of that relationship?

3    A    At that time.

4    Q    At the time of the deposition?

5    A    Yeah.

6    Q    And so since you -- so since then you've learned.  Okay.

7    My question was not that.  My question was at the time -- on

8    July 18th before your deposition, going back to July 18th --

9    A    I'm sorry.  I missed --

10   Q    Okay.  Okay.

11   A    That would be correct.

12   Q    We're not on the same page.

13   A    Yes.

14   Q    I think we are now.  At the time of the July 18th letter

15   that you issued approving the bankruptcy filing, were you

16   aware then that a significant portion of the city's pension

17   liability was allocable to the Water and Sewer Department?

18   A    Not at that time.

19   Q    You were aware, were you not, that under law you could

20   have, had you chosen, put a contingency on your approval and

21   made the bankruptcy filing contingent on Mr. Orr not seeking

22   to impair accrued pension liabilities?  Are you aware that

23   you had that power?

24   A    Yes.

25   Q    Okay.  And you chose not to exercise it?

1    A    Yes.

2    Q    Did you speak to Mr. Orr at any time about using Chapter

3    9 to get -- to eliminate pension liabilities of the city?

4    A    Those discussions would have been with attorneys.

5    Q    Okay.  So are you refusing to answer the question?

6    A    Yes.

7    Q    Okay.  Did you speak to Mr. Orr at any time about the

8    timing of the bankruptcy filing?

9    A    Those discussions would have been with attorneys present.

10   Q    And you're refusing to answer that question?

11   A    Yes.

12           MR. DECHIARA:  Your Honor, I'm sorry if I'm taking

13   some time.  I'm trying to eliminate so --

14           THE COURT:  Okay.

15           MR. DECHIARA:  -- I don't duplicate.

16           THE COURT:  Take your time.  Actually, while you're

17   doing that, I'm going to consult with my court security

18   officer here, so give me just a minute, please.  You may

19   proceed whenever you are ready, sir.

20           MR. DECHIARA:  Thank you, your Honor.

21   BY MR. DECHIARA:

22   Q    Are you aware, Governor, that revenue sharing by the

23   state with the city -- in other words, monies given by the

24   state to the city -- have been reduced substantially over --

25   in recent years?

1          MR. SCHNEIDER:  Objection to relevance.

2          THE COURT:  No.  That objection is overruled.

3    Please answer the question.

4          THE WITNESS:  Yes.

5    BY MR. DECHIARA:

6    Q    And is -- that's true, that it has been reduced

7    substantially over recent years?

8    A    It has been reduced, yes.

9    Q    Okay.  Is it true, in your view, that if that state

10   revenue sharing had not been reduced, there might have been

11   monies to maintain the pensions of the Detroit retirees?

12   A    That would be speculative.

13   Q    Well, if the city had more money from the state, wouldn't

14   that -- wouldn't it not have more money available to pay for

15   pensions?

16   A    Again, that's speculative because there are approximately

17   somewhere between 15 and $18 billion worth of debt and needs

18   in the services for better services -- excuse me -- the

19   citizens having better services within the city.

20   Q    Did Mr. Orr at some point ask you whether his decision

21   whether or not to become emergency manager would impact the

22   decision on whether or not Jones Day would be hired as

23   restructuring counsel for the city?

24   A    Would you repeat that again?

25   Q    Sure.  It was a little complicated.  Did you -- excuse

1  me.  Did Mr. Orr at any point when he was a candidate for

2  emergency manager -- did he ever have a conversation with you

3  where he said something to the effect of, "I don't want my

4  decision as to whether or not I accept the job to impact

5  Jones Day's chances of being hired as restructuring counsel

6  for the city"?  Did Mr. Orr ever say anything to you --

7  A    I don't recall.

8  Q    -- along those lines?

9  A    I don't recall that.

10 Q    Did Mr. Orr ever come to you at any point since he's been

11 emergency manager asking whether or not the state would share

12 in the financial burden of some or all of Detroit's pension

13 liabilities?

14 A    That would have been in meetings with attorneys present.

15 Q    I'm just asking whether that conversation occurred.

16 A    That particular question I don't recall being ever

17 brought up.

18 Q    You don't recall whether it was ever brought up, but if

19 it did, it was -- it happened before attorneys?  Is that your

20 testimony?

21 A    Well, again, we had discussions on pensions, but

22 attorneys were present in those meetings.

23 Q    Right, but this is a specific question.  Did Mr. Orr ever

24 have discussions with you about the state sharing in the

25 financial burden in whole or in part of Detroit's financial

1  liabilities?

2  A   I don't recall.

3       MR. DECHIARA:  Nothing further, your Honor.

4       THE COURT:  All right.  Hang on.  We're going to

5  take our afternoon break at this time for 15 minutes.  Well,

6  actually until 2:45.  I will, however, ask everyone to remain

7  seated until the governor can make his exit, and so give us a

8  couple minutes for that, and then we'll reconvene at 2:45.  I

9  think the court security officer or one of them will show you

10 to the judges' conference room down the hall.

11      THE WITNESS:  Okay.  Just trying to show the right

12 etiquette, Judge.

13      THE COURT:  I'm sorry, sir.

14      THE WITNESS:  That you were leaving first.

15      THE COURT:  No, no, no.  I'm going to sit here with

16 everyone else, and then when you're all settled, we will go.

17 Okay.  All right.  We're going to be in recess.

18      THE CLERK:  All rise.  Court is in recess.

19      (Recess at 2:27 p.m. until 2:45 p.m.)

20      THE COURT:  You may proceed.

21      MS. LEVINE:  Good afternoon, your Honor.  Sharon

22 Levine, Lowenstein Sandler, for AFSCME.  Just to clarify the

23 record, AFSCME also served a trial subpoena and appreciated

24 the acceptance of service by the state.  Thank you.

25                  DIRECT EXAMINATION

1  BY MS. LEVINE:

2  Q   Good afternoon, Governor.

3  A   Good afternoon.

4  Q   Briefly, do you recall a coalition of unions negotiating

5  a tentative agreement with the City of Detroit back in -- in

6  or around February of 2012?

7  A   I don't recall.

8  Q   If I could try just to refresh your recollection for a

9  moment, there were about 30 unions that negotiated a

10  tentative agreement that was a concessionary agreement that

11  resulted in savings for the city.  The unions ratified that

12  agreement and then were advised by the city that the state

13  asked them not to implement it.  Are you familiar with that?

14  A   I recall the general topic but no specifics.

15  Q   Do you know why the state asked the city not to implement

16  the terms of the concessionary agreement, which would have

17  provided for savings to the city?

18          MR. SCHNEIDER:  Objection to relevance.

19          THE COURT:  Overruled.  Please answer.

20          THE WITNESS:  I don't recall.

21  BY MS. LEVINE:

22  Q   Governor, it's true, is it not, that in a nonmunicipal

23  bankruptcy case, the Pension Benefit Guarantee Corp. or the

24  PBGC provides insurance coverage for retirees if their

25  pensions are terminated; correct?

1  A   For private entities, I believe that's true.

2  Q   For private entities with, for example, single employer

3  defined benefit plans; correct?

4  A   Yes.

5  Q   And the current level of protection provided by the PBGC

6  is $57,500; is that correct?

7  A   I wouldn't be aware of that number.

8  Q   Well, isn't it true that -- our understanding is that the

9  average pension in Detroit is approximately $18,000 a year,

10  but even using your figure of between one or $2,000 a month,

11  which is slightly higher, isn't it true that all of the

12  retirees in Detroit would fall within the limits of the PBGC

13  protections?

14  A   Again, I'm relying on your statements.

15  Q   So it's true, though, that all of the retirees would fall

16  within the limits of about $57,000, in fact, substantially

17  under $57,000 a year?

18  A   Again, I don't know to a fact that every retiree is under

19  that number.

20  Q   Okay.  We'll try this a different way.  You reviewed the

21  June 14th proposal prior to the time of the June 14

22  presentation; correct?

23  A   Yes.

24  Q   Were you present at the June 14 presentation?

25  A   No.

1  Q   Kevyn Orr was present at the June 14 presentation?  Yes?

2  A   Yes.

3  Q   But he had discussions with you prior to that time?

4  A   Yes.

5  Q   And you reviewed the presentation before it was made;

6  correct?

7  A   Yes.

8  Q   And on page 109 of the presentation, which was Exhibit

9  43, and on page 59 of the executive summary of the

10  presentation, which is Exhibit 44, there is a comment with

11  regard to underfunded pension, and I'm just going to read it

12  so we don't have to find the document right now.  "Because

13  the amounts realized on the underfunding claims will be

14  substantially less than the underfunding amount, there must

15  be significant cuts in accrued vested pension amounts for

16  both active and currently retired persons."  Do you recall

17  that?

18  A   Yes.

19  Q   Did you read that before June 14?

20  A   Yes.

21  Q   Now, with regard to the amount of the underfunding, I

22  believe you previously testified today that you don't know

23  what it is, is that correct, as we sit here today?

24  A   Yes.

25  Q   And it would be speculative to guess what it would be as

1  you sit here today; correct?

2  A   Yes.  There could be a wide range on that.

3  Q   So there is nothing in this so-called proposal to

4  creditors, for example, that would say to a retiree that if

5  they earn currently $18,000 a year, that after the proposal

6  was implemented, if it's implemented, their annual benefit

7  will drop to nine, five, four, or zero; correct?

8  A   Well, that was a proposal subject to mutual negotiations,

9  so it didn't --

10  Q   No, no, but under the proposal, regardless of what the

11  mutual negotiation is, if I'm a retiree -- Sharon Levine is

12  86 years old.  I live in Detroit.  I look at this proposal,

13  and I say to myself, okay, I currently get $18,000 a year.

14  After the proposal, my vested accrued pension benefit payment

15  will now drop to nine, five, seven, whatever the number is.

16  You can't tell that from this proposal; correct?

17  A   I believe that would be difficult.

18  Q   And in addition to that, it talks about a $2 billion note

19  for all of the unsecured creditors to share; correct?

20  A   Yes.

21  Q   And we don't know what the total universe of all

22  unsecured claims are, do we?

23  A   I believe -- well, there's an estimate in the proposal to

24  creditors.

25  Q   Right, but as we sit here today, exactly what that number

1  is going to be, we don't know what it is, do we?

2  A   Correct.

3  Q   And so any individual creditor doesn't really know, as we

4  sit here today, what their share of the $2 billion note will

5  be over the term of that note; correct?

6  A   Well, you said "will be."  You're assuming that will be

7  the case.  That's past tense now that --

8  Q   Let's go back.

9  A   -- we're in bankruptcy.

10 Q   Let's go back to June 14 again.  I'll try it again.

11 Okay.  On June 14 the city made a proposal that you read

12 before it was made.

13 A   Yes.

14 Q   Okay.  And a retiree reading that proposal doesn't know

15 what their post-proposal, if it's implemented, retiree annual

16 benefit is going to be post-proposal.  We just had that

17 conversation.  We don't know if 18 is dropping to 9 or 4 or 7

18 or whatever the number is going to be; correct?

19 A   I'm not trying to be difficult, but you're speaking in

20 the future tense.

21 Q   No.  I'm speaking in the past.  In other words, one of

22 the things we're looking at --

23 A   You said what it will be --

24 Q   Okay.  I'll rephrase it.

25 A   -- or what it would have been.

1  Q   I'll rephrase.

2  A   Yeah.

3  Q   I'll rephrase.

4  A   I'm sorry.  I'm just trying to make sure I'm answering --

5  Q   I'll rephrase.  Going back to June 14, we're making a

6  proposal; right?  We have a proposal.  It's the so-called

7  proposal to creditors.  A retiree is a creditor; correct?

8  A   Yes.

9  Q   Okay.  An individual retiree picks up the proposal or

10  takes it off the website or comes to one of the public

11  meetings.  They currently get $18,000 a year.  They take a

12  look at this proposal.  There is nowhere in that proposal

13  that tells them what they're going to get if the proposal is

14  implemented on that -- what they now know to be their $18,000

15  a year; correct?

16  A   Yes.

17  Q   Okay.  And in addition to that, whatever that

18  underfunding is would -- if I understood your testimony

19  correctly, would be part of what gets paid under the $2

20  billion note; correct?

21  A   Yes.

22  Q   Okay.  Now, there's nothing in that proposal, though,

23  that would tell an individual creditor or an individual

24  retiree exactly what their proportionate share of the $2

25  billion note would be; correct?

1    A    I thought you already asked that, but yes.

2    Q    Well, but we were -- okay.  So that's good.  So we don't

3    know what we're getting on our annual pension benefit

4    anymore, and we don't know what our claim is going to be

5    worth as we read the June 14 proposal for creditors; correct?

6    A    Yes.

7    Q    Okay.  In addition to that, as we sit here today, is it

8    your understanding that the individual retiree asserts a

9    claim for the underfunding portion, or is it, as the city

10   contends, only the Retirement System that asserts that claim?

11   A    That would be a legal question that I'd leave to the --

12   Q    So a retired person who is coming to the June 14 meeting

13   doesn't know what their annual pension benefit is going to be

14   reduced to, doesn't know what their pro rata share of this $2

15   billion note is going to be, and doesn't even know if they're

16   going to be allowed to assert a claim to share in the $2

17   billion note; is that correct?

18   A    If you're speaking in the present tense, I believe one of

19   the first things that was requested by the city during the

20   bankruptcy process was to have someone represent the

21   creditors so they would have a voice at the table, so I view

22   that as one of the constructive issues that I looked at that

23   retirees weren't having the kind of representation I thought

24   they deserved until we got into this process.

25   Q    Okay.  But I'm going to ask my question again.  On June

1    14, if you're a retiree and you're reading this proposal --

2    okay -- you cannot tell -- it's correct that you can't tell

3    what your -- and I'm using a hypothetical -- $18,000 a year

4    is going to be reduced to, you can't tell what your pro rata

5    share of the $2 billion note is going to be in real

6    quantifiable dollars, and you don't know even if you're going

7    to be allowed to assert that claim or whether that claim only

8    gets asserted by the pensions themselves; isn't that correct?

9    A    The first two statements I would say yes.  The third one

10   is a legal question that I don't know the answer to.

11   Q    But, Governor, if you don't understand it, how does the

12   86-year-old retiree understand it?

13   A    Again, that's --

14            MR. SCHNEIDER:  Objection.  Speculation.

15            THE COURT:  Overruled.  Can you answer the question?

16            THE WITNESS:  That would have been the part of the

17   negotiate process because I believe Mr. Orr was trying to

18   have meetings with various union and other representatives to

19   potentially represent the retirees.  My understanding is in

20   many cases they would not take up that interest in

21   representing the retirees.

22   BY MS. LEVINE:

23   Q    Governor, are you aware that AFSCME wrote several letters

24   to Jones Day and Miller Buckfire requesting meetings prior to

25   the filing of the bankruptcy case on July 17 requesting

1    meetings with regard to negotiations?

2    A    No.

3    Q    Were you aware that those requests were declined?

4    A    No.

5    Q    In response to earlier questioning, you said if the Court

6    ordered you -- sorry.  In response to prior questioning with

7    regard to not diminishing or impairing vested pension

8    benefits, I believe you testified, and I quote, here today,

9    if the court ordered you had to pay them, you would pay them.

10   Is that a true statement?

11   A    I will follow a lawful order of a court every time.

12   Q    So if this Court finds --

13   A    That's my goals as governor.

14   Q    So if this Court finds that it's unconstitutional or

15   unconstitutional as applied to impair or diminish vested

16   pension benefits, are you, as the governor of the State of

17   Michigan, saying that the state will pay those pension

18   benefits?

19   A    I think you're asking a broader question in that context

20   because the case is with the City of Detroit, not the State

21   of Michigan.

22   Q    Your comment was if the court ordered you had to pay

23   them, you would pay them.

24   A    If the court through this process -- if I have a valid

25   judicial order that's been reviewed and gone through the

1  judicial system ordering me to take an action, I'm going to

2  follow the action of the court.

3  Q   As we sit here today, have you or has anyone on behalf of

4  the state offered to Detroit or Kevyn Orr state funding to

5  avoid impairing or diminishing pension benefits?

6  A   Those discussions would have been with attorneys present.

7  Q   I'm not asking you what the discussions were.  I'm not

8  asking what you said or what they said.  I'm asking as we sit

9  here today, have you or has anyone on your behalf or on

10 behalf of the state offered Detroit or Kevyn Orr state

11 funding to avoid impairing or diminishing vested pension

12 benefits?

13      THE COURT:  I'm going to ask you to answer that

14 question but with one further limitation, which is I don't

15 want you to disclose any conversations that you have had or

16 that you are aware has been had in the context of the

17 District Court's mediation here.

18      MS. LEVINE:  And we weren't looking for that, your

19 Honor.

20      THE COURT:  So with that limitation, would you

21 answer the question?

22      THE WITNESS:  Could you walk through that one more

23 time for me?  Sorry.

24 BY MS. LEVINE:

25 Q   As we sit here today --

1          THE COURT:  That's all right.  That's all right.

2    BY MS. LEVINE:

3    Q    -- have you or has anyone on your behalf or on behalf of

4    the state offered Detroit or Kevyn Orr state funding to avoid

5    impairing or diminishing vested pension benefits?

6    A    No.

7          MS. LEVINE:  No further questions, your Honor.

8                        DIRECT EXAMINATION

9    BY MR. KING:

10   Q    Good afternoon, Governor.

11   A    Good afternoon.

12   Q    My name is Ron King, and I represent the two Detroit

13   Retirement Systems.  If I understood your testimony

14   correctly, leading up to the June 18th authorization, you'd

15   indicated that this was a two-and-a-half-year-in-the-making

16   process.  Is that accurate?

17   A    I had been involved with serious discussions on Detroit's

18   financial condition over the last two and a half years, yes.

19   Q    And as part of those discussions, is it safe to assume

20   that there was substantial review of financial information,

21   compilation of multiple reports, in-depth analysis of cash

22   flow, and other factors that would go into evaluating the

23   financial condition of the city?

24   A    Yes.

25   Q    And, additionally, even dating back to 2012, the city had

1  professionals on board, consultants on board, that were

2  engaged in the process of conducting and compiling this

3  information and performing those types of reviews, to your

4  knowledge; correct?

5  A   Yes.

6  Q   So this has been a very lengthy ongoing process leading

7  up to your authorization on July 18th.  Is that accurate?

8  A   Yes.

9  Q   And you indicated that you were familiar with the June

10 14th proposal to creditors; correct?

11 A   Yes.

12 Q   And I believe you agreed that that June 14 proposal

13 actually used the language that there would be significant

14 cuts to pension benefits.  Is that accurate?

15 A   Yes.

16 Q   And I think you also stated just a moment ago -- and I

17 know you also did in your deposition -- that one of your

18 concerns understandably was that retirees would have a voice

19 in this process.  Is that accurate?

20 A   Yes.

21 Q   If the city were to put forth a proposal that didn't

22 contemplate an impairment or diminishment of pension

23 benefits, then there wouldn't be a need for the retirees to

24 have a voice, would there be?

25         MR. SCHNEIDER:  Objection.  Calls for speculation.

1        THE COURT:  Sustained.

2   BY MR. KING:

3   Q   Do you know if the city has set forth any other proposals

4   to creditors other than the June 14 proposal?

5   A   I wasn't present for the follow-up negotiations, the

6   meetings that would have taken place in terms of I wasn't

7   present in those meetings with all those various creditors.

8   Q   And do you know whether or not the city contemplated a

9   proposal that would not impair or diminish pension benefits?

10  A   I don't recall.

11  Q   Have you and Mr. Orr had any discussions that would

12  contemplate a proposal that would not include the impairment

13  or diminishment of pension benefits, and that's subject to

14  Judge Rhodes' caveat that obviously you can't include

15  anything that was done in the context of the mediation?

16  A   I'm trying to recall.

17  Q   And I can -- let me -- you want me to repeat the question

18  for you?  Have you or Mr. Orr had any discussions prior to

19  your June 18 -- your July 18th authorization about putting

20  forth a proposal to creditors that does not contemplate the

21  diminishment or impairment of pension benefits?

22        MR. SCHNEIDER:  Objection if the question is calling

23  for attorney-client privileged information.

24        MR. SHUMAKER:  Same objection.

25        THE COURT:  You can answer that question if it does

 1  not involve communication with counsel.

 2          THE WITNESS:  It did involve counsel.

 3          THE COURT:  All right.

 4  BY MR. KING:

 5  Q   Thank you, Governor.

 6          MR. KING:  Can we see Exhibit 615, please?

 7  BY MR. KING:

 8  Q   And, Governor Snyder, if I could just focus your

 9  attention to the last sentence of the first paragraph, and

10  this is the e-mail from then Treasurer Dillon to you, and

11  that sentence says, "Because pensions have such a long life,

12  there are a lot of creative options we can explore."  Have

13  you explored any of these creative options that Treasurer

14  Dillon set forth in this e-mail to you?

15  A   In terms of this particular e-mail, what would have

16  happened is -- what happened is I believe there was a phone

17  conversation that he called me that evening and had a general

18  discussion on that.  I listened to what he had to say.  I

19  appreciated what he had to say.  And then I passed it on to

20  discussions with Kevyn Orr and the city in meetings that

21  attorneys were present at and giving advice on.

22  Q   Did any of these creative options contemplate a scenario

23  where pension benefits were not diminished or impaired?

24  A   I don't recall that specifically.

25  Q   And let me -- if we could put up -- oh, one more question

1   on this.

2          MR. KING:  Could we go back to the full text of the

3   e-mail, please?

4   BY MR. KING:

5   Q   In this e-mail, there's also a reference to at least

6   Governor -- or excuse me -- Treasurer Dillon's statement that

7   it's early in the process, and this is still in the

8   informational stage.  As of July 9th of 2013, did you believe

9   that statement to be true?

10  A   Which part?  I'm sorry.

11  Q   The part that's now --

12         THE COURT:  Would you just rephrase the question?

13         MR. KING:  Sure.

14  BY MR. KING:

15  Q   In this e-mail Treasurer Dillon says, "In my view, it's

16  too early in the process to respond to hypothetical

17  questions.  We remain in many ways at the information stage,"

18  and my question was as of July 9th, do you agree with that

19  statement?

20  A   That's what he shared with me, so I took that as

21  accurate.

22  Q   Do you agree that that's the case even today, as we sit

23  here today?

24  A   There's more work that's been done on the subject matter,

25  and I believe people are still analyzing data on this

1    question.

2    Q    Thank you.

3            MR. KING:  Can you put up UAW 625, please?  And can

4    you scroll down to the second full paragraph where it starts

5    "I favor"?  Thank you.

6    BY MR. KING:

7    Q    Now, this was an e-mail from your counsel to you, and --

8    A    Actually, it was not to me.  This e-mail wasn't -- you're

9    quoting the part from Mike Gadola to a number of people that

10   Mike Gadola -- that Dennis Muchmore then forwarded to me.

11   Q    Fair enough.  Did you see this statement here?

12   A    Yes.

13   Q    And did Mr. Gadola ever share with you his opinion that

14   you should exercise your ability under PA 436 to put

15   contingencies on the bankruptcy filing?

16   A    Yeah.  I don't want to be difficult here.  I just need

17   some help --

18   Q    Sure.

19   A    -- in the sense that it's in this document that's now an

20   exhibit, but Mike Gadola is my counsel, so he shared

21   information on this topic, but that's where I just need help

22   to know is that subject to privilege or because it's here

23   it's not anymore?

24           MR. KING:  Your Honor, I'm not familiar with the

25   agreement that Mr. Wertheimer entered into with the city, but

1    it's my understanding that there was a waiver of privilege at

2    least with respect to this document.

3         MR. SCHNEIDER:  Your Honor, the waiver is only as to

4    this document, nothing else.

5         MR. WERTHEIMER:  The waiver is as to this and other

6    documents but nothing beyond the documents.

7         MR. KING:  Let me move on, your Honor.

8         THE COURT:  All right.

9    BY MR. KING:

10   Q    At some point, you elected not to include any

11   contingencies with the authorization that you sent to Mr. Orr

12   on July 18th; correct?

13   A    Correct.

14   Q    And at the time that you sent that authorization to

15   Mr. Orr, you were aware of his public position and, of

16   course, the position set forth in the June 14 proposal that

17   he believed pension benefits needed to be significantly

18   reduced; is that correct?

19   A    Again, I didn't take the June 14th proposal as

20   conclusive.  Again, that was part of the mutual negotiation

21   process to avoid the bankruptcy.  Now that we're in

22   bankruptcy, it's really contingent on waiting for a plan on

23   bankruptcy to be presented to the judge.

24   Q    But at your deposition you indicated that you were aware

25   at the time that you executed the July 18th letter that it

1    was Mr. Orr's position that there had to be significant cuts

2    in accrued pension benefits?

3    A    It was what he presented in the proposal to creditors.

4    Q    And why is it that you chose not to put a contingency in

5    the July 18th authorization related to accrued pension

6    benefits?

7    A    I made a decision not to put a contingency with respect

8    to any conditions because my concern was is this is an

9    extremely difficult process; that we're in a crisis mode; and

10   that we have serious issues here.  And I felt it could be an

11   issue causing more delays, concern, complexity to a very

12   complex case to begin with; that I have confidence in the

13   judicial process, and that's why I actually asked that

14   additional statement to be added in that paragraph that any

15   plan that comes out of this has to be a legal plan.  I

16   thought it was a good opportunity to get people that are the

17   appropriate people to make decisions that then I can help

18   support the city in the implementation.

19   Q    But ultimately you decided that the July 18th

20   authorization should not have any contingencies?

21   A    Yes.  I made that decision.

22   Q    And I'm going to finish up, I think, where you started,

23   which was -- I think you testified very, very early on that

24   you believe that the issue affecting the Detroit bankruptcy

25   is one of I think national importance.

1   A   Not national importance.  It could be viewed that way.

2   My concern is with the citizens of Michigan and the City of

3   Detroit, including the retirees.  To the degree it affects

4   things nationally, that's a national issue.  What I was

5   putting in is if you look at difficult problems around our

6   country, this is a problem that's been accumulating for 60

7   years and had not been solved before, and there are not many

8   problems of this magnitude in our country.

9   Q   So you certainly would agree that the situation in

10  Detroit impacts the citizens of the State of Michigan?

11  A   Yes.

12  Q   And do you agree with me that until such time that the

13  people of the State of Michigan, through a lawful amendment

14  to the Constitution, choose to modify Article IX, Section 24,

15  that the state should otherwise honor that obligation?

16  A   I believe I'm following Michigan's Constitution and the

17  Constitution of the United States, and the article says

18  accrued financial benefits shall be treated as a contractual

19  obligation.

20         MR. KING:  Thank you, Governor.  Appreciate your

21  time.

22                DIRECT EXAMINATION

23  BY MS. PATEK:

24  Q   Good afternoon, Governor.  Barbara Patek.  I represent

25  the four public safety unions that represent the police and

1  fire fighters of the City of Detroit, and I have just a

2  handful of questions for you.  I want to start with Public

3  Act 436.  Obviously you're the chief executive of our state,

4  and you're not a legislature, but Public Act 436 was an act

5  that you favored; is that right?

6  A    Yes.

7  Q    And you favored it because it provided a number of tools

8  that could be used in circumstances like that facing the City

9  of Detroit; correct?

10  A    That was very general.  I'd be happy to give you more

11  specific reasons.

12  Q    And I'm going to ask you about --

13  A    Okay.

14  Q    -- some of the -- I mean I'm not suggesting that there

15  aren't reasons --

16  A    Okay.

17  Q    -- but I'm going to ask you about some of those reasons.

18  Among those tools, it did allow, upon a finding of a

19  financial emergency, for the appointment of an emergency

20  manager like Mr. Orr; right?

21  A    Public Act 436 actually gives options to communities

22  about one of four courses to follow, which --

23  Q    Correct.

24  A    -- was an improvement on Public Act 4.

25  Q    I think you and I are talking about the same thing, but

1    I'm just asking about specific --

2    A    Okay.

3    Q    -- aspects of that.  So among those options is, under the

4    appropriate circumstances, an emergency manager like Mr. Orr

5    can be appointed.

6    A    A city may select that.

7    Q    And that occurred in this particular case; correct?

8    A    What happened in this particular case is Kevyn Orr

9    came -- originally this process was under Public Act 72; that

10   then he transitioned to Public Act 436.

11   Q    But at the time Kevyn Orr became first the emergency

12   financial manager under Public Act 72 or former Public Act

13   72, everyone knew that a few days hence that he would become

14   the emergency manager under Public Act 436; isn't that right?

15   A    He became -- it was under Public Act 72 that he would be

16   transitioning to 436, yes.

17   Q    And when that happened, you knew and the others involved

18   with the City of Detroit knew that within a few days after

19   that appointment because Public Act 436 would become

20   effective on March 28th of this year, that he would then --

21   Kevyn Orr would then become the emergency manager under

22   Public Act 436.

23   A    He would transition from one act to the other.

24   Q    And one of the -- one of the things that Public Act 436

25   also does is it allows an emergency manager to seek your

1   authorization to file for Chapter 9; correct?

2   A   Correct.

3   Q   And as we know, that, indeed, occurred in this case?

4   A   Correct.

5   Q   And we've talked a lot about -- well, strike that.

6   Another thing that Public Act 436 does is it is designed to

7   in a financial emergency situation reduce or eliminate under

8   certain circumstances the collective bargaining rights of

9   public employees.

10  A   It allows contracts to be changed in some fashion, yes.

11  Q   Including collective bargaining agreements, and it has --

12  A   There is a process, though, that has to be followed.

13  It's not simply a decision of the manager.

14  Q   And if that process is followed, those -- the right to

15  bargain collectively can be suspended?

16  A   Yes.

17  Q   And we talked about the June 14th proposal, and as I'm

18  hearing your testimony sitting here this afternoon, one of

19  the things that I hear you saying is it was the expectation

20  that there would be some kind of more robust give-and-take

21  negotiating process once that proposal was made that would

22  potentially result in a solution to one or more of the

23  problems facing the City of Detroit?

24  A   I'm not sure I follow you.  Could you --

25  Q   The June 14th proposal, I think you've indicated a number

1   of times you expect -- you expected that proposal to trigger

2   negotiations between the various interested parties.

3   A    Yes.

4   Q    And was it your expectation that that negotiating process

5   would take some time?

6   A    Given that it's an environment of crisis, it would -- it

7   could take some time, but hopefully it would be done promptly

8   and thoughtfully given the urgency.

9   Q    And one of the difficulties, as Ms. Levine went over with

10  you a few moments ago, with respect to the impairment of the

11  accrued vested pension benefits was the fact that there were

12  a lot of numbers missing from the equation; that is, exactly

13  what that impairment meant wasn't quite clear as of the time

14  of the June 14th proposal.  You would agree with that?

15  A    In the proposal itself there were open issues, but that

16  was the point of it being a proposal that needed further

17  negotiation.

18  Q    And I think you also told us when you made the decision

19  in response to Mr. Orr's July 16th letter to authorize the

20  Chapter 9 filing, you really went back over your term as

21  governor and reviewed for yourself the process of -- you

22  know, everything sort of that the City of Detroit had gone

23  through and the milestones that perhaps had not been met

24  and -- before you granted the authorization.

25  A    Yes.

1  Q   You are familiar, as the governor of the state, with Act

2  312?

3  A   Yes.

4  Q   And you know that that provides a mechanism that includes

5  mediation and arbitration of disputes between public safety

6  employees like police and fire with their various

7  municipalities?

8           MR. SCHNEIDER:  Objection as to the relevance.

9           THE COURT:  Overruled.  Go ahead.

10          THE WITNESS:  Yes.

11          MS. PATEK:  Can we have 720?  Hopefully this will

12  work.  You can go to the second page, please.

13  BY MS. PATEK:

14  Q   Were you monitoring or following closely the activities

15  in terms of what was going on with the financial emergency in

16  the City of Detroit after Mr. Orr's appointment on March

17  28th?

18  A   Well, I'm not sure how you define "following closely."  I

19  followed it.

20  Q   Were you aware that there were a number of collective

21  bargaining agreements among the public safety unions that

22  were due to expire as of June 30th of 2013?

23  A   I believe there were some.

24  Q   And would you agree with me -- well, strike that.  Are

25  you aware or did you play any role in the city's decision to

1   block the Act 312 proceedings associated with those efforts

2   to negotiate and extend those collective bargaining

3   agreements?

4   A   No.

5   Q   Would you agree with me that if the city were, in fact,

6   looking to negotiate and address the problem of the accrued

7   vested pension benefits, that, first of all, as a general

8   matter, there was at least some question as to whether

9   outside of bankruptcy those benefits could be impaired

10  because of the state Constitution?  Would you agree with

11  that?

12  A   I don't think I have enough knowledge to answer that

13  question.

14  Q   Would you agree that in the context of a negotiation and

15  perhaps as a quid pro quo for an extension of the term of the

16  contract, that that might be a place for the city to begin to

17  address on a relatively expeditious basis the accrued vested

18  benefits, at least of the active public safety employees

19  involved in those negotiations?

20          MR. SCHNEIDER:  Objection.  Calls for speculation.

21          THE COURT:  Overruled.  Excuse me.  Overruled.

22  Please answer.

23          THE WITNESS:  Again, I don't have enough knowledge

24  of the specifics of the situation that I would just be

25  speculating.

1          THE COURT:  Okay.

2    BY MS. PATEK:

3    Q    Do you know whether or not pursuant to Public Act 436 in

4    this case the collective bargaining rights of the public

5    safety employees were at least in some cases suspended by the

6    emergency manager?

7    A    I believe they had been suspended for some time under the

8    prior emergency manager laws.

9    Q    And that allowed the state to impose terms?

10   A    Again, it's not the state.  It would be the City of

11   Detroit.

12   Q    I'm sorry.  That allowed the city to impose terms.

13   A    Yes.

14   Q    Well, by the time the emergency manager took his role

15   under Public Act 436, if we focus on March 28th, 2013,

16   whether -- without getting into the specifics, would it be

17   fair to say that the legacy costs facing the City of Detroit

18   were in issue?

19   A    They had been an issue for some time.

20   Q    And having the opportunity to have a negotiation with the

21   public safety unions could provide a venue in which that

22   issue could be addressed?

23   A    That would be possible.

24   Q    Now, in terms of the proposed significant impairments to

25   pension benefits that we've been talking about, do you

1 understand that included in those accrued vested pension

2 benefits are the benefits belonging to the active public

3 safety -- that is, police and fire fighters -- who are

4 working today for the City of Detroit?

5 A   Yes.

6 Q   And do you understand that in addition to -- well, strike

7 that.  Are you aware that the police and fire fighters in the

8 City of Detroit do not have the benefit of Social Security?

9 A   Yes.

10 Q   And am I correct that in order for the City of Detroit to

11 be exempted from paying Social Security on behalf of those

12 fire fighters and police officers, it has to have a Section

13 218 agreement with the federal agreement?

14 A   I'm not aware of that.

15 Q   Are you aware that there has to be some sort of agreement

16 with the federal government under which the federal

17 government has to be satisfied that there is a qualified

18 pension plan to provide pension and disability benefits to

19 the affected employees?

20 A   No.  I'm not familiar with those federal statutes.

21 Q   And if I were to ask you whether or not you were aware of

22 the requirement that such a pension plan provide any minimum

23 level of benefits, I take it you're unaware of that?

24 A   With regard to federal law.

25 Q   And would it be fair to say that you were unaware of that

1    at the time you authorized the bankruptcy filing on July

2    18th, 2013?

3    A    Yes.

4           MS. PATEK:  I think that's all I have.

5           THE COURT:  Any other questions for the witnesses?

6           MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

7    Brimer.

8                          DIRECT EXAMINATION

9    BY MS. BRIMER:

10   Q    Good afternoon, Governor.  My name is Lynn Brimer.  We've

11   not met.  I represent an association, the Retired Detroit

12   Police Members Association, in this matter.  Your Honor,

13   my -- Governor, my line of questioning will probably be a bit

14   different, and if you don't mind to indulge me, I'd like to

15   ask just a few questions to get a little bit of the lay of

16   the land.  Treasurer Dillon is an appointee that you

17   appointed; correct?

18   A    Yes.

19   Q    And Treasurer Dillon and his staff ultimately would be

20   responsible for reporting to you in connection with their

21   activities on behalf of the State of Michigan.  Is that a

22   fair assumption?

23   A    Yes.

24   Q    Now, Richard Baird, do you mind explaining to me who

25   Richard Baird is?

1    A    Yeah.  He works as part of the executive office in terms

2    of his title is transformation manager with his primary

3    responsibilities involving human relations, HR functions, in

4    terms of sourcing people, finding people, counseling people.

5    Q    And does he report directly to you, or does he report to

6    some other representative in the executive office?

7    A    No.  He reports to me.

8    Q    Now, at some point in 2011, Public Act 4 was referred --

9    a petition was circulated, and the matter was referred for

10   being placed on the 2011 ballot for a referendum; is that

11   correct?

12   A    I believe it was the 2012 ballot.

13   Q    You know, your Honor -- Judge -- Governor, yes, you are

14   right.  It was in early 2012.

15   A    It was suspended and then went on the ballot in November

16   of two thousand --

17   Q    Do you recall when PA 4 was suspended?

18   A    I don't recall the specific date, but it would have been

19   in the earlier part of 2012.

20   Q    And do you have an understanding of what the implications

21   were of PA 4 being suspended?

22   A    It meant that PA 72 came back, and that somewhat changed

23   the rules.  PA 72 has been around since 1990.  It provided

24   for emergency managers.

25   Q    So once it was suspended, you were no longer authorized

1   to appoint an emergency manager under PA 4; is that correct?

2   A    That's correct.

3   Q    And when PA 4 was placed on the ballot for referendum, it

4   became a concern to the state that it may be rejected; is

5   that correct?

6   A    It became a concern that I think it had some value.  I

7   wouldn't say to the state necessarily.  People had different

8   opinions of it.

9   Q    Did it become a concern to you personally that PA 4 may

10  ultimately be rejected?

11  A    Yes.

12  Q    So at some point in time, the state began drafting a new

13  law to replace PA 4.  Do you recall when that took place?

14  A    It was after PA 4 was eliminated.

15  Q    Are you aware of any discussions prior to the repeal of

16  PA 4 regarding the drafting of a law to replace PA 4 in the

17  event it was rejected?

18  A    There were many discussions about alternatives and issues

19  relating to PA 4's potential replacement because there were

20  actually issues with PA 4 in terms of approvement, so as soon

21  as PA 4 was passed, through that entire process, there was

22  issues talking about how PA 4 could be improved, and they

23  were talking about different options and ideas should PA 4 be

24  eliminated.

25  Q    Now, some --

1   A   But the actual process, the main process didn't take

2   place until after it was eliminated, as I recall.

3   Q   Sometime in approximately March of 2012, Miller Buckfire

4   was retained by the State of Michigan to perform a financial

5   review of the City of Detroit.  Are you familiar with that

6   engagement?

7   A   No.  I don't recall them being hired by the state.

8   Q   You are familiar that during the early months of 2012,

9   Miller Buckfire was, in fact, involved with a review of the

10  City of Detroit?

11  A   They could have been.  That could have been hired by the

12  city or -- again, they were doing work on the project

13  relating to the city.

14  Q   Are you aware of the law firm of Jones Day being retained

15  by the State of Michigan at any point in time in connection

16  with the City of Detroit?

17  A   No.

18  Q   Are you aware that representatives of Miller Buckfire and

19  Jones Day were involved with the Department of Treasury and

20  Mr. Dillon specifically in connection with negotiating the

21  consent agreement that was -- or drafting the consent

22  agreement, rather, that was presented to the City of Detroit?

23  A   Yeah.  I don't recall that.

24  Q   So if those activities were taking place, Miller Buckfire

25  was hired by the State of Michigan to perform a financial

1  review and Miller Buckfire and Jones Day were engaged in

2  drafting or working with Andy Dillon in connection with

3  drafting a consent agreement, you were not apprised of that?

4  A   Again, I would have been working with the treasurer on

5  the consent agreement.  They have lots of consultants that

6  they work with on a multitude of projects.

7  Q   So were you involved in the drafting of the law that was

8  ultimately passed and became PA 436?

9  A   Yeah.  Switching subject -- yes.

10  Q   And what was your involvement?

11  A   Well, as governor of the state, I am involved in the

12  legislative process, so I was involved in helping define some

13  of the key parts of Public Act 436 that I viewed as

14  improvements over Public Act 4 listening to what our citizens

15  said, and then ultimately I signed the bill into law.

16  Q   So one of those key provisions would have been, I think

17  you testified a few moments ago, that cities have the

18  opportunity to request that an emergency manager be

19  appointed; is that correct?

20  A   That would have been one of the improvements.

21  Q   In the case of the appointment of Mr. Orr, he had

22  actually, though, been appointed under PA 72; correct?

23  A   Correct.

24  Q   And he automatically became the emergency manager when PA

25  436 was effective; is that correct?

 1   A   Correct.

 2   Q   So the City of Detroit did not have the opportunity to

 3   exercise any of the options that were presented in PA 436; is

 4   that correct?

 5   A   Yes.  PA 436 didn't apply.  They had opportunities to

 6   speak and comment under --

 7   Q   But, yes --

 8   A   -- the PA 72 process.

 9   Q   Governor, I just -- that was a "yes" or "no" question.

10   The City of Detroit did not have the opportunity to exercise

11   any of the options that were presented in PA 436, and you --

12   A   Correct.

13   Q   Correct.  Okay.  So PA 436 contains a spending provision.

14   Are you familiar with that?

15   A   Yes.

16   Q   Are you familiar with Article II, Section 9, of the

17   Michigan Constitution?

18   A   Yes.

19   Q   And is it true that Article II, Section 9, of the

20   Constitution reserves to the people the right of referendum;

21   is that correct?

22   A   Yes.

23   Q   Other than those provisions, Governor, that contain a

24   spending provision; is that correct?

25   A   Correct.

1  Q   Are you familiar with the provision of Article II,

2  Section 9, which provides that -- and I'll read it to you.

3  "No law as to which the power of referendum properly has been

4  evoked shall be effective thereafter unless approved by a

5  majority of the electors thereon at the next general

6  election."  Are you familiar with that provision?

7  A   Yes.

8  Q   And did you discuss that provision -- I'm just asking if

9  you discussed, not the content -- that provision with your

10 counsel prior to passing PA 436?

11 A   PA 436 was a different act.

12 Q   I just asked -- Governor --

13 A   Yes.

14 Q   -- "yes" or "no"?  Did you discuss this provision with

15 your counsel prior to passing PA 436, this provision?

16 A   This provision?

17 Q   Yeah.

18 A   Yes.

19 Q   Now, PA 4 was rejected on appeal on November 6, 2012;

20 correct?

21 A   I believe that's the date.

22 Q   Do you know the date that the law that was ultimately

23 signed as PA 436 was presented to Congress, the State of

24 Michigan's legislators, and ultimately passed by both Houses?

25 A   I believe it would have been in December.

1  Q   Do you know what date in December?

2  A   No, not without looking.

3  Q   You ultimately signed it on December 26th; is that

4  correct?

5  A   I believe so.

6  Q   Okay.  So less than 60 days a new law was drafted,

7  presented.  I believe there was even a bill that was the

8  combined bill of the two Houses, made its way through both

9  Houses, and you signed it; is that correct?

10  A   We work much more efficiently than Congress.

11  Q   Now, the spending provisions, those are Sections 34 and

12  35 of the bill.  Section 34 provides for $780,000 to cover

13  the salaries of the emergency managers and their staff.  Do

14  you know whether or not anyone -- let me step back.  Did you

15  analyze whether or not $780,000 was a sufficient

16  appropriation for the then appointed emergency managers or

17  those emergency managers that you anticipated appointing

18  under PA 436?

19  A   I relied on the Treasury Department to make those

20  calculations.

21  Q   Are you aware of whether or not Treasury made those

22  calculations?

23  A   I believe so.

24  Q   Did you review those calculations?

25  A   No.

1  Q    There were, though -- there were at the time a number of

2  emergency managers in place in the State of Michigan; is that

3  correct?

4  A    I believe it was approximately seven or eight in both

5  cities and school districts.

6  Q    And the $780,000 was to cover their salaries.  Do you

7  know what the salary for the emergency manager that was

8  appointed to the Detroit Public School system was?

9  A    I would just be speculating.

10  Q    Then there's a second provision for $5 million for the

11  financial consultants.

12  A    Yes.

13  Q    Okay.  Do you know whether or not any financial analysis

14  had been performed, I assume, then again, by Treasury, in

15  order to determine whether or not that was a sufficient

16  spending provision?

17  A    Treasury did make some analysis of that.

18  Q    Did you review that analysis?

19  A    No.

20  Q    Was the analysis presented to you?

21  A    No.

22  Q    Did you ever discuss the analysis with the treasurer?

23  A    I don't recall.

24  Q    Would it be common for you to review the analysis of a

25  spending provision in a law that you are signing?

1   A    Quite often I do.

2   Q    In which instances do you determine that it's not

3   necessary for you -- I understand your background -- for you

4   to review the financial analysis of a spending provision?

5   A    The State of Michigan's budget is approximately $40

6   billion, so it's quite significant.  So in terms of going

7   through every line item, that's the point of having a

8   treasurer and a budget office that are very good at what they

9   do, so in many respects I count on the work of Treasury.

10  Quite often they're checked by DTMB, the Department of

11  Technology, Management & Budget.

12  Q    So in light of an approximate $40 billion budget,

13  $5,780,000 as a spending provision is not significant, is it,

14  Governor?

15  A    It is significant.  Every taxpayer dollar is significant.

16  In terms of the numbers, the $5 million, we had quite a bit

17  of experience, having been through emergency managers going

18  back to my predecessor, in understanding the cost from 2011

19  and 2012.  The number -- the 700,000-and-some thousand

20  dollars for emergency managers, you may wonder why it's that

21  number.  If you look at -- it's probably a half-year number

22  because -- or less than a full-year number because it's

23  during the middle of a year, and for us to follow through to

24  implement the legislation, we needed legislative

25  authorization to have the dollars to pay them, which was one

1    of the improvements of 436 over 4.

2    Q    So the prior laws didn't require a spending provision,

3    did they?

4    A    The prior laws -- we were expending money on consultants

5    and resources to help cities because we really do care about

6    these cities and their citizens, so we thought it appropriate

7    to provide additional resources so we could carry some of

8    those opportunities and burdens through state resources.

9    With the emergency manager, that was specifically done in

10   response to concerns that were raised through the ballot

11   initiative on PA 4.  Previously emergency managers were paid

12   by the city.  In looking at it in retrospect, that wasn't

13   appropriate, so we thought we should pay for them through the

14   state.

15   Q    Okay.  You were aware, though, that by adding a spending

16   provision, PA 436 would not be subject to the referendum;

17   isn't that true?

18   A    Yes.  That would be one of the consequences with my

19   reasoning being we needed the dollars to pay the consulting

20   and the --

21   Q    I just asked.  You were fully aware that by adding a

22   spending provision, PA 436, which is replacing a law that had

23   just within weeks been repealed or rejected by the citizens

24   of the State of Michigan, would not be subject to referendum?

25   A    Yes.

1  Q   Are you aware of any discussions between Mr. Dillon and

2  the Jones Day attorneys in early 2012 with respect to the

3  inclusion of a spending provision on a revised law in the

4  event PA 4 was rejected?

5  A   No.

6  Q   So if he had such discussions, he kept -- he did not

7  share them with you?

8  A   Not that I recall.

9  Q   Now, I'd just like to -- if I could look at 44,

10  Retirement Systems 44, you looked at this exhibit with

11  Mr. Wertheimer in connection with the second page.  Do you

12  recall that?  And he pointed out a memo in connection with

13  the constitutionality of the pension provisions.

14  A   Yes.

15  Q   Okay.  But if you'll see on the very top line of the

16  attachments, "Memo Re. Public Act 4 and Chapter 9" -- do you

17  see that?

18  A   Yes.

19  Q   So if Mr. Dillon received a copy of a memo regarding

20  Public Act 4 from the Jones Day attorneys, he did not share

21  that with you?

22  A   I don't recall.

23  Q   And this e-mail, if you can go up just a bit in the

24  paragraph, it's dated June 5th, 2012.  Do you see that?

25  A   Yes.

1   Q   So is it fair to conclude that Mr. Dillon, at a minimum,

2   on behalf of the state, is addressing issues with respect to

3   the repeal of PA 4 at least in June of 2012?

4         MR. SCHNEIDER: Objection, your Honor. Calls for

5   speculation.

6         THE COURT: Any response?

7         MS. PATEK: I'll withdraw the question.

8         THE COURT: Okay.

9   BY MS. PATEK:

10   Q   Do you have regular meetings with Mr. Dillon?

11   A   Yes.

12   Q   And during 2012, did you have regular meetings with Mr.

13   Dillon?

14   A   Yes.

15   Q   In your experience, does Mr. Dillon conduct business on

16   behalf of the State of Michigan without informing you as his

17   executive, chief executive?

18   A   He has to make decisions as to what he thinks is most

19   important to bring to my attention.

20   Q   Now, Mr. Orr sits at your pleasure; correct? You could

21   terminate him with or without cause?

22   A   Yes.

23   Q   Now, Mr. Baird -- you testified a few moments ago he

24   reports directly to you. Are you aware of that? That was

25   your testimony; correct?

1   A    Yes.

2   Q    Are you aware that in early January 2013 that Mr. Baird

3   was conducting a review of the law firms that were

4   presenting -- making presentations to the City of Detroit?

5   A    I believe the city had asked him to help them in that

6   process.

7   Q    Are you aware that one of his concerns was the bankruptcy

8   background of those law firms?

9   A    I don't recall.

10  Q    When do you recall the state first discussing the filing

11  of a Chapter 9 by the City of Detroit?

12  A    There was a lot of people that brought information to us

13  about Chapter 9.  In terms of discussions, in terms of the

14  serious part, we had that discussion earlier.  It literally

15  was the week before because we were working through it as a

16  last resort to the fact that the negotiations were not being

17  successful.  There were contingency plans put in place going

18  back some time to say in the event things don't work, you

19  needed to be thoughtful about it, but the serious discussion

20  of getting the recommendation was really in that week before.

21  Q    So if Mr. Dillon was having discussions with the

22  attorneys at Jones Day regarding a filing of a Chapter 9 on

23  behalf of the city in April of 2012, you were not a party or

24  aware of those discussions?

25  A    Again, I don't recall.

1  Q   Were you at all involved or did you have any discussions

2  with Mayor Bing regarding his selection of Miller Buckfire as

3  financial consultants to the City of Detroit?

4  A   I don't recall any specific discussions.

5  Q   Did you have general discussions with the mayor regarding

6  the selection of a financial consultant in late December of

7  2012 or early January?

8  A   Again, I don't recall.

9  Q   Did you have any discussions with the mayor regarding the

10  selection of counsel, specifically ultimately Jones Day, and

11  the selection process?  Did you have --

12  A   I don't recall.  Those were city decisions.

13  Q   Did you ever advise the mayor that the State of Michigan

14  had retained Miller Buckfire to perform a 60-day financial

15  review of the City of Detroit in March of 2012?

16  A   I did not.

17  Q   Did you ever advise the mayor or the City Council that

18  Jones Day had been discussing the repeal of PA 4 with the

19  Department of Treasury and its implication?

20  A   I did not.

21  Q   Did you ever discuss with the mayor or the City Council

22  the fact that the Jones Day attorneys had been discussing

23  with the treasurer the potential of filing a Chapter 9 on

24  behalf of the city as early as April of 2012?

25  A   No.

1          MS. BRIMER:  May I have one moment, your Honor?

2          THE COURT:  Yes.

3          MS. BRIMER:  Thank you, your Honor.  Thank you,

4   Governor.

5          THE COURT:  Any other questions for the governor?

6          MR. MONTGOMERY:  None from the Retiree Committee,

7   your Honor.

8          MR. WERTHEIMER:  Your Honor, I know I'm out of turn,

9   but I have one follow-up to Ms. Brimer's question.  I

10  promise, two minutes.

11         THE COURT:  Well, let me see if there's any

12  examination of the governor by either the state or the city,

13  and then we'll get back to redirect.

14         MR. SCHNEIDER:  Yes, your Honor.  Could we have just

15  one moment?

16         THE COURT:  Yes.

17                     CROSS-EXAMINATION

18  BY MR. SCHNEIDER:

19  Q   Good afternoon, Governor.  Governor, what did you do

20  prior to becoming governor?

21  A   I was a venture capitalist and entrepreneur.  Prior to

22  that, I was an executive at a computer company running that,

23  and prior to that, I was in public accounting as a CPA.

24  Q   So is it safe to say that your background involves the

25  review of financial statements, financial documents; is that

1  correct?

2  A    I have extensive experience in those matters.

3  Q    And do you have extensive experience in reading and

4  understanding balance sheets as well?

5  A    Yes.

6  Q    How long in your career have you been working in issues

7  of finance of accounting?

8  A    Since 1982.

9  Q    Does your educational background also involve finance and

10 accounting?

11 A    It does.  I have an MBA from the University of Michigan

12 and basically a number of accounting classes in my

13 undergraduate plus a law degree.

14 Q    You're also a CPA; is that correct?

15 A    That's correct.  That's where the nerd thing came from.

16 Q    Your Honor -- or, Governor -- a reoccurring problem in

17 this courtroom apparently.  After you --

18         THE COURT:  I'm wondering if there's some interest

19 in a judicial position that you haven't disclosed to us.

20         THE WITNESS:  I'm not that qualified, your Honor.

21 BY MR. SCHNEIDER:

22 Q    Your Honor, you -- Governor, you testified -- you

23 testified regarding your review of financial reports after

24 you became governor related to the City of Detroit.  Do you

25 remember that testimony?

1  A    Yes.

2  Q    Did you review reports regarding cash flow for the city?

3  A    Yes.

4  Q    And through this process, were you able to determine

5  whether or not there was a cash flow problem with the City of

6  Detroit?

7  A    There's a serious cash flow problem.

8  Q    And is it safe to say that the longer you stayed in

9  office as governor, the cash flow problems worsened; is that

10 correct?

11 A    Yes.  The most nonaccounting description I would use is

12 the word hemorrhaging.

13 Q    Okay.  In fact, you received some reports from the

14 financial review teams calling it a cash crisis; is that

15 correct?

16 A    Yes, including statements by the mayor going back to, I

17 believe, 2011 talking about the city even at that point

18 potentially running out of cash.

19 Q    Okay.  So the dialogue of -- and the discussion of

20 running out of cash had been continual; correct?

21 A    Yes.

22 Q    And things were getting worse and not better.  Is that

23 accurate?

24         MR. DECHIARA:  Objection.

25         THE WITNESS:  Yes.

1      MR. DECHIARA:  That was leading.

2      THE COURT:  Yes.  Please don't ask leading

3  questions.  The objection is sustained.

4  BY MR. SCHNEIDER:

5  Q   Ultimately, however, Mr. Orr was appointed as emergency

6  manager; correct?

7  A   Yes.

8      THE COURT:  Yes, that was another leading question.

9      MR. SCHNEIDER:  I'm sorry, your Honor.

10  BY MR. SCHNEIDER:

11  Q   Governor, there's been a lot of talk here about Chapter 9

12  filing, and I want to ask you during this process about cash

13  flow discussions and your review of the reports, where was

14  Chapter 9 in your mind?

15  A   It was a last resort.  When you looked at the entire

16  process, I tried to be very diligent about this in a very

17  difficult situation.  If you go back to the time I took

18  office, first it involved working with the mayor.  I actually

19  attended the State of the City address to show support for

20  the mayor in a public fashion to help work in a collaborative

21  fashion through that process.  Then it became clear -- he

22  made the statement, for example, that they were going to run

23  out of cash, and there were other issues, so we started

24  the -- the Treasury began a preliminary review of the city's

25  finances, I believe, in late 2011.  That's an objective

1   process. That's not a subjective process. They came out

2   with their findings that then led to a financial review team

3   that did an objective process again under Public Act 4

4   finding there's severe financial distress. There was a

5   series of options given to me at that point in time that

6   include there's no distress, there's a consent agreement, or

7   there's a need for an emergency manager. We worked very hard

8   and very diligently to do a consent agreement, and we finally

9   got a consent agreement done that included an appendix that

10  had 20-some items, I believe 23 different items to follow

11  through on, again, to avoid more serious consequences, so

12  there was a lot of work done through the summer on the

13  consent agreement. Unfortunately, by fall it appeared that

14  most of the items in that consent agreement were not being

15  implemented. Again, people worked hard on doing those

16  things, but they didn't happen. So another review took place

17  along with continuing cash crises, so another review cycle

18  was begun under Public Act 72 because this is a crisis. It

19  still is a crisis today. And so we went through that

20  exercise, and then they found that the consent agreement was

21  not going to end up in a satisfactory plan that led to the

22  emergency manager situation, and so, again, we went through a

23  hearing process there. I appointed an emergency manager.

24  The emergency manager went through a process of negotiation

25  proposing something to creditors to work out. He came to me

1  then and said that was not successful.  I authorized
2  bankruptcy, and now that's where we're at.  One of the things
3  that doesn't come across very often is an overriding concern
4  for the citizens of Detroit.  That is, while all this is
5  taking place, all we've seen is more blight, more lights
6  going out, challenges on the police force.  These things have
7  to get resolved.  It's an unacceptable situation.
8  Q   So is it correct to say that you -- when you were
9  reviewing these reports, you did not do so with the intention
10  to authorize or seek a filing?
11  A   I worked very diligently to avoid this process in good
12  faith and to go through this process to say what are all the
13  other steps possible and, again, avoid subjectivity and do it
14  as objectively understanding that the subjective piece is
15  people are suffering, the 700,000 citizens of Detroit.
16  Q   Let me ask you some questions regarding PA 436.  You
17  testified that it gives options to communities.  Can you
18  explain just a little bit about what you meant by that?
19  A   Yeah.  One of the issues with Public Act 4 is it really
20  had those three choices that I mentioned.  What now happens
21  is there's an opportunity for four different choices that the
22  community has.  They can do a consent agreement.  There's an
23  option for an emergency manager.  There's an option for
24  looking at a negotiated settlement to try to go to creditors
25  to work things out, and then there's potentially bankruptcy.

1   Q   Let me ask you more specifically about PA 436.  You were

2   asked regarding the appropriations provisions.  For you what

3   was the point of those appropriations, the purpose?

4   A   Yeah.  We were in the course of the middle of a fiscal

5   year, and under Michigan's Constitution, I can't -- we cannot

6   expend funds without an appropriation.  Part of Public Act

7   436 is saying we were going to relieve the cities of the

8   burden of paying for the emergency manager because that is a

9   burden on them, so we needed an appropriation to do that, and

10  it was the simplest best way to do it, in my view, along with

11  the fact significant dollars were being spent on consultants

12  in some capacity, whether it be the city or the state, and

13  for us to continue to do consulting work to help cities out

14  across our state is by having that additional appropriation

15  we'd have those resources available.  That was done to get us

16  through that budget year with a view that I would include

17  similar numbers for the following budget year, which was

18  proposed in February, and that took effect this October 1.

19  Q   Well, you signed the bill, so was your purpose to make it

20  referendum-proof?

21  A   No.  It was to deal with this issue of paying for

22  emergency managers and having financial resources in a crisis

23  available.

24  Q   Can the state make an expenditure without an

25  appropriation?

1  A   No.

2  Q   So in order to pay for these salaries, an appropriation

3  was required; is that correct?

4  A   Yes.

5  Q   And was the most efficient or best way to do this by

6  putting the appropriation in the bill?

7        MR. WERTHEIMER:  Object.  I think we're back to the

8  leading.

9        THE COURT:  Yes.  That was a leading question.

10       MR. SCHNEIDER:  Okay.

11       THE COURT:  The objection is sustained.

12 BY MR. SCHNEIDER:

13 Q   Did either PA 4 or PA 72 require the state to pay for

14 emergency managers' salaries?

15 A   No.

16 Q   So after the bill took effect, after PA 436 takes effect,

17 was there ever a later appropriation in a budget bill to

18 handle this type of issue?

19 A   For ongoing expenses, I proposed it in the February

20 budget message that I put forward.  That would have been

21 included in the budget adopted in the June time frame that

22 began this October 1.

23 Q   What was the purpose of that?

24 A   Again, for ongoing, to help pay for the ongoing costs of

25 emergency managers and consultants.

1          MR. SCHNEIDER:  Thank you, your Honor.

2          THE COURT:  Questions from the city?

3          MR. SHUMAKER:  Your Honor, the city has no questions

4    for the governor.

5          THE COURT:  All right.  Mr. Wertheimer, do you have

6    questions?

7          MR. WERTHEIMER:  Yes, I do.

8          MS. LEVINE:  Your Honor, a point of process, so that

9    there's time for all the objectors who want to redirect, can

10   we talk about perhaps time limits?

11         MR. WERTHEIMER:  I'll be two, three minutes.

12         THE COURT:  Well, of course, your redirect of the

13   governor should be limited to what was covered on his cross-

14   examination, which wasn't much.

15         MS. LEVINE:  Yeah.  No, no.  I'm going to be brief,

16   your Honor, but I --

17         THE COURT:  I don't mean to minimize his testimony,

18   but it didn't take very long.

19         MS. LEVINE:  Plan to be brief, your Honor, but I am

20   third in the queue, so I just want to make sure third doesn't

21   show up at five.

22         THE COURT:  All right.  Let me just see a show of

23   hands.  How many of you propose to ask redirect examination

24   at this point?  Just the three of you?  All right.  I think

25   we'll be all right then.

1                        REDIRECT EXAMINATION

2    BY MR. WERTHEIMER:

3    Q    Governor, would you agree with me that the fact that

4    these problems that Detroit has that we all recognize, that

5    they have to be resolved and have to be resolved

6    expeditiously, does not mean that they have to be resolved on

7    the backs of retirees making one or $2,000 a month?

8              MR. SCHNEIDER:  Objection.  Relevance.

9              MR. WERTHEIMER:  Your Honor, the governor made a

10   long statement in response to a question that implied that

11   all he was doing was dealing with the problem expeditiously,

12   and I'm simply attempting to make the point that I'm

13   attempting to make that seems obvious to me.

14             THE COURT:  I'll permit it.  Go ahead, sir.  Can you

15   answer the question?

16             THE WITNESS:  Again, I have concerns about the

17   retirees also.  I'm concerned about the 700,000 citizens of

18   Detroit, the citizens of Michigan, which include these

19   retirees.

20   BY MR. WERTHEIMER:

21   Q    Governor, I did not ask you whether you had concerns.

22   Again, I'll ask you the same question again, and try to just

23   answer that, please.  Would you agree with me that the fact

24   that the problems that you've identified that have to be

25   resolved and have to be resolved quickly, that that does not

1  mean that they have to be resolved on the backs of the city

2  retirees?

3  A   I think you're asking me to speculate because we're still

4  in this process where there isn't even a plan on the table to

5  say how to resolve this issue.

6  Q   All right.  I'll let it go.  Ms. Brimer asked you a

7  question about you having the ability to fire Mr. Orr.  Do

8  you recall that?

9  A   Yes.

10  Q   You were also the person who recommended that he be

11  hired, were you not?

12  A   Yes.

13          MR. WERTHEIMER:  That's all I have.  Thank you.

14                REDIRECT EXAMINATION

15  BY MS. LEVINE:

16  Q   Good afternoon again, Governor.  Sharon Levine,

17  Lowenstein Sandler, for AFSCME.  In response to your

18  counsel's questions, you went through your education, your

19  CPA, your law degree, and some other financial experience

20  that you've had; correct?

21  A   Yes.

22  Q   And that you also discussed the fact that going back to

23  even 2011 you were having discussions with the mayor of

24  Detroit about the fact that the mayor of Detroit was running

25  out of cash; correct?

1    A    It was a public statement.  I was quoting a public

2    statement the mayor made back, I believe, in November of 2011

3    where he publicly came out and said there was a concern about

4    running out of cash.

5    Q    So you were aware -- you were watching Detroit and its

6    cash position going back as far as 2011; correct?

7    A    Yes.

8    Q    Okay.  Does that refresh your recollection with regard to

9    why the state stopped the implementation of the tentative

10   agreement in February of 2012, which was ratified by a

11   coalition of 30 unions and provided for substantial cash

12   savings for the City of Detroit?

13   A    No.

14   Q    You also testified that Chapter 9 was a last resort and

15   that you were looking to try to resolve it some other way in

16   good faith; is that correct?

17   A    Yes.

18   Q    So then I'm going to go back to the June 14 proposal to

19   creditors, and with your CPA and all of your financial

20   background, if you didn't understand exactly what was being

21   offered in dollars and cents to the retirees, how is it good

22   faith if the retirees couldn't understand that either?

23   A    What I would say is is if you looked at that package, it

24   was described as preliminary, that there are many pieces

25   needed to be fleshed out, including there's a section in

1   there about there had been no real evaluation of the assets

2   of the city, so it was an open question as to where it would

3   go.  And the way I viewed it is in a situation like this, you

4   had to start the discussion at some starting point, and this

5   was something to get out on the table to say now people can

6   have informed discussions, have dialogue, have questions,

7   have answers, and then hopefully move towards a conclusion.

8   In the case of retirees, in particular, though, in

9   retrospect, I think there was a real challenge to say who was

10   going to step up to represent them.  And I felt that was one

11   of the problems in that whole process that I thought could

12   get resolved by authorizing the bankruptcy; that then

13   somebody could be appointed to represent them.

14   Q   So this is not a proposal for creditors or an offer for

15   creditors.  All it is is an invitation to start a process?

16   A   No.  I hope -- I believe it was a good faith negotiation,

17   put something on the table based on the facts that were

18   available.  Again, you know, I --

19   Q   I'm just trying to clarify.  Is it a -- is it an

20   invitation to negotiate, or is it an actual proposal to

21   creditors?

22   A   I believe it was a proposal, but then you start a

23   dialogue because, again, it needed to be mutually agreed to.

24   Q   Okay.  So as a proposal --

25   A   I don't think those two comments are mutually exclusive.

1  Q   As a proposal to creditors, is it your testimony that it

2  actually clarified how those creditors were going to be

3  treated, including specifically how the retirees were going

4  to be treated?

5  A   I think it helped clearly clarify the financial situation

6  of Detroit saying here are the resources available, here's

7  where dollars need to go, and have a discussion as to what's

8  possible.

9          MS. LEVINE:  Thank you, Governor.

10                  REDIRECT EXAMINATION

11  BY MS. BRIMER:

12  Q   Just a very brief follow-up, Governor.

13          MS. BRIMER:  And I'd like to ask him if he's ever

14  seen this e-mail.  It's Retirement Systems Number 46.  No.  I

15  want to ask if he's ever seen it first.  If he's not seen it,

16  then I have no questions on it.  I'd like to ask the governor

17  if he's seen an e-mail that has been presented as an exhibit.

18  He's not a part of it, but I may have questions if he's seen

19  it.  May I approach?

20          THE COURT:  You may.  What exhibit is it?

21          MS. BRIMER:  It is the Retirement Systems Number

22  846.

23          THE COURT:  You may ask the witness if he has seen

24  it.

25  BY MS. BRIMER:

1   Q   Have you --

2           MR. SCHNEIDER:  Your Honor, before we go any

3   further, I object because this is outside the scope of my

4   examination.

5           MR. SHUMAKER:  The city joins the objection.

6           MS. BRIMER:  I believe -- I believe I will be able

7   to tie it to his examination, your Honor.

8           THE COURT:  All right.  Have you seen this before,

9   sir?

10          THE WITNESS:  I don't recall.

11          MS. BRIMER:  And if he's not recall -- does not

12  recall seeing it, your Honor, I'll take it back from him, ask

13  him a few questions --

14          THE COURT:  Okay.

15          MS. BRIMER:  -- not on it, but --

16  BY MS. BRIMER:

17  Q   Governor, do you recall who suggested that the

18  appropriation provisions in PA 436 should be included in the

19  act?

20  A   I don't recall.

21  Q   Were you the one who suggested if -- that they should be

22  included?

23  A   Again, I said I don't recall --

24  Q   Okay.

25  A   -- because, again, that's an interactive process on

1  legislation, and clearly I do several hundred bills a year.

2         MS. BRIMER:  I have nothing else, your Honor.

3         THE COURT:  All right.

4         MR. KING:  Your Honor, I just have a few questions.

5                    REDIRECT EXAMINATION

6  BY MR. KING:

7  Q    Governor, you indicated that you had reviewed a host of

8  financial information and other documentation in the course

9  of your review of Detroit's financial situation.  I think

10 that was what you just testified to with Mr. Schneider.  Did

11 you ever have an opportunity to review any information

12 regarding funding levels of other Retirement Systems in the

13 state relative to the two pension systems in Detroit?

14 A    No.

15 Q    So you wouldn't know one way or the other whether or not

16 the Detroit systems, for example, are significantly better

17 funded than either the Michigan State Employees Retirement

18 System or the Michigan Public School Employees Retirement

19 System?  You wouldn't know one way or the other whether the

20 Detroit systems are better funded than either -- better

21 funded than either of those two state systems?

22 A    Correct.

23         MR. KING:  Thank you.

24         THE COURT:  All right.  We have concluded the

25 witness' testimony.  Sir, you are excused.  Thank you very

1  much for coming today.  Appreciate it.

2       (Witness excused at 4:08 p.m.)

3            THE COURT:  We will remain in place while the

4  governor takes his leave.  Mr. Ciantra, I had indicated we

5  would take up your issue tomorrow morning, but since we have

6  time yet today, is it okay with you if we take up your issue

7  today?  All right.

8            MR. SHUMAKER:  Your Honor, the attorneys that have

9  been dealing with that issue are not present for the city.

10           THE COURT:  Oh.

11           MR. SHUMAKER:  I'm sorry about that.

12           THE COURT:  Okay.  Well, that's a problem.  Remind

13  me who that -- remind me who that was.

14           MR. SHUMAKER:  It was Mr. Stewart.

15           THE COURT:  Of course; of course.  All right.  Well,

16  we'll deal with it first thing tomorrow morning then.  Is

17  there anything else we can do today?  All right.  We'll be in

18  recess till tomorrow morning.

19           MR. SHUMAKER:  Thank you, your Honor.

20           THE CLERK:  All rise.  Court is adjourned.

21       (Proceedings concluded at 4:09 p.m.)

245

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | 6 | 81 | | |
| Governor Rick Snyder | 122/166 185/196 204/213 | 228 | 236/238 241/243 | |

| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 41 | 35 |
| Exhibit 615 | 155 |
| Exhibit 616 | 154 |
| Exhibit 625 | 158 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                         November 3, 2013
_____    _____
Lois Garrett

# ITEM NO. 68

```
 1              UNITED STATES BANKRUPTCY COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3   IN THE MATTER OF,           Case No. 13-53846
                                 Detroit, Michigan
 4   CITY OF DETROIT, MI         October 29, 2013
     _____/    9:00 a.m.
 5
                     IN RE:  ELIGIBILITY TRIAL
 6           BEFORE THE HONORABLE STEVEN W. RHODES
             TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.
 7
     APPEARANCES:
 8
     For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                  GEOFFREY STEWART, ESQ.
                                    GREGORY SHUMAKER, ESQ.
10                                  THOMAS CULLEN, JR., ESQ.
                                    MIGUEL EATON, ESQ.
11                                  Jones, Day
                                    51 Louisiana Avenue, N.W.
12                                  Washington, D.C. 20001-2113
                                    202-879-3939
13
                                    BRUCE BENNETT, ESQ.
14                                  Jones, Day
                                    555 South Flower Street
15                                  Fiftieth Floor
                                    Los Angeles, CA 90071-2452
16                                  213-243-2382

17                                  ROBERT HERTZBERG, ESQ. (P30261)
                                    Pepper, Hamilton
18                                  4000 Town Center
                                    Suite 1800
19                                  Southfield, MI 48075-1505
                                    248-359-7333
20
     For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
21                                  (P62190)
                                    Chief Legal Counsel
22                                  Attorney for State of Michigan
                                    Michigan Department of
23                                  Attorney General
                                    P.O. Box 30754
24                                  Lansing, MI 48909
                                    517-373-0126
25
```

```
 1                              STEVEN HOWELL, ESQ. (P28982)
                                Special Assistant Attorney
 2                              General
                                Dickinson, Wright
 3                              500 Woodward Avenue
                                Suite 4000
 4                              Detroit, MI  48226-3425
                                313-223-3033
 5
    For Michigan Council 25 of  SHARON L. LEVINE, ESQ.
 6  the American Federation of  JOHN SHERWOOD, ESQ.
    State, County and Municipal Lowenstein, Sandler, LLP
 7  Employees (AFSCME), AFL-CIO 65 Livingston Avenue
    and Sub-Chapter 98, City of Roseland, NJ 07068
 8  Detroit Retirees:          973-597-2500

 9  For Detroit Retirement     ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement JENNIFER GREEN, ESQ.
10  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of  151 S. Old Woodward Avenue
11  the City of Detroit:       Suite 200
                                Birmingham, MI 48009
12                              248-988-5882

13                              RONALD KING, ESQ. (P45088)
                                Clark, Hill
14                              212 East Grand River Avenue
                                Lansing, MI 48906
15                              517-318-3015

16  For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit   JULIE BETH TEICHER, ESQ.
17  Police Officers Association (P34300)
    and the Detroit Police     DAVID EISENBERG, ESQ. (P68678)
18  Lieutenants and Sergeants  Erman, Teicher, Miller, Zucker
    Association:               & Freedman
19                              400 Galleria Officentre
                                Suite 444
20                              Southfield, MI 48034

21  For International Union, UAW: BABETTE A. CECCOTTI, ESQ.
                                PETER D. DECHIARA, ESQ.
22                              THOMAS CIANTRA, ESQ.
                                Cohen, Weiss, and Simon, LLP
23                              330 West 42nd Street
                                New York, NY 10036-6976
24                              212-356-0227

25
```

```
 1  For the Detroit Retired        THOMAS MORRIS, ESQ. (P39141)
    City Employees Association,     Silverman & Morris
 2  Retired Detroit Police and     30500 Northwestern Highway
    Fire Fighters Association,      Suite 200
 3  Shirley V. Lightsey, and       Farmington Hills, MI 48334
    Donald Taylor (Retiree         248-539-1330
 4  Association Parties):

                                   RYAN PLECHA, ESQ. (P71957)
 5                                 Lippitt, O'Keefe
                                   370 East Maple Road
 6                                 3rd Floor
                                   Birmingham, MI 48009
 7                                 248-646-8292

 8  For the Official Committee of  MATTHEW E. WILKINS, ESQ.
    Retirees:                      (P56697)
 9                                 Brooks, Wilkins, Sharkey &
                                   Turco, PLLC
10                                 401 S. Old Woodward Avenue
                                   Suite 400
11                                 Birmingham, MI 48009
                                   248-971-1711
12
                                   CLAUDE D. MONTGOMERY, ESQ.
13                                 ANTHONY ULLMAN, ESQ.
                                   ARTHUR RUEGGER, ESQ.
14                                 Dentons
                                   1221 Avenue of the Americas
15                                 New York, NY 10020-1089
                                   212-768-6700
16
    For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
17  Police Members Association:    MEREDITH TAUNT, ESQ. (P69698)
                                   MALLORY FIELD, ESQ. (P75289)
18                                 Strobl & Sharp, P.C.
                                   300 East Long Lake Road
19                                 Suite 200
                                   Bloomfield Hills, MI 48304-2376
20                                 248-540-2300

21  For the Flowers Plaintiffs –   WILLIAM A. WERTHEIMER, ESQ.
    Robert Flowers, Michael Wells, (P26275)
22  Janet Whitson, Mary Washington 30515 Timberbrook Lane
    and Bruce Goldman:             Bingham Farms, MI 48025
23                                 248-644-9200

24

25
```

```
1   For Ambac Assurance          DANIEL WEINER, ESQ. (P32010)
    Corporation:                 Schafer & Weiner
2                                40950 Woodward Avenue
                                 Suite 100
3                                Bloomfield Hills, MI 48304
                                 248-540-3340
4
    Court Recorder:              Letrice Calloway
5
    Transcriber:                 Deborah L. Kremlick
6

7

8

9   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2  <u>WITNESSES FOR</u>          <u>Cross</u>
   <u>THE CITY:</u>
3
   KEVYN ORR          22,69,115,
4                     131,166,171

5  <u>EXHIBITS:</u>                                    <u>ID</u>   <u>ADM</u>

6  UAWEX619 Chain of Emails                       77   78
   UAWEX620 Email                                 81   81
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
        (Court in Session)

2
                THE CLERK:  All rise.  Court is in session.  Please

3
be seated.  Case number 13-53846, City of Detroit, Michigan.

4
                THE COURT:  Good morning.  Everyone appears to be

5
here.  Sir.

6
                MR. CIANTRA:  Good morning, Your Honor.  If I may

7
proceed.

8
                THE COURT:  Yes.

9
                MR. CIANTRA:  Thank you.  Thomas Ciantra, Cohen,

10
Weiss, and Simon, LLP for the UAW.

11
        And I rise with respect to the motion I made during the

12
examination of Mr. Moore to exclude one part of his testimony.

13
And that is the portion of his testimony where he related a

14
conversation in the presence of counsel with respect to the

15
calculation of the unfunded liability of the Detroit City

16
Retirement Plans.

17
        And I'm going to make a -- a brief argument with respect

18
to that.  Cited a couple of cases.  And relied on some

19
deposition excerpts that I'll read to the Court that I've

20
shared with counsel for the city earlier this morning.

21
        We start with some of the basics.  Obviously under the

22
federal rules, discovery should be open and robust.  It's

23
intended to get at both the facts, to develop a factual

24
record, to present to the Trier of Fact.  And as well to

25

1  enable the parties to learn and understand the positions and

2  contentions of the other side.  That's -- that's what

3  discovery is supposed to get at.

4      And the case law as it is developed, is clear, at least

5  with respect to one thing which is that if a party asserts a

6  privilege, whether it be attorney/client, the Fifth Amendment,

7  spousal or something else, it cannot be both used as a shield

8  against disclosure to the adversary.  And then effectively as

9  a sword through selective later disclosure.

10     And that is -- is really a matter of fundamental --

11  fundamental fairness in the -- in the adversarial process.

12  And the case law as I said has applied this principal in --

13  with respect to the attorney/client privilege.  It's applied

14  it with respect to the Fifth Amendment privilege against self

15  incrimination which obviously carries with it other

16  constitutional values that aren't -- aren't present with

17  respect to the attorney/client privilege.

18     But -- and the basic principle that I think that

19  developed in that case law is that if a party is -- is going

20  to assert privilege with respect to a particular subject

21  matter, it has to be prepared to accept the consequence that

22  the -- the universe of proof that may -- it may introduce with

23  respect to that is going to be -- is going to be limited by

24  the -- by the extent to which is has asserted the privilege.

25     And in this district, the Eastern District of Michigan,

1  that case law has developed most clearly in cases involving

2  the Fifth Amendment privilege and I would point the Court to

3  -- to -- two District Court decisions.  One by Judge Gadola,

4  it's a forfeiture case, U.S. v $60,000.  That is reported at

5  763 F Supp 909.  And a franchise case, a decision by Judge

6  Rosen, Dunkin Doughnuts v Taseski.  That's 47 F Supp 2d 867.

7       And in both of those cases we had parties who asserted

8  privilege in discovery to limit inquiry and then were

9  precluded once discovery had closed and summary judgment and

10  trial from then selectively waiving privilege to -- to either

11  try to defeat summary judgment or -- or defeat the claims of

12  -- of the -- their adversary.

13       In the -- in the Dunkin Doughnuts case it was evidence

14  with respect to sales levels under a franchise agreement and

15  the -- the franchisee took the Fifth Amendment apparently

16  because of the fraud allegations.  In the -- the forfeiture

17  case, it was someone whose property was seized at the airport

18  after a, you know, dog identified it as positive for drugs.

19       In both of those cases discovery had closed.  And -- and

20  the Court precluded the party that had asserted privilege from

21  then asserting by way of affidavit or other discovery

22  material, evidence to try to defeat summary judgment on the

23  principle that once the privilege had been asserted and

24  discovery had closed, the -- the adversary was precluded from

25  effectively from -- from rebutting it and the -- the party

1 that had asserted privilege had to accept the -- the

2 consequences of that assertion.

3 Now here, the city largely shielded almost entirely from

4 disclosure, the deliberations of the pension task force that

5 there's been testimony about. That task force worked with

6 actuaries at the Milliman firm that the -- the city had

7 retained and it had the -- those actuaries undertake various

8 analyses with respect to the -- the funded status of the plan

9 and various alternatives and issues related to the plans that

10 the -- that the city was investigating.

11 And Mr. Moore's testimony with respect to that concerned

12 some of the work of that task force with respect to its -- the

13 -- the actuary's calculation based on the -- the retirement

14 system's actuary's work of what the unfunded liability of the

15 plan was.

16 But the -- the city did not in discovery permit the

17 objecting parties to take -- permit inquiry with respect to

18 the deliberations of the task force. And in addition to the

19 excerpt that -- from Mr. Moore's deposition that we recited on

20 Thursday, which I will concede was not the crispest assertion

21 of privilege.

22 That issue -- that tactic was clearly pursued in the

23 deposition of the -- the actuary himself, Mr. Bowen. And I

24 would point to two instances during my deposition of Mr. Bowen

25 and there was as well a follow up inquiry by counsel for the

1 | retiree committee.

2 | Let's talk about the -- the first one. There is an

3 | issue, Your Honor, with respect to remedies that the emergency

4 | manager has under Public Act 436. In the event that there is

5 | a certain level of under funding in the pension system, the

6 | emergency manager can take certain remedies with respect to

7 | the governance of the system.

8 | And the actuaries were asked -- tasked to compute the

9 | under funding of the system lining up the provisions of this

10 | statute. The one question that became obvious was if the

11 | actuaries and the emergency manager believed that the under

12 | funding of the system permitted them to take remedies with

13 | respect to the governance of the system, essentially replacing

14 | the trustees, why had they not done so. And what does that

15 | tell us with respect to their confidence in the -- in the

16 | calculation of the under funding.

17 | So with respect to that issue, I questioned the actuary

18 | with respect to the discussions of the task force where that

19 | assignment was discussed, the assignment to calculate the --

20 | the liabilities of the -- unfunded liabilities of the pension

21 | plans in light of the -- the statutory provisions.

22 | And this appears beginning at Page 53 of Mr. Bowen's

23 | deposition. And I'm -- I'm using the minuscript version of

24 | the transcript. And it continues a bit further. And I'll --

25 | let me read from that -- from that transcript.

1       This is my question.  The pension task force conference

2  call that you -- that you discussed where this assignment was

3  given to you, who participated in that?  Was there an attorney

4  on the line that participated in that call?  Answer, yes,

5  there was.

6       Okay, who was that?  That would have been Evan Miller

7  from Jones, Day.

8       All right.  Did Mr. Miller give you the instruction with

9  respect to this particular assignment?  I don't recall which

10  particular party on the pension task force asked the direct

11  question to do this now.

12       Next question.  Okay.  Was there a reason given for why

13  you were being asked to do this?  An objection is raised at

14  that point.  Mr. Miller, and again, to the extent that any

15  discussion that you had with members of the task force

16  relating to this assignment involved counsel for the city, I

17  would instruct you not to respond on the grounds of

18  attorney/client privilege.

19       And then I -- then I questioned.  So you can respond to

20  that question consistent with your counsel's direction or the

21  city -- the city counsel -- city's counsel's direction.

22  Answer -- or the witness, I have no response.

23       Question, yes.  But for Mr. Miller's instruction would

24  you answer the question?  Answer, I'm not going to disobey the

25  attorney for my client.

1    Continue.  So I assume the answer to that is yes, other

2   than his instruction you would answer the question.  The

3   witness, answer, yes.  That's -- that's a very difficult

4   hypothetical because that instruction exists and I plan to

5   follow the advice -- the instruction of my client's attorney.

6   And then I respond, I think that's clear.

7    So at that point our inquiry with respect to the reasons

8   for that calculation and that subject matter were clearly --

9   were clearly cut off.  Similarly, we sought to question the

10  witness with respect to the -- their analysis of the costs of

11  a defined contribution plan that they were proposing to

12  implement as a follow on to the -- the defined benefit plan

13  that the city contends it will no longer fund.

14    And there again at Page 77 of the transcript, I sought to

15  question them with respect to where that 10% number -- how

16  that 10% number was derived.  And I asked beginning at Lines

17  19 on Page 77.

18    And where -- how was that 10% number arrived at?  Answer,

19  it was provided to us by the pension task force.

20    Was there or were there discussions of using different --

21  a different percentage of pay?  Mr. Miller, wait.  To the

22  extent that those discussions if any involved counsel for the

23  City of Detroit, I would instruct the witness not to answer

24  those on the grounds of attorney/client privilege.

25    By Mr. Ciantra, so you can answer that question?  The

1    witness, no answer.  Because of the direction of the city

2    counsel -- the city's counsel?  Answer, that's correct.

3        So at that point, Your Honor, it was pretty clear at

4    least to me, that there was -- the city was not going to

5    permit the actuary to testify with respect to any of the

6    deliberations of the task force with respect to the

7    calculations that he had made.

8        And as a result, those areas were effectively blocked off

9    from our inquiry, both by deposition and -- and as well with

10   respect to -- to documents.  So at this point the city of

11   course has not -- did not call the actuary to testify.  They

12   didn't put in an -- an expert report with respect to these

13   calculations.

14       And the -- the evidence with respect to the Milliman

15   actuary's calculations has come in through the report of Mr.

16   Moore.  That was privileged.  It was made in the presence of

17   an attorney as to which we would submit that subject was not

18   permitted on account of their assertion of privilege, our

19   ability to take discovery with respect to that.

20       So we would ask that just that question and answer,

21   that's the only remedy that we are asking, be stricken from

22   the record because it's -- it is selective use of the

23   privilege that is simply inconsistent with notions of

24   fundamental fairness.

25                THE COURT:  Do you have the official transcript from

1  Mr. Moore's testimony and can you identify the pages and lines

2  that you want stricken?

3        MR. CIANTRA:  I do not at this point have the

4  official transcript.  You know, I have the unofficial daily,

5  but certainly I could provide that, Your Honor.  Once -- well,

6  I don't believe that it -- I don't believe that's been made

7  available to us as of yet.

8        THE COURT:  Okay.  So what was the precise question

9  and answer that you want stricken?

10       MR. CIANTRA:  The precise question and answer that I

11  would -- would ask that the Court strike, is the question

12  where he report -- he was asked to report on the -- the

13  calculation by the actuary of the -- the under funding of the

14  city's retirement system.  And he testified that the actuary

15  had taken the calculations of the systems actuaries, revised a

16  earnings assumption --

17       THE COURT:  Right.

18       MR. CIANTRA:  -- and instead of using the actuarial

19  value of the assets, had used a market value and that that

20  sort of in total gave the --

21       THE COURT:  He adjusted the discount rate.

22       MR. CIANTRA:  He adjusted -- well, there are two

23  things.  He adjusted the discount rate and then he used a

24  market valuation of the assets --

25       THE COURT:  Right.

1          MR. CIANTRA:  -- as of the date and time rather than

2     the actuarial value.

3          THE COURT:  All right.  Thank you, sir.

4          MR. STEWART:  Geoffrey -- Geoffrey Stewart of Jones,

5     Day for the city, Your Honor.

6     A couple of things.  First of all, just to put things in

7     perspective, the testimony we're talking about Mr. Ciantra

8     just described, and let me make a couple of points.

9     First of all, in his deposition Mr. Moore answered every

10    single question he was asked but one.  And the one was, what

11    did you discuss with your lawyer in preparing for your

12    deposition.  So there was no instruction to Mr. Moore to not

13    answer any substantive question.

14    Moreover, he was asked about and he did testify about at

15    no short length, this 3.5 billion dollar number.  And I guess

16    -- I think it was by Mr. Ciantra himself -- no, it was by Mr.

17    Ruegger.  And it's -- that questioning starts on Page 62 of

18    his deposition and runs for at least five more pages.

19    So this is a matter that he was not instructed on.  He

20    was asked -- he was asked about and he did testify about.  So

21    this is not a matter where any inquiry was blocked.  And I

22    think I said the pages but if not, I'll repeat myself.  It's

23    62 through 67 of Mr. Moore's deposition.

24    So there is no sword/shield issue going on with respect

25    to Mr. Moore if only because of the simple expedient that only

1 one question was he instructed to not answer and it was one

2 that no one I think would challenge.  It's certainly an

3 instruction objectors have given when their depositions were

4 taken.  And as I just said, he was allowed to answer questions

5 on this very subject.

6     Mr. Ciantra then goes to a different witness, one who has

7 not been called to testify here today, Mr. Bowen who is an

8 actuary.  And he did -- Mr. Ciantra kindly gave me the

9 deposition cites in the hall this morning so I did have a

10 chance to look at them.

11     There were two different topics and I agree, and I think

12 he -- Mr. Ciantra has accurately described them of what Mr.

13 Bowen was asked about that drew instructions.  The first had

14 do with a possibility under PA436 that if pension assets fell

15 below 80%, the emergency manager might have the right to

16 replace the pension plan trustees with trustees of his own

17 choosing.

18     The question there wasn't -- and that question, that

19 topic was certainly raised.  The instruction had to do with

20 how the subject came up in a meeting.

21     There was no instructions against and there were -- there

22 was, I ought to say, fairly significant testimony by Mr. Bowen

23 about Milliman, that's his firm.  Of Milliman's calculations

24 of whether or not the plan was under funded at the 80%

25 threshold.

1    Now let me grab the pages on his deposition and we can

2  provide that as well to the Court.  That -- after the

3  instruction, counsel then asked the question, well, sir, what

4  did you do?  And there were no instructions.  That starts on

5  Page 55 and goes at least to Page 62 of Bowen's deposition.

6    So once again I'd submit two things.  One is this is not

7  even the same subject as the testimony they would like to

8  strike.  It's not the same witness.  And the witness they did

9  question did answer all of their questions about the threshold

10  funding and what he did among other things is to say actually

11  if I look at your own actuary, you're so far below 80%, it's

12  -- it's not even a real issue.  And in the event by the way as

13  we all know, the emergency manager has not replaced any

14  trustees of the pension plan.

15    So the second one is -- is this.  Milliman was asked to

16  prepare a series of scenarios of what numbers would look like

17  if the plans were changed to define contribution from defined

18  benefit.  And then there were various assumptions.

19    That under this assumption the numbers came out this way,

20  and under that assumption, they came out a different way.  Mr.

21  Bowen was -- and once again obviously this is not the subject

22  Mr. Moore testified about, this is a different subject.

23    Mr. Bowen was asked about one of these scenarios called

24  scenario 2 where one of the assumptions came from, namely an

25  assumption of 10% of pay as the defined contribution.  And

1  counsel said, to the extent those discussions involve counsel

2  for the city, I'd instruct you not to answer.

3      And as Mr. Ciantra quoted, the witness did not answer.

4  However, when they went to what the scenarios were, how things

5  were calculated, and what was done, the witness testified

6  quite fully.  His testimony started on Page 79 and continued

7  for several pages thereafter where he described how the

8  scenarios were run, how he used the numbers, and what results

9  they came up with.

10     It is not the case that at that point anyone thought that

11 there was going to be total blocking of testimony about the

12 pension task force.  And in fact Mr. Ciantra on Page 83 asked

13 a question.  Other than these, the several letters that we've

14 gone through has Milliman analyzed any other scenarios on

15 behalf of the pension task force?  And there was an answer to

16 that.

17     So, just to be clear, our position is there were no --

18 there has not been a sword or shield issue.  The instructions

19 given are two in the Bowen deposition, none in the Moore

20 deposition.

21     They do not involve the subject of Mr. Moore's testimony

22 on the 3.5 billion dollars.  And in fact he was questioned

23 about that at his deposition and he did answer those

24 questions.

25     As to Mr. Bowen, there was no wholesale blocking of

1  inquiry into the pension task force.  Two instances and only

2  two, was there an instruction.  And in that case, in both

3  cases, counsel then proceeded with his questioning and got

4  answers to the substantive questions and in fact went on for a

5  number of pages in asking questions and getting answers.

6      And finally as I've said, these subjects do not relate to

7  the 3.5 million.  Anyway, they're extraneous.  And so I don't

8  think there has been any sword or shield used at all, Your

9  Honor.  Thank you.

10      THE COURT:  All right.  May I have the Moore and

11  Bowen deposition transcripts, please?

12      MR. STEWART:  Your Honor, I could pass you my copy

13  now or have a clean copy delivered later today.

14      MR. CIANTRA:  I have clean --

15      THE COURT:  Do you have them?

16      MR. CIANTRA:  I have clean copies, Your Honor.

17      THE COURT:  All right.  May I -- may I have your

18  copies then?  Thank you.

19      MR. CIANTRA:  Yes, the whole transcript.  I'll just

20  double check to make sure, I didn't write on it.  May I

21  approach, Your Honor?

22      THE COURT:  Please.

23      MR. CIANTRA:  Thank you.

24      THE COURT:  Now can you direct me to the page number

25  of the Bowen transcript where -- or page numbers where the

1  privileges are asserted?

2        MR. CIANTRA:  Yes, Your Honor.  Page 53, beginning

3  on Line 12.  And then continuing to Page 55, Line 8.

4        THE COURT:  Thank you.  Stand by, please.

5        MR. CIANTRA:  Oh, I'm sorry.  And then Page 77, Line

6  19, through Page 78, Line 14.  Those are the excerpts that I

7  read to the Court.

8        THE COURT:  Okay.

9        MR. CIANTRA:  Thank you, Your Honor.

10        THE COURT:  One second.  All right.  Anything

11  further, counsel?

12        MR. STEWART:  I do have one thing.  All right.  Your

13  Honor, I had not known until Mr. Ciantra raised it that the

14  relevance he was urging for this was that this point about

15  PA436 and the assumption of power over the pension systems.

16     Leafing through this, I see that Mr. Moore was also asked

17  about this.  Pardon me.  Pages 132 and following of his

18  deposition and he answered all of those questions and there

19  were no instructions to not answer.

20        MR. CIANTRA:  I have nothing further, to add, Your

21  Honor.

22        THE COURT:  Well, before I resolve this, I want to

23  have a conversation with Mr. Miller.  Is there a Mr. Miller

24  here?

25        MR. STEWART:  He is not here.  Pardon me, Your

1 Honor, he has been in Court, but he's not here today. He's a

2 Jones, Day partner in the pension area.

3       THE COURT: All right. Well, communicate to him on

4 my behalf then, please.

5       MR. STEWART: Yes, I will do so.

6       THE COURT: In the few pages of these transcripts

7 that I have read, especially the transcript of Mr. Moore, it

8 appears that Mr. Miller objects to virtually every question

9 stating, "object to form". Tell him that from now on he has a

10 standing objection on the grounds of form and he is not to

11 interrupt the flow of depositions with that objection.

12       MR. STEWART: Pardon me. Of course, Your Honor.

13       THE COURT: All right. After reviewing these --

14 these transcripts and reviewing the testimony that is sought

15 to be stricken here, the Court concludes that there is no

16 unfairness in permitting this testimony to be offered here, or

17 received here despite the earlier claim of attorney/client

18 privilege.

19     The Court so concludes because there was nothing about

20 the isolated and specific claims of privilege that were

21 asserted in the Bowen deposition that precluded a full

22 opportunity for discovery on all factual matters that directly

23 related to the subject of Mr. Moore's testimony now sought to

24 be stricken. So the motion to strike is denied and I will

25 return the transcripts to counsel.

 1          MR. CIANTRA:  Thank you, Your Honor.

 2          THE COURT:  Okay.  Anything further before we resume

 3   with Mr. Orr?  All right.  Can we arrange for him to be

 4   brought back into the courtroom, please?

 5      Mr. Orr, you may be seated.  You understand that you are

 6   still under oath.

 7          THE WITNESS:  Yes, Your Honor.

 8      (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

 9          THE COURT:  Thank you.  And you may proceed, sir.

10          MR. ULLMAN:  Good morning, Your Honor.  Anthony

11   Ullman for the retiree committee.

12                      CROSS EXAMINATION

13   BY MR. ULLMAN:

14   Q    Good morning, Mr. Orr.

15   A    Good morning, Mr. Ullman.

16   Q    And you may recall when we broke yesterday, I had been

17   asking you about the -- your knowledge as to the size of the

18   unfunded pension liability.  And I think we had just finished

19   discussing the May 2013 plan that was Exhibit 407.  Do you

20   recall that in general?

21   A    Yes, I do.

22   Q    Okay.  Now the size of the unfunded pension liability was

23   also mentioned in the June 14 proposal which is number --

24   Exhibit 408, is that right?  Do you want to just put the cover

25   on the screen?

1  A    Yes.  It was mentioned in the June 14th presentation.

2  Q    And does what's written in Exhibit 408, the June 14

3  proposal, accurately reflect your knowledge about the size of

4  the unfunded pension liability as you understood it as of June

5  14th, 2013?

6  A    Yes.  It accurately reflects the size of the unfunded

7  pension liability to the extent -- to the best of our

8  knowledge, yes.

9  Q    Okay.  So if we look at Page 23 of this document, and

10 what we see there's a -- a bullet point there.  Yeah, thank

11 you.  We can pull out.  And it says, that further analysis by

12 the city using more realistic assumptions (including by

13 reducing the discount rate by one percentage point) suggests

14 that the pension UAAL will be approximately 3.5 billion as of

15 June 30, 2013.  Do you see that?

16 A    Yes.

17 Q    Okay.  And that reflects the state of things as you

18 understood it as of June 13, 2013?  I'm sorry, June 14, 2013?

19 A    Yes, I believe so.

20 Q    Okay.  And at that point in time it was characterized as

21 a suggestion, correct?

22 A    It was characterized as a proposal based upon our best

23 analysis at that time.

24 Q    I'm focusing on the bullet point that we have

25 highlighted.  This is -- this is what the analysis regarding

1   the unfunded pension liability suggests.  Did I read that

2   correctly?

3   A    Yes.  The document speaks for itself, that's what it

4   says.

5   Q    Okay.  And is it fair to say that what you knew about the

6   size of the unfunded pension liability in June 2013 was

7   fresher in your mind in June 2013 than it is today?

8   A    I think I've been aware of the unfunded -- the amount of

9   the unfunded pension liability from then until now.  I think

10  it's been fairly consistent.

11          MR. ULLMAN:  Okay.  I'll move to strike as

12  non-responsive, Your Honor.

13          THE COURT:  Motion denied.

14          MR. ULLMAN:  Okay.  Thank you.

15  Q    My question, Mr. Orr, was actually a different -- well,

16  let me rephrase the question.  Would you agree that the

17  information that you had about the size of the unfunded

18  pension liability as of June 14, 2013 was fresher in your mind

19  in June of 2013 than it is today?

20  A    No.

21  Q    And Mr. Orr, I previously asked you about the retiree

22  health benefits and how those were to be treated under the

23  June 14th proposal.  Do you remember that?

24  A    Yes

25  Q    Okay.  And just for clarity, the health benefits that we

1  were talking about are what is referred to in the June 14

2  proposal as OPEB, is that right?

3  A    Yes.  Other employee benefits.

4  Q    Okay.  And is it correct that according to -- in the

5  analysis that you had as of June 14, 2013, the unfunded OPEB

6  liabilities were reported as 5.7 billion dollars?

7  A    Yes.  I believe that's correct.

8  Q    Okay.  And that's set out in your June 14 proposal, isn't

9  it?

10  A    Yes, I believe so.

11  Q    Okay.  Now staying in the June 2013 time frame, and

12  putting aside the possibility of a consensual resolution,

13  okay.  Have you come up with what you considered a viable

14  course of action that allowed the city to cut pension benefits

15  that did not involve a Chapter 9 filing?

16  A    I'm just trying to -- that's a long question, so I'm

17  making sure that I understand it.  Putting aside a potential

18  consensual resolution, had we come up with a viable option to

19  cut pension benefits without filing Chapter 9.

20  Q    That's the question, sir.

21  A    Okay.  There were other options.  I don't know if they

22  were viable or not.  I think between June 14 and until a few

23  months later, it became clear that there were no other viable

24  options.

25  Q    Okay.  Thank you.  Now you in fact did file the Chapter 9

1  petition obviously, right?

2  A    I instructed my attorneys to file the Chapter 9 petition

3  after receiving authority from the Governor.

4  Q    Okay.  And in fact it is the City of Detroit that is the

5  debtor, not the emergency manager as such, right?

6  A    Yes.  Under 436 I act for the city.

7  Q    All right.  Okay.  And to be clear at the time the city

8  filed for bankruptcy, is it correct that it was your position

9  that there had to be significant cuts in accrued pension

10 rights for both active employees and retirees?

11 A    Well, I don't know if active employees receive pensions,

12 but I think the gist of your question is, would there have to

13 be cuts in the accrued actuarial liability and the answer is

14 yes.

15 Q    Okay.  I was asking specifically about cuts in accrued

16 pension benefits for both actives and retired persons.

17 A    Well, they're vested pension benefits that active

18 employees if they vest, have them.  And then there's accrued

19 actuarial liabilities.  Let's just assume that we're talking

20 about both in your question, is that fair?

21 Q    Yes.

22 A    Okay.  Then yes, there would have to be cuts.

23 Q    Okay.  And is it correct that as part of the proceedings

24 in this -- in this action after the Chapter 9 filing was made,

25 that the city has in fact agreed and admitted that -- that it

1  in fact intends to cut vested pension benefits for actives and

2  retired persons?

3  A     I think you're referring to a request for admissions.

4  Q     Yes.

5  A     Yes, I believe so.

6  Q     Thank you.  Now I understand it's your position that the

7  Chapter 9 filing was done under the authority of PA436, is

8  that right?

9  A     Yes.

10 Q     Okay.  And of course you're generally familiar with that

11 law?

12 A     Yes.

13 Q     Okay.  And you're also generally familiar with PA4, the

14 predecessor statute?

15 A     Not quite as familiar.  Yes.

16 Q     Are you aware of it?

17 A     I'm aware of it.

18 Q     And you were aware that it was repealed by a referendum?

19 A     Yes.

20 Q     Okay.  And then PA436 was enacted with an appropriationed

21 measure that was tacked on that avoided the possibility of

22 another referendum for PA436, correct?

23 A     I'm aware that an appropriation measure was tacked on.  I

24 have read that that was to resolve the possibility of another

25 referendum, yes.

1  Q    Okay.  And I believe that prior to your appointment as

2  emergency manager, you yourself looked at the history of PA4

3  and PA436 at least to some degree, is that right?

4  A    If you're talking about the first day between January 30th

5  to 31st, I looked at it initially then.  And then I looked at

6  it in more depth later.

7  Q    Okay.  So let's put on the screen Exhibit 403.  Okay.

8  This is an email that you wrote from January 13, 2003 (sic).

9  Is this what you were referring to?

10 A    Yeah, I think that's the email we discussed during my

11 deposition.

12 Q    Okay.  And if we focus on the -- it talks about a number

13 of things.  What it does as you said, go over some of your

14 understanding of the legislative history.  And if we look at

15 the first paragraph, it's talking about the new EM law which

16 is PA436, correct?

17 A    Yes.

18 Q    And if you focus in particularly on the second to last

19 sentence it says, by contrast Michigan's new EM law is a clear

20 end run around the prior initiative that was rejected by the

21 voters in November, correct?

22 A    What day is this dated?

23 Q    I'm sorry?

24 A    Is this dated the 31st?

25 Q    January -- I think I may have said the 13th, but thank

1  you, it is the 31st.

2  A    Okay.  Thank you.  Yes, I see that.

3  Q    Okay.  And that was what you wrote in this email of

4  January 31st?

5  A    Yes.  That's what I wrote one day after being approached

6  about becoming the EM.

7  Q    And then if we skip two paragraphs down, there is --

8  right.  In the last paragraph we see the -- the phrase you

9  wrote.  It says, so although the new law provides the thin

10 veneer of a revision, it is essentially a redo of the prior

11 rejected law and appears to merely adopt the conditions

12 necessary for a Chapter 9 filing.  Do you see that?

13 A    Yes, I see it.

14 Q    Okay.  And that's what you wrote and concluded when you

15 created this email in January of 2013?

16 A    Yes.

17 Q    And subsequent to then, to that time, have you done any

18 further investigation as to how PA436 came about and the --

19 the origin of the appropriations measure?  It's really a yes

20 or no question.

21 A    Well, no, I want to be complete in my answer so it's not

22 misinterpreted either by people in the courtroom or the

23 public.  But have I done further investigation --

24 Q    I'm sorry, Mr. Orr, but the question is simply whether

25 you did investigation, sir.

 1          THE COURT:  And as I've indicated to you before, if

 2   you can't answer a question with a yes or a no answer, just

 3   say that.

 4   A    Okay.  I can't answer that question with a yes or no

 5   answer.

 6   Q    You cannot tell me yes or no whether you did any further

 7   investigation subsequent to January of 2013?

 8   A    It would be misleading for you to give just -- for me to

 9   give you just a yes or no answer.

10   Q    Okay.  Did you ask any of your colleagues at Jones, Day

11   whether they had any information about the circumstances

12   surrounding the repeal of PA4 or the creation and enactment of

13   PA436?

14   A    I don't think I asked anyone at Jones, Day.  I think I

15   did my own analysis.

16   Q    Well, were you aware that Jones, Day was in discussions

17   with the State of Michigan in March of 2012 concerning the

18   challenge to PA4?

19   A    No.

20   Q    Okay.  Well, let's put 845 on the screen.  This is

21   Exhibit 845.  This is a March 24th, 2012 email.  Do you -- do

22   you need -- I think we have a hard copy in the binders there

23   if it's easier for you to look --

24   A    No, that's okay with my reading glasses, I can -- I can

25   keep up.

1  Q    Okay.  And why don't you take a moment to read it because

2  I don't want to just, you know, spring the paragraph on you.

3  A    All I have on the screen is the two's.

4  Q    Okay.  Can you just put the -- the document on the screen

5  so Mr. Orr can read it?

6  A    Well, I can't read that.  You want me to read the whole

7  email or just --

8  Q    You can look at the second page too and then I'll ask you

9  a few questions.

10  A    Okay.

11  Q    And then we'll move on.  Have you had a chance to look

12  through that, Mr. Orr?

13  A    I haven't read it all, but I -- I get the gist of the

14  email.

15  Q    Okay.  And this is as I said it's a May -- it's a March

16  24, 2012 email.  You are not on it.  I'm not suggest that you

17  are.

18  A    No.

19  Q    It's talking about a meeting that took place with Braum

20  Stibitz.  That's a person from the -- of the Treasury

21  Department of the state, is that right?

22  A    Yes.

23  Q    And if you look at the paragraph numbered 1 with the

24  Arabic number 1, giving the context it says the state and the

25  city were concerned that PA4 may not survive the petition

1 | challenge.  Do you see that?

2 | A    Yeah, that's what it -- that's what it says, yes.

3 | Q    Yeah, okay.  And then if you go on to the next page, you

4 | go through some more discussion.  It goes to the next page and

5 | there is a -- a paragraph that says based on that conclusion,

6 | it said the state quickly began evaluating the alternatives.

7 | And go through one, could a consent agreement be achieved to

8 | an artful solution such as the DEP was intended.

9 |     And then it goes to number three, thus, the state was

10 | looking at declaring an emergency and appointing an EFM with a

11 | likely subsequent step of a Chapter 9.  Do you see that?

12 | A    Yes, I see that.

13 | Q    Then in the next paragraph it goes on to say, the state

14 | believes it needs PA4 or worse case PA72 to file a Chapter 9

15 | case based on law.  And as such state legal counsel and Jones,

16 | Day provided guidance on whether a Chapter 9 filing in April

17 | could be upheld if PA 4 is pulled back at the end of April.

18 | And does that refresh your recollection, Mr. Orr, as to

19 | whether Jones, Day was involved in discussions in -- in -- or

20 | in the spring of 2012 with the state concerning PA4 and

21 | potential challenges to it?

22 | A    No.  I have no -- I have -- did not have then and I just

23 | learned now that Jones, Day had involvement in March 2012.

24 | Q    Okay.  Well, were you aware, or are you aware I should

25 | say, that Jones, Day itself was involved in suggesting the

1  addition of an appropriation measure to PA436?

2          MR. STEWART:  Objection, Your Honor, foundation.

3          THE COURT:  I'll permit it.  Go ahead, sir.

4  A    No.

5  Q    You've never heard that?  You don't recall ever hearing

6  that from anyone at Jones, Day?

7  A    I just heard it from you.

8  Q    That wasn't my question.  You don't recall ever hearing

9  that from anyone at --

10 A    I never heard it from anyone at Jones, Day, no.

11 Q    Okay.  I'm going to show you a document and see if this

12 refreshes your recollection.  The document I'm going to show

13 the witness is not in evidence, so I will not put it on the

14 screen.  With permission, I'll just direct --

15          THE COURT:  Well, the -- the witness did not

16 indicate a lack of recollection.  He said -- the answer was

17 no.  He was not aware of that.

18          MR. ULLMAN:  Well, he said he -- I thought I asked

19 him whether he recalled ever hearing it and he said no.

20          THE COURT:  That he wasn't aware of it.  Is that

21 right, sir?

22 A    Yes, Your Honor.

23          MR. ULLMAN:  Well, Your Honor, if -- if he saw

24 something that refreshed his recollection that he had heard

25 of, then he would have been aware.  It's a little --

1          THE COURT:  But that's a question of impeachment,

2    not refreshing recollection.

3          MR. ULLMAN:  Okay, Your Honor.

4    Q    Mr. Orr, prior to the Chapter 9 filing, were you aware of

5    any legal precedent specifically allowing a city or an

6    emergency manager to use Chapter 9 as a means to trump a

7    provision of the State Constitution that protects vested

8    pension rights?

9    A    I cannot answer that in a yes or no fashion.  I'll give

10   you an explanation.

11        I -- as I had said before in my background, I handle

12   cases for federal preemption over state law in a number of

13   different roles.  And so I generally was aware and -- and as

14   you've said before with my oath, that federal law takes over

15   state law.

16        Was I aware of any specific cases regarding an emergency

17   manager authorizing a Chapter 9 to trump state filings.  I

18   don't think there were any specific cases of State

19   Constitution regarding vested pension rights.  I don't think

20   there were any specific cases that I was aware of in that

21   regard, but I was aware of federal preemption, yes.

22   Q    Okay.  And were you at the time that you filed, were you

23   aware of any legal precedent allowing a city or an emergency

24   manager to use Chapter 9 as a means to trump a state

25   constitutional provision in general, even apart from -- from

1 | vested pension rights?

2 | A    Here again broadly, federal supremacy takes over state

3 | constitutional law.  I don't recall any specific cases in that

4 | regard.

5 | Q    Okay.  No specific cases regarding federal law trumping

6 | the State Constitution, is that correct?

7 | A    No.  I think I am aware of specific cases of federal law

8 | trumping state constitutional law.  What I was saying to you,

9 | I was not aware of specific cases of federal law trumping

10 | state constitutional law regarding vested pension rights.

11 | Q    Okay.  Do you recall being deposed before right around

12 | September 16th?

13 | A    Yes, I was deposed.

14 | Q    And I think you indicated that you were testifying

15 | truthfully when you --

16 | A    I was testifying truthfully.

17 | Q    Okay.  Let's show the -- the clip beginning at Page 192,

18 | Line 2.  I'd like to know, Mr. Orr, whether this was testimony

19 | that you gave during that deposition?

20 | MR. STEWART:  Objection, Your Honor.  I don't think

21 | that this is a proper use of -- of deposition testimony.  And

22 | I would -- if Mr. Ullman has a question.

23 | THE COURT:  What -- what do you assert is improper

24 | about it?

25 | MR. STEWART:  Well, there has been no statement

1 inconsistent with the deposition.

2          THE COURT:  Well, then the impeachment will be

3 ineffective.  But I'll permit counsel to -- to try.

4 Q    Okay.  The question is, do you recall giving this

5 testimony that we're about to play and you can answer yes or

6 no once you get --

7 A    Yes, I recall September 16 deposition.

8 Q    Okay.  Why don't I just play the testimony?

9          (Video Being Playing at 9:56 a.m.; Concluded at 9:56

10 a.m.)

11 Q    Now, Mr. Orr, is it correct that you've been told by the

12 State Attorney General that in his view the Michigan

13 Constitution protects the pensions that you're seeking to cut?

14 A    Yes.

15 Q    Is it correct that prior to the Chapter 9 filing there

16 were State Court proceedings that had been filed alleging

17 among other things that PA436 was unconstitutional inasmuch as

18 it purported to allow you to file for Chapter 9 without

19 insuring that the vested pension payments were protected?

20 A    Yes.

21 Q    Okay.  And those were pending as of July 2013, correct?

22 A    I believe they began July 3rd and there was another one

23 the following week and then one on July 15th, but yes.

24 Q    Okay.  And that litigation was pending in Ingham County

25 before Judge Aquiline?

1  A    Yes.  There was one case prior to the July cases

2  challenging the constitutionality of 436.  But the cases

3  you're talking about Flowers, Webster, and GRS, I think were

4  all pending in Ingham County.

5  Q    Yeah, in Ingham County.  And is it correct that at -- at

6  least at some point in July the date for the bankruptcy filing

7  had been planned for July 19?

8  A    No.  I think I said before that I wanted to file as soon

9  as I got the authority.  There wasn't a planning date.  But I

10 was going to file as soon as I asked for the authority to do

11 so.

12 Q    Okay.  Isn't it correct that there was a plan that had

13 been -- a written plan that had been put in place and that had

14 been created at least that showed the filing date of July 19?

15 A    I don't know if there was, I'm trying to recall.  I don't

16 know if there was a plan.  I think we had had discussions

17 about timing, yes.

18 Q    Okay.  And why don't we put on the screen Exhibit 831,

19 please.  Or, yeah, I'm sorry, or we can use 452, I think

20 that's easier.

21      Okay.  And what I'm putting before you is an email with

22 various attachments that comes from a Bill Nowling dated July

23 8th, 2013.

24 A    Yes.

25 Q    And it indicates at the bottom that Mr. Nowling works for

1  the office of the emergency manager, you?

2  A    Yes, he's my communications director.

3  Q    Okay.  And this is a document that was created by Mr.

4  Nowling, is that right?

5  A    I assume it was.  I haven't seen this document before.

6  Q    Okay.

7  A    But I assume it was.

8  Q    Okay.  And as you look at the attachments, it says

9  Chapter 9, COMS, which I assume is communications document,

10 Chapter 9 messages, Chapter 9 communications roll out from

11 July 4, 2013.  Do you see that?

12 A    Yes, that's what it says.

13 Q    Okay.  And Mr. Nowling in his ordinary course of duties

14 communicates with other people as to the state of things and

15 what the current schedule looks like, is that right?

16 A    Yes.  Mr. Nowling is the communications director and he

17 does a number of different things.

18 Q    Okay.  And if we turn to Page 7 of this document.  Okay.

19 This is what we see, it looks like the roll out schedule which

20 was referred to in the attachment.

21      And if we look at the first entry, under the middle

22 column, event.  It says Friday, July 19th, 2013 FILING DAY in

23 capital letters.  Do you see that?

24 A    Yes.

25 Q    And then if you look at the second box below there is an

1   item for 10:00 a.m., file necessary paperwork with Court

2   system?

3   A    Yes, that's what it says.

4   Q    Okay.  And this is all referring to the Chapter 9 filing,

5   isn't it?

6   A    I believe so.

7   Q    Okay.  Now do you recall, and I think you indicated

8   previously that in -- in early to mid-July you were aware that

9   there was -- there had been a hearing in the State Court

10  litigation for a TRO that had been scheduled for July 22nd, is

11  that right?

12  A    Yes.

13  Q    Okay.  And is it correct that the TRO hearing was then

14  moved up to July 18 in the late afternoon?

15  A    I believe so.

16  Q    Okay.  And is it correct that the bankruptcy filing was

17  in fact done on July 18, not on the 19th?

18  A    Yes.

19  Q    And is it correct that it was around 4:06 in the

20  afternoon of the 18th that it was filed shortly before the

21  State Court TRO hearing was scheduled to start?

22  A    If -- if that's the time it shows on the documents then

23  yeah, that's correct.

24  Q    Okay.  Now why don't we put up the -- do we have the

25  petition here?  And this is just from the Court files.  This

1  is a copy from the petition.

2      And if we look at the bottom, we see the filing date and

3  we see the filing time which is 4:06 in the afternoon.  And if

4  you look at the date, there was a date that was handwritten to

5  July 18th.  And I believe you've indicated previously that you

6  hand wrote the date to change it from July 19 to July 18, is

7  that right?

8  A    Yes, I did that.

9  Q    Okay.  Now, you of course know Kenneth Buckfire, is that

10 right?

11 A    Yes, I know Ken Buckfire.

12 Q    Okay.  And do you recall telling Mr. Buckfire that one of

13 the reasons that the bankruptcy filing was moved from the 19th

14 to the 18th, was to avoid the impact of a decision in the State

15 Court litigation that might have prevented you from filing the

16 bankruptcy petition?

17 A    I don't recall specifically saying that, but I may have

18 said it.

19 Q    Okay.  So if Mr. Buckfire testified to that, would you

20 have any reason to challenge that testimony?

21 A    Like I said, I don't specifically recall it, but I have

22 no reason -- I have no reason to say I did not say it.

23 Q    Okay.  And are you aware of any particular reason why the

24 Chapter 9 filing was filed when it was other than to get a

25 jump on a decision by the State Court?

1  A    Yeah.  I think I said before that once I sent the letter

2  to the Governor, I was prepared to file the case immediately.

3  I had said before that we were going to give it a month to try

4  to reach some sort of consensual resolution through the

5  process that we had outlined on June 14th and that wasn't

6  forthcoming.

7      I had said before that things were beginning to spiral

8  out of control.  We had sat by for the better part of three

9  weeks being sued on a regular basis.  We had the Syncora

10  litigation.  And the -- TRO, temporary restraining order that

11  was due to expire at the end of that week.  There were a

12  number of reasons besides the implication of your question

13  which was to try to get a jump.  That we were concerned about

14  filing as soon as we could.

15  Q    Okay.  Mr. Orr, again, you remember testifying on

16  September --

17  A    Yes.

18  Q    Of September?

19  A    Uh-huh.

20  Q    I'm sorry, September of -- of this year.

21  A    Yeah.

22  Q    And again you indicated you were testifying truthfully?

23  A    Yes, I was testifying truthfully.

24  Q    Okay.  And can you tell me did you give the following

25  testimony that we're about to play?

1  A    Sure.

2     (Video Being Played at 10:03 a.m.; Concluded at 10:04

3  a.m.)

4  Q    Okay.  That was your testimony, Mr. Orr?

5  A    Yes.

6  Q    Okay.  Now isn't it the case that subsequently the State

7  Court ruled that PA436 was unconstitutional to the extent that

8  it allowed a filing for Chapter 9 without protecting vested

9  pensions?

10 A    I'm aware that there was a State Court ruling.  I'm not

11 aware of the details.  But I think I -- I think I have heard

12 that.  I didn't -- I may have read the ruling, but I don't --

13 I think that's the gist of the ruling, yes.

14 Q    You're aware of that in substance?

15 A    I'm aware of that in substance.

16 Q    Okay.  And you didn't withdraw the bankruptcy petition in

17 response to the State Court ruling, did you?

18 A    No.  You asked me that on September 16th.  No.

19 Q    Now in connection with the bankruptcy filing, you filed

20 -- you yourself submitted a declaration, is that right?

21 A    Yes.

22 Q    Okay.  And in it among other things you gave figures as

23 to the city's liability in cash flow?

24 A    Yes.

25 Q    Okay.  And on the liability side, I believe you said that

1  the total liabilities are over $18,000,000,000, is that right?

2  A    Yes.

3  Q    Okay.  And I think you also broke that $18,000,000,000

4  figure down in a couple of ways.  And we can -- I can show

5  you.  Okay.  So why don't we put -- let's put Exhibit 414 on

6  the screen.  This is your declaration that you filed, isn't

7  it?

8  A    Yes.

9  Q    Okay.  And if we can go to Paragraph 9 which is on --

10 starts on Page 5 and then continues.  So okay, I guess we have

11 it all pieced together here.  So we see here that you wrote in

12 Paragraph 9 that the city has over 18,000,000,000 in accrued

13 obligations, right?

14 A    Yes.

15 Q    And then you go on further to say, that there is over

16 6,000,000,000 -- a little further down, over 6,000,000,000 in

17 obligations backed by enterprise revenue -- enterprise

18 revenues or that are otherwise secured?

19 A    Yes.

20 Q    Okay.  And then you elaborate that a little more in

21 Footnote 4.  Will you put Footnote 4 on the screen?  Okay.

22 And there is a phrase in there exactly where you say -- you're

23 elaborating on what that 6.4 billion dollar figure is.  And

24 among other things you say that that consists of 5.85 billion

25 in enterprise fund debt.  Do you see that?

1  A    Yes.

2  Q    Okay.  And is it correct that that is basically referring

3  to bonds that are issued by the Detroit Water and Sewer

4  Department and state loans that are also made to the

5  Department of Water and Sewer?

6  A    Yes.  That's generally -- yeah, 6,000,000,000 of it

7  belongs to DWSD, yes.

8  Q    And the DWSD, that's department of -- that's the Detroit

9  Water and Sewer Department?

10 A    Detroit Water and Sewer Department.

11 Q    Okay.

12 A    We call it DWSD.

13 Q    And the DWSD is operated as a separate authority in

14 Detroit, is that right?

15 A    It's a department of the City of Detroit, but it is

16 operated as a -- not as -- necessarily as an authority.  It's

17 operated with some autonomy, both operationally and as a

18 result of Judge Cox's ruling in the Clean Water Act case.

19 Q    Okay.  And it keeps its own books and records?

20 A    Yes.

21 Q    And the DWSD is responsible for the payment of these

22 bonds, isn't it?

23 A    Yeah.  There's a mechanism but generally, yes.

24 Q    Okay.  So the payment of these bonds, this about

25 6,000,000 is not allocable to the -- to the Detroit general

 1  fund, is it?

 2  A     Six billion.

 3  Q     Six billion.  Did I say million?

 4  A     Yeah, you did.

 5  Q     Thank you.

 6  A     Okay.  Six billion.

 7  Q     And that's -- the payment -- the responsibility for the

 8  6,000,000,000 in the DWSD related bonds and -- and loans is

 9  not allocable to the general fund, is it?

10  A     No.  No, it's not part of the general fund debt, but it

11  is an obligation of the city.

12  Q     Okay.  And the DWSD has the financial wherewithal to make

13  the payments on its bonds as they come due, doesn't it?

14  A     Yes.  And it is doing so.

15  Q     Okay.  Now if we look a little further in your

16  declaration, staying with Paragraph 9.  You talk about where

17  is the 11. -- no, it's the top part.  11.9 billion in

18  unsecured obligations to lenders and retirees.

19  A     Yes.

20  Q     And we go back down this time to Footnote 3.  And we see

21  in -- in little letter (a), we see the 5.7 billion -- billion

22  dollar figure in the OPEB liabilities, right?

23  A     Yes.

24  Q     And then in little (b) we see that number again, 3.5

25  billion in under funding pension liabilities, correct?

1  A    Yes.

2  Q    Okay.  And that's a reference to the state of things as

3  you believe them to exist or saying they existed as of June

4  14, 2013, correct?

5  A    Well, I -- I think my affidavit also includes a state of

6  play that we believe them to exist at the time of filing.

7  Q    Well, I'm looking right now at Footnote 3 which says on

8  June 14, it says we met and these were the obligations.  And

9  it says see proposal for creditors as of June 14, correct?

10 A    Yeah.  I'm not taking issue with what is said in there,

11 I'm just saying that I didn't see any change in those numbers,

12 yes.

13 Q    Okay.

14 A    But the answer to your question is yes.

15 Q    Okay.  Now is it correct that as of June 14 -- and you

16 had not been aware of any -- was there any substantial

17 revision to the work that had been done regarding the size of

18 the unfunded pension liability as you recall between June 14

19 and the time of the bankruptcy filing?

20 A    There -- there -- there is ongoing work on these issues

21 through from June 14th until the bankruptcy filing.  But there

22 were no, to the best of my knowledge, there were no

23 substantial changes in the amount of the debt represented by

24 these figures.

25 Q    Okay.  And is it correct then that as of June 14, the

1  work that had been done by Milliman was in fact preliminary

2  work?

3  A    I don't remember the exact date, but I believe June 14th

4  is correct and that Milliman's first work was done off of

5  Gabrielle Roeder, yes.

6  Q    Okay.  So the June 14 preliminary.

7  A    Yeah.

8  Q    Was it still preliminary as you understood it as of the

9  date of the bankruptcy filing, July 18?

10  A    I don't know if it's -- if it's -- it's preliminary until

11  we reach agreement as to what the numbers are.  So the work is

12  consistently estimates.  When you say preliminary, I assume

13  you mean that we haven't reached a final conclusion as to the

14  amount.  But this represents our best analysis of what those

15  numbers are.

16  Q    Yes.  Preliminary in the sense that the Milliman firm had

17  not reached a final conclusion as to what the right number was

18  for the pension liability.

19  A    I -- I think that's fair.

20  Q    Okay.  And I think you testified earlier that during this

21  time frame, Milliman was doing an analysis of the Gabrielle

22  Roeder work, correct?

23  A    The --

24  Q    Well, I'm not saying that's all, I'm just taking this

25  piecemeal.

1  A    Yeah.  Well, so I don't -- without -- without looking at

2  the actual documents, I want to be sure I'm not misleading.

3  Milliman -- the sequence was Milliman was doing analysis of

4  Gabrielle Roeder.  Milliman then began doing its own analysis.

5  I don't remember the exact dates, so I don't want to say June

6  14th and it turns out it was June 15th.  But generally that's

7  the sequence and that's the approximate time.

8  Q    Okay.  So there are two aspects to what -- so we're

9  clear, what Milliman was doing one, was doing an analysis

10 based on the Gabrielle Roeder work, right?

11 A    Yes.

12 Q    And so we're clear Gabrielle Roeder is the actuary

13 retained by the retirement systems, correct?

14 A    Yes.

15 Q    Okay.  And it was also, I think you had said earlier, in

16 the process of creating its own valuation?

17 A    Yes.

18 Q    Okay.  And is it correct that as late as September 18,

19 2013, Milliman had not in fact yet completed its work and the

20 city was not in a position to know the actual size of the

21 pension under funding?

22 A    I think it's correct that as of the 18th, Milliman may

23 have not -- here again I'm trying not to be specific with

24 dates if they're different and are proven to be different,

25 that's fine.  But that's approximately the time.  I don't know

1  if it's fair to say that the actual valuations hadn't been

2  concluded.  Our valuations have been fairly consistent based

3  upon the assumptions used.

4  Q    Okay.  And you know Charles Moore, correct?

5  A    Yes.

6  Q    Okay.  And he is on the pension task force?

7  A    Yes.

8  Q    Okay.  And he was tied in with the Milliman work and the

9  status of it at various points in time?

10 A    Yes.

11 Q    Okay.  Why don't we put on the screen some deposition

12 transcript excerpts.  Do you know what I'm -- okay.

13     This is from the deposition of Mr. Moore on September 18th

14 of this year.

15     MR. STEWART:  Objection, Your Honor.

16     MR. ULLMAN:  I'm not sure what the objection is,

17 Your Honor.  I want to ask him some questions about some

18 specific things, made -- statements made by Mr. Moore.  This

19 document has not been objected to, or rather this -- this

20 deposition testimony has not been objected to.

21     THE COURT:  It's really not appropriate to ask one

22 witness about the testimony of another witness, or to confront

23 one witness with the testimony of another witness.  The

24 objection is sustained.

25 Q    Okay.  Is it correct, Mr. Orr, that so far as you were

1  aware that as late as September 18ᵗʰ, 2013, the city and its

2  actuary Milliman, had not completed the analysis on the

3  unfunded pension liability?

4  A    As I said, I think that's the approximate date. I don't

5  recall independent the exact date. But I think it's around

6  that time.

7  Q    What are you saying, it's around that time that they

8  complete -- I'm not sure when you say -- what's around that

9  time?

10  A    No, at some point Milliman completed its analysis. I

11  don't remember the exact date that that was done.

12  Q    Okay. But at -- you would agree that at least as of

13  September 18ᵗʰ, 2013, that Milliman had not completed its

14  analysis, correct?

15  A    I'll agree that it was around that date. I don't want to

16  say yes and then it turns out that they had and I was wrong

17  because I just don't recall the date.

18  Q    Okay. So that your best knowledge is around that date,

19  around September 18ᵗʰ.

20  A    Sometime in September.

21  Q    Okay. And is it correct that as recently as September

22  18, Milliman and the city were still in the process of trying

23  to create their own valuation model?

24  A    That -- here again, it may be around that time. I mean

25  we continually do work on -- on valuations and analysis, but

1  that may have been the approximate time.

2  Q    Okay.  And to the extent that they were still working on

3  it as of around the July -- I'm sorry, the September 18 time

4  frame, do you have any personal knowledge as to when if ever

5  the Milliman valuation work was completed?

6  A    Do I have personal knowledge of -- of when?  I believe it

7  was completed.  I don't know the exact time it was.

8  Q    In any event it -- to the extent it was, it would have

9  been sometime on or after September 18th, is that true?

10 A    Yeah, if your supposition is correct, that September 18th

11 it was still a work in progress, then it would have flowed

12 that it would follow sometime after that.

13 Q    Now I think you also made reference in your June 14

14 proposal to the investment rate of return that had been used

15 by the retirement systems actuary, do you recall that?  A 7.9

16 figure?

17 A    Yes.

18 Q    Okay.  And do you want me to show that to you, or do you

19 agree that you made some reference to that as being what you

20 considered an inappropriate assumption?

21 A    To move along, I will agree that we made a reference to

22 in our anticipated rate of return.  And if you say it was 7.9,

23 I have no reason to -- to disagree with you.

24 Q    Okay.  And as it correct that as -- as late as September

25 24, 2013, the Milliman firm had not given any opinion as to

1   whether the investment rate of return that was used by the

2   retirement systems actuary was inconsistent with actuarial

3   standards of practice?

4   A    Here again I'm -- I'm going to defer to the documents and

5   -- and the actual timing of when those reports were produced.

6   But I think there was one report that had a range of

7   assumptions as far as what was reasonably anticipated to be

8   the expected rate of return.

9   Q    My question is a little -- is really quite specific.  Are

10  you aware -- they called actuarial standards of practice?

11  A    Yes.

12  Q    Okay.  And is it correct that at least as late as

13  September 24, 2013, the Milliman firm had not opined, had not

14  given an opinion --

15  A    Right.

16  Q    -- that the investment rate of return used by the

17  retirement systems actuaries was inconsistent with actuarial

18  standards of practice?

19  A    Yeah, without seeing the report, I don't recall if

20  Milliman ever opined.  They may have, I just don't recall it.

21  If you say that there was some time after September 24th is

22  what you said, without getting caught up in the dates because

23  I don't have the document, and that document speaks for

24  itself, I have no reason to disagree with it.

25  Q    Okay.

 1        THE COURT:  What's the relevance of all of this to

 2  whether the city was eligible to file two months earlier?

 3        MR. ULLMAN:  This has to go to what the city knew

 4  and what it's the city, not Mr. Orr necessarily personally,

 5  but the city and its state of mind in making the

 6  representation that the number for the unfunded pension

 7  liability was indeed 3.5 billion when we believe the evidence

 8  will show and shows that no one had come to that conclusion

 9  yet and in fact work was still ongoing.

10        THE COURT:  All right.  I'll permit some brief

11  further inquiry into this and then ask you to move on.

12        MR. ULLMAN:  Thank you, Your Honor.

13  Q    Is it correct that as of September -- at least September

14  24, 2003 (sic), the work done by Milliman, the city's actuary,

15  had not in fact progressed to the point where it was even able

16  to replicate the valuation model that had been used by the

17  retirement systems actuaries?

18  A    Mr. Ullman here again, I don't know what your dates are.

19  And I don't recall at what point --

20        THE COURT:  All right.  Mr. Orr --

21  A    I don't know.

22        THE COURT:  If you don't know, just say --

23  A    I don't know.

24        THE COURT:  -- I don't know.

25  A    I don't know.  I'm sorry, Your Honor.  I don't know.

1  Q    Is it correct, Mr. Orr, that the last actuarial valuation

2  for the pension liability as a whole was done as of June 2011,

3  that's for both systems, the GRS and the police and fire?

4  A    I don't know if that's the date.

5  Q    Okay.  Well, you recall that there was an actuarial

6  evaluation for June 2011 that showed a total unfunded

7  liability of about 643.8 million dollars?

8  A    I don't recall if that was the date.  I recall during a

9  deposition us discussing that number.  I think that number was

10 based off the Gabrielle Roeder report as part of their annual

11 valuation.

12 Q    Yeah.  And that number, the 643.8 million is referenced

13 in the June 14 proposal, isn't it?

14 A    I think it is, yeah.

15 Q    Okay.  And that would be for June 11, 2000 -- I'm sorry,

16 June 2011, right?

17 A    I -- I -- I think that's when the report dates back to.

18 Q    Okay.

19 A    The end of the calendar -- I mean fiscal year.

20 Q    Now for that -- didn't mean to interrupt you.  Now,

21 taking that number, the total liability number for the

22 unfunded pension liability of the reported figure of 643.8

23 million, not all of that is allocable to the general fund, is

24 it?

25 A    No.  I think we discussed this on September 16th.  There's

1  a mechanism for some allocation to DWSD, but Gabrielle Roeder

2  doesn't break that out between general fund and DWSD.

3  Q    Okay.  And the fact is that a substantial portion of the

4  unfunded pension liability, the reported one, the 643.8

5  million, was allocable to DWSD, correct?

6  A    Well, I think you and I discussed on September 16th that

7  the math, and I thought I said let's be careful.  The math

8  works out to about 38%.  I -- I think that figure does not --

9  I think that figure focuses on what was actually paid as

10 focusing on what was obligated.  That 38% might go down if you

11 include the deferrals that we made.  But generally somewhere

12 between a third to 40% is DWSD.

13 Q    Of the unfunded pension liability --

14 A    Of the unfunded --

15 Q    -- is allocable -- I'm sorry, I didn't mean to --

16 A    I didn't mean to interrupt you, I'm sorry.

17 Q    Okay.  To be clear though about you said 38 to 40% of the

18 unfunded pension liability is allocable to DWSD.

19 A    What I -- what I said was, depending upon if you're

20 looking at just what was paid for that year, or what was paid

21 and deferred that that percentage probably ranges, because

22 Gabrielle Roeder doesn't break out the difference between the

23 general fund and DWSD obligations.  Probably ranges between 30

24 to 38%.  I think that 38% is what we discussed during my

25 September 16th deposition.

1  Q    Okay.  Just so I'm clear, the 38% that we discussed was

2  -- was allocable to the -- that we're talking about the

3  unfunded pension liability.  And you're getting a little

4  confused is your answer?

5  A    Yeah.  Let me -- yeah.  I'm going to try to clarify as

6  best I can because I want to be responsive.

7       If you calculated in the total amount the city had due

8  for instance in 2013 of about $130,000,000, then DWSD's

9  responsibility would be about 30% of that number.  If you

10 calculated in just the amount that was actually paid and other

11 deferrals in other years, then the DWSD component would

12 probably be about 38% of that number because it's -- it's a

13 larger component of what was actually paid as opposed to what

14 was obligated but a portion of which was deferred.

15 Q    Okay.

16 A    So the range depending upon whether it's -- it's all that

17 should be paid but was deferred, or whether it's just what was

18 actually paid, is somewhere between 30 to 38%.

19 Q    Isn't it correct that the unfunded pension, just the

20 unfunded amount allocable to DWSD is about 39 to 40%, that

21 range?

22 A    That's the figure we discussed on September 16th.  And --

23 and that -- that is correct for the amount that's actually

24 paid.  That percentage goes down if you include the deferral

25 amount.  But yes, that's correct.

1  Q    Okay.  Just so we're real clear, can we put up the City's

2  Exhibit 68?  Look at Page 1 first.  Okay.  This is the

3  Gabrielle Roeder.  It's a -- a report from July 2012.  Do you

4  see that?

5  A    Yes.

6  Q    And if we go to Page B3.  Okay.  If we can blow that up.

7  Do you see here Gabrielle Roeder actually breaks down the --

8  the actuarial accrued liability as of June 30, 2011?

9  A    Yes.

10  Q    And at the very bottom there's unfunded actuarial accrued

11  liabilities?

12  A    Yes.

13  Q    Okay.  You see there's a -- a total column at the far

14  right?

15  A    Yes.

16  Q    Okay.  And in the middle it's Department of Water and

17  Sewage -- or Sewage?

18  A    Yes, the middle column.

19  Q    The two forty-seven --

20  A    Yes.

21  Q    And I believe if you do the math, if you divide the two

22  forty-seven six two four figure into the total unfunded

23  accrued liabilities, it comes out to just about 38.6%.  Do you

24  see that?

25  A    Yeah, that's the discussion we had on September 16th.

1  Q    Okay.  And this is -- so this is talking about the

2  unfunded liabilities only, correct?

3  A    Yes.

4  Q    Okay.  And in the -- going back now to our discussion

5  September 16th, do you remember that there was some -- there

6  was some confusion over how to do the math to get the right

7  number?

8  A    Yes, I do.

9  Q    And remember we first did it the wrong way and we ended

10  up with 38%.  And then we went back and tried it again and you

11  ended up saying yes, the right number is 61 -- it was

12  something like 61%.

13  A    Well, I said if you -- I think what I said was, and I'm

14  sorry because we were both going back and forth on the math.

15  I think what I said is, the math is the math, but be very

16  careful with the numbers because you'd actually have to do

17  down.  So just -- just to clarify that whole discussion --

18  Q    I -- I agree.

19  A    We're -- we're talking about 38%.

20  Q    Right.  And at the deposition I think we ended up with

21  61, but we see now that the right number is more at -- at

22  38.6?

23  A    Yes, that's right.  Attorneys doing math.

24  Q    Thank you.  Okay.  And now with respect to the unfunded

25  pension liability that is allocable to DWSD, that is -- DWSD

1  bears financial responsibility for that, doesn't it?

2  A    Yes.

3  Q    Okay.  And so again that's not allocable to the general

4  fund, is it?

5  A    No.  It's accounted for in DWSD, but the general fund

6  makes the payment.  So whether or not, I don't want to get

7  confused with a legal conclusion as to whether or not there's

8  an obligation by the city to fund that, but DWSD makes a

9  contribution for that amount.

10  Q    So ultimately it's borne that the unfund -- the pension

11  amounts including the unfunded would ultimately be borne by

12  DWSD, correct?

13  A    Ultimately the -- the portion of that obligation due for

14  employees at DWSD is borne by DWSD, but is still a city

15  obligation because they're a department of the city.

16  Q    Okay.  But ultimately not an obligation that's payable at

17  the end out of the general fund?

18  A    It's not taken out of the general fund.

19  Q    Okay.  Now, is it correct -- what we've been talking

20  about now is the 643,000,000 or so liability as of June 2011.

21  And then we saw that there's an amount about 38 -- it was 38

22  to 39% that's allocable to DWSD.  Is it correct that with

23  respect to the unfunded pension liability, that if it were

24  concluded subsequently that the correct amount of the unfunded

25  pension liability is higher than 643.8 million, even as high

1 | as 3.5 billion, that a substantial portion of that would still

2 | remain allocable to DWSD?

3 | A    I -- I think I cautioned on September 16th with being

4 | careful about doing a straight line analysis.  And I think I

5 | said then that you'd have to go back and do analysis of

6 | deferrals and payments and so on and so forth.  So I'm going

7 | to say that again today.  But if you're relying on the math, a

8 | portion of that obligation is due from DWSD.

9 | Q    And I was not suggesting that it was necessarily a

10 | straight line relationship, but simply that there would be a

11 | substantial portion of the unfunded liability that would

12 | remain allocable to DWSD, correct?

13 | A    Yeah.  I'm just going to -- I'm going to caution a little

14 | bit about substantial.  There will be a portion substantial if

15 | we go back and do an analysis that of the deferrals, different

16 | proportion than other things.  Let's just be a little careful.

17 | But generally speaking, there are obligations due from DWSD.

18 | Q    Yeah.  And as you sit here now you don't know what that

19 | portion that's allocable to DWSD would be, do you?

20 | A    No.  We'd have to do an analysis.

21 | Q    Is it correct that the City of Detroit owns certain

22 | pieces of art that are maintained at the Detroit Institute of

23 | Arts?

24 | A    Yes.

25 | Q    Okay.  And this is art that the -- we're talking about

1  art that the city owns itself, right, not art that's subject

2  to any kind of public trust?

3  A    Yes.

4  Q    Okay.  And that art is very valuable, is it not?

5  A    We're currently going through a valuation, but I believe

6  it's very valuable, yes.

7  Q    Okay.  And Christie's has been retained, correct?

8  A    Christie's has been retained, correct.

9  Q    And they were retained in August, is that right?

10 A    I believe -- well, let's -- let's get by the sequence.  I

11 believe they were initially requested to come out.  I told

12 them go away.  We were taken actually --

13          THE COURT:  Mr. Orr, please, just answer the

14 question.  Were they retained in August?

15 A    I don't recall a specific date.  I think it was August.

16 Q    Okay.  So you were appointed the emergency manager at the

17 end of March and Christie's was not retained until August.

18 Was that in the beginning or the end of August, do you recall?

19 A    I don't know.

20 Q    Okay.  Now the art is a potential source of cash for the

21 city, is it not?

22 A    I don't know.

23 Q    Okay.  Well, isn't it potentially a very large source of

24 cash for the city?

25 A    It is valuable.  I don't know if it's a large source of

1  cash for the city.

2  Q    Okay.  Have you received any estimates or preliminary

3  views of its total value from Christie's?

4  A    No.

5  Q    You're aware of course of reports in the press that the

6  art that's own by the city could be worth billions?

7  A    Yes, I'm aware of press reports, yes.

8  Q    Okay.  And billions in cash flow would certainly help the

9  city's financial position, would it not?

10  A    I think it would.

11  Q    And in fact an influx of cash of that magnitude would

12  provide funds to at least pay pension contributions for the

13  next several years, isn't that right?

14  A    It might.

15  Q    And is there -- there -- let me ask it this way.  There's

16  nothing in the June 14 proposal that recognizes the potential

17  cash influx from the sale of art as a means to pay vested

18  pensions, is there?

19  A    June 14th proposal speaks to DIA, but we did not speak to

20  any sale of art.

21  Q    Okay.  We've also talked about the Department of Water

22  and Sewer.  That's another potential cash source for the city,

23  isn't it?

24  A    Yes.

25  Q    Okay.  And I think you've indicated previously that

1   you've been looking at ways to monetize that?

2   A    Well, yes.

3   Q    And at this point do you have any understanding as to

4   the, at least a preliminary valuation of what the -- the

5   amount of cash the Department of Water and Sewer might be able

6   to generate for the city?

7   A    No.

8   Q    And I take it nothing in the June 14 proposal shows any

9   funds generated by DW -- excuse me, DWSD being used to pay

10  retirees pension benefits, does it?

11  A    Well, to the extent the June 14th report speaks to trying

12  to monetize some value out of DWSD and that monetization would

13  go into in some form the $2,000,000,000 note, to the extent

14  pensions are unsecured, they would receive a benefit from that

15  process.

16  Q    Okay.  So the answer to my question is, I was correct,

17  wasn't I, that nothing in the June 14 proposal shows any funds

18  that might be received through DWSD is going to pay vested

19  pension benefits?

20  A    No, I don't think that's correct.  I think the June 14th

21  proposal speaks about a -- a process by which we would provide

22  benefits through the monetization of certain city assets to

23  the unsecured creditor class, so consequently they would

24  benefit.

25  Q    You're saying that if -- that under the June 14 proposal,

1  the pension holders would be treated as any other unsecured

2  creditor and the value of their bonds might go up a little,

3  correct?

4  A    Yes.

5  Q    But there's nothing in the June 14 proposal that says if

6  we're able to get cash out DWSD, we'll use that cash to

7  preserve pension benefits and not have to cut them or not have

8  to cut them so significantly, is there?

9  A    There is nothing that treats pension benefits differently

10  than any other unsecured creditor.

11  Q    Okay.  Going back now -- just a few more questions.

12  A    Okay.

13  Q    To the June 14 meeting.  Do you recall being there?

14  A    Yes.

15  Q    Okay.  There were no negotiations that took place at the

16  June 14 meeting, were there?

17  A    No.  I wouldn't call those negotiations.

18  Q    Okay.  Now subsequent to the June 14 proposal and the

19  meeting on June 14, there -- there were series of

20  presentations and discussions concerning the terms of the

21  proposal with respect to various persons and entities that

22  would be affected under it, correct?

23  A    Yes.

24  Q    Okay.  And is it correct that you yourself did not attend

25  all of the presentations and discussions that took place

1  concerning that subsequent to June 14?

2  A    Yes, that's correct.

3  Q    Okay.  And you didn't attend the June 20 meetings, did

4  you?

5  A    No.  I think I did attend the June 20th meeting.

6  Q    Okay.  Well, I'd just like to, if we can pull up Exhibit

7  414.  This is your declaration, Mr. Orr?

8  A    Yes.

9  Q    I just want to ask you if you can -- if we can turn to

10  Paragraphs 91 and 92.  Well, I'll just do it.  Do you see in

11  Paragraph 91 and 92 it's both talking about the June 20

12  meeting?

13  A    Yes.

14  Q    Okay.  And we can also show you the preceding paragraph

15  where it's talking about advisors.

16  A    Right.

17  Q    But if we focus on 91 and 92, it says on June 20, 2013,

18  certain of these advisors met in Detroit with representatives

19  of the city's unions and retiree associations.  And then in

20  Paragraph 92, it again in the first sentence talks about the

21  city's advisors answering as many questions as were asked.  Do

22  you see that?

23  A    Uh-huh.

24  Q    Okay.  And there's no reference to you personally being

25  there at the June 20 meetings, is there?

1  A    No, but I remember attending because I bought lunch.

2  Q    Okay.

3  A    Out of my pocket.

4  Q    Okay.  So if Mr. Malhotra testified that you were not

5  present at either of the June 20 meetings, would you have any

6  particular basis to disagree with him?

7  A    No.  But Mr. -- the way the meetings were designed, I

8  think there was a session in the morning, there was a session

9  in the afternoon.  And I may have been at one session that he

10 was not at.  But I remember being at the meeting.

11 Q    Okay.  And there were also meetings on July 10th and 11th,

12 correct?

13 A    I believe so.

14 Q    Okay.  And you -- I think you indicated previously that

15 you have no recollection of being present at those meetings,

16 is that correct?

17 A    No, I wasn't at those meetings.

18 Q    Okay.  Now on July 16th, you sent a letter to the

19 Governor, is that right?

20 A    Yes.

21 Q    Okay.  And why don't we put the July 16th letter, that's

22 Exhibit 409 on the screen?  Okay.  And this is a letter on

23 which you asked authorization to file the Chapter 9 filing, is

24 that right?

25 A    Yes.

1  Q    Okay.  And in this letter you went through a variety of

2  things reviewing what you represented to be the facts for the

3  Governor in which the Governor was to base his decision, is

4  that right?

5  A    Yes.

6  Q    And among other things you discussed the substance of

7  what happened at the various creditor meetings that took place

8  after June 14th, is that right?

9  A    Yes.

10 Q    Okay.  And if we look at page -- look at Pages 8 to 9 of

11 this document, we see there is a heading entitled individual

12 follow up meetings?

13 A    Yes.

14 Q    And that goes on to the next page?

15 A    Yes.

16 Q    Okay.  So just going through this briefly, the first one

17 talks about June 20.  And it says again, the city's advisors

18 conducted meetings with unions and retiree associations.  Do

19 you see that?

20 A    Uh-huh, yes.

21 Q    Okay.  On the 25th it says the advisors met with various

22 persons and among them is the GRS and PFRS?  Do you see that?

23 A    Yes, that's what the document says.

24 Q    And that that's -- the GRS and PFRS, that's the

25 retirement systems, right?

1  A    General retirement system, police and fire retirement

2  system, yes.

3  Q    Okay.  Then the next bullet on the next page talks about

4  July 9th and 10th and it talks about due diligence with persons

5  including GRS, PFRS.  Do you see that?

6  A    Yes.

7  Q    Okay.  And then on July 10th, it talks about follow up

8  diligence sessions again GRS and PFRS were mentioned and the

9  unions?

10  A    Yes, I see what it says.

11  Q    Okay.  And then on July 11th, it again talks about

12  sessions with business people and advisors for the unions,

13  right?

14  A    Yes.

15  Q    And then finally on the last bullet it talks about

16  negotiations with counter parties to the pension related swap

17  contracts?

18  A    Yes.

19  Q    Okay.  And on the -- the counter parties to the swap

20  contracts though, they don't have anything to do, they're not

21  the unions or retiree association or the retirement system,

22  are they?

23  A    No.

24  Q    Okay.  Now in this final bullet paragraph, you say the

25  city's negotiations.  Do you see that?  You refer to the

 1  city's negotiations?

 2  A    Yes.

 3  Q    Okay.  In any of the preceding bullet paragraphs that we

 4  have talked about, did you use the word negotiations in

 5  describing what took place?

 6  A    The document speaks for itself, but I -- I don't see the

 7  word negotiations, no.

 8           MR. ULLMAN:  I have nothing further.

 9           THE COURT:  All right.  We'll take out break now and

10  resume at 10:55, please.

11     (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 10:38 A.M.)

12           THE CLERK:  All rise.  Court is in recess.

13     (Court in Recess at 10:38 a.m.; Resume at 10:55 a.m.)

14           THE CLERK:  Court is in session.  Please be seated.

15           MR. DECHIARA:  Good morning, Your Honor.  Peter

16  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

17  the UAW International Union.

18                      CROSS EXAMINATION

19  BY MR. DECHIARA:

20  Q    Good morning, Mr. Orr.

21  A    Good morning, Mr. Dechiara.

22           THE COURT:  You may proceed, but please no redundant

23  questioning.

24           MR. DECHIARA:  I will try my best, Your Honor, to

25  avoid redundant questions.

1 Q    Mr. Orr, you testified at the beginning of your direct

2 fairly extensively about your background.  I just want to ask

3 you a few questions about that.

4 A    Sure.

5 Q    You testified you were born and raised in the State of

6 Florida, is that correct?

7 A    Yes.

8 Q    Okay.  Prior to --

9         THE COURT:  Excuse me, the first question you asked

10 was a redundant question.

11        MR. DECHIARA:  I was just saying the framework for

12 my next question, Your Honor.  I apologize.  I'll try my best

13 to keep it focused.

14 Q    Before you became emergency manager, had you ever lived

15 in the City of Detroit?

16 A    No.

17 Q    Do you currently maintain a permanent residence in the

18 Washington, D.C. area?

19 A    Yes.

20 Q    And I believe you -- and does your wife -- do your wife

21 and kids live in the Washington, D.C. area?

22        MR. STEWART:  Objection, relevance, Your Honor.

23        MR. DECHIARA:  Your Honor --

24        THE COURT:  The objection is sustained.

25 Q    Okay.  Since becoming emergency manager, do you commute

1  back and forth between Detroit and Washington, D.C.?

2  A    Yes.

3  Q    And you don't maintain a permanent residence in Detroit,

4  is that correct?

5  A    No.

6  Q    And since you've been emergency manager you've been --

7           THE COURT:  Fine.  Counsel said, is that correct and

8  you said no.  So you do or you don't maintain a permanent

9  residence here?

10 A    I do not maintain a permanent residence here.

11 Q    Since you've become emergency manager you -- while in

12 Detroit you've been living out of a hotel, is that correct?

13 A    Yes.

14 Q    You testified -- you were asked on -- on direct whether

15 you took the emergency manager job for the money.  Do you

16 recall that question?

17 A    Yes.

18 Q    And your answer on direct was no, correct?

19 A    I did not take the job for the money.

20 Q    Okay.  How much money do you earn as emergency manager?

21 A    As stated by -- stated in my contract $275,000 a year.

22 Q    Okay.  And do I take it from your answer that you didn't

23 take the job for the money to mean that when you were a

24 partner at Jones, Day you were earning much much more than

25 that?

1   A    Yes.

2   Q    And apart from your $275,000 a year salary, do you

3   receive any other compensation for your services as emergency

4   manager?

5   A    I do not receive directly any other compensation.  If

6   you're -- if you're trying to talk about the expenses of the

7   hotel, I've since understood that those are paid from a fund.

8   Q    What fund?

9   A    I believe it was the NERD fund.

10  Q    Okay.  And do you know who contributes to that fund?

11  A    I know nothing about that fund.  I know nothing about how

12  it's paid.  I've never seen my lease.

13  Q    Do you know that -- that fund, the NERD fund is the

14  Governor's fund?

15  A    I know that.  I know it's related to the Governor.  I

16  don't know what you mean by the Governor's fund, but yes, I

17  know that.

18  Q    Okay.  You know Richard Baird, do you not?

19  A    Yes, I do.

20  Q    Okay.  And he is a consultant to the Governor?

21  A    He is now a state employee.

22  Q    As of the time that -- as of January and February of

23  2013, was he a consultant to the Governor?

24  A    Yes.

25  Q    And in that period of time he worked closely with the

1 | Governor?

2 | A    I don't know about his -- I assume he did.  He -- I think

3 | his title was transformation manager to the Governor.

4 | Q    Okay.  To the best of your knowledge based on your

5 | dealings with him, was it your understanding that he worked

6 | closely with the Governor?

7 | A    To the best of my knowledge based on my dealings with

8 | him, yes.

9 | Q    The meeting, and there's been a lot of testimony about

10 | this, the meeting at which Jones, Day made a pitch to become

11 | restructuring counsel for the City of Detroit was on January

12 | 29th, 2013, correct?

13 | A    Yes.

14 | Q    Okay.  And the very next day Mr. Baird called up the

15 | managing partner of Jones, Day, Steven Brogan to inquire about

16 | whether he could speak to you about becoming a candidate for

17 | emergency manager, is that correct?

18 | A    I believe that's correct.

19 | Q    And then the very next day after that you spoke to Mr.

20 | Baird, correct?

21 | A    I may have spoken to him that day, or the day after that,

22 | but it was closely after that, yes.

23 | Q    Okay.  So it was either January 30th or January 31st that

24 | you spoke to Mr. Baird?

25 | A    I believe so.

1   Q    Okay.  Just to make the record clear, if I could ask you

2   to turn your attention to Exhibit 401.  Can -- can you blow

3   that up a bit?  Do you have that on your screen, Mr. Orr?

4   A    Yes, I do.

5   Q    Okay.  And is that an email from -- from you to others

6   dated January 31st, 2013?

7   A    Yes.

8   Q    And it says in the first sentence, I had a good

9   conversation with -- with Rich Baird this morning?  Do you see

10  that?

11  A    Yes, I do.

12  Q    Does that refresh your recollection about whether it was

13  on the 30th or the 31st that you spoke to Mr. Baird?

14  A    I -- I may have spoken with him both on the afternoon of

15  the 30th and again on the 31st.  But this says I clearly spoke

16  with him on the 31st, so I certainly spoke with him on the 31st.

17  Q    You interviewed with the Governor to become emergency

18  manager, correct?

19  A    Yes.

20  Q    And you interviewed with Mr. Dillon?

21  A    Yes.

22  Q    And you interviewed with Mr. Baird?

23  A    Mr. Baird was at the meeting that I had with the

24  Governor.

25  Q    Okay.  Now I believe you testified on direct that you

1  didn't want your decision about whether or not to become --

2  whether or not you wanted to become emergency manager to have

3  any impact on whether or not Jones, Day would be chosen as

4  restructuring counsel for the city, is that -- am I getting

5  that right?

6  A    Yes.  I think I testified that whether or not I was

7  interested in becoming the emergency manager, I did not want

8  it to either help or hurt Jones, Day.

9  Q    Okay.  And in fact on direct you testified that you told

10 the Governor, and the Treasurer, and Mr. Baird that you did

11 not want your decision about whether to become emergency

12 manager to have any impact on whether or not Jones, Day was

13 chosen as restructuring counsel for the city.  Am I -- am I

14 correct that that's what you testified on direct?

15 A    Yes.  I think I told both the Governor, and Mr. Baird,

16 and Treasurer Dillon as well.

17 Q    Okay.  And the reason you told the Governor that, and the

18 reason you told Mr. Dillon that, was because you understood

19 that they would be in a position to have influence or impact

20 on whether or not Jones, Day was chosen for -- as

21 restructuring counsel, correct?

22 A    I told Mr. Dillon and Mr. Baird that because they were on

23 the review team that we pitched to.  I think I told the

24 Governor that just to reinforce what I told Mr. Baird and Mr.

25 Dillon.

1       I assumed that Mr. Baird and Mr. Dillon would have some

2   influence on the selection process since they were on the

3   team.  I don't think I said that just because I assumed the

4   Governor would have that influence.

5   Q    Did the Governor say anything to you in response when you

6   said that to him?

7   A    I think the Governor agreed that it went one way or the

8   other.

9   Q    Okay.  I'd like to show you a document that's UAW 619.

10  It's --

11       MR. DECHIARA:  Your Honor, it's not yet admitted

12  into evidence.  I would just ask the witness to -- it's in the

13  UAW binders which were provided to the Court and the witness

14  and -- and city counsel this morning.

15  Q    Mr. Baird, if I could ask you to turn to -- behind Tab

16  619.

17  A    Mr. Orr?

18  Q    I'm sorry, whatever I said, excuse me.  Mr. Orr.  Are you

19  at -- do you see this exhibit?

20  A    Yes.

21  Q    Okay.  Am I correct that this is -- these -- this

22  exhibit, and I'm just referring to the first page, the first

23  page of this exhibit is a chain of emails.  The first one --

24  or the middle one is from Mr. Baird to you dated February 20th,

25  2013?

1  A    Yes.

2       (UAW Exhibit 619 was identified)

3  Q    Okay.  Did you receive that email?

4  A    Yes.

5  Q    And do you recall what the -- let me just read it.  It

6  says, FYI --

7            THE COURT:  Not in evidence yet.

8            MR. DECHIARA:  Okay.  Your Honor, I -- I would move

9  this document at this point into evidence.

10           MR. STEWART:  The objection is relevance, Your

11 Honor.

12           MR. DECHIARA:  Your Honor, a major theme of -- of

13 our case, and I believe some of the other objectors' cases, is

14 that the state was working hand and glove with the firm of

15 Jones, Day to implement this effort, this scheme, this

16 strategy to end run the Michigan Constitution in order to cut

17 the pensions of Detroit retirees.

18      And this is one data point, if I -- if I could, that

19 shows the intimate relationship between the state and Jones,

20 Day.  This is an email from the Governor's right hand man, Mr.

21 Baird before Mr. Orr was emergency manager, but while he was a

22 partner at Jones, Day saying what it says in this email which

23 if I may refer to it --

24           THE COURT:  No, that's all right I'm satisfied that

25 the document is relevant and that objection is overruled.

1  What -- what number was it again, sir?

2          MR. DECHIARA:  Six nineteen.

3          THE COURT:  Okay.

4    (UAW Exhibit 619 was admitted)

5  Q    Could you blow up the -- okay.  Do you recall Mr. Orr,

6  what this email was about?  What the general subject matter of

7  this exchange was?

8  A    Yes.

9  Q    What was it?

10 A    This was discussion of a proposed partnership agreement

11 between the Mayor and myself if I were to become emergency

12 manager.

13 Q    Okay.  I'd like to refer you to second sentence.  It's --

14 Mr. Baird writes, told him that there were certain things I

15 would not think we could agree to without your review,

16 assessment, and determination.  And then the sentence goes on

17 and you can read it, but I'll stop reading out loud there.  Do

18 you know who -- I know you didn't write the sentence, but did

19 you have an understanding of who the we was, that last word on

20 the -- on the second line on the -- on the right?

21 A    Yes.  I think he was talking about the Mayor.

22          MR. WERTHEIMER:  Pardon me.  I can't hear him and I

23 apologize.

24          THE COURT:  Would you repeat your answer, please?

25 A    Yes, Your Honor.  Yes, I think he was talking about the

1  Mayor.

2  Q    Okay.  Mr. Baird was talking about himself and the Mayor?

3  A    You know, I don't -- I don't know.

4  Q    Okay.  I don't want you to guess if you don't know.

5  A    I don't know.

6  Q    Okay.  All right.  But nonetheless, Mr. Baird was saying

7  to you that he did not think that we, whoever we were, could

8  agree to something without your review, assessment, and

9  determination.

10 A    Mr. Dechiara, let me clarify my answer.  I think this

11 email is Mr. Baird talking about an outline that he gave the

12 Mayor.  And I think the we is referring to me and Mr. Baird.

13 Q    Okay.  Did Mr. Baird ever explain to you apart from

14 what's written in this email, why your agreement -- your

15 review assessment and determination were necessary at this

16 point in time?

17 A    You know, as I read this email, Mr. Dechiara, let me

18 further clarify.

19       THE COURT:  I think I just need you to answer that

20 question, please.

21 A    Oh, I'm sorry, Your Honor.  Please --

22 Q    Did -- did Mr. Baird apart from what's written in this

23 email, ever explain to you why in his view your review,

24 assessment, and determination were necessary?

25 A    I don't recall.

1  Q    Okay.  But just to be clear, you were a partner at Jones,

2  Day at the time of this email, correct?

3  A    Yes.

4        THE COURT:  Excuse me one second.  Now, witness, you

5  say there's some testimony you'd like to clarify?

6  A    Yes, Your Honor.

7        THE COURT:  You can do that.

8  A    I think the we that's circled here at the end of the

9  second line is referring to both the -- the -- to Mr. Baird,

10 to myself, and the Mayor, the royal we if you will.

11 Q    And did Mr. Baird ever explain to you apart from what's

12 written here what -- what the we was, or are you just --

13 A    I don't recall.  I'm just reading the context of the

14 email.

15 Q    Okay, okay.  Let me refer you now to UAW Exhibit 620.

16 It's the next tab in the book.  And do you have it in front of

17 you, Mr. Orr?

18 A    Yes, I do.

19 Q    Okay.  Let me refer you to the -- the middle email, the

20 one that is from Richard -- which appears to be from Richard

21 Baird to you dated February 22nd, 2013.  Do you see that?

22 A    Yes, I do.

23 Q    And is that in fact an email that Richard Baird sent to

24 you on February 22nd, 2013?

25 A    Yes, I believe so.

1    (UAW Exhibit 620 was identified)

2         MR. DECHIARA:  Move the admission of UAW 620, Your

3    Honor.

4         MR. STEWART:  Same objection, Your Honor.

5         MR. DECHIARA:  Same argument, Your Honor.  It's --

6    it's just part of the same -- and it's not like I have a lot

7    of these.  This is the only other one on this line.

8         THE COURT:  All right.  It is admitted.  The

9    objection on relevance grounds is overruled.

10    (UAW Exhibit 620 was admitted)

11   Q    Let me if -- thank you.  Let me refer to the email from

12   Richard Baird it says, Kevyn, about to be in a car for several

13   hours so thought I would send this to you prior to hearing

14   back from the G a final time.  Did -- did you have an

15   understanding of who the G was?  That was the Governor, wasn't

16   it?

17   A    I -- I think it's referring to the Governor, yes.

18   Q    And then the -- and then the email goes on, if you agree

19   with what I have done to the doc, based on everyone's input

20   and agree that you should be the one to provide it to the

21   Mayor as fully endorsed by the Governor, and the Treasurer,

22   and you, then I think that clearly established that you are

23   already behaving as an agent of the state committed to getting

24   Detroit back on track.

25        Did you agree with Mr. Baird's statement there that if

1  you agree to the things that he refers to in that sentence

2  that you were already behaving as an agent of the state?

3  A    No.

4  Q    Did you disabuse Mr. Baird of that notion and -- and --

5  and tell him that he was wrong about that?

6  A    I don't recall.

7  Q    You did respond to the email, didn't you in the -- in the

8  email that is at the top of the exhibit?

9  A    Yes.

10  Q    If -- if you could blow that up.  And am I correct that

11  nowhere in that response do you say anything to Mr. Baird that

12  his statement in his email was incorrect, am I reading that

13  email accurately?

14  A    I think the email speaks for itself, yes.

15  Q    Okay.  Thank you.  Is it your understanding that you

16  serve at the pleasure of the Governor?

17  A    Yes, provided I'm acting under 436.  I think the Governor

18  has certain authority to remove me as well as the city council

19  and the Mayor at the end of 18 months.

20  Q    Are you aware of any limits on -- are you -- can the

21  Governor remove you at will?

22  A    I think that may be a legal conclusion under the statute.

23  Q    I'm not asking for your legal conclusion.  I'm asking for

24  your understanding.

25  A    I don't know.

1  Q    Okay.  Since you've become emergency manager, you've met

2  frequently -- frequently with the Governor, have you not?

3  A    Yes.

4  Q    Both in formal group settings with staff and -- and

5  advisors present as well as one on one?

6  A    I meet with the Governor --

7  Q    It's a yes or no question.

8  A    No.

9  Q    You have not met with the Governor both in formal

10  settings with others present as well as one on one since

11  you've become emergency manager?

12  A    Yes.  I have met with the Governor in formal settings and

13  with one on one.  The difference in my answer was your use of

14  frequently.  I meet with the Governor less frequently in the

15  one on one sessions.

16  Q    Okay.  But the totality of your meetings with the

17  Governor, are frequent, correct?

18  A    Yes.

19  Q    Okay.  And in your meetings with the Governor, have you

20  discussed the -- prior to the bankruptcy filing, did you

21  discuss plans for the filing of Detroit's bankruptcy petition?

22  A    Outside of implicating any privilege discussions?

23  Q    I'm just asking you the question.

24       MR. STEWART:  I would state an objection to the

25  extent that it's going to call the witness to reveal

1  attorney/client information.

2  A    We had discussions.

3  Q    And what were your -- what was discussed?  But let me --

4  let me -- let me -- let me ask you, on how many occasions did

5  you have those discussions?

6  A    The Governor and I and the Detroit --

7  Q    But do you have a number?

8  A    Weekly.

9       THE COURT:  That's not a number, but okay.

10  A    I don't -- I don't know the number, Your Honor.

11  Q    Okay.  Just so I understand -- understand your testimony,

12  testimony, Mr. Orr, you discussed with the Governor on a

13  weekly basis plans for the filing of the -- the bankruptcy

14  petition?

15  A    No.

16  Q    Okay.  So my question is, how often did you meet with the

17  Governor or speak to the Governor if it was by phone, about

18  plans for Detroit's bankruptcy filing?

19  A    Somewhere between two and four or five, maybe.

20  Q    And do you have a recollection of what was said in those

21  discussions between you and the Governor?

22       MR. STEWART:  Same objection, Your Honor, to the

23  extent it's calling for the witness to reveal privileged

24  attorney/client communications.  I would ask that he not

25  answer.  But if there were such discussions without counsel

1  present.

2         MR. DECHIARA:  I think the objection is premature,

3  Your Honor.  I simply asked whether he recalls what was said.

4  I didn't ask I didn't yet ask him to reveal it.

5  Q    Do you recall what was said in those meetings?

6  A    I recall some of what was said, yes.

7  Q    Okay.  Now I would ask you to -- to testify as to what

8  was said.

9         MR. STEWART:  Same objection.

10 A    Those meetings were held with attorneys acting as

11 attorneys, Your Honor, and I'm remembering the admonition from

12 the Court about my follow on deposition.  So I -- I'd like to

13 say that the Governor has a J.D., and I believe the Treasurer

14 has a J.D., so I'm not talking about them.  I'm talking about

15 attorneys acting as attorneys.

16        THE COURT:  So is it your testimony to the Court

17 that none of the meetings at which the filing of this case was

18 discussed, was held outside of the presence of lawyers?

19 A    To the best of my recollection, none were held outside

20 the presence of lawyers acting as lawyers.

21 Q    What lawyers?

22 A    I believe it was -- there were -- there were a lot of

23 meetings with lawyers.  The Governor's staff lawyers --

24        THE COURT:  Fine, Mr. Orr.  The question was, what

25 lawyers attended the meetings where the filing of this case

1  was discussed.

2  A    Yes, Your Honor.

3         THE COURT:  The two to five that you said.  Was it

4  five?

5         MR. DECHIARA:  He said -- I think he said two to

6  four or five.

7  A    Two to four or five.

8         THE COURT:  Two to four or five.

9  A    Two to four or five.

10        THE COURT:  Those meetings.  What lawyers?

11 A    There were lawyers on the Governor's staff, Valerie

12 Brader and Mike Gadola.  There were lawyers from Jones, Day at

13 some of those meetings sometimes on the phone.  There would be

14 lawyers perhaps on the city's staff.  From Jones, Day it could

15 include David Heiman, could include Heather Lennox.  I'm

16 trying to think of other lawyers.  But generally lawyers both

17 on the Governor's staff and lawyers at the city's counsel,

18 Jones, Day.

19        MR. DECHIARA:  Your Honor, it's the UAW's position

20 that the -- the attorney/client privilege should not apply

21 here.  That these attorneys either for the state or Jones, Day

22 were being -- were working for the city or the state, public

23 entities of this -- of this state, paid for by the city or the

24 state.  And their presence at these meetings should not shield

25 from disclosure what was said at these critical meetings.

1          THE COURT:  Well, how do I reconcile that with your

2    relevance offer just a little while ago where you talked about

3    the common, I think the word you used was scheme.

4          MR. DECHIARA:  I don't see any tension between the

5    two, Your Honor.

6          THE COURT:  All right.  Response, please.

7          MR. STEWART:  Your Honor, there's no -- the

8    attorney/client privilege maintained applies to government --

9    government officials just like it will apply to private

10   parties and because of the fact that the lawyers were there in

11   connection with the rendition of legal advice and in

12   conjunction with the common interest agreement, we would

13   submit that they're privileged.

14         THE COURT:  Is there any reason for a different

15   ruling on the common interest issue here than there was

16   earlier?

17         MR. DECHIARA:  Your Honor, it's -- the UA -- UAW

18   took issue with Your Honor's ruling on that.  We moved for

19   reconsideration.  Your Honor, we're obviously not going to --

20   we're obviously going to comply with whatever ruling you make

21   on this issue.  I've stated our argument.

22         THE COURT:  And I appreciate that.  I appreciate

23   that, but my -- my question to you was in this specific

24   context, is there -- is there a reason to have a different

25   ruling --

1          MR. DECHIARA:  No, I think -- I think this specific

2   context --

3          THE COURT:  Is there a distinction to be made here?

4          MR. DECHIARA:  Yeah, this specific context is not

5   unique, it's part of a larger effort by the city and the state

6   to cloak under the attorney/client privilege these critical

7   discussions that bear -- that have such importance to the

8   people of this city and state.

9          THE COURT:  All right.  The Court will sustain the

10  claim of privilege and to the extent there was a motion to

11  compel, the Court will deny that.  But I do want to clarify

12  there was no one on one conversation between you and the

13  Governor with no one else present where the filing of this

14  case by the city was discussed, is that your testimony to this

15  Court?

16  A    Not that I recall, Your Honor.  The Governor and I have

17  one on ones.  Okay.

18         MR. DECHIARA:  Your Honor, if I may.  Your Honor --

19         THE COURT:  One second.  You need to be near a

20  microphone, sir.

21         MR. DECHIARA:  Your Honor, I don't want to burden

22  the record or take the Court's time necessarily.  I did -- I

23  was planning on asking the witness a series of questions about

24  what discussions he may have had with the Governor on issues

25  central to this case, including the timing of the bankruptcy

1  filing, the reasons for the bankruptcy filing.

2      If the Court's ruling is going to be if there were state

3  and city attorneys present, that the attorney/client privilege

4  applies, I would just like to note for the record that the UAW

5  would take exception to that ruling and preserve our position

6  for any possible subsequent proceedings.

7          THE COURT:  Well, I –- I appreciate your interest in

8  -- in saving time, but let's just clarify that the subjects

9  you were going to ask the witness about included matters

10  relating to the filing of the case, yes?

11          MR. DECHIARA:  Yes.

12          THE COURT:  Okay.  And your testimony, Mr. Orr, is

13  that every time you discuss matters relating to the filing of

14  the case with the Governor there were counsel –- counsel and

15  attorneys present.

16  A    Yes, Your Honor.

17          THE COURT:  All right.  You may have that objection.

18          MR. DECHIARA:  Thank you, Your Honor.  I will yield

19  to Mr. Wertheimer.  I believe he had something to say.

20          MS. LEVINE:  Your Honor, can all of the objectors

21  join in that reservation of rights so we don't have to do it

22  again?

23          THE COURT:  Yes, absolutely.

24          MS. LEVINE:  Thanks.

25          THE COURT:  Absolutely.

1          MR. WERTHEIMER:  William Wertheimer, Your Honor, on

2  behalf of the Flowers plaintiffs.  I just wanted to do a

3  couple of things.  First, join in that objection so that I

4  didn't have --

5          THE COURT:  Okay.  I appreciate that.

6          MR. WERTHEIMER:  -- to do it.  But second, Your

7  Honor, I would also add to the point made by counsel for the

8  UAW, that my objection is also based on the fact that the

9  Court consistent with its rulings yesterday relative to the

10  Governor, has acknowledged the attorney/client privilege and

11  says that it should apply with no more evidence than that an

12  attorney was present at a discussion.

13      And I just want the record to reflect that it's -- our

14  argument -- or the Flowers plaintiffs' argument is not just

15  that these are government attorneys, but that more of a

16  showing needs to be made for the privilege to apply, than that

17  an attorney was present.

18          THE COURT:  Well, since you've challenged that, sir,

19  I will state for the record that my ruling is based on more

20  than the fact that -- more than merely the fact that an

21  attorney was present.  When you're talking about as we are

22  here, the filing of a bankruptcy case, those conversations

23  relating to the filing of a bankruptcy case are in relation to

24  a legal matter and not what would otherwise be an unprivileged

25  matter.

1          MR. WERTHEIMER:  I did not mean to imply that the

2   Court was not making that ruling in that context.

3          THE COURT:  All right.

4          MR. WERTHEIMER:  I would add just one other point.

5   And that is I think consistent with your rulings yesterday

6   that the privilege would also be asserted were any questions

7   to be asked relative to communications between the Governor

8   and Mr. Orr relating to Section 924 of the State Constitution,

9   the constitutional pension provision, and what its impact

10  could be on the bankruptcy.  I would assume the privilege

11  would be asserted as to that and that the Court's ruling would

12  be the same.

13      Again for purposes of the record, I think that was the

14  position taken by the Governor yesterday.  I think it's

15  consistent with the Court's ruling yesterday.  But I want to

16  make sure that it's included as to this testimony also.

17          THE COURT:  All I can say as to that is, it sounds

18  like it would, but if in the context of a specific area of

19  inquiry you think that this ruling should be different because

20  of particular facts or circumstances, I certainly invite you

21  to draw my attention to any distinction that you think should

22  require a different result.

23          MR. WERTHEIMER:  I -- I understand that, Your Honor.

24  I -- my last point was just to make clear that it's my

25  understanding that the city is asserting the privilege also as

1  to conversations between --

2         THE COURT:  All right.  I think we've gone as far as

3  we can with this.  So I'm going to ask that we resume with our

4  cross examination at this time.

5         MR. WERTHEIMER:  Thank you, Your Honor.

6  Q    Mr. Orr, did you send a draft of your June 14th proposal

7  to creditors, to the Governor to review?  And when I say you,

8  I mean you or your staff?

9  A    I'm -- I'm trying to -- I don't recall.

10 Q    Do you recall whether you received feedback from the

11 Governor or comments of any sort on a draft of the June 14th

12 proposal to creditors?  And when I say you, I mean you or

13 people in your office.  And when I say the Governor, I mean

14 the Governor or his staff.

15 A    I don't think we received feedback.

16 Q    Did you receive any comments from the Governor or his

17 office on the proposal before it was made public?

18 A    No, I'm not aware of any comments.

19 Q    If the Governor had made comments or been given feedback,

20 is that something you would have been made aware of?

21 A    I might have been.  It might have been done at a

22 different level, at the drafting level.

23 Q    But if the Governor of the state had comments about the

24 June 14th proposal of the -- the key document in this case,

25 it's your testimony that you would not have been aware of his

1  comments?

2  A    One of the key documents.  And it's my testimony that

3  those comments could have been communicated through attorneys

4  or through a staff level that would not have gotten to me

5  during the drafting stage.

6  Q    Would they have gotten to you at some point before the

7  document was made public?

8          THE COURT:  Okay.  So counsel on this question, when

9  you say Governor, you don't mean the Governor or his staff,

10  you mean the Governor personally?

11          MR. DECHIARA:  No, I mean the Governor and his

12  staff.  Well, let me break it down to be clear.  Thank you,

13  Your Honor.  I appreciate the clarification.

14  Q    So let me start with the Governor.  Is it your testimony

15  that the Governor and the state had comments on the June 14th

16  creditors' proposal, you before the document became public,

17  would not have known about those comments?

18  A    It is my testimony that I don't recall the Governor

19  providing any comments and that if he had, they may not have

20  made their way to me.

21  Q    You -- you are aware, are you not, that part of your June

22  14th proposal, where that stated that there must be significant

23  cuts to accrued pension liabilities?

24  A    Yes.  I think we said that in the June 14th proposal.

25  Q    And was the June 14th proposal negotiable?  Were you

1 prepared to negotiate on it?

2 A    Yes.  That's why we called it a proposal.

3 Q    And were you prepared to negotiate on every -- every

4 element of it?

5 A    Yes.  I think we said that.

6 Q    And were you prepared to negotiate a -- an agreement that

7 would not have had any cuts to accrued pension liabilities?

8 A    I'm not sure that's accurate.  I think the amount of

9 unaccrued pension liabilities was so significant that we may

10 not --

11          THE COURT:  All right.  Mr. Orr, again, I have to

12 ask you please, just answer the question.  We're going to be

13 here a really long time if you insist on going on and on.

14 A    And -- and I don't want that, Your Honor.  I'll try to

15 answer just the question.  Please, Mr. Dechiara.

16 Q    I'll -- I'll repeat the question.

17 A    Uh-huh.

18 Q    Were you prepared in response to your proposal, your June

19 14th proposal, to accept any counter proposal that had as part

20 of the counter proposal, an element that would have spared,

21 that would have not had -- would not have impaired at all

22 accrued pension liabilities?

23 A    We were prepared to accept any counter proposal.

24 Q    Including a counter proposal that would have had no cuts

25 at all in accrued pension liabilities, is that your testimony?

1  A    Yes.

2  Q    Okay.  And are you prepared to do that today?

3  A    If there's a counter proposal, yes.  When you say accept,

4  Mr. Dechaira, we'll accept counter proposals, that's not

5  agreed to.

6  Q    Okay.  Thank you for that clarification.  That's what I'm

7  getting at.  Okay.  So let me -- let me try it again because I

8  think that's an important point.  At the time you made the

9  June --

10        THE COURT:  While we're clarifying here, I'm going

11  to strike the last question and answer about what he's willing

12  to do today.

13        MR. DECHIARA:  Thank you, Your Honor.  I -- I -- I

14  will not go there.

15  Q    At the time you made the June 14th proposal, until the

16  time you filed for bankruptcy, were you prepared to agree to

17  an agreement with the stakeholders that would have spared the

18  pension -- accrued pension liabilities from any cuts?

19  A    Probably not.

20  Q    Is it -- am I correct that the procedure at the June 14th

21  meeting was that for an attendee, in other words someone who

22  was invited to attend, for an attendee to make a comment or

23  ask -- ask a question, they had to fill out a card and have

24  that card brought up to the front of the room and read -- read

25  by someone else?

1  A    Yes, I believe so.

2  Q    You -- is your testimony here today on direct -- I mean,

3  not on direct, but on cross by -- by the retiree committee

4  that you did attend the June 20th meeting?

5  A    Yes.

6  Q    Okay.  Do you recall giving a deposition in this

7  proceeding on September 16th?

8  A    Yes.

9  Q    Okay.  And did you testify truthfully in that deposition?

10 A    Yes.

11 Q    I'd like to read for you, from Page 261 of your

12 deposition.  I'm at Line 16.

13      Question, okay.  So do you recall whether you attended

14 June 20th?  Answer, I think I did, but I don't recall.

15 A    Yes.

16 Q    Is it true that as of June 16th you could not recall with

17 certainty whether you had attended the June 20th meeting?

18 A    As of September 16th?

19         THE COURT:  You mean September 16th?

20         MR. DECHIARA:  Yes, I'm sorry.

21 A    Okay.

22 Q    Thank you.  As of September 16th?

23 A    I -- I think my answer was, I think I did, but I didn't

24 recall with specificity.  I now recall that I did.

25 Q    Was there something that happened between September 16th

1   and today that caused your recollection to improve on that

2   point?

3   A    Yes.

4   Q    What happened?

5   A    I went over my old American Express bills.

6   Q    Fair enough.  Was the same procedure that you -- that you

7   -- I asked you about -- about using the cards, did that apply

8   to the June 20th meeting as well?

9   A    I don't recall.

10  Q    I'd like to show you what's been admitted into evidence,

11  it's in your UAW binder as Exhibit 623.  Do you -- do you

12  recognize this -- is this -- it's a two page document.  If you

13  can look at both pages.  Putting aside this particular

14  document, is this the form of the question cards that were

15  used at these meetings?

16  A    I don't recall.

17  Q    Okay.  Do you recall this particular document?

18  A    I do not.

19  Q    Do you agree that the June 20th meeting was an

20  informational meeting?

21  A    Yes.  I would agree in part it was informational.

22  Q    Are you familiar with the term OPEB, other post

23  employment benefits?

24  A    Yes.

25  Q    Okay.  Did anyone at Jones, Day ever communicate to you

1  that the UAW was interested in setting up a process for

2  negotiating over OPEB benefits?

3  A    I don't recall.

4  Q    Let me now refer you to your July 16th letter requesting

5  permission from -- requesting authorization to file for

6  bankruptcy.  Do you recall that letter?

7  A    Yes, I do.

8  Q    Did you or your staff show a draft of that letter to the

9  Governor or his staff at any time before July 16th?

10 A    No, I don't think so.

11 Q    Did you or your staff show a draft of the July 16th letter

12 to the Treasurer or his staff at any time before July 16th?

13 A    No, I don't think so.

14 Q    I'd like to show you -- well, first, I'd like to call

15 your attention to the July 16th letter which is Exhibit 409.

16 Could you please call up Exhibit 409?  Mr. Orr, could you

17 please turn to Exhibit 626 in the UAW binder?

18 A    Yes, I have it.

19 Q    And this appears to be a July 10th email from Andy Dillon

20 to certain individuals, none of whom appear to be you?  Do you

21 see that?

22 A    Yes.

23 Q    Okay.  Did you -- have you ever seen this document

24 before?

25 A    I have not.

1  Q    Okay.  Let me refer you, and I'm not going to read it

2  because it's not in evidence.  But let me just refer you to

3  the -- do you see the numbered paragraphs on the bottom of

4  page -- the first page?

5  A    Yes.

6  Q    Okay.  Let me refer you to the first one.  If you could

7  just read that to yourself.

8  A    Yes.

9  Q    Okay.

10           THE COURT:  What's the purpose of this, counsel?

11           MR. DECHIARA:  Your Honor, the purpose of this is to

12  show, to clearly show, we believe, that the Treasurer, not

13  only was shown a draft of the July 16th letter in contradiction

14  to the witness' testimony, but that the -- the Treasurer's

15  comments on the draft were incorporated into the final letter.

16           THE COURT:  Is the document in evidence?

17           MR. DECHIARA:  No, it's not, Your Honor, but --

18           THE COURT:  Okay.  So, you can't confront him with

19  it until it is.

20           MR. DECHIARA:  I'm trying to refresh -- Your Honor,

21  we -- we do intend to put it into -- into evidence, but I'm

22  trying to establish to essentially impeach this witness'

23  testimony that a draft was not provided to the Treasurer by

24  pointing out to him what I just said.

25           THE COURT:  Well, why don't you just point it out to

1  me after the document is in evidence.

2        MR. DECHIARA:  I will, Your Honor.

3  Q    Let me ask if Exhibit 44 can be called to the screen.

4  And while that's being done, Mr. Orr, let me ask you, when did

5  you begin to -- you didn't write the July 16th letter on July

6  16th, correct?  The preparation for that letter became -- began

7  earlier?

8  A    Yes.  There were drafts of that letter being made earlier

9  than July 16th.

10 Q    Okay.  Can we turn to Page 61 of Exhibit 44?  And if you

11 could blow that up, please.  And by the way, Mr. Orr, Exhibit

12 44 is the executive summary of the June 14th proposal, correct?

13 A    Yes.

14 Q    Okay.  And that was presented at the June 14th meeting?

15 A    Yes.

16 Q    And on Page 61, third bullet point, it says that there

17 would be -- it says as part of the calendar, there would be an

18 evaluation period from July 15th to July 19th, 2013.  Do you see

19 that?

20 A    Yes.

21 Q    Okay.  And you told the attendees at the June 14th

22 meeting, and I think I'm quoting you accurately from your

23 direct, but tell me if I'm not, "that that was a schedule that

24 you were sticking to".

25 A    Yes.

1  Q    Did you say that?

2  A    Yes.

3  Q    Okay.  And in fact you did not stick to that schedule,

4  isn't that a fact?

5  A    We substantially stuck to it, yes, but no, not exactly on

6  the 19th.

7  Q    Well, in fact you filed for bankruptcy on the 18th,

8  correct?

9  A    Yes.

10 Q    And in fact before July 15th, you were already writing

11 your July -- what became your July 16th letter, correct?

12 A    I or members --

13 Q    Just answer the question.

14 A    I wasn't writing it.

15 Q    It was -- the letter was being prepared, is that correct?

16 A    Yes.

17 Q    Did you tell -- did you contact the stakeholders or the

18 creditors who were at the June 14th meeting and tell them that

19 you were not going to be sticking to the schedule the way you

20 had told them you would?  Did you do that?

21 A    No.

22 Q    You testified, I believe on direct, that as a result of

23 the Flowers, Webster and -- lawsuits and the lawsuit by the

24 pension funds, that the situation, and I think I'm quoting you

25 correctly on direct, but -- but tell me if I'm not.  Was

1  becoming out of control?  Was -- was that your direct

2  testimony?

3  A    I think that's -- yes.  I think that's substantially my

4  testimony.

5  Q    Okay.  Is it fair to say that the plaintiffs in the -- in

6  those three lawsuits were exercising their lawful right to go

7  to the state judiciary to obtain a determination on a

8  important issue of law?

9  A    I think the plaintiffs were doing whatever they thought

10  was in their best interest.

11  Q    That may be, but that doesn't answer my question.

12  A    But your question were they exercising their judicial

13  rights.  I -- I don't know what they were doing.  I know that

14  they were not keeping with the schedule and not coming forward

15  with counter proposals, that's what I know.

16  Q    Well, they were filing lawsuits with the state judiciary,

17  correct?

18  A    Yes.

19  Q    And you consider that to be behavior that was out of

20  control?

21  A    No.  I consider that to be behavior that was calculated

22  to undermine my ability to discharge my obligations under the

23  statute.

24  Q    It was calculated to prevent you from filing for

25  bankruptcy, wasn't that what it was about?

1  A     No.  I -- I didn't say that.

2  Q     Could it -- could you not have waited a few days to see

3  how the Courts would have -- the State Courts would have

4  resolved important issues involving the statute and the

5  Constitution?

6  A     Mr. Dechaira, we'd waited almost a month.

7  Q     Okay.  Have you ever spoken to the Governor about having

8  the state assume some or all of the city's pension

9  liabilities?

10 A     I don't recall.

11 Q     You don't recall ever having done that?

12 A     No, I don't.

13 Q     Okay.  So you -- you may have done it, and you just don't

14 recall?

15 A     Yes.

16 Q     Did you ever undertake or cause to --

17        THE COURT:  One second.  I want to make sure I

18 understand that answer.

19 A     Yes.

20        THE COURT:  You do not remember asking the Governor

21 to write a check for 3.5 billion dollars?

22 A     This is the problem with a yes or no.  The number may not

23 have been 3.5 billion.  The -- the question may have come in

24 in terms of some assistance.  But I don't recall asking it in

25 that context, Your Honor.  There are things I can testify to,

1   it's just that question I don't recall.

2   Q    Just so the record is clear, let me ask it again.  Do you

3   recall ever making a request to the Governor in any context

4   seeking assistance, financial assistance from the state for

5   some or all, any -- any amount of the state's pension

6   liabilities -- of the city's pension liabilities?

7   A    I don't recall asking for assistance in that form.

8   Q    Do you recall asking in any form?

9   A    I recall having discussions about whether the state would

10  be in a position to make any assistance to the city to deal

11  with its problems and I think I said this publicly before.

12  And that it was made clear that the city's obligated to

13  resolve its own problems.

14  Q    When -- when did you make that request?

15  A    I don't recall.

16  Q    Was it before you filed for bankruptcy?

17  A    Probably.

18  Q    You don't remember when?

19  A    I do not remember when.

20  Q    Was it a request in writing?

21  A    I don't think so.

22  Q    Was it -- was it a request face to face with the

23  Governor?

24  A    Yes.

25  Q    Was -- do you recall where the meeting took place?

1  A    No, our meetings either take place in Lansing or here in

2  -- in -- in Cadillac Place, but I don't recall which -- which

3  location.

4  Q    Do you recall who was present other than you and the

5  Governor?

6  A    There were -- it was -- it would have been in the Detroit

7  team meeting.

8  Q    What does that mean?  Who -- who would have been present

9  at the meeting?

10  A    In -- in those meetings, sometimes it's me and the

11  Governor, Treasurer Dillon, Tom Saxon on behalf of the state,

12  Braum Stibitz occasionally, Rich Baird, Valerie Brader, Mike

13  Gadola.  There may be attorneys on the line, my state liaison

14  Greg Tedder.  There may be other attendees at those meetings.

15  Q    What to the best of your recollection was said at that

16  meeting on the subject that I've just asked you about?

17          MR. SCHNEIDER:  Objection, Your Honor, on behalf of

18  the state.  I object to any conversation--

19          THE COURT:  Go ahead and approach the podium and --

20  and -- and speak, sir.

21          MR. SCHNEIDER:  Objection to the -- on behalf of the

22  state to any content of this that might implicate the

23  attorney/client privilege.

24          THE COURT:  How is the state providing help to the

25  City of Detroit for assistance on its fiscal problems

1  protected by attorney/client privilege?

2           MR. SCHNEIDER:  The reason why I'm stating this is

3  because I believe the witness --

4           THE COURT:  I just need an answer to my question.

5           MR. SCHNEIDER:  Could you state it again, please?

6           THE COURT:  How is a conversation between Mr. Orr

7  and the Governor about whether the state can or is willing to

8  help the city with its fiscal problems, protected by

9  attorney/client privilege?

10          MR. SCHNEIDER:  Well, to the extent that attorneys

11 were present and attorney discussion was relevant -- relevant

12 to that, and that these conversations did take place if that

13 is what happened with attorneys advising and being there for

14 the purpose of that, I believe that that would be

15 attorney/client privilege information.

16          THE COURT:  Well, but how is -- how is it a

17 discussion about a legal matter?

18          MR. SCHNEIDER:  I don't know what the witness is

19 going to testify to.  The reason why I objected is because the

20 statement was made that attorneys were present.  And that's --

21 that's the --

22          THE COURT:  Well, but you certainly agree with the

23 proposition that just because attorneys were present doesn't

24 make every conversation protected by the attorney/client

25 privilege, don't you?

 1            MR. SCHNEIDER:  I believe in this situation --

 2            THE COURT:  Don't you, sir?

 3            MR. SCHNEIDER:  I think when the attorneys are

 4  present, Your Honor, my position is, is that they are there

 5  for the purposes of providing legal advice.

 6            THE COURT:  So there's like a presumption.  Any law

 7  in support of that?

 8            MR. SCHNEIDER:  Well, Your Honor, I'm willing to

 9  yield back to the city.  I just wanted my objection noted to

10  the extent that attorney/client privilege is --

11            THE COURT:  Well, counsel, we don't make objections

12  for the sake of making objections for the record.  We make

13  objections because you don't want the testimony to come in and

14  you have to be prepared to argue that.

15            MR. SCHNEIDER:  That's true.  And I don't know what

16  the testimony is and that's why I was objecting.

17            THE COURT:  All right.  I'm going to hold that --

18  that this question does not relate to a legal matter and

19  therefore is not protected by the attorney/client privilege

20  even though there may have been attorneys who were either

21  listening in to the conversation, or participating in it.  So,

22  please answer the question.

23  Q    Okay.  What was said at that meeting on the subject I

24  asked you about?

25  A    I don't recall the specifics, but the subject was

1  generally discussed that there was no ability for the state to

2  provide direct financial assistance to the city and that we

3  had to find a way to resolve our problems based upon what we

4  could work with.

5  Q    The words that you just said, were you saying those

6  words, or was -- was the Governor saying those words?

7  A    It -- it was an exchange.  I don't recall verbatim what

8  was said during the exchange.

9  Q    Did the Governor in any forum deny the request that you

10 were making?

11 A    I guess you could call that -- I don't know one, if it

12 was a request, or one if you call it denial.  I know there was

13 a dialogue and it became clear that there would be no

14 assistance coming from the state.

15 Q    Were you in that meeting seeking assistance from the

16 state?

17 A    I don't know if we were just seeking assistance for the

18 state, Mr. Dechaira.  As I said, it was part of a dialogue and

19 -- over a number of different things.

20 Q    Well, Mr. Orr, I wasn't at the meeting.  I'm asking you,

21 do you -- do you know what you were doing in that meeting on

22 this subject?

23 A    As I've said, we have weekly meetings.  We discussed a

24 number of things.  In those meetings there was an exchange in

25 dialogue about the state's ability to potentially help the

1  city.

2      It became clear as a part of that discussion that the

3  state would not be forthcoming with any assistance from the

4  city.  The exact exchange and the exact dialogue, I do not

5  recall, but that is the gist of the discussion.

6  Q    Okay.  And I'm not going to ask you to recollect

7  verbatim, I wouldn't expect that what was said.  But I want to

8  just get some basic information.

9  A    Uh-huh.

10  Q    Were you in what you said seeking in one form or another,

11  aid from the state for this -- to pay for -- to help pay for

12  the city's pension liabilities?

13  A    I don't recall.

14  Q    Okay.  And do you recall whether the Governor responded

15  in any way to what was said on that subject, other than what

16  you've already said?

17  A    I don't recall.

18  Q    Have you ever undertaken or caused to be undertaken any

19  analysis of whether it would be possible to craft a legal

20  claim by the city against the state to try to hold the state

21  responsible for some or all of the city's pension liabilities?

22  Have you ever caused any analysis to be undertaken on that

23  point?

24  A    No, not that I'm aware of.

25  Q    Have you ever looked into the issue of whether or not

1  there might be a conflict of interest between the existence of

2  such a claim and your position being paid by the state and

3  being housed by the Governor's NERD fund?  Have you ever

4  looked -- done any analysis to look into whether or not there

5  might be a conflict of interest?

6  A    No.

7  Q    Are you familiar with the concept of deferred

8  compensation?

9  A    Yes, I'm familiar with it.

10  Q    And is it your understanding that when an employee works

11  in exchange for his or her labor, the employee receives

12  current wages but also in certain circumstances part of that

13  compensation for the worker's labor is deferred until

14  retirement.  Is that your understanding of what deferred

15  compensation is?

16  A    It can mean that, yes.

17  Q    Okay.  And in that context if you have deferred

18  compensation such as a pension, is it your understanding that

19  that pension even though it's collected in retirement, has

20  already been earned through years of labor by the employee?

21  A    Mr. Dechiara, I believe that implicates a legal

22  conclusion.  It might be true.

23  Q    Well, I'm not asking a legal conclusion, unless you have

24  one.  But I'm -- I'm looking for your understanding apart from

25  any legal conclusion.

1  A    My understanding of your concept that pensions are a form

2  of deferred compensation, I'm aware of that.  My understanding

3  in this situation as to whether or not the pension fund is

4  adequately protected, that responsibility is a different

5  understanding.

6  Q    My question is, has the pension already been earned

7  through the employee's years of labor for the City of Detroit?

8  That's my question.  Do you have an understanding of that --

9  that, one way or another?

10  A    Yes.

11  Q    And what's your understanding?

12  A    My understanding is that the concept you're trying to

13  discuss is one where the employee's pension is earned through

14  the labor.

15  Q    Okay.  Is -- would you agree with me in your position as

16  emergency manager that to revitalize the City of Detroit

17  requires capable and committed employees working for the city?

18  A    Yes.

19  Q    Have you done any analysis as to whether proposing -- or

20  strike that.  Have you done any analysis as to whether cutting

21  accrued retiree benefits for active employees would negatively

22  impact their morale?

23  A    No.

24  Q    Have you done any analysis such as speaking to a labor

25  economist as to whether or not cutting accrued retiree

1  benefits for active employees of the city would diminish the

2  city's ability to attract and retain committed and capable

3  employees?  Have you ever undertaken any analysis on that

4  point?

5  A    I'm thinking it through because we recently held a job

6  fair and we received over 1,700 applications, so it doesn't

7  appear that the current situation is impairing our ability to

8  attract workers.

9  Q    That was not my question, Mr. Orr.

10  A    That's -- have I done analysis?  Yes.

11  Q    I'm sorry?

12  A    Yes.

13  Q    You have done analysis?

14  A    In my mind that's an analysis.

15  Q    You -- so you have done your own analysis, is that what

16  you're testifying?

17  A    Yes.  Unless you want to define some other term, yes.

18  Q    So, tell me what your analysis is?

19  A    My analysis is that during the course of the job fair,

20  we've seen another employees come in.  My analysis is that

21  we've spoken with several uniform unions who have said that

22  their morale is increasing even under the current

23  circumstances.

24      My analysis is, that I've spoken with city employees that

25  say despite the current circumstances, they continue to work

1  hard at their jobs and they're committed to assist this city

2  going forward.

3  Q    You testified on direct, I believe, that your June 14th

4  proposal was in the best interests of the citizens of Detroit.

5  Do you recall that?

6  A    Yes.

7  Q    And -- and when you say the best interests of the

8  citizens of Detroit, are you including the retirees of the

9  City of Detroit?

10  A    Not all the retirees are citizens of Detroit, Mr.

11  Dechiara.

12  Q    The ones that are, are you including among the citizens

13  of Detroit for whom you think your proposal would be in the

14  best interest?

15  A    I'm including the -- I'm sorry.

16  Q    Are you including retirees?

17  A    I'm including all of the 700,000 residents of the citizen

18  of Detroit and if that includes retirees, yes, I'm including

19  them.

20  Q    Do you have any doubt that some of the retirees of the

21  City of Detroit live in the City of Detroit?

22  A    No, I do not.

23  Q    Okay.  Have you done any analysis in coming to the

24  conclusion that your proposal is in the best interests of the

25  city -- of the citizens of the City of Detroit including the

1    retirees?  Have you done any analysis of the amount that

2    Detroit retirees receive on average annually in pension?

3    A     Have I done?

4    Q     Yes.

5    A     No.

6    Q     Have you taken any steps to inform yourself as to that

7    question, what's the average annual pension of a Detroit

8    retiree?

9    A     Yes.

10   Q     Have you?  Okay.  And did you come -- did you learn the

11   answer?

12   A     I've seen ranges, but yes.

13   Q     Okay.  And what's the range?

14   A     The ranges have gone from 19,000, approximately 24,000,

15   to 35,000 or more.

16   Q     And do you know whether there's any federal or other

17   insurance that would cover retirees to which -- strike that.

18   Are you aware of whether there's any federal or other

19   insurance that would provide benefits to retirees in the event

20   that their accrued pension liabilities were impaired?

21   A     Yes.

22   Q     What -- there -- is it your belief there is insurance?

23   A     No, you asked me if I were aware.

24   Q     Okay.  And is there such insurance?

25   A     No.

1  Q    Okay.  Have you done any analysis to determine whether if

2  retirees, whether they're earning $18,000 a year in

3  retirement, or $24,000 a year, have you done any analysis

4  whether under your proposal to significantly cut their

5  pensions, have you done any analysis to determine whether

6  those retirees would be able to make ends meet in terms of

7  paying their mortgage, paying their rent, putting food on the

8  table, buying their medications, et cetera?  Have you done any

9  analysis?

10           MR. STEWART:  Objection.  Objection, Your Honor,

11  relevance.

12           MR. DECHIARA:  We think it --

13           THE COURT:  Objection is -- the objection is

14  sustained.

15           MR. DECHIARA:  I have nothing further, Your Honor.

16                       CROSS EXAMINATION

17  BY MS. LEVINE:

18  Q    For two more minutes.  Good morning, Mr. Orr.

19  A    Good morning, Ms. Levine.

20           MS. LEVINE:  Your Honor, Sharon Levine, Lowenstein,

21  Sandler for AFSCME.

22  Q    Mr. Orr, do you receive -- do you recall receiving a

23  request from Ed McNeil on behalf of AFSCME's Council 25 on --

24  actually let me go back.  You were -- your -- you first day of

25  work if you will as the emergency manager, was March 25?

1  A     Yes.

2  Q     Do you recall receiving a request from Ed McNeil on

3  behalf of AFSCME Council 25 on March 25 to meet with you on

4  behalf of not only himself, but -- but a coalition of 30 city

5  unions who had previously worked together with regard to

6  concessionary bargaining and wanted to work together with you?

7  A     Are you talking about proposed two year collective

8  bargaining agreement that was presented to me on the --

9  Q     No, no.  I guess I've already -- a question.  Did you get

10  a request?

11  A     That was presented to me on the 26th.

12  Q     Did you get a request?  Do you recall getting a request

13  from Ed McNeil on March -- on your first day of work, on March

14  25th asking you and inviting you to meet with him and the

15  coalition of unions to work together with regard to the -- to

16  solving Detroit's problems?

17  A     Are you talking about the request of Mr. McNeil said he

18  taped to the door?

19  Q     That's the one.

20  A     The one.  I recall that that was sent to someone on my

21  staff.  I recall the next day I also got another request.

22  Q     And did your respond by offering to set up a meeting?

23  A     I think I said I was willing to meet with anyone going

24  forward.

25  Q     No, no.  But they specifically asked you to schedule a

1  meeting with them and it's -- actually let me rephrase it.

2  Isn't it true that you actually never met with the coalition

3  of unions separate -- separate and apart from the meetings

4  that we've been -- or the presentations that we've previously

5  been discussing that occurred on the 4th, the big 4th, what

6  we'll call the big 4th?

7  A    Me personally?

8  Q    Yes.

9  A    Yeah, I believe that's true.

10 Q    All right.  Is it your position that you directed

11 somebody on your behalf to meet with the coalition separate

12 and apart from the June 14, June 20, July 10, and July 11

13 meetings with the coalition of unions?

14 A    Are we still talking about the request?

15 Q    The -- the question is, did you direct somebody on your

16 behalf to meet with the coalition of unions separate and apart

17 from the June 14, June 20, July 10, and July 11 presentations

18 prior to the filing of the bankruptcy petition on July 18th?

19 A    There were meetings with other CDA's.  I don't know

20 specifically the coalition.  The request that you're talking

21 about was a request to enter into collective bargaining which

22 has been suspended by 436.

23 Q    I'm going to try again.

24         THE COURT:  No.  We're going to take our lunch break

25 now.  And Mr. Shumaker, I have obviously been ineffective at

1  having the witness answer questions.  So I'm going to instruct

2  you to counsel with your client over this lunch break about

3  the absolute criticality of just answering the question.  Will

4  you do that, please?

5          MR. SHUMAKER:  I will do that, Your Honor.

6  A    I apologize, Your Honor.

7          THE COURT:  Mr. Orr, I will accept your apology, if

8  you accept my advice and your attorney's advice.

9  A    Yes, Your Honor.

10         THE COURT:  All right.  1:30.

11     (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 12:00 P.M.)

12         THE CLERK:  All rise.  Court is in recess.

13     (Court in Recess at 12:00 p.m.; Resume at 1:30 p.m.)

14         THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Recalling case number 13-53846, the City of

16  Detroit, Michigan.

17         THE COURT:  It appears everyone's here.  You may

18  proceed.

19  BY MS. LEVINE:

20  Q    Good afternoon, Your Honor.  Mr. Orr.

21  A    Good afternoon, Ms. Levine.

22  Q    Going back to where we were right before we broke for

23  lunch.  So on March 25, 2013, you received a request from Ed

24  McNeil from AFSCME Michigan Council 25 to meet, correct?

25  A    Yes.

1  Q    And that request was on behalf of not only himself, but a

2  coalition of approximately 30 unions, correct?

3  A    I believe so.

4  Q    And in that request he indicated that the coalition of

5  unions had met previously including with Ernst and Young and

6  were -- had agreed to concessions that hadn't been imposed,

7  but they -- they wanted to continue that dialogue with you,

8  correct?

9  A    I don't recall the specifics of the request.

10 Q    Well, you received a copy of a letter which I believe you

11 described as being taped to your door?

12 A    Yes.

13 Q    And you gave that letter to somebody who worked for you

14 in order to respond, is that correct?

15 A    Yes.  I or a member of my staff.

16 Q    Okay.  And do you recall who you gave the letter to?

17 A    I do not.

18 Q    Did you meet with that coalition of unions?

19 A    Not to the best of my knowledge.

20 Q    Did anybody -- did you direct anybody to meet with that

21 coalition of unions prior to the time that you filed the

22 bankruptcy?

23 A    I don't recall.

24 Q    Well, isn't it true that there was no meeting between

25 anybody on behalf of the emergency manager and that coalition

1  of unions prior to the filing of the bankruptcy case?

2  A    I don't know.

3  Q    If you personally attended a meeting with the coalition

4  of unions, is that something you believe you would recall?

5  A    I might.

6  Q    Okay.  Besides the June 14 proposal, presentation,

7  between March 25 and June 18 -- I'm sorry, and June 13, you

8  were never personally in a room with anybody from AFSCME where

9  the topic of concessions, labor, pension, or health benefits

10  was discussed, correct?

11  A    I don't think so.

12  Q    And between March 25 and June 13th you had no telephone

13  calls with anybody from AFSCME where the topic of concessions,

14  labor, pension, or health benefits was discussed, correct?

15  A    I don't recall.

16  Q    Do you recall having those types of conversations by

17  telephone?

18  A    I don't recall.

19  Q    Between June 14 and July 18, other than attending the

20  presentation on June -- on June 14, you were never in the same

21  room with anybody from AFSCME where the proposal for creditors

22  was discussed, correct?

23  A    I don't recall.

24  Q    Between June 14 and July 18th, you did not participate in

25  any telephone calls with anybody from AFSCME where the

1  proposal for creditors was discussed, correct?

2  A    Not to the best of my recollection.

3  Q    At the June 14 presentation of the so-called proposal to

4  creditors, your team perhaps through counsel announced that

5  these were not negotiations, correct?

6  A    I believe so.

7  Q    Is it true that -- that your team also announced that

8  these were not negotiations at the June 20, July 9, and July

9  10 presentations?

10  A    I don't know.

11  Q    Okay.  So going back to when you were still at Jones, Day

12  and even before your -- your practice was primarily

13  bankruptcy, is that correct?

14  A    Yes, I think that's fair.

15  Q    So you're generally -- generally familiar with the

16  process for achieving labor concessions under 1113 of the

17  Bankruptcy Code?

18  A    Generally, yes.

19  Q    And it's your understanding that under 1113 there are

20  certain protections that are afforded unions that don't exist

21  for example, under Bankruptcy Code Section 365, is that

22  correct?

23  A    Generally, yes.

24  Q    And are you generally familiar with the process for

25  achieving concessions to retiree health benefits under

1  Bankruptcy Code Section 1114?

2  A    I'm –- I'm familiar with Section 1113 generally, yes.

3           THE COURT:  The last question was about Section

4  1114.

5  A    1114, yes, I am.

6  Q    And are you generally familiar with the process for

7  seeking a distressed termination of a single employer defined

8  benefit pension plan in the corporate context under Chapter

9  11?

10 A    Generally, yes.

11 Q    So generally under Bankruptcy Code, Section 1113 and

12 1114, in order to modify or get concessions with regard to

13 CVA's or retiree health, there are certain elements that the

14 case law deciphering 1113 has come up with, correct?

15 A    I believe so.

16 Q    And that would include presenting a proposal explaining

17 the concessions that are being requested, correct?

18 A    I believe there's a process under 1113.  I don't know if

19 it's that specific but generally, yes.

20 Q    And does that process also include having the proposal be

21 based on complete reliable information?

22           MR. STEWART:  Objection, Your Honor, it calls for a

23 legal conclusion.

24 Q    Is it your understanding that under 1113 and 1114 the

25 process for seeking concessions under –- under collective

1  bargaining agreements and retiree health requires that the

2  proposal be based on complete and reliable information?

3  A    I think the statute speaks for itself.

4  Q    I'm asking your understanding, Mr. Orr.

5  A    I don't know.

6  Q    Is it your understanding that under 1113 and 1114 the

7  proposal needs to be fair and equitable?

8  A    Yes.

9  Q    And is it your understanding that under 1114 and 1113

10 there have to be good faith negotiations?

11 A    Yes.

12 Q    Are you aware that AFSCME made information requests both

13 through Ed McMahon (sic) and Steve Kreisberg requesting

14 additional information following the June 14 proposal?

15 A    No.

16 Q    Do you know whether or not all of the information

17 requests made from various constituencies were responded to in

18 the ordinary course between June 14, but prior to the filing

19 of the bankruptcy case?

20 A    No.

21 Q    Okay.  During the time that you were at Jones, Day,

22 Jones, Day was debtor's counsel in Chrysler, correct?

23 A    Yes.

24 Q    And isn't it true in Chrysler that vested pension

25 benefits survived even though creditors were adjusted?

1  A    Yes.

2  Q    And isn't it true that Jones, Day represent -- was

3  conflicts counsel in AbitiBowater and vested -- vested pension

4  benefits survived even though creditor claims were -- were

5  compromised?

6  A    I don't know.

7  Q    And isn't it true that in AES Eastern Energy, Jones, Day

8  represented a committee of certificate holders where the

9  pension, vested pension benefits survived, but the claims of

10 creditors were adjusted?

11 A    I don't know.

12 Q    And isn't it true that Jones, Day represented the debtor

13 in Dana where the pension, vested pension benefits survived

14 and the claims of creditors were adjusted?

15        MR. STEWART:  Objection, relevance.

16        MS. LEVINE:  Your Honor, it goes to good faith

17 negotiations with regard to whether or not we can actually

18 have a situation where vested pension benefits survive and you

19 can adjust the claims of creditors to successfully go through

20 a bankruptcy process.

21        THE COURT:  Well, the problem is that not only is

22 every case different, but of course Chapter 11 is different

23 from Chapter 9.  So the objection is sustained.

24 Q    Well, Mr. Orr, unlike Chapter 11, in all of those cases

25 where if the pensions had been terminated the retirees would

1  have had the benefit of a PBGC.  Isn't it true that under

2  Chapter 9 there is no similar insurance protection?

3  A    It is true that under Chapter 9 there's no protection by

4  PBGC.

5  Q    And isn't it true that the current protection provided by

6  the PBGC now is over $57,000 a year?

7  A    I don't know.

8  Q    Well, assuming for the moment that it is over $57,000 a

9  year.  Isn't it true that all of the retirees who received

10 pension benefits in -- from Detroit would fall within the PBGC

11 protections if that protection existed in municipal

12 situations?

13          MR. STEWART:  Objection, calls for speculation.

14          THE COURT:  That objection is overruled.  Please

15 answer if you can.

16 A    I don't know.

17 Q    Mr. Orr, is it your understanding that to the extent

18 pension benefits are cut, the individual retirees will become

19 unsecured creditors?

20 A    Yes.

21 Q    So then is it your understanding that to the extent

22 retiree pension benefits are cut, the individual retirees

23 would share in the $2,000,000,000 note that's -- that exists

24 under the currently existing proposal for creditors?

25 A    Yes.

1  Q    So is it your understanding then that the individual

2  retirees would have to file proofs of claim in order to assert

3  their claims in this bankruptcy case?

4  A    I don't know.

5  Q    Well, how would they -- how would you know the dollar

6  amount of the claims of the individual retirees in order to

7  determine what their pro rata share is under the

8  $2,000,000,000 note?

9  A    I don't know how to answer your question.

10 Q    Prior to the time that Detroit filed for bankruptcy, did

11 the retirement system discontinue paying pension benefits?

12 A    Prior to the time?

13 Q    Uh-huh.

14 A    No, I don't think so.

15 Q    And in fact as we sit here today, they continue to make

16 the pension benefits payments, correct?

17 A    Yes.

18 Q    Anywhere in the proposal for creditors, Exhibit 43 or

19 Exhibit 44, is there a chart or explanation that an individual

20 retiree can look at to know exactly what their benefit would

21 be if in fact the proposal for creditors were implemented?

22 A    No, I don't think so.

23 Q    Mr. Orr, there was some press coverage that seemed to

24 imply that you were considering or would consider a

25 restructuring or a plan of adjustment that would include

 1 | freezing pension benefits.  Is that under consideration by

 2 | you?

 3 |          THE COURT:  Excuse me, are you talking about now?

 4 |          MS. LEVINE:  I'm talking about now.

 5 |          MR. STEWART:  Objection, relevance, Your Honor.

 6 |          MS. LEVINE:  Well, then I'm going to ask the next

 7 | question.

 8 |          THE COURT:  I'm sorry then what?

 9 |          MS. LEVINE:  Then I'm going to ask him whether he

10 | considered it before July 19th, Your Honor.

11 |          THE COURT:  You may ask that question.

12 | Q    Are -- are you considering it now?

13 |          THE COURT:  Well, I'm sorry, my ruling was you can

14 | ask about his intent as of July, but --

15 |          MS. LEVINE:  Your Honor --

16 |          THE COURT:  But what's the relevance of that now?

17 |          MS. LEVINE:  Your Honor, it goes in part to the --

18 | to the discussion that we've been having or the arguments that

19 | we've been making with regard to good faith.  We had a month

20 | and three days in order to negotiate prior to the bankruptcy.

21 | If all we had were no real negotiations just presentations,

22 | and no opportunity to have a dialogue with regard to some of

23 | these issues and they are in fact being considered now, then

24 | why weren't they considered then.

25 |          THE COURT:  No, I'm going to sustain the objection.

1  Q    Mr. Orr, did you consider freezing the pensions prior to

2  July 19th?

3  A    Yes.

4  Q    And in connection with that consideration, did you talk

5  at all to the -- with the Governor about the state providing

6  support to the extent it was necessary in order to fund any

7  shortfall to effectuate a freezing?

8  A    I don't recall.

9  Q    In the Governor's testimony before this Court, with

10 regard to being questioned on vested pension benefits, he

11 responded, if the Court ordered you had to pay them, you would

12 pay them.

13      So in other words it appeared that the Governor was

14 saying that if in fact the Court directed that he pay whatever

15 was necessary in order to keep the vested pension benefits

16 from being impaired or diminished he would pay that.  Have you

17 had conversations with the Governor prior to July 19th in that

18 regard?

19 A    No.

20 Q    From January 2012, but prior to being retained by the

21 city, did your firm -- did your prior firm provide services to

22 the Governor?

23 A    I don't know.

24 Q    Did they provide services to the state?

25 A    I don't know.

1  Q    Did they provide services to anybody affiliated with the

2  Governor or the state?

3  A    I don't know.

4  Q    Did you run a conflict search before you took the

5  position as emergency manager?

6  A    No, I resigned from my firm.

7  Q    And do you know whether or not your firm ran a conflict

8  search before being retained as counsel to the city in these

9  proceedings?

10 A    I recused myself from the retention process, I don't

11 know.

12 Q    Prior to July 19, did you or did anybody on your behalf

13 if you didn't do it personally, or on behalf of the City of

14 Detroit, ask the Governor or anybody associated with the

15 Governor, for funding to avoid impairing or diminishing vested

16 pension benefits?

17         MR. STEWART:  Objection, foundation.

18         THE COURT:  What foundation is missing?

19         MR. STEWART:  Well, she asked for whether Mr. Orr,

20 any of his staff, or anyone else asked the Governor.  This

21 witness can only testify as to what he knew.

22         MS. LEVINE:  I'll -- I'll rephrase, Your Honor.

23 There was a on his behalf in there, but it may have gotten

24 lost for the record.

25 Q    As we sit here today, have you or has anybody on your

1  behalf, or anybody on behalf of the City of Detroit who -- who

2  responds to you, ask the Governor, or anybody affiliated with

3  the state, for funding to avoid impairing or diminishing

4  vested pension benefits, outside of any request that may have

5  been made through mediation?

6  A    I don't know.

7  Q    Well, we've heard the Governor testify and we've seen in

8  the press that the Governor's view seems to be that Detroit

9  has to handle Detroit's own problems.  Are you familiar with

10  that press?

11  A    Yes.

12  Q    Is that consistent with your conversations with the

13  Governor?

14  A    Yes.

15  Q    And we've heard both you and the Governor speak about the

16  fact that you serve at the pleasure of the Governor, correct?

17  A    Yes.

18  Q    At any time between July 15th and -- or July 14th and July

19  18th, did you ever feel that your job was in jeopardy?

20  A    Not at all.

21       MS. LEVINE:  No further questions.  Thank you.

22  A    Thank you.

23       THE COURT:  Who is next?

24                    CROSS EXAMINATION

25  BY MS. GREEN:

1  Q    Good afternoon, Mr. Orr.  Jennifer Green on behalf of the

2  retirement systems for the City of Detroit.

3  A    Good afternoon, Ms. Green.

4  Q    We've met on a few occasions at your prior deposition.

5  A    Yes, we have.

6  Q    I want to follow up on a question, something you stated a

7  second ago.  Why did you tell Christie's to go away in May of

8  2013?

9  A    We were immediately trying to assess a number of

10 different things and I felt that that wasn't as high a

11 priority as getting a real view of the financial condition of

12 the city.  And I didn't think it was ready to be assessed yet.

13 Q    And you changed your mind as of August 5th when I believe

14 they were retained, correct?

15 A    Approximately around that time.

16 Q    I'd like to draw your attention to Exhibit 865 if I may.

17 Do you have the appropriate witness binder or would you like

18 to see it on the screen?

19 A    I'll find it.

20     MR. STEWART:  State exhibit, retirees?  The exhibit

21 retiree committee.

22 Q    If you're okay with the screen, we can do the screen as

23 you have been.  I just wanted to verify.

24 A    I'll do the screen.

25 Q    Okay.  Do you recognize that email, Mr. Orr?

1   A     Yes.

2   Q     And it's dated February 11th, 2013?

3   A     Yes.

4   Q     And you were still a Jones, Day partner at this time?

5   A     Yes.

6   Q     When exactly did you resign from Jones, Day?

7   A     I resigned effective Friday, March 15th.

8   Q     If I may draw your attention to the first paragraph.  It

9   -- it talks about preparation -- well, I assume that's what

10  the abbreviation prep stands for, correct?

11  A     Uh-huh.

12  Q     Prep for EM appointment is important.  Ideally we would

13  like to plan for orderly transition to EM, whoever it is, not

14  a splash landing.  Does that -- do you remember getting this

15  email?

16  A     Yes.

17  Q     And the second paragraph talks about I am not sure the

18  state, Dillon, Baird, Governor, are really thinking on an

19  operational and practical level.  Do you see that part?

20  A     Yes.

21  Q     Further down there's a paragraph that states, it would be

22  a better process if the firm is on the ground working,

23  preparing and coming up with a well thought out game plan

24  before EM is appointed.  Do you see that portion?

25  A     Yes.

1  Q    At this time you were not yet appointed emergency

2  manager, correct?

3  A    Correct.

4  Q    At the bottom of the page, there is discussion about J.B.

5  should be there to make sure EM and process works.  Question,

6  maybe how does state get city and us six to eight weeks before

7  appointment if possible.  So my question for you is, was

8  Jones, Day already working on this case before your official

9  appointment six weeks later?

10 A    Not to the best of my knowledge.

11 Q    As of your appointment in March your public contract

12 states that your salary is $275,000, correct?

13 A    Yes.

14 Q    Are there any supplements or bonus payments associated

15 with that contract?

16 A    No.

17 Q    I'd like to direct your attention to Exhibit 807.  Do you

18 recognize this email, Mr. Orr?

19 A    Yes.

20 Q    Bullet point 2 talks about your contract period not to

21 exceed 18 months with incentives if job is completed sooner

22 based on mutually agreed milestones.  The next bullet point

23 talks about an intent to raise private funding for performance

24 measure outcome bonus.  And this is before -- this is a month

25 before you were appointed?

1  A    Yes.

2  Q    Was there ever an incentive bonus included in your

3  compensation package?

4  A    No.

5  Q    After you were appointed, was there any change to your

6  contract?

7  A    No.

8  Q    Was there ever a request made from a state fund to have a

9  performance bonus included with your contract?

10 A    No.  This is the only time it was mentioned, I let it

11 drop.

12 Q    You were never sent a letter in April of 2013 relating to

13 a -- a performance bonus?

14 A    I don't recall.

15 Q    You are familiar with the NERD fund, I think we've talked

16 about it a few times?

17 A    I have heard what I read in the paper.

18 Q    This is not in our witness binder.  I will give you a

19 copy.

20        THE COURT:  Not in the exhibit binder.

21        MS. GREEN:  It is not in the exhibit binder, Your

22 Honor.  We received it on Friday afternoon with the latest

23 production from the city and the state.  So I apologize it's

24 not in our binder.

25        THE COURT:  Yes, is there an exhibit number on it?

1          MS. GREEN:  It will be 869.

2          THE COURT:  Okay.

3   Q    Do you recognize the letter dated April 12th, 2013?

4   A    No.

5   Q    You were never sent a letter discussing an early out

6   provision incentive payment in addition to your regular

7   compensation?

8   A    No.

9   Q    And there has been no discussion or contract -- contract

10  executed where you would get an early payment bonus if you

11  completed your emergency manager goals before the 18 months is

12  completed?

13  A    No.

14  Q    I'd like to draw your attention now to Exhibit 853.  For

15  starters Mr. Orr, do you -- do you recognize this email dated

16  January 28th, 2013?

17  A    I don't recall specifically but I see that I was one of

18  the addressees.

19  Q    For starters, what is Detroit News?

20  A    I think that's a -- I don't know.

21  Q    Have you ever heard the phrase project Detroit used

22  internally at Jones, Day?

23  A    Yes.

24  Q    Is it -- is it perhaps a play on the French pronunciation

25  of Detroit?

1   A    It might well be, I don't know for sure.

2   Q    So this email is relating to the City of Detroit.  At the

3   bottom I'd like to draw your attention to Paragraph 4.  June

4   -- I'm sorry, January 28th was the day before you pitched your

5   services to the State of Michigan and the City of Detroit,

6   correct?

7   A    Yes.

8   Q    At the bottom there, the discussion about avoiding

9   pitfalls of alienating the state, e.g. if something happens to

10  city's pension, state will probably step up to deal with, but

11  thus far has failed to concede this point at all.  Do you

12  recall any discussion about trying to side step this issue in

13  your pitch to the state and city officials?

14  A    No.

15  Q    In your pitch to the state and to the city, was this

16  issue of seeking contributions from the State of Michigan ever

17  raised?

18  A    Not that I recall.

19  Q    And when was the first time that after you became

20  emergency manager the issue of potentially seeking

21  contributions from the State of Michigan was -- was raised?

22  A    I don't recall.

23  Q    Yesterday you were asked to answer whether under PA436

24  you believed you had the authority to impair pensions.  Do you

25  recall that question?

1  A    Yes.

2  Q    I believe your response was, that you felt it called for

3  a legal conclusion?

4  A    Yes.

5  Q    Do you recall being asked the same question following

6  your June 14th meeting where you laid out the proposal for

7  creditors?

8  A    Generally, yes.

9  Q    Do you recall what your response was?

10 A    No, I don't.

11 Q    Can you pull up the part number 1?  I'm going to ask you

12 if you've -- if this refreshes your recollection.

13 A    Uh-huh.

14 Q    To what your response was at the time.

15      (Video Being Played at 1:57 p.m.; Concluded at 1:58 p.m.)

16 Q    Do you recall answering the question in that manner on

17 June 14th?

18 A    That was a press event after the meeting.  I might well

19 have said that, I don't recall specifically.

20 Q    Assuming that's what you said --

21 A    Uh-huh.

22 Q    By legislative relief, did you mean a constitutional

23 amendment?

24 A    I don't recall.

25 Q    Did you mean legislative relief in the form of

1  contributions from the State of Michigan?

2  A    No, I don't recall.

3  Q    You don't recall one way or the other what you meant?

4  A    I -- I don't recall one way or the other.

5  Q    You would agree with me though that this response is

6  different than the response you gave yesterday?

7  A    No.

8  Q    How so?

9  A    Well, I think this response I was saying that you can

10  negotiate which is what I think I said yesterday.  Read it

11  back.  I think this one said legislation.  I think yesterday I

12  also said that discussion was in the context of federal

13  supremacy.  And I'll stand by those statements.

14  Q    Was there any discussion following this statement as to

15  whether you should continue to make such statements regarding

16  the need for legislative relief in the face of the pensions

17  clause?

18  A    No.

19  Q    Were you ever advised that you should not state in the

20  future that legislative relief would be necessary if there was

21  not a consensual agreement?

22  A    No.

23  Q    Mr. Orr, did you have any involvement in the creation of

24  the pension task force?

25  A    Yes.

1  Q    How so?

2  A    Everything that's done under the aegis of 436 and the

3  efforts that we're making in the city is done under my

4  authority, so I suppose I had some involvement.

5  Q    And am I understanding it correctly that the pension task

6  force consists of attorneys from Miller, Canfield, attorneys

7  from Jones, Day, and then certain other financial advisors,

8  correct?

9  A    Financial and operational advisors, yes.

10 Q    Okay.  And when was it created?

11 A    I don't know.

12 Q    Was it in place before you became emergency manager?

13 A    Not to the best of my knowledge.

14 Q    Okay.  And -- and who created it specifically?  Was it

15 you under PA436?

16 A    I don't recall.

17 Q    Who else, if I may ask, would have the authority to

18 create a pension task force if it wasn't you?

19 A    As part of the financial stability agreement and the

20 memorandum of understanding, both of which were entered into

21 in 2012, there were certain tasks that were to be undertaken

22 at that point.  The task force itself as you're referencing

23 may have begun at that process.

24      Since Jones, Day got involved further in 2013, there may

25 have been other attorneys added to that task force, but the

1  MOU of November 2012 speaks to certain tasks that Milliman,

2  Miller -- Miller, Canfield, Conway, MacKenzie, E & Y, are

3  supposed to undertake.

4  Q    And what was the purpose of the pension task force?

5  A    I don't know.

6  Q    Well, who does it report to?

7  A    Well, it now reports to me.

8  Q    But you don't know the purpose of it?

9  A    Well, the purpose as spelled out in the MOU was to

10 examine certain pension issues.  But you asked me what was the

11 purpose of the task force as far as I understand it.  It's

12 what it does for me now.

13 Q    Okay.  So what does it do for you now?

14 A    It -- it analyzes and reports to me different issues

15 regarding the city's pension obligations.

16 Q    Have there been any findings, written reports,

17 memorandums, anything like that --

18 A    Yes.

19 Q    -- created by the pension task force?

20 A    The task force or members of the task force.

21 Q    Have those documents been produced in this litigation?

22 A    I don't know.

23 Q    And no one from either of the two retirement systems was

24 asked to participate in the pension task force, correct?

25 A    I don't know.

1  Q    Well, did you personally ask anyone from any of the

2  retirement systems to participate in the task force?

3  A    No.

4  Q    And no one from any of the retiree associations or active

5  employee associations were asked to join this pension task

6  force, correct?

7  A    I don't know.

8  Q    And no one from the unions were asked to join the pension

9  task force?

10 A    I don't know.

11 Q    But you don't know, or you did not do it?

12 A    I did not ask them.

13 Q    Okay.  Would anyone else have authority to be asking

14 people to join the pension task force?

15 A    Yes.

16 Q    Who would that be?

17 A    The people that were tasked, I think, under the MOU in

18 2012 and members of my staff whether they joined it or asked

19 them to participate would be authorized to solicit information

20 from other parties.

21 Q    But to your knowledge none of those people reached out to

22 any of the people I just listed, the retirement systems active

23 employees, retirees, or unions to join the pension task force,

24 correct?

25 A    I don't know.

1  Q    And this task force was not -- the existence of the task

2  force was not made public until the bankruptcy filing,

3  correct?

4  A    I don't know if that's true.

5  Q    Did the pension task force ever approach the retirement

6  systems to discuss any creative options relating to the design

7  of the pension plans or any cash flow changes that could be

8  made to resolve under funding problems?

9  A    I don't know.

10 Q    Yesterday I believe you stated that with respect to your

11 -- or I'm going to call them commercial creditors.  You said

12 that you followed all the notice provisions in the loan

13 documents and you sent notices of the June 14th meeting,

14 correct?

15 A    Yeah.  I said that we followed -- followed notice

16 provisions, sent notices to all record holders or their

17 agents, and also received telephone calls and other requests.

18 Q    Did you do the same thing with any active employees or

19 retirees?

20 A    I believe we reached out to -- I -- I don't know for

21 sure.

22 Q    Okay.  Let's talk about what attempts if any you made to

23 mobilize the actives or the retirees.

24 A    Uh-huh.

25 Q    Did you or anyone on your team make phone calls to each

1  individual?

2  A    To each individual active employee?

3  Q    Or retiree.

4  A    No, not that I know of.

5  Q    Did you reach out by mail, write letters, things of that

6  nature?

7  A    To the actives I believe we reached out.  There certainly

8  -- there are actives on my staff so they would have been

9  aware.  There are actives that are working with the

10  consultants, so they would have been aware.  To the retirees,

11  we asked certain bargaining units, unions to represent them

12  and they declined.

13  Q    My question was, did you reach out directly to any of the

14  retirees before the June 10th or June 14th meetings?

15  A    I don't know.  I don't recall.

16  Q    Did you post any public notices in newspapers or

17  advertise on television that there were these meetings coming

18  up?

19  A    I don't recall.

20  Q    Did you set up a web site where you could communicate

21  directly with any of the retirees or actives?

22  A    We have a web site in the city.  Whether or not that's of

23  the type you're talking about to communicate directly, you

24  have to examine the web site.

25  Q    I have.

1  A     Okay.

2  Q     I did not see anything.  It's your web site.  Do you have

3  anything on that web site that you believe enabled you to

4  directly communicate with actives or retirees?

5  A     Yes, I think I do, yeah.

6  Q     Okay.  Did you use anything on your web site before the

7  June 14th and June 10th meetings to reach out directly to any of

8  the actives or retirees?

9  A     Not that I recall.

10 Q     Okay.  Did you mail a copy of your proposal for creditors

11 to all of the -- or any of the actives or the retirees?

12 A     I don't know.

13 Q     You -- you do have a list of all those names though,

14 don't you?

15 A     We believe we have a list of all active employees.  I

16 would think that we would have a list of all retirees.  I know

17 we asked for some help in compiling that list, but they're our

18 list.

19 Q     And if you needed those identities there were places you

20 could look and people you could ask for that information,

21 correct?

22 A     We did ask.

23 Q     And you -- you never attempted to develop sub groups of

24 these retirees so that you could negotiate with them directly,

25 correct before the bankruptcy?

1  A    I don't know.

2  Q    Are you familiar with anyone else on your staff being

3  tasked with breaking up the group of retirees into smaller

4  groups to be able to negotiate with smaller groups directly?

5  A    Yes.

6  Q    Okay.  Who on your staff was responsible for that?

7  A    There are members both on the legal team and on the

8  actuarial as well as the -- well, principally that would have

9  been -- probably members on the legal team.

10  Q    And who would those individuals be that were tasked with

11  breaking the retiree groups into smaller sub sections?

12  A    That would have been led by the -- probably Evan Miller

13  at Jones, Day.

14  Q    And when did these smaller sub group negotiations, or

15  alleged negotiations take place?

16  A    I don't know.

17  Q    Are there any documents that actually reflect that

18  smaller sub groups were created for the purpose of

19  negotiating?

20  A    I -- I don't know.

21  Q    Have any documents been -- been produced in this case

22  that show that actual sub groups had been developed?

23  A    A lot of documents have been produced.  There may well

24  have been.  I don't know for sure.

25  Q    Are you familiar with any such documents?

1  A    I wasn't involved in the document production, no.

2  Q    Are you familiar with testimony on Friday that there was

3  no attempt made to create smaller sub groups of retirees?

4  A    No, I'm not familiar with that testimony.

5  Q    If it was from Mr. Buckfire who was your lead negotiator

6  for your financial advisory team, would it surprise you to

7  hear him saying that there had been no group, smaller sub

8  group developed?

9  A    No.  Mr. Buckfire may have not have been involved in all

10  aspects of it.

11  Q    Okay.  So it's your testimony the Jones, Day lawyer was

12  tasked with breaking out smaller sub sections and negotiating

13  directly?

14  A    It's my testimony that they could have been.  I don't

15  recall specifically the timing or the sub groups as you're

16  characterizing it.

17  Q    Okay.  So if we ask the retirees that are testifying next

18  week if anyone contacted them for the purpose of breaking into

19  smaller sections so that they could be negotiated with

20  directly, we're going to expect to hear that yes, Evan Miller

21  contacted me to negotiate?

22        MR. STEWART:  Objection, Your Honor, calls for

23  speculation.

24        THE COURT:  Sustained.

25  Q    What specific strategies other than this apparent sub

1  group that you've formulated, did you come up with to overcome

2  what was the perceived impractical nature of directly dealing

3  with large groups of people?

4  A    Can you impact that question a little bit?

5  Q    What specific strategies did you come up with to try to

6  overcome any perceived difficulty with negotiating with large

7  numbers of people, list them?

8  A    Related to retirees?

9  Q    Yes.

10 A    Okay.  Because your question said, as you did, we asked

11 for a retiree committee in bankruptcy.  You're talking about

12 before?

13 Q    Before bankruptcy.

14 A    Before bankruptcy.  We had made requests from certain of

15 the bargaining units to represent retirees.  I have certainly

16 met with I believe the Police and Fire Retiree Association.

17 Q    Okay.  Would that be the sum total of what you did?

18 A    It may not be.  Many of my consultants meet with

19 different groups all the time.  And sometimes I'm not aware of

20 all meetings.

21 Q    We talked a little bit about the pension task force.  Was

22 there a negotiations task force that was put together by your

23 team?

24 A    By my team?

25 Q    Yes.

1  A    I would think the entire effort was a negotiations task

2  force.

3  Q    But there was no specific committee on your team dealing

4  with how to tackle the problem of the retirees that needed to

5  be negotiated with, correct?

6  A    My team and consultants worked together collaboratively.

7  Whether or not that's called a task force as a proper noun, is

8  a different question.

9  Q    Well you had names for your teams.  I'm asking was there

10 an official team dedicated to negotiating with retirees?  Yes

11 or no?

12 A    Not -- I don't know.  Not that I'm aware of.

13 Q    The June 10th, June 14th, and June 20th presentations, I

14 believe we're all in agreement now were purely informational.

15 I believe that's what you've said between yesterday and today,

16 correct?

17 A    Generally, yes.

18 Q    In the June 10th time frame, you held the -- the public

19 meeting at Wayne State, correct?

20 A    Yes.

21 Q    And that was as I believe you testified kind of the

22 ground work and you were laying the foundation for the

23 negotiations that you expected to occur in the following

24 weeks?

25 A    No.  I think what I testified to was that the June 10th

1  meeting was required as a public meeting within 30 days of my

2  May 12th report.

3  Q    You may have said that.  At some point you agree with me

4  that that was your first public meeting and you were trying to

5  set the foundation for what was to occur?  Maybe I'm

6  mischaracterizing slightly, but it's the gist of what I got

7  from what you said yesterday.

8  A    Well, I -- I can't be responsible for the gist of what

9  you got.  What I said was, the June 10th meeting was required

10 by 436 within 30 days of the May 12th report.  There were many

11 things that were done at that meeting, but what I was trying

12 to relay yesterday was I was meeting my statutory obligations

13 under 436.

14 Q    Okay.  Do you remember at that June 10th meeting that it

15 was video taped?

16 A    Yes.

17 Q    And in fact you've posted these videos on your emergency

18 manager web site, correct?

19 A    Yes.

20 Q    Do you recall being asked a question by a retiree at the

21 June 10th meeting about what to expect to happen to their

22 pension funds?

23 A    I don't recall a specific question, but you're welcome to

24 show it to me.

25 Q    I will do that.

1       (Video Being Played at 2:12 p.m.; Concluded at 2:14 p.m.)

2  Q    So on June 10th when asked by a retiree what was to happen

3  to their pension benefits, you said they were sacrosanct and

4  they could not be touched, correct?

5  A    I think there was more to that clip.

6  Q    I'm only asking about that part.  I -- we can keep

7  playing it.  You say except OPEB's are different.  Is that --

8  did that refresh your recollection of what you followed

9  that --

10 A    No.  I mean the entire clip.  I think there were multiple

11 questions, but that clip speaks for itself, yes.

12 Q    Okay.  So on June 10th you told retirees at the June 10th

13 meeting that their pensions were sacrosanct and they couldn't

14 be touched.  And four days later you held the proposal for

15 creditors meeting.

16      And at that time you produced a 135 page proposal and I

17 believe we've shown it up on the screen a few times Page 109

18 where you say significant cuts will have to be taken.  Did you

19 invite all the same retirees to the second meeting and then

20 explain to them that what they may have heard at the June 10th

21 meeting was now being changed?

22 A    I don't know.

23 Q    Well, did you correct any misunderstanding out there

24 where retirees thought their pension obligations were indeed

25 sacrosanct and safe?

1  A    I may well have.

2  Q    So you told them no cuts.  Four days later you said cuts.

3  And that was on June 14ᵗʰ.  And the time line that you laid out

4  on your proposal for creditors slated June 17ᵗʰ through July

5  12ᵗʰ as the initial discussion round, correct?

6  A    It is whatever it is in the document, yes.

7  Q    We've looked at it a few times.  I won't bother pulling

8  it up again.  So on the 14ᵗʰ you -- you did state there had to

9  be cuts.  And three days later the negotiations were to

10  commence, correct?

11  A    Yes, generally.

12  Q    Okay.  And the data room wasn't live until June 20ᵗʰ,

13  right?

14  A    I don't know.

15  Q    If other people have testified June 20ᵗʰ, does that sound

16  about correct?

17  A    That -- that would not surprise me.  I don't know the

18  exact date.

19  Q    And as of the 20ᵗʰ the data room was not fully populated

20  with the -- with the data, right?

21  A    I don't know.  I wasn't populating the data room.

22  Q    And if other people testified that it was not fully

23  populated would that --

24  A    That would not surprise me.

25  Q    Okay.  So three days into the initial round of

1  discussions with all the stakeholders, the documents were

2  still not up?  You gave a proposal for creditors that changed

3  information that you had said at the public meeting on the

4  10th.  And you did not give a copy of this proposal for

5  creditors to all of the retirees, correct?

6  A    Not necessarily, Ms. Green.

7  Q    Okay.  When was the first time that you realized Chapter

8  9 was going to be necessary to cut the pension benefits?

9  A    I don't know if I realized Chapter 9 was going to be

10  necessary just to cut the pension benefits.

11  Q    Did you know it before you said on the 10th that pension

12  benefits could not be touched?

13  A    I think you're taking that quote out of context, but let

14  me respond this way.  The 10th and 14th, we were negotiating

15  with Bammel.  We thought that was going to spur other

16  settlements and other negotiations.  I had made no conclusion

17  regarding Chapter 9 at that point.

18  Q    Well, isn't it true you were being advised by your

19  financial advisors that Chapter 9 was necessary?

20  A    Chapter 9 had been discussed since 2005, Ms. Green.

21  Q    Can we look at Exhibit 870, please?  You were in contact

22  with your financial advisors continuously throughout this

23  period, correct, Mr. Orr?

24  A    Yes.

25  Q    And Chuck Moore is one of your financial advisors?

1  A    Yes.

2  Q    And he's on the pension task force?

3  A    Yes.

4          MR. STEWART:  Counsel, could I get a copy of that

5  document?  I don't think we have it.

6          MS. GREEN:  Oh, this was just -- I'm sorry, Your

7  Honor.  This was produced on Friday as well.  And we do have

8  extra copies for the Court today.

9  Q    Do you recognize this email?

10  A    Is it in here?

11  Q    It should be on the screen.

12  A    Okay.  Okay.  Thank you.

13  Q    Do you recognize this email dated June 7th, 2013?

14          THE COURT:  Do you have a number for this?

15          MS. GREEN:  It's 870, Your Honor.

16          THE COURT:  Thank you.

17  A    Yes.

18  Q    And at the bottom of that email it's -- it's a whole

19  string and there's an email from Chuck Moore at Conway,

20  MacKenzie dated 6-5-2013?

21  A    Yes.

22  Q    And it's an email to you, correct?

23  A    Yes.

24  Q    Discussing a lengthy call with Milliman this afternoon?

25  A    Yes.

1  Q    And you received this -- this email, right?

2  A    Yes, I believe so.

3  Q    On the second page there are numbered paragraphs.  I'd

4  like to call your attention to Paragraph 3.  Just above it

5  it's talking about under funding liability.

6       And it states, we anticipate a significant reduction and

7  already accrued benefits will be required in order to get

8  required contributions to the level of available cash to

9  service the UAAL.  It appears this may only be possible in a

10 Chapter 9 proceeding.

11 A    Yes.

12 Q    Do you -- do you recall receiving that portion of the

13 email?

14 A    Yes.

15 Q    And this was on June 5th?

16 A    It's dated June 5th, so I assume I received it around

17 then, yes.

18 Q    But on the meeting of June 10th you responded to questions

19 regarding the pension benefits and you stated that they could

20 not be touched?

21 A    In the clip that you showed, yes.

22 Q    So did you knowingly give misinformation to the retirees

23 that were asking questions on the 10th?

24 A    No.

25 Q    I believe that you testified earlier that Ernst and

1  Young, Miller, Buckfire, and Conway, MacKenzie had all been

2  engaged by the city prior to your arrival, correct?

3  A    Yes.

4  Q    And they were working since 2012 putting all the

5  financial data together, correct?

6  A    I believe Ernst and Young was engaged in 2012.  The

7  others may have begun work either at the end of December 2012,

8  or the beginning of 2013.

9  Q    And all of their work culminated with this proposal for

10  creditors that you laid out in the middle of June?

11  A    Yes.

12  Q    So that took your team of three financial advisor firms,

13  yourself, and whomever else you had working on it, several

14  months, five, six months all together, maybe longer?

15  A    I believe they met in 2013 and began to come up with

16  concepts and it culminated in this document.  But if that's

17  your supposition, yes.

18  Q    Okay.  And yet the time frame that you laid out for the

19  initial rounds of discussions with the relevant stakeholders

20  lasted from June 17th to July 12th, right, just a three week

21  period?

22  A    July 19th, but yes.

23  Q    And the evaluation period that you set forth in your

24  proposal for creditors was July 15th through the 19th, right?

25  A    Yes.

1  Q    I think you stated earlier that the pre-petition lawsuits

2  helped force the bankruptcy filing, correct?

3  A    I think I said either on September 16th, or yesterday, or

4  the day before, that we were getting ready to lose control,

5  that those lawsuits were creating concerns, yes.

6  Q    Okay.  And I believe you said that at first you ignored

7  the -- the lawsuits that were filed?

8  A    Yes.

9  Q    How long did you ignore them for?

10 A    Almost three weeks.

11 Q    Okay.  You were asked yesterday if you were aware of any

12 hearings that were scheduled in State Court lawsuits as of the

13 time that you sent your letter on the 16th?

14 A    Yes.

15 Q    And you stated that at time you were unaware of any

16 hearings in the State Court litigation?  The 16th.

17 A    I don't -- yeah.  I don't know if as of the 16th.  I don't

18 -- I don't recall when I became aware.  There were hearings

19 scheduled for the following week.  I may not have known as of

20 the 16th.

21 Q    What about the 18th when you filed the petition?

22 A    I think by the 18th, I knew there were hearings scheduled

23 for the following week.

24 Q    You said earlier that you were concerned that one of

25 these lawsuits could impact your ability or would undermine

1  your authority under PA436 to get your job done, something to

2  that effect.  Do you recall that from this morning?

3  A    Yes.

4  Q    What authority under PA -- PA436 did you think was going

5  to be undermined?

6  A    All of my authority.

7  Q    And in fact you expected these lawsuits, didn't you?

8  Let's call up Exhibit 403.  Do you recognize this email from

9  January of 2013?

10  A    Yes.

11  Q    And isn't it true that at that time you were observing

12  that there were already reports that "opponents of the prior

13  law are already lining up to challenge this law"?

14  A    Yes.

15  Q    So as of January before you even were appointed emergency

16  manager, you expected a legal battle forthcoming, correct?

17  A    Not of the nature you're talking about, but yes, I

18  expected that there were challenges because that's what I

19  read.

20  Q    Well, and to be clear the State Court lawsuits were

21  challenges to PA436 and your authority thereunder, correct?

22  A    Yes.  But I don't want to mislead you.  This is talking

23  about lawsuits to PA436.  I wasn't expecting injunctions, I

24  was expecting more lawsuits in the nature of declaratory

25  judgments and the like.

1        So the specifics of the lawsuit, I wasn't talking about

2    in here.  But I was expecting challenges because that's what

3    was being talked about in the news reports.

4    Q    Well, and there were in fact declaratory judgments sought

5    in those pre-petition lawsuits, weren't there?

6    A    I believe so.

7    Q    Okay.  And the retirement systems didn't file their

8    lawsuit until July 16th, correct?

9    A    Yes.  I believe GRS filed July 15th.

10   Q    Well, either way it was -- it was after the week, after

11   in your own time line, it was after the period where you had

12   set aside for discussions to take place with your

13   stakeholders?

14   A    Yes.

15   Q    Okay.  So there were no -- there wasn't a lawsuit

16   vis-a-vis the retirement systems during the week that you were

17   meeting with the retirement systems, correct?

18   A    I don't think so.

19   Q    And I believe you said yesterday the TRO from the Syncora

20   litigation was set to expire within 14 days?

21   A    Yes.

22   Q    And that would take you to July 19th?

23   A    I believe so.

24   Q    But the July 19th date was set forth on your proposal for

25   creditors as the end date unrelated to the Syncora litigation,

1  correct?

2  A    I think it was set forth related to everything.

3  Q    Yesterday you talked a lot about the swap transactions

4  and that negotiation.  At your deposition you testified that

5  they were extraordinarily complex.  I presume that your

6  testimony would be the same today?

7  A    The swap transactions.

8  Q    Yes.

9  A    Yes.

10  Q    And those negotiations started in earnest on June 4th,

11  right?

12  A    I don't recall the exact date, but that sounds about

13  right.

14  Q    Okay.  And the general terms of that negotiation were

15  agreed upon around June 11th?

16  A    Generally, yes.  Generally about those days, yeah.

17  Q    And then between June 11th, and July 15th through the 17th,

18  the paperwork was drafted and the forbearance agreement was

19  executed, correct?

20  A    Yes, forbearance and optional termination agreement, yes.

21  Q    Okay.  So even though the transactions were extremely

22  complex, and I believe you testified that the negotiations

23  were -- there was a lot of back and forth?

24  A    Uh-huh, yes.

25  Q    Even with all of that, the whole thing was wrapped up in

1  about four weeks, right?

2  A    Yes, I believe so.

3  Q    And that freed up the casino revenue?

4  A    Yes.

5  Q    That you thought was critical to the city's liquidity?

6  A    Yes.

7  Q    And yet having successfully negotiated that complex deal,

8  you didn't continue down the path of negotiating.  Two days

9  after you executed the forbearance agreement you actually

10 filed your bankruptcy petition, correct?

11 A    That's correct.  Forbearance agreement is dated July 15th

12 and we filed on July 18th.

13 Q    In three days?

14 A    Whatever that is, yeah.

15 Q    Okay.  We talked a lot about negotiations.  Isn't it true

16 though that if negotiations do not -- if there's -- I'm sorry,

17 let me restate that.  It was a terribly started question.

18 A    I understand.

19 Q    We talked about negotiations, but isn't it true that if a

20 consensual deal is not worked out, the city will use the cram

21 down provisions of the Bankruptcy Code to force a resolution?

22 A    The city would propose a resolution, but the cram down

23 provisions are available in Bankruptcy Code.

24 Q    So the answer is yes?

25 A    We hope to reach a negotiated solution even now.

1  Q    But if you don't, the answer is yes, correct?

2  A    If I don't we will address that situation then, but

3  certainly cram down is an opportunity available to us.

4  Q    And the $2,000,000,000 note that was proposed, there's no

5  recourse if the city fails to pay that note back, correct?

6  A    It is a non-recourse note.

7  Q    And in fact as of June 14th the proposal for creditors

8  does not actually identify anywhere in that document the

9  amount that an individual -- an individual's benefits would be

10 impacted, correct?

11          MR. STEWART:  Objection, asked and answered before,

12 Your Honor.

13          THE COURT:  Sustained.

14 Q    If an individual retiree was looking to find how much

15 their individual pension benefits would be impacted prior to

16 the bankruptcy filing, where would they look?

17          MR. STEWART:  Same objection, Your Honor.

18          MS. GREEN:  A different question.

19          THE COURT:  Well, it's slightly different.  What's

20 the answer, please?

21 A    I don't know, Your Honor.

22 Q    Mr. Orr, earlier we looked at Exhibit 831.  If we could

23 see that again, please.  This is the time line from July 8th.

24 Bill Nowling or Nowling is your press secretary?

25 A    He's my communications director, yes.

1  Q     Okay.  I would draw your attention to about three pages

2  in.  There is a list of bullet points relating to a

3  communications plan.  There we have it.  And as of July 8th

4  your communications plan was that you believe the Court

5  supervised restructuring is the best and most efficient way to

6  secure a viable strong future for Detroit, correct?

7  A     Yes.

8  Q     And further down on the page, there is a bullet point

9  that states, we negotiated in good faith with all of Detroit's

10 creditors and we will continue to work cooperatively with them

11 in the Federal Bankruptcy Court process, correct?

12 A     Yes.

13 Q     And it states that at this point it would be impractical

14 to continue discussions out of Court, correct?

15 A     Yes, it says that.

16 Q     And it states that the State of Michigan has authorized

17 the emergency manager to take this step?

18 A     Yes.

19 Q     As of July 8th, you had not yet even conducted several of

20 the meetings with the relevant stakeholders, correct?

21 A     July 8th?

22 Q     Right.

23 A     I think we had meetings beginning on June 17th, so we had

24 conducted a number of meetings.

25 Q     What about the ones on the 10th and the 11th?  Those had

1   not even taken place, correct?

2   A    Of July.

3   Q    Right.

4   A    Yes.  No, they hadn't taken place.

5   Q    And I think we established earlier that all the

6   presentations on the 10th, 14th, and 20th were merely

7   informational and presentational, correct?

8   A    Of July?

9   Q    Of June.

10  A    Of June, yes.

11  Q    Okay.  And this same document has the filing date of the

12  19th, right?

13  A    Yes.

14  Q    Okay.  Was there another document that set forth some

15  sort of contingency plan if negotiations actually were

16  fruitful?

17  A    It looks like this is one of them.

18  Q    Where on here does it say what your steps are if the

19  negotiations, the meetings that took place July 10th and 11th

20  where --

21  A    Did you say that they were fruitful, or unfruitful?

22  Q    If they were fruitful.

23  A    Oh, they were fruitful.

24  Q    Where is your plan for if the negotiations on the 10th and

25  11th worked out?

1  A     Rephrase your question because I'm not sure I'm

2  understanding it.

3  Q     This document lays out a time line as of July 8th.

4  A     Contingency plan, yes.

5  Q     Okay.  Where on the document does this say it's a

6  contingency plan?

7  A     No.  I'm just saying that you do contingency planning.

8  It doesn't have to be called a contingency plan.  You plan for

9  contingencies before the last minute, Ms. Green, I'm sure

10 you're aware of that.

11 Q     Okay.  So where is the contingency plan for if

12 negotiations were fruitful?

13 A     I don't know.

14 Q     In the 200,000 pages of documents the city has produced,

15 is there a single contingency plan relating to negotiations

16 with creditors?

17         MR. STEWART:  Objection, Your Honor, foundation.

18         THE COURT:  Overruled.  Answer the question if you

19 know.

20 A     I don't know.

21         MS. GREEN:  Your Honor, I'm sorry.  I'm just going

22 through my notes.  I want to make sure I got everything.

23 Q     I have one more question.  At the June 10th proposal, or

24 I'm sorry, public meeting.

25 A     Uh-huh.

1  Q    Do you recall talking about your authority under PA436?

2  A    Yes.

3  Q    Do you recall making a statement about how powerful your

4  authority was under PA436?

5  A    Yes, I do remember that.

6  Q    Do you remember saying, and I don't want to misquote you,

7  so I'm going to have to play the clip, but do remember saying

8  that the statute itself was powerful, but you had a much more

9  powerful Chapter 9?

10  A    Yes.  I remember saying that I have a very powerful

11  statute, 436 is even a more powerful statute, Chapter 9, but I

12  don't want to use it.

13  Q    And didn't you end with but -- let's just play the clip

14  from what you actually said before --

15          MR. STEWART:  Your Honor, objection.  The -- the

16  witness has stated his memory.  There's no reason to -- to

17  show a -- a clip.

18          THE COURT:  I'll permit it, go ahead.  Go ahead.

19          MS. GREEN:  The clip says something different.

20          THE COURT:  Go ahead.

21      (Video Being Played at 2:35 p.m.; Concluded at 2:35 p.m.)

22  Q    Do you also recall just prior to that June 10th meeting

23  the -- the email we looked at earlier from Chuck Moore stating

24  that Chapter 9 would be necessary to deal with the pension

25  obligations?

1  A    I recall receiving that email.

2  Q    When you were discussing to the public this issue with

3  respect to Chapter 9, were you aware of the fact that your

4  financial advisors had already set on a course for Chapter 9

5  proceedings?

6  A    I'm not sure we'd set on a course for Chapter 9

7  proceedings.  We were trying very hard to get some consensual

8  resolutions and had one in hand.

9  Q    Last question.  Do you remember being asked by a precinct

10 delegate for the Democratic party after you made that

11 statement about Chapter 9.  Do you remember a woman standing

12 up and asking you -- stating that she felt as though she was

13 threatened by your Chapter 9 comments?

14 A    No, I don't remember.  Somebody may have said that, I

15 don't remember.

16 Q    Do you believe that when you stated that you had a very

17 powerful Chapter 9, that you were trying to set the tone for

18 the negotiations that were to take place over the following

19 weeks?

20 A    No, not necessarily.  I was just speaking.

21         MS. GREEN:  I have nothing further, Your Honor.

22                   CROSS EXAMINATION

23 BY MR. WERTHEIMER:

24 Q    Good afternoon, Mr. Orr.  My name is Bill Wertheimer and

25 I represent the Flowers plaintiffs, the plaintiffs in that

1  lawsuit --

2  A    Good afternoon, Mr. Wertheimer.

3  Q    We have not met, have we?

4  A    No, we have not.

5  Q    I'd like to clear up, if I can, the timing related to

6  these hearings in the State Court.  You testified that the

7  suits were filed on July 3rd, correct?  The Flowers and the

8  Webster suits were filed on July 3rd, correct?

9  A    Yes, I believe so.

10        THE COURT:  Counsel, I have to caution you not to

11  ask any redundant questions.

12        MR. WERTHEIMER:  That was -- I will not further.

13  Q    Did you also learn at the same time you learned about the

14  lawsuits that along with the lawsuits the same day the

15  lawsuits were filed, the Judge in that case entered an order

16  to show cause scheduling a hearing for preliminary injunctions

17  on the Websters and Flowers case for July 22nd?

18  A    No.

19  Q    When in time did you learn that hearings were scheduled

20  for July 22nd in front of Judge Aquiline?

21  A    I'm not aware if I ever knew in front of which Judge.  I

22  think I learned that a few days or weeks later.

23  Q    Okay.  Have you ever in your meetings or communications

24  with the Governor, or any of his staff people in any way

25  communicated to him that it was your intention as the

1  representative of the people of the City of Detroit to make a

2  legal claim against the state, that the state would be

3  obligated to pay any pension monies that the city could not

4  pay because of Article 9, Section 24 of the Constitution?

5  A    No, I don't think so.

6  Q    In any of your conversations with the Governor, beginning

7  at the time you became emergency manager in March, did you

8  ever communicate to the Governor what you communicated to that

9  retiree at a public meeting, that is that because of the state

10  law in Michigan pensions are sacrosanct?

11  A    I don't recall.

12  Q    You don't recall?  Are you testifying under an oath you

13  -- oath you don't recall one way or another whether you used

14  the term sacrosanct in your discussions with the Governor

15  relative to this issue?

16        MR. STEWART:  Objection, asked and answered.

17        THE COURT:  The objection is sustained.

18  Q    In your -- these conversations with the Governor, any of

19  them from the time you became emergency manager, have you had

20  discussions with the Governor about your claim that federal

21  law trumps state law on this pension issue?

22        MR. STEWART:  Objection, Your Honor.  To the extent

23  that the question calls for the witness to reveal privileged

24  attorney/client communications.  If there were lawyers in the

25  room and it was in connection with the rendition of legal

1  advice, I would object.

2          MR. WERTHEIMER:  Can I follow up a question?

3          THE COURT:  Uh-huh, sure.

4  Q    First of all, have you had any discussions with the

5  Governor where the issue of the impact of the filing of a

6  federal bankruptcy would have on this state constitutional

7  right outside the presence of attorneys?

8  A    No.

9  Q    How many meetings have you had with the Governor either

10 personally or over the telephone since you became emergency

11 manager approximately?

12         MR. STEWART:  Objection, asked and answered.

13         THE COURT:  Sustained.

14 Q    It was two to four or five, right?

15 A    No, I have weekly meetings but two to four or five with

16 the Governor.

17 Q    Okay.  Thank you.

18 A    Uh-huh.

19 Q    And in your meetings were there ever occasions where

20 attorneys were present and in your view of things you were not

21 seeking legal advice, they just happened to be either on the

22 line or in the meeting?

23 A    With the Governor?

24 Q    Yes.

25 A    Yes.

1  Q    In those meetings, were there occasions where you and the

2  Governor discussed the issue of federal law trumping or in

3  some way allowing you to adversely impact pension benefits?

4            MR. STEWART:  Renew my earlier objection, Your

5  Honor.

6            THE COURT:  Which objection, sir?

7            MR. STEWART:  The -- the -- to the extent that the

8  -- the question asks for the witness to reveal attorney/client

9  communications, we'd object.

10           MR. WERTHEIMER:  I'm only now asking about meetings

11  where he's acknowledged the attorneys were not there giving

12  legal advice.  He says there were such meetings.

13           MR. STEWART:  The question of -- I'm sorry.  The

14  question of whether federal law trumps, or trumps the Michigan

15  Constitution is clearly a request for legal advice.

16           MR. WERTHEIMER:  He's now testifying.  That's not

17  what Mr. Orr said.  Mr. Orr said --

18           THE COURT:  The problem is your question was

19  misleading, sir.  Because you asked --

20           MR. WERTHEIMER:  With all due respect, Your Honor, I

21  don't believe it was.

22           THE COURT:  Excuse me, you -- you asked were there

23  such meetings and there may have been.  But that doesn't mean

24  that every subject that was covered in such meeting was --

25  were subjects that did not involve legal advice.

1       MR. WERTHEIMER:  Well, then may I ask the question?

2   Q    At these -- these one or more meetings where there were

3   attorneys present, either on the telephone or in person, but

4   where you're not talking about legal advice or seeking legal

5   advice from those attorneys, in any of those contexts, did you

6   and the Governor talk about what the impact of your filing a

7   Chapter 9 proceeding might be on the pension rights of

8   citizens of the State of Michigan?

9       MR. STEWART:  Same objection, Your Honor.  That

10  issue is by definition one of a legal character.

11      THE COURT:  It seems to me, but I'll permit the

12  witness to answer.

13  A    No.

14      MR. WERTHEIMER:  Thank you.

15      THE COURT:  Any other questions for the witness?

16  Any redirect?  Oh, this I assume had all been worked out.  I'm

17  sorry.

18      MS. BRIMER:  I'm standing, Your Honor.  I'll --

19      THE COURT:  How many more?

20      MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

21  Brimer appearing on behalf of the Retired Detroit Police

22  Officers Association.

23                    CROSS EXAMINATION

24  BY MS. BRIMER:

25  Q    Mr. Orr, my name is Lynn Brimer.

1    A    Good afternoon, Ms. Brimer.

2    Q    We have never met before?

3    A    No, we have not.

4    Q    Mr. Orr, I'd like to go back to some discussion prior to

5    your appointment as the -- as the emergency manager.  Do you

6    recall when you first learned that Jones, Day would be

7    involved in preparing or presenting a pitch to the City of

8    Detroit for engagement?

9    A    Yes.

10   Q    And when was that?

11   A    Two weeks or so prior to the pitch.

12   Q    So about --

13   A    Mid-January.

14   Q    About mid-January?

15   A    Yes.

16   Q    And at that point in time did the topic of a Chapter 9

17   filing come up in your discussions?

18   A    No, not initially, no.

19   Q    Could we have Exhibit 866, please?  Do you -- do you see

20   that Exhibit 866?

21   A    Yes.

22   Q    All right.  Now that's an email from Ms. Ball and you're

23   listed on there at the end of the carbon copies, is that

24   correct?

25   A    Yes.

1  Q    What is Ms. Ball's role in connection with the City of

2  Detroit project at Jones, Day?

3  A    Ms. Ball is one of the attorneys at Jones, Day in the

4  restructuring practice that was at the pitch -- pitch

5  presentation.

6  Q    Okay.  So if you'd go down midway through the page you'll

7  see there is a paragraph that says Kevyn.

8  A    Uh-huh.

9  Q    I assume that's you, Mr. Orr?

10  A    Uh-huh.

11  Q    There are diversity related issues.  You have to be the

12  star on this stuff and be able to discuss what we can provide.

13  (We do submit reports to the Bar Association).  Also, can you

14  check with Dan Moss where he is on updating our Chapter 9

15  paper with new decisions like the ones in California, PA, and

16  Alabama among others.

17  A    Yes.

18  Q    All right.  Who is Mr. Moss?

19  A    Mr. Dan Moss is an attorney at Jones, Day seated at

20  counsel's table.

21  Q    And he was involved in the project to pitch to the City

22  of Detroit, correct?

23  A    Yes.

24  Q    All right.  Now already at least as early as January 15,

25  2013, the issue of a Chapter 9 was being addressed by the

1 Jones, Day attorneys, is that correct?

2 A    Yes, it appears to be so.

3 Q    So now you spent the -- the pitch was actually made on

4 January 29th, is that correct?

5 A    Yes.

6 Q    And who attended that pitch?

7         MR. STEWART:  Objection, Your Honor, asked and

8 answered.

9         THE COURT:  Sustained.

10 Q    There were attorneys from various offices of Jones, Day

11 at that pitch, is that correct?

12 A    Yes.

13 Q    And in that two week period were there discussions among

14 the attorneys of the role each would play in the pitch with

15 the city?

16 A    Yes.

17 Q    And during any of those discussions, did Ms. Ball ever

18 discuss any prior involvement with the State of Michigan?

19 A    Not with me.

20 Q    Was Ms. Lennox also involved in the pitch?

21 A    Yes.

22 Q    And did Ms. Lennox ever discuss in any of the meetings or

23 conversations preparing for the pitch, her role or Jones,

24 Day's role in connection with prior advice rendered to the

25 State of Michigan?

1  A    Not that I recall.

2  Q    Now shortly after the pitch you were approached in

3  connection with becoming the emergency manager?

4  A    Yes.

5  Q    And there were discussions internally with respect to

6  what Jones, Day may be able to do to generate funding for the

7  project and to nationalize the project, is that correct?

8  A    I think there was an email, yes.

9          MS. BRIMER:  Could we have 605?  It's 805, I

10 apologize.  And, Your Honor, I'm using exhibits that have been

11 admitted.

12         THE COURT:  Thank you.

13 Q    This is an email chain between you and Mr. Moore -- Moss,

14 is that correct?

15 A    Yes.

16 Q    Do you see that?  Okay.  Now if you go down to the second

17 page, it begins with an email to you from Ms. Ball, the last

18 sentence -- well, actually we'll go all the way down to the

19 first food for thought.  For your conversation with Baird and

20 us, I understand Bloomberg Foundation has a keen interest in

21 this area.  Do you know what area she is referring to?

22 A    I do not.

23 Q    Well, and the subject is D.  Do you know what that D is

24 referring to?

25 A    I think it's referring to Detroit.

1  Q    Okay.  I was thinking about whether we should talk to

2  Baird about financial support for this project and in

3  particular the EM.  So the issue is discussions with respect

4  to whether or not you can generate additional funding for it,

5  is that correct?

6  A    I believe so.

7  Q    The last sentence is, I can ask Harry, I believe that's

8  Harry Wilson from the auto task force, for contact

9  information.  This kind of support and weighs -- nationalizes

10  the issue and the project.  What project is that she's

11  referring to, do you know?

12  A    I assume she's referring to something related to Detroit.

13  Q    So she related to the -- does the project relate to the

14  representation of the City of Detroit by the Jones, Day

15  attorneys?

16  A    I don't know.

17  Q    All right.  So then if you go up from that, there is an

18  email from Mr. Moss to you that begins, making this a national

19  issue is not a bad idea.  It provides political cover for the

20  state politicians.  Indeed this gives them an even greater

21  incentive to do this right because if it succeeds, there will

22  be more than enough patronage to allow either Bing or Snyder

23  to look for higher callings whether cabinet, Senate, or

24  corporate.  Further, this would give you, I assume you means

25  you, Mr. Orr.

1  A    Uh-huh.

2  Q    Would give you cover and options on the back end, I

3  assume that's when you're finished with your appointment as

4  the EM, to make up for lost time here.

5  A    Yeah.

6  Q    Is the perception at Jones, Day that your appointment as

7  the emergency manager for the City of Detroit is lost time?

8  A    No.

9  Q    Then why would Mr. Moss have included that sentence in an

10  email, if you know?

11  A    I don't know.

12  Q    Was it important to move forward with this project in a

13  fashion that provided political cover for those who are

14  involved?

15  A    No.  I think I say that in one of the following emails.

16  Q    Now when did you first learn that the Mayor -- I mean

17  that the Governor would be supporting your candidacy as the

18  emergency manager?

19  A    Sometime after we met in mid-February.

20  Q    Could we have 807?  So 807 is an email chain between

21  yourself and Mr. Baird, is that correct?

22  A    Yes.

23  Q    The Re line is tribute to my dad, Reverend Dr. Allen E.

24  Orr.

25  A    Senior.

1  Q    If we could go to the email midway down from Mr. Baird to

2  you dated February 12, 2013.  Do you recall receiving this

3  email?

4  A    Yes.

5  Q    And I think we've discussed part of this email with Ms.

6  Green.  But the paragraph that begins a little further down,

7  Kevyn, I know you have work -- you have to work logistics on

8  your end, but I do want you to know our folks are already

9  behaving if you have -- as if you accepted the job.  I guess

10 that's human nature since the chemistry envisioned was so

11 aligned with our own.

12     The last sentence in that paragraph reads, anyway, I need

13 to clue -- I need you to clue me in.  Are you feeling

14 differently because the boss and his team are already

15 arranging for the church and pastor and I need to talk them

16 off the ledge if you tell me we are misreading the

17 relationship.

18     So already by February 12th you understood that the

19 Governor was seriously supporting your candidacy, is that

20 correct?

21 A    Yes.

22 Q    Did you at that point in time do anything to advise the

23 Governor that you would not be taking the position?

24 A    No.  I think I still was taking it under consideration.

25 Q    Let's see here.  All right.  I'd like to -- I do have an

1  exhibit here --

2          THE COURT:  Actually, Ms. Brimer, I'm -- I'm going

3  to conclude Court now.  We do have some housekeeping matters

4  that I need to review with everyone.  How much longer will

5  your cross examination be?

6          MS. BRIMER:  Probably only about 15 minutes, Your

7  Honor.

8          THE COURT:  And the other cross examination, sir?

9          MR. WILKINS:  About 10 to 15 minutes.

10         THE COURT:  Ms. Patek?

11         MS. PATEK:  It will be less than that, Your Honor.

12         THE COURT:  All right.  So we'll reconvene next

13  Monday morning at 9:00 a.m.

14      Now I have been advised regarding exhibits and your other

15  property that your choices are a little more constrained at

16  this point.  You can either leave them in the jury room where

17  they will be locked, or you can take them with you.  But we

18  can't leave them in place between now and Monday.  I think

19  Judge Cook will be using this courtroom for other purposes.

20  Who else is the city intending to call, please?

21         MR. STEWART:  This is our last witness, Your Honor.

22         THE COURT:  All right.  Monday morning when we meet,

23  I would like some good faith estimate from the objecting

24  parties as to how long your case will take.  We need that

25  because if it's going to go beyond Thursday of that week, we

1  need to arrange for -- for courtrooms after that.

2      All right.  Any other further housekeeping matters?  Yes,

3  Ma'am.

4          MS. LEVINE:  Your Honor, just a question.  Assuming

5  the witnesses conclude maybe even Monday or Tuesday, can

6  closings be after we submit our briefs on 11-13 on Wednesday,

7  or are you going to want closings to be --

8          THE COURT:  No, I want closings immediately after

9  the conclusion of the proofs.

10         MS. LEVINE:  Thank you.

11         MR. DECHIARA:  One question in that regard, Your

12 Honor.  Is it your expectation that if we are not finished for

13 whatever reason Tuesday afternoon that we will go Wednesday

14 despite the current mediation order that's in place?

15         THE COURT:  I had not taken that into account.  Is

16 this something you need to know now, or can I get back to you

17 on Monday on that?

18         MR. DECHIARA:  No, you can get back to us on Monday,

19 Your Honor.

20         THE COURT:  All right.  If -- if -- if I don't,

21 please remind me of this question.  Anything further, anyone?

22 All right.  We'll stand in place while Mr. Orr takes his exit.

23 And my apologies to you for blasting out of here at lunch

24 without giving you that opportunity, sir.

25 A    Thank you.  Thank you.

1          THE COURT:  But go ahead and we'll just wait here.

2      (WITNESS KEVYN ORR WAS EXCUSED AT 2:59 P.M.)

3          THE COURT:  Jim, you'll let us know when we can go.

4  Ready?

5          THE CLERK:  All rise.

6          THE COURT:  All right.

7          THE CLERK:  Court is adjourned.

8      (Court Adjourned at 2:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-4-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**ITEM NO. 69**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
# TRANSCRIPT ORDER FORM

111 First Street          211 W. Fort Street          226 W. Second Street
Bay City, MI 48708        17th Floor                  Flint, MI 48502
                          Detroit, MI 48226

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ____ **Miller, Canfield, Paddock and Stone, P.L.C.** ____

Address ____ **150 West Jefferson Avenue, Suite 2500** ____

City, State, Zip ____ **Detroit, Michigan 48226** ____

Phone ____ **313-496-7631** ____

Email ____ **wysocki@millercanfield.com** ____

**Case/Debtor Name:**

**Case Number:**     **13-53846**

**Chapter:**     **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'⦿ **Bankruptcy**     ◯ **Adversary**

◯ **Appeal**     **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **11/4/2013**     **Time of Hearing:** **9 am**     **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested:  ⦿ **Original/Unredacted** ◯ **Redacted** ◯ **Copy** *2nd Party)

⦿ Entire Hearing     ◯ Ruling/Opinion of Judge     ◯ Testimony of Witness     ◯ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki          Date: **11/5/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
                          Date     By

Order Received:

Transcript Ordered

Transcript Received

# ITEM NO. 70

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ____ **Miller, Canfield, Paddock and Stone, P.L.C.** ____

Address ____ **150 West Jefferson Avenue, Suite 2500** ____

City, State, Zip ____ **Detroit, Michigan 48226** ____

Phone ____ **313-496-7631** ____

Email ____ **wysocki@millercanfield.com** ____

**Case/Debtor Name:**

**Case Number:**   **13-53846**

**Chapter:**   **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

' ◉ **Bankruptcy**   ○ **Adversary**

○ **Appeal**   **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _11/5/2013_   **Time of Hearing:** _9 am_   **Title of Hearing:** _Trial on Eligibility Objections_

Please specify portion of hearing requested: ◉ **Original/Unredacted** " ○ **Redacted** """ ○ **Copy** *2nd Party)

◉ Entire Hearing      ○ Ruling/Opinion of Judge      ○ Testimony of Witness      ○ Other

Special Instructions: _____

---

**Type of Request:**

[X] Expedited Transcript - $4.85 'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki            Date: **11/6/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____
                    Date        By

Order Received:

Transcript Ordered

Transcript Received

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm _____ **Miller, Canfield, Paddock and Stone, P.L.C.** _____

Address _____ **150 West Jefferson Avenue, Suite 2500** _____

City, State, Zip _____ **Detroit, Michigan 48226** _____

Phone _____ **313-496-7631** _____

Email _____ **wysocki@millercanfield.com** _____

**Case/Debtor Name:**

**Case Number:**      **13-53846**

**Chapter:**      **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'⦿**Bankruptcy**    ◯**Adversary**

◯ **Appeal**    **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** _11/7/2013_    **Time of Hearing:** _9 am_    **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested:  ⦿**Original/Unredacted** "◯ **Redacted** """◯**Copy** *2nd Party)

⦿ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: _____

---

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki    Date: **11/8/2013**

By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____ Date    By

Order Received:

Transcript Ordered

Transcript Received

**ITEM NO. 72**

```
IN RE:  CITY OF DETROIT,      .      Docket No. 13-53846
        MICHIGAN,             .
                              .      Detroit, Michigan
                              .      November 4, 2013
                   Debtor.    .      9:01 a.m.
. . . . . . . . . . . . . . . .
```

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          GREGORY SHUMAKER
                          THOMAS CULLEN, JR.
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

```
For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City          JOHN K. SHERWOOD
of Detroit           65 Livingston Avenue
Retirees:            Roseland, NJ  07068
                     (973) 597-2374


For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT D. GORDON
General Retirement        JENNIFER K. GREEN
System of Detroit,   151 South Old Woodward, Suite 200
Police and Fire      Birmingham, MI  48009
Retirement System    (248) 988-5882
of the City of
Detroit:             Clark Hill, PLC
                     By:  RONALD A. KING
                     212 East Grand River Avenue
                     Lansing, MI  48096
                     (517) 318-3015


For the Detroit      Erman, Teicher, Miller, Zucker &
Fire Fighters          Freedman, P.C.
Association, the     By:  BARBARA A. PATEK
Detroit Police            JULIE BETH TEICHER
Officers Associa-         DAVID EISENBERG
tion and the         400 Galleria Officentre, Suite 444
Detroit Police       Southfield, MI  48034
Lieutenants &        (248) 827-4100
Sergeants
Association:


For the Inter-       Cohen, Weiss & Simon, LLP
national Union,      By:  BABETTE A. CECCOTTI
UAW:                      PETER D. DECHIARA
                          THOMAS N. CIANTRA
                     330 West 42nd Street, 25th Floor
                     New York, NY  10036-6976
                     (212) 356-0227
```

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1     THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.

4          MR. MONTGOMERY:  Good morning.

5          THE COURT:  It appears that everyone is here.

6   Before we continue with the trial, Mr. Montgomery, may I have

7   your attention for a moment, please?

8          MR. MONTGOMERY:  Yes, sir.

9          THE COURT:  As you know, the city has filed a motion

10  to adjourn the preliminary injunction hearing that we had

11  tentatively set for Friday.  Is it okay with you if we have a

12  hearing on that motion to adjourn tomorrow morning before the

13  trial?

14         MR. MONTGOMERY:  I think that would be fine, your

15  Honor.  I think the debtor had proposed that we file

16  objection papers today, and so I believe that is our

17  intention to file --

18         THE COURT:  If you feel the need to do that, that's

19  fine.  Otherwise we can just have a conversation about it

20  tomorrow morning.

21         MR. MONTGOMERY:  In any case, we will be here

22  tomorrow morning, your Honor.

23         THE COURT:  All right.

24         MR. MONTGOMERY:  Thank you.

25         THE COURT:  We'll notice that for hearing then.  All

1  right.  We will continue with Mr. Orr's testimony.

2          MS. BRIMER:  Good morning, your Honor.  Lynn M.

3  Brimer appearing on behalf of the Retired Detroit Police

4  Members Association.

5          KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

6                     CROSS-EXAMINATION

7  BY MS. BRIMER:

8  Q    Good morning, Mr. Orr.

9  A    Good morning, Ms. Brimer.

10  Q    Mr. Orr, I'd like to just go back over without

11  duplicating any of the testimony a couple of items just to be

12  sure I have everything clear.  When you were present at the

13  January 29 presentation by the Jones Day attorneys, were

14  you -- did you leave the room at any time during the Jones

15  Day presentation?

16  A    No.

17  Q    During the presentation, did you hear any of the members

18  of the Jones Day team advise the city, the mayor, or the City

19  Council that they had been involved with Treasurer Dillon and

20  other members of the state in connection with the drafting of

21  the consent agreement?

22  A    The mayor and the City Council weren't there, no.

23  Q    Did they advise anyone on behalf of the city that they

24  had been involved in drafting the consent agreement?

25  A    Not that I recall.

1  Q   To your knowledge, did they advise anyone on behalf of

2  the city that they had been involved in the redrafting or the

3  drafting of Public Act 436?

4          MR. SHUMAKER:  Objection, your Honor.  It states --

5  misstates facts not in evidence.

6          THE COURT:  Overruled.  Please answer the question.

7          THE WITNESS:  Not that I recall.

8  BY MS. BRIMER:

9  Q   When did you first learn that members of Jones Day had,

10  in fact, been involved with the drafting of the consent

11  agreement, if at all?

12  A   I don't know that.

13  Q   Okay.  You are aware that members of the Jones Day team

14  gave advice to Treasurer Dillon in connection with drafting a

15  law to replace PA 4 in the event PA 4 was repealed; correct?

16  A   No.

17  Q   I'd like to direct your attention to Exhibit 866.  In

18  January of 2013, you were with the bankruptcy department at

19  Jones Day; correct?

20  A   Yes.

21  Q   And you were in the Washington office?

22  A   Yes.

23  Q   What office was Mr. Moss in in January of 2013?

24  A   Washington.

25  Q   We've already talked about this exhibit, and that is you,

1  Kevyn, that is referred to a few paragraphs into the e-mail;

2  correct?

3  A    Yes.

4  Q    And I believe this e-mail is in evidence.  I did not ask

5  you -- it refers to, "Check with Mr. Moss regarding updating

6  our Chapter 9 paper."  What Chapter 9 paper, if you know, is

7  Ms. Ball referring to in that paragraph?

8  A    I don't recall.

9  Q    Are you familiar with a paper that was drafted by members

10  of Jones Day in connection with Chapter 9 and the treatment

11  of pensions?

12  A    At this time?

13  Q    At any time.

14  A    Yes.

15  Q    Do you recall the name of that article?

16  A    No.

17         MS. BRIMER:  Your Honor, may I, just to refresh his

18  memory?

19         THE COURT:  Yes.  So the question is whether what

20  Ms. Brimer just handed you refreshes your recollection on the

21  name of that article.

22         THE WITNESS:  No.

23  BY MS. BRIMER:

24  Q    Have you ever seen the article before, Mr. Orr?

25  A    I don't think so.

1    Q    What office was Mr. Ellman in in January of 2013?

2    A    Atlanta.

3    Q    Was Mr. Ellman a member of the bankruptcy department at

4    Jones Day?

5    A    Business restructuring and reorganization group.

6    Q    Is that different than the bankruptcy department, or is

7    that the department you were in as well?

8    A    It's the same one I was in.  It just has a broader

9    connotation.

10   Q    All right.  Now, I'd like to refer your attention to

11   Exhibit 860.  This is an e-mail from Ms. Ball, and as you'll

12   see, you'll note that you're one of the -- you are a

13   recipient of this.  Do you see that?

14   A    Yes.

15   Q    It's dated 1-28.  That's the day before the presentation

16   by Jones Day; is that correct?

17   A    Yes, I believe so.

18   Q    And do you recall reviewing this e-mail?

19   A    I suspect I did.

20   Q    You have no reason to believe you didn't review it at the

21   time?

22   A    That's correct.

23   Q    You'll notice the first sentence, "Just heard from

24   Buckfire."  Do you believe that is Ken Buckfire from Miller

25   Buckfire?

1  A   Yes.  Well, strike that.  I'm not sure.

2  Q   But it would be a representative of Miller Buckfire?

3  A   It could be, yes.

4  Q   Could it be anyone else?

5  A   I think it would be somebody affiliated with Miller

6  Buckfire.

7  Q   And you'll see a little bit further down "questions that

8  Miller Buckfire has drafted for interview."  See that?

9  A   Yes.

10 Q   So the Jones Day team had the interview questions prior

11 to the interview.  Is that what we can interpret from this?

12 A   I don't know that.  You could interpret that.

13 Q   Okay.  And then you'll see much further down how can the

14 costs, especially legal costs, be controlled, strong advice,

15 not to mention a thousand hours except to say we don't have

16 major learning curve.  Do you know what that thousand hours

17 is referring to?

18 A   No.

19 Q   Is that thousand hours referring perhaps to the thousand

20 hours that members of the Jones Day team already has in this

21 project?

22 A   I don't know.

23 Q   Did you ever discuss with any of the members of Jones Day

24 what they had done in order to prepare for the presentation?

25 A   Yes.

1  Q    And what were you advised by the other members of the

2  presentation team regarding the Jones Day preparation for the

3  project?

4  A    I get the gist of your question.  Nothing regarding

5  anything related to prior orders -- hours.  Anything we

6  discussed concerned putting on the presentation.

7  Q    Were any other members of the team that made the

8  presentation also in the Washington, D.C., office of Jones

9  Day?

10  A    Yes.

11  Q    And who was that?

12  A    Steve Brogan.

13  Q    That's the managing partner?

14  A    Yes.

15  Q    So your managing partner never discussed with you any of

16  the prior involvement that Jones Day had with the State of

17  Michigan relative to the City of Detroit's finances?

18  A    No, not that I recall.

19  Q    You indicated you had recused yourself from the Jones Day

20  RFP.  Do you recall when you did that?

21  A    I believe it was sometime in February.

22  Q    Was it early February, late February?

23  A    I don't recall a specific date.

24  Q    Was it before you submitted your application -- at some

25  point you submitted an application on line for the EM

1    position; is that correct?

2    A    Oh, yes.  It was before that.

3    Q    So do you recall when you submitted that application?

4    A    That would have been late February or March.

5    Q    Could it have been as early as February 15th?

6    A    It might.

7         MS. BRIMER:  I'd like to show him something else,

8    your Honor, to refresh his recollection.  The date is

9    important to my cross-examination.

10        THE COURT:  Refresh his recollection regarding the

11   date?

12        MS. BRIMER:  Regarding the date.

13        THE COURT:  Yes, you may.

14   BY MS. BRIMER:

15   Q    I don't believe that this is in evidence.  I'd just like

16   you to take a look at the paragraph in the middle of that

17   first page.  Does that refresh your recollection with respect

18   to the date that you submitted your application?

19   A    Yes.

20   Q    And so what date was that?

21   A    That says February --

22        THE COURT:  Well, the question is not what the

23   document says.  The question is what do you remember after

24   having reviewed the document.

25        THE WITNESS:  I thought it was later than this.  The

1   document has a date up here, but I'm not sure it's affiliated

2   with this e-mail.  It might well be.

3   BY MS. BRIMER:

4   Q   So was it about mid-February that you submitted your

5   application on line?

6   A   This appears to say so.

7   Q   I'd like to direct your attention to Exhibit 865, and

8   this exhibit is in evidence as well.  This is an e-mail from

9   Ms. Ball directly to you.  Do you see that?

10  A   Yes.

11  Q   It's dated February 11th --

12  A   Yes.

13  Q   -- correct?

14  A   Yes.

15  Q   Do you recall reviewing this e-mail?

16  A   I have no independent recollection, but I have no reason

17  to believe that I did not review it.

18  Q   So if we could move down -- the third paragraph from the

19  bottom, do you see that paragraph?  "Given an alternative, I

20  am not sure that an immediate Chapter 9 is superior.  If we

21  can get time, it would be better.  The city is not ready for

22  a Chapter 9, hyphen, at least not the one we would like.  It

23  would be better to negotiate with creditors and assess city

24  management, et cetera."  Do you know who Ms. Ball is

25  referring to when she says "not the one we would like"?

1   A   No.

2   Q   If you look back up at the parties that this e-mail has

3   been addressed to, is there anyone other than Jones Day --

4   A   No.

5   Q   -- attorneys on that?

6   A   No.

7   Q   So other than Jones Day attorneys, you believe that the

8   "we" could have been referring to anyone other than the Jones

9   Day personnel?

10   A   It could have been; it could not have been.

11   Q   So at least as early as February 11th, the Jones Day

12   attorneys were contemplating and believed a Chapter 9 was

13   appropriate for the City of Detroit; is that correct?

14   A   No.

15   Q   What do you interpret from this paragraph that Ms. Ball

16   has sent out to the Jones Day attorneys?

17   A   It says it might be appropriate, it might be appropriate

18   to negotiate with creditors and assess city management.

19   Q   So other than the fact that an immediate -- "I'm not sure

20   an immediate Chapter 9 is superior, at a minimum, not the one

21   we would like," must be referring to Jones Day personnel, is

22   it -- does it not, because there's no one else on the e-mail?

23          MR. SHUMAKER:  Objection.  Asked and answered.

24          MS. BRIMER:  I'll withdraw it.

25          THE COURT:  All right.  The question is withdrawn.

1   BY MS. BRIMER:

2   Q   And we can also interpret this that at least in January

3   11th you're still involved with the Jones Day process;

4   correct?  I mean February 11th you're still involved with the

5   Jones Day application for appointment as counsel for the

6   city; correct?

7   A   I might have been.  I don't recall independently.

8   Q   Well, it is directed -- we'll go back up to who this is

9   directed to.  It's only directed to you, and the other

10  parties on it are carbon copies, not direct recipients;

11  correct?

12  A   Yes.

13  Q   So I'd like to direct your attention to Exhibit 8 -- 808.

14  This is a series of e-mails between yourself and the governor

15  and Mr. Baird; correct?

16  A   The one in the middle?

17  Q   Well, it starts -- if you go to page 2, it starts with an

18  e-mail from --

19          THE COURT:  Would you like the paper copy, sir?

20          THE WITNESS:  It would be helpful if counselor would

21  like me to read the whole e-mail.

22          MS. BRIMER:  I can hand him a paper copy, your

23  Honor.

24  BY MS. BRIMER:

25  Q   So it begins with an e-mail from Governor Snyder to you;

1  correct?

2  A    Yes.

3  Q    And then it continues with some other e-mails between

4  yourself and other representatives of the state, correct,

5  Richard Baird?

6  A    Yes.  There's e-mails copied to Mr. Baird.

7  Q    And the date of the -- then the final e-mail is dated

8  February 15.

9  A    Yes.

10  Q    It's an e-mail from you to Ms. Ball and other members of

11  the Jones Day team; correct?

12  A    Yes.

13  Q    So on February 15 at about the time you were applying --

14  submitting your application, you're still keeping the Jones

15  Day team -- in fact, it says, "They're pretty good at keeping

16  me in the loop," so you're still keeping your Jones Day team

17  in the loop on what's going on between yourself and the

18  representatives of the state; is that correct?

19  A    Yes.  That's what this e-mail says.

20  Q    This e-mail was three days after -- if you will recall,

21  three days after the governor had indicated that you were the

22  candidate he intended on supporting; is that correct?

23  A    I don't recall that.

24  Q    All right.  Well, then we can go back to an e-mail we

25  discussed, which is 807.  We discussed this e-mail, and I'm

 1  trying not to duplicate testimony we've already had, but at a

 2  minimum, on February 12th, if you'll scroll down, you'll see

 3  that Mr. Baird has indicated to you -- and we discussed this

 4  on Friday -- that you were the candidate that the governor

 5  intended on supporting.  In fact, they were arranging for the

 6  church and pastor is the language that Mr. Baird used,

 7  correct, on the -- if you --

 8            MS. BRIMER:  And I'll hand him a hard copy, your

 9  Honor.

10            THE COURT:  Okay.

11            THE WITNESS:  Okay.  Thank you.  Okay.

12  BY MS. BRIMER:

13  Q   So at what point would you have thought it appropriate to

14  withdraw yourself from the Jones Day team that was

15  negotiating and dealing with the city and the state for its

16  engagement after you were already aware that the governor was

17  supporting your application for the appointment as --

18  A   I recused --

19  Q   -- emergency manager?  Okay.  Go ahead.

20  A   I recused myself at some point during the process.  I

21  believe there are two e-mails speaking to that recusal.  If

22  you have them to refresh my recollection, that would be

23  helpful.  I don't recall the specific date.

24  Q   So at what point did you become aware that the Jones Day

25  personnel were interested in filing a Chapter 9 for the City

1  of Detroit?

2  A    The documents speak to it and the presentation, but the

3  implication is that they were interested in filing it, and I

4  don't know if that's true.  The document you showed me said

5  that we should first negotiate.

6  Q    How about if we take a look at Exhibit 853?  This is an

7  e-mail the day prior to the Jones Day presentation dated 1-

8  28, 2013.  Do you see that?

9  A    Yes.

10 Q    And it is from Mr. Ellman to various members of the Jones

11 Day team.  You're included in that.

12 A    Yes.

13 Q    You recall reviewing this e-mail, Mr. Orr?

14 A    I have no independent recollection, but there's no reason

15 for me to believe I would not have reviewed it.

16 Q    So the first paragraph from Mr. Ellman, "The RFP process

17 will inevitably lead to some internal issues about the

18 various certifications and commitments that the city may

19 require and that Jones Day may not want to give," do you know

20 what certifications and commitments Mr. Ellman is referring

21 to?

22 A    No.

23 Q    Did you ever inquire with Mr. Ellman of the

24 certifications and commitments that he was referring to?

25 A    Not that I recall.

1  Q    You didn't think it was important prior to giving a

2  presentation for this engagement to understand what

3  commitments and commitments -- what certifications and

4  commitments may cause a problem for Jones Day?

5  A    Not prior to the presentation, no.

6  Q    Then if you'll look a little further down, there's an e-

7  mail from an Amy Ferber also at Jones Day.  It's to various

8  members of Jones Day, including yourself.  Do you see that?

9  A    Yes.

10 Q    I believe Debtwa News we've established is the Detroit

11 bankruptcy -- the Detroit engagement; correct?

12 A    I believe so.

13 Q    So just in paragraph 1, the last sentence, this is

14 discussing the other -- some of the other firms that would be

15 interviewing, one of them being Foley & Lardner, and they

16 would be taking Ken Klee with them.  Mr. Klee this indicates

17 is involved in the Jefferson County bankruptcy, and you'll

18 see the last paragraph.  "It should also prove interesting

19 that MB" -- MB must be Miller Buckfire -- "has said that no

20 one wants this bankruptcy to go the way of Jeff County,"

21 Jefferson County, which, of course, Ken is running, so no one

22 wants this bankruptcy.  It's already predetermined from this

23 e-mail, isn't it, Mr. Orr, that there will be a bankruptcy

24 for the City of Detroit?

25 A    No.

1   Q   Then I'll direct your attention down to paragraph 4. "We

2   are to be as detailed as possible in our discussions of

3   specific issues facing the city, OPEB, but avoid pitfalls of

4   alienating the state. If something happens to the city's

5   pensions, state will probably step up to deal with this but

6   thus far has failed to concede this point," so at least as

7   early as January 28th, you were aware and the Jones Day team

8   was aware that covering the unpaid pensions was a possibility

9   from the state; correct?

10   A   Was a possibility?

11   Q   Yes.

12   A   Anything is possible, yes.

13   Q   Have you requested that the state cover any shortfall for

14   the pensions as of today?

15   A   Not directly, no.

16   Q   So based on this e-mail, it's a foregone conclusion as of

17   January 28th that Detroit will be filing a bankruptcy, isn't

18   it?

19   A   No.

20         MS. BRIMER: Your Honor, I'd like to move for the

21   admission of this exhibit. It was not one of the stipulated

22   exhibits.

23         THE COURT: What number is that?

24         MS. BRIMER: 853, your Honor.

25         THE COURT: Any objections to 853?

 1            MR. SHUMAKER:  I believe it's already in evidence,

 2   your Honor.

 3            THE COURT:  Ah, let's just check.  It wasn't on the

 4   original list.  Kelli, do we show it in the meantime?  All

 5   right.  Well, if it hasn't been admitted, we'll admit it now.

 6       (Exhibit 853 received at 9:29 a.m.)

 7            MS. BRIMER:  Thank you, your Honor.

 8   BY MS. BRIMER:

 9   Q   Were you at all involved in the preparation of the RFP by

10   Jones Day?

11   A   Yes.

12   Q   And what was your involvement?

13   A   Generally speaking, reviewing drafts, perhaps preparing

14   comments, things along those lines.

15   Q   Do you know when that process took place?

16   A   I believe it took place sometime in mid to late January.

17   That was my involvement.

18   Q   809.  Well, again, this isn't the e-mail that I had

19   marked as 809.

20            MS. BRIMER:  Your Honor, if I may approach the

21   witness.  I don't even need this in.  I was going to refresh

22   his memory.

23            THE COURT:  Okay.

24   BY MS. BRIMER:

25   Q   So from that e-mail it's clear that the RFP was not even

1    issued to the firms until February 27th; is that correct?

2    A    This e-mail?

3    Q    Well, see, that's an e-mail to you.

4    A    I think we are talking about different documents.

5    Q    A different RFP?

6              MR. SHUMAKER:  Objection, your Honor.  The issue is

7    whether it refreshed the witness' recollection, I believe.

8              THE WITNESS:  Yeah.  I have no knowledge of --

9              THE COURT:  Don't testify about the content of the

10   document.  The only issue is what you remember after having

11   read it.

12             THE WITNESS:  Nothing related to this document, your

13   Honor.

14   BY MS. BRIMER:

15   Q    Were you involved with the Jones Day RFP that was

16   submitted in early March?

17   A    No.

18   Q    So to this day you're still unaware that the members of

19   the Jones Day team have been involved with the City of

20   Detroit since March of -- at least March of 2012?

21   A    No.  I became aware of it as part of this process.

22   Q    And when was that?

23   A    At some point last week or week before.

24   Q    Do you know when Jones Day's engagement agreement with

25   the city was executed?

1   A    No.

2   Q    Do you know if it was after you were appointed as the

3   emergency manager?

4   A    It might have been.

5          MS. BRIMER:  I have nothing further, your Honor.

6          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

7   on behalf of the Retiree Association parties.

8                         CROSS-EXAMINATION

9   BY MR. PLECHA:

10  Q    Good morning, Mr. Orr.

11  A    Good morning, Mr. Plecha.

12  Q    I just have a couple of quick questions for you.  Prior

13  to the June 14th proposal for creditors, had you at that

14  point advised retirees that the city intended to cut accrued

15  vested pension rights?

16  A    I don't think so.

17          THE COURT:  Excuse me, sir.  Could you point that

18  microphone more at you?  Just turn it.  There you go.  Thank

19  you.

20          MR. PLECHA:  Thank you.

21  BY MR. PLECHA:

22  Q    Then isn't it also correct that the retirees would not

23  have had two years to prepare for those cuts?

24  A    No.

25  Q    It's not true?

1  A    No.

2  Q    How would the retirees have known that cuts were coming?

3  A    Issues regarding pensions and potential reductions were

4  discussed in this city for a number of years prior to my

5  appointment.

6  Q    Okay.  When do you know or when was the first time you

7  were aware of that?

8  A    When I was doing --

9        THE COURT:  Excuse me.  Is the question when did he

10  become aware of it, or when does he understand they were --

11  that these issues were first discussed?

12        MR. PLECHA:  When does he believe they were first

13  discussed?  Thank you, your Honor.

14        THE WITNESS:  I don't know a specific date, but I

15  know that in doing some research for the position, I recall

16  discussions in late 2011 and 2012 regarding OPEB and

17  pensions.

18  BY MR. PLECHA:

19  Q    And did that involve cutting vested pension rights?

20  A    I don't recall.

21  Q    Okay.  You or someone on your staff has requested answers

22  from the union on whether they would represent retirees;

23  correct?

24  A    Yes.

25  Q    Did anyone on your staff contact the Detroit Retired City

1    Employees Association to ask if they would represent

2    retirees?

3    A    I don't know.

4    Q    Did you ask anyone on the DRCEA?

5    A    Not personally, no.

6    Q    Okay.  Did you ask the Retired Detroit Police and Fire

7    Fighters Association if they would represent retirees?

8    A    Personally?

9    Q    Correct.

10   A    I don't think so.

11   Q    Did anyone on your staff?

12   A    I don't know.

13   Q    Upon taking office, did you have conversations with City

14   Council members?

15   A    Yes.

16   Q    Did you ask them if there were any retiree

17   representatives you should speak with?

18   A    I don't recall.

19   Q    Isn't it true that retiree representatives are entitled

20   under the city charter to attend budget hearings and

21   legislative proceedings of the city?

22   A    I believe citizens -- yeah.  I believe citizens are

23   entitled to attend those meetings, yes.

24   Q    Isn't it true that the DRCEA has been formally invited

25   and participated in budget hearings before City Council?

1  A    They may well have.

2  Q    Isn't it true that the RDPFFA has been formally invited

3  and participated in budget hearings before the council?

4  A    They, too, may well have.

5  Q    But you're not aware?

6  A    Not with specificity, counsel.

7  Q    To your knowledge, is the RDPFFA a plaintiff or co-

8  plaintiff in any of the July 2013 litigation?

9  A    I don't recall.

10  Q    Do you know if the DRCEA was a plaintiff or co-plaintiff

11  in any of the July 2013 litigation?

12  A    I don't recall.

13  Q    Did you ask either of those groups if they were going to

14  file a lawsuit?

15  A    Not that I recall.

16  Q    Then isn't it true that the RDPFFA and the DRCEA were not

17  being litigious?

18  A    If they weren't filing suits?

19  Q    "Yes" or "no" is okay.

20  A    I don't know.

21  Q    So how would they be litigious if they weren't filing

22  lawsuits?

23  A    They may have been.  Sitting here today, I don't know if

24  they joined suits or were involved or if they were working

25  together behind the scenes.  I don't know.

1  Q   Did you ever ask them?

2  A   No, I don't think I have.

3  Q   Did anyone on your staff ask them?

4  A   I don't know.

5  Q   Mr. Orr, you testified that you never turned down a

6  request for a meeting; is that correct?

7  A   Me or my staff, yes.

8  Q   Okay.  Do you recall receiving a letter from Ms. Shirley

9  Lightsey on May 4th requesting a meeting?

10 A   No.

11         MR. PLECHA:  If we could please show Exhibit 309,

12 which has been admitted into evidence.

13 BY MR. PLECHA:

14 Q   Do you recall receiving this letter?

15 A   No.

16 Q   Do you see that it clearly requests a meeting?

17 A   Yes.

18 Q   And that meeting never happened?

19 A   Not that I recall with me.

20 Q   Did you or anyone on your staff schedule a meeting

21 specifically with the DRCEA?

22 A   I don't recall.

23 Q   And do you see that it says that the DRCEA has been the

24 eyes and ears of the GRS system retirees, now nearly 12,000,

25 since 1960?

1   A   I see what it says on the document.

2   Q   At any of the meetings you attended relating to

3   restructuring, you testified that you answered all questions;

4   correct?

5   A   Yes.

6   Q   Did you ask the individuals asking those questions if

7   you, in fact, answered their questions?

8   A   I don't recall.

9   Q   So it's possible that you responded without actually

10  answering the heart of the question?

11  A   I don't know.

12  Q   Is it possible?

13  A   Anything is possible.

14  Q   But you didn't ask them if their answer -- if their

15  questions were answered; correct?

16  A   I just said I don't --

17  Q   Did you ask them --

18  A   I just said I don't recall.

19  Q   Okay.  Okay.  Do you have any agreement with Jones Day to

20  rejoin the firm after your EM term expires?

21  A   No.

22  Q   Did you have any discussions with Jones Day about

23  rejoining the firm?

24  A   No.

25          MR. PLECHA:  No further questions.

1    MS. PATEK:  Good morning, your Honor.  Barbara Patek

2  on behalf of the Detroit public safety unions.

3                    CROSS-EXAMINATION

4  BY MS. PATEK:

5  Q   Good morning, Mr. Orr.

6  A   Good morning, Ms. Patek.

7  Q   Mr. Orr, I want to start with the idea of metrics and

8  milestones, which you talked about in your testimony last

9  week.  When you became the emergency manager, did you seek

10  out or ask the state, the treasurer, the governor, any

11  representative of the state about establishing milestones or

12  metrics with regard to your going forward as the emergency

13  manager?

14  A   In what respect?

15  Q   In terms of -- well, you told us last week that, for

16  example, there were certain milestones or metrics that were

17  set forth in past consent agreements with the city that the

18  city did not meet.

19  A   Yes.

20  Q   Did you make any effort when you became the emergency

21  manager to attempt to negotiate with the state additional

22  milestones and metrics that might have facilitated your

23  performance?

24  A   Not that I recall.

25  Q   And you were asked by Ms. Brimer with regard to whether

1    you had sought any additional support from the state since

2    becoming appointed emergency manager, and you said not

3    directly.  Have you indirectly sought such support from the

4    state?  And I want to focus my question on from the time

5    period that you were appointed the emergency manager until

6    the date of the filing of the bankruptcy petition.

7    A    Yes.

8    Q    And can you tell us what support you've sought and how?

9    A    The Belle Isle lease relieves the city of tens if not

10   hundreds of millions of dollars in liability over 30 years.

11   MMSA assisting the city with rolling out the benefit plan

12   relieves the city of several million dollars of obligation.

13   For instance, also having the state assist us with tax

14   collection provides the city with enhanced revenue collection

15   and milestones, things of those nature -- things of that

16   nature, which are operational.

17   Q    Have you indirectly or otherwise asked the state for any

18   assistance with the anticipated unfunded pension liability?

19   A    You mean cash assistance?

20   Q    Yes.

21   A    Not directly.

22   Q    And what about indirectly?

23   A    Not that I recall.

24   Q    At the time you took the job as emergency manager for the

25   City of Detroit, you were a very experienced bankruptcy and

1  restructuring professional.  Is that fair?

2  A   I had practiced in the area of bankruptcy and

3  restructuring for a long period of time, yes.

4  Q   And you had extensive experience in Chapter 11 with

5  corporate or business reorganizations?

6  A   Yes.

7  Q   Did you also have experience with municipal

8  reorganizations either inside or outside of court?

9  A   Municipal reorganizations?

10  Q   Yes.  Municipal restructuring.

11  A   Not in the sense that you mean, no.

12  Q   You had not before participated as counsel in a Chapter

13  9?

14  A   That is correct.

15  Q   And you had not, I take it from your testimony,

16  participated in -- on behalf of a municipality in a

17  restructuring or reorganization in an effort to address

18  municipal debt?

19  A   I think in my days in Florida I did land use and other

20  types of practices, but I don't think it's the nature of what

21  you're inquiring about.

22  Q   And had you ever been involved in a restructuring or

23  insolvency proceeding where public safety was an issue in the

24  case?  And so I'm clear, I'm talking about municipal

25  provision of public safety.

1   A   Do you mean like police, fire, and EMS --

2   Q   Yes.

3   A   -- as opposed to public safety at large?

4   Q   Yes.

5   A   I get the gist of your question.  There are cases I'm

6   involved with that certainly had public safety implications,

7   but the nature of your question is of this character, and I

8   think it's fair to say not in the sense that you mean.

9   Q   And you have an impressive resume, but I take it you,

10  before your appointment as an emergency manager, never worked

11  as a police officer or a fire fighter?

12  A   I never worked as a police officer or fire fighter.

13  Q   And I take it upon undertaking your responsibilities as

14  emergency manager, you undertook to educate yourself about

15  the jobs that the police and fire do in the City of Detroit?

16  A   Yeah.  I'd like to think I had done some of that before

17  becoming emergency manager, but, yes, specifically with

18  regard to police and fire in the City of Detroit.

19  Q   And you would agree with me that the ability of the City

20  of Detroit to provide effective public safety services is at

21  the core of what's essential to Detroit's survival?

22  A   Yes.

23  Q   And would you agree with me that at the time you assumed

24  the role of emergency manager, that the working conditions

25  for fire and police in the City of Detroit were, in fact,

1    deplorable?

2    A    The working conditions were substandard.

3    Q    Would you agree that at the time you assumed the position

4    of emergency manager, that the police department was, in

5    terms of its ability to provide effective public safety,

6    undermanned?

7    A    The reason I'm hesitating, I've seen studies that address

8    deployment, so on and so forth, and whether it's a manpower

9    issue and the number of people that are doing clerical jobs

10   as opposed to the 30 percent that should be on the street, so

11   I don't know how to answer your question.  I don't know.

12   Q    You don't know the answer to that?

13   A    I don't know the answer, no.

14   Q    With respect to its ability to provide adequate fire

15   protection for the citizens, businesses, and visitors to the

16   City of Detroit, would you agree that the Detroit Fire

17   Department was, at the time you assumed the position of

18   emergency manager, undermanned?

19   A    I would agree that it was substandard, yes.

20   Q    And would you agree that one of your most important

21   obligations in the course of this city's restructuring is to

22   ensure that at the end of the day that the City of Detroit

23   has enough qualified, committed, well-trained, and well-

24   equipped police and fire fighters to provide effective public

25   safety for its residents, businesses, and visitors?

1   A    Yes.

2   Q    At the time you were involved in the Jones Day pitch

3   proposal to the City of Detroit in late January and perhaps

4   into early February of this year, did you have any

5   understanding with regard to whether or not, as a general

6   matter, public safety officers -- that is, police and fire --

7   were participants in the federal Social Security program?

8   A    As of the pitch?

9   Q    Yes.

10  A    I don't recall.

11  Q    At the time you assumed the position of emergency manager

12  in March of 2013, did you have an understanding as to whether

13  or not police and fire in the City of Detroit were

14  participants in the federal Social Security program?

15  A    I don't recall.

16  Q    Do you know whether or not by the time you issued your

17  financial operating plan for the City of Detroit in May of

18  2013 whether you were aware at that time that police and fire

19  fighters for the City of Detroit were not participants in

20  Social Security?

21  A    Yes.

22  Q    And I take it then certainly at the time of the June 14th

23  proposal you were also aware that they were not participants

24  in Social Security?

25  A    Yes.

1  Q   And did you also have an understanding that for police or

2  fire fighters hired before March 31st of 1986 those

3  individuals also were not participants or did not have

4  access, at least through their employment with the City of

5  Detroit, to the Medicare program?

6  A   No.

7  Q   Do you understand that sitting here today?

8  A   Yes.

9  Q   At the time you took the position of the emergency

10  manager, you indicated that you went back and you looked back

11  at the relationship between the various unions, including

12  public safety unions, and the City of Detroit.  Is that fair?

13  A   I think I did some of that prior to me becoming emergency

14  manager, but I think your statement is fair.

15  Q   So you had reviewed at least what would have been the

16  existing collective bargaining agreements at the time you

17  became the emergency manager?

18  A   I don't recall.

19  Q   Was it your impression that the city, as of the time that

20  you became the emergency manager, had made great strides

21  under the consent agreement in reducing costs imposed by the

22  active and expired collective bargaining agreements that

23  affected the city's relationship with the various unions?

24  A   No.

25  Q   Was it your impression that some of the cost savings that

1  the city had achieved prior to your assuming the role of

2  emergency manager had actually been achieved through interest

3  arbitration awards under Act 312?

4  A   I think it's fair to say there were cost savings achieved

5  associated with police and fire, but there were also

6  arbitration awards that restored some of those savings.

7  Q   You would agree that some of the cost savings, however,

8  that had been achieved had been achieved through the --

9  through Act 312 interest arbitration awards?

10  A   Yes, some.

11  Q   At the time -- well, strike that.  Did you ever review

12  any of the concessionary agreements that had been negotiated

13  between the city and some of the public safety unions prior

14  to your assuming the role of emergency manager?

15  A   I don't recall.

16  Q   Are you aware sitting here today that such agreements, in

17  fact, existed?

18  A   Yes.

19  Q   And is it your understanding that those agreements were

20  never, in fact, implemented by the City of Detroit?

21  A   To be fair, there are aspects that may have been

22  implemented through CET's and through give-backs of costs,

23  but the agreements in toto I'm unaware of.

24  Q   So stated another way, there were, in fact, negotiated

25  agreements that included cost savings that were not made

1   effective or were not implemented in toto; correct?

2   A   Yes.

3   Q   And instead what happened was the city implemented the

4   aspects of those agreement that the city liked and imposed

5   them on the various unions?

6   A   I don't know the city liked or not.  I know that the city

7   implemented certain aspects of those agreements.

8   Q   And would it be fair to say that those -- they would --

9   well, strike that.  You were appointed -- or you assumed the

10  role of emergency financial manager on March 25th, 2013;

11  correct?

12  A   Yes.

13  Q   And that was three days before Public Act 436 became

14  effective?

15  A   Yes.

16  Q   And is it true that by virtue of your appointment on

17  March 25th, the city -- well, strike that.  Let me withdraw

18  that.  Were you or did you become aware of an Act 312 award

19  issued on or about March 25th, 2013, that involved the city

20  and the Detroit Police Officers Association?

21  A   Talking about the arbitrator, Mr. Roumell, DPOA award?

22  Q   Yes, I am.

23  A   Yes.  I think I became aware of that on or about the

24  25th.

25  Q   And did you review that award?

1  A    I don't recall, but I think I did.

2  Q    And do you recall -- did you play any role as the

3  emergency manager in any decision to appeal any portion of

4  the -- I'm going to call it the Roumell arbitration award?

5  A    I believe I was consulted and advised as to the reasons

6  why, so to that extent, yes.

7  Q    Okay.  And was it your understanding that the only

8  portion of the Roumell award that was appealed by the City of

9  Detroit was the portion of the award that would have given

10  back to the DPOA's members part of the ten-percent pay cut

11  that had been imposed on them?

12  A    Yeah.  If you're talking about the five-percent give-

13  back, that's -- there may have been other provisions, but I

14  recall that.

15  Q    And is it your understanding that the terms of that Act

16  312 award form now the basis of the contractual relationship

17  between the city and the Detroit Police Officers Association?

18  A    Without straying into a legal conclusion, I'm aware that

19  there's an Act 312 award.  I'm aware that there's an appeal

20  of the award.  I'm aware that it gave back five percent.

21  Q    And are you -- do you have an understanding here today as

22  to whether or not that Act 312 award, leaving aside the

23  appeal of the five-percent give-back, governs the

24  relationship between the City of Detroit and the Detroit

25  Police Officers Association and its members as we sit here

1  today?

2         MR. SHUMAKER:  Objection, your Honor.  Relevance.

3         MS. PATEK:  Your Honor, I think it's absolutely

4  relevant.  I think the -- I think to date the city has not

5  directly acknowledged that there is a contract between the

6  Detroit Police Officers Association and the city, and it's

7  our position that there is.

8         THE COURT:  How is that relevant to eligibility?

9         MS. PATEK:  I think it's relevant to eligibility

10  from the standpoint of the city's obligations with respect to

11  negotiating.  It's a city's ability to impose terms in that

12  regard.

13         THE COURT:  All right.  It's arguable.  I'll permit

14  it.

15         THE WITNESS:  I don't know if it forms a contractual

16  relationship.

17         MS. PATEK:  Can I have City's Exhibit 75?  And I'm

18  looking at page 13.

19  BY MS. PATEK:

20  Q   Mr. Orr, I'm going to ask you to take a look at City

21  Exhibit 75 and look at the first few lines of -- under

22  "Bargaining Unit Overview."  And I'm going to ask you if

23  the -- reading that -- well, strike that.  This is a document

24  that you authored; correct?

25  A   Can we just verify which document you're talking about?

1  This is the report?

2  Q    Yes.  This is City Exhibit 75 --

3  A    The May 12th report.

4  Q    -- the financial May -- yes.

5  A    Okay.  That's the financial and operating plan.  Okay.

6  Q    And you authored this document?

7  A    I and my team authored this document.  I didn't write it

8  out longhand.

9  Q    And this is the document that you told us was not a

10 plebescite.  This is just the fact of the way it is for the

11 City of Detroit as of May 12th, 2013.

12 A    Yes.  This is the document caught up in that interview

13 and all that statement.

14 Q    And --

15 A    Can we go back?

16 Q    Looking at the first sentence under "Labor Initiatives,

17 Bargaining Unit Overview, and Collective Bargaining Agreement

18 Consolidation," does that refresh your recollection as to

19 whether, in fact, the city had made great strides under the

20 consent agreement in reducing costs imposed by its numerous

21 active and expired collective bargaining agreements?

22 A    Yes, for all 48 CBA's.

23 Q    And some of those cost savings, as we've already

24 established, included the cost savings received by -- through

25 interest arbitration awards?

1   A   Yes.  I think we just talked about that.

2           MS. PATEK:  Can I have 720?  And if we can go to the

3   second page --

4   BY MS. PATEK:

5   Q   One of the things that Public Act 436 did was to allow

6   you, at your option, to suspend collective bargaining with

7   the various unions who had collective bargaining

8   relationships with the city; is that right?

9   A   Well, here again, without straying into legal

10  conclusions, I think the act does that by itself, but, yes,

11  it suspends collective bargaining for five years.

12  Q   You were not -- you could have at your option chose to

13  bargain collectively with the various unions.  Is that fair?

14  A   I'm not sure.

15  Q   Well, and, in fact, you did choose to do so with respect

16  to some of the transportation unions; isn't that right?

17  A   No.

18  Q   You did not continue to bargain collectively with the --

19  any of the transportation unions?

20  A   No.  I think I've instructed my team to make it very

21  clear that any discussions or negotiations we are engaged in

22  are not collective bargaining or waiving that provision under

23  the statute.

24          MS. PATEK:  I'm going to ask you to flip back to 75

25  for a moment, and I'd like page 14.

1  BY MS. PATEK:

2  Q   And if you look at the first sentence, Mr. Orr, when you

3  issued your March 12, 2013, report, was it accurate that the

4  city was currently bargaining with transportation employees

5  covered under Section 13(c) of the Federal Mass Transit Act?

6  A   Yes, but they have an exemption from other provisions,

7  which I think we validated at some point prior to this.

8  Q   So, in fact, the city was bargaining with the

9  transportation employees?

10  A   Transportation is separate under 13(c) of the Federal

11  Transportation Act.  They have an exemption which supersedes

12  the state provision of 436.

13  Q   Was it your understanding that you could not, even if you

14  wanted or chose to do so, bargain collectively with any of

15  the public safety unions after March 28th, 2013?

16  A   I'm not sure.  That may draw for -- call for a legal

17  conclusion.

18  Q   You don't know one way or the other?

19  A   Yeah.  I think that's correct.  I'd consult counsel.

20        MS. PATEK:  We can go back to page 2 of the

21  timeline.

22  BY MS. PATEK:

23  Q   Did you at some point in time shortly after your

24  appointment as emergency manager authorize city

25  representatives to file a motion in an effort to block Act

1   312 proceedings that had been filed by, among others, the

2   Detroit Police Command Officers Association and Detroit

3   Police Lieutenants and Sergeants Association?

4           MR. SHUMAKER:  Objection, your Honor.  Relevance.

5           MS. PATEK:  Again, your Honor, this goes to

6   negotiating in good faith.  I mean if --

7           THE COURT:  I'll permit it.  Go ahead.

8           THE WITNESS:  Yes, I believe so.

9   BY MS. PATEK:

10  Q   And do you know if you were aware at the time you

11  authorized the filing of that motion that the Detroit Police

12  Command Officers Association did not have a collective

13  bargaining agreement with the city?

14  A   DPCOA?

15  Q   Yes.

16  A   I don't recall.

17  Q   Were you aware that there were a number of collective

18  bargaining agreements, including the Detroit Police

19  Lieutenants and Sergeants Association's, which was scheduled

20  to expire on June 30th of 2013 at the time you authorized

21  that motion?

22  A   I believe a number of CBA's were due to expire on the

23  30th.  I don't recall with specificity if DPLSA's was one of

24  them.  I have no reason to believe that it was not.

25  Q   And are you aware that ultimately there was an order that

1  came out of the Michigan Employee Relations Commission, in

2  fact, on June 14th which blocked those Act 312 proceedings

3  from going forward?

4  A    I don't recall the date, but I remember an order.

5  Q    You knew before you assumed the role of emergency manager

6  that one of the issues you would have to find a way to

7  address was -- were the pension issues and the legacy costs

8  that faced the City of Detroit?

9  A    Yes, I believe so.

10 Q    And you certainly knew that that might entail having to

11 address the accrued vested pension rights of Detroit public

12 safety employees?

13 A    Yes, I believe so.

14 Q    And in terms of your ability to address those issues, you

15 had the benefit of multiple advisors, including Ernst &

16 Young, Conway MacKenzie, Miller Buckfire, Jones Day, Miller

17 Canfield, and the city legal department to help you get your

18 arms around what needed to be done to address those issues?

19 A    Yes.

20 Q    And all of those various advisors, I take it, assisted

21 you in preparing the first financial operating report that

22 was issued on -- or operating plan that was issued on May 12,

23 2013?

24 A    Yes.

25 Q    And Public Act 436, in fact, I think you testified

1  earlier, gave you 45 days to put together that financial

2  operating plan; correct?

3  A   Yes.

4  Q   And with the assistance of those advisors, you needed

5  every bit of those 45 days to do so?

6  A   We used 45 days, but there are analyses that were already

7  in the works.

8  Q   And we can agree that the financial operating plan was

9  not rolled out early, but it was rolled out in a timely

10 fashion?

11 A   Yes.  It was rolled out on time.

12 Q   And then you had -- I think we've talked about earlier on

13 June 10th you had your first public meeting at Wayne State

14 University to discuss that financial and operating plan?

15 A   Yes.

16 Q   And your first proposal with respect to what would happen

17 with the accrued vested pension benefits was rolled out four

18 days later on June 14th of 2013, about 75 days or two and a

19 half months after you took office?

20        MR. SHUMAKER:  Objection, your Honor.  Asked and

21 answered.

22        THE COURT:  Sustained.

23 BY MS. PATEK:

24 Q   And I don't want to go back over the time line of the

25 various meetings.  I want to jump ahead.  You know, we've

1  talked about the June 14th meetings, and I believe you

2  testified to some meetings June 20th, July 10th and 11th held

3  with the various unions, including the public safety unions.

4          MS. PATEK:  I'd like to bring up -- I think it's

5  704, and this is in evidence.

6  BY MS. PATEK:

7  Q   Mr. Orr, have you seen this letter before?  It's a letter

8  on Detroit Fire Fighters Association letterhead dated July

9  12th, 2013.

10  A   I believe so.

11  Q   And wasn't one of your goals in terms of when you rolled

12  out the proposal on June 14th to -- in addition to addressing

13  the legacy costs, to establish some uniformity among the

14  contracts between the city and its various unions?

15  A   I think that's fair, yes.

16  Q   And this June 12th letter went to Mr. Miller and Mr.

17  Heiman, who were two of the contact people to whom people

18  were directed at the June 14th meeting and at the later

19  benefits meeting?

20  A   Yes.

21  Q   And if we scroll down to the bottom, this letter came

22  from the presidents of each of the four public safety unions;

23  that is, the fire fighters, the Detroit Police Command

24  Officers Association, the Detroit Police Lieutenants and

25  Sergeants Association, and the Detroit Police Officers

1 Association?

2 A   Yes.  I see their initials behind their signatures, but I

3 assume there was authority for them to sign it, so the answer

4 is yes.

5 Q   And would you agree with me that at this point in time

6 that it may have been beneficial for the city in terms of its

7 effort to get uniform contracts to be able to negotiate with

8 these four public safety unions as a coalition?

9 A   It may or may not have been either as a coalition or

10 either individually.

11 Q   You don't have an opinion one way or the other?

12 A   No.

13 Q   Do you know whether or not historically these unions had

14 negotiated individually as opposed to as a coalition with the

15 City of Detroit?

16 A   I don't recall.

17 Q   And during this letter, the individuals who sent the

18 letter were requesting specific restructuring proposals from

19 the city.  Do you see that in the third full paragraph?

20 A   Yes.  I see what it says.

21 Q   And we've covered this earlier.  You can agree that while

22 there was a statement that accrued vested pension benefits

23 would have to be significantly impaired, there was no

24 specific proposal as to by how much?

25 A   On June 14?

1    Q    Yes.

2    A    Yes.

3    Q    And I take it that would also have been true as of the

4    date of this letter as of July 12th?

5    A    I don't recall.

6    Q    Do you have any information sitting here today that there

7    was a more specific proposal provided to any of the Detroit

8    Fire Fighters Association, the Detroit Police Command

9    Officers Association, the Detroit Police Lieutenants and

10   Sergeants Association, or the Detroit Police Officers

11   Association as of July 12th, 2013?

12   A    Do I have any specific information that more detailed

13   information was provided?  Is that your question?

14   Q    That specific proposal --

15   A    Oh, okay.

16   Q    -- a more specific proposal was provided.

17   A    I don't recall.

18   Q    Do you know whether or not you received a copy of this

19   letter from anyone at or around July 12th, 2013?

20   A    I received it at some point.  I don't recall if it was at

21   or around the 13th, but somewhere in that time frame.

22   Q    Do you know whether or not you, as the emergency manager,

23   played any role in directing the city's response to this

24   communication from the four public safety unions?

25   A    There were a lot of discussions about reaching out to the

1  public safety unions, and that may have included this time or
2  later more information, so I don't recall with specificity if
3  it was at or around this time.
4  Q   And I want to skip down to the next paragraph in that
5  letter and actually the next two paragraphs.  The letter
6  states that the four public safety unions were reviewing and
7  will provide the city with specific proposals, but it would
8  be productive if the city could provide us with its specific
9  proposals on pension benefit restructuring as soon as
10 possible.  Do you see that?
11 A   Yes.
12 Q   This was six days before the city filed its bankruptcy
13 petition; correct?
14 A   I believe so.
15 Q   Do you know whether or not anybody either from Jones Day
16 or from your office made any effort to contact any of these
17 four individuals with regard to providing them with
18 counterproposals?
19 A   I know there were a lot of discussions with certain
20 groups here.  I don't know if they were provided with
21 specific proposals.
22 Q   I want to jump ahead to Exhibit 705.  And we know in
23 terms of our timeline that on July 16th you had already
24 written the governor to ask for authorization to file for
25 Chapter 9 protection; correct?

1  A    Yes.

2  Q    And have you seen this letter before, that being Exhibit

3  705, which is a July 17th, 2013, letter on Jones Day

4  stationery?

5  A    Yes.

6  Q    And the letter is addressed to the four presidents of the

7  four Detroit public safety unions, is it not?

8  A    Yes.

9  Q    And the letter itself does not indicate whether it was

10 transmitted by e-mail, regular mail, or some other means?

11 A    That's correct.  I don't see it.

12 Q    The letter starts out, "Thank you for your letter of July

13 12th, and thank you for further continuing to discuss in good

14 faith the difficult issue of pension restructuring.  The

15 office of the emergency manager appreciates your strong

16 cooperation."  Do you know if you directly authorized the

17 sending of this letter?

18 A    I instructed my team to continue cooperating and reaching

19 out to the various stakeholders.  I don't recall if I

20 directly authorized this particular letter.

21 Q    Was it your impression and understanding that as of July

22 17th, 2003 (sic), that the four public safety unions were

23 cooperating and, in fact, providing strong cooperation in

24 terms of being willing to discuss and negotiate and address

25 the difficult legacy cost issues that were facing the city?

1    A    It was my understanding that there were ongoing

2    discussions without characterizing the level of cooperation.

3    Q    You certainly would not have authorized the lawyers at

4    Jones Day to put something that was not true in a letter

5    going out to the public safety officers?

6    A    I certainly would hope not.

7    Q    Is it your position prior to the filing of the

8    bankruptcy -- well, strike that.  As a bankruptcy

9    practitioner, you've been involved in, I take it, many

10   difficult negotiations.

11   A    Yes.  I think that's fair.

12   Q    And we can all agree that -- even those of us who are

13   litigators, that a consensual solution is generally

14   preferable to a litigated solution?

15   A    Yes.  We can agree with that.

16   Q    Because it gives both parties input into and control --

17   at least some control over the outcome?

18   A    There are a number of reasons, but those are part of

19   them, yes.

20   Q    And it also gives the participating parties some

21   ownership of whatever that decision turns out to be?

22   A    There are a number of reasons.  Among them may be those

23   reasons as well.

24   Q    You are certainly aware of the give and take that's

25   necessary in such negotiations for them to be successful?

1    A    Yes.

2    Q    And you're also aware that sometimes, especially when the

3    issues are complicated and long-standing, that they can take

4    an extended period of time?

5    A    Sometimes they can; sometimes they can't.

6    Q    Did you ever consider upon assuming the role of emergency

7    manager at any time prior to the filing of the bankruptcy

8    petition using the opportunity to potentially extend the

9    contracts of the four Detroit public safety unions as a

10   bargaining tool to address the difficult legacy and pension

11   issues facing the city?  And that's a "yes" or --

12   A    I may have.  I don't recall with specificity.

13   Q    You elected not to do so, however?

14   A    We may have with regard to some of the bargaining units.

15   I just don't recall.

16   Q    Did you consider, based upon your prior experience as a

17   bankruptcy practitioner, whether it might chill your ability

18   to negotiate these difficult pension restructuring issues

19   with the public safety employees to tell the unions that you

20   were exercising your right not to bargain collectively with

21   them?

22   A    No.

23   Q    With respect to -- well, strike that.  The June 14th

24   proposal that was put out at the airport, did that proposal

25   contain terms that could be accepted or rejected within the

1   time frame between June 14th and July 18th?

2   A   It might have.

3   Q   You can't say one way or the other?

4   A   No.  I'm saying people may have been willing to accept

5   terms in the proposal.  It might have.

6   Q   Well, there was no -- I think we've already established

7   there was no specific proposal with respect to how the

8   accrued vested pension benefits were going to be impaired by

9   that proposal.

10  A   I think that's correct.

11  Q   And so even if the public safety unions or one of the

12  other unions had been willing to accept, there really was not

13  a proposal with enough -- let's call it meat on it for them

14  to accept at that time?

15  A   I don't know what they would have required to accept, so

16  there might have been.

17  Q   Was it your -- well, in terms of the active employees,

18  you certainly understood by the time of the June 14th

19  proposal that for the police and -- active police and fire

20  employees that if their pension benefits were significantly

21  impaired by the restructuring, that they would not have

22  through their employment at the City of Detroit the benefit

23  of falling back on Social Security?

24  A   I think that's fair.

25  Q   And you also understood -- strike that.  Did you have an

1  understanding in terms of the pension restructuring as to how

2  that restructuring would affect their ability to receive duty

3  disability; that is, for police and fire fighters who were

4  disabled as a result of on-the-job injuries, whether and how

5  they would be impacted by the restructuring proposal?

6  A    Did I have an understanding when?

7  Q    As of June 14th when you made -- when you put the

8  restructuring proposal out at the airport --

9  A    Right.

10  Q    -- did you have an understanding as to how significant

11  impairments of accrued vested pension benefits would affect

12  disabled police and fire fighters?

13  A    I think sometime around this time, I had a general

14  understanding, including disability and physical therapy.  I

15  don't recall if it was with the level of specificity you seem

16  to be implying.

17  Q    Can you tell me generally what your understanding was?

18  A    Well, my understanding was that there would have been

19  impacts to some of their coverage, and we were discussing

20  perhaps ways of addressing that.

21  Q    As rolled out, the June 14th proposal did not address

22  those issues, though; correct?

23  A    I don't think the proposal itself did.

24           MS. PATEK:  I think that's all I have, Mr. Orr.

25           THE WITNESS:  Thank you.

1          THE COURT:  Any other questions for the witness?

2     All right, sir.  You are excused.

3          MR. SHUMAKER:  Your Honor, I do have a few redirect

4     if I could.

5          THE COURT:  Oh, you do?

6          MR. SHUMAKER:  Yes, if I may.

7          THE COURT:  I didn't hear you reply.

8          MR. SHUMAKER:  I'm sorry.  I thought you were asking

9     the objectors.

10         THE COURT:  Go for it.

11         MR. SHUMAKER:  Sorry about that, your Honor.  For

12    the record, Gregory Shumaker of Jones Day for the city.

13                    REDIRECT EXAMINATION

14    BY MR. SHUMAKER:

15    Q   Good morning, Mr. Orr.

16    A   Good morning, Mr. Shumaker.

17    Q   I'm going to jump around here a little bit, but I'd like

18    to ask you a few questions about some of the questions you've

19    been asked over the last three days of cross-examination.

20    I'd like to show you Exhibit 418, and I believe Mr. Ullman,

21    if you can recall back that far, asked you a few questions

22    about this document, and this is the Jones Day pitch book;

23    correct?

24    A   Yes.

25    Q   Mr. Ullman showed you a page where Jones Day discussed

1  filing a Chapter 9 case if one was warranted.  Do you recall

2  that?

3  A   Yes.

4  Q   I want to show you a page that Mr. Ullman did not show

5  you.

6         MR. SHUMAKER:  Go to page 13.  Thank you.  And could

7  you blow up the top there, Laurie?

8  BY MR. SHUMAKER:

9  Q   Mr. Orr, you just testified in response to some of Ms.

10 Patek's questions that out-of-court solutions are preferred.

11 Was this -- first of all, was this slide shown to the

12 participants of the January 29th --

13 A   Yes.

14 Q   -- meeting?  And did you agree with this slide when it

15 was shown?

16 A   Yes.

17 Q   Why would out-of-court solutions be preferred?

18 A   For a number of reasons listed here but also because, as

19 I think I testified during my cross with Mr. Ullman, the

20 issues that are being discussed in this deck had been

21 examined by the city over a number of years.

22 Q   And the benefits listed are the ones that you're

23 referring to down below?

24 A   Yes.

25 Q   When you became emergency manager, did you agree that an

1   out-of-court solution was preferable?

2   A   Yes.

3   Q   Is that what you were aiming for in the months from March

4   25th through July 18th?

5   A   Yes.

6           MR. MONTGOMERY:  Objection.  Leading, your Honor.

7           THE COURT:  No.  That question is not leading.  I'll

8   permit it.  Go ahead.

9           THE WITNESS:  Yes, your Honor.

10  BY MR. SHUMAKER:

11  Q   Mr. Orr, at the bottom of that slide, there's a point

12  that says "extremely difficult to achieve in practice."  Do

13  you see that?

14  A   Yes.

15  Q   Do you have any understanding as to why Jones Day would

16  share that message with the city?

17  A   Yes.

18  Q   And why is that?

19  A   Typically out-of-court solutions require parties to agree

20  to significant concessions in some cases to deal with legacy

21  issues that have been under discussion and under review for a

22  long period of time.  Oftentime parties are unwilling for a

23  number of reasons to do that.

24  Q   Is there anything in your subsequent experience as

25  emergency manager that has made you believe in any way that

1   Jones Day was wrong in that assessment?

2   A   No.

3   Q   Mr. DeChiara showed you Exhibit 44.

4        MR. SHUMAKER:  If we could put that up, please.

5   BY MR. SHUMAKER:

6   Q   And he showed you page 61 of that document.

7        MR. SHUMAKER:  If you could blow that up, please.

8   BY MR. SHUMAKER:

9   Q   Mr. DeChiara asked you a number of questions and

10  suggested that you had not stuck to the schedule because you

11  had filed on July 18th instead of July 19th.  Do you recall

12  that?

13  A   Yes.

14  Q   He also indicated that someone had started drafting your

15  letter requesting authorization to file a Chapter 9 filing

16  earlier that week or later in the prior week.  Do you recall

17  that testimony?

18  A   Yes.

19  Q   Did you believe that having someone start drafting up

20  your request for authorization was inconsistent with what you

21  had told the June 14 meeting participants?

22  A   No, not at all.

23  Q   Why was that?

24  A   We had said at the meeting that we had to make some very

25  difficult decisions.  If we were getting proposals in in the

1   nature of term sheets or agreement in principles, we might

2   extend it for another 30 days, but if we were not within that

3   time frame, that we were going to have to make a hard call.

4   I think I said the same thing at the June 10th meeting for --

5   public meeting and that, in fact, we were not getting

6   progress along those lines within this time frame.

7   Q   So you mentioned the fact of possibly having to file a

8   Chapter 9 at both the June 10th and the June 14th meetings?

9   A   Yes.

10  Q   Were you keeping that fact, that there might have to be a

11  Chapter 9 filing, from those meeting attendees?

12  A   No.

13  Q   Mr. DeChiara also showed you another document.  It was

14  Exhibit 620.

15          MR. SHUMAKER:  If you could put that up, please.

16  BY MR. SHUMAKER:

17  Q   I'm looking -- he was asking you about the second e-mail

18  down.  It starts out "Kevyn."

19          MR. SHUMAKER:  Yes.  Thank you.

20  BY MR. SHUMAKER:

21  Q   And Mr. DeChiara focused your attention on, I believe,

22  the last sentence there.  Do you see that?  It starts with

23  "if you agree."

24  A   Yes.

25  Q   Okay.  My question is -- and he referred you, if you

1  recall, to the last clause of that sentence that talked

2  about, "Then I think that clearly establishes that you are

3  already behaving as an agent of the state committed to

4  getting Detroit back on track."  Do you recall that?

5  A   Yes.

6  Q   And this e-mail was dated February 22nd, 2013; correct?

7  A   Yes.  That's what it says.

8  Q   On that date, did you believe you were acting as an agent

9  of the state?

10 A   No.  I believe Mr. Baird was just salesmanship and

11 puffing, no legal conclusion.

12 Q   Had you been offered the job of emergency manager at that

13 time?

14 A   I don't think so.

15 Q   Had you accepted the job of emergency manager at that

16 time?

17 A   No.

18 Q   Ms. Levine asked you a number of questions.  If you

19 recall, she asked you about a note that Ed McNeil had taped

20 to your door.  Do you recall that?

21 A   Yes.

22 Q   And she asked you a series of questions about whether you

23 had any meetings or phone calls with anybody from AFSCME

24 between March 25th and June 13th.  Do you recall that?

25 A   Yes.

1   Q   She even asked you if you'd ever been in the same room

2   with AFSCME officials?

3   A   Yes.

4   Q   And you couldn't recall; correct?

5   A   What are the dates?

6   Q   March 25th through June 13th.

7   A   Yes.

8   Q   You couldn't recall?

9   A   I couldn't recall.

10  Q   And Ms. Patek just asked you some questions about --

11  related questions about this, but was there anyone on your

12  team responsible for contacting the unions?

13  A   Yes.

14  Q   Including AFSCME?

15  A   Yes.

16  Q   Who were those team members?

17  A   We had a number.  Brian Easley of Jones Day would be

18  involved with the unions as well as Evan Miller.  Lamont

19  Satchel had contacts with the unions.  In fact, in the second

20  day, I believe AFSCME submitted a new two-year CBA, I think,

21  on the 27th, on the eve of the 28th.  There would have been

22  other members of the legal team involved whose names escape

23  me right now.

24  Q   I'm sorry.  Did you say Mr. Miller?

25  A   Yeah, Evan Miller, Brian Easley.  Another is Lamont

1   Satchel, who is the city's labor negotiator, and others.

2   Q   Do you know whether they ever made any contact with the

3   unions --

4   A   I believe so.

5   Q   -- during this time frame from March 25th through June

6   13th?

7   A   Yes.

8   Q   How about with AFSCME?

9   A   I believe so.

10  Q   Do you know whether they ever met with those officials?

11  A   I believe they did, but I don't know with which

12  officials.

13  Q   Do you know whether they sent them letters?

14  A   Yes.

15  Q   Did you instruct the team to contact the unions?

16  A   Yes.

17  Q   Including AFSCME?

18  A   Yes.

19  Q   Are you aware of communications between this team that

20  you just described and the unions?

21  A   Yes.

22  Q   I'd like to refer you to a document that is not in

23  evidence.

24          MR. SHUMAKER:  I do not know -- this document is

25  Exhibit 32, your Honor.  It's a composite exhibit, and it's a

1  lengthy one.  It's about 148 pages.  It is the -- provides

2  the underpinnings of Exhibit 32, which has been admitted into

3  evidence.  32 is the big chart.

4          THE COURT:  You mentioned 32 twice now.

5          MR. SHUMAKER:  Oh, I'm sorry.  Did I?  36.  I think

6  it's 36.

7          THE COURT:  36 is the one you're talking about?

8          MR. SHUMAKER:  Yes, your Honor.  Can you put up 36

9  now, please?

10          THE COURT:  36 is admitted.

11          MR. SHUMAKER:  Yes, your Honor.  And the question --

12  this document is not in evidence now.  We'd like to move into

13  evidence.  This is not 36.  I'm referring to --

14          THE COURT:  Which is the one you're moving now?

15          MR. SHUMAKER:  Exhibit 32.

16          THE COURT:  All right.  So you're making that motion

17  now?

18          MR. SHUMAKER:  Yes, your Honor.

19          THE COURT:  Is there any objection to the admission

20  into evidence of Exhibit 32?  All right.  It is admitted.

21      (Debtor's Exhibit 32 received at 10:33 a.m.)

22          MR. SHUMAKER:  Okay.  If you could put up City

23  Exhibit 32.

24  BY MR. SHUMAKER:

25  Q   Mr. Orr, do you have the -- could I refer you to the

1   binder of the exhibits that should be right in front of you?

2   A   Yes.

3   Q   There's a number of pages there, I know.  I'd like to

4   direct your attention first, if you will, to the following

5   Bates number.  For the record, it's DTM100084885.  And for

6   convenience, Mr. Orr, if I could, I'll just refer to the last

7   three numbers of the Bates number from now on if that's okay

8   with you.

9   A   Yes.  That's fine.

10  Q   Mr. Orr, do you see on the next page that you're cc'd on

11  this letter?

12  A   Yes.

13  Q   Will you take a look at that letter?  Do you recognize

14  this letter?

15  A   Yes.

16  Q   And was it sent at your direction?

17  A   Yes.  I instructed my team generally to correspond and

18  reach out to all interested parties.

19  Q   And who was this letter sent to?

20  A   Mr. Garrett, who's president of AFSCME Council 25.

21  Q   Now, I'd like you to take a look --

22          MR. SHUMAKER:  If you could blow that up, Laurie,

23  just the -- no, just the address.

24  BY MR. SHUMAKER:

25  Q   I'm sorry.  When you say president of a local, what do

1  you mean by that?

2  A    I think he's president of the council for the state,

3  AFSCME's Council 25, which includes the local here in

4  Detroit.

5  Q    So this letter was sent to AFSCME on May 20th, 2013?

6  A    Yes.  That's what it says.

7  Q    I ask you to take a look at the next several pages behind

8  this one, specifically to pages 889 through 924.  And I know

9  that's a number of pages, but if you could take a look at

10 that, and if you will, I'd like to direct your particular

11 attention to the addressees of those letters.

12 A    Yes.

13 Q    First of all, could you count the number of letters that

14 I've referred you to, including the one to Mr. Garrett?

15 A    One, two, three, four, five, six, seven, eight, nine,

16 ten, eleven, twelve, thirteen, fourteen, fifteen, sixteen,

17 seventeen, eighteen, twenty -- I believe it comes in at

18 twenty.

19 Q    And the addressees of those letters, who are they to?

20 A    I believe the one to Mr. Garrett, as I said, is the

21 president of the council, and I believe the others are to the

22 presidents of the locals in various units.

23 Q    So is it fair to say that your team that was dealing with

24 the unions sent out 20 letters to the presidents of AFSCME

25 locals?

1   A   Yes.  Well, 19 to the locals and 1 to the council

2   president.

3   Q   Now, I'd like to -- do you know whether the unions ever

4   responded to these letters?

5   A   I never received a response.  I don't know if they

6   responded to someone else.

7   Q   Did any of your team members ever share with you that

8   some of those letters had been responded to?

9   A   No.

10  Q   I'm going to refer you to page 811 through 812.

11  A   Yes.

12  Q   Are you there, Mr. Orr?  Okay.  And what's the date of

13  this letter?

14  A   May 24th.

15  Q   I'd ask you who signed this letter.

16  A   Mr. Edward McNeil.

17  Q   Is Mr. McNeil the person who taped the message on your

18  door?

19  A   Yes, at least to the best of my knowledge.  I didn't see

20  him do it.

21  Q   I'd like to direct your attention to the first paragraph,

22  if you will.  Would you take a look at the second sentence of

23  that paragraph, please, sir?

24  A   Yes.

25  Q   It says, "Please be advised that in accordance with

1    Michigan law we have no authority in which to renegotiate the

2    pension or medical benefits that members of our union

3    currently receive."  Do you see that?

4    A    Yes.

5    Q    Is this -- was this sentiment shared by Mr. Easley and

6    others on your team that was dealing with the unions to you

7    during this time frame?

8    A    Yes.  I'd asked them to reach out and see if they would

9    represent retirees as well, and it came back to me that they

10   declined to do so.

11   Q    Do you know whether other unions responded in this

12   fashion?

13   A    As far as I knew, that was the general response, that no

14   one wanted to represent the retirees at this time.

15   Q    Let me direct you to page 790, if you would.

16   A    Yes.

17   Q    And what is that, Mr. Orr?

18   A    This appears to be a May 22nd, 2013, letter to Mr. Brian

19   Easley from John Cunningham, the international representative

20   of UAW Region Number 1.

21         MR. SHUMAKER:  I'd ask if you could blow up the

22   first paragraph, please, Laurie.

23   BY MR. SHUMAKER:

24   Q    Mr. Orr, could you read the third sentence there?

25   A    "These locals do not, however, represent current retirees

1   and have no authority to negotiate on their behalf."

2   Q    Is this consistent with the feedback you were receiving

3   from your team dealing with the unions regarding other unions

4   as well?

5   A    Yes.

6   Q    Your team kept you apprised of its dealings with the

7   unions during this time; is that correct?

8   A    Yes, they did.

9   Q    Did that include between June 14th and July 18th?

10  A    Yes.

11  Q    Was the position that's set forth in the UAW letter

12  consistent with what you were hearing from that team during

13  that time?

14  A    Yes.  I was informed that no one wanted to represent the

15  retirees.

16  Q    Did the positions of the unions ever change during that

17  time?

18  A    Not that I'm aware of.

19  Q    Mr. Orr, Ms. Green asked you a few questions, and she

20  asked you a number of questions regarding your efforts to

21  negotiate with the swap counterparties.  Do you recall that?

22  A    Yes.

23  Q    She referred to the swap transactions as extraordinarily

24  complex.  Do you recall that testimony?

25  A    Yes, I believe so.

1    Q    That was Ms. Green's words.

2    A    Yes, I remember.

3    Q    My question is why during this time frame -- and I'm

4    focusing now on the June, July time frame -- why were you

5    able to negotiate with the swap counterparties?

6    A    Well, I think we were able to negotiate with the swap

7    counterparties because we had laid out sort of the broad

8    sketch of what we needed and the urgency with which we needed

9    it and that the concessions were essential for the city to

10   receive the cash flow that it needed to operate, and also the

11   city was in somewhat of a crisis because starting in mid-June

12   the city would have, at best, on a billion dollar budget

13   about four to $7 million of free cash and was at some risk of

14   going below the line.

15   Q    You were able to reach an agreement with the swap

16   counterparties; correct?

17   A    Yes.

18   Q    How long did it take you to reach an agreement regarding

19   this extraordinarily complex transaction?

20   A    I think it took from the end of May until it was

21   announced on June 14th.  I believe we actually reached an

22   agreement in principle on June 12th or 13th.

23   Q    Based upon what you were hearing from the team dealing

24   with the unions, did you think you were able to achieve

25   similar results in negotiations with them?

1   A    Yes.  I thought their issues had been talked about both

2   in the 2012 MOU and the 2012 consent agreement.

3   Q    And you negotiated with those unions in the same way that

4   you negotiated with the swap counterparties?

5   A    Yes.  I thought the issues that we were going to be

6   discussing had been discussed for many years.

7   Q    I just have a couple more questions, Mr. Orr.

8   A    Um-hmm.

9   Q    One is Ms. Green showed you a couple of video clips from

10  the June 10th, 2013, meeting.  Do you recall those?

11  A    Yes.

12  Q    And one of those clips you were quoted as saying

13  something about vested pension rights being sacrosanct, that

14  they couldn't be touched.

15  A    Yes.

16  Q    Do you recall that?

17  A    Yes, I do.

18  Q    When you made that statement to the June 10th meeting,

19  what were you attempting to convey with your words?

20  A    Despite the implication, I wasn't attempting to mislead

21  anyone.  I was simply trying to say we understood that there

22  were these issues regarding pensions.  I believe at that time

23  they had been discussed before, but they were going to have

24  to be addressed, and we were going to address them coming on

25  in the following part of the week.

1  Q   Were you attempting to mislead that gentleman who asked

2  the question?

3  A   No, not at all.

4  Q   Were you trying to give him misinformation?

5  A   No.

6  Q   Ms. Green showed you another video snippet.

7          THE COURT:  Excuse me one second.  What would you

8  say to that retiree now?

9          THE WITNESS:  About what, your Honor?

10         THE COURT:  Okay.  What would you say to him --

11         THE WITNESS:  You know, I mean what I said then

12  or --

13         THE COURT:  What would you say to that retiree now

14  about his rights?

15         THE WITNESS:  I would say that his rights are in

16  bankruptcy now.  I would say that his rights are subject to

17  the supremacy clause of the U.S. Constitution.

18         THE COURT:  That's a bit different than sacrosanct,

19  isn't it?

20         THE WITNESS:  No.  What I was trying to convey, your

21  Honor, without being misleading, is to say that I understood

22  there were these issues, but I also think I said during that

23  meeting that they would have to be resolved by a federal

24  court.  I believe I also said at June 14th -- June 14th and

25  June 10th that I had been involved in other cases.  I think I

1   said it June 14th, as a matter of fact, and June 10th that I

2   had been involved in other cases where the supremacy clause

3   had been employed in other contexts.

4   BY MR. SHUMAKER:

5   Q   Ms. Green showed you another snippet from the June 10th

6   meeting.  Do you recall that?

7   A   Yes.

8   Q   And the one that I'd like to refer you to is that you --

9   she showed the part where you were talking about there being

10  a caveat regarding PA 436 and Chapter 9 being powerful

11  statutes.  Do you recall?  You said that there was a caveat,

12  and 436 and Chapter 9 were powerful statutes?  Do you recall

13  that?

14  A   Yeah.  I think I said we have a powerful tool in 436,

15  even more powerful one in Chapter 9.

16  Q   What I want to show you is what she didn't show you was

17  the lead-up to that statement, if I could --

18  A   Um-hmm.

19  Q   -- show you that quickly.

20      (Videotape played at 10:46 a.m. as follows:)

21          "MR. ORR:  But I need your help because the way I'm

22  trying to do this collaboratively, cooperatively is the way I

23  think is appropriate because, quite frankly, I think the city

24  has suffered through enough errors of strife and pain and

25  anguish and finger pointing and vitriol and bile.  To what

1  end?  Where's it got us?  What have we achieved?  What's the

2  end result?  More of the same.  Now, I'll say that with this

3  caveat."

4      (Videotape concluded at 10:47 a.m.)

5  BY MR. SHUMAKER:

6  Q   Was that an important part of the message you were giving

7  to the meeting on June 10th, Mr. Orr?

8  A   Yes.  I was trying to say it's time for us to put beyond

9  conflict and continued strife and let's try to reach a

10  consensual resolution.

11      MR. SHUMAKER:  That's all I have, your Honor.  Thank

12  you, Mr. Orr.

13      THE COURT:  Any other questions for the witness?

14      MS. LEVINE:  Short redirect, your Honor.

15                      RECROSS-EXAMINATION

16  BY MS. LEVINE:

17  Q   Good morning, Mr. Orr.  Sharon Levine, Lowenstein

18  Sandler, for AFSCME.

19  A   Good morning, Ms. Levine.

20  Q   Very briefly, so Ed McNeil on behalf of the coalition of

21  unions requests a meeting of you on the day you're appointed,

22  which is March 25; correct?

23  A   As far as I know, yes.

24  Q   And you wait until May 20 to send a response basically

25  asking for meetings which were the exact meetings that Mr.

1    McNeil asked you for on March 25; is that correct?

2    A    I don't know if that's correct, Ms. Levine.

3    Q    And then on March 24, your counsel just pointed out to

4    you a letter that said that the unions were taking the

5    position that they couldn't negotiate retiree benefits; is

6    that correct?

7    A    Yes.

8    Q    And you're saying that based upon that letter, you

9    assumed that there was no ability to negotiate with the

10   unions over retiree benefits; is that correct?

11   A    No.  I don't think it was just on the basis of that

12   letter.

13   Q    Well, after that letter, you invited AFSCME along with

14   the other unions to the June 14, June 20, July 10, and July

15   11 meetings; correct?

16   A    Yes.  I think there were representatives at the June 10th

17   meeting, yes.

18   Q    I'm asking if you invited them.

19   A    I know we did at the 14th, and I know we did at the other

20   ones.  I'm not as sure about the June 10th meeting, but I

21   believe we did.

22   Q    Well, you invited them -- would it refresh your

23   recollection as to whether or not you invited them to know

24   that they actually came to those meetings?

25   A    Yeah.  The only reason -- Ms. Levine, I get your measure,

 1   but the only reason I say the June 10th, because it was a

 2   public meeting, and we -- it may not have been as formal as

 3   the 14th and the other --

 4   Q    Did you invite them to the June 11 meeting?

 5   A    Well, I'm finishing.  It was a public meeting, and it may

 6   not have been as formal as the other ones, but they were

 7   generally invited.

 8   Q    Did you invite them to the June 11 meeting -- sorry --

 9   the July 11 meeting?

10   A    Okay.  I believe so.  I don't recall with --

11   Q    And that meeting was specifically to discuss pension

12   issues; correct?

13   A    I believe so.

14   Q    And they attended all four of those meetings; correct?

15   A    To the best of my knowledge.

16   Q    And they made information requests with regard to the

17   cost savings you were requesting, the benefit changes you

18   were requesting, and the pension changes you were requesting;

19   correct?

20   A    I think the information requests were going both ways,

21   but I think information requests were made.

22   Q    I'm just asking what AFSCME requested of you, and they

23   requested information of you either through Jones Day or

24   through Miller Buckfire or to you directly with regard to

25   cost savings, benefits, and pensions; correct?

1   A   I don't recall if they made any to me directly.  I do

2   think they made them to my representatives.

3   Q   And they also signed the confidentiality agreement you

4   requested; correct?

5   A   The nondisclosure agreement, yes.

6   Q   And they were in the data room; correct?

7   A   I believe they were in the data room.

8   Q   And you provided some information in response to those

9   information requests that were populated into the data room;

10  correct?

11  A   Yes, I believe we did.

12  Q   But not all of the information that was requested was

13  provided prior to July 18, 2013; correct?

14  A   I don't know that.

15  Q   I believe you testified that the team to talk to AFSCME

16  were two lawyers from Jones Day and Lamont Satchel; correct?

17  A   No.  I believe that I recall with specificity Brian

18  Easley, Evan Miller, and Lamont Satchel, and there might have

19  been others.

20  Q   Did any of those three or others at any time meet with

21  anybody from AFSCME --

22  A   I don't recall.

23  Q   -- between March 25 and June 13?

24  A   I don't recall.

25  Q   Do you recall running into -- do you recall you

1  personally running into Ed McNeil at events in the city at

2  any time between March 25 and July 18?

3  A    You asked me about a meeting.  Now you're just asking

4  about run-ins?

5  Q    You can -- we can do it both ways.  First I'm asking if

6  you ran into him at other events, and, second of all, I'll

7  ask you if you ran into him -- if you actually had a meeting

8  with him.

9  A    I believe I've run into him in other events from time to

10  time.

11  Q    And isn't it true that every time he's seen you during

12  that period of time he asked you to schedule a meeting with

13  AFSCME to discuss these issues?

14  A    No.  I don't think that's true.

15  Q    Did you -- you were starting to talk about the fact that

16  you had a meeting with Ed McNeil.  Did you meet one on one

17  with Ed McNeil at any point in time between March 25 and July

18  18?

19  A    I don't think so.

20  Q    Did you have a meeting with him with others between March

21  25 and July 18th?

22  A    I may have, but I don't recall.

23  Q    Do you recall whether or not you discussed with him

24  specifically the proposal other than just the presentations

25  made at the four meetings that were public presentation

1  meetings?

2  A   I don't think I personally discussed it with him, no.

3        MS. LEVINE:  No further questions, your Honor.

4        MR. MONTGOMERY:  Your Honor -- excuse me.

5                    RECROSS-EXAMINATION

6  BY MR. MONTGOMERY:

7  Q   Mr. Orr, Mr. Ullman is not here today, so I have the

8  honor of talking to you.  One quick clarification.  I believe

9  you just testified in response to a question by Mr. Shumaker

10 that your negotiations with the swap counterparties started

11 in May of 2013; is that correct?

12 A   They may have started towards the end of May 2013 or

13 June.  I believe I said it could have been May through June,

14 but it was in that time frame.

15 Q   Now, isn't it true, sir, that those negotiations began in

16 2012?

17 A   Not to my knowledge.

18 Q   Isn't that what you told the governor in your letter of

19 recommendation, sir?

20 A   Those specific negotiations regarding the swap deal, to

21 my knowledge, the specific ones we're talking about, began in

22 May and June.

23        MR. MONTGOMERY:  Could I have Exhibit 409 shown on

24 the screen, specifically page 8?  Could you go to the fourth

25 bullet and amplify that for the witness, please?

1  BY MR. MONTGOMERY:

2  Q   Now, sir, isn't it true that you told the governor that

3  negotiation with the pension-related swap contracts had been

4  going on since 2012?

5  A   Yes, Mr. Montgomery.  This document speaks for itself,

6  but the question I was asked was the specific ones regarding

7  the counterparty agreement that's since been reached.

8  Q   Now, your Honor -- sir, negotiations had been going on

9  since 2012, not May of 2013; is that not correct?

10  A   As I said, the specific ones regarding the deal we

11  eventually reached began sometime in late May and went on

12  until June 12th or 13th.  This letter speaks about ongoing

13  negotiations which may have occurred.  I was speaking about

14  the specific ones that yielded the agreement we now have.

15  Q   And the negotiations which yielded the agreement which

16  you now have, your words, actually commenced in 2012; is that

17  not correct?

18          MR. SHUMAKER:  Objection, your Honor.  Asked and

19  answered.

20          MR. MONTGOMERY:  He did not, in fact, answer the

21  question.

22          THE COURT:  No.  Overruled.  Please answer the

23  question.

24          THE WITNESS:  To the best of my knowledge, the

25  negotiations regarding the swap, as this statement has said,

1   have been ongoing since 2012, but --

2           MR. MONTGOMERY:  Thank you.

3           THE WITNESS:  -- the specific ones related to the

4   agreement were in May to June just like labor negotiations.

5           MR. MONTGOMERY:  No further questions, your Honor.

6           MR. PLECHA:  Ryan Plecha for the Retiree Association

7   parties.

8                       RECROSS-EXAMINATION

9   BY MR. PLECHA:

10  Q   Mr. Orr, did Mr. Easley or Mr. Miller send letters to the

11  DRCEA or the RDPFFA to request whether they would represent

12  retirees?

13  A   I don't recall with specificity.  If you have a document

14  to refresh my recollection, I'm happy to look at it.

15  Q   All right.  The answer is fine.  Did you instruct Mr.

16  Miller or Mr. Easley to contact anyone that was not a union

17  to see if they would represent retirees?

18  A   Generally we instructed them to reach out to anyone who

19  was willing to represent unions who appeared to have the

20  authority to do so.

21  Q   And in your answer I believe I heard you use the word

22  "union."  Anyone besides unions?

23  A   You got to reach out to all parties, interested parties,

24  is what I said --

25  Q   Okay.

1  A   -- not just in my testimony, but that's what I said then.

2  Q   Okay.  Is it not true that the DRCEA informed the city

3  that it was willing to represent general retirees?

4  A   I don't recall.

5       MR. PLECHA:  Could I have Exhibit 309, please?  Just

6  blow up the middle paragraph, please.

7  BY MR. PLECHA:

8  Q   Did you receive this letter, Mr. Orr?

9  A   I believe so.

10  Q   And did you instruct Mr. Easley or Mr. Miller to send a

11  letter to the DRCEA to see if they would represent retirees?

12  A   I don't recall.

13  Q   Isn't it true that you received -- or that the city was

14  informed that the RDPFFA informed the city that it was

15  willing to represent uniformed retirees?

16  A   I don't recall that.

17  Q   Isn't it true that neither of the retiree association

18  denied the request to represent retirees?

19  A   I don't know.  I don't recall receiving a letter.  If you

20  have something to refresh my recollection, I'd be happy to

21  see it.

22  Q   In all of those letters that Mr. Shumaker had you review

23  the addressees on, did any of those letters come from either

24  retiree association party saying that they did not want to

25  represent retirees?

1  A   None of the ones I reviewed today.

2  Q   And to your knowledge, are those all of the letters?

3  A   I don't know.  There are a lot of letters.

4        MR. PLECHA:  No further questions.

5                       RECROSS-EXAMINATION

6  BY MR. WERTHEIMER:

7  Q   Good morning, Mr. Orr.

8  A   Good morning.

9  Q   I just have a follow-up on a question that Lynn Brimer

10 asked you.

11       MR. WERTHEIMER:  Could you put 866 up, please?

12       MR. SHUMAKER:  Your Honor, I'm going to object to

13 the extent that this is outside the scope of the redirect.

14       MR. WERTHEIMER:  It is, your Honor, and I'd request

15 permission.  There was a -- seemed to me an obvious follow-up

16 to a question Ms. Brimer asked.

17       THE COURT:  All right.  One question I'll permit.

18       MR. WERTHEIMER:  Thanks.  Could you highlight the

19 paragraph that begins "Kevyn"?

20 BY MR. WERTHEIMER:

21 Q   Mr. Orr, did you check in with Dan Moss regarding the

22 Chapter 9 paper that Jones Day was putting together as

23 Corrine Ball suggested you should?

24 A   I don't recall, but I have no reason to believe that I

25 did not.

1  Q   Is that another way of saying you probably did?

2  A   I just don't recall.

3          MR. WERTHEIMER:  Okay.  Fair enough.  Thank you.

4                    RECROSS-EXAMINATION

5  BY MS. PATEK:

6  Q   Two quick things, Mr. Orr.  Barbara Patek again on behalf

7  of the Detroit public safety unions.  I believe you told Mr.

8  Shumaker that you negotiated with the unions in the same way

9  that you negotiated with the swap counterparts on his

10  redirect.  Is that your testimony?

11  A   Generally, that's the gist of it, yes.

12  Q   But, in fact, that's not accurate, is it?

13  A   Why not?

14  Q   Well, in fact, didn't you rely under Public Act 436 on

15  the -- what you talked about as the suspension of your duty

16  to bargain to not engage in the kind of robust hard give-and-

17  take negotiations that presumably occurred with the swap

18  counterparties?

19  A   No.  I wouldn't agree with that as a characterization of

20  what I said.

21  Q   You would not agree with that, that that's -- well,

22  strike that.  Are you testifying now that you did engage in

23  give-and-take hard negotiations with the public safety

24  unions?

25  A   Ms. Patek, you're using your characterization.  When I

1  said that I engaged with the unions in the same way we did

2  with the creditors, it was to mean that we reached out to

3  them.  We expected responses, and we would have responded in

4  kind.

5  Q   But it was not to suggest that you were engaging in the

6  kind of hard give-and-take negotiations with the unions that

7  you engaged in with the swap counterparts?

8  A   I don't know how to answer your characterization.

9  Q   I want to talk just for a minute about the supremacy

10  clause because I think you told us that that's -- you told

11  the Court that that was what made -- you know, took

12  sacrosanct sort of out of play once we got into bankruptcy.

13          THE COURT:  I think we've had enough testimony

14  regarding the supremacy clause, and besides it's not really

15  within the scope of this trial.

16          MS. PATEK:  Okay.  Thank you, your Honor.

17          THE COURT:  Any other questions?  You are excused

18  this time, sir.

19          THE WITNESS:  Thank you, your Honor.  The young

20  woman --

21          MS. BRIMER:  I'll take the compliment.

22          THE WITNESS:  Thank you, your Honor.

23      (Witness excused at 11:02 a.m.)

24          THE COURT:  And we will take a recess until 11:20,

25  please.

1        THE CLERK:  All rise.  Court is in recess.

2    (Recess at 11:02 a.m. until 11:20 a.m.)

3        THE CLERK:  Court is in session.  Please be seated.

4        THE COURT:  It appears that everyone is here.  Sir.

5        MR. IRWIN:  Good morning, your Honor.  Geoff Irwin,

6    Jones Day, on behalf of the city.  I wanted to advise the

7    Court that that concludes the city's case in chief.  We don't

8    intend to call additional witnesses as part of our case in

9    chief.  We do reserve the right, of course, to introduce new

10   evidence and call witnesses as part of our rebuttal case, but

11   we'll have that determination after we see the objectors'

12   proofs.

13       I also wanted to advise the Court and come back to

14   something that we had talked about in connection with or at

15   the pretrial conference.  The only other exception to the

16   city's case in chief relates to deposition designations.  We

17   have been working with objectors pretty cooperatively on

18   this, and we're trying to put something together that would

19   be the easiest for the Court to deal with in that regard.  We

20   are designating and counter-designating and talking about a

21   system whereby we would have a single transcript if the Court

22   would like, and it would be color-coded with objections and

23   keyed with testimony from each side.  There are also some

24   videotape depositions that I think the objectors would like

25   the Court to consider, and we are, again, working with them

1  to submit those all together.  I think we would be in a

2  position to do that shortly, but I just wanted to advise the

3  Court that we are continuing to work on that, and that is

4  part of the city's affirmative case.

5         THE COURT:  Thank you.  The city rests.  Who'd like

6  to call a witness?

7         MR. IRWIN:  I'm sorry.  I thought Mr. Ruegger was

8  going to address that as well.  I have one other --

9         THE COURT:  Oh, I'm sorry.

10        MR. IRWIN:  -- administrative issue to --

11        MR. RUEGGER:  Good morning, your Honor.  Arthur

12  Ruegger from Dentons on behalf of the Retiree Committee.

13  Yes.  I'd just like to agree with Mr. Irwin's comments.  We

14  do have some videotape depositions that we'd like your Honor

15  to review.  We can present them in two different formats,

16  though.  One is a PowerPoint, which your Honor could review

17  on a computer.  Another would be a DVD that obviously you

18  could read on a DVD player.  The latter format would take us

19  some hours to prepare, but whatever your Honor --

20        THE COURT:  Whatever is easiest for you is fine with

21  me.

22        MR. RUEGGER:  Very well, your Honor.  We should have

23  the videotapes and the hard copies at least for the

24  depositions that I've discussed with Mr. Irwin ready no later

25  than tomorrow for your Honor.

```
 1          THE COURT:  All right.

 2          MR. RUEGGER:  Thank you.

 3          MR. IRWIN:  Just one other administrative matter,

 4   your Honor.  We have been coordinating with objectors in

 5   terms of trying to get a preview of their witness lists and

 6   estimates, nonbinding, but estimates on their direct

 7   examinations and trying to budget accordingly.  We are all, I

 8   think, looking forward and looking ahead to closing

 9   arguments.  We don't know entirely when that will happen, but

10   we're all starting to prepare for those.  The city -- and

11   we've reached out to objectors yesterday.  We were wondering

12   if the Court had direction to the parties in terms of any

13   time limits or allocations of time between and among the

14   parties along the lines of what the Court did at the legal

15   argument stage of the eligibility proceeding, and we would

16   obviously take our direction from the Court in that regard.

17          THE COURT:  Frankly, I had decided, in light of the

18   importance of these issues, not to set any specific time

19   limits.  Having said that, I will assume counsel will be

20   responsible about this latitude that I am allowing to them,

21   and so that's my conclusion on it.  Is it your -- are you

22   trying to tell me that you think there should be time limits?

23   I didn't quite hear that.

24          MR. IRWIN:  I'm not -- I am not suggesting that

25   there need be time limits.  I'm looking -- we were wondering
```

1  if the Court was expecting something from us either

2  because --

3          THE COURT:  No.

4          MR. IRWIN:  -- we should work something out between

5  us or the Court had some expectation that we needed to know

6  about.

7          THE COURT:  No, no.

8          MR. IRWIN:  All right.  Thank you, your Honor.

9          THE COURT:  All right.  Are we ready to begin the

10  objectors' case now?

11          MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

12  on behalf of the Retiree Association parties.  I would like

13  to call Shirley Lightsey.

14          SHIRLEY LIGHTSEY, OBJECTOR'S WITNESS, SWORN

15          THE COURT:  Please sit down.

16                    DIRECT EXAMINATION

17  BY MR. PLECHA:

18  Q   Good morning, Ms. Lightsey.

19  A   Good morning.

20  Q   Could you please state your full name for the record?

21  A   Shirley Virginia Lightsey.

22  Q   And are you retired from employment with the City of

23  Detroit?

24  A   Yes.

25  Q   Do you currently receive a pension from the City of

1   Detroit?

2   A    Yes.

3   Q    Do you currently receive healthcare benefits from the

4   City of Detroit?

5   A    Yes.

6   Q    Would you be negatively impacted if pension benefits were

7   reduced?

8   A    Yes.

9   Q    Would you be negatively impacted if healthcare benefits

10  were reduced?

11  A    Yes.

12  Q    Have you already taken financial planning measures to

13  prepare for potential cuts to pension and benefits?

14  A    Yes.

15  Q    Before you began your work with the city, could you

16  please explain your education after high school?

17  A    I went to Wayne State University and eventually graduated

18  from Wayne State University.

19  Q    And did you obtain a degree?

20  A    Pardon?

21  Q    Did you obtain a degree?

22  A    Yes.

23  Q    And what was that?

24  A    Bachelor of Arts in Sociology.

25  Q    What was your final position with the City of Detroit?

1    A    Was personnel manager, which would now be equated to

2    human resources manager two.

3           THE COURT:  Excuse me one second.  Would you just

4    push the microphone a bit away from you or sit back a bit

5    from it?  That's better.  Thank you.

6    BY MR. PLECHA:

7    Q    Ms. Lightsey, how long did you work for the city?

8    A    Thirty years.

9    Q    And what were your job duties as the personnel manager?

10   A    I was responsible for the budget of that department,

11   which included several support functions, which would be

12   safety, labor relations, security, payroll, personnel

13   activities, training, and I also had an administrative

14   section that took care of EEOC and Workers' Comp cases.

15   Q    And could you briefly describe that budget for me for the

16   Water and Sewerage Department?

17   A    Question again?

18   Q    What size, approximately, was the budget for the Water

19   and Sewerage Department?

20   A    I'm not sure of the total budget for the Water and

21   Sewerage Department.  I know we had 3,000 employees, but my

22   budget was a little over three million.

23   Q    Okay.  While you worked with the city, did you have any

24   positions with any labor organizations?

25   A    Yes.

1   Q   Okay.  What position was that?

2   A   I was a steward.

3   Q   Okay.  Are you familiar with an organization known as the

4   DRCEA?

5   A   Yes.

6   Q   What does the DRCEA stand for?

7   A   Detroit Retired Employees -- DR -- Detroit Retired City

8   Employees Association.

9   Q   Okay.  Thank you.  What is the DRCEA?

10  A   It's an organization established in 1960 to -- in my

11  words, we are the eyes and ears of the general systems

12  retirees.

13  Q   Okay.  And are you a member of the DRCEA?

14  A   Yes.

15  Q   How long have you been a member?

16  A   Approximately 27 years.

17  Q   And do you hold a position with the DRCEA?

18  A   Yes.

19  Q   What position is that?

20  A   President.

21  Q   How did you obtain that position?

22  A   I was elected into the position.

23  Q   And how long have you held that position?

24  A   Fourteen out of sixteen years.

25  Q   Okay.  Can you please summarize briefly for the Court

1  your duties as president of the DRCEA?

2  A   I'm sorry.  I didn't hear the question.

3  Q   Could you please summarize your duties as DRCEA

4  president?

5  A   I conduct the meetings.  I appoint committees every year.

6  I recommend our nominating committee to the full board.  I

7  keep the board and the members informed of anything that they

8  may be involved -- that may involve retirees, and I'm sure

9  there's some other duties I just can't remember right now.

10  Q   Okay.  Ms. Lightsey, is the DRCEA incorporated?

11  A   Yes.

12       MR. PLECHA:  If I could please have Exhibit 305

13  displayed.  This has been admitted into evidence.

14  BY MR. PLECHA:

15  Q   Are you familiar with this document, Ms. Lightsey?

16  A   Yes.

17       MR. PLECHA:  And I believe there is a hard copy of

18  exhibits, if we could also provide that to Ms. Lightsey so

19  she doesn't have to read it off the screen.

20       THE COURT:  You can do that, counsel.

21       MR. PLECHA:  Thank you.

22  BY MR. PLECHA:

23  Q   Ms. Lightsey, could you please read Article 2 for me,

24  please?

25  A   I'm sorry.  The exhibit number?

1  Q   Oh, it's Exhibit 305.  I'm sorry.

2  A   Yes.

3  Q   Could you please read Article 2 for me, please?

4  A   "To take appropriate action to promote the pension rights

5  of the retired employees of the City of Detroit and generally

6  to engage in such lawful activities as are determined by the

7  board of directors to promote the best interest of the

8  retired employees of the City of Detroit."

9  Q   And is that statement consistent with the DRCEA's current

10  purpose?

11  A   Yes.

12  Q   Has the association been in continuous existence since

13  its formation?

14  A   Pardon?

15  Q   Has the DRCEA been in continuous existence since its

16  formation?

17  A   Yes.

18  Q   Does the DRCEA have by-laws?

19  A   Yes.

20        MR. PLECHA:  If I could please have Exhibit 303.

21  BY MR. PLECHA:

22  Q   Do you recognize this document, Ms. Lightsey?

23  A   Yes.

24  Q   Are these the current by-laws for the DRCEA?

25  A   Yes.

1    MR. PLECHA:  If I could please display page 2.

2    THE WITNESS:  Page 3?

3    MR. PLECHA:  Two.

4    THE WITNESS:  Two?

5  BY MR. PLECHA:

6  Q    Could you read Article 2 for me, please?

7  A    "The Detroit Retired City Employees Association is a

8  service organization existing for the purpose of representing

9  and protecting the interests of the civilian City of Detroit

10  retirees, the spouses or deceased retirees and other

11  beneficiaries of deceased retirees."

12  Q    Does this currently state the -- does this accurately

13  state the purpose of the association?

14  A    Yes.

15  Q    Okay.  Is the DRCEA governed by a board of directors?

16  A    Yes.

17  Q    How often are board meetings conducted?

18  A    Once a month.

19  Q    How many individuals serve on the board of directors?

20  A    Five officers, seventeen board members, and one pension

21  representative.

22  Q    Okay.  And does the DRCEA board have committees?

23  A    Yes.

24  Q    Do any of those committees deal with pension or other

25  retiree benefits?

1    A    Yes.

2    Q    What committee would that be?

3    A    For retiree benefits we have the pension.  Then we have

4    the medical benefits board -- committee.  I'm sorry.

5    Q    Okay.  And are you aware of any board of directors

6    individuals who have professional experience with the

7    finances of the City of Detroit?

8    A    Yes.

9    Q    Who would that be?

10    A    Gerald Fischer, Tom Sheehan, Pam Scales -- Pamela Scales.

11    I think that's all.

12    Q    And could you just very briefly give me a description of

13    what those individuals did for the city?

14    A    Well, Gerald Fischer had many positions.  He was an

15    appointee.  I know he was the assistant director of the

16    Water -- Detroit Water and Sewerage Department.  He was also

17    an appointee to the finance or budget departments, and that's

18    about all I can really state.  I don't know what his

19    positions or titles were.

20    Q    What about Mr. Sheehan?

21    A    Mr. Sheehan worked for the finance department and --

22    total of years, but I don't really remember what his title

23    was.

24    Q    Okay.  What about Ms. Scales?

25    A    Ms. Scales worked until the last year or two, and she was

1    the budget director.

2    Q    Is that the budget director for the entire city?

3    A    Yes.

4    Q    Is there any member on the board of directors that has

5    professional experience with the city as it relates to labor

6    relations?

7    A    Yes.

8    Q    Who would that be?

9    A    Barbara Wise Johnson.

10   Q    What did Ms. Johnson do?

11   A    She was director of labor relations, which included

12   benefits.

13   Q    Is there any member on the board of directors who has

14   professional experience with the city as it relates to

15   pensions?

16   A    Yes.

17   Q    Who would that be?

18   A    That would be Tom Sheehan.  He was a trustee as an active

19   employee, and he is now a trustee of the retirees.

20   Q    Okay.  Is there any member on the board of directors who

21   has professional experience with the city as it relates to

22   legal matters?

23   A    Yes.

24   Q    Who would that be?

25   A    Kay Schloff, who was an attorney, and Marian Harper, who

1    was an attorney.

2    Q    What did Ms. Schloff do at the city?

3    A    She codified the charter.

4    Q    Can you please tell me what the DRCEA does for general

5    city retirees?

6    A    I don't understand the question.

7    Q    Okay.  Can you please tell me what the association does

8    for its general city retiree members?

9    A    We maintain a watch over benefits and pension issues.

10   Q    Do you provide information to general retirees?

11   A    Yes.

12   Q    Do you advocate for general city retirees?

13   A    Yes.

14   Q    Do you organize general city retirees?

15   A    Organize?

16   Q    Hold meetings with them --

17   A    Yes.

18   Q    -- luncheons?

19   A    Yes.

20   Q    Do you communicate with general city retirees?

21   A    Yes.

22   Q    Do you represent general city retirees?

23   A    Yes.

24   Q    Does the association provide all services to members and

25   nonmember general city retirees?

1  A    Yes.

2  Q    Okay.  Has the DRCEA ever had the occasion to appear

3  before the City Council in budget-related matters?

4  A    Yes.

5          MR. PLECHA:  If I could, your Honor, I would like to

6  have the Court judicially notice Section 9-601 of the city

7  charter that's entitled "Retirees Representation," which

8  states, "Retired general city employees are entitled to be

9  represented in the city legislative and budgetary proceedings

10  on issues affecting their interest by persons elected by

11  them."

12          THE COURT:  Thank you.  Any objections?

13          MR. IRWIN:  I have no notice of this.  If it's being

14  read accurately, I have no objection, your Honor.

15          THE COURT:  All right.  Well, have a look at it, and

16  at some point when you're ready let me know if you have any

17  objection to this.

18          MR. IRWIN:  Thank you, your Honor.

19  BY MR. PLECHA:

20  Q    Ms. Lightsey, has the DRCEA been formally invited to

21  those budgetary meetings?

22  A    Yes.

23  Q    Did the DRCEA, in fact, participate in those meetings?

24  A    Yes.

25  Q    To your knowledge, did any other group appear at those

1    meetings on behalf of general city retirees?

2    A    No.

3    Q    At any time, did the DRCEA have an open invitation to

4    appear before City Council?

5    A    Yes.

6    Q    Did the DRCEA serve on the charter revision commission

7    for the City of Detroit?

8    A    Yes.

9    Q    Has the DRCEA ever filed a lawsuit against the City of

10   Detroit?

11   A    No.

12   Q    What about any that it joined with the City Council?

13   A    Yes.  We did join back in the '90s when council was

14   challenged on their legal rights to do what they were doing.

15   Q    Did you file any lawsuits in July 2013?

16   A    No.

17   Q    Approximately how many members does the DRCEA currently

18   have?

19   A    Members?  Approximately 70 -- between 76 and 7,800.  I

20   don't have the exact number.

21   Q    And that's out of approximately how many general --

22   A    12,000.

23   Q    Okay.  And do your members pay dues?

24   A    Yes.

25   Q    Is it a voluntary association?

1   A    Yes.

2   Q    Do the officers and board members serve as volunteers?

3   A    Yes.

4   Q    Has the DRCEA ever had pamphlets that it would provide to

5   your members and nonmembers to provide information about the

6   DRCEA?

7   A    Yes.

8           MR. PLECHA:  If I could please have Exhibit 315

9   displayed.

10  BY MR. PLECHA:

11  Q    Do you recognize this document, Ms. Lightsey?

12  A    Yes.

13  Q    If I could have you page -- turn to page 7 -- I'm

14  sorry -- page 5.  Could you read the bottom paragraph in the

15  lower right-hand corner?  It's on the screen if that's easier

16  for you, Ms. Lightsey.

17  A    Pardon?

18  Q    It's on the screen if that's easier for you.

19  A    "The watchdog for city retirees.  DRCEA maintains a year-

20  round watch on the city administration, mayor, City Council,

21  and the General Retirement System board of trustees

22  continually monitoring actions that may affect your pension

23  or retirement benefits."

24  Q    Is that statement accurate today for the DRCEA?

25  A    Yes.

1   Q   Does the DRCEA conduct regular membership meetings?

2   A   Yes.

3   Q   How often are those meetings held?

4   A   We have one annual meeting and schedule any others when

5   needed.

6   Q   Does the DRCEA hold special meetings?

7   A   Yes.

8   Q   Who's invited to those special meetings?

9   A   All general retirees.

10  Q   And are there regular communications to general retirees?

11  A   Yes.

12  Q   What type of communications?

13  A   We have a newsletter that goes out every three, sometimes

14  four times a year.  We have a website.  We have e-mails for

15  some of our members.

16  Q   What type of information is posted on your website,

17  Ms. Lightsey?

18  A   News articles.  Every now and then I write a letter to

19  them, coming events, and anything we deem informational for

20  our retirees.

21  Q   Is the contact information listed on the website?

22  A   Yes.

23  Q   Are there benefit resources on the website?

24  A   Yes.

25  Q   Pension resources?

1   A   Pension resources, I'm not sure.

2   Q   Links to places that --

3   A   Links.  We have links, right, to -- yeah.

4   Q   Has the DRCEA ever sent out correspondence to all general

5   retirees that requested a return mailing --

6   A   Yes.

7   Q   -- or a response?

8   A   Um-hmm.

9   Q   Okay.  Could you tell me about that?

10  A   Well, recently, the most recent one, we sent out the

11  consent form.  We had recommended eight of our members for

12  the -- to the trustees -- to the Justice Department trustees

13  for the Retiree Committee.

14  Q   Okay.  And did you receive feedback from those

15  communications?  Did you receive responses back?

16  A   Yes.

17  Q   Do you know approximately how many?

18  A   There were thousands.  I don't know because I wasn't -- I

19  haven't been brought up to date on that.

20  Q   Okay.  And do you know approximately how long it took to

21  get these thousands of responses back?

22  A   I would say the first couple of thousand came in within

23  seven days.  After that, I'm -- they came in in batches.

24  Q   Okay.  How did the general retirees generally communicate

25  to the DRCEA?

1    A    I'm sorry.  Repeat that.

2    Q    How did the general retirees generally communicate to the

3    DRCEA?

4    A    By notes, by comments on the cards that we send for

5    renewals, by e-mail, by voicemail, and socially anywhere they

6    can find a DRCEA member to ask questions.

7    Q    So they recognize you and stop you in public?

8    A    Pardon?

9    Q    They recognize you and stop you in public to ask you

10   questions?

11   A    I didn't understand that question.

12   Q    Do members recognize you and ask you questions as it

13   relates to retiree matters in public?

14   A    Our members, yes.

15   Q    Does anyone on behalf of the association read those

16   letters that are sent in?

17   A    Yes.

18   Q    Does the board generally respond to those letters?

19   A    We respond to some.  Others are just information that

20   they're giving us or comments that they're making that don't

21   require a response.

22   Q    Have you received expressions of concern from general

23   retirees regarding their pensions and benefits?

24   A    Recently, yes.

25   Q    Have any of your members told you that they've already

1  made financial planning changes based on the potential cuts

2  to their pensions?

3  A   Yes.

4       MR. IRWIN:  Your Honor, I object to the relevance of

5  this line of questioning.  I also find the questions fairly

6  leading.

7       MR. PLECHA:  I believe they're relevant as ripeness

8  has been contested in this matter, and it goes to the present

9  impact of the proposed cuts that they're already taking

10  measures directly related to those proposed cuts.

11       THE COURT:  This is arguable.  I'll permit it.  Go

12  ahead, sir.

13  BY MR. PLECHA:

14  Q   Ms. Lightsey, has any of the members let you know that

15  they've made financial planning changes based on the proposed

16  cuts to pensions?

17  A   Yes.

18  Q   Okay.  I'm going to switch topics a little bit.  Did you

19  become aware that Mr. Orr was appointed as the emergency

20  manager for the city?

21  A   Yes.

22  Q   Have you ever met Mr. Orr?

23  A   Yes.

24  Q   When did you first meet Mr. Orr?

25  A   I attend pension board meetings throughout the year, and

1  Mr. Orr was at a meet-and-greet pension board meeting the end

2  of April.  I think it was the last Wednesday in April.  I'm

3  not sure.  I think that's when it was.

4  Q   Do you recall how you were introduced to Mr. Orr?

5  A   I was introduced to Mr. Orr as the president of the GRS

6  retirees.

7  Q   After meeting Mr. Orr, did you ever contact him?

8  A   Only by letter.

9       MR. PLECHA:  If I could have Exhibit 309 displayed,

10 please.

11 BY MR. PLECHA:

12 Q   Do you recognize this document?

13 A   Yes.

14 Q   Is this the letter you, in fact, sent to Mr. Orr?

15 A   Yes.

16 Q   And why did you send this letter to Mr. Orr?

17 A   To have a meeting to understand what it was that the

18 retirees were expected to discuss or --

19 Q   Did you ever receive a response to this letter?

20 A   No.

21 Q   Did you ever receive a meeting response for this letter?

22 A   No.

23 Q   Did you ever receive a letter from the city or its

24 professionals requesting information about who the DRCEA

25 represents?

1  A   Yes.

2  Q   Did you respond to that letter?

3  A   Yes.

4  Q   Did you inform them that you were willing to represent

5  retirees?

6  A   If that was what was on the letter.  I don't remember the

7  questions, but I'd have to see my response.  I responded to

8  whatever the questions were.

9          MR. IRWIN:  I have a best evidence objection to the

10  witness testifying as to the contents of a letter that is not

11  in evidence and that I'm not aware of.

12          THE COURT:  The objection is sustained.

13  BY MR. PLECHA:

14  Q   Did you happen to attend a meeting on June 14, 2013?

15  A   No.

16  Q   Why not?

17  A   I wasn't invited.

18  Q   Did you ever learn that other retiree associations

19  attended this meeting?

20  A   Yes.

21  Q   When did you learn this?

22  A   I really don't remember.  I just remember that I didn't

23  receive an invitation --

24  Q   How did you learn this?

25  A   -- for the DRCEA.  Pardon?

1    Q    How did you learn this?

2    A    How did I what?

3    Q    How did you learn that other associations attended?

4    A    Through conversation, and I really don't remember.  It

5    wasn't anything official.  It was probably through a member

6    or it may have been the news.  I don't know.  I don't

7    remember.

8    Q    Did you attend a meeting on June 20th, 2013?

9    A    Yes, I did.

10   Q    Was your invitation limited in any way?

11   A    It was limited to two people.

12   Q    And who attended on behalf of the DRCEA?

13   A    Myself and Marian Harper.

14   Q    And was this meeting only for retirees?

15   A    I'm not sure.

16   Q    Was there any attendees on behalf of AFSCME?

17   A    Yes.

18   Q    The UAW?

19   A    Yes.

20   Q    The public safety unions?

21   A    Not that I recall.

22   Q    Who was there on behalf of the city?

23   A    Ms. Lennox, Mr. Heiman.  I can't think of the other

24   gentleman's name, but there were about five or six that were

25   there that day.

1  Q   Was Mr. Orr there?

2  A   No.

3  Q   Did anyone ask you to present the DRCEA's position at

4  this meeting?

5  A   No.

6  Q   Were you permitted to submit questions at this meeting?

7  A   Yes.

8  Q   Did you ask any questions?

9  A   No.

10 Q   Why not?

11 A   Others had asked questions.  I didn't see any need to

12 repeat the same questions.

13 Q   Were you comfortable with asking retiree-specific

14 questions in this meeting setting?

15 A   I'm sorry.  I don't understand that.

16 Q   Were you comfortable asking retiree-specific questions in

17 this meeting setting?

18 A   Not really.

19 Q   Was there an opportunity at this meeting to break out in

20 smaller groups to discuss retiree-specific issues?

21 A   No.

22 Q   Following the June 20th meeting, did you take any actions

23 or communicate with the city?

24 A   Yes.

25 Q   And who did you communicate with?

1   A   Pardon?

2   Q   Who did you communicate with?

3   A   Mr. Easley.

4   Q   Do you recall why you sent a letter to Mr. Easley?

5   A   In response to what was, I guess, discussed at the

6   meeting.

7   Q   Did you ask him how the DRCEA should proceed?

8   A   Yes.

9   Q   Did anyone from the city ever respond to your letter?

10   A   No.

11   Q   Anyone from Jones Day?

12   A   No.

13   Q   Okay.  Did you attend a meeting on July 10th?

14   A   Yes.

15   Q   Were you invited to this meeting?

16   A   Yes.

17   Q   Was your invitation limited in any way?

18   A   Two people.

19   Q   Did anyone ask you to present the DRCEA's position at

20   this meeting?

21   A   No.

22   Q   Was there an opportunity for you to break out and discuss

23   retiree-specific issues?

24   A   No.

25   Q   Did you attend a meeting on July 11th?

1    A    Yes.

2    Q    Were you invited to that meeting?

3    A    Yes.

4    Q    Was your invitation limited?

5    A    Two people.

6    Q    Did you ask any questions at this meeting?

7    A    Yes.

8    Q    What questions did you ask?

9    A    I asked if the city proposed to offer vision and dental

10   to retirees in 2014.

11   Q    And was your question answered?

12   A    Yes.

13   Q    Did that answer cause you to do anything following the

14   meeting?

15   A    Yes.

16   Q    What did it cause you to do?

17   A    Inform our board and immediately start to look for vision

18   and eye care possibilities for our members.

19   Q    So you started to look for alternatives?

20   A    Yes.

21   Q    Did you have enough time between July 11th and July 18th

22   to prepare counterproposals as it relates to dental and eye

23   care?

24   A    No.

25   Q    During the July 11th meeting, did you have the

1    opportunity to break out into smaller groups to discuss

2    retiree-specific issues?

3    A    No.

4    Q    Following the June 20th meeting, did you take any action

5    as it relates to communicating with Jones Day?

6    A    20th.  That was -- yes.

7    Q    What did you do?

8    A    Four days later on the 24th, I think it was, I sent a

9    request for information.

10   Q    Was that ever responded to?

11   A    No.

12   Q    Did you ever request your attorney send a letter to Jones

13   Day to request a meeting with the DRCEA?

14   A    Yes.

15   Q    Did the city ever respond?

16   A    No.

17   Q    In any of your meetings with the city, were there

18   breakout sessions for retirees?

19   A    No.

20   Q    Did anyone at these meetings ever tell you that they were

21   going to have breakout sessions specific for retirees?

22   A    No.

23   Q    Did anyone tell you that they intended to create breakout

24   meetings for retirees?

25   A    No.

1   Q   Prior to July 18, 2013, did the city provide you with a

2   copy of the June 14th proposal to creditors?

3   A   No.

4   Q   Prior to filing the bankruptcy by the city, did you ever

5   consider general retirees as creditors of the city?

6   A   What was the date that you said?

7   Q   July 18th before they filed for bankruptcy.

8   A   I had heard it enough that we were now looked at as

9   creditors, so that would have been prior to July 18th through

10  the media and other areas.

11  Q   Did anyone on behalf of the city at any of these meetings

12  specifically request counterproposals from the DRCEA?

13  A   I didn't receive it that way, no.

14  Q   Did anyone on behalf of the city say that if

15  counterproposals were not received by July 19th, a Chapter 9

16  case would be filed?

17  A   I don't remember hearing that.

18  Q   Prior to July 18th, did you have enough information to

19  make counterproposals?

20  A   No.

21  Q   Has the DRCEA ever advocated for benefit enhancements to

22  retirees that was applied to all general city retirees?

23  A   Yes.

24  Q   How did the DRCEA do that?

25  A   Through the budget process.

1  Q    Is that with City Council?

2  A    That would be through the mayor first and then the City

3  Council, yes.

4  Q    That applied to all general retirees regardless of

5  membership?

6  A    Yes.

7  Q    In this current bankruptcy case, has the DRCEA ever

8  claimed to be able to legally bind its members?

9  A    No.

10  Q    Is the DRCEA a collective bargaining unit?

11  A    No.

12  Q    Following each of the meetings you had with the city, did

13  you discuss those meetings with your board of directors?

14  A    Yes.

15  Q    Did the city ever provide you with a proposal to take

16  back to the board of the DRCEA as it relates to retiree

17  issues?

18  A    No.

19  Q    Would the board have been able to accept and consider a

20  proposal?

21  A    Yes.

22  Q    Could the board have then communicated that information

23  to the general city retirees?

24  A    Yes.

25  Q    Was negotiation with the DRCEA as it relates to retiree

1    issues possible?

2    A    Yes.

3            MR. PLECHA:  No further questions.

4            THE COURT:  Any cross-examination?

5            MR. IRWIN:  Yes, your Honor.

6                         CROSS-EXAMINATION

7    BY MR. IRWIN:

8    Q    Good morning, Ms. Lightsey.

9    A    Good morning.

10   Q    I believe I heard you testify that your organization has

11   been around for more than 50 years; is that right?

12   A    Yes.

13   Q    And you consider yourself and the organization to be

14   advocates of retirees; is that right?

15   A    Yes.

16   Q    And I think we heard some examples in that regard.  I

17   think you talked about how you advocated for enhancements

18   before the City Council.  Do you recall that?

19   A    Yes.

20   Q    And I heard you testify in connection with the articles

21   of incorporation of your organization that your mission is to

22   promote rights of retirees; is that right?

23   A    Correct.

24   Q    And you've also described the mission of the organization

25   to be a conduit for information.  You have the ability to

```
 1  pass along information to your members; is that right?

 2  A   Yes.

 3  Q   And you have, in fact, lobbied on behalf of your

 4  organization; is that right?

 5  A   Yes.

 6  Q   And you've been granted legal standing in courts on

 7  behalf of your organization; is that right?

 8  A   Repeat that again.

 9  Q   You've been granted legal -- you've been involved in

10  lawsuits, is that right, the organization?

11  A   Yes.

12  Q   Okay.  One of the things that I don't believe you've

13  mentioned yet is whether your organization -- or you haven't

14  mentioned an instance in which the DRCEA has with binding

15  effect negotiated health or pension reductions on behalf of

16  your membership; is that right?

17  A   We cannot do binding.

18  Q   That's right.  The organization doesn't have the

19  authority or the power to enter into any binding agreements

20  with regard to health or pension benefits on behalf of its

21  members; is that right?

22  A   Correct.

23  Q   Okay.  And that was true at all points in time leading up

24  through the bankruptcy filing in this case on July 18th; is

25  that right?
```

1    A    Well, that depends on how far you go back as all time.

2    Q    Are you --

3    A    Are you going back to 1960, or are you going back to last

4    year?

5    Q    I'll go back to information that's within your personal

6    knowledge, so as long as you've been involved with the

7    organization, the organization has not entered into binding

8    agreements to reduce pension or health benefits on behalf of

9    the membership?

10   A    No.  I can't make that statement because I've been on the

11   board for 27 years, but I can't make that statement.  I was

12   not always the president, so I don't remember.

13   Q    But you're not -- is it fair to say that you're not aware

14   of a situation in which the organization has entered into a

15   binding agreement to reduce pension or healthcare benefits

16   for its membership?

17   A    I'm not aware.

18   Q    All right.  Let's turn -- Ms. Lightsey, do you recall a

19   point in time in this proceeding when the DRCEA was in

20   receipt of written questions or interrogatories, and it was

21   incumbent upon the organization to respond to those?

22   A    I don't remember.

23   Q    Okay.  Maybe I'll -- we can take a look at them, and it

24   may refresh your recollection.

25           MR. IRWIN:  Can we put up Exhibit -- can we put up

1    Exhibit -- city 83, please?

2    BY MR. IRWIN:

3    Q   Ms. Lightsey, there's an exhibit on your screen in front

4    of you.  Do you see that?

5    A   Yes, yes.

6    Q   Does this exhibit refresh your recollection at all in

7    terms of questions that were put to the organization that

8    needed to be answered?

9    A   Yes.

10   Q   Okay.  And you personally participated in this exercise;

11   is that right?

12   A   I turned this document over to my attorneys.

13   Q   Yes, but you also provided and verified the responses

14   that were given to the city; isn't that right?

15   A   I would have to see the responses.

16   Q   Okay.

17          MR. IRWIN:  Well, let's turn to the -- I think it's

18   page 16 of the document, please, and if we could blow up the

19   signature block in the lower right corner.

20   BY MR. IRWIN:

21   Q   Ms. Lightsey, is that, in fact, your signature on this

22   document?

23   A   Yes, it is.

24   Q   Okay.  Does that refresh your recollection that you

25   participated in the responses that were delivered in

1  connection with these questions?

2  A   Yes.  Now I understand your question.

3  Q   Okay.  And did you review these answers before you signed

4  your name to the end of this document?

5  A   I reviewed -- I'm pretty sure I reviewed most of them,

6  yes.

7  Q   And that's a fair point.  There are questions that relate

8  to a different organization, and there are questions that

9  relate to the DRCEA.  It's a combined set of questions and

10  answers; is that right?

11  A   Right.

12  Q   And you responded on behalf of the DRCEA; is that right?

13  A   I would imagine so.  I'm not sure.  I'd have to look at

14  them again, but I'm pretty sure I did.

15  Q   Okay.  Well, let's look at some of the specific questions

16  if we could.  If you could please turn to --

17  A   I'm not reading this well on this screen, so --

18  Q   And we're going to -- we're going to publish the pages

19  for you so that you can --

20  A   Okay.

21  Q   -- follow along.  We're going to look at page 8 of the

22  document, which is Interrogatory Number 6.  Do you see that,

23  Ms. Lightsey?

24  A   Yes.

25  Q   We're going to -- we're going to read it, so you can --

1   we can read along together, but the interrogatory to the

2   DRCEA reads as follows, "Identify any person or persons who

3   have knowledge of any agreement entered into by the DRCEA and

4   the City of Detroit in which the DRCEA agreed to reduce,

5   limit, or abridge the health benefits provided by the City of

6   Detroit to existing DRCEA member retirees."  Did I read that

7   right?

8   A   Yes.  Is that --

9   Q   This is Number 6, ma'am.

10  A   Oh, Number 6.  Yes.

11  Q   And did you understood -- and this is one of the

12  interrogatories that's directed to the DRCEA, so am I correct

13  in assuming that this was a question and response that you

14  participated in drafting the answer to?

15  A   Yes.

16  Q   Okay.  And the question asks for -- the question asks for

17  the DRCEA to identify anyone who has knowledge of a prior

18  agreement between the DRCEA and the city where health

19  benefits were reduced.  You understood that?

20  A   Yes.

21  Q   Okay.  And let's look at the response.  The answer

22  below -- there are some objections that are posed in the

23  first couple lines, but if you look about halfway down, the

24  answer reads, "However, without waiving said objections and

25  in the spirit of cooperation, the DRCEA states that it is not

1    aware of any individual with knowledge responsive to this

2    interrogatory."  Do you see that?

3    A    Yes, I see it.

4    Q    All right.  And it continues, and it says, "By way of

5    further statement, the purpose of the DRCEA has always been

6    and remains to protect and preserve benefits of retirees, not

7    to reduce such benefits."  Do you see that?

8    A    Yes.

9    Q    And so am I correct in interpreting this response that

10   there has never been, to the best of your knowledge, any

11   agreement between the DRCEA and the city where the DRCEA has

12   agreed to reduce health benefits?

13   A    I would imagine not.

14   Q    And that has --

15   A    Not that I can recall, no.

16   Q    And that has never happened?

17   A    I can't say that it's never happened.  I don't know.

18   Q    Best of your knowledge, it has never happened?

19            MR. PLECHA:  Objection.  Asked and answered.

20            THE COURT:  Objection sustained.

21   BY MR. IRWIN:

22   Q    And, Ms. Lightsey, let's look at the very next question

23   because it's a little bit different.  Do you see Number 7?

24   A    Yes.

25   Q    Okay.  I'm going to read Number 7.  "Identify any person

1   or persons who have knowledge of any attempt prior to July

2   19th, 2013, by the DRCEA to obtain any form of legal

3   authority from its members to appoint DRCEA their

4   representative in connection with negotiations" --

5           MR. PLECHA:  Objection, your Honor.  I think this

6   exceeds the scope of direct.

7           THE COURT:  The objection is overruled.  Go ahead,

8   sir.

9   BY MR. IRWIN:

10  Q   Any form of legal authority from its members to appoint

11  DRCEA their representative in connection with negotiations to

12  reduce, limit, or abridge health benefits provided by the

13  City of Detroit to retirees.  Do you see that?

14  A   Yes, I see it.

15  Q   So it's a similar question, but it's asking if there's

16  ever even been an attempt to get authority from the

17  membership to negotiate to reduce health benefits; is that

18  right?

19  A   Right.

20  Q   Yes.  And let's look at the answer, which is on the next

21  page.

22          MR. IRWIN:  I'd like to pull the answer up, please.

23  BY MR. IRWIN:

24  Q   And the answer -- I'm skipping to the middle paragraph

25  again, but it's the same answer.  However, without waiving

1  said objections and in the spirit of cooperation, the DRCEA

2  states that it is not aware of any individual with knowledge

3  responsive to this interrogatory.  Do you see that?

4  A   Yes.

5  Q   It further states that the purpose of the DRCEA has

6  always been and remains to protect and preserve benefits of

7  retirees, not to reduce such benefits.  Do you see that?

8  A   Yes.

9  Q   So, to your knowledge, never in the history of the DRCEA

10  has it ever sought approval from its membership to reach an

11  agreement to reduce health benefits; is that right?

12  A   In the history of the DRCEA?

13  Q   Yes, according to this response.

14  A   I didn't construe it as meaning the full history of the

15  DRCEA back --

16  Q   Well, how about to the history of the --

17  A   -- to 1960.

18  Q   How about to the history of the DRCEA to your knowledge?

19  A   DRCEA, to my knowledge, I could -- I could agree, I

20  guess, on that.

21  Q   All right.  Now, let's look at one more, which is the

22  next interrogatory.  It's Number 8.  It's the very next one.

23  Now, we're shifting gears a little bit because this question

24  relates to pension benefits.  The two that we were talking

25  about before were health benefits.

1  A    Um-hmm.

2  Q    So here's Number 8.  "Identify any person or persons who

3  have knowledge of any attempt prior to July 19th, 2013, by

4  the DRCEA to obtain any form of legal authority from its

5  members to appoint DRCEA as their representative in

6  connection with DRCEA negotiations to reduce, limit, or

7  abridge pension benefits on a prospective basis only provided

8  by the GRS."  Do you see that?

9          MS. LEVINE:  Your Honor, objection.  Isn't the

10  purpose of the interrogatory to refresh recollection after

11  the witness answers?  There hasn't been any --

12          THE COURT:  It's not limited to that purpose.  The

13  objection, if there was one, is overruled.

14          THE WITNESS:  Now, question again.

15  BY MR. IRWIN:

16  Q    Did I read that correctly?

17  A    You're reading it correctly.

18  Q    Okay.  And did you understand it to -- did you understand

19  the question to be asking for if, to your knowledge, the

20  organization had ever sought authority from its membership to

21  negotiate to reduce pension benefits?

22  A    Not to my knowledge.

23  Q    I understand that.  You understood -- you understand

24  that's what the question is asking for.

25  A    Right.

1  Q    Right.  Okay.  Let's look at the answer.  Again, about

2  halfway through the answer -- and this is an answer -- this

3  is a document which you have affixed your signature -- the

4  DRCEA states that it is not aware of any individual with

5  knowledge responsive to this interrogatory.  Do you see that?

6  A    Yes.

7  Q    And so it is your understanding and your testimony that

8  the DRCEA has never even attempted to get authority from its

9  members to reduce pension benefits?

10  A    Not that I can recall.

11  Q    Right.  And, in fact, there's a new -- there's a new

12  sentence here at the end of this response which I would like

13  to direct your attention to, and it says the DRCEA would not

14  take any action to obtain or solicit authority from its

15  members to do something prohibited by the Michigan

16  Constitution.  Do you see that?

17  A    Yes, I see that.

18  Q    Okay.  You understand that your attorneys have filed

19  papers in this case, and you understand the position that

20  you've taken in this case is that pension benefits are

21  protected by the Michigan Constitution, do you not?

22  A    Yes.

23  Q    Okay.  And is this sentence in this interrogatory

24  response when it says "something prohibited by the Michigan

25  Constitution," you are referring to the pension protection in

1 | the Constitution; right?

2 | A   Yes.

3 | Q   Okay. And so what you're saying here is that the DRCEA

4 | would not take any action to solicit authority from its

5 | membership to reduce pension benefits because they're

6 | protected by the Michigan Constitution; is that right?

7 | A   Yes.

8 | Q   Okay. And did you make that plain to anyone from the

9 | city in connection with any of the meetings you attended?

10 | A   No.

11 | Q   You did attend meetings; right?

12 | A   Yes.

13 | Q   Yes. I think we heard about some of those on direct.

14 | And you did not make any counterproposals to the city either

15 | at or after any of the meetings you attended; is that right?

16 | A   No.

17 | Q   And that is because you did not have the authority from

18 | your membership to make those counterproposals; is that

19 | right?

20 | A   No.

21 | Q   No, you did not have that authority; right?

22 | A   No. That's not true.

23 | Q   Okay. Did you have authority from your members to make a

24 | counterproposal to the city at or after any of these meetings

25 | to reduce healthcare or pension benefits?

1  A    I never understood any of those meetings as being

2  meetings that they were presenting proposals for me to even

3  do what you just asked.

4  Q    Okay.  But I'm asking a slightly different question.  I'm

5  asking whether you had authority from your membership to make

6  a binding counterproposal to either reduce healthcare or

7  pension benefits at the meetings?

8  A    I've never had the authority to make a binding, and I've

9  never asked for that from the membership.

10          MR. IRWIN:  Okay.  Thank you.  That's all I have,

11  your Honor.

12          THE COURT:  Any more questions for the witness?

13          MR. PLECHA:  I have some redirect, your Honor.

14          THE COURT:  Yes, sir.

15                    REDIRECT EXAMINATION

16  BY MR. PLECHA:

17  Q    Ms. Lightsey, has the City of Detroit ever filed Chapter

18  9 bankruptcy before?

19  A    No, not that I --

20          THE COURT:  Seriously?

21          MR. PLECHA:  I think that goes directly to --

22          THE COURT:  Ask your next question.

23          MR. PLECHA:  Okay.

24  BY MR. PLECHA:

25  Q    To your knowledge, Ms. Lightsey, has the city ever

1  requested a reduction in benefits from the DRCEA?

2  A   I'm not sure.  I can't answer that "yes" or "no."

3  Q   So you don't recall if they ever asked the DRCEA to

4  negotiate reductions?

5  A   Not that I can recall.

6  Q   In all of the meetings you attended before City Council,

7  were you advocating for enhancements to benefits?

8  A   Yes.

9  Q   So there would be no need to seek authority to reduce

10  benefits in that situation?

11  A   No.

12  Q   And Mr. Shumaker asked you some questions from the

13  requests for interrogatories, one of which related to the

14  answer addressing the Michigan Constitution or the

15  protections of pensions; correct?

16  A   Correct.

17  Q   And that was asking for any attempt prior to July 19th;

18  correct?

19  A   Correct.

20  Q   And that was prior to the filing of the bankruptcy?

21  A   Correct.

22          MR. PLECHA:  No further questions.

23          THE COURT:  Any more questions for the witness?  You

24  are excused, ma'am.  Thank you very much for your testimony

25  today.

1          THE WITNESS:  All right.

2      (Witness excused at 12:16 p.m.)

3          THE COURT:  Let's take our lunch break now and

4  reconvene at 1:45, please.

5          THE CLERK:  All rise.  Court is in recess.

6      (Recess at 12:16 p.m. until 1:45 p.m.)

7          THE CLERK:  All rise.  Court is in session.  Please

8  be seated.  Recalling Case Number 13-53846, City of Detroit,

9  Michigan.

10         THE COURT:  Sir.

11         MR. MORRIS:  Good afternoon, your Honor.  Thomas

12  Morris on behalf of the Retiree Association parties.  I

13  believe it's our turn to call the next witness, and the

14  Retiree Association parties call Donald Taylor.

15          DONALD TAYLOR, OBJECTOR'S WITNESS, SWORN

16         THE COURT:  All right.  You may sit down.

17                  DIRECT EXAMINATION

18  BY MR. MORRIS:

19  Q   Good afternoon, Mr. Taylor.  Would you please state your

20  full name for the record?

21  A   Donald Taylor.

22  Q   Mr. Taylor, you're a retired Detroit police officer; is

23  that correct?

24  A   Yes.

25  Q   And do you receive a pension from the city?

1    A    Yes, I do.

2    Q    And post-employment benefits as well; is that correct?

3    A    Yes.

4    Q    How long did you work for the city?

5    A    Twenty-six years.

6    Q    And during your employment with the city, did you ever

7    hold a position with any labor organization?

8    A    Yes, I did.

9    Q    And what position was that?

10   A    It was a union steward, chief steward, and executive

11   board member with the Detroit Police Officers Association.

12   Q    Are you familiar with an organization known as the

13   RDPFFA?

14   A    Yes.

15   Q    And what do those initials stand for?

16   A    Retired Detroit Police and Fire Fighters Association.

17   Q    And what position do you hold with that organization?

18   A    President.

19   Q    And how long have you been president?

20   A    Seven years.

21   Q    Were you elected to that position?

22   A    Yes.

23   Q    And how long have you been a member of the RDPFFA?

24   A    Fifteen years.

25   Q    Did you hold any prior elected position prior to being

1  president?

2  A   Vice president.

3  Q   Do you hold any positions with any other organizations at

4  this time?

5  A   By virtue of my position as president of the Retired

6  Detroit Police and Fire Fighters Association, I'm also a

7  member of the board of trustees of the C.O.P.S. Trust.

8  That's Coalition of Public Safety.  It's an organization that

9  provides healthcare benefits to public safety officers.

10  Q   Is that a statewide organization?

11  A   Yes.

12  Q   Would you please summarize for the Court your duties as

13  president of the association?

14  A   Day-to-day operation.  We have a full-time office open

15  five days a week, and I manage the day-to-day operations,

16  also conduct the meetings, chair the meetings at our board

17  meetings, general membership meetings.  I'm also the

18  representative for the association in hearings with the state

19  or city level and whatever else is necessary in signing,

20  counter-signing checks, things of that nature.

21  Q   Is the association governed by a board of directors?

22  A   Yes, it is.

23  Q   How often are board meetings conducted?

24  A   Once a month.

25  Q   And how many persons serve on the board?

1  A   Right now there's ten.

2  Q   Can you tell me, please, when the association was formed?

3  A    It was originally formed, I believe, back in the 1950s.

4  At that time, it was an organization of just retired police

5  officers, and in the '70s it merged with fire and became

6  known as the name that it operates under now.

7  Q   Would you please take a look at the document that's been

8  labeled as Exhibit 304?  I'm sorry.  Is there an exhibit book

9  up there for you?

10  A   No.

11        THE COURT:  On the table there to your right.

12        THE WITNESS:  That could be it.

13        MR. MORRIS:  Yes, please.  Can you display 304,

14  please?

15        THE WITNESS:  Okay.

16  BY MR. MORRIS:

17  Q   Can you tell me, please, if you can identify this

18  document?

19  A    It's the restated by-laws for the association.

20  Q   And would you take a look, please, at page 6, page 6 by

21  paper?  It's the numbered page 1.

22  A   Okay.

23  Q   And look at Article II, Section 1, and can you tell me,

24  please -- tell the Court what that states?

25  A    It's to provide the members with information concerning

1    the status of pensions, hospitalization, and insurances and

2    to keep the members informed on all matters relative to the

3    best interest of the association and its members.

4    Q   And is this stated in the by-laws as the purpose of the

5    organization?

6    A   Yes, sir.

7    Q   And is that an accurate statement of the association's

8    objectives and purpose, as far as you understand it?

9    A   Yes.

10   Q   And does the association, in fact, provide its members

11   with information concerning the status of pensions,

12   hospitalization, and insurances?

13   A   Yes, it does.

14   Q   How does it provide that information?

15   A   A number of different ways.  Like I mentioned earlier, we

16   have a full-time office where the members have access to the

17   office.  We have a website which the information is posted on

18   our website.  We regularly send out e-mails.  We have 3,000

19   of our members on e-mail.  We have regular general monthly

20   membership meetings, and we inform the members at those

21   meetings also.

22   Q   Does the association also provide information to

23   nonmember retirees?

24   A   Yes.

25   Q   And how does it do that?

1  A   It's available on our website.  Our website is not

2  password protected, and all of our information is displayed

3  on that website.  Also, on an annual basis we send out a copy

4  of our monthly Unity magazine to all members, nonmembers and

5  the like, and whenever it's necessary when very important

6  issues come up, we notify by mail all retired police officers

7  and fire fighters, and we've done that on a number of

8  occasions.

9  Q   Do you have the capacity to communicate by e-mail as

10  well?

11  A   Yes.  Like I said, we have about 3,000 members on e-mail.

12  Q   And are regular membership meetings conducted?

13  A   Yes, once a month.

14  Q   Is there information on the website relating to the

15  bankruptcy case?

16  A   Yes, there is.

17  Q   Do police and fire retirees communicate with the

18  association?

19  A   Yes.

20  Q   And how do they communicate with the association?

21  A   By phone, by e-mail, at the general membership meeting,

22  by letters.

23  Q   Have you noticed an increase in the number of letters

24  since the bankruptcy has been filed?

25  A   Yes.  I think we received around 900 letters in the last

1   couple months from the members.

2   Q   And how many members does the association have?

3   A   Right around 6,500.

4   Q   How many total police and fire retirees are there?

5   A   I believe it's right around 8,000.

6   Q   Do the members pay dues?

7   A   Yes.

8   Q   Is membership in the association automatic when you

9   retire from police or fire service?

10  A   No.  It used to be automatic for the fire fighters

11  because the Fireman's Fund used to provide the first year's

12  membership, but they don't do that.  They quit this year.

13  Q   Has the association in the past been a party to any

14  lawsuit regarding benefit for police and fire -- benefits for

15  police and fire retirees?

16  A   A number of lawsuits.

17  Q   Has the association ever been a party to any compromise

18  regarding healthcare benefits?

19  A   Yes, they have.

20  Q   And can you please tell me about that?

21  A   Yeah.  The latest would be referred to as the Weiler

22  settlement agreement.  I think that was reached in 2009; had

23  to do with reductions in healthcare benefits to retired

24  police officers and fire fighters.

25  Q   And did the association participate in that settlement --

1  A    Yes, they did.

2  Q    -- or that reduction, I should say?

3  A    Yes, they did.

4  Q    How did that occur?

5  A    Once the benefits were changed, we initiated a lawsuit

6  against the City of Detroit, and during the hearings on that,

7  there were some negotiations started to take place with our

8  attorneys and with Judge Torres, and we were able to come up

9  with what we felt was a compromise.  And we addressed that to

10  our memberships in advance, and we told the -- advised our

11  attorney to go ahead with the settlement agreement.

12  Q    And was that settlement, in fact, implemented?

13  A    Yes, it was.

14  Q    Has the association ever lobbied the state legislature on

15  behalf of police and fire retirees?

16  A    Yeah, on a number of occasions.

17  Q    Can you tell me about one of those occasions --

18  A    Well, we --

19  Q    -- for example?

20  A    We had three different pieces of legislation that we

21  assisted in drafting, had to do with the composition of the

22  police and fire pension board in the City of Detroit.

23  Q    As president of the association, have you ever been

24  consulted by elected officials to discuss proposed

25  legislation at the state level?

1   A    At the state, yes, I have.

2   Q    Can you give me an example of that?

3   A    Andy Dillon has contacted me as the president of the

4   association to discuss legislation up there, and also the

5   mayor of the City of Detroit contacted me to discuss

6   legislation on the city.

7   Q    Have you ever served on a committee regarding benefits

8   legislation?

9   A    Yes, I have.  When Andy Dillon -- when he was the Speaker

10  of the House -- I think it was about four years ago -- he

11  proposed legislation that would establish a statewide

12  healthcare program for public employees within a committee

13  that he chaired, and there was a breakout committee for

14  retirees, and I was asked to serve on that breakout committee

15  representing retirees.

16  Q    Mr. Taylor, are you registered as a lobbying agent?

17  A    As a lobbying agent for the retired Detroit Police and

18  Fire Fighters Association.

19  Q    Has the association ever expressed a position before the

20  City Council on behalf of retirees?

21  A    A number of occasions.

22  Q    Was the association involved with the Detroit City

23  Charter Revision Committee --

24  A    Yes, it was.

25  Q    -- or Commission, I should say?

1  A   Commission.

2  Q   Was it the Detroit --

3  A   Yeah, to revise.

4  Q   -- City Charter Revision Commission?

5  A   Revise the charter, yes.

6  Q   And when was the Charter Revision Commission active?

7  A   I believe the election was in 2011, so 2010, 2011.

8  Q   What was the purpose of your association participating in

9  the commission?

10  A   As the president of the association, I was invited to

11  participate in the portion of the charter revision that

12  referred to the pensions, and I was -- took part in the

13  board, questions from the public and from the board.

14  Q   Have you met with state officials on behalf of the

15  association?

16  A   Yes, a number of them.

17  Q   Did you meet this spring with State Treasurer Dillon?

18  A   Yes, I did.

19  Q   And did you request that meeting?

20  A   Yes, I did.

21  Q   Why did you want to meet with Mr. Dillon?

22  A   It was shortly after the new emergency manager

23  legislation had been passed, and I notified him that I wanted

24  to meet with him to discuss any possible effect that it could

25  have on retired police officers and fire fighters.

1  Q   Did you advise Mr. Dillon of any concern for payment of

2  pensions and benefits?

3  A   At that meeting?

4  Q   Yes.

5  A   Yes.  We discussed a number of issues at the meeting.

6  Q   Did you ask Mr. Dillon about the effect the legislation

7  might have on police and fire retirees?

8  A   Yes.  During the discussion, I brought up what proposals

9  or what possible changes that he could see on a number of

10  issues.  One of those included the composition of the police

11  and fire retirement board, and he indicated that there may be

12  some changes on that board, but it would not affect retirees'

13  positions.  I then asked him if there was anything that he

14  would see as possible changes on the pensions or anything of

15  that nature, and he informed me that there would be no

16  changes because the current retirees' pensions were

17  guaranteed by the state Constitution, but they were looking

18  at possible changes for future retirees on the way in which

19  their pensions may be calculated in the future.  And I also

20  asked him about our healthcare settlement, the Weiler

21  settlement agreement, if he's seen any possibility that that

22  would be affected during these hearings, and --

23  Q   Did you receive a response to that question?

24  A   Yes.  He informed me it was the State of Michigan's

25  intention to attempt to set aside that agreement or overturn

1  that agreement.

2           MR. IRWIN:  Your Honor, I have an objection to the

3  testimony as hearsay.

4           THE COURT:  This was -- these were statements that

5  Mr. Dillon made to you?

6           THE WITNESS:  Directly to me, yes, sir.

7           THE COURT:  The objection is overruled.  You may

8  proceed.

9  BY MR. MORRIS:

10 Q   Mr. Taylor, did you become aware this spring of the

11 appointment of Mr. Orr as emergency manager for the City of

12 Detroit?

13 A   Yes, I did.

14 Q   And following his appointment, did you contact Mr. Orr?

15 A   Yes.  I sent a letter and requested a meeting.

16 Q   Did you receive any response?

17 A   Yes, I did.  His office contacted me by phone and set up

18 a date for a meeting.

19 Q   And did you eventually meet with Mr. Orr?

20 A   Yes, I did.

21 Q   And do you recall when that meeting occurred?

22 A   It was towards the end of April.  I think it was April

23 18th.

24 Q   And who was at that meeting?

25 A   It was the secretary treasurer of our association, Allan

1    Grant; the vice president of our association, Greg Trozack;

2    Mr. Orr; and myself.

3    Q    And what was discussed at the meeting?

4    A    There was a number of issues.  We had a 45-minute

5    meeting, and, first of all, I introduced who we were and what

6    our organization does, and I asked him some of the same

7    questions I had spoke with with Mr. Dillon.  I asked him if

8    he seen changes in the composition of the pension board, and

9    he said he hadn't made any decisions on that yet.  I asked

10   him if he was -- about the pensions of retirees.  He said

11   that he was fully aware that the pensions were protected by

12   the state Constitution, and he had no intention of trying to

13   modify or set aside it or change the state Constitution, and

14   I went on.  I asked him if he was familiar with the Weiler

15   settlement agreement.  He indicated that he was, and he

16   indicated to me that he was -- assured me that under the

17   Emergency Manager Act, he had no authority to set aside that

18   agreement or modify that agreement.  After he made that

19   statement, I told him that I'd had a meeting with Andy

20   Dillon, and Andy Dillon had indicated that the state's

21   intention was to attempt to overturn that settlement

22   agreement.  He indicated that he doesn't speak for the state,

23   but that was not his intention, and he had no intention of

24   trying to set aside that agreement.

25   Q    Was there any discussion at that meeting about the

1    possibility of having future meetings with Mr. Orr?

2    A    Yeah.  Following the meeting, Mr. Orr indicated to me as

3    he was just starting to proceed and there was more

4    information that he was gathering, and as the process moved

5    along, he would contact our association for further meetings.

6    Q    After this meeting, did you communicate the results to

7    the board of directors of the association?

8    A    Yes, I did, and also to the membership.  I sent out an e-

9    mail regarding our meeting.

10   Q    Was an e-mail sent to the membership?

11   A    Yes.

12   Q    To the e-mail list?

13   A    Yes.

14   Q    After your meeting with Mr. Orr, did you receive a

15   communication from the city asking who the association

16   represents?

17   A    Yes, I did.

18   Q    And did you respond to that?

19   A    Yes, I did, that we represent all police and fire

20   retirees.

21   Q    After meeting with Mr. Orr, did you hear again from Mr.

22   Dillon's office?

23   A    Yes.  I received an e-mail from Mr. Dillon's office -- I

24   think it would be towards the end of May, maybe the first

25   part of June -- advising me that I should contact

1   Mr. Buckfire's -- Ken Buckfire and one other member of his

2   team regarding things that may affect police and fire in the

3   bankruptcy proceedings.

4   Q    Did you contact Mr. Buckfire?

5   A    Yeah.  I sent e-mails to Mr. Buckfire, and I don't recall

6   the other representative's name.  And I also called

7   Mr. Buckfire by phone and left a message with his secretary.

8   Q    Did you receive --

9   A    I assume it was his secretary.

10  Q    Did you receive a response?

11  A    Yes, I did, in both occasions, by e-mail and by phone.

12  Q    And what was the response?

13  A    Mr. Buckfire indicated to me by phone that they would be

14  in touch and they would be setting up meetings and would get

15  back with me at a later time, and that was pretty much --

16  both e-mails came back from both representatives saying

17  basically the same thing, that they would be in touch and

18  meetings would be set up in the future.

19  Q    And were further meetings set up?

20  A    Not with our organization.

21  Q    But did you attend a meeting on June 14th at the Metro

22  Airport?

23  A    Yes, I did.

24  Q    And were you invited to attend that meeting?

25  A    Yes, I was.

1    Q    Who invited the association to attend the meeting?

2    A    It was done by e-mail.  It was from representatives from

3    Jones Day.  I don't recall the name.

4    Q    Who attended on behalf of the association?

5    A    We were limited to two, and it was the secretary-

6    treasurer, Allan Grant, and myself.

7    Q    Do you recall how many persons were in the audience at

8    that meeting?

9    A    It was maybe at least a couple hundred.

10   Q    Do you know what groups were represented at that meeting?

11   A    There was -- pretty much every group was represented

12   there, the active associations, the pension board, the

13   bondholders, every --

14   Q    Was the proposal for creditors document that's been

15   referred to circulated at that meeting?

16   A    Yes, it was.

17   Q    Did you receive a copy?

18   A    Yes.

19   Q    Did you furnish a copy to the association's attorneys?

20   A    Yes, I did.

21   Q    At that meeting, were you or other representatives of the

22   association given an opportunity to discuss your position?

23   A    No, not to discuss the position.

24   Q    Was there an opportunity to submit questions?

25   A    You could submit written questions.

1    Q    Did you submit a question?

2    A    No.

3    Q    And was there a reason why you didn't submit a question?

4    A    At that point, I had met with the state treasurer and

5    Mr. Orr, and I was under the impression that the members of

6    the Retired Police Officers and Fire Fighters benefits were

7    not at that great a risk at that point, and I was informed

8    that Mr. Orr would notify me and would set up future meetings

9    with our association if it became necessary.

10   Q    And following that meeting, did you report back to the

11   board of directors?

12   A    Yes.

13   Q    Did you attend another meeting on June 20?

14   A    Yes.

15   Q    And do you recall where that meeting occurred, where that

16   was held?

17   A    I think that was the one in the auditorium at City County

18   Building.

19   Q    And was there someone that invited you to attend?

20   A    Yes, same way, by e-mail.

21   Q    And who attended on behalf of the association?

22   A    Once again, it was restricted to -- I was -- myself and

23   our attorney, Brian O'Keefe.

24   Q    And this -- you said it was restricted.  What do you mean

25   by --

1   A   We had two positions, yes.

2   Q   You were allowed to have two people attend?

3   A   Yeah.

4   Q   Do you recall how many persons were in the audience?

5   A   I'm going to guess 50, 60.

6   Q   And what groups were represented?

7   A   All the active labor organizations were there, and I

8   think there was probably representatives from the pension

9   board and some that I'm not familiar with who they were, but

10  there was a number of people there.

11  Q   Did the city at this meeting tell you what it intended to

12  do with police and fire pensions?

13  A   No, they didn't.

14  Q   Were you asked your position?

15  A   No.

16  Q   Did you submit any questions at this meeting?

17  A   No.

18  Q   And why not?

19  A   Once again, I had no reason to submit.  I was still under

20  the impression -- I wasn't sure what they were referring to

21  and --

22  Q   How many different retiree groups were represented at

23  that meeting?

24  A   One.

25  Q   Basically two people there on behalf of your association?

1   A   Yeah.  I was the only retiree and an attorney, as far as

2   I know.  There may have been some individual retirees with

3   him, but there was no retiree association.

4   Q   Now, did you attend another meeting with the city?

5   A   Yes.

6   Q   In July?

7   A   Yeah.

8   Q   Do you recall the date of that meeting?

9   A   There was two in a row.  I think they were the 10th and

10  11th.

11  Q   And were you invited to attend that meeting?

12  A   Not initially, no.

13  Q   Did you hear about it somewhere?

14  A   Yeah.  One of our board members is -- he also is a member

15  of the Police Officers Association of Michigan, and he was

16  invited as a representative for the EMS.  And once he was

17  invited, he sent me a copy of his e-mail, and once I received

18  his e-mail that these meetings were set up, I contacted the

19  phone number at the bottom of his and asked if we would be

20  allowed to attend to represent the interest of retirees, and

21  I don't recall the name of the person, but they was from

22  Jones Day, and they indicated that they would run it up the

23  chain and get back with me.

24  Q   And did you receive a response?  Did you receive a --

25  A   No.  I also forwarded that e-mail to our attorney, and he

1  indicated he also called and requested a meeting, and a few

2  hours later that day he notified me that they were going to

3  give us one position.

4  Q   Now, are EMS part of the police and fire?

5  A   No.

6  Q   Was there also a limit on the number of persons permitted

7  to attend this meeting on behalf of the --

8  A   Yeah.  Initially it was just going to be one, and then

9  the attorney indicated to me that he called them back, and

10 they were allowed -- I was allowed to bring an attorney.

11          THE COURT:  Allowed to bring what, sir?

12          THE WITNESS:  The attorney.

13 BY MR. MORRIS:

14 Q   And who was in attendance at this meeting?  Who was in

15 the audience?

16 A   Once again, it was all the public safety unions and

17 different labor organizations and I think probably the

18 pension board and pension trustees, the actuaries, and

19 depends on what you --

20 Q   Did the city make a proposal at that meeting with respect

21 to police and fire retirees?

22 A   No.  Well, which meeting are you referring to?

23 Q   July --

24 A   I assume the pension meeting was first, right, the

25 pension -- that was the 10th?

1  Q   July 10 I'm referring --

2  A   Yeah.

3  Q   -- to, the first of the two meetings.

4  A   Yeah.

5  Q   Was there a discussion at this meeting regarding active

6  employees?

7  A   Yes.  There was a lot of discussion because it was pretty

8  much all active members there with the exception of myself,

9  and there was some discussion over modifications on how their

10 pensions were going to be altered or administered in the

11 future, so most of the meeting geared around the active

12 members.

13 Q   Are those issues that concern your association?

14 A   No.

15 Q   Was there discussion regarding retiree issues?

16 A   Not that I recall.

17 Q   At this meeting, were you asked your position on any

18 issues?

19 A   No.

20 Q   Did you have any questions at this meeting?

21 A   No.

22 Q   Did the city at this meeting state that it intended to

23 reduce or impair police and fire pensions for current

24 retirees?

25 A   Not for current retirees.

1    Q    Now, you also said there was another meeting --

2    A    The next day.

3    Q    -- the next day?

4    A    Yes.

5    Q    And was that -- did that meeting regard --

6    A    Healthcare.

7    Q    -- healthcare?

8    A    Yeah.

9    Q    And were you invited to this meeting?

10   A    In the same method as the previous one.  It was done at

11   the same time.

12   Q    Two meetings go together.

13   A    Yeah.  They were published at the same -- together as

14   joint meetings.

15   Q    And was the audience similar to the July 10 meeting?

16   A    Yes.  There may have been a little -- I'm not sure at the

17   second meeting if the actuaries from the pension board was

18   there or not.

19   Q    Did the city at this meeting make a proposal regarding

20   police and fire retirement benefits?

21   A    They passed out a -- I guess you could call it a

22   proposal.  It was a four-line -- just one paragraph that had

23   four options for healthcare benefits for retirees.

24   Q    Like the names of healthcare plans?

25   A    There was two options from Blue Cross and two options

1  from HAP.

2  Q   Did you ask any questions at this meeting?

3  A   Yes.  I asked one question regarding whether their

4  intention was to modify or to include those that were covered

5  by the Weiler settlement agreement in this healthcare

6  proposal.

7  Q   Did you receive an answer to your question?

8  A   Not a direct -- at that point, once I asked that

9  question, the attorney who represented us in the -- Mr.

10  Legghio, Mr. Chris Legghio, was present, and he kind of took

11  over once I brought up the question, and then there was an

12  exchange of legal back and forward between that attorney and

13  the Jones Day attorneys.  And they indicated that there was

14  some legal questions regarding whether they would be able to

15  enforce that, and that was still being looked into by the

16  attorneys.

17  Q   The attorney you referred to, Mr. Legghio, had he been

18  involved in the Weiler litigation?

19  A   Yeah.  He was the -- he was the attorney that handled the

20  class action.

21  Q   Following this meeting, did you have the opportunity to

22  ask for a separate meeting with the emergency manager's

23  representatives?

24  A   Yeah.  I don't recall the exact procedure.  It was either

25  after that meeting or the previous one.  As I was leaving the

1  meeting with our attorney, Brian O'Keefe ran into one of the

2  Jones Day senior attorneys.  Once again, I'm not good with

3  names, you know, but we -- they had a brief discussion in the

4  hallway.  At that time, I indicated to him that we would like

5  to have a meeting on our own, a breakout meeting just

6  affecting retired Detroit police and fire fighters.

7  Q    Did that meeting ever occur?

8  A    No.  He indicated to our attorney that -- asked that the

9  attorney, you know, put that in writing, forward it to him,

10  and forward the request to him.

11  Q    Following this meeting or these meetings on July 10 and

12  July 11, did you meet with any of the other persons in the

13  audience to discuss issues?

14  A    Following the meeting?  After the second meeting, the

15  active unions, we all met out in the hallway for a short

16  time, you know, right outside the meeting, and then we

17  decided to all go over to the office of the Detroit Police

18  Officers Association and discuss what had just transpired.

19  Q    And did you attend that meeting at the --

20  A    Yes, I did --

21  Q    -- DPOA headquarters?

22  A    -- along with our attorney.  We all went to the offices

23  of the Detroit Police Officers Association.

24  Q    Did you hear testimony previously regarding a letter sent

25  by the public safety unions to the city manager?

1   A    Yes.

2   Q    Do you recall that letter that was being discussed?

3   A    Not at that particular -- what we discussed at that

4   meeting when we all got in, we decided that as a group we

5   would select like a lead organization to represent us as a

6   group and request further meetings, and at that meeting we

7   decided that the lead would be the Detroit Police Officer --

8   the president of the Detroit Police Officers Association, and

9   he asked that we all submit questions to him so that he could

10  forward this information or request on to the city's

11  representatives.

12  Q    So is it fair to state that you participated in

13  discussions that led up to a letter being sent?

14  A    Yeah.  I was involved in a meeting with the Detroit

15  Police Officers Association.

16  Q    Did the association -- after the bankruptcy was filed,

17  did the association send out a mailing to police and fire

18  retirees?

19  A    Yeah.  That's what we considered -- referred to as a

20  consent agreement where we sent letters out to all the

21  retired police officers and fire fighters asking if they

22  wanted to -- us to represent them in the bankruptcy

23  proceedings.

24  Q    Was this sent immediately after the bankruptcy was filed?

25  A    Yes.

1   Q   And who was this sent to?

2   A   All retired police officers and fire fighters.

3   Q   And what responses were received?

4   A   We got back at this point I think a little over 5,300.

5   Q   Did you receive any responses from nonmembers?

6   A   Yes.

7   Q   Did you receive any responses that indicate that the

8   association should not represent the retirees?

9   A   Yes, we did.

10  Q   How many of those did you receive?

11  A   One.

12  Q   Did you receive any responses that indicated that the

13  retirees wanted the association to represent the retirees?

14  A   Yes, as I said, 5,300, over 5,300.

15  Q   Did you receive feedback from police and fire retirees

16  regarding the city's bankruptcy petition?

17  A   You're going to have to repeat that.

18  Q   Did you receive feedback?  Did the association receive

19  feedback from police and fire retirees regarding the city's

20  bankruptcy petition?

21  A   Oh, yeah.  As I said, we have a full-time office, and the

22  phones have -- basically, like I say, ringing off the hook.

23  We were constantly receiving phone calls, e-mails, and

24  letters asking what's going to happen, are they going to --

25  many times before the first of the month we got calls to ask

1   if they're going to get their pension check, is our pension

2   check still coming, what's going to happen on January 1st.

3   We -- it's hundreds of inquiries.

4   Q   Was the board of directors of the association in a

5   position to receive a proposal from the city regarding police

6   and fire retirees?

7   A   Yes.

8   Q   Was it in a position to consider such a proposal?

9   A   Yes.

10  Q   Was the board in a position to transmit any such proposal

11  or other information to the membership?

12  A   Yes.

13  Q   Was the board in a position to transmit that information

14  to the retirees, the police and fire retirees who were not

15  members?

16  A   Yes.

17          MR. IRWIN:  Objection.  This is very leading, your

18  Honor.

19          THE COURT:  No.  I'll permit this.  Go ahead, sir.

20  BY MR. MORRIS:

21  Q   Did the city ever make a proposal specifically to police

22  and fire retirees?

23  A   No, not that I'm aware of, not to our organization.

24  Q   Did you ever inform Mr. Orr that the RDPFFA did not want

25  to represent police and fire retirees?

1  A    No.

2  Q    Did negotiations occur with the RDPFFA?

3  A    No.

4  Q    Was it possible for the city to negotiate with the

5  RDPFFA?

6  A    Yes.

7  Q    Has the uncertainty regarding future pensions -- pension

8  and benefit payments affected your members?

9  A    Yes.

10  Q    Has it affected you personally?

11  A    Yes.  Everything affects everybody.  You're not sure

12  what's going to happen, whether on January 1st -- my personal

13  thing, my daughter has asked me to loan her money for a down-

14  payment on a house, and I told her we're going to have to

15  wait a few months, see what happens.  My car currently has

16  250,000 miles on it.  It's still running, but it's got 250,

17  so I'm holding off any big expenditures until I get a better

18  picture of what's going to -- the future is going to hold.

19          MR. MORRIS:  Thank you, Mr. Taylor.  I have no

20  further questions.

21                    CROSS-EXAMINATION

22  BY MR. IRWIN:

23  Q    Good afternoon, Mr. Taylor.

24  A    Good afternoon.

25  Q    I just want to revisit briefly something that you

1  described in connection with your background and the

2  background of the organization, the --

3  A  Okay.

4  Q  -- RDPFFA.  We saw earlier in connection with the by-laws

5  of the organization that there are actually two missions, if

6  you will, for the organization.  One was to provide

7  information.  Do you recall that?

8  A  Yes.

9  Q  And the other was to promote goodwill among the

10  membership; is that right?

11  A  Yes.

12  Q  And did the organization start or did it have roots as a

13  social organization of some sort?

14  A  Oh, yes.  Yes.

15  Q  And it was formed over 50 years ago?

16  A  Yes.

17  Q  And you consider the organization to be advocates for the

18  membership; is that right?

19  A  Yeah, advocates for all retired police officers and fire

20  fighters.

21  Q  Correct.  And I believe that you have indicated that the

22  organization has been involved in lawsuits before; is that

23  right?

24  A  Yes.

25  Q  And is it a true statement that the only time that the

1    organization has been able to bind the members in connection

2    with a reduction in benefits has been by court order or by

3    consent of all the retirees; is that right?

4    A    Yeah.  It was either by court order or consent.  There

5    was a time when we used consent on the 13th check agreement.

6    Q    And in connection with the settlement agreement that you

7    were talking about, that was done with the consent of the

8    members; is that right?

9    A    Yes.

10   Q    And -- well, I'll return to that in just a moment.  The

11   Weiler settlement agreement that you were talking about

12   previously, do you recall that --

13   A    Yes.

14   Q    -- testimony?  And that was a topic that had actually

15   come up at a number of the meetings that you had with the

16   city; is that right?

17   A    Yes, with the city and the state.

18   Q    And I think you mentioned that at your first meeting with

19   Mr. Orr -- I think you said that was late April; is that

20   right?

21   A    Yes.  April 18th I think was the date.

22   Q    And you said that that was -- that particular consent

23   decree was important enough to you that you wanted to make

24   sure that there was some discussion about that at the

25   meeting; is that right?

1   A   Yes.

2   Q   Okay.  Did you at that meeting indicate to Mr. Orr that

3   you had any authority from the membership of the organization

4   to renegotiate the Weiler consent decree?

5   A   No.  I wouldn't seek that in advance.  Why would I seek

6   that in advance?

7   Q   Did you ever -- did you ever in the -- did you ever,

8   prior to the time that the bankruptcy was filed, seek

9   authority from the membership of your organization to reduce

10  the benefits that were memorialized in the Weiler consent

11  decree?

12  A   No.  I don't see that as part of the negotiating process.

13  I was a member of the Detroit Police Officers Association

14  from 20 years as an executive there, and we never sought in

15  advance permission from the members to reduce benefits then

16  either.  That's not something -- I don't see that as part of

17  the bargaining process.

18  Q   Is that a "no"?  Is it a fair statement to say that you

19  did not, in fact, get authorization from the membership at

20  any time prior to the bankruptcy filing to renegotiate the

21  Weiler consent decree?

22  A   I didn't feel it was necessary at that point.

23  Q   Okay.  And did you ever indicate -- I assume then you

24  never indicated to Mr. Orr or any city officials at your

25  meetings that you were prepared to renegotiate the Weiler

1  consent decree?

2  A    No.   Mr. Orr --

3           MR. MORRIS:  Objection.  Asked and answered.

4           THE COURT:  It's a slightly different question.  You

5  may answer it, sir.

6           THE WITNESS:  Mr. Orr never indicated to me at our

7  meeting -- I think I said that -- that he intended to reduce

8  our benefits, so I wasn't going to suggest that he reduce our

9  benefits.

10  BY MR. IRWIN:

11  Q    Did you ever indicate -- or the discussion that you

12  described at one of the meetings -- I think it was the -- one

13  of the July meetings, and you said there was an attorney

14  there for the class in the Weiler consent decree.  He was

15  present at the meeting.

16  A    Yeah.  Chris Legghio.

17  Q    And do you recall observing the communications or the

18  dialogue back and forth between Mr. Legghio and the Jones Day

19  attorneys?

20  A    Yes.

21  Q    Okay.  Did you observe -- in what you saw and heard, did

22  you observe Mr. Legghio at any time make an offer to

23  renegotiate the terms of Weiler?

24  A    No.

25  Q    And did anyone at that meeting indicate to anyone at the

1  city that they had authority from the members of your

2  organization to renegotiate Weiler?

3  A   Once again, I think you're putting things ahead of time.

4  Why would we negotiate something before anything is offered?

5          THE COURT:  Is the answer "no"?

6          THE WITNESS:  No.  The answer is "no."

7  BY MR. IRWIN:

8  Q   Did you believe that the city had the right to

9  renegotiate the terms of Weiler at that meeting?

10  A   Through consent, yes.

11  Q   And have you at any point in time, even after the

12  bankruptcy filing, approached your membership and asked for

13  consent or authorization to renegotiate Weiler?

14  A   Once again, I repeat the same thing.  I don't have -- it

15  would be premature.

16  Q   Is that a "no"?

17  A   That's a "no."

18  Q   Okay.  And is it also true, Mr. Taylor, that your

19  organization, the RDPFFA, has not negotiated in a binding way

20  a reduction in healthcare costs -- or sorry -- healthcare

21  benefits for its membership?

22  A   No, that's not true.  We did do -- we did negotiate a

23  reduction in healthcare benefits.

24  Q   Are you talking about the Weiler --

25  A   Yes.

1    Q    -- consent decree?  Setting Weiler aside, which was a

2    class action lawsuit --

3    A    Yeah.

4    Q    -- has there ever been any other instance where the

5    organization has had the authority and has negotiated with

6    binding effect to reduce healthcare benefits to the members?

7    A    No.  It was never necessary.

8    Q    Okay.  And has there ever been any other attempt by the

9    organization to get authority from its members to reduce

10   healthcare benefits in a binding way?

11   A    No.  It was never necessary.

12   Q    So the way the process would need to work then, if I

13   understand it, is that the organization would, if invited,

14   participate in negotiations with the city; is that right?

15   A    Yes.

16   Q    Okay.  And then what would happen -- if the city were to

17   make a proposal to the RDPFFA, that is a proposal that the

18   RDPPFFA (sic) could consider; is that right?

19   A    That's right.

20   Q    And it could negotiate -- it could pass along that

21   information to the members; is that right?

22   A    Yes.

23   Q    And it could even perhaps recommend that the membership

24   accept that proposal; is that right?

25   A    That's what we've done in the past, yes.

1  Q   But ultimately is it not true that it would be up to the

2  individual members of the association to decide if they would

3  accept or reject that offer?

4  A   Yes.

5  Q   Okay.  And so it could be the case certainly that the

6  city could negotiate with your organization and make a

7  proposal and, in fact, reach an agreement in principle only

8  to find that the vast majority if not all of the members

9  rejected it?

10 A   And that would be true with the actives the same.  They

11 vote on their contracts.

12 Q   And in that case, the city would have to negotiate with

13 the individual members themselves if they wanted to reach an

14 agreement to reduce benefits?

15 A   No.  I believe we could follow the same procedure that we

16 followed with the Weiler.  We'd bring in the assistance of

17 attorneys and a court.

18 Q   But in terms of a straightforward negotiation, though,

19 the city would have to negotiate with members individually in

20 that case; is that right?

21 A   Not necessarily.  I just said we did it with the Weiler

22 through a class action.  I believe they could follow the same

23 proceeding.

24 Q   Outside of a class action setting where the members are

25 suing the city, if we're just talking about a negotiation

1  where the city is attempting to reduce healthcare benefits,

2  if the city made a proposal, it would ultimately have to

3  negotiate with the individual members; is that right?

4  A    Yeah.  I believe they could put it out --

5          MR. MORRIS:  Objection, your Honor.

6          THE WITNESS:  -- for a vote, and the members --

7          MR. MORRIS:  Calls -- I'm sorry.

8          THE COURT:  What is your objection, sir?

9          MR. MORRIS:  Calls for a legal conclusion.

10         THE COURT:  Well, the witness can give us his

11 understanding if he feels comfortable doing that.

12         THE WITNESS:  Yes, sir.  I'll give an answer.  I

13 believe that the city could propose that to the retired

14 police officers and fire fighters, and they could vote on the

15 proposal.

16 BY MR. IRWIN:

17 Q    They would decide for themselves if they wanted to accept

18 the proposal; is that right?

19 A    Yes, they would.

20 Q    All right.  We've been talking about healthcare benefits;

21 right?  We've been talking about the Weiler settlement and --

22 A    Yes.

23 Q    -- healthcare benefits.  Let's talk about pension issues

24 for a moment, if we could.

25 A    Okay.

1 Q   It is your position, is it not, Mr. Taylor, that the

2 organization -- your organization is not empowered to enter

3 into binding agreements with the city in order to reduce

4 pension benefits?  Is that a true statement?

5 A   Not on our own, and it would have to be done in the same

6 method, and it would have to -- obviously that one would have

7 to be a consent, and that is a more legal question than I

8 could answer.

9          MR. IRWIN:  Well, let's put -- why don't we put

10 up -- let's put up Exhibit 302, if we could.

11 BY MR. IRWIN:

12 Q   Do you see Exhibit 302 in front of you, Mr. Taylor?

13 A   Yes, I do.

14 Q   Do you recall -- do you recall providing a declaration in

15 connection with the legal proceedings in this case?

16 A   Yes.

17 Q   And is this a true and accurate copy, to the best you can

18 tell, of that declaration?

19 A   Yes.

20 Q   And did you sign it on or around August 19th of this

21 year?

22 A   If that's the date, yeah.  It would be around then.

23 Q   We can confirm it.

24 A   Yeah.

25 Q   It's on the last page of the document.

1   A    Okay.  Yeah.

2   Q    Is that your signature on the last page?

3   A    Yes, sir.

4   Q    Okay.  If I could direct your attention, please, to

5   paragraph 6 of that document -- it's on the second page at

6   the bottom.

7   A    Okay.

8   Q    Have you had a chance just to read that paragraph?

9   A    Yes.

10  Q    I'd like to direct your attention to the second line

11  where you state, "The RDPFFA is not empowered to enter into a

12  binding agreement with the city regarding pension benefits."

13  A    Yes.

14  Q    Do you see that?

15  A    I stated that, not without outside assistance.

16  Q    Not without outside assistance.  You mean the consent of

17  the members?

18  A    Yes, or through the legal process through a court.

19  Q    Right.  So the organization does not have the authority

20  absent the consent --

21  A    Consent, yes.

22  Q    -- of the members who you would purport to bind --

23  A    Right.

24  Q    -- in order to reduce pension benefits?

25  A    Right, yeah.

1    Q    Which means that if the city were to wish to negotiate a

2    reduction in pension benefits, ultimately it would need to

3    negotiate with the individual members; correct?

4    A    Not the individual members.  They could put a proposal

5    and present it for their vote, yes.

6            MR. IRWIN:  And if we could -- while we're on the

7    subject of pension benefits, if we could also put up --

8    Laurie, if you could put up Exhibit 83.

9    BY MR. IRWIN:

10   Q    Do you see Exhibit 83 in front of you, Mr. Taylor?

11   A    Yes.

12   Q    Do you recall participating in responding to written

13   questions that were posed to your organization in connection

14   with this proceeding?

15   A    Yes.

16           MR. IRWIN:  And could we go to the last page of

17   document, Laurie, the signature page?  If you could blow up

18   that bottom left section --

19           THE WITNESS:  Yeah.  I can see it.

20   BY MR. IRWIN:

21   Q    Can you see it okay?

22   A    Yeah.

23   Q    Okay.  Is that your signature, Mr. Taylor?

24   A    Yes.

25   Q    Does that indicate that you personally participated in

1  the preparation of the responses to these questions?

2  A   Yes.  I reviewed them, yeah.

3  Q   To the extent they applied to your organization.

4  A   Yeah.

5  Q   This was a composite set of questions and answers, some

6  of which applied to your organization and some to another; is

7  that right?

8  A   That's right.

9  Q   And to the extent that there are questions and answers

10  that relate to your organization, may I presume that you were

11  the person who provided the substantive responses and

12  verified them; is that right?

13  A   Yes.

14  Q   Okay.  And you signed this believing that these answers

15  were truthful and accurate?

16  A   Yes.

17  Q   Okay.

18          MR. IRWIN:  Could we then turn to -- let's look at

19  response Number 3 -- sorry -- response Number 5 is the one I

20  wanted to focus on, the question and answer Number 5.  I

21  think it's one more page.  There we go.  Could you blow that

22  up?

23  BY MR. IRWIN:

24  Q   All right.  This is a question, and I'll read it -- and

25  I'd like you to make sure I've read it right -- where we

1  ask -- the city asks to identify any person or persons who

2  have knowledge of any attempt prior to July 19th, 2013, by

3  the RDPFFA to obtain any form of legal authority from its

4  members to appoint RDPFFA as their representative in

5  connection with negotiations to reduce, limit, or abridge

6  pension rights or benefits on a prospective basis only

7  provided by the PFRS.  Do you see that?

8  A   Yes.

9  Q   And did you understand the question at the time you were

10  responding to it?

11  A   Yes.

12  Q   And is it a fair summary to say that the question is

13  asking for individuals with knowledge of any prior attempt to

14  get authority to negotiate a reduction in pension benefits on

15  behalf of the membership?

16  A   Yes.

17  Q   Okay.

18  A   Like I said, it would be premature.

19  Q   Yes.  But you answered this question, did you not?

20  A   Yes, I did.

21  Q   Okay.  And let's look at your answer.  It actually

22  extends onto the next page of the document.  There are

23  several lines where there are some objections that are

24  stated, and then there's a response that begins on the next

25  page.  Do you see that?

1  A    Yes.

2  Q    Okay.  And the answer provides -- there's a sentence that

3  begins, "However," and it says, "without waiving said

4  objections and in the spirit of cooperation, the RDPFFA

5  states that it is not aware of any individual with knowledge

6  responsive to this interrogatory."  Do you see that?

7  A    Yes.

8  Q    And may I interpret that to mean that there is no --

9          THE COURT:  Excuse me.  What answer were you reading

10  from?

11          MR. IRWIN:  The response to Number 5.  Maybe we

12  didn't have it pulled up the right away.

13          THE COURT:  Yeah.  Let's get this --

14          MR. IRWIN:  Yeah.

15          THE COURT:  -- set up properly here.

16          MR. IRWIN:  Yeah.  I think it was just a problem

17  with the screen.  I was reading from Number 5, and I'll do it

18  again.

19          THE COURT:  Here we go, yes.  It was the second page

20  on the screen that wasn't the correct second page, so --

21          MR. IRWIN:  Yeah.

22          THE COURT:  -- let's just hold on.

23          MR. IRWIN:  We'll blow it up.

24          THE COURT:  Hold on.

25          MR. IRWIN:  Yeah.

| | |
|---|---|
| 1 | THE COURT: Yeah. Hold on one second. |
| 2 | MR. IRWIN: Right. |
| 3 | THE COURT: Okay. Now you may proceed. |
| 4 | BY MR. IRWIN: |
| 5 | Q   I apologize, Mr. Taylor. I think we've got this right |
| 6 | now. |
| 7 | A   All right. I was confused anyway. |
| 8 | Q   Sorry? We have it. Okay. I think we've got it right |
| 9 | now. |
| 10 | A   Okay. |
| 11 | Q   Okay. And I'll read it. I'll read from the answer. |
| 12 | A   Yeah. |
| 13 | Q   It says, "However, without waiving said objections and in |
| 14 | the spirit of cooperation, the RDPFFA states that it is not |
| 15 | aware of any individual with knowledge responsive to this |
| 16 | interrogatory." Do you see that? |
| 17 | A   Yes. |
| 18 | Q   And do I correctly interpret that to mean that you are |
| 19 | not aware of any prior instance where the organization has |
| 20 | asked for authority from the membership to negotiate a |
| 21 | reduction in pension benefits? |
| 22 | A   In advance, no, we haven't. |
| 23 | Q   We have not. And it is true that you did not ask for |
| 24 | permission in advance in this case here to negotiate with -- |
| 25 | A   No. |

1  Q    -- the city.

2  A    No.

3  Q    "No," that's correct?

4  A    Yes, that's correct.

5  Q    Okay.  Then I want to skip down to the end of the answer.

6  There's a sentence here that reads, "The RDPFFA would not

7  take any action to obtain or solicit authority from its

8  members to do something prohibited by the Michigan

9  Constitution."  Do you see that?

10 A    Yes.

11 Q    And you're aware that your organization has advanced a

12 claim in this case that pension benefits are protected by the

13 Michigan Constitution?

14 A    Yes.

15 Q    And is that the reference that you're making in this

16 answer?

17 A    Yes.

18 Q    Yes.  And the answer states that the organization would,

19 in fact, not ever seek authority from its members to reduce

20 those pension benefits because they're protected by the

21 Constitution?

22 A    Yes.

23 Q    Am I reading that right?

24 A    Yes, not without their consent.

25 Q    And did you make that plain to officials from the city at

1   any of the meetings that you attended?

2   A   No.

3   Q   Okay.  But it was your belief at the time that you would

4   not seek authority to negotiate a reduction in pension

5   benefits?

6   A   At the meetings I was at, it wasn't only my belief, it

7   was that of Mr. Orr and Mr. Dillon, so, once again, I'm not

8   sure why I would make such a statement.

9   Q   And at no point prior to the filing of the bankruptcy did

10  you make it plain to anyone at the city that you would not be

11  willing to negotiate pension benefits?

12  A   No.  What --

13          MR. MORRIS:  Objection.  Asked and answered.

14          THE COURT:  Well, I'll permit it.  I'll permit it

15  one more time.  Go ahead.

16          THE WITNESS:  Rephrase it again.

17  BY MR. IRWIN:

18  Q   Sure.  At any point in time prior to the filing of the

19  bankruptcy, did you come to understand that pension benefits

20  might, in fact, need to be renegotiated?

21  A   No, not the filing, not as it related to police and fire

22  pensions.

23  Q   And so, therefore, you did not indicate that you were

24  unwilling to negotiate reductions in pension benefits to

25  anyone at the city?

1  A   No, because I was told all along this process that the
2  pensions for police and fire were protected by the state
3  Constitution by Mr. Orr and by Mr. Dillon.
4  Q   And in connection with the meetings that you did attend,
5  you were provided -- you received either presentation
6  materials or you saw things that were presented to you; is
7  that right?
8  A   Yes.
9  Q   And did you at any point in time -- did you at any point
10 in time seek guidance from any advisors outside of counsel in
11 terms of how to interpret those presentations?
12 A   No, because I was -- at that point, I was still waiting
13 for a call back from Mr. Orr, and he had notified me when I
14 met with him if it came to the point where we were affected,
15 he would notify me, and we would be invited back to meet with
16 him, and that, I assumed, would be the time we would discuss
17 things that affected police and fire retirees.
18 Q   And if Mr. Orr at one such meeting had indicated to you
19 that he, in fact, did intend to impair pension benefits, it
20 was your belief at the time that that could not be done under
21 the Constitution?
22 A   He didn't indicate that to me.
23 Q   I understand that.
24 A   Yeah.
25 Q   But it was your belief that that could not be done?

1   A    Yes.

2   Q    Okay.

3            MR. IRWIN:  That's all I have, your Honor.

4            MR. MORRIS:  Could I have -- I'm sorry.  Go ahead.

5            MS. PATEK:  Good afternoon, Mr. Taylor.  Barbara

6   Patek, your Honor, again, on behalf of the Detroit public

7   safety unions.

8                        CROSS-EXAMINATION

9   BY MS. PATEK:

10  Q    In your testimony talking about the July 11th meeting,

11  you mentioned an attorney by the name of Chris Legghio, who

12  represented you in the Weiler litigation.

13  A    Yes, ma'am.

14  Q    To your knowledge, do you know whether or not Mr. Legghio

15  also represents the Detroit Fire Fighters from time to time

16  in their labor relations with the City of Detroit?

17  A    Yeah.  I believe that's why he was at that meeting as

18  their representative.

19  Q    And you also mentioned going over to the Detroit Police

20  Officers Association offices after that meeting on the 11th?

21  A    Yes.

22  Q    And there was some discussion that the president of the

23  DPOA would be sort of taking the lead on moving this process

24  forward?

25  A    Yes.

1  Q   Can you tell us who that individual was?

2  A   Mark Diaz.

3          MS. PATEK:  That's all I have.

4          THE COURT:  Redirect.

5          MR. MORRIS:  Could I have Exhibit 302 on the screen,

6  please, specifically paragraph 6 we were looking at before?

7                    REDIRECT EXAMINATION

8  BY MR. MORRIS:

9  Q   Mr. Taylor, do you have that there?  I'm looking at

10  paragraph 6 of Exhibit 302.

11  A   Page 2?

12  Q   Yes, it is, page 2.

13  A   Yes.

14  Q   Page 2 to page 3, yes.  Mr. Taylor, would you please read

15  that paragraph?  Now, on cross-examination you were asked to

16  read a part of this.  Would you please read the complete

17  paragraph 6 for the Court?

18  A   Although like a committee of retirees to like the --

19  although like a committee of retirees to -- appointed by the

20  United States Trustee in this case, the RDPFFA is not

21  empowered to enter into binding agreement with the city

22  regarding pension benefits.  The RDPFA (sic) is a

23  representative of the interest of its members and other

24  police and fire retirees and was at all times relevant to

25  this matter in a position to negotiate on their behalf, to

1   communicate and comment upon proposals made by the city and
2   to recommend to its members and to all police and fire
3   retirees an acceptable proposal.  The RDPFFA retained counsel
4   to assist in the discussions with the city.
5   Q   Thank you.  Mr. Taylor, is that an accurate statement?
6   A   Yes.
7           MR. MORRIS:  No further questions.
8           THE COURT:  All right, sir.  You may step down.
9   Thank you very much for your testimony today.  You're
10  excused.
11      (Witness excused at 2:37 p.m.)
12          MS. LEVINE:  Your Honor, we just have to find
13  Mr. Kreisberg.  He's been sequestered.
14          THE COURT:  Okay.  Thank you.
15          STEVEN KREISBERG, OBJECTOR'S WITNESS, SWORN
16          THE COURT:  Please sit down.
17                      DIRECT EXAMINATION
18  BY MS. LEVINE:
19  Q   Good afternoon, Mr. Kreisberg.
20  A   Good afternoon.
21  Q   Can you state your name and spell your last name for the
22  record, please?
23  A   My name is Steven with the "V."  Last name is
24  K-r-e-i-s-b-e-r-g.
25  Q   And by whom are you employed?

1   A   The American Federation of State, County and Municipal

2   Employees, AFSCME.

3   Q   Is that the International?

4   A   Yes, it is.

5   Q   And what's your title?

6   A   I'm the director of collective bargaining and healthcare

7   policy.

8   Q   And how long have you held that position?

9   A   In different titles about 17 years.

10   Q   In your role as director of collective bargaining and

11   healthcare policy, do you provide assistance to AFSCME locals

12   such as AFSCME Michigan Council 25 in their collective

13   bargaining efforts?

14   A   I do.

15   Q   Do you or does your department in the ordinary course

16   retain copies of the various collective bargaining agreements

17   negotiated and ratified by the various AFSCME locals?

18   A   Yes.

19           THE COURT:  Ms. Levine, could you slow down a little

20   bit for me, please?

21           MS. LEVINE:  This is slow.

22           THE COURT:  Slow?  Well --

23           MS. LEVINE:  Yes, your Honor.

24           THE COURT:  -- okay.  Slow down a little bit more

25   then.

1  BY MS. LEVINE:

2  Q   About how many collective bargaining agreements do you

3  have access to in your capacity as the AFSCME director of

4  collective bargaining and healthcare policy?

5  A   Approximately 8,000.

6  Q   Does the AFSCME constitution require that the AFSCME

7  locals share a copy of all of their negotiated agreements

8  with the AFSCME International?

9  A   Yes.

10  Q   As part of the -- as part of the CBA negotiation process,

11  does AFSCME and its locals negotiate CBA's that provide

12  health plan and pension benefits?

13  A   Yes.

14  Q   As part of the CBA negotiation process, does AFSCME and

15  its locals negotiate CBA provisions requiring employee

16  contributions to health plan and pension benefits?

17  A   Employee and employer contributions.

18  Q   Prior to July 18 -- and I'm not suggesting anything

19  changed after July 18.  It just happens to be the date that

20  the city filed its bankruptcy petition.  Prior to July 18th,

21  in Detroit before the consent decree and before the CET's,

22  the city employment terms, on retirement, did a retired

23  AFSCME employee continue to receive health plan and pension

24  benefits on the terms that were in effect under their

25  collective bargaining agreement on their retirement?

1   A    Yes.

2   Q    And prior to July 18, in Detroit after the consent decree

3   and after the CET's, on retirement, did a retired AFSCME

4   employee continue to receive health and pension benefits on

5   the same terms as those in effect under the CET's on their

6   retirement?

7   A    Yes.

8            MS. LEVINE:  Can we have AFSCME Exhibit 505, please?

9   BY MS. LEVINE:

10  Q    Mr. Kreisberg, I'm going to show you what's been marked

11  as Exhibit 505.  It's a -- it's what we've been referring to

12  as the February 1, 2012, tentative agreement.  Do you see

13  that document?

14  A    Yes, I do.

15  Q    Is this one of the 8,000 CBA documents you have access to

16  in your role as the director of collective bargaining and

17  healthcare policy for AFSCME?

18  A    Yes.

19  Q    Can you identify this tentative agreement from your own

20  personal knowledge or from your review of the records kept in

21  AFSCME's ordinary course of business?

22  A    Yes.

23           MS. LEVINE:  Your Honor, we'd like to move this

24  document into evidence, please.

25           THE COURT:  Any objections?

1          MR. STEWART:  Yes, your Honor.  What's the relevance

2     of it?

3          THE COURT:  The Court overrules the relevance

4     objection.  The document is admitted into evidence.

5       (Exhibit 505 received at 2:42 p.m.)

6          MS. LEVINE:  Thank you, your Honor.

7     BY MS. LEVINE:

8     Q   Did this agreement cover certain AFSCME locals here in

9     Detroit?

10    A   It did.

11    Q   Did the agreement also cover certain other local unions

12    representing various other Detroit city employees?

13    A   Yes.

14    Q   Was this agreement negotiated by a coalition of local

15    Detroit unions working together?

16    A   Yes.

17    Q   Is this a concessionary agreement?

18    A   Yes.

19    Q   And by "concessionary agreement," does that mean that

20    this agreement reflects reductions in the terms and

21    conditions of employment that were previously in effect?

22    A   Yes, specifically compensation levels.

23    Q   Was this agreement ratified or approved by the unions who

24    were parties to this agreement?

25    A   It was.

1    Q    Does that mean that the city represented employees

2    actually voted "yes"?

3    A    Yes, it does.

4    Q    Was this agreement ever put in effect?

5    A    No, it was not.

6    Q    What's your understanding as to why it wasn't put in

7    effect?

8    A    The City Council had never voted to approve the agreement

9    based on instructions it had received from state officials.

10   Q    Under this agreement, would retiree benefits have been

11   affected?

12   A    Yes.

13   Q    And it was a concessionary agreement, so there would have

14   been -- there would have been concessions to those retiree

15   benefits; correct?

16   A    That is correct.

17   Q    And would that have affected active as well as retired

18   employees?

19   A    Yes.

20   Q    Okay.  Turning now to --

21            THE COURT:  Excuse me one second, please.  What

22   state officials did you understand directed the City Council

23   not to approve Exhibit 505?

24            THE WITNESS:  My understanding that it was Treasurer

25   Dillon and perhaps Mr. Baird.

1    MS. LEVINE:  That was for tomorrow, your Honor.

2    THE COURT:  Oh, I jumped the gun.  My apologies.

3    MS. LEVINE:  No.  That's fine.  I just -- I wasn't

4  sure he had personal knowledge.

5  BY MS. LEVINE:

6  Q    Turning now to the good faith negotiations or the lack of

7  good faith negotiations, did you attend the June 14

8  presentation with the city with regard to the so-called

9  proposal to creditors?

10  A    Yes.

11  Q    About how long did the presentation last?

12  A    The entire meeting lasted a little less than two hours.

13  Q    Did the city present certain slides at that meeting?

14  A    They did.

15  Q    What was the title?

16  A    "Proposal to Creditors, City of Detroit."

17  Q    Do you recall about how many slides were presented?

18  A    The slide presentation was approximately 50 slides out of

19  a fuller deck that was made available to us at the end of the

20  meeting.

21  Q    The fuller deck was the full -- there was an executive

22  summary that was presented at the meeting.  Is that your

23  understanding?

24  A    Yeah, a shortened version of the full proposal.

25  Q    Were questions permitted during the slide presentation?

1   A   No.

2   Q   Were questions permitted after the slide presentation?

3   A   Yes, in written form.

4   Q   Were you told one way or the other at that meeting

5   whether or not it was a negotiation?

6   A   We were told it was not a negotiation.

7   Q   Who made that comment?

8   A   The leaders of the meeting.

9   Q   Was that --

10  A   City officials and their attorneys.

11  Q   Was Mr. Orr present at that meeting?

12  A   He was.

13  Q   As the director of collective bargaining and healthcare

14  policy for AFSCME, have you participated with AFSCME locals

15  in collective bargaining sessions?

16  A   Yes.

17  Q   About how many CBA negotiations have you attended?

18  A   Hundreds, thousand, I mean if you're talking about

19  individual discrete sessions.

20  Q   In your experience, was the June 14 presentation a

21  negotiation?

22  A   No.

23  Q   Did you attend the June 20 presentation with the city?

24  A   Yes.

25  Q   And did you also attend the July 10 and the July 11

1  presentations?

2  A    I did, yes.

3  Q    To try and shortcut them, I'm going to sort of ask these

4  questions together.  Did the city make presentations at all

5  three of those meetings as well?

6  A    Yes, they did.

7  Q    Was Mr. Orr present at any of those meetings?

8  A    No, he was not.

9  Q    Did they permit questioning during the presentations?

10 A    Not during the June 20th meeting.  Again, it was written

11 questions at the end of the presentation.

12 Q    And what about during the July 10 and July 11 meeting?

13 A    July 10 and 11 meetings, questions were permitted in a

14 less formal and structured manner.

15 Q    How long did the June 20 meeting last?

16 A    Approximately two hours, maybe a bit less.

17 Q    And what about the July 10 presentation?

18 A    The same.

19 Q    And what about the July 11 presentation?

20 A    The same as well.

21 Q    What was the topic of the June 20 presentation?

22 A    Legacy costs.

23 Q    And what about the July 10?

24 A    July 10th meeting pertained to pensions.

25 Q    And what about the July 11 meeting?

1    A    Retiree healthcare.

2    Q    Were you told whether or not any of these meetings were

3    negotiations?

4    A    We were expressly told they were not negotiations.

5    Q    At each meeting that announcement was made?

6    A    Yes.

7    Q    In your mind, were these negotiations?

8    A    No, they were not.

9    Q    Was Mayor Bing at any of these meetings?

10    A    No, he was not.

11    Q    Between June 14 and July 18, were you or AFSCME invited

12    to any other presentations by the city?

13    A    No.

14    Q    Between June 14 and July 18th, was AFSCME invited to any

15    meeting you would consider a negotiation or where there was a

16    discussion, a give-and-take about the June 14 proposal?

17    A    Other than the ones we described, no.

18    Q    Did you request any financial or other information from

19    the city between June 14 and July 18 to better understand the

20    information provided at those meetings?

21    A    Yes, we did.

22    Q    Did you request information about the city's financial

23    condition?

24    A    Yes.

25    Q    Did you request information to better understand the

1  health benefits?

2  A   Not directly.  Understand the retiree healthcare?

3  Q   All right.  Did you request information to better

4  understand retiree health benefits?

5       MR. STEWART:  Objection, your Honor.  We've had a

6  series of leading questions.  Could we perhaps not have so

7  many leading questions?

8       THE COURT:  No.  The Court does not consider these

9  leading, so you may continue.

10      MS. LEVINE:  Thank you, your Honor.

11 BY MS. LEVINE:

12 Q   Did you request information to better understand the

13 pension portion of the June 14 proposal and the discussions

14 that were had on June 20, July 10, and July 11?

15 A   Yes.  I requested information regarding the funding

16 levels of the pension.

17 Q   Did you personally sign a NDA or confidentiality

18 agreement to access the city's data room?

19 A   I did.

20 Q   Did you access the city's data room?

21 A   Yes, I did.

22 Q   Was certain information in response to your request

23 posted to the data room?

24 A   Yes, it was.

25 Q   Was all of the information you requested posted to the

1    data room?

2    A    No.

3    Q    Did you consider any of the information you requested

4    inconsistent with the type of information you would normally

5    request in the context of a CBA negotiation?

6    A    No, I did not.

7    Q    Prior to the July -- prior to July 18, did the city ever

8    ask you to agree to or to sign a document waiving the right

9    to assert that the city had waived any of its rights under PA

10   436 to facilitate discussions or a give-and-take with regard

11   to the city's proposal?

12   A    The city never sought such a waiver from me.

13   Q    Prior to July 18th, was the June 14th proposal ever

14   modified or revised with regard to the retiree health or

15   pension benefits?

16   A    No.

17   Q    The average AFSCME retiree has what level -- collects

18   what level of pension benefit?

19   A    In the City of Detroit, it's approximately 18 to $19,000

20   a year.

21   Q    In your position as director of collective bargaining and

22   healthcare policy, do you have an opportunity to review from

23   time to time what the poverty level is?

24   A    I do.

25   Q    What is the poverty level for a family of three?

1   A    Family of three, approximately $19,500 annually.

2   Q    And what's the poverty level for an individual?

3   A    Approximately $11,500.

4   Q    Based upon the proposal to creditors provided here, can

5   you tell whether or not AFSCME retirees will be reduced below

6   the poverty level as a result of this proposal as it

7   currently sits?

8   A    It's hard to say.  The proposal was not to pay into the

9   pensions,  and it was -- the representatives of the city

10  declared that there would be no funding of the pensions in

11  terms of the unfunded obligations.  It has been not described

12  to this date that I'm aware of what impact would be and what

13  the effect would be on particular benefits, and, of course,

14  the benefits for individuals vary based on their years of

15  service and their salary levels at the time of retirement.

16  Q    There was a letter that was written by Ed McNeil in May

17  where he indicates that he's not negotiating on -- or is not

18  going to negotiate pensions or retiree benefits.  Are you

19  familiar with that letter?

20  A    I am.

21  Q    And so the questioning seems to indicate that the city is

22  concluding that as a result of that letter, AFSCME was either

23  refusing to negotiate on behalf of its retirees or couldn't

24  negotiate on behalf of its retirees.

25          MR. STEWART:  Objection, your Honor.

1  Characterization of another witness' testimony and also

2  hearsay since she's speaking about the substance of a

3  document that's not before the witness or in front of us but

4  I should add asking the witness to speculate about the

5  contents of that document.

6          THE COURT:  I need you to just ask a question.

7  BY MS. LEVINE:

8  Q   Is it your understanding that AFSCME has from time to

9  time taken the position that it can't negotiate retiree

10 health or pension benefits?

11 A   Yes, we have.

12 Q   But in the February tentative agreement that we were

13 discussing earlier, February 2012, did that agreement affect

14 retiree health benefits?

15 A   It did affect retiree health benefits.

16 Q   And are there other recent examples where AFSCME has

17 worked around the issue of both protecting its members' right

18 to retiree health and pension benefits but also come up with

19 a work-around to effectively negotiate a businesslike

20 solution to an economic problem like this one?

21         MR. STEWART:  Objection to form.

22         THE COURT:  Overruled.  Please answer, sir.

23         THE WITNESS:  Well, across the nation, you know --

24 it's a diverse country, as we all know, and we've -- we enter

25 into all sorts of agreements.

1          THE COURT:  Well, let me interrupt you.

2          MS. LEVINE:  Well, let me -- actually, let me try --

3          THE COURT:  You're talking about --

4          MS. LEVINE:  Let me do -- let me go narrower, your

5  Honor.

6          THE COURT:  -- here in the city?

7          MS. LEVINE:  Actually, I have a specific --

8  BY MS. LEVINE:

9  Q    What are you guys doing right now in Illinois?

10  A    Okay.

11          THE COURT:  By "you guys," you mean AFSCME?

12          MS. LEVINE:  AFSCME.

13          THE WITNESS:  Yeah, the union.  The State of

14  Illinois passed legislation in the recent past which would

15  impair our retiree healthcare benefits.  Traditionally, state

16  employees, upon retirement, would enjoy health benefits

17  without being assessed any premium charge for the healthcare.

18  The state enacted a statute requiring that retirees now pay

19  for some cost of their retiree healthcare but did not specify

20  a rate, and instead the legislation required that the state

21  negotiate the rate that would be charged to the retirees with

22  the active employees' union, which is an AFSCME affiliate,

23  Council 31, so at the collective bargaining table over their

24  most recent state agreement, those negotiations took place.

25  However, our position -- the union's position is that that

1  particular statute is unconstitutional under Illinois'

2  Constitution, which also has a nonimpairment very similar to

3  the one here in Michigan.  And based on that, the

4  understanding we've reached with the state was we are not

5  waiving our rights to challenge the statute and the

6  requirement for payment, so by entering into that agreement,

7  it was very clear that we were not prejudicing our rights.

8  We were not waiving our rights to eventually -- and we are

9  right now in court challenging the legality of imposing the

10 premium payments on the retirees.

11 BY MS. LEVINE:

12 Q   So you both negotiated a good faith solution on the

13 assumption that you would -- you might lose in court, and you

14 continued to preserve your rights with regard to your -- what

15 you believe to be your constitutional rights in court;

16 correct?

17 A   Correct.  We thought that was -- yeah.

18         MS. LEVINE:  Your Honor, I have no further questions

19 for Mr. Kreisberg.

20         THE COURT:  I do need to stop at three.  Do you want

21 to start now, or do you want to just pick it up in the

22 morning?

23         MR. STEWART:  May be better in the morning.  I'll

24 have to break it up otherwise, your Honor.

25         THE COURT:  All right.  In the meantime, is someone

1  willing to volunteer me from the -- volunteer for me on the

2  objectors' side how long the case might take for our planning

3  purposes?

4         MR. MONTGOMERY:  Your Honor, we have shared with the

5  city estimated times for witnesses.  I would say it's fair

6  that the sum of direct and cross for the two witnesses have

7  started -- has gone beyond the time estimates.  I would say

8  on current projections we would finish sometime Thursday

9  morning, so in theory Thursday afternoon is available for the

10  start of closing.  Again, if all changes are simply additive

11  and not plowed earth.

12         THE COURT:  Right.  Okay.  So our closings would

13  then be on Thursday, perhaps into Friday.

14         MR. MONTGOMERY:  Yes, sir.

15         THE COURT:  All right.  And I've been asked to

16  remind you that we are back in this room tomorrow.  We are

17  not going to Room 100.  We're back in this room.  And I think

18  that's it for today, so we'll be in recess.

19         THE CLERK:  All rise.  Court is adjourned.

20         (Proceedings concluded at 2:56 p.m.)

INDEX


| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Kevyn Orr | | 6/23/29 | 55 | 73/78/80 82/83 |
| Shirley Lightsey | 88 | 114 | 126 | |
| Donald Taylor | 128 | 155/174 | 175 | |
| Steven Kreisberg | 176 | | | |


| EXHIBITS: | Received |
|---|---|
| Debtor's Exhibit 32 | 63 |
| Exhibit 505 | 180 |
| Exhibit 853 | 21 |


    I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.




/s/ Lois Garrett                    November 8, 2012
_____             _____
Lois Garrett

**ITEM NO. 73**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

IN THE MATTER OF,                    Case No. 13-53846
                                     Detroit, Michigan

CITY OF DETROIT, MI                  November 5, 2013
_____/      9:17 a.m.

IN RE:  ELIGIBILITY TRIAL

BEFORE THE HONORABLE STEVEN W. RHODES
TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.

APPEARANCES:

For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.

GEOFFREY STEWART, ESQ.
GREGORY SHUMAKER, ESQ.

THOMAS CULLEN, JR., ESQ.
MIGUEL EATON, ESQ.

Jones, Day
51 Louisiana Avenue, N.W.

Washington, D.C. 20001-2113
202-879-3939

BRUCE BENNETT, ESQ.

Jones, Day
555 South Flower Street

Fiftieth Floor
Los Angeles, CA 90071-2452

213-243-2382

ROBERT HERTZBERG, ESQ. (P30261)
DEBORAH KOVSKY-APAP, ESQ.

(P68258)
Pepper, Hamilton

4000 Town Center
Suite 1800

Southfield, MI 48075-1505
248-359-7333

| | | |
|---|---|---|
| 1 | For State of Michigan: | MATTHEW SCHNEIDER, ESQ. |
| | | (P62190) |
| 2 | | Chief Legal Counsel |
| | | Attorney for State of Michigan |
| 3 | | Michigan Department of |
| | | Attorney General |
| 4 | | P.O. Box 30754 |
| | | Lansing, MI 48909 |
| 5 | | 517-373-0126 |
| | | |
| 6 | | MARGARET NELSON, ESQ. (P30342) |
| | | Assistant Attorney General |
| 7 | | Michigan Department of |
| | | Attorney General |
| 8 | | 525 W. Ottawa Street |
| | | Floor 7 |
| 9 | | P.O. Box 30212 |
| | | Lansing, MI 48933 |
| 10 | | 517-373-1124 |
| | | |
| 11 | | STEVEN HOWELL, ESQ. (P28982) |
| | | Special Assistant Attorney |
| 12 | | General |
| | | Dickinson, Wright |
| 13 | | 500 Woodward Avenue |
| | | Suite 4000 |
| 14 | | Detroit, MI  48226-3425 |
| | | 313-223-3033 |
| 15 | | |
| 16 | For Michigan Council 25 of | SHARON L. LEVINE, ESQ. |
| | the American Federation of | JOHN SHERWOOD, ESQ. |
| 17 | State, County and Municipal | Lowenstein, Sandler, LLP |
| | Employees (AFSCME), AFL-CIO | 65 Livingston Avenue |
| 18 | and Sub-Chapter 98, City of | Roseland, NJ 07068 |
| | Detroit Retirees: | 973-597-2500 |
| 19 | For Detroit Retirement | ROBERT D. GORDON, ESQ. (P48627) |
| | Systems - General Retirement | JENNIFER GREEN, ESQ. |
| 20 | System of Detroit, Police and | Clark, Hill, PLC |
| | Fire Retirement System of | 151 S. Old Woodward Avenue |
| 21 | the City of Detroit: | Suite 200 |
| | | Birmingham, MI 48009 |
| 22 | | 248-988-5882 |
| | | |
| 23 | | RONALD KING, ESQ. (P45088) |
| | | Clark, Hill |
| 24 | | 212 East Grand River Avenue |
| | | Lansing, MI 48906 |
| 25 | | 517-318-3015 |

| | | |
|---|---|---|
| 1 | For the Detroit Fire Fighters | BARBARA PATEK, ESQ. (P34666) |
| | Association, the Detroit | JULIE BETH TEICHER, ESQ. |
| 2 | Police Officers Association | (P34300) |
| | and the Detroit Police | DAVID EISENBERG, ESQ. (P68678) |
| 3 | Lieutenants and Sergeants | Erman, Teicher, Miller, Zucker |
| | Association: | & Freedman |
| 4 | | 400 Galleria Officentre |
| | | Suite 444 |
| 5 | | Southfield, MI 48034 |
| | | 248-827-4100 |
| 6 | | |
| | For International Union, UAW: | BABETTE A. CECCOTTI, ESQ. |
| 7 | | PETER D. DECHIARA, ESQ. |
| | | THOMAS CIANTRA, ESQ. |
| 8 | | Cohen, Weiss, and Simon, LLP |
| | | 330 West 42nd Street |
| 9 | | New York, NY 10036-6976 |
| | | 212-356-0227 |
| 10 | | |
| | For the Detroit Retired | THOMAS MORRIS, ESQ. (P39141) |
| 11 | City Employees Association, | Silverman & Morris |
| | Retired Detroit Police and | 30500 Northwestern Highway |
| 12 | Fire Fighters Association, | Suite 200 |
| | Shirley V. Lightsey, and | Farmington Hills, MI 48334 |
| 13 | Donald Taylor (Retiree | 248-539-1330 |
| | Association Parties): | |
| 14 | | RYAN PLECHA, ESQ. (P71957) |
| | | Lippitt, O'Keefe |
| 15 | | 370 East Maple Road |
| | | 3rd Floor |
| 16 | | Birmingham, MI 48009 |
| | | 248-646-8292 |
| 17 | | |
| | For the Official Committee of | MATTHEW E. WILKINS, ESQ. |
| 18 | Retirees: | (P56697) |
| | | Brooks, Wilkins, Sharkey & |
| 19 | | Turco, PLLC |
| | | 401 S. Old Woodward Avenue |
| 20 | | Suite 400 |
| | | Birmingham, MI 48009 |
| 21 | | 248-971-1711 |
| 22 | | CLAUDE D. MONTGOMERY, ESQ. |
| | | ANTHONY ULLMAN, ESQ. |
| 23 | | ARTHUR RUEGGER, ESQ. |
| | | Dentons |
| 24 | | 1221 Avenue of the Americas |
| | | New York, NY 10020-1089 |
| 25 | | 212-768-6700 |

```
 1                                   SAM ALBERTS, ESQ.
                                     DAN BARNOWSKI, ESQ.
 2                                   Dentons US LLP
                                     1301 K Street, N.W.
 3                                   Suite 600 East Tower
                                     Washington, D.C. 20005-3364
 4                                   202-408-7004

 5   For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
     Police Members Association:     MEREDITH TAUNT, ESQ. (P69698)
 6                                   MALLORY FIELD, ESQ. (P75289)
                                     Strobl & Sharp, P.C.
 7                                   300 East Long Lake Road
                                     Suite 200
 8                                   Bloomfield Hills, MI 48304-2376
                                     248-540-2300
 9
     For the Flowers Plaintiffs -   WILLIAM A. WERTHEIMER, ESQ.
10   Robert Flowers, Michael Wells, (P26275)
     Janet Whitson, Mary Washington 30515 Timberbrook Lane
11   and Bruce Goldman:             Bingham Farms, MI 48025
                                     248-644-9200
12
     For Ambac Assurance            DANIEL WEINER, ESQ. (P32010)
13   Corporation:                   Schafer & Weiner
                                     40950 Woodward Avenue
14                                   Suite 100
                                     Bloomfield Hills, MI 48304
15                                   248-540-3340

16   Court Recorder:                Letrice Calloway

17   Transcriber:                   Deborah L. Kremlick

18

19

20
     Proceedings recorded by electronic sound recording, transcript
21   produced by transcription service.

22

23

24

25
```

```
 1                        INDEX

 2  WITNESS FOR        Direct     Cross    Redirect    Recross
    THE AFSCME:
 3
    STEVEN KREISBERG              7         20          24
 4
    WITNESSES FOR
 5  THE UAW:

 6  MICHAEL NICHOLSON    26        75

 7  WITNESS FOR
    THE FLOWERS:
 8
    JANET WHITSON       85        94
 9  ANDY DILLON     101,134,154

10  EXHIBITS:                                          ID   ADM

11  CityX 105   Typed Notes                            75    75
    UAWX624     Affidavit                              52    52
12  UAWX626     Email                                 122   122
    RSX870      Email                                 159   162
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (Court in Session)

2           THE CLERK:  Case number 13-53846, City of Detroit,

3  Michigan.

4           MR. ALBERTS:  Your Honor, may we be excused?

5           THE COURT:  Yes.

6           MR. ALBERTS:  Thank you.

7           MR. SCHNEIDER:  Your Honor, Matthew Schneider on

8  behalf of the State of Michigan.  Before we begin, because

9  we're discussing witnesses here and the order of witnesses,

10  Ms. Brimer and I have been talking about one of the witnesses

11  that the objectors wish to have, Howard Ryan.

12      And Ms. Brimer and I are in agreement that instead of

13  having to have him called, that his 30(b)(6) deposition tape

14  could be a part of the record instead.  And Ms. Brimer and I

15  wanted to make sure that you were okay with that.

16           THE COURT:  Uh-huh, absolutely.  If that works for

17  you, it works for me.

18           MR. SCHNEIDER:  We also wanted to make sure that

19  nobody else objects to that.

20           THE COURT:  Any other objections to using the video

21  tape?

22           MR. SHUMAKER:  The city is in agreement with that,

23  Your Honor.

24           MS. BRIMER:  Thank you, Your Honor.

25           MR. SCHNEIDER:  Thank you, Your Honor.

1          THE COURT:  Are you ready, sir?

2                    CROSS EXAMINATION

3    BY MR. STEWART:

4    Q    Geoffrey Stewart for Jones, Day.  Good morning, Mr.

5    Kreisberg.  I don't think we've met.

6    A    No.

7    Q    My name is Geoffrey Stewart.  I'm a lawyer for Jones, Day

8    representing the city.  Let me collect my papers for a minute.

9         You, I think, testified that you attended the June 14

10   meeting?

11   A    Yes.

12   Q    Okay.  Can we put up Exhibit 43, Page 109?  While that's

13   being done, Mr. Kreisberg, that was the big meeting if you --

14   are you looking for your glasses as I look for mine all the

15   time?

16   A    Yeah, well -- I wasn't sure.

17   Q    I have a spare pair if you need them.

18   A    I'll be able to see.  If I have trouble, I'll --

19   Q    Okay.  I do -- I actually do have a spare pair.

20   A    Thank you.

21   Q    Okay.  And you remember that day attending a meeting for

22   I think you said that lasted a little less than two and a half

23   hours?

24   A    Yes, yes.

25   Q    And various slides were shown at the meeting.  I think you

1  testified?

2  A    That's correct.

3  Q    Do you remember this slide and we're on Page 109 of

4  Exhibit 43.  Do you remember this slide being shown -- shown

5  that day?

6  A    It's -- it's possible the content was shown.  I don't

7  think it would have been slide 109 because the slide deck that

8  was shown had less slides than 100 slides.

9  Q    Okay.  I think we may have had slide deck inflation here.

10  Let me just put it this way.  Do you remember the subject

11  coming up at the meeting about what the city's intentions were

12  when it came to claims for unfunded OPEB liabilities?

13  A    Yes.

14  Q    And just for the record OPEB is short for other post

15  employment benefits?

16  A    That's right.

17  Q    And usually that's retiree benefits for health or

18  something else?

19  A    Correct.

20  Q    Okay.  I'm going to use OPEB unless that is going to be

21  confusing for you if I do.

22  A    It's fine with me.

23  Q    Okay.  Do you remember what the city said on June 14

24  about its intentions with respect to OPEB benefits?

25  A    I do.

1  Q     And what do you remember the city telling you?

2  A     Essentially that they would cease providing the current

3  benefit offerings and in lieu therefore they would provide

4  distinct benefits for pre-Medicare retirees and post-Medicare

5  retirees that would cost in -- in a pay range of approximately

6  100.00 to $130.00 per month for each of those categories with

7  a -- a separate category for retirees who may not be eligible

8  for Medicare.

9  Q     How extensive did you consider that proposal in a way of

10 changes to what the retirees currently enjoyed?

11 A     Well, the proposal lacked detail.  But the structure that

12 was described was very extensive.

13 Q     Okay.  And then the next bullet point on this slide has

14 to do with claims for unfunded pension liabilities.  Now, I

15 understand you may not remember this slide.  So if it helps

16 you, fine, but if not, you don't need to look at it.

17       Do you remember what it was the city said that day about

18 its intentions when it came to unfunded pension liabilities?

19 A     The city essentially said it would -- it would not be

20 paying into the fund for those unfunded liabilities other than

21 some of the contingency note that they talked about which

22 frankly at the time I didn't quite fully understand.

23 Q     Did you consider -- let's put it this way.  How extensive

24 or major did you consider the city's planned changes to its

25 pension liabilities?

1   A    Again the -- the city's proposal lacked any detail.  But

2   the structural changes described were very extensive.

3   Q    Okay.  Now is it not the case that your union AFSCME,

4   represents about half of all the city employees?

5   A    That's correct.

6   Q    Okay.  And is it also not the case that your union lacked

7   the authority to negotiate with respect to either pension

8   liabilities or OPEB with respect to retirees?

9   A    That's not the case.

10  Q    Okay.  Well, let me go to your deposition then.  Can we

11  put up Page 29, starting with Line 17.  And while we're doing

12  that, you remember giving a deposition in this case, do you

13  not, Mr. Kreisberg?

14  A    I do, I remember.

15  Q    That was just a few weeks ago.  And you were examined for

16  a couple of hours?

17  A    It seems like more than a couple of hours.

18  Q    Okay.  Let me start, I'm just going to read a part to

19  you.  And I'm going to read these questions and answers.  And

20  again I'm going to ask you whether this is -- these are the

21  questions you were asked and these were the answers you gave.

22      Question, by Mr. Miller, let me ask a clarifying

23  question.  Is it your understanding that under Michigan law

24  unions would be able to waive the rights of existing retirees

25  to their existing health benefits?  And then Mr. Sherman

1  interposes an objection.  And I'm jumping down to your answer.

2  The witness, again, that is a matter of law that I haven't

3  fully researched.

4      Question, so you would have no opinion about that?  Then

5  Mr. Sherwood interposes an objection.  And Mr. Miller says,

6  you can answer.  And you say, I may have opinions, but I have

7  no legal conclusion.

8      Question, what is your personal opinion?  My opinion

9  would be that the union can engage in such bargaining and

10 could possibly extensively or not extensively, you know, make

11 reasonable adjustments to retiree health care benefits.

12     Question, without the retirees' approval?  Answer,

13 without the retirees' approval.

14     Question, what about extensive changes to retirees health

15 benefits?  Could they make that without the retirees'

16 approval?  There's an objection.  You answer, I do not think

17 so.

18     Question, so the ability of the union to make changes to

19 the retirees benefits without the retirees' approval hinges on

20 the nature of the change?  Answer, yes.

21     And the more extensive the change at some point the union

22 does not have the ability to bind the retirees?  Answer, that

23 would be my opinion.

24     Were you asked those questions and did you give those

25 answers in your deposition?

1    A    Yes, sir.

2    Q    And were your answers truthful?

3    A    Yes.

4    Q    Now you were asked yesterday -- take that down and put up

5    Exhibit 505.  You were asked yesterday about the tentative

6    agreement.  Do you remember questions you were asked and this

7    Exhibit 505 was put up on the screen for you back then?

8    A    Yes.

9    Q    Okay.  It was the case, was it not -- first of all, that

10   was negotiated by a coalition of city unions, correct?

11   A    Correct.

12   Q    That did not include the uniform unions, right?

13   A    That is correct.

14   Q    It also did not include the water and sewer employees?

15   A    Again correct.

16   Q    Now is it also not the case that in those negotiations

17   the coalition did not represent retirees?

18   A    That's correct.

19   Q    Instead what the coalition did was agree that if the city

20   after this happened cut retiree benefits, the unions would not

21   help those retired employees in any grievance they might file

22   against the city?

23   A    I disagree with that characterization.

24   Q    Let's go to the last page of the exhibit then.  I think

25   that's -- there it is.  There's one more.  Should be another

1  page back there.  And you want to go to Page 21 or what would

2  be 21 if it were numbered.  There.  Do you have that page

3  before you?

4  A    I do.

5  Q    And can you tell us what it is?

6  A    If you make that piece larger like we did the others.

7  Q    Go ahead, can you make the text larger for the witness,

8  please?

9         MS. LEVINE:  Reading glasses, is that what you're

10  using?

11         MR. STEWART:  You can have mine.  I actually do have

12  a second pair.  May -- may I approach the witness, Judge?

13         THE COURT:  Do you want to borrow some reading

14  glasses, sir?

15  A    I think we're going to be fine.

16         THE COURT:  Okay.  All right.  He's going to be

17  fine.

18         MR. STEWART:  I buy them by the box literally at

19  this age.  I have very -- very poor eyesight.

20  A    Where do you get them?  I could use them.

21         MR. STEWART:  Actually I get them on line and I will

22  after the break I will give you the web address.

23         THE COURT:  All right.  Let's proceed.

24         MR. STEWART:  I'm sorry, Your Honor.  Anyhow --

25         THE COURT:  Okay.

1   Q    Do you have this before you?

2   A    I do, yes.  Thank you.

3   Q    Okay.  And it says -- and first of all, who signed all of

4   this just in general?

5   A    These are the coalition union representatives.

6   Q    Okay.  Is your signature here by the way?

7   A    No, it is not.

8   Q    Okay.  And it says it is hereby agreed between the

9   parties that the coalition of unions waive their rights to

10  grieve and arbitrate, participate as a party, or sponsor legal

11  action brought by retirees concerning the changes in their

12  health care which may arise in 2012.  Is that -- did I read

13  that correctly?

14  A    Yes.

15  Q    And that was the coalition agreeing that if a retiree was

16  aggrieved by changes to health care benefits, the unions would

17  not support that grievance, right?

18  A    That's correct.

19  Q    Okay.  Now -- you can take that down.  There were a

20  series of meetings that counsel asked you about and I'll go

21  through them very quickly.

22       We talked about the one on the 14th already.  Then there

23  are meetings on June 20th, correct?

24  A    Correct.

25  Q    And you attended those?

1   A    Yes.

2   Q    And July 10?

3   A    I attended that meeting.

4   Q    And July 11th?

5   A    I attended that meeting.

6   Q    And there was a data room which was available to you and

7   you or people working with you accessed the data room?

8   A    Yes.

9   Q    Okay.  And during that period of time am I correct that

10  the city said to you that they were willing to talk with you

11  and share information with you and wanted to have discussions

12  with you?

13  A    The city had indicated it would share data.

14  Q    Uh-huh.  And they did?

15  A    Through the data room.

16  Q    Okay.  Well, they -- they also gave you data, did they

17  not, during various meetings that you attended with them?

18  A    The data consisted of the proposal for creditors which

19  was provided both in the shortened version and made available

20  in the longer version at the conclusion of the meeting on June

21  14th.

22  Q    Uh-huh.

23  A    And then approximately 20 or 25 page slide deck.

24  Q    Right.

25  A    On legacy costs on June 20th.

1    Q     Uh-huh.

2    A     And then a single page describing the bare outlines of

3    the OPEB proposal on July 11th.

4    Q     Uh-huh.

5    A     Most of those I would not characterize as data other than

6    the June 14th.  I would consider that a presentation which

7    included some data.  But it was not completely responsive to

8    all the data.

9    Q     I see.

10   A     That we would need.

11   Q     That all having been said, did the city not ask your

12   union more than once to make a counter proposal to them?

13   A     That was not a term that was used.

14   Q     And what term did you use?

15   A     They -- they were fond of the term feedback.

16   Q     I see.  But did the day come when your union actually did

17   prepare a counter proposal?

18   A     We never provided a counter proposal to the city.

19   Q     That wasn't my question.  My question was whether you

20   prepared one.

21   A     I did not prepare a proposal.

22   Q     Did your union prepare a proposal?

23   A     If I could -- could I ask a clarifying question of you?

24   Is that permitted?

25   Q     I'm sorry?

1  A     Is it permitted for me to ask a clarifying question?

2  Q     You can ask me whatever you want.

3  A     On what subject?

4  Q     Health care benefit, retiree health.

5  A     No.

6  Q     Did you prepare a counter proposal on anything?

7  A     We had on a post-petition -- post-petition we prepared a

8  counter proposal on active employee health care.

9  Q     Uh-huh.  Let's go to your deposition Page 82, Line 16.

10        MS. LEVINE:  Your Honor, I apologize.  Before we ask

11  a question, I just want to caution the witness to stay before

12  July 18th and not to discuss anything going on in the

13  mediations.

14        THE COURT:  That's good advice, sir.

15  Q     Page 82, Line 16.  And once again, Mr. Kreisberg, I'm

16  going to read the questions and answers and at the end I'm

17  going to ask you whether this was your testimony.  All right?

18        Question, did AFSCME make any formal counter proposal

19  subsequent to the June 20th meeting respecting retiree health?

20  Answer, we had proposed that we negotiate and suggested a date

21  for negotiations.

22        Question, but a labeled proposal to negotiate is not

23  itself a counter proposal, correct?  Answer, the counter

24  proposal would have been provided at the negotiating session.

25        Question, so you were prepared at a negotiating session

1  in July to provide a counter proposal?  Answer, we had

2  suggested having a meeting on July 10 to do such.

3      Question, but you just testified that you were prepared

4  if there were to be a negotiating session in July to make a

5  counter proposal, correct?  Answer, yes.

6      Question, okay.  Did you make any counter proposals at

7  the meetings in July 10 or July 11?  Answer, no.

8      Question, did you have at that time the counter proposal

9  to make?  Answer, can I consult with counsel?  Question, no,

10 it's a pending question.  I would like you to answer it first.

11 Mr. Sherwood says, I would just -- if it involves privileged

12 communications.  Witness, that is the point.  I discussed such

13 a proposal with counsel.  Question, I'm sorry, it involved

14 discussions with counsel.  And you go on.

15     And now let's go to Page 84, 19.

16 A  Excuse me?

17 Q  Were you asked those questions and did you give those

18 answers?

19 A  Yes.

20 Q  Okay.  Now go to Page 84, Line 19.  Question, did you

21 have a counter proposal to make?  Answer, yes.

22     Question, but you did not make the counter proposal,

23 correct?  Answer, correct.

24     Were you asked those questions and did you give those

25 answers?

```
 1  A    Yes.

 2  Q    Now, let me -- you can take that down.  I believe you

 3  were asked by counsel about the provisions of the Michigan

 4  Constitution which at sometimes has been called the pension

 5  clause.  Do you -- do you know of something called a pension

 6  clause?

 7  A    Yes.

 8  Q    Okay.  And it's -- I think it's Article -- Article 9,

 9  Section 24 if I recall correctly.  Is it the position of

10  AFSCME that the accrued pensions, investment pensions of city

11  retirees can never be cut back?

12            MS. LEVINE:  Objection, Your Honor.  Calls for a

13  legal conclusion.

14            THE COURT:  Overruled.  Please answer.

15  Q    Is that the union's position?

16  A    I'm not a lawyer but that's our position, yes.

17  Q    Okay.  And that's something you believed back in June?

18  A    It is.

19  Q    And in July?

20  A    Yes.

21  Q    And today?

22  A    Yes.

23  Q    Have you advised any of your employees to waive their

24  constitutional rights?

25  A    I have not.
```

1 Q    Is the union prepared to advise people to waive -- waive

2 their constitutional rights?

3           THE COURT:  Don't answer that question.

4           MR. STEWART:  I'm sorry?  Okay.  You said not to

5 answer the question.

6           THE COURT:  Yeah, I -- I don't want the witness to

7 answer that question.  You can ask him that question as it

8 pertained to pre-petition.

9           MR. STEWART:  Yes.

10           THE COURT:  But not Monday.

11 Q    Limiting us to all days before and -- and including July

12 18 of this year, was -- excuse me, was your union prepared to

13 advise its members to waive their constitutional rights?

14 A    No.

15           MR. STEWART:  Thank you.  That's all I have.

16           MS. LEVINE:  Your Honor, brief redirect.

17           THE COURT:  Uh-huh.

18                      REDIRECT EXAMINATION

19 BY MS. LEVINE:

20 Q    Just a couple of questions, Mr. Kreisberg.  With regard

21 to the deposition testimony that you were just read with

22 regard to retiree health.  It -- it sounded like you actually

23 had a written proposal sitting in your desk drawer that you

24 just didn't give to anybody.  Did you have thoughts about a

25 proposal, or did you actually have a physical written fully

1  blown proposal?

2  A    I had thoughts about a proposal that I discussed with

3  counsel.

4  Q    And did you want to have those discussions with the city

5  to see whether or not some of your thoughts would make sense

6  in a counter proposal?

7  A    Yes.

8  Q    Same question with regard to the pension issues.  Did you

9  have some thoughts about the pension proposal that was made by

10 the city that you wanted to discuss with the city to see if it

11 made sense?

12 A    Yes.

13 Q    And in addition to that did you also require additional

14 information to make those thoughts more formal into what might

15 be deemed to be an actual written formal counter proposal?

16 A    Yes.

17 Q    You were asked by counsel if -- if AFSCME was willing to

18 advise its members to waive its constitutional rights.  Do you

19 recall that testimony?

20 A    I do.

21 Q    Under the -- under the February 12th collective bargaining

22 agreement on a go forward basis, were there changes to pension

23 benefits?

24 A    Yes.  The TA reduced post effectively the pension

25 accruals of active employees.

1  Q    And did it also permit for certain pensions for new hires

2  to get a defined contribution plan?

3  A    It gave the -- the city the authority to establish a

4  defined contribution plan.

5  Q    And did you think that making those changes violated the

6  pension clause?

7  A    I did not.

8  Q    In addition to that, in -- in the example we were

9  discussing yesterday in Illinois, where the -- there was a

10 concern that the proposed changes violated a constitutional

11 right.  Do you recall that discussion?

12 A    I do.

13 Q    Did you along with the AFSCME locals involved there

14 negotiate revisions to retiree benefits consistent with the

15 current form of the statute?

16 A    Yes.

17 Q    And were those changes implemented?

18 A    Yes.

19 Q    And -- and was there also a reservation of right that

20 allowed the local there to continue to preserve its

21 constitutional rights?  Continue to litigate over the issue of

22 whether or not their constitutional rights were abridged?

23 A    Yes.  The agreement was without prejudice to a right to

24 continue the litigation challenging the constitutionality of

25 the law.

1  Q    You were showed a page in the tentative agreement where

2  the unions agreed not to support the retirees in connection

3  with any grievance or other claims.  Do you recall that?

4  A    I do.

5  Q    In Illinois, isn't it true that the named plaintiff there

6  is an individual retiree?

7  A    I believe so, yes.

8  Q    And who is paying for the cost of that litigation?

9  A    The union is, the AFSCME and as well as other unions are

10  challenging it as well.

11  Q    One more follow up question.  How long did the

12  negotiations take for the tentative agreement, recognizing

13  that it was Thanksgiving and Christmas and we weren't in a

14  pre-bankruptcy filing regime.  But actual days of negotiation,

15  about how long did it take to negotiate that coalition

16  agreement?

17  A    Yeah, I really don't know the number of days the parties

18  met.  But it -- it occurred over a period of a few months, the

19  negotiations.  But there's -- in those negotiations like many

20  others there's a period of intense activity which is probably

21  about 60 to 90 days.

22           MS. LEVINE:  Thank you.  No further questions, Your

23  Honor.

24           MR. STEWART:  If I might, Judge, just a few raised

25  by the questions.

```
 1              THE COURT:  Yes, sir.

 2                    RECROSS EXAMINATION

 3  BY MR. STEWART:

 4  Q    How long did the negotiations in Illinois take?

 5  A    The negotiations in Illinois over the retiree health

 6  care?

 7  Q    What you just talked about.

 8  A    They were part of a master agreement involving many many

 9  issues.

10  Q    And how long did they take?

11  A    I believe they lasted over a year.

12  Q    Okay.  And you were asked about the tentative agreement.

13  Were vested pension rights reduced under the tentative

14  agreement?

15  A    Not at all.

16  Q    Were vested pension rights reduced under the tentative

17  agreement?

18  A    Maybe I didn't understand the last question.  Did you

19  just repeat the question twice?

20  Q    And maybe I just repeated myself.  Were any vested rights

21  to be reduced under the tentative agreement?

22  A    Not that I'm aware of, no.

23  Q    And is that why in your opinion there is no violation of

24  the pension clause?

25  A    Yes.
```

1          MR. STEWART:  Thanks.  That's all I have.

2          THE COURT:  In one of your answers, or maybe more

3    than one, you used the phrase TA.  Is that tentative

4    agreement?

5    A    Yes, sir.

6          THE COURT:  All right.  Any more questions for the

7    witness?  You may step down, sir, and you are excused.

8    A    Thank you.

9          (WITNESS STEVEN KREISBERG WAS EXCUSED AT 9:40 A.M.)

10          THE COURT:  Thank you for your testimony.

11          MR. DECHIARA:  Good morning, Your Honor.  Peter

12    Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

13    the United Auto Workers International Union.  The UAW for its

14    first witness calls Michael Nicholson who is out in the hall

15    and I will go get him.

16          THE COURT:  Thank you.

17          THE WITNESS:  Good morning, Your Honor.

18          THE COURT:  Step forward, please.  Raise your right

19    hand.

20          (WITNESS MICHAEL NICHOLSON WAS SWORN)

21          THE COURT:  Please sit down.

22          MR. DECHIARA:  Your Honor, before we begin, I'm

23    going to be referring with the witness to a couple of exhibits

24    in the UAW exhibit book.  If I could ask the witness to please

25    locate the UAW exhibit book that's on the table there.  And if

 1  I may, I'll --

 2              THE COURT:  Yes, please.

 3                       DIRECT EXAMINATION

 4  BY MR. DECHIARA:

 5  Q    Good morning.

 6  A    Good morning.

 7  Q    Would you please state your full name for the record?

 8  A    Michael Brendan Nicholson.

 9  Q    By whom are you employed?

10  A    International Union, UAW.

11  Q    And in what position?

12  A    General counsel.

13  Q    Does the UAW have any members who may be affected by this

14  proceeding?

15  A    Yes.  We have members who are not employees of the City

16  of Detroit, but are employees and retirees of the Detroit

17  Public Library which is a separate municipal corporation but

18  whose employees and retirees participate in the Detroit

19  general retirement system.

20       In addition, we have employees and retiree -- employee --

21  employee and retiree members who work for the City of Detroit

22  Law Department as lawyers, some Detroit Water and Sewer

23  Department employees, some civilian police investigators, some

24  paralegals, and I may be missing something, but I think that's

25  about the -- the size of the list.

1  Q    So about?

2  A    You know, less than 200 employees.  Less than 200

3  retirees.  I don't have an exact count, but to give you an

4  idea of the magnitude, Your Honor.

5        THE COURT:  Okay.  Can you point that microphone

6  more right at you?  You can adjust the --

7  A    Like this?

8        THE COURT:  Yes.  That's better.

9  A    Okay.

10       THE COURT:  Don't -- don't speak too close to it,

11  but it needs to be pointed right at you.

12  A    All right.  I'll look for your reaction to see if I'm

13  talking too loud.

14       THE COURT:  Okay.

15  Q    Where and when did you go to law school?

16  A    I attended the University of Michigan Law School and I

17  graduated with an honors J.D. degree in 1977.

18  Q    And can you recount for us briefly your professional

19  career since law school?

20  A    Having left law school, I -- my first job was with the

21  appellate court branch of the National Labor Relations Board

22  at their headquarters in Washington, D.C.  I argued cases in

23  the various United States Courts of Appeals around the

24  country.

25       I also, while I was there, took up an interest in

1 | bankruptcy law.  They were looking for people in a branch
2 | called the -- the special litigation branch to help on
3 | bankruptcy matters.  And so I did that.  That was actually my
4 | first involvement with bankruptcy as a lawyer for the labor
5 | board.  I worked for the labor board until March 1980.
6 | Q    And what did you do next?
7 | A    I was hired as a lawyer by International Union, UAW.  I
8 | had clerked there during law school.
9 | Q    And how long did you stay at the UAW?
10 | A    That time I stayed from 1980 until 2000, I believe.  2000
11 | or 2001.  And --
12 | Q    And during that period what -- what kind of work did you
13 | do at the UAW?
14 | A    The first -- continuing my theme of -- I did a lot of
15 | different kinds of work, but one of the first things I
16 | remember when I went there was I got in on the tail end of the
17 | Chrysler, I won't call it a bankruptcy because it wasn't in
18 | Bankruptcy Court, but it was a restructuring through Congress.
19 |      Learned about retiree insurance issues there for the
20 | first time before there was an OPEB, before that term existed.
21 | I worked on that.  We went into a severe financial crisis in
22 | the auto industry almost with my starting.
23 |      The UAW when I hired in had a million and a half members
24 | and that started a decline, mostly in the parts industry, but
25 | also otherwise in a lot of business failures, a lot of

1 bankruptcies.  And I dealt with those issues and the impacts

2 on employees and retirees.

3 Q    Were you involved in any legislative activities while you

4 were at the UAW in that period?

5 A    I was.  I was basically -- because I was the lead

6 bankruptcy lawyer in the eighties for the UAW, I was involved

7 in a number of high profile cases, one of which was LTV.  Your

8 Honor may remember that.  It wasn't in this Court, it was in

9 the Southern District of New York.

10     And the case began by the debtor which was a conglomerate

11 and had steel mills where the steel workers were the union,

12 but also had an aerospace division in Texas where we were the

13 union.  The debtor stopped paying retiree health care

14 immediately upon filing and there was immediate reaction in

15 Congress.  An emergency piece of legislation was passed

16 reversing that decision essentially.

17     And then longer term legislation was considered and

18 enacted.  I was at work directly with Senator Metzenbaum's

19 staff who was the sponsor of the bill that included among

20 other things Section 1114 of the Act and I actually drafted

21 significant portions of 1114 as well as the Senate report that

22 accompanied it.

23 Q    What did you do after 2000?

24 A    I retired from the UAW.  I went to work for the office of

25 the election administrator of -- for the International

1  Brotherhood of Teamsters.  That takes a little bit of

2  explanation, but not much.

3      So the Justice Department had sued the Teamsters under

4  the Racketeering and Corrupt Organizations Act back in the

5  late eighties I think.  And to -- in an effort to remove the

6  influence of organized crime in the Teamsters union.

7      And that was settled with a consent decree that was

8  administered and still is administered.  It's still alive

9  today by the Justice Department.  And one of the pieces of the

10  consent decree was that Justice Department and Court approved

11  monitors would monitor the International officer elections of

12  the Teamsters and issue decisions.

13      So I ran with Mr. Wertheimer who was the election

14  administrator appointed directly by Justice.  I was the

15  general counsel of that.  I ran a team of lawyers and

16  investigators around the country dealing with issues from as

17  mundane as, you know, whether an election was run properly, a

18  local union delegate election to issues of alleged -- alleged

19  corruption.  And I investigated, I deposed, and I ran a team

20  of about 30 or 40 people all around the U.S.  Who were mostly

21  lawyers, but some Justice -- or some labor department

22  investigator types as well.

23  Q    And how long did that job last?

24  A    About -- I did that until -- I think I must have started

25  there, I must have started there in 2001, so it was about

1  three years.  So I ended that in 2004.  The election was held,

2  we certified the results, finished our forensic accounting and

3  all -- all the work that went with this, a lot of work.  And

4  the UAW asked me to come back and I did.  I returned to the

5  UAW.

6  Q    And how long did you remain at the UAW?

7  A    Not long.  I was there about 19 months as I recall and

8  then I was offered a tenured professorship at Indiana

9  University which I accepted.

10 Q    And while you were at -- while you were at Indiana

11 University did you also perform legal work?

12 A    I was allowed to do some work on the side under my

13 contract and I started out in a full time position.  I worked

14 also part time for a while when I got involved in some very

15 interesting legal work and they allowed me to work part time

16 in addition to teaching the courses that I taught.

17 Q    What is the -- the legal work that you did?

18 A    The legal work I did was pretty much the same kinds of

19 things that I had specialized in.  So I -- I was there until

20 2010.  So it's about a six year period part full time, part

21 part time.  And I worked on retiree insurance litigation.  I

22 worked on the Dana Chapter 11 which worked on with people at

23 Jones, Day.  I know a couple of the people sitting in the

24 courtroom from that.  And we had a successful resolution of

25 that Chapter 11.

1    We recovered -- we recovered $723,000,000 that went into

2  a VEBA fund for retiree health care.  And that VEBA actually

3  was in some ways, if you looked at it at that point in time at

4  the onset, better funded than the VEBA's that were eventually

5  -- came out of the General Motors, and Chrysler, and Ford

6  situations.  I was very proud of that.

7  Q    And then when did you return to the UAW again?

8  A    I returned to the UAW in 2010.  I finished up my -- my

9  courses and I was offered a job by the newly elected President

10  of the UAW, Bob King to come and be his general counsel.

11    One of the -- I had gotten to know Bob from working on

12  the Rouge Steel bankruptcy which is local.  But it was filed

13  in Bloomington, Delaware and also a successful, very

14  successful result.  That steel mill is still operating and the

15  retirees are still getting their retiree insurance.

16    And Bob got to know me through working on that and asked

17  me to come back and be his general counsel and I accepted.

18  Gave up my tenure and left Indiana University.

19  Q    Over the years that you've been at the UAW, have you

20  engaged in any types of negotiations?

21  A    Yes.

22  Q    Can you tell us what types of negotiations you've been

23  involved in?

24  A    Many kinds.  First of all, collective bargaining

25  negotiations by which I mean negotiations for collective

1  bargaining agreements which typically run in cycles.  They

2  could be three years, they could be four, they could be five.

3  The law doesn't set a -- a fixed term.

4      So that's the most typical kind of collective bargaining.

5  A person in my position did not do collective bargaining of

6  that type except for major companies.  And my predominant

7  assignment for that kind of collective bargaining over the

8  years, really over the 20 year span I was there was for Ford

9  Motor Company.  I worked with the UAW's lawyer at the Ford

10 Motor Company negotiations.

11 Q   Were you involved in any other types of negotiations in

12 your years at the UAW?

13 A   Many.  We had plant closing negotiations which are a type

14 of collective bargaining under the National Labor Relations

15 Act dealing with plants that are closing or relocating.  There

16 may be benefits issues.  There's all kinds of issues that have

17 come up, transfer rights.  I did that kind of negotiations.

18     Also there's a whole another branch of negotiations that

19 aren't collective bargaining negotiations per say but are

20 negotiations in relationship to litigation.  I did much of

21 that.  Much -- I'd say more of that than collective bargaining

22 negotiations.

23     And then bankruptcy itself is a sort of a sub -- a subset

24 of that.  Bankruptcy is a kind of litigation in a way.  And

25 the lead up to bankruptcy is kind of in some ways like the

1  lead up to regular litigation.  There's differences too, but

2  bankruptcy insolvent -- let's -- let's use the term insolvency

3  negotiations.  I did a lot of insolvency negotiations over the

4  years.  That was my predominant area of expertise over the

5  years.

6  Q    Have you been involved on behalf of the UAW in

7  negotiations regarding employee benefits?

8  A    Yes, I have.

9  Q    Can you give us any examples?

10  A    I -- two come to mind.  One reminds in -- me in some ways

11  of this case.  It was one of my first ones.  That was the

12  first case in which I was a co-chair of a creditors'

13  committee.  I'd served on -- served on a number of creditors'

14  committees over the years.

15      I was co-chair of the -- the UAW was co-chair, I was the

16  person sitting.  It was an institutional appointment on that

17  committee.  And it was a -- a heavy -- heavy earth moving

18  equipment division of General Motors.  It was spun off.

19      And a few years after it was spun off, with the

20  management in place that was there under General Motors went

21  bankrupt, filed -- filed for bankruptcy.  And the UAW and the

22  other creditors, none of them labor, we were the only labor --

23  labor creditor, determined through our experts and our lawyers

24  and our own knowledge of the business, that the business was

25  under capitalized by General Motors.  That the current

1  management had a conflict of interest and they were reluctant

2  or would refuse to sue –– the debtor, would refuse to sue

3  General Motors.

4      And so the creditors' committee authorized and our

5  lawyers filed a lawsuit, an equitable subordination lawsuit

6  attacking the –– the setting up of this company as an under

7  capitalized company.  We –– that resulted in a recovery, a

8  settlement, and a recovery that funded a plan that treated

9  creditors very well.

10     And we –– had we not acted, because the debtor refused to

11 act against somebody who was jointly responsible, the debtors

12 would have –– or the creditors would have received virtually

13 nothing.

14     And the other case is –– and also bears some similarities

15 to this.  It's important.  It's actually –– I'm very proud of

16 this too.  This is the first VEBA that I know of that was ever

17 set up.

18     Allis Chalmers.  Allis Chalmers was a company that at one

19 point had tens of thousands of workers and minimal number of

20 retirees.  And over time the balance shifted, the company

21 shrank, they sold off one product line after another.

22     And at the time I got involved they had 12,000 retirees

23 and less than 1,000 workers, the bulk of which on the hourly

24 side were UAW.  They hired Joe Califano who was LBJ's

25 secretary of HEW to come in and talk to us, a good Democrat

1  so a friend of ours.

2      And told us -- they told us they couldn't afford retiree

3  health care on a cash flow basis, it was going to kill them.

4  And we talked about it and it was my advice that we asked them

5  to pay for an investment banker.  We at that point, really had

6  no dealings with investment bankers because I had thought that

7  the best deal for our members active and retired, would be if

8  the company was sold as a going concern.

9      What was left was a viable company.  And that the

10  proceeds would be used at that point to fund retiree health

11  care, pay out the creditors a premium as well.  And we

12  accomplished that and funded a VEBA for those retirees.  Most

13  of them have died off now, but there's still some left and the

14  VEBA is still alive and paying retiree health care.  That was

15  in -- around 1985, '86 that that started.

16      So that -- that is a case that in the Chapter 11 side, is

17  -- is instructive and in fact was a paradigm in many ways for

18  subsequent events.  Many VEBA's have been negotiated.  OPEB

19  still wasn't a term of art at that time.

20      It became a term of art when the Financial Accounting

21  Standards Board passed FAS 106 which required companies to

22  book unfunded retiree health care liability and then the flood

23  gates were open in terms of this becoming a live issue in the

24  private sector side, not on the public side.

25      We don't have a lot of public members, we have some.

1 Obviously Detroit and State of Michigan and some others around

2 the country.  But that in -- in many ways that case was a -- a

3 paradigm for what was to come in the following decades.

4 Q    Has the UAW to your knowledge ever been involved in

5 settling retiree benefit disputes outside of bankruptcy?

6 A    Yes, we have.

7 Q    And can you explain how that works?

8 A    Yes.  So we often, very often in ongoing bargaining

9 relationships with companies, are met with bargaining demands

10 to -- in collective bargaining negotiations, to reduce retiree

11 health care benefits for retirees who are already retired.

12        And we have -- our union has historically taken the

13 position based on a very to us, where this shows how much

14 inside base of all this is, I guess, but a very significant

15 and important footnote in, whose number I remember Footnote

16 20, in Allied Chemical Workers v Pittsburgh Plate Glass.  I

17 think it's in Volume 414 of the U.S. Report.

18        And that footnote says that it's about whether retiree

19 benefits for those already retired or what are called

20 mandatory bargaining subjects under the National Labor

21 Relations Act.  And it says they are not.

22        And in this Footnote 20 even more significant in some

23 ways to us, is a statement that with respect to already vested

24 benefits as a matter of law, federal labor law, retirees have

25 to individually consent to have their vested benefits reduced.

1  Unions or anybody else, their neighbor, the retiree

2  association, nobody has the right to do it for them unless

3  they give them that right.  They have to agree themselves.

4      So we have taken the position historically when employers

5  address us, come to us with this, at the onset especially in

6  collective bargaining negotiations, that those are things that

7  we can't bargain about.  The Supreme Court says they're

8  protected.

9      However, we live in a real world.  And if we are -- if we

10  are convinced, and I know this from countless cases that I've

11  been involved in, if we are convinced that there are risks

12  inherent in the situation, and that those risks require a

13  consideration of making a deal, some sort of compromise that

14  would put our retirees in a better position long run -- in the

15  long run, then we are open to negotiations.  But always with

16  the caveat that the results because of Pittsburgh Plate Glass

17  have to be accomplished through a class action approval

18  process always.

19      And all the settlements that we've reached in -- in that

20  kind of litigation, and even sometimes pre-litigation talks

21  are -- are couched in that -- with that condition, very

22  important condition to us.  You'll note as an analog, Judge,

23  1114 has a provision in it, I remember at the table being the

24  scribe of this sentence that says in 1114 unions are the

25  authorized representative and can negotiation, this is not a

1  quote, but can -- they can negotiation the reductions.

2      It was our idea to put that in there so that 1114 as a

3  process, Chapter 11 as a process could, you know, it's kind of

4  a quick moving -- can be quick moving process, especially 1113

5  and 1114.  And they're comparative to each other in some ways.

6      And we wanted to -- we -- we thought it should be clear

7  and we convinced our friends on capitol hill and I think the

8  lobbyists for the other side as well that that was a good

9  idea.

10     But outside of Chapter 11, you have to have this class

11  action process.  And what we do is, so you can understand our

12  thinking, we look at the types of risks that are involved.

13  And there are two basic kinds of risks.

14     There's insolvency risk and there's litigation risk.

15  Litigation risk is the risk that the employer either has sued

16  or will sue and sue the retirees, sue the union, and ask for a

17  reduction in benefits because the benefits aren't vested.  Ask

18  the Court to say the benefits aren't vested.  That's a

19  litigation risk.

20     Insolvency risk is a risk of collection.  That's what we

21  were facing in <u>Allis Charmers</u> by the way.  It was insolvency

22  risk.  They never even -- they admitted they owed them

23  lifetime retiree health care benefits that they couldn't

24  change.

25     But we were faced with insolvency risk and we either

1  could deal them now or face a company that was going to, we

2  thought, increasingly shrink in terms of its asset value.  And

3  at the end of the day the cash would run out and we wouldn't

4  be able to pay.

5      So we -- we were the ones who initiated that process.  We

6  suggested Chapter 11 to them and they ultimately agreed.  And

7  -- and so those are the kinds of -- that's the kind of

8  thinking that -- and I'm sorry about running on, but that's --

9  it's a complex area.  That's the kind of thinking we engage in

10 in deciding whether to negotiate about retiree health care.

11     But you got to understand what negotiation means.  It --

12 it -- the caveat about class action approval is critical and

13 it's driven in our view by the requirement of Footnote 20 in

14 Pittsburgh Plate Glass.

15     No one has ever really quarreled with us on the -- in the

16 settlement fund on that.  That's how when we settle we always

17 do it on a class action basis.

18 Q   You've testified about various negotiations regarding

19 insolvency that the UAW has been engaged in.  Do you know

20 whether the Jones, Day law firm has ever been on the other

21 side of those negotiations?

22 A   Yes, yes.  They weren't, you know, a lot of -- there's a

23 lot of law firms that do this.  Jones, Day does it.  And with

24 us there were two cases that I can think of, Dana first of

25 all,

 1      They were the lead counsel, Corrine Ball was the -- the

 2   lead counsel of the lead counsel firm, Jones, Day.  Andy

 3   Cramer was the sort of co-lead counsel.  He's a person we at

 4   the UAW greatly respect.  He's unfortunately passed away a

 5   little bit ago.  He's a deal maker par excellence and we miss

 6   him.

 7      And the other -- and that resulted as I said in a -- in a

 8   very well funded VEBA.  Also all the plants really kept open.

 9   We have a good collective bargaining relationship with this

10   company, Dana.  It's a -- it's a real positive.  So that's

11   one.

12      And then on the tail end of the General Motors, I was

13   gone -- I was not at the UAW for the GM and Chrysler 11's.

14   But there has been some spallo on litigation in -- from

15   General Motors that some of it in the Bankruptcy Court, some

16   of it is now pending in this Court.  And although Jones, Day

17   was not the lead counsel, was not counsel according to the

18   appearance sheet that I looked at it in the out of Court VEBA

19   -- sorry I'm confusing two things.

20      Let me start over.  There -- General Motors filed Chapter

21   11 as everyone in this city knows.  A deal was reached.  The

22   company survived under new ownership.

23      Following on from that, there was a dispute between the

24   UAW and General Motors about whether 450,000,000 additional

25   dollars was owed to the GM VEBA.  Litigation was had

1  commenced in both the Bankruptcy Court here in the Eastern

2  District of Michigan.  The Bankruptcy Court ruled that the

3  litigation should proceed here, it's pending in front of Judge

4  Cohn.  To this day we're waiting -- pending on dispositive

5  motions.

6      And Jones, Day was involved, but our primary -- my

7  primary dealing with Jones, Day on that was -- was trying to

8  see if a settlement could be negotiated and talk to the other

9  side, and talk to Mr. Cramer and we determined we were too far

10  apart.  And so -- and we haven't really pursued that.

11      So Dana and General Motors but not really the -- the

12  heart of the bankruptcy, but a follow -- follow on piece of

13  litigation.  That's -- that's my knowledge about Jones, Day.

14      There are other Jones, Day matters that I have been

15  personally involved in.  Continental Tire and some other ones

16  I'm probably missing, but that is -- we do have some dealings

17  with Jones, Day, yes.

18      And we were -- and I'll say this.  When -- when the --

19  because of our positive relationship with Mr. Cramer,

20  particularly we didn't know for sure when this process started

21  at Detroit before the filing, the sort of lead up to the

22  process until the filing.  We -- we wondered whether that, you

23  know, positive relationship would -- would continue or not.

24  Q    Did you attend the June 14th, 2013 meeting where Mr. Orr

25  presented his document called proposal to creditors?

1  A    I did.

2  Q    What's your recollection of that meeting?

3  A    Well, there was a book that was passed.  My guess is,

4  it's in evidence.  And they walked through the book and

5  described the various pages and the explanation passed back

6  and forth between various people.

7      Up on a dais, it was held in a room out at the airport.

8  There was a dais and -- and a number of representatives from

9  Jones, Day and some of the other professional firms that are

10  in the case today, where they were talking and they made a

11  presentation.  People listened.  And then at the end of the

12  listening they -- there were cards that were passed out if

13  people wanted to ask questions and people filled in cards.

14  Q    Were --

15  A    And they were read out, not by the questioners, but by

16  the people on the dais and -- and answered.

17  Q    Were the people who were invited to attend the meeting

18  allowed to speak freely during the meeting?

19  A    They weren't allowed to speak at all.

20  Q    In any of your prior experiences in negotiations, had you

21  ever attended or participated in negotiations where one side

22  wasn't allowed to speak freely?

23  A    With respect to all the various kinds of negotiations, I

24  have testified to just now, and if there's any others I've

25  missed, any negotiations of any type, I have never ever been

1 | in negotiations where only one side speaks.

2 | Q    At the June 14th meeting, was Mr. Orr asked about Article

3 | 9, Section 24, of the Michigan Constitution?

4 | A    He was.

5 | Q    Do you recall whether he gave a response and if so what

6 | it was?

7 | A    It -- it was something to the effect that -- that, you

8 | know, the question was something like does that -- how does

9 | that affect what you want to do.  Because the book they passed

10 | out said they wanted to cut pension benefits.

11 | And he said well, it might take legislative action or

12 | agreement.  And that was the extent of it, it was a very short

13 | answer.

14 | Q    After the June 14th meeting, did you report back to the

15 | UAW leadership about Mr. Orr's proposal?

16 | A    I did.

17 | Q    And what was -- can you describe that interaction that

18 | you had with the UAW leadership?

19 | A    Yes.  I talked to our President Bob King directly one on

20 | one.  I reported what happened.  He asked me to be --

21 | personally lead our effort despite the small number of

22 | retirees we had because we care deeply about what happens to

23 | the City of Detroit, and its citizens, and its retirees, and

24 | its employees.  And it's our home.  And he said, let's do

25 | everything we can to protect the retirees and let's try to

1 | play a constructive role in trying to bring a resolution of

2 | this.

3 | Q    Did you attend a June 20th meeting regarding the proposal

4 | that the emergency manager had made?

5 | A    I did.

6 | Q    And was the same procedure that you testified about

7 | concerning the June 14th meeting in place at the June 20th

8 | meeting, i.e. that attendees were not allowed to speak freely,

9 | but had to submit cards?  Was that same procedure in place?

10 | A    It was.  The dynamics of the meeting were just a little

11 | different.  I just thought of this sitting here now.  In the

12 | airport meeting the -- the city professionals were up -- up on

13 | the dais overlooking us.  And this meeting happened to be in

14 | an amphitheater in the 13th floor of the city county building

15 | and everybody was looking down on them like an operating room

16 | where the surgeons all look -- the surgeon students look down

17 | at the operating table.  So it was a little different.

18 |      But the card thing was exactly the same.  If you had a

19 | question -- Mr. Orr wasn't there.  So it was led by Heather

20 | Lennox and some other Jones, Day and other professional

21 | people.  But the same process was there, they passed out

22 | cards.

23 | Q    And did you submit any question cards at that meeting on

24 | June 20th?

25 | A    I -- I submitted two question cards.

1   Q    Okay.  I'd like to draw your attention to Exhibit 623.

2   It's -- it should be in the book behind you.  And if we can

3   have it on the screen as well.

4   A    This.

5   Q    The image on the screen is in black and white and it's

6   hard to read.

7   A    That's kind of blacked out in the corner, so --

8   Q    Right.  But the book, the hard copy book has it in color.

9            MR. DECHIARA:  And, Your Honor, I -- the -- the

10  Court has been submitted copies in color that are legible.

11  A    Are you ready, Your Honor?  You've got it?

12  Q    Since -- Mr. Nicholson, since legibility of the -- of the

13  image on the screen is -- is limited and since -- since it's

14  in handwriting, I would just ask you to -- to read into the

15  record the -- the question that you submitted and Exhibit 23

16  is a two page document.

17       So let me first ask you to read the -- the first one.

18  It's -- it's stamped at the bottom UAW 0302.  Can you read

19  what your question was on that page?

20  A    That's actually two questions on that one card.  And the

21  first -- and as you can see, there's a little cut off at the

22  bottom, but I can help piece that together.

23       So question one is, how does the emergency manager

24  propose to compromise the rights to pension payments which are

25  protected by the Michigan Constitution?

1   Question number two was, how could Governor Snyder

2   authorize a Chapter 9 filing by the city without violating

3   Article 9, Section 24 of the Michigan Constitution given the

4   announced intention and then I believe the words are of the EM

5   to impair and diminish pension benefits.

6   You can see the ish and the D in front of -- in front of

7   pension.  That's diminish and you can see the R and the

8   capital I and so on on impair before the -- it's not a

9   preposition, whatever the word is sorry, but -- but that --

10  that's basically what it says.

11  Q   Do you recall whether you received a response to those

12  questions that you posed at that meeting?

13  A   Heather Lennox responded to that.

14  Q   Do you recall what she said?

15  A   Yeah.  I -- I will tell you.  And I'm going to take it

16  one question at a time here.

17  Basically the response on the first one was kind of a

18  non-response.  I didn't really understand --

19        THE COURT:  Just tell us what she said, sir.

20  A   Okay, I will.  I will.  Let me think.

21  Q   Well, let me ask you, do you have a verbatim recollection

22  of what she said?

23  A   I don't have a verbatim recollection.

24  Q   What's your best recollection of what she said?

25  A   My best recollection is she said something like, well

1  we're just -- that's something we're just going to have to

2  deal with.  Something like that.  And that is not verbatim.

3     And then on the second question, I had a more specific

4  recollection about Governor's Snyder's authorization.  And

5  with respect to that, Ms. Lennox said, it's a two -- and again

6  this is not verbatim, but it's very close.

7     It's really a two part process.  The Governor authorized

8  this bankruptcy and then what happens to the pensions just --

9  is just something that happens in the Chapter 9 proceeding.

10 So they don't happen together, it's a two part process.  I

11 remember that phrase.  And I -- I heard that.

12 Q    Let me now turn you to the second question card, the one

13 that's stamped at the bottom UAW 0303.  Can you read into the

14 record what the questions are on that card?

15 A    Yes.  This is a -- sorry about the complexity of this,

16 but there is a -- three questions with a sub part in the first

17 one.  So we'll take it in terms of reading one sentence at a

18 time.

19    The first sentence is, does the emergency manager law

20 under which Mr. Orr was appointed, grant my union, and it's

21 the UAW, the authority to A, negotiate over, and B, compromise

22 either X, OPEB for present retirees or Y, pension benefits

23 already accrued by present and/or future retirees.

24    The second sentence says, please explain and cite me to

25 the basis for any such authority.

1    And the third sentence says, if the answer to either of

2  the above is no, who does Mr. Orr propose to negotiate with.

3  Q    And do you recall whether there was a response given to

4  those questions?

5  A    The response was, in -- in so many words, that they

6  didn't have any doubt about the -- the ability of the -- Mr.

7  Orr to negotiate.  It was up to the other side to figure out

8  what to do.  It was our problem in other words.

9    And that's not what I was asking.  I wasn't asking

10  whether it was our problem.  I was asking legally what --

11    THE COURT:  You've answered the question, sir.

12  A    Okay.  Thank you.

13    MR. DECHIARA:  Your Honor, Exhibit 623 is already in

14  evidence, I won't move it into evidence.

15  Q    Mr. Nicholson, was the UAW willing to negotiate with the

16  emergency manager over reduction in accrued pension benefits

17  for its members?

18  A    No.

19  Q    Why not?

20  A    At the meeting that we just -- the June 20th meeting, I

21  spoke after -- and I said -- I said our position on this.  So

22  you didn't ask me that, but I'll tell the Court.

23    THE COURT:  No, the simple question was, why not?

24  Please answer that question.

25  A    Okay, I will.  The Michigan Constitution, Article 9,

1  Section 24 which we believe is binding on the UAW and binding

2  on all citizens of Michigan including the Governor, precludes

3  impairment or diminishment of pension benefits.

4      And in our view it would be a violation of law for us to

5  do that.  And I also believe that only the citizens of the

6  State of Michigan through the amendment process with respect

7  to their Constitution, have the authority to change that legal

8  fact.  And that has not happened.  And the Governor can't

9  amend the Constitution, nor can Mr. Orr.  They're not

10  authorized to do so under our law, our basic law in this

11  state.

12  Q    You testified earlier about OPEB, other post employment

13  benefits.  Do you recall using that phrase?

14  A    Yes.

15  Q    Was the UAW willing to participate in the resolution of

16  OPEB issues with the emergency manager?

17  A    Yes.

18  Q    What was the UAW prepared to do?

19  A    While the pre-bankruptcy -- let's talk about the

20  pre-bankruptcy period.  I think -- and -- and limit it to

21  that.  And if you want --

22  Q    Right.  That's all I'm asking about, pre -- pre-July 18.

23  A    Right.  I previously told you, Your Honor, about this

24  process that we go through in figuring out whether we have an

25  employer who is --

1           THE COURT:  The question was, what are you -- what

2   were you willing to do?

3   A    Okay.  Well, we went through this process that I

4   described and evaluated the city.  And we -- and we looked at

5   the -- the -- we didn't have access to the data room.  And I

6   think you'll remember that.

7           THE COURT:  Again sir, you're going beyond the

8   question.

9   A    Okay.  We --

10          THE COURT:  What were you willing to do?

11  A    Based on our analysis of the situation, I told lawyers

12  for Jones, Day at a meeting on July 11th that the UAW was

13  willing to engage in a class action process to deal with and

14  try to resolve the OPEB issue and take leadership in that role

15  since we, more than any other union in the country, have dealt

16  -- had to -- had to deal with that issue.  And I asked Mr.

17  Miller, Evan Miller, I -- I said you know, there's a process

18  Evan, to deal with this --

19  Q    Who is Evan Miller?

20          THE COURT:  And again -- again you're going beyond

21  the question.

22  A    All right.  I'll let my counsel fill in.  Trying to move

23  -- move this along, Your Honor.

24          MR. DECHIARA:  Your Honor, I'm going to refer the

25  witness next to Exhibit 624 which is currently not in

1  evidence.  I've spoken to counsel for the city.  I understand

2  they have no objection, so I would now move Exhibit 624 into

3  evidence.

4         THE COURT:  Any objections?

5         MR. STEWART:  Hold on a minute.  Oh, no, no

6  objection.

7         THE COURT:  It is admitted.

8      (UAW Exhibit 624 was admitted)

9  Q   Mr. Nicholson, can you either look on the screen or turn

10 in your book to Exhibit 624?  And I would first ask you, it's

11 a three -- it's a three page document.  Can you identify what

12 each of the pages are?

13 A   It's actually a four page document.

14 Q   Thank you.

15 A   And it's -- it's an affidavit that I swore to on July

16 18th, 2013 with two exhibits that are identified in the text of

17 the affidavit.

18     (UAW Exhibit 624 was identified)

19 Q   Okay.  Can you identify the third page?  The page that

20 says Exhibit A on it.

21 A   Yes.  That's an email from David Birnbaum of Jones, Day

22 to me dated June 28th, 2013.

23 Q   Okay.  And now I'd like you to turn the page to the last

24 page of the exhibit and ask you to identify what that document

25 is.  The one that says Exhibit B on it.

1 A    That's an email I sent to Mr. Merrett and Mr. Birnbaum at

2 Jones, Day on July 9, 2013 in advance of the meetings that

3 were scheduled and that we were planning to attend with

4 representatives of the city on July 10 and 11, 2013.

5 Q    Okay.  I'd like to direct your attention to the first

6 paragraph of that email that's marked as Exhibit B.  It

7 states, UAW has requested access to the City of Detroit data

8 room maintained by your firm.  You have responded by

9 proffering a proposed non-disclosure agreement and release and

10 have made UAW's execution of such documents a condition of our

11 access to the data room.  Do you see that language that I just

12 read, Mr. Nicholson?

13 A    I do.

14 Q    And what was the UAW's position in regard to the

15 requested non-disclosure agreement?

16 A    Well, we had -- to that point not agreed to sign it.  Our

17 counsel, Cohen, Weiss, and Simon, had thought we should.  But

18 I said no, this is a public -- said to them, no, this is a

19 public proceeding involving a public entity and it should be

20 transparent and open and there should not be some secret data

21 room.  I can accept that in a Chapter 11 proceeding with a

22 private entity, but not with a public entity.

23       So but the second paragraph asked them -- you asked our

24 position at this time, but we asked them to explain the basis

25 for that condition of signing confidentiality.

1  Q    Right.  And let me --

2  A    We asked them to explain.

3  Q    Let me just direct your attention to the last sentence of

4  the second paragraph.  It says, "I would like to understand

5  the basis for withholding data room information with respect

6  to the City of Detroit based on claims of confidentiality".

7  Do you see -- do you see that sentence there, I just read, Mr.

8  Nicholson?

9  A    I do.

10 Q    Did you get a response to that statement?

11 A    Never.

12 Q    Was the UAW allowed access to the data room prior to the

13 bankruptcy filing?

14 A    Unless we refused -- unless we agree to sign the

15 confidentiality agreement and release, we were not allowed

16 access and we did not sign the confidentiality agreement and

17 release.  And this Court, as Your Honor knows, subsequently --

18 it was subsequently removed as a condition for access.

19 Q    Okay.  And just to be clear on your answer, before the

20 bankruptcy filing, did the UAW -- was the UAW given access to

21 the data room?

22 A    No.

23 Q    In your experience, how important is it in negotiations

24 over retiree benefits to have access to relevant information?

25 A    It is absolutely essential.

1  Q    Let me now refer --

2  A    Good faith negotiations cannot occur without access to

3  information.  As a matter of fact, under the National Labor

4  Relations Act that's a basic tenant of the national labor law.

5  And -- and especially when an employer is claiming inability

6  to pay.  That's a condition precedent to any good faith

7  negotiations.  And we were denied access here.

8           THE COURT:  Okay.  I think you've answered the

9  question, sir.

10  A    Thank you, Your Honor.

11  Q    Let me now refer you to Paragraph 4 of Exhibit 624.  If I

12  -- if I could have that exhibit on the screen.  It's the big

13  paragraph in the middle.

14  A    Yes.

15  Q    Do you see that paragraph, Mr. Nicholson?

16  A    I do.

17  Q    Okay.  I'm going to refer you to the sixth line that on

18  the right side of the line there's a sentence that begins,

19  please tell me what.  Do you see that?

20  A    Are you going to highlight it?  I see it.  Give me a

21  second.

22  Q    Sure.

23  A    It actually helps a lot if you highlight it because it's

24  kind of squeezed.

25  Q    Okay, yeah.  If the -- the rest of the paragraph could be

1  highlighted.

2  A    Well, you want to ask me about the first sentence that

3  you've highlighted?

4  Q    Yes.

5  A    Please tell me what authority your firm and/or Mr. Orr

6  gives the UAW the right to compromise vested benefits --

7  benefits, sorry, despite the contrary provisions of Article 9,

8  Section 24.  It's very similar to the question I asked at the

9  June 20 meeting.

10 Q    And I'm not going to read them out loud into the record.

11 It's in print, and it's highlighted on the screen.  And -- and

12 Mr. Nicholson you could read those questions yourself.

13      And my -- my question is, did you ever receive a response

14 from Jones, Day or the emergency manager to the questions that

15 are set forth in that paragraph?

16 A    Never.

17 Q    Let me now refer to the last paragraph of the -- the

18 exhibit and the last sentence of the last paragraph.  It says,

19 your full answers to the questions posed in the foregoing

20 paragraphs of this message will help the UAW determine the

21 scope of any such negotiations and the UAW's decision

22 regarding it's representative capacity in them about which

23 your firm has inquired.  Do you see that sentence?

24 A    I see it.

25 Q    What did you mean when you wrote that?

1  A    I wrote it and I meant that.  We were trying to

2  understand their point of view with respect to the ability to

3  conduct negotiations and our ability to compromise.

4       And we were trying to make decisions, we were -- I -- I

5  was the lead person here for the UAW.  And I personally was

6  trying to make decisions about whether we had a bargaining

7  partner here or not.

8       And this was part of my inquiry and thought process which

9  continued -- which I intended to continue put it that way.  At

10 that point at the July 10th and 11th meetings, key to

11 understanding the -- my motivation in asking that question and

12 saying what you've got highlighted there, your full questions,

13 et cetera, that sentence, is the fact that this was the day

14 before the July 10th and the 11th meetings.  We were going to

15 talk about pensions on the 10th and OPEB on the 11th.

16      So I sought that inquiry.  I -- I posed that inquiry but

17 never really got a response.  Never got a response at all to

18 anything in this email.  It went unresponded to.  My sworn

19 affidavit that was filed in the State of Michigan, Circuit

20 Court for the County of Ingham was un -- un -- unopposed.

21 Nobody said it was untrue.  It is true.  So, the next thing

22 that happened was, we showed up for the meeting on July 10th.

23 Q    Okay.  You anticipated my next question.  You attended

24 the July 10th meeting?

25 A    I went to the city -- I went to the City of Detroit city

1  county building to attend it and was in the room for a brief

2  period of time, also talked to Mr. Miller for a short period

3  of time out in the hall before.

4  Q    Who is Mr. Miller?

5  A    Mr. Miller is a partner at Jones, Day who is an ERISA

6  partner.

7  Q    And what happened at the July 10th meeting during the time

8  you were there.

9  A    Well, out in the hall -- out in the hall before the

10  meeting, this will not take long because I basically had to

11  leave the meeting.  Out in the hall before the meeting Mr.

12  Miller asked me if I -- if he could engage in an off the

13  record discussion with me and I said, Evan, I don't think this

14  is the time for that.

15      We have to do what we have to do here.  And so I don't

16  think this is the time, but I appreciate that.  Then we walked

17  into the meeting.

18      I saw Ed Hammond, a partner at Clark, Hill.  They're, I

19  presume, representing the retirement systems.  Ed and I know

20  each other.  We were -- worked together very closely to

21  resolve the Rouge Steel bankruptcy.  And especially on pension

22  issues and retiree health care issues.

23      And I exchanged pleasantries with Ed and he said to me,

24  you know, Mike, you should check out the legislative history

25  of ERISA which I know a fair amount -- amount about.  And --

1  but I wasn't aware of this piece.

2       And he said, Congress made clear in that legislative

3  history that the reason it didn't extend the pension guarantee

4  system to state and city employees was because it believed

5  that states and cities would stand behind their pension

6  promises.  And I said thank -- thank you for that.  I

7  appreciate that.  Then we sat down.

8            THE COURT:  Excuse me one second.  Is there

9  something you want to say, sir?

10            MR. STEWART:  Your Honor, I think -- I think maybe a

11  question and answer approach might work better here.  So I

12  would actually move to strike Mr. Nicholson's last testimony

13  and maybe we can move things along more quickly if we did it

14  that way.

15  A    I'll try to stick with question and answer, Your Honor.

16            THE COURT:  A good idea.  The Court will strike the

17  last answer, it was hearsay.

18            MR. DECHIARA:  Well, Your Honor, the witness was

19  just recounting what the conversation was he had with this

20  individual.  I don't believe that -- we're not submitting it

21  for the truth of what the other individual --

22            THE COURT:  What's the relevance of it then?  The

23  evidence is stricken.

24            MR. DECHIARA:  It's --

25            THE COURT:  Please proceed in question and answer

1  format.

2  Q    What else do you recollect from that meeting?

3  A    The meeting began -- the meeting was conducted by well,

4  such as it was.  I was there for a short period of time.

5  David Heiman, a partner at Jones, Day began the meeting by

6  saying, if you're -- and this is not verbatim, but this is --

7  this is the nub of it.

8      If you want to attend this meeting you have to agree that

9  this is a Rule 408 meeting, protected by Rule 408 of the

10  Federal Rules of Evidence.

11  Q    And what was your understanding of what that meant?

12  A    He meant that what happened in the meeting could not go

13  here, or perhaps elsewhere in terms of evidence or perhaps

14  other things, I don't know.  I responded and told him that the

15  UAW was not willing to accept that condition as a condition of

16  participation in the meeting because we believed again that

17  this should be an open process.  We're dealing with public

18  employees and we have to be able to tell our members what

19  we're doing.  We don't want to have secret meetings.

20      And we want -- and we also thought it was relevant for

21  what might happen down the road.  So I -- it was all very

22  polite, but I said I'm sorry, I can't accept those conditions

23  and I left.

24  Q    Did you attend the July 11th meeting the next day?

25  A    I did.

1  Q    Do you recall what the subject of that meeting was?

2  A    It was announced to be a meeting about retiree health

3  care OPEB.

4  Q    Okay.  Was Mr. Orr present at the July 11th meeting?

5  A    He was not present at the July 10 or 11 meetings when I

6  was in the room.  And I was in the room for all of the July 11

7  meeting.

8  Q    Do you recall a presentation by the Jones, Day attorneys

9  at the July 11th meeting?

10  A    Yes.

11  Q    And what's your recollection of the substance of that

12  presentation?

13  A    Evan Miller walked through their proposal on OPEB

14  benefits.  On -- and on health care benefits.

15  Q    Did you speak at the meeting?

16  A    I did.

17  Q    And do you recall what you said?

18  A    I spoke several times.  I asked some questions.  But at

19  the beginning before we got into the substance of OPEB in

20  response to Mr. -- Mr. Heiman said we're not going to impose a

21  408 condition on participation in the meeting.  And I said

22  that's good because I thought of a -- another reason why it

23  would be inappropriate because if this was evidence -- if --

24  it would be evidence -- it would important to look at what

25  happened because of Bildisco.  I said that

1    Q     But --

2    A     And then I spoke later in the meeting as well.

3    Q     What -- what are you referring to, by the word Bildisco?

4    A     Bildisco is a Supreme Court decision about rejection of

5    agreements pre 1113 of the Bankruptcy Code and it talks about

6    how a Court should look at what happened in dealings between

7    the parties in negotiations so to speak.

8    Q     I'm sorry, I interrupted you.  You were -- you were

9    recounting what you said at the July 11th meeting.

10   A     I spoke again after we were well into the discussion of

11   retiree health care benefits and health benefits in general.

12   Q     And --

13   A     Do you want me to say what I said or --

14   Q     Yes, recount what you said.

15   A     I'm trying to stick to the Q and A, so -- I -- several

16   questions.  And my first question as I recall was to Mr.

17   Miller because he was really the presenter.  Was could the

18   city having if this -- if this were to be, this program that

19   they were proposing were imposed in any way by agreement or

20   otherwise, would the city be free in the city's eyes to

21   eliminate the reduced benefits at any time and he said yes, it

22   would.  That was -- and then I spoke again shortly thereafter.

23   Q     What did you say then?

24   A     Okay.  I said, what recovery would there be for lost

25   benefits.  In other words the difference between a reduced

1  benefit level and the benefits that were in place at the time

2  the chapter -- at the time -- we weren't in Chapter 9.  We

3  were trying to avoid Chapter 9.

4      But under a deal what would -- what would happen to that

5  differential between the benefits as they were and the

6  benefits at the reduced level.  Would there be a recovery for

7  workers.  And Mr. Miller said, no.

8  Q    Do you recall having any other interchanges --

9  A    I said, and I responded, that's very unusual.  That's

10  certainly not the way it works in 1114 which I know a little

11  bit about.

12  Q    Did you have any other interchanges with Jones, Day

13  attorneys on July 11th?

14  A    Yes.

15  Q    Can you tell us what those were?

16  A    At the -- near the conclusion of the meeting, I spoke up.

17  I started to talk about this earlier, but near the conclusion

18  of the meeting, I having thought about this issue going into

19  the meeting, looked at Mr. Miller and said, Evan, I want you

20  to go back and tell Mr. Orr that the UAW -- well, let me stop.

21      I -- I said Evan, there's a way to deal with this despite

22  the fact that we have this issue of being able to bargain or

23  not bargain for retirees.  You know what it is.  And he said

24  yes, class action.

25      And I said, that's right.  And I said, you should go back

1  and tell Mr. Orr that the UAW which has a lot of experience in

2  doing that, is willing to engage and lead in that process with

3  you in order to avoid a bankruptcy proceeding.  And please go

4  back and present that to Mr. Orr and get back to me because we

5  are serious about that.

6  Q   And between July 11 when you made that statement to Mr.

7  Miller, and July 18th when the bankruptcy was filed, did you

8  receive any response from the emergency manager or from Jones,

9  Day regarding the UAW's proposal to have a class action

10 process put in place?

11 A   Never.

12 Q   To what extent were there what you would consider, given

13 your experience, to -- to what extent were there what you

14 would consider negotiations over pension benefits at the June

15 14th, the June 20th, and the July 11th meetings?

16 A   There were two significant deficits that precluded

17 negotiations but each of which could have been taken out of

18 the way.  The first was access to information unimpeded by

19 secrecy.  That was not taken away.

20     The second was a process because --

21     THE COURT:  I think your lawyer wants to say

22 something to you.

23     MR. DECHIARA:  Thank you, Your Honor.

24 A   I'm sorry, I apologize.

25 Q   Specifically in my question I'm talking about to what

1  extent do you believe there were negotiations over accrued

2  pension benefits?

3  A    Did I -- if I misunderstood you about pension, I'm sorry.

4  I -- I must not have heard --

5  Q    That's fine.  But now that I've clarified the question,

6  can you answer it?

7  A    The question is, were there discussions about pension

8  benefits.

9          THE COURT:  No, that's not the question.

10 Q    The question is, to what extent in your experience, given

11 your experience --

12 A    Yes.

13 Q    Were there what you would consider to have been

14 negotiations over accrued pension benefits at the meetings

15 that you attended?

16 A    As far as the UAW was concerned, no.  And in our view

17 there could not have been because it would have been contrary

18 to Michigan's basic law, the Constitution.

19 Q    And now let me ask you the same question, but instead of

20 limiting it or instead of referring to accrued pension

21 benefits, let me ask you to what extent do you believe there

22 were negotiations over OPEB?

23 A    And this is what I started to answer before and I

24 apologize to the Court for mishearing the question.  We tried

25 to start negotiations.  There could have been -- there were

1  impediments.

2          THE COURT:  That's not the question.

3  A    Were there negotiations?

4          THE COURT:  To what extent were there negotiations.

5  A    We asked to be involved in negotiations.  We invited the

6  city to --

7          THE COURT:  And this is not a question about your

8  attitude or your intent.

9  A    But it's about --

10          THE COURT:  The question is to what extent were

11  there negotiations?

12  A    The first step in negotiations --

13          THE COURT:  I want to tell you, sir --

14  A    Okay.

15          THE COURT:  This question and the last question are

16  probably the most important questions you are asked here this

17  morning.

18  A    I understand.

19          THE COURT:  To what extent were there negotiations.

20  A    There were.  And in our view the first step --

21          THE COURT:  Were what?

22  A    There were negotiations that we tried to initiate with

23  the city over OPEB.  We invited them to negotiate through a

24  class action process.  The first step in negotiations is to

25  ask the other side to participate in the process, process that

1  will lead to a resolution.

2      We asked.  We asked that be taken back to Mr. Orr and Mr.

3  Orr never responded to us, nor did his lawyers ever.  That's

4  my answer.

5  Q   And given the lack of response by Mr. Orr, was what

6  occurred -- what actually occurred, were those negotiations?

7  A   In my view the first step in negotiations is to ask, but

8  following --

9          THE COURT:  Again you're not answering -- you're not

10 answering the questions.

11 A   Okay.  All right.

12          THE COURT:  Given your --

13 A   They never took us up on it, put it that way.

14          THE COURT:  Given your perception of what actually

15 happened, and your understanding of what negotiation means,

16 that phrase, that term means, to what extent was what happened

17 negotiation in your opinion?

18 A   I have to explain what I mean by negotiations to answer

19 that, Your Honor.

20          THE COURT:  No, you don't.  You just have to tell me

21 the extent to which it was negotiation.

22 A   The first step in negotiations --

23          THE COURT:  Okay.  This -- this answer you've

24 already given me.  If that's your answer, we'll move on.

25 Q   Mr. Nicholson, are you familiar with the Flowers

1  litigation?

2  A    One second.

3          THE COURT:  What's the matter, sir, do you need a

4  minute?

5  A    I do.

6          THE COURT:  All right.  We'll take a recess until

7  10:55.

8      (WITNESS MICHAEL NICHOLSON WAS TEMPORARILY EXCUSED AT

9  10:55 A.M.)

10         THE CLERK:  All rise.  Court is in recess.

11     (Court in Recess at 10:39 a.m.; Resume at 10:56 a.m.)

12         THE CLERK:  All rise.  Court is in session.  Please

13  be seated.

14     (WITNESS MICHAEL NICHOLSON RESUMED THE STAND AT 10:56

15  A.M.)

16         THE WITNESS:  Your Honor --

17         THE COURT:  One second.  It looks like everyone is

18  here.  Sir.

19         THE WITNESS:  There's two things I need to tell you

20  about my testimony if you'll give me permission.

21         THE COURT:  Any objection?

22         MR. STEWART:  No.  No objection, Your Honor.

23         THE WITNESS:  First of all, Your Honor, I just -- I

24  want to make the Court aware that my -- I'm trying to stay

25  focused on this, but I just learned this morning -- this

1 morning that my brother is in the hospital with end stage

2 liver cancer. And I want to be with him. So I'm trying to

3 stay on task here, okay?

4          THE COURT: Okay.

5          THE WITNESS: And -- but I think you should know

6 that because you have to judge my credibility and my frame of

7 mind.

8          THE COURT: Right.

9          THE WITNESS: The -- the second thing I want you to

10 know if there's something -- an additional thing I remembered

11 about I should have responded to it about the July 11th

12 meeting. And with your permission, I'll tell you so you have

13 a complete story, but it's up to you.

14          THE COURT: Go ahead.

15          THE WITNESS: So, after I asked Mr. Miller to go

16 back to Mr. Orr and tell him the UAW was willing to engage in

17 a class action type process, something would culminate that to

18 resolve retiree health care out of bankruptcy.

19      Mr. Heiman -- Heiman, I'm sorry, said there isn't time

20 for that. And I said, there is time, we got this resolved

21 very quickly in a number of cases including Ford, and GM, and

22 Chrysler.

23      That was the last discussion we had. So the negotiations

24 such as they were, there was nothing beyond that point. There

25 was an ask, an invitation, but no acceptance.

1 BY MR. DECHIARA:

2 Q    The last topic, Mr. Nicholson.  I'm going to ask you

3 about July 18ᵗʰ.  But let me first ask you some questions to

4 set the stage.  Are you familiar with the Flowers litigation?

5 A    Yes.

6 Q    And what was –– what was or is the UAW's role in the

7 Flowers litigation?

8 A    First of all, I conceived of the idea of the basic

9 premise and theory behind the litigation.  That's the first

10 part of the role.

11      Second, the UAW funds the attorney for the Flowers

12 plaintiffs.

13      Third, the UAW cooperates and lends assistance to those

14 attorneys.  However, those attorneys make their own mind up

15 with respect to representing their clients.  So that's the

16 answer.

17 Q    And do you know Bill Wertheimer, counsel to the Flowers

18 plaintiffs?

19 A    I've known Bill for decades.

20 Q    Okay.  Are you aware that the Flower plaintiffs moved for

21 a preliminary injunction?

22 A    Yes, I am aware of that.

23 Q    And are you aware of the date that the preliminary

24 injunction was scheduled to be held?

25 A    Yes.  It was scheduled by the Ingham County Circuit Court

1  to be heard on July 22nd.

2  Q    Okay.  And do you recall working with Mr. Wertheimer on

3  reply papers for that preliminary injunction motion?

4  A    Yes.  Bill came to my office at UAW solidarity house on

5  July 18th and we worked on finalizing a reply brief and I also

6  signed the affidavit which is -- which was notarized and is in

7  the record as Exhibit 624 that day.

8  Q    Now on that day, did you become aware that the retiree

9  system in its -- its lawsuit had filed papers for an ex parte

10 TRO?

11 A    We received a call.  Bill and I were in my office along

12 with our law clerk, great law clerk at the time, Kristin

13 White, working busily away on the reply brief which had to be

14 filed that day, July 18th.  So that was why we were there,

15 because it had to be driven up to Lansing as I understand it.

16     And we had a call during that day to that effect, that

17 they were going to Court and seek an ex parte restraining

18 order restraining the city from filing a Chapter 9 petition

19 because they had heard --

20     THE COURT:  All right.  Sir, you've answered the

21 question.

22 A    I'm sorry.

23 Q    Did you and Mr. Wertheimer that afternoon have a

24 discussion about the retiree systems seeking a ex parte TRO?

25 A    Yes.

1 Q    And can you recount the conversation that you and Mr.

2 Wertheimer had on that subject?

3 A    Yes.

4          MR. STEWART:  I just -- it's a proper question,

5 however, there's going to be a waiver here.

6          MR. DECHIARA:  Your Honor, first of all, Mr.

7 Wertheimer is counsel for the Flowers plaintiffs, Mr.

8 Nicholson is counsel for the UAW.  But I'm not asking for any

9 -- any discussion of any legal issues, just a discussion of

10 this event in a -- in a separate lawsuit.  And -- and it's

11 foundational, Your Honor.  It's -- it's -- it's --

12          THE COURT:  Then proceed.

13          MR. DECHIARA:  Thank you.

14 A    The question, can you repeat it?

15 Q    Can you recount your conversation with Mr. Wertheimer on

16 the subject of the retiree systems seeking the ex parte TRO

17 that you had been informed of?

18 A    We were told they were going to Court that afternoon in

19 front of Judge Aquiline.  Bill and I decided that since we had

20 to go to Lansing anyway and since that Court hearing was

21 probably going to be pretty important, that we ought to finish

22 the reply brief in the car and drive it up -- drive up there

23 right now so we got there in time for the hearing and that's

24 what we did.

25 Q    And did you have any discussion with Mr. Wertheimer about

1  whether the state should be notified of the ex parte TRO?

2  A    Yes.

3  Q    What -- can you recount that discussion?

4  A    We finished the brief on the -- I was sitting in the back

5  seat typing away on my laptop.  We finished the brief.

6  Q    This is in the car to Lansing?

7  A    The car on the way to Lansing.  And Bill asked me Mike,

8  do you think we should notify the state.  And I took it as an

9  ethical question, a practical -- what I would call in my

10 terms, practical ethics.  What's the right thing to do.

11      And I said yeah, Bill, I think we have to, it's not in

12 our interest, but I think we have to do that, that's the right

13 thing to do and he agreed.  And he proceeded to call the state

14 Attorney General's office and tell them that we were going to

15 be there even though it wasn't our motion and that there was

16 an ex parte motion being brought.

17      We didn't know ahead of time what was going to happen in

18 Court.  Bill ended up asking for relief because we had just

19 filed the reply brief and it was now a fully briefed

20 preliminary injunction motion.

21 Q    How do you know -- how do you know Mr. Wertheimer called

22 the state attorneys?

23 A    I heard him talking to them while I was in the car.  And

24 then -- and he actually had two calls with them and we

25 discussed it in the interim.  I also know because I talked to

1   the state Attorney General, the lawyer for the state, not Mr.

2   Schuette, but the lawyer for the state Attorney General, Mr.

3   Canzano.  And he told me Bill called and I told him and he

4   told me how much he appreciated Bill's ethical behavior.

5       And I said well, I was part of that and I was part of

6   that decision too.  And he said well, I appreciate you doing

7   that as well.

8   Q   Do you know what time on July 18th Mr. Wertheimer called

9   the state to notify them of the TRO hearing?

10  A   I can put it within about a ten minute window because I

11  know --

12  Q   What time?

13  A   Around 3:35.

14  Q   P.M.?

15  A   Yes.

16  Q   And how can you put it in such a tight window?

17  A   Because I remember a sequence of events, one of which is

18  -- is an email I sent that nails down the time.  It was

19  between the first and the second conversation Mr. Wertheimer

20  had with the Attorney General's office.

21      I've also seen Mr. Wertheimer's cell phone records that

22  confirm that.  But that -- but I have my own memory of it as

23  well.  And I also know from talking to Mr. Canzano because he

24  is of the same view as to the time.

25          MR. DECHIARA:  No further --

1  A    I talked to Mr. Canzano about that this morning.

2         MR. DECHIARA:  No further questions on direct.

3                    CROSS EXAMINATION

4  BY MR. STEWART:

5  Q    Good morning, Mr. Nicholson.

6  A    Good morning.

7  Q    Could we first put up Exhibit 105?  Mr. Nicholson, are

8  these notes that you took at the July 11 meeting?

9  A    They're notes I typed, yes.

10       (City Exhibit 105 was identified)

11  Q    You typed them at the time?

12  A    During the meeting.

13  Q    And why did you prepare them?

14  A    I prepared them because I was -- it turns out -- I

15  thought I wasn't -- didn't take notes at that meeting.  When I

16  found this document, I recalled that I did.  And I prepared

17  them to record some of what happened.  It's very much

18  shorthand about what happened.

19       MR. STEWART:  I'd move -- I move the admission of

20  Exhibit 105.

21       THE COURT:  Any objections?

22       MR. DECHIARA:  No objection.

23       THE COURT:  105 is admitted.

24       (City Exhibit 105 was admitted)

25  Q    Mr. Nicholson, just a couple of things.  First of all

1  just the chronology so that I understand it.  You attended the

2  June 14 meeting, correct?

3  A    Yes.

4  Q    And the June 20th meeting, correct?

5  A    Yes.

6  Q    Your union funded and you said you were a participant in

7  the thinking about the Flowers litigation?

8  A    Yes.

9  Q    That was brought July 3rd?

10 A    I believe that's right.

11 Q    And you began thinking of that before July 3rd, correct?

12 A    Yes.

13 Q    Probably about a week before July 3rd?

14 A    I -- what led me to start thinking about it --

15 Q    Well, just when -- when did you --

16      THE COURT:  The question was when did you start

17 thinking it?

18 A    I -- when I -- I can't think of the exact date, but I

19 know the event.

20      THE COURT:  Approximately.

21 A    I'll have it just a minute, I'm just lining up a

22 sequence.

23      THE COURT:  While he's thinking, can we have a copy

24 of Exhibit 105 which was just admitted?

25      MR. STEWART:  Yes, Your Honor.

1           THE COURT:  If not at this moment, then at some

2   point, please.

3           MR. STEWART:  I believe we have extras, Your Honor.

4   Let me get it from our -- may I approach, Your Honor?

5           THE COURT:  Yes.  Do you have an answer, sir?

6   A    Yes.  Within a few days after the June 14th meeting is

7   about the best I can put it -- put it to, Your Honor.

8   Q    Okay.  So let me go back.  You were at the June 14

9   meeting.

10  A    Yes.

11  Q    Within a few days you began thinking of a lawsuit,

12  correct?

13  A    Yes.

14  Q    You went to the June 20th meeting?

15  A    Yes.

16  Q    Lawsuit was filed July 3rd?

17  A    I think that's the date it was filed, yes.

18  Q    You were involved in the thinking behind and the work of

19  the lawsuit?

20  A    Yes.

21  Q    The UAW paid the lawyers for the lawsuit?

22  A    Yes.

23  Q    Mr. Flowers was a UAW member?

24  A    A proud UAW member.

25  Q    And didn't -- you did not at any point tell the city its

1  lawyers that the UAW was behind this lawsuit, did you, until

2  your deposition when I asked you that question?

3  A    I don't think I was asked, but no, I think that's right.

4  The first time I told them was when you asked me the question

5  in the deposition, I said yes.

6  Q    And then on -- on July 10 there were two meetings.  One

7  in the morning, one in the afternoon.

8  A    I was not invited to a meeting in the afternoon.  I heard

9  there was one for police and fire workers.

10 Q    And at the beginning of the July 10 meeting Mr. Heiman of

11 Jones, Day invoked Rule 408 of the Federal Rules of Evidence,

12 correct?

13 A    Uh-huh.

14 Q    And you understand that that rule is a rule designed to

15 insure the privilege that attend to settlement negotiations,

16 correct?

17 A    Yes.

18 Q    You would not agree to that, so you did not attend the

19 meeting, right?

20 A    I would not agree to accepting that as a condition of

21 attending and therefore I excused myself because they were

22 free to impose whatever conditions they want, I suppose.

23 Q    So you decided to not accept the conditions and not

24 attend the meeting?

25 A    That's right.

1  Q    Okay.  And by the way you mentioned the data room.  There

2  was a non-disclosure agreement that had to be executed before

3  the filing of the petition in this case, before one could

4  access the data room.  Do you remember your testimony about

5  that?

6  A    Yes.

7  Q    And you decided not to sign that non-disclosure

8  agreement, correct?

9  A    That's right.

10 Q    And as a result you did not have access to the data room,

11 correct?

12 A    Correct.

13 Q    Other unions did sign the non-disclosure agreement.

14 A    I don't know that for a fact.

15 Q    You don't know --

16 A    I would not be surprised if they did, but I don't know

17 that for a fact.

18 Q    Don't speculate.  If you don't know, just tell me.

19 A    I don't know that for a fact, I know what we did.

20 Q    On the -- on the morning of July 10 did other unions

21 proceed to attend that meeting?

22 A    When I left the room, there was Mr. Kreisberg for AFSCME.

23 He may have had somebody with him.  And at that point I wasn't

24 sure who on the police and, you know, July 10th.  I was in that

25 for such a short period of time, actually the only -- the only

1  parties other than the debtor's representatives that I --

2  sorry, the city's representatives that I remember being there

3  were Clark, Hill people and Mr. Kreisberg.  I'm sure -- I know

4  there were others in the room, but I -- I didn't know a lot of

5  these people at that point in time.

6  Q    Okay.  All right.  And then you mentioned a meeting on

7  July 11, correct?

8  A    That's correct.

9  Q    You attended and those are your notes, right?

10  A    That's correct.

11  Q    Okay.  Now so our chronology from the time of that first

12  meeting from June 14th to July 11th is what, four weeks?

13  A    Whatever the calendar says.  It's about 28 days maybe.

14  Q    Uh-huh.  Now you mentioned various discussions you had

15  with lawyers for the city and in particular lawyers from

16  Jones, Day.  Do you remember your testimony on that?

17  A    I think I remember what I testified to this morning, yes.

18  Q    Okay.  That was Mr. Heiman?

19  A    I remember saying what Mr. Heiman said at the July 11th

20  meeting.  I think I just said that part of it when I just --

21  we just came back from break and -- and a little bit before

22  about David saying at the beginning of the meeting that he

23  wasn't imposing a Rule 408 condition for attendance.

24  Q    Well, you also -- and Mr. Miller.  You testified you

25  talked to Mr. Miller?

1  A    Well --

2  Q    Yes, sir, yes or no, did you --

3  A    On the 11th?

4  Q    At any time before the filing -- between the 14th and the

5  filing of the petition, did you or did you not talk to Mr.

6  Miller?

7  A    Yes.

8  Q    Okay.  And he -- did at any time did Mr. Miller tell you

9  he was not willing to talk with you some more?

10  A    He didn't utter those words.

11  Q    Did Mr. Heiman utter those words?

12  A    No.

13  Q    Now you testified about -- put up 38, please.  You

14  testified about something called a VEBA?

15  A    That is correct.

16  Q    That is a Voluntary Employee Beneficiary Association?

17  A    That's what the acronym stands for.

18  Q    And those are -- that's the class action mechanism that

19  you proposed?

20  A    A VEBA is --

21  Q    Sir, yes or no?

22  A    No, it is not per say limited to class actions, it's

23  often the result of a class action retiree insurance

24  settlement.

25  Q    Okay.  And when you --

1  A    It can also result from a bankruptcy resolution through

2  1114.

3  Q    Uh-huh.

4  A    In Chapter 11's.

5  Q    Uh-huh.  And at the time you'd had these discussions, was

6  the city in bankruptcy?

7  A    The city filed bankruptcy --

8  Q    Sir, yes or no.  At the time of your discussions before

9  July 18, was the city in bankruptcy, or was the city not in

10 bankruptcy?

11 A    The city was not in bankruptcy until --

12 Q    Thank you.

13 A    -- 4:06 p.m. on July -- on July 18th, 2013.

14 Q    Now, these class action resolutions that you told us

15 about.  You mentioned the one in Dana.

16 A    That's right.  That was not a class action resolution,

17 that was a Chapter 11 resolution reached through 1114.

18 Q    And how long --

19 A    Dana was a Chapter 11.  Your firm worked on it with us.

20 Q    Uh-huh.  And it took about a year?

21        THE COURT:  Excuse me one second.  Again, Mr.

22 Nicholson, I have to ask you please just answer the question.

23 A    Well, he said Dana was a -- a class action and it's not

24 right.  So I want to make sure you understand what the facts

25 are, Your Honor.  That's why I'm answering the way I am.

1          THE COURT:  I appreciate that very much, but your

2  job is just to answer the question.

3  A    All right.

4          MR. DECHIARA:  Your Honor, I think what the witness

5  is trying to say is, the question assumed a fact that was

6  contrary to fact.  So he was trying to explain.

7          THE COURT:  And I -- and I appreciate that.  But his

8  job is just to answer the question.  If he can't answer the

9  question, he should say that.  All right.  So let's try to

10  proceed on that basis.

11  A    I know it's not my job to object to the form of the

12  question, Your Honor.  But -- and I hear what you're saying

13  and I will comply.

14          THE COURT:  Go ahead, sir.

15  Q    Dana took about one year to resolve?

16  A    It depends on when you start counting.

17  Q    Uh-huh.  From the time negotiations began until the time

18  you were done in Dana was about one year, isn't that true?

19  A    That is not my recollection sitting here today, but I

20  don't -- I did not refresh myself on that particular question.

21  Q    Now you mentioned the VEBA that was done in General

22  Motors?  That took over one year, did it not?

23  A    There were three VEBA settlements in General Motors, Your

24  Honor, which one?

25          THE COURT:  Please answer the question

1  A    I -- you have to tell me which VEBA settlement you mean.

2  Q    The one that this Court approved on March 2006.  That was

3  after a one year negotiation process, wasn't it?

4  A    This Court never approved a VEBA settlement in 2006.

5  Q    The Eastern District of Michigan did not?

6  A    This is a -- the Bankruptcy Court, not the District

7  Court.

8  Q    All right.

9         THE COURT:  Apart from that distinction --

10 A    Yes.

11        THE COURT:  Perfectly valid.  Did it take a year, or

12 over a year?

13 A    I was not involved in that case.

14        THE COURT:  You don't know?  Just say I don't know.

15 A    No, I don't know.

16 Q    And you're aware of the VEBA in Goodyear.  Do you know

17 about that?

18 A    I heard -- read about it in the newspapers, that's all.

19 Q    Do you know that took 22 months?

20 A    I don't know.

21 Q    So I have up on the screen Exhibit 38.  And that I'd

22 represent to you is a chart showing the cash forecast the city

23 had through the end of its 2014 fiscal year.  Starting in July

24 of 2013, what is the city's cash -- cash -- cash position

25 after one year?

1          MR. DECHIARA:  Objection, Your Honor, it's beyond

2   the scope of direct.  There's no foundation that this witness

3   can testify about the city's cash flow position.

4          THE COURT:  The objection is sustained.  You can

5   represent to the witness what the exhibit says if you want to.

6          MR. STEWART:  Well, I think I made my point.  I'm

7   going to sit down.  Thank you, Mr. Nicholson.  That's all I

8   have.

9          THE COURT:  Any more questions for the witness?

10         MR. DECHIARA:  No redirect.

11         THE COURT:  All right.  Sir, you're excused.  Thank

12  you very much for your testimony.

13  A    Thank you.

14      (WITNESS MICHAEL NICHOLSON WAS EXCUSED AT 11:16 A.M.)

15         MR. WERTHEIMER:  Your Honor, I have to go get our

16  next witness.  It will take me just a few minutes.

17         THE COURT:  Okay.  Please raise your right hand.

18      (WITNESS JANET WHITSON WAS SWORN)

19         THE COURT:  Please sit down.

20                    DIRECT EXAMINATION

21  BY MR. WERTHEIMER:

22  Q    Would you state your name and address, please?

23  A    Janet Whitson, 25260 East Deborah, Redford, Michigan.

24  Q    You are one of the plaintiffs in what we've been calling

25  the Flowers litigation?

1  A    I am.

2  Q    How old are you, Ms. Whitson?

3  A    Sixty-six.

4  Q    And are you retired?

5  A    Yes.

6  Q    Where are you retired from?

7  A    The Detroit Public Library.

8  Q    And when did you retire?

9  A    2002.

10 Q    How old are you now?

11 A    Sixty-six.

12 Q    Could you briefly tell the Court how you came to be a

13 plaintiff in the Flowers litigation?

14 A    On the Local 2200 list serve there was a query, asking if

15 someone would be interested in volunteering to be on the part

16 of the lawsuit and I volunteered.

17 Q    And Local 2200 is the UAW local that represents the

18 active librarians?

19 A    Yes.

20 Q    When did you begin working at the public library?

21 A    May of 1969.

22 Q    At that point what education did you have beyond high

23 school?

24 A    I had a Bachelor's Degree in history from the University

25 of Detroit.

 1  Q    And when did you obtain that Bachelor's Degree?

 2  A    May 3rd of 1969.

 3  Q    So you started right in at the library right out of

 4  college?

 5  A    Yes.

 6  Q    What did you hire in as?

 7  A    A pre-professional librarian.

 8  Q    When you hired in as a pre-professional librarian, did

 9  you make any kind of commitment to the library as to education

10  you would have to undergo?

11  A    Yes.

12  Q    And what was that commitment?

13  A    That I would complete my library degree in six years.

14  Q    And did you do that?

15  A    Yes, I did.

16  Q    What degree did you obtain?

17  A    A Master's in library science.

18  Q    And where did you obtain it from?

19  A    At the University of Michigan.

20  Q    And when did you obtain your Master's?

21  A    In 1972.

22  Q    And you're working all this time at the library?

23  A    Yes, I was.

24  Q    Did you receive any other education beyond that during

25  your years at the library?  That is beyond the Master's?

1  A    Yes, I did.

2  Q    Briefly tell us what that is.

3  A    I have a post-Master's specialist in archival

4  administration from Wayne State University.

5  Q    And when did you obtain that?

6  A    In 1987, I believe.

7  Q    Now I'd like to ask you just a couple of questions about

8  your work at the library.  When you first started work in

9  1969, did you work in one or -- one of the branches?

10  A    Yes, I did.

11  Q    And for how long a period did you work in the branches?

12  A    Initially from 1969 to 1980.

13  Q    And how many different branches did you work in in that

14  11 year period?  Just approximately.

15  A    Five.

16  Q    What did you do at that point?  Or where did you work

17  from that point forward, from 1980?

18  A    I was at the main library.

19  Q    And what were you doing -- let -- let me back up.  Just

20  generally tell us what you did at the branches, what kind of

21  library work?

22  A    I initially was a young adult librarian.  I specialized

23  and worked with teenagers, but I did reference work and book

24  selection.  And really that's it, book selection, reference

25  work.  We did the collections, worked with the public, that

1  type of work.

2  Q    Okay.  When you went down to the main library in 1980,

3  and that's the library on Woodward?

4  A    Yes.

5  Q    How long did you remain at the main library the first

6  time you were working there?

7  A    Five years.

8  Q    And just briefly tell us what you did there.

9  A    I again was -- there I was an adult librarian.  Worked in

10  with -- those were special collections.  So working with the

11  subject matter and those collections.  General information was

12  sports, cooking, gardening, and biography.  And the Burton

13  historical collection was local history and genealogy.

14  Q    What was your position relative to the Burton historical

15  collection?

16  A    At that point I was a librarian too in that department.

17  Q    Did you then go back out into the branches for a few

18  years?

19  A    Yes.  I was promoted and went out to the branches.  I

20  went out to Franklin branch.

21  Q    And how long did you stay out in Franklin or in another

22  branch?

23  A    Three years.

24  Q    Did you then come back to the main library?

25  A    I was promoted to manager of the rare books collection.

1  Q    Would you tell the Court what that -- what that means or

2  what that entails?

3  A    Well, I had received that special collections training,

4  so I went to the Burton historical collection -- I went to the

5  rare books collection as manager and that was really the

6  greatest job in the State of Michigan.  And I had --

7  Q    For a librarian?

8  A    For a librarian.  I handled rare materials.  George

9  Washington's diary incunabula.  Books from the first 50 years

10 of printing, illuminated manuscripts, papyrus fragments,

11 Babylonian clay tablets.

12 Q    Okay.

13 A    It was extraordinary.  It was great, great materials to

14 handle.

15 Q    And then you retired in 2002?

16 A    Yes.

17 Q    About how old were you at the time you retired?

18 A    Fifty-five.

19 Q    Did you have any physical problems that led to your

20 retirement?

21 A    I went out on a medical disability.

22 Q    And just briefly tell us what that physical problem was.

23 A    Two failed back surgeries.

24 Q    You have, I take it, remained retired since -- since '02?

25 A    Disabled since '02

1  Q    Do you receive a pension from the library?

2  A    Yes.

3  Q    Approximately how much do you receive a month?

4  A    Twenty-five hundred dollars.

5  Q    Do you also receive Social Security?

6  A    Yes, I do.

7  Q    Approximately how much do you receive Social Security?

8  A    Just about 2,000.

9  Q    Do you have any other sources of income?

10 A    No, I don't.

11 Q    Do you have an IRA?

12 A    No.

13 Q    Do you have any substantial monies in the bank?

14 A    No.

15 Q    Do you have any equity in your home?  Let me ask you, do

16 you own your home?

17 A    Yes.  It has a mortgage, but --

18 Q    Do you have any equity in your home such that you could

19 do a reverse mortgage or get money out of it?

20 A    No.

21 Q    What is your marital status?

22 A    I'm divorced.

23 Q    Do you have children?

24 A    Two sons.

25 Q    Are they grown?

1   A    Yes.

2   Q    Do they have their own families?

3   A    Yes.

4   Q    Do they provide you with any financial support?

5   A    No, they don't.

6   Q    Are you able to go back out into the work force now?

7   A    No.

8   Q    Why not?

9   A    I have a difficult time walking and standing.

10  Q    Do you have health insurance now?

11  A    Yes.

12  Q    Do you have Medicare?

13  A    Yes.

14  Q    Do you pay for Part B of Medicare?

15  A    Yes.

16  Q    Okay.  And that's about $100.00 a month?

17  A    Yes.

18  Q    Do you currently have health care through the city?

19  A    Yes.

20  Q    And are there co-pays for that?  That is do you pay

21  something for that?

22  A    Yes.

23  Q    Approximately how much do you pay?

24  A    Right now it's $85.00 a month out of my check.

25           MS. KOVSKY-APAP:  Your Honor, we object to the

1 relevance of this line of questioning. It doesn't seem to

2 have anything to do with the city's eligibility.

3          MR. WERTHEIMER: Your Honor, I'm done with this line

4 of questioning. The -- the relevance is, I think that we are

5 entitled to put a face on the retirees who were litigious thus

6 forcing the emergency manager to file bankruptcy.

7          THE COURT: I'll permit it to stand. Go ahead.

8          MR. WERTHEIMER: Thank you.

9 Q    During the time you worked at the library, did you hold

10 any office with the -- the local union?

11 A    Yes.

12 Q    What offices did you hold and approximately when?

13 A    In the early eighties, I was unit secretary for the --

14 what we refer to as the POOL unit, but is the professional

15 organization of librarians. And I was Vice President of the

16 amalgamated Local 2200 and then I was President for nine

17 years.

18 Q    What were the approximate nine years that you were

19 President?

20 A    1993 to 2002.

21 Q    And finally I asked you how you came to be a plaintiff in

22 the Flowers litigation. Why did you agree to become a

23 plaintiff in the Flowers litigation?

24 A    Well, I had always understood that my pension was

25 protected by the -- just always understood it was protected by

1  state law.  And suddenly it seemed to be in jeopardy when I

2  was reading the paper over the summer.  So I felt I better get

3  involved.

4  Q    Are you a litigious person?

5  A    No, not really.

6  Q    Have you ever sued anyone?

7  A    I had to in my divorce.

8          MS. KOVSKY-APAP:  Objection, relevance.

9          THE COURT:  The objection is sustained.

10         MR. WERTHEIMER:  I have nothing further.  Thank you,

11 Your Honor.  Thank you, Ms. Whitson.

12 A    Uh-huh.

13                        CROSS EXAMINATION

14 BY MS. KOVSKY-APAP:

15 Q    Ms. Whitson, my name is Deb Kovsky-Apap.  I'm one of the

16 lawyers for the city.

17         THE COURT:  I'm sorry, would you repeat your name,

18 please?

19         MS. KOVSKY-APAP:  Sorry, Deborah Kovsky-Apap.

20 Q    Ms. Whitson, you testified that you were a librarian with

21 the Detroit Public Library for approximately 32 years, is that

22 correct?

23 A    Yes.

24 Q    And it's your understanding that the Detroit Public

25 Library is a separate municipal corporation from the city, is

1  that right?

2  A    Yes.

3  Q    But employees of the Detroit Public Library are eligible

4  for pensions under the city's general retirement system,

5  correct?

6  A    Yes.

7  Q    And you said that when you were actively employed you

8  were a member of UAW Local number 2200?

9  A    Yes.

10  Q    And that's a collective bargaining unit?

11  A    Yes.

12            THE COURT:  Could you speak more into the mike for

13  me?  There you go.

14  Q    Can you tell me who does Local 2200 represent?

15  A    Right now?

16  Q    Or at the time that you were a member?

17  A    The time that I was a member, it -- it changes.  It's an

18  amalgamated local.  But at the time that I was a member, it

19  had the librarians 1, 2, and 3 in a unit that was called the

20  Professional Organization of Librarians.  It had the librarian

21  managers and coordinators in a unit that was called the

22  Association of Professional Librarians.  It had the skilled

23  trades at the -- at the Detroit Public Library.  It had a

24  health and safety unit sometimes that was called SEMCOSH.  And

25  it represented some of the doctors from the City of Detroit

1  Q    Local 2200 represented only active employees, correct?

2  A    Correct.

3  Q    To your understanding, as a former President of Local

4  2200, was the union authorized to enter into agreements to

5  bind retirees without their consent?

6  A    I didn't hear all of your question.

7  Q    To your understanding, was Local 2200 authorized to enter

8  into agreements to bind retirees without their consent?

9  A    No.

10        MR. WERTHEIMER:  Your Honor, I think this is asking

11 her for a legal opinion, or at a minimum an -- an opinion that

12 may be outside any area she dealt with at the local.  There's

13 no evidence that she ever had to deal with this issue during

14 the time that she was --

15        THE COURT:  Well, she -- she was President.

16        MR. WERTHEIMER:  Yes.

17        THE COURT:  If she doesn't know, she can say so.

18        MR. WERTHEIMER:  That's fine.

19        THE COURT:  Please answer the question.

20 A    I don't know.

21 Q    You mentioned that when you were at the Detroit Public

22 Library you served as the manager of the rare books

23 collection.  Do you recall that?

24 A    Yes.

25 Q    And that's part of the Burton historical collection?

1  A    Yes.

2  Q    That's an important resource for scholars and

3  researchers, isn't it?

4  A    It is.

5  Q    And since your retirement, you continue to be involved in

6  organizations related to books and libraries, correct?

7  A    Yes.

8  Q    You're the immediate past President and librarian of the

9  Irish Genealogical Society of Michigan?

10  A    That's true.

11  Q    And that's an organization that focuses on research,

12  genealogical research?

13  A    Yes.

14  Q    And the Detroit Public Library is one of the resources

15  that may be used by organizations such the Irish Genealogical

16  Society?

17  A    Yes.

18  Q    You were also the Vice President of the Book Club of

19  Detroit, is that correct?

20  A    Yes.

21  Q    And is it fair to say that the Book Club of Detroit is a

22  non-profit association of Detroit area biblio files who

23  assembly periodically for the purpose of stimulating a mutual

24  interest in books, manuscripts, and prints?

25  A    Yes.

1  Q    And the book club frequently co-sponsors events with

2  libraries and collections such as the Burton historical

3  collection, is that right?

4  A    Yes.

5  Q    And you said that's part of the Detroit Public Library,

6  correct?

7  A    Wait a minute.  Go back and ask me that question again.

8  Q    Sure.  The book club frequently co-sponsors events with

9  libraries and collections such as the Burton historical

10 collection?

11 A    Yes, it does.

12 Q    And you said that the Burton historical collection is

13 part of the Detroit Public Library, correct?

14 A    Yes.

15 Q    So it's fair to say that you are currently a user of

16 Detroit Public Library services, is that right?

17 A    Yes.

18 Q    And you believe in the importance of libraries to a

19 community, correct?

20 A    I do.

21 Q    As a librarian in Detroit, were you aware that for some

22 Detroiters the public library is their only source of books

23 and internet access?

24 A    Yes.

25 Q    As a former employee and current user of the Detroit

1  Public Library, are you aware that -- of how the Detroit

2  Public Library is funded?

3  A    How it's currently funded?

4  Q    Or how it has been funded in the past.

5  A    I'm generally aware of how it's been funded in the past.

6  Q    Are you aware that the Detroit -- is it -- is it your

7  understanding that the Detroit Public Library has been funded

8  through property taxes?

9  A    That's one of its sources of funding, yes.

10 Q    Are you -- I'm sorry, I didn't mean to cut you off.

11 A    I'm aware that property taxes are one of its sources of

12 funding.

13 Q    Are you aware that the property taxes funding the library

14 have decreased significantly in recent years?

15 A    I think that's possible.  I'm not aware of to what extent

16 that's true.

17 Q    Did you become aware around March 2011 that the Detroit

18 Public Library laid off approximately 20% of its staff?

19 A    I'm not aware on the figure of 20%.

20 Q    Were you aware of any lay offs around that time period?

21 A    Only what I might have heard from fellow retirees.  I

22 have been retired since 2002.

23 Q    As a current user of Detroit Public Library services, did

24 you become aware in late 2011 that four branches of the

25 Detroit Public Library were closed due to a budget shortfall?

1  A     No.

2  Q     As a user of Detroit Public Library services are you

3  aware that certain branches of the Detroit Public -- Public

4  Library are currently operating on reduced hours?

5  A     Not aware of the extent of the reduced hours at four

6  particular branches, no.

7  Q     Is it your understanding that the City of Detroit's

8  financial problems have affected its ability to deliver

9  library services to the residents of Detroit and other users

10  of the Detroit Public Library?

11  A     The library runs on a mileage.  And I'm not sure how much

12  the -- the city's finances have influenced the library so no,

13  I'm not aware of that.

14  Q     No one has yet made a proposal to you regarding a

15  specific amount by which any retiree pension or other benefits

16  would be reduced, have they?

17  A     No.

18          MS. KOVSKY-APAP:  Thank you.  I have no further

19  questions.

20          MR. WERTHEIMER:  Nothing further, Your Honor.

21          THE COURT:  You are excused, Ma'am.  Thank you very

22  much for your testimony.

23  A     Thank you.

24          (WITNESS JANET WHITSON WAS EXCUSED AT 11:38 A.M.)

25          THE COURT:  Who is your next witness, sir?

 1           MR. WERTHEIMER:  I call Andy Dillon.

 2           THE COURT:  Please raise your right hand, sir.

 3      (WITNESS ANDY DILLON WAS SWORN)

 4           THE COURT:  Please sit down behind you.

 5           MR. WERTHEIMER:  Your Honor, William Wertheimer on

 6  behalf of the Flowers plaintiffs and also the UAW as to

 7  examining this witness.

 8      Before I begin, I would request permission from the Court

 9  to examine Mr. Dillon pursuant to Federal Rule of Evidence

10  611(c)(2).

11           THE COURT:  Any objections?

12           MS. NELSON:  No objections, Your Honor.

13           THE COURT:  For the city?

14           MR. SHUMAKER:  We have no objection, Your Honor.

15           THE COURT:  All right.  Your motion is granted.

16           MR. WERTHEIMER:  Thank you.

17                     DIRECT EXAMINATION

18  BY MR. WERTHEIMER:

19  Q    Good morning, Mr. Dillon.

20  A    Good morning.

21  Q    You are appearing here pursuant to subpoena, are you not?

22  A    Yes.

23  Q    And you have been the state Treasurer of the State of

24  Michigan for a period of time?

25  A    Yes.

1  Q    When did you become state Treasurer?

2  A    I believe January 1 of 2011.

3  Q    And what was your last day as state Treasurer?

4  A    October 31 of '13.

5  Q    So just last week?

6  A    Right.

7  Q    Okay.  Would it be fair to say that you have been -- that

8  as state Treasurer, you were involved in the problems of the

9  state dealing with the city's financial situation from your --

10  the beginning of your -- of being state Treasurer?

11  A    Yes.

12  Q    Okay.  Could you generally characterize for us what that

13  involvement has been from the beginning?

14  A    The city was in emergency.  We inherited some that were

15  in emergency, our school district.  We worked closely with the

16  manager in those instances.  For those that were finding

17  themselves getting in financial trouble, we tried to work with

18  them to keep them out of financial trouble.  So it would vary

19  depending on the condition that you found in the various

20  school district or city.

21  Q    All right.  Did you stay involved in -- in issues

22  relating to the City of Detroit from the beginning of your

23  tenure as state Treasurer until your end last week?

24  A    Yes.

25  Q    Okay.  I want to direct your attention to a few discreet

1  periods of time and ask you some questions about that.  And

2  the first period is around March of 2012.  Do you recall

3  generally what was going on at that point in time?

4  A    I believe we had completed a review and were working on

5  negotiating a consent agreement with the City of Detroit.

6  Q    Okay.  And what were the results of those negotiations?

7  A    We ultimately reached agreement on something called a

8  financial stability agreement.

9  Q    When was that?

10  A    I believe the final day was around April 4 of 2012.

11  Q    So the negotiations would have been ongoing in March of

12  2012?

13  A    I believe so, yes.

14  Q    And your part of the negotiating team for the state,

15  negotiating with the city?

16  A    Correct.

17  Q    And it was an arm's length negotiations that is

18  adversarial not in the bad sense of the word?  They had their

19  position, you had yours?

20  A    That's right.

21  Q    Would that be fair?

22  A    Yeah.

23  Q    Okay.  And you were using the Jones, Day law firm to

24  represent the state at that point in time, were you not?

25  A    I actually don't think so, although they were involved

1  We had a relationship with Miller, Buckfire.  And I believe

2  that Miller, Buckfire reached out to Jones, Day for legal

3  advice.  So there was a role, but they were not, to my memory

4  -- I -- I don't recall a contractual relationship between the

5  state and Jones, Day.

6  Q    When you say you don't recall a contractual relationship,

7  is that another way of saying you weren't paying them?

8  A    I believe that's correct.

9  Q    Okay.  But they were providing work for you on a pro bono

10 or some other kind of basis, were they not?

11 A    I believe that to be true.

12 Q    They were putting together drafts of the consent

13 agreement, were they not?  That is Jones, Day.

14 A    Yeah.  But we did have counsel, Michigan based counsel

15 that was in the room negotiating the document.  But we were

16 getting input and advice from Jones, Day, yes.

17 Q    Did that advice include actual drafts of the consent

18 agreement from Jones, Day as opposed to your in house people

19 in March of 2012?

20 A    I believe so.

21 Q    And you indicated Buckfire.  They were also assisting the

22 state in those negotiations with the city, correct?

23 A    Correct.

24 Q    Did you ever talk or did you have any understanding as to

25 why Jones, Day was doing what they were doing?  That is

1 providing legal services for you and not billing you whatever

2 their hourly rate was at the time?

3 A    We were working with Ken Buckfire at the time to make a

4 consent agreement that would work and function for the city.

5 And he had a relationship with Jones, Day and -- and would

6 seek their advice.

7 Q    Didn't you understand that let's start with Mr. Buckfire.

8 That Mr. Buckfire, was he being paid by the state?

9 A    I think there's a brief window of time where he had a --

10 a short term contract.

11 Q    Did you assume that Mr. Buckfire and his -- on behalf of

12 his firm when he was helping you out in March of 2012, was

13 looking for more work in the future relative to the City of

14 Detroit?

15 A    I think he was very interested in having a role with

16 Detroit going forward, yes.

17 Q    And didn't you assume the same with Jones, Day?

18 A    Yes.

19 Q    Did you have discussions in March of 2012 about the

20 possibility of a Chapter 9 filing at that time?

21 A    I don't recall and -- I don't recall.

22 Q    Can you put up 852?  And can you go to the second --

23 well, let's start.

24          MR. SHUMAKER:  Objection, Your Honor.  We have a

25 hearsay objection.

1          THE COURT:  We don't have -- we don't quite have a

2    question yet, so let's get a question and then I'll take your

3    objection.

4    Q    Let me -- let me do it a different way based on the

5    objection and -- and what I'm saying here.  I'm going to show

6    you -- forget what's on the screen, Mr. Dillon, if you would.

7    I'm going to show you what's been marked for identification

8    purposes --

9          THE COURT:  I need you to be by the microphone.

10          MR. WERTHEIMER:  I'm sorry.

11    Q    I'm going to show you what's been marked for

12    identification purposes as Exhibit 852.  And ask you to take a

13    look at the second page of it in the middle.  And -- and read

14    it to yourself.  And my question is going to be whether that

15    refreshes your memory as to whether there might not have been

16    discussions involving Jones, Day people and others about the

17    possibility of filing Chapter 9 in March of 2012?

18          MS. NELSON:  May I see it, please before it's handed

19    to the witness?

20          THE COURT:  You can see it after it's handed to the

21    witness.

22    Q    Take a look at whatever you need to put it in context.

23          THE COURT:  Mr. Wertheimer, I have to insist that

24    anything you say to the witness be from the lectern so that

25    it's on the record.

1          MR. WERTHEIMER:  Sorry.

2   Q    I was just telling you, Mr. Dillon, take a look at any of

3   it that you need to put it in context.  But the part I'm

4   asking you to take a look at to see if it refreshes your

5   recollection as to what was going on then is in the middle of

6   the second page of the document.

7          THE COURT:  And did you represent that that is

8   exhibit what, I'm sorry?

9          MR. WERTHEIMER:  852.

10         THE COURT:  Do you have that exhibit, Ma'am?

11         MS. NELSON:  Oh, yes, I do, Your Honor.  I didn't

12  realize that's what he was referring to.

13         THE COURT:  All right, then we're all set.

14  A    This refreshes my memory.  I didn't read Page 2.  Do you

15  want me to?

16  Q    Yeah.  Yeah, go ahead and read Page 2.

17  A    Okay.

18  Q    Mr. Dillon, does having read the proposed Exhibit 852

19  refresh your memory on the issue that I was asking about?

20  A    It does.

21  Q    Okay.  And what is your memory now as to Chapter 9 filing

22  -- a Chapter 9 filing being discussed by you, other people for

23  the state, and lawyers from Jones, Day in March of 2012?

24  A    I mean it was a topic of conversation, but the -- you

25  know, even the thought at that time was that we did want to

1  get to a consent agreement.  We didn't want to declare an

2  emergency.  And Chapter 9 was always out there as an issue but

3  it wasn't front and center.

4  Q    And Jones, Day was involved in those discussions?

5  A    I don't recall if they were physically present, but I

6  believe that yes, in the background they were looking at

7  versions of agreements that were being drafted and obviously

8  from reading that they were looking at the options for a

9  Chapter 9.

10  Q    Okay.  Let me -- can you put up 851, please?  And I

11  believe it has been admitted.  Mr. Dillon, this is a -- the

12  first page is an email from Corrine Ball to L. Marcero at

13  Huron Consulting.  Can you tell us, first of all, who Corrine

14  Ball is?

15  A    She's an attorney at Jones, Day.

16  Q    And who is L. Marcero?

17  A    She works for Huron Consulting.  She's a -- she lives in

18  the Detroit area and was advising us on working through these

19  issues with the City of Detroit.

20  Q    And -- and Huron Consulting is a separate entity from

21  Miller, Buckfire?

22  A    Yes.

23  Q    Any relationship between the two as far as you know?

24  A    Not as far as I know.

25  Q    Okay.  If you could put up the second page of 851.  If

1  you look at the top, Mr. Dillon, this is a email from Corrine

2  Ball at Jones, Day to L. Marcero.  Am I pronouncing it right?

3  A    I think it's Laura Marcero.

4  Q    Laura Marcero.  And in the email Laura is saying to

5  Corrine, if at all possible, can you call me.  I need to link

6  you into a Chapter 9 conversation with Andy very quickly.  Do

7  you recall ever being linked in to such a conversation?

8  A    I don't have a specific memory of that.

9  Q    Do you have a general memory of it?

10 A    No.  I mean to me I think from reading that memo and

11 refreshing my memory a little bit, it was about whether or not

12 the city would be eligible if in fact a Chapter 9 became

13 something that had to happen in the view of -- of the folks at

14 the table.

15 Q    Okay.

16 A    But it wasn't our priority, it was always a last resort

17 option for us.

18 Q    I want to direct your attention now to December 2012 and

19 January 2013.  In other words nine months later or so.  Were

20 you involved in the hiring of Kevyn Orr as emergency manager?

21 A    Yes.

22 Q    And Kevyn Orr up to then had been a partner at Jones,

23 Day, had he not?

24 A    To my knowledge.

25 Q    And would you tell the Court generally what your

1  involvement was?

2  A    The first time I believe I ever met Kevyn Orr was around

3  the January 29th date where we interviewed, I believe, five or

4  six different law firms as potential restructuring firms for

5  the City of Detroit.  He was one of the members on the team

6  from Jones, Day.

7       We did all of those interviews in one day, so I think

8  give or take each interview with each firm lasted around an

9  hour, it could have been a little more for each firm.  That

10 was the first time I met him.

11 Q    Okay.  Did you recommend that he be hired?

12 A    I got a phone call from Richard Baird who asked me what I

13 thought about Kevyn.  I thought he was impressive in the

14 meeting and should be someone that we considered.

15 Q    Were you concerned at the time that he was with Jones,

16 Day and that Jones, Day had been advising the state for up to

17 a year on this issue of how the state was going to deal with

18 the Detroit financial situation?

19         MS. NELSON:  Objection, assumes facts not in

20 evidence.  There's no indication that Jones, Day had been

21 providing advice to the state for up to a year.

22         THE COURT:  Well, the objection is overruled.

23 Please answer the question if you can.

24 A    Not terribly.  There was a -- a review team that was

25 involved in interviewing all the firms.  It wasn't just my

1  decision to make, so I thought they would have to stand on

2  their own as the -- as the law firm of choice.

3  Q    Well, does -- does the beginning of your answer being not

4  terribly mean that there was some concern?

5  A    It could have an appearance of impropriety which I

6  recognized and -- and gave consideration to.  And in fact

7  because when ultimately they were hired, I believe there were

8  six to eight people on the panel.  I actually held my vote

9  back to let the group move on their own because I was one of

10  two people that even knew that they were being considered.

11  Q    Okay.

12  A    Or that Kevyn was being considered.

13  Q    What -- did you recognize the same or even more extreme

14  propriety issues when in March or April of 2013 with Kevyn Orr

15  in place, there was a consideration as to hiring the Jones,

16  Day law firm now as counsel for the city through the emergency

17  manager as opposed to being counsel for the state as it had

18  been in the past?

19  A    I thought the sequence was that Jones, Day was hired

20  before Kevyn was announced is my memory.

21  Q    Whatever the sequence was, did you have the same concerns

22  with propriety relative to the hiring of Jones, Day as you did

23  as to the potential hiring of Kevyn Orr?

24  A    No.  Because there was -- there was quite a few people

25  that were on the hiring team.  And -- and I didn't cast -- it

1  was unanimous vote for Jones, Day and I withheld my vote and I

2  was careful not to kind of push any particular firm that day

3  because I knew that Kevyn was a possible EM candidate.  And I

4  -- I was also informed that Kevyn withdrew from pushing Jones,

5  Day to get the contract in Detroit.

6  Q    So that it was -- it was done without the help of Kevyn

7  Orr as far as you knew?

8  A    I was advised that the firm was hired that -- or was

9  advised by Rich Baird that the hiring of Kevyn Orr would

10 neither help or hinder their efforts to become the

11 restructuring counsel for the City of Detroit.

12 Q    Who is Braum Stibitz?

13 A    He works for me in treasury.

14 Q    Or past tense?

15 A    Yes.

16 Q    Worked.  Sorry.  What was his position in April of 2013?

17 A    And I forget the exact title, but he was my right hand

18 guy.  He didn't have the title of Chief of Staff, but he

19 functioned that way.

20 Q    Okay.  And what about Terry Stanton?

21 A    Terry is a public information officer for the Department

22 of Treasury.

23 Q    Were you aware that in April of 2013, Terry Stanton

24 authored an email to Braum Stibitz that took issue with Jones,

25 Day being hired as the attorneys for the city?

1  A     I don't recall that.

2  Q     Let me put --

3           THE COURT:  Excuse me, Mr. Wertheimer.  How much

4  longer will you be on your direct examination of the witness?

5           MR. WERTHEIMER:  Half hour.

6           THE COURT:  All right.  In that event, we'll take

7  our lunch break now and reconvene at 1:30.  Everyone please

8  stand by for me for one second while I consult.

9      All right.  Everyone please stand by while Mr. Dillon

10 makes his exit.

11      (WITNESS ANDY DILLON WAS TEMPORARILY EXCUSED AT 12:02

12 P.M.)

13           THE COURT:  And we'll be in recess until 1:30.

14           THE CLERK:  All rise.  Court is in recess.

15      (Court in Recess at 12:02 p.m.; Resume at 1:30 p.m.)

16           THE CLERK:  All rise.  Court is in session.  Please

17 be seated.  Recalling case number 13-53846, City of Detroit,

18 Michigan.

19           THE COURT:  It appears that everyone is here.  Sir,

20 you may proceed.

21           MR. WERTHEIMER:  Thank you, Your Honor.

22      (WITNESS ANDY DILLON RESUMED THE STAND AT 1:30 P.M.)

23 BY MR. WERTHEIMER:

24 Q     Can you put 835 on the screen?  Mr. Dillon, as I recall

25 it when we left I was asking you some questions about who

1  Braum Stibitz was and Terry Stanton.  And you had answered

2  those questions.  Do you recall that?

3  A    Yes.

4  Q    Would you take a look at what's on your screen and on the

5  big screen?  It's an email from Braum Stibitz who I think you

6  identified -- or I'm sorry, to him from Terry Stanton from

7  April of 2013.

8         MR. STEWART:  Objection, Your Honor, hearsay.

9         MS. NELSON:  Same objection, Your Honor.

10        THE COURT:  Again let's -- let's wait until we have

11 an actual question and then I'll take your objection.

12 Q    Have you seen that document before, Mr. Dillon?

13 A    I don't believe I have.

14 Q    Do you recall -- would you -- well, let me ask it this

15 way.  Do you recall Terry Stanton or anyone else at treasury

16 raising the issue of the appearance of impropriety in the city

17 hiring Jones, Day to be its lawyer at around this time, March

18 or April of 2013?

19 A    I don't recall that.

20 Q    You don't recall any internal discussions relative to it?

21 A    No.

22 Q    Mr. --

23        THE COURT:  Can we take this document down, please?

24        MR. WERTHEIMER:  Yes, we can take it down.

25 Q    Mr. Stibitz never raised it with you?

1   A     I don't recall that.

2   Q     Again, I want to make sure we're on the same wave length.

3   Leaving aside the email, do you recall ever Mr. Stibitz

4   raising with you generally the issue of the appearances of

5   Jones, Day being hired as the city's attorney in the spring of

6   2013?

7   A     I don't specifically recall that, no.

8   Q     Do you generally recall it?

9   A     No.

10  Q     Do you recall being concerned about that issue yourself

11  at that point in time?

12  A     It was an issue that I gave some consideration to, yes.

13  Q     And did -- I was unclear on your testimony from -- from

14  this morning, did -- was that the reason that you abstained

15  from a particular vote?

16  A     I just held my vote back and it ended up being a

17  unanimous vote.  But yeah, I intentionally tried not to lead

18  the outcome of that vote, so I held my opinion back.

19  Q     And this was a vote on Jones, Day being selected as the

20  city's attorneys?

21  A     Right.

22  Q     It would have occurred sometime in the spring of 2013?

23  A     Right.

24  Q     Did you have any discussions with your staff before you

25  decided to do that about that issue?  That is the issue of

1  abstaining or in some way not voting as a -- for -- for the

2  reason you stated?

3  A    I did not.  I kept that to myself.

4  Q    Okay.  Would you put 858 up, please?  Mr. Dillon, this is

5  an email that you sent to the Governor, July 8, 2013.  Do you

6  recall you were questioned about this at your deposition?

7  A    Yes.

8  Q    And I'm not going to go over the entire email, but I just

9  have a question or two on it.  Would I be correct in recalling

10  that you testified that the recent suits against you and me in

11  that last sentence in the first paragraph would have been a

12  reference to the Flowers and Webster lawsuits?

13  A    It was logical to conclude that based on reading it and

14  putting it in the time frame, yes.

15  Q    All right.  And part of the logic being you did know

16  about those lawsuits at that time, correct?

17  A    I believe so.

18  Q    And you also knew that a hearing was scheduled for a

19  preliminary injunction in those cases, did you not?

20  A    At that time I can't say that I did.

21  Q    All right.  By a couple of days thereafter you did?

22  A    I don't have specific memory of that.  But I knew at some

23  point there was a hearing scheduled.

24  Q    Okay.  Before the date of the hearing?

25  A    Yes.

1  Q    In other words you knew that there was a hearing

2  scheduled in the future?

3  A    Right.

4  Q    In the Flowers and Webster cases, correct?

5  A    Correct.

6  Q    If you'd take a look -- now if you would put up 834,

7  please.  Let me -- I -- I apologize, Mr. Dillon.  Let me just

8  go back a second.

9      Would it also be correct that by July 15th you knew that

10  there was a schedule in place and per that schedule the

11  bankruptcy would be filed on July 19th, is that correct?

12  A    I don't have a specific memory of the date of the filing,

13  but I do remember prior to that filing date that was in the

14  schedule that we were presented with, a pretty detailed

15  schedule about what a Chapter 9 would look like and all the

16  events that would have to transpire.

17  Q    All right.  And do you recall that whatever the details

18  of that schedule that you don't recall, do you recall that in

19  fact the bankruptcy was filed a day before the dates in that

20  document?

21  A    I believe that to be true, yes.

22  Q    Okay.  Now if you'll take a look.  This is an email that

23  you sent the next day, that is after the July 8 email to the

24  Governor, is it not?

25  A    I believe so, yes.

1  Q    And by the way just for the record, that the email from

2  the 8th is an email from you to the Governor?

3  A    Correct.

4  Q    Okay.  In this email on the 9th, you indicate -- I'm --

5  I'm looking at the last paragraph.  The second of the three

6  sentences.  You say to the Governor on July 9, we remain in

7  many ways at the informational stage.  That was a true

8  statement when you made it, was it not?

9  A    I believe so, yes.

10 Q    Did anything happen that you knew of between July 9th and

11 July 18th to take it out of the informational stage?

12 A    We were getting more information and the numbers kept

13 getting worse for the funding level of the pension fund.  As

14 we learned new facts, the -- the health of the pension funds

15 seemed to be getting worse.

16 Q    Are you suggesting that you learned these facts after

17 July 9?

18 A    I don't have specific memories, but in reading these

19 emails they refresh my memory that information was flowing in

20 as I was sending them to him.

21 Q    Well, how about you didn't get that information in the

22 next day, did you, by the 10th?

23 A    I -- I'd want to go back and read the one from the 8th.  I

24 think you're --

25 Q    I'm sorry, go ahead.  Will you put up that one which is

1 | -- I'm sorry, 858.  Go ahead.  You say you wanted to read that

2 | one?

3 | A    The day I sent this I believed I was going to learn more

4 | information.  I don't recall now if it actually happened on

5 | that date or not.

6 | Q    Okay.  Do you recall communicating to the Governor's

7 | office just before July 12th that a more deliberative approach

8 | should be taken at the Governor's end relative to authorizing

9 | a bankruptcy?

10 | A    I don't have a specific memory of that, no.

11 | Q    Would you put up 625, please?  Mr. Dillon, I'm going to

12 | -- this has been introduced as Exhibit 625.  I'm going to

13 | direct your attention to the -- the second email there, not

14 | the top one, but the second one that goes on for three

15 | paragraphs.

16 |      To the first paragraph about halfway down.  And by the

17 | way, this is July 12.  And this is from Mike Gadola.  And he's

18 | saying, I spoke to Rich this morning and he informed me that

19 | last night he had a discussion with Andy and the LG about the

20 | exchange of letters.  Rich now favors as I do, a more

21 | deliberative approach at the Governor's end.  He indicates

22 | Andy and the LG are on board with that approach.  Does that

23 | refresh your memory on that issue?

24 | A    I have a vague recollection of this email.

25 | Q    All right

1  A    Or that --

2  Q    But my question is as to the broader issue.  Do you

3  recall communicating in one way, shape, or form, whether

4  through Baird much more directly with Snyder -- excuse me,

5  with Governor Snyder, do you recall communicating to the

6  Governor's office at around this time your view as the state

7  Treasurer that a more deliberative approach at the Governor's

8  end was in order as of July 12?

9  A    From reading this, it's -- I don't have a clear

10  recollection of this conversation, but I have no reason to

11  believe that this is not an accurate description of a call I

12  had with Rich Baird and the LG.

13  Q    Okay.  Fair enough.  If you look down in the next

14  paragraph, and again this is from Mike Gadola to Mr. Muchmore

15  and John Roberts.

16        He supplies some additional reasons for this approach

17  including, I'm about halfway down, the conditions could also

18  include such items as pre-approval for anything having to do

19  with vested pension benefits.  Do you recall Mr. Gadola taking

20  that position at around this time?

21  A    I believe I had conversations with Mike Gadola in this

22  time frame that I believe is subject to the lawyer client

23  privilege, attorney/client.

24  Q    Well, I -- I will indicate to you, Mr. Dillon, that this

25  document has been produced and that the attorney/client

1  privilege has been waived as to this document.

2  A    I don't know if I was copied on it.

3           MS. NELSON:  If I may respond.  If I may respond,

4  Your Honor.  This is not a communication from the attorney to

5  Mr. Dillon.  This was to Mr. Muchmore and then to Baird.  So,

6  Mr. Dillon is testifying about separate conversations in

7  response to Mr. Wertheimer's question that were separately

8  attorney/client privilege.

9           MR. WERTHEIMER:  I think that's correct actually.

10           THE COURT:  Okay.

11  Q    Do you recall having discussions with -- may I back up?

12           MR. WERTHEIMER:  For the record, I would take an

13  exception based on the arguments we've previously made as to

14  the applicability of the attorney/client privilege to

15  communications involving public officials, et cetera.

16  Q    Do you recall having discussions at around this time with

17  the Jones, Day law firm relative to contingencies being placed

18  on the bankruptcy?

19  A    Yes.

20           MS. NELSON:  Same objection, Your Honor,

21  attorney/client privilege as to their content.

22           MR. SHUMAKER:  The city joins in the objection.

23           MR. WERTHEIMER:  I'm not going to go any further

24  than -- than his yes response.

25           THE COURT:  All right.

1  Q    I'm going to show you a document, Mr. Dillon that has

2  been marked for identification purposes as UAW 626.  And ask

3  you if you can identify it as an email that you sent to Braum

4  Stibitz who you've already identified and others on July 10,

5  2013?

6  A    Yes, I recall this.

7       (UAW Exhibit 626 was identified)

8            MR. WERTHEIMER:  Move for its admission.

9            THE COURT:  What was the number again, sir?

10           MR. WERTHEIMER:  626.

11           THE COURT:  Any objections?

12           MS. NELSON:  No objections.

13           MR. SHUMAKER:  No objection, Your Honor.

14           THE COURT:  It is admitted.

15      (UAW Exhibit 626 was admitted)

16 Q    Put it up.  I want to direct your attention -- I'm -- I'm

17 going to go through it to some extent with you, Mr. Dillon.

18 It begins -- or you begin by saying, I would like to get a

19 response to the proposed Orr letter out tomorrow about noon.

20 Would I be correct in understanding that the proposed Orr

21 letter is his letter seeking authorization to file bankruptcy

22 to you and the Governor?

23 A    Yes.

24 Q    And this is dated July 10, correct?

25 A    Yes.

1  Q    Do you recall when you received the draft of the proposed

2  Orr letter that you would have been working from when you

3  created 626?

4  A    Not specifically, no.

5  Q    That day, a day before?  I mean was it a tight --

6  A    Yes.

7  Q    Fairly tight time frame?

8  A    Yes.

9  Q    How did you come to receive it?

10 A    I believe it came in via email.

11 Q    From whom?

12 A    I don't recall.

13 Q    From someone at the emergency manager's end, or was it

14 already being distributed at the state if you recall?

15 A    I don't recall.

16 Q    Do you recall the context at all of how you received it?

17 A    No.  I -- I had been briefed on the schedule.  I was

18 aware things were going to be in motion.

19 Q    To your knowledge, were other people at the state end

20 being provided with a copy of the draft authorization?

21 A    Not to my knowledge.

22 Q    As far as you knew it was only you?

23 A    Well, treasury.

24 Q    Did you think there was anything untoward with Orr asking

25 for your input into his request to you for something that you

1  and the Governor would need to act on?

2  A    No.  I thought it was a courtesy.

3  Q    You thought it was a courtesy, is that right?

4  A    Yes.

5  Q    You felt free, did you not, to suggest changes both

6  typographical if you will, and substantive, did you not?

7  A    Apparently, yes.

8  Q    Okay.  Fair enough.  And in fact Mr. Orr if you -- I

9  don't know if we can get two on the screen at once, but if we

10  take a look at Mr. Orr's authorization of July 16 which is

11  Exhibit 28 for example.  Your point number one back to 626 is

12  that you think initiates should be initiatives.  That is that

13  it was just a mistake in the word choice, correct?

14  A    Yes.

15  Q    And if you look at Exhibit 28, he agreed and changed the

16  word to initiatives near the end of the second full paragraph

17  on Page 2, did he --

18          MS. NELSON:  Your Honor, I'm going to object.  First

19  of all, it calls for hearsay.  There's no foundation that this

20  was even communicated to Mr. Orr ultimately or even back to

21  anyone who prepared Exhibit 28 for what Mr. Orr accepted or

22  didn't accept.

23          THE COURT:  The objection is overruled.  You may

24  proceed.

25          MR. WERTHEIMER:  Thank you.

1  Q    Let me ask you, however, you did communicate your changes

2  to Stibitz.  We know who he is, correct?

3  A    Correct.

4  Q    Who is Saxton, Tom Saxton?

5  A    He works for treasury as well.

6  Q    And what does he do there?

7  A    He's the Deputy Treasurer.

8  Q    And Mr. Headen?  Who is Mr. Headen?

9  A    He's the lawyer that works within Treasury Department.

10 Q    Okay.  Did you in one way or another assume that your

11 people would have got your input back to Mr. Orr?  In other

12 words you weren't doing some academic exercise, were you?

13 A    At this point I thought that this would be transformed

14 into a letter written by Fred Headen which never transpired.

15 Q    Okay.  And so you thought at this point Headen was going

16 to write a letter back to Orr?

17 A    I thought we would send a letter back to whoever sent

18 this to us.

19 Q    And which you would point out the things that you thought

20 should be changed?

21 A    I shared with them my views and expected that they might

22 have some of their own thoughts as well.

23 Q    Okay.  What did happen to the changes that you were

24 suggesting?  Did -- tell -- tell us what your knowledge is as

25 to how if at all these suggestions were communicated back to

1  Mr. Orr?

2  A    There was a phone call, but not to Mr. Orr.  Excuse me.

3  Q    Who -- who called who?

4  A    There was a conference call with a few people from my

5  staff as well as the Jones, Day lawyers.

6  Q    So you get on to a conference call with you, your staff

7  people, and Jones, Day lawyers and during that conference

8  call, you communicate the contents of this email which is now

9  626 back to Orr through the Jones, Day lawyers, do I

10  understand that correctly?

11          MS. NELSON:  Objection, attorney/client privilege.

12          MR. SHUMAKER:  Same objection, Your Honor.

13          MR. WERTHEIMER:  Your Honor, the privilege has been

14  waged -- waived as to this document.

15          THE COURT:  The question merely summarized what the

16  witness previously said, so I'll permit it.  Please answer the

17  question, sir.

18  A    I spoke to some lawyers over the phone with Jones, Day.

19  What they communicated to Kevyn, I don't know.

20  Q    Fair enough.  But what you -- you had -- I assume you had

21  in front of you the contents of your email?

22  A    I believe I did.

23  Q    And you communicated those contents to the Jones, Day

24  lawyers?

25  A    I did.

1  Q    And you communicated them for the purpose of getting back

2  to Orr your comments relative to his request for an

3  authorization?

4  A    I don't know that I made that leap but, sure.  They were

5  obviously involved in this issue for Mr. Orr.

6  Q    All right.

7  A    And how they communicated with him, I have no personal

8  knowledge.

9  Q    All right.  They're competent counsel and you assumed

10  that they would have communicated back to the client what the

11  treasury secretary was suggesting.  Would that be fair?

12  A    That would be fair.

13  Q    Okay.  Thank you.  And if you look at 626, your third

14  point is no mention of GRS.  And then your question is why.

15  Am I reading that right?

16  A    Yes.

17  Q    What is GRS?

18  A    General employee retirement system.

19  Q    Okay and that got put into the authorization request, did

20  it not?

21  A    I believe it did.

22  Q    And it's just to be clear for the record, if you -- if we

23  look at the authorization letter, Page 4, the third full

24  paragraph, there's now a paragraph relating to GRS and other

25  things, correct?

1  A    I didn't read it right now, but that's my memory.

2  Q    Okay.  And that was not in your memory, I would -- is

3  your memory that that was not in the draft that you were

4  looking at?

5  A    Yes.  That's my memory.

6  Q    Okay.  Now I won't match up all the other things, but --

7  but let me just ask kind of a summary question that I think

8  will -- we can then figure it out from the record.

9      Would it be fair to say that all the suggestions you made

10 in your July 10 -- or that are recorded in your July 10 email,

11 are things that were not in the version that you were looking

12 at?  In other words you're suggesting additions or changes to

13 what was in the Orr draft at the time you were looking at it,

14 would that be fair?

15 A    I think it's an overly broad description.  I read a

16 document, here's my thoughts.

17 Q    Okay.

18 A    Sometimes it was an omission, sometimes it was a failure

19 to hit on a theme.

20 Q    All right, fair enough.  I want to direct your attention

21 now to the second page of your Exhibit 626, number 10.  You

22 say here I, Andy Dillon, don't think we are making the case

23 why we are giving up so soon to reach an out of Court

24 settlement.  That was a true statement of yours at the time

25 you made it, was it not?

1  A    That's what I believed at the time.

2  Q    And you then said, looks premeditated, did you not?

3  A    Yes.

4  Q    Period, a two word sentence. You believed that to be

5  true when you wrote it -- when you typed it down on to your

6  computer on the 10th, did you not?

7  A    Yes.

8  Q    Then you go on to say, I think we need to say facts got

9  worse as we dug into the numbers. And I believe there is a

10 State Court option to get retirees into a class (we don't

11 acknowledge that) and why is that impractical? That was a

12 correct statement of your thinking at the time, was it not?

13 A    Yes.

14 Q    You believed that there was a State Court option to get

15 retirees into a class and that it was not impractical?

16 A    That's what I believed at the time. I was never apprised

17 to know if that was ultimately the case.

18 Q    All right. Then you say, we don't even say they rejected

19 the city's proposal. That was true as far as you knew it at

20 the time. That is that was not being said in Orr's

21 authorization request, correct?

22 A    Correct.

23 Q    Then you say, I think we may want to take it or -- I'm

24 sorry. I think we may want a take it or leave it demand

25 before we pull this trigger. First of all, is the trigger the

1  Chapter 9 filing?

2  A    Yes.

3  Q    And did you mean by take it or leave it demand that the

4  -- that Orr or somebody on his behalf should make such a

5  demand before the Chapter 9 was filed?

6  A    I thought that might have been beneficial.

7  Q    Then you say, I agree with the recommendation.  Are you

8  referring now to the recommendation to proceed to bankruptcy?

9  A    Yes.

10  Q    But I don't think we make the case.  Was that true on

11  July 10?  You did not think that Orr had made the case?

12  A    In the document that I read.

13  Q    Now and I -- would I be correct in assuming that the

14  information that's included here under your number 10 on Page

15  2 of 626, that you communicated that in this conference call

16  you had with Jones, Day shortly either on July 10, or shortly

17  thereafter?

18  A    I believe that's true.

19  Q    You didn't leave any of it out?

20  A    I don't know if I went into as much detail here, but I

21  think I would have made the point.

22  Q    Then finally down at the bottom, you say after this

23  letter is revised, let's work on Governor's response.  By

24  Governor's response you meant the response that the Governor

25  would make either authorizing or not, or conditioning or not,

1  to Mr. Orr's letter, did you not?

2  A    That's what I meant, yes.

3  Q    So you were of the view at that point -- let me -- sorry.

4  And you then indicated at end just for completion, that these

5  were just your initial thoughts, correct?

6  A    Correct.

7  Q    Did you have any further input into the Orr authorization

8  request beyond what's on this document between July 10 and

9  July 16 when he submitted it to the Governor?

10  A    I don't believe so.

11  Q    Now back to the Governor's response.  You're saying we're

12  going to revise this letter and then we're going to work on a

13  response to it, correct?

14  A    Correct.

15  Q    And as I understand it based on what you say you talked

16  to Mr. Gadola about, the response -- well, you tell me.  What

17  was the response going to be at that point?

18  A    I wanted to finish this before we got to that.

19  Q    One step at a time?

20  A    That's right.

21  Q    All right.  But one step at a time.  But you're on both

22  sides of each of the steps, would that be fair?

23  A    Actually not.

24  Q    Well, you're helping to create the authorization request,

25  correct?

1  A    I shared comments about it.

2  Q    And you're -- oh, okay.  You're hoping to be involved in

3  what the Governor's response will be, correct?

4  A    I don't know if I agree with the word hoping or thought.

5  It may fall on to my duty list.

6  Q    Fair enough.  All right.  But do I take your answer to

7  mean, or can I conclude from it that in fact you were not

8  involved in what became the Governor's response, the July 18

9  document?

10  A    That's correct, I was not.

11  Q    Is that correct?  You were not?  You were out of the loop

12  on that?

13  A    Yes.

14        MR. WERTHEIMER:  Okay.  Can I have just one minute,

15  Your Honor?

16        THE COURT:  Yes, sir.

17  Q    Back with just one clean up question, Mr. Dillon.  Back

18  to questions and your answers relative to your not

19  participating in the vote where Jones, Day was hired.  Do you

20  recall that?

21  A    Yes.

22  Q    Did you -- first of all, what board was this that was

23  deciding that ostensibly at least deciding that issue?

24  A    I don't remember all the attendees, but there were people

25  from the City of Detroit there, there was people from treasury

1    there.  There might have even been some members of the

2    financial advisory board there.

3    Q     Was that what it was?  Was that the body voting,

4    financial advisory board?

5    A     It was not a formal entity.  It was --

6    Q     Oh, okay.  It was just an informal group of people?

7    A     Right.

8    Q     At the point that you decided not to vote, did you

9    communicate to the other people who were voting that Jones,

10   Day had been actively involved in providing legal assistance

11   to the state in March of 2012 or any other time?  In other

12   words that they had previously done work on this case for a

13   client different than the City of Detroit and a rather big

14   client?

15   A     Well, this case I don't understand that.  Can you explain

16   that?

17   Q     I'm sorry.  I kind of loaded it up.  I apologize.  Did

18   you communicate to the other members of the board at the time

19   that you were deciding not to vote, based at least in part on

20   your concern about the appearance of things, did you

21   communicate to the other members of -- of the people voting,

22   that Jones, Day had been actively representing the state in

23   March of 2012?

24             MS. NELSON:  I'm going to object again, Your Honor.

25   That assumes facts not in evidence.  That was not the

 1  Treasurer's testimony.

 2          MR. WERTHEIMER:  It certainly was and it's all over

 3  the --

 4          THE COURT:  Objection is overruled.

 5          MR. WERTHEIMER:  Sorry.

 6  A    I didn't reference that they played a role in the

 7  negotiation of the consent agreement.

 8  Q    You just abstained?  Silently, you didn't --

 9  A    Yeah.

10          MR. WERTHEIMER:  Yeah, okay.  That's all I have, Mr.

11  Dillon.  Thank you very much.

12                      DIRECT EXAMINATION

13  BY MS. LEVINE:

14  Q    Good afternoon, Mr. Dillon.  Sharon Levine, Lowenstein,

15  Sandler for AFSCME.  Just a couple of questions.

16          During the period of time that you were Treasurer, did

17  you report to the Governor?

18  A    Yes.

19  Q    And did there come a point in time, actually either

20  before or after you became Treasurer that you began to think

21  that Detroit was insolvent or to avoid the need for a legal

22  conclusion financially distressed?

23  A    Yes.

24  Q    And when was that?

25  A    Well, pretty much from day one, but it continued to get

1  worse over the two year window.

2  Q    And what were some of the indicators that caused you to

3  think that Detroit was financially in distress?  Did it

4  include the blight?

5  A    Sure.

6  Q    Conditions with regard to the police and fire services?

7  A    Yes.

8  Q    Did you -- did you review any financial documentation in

9  that regard?

10  A    In what regard?

11  Q    Numbers relating to Detroit's cash flow?

12  A    Yes.

13  Q    What did you review?

14  A    Cash flow forecast that we requested to be developed.

15  Q    By whom?

16  A    By the city.

17  Q    By whom for the city?

18  A    Well, we had invited Ernst and Young to participate and

19  help the city develop its cash flow forecast.

20  Q    When did you retain -- when was Ernst and Young retained?

21  A    I don't recall specifically.

22  Q    Were they retained by the city, or by the state, or by

23  somebody else?

24  A    I'd have to guess, but I believe the city.

25  Q    Did there come a point in time also when Miller, Buckfire

1  was retained?

2  A    By the city?

3  Q    Well, by anybody in connection with the Detroit

4  situation.

5  A    Yes.

6  Q    And when was that?

7  A    There was a short period of time, I don't know when it

8  began, but in the early part of 2012 they were hired for a

9  specific project.  And then --

10 Q    By the -- by the state?

11 A    I believe by the state, yes.

12 Q    And at the conclusion of that project, were they then

13 retained at some point in time by the city?

14 A    About a year after.

15 Q    But in 2012, E & Y, or Ernst and Young was just retained

16 by the state and continued to be retained by the -- I'm sorry,

17 just retained by the city and continued to be retained by the

18 city, correct?

19 A    I believe that's right.

20 Q    Did there come a point in time when Conway, MacKenzie was

21 retained?

22 A    Yes.

23 Q    And when was that?

24 A    I don't recall the specific date.  It would have been

25 early 2013, I believe.

1  Q      And by whom were they retained?

2  A      The city.

3  Q      Did any of these professionals, E & Y, Miller, Buckfire

4  or Conway, MacKenzie during 2012, and I guess it wouldn't be

5  Conway, MacKenzie because they hadn't been retained yet, do

6  what's known as a bottom's up analysis?

7  A      I don't recall that term of art.

8  Q      Do you have an understanding of what a bottom's up

9  analysis is as opposed to a top down analysis?

10  A      Why don't you describe it to me, that would be safer.

11  Q      Did any of these professionals actually instead of

12  relying on numbers provided to them by city officials or

13  others, actually go in and stress test the numbers?

14  A      I believe so.

15  Q      And who was that?

16  A      I think it would have been a combination of E & Y and

17  Conway.

18  Q      And when did Ernst and Young prepare this bottom's up

19  analysis?

20  A      We didn't use that term, so their engagement grew over

21  time as the situation got worse and -- and as they were there

22  longer they started to get better -- better numbers and

23  understand the environment better.  And then let's say from

24  January of '13, you know, through May or June, there was a lot

25  of effort to put together a ten year forecast for the city

1  that was based on a lot of effort to dig under and understand

2  the numbers.

3  Q   And that took place starting in January of 2013, but not

4  earlier?

5  A   I believe earlier.  I think as E & Y was there, the

6  longer they were there, the better comfort they got.  So we --

7  we always relied and looked at the cash flow forecast and some

8  understanding of the city's profit and loss statement.  So I

9  mean it was -- started from day one really.  But the numbers

10 got more refined as we learned more.

11 Q   Did anybody look behind -- did anybody look behind the

12 numbers in terms of finding other sources of revenue for the

13 city?  For example we've heard a lot of talk about uncollected

14 taxes.  Did E & Y or any of the professionals actually go in

15 and dig into those numbers directly?

16 A   Conway -- I mean everyone in treasury did.  And we had --

17 we were working on a partnership with the city where the state

18 would help them collect their taxes.  We did go look at their

19 outstanding receivables to see if there's monies that could be

20 collected there.

21    That probably was 2011, maybe 2012 when that happened.

22 Conway, MacKenzie did a study of all the cash collection

23 operations.  I don't recall when that project happened.  And

24 then E & I was -- E & Y was on the ground for pretty much the

25 entire time.  And I wasn't on the ground with them, so I don't

1  know all the areas that they paid attention to.

2  Q    But you were concerned about the revenue stream from the

3  City of Detroit going back all the way to the time you took

4  office in 2011?

5  A    Yes.

6  Q    State shared revenue.  For every year that you were in

7  office, did the state share revenue provided to Detroit

8  diminish?

9  A    I believe it actually grew.

10 Q    The state shared revenue?

11 A    Maybe the first year.  The first year might have been a

12 cut and then after that I think it grew every year from that.

13 Q    Do you recall what the number was the first year?

14 A    I do not.

15 Q    Do you recall what the number was that -- the second or

16 third year?

17 A    No.

18 Q    What makes you think it grew?

19 A    I just remember the state's economy began turning around

20 and -- and the initial cuts from the first year the Snyder

21 administration was kind of the bottom.  And the revenues with

22 the state started to increase from that point forward.

23 Q    But isn't the state shared revenue also tied to the city

24 population and wasn't Detroit losing population?

25 A    I'm not totally familiar with the state shared statutory

1  formulation.  But I do believe it's tied to revenue.  And when

2  Detroit fell below a million, that was a relevant number for

3  the city.  I don't know in that sense this number took place

4  and when the new numbers were relied upon.

5  Q    So would it be fair to say then that you're not really

6  sure whether or not the state shared revenue to Detroit grew,

7  or shrank, or stayed the same?

8  A    I would rather see the numbers, yes.

9  Q    Were you involved in the selection of E & Y on behalf of

10  the city back in 2012?

11  A    Well, I think they were brought in before '12.

12  Q    Were you involved in the selection of Miller, Buckfire on

13  behalf of the state in 2012?

14  A    Yes.

15  Q    And were you involved in the selection of Miller,

16  Buckfire on behalf of the city about a year later?

17  A    Yes.

18  Q    And were you involved in the selection of Conway,

19  MacKenzie for the city in 2013?

20  A    Yes.

21  Q    How long did the interview process last with Miller,

22  Buckfire before they were actually retained by the city?

23  A    I don't recall.

24  Q    Do you recall how long the interview process took with

25  Conway, MacKenzie before they were actually retained by the

1  city?

2  A    Not specifically, but it was hours.

3  Q    You met them and hired them on the spot?

4  A    No, no.  It was hours and it took several meetings.

5  Q    Over what time frame, do you know?

6  A    The process -- I don't recall specifically, but it was

7  not a matter of days.  It was several -- it was a competitive

8  process and there was a lot of meetings.  And a lot of time

9  was spent on that.

10 Q    Same thing with choosing Miller, Buckfire, several

11 meetings, competitive process, a lot of days?

12 A    Not quite the same with Miller, Buckfire.

13 Q    How many -- how many investment bankers were interviewed

14 during the process that resulted in Miller, Buckfire being

15 retained by the city?

16 A    I don't recall.

17 Q    More than two?

18 A    I don't recall a formal interview process like we had

19 with the law firms, or the accounting firms, or the

20 restructuring firms.

21 Q    So it's possible it was just Miller, Buckfire that was

22 considered and ultimately retained?

23 A    I don't recall if no one else was considered, but it's

24 possible.

25 Q    Now were you involved in the selection of Jones, Day?

1  A    Yes.

2  Q    And there were several law firms that were considered

3  along with Jones, Day?

4  A    Correct.

5  Q    And the interview took place on January 29?

6        MS. NELSON:  Your Honor, asked and answered.

7        THE COURT:  Many times.

8        MS. LEVINE:  I'll move on.

9  Q    When did you personally become first aware of Jones,

10  Day's interest in serving as counsel for the city?

11  A    For what purpose?

12  Q    For any purpose.

13  A    Well, they had some role during the efforts to negotiate

14  a consent agreement.  So that suggested to me that they had an

15  interest in this case.

16  Q    Back in 2012?

17  A    Right.

18  Q    Was it earlier than 2012?

19  A    Could have been December even, but I don't recall

20  specifically when it started.

21  Q    Now I don't want to go through again the entire interview

22  process with -- with Kevyn Orr, but Kevyn Orr first became

23  considered on 1-29-13, is that correct?

24  A    By me it would have been later.  It would have been after

25  Rich Baird called to ask me if I thought he could be a

1  candidate.

2  Q    But the state was considering him effective as of the

3  interview date with Jones, Day, correct?

4  A    After the -- that date.  I don't recall the day I got a

5  phone call.

6  Q    And he was formally retained on March 25?

7  A    That sounds right.

8  Q    And there was an interview process and negotiation back

9  and forth between January 29 and March 25, correct?

10  A    Correct.

11  Q    There was some discussion earlier with regard to Jones,

12  Day working on the consent decree and some other Miller,

13  Buckfire working perhaps for the state and then for the city.

14  Did the state or any entity affiliated with the state or any

15  of its officers fund any of the professionals currently

16  involved in this case, Jones, Day, Conway, MacKenzie, Miller,

17  Buckfire, or E & Y?

18  A    Could you restate the question?

19  Q    Did the state or any entity affiliated with the state, or

20  its officers, at any time fund any of the professionals

21  retained by the city in this case, Jones, Day, Conway,

22  MacKenzie, Miller, Buckfire, E & Y?

23  A    Yes.  For those units we contributed to the city's cost

24  of retaining them.

25  Q    So the state itself?

1    A    Yes.

2    Q    Anybody on behalf of the state or affiliated with the

3    state or any of its officers?

4    A    I don't know if I understand the question, but treasury

5    was -- appropriated some money from the legislature for me to

6    assist local units of government retain professionals that can

7    help them navigate financial difficulties.

8    Q    Well, there -- there was some testimony earlier that the

9    NERD fund for example, contributed to defray some of Kevyn

10   Orr's expenses.  Were there any other entities affiliated with

11   the state or any officer of the state that helped defray the

12   costs of the professionals retained by the city in this case?

13   A    I'm not aware of any other funds.

14   Q    Okay.  Are you familiar with the June 14 proposal to

15   creditors made by the EM in this -- the emergency manager in

16   this case?

17   A    Yes.

18   Q    Did you -- and by EM I mean emergency manager as we have

19   a shorthand.  Did you review that proposal for creditors

20   before it was made on June 14?

21   A    I don't believe so.

22   Q    When was the first time that you saw it?

23   A    I believe when I attended it.

24   Q    When you attended the June 14 meeting?

25   A    Right.

1  Q    Did you see that there was a time line at the back of

2  that proposal that concluded on July 19?

3  A    I don't recall that.

4  Q    Does a -- does a time line running from the June 14

5  meeting through July 19 ring a bell?

6  A    I believe I recall a time line that was scheduled for the

7  process and that sounds about right.

8  Q    And was it your understanding that there were to be

9  negotiations with various stakeholders between June 14 and

10 July 19 as a precursor to the Chapter 9 filing?

11 A    Yes.

12 Q    And what's your understanding of the total debt in

13 Detroit?

14 A    About 18,000,000,000.

15 Q    Did you think it was reasonable to schedule negotiations

16 with the various stakeholders of $18,000,000,000 of debt for

17 one month and three or four days?

18 A    I don't think I passed judgment on that.  I knew it was

19 an aggressive schedule.

20 Q    Okay.  You've previously testified that you were

21 concerned about Detroit's finances virtually from the time you

22 took office back in 2011, correct?

23 A    Correct.

24 Q    And that there were various restructuring professionals

25 in and around the Detroit situation.  Some dating back to even

1  as far as December 2011, but coming through straightforward

2  till the filing of the bankruptcy in -- in July of 2013,

3  correct?

4  A    Correct.

5  Q    And in response to some questions by Mr. Wertheimer, you

6  testified to the fact that Chapter 9, while not necessarily

7  being considered, was in the background at least since April

8  of 2012, correct?

9  A    I believe I testified to that, sure.

10  Q    So knowing what one of the precursors to a Chapter 9 is

11  to try and negotiate with your various stakeholders prior to a

12  filing, why didn't negotiations start with these various

13  stakeholders back in April of 2012?

14  A    Of '12?

15  Q    Uh-huh.

16  A    Our hope was to avoid emergency and to get to a consent

17  agreement back in '12.

18  Q    Were you negotiating with municipal bond holders and

19  others with regard to -- the consent decree didn't solve the

20  debt problem?

21  A    No.

22  Q    Were you negotiating with the stakeholders back in 2012?

23  A    No.  We were negotiating with the city to see if we could

24  reach an agreement that would give them a chance to

25  restructure the city.

1  Q    Did you encourage the city during the period of time that

2  you were negotiating with the city to be also negotiating with

3  their stakeholders?

4  A    I don't have a specific memory about that.

5  Q    There were negotiations in late 2011, early 2012 with a

6  coalition of unions for Detroit with regard to a concessionary

7  agreement.  Are you familiar with that?

8  A    Yes.

9  Q    And there were about 30 unions that participated in those

10  concessionary negotiations, is that your understanding?

11  A    I'm aware that the city was negotiating something that I

12  think were described as TSA's.  Who was involved, I don't

13  remember each name of each union.

14  Q    But it was a coalition of unions?

15  A    Yes.

16  Q    It wasn't just one union.  And on the other side of the

17  table was city, correct?

18  A    Correct.

19  Q    And involved in that on behalf of the city was E & Y,

20  correct?

21  A    Yes, they were there.

22  Q    Do you recall who the person was at E & Y who was

23  involved in that?

24  A    I believe Gaurav Malhotra.

25  Q    And as a result of those negotiations, there was a

1  consensual agreement that was actually reached, isn't that

2  correct?

3  A     Between the city and the unions, yes.

4  Q     And the unions ratified the agreement so approximately

5  4,000 plus city employees voted in favor of the agreement, is

6  that correct?

7  A     I don't believe every union ratified.

8  Q     To your knowledge did most of the unions ratify?

9  A     I don't recall.

10  Q     Would you be surprised if I told you that the unions

11  actually ratified?

12  A     Yeah, because my memory was that not all of them

13  ratified.

14  Q     Was the -- was the agreement brought before the city

15  council for ratification?

16  A     I don't remember.

17  Q     Well, did you tell the city, you personally tell the city

18  not to ratify this agreement and not to agree to the terms and

19  conditions of this collective bargaining agreement?

20  A     I didn't think that those agreements would work for the

21  city, so I was not supportive of them.

22  Q     Why is that?

23  A     Because I didn't think -- well, I sought expert advice on

24  and had them reviewed.  And there was several issues that

25  surfaced and the advice I received was that these agreements

1 won't work for the city.

2 Q    And was one of the pieces of that advice that it would be

3 bad for the city to enter into a three year collective

4 bargaining agreement if it wanted to file Chapter 9 to

5 jettison the pensions?

6 A    No.  I mean --

7 Q    Who did you seek advice from?

8 A    Huron was involved looking at them.  I believe they had

9 some --

10 Q    But so Huron, a financial consulting firm, took a look at

11 these and said they were bad while E & Y, a consulting firm

12 that you were also involved with took a look at these and said

13 that they were good, is that what was happening?

14 A    I can't tell you what E & Y's professional opinion was on

15 those agreements.  The mere fact that he was there with the

16 city doesn't mean that E & Y was putting their seal of

17 approval on those TSA's.

18 Q    What were they advising the city in the room, if not how

19 to get to a consensual agreement that made sense for the city?

20 A    I -- I don't -- I wasn't a part of the relationship

21 between the Mayor, and the COO, and E & Y.  Maybe they were

22 there just to provide numbers, or -- I wasn't there, I can't

23 tell you.

24 Q    When did it first come to your attention -- or when did

25 you first -- well, let me ask the question a different way.

1  Are you of the belief right now that the pensions are under

2  funded?

3  A    I believe they are.

4  Q    And do you believe that's part of the reason why you

5  would view Detroit as insolvent?

6  A    It's a contributing factor.

7  Q    And when did you first reach the conclusions that the

8  pensions were under funded and that was a contributing factor?

9  A    It would have been the spring probably of '13.

10  Q    At no time prior to the spring of '13 did you have a

11  concern about the vested pension benefits and the cost of

12  maintaining the vested pension benefits?

13  A    I don't recall when that first became an issue for me.

14  From day one, it was the unfunded health care liability that

15  to me was really the big challenge for the city.

16  Q    And --

17  A    And the level of the pensions, the numbers seemed to move

18  quite a bit, but the funds themselves were advertising

19  themselves at over 90 and over 80% funded.  If that was true,

20  that would not have been alarming to me.  It's not perfect,

21  but not bad.  There's a lot of pension funds worse funded than

22  that.

23  Q    When did you first reach the conclusion that the health

24  benefits were under funded?

25  A    Early on.  We knew it was a big number from --

1  Q     2011?

2  A     -- the first day I started, yeah.

3  Q     Did you start talking to the city about negotiating with

4  the unions or others with regard to solving that problem back

5  in 2011?

6  A     We had discussions dating from the very beginning about

7  that issue, yes.

8  Q     Did you have discussions with anybody besides the city?

9  In other words with the actual stakeholders with regard to

10 that issue?

11 A     With lawyers and some of the consultants working with the

12 city, we had those discussions.  But that's --

13 Q     Did you talk to the unions?  Did you talk to any

14 retirees?  Did you talk to anybody who was actually receiving

15 health benefits with regard to those issues?

16 A     I did.  I met with various union officials throughout

17 this two and a half year window.

18 Q     Did you participate in the negotiations that led to the

19 concessionary agreement in February of 2012?

20 A     No.

21 Q     Why not?

22 A     I don't recall being invited.

23 Q     If the issue was health care, did you pick up the phone

24 and call anybody about that and suggest that maybe you should

25 be involved in that?

1  A    I didn't ask to be at the table.

2  Q    After the proposal for creditors disseminated, there was

3  a time frame from June 13th, 14th, to July 19th to negotiate

4  with all of these stakeholders.  Do you recall that?

5  A    I do.

6  Q    Do you believe it was practical to believe that there

7  could be resolutions reached with all of these stakeholders

8  during that short period of time?

9  A    Can you rephrase it?  Or just repeat it.  Just --

10  Q    Do you believe it was possible to reach an agreement with

11  all of the city's stakeholders between June 14th, and July 19th?

12  A    Possible, yes.

13  Q    Okay.  As you -- as the deadline approached and there was

14  a lot of testimony that you gave earlier with regard to back

15  and forth over the authorization letter to Kevyn Orr to file

16  Chapter 9 and it looked more likely that a Chapter 9 was going

17  to be filed.  Was there any thought given to the city funding

18  a period of time for Detroit to engage in more meaningful,

19  more productive negotiations for another 60, 30, 90 days in

20  order to allow the stakeholders a real opportunity to engage

21  in a back and forth negotiation to try and solve these

22  problems before rushing into Chapter 9?

23  A    I'll tell you the thing that troubled me the most was

24  when they put together the ten year plan that talked about

25  investing in the city which is important for it to turn around

1  eventually.  That the recovery for the unsecured creditors was

2  so low I didn't know how anyone practically could cut a deal

3  and walk out of the settlement room accepting something based

4  on those numbers.  I became very skeptical that an out of

5  Court solution could happen.

6  Q    Did you ever suggest that perhaps there should be some

7  funding to provide a limited further longer period of time to

8  better develop a proposal that could actually form the basis

9  of a successful out of Court plan of adjustment?

10 A    I was not optimistic that you could reach it out of Court

11 after the numbers kept getting worse and when you saw the

12 potential recovery, I just don't know practically how the

13 unsecured creditors could accept that practically.  And that's

14 probably the biggest influence on me.

15 Q    So then at no point from 2011 through the filing of the

16 Chapter 9 did you actually sit down and participate in and

17 engage in negotiations with the stakeholders of the City of

18 Detroit, personally?

19 A    It's overly broad.  I mean I had various meetings with

20 some union -- union representatives during those windows of

21 time where we discussed various matters.  I think I'd need a

22 little more definition to the question.

23 Q    Well, there was a proposal for creditors that came out on

24 June 14th.  What you're saying was a proposal that nobody could

25 possibly agree to, so you viewed it as impractical.  But

 1  Detroit's financial condition had been deteriorating for the

 2  whole time that you'd been in office if I'm understanding your

 3  testimony correctly.  So at any point in time did you suggest

 4  to anybody now is the time for us to get in front of this

 5  situation, make a proposal, and start negotiating?

 6  A    I don't believe so.

 7          MS. LEVINE:  Thank you.  No further questions.

 8          THE COURT:  Other questions for Mr. Dillon?

 9                    DIRECT EXAMINATION

10  BY MS. GREEN:

11  Q    Good afternoon, Mr. Dillon.  Jennifer Green on behalf of

12  the general and the police and fire retirement systems.

13          I'd like to follow up on some questions that Ms. Levine

14  just asked.  Can we pull up UAW Exhibit 626?  The second page.

15  Paragraph 10 -- no, 11, Paragraph 11.  At the bottom these are

16  your comments, correct, to the authorization letter -- or I'm

17  sorry, the recommendation letter by Kevyn Orr?

18  A    Yes.

19  Q    And you note here you think it should say there's a

20  fundamental reality that after fully estimating the city's

21  liabilities, the pennies on the dollar outcome for unsecured

22  creditors make it practically impossible for them to accept

23  KO's offer.  Is that the sentiment that you were referring to

24  just a moment ago when you said that you thought that

25  basically the recovery was so low that it would be impossible

1  for anyone to accept it?

2  A    Yes.

3  Q    Do you know if anyone else in -- in the state or city

4  shared your view that a pennies on the dollar offer was really

5  a non-starter?

6  A    I don't have a specific memory on that.

7  Q    The paragraph just prior to this, Paragraph 10, you had

8  made a statement, I believe there's a State Court option to

9  get retirees into a class.  We don't acknowledge that and why

10 is that impractical?

11      I believe your testimony was that you were never

12 ultimately briefed on why that was the case.  But did you ever

13 ask about this particular option on the conference call that

14 you had just later on July 10th?

15 A    I don't recall.

16 Q    So you never got an explanation to your question as to

17 why that State Court class action option was impractical?

18 A    I don't recall having that conversation in that call.

19 Q    Do you know if anyone else shared your view with the

20 State Court option that no one had fully explained why that

21 was not a practical option?  Anyone at the state or city?

22 A    I don't recall any discussions on it.

23 Q    At the bottom of the letter, it says after this letter is

24 revised, let's work on the Governor's response.  And you knew

25 as of July 10th then as the date of this email that the Chapter

1  9 filing was going to be filed on July 19th, correct?

2  A    I don't think I acknowledged that the exact date, but I

3  remember seeing a time schedule that that date was likely in

4  that schedule.

5  Q    And the time line that you're referring to, do you -- do

6  you recall who you got that from?

7  A    Who was that?  Whenever our weekly Monday meetings, I

8  believe, with the Governor and Kevyn and miscellaneous people

9  from the Governor's office and treasury.  And possibly some of

10 the consultants.

11 Q    Do you recall if the time line was given to you from

12 someone by the city, or someone from the state?

13 A    From the city.

14 Q    Do you recall if it was a time line prepared by Bill

15 Nowling?  Does that name ring a bell?

16 A    It does.  I don't believe it came from him.

17 Q    I'm sorry, what?

18 A    I don't recall it coming from Bill.

19 Q    Do you know if it came from Sarah Wurfel, the Governor's

20 press secretary?

21 A    It -- I don't recall that it came from her.

22 Q    Okay.  If I showed you a copy of the time line would you

23 recognize the time line or --

24 A    Yeah, I mean there's some press and media coverage tied

25 to this -- the time line.  But the relevant time line to me

1  was the actual if there's going to be a filing, a filing and

2  all the steps that follow a filing.  I do recall the

3  conversations about doing media issues, but that wasn't

4  relevant to me.

5  Q    You stated though after this, after let's get to work on

6  the Governor's response, that you were then left out of the

7  loop.  Why was that?

8  A    I never had a discussion, but I think the Governor

9  decided he was going to do it himself.

10  Q    Was there ever a version of Kevyn Orr's recommendation

11  letter with a contingency placed in it?

12  A    I don't know.  I don't recall it in the version that I

13  read.

14  Q    In -- in any subsequent version?

15  A    I'm sorry?

16  Q    Was there a subsequent version that may have contained

17  the contingency?

18  A    I don't recall that.

19  Q    Do you ever recall seeing a version of the Governor's

20  letter that had a contingency placed in it?

21  A    No.

22  Q    In the July 8th email to the Governor, you mentioned that

23  there was financial information forthcoming from certain

24  financial consultants regarding the pension under funding.

25  Who were the consultants that you were referring to?

1  A    Milliman and probably Conway, MacKenzie.

2  Q    And that would be Chuck Moore from Conway, MacKenzie?

3  A    Right.

4  Q    Were you at all involved in the pension task force with

5  Chuck Moore?

6  A    No.

7  Q    Were you aware of that group?

8  A    I don't recall.

9  Q    Do you know if anyone from the state had anything to do

10  with the formation of the pension task force?

11  A    I don't recall.

12  Q    Did they -- did that task force in any way report to

13  anyone at the State of Michigan?

14  A    I don't believe so.

15  Q    When was the first time that you recall a financial

16  advisor telling you that the pensions would have to be cut

17  significantly?

18  A    I don't recall specifically.

19  Q    Do you recall who that would have been?

20  A    I believe it would have been in the spring and we would

21  have Friday meetings before Kevyn was on board with Chris

22  Andrews and Jack Martin and the various consultants.  It was

23  probably the first time it came up that the pension fund

24  numbers were not what they thought they were.

25  Q    Can you put a finer point at all?  Would it have been

1   May, April?

2   A    I'd be guessing.

3   Q    Do you know if it was before Kevyn Orr came on board as

4   emergency manager?

5   A    I don't recall.

6   Q    Do you remember in June of 2013 receiving advice that the

7   pensions would have to be reduced and that the only way to do

8   that would be in a Chapter 9 proceeding?

9   A    I received advice on that date?

10  Q    Do you recall receiving advice in June of 2013 that the

11  pensions would have to be cut significantly and that a way to

12  do that would be a Chapter 9 filing?

13  A    I'm sorry, I don't mean to be difficult, but did I

14  receive advice or information --

15  Q    Do you recall receiving that advice?

16  A    No, not specifically.

17  Q    Can we pull up Exhibit 870, please?  I'd like to draw

18  your attention to the middle of the page.  There's an email

19  that says from Kevyn Orr to Andy Dillon on June 7th, 2013.  Do

20  you recollect getting this email?

21       (Retirement Systems' Exhibit 870 was identified)

22  A    It might be helpful if I could read more of it.

23  Q    Yup, no problem.  The next page contains the substance of

24  the email.

25  A    Can I see a hard copy?  It might be easier

1          MS. GREEN:  Your Honor, can I approach?

2          THE COURT:  Yes.

3  A    Okay.  Can we restate the question?

4  Q    Do you recall getting an email on June 7th from Kevyn Orr?

5  A    I don't have specific memory of this email.

6  Q    On the second page of the email there is a bullet point 3

7  under GRS.  And it says based on this, we anticipate a -- a

8  significant reduction in already accrued benefits will be

9  required in order to get required contributions to the level

10 of available cash to service the UAAL.  It appears that this

11 may only be possible in a Chapter 9 proceeding.

12         Do you recall receiving at least this portion of the

13 email in June of 2013?

14 A    I don't recall seeing this language, no.  And it's

15 possible I did, I just don't have a specific memory of it.

16 Q    But suffice it to say that by July you were -- you had

17 advised the Governor that you -- some financial consultant had

18 told you that there would have to be significant cuts to the

19 pensions, correct?

20 A    The numbers for the pension funds were very volatile.  I

21 remember just not having a lot of confidence in -- in really

22 what was the number.  And so I was worried about them, but I

23 never felt like we had a number that we could rely upon.

24         MS. GREEN:  And, Your Honor, just a matter of

25 housekeeping.  870 has been used, but I don't know that it has

1 been formally moved for admission, so I'd seek to move for its

2 admission.

3          THE COURT:  Any objections to 870?

4          MS. LEVINE:  Well, Your Honor, I don't believe an

5 appropriate foundation has been laid through this witness.  He

6 doesn't recall this email at all.  And I don't believe it

7 would be appropriate to admit it through his testimony.

8          MS. GREEN:  Can I respond?  He did say he recalled

9 receiving it.  I don't -- he didn't recall the exact sentence

10 that was -- that I drew his attention to.  And Kevyn Orr

11 testified that he recalled receiving it and we had established

12 foundation through that way.

13          THE COURT:  Do you recall receiving this email, sir?

14 A    Well, I see my name on here.  I don't have a specific

15 memory of this document.

16          THE COURT:  Is there some doubt about it's

17 authenticity, Ma'am?

18          MS. LEVINE:  I have nothing -- no, Your Honor, at

19 this point.

20          MR. SHUMAKER:  It is hearsay, Your Honor.

21          MS. GREEN:  Your Honor, if I may respond to that.

22 At least a portion of the email, it is an email directly from

23 Kevyn Orr and we've already established through other emails

24 that that is a party admission, so I'm not exactly sure what

25 the hearsay argument is based on.

1          THE COURT:  May I see it, please?  I don't want the

2     one with all your markings on it.  Is there a -- is there a

3     clean one?

4          MS. GREEN:  There is a clean one.

5          THE COURT:  What number is it again?

6          MS. LEVINE:  Take Mr. Dillon's.

7          THE COURT:  Oh, yes, let me just have Mr. Dillon's,

8     that will work.

9          MS. GREEN:  And, Your Honor, if I may add one more

10    thing.  We've argued in other situations including the city

11    that statements by the financial advisors are being considered

12    party admissions and this is an email from Chuck Moore of

13    Conway, MacKenzie, clearly a party admission.

14         THE COURT:  The Court will admit 870 into evidence.

15    Hold on one second, please.  Can we keep this one?  We don't

16    appear to have it.  Okay.  Can you put the number on there so

17    it will have a number?  Okay.

18    (Retirement Systems' Exhibit 870 was admitted)

19    Q    And if we may pull up Exhibit 834.  You were already

20    questioned a little bit about this email.  I believe that you

21    testified at your deposition the reason you were telling the

22    Governor that you were still in the informational stage was

23    because as you explained the building block is what the funded

24    status was and that issue was fluid, correct?

25         And I believe you further explained that if you're going

1  to reach a settlement with your creditors, it's important to

2  understand what's the funding level.  From there you can start

3  to figure out how do you solve the equation going forward.  Do

4  you recall that?

5  A    Yes.

6  Q    And yet you admit that at this time in July 9th there was

7  no clear understanding of what that level of under funding

8  was, correct?

9  A    For me personally.

10 Q    Do you know anyone else that had a clear understanding at

11 the city or state?

12 A    Well, I believe Chuck Moore was working closely with

13 Milliman and I think he had a pretty clear understanding of

14 where he thought the funding was.  I think he and Kevyn

15 were --

16 Q    But you personally were not convinced?

17 A    I hadn't seen what I thought were final numbers that gave

18 me a good sense of really what was the funding status of the

19 pension plans.

20 Q    And at this time on the email it says that the -- the

21 actual number was not going to be shared as far as the amount

22 and how that would impact the creditors, is that right?  I'm

23 not reading it verbatim.  It doesn't say that, I'm

24 summarizing.

25 A    My understanding that if Kevyn were to meet with them is

1    really just get to what was the funded level.  What's --

2    what's the status.  And from there you can start to translate

3    what may or may not need to happen to get the pension fund to

4    be solvent going forward.

5    Q    But you're -- what you were saying in this email was he

6    was not going to be translating that into an impact on

7    retirees or employees vested rights, correct?

8    A    I thought it best that they come to an agreement.

9    There's a lot of different ways to measure the funding status,

10   the number of years that you're smooth, and what's your

11   amortization rate, and I thought it best to at least see if

12   there's common ground on what the funding level is based on

13   some agreed upon criteria.  But from there then you -- the

14   math kind of falls in place.

15   Q    But at this time there was no number agreed upon as to

16   what the impact would be on the individual retirees, correct?

17   A    Not that I was aware.

18   Q    And that number was thus not going to be shared with

19   anyone at the meeting the following day, correct?

20   A    That was my understanding.

21   Q    You also note at the bottom of the -- the last sentence

22   of the first paragraph.  Because pensions have such a long

23   life, there are lots of creative options we can explore to

24   address how they will be treated on restructuring.  Did you

25   ever explore any of these creative options with the retirement

1  systems?

2  A     No.

3  Q     Did you ever explore any of these creative options with

4  any of the unions or the retirees?

5  A     No.

6  Q     Did you ever prepare a proposal with any of these

7  creative options and then share that proposal with the

8  retirement systems or the unions?

9  A     No.

10  Q     Now this email also says that you expect to get better

11  financials on Thursday which I believe is the middle

12  paragraph.  Who were you expecting to receive better

13  financials from on Thursday?

14  A     I don't specifically recall from the city.

15  Q     You were also asked just a moment ago about whether or

16  not you thought anything changed between the date of this

17  email on July 9th and the filing on the 18th.  Because in this

18  email you stated you thought were in the informational stage.

19  Do you recall that testimony?

20  A     Let's rephrase the question if we can.

21  Q     You were asked by Mister, I think it was Mr. Wertheimer

22  asked you what changed between July 9th and July 18th to take

23  you out of the informational stage.  Do you recall that

24  question?

25  A     I do.

1  Q    And -- and I believe you said something different today

2  than you said in your deposition.  Today you -- do you recall

3  what you said exactly?

4  A    I think it had something to do with that the pensions to

5  me weren't the major driver in the decision whether or not to

6  file.  That, you know, out of 18,000,000,000 this was

7  somewhere, depending on what the union's position was versus

8  the city's, that number was relevant but not a driving factor

9  for whether or not 9 was necessary.

10  Q    So it sounds like your answer has less to do with what my

11  question was.  My question was, do you admit that nothing

12  changed between July 9th and the 18th to take out -- take you

13  out of what you were referring to as the informational stage.

14  A    As it related to the pension?

15  Q    Yes.

16  A    Yes, nothing -- I don't recall having new numbers that

17  came in that made me want to call the Governor and say hey,

18  things are better or things are worse.

19  Q    So nothing changed and you were still in the

20  informational stage the following week, right?

21  A    I believe so.

22  Q    You've testified before that you believed there was a

23  "general understanding" that there was a constitutional

24  protection of pensions that was understood by folks from day

25  one.  And this was the premise of all discussions that we had,

1  correct?

2  A    Correct.

3  Q    And you also testified that the Governor and Kevyn Orr

4  both understood that this constitutional protection existed,

5  correct?

6  A    Yes.

7  Q    And I think you even explained that this presumption was

8  discussed early on and it was understood by people that there

9  was this provision that you had to grapple with, correct?

10  A    The conversation that I had dealt with that the state

11  wasn't liable for pension liabilities of a particular city.

12  That was discussed.  There was also the general understanding

13  that this provision existed in the Constitution.

14  Q    Okay.  I'll get to both.  The first question is, when was

15  the first time that you recall learning of this constitutional

16  protection?

17  A    I don't recall.

18  Q    Do you know if it was during your time as Treasurer, or

19  would it have been something that you knew from your

20  background when you were in the legislature?

21  A    I think it predated my time at the treasury.

22  Q    Okay.  And in fact do you recall citing this

23  constitutional protection to any of the unions or retirees

24  that you met with prior to the bankruptcy filing?

25  A    I don't recall that

1  Q    And then you also just said that there was a component of

2  your discussions related to whether the state had to provide

3  funding, correct?

4  A    That was a concern early on and because we have other

5  cities and units that are beyond just Detroit.  So it was a

6  concern did the state have any credit exposure to failed

7  pensions at the local level.

8  Q    And in any of these meetings or conversations, do you

9  recall Kevyn Orr ever asking the state to contribute money

10  toward the pension under funding for the City of Detroit?

11  A    I don't recall that.

12  Q    Do you recall if anyone else from his team asked the

13  state if it would contribute funding for the City of Detroit's

14  pension under funding?

15  A    I believe the question was asked.

16  Q    And who asked the question?

17  A    I don't recall.

18  Q    Do you recall what the answer was?

19  A    I think -- well, I recall saying that I don't think A,

20  the state can't lend credit to local units of government.  So

21  constitutionally we're prohibited from doing that.  And then

22  my comment was, I don't ever see the situation where the state

23  legislature would appropriate money to shore up liabilities of

24  the city.

25  Q    So you're constitutionally prohibited from what?

1  A    Lending credit from the state to local units.

2  Q    And that was a constitutional prohibition that you

3  thought was appropriate to enforce even in the case of the

4  Chapter 9 proceeding?

5  A    I was responding to a question from someone that said

6  will the state contribute money.  And I gave them two reasons

7  why I didn't think that would ever happen.

8  Q    Did you think that the state's constitutional prohibition

9  against lending credit was more important than the state

10 constitutional prohibition against impairing or diminishing

11 pension benefits?

12 A    I don't think it's appropriate to compare them in terms

13 of importance.  I think the Courts will ultimately decide what

14 they want as it relates to pensions meanings and what their

15 rights are.  But I was pretty clear as Treasurer that I

16 couldn't lend credit to local units of government, that I was

17 prohibited from doing that.

18 Q    But the Courts could have decided if you did lend credit

19 perhaps the Court could also decide that issue, correct?

20 A    I swear an oath to uphold the Michigan Constitution when

21 I took this position and I intend to follow that rule, or I

22 did.

23 Q    So if there was a prohibition in the Michigan

24 Constitution that you think directly constrained your actions,

25 you would find that to be a violation of your oath of office?

1  A    If I lend -- as Treasurer lend credit to local government

2  when the Michigan Constitution says that I can't do that, then

3  I would feel that yes, I violated my constitutional

4  obligations.

5  Q    But you don't feel the same way about Article 9, Section

6  24 of the Michigan Constitution?

7          MS. LEVINE:  Objection, Your Honor, argumentative

8  and vague.

9          THE COURT:  I'll permit it.  What's your answer,

10 sir?

11 A    I don't know that that provision influenced any way

12 whether the Governor was -- I don't think it blocks him or

13 prevent him from authorizing a Chapter 9.  We had it in

14 Article 72.  We had it in Public Act 4.  We had it in Public

15 Act 436.  That's always been out there.

16 Q    You mean the power to permit a Chapter 9?

17 A    Yes.

18 Q    And there's also the power to place a contingency on a

19 Chapter 9, correct?

20 A    I believe that's in 436.

21 Q    And we looked at an email earlier where it was discussed

22 whether or not such a condition should be placed on this

23 filing, correct?

24 A    I believe that.

25 Q    It was an email dated July 12th.  Do you know ultimately

1  why no contingencies were placed on the Chapter 9 filing?

2  A    Just from what I read in the Governor's letter.

3  Q    You were never briefed afterward?

4  A    No.

5  Q    As for the bankruptcy timing, the July 19th date that was

6  picked, it was your understanding that that date was picked

7  because in part the Governor had a desire that if you're going

8  to do a Chapter 9, he wanted it to be fast and efficient,

9  correct?

10  A    Uh-huh.

11  Q    So was that the primary driver of the July 19th date and

12  why it was ultimately decided upon?

13  A    Well, I -- I can't speak to why that specific date was

14  picked.  I -- I was aware that it was being considered, the

15  filing was being considered.  And I do know that there was a

16  sequence of events, dates that followed months after the

17  actual filing.  And there was a briefing to the Governor if --

18  you know, all these events have to transpire the filing and

19  how that landed on that particular date, I don't -- I was

20  never briefed specifically on why that date.

21  Q    But your understanding was in general it was supposed to

22  be fast and efficient?

23  A    That's what the Governor wanted.

24  Q    Was that in part driven by trying to get it done within

25  the 18 months of the emergency manager's appointment?

1  A    You'd have to ask the Governor that, but it would make

2  sense to me.

3  Q    Were you ever privy to any conversations where that time

4  line was discussed for that reason?

5  A    I don't recall that.

6  Q    The time line that we've discussed, you said that you had

7  meetings and you were briefed on the time line?

8  A    Yes.

9  Q    Was there ever a back up time line that you saw a copy

10 of?

11 A    There was an understanding that these dates could slip or

12 move.

13 Q    And it did, right?

14 A    But I didn't see an alternative schedule.  This was the

15 one that was mapped out.

16 Q    Okay.  But it did move by one day?  The bankruptcy filing

17 was delayed by one day.

18 A    I don't dispute that.  I don't have specific memory of

19 the date that it was supposed to be filed and the original

20 time line.  But I have a vague memory that -- that might have

21 been pulled up.

22 Q    Okay.  Did you attend a meeting in June of 2012 with the

23 Governor and Ken Buckfire of Miller, Buckfire and any

24 attorneys from Jones, Day?

25 A    In June of '13?

1  Q    2012.

2  A    '12.  June of 2012, Miller, Buckfire, Jones, Day, the

3  Governor and I?

4  Q    Yes.

5  A    I don't recall.

6          THE COURT:  All right.  We have to stop now.  How

7  much longer will you be?

8          MS. GREEN:  I actually had just like one more

9  question.  If you want, I can finish it or I can go --

10          THE COURT:  Okay.  One more question.

11 Q    With respect to the meeting that we just discussed, do

12 you recall receiving memos from Jones, Day relating to the

13 pension obligations back in 2012?

14 A    I don't have a specific memory of it.

15 Q    Do you recall --

16 A    And actually let's be clear.  What pension obligation

17 certificates, or what?

18 Q    The constitutional protections of pension obligations in

19 Michigan.

20 A    I don't recall.

21 Q    Do you recall receiving any memos relating to Chapter 9

22 filings for the City of Detroit?  Memos on that topic?

23 A    Not specifically.

24          THE COURT:  All right.  We have to stop now.  We do

25 not have Court tomorrow.  We'll reconvene Thursday morning at

1  9:00.  At that time if I could get a representation from the

2  objectors group as to how long you think your closing

3  arguments will be, that will help me a lot.  We are still

4  researching the issue of courtrooms for next week, so I hope

5  to have some further information for you about that.  And

6  we'll be in recess.

7          (WITNESS ANDY DILLON WAS EXCUSED AT 3:00 P.M.)

8              THE CLERK:  All rise.  Court is adjourned.

9          (Court Adjourned at 3:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-8-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25