**<u>ITEM NO. 74</u>**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
## TRANSCRIPT ORDER FORM

| 111 First Street | 211 W. Fort Street | 226 W. Second Street |
|---|---|---|
| Bay City, MI 48708 | 17th Floor | Flint, MI 48502 |
| | Detroit, MI 48226 | |

**Order Party: Name, Address and Telephone Number**

Name _____ **Robin Wysocki** _____

Firm ___ **Miller, Canfield, Paddock and Stone, P.L.C.** ___

Address ___ **150 West Jefferson Avenue, Suite 2500** ___

City, State, Zip ___ **Detroit, Michigan 48226** ___

Phone ___ **313-496-7631** ___

Email ___ **wysocki@millercanfield.com** ___

**Case/Debtor Name:**

**Case Number:** **13-53846**

**Chapter:** **9**

**Hearing Judge** _ **Hon. Steven Rhodes**

'◉**Bankruptcy**  ○**Adversary**

○ **Appeal**  **Appeal No:** _____

---

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** **11/8/2013**  **Time of Hearing:** **9 am**  **Title of Hearing:** Trial on Eligibility Objections

Please specify portion of hearing requested: ◉**Original/Unredacted** "○ **Redacted** """○**Copy** *2nd Party)

◉Entire Hearing  ○Ruling/Opinion of Judge  ○Testimony of Witness  ○Other

Special Instructions: _____

---

**Type of Request:**

[X] Expedited Transcript - $4.85'r gt'r ci g (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki _____ Date: **11/8/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____  Date  By

Order Received:

Transcript Ordered

Transcript Received

**ITEM NO. 75**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,      .      Docket No. 13-53846
     MICHIGAN,              .
                    .      Detroit, Michigan
                    .      November 7, 2013
           Debtor.      .      9:02 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                    By:  BRUCE BENNETT
                    555 South Flower Street
                    Fiftieth Floor
                    Los Angeles, CA  90071-2452
                    (213) 243-2382

                    Jones Day
                    By:  GEOFFREY S. IRWIN
                         GEOFFREY S. STEWART
                         GREGORY SHUMAKER
                         THOMAS CULLEN, JR.
                         MIGUEL F. EATON
                    51 Louisiana Avenue, N.W.
                    Washington, D.C.  20001-2113
                    (202) 879-3768

                    Pepper Hamilton, LLP
                    By:  ROBERT S. HERTZBERG
                         DEBORAH KOVSKY-APAP
                    4000 Town Center, Suite 1800
                    Southfield, MI  48075-1505
                    (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                    By:  MATTHEW SCHNEIDER
                       MARGARET NELSON
                    P.O. Box 30754
                    Lansing, MI  48909
                    (517) 241-8403

APPEARANCES (continued):

                        Dickinson Wright, PLLC
                        By:  STEVEN G. HOWELL
                        500 Woodward Avenue, Suite 4000
                        Detroit, MI  48226-3425
                        (313) 223-3033

                        Dickinson Wright, PLLC
                        By:  PETER H. ELLSWORTH
                        215 South Washington Square, Suite 200
                        Lansing, MI  48933-1816
                        (517) 371-1730

For AFSCME,             Lowenstein Sandler, LLP
AFL-CIO, and Sub-       By:  SHARON L. LEVINE
Chapter 98, City             JOHN K. SHERWOOD
of Detroit              65 Livingston Avenue
Retirees:               Roseland, NJ  07068
                        (973) 597-2374

For Detroit             Clark Hill, PLC
Retirement Systems-     By:  ROBERT D. GORDON
General Retirement           JENNIFER K. GREEN
System of Detroit,      151 South Old Woodward, Suite 200
Police and Fire         Birmingham, MI  48009
Retirement System       (248) 988-5882
of the City of
Detroit:                Clark Hill, PLC
                        By:  RONALD A. KING
                        212 East Grand River Avenue
                        Lansing, MI  48096
                        (517) 318-3015

For the Detroit         Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the        By:  BARBARA A. PATEK
Detroit Police               JULIE BETH TEICHER
Officers Associa-            DAVID EISENBERG
tion and the            400 Galleria Officentre, Suite 444
Detroit Police          Southfield, MI  48034
Lieutenants &           (248) 827-4100
Sergeants
Association:

APPEARANCES (continued):

| | |
|---|---|
| For the Inter-<br>national Union,<br>UAW: | Cohen, Weiss & Simon, LLP<br>By:  BABETTE A. CECCOTTI<br>        PETER D. DECHIARA<br>        THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY  10036-6976<br>(212) 356-0227 |
| For Detroit<br>Retired City<br>Employees<br>Association,<br>Retired Detroit<br>Police and Fire<br>Fighters Associa-<br>tion, Shirley V.<br>Lightsey, and<br>Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official<br>Committee of<br>Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>        ANTHONY B. ULLMAN<br>        ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Dentons US, LLP<br>By:  SAM J. ALBERTS<br>        DAN BARNOWSKI<br>1301 K Street, NW<br>Suite 600 East Tower<br>Washington, DC  20005-3364<br>(202) 408-7004<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired<br>Detroit Police<br>Members<br>Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>        MEREDITH E. TAUNT<br>        MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |

APPEARANCES (continued):

```
For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340


Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1      THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3      THE COURT:  Is everyone here?  Well, first, good

4  morning.

5      ATTORNEYS:  Good morning (collectively).

6      THE COURT:  Is everyone here, or are there people we

7  need to wait for?  All right.  No response, so I'll assume we

8  are all here.  Ms. Green.

9              ANDY DILLON, WITNESS, SWORN

10             DIRECT EXAMINATION (CONTINUING)

11  BY MS. GREEN:

12  Q   Good morning, Mr. Dillon.

13  A   Good morning.

14  Q   Jennifer Green on behalf of the Retirement Systems for

15  the City of Detroit.  I just have a few more small lines of

16  questioning.

17  A   Who is Brom Stibitz, and what is his position within the

18  Treasury Department?

19      MS. NELSON:  Asked and answered, your Honor.

20      MS. GREEN:  Maybe it's foundational.  I just really

21  don't recall what his position was.

22      THE COURT:  I'll ask it.  I'll permit it.  Go ahead.

23      THE WITNESS:  He works for the Department of

24  Treasury.  He serves without the same title but basically as

25  my chief of staff.

1  BY MS. GREEN:

2  Q    And Tom Saxton?

3  A    Tom is a chief deputy.

4  Q    And Terry Stanton?

5  A    Terry Stanton is the public information officer.

6  Q    Okay.  And so they all reported directly to you?

7  A    Yes.

8  Q    Do you recall questions in late June of 2013 from

9  reporters in the media regarding how general obligation bonds

10  would be handled with the City of Detroit?

11  A    With the Bond Buyer?

12  Q    Yes.

13  A    From the last deposition, I think I saw a story on that

14  interview --

15  Q    Okay.

16  A    -- if that's the one we're referring to.

17  Q    It is.  Who is R.W. Baird, and how is that company

18  involved with the Detroit matter?

19  A    R.W. Baird is a financial consultant.  They advise the

20  state.  They may have been involved with helping Detroit

21  issue some debt as well.

22  Q    And is Wayne Workman a financial advisor at R.W. Baird?

23  A    He was at the time.

24  Q    Okay.  And did he report to you in any way?

25  A    He worked directly with Tom Saxton.

1  Q   Okay.  And did you communicate with Mr. Workman about the

2  City of Detroit's financial condition?

3  A   When?

4  Q   In that time period, June of 2013.

5  A   I don't recall that.

6  Q   Do you recall when you would have communicated with him

7  about the situation?

8  A   We worked with him during my entire tenure on various

9  bond matters.  I don't recall having a specific discussion

10  with him about Detroit.  We did a bond deal in 2012 for the

11  city.  They may or may not have been engaged.  I suspect they

12  might have been.

13  Q   So would he have been privy to any of the timelines or

14  any of the dates that were planned for the bankruptcy filing?

15  A   I doubt it.

16  Q   Pardon me?

17  A   I doubt that he would have been.

18  Q   If there was e-mail correspondence between Brom Stibitz,

19  Tom Saxton, and Wayne Workman, would you have been aware of

20  those communications?

21  A   Not necessarily.

22  Q   Do you recall at any point Brom Stibitz, Mr. Stanton, or

23  Mr. Saxton asking you about the inquiry from Bond Buyer

24  magazine regarding the general obligation bonds?

25  A   I remember an incident.  I don't know if it was the one

1    you're referring to.

2            MS. GREEN:  Can we bring up Exhibit 848, please?

3    BY MS. GREEN:

4    Q    Does this document look familiar to you?  Is this the

5    incident that you were referring to?

6    A    I don't recall seeing this specific e-mail.

7    Q    Do you recall questions within the Treasury Department

8    about how to handle this issue?

9            THE COURT:  Excuse me one second, please.  Who's

10   ever in charge of getting this monitor going, I need help

11   because it's not running.  Feel free to come right on up here

12   and work your magic.  Excellent.  Thank you, sir.

13           MS. NELSON:  Your Honor, I don't believe this e-mail

14   is in evidence, and I think it's inappropriate to display it

15   until it is.

16           MS. GREEN:  I was ask -- he mentioned an incident

17   with this exact situation.  I thought that he would be able

18   to testify or I was asking if he could testify is this the

19   incident that he was referring to a moment ago.  If you would

20   prefer, I can refresh his recollection with it instead if --

21           THE COURT:  I didn't quite hear the witness say that

22   there was something he didn't recall.

23           MS. GREEN:  He said there was an incident with Bond

24   Buyer magazine.  I believe this is the incident he was

25   referring to, so I had asked him if he recognized the

1  document, if this was the incident.

2          THE COURT:  Well, you can certainly ask the witness

3  if he has seen the e-mail before.  Otherwise, it's not

4  appropriate to show it to him.

5          MS. GREEN:  That was the -- I believe my question to

6  him was, "Do you recognize the document?  Is this the

7  incident you referred to?"

8          MS. NELSON:  And his answer was he did not recall

9  seeing it, so it's been asked and answered.

10          THE COURT:  Is that right, sir?  You don't recall

11  that specific e-mail?

12          THE WITNESS:  I do not.

13          THE COURT:  All right.  The objection is sustained.

14  BY MS. GREEN:

15  Q   Do you know why Mr. Workman would have been privy to

16  discussions relating to the court option with respect to the

17  City of Detroit?

18  A   The court option?

19  Q   Court option versus out-of-court option.

20  A   He was a consultant to Treasury.  He handles a lot of our

21  debt issuances.  I'm certain Mr. Saxton relies on his advice

22  regularly.

23  Q   Do you know if Mr. Saxton would have shared with him some

24  of the planning that was going on with respect to the City of

25  Detroit bankruptcy?

1   A   I can't answer that.

2   Q   Do you know if Mr. Stibitz or Mr. Saxton or Mr. Stanton

3   would have been involved with R.W. Baird relating to the

4   timing of the City of Detroit bankruptcy filing?

5   A   Can you rephrase that or restate it?

6   Q   Would any three of the individuals that worked at

7   Treasury that we just spoke of, Terry Stanton, Thomas Saxton,

8   or Brom Stibitz, have been in contact with R.W. Baird and Mr.

9   Workman relating to the City of Detroit bankruptcy filing?

10  A   I would highly doubt that Stibitz or Stanton would.  I

11  can't speak to what Mr. Saxton spoke to him about.

12  Q   If Mr. Workman was of the understanding that court seemed

13  like a foregone conclusion, would you have any reason to

14  believe that it was based on conversations with people from

15  the Treasury Department?

16          MS. NELSON:  Objection, your Honor.  Inappropriate

17  hypothetical.  Assumes facts not in evidence.  Lacks

18  foundation.

19          THE COURT:  The objection is sustained.

20  BY MS. GREEN:

21  Q   In March of 2013, do you recall planning for the

22  emergency manager's appointment and the topics that you

23  wanted him to handle when he was appointed?

24  A   I don't recall.  We had a lunch.  We met with him.  Tom

25  Saxton, Brom Stibitz, and I met for lunch with Kevyn and just

1    gave him our experience of working with emergency managers

2    and what the experience would be like.  It was a lunch.  It

3    was fairly informal.  I don't recall much more than that.

4    Q    And do you recall compiling a list of key items that you

5    wanted him to focus on as soon as he was appointed?

6    A    We may have done that.  I don't have a specific memory of

7    it.

8          MS. GREEN:  Can we pull up Exhibit 836, please?

9          MR. SHUMAKER:  Your Honor, this exhibit is not in

10   evidence either.  I don't think it's appropriate to display.

11         MS. GREEN:  Your Honor, I can ask him if he

12   recognizes it and then move for its admission if he does.

13         THE COURT:  You can do that.  You can put it back on

14   the screen for that purpose.

15   BY MS. GREEN:

16   Q    Mr. Dillon, do you recognize this e-mail?  Do you

17   recognize your name in the "To" --

18   A    Yes.

19   Q    -- column?  Do you recall receiving this e-mail in March

20   of 2013?

21   A    Can I read it?

22   Q    Sure.

23         UNIDENTIFIED SPEAKER:  I'm sorry.  Could you tell us

24   what number this is, please?

25         MS. GREEN:  836.

1          UNIDENTIFIED SPEAKER:  836.

2          THE WITNESS:  I'm sure I saw it at the time.  I

3    don't have a specific memory today of it.

4    BY MS. GREEN:

5    Q    In the middle -- well, almost to the end paragraph, it

6    begins with March 28th.  It states, "There may be a narrow

7    window for taking action before lawsuits are filed."  What

8    type of lawsuits were you expecting?

9    A    We get sued all the time, and in our experience with

10   working with other cities where there were emergency

11   managers, there's all kinds of litigation that follows.

12   Q    So would it be safe to assume that you were relating

13   to -- or you were referring to PA 436 lawsuits?

14   A    Most likely, yes.

15   Q    Okay.  Do you recall if there were topics relating to --

16   or I'm sorry -- discussions relating to lawsuits relating to

17   Article IX, Section 24, of the Michigan Constitution?

18   A    I'm sorry.  Could you restate that?

19   Q    Would there have been discussions relating to lawsuits

20   involving Article IX, Section 24, of the Michigan

21   Constitution?

22   A    I don't have any memory of that.

23   Q    So would this be limited to the PA 436 lawsuits you were

24   expecting?

25   A    We got sued on open meetings acts.  All kinds of theories

1    were surfacing, and I literally believe there's over a

2    hundred lawsuits.  I mean there's a substantial number, so

3    every theory I don't recall.

4    Q    So they were certainly expected and somewhat planned for?

5    A    Apparently.

6    Q    The next paragraph just below that says "status and

7    timing of the ongoing 312 arbitration."  Do you recall what

8    that's referring to?

9    A    I know there was an arbitration between the city and

10   maybe DPD.  There might have been some other uniform

11   arbitrations that were ongoing, and I believe, yes, there was

12   an ongoing arbitration at the time.

13   Q    And so when you say "timing of the ongoing arbitration,"

14   what specifically were you referring to?

15            MS. NELSON:  Well, I'm going to object, your Honor.

16   That mischaracterizes.  This is an e-mail to Mr. Dillon.

17   This is not Mr. Dillon's e-mail.

18            MS. GREEN:  He said they had a meeting where they

19   were discussing the topics.  I'll rephrase the question to

20   make it more clear.

21   BY MS. GREEN:

22   Q    Was this one of the topics that you discussed at your

23   meeting when you said that you were talking about the items

24   that you wanted Kevyn Orr to focus on when he took over as

25   emergency manager?

1    A    I described the meeting as a lunch where we just shared

2    with him generally what an experience of being an EM is.

3    That topic I highly doubt came up at that lunch.

4    Q    Okay.  Did this topic come up at any other time in your

5    discussions relating to the emergency manager?

6    A    Me personally?  I don't recall it.

7              MS. GREEN:  Your Honor, I'd move for the admission

8    of Exhibit 836.

9              THE COURT:  Any objections?

10             MS. NELSON:  No objection.

11             MR. SHUMAKER:  Hearsay, your Honor.

12             MS. GREEN:  Your Honor, it's an e-mail to him.  He's

13   the recipient of it.  It's a business record under 803(6),

14   and he spoke about the communications and was able to respond

15   to the substance of what was referred to in the e-mail.

16             THE COURT:  Well, do you remember receiving this e-

17   mail or not?

18             THE WITNESS:  I don't have a specific memory of it,

19   no.

20             THE COURT:  All right.  The objection is sustained.

21             MS. GREEN:  Your Honor, if I may, there have been

22   several e-mails that were -- where people did not have a

23   specific recollection of that we have all permitted to be --

24             THE COURT:  If there's an objection as opposed to by

25   stipulation, I have to deal with it.  If the witness can't

1   authenticate it, then it's not admissible.

2   BY MS. GREEN:

3   Q   When we last spoke, Mr. Dillon, you referred to a section

4   of the Michigan Constitution that you thought prohibited the

5   state from reimbursing the City of Detroit for the pension

6   underfunding.  Do you recall that?

7   A   I don't recall the topic, but I think you've

8   mischaracterized my testimony.

9   Q   Do you recall saying that you thought that you were

10  prohibited from lending credit --

11  A   Yes.

12  Q   -- to the City of Detroit?  What provision of the

13  Constitution were you referring to?

14  A   I don't know.  It's just the general understanding I had

15  serving in the role as treasurer.

16  Q   Were you referring to a prohibition against the state

17  guaranteeing obligations of the city?

18  A   It's my understanding that the interpretation of that

19  lending of credit is fairly broadly construed, so my

20  understanding would be a guarantee would be contrary to

21  what's permissible under the Constitution.

22  Q   But if there was legislation enacted that gave an

23  appropriation to a particular municipality, that would not be

24  prohibited; correct?

25  A   That's my understanding, yes.

1    MS. GREEN:  I have nothing further, your Honor.

2         THE COURT:  Any further questions for the witness?

3         MS. BRIMER:  Good morning, your Honor.  Lynn M.

4    Brimer appearing on behalf of the Retired Detroit Police

5    Members Association.

6                    DIRECT EXAMINATION

7    BY MS. BRIMER:

8    Q    Good morning, Mr. Dillon.  My name is Lynn Brimer.

9    A    Good morning.

10   Q    I represent an association of retired police personnel.

11   We've not met before, have we?

12   A    I don't believe so.

13   Q    One thing that no one has asked you yet is regarding your

14   background.  You hold a law degree, do you not?

15   A    I do.

16   Q    And when did you obtain your law degree?

17   A    1988.

18   Q    All right.  And you are admitted to practice law?

19   A    I am.

20   Q    And is that in the State of Michigan?

21   A    Yes.

22   Q    And when were you admitted to practice?

23   A    I believe '89.

24   Q    All right.  And you have continuously been admitted to

25   the Michigan State Bar since 1989, approximately?

1  A   Yes.

2  Q   All right.  Now, I'm going to go back to early 2012, and

3  without hopefully duplicating any of the answers you've

4  already given or questions you've already asked, I'd like to

5  go over some of the early dealings between the state and the

6  consultants, so in early 2012 Miller Buckfire and Huron

7  Consulting were hired to perform a 60-day review of the City

8  of Detroit; is that correct?

9  A   I believe so.

10 Q   And were you involved in the retention of either Huron

11 Consulting or Miller Buckfire?

12          MS. NELSON:  Objection --

13          THE WITNESS:  Yes.

14          MS. NELSON:  -- your Honor.  This line has already

15 been asked and answered.

16          THE COURT:  It has.

17          MS. BRIMER:  Your Honor, I believe I will ask some

18 questions that have not been asked of Mr. Dillon, and I will

19 try very hard not to be duplicative.  I understand the Court

20 and counsel's concern.

21 BY MS. BRIMER:

22 Q   So at the end of that 60-day review, was a report

23 produced by Miller Buckfire or Huron Consulting?

24 A   I don't specifically recall.

25 Q   All right.  So you don't specifically recall reviewing a

1    report then either?

2    A    I assume we got some financial data from Miller Buckfire.

3    I know we got some information on other matters from Huron,

4    but specifically I don't have a memory of reading a binder or

5    document that was put together that summarized everything.

6    Q    Now, at some point you testified that Miller Buckfire

7    brought in Jones Day in connection with the consent

8    agreement.  Do you recall when that happened?

9    A    Not specifically.

10   Q    Are you aware that in 2011 Jones Day had submitted a

11   response to an RFP in connection with the appointment of

12   emergency managers by the State of Michigan?

13   A    I didn't recall that recently.  That happens under my

14   department.  I don't -- I'm not involved in the specifics of

15   those, so I wasn't part of the decision group to put them on

16   the list, but I knew we did an RFP to assist with troubled

17   units.

18   Q    So you were aware that at least as early as March 2nd of

19   2011, multiple attorneys from Jones Day were working with

20   Miller Buckfire and Huron Consulting on the consent agreement

21   with Department of Treasury; correct?

22   A    Yes.

23   Q    Were you aware of the number of attorneys from Jones Day

24   that were working with Miller Buckfire?

25   A    No.

1     MS. BRIMER:  Exhibit 202, please.

2     UNIDENTIFIED SPEAKER:  I don't have 202.

3     MS. BRIMER:  Oh, I'll give you --

4     MS. NELSON:  Oh, wait.  There it is.

5     MS. BRIMER:  Oh, there you go.

6  BY MS. BRIMER:

7  Q   That's an e-mail dated March 3rd, 2012; is that correct?

8     MS. NELSON:  Your Honor, I don't believe this has --

9  objection.  This hasn't been admitted, and it would be

10 inappropriate to ask questions on the substance.  If she's

11 laying foundation, I don't have an objection, but to question

12 on the substance of the e-mail would be inappropriate at this

13 point.

14     MS. BRIMER:  Well, preliminarily, your Honor, last

15 evening the city and the RDPMA agreed to the admission of

16 this exhibit.

17     THE COURT:  Any objections to its admission?

18     MR. SHUMAKER:  No, your Honor.

19     THE COURT:  All right.  So that's 202, did you say?

20     MS. BRIMER:  Yes.  For the record, your Honor, we've

21 also stipulated to the admission of Exhibit 201.

22     THE COURT:  Is that right?

23     MR. SHUMAKER:  That's correct, your Honor.

24     THE COURT:  All right.  Exhibits 201 and 202 are

25 admitted.

```
 1          (Exhibits 201 and 202 received at 9:25 a.m.)
 2              THE COURT:  You may proceed.
 3              MS. BRIMER:  Thank you, your Honor.
 4    BY MS. BRIMER:
 5    Q   So that's an e-mail dated March 3rd, 2012, from Ms.
 6    Lennox; correct?
 7    A   Correct.
 8    Q   And it's addressed to you; correct?
 9    A   Correct.
10    Q   Do you recall reviewing that e-mail?
11    A   I recall during my deposition having my memory refreshed
12    about it.
13    Q   So as you'll note -- I'd actually like to go back up to
14    the caption -- it's from Ms. Lennox, who's an attorney at
15    Jones Day, and in the carbon copy there's Ms. Ball, Jeffrey
16    Ellman, David Kates and Thomas Wilson, so we have five
17    attorneys from Jones Day involved in the Detroit consent
18    agreement; correct?
19              MS. NELSON:  I'm going to object.  I don't believe
20    there's a foundation for those attorneys' specific
21    involvement with the consent decree.
22              THE COURT:  It's a question, so the objection is
23    overruled.  If you can answer, sir.
24              THE WITNESS:  What's the question again?
25    BY MS. BRIMER:
```

1  Q   Well, there's five attorneys from Jones Day that are

2  being copied in connection with the involvement of Jones Day

3  on the drafting of the consent agreement for the City of

4  Detroit; correct?

5  A   I only know what this document shows me.

6  Q   And it shows us five attorneys involved or at least

7  copied on this e-mail; correct?

8  A   Yes.

9  Q   And then there's a number of consultants both from Huron

10  Consulting and Miller Buckfire; correct?

11  A   Yes.

12  Q   All right.  Now, if we go down to the body of the e-mail,

13  it's an e-mail addressed directly to you from Ms. Lennox;

14  correct?

15  A   Yes.

16  Q   So you were dealing directly with Ms. Lennox in drafting

17  the consent agreement for the city; correct?

18  A   A very limited basis.

19  Q   And it indicates that, "Attached for your consideration

20  is a consent agreement reviewed by Miller Buckfire and

21  Huron," meaning Huron Consulting; correct?

22  A   Correct.

23  Q   All right.  So you're aware that these three consulting

24  firms, which at this point in time you've testified were not

25  hired by the city in connection with the consent agreement,

1  were working on the consent agreement; correct?

2  A   They were providing advice, but we had -- the state had

3  its own counsel in negotiations of the consent agreement.

4  Q   And who was that?

5  A   There's probably an AG and Steve Liedel from Dykema

6  Gossett.

7  Q   So was Dykema Gossett aware that Jones Day was working

8  with you on drafting a consent agreement?

9  A   They were providing input that I'm certain certain items

10 were shared with them.  They may have reviewed the documents.

11 I don't recall.

12 Q   Would they have reviewed the documents directly from

13 Jones Day, or would they have been provided to Dykema from

14 someone at Treasury?

15 A   I can't answer that.

16 Q   And at this time, none of these consulting or lawyers are

17 charging Department of Treasury for the services they're

18 providing in connection with the consent agreement; correct?

19 A   Not correct.  I think we testified that we did retain

20 Miller Buckfire for a brief period of time.

21 Q   In connection with the 60-day review -- financial review

22 of the city?

23 A   That's right.

24 Q   And were their duties expanded to include the consent

25 agreement?

1   A    We engaged them as we were going through the review and

2   in preparation of the consent agreement.  We were working

3   closely with Huron Consulting as well as Miller Buckfire.

4   Q    Okay.

5   A    Those firms reached out to lawyers and provided advice we

6   didn't -- generally we asked for, but they, I think, were

7   supplementing their efforts to help us out.

8   Q    And the drafting of the consent agreement took a fairly

9   lengthy period of time, at least 30 days; correct?

10  A    Yes.

11  Q    And Jones Day, Miller Buckfire, and Huron Consulting were

12  involved during that entire 30-day process; correct?

13  A    There's a negotiation.  We met probably five or more

14  times with the City of Detroit and their lawyers.  It was an

15  arm's length bargain negotiated aggressively, and I don't

16  recall any of them being in the room during those

17  negotiations.

18  Q    But they did continue to review the consent agreement and

19  its multiple revisions; correct?

20  A    I don't specifically recall when their input ended or

21  necessarily even began, but --

22       MS. BRIMER:  Can we see Exhibit 841, please?

23  BY MS. BRIMER:

24  Q    You'll notice about midway down there is an e-mail that

25  is addressed to you; correct?

1  A   Can we grow the font size here?  Okay.  I'm sorry.  Could

2  you restate the question?

3  Q   So that's an e-mail to you.  That's from someone at

4  Miller Canfield, also a law firm the city works with;

5  correct?

6  A   Correct.

7  Q   And it's regarding the --

8          MS. NELSON:  Objection, your Honor.  This has not

9  been admitted into evidence.  It would be inappropriate to

10  ask substantive questions regarding this e-mail.

11  BY MS. BRIMER:

12  Q   So the e-mail is addressed to you; correct?

13  A   I see my name there, yes.

14  Q   Do you recall reviewing this e-mail?

15  A   I bet we turned that document six to ten times, so I

16  remember these incidents where we would get versions from the

17  city, and they would get them from us, so generally I

18  remember these types of e-mails.

19  Q   Do you have any reason to believe that you did not review

20  this e-mail from Mr. McGee dated March 29th addressed to you?

21  A   No.  I would think I seen it, yeah.

22          MS. BRIMER:  Your Honor, I'd move for the admission

23  of this Exhibit 841.

24          THE COURT:  I'm sorry.  Was your answer you have

25  seen this or --

1          THE WITNESS:  I believe I saw it at the time, yes.

2          THE COURT:  You do.  All right.  Any objections?

3          MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

4          THE COURT:  Hold on one second.  Well, are you

5     offering the -- I'm sorry --

6          MS. BRIMER:  Thanks.

7          THE COURT:  -- offering the entire document or just

8     the e-mail that Mr. Dillon received?

9          MS. BRIMER:  Well, I'd actually like to offer the

10    entire document, your Honor, because I think it establishes

11    what Treasury has done with it.

12         THE COURT:  The issue isn't relevance.  The issue is

13    hearsay.

14         MS. BRIMER:  But it is forwarded, your Honor, by a

15    member of the State of Michigan who works -- and Mr. Dillon

16    indicated that Mr. Stibitz works directly for him, so that

17    would become an exception as a party --

18         THE COURT:  May I see the paper copy of this,

19    please?

20         MS. BRIMER:  If I may, your Honor, it has only

21    highlighting similar --

22         THE COURT:  Okay.  All right.  I will return this to

23    you.  The Court will admit so much of the document as begins

24    from McGee, comma, Michael P., but not the part above it.

25         (Exhibit 841 excerpt received at 9:34 a.m.)

1          MS. BRIMER:  Thank you, your Honor.

2          THE COURT:  And that was Exhibit -- what number

3    again?

4          MS. BRIMER:  841, your Honor.

5    BY MS. BRIMER:

6    Q    So, Mr. Dillon, do you know when the consent agreement

7    was executed by the city?

8    A    I think on or around April 4.  That might have been the

9    date City Council voted on it.  I'm not sure.

10   Q    So is it in the ordinary course for the Department of

11   Treasury to receive that type of consulting from outside law

12   firms that have not yet been retained by the Department of

13   Treasury or any other agency for the state?

14   A    I can't say that it hasn't happened in another unit of

15   government.  On occasion some will provide some pro bono

16   services if we have an urgent need.  I know that happened

17   with DPS and a little bit with Flint, a little bit with

18   Highland Park, so it's not unusual.

19   Q    Were Jones Day providing any other consulting services in

20   connection with any other matters before the Department of

21   Treasury?

22   A    Not to my memory.

23   Q    So at some point in time Jones Day became involved with

24   the -- with Public Act 4 and a concern with respect to

25   whether or not that might be repealed; is that -- or rejected

1  on the referendum; is that correct?

2          MS. NELSON:  Objection.  Lacks foundation and is

3  vague.

4          THE COURT:  Overruled.  You may answer the question.

5          THE WITNESS:  Could you restate that?

6  BY MS. BRIMER:

7  Q   At some point Jones Day also became involved with the

8  Department of Treasury and concerns regarding the rejection

9  of PA 4 on referendum; correct?

10  A   I wouldn't characterize it that way.  What we were

11  working on was a consent agreement that we wanted to survive

12  even if PA 4 was repealed, so there's other provisions of

13  state law that would allow for the consent agreement to have

14  legal standing and substance, so I believe they looked at

15  those other provisions of the law to make certain the

16  agreement we worked so hard to develop would survive a repeal

17  of PA 4.

18  Q   Did anyone at Jones Day give either you or anyone at the

19  Department of Treasury any advice in connection with how to

20  react or an approach to take in the event PA 4 was, in fact,

21  repealed?

22  A   Only what would be in that document, but it wasn't -- you

23  know, Steve Liedel is an expert on this at Dykema.  Actually,

24  I think we relied on him more than Jones Day on that issue.

25          MS. BRIMER:  So I'd like Exhibit 201, please.  No.

1   I think that's 202.  201.

2           THE COURT:  It says 201.

3           MS. BRIMER:  Oh, it's possible this is the second

4   page.  Is there a first page?  Okay.  It's also marked as an

5   Exhibit 8 -- 846, so 846 would be, your Honor, admitted since

6   it's the same document as 8 -- as 201, which the city has

7   stipulated to.

8           THE COURT:  Is that all right?

9           MR. SHUMAKER:  That's correct, your Honor.

10          THE COURT:  All right.  Thank you.

11  BY MS. BRIMER:

12  Q   So this is an e-mail dated March 2nd, 2013.  Do you see

13  that?

14  A   Yes.

15  Q   And it's just addressed from Mr. Ellman to other

16  attorneys at Jones Day.

17          MS. NELSON:  I would just like to correct the

18  record.  I think Ms. Brimer indicated this was dated March 2,

19  2013, and it's 2012.

20          MS. BRIMER:  Oh, '12, 2012.

21          MS. NELSON:  Thank you.

22          THE COURT:  Thank you.

23  BY MS. BRIMER:

24  Q   You're not copied on that e-mail; correct?

25  A   I don't see my name.

1  Q   Have you ever seen this e-mail before?

2  A   I believe in preparation for deposition and this

3  testimony, I may have seen it.

4  Q   All right.  So it indicates in the first paragraph that,

5  "We spoke to a person from Andy's office."  That Andy, that

6  would be you?

7  A   I suspect that.

8  Q   So when you prepared for your deposition, did you read

9  this e-mail all the way through?

10  A   I glanced through it.

11  Q   Okay.  It further indicates, "I thought MB was also going

12  to try to follow up with Andy directly about the process for

13  getting this to the governor."  Do you recall anyone from

14  Miller Buckfire discussing with you, if you've read this, the

15  content of this e-mail?

16  A   I'd like to read the whole document before I answer.  I

17  don't --

18  Q   Take your time.

19  A   Okay.  Could you restate the question?

20  Q   Do you recall at about this time someone from Miller

21  Buckfire discussing the content of this e-mail with you

22  directly?

23  A   We were having daily conversations at this time.  I'm

24  certain we discussed items in this e-mail.

25  Q   So you'll see about midway down if PA 4 is repealed or

1 suspended, there may be an argument that some or all of this

2 does not work, so there was a concern by Treasury, Miller

3 Buckfire, Jones Day that what was being put in place in

4 connection with the consent agreement might be in jeopardy in

5 the event PA 4 was repealed; correct?

6 A    That's what it says, yes.

7 Q    Then if you go a little further down, "The cleanest way

8 to do all of this is probably new legislation that

9 establishes the board" -- I assume that's the Financial

10 Review Board -- "and its powers and" -- and the "and" is in

11 capital letters -- "includes an appropriation for a state

12 institution.  If an appropriation is attached to and included

13 in the statute to fund a state institution, which is broadly

14 defined, then the statute is not subject to repeal by the

15 referendum process."  Do you see that?

16 A    I do.

17 Q    So is it -- it's correct that by March of 2012 the

18 consultants that were working with Treasury and Treasury are

19 already contemplating new legislation that would include a

20 spending provision in order to avoid a referendum in the

21 event PA 4 was rejected?

22 A    I think you're overstating the case here.

23 Q    Okay.

24 A    Even if PA 4 stayed in law, the advice and recommendation

25 we were getting was to have something like -- the model we

1  were following is the MAC that was put into existence in the

2  late '70s in New York City. The advice we were getting is

3  that the state should have some statute that defines what the

4  role -- in this case it became the FAB, the Financial

5  Advisory Board -- what its powers and duties may be, so this

6  is, I guess, related in some way to PA 4 or PA 72, but their

7  advice was and remains today that the state should have some

8  statutory construction around what is the role of a Financial

9  Advisory Board.

10  Q   And so at least as early as March of 2012, that advice is

11  coming to Department of Treasury from the Jones Day

12  attorneys; correct?

13  A   The person lobbying me or recommending and pushing me to

14  do this even before this date was Miller Buckfire.

15  Q   And it was Miller Buckfire that brought in Jones Day?

16  A   Yes.

17  Q   So the concern was just how much control the state would

18  have over a city that was subject to the appointment of a

19  financial emergency manager; correct?

20  A   Can you restate that question?

21  Q   The concern that you just indicated that was being raised

22  was the level of control that the state would have over a

23  city in the event an emergency manager was appointed?

24  A   There's other provisions in state law that give us the

25  ability to negotiate a consent agreement, so we examined what

1    those other ones were in case PA 4 was resolved.  And you go

2    through all this effort of creating the consent agreement,

3    and if PA 4 was repealed and it didn't rely on those other

4    provisions of state law, then there would have been an issue,

5    and a lot of that work and effort to have a viable working

6    consent agreement would have been lost.

7         MS. BRIMER:  So if we could see Exhibit 840.

8    BY MS. BRIMER:

9    Q    You'll see about a third of the way down an e-mail from

10   Laura Marcero -- Marcero -- and it's addressed to you;

11   correct?

12   A    Correct.

13   Q    It's dated March 25th, 2012; correct?

14   A    Correct.

15   Q    Do you recall seeing this e-mail?

16   A    Yeah.  I have a memory of this.

17   Q    You have a memory of this?

18        MS. BRIMER:  Just to be clear, your Honor, I'd like

19   to move for the admission of the e-mail -- the portion of

20   this exhibit that is an e-mail addressed to Mr. Dillon.

21        THE COURT:  And what number again is that?

22        MS. BRIMER:  840, your Honor.

23        THE COURT:  Any objections?

24        MR. SHUMAKER:  Yes, your Honor.  It's hearsay.

25        THE COURT:  All right.  That objection is overruled.

1          MS. BRIMER:  Thank you, your Honor.

2          THE COURT:  The document is admitted or this much of

3    the document is admitted.

4          (Exhibit 840 excerpt received at 9:48 a.m.)

5    BY MS. BRIMER:

6    Q   And if you'll go down to paragraph 4, the first sentence,

7    this e-mail is regarding concerns, you would agree, over a

8    draft of the consent agreement that the city had sent back to

9    Treasury; correct?

10   A   I'm sorry.  I was reading it when you were asking -- let

11   me -- can I read it --

12   Q   Go right ahead.

13   A   -- over again?  Okay.

14   Q   So the content of the e-mail regards a revised draft of

15   the consent agreement that had been forwarded to Treasury

16   from the city; correct?

17   A   Correct.

18   Q   Okay.  And you'll see paragraph 4, the first sentence,

19   "The ability to call defaults on projects and diminish the

20   mayor's authority seems to have limitations now," so the

21   concern was drafting an agreement that would allow the state

22   to take control and authority from the mayor; correct?

23   A   I believe that this was in conjunction with the financing

24   we did, and money was in escrow.  And there were certain

25   milestones the city had to meet to achieve a consent

1   agreement, which we wanted to achieve as well.  We didn't

2   want to go to emergency status, so when we negotiate a

3   consent agreement, whether it be with Detroit or any other

4   unit, there's certain expectations that we have, and these

5   units have to hit certain milestones or benchmarks to stay in

6   a consent agreement relationship where they have their

7   authority, so, yeah, there's certain requirements that we

8   had, and with Detroit being such a significant operation, we

9   had expectations that they would meet during the consent

10  agreement so that they could stay in it.

11  Q   So was the milestone agreement executed before the

12  consent agreement?

13  A   It became part of it.

14  Q   Was it executed before, though, or after?

15  A   Actually, the milestones were pretty much universally

16  agreed between the city and the state.  By that I mean there

17  wasn't a lot of dispute about what should be in there.

18  Q   So even after the consent agreement was drafted, Miller

19  Buckfire, Huron Consulting, and Jones Day continued to advise

20  Treasury and you yourself individually in connection with the

21  situation in the City of Detroit; correct?

22  A   I don't believe so.

23          MS. BRIMER:  Your Honor, I'd like to show an exhibit

24  that I believe has not yet been admitted.  842 has not been

25  admitted, has it?  I'll show Ms. Nelson.  If I may approach,

1  your Honor --

2          THE COURT:  I'm sorry.  I can't permit you to have a

3  private conversation with the witness.  If there's something

4  you'd like to say to him, you can feel free to say it at --

5          MS. BRIMER:  I directed him to look, your Honor --

6          THE COURT:  I'm sorry.  You can feel free to say it

7  at the microphone so that it is on the record.

8          MS. BRIMER:  For the record, your Honor, I directed

9  him to the paragraph that I identified for Ms. Nelson that I

10  believe may refresh his recollection.

11          THE WITNESS:  Okay.  Could you restate the question?

12  BY MS. BRIMER:

13  Q   Does that refresh your recollection with respect to the

14  continued advice and consulting that Treasury and you

15  individually were receiving from Jones Day, Miller Buckfire,

16  and Huron Consulting even after the consent agreement was

17  finalized?

18  A    Yeah.  After the -- before the consent agreement was

19  finalized, there was very, very frequent, if not daily,

20  conversations with Hugh Sawyer and Laura and Miller Buckfire

21  to maybe a lesser extent, very little dialogue with us and

22  Jones Day other than for a few of these e-mails and some of

23  their comments on the drafts.  After the consent agreement

24  was in place, we stayed in touch but on a much less frequent

25  basis.

1  Q   And after the consent agreement, what matters did you

2  remain in touch with the -- Jones Day and other -- Miller

3  Buckfire and Huron Consulting individuals in connection with?

4  A   I don't recall any contacts with Jones Day after it until

5  2013 let's say, and then -- I mean throughout -- there could

6  be various issues that came up, and we may pick up the phone

7  and ask for advice from Hugh or Laura, and I think there was

8  similar infrequent contact with Miller Buckfire.

9  Q   So I believe Ms. Green asked you whether or not you were

10 aware of a meeting in June between Ms. Lennox, Mr. Buckfire,

11 and the governor, and I don't recall your answer to that.

12 A   I think I said I didn't remember.

13 Q   So it's possible that the governor's office continued to

14 remain in contact with the Jones Day attorneys without your

15 being aware of that?

16      MS. NELSON:  I'm going to object.  Inappropriate

17 hypothetical and lacks foundation.

18      THE COURT:  The objection is sustained.

19 BY MS. BRIMER:

20 Q   Now, at some point Public Act 4 was, in fact, repealed;

21 correct?

22 A   Correct.

23 Q   And a new law was enacted, what we've referred to as

24 Public Act 436; correct?

25 A   Correct.

1    Q    Who was responsible for drafting PA 436?

2    A    Right after the election, there was -- I probably

3    attended two or three meetings with the governor and Brom

4    Stibitz from my staff and maybe a few folks from the

5    Governor's Office to discuss, you know, what about PA 4 could

6    be improved.  There were some items that we just learned by

7    working with PA 4 that we wanted in a new law, and then some

8    of the criticisms of PA 4 we genuinely sought to address,

9    giving locals more control, different options than just going

10   into emergency, so I attended -- I don't know -- two to four

11   maybe meetings during mid- to late November through early

12   December.  The governor drew up -- kind of put a little chart

13   together that showed what the new law could look like.  From

14   that point forward, it was folks on my staff and the

15   Governor's Office that moved the legislation through the

16   legislature.

17   Q    Now, to be clear, the appointment of Kevyn Orr was under

18   PA 72; correct?

19   A    I believe so, for three days.

20   Q    And he automatically became the emergency manager under

21   PA 436; correct?

22   A    That's my understanding, yes.

23   Q    So the city did not have any of the other options that

24   were added into PA 436 to avoid the appointment of an

25   emergency manager; correct?

1  A    Correct.

2  Q    Okay.  Now, one of the things PA 436 included were some

3  spending provisions.  Do you recall those?

4  A    Yes.

5  Q    Who drafted those provisions?  Do you know?

6  A    I don't.

7  Q    Have you reviewed those spending provisions?

8  A    Yeah.  I know that my office did the calculation of how

9  much money -- one of the new requirements of 436 was that

10  Treasury would have to pay emergency managers.  That was one

11  of the criticisms of PA 4, that you put someone in place and

12  then you make them pay for them, so I know my office did the

13  calculations to identify how much we would need to pay the

14  salaries of the EM's that were in place throughout the state,

15  and I believe that number was about 780,000.

16  Q    So when you performed your calculation, did you only

17  address those emergency managers that were in place at the

18  time, or did you address the potential emergency managers

19  that the state was aware it intended on or hoped to put in

20  place?

21  A    Someone on my staff did that calculation.  I can't speak

22  to what the components of it were.

23  Q    Did you ever review the financial analysis that was

24  performed by your staff?

25  A    No.  I think they just shared the number with me, that

1  that's what we would need to get through the fiscal year.

2  Q   And there was then a second spending provision; correct?

3  A   Yes.

4  Q   And that provided for funds to cover consultants;

5  correct?

6  A   Correct.

7  Q   And that was approximately $5 million?

8  A   Right.

9  Q   Do you believe those spending provisions were adequate to

10  cover both the salaries for the emergency managers and the

11  professionals that emergency managers may retain?

12  A   I'm pretty certain they were -- the emergency manager

13  number was probably quite close because it was very

14  predictable.  The consultant costs, you know, those

15  consultants, you never can trust them.  They get really

16  expensive.

17  Q   Well, let's just talk about the consultants for a moment.

18  As time went on, was that, in fact, sufficient to cover the

19  fees of the consultants in connection, for example, with the

20  City of Detroit?

21  A   Well, so far we haven't had to go back to the legislature

22  to ask for additional money, so I -- so far it's been

23  adequate.

24  Q   So the $5 million has covered the Jones Day attorneys'

25  fees, the Miller Buckfire, the Conway MacKenzie, and the

1    Ernst & Young fees in connection with the City of Detroit

2    from -- I believe it would have just been from the effective

3    date, March 28th, through September?

4    A    You'd have to ask -- I go to Brom Stibitz when I want to

5    know how we're doing on resources to hire consultants, and he

6    just tells me we're fine or we're not fine.  I can't speak to

7    the specifics.

8    Q    Well, at some point you did become concerned, did you

9    not?

10   A    I worry about a lot of things.

11          MS. BRIMER:  Your Honor, I'd like to show the

12   witness an exhibit, an e-mail that is, in fact, from him.  I

13   shared it with Ms. Nelson.

14          THE COURT:  What are you showing him?  Is it an

15   exhibit number?

16          MS. BRIMER:  Well, we can mark it as Exhibit 206,

17   your Honor.

18          THE COURT:  Okay.

19      (Exhibit 206 marked at 10:02 a.m.)

20          MR. SHUMAKER:  Your Honor, we would state an

21   objection.  This is not -- this document was not a mystery

22   and wasn't placed on their exhibit list at the beginning of

23   trial.

24          THE COURT:  Well, let's see if it's offered into

25   evidence, and then I'll hear your objection.  Are you asking

1  the witness to have a look at it?

2  BY MS. BRIMER:

3  Q   Have you had a chance to review that?

4  A   Yes.

5  Q   That's an e-mail from you --

6  A   Yes.

7  Q   -- dated June 11, 2013?

8  A   Yes.

9  Q   Do you recall sending this e-mail?

10 A   Very much so.

11        MS. BRIMER:  Your Honor, it was not offered at the

12 time the pretrial was prepared.  I believe this runs directly

13 to the issue of whether or not the spending provision was, in

14 fact, ever properly evaluated.

15        THE COURT:  Isn't relevance.  It's why wasn't it on

16 the original exhibit list.

17        MS. BRIMER:  I think I can explain, your Honor.

18 Your Honor only on the day -- the day before the pretrial was

19 finalized suggested that your Honor would take evidence

20 regarding the intent on the referendum, and this exhibit,

21 your Honor, was produced by the city.  It was used in Mr.

22 Dillon's deposition.  It is certainly not a shock and

23 surprise to the parties.

24        THE COURT:  It certainly would not have surprised

25 you that I would be willing to take evidence on that point

1  since you advocated that.  You didn't think you were going to

2  lose, did you?

3         MS. BRIMER:  No, your Honor, but your Honor had

4  suggested that it was a legal issue.  I think I can ask the

5  witness a few questions then if -- I believe it's relevant.

6  I believe it should be admitted.

7         THE COURT:  The issue is not relevance.

8         MS. BRIMER:  I understand that, your Honor.

9         THE COURT:  In light of the failure to list it and

10  the lack of cause for that, the Court sustains the objection.

11  BY MS. BRIMER:

12  Q   So isn't it true, Mr. Dillon, that by June 11 of 2013,

13  the state was already running out of money in connection with

14  the fees of the consultants?

15  A   What I was referring to here was a forecast of what --

16         THE COURT:  Mr. Dillon, the document has not been

17  admitted into evidence, so don't tell us what's in it.  Just

18  answer the question.

19         THE WITNESS:  All right.  Going forward, sure, the

20  money would not have been adequate.

21  BY MS. BRIMER:

22  Q   Now, you testified to Ms. Levine -- when she asked you

23  why Jones Day was involved with the state in March of 2012,

24  you indicated that you knew that they were always interested

25  in this case, so you knew as early as March of 2012 that

1    Jones Day was interested in a Chapter 9 for the City of

2    Detroit; correct?

3            MR. SHUMAKER:  Objection.  Asked and answered.

4            MS. NELSON:  Same objection, your Honor.

5            THE COURT:  Sustained.

6    BY MS. BRIMER:

7    Q   So then you were involved in the March -- excuse me --

8    the interview process for the preliminary interview in

9    January of 20 -- January 29th, 2013, for the attorneys;

10   correct?

11   A   Correct.

12           MS. NELSON:  Objection.  Asked and answered.

13   BY MS. BRIMER:

14   Q   And that initial interview on January 29th was merely to

15   narrow down the firms that would then be invited to submit a

16   response to the RFP that would later be issued; correct?

17           MS. NELSON:  Objection, your Honor.  This whole line

18   has been asked and answered on Tuesday.

19           MS. BRIMER:  I have two or three questions that have

20   not been asked.  That question was not asked.

21           THE COURT:  I don't think that specific one was, so

22   you may answer that, sir.

23           THE WITNESS:  There's very specific procurement

24   rules, so I hesitate to say "yes," but I did participate in a

25   day of meetings at the airport where several law firms were

1  interviewed.  Now, legally, what follows from that to

2  actually make them eligible to be hired, I won't -- I'm not

3  an expert on the procurement practices of the city or the

4  state.

5  BY MS. BRIMER:

6  Q   Were you aware that Miller Buckfire had provided the

7  interview questions to the Jones Day attorneys prior to the

8  interview?

9  A   I don't think I ever saw the questions myself, so I don't

10  know that, no.

11  Q   Okay.  So after the interview process, who drafted the

12  RFP?  Do you know?

13  A   I do not.

14  Q   Could it have been Miller Buckfire?

15  A   Is it possible that they did?  I mean is that the

16  question?

17  Q   Yes.

18        MS. NELSON:  I'm going to object.  Calls for

19  speculation.  He's already indicated he doesn't know.

20  BY MS. BRIMER:

21  Q   Was it someone on the staff of Treasury that drafted the

22  RFP?

23        MS. NELSON:  Same objection, your Honor.  That's

24  been asked and answered.  He indicated he doesn't know.  This

25  would call for speculation.

1    THE COURT:  Do you know the answer to that question?

2    THE WITNESS:  I don't know who drafted it.

3  BY MS. BRIMER:

4  Q   Do you recall asking Brom Stibitz to put together a

5  stable of bankruptcy attorneys for future Chapter 9's?

6  A   It doesn't sound unlikely.  I knew that we would probably

7  need some in case these things --

8    THE COURT:  The question is do you remember doing

9  that?

10    THE WITNESS:  Generally, yes.

11  BY MS. BRIMER:

12  Q   And did Mr. Stibitz provide you with a list of potential

13  bankruptcy attorneys?

14  A   I think we did an RFP.  We've done two RFP's, I believe,

15  at Treasury to get people on a list that we can tap if we

16  need.

17  Q   And was Jones Day one of the firms that responded to

18  either of those RFP's?

19  A   I don't have a memory, but apparently they did because I

20  think I've seen something during this process where their

21  name is on the state list as well.

22  Q   Okay.  Did you ever disclose to anyone with the City of

23  Detroit that Miller Buckfire had performed a 60-day review

24  for the city -- for the state of the city's finances in early

25  2012?

1   A    I think they were very familiar that they were doing

2   that, yes, because they worked with the city.  They were

3   present in City Hall.

4   Q    Did you advise the city that -- prior to the engagement

5   of Jones Day that Jones Day had been working with the state

6   on the consent agreement?

7   A    I don't believe I did.

8   Q    Did Jones Day have any involvement in the drafting of PA

9   436?

10  A    Not to my knowledge.

11  Q    Do you know whether or not anyone on your staff provided

12  Jones Day with copies of drafts of PA 436?

13  A    I don't recall that.

14  Q    Have you ever heard of the hundred day plan?

15  A    Yes.

16  Q    And what was that?

17  A    It can be a term of art, but generally when you come in,

18  you -- if you're in a turnaround situation, you have a goal

19  to accomplish certain things within a hundred days.

20  Q    And in the event those goals aren't accomplished, a

21  bankruptcy would then be filed?  Is that --

22  A    Not necessarily, no.

23  Q    Did the state institute a 100-day plan in connection with

24  the City of Detroit?

25  A    I believe we had one during the -- for the consent

1   agreement, and then I believe -- under 436 there's certain
2   reports that have to come in with a certain number of days,
3   and I don't think any of those reports line up to a hundred
4   days.  I think there's 45 days and six months, what's in the
5   law.
6   Q   And isn't it true that at least as early as March of 2012
7   Treasury personnel who worked directly for you were
8   discussing a Chapter 9 on behalf of the city with the Jones
9   Day attorneys?
10  A   I don't know what you mean by "discussing."  Chapter 9
11  was always an option, but it was the last resort.  We
12  obviously were fighting to get to a consent agreement with
13  the city and wanted to avoid even emergency, so if we were
14  thinking of Chapter 9, then we would not have gone consent
15  agreement because you couldn't get into 9 that way.
16  Q   But under the then existing law, the consent agreement
17  was the way to proceed; correct?
18  A   No.  Under a consent agreement, you can't enter Chapter
19  9.
20  Q   Okay.
21          MS. BRIMER:  I have nothing else, your Honor.
22          THE COURT:  Thank you.  Any other questions for the
23  witness?
24          MS. PATEK:  Your Honor, Barbara Patek on behalf of
25  the Detroit public safety unions.

1               DIRECT EXAMINATION

2   BY MS. PATEK:

3   Q   Mr. Dillon, I represent the Detroit public safety unions.

4   Good morning.  I have a handful of questions for you.  At or

5   about the time of Mr. Orr's appointment -- well, strike that.

6   Going back to your involvement with the situation in the City

7   of Detroit even from the time you became state treasurer,

8   were you aware that the police and fire fighters for the City

9   of Detroit were not eligible through their employment at the

10  City of Detroit for Social Security?

11  A   It was a -- we were aware that that was very likely the

12  case.  I never saw a report that said who was and who wasn't,

13  but we knew that was a real issue.

14  Q   And was that an important issue to you?

15  A   Yes.

16  Q   And at any time before Mr. Orr's appointment, did you

17  take it upon yourself to confirm whether or not, in fact, the

18  City of Detroit fire fighters and police were eligible for

19  Social Security?

20  A   We asked quite often -- my memory is that there may be

21  some that were eligible at some point, but I couldn't tell

22  you what percentage are eligible versus not.

23  Q   Do you know whether or not police officers and fire

24  fighters hired before March 31st, 1986, are eligible for

25  Medicare?

1       MS. NELSON:  I'm going to object to this line of

2  questioning, your Honor, as irrelevant.  I don't know how

3  this has any relevance to the eligibility issues or Mr.

4  Dillon's testimony.

5       THE COURT:  No.  I see the relevance.  I'll permit

6  it.  Go ahead.

7       THE WITNESS:  I was aware of the issue.  It was

8  important to me, but the specific dates and numbers I

9  didn't -- I wasn't familiar with.

10  BY MS. PATEK:

11  Q   Did you ever determine whether or not for those officers

12  not covered by Social Security they had to, as a matter of

13  federal law, be provided a certain minimum level of

14  retirement benefits by the state?

15  A   I'm not familiar with that.

16  Q   And you're not aware of that sitting here today?

17  A   No.

18  Q   You would agree with me in these Chapter 9 proceedings

19  that one of the things that cannot happen is that the City of

20  Detroit cannot be liquidated?

21  A   I don't know if it's a legal impossibility, but it's not

22  something that we ever envisioned.  I think the City of

23  Detroit will need to carry on and move forward.

24  Q   And among the City of Detroit's obligations in carrying

25  on and moving forward is providing effective police and fire

1    services.  Would you agree with that?

2    A    Very much so.

3    Q    And that would be absolutely essential to any

4    restructuring?

5    A    Yes.

6    Q    Do you believe that -- well, strike that.  I want to -- I

7    want to go back to an issue that came up earlier with Ms.

8    Green.  You were asked some questions about an Act 312

9    arbitration.  Do you know what Act 312 is?

10   A    I do.

11   Q    And that's a procedure or a statute that provides for a

12   mechanism, including mediation and arbitration, by which the

13   public safety unions resolve their employment disputes with

14   the particular municipality; is that right?

15   A    That's right.

16   Q    And isn't it true that at or near the time Mr. Orr was

17   about to be appointed as the emergency manager of the City of

18   Detroit, that there was a pending Act 312 arbitration

19   proceeding involving the Detroit Police Officers Association

20   and the City of Detroit?

21   A    Yes.

22   Q    Was there a concern on the part of Treasury that if --

23   well, strike that.  Do you understand that when an Act 312

24   award is issued following the conclusion of those

25   proceedings, that the results of that award become part of

1  the collective bargaining agreement between the union and the

2  municipality?

3  A   That's my general understanding.

4  Q   And did you have an understanding that if, in fact, an

5  Act 312 award were to issue in connection with the ongoing

6  proceedings between the city and the Detroit Police Officers

7  Association, that that would potentially extend the length of

8  the collective bargaining agreement between the Detroit

9  Police Officers Association and the City of Detroit?

10  A   I assume it could do a lot of things.

11  Q   And would that be one of them, to extend the length of

12  the agreement?

13  A   I'm not an expert on 312.  I can't say that it was not

14  one of the things that could have happened, but I do recall

15  that he had -- I don't recall extending the CBA is an item,

16  but it very may well have been.

17  Q   Were you concerned about the Act 312 award providing

18  certain terms to the Detroit police officers that would be

19  contrary to what the state was thinking would be an

20  appropriate restructuring plan?

21  A   I had concerns about an award that could -- that the city

22  couldn't afford, that it was a possibility.

23  Q   Were you looking for a mechanism to prevent those Act 312

24  proceedings involving the city and the Detroit Police

25  Officers Association from coming to a conclusion?

1    A    Mechanisms to prevent?  I can tell you I was concerned

2    about whipsawing the police and fire and having something

3    come out that wasn't sustainable and may have to be adjusted

4    in an emergency status, so I had concerns, yes.

5    Q    You didn't want them, for example, to get some wage cuts

6    reinstated only to have those reimposed again by an emergency

7    manager?

8    A    It was a concern of mine.

9    Q    Do you believe -- or did you believe as state treasurer

10   that the morale of the Detroit public safety unions,

11   including the Detroit Police Officers Association, was

12   important to their ability to provide the public safety

13   services required by the City of Detroit?

14   A    Yes.  And I also believe that they, unfortunately, are

15   underpaid.  If you look at them compared to comparable

16   cities, they're not overpaid, and it's just unfortunate the

17   city didn't have the resources to pay more.

18   Q    And would you also agree that as a general matter, based

19   upon your knowledge as state treasurer at the time, that they

20   were undermanned; this is, that there were not enough of them

21   out there to really provide effective public safety?

22   A    That's a tougher question because a lot of the

23   information we had is that two-thirds of the police, for

24   example, worked behind desks rather than on the street, so I

25   don't know if it was a lack of personnel or just they could

1   be better utilized.  As it relates to the fire, I don't have

2   that similar information.

3   Q   And with respect to the police, let me reframe the

4   question.  With respect to police officers on the street, was

5   your understanding that there was an inadequate number of

6   those?

7   A   I believe there may have been.

8   Q   Was there -- well, strike that.  Was it part of the

9   restructuring plan, at least as it was envisioned by the

10  state, to have all of the collective bargaining agreements

11  for the public safety unions expire sometime in the summer of

12  2013?

13  A   I don't know if I understand the question.

14  Q   Was there -- was part of the goal of the restructuring to

15  put the -- either the state, through an emergency manager, or

16  the city in a position to impose terms without having to

17  bargain or negotiate with its public safety employees?

18  A   In what time frame?

19  Q   In the time frame leading up to and after the appointment

20  of Mr. Orr as the emergency manager.

21  A   In 2013, I think that was less of a consideration because

22  the emergency manager has that power if he needs to do it.

23  Q   Are you aware whether or not the Act 312 -- an Act 312

24  award ever issued in the arbitration between the City of

25  Detroit and the Detroit Police Officers Association?

1  A    My memory is that one did.

2  Q    And is it your understanding in that regard that that

3  agreement then became part or that award then became part of

4  the collective bargaining agreement between the city and the

5  Detroit Police Officers Association?

6  A    That's my memory.

7  Q    You told me earlier that the issue of whether or not

8  police and fire received Social Security benefits was an

9  important issue to you, and let me step back from that as a

10  moment -- your understanding is if they don't -- if the city

11  doesn't contribute and they don't participate in Social

12  Security, they are also not eligible through their city

13  employment for Social Security Disability benefits; is that

14  right?

15  A    I don't think my understanding related to disability.

16  Q    You didn't have any understanding one way or the other as

17  to whether or not these fire fighters and police officers

18  would be eligible for Social Security Disability whether or

19  not the city participated in the Social Security program?

20  A    Yeah.  I don't recall the aspect of Social Security as it

21  relates to disability being discussed in any of the meetings

22  I attended.

23  Q    Do you think disability is a significant issue for police

24  and fire fighters?

25  A    I understand it may well be.

1    Q    Do you think it would be an important part of the

2    equation in terms of the city's ability to provide the

3    essential services of public safety?

4    A    Yes.

5    Q    And is that why the Social Security issue was, in part,

6    important to you?

7    A    I'm not -- I viewed it more in terms of retirement.  I'm

8    not certain -- and I'm not a benefits experts -- about if

9    you're an active employee and you are injured on the job

10   site, is it your employment insurance or Social Security

11   Disability?  I'm not an expert to have an opinion on that.

12   Q    Would it trouble you to know that police officers

13   currently who do not have from some other source access to

14   Social Security are not entitled to Social Security

15   Disability given what has been proposed by the emergency

16   manager in terms of impairing their pension benefits?

17              MS. NELSON:  Objection.  Relevance.

18              THE COURT:  Sustained.

19   BY MS. PATEK:

20   Q    You told us, based upon your experience as treasurer,

21   that you did not see any scenario where the Michigan

22   legislature would be willing to help the City of Detroit with

23   its pension funding problem; is that correct?

24   A    I was asked the question about would the funds come from

25   the state, and I answered it with, I think, I thought it

```
 1  might be difficult to get the Michigan legislature to
 2  appropriate funds for that.
 3  Q   Would it be fair to say that it's your impression that
 4  the Michigan legislature lacks the political will to provide
 5  such assistance?
 6           MS. NELSON:  Objection.  Relevance and speculation.
 7           MS. PATEK:  Your Honor, I think this is entirely
 8  relevant to the issue of bad faith and eligibility in terms
 9  of the purpose for which these Chapter 9 proceedings are
10  being used.
11           MS. NELSON:  If I may address that, your Honor,
12  she's clearly asking a political question, which is outside
13  the scope of not only the Court's jurisdiction but the
14  eligibility factors that are to be considered for purposes of
15  this case.
16           MS. PATEK:  If I may respond, your Honor, I would
17  think that if these Chapter 9 proceedings were, in fact,
18  being used for a political purpose, which I think is not
19  unfathomable given the record --
20           THE COURT:  My only problem with the question is the
21  phrase "political will."  I'm not sure what that means.  You
22  can ask him why he has this belief, but --
23           MS. PATEK:  I think --
24           THE COURT:  -- I think a more direct question there
25  would be appropriate.
```

1  BY MS. PATEK:

2  Q   I'll take the Court's question, Mr. Dillon.  Why do you

3  have the belief that there would be no set of circumstances

4  that you can envision in which the Michigan legislature would

5  provide support to the City of Detroit for its pension

6  problem?

7  A   I don't know if I described the situation that way, but

8  having served in the legislature for six years and

9  understanding a lot of the mentality of people that don't

10  come from the Detroit area, I think it would be very

11  difficult to get them to subsidize or fund or support Detroit

12  with an appropriation.

13          THE COURT:  Excuse me one second.  Would you just

14  slide back a little bit from the microphone?  Thank you.

15  BY MS. PATEK:

16  Q   You're saying it would be difficult to get the Michigan

17  legislature to support Detroit with an appropriation for any

18  purpose?

19  A   I didn't say that, but I think if it was funding

20  something about a historical liability, I think that would be

21  much more difficult.

22  Q   In terms of revitalizing the city, providing blight

23  relief, is that something that you believe they might fund?

24  A   I think it would have a much better chance.

25  Q   You were asked a couple questions about -- or by Ms.

1   Green and then later Ms. Brimer about the timing of the

2   appointment of Mr. Orr as the emergency manager, and it's

3   true, is it not, that by appointing Mr. Orr on March 25th

4   three days before the effective date of Public Act 436, that

5   that removed from the City of Detroit the right to choose

6   some of the new options available under Public Act 436?

7           MS. NELSON:  Asked and answered, your Honor.

8           MS. PATEK:  This is foundational, and I can go to

9   my --

10          THE COURT:  Please.

11  BY MS. PATEK:

12  Q   One of those options was a negotiated -- or a period of

13  negotiations to attempt to do an out-of-court workout; is

14  that right?

15  A   Can you start from the beginning?

16  Q   Yeah, yeah.  Are you generally familiar with Public Act

17  436 and those four options it gave to a municipality?

18  A   Yes.

19  Q   And among those options were a consent agreement, which

20  the City of Detroit had already done; correct?

21  A   Yes.

22  Q   And the consent agreement itself, did that provide if the

23  City of Detroit didn't make its metrics that an emergency

24  manager would be put into place?

25  A   You can have a default of a consent agreement that then

1    leads to a different option.

2    Q   I'm asking you, though, in this particular case, the

3    April 4th, 2012, consent agreement, that did not have as a

4    default option the appointment of an emergency manager, did

5    it?

6    A   I'd have to review the document.

7    Q   With respect to Public Act 436 --

8            MS. PATEK:  Can you put up -- I think it's 721.

9    This is just actually the act itself, and I want Section 25.

10           MR. SHUMAKER:  Your Honor, 721 is not on the exhibit

11   list.

12           MS. PATEK:  And I'm just going to ask the -- I'm

13   just putting up the text of Public Act 436 --

14           THE COURT:  I'll permit that.

15           MS. PATEK:  -- which is --

16   BY MS. PATEK:

17   Q   Mr. Dillon, you see the text of Section 25 of Public Act

18   436 in front of you there?

19   A   Yes.

20   Q   And one of the options given to a community or a

21   municipality under Public Act 436 was a neutral evaluation

22   process; isn't that right?

23   A   Right.

24   Q   And that neutral evaluation process provided by Public

25   Act 436 is not unlike the mediation process now ongoing in

1 these Chapter 9 proceedings; isn't that right?

2        MS. NELSON:  Objection.  Calls for a legal

3 conclusion and speculation.  He's not participating in that

4 process.

5        MS. PATEK:  Well, I believe the state has been

6 ordered into the process.

7        THE COURT:  You can ask the witness his

8 understanding.

9 BY MS. PATEK:

10 Q   Are you aware that there is in these Chapter 9

11 proceedings confidential mediation proceedings supervised by

12 the Court?

13 A   I'm aware that they're ongoing.

14 Q   And is the neutral evaluation process provided by Public

15 Act 436 similar to the mediation process in these

16 proceedings, to your knowledge and understanding?

17 A   We've never had one in Michigan, so -- and I'm not part

18 of these here, so I can't answer that.

19 Q   We can agree, however, by appointing Mr. Orr three days

20 before the effective day of Public Act 436 this neutral

21 evaluation option was taken away from the City of Detroit?

22 A   I don't recall what triggered the emergency, whether

23 if -- I don't recall the date the governor decided that he

24 was going to declare an emergency in Detroit.

25 Q   So you can't answer -- you don't know the answer to that

1    question?

2    A    I don't know if it's triggered by the date Kevyn Orr

3    started or by the governor's declaration of emergency.   I

4    don't recall the -- what the statute says on that point, but

5    I would guess it's the date the governor declares the

6    emergency is what would answer your question, not the date

7    that the manager is hired.

8    Q    Well, isn't it accurate that one of the things that

9    Public Act 436 did was to make sure that actions that had

10   been taken under former Public Act 4 or former Public Act 72

11   would be sustained and continue on?

12   A    Right.

13   Q    And that included an appointment, for example, of an

14   emergency manager under Public Act 72?

15   A    Right.

16            MS. PATEK:   That's all I have.

17                       DIRECT EXAMINATION

18   BY MR. MONTGOMERY:

19   Q    Good morning, Mr. Dillon.

20   A    Good morning.

21   Q    Claude Montgomery.   Real simple line of inquiry regarding

22   one topic.   You were very much involved in trying to

23   understand the pension questions for the state, were you not,

24   for the City of Detroit?

25   A    I wouldn't say very much involved.

1  Q    You would not say you were very much involved?

2  A    Well, there was -- the consultants on the ground were

3  very focused on it, and a professional firm was hired to do

4  evaluation, so I was aware that those were going on, but I

5  was not in day-to-day work groups working through those

6  numbers.

7  Q    But you were trying to follow the issue as best you could

8  as treasurer, were you not?

9  A    Yes.

10  Q    And from time to time you would inform the governor of

11  your views with respect to pension issues, did you not?

12  A    I did, yeah.

13  Q    And focusing on the time period on or about July 9, 2013,

14  do you remember having formed the conclusion that from your

15  perspective you were still in the informational stage with

16  respect to pensions?

17  A    Yes.

18  Q    And do you recall telling the governor that on or about

19  July 9?

20  A    Yes.

21  Q    And did you do so by e-mail?

22  A    Yes.

23        MR. MONTGOMERY:  Could you put on the screen,

24  please, common Exhibit 438?  If you could expand the "to" and

25  "from" line, please, first.

1 BY MR. MONTGOMERY:

2 Q   Did you, in fact, send this e-mail on or about July 9,

3 2013?

4          MS. NELSON:  Your Honor, this has been asked and

5 answered and was admitted as an exhibit on Tuesday through

6 the treasurer's testimony, and he testified about this e-mail

7 and specifically the "to" and the "from."

8          MR. MONTGOMERY:  Well, that's interesting because my

9 notes still had objected to hearsay, so I was going to move

10 its admission to make sure it was part of the record.

11          THE COURT:  What number is it?

12          MR. MONTGOMERY:  438.

13          MR. SHUMAKER:  The city does object because it's

14 hearsay, your Honor.

15          MR. MONTGOMERY:  There we go.

16          THE COURT:  Kelli, do we show it admitted?  Can you

17 open up the exhibit for me to see the whole thing?  Thank

18 you.  And do you recognize this exhibit, sir?

19          MR. MONTGOMERY:  Yes.

20          THE COURT:  It's admitted.

21     (Exhibit 438 received at 10:35 a.m.)

22          MR. MONTGOMERY:  Thank you.

23 BY MR. MONTGOMERY:

24 Q   And so just to conclude, sir, on or about July 9, you

25 shared with the governor your opinion that you were still in

1  the informational stage with respect to pensions, did you

2  not?

3  A   Yes.

4  Q   Okay.  And --

5        THE COURT:  Sir, I'm advised that you need to be

6  closer to the microphone or have it pointed more at you

7  because the other room is having trouble hearing you.

8        MR. MONTGOMERY:  Is that better, your Honor?

9  Better?

10        THE COURT:  There you go.

11        MR. MONTGOMERY:  Okay.

12        THE COURT:  Try that.

13  BY MR. MONTGOMERY:

14  Q   So, again, I believe my question was on or about July 9,

15  you informed the governor of your opinion that with respect

16  to pensions you were still very much in the informational

17  stage?

18  A   Yes.

19        MR. MONTGOMERY:  All right.  Thank you.  No further

20  questions, your Honor.

21        THE COURT:  Any other questions from counsel on

22  this?  Cross-examination.

23        MS. NELSON:  No questions, your Honor.

24        MR. SHUMAKER:  The city has no questions, your

25  Honor.

1          THE COURT:  All right.  Mr. Dillon, thank you very
2     much for your testimony.  You're excused.
3          THE WITNESS:  Thank you, Judge.
4       (Witness excused at 10:36 a.m.)
5          THE COURT:  And let's take our morning break now and
6     reconvene in 15 minutes at 10:50, please.
7          THE CLERK:  All rise.  Court is in recess.
8       (Recess at 10:36 a.m. until 10:50 a.m.)
9          THE CLERK:  All rise.  Court is in session.  Please
10    be seated.
11         MR. WERTHEIMER:  William Wertheimer, your Honor, on
12    behalf of the Flowers plaintiffs and the UAW for this
13    witness, and we will call Richard Baird.  I would indicate
14    that -- or request that the Court give permission to allow
15    the examination pursuant to Rule 611(c).
16         THE COURT:  Thank you.  Any objections to that?
17         MR. SHUMAKER:  No objection, your Honor.
18         THE COURT:  You may.
19         MR. ELLSWORTH:  Your Honor, I'm Peter Ellsworth on
20    behalf of the state.
21         THE COURT:  Welcome, sir.  Step forward, please,
22    sir.  Just step over here, and then I will administer the
23    oath to you.
24              RICHARD BAIRD, WITNESS, SWORN
25         THE COURT:  Please sit down.

1      DIRECT EXAMINATION

2   BY MR. WERTHEIMER:

3   Q    Would you state your name for the record, please?

4   A    Richard L. Baird.

5   Q    Mr. Baird, you are appearing here pursuant to subpoena;

6   is that correct?

7   A    Yes.

8   Q    And are you currently a state employee?

9   A    Yes.

10  Q    When did you become a state employee?

11  A    October 16th.

12  Q    Of this year?

13  A    Yes.

14  Q    You were involved with working indirectly for the

15  governor from the time he took office, were you not?

16  A    Yes.

17  Q    I'd like to ask you just a couple of questions about what

18  your relationship was at that -- at the time from your

19  beginning with the governor up until you became a state

20  employee a couple of weeks ago.  Okay?

21  A    Sure.

22  Q    Are you familiar with an organization called MI Partners,

23  LLC?

24  A    Yes.

25  Q    And what is it?

1    A    It is a limited liability corporation incorporated in the

2    State of Michigan, and it does organization development and

3    consulting.

4    Q    And are you an employee -- or were you an employee during

5    that time period -- that is, from 2011 up until a couple of

6    weeks ago -- of MI Partners, LLC?

7    A    I was the founder and the only employee.

8    Q    And you're the owner of it?

9    A    Yes.

10   Q    No other owners?

11   A    No.

12   Q    And what business does it -- is it in or was it in during

13   the time period we're talking?

14   A    Predominantly organizational consulting, team

15   development, talent selection.

16   Q    And how --

17        THE COURT:  One second, please.  Can you either pull

18   the microphone a few inches closer to you or sit closer to

19   it?

20        THE WITNESS:  Is this better?

21        THE COURT:  Yes, but not too close.  Thank you, sir.

22   BY MR. WERTHEIMER:

23   Q    During the period from the beginning of 2011 up until a

24   couple of weeks ago, how many clients did this entity have?

25   A    One client.

1  Q    And who was that client?

2  A    It was the New Energy to Reinvent and Diversify Fund.

3  Q    And tell us what that fund was.

4  A    That fund was a 501(c)(4) that was formed to further good

5  government at nontaxpayer expense.

6  Q    And has it sometimes in the public gone by an acronym

7  NERD?

8  A    Yes.

9  Q    Would you generally describe for the Court what role you

10 played vis-a-vis the state and particularly the governor from

11 the time the governor came in in January of 2011?

12 A    I was involved in helping source and select members of

13 the governor's team and also critical positions for other

14 departments or for state oversight operations such as failing

15 school districts or municipalities.

16 Q    Did you play any particular role relative to the issues

17 that were in place from when the governor first came in

18 relative to the financial problems of the City of Detroit?

19 A    I'm sorry.  Did I play a role relative to --

20 Q    The work the Governor's Office was doing on that problem.

21 A    Yes.

22 Q    And what role did you play?

23 A    My role was predominantly focused on assessing talent for

24 potential positions that may come as a result of a failing

25 school district or municipality.

1    Q    Did you play a particular role relative to the ultimate

2    hiring of an emergency manager for the City of Detroit?

3    A    I played a role in the identification, sourcing, and

4    recommendation to the governor, who then made recommendations

5    to the Emergency Loan Board, which made the selection of the

6    emergency manager.

7    Q    Okay.  Would it be fair to say that you worked intimately

8    with the governor on this issue?

9    A    I worked intimately with the governor on the planning for

10   contingency, but my degree of interaction with him didn't

11   become what I would call intimate until I had live candidates

12   for his consideration.

13   Q    All right.  And were you the person who made the at least

14   tentative decision to move forward relative to Kevyn Orr

15   becoming emergency manager?

16   A    I was the person that made a recommendation to both the

17   governor and the treasurer that Kevyn Orr had the

18   qualifications and capabilities that led me to believe he

19   should be a candidate for consideration should a

20   recommendation to the ELB be made.

21   Q    And were you -- did you attend the pitch meeting in late

22   January of this year?

23   A    Yes.

24   Q    And was it the day after that meeting that you made an

25   initial outreach to the Jones Day law firm to talk to someone

1  there about the possibility of Kevyn Orr being considered for
2  that position?
3  A   Yes.
4  Q   And who is the person that you made that outreach to at
5  Jones Day?
6  A   I called Steve Brogan, a managing partner.
7  Q   By the way, at this point, did you have any knowledge
8  that Jones Day had been working for the state on the problems
9  it was having with the city, in fact, was helping it in the
10  negotiations over a consent agreement in March of 2012; that
11  is, about nine or ten months before the initial consideration
12  of Mr. Orr?
13  A   I don't believe so.
14  Q   And in your conversation with Mr. Brogan -- this initial
15  conversation would have been on January 30th?
16  A   Yes.  That's correct.
17  Q   The pitch meeting having been on the 29th?
18  A   You call it a pitch meeting.
19  Q   I'm sorry.  Go ahead.
20  A   I did not view the 29th meeting as a pitch meeting.  It
21  was bringing in several highly competent restructuring
22  oriented legal advisors to help the city in the preparation
23  for its RFP.
24  Q   When you talked to Mr. Brogan on the 30th, did you make
25  it a point to tell him at that point in this initial contact

```
 1   that Jones Day would be neither hurt nor helped if you went
 2   further relative to recruiting Mr. Orr for the emergency
 3   manager position?
 4   A   I'll tell you what I recall that I said in that
 5   conversation.
 6   Q   Can you answer my question?
 7   A   Those exact words, no.
 8   Q   Go ahead.  Tell me what you recall.
 9   A   I said -- I asked for the managing partner's permission
10   to speak with Kevyn Orr.  I said if it was -- whether it was
11   granted or not and further discussions took place, that
12   should not help or hurt Jones Day in any potential bid for
13   work with the city or the state.
14   Q   And you were speaking as a representative of the state to
15   the Jones Day managing partner at that time, were you not?
16   A   No.  I was never a representative of the state.
17   Q   Who did you hold yourself out as in your discussions with
18   Mr. Brogan?
19   A   An independent consultant to the governor and his team
20   involved in talent sourcing.
21   Q   But you were working for the governor.  He would have
22   understood that.
23   A   Well, I was working with the governor.
24   Q   You weren't working for the City of Detroit, were you?
25   A   No.
```

1  Q   If you were working for anybody, it would have been the

2  governor?

3  A   I was working for the NERD Fund.

4  Q   Okay.  Which is the -- which is a fund that -- set up

5  either directly or indirectly by the government -- or the

6  governor.  You understood that, did you not?

7  A   No, I don't understand that.

8  Q   Okay.  Had you talked to anyone -- had you talked to

9  anyone with the state to get the approval for the

10 representation you made to Mr. Brogan; that is, that Jones

11 Day would neither be hurt nor helped if you went forward

12 relative to Orr?

13 A   No, and I've testified in my deposition that upon

14 recollection of that, I did not have the right to make that

15 assertion.

16 Q   You never withdrew that assertion from Mr. Brogan or

17 anyone else at Jones Day, did you not?

18 A   Not that I recall.

19 Q   And you always acted consistent with it, did you not?

20 A   I believe I did.

21 Q   In fact, you pushed for Jones Day to be hired by the

22 city, did you not?

23 A   Define "push," sir.

24 Q   You spoke in their favor, talked to people, suggested

25 that Jones Day would be a good choice, something like that?

1   A    I said any of those five firms that presented that day
2   would be a good choice.
3   Q    Did you tell Kevyn Orr on January 31st that you were --
4   at the time you were soliciting him, that you were also going
5   to be pulling for Jones Day?
6   A    I believe I did.
7   Q    And you told him that because, in fact, you were going to
8   be pulling for Jones Day; correct?
9   A    I hoped that they would be successful, yes, sir.
10  Q    What did you mean by the term "pulling" when you used it
11  in your conversations with Mr. Orr?
12  A    That I hoped they would be successful.
13  Q    It's like a wish?
14  A    It's a hope.
15  Q    "Pulling" implies a little bit more than a hope, does it
16  not?
17  A    Not in my view, sir.
18  Q    You're the governor's right-hand man at the time, are you
19  not?
20  A    There's nothing in my job description or my contractual
21  agreement that puts that label on me, sir.
22  Q    Is there anybody you know of who was closer to the
23  governor in terms of this operation relative to who's going
24  to be hired as emergency manager and who's going to do the
25  legal work than you?

1  A   My job was to source talent.

2  Q   Anybody that you knew from your involvement in the

3  process had any more in a role of it than you?

4  A   I don't have a perspective to tell you.  My job was to

5  source talent.  There were a lot of people involved in the

6  City of Detroit issues.

7  Q   But you were the one that was involved to source talent;

8  correct?

9  A   Correct.

10  Q   And part of sourcing talent was your determination that

11  Orr would be good talent for the emergency manager's job;

12  correct?

13  A   My job was to assess his experience and qualifications

14  for that job, yes.

15  Q   Okay.  And part of your role in assessing talent would be

16  to assess that the Jones Day law firm would also be a good

17  choice for the City of Detroit, would it not?

18  A   No, sir.  That was not my role.

19  Q   I thought you said your role was in talent

20  identification.

21  A   Well, there's a difference between talent identification

22  for an emergency manager possibility and recommending a law

23  firm to a city that has to make its own decision.

24  Q   What did Kevyn Orr say to you when you told him on

25  January 31st that you'd be pulling for Jones Day?

1  A   I don't recall what he said at that time.

2  Q   Do you recall a conversation a couple weeks later with

3  Kevyn Orr where you talked both about his retention and the

4  retention of Jones Day?

5  A   I'm sorry.  Ask the question again.

6  Q   Do you recall having a conversation with Kevyn Orr around

7  the middle of February of this year in which you talked to

8  Mr. Orr both about the possibility of his being retained and

9  in that same conversation him bringing up the possibility of

10  Jones Day being retained?

11  A   I don't recall explicitly, but I would have said probably

12  the same thing to Kevyn Orr that I said to Steve Brogan,

13  which is in my -- which I've already testified I probably had

14  no right to say, but my issue was I wanted permission to talk

15  to Kevyn Orr about the prospects for this opportunity, and I

16  did not want it to have a positive or a negative impact on

17  anything occurring between Kevyn Orr's firm and the City of

18  Detroit.

19  Q   Mr. Baird, isn't pulling for Jones Day a little bit

20  stronger than not having it hurt Jones Day?  Don't you

21  recognize a difference between those two phrases?

22  A   No, sir, I don't.  I know it's --

23  Q   You've answered my question.  Thank you.

24         MR. WERTHEIMER:  Would you put 807 up, please?

25  BY MR. WERTHEIMER:

1    Q    I'm going to ask you, Mr. Baird, if this refreshes your

2    memory as to the specifics between you and Mr. Orr around

3    February 13th.  This is an e-mail he's sending to you

4    February 13th, and I'm directing your attention down to he's

5    saying to you, "In the interim" -- you with me --

6    A    Yes.

7    Q    -- "when you have time, I'd like to speak with you about

8    the timing and process for both the retention of the EM" --

9    i.e., him -- "and legal counsel" -- i.e., Jones Day.  Do you

10   recall Mr. Orr e-mailing you asking you if you could have --

11   he could have that conversation with you?

12   A    Well, I recall this e-mail, but I didn't specifically

13   recall this part about the request and process for timing of

14   the EM and legal counsel.

15   Q    Do you recall it now?

16   A    Well, I see it's here, so -- and I read the rest of the

17   e-mail, so I now agree that it's part of the same e-mail.

18   Q    Okay.  And you agree that Kevyn Orr wants to communicate

19   that information to you; correct?

20   A    Well, I mean I agree that he says, "In the interim, when

21   you have time, I'd like to speak with you about the timing

22   and process for both the retention of the EM and legal

23   counsel."  That's what this memo says.

24   Q    And didn't you understand when you received it that what

25   Orr was doing was continuing the pitch, this time both for

1    himself and for Jones Day, to make sure that both things
2    would be accomplished?
3    A    No, sir.
4    Q    No?  Do you recall talking to Mr. Orr after receiving
5    this e-mail about this per his request?
6    A    I spoke with Mr. Orr several times over this period of
7    time, and I don't recall talking about this request.
8         MR. WERTHEIMER:  That's all I have, Mr. Baird.
9    Thank you.
10                    DIRECT EXAMINATION
11   BY MS. LEVINE:
12   Q    Good morning, Mr. Baird.
13   A    Good morning.
14   Q    Sharon Levine, Lowenstein Sandler, for AFSCME.  Just a
15   couple of questions if you would.  You testified that when
16   you were with your consulting firm before you were retained
17   by the state, your client was the NERD Fund; correct?
18   A    Correct.
19   Q    And in that capacity, the NERD Fund paid you, but you
20   provided services benefitting the state; correct?
21   A    Yes.
22   Q    Do you know if the NERD Fund paid for any other
23   consultants that provided services benefitting the state or
24   the City of Detroit?
25   A    I don't know.

1  Q    Do you know if there are any other funds or affiliations
2  that paid for the services of consultants that provided
3  services to the city in connection with Detroit?
4  A    No.
5  Q    No, there aren't any, or, no, you don't know?
6  A    I don't know.
7  Q    I apologize.  It was my -- it was my question that was
8  off.  Okay.  So when did you start providing services to the
9  governor, again?
10 A    In January of 2011.
11 Q    And at the point in time that you started providing those
12 services, was it your understanding that the governor's view
13 was that Detroit was already financially distressed?
14 A    It was my understanding that the governor was concerned
15 about Detroit's financial condition, yes.
16 Q    In addition to the assistance you provided the governor
17 in connection with the selection of Jones Day and the
18 emergency manager, did you have any involvement in the
19 selection or retention of Ernst & Young, Miller Buckfire, or
20 Conway MacKenzie?
21 A    Not in the selection or retention, no.
22 Q    During the course of the time that you provided services
23 for the governor, did you interact with Ernst & Young?
24 A    Yes.
25 Q    Did you interact with them in 2002?

```
 1   A    I'm sorry.  Two thousand --
 2   Q    Two.  I'm sorry.  2012.  Sorry.  I'm tired.
 3   A    I would have to check that.
 4        THE COURT:  Ms. Levine, could you pull the
 5   microphone a little closer to you, please?
 6        MS. LEVINE:  Yes, your Honor.  I'm sorry.
 7        THE COURT:  Thank you.
 8   BY MS. LEVINE:
 9   Q    Were you involved at all with the -- providing services
10   to the governor -- actually, let me start a different way.
11   Are you aware that in late 2011, early 2012, there were
12   negotiations with a coalition of unions and the City of
13   Detroit with regard to some concessionary bargaining?
14   A    I believe I was, yes.
15   Q    And that Ernst & Young was involved in those or attended
16   those negotiations as a consultant for the city?
17   A    I don't know that or at least I don't recall that.
18   Q    How did you become aware of those negotiations?
19   A    I believe through the newspapers.
20   Q    Did you have any involvement or discussions about those
21   negotiations other than through learning about them through
22   the press?
23   A    Not that I recall, no.
24   Q    Did you have any discussions with the governor about
25   those negotiations?
```

1   A    No.

2   Q    Did you have any discussions with Mr. Dillon about those

3   negotiations?

4   A    Not that I recall.

5        MS. LEVINE:  I have no further questions.  Thank

6   you.

7                     DIRECT EXAMINATION

8   BY MS. GREEN:

9   Q    Good morning, Mr. Baird.  Jennifer Green on behalf of the

10  General Retirement System and the Police and Fire Retirement

11  Systems for the City of Detroit.

12  A    Good morning.

13  Q    Who is Dennis Muchmore?

14  A    He's the governor's chief of staff.

15  Q    And do you interface with him on a regular basis?

16  A    Yes.

17  Q    Do you recall discussing the issue of the governor's

18  authorization letter for the Chapter 9 filing in or about

19  July of 2013 with Mr. Muchmore?

20  A    Not the authorization letter, no.

21  Q    How about the request letter from Kevyn Orr?

22  A    No.

23  Q    Do you remember a meeting in or around July 12th relating

24  to the governor's authorization of the Chapter 9 filing?

25  A    I'm sorry.  A meeting -- say that again.

1  Q  Do you recall a meeting in or around July -- on or around

2  July 12th relating to the governor's authorization for the

3  Chapter 9 filing?

4  A  There were several meetings, and they were subject to

5  attorney-client privilege.  And I was in some of them and not

6  in others, but I don't recall the specific one that you're

7  asking about.

8  Q  When you say the "attorney-client privilege," which

9  attorney do you recall being at the meeting?

10  A  Well, it wasn't always the same one, but it would be

11  usually Mike Gadola or someone in Mike Gadola's shop.

12        MS. GREEN:  Your Honor, I believe that the privilege

13  has been waived with respect to that meeting.  There's a

14  document that was admitted into evidence.  It's UAW Exhibit

15  625, and I believe that all privilege assertions have been

16  waived with respect to that meeting.  We discussed this

17  meeting yesterday.

18        THE COURT:  Well, I suggest you ask your questions,

19  and we'll see what objections, if any, we get on this ground,

20  and we'll deal with it on a question-by-question basis.

21        MS. GREEN:  I will certainly do so.  I was trying to

22  head off an objection that I felt was coming, so --

23  BY MS. GREEN:

24  Q  You do recall a meeting with Mike Gadola the week of July

25  12th?

1  A    Counselor, we have a lot of meetings, and so I'd have to

2  go back and check that specific one and look for triggers to

3  help my recollection.

4  Q    Sounds like an invitation for me.

5           MS. GREEN:  Can we pull up Exhibit 625, please?

6  BY MS. GREEN:

7  Q    The top part of that e-mail discusses a Monday meeting

8  the week of July 12th, which actually it would have placed

9  the meeting earlier in the week.  Does that refresh your

10 recollection as to whether you had a meeting with certain

11 state officials relating to the governor's authorization?

12 A    Well, I don't recall a specific meeting, but it says here

13 that Mr. Gadola spoke to me, Rich, this morning, and so I

14 would have no reason to think that's not accurate.

15 Q    Do you recall discussing and taking the position that the

16 governor should take a more deliberative approach to his

17 authorization of the Chapter 9 filing?

18          MR. ELLSWORTH:  Your Honor, I object.  The privilege

19 has been waived with respect to the document but not the

20 discussions.

21          THE COURT:  The objection is overruled.  Please

22 answer the question.

23          THE WITNESS:  Would you repeat the question?

24 BY MS. GREEN:

25 Q    Can I repeat the question?  I don't remember the exact

1    wording, but my question was do you recall discussing the

2    issue of the governor's authorization and whether or not a

3    more deliberative approach should be taken with respect to

4    that authorization?

5    A    I don't recall "more deliberative" ever being part of a

6    conversation between Mike and I.  I do recall perhaps what

7    he's referring to.

8    Q    Okay.  Can you explain what that would be?

9    A    We had had conversations about whether it might be

10   advisable to have contingencies around this process, and I

11   had provided the opinion that I thought a contingency would

12   be appropriate, and that contingency would be in the form of

13   a control that the governor would have to approve certain

14   areas of concern.

15   Q    And what were these certain areas of concern?

16   A    I don't recall specifically, but it would have covered

17   any of the entire spectrum of liabilities or claims by

18   creditors.

19   Q    Was one of those areas of concern the pension benefits?

20   A    Well, certainly the pension liabilities were a

21   significant component.

22   Q    So you agreed with other state officials that a more

23   deliberative approach should be taken due to this contingency

24   issue?

25   A    I'm not sure I would have termed it as "a more

1   deliberative approach."  What my particular opinion was --

2   and I come from a long time with a large public accounting

3   firm -- that I thought it would be advisable to have an

4   internal control or a check and balance relative to the

5   governor's approval of certain things that might go into a

6   plan of adjustment.

7   Q   And others shared your view; correct?

8   A   I didn't have conversations with anyone other than Mike

9   Gadola on this.

10  Q   Did you have a discussion with Treasurer -- you did not

11  have a discussion with Treasurer Dillon then?

12  A   I don't believe so.

13  Q   Do you recall a discussion with Lieutenant Governor Brian

14  Calley on this issue?

15  A   I don't recall talking to either of those individuals.

16  From this memorandum, it would appear that Mike Gadola did,

17  though.

18  Q   Do you know ultimately why such a contingency was not

19  included with the authorization of the Chapter 9 filing?

20  A   I would have to speculate.  I mean I know that the

21  governor did not agree, but I'd have to speculate as to what

22  the reason might be.

23  Q   Outside of Lieutenant Governor Calley, Attorney General

24  Mike Gadola, Treasurer Dillon, and yourself, were there

25  others that also shared the belief that a contingency was

1    appropriate?

2    A    I don't know that.

3    Q    Do you know if there were people within the city that

4    believed that a contingency was appropriate?

5    A    I don't know that.

6    Q    Do you recall communicating with Dennis Muchmore via e-

7    mail the week of July 12th relating to this issue separate

8    and apart from this e-mail?

9    A    No, I don't.  I don't believe I did, but I don't recall

10   if I did.

11          MS. GREEN:  Your Honor, I have a new e-mail that was

12   produced by the state after the pretrial order was already

13   entered, so it is not on the pretrial list, but I believe

14   because it was produced on the 25th of October it is

15   appropriate to be able to use the document, and I have copies

16   for counsel.

17          THE COURT:  Okay.  One second.  Do you have a number

18   for it?

19          MS. GREEN:  It's 872.

20          THE COURT:  872.

21          MS. GREEN:  May I approach?

22          THE COURT:  Are you going to ask the witness to

23   identify it?  Is that your plan?  Okay.  And I guess we'll

24   need copies, too, at some point.  Thank you, sir.

25   BY MS. GREEN:

1  Q   Do you recognize the document that I just handed to you,

2  sir?

3  A   I'd like to read it, please.

4  Q   Absolutely.

5  A   Yes.  I recall this.

6  Q   Okay.  And do you agree that the vast majority of the e-

7  mail is the same as Exhibit 625 that I just showed you with

8  the exception of a slight modification to the top of the

9  document, which is a new portion of an e-mail?

10 A   I'm not sure I follow your question, but I believe that

11 it was -- that I was not copied on any of this e-mail until

12 Dennis Muchmore sent me what you've just provided me.

13 Q   My question was just that the -- 75 percent of this e-

14 mail is the exact same e-mail chain that we just discussed.

15 That was Exhibit 625.  Do you recognize that they are the

16 same document largely?

17 A   I'm still confused.

18 Q   We can move on.  I was just asking if you recall that we

19 just discussed the same e-mail, which is a slightly

20 different --

21 A   May I add to my testimony because this has jogged my

22 recollection?

23 Q   Okay.

24 A   I did not recall a specific meeting with lieutenant

25 governor and Treasurer Dillon, and the reason I didn't recall

1  it is because we had dinner together as part of a -- of

2  something another staff person who lectures at University of

3  Michigan had arranged for some of his students, and so we did

4  have a few moments before that dinner began, and I remember

5  we did talk about contingencies.

6  Q    Okay.

7  A    So I'd like to amend my testimony.  I recall that.

8  Q    Is there anything else that you recall relating to that

9  conversation regarding contingencies specifically?

10  A    No.

11  Q    Okay.  The top of the e-mail to you, you wrote "left a

12  voicemail for you," and that is a voicemail to Dennis

13  Muchmore, correct, the chief of staff?

14  A    Correct.

15  Q    He wrote back to you --

16         MS. GREEN:  And if we could pull up Exhibit 872.

17  It's a July 12th, 2013, e-mail.

18  BY MS. GREEN:

19  Q    "Thanks.  This La Costa" --

20         THE COURT:  You have not offered this yet.

21         MS. GREEN:  Oh, I'm sorry.  I actually wanted to

22  make sure that he recognized the top part before I offered

23  it.  I was going to ask him --

24         THE COURT:  Well, you can just ask that question.

25         MS. GREEN:  Okay.

1           THE COURT:  Sure.

2   BY MS. GREEN:

3   Q   Mr. Baird, do you recognize the top half of the e-mail?

4   That's the new portion.

5   A   I now know what he's referring to, but I don't recognize

6   the e-mail.  I'm not even sure I read it.

7   Q   So you know what he's referring to, but you don't know if

8   you read the e-mail?

9   A   Well, what I'm saying is he refers to this "La Costa is

10  not all it's cracked up to be," and I recall --

11          THE COURT:  Don't tell us what's in it until we

12  admit it into evidence.

13          THE WITNESS:  I'm sorry, your Honor.

14          THE COURT:  The only question before you now is do

15  you recognize the top portion of the e-mail?  Have you seen

16  it before?

17          THE WITNESS:  I don't recall having seen this e-mail

18  before.

19          THE COURT:  All right.

20  BY MS. GREEN:

21  Q   Do you deny that you would have received the e-mail?  You

22  just don't specifically remember it?

23          MR. SHUMAKER:  Objection.  Asked and answered.

24          MS. GREEN:  Well, I think the -- I thought it was a

25  different question.  I mean --

1    THE COURT:  It is a different question, but it's not

2 a particularly relevant question.

3    MS. GREEN:  Okay.

4 BY MS. GREEN:

5 Q   What was the reference to -- that you remembered?

6    THE COURT:  I'm sorry.  What?  Could you rephrase

7 that?

8    MS. GREEN:  He said that he had -- it referred him

9 to something, and he remembered.  I'm asking --

10    THE WITNESS:  The Judge just admonished me.  I don't

11 care to be admonished again.

12    MS. GREEN:  Your Honor, I guess I'm asking can I

13 refresh his recollection with it?  Is that okay?  Can I

14 refresh his recollection as to what his reference was?  I

15 believe even if it's not admitted I can refresh his

16 recollection as to what he was -- what this meant.

17    THE COURT:  It sounds like you're asking him what's

18 in the document, and I can't permit that.  If you have a

19 different question, we can try it.

20    MS. GREEN:  Okay.

21 BY MS. GREEN:

22 Q   Do you recall having conversations with Dennis Muchmore

23 the week of July 12th regarding the process related to

24 Chapter 9?

25 A   No.

1  Q   Do you recall communicating with Dennis Muchmore via e-

2  mail relating to the process of Chapter 9?

3  A   I do not recall, no, while he was away.

4  Q   If there is a -- was there a shared understanding that

5  the process was becoming long?

6  A   I don't know that.

7  Q   Would there have been some sort of shared sentiment that

8  the process was becoming worn or lengthy?

9  A   I don't know that.  I mean --

10      MS. GREEN:  Your Honor, if I might try it this way,

11 I believe that this document is a party admission.  We've

12 been admitting e-mails from state officials throughout the

13 proceeding as an admission of a party, and this is another e-

14 mail nearly identical to Exhibit 625 that was admitted as a

15 party admission.

16      THE COURT:  Any objection?

17      MR. ELLSWORTH:  Well, I object.  He says that he

18 doesn't recognize the document.  He can't identify it, so it

19 shouldn't be admitted.

20      THE COURT:  It can only be a party admission if it's

21 authenticated, and the witness can't authenticate it.

22      MS. GREEN:  I believe there's a difference between

23 not specifically remember reading an e-mail and being able to

24 authenticate it.  Yes, this is to me.  I recognize the date.

25 I recognize the people on it.  I recognize this is an e-mail

1  that I would have received but for perhaps I don't

2  specifically recall reading e-mails from several months ago.

3  I think the authentication bar is much lower than being able

4  to substantively testify to it.

5          THE COURT:  As low as it is, still the witness has

6  to be able to testify that he has seen it before, and he does

7  not remember seeing it before.  Am I right about that, sir?

8          THE WITNESS:  That's correct.

9          THE COURT:  All right.  So the objection is

10  sustained.

11          MS. GREEN:  My last attempt is it was produced via

12  subpoena by the State of Michigan specifically by a request

13  from the parties on October 25th.  I believe the

14  authentication bar is very low in the fact that they produced

15  it and that --

16          THE COURT:  Did the state produce this e-mail, sir?

17          MR. ELLSWORTH:  Yes.

18          THE COURT:  Doesn't that establish its

19  authentication?

20          MR. ELLSWORTH:  Well, I don't think that establishes

21  the authentication.  You can't admit a --

22          THE COURT:  Why wouldn't it?  The state wouldn't --

23          MR. ELLSWORTH:  Because this witness --

24          THE COURT:  The state wouldn't produce an

25  inauthentic e-mail, would it?

1              MR. ELLSWORTH:  No, your Honor, but this witness
2   doesn't recognize the document and doesn't recall receiving
3   it.
4              THE COURT:  Right, but you just admitted the
5   document is authentic.
6              MR. ELLSWORTH:  The state produced the document,
7   yes, your Honor.
8              THE COURT:  All right.  And what is the document
9   offered for?  And we're talking about the top part of it,
10  right --
11             MS. GREEN:  Yes.  He had a --
12             THE COURT:  -- because the rest of it was already
13  admitted?
14             MS. GREEN:  It sparked his recollection about he
15  knew what this reference was to, and he -- when I showed him
16  the e-mail he remembered, and he said he had testimony he
17  knew what this meant, so the question is what is this
18  reference to and what does it mean to you and --
19             THE COURT:  All right.  The Court will reverse its
20  prior ruling and admit the document into evidence.  What
21  number was it again?
22             MS. GREEN:  Exhibit 872.
23             THE COURT:  All right.
24     (Exhibit 872 received at 11:30 a.m.)
25  BY MS. GREEN:

1    Q   Mr. Baird, you've read the e-mail now.  At the top of the

2    e-mail you stated earlier that this sparked your recollection

3    of either a conversation or an incident or something of that

4    nature.  Can you explain that, please?

5    A   I recollect that members of the governor's team had

6    discussed contingencies as a recommendation to the governor

7    and that the chief of staff said it's time to take this to

8    the governor and get a decision.

9    Q   What did you understand to be meant by the "kind of worn"

10   phrase?

11   A   He's talking about the resort where that particular

12   conference was being held.

13   Q   Oh, okay.

14   A   That's what sparked my recollection.

15   Q   Recollection of -- okay.

16        MS. GREEN:  Your Honor, I don't have any further

17   questions.  However, Exhibit 836 was also produced by the

18   state.  I don't know if that would mean that the -- your

19   ruling that it's authentic because it was produced by the

20   state would also apply equally to that.  It was an Andy

21   Dillon e-mail produced by the State of Michigan.

22        MR. SHUMAKER:  Your Honor, that was a hearsay

23   objection.  It was not an authentication objection.

24        THE COURT:  Let's just pause for just a second.  Can

25   you produce that for me again?

 1          MS. GREEN:  836?

 2          THE COURT:  Please.

 3          MS. GREEN:  Yes.

 4          THE COURT:  I remember seeing it, but I need to see

 5   it again.  Okay.  Ms. Green, we have it here, so we're all

 6   set.  Thank you, Kelli.  So stand by one second, please.

 7   Counsel, did the state produce Exhibit 836 in discovery?

 8          MR. ELLSWORTH:  Yes, your Honor.

 9          THE COURT:  All right.  Then the Court will reverse

10   its earlier denial of the admission of this document and

11   admit it into evidence.

12      (Exhibit 836 received at 11:33 a.m.)

13          MS. GREEN:  Thank you, your Honor.  I have nothing

14   further for Mr. Baird.

15          MR. RUEGGER:  Good morning, your Honor.

16                    DIRECT EXAMINATION

17   BY MR. RUEGGER:

18   Q    Good morning, Mr. Baird.

19   A    Good morning.

20   Q    You probably don't remember me.  I appeared at your

21   deposition but didn't ask you any questions.  My name is

22   Arthur Ruegger from the Dentons firm.  We represent the

23   Retirees' Committee.  I have a couple of issues I'd like to

24   talk to you about this morning.  Shouldn't be too long,

25   though.  The first is the date when Mr. Orr accepted your

1   invitation or the state's invitation to become emergency

2   manager.  Do you remember the specific date he said yes?

3   A    No.

4   Q    You'll recall Mr. Wertheimer showed you an exhibit.  It

5   was 807.  I think it was an e-mail dated February 13th, and

6   that, if I read it correctly, seems to indicate he had not

7   yet made his mind up.  Is that consistent with your

8   recollection?

9   A    Yes.

10  Q    I'm going to ask to show you a document that may refresh

11  your recollection about the timing of his acceptance.  I have

12  a document marked for identification RC Exhibit 460.

13          MR. RUEGGER:  With your Honor's permission, I'll

14  present it to the witness.

15          THE COURT:  Yes, sir.

16          MR. RUEGGER:  It's not on the list, gentlemen.  It's

17  just marked for identification.  I haven't offered it yet.

18          THE WITNESS:  All right.  I've completed my review.

19  BY MR. RUEGGER:

20  Q    Does that refresh your recollection, sir, about the date

21  that Mr. Orr accepted the position as emergency manager?

22  A    No, sir.

23  Q    Do you recognize that document?

24  A    I believe I have seen this document, yes.

25  Q    Can you tell us what it is?

1   A   It is a --

2           MR. SHUMAKER:  Your Honor, we would object before

3   the witness gets into the exhibit that this exhibit was not

4   on the pretrial exhibit list.

5           MR. RUEGGER:  It was only recently produced, and I

6   only found it within the last day or so, so I don't believe

7   it was produced before the date of the pretrial order.

8           MR. SHUMAKER:  This is a document produced in the

9   Davis litigation.

10          MR. RUEGGER:  I don't have any basis to question

11  your --

12          THE COURT:  Counsel, I have to ask you to address

13  your comments to the Court, not to each other.

14          MR. RUEGGER:  Sorry, your Honor.

15          THE COURT:  So the question is when was this

16  document produced or how?

17          MR. SHUMAKER:  Your Honor, again, this was not on

18  the pretrial exhibit list, and the indications are that it

19  was a document produced in the Robert Davis litigation, which

20  predated the deadline of the pretrial order.

21          THE COURT:  And just so we're clear, what number

22  exhibit are we talking about?

23          MR. RUEGGER:  It's Exhibit Number 460, your Honor.

24          THE COURT:  Okay.

25          MR. RUEGGER:  We've only marked it today.  It's not

1   on the pretrial list.  Mr. Shumaker is correct about that.

2   And I believe there's an objection to my question as to

3   whether the witness can identify the document.

4           MR. SHUMAKER:  You were asking him questions about

5   the document's contents.  That's why I objected.

6           MR. RUEGGER:  Well, I believe my question was

7   whether he could identify the document.

8           THE COURT:  No.  He said he could recall it.  Then

9   you asked him --

10          MR. SHUMAKER:  What is it?

11          THE COURT:  -- what is it?

12          MR. SHUMAKER:  Another objection --

13          THE COURT:  I'll allow it to be identified for the

14  record, but if you offer it in evidence, we're going to have

15  to deal with this issue of it not being on the list.  Can you

16  just tell us generally what the document is without telling

17  us the contents?

18          THE WITNESS:  The document is a -- is the forwarding

19  of a prospective timetable of communications and

20  announcements predicated upon Kevyn final decision, which at

21  the time of this document had not been made.

22  BY MR. RUEGGER:

23  Q   So is it your testimony, sir, that as of the date of this

24  document, Mr. Orr had not made any final decision?

25  A   Yes.

1   Q   But I believe your testimony was that you were forwarding

2   to him a proposed timetable on the contingency that he would

3   make a final decision?

4   A   I can't answer your question without the judge's

5   permission because there's a key part of this that I believe

6   you're ignoring.

7   Q   Apart from the document, sir, did you forward to Mr. Orr

8   a proposed timetable related to his potential acceptance of

9   the emergency manager position and the events that would

10  follow from that acceptance?

11  A   Pursuant to his decision, yes.

12  Q   And which decision was that?

13  A   The decision of whether he would accept this nomination

14  if recommended.

15  Q   And you forwarded that timetable before he gave you his

16  decision?

17  A   Yes.

18  Q   Do you recall how far in advance of his decision you

19  forwarded that timetable?

20  A   I don't remember his exact date.

21  Q   So even before his decision, the state had a proposed

22  timetable for events that were to follow from receipt of his

23  decision?

24  A   It was a -- it was a tentative plan, yes.

25  Q   Okay.  And can you tell us what dates or events were part

1  of that timetable?

2  A    Well, that would be giving the content of the memorandum.

3  Q    Without -- sorry, your Honor.  Without basing your

4  testimony on the document in front of you, from your

5  recollection, can you recall those events?

6  A    No, I cannot.

7         MR. RUEGGER:  Okay.  I would offer Exhibit 460 in

8  evidence.

9         MR. SHUMAKER:  Same objection, your Honor, and

10  hearsay.

11         THE COURT:  Well, what do you have to suggest that

12  you only recently got this document, for example, after the

13  final pretrial?

14         MR. RUEGGER:  Your Honor, the Retirees' Committee

15  was not part of the Davis litigation.  We did not serve a

16  subpoena on Jones Day in any litigation.  We've learned about

17  some of these productions in the course of the depositions

18  leading up to this trial, but we were behind the eight ball,

19  if you will, in terms of learning about this.  We tried to

20  follow up when we could.  It was a hectic schedule.  We only

21  got these documents in the last 48 hours, to the best of my

22  knowledge.

23         MR. SHUMAKER:  Your Honor, the Retiree Committee has

24  multiple documents that are based -- are documents produced

25  in the Davis litigation, specifically Exhibits 400, 401, 402,

1  403, so clearly Retirees' Committee had time in advance of

2  the joint pretrial order to submit this document.

3          THE COURT:  May I see a copy, please?

4          MR. SHUMAKER:  May I approach?

5          MR. RUEGGER:  Your Honor --

6          THE COURT:  The Court concludes -- I'm sorry.

7          MR. RUEGGER:  I'm sorry, your Honor.  In response to

8  Mr. Shumaker's objection that we had documents from the Davis

9  litigation, we attended the Orr deposition.  Someone

10 marked -- was it -- I don't know if it was ours -- some

11 documents from certain of these litigations, but, to the best

12 of my knowledge, we were behind the eight ball trying to get

13 these documents.  I don't have a personal knowledge as to

14 exactly when we did get these.

15         THE COURT:  The Court concludes that the record does

16 establish cause for the late addition of this document to the

17 exhibit list.  The other objection is overruled.  Exhibit 460

18 is admitted.

19     (Exhibit 460 received at 11:43 a.m.)

20         MR. RUEGGER:  Thank you, your Honor.  May I proceed?

21         THE COURT:  Yes.  Did we give you your document

22 back?

23         MR. RUEGGER:  Do you want an extra copy?  You're

24 okay.

25         THE COURT:  Oh, yes.  I need a copy.  So that's our

1  copy that we have?  Okay.

2  BY MR. RUEGGER:

3  Q   Mr. Baird, can you tell us now what Exhibit 460 is?

4  A   Exhibit 460 is my forwarding a tentative communications

5  timetable that was given to me by the governor's press

6  secretary to Kevyn Orr on February 21st, 2013.

7  Q   And that timetable contemplates a date where the governor

8  would announce his recommendation of Mr. Orr as emergency

9  financial manager; correct?

10        THE WITNESS:  May I read from the document, your

11  Honor?

12        THE COURT:  Yes.

13        THE WITNESS:  "A Thursday, March 14th, date for

14  governor to confirm the emergency post-hearing as required

15  legally and recommend ELB candidate and for the ELB to

16  confirm and make the emergency financial manager

17  appointment."

18  BY MR. RUEGGER:

19  Q   And if you turn to the last page of that document, the

20  timetable also contemplated that Mr. Orr would start in his

21  official capacity as of March 25th; correct?

22  A   That was the working timetable, yes, sir.

23  Q   And would this timetable have slipped at all if Mr. Orr

24  had not accepted the position on or about the date you sent

25  this timetable?

1   A    For Mr. Orr, yes.

2   Q    So there were other candidates that the governor might

3   have recommended to comply with this timetable?

4   A    I'm sorry.  Say that again.

5   Q    If I understood your testimony correctly, you said that

6   if Mr. Orr had not accepted promptly on or about the date you

7   sent the timetable, the timetable would have slipped for

8   Mr. Orr.

9   A    Mr. Orr had not made his decision at the time of this,

10  and it was predicated on something needing to happen that had

11  not yet happened, and so this was all very tentative.

12  Q    You state in the first paragraph on the first page that,

13  "We would like you here physically for announcement,

14  stakeholder meetings, and media on March 15 and as much of

15  the following week as you could manage before the start date

16  of March 25th."

17           THE COURT:  What is your question?

18  BY MR. RUEGGER:

19  Q    My question is did Mr. Orr say he could be physically

20  available on those dates?

21  A    I don't recall him saying because it was contingent upon

22  something else happening.

23  Q    Do you recall approximately -- or specifically when after

24  you sent this e-mail Mr. Orr accepted the position?

25  A    Well, Mr. Orr never accepted the position.  He only

1    accepted the nomination of the governor to the Emergency Loan

2    Board, so there was no acceptance of position until that

3    action had occurred.

4    Q   I stand corrected.  When did Mr. Orr indicate to you he

5    accepted whatever positions or contingencies you were

6    offering?

7    A   I don't remember the exact date, but I know it was after

8    this memo.

9    Q   Thank you, sir.  I'd like to switch time and subject

10   slightly to July of this year.  Do you recall whether you had

11   any role in the structuring of the city's advisors' fees in

12   the upcoming Chapter 9 proceeding?

13   A   I'm sorry.  Say that again, please.

14   Q   In July of this year, as everyone in this courtroom

15   knows, there was a petition for Chapter 9 relief on behalf of

16   the city.  Leading up to that petition, did you have any role

17   in the structuring of the fees for the city's various

18   advisors in that Chapter 9 proceeding?

19   A   Not structuring of the fees, no, sir.

20   Q   What role, if any, did you have?

21   A   I was requested by the emergency manager to go back to

22   members of the restructuring team and discuss putting a finer

23   point on their fees, which the original estimates were higher

24   than what the emergency manager believed were affordable.

25   Q   Do you recall compiling proposed fees for each of the

1  advisors to the city in that connection?

2  A   Compiling fees?

3  Q   Did you determine any approximate fees for those advisors

4  going forward?

5  A   I had conversations with the principals of those entities

6  about reducing the estimates that they had previously

7  provided.

8  Q   So if I understand you correctly, the advisors had given

9  estimates for their fees in the Chapter 9 proceeding, and you

10 were tasked with engaging with them about whether those fees

11 could be reduced?

12 A   Yes.

13 Q   Do you recall communications with Mr. Saxton and Mr.

14 Dillon at Treasury on this subject?

15 A   Yes, I do.

16 Q   What did you tell them?

17 A   When?

18 Q   On or about July 16th, 2013.

19 A   I don't recall the exact -- can you tell me is that

20 before or after I had the conversations with the

21 restructuring team principals?

22 Q   Well, I'm not allowed to tell you that, sir, but if I

23 can --

24 A   Then I don't recall.

25          MR. RUEGGER:  Can I approach the witness with an

1 exhibit that I believe will help refresh his recollection?

2         THE COURT:  You may.

3         THE WITNESS:  Yes.  This is consistent with my prior

4 testimony and does help me recollect.

5         THE COURT:  Excuse me, sir.  The only question was

6 does that document refresh your recollection on this point.

7         THE WITNESS:  Yes, it does.

8 BY MR. RUEGGER:

9 Q   Thank you.  Do you recall on or about that date giving

10 Mr. Saxton and Mr. Dillon estimated fees for the advisors to

11 the city in Chapter 9?

12 A   Well, estimated reductions, which netted to estimated

13 fees, yes, sir.

14 Q   Okay.  Can you tell us without discussing the content

15 what the document that's been marked as 458 is?

16 A   Well, yes.  It's hard to -- the content is all numbers,

17 so -- but effectively it is -- as I said before, it is a

18 communication to Tom Saxton from -- to Tom Saxton and Andy

19 Dillon from me that deals with conversations that I had had

20 with Ernst & Young, Miller Buckfire, Jones Day, and Conway

21 MacKenzie dealing with a reduction in fee estimates.

22         MR. RUEGGER:  Your Honor, we offer 458 in evidence.

23         MR. SHUMAKER:  Objection, your Honor.  It's another

24 brand new one.  Also, it's hearsay.

25         MR. RUEGGER:  Your Honor, it was produced by the

1  State of Michigan.  Again, as with the earlier document, we

2  were behind the eight ball in terms of receipt of these

3  documents.  We did not subpoena them ourselves.  The other

4  parties did, but I only received this document in the last 24

5  hours.

6       THE COURT:  All right.  For the same reason, the

7  Court will overrule the objection and admit it into evidence.

8       (Exhibit 458 received at 11:52 a.m.)

9       MR. RUEGGER:  Thank you, your Honor.

10 BY MR. RUEGGER:

11 Q   So, Mr. Baird --

12      THE COURT:  Before we proceed, however, I will ask

13 you over the lunch break, which we will take here shortly, to

14 advise counsel for the city and the state if there are any

15 other exhibits that you intend to offer into evidence on the

16 same grounds.  All right?  Will you do that?

17      MR. RUEGGER:  I can certainly do it.  I can state

18 now that are no such documents related to this witness, your

19 Honor, but I will ask my colleagues related to any other

20 witnesses.

21      THE COURT:  And we need a copy of Exhibit 458.  Can

22 you provide that for us, please?  Thank you, sir.

23 BY MR. RUEGGER:

24 Q   Mr. Baird, in the e-mail that's at the middle of the page

25 going to the bottom, which is, I believe, addressed from you

1  to Messrs. Saxton and Dillon, are those, as you testified

2  earlier, your determination of the fee reductions you believe

3  are achievable in the Chapter 9 case?

4  A   I would testify that these are an accurate summary of my

5  conversations with each of those parties.

6  Q   And you believe that the total fees from the four

7  advisory firms were approximately $75.2 million; is that

8  correct?

9  A   Well, that's the mathematical exercise, yes.  That's what

10  the memo says.

11  Q   So what's the -- can you explain the difference between

12  the breakout of the four sets of fees that's in the beginning

13  of that e-mail and then the four sets of fees that's at the

14  bottom of that e-mail?

15        THE COURT:  Excuse me, sir.  I'm going to interrupt

16  your answer to that question.  What's the relevance of all of

17  this?

18        MR. RUEGGER:  Your Honor, there's several pieces of

19  relevance, one of which is whether the advisors had an

20  incentive to rush to Chapter 9 vis-a-vis the cap that might

21  have been on their fees before the Chapter 9, and that's one.

22  Another is the reasonableness of the $5 million advisory cap

23  that is stated in the appropriations part of PA 436.  I'm not

24  going to spend a lot of time on this, Judge.

25        THE COURT:  Yeah.  I don't think any of those --

1   either of those is reasonably arguable, so I'm going to ask

2   you to move on.

3             MR. RUEGGER:  Very well.  I have no further

4   questions of this witness.  Thank you.  Thank you, Mr. Baird.

5                    DIRECT EXAMINATION

6   BY MS. BRIMER:

7   Q   Good morning, Mr. Baird.  My name is Lynn Brimer.  I

8   represent the Retired Detroit Police Members Association.  I

9   only have a handful of questions for you.  You indicated you

10  participated in the January 29 interview process for the law

11  firms.  Were you aware that Miller Buckfire had shared the

12  interview questions with the Jones Day team?

13  A   No.

14  Q   Would you have considered it appropriate to have shared

15  the interview questions with the teams in advance of the

16  meeting?

17  A   Well, you've characterized this as an interview.  It was

18  not an interview.

19  Q   So if it wasn't an interview, what was the meeting -- the

20  January 29 meeting intended to be?

21  A   It was bringing together credentialed firms to address

22  various considerations to assist the city in creating a

23  request for proposal which would have had to go out

24  subsequent to that time.

25  Q   You're aware that Jones Day put together what they

1  considered to be a pitch book for that meeting; correct?

2  A   I'm aware that all of those firms invited would have

3  hoped to have been candidates for any future successful RFP.

4  Q   Were you aware that Miller Buckfire had presented or

5  brought in Jones Day in the -- to Treasury in the process of

6  drafting the consent agreement?

7  A   I don't believe so I was.

8  Q   Okay.  Were you aware that Miller Buckfire -- I mean that

9  Jones Day had provided advice in connection with revising

10  Public Act 4 to members of Treasury?

11  A   No.

12  Q   Do you know who drafted the RFP that was ultimately

13  issued in connection with the retention of counsel?

14  A   I don't know who specifically drafted it.

15  Q   Do you know whether or not Miller Buckfire participated

16  in the drafting of the RFP?

17  A   I do not.

18  Q   Now, you indicated you were not aware of when Mr. Orr

19  actually accepted his nomination by the governor.  Do you

20  know when it was that the governor had finally -- or had

21  determined that Mr. Orr would be the candidate he nominated?

22  A   I was asked about the exact date, and I did not recall

23  the exact date.  And I would say that I don't recall the

24  exact date where the governor was involved in saying this is

25  my person either.

1      MS. BRIMER:  Could we see Exhibit 807?

2  BY MS. BRIMER:

3  Q    And I believe, Mr. Baird, this exhibit has already been

4  admitted into evidence.  You'll see midway down there's an e-

5  mail from you to Mr. Orr.  Do you see that?

6  A    Yes.

7  Q    That's dated February 12th; correct?

8  A    February 12th, yes.

9  Q    All right.  And if you look at the second page or

10  perhaps -- yeah.  We'll look at the second page.  There's a

11  sentence in that very top paragraph, "Anyway, I need you to

12  clue me in" -- "to clue me in you are" -- if -- I believe

13  you're missing the word "if" -- "if you are feeling

14  differently because the boss" -- does the boss refer to the

15  governor --

16  A    In this context, I think it did.

17  Q    -- all right -- "and his team are already arranging for

18  the church and pastor, and I need to talk them off the ledge

19  if you tell me we are misreading the relationship."  So was

20  it by at least -- was it by February 12th that the governor

21  had determined -- can you interpret from this that the

22  governor had determined that Mr. Orr would be the candidate

23  he nominated?

24  A    I think the governor had determined by this point that

25  subject to further due diligence and research that he would

1   be very comfortable with this individual as his nomination.

2   Q   Were you aware that after February 12 Mr. Orr continued

3   to share the e-mails that you and the governor had shared

4   with him with members of his team at Jones Day?

5   A   Not at the time.

6   Q   Have you since learned that?

7   A   I believe I've seen some e-mails since then, yes.

8   Q   Was Mr. Orr the only candidate that the governor

9   nominated in connection with this -- the EM position?

10   A   Nominated to the ELB?

11   Q   Yes.

12   A   Yes.

13         MS. BRIMER:  I have nothing further, your Honor.

14         THE COURT:  Thank you.  We'll stop for lunch now and

15   reconvene at 1:30, please.

16         THE CLERK:  All rise.  Court is in recess.

17     (Recess at 12:01 p.m. until 1:30 p.m.)

18         THE CLERK:  All rise.  Court is in session.  Please

19   be seated.  Recalling Case Number 13-53846, City of Detroit,

20   Michigan.

21         THE COURT:  It appears everyone is here.  You may

22   proceed.

23         MS. PATEK:  Good afternoon, your Honor.  Barbara

24   Patek on behalf of the Detroit public safety unions.

25                DIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Good afternoon, Mr. Baird.

3  A   Good afternoon.

4  Q   Just a couple questions for you.  You indicated in your

5  testimony this morning that you had advised the governor to

6  perhaps have some internal controls about what could go into

7  the plan.  Can you tell me what those internal controls that

8  you advised were?

9  A   There was really only one that was on my mind.

10  Q   And what was that?

11  A   That the governor reserved the right to approve decisions

12  taken of a particular magnitude before they were executed.

13  Q   When you say "decisions of a particular magnitude," can

14  you explain what you mean by that?

15  A   Proposed plan of adjustment kind of conditions of a

16  material nature.

17  Q   Are you talking about diminishment or impairment of

18  certain obligations of the city?

19  A   It could have been diminishment or impairment, but

20  specifically I didn't have monetary notion in mind.  I had an

21  internal control of a secondary approval in mind.  I can't

22  speak for the others relative to their notion of

23  contingencies.

24  Q   So I take it those internal controls or contingencies

25  were not directly related to the pension issues in the case?

1  A    Not in my mind, no.

2  Q    Last series of questions.  You indicated also that at

3  some point -- I think it was in June of 2003 (sic) -- the

4  emergency manager had raised some concerns about the fees of

5  the various professionals, and he consulted with you in that

6  regard.

7  A    I don't recall if it was -- if it was the emergency

8  manager and the treasurer or just the emergency manager, but

9  I do recall the conversation with the emergency manager was

10 that he had not had an opportunity to talk with the members

11 of the restructuring team, the external lenders, the

12 professional firms, about their fee estimates, and that was

13 something that really needed to be done prior to any

14 potential filing.

15 Q    And you said you put together some figures for him?

16 A    I did.  I put together some -- I put together an approach

17 that suggested here are two different approaches that we

18 might take in conversations with those individuals.

19 Q    And who -- and for whom were you working at the time you

20 put those figures together?

21 A    Well, I was doing this at the request of Emergency

22 Manager Kevyn Orr.

23 Q    And did you see yourself as working at that point on

24 behalf of the state or on behalf of the city?

25 A    I actually saw that I continued to work on behalf of my

1  own company, but I'd been asked to take on a task, and I

2  agreed to do that.

3  Q   Okay.  And did you see any conflict in that regard?

4  A   No.

5       MS. PATEK:  That's all I have.  Thank you.

6       THE COURT:  Anybody next?  Questions from the state

7  or the city?

8       MR. ELLSWORTH:  No, your Honor.

9       MR. SHUMAKER:  The city has no questions, your

10 Honor.

11      THE COURT:  Mr. Baird, you are excused.  Thank you

12 very much for your testimony today.

13      THE WITNESS:  Thank you, your Honor.

14   (Witness excused at 1:33 p.m.)

15      MR. KING:  Good afternoon, your Honor.  Ron King

16 with Clark Hill on behalf of the Retirement Systems.  The

17 next witness we're going to call is Brad Robins.

18      THE COURT:  Step forward, please, sir, and before

19 you sit down, please raise your right hand.

20          BRADLEY ROBINS, WITNESS, SWORN

21      THE COURT:  Please sit down.

22              DIRECT EXAMINATION

23 BY MR. KING:

24 Q   Good afternoon, Mr. Robins.

25 A   Good afternoon.

1  Q   For the record, will you please state your name and

2  business address, please?

3  A   Yes.  My name is Bradley A. Robins.  I'm a managing

4  director at Greenhill & Company, 300 Park Avenue, New York,

5  New York.

6  Q   And, Mr. Robins, could you briefly describe for the Court

7  your educational background?

8  A   Sure.  I have a BA in economics from Middlebury College

9  in Middlebury, Vermont.  I have a law degree from the

10 University of Pennsylvania.

11 Q   And where did you graduate from Middlebury College?

12 A   1986.

13 Q   And when did you attend law school?

14 A   University of Pennsylvania.

15 Q   And when did you graduate from law school?

16 A   1990.

17 Q   And for the benefit of the Court, we'd like to just go

18 through your professional background and experience.  After

19 you graduated from law school, were you employed?

20 A   Yes.  My first job was as a law clerk to Judge Walter

21 Stapleton on the Court of Appeals for the Third Circuit, U.S.

22 Court of Appeals for the Third Circuit, and after --

23 Q   And how long were you clerking?

24 A   That was a one-year job.  After that I was an attorney at

25 Wachtell, Lipton, Rosen & Katz in New York in the creditors'

1   rights department.

2   Q   How long were you employed at Wachtell?

3   A   I was employed there about six or so years, little more

4   than six years.

5   Q   And what types of work did you do as an attorney at

6   Wachtell?

7   A   As an attorney at Wachtell, I did restructurings,

8   bankruptcies, and financings along with leveraged buyouts.

9   Q   When did you leave Wachtell?

10  A   I left Wachtell in late 1998 or sometime in 1998,

11  thereabouts.

12  Q   And did you take another position at that point?

13  A   I did.  I went to the investment banking firm of

14  Houlihan, Lokey, Howard & Zukin, and I joined the financial

15  restructuring group there.

16  Q   And what type of work did you do at Houlihan Lokey?

17  A   There again it was on the banking side rather than legal,

18  but I did restructurings, distressed M&A transactions,

19  assignments like that.

20  Q   Can you give us some examples of the types of assignments

21  that you performed?

22  A   We advised United Artists, the movie theater chain, when

23  they went through bankruptcy, worked with some oil and gas

24  companies doing out-of-court restructurings as well as

25  bankruptcies.

1    Q   And what type of work were you specifically doing?

2    A   Well, I was a vice president -- a senior vice president,

3    so I was kind of leading the execution team and overseeing

4    the associates and analysts on the assignments.

5    Q   When you say "execution team," for my benefit, what does

6    that mean exactly?

7    A   It means doing the day-to-day work on the assignments.

8    Q   And how long were you at Houlihan Lokey?

9    A   About two years, a little over two years.

10   Q   And after you left Houlihan Lokey, where were you

11   employed?

12   A   At Greenhill & Company.

13   Q   And that is your present employer?

14   A   Yes, it is.

15   Q   And what year did you start with Greenhill?

16   A   I began in late 2000 or the beginning of 2001.

17   Q   And generally what types of work were you performing at

18   Greenhill?

19   A   Very similar to Houlihan Lokey, so advising companies,

20   investors, stakeholders in companies that were distressed, in

21   and outside of court restructurings or companies looking to

22   invest in distressed companies.

23   Q   And can you give us a little more specific understanding

24   of the types of work or the types of engagements that you're

25   undertaking?

1    A    Sure.  A lot of the clients are companies, so advising

2    companies who are recognizing or thinking about needing to

3    restructure.  Those have included Loral, for example, AT&T

4    Canada, Refco, which was a commodities broker.  We also

5    worked with creditors.  And another significant client over

6    the years has been the Pension Benefit Guaranty Corporation,

7    which is the sort of quasi governmental entity that

8    guarantees -- insures private company pensions, and for them

9    I advise them in connection with a number of big

10   bankruptcies, American Airlines most recently, also --

11   Q    Let me --

12   A    Sorry.

13   Q    Well, let me stop you there.

14   A    Yep.

15   Q    About how many engagements do you believe you've

16   undertaken for the PBGC?

17   A    The PBGC, maybe six, six or so.

18   Q    And for my benefit, can you explain exactly what the PBGC

19   does?

20   A    Sure.  I mean their role is to insure corporate pensions.

21   In bankruptcy cases, if a company terminates the pension

22   plan, the PBGC has to take on that -- take on the plan, so

23   the role for the PBGC in a bankruptcy is to really --

24   particularly in cases where companies are thinking about

25   terminating the plans, work to due diligence, negotiate

1  pushbacks so they keep the plans if possible and, if they
2  don't, figure out whether they can at least keep some, and
3  then negotiate the treatment they would receive in the
4  bankruptcy case if a plan is terminated.
5  Q   Can you give us a specific example of where you were
6  performing those types of services?
7  A   Yeah.  I mean the most recent is American Airlines, and
8  American Airlines filed for bankruptcy a couple years ago,
9  you know.  And when they did, they announced pretty quickly
10 they intended to terminate all the pension plans, so that was
11 a pretty good example of working with PBGC both as a member
12 of the creditors' committee but also to really diligence and
13 negotiate over that, the treatment of the pensions in the
14 plans.
15 Q   Well, let me stop you there.  Describe what you mean by
16 "diligence and negotiate" with respect to the pension
17 benefits.
18 A   Okay.  Well, you know, the question when American
19 Airlines -- American said they couldn't afford the pensions
20 anymore.  They weren't affordable.  One of the things that
21 happens early on in a restructuring discussion usually is a
22 company puts out a proposed business plan, so a big part of
23 the early work is reviewing that business plan, diligencing
24 that business plan, spending time with the leaders at the
25 airline who run the different parts of the business that

1    generate those revenues, understand it, really ask questions

2    and probe.  Usually what ends up happening is changes are

3    made to a company's business plan during that process, so,

4    you know, that was the initial stage at American Airlines.

5    Also negotiating and talking to other creditors about what

6    the effect would be if the company did successfully terminate

7    the plans and together make the case that they couldn't

8    successfully do it if they tried and they --

9    Q    I'm sorry.  They could not successfully do it if they

10   tried?

11   A    Yes.

12   Q    And why was that?

13   A    Because we were working to make the case and show that

14   they did have sufficient cash flows to afford the pension

15   plans in that case.

16   Q    And what was the ultimate outcome in the American

17   Airlines matter?

18   A    Ultimately, the plan that was confirmed keeps all the

19   pensions.  It hasn't consummated yet because they're awaiting

20   the anti-trust trial with U.S. Airways, but the plan that's

21   been confirmed has all the pension plans still in place.

22   Q    And what was your specific role in that engagement?

23   A    I led the Greenhill team that advised PBGC.  We, you

24   know, engaged in the negotiations on behalf of the business

25   folks at PBGC and deeply involved in the financial diligence

1   of American's business plan.

2   Q   Is it possible for you to quantify the number of

3   restructurings that you'd been involved in in let's say the

4   last five years?

5   A   Not specifically, but it would be dozens I would say.

6   Q   It would be enough so that if I asked you if you could

7   define what your understanding of a proposal is that you

8   could do it; is that right?

9   A   Yes.

10  Q   And how would you define a proposal in the context of the

11  restructuring work that you performed?

12  A   Well, a proposal would be a company or a debtor coming

13  forward with some pretty specific changes it wanted to make

14  to either debt or other obligations and laying out both the

15  specific changes it wants and the reasons for that.

16  Q   Along those same lines, in your experience, how would you

17  define negotiations in the context of the restructuring work

18  you performed?

19          MR. CULLEN:  Objection, your Honor.  Is there a

20  point to having a lay witness define a common term?

21          MR. KING:  This is his understanding of these terms,

22  your Honor, in the context of his experience and his work in

23  this industry.

24          THE COURT:  I agree.  I'll permit it.

25          THE WITNESS:  Can you repeat the question?

1  BY MR. KING:

2  Q   Sure.  In your experience in the context of the

3  restructuring work you've done, what's your definition or how

4  would you define negotiations?

5  A   Typically it would involve the initial proposal from the

6  party in a restructuring who wants to make changes to the

7  debt or other obligations it has, and then the creditors and

8  other stakeholders reviewing that proposal, coming back with

9  alternatives saying yes, no, or providing some other

10 alternative, and then there's a back and forth.  It's based

11 on a combination of, you know, information that's available

12 and business leverage and negotiations.

13 Q   In your professional experience, have you developed

14 proposals -- excuse me -- developed proposals addressing the

15 affordability of pension benefits?

16 A   Yes.

17 Q   And so that would be similar to the work that you did for

18 American, for example?

19 A   Yes.

20 Q   And in that same context, have you personally been

21 involved in negotiations regarding the treatment of pension

22 benefits?

23 A   In a Chapter 11, yes.

24 Q   So that's a good point.  Have you ever had an engagement

25 involving a Chapter 9 proceeding?

1   A   I have not.

2   Q   Your experience is limited to Chapter 11?

3   A   Yes.

4   Q   Now, by virtue of the fact that you're sitting here

5   today, at some point you have been engaged in some capacity

6   to participate in the bankruptcy proceeding or the Detroit

7   restructuring matter?

8   A   Correct.

9   Q   Can you explain for the Court how you became involved in

10  this matter?

11  A   Yes.  I was contacted this spring by an attorney, Bob

12  Gordon, one of your partners, to ask if we'd be interested in

13  pitching for the role of financial advisor to the Retirement

14  Systems in contemplation of a potential restructuring of

15  Detroit.

16  Q   And when you were initially contacted, what was your

17  understanding of the scope of that engagement?

18  A   Well, my understanding -- it was certainly from the press

19  clear there were issues financially in Detroit.  I was also

20  aware that they hadn't made some of the recent pension

21  payments that they were obligated to make, so, you know, it

22  was unclear exactly what the scope would be, but we expected

23  it would involve a fair amount of diligence on the city's

24  financial situation, and we expected there'd be negotiations

25  with the city over the treatment at least of the payments

1  that hadn't been made and maybe other items and also maybe

2  just advising the pensions' interest in the context of an

3  overall restructuring, including potentially a Chapter 9.

4  Q   But initially it was really to assist in what -- if I

5  understand it correctly, was it to assist in what the

6  Retirement Systems believed would be a restructuring

7  negotiation on a going forward basis?

8  A   Yes.

9  Q   And you're aware that at least conceptually a Chapter 9

10  had been discussed either in the media or elsewhere?

11  A   Yes.

12  Q   Was it your understanding that you -- that Greenhill was

13  retained specifically to advise the Retirement Systems with

14  respect to a Chapter 9 filing?

15  A   No.

16  Q   And what is your understanding of the scope of the

17  testimony that you've been asked to provide today?

18  A   My understanding is that I'm being asked to testify about

19  whether there were negotiations that took place between the

20  city and the Retirement Systems in advance of the Chapter 9

21  filing.

22  Q   And in your judgment, had any negotiation -- did any

23  negotiations take place between the city and the Retirement

24  Systems prior to the Chapter 9 filing?

25  A   No.

1  Q   You're familiar with the June 14, 2013, proposal for
2  creditors?
3  A   Yes.
4  Q   And you're aware that there was a meeting that was
5  conducted at the Detroit airport with respect to that
6  proposal?
7  A   Yes.
8  Q   And did you attend that meeting?
9  A   I did not.
10 Q   Have you subsequently come to an understanding of what
11 occurred at that meeting?
12 A   Yes.
13 Q   And what's your understanding?
14 A   My understanding is that Kevyn Orr and others took the
15 people who were there through a 120-page deck, and I'm not
16 sure exactly in what detail, but really starting to make the
17 case that the city was in serious financial issues and would
18 want to engage in restructuring discussions with the
19 creditors who were there.
20 Q   And the deck you're referring to is the document that's
21 titled "Proposal for Creditors"?
22 A   Correct.
23 Q   And have you personally reviewed that document?
24 A   I have.
25 Q   And have members of your team reviewed that document?

1  A   Yes.

2  Q   Is it possible to characterize how many hours you or your

3  team may have spent analyzing the materials that were

4  presented in that deck, as you described it?

5  A   I mean the deck itself I'm sure we've each spent at least

6  a few hours on it and then more diligence to the items behind

7  it.

8          MR. KING:  Can we look at Exhibit 43, page 109,

9  please?

10 BY MR. KING:

11 Q   And if I can turn your attention to the paragraph almost

12 at the bottom referring to claims for unfunded pension

13 liabilities.

14 A   Yes.

15 Q   See where I'm referring?

16 A   Yes.

17 Q   And you're familiar with that paragraph; correct?

18 A   I am.

19 Q   And would you consider this to be a proposal with respect

20 to the unfunded pension liabilities?

21 A   It may be a proposal for the unfunded liabilities, but I

22 didn't consider it a proposal in terms of how to treat the

23 pension plans overall.

24 Q   There's a note in there that discusses underfunding of

25 approximately $3.5 billion.

1  A    Yes.

2  Q    Do you know what -- do you know what that is referring

3  to?

4  A    Yes.   That's referring to the city's estimate of the

5  underfunded actuarial accrued liability for -- combined for

6  the two pension funds.

7  Q    And do you know how that number was derived?

8  A    I believe it was derived by Milliman running the math

9  based on assumptions that representatives of the city gave

10  it.

11  Q    And do you have an understanding of how the pension

12  liability is proposed to be treated as set forth in this

13  proposal or in this document?

14  A    Yes.

15  Q    And what's that understanding?

16  A    The understanding is that in this document it proposes

17  that underfunding would be treated ratably with the other

18  unsecured creditors, although, again, I think that's what it

19  says.  It's not entirely clear.  The other groups on that

20  page you see there's a bullet treatment, and it says what the

21  treatment is.  It doesn't say that here.  But I think this is

22  probably what it's trying to do.  And it would propose that

23  those groups share ratably in this note that is laid out in

24  the proposal here.

25  Q    Let me refer you back to the reference to the treatment

1 under the other bullet points.  Your testimony is that there

2 isn't, you know, a, quote, unquote, bullet point for

3 treatment under the unfunded pension liabilities; correct?

4 A   Correct.

5 Q   And I'm sorry.  What did you -- you thought there might

6 be some significance with respect to that omission?

7 A   No.  I just note that although this may be a proposal for

8 how to treat the underfunding, you know, it's not a hundred

9 percent clear, and I'm just noting that, for example, it

10 identifies treatment for all the other classes.  It doesn't

11 do so for the unfunded pension liabilities.

12 Q   And your testimony was that the unfunded pension

13 liability would be treated ratably.  Can you explain what

14 that means?

15 A   Yeah.  What it looks like, each line lists -- each

16 category on this page 109 lists out an aggregate estimated

17 claim amount for these different groups, and I believe this

18 proposal suggests that those claims would each get their pro

19 rata share of the new $2 billion note that is proposed in

20 this deck.

21 Q   And what's your understanding of the $2 billion note?

22 A   You know, I guess it's sort of the city's opening shot.

23 I mean I viewed it more as just a shot across the bow that

24 they're looking to negotiate, which is why there's a hundred

25 pages of information leading up to this.  The note itself I

1  thought was not really a serious proposal but may be a

2  placeholder.

3  Q   Why didn't you think it was serious?

4  A   You know, essentially, although it says it's a $2 billion

5  note, there's no maturity.  It's really promising to pay $30

6  million a year for 20 years, but they're calling it a $2

7  billion note, and I just -- I didn't view that as a serious

8  proposal.

9  Q   When you say there's no maturity, there's no obligation

10 for the city to pay?

11 A   Correct.

12 Q   And is there any income stream or security that would

13 guarantee payment of the note?

14 A   No.  It does provide for annual interest at one and a

15 half percent, and it has provisions for the note to collect

16 on extra revenue that gets collected from asset sales or fund

17 for blight removal, but there's no obligation for the city to

18 pursue any of that or, you know, any incentive for the city

19 to pursue any of that to pay the note.

20 Q   Did you take that as a serious proposal for the

21 creditors?

22 A   No.  I took it as the city sending -- putting the

23 creditors on notice that it wanted to begin the process of

24 having a discussion about a restructuring.

25 Q   And did you attend a June 20th, 2014 (sic), meeting with

1  the city and its financial advisors?

2  A   I did.

3  Q   And who -- I'm sorry.  Where was that meeting?

4  A   It was in the Coleman Young Building.

5  Q   And who attended that meeting?

6  A   There were two meetings that I attended that day, one in

7  the morning and one in the afternoon.  One of the meetings

8  was -- and the city was the host of both.  Representatives of

9  the city presented to the uniformed retirees in one and the

10 nonuniformed retirees in the other meeting, and it was meant

11 to, I believe, provide that group specifically more

12 information on the healthcare proposal that had been made and

13 to start to address, you know, their concerns the city had

14 about the pension funds as they currently existed.

15 Q   Did you attend both meetings?

16 A   I did.

17 Q   And were there any materials handed out at that meeting?

18 A   There were.

19      MR. KING:  Can we look at Exhibit 49, please?  And

20 we'll refer to page 21.

21 BY MR. KING:

22 Q   Mr. Robins, do you recall seeing page 21 of the materials

23 that were passed out at the June 20th meeting?

24 A   Yes.

25 Q   And what's your understanding of what's set forth in this

1    page?

2    A    What is set forth -- this page followed a number of pages

3    where the city kind of summarized some financial information

4    to explain -- start to really explain its view that it needed

5    to change the pension plans as they currently exist, and then

6    what it stated is it concluded -- or near concluded with this

7    saying that these are its objectives for restructuring in

8    this case of the PFRS pension fund.

9    Q    Would you characterize these objectives as a proposal?

10   A    No.

11   Q    And did you ever provide any feedback to the city or any

12   of its professionals with respect to these objectives?

13   A    The feedback really was, you know, when will the data

14   room be open so we can start to do the work and do the

15   information gathering we need to engage in a negotiation with

16   you.

17   Q    At the June 20th meeting, were there any negotiations

18   between the Retirement Systems and the city or its

19   professionals?

20   A    No.

21   Q    And there's been some prior testimony with respect to the

22   data room, but can you explain to the Court your

23   understanding of the data room and its function in the

24   capacity of the Detroit restructuring?

25   A    Sure.  It's an electronic data room where the city has

1   loaded onto, you know, a virtual data room, as they call it,

2   financial legal information about the city, its assets, its

3   historical finances, you know, the business plan going

4   forward and the back-up and build-up to that business plan.

5   Q    Is the use of a data room a fairly common practice in the

6   context of the restructuring engagements that you've been

7   involved in?

8   A    Yes.

9   Q    And what's the benefit or the value of populating a data

10  room with financial information?

11  A    Well, it lets a debtor or in this case the city provide

12  information to all of its creditors or the creditors it wants

13  to -- needs to negotiate with in a pretty efficient manner

14  and makes sure all the creditors are getting the same

15  information at the same time.

16  Q    Did you or anyone on your team -- let me back up.  When

17  did the Greenhill term first obtain access to the data room?

18  A    I believe it was June 21st.  I think it was just after

19  these meetings.

20  Q    And in the context of gaining access, Greenhill had to

21  execute certain nondisclosure agreements and confidentiality

22  agreements.  Is that accurate?

23  A    That is true.

24  Q    And have you or members of your team accessed the

25  information that's contained in the data room?

1  A    Yes.

2  Q    And when you accessed that information, did you come to

3  an understanding of whether or not the information that was

4  in the data room as of June 21st was complete?

5  A    Yes, I did.

6  Q    And what was that understanding?

7  A    It was not complete.

8  Q    And what did you find to be lacking?

9  A    Lots of information on values of assets, different

10  projections and build-ups, and it really is typical.  A data

11  room is loaded.  People start looking.  They ask questions.

12  That leads to more requests for additional information, and

13  that's a typical -- it's an iterative process, which is

14  typical, and that's what's happened here and is ongoing.

15  Q    In the data room, were there any proposals with respect

16  to pension benefits?

17  A    No.

18  Q    You described an iterative process that would involve

19  asking questions.  Did you or anyone on your team at

20  Greenhill subsequently ask the city or its professionals for

21  additional information following your review of the

22  information in the data room?

23  A    Yes.

24  Q    And which professionals particularly have you had contact

25  with?

1   A    At Greenhill or at --

2   Q    At the city.

3   A    At the city?  The diligence questions mostly go through

4   Miller Buckfire, the formal questions.  The request is that

5   formal lists be made and sent around.  A lot of the

6   conversations, though, also take place with Conway MacKenzie

7   and, in addition, professionals from Ernst & Young.

8   Q    Since June 21st, how often would you say that Greenhill

9   has requested information from the city or its professionals?

10  A    I would say formerly -- formerly -- sorry -- formally in

11  writing maybe a half dozen times, but there's a lot of, you

12  know, conversation that goes on pretty regularly as we try to

13  work through that.

14  Q    And by a conversation, I'm assuming that's your team

15  picks up the phone and contacts someone from, say, Miller

16  Buckfire, for example?

17  A    Correct; correct.

18  Q    And is that happening on a regular basis?

19  A    Yes.

20  Q    And for the most part, have the professionals of the city

21  been responsive to your requests?

22  A    They've been responsive.  I think they had struggled at

23  times to get information that we have asked them for, but

24  they have been responsive in acknowledging the receipts

25  and -- the receipt of our requests and trying to track it

1  down, I believe.

2  Q   When you say that they've been frustrated, what do you

3  mean by that?

4  A   I think some of the information that's been requested --

5        MR. CULLEN:  Objection, your Honor.  He's

6  characterizing somebody else's state of mind.

7        MR. KING:  I'm just asking the witness whether --

8  what his understanding was of the discussions that he's

9  having with the professionals from the city, your Honor.

10        THE COURT:  He can testify to what they said.

11        MR. KING:  That's fair.

12  BY MR. KING:

13  Q   What did they say, Mr. Robins?

14  A   They have at times expressed -- I won't say frustration,

15  but that they are having difficulty getting the information

16  that we've asked them for.

17  Q   Do you believe that prior to July 18th Greenhill was

18  furnished complete information to fully evaluate what was

19  laid out in the June 14 proposal to creditors?

20  A   No.

21  Q   Can you give a couple of examples of the type of

22  information that you requested but did not receive prior to

23  July 18th?

24  A   I mean a major category is the value of assets.  I mean,

25  you know, there's two main sources of recovery for creditors

1    here.  One is from cash flows, and one is from assets.  And

2    there's been very little information available on the value

3    of assets, for example.

4    Q    And did you attend diligence meetings on July 9th?

5    A    I did.

6    Q    And what were the nature of those meetings?

7    A    Those meetings were conducted primarily by Conway

8    MacKenzie and Ernst & Young, and it was to provide an

9    opportunity for creditors and creditors' advisors -- you

10   know, the audience was primarily the financial advisors for

11   some of the different creditor groups -- opportunity for them

12   to ask questions and engage in some discussion about how the

13   ten-year projections were constructed and put together.

14   Q    Where was that meeting conducted?

15   A    That was held -- I believe it's called Cadillac Plaza in

16   midtown here in Detroit.

17   Q    And were there any proposals set forth at that meeting?

18   A    No.

19   Q    Were there any negotiations that occurred at that

20   meeting?

21   A    No.

22   Q    Did you attend a meeting on July 10th with the city and

23   its advisors?

24   A    Yeah, several.  The diligence meeting of July 9th carried

25   over to July 10th, so that -- I was there till about one

1 o'clock, and then in the afternoon certain city advisors met

2 with I guess the representatives of the retirees again, one

3 meeting with the uniform, one nonuniform, but a smaller

4 group.

5 Q   And who was there on behalf of the city?

6 A   At which meeting?

7 Q   The smaller meetings that you're describing that occurred

8 on the afternoon of July 10th.

9 A   It was David Heiman and Evan Miller from Jones Day, Chuck

10 Moore from Conway MacKenzie, and I think Gaurav Malhotra from

11 E&Y was there as well.

12 Q   At any of the meetings that you attended on July 10th,

13 were there any proposals presented to you or your team?

14 A   There were no proposals for treatment of the pensions.

15 There was discussion about setting up a structure really to

16 diligence -- I thought of it as to continue the diligence on

17 pension issues.

18 Q   Were there any negotiations at any of those meetings?

19 A   No.

20 Q   Do you think that prior to July 18th that the city had

21 thought it presented a proposal to you to consider?

22 A   No.

23 Q   Why is that?

24 A   There were at least two occasions, meetings I was at,

25 where there was discussion specifically of OPEB and the

1    treatment of healthcare, and financial advisors to other

2    creditors asked the city advisors, "Have you made a proposal

3    as to pensions?" and the answer was no.

4    Q    Just a couple more questions.  Prior to July 18th, did

5    the city or any of its professionals ever present to you or

6    your team any scenario which did not contemplate the

7    impairment or diminishment of pension benefits?

8    A    No.

9    Q    Could they have done so?

10            MR. CULLEN:  Objection.  Foundation, your Honor.

11            THE COURT:  I'm not sure what the question means,

12   could they have done so.

13   BY MR. KING:

14   Q    Was there sufficient data prior to July 18th to come up

15   with a proposal that didn't contemplate impairment or

16   diminishment of pension benefits, in your judgment?

17   A    I hadn't seen it.  I don't know if they had it or not.

18   Q    In your experience, do you believe that the 35 days

19   between the June 14th meeting and the July 18th bankruptcy

20   filing was a reasonable period of time for your team to

21   evaluate data, perform the analysis that you deemed

22   appropriate, and come up with solutions or proposals for the

23   city's consideration?

24   A    No.

25   Q    And I assume the same answer is true for the 28-day

1  period that elapsed between the time Greenhill was provided

2  access to the data room on June 21st and the filing of the

3  bankruptcy on June 18th -- July 18th?  Excuse me.

4  A   That is correct.

5  Q   So last question and important question.  Throughout your

6  entire experience in the process of working with the city and

7  its advisors, were there ever any negotiations with respect

8  to pension benefits?

9  A   Ever or pre-petition?

10  Q   Pre-petition.

11  A   Pre-petition, no.

12          MR. KING:  Thank you.

13          THE COURT:  Thank you.  Other questions for the

14  witness?

15          MR. CULLEN:  If I may, your Honor --

16          THE COURT:  One second.  We have Ms. Levine who

17  wants to ask some questions.

18          MR. CULLEN:  Oh, I'm sorry.

19                     DIRECT EXAMINATION

20  BY MS. LEVINE:

21  Q   Sharon Levine, Lowenstein Sandler, for AFSCME.  Good

22  afternoon.

23  A   Hello.

24  Q   You just testified that you didn't think the month and

25  three or four days was sufficient time to negotiate a

1    proposal and come up with a consensual resolution; correct?

2    A    Correct.

3    Q    Do you believe it was -- one of the things the city seems

4    to be contending is that it was impractical and it couldn't

5    have been done no matter how much time you had.  Do you

6    believe, given a reasonable period of time, you could have

7    come up with a proposal or a solution or a consensual

8    arrangement with the city?

9    A    Yes.

10            MS. LEVINE:   Thank you.

11            MR. CULLEN:   Good afternoon, your Honor.

12                       CROSS-EXAMINATION

13   BY MR. CULLEN:

14   Q    Good afternoon, Mr. Robins.  I'm Thomas Cullen of Jones

15   Day representing the city.

16   A    Good afternoon.

17   Q    I believe we met briefly in one of those big rooms a

18   couple weeks ago.

19   A    I believe that's right.

20   Q    All right.  A few questions for you.

21            MR. CULLEN:   If I could have Exhibit 48, which is

22   one of the document -- which is the other document from the

23   June 20th meeting, the presentation with regard to the

24   nonuniform retirees.

25   BY MR. CULLEN:

1  Q    Do you see that, sir?  Do you see it in front of you?

2  A    I do, yeah.

3  Q    Remember this document?

4  A    Yes, I do.

5  Q    Okay.  And I'm going to direct you to -- my basic

6  question is going to be with respect to this document, was

7  the city presenting ideas for the restructuring that it

8  wanted a response from you on in this document?

9  A    Unclear.  I mean this document clearly presents a

10 proposal on healthcare.  When it comes to pensions, it talks

11 about objectives, and I think is this one possible ideas, so,

12 you know, again, I viewed this, I think I said before, as

13 part of the city wanting to kick off discussions, you know.

14 Our reaction was when is the data room open because we need

15 to start digging and understanding your position.

16 Q    So let's flip through it just quickly.

17 A    Sure.

18 Q    Let's look at page 8.  Eight.  Here we go.  That's what

19 you talked about in terms of objectives for retiree

20 healthcare restructuring; is that right?

21 A    No.

22 Q    That wasn't in the document?

23 A    That's not what I was referring to.

24 Q    Okay.  But it is part of the document that was presented

25 to you on this date; right?

1    A    It is, yes.

2    Q    Okay.  And it set forth some objectives for the city for

3    this process of restructuring, did it not?

4    A    It does.

5    Q    All right.  And did you discuss those objectives?

6    A    I did not.

7    Q    Okay.  And did you offer any ideas for different ways to

8    address those objectives?

9    A    No.

10   Q    Okay.  Let's look at the next page, page 9, for Medicare

11   eligible retirees, proposed design solution.  Do you see

12   that, sir?

13   A    I do.

14   Q    And was that discussed at this meeting?

15   A    It was discussed at the meeting, yes.

16   Q    And what was your part of that discussion?  What did you

17   say?

18   A    I listened.

19   Q    You didn't say anything?

20   A    I said nothing.

21   Q    Okay.  Did you understand the page?

22   A    Yes.

23   Q    Let's look at page 10 where it presents the rationale for

24   that structure.  Did you discuss with the city the rationale

25   for that structure as presented in that meeting?

1    A    I did not.

2    Q    Okay.  Let's look at page 11 where it says "proposed

3    design solution."  Was that presented at the meeting?

4    A    It was.

5    Q    Okay.  And what was your response -- did you discuss it?

6    A    No.

7    Q    You just listened?

8    A    Yes, I did.

9    Q    Okay.  And on page 12 where we talk about the rationale,

10   did you discuss the rationale or take issue on the rationale?

11   A    I did not.

12   Q    Did you understood -- you understood what was being

13   presented in those --

14   A    I did.  I understood a healthcare restructuring proposal

15   was being made.

16   Q    Okay.  All right.  So when we look at page 14 and --

17   well, it's 13 and 14 for both.  You understood that there was

18   a proposed design solution being suggested for healthcare.

19   A    Yes.

20   Q    And you understood that in the course of this meeting as

21   a whole, the city was conveying to you the message that it

22   wanted to work cooperatively with the creditors on these

23   issues; correct?

24   A    Yes.

25   Q    All right.  And by "work cooperatively on those issues,"

1  it wanted you to engage in discussion of these ideas so that

2  progress could be made; correct?

3  A    I don't know.  I'd be speculating.

4  Q    Was that your understanding?

5  A    Yes.

6  Q    Okay.  And as a matter of fact, on page 15 under the

7  heading "Key Message," that's exactly what the city was

8  telling you; correct?

9  A    Correct.

10  Q    Now, let's move on through the document to page 20, if we

11  could, please.  Twenty.  Once had a trial where in the middle

12  the whole system went down.  The woman running it nearly had

13  a heart attack, and there was mad copying going on in the

14  halls.  She nearly had to be sedated.  You see this, plan

15  freeze contributions, GRS --

16  A    I do.

17  Q    -- right?

18  A    Yes.

19  Q    And this was proposal of an idea with respect to -- and

20  the impact of an idea or scenario on pension benefits;

21  correct?

22  A    I'm not sure if it was a proposal of an idea or an

23  illustration of a scenario, but --

24  Q    It was one or the other?

25  A    I viewed it as an illustration of a scenario as they're

```
 1   laying out their case.

 2   Q    And, again, this is something you just listened, you had

 3   nothing to say about.

 4   A    Correct.

 5   Q    All right.  And if you look on the next page where it

 6   gets to possible GSR restructuring ideas -- no, no.  Let's go

 7   to 22.  Possible GRS restructuring ideas.  You see that?

 8   A    I do.

 9   Q    Is that right?

10   A    Yep.

11   Q    And these were ideas that the city was putting forward --

12   A    That is right.

13   Q    -- restructuring the plan?

14   A    Correct.

15   Q    And we can agree that they're ideas and they're

16   discussable ideas?

17   A    Yes, we can.

18   Q    And from your field, you understand these ideas and how

19   you could discuss them; correct?

20   A    Correct.

21   Q    Because you had already had some exposure to the data

22   here because you had full access to the systems actuary,

23   Gabriel, Roeder; correct?

24   A    Correct.

25   Q    And so in order to get information about how the system
```

1   was actually being run and the actual liabilities of the

2   system, you had firsthand knowledge of that; correct?

3   A   Correct.

4   Q   And there were no restrictions placed upon your access to

5   Gabriel, Roeder?

6   A   No.

7   Q   Now, but again with respect to -- going back to 21 now

8   for just a second, in terms of the objectives for the GRS

9   restructuring, was there any discussion of those objectives?

10  A   I don't recall specifically.  I mean we were in a very

11  large conference room.  Questions were only accepted in

12  writing on note cards.  So I think, you know, it was really a

13  presentation by the city, so it was not a small back-and-

14  forth discussion.

15  Q   And, again, you just listened?

16  A   I did.

17  Q   And after the meeting, with respect to all of these

18  things that you just listened to --

19  A   Yes.

20  Q   -- at the meeting, with respect to the scenarios and the

21  ideas of the structures and the rationale --

22  A   Yep.

23  Q   -- presented at this meeting --

24  A   Yep.

25  Q   -- did you pick up the phone and say, "Explain this to me

1    better"?

2    A    I did not say that.  I said, "When will the data room be

3    open?" is what I said.

4    Q    Okay.  And even after the data room was open, as you

5    indicated, this would be an iterative process --

6    A    Absolutely.

7    Q    -- by which you mean that more production yields more

8    questions --

9    A    Yes.

10   Q    -- and so on and so on; correct?

11   A    Yes.

12   Q    All right.  And, again, page 23 here, work cooperatively

13   to equitably restructure GRS pensions consistent with the

14   city's severe financial limitations, do you see that?

15   A    Yes.

16   Q    Did you understand again here consistent with your

17   understanding of what was being attempted by the city on June

18   14th that the city was trying to coax a response or ideas out

19   of you; correct?

20   A    Not clear to me at all really since, again, the data room

21   wasn't even open.  I viewed this as an opening salvo where we

22   don't want to work with you, but the first step of that is

23   getting the data room open, so --

24   Q    Do you have your deposition there available?  Do you have

25   your deposition available?

1   A    No.

2   Q    Please.

3              MR. CULLEN:  May I approach, your Honor?

4              THE COURT:  Yes.

5   BY MR. CULLEN:

6   Q    And if you look at page 46, items -- lines 2 through 6,

7   where you were asked, "What did you understand the city's

8   request for cooperation to mean?" and the answer was, "Well,

9   I understood that they were looking to have negotiations at

10  some point over the OPEB and the pension obligations."

11             MR. KING:  Your Honor, objection.  To the extent --

12  to the best of my knowledge, all we have is a rough draft,

13  uncertified copy of the deposition transcript today.  As long

14  as the witness doesn't mind answering or can answer the

15  questions, I don't have a problem with proceeding.  I just

16  want to, you know, bring that to the Court's attention

17  because I know the Court is sensitive to having the official

18  record available.

19             THE COURT:  Thank you, sir.

20             MR. CULLEN:  Is it all right if I proceed, your

21  Honor?

22             THE COURT:  Yes.

23             MR. CULLEN:  All right.

24  BY MR. CULLEN:

25  Q    Would you agree that the Jones Day's generally --

1  attorneys in this meeting generally took an approach that,

2  look, we think there is this problem, here's some possible

3  ideas that we thought of, but we're going to want to get you

4  to see or work cooperatively to equitably restructure these

5  pensions consistent with the city's severe financial

6  limitations?  Do you agree with that, sir?

7  A    I'm sorry.  Were you just reading from the --

8  Q    If you take a look at 46, 7 through 17.

9  A    46, 7 -- yeah.  You're reading my answer there?

10  Q    Yes.

11  A    Yeah, I do agree with that.

12  Q    Okay.  All right.  Now, as of this time and at no time in

13  terms of the ideas that the city was coming up with and

14  bouncing off you in this meeting, did you ever have any

15  substantive response to any of these ideas?

16  A    No, other than we really need to dig in to do the work on

17  the diligence.

18  Q    Okay.  All right.  Now, let's -- in terms of your

19  relationship with your client throughout this period, did you

20  ever have authority to negotiate any diminution or impairment

21  of vested pension rights?

22  A    No.  I mean there was no specific proposal that I took

23  back to them, so there's no reason they would have given me

24  that.

25  Q    Did you take these ideas back to them, the ideas we've

1  talked about in the January 20th proposal?

2  A   Yes.  We told them about the meeting, and some of the

3  trustees were there, so they were aware of those ideas.

4  Q   And did you ask for authority to discuss any of these

5  ideas?

6  A   No.

7  Q   Did they ever give you authority to discuss any of these

8  ideas?

9  A   No.

10 Q   These, I take it, are all ideas in which you have

11 competence, training, and the expertise to address and

12 discuss; correct?

13 A   With sufficient information, yes.

14 Q   Okay.  And it's true, is it not, that with respect to

15 vested pension benefits, it was your understanding that there

16 would be no retreat or compromise beyond a hundred cents on

17 the dollar unless and until there was no alternative

18 whatsoever?  Is that true, sir?

19 A   I know it would be our starting point that the vested

20 benefits should be unaffected for sure.

21 Q   Did you ever indicate any willingness to move beyond that

22 starting point?

23 A   Probably not.

24 Q   And did you, in fact, indicate affirmatively that you had

25 no authority nor any intention of moving beyond that starting

1  point?

2  A    I don't believe so.

3  Q    Okay.  Did members of your client in meetings before the

4  date of filing indicate that position either to you or to

5  representatives of the city?

6  A    I don't know.

7  Q    If I'll take you forward to the meeting on -- the small

8  group meeting on July the 10th, I believe it was --

9  A    Yes.

10  Q    -- with representatives of Jones Day --

11  A    Yes.

12  Q    -- and I believe at that meeting the Jones Day lawyers

13  were trying to set up a process to deal with your diligence

14  problem, correct, among other things?

15  A    Yes.

16  Q    And they were trying to set up a four-step process;

17  correct?

18  A    Yes.

19  Q    Do you remember the four steps?

20  A    I believe so.

21  Q    Do you?

22  A    I believe I do, yes.

23  Q    Could you tell us?

24  A    I will try.

25  Q    Okay.

1    A    The proposed four steps were to first have the actuaries

2    spend time together to see if they could agree on what the

3    underfunded liability is.  The second step was to have the

4    financial advisors spend time working with each other to see

5    if they could agree on how much cash was available to fund

6    pension funds.  The third step would be, in light of the

7    results of the diligence on those first two, to see if

8    parties could agree on whether or not any changes needed to

9    be made to the pensions.  And the last step would be if

10   changes were required, what mechanisms could be put in place

11   to restore benefits if things turned out better later on.  I

12   believe that is what they proposed.

13   Q    And at that meeting, there was at least discussion in

14   which you participated of the merits of that four-step

15   process; correct?

16   A    Correct.

17   Q    And you took the viewpoint that deciding what was

18   available in terms of assets or funding should precede

19   looking at the amount of the underfunding; correct?

20   A    Correct.

21   Q    And you and representatives of the city argued the merits

22   of the two different positions; correct?

23   A    Correct.

24   Q    And you didn't come to a conclusion at that meeting?

25   A    That is correct.

1   Q   Okay.  Was it in your view that whether step one came

2   first or step two came first, was that a deal breaker for you

3   or your client?

4   A   No.

5   Q   All right.  But, nonetheless, you had to go back to your

6   client to get authority even for that; correct?

7   A   Correct.

8   Q   And the authority you were going to get from your client

9   was in a meeting some eight days later?

10   A   About --

11   Q   Was to be --

12   A   Yes.

13   Q   -- in a meeting some eight days later?

14   A   Yes.

15   Q   Okay.  And sometime during that eight-day period, were

16   you feeling any sense of urgency about these negotiations at

17   this time?

18   A   No.

19   Q   Okay.  And during this eight-day period, your client

20   decided to file a suit against the city, the state, the

21   governor, and the financial manager; correct?

22   A   I believe that's right, but --

23   Q   Yeah.  When did you know that they were going to file a

24   suit with the stated objective in the suit filed July 17th

25   that neither the governor nor the emergency manager either

1 inside or outside bankruptcy had any authority to impair any

2 vested pension rights?  That was the point of the suit, as

3 you recall it; right?

4 A    I believe that's correct, yeah.

5 Q    All right.  When did you know that they were preparing

6 that suit?

7 A    I don't know.

8 Q    Was it before or after July the 10th?

9 A    I believe it was after, but I'm not sure of that.

10 Q    All right.  Were you working out of the same offices as

11 Clark Hill at some times during this engagement?

12 A    At some times, yes.

13 Q    Yeah.  Did you ever become aware that they were preparing

14 for this litigation while you were in their offices?

15 A    No.

16 Q    Did you ever discuss it with the lawyers for Clark Hill?

17 A    After it was filed I think I did.

18 Q    All right.  So with respect to this lawsuit, was it your

19 understanding that by virtue of either negotiations or to the

20 law -- or through the lawsuit, that the -- that your client,

21 the Retirement Systems, would exhaust every legal remedy

22 before they would negotiate any diminution in vested pension

23 rights?  Was that your understanding?

24 A    No.

25 Q    All right.  Tell me what you have that's inconsistent

1  with that understanding.  What authority did you have pre-
2  petition to address those issues, even to address ideas?
3  A   Again, I don't know that I had any specific authorities.
4  I didn't request it.  The advice to my client was we need a
5  lot more information before we're ready to engage on this.
6  Q   Well, let's just take a for instance.  This is a defined
7  benefit -- the current plan is a defined benefit plan, is it
8  not?
9  A   It is.
10  Q   And the city was proposing a defined contribution plan,
11  was it not?
12  A   Correct.
13  Q   Were you ever asked to your -- by your client or did you
14  suggest to your client that you could address a hybrid plan
15  which maintained elements of both?  Does that make sense to
16  you as a concept, sir?
17  A   It does, yes.
18  Q   Okay.  Within the range of your gifts and expertise to
19  put together such a plan; correct?
20  A   With some help from the actuaries, yes.
21  Q   All right.  And it was also within the range of your
22  expertise to address the fourth point on the four-point
23  program, which would be how to get back some of the lost
24  pension funding that might have been lost in the early years
25  of the reinvestment; correct?

1  A   Correct.

2  Q   All right.  And prior to the petition date, did you ever

3  address that in detail?  Did you ever propose anything?

4  A   Look, as I told you, where I wanted to start is

5  affordability.  All right.  So the primary issue for us was

6  getting together with the city, understanding the business

7  plan, and seeing whether we agreed with their view they could

8  afford it or not.  We were nowhere on that, so the rest of

9  this you're just -- you're getting ahead of yourselves.

10  Q   Okay.  Ms. Levine asked you how long you thought a proper

11  negotiation process would take for this set of obligations

12  for the city.  Do you remember that question?

13  A   I don't think that's what she asked, but --

14  Q   Well, I'll ask you.  How long do you think it would take?

15  A   It's really a function of a lot of things, including

16  information availability, so I don't know.  I don't know.

17  Q   Did you ever make a representation to the city that if I

18  get "X" information, that I can -- we can clear this up in

19  some finite amount of time?

20  A   No.

21  Q   So you at no point offered the city any finite

22  negotiation path; correct?

23  A   That's correct.

24  Q   All right.

25            MR. CULLEN:  That's all I have, your Honor.

1          THE COURT:  Any other questions for the witness?

2          MR. KING:  Just a couple, your Honor.

3          THE COURT:  Go ahead, sir.

4                   REDIRECT EXAMINATION

5     BY MR. KING:

6     Q   Mr. Robins, in your engagement with the Retirement

7     Systems, have you been asked to take a direct role in

8     evaluating healthcare benefits for retirees?

9     A   No.

10         MR. CULLEN:  I was just going to direct him to pre-

11    petition, so -- but if it's no, it's no.

12         THE WITNESS:  No.

13    BY MR. KING:

14    Q   You're not -- you haven't been asked to evaluate OPEB at

15    all with respect to retiree benefits?

16    A   Correct.

17         THE COURT:  The questions were focusing on pre-

18    petition, please.

19         MR. KING:  Pre-petition.

20         THE WITNESS:  Understand.

21    BY MR. KING:

22    Q   And your testimony was that you believe Greenhill first

23    had access to the data room on June 21st?

24    A   Correct.

25    Q   And at any time prior to the filing of the petition, did

1  you feel you had sufficient information to make any

2  meaningful proposal to your client?

3  A    No.

4  Q    And on the July 10th meeting you just testified regarding

5  the four-step process, do you recall that testimony?

6  A    Yes.

7  Q    As of July 10th, did you believe that you had sufficient

8  data or information to meaningfully respond to that four-step

9  process?

10  A    Well, I viewed the process -- and I think the question

11  from Jones Day characterized it this way, I agree -- as a

12  process really to address the diligence issues around -- the

13  diligence issues around pension issues.

14  Q    At that July 10th meeting, did you have or gain an

15  understanding of what the city's position was relative to the

16  treatment of pension benefits going forward?

17  A    Not specifically, no.

18  Q    Did you understand their position to be that in all

19  circumstances there had to be an impairment or diminishment

20  of those pension benefits, at least as presented as of July

21  10th?

22  A    Well, I think they made it clear that they needed some

23  sorts of changes, and, you know, consistent with the

24  materials from June 20th, they had some different ideas they

25  had in mind, but they didn't have a specific proposal.

1   Q   Can you engage in meaningful negotiations in a

2   restructuring setting without an overall asset picture of the

3   restructuring entity, the City of Detroit in this case?

4   A   Not very effectively, no.

5   Q   At any time prior to the pension systems filing its

6   lawsuit on July 17th, did anyone from the pension systems

7   ever tell Greenhill to cease and desist discussions, phone

8   calls, e-mails, with the city or any of the city's

9   representatives?

10  A   No.

11          MR. KING:  Nothing further, your Honor.

12          THE COURT:  Any further questions?

13          MR. CULLEN:  No redirect, your Honor.

14          THE COURT:  Thank you, sir.  You may step down, and

15  you are excused.

16          THE WITNESS:  Thank you.

17          MS. LEVINE:  Your Honor, sorry.

18          THE COURT:  I'm sorry.

19          MS. LEVINE:  Just a couple.

20          THE COURT:  Oh, I'm sorry.  Yes.  You're not

21  excused.

22                      REDIRECT EXAMINATION

23  BY MS. LEVINE:

24  Q   Just going back to the colloquy with regard to what was a

25  reasonable period of time --

1   A    Yes.

2   Q    -- in the American Airlines case, for example, that was a

3   complex pension issue; correct?

4   A    Yes.

5   Q    And at the time that the company filed, the debtor's

6   position was that the pensions were going to be terminated;

7   correct?

8   A    Correct.

9   Q    And within the time period -- it took, in fact, less than

10  the time period it took for that company to run through its

11  1113 process, you had -- the PBGC already negotiated and

12  resolved and entered into a settlement agreement to resolve

13  the pension issues; is that correct?

14  A    I believe that is correct, yep.

15  Q    Okay.  Going back to United Airlines, Greenhill was also

16  a financial advisor in that case as well; correct?

17  A    Correct.

18  Q    And the pension issues were resolved also within a

19  relatively -- one-, two-, maybe three-month period of time;

20  correct?

21  A    I honestly don't recall the timing on that, Sharon.

22  Sorry.

23  Q    All right.  Thank you.

24  A    Okay.

25          THE COURT:  All right, sir.  You are excused.  Thank

1  you.

2          THE WITNESS:  Thank you.

3       (Witness excused at 2:34 p.m.)

4          MS. PATEK:  Good afternoon, your Honor.  Barbara

5  Patek on behalf of the public safety unions, and at this time

6  the public safety unions call Mary Ellen Gurewitz.  And can I

7  just check to make sure our exhibit book is up here?

8          THE COURT:  Yes.

9            MARY ELLEN GUREWITZ, WITNESS, SWORN

10          THE COURT:  Please sit down over there.

11          MS. PATEK:  Your Honor, if I might approach again,

12  it doesn't look like the book --

13          THE COURT:  Yes.

14                     DIRECT EXAMINATION

15  BY MS. PATEK:

16  Q   Good afternoon.  Can you state your name, please?

17  A   Mary Ellen Gurewitz.

18  Q   And can you briefly tell the Court what it is you do for

19  a living?

20  A   I'm sorry.  What?

21  Q   What it is you do for a living.

22  A   Oh, I'm an attorney with Sachs Waldman.

23  Q   And what kind of law do you practice?

24  A   Union side labor law and political and election law.

25  Q   And how long have you been an attorney?

1  A   Since 1974.

2  Q   Can you give us a very brief overview of your education

3  and professional background?

4  A   I graduated from the University of Michigan in 1965 and

5  from Wayne Law School in 1974.  I then clerked for Judge

6  James Churchill in the Eastern District of Michigan, and then

7  from 1975 through 1979 I was an attorney with the National

8  Labor Relations Board.  And then I joined the law firm that

9  I'm with now.

10 Q   And in that capacity, do you represent the Detroit Police

11 Command Officers Association?

12 A   Yes, I do.

13 Q   And what is the Detroit Police Command Officers

14 Association?

15 A   It's a bargaining unit consisting of the commanders and

16 captains in the Detroit Police Department.

17 Q   And for how long have you represented the Detroit Police

18 Command Officers --

19 A   My office has represented them since about 1995, and I

20 have been their principal attorney since, I believe, 2003.

21 Q   And what kind of matters do you handle for the DPCOA?

22 A   The whole gamut of representation of a labor union, and

23 that has included grievance arbitration, negotiation.  I did

24 an Act 312 for the DPCOA, so whatever arises where they need

25 representation.

1  Q    I want to talk for a moment about Act 312.  What are Act
2  312 proceedings?
3  A    Act 312 is the statute called compulsory arbitration for
4  police and fire disputes, compulsory labor arbitration, so it
5  is a supplement to the Public Employment Relations Act.  And
6  when parties are unable to resolve their contract to reach
7  agreement on a collective bargaining agreement, they can
8  submit the dispute for compulsory arbitration.  It is
9  available only to police and fire.
10 Q    And to your understanding, is there a reason for that?
11 A    Because of the importance of public safety and because
12 they have no right to strike, it is a way to resolve their
13 disputes.
14 Q    And how are Act 312 proceedings triggered?
15 A    They are triggered when either the employer or the union
16 files a request for Act 312 with the Michigan Employment
17 Relations Commission.
18 Q    And is there a state agency that oversees Act 312
19 proceedings?
20 A    Right.  It is the Michigan Employment Relations
21 Commission.  We call it MERC.
22 Q    Ms. Gurewitz, I'd like you to take a look at in the
23 exhibit book that I handed you at the start of your testimony
24 Exhibit 718 and 719.  We'll start with 718.
25 A    All right.

1   Q   Okay.  Can you identify for the record what 718 is,

2   please?

3   A   Yeah.  718 is a MERC decision which issued in June of

4   this year.  Do you want to know the substance of it?

5   Q   Not yet.  Are MERC opinions such as Exhibit 718 public

6   records?

7   A   Yes, they are.

8   Q   And are they matters on which the Michigan Employment

9   Relations Commission has a legal duty to report?

10  A   Yes.

11  Q   And as far as you know, are they maintained as public

12  records by the State of Michigan and by the Michigan

13  Employment Relations Commission?

14  A   Yes, they are.

15  Q   And are they available to anyone who wants to access them

16  on the state website?

17  A   Yes, they are.

18              MS. PATEK:  Your Honor, at this time I would move

19  for the admission of Exhibit 718.

20              MS. KOVSKY-APAP:  Your Honor, we object on the

21  grounds of relevance and hearsay.

22              THE COURT:  The objections are overruled.  The

23  document is admitted.  What was the number again, please?

24              MS. PATEK:  718.

25          (Exhibit 718 received at 2:40 p.m.)

1  BY MS. PATEK:

2  Q   And, Ms. Gurewitz, if you could take a look at Exhibit

3  719.

4  A   Yes.

5  Q   Is that also a MERC opinion?

6  A   Yes, it is.

7  Q   And if I were to ask you the same series of questions

8  about its status as a public record, would your answers be

9  the same?

10  A   Yes.

11         MS. PATEK:  Your Honor, at this time we'd move for

12  the admission of Exhibit 719.

13         MS. KOVSKY-APAP:  Your Honor, the same objections.

14         THE COURT:  All right.  The objections are

15  overruled.  Exhibit 719 is admitted.

16     (Exhibit 719 received at 2:41 p.m.)

17  BY MS. PATEK:

18  Q   I want to ask you some general questions regarding your

19  knowledge and understanding with respect to issues related to

20  the DPCOA that they've had during the time you've been

21  representing them.  First of all, have you represented the

22  DPCOA with regard to negotiations related to pension and

23  healthcare?

24  A   Pension and healthcare are always subjects for collective

25  bargaining, so in negotiations we have certainly addressed

 1  those issues.

 2  Q    And as a result of your representation of the DPCOA in

 3  that capacity, do you know whether or not through their

 4  employment with the city DPCOA members are entitled to Social

 5  Security?

 6  A    They are not.

 7  Q    And do you know whether or not they are entitled to

 8  Medicare?

 9  A    People became entitled to Medicare or it became mandatory

10  for contributions to be made for Medicare in 1986, so anyone

11  hired before 1986 is not Medicare eligible.

12  Q    And what impact does that have on DPCOA members upon

13  their retirement?

14  A    Well, they are -- assuming that they were hired before

15  1986, they are not eligible at the time they retire and they

16  will never be eligible for Medicare, and Social Security is

17  also unavailable to them, so their entire retirement income

18  comes from the pension system.

19  Q    And in the event that a DPCOA member suffers a either

20  duty- or nonduty-related disability, can you tell the Court

21  whether or not such individuals are eligible for Social

22  Security Disability?

23  A    They are not.

24  Q    And do you have an understanding as to the basis on

25  which -- well, strike that.  Do you know whether or not the

1  same rules with regard to Social Security and Medicare apply

2  to the other Detroit public safety unions; that is, the fire

3  fighters, the Police Officers Association, and the Police

4  Lieutenants and Sergeants Association?

5  A   Yes.  Exclusion from Social Security is for police and

6  fire employees.

7  Q   Do you have an understanding as to the rationale for

8  excluding police and fire from Social Security?

9  A   I think early on Social Security did not -- was not

10 available or did not cover employees of state and municipal

11 governments at all, and then gradually there were amendments

12 to the statute so that more people were brought under its

13 coverage.  It is -- there are certainly statements in the

14 legislative history and in the legislation itself that says

15 that the exclusion from Social Security is based upon the

16 fact -- or occurs only -- can only occur when the employees

17 are covered by a public retirement system which meets certain

18 standards established by the IRS.

19       MS. KOVSKY-APAP:  Your Honor, we object to this

20 testimony.  The witness is giving legal opinions.  She was

21 not called as an expert witness, and to the extent she's able

22 to give facts testimony, this isn't within her personal

23 knowledge.  She's reciting the law.

24       THE COURT:  No.  The Court will permit it, but, Ms.

25 Kovsky, I caution you that if you object to testimony, it's

1  better to do it before.

2  BY MS. PATEK:

3  Q    Moving on, Ms. Gurewitz, do you recall the last Act 312

4  proceeding in which you were involved on behalf of the DPCOA?

5  A    Yes.  We had hearings in 2009, and we got an Act 312

6  award in January 2010.

7  Q    And can you tell the Court when the last collective

8  bargaining agreement with the City of Detroit applicable to

9  the DPCOA expired?

10 A    It actually expired in June 2009 so that the Act 312

11 award that we got had already expired by the time that we got

12 it, so it was for a period from 2005 through 2009.

13       MS. PATEK:  Your Honor, at this time, I'd like to

14 bring up Exhibit 717, which previously was identified by Mr.

15 Malhotra has an agreement that was negotiated between the

16 city and the DPCOA back in 2011, 2012.  He identified the

17 city's signature on the agreement.  And I'd like to move for

18 its admission.

19       MS. KOVSKY-APAP:  Your Honor, we object on hearsay

20 and relevance.

21       THE COURT:  One second, please.  Oh, can you put it

22 back on the screen for me, sir?  Thank you.   The objection

23 is overruled.  The document 717 is admitted.

24    (Exhibit 717 received at 2:46 p.m.)

25 BY MS. PATEK:

1    Q   Ms. Gurewitz, are you familiar with Exhibit 717?

2          THE COURT:  Give me one second before you proceed.

3    Ms. Gurewitz, could you do us a favor and sit back a couple

4    of inches from the microphone?  There you go.  Thank you.

5    Now you may proceed.

6    BY MS. PATEK:

7    Q   Ms. Gurewitz, do you recognize Exhibit 717?

8    A   Yes, I do.

9    Q   And what is that?

10   A   It is a tentative agreement that was reached between the

11   DPCOA and the City of Detroit in about -- well, it's signed

12   February 2012.

13   Q   Do you know whether Exhibit 717 included -- was a

14   concessionary agreement?

15   A   Yes, it was.

16   Q   And do you know whether those concessions included

17   changes to pension?

18   A   You know, quite frankly, I'm not sure.

19   Q   Do you know whether Exhibit 717, while ratified by both

20   parties, was ever implemented?

21   A   It was not.

22   Q   And why is that?

23   A   It was rejected, as I understood it, by the State of

24   Michigan.

25   Q   And in that regard, between the negotiation of this

1  concessionary agreement and the appointment of the emergency

2  manager on March 25th, 2013, did the DPCOA make any further

3  effort to engage the city in collective bargaining?

4  A   We did.  After the rejection of the tentative agreement,

5  we periodically sought to further negotiate an agreement

6  because we had not had one for such a long time.  In July

7  2012 the city imposed new terms and conditions of employment.

8  It was called the CET.

9  Q   The city employment terms?

10  A   Yes.

11  Q   And as part of those city employment terms, was the

12  DPCOA -- was one of the things that was eliminated was their

13  right to just cause on termination?

14  A   That's correct.

15  Q   And that was under Public Act 4, is that correct, former

16  Public Act 4 that the CET --

17  A   Public Act 4 was in effect, and the CET was imposed.  The

18  city had no -- took the position that it had no obligation to

19  bargain and that it could impose terms without negotiation.

20  Q   And did there come a time when Public Act 4 was

21  subsequently suspended?

22  A   It was suspended in August of 2012.

23  Q   And at the time of its suspension, did you or the DPCOA

24  make any further effort to engage the city in negotiations

25  with regard to terms and conditions of employment for the

1   DPCOA members?

2   A    We did.   The city, prior to the imposition of the CET,

3   had actually itself initiated 312 proceedings, so when PA 4

4   was suspended, we tried to resuscitate those proceedings.

5   The city withdrew its request, and we then filed our own

6   request for Act 312.

7   Q    And did the process for Act 312 begin at that point in

8   time?

9   A    It did, and MERC appointed an arbitrator.

10  Q    And can you tell us just very briefly what happened in

11  those proceedings?

12  A    We had a number of hearing days scheduled in March of

13  2013, and prior to those hearings, the city approached us to

14  negotiate.   It was really the first time that they had

15  negotiated with us in several years.   And we had some fairly

16  productive negotiations in March of 2013, and, in fact, we

17  did postpone the hearings that had been scheduled.   We were

18  not able to reach an agreement, a complete agreement, and

19  then the emergency manager was appointed.

20  Q    And what happened once the emergency manager was

21  appointed?

22  A    Then our negotiations ceased.

23  Q    And did the city take any action in regard to ensure that

24  there were no further negotiations?

25  A    Yeah.   The city filed a motion to dismiss the Act 312

1  proceedings that the DPOA had -- excuse me -- the DPCOA had

2  pending, and there were also -- there were motions that were

3  heard by MERC to dismiss both the DPCOA Act 312, an Act 312

4  that was pending for the Detroit Police Lieutenants and

5  Sergeants Association, and an Act 312 that was pending for

6  the Police Officers Association of Michigan, which

7  represented the emergency services.

8  Q    And was the result of that motion by the city the opinion

9  that we previously identified as Exhibit 718?

10 A    Yes, it is.

11 Q    And that opinion was issued on June 14th, 2013?

12 A    Yes, it did.

13 Q    You were not involved in the meetings between the DPCOA

14 and the city that began with the meeting of creditors at the

15 airport on June 14th, 2013; is that correct?

16 A    I was not.

17 Q    And were you involved in any of the subsequent meetings

18 with the city that took place on -- the record has

19 established June 20th, July 11th, and July 10th of 2013?

20 A    No, not prior to the bankruptcy.

21 Q    Did you become involved at some point prior to the

22 bankruptcy in advising the DPCOA with regard to the issues

23 that were facing it as to the City of Detroit?

24 A    Right.  I recommended to the DCPOA and helped organize a

25 coalition of the Detroit public safety unions -- that would

1   be the lieutenant and sergeants and the commanders and the

2   DPOA and the fire fighters -- to retain bankruptcy counsel.

3           MS. PATEK:  I don't have anything further, your

4   Honor.

5           THE COURT:  Thank you.

6           MS. KOVSKY-APAP:  Deborah Kovsky-Apap on behalf of

7   the city.

8                        CROSS-EXAMINATION

9   BY MS. KOVSKY-APAP:

10  Q   Ms. Gurewitz, it's nice to see you again.  We met at your

11  deposition.  The DPCOA does not represent current retirees;

12  is that correct?

13  A   That's correct.

14  Q   So the DPCOA would not be empowered to negotiate on

15  behalf of current retirees; correct?

16  A   That is correct.

17  Q   And the DPCOA would not be authorized to enter into

18  binding agreements on behalf of current retirees; correct?

19  A   Correct.

20          MS. KOVSKY-APAP:  Thank you.  I have no further

21  questions.

22          THE COURT:  Any further questions of the witness?

23          MS. PATEK:  One question.

24          THE COURT:  Yes.

25                      REDIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Why is it that the DPCOA cannot bargain on behalf of

3  current retirees?

4  A   The statute provides that a union is authorized to

5  represent employees for purposes of negotiating over wages,

6  hours, and terms and conditions of employment, and retirees

7  are not employees.

8           MS. PATEK:  Thank you.

9           THE COURT:  All right.  You may step down.  You're

10  excused.  Thank you very much.

11      (Witness excused at 2:53 p.m.)

12           MS. PATEK:  Your Honor, at this time, the Detroit

13  public safety unions call Mark Diaz.

14                    MARK DIAZ, WITNESS, SWORN

15           THE COURT:  All right.  Please sit down.  Before we

16  proceed with questioning the witness, may I ask how many more

17  witnesses?

18           MS. PATEK:  I think this is it, your Honor.  I don't

19  want to speak out of turn, but I'm pretty --

20           THE COURT:  Anyone else have any other witnesses?

21  Any rebuttals for the city that you foresee?

22           MR. SHUMAKER:  No, your Honor.

23           THE COURT:  Or the state for that matter?  All

24  right.

25                    DIRECT EXAMINATION

1  BY MS. PATEK:

2  Q   Sir, can you state your name for the record?

3  A   Mark Diaz.

4  Q   By whom are you employed?

5  A   The Detroit Police Department.

6  Q   And are you employed by anybody else?

7  A   Yes, I am.

8  Q   And who is that?

9  A   I am employed by the Detroit Police Officers Association

10 as well as the Township of Holly.

11 Q   And with respect to the Township of Holly, what do you do

12 there?

13 A   I'm a planning commissioner.

14 Q   And with respect to -- well, first of all, what is the

15 Detroit Police Officers Association?

16 A   It's the collective bargaining unit that represents the

17 police officers of the Detroit Police Department.

18 Q   How long have you been employed by the DPOA?

19 A   I've been employed by the DPOA since January 1st of 2013.

20 Q   And how was it that you became employed by the DPOA on

21 January 1st of 2013?

22 A   I was elected by the members of the Detroit Police

23 Officers Association.

24 Q   To what office?

25 A   To the position as president.

1   Q   And how long have you been employed by the Detroit Police

2   Department?

3   A   Just under 20 years, since March 21st of 1994.

4   Q   Can you tell me a little bit just briefly about your work

5   historically with the Detroit Police Department?

6   A   As a new police officer, I worked various positions,

7   including patrol. I worked undercover operations. I worked

8   in community relations. I worked in special operations,

9   which essentially is the booster crew going after -- my main

10   role was to investigate part one crimes and -- which is

11   essentially major felonies, as well as apprehending suspects

12   associated with those crimes. I've also been an instructor

13   at the Detroit Police Academy for -- since -- well, for seven

14   years.

15   Q   And what do you teach, or what have you taught at the

16   Detroit Police Academy?

17   A   As an instructor at the Academy, I have taught the state

18   computer systems. I was an administrator for that. I taught

19   first-aid, CPR, AED. I taught officers to operate and use

20   the department motorcycles as well as I taught cultural

21   diversity and advanced police ethics.

22   Q   And tell us a little bit about your educational

23   background.

24   A   Well, out of high school I began attending Schoolcraft

25   College until I was hired by the Detroit Police Department

1  shortly thereafter.  Since then I've attended Oakland

2  Community College, Wayne County Community College, and I've

3  been enrolled studying accounting with the University of

4  Phoenix for the last two years.

5  Q    And in addition to that course -- well, first, let me ask

6  you this.  Do you have any affiliation besides the fact that

7  you're a beneficiary with the Police and Fire Retirement

8  System of the City of Detroit?

9  A    Yes.  I'm an elected trustee on the Police and Fire

10 Retirement System board.

11 Q    And how long have you held that position?

12 A    Since July 1st of 2011.

13 Q    And have you taken any kind of continuing education in

14 that capacity?

15 A    Yes, I have.

16 Q    And can you tell us what that was?

17 A    It ranges but specifically executive portfolio

18 management.  I've taken that course at the Wharton University

19 twice.

20 Q    And what is executive portfolio management?

21 A    Essentially, it gives the -- it's a very rigorous course

22 that gives a trustee a basic foundation of the fundamentals

23 of running a pension system and the -- again, a basic

24 foundation for the various investments.

25 Q    You are not a finance expert, are you?

1    A    By no stretch, no, I'm not.

2    Q    And you are also not an actuary?

3    A    No, I'm not.

4    Q    As a member of the Detroit -- well, as a member of the

5    Detroit Police Department, does the city contribute to Social

6    Security on your behalf?

7    A    No.

8    Q    If you become disabled, are you entitled to receive

9    Social Security Disability?

10   A    No.

11   Q    And is -- do you have an understanding as to whether or

12   not your members are entitled to receive Social Security

13   Disability?

14   A    Not through the Detroit Police Department they are not.

15   Q    And can you tell the Court how the issue of disability is

16   addressed for DPOA members?

17   A    With respect to officers who are injured in the line of

18   duty?

19   Q    Yes.

20   A    Well, officers who are injured in the line of duty

21   ultimately are -- at this point in time, they are carried in

22   a disabled status and -- well, in essence, they receive a

23   portion of their base pay, and, again, at this time they are

24   also receiving medical benefits as well.

25   Q    And how is that funded, to your knowledge and

1  understanding?

2  A    Through the pension system.

3  Q    I want to focus your attention on the time period

4  beginning in late 2012, early 2013, and ask you this

5  question.  When was the election held that resulted in your

6  being elected the president of the DPOA?

7  A    As I recall, that was in September.  It was either

8  September or November of 2012.

9  Q    And at the time of your election, were there ongoing Act

10  312 proceedings relative to the DPOA?

11  A    Yes.

12  Q    And were those -- you became the president on January

13  1st, 2013?

14  A    That's correct.

15  Q    Upon your election, did you do anything to familiarize

16  yourselves with the ongoing Act 312 proceedings?

17  A    As president elect, I began attending the 312

18  proceedings.

19  Q    And did you continue when you became the president in

20  January of 2013 to attend and participate in those

21  proceedings?

22  A    Yes.

23  Q    And what was the result of those proceedings?

24  A    Ultimately the result was an arbitration award for the

25  Detroit Police Officers Association.

1    Q    And do you recall approximately when that award was

2    issued?

3    A    I believe it was March 25th or 26th of 2013.

4    Q    Okay.  I'm going to ask you -- there's a notebook of

5    exhibits there, and if you look at -- I believe it is 706,

6    707, and 708.

7              MS. PATEK:  May I approach the witness for just a

8    moment?

9              THE COURT:  Yes.

10   BY MS. PATEK:

11   Q    We'll start with Exhibit 706, and I know that's a rather

12   voluminous exhibit, but if you can turn towards the back,

13   you'll see on the last several pages -- come to the signature

14   pages --

15   A    Okay.

16   Q    Okay.  Can you identify -- well, strike that.  First of

17   all, is Exhibit 706 part of the arbitration award that was

18   issued by the arbitrator in the DPOA's Act 312 proceedings?

19   A    It appears to be, yes.

20   Q    And with respect to the signature pages, do you recognize

21   the signatures on those pages?

22   A    If I'm looking at the correct pages here, there are

23   several.

24   Q    Okay.

25   A    And the --

1  Q   Is one of them the signature of the arbitrator, George

2  Roumell?

3  A   Yes, it is.

4  Q   And is one of them the signature of the city's

5  representative?  I believe it was a Mr. Schafer.

6  A   Craig Schwartz.

7  Q   Schwartz?  And is one of them the DPOA's representative?

8  A   Yes.

9  Q   And that would be Mr. Iorio, I-o-r-i-o?

10 A   Yes.

11 Q   And if you could move forward to 707 and 708, and I'd ask

12 you to take a look at those signature pages as well.  And if

13 you don't mind doing them both together, we can try for a

14 twofer here.

15 A   Okay.  For 707 I see the same three signatures for Mr.

16 Roumell, Mr. Schwartz, as well as Mr. Iorio.  However, on 708

17 I only see the signature for Mr. Roumell.

18 Q   Okay.

19         MS. PATEK:  Your Honor, at this time we would move

20 for the admission of 706 and 707, which are the arbitration

21 awards issued to the DPOA.

22         MR. STEWART:  Your Honor, no objection other than

23 we -- I assume if we ask the witness he would establish

24 there's a public record foundation for these to deal with

25 hearsay objections as you did with the previous witness, or

1   if you can represent that to the Court, that'll be fine.

2   BY MS. PATEK:

3   Q   Is this record, Mr. Diaz, publicly available on the DPOA

4   website?

5           MR. STEWART:  Well, I think the actual issue is is

6   it issued by a government agency pursuant to its charter.

7           MS. PATEK:  I'm not sure it's --

8           MR. STEWART:  That's the exception in the rule of

9   evidence for it, not whether it's publicly available.  Is it

10  issued by a public body?

11          THE COURT:  Okay.  Counsel, again, I have to ask you

12  to address the Court rather than each other.

13          MR. STEWART:  All right.

14          MS. PATEK:  Your Honor, this is signed by a private

15  arbitrator.  It is overseen and administered by MERC, as Ms.

16  Gurewitz previously testified, and I believe it is a public

17  record available to anybody, but I will --

18          THE COURT:  Well, but it wasn't issued by a public

19  body.

20          MS. PATEK:  Well, it also, however, is part of a

21  proceeding in which the City of Detroit, in fact,

22  participated, had a representative sign off on and, as we

23  heard Mr. Dillon testify earlier today, to his understanding,

24  becomes part of the collective bargaining agreement between

25  the City of Detroit and the DPOA, and I think that's an

1  additional basis on which it ought to be admitted.

2        MR. STEWART:  Perhaps, your Honor, we'd have no

3  dispute if we agree it's being introduced only for what it

4  purports to say as opposed for any internal hearsay that it

5  might contain.

6        MS. PATEK:  I have no problem with that, your Honor.

7        MR. STEWART:  In other words, its rulings --

8        THE COURT:  All right.

9        MR. STEWART:  -- holdings, or award.  If that's

10 acceptable, then we would not object to it.

11       THE COURT:  With that limitation, 706 and 707 are

12 admitted.

13     (Exhibits 706 and 707 received at 3:06 p.m.)

14 BY MS. PATEK:

15 Q   To your knowledge, Mr. Diaz, did the city take any action

16 with regard to the Act 312 award that we've been talking

17 about?

18 A   Yes.

19 Q   Did it appeal a portion of the award?

20 A   Yes.

21 Q   And can you tell us about that?

22 A   The city appealed a portion of the 312 award that spoke

23 to a five-percent restoration for DPOA members which was to

24 take effect January 1st of 2014.

25 Q   And does that appeal remain pending?

1  A   Yes.

2  Q   And is it your understanding it's stayed by these

3  bankruptcy proceedings?

4  A   Yes.

5  Q   I want to focus on the time period now after Mr. Orr's

6  appointment as emergency manager.  First of all, at or around

7  that time, did you become aware that the City of Detroit was

8  searching for a new police chief?

9  A   Yes.

10 Q   And can you tell the Court what, if anything, you did and

11 in what time frame on behalf of the DPOA with regard to that

12 search?

13 A   In around March or April of 2013, I had learned of

14 several individuals who had applied or shown interest in

15 becoming the chief of police for the City of Detroit.  One of

16 the individuals I was not familiar with, I learned that he

17 was the chief of police in Cincinnati.  I then began, I

18 guess, sporadically or no real method to the madness but

19 contacting different police officers in Cincinnati and asking

20 them questions about their chief.

21 Q   Was that Chief Craig?

22 A   Yes.

23 Q   And what did you find out as a result?

24         MR. STEWART:  Objection.  Asks for hearsay.

25 BY MS. PATEK:

1  Q   Well, let me ask you this.  Did there come a point in
2  time when you actually reached out to Chief Craig?
3  A   Yes.
4  Q   And did that happen prior to him assuming the job as
5  chief of the City of Detroit Police Department?
6  A   Yes.
7  Q   And since he has become the chief of the City of Detroit
8  Police Department, have you and your members reached out to
9  him?
10  A   Yes.
11  Q   And to your knowledge, have the members of the other
12  police unions done the same?
13  A   Yes.
14  Q   And in terms of -- I'm not talking about collective
15  bargaining issues, but I'm talking about issues related to
16  the management and restructuring of the Detroit Police
17  Department.  Have you participated actively in those efforts?
18  A   Yes.
19  Q   And do you consider that there has been a give and take
20  and a sharing of ideas and exchanging of proposals in that
21  regard?
22  A   Yes.
23  Q   Do you think that you are making progress in that regard?
24  A   I do.
25  Q   With regard -- and the next series of questions I'm going

1  to ask you are going to be going only up through the date the

2  bankruptcy petition was filed on July 18th.  With respect to

3  that time frame and since the Act 312 arbitration award was

4  issued by the city, has the city engaged the DPOA in any

5  further negotiations with regard to terms of employment,

6  healthcare benefits, anything of the like?

7  A    You're referring to the time pre-petition?

8  Q    Yes.

9  A    No.

10  Q    Did you -- we've heard a lot in this courtroom, and I

11  know you, as the DPOA's representative, have sat through this

12  part of -- part of the trial, but let me ask you this, first

13  of all.  With regard to your membership, are you -- since

14  assuming the job of president -- and let's just take up

15  through the date of the filing of the bankruptcy petition,

16  have you been generally in touch with them on a day-to-day

17  basis?

18  A    Yes.

19  Q    Do you have regular communications?

20  A    Yes.

21  Q    Do you have a sense as to -- as their president as to

22  their morale?

23  A    Yes.

24  Q    Do you have a sense of the issues that are of concern to

25  them?

1  A   Yes.

2  Q   And is the issue of pension and disability an issue of

3  significant concern?

4  A   Yes, it is.

5  Q   Now, with regard to those issues, did you attend a

6  meeting at the airport on June 14th, 2013, regarding the

7  city's unveiling of a proposal for creditors?

8  A   Yes, I did.

9       MS. PATEK:  And if you could -- could I have Exhibit

10  43, page 109?

11  BY MS. PATEK:

12  Q   First of all, Mr. Diaz, with regard to the June 14th

13  meeting for creditors, was there any statement by the city or

14  its representatives as to whether or not that meeting was a

15  negotiation?

16  A   No.

17  Q   And in terms of -- in terms of your particular interests,

18  looking at page 109, I take it of particular significance is

19  the claim for unfunded pension liabilities that we see on

20  109?

21  A   Yes.

22  Q   And when you were at that meeting, first of all, were

23  people allowed to ask questions verbally; that is, was there

24  any back-and-forth discussion?

25  A   No, not that I recall.

1   Q   Do you recall at that particular meeting submitting any

2   questions?

3   A   I did not.

4   Q   Did you review this document; that is, the proposal for

5   creditors, and, in particular, page 109?

6   A   Yes, I did.

7   Q   Did you view what you saw on page 109 as a proposal to

8   the DPOA?

9   A   I did not.

10  Q   And did you -- well, strike that.  Did you attend

11  subsequent meetings on June 20th, July 10th, and July 11th on

12  behalf of the DPOA?

13  A   I believe those were the dates, yes.

14  Q   And were any of the -- at any of those meetings was there

15  any statement by the city with regard to whether or not

16  negotiations would take place at those meetings?

17  A   I'm not entirely sure I can answer that question with a

18  "yes" or "no."

19  Q   Okay.  Why not?

20  A   With respect to whether at any of those meetings --

21  excuse me -- it was portrayed to me as a union representative

22  that these meetings were negotiations, at one of the meetings

23  it was definitely portrayed to me that it was -- these were

24  not negotiations.

25  Q   And tell me how you came to understand that.

1    A    I asked a question if, in fact, these meeting -- this

2    meeting was a negotiation, and I was informed that it was

3    not.

4    Q    Subsequent -- or, well, as these meetings were

5    proceeding, were you taking any action with regard to the

6    restructuring issues facing the City of Detroit as the

7    president of the DPOA?

8    A    Yes.

9    Q    Did there come a point in time when you began

10   communicating with members of the other public safety unions

11   and their executive boards?

12   A    Yes.

13   Q    And can you tell the Court approximately when that was?

14   A    It was shortly after -- as memory serves, shortly after

15   the June 14th meeting.

16   Q    And did there come a point in time when you and the

17   presidents of the other three public safety unions -- that

18   is, the Detroit Fire Fighters, the Police Lieutenants and

19   Sergeants Association, and the Detroit Police Command

20   Officers Association -- decided as a group to reach out to

21   the city?

22   A    Yes.

23           MS. PATEK:  And if I could have -- I believe it is

24   704, and this is in evidence.

25   BY MS. PATEK:

1 Q   Mr. Diaz, do you recognize Exhibit 704?

2 A   I do.

3 Q   And before we talk about this, I wanted -- I'm sorry to

4 do this to you, but I want to step back to one point I just

5 forgot to cover.  In approximately May of 2013 and before the

6 meeting of creditors, do you recall receiving correspondence

7 from an attorney at Jones Day regarding pension issues?

8 A   As I recall, yes.

9 Q   And did that -- was it an inquiry to ask if you would

10 represent the retirees who were former DPOA members?

11 A   That's exactly what I remember, and I --

12 Q   Did you respond promptly to that request?

13 A   I did, yes.

14 Q   And can you tell the Court what your response was?

15 A   That I do not represent retirees.  I represent active

16 DPOA members and their future retirement benefits.

17 Q   And is there anything unique with regard to your active

18 employees with regard to some of them actually receiving, at

19 least in an escrow account, retirement benefits while they're

20 still active?

21 A   Yes.  There is a -- I don't want to use the word

22 "hybrid," but there is an element of active employees who

23 are, in fact, having a portion of their retirement set aside

24 in an escrow account, and for all intents and purposes, in

25 the view of the pension system, they are, in fact, receiving

1   a pension benefit under a form of a retirement status which

2   is referred to as the deferred retirement option plan.

3   Q   And as I understand it, that means that once they elect

4   to DROP, D-R-O-P --

5   A   Correct.

6   Q   -- their retirement benefit is frozen at that level?

7   A   That is correct.

8   Q   And they cannot access it until they actually retire?

9   A   Correct.

10  Q   Going back to this letter on July 12th, this was sent to

11  Jones Day on behalf of the four public safety unions; is that

12  correct?

13  A   Yes.

14  Q   And you were indicating -- well, strike -- what was the

15  purpose of this letter?

16  A   Well, as pointed out in the first paragraph, the purpose

17  was -- is a follow-up to the July 10th meeting with the city

18  to discuss pension restructuring proposals.

19  Q   And were the four public safety union presidents willing

20  to attempt to engage the city in some kind of counterproposal

21  or proposal with regard to pension benefits?

22  A   I'm sorry.  You're asking if we were prepared to do so?

23  Q   I'm asking not whether you were prepared to do so but

24  whether you were willing to do so at that time.

25  A   Yes.

1    Q   And you made a request to the city in that regard for

2    some additional information?

3    A   Yes.

4    Q   And do you recall receiving a response from the city?

5    A   I have not, no.

6              MS. PATEK:  If we could put up 705.

7    BY MS. PATEK:

8    Q   Mr. Diaz, does this -- looking at 705, does that refresh

9    your recollection as to whether or not you ever received a

10   response?

11   A   I do not personally recall receiving this response.

12   Q   That response is, however, from Jones Day?

13   A   Yes, it is.

14   Q   Thanking you for your strong cooperation?

15   A   Yes.

16   Q   Dated the day before the bankruptcy petition was filed?

17   A   That's correct.

18   Q   During the time period from -- you sent your letter on

19   July 12th until July 18th, the date the bankruptcy petition

20   was filed, did anyone from either the emergency manager's

21   office or Jones Day reach out to you with regard to providing

22   further information or talking more about restructuring

23   proposals?

24   A   For the sake of clarity, I personally did not send the

25   letter to Jones Day on July 12th, but to follow up with the

1  remainder of that question, the answer is no.

2  Q    Mr. Diaz, do you consider the services your members

3  provide essential to the City of Detroit?

4  A    They are.

5  Q    Are you and your members committed to the City of

6  Detroit's restructuring?

7  A    Yes, we are.

8  Q    And do you want to be a positive force in that process?

9  A    Yes.

10  Q    With respect to the Act 312 arbitration award -- well,

11  strike that.

12        MS. PATEK:  That's all I have.

13        THE COURT:  All right.  We'll take our afternoon

14  recess now until 3:40, please.  Before we do that, can I get

15  an estimate on the length of closing arguments, please, on

16  each side?

17        MR. BENNETT:  Your Honor, I'm planning my opening

18  statement to be about an hour and a half, and I don't know

19  how much I will need on the back end.  It will depend partly

20  on how much time the objectors do so.

21        MR. SCHNEIDER:  Probably 20 to 30 minutes for me.

22        THE COURT:  Thank you, sir.

23        MR. MONTGOMERY:  Your Honor, we've undertaken to

24  sort of collect the estimates, and I think we're running

25  about three hours for the objectors as a whole.

1    THE COURT:  All right.  In light of those estimates,

2  it would be my intent to conclude court after the balance of

3  the examination of this witness and start with our closing

4  arguments tomorrow morning.  And what did I say?  3:40,

5  please.

6    MR. STEWART:  Your Honor, my cross-examination is

7  going to be extremely brief with this witness if you wanted

8  me to just get it out of the way before the break and perhaps

9  dispense with the need for a break and then return as the

10  Court wishes.

11    THE COURT:  Okay.  Go for it.

12    CROSS-EXAMINATION

13  BY MR. STEWART:

14  Q   Good afternoon, Mr. Diaz.  I'm Geoffrey Stewart of Jones

15  Day.

16  A   Good afternoon.

17  Q   Just a few questions for you.  You testified that with

18  the exception of those active employees who had the -- I

19  guess you called it the DROP or DROP's escrow arrangement for

20  their pensions, your union does not represent retirees?

21  A   That's correct.

22  Q   You don't negotiate on their behalf?

23  A   No.

24  Q   You cannot bind them either?

25  A   No.

1    Q    Okay.  Then one other thing.

2         MR. STEWART:  Can you put up Exhibit 60, please?

3    BY MR. STEWART:

4    Q    You, I think, were asked about various meetings that you

5    attended.  Do you remember a meeting that you attended on

6    July 11 on the subject of healthcare?

7    A    To narrow that down, there were two meetings we had on

8    healthcare.  There was one at the Coleman A. Young Municipal

9    Building.  Well, actually, they were both there.

10   Q    Right.

11   A    One was in the auditorium.  One was in a smaller room.

12   Could you narrow it down as to which room we're talking

13   about?

14   Q    You know, I can't.

15   A    Okay.

16   Q    Do you remember attending a meeting on the 11th where

17   specific healthcare proposals were made to you?

18   A    Yeah.  With the specific date, I can't.  I do not -- I

19   can't give you that answer.

20   Q    Could you look at Exhibit 60 and tell me if you've seen

21   it before?

22   A    I believe I have, yes.

23   Q    Does it refresh your recollection as to the date of a

24   meeting and what happened at the meeting?

25   A    This document in and of itself does not refresh my

1  recollection as to which meeting we're referring to.

2  Q   Do you remember a meeting, though, at which these

3  healthcare options were presented to you as proposals by the

4  city?

5  A   As I recall, yes.

6          MR. STEWART:  Thank you very much.  That's all I

7  have.

8          THE COURT:  Any other questions for the witness?

9          MR. KING:  I'm sorry, your Honor.  This will take

10 two minutes.

11                  CROSS-EXAMINATION

12 BY MR. KING:

13 Q   Ron King on behalf of the Retirement Systems.  Good

14 afternoon, Mr. Diaz.

15 A   Good afternoon.

16 Q   You testified that you also serve as a trustee of the

17 Police and Fire Retirement System?

18 A   Correct.

19 Q   And in your capacity as a trustee, are you familiar with

20 the operations generally of the Retirement Systems staff and

21 the systems themselves?

22 A   Vaguely, yes.

23 Q   And do you have interaction with the staff members at the

24 Retirement System?

25 A   I do.

1   Q   Are you aware of whether the Retirement System keeps a

2   database of all the retirees of the City of Detroit?

3   A   Yes.

4   Q   And does the Retirement System maintain a website?

5   A   Yes.

6   Q   Does the Retirement System have the capabilities of

7   reaching out to the Retirement Systems either through its

8   database or by way of its website?

9   A   Very easily, yes, it does.

10   Q   Are you aware of any effort on the part of the city to

11   ask the Retirement Systems to use its resources to contact

12   retirees in the context of restructuring proposals?

13   A   Not at all.

14        MR. KING:  Thank you.  Nothing further.

15        MR. STEWART:  Just one question unless -- other

16   questions?

17                   RECROSS-EXAMINATION

18   BY MR. STEWART:

19   Q   Did the city impede your ability to reach out to those

20   retirees?

21   A   For the purpose of --

22   Q   Anything at all.

23   A   Not to my knowledge, no.

24        MR. STEWART:  Thank you.

25        THE COURT:  Is that it then?  All right.  Sir, you

1    may step down.  You are excused.  Thank you for your

2    testimony.

3         (Witness excused at 3:26 p.m.)

4              THE COURT:  And we'll be in recess for the day, and

5    we'll reconvene for our closing arguments tomorrow morning at

6    nine o'clock.

7              THE CLERK:  All rise.  Court is adjourned.

8         (Proceedings concluded at 3:26 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Andy Dillon | 5/16 48/61 | | | |
| Richard Baird | 66/77 80/94 108/111 | | | |
| Bradley Robins | 114/139 | 140 | 157/159 | |
| Mary Ellen Gurewitz | 161 | 173 | 173 | |
| Mark Diaz | 174 | 194/196 | | 197 |

| EXHIBITS: | Marked | Received |
|---|---|---|
| Exhibit 201 | | 20 |
| Exhibit 202 | | 20 |
| Exhibit 206 | 40 | |
| Exhibit 438 | | 63 |
| Exhibit 458 | | 106 |
| Exhibit 460 | | 100 |
| Exhibit 706 | | 183 |
| Exhibit 707 | | 183 |
| Exhibit 717 | | 168 |
| Exhibit 718 | | 164 |
| Exhibit 719 | | 165 |
| Exhibit 836 | | 94 |
| Exhibit 840 (excerpt) | | 33 |
| Exhibit 841 (excerpt) | | 25 |
| Exhibit 872 | | 92 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    November 12, 2013

_____          _____
Lois Garrett

**ITEM NO. 76**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN THE MATTER OF,                    Case No. 13-53846
                                     Detroit, Michigan
CITY OF DETROIT, MI                  November 8, 2013
_____/        9:00 a.m.

        IN RE:   ELIGIBILITY TRIAL CLOSING ARGUMENTS
          BEFORE THE HONORABLE STEVEN W. RHODES
        TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.

APPEARANCES:

For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
                              GEOFFREY STEWART, ESQ.
                              GREGORY SHUMAKER, ESQ.
                              THOMAS CULLEN, JR., ESQ.
                              MIGUEL EATON, ESQ.
                              Jones, Day
                              51 Louisiana Avenue, N.W.
                              Washington, D.C. 20001-2113
                              202-879-3939

                              BRUCE BENNETT, ESQ.
                              Jones, Day
                              555 South Flower Street
                              Fiftieth Floor
                              Los Angeles, CA 90071-2452
                              213-243-2382

                              ROBERT HERTZBERG, ESQ. (P30261)
                              DEBORAH KOVSKY-APAP, ESQ.
                              (P68258)
                              Pepper, Hamilton
                              4000 Town Center
                              Suite 1800
                              Southfield, MI 48075-1505
                              248-359-7333

                              PETER ELLSWORTH, ESQ. (P23657)
                              Dickinson, Wright
                              215 S. Washington Square
                              Suite 200
                              Lansing, MI 48933-1816
                              517-371-1730

```
 1   For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
                                   (P62190)
 2                                 Chief Legal Counsel
                                   Attorney for State of Michigan
 3                                 Michigan Department of
                                   Attorney General
 4                                 P.O. Box 30754
                                   Lansing, MI 48909
 5                                 517-373-0126

 6                                 STEVEN HOWELL, ESQ. (P28982)
                                   Special Assistant Attorney
 7                                 General
                                   Dickinson, Wright
 8                                 500 Woodward Avenue
                                   Suite 4000
 9                                 Detroit, MI  48226-3425
                                   313-223-3033
10
     For Michigan Council 25 of    SHARON L. LEVINE, ESQ.
11   the American Federation of    JOHN SHERWOOD, ESQ.
     State, County and Municipal   Lowenstein, Sandler, LLP
12   Employees (AFSCME), AFL-CIO   65 Livingston Avenue
     and Sub-Chapter 98, City of   Roseland, NJ 07068
13   Detroit Retirees:             973-597-2500

14   For Detroit Retirement        ROBERT D. GORDON, ESQ. (P48627)
     Systems - General Retirement  JENNIFER GREEN, ESQ.
15   System of Detroit, Police and Clark, Hill, PLC
     Fire Retirement System of     151 S. Old Woodward Avenue
16   the City of Detroit:          Suite 200
                                   Birmingham, MI 48009
17                                 248-988-5882

18                                 RONALD KING, ESQ. (P45088)
                                   Clark, Hill
19                                 212 East Grand River Avenue
                                   Lansing, MI 48906
20                                 517-318-3015

21

22

23

24

25
```

```
 1  For the Detroit Fire Fighters    BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit         JULIE BETH TEICHER, ESQ.
 2  Police Officers Association      (P34300)
    and the Detroit Police          DAVID EISENBERG, ESQ. (P68678)
 3  Lieutenants and Sergeants        Erman, Teicher, Miller, Zucker
    Association:                     & Freedman
 4                                   400 Galleria Officentre
                                     Suite 444
 5                                   Southfield, MI 48034
                                     248-827-4100
 6
    For International Union, UAW:    BABETTE A. CECCOTTI, ESQ.
 7                                   PETER D. DECHIARA, ESQ.
                                     THOMAS CIANTRA, ESQ.
 8                                   Cohen, Weiss, and Simon, LLP
                                     330 West 42nd Street
 9                                   New York, NY 10036-6976
                                     212-356-0227
10
    For the Detroit Retired         THOMAS MORRIS, ESQ. (P39141)
11  City Employees Association,     Silverman & Morris
    Retired Detroit Police and      30500 Northwestern Highway
12  Fire Fighters Association,      Suite 200
    Shirley V. Lightsey, and        Farmington Hills, MI 48334
13  Donald Taylor (Retiree          248-539-1330
    Association Parties):
14                                  RYAN PLECHA, ESQ. (P71957)
                                    Lippitt, O'Keefe
15                                  370 East Maple Road
                                    3rd Floor
16                                  Birmingham, MI 48009
                                    248-646-8292
17
    For the Official Committee of   MATTHEW E. WILKINS, ESQ.
18  Retirees:                       (P56697)
                                    Brooks, Wilkins, Sharkey &
19                                  Turco, PLLC
                                    401 S. Old Woodward Avenue
20                                  Suite 400
                                    Birmingham, MI 48009
21                                  248-971-1711

22                                  CLAUDE D. MONTGOMERY, ESQ.
                                    ANTHONY ULLMAN, ESQ.
23                                  ARTHUR RUEGGER, ESQ.
                                    Dentons
24                                  1221 Avenue of the Americas
                                    New York, NY 10020-1089
25                                  212-768-6700
```

```
 1                                  SAM ALBERTS, ESQ.
                                    DAN BARNOWSKI, ESQ.
 2                                  Dentons US LLP
                                    1301 K Street, N.W.
 3                                  Suite 600 East Tower
                                    Washington, D.C. 20005-3364
 4                                  202-408-7004

 5  For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
    Police Members Association:    MEREDITH TAUNT, ESQ. (P69698)
 6                                  MALLORY FIELD, ESQ. (P75289)
                                    Strobl & Sharp, P.C.
 7                                  300 East Long Lake Road
                                    Suite 200
 8                                  Bloomfield Hills, MI 48304-2376
                                    248-540-2300
 9
    For the Flowers Plaintiffs –   WILLIAM A. WERTHEIMER, ESQ.
10  Robert Flowers, Michael Wells, (P26275)
    Janet Whitson, Mary Washington 30515 Timberbrook Lane
11  and Bruce Goldman:             Bingham Farms, MI 48025
                                    248-644-9200
12
    For Ambac Assurance            DANIEL WEINER, ESQ. (P32010)
13  Corporation:                   Schafer & Weiner
                                    40950 Woodward Avenue
14                                  Suite 100
                                    Bloomfield Hills, MI 48304
15                                  248-540-3340

16  Court Recorder:                Letrice Calloway

17  Transcriber:                   Deborah L. Kremlick

18

19  Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
20

21

22

23

24

25
```

1    (Court in Session)

2         THE CLERK:  All rise.  Court is in session.  Please

3  be seated.  Case number 13-53846, City of Detroit, Michigan.

4         MR. IRWIN: Good morning, Your Honor.  For the

5  record, Geoff Irwin, Jones, Day on behalf of the city.

6         Just one housekeeping matter.  I think we've -- we've

7  talked about this a couple of times.  Both objectors and the

8  city have deposition designations that we wish to submit in

9  hard copy and I think in a few instances, by video as well.

10  So I have them here if you'd like me to hand them up.

11         THE COURT:  Okay, please.

12         MR. IRWIN:  And we will be submitting a revised

13  pre-trial order which will conform to dep designations in a

14  pre-trial order too while we are handing up.

15         THE COURT:  Okay.

16         MR. RUEGGER:  Your Honor, for the record Arthur

17  Ruegger from Dentons on behalf of the retirees committee.  We

18  have four copies of the Moore deposition which is marked as

19  Exhibit 456 with everyone's designations, and cross

20  designations, and the Bowen deposition marked as 455 equally

21  with cross designations.

22         We also have, Your Honor, the video deposition of Mr. Orr

23  on September 16th and October 4th marked as Exhibit 446.  And

24  the Bing deposition marked as 447.  There are only two copies

25  of these disks right now, Judge, but with your permission,

1  we'll hand up two more later on.

2          THE COURT:  Okay.  Thank you.

3          MR. RUEGGER:  One -- one final issue, Your Honor.

4  And we don't need a ruling on this yet.

5      The pre-trial order that Mr. Irwin submitted contains

6  only the exhibits that were a part of the original pre-trial

7  order.  As everyone here knows, a number of exhibits have been

8  offered and some accepted since that list went in.  We'd like

9  to help the Court as best we can with a list of those

10  supplemental exhibits which have been discussed, whether

11  they've been accepted or -- or rejected during the course of

12  the trial if that will help the Court.  And we would -- could

13  submit that next week.  But if Your Honor has any other

14  procedure we're happy to oblige.

15          THE COURT:  We've maintained a list of the admitted

16  exhibits that were not admitted pre-trial that were admitted

17  during the course of the trial.  And so at lunch time I would

18  propose to just give you that list and ask you if we have it

19  right.

20      Are there exhibits on the list that shouldn't be on the

21  list, or are there exhibits that aren't on the list that

22  should be.  And ask you all to review that over the lunch

23  hour, compare it to your own notes regarding admitted

24  exhibits, and then we'll discuss that further this afternoon.

25          MR. RUEGGER:  Very well.

1    THE COURT:  That's -- that's the help I need.  And

2  then of course what we'll do, is go through our copies of the

3  exhibit books that we have here and just remove the exhibits

4  that are in there that were not admitted into evidence and --

5  and not consider them.

6    MR. RUEGGER:  Thank you, Your Honor.

7    THE COURT:  Okay.  Are we ready to proceed with the

8  closing arguments now?  Okay, let's do that.

9    MR. SCHNEIDER:  Good morning, Your Honor.  Matthew

10  Schneider on behalf of the State of Michigan.

11    May it please the Court.  Years ago the people of

12  Michigan and the citizens of this city started to learn that a

13  tremendous and terrible storm was headed toward the City of

14  Detroit.  And this was no secret.

15    The people of Michigan, the citizens of Detroit, and the

16  city could see what was headed their way.  And throughout this

17  trial we've heard the evidence that this storm was coming.

18    Exhibit 21, please.  In the City of Detroit's preliminary

19  review findings, it indicates that since 2006, the city has

20  been experiencing significant financial problems caused by the

21  loss of residence, the financial challenges of the automobile

22  industry, the destructions in the financial markets, and the

23  overall economic issues faced by the country.  You can take

24  that down.

25    So with that in mind in January of 2011, Governor Snyder

1  takes office.  And he begins to read these weather reports.

2  The weather reports in this case are cash flow reports.  And

3  they are forecasting the storm.

4      And the Governor realizes as he testifies that there is a

5  serious cash flow problem.  And the Treasury Department is

6  also reviewing these weather reports.  And in December 2011

7  they conduct a preliminary review of the city's finances.  And

8  the conclusion is, significant cash flow shortages, long term

9  debt liabilities, $12,000,000,000 not including almost

10  5,000,000,000 in interest owed.

11      The long term bond rating, the city is in junk status.

12  And the city has no adequate plan to fix the deficit.  There

13  is probable financial stress and there is need of a financial

14  review team.

15      Exhibit 21, second page.  And the preliminary review

16  indicates that the inability of the city to avoid fund

17  deficits, recurrent accumulated deficit spending, severe

18  projected cash flow shortages resulting in an improper

19  reliance on inter fund and external borrowing, the lack of

20  funding of the city's other post-retirement benefits, and

21  increasing debt of the city calls for a financial review team.

22  You can take that down.

23      So in December 2011, the Governor appoints a financial

24  review team.  And this review team produces another weather

25  report.  In March of 2012, the weather report indicates that

1  the City of Detroit is in a condition of severe financial

2  distress.

3      The conclusions are that the general fund deficit is

4  increasing.  Moody's is downgrading approximately two five --

5  2.5 billion of the city's debt.  Some of it five to six levels

6  below investment grade.  The city is facing a significant

7  depletion of its cash and the forecast is a negative cash

8  balance.

9      Exhibit 22.  Because this conclusion is that the City of

10  Detroit is in a condition of severe financial stress, the next

11  step is that a consent agreement between the city and the

12  state is attempted.  You can take it down.

13      The Governor testified that he worked very hard to get

14  this done but by the fall the city was not living up to -- to

15  its part of the obligations.  And so, Your Honor, the

16  impending storm here is not getting better, it is getting

17  worse.  And in February of 2013, another financial review is

18  done.  And what does this weather report show us, Exhibit 25?

19  There is a cash crisis.

20      The city continues to experience a significant depletion

21  of its cash.  Projections have estimated accumulative cash

22  deficit in excess of $100,000,000 by June 30, 2013 absent

23  implementation of financial counter measures which aren't on

24  the horizon.

25      Over $14,000,000,000 in liabilities are facing the city

1  and the city has no workable plan.  And what does the Governor

2  call this?  He says that the city is hemorrhaging cash.

3       What else is going on with the city at this time?  The

4  evidence in this case shows a lot else is going on.  The

5  streetlights aren't working.  Forty percent of them are out in

6  the first quarter of 2013.

7       Ambulances aren't responding in time.  Detroiters are

8  waiting 58 minutes for police to respond to calls.  There is

9  78,000 abandoned buildings.  The evidence shows that the

10  health, safety, and the welfare of the citizens of Detroit are

11  at risk.

12       And this is what caused the appointment of the emergency

13  manager.  Throughout this whole process, the state and the

14  city are working together.  They are working together in a

15  partnership to survive this storm.

16       And also throughout this whole process, the state and

17  city are receiving financial advice.  And some of this is

18  unsolicited.  Miller, Buckfire is offering advice, Jones, Day,

19  Miller, Canfield, Dykema, Huron Consulting, Ernst and Young,

20  Conway, MacKenzie.  Some of this is unsolicited advice, pro

21  bono, for free.

22       Mr. Dillon testified, this is not unusual.  Ultimately

23  the storm arrives and the Governor says, this is the last

24  resort.  Because people are suffering.  The 700,000 citizens

25  of Detroit are suffering and his overriding concern is for the

1  citizens. And because of that, he authorized -- authorizes to

2  file for Chapter 9 protection.

3      So what is the objectors' theory of this case? Their

4  theory appears to be don't go speaking with weather experts

5  too early or consultants because that must mean you want the

6  storm to come. Their theory is apparently that the state or

7  the city shouldn't consider the last resort and don't be

8  prepared. Don't even ask whether you need a raincoat.

9  Because if you buy a raincoat, or you ask someone whether you

10 need a raincoat, then you want the storm to come.

11     This makes no logical sense. Doesn't it make sense that

12 when you have a storm of this magnitude coming toward you, you

13 want all the help you can get? So was the state working with

14 the city? Were consultants involved? Of course they were for

15 the benefit of the citizens of Detroit.

16     If you saw this storm coming toward you, isn't this what

17 you'd expect out of your government? You would expect

18 planning, you'd expect cooperation, you'd expect your

19 government leaders to prepare and plan and be ready for

20 anything. And that is just responsible government. Like any

21 good government, it would be foolish to go alone. It would be

22 irresponsible to fail to prepare.

23     The evidence in this case shows that the city and the

24 state prepared for the worst, but they hoped for the best.

25 And as Mr. Orr testified, we pray for peace, but prepare for

1   war.

2       The objectors apparently want to punish the Governor or

3   the Treasurer for contingency planning, for doing their jobs

4   to protect the people of Detroit.  But working together was

5   the right thing to do.

6       The evidence in this case shows that this was never about

7   pre-determining a Chapter 9 filing.  This was only about

8   careful consideration.

9       So then it begs the question, what is this trial about?

10  It's about eligibility.  It's about whether the City of

11  Detroit is eligible for bankruptcy, that's it.  It is not

12  about when Jones, Day and Miller, Buckfire became involved to

13  give advice on how to weather this storm.  It is not about

14  whether Kevyn Orr has a background as a bankruptcy lawyer.  It

15  is not about whether a Judge in Ingham County had set a

16  hearing.  It's not about whether the Governor decided to

17  authorize a filing a day before than his communications staff

18  had planned.  And it's definitely not about all the other

19  confirmation arguments that the objectors have raised.

20      It is about eligibility and the facts and the evidence

21  show that the city is eligible for bankruptcy protection.  So

22  let's look at the law.

23      To be eligible for bankruptcy, we have to look at Section

24  109(c)(2) of the Bankruptcy Code which states that an entity

25  may be a debtor if such entity is specifically authorized to

1  be a debtor by a governmental officer empowered by state law

2  to authorize a filing.  That process is governed by state law.

3      So determine -- to determine who is the governmental

4  officer empowered by state law, we have to look at the state

5  law PA436.  And Section 18(1) describes this process.  It

6  effectively states that the process is that the emergency

7  manager recommends a filing to the Governor and the Treasurer.

8      Second, if the Governor approves, he informs the

9  emergency manager and Treasurer in writing.

10      Third, the Governor may place contingencies on the filing

11 but he does not have to.

12      And fourth, upon receipt of the written approval, the

13 emergency manager may file.

14      Well, Your Honor, that's what happened in this case.

15 There is really no serious dispute that that happened.

16 Exhibit 28, which is Mr. Orr's letter and Exhibit 29, which is

17 the Governor's letter, comply with PA436.

18      The statutory process was followed in this case to the

19 letter.  And the objectors cannot refute that.  They can't

20 argue that the authorization process failed to follow that

21 statute.  And they can't seriously refute that the city is out

22 of cash.  So they have to refute everything else, even things

23 that have nothing to do with eligibility.  And that is truly

24 the theory of their case.

25      I want to object -- address some of the objectors'

1  arguments.  And I'd like to go through five separate issues.

2       Number one, the objectors say that the purpose of the

3  appropriation provision in PA436 was to make it referendum

4  proof.  And therefore that violates the referendum clause.

5       Well, first of all, as been -- as it has been argued in

6  this Court, it is improper to speculate on the motives of the

7  legislature.  And the <u>MUCC v Secretary of State</u> case tells us

8  that.

9       Now Howard Ryan did indicate that one of the motives was

10  for proofing it.  Okay.  But who did the objectors really cite

11  to for the motive to make this referendum proof?  They present

12  emails from March 2 and 3.  They're talking about Jones, Day

13  lawyers talking about this.

14       Well, that's all very interesting, but those Jones, Day

15  lawyers are not legislators.  And they are not the Governor.

16  The Governor signed the bill and he testified no, that was not

17  his purpose.

18       The Governor testified that the purpose was to pay the

19  emergency managers.  And the Treasurer indicated as much as

20  well.  To pay for emergency managers -- managers not just for

21  Detroit.  Because there were seven or eight emergency

22  managers.  This is a statewide problem, not just a situation

23  in this city.  And it's to pay consultants to get through the

24  fiscal year.

25       And -- and, Your Honor, you can look at the language of

1  the statute to find out exactly what those appropriation

2  provisions said.  But the testimony from the Governor and the

3  Treasurer was that the purpose really was to respond to the

4  criticism from cities because you had put an EM in place and

5  then you would make the city pay for it.  And the improvement

6  in this was, that's not appropriate.  Let's have the state pay

7  for the EM so that we don't put that burden on the city, or

8  the school district.

9      But most significantly as the Governor testified, after

10  PA436 was done, he later signed another appropriations bill.

11  And in that appropriations bill, he funded emergency managers.

12  So the appropriation was put back in later.

13      So if the purpose of the appropriation was to proof it

14  from referendum, why would they put in an appropriation again

15  in a later bill?  That's why this doesn't -- their theory

16  makes no logical sense.

17      The second point I'd like to make is that the objectors

18  argue that the Governor acted with bad faith effectively by

19  rushing this filing.  But the facts and the evidence just

20  don't support that.

21      We look at the evidence, we look at what the Treasurer

22  said, and we look at what the Governor said.  He testified

23  that he went back literally since the time he became Governor,

24  he reviewed the financial review team reports.  He reviewed

25  the 45 day report.  He reviewed other items.  And he worked

1  diligently to go through this process in good faith and that

2  is what he said.

3      He said that he reviewed this file himself.  The evidence

4  shows that the Governor took careful, and thoughtful, and

5  deliberate consideration about this.

6      Point number three, the objectors argue that the

7  Governor's failure to place a contingency in his authorization

8  excluding pensions was either sinister, or unconstitutional,

9  or both.  Well, we know why the Governor did this.  The

10  evidence is what he said.

11      He testified, we're in a crisis mode.  We have serious

12  issues here.  And contingencies could cause more delays, more

13  concern, more complexities to an already complex case.  The

14  Governor said that he has confidence in the judicial process

15  and he himself asked that the statement be added that any plan

16  has to be a legal plan.

17      To get into the legal system so the appropriate people

18  can decide.  And that is what he said.  It doesn't matter

19  whether the Governor's legal counsel, Mr. Gadola, thought

20  contingency should be included because the statute provides

21  that the Governor makes that decision.  The Governor, himself,

22  after careful thought, chose not to place contingencies.  And

23  this was allowed and appropriate under the law.

24      Point number four.  The objectors argue that the state

25  had some sort of scheme to end a run -- end run around the

1   Constitution, the pension clause, in order to cut the pensions

2   of retirees.

3       Well, again, let's look at the facts.  The facts are both

4   the Governor and the Treasurer explained, even if you take out

5   this 3.5 billion dollars in pension fund liability, the city

6   is still 14,000,000,000 or $15,000,000,000 in debt.  It is

7   inconceivable that the purpose of seeking a Chapter 9 filing

8   is to get the pensions.

9       Even Mr. Dillon testified that the problem that the

10  pensions was underfunded, the health care liability was in an

11  even bigger problem.  So the pensions can't be the target.

12      Point number five.  The objectors want this Court to

13  believe that there was some sort of alliance between the

14  consultants, and the state, and the city to drive the city

15  into Chapter 9.

16      And we've seen these emails from the consultants and the

17  lawyers talking about a Chapter 9 filing.  You know, these

18  consultants and the lawyers, they can talk all they want and

19  if we had a nickel for every time a lawyer gave free advice,

20  we'd all be wealthy.

21      But ultimately it's not those consultants' decision to

22  authorize the filing, it is the Governor's decision.  So the

23  best evidence is the Governor's testimony.  He said that lots

24  of people were talking about Chapter 9.  There were

25  contingency plans going back quite some time.  So why do we

 1  have contingency plans?  It's because it's a contingency.

 2  It's not our goal.

 3      The Governor said, you needed to be thoughtful about

 4  this.  And he said that the serious discussion of Chapter 9

 5  was the week before the authorization.  The Treasurer also

 6  presented evidence why this argument is meritless.

 7      In Ms. Brimer's last question, her last few questions of

 8  Mr. Dillon really spelled this out.  And this goes to the

 9  heart of what the objectors' theory is.  The question was,

10  about as early as March 2012 were people at the state and

11  consultants speaking about the filing for Chapter 9?  Well,

12  let's remember what the Treasurer said.  He said, it was

13  always a last resort.

14      If we were thinking of Chapter 9, we wouldn't have gone

15  into a consent agreement.  Because you can't get into Chapter

16  9 through the consent agreement route.  And that's what the

17  statute says.

18      So to agree with this conspiracy theory, then you must

19  conclude that the entire consent agreement process was just a

20  charade.  The problem for the objectors is there is no

21  evidence of that.  In fact the evidence proves otherwise.

22      The evidence proves that the state didn't want to rush

23  into Chapter 9.  The state even wanted to avoid a declaration

24  of financial emergency because the state wanted the locals to

25  work it out.  That's what the testimony in this case was,

1    That was the purpose of the consent agreement.  And both the

2    Governor and the Treasurer explained that.

3        The objectors argue much more.  And the city will address

4    those points and Mr. Bennett will be up here in just a moment

5    to do so.

6        So let me conclude by saying this, Your Honor.  This

7    world is full of critics.  The objectors can criticize the

8    Governor, and the state, and the Treasurer, and the emergency

9    manager because they don't like where they think this case is

10   heading.

11       But this eligibility case isn't about their critiques.

12   The witness testimony shows that it's about leadership.  By

13   authorizing a Chapter 9 filing, the Governor took on an

14   enormous task.  He saw that the problem was getting worse and

15   no one was solving it.

16       He showed leadership by making the hard decision to

17   authorize the filing.  That's not a showing of bad faith,

18   that's good faith.  It's good faith to step up and do what

19   needed to be done to protect the health and the safety of the

20   citizens of Detroit.

21       The evidence in this case shows that Chapter 9 was always

22   a last resort.  Unfortunately the deplorable financial facts

23   of this case required that it come to that.  This city is

24   eligible for bankruptcy.

25           THE COURT:  Thank you, sir.

1          MR. BENNETT:  Good morning, Your Honor.  I think --

2   while I will be using the screen, I will be talking a lot

3   about Exhibit 43, so if the -- if you want to get that handy,

4   it might --

5          THE COURT:  Okay.

6          MR. BENNETT:  It might make some sense.

7          THE COURT:  One second, please.

8          MR. BENNETT:  Okay.

9          THE COURT:  Okay.

10          MR. BENNETT:  All right.  First of all, I'm going to

11  try really hard not to repeat any --

12          THE COURT:  Would you point the mike right at you?

13          MR. BENNETT:  I'm going to try really hard not to

14  repeat any of the things that we've just heard or cover any of

15  the same subjects.  Frankly the city is in exactly the same

16  place as the state in those points.

17      I will add one comment which is that in the careful

18  exegesis of all of the emails about what was going on around

19  the Governor at various points in time, it's been pointed out

20  that there have been lots of different opinions expressed by

21  different actors.  And I frankly take that as comforting.

22  Internal debate, free internal debate is a good thing.

23      I would be much more concerned and frankly with this

24  administration, surprised if everybody wouldn't say a thing

25  until the Governor said what he wanted to do and then they

1  said okay.  So, I think we have in the -- in all of the

2  internal debate where people are talking about suggestions

3  that may or may not have been adopted along the way, we're

4  seeing an additional sign of a healthy process and an

5  additional reflection of good faith.

6      I want to begin by finding our way through the math

7  because while the testimony has been quite wide ranging and

8  some of the points are a little bit open ended, there is a

9  certain amount of business that we have to do.  And that

10 business is to work our way through 109(c) and determine

11 whether the City of Detroit is authorized to be a debtor under

12 Chapter 9.  I think just to check the box, I don't think

13 there's any dispute with respect to (c)(1) that it is a

14 municipality.  The city is a municipality.

15     Number two, second requirement, we've heard about

16 specific authorization from the state this morning.  It was

17 also of course a subject touched on extensively during the

18 arguments concerning legal issues.  I am not going to repeat

19 any of those arguments today.  I don't think Your Honor wants

20 me to.  Of course I'd be happy to answer any questions you may

21 have.

22     We then reach 109(c)(3) which is whether or not the city

23 was insolvent.  I'm going to have some very brief comments on

24 that question.  But I do want to point out that only one

25 objector actually put the issue -- put insolvency in issue

1  They -- this was AFSCME.

2       They made certain promises about what they would prove in

3  the context of their trial brief and opening statement.  And I

4  didn't see them prove anything.  But it is our burden, we will

5  cover -- we will demonstrate that we have met our burden, but

6  it may be that we can do this in a relatively condensed way

7  because I'm not sure there's a dispute anymore.  And -- and --

8  and perhaps we'll get some help about that when the AFSCME

9  representative reaches the podium.

10      The fourth issue is whether or not the city desires to

11  effect a plan to adjust its debts.

12      And then the fifth issue is the disjunctive tests

13  concerning practicability of negotiations and good faith.

14      Those are the specific things we need to do to move from

15  here to the next phase of the case.  Now woven through some of

16  the objections was an argument that Section 921, good faith

17  was also an issue which of course opened up a few additional

18  doors for testimony.

19      I'm going to try to cover 921 good faith in the context

20  of the discussions relating to 109(c)(5)(B) because I think

21  the overlap is so great that to try to do it separately would

22  just take too much time.

23      So let's begin with the issue of whether or not Detroit

24  is insolvent.  At the opening I promised that our witnesses

25  would present a mountain of evidence showing that the City of

1 Detroit was insolvent and it wasn't pretty, but it turns out

2 that we did in fact do that.  I will take through very -- take

3 us through a little bit of it in a minute.

4     As I said before, this evidence was not rebutted by any

5 evidence introduced by anybody else.  So let's just cover a

6 few of the very very key points that are suggested by the

7 statute and we'll cover a little more later.

8     First of all, Mr. Buckfire testified that when he took a

9 hard look at -- at -- at liquidity in May, he found that the

10 city's position was on a razor's edge.  And that was at a time

11 when vendors were not being paid on schedule.  That there was

12 involuntary deferral of vendor payments.

13     Then Mr. Malhotra got a lot more technical but just to

14 get one glimpse of his testimony, Exhibit 38, please.  I'm

15 sure everybody remembers this chart, the two different lines,

16 the light blue line which is if you were paying all of your

17 debts how much cash you would have left.  And of course that's

18 below the break even line at every point on the chart.

19     And then there's the darker line which shows the cash

20 flow situation given the cash conservation steps that the city

21 took.  And by those cash conservation steps, they weren't

22 saving money so that you had more money to pay creditors, it

23 was testified that the cash conservation steps were not paying

24 debts as they become due.  And -- and most prominent of course

25 is the decision by the city not to make the June -- I think it

1  was due on the weekend, June 15th payment on the -- of

2  principal on the COPs.

3      But at the same point -- point in time, as not only Mr.

4  Buckfire, but I think Mr. Malhotra testified there was also

5  deferrals in the trade payment area.  And there is now other

6  problems that may well occupy some time later in the case that

7  the city's cash position was -- was calculated based upon a

8  past commingling of certain other -- money from certain other

9  accounts.  So there was roughly 103,000,000, the number sticks

10  in my head, could be off by a little bit of cash that was

11  really from other funds that could be called back at -- or

12  could conceivably be called back at any point in time.

13      But it's not technically right to say that that money

14  should be regarded as part of the city's cash balance.  That's

15  another form of borrowing.  And so to make it, to -- to

16  actually not hit the wall, the city was not paying its debts

17  as they become due.

18      Now, let's not be content with this horrifying snapshot.

19  Let's take a look at Mr. Orr's budget for fiscal '14 to see

20  what the situation looked going out from the vantage point of

21  June of this year.

22      This exhibit was displayed during Mr. Orr's testimony.

23  Again, in the interest of time, I'm just going to zero in on

24  the numbers at the bottom, but you can blow them off as fine.

25  And note the -- the surplus (deficit) before concessions,

1  That's the kind of general fund deficit, the $379,000,000

2  number that the city was facing if nothing changed for the --

3  the 2014 fiscal year.

4     That's a big number.  It's not -- you're not going to get

5  there by the way with contract changes that the unions may be

6  proud of that they negotiated pre-petition and weren't

7  implemented.  The highest savings number, multi year savings

8  number, I ever heard attached to those was a little over

9  $100,000,000.  And that was over the entire term of the

10 contract.

11    So this is a number that -- that there was no non-debt

12 adjustment mechanism to address.  And no evidence was adduced

13 concerning any conceivable non-debt adjustment approach to

14 creating some form of balance on a cash flow basis to the

15 city's financial affairs in '14.

16    But the sterile numbers only understate the problem.  We

17 also proved what this means, what this -- what the reality is

18 faced by citizens because of the fact the city's budget is so

19 stressed.  And some of that was covered in the state's

20 opening, not going to repeat it.  I'm of course referring to

21 Chief Craig's testimony and I'm going to skip over the

22 different points and just say the cases actually look at the

23 things that -- that Chief Craig talked about as reflective of

24 something called service insolvency.

25    Why do the cases talk about service insolvency and say

1  it's relevant?  Well, that's kind of for the cases where the

2  -- the municipality is somehow managing to pay its debts and

3  maybe not having deferrals, but is not providing adequate

4  services.  So it means that the money it should be spending

5  would render it insolvent.

6      In our case, it tells us that even the numbers that get

7  to the three seventy-nine negative are not generating an

8  adequate result for citizens.  So the inference is, is that

9  the $379,000,000 number actually understates the extent of the

10  problem.

11      Detroit is one of those situations where the insolvency

12  tests are made without regard to the fact that the services

13  being provided are not adequate by any measure.  And when you

14  consider that making them adequate will cost more money, it

15  only means the situation is far worse.

16      My first reference to the proposal for creditors is a

17  chart -- is a chart on Page 34.  This is the chart that

18  quantifies what Chief Craig is talking about, or says the same

19  thing from a different perspective.  And I want to just zero

20  in on the bottom line.

21      And -- and one thing I'm going to say over and over

22  again, Your Honor's going to be tired of hearing it by the

23  time I'm done, but it's important for emphasis.  This chart's

24  in evidence.  No one said a word, no evidence was adduced that

25  there's anything inaccurate, incomplete, or misleading about

1  this chart.

2      And the bottom line shows the percentage of revenues in

3  the general fund that are devoted to paying legacy liabilities

4  in the general fund.  And what it means in the 2013 fiscal

5  year just ended, is that when the city walks up to a taxpayer

6  and collects a dollar of taxes, there is only 57 1/2 cents

7  that's going to be spent on services for that resident.  That

8  that residence is going to get today.

9      And I'm going to use Chapter 11 analogies a lot during

10 this case, but if we had a situation where -- where we had a

11 store that was in bankruptcy and the -- the reality was was

12 that -- that the dollar in that store was only going to give

13 the customer 57 1/2 cents worth of goods, and there's a store

14 down the street where the customer is going to get 84 or 85

15 cents, just turns out to be about what the average is for well

16 managed cities, out of the dollar they spend in the store, we

17 have a reorganization problem in our store that needs to be

18 fixed.

19     That's bad enough.  But because of increases in pension

20 contributions that would be required if things aren't fixed,

21 and escalation of other numbers over time like OPEB's, this

22 problem gets worse, and worse, and worse, and worse in future

23 years.  This has to be addressed.  This cannot be ignored.

24     Finally, there's one more dimension to this -- to the

25 city's insolvency that we have to talk about.  And it's the

1  close in problems that the city was confronting in and around

2  June.

3      We already talked about the fact that the city had its

4  first payment default on borrowed money indebtedness by

5  foregoing the principal payment with respect to the COPs.  The

6  full repercussions of that were not yet known, but they were

7  dealing with that and the clock was ticking on it.

8      It was known that that was an additional default that

9  might give additional rights to the swap counter parties.  And

10 as Your Honor knows, there was testimony that there was a

11 series of negotiations started, actually a little before the

12 June 14th presentation.  This is the 60 days of negotiations

13 that Mr. Orr was testifying about and other people criticized

14 him for not including prior negotiations that were actually

15 triggered by something different.

16     And a settlement was reached with the swap counter

17 parties right about the, you know, kind of in and around the

18 same time.  But Syncora was initiating a campaign initially

19 letter writing, ultimately in litigation to seize the casino

20 revenues, notwithstanding the swap counter parties' agreement

21 to leave them available to the city.

22     And of course that -- Syncora's campaign wasn't actually

23 stopped until this Court decided that the automatic stay

24 applied.  So that campaign actually lasted even into the

25 Chapter 9 case to a degree and of course there's still an

1  appeal.

2      So when we evaluate as we're going to have to in a few

3  minutes, the reasonableness of the city's position concerning

4  what a negotiation period should be and what we should try to

5  accomplish out of Court.  There are three things that were

6  clearly on the city's mind and have to be on the mind of

7  anyone evaluating that.

8      One is, the 15th, June 15th was the first payment default

9  on public debt.  Second is, that created additional covenant

10  defaults under the swap.  Third is, that Syncora, at least,

11  even though a deal was getting done with respect to the swap

12  banks, Syncora was seeking to cut off the casino cash.

13      I'm going to stop here because again only AFSCME

14  contended that the city was not insolvent.  And neither it nor

15  the others who have joined it on some questioning on this

16  question -- on this issues, has adduced any evidence that

17  counters anything that the city introduced.

18      And so if I have to review -- cover -- cover this topic

19  more, I'll cover it on reply.  Suffice it to say we don't --

20  we don't think there is fair ground to dispute that the city

21  is insolvent within the meanings -- within the relevant

22  definition of the statute.

23      The next place, staying in order, is whether the city

24  desires to affect a plan to adjust its debts.  Again, proposal

25  for creditors, Exhibit 43 is in evidence.  At the opening I

1  said that the plan proposal speaks for itself.  I said it was

2  reasonably detailed.  I said it contained the classification

3  scheme.  I said it included a term sheet for notes to be

4  distributed to creditors, and I said it defines treatment for

5  all classes.

6      And the objectors seem to disagree with that.  They

7  contend that there isn't a specific proposal on reduction of

8  pension benefits.  And sometimes this argument or this

9  statement is accompanied by just a citation of half of one

10  sentence that's in the document.  But other times the -- even

11  looking at the entire paragraph that seems to be the

12  contention.

13      So let's do a little work ourselves and see if we can

14  figure out what the treatment that is proposed in the plan is.

15  Because I think we can do it with Exhibit 43 in a couple of

16  minutes.  So if I could have Exhibit 43, Page 109, please.

17  And if you would do me a favor and leave it open for now.  But

18  -- but later we're going to block just a part on pension,

19  unfunded pension liabilities.

20      One of the points Mr. Robbins made, and his testimony on

21  this was a little bit -- it moved around a little bit during

22  the testimony.  Was he said well, other -- treatments of other

23  classes, there's a specific treatment provision, but there

24  isn't in the section of claims for unfunded pension

25  liabilities.

1    So let's try to figure out if we can figure out what he's

2    talking about.  So going up to the top, claims under unsecured

3    general obligation bonds and notes, the treatment says and I

4    quote, "exchange for a pro rata (relative to all unsecured

5    claims) principal amount of new notes".

6        All right.  Let's go to the next paragraph.  Another

7    class of unsecured creditors.  This is claims of service

8    corporations.

9        And by the way, note here that we don't say this is the

10   treatment of the COPs.  Now why don't we do that?  Well,

11   because the COPs are obligations of trusts.  Trusts in turn

12   are beneficiaries of contracts between the city and service

13   corporations.  So from the perspective of the city, these

14   technical details have a tendency to matter, from the

15   perspective of the city, the counter party is the service

16   corporations, the relevant -- relevant obligation is the

17   city's obligation to the service corporations.

18       So we focus on that and we say treatment.  Exchange for a

19   pro rata (relative to all unsecured claims) principal amount

20   of new notes.

21       By the way the next paragraph says the same thing, we'll

22   skip it just for time purposes.  Now could we blow up the

23   section, claims for unfunded pension liabilities?  And

24   skipping to the middle paragraph it says, claims for the

25   underfunding will be exchanged for, this will sound a little

1  familiar, for a pro rata relative to all unsecured claims

2  principal amount of new notes.

3      So first of all, if Mr. Robbins found the other

4  discussions sufficiently informative and in a specification --

5  specification of treatment, I am having a hard time

6  understanding how he did not find the specification of

7  treatment with respect to unfunded pension liabilities hard to

8  understand.

9      Well, let's stay here because I think we can learn a

10 little more if we read words and take a look at other parts of

11 the document.  First of all, very much like the situation with

12 service corporations, when we reach unfunded pension

13 liabilities, we have to pause and think about what exactly is

14 the city's remaining liability with respect to pensions.

15 Because the pension funds are not funded at zero.  There is

16 funding in both pension funds.

17     I thought there was going to be a big dispute over it,

18 how much the underfunding was.  Of course that dispute didn't

19 show up in this courtroom.

20     So let's look at the first paragraph, or excuse me, the

21 first bullet point, it's not quite a paragraph.  The first

22 sentence says as set forth above and is material earlier in

23 the presentation that we won't bother visiting, preliminary

24 analysis indicates that the underfunding in GRS and PFRS is

25 approximately 3.5 billion.  I'll show you the number in a

1 | minute.

2 | At this level of underfunding, the city would have to

3 | contribute approximately 200,000,000 to 350,000,000 annually

4 | to fully fund current accrued vested benefits. Again, more

5 | information about how the city views its obligation relative

6 | to pension. That's what we're focusing on, the city's

7 | obligation.

8 | And then the statement which was hard for everyone to

9 | make but is driven by math, we'll come to that soon. Such

10 | contributions will not be made under the plan. Okay. So the

11 | city has obligations to make contributions. Note, that's what

12 | we're talking about.

13 | We're not talking about the individual pension benefits

14 | yet because to the city that's not the problem. The city's

15 | problem is, obligations to make contributions on account of

16 | underfunding.

17 | So next sentence. Claims for the underfunding will be

18 | exchanged for a pro rata relative to all unsecured claims

19 | principal amount of new notes.

20 | Okay. First of all, this sentence talks about claims for

21 | underfunding. Those familiar with the pension system, and Mr.

22 | Robbins surely must be assumed to be familiar with the pension

23 | system knows, this is part of the formula. There is existing

24 | funding which is another part of the formula.

25 | Now, let's pause for a second. Is this sentence really

1  mysterious about what we're talking about when we say a pro

2  rata relative to all unsecured claims, principal amount of the

3  new notes.  Well, we know that the principal amount of the new

4  notes is capped at 2,000,000,000.  That's something that's

5  also in the exhibit.

6       But let's just take a quick look at Page 98.  Because the

7  fact of the matter is, no one expected the creditors to guess

8  what we were talking about when we said pro rata portion of

9  unsecured claims.  And there's a box at the lower left corner

10  of the page.  And all in one place is the estimated claim

11  amounts for every single class of unsecured claims.

12       In a way some of these numbers have a little bit of a

13  false precision because with respect to OPEB liability as

14  disclosed in other parts, it's an estimate.  With respect to

15  pension unfunded liability, it's an estimate.  Under the

16  pension unfunded liability, it's an estimate.

17       But Mr. Robbins is a bankruptcy professional.  And this

18  Court is a bankruptcy professional.  And we've seen plans that

19  say we think claims in all of the different categories are

20  these.  And creditors and the debtor are going to have to deal

21  with some uncertainty about what's in each of the categories.

22  But it's normal to spell out the different categories so

23  people have some visibility as to what's in a broad pool.  And

24  then it's just as normal to specify here is what is going to

25  be distributed to that pool of creditors.

1    So what have we shown?  We demonstrated that we've

2   specified what's going to be given to the pool of creditors.

3   They don't like it, we'll come to that in a second.  And we

4   specified what the pool of creditors look like, its goal

5   there.

6    So to the extent that one of the objections is there was

7   no proposal, therefore that the county doesn't intend to

8   affect a plan of a judge -- a plan to adjust its debts, I

9   submit that the Exhibit 43 in fact contains a proposal and

10   it's quite precise with respect to the city's obligation to

11   provide funding in respect to pensions.

12    Now, let's return to Page 109 because we have one more

13   sentence we have to deal with.  It's everyone's favorite

14   sentence, or half of it's everyone's favorite sentence.  But

15   it turns out it's not the sentence about treatment.

16    This sentence is about consequences.  This sentence says

17   again, it should be completely obvious to Mr. Robbins, it's

18   completely obvious to me, I think it's completely obvious to

19   the Court, but we weren't only talking to Mr. Robbins, we were

20   talking to other people that might have a lower degree of

21   sophistication.

22    And so we explained because the amounts realized on the

23   underfunding claims, part of the equation, not the whole

24   equation, will be substantially less than the underfunding

25   amount, there must be significant cuts in accrued vested

1   pension amounts for both active and currently retired persons.

2       So what are we saying there?  We're saying a consequence

3   of the fact that the city's distribution on account of this

4   claim is going to be less than the amount that the pension

5   funds were expecting to receive by the city, something has to

6   give.  And that is pension amounts.

7       We didn't say which and when.  And there's two reasons

8   why one might expect that you wouldn't.  One, it's

9   presumptuous.  This is an issue as to which in a lot of ways

10  the city's indifferent.  Legally indifferent, not necessarily

11  emotionally indifferent, but legally indifferent.

12      And there's all kinds of reasons why the pension

13  adjustments, and in fact it's kind of traditional, why the

14  pension adjustments wouldn't meet standards like uniform

15  treatment for all persons in a class.  Because there might be

16  very legitimate social reasons for inflicting relatively less

17  impairment on older people and more impairment on younger

18  people.  And in fact that pattern is -- persists all the time,

19  but it might or might not be legal.

20      Viewing the world this way, which is correct as a matter

21  of law, also creates flexibility for the parties to deal with

22  the consequences of the distribution on the claims asserted

23  against the city in ways that might make more sense than those

24  that could be required by law if you looked at it a different

25  way and quite frankly not the way technically correctly as far

1  as I'm concerned.  And I actually think that the funding --

2  pension funds' counsel agrees with this analysis, but maybe

3  we'll hear.

4      Okay.  So the summary with respect to this point, the

5  pension claims themselves will have to be adjusted, but the

6  city saw no reason to unilaterally decide that.  The city's

7  issue is not about that.  The city's issue is about much it

8  will have to pay and the distribution, proposed distribution

9  on account of the pension underfunding claim is very

10 specifically laid out.

11     Last couple of points on the issue of the city's desire

12 to adjust its debts or to effect a plan to adjust its debts.

13 There -- I think there is the assertion, it's covered in our

14 briefs very briefly here, that the -- that there's a -- a --

15 that the plan as proposed can't be confirmed, so it's a plan

16 that doesn't count.

17     And I think I covered this in oral argument, the plan

18 clearly, we believe, can be confirmed.  We understand there

19 are legal disputes.  We -- we understand that there is an

20 assertion that the pensions clause of the Michigan

21 Constitution precludes impairment.  Your Honor knows our

22 position on that.  The subject of bankruptcies includes

23 clearly priorities of claims, rights to distributions,

24 consequences -- bless you, consequences of when there's not

25 enough to go around and discharges.

1    This is at the core of things that are the subject of

2  bankruptcies.  A declaration that a claim is not impaired is

3  inconsistent with that.  That is a part of federal law that is

4  not limited by -- by powers reserved to the states.

5    It was also asserted in papers, again no testimony, that

6  because there was a dispute as to the amount of the pension

7  claim, pension underfunding claim, and if that wasn't settled,

8  the plan could not be confirmed.  Of course that's not the

9  case.  The Bankruptcy Code is specifically structured to allow

10  subsequent determination of claims even after a plan is

11  confirmed.  But that was all premised on the idea that Your

12  Honor was going to hear some proof that the city's estimate

13  was wrong.

14    You heard no such proof.  So for purposes of today, there

15  actually isn't a dispute of the amount of the underfunding

16  claim.  And I think it's worth pointing out that when the city

17  says the underfunding claim is 3.5 billion dollars and it's

18  making a distribution based upon 3.5 billion dollars, it's

19  strange for the pension funds to be saying it's really less.

20  Because the consequences are that you would get a lower

21  distribution if the underfunding amount was less than the

22  estimate that the city believes is right.

23    But nevertheless we found ourselves clearly as a

24  historical matter in that strange place.  I'm not sure based

25  upon the evidence introduced that we are in that strange place

1  anymore.

2      So with respect to this part, the city's demonstrated the

3  desires to effect the plan.  The plan is a -- is an outline --

4  that's all that's required, but it's actually more fleshed out

5  than that.  An outline of a plan that can be confirmed.  We do

6  think it's confirmable.  I've also said before, that it will

7  change, that's -- that's also clear.

8      And -- and I'm not going to come back to this point, but

9  there's a -- there's -- there's an argument actually supported

10  by the cases that when considering the requirements for good

11  faith negotiations under -- under Bankruptcy Code Section

12  109(c)(5), that you also have to demonstrate that the plan you

13  started with is a plan of adjustment that could conceivably be

14  confirmed under Chapter 9.  I think I've dealt with that

15  issue, I'm not going to return to it in the interest of time.

16      But this brings us to an important aside.  And -- and I'm

17  not again going to repeat, but I endorse the state's argument

18  that from the very beginning of this case, or from the very

19  beginning of the -- of the Governor's administration when they

20  focused on the situation in Detroit, that it was prudent as a

21  matter of common sense, sensible planning, and because

22  everyone else in the world was talking about it, to look at

23  Chapter 9 as -- as something that might some day, if

24  circumstances didn't get better, have to be considered for the

25  City of Detroit.

1    The aside is to -- to basically inform the Court that

2  actually the law that we just talked about, the law pressed by

3  the opposition that the plan, that the -- that the city has to

4  start with, is a plan that is a plan of adjustment, or an

5  outline of a plan of adjustment that could be confirmed.

6  That's actually a legal command that when you're confronting a

7  municipality that has financial difficulties you have to start

8  with Chapter 9.

9    Because if you don't understand what the rights, and

10  powers, and obligations of a municipality are under Chapter 9,

11  and what a plan adjustment would have to look like in the case

12  of a Chapter 9 case, you can't start. So in addition to all

13  of the, you know, very practical observations, and the fact

14  that it's very sensible to pay attention to the same law that

15  frankly your creditors are paying attention to when they're

16  thinking about what they might have to do in an out of Court

17  scenario, in this one circumstance the law actually commands

18  an early look at the statute. So I think that if the law

19  commands an early look at the statute, an early look at the

20  statute cannot constitute evidence of a lack of good faith by

21  anybody.

22        THE COURT: Before you go on, this question. So is

23  it the city's position that with regard to the pension

24  liability underfunding, the creditors -- the only creditors

25  were the two plans and not the retirees themselves?

1          MR. BENNETT:  Your Honor, I think that's -- at the

2     end of the day, I think that's probably right.  We expect it

3     to be disputed, we understand it will be disputed.  I think

4     you will find that the -- the -- the -- I think you should ask

5     them when they reach the podium.

6          We think that's right.  That by the way, is the reason

7     that the first people we asked about whether they could

8     represent retirees in discussions that would ultimately affect

9     their pensions was them.  And they basically told us that we

10    can fight to preserve our claims, but we can't compromise

11    them.

12         THE COURT:  Well, all right.  I will -- I will look

13    forward to your discussion of how this impacts your argument

14    regarding impracticality.

15         MR. BENNETT:  We'll get there.  Okay.  Well, we're

16    there.  Impracticality.

17         You know, back to the -- coming back to the opening

18    argument, we started with, and we'd start with again, the

19    number of bond issues that the city has.  The fact that bond

20    holders have the right, each individually, to consent to any

21    impairment of their principal amount or of their interest.

22         And the -- the -- the one -- one place where you can

23    find, I said this at opening also, a list of all the different

24    issues, and demonstrate how numerous they are, are in the

25    appendix to the proposal for creditors.  There's a complete

1  list.

2      There's also -- it also reveals that many are insured,

3  but some are not which is an additional complication.  Mr.

4  Buckfire testified that although talking to the insurers was a

5  place to start, his -- his view was, because it's also the

6  law, that they could just make recommendations and there were

7  some issues as to which, according to this book, it's true,

8  there were no -- there -- there are no insurers.

9      And so ultimately if an insurer is going to recommend

10  something and you're going to send it out to a vote, you're

11  going to get some yes votes and that's great but there's

12  nothing you can do with respect to the no votes under

13  applicable non-bankruptcy law.

14      And so with respect to the bond holders, while there was

15  someone to talk to to get started, there was no way to get all

16  the way home.  And no one has suggested that there was a way

17  to go all the way home.

18      So -- but the -- and the second part we said at opening,

19  and again I'm -- I'm not going to repeat it here, is that

20  frankly that's the end of the inquiry.  Because

21  impracticability with any one class means that out of Court

22  negotiations are impracticable.

23      There are cases that say this, they're cited in our

24  papers.  I also spent some time thinking with the Court about

25  the problem about, you know, how you would go about it if you

1  thought that you still had to conduct good faith negotiations

2  with a group you could negotiate with, but you have another

3  group that you couldn't negotiate with and where it leads you

4  is delay for no purpose.

5      Ultimately you wind up having to be in a Chapter 9 case

6  anyway.  And whenever we talk about delay as -- as a -- as an

7  answer, let's go back to the undisputed fact that we had a

8  very severe insolvent situation that was also unstable.  The

9  instability being the recent default, the Syncora activities,

10  and the other things that -- and the delayed trade payments.

11      So the -- so delay isn't an answer for anything.  In the

12  context where there is actual near term prechter, there --

13  there is a serious problem that has to be addressed.

14      So the next step is were negotiations -- excuse me, there

15  should be no next step, but the next step in the event that

16  the Court decides, and I think this would be wrong, and

17  against the cases, that impracticability of one class is not

18  determinative.  That it -- that it has to be impractical with

19  every class which would mean that you have to conduct good

20  faith negotiations with classes where it is practicable.  We

21  then deal with the assertion by the -- the different retiree

22  groups that somehow negations in this case were practicable.

23      And I think there's -- there's a -- a -- three different

24  reasons why negotiations with the -- with the different

25  employee groups are impracticable.  And the first, which will

1  also apply to the retiree the -- excuse me, the two funds, is

2  the -- is the testimony of Mr. Taylor.  I think best

3  represented by the testimony of Mr. Taylor, but represented by

4  the testimony of other witnesses.

5      He said a couple of things that are relevant to the

6  subject of impracticability, we'll cover more of them.  But

7  right now I want to zero in on -- on what he said after he

8  acknowledged that he did not have the authority to bind any

9  retirees.

10     He said, he was nevertheless willing to conduct

11 negotiations.  Let's put aside for a second what negotiations

12 really mean with someone who's not authorized to bind anyone.

13 But he's ready to conduct negotiations and if he actually got

14 to the point with the city that there was a proposal for

15 modification of benefits that he -- that he was okay with, he

16 would recommend it to retirees.

17     And -- and -- and I don't remember if he was asked or he

18 volunteered, that what would have -- have to happen next, he

19 said there'd be a vote.  So what does a vote mean in this

20 context?  Again, out of Court.

21     It means that those who vote yes, I suppose, supposed to

22 be some form of solicitation materials, would be bound.  And

23 that would be a partial solution to the problem.  That would

24 be progress.  But everyone who voted no wouldn't be bound.

25 Well, what happens then?

1          THE COURT:  Well, but -- but this assumes that your

2   negotiation is with the retirees because they're creditors.

3          MR. BENNETT:  I -- I -- I understand.

4          THE COURT:  A point you weren't willing to --

5          MR. BENNETT:  I'm going to get to that.

6          THE COURT:  -- a moment ago.

7          MR. BENNETT:  Okay.  I'm not going to forget the

8   issue.  I'm talking about the people who stepped forward and

9   said, you should have talked to us.  Okay.

10      And Your Honor, this is exactly the situation we faced

11  with the bond holders.  That if -- if this is -- if -- if we

12  ultimately at the end of the day have to negotiate with

13  retirees and there is ultimately a retiree vote on some basis,

14  the fact that you could have a vote at some point out of Court

15  doesn't solve your problem.  You need to get the centers as

16  well.

17      Let's get to the retiree funds.  They said, they told us,

18  I think -- can we skip to the chart?  And I need a blow up the

19  top so I can find them.  Oh, there they are.

20      The police and fire retiree systems.  They're all --

21  they're all the way --

22          THE COURT:  I see it, sir.

23          MR. BENNETT:  Okay.  And --

24          THE COURT:  And I see the other one too.

25          MR. BENNETT:  Okay.  All right.

1          THE COURT:  The General Retirement Systems is the

2    other one you were looking for?

3          MR. BENNETT:  Right.

4          THE COURT:  Okay.

5          MR. BENNETT:  Okay.  I can't -- I'm -- the fire is

6    covered.  They either didn't respond or said no.  They

7    verbally responded.  You can ask them what their response was,

8    that they don't have the power to bind retirees.

9      Okay.  We'll talk about, by the way, what they did

10   because that may be important too.  Okay.  So with respect to

11   the first point, that every -- that even the people who -- who

12   stood up here and said, you should talk to me even though I

13   don't have authority.  At the end of the day, they led to a

14   place that did not give you retiree votes.

15     Again, we could stop here.  This is impracticability, the

16   same kind of impracticability as the bonds demonstrated also

17   with respect to the holders of retiree claims if we have to

18   talk to them.  And -- and if our -- if the objectors say we

19   don't have to talk to them, we'll get to that in a second.

20     Second, I was going to talk about this chart, so we can

21   leave it up.  The responses that -- that the city actually

22   received to the basic inquiry concerning whether the unions or

23   pension funds were actually in a position to represent

24   retirees, also demonstrates impracticability.  That alone.

25         So even if they say, and they -- but they didn't, I mean

1  they didn't say if -- we can talk and recommend.  That's not

2  actually what they said.  What they actually said, and you

3  have a big exhibit of the letters is, not us, we don't

4  represent them.  That's what they said to the city when they

5  were asked the question.

6      They didn't say to the city, we can't represent them as a

7  formal matter, but we have found ways to get around that which

8  I think was the testimony of some of the witnesses.  What they

9  said was, no, we don't represent them.  What you heard

10 testimony from -- from one of the -- the next to the last

11 witness yesterday, was that maybe as a matter of law they

12 couldn't have even represented retirees.

13     But I -- I submit that the actual letters which are in

14 evidence demonstrate that confronted with a broad statement,

15 we do not represent retirees or cannot represent retirees, is

16 another indication of impracticability, again, assuming for

17 the moment that retirees are even needed which they say they

18 are.  But --

19     And then finally, the third reason why I think in this

20 case you can find impracticability by the unions are the

21 numerous statements kind of throughout the record, starting

22 with the -- the briefs filed by the UAW, which I pointed out

23 at opening argument.  The briefs filed by the retiree

24 committee, the brief retiree committee proclaims that it's bad

25 faith even to ask for a impairment of the underfunding claims.

 1      The UAW said in their briefs they would never agree to an

 2   impairment of the underfunding claims because of the

 3   non-impairment provision with respect to contracts.  And then

 4   others at the trial, Ms. Lightsey, Mr. Taylor, Mr. Nicholson,

 5   these are persons who said they would have represented

 6   retirees but would have never agreed to a plan that modified

 7   vested pension benefits.

 8      And, Your Honor, in some instances, they actually said

 9   that from the witness stand.  In other instances, it's found

10   in the interrogatory responses that they filed in discovery.

11   Some of them were projected here and this is a good time to

12   come -- to start coming back to the retiree funds because we

13   have their interrogatory responses that I think covers Your

14   Honor's question.

15      This is -- this is -- Exhibit 79.  Okay.  And I want to

16   go to Page 10.  Is that the first page?  Yes, Page 10 is the

17   first page.  Okay.  Paragraph 3, if you could blow it up.

18      Please describe any authority delegated to or otherwise

19   possessed by the trustees of GRS.  And -- and, Your Honor,

20   I'll take you through the GRS section.  There's an exactly

21   parallel set of questions for the uniformed pension fund the

22   PFRS.  So I'll do it once as opposed to twice to save time.

23      To eliminate or reduce on a prospective basis only, the

24   benefits, rights, and features of the pensions provided to GRS

25   participants who were already retired or terminated from the

1  City of Detroit.

2      And their response.  If you'd go -- I think we have to

3  read most of it.  Because first of all, GRS doesn't think this

4  is a direct enough question and so they object.  Because it's

5  incomprehensible.  Because the phrase is they don't understand

6  what any authority delegated to, otherwise possessed,

7  eliminated or reduced.  They don't know what any of those

8  words mean.  That's the first response.  So if we're going to

9  gauge constructive, you know, negotiations, this is part of

10  what we were dealing with.

11      Due to this imprecision, it is difficult to ascertain

12  what information is sought by the interrogatory.  And the GRS

13  is effectively asked to speculate as to its meaning which may

14  or may not include requests for legal conclusions.  The GRS

15  objects to this inquiry.  Okay, skip the rest of this.

16      Now let's move over to when they finally say the answer

17  is on the top of Page 11.  Well, let's go up to the last

18  objection to it, I'm sorry.  The last objection to the

19  interrogatory, GRS also objects to this interrogatory because

20  it assumes the existence of authority to act in contravention

21  of Article 9, Section 24 of the Michigan Constitution of 1963,

22  the pension clause that prevents any impairment or

23  diminishment of accrued financial benefits which authority

24  does not exist.

25      Okay.  Let's go to the next paragraph.  Now by the way, I

1  -- I -- I hope Your Honor is keeping track.  The -- the

2  interrogatory started on Page 10.  And we got to the answer

3  kind of in the middle of Page 11.

4       Subject to and without waiving the foregoing objections,

5  GRS states at no time from 2004 to the present have the

6  trustees of GRS had or been delegated authority to eliminate

7  or reduce on a prospective basis, the basis the benefits,

8  rights, and features including but not limited to the elements

9  of the pension formula of the pensions provided to GRS

10 participants who are already retired or terminated from the

11 city because the pension clause prohibits the elimination or

12 reduction of approved financial benefits of GRS participants

13 who are already retired, terminated from employment with the

14 city.

15      So what we have from the retiree committee, Your Honor,

16 is an admission that they aren't going to do anything that

17 they interpret as impairing or modifying pensions.  And so I

18 think frankly the third reason why Your Honor can find that

19 negotiations were impracticable as to retiree groups if that's

20 the question, and we don't even think you reach that question,

21 is that all of the different places you would think to go if

22 you think it's the funds, and frankly initially we did, you

23 would say to the funds, try to talk about something.  I think

24 we know they won't talk.

25      If you -- if you -- if you think it's the retirees, we

1  have explained that number one, we got a whole bunch of

2  letters that said we're not the right persons to talk to you.

3  And secondly, we got a -- even those people who said

4  notwithstanding our lack of authority, we would still like to

5  talk to you, they have all said we are working to a

6  recommendation.  The next step would be a vote.  And that

7  still would not give the -- the city any means to deal with

8  persons who choose to vote no, or actually more importantly,

9  persons who don't vote at all.

10      Now there's one exception to this, I guess.  And -- and

11  that is, it was asserted that there is a class action

12  mechanism that would conceivably have resolved the problems

13  with respect to the unions.  I actually want to hear exactly

14  what that mechanism is that was proposed.  And so while I am

15  prepared to discuss why a class action mechanism was not

16  practicable at all, particularly in light of the fact -- the

17  financial pressures that the city was confronting, I think

18  it's best if I hear exactly what the objectors had in mind

19  before responding.

20      Take a sip of water before turning to good faith.  It's

21  warmer in here than it was yesterday.  Okay.

22          THE COURT:  Excuse me one second.  Is that someone's

23  electronic device?  Is it off now?  Yes?  Okay.

24          MR. BENNETT:  Okay.  As I said before, and I think

25  it's important, at least as far as eligibility is concerned,

1  perhaps not with respect to 921, Your Honor's opinion can stop

2  here because the -- as Your Honor knows, the requirements in

3  109(c)(5) are disjunctive if negotiations are impracticable,

4  whether or not negotiations proceeded or whether negotiations

5  were in good faith are just not issues for the Court to be

6  concerned with.

7      And of course the legislative history of -- of the

8  impracticability prong is that it was designed for big cities.

9  New York was actually the pragmatic example that everyone was

10  concerned about at the time.  Where it was just understood

11  that when dealing with a situation as large as this one, as

12  large as New York which by the way was smaller than, at least

13  in nominal terms, than this is now, is a -- is a -- is enough

14  of a reason to recognize that in a lot of large city cases,

15  the negotiation prong is not going to be terribly relevant

16  because impracticability is the reality as it is here for all

17  the reasons we've described.

18      But nevertheless -- well, I should start with there's two

19  clauses actually to 109(c)(5)(B).  The first is, it deals with

20  negotiations in good faith.  And the second is, creditors

21  holding at least the majority in amount of the claims of each

22  class that such entity intends to impair under a plan in a

23  case under such chapter, well, I think it's stipulated that we

24  didn't get a majority in any class.  And we certainly didn't

25  get the retiree funds, or the retirees to agree to a plan.  So

1  we met the second half, and -- and I think there's no dispute

2  about that.

3     The -- the -- now we have to talk about whether the city

4  has negotiated in good faith with creditors.  And I think Your

5  Honor, the city's good faith in the negotiations and in this

6  whole process is demonstrated by what it did.

7     And I'm actually going to start with the process of

8  generating the proposal for creditors.

9        THE COURT:  Again, I have to ask you to pause here.

10  It -- it strikes me as factually impossible for it to be

11  impracticable for that party to negotiate with other parties

12  in any circumstance, and to negotiate with them in good faith.

13        MR. BENNETT:  You know, I -- I think the -- I -- I

14  disagree.  I think that the -- the -- the -- the view of the

15  professionals, and can we put up for just a second, Exhibit

16  413, Page 13.

17        THE COURT:  I'm sorry, page what?

18        MR. BENNETT:  Exhibit 413 -- 418, Page 13.  I'm --

19  I'm more using this to kind of organize the topic than -- than

20  for the evidentiary value which will come later.  But I think

21  anyone who looked at the situation back at the beginning

22  thought this, that's on this chart.

23     They -- everyone understands that if you can have an out

24  of Court solution, it's a great thing for all the reasons

25  listed on this chart.  And it's really, really, really hard to

1 say to yourself or to anybody else given all of the potential

2 advantages of an out of Court solution of saying, it's

3 impossible.

4      So look at the next part.  The -- you know, it's also a

5 recognition like -- I guess I want to say it this way.  The

6 first part benefits of well planned out of Court restructuring

7 in that list, that's all the stuff you know in your heart.

8      The next section, consensus or near consensus is

9 necessary for a successful out of Court restructuring.  And

10 then the thing in Italics is really an understatement.  It's

11 extremely difficult to achieve and practice.

12      In your head you know it's nearly impossible.  But you

13 hate to say it's impossible.  And so even in circumstances

14 where this is how you evaluate the situation, and I believe

15 that -- that -- that -- that Page 13 of Exhibit 418 is how

16 every really qualified insolvency professional who knows

17 anything about Chapter 9 would look at this situation.  You

18 get to the end and you say okay, I'm going to try anyway.

19      But you could -- you could have given the circumstances

20 of this city, you could easily have written this page that

21 said out of Court situations are preferred and unfortunately

22 it will not be possible here.  And that would have been true

23 too.

24      So I think the -- the -- the -- what the city did was

25 they said, this is extremely difficult to achieve, but we're

1  going to try anyway.  So I think you absolutely can believe in

2  your head that this is never going to work, but try anyway.

3  And that's what I think the situation is in this case.

4      So let's talk about what the city did.  And let's see

5  whether it's reflective of a good faith attempt,

6  notwithstanding what may well have been insurmountable odds.

7      What you heard testimony about from multiple witnesses

8  from Mr. Moore, from Mr. Malhotra, from -- from -- from Mr.

9  Buckfire, and a little bit from the outside looking in from

10  Mr. Dillon, was that there was a lot of effort, probably

11  beginning a long time ago, but really intensifying at the

12  beginning of '13 by professionals as they were hired to study

13  the situation carefully and get up to speed.

14      And one of the things that you also heard several times

15  in testimony of several witnesses, that many of the people

16  involved at one point or another, were surprised at what they

17  found.  And none of the surprises were positive.  You heard

18  that with Mr. Buckfire when he got the liquidity numbers in

19  May, you heard Mr. Dillon talk about the numbers kept getting

20  worse.  You talked about -- Mr. Malhotra said it in a number

21  of different ways.

22      And -- and that is a theme that I think Your Honor has to

23  also keep coming back to which is this situation, the economic

24  situation.  Whatever people thought it was going to be it

25  ultimately looked worse than everyone's initial impressions.

1    So they determined what they thought the situation was,

2  and then they developed the June 14th proposal.  Now, the June

3  14th proposal is really important because number one, it's in

4  evidence.  And number two, when we go through not every page,

5  but I'm going to go through the sections and explain their

6  significance.

7    It's important to remember that with one exception that

8  I'll get to and discuss having to deal with the section on

9  assets, throughout all of the testimony of all of the

10  witnesses that came here, no one objected to any of the

11  findings, conclusions, and data that is contained in this

12  report.  And as importantly, no one objected to the math.

13    And so I think this proposal stands frankly as a monument

14  to the city's good faith in this process.  And I'm going to

15  show you why.

16    The book is divided into sections and frankly the

17  sections are a progression.  The first 40 pages is about the

18  current financial condition of the city with some emphasis on

19  the services that are being provided to the residents.  It

20  covers the economic service -- the economic circumstances, the

21  tax base, legacy liabilities, deficiencies of service

22  delivery.

23    As I said before, no one adduced any evidence that

24  anything contained in these pages is incorrect in any respect,

25  and it's a horrifying story.  I'm sure Your Honor has looked

1  at it.

2      But now let's look at Page 41.  Page 41 is a statement of

3  key objectives.  It's what the city is trying to accomplish.

4  Nobody even mentioned it.  But it's really important when

5  assessing the good faith of the city.  Let's look at what it

6  says.  If we can blow it up a little bit.

7      It starts with to the fullest extent possible under all

8  the circumstances.  All the circumstances recognizing that

9  things aren't so good.

10      The first item, provide incentives and eliminate

11  disincentives for businesses and residents to locate and/or

12  remain in the city.  The city cannot stabilize or pay

13  creditors meaningful recoveries if it continues to shrink.

14  Achieving this goal requires improvements in city services,

15  particularly the area of public policies.  Public safety and

16  tax reform to reduce the cost of living in the city and to

17  more closely approximate costs of living in nearby areas.

18      No one took issue with this.  That a fundamental problem

19  for the city is fixing delivery of services and -- and

20  actually reforming taxes.  Neither one of these things are

21  good for creditors because both of them cost money.

22      And going back, I said I was going to use a Chapter 11

23  analog.  We know that there are some cases that come to Court

24  and they advertise the business is just fine, we just have a

25  debt problem.  I'm not sure I've ever really seen a case where

1 that's been true, but there are cases that are portrayed that

2 way.

3      This is not one of them. This is a case that requires a

4 rehabilitation and a debt restructuring at the same time. And

5 we're saying it right there and we're saying it's going to

6 cost money. No one walked into this Court and said that's

7 wrong.

8      Next point. Maximize recoveries for creditors. But

9 there's a recognition. Since the city will not generate

10 sufficient cash to pay all liabilities, alternatives have to

11 be considered. No one walked into this Court and said that

12 was wrong.

13      Go to the next section. We recognized that it's

14 important to provide affordable pension and health insurance

15 benefits, affordable, what the city can afford in restructured

16 governance of pension arrangements. It didn't come up here,

17 but it's in the book. There's been some problems there.

18      Next, eliminate blight to assist in stabilizing and

19 revitalizing neighborhoods and communities within the city.

20 No one objected. No one says this is wrong.

21      Next, reform city government operations to improve

22 efficiency and reduce costs. In many areas longer term

23 benefits will require immediate increases in capital

24 investments. No one said this is wrong.

25      Maximize collection of taxes and fees that are levied and

1 imposed.  We've heard complaints that there's insufficient

2 attention to this, but no one noted it's in the key objectives

3 that it is part of the plan.

4     And lastly, generate value from city assets where it's

5 appropriate to do so.  And we're going to talk more about

6 that.  We've been up front about that from day one.

7     So, with all of the contentions that the city is acting

8 in bad faith, there hasn't been and there can't be a

9 contention that the city understands what the objectives of

10 this exercise is, and has identified the correct ones because

11 there is no evidence to the contrary.

12     Pages 43 to 50, we're not going to look at them because

13 we've talked about the city, but it's a review of the city

14 budget for the past several years.  Again, less important with

15 this -- this section, but there's no evidence in the record

16 that anything contained in these pages is wrong in any

17 respects.

18     But now let's do pause and take a look at Page 51.

19 Fifty-one is one of those pages that I'm sure, although I

20 don't know, the Governor's office looked at and was horrified.

21 What this page does is it looks at -- at five years of fiscal

22 actuals and we can blow it up for Your Honor if you don't have

23 it in front of you.  But I wasn't planning to.

24     And then -- then forecast going forward for the next five

25 years based on nothing changing.  No debt restructuring.  Keep

1  things the way they are.  And you have progressively building

2  budgets -- budget deficits in every single year.  No one

3  introduced any evidence that there's anything inaccurate about

4  this page.

5      Pages 53 to 60 then go and say well, what has it already

6  done to address these problems?  And there's a discussion

7  about the consent agreement, the appointment of the emergency

8  manager, and many things.  There's another part to pages -- in

9  Pages 53 and 60 that are worth dwelling on because they're

10 partly relevant to what's going on here.

11     Which is there's a summary of things that emergency

12 managers have been trying to do in other jurisdictions that

13 were precipitated litigation, some of which have the effect of

14 imposing limitations on emergency managers' powers and

15 affecting their ability to accomplish things that would have

16 to be accomplished in the City of Detroit.  Suggesting, of

17 course, that there were true limitations to what could be

18 accomplished out of Court as we've discussed in the context of

19 the impracticability section.  No evidence introduced that

20 anything contained in that section is inaccurate in any way.

21     Pages 61 to 78 talk about what has to be done to address

22 the rehabilitation part of the program.  And again in a

23 Chapter 11 example, everybody recognizes that you have to keep

24 the business going and keep the customers coming in the door

25 and to continue to keep your customers happy.

1    It's not any different in a city, particularly one that

2  has confronted declining population for as long as everyone

3  can remember.  Pages 61 to 78 is a proposal for addressing

4  those things.  And no evidence was adduced at this hearing

5  that anything contained in Pages 61 to 78 is incorrect,

6  unreasonable, imprudent, unnecessary, in any way.

7    Pages 79 to 82 only bear a short mention because this is

8  one area where there is no specific proposal.  There is the

9  general recognition that taxes have to go down rather than up.

10 And of course the only thing -- there's -- there's no specific

11 proposal with respect to that.  They will have to be some day,

12 but the point here is, is that in many cases it is asserted

13 that a debtor is not eligible because it can go solve its

14 problems by raising taxes.

15   And of course not a single witness has presented himself

16 or herself to Your Honor and suggested that that is a solution

17 to the problems of the City of Detroit for reasons described

18 elsewhere in the report, it is not.

19   And finally -- well, not finally, but we've now reached

20 the section where there's been some controversy which is the

21 -- which is realization of value of assets on Pages 83 to 89.

22 And first, I want to talk about complaints that weren't made.

23   There was no complaint that an asset is missing.  The --

24 the -- the report covers the -- the assets that people at the

25 very beginning of the case were thinking about as places where

1 value might be extracted to help out with the creditor

2 situation.  And no one testified that one was missing or

3 hidden.

4     There's also no testimony by anyone that the information

5 presented with respect to the various assets is inaccurate or

6 incomplete in any way.  The specific complaint from Mr.

7 Robbins, and frankly it was -- we'll come to this in more

8 detail later, but Mr. Robbins had lots of complaints about

9 there wasn't enough information, or at least the -- the -- the

10 testimony was elicited from him that he needed more

11 information.

12     Then he qualified that by saying, well, we needed more

13 information because any time you look at information more

14 questions come up and we have to ask for more.  And then he

15 was asked well, what additional information did you really

16 need.  And the only specific category he could think of was

17 values of assets -- values of the assets.

18     So I want to cover this in two different ways.  First of

19 all, it's worth asking would creditors have credited a city

20 value on any of those assets if they had offered one at that

21 stage in the case.

22     I have been doing this for a really long time.  I am

23 waiting to see a case where a debtor puts a value on assets

24 and the creditors immediately respond, gee, those are great,

25 we'll use them and not dispute them.  I'm pretty sure Your

1  Honor hasn't seen that case yet either.

2     But in any event, the -- the -- Mr. Buckfire's testimony

3  demonstrated that there were really only two of the listed

4  assets that can contribute material value to resolving

5  creditor -- creditor problems in this case or the city's

6  problems in this case.  And the reality is, is that both of

7  those involve publicly known circumstances is the best way I

8  can put it, the cloud value.

9     So even if you create theoretical valuations, or

10  appraisals, or -- or -- or try to, you know, kind of come to

11  values of assets that turn out to be very difficult to value

12  to begin with, there are what I'll call other issues.

13     First, with respect to DWSD as is explained in the

14  proposal for creditors, realizing value from DWSD for the

15  benefit of creditors involves a very complex transaction with

16  -- with surrounding governmental units.  A topic by the way

17  that I think has been a subject of discussion for more than

18  five years.  And it involves a lot of competing concerns of

19  the other municipalities and desires to pay less when the city

20  would want more.

21     And secondly, as we pointed out in oral argument, the

22  second category is the art, the Detroit Institute of Art and

23  the collection contained therein.  And as I pointed out there,

24  we are currently operating under an Attorney General opinion

25  that says the city can't realize any value from it.  And that

1  is probably not the only, but it's a significant issue with

2  respect to the asset, but it's probably not the only issue

3  that is relevant for consideration.

4      So the reality is with these assets as with so many more

5  in so many other cases that we've all been a part of, there

6  are tremendous uncertainties as to what the true value

7  realization potential is.  It's in a really big range.

8      And it may well be and in fact we can -- we should in a

9  second, cross reference to another part of the presentation,

10  recognize that these things might not be resolved in -- during

11  the pendency of any Chapter 9 case, and there might have to be

12  an agreement that deals with allocations of values as if and

13  when realized on a sensible basis.  Not exactly an unheard of

14  plan term.

15      In our own way, maybe not artfully enough, we signaled

16  that.  And so if Your Honor goes to the book, and I didn't

17  prepare the pages to be presented, but I'll just give people

18  references so that they can go to the right place if they need

19  to.  In a description of the note that is -- was intended to

20  be distributed pro rata to unsecured creditors, there are a

21  couple of terms that deal with these uncertainties.

22      In particular there are two kinds of participation

23  payments that are prescribed by the note.  One deals with

24  revenues, and one deals with designated assets which weren't

25  defined, but that was something that people could talk about,

1    And the idea was that if as and when monies were

2  received, 70% would be devoted to creditor recoveries and 30%

3  would be retained by the city.  Which also by the way answers

4  one of Mr. Robbins' complaints about there wasn't an incentive

5  for the city actually to realize value.  Thirty percent was

6  part of that.

7    But another part of that, of course, is the possibility

8  that exists in many cases for post effective date supervision

9  by Courts.  It will surprise some people, but believe it or

10 not, the Orange County Chapter 9 case was open for about a

11 decade after the plan was confirmed and it was reopened last

12 year because some loose end developed that had to be closed.

13   So in any event, we -- in its own way the proposal

14 anticipates the reality that many had to have recognized that

15 asset values at this point in time were really hard to

16 deliver, would not be precise, and in any event would not

17 necessarily represent a number that would effectively result

18 in a distribution.  That that information might come much much

19 later.

20        THE COURT:  What page was that on?

21        MR. BENNETT:  It's asset distribution proceeds, Page

22 108, about one-third from the top.

23        THE COURT:  Thank you.

24        MR. BENNETT:  And the -- and the provision relating

25 to sharing of -- of improvement in gross revenues is -- is on

1  the prior page.  It's 107 on the bottom.

2      Okay.  So after the description of assets we come to the

3  ten year projections.  And here again no evidence at all was

4  introduced that says anything about the assumptions on which

5  the projections were based, or the number crunching and the

6  math that actually generates the results are wrong in any way.

7  And -- and really in this section the assumptions are

8  summarized and then math takes over.

9      We should -- let's take a look at Page 98, just very very

10 briefly once again.  Page 98 where there is the -- the box of

11 estimated claim amounts, is also the place where we show

12 available cash under the first ten years that is generated by

13 the model and the assumptions that are listed in that section.

14     And if you'll -- if you could blow -- blow up the box

15 above the box we saw last time.  So the one that goes all the

16 way across the page.  Okay.

17     So the first line is funds available for unsecured

18 creditors based upon city operations and city tax collections.

19 Further demonstrating that nobody was hiding the ball about

20 the importance of asset sales as -- or asset monetization as a

21 potential source of recovery in the case, there's a line that

22 shows that there -- there may or may not be something.  TBD of

23 course means to be determined.

24     And then the bottom line, funds that we know are

25 available for unsecured claims.  And then notice the last two

1  words, with opportunities, recognizing that it's hoped that

2  things will be better.  That's why there's the revenue sharing

3  provision in the other sections.

4      But as I said before, at this point the math has taken

5  over.  And it is these numbers, the numbers we know we're

6  going to have that drive the next section which is treatment.

7  We've already discussed the plan.  I don't think there's any

8  more reason to discuss it.  As I said before, it's driven by

9  the numbers, it is complete, covers all the contingencies

10  people are concerned about.  It may not cover them the way

11  they want, and we'll come to that in a second, but no one is

12  hiding the ball.  Every issue that anyone has ever talked

13  about in this Court that has to be dealt with in this case, is

14  highlighted here, a reflection of good faith, not bad faith.

15      On -- there's another section on post -- post plan

16  governance recognizing that that's another subject that has to

17  be addressed, it got no attention here.  So the proposal

18  itself shows that the city's professionals did a lot of work.

19  It shows that the results were driven by math that no one

20  challenges, and at this point, and I can skip it now because

21  we went there already, I wanted to make the point that

22  everyone involved understood that the negotiations were likely

23  to fail because it was impracticable to expect that you could

24  achieve a negotiated solution in this case.

25      And by the way, Mr. Dillon said something that I think --

1  but of course the evidence doesn't show directly, that

2  everybody else also understood, which is as the numbers got

3  worse, everyone testified in varying ways that the numbers got

4  worse and the negative surprises.  The chances that a deal

5  could be worked out out of Court actually decreased because

6  it's harder to get a deal done when there's low recoveries

7  than a deal done when there's relatively higher recoveries.

8      And I don't think at any time people thought the

9  recoveries could be great.  But I think that when you look at

10 the recoveries that are -- are projected and the plan

11 provisions that are included in the June 14th proposal, what

12 you're seeing is the lowest situation, or the worst situation

13 anyone envisioned at any point in the process.

14     So to the extent that back on January 29th, there is

15 optimism in the Jones, Day report that, you know, all these

16 great things can happen if you can get something done out of

17 Court, and it's very difficult, because the numbers went down

18 from there, I think people felt even worse about the

19 prospects.  But as I said before, they tried anyway and they

20 tried hard.

21     Okay.  Well, notwithstanding the reservations that this

22 was going to be very hard if not impossible, a meeting was

23 scheduled, presentation was finalized, a meeting was

24 scheduled.  Many many people were invited to that meeting.  I

25 think the testimony is uniform on that

1      Some people managed not to get an invitation.  I frankly

2   think that the -- that the broad array of people who weren't

3   invited was a reflection of good faith as opposed to bad faith

4   and the fact that a few -- we missed a few, I don't think

5   reflects any -- any lack of good faith.

6      There was a big room at the first meeting, very clearly

7   no negotiations were intended there.  And so all the testimony

8   about how there were no negotiations at the first meeting, I

9   stipulate to that.

10     I will point out that everyone testified that all

11  questions were answered.  Some people testified they didn't

12  ask questions.  Some people testified that there was a card

13  system used because of -- frankly because of the size of the

14  room, it was a pretty reasonable thing to do.

15     But the fact that some people were discouraged from

16  asking questions frankly is not evidence of the city's bad

17  faith.  That certain professionals might have decided not to

18  ask questions for whatever reasons, certainly is not a

19  reflection of the city's bad faith, but that obviously could

20  have impeded progress to a degree.

21     At the end of the initial presentation the city discussed

22  what it was going to do next.  And if we can have Exhibit 44,

23  Page 61.  Your Honor's seen it before, I'm not going to read

24  it.

25     I'm going to only point to the words initial round of

1  discussions with stakeholders.  No one ever said we're going

2  to negotiate a plan in four weeks or else.  But what is said

3  is, we're going to have an initial round of discussions with

4  stakeholders.  And then we're going to evaluate where we are.

5      So now you've got a city that said, I've got a really bad

6  situation, the numbers clearly show that.  No one denies that.

7  We're going to make a shot because in -- because in our hearts

8  we would love to have an out of Court deal even if in our

9  heads we think it's impossible.

10      So let's see what the initial reactions are to what we

11 are proposing.  And we are proposing something by the way

12 backed with a huge amount of information and backed with a

13 progression that explains exactly how we got to the place

14 where we got.

15      I'm going to ignore for the time being and hold for

16 reply, the whole potential confusion over the subject of

17 whether there were negotiations or not at different stages.

18 But I think the testimony showed that everyone understood, or

19 that many, not everyone, many understood -- actually the most

20 important people understood that the city representatives were

21 looking for feedback.  No one denies that.

22      And in fact a list of some of the witnesses.  Nicholson

23 acknowledges this, Kreisberg acknowledged this.  By the way,

24 they were actually the most professional negotiators involved

25 back at that point in time along with Mr. Robbins.  We'll get

1   to in a second.

2       And -- and Kreisberg is a person who understood that a

3   counter proposal was kind of the right next step.  Because

4   Kreisberg testified that he actually had worked out a counter

5   proposal of some sort, he just decided not to present it.  I

6   don't know if he would have presented it, it would have

7   changed anything, but it would have been more information for

8   the evaluation that the city said was going to follow.

9       Robbins testified that the proposal itself with all of

10  the flaws that he asserted are in it, signaled that the city

11  wanted to negotiate and have discussions.  He used both of

12  those words, although I don't have the official transcript, it

13  was just yesterday.

14      But he also volunteered that he didn't think the city's

15  proposal was serious.  And he said -- and the reasons when he

16  asked about that he said well, there was no incentive to

17  actually realize monetization with respect to assets.  Your

18  Honor can create your own judgment on that.  And that there

19  was no requirement in the -- in the notes to pay on maturity

20  if asset sales and if the distributions didn't happen.

21      Well, again, that's a function of the math.  There are

22  projections that shows how much cash is available.  It's

23  already being used for interest on the note.  There's a

24  separate provision saying some of it's going to be used for

25  purposes of supplementing OPEB benefits.  It wasn't a lot of

1   money.  But again, those were thoughts he kept to himself.  He

2   didn't ask questions or discuss.

3       As I said before, at this evaluation period what was

4   going to happen.  Well, a lot of things could have happened.

5   It might have been unlikely, but one thing could have happened

6   is, the germ of an idea, or the possibility of agreement might

7   have emerged and it would have been pursued.

8       The other thing that could have happened is, is that

9   there was no prospect of an agreement and the objective

10  judgment that things were -- were impracticable would be

11  confirmed.  But one thing should not be surprising, is that

12  work on both contingencies proceeded at all times.  Because

13  remember, the backdrop was an insolvent city with a number of

14  recent events that created instability.  And no one could

15  ignore that.

16      And Mr. Nowling's schedule is part of normal

17  pre-bankruptcy planning, nothing more, nothing less.  And

18  pre-bankruptcy planning is not a reflection of a lack of good

19  faith, it's a reflection of sensibly managing your affairs in

20  circumstances where you're under extreme financial pressure

21  and you know that the only proposal that you can afford isn't

22  so great.

23      There was testimony about other large group meetings.

24  There was testimony about in the hall meetings.  There was a

25  lot of -- there was at least some testimony about all of the

1  meetings that were happening on the bond holder side.  And

2  there too, there was big meetings and small meetings, and

3  individual meetings.  There were lots and lots and lots of

4  meetings during the four week period of time.

5      Again, whether or not negotiations occurred, discussions

6  did occur.  And multiple requests for feedback were made,

7  they're in the record.

8      Robbins actually says the same thing a little bit

9  differently.  You know, he -- he -- he doesn't say that

10  feedback was attracted, I think I mentioned before he said it

11  was implicit in the proposal.

12      But what I think for these purposes, I want to go back to

13  that testimony that -- that these three experienced

14  negotiators at a minimum two on the labor side, one an

15  investment banker representing labor side, they knew that a

16  negotiation that the city was trying to start negotiation.

17  And they just didn't accept the invitation.

18      So I -- I think again we ask ourselves two questions.

19  One, how does a dialogue get started.  And two, what is the --

20  the city supposed to do, what is a good faith city supposed to

21  do when the dialogue doesn't get started?  Well, I think it's

22  incredibly obvious that the way a dialogue has to -- has to

23  get started, is that when -- when you get a proposal from

24  someone and you don't like it, but you want to or need to make

25  a deal with that person, you make a counter proposal.

1    I -- I -- very short digression, we're in Motor City.  So

2  let's talk about how people go about buying cars which should

3  be familiar to everyone in this room except a couple of New

4  Yorkers who may never have owned one.

5    You go to a dealer.  There's a sticker on the car.  And

6  let's say you like the car.  You don't want to pay the sticker

7  price ever.  What do you have to do to find out what the real

8  price of the car is going to be and if you're going to be able

9  to buy it.

10    The dealer, the sales person, or the manager says, how

11  much are you willing to pay for the car.  And you have to tell

12  them, you have to make an offer, otherwise you're not going to

13  buy the car.  That's how a dialogue gets started.

14    No one ever answered the question which Robbins

15  understood was on the table, which Kreisberg understood was on

16  the table, which Nicholson understood was on the table, and

17  many other people may have understood on the table as well.

18  Which is okay, in light of all this data, the progression, the

19  argument, the presentation about what the problems are, which

20  is not contested at all in this hearing.  It had five months

21  to decide that there was something wrong with this.

22    Propose something else that you like better that works.

23  That never happened.  And actually what did happen, the

24  evidence shows, the interrogatory responses told, is that to

25  the questions with respect to pension retirees, whether the

1  response is from the -- the -- the two funds, any one of the

2  retiree representatives who say we should have negotiated with

3  them, the response was, I'll pay zero because their statement

4  was, no impairment at all.

5      I don't think this is that hard.  Other city creditors

6  knew how to respond.  From Mr. Orr we have the testimony about

7  the negotiations with the swap banks and the 60 days, the

8  roughly 60 day period beginning from the time when everyone

9  started to understand there was going to be a default on the

10  COPs.

11      Buckfire testified, and it's in the record, that some of

12  the GO insurers actually did submit a written out offer, a

13  competing framework.  It wasn't acceptable but they submitted

14  something.

15      He also testified that someone else had half a proposal.

16  I think he called it half a proposal.  It was -- it was -- it

17  was verbal.  But other professionals who Mr. Robbins would say

18  he is as qualified as, or in the same league with, knew what

19  to do if there was any hope at all of starting a dialogue.

20      So now we get to the next -- the next part of the

21  question.  What is a good faith city supposed to do when

22  confronted with counter parties that said to the city, you

23  have miscalculated the pension underfunding claim, said it's

24  too high as opposed to too low.  But no impairment will be

25  acceptable.  As I said in the vernacular of the car buyer,

1  zero.

2      And some of them they say they don't -- they don't even

3  really represent the employees as reflected by the

4  interrogatory responses which are admissions.  This is really

5  important.  There is no answer to that question in the

6  evidence, none.

7      The answer that well, spend more time.  There's two

8  responses to spend more time.  One is the city didn't have

9  more time.  There were other pressures.  This wasn't just

10  about a negotiation however long it could be.  It was a

11  constant tension between spending more time in negotiations

12  and incurring more financial instability risk.

13      But the second part is, what would more time have led to.

14  There was no evidence of any overt indication that the city

15  could have looked at and said, there's a path to a deal.

16      With respect to UAW, there's an additional complication

17  we now know, didn't know then, that the UAW was secretly

18  financing a lawsuit, the Flowers case.  By the way, the UAW is

19  the one that in their brief, their trial brief for this

20  proceeding says, they were never going to make a deal because

21  they would never ever ever compromise on pension claims.

22  Three times in their trial briefs they say that.  There is no

23  answer to the question as to what a good faith city is

24  supposed to do in response to that position.  That works, that

25  makes things better.

1        And then we have Mr. Robbins and his client the funds.

2   Now remember how those discussions ended.  Robbins has a

3   meeting with city representatives and they are talking about a

4   process for trying to reach agreement.  What steps are we

5   going to take?  What things are we going to try to talk about?

6   Really due diligence points.  They actually weren't even

7   talking about an agreement.

8        I'm going to call those things the shape of the table.

9   So Mr. Robbins says -- is trying to talk about the shape of

10  the table.  And he says back, I need eight days to discuss

11  with my client my authority and my recommendations concerning

12  the shape of the table.

13       Mr. Robbins knows the city has already defaulted on some

14  of its debt.  Mr. Robbins may or may not know, or maybe didn't

15  ask about what was going on with Syncora.  I don't know.  But

16  Mr. Robbins knows that there's an emergency and Mr. Robbins

17  knows a valuation is starting soon.  But he says, I'll get

18  back to you in eight days.

19       And what happens during those eight days?  Well, with or

20  without Mr. Robbins' knowledge, don't know what was going on

21  inside the funds as to what they were really talking to each

22  other, his client initiates litigation against the city.  I

23  don't understand why Mr. Robbins was surprised by the timing

24  of the filing.  In fact I don't know how anyone could have

25  been under all the circumstances.

1    On some -- some other points that I'm going to do a

2    little anticipating now, but only a little.  About the kinds

3    of objections that we expect to see to the good faith of the

4    city.  But I don't think I have a vivid enough imagination to

5    figure out all of them.

6        One is, not enough information was provided.  We talked

7    about that already in a number of places we've talked about

8    it.  Robbins is so far as I can tell, the only specific

9    testimony about information that was missing.  There is no

10   doubt that more can always be provided, more is always

11   provided, and another thing I've never had happen to me yet in

12   my professional career, is where an adverse party has said,

13   enough, I have enough information.  Just never happened to me

14   yet.  I don't expect it to happen for the rest of the case.

15       But the fact that there is more information that is

16   always available does not mean negotiations aren't supposed to

17   start.  Enough information will never be available.

18       By the way, the only person who was really asked about

19   the operation of the data room was Mr. Robbins and he

20   testified that Miller, Buckfire had been responsive and he was

21   generally satisfied with the way it was working, although

22   admittedly he said, and it's true, the city was having

23   problems coming up with some of the information he was

24   requesting.

25       Filing on July 18th instead of July 19th.  The Ingham

1  County -- it's one thing about the Ingham County forum that I

2  think everyone would have to stipulate to.  There is nothing

3  about what was going on in the Ingham County forum that was

4  going to solve the city's problems.  It was only going to make

5  the situation worse.

6      To me that's the -- an example of the beginning of

7  uncoordinated creditor action that bankruptcy laws are

8  designed to supplant.  And bankruptcy laws do supplant.  And

9  so by filing this case here, when the city was already facing

10  time pressure, already had been through the period of time it

11  told everyone it was going to have discussions based on which

12  it would conduct an evaluation, and where everything that it

13  heard confirmed the fears that -- that things were as

14  impractical as their heads told them, it was not only in good

15  faith, but it was sensible to engage a forum that not only had

16  exclusive jurisdiction to decide all the questions that

17  someone was trying to raise in Ingham County, but could

18  actually and did actually have the power to solve -- help

19  solve the city's problems.  That can't possibly be in bad

20  faith.

21      I expect to hear that the city did not negotiate in good

22  faith because it took at face value the retiree

23  representatives' disclaimer of authority to negotiate.

24  Because what you've heard here, is that while they can't

25  change their interrogatory responses and the letters that they

1  sent which said we can't negotiate, don't have authority, have

2  never sought authority.

3      They appear to contend that the city should have figured

4  out that they didn't mean it.  I think you've heard testimony

5  that we thought they did mean it.  But let's assume that there

6  was a misunderstanding.

7      If there was a misunderstanding, it was a

8  misunderstanding created by the written letters which don't

9  admit an exception to the statements that were made, or don't

10 admit to the existence of a work around to the statements that

11 are made.  I don't think it was a misunderstanding, but if

12 there was a misunderstanding, that does not reflect bad faith.

13     Another point that I -- I think we will hear was that the

14 proposal that was made was not acceptable.  You've already

15 heard the retiree committee, any proposal that involves any

16 impairment to pension benefits was not going to be acceptable.

17     To Mr. Montgomery's cross examination of Mr. Buckfire and

18 he wasn't here of course at the very beginning, but drawing

19 inferences from his cross examination, it sounds like the

20 retiree representatives didn't like the interest rate.  It

21 sounds like the retirement on the note.  It sounds like the

22 retiree representatives didn't like that the principal amount

23 was 2,000,000,000 as opposed to a different number.  It sounds

24 like the retiree representatives didn't like the Dutch auction

25 mechanism.

1      Those things are good to hear.  They would have been

2  better to hear if there was any chance of -- of having a

3  consensual solution back at the time when the proposal was

4  made and a discussion -- period for discussion with creditors

5  was going on.  There is no evidence that any creditor stood up

6  and made any of the points that Mr. Montgomery made in his --

7  or tried to make in his cross examination of -- of Mr.

8  Buckfire at any time during the negotiation period.

9      Again, perhaps they were under no obligation.  Your

10  Honor, once observed to me that the good faith requirement

11  points to the city and it does.  But the question is, in the

12  absence of the kind of feedback that I guess the retiree

13  committee is now effectively admitting, is the kind of things

14  people talk about when they receive a proposal, speaks volumes

15  to the question of what a good faith city is supposed to do

16  when it doesn't get that feedback.

17      City representatives at meetings were not "authorized to

18  negotiate".  And -- and I think the testimony from the

19  witnesses was a little clear when that question was sprung --

20  unclear when the question was sprung at them.  Some said, you

21  know, well, I work for Mr. Orr, he wasn't there.  But the

22  reality is, is that the representatives of the city were there

23  to collect feedback and figure out what to do about it.

24      And they have the ability to make a recommendation to a

25  single person who yea or nay and sometimes with government

1  approval depending upon the amounts of money at stake, could

2  actually instantly or very promptly respond.  That Mr. Orr was

3  not in the room is -- does not make a difference.  He sent

4  people to collect feedback to figure out what the next step

5  should be.  That should be sufficient.

6       No one proved, Your Honor, and -- and I'm going to be

7  slightly going over matters that the state covered, so I'll be

8  very brief.  No one proved that the filing of the Chapter 9

9  case was preordained, or planned, or implemented without

10  considering approvals.

11      I said before the fact that state -- the state, the

12  professionals who ultimately represent the city looked at

13  Chapter 9, realized that the city might be headed there, and

14  thought about that, doesn't show a lack of good faith, it

15  shows two things.  It shows a lack of prudent and practical

16  planning, and as I pointed out, it may also show due regard

17  for the law.

18      I think this is a -- I think -- while there will be, I'm

19  sure, other assertions of indicia of lack of good faith that

20  arose at different points in the process, I think I will save

21  that for reply, because I think I'm also a little bit

22  overstaying the time I reserved for myself.

23      For a very short summary.  First of all, I want to harken

24  back to where I started.  That there's a list of five things.

25  109(c)(1), (2), (3), (4), (5) that Your Honor has to make

1  decisions on to demonstrate to find that the city is eligible.

2      I think the evidence overwhelmingly demonstrates that the

3  city is eligible, that there's been no effective rebutting of

4  the -- of the city's prima facie case on any of the points.

5  And this Court could clearly find in the alternative that it

6  was impracticable and the city tried anyway.  And everything

7  they did in that process was in good faith and did not exhibit

8  any lack of good faith.  And I think for the same reason,

9  there is no basis for dismissing the case under 921.

10      I think it is important in -- in listening to the

11  argument you're about to hear, whether any of the complaints

12  about the process are followed with, and if this particular

13  thing was done differently, the city's problems would be

14  solved as follows.

15      The second half has never been a part of the dialogue.

16  If you scour through all of the pre-trial briefs that were

17  filed, AFSCME recognizes that it's something they have to say,

18  or a topic they have to address.  And then they address it by

19  saying well, there were lots of ways that the city could have

20  avoided bankruptcy if they just talked some more.

21      Well, lots of unspecified ways don't cut it anymore.  If

22  there is a assertion that there was a fork at the road where

23  the city acted in any way lacking complete good faith, and

24  could have acted differently, they should specify what the

25  city should have done differently, and what consequence of

1  that act would have made this proceeding unnecessary and

2  redundant.

3     That question has never been answered.  And that's the

4  most important question before you.  I think the facts are

5  overwhelming, the city should -- the Court should determine

6  the city is eligible and the case should not be dismissed

7  under 921.  I'm happy to answer any questions Your Honor might

8  have.

9        THE COURT:  Thank you, sir.  And who is going first

10  on the objectors side?

11        MS. LEVINE:  We are, Your Honor.

12        THE COURT:  So I'll ask you your preference.  Would

13  you like to take an hour and a half now for what would be an

14  early lunch break, or do you want to plow ahead after a 20

15  minute recess?

16        MR. MONTGOMERY:  Your Honor, if I may make an

17  inquiry of the Court.  Which is initially when would you

18  otherwise plan to take the lunch break for today?

19        THE COURT:  Probably after the first of the

20  arguments.  That's why I was leaving it up to Ms. Levine.

21        MR. MONTGOMERY:  Your Honor, whatever Ms. Levine

22  wants to do, we'll follow.  If she wants to take a break now.

23        THE COURT:  I agree, it's all on you.

24        MS. LEVINE:  Okay.  We'll start.

25        THE COURT:  Okay.  Well, I would like to take a 20

1  minute break at this point.  Is that okay?

2          MS. LEVINE:  If we -- if we take lunch then does

3  that obviate the 20 minute break and maybe gets out a little a

4  bit earlier on Friday?

5          THE COURT:  It would.

6          MS. LEVINE:  Then we will eat lunch.

7          THE COURT:  All right.  It's 11:15.  We'll reconvene

8  at 12:45, please.

9          MS. LEVINE:  Thank you.

10          THE CLERK:  All rise.  Court is in recess.

11      (Court in Recess at 11:14 a.m.; Resume at 12:48 p.m.)

12          THE CLERK:  All rise.  Court is in session.  Please

13  be seated.  Recalling case number 13-53846, City of Detroit,

14  Michigan.

15          MS. LEVINE:  Good afternoon, Your Honor.  Sharon

16  Levine, Lowenstein, Sandler for AFSCME.

17          THE COURT:  You may proceed.

18          MS. LEVINE:  Thank you, Your Honor.  Your Honor,

19  based on these facts, Detroit is not eligible to be a debtor

20  under Chapter 9 of the Bankruptcy Code.

21      Under the Bankruptcy Code, in Chapter 11, it works

22  because of transparency and because there's value creation for

23  all of the constituents.  There's an exchange for the

24  automatic stay.  There is a fish bowl.

25      The private sector company defaults, creditors understand

1    how bankruptcy works.  The bonds get equity or get

2    restructured debt, vendors get equity and they get to keep a

3    customer.  And even if you're part of the cadre of -- of costs

4    that have to get kicked to the curb, like -- like the

5    pensioners or the retirees, there's safety nets in the private

6    sector that -- that protect against that.

7        There's the Pension Benefit Guaranty Corp which provides

8    federal insurance.  The is multi employer pension plans.

9    There are VEBA's.  There's COBRA.  It's not as if you're --

10   you're left there with no pension and no Social Security.

11       Here, Your Honor, in Detroit, there is no such safety

12   net.  And while we heard you ask Mr. Orr whether or not he had

13   asked the Governor for that help and we certainly heard the

14   Governor say that he doesn't have to provide that help because

15   the bankruptcy process will take care of it.  As we sit here

16   today, there is no -- there is no visibility on that issue.

17       We'd respectfully submit that operating outside of a fish

18   bowl but under a cloak of secrecy, leaves folks with a limited

19   understanding of what's happening, why it's happening, and why

20   it's happening now.  And particularly troubling here, Your

21   Honor, is -- and we've heard the testimony and then we just

22   heard the state and the city acknowledged in their closings,

23   when the Governor took office, when the Treasurer took office

24   in 2011, they were -- they already had their eye on Detroit,

25   they already believed it to be financially distressed.

1    There was a slow decline that the state believed was

2  occurring, that the Governor believed was occurring at that

3  time which didn't result in an emergency or a crisis on June

4  14 when the proposal for creditors was made and an emergency

5  that necessitated a July 19 or a July 18 filing.  There was a

6  multi year decline where the Governor chose to do nothing and

7  Detroit suffered the consequences.  That is not -- that's not

8  impractical and that's not good faith.

9    Turning first, Your Honor, to insolvency.  You know,

10  there's a little bit of tongue in cheek when we talk about the

11  fact that the city needs to prove insolvency because we're not

12  -- you know, we're not immune to the fact that there clearly

13  is blight and no lights.  And we'd like to see more from the

14  police and from the fire.  And we'd like to help them be able

15  to do more to -- to make the -- to make this city safer.

16    But under Bankruptcy Code Section 109, only one type of

17  debtor has to prove insolvency at the beginning of the case

18  and that's a municipality.  And we would respectfully submit

19  that that makes sense because of how unusual this is and how

20  scary this is for its citizens.

21    So for the city to say, sort of tongue in cheek that of

22  course we wouldn't expect them to offer evidence of value at

23  the start of the case, you need to negotiate those values and

24  do that at the end of the case.  That works.  We've done that,

25  that works in a Chapter 11.

1    But that doesn't work in the Chapter 9 context, Your

2  Honor.  So if I owe a dollar and I choose not to pay it, even

3  if I have it, that doesn't make me insolvent.  If I have an

4  asset and I choose not to pay that dollar because the Governor

5  through the Attorney General has told me not to sell or

6  dollarize that asset, that doesn't make me insolvent.

7    And if the police chief gets on the stand and despite the

8  fact that the testimony is compelling, and it is compelling,

9  how much he wants to improve the city.  Or even frankly I

10  found particularly compelling, Your Honor, the retired

11  librarian who -- who loved the library and who -- and who was

12  very compelling in the sadness that she felt that some of the

13  libraries were being closed.  That's not proof of insolvency,

14  that's anecdotal.

15    And what -- and what -- and if you listen to what Captain

16  Craig said on cross examination, he has not given the city a

17  budget.  We don't know what the hole is.  We don't know what

18  the path is to fix it and we don't know how much it's going to

19  cost.

20    We know they're going to take from the retirees.  We know

21  they're going to take from the active employees.  We know

22  they're going to take, but we don't know what -- whether or

23  not it's going to fix anything, and how it's going to be used,

24  and what that taking is going to mean.

25    Your Honor, we've also heard anecdotal evidence about the

1  fact that we can't collect taxes.  And that therefore we -- we

2  don't know what our revenue stream.

3      My co-counsel Richard Macks lives in the city and he pays

4  his taxes.  And we went through this thing, this 109 pages

5  together.  We don't understand who is not paying, and why

6  they're not paying, and whether or not that's valid.

7      Now it may be, Your Honor, that, you know, we see the

8  blight and we see the problems.  And we're not saying that

9  those aren't real issues.  And we're not saying that -- that

10 Detroit doesn't have, you know, issues with tax collection.

11 But what we are saying is, a municipality for a very important

12 and compelling reason has the burden of proof and they haven't

13 proved it here.

14     We don't see valuations.  We don't see appraisals.  We

15 don't see actuarial reports.  We don't see any expert reports

16 with regard to the shortfall -- alleged shortfall in the

17 vested pension benefits or otherwise.  And we have heard that

18 that's for strategic reasons.

19     But let's assume -- but -- but even if that is, Your

20 Honor, we still have a Chapter 9 municipality and a Chapter 9

21 municipality to be eligible must -- must prove solvency.  And

22 even if Your Honor disagrees with us that we need expert

23 testimony on that which we believe you do, then we need to

24 take a look at what factual evidence they've given us.  Okay.

25     They've put up slides that say these are the numbers and

1  they say we haven't refuted them, but that's not true, Judge.

2  We absolutely have.  They've -- they've offered the testimony

3  particularly of Ernst and Young, of E & Y.  And those -- and

4  E & Y has been involved with the city according to Mr. Dillon

5  in 2012 and maybe even as early as 2011 because E & Y

6  participated in the concessionary bargaining negotiations with

7  labor.  Okay.

8      So E & Y is the guy that everybody is telling us has

9  really gotten underneath the numbers.  We didn't agree that

10  the terminology was a bottoms up terminology, but we did agree

11  that E & Y was the guy that got underneath the numbers.

12      So why when E & Y took the stand, are they relying on

13  audited financial statements from non-testifying CPA's?  Or

14  even more confusing, if the theory is that we need an

15  emergency manager because the -- because the city is being

16  mismanaged by itself, why is E & Y relying on untestifying,

17  untested city employees to provide the information that

18  they're relying on.

19      Either -- either they're a fact witness and they're doing

20  their own fact checking, bottoms up, true digging in and

21  understanding the numbers, or they're an expert and they're

22  really offering expert testimony.  We have neither.  We have

23  neither, Your Honor.  They haven't demonstrated insolvency.

24  Okay.

25      So we have a flock of financial consultants who have been

1  involved in this process for at least since the middle of

2  2012.  And it's frankly baffling to the stakeholders that they

3  want to cut claims, that they want to cut jobs, that they want

4  to cut retiree health, that they want to cut pensions, but

5  they don't have an indication for us yet as to what is that

6  hole that they need to fill.

7     And frankly, Your Honor, unlike some cities that find

8  themselves distressed, Detroit is in a solvent state.  So if

9  we have a Governor who is starving the city and then delaying

10  taking action with regard to the stakeholders, that is not, we

11  would respectfully submit, proof of insolvency.

12     We were –– we heard colloquy on the stand actually, Your

13  Honor, and I think Your Honor actually questioned Mr. Orr with

14  regard to why he didn't ask the Governor specifically for the

15  3.5 –– or why he didn't remember whether or not he asked the

16  Governor for the 3.6 billion to fill the pension hole.  Your

17  Honor, I have kids, they know when not to ask.

18     Your Honor, with regard to good faith and with regard to

19  the negotiations.  AFSCME and others sought to meet with the

20  emergency manager on the day, the very day he was appointed.

21  Ed McNeil went to his office and when he couldn't get into the

22  office, he posted a letter to the door requesting a meeting

23  with the coalition of unions that wanted to meet with him.

24     AFSCME and others, including Mr. Kreisberg went to all

25  four of the presentations that were offered.  AFSCME and

1  others signed a confidentiality agreement to access the data

2  room to get access to information.  AFSCME sent information

3  requests requesting reasonable financial, cost, health

4  benefit, retiree health, pension information.

5       Mr. Kreisberg testified that despite the fact that there

6  was some colloquy during his deposition that may have

7  indicated otherwise, he did want to meet and he was trying to

8  get information from the city with regard to what might

9  constitute the underpinnings of a successful proposal, or a

10  successful counter proposal.  And that was not forthcoming.

11      There were no meetings.  There were no responses to those

12  inquiries.  And in addition to that, there was not sufficient

13  information in the data room as of the filing date to make a

14  reasonable counter proposal.

15      In fact we're not sure, Your Honor, and we would

16  respectfully submit that Your Honor find, that this proposal

17  isn't a proposal.  We saw some of the pages that the city

18  pointed us to during their opening, but if you look at this

19  proposal, and you're a retiree counting on health benefits,

20  you don't know what your new benefits are going to be.  You

21  don't know what benefits are going to be cut.  And you don't

22  know how much the city is saving because they're making those

23  changes.  So you can't really counter or offer something

24  different or potentially less devastating to you.

25      Same with regard to the pension, including vested pension

1  benefits.  You don't know what's going to be cut, you don't

2  know what your pension benefit is going to be.  And you don't

3  know what the savings are as a result of those cuts.  In fact

4  with regard to the pensioners, you don't even know if you're

5  considered a creditor.

6      With regard to jobs, Your Honor, you don't know if you're

7  going to have one.  And you don't know what they're going to

8  save by outsourcing your job or by eliminating it.  How can

9  you make a counter proposal without these very basic simple

10 facts?

11     And equally telling, equally telling is that we've seen a

12 plethora of information and evidence with regard to the fact

13 that people were reviewing and looking at whether or not you

14 could terminate the pensions through the use of Chapter 9 way

15 back into 2012.

16     Not one shred of evidence, Your Honor, not one shred of

17 evidence on how you conduct the good faith negotiations you

18 need to conduct to be a Chapter 9 debtor consistently with

19 whatever rights you want to reserve under PA436.  Not one

20 shred of evidence on how they could actually facilitate those

21 discussions.

22     We would respectfully submit that the arguments with

23 regard to impractical also go to bad faith and a -- and a lack

24 of -- and a lack of authority.  They've admitted financial

25 distress at least as of the time the Governor took office in

1  2011, yet the state created a situation where there was only

2  one month and four days that we could do these negotiations.

3  They did not, the Governor did not before June 14th, encourage

4  negotiations with stakeholders.

5      We heard testimony from the bevy of consultants that

6  there were no discussions with the bonds before the -- before

7  the -- before the EM was appointed.  There were no discussions

8  with vendors.  There were no discussions on the pensions.

9  There were no discussions with the retirees.

10      And when there were discussions, with a coalition of

11  unions led by Ed McNeil and others that resulted in a

12  concessionary agreement where the city sat in the room and

13  worked hard for several months and frankly it could have been

14  done shorter, if it needed to be done shorter as a precursor

15  to Chapter 9 and where E & Y, the one -- the one consultant

16  that the -- the state has testified is the guy that knows the

17  numbers, sat in the room and participated in those

18  discussions.  When that negotiation concluded, the state said

19  no.

20      And not only were there no negotiations with retirees,

21  Your Honor, but you heard testimony from at least two of the

22  -- two of the witnesses that you can do settlements with

23  retirees.  You can do settlements through class actions, you

24  can do settlements as Mr. Kreisberg testified actually

25  occurred here in Detroit by -- by having the unions as part of

 1  the concessionary bargain, which by the way dealt with retiree

 2  health and dealt with pensions.  Also have the unions agree

 3  not to fund retiree litigation.

 4      There's no retiree with 18,000 or $19,000 in pensions

 5  undertaking a Supreme Court challenge to -- to litigation.

 6  And for the city to say they're surprised to learn that in

 7  like -- like with AFSCME in Illinois, or with the Flowers

 8  litigation that that wasn't being funded by the retiree, is --

 9  is just -- is frankly disingenuous.  Not only -- not only do

10  they know it, Your Honor, they participated in the settlement

11  negotiations that resulted in how to stop it.

12      Your Honor, as you approach Chapter 9, one of the

13  criteria under Chapter 9 is that you enter into an agreement

14  that is approved by a majority of your creditors.  That is

15  completely consistent with the concept of a pre-packaged

16  bankruptcy in a Chapter 11 context.  And it's a good thing to

17  do because it vests people like the labor negotiation vested

18  people in the making better of the problem.

19      They're owning, they're owning the resurgence of Detroit

20  as opposed to being discarded by the Governor's view of what

21  that resurgence should look like.  But instead of that, Your

22  Honor, we're doing things where we're kicking people off to

23  the side and disenfranchising them.  And that's not the proper

24  way to be using Chapter 9.

25      Outside of bankruptcy if you say the bond holders can't

1  consent because the indentures or the loan documents require

2  100% consent, then you get to one-half in number and

3  two-thirds in dollar amount.  You don't even have to do that

4  in Chapter 9.  In Chapter 9, you only need a majority.

5      If you say that the insurance carriers, that the bond

6  insurers aren't getting to consent, same thing, Your Honor.

7  You only need a majority.  You don't even need the high bar

8  that you have in Chapter 11 for a pre-package.  In a Chapter 9

9  it's only a majority of the creditors.

10      They didn't get to a majority of the creditors because

11  they didn't spend sufficient time with those creditors to do

12  those negotiations.  And by sufficient time we don't mean two

13  years, we just mean more than a month and five days.  They

14  took more time, Your Honor, the Governor took more time to

15  interview the consultants that were hired to help the city

16  with its restructuring than they took to negotiation the

17  restructuring itself.  That's absurd.

18      Your Honor, you're being asked today here to set a very,

19  very dangerous precedent, not only for Detroit, but if the

20  Governor is allowed to create a self -- a slow decline with no

21  real emergency and just wait until we're at the precipice and

22  then say oh, we have to do something, and now with that self

23  created emergency, be able to use Chapter 9 to further what

24  might be because we're under this -- this cloak of -- of lack

25  of transparency, an agenda that is not truly a financial

1  agenda, but a political agenda, a bi-partisan agenda, a

2  socioeconomic agenda, a racial agenda, Your Honor, you're

3  going to be put in a situation where this will allow the

4  Governor to do this to any city in -- in Michigan and it will

5  be a road map for Governors across the country to use Chapter

6  9 by creating a self created emergency to deal with issues

7  that are unrelated to really truly solving the financial woes

8  of particular cities.

9      And the facts in Detroit are particularly egregious.

10 Because in addition to not doing anything, trying to negotiate

11 with the stakeholders all during 2012, they actually stopped

12 the one stakeholder that begged the city to negotiate with

13 them which was labor.  We had concessionary agreements by 30

14 unions that were approved with the city with E & Y in the room

15 and the state said no.  And then they went one step further.

16 They negotiated a consent decree.

17     And the only substantive right other than technical

18 assistance that they're giving to themselves in that consent

19 decree, is the right to veto labor agreements.  And the only

20 reference to the Constitution in that consent decree, Your

21 Honor, is not to the pension clause, it's to the fact that the

22 Constitution limits funding.  We can't help the city

23 financially, it's silent on the pension clause.

24     And what happens after the consent decree?  The -- the --

25 the Governor enacts 436.  What's the only thing that 436 does

1   here?  Is it stops negotiations.  So now we have the

2   consultants in a pretzel trying to figure out how they can

3   conduct good faith negotiations as required as a precursor to

4   Chapter 9 while simultaneously not waiving rights under PA436.

5       Now I would respectfully submit that had they spent one

6   scintilla of time working on the problem the way they did on

7   getting rid of the pensions, they could have come up with a

8   creative solution.  But that road block was put there by the

9   state and blocks the ability of Detroit to reasonably be here.

10      We understand, Your Honor, that this is a hard situation.

11  We --

12          THE COURT:  What -- what was the Governor's

13  motivation in your view?

14          MS. LEVINE:  Your Honor, I don't -- I'm not -- I'm

15  speculating.  I've heard -- I've heard from our constituents.

16          THE COURT:  The evidence to suggest what his

17  motivation was other than to help the city, is there?

18          MS. LEVINE:  Your Honor, the -- the -- actually we

19  think the evidence is to the contrary.  We think that there's

20  accumulation of evidence that says that starting back in 2011

21  he was aware of this financial condition and has not done

22  anything other than create this emergency here.  And what was

23  in his mind?

24          THE COURT:  For what purpose though?

25          MS. LEVINE:  I'd be speculating.  But I -- but I'd

1 be speculating also to say it was just out of altruism with

2 regard to the financial situation of Detroit.

3    And, Your Honor, I would also respectfully submit that

4 regardless of that motivation, if this really is all you have

5 to do to prove impractical -- to prove it's impractical, just

6 to wait for the time period to pass till you get to a

7 precipice, it couldn't possibly be surprising to all of these

8 financial consultants that we were reaching the point in time

9 when the bond holders were going to call a default, or where

10 the bond insurers were going to call a default.  That just

11 makes no sense.  Okay.

12    And while it might -- the EM might not have been

13 appointed until March, all these consultants were involved

14 since 2012.  If what we're saying here, Your Honor, is that we

15 can use Chapter 9, potentially just to get rid of the pensions

16 and the retirees, who aren't like -- who are not going to

17 share in the upside, or potentially get rid of some of the

18 bond debt or other debt who aren't going to share in the

19 upside, that's an -- that's an improper use under this factual

20 setting.

21    It's unconstitutional to use -- to apply Chapter 9 in

22 this way, Your Honor.  It's unconstitutional under the state

23 constitution to get rid of the pensions in this way.  It's

24 unconstitutional to apply Chapter 9 as a work around for

25 PA436.

1       We would respectfully submit it's an unconstitutional

2  application to use Chapter 9 to jettison legacy liabilities

3  without any safety net for those recipients.  And we would

4  respectfully submit, Your Honor, it's a terrifying use of

5  Chapter 9.  Thank you.

6       MR. GORDON:  Good afternoon, Your Honor.  Robert

7  Gordon of Clark, Hill on behalf of the Detroit Retirement

8  Systems.

9       Your Honor, similar to when we had oral argument back on

10  October 15th, if I may, I just want to give a little bit of a

11  road map if I may as to the sequencing of -- of closing

12  arguments following Ms. Levine at this point.

13      Consistent with the opening arguments, Your Honor, will

14  recall, Ms. Green from our office was sort of cast by all of

15  the objectors on behalf of all of the objectors because of her

16  singular facility with all of the volume of -- of evidence,

17  and facts, and documents, to construct and -- and present to

18  the Court a timeline of the evidence that was intended to be

19  introduced and that had been adduced in discovery.

20      Consistent with that, she has been essentially asked to

21  again provide to the Court an enhanced form of her timeline to

22  review with the Court succinctly to review what evidence has

23  indeed been introduced in this trial with highlighting, and

24  this is the enhanced part of it, highlighting the specific

25  facts, pertinent facts that have been developed during the

1  trial that weren't in the original timeline.

2      So with that, Your Honor, the -- the suggestion is that

3  Ms. Green would provide the enhanced timeline on behalf of all

4  of the objectors.  I would then provide some limited comments,

5  legal arguments on behalf of the retirement systems, and then

6  it would be followed by a -- a number of the other objectors

7  including in a particular order.  If the Court wants to know,

8  I can give you that as well.

9          THE COURT:  That's fine.

10         MR. GORDON:  Okay.  As I understand it --

11         THE COURT:  On one condition.

12         MR. GORDON:  Yes, Your Honor.

13         THE COURT:  Ms. Green, succinct doesn't mean talk

14  fast.

15         MS. GREEN:  I have the word slow written on the

16  cover.

17         THE COURT:  Because I want to -- I want to

18  comprehend what you're saying.

19         MS. GREEN:  I can't talk as fast as Ms. Levine

20  either, so I won't.

21         THE COURT:  Okay, fair enough.

22         MR. GORDON:  Duly noted for everyone.  If I misstate

23  the -- the order of objectors, I will apologize.  But for the

24  Court's assistance, my understanding is that after the

25  retirement systems, then the retired Detroit Police Members

1  Association would be next, and then the UAW, then the Flowers

2  plaintiffs, then the public safety unions, then uniform and

3  non-uniform retiree associations, including Ms. Lightsey and

4  Mr. Taylor, and then the retiree committee.  If I got that

5  correct.  Thank you, Your Honor.

6         THE COURT:  That's fine.  Thank you.  Thank you for

7  your work in organizing that.

8         MS. GREEN:  Good afternoon, Your Honor.  Jennifer

9  Green on behalf of the retirement systems.

10      The objecting parties began trial on the 23rd of October

11  by showing a similar timeline of what we believed the evidence

12  would show at trial.  And we believed that evidence would show

13  that there was never an intent to actually negotiate prior to

14  the bankruptcy filing and that it was a foregone conclusion

15  before any of those negotiations or alleged negotiations took

16  place that the end game would be Chapter 9.

17      And we believe that timeline that now includes more

18  evidence that was adduced at trial, in addition to new

19  documents that were produced during trial, will indeed show

20  that.  And I will look quickly through some portions that I'm

21  sure are undisputed by this point, but they are included for

22  your reference.

23      At trial the Governor testified that this process has

24  been a two and a half year effort which was consistent with

25  his previous accurate characterization.  In March of 2011,  PA4

1  was signed into law.  In February of 2012, as Ms. Levine just

2  stated, the coalition of 30 unions ratified a concessionary

3  agreement that was later blocked by the state.  And in

4  February of 2012, Stand Up for Democracy filed a petition to

5  invoke a referendum on PA4.  Within just days of that, Stand

6  Up for Democracy's petition, there were already discussions

7  about how to insulate PA -- what became PA436 later from

8  referendums.

9       At about the same time, Jones, Day and the State of

10  Michigan began to work together on issues relating to the

11  possible repeal of PA4 and the consent agreement.  And we have

12  exhibit number 849 here that discusses that.

13       On March 23rd, Treasurer Dillon admitted at trial that a

14  possible Chapter 9 for the city was discussed as far back as

15  the spring of 2012.  And at that time Huron Consulting,

16  Miller, Buckfire, and Jones, Day lawyers were also discussing

17  a potential Chapter 9.

18            THE COURT:  Something you'd like to say, sir?

19            MR. IRWIN:  Your Honor, I -- I am extremely

20  reluctant to interrupt during summation, but I don't believe

21  that Exhibit 852 is in evidence.

22            THE COURT:  Oh.

23            MR. IRWIN:  It is not on the Court's list of

24  documents provided to us during the break.  We have tracked

25  these things quite carefully and we don't believe this is in

1  the record.  We believe it was discussed with a witness but

2  never offered.  And we have an objection to it in the

3  pre-trial order.

4            MS. GREEN:  I believe --

5            MR. MONTGOMERY:  I believe, Your Honor, on our list

6  has 852 which is also Bowen deposition exhibit number 14 as

7  having been admitted --

8            MS. GREEN:  Uh-huh.

9            MR. MONTGOMERY:  -- in the trial.  That's on our

10  master list.

11            MS. GREEN:  I will say, Your Honor, when putting

12  this together we double checked every exhibit we included in

13  closing as having been admitted.

14            THE COURT:  Do you have a date for the admission?

15            MR. MONTGOMERY:  Yellow highlight means what?

16            MS. GREEN:  Either day six or day seven.

17            THE COURT:  Six or seven was the response?  Well, I

18  think rather than take the time to try to dig into the record

19  to see if it was admitted or not, we'll let Ms. Green continue

20  with the understanding that any references to it will be

21  stricken if it was not admitted into evidence.

22            MR. IRWIN:  Your Honor, if there are additional

23  documents with this issue, I -- I would feel the need to in

24  fact raise the same objection.

25            THE COURT:  Absolutely you should, absolutely.

1          MS. GREEN:  I believe this was admitted into

2    evidence during Treasurer Dillon's testimony.

3          THE COURT:  Okay, that helps.

4          MS. GREEN:  That date, I think is the right day.

5    Later that same day Huron Consulting emailed Jones, Day

6    discussing a Chapter 9, stating I need to link you into a

7    Chapter 9 conversation with Andy very quickly, referring to

8    Andy Dillon.

9          On April 4th, 2012, the city entered into the consent

10   agreement which Jones, Day had helped craft with the State of

11   Michigan.

12         In June of 2006 -- or 2012, Heather Lennox of Jones, Day

13   and Ken Buckfire met with Governor Snyder and they pulled

14   together some memos that they had prepared for Andy Dillon,

15   including some of the topics that are relevant to these

16   proceedings, including a comparison of PA4 in Chapter 9, a

17   memorandum on constitutional protections and pension, and an

18   analysis of filing requirements of Section 109(c)(5) of the

19   Bankruptcy Code regarding impracticability and negotiating in

20   good faith.

21         And we raise these, Your Honor, not to -- this isn't a

22   Jones, Day led conspiracy argument.  The fact of the matter

23   is, that we think things like this relate to whether or not it

24   was good faith to wait until 34 days before filing when these

25   issues were clearly on the horizon back in 2012 as Ms. Levine

1  just argued as well.

2      In July of 2012, Miller, Buckfire was hired by the state

3  to perform a 60 day review of the city's financial condition.

4  And at that time Miller, Buckfire, Ken Buckfire from Miller,

5  Buckfire testified that he was approached by Jones, Day and

6  that one of the partners had wanted to meet -- or that she

7  wanted to introduce one of her partners who was the lead

8  bankruptcy partner for Orange County which was a successful

9  Chapter 9.

10     In October 2012, before PA4 was rejected by the voters,

11 the Treasury Department and the Governor's office began

12 discussing creation of a new emergency manager statute in case

13 the referendum passed.  This testimony comes from the

14 deposition of Howard Ryan that has been submitted to Your

15 Honor.  He did not testify live.

16     In 2012 December, PA436 was introduced in the Michigan

17 legislature and passed shortly thereafter.  PA436 was

18 insulated from a public referendum because it had an

19 appropriation in the amount of 5,000,000 -- just over

20 $5,000,000.  And as you heard Treasurer Dillon testify, that

21 covered a small portion of the budget for only the City of

22 Detroit's consultants.  This was not enough money to even

23 cover other emergency manager situations across the State of

24 Michigan.

25     Howard Ryan, a state 30(b)(6) witness, testified very

1 candidly that the reason that the appropriation language was

2 put in there was so that it would not be defeated by a

3 referendum.

4     In January of 2013, Miller, Buckfire was re-engaged and

5 at this time Miller, Buckfire discovered that the DIA art

6 collection was a potential asset capable of monetization.

7 However, there were no actions taken on the DIA artwork until

8 August 5th.  At the same time Miller, Buckfire was asked by

9 Treasurer Dillon to make arrangements for the city and state

10 officials to interview Jones, Day and seven other law firms

11 that were interested in serving as restructuring counsel.

12     At the end of the month an internal email at Jones, Day

13 shows as though they were acting like a Chapter 9 was already

14 the plan.  There is an email from that date that states, it

15 should also prove interesting that Miller, Buckfire has said

16 no one wants this bankruptcy to go the way of JEFFCO.  And

17 there's also a caution at the bottom, that when they do their

18 pitch to avoid alienating the state and not to mention that if

19 something were to happen with the city's pensions, that the

20 state would probably step up to deal with but thus far has

21 failed to concede this point.

22     At the pitch, and we've all seen the presentation, so I

23 will skip through these very quickly.  The strategy was laid

24 out.  Negotiating in the shadow of a Chapter 9 and attempting

25 to bolster eligibility for and success in a Chapter 9

1   proceeding by establishing a good faith record of seeking

2   creditor consensus, was one thing that was laid out.

3       And these are the speaker notes from the pitch

4   presentation and it states, this will deflect any eligibility

5   complaints based on alleged failure to negotiate or bad faith.

6   Further it blatantly says, if needed Chapter 9 could be used

7   as a means to further cut back or compromise accrued financial

8   benefits otherwise protected by the Michigan Constitution.

9       Shortly thereafter, Richard Baird reaches out to Jones,

10  Day to inquire about hiring Kevyn Orr as the emergency

11  manager.  On January 31st, Orr calls PA436 a clear end run

12  around the prior initiative that was rejected by the voters.

13  And although the new law provides a thin veneer of a revision,

14  it is essentially a redo of the prior rejected law.

15      That same day Jones, Day opines that it seems the ideal

16  scenario would be that Snyder and Bing both agree that the

17  best option is simply to go through an orderly Chapter 9.  In

18  February, Mayor Bing was -- Mayor Bing was approached by

19  Richard Baird regarding Kevyn Orr as a candidate for the EM

20  position.  And Mayor Bing recalls that the only qualification

21  -- qualification he was offered about Orr was his bankruptcy

22  experience.

23      In March, the Governor declared a local emergency, a

24  local financial emergency.  Kevyn Orr was appointed emergency

25  manager, and in April, Jones, Day was engaged as legal counsel

1  for the city.

2      On April 18th, Don Taylor has a face to face meeting with

3  Kevyn Orr and several other members of the Retired Detroit

4  Police Officers and Fire Fighters Association.  And Kevyn Orr

5  told Mr. Taylor at that time that pension benefits are

6  protected under the Michigan Constitution.

7      Mr. Taylor testified at trial, I asked him about the

8  pensions of retirees.  He said that he was fully aware that

9  the pensions were protected by the state constitution and he

10 had no intention of trying to modify, or set aside, or change

11 the state constitution.

12     A month later the emergency manager was quoted as saying,

13 the public can comment on the city's financial and operating

14 plan, but this isn't -- we all heard this in Court a thousand

15 times, but this isn't a plebocite, we are not like negotiating

16 the terms of the plan.

17     In May, the city met with Christie's, but Kevyn Orr

18 testified that he told them to go away.  Buckfire met with

19 Christie's in May and again failed to retain them until after

20 the bankruptcy filing.  He retained them on August 5th.

21     At trial Buckfire denied telling the DIA board members

22 about an imminent bankruptcy filing, although Buckfire was

23 later impeached on that point with an email recounting a

24 meeting between himself and board member David Meador.

25     On June 5th, Chuck Morris sent an email to Kevyn Orr

1 stating that the pension underfunding is so large that Chapter

2 9 is the only way to deal with it.  Thus, the city knew at

3 least as of June 5th that "a significant reduction was

4 necessary".  And two days after this email, Kevyn Orr

5 forwarded that email to Treasurer Dillon alerting him of the

6 situation.

7     On June 10th, Kevyn Orr held his first public meeting

8 pursuant to his statutory duties under PA436.  And when asked

9 a question from an audience member regarding pension benefits,

10 Orr told the public that the benefits are sacrosanct and

11 cannot be touched.

12     (Video Being Played at 1:24 p.m.; Concluded at 1:25 p.m.)

13     On June 10th, Orr's assertion that accrued benefits are

14 sacrosanct is consistent with what he told Don Taylor, the

15 President of the RDPFFA in their meeting in April.  But it is

16 inconsistent with what Orr proposes at the proposal for

17 creditors meeting that occurs just four days later.

18     Orr admitted on the stand that he never corrected this

19 misinformation.  So at best the city mistakenly gave

20 misinformation to the very class of creditors it was supposed

21 to be negotiating with, or at worse, the city outrightness led

22 the retirees into thinking that their pensions were safe.

23     Three days after telling the retirees at the public

24 meeting that their pensions could not be touched, Mr. Orr gave

25 an interview with the *Detroit Free Press* and expresses his

1  intention to evade the pension clause through a federal

2  Chapter 9 bankruptcy proceeding.

3      The following day the emergency manager held the meeting

4  at the Detroit Metropolitan Airport and presented the proposal

5  for creditors.  Attendees at this meeting all testified that

6  it was announced that this was not a negotiation.  And I

7  believe Mr. Orr also admitted during trial that indeed the

8  meetings on the 10th, and the 14th, and the 20th were not

9  negotiations, they were merely presentational.

10     And this is when the city admitted for the first time

11 that it fully intended to impair and diminish accrued

12 financial benefits.  However, this was buried 109 pages into

13 the proposal.

14     At the end of the proposal the city laid out a timeline.

15 It gave 34 days for the informational stage as well as the

16 negotiations to take place.  It is the objecting parties'

17 position that a four week time frame was inadequate.  Buckfire

18 testified they'd been working around the clock for months on

19 the proposal for creditors, but the state quotas were given

20 just three weeks to review the data and then negotiation

21 within that compressed time frame.

22     As Ms. Levine mentioned earlier, the city could have been

23 negotiating since 2012.  Chapter 9 had been contemplated since

24 2012.

25     And the state raised an issue this morning about

1  preparing for the storm and -- and buying a raincoat and

2  umbrella and all of that.  But it's as though they knew the

3  storm was coming for two years, but then only gave 34 days for

4  people to get ready which we think was unfair because to argue

5  that it was impracticable when they knew all along that they

6  had this time, was not good faith.

7       In June 17th the initial rounds of stakeholder

8  negotiations were set to start.  And somehow the pension

9  people that were involved were supposed to know that the city

10 was expecting them to negotiate even though Orr had told Don

11 Taylor of the RDPFFA that pensions would not be cut.  And he

12 later asserted on June 10th again, that pensions would not be

13 touched.

14      The vast majority of the retirees were not even aware of

15 the creditor proposal because the city admitted, Mr. Orr

16 admitted, that it did not mail them each a copy of it.  The

17 city had also informed people that attended the meeting on the

18 14th that it was not a negotiation and the city and state

19 witnesses all admitted that the proposal did not identify the

20 amount to which the pensions would be reduced.  And in fact to

21 date the city has never put an exact dollar amount on the

22 level of intended cuts.

23      On June 20th, the data room was opened, but as witnesses

24 testified, it was not fully populated.  Brad Robbins testified

25 it was missing key information such as data regarding the

1  city's assets.  And he also testified that the first step in

2  any restructuring negotiation is investigating the

3  affordability issue and reviewing the relevant data.

4      He referenced the <u>American Airlines</u> case where the debtor

5  had claimed the pensions could not be afforded, but he and his

6  team were able to restructure the pensions and keep the

7  benefits intact.  This morning I believe Mr. Bennett said that

8  was the only example, the asset information, but Mr. Robbins

9  did testify several times that financial data relating to

10  whether or not the pensions were indeed incapable of moving

11  forward, is the information he was looking for.

12      On June 27th the city sent a letter to the UAW thanking

13  them for their time.  And in that letter even the city

14  acknowledged that the unions would need more information.  Mr.

15  Bennett said this morning that no one except Mr. Robbins had

16  asked for more information and that is not true as the city

17  admits in this letter that the UAW had asked for more

18  information.  And the date is interesting because it's June

19  27th which is already outside of the one week time period the

20  city had given for an informational swap.

21      In June of 2013, Orr testified that he had authorized his

22  team to start preparing a potential Chapter 9 filing, in late

23  June or early July.  Malhotra admitted at trial that his

24  declaration was being drafted by late -- by late June.  On

25  July 3rd, Robbie Flowers, Gracie Webster, and Veronica Thomas,

1  commenced their lawsuits.

2      And while Orr testified at trial that these lawsuits made

3  clear to him that the parties are not interested in

4  negotiating, this testimony is undermined by the fact that

5  several witness testified that the city was expecting lawsuits

6  and expecting challenges to PA436.  Exhibit 403 noted that

7  opponents were lining up to challenge PA436.  Dillon testified

8  that they not only expected these lawsuits, they had planned

9  for them in advance.

10      Further, Orr admitted that he ignored these lawsuits for

11  three weeks.  In other words he ignored them during the time

12  period that the city had given for the alleged negotiations.

13  Therefore I don't know how these lawsuits could have impacted

14  the negotiations.  Further, there were only a handful of

15  plaintiffs at issue and there were plenty of other parties the

16  city could still be negotiating with.

17      And lastly, the retirement systems lawsuit was filed

18  after the time period the city dedicated to negotiations, so

19  their lawsuit also could not have impacted any of the

20  so-called negotiations.

21      Therefore, we believe the evidence adduced at trial

22  showed that the city had no intention of ever negotiating with

23  creditors.  You saw a timeline dated July 8, 2013, where the

24  city had already determined its Chapter 9 petition would be

25  filed on July 19th.  The timeline created had a filing date

1   despite the fact that creditor meetings had not even yet

2   occurred.  Therefore, we believe that shows that it was a

3   foregone conclusion before the creditor meetings ever took

4   place that the end game was a Chapter 9 filing on the 19th.

5        This is a copy of the communications roll out that was

6   admitted into evidence.  And as of July 8, the city's position

7   is, that we negotiated in good faith, we presented a

8   comprehensive restructuring plan, but at this point it would

9   be impractical to continue discussions out of Court because it

10  is clear that we will be able to reach -- we'll be able to

11  reach agreement with some of our creditors only through a

12  Court supervised process.  However, the creditor negotiations

13  had -- the meetings had not even taken place and this was

14  already their position.  And further as of July 8th, July 19th

15  was clearly the date already set forth as the filing date.

16            THE COURT:  Well, how do you deal with the city's

17  argument that this timeline was merely a contingency?

18            MS. GREEN:  The slide.

19            THE COURT:  Okay.

20            MS. GREEN:  Orr and Buckfire both characterize this

21  timeline as a contingency, however, on cross exam they were

22  forced to admit that nowhere on the face of the timeline does

23  it say contingency plan.  Further, there were no other

24  contingency plans produced or admitted that he knew of no

25  other alternative timeline out of the hundreds of pages of

1   documents that were produced by the city.

2       And when asked about the timeline, Treasurer Dillon said,

3   I didn't see an alternative schedule.  This was the one that

4   was mapped out.

5       On July 8th, as set forth in Exhibit 452, they had already

6   mapped out the communications message that it would be

7   impractical to continue discussions.  But the only meetings

8   that had taken place at that time were the June 10th, 14th, and

9   20th meetings which Mr. Orr testified were merely informational

10  and presentational.  That is direct evidence that there was no

11  intention of actually negotiating at the upcoming stakeholder

12  meetings being held on July 9th, 10th, and 11th because the

13  decision to file had been made regardless.

14      The key filing messages also took the position that

15  before any creditor meetings, the negotiations would be

16  impracticable.  But this ignores these facts.

17      The city carries the burden of proof.  It actually has to

18  prove that it was impracticable to negotiate which it cannot

19  do because the city did nothing to reach out to active or

20  retired employees.  Orr admitted the city did not mail

21  letters, did not mail informational materials to retirees or

22  active employees.

23      He admitted the city did not create a special web site to

24  communicate with these stakeholders.  He admitted they didn't

25  reach out over the telephone.  They didn't post public

1 notices, they didn't use the media to communicate with these

2 stakeholders.

3      The city also did not break the retirees into smaller sub

4 groups that could be negotiated with directly.  Mr. Orr

5 testified that he thought perhaps Ed Miller at his firm had

6 done so, however, none of the witnesses at trial confirmed

7 this.  And Ken Buckfire testified that while this idea was

8 raised, he was told by David Heiman and Heather Lennox at

9 Jones, Day that this would be impracticable to do and so no

10 one bothered to try.

11     The city has repeatedly said that negotiations were

12 impracticable because no one would represent retirees.  But

13 the city had several viable options that they could have taken

14 advantage of.  Namely, the DRCEA, the RDPFFA, the retirement

15 systems, and the pension task force.

16     Shirley Lightsey testified on behalf of the DRCEA.  She

17 told the Court that she introduced herself to Kevyn Orr as the

18 President of the DRCEA at a meet and greet in April.  That

19 organization represents between 7,600 and 7,800 of the 12,000

20 retired general employees, roughly 63 to 65%.

21     She testified that her organization has the power to

22 appoint committees and call special meetings.  It has a web

23 site, its members can be communicated with via telephone,

24 email, and in writing.  She also testified that her

25 organization provides information to even non-member retirees.

1  Thus the DRCEA could have been utilized to mobilize the

2  general retirees.  And while the DRCEA could not itself bond

3  the members, its infrastructure could have been used to

4  communicate with those people and then the members themselves

5  could vote.

6      But the city never utilized the DRCEA.  And in fact

7  Shirley Lightsey was not even invited to the June 14th proposal

8  for creditors meeting as she testified.

9      The RDFPPA, it should be RDPFFA, represents 6,500 out of

10  the 8,000 retired police and fire fighters which is over 80%

11  of the retired police and fire fighters.  That organization

12  has a web site, holds monthly meetings, circulates a monthly

13  magazine, and has lines of communication to all of its

14  members.

15      Mr. Taylor, the President, testified that his group has

16  negotiated reductions in benefits in the past.  And he

17  explained in detail a prior situation where his group came up

18  with a compromise, the members voted, and a settlement was

19  reached.  But this organization was also not utilized by the

20  city and in fact its President was misinformed by both Andy

21  Dillon the state Treasurer, and the emergency manager that

22  their pensions would not be touched.

23      Mr. Taylor testified that he passed this information on

24  to his membership who were then lulled into inaction.  You may

25  recall there was an exchange where Mr. Taylor was asked why he

1  didn't ask questions at the meeting.  And he said because I

2  was told that our pensions were not going to be touched.

3      The city also could have used the pension task force

4  which is currently comprised of representatives from Milliman,

5  the actuarial firm, Conway, MacKenzie, and Jones, Day.  There

6  are no representatives from the retirement systems, Gabriel

7  Roeder, Greenhill, the unions, or any of the retiree groups

8  that I just mentioned.  They were never asked to join the task

9  force.  And if they were, if the city was serious about

10  restructuring efforts, or implementing new cash flow

11  strategies to avoid having to impair, these different groups

12  of people could have been reached out to as a way to

13  negotiate.

14      Treasurer Dillon himself admitted there are lots of

15  creative options given the long life of a pension fund.  But

16  he also admitted that none of these creative options were ever

17  raised with the unions, the retirees, or with the retirement

18  systems themselves.

19      In addition Mark Diaz, a trustee of the retirement

20  systems testified yesterday that the systems themselves could

21  have been used as a partner to communicate to the retirees.

22  The systems have a data base of all the retirees, they have a

23  web site, and they can "very easily communicate with all of

24  the individual people".  But when Mr. Diaz was asked if the

25  city ever requested that the systems infrastructure be used in

1 this manner he said no, not at all.

2     And lastly with respect to the bond holders, Mr. Buckfire

3 admitted that with respect to those negotiations, he knew all

4 of the bond trustees and their insurers, those parties were

5 "organized" and that they could be relied on to speak for, if

6 not actually vote the interest of the underlying bond holders.

7     Similar to what Ms. Levine just argued, the position is,

8 that the city should not be permitted to have created an

9 environment of impracticability and then use that

10 impracticability as its excuse for refusing to negotiate.  And

11 the point is, if they knew back in 2012 that Chapter 9 was

12 being contemplated, then why did we wait till 34 days before

13 the filing to begin.

14     And if that is the way that 109(c)(5) works, then in

15 essence good faith negotiations and impracticability

16 provisions may as well be read out of the Code if all we have

17 to do is make a conclusory statement that negotiations are

18 impracticable without actually proving that those negotiations

19 were in fact an impracticability.

20     On July 9th, Treasurer Dillon wrote to the Governor of the

21 State of Michigan and as you know it's used a lot at trial.

22 But it highlights that as of July 9th, the Treasurer believed

23 that we were still in the informational mode, not in the

24 decision making mode.  And yet when he was asked what changed

25 between July 9th and July 18th, he said that nothing changed to

1  take them out of the mere informational stage.  It obviously

2  -- key decisions were being made just a week later because the

3  filing was on July 18th.

4      On July 9th, as Mr. Dillon said, they were in the

5  informational mode.  The level of underfunding in the pension

6  systems was still being debated and Mr. Dillon testified to

7  that.  And how much the actual reduction would be for the

8  retirees was still unknown.  Dillon and Orr both admitted that

9  it would be impossible to negotiate when these numbers were

10 not known.

11     Mr. Dillon admitted if you're going to reach a settlement

12 with your creditors, it's important to understand what's the

13 level, what's the funding level.  He also admitted that they

14 did not know these numbers during the week of the alleged

15 creditor negotiations which took place on July 10th and 11th.

16 And to date they still don't know the exact numbers he

17 admitted.

18     On July 10th, the same day that the creditor negotiations

19 were allegedly taking place, the recommendation letter by

20 Kevyn Orr is already being authored by Treasurer Dillon and

21 others.  Dillon admitted that the July 19th filing date had

22 already been decided as of this date on July 10th when they

23 were writing the recommendation letter.  And he testified

24 about a detailed timeline and schedule that had been

25 circulated.

1    However, that same week Dillon was very skeptical about

2  whether the city had adequately made the case for a Chapter 9

3  and he raised his concerns with Kevyn Orr's team on a

4  conference call and he laid them out in an email.  He stated,

5  I don't think we are making the case.  Why are we giving --

6  why we are giving up so soon to reach an out of Court

7  settlement.  Looks premeditated.

8    He also says, I believe there is a State Court option to

9  get retirees into a class.  We don't acknowledge that and why

10  is that unpractical.

11    That I believe is the State Court class action option

12  that was testified to by Michael Nicholson of the UAW.  And

13  Treasurer Dillon said that no one ever explained to him why

14  that option was not practical.  He also states, I think we may

15  want a take it or leave it demand before we pull this trigger.

16  I agree with the recommendation, but I still don't think we

17  make the case.

18    And at the end he said, the pennies on the dollar outcome

19  for unsecured creditors make it practically impossible for

20  them to accept KO, Kevyn Orr's offer.  And Treasurer Dillon

21  also testified that the recoveries were so low that it seemed

22  to be that negotiations were expected to be unfruitful.

23    On July 10th and 11th, the creditor meetings took place.

24  The retirement systems met with attorneys from Jones, Day

25  regarding the city's finances.  The EM did not attend.  Brad

1  Robbins did attend and he testified yesterday that he did not

2  observe or participate in any negotiations regarding the

3  city's financing and that the meetings were purely

4  informational.

5      And this is consistent with Treasurer Dillon's report to

6  the Governor that as of this time frame, he considered

7  themselves to be still in the informational mode.  It is also

8  consistent with the city and state's communications roll out

9  which had already adopted the excuse that negotiations were

10  going to be impractical.

11      On July 12th the Governor's legal counsel, Mike Gadola of

12  the Attorney General's office, Treasurer Dillon, Lieutenant

13  Governor Brian Calley, and Richard Baird were all urging that

14  a more deliberative approach be taken with respect to the

15  Chapter 9 filing.  They specifically urged that a condition be

16  placed on the bankruptcy filing.  And they even more

17  specifically urged that a condition be placed on the

18  bankruptcy filing with respect to the vested pension benefits.

19      On July 12th, the Detroit Firefighters Association sent a

20  letter to the emergency manager asking for more specific

21  information on pension benefit restructuring as soon as

22  possible.  They noted that they have had two meetings with the

23  city where pension benefits were addressed and still have only

24  a general observation that pension benefits must be reduced.

25  Mark Diaz testified that no specific proposals were ever --

1  ever given.

2      On July 15th, just a few days before the bankruptcy

3  petition was filed, the Webster defendants filed a response

4  brief in the State Court action.  There was a hearing

5  scheduled for -- it should be July 22nd which was the following

6  Monday.  The State Court -- or the state asserted in its

7  response that a bankruptcy filing was still only a

8  possibility, that the plaintiffs' claims were unripe, and

9  premature, and based on a speculative threat of future injury.

10 However, as we all know, there was already a recommendation

11 letter and an authorization letter being worked on and the

12 decision had actually been made to allow the filing.

13     On July 16th, Mr. Orr submitted the bankruptcy

14 recommendation letter to Governor Snyder and Treasurer Dillon.

15 And it stated in that letter that dramatic but necessary

16 benefit modifications would be needed.

17     Governor Snyder acknowledged when he testified that he

18 read the letter before authorizing the filing.  And he

19 admitted that he knew that the city's request for an

20 authorization included that dramatic cuts to accrued benefits

21 would be part of any Chapter 9.

22     On July 17th, the day before the bankruptcy filing, the

23 DPSU received correspondence from the city thanking them on

24 behalf of the emergency manager for their strong cooperation

25 and their good faith negotiations regarding the difficult

1   issue of pension restructuring.

2       On July 17th the retirement systems filed their lawsuit

3   against the Governor and the emergency manager.  The complaint

4   was served on the Governor's office and the EM's office in

5   Detroit.  And that night the exhibit that you saw was the

6   Sarah Wurfel timeline circulated throughout the state without

7   -- throughout the state officials.  And at 6:23 on July 17th,

8   the plan was still to file on Friday, July 19th.

9       However, the following day, as you heard Mr. Nicholson

10  from the UAW testify, the retirement systems went to Ingham

11  County Court seeking a TRO.  The AG's office received a phone

12  call stating that the retirement systems were in the State

13  Court seeking a TRO, 3:47 the Governor emailed the

14  authorization letter, and at 4:06, Orr changed the date on the

15  filing papers, hand wrote in an 18, and filed the petition.

16  And at 4:10 the Attorney General appeared at the TRO hearing.

17  Orr admitted that he had been counsel, it would be

18  irresponsible not to file sooner rather than later given all

19  of the lawsuits.

20      In authorizing the bankruptcy with no conditions.  The

21  Governor ignored the advice of his own counsel at the AG's

22  office to further probe the conclusions in Orr's letter,

23  undertake due -- due diligence to confirm the eligibility

24  requirements had been met, and to place a condition on the

25  bankruptcy filing with respect to pension benefits.  That's

1  Exhibit 625 that we just looked at.

2      But the Governor testified he chose not to impose any of

3  these conditions because he did not want to create more

4  delays.  As Treasurer Dillon testified, the reason the July

5  19th filing date was originally chosen was because the Governor

6  wanted the process to be "fast and efficient".  However, due

7  to the desire for the Chapter 9 case to be fast and efficient,

8  adequate time was not given for the negotiation process to be

9  undertaken.

10      The Chapter 9 case was filed despite the fact that as

11  Chuck Moore testified, the actuarial numbers were still being

12  refined.  Mr. Buckfire cautioned that the Milliman reports,

13  which the city relied upon to state the 3.5 billion dollar

14  underfunding number, cautioned on their face that a "more

15  robust projection model could vary the results".  And

16  Treasurer Dillon stated that he also was not confident in the

17  pension underfunding numbers and that they were a moving

18  target.

19      In addition to the primary assets were still an unknown,

20  the Water and Sewage Department, and the city owned artwork at

21  the DIA which the objecting parties would submit is in large

22  part due to the fact that knowing the process was going to

23  take several months, the city waited until after the petition

24  date to even begin that process.

25      And in conclusion, because the city did not negotiate in

1  good faith, did not prove that the negotiations were in fact

2  impracticable, and instead filed this bankruptcy in bad faith

3  to evade the pensions clause, this case must be dismissed, or

4  the city must be forced to cure its bad faith by seeking new

5  authorization with a proper contingency under PA436 for the

6  pension benefits.  Thank you.

7          THE COURT:  I want to get back to that Exhibit 852

8  issue.  Is it possible that that exhibit was the same document

9  as an exhibit with a different number that was admitted?

10         MS. GREEN:  It could be 202, 2, 0 -- that is very

11  possible.  We had several that were --

12         THE COURT:  Can you check that out and let us know?

13         MS. GREEN:  Yes, I will.

14         MR. IRWIN:  Can I briefly be heard on that, Your

15  Honor?  We -- we -- it's hard to do this on the fly, so I have

16  a little bit more information at this time.

17     It is true 852 was used by Mr. Wertheimer.  It was used

18  during the Dillon examination.  It was an attempt to refresh

19  his recollection.

20         THE COURT:  Right.

21         MR. IRWIN:  It was not refreshed, and it was not

22  offered, and it was not admitted.  That is on November 5th and

23  the lines are Page 126, Line 25, to Page 129, Line 5.  It was

24  not offered, it was not accepted.

25         THE COURT:  All right.  Well, check to see if it was

1  another -- if it -- if the document itself is another exhibit

2  that was admitted and let us know.  202 is in, but the

3  question is, is it the same as 852.

4      Okay.  And -- and before we go to the next argument, are

5  there any other exhibit discrepancies?

6          MR. IRWIN:  There is one, Your Honor.  Exhibit

7  number 452.

8          THE COURT:  Yes.

9          MR. IRWIN:  This was the email from Mr. Nowling that

10 attached the timeline.  And -- and Ms. Green referred to it.

11 There was examination on that exhibit during the hearing,

12 however, again, and this was a -- a pattern to some degree,

13 was discussed, there was an objection to it in the pre-trial

14 order, and it was moved on before that objection -- before the

15 exhibit was offered, so that the objection could be ruled on.

16 And it is therefore not in the record.  It is not on the

17 Court's for that reason, we believe, indication of the

18 exhibits that are in evidence.

19         THE COURT:  Uh-huh.  Was 452 one of the exhibits in

20 Ms. Green's --

21         MR. IRWIN:  It was.

22         THE COURT:  -- slide show?

23         MR. IRWIN:  Those were the only two that I saw, Your

24 Honor, 852 and 452.

25         MS. GREEN:  That one also may have been a duplicate.

1  It's also the same as 831 which -- it's just hard because

2  other people have different numbers for the same exhibit.

3              THE COURT:  Right.

4              MS. GREEN:  But I believe it's the same as 831 which

5  is in evidence.

6              MR. IRWIN:  831, I have not in evidence, Your Honor,

7  according to your list for the same reasons.

8              THE COURT:  And it's not in the pre-trial order?

9              MR. IRWIN:  It is not.  It is in the pre-trial order

10  with an objection.

11             THE COURT:  Okay.

12             MR. WERTHEIMER:  Your Honor, for the record --

13             THE COURT:  In order for you to be on the record,

14  you need to be near a microphone.

15             MR. WERTHEIMER:  For the record William Wertheimer

16  for the Flowers plaintiffs.  Your Honor, my memory is

17  consistent in part with counsel's relative to 852.

18             THE COURT:  Well, memory doesn't matter.  What

19  matters is what's on the record.  Have you checked --

20             MR. WERTHEIMER:  I understand and it --

21             THE COURT:  Have you checked the record?

22             MR. WERTHEIMER:  I have not checked the record.  But

23  I believe the representation that his memory was not refreshed

24  is incomplete.  My memory is, he admitted the facts that Ms.

25  Green pointed to on the exhibit.

1          THE COURT:  All right.  Well, let me just ask, are

2    there any other exhibits that are not on the list that we had

3    passed around at lunch that anyone thinks was admitted into

4    evidence?

5          MR. RUEGGER:  Good afternoon, Your Honor.  Arthur

6    Ruegger from Dentons on behalf of the retiree committee.

7      I have been provided a list of several exhibits that the

8    notes of our team that they indicate that they were admitted.

9    I'd like to verify that before I bother the Court with it.

10   I'd also like to --

11         THE COURT:  How will you verify it?

12         MR. RUEGGER:  I'd like to check what transcript,

13   informal transcript references we have, Judge.

14         THE COURT:  Okay, fair enough.

15         MR. RUEGGER:  Thank you.

16         THE COURT:  Any others?  Okay.  Are there any

17   exhibits on -- that were on our list that you don't think were

18   admitted into evidence anyone?

19         MR. IRWIN:  Not from the city, Your Honor.  The --

20   the Court's list virtually tracks ours verbatim.

21         MR. RUEGGER:  We have no problem with the exhibits

22   on your list, Your Honor.

23         MR. IRWIN:  All right.

24         THE COURT:  All right.  Who's next?  Mr. Gordon,

25   yes, of course.  Go ahead.

1        MR. GORDON:  Thank you, Your Honor.  Robert Gordon

2  on behalf of the Detroit Retirement Systems.  I will do my

3  very best to not repeat any of what Ms. Green has provided.

4        THE COURT:  Oh, before -- on that subject before you

5  actually launch here, we need to have a hard copy of that

6  slide presentation marked as an exhibit, not for purposes of

7  admission, but just for purposes of identification so that it

8  can be included in the record of the case for -- for

9  completeness purposes.  So what -- do you have an exhibit

10  number that you would use for that?

11        MS. GREEN:  I believe it would be 873.

12        THE COURT:  Okay.  Go ahead, sir.

13        MR. GORDON:  Thank you, Your Honor.  I know that

14  others will want to make a number of -- of comments about the

15  -- the evidence.  I'm going to try to keep my comments fairly

16  limited as a result to allow others to express their -- their

17  points of view as well.

18      As a sort of I guess a housekeeping matter, if I may,

19  Your Honor, to begin with, I thought I had heard in the

20  presentation by counsel for the city, essentially a suggestion

21  that there has been no objection made to the asserted

22  underfunding liability in a particular document of -- prepared

23  at one time by Milliman.

24      I would like to make clear for the record that it is not

25  our impression that this is an evidentiary hearing about what

1  the underfunding level is, or was at the time of the petition,

2  or is or was today.  That document was not introduced for that

3  purpose.  There has been no expert testimony on that point and

4  we reserve all rights as to that.

5      Indeed, it is impossible we would submit to determine

6  what the underfunding level is unless you know what treatment

7  is going to be made of the pension systems, whether they're

8  going to be frozen and closed, or whether the defined benefit

9  plans are going to be continued, and that has yet to be

10  determined.  So we reserve all rights on that, Your Honor.

11      In fact, the document that was submitted from Milliman,

12  had a caveat in it by Milliman that if they had more robust

13  data to work with their calculations may vary.  So in -- in

14  itself it -- it indicates that it's not a very reliable

15  document.  But again for all the other reasons I just stated,

16  we submit that there has not been any -- that there shouldn't

17  be any interpretation that -- that any of the parties here,

18  and particularly the retirement systems, agree to the

19  underfunding level asserted in that one document, Your Honor.

20      Your Honor, we don't dispute that prior to the city

21  filing its bankruptcy petition the city was experiencing

22  financial distress.  And whether or not that financial

23  distress constitutes insolvency for purposes of Section

24  109(c)(3) of Bankruptcy Code, is -- is only one issue.  And I

25  will not opine on whether the city met its burden of proof on

1  that issue, since we did not specifically raise the insolvency

2  issue.

3      But there is another issue here under 109(c)(5) which is

4  how did the state and the city proceed to address the

5  situation.  And this is very important because the Bankruptcy

6  Code does require specifically that a municipality proceed in

7  a specific fashion before it takes the extraordinary step of

8  filing for bankruptcy.  And these are important requirements,

9  they are not merely pro forma.

10      And this is where we submit that the city's argument

11  really breaks down.  Because if you pull back from the -- the

12  -- the -- the huge amount of evidence that's been introduced

13  here, as Ms. Green has -- has shown through her slides, the

14  fact of the matter is, that the city and the state over many

15  many months analyzed the financial and operational situation

16  of the City of Detroit, a very complex undertaking when you're

17  talking about a city of 700,000 residents.  It devoted

18  significant resources in analyzing those issues.

19      And then they made a proposal on June 14th and within 34

20  days it filed a bankruptcy.  If you just pull back and look at

21  those simple facts, there simply was not time for good faith

22  negotiations.

23      Now, there was testimony by the retirement systems

24  through Mr. Robbins about the inability to have good faith

25  negotiations during that 34 day period.  And there was some

1  reference to that this morning by the city's counsel.  And I

2  want to make sure that the characterization of the testimony

3  is accurate.

4      There was some suggestion that financial advisors are

5  never satisfied with the amount of information that they have

6  and things of that nature.  Mr. Robbins did not testify that

7  he had adequate information but not optimal amounts of

8  information.  Mr. Robbins testified clearly and unequivocally

9  that he did not have adequate information with which to begin

10  negotiations.  And that the proposal such as it was on June

11  14th, and I say such as it was because it did not even include

12  a proposal for how the pension systems, the pension plans

13  would be treated on a go forward basis, was not really a -- a

14  serious proposal and that information was needed.

15      Now counsel for the city has also suggested that no one

16  disputed the facts in the proposal and no one asked any

17  questions.  That simply isn't true.  Now, maybe at the airport

18  on June 14th in a room of 200 people, when people were provided

19  for the first time with 120 page document, not a lot of

20  questions were asked.

21      But the evidence is clear, there were due diligence

22  sessions on June 25th, and on July 9th, and July 10th with

23  financial advisors.  And I am sure lots of questions were

24  being asked.  I was in those rooms as well.  There were lots

25  of questions being asked about the financials.

1      Mr. Robbins testified among other things that there was

2   not information in the proposal or in the data room regarding

3   significant assets.  One of those assets is the cash flows

4   from the Detroit Water and Sewage Department.

5      Counsel for the city indicates that seeking information

6   regarding the cash flows from a potential transaction from the

7   water authority is really not a fair ask because that's

8   something that's been discussed for many years and it may or

9   may not come to fruition.  We want to be clear here.  That's

10  not the information that was missing from the June 14th

11  forecasts.

12     What was missing from those forecasts were the actual

13  existing cash flows from the DWSD to the city that exist as of

14  today.  Very substantial cash flows.  They're not in the

15  projections.  That was also testified to by Mr. Buckfire

16  himself.  Mr. Buckfire also testified that there were no fair

17  market value analyses of any of the assets.

18          THE COURT:  I thought the evidence was that the

19  DWSP provided -- or DWSD provided no net cash flow to the

20  city.  Am I wrong about that?

21          MR. GORDON:  That's not correct, Your Honor.  It

22  depends on how you look at the cash flows.  There -- there is,

23  if I understand it correctly, and I may get this number wrong,

24  but I think there's approximately $80,000,000 that flows from

25  DWSD just to support the -- the employee and -- and legacy

1  obligations.  And there may be additional amounts that come to

2  the city but I'm not exactly sure how much that is.  But there

3  definitely are cash flows from DWSD to the city and/or the

4  pension systems that are not in the cash flows at all.

5       THE COURT:  So what you're referring to is what the

6  city paid -- excuse me, what the department pays to the city

7  for retirement funding.

8       MR. GORDON:  That's correct, Your Honor.  The

9  proposal does not propose those cash flows to continue --

10       THE COURT:  I do recall that.

11       MR. GORDON:  -- to the pension systems, nor do they

12  come to the general fund in the cash flow forecasts.

13       THE COURT:  But I don't recall any evidence that the

14  water department provided funding to the city for any other

15  purpose.  Have I missed something?

16       MR. GORDON:  I'm not -- I'm not certain whether the

17  evidence did provide that, Your Honor.

18       THE COURT:  All right.

19       MR. GORDON:  I can't comment on that.  But there --

20       THE COURT:  All right.

21       MR. GORDON:  As I said, there is a -- is a

22  substantial amount that comes to the pension systems that in

23  the proposal from June 14th there is no discussion of those

24  amounts coming to the pensions any further, nor do they come

25  into the -- the forecasts in any way, shape, or form.

1      Your Honor, if I may, I just want to comment on a couple

2  of other items that I think particularly pertain to the

3  retirement systems.  Mr. Dillon, who as we know was the state

4  Treasurer at all times relevant to this matter, indicated in

5  an email dated July 9, 2013, I think it's marked as Exhibit

6  834, that and I quote, "because pensions have such a long

7  life, there are a lot of creative options we can explore to

8  address how they will be treated in a restructuring".

9      And in that same email he further indicates a desire to

10 explore ways to avoid negatively impacting pensions.  In

11 counter point to Mr. Dillon's views, we have the pension task

12 force.  And the pension task force as we understand it

13 consists of two personnel from the Milliman firm, Mr. Moore

14 from Conway, MacKenzie, and several other non-actuarial

15 professionals.

16     Now, there is a document Exhibit 870 that is in evidence

17 that reflects some of the activities of the pension task

18 force.  And it indicates that scenarios were run by Milliman

19 based on assumptions provided to them by Conway, MacKenzie

20 and/or others on behalf of the city.

21     The exhibit shows that an assumption is being

22 unilaterally made by the pension task force that the General

23 Retirement System Plan ought to be frozen, which by the way,

24 would drive up the underfunding level of that plan

25 exponentially.  And a conclusion is then drawn that a

1 significant reduction in accrued pension benefits is required

2 and that I quote, "it appears this may only be possible in a

3 Chapter 9 proceeding".

4         THE COURT:  And what are those two exhibits again?

5         MR. GORDON:  That would be Exhibit 870, Your Honor.

6         THE COURT:  That's the task force document?

7         MR. GORDON:  That's correct.  And the quote from Mr.

8 Dillon is Exhibit 834.

9     What is remarkable about this, Your Honor, I would

10 submit, is that the pension task force simply assumed that

11 accrued benefits must be impaired without ever asking the

12 people who would know.  The retirement systems and their

13 actuaries Gabriel Roeder.  They never asked the retirement

14 systems and Gabriel Roeder about this.  They never came to the

15 retirement systems and Gabriel Roeder with a business plan and

16 said, here's our proposal, here are the needs of the city in

17 terms of diverting cash flows to reinvesting in the city and

18 so forth and is there a way that we can do this and perhaps

19 restructure or reschedule employer contributions in a way that

20 will not impair or diminish the -- the -- the pension

21 benefits, but will accommodate our business plan.

22     That discussion was never had.  Nor was there any such

23 discussion in conjunction with Greenhill and Mr. Robbins whose

24 experience in preserving pensions in American Airlines and

25 other bankruptcy cases, might have been of some assistance

1 | here.

2    Counsel for the city suggests this morning that there's

3 | no evidence in the record that having such discussions would

4 | have led to a solution.  And the problem is we'll never know.

5 | They never tried.  The suggestion is that impracticability is

6 | a completely subjective determination to be made by the

7 | municipality alone.  We suggest that that's inappropriate.

8    Now based on the city's purely internal conclusion that

9 | the city -- purely internal conclusion that -- that accrued

10 | benefits must be impaired, the city further concludes that

11 | negotiation with the retirement systems is impracticable

12 | because the retirement systems are constrained by the pensions

13 | clause of the state constitution to not negotiate any

14 | impairment or diminishment of the accrued benefits.

15    As I just indicated, there were other discussions that

16 | could have been had about how to perhaps modify employer

17 | contribution schedules, or do something that didn't

18 | necessarily involve impairing and diminishing the -- the

19 | benefits over the long term, but there was no such discussion.

20    So the city uses an untested internally created premise

21 | that benefits must be impaired to then make a further, I would

22 | submit, infirm conclusion that negotiations with the

23 | retirement systems are futile and impracticable.  While this

24 | exercise is convenient for the city, it does not stand up to

25 | scrutiny from a legal perspective and does not meet the test

1  of Section 109(c)(5)(C) of the Bankruptcy Code.

2      Your Honor, what is also particularly remarkable in this

3  regard we would submit is that the evidence shows that the

4  state and the city were aware of the pensions clause, but

5  instead of trying to determine if they could accommodate the

6  pensions clause in their restructuring plan, they essentially

7  just assumed that they could not without speaking to the

8  retirement systems and their professionals and instead decided

9  to just take their chances on being able to run roughshod over

10  the pensions clause and the state constitution in this Chapter

11  9 case.

12      Now this argument ends up being rooted very much in the

13  arguments that we made on October 15 that in order to have

14  valid state authorization for the bankruptcy, that there must

15  be a condition that -- that respects and upholds the pensions

16  clause.

17          THE COURT:  We need not repeat here which -- but I

18  do want to ask you this question.  What inference do I draw

19  here in -- in the context of this trial from the fact that

20  your client submitted no evidence that there was a viable way

21  for the city to propose a restructuring of its retirement

22  program?

23          MR. GORDON:  Well, Your Honor, I think that that's

24  -- if I may say so, sort of putting the shoe on the wrong

25  foot.  If the city had come to us and asked to have that

1  conversation we would have been happy to have that

2  conversation with them.

3      There never was an opportunity to.  As we said, there was

4  34 days from the date that a proposal was put on the table at

5  the airport to the day that the bankruptcy was filed.  In

6  fact, I –- I hesitate to mention this because this is an

7  evidentiary hearing, but I –- the general counsel for the

8  General Retirement Systems actually reached out to the

9  emergency manager earlier than that to try to have a meeting

10  and was rebuffed because it didn't fit the timeline that the

11  emergency manager was on or his schedule.  So there really

12  wasn't an opportunity for us to –- to ever have that

13  discussion.

14      THE COURT:  Well, but whether there was an

15  opportunity to have the discussion or not, my question wasn't

16  that so much as what do I do with the fact that there is no

17  evidence that there was a viable alternative plan?

18      I don't know whether there is or not.  All I know is

19  what's here in the evidence.  And you didn't submit any

20  evidence that there was a viable alternative plan.  What

21  inference do I draw from that, that's the question.

22      MR. GORDON:  Excuse me.  I think what you –- what

23  the testimony was of Mr. Robbins was that –- and this –- and

24  this highlights the problem which is not a problem that we

25  have created.  The problem is that we don't have enough

1  information.

2      And -- and I'm not casting aspersions on the city or its

3  professionals in that regard.  It's a difficult process.  It's

4  a complicated process.  But the process needed to play out and

5  it didn't.

6          THE COURT:  Uh-huh.

7          MR. GORDON:  So there was never enough information

8  there.  But what Mr. Robbins, I believe indicated, was that

9  based upon the information that he had and has, it is not

10  clear that there needs to be an impairment and diminishment of

11  the pension -- accrued pension benefits in order to

12  restructure here.

13      But beyond that, we can't go further than that yet

14  because we don't have all of the information, Your Honor.  I

15  don't know if I'm answering the question.

16          THE COURT:  No, but isn't -- isn't -- yeah.  No,

17  that -- that's good.  But isn't it -- isn't -- isn't the

18  underfunding, underfunded liability here according to the

19  retirement systems own experts at least a billion and

20  something?

21          MR. GORDON:  That's a difficult question.  You know,

22  it depends again on whether the pension systems, the defined

23  benefit plans are kept open or are frozen and closed.  I think

24  it is --

25          THE COURT:  Uh-huh.

1        MR. GORDON:  I wouldn't want to -- I wouldn't want

2  to speculate on that.  But let's assume that it's -- it's over

3  a $1,000,000,000.  Okay.  It's a, as -- as Mr. Dillon himself

4  said, it's a long term issue.

5        THE COURT:  Uh-huh.

6        MR. GORDON:  The liabilities can rise and fall.  The

7  performance of the investments can rise and fall.  There are

8  -- and again, I think because it's a long term issue there can

9  be flexibility in the way it's approached.  And it -- and a

10  $1,000,000,000 sounds like a lot money, but it's --

11        THE COURT:  All fair enough, but what -- what

12  prevented your client from making a proposal based on its view

13  of what the reasonable assumptions were as necessary to create

14  a proposal, given that there is some level of underfunding

15  that its own experts have found.

16        MR. GORDON:  Right.  But if you don't know what the

17  true cash flows are, and you don't know what the opportunities

18  for monetization of assets are --

19        THE COURT:  Uh-huh.

20        MR. GORDON:  -- to try to negotiate against yourself

21  as to how much you should be deferring, what you should be

22  getting paid, is really negotiating against yourself.  It's

23  impossible to do.  You need to have the full picture or at

24  least a reasonably full picture.

25        I understand Mr. Bennett's concern that, you know,

1  financial advisors never have enough information.  This is not

2  that situation.  The -- there were major pieces of information

3  that were missing here that made it impossible quite frankly,

4  to have that discussion at this stage.

5            THE COURT:  All right.

6            MR. GORDON:  Your Honor, I -- I don't want to -- and

7  I'm sure you don't want me to repeat arguments relative to

8  109(c)(2) that really are the same types of arguments that

9  support in our opinion a finding that the petition was filed

10  in bad faith under 921(c) because it seeks to impermissibly

11  abrogate the protections of the pensions clause.  So with

12  that, Your Honor, I have no further comments.

13            THE COURT:  All right.

14            MR. GORDON:  Thank you.

15            THE COURT:  Who is next?

16            MR. GORDON:  Your Honor, if I may, I just wanted to

17  make one more comment.

18            THE COURT:  Oh, okay.

19            MR. GORDON:  Mr. King apprised me that I should make

20  this point and I agree.  I just want to make the record clear

21  that prior to June 14th, before we saw that proposal, there was

22  no information or indication from the city or the state to the

23  retirement systems that there would be a -- a seeking of an

24  impairment or diminishment of the accrued pension benefits of

25  the pension plans.  Thank you.

1          MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

2    Brimer appearing on behalf of the Retired Detroit Police

3    Members Association.

4        Your Honor, I'd like to address three points with the

5    Court this afternoon.  The first, the spending provision that

6    was added to PA436, the evidence has established was in fact

7    meaningless and was adopted in order to disregard the will of

8    the electorate with the intent of avoiding the people's right

9    of referendum.

10       The second, even if the spending provision is deemed by

11   this Court to have been appropriate, PA436 nonetheless

12   violates Article 2, Section 9 of the Michigan Constitution as

13   a re-enactment of a law previously properly referred to the

14   referendum process and defeated by the -- on referendum that

15   was then not re-subjected to the people.

16          THE COURT:  Okay.  Ms. Brimer, you've already argued

17   that one, right?

18          MS. BRIMER:  There is though one piece of evidence

19   that has not been -- that has not been objected to, that has

20   not been presented to the Court that I would like to review

21   with the Court very briefly, Your Honor.

22          THE COURT:  Okay.

23          MS. BRIMER:  Okay.

24          THE COURT:  I'll let you argue the evidence, but I

25   don't want to re-argue the point of law.

1          MS. BRIMER:  I -- I understand that, Your Honor.

2          THE COURT:  Okay.

3          MS. BRIMER:  And then finally, that the evidence

4    does in fact establish a lack of good faith and a

5    pre-determination by the EM's advisors that a Chapter 9 was in

6    fact inevitable.

7          Your Honor, this morning we heard from Mr. Schneider that

8    there was an impending storm heading for the City of Detroit.

9    And that a review of the weather reports indicated that the

10   city's cash flow was in despair.  In fact I would probably

11   argue that those of us in the courtroom who live in and near

12   the City of Detroit would probably not disagree that the

13   weather reports for the City of Detroit sadly have in fact

14   deteriorated over the past few years.

15         However, an impending storm and poor weather reports are

16   simply not a basis for the state, the Governor, and the

17   Treasurer to disregard the constitutional rights of the

18   citizens of the State of Michigan.

19         Despite the fact that Mr. Schneider discussed some case

20   law, I will, Your Honor, disregard it, because we have, I

21   believe, all briefed and properly briefed all of those issues.

22         With respect to the spending provision, Your Honor, we do

23   have a few critical facts that are worth reviewing with the

24   Court.  First we know that on February 29, 2012, PA4 was

25   referred for a referendum vote.  We also know, and this Court

1  has reviewed numerous times, so I will not bring up again,

2  that within three days of that referral, the attorneys at

3  Jones, Day were counseling Treasury and the State of Michigan

4  with respect to the passage of new legislation with a tacked

5  on spending provision in order to render the new law

6  referendum proof.

7      Eventually on November 6, 2012, PA4 was in fact rejected

8  by the people of the State of Michigan.  Within 39 days, the

9  new bill was approved by the Senate and within 50 days of

10  rejection, the new law PA436 was signed by the Governor.

11      Now we've discussed that that new law contains two

12  spending provisions.  One for $5,000,000 to cover the

13  consultants and one for $780,000 to cover the salaries of the

14  EM's.

15      We also know from Mr. Buckfire who testified that a

16  $7,000,000 cushion was almost nothing for the City of

17  Detroit's budget.  The Governor testified that the state's

18  budget is $40,000,000 rendering this appropriation .014% of

19  the state's budget.

20      We also know that both the Governor and the Treasurer

21  testified that they did nothing to review any of the financial

22  analysis associated with these spending provisions.  In fact

23  they were more interested, Your Honor, in pushing this piece

24  of legislation through than insuring that the appropriation

25  was sufficient to cover the spending provisions.

1    Mr. Schneider this morning in fact indicated and told us

2  that the state was in fact forced to seek additional

3  appropriations for the fiscal year 9-30-13 in connection with

4  PA436.

5    Mr. Dillon testified that by June 11, he was seeking

6  re-negotiation of the professionals' contract in connection

7  with the consultants and their $5,000,000 appropriation.

8    And Mr. Baird testified in Exhibit 458 which has been

9  admitted into evidence, demonstrates that he determined that

10  the professionals would need approximately 75.2 million

11  dollars for this case.  A far cry, Your Honor, from the

12  $5,000,000 spending provision that was tacked on to PA436.

13    In fact, on cross examination by Mr. Ullman, Mr. Orr in

14  fact testified that he understood that the spending provisions

15  were added to PA436 to resolve the possibility of another

16  referendum.

17    Finally, Your Honor, Mr. Howard Ryan, the state's own

18  30(b)(6) witness, the witness they selected to appear at

19  deposition and testify on behalf of the state, testified at

20  Page 46 of his deposition which has in fact been admitted into

21  evidence, that the spending provision was added to PA436

22  specifically to avoid a new referendum.

23    There's no evidence and Mr. Dillon testified that even

24  the provision relative to the salaries of the EM's was only

25  for those EM's that were then appointed.  No projections, no

1  analysis of whether or not it would cover the EM's and at that

2  point in time they knew they were going to be hiring certainly

3  an emergency manager for the City of Detroit.

4      This simply was a spending provision that in the short

5  period of time that the state had to get this law passed, that

6  they put into play in order to avoid a referendum.

7          THE COURT:  One second, please.  Does someone have

8  Mr. Ryan's deposition I can look at?  Apparently ours has

9  already gone back to our office.

10          MS. BRIMER:  I do, Your Honor, and I have pulled out

11  the relevant page.  But I can put this back in and give the

12  Court my entire copy.

13          THE COURT:  Okay.  I'll give it right back to you.

14  I just want to see it.

15          MS. BRIMER:  Would you just like Page 436, Your

16  Honor -- 46?

17          THE COURT:  Page 46, yes, please.

18          MS. BRIMER:  Yes, if I may.

19          THE COURT:  Stand by.  Thank you.  I will return

20  this to you now.

21          MS. BRIMER:  Your Honor, given the speed with which

22  the new law was passed, the lack of any financial analysis by

23  either the Governor or the Treasurer, it's clear that those

24  spending provisions were added on simply to insure that the

25  state would have a law by which they could appoint an

1  emergency manager who would have the authority to file this

2  Chapter 9.

3      Even assuming, Your Honor, that those spending provisions

4  are deemed by the Court to be appropriate, the law is

5  nonetheless unconstitutional under the second paragraph of

6  Article 2, Section 9 which provides that no law that has been

7  properly referred on the referendum can be then enacted

8  without being referred to the people.

9      And if I may refer the Court to Exhibit 205.  There are

10 two reasons why, Your Honor, we believe that even if the

11 spending provisions are appropriate, it's still nonetheless --

12 if -- if we could go to Page 20.

13          MR. SCHNEIDER:  Your Honor, if I could.  I -- I -- I

14 don't recall that this was entered into evidence.

15          MS. BRIMER:  This was not objected to, Your Honor,

16 at pre-trial and I understood the exhibits not objected to

17 were accepted into evidence.

18          MR. SCHNEIDER:  I'm sorry, Mr. Irwin indicates that

19 it may be.

20          MS. BRIMER:  Page --

21          MR. SCHNEIDER:  Yeah.

22          THE COURT:  Hold on.  I'll check.

23          MR. IRWIN:  There was no objection pre-trial, Your

24 Honor, to 205.

25          THE COURT:  It has been admitted.

1           MS. BRIMER:  Thank you, Your Honor.

2           THE COURT:  So go ahead.

3           MS. BRIMER:  Section 23, Page 19, I think it is.  So

4   the relevant provision in this instance, Your Honor, are the

5   provisions relative to the filing of a bankruptcy and this is

6   a red line version of PA4 and a comparison with PA436.  And it

7   may well just be -- we're taking that down.

8        And you'll notice, Your Honor, it's two sections.  And

9   put the other page next to it.  Well, no, just the next page.

10  There's only one change and it's a meaningless change in the

11  Chapter 9 filing provisions from PA4 to PA436.  That's the

12  entire provision.

13       There's one change.  And it provides that the Governor

14  may place contingencies on a local government in order to

15  proceed under Chapter 9.  And the reason I would express to

16  the Court that I believe this is a meaningless addition and

17  does not do any more than reenact the prior law, because

18  there's no prohibition in PA4 from placing contingencies.  So

19  this is just a redo with a minor change with an attempt to

20  remove this from the people's right of referendum or their

21  right to review a law that has been referred to referendum.

22       We did hear some testimony, Your Honor, from the Governor

23  that there were changes, new options in PA436 for the cities.

24  However, as applied in this case, Your Honor, the state took

25  specific steps to insure that those options would not be

1  available to the city and the citizens of Detroit.

2      PA436 became effective on March 29th.  The state announced

3  the selection of Mr. Orr as the emergency manager who would be

4  appointed over the city.  He entered a contract on March 25th,

5  a Friday.  In order to insure that he was enacted as an

6  emergency manager under PA72 which did not afford these

7  options to the city, and would automatically become the

8  emergency manager with this broad authority to file a Chapter

9  9 under PA436 without affording the city any opportunity to

10  take advantage of the purported changes and options in the new

11  enacted law, a clear attempt, Your Honor, to disregard the

12  will of the people.

13      If all it takes, Your Honor, is the inclusion of a minor

14  change or the tacking on of a spending provision, then we have

15  simply read the second paragraph of Article 2, Section 9 out

16  of the Michigan Constitution.

17      Now with respect to the history of this filing, and the

18  fact that I would assert that there has been bad faith on the

19  part of the emergency manager's consultants, and a

20  pre-determination that a Chapter 9 would be filed, I think the

21  record is replete with that evidence.

22      We have numerous emails dating back at least until March

23  of 2012 where Jones, Day and Miller, Buckfire are gratuitously

24  offering their services to the state, advising the state on

25  how to pass a new piece of legislation that would insure that

1  a Chapter 9 would be -- that the city would be able to file a

2  Chapter 9 without any push back from the citizens.  We know

3  that Jones, Day invested at least 1,000 hours on this project.

4      And we do have Mr. Dillon telling us that from time to

5  time other counsel and consultants may have provided pro bono

6  services and I can understand that.  However, what we don't

7  have, Your Honor, despite the numerous emails from the Jones,

8  Day attorneys, the law firm that the emergency manager was a

9  partner at, the law firm that the emergency manager continued

10  to provide communications between Mr. Baird, the Governor, and

11  himself, with his partners even after he was aware that he was

12  the preferred candidate, we have no email in the record from

13  any other consultants recommending a Chapter 9.

14      Mr. Dillon advised us that at this very same period in

15  time he was working with Steve Liedel from Dykema.  And we

16  also know that Miller, Canfield was advising the city.  We

17  have no emails, no information to suggest that any other

18  consultants were recommending that the city drive -- that the

19  state drive the city into this Chapter 9.

20      We know from Mr. Dillon that Mr. Buckfire is the

21  individual or the party that brought Jones, Day to the state.

22  We know from the email communications that Mr. Buckfire

23  provided Jones, Day with the interview questions, drafted the

24  RFP that Jones, Day would be responding to, and was hired

25  prior to Jones, Day's involvement so he had some influence

1 over the process.

2     We can conclude, Your Honor, that from day one of the

3 involvement of the -- the consultants, they have been

4 advocating for the filing of a Chapter 9.  It became a

5 foredrawn conclusion from the day they were retained as the

6 city's restructuring counsel and the Court should also take

7 into consideration that Mr. Buckfire and Mr. Dillon both

8 testified that at no point in time did anyone advise the city,

9 and it was the city who initially engaged Jones, Day, that

10 Jones, Day had been working with Miller, Buckfire and/or the

11 state in drafting the consent resolution.

12     So in conclusion, Your Honor, not only do we have an

13 authorization from the Governor based on an unconstitutional

14 law, we have no evidence that the emergency manager and his

15 consultants have met the burden of demonstrating that they

16 have been engaged in good faith negotiations intending -- and

17 that they were intending anything other than the filing of

18 this Chapter 9.

19     The Chapter 9, Your Honor, that the Jones, Day attorneys

20 communicated with the emergency manager was the Chapter 9 that

21 we, the Jones, Day personnel would like to see.  Thank you.

22         THE COURT:  Thank you.  We'll take a recess now

23 until 2:55, please.

24         THE CLERK:  All rise.  Court is in recess.

25     (Court in Recess at 2:37 p.m.; Resume at 2:55 p.m.)

```
 1              THE CLERK:  Court is in session.  Please be seated.
 2              THE COURT:  One second, please.  We have -- we have
 3   determined that Exhibit 452 was not admitted into evidence
 4   even under another number.  So in the circumstances, I will
 5   strike from the slide show which has been marked for
 6   identification purposes as Exhibit 873, the one slide that
 7   does refer to 452.  Ms. Green, can you arrange for that,
 8   please?
 9              MS. GREEN:  Yes, Your Honor.
10              THE COURT:  All right.  Now let me ask counsel for
11   the city, with that slide stricken, do you have any objection
12   to the Court using during its deliberations, Ms. Green's slide
13   show?
14              MR. IRWIN:  No, Your Honor.
15              THE COURT:  All right.  Will you make that available
16   to the Court, please with that change.
17              MR. IRWIN:  There was 852 as well.  Would that --
18   would the same investigation be conducted with regard to that
19   exhibit?
20              THE COURT:  We have determined that that was not
21   admitted either.
22              MR. IRWIN:  Right.  So with -- could -- both of
23   those two slides then the city has no objection.
24              THE COURT:  That's right.  There was a slide on that
25   one too.
```

1            MS. GREEN:  If I may respond, Your Honor.  852 is a

2    duplicate of 845.  We just pulled some of the transcripts.

3    There is a reference to Exhibit 845, Ms. Brimer used it, Your

4    Honor.  I think this exhibit is in evidence.  I believe it's

5    845.  That was --

6            THE COURT:  You think 845 was admitted?

7            MS. GREEN:  I thought so.  It says it was already in

8    evidence as of the date of her line of questioning.  And

9    that's a duplicate --

10           THE COURT:  Is that on -- is that on the Court's

11   list?

12           MR. IRWIN:  It's not, Your Honor.  Just because Ms.

13   Brimer says and represents that it's in evidence does not mean

14   it's in evidence.  And 845 on our list again is consistent

15   with what counsel is saying, was in fact used, but it was

16   never offered and our objection was never heard.

17           MS. GREEN:  If I could continue.  The Judge -- or

18   Your Honor had asked that the retiree committee and the city

19   get together one weekend to come up with -- there were some

20   issues with all the different exhibits.

21       And my understanding was that there was a meeting over

22   the weekend in the courthouse and I was given a list of

23   exhibits marked at trial after that meeting.  My understanding

24   was that this was the agreed upon list of exhibits.

25       I spoke with Mr. Irwin over the break and he said that

1  that was not his understanding, however, many objecting

2  parties all believed that this was the list of exhibits marked

3  at trial.  And I checked every slide against what I believed

4  to be was the agreed upon --

5          THE COURT:  Well, but -- but the fact that there was

6  an agreement on what exhibits were marked with what numbers

7  doesn't mean that there was an agreement on their admission

8  into evidence.

9          MS. GREEN:  My understanding was that this was the

10  list agreed upon as used at trial, admitted into evidence.

11  But Mr. Irwin said that that is not the case.

12      There were several of us that were of that understanding,

13  that that's what the agreed upon list was supposed to be.  And

14  I also thought, and I have not looked yet through the record,

15  that the Bill Nowling timeline was used and admitted as a

16  party admission because it was Kevyn Orr's press secretary.  I

17  have not yet looked through the transcript, I just received

18  some of the transcripts.

19          THE COURT:  What exhibit is that?

20          MS. GREEN:  Well, it's a duplicate.  It's 452 and

21  there's also 831.  And it may be others.  It may be a UAW

22  exhibit as well because we all had a lot of the same exhibits.

23          THE COURT:  Well, if you can show me that any of

24  those was admitted, we're all set.  Otherwise we look for what

25  we look for.  As to what your understanding was, unless it's

1  on the record as an agreement, I -- I can't really give it

2  much weight.  So, I'll ask you to submit the slide show of

3  your closing argument without the two slides that address

4  these -- these two exhibits which were not admitted into

5  evidence.

6          MS. GREEN:  Okay.  Thank you, Your Honor.

7          MR. IRWIN:  Your Honor, may I briefly be -- be heard

8  on that?  We -- we were in fact in Court, or one of the

9  lawyers from the Dentons firm was here that weekend.  And we

10 were stuffing exhibit binders, updating the Court's collection

11 of exhibits to make sure those binders were accurate.

12     We have never exchanged a list of exhibits where there

13 was some agreement in terms of what is in evidence or not.

14 And I am not impugning Ms. Green's intent.  Whether she relied

15 on that document that objectors have been circulating is not

16 my issue.  I am simply making the observation that it is not

17 in evidence.

18         THE COURT:  All right.

19         MR. IRWIN:  And may I make a -- a related point,

20 Your Honor?  And I'm not asking the Court to -- to rule on

21 this.  I just want to correct something.

22     I understood Ms. Brimer to make the point with respect to

23 the -- the Howard Ryan deposition testimony.  I think she said

24 it's in evidence and that is right.  It is one of the

25 transcripts that we submitted.  I think it was an agreement

1  between the state and Ms. Brimer to avoid the need for Mr.

2  Ryan to testify live.

3      We did make very limited objections to the testimony that

4  she has referred to and those have not been waived.  Again I'm

5  not asking the Court to rule on them, I just don't want there

6  to be any mistake in terms of what has been stipulated into

7  the record or not.

8          THE COURT:  Where do I find those objections?

9          MR. IRWIN:  They were in the pre-trial order.

10          THE COURT:  In the pre-trial order.

11          MR. IRWIN:  Yes.

12          THE COURT:  All right.  Thank you, I'll consider

13  that.  Okay, sir.

14          MR. CIANTRA:  Thank you and good afternoon, Your

15  Honor.  Thomas Ciantra, Cohen, Weiss, and Simon, LLP for the

16  International Union UAW.

17      Let me start, Your Honor, by thanking the Court for its

18  consideration and courtesy during the past few weeks of this

19  trial.  It has been most appreciated.

20      Begin, Your Honor, by noting the interest and role of the

21  UAW in these proceedings as Mr. Nicholson, the union's general

22  counsel testified.  The UAW represents a relatively small

23  number of employees of the City of Detroit.  It has obviously

24  taken an outside interest in these proceedings.

25      And as Mr. Nicholson testified, the union's President has

1  directed that -- that the union's resources and its expertise

2  in the restructuring area in particular, be brought to bear to

3  assist in and provide a catalyst for hopefully a consensual

4  resolution of a number of the issues that have been raised in

5  these proceedings and have been the subject of discussion and

6  concern up -- up to and -- up to the date of the filing and to

7  the present day.

8       And there are a couple of reasons for that, Your Honor.

9  The first is of course the obvious reason that Detroit is home

10 for the UAW and it has an obvious interest in the

11 revitalization and rebirth of -- of -- of the city.

12      The second interest is -- is also, I think, obvious.  And

13 that is in the protection of the rights of Detroit's active

14 and retired employees in their post-retirement benefits, in

15 their medical benefits that are obviously critical, and in

16 their pension benefits that are constitutionally protected

17 here in Michigan under Article 9, Section 24 of the

18 Constitution.

19      And it is those rights that the UAW is most vigorous in

20 seeking to have vindicated here.  Because they are at threat.

21 And with respect to that, and in response to observations by

22 the city, the city's apparent surprise that the UAW is

23 supporting the Flowers litigation to assert and protect the

24 rights of those -- of those retirees, we do not shy from and

25 indeed we rise to the challenge of defending the interests of

1  those retirees and employees in these -- in this extremely

2  critical area.

3      The record, we would submit of this trial, has

4  demonstrated that the approach of the present state

5  administration towards Detroit's fiscal crisis is based upon

6  it seems three elements.  One, is taking the position that

7  there will be no financial support by the state for the city's

8  reorganization.

9      The second is of course the use of the extraordinary

10  powers provided by PA436 to displace local elected leadership.

11      And the third component is through the working of the

12  emergency manager selected by the Governor under that law to

13  use Chapter 9 to vitiate the constitutional protection of

14  pension benefits so that in effect the financially vulnerable

15  retirees and employees of the city may be made to finance a

16  rather extensive restructuring plan that the emergency manager

17  has promulgated.  No one, I think, can deny that there is a

18  fiscal problem here.  No one can deny that there is a need for

19  reinvestment.  The question is, who is going to pay for that.

20      And as we have submitted, Your Honor, the option of

21  forcing the retirees to pay for that through a decision to

22  cease funding their pension benefits, is -- is a null set.  It

23  is inconsistent with the protections provided by the state

24  constitution and as we have argued is a legal matter.  The

25  Chapter 9 authorization is invalid for that reason alone.

1    The -- the trial evidence has made it clear obviously

2    that the Governor was well aware of the intent of the

3    emergency manager.  In the filing he was provided with a copy

4    of the June 14 creditors' proposal and was familiar with its

5    terms beforehand.

6        In short, we submit that the Governor and the state

7    cannot use bankruptcy to take away the pension benefits.  He

8    -- the state -- the state's executive leadership and its

9    legislature cannot change the Constitution.  Only the people

10   of the State of Michigan can do that.

11       The strategy that the city has -- the city acting through

12   the emergency manager has taken in this respect, was

13   foreshadowed quite extensively in the January 29th -- what's

14   been referred to the pitch book that the Jones, Day law firm

15   made in support of its candidacy to be hired as restructuring

16   counsel.

17       And if I could have Exhibit 600 which is I guess the --

18   the UAW's admission of that.  And if we could go to Page 57 of

19   that.  And there we see that the -- a discussion of the -- the

20   Chapter 9 process and the intent here.

21       Counsel notes, plans of adjustment address narrow range

22   of economic compromises.  That's what a plan of adjustment is.

23   It's an effort to compromise outstanding debt obligations.

24   And then it goes on to note that other fundamental changes

25   must occur outside of the plan context

1    The -- the -- the -- the presentation goes on to note,

2   final bullet point, the city should take advantage of its

3   opportunity for long term comprehensive solutions.  And it

4   should do so by using the force of Chapter 9 to negotiate with

5   creditors.  It should use the tools of Chapter 9 to develop

6   and fund a large scale revitalization program.

7        THE COURT:  What does the language negotiating in

8   Chapter 9 or its shadow mean?

9        MR. CIANTRA:  It means that either you negotiate in

10  Chapter 9, or with the threat of it to try to extract

11  concessions from creditors that can -- that can fund something

12  that a large scale revitalization plan that goes beyond a

13  narrow adjustment of creditor relations.  That's what the city

14  is looking at.  That's what the city proposed --

15       THE COURT:  So are you being critical of the city

16  for its plan, or critical of Jones, Day for suggesting to the

17  city a plan to threaten Chapter 9 to negotiate retirement

18  benefit concessions?

19       MR. CIANTRA:  Yes, Your Honor.  Because the -- the

20  -- the pension benefits are protected by the Constitution,

21  they cannot be reduced.  That -- that should have been a third

22  rail in this -- in this process.

23    What they have done is used the Chapter 9 process, used

24  the threat of Chapter 9, to -- to put the pension benefits at

25  play --

1           THE COURT:  So it would have been impracticable for

2   the city to negotiate with retirees regarding pension

3   benefits?

4           MR. CIANTRA:  It -- it may have -- it may have been

5   difficult, Your Honor, and as -- as I -- I will go on to point

6   out, obviously with respect to the unions, the unions are not

7   in a position as a matter of law to negotiate for retirees.

8   That is clear.  That was clear to Jones, Day at the outset of

9   that process.

10          THE COURT:  Well, but apart from that, what I'm

11  hearing you say, is that it would not have been good faith for

12  the city to even attempt to negotiate with retirees directly

13  on -- on impairing their benefits.

14          MR. CIANTRA:  Yes, Your Honor, from the outset.

15  That was bad faith.  They should not have been looking to

16  reduce those accrued pension liabilities.  They should not

17  have been looking to use Chapter 9 as leverage for that.

18          THE COURT:  Or even the shadow of Chapter 9.

19          MR. CIANTRA:  Yes.  Or even the shadow of Chapter 9.

20  That's -- those were -- those are inviolate.

21          THE COURT:  And that's true even -- and that's true

22  even though Chapter 9 requires as a condition of eligibility,

23  good faith negotiations or its impracticability --

24  impracticability.

25          MR. CIANTRA:  And it requires that -- that the --

1  the filing be specifically authorized.  And we have maintained

2  as a matter of law --

3          THE COURT:  Well, but that -- that -- that's not my

4  question.

5          MR. CIANTRA:  That cannot happen --

6          THE COURT:  My question was, in order to file they

7  have to -- they have to either negotiate in good faith, or

8  show that that would have been impracticable.

9          MR. CIANTRA:  And what would have been --

10          THE COURT:  You say they could do neither one in

11  regard to this specific obligation because of the Michigan

12  Constitution.

13          MR. CIANTRA:  Correct, correct.  They could have

14  negotiated about a lot of things and -- and so we'll go on, I

15  think there -- there were openings for negotiations about for

16  example other post-employment benefits that were not taken up.

17  But the pensions -- the pensions were the third rail.

18          THE COURT:  So they could have negotiated regarding

19  health -- health benefits?

20          MR. CIANTRA:  Yes.  And -- and --

21          THE COURT:  Okay.

22          MR. CIANTRA:  Yes.  So as -- as the process

23  developed obviously the emergency manager was selected by the

24  emergency loan -- the emergency loan board which is comprised

25  of an appointee of the Governor, the Treasurer, and two of his

1  deputies.

2      The emergency manager's vision and chemistry according to

3  Mr. Baird, and this is from Exhibit 807 were obviously seen as

4  aligned with those of the state administration.  Obviously

5  during this process the Governor and Mr. Orr conferred very

6  frequently, both in formal meetings and in one on one

7  discussions.  And they had obviously multiple discussions

8  ahead of time with respect to the Detroit bankruptcy filing.

9      Throughout this process, however, the city and the state

10  have pretty consistently sought to limit access, limit public

11  access to those deliberations and to relevant information.

12  The city sought to limit access to its data room on the

13  execution of a -- a non-disclosure agreement.  The state

14  initially stated an aggressive position with respect to

15  executive privilege concerning its role in this process.

16  There is of course the common interest agreement that has been

17  the subject of litigation and repeated assertions of the

18  attorney/client privilege during these proceedings to shield

19  from -- from public scrutiny questions of the state support or

20  its willingness to support the restructuring as well as

21  discussions of the protection of the pension benefits.

22      The -- the -- as -- as I mentioned, the -- the -- the

23  Governor was well aware in advance of Mr. Orr's demand that

24  accrued pension benefits be cut in the proposal to creditors.

25  He was provided with drafts of that proposal to review.  And

1    in fact as shown in Exhibit 814, Treasurer Dillon had played a

2    fairly extensive role with respect to editing and revising the

3    very request for authorization for the filing that Mr. Orr

4    subsequently made.

5        So, the -- the -- the creditors' plan that was submitted,

6    this extensive and -- proposal, a hundred and some odd page

7    proposal, was not as I said, focused on a narrow range of

8    economic compromises with -- with creditors.  But it is

9    instead a -- a ten year comprehensive restructuring plan for

10   the city.

11       And it is as discussed on that -- in that pitch book.

12   And -- and -- and an effort to take advantage of the

13   opportunity for long term comprehensive solutions that is

14   presented by the finance -- by this financial crisis and by

15   this Chapter 9 filing.

16       Now the -- the -- the plan's details of course as we --

17   we heard, involved the spending of over one and a quarter

18   billion dollars over ten years in various reinvestment and

19   renewal projects.  And where is the money coming from for

20   that?  Well, that was -- came out pretty clearly in the

21   testimony of Mr. Moore.

22       The city has taken the position that it cannot

23   effectively raise taxes, that the share of revenue that is

24   received from the state is declining, and that as a

25   consequence, a substantial amount of that funding is going to

1   come from impairing the -- the city's existing debt, its bond

2   debt, and the -- its obligation to fund pension benefits and

3   other post-employment benefits.

4        The Governor has made clear and in fact I think that is

5   reflected in the -- the creditor proposal, that the city must

6   solve its own problems.  And that -- that state aid would not

7   be forthcoming with respect to the city's legacy obligations.

8             THE COURT:  And -- and what's the UAW's position on

9   where any pension underfunding liability should be paid from?

10            MR. CIANTRA:  Well, it -- it -- it remains to be

11  seen, Your Honor, frankly whether the -- whether the city has

12  claims against the state with respect to those obligations.

13            THE COURT:  Uh-huh.

14            MR. CIANTRA:  I think that is something that has to

15  be pursued.  It has to be investigated, it has to be

16  discussed.

17       So under the proposal, contributions to the retirement

18  plan would cease and as a result there would have to be cuts

19  unspecified in the proposal.

20            THE COURT:  Of course there's nothing about a

21  finding of eligibility that would preclude the city from that

22  investigation and/or litigation if appropriate, is there?

23            MR. CIANTRA:  That -- I suppose strictly speaking as

24  a matter of law, not.  But under the circumstances of how the

25  -- the city is -- is being run by an emergency manager --

1          THE COURT:  Uh-huh.

2          MR. CIANTRA:  I think there's -- there's a question

3   there.

4          THE COURT:  Uh-huh.

5          MR. CIANTRA:  A question of -- of interests of whose

6   interests are being served by that.

7          THE COURT:  Conflict of interest?

8          MR. CIANTRA:  Yeah.  So what --

9          THE COURT:  And any other source other than a claim

10  against the estate?

11         MR. CIANTRA:  I'm sorry, Your Honor, did not hear

12  that.

13         THE COURT:  Yeah, any other source for funding the

14  underfunded liability, pension liability, than a potential

15  claim against the State of Michigan?

16         MR. CIANTRA:  Well, presumably as has been

17  discussed, there are various assets that the city has that

18  could be monetized that -- that could be used to pay its

19  obligations.  But certainly a potential claim against the

20  state has to be something that has to be considered.

21         THE COURT:  Okay, thank you.

22         MR. CIANTRA:  Now with respect to the particular

23  proposal that was being made to creditors, the -- we would

24  submit that the position of retirees or employees with respect

25  to that is quite a bit different than the perspective or

1   position of bond holders or their insurers.

2       For the -- for the bond holders or the insurers, their

3   insurers, it's a cents on the dollar question.  It's how much

4   -- how much of that note is going to be theirs and how much of

5   their debt is that note going to cover.  That is what their

6   issue is, it is dollars and cents.  It's a -- it's a bean

7   cutting exercise for them.

8       For the employees it's quite a bit different.  For the

9   employees, it's a matter of unpacking a proposal that

10  discusses underfunding of the pensions, but does not in -- in

11  fact at the time could not translate into any meaningful

12  numbers in terms of what that would mean on a day to day basis

13  in terms of reduction of benefits.

14      It is as -- as -- as we submit, in effect a -- a -- a

15  plan to use in part the pension underfunding claims, to not

16  pay them, and to use those funds to -- to fund the

17  revitalization of the city under this plan.  And so what --

18  what are these pensions that are at issue?

19      As the Governor testified, he estimated --

20          THE COURT:  Let me -- let me ask you to pause there

21  and answer the city's assertion that its revitalization is

22  necessary for it to get back into a position where it doesn't

23  continue to underfund pension liabilities?

24          MR. CIANTRA:  Well, as I said at the outset, Your

25  Honor, you know, there is obviously a hole here.  It's a --

1  it's a bankruptcy that's -- it's like doughnut there's always

2  a hole, right.  It has to be filled.

3          THE COURT:  True.

4          MR. CIANTRA:  Okay.  The question is, where is it

5  going to be filled?  Who is going to be paying for it and

6  where is it going to come from, all right.

7      And it's our position that the -- the pensions are a

8  third rail, that's -- that's a piggy bank that they cannot

9  touch.  There are other sources that they have both with

10 respect to their existing creditors and elsewhere that they

11 can use.

12         THE COURT:  For -- for revitalization --

13         MR. CIANTRA:  Yes.

14         THE COURT:  In addition to plugging this doughnut

15 hole?

16         MR. CIANTRA:  Right.

17         THE COURT:  Okay.

18         MR. CIANTRA:  The -- the position and -- and there

19 was some testimony I think from -- from Mr. Buckfire with

20 respect to this.  That the -- the pensioners find themselves

21 -- that the -- that the city is -- is -- is treating everyone

22 the same.  We're treating all unsecured creditors the same.

23     It -- frankly it ignores social reality.  Obviously the

24 bond -- bond holders are relatively sophisticated financial

25 investors.  They are paid for taking on risk.  And that I

PAGE    172

1  think is pretty well reflected in the interest rates that

2  you'll see at the back of the creditor proposal with respect

3  to the bond rates.  It's a market.

4      As the city's bond rating has fallen as Mr. Bennett

5  outlined in his -- in his opening, the rates that the city has

6  had to pay have -- have risen.  And investors have taken on

7  that risk knowingly.

8          THE COURT:  Well, but isn't this kind of equitable

9  argument, one that's more appropriately focused at plan

10 confirmation when and if cram down becomes necessary and the

11 issue is whether the plan is fair and equitable?

12         MR. CIANTRA:  I -- it certainly -- it certainly is

13 relevant there, Your Honor.  I also, however, think it's

14 relevant here in terms of the good faith of proposing a

15 proposal that treats these folks the same.

16         THE COURT:  Okay.

17         MR. CIANTRA:  Because as a practical matter, Ms.

18 Whitson who testified, or Mr. Taylor who testified, were not

19 in the same position as some bond holder who could diversify

20 these investments.  They're stuck.  And they don't have a

21 backstop.

22     This is not like a -- the airline case that Mr. Robbins

23 testified to where the Federal Government has provided an

24 insurance safety net for single employer defined benefit

25 pension plans.  There is no safety net to those benefits here.

1      And unlike -- unlike the bond holders.  As Mr. Buckfire

2  testified, a substantial number of those bond issues are

3  insured.  They are the -- they are the economic party that's

4  at risk.  Those insurers.  That's why he was negotiating with

5  them.

6      It's not a matter of having as a practical matter, to

7  negotiate with thousands of -- of little old ladies in

8  Pasadena, or thousands of mutual funds.  It's a matter of

9  dealing with the insurers who are taking on the economic risk

10  of default.

11      Let me turn to the -- the question of good faith in the

12  negotiations.  The city and the state we submit, created

13  conditions under which a consensual resolution became all but

14  impossible.  And we think the evidence supports the conclusion

15  that the reason for that is that the emergency manager had

16  determined that he wanted to obtain the tools that were

17  provided by Chapter 9 to -- to -- to push through the -- the

18  -- the plan of restructuring that is set out in the creditor

19  proposal.

20      You can't simply create circumstances that make a

21  consensual resolution impossible and then complain that you

22  didn't have a consensual resolution.  All right.  As Mr.

23  Buckfire testified, the June 14th creditor proposal was a

24  bombshell.  That's his word, not mine.

25      Indeed just days before the emergency manager had told --

1  spoken in a public meeting here and stated in response to a

2  retiree's direct question, that pension benefits were

3  sacrosanct.  Yet on the 14th obviously the proposal was quite a

4  bit different.

5      And there was a -- a -- an extensive, a -- a very

6  abbreviated rather, schedule for discussions that was set out

7  in that proposal.  And it's been discussed by -- by many and

8  I'm not going to go -- go through the details.  But the

9  obvious fact is that the -- the emergency manager set a

10  abbreviated period, a little over a month for discussions with

11  stakeholders to take place before an -- before his evaluation

12  period and then a -- an expected conclusion of this process on

13  the -- the 19th of July.

14      So despite the fact that obviously as the testimony was,

15  that months of work went into the production of the financial

16  reports and the creditor proposal, the discussion period was

17  very short indeed.  And there were very few meetings that were

18  held to -- where that proposal could be discussed and

19  digested, much less actually negotiated.

20      That has been the subject of much discussion previously

21  in Ms. Green's timeline with respect to those meetings and the

22  conditions under which they were taken -- had taken place.  I

23  think they are well known to the Court and I'm not going to --

24  to dwell on them here.

25      But the fact that the emergency manager did not attend

1  all the meetings and did not send anyone who could actually

2  negotiate an agreement is, I think, telling.  Now the city

3  contends well, it wasn't any big deal, someone could have gone

4  back to the emergency manager and relayed whatever proposal

5  might have been made and -- and there could have been further

6  discussions and progress could have been made.

7      But the fact of the matter is that of course the city was

8  -- and the emergency manager were insisting on a highly

9  abbreviated time schedule.  So if you want work to get done on

10  that type of a schedule, it's important to send people to

11  meetings who can actually get work done rather than just carry

12  information back to home base as it were.

13      There were -- the -- the -- the process of discussion

14  limited by information issues as was previously noted and as

15  seen on Exhibit 814, the city even acknowledged to my client,

16  the UAW, that it needed time and information to review the

17  proposal.  That was on June 27th.  That's already almost two

18  weeks into this process.  As noted the city conditioned access

19  to the data room on -- on the execution of a non-disclosure

20  agreement which we believe it improper given the -- the public

21  nature of what's at issue here.  And even the Treasurer, Mr.

22  Dillon, in his email of July 9th, that's Exhibit 834, noted

23  that in many ways we were still in the "informational" stage.

24      So there are a lot of obstacles that existed to getting a

25  consensual agreement done here.  The time frame, and the

1  information issues being two notable -- two notable issues.

2      The city also in this connection did not address the

3  legitimate concerns that the unions raised with respect to

4  their ability to negotiate at least with respect to the

5  pension obligations.  The basis of that concern really was

6  obvious as Mr. Nicholson and Ms. Gurewitz testified.  Just as

7  a matter of pretty simply labor law, unions collective

8  bargaining responsibilities extend to units of active

9  employees.  The city was well aware of that.

10      And -- and the UAW demanded that the city provide the

11  basis for its contention that the union could lawfully

12  negotiate over those benefits, especially given their

13  constitutional protection.  That -- that's in Exhibit 624, the

14  affidavit that Mr. Nicholson presented in the Flowers case in

15  Exhibit B.

16      Yet the city provided no response.  It provided no -- no

17  explanation of its contention that it could legitimately seek

18  to have the unions negotiate over those benefits.  And of

19  course it -- it never modified its proposal.  Indeed Mr. Orr

20  testified that he probably -- "probably would not have

21  accepted a counter proposal that left pension benefits intact

22  in any event".

23      When Mr. Dillon testified the other day, he noted that in

24  his view the OPEB liability was more of a concern.  That it

25  was at least as I have his testimony, the big challenge.  Why?

1   Because it was not funded at all.

2        And if we recall the -- the chart that counsel for the

3   city showed of the outstanding unsecured claims, obviously

4   that OPEB number is -- is bigger even than the pension

5   underfunding number that the -- that the city had claimed. All

6   right.

7        Mr. Nicholson testified that on the 11th of July, the

8   meeting attended by city representatives, that he spoke with

9   Evan Miller of Jones, Day.  Mr. Miller is one of the leading

10  bankruptcy practitioners in the United States, a benefits

11  practitioners in the United States.  A person of substantial

12  knowledge in this area.

13       And as Mr. Nicholson testified, he told Mr. Miller,

14  there's a way, you know, that we can get at solving the OPEB

15  issue.  And as Mr. Nicholson testified, Mr. Miller answered --

16  finished his sentence, yeah.  He said the class action method.

17       As Mr. Nicholson testified, that was the way or has been

18  the -- the tool that has been used by UAW and another -- a

19  number of other unions to reach comprises over retiree health

20  obligations in different circumstances.  And it provided

21  frankly a framework for negotiation of that issue that could

22  work to a conclusion, that could get you to a conclusion.

23       As Mr. Nicholson testified, the first step in any

24  negotiation is to invite the -- the other side to participate

25  in a process that can be expected to lead to a resolution.

1  That's what he was doing with Mr. Miller.

2      The city didn't take him up on that.  And in fact the

3  Treasurer, Mr. Dillon, in Exhibit 626, just -- just a couple

4  days before Mr. Nicholson's meeting with Mr. Miller, he

5  acknowledges that that structure coming up with a class action

6  as a way to deal with retiree benefit obligations, is an -- an

7  option.  And it appears at point ten, I think it's the next

8  page if you -- if you would of that exhibit.

9      All right.  I knew that was too fancy for me, Your Honor.

10 Let me -- I can just talk about the exhibit the old fashioned

11 way.  He acknowledged --

12          THE COURT:  Mr. Wertheimer seems to have it for you,

13 sir.

14          MR. CIANTRA:  Well, I -- no, I have the document.

15          MR. WERTHEIMER:  Okay.

16          THE COURT:  What does it say?

17          MR. CIANTRA:  He says well, I'll just read it.  It's

18 point -- it's point ten and he's talking about the -- the

19 draft letter to -- that Mr. Orr has circulated requesting

20 authorization.

21          THE COURT:  Uh-huh.

22          MR. CIANTRA:  He says, I don't think we are making

23 the case why we are giving up so soon to reach an out of Court

24 settlement.  Looks premeditated.

25      I think we need to -- need to say facts got worse as we

1  dug into the numbers and I believe there is a State Court

2  option to get retirees into a class. We don't acknowledge

3  that. And why is that impractical? Then he goes on, we don't

4  say they even rejected the --

5          THE COURT: Uh-huh.

6          MR. CIANTRA: -- city's proposal, et cetera.

7    Mr. Dillon was aware of that option. Jones, Day lawyers

8  were certainly aware of that option. Mr. Miller finished Mr.

9  Nicholson's sentence. That was a structure that would have

10  provided a way to get to an agreement on that issue. And an

11  issue that obviously was a -- a $5,000,000,000 issue, at least

12  as reflected in the -- the city's proposal.

13    As Mr. Nicholson said, you need to create as a first step

14  in a negotiation, an understanding, the other side, as to what

15  the process is that's going to be followed and an agreement

16  that that process is something that's going to lead to a

17  resolution.

18    Contrast this in fact with the process that the city

19  asked parties to undertake with respect to negotiation of the

20  pension issue, all right. The city through the cross

21  examination of Mr. Robbins just the other day, indicated

22  essentially that it was following that same approach. It

23  wanted to get Mr. Robbins to agree to a process for

24  discussion.

25    And its -- and its proposed construct was well, we start

1   by getting the actuaries for both sides, for all these parties

2   to agree on what the underfunding number actually is.  Then we

3   get financial advisors to agree on how much the city can pay

4   and then we go from there.  We figure out what can we pay for,

5   what can be afforded, what cannot.

6       And there was discussion between Mr. Robbins and -- and

7   counsel for the city because Mr. Robbins thought gee, step two

8   should be what -- what we focus on first rather than getting

9   the actuaries involved.  But the same idea.  Here's a process,

10  here's how you begin to constructively deal with that issue.

11      But here with respect to the pension issue, all right,

12  the city was at no point in this process able to get to step

13  one because its actuaries had not finished the work.  So there

14  -- there was no way to undertake that process here, all right.

15      You know, as Mr. Dillon said in -- in the email that I

16  quoted from before, Exhibit 434, we remain in many ways at the

17  informational stage with respect to the pensions.  And as the

18  deposition excerpts from Mr. Moore, I think made quite clear,

19  this is at really page -- Pages 149 through 151.  The city's

20  actuaries hadn't completed their work.

21      They didn't know what the underfunding number was.  And

22  so again, how -- how even under the city's construct for --

23  for these negotiations to take place, could you have had it

24  meaningfully take place.

25      We'd submit that for those reasons there was no -- there

1  was no good faith negotiation here.  It was impossible.  The

2  city created the impossibility that it's complaining of.

3     Now were they impractical?  Well, I don't -- I don't

4  believe so.  The Detroit financial crisis was well known for a

5  period of years.  There is no reason why these issues could

6  not have been addressed beforehand to have permitted the type

7  of -- these type of processes that Mr. Nicholson talked about

8  and that Mr. Robbins talked about to -- to take place.

9     And indeed here the -- the unions had -- had a history of

10  coalition bargaining over concessions.  There was a lot of

11  testimony with respect to the 2011, late 2011 early 2012

12  concessionary agreement that was negotiated by a coalition of

13  30 -- 30 labor organizations including the UAW Locals.  There

14  is the possibility as I mentioned of a potential class action

15  resolution with respect to the OPEB issues.  And as we

16  discussed, obviously the -- the city could have -- could well

17  have undertaken negotiation with the bond holders who -- who

18  hold the fundamental economic interest here as -- as Mr.

19  Buckfire testified substantially all of the bond -- bond

20  holders were insured by -- by one of six insurance companies

21  that are identified in the -- in the June 14th proposal.

22     They obviously hold the economic interest.  They

23  obviously were the parties, the discreet parties to negotiate

24  with.

25     The -- the Governor as we said, knew that the emergency

1    manager intended to impair pensions as part of any Chapter 9

2    filing.  And he also knew that under PA436 he could have

3    conditioned his approval of that on protection of those

4    constitutionally protected benefits.  And in fact his counsel

5    advised him to place conditions on the filing.  And

6    specifically identified potential conditions with respect to

7    anything having to do with vested pension benefits.  That's in

8    Exhibit 625.

9        But the Governor rejected that advice and he in effect

10   turned that issue over to this Court.  He did not consider the

11   requirements of state law in authorizing the filing.  And he

12   left it to the Federal Bankruptcy Court to sort out whether

13   those accrued pension obligations could be reduced.

14       And we submit, Your Honor, that that is not appropriate

15   authorization under the statute.  The Governor's statement in

16   his July 18th letter that the plan of adjustment must be

17   legally executable under Section 943(b)(4), was insufficient

18   because of course the Governor knew that the emergency manager

19   was pursuing the pension proposal as part of the -- of the

20   filing.

21       And 943(b)(4) which applies to confirmation of the plan

22   of adjustment does not provide the requisite gatekeeping

23   authorization that is required, we submit, under 109(c)(2).

24   Effectively an evasion of responsibility with respect to the

25   obligation to support the Michigan State Constitution.

1    Finally, Your Honor, I just want to reiterate where I

2  started.  And that is that the UAW is committed to playing a

3  constructive role here, no matter what the result is in this

4  -- on this issue.  And it is fully prepared to bring to bear

5  the restructuring expertise that it has developed in the

6  assistance of this Court and to hopefully serve as a catalyst

7  for consensual resolution.  Thank you.

8        THE COURT:  Thank you, sir.  Before we continue,

9  let's do a -- a head count of how many more final closing

10  arguments we have.  One, two, three, four.  We're running over

11  time here, so I'm going to ask you to keep them as concise as

12  possible because we also have rebuttal arguments.

13        MR. WERTHEIMER:  William Wertheimer, Your Honor, on

14  behalf of the Flowers plaintiffs and I will keep it brief.

15  And particularly not -- try not to repeat anything that

16  counsel for the UAW just said, either directly or indirectly.

17    But -- but one point I think does need to be made and

18  that is from the beginning the position of the Flowers

19  plaintiffs has been that the Governor and the Treasurer were

20  attempting to use Chapter 9 to avoid the requirements of

21  Article 9, Section 24.

22    And that that legally constituted a tort.  And that that

23  made their -- that -- that impacted on the eligibility issue

24  under 109(c)(2).  Simply put, and consistent with what counsel

25  for the UAW said, and in contra distinction to what was said

1  by the Attorney General, the tort claim is that the Governor

2  has allowed his political position to influence his legal

3  position.  And has done that from the beginning.  And that

4  that constitutes a tort.

5      We're not saying that the Governor did anything evil,

6  we're not saying that the Governor conspired with Treasurer

7  Dillon.  What we are saying is, that from the beginning, the

8  Governor has taken the position that his political position

9  has been no financial support from the state.  And that has

10  driven everything that has happened here.

11      I'll just go over briefly the points that the state made

12  this morning relative to those -- that claim.  The state made

13  five points.  The first had to do with referendum and Ms.

14  Brimer dealt with that, I won't speak to it at all.

15      The second had to do with the allegation that there was a

16  bad faith rush to file.  I won't repeat anything that's been

17  put up on the board.  I think we all kind of know what

18  happened when.  I would just add two things relative to that

19  rush to file.

20      One, not only is it clear that the move from the 19th to

21  the 18th was because we were in Court on the 18th, it's also

22  clear that scheduling the bankruptcy for the 19th was done

23  because we filed on the 3rd and had a hearing scheduled for the

24  following Monday.  There is all kinds of evidence to support

25  that.

1        Second point, there is no --

2              THE COURT:  Let me ask you to pause there.

3              MR. WERTHEIMER:  Yes.

4              THE COURT:  I think in my experience it's fair to

5   say that many many bankruptcy filings, maybe even most

6   bankruptcy filings are precipitated by creditor action.  And

7   so even if this one was, why is that evidence of bad faith?

8              MR. WERTHEIMER:  Because this is different, Your

9   Honor.  I made that point before and I recognize it as being

10  true.

11       This is a Governor who is taking action when he's taking

12  action in order to avoid a State Court Judge coming out with a

13  decision which will require him to do something that he

14  doesn't want to do.  We now know --

15             THE COURT:  Well, why is that different than every

16  other bankruptcy?  I mean people file Chapter 13 to --

17             MR. WERTHEIMER:  Because the Governor took an

18  oath --

19             THE COURT:  Because they don't want their --

20             MR. WERTHEIMER:  I'm sorry.

21             THE COURT:  -- homes foreclosed, or they don't want

22  their cars repossessed, or -- or they file Chapter 7 because

23  they're tired of the phone calls, all of which are perfectly

24  legal actions by those creditors to be taking regarding debts

25  that -- that debtors promised to repay.

1          MR. WERTHEIMER:  We think it is different when it is

2     a Governor rushing to Court in order to avoid a State Court

3     decision that he believes will be politically damaging to him

4     and will make it more difficult for him to maintain his

5     political position that -- that there should be no financial

6     support from the state and that this bankruptcy should go

7     forward without condition.

8          THE COURT:  Okay.

9          MR. WERTHEIMER:  We think it's qualitatively

10    different.

11         Let me move on to the third point that the state made.

12    And that had to do with our claim that -- that the Governor at

13    a minimum had an obligation to put contingencies on.  What do

14    we know now we didn't know at the start of this case relative

15    to that?

16         We know that all of the Governor's advisors agreed with

17    us.  Because we now have the document that was being withheld

18    based on the attorney/client privilege.

19         The fourth point they made, or the AG made this morning,

20    was to characterize what we're claiming is -- is some kind of

21    a -- essentially they're saying, we're claiming that this is

22    some kind of scheme to end run 924 to save three and a half

23    billion dollars when there's $18,000,000,000 at stake, that

24    doesn't make any sense.  That's not what we're claiming.

25         We're not suggesting that the Governor started the whole

1  process.  We're not suggesting that the Governor is not in

2  good faith generally in attempting to deal with the Detroit

3  problem.  We've never claimed that.  That's just a false

4  issue.

5      All we have claimed is that as to 924 and that pension

6  obligation, the Governor -- Governor from day one has acted in

7  his own interests and not in the interests of the citizens of

8  the State of Michigan, pure and simple.

9      The fifth point they make is that they try to

10  characterize what we're claiming as some sort of crazy

11  conspiracy among Jones, Day, Miller, Buckfire, the state, the

12  city.  No.  It's very simple.  And it goes back to what we

13  claim the Governor has been doing from the beginning.

14      And if we take a look just at a couple of documents which

15  haven't been referenced at different points in time, if you go

16  to June of 2012, document 844, you have Heather Lennox of

17  Jones, Day saying I'm going with Ken Buckfire, Miller,

18  Buckfire, to talk to the Governor Richard Snyder in Michigan

19  tomorrow.

20      And what's the attachment that she's bringing with her

21  per somebody's request?  Among others, a memo on Michigan

22  constitutional pension plan protections.  Everybody in this

23  courtroom knows what that memo said.

24      That's June of 2012, Jones, Day is providing pro bono,

25  it's too late in the day for me to make a joke about that, but

1  pro bono work to the -- to the State of Michigan at this point

2  and that's what they're doing in June of 2012.

3      Now move forward to February of 2013, this year.  Richard

4  Baird, Exhibit 810.  He's communicating with Kevyn Orr.  And

5  he says, that clearly establishes that you are already

6  behaving as an agent of the state.

7      That's not a slip of the tongue.  That's part of the

8  whole game plan.  Orr is from Jones, Day, Jones, Day has been

9  on board from the beginning.  Even little pieces, and I'll

10  stop with this, Judge, in terms of these other exhibits.  Even

11  little pieces, in the opening briefs I think both AFSCME and

12  the UAW talked about a Jones, Day partner's article that was

13  circulating in the bankruptcy world that I knew nothing about

14  at that point relative to how municipalities and states could

15  get out from under pension obligations.

16      And the claim was made by the UAW, by AFSCME, by others

17  ah, ha.  Well, there's an exhibit in evidence in which Kevyn

18  Orr is provided with a copy of that as part of this whole

19  process.  It all fits.  It is what happened.  This totally

20  innocent explanation is not consistent with reality.

21      And then finally let me bring you to just about two or

22  three weeks ago.  We're all in Court and the Court asked Mr.

23  Bennett a question relative to -- and I don't want to

24  characterize it because I'm not sure exactly what it was, but

25  something that brought at issue whether the city was going to

1 be making a claim against the state.  Something similar to

2 what counsel for the UAW was talking about just a few minutes

3 ago.

4      If you will recall, Mr. Bennett did not answer the

5 Court's question as to his client, the city.  He said, he gave

6 you Jones, Day's opinion.  And guess what?  Jones, Day's

7 opinion is, the state isn't liable.  There's a serious

8 conflict related to that, an obvious conflict.

9      The AG concluded by saying that the Governor had

10 expressed leadership and made a hard decision.  He has done

11 exactly the opposite.

12      He has made no decision.  He hasn't even made a decision

13 under state law.  He hasn't said -- at least the Attorney

14 General, Mr. Schuette or Attorney General Schuette has taken a

15 legal position -- taken a position, not Governor Snyder.

16      Why?  Because it's not in his political interest to do

17 so.  And therefore he says, I have no position, I defer to Mr.

18 Orr, and I know what he's going to do.  He's going to take it

19 to Bankruptcy Court and it's going to be trumped and guess

20 what?  You then can make the decision instead of the Governor

21 of the State of Michigan.  That's not right.  Thank you.

22           THE COURT:  Thank you, sir.

23           MS. PATEK:  Good afternoon, Your Honor.  Barbara

24 Patek on behalf of the Detroit Public Safety Unions.

25      I want to start with one brief housekeeping matter given

1  this issue that's come up about the exhibits.  I'm not going

2  to put any exhibits up, but I do have my timeline and I have

3  in that I moved for the admission of both 714 and 717

4  yesterday based upon Mr. Malhotra's identification of the

5  city's.  And I thought they were both admitted.  They're not

6  on the -- on the list, only 717 is.

7       So I'm going to proceed as if it's only 717, the point if

8  there's one concessionary agreement.  And the record will bear

9  out, you know, as to whether they're both in.

10      With that, may I ask if you can put up -- and we will

11  mark this as -- as 723 and provide the Court with a -- with a

12  hard copy as well.

13           THE COURT:  Is this different from the timeline you

14  used in your opening?

15           MS. PATEK:  It is very similar.  We've just filled

16  in some of the --

17           THE COURT:  Okay.

18           MS. PATEK:  -- evidence.  And there's a couple

19  additional facts.  And -- and for the Court's convenience,

20  what's in blue is what's added.  So that you can easily see

21  what's --

22           THE COURT:  Oh, okay.  Thank you.  723 you say?

23           MS. PATEK:  Yes.  As the Court is aware, you know,

24  at the time of the first day hearings, the Detroit Public

25  Safety Unions did come into the Court supporting the city's

1  request for the benefit of the automatic and the extension of

2  the automatic stay.  In fact attempting as they have tried to

3  be for the last several years, a willing partner in the city's

4  effort to restructure itself.

5      However, at that time we reserved our rights on

6  eligibility and -- and we're here today to address that issue.

7  And I want to start with the debtor that the Court raised with

8  -- I'm trying to remember who it was now, but you asked a

9  question about why would the Governor have done that, what

10  would have been his purpose in sort of delaying and let the

11  city continue to deteriorate.

12      And I'm going to try to propose an answer to that

13  question.  And -- and --

14          THE COURT:  I put Ms. Levine on -- Levine on the

15  spot.

16          MS. PATEK:  -- so I don't know if this bails her out

17  or not, but I'm going to take -- take a stab at it.  First of

18  all, it goes without saying that we're in Chapter 9 so

19  inherently people get here one way or the other through

20  politicians.

21      Second, I think that there is a -- a very human instinct

22  to try to control the process and whether it's Governor

23  Snyder, or Treasurer Dillon, or the emergency manager, or

24  Mayor Bing, when you are in a position of having public

25  responsibility, the instinct is always to control the process

1 so that it comes out consistent with your view of what the

2 public interest is.

3     Which brings me to my first point which is, first of all,

4 I think the constitutional issues hovering above us here

5 today, again it shows the -- the wisdom of the checks and

6 balances built into our federal system and the states' rights

7 and the  -- and the Federal Government's rights.

8     But the second, it also shows the wisdom and perhaps the

9 constitutional necessity of Section 109 and in particular

10 109(c) which provides a number of transparent and consensual

11 ways for people to attempt to work out their -- the adjustment

12 issues outside of Chapter 9.

13     I -- I have a couple of points to make and I will try to

14 be quick and -- and go through my timeline here.  And they are

15 as follows.

16     First, the active members of the Detroit Public Safety

17 Unions are both the providers as we've heard many times and

18 from many witnesses in this Court, of the indispensable

19 essential fire and police services that are necessary for the

20 city to continue on.  And they are also holders of a

21 potentially significant portion of what the city claims is a

22 3.5 billion dollar underfunded pension liability.

23     We believe that the 35 day window that the city gave is

24 inadequate.  I will also show based on our timeline, that it's

25 undisputed that not only did the city choose not to negotiate

1  with this important stakeholder as its condition was

2  deteriorating, but it used every tool in its legal and

3  political tool kit to in fact prevent such negotiations.

4      Treasurer Dillon told us yesterday that there were a lot

5  of creative ways that these problems could be solved and I

6  will talk about those in a few moments.  But I will say that

7  we believe that in order to solve this problem, and knowing

8  what it knew, and obviously doing the careful planning that it

9  was doing, that the city had an obligation to begin

10 negotiations much much sooner.

11     Why didn't they?  I'm not certain.  Part of it may be

12 that this -- that this is a political process.  Part of it is

13 perhaps there was a perceived mistrust in the case of labor

14 with their negotiating partner.

15     But I'm going to suggest to the Court that they passed up

16 an opportunity to begin to solve a significant portion of the

17 -- this process in the very way that I suggested to the Court

18 when we came here on the first day of the trial, that made it

19 inevitable that they would be able to come before the Court

20 and tell it that it was impractical for -- for this problem to

21 be solved outside of bankruptcy.

22     When on June 14th the city at that first meeting of

23 creditors outside of bankruptcy dropped the claimed 3.5

24 billion dollar elephant on the active employees, the retirees,

25 and the pension systems, and -- and gave it 35 days to sort of

1  swallow it whole or else, I think they -- they set any

2  possible negotiations up for failure.

3     And with respect to the active public safety unions, I

4  want to go back on my timeline to the negotiation of the

5  concessionary agreements in December of 2011 and January of

6  2012 when by which time it was clear that there were serious

7  financial issues in the City of Detroit.  Those exhibits were

8  negotiated.  Mr. Malhotra indicates he was there when they

9  were negotiated.  Ms. Gurewitz talked about the negotiation of

10  the agreements in advising her clients.

11     And the state elected not to have those agreements become

12  effective.  And the -- and the reasons were several fold, but

13  I -- I believe one of the suggestions was that they wanted to

14  maintain flexibility.  That is if they extended the length of

15  the -- the collective bargaining agreements it would somehow

16  restrict their ability to restructure.

17     I'm going to suggest to the Court given what Public Act 4

18  said, given what Public Act 436 says, and given Section 365

19  and the tools available in Chapter 9, if that became an

20  inevitability that that is a false construct.  There were

21  tools that allowed them to modify and/or reject those

22  agreements and for them to suggest and leave savings on the

23  table so that they could proceed in a certain way, I -- I -- I

24  think is some early evidence of a potential lack of good faith

25  negotiations in this case.

1      I then want to fast forward into the time period before

2   the emergency manager took --

3            THE COURT:  Before you change slides --

4            MS. PATEK:  Yes.

5            THE COURT:  If you were about to, our notes do show

6   that Exhibit 714 was not admitted.

7            MS. PATEK:  Correct.  That's the one I mentioned

8   when we first started as the housekeeping matter.  So I --

9   I --

10            THE COURT:  But I just want to --

11            MS. PATEK:  -- it's perfectly possible that I

12   misspoke and my notes are incorrect and I'm -- I'm not going

13   to put it up.

14            THE COURT:  I want to confirm that for you.  So I

15   will have to ask you to change that slide before you submit it

16   to the Court.

17            MS. PATEK:  We -- we will.  With respect to March

18   25th, that's the date, and Mr. Diaz testified about this, Mr.

19   Dillon testified about his efforts to prevent any Act 312

20   awards from being issued.  The award itself is in evidence

21   pursuant to the agreement reached with Jones, Day that we're

22   looking at the contractual terms, not any comments made by the

23   arbitrator unrelated to that.

24      That agreement was reached on March 25th.  And that's also

25   the day that Kevyn Orr assumed the role of the emergency

1   financial manager under former Act -- Public Act 72.

2        As Mr. Dillon conceded when he was on the witness stand

3   yesterday, that timing eliminated the city's right to elect

4   the neutral evaluation process, or the negotiated solution

5   that is provided for under Public Act 436 by instead

6   triggering the provision that would make Mr. Orr automatically

7   the emergency manager of the City of Detroit when Public Act

8   436 became effective a few days later.

9        I would suggest given the careful planning that -- that

10  has been demonstrated through the evidence that the Court has

11  seen, that -- that that timing was not an accident.

12       I want to go now to the next slide.  And the next date we

13  have is that effective date of Public Act 436, March 28th.

14  Both Mr. Diaz, the President of the Detroit Police Officers

15  Association, and Ms. Gurewitz told the Court that as of that

16  date all negotiations with the Public Safety Unions ceased.

17       And in fact Ms. Gurewitz testified that her clients, the

18  Command Officers Association in fact had Act 312 hearings

19  scheduled but put them off because the city was negotiating in

20  what she believed were productive negotiations.  I will leave

21  it to the Court to decide whether or not that was again

22  perhaps some lack of good faith in terms of trying to get to a

23  certain time period where they could suspend their obligation

24  to negotiate.

25       Very shortly thereafter the -- in fact about two and a

1   half weeks later, the city filed its emergency motion seeking

2   to dismiss the pending Act 312 proceedings for two of the

3   public safety unions, the Command Officers Association, and

4   the Police Lieutenants and Sergeants Association.  That the

5   opinion upholding that dismissal and the dissenting opinion

6   are Exhibit 718, which is in evidence.  Ms. Gurewitz testified

7   about that.  And that opinion came down on June 14th, the very

8   same day that the meeting of creditors took place at the

9   airport.

10      I don't want to go over what happened at the individual

11  creditor's meetings, but instead I want to focus on the Public

12  Safety Unions, so if we can go ahead to the next slide.

13      My June 25th date in fact by virtue of some agreements, we

14  don't have that evidence, but I think that June 30th covers it.

15  We had reached some stipulations with the city to shorten our

16  proofs.  That the existing -- is collective bargaining

17  agreements between the city and the DFFA and the city and the

18  Lieutenants and Sergeants expired.  As Ms. Gurewitz testified

19  the command officers have not had a collective bargaining

20  agreement since 2010 and were in fact essentially at will

21  employees at that time.

22      The very next day Chief Craig assumed his job as Detroit

23  Police Chief.  And I think on the issue of whether or not the

24  Detroit Public Safety Unions, and we don't have specific

25  evidence on the -- the fire fighters here, but I think that --

1  that the evidence on the police unions is -- is sufficient to

2  cover the waterfront here.

3      Every witness who was asked testified that the Detroit

4  Police Officers Association, the various bargaining units,

5  first of all, that -- that the membership were under paid.

6  That their working conditions were deplorable.  And

7  nevertheless Chief Craig testified that the Detroit Police

8  Officers Association and the other bargaining units had in

9  fact reached out to him and that there were negotiations.  And

10 there was a lot of flexibility demonstrated.

11     And in fact in terms of issues on the restructuring that

12 did not involve dollars going into the pockets of these

13 Detroit Public Safety Union members, they were working

14 diligently in the restructuring and as we heard from Mr. Diaz

15 yesterday, even before Chief Craig came on board, the Detroit

16 Police Officers Association was reaching out to him to try to

17 find out what they -- they could do.

18     So to suggest that the city did not have a willing

19 partner here, I think, and to suggest that it did not have an

20 opportunity, particularly with, and I believe it was Mr.

21 Buckfire who -- who I -- I questioned about this, where they

22 had these collective bargaining agreements that were expiring,

23 to try to obtain some concessions.

24     There are creative ways perhaps without impairing

25 existing vested pension benefits, to try to begin to solve

1 this puzzle so that people wouldn't on June 14th be faced with

2 having to swallow the elephant whole.  And in that regard as I

3 think the Court has heard, the active Detroit Public Safety

4 Unions have the folks who are out there working in the street

5 who have accruing, but not vested and therefore not

6 constitutionally protected pension benefits.  They have

7 members who have vested and constitutionally protected accrued

8 pension benefits.  And there are those who have dropped.  That

9 is who are actually receiving what amounts to a pension

10 payment into a separate account that they'll -- they can't

11 touch until they get to retirement.

12    For -- for whatever reason the city elected not to engage

13 these folks, and if we can go now to the next slide.  We have,

14 and I don't want to belabor this because I know this has been

15 up a number of times.  But there was the letter that was sent

16 on July 12th and I think we can all agree by now that -- that

17 -- that July 12th was likely too late given what the rest of

18 the evidence shows.

19    But the four public safety unions got together and the

20 Court heard Ms. Gurewitz testify yesterday that she was part

21 of advising them in terms of obtaining bankruptcy counsel, in

22 terms of trying to form a coalition.  And sent a letter

23 together to -- to the city asking and indicating a desire to

24 make a counter proposal, to -- asking for some more concrete

25 information.

1        And the response by the city was a letter dated July 17th,

2   after Mr. Orr had sought his authorization to file, and only a

3   day before the bankruptcy petition was filed, thanking them

4   for their strong cooperation in the city's restructuring

5   efforts.

6        I would suggest to the Court on the issues of -- of good

7   faith and impracticability that here the city for whatever

8   reason passed up an opportunity to begin to address this

9   problem in a constructive way, more than a year before the --

10  the June 14th meeting of creditors.  Actively refused to engage

11  one of its most important partners in the restructuring.  And

12  instead rather than treating them as I think somebody in my

13  office suggested, you know, we're like the landlord.  They

14  really need us and -- and -- and should be engaging us.

15       They -- they were treated like general unsecured debt and

16  were repeatedly told, we don't have to negotiate with you and

17  we don't have to bargain with you.  And I think that -- that

18  timeline and that series of events together with the other

19  legal questions that have to be resolved, should help inform

20  this Court's decision as to whether or not the city in fact

21  engaged in good faith negotiations or has successfully shown

22  impracticability when they had opportunity when it was clearly

23  not impractical to engage certainly one of -- certainly the

24  Public Safety Unions and probably the other unions based upon

25  what we've heard as well in bargaining that could have begun

1  to solve the -- the problem that we're now all facing in the

2  Court today.  Thank you.

3          THE COURT:  Thank you.

4          MR. IRWIN:  Your Honor, briefly.  The city would

5  simply request a copy of -- of the timeline with -- with the

6  removal of the reference to Exhibit 714.  The city has no

7  objection.

8      There's one other correction that the city would request,

9  however, on the -- on the second page of the timeline there

10  was a reference to an Exhibit 869.  I think it's just an

11  administrative problem.  869 is not in the record.  It's an

12  email and I believe it was -- it was in reference to a -- a

13  Kevin Orr video clip that just needs to be fixed.

14          MS. PATEK:  Okay.

15          MR. IRWIN:  So it's just a question of fixing the

16  reference to 869.

17          THE COURT:  I'll ask the two of you to work on that

18  and -- and then provide a copy to city's counsel and the

19  Court, please.

20          MR. IRWIN:  Thank you, Your Honor.

21          THE COURT:  Sir.

22          MR. PLECHA:  Good afternoon, Your Honor.  Ryan

23  Plecha on behalf of the retiree association parties.

24      Your Honor, with my time today, I would like to spend it

25  discussing and highlighting the evidence as it relates to the

1 retirees.  No one in this case has disputed the city's

2 pre-petition intent to impair the class of retirees under a

3 plan of adjustment.

4      Therefore under Section 109, it is clear that the city

5 must either obtain agreement from a majority of the retirees,

6 negotiate with the retirees in good faith, or prove that

7 negotiations with retirees was impracticable.  The city cannot

8 prove or meet any of these burdens.

9      It is clear that the city in fact did not reach an

10 agreement with the majority of retirees.  The city did not,

11 nor does it claim that it negotiated in good faith with

12 retirees.  And finally, the city has failed to satisfy its

13 burden of proving that negotiations were in fact

14 impracticable.

15      Your Honor, the testimony presented throughout the trial

16 is clear that the city did not negotiate with retirees.  Ms.

17 Lightsey and Mr. Taylor unequivocally testified that the city

18 did not negotiate with the DRCEA or the RDPFFA.  The city did

19 not respond to the DRCEA's request for retiree specific

20 meetings.  It did not even invite the DRCEA to the June 14th

21 meeting and in fact has never provided a copy of the June 14th

22 proposal to creditors directly to the DRCEA.

23      As others have said today, Mr. Taylor did request and in

24 fact had a meeting with Mr. Orr regarding retiree issues.  In

25 this meeting Mr. Orr told Don Taylor, representative of the

1 RDPFFA, that the retirees on the police and fire side's

2 benefits and health care were not at risk.  He essentially

3 told the police and fire retirees that they had protection

4 from the oncoming financial storm or had protection from the

5 upcoming war and need not worry.

6     After making this inaccurate statement to Mr. Taylor, the

7 city ignored multiple requests from the retirees belonging to

8 the RDPFFA for specific meetings.

9         THE COURT:  Can you remind the Court when that

10 meeting was with Mr. Taylor?

11         MR. PLECHA:  I believe it was April 18th.

12         THE COURT:  Thank you, sir.

13         MR. PLECHA:  You're welcome, Your Honor.  Therefore

14 the only individual meeting that was held specifically with

15 retirees was based solely on this information.  This in no way

16 can constitute negotiations, let alone good faith

17 negotiations.

18     Therefore, Your Honor, the city did not introduce any

19 evidence to support a claim that the city actually negotiated

20 with retirees or their representatives.  Your Honor,

21 negotiations with the retirees was practicable through the

22 DRCEA and the RDPFFA.  However, Your Honor, instead of

23 attempting to negotiate with retirees in good faith, the city

24 instead attempted to create a paper case of impracticability.

25     This tactical scheme was predicated on the city's red

1  herring argument that because there was no negotiating partner

2  that could unilaterally -- unilaterally bind the retirees,

3  negotiations were impracticable.  This is not the appropriate

4  legal standard for determining whether negotiations were

5  impracticable.

6      The city documented this alleged impracticability by

7  requesting various union representatives represent retirees,

8  all the while knowing they were not the appropriate parties to

9  do so.  The city's purpose of this campaign was to add to the

10 paper record in case of impracticability.

11     The city has presented to Your Honor multiple times, a

12 chart alleging impracticability on these grounds representing

13 whether various groups would represent retirees with checks,

14 X's, and dashes.  Further, the city beat the drum of

15 impracticability through repetitive testimony of Mr. Orr that

16 no unions would represent the retirees.

17     Well, Your Honor, the city was asking the wrong person.

18 It may be true that they knocked on many doors.  Not only did

19 they not knock on the correct door, representatives from the

20 DRCEA and the RDPFFA in fact requested to be that party that

21 they were looking for to represent and negotiate on behalf of

22 the retirees.

23     Both Ms. Lightsey and Mr. Taylor testified that they

24 responded to the very same letters that the city sent to the

25 unions and in fact requested to represent retirees in

1  negotiations with the city.  Both associations requests for

2  those meetings were denied or never followed through on.

3        THE COURT:  Okay.  But legally speaking, why are

4  those organizations in a better position to negotiate as

5  partners with the city than any other potential partner that

6  the city did seek out?

7        MR. PLECHA:  Your Honor, these associations each

8  have been in existence for over 50 years.  They have lines of

9  communication open to provide information to their members,

10  get information back from their members.  They have a

11  mechanism in place to get the appropriate votes and

12  information necessary to provide that to the Court to show

13  that there is an agreement or there is not an agreement.

14        Under 109 the requirement is that a majority of a class

15  agrees to it.  That's solely for the purpose of eligibility,

16  that's not for plan confirmation.  We could have sent out

17  through the associations these requests for votes on a plan

18  that was negotiated by the associations, they could be sent

19  back to the Court or the associations to show whether there

20  was in fact an agreement possible.

21        The city's plan to create its own impracticability fails

22  because of the association's presence, history, and desire to

23  represent retirees.  As been shown through the evidence and

24  testimony, and I just said, the retirees associations, the

25  DRCEA has been in existence for over 50 years.  They have

1  served as the watchdogs and sole voice of general retirees.

2  They have obtained the benefit enhancements applicable to all

3  general city retirees through the city council budget

4  proceedings which it was formally invited to and participated

5  in.

6      That attendance was set forth in the city charter.  The

7  DRCEA has over 7,600 members and represents all general city

8  retirees regardless of membership.

9      The evidence is very similar as it relates to the RDPFFA.

10  They as well have been in existence for over 50 years.  They

11  have served as the united voice of police and fire retirees.

12      The RDPFFA in fact has engaged in concessionary

13  negotiations which were implemented and impacted all police

14  and fire retirees within a particular class.  The RDPFFA has

15  also bound retirees in an agreement through consent of the

16  police and fire retirees.

17      They as well have the similar invitation to, and in fact

18  participated in city council proceedings.  They also have

19  frequent communications with their retirees.

20      Despite all this, Mr. Orr and his team at the city chose

21  not to inform themselves of the associations or take any steps

22  to acknowledge the existence of any group that could foil its

23  impracticability scheme.  This impracticability scheme was

24  coupled with an extraordinarily aggressive timetable that has

25  been discussed by other objectors which I will not get into.

1    Therefore, the city cannot now claim impracticability

2  based on its own self imposed timeline.  It's also important

3  to note that Ms. Lightsey's letter to Mr. Orr still remains

4  unanswered as to the time of filing.

5    Each of the associations were capable of negotiations.

6  As testified to by Ms. Lightsey, the DRCEA's board includes a

7  former city budget director, a former city personnel manager,

8  a former director of labor relations who is also in charge of

9  benefits, and a former trustee of the pension funds.  These

10 are the people that would be negotiating on behalf of the city

11 had there not been an emergency manager and had those

12 individuals not retired from the city.

13    The associations in fact are the eyes and ears of

14 retirees.  The associations are trusted by their members who

15 have turned to them for decades to receive benefit assistance,

16 and information.  The majority of all retirees of either the

17 DRCEA or the RDPFFA are members of the representative

18 associations.  And two-thirds of all retirees are a member of

19 one association or the other.

20    As I said previously, Your Honor, 109 does not envision

21 unanimous consent.  109(c)(5)(A) would be satisfied with only

22 agreement of a majority of retirees.  Given that the

23 associations together represent two-thirds of all retirees,

24 they were in fact in a position to solicit and obtain

25 agreement of a majority of the retirees.

1       That would have not been impracticable if the city had

2    negotiated in good faith.  Therefore, Your Honor, the evidence

3    does show that negotiation with retirees through the

4    associations was practicable.

5       Your Honor, the requirements of 109(c)(5) cannot be met

6    by clearly just the city acknowledging that it was difficult

7    in deciding not to engage or attempt to engage in any

8    negotiations.  109 was intended by Congress to require that a

9    municipality seeking to reorganize under Chapter 9 exhaust the

10    possibility of a negotiated resolution with each class of

11    creditors.

12       As for retirees who merit recognition as a class due to

13    the constitutional protections of their pensions, the evidence

14    has showed that the timeline, the avoidance of the city, of

15    the retiree associations, was not in good faith and that

16    negotiations were practicable.

17       Further, Your Honor, the discovery responses cited to by

18    the city were in fact post-petition.  Mr. Taylor testified

19    that he never provided his position to the city as did Ms.

20    Lightsey.  So the city at the time of filing its petition had

21    no knowledge of these alleged positions.  They may be true,

22    but the city did not know.  The city did not ask.  Quite

23    frankly the city did not care because it did not comply with

24    its plan.  Thank you, Your Honor.

25           THE COURT:  Thank you.  At this time I think it's in

1  everyone's best interest to take a brief break, ten minutes

2  and we'll reconvene at 4:35 please.

3          THE CLERK:  All rise.  Court is in recess.

4      (Court in Recess at 4:34 p.m.; Resume at 4:35 p.m.)

5          THE CLERK:  Court is in session.  Please be seated.

6          THE COURT:  It looks like there are some people who

7  aren't here.  Should we wait, or should we plow on ahead?

8          MR. MONTGOMERY:  Your Honor, I think it may be a

9  function of my simply being the last man standing.

10         THE COURT:  All right.  All right.  You may proceed,

11  sir.

12         MR. MONTGOMERY:  Thank you, Your Honor.  I'm going

13  to try in my time this afternoon to try to tie the evidence

14  that came through in seven days of testimony to our specific

15  theories of the case, not in the -- necessarily in the -- in

16  the broadest sense, but with -- to the specific points we are

17  trying to make, mentioned first in our opening and then that

18  we think are important here.

19     Now we know of course that the backdrop for point one in

20  this whole discussion is the authorization question.  Now the

21  legal question on whether or not --

22         THE COURT:  Can I ask you not to repeat the

23  arguments of your --

24         MR. MONTGOMERY:  Yes, exactly.  We're not going

25  there, we're not going there.

1          THE COURT:  Okay.

2          MR. MONTGOMERY:  This is just nothing but context

3    and there's no dispute as to the existence of authorization

4    letters.

5      There is a dispute as to whether or not that

6    authorization violates that, that's argued legally, but we

7    also argue specifically that there was an -- an intent to

8    violate the pending clause, Your Honor.  And so the question

9    is, is there proof of intent, all right.

10      Now, the first step --

11          THE COURT:  The theory being that would go to good

12    faith?

13          MR. MONTGOMERY:  Yes, Your Honor.  And it would go

14    to whether or not -- if there was an -- an intention to

15    violate a state law, specifically the Constitution, does that

16    somehow affect or infect the actual grant of authorization

17    itself.  Meaning that if there were no intent to violate a

18    law, it's a pure legal issue.

19      If there is an intent to violate -- violate the law, does

20    that render the act void ab initio.  That's something we've

21    argued.  We think you need to know the facts before you can

22    actually apply that issue.

23          THE COURT:  So there's a different consequence if

24    there's intent versus no intent?

25          MR. MONTGOMERY:  We believe there is, Your Honor.

1  Because --

2           THE COURT:  Okay.

3           MR. MONTGOMERY:  -- the question.  We do.

4           THE COURT:  Go for it.

5           MR. MONTGOMERY:  And so whether we're right or we're

6  wrong, we need to have the facts in front of you.

7           THE COURT:  Uh-huh.

8           MR. MONTGOMERY:  All right.  Now where do we start?

9  Of course the city admitted to you in oral argument and it

10 admitted in its admissions that it intended to diminish or

11 impair accrued financial benefits of the participants and

12 the --

13          MR. GORDON:  Retirement system objection, please.

14 If you're going to make that statement at least read it

15 correctly.

16          MR. MONTGOMERY:  Fair enough, sir.  The admission of

17 the city was that --

18          THE COURT:  Hold on.  Sir, is that your electronic

19 device?

20          A VOICE:  Yes, I apologize, Your Honor.

21          THE COURT:  Please turn it off.  Is everyone's

22 electronic device off?  All right.  I'll assume from silence

23 that the answer is yes.  You may proceed.

24          MR. MONTGOMERY:  What did the city admit?  Admit

25 that the city intends to seek to diminish or impair the

1  accrued financial benefits of the participants in the

2  retirement systems through this Chapter 9 case, response

3  admitted.

4       Now, that is the beginning of the process.  The city

5  knows it's trying to do something that on its face appears to

6  violate the constitutional provision.  Now we think intent can

7  be shown not just by the statement that they intend to do so

8  here, but that they had intended to do so for time.  And it

9  was part of the planning process leading up to the Chapter 9.

10       Now we also have to show you various other topics which

11  we -- I will touch on.  There's a rightness question that Your

12  Honor needed to hear from us on.  We think the evidence on

13  rightness is in and we'll explain how.

14       Second, is we have an alternative explanation for the

15  specific timeline that has appeared.  We think that the

16  financial information, and we will show you how, that is in

17  evidence shows that July or early August at the latest, was

18  the right time for the city to file a Chapter 9 if it was

19  going to.  And we think the evidence will support the debtor

20  understand that.  And it -- and it must have understood it

21  long ago.

22       The next thing we have to show you, and we think we do,

23  is that there is in fact no plan of adjustment.  You may

24  recall that Mr. Bennett said he was going to prove that there

25  was a plan of adjustment in his opening.  We said we were

1   going to prove there was no plan of adjustment in our opening.

2   We think the evidence supports our view of it.  We're going to

3   try to show you how today.

4        We're also going to try to show you that related to that

5   question that there were insufficient disclosures.  We're

6   going to show you that what -- some disclosures were

7   misleading.  We're going to show you that there was a general

8   desire to avoid asset sales.  That is both intentional and

9   accidental.  We believe the evidence will support that.

10       We're going to show you that the proposal was not fair

11  and even handed.  We think that is part of the good faith

12  standard.

13       We're going to show you that part of this whole drama is

14  that the person who was chosen to lead this march towards

15  Chapter 9 really could only do that.  The qualifications of

16  this very talented individual, Mr. Orr, related to nothing

17  other than leading a march to Chapter 9.

18       We'll also try to show you some credibility challenges

19  which we think relates to the question of whether or not the

20  debtor has been exercising good faith, not just vis-a-vis the

21  creditors in general, but with respect to retirees

22  specifically.  And then we will conclude.

23       Now, Mr. Orr again, a well educated, legal degree

24  individual, made a statement on June 10 in response to a

25  question that the state constitution and state case law says

1  that vested pension rights are sacrosanct, they can't be

2  touched.  Now why do I think that's of interest to the Court

3  with respect to the question of intent?

4      First, it is a statement of importance.  The use of the

5  word sacrosanct suggests it cannot be touched.  It's too

6  important or too respected.  One might turn to a dictionary,

7  Webster's on line dictionary or something like that, and find

8  a definition like too important and respected to be changed or

9  criticized.  That's from Webster's on line.

10      You will also see that he purports to have an

11  understanding of law, perfectly logical for a lawyer to have

12  an understanding of law.  So he knows what the law is, he

13  knows what the Constitution is.  And he knows that vested

14  pension rights are part of that constitutional protection and

15  he knows that it's so important that he uses the word

16  sacrosanct.  And then he adds the practical statement that in

17  the environment he found himself in on June 10, they couldn't

18  be touched.

19      However, the proposal he made in fact on June 14th, has as

20  is demonstrated in Exhibit 408, Page 109 which is the June 14

21  proposal, with respect to pensions is the clause that has been

22  cited to Your Honor before, but it simply says of importance,

23  because the amounts realized on the underfunding claims will

24  be substantially less than the underfunding amount, there must

25  be significant cuts in accrued vested pension amounts for both

1  active and currently retired employees.  The people that my

2  committee represents.

3      Now, this proposal, June 14 is four days after Mr. Orr

4  made the video tape statement.  It's impossible for me, and I

5  suggest for the Court to infer, that Mr. Orr changed his mind

6  between June 10 and --

7          THE COURT:  Just a question about the record.  Is

8  the video tape of June 10th in the record or a transcript of

9  it?

10          MR. MONTGOMERY:  I believe it is, Your Honor.

11          THE COURT:  Do you have a number, or does anyone

12  have a number?

13          MR. MONTGOMERY:  Hang on.  The --

14          MS. GREEN:  It is in the record a transcription and

15  a video.  I believe it is 871.  I have copies of the CD with

16  me today to update it in the binder so you have a video clip

17  and the transcription if you --

18          THE COURT:  I'm sorry, the video clip is what?

19          MS. GREEN:  871.

20          THE COURT:  It's part of 871?

21          MS. GREEN:  The video clips are all on a CD with --

22          THE COURT:  Or, they're on a CD.

23          MS. GREEN:  Yes.

24          THE COURT:  Is that one of the ones that was given

25  to me today, or where is -- where is the CD?

1           MS. GREEN:  I have the CD's.  The transcriptions

2    were already in the binder.  But I have the CD's themselves

3    today.

4           THE COURT:  Okay.

5           MS. GREEN:  To update the binder.

6           THE COURT:  So are we going to get those?

7           MS. GREEN:  I have them with me today to give to the

8    Court.

9           THE COURT:  Okay.  Good, thank you.  You may

10   proceed, sir.

11          MR. MONTGOMERY:  Thank you.

12          THE COURT:  Something you wanted to say, sir?

13          MR. IRWIN:  Well, there were -- there were

14   completeness designations from the city as well.  I believe

15   they were in the transcript, I just wanted to confirm that

16   they were on the video as well.

17          THE COURT:  Is that right, Ms. Green?

18          MR. IRWIN:  The city's completeness designations

19   that were on the transcript on the -- on the video too.

20          MS. GREEN:  Yes.  There was a counter designation by

21   the --

22          MR. IRWIN:  Yeah, they're all there.

23          THE COURT:  So they are on the CD or the DVD also?

24          MS. GREEN:  Yes.

25          THE COURT:  Okay.

1      MR. MONTGOMERY:  Thank you, Your Honor.  The

2  inference I was suggesting the Court might draw from the

3  timing of this statement and the timing of the June 14th

4  proposal, is that Mr. Orr already knew that the June 14th

5  proposal was going to have either language like this, or the

6  intention expressed by this document which is of course the

7  June 14th proposal.

8      Now, we further suggest that it was the June 10 statement

9  that meant little to Mr. Orr despite the fact that he was

10  talking about the Constitution as someone who had a legal

11  education, despite the fact that as the emergency manager he

12  had taken an oath to uphold that Constitution, and despite the

13  fact that he was trying to answer a question posed by an

14  ordinary human being.  What are you doing to me?  Pensions

15  aren't going to be touched is effectively what he said.  A

16  lie, he knew better.  I think that that's only one example of

17  the lack of good faith in the process of dealing with

18  creditors associated with the city of Michigan.

19      Now we also believe that in the process of the request

20  for authorization, you will find the key to the prior intent

21  to violate the state constitution with respect to pensions.

22  You will notice that the very first sentence on Page 6 of

23  Exhibit 28, and we use this two page because we'll come back

24  to it and there is no point in repeating it, it says as a

25  first step in this process, I worked with the city advisors to

1   develop a financial and operating plan for the city, the

2   financial and operating plan, which placed the city's

3   challenges in context and defined a series of key

4   restructuring goals and initiatives.  All right.

5       Now, this is Exhibit 28 at Page 6.  Now the same document

6   may appear as Exhibit 407.  Now, 407, Page 21 is the same as

7   the operating and financial plan.

8       This plan put forward on May 12, 2013, recognizes, and

9   here I've highlighted language of interest to me, although the

10  entire sentences are there, recognizes that legacy liabilities

11  must be evaluated as part of the city's comprehensive

12  restructuring.  Significant and fundamental debt relief must

13  be obtained to allow the city's revitalization to continue and

14  succeed.

15      Okay.  So what.  Well, the -- first, this is the same

16  plan that was not a plebocite.  This is the same plan that was

17  not negotiable.  And we say to you that this is the same plan

18  that thinks that the pension number is only $646,000,000.

19      A statement from Exhibit 407, Page 37 says, as of June

20  30, 2011, the most recent actuarial reports provided to the

21  city by the pension funds showed the pension UAAL, unfunded

22  actuarial accrued liability, at $646,000,000.  But the

23  emergency manager then speculated that with utilizing more

24  current assumptions -- excuse me, more current data and/or

25  more current assumptions could cause that deficiency to rise

1 | into the billions of dollars.

2 | So he's thinking about this at the time of the May 12th,

3 | again before June 10, and certainly before June 14. And he's

4 | thinking this problem is temporarily defined as a $646,000,000

5 | problem, but it could rise to $1,000,000,000 or more problem.

6 | And so he says to all of us, or to those who were given

7 | access, annual payment on accounts of these legacy liabilities

8 | are expected to increase in the future if no action is taken

9 | to modify them. If no action is taken to modify them, he

10 | thinks the problem gets worse.

11 | Now, in his cross with Mr. Ullman on October 28 --

12 | MR. BENNETT: Excuse me, Your Honor. If you're

13 | reading, I don't need to object, but he misread this sentence

14 | again. But if you're reading, I won't object.

15 | THE COURT: I am it says mitigate. Go ahead.

16 | MR. MONTGOMERY: Thank you, Your Honor. The -- the

17 | testimony by Mr. Orr in response to cross examination, is that

18 | pensions and pension benefits had to be cut back and that he

19 | had made that conclusion on or before May 12. Why do I say

20 | that?

21 | So this is cross by Mr. Ullman. At trial we don't have

22 | the formal, so we think this is what your transcript will show

23 | when you get it, that on -- on October 28th. So he was asked

24 | the following question by Mr. Ullman.

25 | Okay. So that we're clear at this point in time, and

1  that's referring to May 12th, you had made the determination

2  that in your view vested pension benefits of Detroit's

3  retirees had to be cut back, is that right?  Answer by Mr.

4  Orr, I think that's a fair characterization of what we --

5  we're saying -- we are saying.

6      Now, Your Honor, now we have Mr. Orr saying on June 14th

7  they must be cut.  We having had concluded on May 12th that

8  they must be cut, but on June 10th he told somebody who was

9  relying on the state appointed official to tell him the truth

10  about what was happening in the world, they were sacrosanct,

11  couldn't be touched.

12      Now in addition to this particular -- let me just skip

13  right back.  In addition to which we've already done this,

14  that all makes sense now from -- from May 12, June 14, Mr. Orr

15  had made the decision, his counsel admitted it for him in the

16  admissions.  So that part of the -- the record is clear, they

17  intended to do something to the Constitution, violate it.

18      Now, the same information was sent to the Governor,

19  meaning Mr. Dillon said that he told the Governor on July 8th

20  by email that the view of the consultants is that current

21  pensions have to be cut significantly.  I believe that the

22  only logical inference there is that he was talking about the

23  consultants for the City of Detroit.

24      So that the Governor understood that this is where the

25  city's advisors were going.  That intention is reflected in

1  the June 14 proposal.  And therefore when the Governor issues

2  his recommendation in response to -- issues his authorization

3  in response to the recommendation that references the May 12

4  plan, that there is no doubt that cutting pensions benefits is

5  part of the scenario.

6      Now, everybody understood this and in fact Mr. -- some of

7  the advisors for the Governor are suggesting they place

8  conditions because they know this is coming.  Specifically

9  conditions could also include such items as preapproval for

10  anything having to do with vested pension benefits.

11      Well, the only reason to even contemplate doing that is

12  because it might be a politically sensitive issue, I suggest

13  to the Court, or it might be unconstitutional for the -- for

14  the Governor to support such an effort.  And so his advisors

15  are saying, give yourself a way out, put conditions on it,

16  make sure the emergency manager doesn't do anything that

17  you're uncomfortable with.

18      But he doesn't do that.  He gives an unconditional

19  authorization knowing that the emergency manager of the

20  biggest municipal bankruptcy in the history of the country and

21  certainly the largest in the State of Michigan, wanted to

22  violate the state's constitution and he said okay.

23      Now, this notion that the Governor understood and that it

24  -- from at least May 12 it was fixed, is merely reflective, we

25  think the evidence will suggest to you, of a longer running

1  thought process by those who are talking directly to, or

2  indirectly to the Governor.  Of course I start my reference in

3  that regard with -- with respect to the Jones, Day pitch book.

4      Now, the significance of the pitch book is not that

5  Jones, Day had reached the conclusion as appears on Page 418

6  -- Page 41, Exhibit 418 if needed Chapter 9 could be used as a

7  means to further cut back, compromise accrued financial

8  benefits otherwise protected by the Michigan Constitution.

9  The fact that they reached that legal conclusion is not what I

10 say to you is important.

11     It's the fact that that view was shared with all of the

12 other actors in the drama.  This was available and part of the

13 process at the interview.  Mr. Orr himself was part of this

14 process.  He knew this was the going in game plan.

15     We know from other -- other testimony and the timeline

16 that Miller, Buckfire was aware of this kind of information.

17 In fact Miller, Buckfire had even told them what kinds of

18 questions to answer if I recall the timeline correctly.

19     Now, so we have advisors saying that if you really want

20 to cut pension benefits you can only do that in Chapter 9

21 because of the Michigan Constitution.  We've got an emergency

22 manager who understands that both legally, because he's a

23 lawyer, and practically because he says he needs to do it.

24     When are you going to take this on?  What -- what makes a

25 logical time to do this?  Well, let's look at the City of

1  Detroit as if it was an ordinary debtor.  What do you do with

2  an ordinary debtor?  You say well, gee, what -- what are its

3  cash flows, what are its assets, what might make a sense of

4  good timing.

5      Well, Mr. Buckfire on direct told us that the city relies

6  on four primary streams of revenue, gaming tax revenue, state

7  revenue share, property tax, and income tax.  He then told us

8  property tax income in particular comes in on a quarterly

9  basis because that's when assessments are made and income

10  taxes come in likewise in a fairly irregular fashion.

11      So that to me says that a bankruptcy plan is going to try

12  to figure out well, when does cash peak and when does it

13  trough.  When are liabilities high, when are they trough.

14  Well, we think, Your Honor, that the answer is, July and

15  August is when cash rises.

16      So all of a sudden it dawned on me as it probably did the

17  Jones, Day advisors when they were thinking about this whole

18  process, as I'm sure instinctively it's true for you as an

19  observer of the bankruptcy process, Your Honor, that June --

20  July or August was the logical time for a Chapter 9 filing to

21  occur.  And that whoever was looking at the cash flows of the

22  city would know that.

23      And E & Y had been looking at the cash flows of the city

24  for over a year prior to the appointment of Mr. Orr as

25  emergency manager.  Miller, Buckfire had been there twice

1  before the appointment of the emergency manager.  The

2  financial people all understood the cash flow timing question.

3  They may not have liked the curve, but they knew the bumps.

4  And so if you're going to file at the right time you do it

5  when cash is king.

6      So when is cash king?  Well, according to Exhibit 75,

7  which was the short term cash flow associated with the May 12

8  report, you will see that July cash is $142,000,000 of

9  operating receipts.  And August there's $254,000,000 of

10  operating receipts.  And then it drops back down

11  significantly.

12      Well, what does that tell me?  Well, that sometime

13  between July and August all things being equal, that's when

14  you want to file because that's when the greatest amount of

15  cash is going to come in.

16      So this notion that a July filing appeared out of thin

17  air in late June, early July of 2013 is wrong.  Whoever was

18  looking at these issues knew that this was the only logical

19  time if you were going to do it in the 12 months of 2013 to do

20  it.  And I suggest to Your Honor that's exactly what you will

21  see when you look at the evidence, the inference you will make

22  that July or August is the logical time.  Come back to that in

23  a moment.

24      Let me just quickly get out of the way the rightness

25  issue.  You have testimony from Ms. Lightsey, and Mr. Taylor

1  and Ms. Whitson about their reliance -- or excuse me, their

2  participation in the pension systems, their receiving health

3  care benefits and that each of them has had some measurable or

4  demonstrable impact already.

5       Now, the other thing I want to suggest to you with

6  respect to rightness is that the city's testimony is

7  unequivocal that but for water and sewer, the city had made no

8  pension contribution since 2011.  So it's already violating

9  the second clause of the pension constitution when Mr. Orr

10 takes office and that doesn't change.

11      Now, I want to skip that.  I'm going to ignore that last

12 one.  Here we go.

13      On the question of whether or not the Jones, Day and Andy

14 Dillon discussion is theoretical with respect to Chapter 9,

15 I'd point the Court's attention to Exhibit 851 which is a

16 March 23 email from Corrine Ball to Laura Marcero of Huron

17 Consulting.  One of the people that was helping the Treasurer

18 in this time frame.  And this is a full year before the

19 appointment of Mr. Orr, a full year.

20      In which they say in response to a question, "however, we

21 point out that you will need executives in place in the -- in

22 the Chapter 9 case.  You need a practical as well as legal

23 response.  We think having the CRO structure with CFO, COO in

24 place from the first day of a Chapter 9 would enhance the

25 position of continuing the case".

1       All right.  So a year in advance of any possible filing

2   they're telling the consultants to make sure you have people

3   in place who can actually run a filing.  Well, why would you

4   say that if it was in response to a purely theoretical

5   question.  I submit that they're actually thinking about a

6   Detroit bankruptcy.  It doesn't happen for well over another

7   year, but they're already thinking about it for real.

8       Now, Mr. Orr is clearly part of this process because

9   before -- let's roll forward nine months.  His -- his people

10  are talking about Chapter 9 and talking about it perhaps

11  theoretically, perhaps practically.  There is no in fact

12  filing happening.

13      But Mr. Orr is asked where is he up -- on updating our

14  Chapter 9 paper with new decisions.  That tells us, we ask the

15  Court to infer, that one, Mr. Orr was personally familiar with

16  the Chapter 9 studies that Jones, Day was doing, and that in

17  fact he was part of the process because he was being asked by

18  one of his partners where are they on updating it.  And how

19  could he possibly know that if he wasn't involved directly.

20      So now what's happening?  So we know that Jones, Day is

21  -- and Mr. Orr are discussing Chapter 9 before their pitch.

22  We know it's going to -- we've seen the pitch book.  It's been

23  referenced by other people, so I don't need to repeat that.

24      So then they go and tell again a consultant with respect

25  to 870, roll forward another six months, the same conclusion,

1  Based on this we anticipate a significant reduction and

2  already accrued benefits will be required in order to get

3  contributions to the level of available cash to service the

4  UAAL.  It appears this may only be possible in a Chapter 9

5  proceeding.

6       Now this is June 5.  This is again before the June 10

7  statement, it's before the June 14 proposal, but it's after

8  the May 12 financial and operating plan.

9       I'll turn back to the request for authorization, Your

10 Honor.  The last bullet which was -- which appears there, it

11 says the city's negotiations with the counter parties to its

12 pension related swap contracts which have been ongoing since

13 2012, intensified in recent weeks and included, and then he

14 goes on to describe what actually happens.

15      But for our purposes, Your Honor, the importance is that

16 they are talking with serious creditors owed a lot of money by

17 the City of Detroit back in 2012 and the discussions are now

18 accelerating.  They're accelerating because they want this

19 issue out of the way when they file.  They know they're going

20 to file.

21      Now, you -- you may recall I just suggested that July or

22 August was the only logical time frame.  That people had been

23 making the decisions on how to get there, managing the

24 process, and that when they put out the executive summary of

25 the June 14 proposal unknowingly I think to most people, I was

1   not here at the time, they're telling us that July 19 is the

2   deadline.  They give themselves three weeks to honor requests

3   -- excuse me, seven days to honor requests for additional

4   information.  They give themselves a month more or less to

5   engage in negotiations.

6       Again one of the parties they've been negotiating with

7   since 2012 by the time this was coming up.  And they say

8   evaluate July 19.  July 19 happens to correspond with

9   testimony that that was the roll out date.  All right.

10      So the only thing that really happens to knock this plan

11  schedule off of a July or August filing, we submit that if

12  it's July, is the fact that the Flowers and retirement system

13  filed litigation.  And what did that -- what impact did that

14  have?  It moved it up by a day.

15      So all this great tamise about oh, the world came to an

16  end when we got sued, no.  It had one 24 hour day's impact on

17  what the city had already been planning, the Chapter 9.

18      Now, switching topics.  Is there a plan of adjustment?

19  We know that -- oh, sorry, Your Honor.  Let me back up for

20  half a second.  I forgot that the acceleration was due only to

21  the TRO litigation and that Mr. Orr conceded that in his

22  deposition which is part of the record and it says in response

23  to Mr. Ullman again asking questions.

24      Is there a particular reason that the bankruptcy filing

25  was made at 4:06 in the afternoon of the same day a TRO was

1  being heard in the State Court other than to get a jump on the

2  State Court ruling?  Mr. Shumaker objected as to form.  Mr.

3  Orr however answered, not to the best of my knowledge.  And he

4  would know better than anyone else because he was the man in

5  charge.

6      Now Mr. Bennett told us that we had to look at, you know,

7  what boxes did we need to check off -- check off.  And one of

8  them is, we believe, is there a plan of adjustment.  And the

9  reason there needs to be a plan of adjustment is of course

10 109(c)(4) mentions it.  But 109(c)(5)(A) says, impair under a

11 plan.  We submit that's a plan of adjustment.

12     109(c)(5)(B) says, intends to impair under a plan.  We

13 submit that's a plan of adjustment.  And then impracticality

14 or fraudulent transfer.  There's no issue with respect to

15 somebody gaining a fraudulent transfer.  That's come up in the

16 evidence, but all the others have been disputed.

17     Now, Mr. Orr in his deposition testimony again designated

18 for the record says, and this is a summary but precise quote

19 from the deposition, "we never called this a plan.  We never

20 called this a deal.  We always called it a proposal because we

21 were open for discussion".

22     Well, that doesn't sound like a plan of adjustment, but

23 maybe we can turn it into one if we do enough of the other

24 things.  The Governor, who authorized the filing, said on

25 cross examination by Mr. Wertheimer on October 28th, again we

1 think that is what the transcript is going to say.  This is

2 our understanding of what it will show.

3      Well, no plan of adjustment has been presented so that

4 would be speculative.  No plan of adjustment.  So the most

5 important officer in the State of Michigan said there's not a

6 plan adjustment in connection with approving the filing of a

7 Chapter 9 proceeding by the City of Detroit.

8      Now, maybe that's a so what because with the right amount

9 of negotiations you can turn it into something.  Well,

10 Treasurer Dillon testified on November 5 in response to

11 questions by Ms. Levine, again this is what we think the --

12 the final transcript will say.  This -- I'll tell you the

13 thing that troubled me the most was when they put together the

14 ten year plan to talk about investing in the city which is

15 important for it to turn around eventually.  That the recovery

16 for unsecured creditors was so low I didn't know how anyone

17 practically could cut a deal and walk out of the settlement

18 room accepting something based on those numbers.  DOA is

19 another way of saying it.

20      It wasn't supposed to be acceptable.  It couldn't be

21 acceptable.  It -- in fact the Treasurer again, a man deeply

22 emeshed in financial issues for the State of Michigan,

23 absolutely understanding how to negotiate, financial number

24 says, he doesn't know how anybody could do it.

25      We suggest to you that that is not only irrelevant to the

1  plan side of the question, it's irrelevant to the good faith

2  negotiation side.  If you put something on the table that

3  nobody can accept, where is the good faith in the -- in the

4  offer?  Where is the good faith in the proposal?  Where is the

5  fair disclosures that make it possible or reasonable for the

6  person to accept it?

7      Now in order to sort of get into this posture they needed

8  to have numbers bigger than the $15,000,000,000 that shows up

9  in the May 12 report.  Well, what grew between May 12 and June

10  14?  Well, the pension number grew between May 12 and June 14.

11      You may recall, I showed you slide earlier, there was

12  $646,000,000 on May 12.  It's three and a half billion dollars

13  by the time Mr. Orr files his declaration on July 18th.

14      This is Footnote 3 to Mr. Orr's declaration in which he

15  identifies his proposal and says that he has identified

16  obligations consisting of and he points out 3.5 billion in

17  underfunding pension liabilities.  That's 3,000,000,000 higher

18  than appeared in the May 12 proposal.  That's how he gets to

19  $18,000,000,000.

20      Now is that a hard number?  No, it's a preliminary

21  number.  How do we know it's a preliminary number?  Because

22  the June 14 proposal tells us it's a preliminary number.

23  Claims for unfunded pension liabilities appearing at 109, as

24  set forth above, preliminary analyses indicates that the

25  underfunding in the GRS and the PFRS is approximately 3.5

1 billion dollars.

2     The rest of the sentence everybody has quoted many times.

3 That is, at this level of underfunding, the city would have to

4 contribute approximately 200,000,000 to 350,000,000 annually

5 to fund currently accrued vested benefits. Such contributions

6 will not be made under this plan. Just in case there was any

7 doubt they -- they aren't doing anything to contribute to the

8 historically accrued vested pension benefits, nothing in the

9 plan other than a share of a note ends up dealing with that

10 issue.

11     Now, Mr. Moore confirmed in his deposition on September

12 18, again this is designated in the record, that the city, I'm

13 going to paraphrase before I quote, city's actuaries had not

14 completed their work.

15     He actually said, "the city and most importantly its

16 actuary has not completed its analysis on the unfunded pension

17 -- unfunded position". All right.

18     Now, so that's preliminary. So for some reason it was

19 important to make that number bigger on June 14th than it had

20 been on May 12, even though no completed analyses have doing.

21 Well, why? Because it's part of the process of making the

22 problem look as bad as it can. It may be that bad, Your

23 Honor. I don't know the answer to that question.

24     But why did they have to jump? The reason they had to

25 jump is they had to justify the position that they were going

1    to cut vested pension benefits.

2        Again Mr. Bowen from Milliman confirms that they hadn't

3    done their work.  He says on 9-24 in response to a question

4    that was, has Milliman done yet a -- a plan valuation of the

5    assets and liabilities of the -- either the police and fire

6    fund or the general pension fund?  He starts to answer, the

7    actual -- Mr. Miller objects to form.  And the witness says

8    yeah, the actuary typically doesn't value the assets, we are

9    provided information from the system and we report the assets

10   in conjunction with liabilities.  As I said, we are in process

11   of doing a replication of each of the two systems.  You can't

12   reach a conclusion until you know what your starting point is

13   and the actuary hadn't finished his work on what the starting

14   point was.

15       Now, the -- there's a second question that sort of comes

16   up in the question of whether or not the information in the

17   June 14 proposal is misleading in any way with respect to

18   pensions.  Now, Exhibit 419 which is the legacy proposal if I

19   am not mistaken, which is put out after the June 14 proposal

20   is put forward, if I've got my timing right.  It says

21   approximately 650,000,000 of unfunded liability as of fiscal

22   year 2012 of which only 250,000,000 relates to the general

23   fund.

24       Well, what's the significance of that?  Well, this is

25   referring to DWSD.  DWSD has a significant share of the UAAL

1  $250,000,000 divided by the $650,000,000 is the 38.5% that

2  Your Honor may remember was bandied about with respect to Mr.

3  Moore's testimony -- Mr. Orr's testimony, I'm sorry.

4      Just in case Your Honor has a question as to where this

5  number might have come from, well, if you look at the

6  actuarial liabilities as of June 11 which is Exhibit 68

7  admitted by the city at Page B3, you'll see that unfunded

8  accrued -- actuarially accrued liabilities for the water and

9  sewage are $247,000,624.  And the total for the GRS of the

10  liabilities, unfunded actuarial accrued liabilities is

11  $639,871,000.  And it just so happens that if you do the math

12  you again end up with a 38 plus percent number.

13      So Mr. Bing in his document, the actuaries all sort of

14  agree that 38% is the right share on a smaller number.  And

15  you may recall that Mr. Orr said it would slide.  He -- there

16  was some confusion as to whether it was six fifty, or 60%.

17  But the bottom line was, it moves with the size of the number

18  and 38% is what both Mr. Bing thought as in his proposal, and

19  what the actuaries thought when they made their assessment in

20  2011.  Those are consistent.  So whether they're right or

21  they're wrong, they had a consistent world view.

22      It's misleading to suggest that DWSD contributions -- or

23  excuse me, that the GRS participants who worked for, or worked

24  now, or worked in the past for Detroit Water and Sewer

25  Department were being funded by tax dollars from the general

1  fund.  They were in fact coming from the DWSD itself.  And

2  DWSD itself was making money.  So we say that is a misleading

3  observation.

4      Again, the suggestion here is that tax dollars are what's

5  servicing the legacy debt.  The city has over 18,000,000,000

6  in accrued obligations.  We've shown that the number rose from

7  fifteen to eighteen.  They said over 6.4 billion in

8  obligations are backed by enterprise revenues, but that

9  doesn't count the legacy obligations, so again the implication

10  is that -- is that those obligations come to the city through

11  the general fund and that tax dollars are paying for it.

12      Now, one of the things that is missing throughout all of

13  this again, we say adversely affecting whether or not this is

14  a plan of adjustment, whether or not it's submitted in good

15  faith, is there was a hole that Mr. Buckfire confirmed during

16  his cross examination with respect to the absence of

17  appraisals, the absence of valuations, the absence of

18  historical cost information in the June 14 proposal, and that

19  it wasn't provided in the data room.

20      And so what does this mean?  Because you know the book

21  had a listing of assets that were non-core, I believe was the

22  answer, but no valuations were given.  So the Detroit Water

23  and Sewer Department, no values of potentially realizable

24  nature or otherwise are actually described in the June 14

25  proposal.

1      The Coleman A. Young airport, again no values associated

2  with that described.  The same with the Detroit Windsor

3  tunnel.  The same for Belle Isle park.  Same for the Detroit

4  Institute of Arts.  No numbers given with respect to what

5  might be -- might be the largest single asset owned by the

6  City of Detroit.

7      City owned land, again no values.  Parking operations, no

8  values.  The Joe Louis Arena, no values.  And, you know, I

9  don't know all the assets of the city, so I said have -- is

10 there anything they might have missed.  I don't know.

11     Well, no values.  Not even the Detroit Zoo, again, I

12 don't even know what it's worth.  I don't know if it's worth a

13 dime, or a lot.  But there was no effort by the city to be

14 exhaustive with respect to assets that might form a basis of

15 recovery.

16     Now you may recall that Mr. Bennett said he was going to

17 show that a trust owned the art.  There was no testimony that

18 came in reflecting a trust owning the art.  In fact Mr. Orr on

19 cross said in response to the following question, is correct,

20 the word it is missing, is correct that the City of Detroit

21 owns certain pieces of art that are maintained at the Detroit

22 Institute of Arts?  Mr. Orr's answer, yes.

23     Question, and this is art talking about the art that the

24 city owns itself, right?  Not art that is subject to any kind

25 of public trust?  Yes, was Mr. Orr's answer.  So again one of

1 the things that Mr. Bennett said he was going to show simply

2 disappeared.

3       Now art again might be a huge issue.  In response -- on

4 direct Mr. Buckfire says, that before his engagement in

5 January he had no knowledge despite his prior visits to the

6 City of Detroit about art.

7       He says well, back in January when we first began our

8 engagement, we discovered and we had not known this before,

9 that the City of Detroit actually does own the building and

10 the art collection of the Detroit Institute of Arts which is

11 operated on the city's behalf by the DIA corp which is the

12 founder society as a contractor to the city.

13      So two witnesses established that this is city owned art.

14 Efforts to appraise, value, get a handle on.  Mr. Orr says in

15 response to questioning he says, yes, he ultimately retained,

16 I'm not reading now, he retained Christie's in August.  So how

17 did he answer that question?

18      Question, and Christie's has been retained, correct?

19 Answer, Christie's has been retained, correct.  And they were

20 retained in August, is that right?  Answer, I believe -- well,

21 let's get the sequence.  I believe they were initially

22 requested to come out and I told them to go away.  We retained

23 them.

24      The Court, Mr. Orr, please just answer the question.

25 Were they retained in August?  I don't recall a specific date.

1  I think it was August.

2      So two things we think the Court should infer from this.

3  One, that August is in fact the date they were hired, and two,

4  Mr. Orr consciously told a potential appraiser of value to go

5  away.  Why would you do that?

6          THE COURT:  I have to interrupt you here and ask you

7  how much longer you'll be.

8          MR. MONTGOMERY:  I have a few more minutes, Your

9  Honor.

10          THE COURT:  A few, sure.

11          MR. MONTGOMERY:  But actually, Your Honor, just tell

12  me how much time you want me to take and I will take that

13  amount of time.

14          THE COURT:  Well, I want to be fair to Mr. Bennett's

15  rebuttal and --

16          MR. MONTGOMERY:  Okay.  So let me rocket through to

17  my last couple of slides.

18          THE COURT:  All right.

19          MR. MONTGOMERY:  All right.  The reason for asking

20  the question about why would you delay is because again the

21  advisors had said that is Jones, Day, and Exhibit 418, Page 31

22  in their speaking notes, make sure that the listeners learn

23  that asset monetization outside of a bankruptcy may implicate

24  eligibility requirement that the city be insolvent, e.g.

25  measured by short term cash.

1   How could that be?  Well, if you sell assets you have

2   cash.  You can pay your debts when they come due, you're not

3   insolvent.  I guess you don't want to sell valuable assets.

4       Again, with respect to the negotiating point.  It's

5   important, highlighted by others, that the word negotiations

6   applies only to the swap counter parties, it doesn't apply to

7   GRS, PFRS and debt insurers.  It doesn't apply to GRS, PFRS,

8   and unions.  And it doesn't apply to business people and

9   unions in general on those three dates July 10, July -- three

10  sets of meetings on July 10 and July 11.

11      Seen that before.  Again, the city has wanted to design

12  and restructure.  They sometimes use different words for cuts.

13  They twice in the discussions talk about restructure and

14  redesign of benefits to a level the city can afford.  Again,

15  what did that mean in the context of the June 14 proposal?

16  How do you deal with the underfunding?

17      Well, they said they had $803,000,000 available.  Total

18  estimated unsecured claims 11,000,000,000, so there's a

19  fraction there.  You would multiply that fraction times the

20  pensions and come up with an assessment.

21      Well, what's the math on that?  All right.  Eight hundred

22  and three million divided by 11,000,000,000 is 7.2% -- 7.02%.

23  Divide -- times it -- times the unsecured creditor side of

24  that world that relates to pensions and OPEB, you come up with

25  $645,000,000 total based on the -- the cash flows -- as rather

1   obligations.

2       What is the total for pensions against 7%, two hundred

3   and forty-three.  Two hundred and forty-three is obviously

4   less than three and a half billion.  Hard not to have an

5   impairment.

6       Okay.  I'm going to skip the further math.  I want to

7   just point out with respect to negotiations that with respect

8   to the bond holder question on the water and sewer side that

9   it was impractical to negotiate with them.  There were four

10  insurers of the sewage disposal system.  There were three

11  insurers of the water system.  Combined they had five insurers

12  total for 6.4 billion dollars of debt.  Doesn't sound like an

13  impossible group to have a conversation with.

14      The note we said was not fair.  We identified on cross

15  and we'd point out to Your Honor here that how could it be

16  fair that percent and a half, there's no support for it as a

17  market rate.  No obligation to pay any amounts other than

18  revenue participation payments, no obligation to go sell any

19  assets.

20      A division if as and -- if as and when there were

21  proceeds.  And here's the one that bothers me the most about

22  the proposal worse than the interest rate, worse than the

23  note.  This concept that the retirees should fight each other

24  for the cash which is what the Dutch auction means.  It's a

25  well tried and trued phenomenon where you have people bidding

1    in their debt in order to receive a pile of cash.

2        Well, a guy or the person who bids the lowest -- the

3    highest amount of debt for the lowest amount of cash, he gets

4    the cash without getting the retirees that are 80% of the

5    obligations to fight among themselves for cash proceeds.  How

6    is that fair and even handed as a starting point?

7        Talked about Mr. Dillon.  Now here's an important point.

8    And I suggested to you earlier that this was all about a

9    bankruptcy case from the beginning.  Mr. Orr, a very talented

10   and well educated man, was supposed to fit in the requirements

11   of 436, Section 9.  Shall have a minimum of five years

12   experience and demonstrable expertise in business, financial

13   from local or state budgetary matters.

14       This is his qualifications we say the evidence suggests

15   that he was litigation and a bankruptcy restructuring lawyer

16   practicing with Jones, Day.  He never worked for a

17   corporation.  He once oversaw the sale of a -- a country club.

18   Worked for the office of the U.S. Trustee.

19       With respect to financial matters, he's not a CPA, an

20   MBA, or an investment banker.  And we suggest to you that

21   other than being a bankruptcy and restructuring lawyer, no

22   particular expertise in finance.  And with respect to local or

23   state budgetary matters, never ran a city or had budgeting

24   responsibility for either state or city.

25       But he was a very good bankruptcy lawyer, Your Honor, and

1  he knew how to take the case into bankruptcy with a very

2  skilled and excellent team to go with him.  And he was from

3  the beginning committed to working with the Governor's office

4  in lock step, point to Exhibit 401.

5      On the 22nd, he acknowledged that he was being looked at,

6  he was being looked at, who knows what he thought, but he was

7  being looked at as an agent of the state.  They weren't going

8  o do things without his consent, Exhibit 619 suggests that.

9  And by the way they wanted to hide it because they were going

10 to we'll broker a meeting via note between you and the Mayor's

11 personal assistant who was not foiable, F-o-i-a, ble, foiable

12 meaning not subject to discovery.

13     Same man thought it was an indirect -- the -- the prior

14 initiative was an end around of an initiative that was

15 rejected by the voters in November.  That the new law was a

16 thin veneer.  This is all going to what this man's

17 understandings are.

18     During his deposition he recalled telling the Governor

19 and his staff in general that one of the purposes, I'm not

20 saying the only purpose, one of the purposes or intentions of

21 Chapter 9 filing would be to allow you to cut back pension

22 benefits.  We probably had that discussion.  I don't recall

23 anything specific, be probably did.  That appears.

24     And we know he said trump.  This is one of the places

25 where he used the word trump, his deposition testimony.  He

1 said, question, you said this -- in this report, referring to

2 the June 14 proposal that you don't believe there is an

3 obligation under our state constitution to pay pensions if the

4 city can't afford it.

5     That's not what he said on June 10.  Answer, the reason

6 we said it that way is to quantify the bankruptcy question.

7 We think federal supremacy trumps state law.  Answer, yes.

8 You don't deny making that statement?  No.  I think I've said

9 it several times.

10      THE COURT:  All right.  Let me ask you to wrap up,

11 please.

12      MR. MONTGOMERY:  Okay.  This is the same man, of

13 course, who said on June 10 that it couldn't be trumped.  We

14 -- we think that -- that was an accident, that last one.  The

15 -- we think that the conclusion that Your Honor -- we think

16 the logical inferences to be drawn by the Court are that the

17 players, in particular the emergency manager lacks the

18 requisite intent to be a good faith actor in this drama, and

19 that therefore you must find that the city is not eligible.

20 Thank you.

21      THE COURT:  Rebuttal.

22      MR. SCHNEIDER:  Your Honor, both the city and the

23 state have rebuttal.

24      MR. BENNETT:  About how much time are you

25 contemplating, Your Honor?

 1          THE COURT:  As little as you think is necessary for

 2    your rebuttal purposes.

 3          MR. BENNETT:  Well, I'm going to look around and

 4    make an estimate.  I think it's under an hour, but I'm sure

 5    it's more than a half an hour.  And I will say that that last

 6    presentation was rather spectacular and I ordinarily wouldn't

 7    spend much time on it, but inasmuch as it accuses the

 8    Governor, the Treasurer, and Mr. Baird, and Mr. Orr even more

 9    explicitly of lying in this courtroom, I think I should go

10    through it with some care.

11        So I think what I would propose at this point, unless you

12    really want to do it tonight, it's a close call for you, I'll

13    come back.  But if you want me to go forward, I'll go forward.

14          THE COURT:  Mr. Schneider, how long are you going to

15    be?

16          MR. SCHNEIDER:  I would probably add 10 to 15

17    minutes on top of that.

18          THE COURT:  What do the attorneys on the objecting

19    side prefer on this issue?  Stay or come back on Tuesday?

20          MR. MONTGOMERY:  Your Honor, the objectors have all

21    suggested that notwithstanding the fact that I will miss the

22    last flight back out of the city, we'd rather finish.

23          THE COURT:  Okay.  That -- that's my preference as

24    well.  It's now 5:35, I want to give the two of you a hard

25    deadline arbitrarily of 6:30.

1          MR. BENNETT:  Okay.  I'll figure out the best way to

2    do this.

3          Your Honor, will forgive me if this is not quite as

4    organized as I was -- would ordinarily like to be.  Let's

5    start with the last presentation first.

6          I want to start with the premise.  I think the purpose

7    was it was said to prove that there was an intent to impair

8    pensions.  And if there was an intent -- excuse me, intent to

9    seek to impair pensions.  That's an important difference.

10          And if there was an intent to seek to impair pensions,

11    that that somehow was different than if a Chapter 9 case was

12    commenced and then it had to impair pensions.  I'm not sure

13    that makes any sense at all.  And I think the premise has to

14    be wrong.

15          In any event, I apologize that we are going back to the

16    constitutional argument, but it's necessary to do so.  As Your

17    Honor will remember, it is the city's position and it is

18    correct that the pensions clause is the same in all functional

19    respects to the contracts clause.  And so all contracts,

20    pension contracts and -- and other contracts are protected by

21    state constitutions and in fact by the federal constitution

22    from amendment and -- and from -- from impairment, excuse me,

23    by the state.

24          When an entity resorts to Chapter 9 following Justice

25    Cardozo's reasoning, following the ultimate holding in

1   Deacons, and following the practice in Chapter 9 cases for as

2   long as there have been Chapter 9 cases, the Bankruptcy Court

3   acts to impair contracts.  That's how it impairs bonds.

4       The ascending antecedent as I think Justice Cardozo put

5   it, or all of the prefatory steps are not relevant.  When

6   you're in trouble you can ask for help.  So if as we have

7   demonstrated, the numbers showed that the City of Detroit

8   could not pay its debts as they become due and going forward

9   could not pay its debts as it's become due on the pension and

10  OPEB side even if it didn't have any bond indebtedness it was

11  in a position where it needs help.

12      That the state authorizes Detroit to get help from the

13  Federal Government.  So that the Federal Government can assist

14  with the problem or address the knot in the words of Cardozo.

15  Whether they intend to do it, or don't intend to do it,

16  doesn't matter.

17      The relevant actor if in fact pensions are to be impaired

18  in this case, if in fact the underfunded amount is not to be

19  paid in full in this Chapter 9 case, and we've said both are

20  very likely results and were within the contemplation of the

21  people who put together the June 14th presentation and the

22  filing, it makes no difference at all.

23      Neither Mr. Orr, Governor Snyder, nor I, nor David

24  Heiman, my partner, are going to be impairing pensions.

25  Unfortunately if it's going to happen that's your job and the

1  reviewing Courts that are going to come later.

2      So the entire -- the entire --

3          THE COURT:  I have to stop you there.  What do I do

4  about the representation that Mr. Orr made at the June 10th

5  meeting to the retiree in response to his question that

6  pensions are sacrosanct and not to be touched.  And his

7  further representation that there was a 50/50 chance of filing

8  bankruptcy?

9          MR. BENNETT:  Okay.

10         THE COURT:  Were those statements misleading?

11         MR. BENNETT:  Can you please put up the actual

12 statement that Mr. Orr made that was utilized in the

13 presentation just now?  Your Honor, that statement -- no, I

14 want the quote, not the clip.

15     Your Honor, that statement may well have been

16 inappropriately timed.  I don't have the words around it, it

17 would be one of the things I would do before Tuesday --

18 Tuesday morning.

19     Technically inelegant but also true.  He says the state

20 constitution and state law, case law says that vested pension

21 rights are sacrosanct, they can't be touched.  That is what

22 the state constitution and state case law says in a very

23 non-technical and actually slightly imprecise sense.

24     He doesn't talk about the Constitution.  Now, would I --

25 so would I have liked him to say --

1          THE COURT:  Well, but the -- but the retiree wanted

2    to know what was going to happen to his pension benefits,

3    right?

4          MR. BENNETT:  Your Honor, I -- I am absolutely --

5    Mr. Orr, during the many many past months has probably been

6    one of the most carefully monitored actors in this entire

7    case.  I am sure there are quotes of endless, endless, endless

8    things that he has said.

9        This may not be the moment where he used the best words.

10   I don't remember enough of the context on both ends.  I know

11   that if there was a -- if Your Honor believes that this

12   statement without more was misleading, it was corrected three

13   days later by their own exhibits.  And it was certainly

14   corrected four -- four days later when the proposal for

15   creditors dated on the 14th, the moment the meeting was over

16   was put on the worldwide web.  So I -- I --

17         THE COURT:  I'm sorry, what happened the moment the

18   meeting was closed?

19         MR. BENNETT:  The entire proposal was put on the

20   web.

21         THE COURT:  Not after this meeting, after the next

22   meeting.

23         MR. BENNETT:  After -- on the 14th.

24         THE COURT:  But not on the 10th.

25         MR. BENNETT:  Not on the 10th.  So there is a --

1  there is a, at maximum, a three or four day period where there

2  was misinformation or frankly a accurate but potentially not

3  complete statement was in the -- was in the record.

4      And that meeting had 200 people in it.  So it's bad but

5  there are 685,000 residents of the City of Detroit.  There are

6  23,000 retirees.  Mistakes happen, I can't do anything about

7  this one.  I don't --

8          THE COURT:  What about the comment that there was a

9  50/50 chance of filing bankruptcy?

10         MR. BENNETT:  I think that -- I don't know if Mr.

11 Orr was questioned about that comment.  I think that was a

12 very optimistic view of the situation, but he is absolutely

13 entitled to be optimistic.

14         THE COURT:  Well, but doesn't it raise a question

15 about whether that's what he really thought?

16         MR. BENNETT:  Does what raise a question as to

17 whether that's what he really --

18         THE COURT:  That statement.

19         MR. BENNETT:  He was -- he was hoping that the

20 negotiations would succeed.

21         THE COURT:  Well, but the question is that on June

22 10th, did he really believe there was a 50% chance that they

23 would succeed?

24         MR. BENNETT:  Your Honor, I'm the wrong person to

25 ask that question.  You would have to ask him.  This was --

1              THE COURT:  You're his lawyer.

2              MR. BENNETT:  At this point in time, it is -- it is

3    before --

4              THE COURT:  You're his lawyer.

5              MR. BENNETT:  Yeah, but this is -- but this is a

6    judgment everybody gets to make based upon really what they

7    think about the people that they know and don't know.  And

8    this is before the presentation is made and before there's

9    been any feedback by anybody.

10       So I -- I -- and certainly it's inappropriate for me to

11   add to the record as to whether or not the 50/50 statement was

12   anything but his belief --

13             THE COURT:  No, I understand that.  And perhaps my

14   question is a little imprecise and inelegant.  But the -- what

15   I'm really asking is, what evidence is there in the record

16   that that is what he genuinely believed as opposed to

17   knowingly misled --

18             MR. BENNETT:  I -- I'm not aware that there's --

19             THE COURT:  -- a crowd.

20             MR. BENNETT:  I'm not aware that there's any

21   evidence either way about that.

22             THE COURT:  All right.

23             MR. BENNETT:  But given that the assertion is that

24   that was bad faith, I would think that's not our problem,

25   that's the objectors' problem, that there's no evidence in the

1   record on that point.

2        THE COURT:  Well, all right.  Let me just ask the --

3   the next question.  Which is, assuming that both of those

4   questions were misleading, what impact does that have, or

5   should that have on the Court's analysis of good faith here?

6   Because that's ultimately the point, the -- the element.

7        MR. BENNETT:  Your Honor, it should have no impact

8   at all.  The -- you have seen a mountain of evidence of a

9   careful deliberative process to pull together the very best

10  reorganization proposal for the City of Detroit that anyone

11  could put together.  You saw it, it was presented to a wide

12  variety of -- of representatives of retirees.  By the way,

13  acting in capacities with respect to the OPEB's and acting in

14  capacities with respect to the pensions.

15       And you have found that notwithstanding after there was

16  no confusion about what the plan was all about and

17  notwithstanding prior statements, you will have found that

18  everybody responded either, I cannot represent retirees, or I

19  cannot represent retirees, and I would never represent them to

20  impair pension benefits because they are -- they are not to be

21  impaired.

22       So, against that factual background, was there anything

23  that the city did in negotiations that means it did not

24  negotiate in good faith.  Is there anything about a statement

25  four days before any discussions ever started that reflects on

1    to the subsequent negotiations?

2        How could it?  Because any conceivable misunderstanding

3    was completely and totally vitiated either three days later or

4    four days later, depending upon which set of statements you

5    want to pick.  And in all events, everything else happened

6    afterwards.

7        I just can't get there from here.  I think that the --

8    that -- that number one, mistakes happen.  They happened all

9    over the place.  And more will.

10       But in this instance nothing that happened before the

11   negotiations even started can inform whether or not the city

12   conducted negotiations in good faith.  And nothing about those

13   statements affected the course of the negotiations.  And

14   there's no evidence at all that suggested that they did.  It

15   was a good effort to try to -- to try to impeach or impair Mr.

16   Orr, but it was not -- did not address anything about the

17   negotiations that followed.

18       I think the other points with respect to the presentation

19   you just saw is that there is massive amounts of testimony in

20   the record that go directly contrary to all of the -- to all

21   of the inferences you were asked to accept.  This is going to

22   be an incomplete list.

23       But as to the timing of the filing and the motivations

24   from the filing from a financial perspective you have the

25   testimony of Malhotra, the testimony of Buckfire.  It is also

1 supported to some extent by testimony of Dillon and testimony

2 of Orr.

3     With respect to the absence of -- of a scheme to march

4 toward a Chapter 9 filing with specific intent to impair

5 pensions from 2012, you have the testimony of the Governor,

6 the testimony of Dillon, the testimony of Baird, the testimony

7 of Orr, the testimony of Buckfire.  And in addition, probably

8 the most compelling piece of -- piece of evidence because it

9 exists from way back when, and no one can change it, is the

10 entry into the consent agreement itself.

11     As was pointed out by Mr. Dillon in -- in his testimony,

12 but also appears from the face of the consent agreement if you

13 read it, under the consent agreement, there is no conceivable

14 way that the city could file a Chapter 9 case.  The consent

15 agreement is -- and it represents directions or agreed

16 directions toward an alternative path.

17     As the testimony revealed there were a long list of

18 things the city had to accomplish which the authors of the

19 consent agreement thought would solve the city's financial

20 problems.  Unfortunately nearly none and maybe none of those

21 things were actually accomplished.

22     But when the state entered into that agreement they were

23 clearly hoping that it were -- was.  And if anything the entry

24 of a consent agreement was a huge delay of addressing a

25 potential Chapter 9, and was viewed -- I know the testimony

1  said it was viewed as a reason for avoiding a Chapter 9.

2      Swap negotiations since 2002.  I think there's testimony

3  in the record that the --

4          THE COURT:  2012?

5          MR. BENNETT:  I'm sorry, 2012.  That there was a

6  downgrade that triggered the early negotiations with the swap

7  counter parties at the beginning of 2012.  Because the -- the

8  restructuring in twenty -- in 2009 included a default under

9  the swaps in the event that there was a downgrade in the

10  city's credit rating.

11      That downgrade happened in -- in 2012.  I do not remember

12  the month.  I don't know if it's in the record.  So the

13  reference in the -- in the -- to negotiations since 2012, had

14  nothing to do with an anticipated filing and nothing to do

15  with the additional COPs payment default that was resulting in

16  another covenant default.  It is not an advanced negotiation

17  with respect to a potential Chapter 9 case.

18      As was testified by Mr. Buckfire, actually both on cross

19  and on redirect, insurers do not control consent of the debt

20  instruments and if you look a little more closely at the

21  charts, not all debt issues are insured.  The insurers are

22  sitting exactly in the same place as I will get to in the case

23  of the -- some of the other presentations, they're in exactly

24  the same place as the retiree associations.  They're in a

25  position to communicate.  They may be in a condition to make a

1   recommendation.  They don't vote.  They can't deliver votes.

2   They can't do anything about non-consenting voters.

3        Eligibility in asset sales.  I actually thought that the

4   record fleshed out quite clearly where that whole thing came

5   about.  It was a question by Miller, Buckfire I think to all

6   of the people presenting to address whether assets sales have

7   anything to do with eligibility.

8        I think Mr. Malhotra gave the best testimony on this.  I

9   will tell you, Your Honor, what I -- my response would have

10  been which is only in a courtroom with a Judge who doesn't

11  understand economics.  And so I wouldn't be worried about it

12  for a minute.

13       But we know that the question was a question that wanted

14  to be addressed.  The -- the showing of speaker notes without

15  a witness ever having said that the speaker said the things

16  that were in the speaker notes, I think goes beyond the

17  record.  The speaker notes were not passed out.  The

18  presentation was passed out.  There was no reference to this

19  issue at all.

20       I am told by my colleague Mr. Schneider that the Detroit

21  Zoo isn't in Detroit.  The other point with respect to that

22  because it was kind of funny at the time, there was some

23  discussion -- I think in a newspaper or something someone

24  talked about the Detroit Zoo.  I remember someone making a

25  joke that -- that whoever thought Detroit -- the Detroit Zoo

1  was an asset didn't recognize that animals eat.  And

2  accordingly it was a liability, not an asset which I suspect

3  is -- so if that's the asset that we -- that -- that we missed

4  on the list of assets, even if it is in Detroit, I'm pretty

5  sure it belongs on the liability side and not in the asset

6  side.

7      You know, whether it's a plan or not a plan, I think

8  there's been lots of comments that I think each and every one

9  was taken out of context about whether the plan was not a

10  plan.  Again, if I had the time, I'd go find the context for

11  all those comments.  I think -- I think frankly Your Honor is

12  perfectly well suited to figure out whether -- and by the way

13  the cases require an outline of a plan of adjustment that can

14  be confirmed.

15      They're actually pretty clear by that like -- in that

16  way.  They don't require a fully fleshed out plan of

17  adjustment.  That argument has been made before and rejected

18  before by every single Court that considered the question.

19      Your Honor, has seen enough plans.  Your Honor has seen

20  enough plans and the summaries and disclosure statements.

21  Your Honor will be able to tell whether or not the proposal

22  that was made on June 14th is a sufficiently detailed outline

23  of a plan of -- of adjustment that is appropriate under

24  Chapter 9 and frankly I think that's an issue for you, not for

25  anybody else.

1      I'm going to move to some of the comments that were made

2  by Mr. Ciantra.  And first of all, the -- there was a -- there

3  was a criticism that he made about the fact that in the

4  pre-filing negotiation environment a non-disclosure agreement

5  was required as condition to access for the data room.

6      Whether or not it was appropriate to continue to require

7  that after the filing of the Chapter 9 case as the proposal to

8  creditors appendix reveals, there were -- I want to do the

9  math, including water and sewer because I think it would be

10  appropriate to include it for these purposes, a little less

11  than $10,000,000,000 of publicly traded debt securities out

12  there in the universe.

13      If you're going to -- to make a data room available to

14  anyone without publishing the whole thing on the internet, I

15  think it's appropriate to have confidentiality agreements in

16  place.  Yes, it turns out some of the bonds are held by widows

17  and orphans too.

18      The social reality as a method of classification and

19  treatment.  That was fascinating.  You know, we're going to

20  have to read the bankruptcy -- bankruptcy law very carefully

21  for purposes of determining who is entitled to what as

22  distribution in this case.

23      And it's going to turn out that there are going to be

24  lots of arguments that -- that debts other than pension claims

25  are also entitled to priority that the June 14th proposal does

1  not accord them.

2      While we were here today, I read an email report that a

3  declaratory judgment action has been filed on behalf of the

4  UTGO, the unsecured UTGO's that we classified as unsecured,

5  claiming since they almost have a security interest they

6  should be regarded as secured and their distributions should

7  come off the top.  That will -- if that lawsuit succeeds, the

8  $830,000,000 number that was misused in the distribution

9  example, I'll come back to that in a second, will be reduced

10  by a number that's roughly $500,000,000.

11      And so there are going to be collisions everywhere over

12  this.  I have not yet seen a basis for distinguishing

13  classification claims based on social reality.  I mention that

14  as a reason why the city perhaps does not want to be in the

15  business of unilaterally dealing with the consequences of a

16  reduction of the -- excuse me, of the change in unfunded

17  amount based upon the distribution contemplated under the

18  plan.  If I missed it in the Bankruptcy Code, someone should

19  give me the reference.

20      Dillon's remarks concerning that he was still in the

21  information gathering stage, on several occasions in Mr.

22  Dillon's testimony he recognized that that was a description

23  as to him.  He fully understood others closer to the situation

24  knew more.

25      The issue -- and -- and -- and -- and all of the

1 discussions from the -- from the United Auto Workers were very

2 interesting.  Because Exhibit 32 includes the United Auto

3 Workers letter which states, and just let me grab it a second.

4 I have -- I have it here.

5      The union does, however, represent current retirees and

6 has no authority to negotiate on their behalf.  Not bind, not

7 -- just we have no authority to negotiate on behalf.

8      So it's first of all, extraordinarily interesting that a

9 person who writes that letter with no qualification, it's part

10 of Exhibit 32, how they can complain about anything that

11 happened in negotiations.  One of the things they complain

12 about many other people do, is the -- is the fact that the

13 so-called concessionary bargain back at the beginning of -- of

14 2012 was not put into effect.

15      For some reason the unions believe that that entire

16 episode represents a great success.  I think we know in

17 retrospect that that entire episode was a great failure.  Huge

18 amounts of time and effort was devoted in an attempt to have a

19 concessionary bargain with a wide variety of unions and at the

20 end of the day the economic results were a drop in the bucket,

21 certainly by comparison to the extent of Detroit's problems

22 however you choose to measure them.

23      That is not a success.  That the -- that the Governor's

24 office had not analyzed it and that others analyzed it and

25 said look, I -- it may have been the best you can do, this

1  just doesn't work for the City of Detroit.  It is not a bad

2  thing, it is probably a good thing.

3      The other assertion that was made that I have to spend

4  just a little bit of time on, is the class action device.  The

5  class action device has been proposed as the perfect way to

6  resolve the problem with retirees.

7      Now by the way, again this is asserted as -- as a counter

8  to the argument on the issue of -- of impracticality and --

9  and Your Honor, actually missed additional points, the ones

10 that I said this morning were probably enough relating to your

11 question of you know, what are the consequences if it turns

12 out that the -- that the pension funds or the two people you

13 have to deal with in the pension context.

14     Well, first of all, no one stood up and said you were

15 right.  Everyone still talked about themselves as being

16 relevant actors.  And that's because that's consistent with

17 the pre-filing atmosphere.

18     But the second part is, is the retirees still become

19 relevant with respect to OPEB's and with respect to OPEB's

20 there is no intervening structure.  And as we've revealed many

21 times before, and it's not our favorite fact, those are

22 essentially completely unfunded.

23     So -- so when they talk about a class action approval

24 also they're only talking about the -- the OPEB side of the

25 question, I think, because these same people have also refused

1   to ever be part of an out of Court deal that -- that impairs

2   pension claims.  But maybe it applies to both.

3       The fact of the matter is, if you page through the cases

4   and we can give -- send you a list of citations if you want

5   them.  If you don't, it's okay.

6       It turns out that these things take a year to 22 months

7   for the examples that we were able to find when we looked in

8   the cases and we were able to use the dates in the cases to

9   figure out how long it is -- it takes to get a class action

10  settlement approved in these contexts where it's a mandatory

11  non-opt out class.

12      I was given a list of the things that have to happen in

13  order to get from here to there, or from an agreement to

14  there.  First of all, the union, in this case I guess, more

15  unions and the city negotiate to reach a tentative agreement.

16  We have no idea how long that would happen, no one has ever

17  put on any evidence to say that we were two or three weeks

18  away back then in -- in July.

19      I think the evidence seems to suggest we were at best

20  months away.  And I say at best because I don't think we were

21  anywhere.

22      Second, you need an independent counsel for the retirees

23  because the people who actually negotiate the deal, their view

24  isn't enough.  The retirees' independent counsel has to

25  investigate the settlement.

1          THE COURT:  I think I have to cut you off here

2    because there was really no evidence on either side of any of

3    this.

4          MR. BENNETT:  This is actually law.  This is just

5    what the -- the -- the legal requirements in order to get a

6    settlement done.  I don't -- I think that Your Honor, if I had

7    -- if I had -- if I was going to brief it, I'd just take it

8    right out of cases.  I would not call a fact witness for any

9    of this.  But if you want me to stop, I'll stop.  This is --

10   this is not -- these are not -- this is just right out of

11   cases.

12         THE COURT:  All right.  I will accept it from you on

13   that premise.

14         MR. BENNETT:  Okay.

15         THE COURT:  But with the understanding that we have

16   no evidence on the specifics of what's required or how long it

17   would take.

18         MR. BENNETT:  Okay.

19         THE COURT:  Any of these steps.

20         MR. BENNETT:  I'm happy to just -- just not go

21   further and -- and submit a list of cases with no commentary

22   if that would make you more comfortable.

23         THE COURT:  I don't want any post-hearing briefing.

24   Because that will add a month to our process here.

25         MR. BENNETT:  Then let me just -- let me just run

1  down -- let me just run the list of the procedures that have

2  to be followed.  These are just procedures that have to be

3  followed.

4      At -- at that point you can bing a non-opt out class

5  action lawsuit against the city in order to get this created.

6  This -- the -- that's the next thing you file in Court after

7  you've got independent counsel and you're at that stage.

8      Then you have a class certification proceeding.  Then you

9  have preliminary approval of the agreement.  Then you have a

10  notice process.

11      MR. CIANTRA:  Your Honor, I'm going to object at

12  this point.  You know, this is -- really should have been a

13  rebuttal case.  If they wanted to put on someone that had --

14  had knowledge as to how these proceed -- proceeds, this should

15  have been done on rebuttal.

16      THE COURT:  Well, I'm not sure I can sustain that

17  because none of this was put in evidence as part of the

18  objectors' case.

19      MR. CIANTRA:  Mr. Nicholson testified that he

20  offered this opportunity, this structure, to Mr. Bennett's

21  partner, Mr. Miller.  That it was discussed.  It was a -- a

22  way that he testified they had settled these issues in the

23  past.  If they wanted to make an argument that this was

24  impractical, they should have called rebuttal testimony.

25      THE COURT:  Well, that's good as far as it goes.

1  except that Mr. Nicholson did not testify as to what the

2  various steps were and how they would work in this context.

3          MR. CIANTRA:  They could have asked him.

4          THE COURT:  Well, but so could you.  It was -- it

5  was part of your defense to this case.

6          MR. CIANTRA:  Well, I -- I made a -- we -- we

7  presented evidence that this proposal was presented to the

8  city, but they did not respond to it.  They did not take us up

9  on that.

10          THE COURT:  I'll permit this with the understanding

11  that we're just talking about how this would work legally.

12          MR. BENNETT:  Okay.  I think all the following by

13  the way is in the Federal Rule of Civil Procedure that governs

14  class actions.  But one of my partners will give us the rule

15  citation and -- and I will demonstrate that I'm not testifying

16  from the lectern.

17          THE COURT:  You mean Rule 23?

18          MR. BENNETT:  No.  Your Honor, I think that what I

19  will do is just say, peruse Rule 23 and then we'll move on.

20  All of -- all of these things are in there.  All the rest of

21  them are.  The others are from the cases.

22      Okay.  I'm now going to turn to the -- to Mr. Gordon's

23  argument.  I think that -- that may make the most sense.

24      Okay.  First of all, again the -- the -- I think we

25  indicated that both funds -- we -- we demonstrated that those

1   funds from their interrogatory responses said that they could

2   not negotiate impairment and would not negotiate impairment.

3       I think that Mr. Gordon misstated the position that I

4   think I very -- very clearly stated this morning.  We fully

5   understand that there are many people who may object to the

6   3.5 billion dollar number.  My point was, was there was no

7   evidence in the record suggesting any other number this

8   morning -- excuse me, during the trial.  And that remains

9   true.

10      So for purposes of this hearing, the only number in

11  evidence is the 3.5 billion dollar number split in the two

12  ways as -- split in two as described in the June 14th

13  presentation.  And that's the number we're working with.

14      We -- we also indicated it is in the record that the

15  retirees committee have a different and lower number as of the

16  end of the school year of 2012.

17          MR. MONTGOMERY:  Objection, Your Honor.  I'm sorry,

18  you are definitely -- we never offered a different number in

19  any evidence or any written submission to this Court.  This

20  goes right to the thing you told me not to ask Mr. Buckfire

21  about.

22          MR. BENNETT:  It was in the slides that he

23  projected.

24          THE COURT:  All right.  The record will reflect what

25  it does.  Let's move on.

1          MR. BENNETT:  Okay.  And again the point with

2   respect to the -- to -- to the exhibit, Exhibit 43.  Was that

3   if -- if there was anybody in the objectors' group who thought

4   that the premises of the proposal were false, misleading, or

5   wrong, the -- the -- the -- we expected evidence suggesting

6   the same.  That of course didn't happen.

7          And finally, I don't remember if was on -- on this point,

8   I don't remember whether it was Mr. Gordon, but Your Honor

9   engaged one of the objectors on the whole subject of well, if

10  you didn't think that the city's premises that were behind its

11  plan were correct, why didn't you propose a plan, or I think

12  you actually said what inference am I to draw from the fact

13  that you didn't produce an alternative scenario.

14         And the answer, it's not a matter of inference, it's

15  decisive.  The fact that they didn't means there isn't another

16  alternative that Your Honor can lawfully consider.

17         By the way, it should not be surprising that a way to --

18  to object to eligibility when you think that the city's plan

19  isn't a good plan, or isn't an accurate plan, is to actually

20  generate a different one.  In the early ages of -- the early

21  stages of the Stockton proceedings, one of the objectors

22  actually did object to the Stockton business plan, or -- or

23  projections and they generated their own.

24         Valeo was all about alternative projections based upon,

25  you know, correcting erroneous business decisions, or

1   erroneous municipal decisions made two years in the past.  So

2   if you go read the cases and -- and watch how other people

3   have successfully or unsuccessfully objected to eligibility,

4   if the reason you're objecting is because the premises were

5   wrong, you should bring different premises to the Court and

6   prove them.

7       As to Mr. Robbins, we were very careful.  Mr. Robbins

8   certainly did say he didn't have enough information.  But when

9   he was pressed on the point, he said only -- he identified

10  only one specific area where he didn't have adequate

11  information and that was asset sales.

12      All of the rest of the testimony was about generalized

13  complaints of lack of information.  And frankly that testimony

14  was significantly blunted by Mr. Robbins' own admissions that

15  as if and when they asked for more data, Miller, Buckfire was

16  pretty receptive in getting it to them and that a lot of the

17  additional things that were requested were things that -- that

18  came about because as you read information, additional

19  questions are raised and there's nothing about that that is

20  unusual.

21      You know, the -- the -- the -- also the assertion by the

22  retiree committee that we didn't negotiate with them with

23  enough.  Mr. Robbins was their agent.  He --

24          MR. MONTGOMERY:  Excuse me, Mr. Bennett.  I think

25  you meant retirement system, not retiree committee.

1          MR. BENNETT:  I'm sorry, I apologize.  The

2    retirement systems.  Mr. Robbins was their agent, okay.  He

3    knows what the -- what the projections mean.  He testified

4    that we -- that the city was pretty clearly starting to --

5    trying to start negotiations.

6          And his response was, I need eight days to figure out

7    what my authority is to negotiate what we're going to be

8    talking about.  What I called the shape of the table.  So at

9    this point in time given that we -- we have not only with

10   respect to the -- the two retirement funds, we have actual

11   evidence that number one, they weren't confused about whether

12   negotiations were sought.  Number two, talks about certain

13   things actually started.  Number three, at the end what had

14   happened was there was a discussion about what we're going to

15   talk about next and the actor says, I need eight days to find

16   out what my client is going to authorize me to do and in that

17   period there was a lawsuit.

18         So of all of the places to be standing up here and

19   saying, there were no negotiations, the city discovers

20   negotiations.  The last that should be heard from is the

21   retiree -- is the retiree funds -- excuse me, the retirement

22   funds.

23         They had perhaps one of the most qualified advisors who

24   admitted that he understood exactly what's going on.  We

25   understand exactly what he did.  And then we come to the

1  question which I foreshadowed this morning should be answered

2  with evidence and isn't.  Which is exactly what is it that a

3  good faith city has to do more than what it did in response to

4  the fact pattern it was presented with with the retirement

5  funds.

6       This is in the negotiations.  This isn't before the

7  negotiations.  This is at a time where everybody knows the

8  city's looking for feedback over a four week period and then

9  figuring out what it's going to do during a time the

10  undisputed evidence demonstrates the city was under financial

11  distress.

12       It was the retiree funds that said -- that you asked what

13  inference should be drawn.  Okay.  Given -- given the -- the

14  -- given that Mr. Robbins of all people was about the most

15  qualified actor from the financial side on -- on the retiree

16  side of the equation, that -- and that he's not only had the

17  negotiation period, but till now to decide whether or not

18  there was anything wrong with the -- with the June 14th

19  presentation and that the financial data should be looked at

20  differently.  The fact that nothing was presented by him or

21  anybody else is decisive, not just the basis of an inference.

22       A couple more things.  It was more than four hours, Your

23  Honor.  I -- I -- I have to spend some time because you're

24  going to take them away with you, with -- with what is going

25  to be new Exhibit 873.  And that is the -- the slides that

1   were shown on -- that were -- that were shown by -- by Ms.

2   Green.  And if they're still available -- are those slides

3   still available?  The slides that -- that you -- that Ms.

4   Green put up?

5              THE COURT:  You mean -- you mean to be projected?

6              MR. BENNETT:  Yeah, to be projected.

7              THE COURT:  Are they available to be projected?

8              MS. GREEN:  Yes.

9              THE COURT:  Apparently so.

10             MR. BENNETT:  Well, I'm just going to skip to a --

11  to -- to -- to a -- to a few.  I'm going to skip the

12  evidentiary issue because that's been dealt with.  Okay.  I

13  would like to go to 13.

14             THE COURT:  Slide number 13?

15             MR. BENNETT:  Slide -- page number -- it has -- they

16  have page numbers at the bottom.

17             THE COURT:  Page number 13?

18             MR. BENNETT:  Slide number 13, at page number 13.

19  Why don't I start and I hope he catches up with me.

20       The slide number 13 is the -- is the testimony of Howard

21  Ryan which Your Honor asked about and -- and putting the

22  objections aside for the second -- for a second, this

23  testimony is completely irrelevant.

24       Because in the -- in the unlikely event that we actually

25  are -- are interested notwithstanding the Michigan cases, and

1    the intent of the legislature in adding the appropriation

2    provisions, the -- the -- the way you find out is asking the

3    legislators who voted for it.  And so it's a huge evidentiary

4    problem but frankly it's the objectors' evidentiary problem.

5        And I can't imagine that you could make the decision as

6    to what the intent of the legislature was in adding the

7    appropriation provisions until you elicited testimony from at

8    least a majority of the majority of each house that voted for

9    it.

10       There may be an argument, you've got to talk to all of

11   them.  But the bottom line is, is that the -- that someone

12   from outside the process, an advisor, I have no idea how he

13   knows, but it seems to me that it's the worst kind of hearsay

14   or speculation as to what -- why the legislature passed a law

15   with -- with certain provisions as opposed to didn't -- passed

16   it with others.

17           THE COURT:  Well, but how do I deal with the fact

18   that this witness, Mr. Ryan --

19           MR. BENNETT:   Yes.

20           THE COURT:  -- was the state's 30(b)(6) witness?  He

21   was the representative of the state to answer these questions.

22           MR. BENNETT:  Your Honor, I think he's --

23           THE COURT:  I mean he could have said, I don't know,

24   but he didn't.

25           MR. BENNETT:  Well, he's at best the executive's

1  30(b)(6) witness.  I don't think and I -- and I think this is

2  something that Mr. Snyder should deal with.  I don't think --

3             THE COURT:  Oh, all right, that's fine.

4             MR. BENNETT:  And -- and the executive of course

5  testified himself as to what -- that's -- that's the Governor.

6  But the law doesn't become law until the legislature passes it

7  both houses and the Governor signs it.  So there's a lot of

8  empty boxes in terms of intent that we have no idea what their

9  intent was.  And you're being asked to presume that the intent

10 was to do something unconstitutional which we pointed out it

11 isn't even really a constitutional question.

12     As to -- as opposed to do something absolutely legitimate

13 which is to allocate funds to the municipalities who are

14 subjected to it at the jurisdiction of an emergency manager

15 don't have to pay for it by themselves.

16     The next slide I'd like you go to is 15.  That's 16.

17 That's still 16.  The one that's -- that one.

18     This was the slide that -- that -- that Ms. Green said

19 demonstrated that it was part of the drive, the -- the -- the

20 preordained drive to Chapter 9.  But she forgot to read the --

21 the -- the first three line highlighted block.

22     Questions that Miller, Buckfire has drafted for review.

23 First one, given the issues that Detroit faces, how can they

24 address them outside of Chapter 9?  I don't think I have to

25 say more.

1      Slide 22, please.  Moved a little quicker when Ms. Green

2  was asking.  May 12, the May 12, we are not like negotiating

3  the terms of the plan.  Once again, it was not anchored to the

4  place where the testimony has anchored it which is this is not

5  referring to the June 14th plan.  The testimony is perfectly

6  clear and actually the statement in context was perfectly

7  clear.  It was -- it was relating to the 45 day report under

8  the law.

9      Next page, Page 23, please.  I'm not sure I'm pronouncing

10  his name right, David Meador.  The record actually doesn't say

11  and the email certainly doesn't say where David Meador came up

12  with the idea that there might be a filing coming in July.

13      As I indicated to -- to -- to Your Honor before, there

14  was rampant speculation everywhere where this was headed.

15          THE COURT:  This is 23, were you looking for 22?

16          MR. BENNETT:  This is 23, this is the one I'm -- I'm

17  sorry, this is 21.

18          THE COURT:  Twenty-three, okay.

19          MR. BENNETT:  I'm sorry.  This is the -- the email.

20  I'm sorry, this is the right one.

21          THE COURT:  Okay.

22          MR. BENNETT:  Okay.  So there is -- the evidence

23  does not actually say that -- that Mr. Meador got this from

24  Mr. Buckfire.  We actually don't know where he got it.

25      Next slide, number 26.  Your Honor raised this issue.  My

1  only point here is that whatever -- whatever

2  misrepresentations or inadequate disclosures Mr. Orr gave on

3  June 10th, it was corrected three or four days later.

4      Moving on to 29, please.  This is about the last point

5  the city could have been negotiating since 2012 when it knew

6  there was a financial crisis.  Your Honor, this is the <u>Valeo</u>

7  decision, or another version of the <u>Valeo</u> decision.

8      If Your Honor will recall, the objecting parties in <u>Valeo</u>

9  said that -- that if <u>Valeo</u> had done things differently two

10 years before their budgeting process they really wouldn't be

11 in trouble.  And the <u>Valeo</u> Judge ultimately decides what I

12 think Your Honor knows, which is there not a bankruptcy case

13 in the world that doesn't start with some mistakes at some

14 period of time.

15     And they decide that no, you do not disqualify yourself

16 for Chapter 9 relief forever if you make a -- if you budget

17 too much or spend too much in a particular year.  I think

18 frankly Judge Klein in <u>Stockton</u> is even stronger on this

19 point.

20     The idea that in 2012 the -- the state should have

21 commenced negotiations that had to be fashioned on a Chapter 9

22 plan because that's the law according to your objectors,

23 instead signed the consent agreement which gave the city the

24 ability to work out its problems away from a courthouse cannot

25 possibly be a basis for the city losing its ability to file

1  Chapter 9 when the consent agreement process failed.  We've

2  got at least two cases that say that, there are probably more.

3      Page 30.  I don't know how to -- how to reconcile items

4  1, and 2, and 3.  One and 2 of this chart with the idea that

5  Your Honor's been presented that the right thing by the

6  objectors that the right thing for the city to do was talk to

7  the unions and talk to the retiree groups.

8      They -- the -- the -- I'm sorry, the introductory

9  language.  The initial rounds of stakeholders negotiations are

10  set to start.  Somehow the pensioners were supposed to know

11  the city was expecting them to negotiate over the pensions

12  even though, and then number two, the vast majority of

13  retirees were not aware of the proposal as the city admitted

14  it did not mail each of them a copy.

15      Well, they've got to decide which way it is.  If the

16  reality is that the retirees themselves were the actual

17  players who had to be involved and had to be informed, then

18  they've admitted impracticability.  And if it's not the

19  retirees who have to be involved and someone else, they have

20  to own up to their letters that said it's not us.  We don't

21  have authority, we're not going to negotiate.

22      And this constant straddling between the two is another

23  demonstration that we are dealing with an impracticability

24  situation.  In any event as I said earlier, the proposal went

25  on a web site accessible to everyone the moment the meeting

1  was over.

2          THE COURT:  Mr. Schneider is concerned that you're

3  eating now into his time.

4          MR. SCHNEIDER:  I probably am.

5          MR. BENNETT:  Would you give me five minutes?

6          THE COURT:  He wants five minutes.

7          MR. BENNETT:  Your Honor, I ask that you be

8  exceptionally careful in reading the -- these slides.  Because

9  they themselves reveal more information if they're read

10 carefully and they -- and if you look at the record in many

11 cases, inferences drawn from them are misleading in light of

12 the overall record.  If Your Honor has any questions, I'll be

13 happy to deal with, otherwise I'm not done, but I guess I've

14 got to be.

15         THE COURT:  All right.  Thank you.

16         MR. SCHNEIDER:  Your Honor, most revealing about

17 what the objectors have said in their closing arguments, in

18 order to rebut their arguments I think is what they didn't

19 say.  Because the objectors argued in their closing that the

20 pensions have been impaired.

21     So tell us which witness actually testified in this case

22 that his or her pension was actually impaired.  None, because

23 that witness does not exist.  Impairment means actual

24 impairment and not a single pension has been impaired.

25     The objectors also didn't cite a single case or testimony

1 saying that the good faith of the Governor, or the Treasurer,

2 or any state actor is even relevant.  Good faith is about the

3 good faith of the debtor.  And even if it is about the

4 Governor, there's plenty of evidence in the record to support

5 his good faith.

6      The objectors also didn't explain what Mr. Dillon really

7 said.  Can we have 626 up on -- on the projector?  In

8 Paragraph 10 of 626, this is -- go to the next page.  Bring up

9 Paragraph 10.

10      First of all, this isn't a communication from Dillon to

11 Orr, okay.  It's -- it's Mr. Dillon's suggestions basically

12 through his legal counsel.  He says, looks premeditated.  That

13 doesn't mean that it is.  Looks premeditated.  In fact the

14 evidence in this case shows that the opposite is true, it's

15 not premeditated.  So don't make it look that way.

16      But look at this last sentence.  I want to -- if you can

17 highlight that last sentence.  This is the -- the sentence

18 that Ms. Green in her testimony didn't highlight.  I agree

19 with the recommendation, but I don't think we make the case.

20      Translation, this case has been made.  The city is

21 eligible, so say so.  Okay.  I agree.  Now just -- would you

22 just say so because it's been made.

23      And this is also shown in Mr. Dillon's testimony.  Mr.

24 Wertheimer asked Mr. Dillon, was it true on July 10 you didn't

25 think that Orr had made the case?  And what is his response?

1    In the document that I read.

2        So Dillon is just -- Mr. Dillon is just saying yeah, in

3    this particular document, the case wasn't made.  But that's

4    not to say that the case wasn't made.

5        Next, Mr. Bennett talked a little bit about the

6    appropriations provisions.  If the objectors here are arguing

7    that it's a bad faith filing due to some alleged improper

8    motive, there is no evidence that these appropriations were

9    added to allow the Governor to authorize this particular

10   bankruptcy.  So this particular filing couldn't have been done

11   in good faith.

12       Now as to Howard Ryan, well, he is the legislative

13   liaison for the Department of Treasury.  And 30(b)(6) is

14   really a discovery tool.  That's -- but this trial depends on

15   witnesses, not a 30(b)(6) discovery tool.

16       And you -- you can effectively override that testimony,

17   or basically you'd be using it to impeach him, with the

18   Governor's testimony.  Now, Howard Ryan, legislative liaison,

19   never a member of the House, never a member of the Senate and

20   definitely didn't sign this bill.  And the Governor did sign

21   the bill and he would know.

22       And he testifies, and his motives are clear, it was done

23   through the appropriation to pay for the emergency managers

24   because cities were upset that they were stuck with these

25   bills.  Now Ms. Brimer calls this appropriation the 5.7

1  million dollar appropriation meaningless.  What does the

2  Governor testify to?  And that's what we have to look at in

3  this case.  The testimony, the evidence.

4      He says, of course that appropriation provision is

5  significant.  Every taxpayer dollar is significant.  And what

6  Mr. Dillon and the Governor said, is we needed that money in

7  this -- we're halfway through the fiscal year, so we needed to

8  appropriate that money.  Do you have any questions about that,

9  Your Honor?

10          THE COURT:  Yes.  How -- how do I reconcile just

11  from a credibility perspective, Mr. Ryan's testimony and the

12  Governor's testimony?

13          MR. SCHNEIDER:  Well, the live witness here, the

14  Governor, was asked under oath, in front of you and explained

15  his provisions.  They're his -- his viewpoint.

16      If you're trying to reconcile this who had -- who would

17  really know better.  Who has the most experience in signing

18  the bill?  Who made the appropriation happen?  And also who

19  signed the later bill to have another appropriation so that we

20  could pay for these emergency managers?  That was the

21  Governor.  And he's the one who did that.

22          THE COURT:  Well, but doesn't that later bill raise

23  or even amplify the question about why it was necessary to put

24  an appropriation in the first bill?

25          MR. SCHNEIDER:  It was necessary because they were

1  halfway through the fiscal year and they had to pay for these

2  emergency managers.  That was the --

3          THE COURT:  But why not have a separate

4  appropriations bill so that the people's right to a referendum

5  could be preserved?  Why not do that?

6          MR. SCHNEIDER:  Because the legislative process in

7  Lansing, it's not -- the Governor testified this is the most

8  efficient way to go on to this, to do it.  And I can -- you

9  know, it's not in the record --

10          THE COURT:  Efficiency trumping the people's right

11  to referendum, is that -- is that your answer?

12          MR. SCHNEIDER:  No, Your Honor.  It's not --

13          THE COURT:  You just said --

14          MR. SCHNEIDER:  What's the most efficient way to get

15  a bill made into law?  Get the appropriation put in the bill

16  and pass it.

17          THE COURT:  No, I understand the efficiency of it.

18  But -- but what I'm hearing you say, is that the efficiency of

19  it was more important than allowing the people their right to

20  referendum, especially considering that just a month before

21  they had expressed a will on this subject.

22          MR. SCHNEIDER:  Well, and that's not what I'm

23  saying.  They did express a will on that subject and that's

24  why there were different changes put into the bill to fix it.

25  There were plenty of other -- as the Governor explained, there

1  were plenty of other fixes in that bill.

2        THE COURT:  Granted, but -- but my question is a

3  different one.  What -- why as a matter of law does the need

4  for efficiency, which is what you assert is the grounds for

5  including the appropriation in -- in PA436.  What -- what

6  justifies that in trumping the people's right to a referendum,

7  especially given that they had just expressed a will on the

8  subject.  There were differences, but they had just expressed

9  a will on the subject.

10        MR. SCHNEIDER:  The basis of that question assumes

11  that if you don't have a separate bill, then that's a

12  trumping.  But that's not the case.  You -- you don't trump

13  the people's will --

14        THE COURT:  Am I missing something?  Doesn't the

15  Constitution say that there's the right of referendum unless

16  there's an appropriation in the bill?

17        MR. SCHNEIDER:  Yes.

18        THE COURT:  So putting an appropriation in the bill

19  has the effect of denying the right of what would otherwise be

20  a right of referendum, right?

21        MR. SCHNEIDER:  But plenty of bills have

22  appropriations.

23        THE COURT:  Do they?

24        MR. SCHNEIDER:  Yes.

25        THE COURT:  There's no evidence of that, is there?

1           MR. SCHNEIDER:  Well, I think the Court can take

2    judicial notice of that.

3           THE COURT:  Well, all right.  Let's assume that's

4    true.  Does that prove anything more than the legislature

5    often violates the right of referendum?

6           MR. SCHNEIDER:  You do not violate the right of

7    referendum by putting an appropriation in a bill.  <u>MUCC v</u>

8    <u>Secretary of State</u> indicates as such.  It's -- if you put --

9    Your Honor, if you violated the Constitution every time you

10   put an appropriation in a bill, we'd never have any money to

11   run this government.  Because then --

12          THE COURT:  But you could have appropriations bills

13   which you actually did here.

14          MR. SCHNEIDER:  That's true.  And we could spend --

15   the legislature in Lansing could spend all its time passing

16   appropriations bills and not passing other bills.  So let's

17   not put appropriations in here, we have to wait and put it in

18   a different appropriations bill.

19      This bill, the evidence is, was at the middle of the

20   fiscal year.  So if they didn't put this appropriation --

21          THE COURT:  Well, but so was the later one.

22          MR. SCHNEIDER:  If they didn't put this

23   appropriation bill in this bill then --

24          THE COURT:  Uh-huh.

25          MR. SCHNEIDER:  Then the fiscal year would have run

1  out.  They wouldn't have been able to get through to this.

2           THE COURT:  But that assumes the wouldn't pass PA437

3  which had an appropriation for PA436.

4           MR. SCHNEIDER:  What I'm saying is --

5           THE COURT:  Why not do that given the will that the

6  people of this state had just expressed a month earlier?  Why

7  not?

8           MR. SCHNEIDER:  Because it's not unconstitutional or

9  improper to put -- let me explain.  It's not improper to put

10 an appropriation in a bill.

11          THE COURT:  Apart from misuse of propriety and

12 constitutionality, why not do that?

13          MR. SCHNEIDER:  Why not do what, Your Honor?  Put it

14 in a separate bill and --

15          THE COURT:  Put it in PA437 and bump the -- the

16 other ones down the line one number.

17          MR. SCHNEIDER:  Because I think the evidence is, is

18 by that time that would -- the legislature wouldn't have been

19 able to do that until the spring time.  And whether the --

20          THE COURT:  I didn't hear that.

21          MR. SCHNEIDER:  Whether that's in the record or

22 not --

23          THE COURT:  Can't the legislature pass an

24 appropriations bill mid term any time it likes?  It did that.

25          MR. SCHNEIDER:  Not when they're in recess.

1          THE COURT:  Well, but -- but the next vote after it

2    took the vote on PA436 could be on PA437 appropriating money

3    for PA436.  Why not?

4          MR. SCHNEIDER:  I think you're --

5          THE COURT:  The people had just spoken a month

6    before.

7          MR. SCHNEIDER:  And yes, they had spoken.  And

8    that's why there were changes put into this bill.

9          THE COURT:  All right.  I think we're going in

10   circles at this point.  Anything further?

11         MR. SCHNEIDER:  Yes, hold on.  There was some

12   testimony about why the Treasurer stopped the tentative

13   agreement in February 2012.  Mr. Dillon testified to that.  He

14   explained that he received expert advice on the agreements.

15   There were several issues raised.  He didn't think the

16   agreements would work for the city, so he wasn't supportive.

17   And it's really as simple as that.

18       Finally, this whole issue about as Mr. Dechiara explained

19   in his theory in his cross of Mr. Orr about kind of this --

20   this theory of the state conspiring with the city in bad faith

21   and kind of to drive in the city into Chapter 9.

22       I think, Judge Rhodes, you asked the correct question.

23   To what end?  I mean why?  What does the Governor or the

24   Treasurer gain by this?  By kind of engineering a bankruptcy.

25   I mean what purpose does that serve?  The objectors never

1    explained that.  And this is my last point.

2        Mr. Wertheimer says, it's a political motive.  What

3    political juice does the Governor get out of doing this?  I

4    mean that makes no logical sense.  He testified -- testified

5    about his motive.

6            THE COURT:  And I really do have to ask for silence

7    from those who are watching these proceedings.  Thank you.

8            MR. SCHNEIDER:  I think that's an indication, Your

9    Honor, if somebody mentions -- or rumblings in the courtroom

10   that it's not a popular move.  In other words, why would this

11   be like a politically popular thing to do?  That's not why it

12   was done.

13       The Governor testified about his motive, to help the

14   citizens of Detroit.  And that's the evidence in this record.

15   Now the political theories and arguments of the counsel,

16   they're not evidence.  And no witness testified otherwise.

17       So although Mr. Montgomery urges you to make inferences

18   of what should be about bad faith.  Mr. Wertheimer does the

19   same.  I don't want you to do that, Your Honor.  You don't

20   have to make those inferences, just look at the evidence and

21   the testimony and the Governor's testimony refutes that.  I

22   think I've run out of time.

23           THE COURT:  Yes.  And -- and more.  Okay.  So we'll

24   be in recess.  I'm going to take this matter under advisement.

25   Is there anything else I need from you?  You're going to give

1 me the documents that have been marked with numbers that are

2 the slide shows from this afternoon.  When -- when can we

3 expect those?

4          MS. GREEN:  You wanted an updated slide deck and I

5 presume the Court is closed on Monday?

6          THE COURT:  We are -- we are closed on Monday.

7          MS. GREEN:  Okay.

8          THE COURT:  Okay.  All right.  Please try to get

9 them to me as promptly as possible.

10          MR. MONTGOMERY:  Your Honor, does that include

11 non-commonly placed slides --

12          THE COURT:  Yeah, I want all -- all of the ones

13 marked for identification purposes and submitted to me.  But

14 to the extent they need to be corrected because of the

15 inaccuracies we've pointed out, or -- or to the extent they

16 mention exhibits not in evidence, they need to be corrected.

17     And just for the record, technically the matter isn't

18 under advisement until the time for you to submit the briefs

19 that I earlier allowed has expired which I think is Wednesday,

20 right?

21          MS. PATEK:  Your Honor, Mr. Irwin and I have already

22 taken care of -- mine are corrected.  I -- we will have a hard

23 copy here on Tuesday and we can also email them if that's

24 better.

25          THE COURT:  We -- we prefer not to use email for

1  this purpose, so a hard copy, please.  Anything further from

2  anyone?  We're in recess.  Thank you all very much.

3          THE CLERK:  All rise.  Court is adjourned.

4      (Court Adjourned at 6:35 p.m.)

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-14-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# ITEM NO. 77

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### TRANSCRIPT ORDER FORM

| | | |
|---|---|---|
| 111 First Street<br>Bay City, MI 48708 | 211 W. Fort Street<br>17th Floor<br>Detroit, MI 48226 | 226 W. Second Street<br>Flint, MI 48502 |

**Order Party: Name, Address and Telephone Number**

Name **Robin Wysocki**

Firm **Miller, Canfield, Paddock and Stone, P.L.C.**

Address **150 West Jefferson Avenue, Suite 2500**

City, State, Zip **Detroit, Michigan 48226**

Phone **313-496-7631**

Email **wysocki@millercanfield.com**

**Case/Debtor Name:**

**Case Number:** **13-53846**

**Chapter:** **9**

**Hearing Judge** Hon. Steven Rhodes

◉ **Bankruptcy**  ◯ **Adversary**

◯ **Appeal**   **Appeal No:** _____

**Hearing Information** (A separate form must be completed for **each** hearing date requested.)

**Date of Hearing:** 12/3/2013   **Time of Hearing:** 9 am   **Title of Hearing:** Eligibility Decision

Please specify portion of hearing requested: ◉ **Original/Unredacted** ◯ **Redacted** ◯ **Copy** (2nd Party)

◉ Entire Hearing    ◯ Ruling/Opinion of Judge    ◯ Testimony of Witness    ◯ Other

Special Instructions: _____

**Type of Request:**

[X] Expedited Transcript - $4.85/pg (7 working days)

**Signature of Ordering Party:**

/s/ Robin Wysocki         Date: **12/3/2013**
By signing, I certify that I will pay all charges upon completion
of the transcript request.

**FOR COURT USE ONLY**

Transcript To Be Prepared By

_____  Date   By

Order Received:

Transcript Ordered

Transcript Received

# ITEM NO. 78

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        December 3, 2013
                  Debtor.       .        10:00 a.m.
. . . . . . . . . . . . . . . .


          HEARING RE. BENCH OPINION RE. ELIGIBILITY
        BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Jones Day
                      By:  DAVID G. HEIMAN
                      North Point
                      901 Lakeside Avenue
                      Cleveland, OH  44144-1190
                      (216) 586-7175

                      Jones Day
                      By:  BRUCE BENNETT
                      555 South Flower Street
                      Fiftieth Floor
                      Los Angeles, CA  90071-2452
                      (213) 243-2382

                      Jones Day
                      By:  HEATHER LENNOX
                      222 East 41st Street
                      New York, NY  10017
                      (212) 326-3837

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                           DEBORAH KOVSKY-APAP
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For the State of      Dickinson Wright, PLLC
Michigan:             By:  STEVEN G. HOWELL
                      500 Woodward Avenue, Suite 4000
                      Detroit, MI  48226-3425
                      (313) 223-3033

APPEARANCES (continued):

```
For the Official      Dentons
Committee of          By:  CLAUDE MONTGOMERY
Retirees:                  CAROLE NEVILLE
                      1221 Avenue of the Americas
                      New York, NY  10020-1089
                      (312) 632-8390

                      Dentons US, LLP
                      By:  SAM J. ALBERTS
                      1301 K Street, NW
                      Suite 600, East Tower
                      Washington, DC  20005-3364
                      (202) 408-7004

                      Brooks, Wilkins, Sharkey & Turco, PLLC
                      By:  MATTHEW E. WILKINS
                      401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
                      (248) 971-1711

For Detroit Retired   Lippitt O'Keefe, PLLC
City Employees        By:  RYAN C. PLECHA
Association,          370 East Maple Road, 3rd Floor
Retired Detroit       Birmingham, MI  48009
Police and Fire       (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For AFSCME,           Lowenstein Sandler, LLP
AFL-CIO, and Sub-     By:  SHARON L. LEVINE
Chapter 98, City      65 Livingston Avenue
of Detroit            Roseland, NJ  07068
Retirees:             (973) 597-2374

For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT GORDON
General Retirement    151 South Old Woodward, Suite 200
System of Detroit,    Birmingham, MI  48009
Police and Fire       (248) 988-5882
Retirement System
of the City of
Detroit:
```

APPEARANCES (continued):

```
For the Detroit        Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police              CRAIG E. ZUCKER
Officers Associa-           EARLE I. ERMAN
tion and the           400 Galleria Officentre, Suite 444
Detroit Police         Southfield, MI  48034
Lieutenants &          (248) 827-4100
Sergeants
Association:

For Retired            Strobl & Sharp, PC
Detroit Police         By:  LYNN M. BRIMER
Members                     MEREDITH E. TAUNT
Association:                MALLORY A. FIELD
                       300 East Long Lake Road, Suite 200
                       Bloomfield Hills, MI  48304-2376
                       (248) 540-2300


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Counsel, would you like to put your

4  appearances on the record, please?

5    MR. HEIMAN:  David Heiman, Jones Day, on behalf of

6  debtors, and with me today are Bruce Bennett and Heather

7  Lennox and Bob Hertzberg as well.

8    MR. HOWELL:  Good morning, your Honor.  Steven G.

9  Howell, Dickinson Wright, special assistant attorney general,

10  appearing on behalf of the State of Michigan.

11    MR. MONTGOMERY:  Good morning, your Honor.  Claude

12  Montgomery of Dentons, and with me are Carole Neville and Sam

13  Alberts from Dentons and Matt Wilkins as local counsel.

14    MR. PLECHA:  Good morning, your Honor.  Ryan Plecha

15  from Lippitt O'Keefe on behalf of the retiree association

16  parties.

17    MS. LEVINE:  Good morning, your Honor.  Sharon

18  Levine, Lowenstein Sandler, for AFSCME.

19    MR. GORDON:  Good morning, your Honor.  Robert

20  Gordon of Clark Hill on behalf of the Detroit Retirement

21  Systems.

22    MS. PATEK:  Good morning, your Honor.  Barbara Patek

23  of Erman, Teicher, Miller, Zucker & Freedman, and with me are

24  Craig Zucker and Earle Erman on behalf of Detroit public

25  safety unions.

1      MS. BRIMER:  Good morning, your Honor.  Lynn M.

2   Brimer appearing on behalf of the Retired Detroit Police

3   Members Association.  With me this morning are Meredith Taunt

4   and Mallory Field.

5      THE COURT:  The Court decided to provide this

6   summary of its written opinion, which it will issue shortly,

7   because it is important to give the people of the City of

8   Detroit the best opportunity to understand what the Court is

9   ruling and why.  I would not call this a brief summary.  It's

10  a bit extended, so settle in, please.  The written opinion

11  will be over 140 pages, and it will address in more detail

12  and with more legal and factual support all of the arguments

13  that have been made regarding eligibility.  I thought this

14  summary would be more accessible.  It is critical to the

15  process, indeed, to any judicial process, that those who are

16  impacted by the Court's ruling have confidence that they were

17  heard and that their arguments and concerns were fully and

18  fairly considered.

19      The matter is before the Court on the parties'

20  objections to the eligibility of the city to be a debtor in

21  this Chapter 9 case under Section 109(c) of the Bankruptcy

22  Code.  The City of Detroit was once a hard-working, diverse,

23  vital city, the home of the automobile industry, proud of its

24  nickname, The Motor City.  It was rightfully known as the

25  birthplace of the American automobile industry.  In 1952, at

1   the height of its prosperity and prestige, it had a

2   population of 1,850,000 residents.  It was building half of

3   the world's cars.

4         The evidence establishes, however, that for decades

5   the City of Detroit has experienced dwindling population,

6   employment, and revenues.  This has led to decaying

7   infrastructure, excessive borrowing, mounting crime rates,

8   spreading blight, and a deteriorating quality of life.  The

9   city no longer has the resources to provide its residents

10   with basic police, fire, and emergency medical services that

11   its residents need for their basic health and safety.  To

12   reverse this decline in basic services and to attract new

13   residents and businesses and to revitalize and reinvigorate

14   itself, the city needs help.

15         The city estimates that its debt is $18 billion.

16   This consists of 11.9 billion in unsecured debt and 6.4

17   billion in secured debt.  It has more than 100,000 creditors.

18   According to the city, this unsecured debt includes $5.7

19   billion for other post-employment benefits through June of

20   2011, which is the most recent actuarial data available; 3.5

21   billion in unfunded pension obligations; $650 million in

22   general bond obligations; $1.43 billion for certificates of

23   participation related to the pensions; $346.6 million for

24   swap contracts, liabilities related to the certificates of

25   participation; and $300 million of other liabilities.  Except

1  for the unfunded pension liability, the parties -- the

2  objecting parties do not seriously challenge the city's

3  estimates of this debt.  The pension plans and others have

4  suggested a much lower pension underfunding amount, perhaps

5  even below $1 billion.  However, the Court concludes that it

6  is not necessary to resolve this issue at this time.

7  Otherwise, the Court is satisfied that the city's estimates

8  of its other liabilities are accurate enough for purposes of

9  determining eligibility, and the Court so finds.

10        For the five years ending with fiscal year 2012,

11  pension payments exceeded contributions and investment income

12  by approximately $1.7 billion for the General Retirement

13  Systems and $1.6 billion for the Police and Fire Retirement

14  Systems.  This, of course, resulted in the liquidation of

15  pension trust principal.

16        Using current actuarial assumptions, the city's

17  required pension contributions as a percentage of eligible

18  payroll expenses are projected to grow from 25 percent for

19  the GRS and 30 percent for the PFRS in 2012 to 30 percent for

20  the GRS and 60 percent for the PFRS by 2017.  Changes in

21  actuarial assumptions would further increase the city's

22  required pension contributions.  During 2012, 39 percent of

23  the city's revenue was used to service legacy liabilities.

24  The forecasts for subsequent years, assuming no

25  restructuring, are 43 percent for 2013 going up to 65 percent

1  for 2017.

2       The Court will now address the transactions referred

3  to as the certificates of participation, often called the

4  COP's, and the swaps associated with them.  These

5  transactions are complex and confusing, and so is the

6  resulting litigation.  The Court will provide only the

7  briefest summary of them at this time.

8       In 2005 and 2006, the city decided to raise $1.4

9  billion for its underfunded pension funds.  A substantial

10  part of this funding was at an interest rate that would float

11  with the market.  If the market interest rate went up, so did

12  the rate on the COP's and vice versa.  As part of the

13  transaction, therefore, the city decided to try to protect

14  itself against interest rates going up, so it entered into a

15  wager.  The more common name for this is a swap, but it's

16  nothing more than a common bet.  If the rate went up, someone

17  would pay the city to help cover the increased interest

18  expense.  If the rate went down, the city would have to pay.

19  In 2008 interest rates dropped dramatically.  As a result,

20  the city lost on the swaps bet.  Actually, it lost

21  catastrophically on the swaps bet.  The city estimates that

22  the damage will be approximately $45 million per year for the

23  next ten years.  The result has been complex and expensive

24  litigation.  In any event, the city estimates that as of June

25  30, 2013, it may owe $480 million from the 2005 COP's and

1   $949 million on the 2006 COP's.  It also has a potential

2   liability in excess of $300 million on the swaps, although

3   the city has serious and substantial challenges to those

4   amounts.

5        Debt service from the city's general fund related to

6   limited tax and unlimited general obligation debt and the

7   COP's was $225 million for fiscal year 2012 and is projected

8   to exceed $247 million in 2013.  The city estimates that 38

9   percent of tax revenues go to debt service rather than city

10  services.  It further estimates that without changes, this

11  will increase to 65 percent within five years.  At the same

12  time, however, tax revenues are going down.  State revenue

13  sharing is also going down.  It has decreased by $161

14  million, 48 percent, since 2002 and by $67 million, 31

15  percent, since 2008.

16       The city has experienced large operating deficits

17  for each of the past seven years.  Through 2013, it has an

18  accumulated general fund deficit of $237 million.  However,

19  this includes the effect of recent debt issuances.  The city

20  borrowed $75 million in 2008, $250 million in 2010, and $129

21  million in 2013.  If the city had not borrowed these amounts,

22  the city's accumulated general fund deficit would have been

23  $700 million through 2013.  In 2012, the city had a negative

24  cash flow of $115 million excluding the proceeds from

25  borrowings.  In March of 2012, to avoid running out of cash,

1  the city borrowed $80 million.  In 2013, the city deferred

2  payments on certain of its obligations totaling $120 million

3  for current and prior year pension contributions and other

4  payments.

5          Absent restructuring, the city projects it will have

6  negative cash flows of $190 million for 2014 increasing to

7  $346 million for 2017.  The city further estimates that by

8  2017 its accumulated deficit will grow to approximately $1.3

9  billion.  The city is not making its pension contributions as

10 they become due.  As of May 2013, the city had deferred

11 approximately $54 million in pension contributions and

12 approximately $50 million on June 30th, 2013, for current

13 year pension contributions.

14         Also, the city did not make the scheduled $39.7

15 million payment on its COP's that were due on June 14, 2013.

16 If the city had not deferred these payments, it would have

17 run out of cash by June 30th, 2013.  Let me repeat that.  If

18 the city had not deferred these payments, it would have run

19 out of cash by June 30th, 2013.  It filed for bankruptcy 18

20 days later.

21         The city will -- the Court will now review the

22 causes and consequences of this.  These are discussed

23 together because it can be hard to tell which is a cause and

24 which is a consequence.  Detroit's population declined to

25 684,800 in December of 2012.  This is a 63-percent decline in

population from its peak in 1950.  In June 2000, Detroit's
unemployment rate was 6.3 percent.  In June 2010, it was 23.4
percent.  In June 2012, it was 18.3 percent.  The number of
employed Detroit residents fell from approximately 353,000 in
2000 to 280,000 in 2012.

The city's credit ratings are below investment
grade.  In calendar year 2012, 136,00 crimes were reported in
the city.  Of these, 15,200 were violent crimes.  The city's
case clearance rate for violent crimes is 18.6 percent.  The
clearance rate for all crimes is 8.7 percent.  These rates
are substantially below those of comparable municipalities
nationally and surrounding local communities.

As of April 2013, about 40 percent of the city's
88,000 streetlights were not working.  There are
approximately 78,000 abandoned and blighted structures in the
city.  Of these, 38,000 are considered dangerous buildings.
The city experiences 11 to 12,000 fires each year for the
past decade.  Approximately 60 percent of these were in
blighted or unoccupied buildings.  In 2012 the average
priority one response time for the police department was 30
minutes.  In 2013 it was 58 minutes.  The national average is
11 minutes.  The police department staffing has been reduced
by approximately 40 percent over the last ten years.  It has
not invested in or maintained its facility infrastructure for
many years and has closed or consolidated many precincts.  It

operates with a fleet of 1,291 vehicles, most of which have reached the replacement age of three years and lack modern information technology.  The average age of the city's 35 fire stations is 80 years.  The fire department's fleet has many mechanical issues, contains no reserve vehicles, and lacks equipment ordinarily considered standard.  During the first quarter of 2013, frequently only ten to fourteen of the city's 36 ambulances were in service.  The city's information technology infrastructure and software is obsolete and is not integrated between departments or even within departments.  The city has reduced the number of its employees by about 2,700 since 2011.  As of May 31st, 2013, it has approximately 9,560 employees.

The city's union employees are represented by 47 or 48 discrete bargaining units.  The collective bargaining agreements covering all of these bargaining units expired before the case was filed.  The city has implemented revised employment terms called City Employment Terms for nonunionized employees and for unionized employees under expired collective bargaining agreements.

It has also increased revenues and reduced expenses in other ways.  It estimates that these measures have resulted in annual savings of $200 million.  The city cannot legally increase its tax revenues nor can it reduce its employee expenses without further endangering public health

1    and safety.

2            Before reviewing the events leading to the filing of

3    this case, a brief review of the winding history of the

4    Michigan statutes on point is necessary.  In 1990 the

5    Michigan legislature enacted Public Act 72 of 1990, the Local

6    Government Fiscal Responsibility Act.  This act empowered the

7    state to intervene with respect to municipalities that faced

8    financial crisis through the appointment of an emergency

9    financial manager, who would assume many of the powers

10   ordinarily held by local public officials.  Effective March

11   16, 2011, PA 72 was repealed and replaced with Public Act 4

12   of 2011, the Local Government and School District Fiscal

13   Accountability Act.  On November 5th, 2012, however, the

14   Michigan voters rejected PA 4 by referendum.  In Davis v.

15   Roberts, the Michigan Court of Appeals held that this

16   rejection revived Public Act 72.  Public Act 72 remained in

17   effect until March 28, 2013, when Public Act 436, the Local

18   Financial Stability and Choice Act, became effective.  The

19   legislature had enacted that law on December 13, 2012, and

20   the governor had signed it on December 26, 2012.

21           On February 19, 2013, a financial review team

22   appointed by the governor submitted its report regarding the

23   city.  That report concluded that a local government

24   financial emergency exists within the City of Detroit because

25   no satisfactory plan exists to resolve a serious financial

1   problem.  On March 1st, 2013, after receiving that report,

2   the governor announced his determination that a financial

3   emergency existed within the city.  On March 12, 2013,

4   Governor Snyder conducted a public hearing to consider the

5   City Council's appeal of his determination.  On March 14,

6   2013, the governor confirmed his determination of a financial

7   emergency within the city and requested that the Local

8   Emergency Financial Assistance Loan Board appoint an

9   emergency financial manager under PA 72.  On March 15, 2013,

10  the Loan Board appointed Kevyn Orr as the emergency financial

11  manager for the City of Detroit.  On March 15, Mr. Orr took

12  office formally.  On March 18, which was the effective date

13  of PA 436, PA 72 was repealed, and Mr. Orr became the

14  emergency manager of the city under PA 436.

15          Under law, the emergency manager acts for and in the

16  place and stead of the governing body and the office of the

17  chief administrator -- administrative officer of the local

18  government.  He has broad powers in receivership to rectify

19  the financial emergency and to assure the fiscal

20  accountability of the local government and the local

21  government's capacity to provide or cause to be provided

22  necessary government services essential to the public health,

23  safety, and welfare.

24          On June 14, 2013, Mr. Orr organized a meeting with

25  approximately 150 representatives of the city's creditors.

1    Mr. Orr presented the June 14 creditor proposal, Exhibit 43,

2    and answered questions.  At the conclusion of the meeting,

3    Mr. Orr invited creditor representatives to provide feedback

4    to the city regarding the proposal.  This proposal described

5    the economic circumstances that resulted in Detroit's

6    financial condition.  It also offered a restructuring of the

7    city's operations, financing, and capital structure.  It also

8    offered recoveries for each creditor group.

9         Regarding creditor recoveries, the city proposed,

10   (a) treatment of secured debt adequate to the value of the

11   collateral; (b) the pro rata distribution of $2 billion in

12   principal amount of interest only limited recourse

13   participation notes to holders of unsecured claims -- that

14   is, the unsecured bondholders, the COP's, the pension

15   systems, retirees, and other unsecured claims -- and (c) a

16   Dutch auction process for the city to purchase or pay the

17   notes.

18        Following the June 14, 2013, meeting at which the

19   proposal to creditors was presented, Mr. Orr and his staff

20   had several other meetings.  On June 3, 2013, two lawsuits

21   were filed against the governor and the treasurer in state

22   court.  These suits sought a declaratory judgment that PA 436

23   violated the Michigan Constitution to the extent that the law

24   purported to authorize bankruptcy proceedings in which vested

25   pension benefits might be impaired.  The suits also sought an

1   injunction preventing the governor from authorizing a

2   bankruptcy proceeding for the City of Detroit in which

3   pension -- vested pension benefits might be impaired.  The

4   two cases were <u>Flowers</u> v. <u>Snyder</u> and <u>Webster</u> v. <u>Snyder</u>.  On

5   July 17, 2013, the GRS commenced a similar lawsuit, <u>General</u>

6   <u>Retirement System of the City of Detroit</u> v. <u>Orr</u>.  On the day

7   before, July 16, 2013, Mr. Orr had recommended to the

8   governor and the treasurer that the city file for Chapter 9

9   relief.  On July 18, Governor Snyder authorized the City of

10   Detroit to file a Chapter 9 bankruptcy case.  At 4:06 p.m. on

11   July 18, 2013, the City of Detroit filed this Chapter 9

12   bankruptcy case.

13         Before turning to the filed objections in this case,

14   it is necessary to point out that the city bears the burden

15   to establish by a preponderance of the evidence each of the

16   elements of eligibility under Section 109(c).  As the Court

17   commented at the conclusion of the hearing on September 19,

18   2013, the individuals' presentations on that day were moving,

19   passionate, thoughtful, compelling, and well-articulated.

20   These presentations demonstrated an extraordinary depth of

21   concern for the City of Detroit, for the adequate level of

22   services that their city government provides, and for the

23   personal hardships that that creates, and most clearly for

24   the pensions of the city retirees and employees.  These

25   individuals expressed another deeply held concern and even

1  anger that became a major theme of the hearing, the concern

2  and anger that the state's appointment of an emergency

3  manager over the City of Detroit violated their fundamental

4  democratic right to self-governance.

5       The Court's role here is to evaluate how these

6  concerns might impact the city's eligibility for bankruptcy.

7  In making that evaluation, of course, the Court can only

8  consider the specific requirements of applicable law.  The

9  popularity of the decision to appoint an emergency manager is

10  not a matter of eligibility under the federal bankruptcy

11  laws.  The Court has carefully considered the concerns of the

12  individuals that filed eligibility objections, including

13  those that addressed the Court on September 19 of this year.

14  Those concerns are addressed throughout the Court's opinion

15  but are primarily addressed in the context of whether this

16  case was filed in good faith.

17       The Court will now begin its findings and

18  conclusions.  The City of Detroit is a municipality as

19  defined in the Bankruptcy Code.  The parties agree to that.

20  Several objecting parties challenge the constitutionality of

21  Chapter 9 of the Bankruptcy Code under the United States

22  Constitution.  Citing the United States Supreme Court's

23  decision in Stern versus Marshall, these parties also assert

24  that this Court does not have the authority to determine the

25  constitutionality of Chapter 9.  Several objecting parties

1    also challenge the constitutionality of Public Act 436 under

2    the Michigan Constitution.  Some of these parties also assert

3    that this Court does not have the authority to determine the

4    constitutionality of PA 436.

5         The Official Committee of Retirees previously filed

6    a motion to withdraw the reference to the District Court on

7    the grounds that this Court does not have the authority to

8    determine the constitutionality of either Chapter 9 or PA

9    436.  It also filed a motion for stay of the eligibility

10   proceedings pending the District Court's resolution of that

11   motion.  In this Court's denial of the stay motion, it

12   concluded that the committee was unlikely to succeed on its

13   arguments regarding this Court's lack of authority under

14   Stern.  For the reasons stated in that opinion, the Court

15   concludes that it has the authority to determine the

16   constitutionality of Chapter 9 and PA 436.

17        The objecting parties argue that Chapter 9 of the

18   Bankruptcy Code violates several provisions of the United

19   States Constitution both on its face and as applied in this

20   bankruptcy case.  Article I, Section 8, of the United States

21   Constitution provides the Congress shall have the power to

22   establish uniform laws on the subject of bankruptcies

23   throughout the United States.  The objecting parties assert

24   that Chapter 9 violates the uniformity requirement of the

25   United States Constitution because Chapter 9 cedes to each

1    state the ability to define its own qualifications for a

2    municipality to declare bankruptcy, and, therefore, Chapter 9

3    permits the promulgation of nonuniform bankruptcies within

4    the states.  The Supreme Court has addressed the uniformity

5    requirement in several cases.  Most notably, in Hanover

6    National Bank v. Moyses in 1902 the Supreme Court held that

7    the incorporation into the bankruptcy law of state laws that

8    relate to exemptions did not violate the uniformity

9    requirement of the Constitution.  The Court stated, "The

10   general operation of the law is uniform although it may

11   result in certain peculiars differently in different

12   States" -- I'm sorry -- "certain particulars differently in

13   different States."

14          The Court concludes that Chapter 9 does exactly what

15   the Supreme Court cases require to meet the uniformity

16   requirement.  The defined class of debtors to which Chapter 9

17   applies is the class of entities that meet the eligibility

18   requirements.  One such class qualification is that the

19   entity is specifically authorized to be a debtor under

20   Chapter 9 by state law.  As Moyses held, it is of no

21   consequence in the uniformity analysis that this requirement

22   of state authorization to file a Chapter 9 case may lead to

23   different results in different states.  Accordingly, the

24   Court concludes that Chapter 9 satisfies the uniformity

25   requirement of the bankruptcy clause of the United States

1    Constitution.

2         The contracts clause of the United States

3    Constitution provides, quote, "No State shall pass any law

4    impairing the Obligation of Contracts," close quote.  It is

5    argued that Chapter 9 violates the contracts clause.  This

6    argument is rejected.  Chapter 9 is a federal law, not a

7    state law.  Article I, Section 10, does not prohibit Congress

8    from enacting a law impairing the obligation of contracts.

9         The Tenth Amendment challenge to Chapter 9 is the

10   most strenuously argued here.  That amendment provides,

11   quote, "The powers not delegated to the United States by the

12   Constitution, nor prohibited by it to the States are reserved

13   to the States respectively, or to the people," close quote.

14   The objecting parties argue that Chapter 9 of the Bankruptcy

15   Code violates the principles of federalism that are reflected

16   in this amendment.  The argument is that through Chapter 9,

17   Congress has established rules that control state fiscal

18   self-management, which is an area of exclusive state

19   sovereignty.  This argument is a facial challenge to the

20   constitutionality of Chapter 9.  The as applied challenge is

21   that if the State of Michigan can properly authorize the City

22   of Detroit to file for Chapter 9 relief without the explicit

23   protection of pension rights for retired city employees, then

24   Chapter 9 is unconstitutional because that would violate

25   Michigan's sovereignty.

1        Before addressing the merits of these arguments,

2   however, the Court must first address two preliminary issues

3   that the United States raised, standing and ripeness.  First,

4   the Court concludes that the objecting parties do have

5   standing.  Section 1109(b) of the Bankruptcy Code provides,

6   quote, "A party in interest, including a creditor, may raise

7   and appear and be heard on any issue in a case under this

8   chapter," close quote.  Section 901(a) makes this provision

9   applicable in a Chapter 9 case.  Accordingly, the objecting

10  parties who are creditors with pension claims against the

11  city have standing to assert their constitutional challenges

12  as part of their objections to this bankruptcy case.

13       The United States further argues that the issue of

14  whether Chapter 9 is constitutional as applied in this case

15  is not ripe for determination at this time.  The city joins

16  in this argument.  Early on in this case, the Court expressed

17  its own doubts about this thinking that the issue of whether

18  pension rights can be impaired in bankruptcy applied more to

19  confirmation than to eligibility.  The Court finds now that

20  these issues are ripe for decision.  At the request of the

21  objecting parties, the Court, therefore -- excuse me --

22  reconsidered that position and now agrees that the issue is

23  ripe at this point.

24       The premise of the argument that the United States

25  makes is that the filing of the case did not result in the

1   impairment of any pensions, thus the United States argues

2   that this issue will be ripe only when the city proposes a

3   plan that would impair pensions if it were confirmed.  Until

4   then, it argues their injury is speculative.  Although the

5   argument of the United States has some appeal, as the Court

6   itself initially concluded, the Court must now reject it.

7           The ultimate issue before the Court at this time is

8   whether the city is eligible to be a debtor in Chapter 9.

9   This dispute arises in the concrete factual context of the

10  City of Detroit's filing this bankruptcy case under Chapter 9

11  of the Bankruptcy Code and the objecting parties challenging

12  the constitutionality of that very law.  This dispute is not

13  an abstract disagreement that is ungrounded in the here and

14  now.  It is here, and it is now.  The Court further concludes

15  that as a matter of judicial prudence resolving this issue

16  now will likely expedite the resolution of this bankruptcy

17  case.  The parties have fully briefed and argued the merits.

18  Further, if the Tenth Amendment challenge to Chapter 9 is

19  resolved now, the parties and the Court can then focus on

20  whether the Court -- whether the city's plan will meet the

21  confirmation requirements of the Bankruptcy Code.

22  Accordingly, the Court concludes that the objecting parties'

23  challenge to Chapter 9 of the Bankruptcy Code as applied in

24  this case is ripe for determination at this time.

25          The Court concludes that the United States Supreme

1    Court has already decided the question of whether a federal

2    municipal bankruptcy act can be administered consistent with

3    the principles of federalism reflected in the Tenth

4    Amendment.  In United States versus Bekins, the Supreme Court

5    specifically upheld the Municipal Corporation Bankruptcy Act

6    of 1937 over the objections that the statute violated the

7    Tenth Amendment.  It is well-settled that this Court is bound

8    by the decisions of the United States Supreme Court.

9        Nevertheless, the objecting parties assert that

10   Bekins is no longer good law because of amendments to the

11   municipal bankruptcy statute after Bekins was decided and

12   because of two more recent Supreme Court decisions regarding

13   the Tenth Amendment.  However, the Court concludes first that

14   changes to the municipal bankruptcy law since 1937 have been

15   minor and do not undermine the continuing validity of Bekins.

16   Second, changes to the Supreme Court's Tenth Amendment law do

17   not undermine the continuing validity of Bekins.  In its

18   recent cases deciding issues under the Tenth Amendment, New

19   York versus United States and Printz versus United States,

20   the Supreme Court has upheld laws that encourage states to

21   regulate according to federal policies so long as the states

22   consent.  On the other hand, laws that compel or commandeer

23   state resources do violate the Tenth Amendment.  The key is

24   state consent.  Chapter 9 simply does not raise a consent

25   issue.  As the Supreme Court emphasized in Bekins, Chapter 9

1   is limited to voluntary proceedings.  The federal government
2   cannot and does not compel states to authorize municipalities
3   to file for Chapter 9 relief, and municipalities are not
4   permitted to seek Chapter 9 relief without specific state
5   authorization.  There is simply no commandeering or
6   compulsion involved.  Therefore, the Court concludes that
7   Chapter 9 is not facially unconstitutional under the Tenth
8   Amendment of the United States Constitution.

9         Several of the objecting parties also raise as
10  applied challenges to the constitutionality of Chapter 9
11  under the Tenth Amendment.  The primary point of these
12  arguments is that if Chapter 9 permits the State of Michigan
13  to authorize a city to file a petition for Chapter 9 relief
14  without explicitly providing for protection of
15  constitutionally protected pension rights, then the Tenth
16  Amendment is violated.  The State of Michigan itself cannot
17  legally provide for the adjustment of pension debts or any
18  debts of the City of Detroit.  That is so because the United
19  States Constitution and the Michigan Constitution both
20  prohibit the State of Michigan from impairing contracts.  It
21  is also because the Michigan Constitution prohibits the
22  impairing of the -- of accrued pension benefits.  These
23  prohibitions, however, do not apply in the federal Bankruptcy
24  Court.  As the Bankruptcy Court in the City of Stockton
25  Chapter 9 case said, the bankruptcy clause of the United

1    States Constitution necessarily authorizes Congress to make

2    laws that would impair contracts, so it has long been

3    understood that bankruptcy law entails impairment of

4    contracts.  For purposes of the Tenth Amendment and state

5    sovereignty, nothing distinguishes pension debt in a

6    municipal bankruptcy case from any other debt.  If the Tenth

7    Amendment prohibits the impairment of pension benefits in

8    this case, then it would also prohibit the adjustment of any

9    other debt in the case like bond debt.  Bekins makes it

10   clear, however, that with state consent the adjustment of

11   municipal debts does not impermissibly intrude on state

12   sovereignty.  This Court is bound to follow that Supreme

13   Court holding.

14          The plans and other objecting parties counter that

15   result by asserting that under the Michigan Constitution

16   pension debt has greater protection than ordinary contract

17   debt.  The argument is premised on the slim read that in the

18   Michigan Constitution the pension clause provides that

19   pension rights may not be, quote, "impaired or diminished"

20   whereas the contracts clause in the Michigan Constitution

21   only prohibits impairing contract rights.  There are several

22   reasons why the slight difference between the language that

23   protects contracts, no impairment, and the language that

24   protects pensions, no impairment or diminishment, does not

25   demonstrate that pensions are entitled to any extraordinary

1   protection.  At common law, before the adoption of the
2   Michigan Constitution in 1963, public pensions in Michigan
3   were viewed as gratuitous allowances that could be revoked at
4   will because a retiree lacked any vested right in their
5   continuation.  In 1963, this new provision enhancing the
6   protection for pensions was included, quote, "The accrued
7   financial benefits of each pension plan and retirement system
8   of the state and its political subdivisions shall be a
9   contractual obligation thereof which shall not be diminished
10  or impaired thereby," close quote.  That's Article IX,
11  Section 24, of the Michigan Constitution of 1963.

12          So here are the reasons why pension rights are
13  contract rights under the Michigan Constitution.  First, as
14  noted, the language of Article IX, Section 24, gives pension
15  benefits the status of a, quote, "contractual obligation,"
16  close quote.  That's the language that it uses.

17          Second, if the Michigan Constitution were meant to
18  give the kind of higher or even absolute protection for which
19  the plans argue here, that language simply would not have
20  referred to pension benefits as a, quote, "contractual
21  obligation," close quote.

22          Third, linguistically there is no functional
23  difference in meaning between "impair" and "impair or
24  diminish."  Now, there certainly is a preference, if not a
25  mandate, to give every -- to give meaning to every word in

1   written law.  At the same time, however, we give undefined

2   statutory terms their plain and ordinary meanings.  If this

3   Court gives these terms, "diminish" and "impair," their plain

4   and ordinary meanings, those meanings would not be

5   substantially different from each other.  The terms are not

6   synonyms, but they cannot honestly be given meanings so

7   different as to compel the result that the plans now seek,

8   the protection of pension rights in bankruptcy.  "Diminish"

9   adds nothing material to "impair."  All diminishment is

10  impairment, and "impair" includes "diminish."

11          Fourth, the argument for a greater protection is

12  inconsistent with the Michigan Supreme Court's interpretation

13  of this constitutional language in two cases, <u>Kosa</u> versus

14  <u>Treasury</u> -- <u>Treasurer of the State of Michigan</u> and <u>In re.</u>

15  <u>Constitutionality of 2011 PA 38</u>.  In <u>Kosa</u> in 1980 the

16  Michigan Supreme Court quoted the history from the

17  Constitutional Convention regarding Article IX, Section 24.

18  Several times that history refers to pension rights as

19  contractual rights.  The Court in <u>Kosa</u> also itself used

20  contractual language when referring to pension rights.  More

21  recently in <u>In re. Constitutionality of 2011 PA 38</u> in 2011,

22  the Michigan Supreme Court stated, quote, "The obvious intent

23  of Section 24, however, was to ensure that public pensions be

24  treated as contractual obligations that, once earned, could

25  not be diminished," close quote.

1          Fifth, an even greater narrative must be considered

2   here focusing on 1963.  At that time, Michigan law allowed

3   municipalities to file a bankruptcy, and <u>Bekins</u> had long

4   since held that that was constitutional, so when the new

5   Michigan Constitution was negotiated and proposed and

6   ratified in 1963, it explicitly gave accrued pension benefits

7   only the status of contractual obligations.  That new

8   Constitution could have given pensions protection from

9   impairment in bankruptcy in several ways, but it did not.  It

10  could have simply prohibited Michigan municipalities from

11  filing bankruptcy.  It could have somehow created a property

12  interest that bankruptcy would be required to respect, or it

13  could have established some sort of a secured interest in the

14  municipality's property.  It could have even required the

15  state to guarantee pension benefits, but it did none of

16  those.  Instead, both the history from the Constitutional

17  Convention and the very language of the pension provision

18  itself, it is made clear municipal pension rights are

19  contract rights.  Because under the Michigan Constitution

20  pension rights are contractual rights, they are subject to

21  impairment in a federal bankruptcy proceeding.  Moreover,

22  where, as here, the state consents, that impairment does not

23  violate the Tenth Amendment.  Therefore, as applied in this

24  case, Chapter 9 is Constitutional.

25          Nevertheless, the Court is compelled to comment.  No

one should interpret this holding that pension rights are
contract rights and subject to impairment in this bankruptcy
case to mean that this Court necessarily will confirm any
plan of adjustment that impairs pensions.  The Court
emphasizes that it will not lightly or casually exercise the
power under federal bankruptcy law to impair pensions.
Before the Court confirms any plan that the city submits, the
Court must find that the plan fully meets the requirements of
Section 943(b) of the Bankruptcy Code and the other
applicable provisions of the Bankruptcy Code.  Together these
provisions of law demand this Court's judicious, legal, and
equitable consideration of the interests of the city and the
interests of all of its creditors, including retirees, as
well as the laws of the State of Michigan.

            Section 109(c)(2) of the Bankruptcy Code requires
that a municipality be specifically authorized to be a debtor
under such chapter.  The evidence establishes that the city
was authorized to file this case.  The issue is whether that
authorization was proper under the Michigan Constitution.
Several objectors argue that the authorization is not valid
because Public Act 436, the statute establishing the
underlying procedure for a municipality to obtain
authorization, is unconstitutional.  The validity of Public
Act 436 under the Michigan Constitution is a question of
state law.  The Michigan Supreme Court has not ruled on the

1   validity of Public Act 436.  As a result, this Court must

2   attempt to ascertain how that Court would rule if it were

3   faced with this issue.

4        As discussed earlier, on March 16th, 2011, the

5   governor signed Public Act 4 into law, but Public Act 4 was

6   repealed by Public Act 72.  However, the voters rejected

7   Public Act 4 by referendum in the November 6, 2012, election.

8   Shortly after that election on December 26th, 2012, the

9   governor signed PA 436 into law, and it took effect on March

10  28th, 2013.  It is argued here that Public Act 436 is

11  unconstitutional because it is essentially a reenactment of

12  the rejected Public Act 4 in violation of the people's

13  referendum rights.  The city and the State of Michigan assert

14  that there are several differences between Public Act 436 and

15  Public Act 4 such that they are not the same law.  In

16  Reynolds versus Bureau of State Lottery in 2000, the Michigan

17  Court of Appeals held that nothing in the Michigan

18  Constitution suggests that a referendum has any broader

19  effect than the nullification of the rejected act.  This

20  Michigan Court of Appeals decision strongly suggests that the

21  referendum rejection of Public Act 4 did not prohibit the

22  Michigan legislature from enacting Public Act 436 even though

23  Public Act 436 addressed the same subject matter as Public

24  Act 4 and did contain very few changes.  Accordingly, the

25  challenge on this ground must be rejected.

1    It is also contended that Public Act 436 is

2    unconstitutional because the Michigan legislature included

3    appropriations provisions in Public Act 436 for the sole

4    purpose of shielding the act from referendum.  There

5    certainly was some credible evidence in support of the

6    assertion that the appropriations provision in Public Act 436

7    were intended to immunize it from referendum.  For example,

8    Howard Ryan, the legislative assistant in the Michigan

9    Department of Treasury, so testified in his deposition.  The

10   Court must conclude, however, that if faced with this issue,

11   the Michigan Supreme Court would not hold Public Act 436

12   unconstitutional on this grounds.  In Michigan United

13   Conservation Clubs versus Secretary of State in 2001, the

14   Court concisely held that a public act with an appropriations

15   provision is not subject to referendum regardless of the

16   motive of the appropriation.  To the same effect was Houston

17   v. Governor decided by the Michigan Supreme Court in 2012.

18   Accordingly, the Court concludes that PA 436 is not

19   unconstitutional on the grounds that the appropriations

20   provisions of it improperly shielded it from the people's

21   right of referendum.

22   Certain objectors also argue that Public Act 436

23   violates the home rule provision of the Michigan

24   Constitution, which recognizes the right of the electors to

25   adopt and amend the city charter and the city's right to

adopt ordinances.  The argument is that the appointment of an
emergency manager for a municipality under PA 436 is
inconsistent with those rights.  This argument fails for the
simple reason that this authority that the Michigan
Constitution grants to municipalities is subject to state
laws enacted by the legislature.  The constitutional
provision specifically says so.  It states, quote, "Each city
and village shall have the power to adopt resolutions and
ordinances relating to its municipal concerns, property and
government, subject to the constitution and law," close
quote.  Indeed, Section 1-102 of the city -- excuse me -- of
the charter of the City of Detroit states, quote, "The City
has the comprehensive home rule power conferred upon it by
the Michigan Constitution, subject only to the limitations on
the exercise of that power contained in the Constitution or
this Charter or imposed by statute," close quote.
Accordingly, the Court finds that PA 436 does not violate the
home rule provisions of the Michigan Constitution.

          Many objectors argue that the bankruptcy
authorization section of PA 436 itself does not comply with
the heightened requirements for protecting pensions in the
Michigan Constitution and, therefore, that PA 436 is
unconstitutional.  Accordingly, the objectors argue that PA
436 cannot provide a valid basis for authorization to file a
bankruptcy.  The Court has already explained that pension

1    benefits are a contractual obligation of the municipality and

2    not entitled to any heightened protection in bankruptcy.  It

3    follows that if a state consents to a municipal bankruptcy,

4    no state law can protect pension rights that are merely

5    contractual rights from impairment in bankruptcy just as no

6    law could protect any other type of contract rights like

7    bonds.  Accordingly, the failure of PA 436 to protect pension

8    rights in a municipal bankruptcy does not make that law

9    inconsistent with the pension clause of the Michigan

10   Constitution any more than the failure of PA 436 to protect,

11   for example, bond debt in bankruptcy is inconsistent with the

12   contracts clause of Michigan Constitution.  For this purpose,

13   the parallel is perfect.  For these reasons, the Court

14   concludes that PA 436 does not violate the pension clause of

15   the Michigan Constitution.

16          PA 436 permits the governor to place contingencies

17   on a local government in order to proceed under Chapter 9.

18   The governor chose not to impose a contingency requiring the

19   City of Detroit to protect pensions in bankruptcy.  Several

20   objectors argue that the pension clause of the Michigan

21   Constitution obligated the governor to include such a

22   condition in his authorization.  The Court concluded earlier

23   that any such condition in PA 436 itself would be ineffective

24   and potentially invalid under federal law.  For the same

25   reason, any such contingency in the governor's authorization

1    letter would have been invalid and may have rendered the

2    authorization itself invalid under Section 109(c).

3    Accordingly, this objection is overruled.  The Court

4    concludes that the governor's authorization to file this

5    bankruptcy case under PA 436 was valid under the Michigan

6    Constitution.

7         On July 3, 2013, Gracie Webster and Veronica Thomas

8    filed a complaint against the State of Michigan, Governor

9    Snyder, and Treasurer Dillon in the Ingham County Circuit

10   Court.  They sought a declaratory judgment that PA 436 is

11   unconstitutional because it permits accrued pension benefits

12   to be diminished or impaired in violation of Article IX,

13   Section 24, of the Michigan Constitution.  The complaint also

14   sought a preliminary and permanent injunction enjoining the

15   governor and the treasurer from authorizing the Detroit

16   emergency manager to commence proceedings under Chapter 9 of

17   the Bankruptcy Code.

18        On Thursday, July 18th, 2013, just minutes after the

19   city filed its bankruptcy petition, the state court held a

20   hearing.  During that hearing, the state court confirmed that

21   the bankruptcy case had been filed.  Nevertheless, the state

22   court granted the relief enjoining the governor and the

23   emergency manager -- excuse me -- enjoining the governor from

24   taking any further action in the bankruptcy proceeding.

25        A further hearing was held the next day on the

1  plaintiff's request to amend the order of the previous

2  afternoon.  At the conclusion of that hearing, the judge then

3  stated her decision to grant the declaratory relief that the

4  plaintiffs had requested.  Later that day on July 19th, 2013,

5  the court entered a declaratory -- an order of declaratory

6  relief.  It states that PA 436 is unconstitutional and in

7  violation of Article IX, Section 24, of the Michigan

8  Constitution.  It also states that PA 436 is to that extent

9  of no force and effect.  In their objections in this case,

10  several of the objectors assert that this judgment precludes

11  or prevents the city from asserting that PA 436 is

12  constitutional or that the governor properly authorized this

13  bankruptcy filing.

14      There are, however, two main reasons why this Court

15  is not required to honor the Webster judgment in this

16  bankruptcy case.  First, upon the city's bankruptcy filing,

17  federal law gave this Court exclusive jurisdiction to

18  determine all issues relating to the city's eligibility to be

19  a Chapter 9 debtor.  At that moment, the state court no

20  longer had jurisdiction.  Accordingly, the state court's

21  order of declaratory judgment on which the objectors rely is

22  void and of no effect.  It does not preclude the city from

23  asserting its eligibility to file bankruptcy in this case.

24      Second, bankruptcy law provides that when a

25  bankruptcy petition is filed, it operates as a stay of any

act to exercise control over property of the estate.  The
main objectives of the plaintiff's case in Webster v.
Michigan was to protect the plaintiff's pension rights by
prohibiting a bankruptcy case which might allow the city to
use its property in a way that might impair pensions.  It
does not matter that neither the city nor its officers were
defendants.  The suit was clearly an act to exercise control
over the city's property.  Accordingly, it was stayed under
the bankruptcy law.  The state court's order of declaratory
relief was entered in violation of the stay.  For those two
reasons, the Court concludes that the judgment in Webster is
void, and this objection to the city's eligibility is
rejected.

        To be eligible for relief under Chapter 9, the city
must establish that it is insolvent.  A few objectors contest
this requirement of eligibility under Section 109(c)(3).  For
a municipality, the Bankruptcy Code defines insolvent as,
quote, "a financial condition such that the municipality is:
(i) generally not paying its debts as they become due unless
such debts are the subject of a bona fide dispute; or (ii) is
unable to pay its debts as they become due."  The Court finds
that the City of Detroit was and is insolvent under both
definitions.  The Court has already detailed the enormous
financial distress that the city faced as of July 18th, 2013,
and will not repeat it here.  The Court finds that the city

1  was generally not paying its debts as they became due.

2        In May 2013 the city deferred payments on $54

3  million in pension contributions.  On July 30th it deferred

4  an additional $5 million fiscal year-end payment.  The city

5  also did not make a scheduled $39.7 million payment on its

6  COP's on June 14th.  It was also spending more money than it

7  was receiving and only making up the difference through

8  expensive and even catastrophic borrowings.  These facts

9  establish that the city was generally not paying its debts as

10 they became due as of the time of filing.

11       The evidence also overwhelmingly establishes that

12 the city is unable to pay its debts as they become due.  The

13 evidence established that as a result of the city's financial

14 state, there are many, many services in the city which do not

15 function properly.  The facts found earlier firmly support

16 this conclusion.

17       Most powerfully, however, the testimony of Chief

18 Craig established that the city is in a state of service

19 delivery insolvency as of July 18th and will continue to be

20 for the foreseeable future.  He testified that the conditions

21 in the local precincts were deplorable.  He said, quote, "if

22 I just might summarize it in a very short way, that

23 everything is broken, deplorable conditions, crime is high --

24 extremely high, morale is low, the absence of leadership,"

25 close quote.  He described the city as, quote, "extremely

1   violent," close quote, based on the high rate of violent

2   crime and the low rate of clearance of violent crimes.  He

3   stated that their facilities, equipment, and vehicles were in

4   various states of disrepair and obsolescence.  Service

5   delivery insolvency focuses on the municipality's inability

6   to pay for all costs of providing services at the level and

7   quality that are required for the health, safety, and welfare

8   of the community.

9          The objecting parties assert that the city could

10  have and should have monetized a number of its assets in

11  order to make up for its severe cash flow insolvency.  Most

12  directly, this objection targets the city's valuable art

13  collection.  However, the city's witnesses credibly

14  established that sales of city assets would not address the

15  long-term operational structural financial imbalance facing

16  the city, and this makes sense.  When the expenses of an

17  enterprise exceed its revenue, a one-time infusion of cash,

18  whether from an asset sale or from a borrowing, only delays

19  the inevitable financial failure unless, in the meantime, the

20  enterprise sufficiently reduces its expenses or enhances its

21  income.  The City of Detroit itself has proven the reality of

22  this many, many times.  In any event, when considering

23  selling an asset, the enterprise must take extreme care that

24  the asset is truly unnecessary in pursuing its mission and

25  unnecessary in enhancing its operational revenue.  For these

1    reasons, the Court finds that the city has established that
2    it is insolvent.

3          The city must also establish that it desires to
4    effect a plan to adjust its debts under Section 109(c)(4).
5    In the City of Stockton case, the Bankruptcy Court explained
6    the cases equate desire with intent and make clear that this
7    element is highly subjective.  At the first level, the
8    question is whether the Chapter 9 case was filed for some
9    ulterior motive such as to buy time or to evade creditors
10   rather than to restructure the city's finances.  Several
11   objectors assert that the city does not desire to effect a
12   plan to adjust its debts.  The Court concludes that the
13   evidence overwhelmingly establishes that the city does desire
14   to effect a plan in this case.  Mr. Orr so testified.  More
15   importantly, before filing this case, Mr. Orr did submit to
16   creditors a plan to adjust the city's debts.  Plainly, that
17   plan was not acceptable to any of the city's creditors.  It
18   may not have even been confirmable under the Bankruptcy Code,
19   although that is not necessary to resolve at this time.
20   Still, it was evidence of the city's desire and intent to
21   effectuate a plan.  There is simply no evidence that the city
22   has an ulterior motive in pursuing Chapter 9 such as to buy
23   time or to evade creditors.  Indeed, the objecting creditors
24   do not really contend that there was any such ulterior
25   motive.  Rather, their argument is that the plan that the

1    emergency manager has stated he intends to propose in this
2    case is not a confirmable plan.  It is not confirmable, they
3    argue, because it will impair pensions in violation of the
4    Michigan Constitution.  Certainly the evidence does
5    establish -- certainly the evidence does establish that the
6    emergency manager intends to propose a plan that impairs
7    pensions.  The Court has already so found.  Nevertheless, the
8    objectors' argument must be rejected.  As established
9    earlier, a Chapter 9 plan may impair pension rights.  The
10   emergency manager's stated intent to propose a plan that
11   impairs pensions is, therefore, not inconsistent with a
12   desire to effect a plan.  Accordingly, the Court finds that
13   the city does desire to effect a plan.
14       The fifth element for eligibility is found in
15   Section 109(c)(5).  Under that section an entity may be a
16   debtor under Chapter 9 if such entity has either negotiated
17   in good faith with creditors or is unable to negotiate with
18   creditors because such negotiation is impracticable.  In the
19   present case, the City of Detroit argues that the June 14,
20   2013, proposal to creditors along with its follow-up meetings
21   was a good faith effort to begin negotiations to which
22   creditors refused to respond.  The Court concludes, however,
23   that the June 14 proposal to creditors and the follow-up
24   meetings were not sufficient to satisfy the requirements of
25   good faith negotiations under law.  The proposal to creditors

did not provide creditors with sufficient information to make
meaningful counterproposals, especially in the very short
amount of time that the city allowed for the, quote,
"discussion," close quote, period.  Charitably stated, the
proposal is very summary in nature.  There was simply not
enough information for creditors to start meaningful
negotiations.  For example, Brad Robins of Greenhill &
Company, the financial advisor for the Retirement Systems,
testified, quote, "The note itself I thought was not really a
serious proposal but may be a placeholder, no maturity, no
obligation for the city to pay," close quote.  The city
asserts that it provided supporting data in an electronic
data room.  However, several witnesses testified that the
data room did not contain the necessary data to make a
meaningful evaluation of the proposal to creditors.
Moreover, the city conditioned access to the data room on the
signing of a confidentiality and release agreement.  This
created an unnecessary hurdle for creditors.  The creditors
simply cannot be faulted for failing to offer
counterproposals when they did not have the necessary
information to evaluate the city's vague initial proposal.
The proposal for creditors provided a calendar.  It allotted
one week, June 17 to 24, for requests for additional
information.  The initial rounds of discussions were
scheduled for July 17 -- sorry -- June 17 to July 12, and the

1   evaluation period was scheduled to be July 15 to July 19.

2   This calendar was very tight and did not request

3   counterproposals or even provide a deadline for submitting

4   them.   The total time available under this schedule for

5   creditor negotiations was approximately 30 days.   Given the

6   extraordinary complexities of the case and the 100,000

7   creditors, that amount of time is simply far too short to

8   conclude that such a vague proposal to creditors rises to the

9   level required to shift the burden to objectors to make

10  counterproposals.

11         In addition, the city affirmatively stated that the

12  meetings were not negotiations.   The city asserts that this

13  was to clarify that the city was not waiving the suspension

14  of collective bargaining under Public Act 436, but the city

15  cannot announce to creditors that the meetings were not

16  negotiations and then assert to this Court that those same

17  meetings amounted to good faith negotiations.

18         Finally, the format of the meetings were primarily

19  presentational, informational, to different groups of

20  creditors with different issues and gave little opportunity

21  for creditor input or substantive discussion.

22         Accordingly, the Court concludes that the city has

23  not established by a preponderance of the evidence that it

24  has satisfied the requirements for good faith negotiations.

25         Congress adopted Section 109(c)(5)(C) specifically

1  to cover situations in which a very large body of creditors
2  would render pre-filing negotiations impracticable.  Several
3  cases suggest that the impracticability requirement must be
4  satisfied based -- or excuse me -- may be satisfied based on
5  the sheer number of creditors involved.  The list of
6  creditors of the City of Detroit is over 3,500 pages.  It
7  lists over 100,000 creditors.  The city estimates over 20,000
8  individual retirees are owed pension funds.  The Court is
9  satisfied that when Congress enacted the impracticability
10  section, it foresaw precisely a situation like that which
11  faces the City of Detroit.  The sheer size of the debt and
12  the number of individual creditors made pre-bankruptcy
13  negotiation impracticable, impossible really.
14       There are, however, several other circumstances that
15  also support a finding of impracticability.  First, although
16  several unions have now come forward that they are the
17  natural representatives of the retirees, these same unions
18  asserted in response to the city's pre-filing inquiries that
19  they could not and did not represent retirees.  These
20  responses sent a clear message to the city that the unions
21  would not negotiate on behalf of retirees.
22       Several voluntary associations of retirees also
23  assert that they are the natural representatives of retirees.
24  However, none assert that they can bind individual retirees
25  absent some sort of cumbersome class action litigation.  As

1    Donald Taylor testified, ultimately it would be up to the

2    individual members of the association to decide if they would

3    accept or reject an offer.

4          Further, several witnesses who testified on behalf

5    of the retiree associations made their positions clear that

6    they would not have negotiated a reduction in accrued pension

7    benefits because they consider them to be fully protected by

8    state law.  It is impracticable to negotiate with a group

9    that asserts that their position is immutable.  As the Court

10   stated in Stockton, "It is impracticable to negotiate with a

11   stone wall."

12         Finally, the city has demonstrated that time was

13   quickly running out on its liquidity.  Accordingly, the Court

14   finds that pre-filing negotiations were impracticable.

15         The last requirement for eligibility is set forth in

16   Bankruptcy Code Section 921(c).  That section provides,

17   quote, "After any objection to the petition, the court, after

18   notice and a hearing, may dismiss the petition if the debtor

19   did not file the petition in bad faith -- excuse me -- in

20   good faith," close quote.  The city's alleged bad faith in

21   filing its Chapter 9 petition was a central issue in the

22   eligibility trial.  Indeed, in one form or another all of the

23   objecting parties have taken the position that the city did

24   not file its Chapter 9 petition in good faith and that this

25   Court should exercise its discretion to dismiss this case.

1   As will be explained, the Court finds that the totality of

2   circumstances coupled with the presumption of good faith

3   which arises because the city has proven each of the elements

4   of eligibility under Section 109(c) establishes that the city

5   filed its petition in good faith under 921(c).

6           In a moment, the Court will review the factors upon

7   which it relies in finding that the city filed this case in

8   bad -- in good faith.  First, however, the Court considers it

9   crucial to this process to give voice to what it understands

10  is the narrative supporting the objecting parties' argument

11  that the City of Detroit did not file this case in good

12  faith.  The Court will then explain why there is some support

13  in the record for this narrative.  After that, the Court will

14  then explain why it still finds that the city filed this

15  petition in good faith.  It must be recognized that the

16  narrative that the Court describes here is a composite of the

17  objecting parties' presentation on this issue.  No single

18  objecting party neatly laid out this precise version with all

19  of its features described here.  Moreover, it includes the

20  perceptions of not only several of the objecting parties

21  whose objections were filed by attorneys, but also many of

22  the individual objecting parties.  This description does not

23  contain the Court's findings.  It is only the Court's

24  perception of a compositive narrative -- excuse me --

25  composite narrative that appears to ground the objectors'

1   various bad faith arguments.

2           According to this composite narrative of the lead-up

3   to the bankruptcy filing on July 18, 2013, the City of

4   Detroit's bankruptcy was the intended consequence of a long-

5   term strategic plan.  The goal of this bankruptcy, according

6   to this narrative, was the impairment of pension rights

7   through a bankruptcy filing by the city.  Its genesis, the

8   narrative goes, was hatched in a <u>Law Review</u> article that two

9   Jones Day attorneys wrote.  This is significant because Jones

10  Day later became not only the city's attorneys in the case

11  but the law firm from which the city's emergency manager was

12  hired.  The article laid out in detail the legal road map for

13  using bankruptcy to impair municipal pensions.  The objectors

14  believe that the plan was executed by the top officials of

15  the State of Michigan and the state's legal and financial

16  consultants.  The goals of the plan included also lining the

17  professionals' pockets while extending the power of the state

18  government at the expense of the people of the City of

19  Detroit.  In this narrative, there may even be a racial

20  element to the plan.  The plan participants foresaw the

21  rejection of PA 4, according to this narrative, coming in the

22  November 2012 election, and so work began on PA 436 even

23  before that.  As a result, it only took 14 days to enact PA

24  436 after it was introduced in the legislature's post-

25  election lame duck session.  PA 436 was also enacted contrary

1   to the will of the people of the State of Michigan, as just

2   expressed in their rejection of PA 4.  The plan included

3   inserting into PA 436 two very minor appropriations

4   provisions so that the law would not be subject to the

5   people's right of referendum and would not risk the same fate

6   as PA 4 had just experienced.  The plan also saw the value in

7   enticing a bankruptcy attorney to become the emergency

8   manager even though he did not have the qualifications

9   required by PA 436.  Another important part of the plan,

10  according to this narrative, was for the state government to

11  starve the city of cash by reducing its revenue sharing, by

12  refusing to pay the city millions of promised dollars, and by

13  imposing on the city a heavy financial burden of expensive

14  professionals.  It also included suppressing information

15  about the value of the city's assets.  The narrative

16  continues that this plan also required active concealment and

17  even deception.  One purpose was to deny creditors,

18  especially those whose retirement benefits would be at risk

19  from such a filing, from effectively acting to protect those

20  interests.  This concealment and deception were accomplished,

21  the narrative goes, through a public relations campaign that

22  deliberately misstated the ultimate objective of PA 436,

23  downplayed the likelihood of bankruptcy, asserted an unfunded

24  pension liability amount that was based on misleading and

25  incomplete data and analysis, understated the city's ability

1  to meet that liability, and obscured the vulnerability of

2  pensions in bankruptcy.  It also included imposing an

3  improper requirement to sign a confidentiality and release

4  agreement as a condition of accessing financial information

5  in the data room.  As the bankruptcy filing approached, the

6  narrative states that a necessary part of the plan became to

7  engage with creditors only the minimum necessary so that the

8  Court could later assert in -- so that the city could later

9  assert in Bankruptcy Court that it attempted to negotiate in

10 good faith.  The plan, however, was not to engage in

11 meaningful pre-petition negotiations with the creditors

12 because successful negotiation might thwart the plan to file

13 a bankruptcy.  "Check a box" was the phrase that some

14 objecting parties used for this.

15       The penultimate moment that represented the

16 successful culmination of the plan was the bankruptcy filing

17 itself.  In this narrative, this was accomplished in secrecy

18 and a day before the planned date in order to prevent the

19 retirees who were at that moment in state court pursuing

20 their available state law remedies to protect their

21 constitutional pension rights.  "In the dark of the night"

22 was the phrase used to describe the actual timing of the

23 filing.  The phrase refers to the secrecy surrounding the

24 filing and captures in shorthand the assertion that the

25 petition was filed to avoid an imminent adverse ruling in the

1   Webster case in state court.

2          The oft repeated phrase that was important to the

3   objectors' theory of the city's bad faith was "foregone

4   conclusion."  This was used in the assertion that Detroit's

5   bankruptcy case was a foregone conclusion perhaps as early as

6   January 2013, perhaps even earlier.

7          Finally, post-petition the plan also necessitated

8   the assertion of the common interest privilege to protect it

9   and its participants from disclosure.  The Court must

10  emphasize again now that what the Court just summarized is

11  what it believes is the viewpoint of the objecting parties.

12  Those were not the Court's findings.

13         The Court will now, however, turn to its evaluation

14  of this viewpoint of bad faith on the city's part in filing

15  this case.  The Court acknowledges that many people in

16  Detroit hold to this narrative or at least to substantial

17  parts of it.  The Court further recognizes, on the other

18  hand, that state and city officials vehemently deny any such

19  improper motives or tactics as this theory attributes to

20  them.  They contend that this case was filed for the proper

21  desire and necessary purpose of restructuring the city's

22  debts, including its pension debt, through a plan of

23  adjustment.  Indeed, the Court has already found that the

24  city does desire to effect a plan of adjustment.  The Court

25  finds, however, that in some particulars the record does

1  support the objectors' view of the reality that led to this

2  bankruptcy filing.  It is, however, not nearly supported

3  enough -- in enough particulars for this Court to find that

4  the filing was in bad faith.  For example, Howard Ryan

5  testified that the appropriations provision of PA 436 was

6  added to evade a referendum.  An e-mail from Kevyn Orr was to

7  the same effect.  The Jones Day pitch book from January 2013

8  laid out the scenario for this bankruptcy case, and Mr. Orr

9  was, after all, a bankruptcy lawyer, and his associates at

10 Jones Day did write the legal road map for this back in 2011.

11 And at the June 10 public meeting, Mr. Orr did mislead the

12 public about the status of pensions in bankruptcy as well as

13 about the chances of filing bankruptcy.  The issue that such

14 evidence presents, however, is how to evaluate it in the

15 context of the good faith issue.  One important question

16 raised, for example, is during the lead-up, was the City of

17 Detroit's bankruptcy filing a foregone conclusion as the

18 objecting parties assert.  The answer is, yes, of course it

19 was, for a long time.  Even if it was a foregone conclusion,

20 experience with both individuals and businesses in financial

21 distress establish that they often wait longer to file a

22 bankruptcy than is in their interests.  Detroit was no

23 exception.  Its financial crisis had been worsening for

24 decades, and it could have and should have filed bankruptcy

25 long before it did, perhaps even years before.  Certainly the

1   Court must conclude that the bankruptcy -- that the
2   bankruptcy filing by the City of Detroit was a foregone
3   conclusion during all of 2013, but waiting too long does not
4   suggest bad faith.

5           Perhaps it would have been more consistent with our
6   democratic ideals and with the economic and social needs of
7   the city if its officials and state officials had openly and
8   forthrightly recognized the need for filing bankruptcy when
9   that need first arose.  It is, after all, not bad faith to
10  file bankruptcy when it is needed, and city officials could
11  also avoided the appearances of pretext negotiations and the
12  resulting mistrust by simply announcing honestly that the
13  city is insolvent, that it needs to file bankruptcy, and that
14  negotiations would not even be attempted because it would be
15  impracticable.  The law clearly permits that and for good
16  reason.  It avoids the very delay and worse the very
17  suspicion and bad feeling that resulted here.  The Court must
18  acknowledge some truth in the factual basis of the objectors'
19  claim that this case was not filed in good faith.
20  Nevertheless, for strong reasons that the Court will state
21  next, it finds that this case was filed in good faith and
22  should not be dismissed.

23          Number one, the Court finds that the city's
24  financial problems are of a type contemplated for Chapter 9
25  relief.  The Court's finding here is based on its finding

1    that the city is insolvent and that the city was unable to

2    negotiate with creditors because that negotiation was

3    impracticable.

4            Number two, the city's filings are consistent with

5    the remedial purpose of Chapter 9.  The Court's analysis on

6    this factor is based on its finding that the city desires to

7    effect a plan to adjust its debts.  To show bad faith on this

8    factor, the evidence must establish that the purpose of the

9    filing of the Chapter 9 was not simply to buy time or --

10   excuse me -- to show good faith on this factor, the evidence

11   must establish that the purpose of the filing was not simply

12   to buy time or evade creditors.  Notably, this argument was

13   not raised by the objectors in any pleadings or at trial, and

14   there's no evidence.  The objectors do assert that the city

15   filed this petition to avoid a bad state court ruling in the

16   Webster litigation.  They argue this is indicative of bad

17   faith.  This argument is also rejected.  It is quite common

18   for creditor lawsuits to precipitate bankruptcy filings.

19   That the lawsuits were in vindication of an important right

20   under the state Constitution does not change this result.

21   They were still suits to enforce creditors' claims against a

22   debtor that could not pay those claims.  The objectors also

23   argue that the city filed the petition so that its pension

24   obligations could be impaired, and this is inconsistent with

25   the remedial purpose of bankruptcy.  Again, discharging debt

1   is what motivates every debtor that files bankruptcy, and

2   that motivation does not suggest bad faith.

3        Three, the city made efforts to improve the state of

4   its finances prior to filing to no avail.  Although the Court

5   finds that the city did not engage in good faith negotiations

6   with its creditors, the Court does find that the city did

7   make some efforts to improve its financial condition before

8   filing its Chapter 9 petition, which resulted in some

9   savings, as stated earlier.  No objecting parties have

10  suggested any other measure that the city could have taken to

11  relieve its financial stress other than selling assets, but,

12  as stated earlier, that would not have solved any long-term

13  financial problems.  The fact that the city did not consider

14  any alternatives to Chapter 9 in the period leading up to the

15  filing does not indicate bad faith either.  By that time, all

16  of the measures that the city had attempted had largely

17  failed to resolve the problem of the city's cash flow

18  insolvency.

19       Four, the residents of the City of Detroit will be

20  severely prejudiced if this case is dismissed.  The Court

21  concludes that this factor is of paramount importance in this

22  case.  The city's debt and cash flow insolvency is causing

23  its nearly 700,000 residents to suffer hardship.  As already

24  discussed at length, the city is service delivery insolvent.

25  Without the protection of Chapter 9, the city will be forced

1  to continue on the path that it was on until it filed this

2  case.  In order to free up cash for day-to-day operations,

3  the city would have to continue to borrow money, defer

4  capital investments, and shrink its workforce.  This solution

5  has proven unworkable.  It is also dangerous for its

6  residents.  This factor weighs heavily in favor of finding

7  good faith.

8          Accordingly, the Court concludes that the city's

9  petition was filed in good faith and the petition is not

10 subject to dismissal under Section 921(c).  The Court

11 accordingly concludes that under Section 109(c) the City of

12 Detroit may be a debtor under Chapter 9 of the Bankruptcy

13 Code.  The Court will enter an order for relief forthwith as

14 required by Section 921(d).  The Court reminds all interested

15 parties that this eligibility determination is merely a

16 preliminary matter in this bankruptcy case.  The city's

17 ultimate objective is the confirmation of a plan of

18 adjustment.  It has stated on the record its intent to

19 achieve that objective with all deliberate speed and to file

20 a plan shortly.  Accordingly, the Court strongly encourages

21 the parties to begin to negotiate or, if they have already

22 begun, to continue to negotiate with a view toward a

23 consensual plan.

24         The Court recognizes and understands, to the extent

25 it can, the widespread anguish and distress that this

1   decision to permit the city's bankruptcy to proceed may cause

2   to the city's employees and retirees as well as their

3   families.  The Court, therefore, implores with all urgency

4   those who administer our social safety net, our governor who

5   authorized this case, our state government leaders, our civic

6   and business leaders, our religious and charitable

7   organizations, to focus yet greater attention on the real

8   human needs that will arise because of the city's bankruptcy.

9           The message of this bankruptcy is that the city does

10  not have enough money to properly care for its residents let

11  alone to pay its debts, and, unfortunately, that economic

12  fact would be true even if pensions did have the legal

13  protection that the city's employees and retirees seek here,

14  and that's the very wisdom of the bankruptcy law.  It

15  recognizes that people, businesses, and even municipalities

16  can't print money, and it tries to provide an equitable and

17  hopeful solution.

18          It is, indeed, a momentous day.  We have here a

19  judicial finding that this once proud and prosperous city

20  can't pay its debts.  It's insolvent.  It's eligible for

21  bankruptcy.  At the same time, it also has an opportunity for

22  a fresh start.  I hope that everyone associated with the city

23  will embrace that opportunity.

24          Under Section 921(e) of the Bankruptcy Code, there

25  is no stay of this finding.  The Court understands that one

1    or more parties may seek an appeal of this directly to the

2    Court of Appeals.  The Court would ask that any such request

3    be made promptly by motion.

4            Is it still the city's intent to file a plan by

5    year-end?

6            MR. HEIMAN:  Your Honor, we're not quite certain.

7    I'm sorry.  David Heiman for the city.  We're still working

8    on our timeline but obviously mindful of your prior request

9    that we file before March 1, so we hope to be well within

10   that request.

11           THE COURT:  All right.  Thank you, sir.

12           MR. HEIMAN:  Thank you.

13           THE COURT:  Is there anything else that anyone would

14   like to raise at this time?  No.  We'll be in recess.

15           THE CLERK:  All rise.  Court is in recess.

16       (Proceedings concluded at 11:33 a.m.)

INDEX


<u>WITNESSES:</u>

None

<u>EXHIBITS:</u>

None


I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                    December 5, 2013
_____        _____
Lois Garrett