UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .       Docket No. 13-53846
        MICHIGAN,               .
                                .       Detroit, Michigan
                                .       January 13, 2014
                    Debtor.     .       9:13 a.m.
. . . . . . . . . . . . . . . .

EVIDENTIARY HEARING RE. MOTION OF THE DEBTOR FOR A FINAL
ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 362, 364(c)(1),
 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and
 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING
LIENS AND PROVIDING SUPERPRIORITY CLAIMS STATUS AND (III)
            MODIFYING AUTOMATIC STAY (DKT#1520)

MOTION OF THE DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING
  THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
  TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
  BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
  RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#17)

CORRECTED MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE
   ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL
  TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE
  BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO
  RULE 9019, AND (III) GRANTING RELATED RELIEF (DKT#157)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

For Bank of            Cadwalader Wickersham & Taft, LLP
America and            By:  MARK C. ELLENBERG
Merrill Lynch          700 Sixth Street, N.W.
Capital Services:      Washington, DC  20001
                       (202) 862-2200

APPEARANCES (continued):

```
For Syncora          Kirkland & Ellis, LLP
Holdings, Ltd.,      By:  RYAN BLAINE BENNETT
Syncora Guarantee,   300 North LaSalle
Inc., and Syncora    Chicago, IL  60654
Capital Assurance,   (312) 862-3062
Inc.:

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  JENNIFER K. GREEN
General Retirement   500 Woodward Avenue, Suite 3500
System of Detroit,   Detroit, MI  48226
Police and Fire      (313) 965-8300
Retirement System
of the City of       Clark Hill, PLC
Detroit:             By:  ROBERT D. GORDON
                     151 South Old Woodward, Suite 200
                     Birmingham, MI  48009
                     (248) 988-5882

For Erste            Ballard Spahr, LLP
Europaische          By:  VINCENT J. MARRIOTT, III
Pfandbrief-und       1735 Market Street, 51st Floor
Kommunalkreditbank   Philadelphia, PA  19103-7599
Aktiengesellschaft   (215) 864-8236
in Luxemburg, S.A.:

For David Sole:      Jerome D. Goldberg, PLLC
                     By:  JEROME D. GOLDBERG
                     2921 East Jefferson, Suite 205
                     Detroit, MI  48207
                     (313) 393-6001

For Financial        Weil, Gotshal & Manges, LLP
Guaranty Insurance   By:  ALFREDO R. PEREZ
Company:             700 Louisiana Street, Suite 1600
                     Houston, TX  77002
                     (713) 546-5040

For Ambac            Arent Fox, LLP
Assurance            By:  CAROLINE TURNER ENGLISH
Corporation:         1717 K Street, NW
                     Washington, DC  20036-5342
                     (202) 857-6178
```

APPEARANCES (continued):

```
For Detroit Retired    Lippitt O'Keefe, PLLC
City Employees         By:  RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please
2  be seated.  Case Number 13-53846, City of Detroit, Michigan.
3    THE COURT:  First, my apologies for being late.  Are
4  we ready to proceed with the closing arguments?
5                    CLOSING ARGUMENT
6    MR. ELLENBERG:  If the Court please, Mark Ellenberg,
7  Cadwalader Wickersham & Taft, representing Merrill Lynch and
8  speaking today on behalf of both of the swap providers.
9    Your Honor, this morning I'd like to focus on
10  certain aspects of the settlement which I think deserve a
11  little more attention than they've gotten in the hearing so
12  far and also talk about some apparent misconceptions about
13  the swaps, but the bottom line is that there is no genuine
14  question that the settlement agreement is extremely
15  beneficial to the city, particularly given the alternatives,
16  and that it is, accordingly, well within the zone of
17  reasonableness.
18    I'd also like to note at the very beginning that
19  we're very aware of what's at stake in this case and that the
20  case is going to have an impact on the city and perhaps on
21  other parties, and we've been very careful to manage our
22  relationship with the city with those broader interests in
23  mind.  And specifically in both 2009 and 2013 we attempted an
24  orderly and cooperative resolution with the city rather than
25  the reflexive exercise of remedies, and, indeed, today we

1  remain the only party in this courtroom who has managed to
2  reach an agreement with the city.

3       The first key point I'd like to make about the
4  settlement is that the swap counterparties can always look to
5  insurance.  FGIC and Syncora have fully guaranteed the
6  payment obligations of the service corporations under the
7  swap agreements.  The swap counterparties would not
8  rationally agree to a settlement with the city that results
9  in a recovery lower than their recovery from the insurers,
10  and the city recognized this.  And it is notable that the
11  policies waive any of all defenses both at law and in equity.
12  Thus, even if the liens were not valid, even if the swaps
13  were not valid, even if the COPs were not valid, we're
14  entitled to collect each periodic payment from the insurers
15  if the service corporations fail to make them.

16       That would give us a floor of approximately 65
17  cents, and the only reason it's not 100 cents is because FGIC
18  is in rehabilitation.  This means that the city effectively
19  pushed us to the lowest number that we would ever accept.
20  And parenthetically, as of Friday, interest rates are down a
21  bit from where they were on December 23rd, and so the city's
22  decision to lock the payment at 165 is actually favorable to
23  them at the moment.  Had they continued to float it, it would
24  be slightly higher today.

25       The second key point I'd like to make is that the

1  insurers were called upon -- if the insurers were called upon

2  to make swap payments to us, they would be subrogated to our

3  right -- our rights, including our right to trap the casino

4  revenues.  We've seen this movie before.  Syncora attempted

5  to trap the casino revenues even before they had subrogated

6  to our rights.  The FOTA, the settlement agreement,

7  eliminates the subrogation claims of the swap providers -- of

8  the monolines, rather, because the swap providers have agreed

9  that they will not make any claims under their policies once

10  the settlement agreement becomes effective.  This provides

11  the insurers with a free release from all of their

12  obligations under the swap insurance policies.  The city

13  asked for this, and it's of great benefit to the city.

14  First, it eliminates the threat of trapping that was just

15  discussed, and, second, by giving the insurers a release of

16  the swaps for free -- normally an insurer pays for a

17  commutation of insurance liabilities.  They're getting it for

18  free, and that effectively frees up additional resources for

19  the city to take advantage of in plan negotiations.

20        The third point I'd like to make is that there were

21  strong rationales for the swaps once the COP structure was

22  decided upon.  Prior to the COPs transactions, the city had

23  failed to meet its obligation under state law to fund certain

24  pension obligations.  It was required by state law to fund

25  that obligation with interest.  The COPs were a means by

1    which the city could meet that legal obligation, and they

2    ended up providing $1.4 billion in cash to the pension plans.

3    The COPs transaction, thus, did not increase the city's

4    obligations.  It merely was a method for meeting an

5    obligation that the city already had.

6            It's also very clear that the city completely

7    understood the transactions it was entering into in 2005,

8    2006, and 2009.  The transactions were thoroughly debated by

9    the City Council, and, indeed, the City Council ultimately

10   passed ordinances permitting the transactions to go forward

11   and authorizing the liens that were granted in 2009.  The

12   city was represented by Michigan bond counsel, Lewis &

13   Munday, and special swap counsel, Orrick Herrington.  Also,

14   in each case the city had two independent outside financial

15   advisors, one for the COPs aspect of the transaction and a

16   separate one for the swaps.  And, finally, there was an

17   extensive legislative authorization process and unqualified

18   opinions covering the authorization, validity, and

19   enforceability of the liens, including in 2009 the lien on

20   the casino revenues, were granted.

21           The swaps were entered into in conjunction with this

22   COPs financing, and the floating rate protected by the swaps

23   was, indeed, the city's idea.  What the public record shows

24   is that the decision to issue floating COPs in 2005 was --

25           THE COURT:  I'm not sure why you're telling me all

1    of this.

2         MR. ELLENBERG:  I think, your Honor, because the

3    agreement -- the transaction has been heavily criticized

4    during the hearing, and it's -- that criticism is being used

5    to attack the validity of the transaction and, therefore, the

6    validity of the settlement agreement.

7         THE COURT:  So, what?  Merrill Lynch is doing this

8    out of the goodness of its heart?

9         MR. ELLENBERG:  I didn't say that, your Honor.

10   Obviously we have a self-interest in achieving the outcome

11   we're achieving, but we are doing it responsibly and in a way

12   that is not only good for us but good for the city.  There is

13   such a thing as a win-win transaction, and there is such a

14   thing as the lesser evil --

15        THE COURT:  Okay.  So argue that.

16        MR. ELLENBERG:  -- and that's what we're trying to

17   reach.  But the ultimate point, your Honor, is that the swaps

18   fully, completely, and effectively protected the service

19   corporations and derivatively the city from interest rate

20   risk.  The swaps fix the floating rate -- turn the floating

21   rate into an effective fixed rate of approximately six

22   percent, which is in the stipulated facts at pages 8 through

23   9, and that was always true.  It was true when they entered

24   into the swaps.  It was true the day they went into

25   bankruptcy.

1          THE COURT:  Termination fee have that effect, sir?

2          MR. ELLENBERG:  The only aspect of the swap which

3     changed with interest rates was the termination fee, but the

4     termination fee is only payable if there's a termination.

5     The amount --

6          THE COURT:  So the answer to my question is no?

7          MR. ELLENBERG:  Well, the amount the city paid on

8     the COPs never changed.  The termination fee did change based

9     on interest rates.  Sometimes it was in the city's favor;

10    sometimes it was not.  But the reason for entering into the

11    transaction was to fix the interest cost associated with the

12    COPs, and the swaps fully and completely did that.

13         THE COURT:  Well, let's just nail this down.

14         MR. ELLENBERG:  Right.

15         THE COURT:  Is it your position that the city's

16    present termination liability, whatever it is, 200 million

17    give or take a little bit, has the effect of fixing, to use

18    your word, the interest rates?

19         MR. ELLENBERG:  No, your Honor.  The swap

20    transaction itself is what fixed the rates.  The termination

21    payment arises only because a termination event has occurred.

22    That is an aspect of the transaction, but it's not the

23    purpose for which it was entered into.

24         THE COURT:  So it's of no economic benefit to the

25    city?

1     MR. ELLENBERG:  The termination payment, no, is not

2   of economic benefit to the city, but the overall transaction

3   was.

4         THE COURT:  And yet by this settlement it's to be

5   paid or at least a good portion of it.

6         MR. ELLENBERG:  Yes, your Honor, because the city

7   made a decision to take the benefits that the swaps did give

8   them, and this was part of the transaction.  And the

9   additional point, your Honor, is that this --

10        THE COURT:  I raise this because you said this here

11  today, and you said it during the trial that the purpose of

12  the swaps transaction was to fix interest rates.

13        MR. ELLENBERG:  Yes.

14        THE COURT:  And to some extent, that's true, but to

15  a great extent it's also not true.  And I want -- and I want

16  the public to understand that.

17        MR. ELLENBERG:  Well, your Honor, it fixed the

18  interest cost.  It absolutely did that.

19        THE COURT:  To some extent it did.

20        MR. ELLENBERG:  Yes.  When you view the COPs and the

21  swaps together, the effect was absolutely to fix the interest

22  rate cost.  When there's a termination event, then this

23  additional liability arises.  There's no question about that.

24  But it should also be noted that the COP -- the swap

25  providers themselves hedge the interest rate risk that they

1   took on through the swap agreement.  That is what traders do.

2   And so any payment they received from the city, they simply

3   passed on to their hedge, and the termination agreement

4   itself, your Honor, is not profit as it's been characterized

5   here.  It's to compensate the swaps -- the swap providers for

6   having to replace the hedge when the city terminates the swap

7   agreement because at that point they become unbalanced.  And

8   if we could pull up City Exhibit 1 for just a minute and go

9   to page 12 --

10          THE COURT:  Is it on your screen?

11          MR. ELLENBERG:  Yes.

12          THE COURT:  Okay.  What do I need to get this screen

13  functional?  Turn it on?

14          UNIDENTIFIED SPEAKER:  Yes.  Reboot.

15          THE COURT:  Okay.  We're all set.

16          MR. ELLENBERG:  All right.  If we go to page 12,

17  which is up, and look at the definition of market quotation,

18  you will see -- is there a way to blow that up?  You will see

19  within that definition in parentheses the term "replacement

20  transaction."  And what the definition says is that quotes

21  are to be obtained to obtain the cost of entering into a

22  replacement transaction, and that's what the termination

23  payment is.  It's compensation to the swap providers for the

24  loss they incur when the city end of the swap is terminated

25  because it leaves them with an unbalanced book.  It's been

1   described in this case as profit.  It is not profit to us.

2   It's what we need to do to cover, in essence.  It's analogous

3   to the UCC concept of cover.  We have to get back into

4   balance by replacing the trade.  And, indeed, your Honor,

5   that is why there are safe harbors in the Bankruptcy Code

6   because swaps don't exist on an island in isolation.  They

7   are always part of a chain of transactions, and the concern

8   of Congress was that there would be a domino effect on the

9   entire chain from the default of a single party.

10          The next point, your Honor, is that the swap

11  providers did an appropriate credit analysis when entering

12  into the swap agreement.  When the swaps were entered into,

13  the swap providers considered the ability of the service

14  corporations to pay them, and if you look at page 22 of the

15  offering circular put into evidence by Ambac, you will see

16  the rating shown with insurance and without insurance, so

17  everyone was -- had a full credit analysis in front of them.

18  And even though the city was investment grade, both the swap

19  providers and the city determined that credit enhancement

20  would be necessary to make the transactions viable.

21  Accordingly, FGIC and Syncora were called upon to issue

22  policies of insurance, which they did, and they were both

23  rated AAA at the time.  The insurance not only protected the

24  swap providers, it protected the city and the service

25  corporations against the city's own credit.  As the swaps

were written in 2005 and 2006, they contained a double
trigger for termination. First, there had to be a downgrade
of the insurers below A-. Only if there were an insurer
downgrade would the city's credit rating matter, and, thus,
in 2009 when the city's credit rating was downgraded, that
only was a termination event because, in addition, the
swap -- the insurance providers had also been downgraded.
Even then the service corporations had 30 days to provide a
replacement insurer. In lieu of that, they provided a
different kind of credit enhancement. They provided the
liens on the casino revenues.

       The next point I'd like to make is that the
objectors are attacking the settlement agreement only to
serve their broader agendas with the city. Indeed, they
recognize the value of this agreement to the city, and that's
why they're trying to hold it hostage. They hope it's going
to benefit them in plan negotiations.

       Ambac is the sole objector to challenge the validity
of the liens and the underlying transaction, and that depends
entirely on disregarding the service corporations. This
objection obviously runs into the teeth of the opinions that
were given, as described by Mr. Orr during his testimony, and
this is also not a unique structure. It's been used by other
municipalities, including municipalities in Michigan, and,
indeed, Ambac itself has wrapped a transaction that uses

 1    service corporations for Dearborn Heights, and we cite to

 2    that in Footnote 21 of our statement in support of the

 3    settlement.

 4         In addition, your Honor, this transaction would be

 5    protected by the safe harbors.  Section 560 of the Code

 6    permits a swap participant or a financial participant to

 7    exercise its right to liquidate, terminate, or accelerate a

 8    swap agreement, and that right shall not be stayed, avoided,

 9    or otherwise limited by operation of any provision of this

10    title or by order of a court.  And there's no question that

11    the security agreement itself is a swap agreement because the

12    definition of "swap" in the Code includes not only the basic

13    swap agreement but any collateral agreement or security

14    agreement related to the swap agreement, so both the swap

15    agreements and the collateral agreement are swap agreements

16    within the meaning of Section 560 and Section 362(b)(17),

17    which is the removal of the automatic stay with respect to

18    termination and setoff.

19         Now, Ambac has questioned whether perhaps the safe

20    harbor applies because they suggest that the swap providers

21    did not have their swap directly with the city, and,

22    therefore, they don't qualify as swap participants under the

23    Code.  Well, first of all, they're also financial

24    participants, but aside from that, for the reason I just

25    said, the collateral agreement itself is deemed a swap

1   agreement for purposes of the Code, so that really is a

2   nonissue.

3          Ambac also relies very heavily on the <u>Enron</u> decision

4   issued by Judge Gonzalez, but that's really a very narrow

5   decision.  That doesn't remotely support the broad

6   proposition that they're urging.  The sole question in <u>Enron</u>

7   was whether a payment by the debtor to redeem its own stock

8   within 90 days of the petition was a settlement payment that

9   would be immunized from preference avoidance under Section

10  546(g) of the Code.  What the Court found was that since the

11  debtor was insolvent at the time of the payment, under

12  applicable state law it was an improper dividend because

13  dividends should not be paid when a company is insolvent, and

14  a payment to redeem stock is a dividend.

15         The important point is that under Section 546(g),

16  you have to find there is a settlement payment.  And the Code

17  definition of "settlement payment" is very vague, and it

18  depends -- it's a circular definition that depends on the

19  market understanding of the term "settlement payment."  And

20  the Court concluded that the market doesn't have an

21  expectation that illegal dividends would be settlement

22  payments.  The question here would be completely different.

23  It would be whether this is a swap agreement within the

24  meaning of Section 560 and Section 362(b)(17).  There is no

25  ambiguity in the definitions involved there.  They're black

1  and white, they've objective, and the swap agreements and the

2  collateral agreement clearly fit within those depositions

3  (sic), so the issue addressed in <u>Enron</u> really is not

4  applicable here at all.

5       THE COURT:  So your position is that even if the

6  Court were to find that the entire transaction were -- was

7  illegal under state law, this Court would be powerless to

8  grant any relief resulting from that finding?

9       MR. ELLENBERG:  Yes, your Honor, because --

10       THE COURT:  How about in state court?

11       MR. ELLENBERG:  Absolutely not.  That would be

12  preempted, your Honor, and --

13       THE COURT:  No court anywhere has the authority to

14  hold an agreement or a transaction illegal under state law if

15  it involves swap agreements.

16       MR. ELLENBERG:  You could find it illegal, your

17  Honor.  What you couldn't --

18       THE COURT:  I'm sorry.  You could what?

19       MR. ELLENBERG:  You could find it illegal.  What

20  you -- or void.  What you couldn't do is find it -- what you

21  couldn't do is enjoin our rights under Section 560 and

22  Section 362(b)(17), and that's because --

23       THE COURT:  Rights arising from the transaction

24  found to be illegal under state law?

25       MR. ELLENBERG:  Yes, and that's because, again,

1    Congress was --

2           THE COURT:  That's quite extraordinary.

3           MR. ELLENBERG:  I understand, your Honor, but

4    Congress was concerned about the contagion effect, which

5    would flow --

6           THE COURT:  About what?

7           MR. ELLENBERG:  The contagion effect, the domino

8    effect, that would flow from the disruption of a link in the

9    chain.

10          THE COURT:  More concerned about that than the

11   illegality of the transaction?

12          MR. ELLENBERG:  Your Honor, it's a very broad

13   statute.

14          THE COURT:  Your answer to my question is "yes"?

15          MR. ELLENBERG:  Yes.  And, of course, your Honor, as

16   Ms. Ball noted in her closing, this trial is not a trial of

17   these particular issues.  It's about what the issues are.

18   This is the argument we would make.

19          THE COURT:  Right.  Okay.

20          MR. ELLENBERG:  And the final point I want to make

21   about that, your Honor, is that throughout all its arguments

22   Ambac ignores again that we have FGIC and Syncora backing us

23   up, and, thus, our floor is 65 cents.  Even if all their

24   arguments were correct, that's where we end up, and that goes

25   to whether this is a reasonable settlement agreement.

1        Last, your Honor, I'd like to address the objections
2   of Syncora and FGIC, which are based on what they assert to
3   be consent rights over our ability to terminate the swaps.
4   The first point is that everyone in this case seems to agree
5   that that issue needs to be decided as part of this hearing.
6   It's one of the few things everyone here seems to agree on,
7   and we certainly agree with that.  It would not make sense
8   for the Court to approve this transaction and then find out
9   that the city couldn't, indeed, execute it because of Syncora
10  or FGIC's consent right.  And I have to say that the
11  arguments put forward with respect to the consent right are
12  barely colorable.  In fact, I'm not sure they're colorable at
13  all.  First of all, we're using the optional termination
14  provision in the swap agreements, a provision that was added
15  in 2009 and specifically consented to by the insurers.  And
16  they actually concede in Section 23 of the stipulated facts
17  that on its face that optional termination provision does not
18  give them a consent right.  There are other terminations
19  where they did have a consent right before they were
20  downgraded, but this one doesn't give them a consent right,
21  and the gyrations they go to to try and import a consent
22  right into a provision that clearly doesn't give them one I
23  just don't think are colorable, your Honor.  We've gone over
24  them extensively in the brief.  I don't want to repeat them
25  here, but I just -- I hate to use the word "frivolous"

1   because I think lawyers overuse it, but I really have to say
2   in this case I think their consent right arguments are
3   frivolous.
4           So, again, your Honor, I think when this is viewed
5   as a whole and when the alternatives are considered, this
6   transaction is absolutely in the best interest of the city,
7   is well within the range of reasonableness, and it should be
8   approved.  Thank you.
9           THE COURT:  Thank you, sir.
10          MS. ENGLISH:  Good morning, your Honor.  Caroline
11  English from Arent Fox on behalf of Ambac Assurance
12  Corporation.  Before I begin, I would like to give the Court
13  a little bit of a road map of what we have planned on our
14  side of the courtroom here.
15          THE COURT:  Okay.
16          MS. ENGLISH:  As you know, we have many objectors
17  here, some who are aligned and some who are not necessarily
18  aligned.  Our briefs all set forth the arguments that we
19  believe lead to a conclusion that this motion should not be
20  approved.  We have some different arguments, some overlapping
21  arguments.  We've tried to organize ourselves so we don't
22  duplicate, and, therefore, we sort of assigned point people,
23  if you will, on the various arguments.
24          I'm going to begin this morning, and I'm going to
25  begin with an overview of the evidence that came in on the

1   swaps portion, the swaps settlement, and then I'm also going

2   to be arguing the two state law issues, one, that the swap

3   obligations are void ab initio under Act 34 and, two, that

4   the liens of the swap counterparties are void because they

5   did not comply with the Gaming Act. Then Mr. Gordon will

6   take it over from me, and he will be focused on the

7   Bankruptcy Code-related claims, that there is no lien on the

8   post-petition acquired casino revenues and the arguments of

9   special revenue, special excise tax, et cetera. After Mr.

10   Gordon, Mr. Perez will be arguing on more fact-related

11   issues, issues specific to the swaps insurers, including

12   consent rights, order and release issues, and 365 issues.

13   Mr. Perez will also transition us into focusing on some DIP

14   arguments. Specifically, he'll be addressing the good faith

15   finding that needs to be made. Then Mr. Marriott will be

16   addressing the Court with respect to issues under 364(c) and

17   Public Act 436. After that Ms. Green will have a short

18   presentation with respect to the proposed order on the DIP

19   financing, and then Mr. Bennett will be speaking with respect

20   to prudential concerns and the best interest of creditors.

21   Following Mr. Bennett, Mr. Goldberg will be speaking with

22   respect to the issues that have been raised in the David Sole

23   objection, and following that we have reserved some time for

24   any other objectors who need a few last-minute words.

25         We have, your Honor -- as of Friday's count, we had

1  207 minutes left.  We have structured this down to 205

2  minutes, so if all goes according to plan, we're going to get

3  out of here two minutes early.

4          THE COURT:  Okay.

5          MS. ENGLISH:  I think, your Honor, we've passed up

6  my PowerPoint deck, and it should be also on the screen

7  hopefully in front of you.  Our trial consultant has given me

8  the clicker, so we'll see if I can be so technologically

9  inclined this morning.

10                  CLOSING ARGUMENT

11          MS. ENGLISH:  All right.  In overviewing the

12  evidence that we heard come in over the three days of trial

13  testimony, we think it is clear that the evidence showed that

14  this deal was done very hastily, and hasty decisions don't

15  make for the best judgment, and they don't make for the best

16  results.  Mr. Buckfire testified he was under extraordinary

17  time pressure.  In fact, they did this deal in one week's

18  time.  They opened negotiations with the swap counterparties

19  on June 4th, and they had a deal on June 11th.  Mr. Buckfire

20  also testified that he went into these negotiations with,

21  quote, "not very good cards to play."  You know, your Honor

22  mentioned at one point in the trial that the city needs to

23  stop acting with a gun to its head.  We feel this is just

24  another example of that kind of decision-making.  The city

25  panicked.  They thought they were in dire financial straits.

1   They might run out of money very soon.  This was a bad deal

2   that they were in, and they wanted to get out of it, so they

3   leaped forward into negotiations in a panic mode.  And doing

4   a deal quickly, again, does not make for the best judgment,

5   and the result, frankly, reflects this.

6           Now, let's look at -- Mr. Buckfire said that he

7   didn't have very good cards to play when he went into the

8   negotiations.  Let's look at what his cards were.  This is

9   testimony from the official trial transcript.  He said he

10  thought the swap counterparties could trap the casino

11  revenues.  He said he thought the swap counterparties were

12  secured, they had secured rights.  He said he went in under

13  the assumption that the swap counterparties had valid liens.

14  When he was asked about what claims the city had, what were

15  the arguments, the legal arguments that the city had to argue

16  against the swap counterparties' positions, he didn't know

17  what they were.  He testified he didn't even know if an

18  evaluation of those claims had been done.  He went into these

19  negotiations completely unprepared.  He was unarmed.  He was

20  handicapped from being able to negotiate with the swap

21  counterparties aggressively.  And this problem was

22  exacerbated in the negotiations by the fact that Mr. Orr

23  deferred completely to Mr. Buckfire.  He testified on cross-

24  examination he sent Mr. Buckfire into these negotiations.  He

25  hadn't had a conversation with him about the legal positions

1   and the arguments.  Sent him and said, "Get the best deal you
2   can."  Mr. Buckfire goes in, a week later comes out and says,
3   "This is the best deal I can get.  Let's go with it."
4           The evidence revealed that there was not a serious
5   consideration given to a litigation strategy.  Mr. Malhotra
6   testified that Ernst & Young was never asked to run cash flow
7   analysis that showed a litigation strategy, and Mr. Orr
8   confirmed that they never asked Mr. Malhotra or Ernst & Young
9   to do that.  Now, in her closing argument, Ms. Ball suggested
10  that there was, in fact, a cash flow analysis that was run
11  showing a litigation strategy, and what she pointed to was --
12  I think it was Exhibit 111 that showed the three lines going
13  across, right, that Mr. Malhotra testified to.  What did
14  those three lines show?  The first one showed DIP financing
15  and a settlement.  Second line showed no DIP financing, no
16  settlement, no trap.  Third line, no DIP financing, no
17  settlement, cash trap.  Where was the line that showed DIP
18  financing, no settlement?  It's the fourth obviously missing
19  line on the chart.  What has happened here is the city tied
20  in their minds the idea of post-petition financing to getting
21  the swaps deal done.  Ms. Ball mentioned also in closing
22  argument that, in fact, the city believed the casino
23  revenues -- freeing up the casino revenues by doing this deal
24  was critical to getting post-petition financing.  Where was
25  the evidence on that?  Nobody testified to that,

1    Mr. Buckfire, Mr. Malhotra, Mr. Doak, Mr. Orr.  Nobody
2    testified that freeing up the casino revenue was going to be
3    necessary to secure DIP financing in bankruptcy nor are there
4    any documents that show this would be necessary, and, in
5    fact, when they went out to look for post-petition financing,
6    they got several proposals from several banks offering post-
7    petition financing not secured by casino revenue but secured
8    by income tax revenues and asset proceeds.  Proof is in the
9    pudding.  There was no need to free up the casino revenue to
10   get post-petition financing.  There was no need to link these
11   two together.  The problem is the city managers didn't have
12   before them the documents they needed to show that litigating
13   was a real possibility.  They were just moving too quickly,
14   and they weren't thinking through all of the options that
15   were available to it.

16          Now, I want to show you the analysis that the city
17   didn't do.  I'm not an accountant.  I don't run cash flow
18   analyses.  But this analysis comes straight from the evidence
19   that was put forth at trial.  Remember the original deal
20   here.  The original deal is $350 million in DIP financing;
21   right?  230 million of that was for the swaps, to terminate
22   the swaps, and that was going to be secured by income tax and
23   asset proceeds, 230 million.  And the other piece of it was
24   120 million for reinvestment.  That's going to be secured by
25   casino revenues.  They call that the quality of life portion

1  of the loan so that it fits within the authorized uses under

2  the Gaming Act.  And, as I said, we know that they did get

3  several offers in, including the Barclays deal that they

4  agreed to, that included $230 million secured by income tax

5  and asset proceeds.

6       Now, on the left side of my screen here is the

7  proposed settlement that we have today.  We are now looking

8  at post-petition financing of 285 million, and the reason

9  that's come down from the original 350 is because now we're

10  looking at a swaps portion of this that's 165 million.  The

11  120 million for reinvestment has stayed the same.  if we back

12  out of that the swaps-related cost of this financing, we back

13  out the 165 million, the result at the bottom there is

14  they're going to have 120 million to spend on their

15  reinvestment programs.

16       Now let's look at the right side of the screen.  The

17  city has demonstrated they can get financing to the tune of

18  $230 million secured by income tax and asset proceeds, so

19  let's assume that's what they get in their post-petition

20  financing, just that portion of the Barclays loan.  Let's

21  assume that they don't get the other $120 million portion

22  because maybe the banks aren't going to be willing to loan as

23  long as the casino revenue is tied up in litigation; right?

24  So let's assume they just get the 230.  Now let's back out of

25  that the swaps-related cost.  Well, the swaps-related cost in

 1   this scenario is the cost of litigating.  Mr. Orr testified

 2   they were budgeting -- maybe it would cost them a million

 3   dollars a month to litigate these issues.  Now, I'm going to

 4   come back to this.  I think that's not credible, and we'll

 5   talk -- I want to talk a little bit later about the

 6   litigation costs and our assessment, but let's just assume

 7   for right now that it's going to cost them a million dollars

 8   a month to litigate these issues, and it's going to take them

 9   six months to do it, $6 million.  You back that out of the

10   230, and now we've got $224 million to spend on reinvestment

11   and to provide extra liquidity for the city.  The city comes

12   out better.  And even my little asterisk at the bottom, let's

13   credit the city's argument that they are concerned the cash

14   might get trapped, the casino revenue might get trapped

15   during litigation.  Now, I'm going to come back to this a

16   little bit, too.  I think that's, frankly, not a realistic

17   fear.  I think the city would be able to get an injunction

18   that preserved the status quo and didn't have the casino

19   revenue trapped, but let's say I'm wrong.  Let's say the

20   casino revenue gets trapped during the course of that

21   litigation.  That's $15 million a month in casino revenue

22   over six months.  We're talking $90 million.  Let's back that

23   out of the number.  Now we're looking at a result of 134

24   million to spend on reinvestment and liquidity, still more

25   than on the settlement side.  Again, this is the analysis

1   that we see no evidence that the city ever did.

2          THE COURT:  Where does the six months come from?

3          MS. ENGLISH:  Six months is our estimate.  Your

4   Honor, the Bankruptcy Court has shown it is able to move

5   through these issues presented, weighty issues, very

6   expeditiously.  The arguments that we are talking about

7   raising in a litigation are pure legal issues.  They could be

8   resolved on summary judgment.  They would require no

9   discovery.  We think six months on the outside is the length

10  of time it would take to try this case.

11         THE COURT:  So not including appeals obviously?

12         MS. ENGLISH:  Correct.

13         THE COURT:  So under this analysis, if the city is

14  going to settle instead of litigate, looking at the numbers

15  here, there's got to be a reasonable and a credible

16  assessment that the claims have significant vulnerability if

17  they're actually going to settle and get to these numbers

18  that are worse, so that begs the question.  Was there a

19  credible assessment done of the city's legal arguments?  We

20  heard Orr testify that he did no independent assessment of

21  the claims.  He did not independently analyze any of the

22  legal claims or the defenses.  The totality of his testimony

23  is what his attorneys told him their assessments were.

24         Then we have the issue where the city claimed the

25  attorney-client privilege, so we have Orr's testimony as to

1  what his attorneys told him, and we have no underlying

2  documents.  We have no way to test the testimony, no analyses

3  that were provided.  All we got was a privilege log that

4  covers only, quote, selected documents, says right on the

5  title, only selected documents that the city chose to log.

6  Notably, those documents include not a single document that

7  shows as going to Mr. Kevyn Orr.  The log shows only five e-

8  mails over a ten-month period, March to December.  Is it

9  credible that Mr. Orr actually received analyses from his

10  lawyers that walked through the legal claims and the

11  defenses, and he used those analyses to inform the

12  negotiations?

13          Mr. Orr also testified that he viewed every single

14  claim that could potentially be raised -- and I think he

15  testified to four independent claims -- every single one, in

16  his mind, was a -- was 50-50 odds.  It was a toss-up.  If we

17  believe Mr. Orr that the claims were truly assessed as having

18  50-percent odds of success, we've still got a problem, and

19  that problem is that the settlement they've done, the deal

20  they've cut, doesn't reflect 50-50 odds.  Now, first, as sort

21  of a footnote, we've got four independent claims here.  If

22  it's true that we've got 50-50 odds on each of them times

23  four each -- any of which alone would invalidate the swap

24  transactions, it's not really that bad odds.  Does it justify

25  a settlement that is now looking at 60-, 70-percent on the

1  dollar?

2        So let's, again, take Mr. Orr's testimony.  He

3  believed that the assessments were 50-percent chance of

4  success, so in June what happens?  Mr. Buckfire goes into the

5  negotiations and starts at 50 percent and negotiates up.

6  That doesn't reflect the legal assessment here.  The original

7  deal they cut was at 75 percent.  That's 25 percent higher

8  than how they assessed the merits of their claims.  And then,

9  your Honor, you indicated to them 75 percent seemed a little

10  high, sent them off, renegotiate, cut a deal that more -- is

11  more tailored to the assessment of the legal claims and

12  defenses here.  So what happens?  They go into the

13  negotiations, and now they're beginning at close to 60

14  percent.  Mr. Orr testified that he believed he was starting

15  somewhere in the range of 50 to 60 percent.  The number he

16  was using in his head was roughly 150 million.  As of the

17  date he's negotiating, that's 59 percent.  That's where he

18  starts, and then he goes up.  He ultimately gets to a number

19  for the new deal at 62 to 62 -- 3 percent is what he

20  believes.  We're still looking at a number that doesn't match

21  their assessment of the claims.  We think this history of

22  negotiations shows that they were trying to get a deal done

23  at any cost.  They were trying to check off the list.

24        THE COURT:  Okay.  Let me pin you down --

25        MS. ENGLISH:  Sure.

1    THE COURT: -- with a number. What do you think was

2    the highest reasonable number to settle with the swaps?

3    MS. ENGLISH: That is putting me on the spot now,

4    isn't it, your Honor? Can I say it's a hundred percent?

5    It's a slam dunk? Probably not. Nothing is a slam dunk in

6    the world of litigation, is it? But the truth is -- and I'm

7    going to be walking through two of these claims, and then Mr.

8    Gordon is going to walk through of them -- through several of

9    them, and we think they are very, very strong. I would have

10   to give them very, very high marks, certainly not 50 percent,

11   not even 75 percent, your Honor. I would give them a mark

12   higher than that. These are very strong, very clean issues.

13   THE COURT: What's your number?

14   MS. ENGLISH: I'm not going to give you a number,

15   your Honor, and I know you respect me for that. Okay. I

16   want to look just for a minute here specifically at the

17   December negotiations. Okay? The city basically put itself

18   in a box in June. It did the deal really fast, got the best

19   deal they thought they could get, weren't really armed in the

20   negotiations, came out with 75 percent. The problem is that

21   when your Honor sent them back into negotiations in December,

22   they just couldn't pull themselves out of that box, and, in

23   fact, they didn't really try. Mr. Orr did not go into those

24   December negotiations armed to bear, ready to refight the

25   fight, ready to negotiate as best he could. He didn't take

 1   that time between the 18th when we recessed and the 23rd when
 2   he went into mediation and pull together -- get his legal
 3   ducks in a row, pull together the analyses, review the
 4   liability that he was facing and get ready to go in there.
 5   He wasn't armed.  He wasn't prepared.  He still hadn't
 6   requested or reviewed any cash flows with the litigation
 7   strategy.  He still hadn't requested or reviewed an interest
 8   rate analysis so that he could forecast termination payment
 9   liability.  He testified quite clearly he didn't actually
10   even know the current termination liability that the city was
11   facing on the day he was negotiating.  That to me is a big
12   problem if you go into negotiations and don't even know your
13   potential liability that you're negotiating against.
14        Then we have this change from the percentage deal.
15   First we were looking at a discount of 25 percent.  Now we're
16   looking at a fixed number, 165 million.  This removes the
17   city's ability to take advantage of interest rates which
18   Mr. Orr agreed are, generally speaking, on the rise, and so
19   by switching it out from a percentage deal and now looking at
20   a fixed fee deal that's going to close by the 31st,
21   potentially this new deal could be the same as the old deal,
22   could even be worse, and let me show you what I mean by this.
23        First of all, I want to point out that the number in
24   the bottom right of the screen that shows a number for
25   January 31st is a hypothetical number.  That's not a real

1  number.  None of us knows what the number is going to be on
2  the 31st, so I don't want to mislead anyone with that, but I
3  do want to walk through a possible result here, so let's look
4  at the first line, the one that starts way over on November
5  29th.  This is a stipulated number in the record.  The city
6  has stipulated that as of November 29th, the total
7  termination payment liability was $277.7 million.  Then if we
8  look at the next number, December 10th, this number comes out
9  of the city's supplement to its motion where it argues that
10  the $165 million it's agreed to is 62 percent of the total
11  termination liability as of December 10th, so that would make
12  that number, easy math here, 266 million.  If we just look at
13  that trajectory there, we've got a loss of roughly a million
14  dollars a day, and if we follow that down, if that were to
15  remain the current trend, follow that down to January 31st,
16  we're going to be looking at a total termination payment
17  liability of 211.4 million, which at that point in time would
18  make the $165 million deal 78 percent, 78 cents on the
19  dollar.
20          Let's look at the second line.  These two numbers
21  are based on the recent stipulation that the city entered
22  into.  They stipulated that on December 23rd, the day that
23  Mr. Orr was negotiating the new deal, the total termination
24  liability as of that date was 256 million.  That would make
25  165 million on that date roughly 64 percent.  The city also

1   stipulated that on December 31st at the close of the year-

2   end, the total termination payment liability was $247

3   million.  That would render as of that date the 165 million

4   67 percent.  Again, if we follow the trajectory down to

5   January 31st, that line also ends up at a 78-percent figure.

6   That line ends up with projecting a possible total

7   termination liability of 212.1 million, and 165 million would

8   be 78 cents on the dollar of that.

9         This causes us great concern.  Again, we don't know

10  what the number is going to be on January 31st, but the point

11  is that by removing the percentage deal, the discount that

12  was negotiated, we may have undone the good of the original

13  deal and made it worse.  That means also, of course, that,

14  you know, Mr. Orr didn't assess this and doesn't know if this

15  deal is going to be better, and we don't know if this deal is

16  going to be better.  And it means the Court also doesn't know

17  if this deal is going to be better.  How can the Court assess

18  today whether this is a fair and equitable settlement of

19  claims if the termination payment deal could be 62 cents on

20  the dollar or perhaps it could be 78 cents on the dollar?

21        Now, I'm going to transition now to talking about

22  the two legal arguments.  This is the test under Rule 9019

23  which the Court is very familiar with.  You know, Ms. Ball

24  asked in her closing argument what is the city's burden.  The

25  city's burden is quite simply this.  The city has to put

1    forth enough evidence, testimony, facts, documents, for the

2    Court itself to make an independent and objective analysis as

3    to the strengths and weaknesses of the claims that are being

4    settled and, thus, to determine whether the settlement amount

5    is fair and equitable.  The Court well knows -- I don't need

6    to tell you this, but the Court well knows it can't just

7    rubber stamp what Mr. Orr wants to do or what the city wants

8    to do.  A fair and objective analysis must be done after

9    looking at all the evidence.  You have to say, your Honor,

10   yes, settling these claims at 62 percent or 78 percent makes

11   sense to me under the evidence that's in front of me.  This

12   represents a fair and equitable settlement.

13        Okay.  These are the two claims I would like to

14   discuss now, first that the swaps are void ab initio because

15   they were unauthorized under Act 34 and, second, that the

16   liens on the casino revenues are invalid and void ab initio

17   because they were not authorized under the Gaming Act.  As I

18   mentioned, Mr. Gordon is going to speak to some of the other

19   legal claims.

20        The Revised -- the Michigan Revised Municipal

21   Finance Act, which we refer to as Act 34, specifically allows

22   municipalities to enter into swap transactions, but in order

23   to do so, it imposes a number of conditions and requirements

24   on cities if they choose to engage in swaps.  This is, of

25   course, because swaps are widely recognized to be inherently

1   risky transactions. Among the risks is the fact that cities

2   often don't anticipate or appreciate termination liability

3   they may ultimately face. The state legislature imposed

4   parameters on how cities can engage in swap transactions

5   specifically so that they could mitigate and address some of

6   these risks. Here the city, in undertaking the swap

7   obligations back in 2005 and 2006, did not follow those

8   requirements of Act 34. There's really no dispute as to

9   this, so I don't intend to spend a lot of time on this

10  because in none of their papers that the city filed or the

11  swap counterparties filed do they dispute that Act 34 was, in

12  fact, not followed.

13        The crux of the problem here goes to the structure

14  of the transaction. Under Section 317(4) of the Revised

15  Municipal Finance Act, in order to undertake a swap

16  obligation, structurally it has to be done as a limited tax

17  full faith and credit pledge or entered into in connection

18  with a municipal security. Here the transactional documents

19  themselves state they are not -- it's not a full faith and

20  credit pledge. Moreover, the definitions set out in Act 34

21  for a municipal security don't line up here with the

22  structure of the transaction.

23        Now, before -- just before I dive into the nitty-

24  gritty of the argument, it's very important here that we

25  understand the substance of the transaction, and the

1   substance is that it is inescapable that the city undertook

2   swap obligations.  Mr. Buckfire testified, quote, unquote,

3   the city entered into swap transactions.  Mr. Orr testified,

4   yes, these are the city's swap obligations.  I have up here

5   on this slide some of the language out of the service

6   contract, in particular, the highlighted portion under

7   Section 8(c).  The city will be obligated to make service

8   payments in respect of hedge payables.  The city was entering

9   into swap transactions.

10          Now, there's two ways to look at this, two views of

11  the world.  Here's view number one.  In the middle we've got

12  the service corporations.  As we know, the service

13  corporations have swap contracts with the swap counterparties

14  on the far right side of the screen.  The city then, through

15  its service contracts, took on mirror image swap obligations

16  to the service corporations, so under this view of the world,

17  the city has swap obligations that run to the service

18  corporations pursuant to the service contracts.

19          There's a second view of the world.  Here the

20  service corporations are viewed as a mere pass-through.  The

21  swap obligations of the city actually are viewed as running

22  to the swap counterparties, which really gives rise to why

23  the city has brought this deal for your Honor's approval in

24  the first place.  They're doing a deal now to resolve the

25  swap obligations that run to the swap counterparties.

1    Under either scenario, under either view, the city
2  has swap obligations, and, therefore, it had to comply with
3  Act 34.  The service corporations here were basically used to
4  do -- to accomplish something indirectly that the city
5  couldn't do directly.  If the city is going to take on swap
6  obligations, it has to comply with Act 34.  They can't -- the
7  city cannot set up a service corporation to take on swap
8  obligations and not comply with Act 34 if it's going to then
9  bind the city to those swap obligations.
10    The city has argued, hey, wait a minute.  Home Rule
11  City Act allows cities specifically to set up service
12  corporations.  There's nothing unlawful about having a
13  service corporation, and they're right.  However, there is
14  something very unlawful about having a service corporation
15  and setting it up in this way to bind the city.  The whole
16  point of using service corporations is what we call off
17  balance sheet financing.  They take on their own obligations.
18  They have their own sources of revenue, and they pay those,
19  and those obligations are not run through the city.  Here, if
20  I can just go back -- whoops -- here's the problem on the
21  left side of the screen, that left swap obligations arrow.
22  Here the service corporations were engaging in their swap
23  obligations with the swap counterparties but then bound the
24  obligations back to the city.  Mr. Orr testified specifically
25  he knows the service corporations don't have any other source

1    of revenue.  These are the city's obligations, and that's the

2    problem with this.

3            Now, I want to address -- sort of pause for a moment

4    and address the city's argument that there might be a bigger

5    problem here, might not just be about the service

6    corporations taking on swap obligations and putting them over

7    on the city.  It might be that the service corporations were

8    used unlawfully to evade the debt limit, and that would

9    render everything invalid; right?  Now we're looking not only

10   at the swap obligations.  Now we're looking at the COPs as

11   well.  That's not the argument that is in front of your Honor

12   today.  In fact, the city has specifically preserved that

13   claim that the COPs could potentially be invalid for another

14   day.  That's not being litigated here.  So all of the smoke

15   about, oh, my gosh, what if the service corporations were

16   used unlawfully to evade the debt limits and it renders all

17   of the COPs invalid, and before you know it this litigation

18   is going to take on a life of its own.  Now everybody on this

19   side of the courtroom is going to be a defendant in this

20   litigation.  We're going to have claims.  We're going to have

21   counterclaims.  We're going to have parties and

22   counterparties, and before you know it, it's going to be

23   huge.  We've got to settle this right away because this

24   litigation is going to be so messy.  That's not actually

25   what's being settled today.  That litigation, if it happens

1   at all, that messy litigation, has been completely preserved

2   for another day.  That's not being released in this

3   settlement.  The only thing that's being released here are

4   claims against the swap counterparties.  Our only argument

5   that we are asserting here today is that the swap obligations

6   themselves are void ab initio because the swap transactions

7   didn't comply with the swap requirements under Act 34.

8           Now, I want to just run through -- I believe there

9   are -- we've basically heard four defenses.  The claim is the

10  swap obligations are void ab initio because they didn't

11  comply with Act 34.  We've basically heard in the evidence

12  and sometimes not through the evidence but just from Ms.

13  Ball's argument four potential defenses that the city says

14  draw into question the strength of the city's legal claim

15  and, therefore, makes it reasonable to settle.  The first

16  purported defense that they raise is service corporations

17  don't have to comply with Act 34.  They are separate and

18  distinct entities.  I think I've already sort of answered

19  this defense.  It's irrelevant because whether your view of

20  the world is that the city took on swap obligations to the

21  service corporations or to the swap counterparties, it's the

22  city that still has swap obligations here that don't comply

23  with Act 34.  But even more to the point, the evidence

24  doesn't bear out their argument.  In neither the June

25  negotiations nor the December negotiations were the service

1  corporations anywhere to be found.  I mean Mr. Buckfire even
2  testified he was still to this day unfamiliar with the
3  service corporations.  They weren't in the room.  They
4  weren't doing negotiations.  Nobody even knows how -- whether
5  and how they negotiated with any party or how they signed the
6  agreement.  To say that they are -- to conclude that the
7  service corporations are not controlled by the city, not
8  affiliated with the city, doesn't match up with the evidence
9  that we heard.

10       The second purported defense raised to the claim
11  that the swaps don't comply with Act 34 and are, therefore,
12  void is that the city didn't actually have to comply with Act
13  34 because there's home rule power in the State of Michigan,
14  and home rule allows it to take on swaps however it would
15  like to.  Well, home rule doesn't work that way.  Home rule
16  doesn't mean municipalities can do whatever they want to do.
17  Home rule powers are specifically limited, and I've thrown up
18  here just three bullet points, the Home Rule Charter, the
19  Home Rule City Act, and the Michigan Constitution, all of
20  which specifically say home rule is limited.  It is subject
21  to the Michigan state Constitution, Michigan state statutes.
22  Act 34 is such a limitation on municipal power.  It is a
23  limitation that says if you're going to enter into swap
24  transactions, great.  Here's how you do it.

25       The question here becomes whether Act 34 preempts a

1    municipality's ability to enter into swaps under any -- in

2    any other manner.  We briefed this pretty extensively in our

3    brief, and there's really been no arguments thrown up against

4    it.  These are the Llewellyn factors for preemption, and

5    what's key to our case here are the second, third, and fourth

6    bullets on the slide, whether preemption of a field

7    regulation can be implied from the legislative history,

8    whether the state regulatory scheme itself is so pervasive

9    that it makes clear that it preempts a municipality --

10   municipal power, and whether the nature of the subject matter

11   demands uniformity, and here all of these factors weigh in

12   favor of a finding that cities cannot enter into swaps

13   outside of Act 34.  Act 34 was clearly put in place -- and

14   the legislative history bears this out -- to protect the

15   credit of the state and its municipalities.  It prohibits a

16   municipality from issuing debt or obligations except in

17   accordance with Act 34.  The legislative scheme is all-

18   encompassing.  The provisions are wide-ranging, and the

19   supervision by the state is all-encompassing, and the act

20   specifically includes a section on swap obligations.  That

21   section, Section 317, is itself all-encompassing.  It imposes

22   numerous prerequisites to entry into interest rate swaps,

23   including specified terms that must be in the agreement,

24   approval, review, compliance enforcement by the Treasury

25   Department, adoption of debt and swap management plans that

1   incorporate analyses of risk and cost and benefits, reporting

2   and disclosure requirements.  This regulatory scheme is both

3   so broad and so detailed that it's clearly intended not as an

4   optional means for which a city could enter into swaps but

5   the required means by which they can enter into swaps.

6           The subject matter also speaks to this.  The purpose

7   of Act 34 was to protect the credit and solvency of the State

8   of Michigan as a whole by protecting its municipalities from

9   entering into risky transactions.  The notion that home rule

10  might provide a defense to a claim that the swaps are void

11  because they didn't comply with Act 34 simply lacks merit.

12          The third possible defense that's been raised to the

13  claim that the swap obligations are void, this comes down --

14  this potential defense is the defense of estoppel, and it

15  comes from Mr. Orr's testimony that there are countervailing

16  facts basically.  The city got a benefit from the swap

17  obligations.  There were City Council findings rendered when

18  they entered into the obligations.  There were legal

19  opinions.  All of these are facts that could potentially give

20  rise to an estoppel claim.  Notably, the city mentions this

21  in its paper.  The swap counterparties do not argue estoppel

22  in their papers, interestingly.  The problem here is it's

23  black letter law that estoppel -- the doctrine of estoppel is

24  wholly inapplicable to challenges that municipal acts are

25  void ab initio or ultra vires, outside the municipal's --

1   municipality's authority.  There's a Supreme Court case on

2   point, <u>Pullman's Palace</u>, that talks about if a contract is

3   ultra vires, it is wholly void, of no legal effect, and

4   neither party, quote, "can be estopped by assenting to it or

5   by acting upon it to show that it was prohibited by those

6   laws."  There's also Michigan state cases that say

7   specifically the doctrine of estoppel is inapplicable to

8   ultra vires acts, and those cases are cited in our brief, so

9   there is no estoppel defense here whatsoever.

10        Finally, the fourth and last defense to a claim that

11   the swaps are void ab initio is something that Ms. Ball spent

12   quite a bit of time on in her closing argument, and we also

13   heard this morning from the counsel for the swap

14   counterparties.  The idea -- I think your Honor said it this

15   morning yourself.  The idea that you could have a transaction

16   that is rendered void, that is void under state law, that

17   could, nevertheless, be not only enforceable but protected in

18   bankruptcy -- I think you called it extraordinary, and I

19   agree.  In fact, I think it's kind of absurd, to be perfectly

20   honest.  I think this is a point of logic.  If you have an

21   obligation that under state law is void, a nullity, of no

22   legal effect, then that same transaction, because you call it

23   something, can't suddenly get protections in bankruptcy.  And

24   Judge Gonzalez in the <u>Enron</u> case -- notably, this is the only

25   opinion on this point.  The swap counterparties' lawyer said

1  this morning, you know, it's a very narrow holding.  He's

2  right.  It is a very narrow holding, and it is directly on

3  point to this case.  Judge Gonzalez looked at the underlying

4  transaction under Oregon law, and Oregon law was very clear

5  that that transaction done in that manner was void under

6  state law, and so he concluded where the transaction is

7  rendered void by state law, it is a nullity, and the purpose

8  of the safe harbor provisions cannot be implicated.  The

9  transaction is void.  The treatment of the financial

10  instrument is the result of state law voiding the entire

11  transaction.  If it is determined that the transaction

12  violated state law, the agreement would be a nullity and have

13  no legal effect.  As a consequence, the transfer would not

14  have been made under or in connection with the swap agreement

15  and could not be protected from avoidance under the

16  Bankruptcy Code.

17       Ms. Ball raised three cases in her closing argument

18  out of the Eighth Circuit, the Northern District of Illinois,

19  and the Second Circuit.  None of these cases even remotely

20  call into question the idea that a void transaction cannot be

21  protected by the safe harbors.  None of them call into

22  question the reasoning of the Enron decision, and that's

23  because in none of those cases was there even an allegation

24  made that the underlying transaction was void under state

25  law, none of them.  I can go through those in more detail if

1    your Honor would like.

2           THE COURT:  Well, I'm more interested in how you

3    deal with the precise language of Section 560 of the

4    Bankruptcy Code.

5           MS. ENGLISH:  Well, the point is that if the swap

6    transaction itself is void, okay, Supreme Court law and

7    Michigan law say if you've got a municipal contract that

8    exceeds the scope of municipal authority, that is ultra vires

9    and, therefore, void ab initio, it's as though the

10   transaction never took place, never happened.  It is of no

11   legal effect, so there is no swap agreement to protect.

12   There are no swap obligations to protect under the safe

13   harbor provisions.  The swap counterparties have no legal

14   position to be protected by the safe harbors.

15          So the question is could the city -- based on these

16   four defenses, could the city have reasonably second-guessed

17   the strength of the legal argument that the swap obligations

18   were void ab initio based on these four defenses, which were

19   the only defenses we heard about?  Can the Court reasonably

20   second-guess the strength of this argument based on these

21   defenses?  The bottom line is that none of these so-called

22   weaknesses or roadblocks that the city has thrown up actually

23   call into question the strengths of the -- the strength of

24   the city's claim that the swaps are void.  There are no facts

25   in evidence and no argument made that Act 34 was actually

 1   followed.  There's no legitimate argument that the city could
 2   enter into swaps without complying with Act 34.  The fact
 3   that the service corporations may be viewed as separate
 4   entities is irrelevant.  The doctrine of estoppel is wholly
 5   inapplicable to claims of void ab initio, and the safe
 6   harbors in bankruptcy cannot save a void transaction that
 7   doesn't qualify as a swap in the first place.  Without any
 8   meaningful defense, how could Mr. Orr say that this claim
 9   gets a 50-50 assessment, 50-50 odds, it's just a toss-up?
10   How can the Court conclude that settling this claim at 62
11   cents on the dollar or maybe even 78 cents on the dollar is
12   fair and equitable?
13        Now I'm going to move to my second argument, and
14   that is that the liens on the casino revenue are also void
15   because, just as the swap obligations were not entered into
16   in accordance with the state statute, the pledge of the
17   casino revenue was also not authorized by a state statute,
18   and I'm talking specifically about the Gaming Act.  The
19   Gaming Act has a specific list of authorized uses of casino
20   revenue.  None of them involve financial obligations or
21   collateralization of financial obligations or swap
22   obligations.
23        Here's the list.  Under the Gaming Act, casino
24   revenue may be used only for hiring, training, deployment of
25   patrol officers, neighborhood and downtown economic

development programs designed to create jobs, public safety

programs, emergency medical services, fire department

programs, street lighting, anti-gang and youth development

programs, other programs designed to contribute to the

improvement of quality of life in the city, relief to

taxpayers, capital improvements, road repairs.  Not a single

one in that list that says hedge interest rates,

collateralize a financial obligation.

What are the city's defenses here as to the argument

that the pledge of casino revenue didn't meet any of those

authorized uses?  They have two.  The first is that it's

permissible under subsection little (v).  That's the section

that says other programs are designed to contribute to the

improvement of quality of life in the city.  Statutory

construction dictates when you have items in a list like we

do here and you see the first several there talk about

programs, economic development programs, public safety

programs, youth development programs, we're talking about

community betterment programs, programs that provide

services.  Is this a program that provides for community

betterment or services?  No.  It's a swap obligation to pay

banks an interest rate.

Ms. Ball argued for the first time in her closing

argument that, hey, look, the pensions are a program, so it

can be an authorized use under this section because they're

1  related to the pensions.  Notably, Mr. Orr never testified to

2  that, not in deposition, not in trial, not a single piece of

3  paper, not a single piece of evidence or testimony that shows

4  this -- that was the defense that was considered that led

5  them to their assessment of 50-50 odds.  This came for the

6  first time in closing argument from Ms. Ball.

7  Notwithstanding that, the pensions are not the program here.

8  There was no money in the swap obligations that was going to

9  the Retirement Systems.  Retirees weren't getting the benefit

10  of this.  This was swapping interest that the city was liable

11  for under a financial agreement, didn't better off the

12  retirees.  This is not a pension program.

13          The argument that the city and the swap

14  counterparties did mention in their briefs was that this is

15  an authorized use of casino revenue in that it would improve

16  the quality of life in the city because if they hadn't

17  pledged the casino revenue in 2009, the city was facing

18  massive liability, and that ultimately would trickle down,

19  and it would affect the quality of life in the city.  Your

20  Honor, that, we respectfully submit, is just too attenuated.

21  If you start to read the Gaming Act that any financial hit to

22  the city might ultimately affect quality of life of the

23  residents of the city and, therefore, might qualify as a

24  quality of life improvement program, we should just -- it

25  renders the entire Gaming Act meaningless.  Having a list of

1    specified uses just gets thrown out the window.

2           As to the tax relief prong, that's the second

3    defense they raise.  Okay.  Well, it's authorized under the

4    factor that says you can use casino revenue to provide relief

5    to the taxpayers of the city from one or more taxes or fees

6    imposed by the city.  We've not heard actually anyone

7    seriously argue this defense, and I submit it's because the

8    language of the statute is very clear.  Use of casino revenue

9    in this way must be to relieve taxpayers from a tax that's

10   been imposed.  There was no such tax that was -- that had

11   been imposed and then was relieved by the pledge of casino

12   revenue, so we submit that this use also doesn't work.

13          So here again, we've not heard any arguments that

14   cast any meaningful doubt on the city's claims that the liens

15   were unauthorized by the Gaming Act and, therefore, invalid

16   or void, so we asked the question again.  Is Mr. Orr's 50-50

17   assessment on this claim credible?  Can the Court view the

18   settlement that's been presented today as reasonable based on

19   this claim that's being settled?

20          I've discussed on the two claims I've addressed that

21   we believe the probability of success is high.  I didn't give

22   you a number, but fair to say we think it is very strong.

23          Let's look at what the rewards of litigation would

24   be.  If these two claims were successful, it would mean that

25   the swap obligations are a nullity, void ab initio, no swap

 1  obligations, and it would mean that there are no liens.  The
 2  swap counterparties don't have any liens on the casino
 3  revenue.  What does this mean for the city?  It means the
 4  casino revenue cannot be trapped.  It means the city is free
 5  to use its casino revenue for quality of life improvement
 6  programs and initiatives.  It means the city is relieved from
 7  having to pay monthly swap payments to the swap
 8  counterparties.  It means the city does not face any
 9  liability for a swaps termination payment, and it means that
10  the swap counterparties will owe the city hundreds of
11  millions of dollars.  Mr. Orr testified to that.  There's
12  going to be a disgorgement claim if the city wins to get the
13  swap payments back.  This deal should have the swap
14  counterparties paying the city, not the city paying the swap
15  counterparties.
16          THE COURT:  How much?
17          MS. ENGLISH:  He keeps wanting a number from me.
18  The swap payments were about $50 million a year, and this is
19  stretching back a number of years.  I haven't looked into the
20  statute of limitations on this, but Mr. Orr agreed it would
21  be hundreds of millions.
22          THE COURT:  I won't press you on the number anymore,
23  but where do the swap counterparties go if the city wins on
24  all of this?
25          MS. ENGLISH:  Well, I don't know the answer to that,

 1  but if the swap obligations in the first place were void and

 2  of no legal effect, the result of that is that typically you

 3  unwind the transaction and restore people back to their

 4  original position.

 5       THE COURT:  Does that put the pension plans at risk?

 6       MS. ENGLISH:  Not on the swap obligations, your

 7  Honor, no, it doesn't.  Pensions did not benefit in any way

 8  from the swap payments that were made.

 9       THE COURT:  Except indirectly as they supported the

10  COPs transaction.

11       MS. ENGLISH:  Again, your Honor, let's -- I don't

12  want to get carried away here as Ms. Ball has done with the

13  idea that we have to unwind everything and look at the COPs'

14  validity right now.  They're not settling that claim right

15  now.  They've reserved the ability to pursue that claim

16  later.  The only thing that's being settled is the swap

17  obligation.

18       One of the factors the Court has to consider is the

19  complexity, expense, and delay of litigating, of course.

20  What's the tradeoff?  If you don't settle, what are you

21  looking at?  And I think I touched on some of this earlier

22  on.  These are pure legal issues that we've presented.  They

23  require no discovery and could be resolved on summary

24  judgment.  We think they could be resolved very quickly in

25  this court.  We think an injunction in order to prevent the

1 swap counterparties from being able to trap the casino
2 revenue during the pendency of the litigation is likely given
3 that the probability of success on the merits is high and
4 clearly the balance of hardships would tip in the city's
5 favor, so ultimately we think the analysis comes out that the
6 litigation cost would be relatively low given the nature of
7 the issues.  They can get their post-petition financing
8 secured by income tax and asset proceeds just as they've
9 shown they can do, which will support ample post-petition
10 financing while they litigate.
11          Given the strength of the city's claims against the
12 swap counterparties, we submit that the settlement on the
13 terms proposed in the current forbearance agreement is far
14 too rich.  Moreover, we don't actually know what the
15 settlement means.  Mr. Orr doesn't know.  We don't know.
16 Your Honor doesn't know.  It could be the 62 percent Mr. Orr
17 thought it was.  It could also be much more.  By agreeing to
18 a fixed rate without doing an interest rate analysis and
19 without knowing what the termination payment is going to look
20 like on January 31st, we've all been handicapped, and we
21 submit that the Court can't conclude under these facts and
22 circumstances whether this settlement is actually fair and
23 reasonable.  I think that'll conclude my presentation.  Thank
24 you.
25          THE COURT:  Thank you.

1                          CLOSING ARGUMENT

2            MR. GORDON:  Good morning, your Honor.  Robert

3    Gordon of Clark Hill on behalf of the Retirement Systems.

4            THE COURT:  Should I not press you for a number

5    either?

6            MR. GORDON:  I'd prefer you didn't, but we can

7    certainly talk about that along the way.

8            THE COURT:  Okay.

9            MR. GORDON:  I apologize, your Honor.  The title

10   page on this does not reflect the updated date of January

11   13th.  I have hard copies that do, though.  It kept changing,

12   your Honor.

13           Your Honor, my comments are going to address

14   specifically and directly the swap settlement and certain

15   arguments that have been put forward both by the Retirement

16   Systems and by Ambac, as Ms. English has referred to.  Of

17   course, those comments then indirectly address the post-

18   petition financing to the extent that that financing is

19   seeking financing to fund a settlement that we don't believe

20   should be approved.

21           Your Honor, as Ms. English has also indicated, we

22   are addressing the settlement under Rule 9019, and the

23   question under that rule is whether the settlement is fair

24   and equitable.  And, of course, courts have used -- whether

25   it's fair and equitable -- I'm sorry -- and whether it's in

1   the best interest of creditors, and, of course, courts have

2   used the four-factor test to assess what is fair and

3   equitable in the best interest of creditors.  I will be

4   addressing those factors specifically as they apply to two

5   arguments, specifically that the settlement fails in treating

6   the swap counterparties as likely secured creditors.  It

7   fails under Bankruptcy Code Section 552 and under Sections

8   902 and 928 of the Bankruptcy Code.

9        Under the four-factor test, your Honor, the

10  Retirement Systems submit that the forbearance agreement

11  should not be approved.  In summary on this page, we indicate

12  that the first factor is the probability of success, and we

13  submit that the probability of the city being successful in

14  challenging the swap counterparties' asserted liens in the

15  post-petition casino tax revenues is very high.

16       The complexity, expense, and delay of litigation is

17  the next factor.  In that regard, the issues briefed and

18  described below are straightforward and primarily legal

19  issues capable of being resolved by the Court on summary

20  disposition, so the expense and delay are minimal.

21       Interest of creditors and proper deference to the

22  reasonable views is the next factor.  We would submit that

23  the reasonable views espoused by numerous large and important

24  creditors in opposing the forbearance agreement should be

25  given proper deference.  The interest of creditors militates

1    in favor of litigating to avoid an unwarranted windfall to
2    one set of creditors to the detriment of all other creditors.
3         And, finally, the last factor is the difficulties of
4    collection, and we would submit that that really doesn't have
5    much applicability in this situation or with respect to the
6    arguments that I'm addressing.
7         Starting with the probability of success, your
8    Honor, the Retirement Systems submit that the city should
9    have sued for declaratory relief and/or lien avoidance with
10   respect to the swaps asserted liens and that they should have
11   done so because there are a host of compelling legal
12   arguments here, the first being, of course, as Ms. English
13   has referred to, that the -- and this is the first of the
14   ones that the Retirement Systems have also articulated, is
15   that the casino revenue liens are entirely invalid under the
16   Michigan Gaming Act.  Moreover, however -- and this is what
17   we will -- I will be addressing -- is that even if the casino
18   revenue liens were valid under the Michigan Gaming Revenue
19   Act pre-petition, those liens do not survive the bankruptcy
20   filing under Section 552(a) of the Bankruptcy Code because,
21   number one, they are consensual liens, not statutory liens,
22   and the post-petition casino revenues are not proceeds of
23   those pre-petition consensual liens.  That's sort of the
24   Section 552 argument.  And then, number two, that the casino
25   revenues are not special excise taxes and, therefore, are not

1  special revenues under Section 902(2) of the Bankruptcy Code,
2  and, thus, the liens are not special revenue liens under
3  Section 928(a) of the Bankruptcy Code.  That's the 902, 928
4  argument that I will refer to.  Your Honor -- and I will deal
5  with those both separately, but, your Honor, ultimately when
6  we go through these arguments, which I think are very strong,
7  there is no reason to treat the swap counterparties as
8  secured creditors with respect to the casino revenues
9  acquired post-petition.

10         So let's start with Section 552 if we may.  Section
11  552(a) provides that property acquired by the debtor after
12  the bankruptcy filing is not subject to a lien resulting from
13  a security agreement entered into by the debtor prior to the
14  petition date.  That is the cutoff provision of Section
15  552(a).  Section 552(a), as indicated in the County of Orange
16  case, quote, "should be viewed broadly given the goal of
17  facilitating a fresh start for the debtor," end quote.  As
18  the Court knows, Section 552(a) applies only to liens arising
19  out of, quote, "any security agreements," end quote, which
20  has been interpreted to mean consensual liens, and,
21  therefore, Section 552(a)'s cutoff does not apply to
22  statutory liens and other types of liens.  Not surprisingly,
23  therefore, the emergency manager and the swap counterparties
24  claim that the swaps -- I'll call them the swaps or the swap
25  counterparties -- have a statutory lien.  They do not.

1    Section 101(53) of the Bankruptcy Code defines a
2  statutory lien as a -- and I quote -- "lien arising solely by
3  force of a statute on specified circumstances or conditions,
4  but does not include security interest or judicial lien,
5  whether or not such interest or lien is provided by or is
6  dependent on a statute and whether or not such interest or
7  lien is made fully effective by statute," end quote.  So even
8  if a security interest or a lien is dependent on a statute to
9  be fully effective, that doesn't make it a statutory lien.
10  The lien must arise solely by force of a statute.

11    The District Court in Orange County cited the
12  legislative history to Section 101(53) of the Bankruptcy Code
13  and stated, quote, "A statutory lien is only one that arises
14  automatically and is not based on an agreement to give a
15  lien," end quote.  The Orange County court also cited the
16  authority under Collier on Bankruptcy, which distinguished
17  statutory liens from security interests by stating, quote,
18  "If the lien arises by force of statute, without any prior
19  consent between the parties, it will be deemed a statutory
20  lien.  If the creation of the lien is dependent upon an
21  agreement, it is a security interest even though there's a
22  statute which may govern many aspects of the lien," end
23  quote.  This language is very important, as you will see.

24    Here, as of early 2009, your Honor, there were no
25  statutes or ordinances authorizing or creating the casino

1  revenue liens until the parties agreed upon all of the key
2  terms and presented a term sheet to City Council, which then
3  adopted Ordinance 05-09 for the express purpose of
4  authorizing the collateral agreement, so let's look at the
5  history of the events.  On March 31, 2009, the city and the
6  counterparties enter into a nonbinding term sheet for the
7  collateral agreement.  On May 26, 2009, the City Council
8  adopts Ordinance 05-09 which adds Article 16 to Chapter 18 of
9  the City Code specifically to implement the term sheet and
10 facilitate the city's entering into the collateral agreement.
11 Section 18-16-4 of the City Code, which was added by
12 Ordinance 05-09, provides in part as follows, and we have the
13 different sections here.  Section -- Subsection F recites
14 that the parties entered into a settlement.  Subsection H
15 discusses settlement terms.  Subsection N states, and I
16 quote, "This Ordinance is adopted for the purpose of
17 implementing the transactions contemplated by the term sheet,
18 and when this Ordinance becomes effective and implemented by
19 one or more resolutions as herein provided and the definitive
20 documents (defined below) are executed and delivered, the
21 complete agreement of the city and the 2006 counterparties
22 shall be expressed thereby," end quote.
23         Then on June 23, 2009, the City Council passes a
24 resolution authorizing the city to enter into the collateral
25 agreement and other transaction documents, and on June 26 the

1    transaction documents are executed.  Thus, it is clear, your

2    Honor, that Ordinance 05-09 merely facilitated the

3    transaction, and the genesis of the casino revenue liens is

4    in the collateral agreement itself, and we've highlighted the

5    section of the collateral agreement that required the

6    authorizing ordinance to be implemented -- adopted in order

7    to create the lien, but it is provided in the first instance

8    in Section 4.1 of the collateral agreement.

9         Put another way, the casino revenue liens are not

10   created automatically and solely by force of an existing

11   general statute.  To the contrary, Ordinance 05-09 was

12   created in part specifically to authorize and implement the

13   collateral agreement and the liens arising thereunder.  In

14   this case, but for the collateral agreement, your Honor,

15   there would be no lien on the casino revenue.  Thus, the

16   liens clearly do not constitute statutory liens.

17        There's also one other interesting argument to take

18   into consideration here, although it's not necessary to this

19   point.  You will note that the argument that the casino

20   revenue liens are statutory liens is solely predicated on the

21   effect of Ordinance 05-09.  Implicit in that argument then is

22   that 05-09 is a statute.  However, we would submit that there

23   is a substantial open question as to whether an ordinance is

24   even the equivalent of a statute for purposes of creating a

25   statutory lien, and we cite the case -- it's not a bankruptcy

1   case, but we cite the case of <u>Rental Property Owners</u>

2   <u>Association</u> versus <u>City of Grand Rapids</u>, 455 Mich. 246, 247,

3   a 1997 case, where they -- and there's a quote there, "A

4   municipal ordinance is preempted by state law if 1) the

5   state's -- the statute completely occupies the field that the

6   ordinance attempts to regulate, or 2) the ordinance directly

7   conflicts with a state statute," end quote, so you see from

8   the language there that there is a distinction being made

9   between statutes and ordinances that we think ought to be

10  considered as well.

11          So if the casino revenue liens arise by consensual

12  liens and not by statutory lien, the next question that one

13  has to ask under the Bankruptcy Code is whether Section

14  552(b)'s exception to the cutoff under 552(a) applies.  The

15  exception there is -- provides that if property acquired by a

16  debtor post-petition constitutes the proceeds, products, or

17  offspring of pre-petition collateral, then the pre-petition

18  lien would continue to reach that collateral or those -- that

19  property acquired post-petition.  Here we've briefed it

20  extensively.  It merits very little discussion.

21          The post-petition casino revenues acquired by the

22  city clearly are not proceeds of the swap counterparties'

23  pre-petition collateral.  The casino tax revenues that are

24  acquired post-petition simply don't arise from the only

25  collateral that the swap counterparties claim that they have,

1  which is the pre -- which is just the casino tax revenues, so

2  post-petition casino tax revenues are not offspring of pre-

3  petition casino tax revenues.  They are products and

4  offspring of the operation of the casinos themselves and the

5  levying of the taxes post-petition.

6          So the next issue, your Honor, is -- since the liens

7  do not survive under Section 552, the question is whether

8  there is an exception under Section 902 and 928 of the

9  Bankruptcy Code as being liens on special revenues, so let's

10  turn to that, if we may.  The emergency manager and the swap

11  counterparties contend that the swap counterparties' asserted

12  liens are liens and special revenues protected under Section

13  928.  They are wrong.  Section 902 -- I'm sorry.  Hang on a

14  second.  Did I go too far?  I did.  I apologize.  Section

15  902(2) defines special revenues as inter alia, quote,

16  "special excise taxes imposed on particular activities or

17  transactions," end quote.  The emergency manager and the swap

18  counterparties have argued that the casino revenues are

19  excise taxes, and, therefore, they're special revenues under

20  Section 902(2)(B) of the Bankruptcy Code.  What they gloss

21  over critically is the word "special."  Not all excise taxes

22  qualify due to the inclusion of the word "special."  And I

23  heard both the emergency manager and counsel for the

24  emergency manager on January 3 say to this Court that the

25  casino revenues are excise taxes; therefore, they're special

1    revenues, not mentioning the word "special" at all.  The
2    placement of the word "special" before "excise tax" in
3    Section 902(2)(B) of the Bankruptcy Code was done to
4    illustrate Congress' intention that Section 928(a) only apply
5    to special revenues that secure the payment of special
6    revenue bonds.  As the Court in the Heffernan case stated,
7    and I quote, "According to Congress, comma" -- sorry -- the
8    intent, quote, "is to define special revenues to include the
9    revenues derived from a project or from a specific tax levy,
10   where such revenues are meant to serve as security to the
11   bondholders," end quote, and they are citing the legislative
12   history in that regard.  Consistent with this notion that
13   special revenues and the protections of Section 928(a) apply
14   only to revenues that support specific bond finance projects,
15   there was a report submitted in connection with the
16   legislative process that illustrates the situations in which
17   excise taxes should be considered special, and, therefore,
18   special revenues, and this report was drafted by Mr. Richard
19   Levin and Lawrence King.  I don't know if they're Mr.
20   Bennett's personal pantheon of great practitioners along with
21   Justice Cardozo, but I think they're fairly authoritative
22   figures.  So they write, and I quote, "Hotel-motel taxes,
23   meal taxes, and the license fees are included in special
24   excise taxes.  They are often imposed for particular
25   purposes.  For example, hotel-motel excise or meal tax might

1   be imposed in a particular area of a municipality or
2   throughout a city to finance the construction and operation
3   of a convention center," and the last sentence of this
4   paragraph is important. "Bonds secured by the special excise
5   tax are issued to finance the construction." I want to read
6   on for just a moment, and I quote again from the report,
7   "Property, sales, and income taxes would generally not be
8   considered special revenues. However, some exceptions may
9   exist, for example, where a special property tax is levied
10  and collected for the specific purpose of paying principal
11  and interest coming due on bonds issued in connection -- in
12  conjunction with the levy of the -- in conjunction with the
13  levy of the property tax, the revenues may constitute special
14  revenues. In these cases, there is generally a prohibition
15  under state law on using the special tax revenue for any
16  purpose other than the payment of the bonds. However, where
17  the revenue may be used for other purposes, it should not
18  constitute special revenues," end quote.
19       So were the casino revenues levied for a specific
20  project here? That's the next question. The answer is no.
21  Section 12(3)(a) of the Gaming Revenue Act identifies eight
22  general categories of purposes for which a wagering tax may
23  be used by a city. It does not specify a specific purpose or
24  project to which the proceeds of a wagering tax may be used.
25  So now we look to the City Code to see if there's some

1　special purpose why these particular casino tax revenues were

2　levied in this instance.  Section 18-14-3 of the City Code

3　creates the wagering tax levy by the city.  Section 18-14-10

4　entitled "Use of Proceeds" merely states that the proceeds

5　from the wagering tax can be used for any purpose under the

6　Gaming Revenue Act.  No specific purpose is identified.

7　　　　　As such, your Honor, the casino revenues constitute

8　general excise taxes, not special excise taxes, and are not

9　special revenues under Section 902(2)(B) of the Bankruptcy

10　Code.  Moreover, the granting of a lien in the casino

11　revenues in favor of the swap counterparties does not change

12　the nature of the casino revenues as general excise taxes.

13　Therefore, Section 928's protection of liens and special

14　revenues does not apply to any asserted lien of the swap

15　counterparties in the casino revenues.

16　　　　　Now, it's interesting.  On page 34 of the city's

17　omnibus reply, all they say in response to this is that this

18　argument isn't -- and I quote, "This is not free from doubt,"

19　end quote, but that's not the standard under Rule 9019, your

20　Honor.  The question is likelihood.  Is it likely that this

21　argument is correct, not that it's free from doubt.  It's

22　likelihood.  And we would submit that the clear likelihood is

23　that the casino revenues are not special revenues.

24　　　　　I heard this morning the swap counterparties'

25　counsel say that they have insurance for their claim.  I

1    would say so what.  That doesn't mean that they or their

2    insurers are entitled to be treated as secured creditors.

3            Your Honor, the analysis that we just went through

4    under 902 is very much consistent with the well-recognized

5    purposes as to what 928 was adopted in the Bankruptcy Code

6    for.  A leading treatise indicates that Section 928(a) should

7    only apply to liens on special revenues that secure revenue

8    bonds that finance the project from which the revenue is

9    derived, and we cite Collier on Bankruptcy for that.

10           In the County of Orange case, it was stated by the

11   Court that the goal was to remove the risk that revenue

12   bondholders would be stripped of their liens on revenue

13   acquired by the debtor after the commencement of a

14   municipality's Chapter 9 case pursuant to Section 552(a) of

15   the Bankruptcy Code.  Collier's states, and I quote, "The

16   effect is to prevent a -- prevent special revenues that

17   secure an issue of revenue bonds from being diverted to be

18   available for the municipality's general expenses or

19   obligations," end quote.  That's essentially what's

20   threatened here.  Here, your Honor, the swap agreements bear

21   no relation to the development of the casinos that generate

22   the casino revenue and, therefore, bear no relation to the

23   policy and intended class of protected claim holders under

24   Section 928(a) of the Bankruptcy Code.  The rationale for

25   Section 928(a) to encourage bond financing investment in

1   municipal programs or projects by protecting the holders of

2   those bonds is simply not implicated with respect to the swap

3   counterparties and their asserted lien claims.  So that deals

4   with the probability issues, your Honor.

5         I would submit it's a bit astonishing if you look at

6   the papers filed by the emergency manager and the swap

7   counterparties how little space they devote to these issues.

8   They, instead, gloss over these issues, I would submit.

9         The complexity -- then the other factors that need

10  to be considered, there's the complexity, expense, and delay

11  of litigation.  Your Honor, here, as I've indicated, these

12  issues are straightforward and primarily legal in nature.

13  You may recall actually the Court at the beginning of the

14  swap matters back in August asked whether there was any need

15  for an evidentiary hearing because the issues seemed to be

16  legal in nature, and it was only when the emergency manager's

17  team suggested that they need to put witnesses on that

18  suddenly it turned into an evidentiary hearing.  This is not

19  highly fact-intensive.  These issues are susceptible to

20  resolution, I would submit, on summary disposition.  For

21  these reasons, the litigation of these issues should not

22  constitute a significant expense, particularly relative to

23  the overall expense of the case and the dollars at stake in

24  this matter.  Similarly, in that context, these issues could

25  have been and still could be litigated in a very quick

1  fashion, so the delay in administration of this case is not a

2  factor.  In fact, at the pace that this case has been going,

3  I would submit that these issues could have been litigated

4  three or four or five times over by now.

5       So what is the response of the emergency manager to

6  these issues?  I would submit not much.  It is recited in a

7  mechanical and pro forma way that the expense and delay of

8  litigating should be avoided, and a settlement provides,

9  quote, unquote, financial stability.  I don't know how

10 layering on $165 million of new debt on the city stabilizes

11 the city's finances.  That boggles my mind.  I don't

12 understand that at all.

13      And then let's look at the proverbial expense and

14 delay that the emergency manager articulates in an anemic

15 sort of way.  As I've mentioned, the expense relative to

16 saving $165 million cannot be a concern in this situation is

17 not persuasive, and the delay is not an issue either.  Ms.

18 English has indicated that with respect to the arguments

19 under Act 34 and so forth that the litigation may take up to

20 six months, and that may well be.  I would submit for these

21 issues maybe six weeks.  It does not take that long to

22 litigate these issues.  I heard on January 3 counsel for the

23 city make reference to that oft cited standard under the W.T.

24 Grant case that a settlement under Rule 9019 only needs to

25 meet the lowest point in the range of reasonableness.  I

1   really question whether that court ever thought that what it
2   stated in that regard would become the standard under Rule
3   9019 for all settlements that debtors bring before courts,
4   but I would submit that that shouldn't be the target, the
5   lowest point in the range of reasonableness, and it shouldn't
6   be a self-fulfilling prophecy.  And in any event, I don't
7   think this settlement even comes close to the lowest point in
8   the range of reasonableness for all the reasons I've stated
9   and the reasons that Ms. English has stated this morning.  I
10  would submit that the city and its creditors deserve far, far
11  better.

12          Your Honor, I don't know why the emergency manager,
13  quite frankly, is pushing this deal.  Often you can at least
14  see some reasons.  I don't see them in this case at all.  On
15  December 18th, the Court suggested to the emergency manager
16  that his team go back to the drawing board, and they emerged
17  several days later with a revised settlement that is
18  remarkable in its obstinacy because it doesn't take to heart
19  the Court's direction and puts back before this Court a
20  settlement that fundamentally continues to ignore the
21  arguments that are being put forward by parties such as Ms.
22  English and myself against the swaps positions and is not
23  substantially or meaningfully better than the original deal
24  and, indeed, may be worse by the time the case -- by the time
25  the transaction would close.  That's all I have, your Honor.

1  Thank you.

2          THE COURT:  Thank you, sir.

3          MR. PEREZ:  Should I go, your Honor, or are you

4  going to take a break?  Go forward?

5          THE COURT:  Sorry?

6          MR. PEREZ:  Should I go forward?

7          THE COURT:  Yes.

8          MR. PEREZ:  Okay.  Your Honor, Alfredo Perez on

9  behalf of FGIC.

10         THE COURT:  Let me just caution you about this

11  little time limitation I do have.  I need to break at about

12  quarter till or ten till twelve for a judges' meeting that I

13  have at noon.

14         MR. PEREZ:  No problem, your Honor.  I will probably

15  be the briefest of all of the speakers, so I can't imagine

16  I'd be more than about 20 minutes.  Your Honor, as a

17  housekeeping matter, I do have copies of the -- certified

18  copies of the order and the plans, whenever I need to

19  substitute that in the record.  Those were Exhibits, I

20  believe, 305 and 306 --

21         THE COURT:  Okay.  Thank you, sir.

22         MR. PEREZ:  -- that were entered in, and I just

23  didn't have them at the time.

24                      CLOSING ARGUMENT

25         MR. PEREZ:  Your Honor, I'm only going to address a

1  couple of things in connection with particularly the

2  forbearance agreement and the insurance rights with respect

3  to the forbearance agreement.  Ms. Ball indicated that what

4  we had was here the allowance of a secured claim, and I think

5  it's a lot more than the allowance of a secured claim.  First

6  of all, your Honor, the parties -- the swap counterparties

7  and the city seek to terminate pursuant to the early

8  termination provisions.  They don't seek to terminate

9  pursuant to the early termination provisions of Section 6

10  but, rather, through the optional termination provisions.

11  And, your Honor, pursuant to those provisions, the swap

12  counterparties cannot terminate and cannot receive a payment.

13  The optional termination provision explicitly provides -- and

14  that's found on part 5(xx) of City Exhibit 133 -- that for

15  the avoidance of doubt, in no event will Party B owe any

16  money to Party A in connection with the election by Party A

17  to exercise the swap termination, so, in fact, just because

18  it's the city as opposed to the service corporations, which

19  are, in fact, the parties to the swaps that are making the

20  payment, that doesn't change the result.  There is no way

21  that the swap counterparties can terminate under that

22  provision and receive payment.

23        And, your Honor, the testimony from Mr. Buckfire is

24  directly on point.  He confirmed that if you use the optional

25  termination provisions, the right to walk away without

1    receiving payment, and if you look on the transcript of

2    December 17th, page 173, lines 13 to 24, again page 174,

3    lines 12 to 13, and page 175, lines 15 through 19, they

4    cannot terminate pursuant to that optional termination

5    provision and receive payment.  So obviously, your Honor,

6    that begs the question why is it that they're terminating

7    under Section 5(xx) as opposed to the optional termination

8    provision under Section 6?  And the reason is is that under

9    Section 6 it's clear that they cannot terminate without our

10   consent, so they're trying to shoehorn themselves in a

11   provision which says they can't receive any money, yet

12   they're receiving $165 million, and the provision that they

13   can use, which would -- in which they are entitled to receive

14   money, they can't do that without our consent, your Honor, so

15   we believe that the forbearance agreement, in essence,

16   modifies the swaps.  They're not entitled to modify the swaps

17   transaction without our consent and that, in essence, what

18   they're doing is they're modifying it against our economic

19   interest, which they're not allowed to do.

20          Furthermore, your Honor, the proposed transaction

21   and specifically the order in connection with the proposed

22   transactions goes way beyond approving a settlement under 19,

23   goes way beyond approving the assumption of a contract under

24   365.  It basically grants a third-party injunction against

25   our clients.  Section G -- I'm sorry.  Paragraph G of the

1   proposed order basically has the Court make a finding that

2   the parties' entry into and performance under the forbearance

3   agreement does not violate any law, including the Bankruptcy

4   Code, does not give rise to any claim against the parties

5   thereto except as expressly provided in the orders, and

6   paragraph 4, paragraph 5, paragraph 7 all make similar types

7   of findings that, in essence, immunize the swap

8   counterparties from any potential claims that we may have.  I

9   mean as the Court is aware, the -- under the Dow Corning case

10  in the Sixth Circuit, generally speaking, third-party

11  injunctions against and third-party releases are not

12  permissible except under unusual circumstances in the plan

13  context.  We're not in the plan context.  There's no evidence

14  as to the unusual circumstances, so that would be

15  impermissible at this point.

16          Additionally, your Honor, they're using Rule 9019 to

17  extinguish third-party rights.  There is -- there are many

18  cases, and probably the best one is the one cited in the

19  materials.  It's called SportsStuff, and let me just read to

20  you the provision in SportsStuff because they're going much

21  farther than they really should be going in the context of a

22  9019.  You heard previously them saying that you have to make

23  a determination as to our consent rights in order to rule on

24  this motion.  I think it was repeated by Mr. -- counsel for

25  the swap counterparties this morning.  I didn't quite hear

1    it, but I think he did repeat that, but in SportsStuff it

2    says a settlement between only two parties to a multi-party

3    lawsuit is not a settlement, and a procedure to approve a

4    compromise under 9019 cannot be used to impose an injunction

5    on a nonsettling party.  And it basically -- and it goes on,

6    and that's precisely what I believe they are trying to do

7    here.

8              THE COURT:  I'm a little confused.  Do you agree

9    that the issue of consent rights should be determined now or

10   not?

11             MR. PEREZ:  I don't think the Court can determine

12   that.  I don't think that's before the Court, your Honor.  I

13   don't think that in the context of a 9019 or in the context

14   of a 365 the Court can determine the rights as between a

15   third-party to that settlement.  It's got to be -- it's got

16   to be an open issue, your Honor.

17             THE COURT:  Well, but the parties can consent to

18   that.  That's why I asked.  Do you consent to it or not?

19             MR. PEREZ:  We do not consent to that, your Honor,

20   absolutely not.  And, your Honor, there's lots of cases --

21   and several of them are cited, including the D.J. Christie

22   case, which you can't -- you can't, in essence, decide things

23   in order to prejudice people's rights, and the same thing is

24   true, your Honor, in the context of 36 --

25             THE COURT:  Well, but how can I determine whether

1  it's appropriate for the city to enter into the forbearance

2  agreement without determining your client's consent rights?

3      MR. PEREZ:  Well, your Honor, I think the Orion case

4  speaks to that, and let me just read the provision of the

5  Orion case, which I think is very important.  And this is in

6  the context of 365, and it was, in essence, my next argument.

7  It says, "Finally, it's important to keep in mind that the

8  bankruptcy court's business judgment" -- because, in essence,

9  that's what you're going to be doing; you're going to be

10 determining whether their business judgment in assuming this

11 contract was appropriate -- "in deciding a motion to assume

12 is just that -- a judgment of the sort a businessman would

13 make.  In no way is this decision a formal ruling on the

14 underlying disputed issues, and thus will receive no

15 collateral estoppel effect.  In a given case, the bankruptcy

16 court might decide it would be beneficial for the trustee or

17 the debtor-in-possession to assume a certain contract.  The

18 court thinks it unlikely that a court would hold the debtor

19 breached the contract, and thus assuming the contract would

20 be good 'business judgment.'  This 'business judgment' could

21 turn out to be wrong, however, if a letter -- if a later fact

22 finder in an adversary proceeding decides that the underlying

23 contract was in fact breached.  In such a case, the judge's

24 wrong decision is simply an error of business judgment, not a

25 legal error."  So, your Honor, you might be making a

preliminary decision on that.  You might be informing
yourself as to the facts, but you're not making a decision on
the merits, and that issue is going to be left for another
day.

        And, your Honor, there are -- the <u>Orion</u> case, which
I read from, is probably the leading case on it, and there
are several other cases, <u>Big Rivers</u>, <u>GI Industries</u>, which
also address this issue and including the issue of the
enforceability of the contract.  We've submitted proposed
language in the order which would, in essence, leave
everybody's rights -- and it would -- and it would, in
essence, undo many of the findings that they're asking you to
make in connection with, in essence, taking away our third-
party rights.

        Finally, your Honor, is the question of the harm.
In essence, this is a balancing of the harms, and there is
harm to the insurers as a result of this.  We have very long
dated obligations.  Some of them go out for more than 20
years.  The swaps were intended to insure against that risk,
and sometimes there was -- in fact, there was at one time
where there was a payment made by the insurance to the city
because the interest rates were in their favor, so to that
extent, taking away the hedge, in essence, does that.  Ms.
Ball argued that in 2009 the city had, in essence, done away
and that the hedge had been undone, but, your Honor, that's

1  only in the case under this provision that they're trying to
2  shoehorn themselves where the city would be receiving a
3  payment, not where the city would be paid.  It was never
4  contemplated, and if you read the plain language of that
5  section of the amended schedule, Section 5(xx), it was never
6  contemplated that the swap insurance would be receiving a
7  payment.  It was always contemplated that the city would be
8  receiving a payment, and if that were the case, they could
9  have easily gone out and hedged again cheaper than they've
10  done -- than they've done -- than they would have done
11  because of that.

12       Additionally, your Honor, the contract
13  administration agreement, Section 6.9.2, basically gives the
14  swap insurers broad consent rights, and what the city and the
15  swap counterparties are doing is is they're just trampling
16  through our consent rights as a result of amending -- in
17  essence, amending the swaps, taking out the provisions that
18  are helpful, and trying to shoehorn themselves in a provision
19  that simply doesn't work.

20       Finally, your Honor, unrelated to the swaps but more
21  related to the DIP, the Court, in essence, instructed us
22  to -- that we couldn't address the issue of need and that we
23  couldn't address the issue of use of funds.  If those two
24  things are not in the record in connection with the financing
25  motion, I question how the Court can make a good faith

1  finding if there's no evidence on any of the -- on any of

2  those two issues.  Thank you, your Honor.

3        THE COURT:  Thank you, sir.

4        MR. MARRIOTT:  Good morning, your Honor.  What time

5  did you say you needed to break?

6        THE COURT:  I need to break at a quarter till or ten

7  till, approximately.

8        MR. MARRIOTT:  All right.  I think that works for

9  me.

10        THE COURT:  Excellent.

11                    CLOSING ARGUMENT

12        MR. MARRIOTT:  Your Honor, Vince Marriott, Ballard

13  Spahr, on behalf of EEPK and affiliates.  I'm going to ask

14  you to switch gears in your head now from forbearance

15  agreement to DIP because what I'm going to be talking about

16  is the DIP, and what I'm going to be addressing are two

17  process issues and whether or not the city cleared two

18  gateway hurdles to obtaining the relief they seek with

19  respect to the post-petition financing.

20        Your Honor, one of these gateway hurdles arises

21  under the Bankruptcy Code and one under state law, and each

22  is designed to protect the integrity of the process so that

23  creditors and other stakeholders are not unduly or

24  unnecessarily prejudiced by the city's efforts to obtain

25  post-petition secured financing from Barclays on the terms it

1   proposes here.

2          The Bankruptcy Code gateway issue is contained in

3   364(c) with conditions, approval of secured post-petition

4   financing on a demonstration by the debtor that unsecured

5   financing is not available.  The state gateway issue is

6   contained in PA 436, which both requires the emergency

7   manager to submit a proposed financing to City Council for

8   approval or disapproval and entitles the City Council to

9   attempt to find an alternative transaction that is at least

10  economically equivalent to what the emergency manager

11  proposes.

12         THE COURT:  Sir, I'm advised that in the overflow

13  courtroom they can't hear you very well.  Can I ask you to

14  turn the microphone more towards you?

15         MR. MARRIOTT:  Yes.  Hopefully that's better.

16         THE COURT:  Yes.  That sounds better.

17         MR. MARRIOTT:  Seems better in here.

18         THE COURT:  Yes.  Go ahead.

19         MR. MARRIOTT:  All right.  I'm going to begin with

20  the Bankruptcy Code and Section 364, and the statute provides

21  specifically that it is a condition to seeking approval of

22  secured post-petition financing or -- and/or financing which

23  has a superpriority administrative expense that the debtor

24  have been unable to obtain unsecured credit.  It is the

25  burden of the debtor to demonstrate that it is unable to

1   obtain such credit, and that burden cannot be met unless the
2   debtor demonstrates it actually attempted to do so, and there
3   are a great number of cases to this effect.  The L.A. Dodgers
4   case, a recent case out of the District of Delaware, 457
5   Bankruptcy Reporter 308, "The Court may not approve any
6   credit transaction under subsection (c) of Section 364 unless
7   the debtor demonstrates that it has attempted, but failed, to
8   obtain unsecured credit under section 364(a) or (b)."
9   Another recent case out of the Southern District of New York,
10  MSR Hotels & Resorts, 2013 Westlaw 5716897, "The standard
11  here does not permit a debtor to purposely choose not to seek
12  financing on better terms on the basis that they themselves
13  subjectively believe that financing they've obtained is the
14  best terms possible."  I'll skip a few of these, drop down to
15  In re. Ames Department Store, 115 Bankruptcy Reporter 34, "A
16  court, however, may not approve any credit transaction under
17  subsection (c) unless the debtor demonstrates that it has
18  reasonably attempted, but failed, to obtain unsecured credit
19  under sections 364(a) or (b)."  Sorry.
20          Your Honor, the testimony of Mr. Doak was clear.
21  The city did not ask a single lender whether it would provide
22  unsecured credit.  Mr. Doak testified,
23              "Question:  As part of the solicitation process,
24              you did not send out a solicitation document that
25              asked parties to return bids for unsecured

1          financing; right?

2             Answer:  No, we did not.

3             And did you personally ask any prospective

4          lender -- and you did not personally ask any

5          prospective lender if it would make the DIP loan on

6          an unsecured basis; right?

7             Answer:  I did not ask that particular

8          question."

9          On further cross, he was asked,

10         "Question:  My understanding is that you led the

11         efforts of the city to find post-petition financing;

12         correct?

13            Answer:  Yes.

14            Okay.  Did you direct anybody else to contact a

15         prospective lender or lenders to ask if they would

16         provide to the city unsecured credit?

17            No, I did not.

18            Did anybody do that anyway and report to you the

19         answer?

20            Not to my knowledge, no."

21         Your Honor, indeed, when the city approached

22  prospective lenders, it did so with an indicative term sheet

23  that proposed to provide lenders all the collateral that

24  ended up being part of the Barclays deal as well as a

25  superpriority administrative expense that is also part of the

1    Barclays deal.

2            Your Honor, a brief excerpt from City Exhibit 56,

3    the collateral swap termination loan.  They describe the

4    collateral as income tax revenues, asset proceeds collateral,

5    quality of life loan, swap termination loan, asset proceeds,

6    income tax revenues, quality of life loan, casino taxes, and

7    asset proceeds collateral and a junior lien on the income

8    tax, and all the loans were going to have a 364(c) and 503

9    superpriority administrative expense status.  This is what

10   went out to prospective lenders.  This, of course, put the

11   rabbit in the hat and essentially reduced to zero the chances

12   that any lender would make a proposal without collateral or

13   without a superpriority administrative expense.  Mr. Doak

14   himself acknowledged this.  He was asked,

15           "So the initial proposal that you sent out

16            contemplated that the DIP financing would be

17            secured; correct?

18            Yes.

19            And the collateral that the city included in its

20            initial proposal was income tax revenue, asset

21            proceeds, and casino revenues; correct?

22            Yes.

23            And you would agree with me that it would be

24            unlikely that a potential lender would remove

25            protections that went out with the city's initial

1         proposal; right?

2           Answer:  I would agree."

3         The city has attempted to overcome this failure to

4 even ask for unsecured credit by offering as opinion

5 testimony the view of Mr. Buckfire and Mr. Doak that such

6 credit would not have been available in any event.

7         I'll point out, Judge, that as an initial matter --

8 this is not under 364(c) but 364(d), which has a comparable

9 requirement that the debtor demonstrate that better credit is

10 not available, that -- and this is the Reading Tube Industry

11 cases.  The court could not find that the debtor met its

12 evidentiary burden based solely on opinion testimony of the

13 chairman of the debtor's board, an individual with extensive

14 financing experience and business acumen, that less onerous

15 financing was not available where the debtor did not engage

16 in an effort to approach other potential lenders.

17 Essentially the Court -- you're being asked to do something

18 that the Reading Tube court declined to do, and that is

19 accept testimony from an individual who, notwithstanding

20 extensive financing experience and business acumen, really

21 shouldn't be making opinion testimony on this issue when all

22 you really actually have to do is go out and ask.

23         More specifically, Judge, the availability of

24 unsecured credit to a Chapter 9 municipal debtor is simply

25 not presently amenable to expert testimony that should be

1  accorded any weight.  First, both Mr. Buckfire and Mr. Doak

2  acknowledged that neither has had any past experience in

3  sourcing municipal debt.  This was his testimony to that

4  effect.  Mr. Doak,

5      "Prior to this case, you had no personal

6      experience sourcing municipal financing; isn't that

7      correct?

8       That's correct."

9     Mr. Buckfire,

10     "My expertise is in the origin of DIP financing

11     for corporations.  This is the first municipal DIP

12     financing we have arranged."

13     Indeed, Mr. Buckfire testified that nobody has done

14  this before.  This has never been done before.  Nobody has

15  ever done a post-petition financing for a municipality, so

16  it's new and different.  Because no one has any experience in

17  sourcing municipal debt for a Chapter 9 debtor, there are no

18  antecedents to provide supporting facts or data for an

19  opinion.  Under those circumstances, the prudent course would

20  be to ask.  After a certain amount of no's, Mr. Doak or

21  Mr. Buckfire could perhaps have opined that they had

22  sufficient data points to conclude that further inquiry would

23  be futile, yet, as noted, neither Mr. Doak nor anyone else on

24  his team approached a single lender about providing unsecured

25  credit.  Indeed, Mr. Doak went out to market with a proposed

1  collateral package, which surely frustrated any effort to

2  obtain unsecured creditors -- credit.  In other words, as a

3  practical matter, no data was available from which to form a

4  basis for an opinion on the availability of unsecured

5  municipal credit to the city.

6          As a result of this failure to seek any input from

7  the municipal markets at all and, thus, lacking any facts

8  whatsoever upon which to base any opinion, Mr. Buckfire and

9  Mr. Doak are simply expressing their own personal views on

10  the subject of available unsecured credit, which is simply

11  not helpful to the Court.  As Judge Spector of this Court has

12  observed citing to the Supreme Court's Daubert case, "It is

13  not sufficient for the expert's testimony to be based merely

14  upon subjective belief or unsupported speculation," and

15  that's in the Dow Corning case, 237 Bankruptcy Reporter 364

16  at 367.

17          Now, if we could put Exhibit 61 up.  Ms. Ball in her

18  argument made reference to City Exhibit 61 in support of

19  meeting the city's burden with respect to the lack of

20  availability of unsecured credit, and Exhibit 61 was a

21  document produced by JPMorgan.  As evidence of the lack of

22  availability of unsecured credit, however, this exhibit

23  suffers from two infirmities.  The first is that, like the

24  indicative term sheet that was sent to prospective lenders,

25  the city communication to JPMorgan to which Exhibit 61 was a

response indicated from the outset that the city would be
providing collateral.  This is indicated in the document
itself at the top there.  The city and its advisors have
identified four distinct revenue streams to be used as
security to secure any potential lending facility, so, again,
out of the box and when approaching JPMorgan the city was
putting the rabbit in the hat.

         Could we go back to -- Mr. Buckfire, in his
testimony, confirmed this point.  When he was asked by Mr.
Hackney when the city sent whatever it sent to JPMorgan
soliciting the response that Exhibit 61 constituted, he
indicated that, "So isn't it fair to say" --

              "Question:  So isn't it fair to say,
         Mr. Buckfire, that the proposal that you sent out
         there also suggested collateral to the market?"
         Some colloquy, then my question was,
              "Isn't it true that when you sent that letter
         out --
              Yeah.
              -- it proposed collateral to the market?
              Answer:  Yes, it did."

         Now, the second issue, your Honor, is as and to the
extent that the city wants to use Exhibit 61 generated by
JPMorgan as evidence of what was available in the market,
they are actually asking the judge to rely on the opinion of

1  JPMorgan, but JPMorgan wasn't here to testify.  JPMorgan

2  wasn't here to be cross-examined.  Therefore, JPMorgan is not

3  in a position to provide opinion testimony to this Court on

4  the availability of unsecured credit.

5          In short, your Honor, having failed to take the

6  simple step of genuinely testing the market for the

7  availability of unsecured credit, the city has failed to meet

8  its burden under Section 364(c) to demonstrate the

9  unavailability of such credit.

10          Second gateway issue, your Honor, is PA 436.  Oops.

11  This should be back to the -- Judge, Section 19 of PA 436,

12  which is what is up on the screen, provides that the

13  emergency manager must submit a proposal to borrow money to

14  the Detroit City Council.  Now, that requirement is in

15  Section 12(u).  They list various parts of Section 12.  The

16  requirement that a borrowing be submitted is Section 12(u),

17  which then has ten days to approve or disapprove.  In

18  addition, the City Council is given the opportunity if it

19  does not approve the proposal -- this is in 19(2) -- to seek

20  and propose an alternative with the same or presumably better

21  financial result.

22          Mr. Orr did, in fact, submit the Barclays proposal

23  to City Council.  This was City Exhibit 98.  But such

24  submission was incomplete.  It did not include the fee

25  letter, which was City Exhibit 93.  The fee letter -- it is

1    the fee letter which set forth what has been called market

2    flex, and your Honor may recall that market flex was the

3    ability that Barclays has if the loan is approved to go out

4    and to syndicate the loan to other lenders, and if it is

5    necessary to achieve a successful syndication, it is entitled

6    to raise the minimum interest rate under the facility from

7    3.5 percent up to 6.5 percent so that the market flex

8    provision and the specifics of it demonstrate a significant

9    variability in what might end up being the minimum interest

10   rate on the loan from 3.5 percent to 6.5 percent.

11          Other than the fact that there was market flex, the

12   substance of it was never provided to counsel.  This was

13   clear from the testimony of both Mr. Doak and Mr. Orr.  Mr.

14   Doak testified that,

15          "In discussions with City Council, the substance

16          of the market flex provision was not provided to the

17          City Council; right?

18          Answer:  No, it was not.

19          Question:  The city notes the existence of

20          market flex but does not actually disclose the

21          specific terms of the market flex; correct?

22          Answer:  Yes."

23          Mr. Orr testified first correctly that he provided

24   to City Council his submission, Exhibit 98.

25          THE COURT:  I'm sorry to interrupt you, sir, but,

1   again, I've been asked --

2           MR. MARRIOTT:  Oh, I'm sorry.

3           THE COURT:  -- to ask you to adjust the microphone

4   again and try to stay closer to it.

5           MR. MARRIOTT:  I apologize.  I get wrapped up in my

6   own argument.  Referring to Exhibit 98, which, as I

7   mentioned, was the -- Mr. Orr's submission under Act 436 to

8   the City Council,

9               "But Exhibit 98, the submission to City Council,

10              did not include a copy of the fee letter that we

11              just reviewed, which was Exhibit 93; correct?

12              I believe that's correct.

13              Just the term sheets that were attached to the

14              commitment letter; correct?

15              Yes."

16          And the term sheets, your Honor, did not contain the

17  scope of the market flex.  It merely identified that there

18  was market flex.  It was the fee letter that provided the

19  substance of the market flex.

20              "Now, other than this communication to City

21              Council regarding the proposed Barclays financing,

22              which does not include the fee letter, which has the

23              substance of the market flex provision, did you

24              personally otherwise communicate to City Council the

25              substance of the market flex provision that's

1            contained in the see letter -- in the fee letter?

2               Answer:  No.

3               To your knowledge, did anybody else?

4               Not that I know of."

5        And Mr. Doak confirmed that he didn't.

6        Now, Judge, it goes without saying, but each of Mr.

7  Doak, Mr. Buckfire, and Mr. Orr confirmed it anyway.  The

8  cost of a credit facility is a key component in the

9  evaluating the attractiveness of the facility.  Mr. Doak,

10            "And you would agree with me that pricing was an

11            important fact when you were evaluating the various

12            proposals; right?

13            Answer:  Yes, it was."

14        Mr. Buckfire,

15            "And the cost of this facility was an important

16            factor in Miller Buckfire's evaluation of the

17            proposals; isn't that right?

18            Answer:  Yes."

19        Mr. Orr, who made the ultimate decision to accept

20  the financing,

21            "When you were asked earlier on direct what

22            factors you considered in making the selection, the

23            first factor you indicated was the cost of the

24            various alternatives available to you; correct?

25            Yes.

1          And, in fact, the cost of financing is an

2          important factor in deciding whether or not to

3          undertake a financing transaction; correct?

4          Answer: Yes."

5      In keeping with the importance of knowing the true

6   cost of a financing facility and evaluating it, the testimony

7   makes clear that neither Mr. Buckfire nor Mr. Orr would

8   recommend -- I'm sorry -- neither Mr. Buckfire nor Mr. Doak

9   would recommend and Mr. Orr would not approve a financing as

10  to which they did not know the true cost.

11         Testimony of Mr. Doak,

12         "In fact, you would not have been in a position

13         to recommend the transaction to Mr. Orr if you were

14         not aware of the specifics of the market flex

15         provision; right?

16         Answer: I think that's correct, yes."

17         Mr. Buckfire,

18         "Question: I believe you testified earlier that

19         you ultimately recommended the Barclays proposal to

20         the emergency manager on the basis that it was --

21         and I think your phrase was 'the cheapest one.' Do

22         you recall that testimony?

23         I do.

24         In order to evaluate among alternative what's

25         the cheapest one, you have to know what the cost of

1    each of the alternatives is; correct?

2        Correct.

3        I mean otherwise there's no basis to make a

4        comparison; correct?

5        Answer:  Correct."

6    And Mr. Orr, "And, indeed" --

7        "Question:  And, indeed, it would be imprudent

8        to accept a financing proposal if you did not know

9        what the cost of the financing would be; correct?

10        Answer:  It might be.

11        Well, it might be or it would be?

12        Generally, yes."

13    Now, the city -- let me first say, having said that

14    they wouldn't recommend a facility if they didn't know the

15    true cost and Mr. Orr saying he wouldn't approve a facility

16    if he didn't know the true cost, this is exactly what they

17    asked of City Council in supposedly complying with PA 436.

18    They recommended and sought approval of a facility as to

19    which they failed to disclose the true potential cost and

20    asked the city to do something that all three of them

21    indicated they would be unwilling to do.

22        Now, the city attempts to gloss over this failure by

23    stating that in meetings with council members -- Ms. Ball

24    referred to this in her argument -- Mr. Doak provided to such

25    members a range of possible rates.  This was in Exhibit 90.

1    This is page 6 of Exhibit 90, including the cover page.  This

2    is the range that the city testified to and that Ms. Ball was

3    arguing from, and it's in the middle there.  And the argument

4    is that this range covered the upside of the market flex,

5    yet, your Honor, a range is not what was provided to Mr. Orr,

6    but, rather, the actual terms of the market flex.  If we

7    could have Exhibit 89, and if we could go to page 6, which is

8    the last page.  Well, maybe one more page.  This is what was

9    provided to Mr. Orr.  This doesn't just have some

10   hypothetical range.  This shows the actual terms of the

11   market flex so that he had available to him the specific

12   information.  And if we could go back to the PowerPoint.  And

13   this is what Mr. Doak says.  Mr. Doak testified that merely

14   having a range of possible interest rates without knowing the

15   actual possible interest rate would be insufficient for him

16   to make a recommendation to the emergency manager.

17            "Okay.  Now, in providing information to

18            Mr. Orr, you didn't provide a range of potential

19            rates from five to nine percent.  You provided the

20            actual potential interest rates, market flex and

21            all, under each of the commitments that the city had

22            in time -- had in hand at the time; correct?

23            Yes.

24            Would you have considered yourself adequately

25            advising him on the potential costs of these

1         facilities?  Instead of giving him the actual

2         interest rates, you just gave him a range?

3          Answer:  No."

4         Moreover, your Honor, when the time came ten days

5 later to prevent a -- to present a briefing to City Council

6 on the Barclays transaction itself, the only substantive rate

7 information given was the low end of the possible rate on the

8 Barclays loan, 3.5 percent.  And if we could go to Exhibit

9 91, which are the materials presented to City Council at that

10 time for that briefing -- look at Exhibit 91.  Under

11 "Pricing" on page 6 of that LIBOR plus 250 basis points, 100

12 basis points, floor; i.e., 3.5 percent as the minimum rate,

13 what do they say about market flex?  Subject to market flex.

14 Don't say what it is.  Don't see any interest rate ranges

15 there.  The only number available to City Council is 3.5

16 percent.

17         Now, Judge, one response to this might be, well,

18 City Council said no anyway.  They just would have said no

19 more vigorously if they'd known the complete interest rate

20 provisions for the Barclays proposal, so no harm.  Well,

21 there are two responses to that, your Honor.  The first is

22 appointment of an emergency manager is an extraordinary step

23 involving the shifting of control over a city from its

24 elected representatives to a state appointee with only a

25 limited reserved role for those elected representatives.  One

1  such limited reserved role is the ability to approve or

2  disapprove borrowings by the city.  The integrity of that

3  limited role is undermined if the emergency manager is

4  permitted to withhold material information when seeking such

5  approval or disapproval.

6  Moreover, just as an example, what if the City

7  Council had instead said yes thinking the interest rate was

8  3.5 percent only to find out later that due to market flex it

9  had jumped to 6.5 percent?  A transparent process would

10  prevent that sort of outcome from happening.  A process where

11  material terms are kept from City Council invites such an

12  outcome, if not here, the next time with something else, and

13  highlights the need for the emergency manager to make full

14  disclosure.

15  Now, second, Section 19 does not just give City

16  Council the ability to approve or disapprove.  There is the

17  corollary right to seek an alternative proposal that would

18  yield the same or better financial result.  The City Council

19  has -- if the City Council has withheld from it material

20  information about the true cost of the loan proposal put

21  forth by the emergency manager, its ability to exercise this

22  right is frustrated, what's its target?  How will it know

23  it's found a better deal if it doesn't know the material

24  terms of the deal before it?  It may well have been

25  impossible for City Council to find an equivalent or better

1  financing proposal at 3.5 percent, and that's all it knew in

2  terms of what its target might be.  If it had known it might

3  go up to 6.5 percent, it might have had a better shot at

4  finding a proposal that it could present as at least as good.

5        Accordingly, your Honor, in sum, the city has failed

6  to satisfy its second gateway hurdle either.  It has not

7  really complied with PA 436 because it really did not provide

8  to City Council all the material terms of the proposal it was

9  asking it to approve and the proposal that the City Council

10  had the right to try to seek an alternative for.  Both for

11  this reason and because of the city's failure to meet is

12  burden under 364(c) to demonstrate the unavailability of

13  unsecured credit, it's our position, your Honor, that the

14  city's motion to approve post-petition financing should be

15  denied.

16        THE COURT:  Thank you, sir.  Stand by, please.  All

17  right.  We'll break for lunch now.  I'm showing 82 minutes

18  left for the objecting parties' arguments.  We'll reconvene

19  at 1:30, please.

20        THE CLERK:  All rise.  Court is in recess.

21     (Recess at 11:44 a.m., until 1:30 p.m.)

22        THE CLERK:  All rise.  Court is in session.  Please

23  be seated.  Recalling Case Number 13-53846, City of Detroit,

24  Michigan.

25        THE COURT:  It appears that everyone is here.  Let's

1    proceed.

2           MS. GREEN:  Good afternoon, your Honor.  Jennifer

3    Green on behalf of the Retirement Systems for the City of

4    Detroit.  Before I begin, can I just confirm how much time we

5    have left?

6           THE COURT:  I'm showing 82 minutes.

7           MS. GREEN:  And one additional housekeeping matter

8    before I begin.  I just wanted to inform the Court that the

9    deposition transcripts for the witnesses who were not called

10   live have been provided to the court clerk as of this

11   morning.

12          THE COURT:  Okay.  Let me just be sure I have the

13   ones you're thinking about.  I have Mr. Turbeville.

14          MS. GREEN:  Yes.

15          THE COURT:  Mr. Corley.

16          MS. GREEN:  Yes.  There were only two.

17          THE COURT:  Oh, those are the two.  Okay.

18          MS. GREEN:  You have them both.

19          THE COURT:  Actually, one more housekeeping matter.

20   It would help me if I could have hard copies of the other

21   PowerPoint slideshows that were used during closing

22   arguments --

23          MS. GREEN:  Yes, your Honor.

24          THE COURT:  -- if those are available.

25          MS. GREEN:  How many copies would you like?

1        THE COURT:  Just the one is fine.

2        MS. GREEN:  Just one.  Okay.

3                    CLOSING ARGUMENT

4        MS. GREEN:  This morning Ms. English addressed the

5   validity of the casino revenue pledge as it relates to the

6   assumption motion, and I will be addressing the validity of

7   that pledge as it relates to the financing motion.

8   Specifically, I'm addressing the proposed order submitted by

9   the city in connection with its financing motion and whether

10  the city has carried its burden of showing the validity of

11  the pledge in support of the proposed Barclays loan.

12       So let's start by taking a look at the proposed

13  order itself.  The proposed order the city seeks to have

14  entered by this Court states that the city is authorized to

15  grant perfected security interests in and liens on the

16  quality of life bond collateral, which is the casino revenue.

17  And the picture here is of the proposed order, page 3.  The

18  proposed order also requests that this Court find the pledge

19  of the casino revenue to be valid, binding, enforceable and

20  nonavoidable.  Thus, the city has the burden of establishing

21  that its pledge of the casino revenue as collateral is valid

22  and enforceable, but in order to do so, the city must first

23  establish, number one, that the casino revenue can be pledged

24  as collateral for a financial obligation of the city, and,

25  number two, if it can be pledged, that the purpose for which

1  the city intends to use those quality of life funds in this

2  case complies with Section 12 of the Gaming Act.

3          And with respect to this first issue, the glaring

4  problem with the city's proposed order is that the city has

5  not once during this proceeding taken the position that the

6  pledge of the casino revenue is actually permissible, yet it

7  seeks this Court to order that it is, indeed, permissible.

8  For example, you may recall that during the city's closing

9  arguments on January 3rd, the city emphasized how low the

10  burden is for the city to seek approval of the swap

11  settlement under the business judgment standard, and the city

12  urged this Court that the lowest point of reasonableness is

13  all that is necessary under that standard.  And in support of

14  its theory of the case, the city has argued that in order to

15  prevail, all it has to establish is that there's a chance

16  that the casino revenue lien is invalid; that there's

17  arguments on both sides; and that while there may be doubt as

18  to whether the casino revenue can even be pledged in the

19  first place, it is this doubt and this uncertainty that is

20  causing it to settle in the first place.  And this

21  uncertainty might be acceptable, although the objecting

22  parties don't agree, but it might be acceptable under a Rule

23  9019 analysis or under a business judgment analysis, but this

24  uncertainty, which is now all that is in the evidentiary

25  record, does not satisfy the burden the city must establish

1     for this Court to enter an order with findings that the city

2     is actually authorized to pledge the casino revenue.  The 50-

3     50 chance that you've heard all about is not enough, for

4     instance, to demonstrate to this Court that the casino

5     revenue can actually be pledged in compliance with Michigan

6     law.

7              And the second issue is, even assuming this Court

8     were to find that generally the casino revenue can be used as

9     collateral for a financial obligation of the city, a separate

10    issue is that the quality of life proceeds must actually be

11    used for one of the eight enumerated purposes under the

12    Gaming Act, and, once again, the city has boxed itself sort

13    of into this impossible position.  It's argued that the scope

14    of your review was so narrow that it does not have to concern

15    itself with how the funds are used, but the problem with that

16    is the city is now stuck with a record that is barren of any

17    facts or testimony sufficient to enable this Court to satisfy

18    itself that the funds will, indeed, be used in compliance

19    with Section 12 of the Gaming Act.  And, in fact, not only is

20    the record barren of any testimony averring that the funds

21    will be used for any particular purpose, the only affirmative

22    testimony on point actually came from Ken Buckfire, who

23    admitted the funds would be used only as working capital,

24    nothing more, and, you know, not for any particular quality

25    of life program.  So as we will see in the next few slides,

1  there's nothing in the record to establish either of these

2  two elements to the case.

3      This morning Ms. English went over the Gaming Act

4  and the eight enumerated purposes, so I will not reread them

5  into the record.  Subsection 5 is the section that the city

6  is seeking to hang its hat on, and it states that other

7  programs that are designed to contribute to the improvement

8  of the quality of life in the city.  Notably, as Ms. English

9  stated this morning, hiring, training, deployment of street

10  patrol officers, public safety programs, things of that

11  nature, are specifically provided for in the Gaming Act, and

12  yet rather than commit to any of those purposes, the city has

13  said that it wants to fall within the catch-all of the

14  improvement of the quality of life for the citizens in the

15  City of Detroit.  But as admitted by the city and its

16  witnesses, there's nothing in the Gaming Act and in those

17  eight provisions in particular that permits the funds to be

18  used as security for a loan, and Kevyn Orr admitted as much

19  during his direct exam.  And we have quoted here his

20  testimony where he states, "Under the state's Gaming Act,

21  there was an argument that the pledge of the casino revenue

22  in 2009 to -- as collateral for the COPs was inappropriate.

23  Section 12 of the Gaming Act.  It was my understanding there

24  were certain limited uses of the gaming revenue -- approved

25  uses by state law and that there was an argument that to

1  pledge it for collateral was inappropriate."  And when he was

2  asked by his counsel why it was inappropriate, Mr. Orr

3  explained, "there were certain specified uses under the

4  Gaming Act generally for programs, street patrol officers,

5  educational programs, or improve the quality of life in the

6  city," but he admitted the act did not specify the use of

7  gaming revenue as collateral for an unrelated debt.

8         And you may also recall that Mr. Orr mentioned that

9  weaknesses with respect to the pledge of the casino revenue

10  claim was that there were legal opinions in support of the

11  pledge and that City Council had voted and even passed an

12  ordinance supporting the pledge.  Notably, with respect to

13  the post-petition financing, there is no such legal opinion

14  opining that the casino revenue pledge is appropriate, and

15  City Council resoundingly voted down the proposed Barclays

16  loan.

17         To add to this uncertainty, the city has never been

18  willing to commit what it will use the funds for in writing

19  in any of its papers.  What we have on the screen for you is

20  the actual motion that was filed in support, and it is

21  Document Number 1520 on the docket, and the city would only

22  go so far as to state that the quality of life note, quote,

23  "may ultimately be used to fund reinvestment initiatives such

24  as police, fire, and blight."  The word "may" is the same if

25  you continue into the proposed order that the city has filed

1    on the docket.  It just states that after the loan is closed,
2    then the city will provide some sort of report regarding what
3    the funds are used for, not before closing and not before
4    this Court is being asked to enter an order that actually
5    signs off on the validity of the pledge.  In other words, the
6    city just says to the Court, "Trust us.  We'll use it for a
7    good purpose, and we'll report back 30 days after closing."
8    And, again, the problem with this is that the city is asking
9    for this Court to approve the use of the casino revenue
10   without having first confirmed to the Court that it will use
11   it for one of the purposes specified in the Gaming Act.

12          Furthermore, the city's own witnesses and documents,
13   which make up the evidentiary record in this hearing,
14   demonstrate that no such quality of life usage is guaranteed
15   to occur in this case.  Ken Buckfire, the city's investment
16   banker, admitted that the quality of life loan proceeds are
17   really intended to provide adequate working capital and that
18   the Barclays financing is a true working capital facility.
19   he also admitted the title of the loan as a quality of life
20   loan is actually not the best choice of words because it
21   probably should have just been called a working capital loan.

22          And internal e-mails such as this one also
23   demonstrate that the proceeds are not intended to provide an
24   improvement of the quality of life for the citizens of
25   Detroit but, rather, to provide general fund liquidity, which

1  is consistent with Mr. Buckfire's prior testimony. And here
2  we have an August 29th e-mail that says use of the proceeds
3  is to financing the swap termination and provide general fund
4  liquidity through the Chapter 9 case.

5          Jim Doak from Miller Buckfire also admitted that
6  this moniker "quality of life" was created by Jones Day
7  attorneys in late August of 2013 after they had had
8  discussions relating to the restrictions in the Gaming Act,
9  and he testified that they were aware of these limitations
10  under Michigan law and that they had attempted to structure
11  the loan in such a way that the casino revenue pledge would
12  be less controversial. And he also testified that some
13  lenders were still concerned about the casino revenue pledge
14  as was City Council. In fact, City Council had asked a
15  question in writing when they were doing their due diligence
16  into the Barclays loan, and they asked a question about under
17  the Gaming Act, which lists the restrictions on the use of
18  the wagering taxes, which category allows the use of wagering
19  taxes to secure the swaps or the proposed financing, and the
20  portion that's highlighted there, the city's answer was, "In
21  connection with the proposed post-petition financing, the
22  city intends to rely on the federal Bankruptcy Code to
23  authorize the pledge of collateral, including the wagering
24  taxes," which is not an answer, and in addition to their
25  motion, their proposed order, Jim Doak's testimony, Ken

1  Buckfire's testimony, their internal e-mails and now this

2  written response to City Council, there has never been a

3  commitment to use the funds for any particular purpose.

4        The deposition that was filed today is one of Mr.

5  Irvin Corley.  He was the executive policy manager tasked

6  with actually conducting the due diligence for City Council

7  in relation to the Barclays financing, and he testified at

8  his deposition that the emergency manager's consultants

9  indicated to him during this due diligence period that the

10 state gaming law would not allow the gaming tax to be used as

11 a pledge and that there were concerns involving using the

12 casino revenue as a pledge.

13       In conclusion, there's nothing in the evidentiary

14 record to support the city's position that the casino revenue

15 can be pledged as collateral in general in any case, nor is

16 there any evidence that the quality of life funds in this

17 case under the Barclays loan will actually be used for a

18 quality of life purpose as required by the Gaming Act, and,

19 in fact, the only affirmative evidence in the record

20 clarifies that the funds are going to be used as nothing more

21 than straight working capital throughout the Chapter 9 case.

22 And the city made its bed by arguing that the scope of this

23 Court's review is so narrow that it need not concern itself

24 with how the funds are going to be used, but now the city has

25 to lie in that bed, and, as a result, we're stuck with a

1   record that is barren of any facts that would satisfy this

2   Court that the funds will be used in a purpose in accordance

3   with Michigan law.

4           THE COURT:  Thank you.

5           MS. GREEN:  Thank you, your Honor.

6                     CLOSING ARGUMENT

7           MR. BENNETT:  Good afternoon, your Honor.  Ryan

8   Bennett with Kirkland & Ellis, and I represent Syncora.  Your

9   Honor, my colleague, Stephen Hackney, sends along his

10   regards.  This morning Mrs. Hackney gave birth to a beautiful

11   baby daughter.  Steve is at home in Chicago with the family.

12           So today in my closing, your Honor, I'd like to

13   focus on the process that the emergency manager undertook in

14   connection with the proposed DIP financing transaction.  The

15   objectors have decided to spend some time on this issue

16   because we believe that the process surrounding the DIP

17   financing is important both with respect to approval of the

18   pending DIP motion and also with respect to the overall

19   bankruptcy case.

20           The focus of my presentation, therefore, is on the

21   flaws in the debtor's approach to date and how such

22   shortcomings impact the finding of reasoned business judgment

23   that the city is requesting from your Honor.  In addition,

24   I'd like to briefly offer some thoughts on the overall

25   process and how the debtor's handling of the DIP financing

1   and -- has the potential to frustrate plan confirmation.  In

2   both the Section 364 and Chapter 9 context, the process is

3   just as important as the substance, and to date we feel like

4   there have been a number of flaws in the emergency manager's

5   process made evident by the lack of any consensus around a

6   Chapter 9 plan to date among the debtor and any of its

7   creditor constituencies.

8           In sum, the purpose of my closing is not just to

9   identify flaws, though, your Honor, but, rather, to outline a

10  better process based on both the purpose and policies behind

11  Chapter 9 and how other municipal debtors have handled their

12  Chapter 9 cases in the past, specifically Orange County.  In

13  particular -- and I know the Court shares my view -- I think

14  it's important that this process be one that focuses on

15  consensus, something that has been clearly and unfortunately

16  absent from the transaction in the debtor's overall process

17  to date.

18          THE COURT:  You're going to argue that any such loan

19  should be in the context of plan confirmation?

20          MR. BENNETT:  Come again, your Honor.

21          THE COURT:  You're going to argue that any such loan

22  should be in the context of plan confirmation?

23          MR. BENNETT:  That's part of my argument, your

24  Honor, yes.

25          THE COURT:  Well, then I hope you'll address why

1    Congress would have made Section 364 applicable in Chapter 9.

2         MR. BENNETT:  Sure, and that'll come up in the

3    context of the Orange County discussion, your Honor.  Thank

4    you.  So as your Honor clearly stated in the -- that its

5    review in relation to the DIP motion will not include the

6    city's proposed uses and needs of the DIP financing, and

7    while that is a limited scope of review and we certainly

8    respect it, the debtor still must show how it's exercised

9    sound business judgment in soliciting, negotiating, and

10   executing the DIP, particularly at this point in its case.

11   The Court itself -- or the city itself acknowledged that

12   review of the DIP motion pursuant to 364 requires the Court

13   to analyze its business judgment.  Specifically, the city

14   noted that for the DIP motion to be approved, the city's

15   business judgment cannot run afoul of the provisions of and

16   policies underlying the Bankruptcy Code, and the main policy

17   and purpose underlying Chapter 9 is to allow a municipal

18   debtor to continue its operations while it refinances or

19   adjusts its creditors' claims with minimum in some -- in most

20   cases no loss to creditors.

21        So to ascertain whether the debtor's business

22   judgment is reasonable, it's important to look at the DIP

23   motion in the context of the broader proceedings.  As a

24   threshold matter, Syncora agrees that Detroit needs help.

25   Many of its citizens need help, but the focus of this Chapter

1   9 case is a limited one.  As this Court recognized in its

2   eligibility ruling, the debtor's focus here and now should be

3   on building consensus around a confirmable Chapter 9 plan, a

4   plan that adjusts Detroit's balance sheet and allows it to

5   have access to liquidity going forward.  Substantial

6   borrowing and spending may be necessary for the city's

7   ultimate revitalization, but this case is first and foremost

8   a debt adjustment process.  As noted, Chapter 9 is and has

9   always been a forum to restructure municipal debts in a

10  consensual fashion where possible.  This is a Bankruptcy

11  Court sitting in Chapter 9.  It's not some type of an

12  emergency triage center for municipal ailments.  It has a

13  focus, which is debt adjustment through a plan, and we

14  believe that should be the debtor's focus, particularly one

15  that's built around and focused on consensus.  The city's

16  decision, unfortunately, is, instead --

17          THE COURT:  What in the Bankruptcy Code says that

18  there is a consensus required before the city can borrow

19  money?  364 doesn't require that.

20          MR. BENNETT:  No, but --

21          THE COURT:  If Congress intended that, they would

22  not have made 364 applicable in Chapter 9 but would have made

23  a permissive provision of plans to borrow money.

24          MR. BENNETT:  Yeah.  Your Honor, I think it's a

25  sequence issue and really that, you know, 364 is available to

1  debtors in Chapter 9.  No doubt about it.  But the key factor

2  here is that the debtor, for whatever reason, decided to

3  proceed forward with this 364 request before ever having any

4  consensus developed in the case.  As Mr. Ellenberg said --

5       THE COURT:  What's the problem with that?

6       MR. BENNETT:  It's actually creating angst and

7  frustration in the bankruptcy case so that because of this,

8  for whatever reason, hurried request, we have no consensus in

9  the case.  As Mr. Ellenberg said, his clients are the only

10  ones to date that have reached any kind of agreement with

11  this debtor when the real focus of this process and this case

12  should be on forming consensus around a Chapter 9 plan.

13  Instead, we've had the opposite.  We've had an alienation of

14  consensus, and --

15       THE COURT:  So the Court should deny the motion

16  because it's impeding consensus on the plan?

17       MR. BENNETT:  The Court should deny the motion for

18  that reason because it's a -- it represents a bad exercise of

19  the debtor's business judgment or, alternatively, the Court

20  could adjourn the motion to be heard in connection with the

21  Chapter 9 plan once the city then focuses on consensus.  Now,

22  there are additional risks, and I will get into that

23  momentarily, but, your Honor, so far the date has really --

24  the focus has really been on these piecemeal motions, these

25  one-off transactions that have really all worked against the

1 consensus that we all want to reach in the context of this

2 Chapter 9 case. The assumption motion was the first example.

3 Then we had the Public Lighting Authority motion as the next,

4 and now the DIP is the latest iteration. What's next? Will

5 it be the art collection? Will it be the DWSD? I don't know

6 what other, you know, more transactions need to be negotiated

7 on this one-off basis outside of the creditor body's

8 consensus and protections that are afforded to it through a

9 Chapter 9 process.

10 THE COURT: I will ask you what I asked Mr.

11 Hackney --

12 MR. BENNETT: Um-hmm.

13 THE COURT: -- when you raised the same issue about

14 public lighting. Is it your position that the people of the

15 City of Detroit have to wait for safe lighting for a plan of

16 adjustment?

17 MR. BENNETT: Your Honor, if the emergency manager

18 wants to implement initiatives, he can under state law. All

19 right. Like your Honor has recognized, like the debtor has

20 argued multiple times, 904 provides for that opportunity.

21 All right. He does not need to come to the Bankruptcy Court

22 if that's what he's trying to do. And if that -- and if he

23 has -- now, he does, to a degree, do so at his peril to the

24 extent -- and as I'll talk about with the Fano decision out

25 of the Ninth Circuit, to the extent you're alienating value

1  to the detriment of creditors outside of a plan, you do

2  create potential confirmation problems down the road, but to

3  the extent the emergency manager needs to focus on

4  initiatives such as public lighting, such as police, he can.

5  He's protected.  You know, he has the -- he has the -- you

6  know, like I said earlier, this is a limited forum, I think

7  your Honor has recognized.  The thing is that he keeps coming

8  back to you for things like good faith findings, for, you

9  know, various other Chapter 9 bankruptcy relief that

10 implicates issues such as -- you know, that would really put

11 us more appropriately focused on a Chapter 9 plan.  Now,

12 again, like I said --

13       THE COURT:  So the answer to my question, if I

14 understand you correctly, was if the emergency manager

15 decides that authorization from the Court is either necessary

16 or appropriate, then, yes, the citizens of Detroit have to

17 wait for plan confirmation?  Do I have that right?

18       MR. BENNETT:  Yes, your Honor.  I think that's the

19 appropriate use.  Your Honor doesn't have to.  Okay.  Your

20 Honor can enter an order approving this stuff now, as you're

21 fully aware.  There is a problem, though, there.  Number

22 one --

23       THE COURT:  I'm asking you -- I'm asking your

24 client's position on these questions.

25       MR. BENNETT:  Yep.

1        THE COURT:  So the citizens of Detroit have to wait

2   for safe lighting when the city manager -- or the city

3   emergency manager decides that it's necessary or appropriate

4   to get court permission because that then would have to wait

5   for plan confirmation?

6        MR. BENNETT:  If the citizens -- if the City of

7   Detroit wants to get out of bankruptcy quick -- in an

8   expedient fashion, then it should wait before it gets that

9   type of relief because what this is doing -- what these one-

10  off motions are doing is creating angst and discontent among

11  the creditor pool and potentially alienating --

12       THE COURT:  What about the safety of the citizens?

13       MR. BENNETT:  Pardon?

14       THE COURT:  What about the safety of the citizens?

15       MR. BENNETT:  Like I said, then Mr. Orr doesn't need

16  to come to your Honor for the relief; right?  He can just

17  implement initiatives in his governance capacity of the city.

18  The emergency manager statute is very broad.

19       THE COURT:  So in deciding between necessary and

20  appropriate process in Bankruptcy Court and citizen safety,

21  he's got to choose one or the other?

22       MR. BENNETT:  If he wants to move forward on an

23  initiative for the benefit of the citizens, he can do so

24  outside of Bankruptcy Court.  To the extent he wants to come

25  to Bankruptcy Court, he needs to remember what the focus is

1  about, and it's about debt adjustment through a plan with the

2  protections associated with a plan and plan confirmation.

3  These one-off approaches outside of that context are

4  stretching out this process and potentially --

5          THE COURT:  How is it stretching out the process?

6          MR. BENNETT:  -- endanger -- your Honor, we're six

7  months into this bankruptcy case, and there is zero consensus

8  at this point among the city --

9          THE COURT:  What about the process?

10          MR. BENNETT:  -- and its creditors.  The city should

11  have been focused on a plan up front instead of spending all

12  this money and focus on these one-off transactions that are

13  the antithesis to it, that really are alienating creditors in

14  the process, so the --

15          THE COURT:  Where's the evidence of that?

16          MR. BENNETT:  Well, the fact we don't have any

17  consensus standing here.

18          THE COURT:  Where's the evidence of that?

19          MR. BENNETT:  None has been announced, none that I'm

20  aware of, your Honor.

21          THE COURT:  Wasn't there a major announcement by the

22  mediators today of a consensus?

23          MR. BENNETT:  There was an announcement about a

24  potential deal around art.  I don't know if anyone, including

25  the potential beneficiaries of that deal, are on board with

1  that arrangement.  I mean it was just a kind of --

2          THE COURT:  Well, but it's progress.

3          MR. BENNETT:  Potentially.  I don't know, your

4  Honor.

5          THE COURT:  All progress is potential until it's

6  done.

7          MR. BENNETT:  Um-hmm.  Now, I'm trying to make

8  some -- I'm trying to understand why the -- hang on -- excuse

9  me -- why the city is focused on going forward with these

10  what I've called piecemeal motions.  There we go.

11          THE COURT:  Okay.

12          MR. BENNETT:  And --

13          THE COURT:  One second, sir.  Okay.  Go ahead, sir.

14          MR. BENNETT:  Okay.  Sure.  And a lot of it is --

15  comes out of some of what Mr. Buckfire said during his

16  testimony that time is not the city's friend, it's got to

17  move forward with this forbearance agreement, yet that record

18  failed to establish really anything that sounded persuasive

19  in terms of why the city should move forward with this

20  transaction right now, both the forbearance agreement and the

21  DIP, recognizing that they both are contractually tied.

22  Mr. Buckfire noted the delay between executing the

23  forbearance agreement in June and the present day worked in

24  favor of the city as interest rate -- rising interest rates

25  have reduced the swap termination payment.  He also conceded

1  that it would be economic irrational -- economically
2  irrational for the swap counterparties to exercise their
3  optional early termination right as long as they were in the
4  money.  He recognized that, so I don't know where the rush
5  comes from in the context of needing to have this forbearance
6  agreement and DIP dealt with now versus in the plan once
7  we've got some consensus around the table, your Honor.  The
8  city -- the evidence at trial failed to show that.

9          You know, we also hear things about that there's
10 this 18-month term for Mr. Orr, you know, and that's used in
11 various contexts to describe why the case needs to move
12 faster and transactions such as the DIP and the forbearance
13 agreement need to be expedited, and, you know, Mr. Orr's
14 testimony, Mr. Buckfire's testimony supported that, that
15 that's the city position, but the key thing is is that Orr's
16 term does not expire in 18 months.  The City Council can
17 remove him by two-thirds vote, but even if they were -- okay.
18 And we know who the City Council is.  And even if they
19 were -- okay -- we know, you know, what their position is on
20 a lot of issues, but even if they were to remove him, the
21 governor can put somebody new in place -- all right --
22 because the governor can decide that the emergency situation
23 has not been fixed, and we can -- and we can remain in
24 emergency management until the consensus is developed and the
25 case is executed.

1          Now, as a result of this kind of hurried approach,

2     right, to the forbearance agreement and the DIP financing,

3     you also have just some breakdowns in just the process around

4     the DIP in general, as Mr. Marriott pointed out earlier;

5     right?  We've got a clear hole in the approach where the city

6     failed to look for unsecured financing where in a scenario

7     like this, it probably -- I would think that that would be a

8     probable course where you've got administrative superpriority

9     status available to you, designated revenue streams.  That

10    would seem to be at least something worth asking a couple

11    questions.

12         THE COURT:  What's hurried about the Court's

13    consideration of a motion in -- a DIP motion that was filed

14    on the first day five months later?

15         MR. BENNETT:  I'm sorry.  Can you say that one more

16    time?  I apologize.

17         THE COURT:  What's hurried about the Court's

18    consideration of a motion that was filed on the first day of

19    the case five months later?

20         MR. BENNETT:  What's hurried about it is that it's

21    ahead of the plan, which is the main focus of a Chapter 9

22    case and should be all of our focus.  And it's distracting,

23    and it's taking away the city's resources, and it's

24    alienating its creditor constituents where all that energy

25    could be focused on the end game, which is a Chapter 9 plan.

1       Now, as further evidence that the city's approach --
2  the emergency manager's approach to the transactions are
3  outside of its sound business judgment, the City Council, the
4  only elected officials involved in the DIP process and
5  arguably the people most familiar with the interests of the
6  citizens of Detroit, emphatically rejected the DIP financing.
7  City Council made detailed findings with respect to the
8  proposed DIP financing, and they filed those on the docket,
9  and I'm sure your Honor has reviewed them.  Among those
10 findings are that the proposed DIP financing transaction is
11 an extremely complex deal on a number of fronts.  It does not
12 seem to be in the best interest of the city.  The DIP appears
13 to be, quote --
14       THE COURT:  I actually have not reviewed that
15 document.  Is it in evidence here?
16       MR. BENNETT:  It is.  It's EEPK Exhibit 805.
17       THE COURT:  805?  Thank you.
18       MR. BENNETT:  The DIP appears to be putting the
19 interests of lenders before the interests of the city and
20 residents, end quote.  The goal seems to be to ensure
21 protection of the lenders at the detriment of all other
22 interested parties, end quote.  The presentation -- or the
23 resolution goes on.  The city still moves forward
24 notwithstanding the City Council's political decision in that
25 regard.

1          Now, notably the city has correctly pointed out that

2     in the course of the process, my client, Syncora, did provide

3     a DIP proposal to the City Council, and, now, unlike

4     Barclays, my client is an incumbent creditor in this case,

5     and unlike the swap counterparties, we are long in Detroit.

6     We are going to be here, and we're not looking to exit.  All

7     right.  And so we had to look at the various alternatives

8     that were in front of us at the time understanding that we,

9     unlike the debtor, do not dictate the process and approach,

10    and we needed to explore contingency plans.

11          THE COURT:  Better than Barclays' deal?

12          MR. BENNETT:  The city determined it was not, it was

13    not better, and the City Council -- I'm sorry.

14          THE COURT:  I'm asking you.

15          MR. BENNETT:  I do think our deal was better than

16    the Barclays deal, yeah --

17          THE COURT:  How?

18          MR. BENNETT:  -- your Honor.  Because, among other

19    things, we had a lower -- well, let's see.  What did we do?

20    We had a -- we did not put restrictions on the asset sales,

21    on the city's ability to make asset sales and what would

22    happen with those proceeds, including -- and we also improved

23    our rate so that it was consistent with Barclays' rates,

24    reduced the fees that we'd previously put in there, but I

25    believe there was a determination that for whatever reason we

1  were not up to snuff in terms of our --

2         THE COURT:  I want to make sure I understand your

3  position.  Is it your position that the city, in proposing

4  this lending, did not exercise sound business judgment

5  because there was a better offer on the table --

6         MR. BENNETT:  No.

7         THE COURT:  -- from your client?

8         MR. BENNETT:  No, your Honor, no.

9         THE COURT:  Oh, all right.

10         MR. BENNETT:  This is merely a footnote.  I think

11  this is -- we would want -- we want this DIP denied.  We want

12  no DIP in the case, all right, not ours, not anybody's, but

13  we recognize --

14         THE COURT:  No DIP?  Okay.  Why did you offer one

15  then?

16         MR. BENNETT:  No.  That was where I was going with

17  my point is that we did it because we did it as a contingency

18  plan because we knew that -- we knew that we didn't control

19  the process and it was likely that even when we make our

20  objections here, were -- you know, were it to be

21  unsuccessful, and if we've got an alternative in place, which

22  is an alternative DIP, it gives us a fallback.  Like I said,

23  we're an incumbent creditor, so -- so I mentioned earlier

24  Orange County, so the only other major DIP post-petition

25  financing in Chapter 9 that we've been able to locate is

1  Orange County, and it was a significant number, 278 million,

2  back in '95.  Now, the difference, though, is notable in the

3  context of when you compare where Orange County was in the

4  context of its Chapter 9 cases versus where Detroit is today,

5  so in Orange County, unlike the present case, the DIP

6  financing had significant creditor support.  It did not

7  prejudice creditor recoveries and was negotiated in a

8  transparent manner as part of a settlement that facilitated a

9  resolution of all claims -- nearly all claims in the case.

10  The Orange County proposal came later in the case, in the

11  bankruptcy case, and closer to a plan, and a plan which

12  provided for full creditor recovery.  That's the significant

13  difference, your Honor.  Here you have creditors who to date

14  have just seen the June 21 proposal which shows their

15  unsecured recoveries getting significant impaired, and Orange

16  County, on the other hand, had a scenario where those

17  creditors got a hundred cents on the dollar.

18          Now, in further contrast -- I mean at this point the

19  city's DIP has virtually no support, no creditor support, and

20  was negotiated behind closed doors with little transparency,

21  and there's almost no claims except those of the swap

22  counterparties and at the same time allows 285 million to

23  come on top of the capital stack to the prejudice -- to the

24  potential prejudice and the prejudice of creditor recoveries,

25  so this takes me to what I mentioned earlier, which is the

1  part about where I talk about how debtor's plan confirmation

2  prospects are being permanently prejudiced.  As courts have

3  recognized, preplan expenditures by a Chapter 9 debtor may

4  threaten the debtor's ability to confirm a plan of

5  adjustment, and this is specifically the Ninth Circuit

6  decision in Fano where the Fano -- where the water authority

7  took -- the irrigation authority took money during the case

8  and before the plan and spent it toward improvements for

9  the -- excessive improvements toward the irrigation facility

10  and then came later to the Bankruptcy Court in the context of

11  its plan and said, "Look, your Honor, we only have 'X' amount

12  of dollars left for creditor recovery, and that's what the

13  recovery should be."  Here we're concerned that a similar

14  situation is going on.  Because you have a part of the loan,

15  at least, that's being used to fund improvements or

16  rehabilitation and by so doing incumbering previously

17  unincumbered collateral, we're creating a situation where

18  there may be potential problems down the road when that

19  collateral has been incumbered and, thus, removed from

20  creditor recoveries, and -- all outside of the context of a

21  Chapter 9 plan.

22         We don't think the debtor should be able to carry

23  out this reinvestment initiative largely at the expense of

24  creditors outside of the plan.  The city's creditors, its

25  retirees, they're entitled to the protections of a Chapter 9

1  plan, and outside of that context, there's significant

2  opportunity for prejudice where the creditors do not have the

3  ability to buy in with voting, with -- do not have the

4  fundamental protections as best -- for best interest of

5  creditors, for fair and equitable.  Those tests -- those

6  protections are not available, and there's a risk that

7  creditors' interest can be prejudiced in the process.

8       You know, I think it's important to note that

9  Detroit's creditors, unlike stakeholders in a traditional

10  Chapter 11 reorganization, do not stand to benefit from the

11  city's additional borrowings under the quality of life note.

12  Indeed, pursuant to the DIP motion, new borrowings will be

13  layered on top of existing creditors and used to fund civic

14  improvements and services which will not inure to a large

15  portion of the city's creditors' benefits.  This is unlike a

16  scenario in Chapter 11 where creditors -- pre-petition

17  creditors might be receiving new stock, right, of the

18  reorganized company.

19       THE COURT:  Won't the city's revitalization enhance

20  its ability to pay its debts back?

21       MR. BENNETT:  That's not been clear to us from the

22  testimony, your Honor.  It looks as if this money is going

23  out the door and not turned into any type of revenue-

24  generating alternative, at least not for purposes of paying

25  off our claim or for plan recovery on any of our claims,

1   certainly not for purposes of the presentation that was given

2   to us on June 21 either.  In that scenario, our recovery was

3   fixed as of that date, so whatever the city did with its

4   value and alienated that value, it did not inure to our

5   benefit.

6           So, your Honor, in closing, we think that the city's

7   business judgment would be more appropriately and responsibly

8   exercised by abandoning this current tack of engaging in one-

9   off preplan transactions that consistently result in

10  substantial opposition and extensive litigation, discovery

11  and appeals, instead focus on building consensus around a

12  plan of adjustment that adjusts the city's balance sheet and

13  cash flows enabling it to access the liquidity it needs to

14  rehabilitate after it gets out of bankruptcy.  This Court

15  should deny the DIP and the forbearance agreement motions or

16  at least adjourn them to be consistent with plan -- to be

17  commensurate with plan confirmation.  Barclays is not going

18  anywhere.  If they do, then we can just work our way down Mr.

19  Doak's list till we find somebody who wants to stick around,

20  but it was pretty clear that Barclays is focused on the exit

21  financing, and this can get rolled in -- this ultimately is

22  part of a plan.  The DIP should and would be exit financing.

23  The swap counterparties, they're not going anywhere either.

24  They're on their sixth amendment, and they're not going to

25  trap cash.  And if they try to trap cash, trust me, Mr.

1    Hertzberg can get a TRO.  Okay.  We know from experience.

2    And so I don't see the -- we don't see the imminent threat,

3    and we think that the proper course really for this city for

4    its citizens would be to secure the rehabilitation through a

5    rapid -- a more expedient exit from Chapter 9 rather than

6    trying to do the rehabilitation during Chapter 9 prior to the

7    exit.  That's all I have, your Honor.

8            THE COURT:  Thank you, sir.

9            MR. BENNETT:  Thank you, sir.

10                    CLOSING ARGUMENT

11            MR. GOLDBERG:  Good afternoon, your Honor.  Jerome

12   Goldberg appearing on behalf of interested party, David Sole.

13   I first wanted to begin by -- your Honor asked Ms. English, I

14   believe, what the disgorgement amount was that would be being

15   pursued if the city was able to succeed in that, and I

16   believe the testimony of Mr. Orr was that that amount was 247

17   million covering the amount that was paid on the swaps from

18   2008 to 2012, and that's also documented in the June 14th

19   financial report.  I think that's 1316, Exhibit -- our

20   Exhibit 1316.  It also included approximately 50 million that

21   was paid this year, so it would be in the neighborhood of

22   $300 million in terms of recovering on what has already been

23   paid on the interest rate swaps.

24            In addition, your Honor, at the hearing on --

25   pretrial hearing on December 13th, your Honor laid out how

 1  the Court's role in this proceeding is to determine whether

 2  the settlement is fair and equitable and whether it is in the

 3  best interest of the estate as a whole.  Your Honor stated

 4  you look at -- the Court looks at what the impact of the

 5  settlement might have on the plan process on the city and

 6  public's interest in reconstruction and revitalization.  Your

 7  Honor, I would submit that the -- paying $165 million in a

 8  termination amount that goes really to two banks through a

 9  third bank, Barclays, at an interest rate that's anywhere

10  from 5.5 to 8.5. percent totaling, as Mr. Orr testified,

11  approximately $30 million to pay off this loan with a $4.2

12  million breakage fee for a total of about $200 million hardly

13  will help the citizens of Detroit in the revitalization

14  process moving forward.  In fact, what it does is pledge 20

15  percent of income tax revenues for the next four years of $4

16  million a month or $48 million a year, and in the city's

17  motion -- and Mr. Orr acknowledged this on testimony -- the

18  city's income tax revenue is approximately 232 million.  It

19  means that 20 percent of income tax revenues that can be used

20  for revitalization and reconstruction of the city, that can

21  be used to turn the lights on, get the busses running,

22  providing services and also pay pensioners and workers what

23  they're due instead will be diverted to UBS and Bank of

24  America through Barclays.  I submit that that is not -- I

25  mean especially when you balance that against a potential

1  recovery of $300 million, it hardly feels to me like that is

2  in the best interest of the citizens of the city and

3  reconstruction and revitalization.

4        In his testimony, the other objectors have

5  eloquently, you know, gone through many of the issues that

6  were raised in terms of why the swap agreements can be

7  challenged on the basis of statutory grounds whether under

8  the Bankruptcy Code or under the state law.  I would just

9  remind the Court that Mr. Orr also testified that the city

10  had drawn up a complaint not just dealing with those issues

11  but raising, rather, what I would call equitable issues.  He

12  testified that the city -- testified that his attorneys drew

13  up a complaint against UBS and Bank of America alleging,

14  among other counts, fraud, unjust enrichment, and breach of

15  contract based on a breach of the implied duties of good

16  faith and fair dealing and that they were ready to file that

17  complaint if no agreement was reached.  The fact that they

18  were ready to file that complaint indicates that they believe

19  that it was a substantive complaint; that there was a basis

20  for that complaint to move forward, and I believe that kind

21  of satisfies the standard, at least initially, in this motion

22  whether this motion was to determine whether a factual

23  predicate in a summary way of what the claim would be.  The

24  fraud count was, in part, based on problems with the LIBOR

25  index, as testified to by Mr. Orr, and is documented based on

1   UBS's admission of fraud in dealing with the LIBOR, which is
2   well-documented.

3        In addition, the claims were based on the following
4   scenarios:  one, that the counterparties had superior
5   knowledge when they entered into this complex financial
6   transaction with the city and had a duty to make clear the
7   terms of the transaction; that the counterparties
8   misrepresented that there was a low risk of default and
9   termination in connection with the swaps; that Bank of
10  America and UBS did not explain to the city the potential
11  dangers that a termination event would mean for the city --
12  i.e., that the city could immediately have to pay tens of
13  millions or hundreds of millions in interest payments and the
14  termination fee; that the city was a ticking time bomb, as
15  Mr. Orr described it, for a default based on the lowering of
16  the city's bond rating because of the city's financial
17  history; and that the fact that the city's chief financial
18  officer, Sean Werdlow, took a job with SBS, one of the
19  counterparties at the time, who was backed up by Merrill
20  Lynch, approximately five months after the swaps were
21  transacted raising a red flag.

22       It should be noted that in -- Sole Exhibit 1328 is
23  the July 31st, 2012, SEC Report on the Municipal Market --
24  Securities Market.  All of these claims that the city was
25  drawing up in its complaint to go after the swap

1   counterparties for disgorgement to recover -- to at least
2   disallow or subordinate the claims and even to go after a
3   recovery of the money that's already been paid, the 300
4   million that's been paid to the counterparties, are
5   consistent with what is reported in this report, in this SEC
6   report, and I would urge your Honor to take a look at pages
7   approximately 92 to 105 of that report, which deals with
8   swaps specifically.  That report outlines a series of SEC
9   actions that have been carried out against -- around these
10  issues.  It lays out the actions that have been taken out
11  that led to settlements, and they included settlements
12  against -- in the Orange County case.  They included
13  settlements in Jefferson County.  They included settlements
14  and judgments against five -- enforcement actions against
15  five major financial actions, Bank of America, UBS, JPMorgan,
16  Wachovia Bank, and GE Funding Capital, for their role in
17  interest rate swaps.  And most of these actions dealt with
18  the precise issues alleged by the city, lack of transparency
19  to the inequality, the difference when you're dealing with a
20  financial transaction of this magnitude between a
21  municipality and a bank in terms of understanding it,
22  misrepresentation of the risk of -- that are incurred by a
23  termination event that can have drastic effects, especially
24  in a city like Detroit, which, as Mr. Orr stated, was a
25  ticking time bomb because of its precarious financial

situation. It detailed potential bribery. That was an issue
in Jefferson County, improper dealings with the -- with city
officials in the context of securing the swaps, and it
detailed also issues dealing with municipal bond rigging. In
fact, another exhibit that we've attached to -- that's been
admitted in this case is a final judgment -- it's Sole
1321 -- on UBS municipal bond rigging that, interestingly
enough, one of the bonds cited was one of the Water Board
bonds in Detroit.

Based on the fact that, again, the -- at this stage,
as your Honor indicated, the proceeding was not to take
testimony to prove these claims but to say whether a
predicate had gone -- was made to move forward on these
claims, and we believe the Orr testimony, when viewed in the
context of similar claims that have been carried out in
connection with municipal bonds and especially interest rate
swaps all over the country lays that predicate to move
forward and to not resolve this case and remove the swaps
from the purvey and jurisdiction of the Bankruptcy Court at
this time.

But there's another issue that I think is important
to look at when we examine the swaps to put them in their
proper context. In Pepper v. Litton, 308 U.S. 295, the U.S.
Supreme Court held that the Bankruptcy Court -- that this
Court -- the Supreme Court has held that for many purposes,

1    courts of bankruptcy are essentially courts of equity, and

2    their proceedings inherently are proceedings in equity.  They

3    have been invoked to that end so that fraud will not prevail;

4    that substance will not give way to form; that technical

5    considerations will not prevent substantial justice from

6    being done.  A claim which has been disallowed may be later

7    rejected in part according to the equities in the case.

8    Disallowance or subordination in light of equitable

9    considerations may originally be made.

10        In examining the equities involved with the swap, I

11   think you can't separate them from the context in which these

12   swaps took place.  The fact is Mr. Orr testified -- and it's

13   well-documented -- that these swaps became a disaster for the

14   City of Detroit beginning in 2008, and what happened in 2008?

15   As Mr. Orr acknowledged, there was a financial collapse that

16   took place in this country and that he admitted -- and I

17   think it was somewhat enlightened in his admission -- that it

18   was in part a product of the subprime predatory lending

19   policies carried out by the major banks across the U.S.  And,

20   in fact, the precipitous drop in interest rates occurred when

21   the government intervened and the Federal Reserve intervened

22   to stimulate the banks, essentially bail them out of their

23   failed policies and their fraudulent policies, and one of the

24   asterisks of the bailout, as Mr. Orr testified, was the

25   purchase of $1.7 trillion in mortgage securities.  In other

1  words, what happened in 2008 and the reason these swaps

2  became a disaster for the city was that interest rates went

3  down precipitously.  They went down to zero, virtually zero,

4  and it was that gap between the floating rate tied to the

5  LIBOR and the fixed rate that caused the disaster that cost

6  the city $300 million already and potentially will cost the

7  city $500 million if this agreement is approved.

8          Exhibit 1326 to the motion hearing is a report by

9  the City of Detroit Planning & Development Department,

10  Neighborhood Stabilization Program Plan, and what it

11  indicates is Detroit almost more than any other city was

12  devastated by the subprime lending policies of the major

13  banks.  And if there's any question that there was fraud

14  involved in these policies, I call your attention to Exhibit

15  1324, which is excerpts from the Senate Subcommittee Report

16  on Wall Street and the Financial Crisis.

17          The Exhibit 26 notes that from 2004 to 2006 73

18  percent of new mortgages written in Detroit were subprime

19  mortgages.  In 2006 that means they're three percent above

20  the prime.  As of 2006, 29,000 adjustable rate mortgages or

21  nine percent of all existing mortgages reset triggering

22  higher payments for loan recipients, and in the case of

23  Detroit, many of these loan recipients were on a fixed

24  income.  It resulted from 2005 to 2007 in the City of Detroit

25  experiencing 67,000 mortgage foreclosures with two-thirds of

1    the homes foreclosed upon staying vacant.  It was this

2    imposition of subprime lending on Detroit that caused the

3    financial collapse in many ways, the immediate collapse in

4    the City of Detroit, and the idea -- the idea that the same

5    banks who participated in these lending practices that had

6    such a devastating consequence on the City of Detroit are now

7    to be paid $165 million with a pledge of 20 percent tax

8    revenues is inequitable and unconscionable.

9         In fact, my client, Mr. Sole, is here today.  He

10   asked me to intervene in this case because he not only is a

11   City of Detroit retiree facing a reduction of his benefits,

12   as is his wife, but he lives on a block on the east side of

13   Detroit which was a thriving residential block ten years ago,

14   but today there are five families -- five homes left standing

15   out of twenty on that block.  The home next to his is boarded

16   up on the right; it's boarded up on the left.  Across the

17   street there are two boarded up and a third one that's

18   occupied by a flock of wild dogs because they didn't -- the

19   banks didn't even bother boarding it up after foreclosure.

20        That's the impact of this crisis that's being felt

21   by the people of the city, and I think in viewing the

22   equities of this case it can't be separated.  It isn't just

23   about numbers.  It isn't just about form.  It isn't just

24   about detail.  And as a court of equity, it's important to

25   view how are we going to move Detroit forward, and moving --

1   Detroit would not move forward if the banks who helped
2   precipitate this crisis through their lending policies become
3   the beneficiaries of 165 million -- really 200 million in a
4   loan that takes them out of the bankruptcy when there's a
5   potential to go after them, and I was excited when I heard
6   Orr actually raise that.

7           The last point I would raise, in pursuing this
8   litigation, Emergency Manager Orr said that he could bring
9   in -- that he had contacted the SEC, and under the Bankruptcy
10  Code specifically in Chapter 9 the SEC could intervene into
11  this bankruptcy.  It could help conduct the investigation of
12  these swaps and these lending practices.  The cost wouldn't
13  just be on the city, but they would come in, and the
14  government could come in and aid us in that if a request was
15  made.  Unfortunately, that request was not made till after
16  August 30th, but I'm glad to hear that the request has been
17  made and they've indicated interest, based on his own
18  testimony.

19          Let me just end by saying there are a number of
20  cases that I could cite that show how -- BKB Properties
21  versus SunTrust Bank.  It's a 2009 U.S. District, Lexis
22  16284, where the Court then -- in the U.S. Eastern District
23  the Court allowed a fraud in the inducement claim based on
24  the fact that the bank was a far more sophisticated entity
25  that brought a sub -- a swap transaction and allowed that to

1  be a basis and indicator of a claim for fraudulent

2  inducement.  in <u>Yellowstone Mountain Club</u> versus <u>Official</u>

3  <u>Committee of Unsecured Creditors</u>, 2009 Bankruptcy, Lexis

4  2047, the Court allowed a claim for equitable subordination

5  to go forward on the basis that the creditor, the bank --

6  that its policies relative to the entity who was -- received

7  the loan was at a far unequal basis and, in fact, that they

8  could see no basis for laying out this loan except the greed

9  of the bank, and that was a basis for finding equitable

10  subordination.

11        So I will end here, your Honor.  I appreciate it.  I

12  think this has been a very important proceeding for the

13  Court, and I appreciate that the Court treated it with the

14  significance it belies because the question here is whether

15  the banks -- at a time when the people of Detroit are facing

16  terrible services, when we're barely surviving, when our

17  lights aren't on, when services are being cut, when retirees

18  are fearing the loss of pensions, to sit back and make a

19  payment of 165 million to UBS and Bank of America, banks with

20  a history of subprime lending that helped cause this crisis,

21  seems unconscionable and will not allow the city to go

22  forward.  If this is examined, it's going to cause a great

23  deal of consternation in the city, and we would hope that the

24  Court rejects this and allows the Court to move forward to

25  deal with these issues in the bankruptcy proceedings in a

1    proper examination of the whole issue.  Thank you.

2          THE COURT:  Thank you, sir.  Any other remarks from

3    objecting parties?

4          MS. ENGLISH:  Could we just --

5          THE COURT:  How much time is left?

6          MS. ENGLISH:  Could we just have five minutes, your

7    Honor?

8          THE COURT:  I'm sorry.

9          MS. ENGLISH:  Could we just have five minutes to

10   make sure we're done?

11         THE COURT:  But to answer the question, you have 25

12   minutes remaining.

13         MS. ENGLISH:  Okay.  Thank you, your Honor.

14         THE COURT:  All right.  I'll just sit here while you

15   decide.

16         MS. ENGLISH:  That's fine.  Thank you.  Thank you

17   for the time, your Honor.  Mr. Marriott would like to address

18   the Court.

19         MR. MARRIOTT:  Good afternoon.  I'm sorry.

20         THE COURT:  And you may proceed, sir.

21         MR. MARRIOTT:  Good afternoon again, your Honor.

22   Vince Marriott, EEPK.  I wanted to briefly address one point

23   that you made in response to Mr. Bennett's argument, which

24   was how can -- in effect, how can you ask the city to choose

25   between the safety of its citizens and its creditors.  And I

1  just wanted to indicate that we're not callous, and we're not

2  suggesting that the city play Russian roulette with its

3  citizens.  It is not our position that the city should just

4  become starved for cash and collapse.  If you recall, before

5  this hearing commenced, the Court ruled that under Section

6  904 of the Bankruptcy Code it was not the province of this

7  Court to pass judgment on the need of the city for borrowed

8  funds or for the uses to which the city planned to put those

9  funds.  As a result, the objectors, although ready to do so,

10  put in no evidence on those issues.  I just think it is

11  important to know -- to put in context the arguments we've

12  made today that had we been entitled to put that evidence in,

13  we would have put evidence in that, in our view, there's not

14  an immediate need for funds to meet what the city is

15  immediately capable of doing, and so we are not -- we would

16  have, had that issue been amenable to evidence from the

17  objectors -- I just think it's important for the Court to

18  know that we are not operating from a perspective that it's

19  choose between the citizens and the banks.  We believe, based

20  on our own analysis, that the city is actually not at this

21  time confronted with that choice.

22          THE COURT:  All right.  Thank you.  Anything

23  further?  All right.

24          MS. ENGLISH:  Thank you.

25          THE COURT:  All right.  Will the city be giving a

1  rebuttal argument?

2          MS. BALL:  Yes, your Honor.

3          THE COURT:  All right.  Before we do that, we'll

4  take a 20-minute recess and reconvene at 2:50, please.

5          THE CLERK:  All rise.  Court is in recess.

6      (Recess at 2:32 p.m., until 2:52 p.m.)

7          THE CLERK:  All rise.  Court is in session.  Please

8  be seated.

9          THE COURT:  Looks like everyone is here.  You may

10  proceed.

11          MS. BALL:  Good afternoon, your Honor.  Corinne Ball

12  of Jones Day for the city.  Your Honor, may I inquire as to

13  how much time we have?

14          THE COURT:  Sixty-eight minutes.

15          MS. BALL:  Thank you, sir.

16                    REBUTTAL ARGUMENT

17          MS. BALL:  Your Honor, we have before you today two

18  motions, one to approve forbearance and optional termination

19  agreement and the other to approve a post-petition financing.

20  The point of these motions is to enable the city to

21  rationalize its debt structure and restore viability to the

22  city by eliminating its most costly obligation and obtaining

23  financing on a cost-effective basis to move forward.

24          Your Honor, these matters are before you as core

25  matters under 28 U.S.C. 157(b)(2)(A), (B), which is the

1  allowance of claims, your Honor, (C) the obtaining credit,

2  (K) the extent of the lien, and (O) the adjustment of debtor

3  and creditor.

4      Your Honor, I'd like to take some time, since the

5  evidence here after three days but more so of voluminous

6  documents may have escaped even Ms. English's notice as to

7  some points that might help the Court where there was

8  evidence for points where she suggested that there weren't,

9  but I must admit, as you know, we agree with Ms. English and

10  Mr. Gordon to the extent that we fully understand -- and we

11  think we do -- one of his arguments that there are litigable

12  claims here.  We do not disagree.  I think we just, in the

13  context of the city and its current circumstance, may have a

14  different conclusion as to what's in the best interest of the

15  city.

16      But with that, your Honor, I'd like to start with

17  the post-petition financing and address the objections of

18  Mr. Marriott that we did not demonstrate that unsecured

19  credit was not available, the objections of Mr. Perez that

20  the good faith findings aren't merited, Mr. Marriott that we

21  didn't comply with 436, and a new one from Ms. Green on the

22  authority for granting liens, which, as your Honor may

23  recall, the authority that we are seeking for the provision

24  of this pledge are authority to pledge under 364(c) as a

25  matter of federal law.

1        Finally, your Honor, in terms of the purpose of

2  Chapter 9 and Mr. Bennett's comments, I think we are really

3  reminded -- and we will get there because we did talk about

4  it in our reply -- the primary purpose of Chapter 9 is to

5  restore viability of the city, and by that it means the

6  provision of public services at the level it deems necessary,

7  meaning the city, not its creditors.  Well, your Honor, with

8  that, moving ahead, I think the evidence has shown that

9  unsecured credit is not available to the City of Detroit and

10  the post-petition financing is the best financing available.

11  Your Honor, we have excerpted opinions from Mr. Doak and

12  Mr. Buckfire.  And I would point out to your Honor that your

13  Honor did qualify Mr. Doak as an expert in sourcing financing

14  in municipal cases, and, your Honor, the reference for that

15  is December 17th's hearing transcript at 250, lines 10

16  through 12, despite some questions from Mr. Marriott on that

17  point.  Mr. Buckfire also qualified as an expert in

18  restructuring finance on December 17th at 131, lines 12,

19  through 132, lines 21.

20        In addition, your Honor, I would point out that

21  during December 18th's hearing Mr. Buckfire, after being

22  qualified as an opinion, was asked,

23        "Question:  And in the process of going out to

24        seek this DIP financing, did you consider the idea

25        of seeking unsecured financing?

1          Answer:  We thought about it and dismissed it as

2      impractical.

3          Question:  When you said you dismissed it as

4      impractical, why is that?

5          Answer:  Well, again, based on my experience,

6      I've never seen any post-petition financing done on

7      an unsecured basis.  Lenders in this field always

8      want security.  They're not going to take what I

9      would call plan risk.  If there were an unsecured

10      lender, they would be taking that, and I don't think

11      there's any case I'm aware of where that's been

12      done."

13          Your Honor, if we move ahead, I think we've had the

14 discussions regarding the JPMorgan Exhibit 61.  This was one

15 of the preliminary market tests that Mr. Buckfire testified

16 to, and it is true that they did identify general revenue

17 sources.  I think the document speaks for itself, but it

18 clearly was another information point that informed the

19 opinion of Mr. Doak -- Messrs. Doak and Buckfire.  And we

20 find it interesting, your Honor, that no objector could bring

21 in any witness, expert or otherwise, who would tell this

22 Court that their bank or financial institution was willing to

23 lend on an unsecured basis.  Indeed, as your Honor elicited

24 from Mr. Bennett, the proposal from Syncora was secured as

25 well and on that same basis with the exception of asset

1   proceeds.

2          Your Honor, then in discussing this with Mr. Orr,

3   who ultimately had to make the decision, and it's his

4   business judgment, we excerpted the evidence where it is

5   clear that Mr. Orr had also discussed the basis and the

6   credit available and what he was looking for.  And, your

7   Honor, I think he was quite clear that he was looking for the

8   best deal available for the city.  If we move ahead -- and I

9   think Mr. Marriott mentioned the next exhibit, which was City

10  Exhibit 88 -- we think the evidence has shown that the city

11  has undertaken a robust competitive process.  The terms and

12  conditions of the post-petition financing are fair and

13  reasonable, reflect the city's best business judgment, and

14  are supported by reasonably equivalent -- excuse me --

15  equivalent value and fair consideration.  The evidence does

16  establish that the city solicited 50 banks and financial

17  institutions.  It received 16 lending proposals.  And as your

18  Honor can see from page 5 of City Exhibit 88, the Barclays

19  proposal was by far the strongest proposal.  Even after that,

20  the city would go on, as was clear from City Exhibit 89, to

21  fully negotiate four commitment letters, and, your Honor, all

22  of those were also secured.  And what I wanted to take time

23  with page 5 of this exhibit to share with your Honor is

24  please note that Barclays again, even with flex, is by far

25  the best proposal.  And one might suggest to you, your Honor,

1     that, indeed, the fact of including a flex provision, which

2     the two most competitive lenders did, in fact, do, as you can

3     see from this exhibit, confirms that unsecured debt would not

4     have been possible if even, in fact, on a secured basis we

5     would have market flex to this extent.

6          I do want to add on a happier note that Mr. Orr also

7     testified on December 18th that he was confident that we

8     would be able to arrange exit financing for this loan rather

9     than the scenario outlined by Mr. Goldberg.  That four-year

10    scenario outlined again by Mr. Goldberg, your Honor may

11    recall, was a product of a limitation that we couldn't

12    possibly have a lender who was enforcing against the city in

13    any way that would inhibit the city's ability to provide

14    services.  So, your Honor, I think the evidence has

15    established that the Barclays proposal is the best available.

16    In fact, I've excerpted for your Honor's benefit the

17    testimony of Jim Doak to that effect and, again, underscore

18    that we provided limited collateral.  It was a fully

19    underwritten commitment by a major financial institution, and

20    it was the most advantageous.  In fact, Mr. Doak would go on

21    to tell us that even with the market flex, it would still be

22    the most advantageous proposal, and, in fact, he's confident

23    that no party was willing to provide comparative overall

24    better terms.

25          Moving on to the issues raised by Mr. Marriott under

1   436, your Honor, the city believes and has demonstrated that
2   the City Council received more than adequate and sufficient
3   information to assess the Barclays proposal, and for your
4   Honor's benefit we have identified those portions of Mr.
5   Doak's testimony where he confirms in his meetings with the
6   individual City Council members -- and, your Honor, the
7   materials for those meetings were City Exhibit 90 -- that he,
8   in fact, did say that the range, even with market flex, was
9   well within the range described to in those materials, and
10  that range, your Honor, was five to nine percent, which more
11  than covered the market flex ranges that we've just gone over
12  on Exhibits 89 and 90.  He also -- again, they did it with
13  the City Council in closed session.

14          Mr. Doak would then go on to tell us that not only
15  did he talk about the market flex, but, although Mr. Marriott
16  is adamant that he didn't give them the fee letter, which is
17  true, Mr. Doak has testified that he discussed the commitment
18  fee that the city agreed to pay with Barclays.  "And did you
19  disclose it?"  And he said, "Yes, I did."  So, your Honor, I
20  think --

21          THE COURT:  Well, but did he testify that he
22  disclosed to the City Council members the market flex
23  process?

24          MS. BALL:  He said -- no, your Honor.  He said that
25  he assured the individual members of the City Council that

1    the interest rates that would result from the Barclays
2    proposal were well within the range that he provided in his
3    materials, which were five to nine percent, which was, in
4    fact, the range of the market flex, your Honor, if you were
5    to look --

6              THE COURT:  So without disclosing the market flex
7    process --

8              MS. BALL:  He did --

9              THE COURT:  -- the consequences, how is that
10   consistent with what PA 436 requires?

11             MS. BALL:  He disclosed the range of possible
12   consequences should flex be invoked, five percent being where
13   no flex was invoked, which would be the best outcome to the
14   city, and nine percent, which would be the range and the all-
15   in cost should the flex be invoked with the fee.  So I think
16   if the City Council were thinking about an alternate
17   proposal, they knew the range that this proposal would,
18   indeed, cost.  That was discussed as was the commitment fee,
19   and, your Honor, we do think that is sufficient for that
20   purpose.  Your Honor may recall that market flex -- there's
21   some commercial sensitivity around market flex, and perhaps
22   we were a little over-sensitive to that, as your Honor's
23   later ruling would confirm, but in terms of the consequences
24   and impact of this Barclays proposal, the spreads were, in
25   fact -- at the bookends of the proposal were, in fact,

1  discussed with City Council members as was the commitment

2  fee.

3        In addition, your Honor, beyond going through the

4  process Mr. Marriott described, which was giving the City

5  Council notice of the proceeding, which, as we said, there

6  were two series of meetings, individual meetings and then the

7  closed session, City Council would then have time to submit

8  an alternate proposal.  The City Council did not approve the

9  post-petition financing, as your Honor is aware, but it did

10  not offer any alternate proposals either.  In that case, the

11  next step indicated under the Home Rule City Act was for the

12  emergency manager to seek approval from the Emergency Loan

13  Board.  And, your Honor, we have excerpted an image of the

14  order of the Emergency Loan Board, which was entered on

15  December 20th after hearing, approving this post-petition

16  financing with certain conditions.  Primary among the

17  conditions, your Honor, is your Honor's approval.  Paragraph

18  7 of that order authorizes the city to issue bonds in an

19  amount not to exceed 350, in fact, recognizes at that time

20  that the transaction might be shifting with the swap parties

21  and, indeed, further qualifies its approval and conditions it

22  on your Honor's approval of the settlement.

23        THE COURT:  Can you please pull the microphone

24  closer to you?

25        MS. BALL:  Of course.  My apologies.  With that,

1    your Honor, I think that we would conclude that we have met

2    our burden on the post-petition financing.  We seek your

3    Honor's authorization under 364(3) to grant the liens and the

4    priority claims that are described in our papers.  We also,

5    based on the robust process that we followed, seek your

6    Honor's findings that the process was, in fact, in good

7    faith.  The matters raised by Ms. Green when she excerpted

8    the financing orders talk about the grant of a lien under

9    Section 364, your Honor, and that authorization under federal

10   law.  As your Honor is well aware, 364 continued in 1978 what

11   had long been a tradition certainly as far back as 34, the 34

12   Act, and, again, the 37 Act, and then the Chandler Act, of

13   certificates of indebtedness being issued by states, and it

14   is very clear that as a matter of federal law, a Bankruptcy

15   Court can issue and authorize liens that are prior to other

16   liens, and it is a federal question within your powers under

17   Section 364, and that is the foundation of what we seek and

18   not to comply with the Gaming Board.  Actually, your Honor,

19   there is no statute governing income taxes either, and in

20   this case -- and we are reminded of your Honor's observation

21   that Section 901 included Section 364(c), (d), and (e) for a

22   reason, and it was in recognition that, yes, in fact,

23   municipalities may need to borrow, and it is that authority

24   that we're asking you to grant us.

25          THE COURT:  So your position is that even if state

1   law prohibits the granting of a lien in whatever property,

2   Section 364 authorizes the Bankruptcy Code to allow the

3   debtor to grant such a lien?

4           MS. BALL:  We think it provides independent

5   authority, and I'm not sure that anyone has established that

6   it's prohibited, your Honor, at least no evidence in this

7   hearing that state law prohibits it, but we do think that the

8   position is that we're asking for it to be authorized as a

9   matter of federal bankruptcy law.

10          THE COURT:  Any cases on that?

11          MS. BALL:  No, your Honor, just the long history of

12  the certificates of indebtedness.  And, in fact, as your

13  Honor is well-aware, superpriority claims and superpriority

14  liens only exist in bankruptcy and nowhere else and certainly

15  would not be permitted under state law.  If your Honor gives

16  me a minute, there may be cases, the reason why I am

17  struggling on that one, your Honor, but if you give me five

18  minutes and we have time, I will get you some.  I am told

19  there are cases.  That argument was not in the Retirement

20  Systems reply or supplemental reply, so it is not in our

21  papers, but we will endeavor, as I move through the

22  assumption motion, to get those cases.

23          Moving on, your Honor, I think that Mr. Bennett's

24  point we actually did cover in our reply.  He suggests that

25  the context for post-petition financing should be a plan, and

 1  the standards should be confirmation standards.  We disagree
 2  with both propositions.  However, we did point out -- and I
 3  would point to paragraphs 49 and 50 of our reply -- that just
 4  in responding to objectors' concerns that they should have
 5  weighed a plan, Chapter 9 is about the payment of creditors
 6  and provision of essential services.  We, in fact, point out
 7  that, no, that's not the case.  The fundamental purpose of
 8  Chapter 9 is to provide municipal services, and it's the
 9  viability of the city.  And in that case, your Honor, we
10  would point you to the Mount Carbon case, 242 B.R. 18, from
11  the District Court of Colorado in 1988, which is cited in our
12  reply, and, your Honor, I would note when Mr. Bennett cites
13  Fano, he neglected to advise you -- and I'm sorry -- it's
14  Bankruptcy Court, District of Colorado, 1999 -- he neglected
15  to advise you that the Ninth Circuit decided four cases that
16  day, the same day that they decided Fano in 1940.
17  Interestingly, Fano was the one case where there was evidence
18  that the irrigation district -- it was not a city; it was an
19  irrigation district -- was eminently solvent, had the power
20  to increase taxes, and did nothing, did not even explore it,
21  and so their plan was not approved.  However, as the three
22  cases that are discussed in Footnote 10 on page 25 of our
23  reply, decided three other cases that day, all of them the
24  plans were approved, so I think we have to look at Fano in
25  the context of its unique facts, your Honor, which are that

1   you had a very solvent situation where there was no evidence

2   that they had attempted to increase taxes in the face of

3   evidence that they could afford to, and certainly in the

4   three companion cases decided that day written by the same

5   circuit judge he went the other way in the other three cases.

6           With that, your Honor, perhaps we can move on to the

7   approval of the forbearance and optional termination

8   agreement, which, your Honor, we seek two things, your

9   approval under Section 365 to assume the forbearance

10  agreement, and implicit in that, your Honor, is the

11  settlement of claims and the allowance of the secured claim

12  of the swap counterparties in the amount of 165 million.  We

13  and Ms. English, Mr. Gordon, Mr. Goldberg see things very

14  similar.  These are litigable claims, and they may, in fact,

15  be litigated.  They have one advantage, however, that my

16  client does not.  The emergency manager has to live in the --

17  has to live in the real world of providing services to the

18  residents of Detroit every day, and he has to address -- we

19  thought of it almost, your Honor, as the missing third column

20  in Ms. English's PowerPoint.  She assumed that we would win,

21  and we would hope if we sued we would win, but she didn't

22  address what happens if the city loses, what would be the

23  real impact, and yet that possibility and those consequences

24  were things that the emergency manager had to consider

25  because, in fact, he would have to live with it, so I would

1  think, your Honor, that the luxury of litigation -- and I

2  don't use that phrase lightly because we have all invested

3  somewhat heavily into what the prospects for litigation is

4  here, and I would like to move on to offer some of our

5  observations which tend to suggest that no outcomes are

6  certain, no outcomes are near certain, and no outcomes are

7  quick.

8          Certainly the issues regarding the validity of the

9  COPs and swaps were reviewed.  We have excerpted for your

10 Honor's benefit the city exhibits that really focus on the

11 service corps, and the one -- two of them, in particular, may

12 be of interest to you, your Honor.  Those are the

13 transactional documents, which are Exhibits 120, 121, which

14 are the service contracts themselves as well as the offering

15 circular, which is Ambac 404.  There is one -- well,

16 actually, there are two -- four service contracts that they

17 cover the obligations to the COPs and swaps.  They're not

18 separate.  They're really not separate provisions.  It's the

19 same funding.  It's the same provisions.  The argument, on

20 the other hand, one, they were authorized.  We have

21 ordinances.  We have opinions.  The opinions are appended to

22 the offering circular that Ambac put into evidence.  We have

23 service contracts that say this is not indebtedness of the

24 city.  You have no recourse but suing as contract vendor.

25 You are left to the annual appropriation process as opposed

1  to full faith and credit.  It was clearly dealt with as a
2  nondebt obligation of the city outside of Article 34.  That
3  evidence supports that proposition; however, in litigation
4  the service corps should be disregarded and Act 34 and its
5  debt limits retroactively applied to declare the swaps and
6  COPs void ab initio.  It is true -- and Ms. English is
7  absolutely right -- that this settlement still preserves the
8  right to continue to look at this transaction in a number of
9  ways, 2005, 2006.  The only thing it settles is the swaps and
10  terminates the swaps.  A lot of other things can be looked
11  at, and, your Honor, the order, I think, is fairly clear on
12  that.  We do not -- Ms. English is right.  We do not share
13  her view of estoppel.  We think the cases, once you get
14  beyond the mid-20th century cases, are -- and your Honor used
15  words differently -- I was somewhat impressed -- illegal
16  versus ultra vires could be a very important difference for
17  estoppel.  Intra vires versus ultra vires could be a very
18  important difference.  And here, because we're talking about
19  the facts and the representations made by the city regarding
20  the service contracts, your Honor, I think we'd have to take
21  that into account that it's not certain, but I would disagree
22  with Ms. English that it is as easy to just sue the swaps and
23  not have the core common facts, core common documents, core
24  provisions when you're coming to Act 34 not involve the COPs.
25  It seems to us that it is the entire transaction and

1 structure, and it is not very realistic to think that one

2 could only attach the swaps.

3       As to issues regarding the validity of the COPs and

4 swaps in terms of the challenges premised on fraud and

5 unconscionability, I think it was quite clear that Mr. Orr

6 understood those claims, evaluated those claims, ranging

7 from -- I think he called it LIBOR price fixing as opposed to

8 LIBOR manipulation, superior knowledge, the ticking time bomb

9 and even the personnel question when former city CFO Werdlow

10 joined the swap bank. Clearly those things are looked at. I

11 also think the downsides to those claims, which involve the

12 duration, difficulty, and fact-intensive nature of any such

13 trial, weighed heavily on his mind.

14       When it came to issues regarding the validity of the

15 pledge of the casino revenues, they were also reviewed.

16 Again, we would view the role of estoppel here somewhat

17 differently from Ms. English, and the reason we would do that

18 here is because clearly on the finding of the pledge, there

19 were findings of fact by the City Council at a legislative

20 hearing, and those findings of fact are unlike one would say

21 the mid-20th century void ab initio cases which are premised

22 on knowledge of the law. Here there was a finding of fact,

23 and, in fact, your Honor, there was also an opinion by a

24 well-known law firm who opined that the pledge was proper.

25 And in addition to that, of course, we had the letter from

1  the executive director of the Gaming Commission, who said

2  there were no compliance issues that they saw.

3       THE COURT:  Well, but let me ask this.  Is there any

4  Michigan case law that prohibits a city on the grounds of

5  estoppel from asserting the illegality of a transaction?

6       MS. BALL:  Your Honor, there is substantial case

7  law, and it's actually coming up in another litigation before

8  you, that says the only party that has standing to assert the

9  illegality of that position is the state treasurer under Act

10  34.  So, your Honor, I am not aware of cases --

11       THE COURT:  That's a different question.  I'm

12  asking --

13       MS. BALL:  I'm not aware of cases of any private

14  citizen where that has been held.

15       THE COURT:  I'm not sure what you mean by "private

16  citizen."  My question was is there any case law that

17  prohibits a city from asserting the illegality of a

18  transaction that it entered into on the grounds of estoppel?

19       MS. BALL:  Your Honor, when you're dealing with an

20  intra vires, yes, Highland Park, and when you're dealing with

21  a factual representation, yes.  If the city was clearly

22  involved in a misrepresented factual situation, there are

23  cases, your Honor, and they would actually be more applicable

24  to the validity of the pledge of casino revenues perhaps than

25  the Act 34 questions, although I think that disregarding the

1   service corporations is a bit complicated.  So, yes, we do

2   know that there are cases where a city where it was intra

3   vires, which meant a city official went beyond their

4   authority, and where there was a fact-finding where a city

5   was estopped from going forward.  There are cases.  There are

6   not such cases, your Honor, that I am aware of in the void ab

7   initio area, which is a distinction here.

8        Your Honor, I wanted to go on to another point that

9   Ms. English made, and I was concerned because she had

10   suggested that the pension obligations were not part of the

11   2009 ordinances, and, indeed, they were.  And, in fact, our

12   next slide highlights the ordinance, which is also in

13   evidence, that talks about the pledge being necessary as

14   incident of the pension funding program, so I think it was in

15   evidence, and it was not something that came out of the clear

16   blue sky, but obviously, your Honor, there are at least two

17   ordinances.  There's a legislative hearing here, and there

18   are a number of opinions, so I'm not surprised.

19        In terms of the issues regarding the special

20   revenues, your Honor, we looked at that.  Are casino revenues

21   special revenues?  It was studied.  I think we were in the

22   camp that there's an issue when you have a definition of

23   special revenues which has some five different kinds of

24   special revenues, only one of which appears to be for a

25   construction project and others of which are very different,

1    and they include special excise taxes.  We were struck by the

2    plain meaning.  After all, the Gaming Control Board Act is a

3    1996 event, and it used the term "excise taxes" entirely

4    independent of whatever might later happen in 2009.

5           We also were a little confused by Mr. Gordon because

6    we think the argument that we and the banks are making is

7    they are squarely within that plain meaning, and they are

8    squarely within the consensual security agreement arrangement

9    described in 922(a) -- 928(a), which, your Honor, actually --

10   Mr. Gordon put it up in his PowerPoints -- provides that a

11   lien granted to -- pursuant to a security agreement will

12   continue post-petition.  Clearly the collateral agreement is

13   a security agreement, and clearly the banks, if there are

14   special revenues, we have excise taxes that are pledged

15   pursuant to a security agreement, and, your Honor, we're

16   dealing with two very plain meaning arguments.

17          THE COURT:  Mr. Gordon distinguishes between excise

18   taxes and special excise --

19          MS. BALL:  Special excise taxes, your Honor.

20          THE COURT:  -- taxes.

21          MS. BALL:  Your Honor, we can find no case that

22   distinguishes or distinguishes as to use, and even Mr. Gordon

23   ended up using two treatises, and we're not aware of where

24   they have been applied.  And, your Honor, we think --

25          THE COURT:  Well, but does the reading you propose

1    read the word "special" out of the Code?

2         MS. BALL:  I think "special" is back -- we think

3    it's included here because it is on a particular activity.

4    We think the casino revenue taxes are special because they

5    are an excise tax on a particular activity, and because

6    they're on that particular activity of gaming, we think they

7    are within the meaning of special.  We don't read it out.

8         THE COURT:  Isn't an excise tax, by definition, a

9    tax on a particular activity?

10        MS. BALL:  Your Honor, I think that the legislative

11   history tells us that it does include those, but, your Honor,

12   I think that's as close as we can get to is reading the words

13   "legislative history" in the statute, and I don't think we're

14   asking you to read the word "special" out, but I do think

15   that one has to be incredibly cognizant of the various types

16   of secured debt that are currently outstanding not only as

17   special excise taxes but as we have here, state intercept

18   secured loans and many other types.  This should not be

19   construed, we would think, your Honor, to prohibit a city

20   from financing itself.

21        THE COURT:  Can you give me an example of an excise

22   tax that is not a special excise tax?

23        MS. BALL:  Sure.  Smoking, tobacco.  I think taxes

24   on gasoline and cigarettes are often considered excise taxes,

25   and I think they're pretty general.  It's not a particular

1  activity.  And if you think about how they're used, I think

2  they are different.  That's not a municipal activity.

3       THE COURT:  If it's in relation to an activity, it's

4  special, but if it's in relation to a product, it's not?

5       MS. BALL:  I would think, your Honor, if it's not a

6  particular product for a particular use in a city within a

7  municipality, yeah, I think we're having trouble if we're

8  talking about a general product that goes beyond a

9  municipality.  And those are called excise taxes, and, in

10 fact, your Honor, they exist in 507 where we use the word

11 somewhat differently.

12      Your Honor, we also were confronted by the opinion

13 of a fairly well-known major law firm that did apply, and, of

14 course, this opinion made it into evidence through the

15 Retirement Systems.

16      THE COURT:  What's the relevance of it, though?

17      MS. BALL:  Your Honor, it's something you -- it's a

18 fact that you would have to overcome.  It would be something

19 that Mr. Orr, as emergency manager, considered.  He had to

20 consider the views that were considered at the time if he was

21 now going to attack them and rethink them, and --

22      THE COURT:  Well, but if the question --

23      MS. BALL:  -- he couldn't just disregard it.

24      THE COURT:  If the question is a question of law,

25 what difference does it make that some lawyer expressed an

1    opinion on it at an earlier date?

2         MS. BALL:  Your Honor, I think it's a matter of

3    diligence.  If it is something as we've had, we can

4    demonstrate through the colloquy we've just had as to what

5    does the word "special" mean, then I think one would do

6    diligence and see what other experts in the area have said,

7    and this would fall into that category of diligence.  He did

8    look.  He should look, and, in fact, those who would be --

9         THE COURT:  So its weight depends on its persuasive

10   value?

11        MS. BALL:  I think so, your Honor --

12        THE COURT:  All right.

13        MS. BALL:  -- as much as a treatise if one would

14   think about it --

15        THE COURT:  All right.  All right.

16        MS. BALL:  -- certainly not less.  If we were to

17   move on, your Honor, I think that in evaluating the

18   litigation, the emergency manager had to reconcile the safe

19   harbors and what they would mean here.  You've heard from the

20   banks earlier today somewhat what the difference means

21   between void and voidable, and, in fact, we have a very

22   different view.  We think that it was an illegal dividend in

23   Contemporary Industries in the Eighth Circuit.  The question

24   before Judge Gonzalez was also an illegal dividend.  I think

25   we have cases now on the non-Bankruptcy Court issues that you

1    raised with the banks and with Mr. Ellenberg when you asked
2    about this.  Right now we do have two cases going neck and
3    neck in the Seventh Circuit.  Your Honor may recall SemCrude,
4    which was a case in Delaware, and we have Bettina White as
5    the trustee of SemCrude bringing a case post-Chapter 11 as
6    the litigation trust to avoid matters, and, in fact, she is
7    being -- her actions were totally disallowed as being
8    preempted by the safe harbors.  We have another case pending,
9    your Honor, and that is the Tribune case, also a litigation
10   trust, also seeking to move post-confirmation of a Chapter 11
11   plan to avoid payments that clearly everyone agreed that
12   during the bankruptcy were safe harbored.  That one is on
13   appeal, and the appeal has not yet been decided, so, your
14   Honor, I think there is still a question not only as to the
15   void and voidable and the doubt cast on Enron, but in answer
16   to your question, which is where are we going with state law,
17   what if we tried to go to a different forum -- as you know,
18   in fact, the city, before the safe harbors attached, did go
19   to state court and did seek relief and, in fact, had very
20   seriously considered the importance of not being in
21   bankruptcy to avoid those safe harbors.  Your Honor, the cite
22   for the SemCrude case is White versus Barclays Bank at 49
23   B.R. 196.  It's in our reply.  And the Tribune case, which is
24   on appeal in the Seventh Circuit going the other way, is also
25   in our reply, your Honor.  If you give me a minute, I can

 1    find you that one, but it is on appeal to try to reverse that
 2    ruling and be able to go forward and attack in state court
 3    what it could not attack in the Bankruptcy Court.  Moving
 4    ahead --
 5         THE COURT:  Well, but from a -- apart from the case
 6    law, from the standpoint of just pure logic --
 7         MS. BALL:  Okay.
 8         THE COURT:  -- why should the safe harbors be
 9    permitted to protect a transaction that under state law is
10    void ab initio?  It's as if under state law the transaction
11    did not exist.
12         MS. BALL:  Your Honor, there is a concern -- and I
13    think Mr. Ellenberg tried to express it, and I think the
14    legal term for it is coming through most strongly as
15    preemption in the Second Circuit's ruling in _Enron_, which is
16    that state law has to give way to federal law where there is
17    an area where Congress has decided to act and exercise its
18    bankruptcy power.  And when it comes to contracts that are
19    traded not only across the country and across state lines but
20    globally, Congress intervened for many -- I think the term is
21    often qualified financial contracts, your Honor, settlements,
22    margin payments, swaps, forwards, commodity contracts, on the
23    theory that this is not an area that states should be
24    intervening in.  These products operate in a market which as
25    2008 -- as fast as the world melted down when we all saw how

1  interconnected we were, that it should be preempted, and, in
2  fact, that's what's suggested by _Enron_ and again by Judge
3  Easterbrook's affirmance of the _Lancelot_ case.  In fact, we
4  even have that view being taken when you have a clear Ponzi
5  scheme as in the _Peterson_ case in the Seventh Circuit, but
6  the logic is really that Congress has spoken.  This is an
7  area that's critical to systemically important financial
8  institutions because of their interdependence, and they have
9  acted and do not believe that states should be meddling in
10 this area.  Do we have a case that says, yes, we have a void
11 ab initio under --
12        THE COURT:  Why is it meddling -- why is it meddling
13 when you're talking about state control over a municipality
14 and what it can and can't do?
15        MS. BALL:  Because we actually have a swap which
16 goes far beyond that municipality and probably involves
17 multiple other parties beyond that municipality.  Your Honor,
18 we would have to go back to was there anything -- and I think
19 we're getting back to was this voidable, was it void ab
20 initio, and what does illegal really mean because it's not
21 clear to me that illegal is one or the other when you say
22 that, and I would think if we do have to litigate this -- and
23 we may -- and, in fact, we may -- that we would be agreeing
24 with Ms. English as this morning that this is an issue that
25 is undecided.  It is still undecided, your Honor, but it does

1    put us in the position of the city, when you think of

2    complexity, duration, and expense, of evaluating how much

3    time are we going to have to spend -- how much time and money

4    are we going to have to spend litigating over whether or not

5    we have the right to litigate?  And I think that certainly to

6    that extent it was a very valid concern for us because it is

7    unclear.  No one could guarantee that those casino revenues

8    would be safe, and because, as I stand here now, I don't know

9    whether we will be seeking an injunction from your Honor --

10   we believe, yeah, maybe there are arguments, and we were

11   prepared through Mr. Hertzberg and his firm to go after them,

12   but, your Honor, how much time and how much appellate -- not

13   even on the substance, just figuring out do we have a right

14   to litigate before we even get to the substance, and that was

15   a concern in this context for the city because there is no

16   doubt here -- and I think Mr. Buckfire may have made it too

17   clear -- that in looking at the litigation, it had to be

18   reconciled with the needs of the city, and what were really

19   realistically available options for the city at the time, and

20   what did the city do to preserve its rights should

21   circumstances change going forward, and perhaps we should

22   turn to talking about that with your Honor's permission.

23            THE COURT:  Sure.  Go ahead.

24            MS. BALL:  Thank you.  Turning to the next -- I

25   think this is the slide that, yes, Ms. English is right.  I

1  do view this as a litigation forecast, and I do view it that

2  way because I have seen no evidence of a loan to fund

3  litigation, and I've seen no evidence that anyone would make

4  a loan when what Mr. Orr testified as 20 percent of the

5  city's revenues are under a tremendous cloud.  It seems

6  pretty speculative to me, but what does seem rational to us

7  is to look at if we could hope for the best and maintain the

8  status quo during litigation, what would it look like, and we

9  did not think while we were litigating over 20 percent of our

10  revenues that it was feasible to get a loan, and no one has

11  come forward with any evidence to the contrary, that even

12  that put us in a very delicate position, not impossible, not

13  impossible, your Honor -- nothing is impossible -- but very

14  delicate.  In fact, Mr. Malhotra testified -- and your Honor

15  may recall that you qualified Mr. Malhotra as an expert

16  twice, once in the field of financial analysis and once as to

17  his expert opinion on cash flow analysis, and, your Honor, he

18  shared with us without the DIP loan if we didn't obtain

19  financing and we had the status quo, that we were in jeopardy

20  as early as March.  He talked about what I called the hard

21  deck, the 50 million operating capital requirements, that

22  that's in jeopardy even earlier, and he reestablished Kevyn's

23  concern and leveled the emergency manager's concern about the

24  hard deck at 50 million.  It's interesting, your Honor, that

25  he had these concerns, and this is our cash, and this is

1  where our cash stands.  And if we go back to Mr. Malhotra's
2  chart, with the benefit of having, thanks in part -- large
3  part to your Honor's ruling on August 28th, with having the
4  casino revenues for June, July, August, September, October,
5  November, December -- that's $77 million we otherwise
6  wouldn't have had, and this is still where we would be, so,
7  your Honor, I don't think it can be taken lightly, and I do
8  think that that was much on Mr. Buckfire's mind.  We had a
9  lot of back and forth about whether or not -- what did Mr.
10  Orr do, what did he think, and, in fact, he would tell us
11  that he had a very significant concern if he didn't step in
12  and do something that this situation would quickly get out of
13  hand.  In fact, I think he testified that he considered doing
14  nothing, and he determined that that would be fairly
15  catastrophic because the city was running out of money.  I'll
16  get to the point made by Ms. English because perhaps June was
17  a pinch point, which is what she has suggested, but for
18  cities whose income is cyclical, there are always pinch
19  points, which is why we want the DIP financing for working
20  capital, as Mr. Buckfire testified.  So it was very much on
21  Mr. Orr's mind, and it's interesting that no objecting party
22  has offered any rebuttal evidence with respect to financing
23  litigation or moving forward.
24        We actually, your Honor, did have the experience,
25  remember, of the casino revenues being trapped for a minor

1  period before we were in bankruptcy, and we did have to sue

2  to get them back, so the concern was real, having had the

3  Syncora experience.  In fact, Mr. Orr further testified that

4  if you were unable to get casino revenues, the consequences

5  would be quite severe, and here, your Honor, is what he had

6  to think about if the city lost, the third column not in the

7  Ambac chart.  The single largest most secure source of

8  revenue would have been imperiled.  Your Honor, I think that

9  that was very important to him.

10       And, your Honor, I would just like to point out for

11  the moment that Ms. English has talked about us rushing and

12  rushing to June, and I wanted to spend just a few minutes on

13  that because, as your Honor is aware -- let's go back --

14  June, low point for the city, no doubt -- in fact, dire was

15  the testimony -- did the deal, agreed in principle in a week,

16  took a month to document it, but, your Honor, what

17  Ms. English neglected to point out to you is that there was a

18  very pressing need for protection for the city.  The Syncora

19  experience totally demonstrated that we needed protection.

20  We needed some assurance that these revenues would be

21  available to the city, but that wasn't turtle up.  We had an

22  escape valve.  And, in fact, City Exhibits 50 to 54 confirm

23  that we kept that escape valve alive until we had another

24  one.  Your Honor, by that I mean that we had a right to walk

25  should we perceive the benefits of this agreement were no

1  longer necessary for the city. We kept that alive first
2  through fifth amendments, which took us to September 23rd.
3  Thereafter, the forbearance agreement itself, which is City
4  Exhibit 18, Section 1.3(m), for reference -- your Honor, we
5  had a right to walk because we failed to get an order within
6  75 days of filing, so until December 24th when we committed
7  before the mediator to not litigate and stay with this deal
8  until after 1-31 if your Honor were to fail to approve it, we
9  did have an escape valve, and we did go back, and if
10  situation changed, there was a way to do this. I would
11  suggest to your Honor that the fundamental key for us is we
12  agree that the challenges are litigable. I think we disagree
13  on the difficulty of establishing the claims, and we disagree
14  on the timing and expense it will take, but footnote, your
15  Honor, we do not agree that rushing is deciding anything
16  ahead of the plan. The city's residents should not have to
17  wait to stabilize the city's finances.
18        We also think it is fairly important to your Honor
19  that you can determine that the issues before you right now
20  are properly before you. We are asking you to approve
21  assumption of the forbearance agreements -- agreement, not
22  the swap, not the service contracts. They're all contracts
23  with different parties at different times. It is an
24  executory contract, and we think, your Honor, there is no
25  doubt in our mind -- and we would urge that the cases would

1  suggest that there should be no doubt in your mind -- that

2  matters regarding the assumption of a contract and a

3  settlement under 9019 -- and I can focus on the post-_Stern_

4  cases if that would be more helpful -- are clearly properly

5  before you as is the allowance of a claim, as is the

6  adjustment of debtor-creditor.

7       Your Honor, we think that your decision on the

8  eligibility motion has confirmed what the cases tell us,

9  which is if our matters are properly before you, then you

10  have the ability to decide them, and that's what we are

11  asking you to do here.  There is no doubt in our mind, your

12  Honor, that 365 and assumption is within your core authority.

13  We think that the Sixth Circuit has recently affirmed that in

14  a case called _In re. G.A.D., Inc._, 340 Fed. 3d 331, and that

15  was just this fall.  Similarly, the Seventh Circuit has said

16  that rejection of a contract is clearly core.  It's 365 even

17  though it involves state law issues, and that was decided --

18  that was affirmed by the Seventh Circuit in 2012, and that is

19  _Lakewood Engineering & Manufacturing Company_, and it is

20  reported -- excuse me, your Honor -- at -- it's reported in a

21  lower court decision, 49 B.R. 306, and the particular point I

22  would urge you to look at is on 312.  It was later affirmed

23  by the Seventh Circuit in 2012, and cert was denied by the

24  Supreme Court, 133 Supreme Court 1790.

25       Similarly, your Honor, the Third Circuit has had two

cases post-<u>Stern</u> where 9019 settlements affecting state court were found to be core.  One was <u>New Century TRS Holdings,</u> <u>Inc.</u>, which is 213 Westlaw 5944049.  Third Circuit decided that on November 17, 2013.  And its second decision is <u>Lazy</u> <u>Days' RV Center, Inc.</u> at 213 Westlaw 3886735, which was also decided by the Third Circuit in 2013.

Interestingly, there's another one, your Honor, on the extent of liens and your power to decide state law issues regarding the extent of liens, their priority and their scope and termination, and interestingly, your Honor, that's an art case.  It's <u>In re. Salander O'Reilly Galleries</u>, 453 B.R. 106, and it's in the Bankruptcy Court in New York, 2011, and would be later affirmed by the Southern District.  We think, your Honor, that all parties here have agreed that the issues to approve these 365, 9019 include the enforceability and validity of the forbearance agreement.  In fact, one of Syncora's lead cases, <u>In re. III Enterprises, Inc.</u>, which was affirmed under the name <u>Pueblo Chemical</u>, actually holds, and I quote, "The issue of existence and enforceability of the underlying contract are threshold issues, the resolution of which is absolutely essential to adjudication of the motion."  Your Honor, that case distinguishes <u>Orion</u>.  I would distinguish <u>Orion</u> on multiple grounds here.  The facts in <u>Orion</u>, as you may recall, your Honor, the underlying contract was between Showtime and <u>Orion</u>.  There was a default, and

1  Showtime was enforcing the default.  There are no defaults
2  under the forbearance agreement.  We have no problems with
3  the forbearance agreement, and that's the agreement that
4  we're talking about, and, in fact, because of that, knowing
5  that, in fact, there is a contract, it has become a critical
6  predetermination.
7          We also thought it would be interesting to your
8  Honor to think about another case that was affirmed by the
9  Third Circuit.  Mr. Perez brought SportsStuff to your
10 attention.  SportsStuff is reminiscent of the channeling
11 injunction cases, but they got it wrong there, but that's not
12 the proposition I would like you to think about with
13 SportsStuff.  What I'd like you to think about is let's first
14 start with a case called RNI Wind Down Corp., 348 B.R. 286,
15 Bankruptcy Court, Delaware, 2006.  That court was called upon
16 to determine whether an objector to a settlement who asserted
17 a consent right -- whether or not their consent right was
18 necessary and whether, in fact, it was legitimate.  That
19 court determined that the objector was not a necessary party
20 to amend the settlement agreement, and consideration of Rule
21 9019 in the face of adjudicating that objector's consent
22 rights more or less was a core proceeding.  That decision
23 would be affirmed by the Third Circuit at 359 Fed. Appendix
24 352.  Interestingly, if you think about SportsStuff just a
25 little bit differently, there you had objectors to a

settlement -- you know, a channeling injunction wasn't under plan the way we usually think about it -- and the issue was could the court decide whether or not those objectors had rights and should pay attention to it, and you know what? That's exactly what it did. So in terms of your ability to reach the decision, SportsStuff would suggest that, yes, you can, and, yes, you should. Similarly, RNI Wind Down, yes, it is within your power to do this, your Honor, to figure out whether these consent rights and to determine that the forbearance and optional termination agreement is a valid and enforceable contract and that that's all core. There's no doubt in our mind -- and this gets to another point raised by Mr. Perez -- that settlements always have collateral consequences on third parties. There are cases to that effect -- multiple cases to the effect. Allowing a secured claim by definition adjusts debtor-credit relationships. I would point out here, however, your Honor, that we were able to resolve the reservation of rights objection that was made by the ad hoc COPs holders represented by Mr. Tom Mayer and that that provision was added to the order, which was filed with your Honor before we started this hearing and, in fact, read into the record on one of those early days by Mr. Mayer. So, your Honor, we think they're core. We think they're appropriately here. We think they are incredibly contract centric. They are legal. There is no ambiguity. There is

1   just interpretation.  And with that, your Honor, I would

2   recommend that you might take heed of an admission by the

3   insurers.  In fact, the insurers admit the express terms of

4   the optional early termination provision did not require

5   their consent, and that's in paragraph 23 of the amended

6   statement of stipulated facts.

7           Your Honor, it's also very clear that 2009 changed

8   the world, and with that, your Honor, I would turn to the

9   optional early termination provision.  We've excepted the

10  one -- excerpted the one that's between UBS and GRS.  As you

11  know, there are four amended swaps schedules, one for GRS,

12  one for police and fire, one for UBS, one for Syncora -- I

13  mean one for UBS, one for BAML.  Here's the optional

14  termination provision, no insurer consent.  The confirmation

15  would have it.  2009 did change the world, but let's take a

16  minute and think about what Mr. Perez said of -- when I think

17  of his telling us that it's an end-run argument, almost

18  ironic in some respects because he's saying, you know, the

19  COPs are valid, the swaps are valid, the service corps are

20  real, it worked for that purpose, but we should disregard the

21  service corps when it comes to the swaps and the optional

22  termination, and we should construe it as an end-run.  Your

23  Honor, this is not a situation where people were not

24  represented by counsel.  This is a contract between extremely

25  sophisticated financial parties.  They knew what they were

1  doing.  And I think that the service corps are different

2  until someone establishes to the contrary from the city and

3  that this is exactly what was contemplated is that the

4  service corps would not pay them and the service corps are

5  not paying the swap counterparties -- whoops -- the city is.

6  In fact, your Honor, I think it was so clear -- and you and I

7  have had this discussion once before -- that in that fateful

8  summer, that June 26 of 2009, the insurers would consent to

9  the optional termination rights.  Your Honor, this is just

10  the very first paragraph of the waiver and consent of

11  insurer, in this case, Syncora, and what we've highlighted,

12  your Honor, is the exact same amended schedule that I just

13  reviewed the optional termination provision from, and you

14  will see that that amended schedule is Romanette iv in this

15  paragraph, and there is an express consent to it.

16        Your Honor, I think it is also disappointing, maybe

17  a little ironic -- I guess perhaps I am being too overly

18  sensitive.  One of the things we kept hearing on closing is,

19  well, the city -- maybe it should just do nothing and it

20  should continue funding, and we actually heard it from Mr.

21  Perez that FGIC will suffer harm.  The harm FGIC suffers is

22  if the city doesn't continue paying the most expensive piece

23  of debt it possibly has, that FGIC will be harmed.  FGIC is a

24  very sophisticated party, and I assume Syncora would join

25  FGIC in these arguments.  It has a separate insurance policy

1  from the COPs from the insurance policy it had from the

2  swaps, and if, in fact, it would be harmed by the termination

3  of the swaps, which it consented to -- and we think it's

4  clear that they did consent to it -- why should the city and

5  its residents be tasked with protecting Syncora and FGIC?

6  Heaven sakes.  We would think that they would be able to go

7  out and buy their own replacement swap once this swap is

8  terminated.  They consented to it.  If they'd like swap

9  protection, the markets are there.  They're free to go.  I

10  don't see why the residents should be delayed or the city

11  should be burdened with protecting them against their own

12  insurance contracts.

13        Moving on, your Honor, I think that the city has

14  demonstrated that the settlement with the swap counterparties

15  which allows a secured claim for 165 million satisfies the

16  Bard test.  As I said, we agree it's litigable, and, in fact,

17  they may yet be litigated.  Of the remaining ten objectors,

18  eight are potential litigating parties.  Many are involved in

19  other pending litigations before you.  The fact that no one

20  would give you a number they would accept other than I

21  respect Mr. Goldberg for his answer is not surprising to us.

22  It's difficult to number, and I think the real issues if we

23  continue through the Bard factors are the difficulty, if any,

24  to be encountered in the matter of collection.  Everyone

25  erases that, your Honor, but you asked us to think about in

1    the context of that _Bard_ factor the strength of the secured
2    position and what it would take really to undermine it, and
3    in this one, your Honor, we did look at the position and the
4    city's ability to sustain litigation to attack it.  This is
5    one of those things where collection became survival, would
6    we live to collect and how much and who would take it up and
7    who would benefit and who would be -- what would be
8    sacrificed in order to get there.  I guess the analogy here
9    is, your Honor, even if the operation were to be a success,
10   there had to be a concern, and we think it does fit into the
11   second _Bard_ factor, that the patient could die on the
12   operating table despite the operation's success.

13           In terms of the complexity, expense, inconvenience,
14   and delay, your Honor may recall that Mr. Orr testified that
15   he estimated costs -- Ms. English reminded us this morning --
16   at roughly a million a month or six to twelve million a year.
17   That's expensive.  As to duration, I think he estimated that
18   it would be a different duration of months between the fraud
19   claim advocated by Mr. Goldberg and some of the others, but
20   the full appellate prospects he has certainly suggested and
21   we would agree and urge your Honor to consider would take far
22   longer than six months.  And that cloud over this asset, 20
23   percent of the city's revenues would continue.

24           I have adjusted the fourth _Bard_ factor, your Honor,
25   because I think in Chapter 9 it's important, and I guess this

1   is where I and Mr. Bennett would part company one more time.
2   Chapter 9 is about restoring viability to municipalities.
3   It's about adjusting debt so they can provide services to
4   their residents, and I think the cases on that are pretty
5   clear, and we went over some of them that are found in
6   paragraphs 49 and 50 of our reply on the financing.
7           If we just want to take a moment, we used to have
8   objection, wait to see if we have the dollars to reap the
9   discount.  Those objections are gone.  Wait for the retiree
10  committee to weigh in.  Well, they did weigh in.  They're
11  supporting this motion.  We have then the remaining group,
12  your Honor, and we had a lot of more information, more
13  discovery.  Well, there was more information, and there was
14  more discovery.  In five months people could learn a lot.
15  And now we're left with two kind of camps of objectors, those
16  who feel that given the strength of the claims, that the deal
17  does not reflect the strength of the claims against the
18  banks, but, as I think you heard from the banks this morning,
19  it's the banks and the insurers versus those who are arguing
20  it's really a matter of consent and the powers of this Court.
21  But, your Honor, it is uncontroverted that this settlement
22  will reduce net debt.  Right now that debt, your Honor --
23  we'll get there in a minute, but it's going to reduce it by
24  that discount and that linear equation, speculation,
25  unsupported -- totally unsupported speculation about 78

1   percent still doesn't controvert its reduction in net debt.

2   And, your Honor, as we know, interest rates have gone down

3   all this week since -- last week since Janice Yellen's

4   confirmation, so you can imagine -- and, in fact, I know

5   what's happened to our swap termination costs, and I would

6   suggest, your Honor, that in light of the interest rate moves

7   and the LIBOR curve moves, which we'll come to in a minute,

8   that it is clear there is going to be a reduction in our net

9   debt.  It should be a substantial one.

10          What is also crystal clear is that this deal will

11  substantially improve the cash flow of the city.  Your Honor

12  may recall that when the post-petition financing was still at

13  the 350 level, the cash flow savings were 33 million a year.

14  They obviously are going to be improved by the improvement of

15  the sixth amendment and the improved deal even beyond that,

16  so there's no controverted evidence that this will clearly

17  improve the cash flow of the city.  It will give --

18          THE COURT:  I can give you about five more minutes.

19          MS. BALL:  Thank you, your Honor.  I think I'm kind

20  of done other than the next slide, your Honor.  We have

21  met -- we've met our burden, I think, under 9019.  The range

22  of reasonableness I think is the test that we would urge your

23  Honor to consider.  And, your Honor, in the context that

24  there's clearly a policy in favor of settlement, as was

25  recognized by these same cases, your Honor, I wanted to do

1   one last, which is the LIBOR curve, and if your Honor would

2   permit me, and then I'm done.

3         Your Honor, the LIBOR curve itself is a reflection

4   of the market's view of interest rates.  By the way, that

5   curve changes constantly.  The objectors have presented no

6   evidence that interest rates can be predicted with any degree

7   of certainty.  In fact, the city's experience would suggest

8   that it has suffered mightily from trying to take away and

9   bet on interest rates.  We also have the testimony, contrary

10   to Ms. English's representations, that Kevyn Orr did, in

11   fact, as the emergency manager, during the mediation, call

12   his investment bankers several times to try to get an idea of

13   what was going to happen to interest rates during the coming

14   weeks, so he did inform himself as to what would happen.

15   And, your Honor, if you want some understanding of what

16   Miller Buckfire knew about the LIBOR curve, I think they had

17   a very interesting exchange, Mr. Doak did, which I've

18   highlighted for you, with Mr. Arnault on behalf of Syncora,

19   and I think that Mr. Doak was quite clear that they move a

20   lot, and it is, in fact, the market's expectation of what

21   will happen to interest rates.  And, your Honor, I don't

22   think anyone can predict interest rates accurately, never

23   mind predict movements in the LIBOR curve, and with that,

24   your Honor, we would ask respectfully that you grant us an

25   order authorizing the post-petition financing and authorizing

1    the assumption of the forbearance and optional termination

2    agreement.

3              THE COURT:  Thank you.

4              MS. BALL:  Thank you.

5              THE COURT:  I would propose, counsel, to reconvene

6    this Thursday, the 16th, at 2 p.m. for the Court's decision.

7    Any objection to that?  All right.  Hearing none, we'll be in

8    recess.  What?

9              MR. PLECHA:  Can I just make one point of

10   clarification, your Honor?  Ryan Plecha on behalf of the

11   retiree association parties.  We have not --

12             THE COURT:  If it's a matter of clarification, yes.

13   If it's a matter of argument, no.

14             MR. PLECHA:  It is not  It's just pure

15   clarification.  The retiree association parties, who were the

16   party that said the Court should wait and see for the Retiree

17   Committee's response, still has a live objection, and it is

18   objecting to both the swap and the forbearance agreement --

19             THE COURT:  Thank you, sir.

20             MR. PLECHA:  -- and the DIP.  Thank you.

21             THE COURT:  All right.  We'll be in recess.

22             THE CLERK:  All rise.  Court is adjourned.

23        (Proceedings concluded at 4:01 p.m.)

INDEX

|  | Page |
|---|---|
| Closing Argument by Mr. Ellenberg | 4 |
| Closing Argument by Ms. English | 21 |
| Closing Argument by Mr. Gordon | 53 |
| Closing Argument by Mr. Perez | 69 |
| Closing Argument by Mr. Marriott | 77 |
| Closing Argument by Ms. Green | 97 |
| Closing Argument by Mr. Bennett | 105 |
| Closing Argument by Mr. Goldberg | 124 |
| Rebuttal Argument by Ms. Ball | 137 |

WITNESSES:

    None

EXHIBITS:

    None

        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett                    January 17, 2014
_____              _____
Lois Garrett