# U.S. Bankruptcy Court
## Eastern District of Michigan (Detroit)
## Bankruptcy Petition #: 13–53846–swr

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*          represented by **Sean M. Cowley (UST)**
**Daniel M. McDermott**               United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–3432
Email: Sean.cowley@usdoj.gov

**Richard A. Roble (UST)**
United States Trustee
211 West Fort Street
Suite 700
Detroit, MI 48226
(313) 226–6769
Email: Richard.A.Roble@usdoj.gov

*Retiree Committee*          represented by **Sam J. Alberts**
**Official Committee of Retirees**          1301 K Street, NW
Suite 600, East Tower
Washington, DC 20005–3364

(202) 408–7004
Email: sam.alberts@dentons.com

**Paula A. Hall**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: hall@bwst–law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632–8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768–6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971–1800
Email: wilkins@bwst–law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 09/23/2013 | | 1004 | Motion for Relief from Stay and Waiving the FRBP 4001 (a)(3) Re: Creditor . Fee Amount $176, Filed by Creditor Catherine W. Phillips (Attachments: # 1 Index # 2 Exhibit 1–Proposed Form of Order # 3 Exhibit 2–Notice of Motion &Opportunity to Object # 4 Exhibit 3–Brief in Support of Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor # 5 Exhibit 4–Certificate of Service # 6 Exhibit 5–No Affidavits Filed Specific to this Motion # 7 Exhibit 6.1–Complaint filed in Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13–CV–11370 # 8 Exhibit 6.2–Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay in Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13–CV–11370 # 9 Exhibit 6.3–Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay, in Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13–CV–11370) (Goodman, William) (Entered: 09/23/2013) |
| 10/07/2013 | | 1107 | Response to (related document(s): 1004 Motion for Relief from Stay and Waiving the FRBP 4001 (a)(3) Re: Creditor . Fee Amount $176,) Filed by Interested Party State of Michigan (Schneider, Matthew) (Entered: 10/07/2013) |
| 10/07/2013 | | 1108 | Objection to (related document(s): 1004 Motion for Relief from Stay and Waiving the FRBP 4001 (a)(3) Re: Creditor . Fee Amount $176,) Filed by Debtor In Possession City of Detroit, Michigan (LaPlante, Stephen) (Entered: 10/07/2013) |

| | | | |
|---|---|---|---|
| 10/07/2013 | | 1109 | Brief *Debtors Brief in Opposition to Catherine Phillips, et al.s Motion For Relief From Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor.* Filed by Debtor In Possession City of Detroit, Michigan (RE: related document(s)1004 Motion for Relief from Stay and Waiving the FRBP 4001 (a)(3) Re: Creditor . Fee Amount $176,, 1108 Objection). (Attachments: # 1 Exhibit A # 2 Exhibit B # 3 Exhibit C) (LaPlante, Stephen) (Entered: 10/07/2013) |
| 10/08/2013 | | 1118 | Transcript regarding Hearing Held 10/02/13 RE: Amended Motion of Creditor Deborah Ryan, an Interested Party, for Relief from this Court's Order Staying Proceedings; Michigan Council 25 of the American Federation of State, County and Municipal Employees, AFL–CIO, Motion for Entry of an Order Modifying the Automatic Stay Solely to Allow Administrative Law Judge to Execute His Opinion and Liquidate Damage Award Before He Retires on October 4, 2013; Petition for Order Lifting Stay. THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 01/7/2014. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 1068 Transcript Request, 1076 Transcript Request, 1110 Transcript Request). Redaction Request Due By 10/29/2013. Redacted Transcript Submission Due By 11/5/2013. Transcript access will be restricted through 01/7/2014. (Garrett, Lois) (Entered: 10/08/2013) |

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                            Chapter 9

CITY OF DETROIT, MICHIGAN,                        Case No. 13-53846

     Debtor.                                    Hon. Steven W. Rhodes

_____/

### CATHERINE PHILLIPS, et al.'s MOTION FOR RELIEF FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

Now come Petitioners Catherine Phillips, et al. (hereafter "Petitioners") and hereby requests that this Court modify its *Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* (Dkt. 166), (hereafter "*Extended Stay Order*"), to lift the Extended Stay from the matter entitled *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint).  In support of this Motion, Petitioners state as follows:

1.     On March 27, 2013, Petitioners herein filed a Complaint in the United States District Court for the Eastern District of Michigan, naming Michigan Governor Richard D. Snyder and Michigan Treasurer Andrew Dillon (hereafter, "Defendants") as defendants, *Catherine Phillips, et al. v. Snyder and Dillon.* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint), (hereafter "the *Phillips* case").

2.     In their Complaint, (Exh. 6.1), Petitioners allege that  Public Act 436 of 2012, M.C.L.A. §§141.1541 *et. seq.*, (hereafter "PA 436"), violates various federal statutory and

Constitutional rights. Petitioners sought declaratory and injunctive relief. The City of Detroit (hereafter, "Debtor") is not, and has never been, a party to that action.

3. On July 19, 2013, Debtor filed a motion seeking to extend the Chapter 9 stay to include certain state entities, non-officer employees and agents and representatives of the Debtor. (Dkt. 56, *Motion of Debtor For Entry of Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor,* (hereafter *"Motion to Extend Stay"*) Specifically, Debtor requested

> that the Court exercise its equitable power under Section 105(a) of the Bankruptcy Code to extend the Chapter 9 stay to actions or proceedings against the Governor, the State Treasurer and the members of the Loan Board . . . **that, directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay.**"

(Dkt 56, *Motion to Extend Stay*, p. 13 at ¶ 20) (emphasis added)

4. In support of its *Motion*, Debtor specifically identified and discussed at length three (3) cases, referred to as the "Prepetition Lawsuits," that had been filed in the Ingham County Circuit Court: a) *Webster v. State of Mich.,* No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013, (the "*Webster Lawsuit*;"); b) *Flowers v. Snyder*, No. 13 729-CZ (Ingham Cnty. Cir. Ct. July 3, 2013), (the "*Flowers Lawsuit*"); and c) *Gen. Ret. Sys. of the City of Detroit v. Orr,* No. 13-768-CZ (Ingham Cnty. Cir. Ct. Jul. 17, 2013), (the "*Pension Systems Lawsuit*"); and *ex parte* injunction orders that had issued against the Governor and the State Treasurer in those suits that had the express purpose and effect of enjoining the defendants in those cases from authorizing a Chapter 9 filing, from taking any further action in aid of the same, and from taking any action that might lead to the impairment of pension claims. (Dkt. 56, *Motion to Extend Stay*, pp. 5-7, 14-15, ¶¶ 10-12, 22-23)

5. Debtor's *Motion* clarified that the extension of the Stay applied specifically to the

"Prepetition Lawsuits" insofar as those lawsuits -- unlike the *Phillips* case herein – sought "…to enforce the plaintiffs' claims against the City or to exercise control over the City's property rights including its powers and rights under Chapter 9."  (Dkt. 56, *Motion to Extend Stay,* p. 15, ¶23, fn 4)

6.      Indeed, Debtor's *Motion* was very explicit in limiting the extension of its requested Stay to actions which "…directly or indirectly seek to enforce claims against the City, interfere with the City's activities in this chapter [sic] 9 case or otherwise deny the City the protections of the Chapter 9 Stay." (Dkt. 56, *Motion to Extend Stay,* p. 13, ¶20)

7.      Debtor's *Motion* – clearly in direct response to the aforementioned "Prepetition Lawsuits" — further asked that this Court enter an Order to "provid[e] expressly, for the avoidance of doubt," that each of the identified "Prepetition Lawsuits," be stayed pending further order of the Court.

8.      It is noteworthy that Petitioners' suit herein was not among those identified by Debtor, (Dkt. 56*, pp. 5-6), insofar as the *Phillips* case had been filed on March27, 2013, long before the filing of this Chapter 9 bankruptcy petition, while all three of the "Prepetition Lawsuits" referred to by Debtor in its *Motion* were filed between July 3 and July 17, 2013, literally days before the filing of the Chapter 9 petition herein.

9.      On July 25, 2013, this Court entered the *Extended Stay Order,* (Dkt. 166), broadly extending the Chapter 9 stay to include certain "State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), Non-Officer Employees and the City Agents and Representatives," Id. at 2, without  any of the aforementioned qualifying limitations specified by Debtor in its *Motion.*

10.     While the *Extended Stay Order* (Dkt. 166) also expressly provides that "For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed…," this Court did not directly incorporate the Debtor's own language, identifying the "Prepetition Lawsuits" in question, specifically, the *Webster*, *Flowers*, and *Pension Systems* lawsuits.

11.     On August 7, 2013, the Michigan Attorney General's office, through Assistant Attorneys General Denise C. Barton, Ann M. Sherman and Michael F. Murphy, filed a *Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay,* (Exh. 6.2, *Phillips* case, Dkt. #29), seeking enforcement of *Extended Stay Order* (Dkt. 166) to the adjudication of the *Phillips* case. This Notice was not filed by, or on behalf of, the Debtor in this case.

12.     On August 22, 2013, the United States District Court, Honorable George Steeh, entered an *Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay*, (Exh. 6.3, *Phillips* case, Dkt. #30) (hereafter "Steeh Order*"*), staying Petitioners' declaratory/injunctive relief action -- a case which challenges the constitutionality of Public Act 436 as it affects every single municipality in the State of Michigan -- despite the fact that Petitioners' suit herein, *Phillips v. Snyder,* was not one of those specifically identified by Debtor as problematic or one that sought to enforce claims against Debtor, interfere with its activities in the Chapter 9 case or otherwise deprive it of any protections of the Chapter 9 stay. (Exh. 6.3, Steeh Order).

13.     In entering the aforementioned *Order,* (Exh. 6.3), the District Court expressly noted that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated" in Petitioners' action. Nonetheless, the District Court concluded that it was bound by the terms of the "broadly worded Extension Order issued by the bankruptcy court," and was therefore required to stay the case "unless and until such time as an order issues lifting or

modifying the stay to permit the captioned matter to proceed." (Exh. 6.3, Steeh Order. Pp.1-2)

14.    Petitioners herein, as plaintiffs in the *Phillips* case, seek an adjudication of the constitutionality of PA 436 in general, as applied to the entire State of Michigan, and not specific to any municipality, including the Debtor City of Detroit, or to the propriety or lawfulness of the Chapter 9 bankruptcy proceedings in this action.  The plaintiffs in Petitioners' cause of action are comprised of persons who represent themselves and interested organizations across the State.   In addition to the proposed withdrawing plaintiffs, the cause of action consists of eighteen (18) plaintiffs representing nine (9) groups.  For example, those groups with whom these plaintiffs are affiliated are: the Pontiac City Council, the Benton Harbor City Commission, the Flint City Council, Rainbow Push Coalition, the National Action Network, the Council of Baptist Pastors of Detroit and Vicinity, the Detroit Public Schools, and the Detroit Library Commission.

15.    Petitioners also seek to amend their Complaint, (Exh. 6.1, the *Phillips* case Dkt. #1), to withdraw the plaintiffs Phillips, Valenti and AFSCME Council 25 as plaintiffs from the underlying action and to voluntarily dismiss, without prejudice, Count I  of the Complaint, which was asserted by the withdrawing plaintiffs.

16.    By this *Motion*, therefore, Petitioners herein seek relief from the Extension Order so that they may proceed in their action for declaratory and injunctive relief against Defendants (who are not officers, employees, agents or representatives of Debtor) as to the remaining counts and obtain relief from the ongoing violations of constitutional and statutory rights alleged therein.

## PRELIMINARY STATEMENT

17.    Petitioners' pre-petition suit which is the subject of this Motion --  *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370 --  challenges the validity of PA 436 on a number of grounds, including the following Constitutional violations: the due-process right to elect officials who possess general legislative power (Exh. 6.1, Complaint,

5

13-53846-tjt  Doc 251-1  Filed 01/23/13   Entered 01/23/13 16:36:04   Page 5 of 16

Count II); the right to a republican form of government (Exh. 6.1, Complaint, Count III) ; the right to equal protection under the law with respect to race, wealth and voting rights (Exh. 6.1, Complaint, Counts IV, V and VI); the First Amendment as it pertains to freedom of speech (Exh. 6.1, Complaint, Count VIII) and the right to petition the government for redress of grievances (Exh. 6.1, Complaint, Count IX); the Thirteenth Amendment as it pertains to the vestiges of slavery with regard to voting rights (Exh. 6.1, Complaint, Count XIII) ; and the right to equal protection under the law with respect to the procedure for removing appointed emergency managers (Exh. 6.1, Complaint, Count XI). The Complaint also alleges violations of the Voting Rights Act of 1965.

18.     Petitioners' suit does not seek money damages for these constitutional and statutory violations, but rather only declaratory relief finding violations of Petitioners' rights as alleged in the Complaint and injunctive relief enjoining the defendants from committing further violations of those rights. To the extent that the Complaint seeks attorney fees and costs as permitted by statute,42 U.S.C. §1988, any such award would be paid by the State of Michigan, not Debtor City of Detroit, as neither the Debtor nor any of its agents is a party to the action.

19.     Debtor's only connection to Petitioners' action against the defendants in the *Phillips* case is that Debtor is currently under the control of an emergency manager appointed by the *Phillips* defendant Snyder pursuant to PA 436. But Debtor is only one of many communities or entities subject to control by a state-appointed emergency manager. Other communities and entities currently under EM control include the cities of Allen Park, Benton Harbor, Flint, Hamtramck, Pontiac, as well as Detroit Public Schools, Highland Park Public Schools, and Muskegon Heights Public Schools. Additionally, the cities of Inkster and River Rouge are currently subject to consent agreements under PA 436, and the City of Ecorse is under the

13-53846-swr   Doc 2504   Filed 09/23/13   Entered 09/23/13 17:39:04   Page 10 of
307
13-53846-swr   Doc 2504   Filed 09/23/13   Entered 09/23/13 11:39:04   Page 10 of 26   10

control of a PA 436 transition advisory board.

20.　　If not modified to permit the *Phillips* case to be adjudicated, the net effect of this Court's *Extended Stay Order* (Dkt. 166) would be that not only Petitioners, but hundreds of thousands of other individuals throughout the State of Michigan, particularly in those communities identified above currently subject to PA 436, would be deprived of any avenue by which they can vindicate their constitutional and statutory rights at issue. Instead, under the terms of the *Extended Stay Order* (Dkt. 166) -- pertaining solely to the Debtor City of Detroit -- if not clarified or modified, Petitioners and all those within the other affected communities and entities will be forced to suffer ongoing violations of those rights while waiting for Debtor's bankruptcy proceedings to conclude.

21.　　By this Motion, Petitioners seek to clarify, lift or modify the *Extended Stay Order* (Dkt. 166) to the extent that it purports and/or has been interpreted to stay <u>all</u> litigation in which the *Phillips* defendants – Richard Snyder and Andrew Dillon – are named as parties, without regard to whether or *not* "…any interests of the City of Detroit bankruptcy proceedings are implicated." (Exh. 6.3, Steeh Order, p.2)

22.　　Petitioners seek this relief so that Petitioners and Defendants may return to the District Court in order to permit an adjudication of the constitutional issues that have State-wide ramifications.

23.　　Petitioners contend that Debtor never asked for or intended so broad a stay as was actually granted. For that reason, the stay should not cover suits such as Petitioners', which does not "directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay." (Dkt.56, *Debtor's Motion to Extend Stay*, p. 13, ¶ 20)

24.     Petitioners reemphasize that Debtor is not a party to its suit against the *Phillips* defendants, and that the defendants cannot be party to Debtor's bankruptcy proceedings. Extension of the stay to include all State officials in all cases raises serious issues regarding the validity of the Chapter 9 proceedings, inasmuch as co-mingling the identities of Debtor and the State officials for purposes of the stay casts doubt on the ability of Debtor to satisfy the basic requirement that it be a "municipality" for the purposes of Chapter 9. This is especially so because Congress intentionally deprived states of the ability to file petitions. The State Entities should not be allowed the benefits of bankruptcy protections in clear violation of congressional intent that Chapter 9 relief is afforded only to municipalities.

25.     But even if this Court determines that it was proper to issue a stay broader than that requested by Debtor, Petitioners respectfully assert that under the circumstances present here, they satisfy the standard for lifting a stay under both: 1) a simple "balancing-of-the-equities" approach; and 2) a "preliminary-injunction" analysis. (See Exh. 3, Brief in Support of Motion, pp. 8-14) Specifically, Petitioners will show that the scope of the *Extended Stay Order* (Dkt. 166) was overbroad under sections 105, 362, and 922 of the Bankruptcy Code; that the *Extended Stay Order* as applied to non-debtor defendants in other cases, i.e. the *Phillips* case, does not further the purposes of granting a stay under the Bankruptcy Code; and that where, as here, the pre-petition litigation at issue involves the vindication of Constitutional rights, enforcement of the Constitution necessarily trumps such a stay.

26.     The facts and law outlined herein and in Petitioners' Brief in Support (Exh. 3, Brief in Support) provide compelling support for Petitioners' requested relief from the *Extended Stay Order* (Dkt. 166).

## **JURISDICTION**

27.     Jurisdiction over this motion is conferred upon this Court by 28 U.S.C. §§ 157

and 1334. This motion is brought pursuant to 28 U.S.C. § 157(b)(2)(G).

28.     Venue is proper in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

29.     The relief requested in this Motion is predicated upon 11 U.S.C. § 362(d) and Rules 4001-1 and 9014-1 of the United States Bankruptcy Court Eastern District of Michigan Local Rules.

## RELIEF REQUESTED

### *Relief From the Extended Stay Order is Warranted Because the Debtor Never Sought a Stay Encompassing All Actions Against Defendants*

30.     In its *Motion to Extend Stay* (Dkt. 56), Debtor specifically identified three lawsuits (which Debtor called the "Prepetition Lawsuits") that it claimed violated the automatic-stay protections of Chapter 9 as applied to <u>Debtor</u> by targeting State officials (the Governor, the State Treasurer, members of the Loan Board) to accomplish indirectly what it could no longer accomplish directly by suing Debtor. (Dkt. 56, pp. 5-8, ¶¶ 10-13; p. 13, ¶ 20; pp. 14-15, ¶¶ 22-23, including fn. 4)

31.     Debtor therefore requested that the Court issue a stay covering actions against Defendants that "directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay," (Dkt. 56, p. 13, ¶ 20) and furthermore, to expressly stay the three identified "Prepetition Lawsuits." (Dkt. 56, pp. 14-15, ¶ 23)

32.     Despite the fact that the *Phillips* case has been pending since March, 27 2013 (Exh. 6.1, *Phillips* Complaint), and the Petitioners' claims were well known long before the filing of this bankruptcy action on July 18, 2013, the Debtor herein did not identify Petitioners' suit as one of the "Prepetition Lawsuits" it wished the Court to expressly stay, nor does Petitioners' suit fall within the scope of those contemplated by Debtor in Paragraph 20 of its motion.

9

33.     Given the limiting language of Debtor's *Motion to Extend Stay* (Dkt. 56), it cannot be said that Debtor intended that all suits naming the Governor or the State Treasurer as defendants should be stayed pending the resolution of Debtor's bankruptcy proceedings and regardless of whether staying such suits would further the purposes of Chapter 9 protection as applied to Debtor.  Clearly such a request would be unsupportable.

34.     But the lack of such qualifying or limiting language in this Court's *Extended Stay Order* (Dkt. 166) has precisely that effect, such that the District Court in Petitioners' case indicated that it was bound by the language of the *Extended Stay Order* to stay Petitioners' suit even though it found that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated." (Exh. 6.3, pp. 1-2)

35.     The broadly worded *Extended Stay Order* is thus constitutionally problematic, inasmuch as Petitioners -- who petition for redresses of grievances on behalf of all citizens of the State of Michigan against the governor and the State Treasurer, in matters wholly outside of Debtor's bankruptcy proceedings -- are denied access to the courts.  This is particularly so where, as here, the grievances involve claims of constitutional violations, because bankruptcy courts do not have any final authority to decide constitutional issues. *Farmer v. First Virginia Bank*, 22 B.R. 488 (E.D. Va. 1982).  Any final decision on constitutional issues must, under the U.S. Constitution, be decided by an Article III court.

36.     Without a modification of this Court's *Extended Stay Order* (Dkt. 166), therefore, Petitioners herein are deprived of a proper judicial review of their constitutional claims in an Article III court.

37.     Further constitutional problems are created by the manner in which the *Extended Stay Order* (Dkt. 166), as currently worded, extends full Chapter 9 protection to state officials,

directly contrary to the congressional intent that such protections are not available to the states.

38.     This Court can thus avoid this constitutional crisis by simply modifying its Extension Order to make clear that the stay only applies to claims, whether direct or indirect, against the res of the Debtor.

### *Relief From the Extended Stay Order is Warranted Because the Scope of the Extended Stay Order is Overly BroadWithin the Limitations of the Bankruptcy Code*

39.     The *Extended Stay Order* (Dkt. 166) purports to extend the "Chapter 9 stay" to cover "State Entities," including Defendants.  Although the *Extended Stay Order* does not reference the statutory provisions that constitute a "Chapter 9 stay," upon information and belief, this Court was characterizing the automatic-stay provisions at 11 U.S.C. §§ 362(a) and 922 as a "Chapter 9 stay."

40.     By its own terms, §362(a) of the Bankruptcy Code, 11 U.S.C. §362(a), automatically stays actions against the debtor or the debtor's property.

41.     Similarly, §922 of the Code, 11 U.S.C. §922, automatically stays any action against an officer or inhabitant of the debtor to the extent that such action ultimately seeks to enforce a claim against the debtor.

42.     Neither section provides a basis for staying claims against non-debtors wholly unconnected to the debtor.

43.     To the extent that §105 of the Code, 11 U.S.C. §105 grants a bankruptcy court some latitude in crafting orders, including expanding the scope or duration of automatic-stay orders, such latitude is not without limits.  In cases involving using section 105 to expand the scope of automatic-stay orders to non-debtors, some close nexus of identity must exist between the non-debtor and debtor (such as an agreement to indemnify) that would render an action against the non-debtor a de facto action against the debtor or its property.

44.     With respect to Petitioners' District Court action, no such nexus exists or could possibly exist as between Defendants and the Debtor.  Therefore, the Extension Order should be lifted as applied to the Defendants in this case.

### *Relief From the Extended Stay Order is Warranted Because the Extended Stay Order Fails to Further the Purposes For Which Stays are Provided in Bankruptcy Cases*

45.     It is well settled that the primary purposes for staying litigation against a debtor are: a) to protect all creditors by preventing financial assets or property of the debtor from being diverted to an individual creditor; and, b) to protect the debtor by preventing additional financial obligations from being imposed upon the debtor as it attempts to marshal assets and inventory obligations for the purpose of crafting a reorganization plan.

46.     Moreover, such stays have the effect of preventing the debtor's limited assets from being further depleted through the expense of defending numerous suits. [While the above purposes are laudable, they are not furthered by staying Petitioners' action for declaratory and injunctive relief against the underlying non-debtor defendants in the *Phillips* case.  Petitioners' action is not against Debtor's assets and does not involve any property of the Debtor.  Debtor is not a party to Petitioners' action and therefore will not incur any expense defending against it. Lifting the stay, thereby permitting Petitioners to resume the prosecution of their claims against the *Phillips* defendants, will not interfere with the progression of Debtor's bankruptcy case. Thus, no harm will be suffered by Debtor if the stay is lifted as to this federal Constitutional litigation.

47.     On the other hand, the injuries alleged by Petitioners are constitutional in nature and as such, constitute irreparable harm for the duration that they are permitted to continue.  See, *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993).   Moreover, the scale

of the constitutional violations, when extrapolated across all of the individuals who reside within the affected communities and school districts throughout the entire State of Michigan, is simply staggering.

48.     Under any of the frameworks used to analyze lift-stay motions, equity requires lifting the stay with respect to the adjudication of the *Phillips* case.  Were it otherwise, the constitutional rights of citizens throughout the State -- in communities such as Allen Park, Benton Harbor, Ecorse, Flint, Hamtramck, Highland Park, Inkster, Muskegon Heights, Pontiac and River Rouge – will continue to be held hostage to the Debtor City of Detroit's progression through bankruptcy despite the lack of any connection between those communities and the Debtor.  Not only is such a result absurd on its face, but it is unconstitutional and contrary to public policy, particularly where such an order sets the precedent that the constitutionality of PA 436 may never be challenged so long as some community or entity subject to the Act is in the midst of bankruptcy proceedings.

49.     Because the *Extended Stay Order* (Dkt. 166), as applied to Petitioners' claims in the *Phillips* case, fails to further the purposes of the automatic stay in these Chapter 9 bankruptcy proceedings as to the Debtor and simultaneously works an irreparable harm upon the Petitioners, the *Order* (Dkt. 166) should be lifted as to the claims against the underlying defendants in the *Phillips* case.

### *Relief From the Extended Stay Order is Warranted Because Where the Petitioners Allege Constitutional Violations, Enforcement of the Constitution Must Take Precedence Over Staying Litigation Against the Non-Debtor Defendants*

50.     Petitioners' Complaint alleges numerous constitutional violations made actionable against the underlying defendants, pursuant to 42 U.S.C. § 1983, in the *Phillips* case.

51.     Section 5 of 42 U.S.C. § 1983 guarantees persons the right to enforce the U.S. Constitution against those who act under color of law to deprive or cause a person to be deprived

of rights, privileges, or immunities secured by the Constitution.

52.    Section 3 of 28 U.S.C. § 1343 guarantees a person the right to have a federal district court and a jury of one's peers adjudicate claims brought under 42 U.S.C. § 1983.

53.    Congress has clearly demonstrated its intent that 42 U.S.C. § 1983 provides the judicial remedy when a person has suffered a violation of constitutional rights. Likewise, the Supreme Court has repeatedly recognized that the enforcement of federal rights is of the highest priority.

54.    In this case, the application of this Court's *Extended Stay Order* (Dkt. 166) to include <u>all</u> claims against the non-debtor defendants Snyder and Dillon -- regardless of the absence of any relationship to the property rights of Debtor herein or to this bankruptcy proceeding -- contravenes the very purpose and intent of Congress and the Supreme Court. Moreover, by delaying the proceedings in the underlying *Phillips* district court action indefinitely, the *Extended Stay Order* has worked a further constitutional injury to Petitioners, inasmuch as it has operated to deprive Petitioners—without any process—of the right to have their claims of constitutional violations adjudicated by the district court and a jury of their peers.

55.    To whatever extent the Bankruptcy Code in general, and Chapter 9 in particular, could be read to permit the expansion of the automatic-stay provisions to include any and all actions against non-debtors even where, as here, the particular claims against those non-debtors have no relevant connection to the Debtor, such a construction is overbroad and conflicts with 42 U.S.C. § 1983.  In such a case, as here, this Honorable Court should construe the Bankruptcy Code narrowly to avoid a constitutional problem or alternatively, lift the stay which avoids the constitutional conflict altogether.

56.    As required by L.B.R. 9014-1(g), Petitioners have sought concurrence in this

Motion from counsel for the Debtor on September 23, 2013, and concurrence was not obtained.

## CONCLUSION

WHEREFORE, Petitioners respectfully request that the *Extended Stay Order* (Dkt. 166) be clarified, modified, or lifted with respect to Petitioners' claims against the underlying defendants in the *Phillips* case, so that: 1) the constitutionality of Public Act 436 may be properly adjudicated pursuant to 42 U.S.C. §1983 by an Article III United States District Court; and 2) Petitioners may amend their Complaint to provide for the voluntary withdrawal of individual plaintiffs Phillips, Valenti, and AFSCME Council 25 and the voluntary dismissal of Count I of their Complaint, without bearing on the Debtor's rights in this bankruptcy proceeding.

Dated: September 23, 2013

Respectfully Submitted,

By:___/s/William H. Goodman_____
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
GOODMAN & HURWITZ PC on behalf of the
DETROIT & MICHIGAN NATIONAL
LAWYERS GUILD
1394 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
Attorneys for Creditor Catherine Phillips, et al.

-and-

John C. Philo (P52721)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, Michigan 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
tparis@sugarlaw.org
Attorneys for Creditor Catherine Phillips et al.

Herbert A. Sanders (P43031)
THE SANDERS LAW FIRM PC
615 Griswold St. Ste. 913
Detroit, Michigan 48226
(313) 962-0099/Fax: (313) 962-0044
haslawpc@gmail.com
Attorneys for Creditor Catherine Phillips et al.

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Creditor Catherine Phillips et al.

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Creditor Catherine Phillips et al.

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Attorneys for Plaintiffs
CONSTITUTIONAL LITIGATION
ASSOCIATES, P.C.
450 W. Fort St., Suite 200
Detroit, MI 48226
313-961-2255/Fax: 313-961-5999
Attorneys for Creditor Catherine Phillips et al.

# SUMMARY OF ATTACHED EXHIBITS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

**Exhibit 1**    Proposed Form of Order

**Exhibit 2**    Notice of Motion and Opportunity to Object

**Exhibit 3**    Brief in Support of  Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain  (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor

**Exhibit 4**    Certificate of Service

**Exhibit 5**    None [No Affidavits Filed Specific to This Motion]

**Exhibit 6.1**    Complaint filed in *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon*, Case No. 13-CV-11370

**Exhibit 6.2**    Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay in *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370*

**Exhibit 6.3**     Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay, in *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370*

13-53846-swr   Doc 2508-1   Filed 09/23/14   Entered 09/23/14 16:35:47   Page 21 of 1
13-53846-tjt   Doc 1504-1   Filed 10/27/13   Entered 10/27/13 17:08:04   Page 21 of 307
307   21

# **EXHIBIT 1**

# **PROPOSED FORM OF ORDER**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                        Chapter 9

CITY OF DETROIT, MICHIGAN,                                    Case No. 13-53846

      Debtor.                                        Hon. Steven W. Rhodes

_____/

**ORDER GRANTING THE PETITIONERS'**
**MOTION TO MOTION FOR RELIEF FROM ORDER**
**PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE EXTENDING THE**
**CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON**
**OFFICER <u>EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE</u>**
**<u>DEBTOR</u>**

This matter coming before the Court on the Petitioners *Catherine Phillips, et al.'s Motion*

*For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The*

*Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And*

*Representatives Of The Debtor* and the Court having determined that the legal and factual bases

set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Petitioners' motion is GRANTED; and

2.      The Automatic Stay of 11 USC § 362 and the *Order Pursuant To Section 105(A)*

*Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non*

*Officer Employees And (C) Agents And Representatives Of The Debtor* (Dkt. 166) entered by this

Court on July 25, 2013 are found, in their entirety, not to apply to the case of *Catherine Phillips,*

*et al. v. Snyder and Dillon*, Case No. 13-CV-11370, before the U.S. District Court, Eastern

District of Michigan, and all stays are otherwise lifted to permit that case to fully proceed

without impediment before the U.S. District Court to an adjudication on the merits and to permit the parties to proceed with any concomitant appeals; and

3.      As a result of this Order, Petitioners are permitted to also amend their Complaint in the case of *Catherine Phillips, et al. v. Snyder and Dillon*, Case No. 13-CV-11370 to voluntarily withdraw individual Plaintiffs Phillips, Valenti, and AFSCME Council 25 as Plaintiffs in that case and to voluntary dismiss, all without prejudice, Count I of their Complaint in that case.


Dated:_____      _____

                                            Honorable Steven W. Rhodes
                                            United States Bankruptcy Judge

# **EXHIBIT 2**

## **Notice of Motion and Opportunity to Object**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                                 Case No. 13-53846

     Debtor.                                              Hon. Steven W. Rhodes

_____/

### NOTICE UNDER LBR 9014-1 OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY & OPPORTUNITY TO OBJECT

Petitioners Catherine Phillips, etc. al. have filed papers with the court to clarify order and/or lift stay relating to the case of *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon*, Case No. 13-CV-11370 pending before the U.S. District Court, Eastern District of Michigan.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to to clarify order and/or lift stay relating to the case of Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370 pending before the U.S. District Court, Eastern District of Michigan, or if you want the court to consider your views on the Motion, within <u>fourteen (14)</u> days, you or your attorney must:

    1.     File with the court a written response or an answer, explaining your position at:[1]

                United States Bankruptcy Court
                211 West Fort Detroit, MI 48226

If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file pleadings electronically.

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e)

1

You must also mail a copy to:

William H. Goodman
Goodman & Hurwitz, P.C.
1394 E Jefferson Ave
Detroit, MI 48207

2.      If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated: September 23, 2013          By:  _/s/William H. Goodman_
                                   William H. Goodman (P14173)
                                   GOODMAN & HURWITZ, P.C., on behalf of the
                                   DETROIT & MICHIGAN NATIONAL
                                   LAWYERS GUILD
                                   1394 E. Jefferson Ave.
                                   Detroit, Michigan 48207
                                   (313) 567-6170/Fax: (313) 567-4827
                                   bgoodman@goodmanhurwitz.com
                                   *Attorneys for Creditor Catherine Phillips, et al.*

# EXHIBIT 3

**Brief in Support of  Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain  (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9

CITY OF DETROIT, MICHIGAN,                Case No. 13-53846

          Debtor.                             Hon. Steven W. Rhodes
_____/

**BRIEF IN SUPPORT OF CATHERINE PHILLIPS, et al.'S MOTION FOR RELIEF**
**FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE**
**EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES,**
**(B) NON OFFICER EMPLOYEES AND (C) AGENTS AND**
**REPRESENTATIVES OF THE DEBTOR**

On March 27, 2013, Petitioners Catherine Phillips, et al. (hereafter "Petitioners") filed a civil rights action in the United States District Court for the Eastern District of Michigan, challenging the validity of PA 436 on federal statutory and constitutional grounds, pursuant to 42 U.S.C. §1983. See, *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint), (hereafter, the "*Phillips* case").    Governor Richard D. Snyder and State Treasurer Andrew Dillon are the only named defendants in the suit, while Petitioners represent a cross-section of citizens from communities across the State of Michigan that are directly affected by the enactment of PA 436.  On July 18, 2013, the Debtor filed for Chapter 9 bankruptcy.  At that time, all litigation against the Debtor or its property was automatically stayed pursuant to 11 U.S.C. §§ 362(a) and 922.  One week later, on July 25, 2013, upon Debtor's motion, (Dkt. 56, *Motion of Debtor For Entry of Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor,* (hereafter *"Motion to Extend Stay"*),  this Court entered an *Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* (Dkt.

1

166), (hereafter "*Extended Stay Order*").

Among those "State Entities" were the two named defendants in the *Phillips* case, Governor Snyder and Treasurer Dillon. At issue in Petitioners' Motion herein is this Court's decision to stay all pre-petition litigation against these defendants, despite the fact that they are not officers, employees, agents, or representatives of the Debtor, and in no way otherwise share some close nexus or special relationship with the Debtor such that a suit against the Defendants would be, in effect, an action against the Debtor. Nor are the substantive issues within the *Phillips* case related in any way to the instant bankruptcy proceeding, to the enforcement of claims against Debtor, or to and of Debtor's activities in this Chapter 9 case. Petitioners seek a lift of the stay as to the *Phillips* case on several grounds: (1) that Debtor never asked for or intended that the stay order would be so broadly worded; (2) that the inclusion of the non-debtor defendants from the *Phillips* case in the *Extended Stay Order* (Dkt. 166) exceeds the permissible scope of such a stay under 11 U.S.C. §§ 105(a), 362(a), and 922; (3) that even if the Bankruptcy Code permitted the extension of automatic stays to non-debtor third parties with no connection to the Debtor, the *Extended Stay Order* (Dkt. 166) fails to further the purposes for which such stays are provided; and (4), of utmost importance, where the Petitioners allege ongoing constitutional violations, enforcement of the Constitution cannot be subjugated by the bankruptcy process.

## STANDARD OF REVIEW

When a bankruptcy petition is filed, most judicial actions against the debtor that were commenced before the filing of the petition are automatically stayed during the pendency of the bankruptcy petition. 11 U.S.C. § 362(a)(1). However, this automatic stay provision was not intended to immutably relegate creditors to a world of limbo or to the resolution of the civil claims within the limitations of a bankruptcy proceeding. Instead, as Congress recognized when enacting the automatic stay provision:

2

> [I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

S. Rep. No. 989, 95th Cong., 2d Sess. 50, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5780, 5836.

Recognizing that some actions are better suited to resolution outside the bankruptcy forum, Congress specifically granted—in the same provision establishing the automatic stay—full discretion to the bankruptcy court to lift the stay and allow litigation to go forward in another forum.  Section 362(d) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall *grant relief from the stay* provided under [§ 362(a)], such as by terminating, annulling, modifying, or conditioning such stay—(1) *for cause,* including the lack of adequate protection of an interest in property of such party in interest . . . .

11 U.S.C. § 362(d)(1) (emphasis added).

To determine whether sufficient cause exists to grant relief from the stay in a non-bankruptcy forum, the bankruptcy court must scrutinize the factual circumstances of the case before it.  *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990); *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987); *Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 687 (Bankr. W.D. Mich. 1992).  Among other factors, the Court should consider whether modifying the stay will promote judicial economy.  *See, e.g.*, *Robbins*, 964 F.2d at 344; *In re MacDonald*, 755 F.2d 715, 717 (9th Cir. 1985); *see also* 2 Collier on Bankruptcy ¶ 362.07[3] (15th ed. 1991) (noting that relief may be granted from the automatic stay where "the liquidation of a claim may be more conveniently and speedily determined in another forum").  Another particularly compelling consideration is whether the bankruptcy petition was filed by the debtor "on the eve of the resolution of pending

prepetition litigation." *In re Wilson*, 85 B.R. 722, 728 (Bankr. E.D. Pa. 1988) (citing *Matter of Holtkamp*, 669 F.2d 505, 509 (7th Cir. 1982)); *see also, In re Castlerock Props.*, 781 F.2d 159, 163 (9th Cir. 1986); *In re Olmstead,* 608 F.2d 1365, 1368 (10th Cir. 1979); *In re Borbridge,* 81 B.R. 332, 335 (Bankr. E.D. Pa. 1988); *In re Philadelphia Athletic Club*, 9 B.R. 280, 282 (Bankr. E.D. Pa. 1981).

In the most recent large-scale municipal bankruptcy, the question of "cause" to lift a stay was framed thusly:

> To determine whether "cause" exists to lift the stay and allow a suit to proceed in a non-bankruptcy forum, a court typically analyzes whether (1) any great prejudice to either the bankrupt estate or the debtor will result from continuation of a civil suit, (2) the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and (3) the creditor has a probability of prevailing on the merits of its lawsuit. *Chizzali v. Gindi (In re Gindi)*, 642 F.3d 865, 872 (10th Cir. 2011), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) (emphasis added); Caves, 309 B.R. at 80; *In re Pro Football Weekly, Inc.*, 60 B.R. 824, 826 (N.D.Ill.1986).

*In re Jefferson County*, 484 B.R. 427, 465-466 (Bankr. N.D. Ala. 2012).

## ARGUMENT

I. **DEBTOR NEVER INTENDED OR ASKED FOR A STAY ORDER THAT WOULD ENCOMPASS ALL ACTIONS AGAINST THE "STATE ENTITIES," WITHOUT REFERENCE TO THE NATURE OF THE ACTION.**

The simplest solution to correct the overbreadth of the *Extended Stay Order* (Dkt. 166) is to recognize that Debtor never sought so broad a stay order as that which ultimately issued from this Court; that it was never intended that the *Extended Stay Order* (Dkt. 166) should apply to actions such as Petitioners' *Phillips* case, which do not implicate any of the Debtors' interests that are protected by Chapter 9; and that the *Extended Stay Order* (Dkt. 166) does not and should not, in fact, apply to Petitioners' case.

Such a conclusion is not only supported by the plain language of the Bankruptcy Code

and its underlying intent, but also by the language of Debtor's own motion seeking extension of the Chapter 9 stay. Debtor did not ask that <u>all</u> actions against the non-debtor Defendants be stayed, but rather only those actions "that**,** directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay." Absent such limiting language, Debtor's motion would rightly have been attacked as seeking relief that was massively overbroad and, in many instances, not even remotely related to the purposes for which Chapter 9 protections exist.

Unfortunately, the absence of such language in the *Extended Stay Order* (Dkt. 166) has created precisely such an impermissibly broad-ranging stay. In its current form and breadth, the *Extended Stay Order* (Dkt. 166) provides that "the Chapter 9 stay hereby is extended to apply **in all respects** (to the extent not otherwise applicable) to the State Entities." (Dkt. 166, *Extended Stay Order*, at p. 2) Without the modification or clarification sought by Petitioners herein, the *Extended Stay Order* therefore not only fails to limit its application in the way requested by Debtor, but instead encourages the broadest possible reading, as evidenced by the words of United States District Court, Honorable George Steeh in his *Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay*, (Exh. 6.3, *Phillips* case, Dkt. #30) (hereafter "Steeh Order*"*), staying Petitioners' declaratory/injunctive relief civil rights action that is the subject of this Motion:

> Although **it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated in the case**, the plain language of the stay order would apply to this lawsuit.

> **In accordance with the broadly worded Extension Order issued by the bankruptcy court, this court will abide by the stay unless and until such time as an order issues lifting or modifying the stay** to permit the captioned matter to proceed.

(Exh. 6.3, *Phillips* case, Dkt. #30, Steeh Order) (emphasis added).

This was not the relief sought by Debtor in its *Motion to Extend Stay* (Dkt. 56), and it was

5

not the relief that should have been granted. Clarifying the *Extended Stay Order* to make clear that it only applies to actions against the *res* of the Debtor, or even adopting verbatim the language proposed by the Debtor in its *Motion to Extend Stay* (Dkt. 56), would permit actions against non-Debtor "State Entities" to continue in courts across the State where such actions do not defeat or frustrate the purposes of Debtor's bankruptcy proceedings.

## II. THE RELEVANT PROVISIONS OF THE BANKRUPTCY CODE DO NOT AUTHORIZE EXTENDING THE AUTOMATIC STAY OF PREPETITION LITIGATION TO ALL ACTIONS AGAINST THE NON-DEBTOR STATE ENTITIES SNYDER AND DILLON.

The relevant provisions of the Bankruptcy Code providing for automatic stays of litigation in Chapter 9 bankruptcy are 11 U.S.C. §§ 362(a) and 922. Section 362(a) provides in pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301,302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against **the debtor** that was or could have been commenced before the commencement of the case under this title, or to recover a claim against **the debtor** that arose before the commencement of the case under this title;

(2) the enforcement, against **the debtor** or against property of **the estate**, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of **the estate** or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of **the estate**;

(5) any act to create, perfect, or enforce against property of **the debtor** any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against **the debtor** that arose before the commencement of the case under this title;

**(7)** the setoff of any debt owing to **the debtor** that arose before the commencement of the case under this title against any claim against **the debtor**; …

11 U.S.C. § 362(a) (emphases added).  Thus on its face, § 362(a) is concerned with preventing the initiation or continuation of any litigation against the debtor or the bankruptcy estate and therefore expressly authorizes staying litigation of claims against the debtor or the estate.

Section 922 makes several other provisions for automatic stays in the Chapter 9 context:

**(a)** A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—
>
> **(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of **the debtor** that seeks to enforce a claim against **the debtor**; and
>
> **(2)** the enforcement of a lien on or arising out of taxes or assessments owed to **the debtor**.

11 U.S.C. § 922(a) (emphases added). On its face, §922 is thus also concerned with preventing the initiation or continuation of any litigation *against the debtor*.  Indeed, § 922 seeks to protect the municipal debtor from both direct and indirect actions against the debtor, where a creditor might sue the officers or inhabitants of a municipality in order to reach the assets of the debtor. *In re City of Stockton*, 484 B.R. 372, 378-379 (Bankr. E.D. Cal. 2012).

But there is nothing in the Code that provides for staying actions against non-debtor third parties such as the State defendants in the *Phillips* case.  Indeed, with respect to §362(a), the Sixth Circuit has noted that "said provision facially stays proceedings 'against the debtor' and fails to intimate, even tangentially, that the stay could be interpreted as including any defendant other than the debtor." *Lynch v. Johns-Manville Sales Corp.,* 710 F.2d 1194, 1196 (6th Cir. 1983).  In *Lynch* court further found:

It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor…The legislative history of §362 discloses a congressional intent to stay proceedings against the

debtor, and no other.

*Id.*

Even in cases where a broader construction to the automatic-stay provisions of §362 have been applied, the extension of a stay to non-debtor third parties typically only occurs when they are co-defendants of the debtor, and even then, only in the most unusual circumstances:

> [S]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties. This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case.

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)

Such unusual circumstances are not present here. Petitioners have not sued Debtor; thus, the underlying defendants in the *Phillips* case -- Snyder and Dillon -- are not co-defendants with Debtor. Nor is there "such identity" between the *Phillips* defendants and Debtor that Debtor would be the real party defendant in the *Phillips* case. Likewise, the *Phillips* defendants are not officers or inhabitants of Debtor, and Petitioners' suit does not seek to enforce any claim against Debtor, rending § 922 inapplicable. As such, authority for inclusion of the *Phillips* case under the scope of the *Extended Stay Order* cannot be found in either §§362(a) or 922(a) of the Bankruptcy Code.

Nor can such authority be found in § 105(a). While it is true that a bankruptcy court is granted additional powers to issue orders that are "necessary or appropriate to carry out the provisions of this title," pursuant to 11 U.S.C. § 105(a), such powers are not without limits. As recognized in *GAF Corp. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 26 B.R. 405 (Bankr. S.D.N.Y. 1983), any extension of a stay made pursuant to § 105 must be carefully

circumscribed to ensure that such an extension is only used to protect the debtor.

The *GAF Corp.* plaintiffs were manufacturers that were named as co-defendants, along with Johns-Manville, in asbestos litigation. When Johns-Manville initiated bankruptcy proceedings, all actions against it were automatically stayed pursuant to §362(a). The *GAF Corp.* plaintiffs moved for an extension of the stay, pursuant to § 105(a), to include all of Johns-Manville's co-defendants in the asbestos litigation. The court rejected this invitation:

> Although Section 105 may be used to extend the stay, Section 105 does not have a life of its own and this extension may only be accomplished within the proper boundaries of Section 362. That is, unless this extension is designed to protect the debtor's interests, it cannot be granted.
>
> \*          \*          \*
>
> Section 105 of the Code was not intended to grant the bankruptcy court powers without bounds, *In re Brada Miller Freight Systems, Inc.,* 16 Bankr. 1002, 6 C.B.C. 2d 375, 389 (N.D. Ala. 1981), and the court's equitable powers thereunder are not unrestricted. *In re Dunckle Associates, Inc.,* 19 Bankr. 481, 6 C.B.C. 2d 600, 605 (Bankr. E.D. Pa. 1982). *See also* 2 Collier on Bankruptcy para. 105.02 at 105-7 (15th ed. 1982). *See also In re Chanticleer Associates, Ltd.,* 592 F.2d 70 (2d Cir. 1979).
>
> The crux of the matter before this Court is whether the injunctive relief sought by the co-defendants under Section 105(a) is "necessary or appropriate" in order to achieve the goals of a Chapter 11 reorganization.

*GAF Corp. v. Johns-Manville Corp.* (In re Johns-Manville Corp.), at 414-415.

The court found that the asbestos litigation plaintiffs would suffer significantly greater harm if the stay was expanded to include the co-defendants than the co-defendants would suffer if the stay was denied, even though the remedy sought by the asbestos plaintiffs was limited to money damages (which meant that such plaintiffs' injuries, however grave, did not constitute "irreparable harm," under a preliminary-injunction standard because an adequate remedy existed at law to compensate the plaintiffs or their survivors):

> The asbestos victims will certainly suffer by the total frustration of their opportunity for a day in court. As Chief Judge Peckham stated in the context of

9

asbestos litigation:

> Such delay is not costless to these plaintiffs, many of whom are suffering financial hardships and who seek damages to redress their injuries and some of whom are dying and whose testimony must be perpetuated. The defendants may be inconvenienced by expeditious resumption of the actions against them. However, under *Landis,* the balance of hardship weighs in favor of the injured plaintiffs.

*In re Related Asbestos Cases,* 23 B.R. 523, 531-2 (N.D. Cal. 1982) (citing *Landis v North American Company,* 299 U.S. 248, 81 L. Ed. 153, 57 S. Ct. 163 (1936)). *Accord, Evans v. Johns-Manville Sales Corp.,* C.A. No. 80-2939, slip op. at 4-6 (D.N.J., October 5, 1982).

To the same effect, *see In re Massachusettes Asbestos Cases,* M.B.L. Nos. 1 & 2 (D. Mass. Sept. 28, 1982), in which the court denied a stay against third parties who were co-defendants of a debtor, stating:

> The suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else . . . .

> Here, it is not a question of a fair possibility. It is certainty that any delay in the continuing efforts to bring these cases to trial will result in continued and increased hardship to the plaintiffs. This is not to ignore the problems of the defendants, but the loss to the plaintiffs far outweighs any possible gain procedural or practical that would inure to them.

Slip Op. at 3.

*GAF Corp. v. Johns-Manville Corp*. (In re Johns-Manville Corp.), at 417.

Unlike the asbestos-litigation plaintiffs, for whom there existed an adequate (if imperfect) remedy at law in the form of money damages, the Petitioners in the instant case are suffering irreparable harm for which there is no adequate remedy at law as long as the violations of their constitutional rights continue. *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993).  As such, the equities tilt overwhelmingly against using § 105 to extend the stay to the

non-debtor defendants in the *Phillips* case.

Some courts have found that a bankruptcy court lacks the power under § 105 to issue a stay against a non-debtor party, *In re American Hardwoods, Inc.,* 885 F.2d 621, (9th Cir. 1989), while others have cautiously allowed such stays where the equities clearly favor them:

> Judicial discretion is not unlimited but is to be carefully honed in light of the facts of the case, applicable precedent and appropriate policy. *Fry v. Porter,* 1 Mod. [1607] 300, 307. The issuance of a stay by any court of equity requires a showing of serious, if not irreparable, injury and a tipping of the balance of the equities in favor of the party seeking the stay. *Landis v. North American Co.,* 299 U.S. 248, 254-55, 81 L. Ed. 153, 57 S. Ct. 163 (1936); *Commodity Futures Trading Commission v. Chilcott Portfolio Mgt. Inc.,* 713 F.2d 1477 (10th Cir. 1983).

*Lesser v. A-Z Assocs.* (*In re Lion Capital Group*), 44 B.R. 690, 701 (Bankr. S.D.N.Y. 1984)

In the case at bar, the *Extended Stay Order* (Dkt. 166) is overbroad as applied to the *Phillips* case because there is simply no reason to believe that Debtor would suffer any substantial harm, let alone irreparable injury, if Petitioners' injunctive action against the underlying defendants was permitted to continue. The District Court recognized as much when it noted that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated" in Petitioners' action, but concluded that it nevertheless was bound by the terms of the "broadly worded Extension Order issued by the bankruptcy court," and was therefore required to stay the case "unless and until such time as an order issues lifting or modifying the stay to permit the captioned matter to proceed." (Exh. 6.3, Steeh Order, *Phillips* case)

Where, as here, Snyder and Dillon, as defendants in the *Phillips* case, are third parties to Debtor's bankruptcy proceedings and there is no close nexus of identity between them and Debtor that would otherwise justify staying litigation against the *Phillips* defendants, the Bankruptcy Code does not authorize staying Petitioners' action. For that reason, the stay as to the *Phillips* case should be lifted.

## III. STAYING PETITIONERS' ACTION AGAINST DEFENDANTS DOES NOT

**FURTHER THE PURPOSES OF THE BANKRUPTCY CODE.**

Even assuming that the Bankruptcy Code could be read as permitting the extension of automatic-stay orders to non-debtor third parties in narrow circumstances (i.e., where an action against a non-debtor is really designed to reach the assets of the debtor/estate), such is not the case here. And in any event, when the circumstances surrounding Petitioners' litigation against the defendants Snyder and Dillon are viewed in their totality, it becomes clear that staying this particular litigation is not "necessary or appropriate to carry out the provisions" of the Code, as required by § 105.

There can be no doubt that the stay provisions of the Code are primarily intended to provide protection to the parties to a bankruptcy proceeding: the debtor and the creditors, as best explained in the legislative history of the Code:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R. Rep. 95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296.

The stay of proceedings was also intended to promote an orderly reorganization or liquidation of the debtor's estate thereby benefiting, secondarily, creditors of the estate:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Id*., reprinted in 1978 U.S.C.C.A.N. 5787, 6297.

Courts have been extremely reluctant to extend this protection to non-debtor third parties, recognizing that "it would distort congressional purpose to hold that a third party solvent co-

defendant should be shielded against his creditors by a device intended for the protection of the insolvent debtor and creditors thereof." *Lynch v. Johns-Manville Sales Corp.,* 710 F.2d at 1197. *See also: In re Related Asbestos Cases*, 23 B.R. 523, 527 (N.D. Cal. 1982); *In re UNR Industries, Inc.,* 23 B.R.144 (Bankr. N.D. Ill. 1982); *Ashworth v. Johns-Manville, et al.*, Nos. C78-470, C81-1545, C77-4088, C79-167 (N.D. Ohio Mar. 21, 1983) at 4.

Asbestos and other mass-tort litigation is instructive on this point, since such cases often involve numerous co-defendants, some of whom are solvent and some of whom are not. In such cases, the solvent defendants are understandably concerned about proceeding without the maximum number of co-defendants and thus prefer to wait until their insolvent co-defendants emerge from bankruptcy. Despite these concerns, where a debtor's solvent co-defendants have moved for an extension of the automatic stay to cover them, they have been routinely denied. When viewed in light of the test that is typically applied by bankruptcy courts to determine whether a stay should be extended to a non-debtor third-party, that result is hardly surprising. In *In re Family Health Servs*., 105 B.R. 937 (Bankr. C.D. Cal. 1989) the court succinctly summarized:

> Courts have applied traditional preliminary injunction tests when determining whether to stay actions against non-debtor parties. It has been held that:
>
>> In order for the Court to enjoin a creditor's action against a co-debtor or guarantor, the debtor must show: 1) irreparable harm to the bankruptcy estate if the injunction does not issue; 2) strong likelihood of success on the merits; and 3) no harm or minimal harm to the other party or parties. *In Re Otero Mills, Inc.,* 25 Bankr. 1018, 1021 (Bankr. N.M. 1982). *In Re Larmar Estates, Inc.,* 5 Bankr. 328, 331 (Bankr. E.D.N.Y. 1980); In *Otero Mills* and *Larmar* the courts determined that "likelihood of success on the merits" equates to the probability of a successful plan of reorganization. *Otero Mills,* 25 Bankr. at 1021;*Larmar,* 5 Bankr. at 331.
>
> The Ninth Circuit has stated the standard test to evaluate claims for preliminary injunctive relief as follows:

13

> Under the first part of this test, the movant must show 1) irreparable injury, 2) probable success on the merits, 3) a balance of hardships that tips in the movant's favor, and 4) that a preliminary injunction is in the public interest. Alternatively, a court may issue an injunction if the moving party demonstrates *either* a combination of probable success on the merits and irreparable injury *or* that serious questions are raised and the balance of hardships tips in his favor.

*F.T.C. v. Evans Products Co.,* 775 F.2d 1084, 1088-89 (9th Cir. 1985). *See also, In re Family Health Servs.*, 105 B.R. 937, 943 (Bankr. C.D. Cal. 1989)

Of course, the cases above all involved co-defendants, co-debtors, or guarantors. In this case, the *Phillips* defendants lack even that once-removed connection to the Debtor. The *Phillips* case does not name Debtor or any of its agents, employees, officers or representatives as co-defendants or parties in any capacity. But even applying the standard applicable to co-defendants, co-debtors, and guarantors, Defendants are not entitled to a stay.

There is nothing to suggest that Debtor would suffer an irreparable injury to the bankruptcy estate if Petitioners' litigation regarding the constitutionality of Public Act 426 was to proceed during the pendency of Debtor's bankruptcy proceedings. Indeed, there is nothing to suggest that the bankruptcy estate would be in any way affected, as: (1) Debtor is not a party to Petitioners' litigation; (2) Petitioners' litigation seeks no money damages; and (3) to whatever extent Petitioners may be entitled to attorney fees and costs if they prevail in the underlying matter, such an award will be the responsibility of the State of Michigan, not Debtor, as Defendants are State officials.

On the other hand, in light of the constitutional violations alleged by Petitioners in their complaint, Petitioners have suffered and will continue to suffer irreparable harm. Courts have held that the mere fact that constitutional rights are being violated is sufficient to demonstrate irreparable harm. *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993).

14

Even a temporary loss of a constitutional right constitutes irreparable harm which cannot be adequately remedied by an action at law. *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Thus, not only can Debtor <u>not</u> demonstrate irreparable harm to the bankruptcy state if Petitioners' claim against Defendants is not stayed, but it also cannot demonstrate "no harm or minimal harm" to Petitioners if the litigation is stayed. As a result, whether analyzed under a preliminary-injunction framework or a simple balancing of the equities, the extension of the stay to include the *Phillips* case cannot be upheld.

## IV. WHERE PETITIONERS ALLEGE CONSTITUTIONAL VIOLATIONS, ENFORCEMENT OF THE CONSTITUTION MUST TAKE PRECEDENCE OVER STAYING LITIGATION AGAINST NON-DEBTOR DEFENDANTS

As explained above, it is not "necessary or appropriate" that all litigation against the non-debtor *Phillips* defendants, Snyder and Dillon, be stayed in order to carry out the purposes of the Bankruptcy Code as applied to Debtor. But as written, that is precisely what the *Extended Stay Order* does. No matter what the facts, no matter what the claims against the State, under the broad language of this Court's *Order,* no lawsuit of any kind can proceed against the Governor or the State Treasurer until one community—the City of Detroit—emerges from bankruptcy. Thus, both on its face and as applied, the *Extended Stay Order* (Dkt. 166) operates to deprive all who reside in the entire State of Michigan of their constitutional rights of access to the courts and to petition for a redress of grievances.

A court can hold a statute unconstitutional either because it is facially invalid or unconstitutional as applied in a particular set of circumstances. *See Coleman v. Ann Arbor Transp. Auth.*, 904 F. Supp. 2d 670, 682-83 (E.D. Mich. 2012) (citing *Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 193 (6th Cir. 1997)). In an 'as applied' challenge, "the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Women's Med. Prof'l Corp.*, 130 F.3d at

15

13-53846-swr   Doc 2504-1   Filed 01/27/14   Entered 01/27/14 16:38:04   Page 43 of 22
307
13-53846-swr   Doc 1504-1   Filed 09/23/13   Entered 09/23/13 17:38:17   Page 16 of 22   43

193 (internal citations omitted).

The stay of proceedings as applied to Petitioners' underlying case in *Phillips* violates their rights under the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983, to a full remedy for the deprivation of their constitutional rights. As such, Petitioners ask this Court to modify the stay with respect to the *Phillips* case in order to avoid such constitutional violations under the Fifth and Fourteenth Amendments.

Specifically, it violates Petitioners' right to due process in that they no longer have an avenue to vindicate the deprivation of their constitutional rights, as guaranteed by the enforcement power given to Congress by § 5 of the Fourteenth Amendment through 42 U.S.C. §1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

42 U.S.C. § 1983.

When Congress adopted the Fourteenth Amendment in 1868, it took steps to ensure that the promise of that amendment—freedom from violations of due process and equal protection by public officials—would be e. Thus, in 1871, the United States Congress first enacted § 1 of the Klu Klux Klan Act, pursuant to § 5 of the Fourteenth Amendment with the express intent to provide for enforcement of that amendment to the United States Constitution, which is specifically entitled, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes." 17 Stat. 13 (1871).

In 1874, Congress codified the substantive portion of the 1871 Act, passing a separate section identical to the present version of the Civil Rights Act, 42 U.S.C. § 1983. The Supreme Court has broadly described the primary purpose of § 1983 as follows:

16

As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as the guarantor of basic federal rights against state power was clearly established. **Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation** . . . .

The **very purpose of section 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights**—to protect the people from unconstitutional action under color of state law . . . .

*Mitchum v. Foster*, 407 U.S. 225, 238-39, 242 (1972). (emphasis added). Throughout our nation's history, therefore, the right of our citizens to enforce their rights under the U.S. Constitution in a United States District Court has been a bulwark of democratic principles. Taking away that right should not be taken lightly.

Petitioners' federal statutory right to vindicate the deprivation of their constitutional rights includes the right to have the United States District Court and a jury of Petitioners' peers adjudicate their § 1983 cause of action, as guaranteed by 28 U.S.C. § 1343(3). *See* U.S. Const. amend. VII (guaranteeing the right to trial by jury); 28 U.S.C. § 1343(3) (providing that "[t]he district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States . . . .").

Congress enacted § 1983 with the "goal of compensating the injured" and "preventing official illegality." *Jaco v. Bloechle*, 739 F.2d 239, 244 (6th Cir. 1984) (internal quotations omitted). In doing so, it clearly established the Federal Government as the guarantor of "the basic federal rights of individuals against incursions by state power." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 503 (1981).

The application of the automatic stay herein to Petitioners' case contravenes the very purpose and intent of Congress and the Supreme Court in enacting and enforcing § 1983, to

provide a judicial remedy for the violation of one's rights under the Constitution. *Accord Felder v. Casey*, 487 U.S. 131, 148 (1988) (recognizing that civil rights actions "belong in court") (quoting *Burnett v. Grattan*, 468 U.S. 42, 50 (1984); *Mitchum*, 407 U.S. at 242-43 (noting that the enforcement of federal rights is of the highest priority). By delaying proceedings in the underlying matter indefinitely, the stay has in essence taken from Petitioners—without any process, let alone adequate process—the opportunity to have the deprivations of their civil rights adjudicated by the district court and a jury of their peers. This stay thus precludes Petitioners from any relief for the violations of their constitutional rights wrought by PA 436. *See Felder*, 487 U.S. at 148.

In this regard, *Perez v. Campbell*, 402 U.S. 637 (1971) is noteworthy. In that case, the Court dealt with the conflict between the Bankruptcy Act and a state "financial responsibility" motorist statute. In so doing, it found that the conflicts presented by the state statute violated the Supremacy Clause. The Court also noted that the conflict was created, and the state law invalidated by the Supremacy Clause, because the state law undermined the "declared purpose" of the federal Bankruptcy Act. *Id*. at 654. In that case the court held that there was "no reason why the States should have broader power to nullify federal law." *Id*. at 652.

Here, however, the Supremacy Clause is useless to resolve statutory conflicts with other federal legislation. It is not the federal Bankruptcy Act that is being frustrated and interfered with, but rather the Civil Rights Act – i.e. the protection of individuals' rights under the United States Constitution -- that is being undermined. The exercise of this Court's discretion in staying proceedings in the *Phillips* case – as well as other § 1983 cases -- interferes with the purpose, intent, and effectiveness of the federal Civil Rights Act. As in *Perez*, in the *Phillips* case there is "no reason" justifying this Court's *Extended Stay Order,* (Dkt. 166), to "nullify federal law," (i.e., the Civil Rights Act of 1871) such that it "frustrates" its "full effectiveness." *Id*.

18

13-53846-swr   Doc 2504-1   Filed 01/27/14   Entered 01/27/14 16:38:04   Page 46 of 22
13-53846-swr   Doc 1504-1   Filed 09/23/13   Entered 09/23/13 17:38:17   Page 46 of 22
307
46

The constitutional conundrum caused by the application of the automatic stay to the *Phillips* case are well described in a recent opinion from the Eastern District of California, *V.W. ex rel. Barber v. City of Vallejo*, No. 12-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013). In *Vallejo*, the court makes the following, highly pertinent observation with regard to the issue of a conflict between the purposes of the Bankruptcy Code and the Civil Rights Act:

> [A]larming as it is, as the bankruptcy statute appears to be written, a municipality may erase its own liability to persons whom it and its officers have willfully and maliciously deprived of their civil rights—and even their lives—by filing for bankruptcy. This extraordinary result would appear to exalt the bankruptcy laws over the civil rights laws (even though the civil rights laws, like the bankruptcy laws, are anchored in the constitution).

*Id.* at 4. In *Vallejo*, however, because neither party had actually raised this issue --and indeed the plaintiff had conceded the jurisdiction of the Bankruptcy Court to discharge her claims -- the Court did not decide the merits of this issue. Nonetheless, the *Vallejo* court went out of its way to identify and flag how the Bankruptcy Code, if improperly applied, may well unconstitutionally interfere with rights secured by § 1983 and the Fourteenth Amendment.

Once again, it should be noted that, unlike the *Phillips* case herein, *Vallejo* involved direct claims for money damages against the debtor municipality. In *Phillips,* the application of the stay to the non-debtor defendants is even more contrary to public policy inasmuch as it allows those defendants to perpetuate constitutional violations by attaching themselves to a third-party bankruptcy proceeding.

Rather than "exalt" the Bankruptcy Code over the Civil Rights Acts, the automatic- and equitable-stay provisions of the Code should be construed to be consistent with § 1983, thus avoiding a constitutional conflict. Where a federal statute is overbroad, as the Bankruptcy Code is here, the Court should construe the statute to avoid constitutional problems if the statute is subject to such a limiting construction. *New York v. Ferber*, 458 U.S. 747, 769 (1982).

19

Here, the automatic- and equitable-stay provisions can be limited through a grant of relief from the stay, which is within this Court's discretion. *In re Atl. Ambulance Assocs., Inc.*, 166 B.R. 613, 615 (Bankr. E.D. Va. 1994) (noting that the bankruptcy "code gives the court a fairly broad discretion to provide appropriate relief from the stay as may fit the facts of the case."); *Capital Commc'ns Fed. Credit Union v. Boodrow*, 197 B.R. 409, 413 (N.D.N.Y. 1996) *aff'd sub nom. In re Boodrow*, 126 F.3d 43 (2d Cir. 1997) ("[A] court has broad discretion to lift the stay in appropriate circumstances." (internal citations omitted)). Petitioners thus ask this Court to lift or modify the Stay as it applies to their case, to allow the Bankruptcy Code to be read consistently with the constitutionally imposed values and principles of § 1983 and, therefore, applied in a constitutional manner.

## **CONCLUSION**

For all of the reasons stated above in their Motion attached hereto, and for good cause shown, Petitioners respectfully request that *Extended Stay Order* (Dkt. 166) be clarified, modified, or lifted with respect to Petitioners' claims against the underlying defendants in the *Phillips* case, so that: 1) the constitutionality of Public Act 436 may be properly adjudicated pursuant to 42 U.S.C. §1983 by an Article III United States District Court; and 2) Petitioners may amend their Complaint to provide for the voluntary withdrawal of individual plaintiffs Phillips, Valenti, and AFSCME Council 25 and the voluntary dismissal of Count I of their Complaint, without bearing on the Debtor's rights in this bankruptcy proceeding.

Dated: September 23, 2013                    Respectfully Submitted,

                                             By:___/s/William H. Goodman_____
                                             William H. Goodman (P14173)
                                             Julie H. Hurwitz (P34720)
                                             GOODMAN & HURWITZ PC on behalf of the
                                             DETROIT & MICHIGAN NATIONAL
                                             LAWYERS GUILD

20

1394 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
Attorneys for Creditor Catherine Phillips, et al.

-and-

John C. Philo (P52721)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, Michigan 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
tparis@sugarlaw.org
Attorneys for Creditor Catherine Phillips et al.

Herbert A. Sanders (P43031)
THE SANDERS LAW FIRM PC
615 Griswold St. Ste. 913
Detroit, Michigan 48226
(313) 962-0099/Fax: (313) 962-0044
haslawpc@gmail.com
Attorneys for Creditor Catherine Phillips et al.

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Creditor Catherine Phillips et al.

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Creditor Catherine Phillips et al.

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Attorneys for Plaintiffs
CONSTITUTIONAL LITIGATION
ASSOCIATES, P.C.
450 W. Fort St., Suite 200
Detroit, MI 48226
313-961-2255/Fax: 313-961-5999
Attorneys for Creditor Catherine Phillips et al.

# **EXHIBIT 4**

## **CERTIFICATE OF SERVICE**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Chapter 9

CITY OF DETROIT, MICHIGAN,                      Case No. 13-53846

      Debtor.                                  Hon. Steven W. Rhodes

_____/

## CERTIFICATE OF SERVICE

      I, WILLIAM H. GOODMAN, certify that on September 23, 2013, I electronically filed *Catherine Phillips, Et Al.'S Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor,* along with a *Summary of Attached Exhibits* and *Exhibits 1-6.3* (as listed on the Summary), with the Clerk of the Court using the ECF system which will send notification of such filing to ECF participants in this matter.

                                  */s/William H. Goodman*_____
                                  William H. Goodman (P14173)
                                  GOODMAN & HURWITZ PC on behalf of the
                                  DETROIT & MICHIGAN NATIONAL
                                  LAWYERS GUILD
                                  1394 E. Jefferson Ave.
                                  Detroit, Michigan 48207
                                  (313) 567-6170/Fax: (313) 567-4827
                                  bgoodman@goodmanhurwitz.com
                                  Attorneys for Creditor Catherine Phillips, et al.

# EXHIBIT 5

## None

## [No Affidavits Filed Specific to This Motion]

# EXHIBIT6.1

**Complaint,**
*Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon*,
**Case No.13-CV-11370**
**[Doc. #1]**

13-53846-swr   Doc 2504-7   Filed 09/23/14   Entered 09/23/14 16:08:04   Page 54 of 52
307
13-58846-tjt   Doc 1504-7   Filed 09/23/14   Entered 09/23/14 16:08:04   Page 1 of 52
54

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

Catherine Phillips, Staff Representative Michigan
AFSCME Council 25, and Chief Negotiator with the
City of Detroit; Joseph Valenti, Co-Chief Negotiator
with the Coalition of Unions of the City of Detroit;
Michigan AFSCME Council 25; Russ Bellant,
President of the Detroit Library Commission;
Tawanna Simpson, Lamar Lemmons, Elena Herrada,
Detroit Public Schools Board Members; Donald Watkins,
and Kermit Williams, Pontiac City Council Members;
Duane Seats, Dennis Knowles, Juanita Henry, and
Mary Alice Adams, Benton Harbor Commissioners;
William "Scott" Kincaid, Flint City Council President;
Bishop Bernadel Jefferson; Paul Jordan; Rev. Jim Holley,
National Board Member, Rainbow Push Coalition;
Rev. Charles E. Williams II, Michigan Chairman,
 National Action Network; Rev. Dr. Michael A. Owens,
Rev. Lawrence Glass, Rev. Dr. Deedee Coleman,
Bishop Allyson Abrams, Executive Board, Council
of Baptist Pastors of Detroit and Vicinity;

|  |  |
|---|---|
|  | Case No. |
|  | Judge: |

Plaintiffs,

vs.

RICHARD D. SNYDER, as Governor of the
State of Michigan, and ANDREW DILLON,
as the Treasurer of the State of Michigan, acting in
their individual and/or official capacities,

*Complaint for Declaratory
& Injunctive Relief*

Defendants.

/

Herbert A. Sanders (P43031)
**THE SANDERS LAW FIRM PC**
615 Griswold St. Ste. 913
Detroit, Michigan 48226
(313) 962-0099/Fax: (313) 962-0044
haslawpc@gmail.com
*Attorneys for Plaintiffs*

1

John C. Philo (P52721)
Anthony D. Paris (P71525)
**SUGAR LAW CENTER**
**FOR ECONOMIC & SOCIAL JUSTICE**
4605 Cass Ave., 2nd Floor
Detroit, Michigan 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
tparis@sugarlaw.org
*Attorneys for Plaintiffs*

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
**GOODMAN & HURWITZ PC on behalf of**
**the DETROIT & MICHIGAN NATIONAL**
**LAWYERS GUILD**
1394 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 567-6170/Fax: (313) 567-4827
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com
*Attorneys for Plaintiffs*

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
**MILLER COHEN, P.L.C.**
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
*Attorneys for Plaintiffs*

Darius Charney
Ghita Schwarz
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
*Attorneys for Plaintiffs*

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
**CONSTITUTIONAL LITIGATION**
**ASSOCIATES PC**

450 W Fort St Ste 200
Detroit, MI 48226
(313) 961-2255/Fax: (313) 961-5999
conlitpc@sbcglobal.net
*Attorneys for Plaintiffs*

Bertram L. Marks (P47829)
**Litigation Associates PLLC**
30300 Northwestern Hwy Ste 240
Farmington Hills, MI 48334
Phone: (248) 737-4444
Fax: (248) 932-6365
BertramMarks@aol.com
*Attorneys for Plaintiffs*

_____/

**THERE WAS ANOTHER PENDING CIVIL ACTION ARISING OUT OF THE SAME TRANSACTIONS OR OCCURRENCE AS ALLEGED IN THIS COMPLAINT, BEFORE THE HONORABLE JUDGE ARTHUR J TARNOW, THAT CIVIL ACTION BEING CASE NO. 12-11461.**

<u>**COMPLAINT FOR DECLARATORY**</u>
<u>**& INJUNCTIVE RELIEF**</u>

NOW COME Plaintiffs, and by and through their attorneys and for their Complaint, do hereby allege as follows.

<u>**I. NATURE OF PLAINTIFFS' CLAIMS**</u>

1.      This is a federal civil rights and voting rights cause of action brought pursuant to 42 USC §1983 for violations of the Plaintiffs' federal and constitutional rights under the United States Constitution, Art. 4, §4; Amend. I; Amend. XIII; Amend. XIV; and pursuant to the *Voting Rights Act of 1965*, 42 U.S.C. §§ 1973 *et. seq.*

2.      The *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012, MCL §§ 141.1541 *et. seq.* (Public Act 436) effectively establishes a new form of government within the State of Michigan. The new form of government allows Michigan cities and other

3

forms of municipal corporations to be ruled by one unelected official, who is vested with broad legislative power and whose orders, appointments, expenditures, and other decisions are not reviewable by local voters.

3.    Plaintiffs' rights under the United States Constitution, include:

    a.   A due process right to engage in collective bargaining.

    b.   A due process right to an elected, republican form of government;

    c.   A right to freedom of speech.

    d.   A right to petition local government.

    e.   A right to equal protection of laws granting Michigan citizens the right to vote in local elections and to remove emergency managers.

Each of these rights is violated by provisions of Public Act 436.

4.    The Voting Rights Act of 1965 protects Plaintiffs from discriminatory laws that disenfranchise voters. Plaintiffs' voting rights are also violated by provisions of Public Act 436.

## II.  JURISDICTION AND VENUE

5.    Federal question jurisdiction is conferred by 28 USC §§ 1331, 1343(a)(3), 1343(a)(4), 1344, 2201 and 2202 over Plaintiffs' Constitutional and Voting Rights Act claims.

6.    Venue is proper pursuant to 28 USC §1391, since all Defendants reside or are located in the Eastern District of Michigan and the events giving rise to this action occurred, in part, within this District.

## III. PARTIES

7.    Plaintiff Catherine Phillips is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Catherine Phillips is also a Staff Representative for Michigan AFSCME Council 25, and Chief Negotiator with the City of Detroit.

8.     Plaintiff Joseph Valenti is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Valenti is also Co-Chief Negotiator for the Coalition of unions of the City of Detroit.

9.     Plaintiff, Michigan AFSCME Council 25 is an unincorporated, voluntary labor association certified by the Michigan Employment Relations Commission, pursuant to the Michigan Public Employee Relations Act, MCLA 432.201 *et seq*. Plaintiff Michigan AFSCME Council 25 has associational standing on behalf of its members as well as its own standing as party to collective bargaining agreements with numerous public entities that will be affected by PA 436, inclusive of, but not limited to the City of Detroit.

10.     Plaintiff Russ Bellant is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Bellant is also President of the Detroit Library Commission.

11.     Plaintiff Tawanna Simpson is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Simpson is also a Detroit Public Schools Board Member.

12.     Plaintiff Lamar Lemmons is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Lemmons is also a Detroit Public Schools Board Member.

13.     Plaintiff Elena Herrada is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Herrada is also a Detroit Public Schools Board Member.

5

14.     Plaintiff Donald Watkins is a citizen of the United States, a resident of the City of Pontiac, County of Wayne, and the State of Michigan. Plaintiff Watkins is also a member of the Pontiac City Council.

15.     Plaintiff Kermit Williams is a citizen of the United States, a resident of the City of Pontiac, County of Wayne, and the State of Michigan. Plaintiff Williams is also a member of the Pontiac City Council.

16.     Plaintiff Duane Seats is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Seats is also a Benton Harbor Commissioner.

17.     Plaintiff Dennis Knowles is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Knowles is also a Benton Harbor Commissioner.

18.     Plaintiff Juanita Henry is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Henry is also a Benton Harbor Commissioner.

19.     Plaintiff Mary Alice Adams is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Adams is also a Benton Harbor City Commissioner.

20.     Plaintiff William "Scott" Kincaid is a citizen of the United States, a resident of the City of Flint Michigan, County of Genesee, and the State of Michigan. Plaintiff Kincaid is also President of the Flint City Council.

21.     Bishop Bernadel Jefferson is a citizen of the United States, a resident of the City of Flint Michigan, County of Genesee, and the State of Michigan.

6

22.     Plaintiff Paul Jordan is a citizen of the United States and a resident of the City of Flint, County of Genesee, and State of Michigan.

23.     Plaintiff Rev. Jim Holley is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Rev. Holley is also a National Board Member of the Rainbow Push Coalition.

24.     Rev. Charles E. Williams II is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Rev. Williams is also the Michigan Chairman of the National Action Network.

25.     Plaintiff Rev. Dr. Michael A. Owens is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Rev. Dr. Michael A. Owens is also President of the Council of Baptist Pastors of Detroit and Vicinity.

26.     Plaintiff Rev. Lawrence Glass is a citizen of the United States, a resident of the City of Redford, County of Wayne, and the State of Michigan.  Plaintiff Rev. Lawrence Glass is also First Vice-President of the Council of Baptist Pastors of Detroit and Vicinity.

27.     Plaintiff Rev. Dr. Deedee Coleman is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Rev. Dr. Deedee Coleman is also Second Vice-President of the Council of Baptist Pastors of Detroit and Vicinity.

28.     Plaintiff Bishop Allyson Abrams is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Bishop Allyson Abrams is also Secretary of the Council of Baptist Pastors of Detroit and Vicinity.

29.     Defendant Richard D. Snyder is the Governor of the State of Michigan. Governor Snyder maintains his principal residence in the City of Ann Arbor in Washtenaw County,

7

Michigan, and at all times relevant hereto was acting individually and in his official capacity as State Governor and top policymaker for the State of Michigan.

30.     Defendant Andrew Dillon is the Treasurer of the State of Michigan. Treasurer Dillon maintains his principal residence in Redford Township in Wayne County, Michigan, and at all times relevant hereto was acting individually and in his official capacity as State Treasurer and as a policymaker.

## IV. COMMON FACTS

31.     Through its provisions, Public Act 436 establishes a new form of local government, previously unknown within the United States or the State of Michigan, where the people within local municipalities may be governed by an unelected official who establishes local law by decree.

### Legislative Background Of
### Municipal Financial Distress In Michigan

32.     During the Great Depression in the 1930s, 4,770 cities defaulted on their debt. Among all states, Michigan had the fourth highest number of defaulting municipalities throughout the depression years. At that time, creditors of defaulting cities were commonly required to file a mandamus action in state courts seeking to compel the municipality to raise taxes to pay debt obligations. Courts then appointed receivers to oversee the finances of municipal debtors.

33.     To improve procedures for creditors and municipal debtors, the federal government adopted Chapter 9 of the federal bankruptcy code in 1937. Chapter 9 permits the use of federal bankruptcy procedures for debt-ridden municipalities. Under Chapter 9, elected officials remain in office and retain significant autonomy while bankruptcy procedures oversee

8

the development of a plan to adjust debts and pay creditors. Before a Chapter 9 petition may be filed however, the state must authorize the municipality to file for bankruptcy.

34.    Prior to 1988, unless proceeding through Chapter 9, municipalities were placed into receivership by the courts, not the state legislature or executive branch. Compensation for court-appointed receivers was derived from property that the courts placed within the care of the receiver.

35.    Since 1937, two Michigan cities have defaulted on bond payments or been placed under a court imposed receivership due to insolvency. Muskegon Township defaulted on revenue bond payments in the early 1960s and the City of Ecorse was placed in receivership by a Wayne County Circuit Court in 1986.

36.    Neither municipality sought the protections of Chapter 9 bankruptcy. Muskegon Township entered into a settlement agreement with its creditors that resolved their defaults. Ecorse remained under court receivership through 1990 and was subject to further state oversight until the late 1990s.

37.    In response to the troubled insolvency of the City of Ecorse, the state enacted Public Act 101 of 1988 (PA 101). Public Act 101 allowed the state to intervene when local municipalities were found to be in financial distress. The statute allowed the state to appoint emergency financial managers over cities experiencing a financial emergency.

38.    In 1990, the legislature replaced PA 101 with the *Local Government Fiscal Responsibility Act*, Act No. 72, Public Acts of 1990 (PA 72). Public Act 72 authorizes state officials to intervene when local governments face a financial emergency. Pursuant to PA 72, Michigan's local financial emergency review board can appoint an emergency financial manager (EFM) only after the Governor declares a financial emergency within the local government.

39.     Under PA 72, local elected officials are not removed from office and the EFM's powers only extended to matters of municipal finances. Their powers did not extend to purely administrative or policy matters. Furthermore, EFMs had the power to renegotiate, but not unilaterally break contracts.

40.     In the late 1990s, legislation was passed to revise municipal revenue sharing laws, severely reducing the amount of funds shared by the state with local government. Local governments saw further revenue reductions when income and property tax revenues sharply declined during the recession of 2000-2003. As a result, municipalities experienced significant financial stress during the late 1990s and early 2000s.

41.     During this time period, the state local financial emergency review board appointed PA 72 EFMs in the cities of Hamtramck, Highland Park, and Flint.

42.     These original Public Act 72 EFMs remained in place as follows:

    a.  Hamtramck from 2000 until 2007 (7 years)[1];

    b.  Highland Park from 2001 until 2010 (9 years);[2] and

    c.  Flint from 2002 until 2004 (2 years)[3].

43.     With the onset of the historic global recession that began in 2007 and resulted in record foreclosures and steep unemployment, cities and municipal corporations in Michigan saw further sharp reductions to income and property tax revenue. State revenue sharing laws were further amended in recent years to reduce revenue sharing with local governments and thereby balance state budgets. As a result, Michigan municipalities again faced widespread financial stress.

---

[1] In 2010, the City of Hamtramck requested permission from the state to file for Chapter 9 bankruptcy. The state refused.

[2] One year later, DTE Energy repossessed the City of Highland Park's street lights due to the city's inability to pay its bills

[3] The City of Flint was again declared in a financial emergency in 2011.

10

44.     Again, the state local financial emergency review board appointed PA 72 EFMs in various cities, including Pontiac, Ecorse, and Benton Harbor. Public Act 72 EFMs were also appointed over the Village of Three Oaks (2008) and the Detroit Public Schools and the review board entered into a PA 72 consent agreement with the city of River Rogue.

45.     The second wave of Public Act 72 EFMs were appointed as follows:

    a.   Pontiac from 2009 until the present (4+ years)

    b.   Ecorse from 2009 until the present (4+ years)

    c.   Benton Harbor from 2010 through the present (3+ years);

    d.   Village of Three Oaks from 2008 until 2009 (1 year); and

    e.   Detroit Public Schools from 2009 until the present (4+ years).

The state's consent agreement with the city of River Rouge has also remained in place from 2009 to the present. Notably, since the onset of the global recession in 2007, the Village of Three Oaks is the only municipality that has emerged from a financial emergency following the appointment of an emergency financial manager, appointment of an emergency manager, or the entering of a consent agreement.

46.     Following elections in November of 2010 and the turnover of state offices in January 2011, the Michigan legislature introduced House Bill 4214 (2011) on February 9, 2011. The bill was widely seen as a response to a court ruling finding that the Detroit Public Schools' School Board, and not the EFM, possessed the power under state law to determine what curriculum would be taught and which texts would be used in the city's public schools. The decision provoked elements of the state legislature who then sought greater control over the content of the curriculum taught in Detroit's schools.

11

47.    House Bill 4214 was rushed through the legislature and quickly presented to the Governor for signature. Defendant Governor Richard D. Snyder signed the *Local Government and School District Fiscal Accountability Act*, Act No. 4, Public Acts of 2011 (PA 4) into law on March 16, 2011. Public Act 4 repealed Public Act 72 and was given immediate effect. Public Act 4 automatically converted all EFMs to Public Act 4 Emergency Managers (EM) and greatly expanded the scope of their powers. The Act also brought all existing consent agreements under the new law.

### Public Act 4's Radical Revision of State Law

48.    Public Act 4 radically revised state law governing the appointment of EMs over cities and school districts during times of financial stress.

49.    Public Act 4 provided that once the Governor had declared a financial emergency, the Governor could then appoint an individual to be the municipality's emergency manager. The Governor was granted broad discretion to declare a financial emergency and, in fact, a municipality was not actually required to be in a fiscal crisis before an EM could be appointed.

50.    Tellingly, the Act changed the title of municipal "emergency financial managers" to "emergency managers" and expanded the scope of their powers to cover all the conduct of local government.

51.    The PA 4 EM's powers extended not only to financial practices and fiscal policy, but rather permitted such managers to fully act "for and in the place of" the municipality's elected governing body. The grant of powers also included a general grant of legislative power (the power to unilaterally adopt local laws and resolutions) to PA 4 EMs.

12

52. Public Act 4's grant of legislative power to EMs extended to the full scope of legislative power possessed by local elected officials. In the state of Michigan, local legislative power is of the same scope and nature as the police power possessed by the state - limited only by the jurisdictional limits of the municipality and where preempted by the general laws of the state. Public Act 4's grant of general legislative power to EMs thus extended to a grant of the full of scope of the local government's police power, previously reserved to local government's elected legislative body and elected mayor.

53. Emergency managers were further granted powers to act in disregard of the local government's local laws – including city charters, ordinances, administrative regulations, school district bylaws, etc.

54. The Act further granted a state financial review team the power to enter into a consent agreement with local government, again without a finding that a financial emergency existed.

55. At the time PA 4 became law, reports from the State indicated that, based on their financial conditions, over eighty (80) municipalities and/or school systems were eligible to have emergency managers.

56. After passage of PA 4, existing EFMs in the cities of Benton Harbor, Ecorse and Pontiac and over the Detroit Public Schools were converted to EMs and vested with PA 4 powers. The state's consent agreement with the city of River Rouge was also converted to a PA 4 agreement.

57. With the continuing global economic recession and steep declines in state revenue sharing and municipal property tax and income tax revenue collection, PA 4 EMs were newly appointed as follows:

    a.  Flint from 2011 until the present (2+ years);

    b.  Highland Park Public Schools from 2012 until the present (1+ year); and

    c.  Muskegon Heights Public Schools until the present (1+ year).

Additionally, the state entered PA 4 consent agreements with the cities of Detroit[4] and Inkster.

58.     After becoming vested with Public Act 4 powers, EMs in Benton Harbor, Ecorse, Flint, and Pontiac have all exercised general legislative power to enact, repeal and suspend local laws and resolutions and have voided various contracts.

### Michigan Citizen's Rejection of Public Act 4
### And the State's Resurrection of Public Act 72

59.     In opposition to Public Act 4, citizens began circulating petitions in May 2011. The petitions were to place a referendum on the ballot that would reject the law. Over 200,000 signatures were gathered and the petitions were submitted to the Secretary of State in February 2012. However to prevent Michigan citizens from having the opportunity to vote on the matter, the petitions were challenged by a lobbying group.

60.     The petitions were challenged on the basis that the title of the petitions were not printed in 14 point font but rather were printed in slightly smaller font of approximately 13.75 or larger.[5]

61.     Along party-line votes, the members of the state Board of Canvassers deadlocked and as a result, the petitions were not certified for the ballot.

62.     The matter was then appealed to the Michigan Court of Appeals. A panel of the Court of Appeals recognized and found that existing law required the referendum to be placed on

---

[4] The state has struggled to identify the state law(s) providing legal authority for the transfer of powers and oversight that was created by the agreement with the city of Detroit. Over time, the state seems to have settled into a belief that PA 4 provided such authority.

[5] No evidence was submitted and it was not argued that signatories of the petitions had been confused or misunderstood what they had signed. In fact, the difference in point size as argued by the challenger was invisible to the naked eye of many.

the ballot. However, the panel sought to overturn existing law, and thereby keep the referendum off the ballot. The panel requested that the full Court of Appeals be polled to convene a special panel to reconsider existing law. The full Court of Appeals however declined to convene the special panel.

63.     An appeal was taken to the state Supreme Court. The Michigan Attorney General in his individual capacity and Governor in his individual and/or official capacity joined the challengers as amici at the state Supreme Court.

64.     On August 3, 2012, the Michigan Supreme Court issued an opinion ordering the state Board of Canvassers certify the petitions and place the referendum on the ballot.

65.     However on August 6, 2012, the state Attorney General issued a formal opinion stating that once the petitions were certified[6], PA 72 would spring back into effect and would remain in effect if voters rejected PA 4 at the November 2012 election.

66.     The state Board of Canvassers certified the petitions on August 8, 2012 and by operation of Michigan law, PA 4 was then suspended until the November.

67.     In response, state officials reappointed all existing PA 4EMs as PA 72 EFMs and proclaimed that all existing consent agreements would continue in place as PA 72 consent agreements.

68.     After certification of the referendum, existing PA 4 EMs were converted to EFMs in the cities of:

        a.   Benton Harbor;

        b.   Ecorse;

        c.   Flint; and

---

[6] Pursuant to Michigan law, once the petitions were certified PA 4 was then suspended until the voters could decide the matter at the next general election.

       d. Pontiac.

69.    Additionally EMs over the following school districts were converted to Public Act 72 EFMs:

       a.  Detroit Public Schools;

       b.  Highland Park Public Schools; and

       c.  Muskegon Heights Public Schools.

70.    Finally, the state's consent agreements with the cities of Detroit, Inkster and River Rogue were proclaimed converted to PA 72 agreements.

71.    At the general election on November 6, 2012, Michigan voters overwhelmingly elected to reject PA 4.

### *Michigan Legislature's Attempt to Overturn Citizen's Vote to Reject Public Act 4 by Enacting Public Act 436*

72.    In response to the decision of Michigan voters to reject PA 4, incensed state officials and segments within the state legislature quickly moved to reenact a new law with emergency manager provisions that are substantially identical to the rejected law.

73.    During the lame-duck session, the state legislature moved quickly to reenact the emergency manager provisions of Public Act 4. The new bill passed the state House and Senate on December 13, 2012 and was signed into law as the *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012, on December 26, 2012.

74.    Public Act 436 again changes the title of existing PA 72 "emergency financial managers" to "emergency managers" and again expands the scope of their powers to cover all the conduct of local government.

75.    The PA 436 EM's powers are substantially identical to the powers that had been granted under PA 4. Public Act 436 EMs are empowered to fully act "for and in the place of"

16

the municipality's governing body.  The grant of powers again includes a general grant of legislative power to emergency managers.

76.   Along with the general grant of legislative power to emergency managers, Public Act 436 exempts the EM from following existing city charters and local ordinances.

77.   The new law does not provide any process that EMs must follow in the adoption or repeal of local laws, but rather permits the EM to do so by private orders, not subject to open meetings requirements.

78.   Public Act 436 states that EMs appointed under PA 4 and EFMs appointed under PA 72 shall be considered EMs under PA 436 once the new law takes effect.

79.   Additionally, PA 436 permits the Governor to appoint persons appointed as EMs under PA 4 and as EFMs under PA 72 to serve as PA 436 EMs under the new law.

80.   Under PA 436, all EMs serve at the pleasure of the Governor and continue to serve until removed by the Governor or until the Governor finds that the financial emergency has been rectified.

81.   Public Act 436 permits the Governor to delegate his powers and duties to the state treasurer and the state treasurer oversees the activities of emergency managers.

82.   When PA 436 takes effect on March 28, 2013, EMs will be in place over the cities of Allen Park, Benton Harbor, Ecorse, Flint, Pontiac and Detroit and over the Detroit Public Schools, Highland Park Public Schools, and Muskegon Heights Public Schools. Finally, the state's consent agreements with Inkster and River Rouge will again be converted – now to PA 436 agreements.

83.    Under PA 436, elected officials in each of these communities will be displaced and/or be divested of governing and law-making authority and citizens will have effectively lost their right to vote for their local legislative bodies, chief executive officers, and school boards.

84.    Local elected officials are thereby effectively removed from office under PA 436 and this removal occurs without any showing of malfeasance or misfeasance causing or contributing to the financial circumstances faced by their municipality or school district. In so doing, the Act implicitly assumes that these local officials were guilty of corruption or gross incompetence that caused or contributed to the financial circumstances of their municipality or school district. Public Act 436 makes this assumption of guilt and removes elected officials without any finding of fault on the part of local elected officials and without any form of due process.

85.    In each of these communities, citizens will have effectively lost their right to vote for local elected officials or had that right diluted so as to render it an exercise in form without substance.

86.    There is no question that Michigan's emergency manager laws have disproportionately impacted the state's population of citizens from African-American descent.

87.    The Black/African-American population of each of the cities where an emergency manager or consent decree will be in place when PA 436 takes effect, is as follows:

   a.  Benton Harbor: 8,952 persons comprising 89.2% of the city's population;

   b.  Ecorse: 4,315 persons comprising 46.4% of the city's population;

   c.  Pontiac: 30,988 persons comprising 52.1% of the city's population;

   d.  Flint: 57,939 persons comprising 56.6% of the city's population;

   e.  Inkster: 18,569 persons comprising 73.2% of the city's population;

18

  f. River Rouge: 3,994 persons comprising 50.5% of the city's population;

  g. Detroit: 590,226 persons comprising 82.7% of the city's population,

  h. Highland Park: 10,906 persons comprising 93.5% of the city's population;

  i. Muskegon Heights: 8,501 persons comprising 78.3% of the city's population; and

  j. Allen Park: 587 persons comprising 2.1% of the city's population.

The Black/African-American population of these cities totals 734,947 persons.

  88. As a result of the Defendants' actions under Public Act 436, fifty two (52%) of the state's Black/African-American population will come under the governance of an emergency manager or consent agreement. In each of these communities, citizens will have either lost or experienced severe restrictions imposed on their right to vote and to participate in public affairs.

  89. There is also no question that each of the aforementioned cities is economically poor communities where significant household wealth has been lost since the onset of the current recession. In these communities, the percentage of persons living below the poverty level is:

  a. Benton Harbor – 48.7%;

  b. Ecorse – 32.7%;

  c. Pontiac- 32%;

  d. Flint – 36.6%;

  e. Inkster – 33.2%;

  f. River Rouge – 40.1%;

  g. Detroit – 34.5%; and

  h. Highland Park – 43.7%; and

  i. Muskegon Heights – 45.6%.

The Michigan average is 15.7%. The City of Allen Park is thus the only city with an EM where

the poverty level is not at least double the state average.

90.   Like PA 4, Public Act 436 reestablishes a new form of local government that is repugnant to the constitutional liberties of all Americans.

91.   Despite a long national history of municipal financial crises following national and global economic depressions and recessions, no other state in the nation has engaged in similar experiments in undemocratic governance as a solution to economic downturns.

92.   Under Public Act 436, the people become subject to government that is composed of one unelected official who wields absolute power over all aspects of local government and whose decisions are without review by either local elected officials or local voters.

### Continued Frustration of Contractual Rights of City of Detroit Employees By Public Act 436 and Its Precursor Public Act 4

93.   The loss of rights suffered by the citizenry and the workforce of the City of Detroit reveals how emergency manager legislation threatens basic civil rights of Michiganders.

94.   In November 2011, the City of Detroit announced a financial crisis and requested that its labor unions offer wage and benefit concessions to alleviate the crisis. At that time, more than thirty of the City of Detroit's forty-eight unions banded together in a "Coalition of Unions" to jointly negotiate concessions with the City of Detroit.   This Coalition represented approximately 5,000 City employees.

95.   The Coalition and the City of Detroit reached a Tentative Agreement, resulting in hundreds of millions of dollars in cost savings and revenue to the City, according to accounting estimates. The City encouraged the Coalition of unions to ratify the Tentative Agreement, which they did on March 22, 2012. The City celebrated the ratification, and planned for execution and implementation of this Coalition contract.

20

96.     Following Coalition ratification of the Tentative Agreement, the State of Michigan and its top-level agents threatened the City of Detroit's elected leadership with the appointment of an EM if City officials continued to bargain collectively with the City unions. The Defendants ordered the City Mayor and City Council not to sign the Coalition contract.

97.     The Defendants' issues with the contract were not financial.   Indeed, the Defendants acknowledged the significant financial concessions made within the Coalition contract.   However, the Defendants wanted unspecified nonfinancial changes made to the agreement.

98.     As a result of the Defendants' actions and interference, Detroit's Mayoral Administration asked the City Council not to finalize and execute the contract.  To date, the Defendants have prevented the execution of the Coalition contract.  Detroit's elected officials acknowledge that the State's threats caused them not to finalize contract.

99.     Under state labor law, the Public Employment Relations Act (MCLA sec 423.210, 215), cities have an obligation to bargain with its unionized workforce over terms and conditions of employment. The statutory obligation to bargain includes the obligation "to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party…" MCLA sec 423.215(1).

100.    At the insistence of the Defendants, the City of Detroit negotiated and signed a Consent Agreement with the state, on April 4, 2012, under Public Act 4. The consent agreement outlined various employment terms for Coalition employees.

101.    Due to the existence of the consent agreement and citing PA 4, the City of Detroit claimed authority to ignore the obligation to bargain with its unions.  As such, it imposed

21

dramatic wage and benefit concessions on the unionized workforce without bargaining, during the months following the execution of the consent agreement.

102.    Following the Michigan voters' rejection of PA 4 in November 2012, the Defendants still have refused to permit the City of Detroit to execute a contract with the Coalition unions.  Thus, even though the PA 4 has been rejected, the City is enjoying the consequence of this rejected and unconstitutional law by refusing to adjust the wage and benefit concessions it had imposed on the Coalition members.

103.    With its continued refusal to permit the City to execute a contract with the Coalition union, the Defendants are frustrating the substantive and procedural due process of the Coalition members.

104.    Public Act 436 continues Defendants violation of the due process rights through provisions that seek to retroactively validate actions taken pursuant to powers and authority granted by Public Act 4 and consent agreements entered thereunder.

## V. CAUSES OF ACTION

### COUNT I – 42 U.S.C. §1983 - Constitutional Violation
### US Const, Amend. XIV – Substantive & Procedural Due Process –
### Right to Collectively Bargain – City of Detroit

105.    Plaintiffs incorporate by reference paragraphs 1 through 106 above as though fully stated herein.

106.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

107.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and official capacities, have engaged in conduct that violates Plaintiffs' Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 rights under Amend. XIV of the U.S. Constitution.

22

108.     Amendment XIV of the United States Constitution holds, in pertinent part: "nor shall any state deprive any person of life, liberty, or property without due process of Law."

109.     Under the Due Process Clause, each person has a property interest in their employment, in the terms of employment negotiated pursuant to contract, and in rights granted under state law and these rights may not be taken away without due process of law.

110.     Under state law, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 were granted a right to collectively bargain with their employer, the City of Detroit.

111.     State law provides that:

> To bargain collectively is to perform the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or to negotiate an agreement, or any question arising under the agreement, and to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party, but this obligation does not compel either party to agree to a proposal or make a concession.#

MCL§ 423.215(1).

112.     The Defendants Snyder and Dillon, acting in their respective individual and/or official capacities, violated Plaintiff's Due Process rights protected by US Const., Amend. XIV, by acts including but not limited to:

    a.  Issuing threats and ultimatums to the Detroit City Council that if it approved the contract, then the State would appoint an EM to govern in the place of City Council;

    b.  Issuing threats and ultimatums to the Detroit City Council that if it did not approve a consent agreement, before considering the contract, then an EM would be appointed;

    c.  Subjecting the tentative agreement and any amended or renegotiated agreements to the approval of the Financial Advisory Board under the terms

23

    d. Subjecting the tentative agreement and any amended or renegotiated agreements to the approval of the Project Management director under the terms of the consent agreement; and

    e. Subjecting future bargaining to the terms of the consent agreement.

113. On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and rights of Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 through provisions of the statute that ratify actions taken by under Public Act 4. See provisions including but not limited to MCL §141.1570.

114. The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the purported government interests of achieving local government financial stability.

115. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 have suffered and will continue to suffer a loss of their constitutionally-protected rights.

**COUNT II – 42 U.S.C. §1983 -- Constitutional Violation**
**US Const, Amend. XIV – Substantive Due Process –**
**Right to a To Elect Officials Who Possess General Legislative Power**

116. Plaintiffs incorporate by reference paragraphs 1 through 115 above as though fully stated herein.

117. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

118. Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities,

24

Defendants have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV of the U.S. Constitution.

119.    Amendment XIV of the U. S. Constitution holds, in pertinent part: "nor shall any state deprive any person of life, liberty, or property without due process of Law."

120.    Under the Due Process Clause, each person has a liberty interest in their right to a democratically elected from of local government.

121.    Under the Due Process Clause, each person has a liberty interest in their right to elect officials of any level of government that exercise general legislative powers.

122.    Under state law, Michigan cities possess local legislative power to enact make charters, adopt and repeal local laws, and pass resolutions.

123.    Under state law, Michigan cities' legislative power over matters within their jurisdiction is of the same scope and nature as the police power of the state.

124.    When a state establishes a local government with legislative power, it must be democratic in form and substance.

125.    The right to a democratic form of government is a fundamental right afforded to all citizens in the state of Michigan through the United States Constitution.

126.    The right to a vote for the officials of local government who exercise general legislative powers is a fundamental right afforded to all citizens in the state of Michigan through the United States Constitution. When a state grants general legislative power to a governmental official, the official must be democratically elected.

127.    On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and disenfranchises citizens from their right to a

democratically elected form of local government and their right to elect local officials who possess general legislative power, through provisions that delegate to EMs the power to:

    a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

128.    On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and disenfranchises citizens from their right to a democratically elected form of local government and their right to elect local officials who possess general legislative power, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

129.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the purported government interests of achieving local government financial stability.

130.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their

constitutionally-protected rights.

## COUNT III – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Art 4, §4 – Republican Form of Government

131.    Plaintiff incorporates by reference paragraphs 1 through 130 above as though fully stated herein.

132.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

133.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective official capacities, Defendants have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Art. 4, §4 of the U.S. Constitution.

134.    Article 4, section 4 of the U.S. Constitution states that the "United States shall guarantee to every state in this union a republican form of government."

135.    Since our nation's founding, federal, state, and local governments throughout the country have been republican forms of government – governments of representatives chosen by the people governed.

136.    In the United States and in Michigan, local governments are traditionally democratically elected and republican in form.

137.    Public Act 436 unconstitutionally strips local voters of their right to a republican form of government by transferring governance, including but not limited to legislative powers, from local elected officials to one unelected emergency manager.

138.    On its face, as applied, and in practice, Public Act 436 violates the US Const., Art. 4, §4 through provisions of the statute that permit EMs to:

> a.   Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

27

b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

139. On its face, as applied, and in practice, Public Act 436 violates the US Const., Art. 4, §4 through provisions of the statute that ratify the legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

140. Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the governing authority and legislative powers of duly elected public officials in affected municipalities throughout the state of Michigan.

141. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

### COUNT IV – 42 U.S.C. §1983 -- Constitutional Violation
### US Const, Amend. XIV, § 1 –Equal Protection a Fundamental Right – Voting Rights

142. Plaintiffs incorporate by reference paragraphs 1 through 141 above as though fully stated herein.

143. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

144. Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violated Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

145. Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

146. The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

147. The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

148. Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

149. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district. While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

150. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

151. On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly revoke and/or impermissibly dilute the community's right to vote for local officials. Such provisions include those that provide for EMs to:

   a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

   b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

   c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

   d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village

charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

152. On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly revoke the community's right to vote for local officials, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

153. Under Public Act 436, Defendants have authority to deprive Plaintiffs of their rights to equal protection by divesting communities of their right to vote for local officials and by removing the authority of duly elected public officials in favor of an unelected EM in such communities.

154. Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the authority of duly elected public officials in various municipalities with disproportionately high poverty rates.

155. The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

156. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT V – 42 U.S.C. §1983 -- Constitutional Violation
## US Const. Amend. XIV, § 1 –Equal Protection based on Race – Voting Rights

31

157.    Plaintiffs incorporate by reference paragraphs 1 through 156 above as though fully stated herein.

158.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

159.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

160.    Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

161.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

162.    The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

163.    Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

164.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.  In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district.  While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing

authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

165.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.   In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan.   Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts.  Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials.  The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

166.    Under Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community.

167.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community.  Such provisions include those that provide for EMs to:

> a.  Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

168.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community and that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

169.    Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the authority of duly elected public officials in various municipalities comprising more than 53% of the state's population of citizens who are of African American descent.

170.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

171.    As a direct and proximate result of the enactment of Public Act 436 and

34

Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally protected rights.

**COUNT VI – 42 U.S.C. §1983 -- Constitutional Violation**
**US Const, Amend. XIV, § 1 –Equal Protection based on Wealth – Voting Rights**

172.    Plaintiffs incorporate by reference paragraphs 1 through 171 above as though fully stated herein.

173.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

174.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

175.    Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

176.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

177.    The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

178.    Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

179.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.   In these municipalities and school districts, the local

35

government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district. While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

180.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

181.    Under Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community.

182.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that condition the revocation of the community's right to vote for local officials based on the wealth of that

community and the individuals who reside there. Such provisions include those that provide for

EMs to:

    a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

183.    On its face, as applied, and in practice, Public Act 436 violates the Equal

Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly

revoke citizen's right to vote for local officials based on the wealth of their community and

themselves, through provisions of the statute that ratify appointments made and legislative acts

taken by EMs acting under Public Act 4. See provisions including but not limited to MCL

§141.1570.

184.    Defendants have caused injury to the Plaintiffs by exercising the authority granted

under Public Act 436 by terminating and/or removing the authority of duly elected public

officials in various municipalities with disproportionately high poverty rates.

185.    The provisions of PA 436 and the powers granted thereby, are not necessary,

narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government

interests of achieving local government financial stability.

186. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT VII– Voting Rights Act of 1965, 42 U.S.C. § 1973 *et. seq.*

187. Plaintiffs incorporate by reference paragraphs 1 through 186 above as though fully stated herein.

188. Section 2 of the Voting Rights Act of 1965, as amended, reads:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

189. Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 prohibits the abridgement or dilution of Black/African-American citizens' right to vote in state and local elections.

190. Michigan's population is estimated at 9,876,187 persons. The Black/African-American's comprise approximately 14.2% of the state's population (1,400,362 persons).

191. As a result of the passage of PA 436, once the law comes into effect more than fifty percent of the state's Black/African-American population will have had their voting rights in local elections effectively revoked.

192. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district. While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

193. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

194. On its face, as applied, and in practice, Public Act 436 violates the Voting Rights Act through provisions that provide for the appointment of EMs and entering of consent agreements that abridge and dilute the voting rights of citizens within these localities. Such provisions include those that provide for EMs to:

a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

195. On its face, as applied, and in practice, Public Act 436 violates the Voting Rights Act through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community and that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

196. Under the totality of the circumstances, the application of Public Act 436 and enforcement has resulted in Black/African American citizens having dramatically less opportunity for self-governance than other members of Michigan's electorate.

197. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT VIII – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend. I –Freedom of Speech & Right to Petition Government

40

198.   Plaintiffs incorporate by reference paragraphs 1 through 197 above as though fully stated herein.

199.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

200.   Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. I of the U.S. Constitution.

201.   Amendment I of the US Constitution states in pertinent part, "Congress shall make no law ... abridging the freedom of speech ... and to petition the Government for a redress of grievances."

202.   Plaintiffs, as citizens of the State of Michigan, have engaged in constitutionally-protected speech on matters of public concern by voting and electing local government officials to serve as their elected representatives.

203.   Plaintiffs, as citizens of the State of Michigan, have engaged in a Constitutionally protected right to petition their local governments on matters of public concern by interacting with duly elected local officials, expressing their concerns, and having them serve as their elected representatives.

204.   The elected officials chosen by the Plaintiffs to serve as their representatives have been inclusive of, but not limited to, mayors, city councils, and local school board members of various municipalities.

205.   Plaintiffs, as citizens of the State of Michigan, have engaged in their Constitutionally protected right to free speech and to petition their government, by repealing Public Act 4.

206.   On its face, as applied, and in practice, Public Act 436 is the mirror image of Public Act 4 and its enactment contrary to the expressed will of the people through the referendum process violates the US Const., Amend. I.

207.   On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. I through provisions that empower EMs to:

   a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

   b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

   c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

   d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

   e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

208.   On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. I through provisions that provide for the appointment of EMs with powers that strip all authority of local elected officials, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

209.   The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

210.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT IX – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend, I –Right to Petition Government – City of Detroit

211.    Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 incorporate by reference paragraphs 1 through 210 above as though fully stated herein.

212.    Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 bring this claim pursuant to 42 U.S.C. §1983

213.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 rights under Amend. I of the U.S. Constitution.

214.    Amendment I of the US Constitution states in pertinent part, "Congress shall make no law … abridging … [right] to petition the Government for a redress of grievances."

215.    Plaintiffs have a clearly established Constitutionally protected right to organize, assemble, and to engage in political, social and economic activities to advance their views and petition their local governments on matters of public concern by interacting with duly elected local officials, expressing their concerns, and having their concerns heard.

216.    The state Local Emergency Financial Assistance Loan Board appointed Kevyn Orr as EFM, and by the terms of the new law, he will be made an EM under Public Act 436 on and after March 28, 2013.

217.    Kevyn Orr is a partner in the Jones Day law firm and retains a financial interest in

the firm. Alternatively, Kevyn Orr nominally resigned from the Jones Day law firm at or about the time of his appointment as EFM of the City of Detroit.

218. At the same time, the Jones Day law firm has been selected as "restructuring counsel" for the City of Detroit under EM Kevyn Orr as the government of the City of Detroit. As such, the law firm is a contractual creditor to the City of Detroit.

219. Upon information and belief, the Jones Day law firm represents other financial institutions, including but not limited to the Bank of American, who are potential creditors to the City of Detroit.

220. On its face, as applied, and in practice, Public Act 436 and appointment of the City of Detroit's EFM and as EM violates the US Const., Amend. I through provisions that:

c. Permit Kevyn Orr to act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Vest the full powers of the local government of the City of Detroit, legislative, executive, administrative, police power, taxing power, powers to sue and be sued, to sell, lease, or purchase assets, to make governmental decisions regarding economic development, public safety, environmental health and, without limitation, all other powers of local government, would be concentrated and held by a single entity represented by Kevyn Orr and the Jones Day law firm;

e. Concentrate all local government powers in this way in a single entity abridges the rights of people who are citizens and residents of the City of Detroit to engage in core protected First Amendment activities to petition government, to organize, assemble, engage in political, social and economic activities to advance their views and interests;

f. Allow concentration of all local government powers in this way in a single entity offers opportunities to Defendants to exploit, profit, sell, lease, purchase, develop, contract and otherwise use their powers of local government for their own private and political as well as economic benefit, and that of their clients and associates, with no significant check or balance because of the disenfranchisement of Plaintiffs and all other residents of the

44

City of Detroit from participation in any of the decisions of local government, in violation of the First Amendment and the State Constitution;

g. Plaintiffs have no personal, political, commercial, economic or social connection or access to Defendants, and their fundamental First Amendment Rights to petition government, to organize, assemble, engage in political, social and economic activities to advance their views and interests, among other rights and constitutionally protected interests, are therefore violated by this new and unprecedented unitary form of local government of the City of Detroit.

221. The provisions of PA 436 and the powers granted thereby and the actions of the Defendants are not necessary, narrowly tailored, rationally or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

222. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT X – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend. XIII, § 1 – Vestiges of Slavery – Voting Rights

223. Plaintiffs incorporate by reference paragraphs 1 through 222 above as though fully stated herein.

224. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

225. Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIII of the U.S. Constitution

226.    Amendment XIII, § 1 bans and form of "slavery or involuntary servitude" within the jurisdiction of the United States of America.  The Thirteenth Amendment further bans acts which perpetuate the badges and incidents of servitude.

227.    Systematic denial of voting rights in local elections to Michigan's Black/African-American citizens is a perpetuation of the vestiges of slavery and involuntary servitude.

228.    Public Act 436 effectively revokes the right to vote by intentionally stripping governing authority from local elected officials and transferring such authority to one unelected EM who serves as the overseer of municipalities or school districts, which are overwhelming Black/African American majority communities, with no accountability to local citizens.

229.    On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. XIII, § 1 through provisions of the statute that perpetuate the vestiges of slavery by discriminatorily and intentionally revoking the community's right to vote for local officials based on the racial composition of that community.   Such provisions include those that provide for EMs to:

    a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

46

    e.  Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

230.  On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. XIII, § 1 through provisions of the statute that perpetuate the vestiges of slavery by discriminatorily revoking the community's right to vote for local officials based on the racial composition of the community that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

231.  Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by intentionally terminating and/or removing the authority of duly elected public officials in various municipalities comprising more than fifty-two percent (52%) of the state's population of citizens who are of African American descent.

232.  The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

233.  As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

### COUNT XI – 42 U.S.C. §1983 -- Constitutional Violation
### US Const, Amend. XIV, §1 –Equal Protection – Removal of Emergency Managers

234.  Plaintiffs incorporate by reference paragraphs 1 through 233 above as though fully stated herein.

235.  Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

236.  Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities,

47

have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution.

237.    Amendment XIV, §1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

238.    The Equal Protection Clause protects against laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

239.    The Equal Protection Clause also protects against laws and the application of laws that discriminate among similarly situated individuals or between groups of persons when no rational basis exists for such discrimination.

240.    Public Act 436 permits cities and school boards to pass a resolution by a 2/3 vote and with the approval of strong mayors thereby remove their EMs after 18 months in office.

241.    At the same time, Public Act 436 converts all existing EFMs to EMs.   Many of the existing managers have been in place for months and even years longer than the 18 month time period after which elected officials to pass a resolution by a 2/3 vote and the approval of strong mayors for the removal such managers.

242.    Thus, the law discriminates against cities and school districts where EFMs and EM have been and are currently in place.   The law discriminates against these municipalities requiring them to suffer an additional 18 months with an EM despite their having had such officials in place much longer than this time period.   At the same time, municipalities that newly receive such managers will be permitted to after which elected officials to pass a resolution by a 2/3 vote and the approval of strong mayors for the removal of such officials after they have been in office for 18 months.

243.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute discriminate between cities and school boards that presently have had EMs for significantly longer than 18 months and those that will receive EMs after March 28, 2013.  Such provisions include but are not limited to MCL §141.1549(11).

244.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

245.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray this Honorable court enter Judgment against Defendants providing:

a.  For declaratory relief holding that Public Act 436 violates the United States Constitution, Art. 4, §4; Amend I; Amend XIII; and Amend. XIV; and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 *et. seq.*;

b.  For injunctive relief restraining the Defendants and any present and future EMs from implementing or exercising authority and powers purportedly conveyed Public Act 436;

c.  For declaratory relief finding that Defendants have impaired and are impairing the rights of the Plaintiffs Catherine Phillips, Joseph Valenti, Michigan AFSCME Council 25 and their covered members in violation of their right to due process of law;

d.  For injunctive relief restraining Defendants, and all persons and entities acting in concert with them, from taking any actions to oppose or frustrate the City of Detroit's recognition and ratification of the Coalition-ratified contract or encourage rejection of said contract;

49

e.  For injunctive relief invalidating and restraining the terms of present and future consent agreements entered into under Public Act 436 that abridge or diminish powers granted to local elected officials under local charters and ordinances;

f.  For liquidated, compensatory, and punitive damages in an amount fair and just under the circumstances;

g.  For attorneys' fees and costs; and

h.  For such further relief as is just and equitable.

March 27, 2013                          Respectfully Submitted,


                                        By: /S/ Herbert A. Sanders
                                        Herbert A. Sanders (P43031)
                                        THE SANDERS LAW FIRM PC
                                        615 Griswold St. Ste. 913
                                        Detroit, Michigan 48226
                                        (313) 962-0099/Fax: (313) 962-0044
                                        haslawpc@gmail.com
                                        Attorneys for Plaintiffs

                                        John C. Philo (P52721)
                                        Anthony D. Paris (P71525)
                                        SUGAR LAW CENTER
                                        FOR ECONOMIC & SOCIAL JUSTICE
                                        4605 Cass Ave., 2nd Floor
                                        Detroit, Michigan 48201
                                        (313) 993-4505/Fax: (313) 887-8470
                                        jphilo@sugarlaw.org
                                        tparis@sugarlaw.org
                                        Attorneys for Plaintiffs

                                        Julie H. Hurwitz (P34720)
                                        William H. Goodman (P14173)
                                        GOODMAN & HURWITZ PC on behalf of the
                                        DETROIT & MICHIGAN NATIONAL
                                        LAWYERS GUILD
                                        1394 E. Jefferson Ave.
                                        Detroit, Michigan 48207

50

(313) 567-6170/Fax: (313) 567-4827
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com
Attorneys for Plaintiffs

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Plaintiffs

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Plaintiffs

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
CONSTITUTIONAL LITIGATION ASSOCIATES
PC
450 W Fort St Ste 200
Detroit, MI 48226
(313) 961-2255/Fax: (313) 961-5999
conlitpc@sbcglobal.net
Attorney for Plaintiffs

# EXHIBIT 6.2

**Notice of Pendency of Bankruptcy Case and Application of the Stay
in *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,*
Case No. 13-CV-11370
[Doc. #29]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief
Negotiator with the City of Detroit; JOSEPH
VALENTI, Co-Chief Negotiator with the
Coalition of Unions of the City of Detroit;
MICHIGAN AFSCME COUNCIL 25; RUSS
BELLANT, President of the Detroit Library
Commission; TAWANNA SIMPSON, LAMAR
LEMMONS, ELENA HERRADA, Detroit
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS,
Pontiac City Council Members; DUANE
SEATS, DENNIS KNOWLES, JUANITA
HENRY AND MARY ALICE ADAMS, Benton
Harbor Commissioners; WILLIAM "SCOTT"
KINCAID, Flint City Council President;
BISHOP BERNADEL JEFFERSON; PAUL
JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan
Chairman, National Action Network; REV.
DR. MICHAEL A. OWENS, REV.
LAWRENCE GLASS, REV. DR. DEEDEE
COLEMAN, BISHOP ALLYSON ABRAMS,
Executive Board, Council of Baptist Pastors of
Detroit and Vicinity,

      Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the
State of Michigan, and ANDREW DILLON, as
the Treasurer of the State of Michigan, acting
in their individual and/or official capacities,

      Defendants.

No. 2:13-cv-11370

HON. GEORGE CARAM STEEH

MAG. R. STEVEN WHALEN

**NOTICE OF PENDENCY OF
BANKRUPTCY CASE AND
APPLICATION OF THE
AUTOMATIC STAY**

Herbert A. Sanders (P43031)
The Sanders Law Firm PC
Attorney for Plaintiffs
615 Griswold Street, Suite 913
Detroit, Michigan  48226
313.962.0099
haslaw@earthlink.net

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
Goodman & Hurwitz PC
Attorneys for Plaintiffs
1394 East Jefferson Avenue
Detroit, Michigan  48207
313.567.6170
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com

Darius Charney
Ghita Schwarz
Center for Constitutional Rights
Attorneys for Plaintiffs
666 Broadway, 7th Floor
New York, New York  10012
212.614.6464
dcharney@ccrjustice.org

Betram L. Marks (P47829)
Litigation Associates PLLC
Attorney for Plaintiffs
30300 Northwestern Hwy, Ste 240
Farmington Hills, Michigan  48334
248.737.4444
bertrammarks@aol.com

Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

John C. Philo (P52721)
Anthony D. Paris (P71525)
Sugar Law Center
Attorneys for Plaintiffs
4605 Cass Ave., 2nd Floor
Detroit, Michigan  48201
313.993.4505
jphilo@sugarlaw.org
tparis@sugarlaw.org

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
Miller Cohen PLC
Attorneys for Plaintiffs
600 West Lafayette Blvd., 4th
Floor
Detroit, Michigan  48226
313.964.4454
richardmack@millercohen.com

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
Constitutional Litigation
Associates PC
Attorneys for Plaintiffs
450 West Fort St, Ste 200
Detroit, Michigan  48226
313.961.2255
conlitpc@sbcglobal.net

_____/

2

## NOTICE OF PENDENCY OF BANKRUPTCY CASE AND
## APPLICATION OF THE AUTOMATIC STAY

On July 18, 2013, the City of Detroit, Michigan filed a petition for relief

under Chapter 9 of Title 11 of the United States Code. (Document 1, *In re City of*

*Detroit, Michigan*, Case No. 13-53846, (Bankr. E.D. Mich.))  In accordance with the

automatic stay imposed by operation of §§ 362 and 922 of the Bankruptcy Code, 11

U.S.C. §362 and 922,  no cause of action filed prior to, or relating to the period prior

to, the Petition Date may be continued or commenced against (i) the City and/or its

employees, or (ii) an officer, employee, or inhabitant of the City, in any judicial,

administrative or other court or tribunal to enforce a claim against the City without

the Bankruptcy Court first issuing an order lifting or modifying the Stay for such

specific purpose.  Further, no related judgment or order may be entered or enforced

against the City without the Bankruptcy Court first issuing an order lifting or

modifying the State for such specific purpose.

On July 25, 2013, the provisions of this automatic stay were extended in all

respects (to the extent not otherwise applicable) to include certain "State Entities"

defined as "the Governor, the State Treasurer and the members of the Loan Board,

collectively with the State Treasurer and the Governor, and together with each

entity's staff, agents and representatives." (Exhibit 1).  Governor Snyder and

Treasurer Dillon are named Defendants in the captioned matter which was filed

prior to the Petition Date and which is subject to this Bankruptcy Court Order

extending the automatic stay.

3

Actions taken while this Stay is in effect and/or in violation of this Stay, including proceedings in this case, are void and without effect.

The Bankruptcy Court for the Eastern District of Michigan has not issued an order lifting or modifying the Stay for the specific purpose of allowing any party in the captioned case to continue this action against the Governor or Treasurer. Under these circumstance, the above-captioned proceeding may not be prosecuted, and no valid judgment or order may be entered or enforced against these "certain State Entities."

These certain "State Entities" will not defend against, or take any other action with respect to, the above-captioned proceeding while the Stay remains in effect.

These certain "State Entities" hereby expressly reserve all rights with respect to the above-captioned proceeding, including, but not limited to, the right to move to vacate any judgment entered in the above-captioned proceeding as void.

Respectfully submitted,

BILL SCHUETTE
Attorney General

s/Denise C. Barton
Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.373.6434
Email: bartond@michigan.gov

Dated: August 7, 2013     P41535

4

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such. I also mailed the foregoing paper via US Mail to all non-ECF participants.

> *s/Denise C. Barton*
> Denise C. Barton (P41535)
> Assistant Attorney General
> Attorney for Defendants
> P.O. Box 30736
> Lansing, Michigan 48909
> 517.373.6434
> E-mail: bartond@michigan.gov

5

# EXHIBIT6.3

**Order**
**Regarding Notice of Pendency of Bankruptcy Case and**
**Application of the Automatic Stay, in**
*Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,*
**Case No.13-CV-11370**
**[Doc. #30]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, et al.,

        Plaintiffs,

                                Case No. 2:13-CV-11370

v.

                                HON. GEORGE CARAM STEEH

RICHARD D. SNYDER et al.,

        Defendants.

_____/

## ORDER REGARDING NOTICE OF PENDENCY OF BANKRUPTCY
## CASE AND APPLICATION OF THE AUTOMATIC STAY [DOC. 29]

On August 7, 2013, defendants filed a Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay. The Notice references the automatic stay imposed by operation of sections 362 and 922 of the Bankruptcy Code, 11 U.S.C. §§ 362 and 922, as well as the order entered by the bankruptcy court on July 25, 2013, which extended the automatic stay to include certain "State Entities" defined as "the Governor, the State Treasurer and the members of the Loan Board . . . ." *In re City of Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.); Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor ("Extension Order"). Governor Snyder and Treasurer Dillon are named defendants in the captioned matter which was filed prior to the petition date and which defendants contend is subject to the bankruptcy court order extending the automatic stay.

Although it is not apparent that any interests of the City of Detroit bankruptcy

-1-

proceedings are implicated in the case, the plain language of the stay order would apply to this lawsuit.

In accordance with the broadly worded Extension Order issued by the bankruptcy court, this court will abide by the stay unless and until such time as an order issues lifting or modifying the stay to permit the captioned matter to proceed. Accordingly,

IT IS HEREBY ORDERED that proceedings in this case are STAYED until further order of the court.

IT IS HEREBY FURTHER ORDERED that this case is CLOSED for administrative and statistical purposes without prejudice because the defendants are covered by the bankruptcy court Extension Order. This closing does not constitute a decision on the merits.

IT IS FURTHER ORDERED that if the bankruptcy stay is removed, or a party obtains relief from the stay, then the case may be reopened upon the motion of any party.

IT IS FURTHER ORDERED that any party may apply to the bankruptcy court for relief from the automatic stay under 11 U.S.C. § 362 or for relief from the Extension Order.

So ordered.

Dated:  August 22, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

-2-

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 22, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,          Chapter 9
                                    Case No. 13-53846
                    Debtor.          Hon. Steven W. Rhodes

_____

**BRIEF IN OPPOSITION TO MOTION FOR RELIEF FROM
ORDER PURSUANT TO SECTION 105(A) OF THE
BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO
CERTAIN (A) STATE ENTITIES,
(B) NON OFFICER EMPLOYEES, AND
(C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Nicole A. Grimm (P74407)
Assistant Attorney General

Steve Howell (P28982)
Special Assistant Attorney
General

Attorneys for Respondents

# TABLE OF CONTENTS

Page

Table of Contents.....................................................................................i

Index of Authorities...............................................................................ii

Introduction ..........................................................................................1

Argument ..............................................................................................3

I.     This Court's Order extending the Chapter 9 Stay applies to
this case. ......................................................................................3

II.    This Court was well within its authority to extend the
automatic stay to this case............................................................6

III.   Petitioners have not demonstrated that imposition of this
Court's stay extension order to the lawsuit is inequitable..............7

Conclusion and Relief Requested...........................................................11

Certificate of Service (e-file)................................................................13

# INDEX OF AUTHORITIES

Page

**Cases**

*A.H. Robins Co. v. Piccinin,*
788 F.2d 994 (4th Cir. 1986)...................................................................6

*Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.),*
963 F.2d 855 (6th Cir. 1992)..................................................................6

*In re Garzoni,*
35 F. App'x 179 (6th Cir. 2002) ..............................................................8

**Statutes**

Public Act 436 ..........................................................................5, 6, 10, 11

# INTRODUCTION

Petitioners are plaintiffs who filed a lawsuit in the United States District Court for the Eastern District of Michigan (the "District Court"), against Governor Rick Snyder and State Treasurer Andy Dillon, commencing Case No. 2:13-cv-11370 (the "lawsuit") and seeking, among other things, "declaratory relief holding that Public Act 436 violates the United States Constitution . . . ." Complaint, *Phillips, et al. v. Snyder, et al.*, No. 2:13-cv-11370, Dkt. No. 1 (E.D. Mich. Mar. 27, 2013), at Pg ID 49.

On August 7, 2013, Respondents, Defendants in the lawsuit, filed a notice advising the District Court of the City of Detroit's petition for bankruptcy and requesting a stay in light of the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (a) State Entities, (b) Non Officer Employees, and (c) Agents and Representatives of the Debtor that was entered on July 25, 2013 (the "Stay Order") which extended the Chapter 9 stay to certain State Entities[1] including Governor Snyder and Treasurer Andrew Dillon. *See*

---

[1] Capitalized terms not defined herein have the meaning given to them in the Stay Order.

Defendants' Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay, *Phillips, et al. v. Snyder, et al.*, No. 213-cv-11370, Dkt. No. 29 (E.D. Mich. Aug. 7, 2013); *see also* Stay Order, Dkt. No. 166, July 25, 2013. The District Court agreed with Respondents' position. *See* Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay, *Phillips, et al. v. Snyder, et al.*, No. 213-cv-11370, Dkt. No. 30 (E.D. Mich. Aug. 22, 2013).

Petitioners now move this Court for an order lifting the stay. In support, Petitioners argue that: (1) this Court's stay extension order does not apply to the lawsuit, either because it only applies to the prepetition lawsuits specifically mentioned in the City's motion for extension of the stay or because it should not be construed to apply to all lawsuits against Governor Snyder and Treasurer Dillon; (2) to the extent this Court's stay applies to the lawsuit, this Court should not have ordered the same; and (3) equity demands that Petitioners' lawsuit not be stayed. Because none of these arguments has merit, Respondents respectfully request that this Court deny Petitioners' request for relief from stay.

# ARGUMENT

## I. This Court's Order extending the Chapter 9 Stay applies to this case.

Petitioners' argument that the Stay Order does not apply to the lawsuit should be rejected. As a threshold matter, the Stay Order does not apply only to the specified Prepetition lawsuits. The Stay Order states, in relevant part:

> 2.    Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 Stay hereby is extended to apply in all respects (to the extent not otherwise applicable) to the State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives) …

> 3.    For the avoidance of doubt, each of the Prepetition lawsuits hereby is stayed ….

Stay Order, Dkt. No. 166, July 25, 2013.

Had the Court intended that the Stay Order apply only to the Prepetition lawsuits, there would have been no need for the broader language in paragraph 2 of the Stay Order, extending the stay to the State Entities. Likewise, if actions against State Entities were stayed only to the extent they applied to the Prepetition lawsuits, the language in paragraph 2 extending the stay to the State Entities "to the extent not otherwise applicable" would be superfluous and without effect in

light of the language in paragraph 3 expressly staying the Prepetition lawsuits.

Nor did the City of Detroit's Motion for Entry of Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (a) State Entities, (b) Non Officer Employees, and (c) Agents and Representatives of the Debtor (the "Stay Motion") extend the Chapter 9 Stay to every case in which State Entities are parties. *See* Stay Motion, Dkt. No. 56, July 19, 2013. Instead, the Stay Motion sought to extend the Chapter 9 Stay "to actions or proceedings against the Governor, the State Treasurer and the members of the Loan Board,…that, directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the city the protections of the Chapter 9 stay." *Id*. at 13. As this Court's stay extension order simply "granted" the relief the Debtor sought in its motion, there is no support for Petitioners' argument that this Court's order extends the Chapter 9 bankruptcy stay to all lawsuits involving the specified State entities, regardless of

the relationship between those lawsuits and Detroit's bankruptcy proceedings.[2]

The Stay Order applies to Petitioner's lawsuit because the lawsuit seeks to interfere with the City's activities in its Chapter 9 case or otherwise deny the City the protections of the Chapter 9 Stay. Petitioners seek a declaration that PA 436 is unconstitutional, which would threaten to constrain Detroit's Emergency Manager's filing of Chapter 9 on behalf of the City of Detroit.  Put another way, were Petitioners to prevail in their lawsuit and Public Act 436 be found unconstitutional, Detroit's Chapter 9 filing would be constrained before this Court has even had the opportunity to determine the City's eligibility.

_____

[2] To the extent Petitioners request that this Court clarify its stay extension order by adopting verbatim the Debtor's language that the stay should apply to all actions "that, directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay," Respondents do not oppose Petitioners' request.

5

13-53846-swr   Doc 2513-1   Filed 01/07/14   Entered 01/07/14 16:08:04   Page 4 of 16
13-53846-swr   Doc 1107   Filed 10/07/13   Entered 10/07/13 17:31:04   Page 4 of 8
307

123

## II. This Court was well within its authority to extend the automatic stay to this case.

Petitioners ask that this Court conclude that the Stay Order is overbroad as applied to their lawsuit or otherwise wrongfully imposed against them. Clearly established law shows the opposite is true.

Although Petitioners argue that applying a stay to a non-debtor third party is inequitable, they appear ultimately to concede that this Court has authority to extend automatic bankruptcy stays to non-debtor entities when, among other circumstances, "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." *Am. Imaging Servs., Inc. v. Eagle-Picher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 861 (6th Cir. 1992). *see also* Petitioners' Brief in Support of Motion, Dkt. No. 1004–4, Sept. 23, 2013 (citing *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986).

Governor Snyder and Treasurer Dillon are parties to the lawsuit which seeks a declaratory judgment that Public Act 436, the law by which all Emergency Managers including Kevyn Orr have been

appointed, is unconstitutional.  Again, if Petitioners prevail, Detroit

may lose its Emergency Manager and the actions he has taken,

including the filing for bankruptcy on Detroit's behalf.  A judgment for

Petitioners would directly or indirectly interfere with this Chapter 9

case as the Emergency Manager has already exercised his authority to

represent the City in bankruptcy proceedings.  With no one to represent

it in bankruptcy proceedings, Detroit's bankruptcy could come to a halt.

Thus, in this case, a "judgment against the third-party defendant will in

effect be a judgment or finding against the debtor."  In sum, as the

lawsuit could directly impact whether the City is eligible to be a

Chapter 9 debtor, and thus, whether the City will be able to adjust its

debts in a Chapter 9 proceeding, the lawsuit is related to this Chapter 9

case and this Court acted within its sound discretion in entering the

Stay Order.

## III.   Petitioners have not demonstrated that imposition of this Court's stay extension order to the lawsuit is inequitable.

Finally, this Court should reject Petitioners' argument that the

equities associated with this case militate against continuing to impose

this Court's stay extension order.  Petitioners offer several "balancing"

tests from which this Court could choose, but each test ultimately leads to the same conclusion: the mere fact that Petitioners raise constitutional questions in their lawsuit does not mean that this Court cannot have or should not have temporarily stayed the lawsuit because of its potential to directly or indirectly interfere with the City of Detroit's Chapter 9 proceeding. As discussed above, Petitioners arguments that the lawsuit is unrelated to the Chapter 9 proceeding simply because they do not seek money damages from the City and the City is not a party should be rejected in light of the reality that Petitioners' requested relief, if granted, could vitiate Detroit's ability to restructure its debts. Likewise, there is no support for Petitioners' claim that temporarily delaying their lawsuit during the pendency of this Court's proceeding would "nullify federal law" as this Court's stay extension order does not deny Petitioners the right to be heard, but merely delays the adjudication of their claims.

While Petitioners instead focus on the tests other jurisdictions have used, it is noteworthy that the five factors enumerated in *In re Garzoni*, 35 F. App'x 179, 181 (6th Cir. 2002) weigh heavily in favor of upholding the Chapter 9 Stay. In that case, the Sixth Circuit explained

that bankruptcy courts consider the following factors in deciding whether to lift a stay: "1) judicial economy; 2) trial readiness; 3) the resolution of preliminary bankruptcy issues; 4) the creditor's chance of success on the merits; and 5) the cost of defense or other potential burden to the bankruptcy estate and the impact of the litigation on other creditors." *Id.* (internal citation omitted).

*First*, Petitioners' lawsuit directly challenges the constitutionality of Public Act 436. As the Court is well aware, various parties who have filed pleadings in opposition to the City's eligibility to be a Chapter 9 debtor have made arguments virtually identical to those raised by Petitioners. Because the lawsuit and this Court's pending determination concerning eligibility address the same issues, judicial economy dictates staying the lawsuit. If Petitioners' claims are heard in a separate forum, concurrent with this Court's adjudication of the eligibility objections, inconsistent adjudications on the same issues could potentially result.

*Second*, the lawsuit is not "trial ready." To the contrary, no discovery has been conducted and while the Defendants have filed a motion to dismiss, it has not yet been decided by the District Court.

The District Court has not yet decided whether there will be a trial, let alone have the parties readied themselves for one to the point that imposition of a stay would be inequitable.

*Third*, as stated above, currently before the Court is the threshold issue of whether the City is eligible to be a Chapter 9 debtor, and various parties have raised challenges to PA 436 in their objections to eligibility which are the same challenges raised in the lawsuit. The fact that the threshold eligibility issue—a preliminary bankruptcy issue— has yet to be decided by the Court weighs heavily against finding cause to grant relief from the Chapter 9 Stay.

*Fourth*, Petitioners have not demonstrated a strong chance of success on the merits of the lawsuit. Indeed, as more fully explained in Respondents' motion to dismiss, Petitioners lack standing to bring the lawsuit in the first place. Yet even if the District Court finds standing, Petitioners' claims universally fail because none of them survive the threshold requirement to state a valid claim for which relief can be granted. *See* Defendants' Motion to Dismiss and Brief in Support, *Phillips, et al. v. Snyder, et al.*, No. 213-cv-11370, Dkt. No. 20 (E.D. Mich. May 16, 2013).

*Fifth,* Petitioners assert that because the City is not a defendant in the lawsuit, and because they seek no money damages from the City, the lawsuit imposes no impact on the City or its property. This assertion ignores the tremendous impact continuation of the lawsuit will have on the process of this Chapter 9 case. As explained above, adjudication in another forum of issues relating to PA 436 threaten to invalidate the City's Chapter 9 filing or at the very least constrain it from moving forward in the proceeding, before this Court has even had the opportunity to determine the City's eligibility.

## CONCLUSION AND RELIEF REQUESTED

Petitioners have not demonstrated that this Court's order does not extend the automatic bankruptcy stay to this case, nor have they shown that this Court could not or should not have issued its order. To the contrary, it is clear that this Court properly extended the bankruptcy stay to this case because the two matters are so intrinsically related that if Petitioners are successful in their lawsuit against Governor Snyder and Treasurer Dillon, Detroit's bankruptcy could be constrained.

Accordingly, Respondents respectfully request that this Court deny Petitioners' motion for relief from this Court's stay extension order.

Respectfully submitted,

*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
SchneiderM7@michigan.gov [P62190]

Nicole A. Grimm (P74407)
Assistant Attorney General
P.O. Box 30736
Lansing, Michigan 48909
(517) 373-6434

Steve Howell (P28982)
Special Assistant Attorney General
500 Woodward Avenue
Suite 4000
Detroit MI 48226
313.223.3500

Attorneys for Respondents

Dated: October 7, 2013

**CERTIFICATE OF SERVICE (E-FILE)**

I hereby certify that on October 7, 2013 I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

*/s/Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan  48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
--------------------------------------------- x
                                              :
In re                                         :          Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                    :          Case No. 13-53846
                                              :
              Debtor.                         :          Hon. Steven W. Rhodes
--------------------------------------------- x
```

## DEBTOR'S OBJECTION TO CATHERINE PHILLIPS, et al.'s MOTION FOR RELIEF FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

The City of Detroit (the "City") objects to Catherine Phillips, et al.'s (collectively, the "Plaintiffs") Motion for Relief from the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor [Dkt. No. 1004] (the "Stay Relief Motion") and supporting brief (the "Stay Relief Brief"). In support of this Objection, the City incorporates in their entirety the arguments set forth in the Brief in Opposition to the Stay Relief Motion, filed contemporaneously herewith (the "Brief in Opposition") and respectfully represents as follows:

## **Objection**

For all of the reasons set forth in the Brief in Opposition, the relief requested in the Stay Relief Motion must be denied.

WHEREFORE, for the reasons set forth herein and in the Brief in Opposition, the City respectfully requests that this Court: (a) deny the Stay Relief Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: October 7, 2013     Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

- 2 -

Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY OF DETROIT

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------- x
                                             :
In re                                        :          Chapter 9
                                             :
CITY OF DETROIT, MICHIGAN,                   :          Case No. 13-53846
                                             :
            Debtor.                          :          Hon. Steven W. Rhodes
-------------------------------------------- x
```

## DEBTOR'S BRIEF IN OPPOSITION TO CATHERINE PHILLIPS, et al.'s MOTION FOR RELIEF FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR[1]

Two days after Mr. Orr formally took office, the Plaintiffs filed the Lawsuit seeking a judgment enjoining Mr. Orr from taking any actions under PA 436 and declaring PA 436 to be unconstitutional. Yet, the Plaintiffs somehow assert that granting them relief from stay to prosecute this Lawsuit to judgment will "not interfere with the progression of the Debtor's bankruptcy case" because the City will not be "in any way affected." Stay Relief Motion at 12; Stay Relief Brief at 14. This is not accurate nor is the timing of the Lawsuit's filing a coincidence. Although some of the Plaintiffs are citizens of municipalities other than the City --

---

[1] Capitalized terms not otherwise defined in this Brief in Opposition have the meanings given to them in the Debtor's Objection, filed contemporaneously herewith.

- 1 -

135

Flint, Pontiac and Benton Harbor -- as the Complaint acknowledges, these municipalities have all had emergency managers for at least two years. The fact that the Plaintiffs did not file the Lawsuit until several years after the appointment of those emergency managers while doing so just two days after Mr. Orr formally took office, cannot be dismissed as mere happenstance. Instead, it is apparent that the Lawsuit is a direct challenge to Mr. Orr's appointment as Emergency Manager and inescapably, an attack on any actions he may take, including his decision to file and prosecute this chapter 9 case.

This Lawsuit, much like the suit and stay relief motion filed by the NAACP [Dkt. No. 740], is an effort to litigate the City's eligibility before a different court in circumvention of the Court's Stay Extension Order and the process this Court adopted to resolve eligibility objections. Granting stay relief to the Plaintiffs will open the flood gates allowing other parties to file suits in different courts which, at the end of the day, would be little more than eligibility challenges to the City's chapter 9 case.[2] As this Court emphasized, litigating eligibility issues in two different courts, simultaneously "does not promote judicial or party efficiency; it is the antithesis. The most efficient way to litigate eligibility in this case is in one court – the bankruptcy court – and then on appeal in the next." Opinion and Order

---

[2] It would appear to be axiomatic that granting stay relief to the Plaintiffs, would also compel the Court to grant stay relief to the NAACP.

- 2 -

Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 19. [Dkt. No. 1039]. As such, the Plaintiffs have not identified any cause, much less sufficient cause, to allow them to proceed with the Lawsuit. Accordingly, the Stay Relief Motion must be denied.

## I.    BACKGROUND

### A.    Appointment of the Emergency Manager

On February 19, 2013, a review team appointed by Rick Snyder, Governor of the State of Michigan (the "Governor"), pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL § 141.1201, et seq. ("PA 72"), issued its report with respect to the City and its finances (the "Review Team Report"). The Review Team Report concluded that a local government financial emergency exists within the City.

On March 14, 2013, in response to the Review Team Report and the declining financial condition of the City and at the request of the Governor, the Local Emergency Financial Assistance Loan Board of the State of Michigan appointed Kevyn D. Orr as emergency financial manager with respect to the City under PA 72, effective as of March 25, 2013.

On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("PA 436"), Mr. Orr

became, and continues to act as, emergency manager with respect to the City under PA 436 (in such capacity, the "Emergency Manager").

On July 18, 2013, the Governor issued his written decision (the "Authorization") approving the Emergency Manager's recommendation that the City be authorized to proceed under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"). Thereafter, also on July 18, 2013, the Emergency Manager issued an order approving the filing of the City's chapter 9 case consistent with the Authorization (the "Approval Order").

In accordance with the Authorization and Approval Order, on July 18, 2013 (the "Petition Date"), the City commenced this case under chapter 9 of the Bankruptcy Code.

### B. The Plaintiffs' Lawsuit in the District Court

On March 27, 2013, the Plaintiffs filed the Complaint against the Governor and State Treasurer Andrew Dillon (collectively, the "Defendants"), commencing Case No. 13-11370 (the "Lawsuit"), in the United States District Court for the Eastern District of Michigan, Southern Division (the "District Court"). The Complaint seeks a judgment (a) declaring PA 436 unconstitutional (Prayer A); (b) enjoining and restraining the Defendants and any present and future emergency managers from implement or exercising authority and powers purportedly conveyed by PA 436 (Prayer B); and (c) invalidating and restraining the terms of

present and future consent agreements entered into under PA 436 that abridge or diminish powers granted to local elected officials under local charters and ordinances (Prayer C). Complaint at 49-50.

Approximately six weeks later, the Defendants filed their Motion to Dismiss (the "Motion to Dismiss"). The Motion to Dismiss is attached as Exhibit A. As set forth in the Motion to Dismiss, the Complaint should be dismissed because the Plaintiffs fail to assert any cognizable legal claims.

On May 30, 2013, the District Court entered an order setting June 27, 2013, as the deadline for the Plaintiffs to file a response to the Motion to Dismiss and July 22, 2013, as the Defendants' reply deadline. The order also set a hearing on the Motion to Dismiss for August 22, 2013.

On August 7, 2013, the Defendants filed a Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay and on August 22, 2013, the District Court entered an order staying the Lawsuit. The order provides that the "plain language" of the Stay Extension Order applies to the Lawsuit.

C.    The Stay Extension Order and Eligibility

On July 19, 2013, the City filed the Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration [Dkt. No. 18] (the

"Eligibility Objection Motion").  The Eligibility Objection Motion requested that the Court set August 19, 2013 ("Objection Deadline"), as the deadline for all parties to file objections to the City's eligibility to obtain relief under chapter 9 of the Bankruptcy Code ("Eligibility Objections").  The Eligibility Objection Motion also asked the Court to set a schedule for hearing and resolving Eligibility Objections.  Eligibility Objection Motion ¶ 28.  The Court granted the Eligibility Objection Motion on August 2, 2013, and entered an order setting the Objection Deadline  ("Objection Order," Dkt. No. 296).  The Objection Order also set a schedule for hearing and resolving Eligibility Objections.

Plaintiffs Charles E. Williams II [Dkt. No. 391], Russ Bellant [Dkt. Nos. 402 & 405], AFSCME [Dkt. No. 505], and numerous creditors and other parties in interest objected to the City's eligibility to be a debtor under chapter 9 of the Bankruptcy Code on the basis that, for one reason or another, PA 436 is unconstitutional on its face or as applied ("PA 436 Eligibility Objections").  See list of objecting parties in the First Amended Order Regarding Eligibility Objections Notices and Hearings and Certifications Pursuant to 28 U.S.C. §2403(a) & (b) [Dkt. No. 821].   The Court conducted a hearing on some of the PA 436 Eligibility Objections and the remainder are scheduled to be heard next week.

On July 19, 2013, the City filed the Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9

- 6 -

Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor [Dkt. No. 56] (the "Stay Extension Motion"). The Stay Extension Motion requested that the Court extend the automatic stay provisions of sections 362 and 922 of the Bankruptcy Code (the "Automatic Stay") to, among others, the Governor and the Treasurer. The City requested such relief to "(a) aid in the administration of [the City's] bankruptcy case, (b) protect and preserve property for the benefit of citizens and stakeholders and (c) ensure that the City is afforded the breathing spell it needs to focus on developing and negotiating a plan for adjusting its debts." Stay Extension Motion at ¶ 15. The City specifically expressed the concern that litigation against the Governor and Treasurer could be used as a means to pursue claims against the City or interfere with the chapter 9 process. Id. at ¶ 22.

Plaintiff AFSCME objected to the Stay Extension Motion on several grounds, including those set forth in the Stay Relief Motion. See AFSCME Objection ¶¶ 45-46 [Dkt. No. 84]. The Plaintiffs and AFSCME also made these same arguments at the hearing during which this Court considered the Stay Extension Motion. See July 24, 2013, Hearing Tr. 1-2, 19-24, 52-54. Relevant portions of the July 24, 2013, Hearing Transcript are attached as Exhibit B.

On July 25, 2013, this Court overruled the objections and entered the Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay

- 7 -

to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor [Dkt. No. 166] (the "Stay Extension Order").  The Stay Extension Order is not subject to appeal and is a final order of the Court.

## II.     ARGUMENT

In support of the Stay Relief Motion, the Plaintiffs advance three arguments: (1) the Stay Extension Order does not apply to the Lawsuit; (2) the Stay Extension Order applies to the Lawsuit but this Court did not have authority to enter it either because it is impermissibly broad or it does not further the purposes of the Bankruptcy Code; and (3) cause exists to grant relief from the Stay Extension Order either because the Complaint alleged constitutional violations or a balance of the equities favors the Plaintiffs.  Again, these are essentially the same arguments asserted by the NAACP in its motion for relief from stay and none have any merit.

### A.     The Stay Extension Order Applies to the Lawsuit

The Plaintiffs misunderstand or misconstrue the relief granted in the Stay Extension Order.  The Lawsuit is precisely the type of case that the Stay Extension Order was intended to cover and, contrary to the Plaintiffs' assertions, it does not stay "all actions" against the Defendants. Stay Relief Brief at 6.  The City addressed these assertions at pages two through five in its brief in response to the NAACP's motion for relief from stay and will not repeat the same arguments here. [Dkt. No. 1044].  The City's Brief in Opposition to the NAACP's motion for relief

from stay is attached as <u>Exhibit C</u>.  Moreover, it appears that the Plaintiffs have

conceded that the Stay Extension Order applies to the Lawsuit since they state that

"No matter what the facts, no matter what the claims against the State, under the

broad language of this Court's *Order*, no lawsuit of any kind can proceed against

the Governor or the State Treasurer until one community—the City of Detroit—

emerges from Bankruptcy." Stay Relief Brief at 15.

### B.    The Court Had Authority to Enter the Stay Extension Order

The Plaintiffs next argue, after conceding that the plain language of the Stay

Extension Order applies to the Lawsuit, that this Court did not have the authority to

enter the Stay Extension Order.  Significantly, the Plaintiffs and AFSCME

previously objected to the Stay Extension Motion on these same grounds.  The

Court overruled the objections and entered the Stay Extension Order.  For the same

reasons the Court articulated in overruling these objections, it should reject the

Plaintiffs arguments here and find that the Stay Extension Order was properly

entered.  Furthermore, the Plaintiffs are precluded from relitigating these same

issues in the context of the Stay Relief Motion. <u>See</u> <u>e.g.</u>, <u>Georgia-Pacific Consumer</u>

<u>Products LP v. Four-U-Packaging, Inc.</u>, 701 F.3d 1093, 1098 (6th Cir. 2012)

(holding that issue preclusion precludes relitigation where (1) the precise issue was

raised and litigated in the prior proceeding; (2) the determination of the issue was

necessary to the outcome of the prior proceedings; (3) the prior proceedings

- 9 -

resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought had a full and fair opportunity to litigate the issue in the prior proceeding).

Moreover, as the Plaintiffs recognize, a bankruptcy court may extend the automatic stay where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." In re Eagle-Picher Indus., Inc., 963 F.2d 855, 861 (6th Cir. 1992) (quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). The Lawsuit seeks a judgment enjoining Mr. Orr from taking any actions under PA 436 and declaring PA 436 to be unconstitutional. Thus, any judgment against the Defendants would in effect be a judgment or finding against the City. As a result, under well-established Sixth Circuit precedent, this Court had the authority to enter the Stay Extension Motion. The Plaintiff's arguments to the contrary must be rejected.

### C. No Cause Exists to Grant Plaintiffs Relief from the Automatic Stay

Finally, the Plaintiffs allege that relief from the Automatic Stay should be granted for "cause." Rather than addressing the concept of cause, as interpreted by courts in this circuit, the Plaintiffs primarily assert that the alleged Constitutional violations take precedence over applying the Automatic Stay to non-debtor

- 10 -

defendants. The Plaintiffs also seem to assert that the Constitutional violations they allege may only be determined by an Article III court and not this Court. However, as this Court recently decided, it has authority to determine constitutional questions and that referral of such questions to an Article III court is not necessary. Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 4-12. [Dkt. No. 1039]. Further, mere allegations of Constitutional violations do not constitute a separate or independent basis to grant relief from the Automatic Stay. Accordingly, no cause (much less sufficient cause) exists to grant the Plaintiffs relief from the Automatic Stay.

1.    **Under Sixth Circuit Law, No Cause Exists to Grant the Plaintiffs Relief from the Automatic Stay**

Although not directly discussed by the Plaintiffs, under the factors generally applied to stay motions in this circuit, there is no cause for relief from stay. Section 362(a) of the Bankruptcy Code provides in relevant part that:

> a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case . . . .

21573415.3\022765-00202

11 U.S.C. § 362(a). The Automatic Stay "is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions." Javens v. City of Hazel Park (In re Javens), 107 F.3d 359, 363 (6th Cir. 1997) (quoting H.R. REP. NO. 95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296).

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to grant relief from the Automatic Stay in limited circumstances. See 11 U.S.C. § 362(d). In particular, section 362(d)(1) of the Bankruptcy Code provides that a party in interest may obtain relief from the Automatic Stay "for cause, including the lack of adequate protection of an interest in property of such party in interest." 11 U.S.C. §362(d)(1).

"The Bankruptcy Code does not define 'cause' as used in [section] 362(d)(1). Therefore, under [section] 362(d), 'courts must determine whether discretionary relief is appropriate on a case by case basis.'" Chrysler LLC v. Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.), 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008) (quoting Laguna Assocs. L.P. v. Aetna Casualty & Surety Co. (In re Laguna Assocs. L.P.), 30 F.3d 734, 737 (6th Cir. 1994)). The determination of whether to grant relief from the Automatic Stay "resides within the sound discretion of the Bankruptcy Court." Sandweiss Law Center, P.C. v.

<u>Kozlowski (In re Bunting)</u>, No. 12-10472, 2013 WL 153309, at *17 (E.D. Mich.

Jan. 15, 2013) (<u>quoting</u> <u>In re Garzoni</u>, 35 F. App'x 179, 181 (6th Cir. 2002)).

> To guide the bankruptcy court's exercise of its discretion
> . . . the Sixth Circuit identifies five factors for the court to
> consider: (1) judicial economy; (2) trial readiness; (3) the
> resolution of the preliminary bankruptcy issues; (4) the
> creditor's chance of success on the merits; and (5) the
> cost of defense or other potential burden to the
> bankruptcy estate and the impact of the litigation on other
> creditors.

<u>Bunting</u>, 2013 WL 153309, at *17 (<u>quoting</u> <u>Garzoni</u>, 35 F. App'x at 181) (internal

quotation marks omitted).  In determining whether cause exists, however, "the

bankruptcy court should base its decision on the hardships imposed on the parties

with an eye towards the overall goals of the Bankruptcy Code."  <u>Plastech</u>, 382 B.R.

at 106 (<u>quoting</u> <u>In re C & S Grain Co.</u>, 47 F.3d 233, 238 (7th Cir. 1995)).

Here, consideration of the these factors confirms that no cause (much less

sufficient cause) exists to justify relief from the Automatic Stay to allow the

Lawsuit to proceed.  With respect to the first factor, the interests of judicial

economy weigh heavily in favor of denying the Stay Relief Motion.  Numerous

parties, including three of the Plaintiffs, have raised similar eligibility issues in this

chapter 9 case that the Plaintiffs seek to litigate in the Lawsuit in front of the

District Court.   As set forth above, litigating eligibility issues in two different

courts, simultaneously "does not promote judicial or party efficiency; it is the

antithesis." Opinion and Order Denying Motion to Stay Proceedings Pending

21573415.3\022765-00202
13-53846-swr   Doc 2510-1   Filed 01/07/14   Entered 01/07/14 18:54:50   Page 14 of 15
13-53846-swr   Doc 2109-1   Filed 01/07/14   Entered 01/07/14 16:28:04   Page 147 of
307                                                                          147

Determination of Motion to Withdraw the Reference at 19. [Dkt. No. 1039].

Accordingly, judicial economy dictates staying the Lawsuit so as to permit this

Court to address the PA 436 Eligibility Objections in the single, unified context of

the eligibility trial.

With respect to the second factor, the Lawsuit is in its preliminary stages.

The Defendants' motion to dismiss remains pending. No discovery has been

taken. Thus, the Lawsuit has not even advanced beyond the pleading stage and is

not trial ready. The third factor also weighs in favor of denying the Stay Relief

Motion as the Court has not even resolved the City's eligibility for relief in this

chapter 9 case. Nothing could be more basic or preliminary to the ultimate

outcome. Further, concerning the fourth factor, as set forth in the Defendants'

motion to dismiss, the Plaintiffs have not demonstrated a likelihood of success on

the merits.

Finally, the fifth factor weighs in favor of denying the Stay Relief Motion.

Although the City is not currently a party in the Lawsuit, the impact that the

Lawsuit may have on the City and its restructuring efforts may require the City to

intervene or otherwise become further involved and take other actions if the Stay

Relief Motion is granted. Requiring the City to defend the Lawsuit in the District

Court would distract the City from its efforts to restructure, diverting its limited

resources at a time when it is both working to negotiate and deliver a plan of

adjustment quickly and engaged in a substantial amount of discovery and litigation (all on its own expedited timeframe) arising in the bankruptcy case itself. The City does not need further impediments to its restructuring efforts. This Court has consistently endeavored to bring all matters which may affect the eligibility of the City before it and have the issues resolved in one forum. Allowing the Lawsuit to proceed in the District Court would cast uncertainty[3] over the eligibility and restructuring process and may chill negotiations among the parties or adversely affect the confirmation of the plan of adjustment. Further, if relief is granted here, it will likely engender further constitutional challenges by other parties in different courts.

In short, allowing the Lawsuit to proceed would undermine the protections of the Automatic Stay and interfere with the City's efforts to restructure. The City sought relief under chapter 9 in part to obtain the "breathing spell" afforded by the Automatic Stay and the consequent protection from its creditors while it restructures its affairs and prepares a plan of adjustment. The City's finances would be further depleted and its personnel distracted from their mission to operate

---

[3] This Court acknowledged that the uncertainty occasioned just by the eligibility objections already before it will likely slow, if not stall entirely, the "City's progress in recovering its financial, civic, commercial, and cultural life and in revitalizing itself." Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 23. [Dkt. No. 1039]. Having the City's eligibility adjudicated simultaneously in two courts obviously compounds that uncertainty.

- 15 -

21573415.3\022765-00202

13-53846-swr   Doc 2510-1   Filed 01/01/14   Entered 01/01/14 18:54:50   Page 15 of 15
13-53846-swr   Doc 2109   Filed 12/17/13   Entered 12/17/13 18:28:04   Page 149 of
307

149

the City for the benefit of its citizens and restructure its affairs if it were denied this

basic protection of chapter 9 and forced to defend itself against the Plaintiffs so

early in the case.  Accordingly, the overall goals of chapter 9 weigh largely in

favor of denying stay relief to the Plaintiffs.

### 2. The Automatic Stay Does Not Deprive the Plaintiffs of their Constitutional Rights

The Plaintiffs also argue that the Automatic Stay, as applied to the Lawsuit,

violates their Fourteenth and Fifth Amendment right to due process.  This

argument misses the point.  The Plaintiffs day in court is not denied but only

delayed.  See Cont'l Ill. Nat'l Bank & Trust Co. of Chicago v. Chicago, Rock

Island & Pac. Ry. Co., 294 U.S. 648, 680-81 (1935) (holding that delaying a

creditor from implementing a contract remedy via a stay issued under the

Bankruptcy Act did not violate the Fifth Amendment's due process requirement).

Indeed, coordinating the Plaintiffs' alleged rights with those of many others is

patently different from depriving the Plaintiffs of those same rights.  In re Singer,

205 B.R. 355, 357 (Bankr. S.D.N.Y. 1997) (noting that the Second Circuit has held

that the automatic stay does not violate due process) (citation and internal

quotation marks omitted); Kagan v. St. Vincents Catholic Med. Ctrs. of N.Y. (In re

St. Vincents Catholic Med. Ctrs. of N.Y.), 449 B.R. 209, 213-14 (Bankr. S.D.N.Y.

2011) (holding that 11 U.S.C. § 362 does not offend the First, Fifth, Tenth, or

Fourteenth Amendments in stay of state FOIA claim) ("[I]f this claim had any

- 16 -

merit, every stay of a judicial proceeding imposed by a Bankruptcy Court would violate the substantive due process rights of the litigants in that proceeding. Clearly this is not the law."). Indeed, the Second Circuit determined that the automatic stay helps balance parties' rights.

> The policy considerations underlying [the automatic stay] are considerable. The automatic stay . . . is designed to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts. The stay insures that the debtor's affairs will be centralized, initially, in a single forum in order to prevent conflicting judgments from different courts and in order to harmonize all of the creditors' interests with one another.

Fid. Mortg. Invs. v. Camelia Builders, Inc. (In re Fid. Mortg. Invs.), 550 F.2d 47, 55 (2d Cir. 1977) (interpreting Bankruptcy Act). Further, the Bankruptcy Code and Rules implementing the automatic stay provide a means to ensure that the stay does not deprive parties of their due process rights, including the opportunity to obtain relief from the stay in this Court if there is sufficient cause to grant relief. Id.

The Plaintiffs argument fails to account for the City's rights, and, when these are added into the equation, the balance of harms to the City against the potential harm to the Plaintiff strongly favors leaving the stay in place at this juncture. The idea that providing the City with "breathing room" to reorganize somehow denies the Plaintiffs their Constitutional rights is simply not true. The

Automatic Stay ensures that the Plaintiff's rights are not enforced to the detriment of both the City and its creditors.

## III. CONCLUSION

For the reasons set forth in this Brief in Opposition, the City respectfully requests that this Court: (a) deny the Stay Relief Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: October 7, 2013                Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939

- 18 -

Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com


ATTORNEYS FOR THE CITY OF DETROIT

21573415.3\022765-00202

EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief Negotiator
with the City of Detroit; JOSEPH VALENTI, Co-
Chief Negotiator with the Coalition of Unions of the
City of Detroit; MICHIGAN AFSCME COUNCIL
25; RUSS BELLANT, President of the Detroit
Library Commission; TAWANNA SIMPSON,
LAMAR LEMMONS, ELENA HERRADA, Detroit
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS, Pontiac City
Council Members; DUANE SEATS, DENNIS
KNOWLES, JUANITA HENRY AND MARY
ALICE ADAMS, Benton Harbor Commissioners;
WILLIAM "SCOTT" KINCAID, Flint City Council
President; BISHOP BERNADEL JEFFERSON;
PAUL JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan Chairman,
National Action Network; REV. DR. MICHAEL A.
OWENS, REV. LAWRENCE GLASS, REV. DR.
DEEDEE COLEMAN, BISHOP ALLYSON
ABRAMS, Executive Board, Council of Baptist
Pastors of Detroit and Vicinity,

       Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the State of
Michigan, and ANDREW DILLON, as the Treasurer
of the State of Michigan, acting in their individual
and/or official capacities,

       Defendants.

No. 2:13-cv-11370

HON. GEORGE CARAM STEEH

MAG. R. STEVEN WHALEN

**DEFENDANTS' MOTION TO
DISMISS UNDER FED. R. CIV. P.
12(B)(1) & (6) AND BRIEF IN
SUPPORT**

_____

Herbert A. Sanders (P43031)
The Sanders Law Firm PC
Attorney for Plaintiffs
615 Griswold Street, Suite 913
Detroit, Michigan  48226
313.962.0099
haslaw@earthlink.net

John C. Philo (P52721)
Anthony D. Paris (P71525)
Sugar Law Center
Attorneys for Plaintiffs
4605 Cass Ave., 2nd Floor
Detroit, Michigan  48201
313.993.4505
jphilo@sugarlaw.org

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
Goodman & Hurwitz PC
Attorneys for Plaintiffs
1394 East Jefferson Avenue
Detroit, Michigan  48207
313.567.6170
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com

Darius Charney
Ghita Schwarz
Center for Constitutional Rights
Attorneys for Plaintiffs
666 Broadway, 7th Floor
New York, New York  10012
212.614.6464
dcharney@ccrjustice.org

Betram L. Marks (P47829)
Litigation Associates PLLC
Attorney for Plaintiffs
30300 Northwestern Hwy, Ste 240
Farmington Hills, Michigan  48334
248.737.4444
bertrammarks@aol.com

Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
Miller Cohen PLC
Attorneys for Plaintiffs
600 West Lafayette Blvd., 4th Floor
Detroit, Michigan  48226
313.964.4454
richardmack@millercohen.com

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
Constitutional Litigation Associates PC
Attorneys for Plaintiffs
450 West Fort St, Ste 200
Detroit, Michigan  48226
313.961.2255
conlitpc@sbcglobal.net

_____/

## DEFENDANTS' MOTION TO DISMISS

Defendants Richard D. Snyder, Governor of the State of Michigan, and Andrew Dillon,

Treasurer of the State of Michigan, move to dismiss Plaintiffs' Complaint for Declaratory and

Injunctive Relief for the following reasons:

1.  Plaintiffs lack standing to bring any of their claims.

2.  2012 Mich. Pub. Acts 436, Mich. Comp. Laws § 141.1541 *et seq*. (P.A. 436), does not
    violate the Due Process Clause or U.S. Const. art. IV, § 4 (Counts 1, 2, 3).

2

3.  P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11).

4.  P.A. 436 does not violate Section 2 of the Voting Rights Act (Count 7).

5.  P.A. 436 does not violate First Amendment free speech and petition rights (Count 8).

6.  The City of Detroit emergency manager appointment of Kevin Orr does not violate the First Amendment right to petition (Count 9).

7.  And P.A. 436 does not violate the Thirteenth Amendment (Count 10).

8.  Defendants sought concurrence from Plaintiffs' counsel but concurrence was not given.

9.  Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed if no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  *Ludwig v. Bd of Trustees*, 123 F.3d 404, 408 (6th Cir. 1997).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not facially plausible.  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

10. Fed. R. Civ. P. 12(b)(1) allows dismissal for lack of subject-matter jurisdiction. It is a plaintiffs' burden to prove jurisdiction.  *Moir v. Greater Cleveland Reg'l Transit Auth*, 895 F.2d 266, 269 (6th Cir. 1990).

Applying the standard of review set out in paragraphs 9 and 10 to each argument in the brief, and for the reasons stated in this motion, Plaintiffs' Complaint fails as a matter of law.

Defendants respectfully request that this Court dismiss Plaintiffs' Complaint in its entirety and with prejudice.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Assistant Attorney General
Attorney for Defendants
Email:  bartond@michigan.gov

Dated:  May 15, 2013

3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief Negotiator
with the City of Detroit; JOSEPH VALENTI, Co-
Chief Negotiator with the Coalition of Unions of the           No. 2:13-cv-11370
City of Detroit; MICHIGAN AFSCME COUNCIL
25; RUSS BELLANT, President of the Detroit                     HON. GEORGE CARAM STEEH
Library Commission; TAWANNA SIMPSON,
LAMAR LEMMONS, ELENA HERRADA, Detroit                         MAG. R. STEVEN WHALEN
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS, Pontiac City
Council Members; DUANE SEATS, DENNIS
KNOWLES, JUANITA HENRY AND MARY
ALICE ADAMS, Benton Harbor Commissioners;
WILLIAM "SCOTT" KINCAID, Flint City Council
President; BISHOP BERNADEL JEFFERSON;
PAUL JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan Chairman,
National Action Network; REV. DR. MICHAEL A.
OWENS, REV. LAWRENCE GLASS, REV. DR.
DEEDEE COLEMAN, BISHOP ALLYSON
ABRAMS, Executive Board, Council of Baptist
Pastors of Detroit and Vicinity,

        Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the State of
Michigan, and ANDREW DILLON, as the Treasurer
of the State of Michigan, acting in their individual
and/or official capacities,

        Defendants.
_____

## BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

Page

Table of Contents ..................................................................................................ii

Index of Authorities ............................................................................................ iv

Concise Statement of Issues Presented ........................................................... viii

Controlling or Most Appropriate Authority...................................................... viii

Introduction ......................................................................................................... 1

Statement of Facts................................................................................................ 1

Argument.............................................................................................................. 3

I.      Plaintiffs lack standing to bring any of their counts..................................... 3

        A.      Individual, Non-Elected Plaintiffs Bellant, Jefferson, Jordan, Holley,
                Williams, Owens, Glass, Coleman, and Abrams lack standing to bring
                Counts 2-8 and 10–11. ................................................................... 3

        B.      Individual, Elected Plaintiffs Simpson, Lemmons, Herrada, Watkins,
                Williams, Seats, Knowles, Henry, Adams, and Kincaid lack standing to
                bring Counts 2–8 and 10–11. ......................................................... 4

        C.      Individual Union Negotiator-Plaintiffs Phillips and Valenti lack standing........... 4

        D.      Council 25 lacks organizational standing to bring any claims. ........................... 5

II.     P.A. 436 does not violate the Due Process Clause or U.S. Const. art. IV, § 4
        (Counts 1, 2, 3). ..................................................................................... 6

        A.      No substantively protected right to collective bargaining is violated.................. 6

        B.      No procedurally protected right to collective bargaining is violated. .................. 7

        C.      No substantive due-process right to elect officials who possess general
                legislative power is violated........................................................... 8

        D.      U.S. Const., art. IV, § 4 is not violated........................................... 9

III.    P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11). .............. 10

        A.      P.A. 436 does not unconstitutionally burden Plaintiffs' fundamental right
                to vote. ................................................................................. 10

  1.  Plaintiffs are not similarly situated to people residing in communities that do not have an emergency manager. ........................ 11

  2.  Plaintiffs have not been denied their fundamental right to vote. ............ 12

  3.  Plaintiffs' fundamental right to vote has not been diluted. ................... 13

 B. P.A. 436 does not discriminate based on race. ................................................ 14

 C. P.A. 436 does not discriminate based on wealth. ............................................ 16

 D. P.A. 436 does not discriminate against local units of government with emergency managers appointed under P.A. 72 or P.A. 4. ............................... 17

IV. P.A. 436 does not violate the Voting Rights Act (Count 7). ........................................ 19

V. P.A. 436 does not violate the First Amendment rights of free speech and petition (Count 8). ................................................................................................................ 20

 A. P.A. 436 does not abridge speech or prohibit Plaintiffs from petitioning the Government. ........................................................................................ 21

  1.  P.A. 436 gives local officials both voice and choice. ........................... 21

  2.  Plaintiffs have no constitutional right to local self-government and an emergency manager is accountable to the State's elected officials. ................................................................................................ 22

  3.  The Petition Clause does not guarantee a particular result. ................... 24

  4.  Rejection of P.A. 4 is not an abridgement of speech or petition and P.A. 436 is not the mirror image of P.A. 4. ......................................... 25

 B. P.A. 436 is also justified by local financial emergencies. ............................... 25

VI. The appointment of Detroit's emergency manager does not violate the right to petition (Count 9). ................................................................................................. 27

VII. P.A. 436 does not violate the Thirteenth Amendment (Count 10). ............................. 28

Conclusion .......................................................................................................................... 29

# INDEX OF AUTHORITIES

Page

**Cases**

*ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004) ........................................ 5

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................................ 20

*Anthony v. State of Michigan*, 35 F. Supp. 2d 989 (E.D. Mich. 1999) ........................................ 1, 6

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ....................................................................................... 4

*Avery v. Midland County,* 390 U.S. 474 (1968) ............................................................................ 32

*Baker v. Carr,* 369 U.S. 186 (1962) ............................................................................................. 16

*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007) .................................................................. 4

*Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004) .............................................................................. 19

*Bivens v. Grand Rapids,* 443 Mich. 391; 505 N.W.2d 239 (1993) ............................................... 13

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................................ 36

*Burdick v. Takushi*, 504 U.S. 428 (1992) .................................................................................... 20

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................................................... 36

*Bush v. Gore*, 531 U.S. 98 (2000) ............................................................................................... 19

*Canfora v. Old*, 562 F.2d 363 (6th Cir. 1977) ............................................................................ 34

*Carlson v. Wiggins*, 675 F.3d 1134 (8th Cir. 2012) .................................................................... 21

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985)………………...…28

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................................................... 6

*City of Memphis v. N.T. Green*, 451 U.S. 100 (1981) .................................................................. 40

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532 (1985) ....................................................... 11

*Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788 (1985) .................................... 36

*Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011) ...................... 18, 27

*Doe v. Mich. Dep't of State Police*, 490 U.S. 491 (6th Cir. 2007) .............................................. 25

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................................................ 17, 25

*Frisby v. Schultz,* 487 U.S. 474 (1988) ................................................................................ 36

*Gomillion v. Lightfoot,* 364 U.S. 339 (1960) ...................................................................... 32

*Graham v. Connor,* 490 U.S. 386 (1989) ............................................................................ 15

*Hadley v. Jr. College Dist. Of Metro. Kansas City, Mo.,* 397 U.S. 50 (1970) .................... 15

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) ............................................... 19

*Holt v. City of Tuscaloosa*, 439 U.S. 60 (1978) ........................................................ 31, 32, 33

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ....................................... 37

*Hunter v. City of Pittsburgh,* 207 U.S. 161 (1907) .................................................. 15, 20, 31, 32

*Johnson v. Harron*, 1995 WL 319943 at 6 (N.D.NY., May 23, 1995) ............................... 39

*Jonson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) ............................................................ 25

*Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir.1998) ......................................... 10

*Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454 (1989) .................................. 13

*Konigsberg v State Bar of California*, 366 U.S. 36 (1961) ............................................... 30

*Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621 (1969) ..................................... 32

*League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008) ................................. 19

*Ludwig v. Bd of Trustees*, 123 F.3d 404 (6th Cir. 1997) .................................................... 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ....................................................... 5, 7

*Mack v. City of Detroit,* 467 Mich. 186; 649 N.W.2d 47(2002) ...................................... 1, 13

*Mallory v. Ohio,* 173 F.3d 377 (6th Cir. 1999) ................................................................ 1, 13

*McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969) ........................................... 19

*Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271 (1984) ................. 35

*Miyazawa v. City of Cincinnati*, 45 F.3d 126 (6th Cir. 1995) ............................................ 6

*Moir v. Greater Cleveland Reg'l Transit Auth*, 895 F.2d 266 (6th Cir. 1990) ................... 4

*Moore v. Detroit School Reform Board*, 293 F.3d 352 (6th Cir. 2002) ............................. 23

*Morgan v. Rhodes,* 456 F.2d 608, 618-620 (6th Cir. 1972)......................................................... 23

*Palko v. Connecticut,* 302 U.S. 319 (1937) ............................................................................... 10

*Papasan v. Allain*, 478 U.S. 265 (1986) ................................................................................... 25

*Parate v. Isibor,* 868 F.2d 821 (6th Cir. 1989) ........................................................................ 11

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000)...................................................................... 18

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005)............................................ 17

*Reynolds v. Sims,* 377 U.S. 533 (1964)........................................................................ 14, 21, 32, 35

*Rodriguez v. Popular Democratic Party,* 457 U.S. 1 (1982)...................................................... 14

*Roth v. Bd. of Regents,* 408 U.S. 564, 572 (1978) ................................................................... 12

*Sailors v. Bd. of Ed. of Kent County,* 387 U.S. 105 (1967) .................................................. 15, 31

*San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1 (1973)................................... 14

*Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463 (1979) ...................... 34

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997)................................................... 36

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ............................................................... 30

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) ................................................. 36

*TriHealth, Inc. v. Board of Com'rs, Hamilton County, Ohio*, 430 F.3d 783 (6th Cir. 2005)16, 18, 22, 24

*United States v. Harriss,* 347 U.S. 612 (1954) ........................................................................ 36

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)............... 17, 18

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ................................................................ 37

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ............................................................... *passim*

## Statutes

42 U.S.C. § 1973.......................................................................................................... 1, 28

42 U.S.C. § 1983............................................................................................................... 1

Mich. Comp Laws § 141.1557............................................................................................ 33

Mich. Comp. Laws § 141.1562.......................................................................................... 33

Mich. Comp. Laws § 117.1 ................................................................................................ 12

Mich. Comp. Laws § 141.1201 ........................................................................................... 2

Mich. Comp. Laws § 141.1547 ................................................................................... 3, 31

Mich. Comp. Laws § 141.1549 ........................................................................ 3, 4, 20, 31

Mich. Comp. Laws § 141.1552 .................................................................................. 3, 12, 39

Mich. Comp. Laws § 423.215 ................................................................................... 12, 13

Mich. Comp. Laws §141.1549 ................................................................................... 26, 28

Public Act 4 .................................................................................................... 2, 30, 39

Public Act 72 .................................................................................................................. 2

Public Act 436 ........................................................................................................ *passim*

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Should all counts be dismissed under 12(b)(1) because Plaintiffs lack standing?

2.      Should the entire Complaint be dismissed under Fed. R. Civ. P. 12(b)(6) because Plaintiffs have failed to state a claim for which relief may be granted under any asserted cause of action?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

<u>Authority</u>:

*ACLU of Ohio Found., Inc., v. Ashbrook*
*Canfora v. Old*
*City of Cleburne v. Cleburne Living Center, Inc.*
*Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*
*FCC v. Beach Commc'ns, Inc.*
*Holt v. City of Tuscaloosa*
*Home Building & Loan Ass'n v. Blaisdell*
*Hunter v. City of Pittsburgh*
*Johnson v. Harron*
*Jonson v. Bredesen*
*Kallstrom v. City of Columbus*
*Lujan v. Defenders of Wildlife*
*McDonald v. Bd of Election Comm'rs*
*Minnesota State Bd. For Community Colleges v. Knight*
*Moore v. Detroit School Reform Board*
*Morgan v. Rhodes*
*Roth v. Bd. of Regents*
*Rodriguez v. Popular Democratic Party*
*Smith v. Arkansas State Highway Employees, Local 1315*
*TriHealth, Inc. v. Board of Comm'rs, Hamilton County, Ohio*
*Village of Arlington Heights v. Metro. Housing Dev. Corp.*
*Washington v. Glucksberg*

## INTRODUCTION

The concept of an emergency manager is not new to Michigan.  Indeed, both major political parties have used such managers to solve local economic difficulties for over 20 years.  But in an economic environment where a disturbingly high number of local governments and school districts are teetering on the brink of financial catastrophe, more flexibility and new tools were required.  The Michigan Legislature responded with 2012 Public Act 436 (P.A. 436), which replaces Michigan's previous emergency-manager law, P.A. 72.

Having lost the political battle to stop P.A. 436 on the steps of the Lansing Capitol, Plaintiffs filed this lawsuit, an action that contains no cognizable legal claims or alternative solutions to the financial problems that have plagued many communities.  Because Plaintiffs' proper remedy is the political process, not the courts, the Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

**Nature of the Case**

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that P.A. 436 violates the U.S. Const. art. IV, § 4 (Republican Form of Government); the First Amendment (freedom of speech and the right to petition government); the Thirteenth Amendment (vestiges of slavery); the Fourteenth Amendment (due process and equal protection); and the Voting Rights Act, 42 U.S.C. § 1973, *et seq*.  (R. 1, Compl., ID# 2.)  Where specific factual allegations are necessary for deciding this motion, those facts have been taken from the Complaint.  Although Plaintiffs allege both facial and as-applied challenges, they make no specific applications of P.A. 436 to any factual occurrence in any paragraph of the Complaint. (Id. at, ¶¶ 122, 128, 138, 139, 151, 152, 167, 168, 182, 183, 194, 195, 206, 207, 208, 220, 229, 230 and 243, ID## 25-28, 30-31, 33-

34, 36-37, 39-40, 42, 44, 46-47, 49.)  Thus, this is only a facial challenge to the constitutionality

of the Act.  And their allegations focus exclusively on the Act's emergency-manager component.

**Michigan's Emergency Financial Manager Acts**

The Legislature enacted P.A. 436 in December 2012, effective March 28, 2013.  P.A. 436

followed the period of time from August 6, 2012 to March 28, 2013, when the State and its

political subdivisions operated under 1990 Mich. Pub. Acts 72 (P.A. 72), Mich. Comp. Laws §

141.1201, *et seq*. which, for purposes of this brief, will be referred to as the original act allowing

the appointment of emergency managers.  P.A. 72 was the operative statute because of the

referendum and rejection of the earlier fiscal responsibility legislation, 2011 Mich. Pub. Acts 4

(P.A. 4).[1]  Under P.A. 72, emergency managers had fewer powers than they previously possessed

under P.A. 4, which contained more tools and authority to rectify financial emergencies in

distressed local communities and school districts.

In December 2012, the Legislature passed P.A. 436—*not* to reenact P.A. 4, previously

rejected by voters but to replace P.A. 72, which was in effect at the time.  The Legislature

reasonably determined that local fiscal stability is necessary for the State's health, welfare, and

safety, and thus, P.A. 436 was necessary to protect those interests as well as the credit ratings of

the State and its political subdivisions.  Mich. Comp. Laws § 141.1543.

**Key Features of P.A. 436**

Unlike earlier laws, P.A. 436 includes two key features:  expanded local government

options—chosen by the local government—to address the financial emergency; a time limit for a

financial manager's appointment; and, authority to petition for removal of a financial manager.

Mich. Comp. Laws §§ 141.1547, 1549(2), 1549(11).  The statute also builds in checks on an

---

[1] See OAG, 2011-2012, No 7267, p 6 (August 6, 2012), available at
http://www.ag.state.mi.us/opinion/datafiles/2010s/op10346.htm.

emergency manager's authority.  See, e.g., Mich. Comp. Laws §§ 141.1552(1)(k) & (u)

(collective bargaining agreements and borrowing money), 1552(4) (selling or transferring public

utilities), 1555(1) (selling of assets), 1559(1) (proposed contracts, sales, and leases).

## ARGUMENT

## I.     Plaintiffs lack standing to bring any of their counts.

This Court should dismiss all counts of Plaintiffs' Complaint for lack of standing.  To

invoke the subject matter jurisdiction of an Article III federal court, individual plaintiffs must

establish, among other things, an injury-in-fact that is concrete and particularized, not conjectural

or hypothetical.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Because

injunctive and declaratory relief is sought, these Plaintiffs also have the heightened burden of

showing a substantial likelihood they will be injured in the future.  *City of Los Angeles, v. Lyons*,

461 U.S. 95, 105 (1983).  The Organizational Plaintiffs have standing only if (a) their members

otherwise have standing to sue in their own right; (b) the interests to be protected are germane to

the organization's purpose; and (c) neither the claim asserted nor the relief requested requires

participation of individual members in the lawsuit.  *ACLU of Ohio Found., Inc. v. Ashbrook*, 375

F.3d 484, 489 (6th Cir. 2004).  None of these requirements are met here.

### A.     Individual, Non-Elected Plaintiffs Bellant, Jefferson, Jordan, Holley, Williams, Owens, Glass, Coleman, and Abrams lack standing to bring Counts 2-8 and 10–11.

This group of Plaintiffs are residents of localities with emergency managers.  (R. 1,

Compl., at ¶10, ¶¶ 21-28, ID## 5, 6-7.)  Yet, they do not allege that Defendants' actions have

injured them in a manner distinguishable from the harm incurred by any resident of any locality

with an emergency manager.

Rather, these Plaintiffs raise only general grievances regarding Defendants' policy

choices related to fiscally distressed local governments.  Their claims are strikingly similar to

3

those considered and rejected by the Supreme Court, the Sixth Circuit, and this Court for lack of

standing.  *See, e.g.*, *City of Los Angeles*, 461 U.S. at 111 (resident challenging police

department's chokehold policy was "no more entitled to an injunction than any other citizen");

*Miyazawa v. City of Cincinnati*, 45 F.3d 126, 126-28 (6th Cir. 1995) (resident challenging city

charter amendment suffers "no harm, nor will she suffer any greater harm than that of any other

voter in the City of Cincinnati"); *Anthony v. State of Michigan*, 35 F. Supp. 2d 989, 1003 (E.D.

Mich. 1999) (Detroit citizens challenging consolidation of Detroit Recorder's Court did not

"articulate how they [were] *particularly* harmed as a result of the merger").

### B.    Individual, Elected Plaintiffs Simpson, Lemmons, Herrada, Watkins, Williams, Seats, Knowles, Henry, Adams, and Kincaid lack standing to bring Counts 2–8 and 10–11.

This group of Plaintiffs lack standing in the same manner as the Plaintiffs discussed in

Section A.  They have met neither the irreducible constitutional requirement of a concrete and

particularized injury nor the applicable, heightened standard requiring a substantial likelihood

that they will be the unique target of future harm.  See *Lujan*, 504 U.S. at 560-61; *City of Los

Angeles,* 461 U.S. at 105.  Their identification as public officials for units of local government

who are subject to P.A. 436 gives them no special status and certainly no greater claim to

standing than any of the other named Plaintiffs in Section A.  (R. 1, ¶ 11-20, I.D. ## 5, 6.)  To

the extent they may purport to bring this action in their official capacities as members of various

local boards, commissions or councils, there is no indication in the Complaint that these local

governmental bodies have authorized any of them to act for or on their behalf.

### C.    Individual Union Negotiator-Plaintiffs Phillips and Valenti lack standing.

For the same reasons, Plaintiffs Phillips and Valenti lack standing to assert Counts 1–11.

While they purportedly belong to the Plaintiffs' labor organization, Plaintiff Michigan AFSCME

Council 25 (Council 25), neither mere union affiliation nor the factual allegations in Plaintiffs'

4

Complaint suggests that Phillips and Valenti have sustained any particularized injury vis-à-vis other residents of localities with emergency managers or union members whose collective bargaining agreements or bargaining "rights" have been impacted.

Indeed, the facts related to the Count I allegations were the basis for an earlier action by Valenti and Council 25 against the City of Detroit, Governor Snyder and Treasurer Dillon.  See, *Valenti, et. al. v. Snyder, et. al.*, USDC-ED No. 12-11461, R. 6, Amended Complaint.  The coalition of unions, for which Valenti was a negotiator and which included Council 25, had negotiated tentative employee concessions with the City of Detroit.  But these terms were never ratified by the City Council and never became effective.  Detroit Charter, §6.408.  The City's duty to collectively bargain was suspended effective April 4, 2012 with the approval of a consent agreement—the Financial Security Agreement—negotiated with the State under P.A. 4.  Thus, the allegations here do not establish any particularized injury to Phillips or Valenti.

Further, with respect to Count 9, the right to petition government, is personal and does not extend to petitioning activity on behalf of others.  C.J.S CONST. LAW § 975 (citing Const. Amend. 1 and *In re Foster*, 253 P.3d 1244 (Colo. 2011); *see also* C.J.S CONST. LAW § 973, citing *Hague v. Committee for Indus. Organization*, 307 U.S. 496 (1939).  Phillip's and Valenti's positions as union negotiators do not provide standing on this claim either.

**D.  Council 25 lacks organizational standing to bring any claims.**

Council 25 also lacks standing to bring Counts 1 – 11.  None of its members have standing to sue for the alleged violations in their own right, as discussed above.  *Ashbrook*, 375 F.3d at 489.  And like Phillips and Valenti, Council 25 lacks standing to bring Count 9 in a representative capacity.

In sum, Plaintiffs collectively lack standing to bring Counts 1 - 11.  Accordingly, this Court should dismiss these Counts with prejudice under Fed. R. Civ. P. 12(b)(1).

## II.   P.A. 436 does not violate the Due Process Clause or U.S. Const. art. IV, § 4 (Counts 1, 2, 3).

### A.   No substantively protected right to collective bargaining is violated.

To properly analyze Plaintiffs' substantive due-process claim based on collective bargaining, this Court is required to carefully identify the fundamental right or liberty interest allegedly implicated. The substantive component of the Due Process Clause protects fundamental rights and liberty interests that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut,* 302 U.S. 319, 326 (1937). Only when a state law infringes these fundamental rights and interests is it subject to strict scrutiny. *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997).

Those fundamental rights and interests accorded substantive protection under the Due Process Clause include matters related to marriage, family, procreation, bodily integrity, and directly related privacy interests. *Id.* at 720; *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1062 (6th Cir. 1998). The Supreme Court is reluctant to expand the concept of substantive due-process further "because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Glucksberg,* 521 U.S. at 720 (quotation marks and citation omitted).

Here, Plaintiffs' claim is not based on a right found within the Bill of Rights or identified by the Supreme Court as "implicit in the concept of ordered liberty" or among those narrowly drawn "liberty" and privacy interests accorded substantive protection. *Id.* at 721. It is premised on an alleged "property interest in their employment, in the terms of employment negotiated pursuant to contract, and in rights granted under state law. . . ." (R. 1, Compl., ¶ 109, ID# 23.) And while state law property interests may give rise to a procedurally protected interest, they do not create a *substantively* protected fundamental right or interest. *Glucksberg,* 521 U.S. at 720.

6

Their substantive claim fails because their alleged substantively protected liberty interest in employment relates only to a generalized right to choose one's field of private employment—"the right of the individual . . . to engage in any of the common occupations of life"—not an expansive right of public employment or to collectively bargain for employment terms. *Roth v. Bd. of Regents,* 408 U.S. 564, 572 (1978); *Parate v. Isibor,* 868 F.2d 821, 831 (6th Cir. 1989).

Plaintiffs fail to allege any plausible substantive due-process right, any facts indicating Defendants interfered with a substantively protected interest, or that P.A. 436 facially violates substantive due process. This claim fails as a matter of law and fact and should be dismissed.

### B.  No procedurally protected right to collective bargaining is violated.

Analysis of Plaintiffs' procedural due-process claim involves a dual inquiry: (1) whether a liberty or property interest exists that the State has interfered with; and (2) whether the procedures attendant upon the deprivation were constitutionally sufficient—that is, provided at a meaningful time and in a meaningful manner. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985); *Matthew v. Eldridge,* 424 U.S. 319, 333, 349 (1976).

But no protected right or interest invoking procedural due process protection is at issue. Plaintiffs' procedural due-process claim is premised on an alleged "property interest in the terms of employment negotiated pursuant to contract, and in rights granted under state law." Plaintiffs rely on Michigan's Public Employment Relations Act (PERA) as creating this right. Mich. Comp Laws § 423.215(1). (R.1, Compl., ¶ 111, ID# 23). PERA provides, "A public employer shall bargain collectively with the representatives of its employees" and "may make and enter into collective bargaining agreements . . . ." *Id.* Yet, the Legislature has also imposed limitations on this duty to collectively bargain. Mich. Comp. Laws § 141.1567(3). See also P.A. 436 Enacting Clause 2; Mich. Comp. Laws §§ 423.215(8), 215(9).

7

The Michigan Legislature has the authority to define and modify the powers, duties and obligations of its local governments, which are derived from the State in the first instance.  Mich. Const. 1963, art. VII, §§ 1-34; *Mack v. City of Detroit,* 467 Mich. 186, 194; 649 N.W.2d 47(2002); Michigan's Home Rule City Act reiterates this principle—all local charters, resolutions and ordinances are subject to and shall not conflict with or contravene the State's Constitution or laws.  Mich. Comp. Laws. § 117.36.

State law confers a procedurally protected benefit, such as the claimed property interest here, only when it mandates specific action in a manner that constrains bureaucratic discretion. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 463 (1989).  Here, no such limitations exist.  First, while a public employer "shall bargain collectively," it retains discretion: "*may* make and enter into collective bargaining agreements."  Mich. Comp. Laws § 423.215(1) (emphasis added).  Second, PERA does not confer a "right to bargain" that infringes the exercise of power under P.A. 436.  Finally, both PERA and P.A. 436 suspend the duty to collectively bargain when the local government is in receivership.  Thus, there is no protected property interest to bargain the terms of public employment and no procedural due process violation.

### C.    No substantive due-process right to elect officials who possess general legislative power is violated.

The "right to vote" is not expressly enumerated in the federal constitution.  *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 35, n. 78 (1973).  Rather, the right to vote is an implicit "fundamental political right" that is "preservative of all rights."  *Reynolds v. Sims,* 377 U.S. 533, 562 (1964).  *Yet,* the Supreme Court has repeatedly recognized that the Fourteenth Amendment does not protect this generalized "right to vote" but instead protects a citizen's right to participate in elections on equal footing with other citizens in the jurisdiction.  *Rodriguez v.*

*Popular Democratic Party,* 457 U.S. 1, 9-10 (1982); *San Antonio,* 411 U.S. at 35.  This right to equal participation is protected by the Equal Protection Clause.  *Rodriguez,* 457 U.S. at 9-10.

In this context, it is perhaps easiest to understand Plaintiffs' substantive due-process claim by first determining what it is *not* about.  (R. 1, Compl., ¶¶ 127, 128, ID## 25, 26.) Plaintiffs do not claim a denial or impairment of their right to vote.  Nor do they claim their vote is not being counted.  Rather, their claim is premised on an undefined, unrecognized right to have the elected official continue to carry out the duties of office—here, legislative powers.  No federal court has ever recognized such a right.  *Rodriquez,* 457 U.S. at 9-10.

Dismissal of this claim is consistent with Supreme Court precedent expressing a reluctance to expand the concept of substantive due process, *Glucksberg,* 521 U.S at 720, and determining that where a more explicit textual context than the generalized Due Process Clause exists within the federal constitution, it must guide the constitutional analysis.  *Graham v. Connor,* 490 U.S. 386, 394-395 (1989).  That Court has determined that the appropriate context is the Equal Protection Clause as applied to the right of equal participation in the voting process.

### D.   U.S. Const., art. IV, § 4 is not violated.

The United States Constitution guarantees that "every State in this Union a Republican form of government."  U.S. Const., art. IV, § 4.  Generally, this guarantee does not extend to local units of government.  Political subdivisions of a State have never "been considered as sovereign entities."  Rather, they are "traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions."  *Sailors v. Bd. of Ed. of Kent County,* 387 U.S. 105, 107-108 (1967) (quoting *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178 (1907)).  Any recognition of a specific form of local government ignores the nature of this traditional relationship.  While the Supreme Court has clarified that a state cannot manipulate its political subdivisions to defeat a federally

9

protected right, the consistent theme of these court decisions is not the form of local government but protection of the "right to vote" against "dilution or debasement." *Sailors*, 387 U.S. at 108; *Hadley v. Jr. College Dist. of Metro. Kansas City, Mo.,* 397 U.S. 50, 54-55 (1970). Significantly, federal courts do not meddle in how States structure their local political subunits. Such political questions and a State's authority to define and regulate its relationship with subordinate political units are generally not justiciable. *Baker v. Carr,* 369 U.S. 186, 208-226 (1962); *Morgan v. Rhodes,* 456 F.2d 608, 618-620 (6th Cir. 1972).

In the absence of any infringement on the Plaintiffs' equal participation in the voting process, Michigan's choice to address the significant issues arising from a local government's financial distress and their temporary impact on the structure of that government do not violate any protected federal right within this Court's purview.  This claim fails as a matter of law.

**III.    P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11).**

Counts 4, 5, 6, and 11 assert that P.A. 436 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  These claims lack merit.

**A.    P.A. 436 does not unconstitutionally burden Plaintiffs' fundamental right to vote.**

The Equal Protection Clause states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).

Plaintiffs assert that P.A. 436 violates their fundamental right to vote protected by the Equal Protection Clause in two ways.  First, they argue the Act "effectively revoke[s] the right to vote by stripping governing authority from local elected officials and transferring such authority

10

to one unelected emergency manager with no accountability to local citizens." (R. 1, Compl., ¶ 148, ID# 29.) Second, they argue the Act "impermissibly dilutes citizen's right to vote in local elections where emergency managers have been appointed" because the emergency managers become vested with all governing authority, leaving local elected officials with only conditional powers and "the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their elected officials." (*Id.* at ¶¶ 149-150, ID# 29.)

### 1. Plaintiffs are not similarly situated to people residing in communities that do not have an emergency manager.

As a threshold matter, Plaintiffs must demonstrate they are similarly situated to the persons allegedly receiving more favorable treatment "in all material respects." *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotation marks omitted); *TriHealth, Inc. v. Board of Com'rs, Hamilton County, Ohio*, 430 F.3d 783, 790-791 (6th Cir. 2005). "Disparate treatment of persons is reasonably justified if they are dissimilar in some material respect." *Id.* In determining whether individuals are "similarly situated," a court should "not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citation omitted).

Here, Plaintiffs, who are residents of local units of government under the administration of an emergency manager (Detroit, Detroit Public School District, Benton Harbor, Pontiac, and Flint), allege they are being disparately treated as compared to residents of local units of government with no emergency manager. That is not true. Each of these named local units, whether under P.A. 72 or P.A. 4, underwent a rigorous review of their financial condition, as assessed against set criteria, and were determined to be in a financial emergency by the Governor

or other executive official. The serious financial problems facing these local units of government cannot be overstated and are laid bare within each letter confirming the financial emergencies.

Plaintiffs are not similarly situated to residents of local units of government that have not been declared to be in a financial emergency. The significant financial condition of their local unit of government is the whole reason an emergency manager was appointed. Thus, comparisons to residents of local units of government in better financial condition do not advance Plaintiffs' claims. Nor do Plaintiffs identify any specific local units of government whose financial conditions are the same as or are sufficiently similar to Plaintiffs' communities that were not placed under the administration of an emergency manager after financial review. As a result, Plaintiffs have failed to make the threshold "similarly situated" showing and their equal-protection claims necessarily fail. *TriHealth, Inc*, 430 F.3d at 790.

## 2. Plaintiffs have not been denied their fundamental right to vote.

The right to vote is a "fundamental" political right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966), and the Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote. *League of Women Voters v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008) (citing *Bush v. Gore*, 531 U.S. 98, 104 (2000)). The specific character of the state's action and the nature of the burden on voters will determine the applicable equal-protection standard. See *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) ("The scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").

If a plaintiff asserts only that a state treated the plaintiff differently than similarly situated voters, without a reciprocal burden on the fundamental right to vote, the rational basis standard of review should apply. *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969) (applying rational basis to a state statute prohibiting plaintiffs' access to absentee ballots where no right-to-vote burden was shown); *Biener*, 361 F.3d at 214-15 (applying rational basis absent a

showing of an "infringement on the fundamental right to vote"). But when a State's classification "severely" burdens the right to vote, strict scrutiny is appropriate. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where the burden is somewhere in the middle, courts apply the "flexible standard" outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick*. See *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011) (applying the balancing test in an equal-protection challenge to the counting of provisional ballots).

Here, there is no suspect class and P.A. 436 does not burden Plaintiffs' right to vote. Residents in local units of government under an emergency manager's administration retain all their rights to exercise the franchise and vote for the candidates of their choice, including candidates for local government, and to have those votes counted. While P.A. 436 may temporarily prohibit a local unit's chief executive officer and governing body from exercising the powers of those offices during the receivership, Mich. Comp. Laws § 141.1549(2), it does not preclude residents from voting candidates into these offices, or the candidates from continuing to hold those offices during the receivership.

Plaintiffs' complaint really is that the officials they have already elected into office are prohibited (at least temporarily) from exercising some or all of the powers and duties they were elected to do—in other words, that their candidates can no longer be effective. But this is not a recognized violation of the right to vote.

### 3. Plaintiffs' fundamental right to vote has not been diluted.

Plaintiffs' claim of vote dilution is that the appointment of an emergency manager in and of itself dilutes Plaintiffs' right to vote, and/or that the appointment of an emergency manager for a particular local unit of government by the Governor, who is elected by voters statewide, dilutes the right to vote of the local residents: "The vote of citizens for their local government in

affected localities is grossly diluted by the statewide participation of the electorate." (R. 1, Compl., ¶ 150, ID# 30.) These arguments are likewise without merit.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. A vote-dilution claim invokes the principle of "one person, one vote," a requirement under the Fourteenth Amendment. See 16B CJS, Constitutional Law, § 1264 (explaining that each person's vote must count the same as any other person's); *see also Carlson v. Wiggins*, 675 F.3d 1134, 1139 (8th Cir. 2012).

P.A. 436 does not violate this requirement. As explained above, residents in local units of government under the administration of an emergency manager retain the same rights to vote for and elect candidates of their choosing, and their votes count the same as residents in other local units of government voting for their local officials. Again, Plaintiffs' real complaint is that their elected candidates will, on a temporary basis, no longer be effective or as effective in their offices. But this "injury," if it exists, does not stem from any recognized violation of the fundamental right to vote or the "one person, one vote" principle.

### B. P.A. 436 does not discriminate based on race.

In Count 5, Plaintiffs vaguely assert that P.A. 436 discriminates based on race. They observe that the Equal Protection Clause "protects [sic] laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights." (R. 1, Compl., ¶ 161. ID# 32.) They then assert that voting in local elections is a fundamental right and that P.A. 436's provisions "effectively revoke the right to vote." *Id.,* ¶ 162, ID# 32. In paragraphs 168 and 169, Plaintiffs allege that P.A. 436 "discriminate[s] in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community" and that Defendants have

14

caused injury by exercising authority under the Act in "various municipalities comprising more than 53% of the State's [African American] population."

Initially, as noted above, Plaintiffs have failed to allege or show that they have been disparately treated compared to citizens of a different race in communities that are similarly situated financially to Plaintiffs' communities. *TriHealth, Inc.*, 430 F.3d at 790. Thus, this race-based equal-protection claim fails.

In addition, P.A. 436 does not embody a racial classification. Neither does it say or imply that voters are to be treated differently on account of their race. The purpose of the Act—resolving financial emergencies within local units of government—encompasses any local unit of government in financial distress, regardless of the racial makeup of its population. As a result, P.A. 436 is facially neutral.

"Where facially neutral legislation is challenged on the grounds that it discriminates on the basis of race, the enactment will be [analyzed under] strict scrutiny only if the plaintiff can prove that it 'was motivated by a racial purpose or object,' or 'is unexplainable on grounds other than race.'" *Moore v. Detroit School Reform Bd*, 293 F.3d 352, 369 (6th Cir. 2002) (internal quotation marks and citations omitted). So "[p]roving that a law has a racially disparate impact, without more, is [] insufficient to establish a violation of either the Fourteenth or the Fifteenth Amendment." *Id*. at 369, citing *Village of Arlington Heights v. Metro. Housing Dev. Corp*., 429 U.S. 252, 264–65 (1977) (rejecting disproportionate impact as constitutionally infirm).

The Supreme Court has identified five factors relevant to determining whether facially neutral state action was motivated by a racially discriminatory purpose: (1) the impact on particular racial groups, (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that

preceded the action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history. *Village of Arlington Heights*, 429 U.S. at 266–68; see also *Moore,* 293 F.3d at 369-370 (addressing these factors in a challenge against Michigan School Reform Act and finding no equal protection violation). To the extent Plaintiffs' allegations even plead these factors, none of the allegations reveal a racially discriminatory purpose on the part of the Michigan Legislature or the Governor in enacting and signing P.A. 436. As a result, Plaintiffs fail to state a claim under a racial discrimination theory.

### C.   P.A. 436 does not discriminate based on wealth.

In Count 6, Plaintiffs allege that P.A. 436 violates equal-protection principles by discriminating based on wealth. They assert that "[u]nder Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community." (R. 1, Compl., ¶ 181, ID#36.) They further allege that P.A. 436 has been implemented "in various municipalities with disproportionately high poverty rates." (*Id*., ¶ 184, ID# 37.) Plaintiffs thus conclude that P.A. 436 violates equal protection "through provisions of the statute that unduly revoke citizen's right to vote for local officials based on the wealth of their community and themselves . . . ." (*Id*., ¶ 183, ID# 37.)

Once again, these claims fail because Plaintiffs have failed to allege or show they have been disparately treated compared to communities or residents that are similarly situated with respect to wealth (or poverty). *TriHealth, Inc.*, 430 F.3d at 790. And P.A. 436 does not discriminate against local units of government, let alone their residents, based on wealth (or poverty). It is the overall financial condition and prognosis of a local unit of government that will subject it to review and the possible appointment of an emergency manager under P.A. 436, not its wealth or lack thereof. For example, a "wealthy" community whose financial books are in order would not be subject to review under P.A. 436, but neither would a "poor" community

16

whose books are also in good order.  P.A. 436 is directed at rectifying financial mismanagement, which can occur in local units of government of any size and any degree of wealth.

In any event, P.A. 436 does not unconstitutionally burden the right to vote.  Thus, no fundamental right is at issue.  Moreover, wealth-based classifications do not discriminate against a suspect class.  *Jonson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Papasan v. Allain*, 478 U.S. 265, 283-84 (1986)).  So P.A. 436 is subject to rational basis review, if any review applies at all.  *Bredesen*, 624 F.3d at 746.  To survive rational basis scrutiny, P.A. 436 need only be "rationally related to legitimate government interests[,]" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (internal quotation marks and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985) (internal citation omitted).

Michigan has a legitimate government interest in preventing or rectifying the insolvency of its political subdivisions.  The insolvency of a local unit of government threatens the health, safety, and welfare of its residents.  Mich. Comp. Laws §141.1543.  It also threatens the interests of the citizens of this State as a whole because it is detrimental to the State's overall economic condition and credit rating.  *Id.*  P.A. 436 thus survives rational basis review.

> **D.      P.A. 436 does not discriminate against local units of government with emergency managers appointed under P.A. 72 or P.A. 4.**

In Count 11, Plaintiffs assert that P.A. 436 "discriminates against cities and school districts where EFMs and EM[s] have been and are currently in place," because those

17

communities will not benefit from a provision in P.A. 436 that permits local units of government to vote to remove emergency managers after 18 months.  (R. 1, Compl., ¶¶ 240-242, ID## 48.) "The law discriminates against these municipalities requiring them to suffer an additional 18 months with an EM despite their having had such officials in place much longer than this time period."  (*Id.*, ¶ 242, ID# 48.)

    The provision Plaintiffs refer to is Mich. Comp. Laws §141.1549(6)(c), which allows the emergency manager, by resolution, to be removed by a 2/3 vote of the governing body of the local government, and if the local unit has a strong mayor, with strong mayoral approval. Neither P.A. 72 nor P.A. 4 had such a provision.  But P.A. 436, Mich. Comp. Laws §141.1549(10), provides that appointed emergency managers "shall be considered an emergency manager under this act [P.A. 436] and shall continue under this act to fulfill his or her powers and duties."  Thus, beginning March 28, 2013, P.A. 436's effective date, all local units of government currently under the administration of an emergency manager are eligible to use this provision at the expiration of 18 months.

    Plaintiffs argue that because their affected local units of government have already been under the administration of an emergency manager longer than 18 months, it is discriminatory to make these communities wait the additional 18 months to take advantage of this section.  But again, as stated above, to prove an equal-protection claim Plaintiffs must demonstrate that they are being treated disparately as compared to similarly situated persons.  *Ctr. for Bio–Ethical Reform, Inc.*, 648 F.3d at 379.  Plaintiffs have not alleged or shown that they are similarly situated to persons in local units of government with emergency managers newly appointed under the P.A. 436 process.  Moreover, there is no fundamental right involved, and Plaintiffs do

18

not allege discrimination against a suspect class.  Again, the rational-basis standard applies to any review of this particular provision of P.A. 436.  *Bredesen*, 624 F.3d at 746.

The rational-basis standard is met.  The Legislature had a legitimate government interest in both setting a potential 18-month endpoint to a local unit of government's administration by an emergency manager and in not making this option immediately available to communities who have had emergency managers longer than 18 months.  This is because neither P.A. 72 nor P.A. 4 had a similar time limit, and the financial plans put in place by these pre-existing emergency managers were not likely designed to resolve a financial crisis within 18 months.  Thus, subjecting existing local units of government to the additional 18 months allows their emergency managers to modify or amend their plans in light of the new time limitation.  Moreover, P.A. 436 expressly provides these local units of government with the interim alternative of petitioning the Governor to remove an emergency manager who has served *less* than 18 months under P.A. 72.  Mich. Comp. Laws §141.1549(11).  P.A. 436 survives rational basis review, and Plaintiffs have failed to state a claim for relief.

## IV.    P.A. 436 does not violate the Voting Rights Act (Count 7).

Count 7, an alleged violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, also fails to state a claim upon which relief may be granted.  To state a claim for violation of Section 2, a minority group must demonstrate what are commonly referred to as the "*Gingles* factors":  (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (compactness); (2) "that it is politically cohesive" (cohesiveness); and (3) that "the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed – usually to defeat the minority's preferred candidate" (white-bloc voting).  *Mallory v. Ohio*, 173 F.3d 377, 381-382 (6th Cir. 1999) (internal citations omitted).

19

First, Plaintiffs' claims should be dismissed because they have not alleged that they constitute a "minority group" capable of bringing a Section 2 claim. *Id.* Second, Plaintiffs' vote-dilution claim—predicated on the purported "statewide participation of the electorate" in their local governance—does not implicate any of the *Gingles* factors. (R. 1, Compl., ¶ 193, ID# 39.) Indeed, their Complaint is devoid of *any* allegations related to compactness, cohesiveness, or white-bloc voting. Instead, it focuses exclusively on their disagreement with Defendants' policy choice in enacting P.A. 436. Yet, the Sixth Circuit has specifically recognized that regardless of the mechanism alleged to cause vote dilution, the *Gingles* factors *must* be satisfied *Mallory*, 173 F.3d at 386. Accordingly, this Court should dismiss Count 7.

## V.   P.A. 436 does not violate the First Amendment rights of free speech and petition (Count 8).

Count 8 is brought only by individual Plaintiffs, not by Council 25. (R. 1, Compl., ¶¶ 202-203, ID# 41.) The bases for this claim is that P.A. 436 strips the local officials of all authority, mirrors P.A. 4, which was rejected by voter referendum, and improperly vests P.A. 436 powers in previously appointed emergency financial managers. (*Id.* at ¶ 206-207, ID# 42.)[2]

These claims fail for two reasons. First, P.A. 436 neither abridges Plaintiffs' speech nor prohibits them from petitioning their government for the redress of grievances. They can still vote and continue to voice their concerns to their elected officials. Second, even if this Court were to determine that an emergency manager abridges these First Amendment rights, the Act is still constitutional because the abridgement is content-neutral and justified by the financial exigencies of the local governments to which it is applicable.

---

[2] Plaintiffs frame their First Amendment claim in part based on "speech on matters of public concern." But the "public concern" balancing test set out by the United States Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563 (1968), is applicable where an public employee is being disciplined, or subjected to an adverse employment decision, for his or her speech or associations. See *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn., 2005) (citation omitted).

20

### A.   P.A. 436 does not abridge speech or prohibit Plaintiffs from petitioning the Government.

The First Amendment provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const., amend. I.  Freedom of speech, though a fundamental right, is not absolute.  *Konigsberg v State Bar of California*, 366 U.S. 36, 49 (1961).  The right to petition and the right to free speech are separate guarantees, yet they are related and generally subject to the same constitutional analysis.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999)

A threshold issue in any First Amendment analysis is whether there has been an abridgement of First Amendment rights.  Here, for four reasons, Plaintiffs' claims fail at the onset because there is no abridgement of free speech or petition rights.

### 1.   P.A. 436 gives local officials both voice and choice.

An emergency manager is not simply thrust on local elected officials.  Even before a preliminary review is conducted, the local governmental unit is notified and has an opportunity to provide comments to the state financial authority. Mich. Comp. Laws § 141.1544(2).  Once the local unit is under review, it then has an opportunity to provide information concerning its financial condition.  *Id*. at § 1545(2).  If after review it is determined that a financial emergency exists, the local unit may appeal this determination.  *Id.* at § 1546(3).  Once the financial emergency is confirmed, the local government has options, including a consent agreement, an emergency manager, a neutral evaluation process option, or bankruptcy.  *Id*. at § 1547(1)(a)-(d).  Thus, an emergency manager is but one of the choices available to a local unit.  Additionally, the process is only an interim one:  an emergency manager may, by resolution, be removed after 18 months, or earlier if financial conditions are corrected.  *Id.* at § 1549(6)(c), (7), (11).

  **2.**  **Plaintiffs have no constitutional right to local self-government and an emergency manager is accountable to the State's elected officials.**

 "'Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to *meet changing urban conditions*.'" *Holt Civil Club v. City of Tuscaloosa*, 439 U.S. 60, 74-75 (1978) (quoting *Sailors*, 387 U.S. at 110-111 (emphasis added)).  Moreover, "[m]unicipal corporations are political subdivisions of the [s]tate, created as convenient agencies for exercising such of the governmental powers of the [s]tate as may be entrusted to them. . . . The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the [s]tate." *Hunter*, 207 U.S. at, 178-179 (1907).

 Accordingly, a state may take action including destroying the municipal corporation entirely, "conditionally or unconditionally, with or without the consent of the citizens, or even against their protest," and may do so "unrestrained by any provision of the Constitution of the United States." *Id.*  Thus, the U.S. Supreme Court in *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178 (1907), upheld an act authorizing city consolidation and providing for temporary government and payment of the consolidated city's debts.

 Although the Supreme Court has placed limitations on this expansive power—none of which apply here[3]—*Hunter* remains good law.  *Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 47 (1994) (citing *Hunter* and affirming that "ultimate control of every state-created

---

[3] Neither states nor their political subdivisions may draw boundaries that discriminate on an invidious basis, such as race or sex.  *See Gomillion v. Lightfoot,* 364 U.S. 339, 341 (1960)  Also, equal protection prohibits states from restricting or diluting votes in violation of the "one person, one vote" principle announced in *Reynolds v. Sims,* 377 U.S. 533 (1964), and extended to local governments in *Avery v. Midland County,* 390 U.S. 474 (1968).  Too, unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government.  *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626 (1969).  But, as argued above, Plaintiffs have no valid equal protection or Voting Rights Act claims.

22

entity resides with the State ... [and p]olitical subdivisions exist solely at the whim and behest of their State") (internal quotation marks omitted); *Kelley v. Metropolitan County Bd. of Educ. of Nashville & Davidson County, Tenn.*, 836 F.2d 986, 994 (6th Cir. 1987).

Moreover, a State's broad authority does not leave citizens without a voice or petition rights in local government affairs.  In *Holt Civil Club v. City of Tuscaloosa*, 439 U.S. at 73-74, a case upholding Alabama's decision to allow cities to exercise extraterritorial jurisdiction over nearby settlements, the Court recognized that it did not "sit to determine whether Alabama has chosen the soundest or most practical form of internal government possible."  Instead, the "[a]uthority to make those judgments resides in the state legislature, and Alabama citizens are *free to urge their proposals to that body*." *Id*. (emphasis added, citation omitted).

The same is true here.  As was true in *Holt Civil Club*, it is not for this Court to second-guess whether P.A. 436 is the most practical solution.  And as in *Holt Civic Club*, Michigan must continue to respond to evolving economic challenges and in doing so has broad authority over local units of government.  Plaintiffs are free to urge their proposals to their state elected officials—even where an emergency manager has temporarily limited the powers of their local officials.  And they *still* get to vote, *still* get to voice their views about how local government is run, and *still* can seek to replace officials with whom they are dissatisfied.

Significantly too, while the local unit of government is in receivership, emergency managers are accountable to the State's *elected* officials—who, in turn, are accountable to Plaintiffs and other voters.  At the six-month mark and each three months thereafter, the emergency manager must submit an accounting of expenditures, contracts, loans, new or eliminated positions, and his or her financial and operating plan to the Governor, the state treasurer, various legislative representatives of the local government, and the clerk of the local

government.  Mich. Comp Laws § 141.1557 (a)-(h).  The Governor ultimately determines whether the financial emergency has been rectified, *id*. at § 1562(2), and has the power to appoint a new emergency manager, *id.*. at § 141.1564.

In sum, how local government is organized is up to the State.  And the way to change state law is through the political process, not the courts.

### 3.    The Petition Clause does not guarantee a particular result.

The Petition Clause guarantees only that an individual may "speak freely and petition openly" and that he will be free from retaliation by the government for doing so.  *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463, 464–65 (1979) (per curiam). But it does not guarantee that the government will listen or respond, or that a particular petition will be effective.  *Id*. (holding that the state's highway commission did not violate unions' First Amendment petition rights merely because it ignored the union, which it was free to do); *Canfora v. Old*, 562 F.2d 363, 363 (6th Cir. 1977) ("[N]either in the First Amendment [or] elsewhere in the Constitution is there a provision guaranteeing that all petitions for the redress of grievances will meet with success).

Here, Plaintiffs may exercise their petition rights by informing their state elected officials—and even their local officials during the receivership under P.A. 436—of their desires with respect to the passage or enforcement of laws such as P.A. 436.  But they cannot control the outcome, and that is really the essence of their claim.  If they are unhappy with the outcome of their previous attempts to petition the government, their remedy for a law they dislike is at the polls.  *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 285 (1984) (explaining that disagreement with public policy and disapproval of officials' responsiveness is to be registered principally at the polls).

### 4.  Rejection of P.A. 4 is not an abridgement of speech or petition and P.A. 436 is not the mirror image of P.A. 4.

Voters exercised their speech and petition rights when they rejected P.A. 4.  They also exercised their speech and petition rights when their elected officials enacted P.A. 436.  P.A. 436 is not a reenactment of P.A. 4.[4]  It replaces P.A. 72, which was in effect at the time.  And the Legislature determined that P.A. 436 was necessary to ensure local fiscal stability.

This is the political process at work.  Plaintiffs may exercise their speech and petition rights to express their discontent with current elected officials and/or elect new state officials. The Legislature's decision to vest formerly appointed emergency financial managers with P.A. 436 powers represents this same political process.  If Plaintiffs are unhappy with the result of the political process, they can attempt to have their current elected state officials hear and respond to them, or they can seek to elect new officials—again, all part of the political process.

### B.  P.A. 436 is also justified by local financial emergencies.

As courts have recognized, there are free speech compromises that are not unconstitutional.  E.g., *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding a law prohibiting display or distribution of campaign materials within 100 feet of a polling place); *Hill v. Colorado*, 530 U.S. 703, 725 (2000) (upholding a statute making it a misdemeanor to pass out material or counsel within 8 feet of a person entering or leaving a health care facility in order to pass out material or counsel).  That is why courts routinely uphold all manner of restrictions on petitioning, including registration and disclosure requirements for lobbyists, *United States v. Harriss,* 347 U.S. 612, 625 (1954); limiting access to the courts, *Swekel v. City of River Rouge*,

---

[4] However, even if P.A. 436 was a mirror image of P.A. 4, there is no legal prohibition to the Michigan Legislature re-enacting a law identical or similar to one disapproved by referendum. See, e.g. *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84; 610 N.W.2d 597 (2000).

25

119 F.3d 1259, 1263 (6th Cir. 1997); and subjecting petitioning to neutral time, place and manner restrictions consistent with public safety and order, *Buckley v. Valeo*, 424 U.S. 1 (1976).

A free speech violation occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *Frisby v. Schultz,* 487 U.S. 474, 479 (1988).  The test for whether a state actor violated a plaintiff's First Amendment right to free speech is:  (1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard.  *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 797 (1985).

Here, the requisite standard is intermediate scrutiny because P.A. 436 (if it abridges speech at all) is content-neutral.  See *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quotation omitted) ("[T]he government may impose reasonable [content-neutral] restrictions on the time, place, or manner of protected speech, provided the restrictions: (1) 'serve a significant governmental interest;' (2) 'are narrowly tailored;' and (3) 'leave open ample alternative channels for communication of the information.'").  There is no indication that P.A. 436 was intended to suppress any ideas or that it has had that effect.

P.A. 436 satisfies intermediate scrutiny.  The State has a significant and compelling interest in addressing the financial distress of local units of government.  And the Act does not abridge more speech or petition rights than necessary to address that distress.  It gives local elected officials options in solving its difficulties, and if locals choose an emergency manager, provides narrowly tailored procedures for the manager's removal.  Again, Plaintiffs have ample channels to voice their concerns to their state elected officials.  Moreover, the financial exigencies of the local units of government that are subject to the Act justify any temporary

26

abridgment of speech or petition rights.   Indeed, governments exercise emergency powers that allow them to temporarily suspend constitutional rights.

These emergencies are often economic.  As early as 1934, the Supreme Court addressed an economic emergency in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934), and upheld Minnesota's mortgage moratorium law in response to the Great Depression.  The Court noted, "[The] principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court."  *Id.* "When major emergencies strike, the 'law of necessity' is the one rule that trumps all the others." William H. Rehnquist, "All the Laws But One:  Civil Liberties in Wartime" (1998).

In sum, P.A. 436 does not abridge First Amendment free-speech or petition rights, and any alleged abridgement cannot be unconstitutional.  This claim fails as a matter of law.

## VI.   The appointment of Detroit's emergency manager does not violate the right to petition (Count 9).

Count 9 is brought by Council 25, its representative and its negotiator, and alleges abridgment of the First Amendment petition right.  (R. 1, Compl., ¶ 212, 214, ID# 43.)  The basis for this claim is the appointment of the City of Detroit's Emergency Manger, Kevyn Orr, formerly the City's Emergency Financial Manager under P.A. 72.  (*Id.*, ¶ 220, ID# 44-45.) Plaintiffs allege that P.A. 436 allows the Governor and Treasurer to use their powers over local government for their own political and economic benefit.  (*Id.,* ¶ 220(f), ID# 44-45.)

For the same reasons Count 8 fails, Count 9 fails as well.  Plaintiffs have not lost the right to petition their elected state officials or even their Detroit elected officials.  They simply do not have the constitutional right to a particular result.

As to the allegations that P.A. 436 provides the opportunity for Defendants to benefit privately, politically, and economically, they are wholly conclusory.  The Act provides numerous

safeguards against any overreaching of power.  See, e.g., Mich. Comp. Laws §§ 141.1552(1)(k) & (u) (safeguards as to collective bargaining agreements and borrowing money), 1552(4) (safeguards for selling or transferring public utilities), 1555(1) (safeguards for selling of assets), and 1559(1) (safeguards for proposed contracts, sales, and leases).  Count 9 should be dismissed for failure to state a claim.

**VII.   P.A. 436 does not violate the Thirteenth Amendment (Count 10).**

In Count 10, Plaintiffs claim that their Thirteenth Amendment rights have been violated because the communities impacted by the appointment of an emergency manager consist mostly of African-American residents.  This claim should be rejected.

The Thirteenth Amendment bars slavery and involuntary servitude and gives Congress the power to impose legislation that prohibits such actions.  U.S. Const. amend. XIII.  As an initial matter, this claim offers no greater protection than Plaintiffs' equal-protection claim and should therefore be dismissed as redundant.  See *Johnson v. Harron*, 1995 WL 319943 at 6 (N.D.NY., May 23, 1995) ("[I]n the realm of equal protection, the Thirteenth Amendment offers no protection not already provided under the Fourteenth Amendment.")

In any event, there is no violation of the Thirteenth Amendment and no legislation enacted by Congress pursuant to the Thirteenth Amendment.  The official actions challenged in this case all emanate from the impact of legislation to fix financially troubled local units of government.  P.A. 436 does not benefit white citizens within these communities in a way that it does not benefit black citizens.  Nor does P.A. 436 "place[] a burden on black citizens as an unconstitutional 'badge of slavery.'"  *City of Memphis v. N.T. Green*, 451 U.S. 100, 124 (1981).  Quite the opposite, P.A. 436's purpose is to benefit all Michigan citizens, of every race and ethnicity.  Count 10 should be dismissed for failure to state a claim.

## CONCLUSION

For the reasons set forth above, Plaintiffs have failed to state claims upon which relief

may be granted, and the Complaint should be dismissed in its entirety, with prejudice.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434
Dated:  May 15, 2013                     Email:  bartond@michigan.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2013, I electronically filed the foregoing paper with the Clerk of
the Court using the ECF system which will send notification of such.

*s/Denise C. Barton*
Denise C. Barton (P41535)
Attorney for Defendants
E-mail:  bartond@michigan.gov

29

EXHIBIT B

```
IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
        MICHIGAN,              .
                               .        Detroit, Michigan
                               .        July 24, 2013
                  Debtor.      .        10:02 a.m.
. . . . . . . . . . . . . . . .
```

HEARING RE. MOTION OF DEBTOR, PURSUANT TO SECTION 105(a)
OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING
THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
BANKRUPTCY CODE (DOCKET #53) AND MOTION OF DEBTOR, PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN
ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE
ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND
REPRESENTATIVES OF THE DEBTOR (DOCKET #56)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

```
For the Debtor:      Jones Day
                     By:  HEATHER LENNOX
                     North Point
                     901 Lakeside Avenue
                     Cleveland, OH  44114-1190
                     (216) 586-3939

For AFSCME:          Lowenstein Sandler, LLP
                     By:  SHARON L. LEVINE
                     65 Livingston Avenue
                     Roseland, NJ  07068
                     (973) 597-2374

For Syncora         Kirkland & Ellis, LLP
Guarantee and       By:  RYAN BENNETT
Syncora Capital     300 North LaSalle
Assurance:          Chicago, IL  60654
                    (312) 862-2074

For Public Safety   Erman, Teicher, Miller, Zucker &
Unions:                 Freedman, PC
                    By:  BARBARA PATEK
                    400 Galleria Officentre, Suite 444
                    Southfield, MI  48034
                    (248) 827-4100
```

APPEARANCES (continued):

```
For Police and        Clark Hill, PLC
Fire Retirement       By:  ROBERT GORDON
System and            151 South Old Woodward, Suite 200
General Retirement    Birmingham, MI   48009
System of the City    (248) 988-5882
of Detroit:

For the UAW:          Cohen, Weiss & Simon, LLP
                      By:  BABETTE CECCOTTI
                      330 West 42nd Street, 25th Floor
                      New York, NY   10036
                      (212) 356-0227

For the Flowers       Law Offices of William A. Wertheimer
Plaintiffs:           By:  WILLIAM WERTHEIMER
                      30515 Timberbrook Lane
                      Bingham Farms, MI   48025
                      (248) 644-9200

For Nathaniel         In pro per
Brent:                NATHANIEL BRENT
                      538 South Livernois
                      Detroit, MI   48209

For the Phillips      The Sanders Law Firm, PC
Plaintiffs:           By:  HERBERT A. SANDERS
                      615 Griswold, Suite 913
                      Detroit, MI   48226
                      (313) 962-0099

For the State of      Michigan Department of Attorney General
Michigan:             By:  MATTHEW SCHNEIDER
                      525 West Ottawa Street, Fl. 7
                      P.O. Box 30212
                      Lansing, MI   48909
                      (517) 241-8403

For the Webster       McKnight, McClow, Canzano, Smith &
Plaintiffs:              Radtke, PC
                      By:  JOHN R. CANZANO
                      400 Galleria Officentre, Suite 117
                      Southfield, MI   48034
                      (248) 354-9650
```

 1          THE COURT:  All right.  So I will allow 15 minutes

 2   for each of the creditors that have filed objections.  These

 3   are the Michigan Council 25 of AFSCME, Syncora, the UAW

 4   together with Creditors Robbie Flowers, Michael Wells, Janet

 5   Whitson, Mary Washington, and Bruce Goldman, the Detroit

 6   public safety unions, if I can refer them -- refer to them by

 7   that, and the General Retirement System of the City of

 8   Detroit and the Police and Fire Retirement System of the

 9   city.  It doesn't matter to me, counsel, the order in which

10   you proceed, so I will leave that to you to work out.

11          MS. LEVINE:  I'm going to go with alphabetical.

12          THE COURT:  Okay.

13          MS. LEVINE:  Good morning, your Honor.  Sharon

14   Levine, Lowenstein Sandler, for Michigan Council 25 of the

15   American Federation of State, County, and Municipal Employees

16   or AFSCME, as it's been referred to here today.

17          Your Honor, very briefly, it's clear that your Honor

18   has read all the papers, and we very much appreciate that

19   given the short time frame that we've been before this Court.

20   Bankruptcy Code Section 105 is extraordinary relief,

21   extraordinary in that it's only used to enforce rights that

22   already exist under the Bankruptcy Code, so it's not there to

23   create new rights that don't currently exist under the Code.

24   What we have here in a Chapter 9 case, which is more

25   restrictive than, for example, a Chapter 11 case, is the

 1   situation where if, in fact, the state has not properly
 2   authorized the Chapter 9 filing, there are rights that don't
 3   exist under the Bankruptcy Code.  If Chapter 9, as has
 4   historically been seen through the unconstitutional finding
 5   of predecessors to Chapter 9, is really being used here to
 6   avoid state constitutional rights, then Chapter 9 in and of
 7   itself is potentially unconstitutional.  If not, it has to be
 8   construed narrowly in order to read it constitutionally.  We
 9   would respectfully submit that using 105 to find rights that
10   don't otherwise exist, particularly of a constitutional
11   nature, is an extremely broad use of 105.  This isn't a
12   situation where we're saying to the controller or the
13   governor or Mr. Orr, you know, don't respond to discovery
14   requests in a state court action in a foreign jurisdiction
15   because we need your attention here.  We're taking away very
16   fundamental constitutional rights.
17            Secondly, your Honor, if, in fact --
18            THE COURT:  So your argument about the narrow
19   application of Section 105 in this case is really a result of
20   the fact that it's a Chapter 9.
21            MS. LEVINE:  Yes, your Honor.
22            THE COURT:  It's not an argument that's based on
23   Section 105, per se.
24            MS. LEVINE:  Yes, your Honor.  In a Chapter 11
25   you'll have circumstances, for example, where even in the

1 broader case of a Chapter 11, you won't use Article -- you

2 won't use Section 105 to grant a casino license or a liquor

3 license or tell a utility board they can't change rates, but

4 we have an even narrower situation here because we're in

5 Chapter 9.

6        Two, Chapter 9 can't be used if, in fact, the state

7 has not authorized under its constitution and its laws the

8 Chapter 9 filing.  The Chapter 9 filing here is arguably

9 flawed because it intends to go after the pensions.  If it

10 goes after the pensions, it arguably violates the state

11 constitution and can't be before this Court, so, again, the

12 issue with regard to whether or not we have an appropriate

13 state constitutional flaw -- sorry.  The issue with regard to

14 whether or not we have an appropriate filing is necessarily

15 limited by whether or not we have an appropriate state -- we

16 have an inappropriate state constitutional authorization.  If

17 we have an inappropriate state constitutional authorization,

18 that is not simply an implementation tool under 105.  That

19 is, in essence, a substantive right that's being creative --

20 created under 105 that does not exist in the state court.

21        In addition to that, your Honor, and also

22 importantly, three, individual citizens of the City of

23 Detroit have the absolute right to protect their own

24 constitutional rights.  If we say to them they can't go to

25 the state courts that are there for the protection of their

1   constitutional rights in part, then we are -- then we're

2   using 105 again way more broadly than it gets used in the

3   ordinary course as simply an implementation tool.  We're

4   creating more substantive rights.  And while this Court

5   has --

6          THE COURT:  Well, but why isn't the extended stay

7   that the city seeks here simply a procedural mechanism to

8   funnel such challenges to the Bankruptcy Court and,

9   therefore, does not have the effect of denying citizens or

10  other creditors of their rights to have their constitutional

11  claims heard?

12         MS. LEVINE:  Your Honor, if this Court is a court of

13  secondary jurisdiction, no disrespect, with -- but if you

14  look at federalism, comity, abstention, and the state courts

15  are the courts of primary jurisdiction, we would respectfully

16  submit that unlike, for example, determining in a Chapter 11

17  case that there's a validly perfected security interest

18  because you've looked at state law and the UCC is properly

19  filed, we have a very fundamental right here that this Court

20  is being asked to address, so what we're saying is instead of

21  going to the court that's primarily responsible, we're going

22  to come into this Court instead, and it's not as if there's

23  delay or uncertainty with regard to the fact that those

24  matters are going to get heard and considered quickly.  We

25  already have state court litigation pending, and the state

1  appellate courts are poised and ready to rule, so there's no

2  reason to divest them of that appropriate jurisdiction under

3  concepts of federalism, comity, and abstention and move that

4  here to a court of secondary jurisdiction on those issues.

5      Your Honor, fourth, with regard to the form over

6  substance, the procedural arguments with regard to 105, in

7  certain circumstances where 105 is being used for things like

8  stopping discovery or minimal things like that, that's one

9  set, but the Federal Rules of Civil Procedure are put in

10 place in order to protect parties and provide due process.

11 There can't be a more fundamental situation where you need to

12 enforce those types of rights than when you're dealing with

13 basic fundamental constitutional rights, and we respectfully

14 submit that even though there are circumstances where

15 expediency mandates the use of 105 quickly, this is not one

16 of those circumstances.

17     Your Honor, the breathing spell under 105 -- the

18 breathing spell under the Bankruptcy Code and the use of 105

19 to extend the breathing spell is only appropriate if, in

20 fact, the underlying bankruptcy is an appropriate bankruptcy.

21 The idea that there's a breathing spell to continue what is

22 potentially an unconstitutional or illegal -- not

23 intentionally, no motive or anything, your Honor, but --

24 proceeding is clearly not anything that 105 was designed to

25 implement.

1       Your Honor, we would respectfully submit that these

2    are very, very fundamental rights, and unlike a Chapter 11

3    case where you have a defined benefit plan where if, in fact,

4    it is terminated, there's federal insurance under the PBGC up

5    to $57,000, or if you have a multi-employer plan, even if an

6    employer withdraws, the beneficiaries themselves are

7    protected, here our members who participate at most are at or

8    below $19,000 a year.  Clearly there's no safety net.  These

9    issues are hard issues.  The collateral advantage to sending

10   this back to the state court for an appropriate decision is

11   that the conversations which we believe should have been

12   happening more robustly before the filing could happen now.

13   We respectfully -- we thank your Honor for the time, and we

14   appreciate your Honor's consideration.

15          THE COURT:  Thank you.  Sir.

16          MR. BENNETT:  Good morning, your Honor.  Ryan

17   Bennett of Kirkland & Ellis on behalf of Syncora Guarantee

18   and Syncora Capital Assurance.  Your Honor, as we attempted

19   to describe in our papers, my client insures, in some cases

20   owns certain securities called the certificates of

21   participation, which were taken out in 2006 to fund some of

22   the city's pension liabilities.  We also insure a swap --

23   four swaps related to those securities that are tied to the

24   interest rate, the floating interest rate associated with

25   them.

1           THE COURT:  Um-hmm.

2           MR. BRENT:  However, this is the city's option.

3 This isn't a requirement of law that they indemnify these --

4           THE COURT:  Um-hmm.

5           MR. BRENT:  -- just as -- my lawsuit is also against

6 various state actors within the State of Michigan, which --

7 but, again, their wanting to extend this to them would

8 prevent me from litigating my claims against the state

9 officials that have already been denied immunity, and it is

10 currently pending.  Those portions they've appealed to the

11 Circuit Court.  So now that they're trying to extend this

12 stay, now the Sixth Circuit Court of Appeals case of <u>Brent</u>

13 versus <u>Wayne County, et al.</u> will be stayed as well where the

14 different state defendants -- state employees have uphill

15 decision to deny their qualified and absolute immunity.

16           THE COURT:  The defendants in your particular suit

17 are both city employees and other defendants are state

18 employees?

19           MR. BRENT:  Yes, and there's also state contractors

20 involved in the lawsuit.

21           THE COURT:  Contractors also.  Thank you, sir.

22 Would anyone else like to be heard?

23           MR. SANDERS:  Good morning, your Honor.  My name is

24 Herb Sanders, and I represent the plaintiffs in the case of

25 <u>Phillips</u> versus <u>Snyder</u> pending before this Court, Case Number

1    2:13-CV-11370, before Judge Steeh. That is a case that

2    challenges the constitutionality of PA 436. Motions for

3    summary -- for at least one summary disposition or summary

4    judgment argument have been scheduled. As I initially read

5    the request for stay extension motion filed by the city, it

6    appeared that the city was seeking an extension of stay

7    concerning financial matters that were being litigated, but

8    pursuant to the oral presentation of the city's attorney, it

9    concerns me when she has indicated -- and I paraphrase --

10    that she seeks relief concerning any litigation that might

11    interfere with the city's rights as a Chapter 9 debtor. And

12    I would suggest to the Court to the extent that it might be

13    proposed or suggested that the litigation which I have

14    referenced in which the constitutionality of PA 436 is to be

15    determined by another judge in this court interferes with the

16    rights of the city as a Chapter 9 debtor, that that case not

17    be included as part of the stay order that this Court would

18    issue. I believe it's imperative to this community, to this

19    state that those issues be determined and, in fact, should

20    probably be determined before the bankruptcy proceeds, but I

21    would encourage the Court to not give a broad order if any

22    order were to issue that would be inclusive of matters that

23    are not financial matters such as there are other matters

24    that I know that the union, AFSCME, and others are a part of

25    seeking FOIA requests from the city, injunctive relief as it

1  relates to these types of matters, and I would ask the Court

2  to consider not giving such a broad order --

3          THE COURT:  Um-hmm.

4          MR. SANDERS:  -- that that type of information could

5  not be obtained and we could not have a determination as to

6  the constitutionality of PA 436 by this Court.

7          THE COURT:  Um-hmm.

8          MR. SANDERS:  Thank you, your Honor.

9          THE COURT:  Thank you.  Sir, can you just give me

10  your name again, please?

11          MR. SANDERS:  Herb Sanders.

12          THE COURT:  Mr. Sanders.  Thank you, sir.

13          MR. SCHNEIDER:  May it please the Court, Matthew

14  Schneider, chief legal counsel to the Attorney General.  I'm

15  here on behalf of the State of Michigan.  Your Honor, I'm

16  here for a very, very limited purpose.  As counsel to the

17  debtor has indicated, they are not seeking to abrogate the

18  exceptions in Section 362(b), and I know that this is a

19  motion regarding Section 362, so our position is is that if

20  the Court is, indeed, inclined to grant the motion regarding

21  the stay, that the Court's order reflect that nothing in the

22  Court -- nothing what the Court is doing will actually

23  abrogate the exceptions afforded under 362(b).

24          THE COURT:  Is there a specific exception you're

25  concerned about?

EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

--------------------------------------------- x
:
In re                            :          Chapter 9
:
CITY OF DETROIT, MICHIGAN,  :          Case No. 13-53846
:
          Debtor.         :          Hon. Steven W. Rhodes
x

---

## DEBTOR'S BRIEF IN OPPOSITION TO PETITION FOR ORDER LIFTING STAY[1]

Six weeks after the Emergency Manager's appointment became effective, the Plaintiffs filed the Lawsuit seeking a judgment declaring not only the Emergency Manager's appointment to be invalid, but all actions he has taken, including the filing of this chapter 9 case, to be unenforceable. Yet, the Plaintiffs somehow assert that granting them relief from stay to prosecute this Lawsuit to judgment will have "no effect whatsoever on the City's ability to reorganize" because it is "completely unrelated" to the chapter 9 case.  Stay Relief Brief at 3, 8. This is not accurate nor is the timing of the Lawsuit's filing a coincidence. The Stay Relief Motion is nothing more than a thinly veiled attempt to litigate the

---

[1] Capitalized terms not defined in this Brief in Opposition, have the meanings given to them in the City's Objection to Petition for Order Lifting Stay, filed contemporaneously with this brief.

City's eligibility before a different court in circumvention of the Court's Stay Extension Order and the process this Court adopted to resolve eligibility objections. The Plaintiffs have not identified any cause, much less sufficient cause, to allow them to proceed with the Lawsuit. Accordingly, the Stay Relief Motion must be denied.

## ARGUMENT

In support of the Stay Relief Motion, the Plaintiffs advance three arguments: (1) the Stay Extension Order does not apply to the Lawsuit, either because it did not specifically identify the Lawsuit or because it cannot be read so broadly as to include the Lawsuit; (2) the Court did not have the authority to enter the Stay Extension Order; (3) the Plaintiffs have demonstrated cause for relief from the Automatic Stay. None of these arguments have any merit.

## I.     The Stay Extension Order Applies to the Lawsuit

The Plaintiffs misunderstand or misconstrue the relief granted in the Stay Extension Order. The Lawsuit is precisely the type of case that the Stay Extension Order was intended to cover and, contrary to the Plaintiffs' assertions, it does not provide the Defendants "complete immunity from all litigation." Stay Relief Brief at 9.

The Plaintiffs devote much of the Stay Relief Motion in a misguided attempt to argue that only a limited set of actions within the definition of "Prepetition

Lawsuits" are covered by the Stay Extension Order. The Plaintiffs reason that, because the Lawsuit is not covered by the definition of "Prepetition Lawsuits," that case is not subject to the Stay Extension Order. Stay Relief Brief at 8.

The Plaintiffs quote only paragraph 3 of the Stay Extension Order which states: "For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed, pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court." This statement clarifies that a small group of three "Prepetition Lawsuits" are included in the relief granted and therefore are stayed. But nowhere does this statement limit the scope of the relief sought or obtained so that it would apply only to these three Prepetition Lawsuits.

The primary relief is granted in the prior paragraphs of the Stay Extension Order. Paragraph 1 states, without reservation or limitation of any kind, that the Stay Extension Motion is "granted." Paragraph 2 of the Stay Extension Order then states broadly that:

> Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 stay hereby is extended in all respects (to the extent not otherwise applicable) to the State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), the Non-Office Employees and the City Agents and Representatives.

As such, the Stay Extension Order makes clear that the Automatic Stay was extended to the Governor and Treasurer to stay any and all cases that "have the

direct or practical effect of denying the City the protections of the" Automatic Stay

so as to aid the City in the administration of its bankruptcy case and ensure the

City is afforded the breathing spell it needs to focus on developing and negotiating

a plan for adjusting its debts. See Stay Extension Motion at ¶ 15. This District

Court judge in the Lawsuit agreed, finding, after review of an objection by the

Plaintiffs, that "the plain language of the stay order would apply to this lawsuit."[2]

Stay Relief Motion, Exhibit A.

If the Lawsuit were to continue, and if the District Court were to grant

judgment in favor of the Plaintiffs, it is almost certain that the Plaintiffs (and

others) would argue before this Court that the decisions and actions of the

Emergency Manager – including the filing and prosecution of this chapter 9 case –

are void and of no effect. Reading the prayer for relief in the Amended Complaint

is all that is necessary to reach that conclusion. Reduced to its basics, the Lawsuit

is yet another vehicle to challenge the City's eligibility for chapter 9 relief or

otherwise attempt to interfere with the City's restructuring efforts. Such a result

---

[2] The Plaintiffs may not re-litigate this issue in this Court. See e.g., Georgia-Pacific
Consumer Products LP v. Four-U-Packaging, Inc., 701 F.3d 1093, 1098 (6th Cir.
2012) (holding that issue preclusion precludes relitigation where (1) the precise
issue was raised and litigated in the prior proceeding; (2) the determination of the
issue was necessary to the outcome of the prior proceedings; (3) the prior
proceedings resulted in a final judgment on the merits; and (4) the party against
whom estoppel is sought had a full and fair opportunity to litigate the issue in the
prior proceeding).

would have the direct and practical effect of denying the City the protections of the Automatic Stay and "interfere with the City's activities in this chapter 9 case" (Stay Extension Motion at ¶ 20) – the precise result that the Stay Extension Order was seeking to avoid. Furthermore, this Court has assiduously and correctly endeavored to consolidate all possible objections to the eligibility of the City to seek chapter 9 relief before it and to avoid the exact result that would be occasioned if stay relief were to be granted to the Plaintiffs to permit an attack on PA 436 and all that implicates. Thus, the Plaintiffs' arguments that either the Stay Extension Order does not apply to the Lawsuit or that it is too broad to be enforced, fail. Stay Relief Brief at 9. Accordingly, as the District Court has already found, the Stay Extension Order applies to the Lawsuit.

## II. The Court Had Authority to Enter the Stay Extension Order

The Plaintiffs also argue that the Court did not have the authority to enter the Stay Extension Order. This is nothing more than a collateral attack upon the Stay Extension Order. Similar arguments were timely raised by other parties and rejected by this Court.[3] As the Plaintiffs recognize, a bankruptcy court may

---

[3] Other parties have raised similar objections to the Stay Extension Motion. See Dkt. No. 84 (the "AFSCME Objection"), ¶ 45-46 (arguing no identity of interests between the City and State Entities); Dkt. No. 141 (the "Retirement Systems Objection"), pp. 16-17 (same, and adding the argument that "[a] judgment obtained in any one of [certain pre-petition lawsuits against the Governor, the Emergency Manager, and others] will not be a judgment against the City. . . ."); see also Dkt. No. 146 (the "Flowers Objection"), ¶ 4 (arguing that "[a]t no point have the
*Continued on next page.*

extend the automatic stay where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." In re Eagle-Picher Indus., Inc., 963 F.2d 855, 861 (6th Cir. 1992) (quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). The Lawsuit seeks a judgment against the Defendants declaring not only the Emergency Manager's appointment to be invalid, but all actions he has taken, including the filing of this chapter 9 case, to be unenforceable. Thus, any judgment against the Defendants would in effect be a judgment or finding against the City. As a result, under well-established Sixth Circuit precedent, this Court had the authority to enter the Stay Extension Motion. The Plaintiff's arguments to the contrary must be rejected.

## III. No Cause Exists to Grant Plaintiffs Relief from the Automatic Stay

Section 362(a) of the Bankruptcy Code provides in relevant part that:

> a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the

---

*Continued from previous page.*
*Flowers* plaintiffs sued . . . or sought any relief against" the City, its officials, or employees). The Debtor addressed these arguments in its reply (Dkt. No. 128, ¶¶ 6-8). The Plaintiffs add nothing to this issue by raising these same arguments again.

debtor that arose before the commencement of the case . .
. .

11 U.S.C. § 362(a).  The Automatic Stay "is one of the fundamental debtor

protections provided by the bankruptcy laws. It gives the debtor a breathing spell

from his creditors.  It stops all collection efforts, all harassment, and all foreclosure

actions." <u>Javens v. City of Hazel Park (In re Javens)</u>, 107 F.3d 359, 363 (6th Cir.

1997) (quoting H.R. REP. NO. 95-595, at 340 (1978), reprinted in 1978

U.S.C.C.A.N. 5787, 6296).

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to

grant relief from the Automatic Stay in limited circumstances.  <u>See</u> 11 U.S.C. §

362(d).  In particular, section 362(d)(1) of the Bankruptcy Code provides that a

party in interest may obtain relief from the Automatic Stay "for cause, including

the lack of adequate protection of an interest in property of such party in interest."

11 U.S.C. §362(d)(1).

"The Bankruptcy Code does not define 'cause' as used in [section]

362(d)(1).  Therefore, under [section] 362(d), 'courts must determine whether

discretionary relief is appropriate on a case by case basis.'"  <u>Chrysler LLC  v.

Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.)</u>, 382 B.R.

90, 106 (Bankr. E.D. Mich. 2008) (<u>quoting</u> <u>Laguna Assocs. L.P. v. Aetna  Casualty

& Surety Co. (In re Laguna Assocs. L.P.)</u>, 30 F.3d 734, 737 (6th Cir. 1994)).  The

determination of whether to grant relief from the Automatic Stay "resides within

the sound discretion of the Bankruptcy Court." Sandweiss Law Center, P.C. v.

Kozlowski (In re Bunting), No. 12-10472, 2013 WL 153309, at *17 (E.D. Mich.

Jan. 15, 2013) (quoting In re Garzoni, 35 F. App'x 179, 181 (6th Cir. 2002)).

> To guide the bankruptcy court's exercise of its discretion
> . . . the Sixth Circuit identifies five factors for the court to
> consider: (1) judicial economy; (2) trial readiness; (3) the
> resolution of the preliminary bankruptcy issues; (4) the
> creditor's chance of success on the merits; and (5) the
> cost of defense or other potential burden to the
> bankruptcy estate and the impact of the litigation on other
> creditors.

Bunting, 2013 WL 153309, at *17 (quoting Garzoni, 35 F. App'x at 181) (internal

quotation marks omitted).  In determining whether cause exists, however, "the

bankruptcy court should base its decision on the hardships imposed on the parties

with an eye towards the overall goals of the Bankruptcy Code." Plastech, 382 B.R.

at 106 (quoting In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995)).

Here, consideration of the these factors confirms that no cause (much less

sufficient cause) exists to justify relief from the Automatic Stay to allow the

Lawsuit to proceed.  With respect to the first factor, the interests of judicial

economy weigh heavily in favor of denying the Stay Relief Motion.  Numerous

parties have raised similar eligibility issues in this chapter 9 case[4] (the Plaintiffs

not being one of them) that the Plaintiffs seek to litigate in the Lawsuit in front of

---

[4] See e.g., The City's Consolidated Reply to Objection to the Entry of an Order for
Relief at 38-44, 89, 95-96, 98. [Dkt. No. 765].

the District Court.   As this Court emphasized, litigating eligibility issues in two different courts, simultaneously "does not promote judicial or party efficiency; it is the antithesis. The most efficient way to litigate eligibility in this case is in one court – the bankruptcy court – and then on appeal in the next." Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 19. [Dkt. No. 1039].  Accordingly, judicial economy dictates staying the Lawsuit so as to permit this Court to address the PA 436 Eligibility Objections in the single, unified context of the eligibility trial.

With respect to the second factor, the Lawsuit is in its preliminary stages. The Defendants' motion to dismiss remains pending.  No discovery has been taken.  Thus, the Lawsuit has not even advanced beyond the pleading stage and is not trial ready.  The third factor also weighs in favor of denying the Stay Relief Motion as the Court has not even resolved the City's eligibility for relief in this chapter 9 case.  Nothing could be more basic or preliminary to the ultimate outcome.

Further, concerning the fourth factor, as set forth in the Defendants' motion to dismiss and in the Defendants' Opposition to the Stay Relief Motion, the Plaintiffs have not demonstrated a likelihood of success on the merits.

Finally, the fifth factor weighs in favor of denying the Stay Relief Motion. Although the City is not currently a party in the Lawsuit, the impact that the

Lawsuit may have on the City and its restructuring efforts may require the City to intervene or otherwise become further involved and take other actions if the Stay Relief Motion is granted. Requiring the City to defend the Lawsuit in the District Court would distract the City from its efforts to restructure, diverting its limited resources at a time when it is both working to negotiate and deliver a plan of adjustment quickly and engaged in a substantial amount of discovery and litigation (all on its own expedited timeframe) arising in the bankruptcy case itself. The City does not need further impediments to its restructuring efforts. This Court has consistently endeavored to bring all matters which may affect the eligibility of the City before it and have the issues resolved in one forum. Allowing the Lawsuit to proceed in the District Court would cast uncertainty[5] over the eligibility and restructuring process and may chill negotiations among the parties or adversely affect the confirmation of the plan of adjustment.

In short, allowing the Lawsuit to proceed would undermine the protections of the Automatic Stay and interfere with the City's efforts to restructure. The City sought relief under chapter 9 in part to obtain the "breathing spell" afforded by the

---

[5] This Court acknowledged that the uncertainty occasioned just by the eligibility objections already before it will likely slow, if not stall entirely, the "City's progress in recovering its financial, civic, commercial, and cultural life and in revitalizing itself." Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 23. [Dkt. No. 1039]. Having the City's eligibility adjudicated simultaneously in two courts obviously compounds that uncertainty.

Automatic Stay and the consequent protection from its creditors while it restructures its affairs and prepares a plan of adjustment. The City's finances would be further depleted and its personnel distracted from their mission to operate the City for the benefit of its citizens and restructure its affairs if it were denied this basic protection of chapter 9 and forced to defend itself against the Plaintiffs so early in the case. Accordingly, the overall goals of chapter 9 weigh largely in favor of denying stay relief to the Plaintiffs.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Court (a) deny the Stay Relief Motion; and (b) grant such other relief to the City as the Court may deem proper.

Dated: September 26, 2013  Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com


Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        October 2, 2013
                   Debtor.      .        10:00 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. AMENDED MOTION OF CREDITOR DEBORAH RYAN,
AN INTERESTED PARTY, FOR RELIEF FROM THIS COURT'S ORDER
STAYING PROCEEDINGS; MICHIGAN COUNCIL 25 OF THE AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, MOTION FOR ENTRY OF AN ORDER MODIFYING THE
AUTOMATIC STAY SOLELY TO ALLOW ADMINISTRATIVE LAW JUDGE
TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE
HE RETIRES ON OCTOBER 4, 2013; PETITION FOR ORDER
LIFTING STAY
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Miller, Canfield, Paddock & Stone, PLC
                       By:  ERIC D. CARLSON
                            TIMOTHY FUSCO
                       150 West Jefferson, Suite 2500
                       Detroit, MI  48226
                       (313) 963-6420

For Deborah Ryan:      Goodman & Hurwitz, P.C.
                       By:  WILLIAM GOODMAN
                       1394 East Jefferson Avenue
                       Detroit, MI  48207
                       (313) 567-6170

For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City       65 Livingston Avenue
of Detroit             Roseland, NJ  07068
Retirees:              (973) 597-2374

APPEARANCES (continued):

```
For AFSCME,         Miller Cohen, PLC
AFL-CIO:            By:  RICHARD G. MACK, JR.
                    6700 West Lafayette Blvd., 4th Floor
                    Detroit, MI  48226-3191
                    (313) 964-4454

For Detroit         Clark Hill, PLC
Retirement Systems- By:  SHANNON L. DEEBY
General Retirement  151 South Old Woodward, Suite 200
System of Detroit,  Birmingham, MI  48009
Police and Fire     (248) 988-5889
Retirement System
of the City of Detroit:

For Detroit Branch  MELVIN BUTCH HOLLOWELL
NAACP:              8220 Second Avenue
                    Detroit, MI  48221
                    (313) 207-3890

For Arab-American   Nabih H. Ayad & Associates, P.C.
Civil Rights        By:  NABIH H. AYAD
League, Ayad Law,   2200 North Canton Center Road, Suite 220
PLLC:               Canton, MI  48187
                    (734) 983-0500

For the State of    Michigan Department of Attorney General
Michigan:           By:  NICOLE A. GRIMM
                    525 West Ottawa Street
                    P.O. Box 30736
                    Lansing, MI  48909
                    (517) 373-6434

Court Recorder:     Letrice Calloway
                    United States Bankruptcy Court
                    211 West Fort Street
                    21st Floor
                    Detroit, MI  48226-3211
                    (313) 234-0068

Transcribed By:     Lois Garrett
                    1290 West Barnes Road
                    Leslie, MI  49251
                    (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

13-53846-swr  Doc 2513-1   Filed 01/03/14   Entered 01/03/14 17:36:24   Page 221 of 88
13-53846-tjt  Doc 2513-1   Filed 01/03/14   Entered 01/03/14 16:08:04   Page 2 of 88
307
221

```
 1        THE CLERK:  All rise.  Court is in session.  Please
 2   be seated.  Case Number 13-53846, City of Detroit, Michigan.
 3        THE COURT:  One moment, please.  Okay.  So is it
 4   okay with everyone if we proceed with the motion for relief
 5   from the stay filed by Deborah Ann Ryan?
 6        MR. GOODMAN:  William Goodman, your Honor.  We're
 7   ready.
 8        THE COURT:  Okay.  Step forward, please, sir, and
 9   you may begin.
10        MR. GOODMAN:  May I ask if I may have my client sit
11   closer so that she can hear the proceedings?
12        THE COURT:  Sure, sure, absolutely.
13        MR. GOODMAN:  Step forward, Ms. Ryan.
14        THE COURT:  I wonder if you could make room for Ms.
15   Ryan at counsel table there.
16        MR. GOODMAN:  Good morning, your Honor.  My name is
17   William Goodman, and I represent Mrs. Ryan, who is a
18   petitioner in this matter.  And I know the Court is
19   unfamiliar with me, but I am -- I have attended a few of
20   these proceedings, and I'm well-aware of the attention that
21   the Court has paid to other pleadings that have been filed
22   and presume that the same is true for these as well.
23        THE COURT:  Yes, sir.
24        MR. GOODMAN:  So I will not impose or reiterate
25   everything that has been said; however, I thought that for
```

1    just a few moments, since the issue of whether or not there

2    is a likelihood of success for the creditor, Mrs. Ryan, in

3    this case, has been put in issue, I might just address it for

4    a moment.  As Jack Webb used to say, just the facts and, more

5    pertinently, just the stark facts in this matter.

6              Mrs. Ryan is the personal representative of the

7    estate of her daughter, Patricia Williams, who was murdered

8    on September the 22nd, 2009, by her then husband, who,

9    immediately after he murdered her extremely brutally, killed

10   himself.  This is a situation which had been building up for

11   at least a couple of days.  It involves two sets of

12   defendants, those -- the police officials from these --

13   Township of Canton as well as from the City of Detroit.  At

14   first the Canton Township responded and finally eventually

15   learned the identities of the domestic violence victim and

16   the perpetrator, and the perpetrator -- both, in fact, were

17   Detroit police officers.  Canton then essentially turned the

18   matter over to Detroit and in so doing failed to enforce the

19   law as we say it should have been enforced, violated the

20   equal protection clause, we are claiming, and thereby created

21   a cause of action under Section 1983 against Canton.  That is

22   not pertinent today other than the fact that those facts are

23   so intertwined with the facts involving the City of Detroit

24   because what Canton did was turn the matter over and the

25   decision as to what to do with Mr. Williams over to the City

 1  of Detroit, which essentially, without any basis whatsoever,

 2  asserted to Canton he's mentally fine.  He had left a suicide

 3  note in addition to having beaten up his wife, waved a gun

 4  around and consumed a bottle of alcohol in a short period of

 5  time, that he was mentally fine, that he was ready to use a

 6  gun -- he was going to the range, in fact, the very next

 7  day -- and not to worry and to cancel the LEIN notice that

 8  Canton had posted.  Canton officers have testified that had

 9  that notice not been canceled, they would have tracked him

10  down -- pinged him, I think is the phrase that law

11  enforcement uses -- and thrown him into a psychiatric unit.

12          None of that happened, and, therefore, this

13  generated a 14th Amendment claim under the substantive due

14  process theory of what is called state-created danger.  And

15  we've cited the Kallstrom case, which is the leading case in

16  the Sixth Circuit on this point, with the cause -- with the

17  basis for that cause of action.

18          There are cases against two individual officers,

19  actually supervisors, Sergeant Kozloff and Inspector

20  Blackmon, and, in addition, there's a case against the City

21  of Detroit, which is called a custom and policy case, a Monel

22  case, which is based upon the fact that Detroit had -- and

23  I've attached to our papers a force investigation report,

24  which acknowledges this -- the highest ratio or the highest

25  proportion of police officer suicides in the United States.

 1   Nonetheless, there was no policy.  There was no training.

 2   There was no guidelines whatsoever for supervisors to deal

 3   with officers who were undergoing non-duty-related stress

 4   that could require hospitalization or affect their duties.

 5   In fact, someone who wanted help, who wanted the lifeline of

 6   the -- an assistance telephone number that the police

 7   department put up to its officers, if they tried to make a

 8   telephone call, that number was disconnected.

 9            So this then -- and, in fact, in addition, Officer

10   Williams himself was, I think, a problematic officer.  He was

11   described by deputy chief of the Detroit Police Department,

12   James Tolbert, as someone who showed a pattern of

13   disobedience throughout his history, who was disruptive, who

14   basically refused to follow rules and regulations.  That's

15   who he was, and, nonetheless, they gave him a clean bill of

16   health and told Canton, yes, drop your LEIN notice.  That

17   is -- I think, meets the tests of the Kallstrom case and

18   establishes a valid state-created danger claim.  All of this,

19   by the way, has been established, as we have pointed out,

20   through extensive discovery, which we have taken, numerous

21   depositions, almost 30, and, as I indicated in our papers,

22   this matter has been teed up, in fact, argued -- we are

23   waiting for an opinion from Judge Goldsmith as to the Canton

24   defendants, and he has told us what his decision is going to

25   be, but he hasn't rendered an opinion, so I think it would be

1  improper for me to state that now, although if asked I would.

2       And we were just about ready to file a response to

3  the city's papers to the motion for summary judgment, and I

4  think somewhat unfairly the city points to its papers to show

5  that we have a small likelihood of success in the underlying

6  matter without our ever having had a chance to file a

7  response because we were basically cut short on that by this

8  filing in this case.  Nonetheless, as I've stated, I think

9  the facts -- every one of the facts that I asserted today and

10  many more can be documented and proven, and there's certainly

11  a factual question as to each of them.

12       Now, this motion, I think, involves an unusual claim

13  in that what we are saying here is that a stay will diminish

14  my client's rights under Section 1983 of the Civil Rights Act

15  and, therefore, directly under the 14th Amendment.  She has

16  rights to full compensation, to an orderly process, to have

17  her case heard, to not have it delayed or diminished or

18  divided up in any way.  And by extending the stay to her, her

19  rights have been affected, and, therefore, her -- in effect,

20  the stay to Mrs. Ryan, both the stay as to the City of

21  Detroit and the extended stay as to the individual Detroit

22  officers, violates her Constitutional rights.

23       And I think the argument has been elaborated fairly

24  successfully in our papers.  If the Court has any questions,

25  I'd be happy to answer them, but I will say this.  The

1   purpose of Section 1983 to pursue these kinds of actions is
2   not only to compensate victims and fully and completely
3   compensate them, but it is, too, as a mechanism that Congress
4   has created to enforce the Constitution so that people's
5   rights are not violated.  Without it, there would be,
6   Congress has determined, additional violations, further
7   violations by state officials of people's constitutional
8   rights, 14th Amendment rights, and other rights as well.

9        A stark example of this -- I think this is a stark
10  example, but perhaps a simpler example would be if some
11  benighted community somewhere, having not heard about the
12  civil rights movement or the Civil Rights Act of 1964, or
13  something else still maintained public facilities that were
14  segregated, and then that municipality goes into bankruptcy,
15  and a lawsuit is brought to -- for damages perhaps and to
16  desegregate those facility -- for injunctive relief to
17  desegregate those facilities.  The municipality could easily
18  say this is going to cost us money to undertake this kind of
19  major change in our operations at this time.  Nonetheless, it
20  would be completely violative of the 13th, 14th, and 15th
21  Amendment for a stay in bankruptcy to operate in such a way.
22  In that respect, really Mrs. Ryan's rights are no different.
23  Her rights or her daughter's rights were violated fairly
24  blatantly by actions of the City of Detroit, and, as a
25  result, we have sought relief in front of Judge Goldsmith and

1    seek to continue that relief.

2          Now, in addition to the constitutional arguments,

3    which I think I have -- as I said, I've alluded to today, and

4    I think --

5          THE COURT:  Well, but why wouldn't the law

6    distinguish between an ongoing violation that demands remedy

7    from this case?

8          MR. GOODMAN:  Well, the law does distinguish between

9    those kinds of situations.  Clearly there's different kinds

10   of relief.  There's injunctive relief.  There are damages.

11   There are distinctions obviously, and I agree with the Court

12   in that respect.  However, I do not think that the cases

13   which say that the federal courts -- Article III courts are

14   the way to proceed to enforce these rights is -- acknowledge

15   that simply because this is an action for damages, the person

16   who has been so injured can wait and that that diminution of

17   their case, the diminution of their compensation and,

18   therefore, their ability to fully enforce the Constitution is

19   acceptable.  I understand what the Court is saying, that

20   there are distinctions, of course, but the other point -- the

21   point that I made initially continues to be the case.  If law

22   enforcement officers or other public officials know that they

23   are not going to be subjected to deposition questioning,

24   judgment by judges and juries, and forced to pay

25   compensation, this is a way in which these constitutional

13-53846-swr  Doc 2511-1  Filed 01/03/14  Entered 01/03/14 16:06:24  Page 9 of 86
13-53846-tjt  Doc 1113  Filed 10/07/13  Entered 10/07/13 17:36:24  Page 228 of 307    228
307

 1  rights will be diminished and violations will increase, so in

 2  that sense I think that there is a similarity between the

 3  two.

 4       THE COURT:  To the extent the law would recognize

 5  that concern, wouldn't it -- couldn't it be addressed by

 6  granting relief from the stay to allow you to liquidate your

 7  claim -- that is, to fix the amount of the claim -- without

 8  allowing you to actually collect on the claim against the

 9  city?

10       MR. GOODMAN:  If I understand your question, what

11  you are asking is a reiteration of an argument or something

12  that I read in the debtor's papers here, which is that

13  doesn't do Mrs. Ryan any good simply to have a new form of

14  claim in the form of a liquidated claim.  That's what I

15  understand you to be asking.  Am I more or less in the right

16  area, your Honor?

17       THE COURT:  Well, sure.

18       MR. GOODMAN:  I think I --

19       THE COURT:  I mean you suggest that her rights under

20  the 14th Amendment are or would be diminished by a stay

21  because the officers involved and the city itself wouldn't be

22  called through the evidentiary process to account for what

23  may have happened here, so my question is if that's a

24  concern, why not just allow that to proceed but with the idea

25  that the collection on the judgment, just like the collection

1  on all the other debts of all the other creditors in this

2  case, needs to wait for a confirmed plan?

3          MR. GOODMAN:  My response to that is that possibly

4  that is a very partial solution to the issues I've raised,

5  but in a broader context, there's still -- Mrs. Ryan still

6  has a claim against the Canton defendants, and as I think I

7  mentioned --

8          THE COURT:  They're not stayed, are they?

9          MR. GOODMAN:  No, they are not stayed, absolutely

10  not.  However, one of the things -- I address this in my

11  reply, and I filed it late yesterday afternoon, and I

12  apologize if it did not get to the Court in time to review

13  it.

14          THE COURT:  Oh, no.  We got it.  We read it.

15          MR. GOODMAN:  Well, what I said there in response to

16  that is that there is an additional interest here, which is

17  the interest of -- there are conflicts between these

18  defendants.  There are who's telling -- you know, who's

19  telling the --

20          THE COURT:  Right.

21          MR. GOODMAN:  -- truth, things like that, that can

22  best be resolved by having it heard in one forum, format, and

23  so on.

24          THE COURT:  Um-hmm.

25          MR. GOODMAN:  And -- well, I've already -- the Court

1    is not --

2         THE COURT:  This solution would address that concern

3    as well, wouldn't it?

4         MR. GOODMAN:  I suppose that it would.  I suppose

5    that it would address that concern.  Whether -- let me put it

6    this way.  I would accede to the Court's suggestion in this

7    regard, if it is a suggestion, but not give up the

8    opportunity to subsequently argue in the -- in light of a

9    verdict at some point that we are entitled to immediately --

10        THE COURT:  Well, let me ask you about that.  Is

11   there any case law that holds that the imposition of an

12   automatic stay violates the 14th Amendment when it delays

13   collection on a valid constitutional claim such as you assert

14   you have here?

15        MR. GOODMAN:  As the Court may know, I've practiced

16   law for almost 50 years.  I have very little familiarity with

17   this particular area of the law.  However, I have not been

18   able to find any such case.

19        THE COURT:  Okay.  Anything further, sir?

20        MR. GOODMAN:  I don't have anything further at this

21   time, your Honor.  Thank you.

22        THE COURT:  All right.  Let me hear from the city

23   then.

24        MR. CARLSON:  Your Honor, Eric Carlson from Miller

25   Canfield on behalf of the City of Detroit.

1          THE COURT:  Sir.

2          MR. CARLSON:  I, likewise, will be brief because I

3     know the Court has read the papers, but I would like to take

4     the opportunity to do three things.  I'd like to highlight a

5     few things in our objection, respond to the reply that was

6     filed late yesterday on a couple items, and then spend a

7     brief moment replying to some of the oral arguments that were

8     made.

9          As we highlighted in our objection, the automatic

10    stay is one of the fundamental principles and protections

11    afforded by bankruptcy.  It's key to give the city a

12    breathing spell, to give them the opportunity to try and put

13    together a plan of adjustment.  The city right now is engaged

14    in a significant number of activities, including eligibility

15    and discovery process that's on a very tight timeline, as the

16    Court knows.

17         THE COURT:  Well, let's pause there --

18         MR. CARLSON:  Sure.

19         THE COURT:  -- and ask whether it's the same

20    attorneys who are dealing with that tight time frame as would

21    be dealing with Ms. Ryan's claims --

22         MR. CARLSON:  You know, I don't know the --

23         THE COURT:  -- under the impression -- and correct

24    me if I'm wrong -- that it was corporate counsel's -- or

25    corporation counsel's office who would be dealing with a

13-53846-swr   Doc 2518-1   Filed 01/08/14   Entered 01/08/14 17:08:04   Page 233 of 98
13-53846-swr   Doc 2518-1   Filed 01/08/14   Entered 01/08/14 17:30:04   Page 13 of 96      232
307

1    personal injury claim or a constitutional claim like this

2    one.

3         MR. CARLSON:  That could be to some degree true;

4    however, your Honor, as you well know probably in discovery

5    proceedings, it's the city and its in-house counsel that has

6    the vast knowledge and resources to be able to gather

7    discovery information and provide it to corporate counsel

8    upon, you know, the need, so even if there is limited

9    overlap, there is clearly overlap, and there is

10   responsibility being had by in-house counsel with respect to

11   these issues.  And the distraction --

12        THE COURT:  Is it your representation to the Court

13   that the individual or individuals who would be assigned to

14   shepherd the city's defense of this injury claim, this

15   constitutional claim, through trial would have

16   responsibilities in this Chapter 9 proceeding?

17        MR. CARLSON:  I can't answer that directly, your

18   Honor.  I haven't asked my -- I haven't asked my client that

19   question, but I would assume for logical reasons that there

20   are individuals that would be involved in this case who also

21   are being asked questions on a daily basis.  For instance,

22   okay, this is Number 12, I think, of the relief from stay

23   motions.  I know I relied on this individual to defend this

24   action.  No doubt there are other actions in this bankruptcy

25   that are coming that this individual would be asked to opine

1  on and help assist with.

2          THE COURT:  Okay.

3          MR. CARLSON:  Tragic set of facts, your Honor, very

4  sad, but with all due respect to opposing counsel, that's not

5  the issue.  The issue for this Court to consider is cause.

6  Cause is defined in this jurisdiction or at least outlined by

7  five factors that the Court is to consider, and the facts and

8  the merits of the case are but one factor.  There are other

9  factors to consider, and as the Plastech Court stated, the

10  overall decision that this Court has to make is a weight of

11  the hardships between the two parties with the eye on the

12  overall goal of the Bankruptcy Code.  And I would submit that

13  at this premature or very early stage in this proceeding, the

14  hardship on the city outweighs the hardship on the plaintiff.

15  That said, the stay doesn't deny her her claims.  The stay

16  doesn't prohibit the claims.  The stay doesn't terminate the

17  claims.  It just stays the claims.  And at a future date

18  maybe there's a -- maybe there's justification to liquidate

19  it in the state court.  That's not the point.

20          THE COURT:  When is that?

21          MR. CARLSON:  I would submit, your Honor, that, at a

22  minimum, it would be after eligibility is determined, and

23  more likely and more logical, it would be after some sort of

24  claims resolution process has been put forth and agreed upon

25  because this is one of --

1          THE COURT:  All right.  Let's talk about that.

2          MR. CARLSON:  Okay.

3          THE COURT:  I asked in our initial status conference

4  way back when what the city's plan was to deal with tort

5  claims, and I'm going to just sort of generically include

6  this kind of a claim within that category.  Didn't really get

7  an answer, and I want to ask it again.  This case is only one

8  of --

9          MR. CARLSON:  700.

10          THE COURT:  -- hundreds.

11          MR. CARLSON:  Um-hmm.

12          THE COURT:  What's the plan?

13          MR. CARLSON:  My understanding is it's being worked

14  along with everything else in this case right now and will be

15  set forth in a short period of time.  I can't speak directly

16  to exactly what the plan is right now because I'm personally

17  not involved in that process; however --

18          THE COURT:  Go ahead and take your time and consult

19  because I want an answer to this question.

20          MR. CARLSON:  My colleague's comment, your Honor, is

21  that there will be a process proposed after a claims bar date

22  is set, and part of the process would be to suggest engaging

23  in mediation prior to moving these claims further in

24  litigation, which obviously would save potential time and

25  costs.

13-53846-swr  Doc 2518-1  Filed 01/07/14  Entered 01/07/14 17:30:20  Page 16 of 98
307
13-53846-swr  Doc 2518-1  Filed 01/07/14  Entered 01/07/14 16:09:04  Page 235 of  235

1    THE COURT:  Ms. Lennox, any idea what the city's

2    intentions are in regard to a claims bar date?

3    MS. LENNOX:  Your Honor, as your Honor might know --

4    oh, I'm sorry.  For the record, Heather Lennox of Jones Day.

5    Earlier this week, we just filed the amended list of the

6    claims with the amounts, which was very crucial, and it took

7    a lot of time getting through the city's system with that, so

8    now that that is filed, we are working on a bar date motion.

9    We would expect to have it filed promptly, hopefully for

10   hearing in October or late November, and then normally we

11   would ask for like a 60-day --

12   THE COURT:  October or early November?

13   MS. LENNOX:  That would be fine, your Honor,

14   certainly.  We can do that.  And normally we'd like to give

15   folks like 60 days, at a minimum, or whatever the Court might

16   think, certainly 30 at a -- 30 days at a minimum to 60 days

17   to get their claims on file, and then the debtor would have

18   to kind of go through them a little bit and then start the

19   process, so that's kind of our general timing that we've been

20   thinking about, your Honor.

21   THE COURT:  Thank you.  So, Mr. Carlson, apart from

22   what you've already said on the record about counsel's

23   potential involvement in both this case and other cases and

24   the Chapter 9, what other prejudice would there be to the

25   city if the Court granted relief from the stay for purposes

1  of liquidating this claim but not collecting on it?

2  MR. CARLSON:  A significant amount of time and

3  effort, your Honor.  Although this case may be ready for

4  trial, by opposing counsel's own admission, it involves a

5  highly complex area of the law.  There have been numerous

6  depositions.  I think he said less -- you know, just shy of

7  30 -- significant discovery, motions for sanctions in the

8  underlying case, I mean a significant contested -- highly

9  contested case.  And the time and energy on the city combined

10 with the costs associated with both representing the city and

11 indemnifying the individual defendants, which is another

12 issue in this motion -- the city is obligated to indemnify

13 and defend those individual defendants -- it is a -- I would

14 submit a major distraction, and as the Court has already

15 mentioned, it's one of 700, so, you know, the question, I

16 guess, I would ask at this point without having a claims

17 procedure process in place is why this one, why now.  It's

18 not -- it's just not the right time, your Honor.

19 Then briefly I'd like to just respond if I could to

20 a couple of things in the reply real quickly, and then I'll

21 address the oral argument.  With respect, real briefly, to

22 the due process argument, your Honor, we did cite to the St.

23 Vincent case in which the Court has ruled on --

24 THE COURT:  Before we move on, I have to ask on this

25 issue of prejudice that you have identified -- and I respect

1   the fact that this is only one of several hundred,

2            MR. CARLSON:  Sure.

3            THE COURT:  Apart from your statements on the record

4   here, is there any affidavit that I've missed from the city

5   that details or specifies this prejudice that you assert?

6            MR. CARLSON:  The hardships that would be imposed

7   upon the city?

8            THE COURT:  Yes.

9            MR. CARLSON:  Not attached to the papers, no, your

10  Honor.

11           THE COURT:  Or filed at all?

12           MR. CARLSON:  There have been numerous motions and

13  numerous objections, so whether there have been in other

14  objections I can't confirm or deny.

15           THE COURT:  All right.  Go ahead.

16           MR. CARLSON:  With respect to the reply, your Honor,

17  real briefly, again, I highlighted earlier and I just wanted

18  to highlight again because it is an issue that was raised by

19  the motions, the city isn't -- the city is obligated to

20  indemnify and defend the individual defendants.  We believe

21  that the extension stay order, Docket Number 166, clearly

22  addresses and covers nonofficer employees, so the combination

23  of the indemnification as well as the extension stay order

24  clearly means that those proceedings against those

25  individuals should not go forward as well.

1      And with that, your Honor, you know, I think our

2  position would be that, again, the motion should be denied,

3  and at this point it's just too early in the proceeding.

4      THE COURT:  Any reply, sir?

5      MR. GOODMAN:  Just briefly.  While it's true that

6  there are -- I have no reason to disagree with 700

7  outstanding cases, and many of them, I'm sure, are just,

8  worthy, and in need of compensation and redress -- there is a

9  difference analytically in our argument between cases which

10  raise issues under the United States Constitution and the

11  Civil Rights Act of 1871 and common law tort cases, and --

12      THE COURT:  Well, but isn't it true that many of the

13  1983 actions are among those that are filed in this District

14  Court?

15      MR. GOODMAN:  I'm sure that's true and in state

16  court as well, and I'm sure that there are many, although I

17  don't know the number because I don't have access to that,

18  and all we've gotten is a gross numerical accounting, and I

19  do think there's a difference.  That's the only point I would

20  like to make.

21      THE COURT:  Right.

22      MR. GOODMAN:  With regard to the Court's inquiry

23  regarding -- or information that was provided to the Court

24  regarding mediation, I understand that a mediation process in

25  this Court might be somewhat different.  However, this case

1 has already been mediated through -- by a magistrate in this
2 district, and the city's position was that notwithstanding --
3       THE COURT:  Well, all you need say is that the
4 mediation was not successful.
5       MR. GOODMAN:  Well, I'm not going to talk about a
6 number here.  I'm simply going to say that their position was
7 there would be no offers made until their motion for summary
8 judgment was decided, and that, of course, goes to the heart
9 of what we've tried to assert here today in court, so that
10 was all I was trying to bring to the Court's attention.
11 Thank you very much.
12       THE COURT: All right.  Thank you.  All right.  I'm
13 going to take this under advisement and issue a written
14 opinion shortly.
15       The next motion I'd like to hear, if it's okay with
16 everyone, is the motion for relief from stay filed by AFSCME,
17 please.  Is that okay with everybody?
18       MS. LEVINE:  Good morning, your Honor.  Sharon
19 Levine, Lowenstein Sandler, for AFSCME, the American
20 Federation of State, County and Municipal Employees, and Sub-
21 Chapter 98.  Your Honor, I want to clarify what may be a
22 little bit ambiguous in paragraph 22 of our motion.  All we
23 seek here today -- all we seek here today is to let the
24 administrative law judge sign his opinion, if he determines
25 to sign his opinion, before he retires on Friday, so we're

1   not asking the city to do anything further.  We're not asking

2   this Court to do anything further.  We're not doing anything

3   further.  We understand that there's a claims reconciliation

4   process that is going to be teed up and heard by the Court in

5   due course.  We understand that with regard to the

6   eligibility issues and what's going on there, a lot of people

7   are drinking from a fire hose right now, but we don't want to

8   lose this window of opportunity to have the administrative

9   law judge, who has spent a year and a half with this matter,

10  to at least ink his opinion, and then whatever your Honor

11  determines is appropriate from that, including if your Honor

12  determines nothing is appropriate from that, we would be back

13  before this Court on that issue.

14          THE COURT:  Okay.  So, again, just to clarify here,

15  if your motion is granted, what impact would that have on the

16  timing and the deadlines associated with what would normally

17  happen in that context if the bankruptcy weren't filed?

18          MS. LEVINE:  Your Honor, our understanding is that

19  because the automatic stay -- and perhaps your Honor's order

20  could then address this directly, but our understanding is

21  that the automatic stay would toll those deadlines for that

22  period of time that the stay was imposed under 108, but if

23  we're wrong about that, your Honor could address that in the

24  order as well.

25          THE COURT:  You think I have the authority to do

1   that?

2          MS. LEVINE:  Your Honor, I think that -- your Honor,

3   I do believe that under the Bankruptcy Code there is a

4   tolling once the automatic stay is in place under Bankruptcy

5   Code Section 108, and I think that your Honor would have the

6   authority to do that, but the -- but more importantly, I'm

7   not sure that anybody is even suggesting that we go back at

8   this point in time to the MERC or to any other administrative

9   proceeding.  Really our understanding is is that the

10  administrative law judge, as part of this decision, could, if

11  he decides, issue a damage award or at least designate a

12  suggested damage award, and given all that's gone on in front

13  of him, that at some point in time in this case might prove

14  of value to the parties here.

15         THE COURT:  How much in damages -- excuse me -- is

16  your client seeking?

17         MS. LEVINE:  Your Honor, I don't recall the numbers,

18  but it's a substantial -- it's a substantial amount.  I don't

19  have all of the -- I'm not sure that we want --

20         THE COURT:  Approximately.

21         MS. LEVINE:  I'm not sure actually that we want to

22  put a number on the record here.  You know, that's part of

23  that proceeding, and we're not ready to pre-try that issue,

24  but to the extent that he inks a number, it would be a number

25  that would then come back and get treated here or to the --

1        THE COURT:  I thought you had filed a paper with a

2   number in it, and I just couldn't remember what the number

3   was.

4        MS. LEVINE:  Your Honor, I don't mean to be hedging,

5   but my understanding is -- and I'm new to this whole

6   process -- is that it's based upon the percentage of

7   investments, and we gave a range, and that's part of the

8   reason actually why we're looking for the administrative law

9   judge's guidance to the extent he wants to give it.

10       THE COURT:  And what was the range?

11       MS. LEVINE:  Our range was different, your Honor,

12   than the debtor's.  What was the debtor's -- your Honor, if I

13   can introduce to the Court my co-counsel.

14       THE COURT:  Sure.  Sir.

15       MR. MACK:  Richard Mack, your Honor.

16       THE COURT:  Richard --

17       MR. MACK:  Richard Mack, M-a-c-k.

18       THE COURT:  Yes.  Okay.

19       MR. MACK:  I'm the attorney who tried that

20   litigation.

21       THE COURT:  Yes.

22       MR. MACK:  The complication in just identifying a

23   number for your Honor is that it was based upon what were

24   determined to be excess earnings beyond the pension fund's

25   performance in the market, so if the pension fund performed

1  beyond 7.9 --

2          THE COURT:  Right.

3          MR. MACK:  -- percent in the market, then that money

4  was to be distributed three ways, as laid out --

5          THE COURT:  Right.

6          MR. MACK:  -- in our supplemental pleadings, so

7  obviously it would depend on this precise investment in the

8  market in the two years at issue here, 2011, 2012, and then

9  one of the ways that we've suggested as a means of obtaining

10  a damage award to the ALJ is assigning an average to that,

11  so --

12          THE COURT:  Yeah.  You were going to go back ten

13  years, do an average.

14          MR. MACK:  Yes.  We cited case law.

15          THE COURT:  So what was your range?

16          MR. MACK:  Well, the percentage is -- I believe it

17  was 54 percent of the excess earnings went to -- again, it

18  depends on the performance in the market in 2011, 2012.  I

19  simply don't have the number.  I think the 2011 year was 18-

20  percent performance in the market.  2012 was -- I think was

21  20-percent performance in the market.  So you would take the

22  percentages above 7.9 for those two years and then divvy up

23  that excess earnings those three ways, so --

24          THE COURT:  Forgive me for not remembering, but did

25  your paper that you filed with the ALJ not calculate all of

13-53846-swr   Doc 2518-1   Filed 01/08/14   Entered 01/08/14 16:08:04   Page 244 of
13-53846-swr   Doc 2518-1   Filed 01/08/14   Entered 01/08/14 17:30:20   Page 26 of 98      244
307

```
 1   that and come to a bottom line request?  I thought it did.
 2          MR. MACK:  We came to a bottom line request on the
 3   percentages.
 4          THE COURT:  Right.  What was it?
 5          MR. MACK:  On the percentages.
 6          THE COURT:  Oh, on the percentage.
 7          MR. MACK:  Yes.
 8          THE COURT:  Not on the amount.
 9          MR. MACK:  No.
10          THE COURT:  All right.
11          MR. MACK:  Not on the amount.
12          THE COURT:  Well, then I won't pin you down any
13   further.  Thank you, sir.
14          MS. LEVINE:  Sorry, your Honor, that we don't have a
15   definitive number.  I was hoping maybe it was just outside
16   what I --
17          THE COURT:  In any event, you're not seeking
18   collection of that now.  That's what you're telling the Court
19   and the city.
20          MS. LEVINE:  Your Honor, we're actually seeking less
21   than not even seeking collection of that now.  In other
22   words, my understanding is that once the AL -- once the
23   administrative law judge inks his decision, there's potential
24   for supplemental proceedings outside of this Court's
25   jurisdiction that might further impact that number.  We're
```

1  not even asking for that and haven't made any decision, and
2  we're assuming that the state hasn't made any -- and the city
3  hasn't made any decision about any further proceedings
4  either.  Literally we just became aware that the
5  administrative law judge was retiring on Friday, and we're
6  just seeking stay relief till Saturday so that if, in fact,
7  he's inclined to issue this opinion, for whatever we all
8  determine it's worth at a later date, we don't lose the
9  benefit of giving him that opportunity.

10  THE COURT:  Though you're not even sure it's going
11  to happen.

12  MS. LEVINE:  No.  I wouldn't presume to know exactly
13  what the judge will or will not want to do, but I -- but we
14  do understand that this Court -- this case was filed right as
15  he was at the point in that process where we ordinarily would
16  have expected that the opinion would have been issued.

17  THE COURT:  Assuming the opinion is issued and it's
18  consistent with his oral opinion a few months back, what
19  impact would that have or could that have on any ongoing
20  obligation of the city?

21  MS. LEVINE:  Your Honor, our -- your Honor, we
22  suspect it depends what happens after the Chapter 9 and what
23  happens in the plan of adjustment.  In other words, once we
24  all have that knowledge in front of us, we'll be able to
25  react to it, but most importantly, what we --

1    THE COURT:  Well, let me be more specific.  Will it

2  be your client's position that following the close of this

3  2013 calendar year, the city will have an obligation

4  consistent with what the ALJ has proposed in his oral

5  decision and presumably will memorialize in his written

6  decision?

7    MS. LEVINE:  The answer is, your Honor, that was the

8  position that we took in connection with that litigation.

9  Obviously this is just a recommendation, and then it would go

10  back through a process, and all that is predicated on the

11  fact that obviously it's our view that the pensions can't be

12  adjusted during this proceeding, but, you know, we have yet

13  to see what will come out of the plan of adjustment process,

14  but we're not here waiving any rights with regard to

15  prospective rights, especially prospective rights that we

16  would have had had the stay not been lifted and the

17  administrative law judge not retired.  In other words, our --

18  you know, our expectation is that all we're really looking to

19  do here is take a snapshot of a particular piece of

20  information that may become useful at a future point in time

21  simply because we're not going to have it available to us at

22  that future point in time.

23    THE COURT:  Well, if there's no reason to believe

24  that the written opinion will vary in any significant respect

25  either in terms of result or rationale from what the judge

1    said on the record, why do you need the written opinion?

2            MS. LEVINE:  Two reasons, your Honor.  Number one,

3    we don't know that for a fact.  He has the ability to

4    reconsider whatever it is he would like to reconsider as part

5    of issuing that written opinion, so that could be useful to

6    know.  And, number two, with the supplemental filings, it's

7    my understanding -- and I'm admitting I'm an onlooker as

8    well, but with the supplemental filings, it's possible that

9    we get more clarity with regard to the dollar amount of

10   awards that could be useful or probative should we determine

11   to use them in connection with claims reconciliation and

12   other issues in this case.

13           THE COURT:  The union's underlying claim here was

14   that the city was required to but failed to negotiate this

15   issue.  Yes?

16           MS. LEVINE:  Yes, in part, your Honor, and that --

17   but that there was also damages that flowed from that.

18           THE COURT:  Are you, by which, of course, I mean the

19   union -- is the union and the city still obligated by law to

20   negotiate this issue?

21           MS. LEVINE:  Your Honor, we would hope so, but part

22   of what we're working through in the mediation --

23           THE COURT:  What is your position on whether the law

24   requires negotiation of this issue?

25           MS. LEVINE:  We believe that the law does require

     1    negotiation of this issue, your Honor, but that is,

     2    frankly --

     3              THE COURT:  And so you fully intend to still do

     4    that?

     5              MS. LEVINE:  On a go-forward basis?  Depends upon

     6    what kind of stay relief we would get, and we're not asking

     7    your Honor to address that issue now.

     8              THE COURT:  Well, for example, as part of the claims

     9    resolution process.

    10              MS. LEVINE:  Well, that's beyond the scope of what

    11    we're looking for today.  In other words, it's --

    12              THE COURT:  I want your assurance that if the law

    13    requires you to negotiate this, you'll do that.

    14              MS. LEVINE:  We would be happy to do that, your

    15    Honor.

    16              THE COURT:  Excellent.

    17              MS. LEVINE:  I thought that you were -- I didn't

    18    want to go beyond what your -- what we were asking for in

    19    terms of the relief.

    20              THE COURT:  I get that.  I feel compelled to ask one

    21    more question here, and if you want to defer to Mr. Mack,

    22    feel free.  Was there anything in writing anywhere, in a

    23    contract, in the pension documents, in a city ordinance, in

    24    the city charter, that explicitly authorized the pension

    25    trustees to make these so-called 13th payments?

 1          MR. MACK:  Mr. Mack again, your Honor.  Yes.  Our

 2    position was that both in the city charter as well as in the

 3    contract itself as well as the --

 4          THE COURT:  What was the language in them that

 5    authorized this?

 6          MR. MACK:  It's part of the pleadings, your Honor.

 7    If you want, I can take a moment and --

 8          THE COURT:  Just summarize.

 9          MR. MACK:  It essentially gave the board discretion

10    to establish payments as it saw fit beyond a certain level of

11    estimated earnings in the pension investment system, so what

12    would happen is each year an actuary --

13          THE COURT:  I know what happened.  That wasn't my

14    question.  My question was what authorized what happened.

15          MR. MACK:  Yes.  The charter and the contract.

16          THE COURT:  All right.  Thank you, sir.  Are you all

17    set?

18          MS. LEVINE:  Thank you, your Honor.

19          THE COURT:  Okay.

20          MS. LENNOX:  Good morning, your Honor.  Again,

21    Heather Lennox of Jones Day for the city, for the record.  At

22    first blush, your Honor, this request -- the request that's

23    posed in AFSCME's motion does seem pretty innocuous, but upon

24    further reflection and upon further analysis of the city, we

25    think it has very far-reaching implications for this case and

1   its creditors and the city going forward.  And why is that?

2   First, the practice of the 13th check program and we think

3   the deleterious effects that it's had on the city and on the

4   pension plans themselves has been pretty well-documented, and

5   I don't need to go into it now.  The practice, which in the

6   past was wholly discretionary and we think financially and

7   actuarially unsound, has caused the pension plans to lose as

8   much as 1.9 billion in asset value over the years.  That was

9   in a report presented from an actuary to City Council in

10  2008.  As an investigation of this practice -- an

11  investigation of the practice and the past practices of this

12  has been ordered by the emergency manager, and that

13  investigation is ongoing, but the preliminary report was

14  issued, and it's pretty grim.  We did attach that report,

15  which is a public document, as Exhibit C to our objection.

16  So the City Council finally abolished this discretionary

17  practice in 2011.  As your Honor --

18          THE COURT:  Is that $1.9 billion figure in that

19  report?

20          MS. LENNOX:  It is in the report of Exhibit A to our

21  motion, yes, sir, the report presented to City Council in

22  2008, at page 9, I believe.  As your Honor knows, the pension

23  underfunding issue is one of the most critical issues in this

24  case.  Any claims that may be asserted with respect to the

25  underfunding or claims related to pension benefits are claims

 1   in this case that we think ultimately should be resolved by

 2   this Court.

 3            Now, one could take the counter-argument and say,

 4   well, look, the administrative law judge heard argument on

 5   this issue seven and a half months ago, why not just let him

 6   commit it to paper, and maybe it could help the Court decide

 7   this issue.  Here's why not.  The hearing on this issue

 8   before the administrative law judge was in February of 2013.

 9   That was a full month before the emergency manager was

10   appointed for the city.  Since that time, several other

11   relevant things have happened.  The collective bargaining

12   agreement has expired.  The Michigan Supreme Court has

13   reversed a decision relied on by the administrative law

14   judge.  The parties have been permitted several months after

15   that hearing to file additional briefs on which no hearing

16   has been held, and this is important because both parties in

17   their briefs -- and those briefs were attached as exhibits to

18   our objection, your Honor -- both parties recognized the

19   changes in circumstances and the changes in the law since

20   that hearing.  In its paper, AFSCME argues for brand new

21   remedies that are inconsistent with past practices because it

22   feared -- and it states this openly -- it feared what an

23   emergency manager might do to affect its claim.  The city

24   pointed out that the Michigan Supreme Court reversed the key

25   case that was relied on by the administrative law judge, so

1   it is clear from the papers themselves, your Honor, that

2   neither party would view what the administrative law judge

3   must do here or what is being requested by this relief as

4   simply memorializing what happened and what he said on --

5   February 2013.  AFSCME is arguing for new claim relief, and

6   the city has new legal arguments.  This would have to be a

7   new ruling on new facts with new law without the benefit of a

8   hearing plus, your Honor, I would say that the Michigan

9   Supreme Court's decision in Macomb County versus AFSCME calls

10  into doubt whether the administrative law judge even has

11  jurisdiction or is the proper forum for hearing and resolving

12  this matter.

13          If AFSCME wants to assert and liquidate its claim

14  against the city, we believe it should do so in this forum

15  and in this Court because perhaps the most important thing

16  that has changed since February 2013 is that the city has now

17  filed a Chapter 9 case, but we don't even need to decide this

18  issue today.  The request in the motion, as Ms. Levine

19  pointed out, is narrow.  It is for relief from the stay for

20  the administrative law judge to issue a recommendation.

21          I just enumerated a host of reasons why that

22  shouldn't happen, and I can add another.  That

23  recommendation, if issued, doesn't fully or finally resolve

24  anything, which is one of the factors that the Court should

25  consider when seeking to lift the stay.  Exemptions and

  1   cross-exemptions could be filed to the MERC.  It may even be

  2   dismissed because that may be an improper forum for hearing

  3   the matter, so there is no full resolution that can happen.

  4   If AFSCME has a claim, it will still be out there, and they

  5   can still assert it in this Court or if your Honor should

  6   decide at some point some other forum, but we believe it

  7   should be this Court.  They will not be harmed one whit by

  8   the maintenance of the stay, but this relief, if there's --

  9   if there's something that is definitive and if something

 10   becomes binding, it's exceedingly far-reaching for the city,

 11   and it goes beyond relief for AFSCME, it would apply -- the

 12   reasoning of it certainly would apply to all of the unions

 13   and all of the pension plans, so we think, your Honor, while

 14   the relief does appear innocuous, it is ill-advised, and we

 15   think the Court should deny the motion.

 16          THE COURT:  Well, if this limited stay relief is

 17   granted and the deadlines for subsequent action, whatever

 18   that might be, are tolled, how would the city be prejudiced?

 19          MS. LENNOX:  I think it would be prejudiced -- well,

 20   again, our position is is that he can't rule.  He's got new

 21   facts, new laws, no hearing.

 22          THE COURT:  Is that for me to decide, or is that for

 23   him to decide?

 24          MS. LENNOX:  I think -- as a matter of due process,

 25   I think it would be important for the city to have a new

1    hearing, and, frankly, his retirement is of no moment.  There
2    can be another administrative law judge to pick this up and
3    have that hearing.

4         THE COURT:  But, again, I ask you is that for him to
5    decide, or is that for me to decide?

6         MS. LENNOX:  Well, I think in the first -- I don't
7    think you have to decide that question, per se, your Honor,
8    but what you're being asked to do is to lift the stay to
9    allow something to happen, something that we don't know as we
10   all sit here in the courtroom here, if the stay is lifted,
11   what will happen.  Will that decision that was issued on the
12   record in February simply be committed to paper, and, if so,
13   what happens with the subsequent facts and briefing?  Will
14   those be taken into account?  Will they not?  Will we have to
15   have another proceeding in front of another administrative
16   law judge to untangle that later?  We don't know as we stand
17   here today because you're right, that is not for anybody in
18   this courtroom to figure out, but lifting the stay could set
19   those activities in motion.

20        THE COURT:  Well, but that wouldn't happen if the
21   relief from the stay were as limited as Ms. Levine asks for
22   here.

23        MS. LENNOX:  If the relief -- what we don't know as
24   we stand here today is what would happen if the relief, as
25   limited as Ms. Levine asks for, happens.  We don't know

1   whether Administrative Law Judge O'Connor would simply write

2   down on a piece of paper that which is already contained in

3   the transcript.  If he would consider further the papers that

4   have been filed and the subsequent facts, in which case he

5   would have done so without a hearing, we just don't know

6   that.

7           THE COURT:  All right.  Thank you.

8           MS. LEVINE:  Your Honor, just briefly.

9           THE COURT:  Yes.

10          MS. LEVINE:  Your Honor, we'd respectfully submit

11  actually for the whole litany of issues that were just raised

12  by the debtor that the limited stay relief is more

13  compelling, not less compelling, especially if the tolling

14  applies, and we would confirm right now that we would consent

15  to tolling to the extent that's an issue, and the debtor can

16  consent on the other side.

17          This administrative law judge has had this in front

18  of him for a year and a half.  He's had the hearings.  He's

19  had the briefing.  And we're assuming that in his mind he has

20  something that he wants to do, which may, in fact, be nothing

21  because that, in effect, is something for these purposes.

22  What we don't want to do is lose that, and if we -- and if we

23  have this limited relief, come Monday we'll all know what

24  that is.  And some appropriate time in the future, we can

25  decide if or when or how that something should be utilized by

         1   this Court, if at all, but if we don't let this judge, you

         2   know, do what it is he feels appropriate here with the

         3   deliberation and the time and the effort and the judicial

         4   resources that he has already expended on this matter, it's

         5   potentially disadvantageous to all of us in this process.

         6           THE COURT:  Do I understand correctly that the

         7   process is that this administrative law judge simply proposes

         8   a recommended order or judgment, whatever it's called --

         9           MS. LEVINE:  I'm shaking my head, for the record.

        10           THE COURT:  -- to the Michigan --

        11           MS. LEVINE:  Yes.

        12           THE COURT:  I'm sorry.

        13           MS. LEVINE:  I was shaking my head.  The answer is

        14   yes.  He issues a recommendation.  It's not a --

        15           THE COURT:  To the Michigan Employment --

        16           MS. LEVINE:  Yes.

        17           THE COURT:  -- Commission.

        18           MS. LEVINE:  Yes.  And we're not asking for

        19   proceedings before the MERC, the Michigan Employment

        20   Commission.  We're just asking that this judge be able to do

        21   whatever it is he would feel appropriate between now and his

        22   retirement on Friday.

        23           THE COURT:  So as a recommendation, does it have --

        24   if that's all that came out of this relief from stay, would

        25   that have any binding effect on anyone?

1      MS. LEVINE:  Your Honor, our understanding -- and my

2  co-counsel can correct me if I'm wrong, but my understanding

3  is that it's an issue that could be considered de novo by the

4  MERC but that it is something that is useful for the MERC to

5  have when it makes those deliberations.  We respectfully

6  submit that if it comes here, as the potentially now

7  appropriate Court, that it could be useful here as well.

8      THE COURT:  Again, a process question about MERC

9  that you could feel free to defer to Mr. Mack, but how do you

10  deal with the city's argument -- or at this point it's just a

11  concern -- that because of this Michigan Supreme Court

12  decision from Macomb County in the meantime, there may not

13  even be jurisdiction?

14      MS. LEVINE:  Your Honor, we're dealing with

15  jurisdictional issues here as well.  That doesn't mean that

16  at the appropriate time by the appropriate tribunal having

17  this piece of paper signed between now and Friday wouldn't

18  help.  If it turns out that he lacked jurisdiction or that

19  the decision should not be considered, that's fine, but if

20  we're wrong about that, then we've lost this window of

21  opportunity.

22      THE COURT:  Did you want to add something to that,

23  sir?

24      MR. MACK:  If you wish.

25      THE COURT:  No.  It's up to you.

1    MR. MACK:  The Macomb County case that was
2  referenced was not appropriately interpreted in the city's
3  pleading, so just for purposes of -- there is no
4  jurisdictional issue raised by the Macomb County court case.

5    MS. LEVINE:  Your Honor, obviously we have views on
6  the Macomb County case, but we're not even asking this Court
7  to consider those.  Win, lose, or draw, we're seeking just
8  very narrow relief that may, in fact, be useful.  And if it's
9  not, so be it, but if it would have been, then we've lost it,
10  and that's really all we're asking for today.  Thank you.

11    THE COURT:  Okay.  Oh, did you want to be heard,
12  too?

13    MS. DEEBY:  Yes, please.  For the record, your
14  Honor, Shannon Deeby of Clark Hill.  I represent both the
15  General Retirement System of the City of Detroit and the
16  Police and Fire Retirement System of the City of Detroit.
17  For today's purposes, we're just addressing the issues
18  related to the GRS.  What we would say, your Honor, is that
19  to the extent that AFSCME's motion is seeking very limited
20  relief enabling it to liquidate a damage claim or a damage
21  amount, we would not oppose the motion.  However, if, as the
22  city suggests in their responsive pleadings and as were
23  raised apparently in the supplemental briefing filed by
24  AFSCME that they were requesting a recommendation that the
25  board be reconstituted as of 2011, 2012, we would oppose any

 1   kind of impact on board composition, board governance, or the

 2   governance of the systems.  We think it would be wholly

 3   inappropriate.

 4           THE COURT:  What's your client's position, since you

 5   have stood up here, on whether the Retirement Systems

 6   distribution of this 13th check for all these decades was

 7   legal?

 8           MS. DEEBY:  As I understand it, your Honor, the

 9   board acted completely within their discretion pursuant to

10   the governing laws and their contracts.

11           THE COURT:  All right.  Thank you.  Because of the

12   urgency of this, I want to give you a decision today, so I'll

13   commit to do that, say, 30 minutes after the conclusion of

14   the next hearing --

15           MS. LEVINE:  Thank you.

16           THE COURT:  -- on the record here.

17           MS. LEVINE:  Thank you very much.

18           MR. MACK:  Thank you, your Honor.

19           MS. LEVINE:  Your Honor, with the Court's

20   permission, there's court-ordered mediation that I'm supposed

21   to be in downstairs.  May I be excused pending coming back to

22   hear the decision?

23           THE COURT:  Of course.

24           MS. LENNOX:  Your Honor, I might make that same

25   request.  I'm supposed to --

```
 1          THE COURT:  Of course.  Go.

 2          MS. LENNOX:  Is there a particular time your Honor

 3   would like us back in the courtroom?

 4          THE COURT:  That would be easier for you, wouldn't

 5   it?  All right.  Let's just pin a time on it, and let's say

 6   one o'clock.

 7          MS. LENNOX:  One.  Thank you, your Honor.

 8          MS. LEVINE:  Thank you.

 9          THE COURT:  The final matter on the Court's docket

10   today is the motion for relief from stay filed by the NAACP.

11          MR. HOLLOWELL:  Good morning, your Honor.

12          THE COURT:  And you may proceed.

13          MR. HOLLOWELL:  Thank you, Judge.  Melvin Hollowell,

14   general counsel on behalf of the NAACP, and my co-counsel

15   here, Nabih Ayad, as well, and we'll address a couple issues

16   for you this morning.  Good morning, Judge.

17          THE COURT:  Yes, sir.  Go ahead.

18          MR. HOLLOWELL:  Again, this is our request of relief

19   from extension of the stay entered by the Court, and first I

20   wanted to deal with just the substance, if I could, just very

21   briefly, of our case that, you know, the case is -- it's not

22   about debtor-creditor issues.  It's about voting rights.  And

23   Public Act 436, the emergency manager law, creates, in our

24   view, two classes of voters.  I guess it's best put in a

25   nutshell.  It creates a superior class of voters where votes
```

for elected officials and those elected have full powers and
duties and an inferior class of voters where you can vote,
but your vote doesn't have the full authority that it should.
And these separate and unequal classes of voters violates the
14th Amendment, and we've cited in our brief Bush versus Gore
and the doctrine of equal dignity of each vote in Headnote 4.

It constitutes a fundamental and irreparable harm,
as we demonstrated in our pleadings, that now since the law
has gone into effect, over 50 percent, 50.4 percent to be
exact, of all African Americans now in the State of Michigan
are under emergency managers versus 1.3 percent of the
state's white population.

We further would say that we have long been at this
issue.  I think, as this Court knows, Judge, we have fully
litigated the question of whether this should have been on
the ballot.  We won that case in front of the Michigan
Supreme Court.  As this Court knows, that the voters of this
state voted by 53 percent to reject the emergency manager
law, and yet just five weeks after that it was overturned by
a lame duck session of the Michigan legislature and a new
emergency manager law was put into place.

So our view on this is, Judge, that, as the NAACP
has done throughout a hundred years, you know, we look at
questions of equal access to quality education and criminal
justice reform and certainly the rights of voters.  Those

13-53846-swr  Doc-2518-1  Filed-01/08/14  Entered-01/08/14-16:09:04  Page-262-of-
13-53846-swr  Doc 2118-1  Filed 01/08/14  Entered 01/08/14 17:30:20  Page 43 of 98  262
307

1   have been the wheelhouse issues for the NAACP for the better
2   part of a century, and this case goes directly to that.  And,
3   you know, the language, again, in Public Act 436 is pretty
4   striking in respect to the evisceration of the powers and
5   duties of elected officials, so it decapitates them.  And so
6   what you have in the nine jurisdictions that are under
7   emergency managers, Detroit but one of them, their powers are
8   advisory, and so they have the authority to meet, but that's
9   pretty much it.  And in our view, that triggers, particularly
10  with the disparate impact on African American voters, a
11  fundamental constitutional right to vote, which is preeminent
12  over all other rights to vote, and I would just draw the
13  Court's attention to the U.S. Supreme Court's decision in
14  Reynolds versus Sims where the Court indicated that the right
15  to exercise the franchise in a free and unimpaired manner is
16  preservative of all other basic rights.

17          Further, in the Elrod versus Burns case -- and
18  that's the 427 U.S. at 373 case -- that goes to ongoing
19  constitutional deprivations, and it says that particularly as
20  it relates to the right to vote, the loss of constitutionally
21  protected freedoms for even minimally periods of time
22  constitutes irreparable injury, quote, unquote.  And so our
23  argument is that not just in the City of Detroit but in all
24  of the other eight jurisdictions across the State of
25  Michigan, these constitutional deprivations are ongoing and

1    deserve to be litigated fully and fairly in front of Judge

2    Steeh where the case has been filed.

3         Second, if I could just briefly issue -- or address

4    the issue of collateral attack, and notwithstanding the

5    allegation that this is a collateral attack, this is not a

6    collateral attack on the Detroit bankruptcy.  It's really

7    a -- it's a direct attack on the constitutionality of Public

8    Act 436.  And, you know, the timeline is very important in

9    connection with this.  I think I talked just a moment ago

10   about 2011 and how we, you know, certainly gathered petitions

11   to get this matter in front of the voters in 2011, 2012

12   litigation, as this Court knows, and about the results of

13   that, but then as we get into 2013, the March 28 effective

14   date of the statute and then the emergency manager was

15   appointed, the NAACP brought its suit on May 13th, and so --

16   and we amended the complaint on June 27th.  And there was

17   some allegation in the pleadings as to, well, you know, you

18   amended it, you know, later.  The reason we amended the

19   complaint was because in the interim between May 13th and

20   June 27th, as this Court I know is aware, the U.S. Supreme

21   Court decided the Shelby County versus Holder case.  We

22   had -- our case is predicated upon the 14th Amendment.  We

23   have one provision which deals with the Voting Rights Act,

24   and so we supplemented Section 5 and 4, which was ruled

25   unconstitutional by the U.S. Supreme Court in the Shelby

1    County case, and substituted Section 3 of the Voting Rights

2    Act, but the claims, other than that, and the relief sought

3    was the same.  This was the NAACP's filing, therefore, on May

4    13th was well in advance of the July 18th bankruptcy hearing,

5    and, furthermore, well before the July 25th Bankruptcy Court

6    order regarding stay.

7           We did not learn of the extension of the stay until

8    into August.  We were not on the certificate of notice.

9    Defendants, State of Michigan, certainly should have noticed

10   us.  That was Docket Entry Number 140.  We were not on that

11   certificate.  There was no reason for us to know.  The first

12   notice we received was in the U.S. District Court in front of

13   Judge Steeh.  Upon notice we moved expeditiously to ask for

14   relief from that stay, so it is not, in our view, our burden

15   here.  It, rather, is on the state and the city as it relates

16   to that as to why we were not noticed.  And we certainly

17   would have liked to have been in front of this Court when

18   there was the initial argument as it relates to this, but,

19   again, we were not noticed and not brought in for those

20   proceedings.

21          And let me just, lastly, address the stay issue

22   itself, Judge, and I would direct the Court's attention to

23   Section Roman Numeral III of the city's brief where it talks

24   about automatic stay and then says in dealing with the -- I

25   think it's a Javens versus Hazel Park case, the Sixth Circuit

```
 1    case, that the automatic stay, quote, "gives the debtor a
 2    breathing spell from its creditors," gives the debtor a
 3    breathing spell from its creditors.  Well, we are not a
 4    creditor.  That is not us.  We are -- we seek no money
 5    damages.  We did not name the city.  We did not name --
 6              THE COURT:  You could have filed an objection to
 7    eligibility.
 8              MR. HOLLOWELL:  We don't take a position on the
 9    eligibility.  Our position is that we should be allowed to
10    prosecute our case on the constitutional issues, and the city
11    is free to move forward on its --
12              THE COURT:  So your position is there was nothing
13    about the filing of this case that violated the United States
14    Constitution.  Is that your position?
15              MR. HOLLOWELL:  There's nothing about the filing of
16    this case that violated the --
17              THE COURT:  Is that your position, sir?
18              MR. HOLLOWELL:  I'm not sure I understand the
19    question.  Our case says that --
20              THE COURT:  I need an answer to my question.
21              MR. HOLLOWELL:  I'm not sure I understand the
22    question, Judge.
23              THE COURT:  Detroit filed Chapter 9.
24              MR. HOLLOWELL:  Yes.
25              THE COURT:  Your clients did not file eligibility
```

1  objections.  They could have.  They didn't.  Is it your

2  position that there is nothing about this filing, this

3  Chapter 9 filing, that violated the Constitution?

4        MR. HOLLOWELL:  Our position is that we don't take a

5  position on the Chapter 9 filing.  We do not take a position

6  on the Chapter 9 filing, so our position is --

7        THE COURT:  Okay.  So whatever argument you could

8  have made about the constitutionality of this filing you

9  waived by not filing a timely objection?

10        MR. HOLLOWELL:  No.  Judge, we would respectfully

11  say that we were not a party to that case nor were we noticed

12  in the docket entry as it relates to parties in that case

13  that the parties in that case, in our view, would have had an

14  obligation to have given us notice for the opportunity to

15  present at that hearing.  Our belief is that --

16        THE COURT:  When you say "that hearing," what

17  hearing are you referring to because we have not had a

18  hearing on eligibility yet?

19        MR. HOLLOWELL:  The matters in front of the judge,

20  the previous matters in front of the judge as it relates to

21  the city's initial filing, and --

22        THE COURT:  You're not seriously contending you

23  weren't aware that the City of Detroit filed bankruptcy?

24        MR. HOLLOWELL:  Certainly was.  We certainly were,

25  but we filed before the city filed, Judge.  That's the point,

 1  and the point is that our case is separate and distinct from

 2  the city's case and that the city --

 3          THE COURT:  Well, but the question that the city

 4  raises is can it be separate.

 5          MR. HOLLOWELL:  Yes.  That is the question that the

 6  city raises, and we said we see no reason why it cannot be

 7  separate and follow a separate track.  Again, it does not --

 8          THE COURT:  Isn't it the case, though, that the

 9  relief you seek, if granted, would terminate the emergency

10  manager, yes?

11          MR. HOLLOWELL:  Yes.

12          THE COURT:  And what impact would that have on this

13  case?

14          MR. HOLLOWELL:  Well, it would be speculative as to

15  where it would go from there, but certainly the elected mayor

16  of the City of Detroit certainly would have the powers and

17  authority to move forward with the bankruptcy if he so chose.

18  That's the point.  Our point is that not just the City of

19  Detroit but all those other cities have had irreparable harm.

20  We are in front of Judge Steeh, and we should have the

21  authority to proceed in front of Judge --

22          THE COURT:  Of course, none of your individual

23  plaintiffs are from any of those other cities, are they?

24          MR. HOLLOWELL:  No.  The individual plaintiffs

25  are --

1          THE COURT:  This case is about Detroit, isn't it?

2          MR. HOLLOWELL:  No.  Well, we also have the Michigan

3     branch of the NAACP, which represents individuals all

4     throughout the State of Michigan.

5          THE COURT:  Right, but none of the members of the

6     state branch who live in those other cities are named as

7     plaintiffs; right?

8          MR. HOLLOWELL:  The state branch of the NAACP --

9          THE COURT:  Am I right about that, sir?

10         MR. HOLLOWELL:  Well, if I could say the state

11    branch represents all NAACP residents throughout the State of

12    Michigan.

13         THE COURT:  Am I right about my question?

14         MR. HOLLOWELL:  Well, the individual plaintiffs,

15    yes.  However, if the judge would take a look at the actual

16    complaint, the complaint is very specific in terms of

17    alleging the harms in each one of those other cities, so it's

18    not like it was just about the City of Detroit.  It was about

19    a lot of different cities, not -- eight other cities, to be

20    specific, and we looked at the individual conduct in each one

21    of those cities, and we pled that, and we put that in the

22    complaint.  And that has been a part of our pleading from the

23    very beginning.

24         As I would also say is that -- Judge, that on the

25    automatic stay issue where it casts uncertainty over the

1  bankruptcy case, we would also argue the reverse, that the

2  bankruptcy casts uncertainty over the fundamental

3  constitutional protections which were filed before the

4  Bankruptcy Court and before bankruptcy and which can and

5  should be addressed by Judge Steeh, so we would finally say

6  that we are not litigating or contesting eligibility, which

7  is what, again, the <u>Garzoni</u> case deals with.  And even if it

8  did apply, again, we were saying that we -- when you look at

9  particularly the hardship upon other --

10  THE COURT:  Okay.  So when you say you're not

11  objecting to eligibility, isn't that same thing as saying you

12  have waived any objections to eligibility that you might

13  have?

14  MR. HOLLOWELL:  We have not taken any position on

15  eligibility.  As Mr. Goodman said earlier, this is -- our

16  case is in federal District Court, and we are pursuing our

17  rights and remedies under the federal District Court, not

18  under the Bankruptcy Court, and we believe that we should be

19  allowed to proceed in the Article III court.

20  THE COURT:  I'm sorry.  I had another question for

21  you, sir.

22  MR. HOLLOWELL:  Oh, yes.

23  THE COURT:  Is there any way your lawsuit can be

24  tailored or permitted to proceed that would not have an

25  impact on this bankruptcy case?

 1          MR. HOLLOWELL:  Yes.  We don't object to

 2     eligibility.  We are not alleging any pecuniary interest.

 3     We're not seeking money damages.  There's no claim against

 4     the city.  There's no --

 5          THE COURT:  So if I gave you a period of time to

 6     file an eligibility objection that was based on the claims

 7     you make in your complaint or any other grounds, for that

 8     matter, you wouldn't file that objection?

 9          MR. HOLLOWELL:  We would not file an objection.

10          THE COURT:  All right.  Thank you, sir.

11          MR. HOLLOWELL:  Thank you, Judge.

12          MR. AYAD:  Good morning, Judge.  For the record,

13     Attorney Nabih Ayad on behalf of the NAACP, Stallworth, State

14     Representative Rashida Tlaib, and the rest of the

15     complainants in this particular matter.  Judge, just to echo

16     brother counsel, Butch Hollowell's, position that we are not

17     objecting to eligibility.  We are not objecting.  And to

18     answer your -- answer this Court's question, Judge, yes, we

19     could move forward.  We could move forward.  You know, what

20     we were asking in our initial complaint before Judge Steeh,

21     Judge, was the issue of an injunctive relief, and we're

22     asking that we could move forward.  Everything that's

23     happened in the past, that's still okay with us, Judge.

24     We're not contesting eligibility.  We're not saying that the

25     emergency manager did not have the power and authority under

 1   PA 436 to file for bankruptcy.  We're not contesting that,

 2   Judge.  And the powers of this Court and the powers of the

 3   Judge Steeh's court in the District Court has the ability to

 4   say, you know, we're not going to, you know, repurchase Belle

 5   Isle back.  We're not going to repurchase certain items back.

 6   We're not going to cut those contracts that we're in and

 7   replace them and everything else.  We're saying, Judge,

 8   moving forward, moving forward on this particular -- the

 9   judge could limit it.  Your Honor could limit it.  So does

10   the Judge Steeh in the District Court can limit the powers,

11   let's say, that moving forward on a prospective injunctive

12   order that PA 436 may be unconstitutional, but what has

13   already happened we're not going to touch.  You know what?

14   Quite frankly, Judge, we're okay with that.  We're more

15   concerned about the abilities of -- more than half of the

16   African Americans in this state lack the ability to vote, a

17   vote fundamental of all fundamental rights across this

18   country.  It is fundamental and basic in our society of fair

19   play and in a democratic society that we have the right for

20   individuals to vote, and the Supreme Court of this land, so

21   has the Sixth Circuit, Judge, spoken about the ability -- the

22   dilution of the vote even on a much, much lower standard, was

23   found to be unconstitutional.  Here we don't have one

24   plaintiff, two plaintiffs, a hundred plaintiffs.  We have

25   hundreds of thousands.  The majority of African Americans in

1  this state can no longer basically represent -- can no longer

2  vote for their state -- for their local elections, Judge.

3        THE COURT:  Let me just interrupt you there, sir,

4  and ask you how you deal with the state's argument that

5  everyone who wanted to vote did vote and their votes counted?

6        MR. AYAD:  Judge, I think that would insult the

7  intelligence of the Court.  It would insult my intelligence

8  as a civil rights attorney, Judge.

9        THE COURT:  I need to hear you articulate your

10  response.

11        MR. AYAD:  I'll tell you exactly why, Judge.  I can

12  vote for a bird.  Doesn't mean that bird is going to be able

13  to do anything, Judge.  If I vote for my city councilman, has

14  no powers -- inherent in each vote in the state is the power,

15  Judge.

16        THE COURT:  One second.  For technical reasons, I've

17  been asked to ask you to move like six inches back from the

18  microphone because --

19        MR. AYAD:  I'm sorry.

20        THE COURT:  -- what happens is our system gets

21  overloaded if it's too loud, and then it cuts out, and then

22  the people in the other rooms can't hear you.

23        MR. AYAD:  Well, I definitely want to be heard,

24  Judge, so --

25        THE COURT:  Okay.

1    MR. AYAD:  -- I'll back up a little bit.  Thank you.
2  Your Honor, you know, inherent in every vote, it's a
3  fundamental constitutional -- it defies all sense of logic
4  that when I vote someone, there is inherent in that vote the
5  right that I'm saying I want you to represent me.  I want you
6  to take -- there's inherent the power of that vote to give to
7  this individual to represent me as a constituent of this
8  region, of the state, and of this country.  When you take
9  away that, if I give you that power and your power is no
10  good, it's a misnomer, Judge.  There is no real power.  There
11  is no real vote.  You're striking the vote.  How about if
12  legislation comes out from the national -- from the Congress
13  and the Senate says -- in the Senate, Judge, and across this
14  nation says each and every one of us have a right to vote.
15  You can vote.  Go ahead and vote whoever you want, but guess
16  what?  We're still going to control everything that we want
17  to do, and we're going to place whoever we want to place in
18  that thing.  It's a misnomer, Judge.  It insults the
19  intelligence of the ordered society.  It insults the
20  intelligence of any democratic society.  That's not the right
21  to vote.  That's not what vote was inherent, and --
22         THE COURT:  How do you --
23         MR. AYAD:  -- that's not what our framers of our
24  Constitution envisioned, Judge.
25         THE COURT:  How do you deal with the state's

1  argument that the people who made the decision to substitute

2  the emergency manager for the mayor and the City Council, to

3  the extent he did, were elected by the vote of the people?

4      MR. AYAD:  Well, Judge, I would have to say -- let's

5  talk about that a little bit.

6      THE COURT:  Please.

7      MR. AYAD:  In fact, that when you guys tried to

8  shove this down our throat and not even put on the ballot, we

9  have to actually fight you and go up to the Supreme Court on

10 it, and the Supreme Court ruled in favor of the individuals

11 to basically put it on that ballot, and it was put on the

12 ballot.  And guess what, Judge?  The majority, the majority

13 who, again, Judge, are not majority African American in the

14 state, voted that they don't want the PA 436, but instead,

15 Judge, what this basically state representatives did is

16 shoved it down the people's throat, Judge,

17 unconstitutionally.  I would still have -- and I'll still

18 have an argument in front of Judge Steeh, Judge --

19     THE COURT:  Is there a constitutional right that

20 people have to have their legislators only enact laws that

21 the people agree with?

22     MR. AYAD:  That's a very good question, Judge.  It's

23 going right to the heart of the argument.  Not necessarily,

24 Judge, but the people do have some kind of right, and that's

25 called the constitution and the bill of rights and the First

1   Amendment rights and the fundamental rights, the right to

2   vote, Judge, across this country, and that trumps all the

3   legislations.  If we look throughout history, Judge, the

4   legislations have been overruled under certain bills and

5   statutes and state statutes, and this is one of those types

6   of situations where they will be overruled on this particular

7   matter.

8           THE COURT:  Right, but they've never been

9   overruled --

10          MR. AYAD:  That's what we think the likelihood of

11  success is strong.

12          THE COURT:  -- because there's evidence that the law

13  was not supported by a majority of the people.

14          MR. AYAD:  No.  It was supported by the majority of

15  the people, Judge.  That's the thing.  It was actually just

16  voted by the --

17          THE COURT:  No, no, no.  My question is broader than

18  that.  No law has ever been held unconstitutional based on

19  evidence that that law was not supported by a majority of

20  people; right?

21          MR. AYAD:  Maybe so, Judge, but the fact of the

22  matter is I know, Judge, and I think we all could understand

23  the importance of a fundamental -- of the most fundamental of

24  rights.  We're not talking about any kind of right, Judge.

25  We're not talking about your ability to have a 30-day hearing

 1  before a certain thing or relief.  We're talking about the

 2  right to vote, Judge.  What is this society -- what is the

 3  American society, the democratic society, without the ability

 4  to vote?  You strip that away, Judge, I don't know what is

 5  more fundamental.  I really don't know what's more

 6  fundamental.

 7       THE COURT:  Right, but to the extent that argument

 8  works as against PA 436 --

 9       MR. AYAD:  Correct.

10       THE COURT:  -- the fact that the people supported or

11  didn't support PA 436 is irrelevant, isn't it?

12       MR. AYAD:  I think it is relevant, Judge, to a

13  certain extent because the will of the people was not

14  followed.  That's one.  But, second, Judge, will of the

15  people are not -- it is a overall will of the Constitution of

16  the United States.  It was a strong component in all the will

17  of the people, and that is the U.S. Constitution.  The U.S.

18  Constitution and the -- all the affirmants thereafter just

19  says the individual should have the right.  One vote, one

20  person, Judge, under the Constitution, and that is so

21  fundamental.  People's lives -- wars were battled over these

22  particular rights, and we shouldn't allow it to be stripped

23  away by the simple PA 436.  I would still be here arguing or

24  I'd be arguing before Judge Steeh had the people not voted

25  for a majority as to pass that particular legislation because

1   it draws on -- blocks off the minority.

2           THE COURT:  Let's bring this back to the bankruptcy

3   case.

4           MR. AYAD:  Yes, I will do that, Judge.  If I may,

5   Judge, you know --

6           THE COURT:  Well, let me focus you on this specific

7   question, which you started to touch on, and so did Mr.

8   Hollowell.  Assume you win tomorrow in the District Court and

9   you get the prospective relief that you seek.

10          MR. AYAD:  Correct.

11          THE COURT:  The emergency manager is out of office.

12  The mayor and the City Council are back in.  What's the

13  impact of that on this bankruptcy?

14          MR. AYAD:  And here it comes, and that's a very

15  important question, Judge, and I agree with you.  And we

16  considered this, Judge, and we considered -- again, we were

17  very careful, Judge.  Our arguments are strictly the Voting

18  Rights Act, the Constitutional fundamental right of the

19  voting rights.  What we're saying is, Judge, there is too

20  many contingencies.  There are two many ifs out there.  Let

21  me give you an example.  First of all, if you lift the stay,

22  we go back before Judge Steeh.  Judge Steeh could rule that

23  PA 436 is constitutional.  That issue for a moment.  Either

24  way, party -- either party is going to appeal to the Sixth

25  Circuit.  We appeal to the Sixth Circuit.  Whether we say

     1   it's unconstitutional or constitutional, the Sixth Circuit
     2   can rule, another if that it's constitutional or
     3   unconstitutional.  Then there may be a certiorari before the
     4   Supreme Court.  Brother counsel is going to be arguing before
     5   the Supreme Court in a month -- less than a month from now,
     6   Judge, on the affirmative action situation, but we may go up
     7   to the Supreme -- then that argument, then it comes back
     8   down -- say the City Council or the mayor -- the mayor may
     9   say, you know, this is in the best interest -- again, another
    10   if and contingency, Judge, that the mayor may say I want this
    11   bankruptcy, not -- maybe the new City Council or the new
    12   mayor may say I want this bankruptcy.
    13          Lastly, Judge, and this is very important and
    14   fundamental, Judge.  We should not, Judge, base our rulings
    15   and our positions on such an important fundamental right.  No
    16   right -- no bankruptcy rule should ever trump the right of an
    17   independent constituent of this nation to be able to vote for
    18   their local elections.  That's a very dangerous, dangerous
    19   route.  There is no more right more fundamental of all
    20   fundamental rights, Judge, as the right to vote, and the
    21   bankruptcy rules should not establish that.
    22          Then lastly, Judge, I want to add, too, again, like
    23   we argued earlier, the judge -- again, we're asking for
    24   injunctive order, Judge.  We're not saying, you know, apply
    25   it retroactively.  We're not saying apply it a month ago or

   1    two months ago.  We're saying just rule that PA 436 is
   2    unconstitutional.  That state judge, Judge Steeh -- that
   3    federal judge, Judge Steeh, can still rule proactively going
   4    forward that it's unconstitutional, but yet you are not to
   5    basically take away from what's already happened because
   6    we're too down in the line for it.  And I heard yesterday
   7    they were leasing -- they've already leased the Belle Isle to
   8    the state, Judge.  Again, we're not going backward, Judge.
   9    We're moving forward.  We're not contesting the eligibility
  10    of the particular bankruptcy.  We're saying if PA 436 is
  11    constitutional, absolutely, Judge.  You know, the emergency
  12    manager is within his right basically to file for bankruptcy
  13    because the state statute gives him that powers and duties.
  14    We're not contesting that.  Our argument, just like so many
  15    different of these arguments, you're not going to see one
  16    particular case in this Court, Judge, that has our particular
  17    arguments, and our arguments are very, very simple.  We're
  18    not creditors.  We're not debtors.  We're not contractual.
  19    We're not asking for service or money damages.  We're simply
  20    saying this is a fundamental constitutional civil rights
  21    issue as to the voting rights of these individuals in this
  22    state.  That's it.  We don't want nothing further, Judge, on
  23    that particular matter.  And with all due respect to this
  24    Court, Judge, we feel that this is not the proper forum for
  25    this, not -- and I agree with your Honor on your previous

1   rulings.  You've indicated that you could decide civil rights

2   issues, and I agree with that.  I'm not contesting that.  But

3   I challenge brother and sister counsels on this particular

4   matter to show me a case where strictly -- only strictly

5   constitutional issues were presented to a Bankruptcy Court as

6   opposed to dual issues where there's a creditor or the City

7   of Detroit is a defendant or debtor and there may be

8   collateral constitutional issues.  This is not the case.

9   This is not the forum.  This is not the situation here,

10  Judge.  We understand that sometimes judges, for instance, in

11  a criminal case, may be called upon to rule on civil rights

12  issues, you know, seizures and what have you, but this is not

13  the case, Judge.  This is strictly, strictly a constitutional

14  civil rights issue to vote.  We don't want nothing from the

15  city.  We haven't named the city.  We haven't named the

16  emergency manager.  We don't want nothing from them, Judge,

17  as to that.

18          THE COURT:  All right.  Let me ask you to wrap up,

19  sir.

20          MR. AYAD:  I'm sorry.

21          THE COURT:  Let me ask you to wrap up, please.

22          MR. AYAD:  All right, Judge.  I will wrap up.  And

23  lastly, Judge, I would say where does an individual that has

24  ongoing constitutional violations incurred such as the

25  majority of African Americans in this state, Judge, where do

13-53846-swr   Doc 2518-1   Filed 01/08/14   Entered 01/08/14 16:09:04   Page 62 of 98
13-53846-swr   Doc 1116   Filed 01/08/14   Entered 01/08/14 17:30:20   Page 281 of
307                                                                        281

1   they go for relief?  If we were to adopt their position, then

2   they're saying basically we should come to the Bankruptcy

3   Court to address our civil rights issues, Judge.  Where do we

4   go for -- where do we go for relief?  Is there a petition?

5   Is there a door that we can go knock on and say, "Give me my

6   relief.  I'm being violated"?  If we were to adopt the

7   opposing's position, Judge, what we would be saying is that

8   if I was arrested as a resident of the City of Detroit and be

9   put in jail the next day, I technically cannot even grieve

10  the City of Detroit, what have you, because the City of

11  Detroit has filed for bankruptcy.  It's too broad.  It's too

12  overwhelming, Judge.  It defies all notions of the --

13  inherent in any democratic society and civil society, Judge,

14  that we have an ability, an ability to ask for relief from

15  when we are grieved, Judge.  And here I don't see unless your

16  Honor allows us to move forward before Judge Steeh and

17  address those simple constitutional issues -- again, Judge,

18  emergency manager, PA 436, that's only one of the powers he

19  has is to file bankruptcy.  He has many powers.  He can sell,

20  fire, discharge.  He can -- you know, he can order supplies,

21  toilet paper, whatever the case may be.  These are just but

22  one of the inherent powers that he has.  We're not

23  challenging those, Judge.  What we're challenging is PA 436

24  as being unconstitutional.

25          THE COURT:  Let me hear from the city.  Thank you.

1          MR. AYAD:  Thank you, Judge.

2          THE COURT:  Or the state.

3          MR. FUSCO:  Good morning, your Honor.  Timothy

4     Fusco, Miller Canfield, on behalf of the City of Detroit.

5     Your Honor, I'll be brief and try to focus on the bankruptcy

6     issues that are presented by this motion.

7          First of all, as your Honor referenced in his

8     questions to counsel, the NAACP was fully aware of the filing

9     and on August 5th filed an appearance in the case.  There's

10    no question that the NAACP could have raised a constitutional

11    objection, which, as your Honor determined in his opinion

12    denying the motion for stay by the Retirees' Committee, is

13    something justiciable before this Court if it relates to the

14    question of eligibility.

15         The plaintiff devotes much of its brief and its

16    reply to two issues that it seems to have abandoned today,

17    first that this case was not contemplated by the extension

18    order and that the extension order entered by your Honor did

19    not deal with this case because it was not one of the

20    enumerated cases.  That issue was, as the plaintiffs note,

21    brought before Judge Steeh, and he made a decision that the

22    plain language of the stay order would apply to this lawsuit.

23    I don't think that's --

24         THE COURT:  I have to ask why the city didn't

25    include this litigation in its motion to extend the stay.

1          MR. FUSCO:  I asked the question myself, and I think

2     the question at that point was just one of visibility at that

3     point.  It may have -- it just slipped under the radar.  It

4     certainly wasn't an intent to exclude this case from the

5     ambit of the extension order.  Second, the --

6          THE COURT:  NAACP litigation in federal court didn't

7     have visibility?

8          MR. FUSCO:  Well, not as much visibility as a judge

9     in Ingham County enjoining people and sending orders to the

10    President, no, it didn't quite have that much visibility.

11         The second issue is this Court didn't have authority

12    to enter the stay order.  Again, that's nothing more than an

13    attempt to relitigate the motion brought before this Court to

14    obtain the extension.  I think it's been decided, and for the

15    same reasons that your Honor referenced in granting the

16    relief initially, it's applicable here, but the real issue is

17    the one --

18         THE COURT:  Are there any other lawsuits out there

19    that lack visibility?

20         MR. FUSCO:  If they're not visible, then they

21    probably don't, no.

22         THE COURT:  That was a serious question.

23         MR. FUSCO:  We're not aware --

24         THE COURT:  Are there any other lawsuits out there

25    that we should know about that are similar to this one?

 1    MR. FUSCO:  Well, there's a motion that's been filed
 2  in the Phillips matter.  I don't know if that was referenced
 3  in the order or not.  And we'll be dealing with that shortly.
 4  I'm not aware at this point of any other constitutional
 5  challenges, if that's what you're asking.
 6    THE COURT:  Well, let me just pin the question down.
 7  Are there any other lawsuits out there that are pending,
 8  federal court or state court, in which the city is going to
 9  contend that issues raised in them should be raised here in
10  the context of eligibility?
11    MR. FUSCO:  We're not aware of any right now.  The
12  state may be, your Honor, and that's a question you might
13  want to pose to the state since the defendants in these cases
14  have been --
15    THE COURT:  Fair enough.
16    MR. FUSCO:  -- state officers rather than the city.
17  When you get to -- and the issue that you did ask counsel,
18  which is isn't this really an eligibility objection, and the
19  question was continually, I think, not answered, in Michigan
20  we have one procedure for the filing of a Chapter 9 case,
21  and, of course, as your Honor obviously knows, the
22  municipality has to be authorized by the state in order to
23  file.  The only way you can file a Chapter 9 is through the
24  appointment of an emergency manager, the emergency manager
25  seeking authority from the governor, then the emergency

1     manager exercising his discretion or her discretion to file

2     the case.  The notion that if the plaintiffs prevail in

3     having the EM law declared unconstitutional -- and what the

4     plaintiff asked for in the complaint is not simply that but a

5     preliminary and permanent injunction prohibiting any EM from

6     exercising any authority and a preliminary and permanent

7     order that actions exercised by the emergency manager under

8     PA 436 are unenforceable.  So at that point, your Honor, I

9     think it's pretty clear we don't have the basis for a filing.

10    We have no EM.  We have no one else that can authorize a

11    filing or continue with the case, so the notion that the

12    mayor and council just suddenly slip into the place of the

13    emergency manager is just not consistent with the statute.

14    This is just as much an objection to eligibility as all the

15    other constitutional objections that were filed and that are

16    being heard by this Court.

17         THE COURT:  Let's pin this down because I want to

18    make sure I understand what you're saying.  You're saying

19    that if prospectively the emergency manager appointment is

20    held unconstitutional and enjoined, that would have the

21    impact or the result of, what, voiding this bankruptcy

22    because under law only the emergency manager can pursue the

23    bankruptcy?

24         MR. FUSCO:  Yes.  And I think if you asked him --

25         THE COURT:  Is that what the emergency manager law

1  says --

2          MR. FUSCO:  No.

3          THE COURT:  -- or does it say that only an emergency

4  manager can file a bankruptcy case?

5          MR. FUSCO:  It says only an emergency manager can

6  file the case, but we have --

7          THE COURT:  Well, that's been done, and if the NAACP

8  is not seeking to avoid that act, what's the problem?

9          MR. FUSCO:  Well, the problem is the NAACP also asks

10 that all the actions taken by the emergency manager are

11 unenforceable.

12         THE COURT:  Well, all right.  Assume for a minute

13 there's been a retraction of that and all they seek is

14 prospective relief.

15         MR. FUSCO:  Well, then I think we have the

16 interference with the bankruptcy case that your Honor is so

17 concerned about and why you've tried to consolidate --

18 arduously tried to consolidate all of the possible issues

19 affecting the bankruptcy case before this Court.  You have at

20 that point a great deal of uncertainty.  Who decides that

21 issue?  If it stays with Judge Steeh, is it he?  Does the

22 issue come back here?  We're trying right now.  In fact, Ms.

23 Lennox is down right now in mediation trying to reach

24 agreements with creditors, and if this case and others like

25 it are allowed to proceed in different forums, we have the

 1   risk of inconsistent results.  We have the result of

 2   uncertainty.  It's going to have a significantly deleterious

 3   effect to this case and how it -- and how it proceeds.  And,

 4   your Honor, we're not depriving -- we're not depriving the

 5   plaintiff of the right to assert these claims.  As your Honor

 6   noted, you said, "Well, what if I allow you to file a late

 7   objection to eligibility?"  And the NAACP wasn't interested

 8   in that, but why not?  File that and have it heard here.

 9   Your Honor has already determined you have jurisdiction to

10   hear that.

11        THE COURT:  Right.  The answer to that that I heard

12   was their case isn't only about Detroit.

13        MR. FUSCO:  Um-hmm.

14        THE COURT:  There are, what, eight other entities --

15        MR. FUSCO:  There are.

16        THE COURT:  -- that have these emergency managers.

17   Where does the NAACP go to bring its claim as to them?

18        MR. FUSCO:  Why wouldn't the result here have the

19   same effect on those as it does on Detroit?  If your Honor

20   determines --

21        THE COURT:  Didn't understand that answer.

22        MR. FUSCO:  If your Honor determines that PA 436 is,

23   indeed, unconstitutional, why wouldn't that have -- be

24   dispositive of the emergency managers in those other

25   jurisdictions as well?  Same statute; same issues.  It's no

 1    different than if Judge Steeh sitting in Detroit says, "Well,

 2    yes, I'm going to declare it invalid."  Presumably that would

 3    affect all of them.  You're hearing the same issue.

 4         THE COURT:  Well, but isn't it the difference that

 5    in this case I can only hear from people who have an interest

 6    in the outcome of this case, which would not include the

 7    residents of Pontiac, Flint, Benton Harbor, the other

 8    jurisdictions that have emergency managers?  There's a

 9    process question here.

10         MR. FUSCO:  Well, except none of those people are

11    involved in this lawsuit now.  They have not claimed --

12         THE COURT:  Well, all right.  I asked that question,

13    didn't I, and the answer I got was that the state NAACP

14    represents --

15         MR. FUSCO:  And that party is here.

16         THE COURT:  -- across the state.

17         MR. FUSCO:  And that party is here, and that party

18    can well participate in this case raising the eligibility

19    objection and make the same exact arguments.  It's a question

20    right now of forum and whether you're going to be able to do

21    what you've tried so hard to do, which is centralize all of

22    these issues before this Court.  I mean I'd, indeed, argue

23    that you're going to get a faster result here than you

24    would -- than you would in front of -- in front of Judge

25    Steeh, so I see -- and when you balance it, if you leave the

1  stay in place right now and the NAACP elects not to file an

2  eligibility objection, once the stay is terminated either

3  because you could, "A," say the city is not eligible -- and

4  we all agree in that case that the matter may go forward --

5  or plan of adjustment is confirmed, and the stay goes away.

6  You can still proceed with the case.  This is no different

7  than any other matter in which we're simply delaying.  Now,

8  it's even better than the tort case.

9        THE COURT:  You wouldn't have any objection if the

10  NAACP filed a second lawsuit seeking relief on the emergency

11  manager law in all of the other municipal entities other than

12  Detroit?

13        MR. FUSCO:  I think what you're asking is what

14  happens if the NAACP files a brand new lawsuit.  It may have

15  to procedurally dismiss this one before it does that, but it

16  files an action in Flint or even better in the Western

17  District for Benton Harbor.

18        THE COURT:  Doesn't matter where it files.

19        MR. FUSCO:  And it files a suit alleging the same

20  claims and saying the emergency manager in Benton Harbor is

21  unconstitutional.  If your first question is do we think the

22  stay would apply to that, the answer is yes.

23        THE COURT:  You do?

24        MR. FUSCO:  We do, um-hmm.  Now, but what would

25  happen --

1        THE COURT:  What are the grounds for that?

2        MR. FUSCO:  Well, why is it any different than any

3   of the other actions?  The outcome in that case would have a

4   direct result and effect on this bankruptcy.

5        THE COURT:  Why is that?

6        MR. FUSCO:  Because that's the decision that your

7   Honor made when you extended the stay.  It's going to be a

8   suit against state officers involving a matter that could

9   adversely affect the bankruptcy case.

10       THE COURT:  And that's the question I'm asking.

11  What's the adverse effect if another judge somewhere holds

12  that the appointment of an emergency manager in Benton

13  Harbor -- and, of course, we don't mean to pick on Benton

14  Harbor -- is unconstitutional?  What's the effect on this

15  case?

16       MR. FUSCO:  Well, it's the same effect as if the

17  plaintiffs prevail in this case.

18       THE COURT:  What is the effect?

19       MR. FUSCO:  The effect is if the Court rules it's --

20  PA 436 is unconstitutional and we don't have an emergency

21  manager statute, then it's our position there's no procedure

22  for the filing of a bankruptcy case.

23       THE COURT:  Well, but that ruling is binding only on

24  the parties in that case.

25       MR. FUSCO:  Well, if it's in the Eastern District,

 1   it presumably would be binding on your Honor, but I know the

 2   District Court, Bankruptcy Court issue, but we can still have

 3   the --

 4            THE COURT:  For the record --

 5            MR. FUSCO:  Yes.

 6            THE COURT:  -- the Bankruptcy Court is not bound by

 7   decisions of the --

 8            MR. FUSCO:  I know.

 9            THE COURT:  -- District Court except as they are on

10   appeal in the case.

11            MR. FUSCO:  Or the law of the case.  That's correct.

12   That's correct.  But think about the effect on the bankruptcy

13   itself, and we're talking right now -- let's look at where we

14   are in the status in this case.  We're very early in both

15   cases.  We're early in the case before Judge Steeh, and we're

16   early in the case here.  There's been no determination of

17   eligibility, and there's been nothing in the District Court

18   case other than cross -- motion to dismiss and a response

19   filed to a motion to dismiss.  Now, you're moving this case

20   forward at an accelerated pace, one that is faster than any

21   other Chapter 9 that I've seen.  We have not even had a

22   determination of eligibility.  You're trying to create an

23   atmosphere where parties are negotiating and endeavoring to

24   reach a consensual plan of adjustment, which obviously is

25   what's in the best interest of everybody in this case.

 1   Putting this case on hold -- and, indeed, the NAACP --

 2        THE COURT:  I don't think that's so obvious to the

 3   NAACP.

 4        MR. FUSCO:  Well, it alluded to that in its reply

 5   where --

 6        THE COURT:  I think what it thinks is in the best

 7   interest of the case is to have the elected mayor and City

 8   Council be the one who do that negotiation.

 9        MR. FUSCO:  Um-hmm.  And there's absolutely no

10   certainty that's what's going to happen.  In fact, I would

11   argue that I think it's highly likely that's not what's going

12   to happen.  And the next -- the first thing you're going to

13   see after that ruling is a motion to dismiss this case.

14        THE COURT:  I was only challenging your assertion

15   that it's obvious that the mediation is in the best interest

16   of everyone.  I'm not sure everyone would share that view.

17        MR. FUSCO:  Well, consensual resolution --

18        THE COURT:  I agree with you.  That's why I ordered

19   mediation, but --

20        MR. FUSCO:  Yes.

21        THE COURT:  -- not everyone agrees with that.

22        MR. FUSCO:  And one result that might be appropriate

23   here is to continue the stay at this point, and if you

24   determine the city is eligible, we can revisit it.

25        THE COURT:  Revisit what?

1        MR. FUSCO:  The stay motion and file another motion,

2   or we can revisit that.  My point is at this point in both

3   cases, it's early.

4        THE COURT:  Why would your position be any different

5   after eligibility than it is now?

6        MR. FUSCO:  I don't know what the --

7        THE COURT:  Argue the same deleterious effect if the

8   mayor came in with the City Council in this case in place of

9   the emergency manager.

10       MR. FUSCO:  We'd have a much better idea where the

11  case is going, I think, at that point.

12       THE COURT:  Well, the same is true after plan

13  confirmation, too, assuming there's --

14       MR. FUSCO:  Yes.

15       THE COURT:  -- confirmation.  All right.  Anything

16  further?

17       MR. FUSCO:  No.

18       MR. HOLLOWELL:  Briefly, Judge --

19       THE COURT:  One second.  You represent the state;

20  right?

21       MS. GRIMM:  I do, your Honor.  Good morning.

22       THE COURT:  All right.  So we're going to hear from

23  the state, and then we'll get back to you.

24       MR. HOLLOWELL:  Thank you.

25       MS. GRIMM:  For the record, Assistant Attorney

1    General Nicole Grimm appearing on behalf of the State of
2    Michigan.  I would simply reiterate most of what the city
3    said.  Our position, I think, is laid out in the briefing
4    before this Court.  I would want to emphasize that it was
5    stated in the beginning repeatedly that this is about voting
6    rights and not debtor creditor, but, again, the relief sought
7    in the second amended complaint -- or I'm sorry -- the first
8    amended complaint would absolutely eviscerate Detroit's
9    bankruptcy filing, and as counsel for the city made clear,
10   that -- having an emergency manager file for bankruptcy is
11   the only way for that filing to happen, so it's difficult to
12   discern how either this Court did not have discretion in the
13   first instance, which I think petitioners imply, at least in
14   their first pleading before this Court, or how now the stay
15   cannot be extended to include this case when it is, I think,
16   axiomatically related to the bankruptcy proceeding.
17           THE COURT:  Well, is it the attorney general's
18   reading of PA 436 that only an emergency manager can
19   prosecute the Chapter 9 case once having filed it?
20           MS. GRIMM:  I would agree with the Court that as far
21   as I know --
22           THE COURT:  It's only a question.  There's
23   nothing --
24           MS. GRIMM:  Right.
25           THE COURT:  -- to agree with or disagree with.

1          MS. GRIMM:  Okay.  Well --

2          THE COURT:  Just a question.  What's the attorney

3     general's reading?

4          MS. GRIMM:  As far as I know, the emergency manager

5     law states only that the emergency manager is the one that

6     has to file it.

7          THE COURT:  Um-hmm.

8          MS. GRIMM:  In terms of prosecution, though, I think

9     that if a law is ruled unconstitutional, then all of the

10    actions taken under that law are null and void, and that's

11    certainly the relief sought in the petitioner's lawsuit.

12         THE COURT:  It's a complex question, but if I heard

13    counsel for the NAACP correctly, they're only seeking

14    prospective relief.

15         MS. GRIMM:  Right.  And that's something new.

16    That's new today and not appearing in any papers that have

17    been filed, but, again, I would --

18         THE COURT:  That solve the problem?

19         MS. GRIMM:  Well, I would question whether that is

20    actually something that's possible because they are not

21    backing off from seeking a declaration that PA 436 is

22    unconstitutional.  If it's unconstitutional now, then I

23    believe, as a matter of law, necessarily, actions taken under

24    it would also have been unconstitutional and void, and that

25    would include the filing for bankruptcy.

13-53846-swr  Doc 2518-1  Filed 01/08/14  Entered 01/08/14 16:08:04  Page 77 of 98
13-53846-swr  Doc 2118-1  Filed 01/08/14  Entered 01/08/14 17:30:20  Page 296 of 98
307                                                            296

```
 1            THE COURT:  Well --

 2            MS. GRIMM:  That's my understanding.

 3            THE COURT:  Do you remember the case of the attorney

 4   who came before the Court seeking relief from the stay so he

 5   could get his attorney fees because the state judge had found

 6   the Open Meetings Act violation?

 7            MS. GRIMM:  Yes.

 8            THE COURT:  Davis.

 9            MS. GRIMM:  Yes.  I'm familiar with that case.

10            THE COURT:  Thank you, staff.

11            MS. GRIMM:  Yes.

12            THE COURT:  Okay.  So he had all this law, right,

13   which said that, you know, even if it's -- even if the

14   appointment is found to be illegal, the actions taken in the

15   meantime are still valid.  He had all that law.

16            MS. GRIMM:  Okay.

17            THE COURT:  Doesn't all that law save whatever Mr.

18   Orr has done in the meantime and especially given the

19   representation made on the record here today?

20            MS. GRIMM:  Can I just ask just which representation

21   the Court is referring to?  The representation that only --

22            THE COURT:  The representation that the relief they

23   seek is only prospective, yes, that.

24            MS. GRIMM:  I don't know if I can speak definitively

25   to that.
```

1          THE COURT:  Okay.

2          MS. GRIMM:  My reading would be I'm not very sure

3     that you could --

4          THE COURT:  You're concerned.  Okay.

5          MS. GRIMM:  Yeah.  I am concerned about that.  Other

6     than that, I think at least what petitioners have stated in

7     their papers is that they're seeking to invalidate Kevyn

8     Orr's appointment and everything he's done pursuant to it,

9     and we would adopt the city's position as well.

10         THE COURT:  Okay.

11         MS. GRIMM:  Thank you.

12         THE COURT:  Thank you.  All right.  For rebuttal,

13    I'm going to ask one or the other of you to speak.

14         MR. HOLLOWELL:  That's fine, Judge.

15         THE COURT:  Take your choice.

16         MR. HOLLOWELL:  Thank you.  Wrap it up, Judge.

17    Again, Melvin Hollowell on behalf of the NAACP.  So as it

18    relates to the Court's inquiry, the federalism republican

19    form of democracy question about the legislature also being

20    elected and how does that work as it relates to a vote of the

21    people, well, that was actually addressed by the Sixth

22    Circuit in the <u>League of Women Voters</u> versus <u>Brunner</u> case,

23    which we cited in our brief today, 458 F.3d 16.

24         THE COURT:  What did they say?

25         MR. HOLLOWELL:  And they said it's part of the

```
 1   inquiry to determine whether or not the statute is
 2   unconstitutional.  That is part of a several-prong test.
 3             THE COURT:  Um-hmm.
 4             MR. HOLLOWELL:  Was there a vote of the people?  And
 5   they look at were there ordinances in place, you know, were
 6   those ordinances voted on by the people, were there state
 7   referenda, were there -- so that is actually part of what the
 8   Sixth Circuit says you have to look at.
 9             THE COURT:  Um-hmm.
10             MR. HOLLOWELL:  So it's part of the case.  The
11   second thing is I would refer the Court to our complaint and
12   Section 61 through 66 very specifically where we outline the
13   jurisdictions outside of the City of Detroit.
14             THE COURT:  Right.
15             MR. HOLLOWELL:  And, third, as it relates to
16   counsel's I think condescending comment that the NAACP's case
17   lacked visibility, it was a nationally -- I think it was
18   pretty condescending.  We're a hundred-year-old organization.
19   It was authorized by the national NAACP.  U.S. Labor
20   Secretary Robert Reich weighed in.
21             THE COURT:  You heard me --
22             MR. HOLLOWELL:  I did.
23             THE COURT:  -- express similar skepticism --
24             MR. HOLLOWELL:  I did.
25             THE COURT:  -- about that response --
```

1          MR. HOLLOWELL:  Incredibly condescending.

2          THE COURT:  -- so I think we can just let it go at

3     that.

4          MR. HOLLOWELL:  Yeah.  We'll let it go at that.  And

5     then as it relates to prospective -- certainly not obvious to

6     us that mediation is the best.  The best for us is democratic

7     rule, and the Court focused in like a laser beam on what we

8     saw as well, is that Public Act 436 is silent with respect to

9     moving forward.  It only talks about filing, but it doesn't

10    say, okay, after filing, and so we're saying we'll sign an

11    order.  We will sign an order saying that we are going to

12    contest anything prior to today or whenever the Court rules

13    relative to --

14         THE COURT:  No.  If you win your lawsuit before

15    Judge Steeh, if that goes ahead, your next step won't be to

16    come into this Court and file a motion to dismiss on the

17    grounds that the filing was unconstitutional.

18         MR. HOLLOWELL:  That's exactly right, and we would

19    sign an order to that effect, Judge.  And, you know, by the

20    same token, you know, in Pontiac they sold the Silverdome to

21    some folks in Canada.  We're not saying go find those folks

22    in Toronto and return the Silverdome back.  The relief is

23    prospective, and so, again, as we've said before, not name

24    the city, there's no debtor creditor issues.  This is purely

25    a voting rights issue.  And for the reasons stated on the

1  record, we would ask that the stay -- that we have an

2  exception to the extension of the stay.

3         Is it okay if he just says what he was going to say

4  to me in my ear?

5         THE COURT:  Okay.

6         MR. AYAD:  Just to give credence that this is not

7  new information, Judge, we indicated on Docket Number 29 and

8  35 in our response to the motion to dismiss before Judge

9  Steeh one of the options is bankruptcy.  We've never ruled

10 that out.  In fact, after we said that, two weeks later they

11 filed for bankruptcy, Judge, so that was something that was

12 contemplated.

13        MR. HOLLOWELL:  Thank you, Judge.

14        THE COURT:  All right.  Everybody all set?

15        MS. GRIMM:  Your Honor, if I may briefly point out

16 something about the Emergency Manager Act?  It does actually

17 say -- in MCL 141.1558, Section 18, it says that the

18 emergency manager is the only one empowered to act

19 exclusively on the local government's behalf in any such case

20 under Chapter 9, so it is not only the filing of the

21 bankruptcy but also the prosecution of it.

22        THE COURT:  All right.  All right.  The Court will

23 take this under advisement and issue a written decision.  I

24 think that's it for our docket today, so we will be in

25 recess --

1          THE CLERK:  All rise.

2          THE COURT:  -- until one o'clock.

3          THE CLERK:  Court is in recess.

4      (Recess at 11:54 a.m., until 1:10 p.m.)

5          THE CLERK:  Court is in session.  Please be seated.

6  Recalling Case Number 13-53846, City of Detroit, Michigan.

7          THE COURT:  The record should reflect counsel are

8  here.  My apologies to you, counsel, for being a few minutes

9  late here, and I need another minute to get organized here.

10  Okay.

11          On September 24, 2013, AFSCME filed a motion for

12  entry of an order modifying the automatic stay solely to

13  allow administrative law judge to execute his opinion and

14  liquidate damage award before he retires on October 4, 2013.

15  It also requested an expedited hearing on this matter, which

16  the Court granted and set for hearing today.  In the

17  meantime, the City of Detroit did file an objection to the

18  motion and a brief.

19          AFSCME asserts that the matter before the Michigan

20  Employment Relations Commission, MERC, has been fully

21  briefed, and, in fact, the administrative law judge, ALJ,

22  is -- has already given an oral opinion in the matter.  The

23  record also reflects that prior to the bankruptcy petition,

24  the parties submitted supplemental briefs to the ALJ

25  regarding the appropriate remedy and other matters.

1   Therefore, AFSCME asserts that all that remains for the ALJ

2   to do is to issue a written opinion.  It asserts that

3   allowing the ALJ to issue a written opinion will simply

4   create a snapshot of the ALJ's recommendation.  It further

5   asserts that this modification of the automatic stay will not

6   prejudice the city or drain city resources or distract the

7   city from the pending Chapter 9 proceedings before the

8   Bankruptcy Court because there is nothing for it left to do

9   in the litigation before the ALJ.

10          A decision whether or not to lift the automatic stay

11  resides within the sound discretion of the Bankruptcy Court.

12  In re. Garzoni, 35 Federal Appendix 179, 181, Sixth Circuit,

13  2002, citing Laguna Associates Partnership v. Aetna Casualty

14  & Insurance Company, In re. Laguna Associates Limited

15  Partnership, 30 F.3d 734, 737, Sixth Circuit, 1994.  The

16  Garzoni court stated on the same page, quote, "Bankruptcy

17  Code Section 362(d)(1) provides that the bankruptcy court may

18  grant relief from the automatic stay for cause.  See 11

19  U.S.C., Section 362(d)(1).  The bankruptcy court considers

20  the following factors in deciding whether to lift a stay:

21  (1) judicial economy; (2) trial readiness; (3) resolution of

22  preliminary bankruptcy issues; (4) the creditor's chance of

23  success on the merits; and (5) the cost of defense or other

24  potential burden to the bankruptcy estate and the impact of

25  the litigation on other creditors."  Bankruptcy courts have

1 held that it may be appropriate to lift the automatic stay

2 when another court, quote, "already had all of the

3 documentation and evidence in its hands in order to rule in

4 the matter and a decision could be made almost immediately,"

5 close quote, In re. Bunting, 2013 Westlaw 153309, Eastern

6 District of Michigan, January 15th, 2013.

7     After reviewing all of these factors, the Court

8 concludes that they weigh in favor of modifying the automatic

9 stay to allow entry of the ALJ's written opinion.  In the

10 Court's view, the most important matter -- or factor is that

11 it does not appear that there will be any prejudice to the

12 city if the relief sought by the moving party, AFSCME, is

13 granted and if all we allow is for the ALJ to issue a written

14 decision.

15     In particular, AFSCME's proposed order only seeks to

16 allow the ALJ to execute his recommended decision before he

17 retires on October 4th, 2013.  In this regard, the Court must

18 state for the record that the fact that the ALJ -- the ALJ's

19 retirement is imminent is, in the Court's view, largely

20 irrelevant.  The Court should decide whether it's appropriate

21 to grant this limited relief from the stay regardless of

22 whether the ALJ happens to be retiring imminently or not.

23 The Court notes that the proposed order also waives the stay

24 of the order as provided for in Bankruptcy Rule 4001(a)(3),

25 and that's appropriate here as well.

 1          The Court does acknowledge and recognize that the

 2     city takes the position that there is much more process that

 3     is required before the ALJ and also before MERC before this

 4     matter is finalized.  The Court concludes, however, that it

 5     is not for this Court to decide whether the ALJ has completed

 6     all of the process necessary for him to issue a decision.

 7     It's for the ALJ to decide.  And, of course, in that regard,

 8     if the city determines that its procedural or substantive

 9     rights have been prejudiced by any action of the ALJ that

10     flows from or results from this order or otherwise, those

11     objections are, of course, fully preserved to be presented as

12     appropriate in future proceedings.

13          Accordingly, the Court does grant relief from the

14     automatic stay but only until 11:59 p.m. on October 4th,

15     2013, for the sole purpose of allowing the administrative law

16     judge to -- the opportunity to issue a written recommendation

17     should he decide that it is appropriate to do so.  This

18     relief that the Bankruptcy Court is granting is neither a

19     request for the ALJ to issue a recommendation or an order to

20     do so.  And just to be crystal clear about this, if the ALJ

21     feels that more process is required for any reason, whether

22     it's the arguments made in the post-hearing briefs or the

23     events that have occurred post-hearing, relief from stay is

24     not granted to allow for any other or further process or

25     procedures.

1    The parties have agreed on the record and the Court

2    does order that all dates and deadlines that would otherwise

3    flow under state law from any opinion or recommendation that

4    the ALJ issues are tolled and will be tolled indefinitely

5    pending a further order of this Court.

6    Finally, the Court feels compelled to state on the

7    record that it has taken the time to articulate on the record

8    here this very narrow ruling so that it is clear that this

9    case should not be considered precedent for other parties'

10   motions for relief from the stay because the facts and

11   circumstances here are unusual or unique, to say the least.

12   The Court will prepare an appropriate order.  Anything

13   further?

14        MS. LEVINE:  Thank you.

15        MS. LENNOX:  No, your Honor.  Thank you.

16        THE COURT:  All right.  We'll be in recess then.

17        THE CLERK:  All rise.  Court is adjourned.

18      (Proceedings concluded at 1:20 p.m.)

                              INDEX


<u>WITNESSES:</u>

        None

<u>EXHIBITS:</u>

        None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 8, 2013
_____        _____
Lois Garrett