**Own fUNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Expedited Consideration** |
|  | ) **Requested** |

---

**EMERGENCY MOTION OF SYNCORA GUARANTEE INC.**
**AND SYNCORA CAPITAL ASSURANCE INC. FOR STAY PENDING**
**APPEAL**

---

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this motion (this "Motion"), pursuant to Federal Rule of Bankruptcy Procedure 8005, for a stay pending appeal of this Court's minute entry, dated January 16, 2014, authorizing the City to enter into debtor-in-possession financing under section 364 of the Bankruptcy Code (the "DIP Order"). In support of the Motion, Syncora respectfully states as follows:

### Background

1.     On July 18, 2013, the City filed its *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 and (III) Granting Related Relief* [Docket No. 17] to assume the Forbearance Agreement and settle

controversies with the Swap Counterparties (together with a supplement filed on December 27, 2013 [Docket No. 2341], the "Forbearance Agreement Motion"). Syncora filed an objection [Docket No. 366] (the "Forbearance Objection") to the Forbearance Motion on August 16, 2013.

2. On November 5, 2013, the City filed its *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Docket No. 1520] (the "DIP Motion" and, together with the Forbearance Agreement Motion, the "Contested Motions"). In the DIP Motion, the City seeks authority to enter into a postpetition financing agreement with Barclays Capital, Inc. (the "DIP Facility") consisting of two parts: funding the termination payment under the Forbearance Agreement (the "Swap Termination Bonds") and funding certain capital improvement projects in the City (the "Quality of Life Bonds"). Syncora filed an objection [Docket No. 1870] (the "DIP Objection") to the DIP Motion on November 27, 2013.

3. On December 10, 2013, the City submitted its reply briefs with respect to the Forbearance Agreement Motion [Docket No. 2029] (the "Forbearance Reply") and the DIP Motion [Docket No. 2023] (the "DIP Reply"). The Swap Counterparties also filed a statement in support of

the Forbearance Agreement Motion [Docket No. 2033] (the "<u>Swap Counterparty Statement</u>").

4.     On December 17, 2013, December 18, 2013, January 3, 2014, and January 16, 2014, this Court held hearings on the Contested Motions (together with the later hearings, as discussed below, that occurred on January 3, 2014, and January 6, 2014, the "<u>Combined Hearing</u>").   On January 16, 2014, this Court informed the parties of its ruling from the bench and entered minute entries denying the Forbearance Agreement Motion and conditionally approving the Quality of Life portion of the DIP Motion.  Following this Court's ruling, Syncora requested an administrative stay of the DIP Order pending briefing on a stay pending appeal.  Syncora also promptly filed a notice of appeal and this Motion.

5.     The DIP Order is likely to be overturned on appeal.  The DIP Order is premised on a standard of review that is not supported by the Bankruptcy Code or its legislative history, particularly given the "plan-like" implications of the DIP Facility.  Indeed, the standard of review applied to the DIP Motion allows the City to deprive creditors of potential sources of recovery to prematurely begin the City's "renaissance" (DIP Motion ¶ 19) while treating this Court as a rubber stamp for the City's borrowing decisions.  This Court's decision will encourage the City to continue engaging in piecemeal "plan-like" transactions that are effectively immune from meaningful review, and amounts to an open invitation to abuse the

chapter 9 process. The City's resulting spending, moreover, may permanently prejudice the City's ability to propose a confirmable plan of adjustment by making it impossible for the City to show that it has reserved sufficient value for creditor recoveries. This Court also erred by concluding that a debtor need not actually seek unsecured financing before it may obtain secured financing under section 364 of the Bankruptcy Code, and further erred by finding that Barclays acted in good faith notwithstanding a lack of evidence in the record on that point. Finally, the DIP Order purports to approve a DIP Facility that, in light of this Court's conditions, has not, in fact, been put forward in any motion or subjected to any process.

6.    Syncora—and, for that matter, the City's other creditors that have objected to the DIP Motion—have a substantial likelihood of prevailing on appeal. Without a stay, however, Syncora anticipates that parties will assert that any challenge to the DIP Facility is rendered moot by section 364(e) of the Bankruptcy Code. Although Syncora will vigorously argue that section 364(e) does not apply because (a) there is insufficient evidence in the record to support this Court's finding that Barclays acted in good faith and (b) effective relief can be crafted notwithstanding section 364(e), the issue will be hotly contested and supports granting a stay. Even setting aside concerns of mootness, consummation of these transactions will cause Syncora to suffer irreparable harm. By contrast, a stay will

4

not significantly harm the City or its stakeholders. Finally, the public interest demands an opportunity for full appellate review of the DIP Facility given that the DIP Facility involves fundamental questions about the purpose of chapter 9, the scope of the bankruptcy courts' role in reviewing transactions that require a courts' imprimatur, the legal standard applicable to postpetition financing in the chapter 9 context, and the ability of municipal debtors to "side-step" plan confirmation requirements by executing "plan-like" transactions.

7.     In the event this Court declines to grant the relief requested in this Motion, Syncora will promptly request, on an emergency basis, a stay pending appeal from the District Court for the Eastern District of Michigan (the "District Court"). Syncora respectfully requests that this Court, at a minimum, grant a temporary stay to maintain the status quo pending the District Court's determination of whether a stay is appropriate.

## Jurisdiction

8.     Syncora brings this motion pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). This Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. A determination of whether to grant a stay pending appeal is a core proceeding pursuant to 28 U.S.C. § 157. Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

9.     Syncora seeks entry of an order, substantially in the form attached hereto as <u>Exhibit 1A</u>, staying the effectiveness of the DIP Order pending appeal.

10.     In the alternative, Syncora seeks entry of an order, substantially in the form attached hereto as <u>Exhibit 1B</u>, temporarily staying the effectiveness of the DIP Order pending the District Court's evaluation of the appropriateness of a stay.

## Basis for Relief Requested

11.     Courts consider the same elements applicable to the grant of a preliminary injunction when determining whether a stay pending appeal should be granted under Bankruptcy Rule 8005:  "(1) whether the movant has shown a strong or substantial likelihood of success on the merits; (2) whether the movant has demonstrated irreparable injury; (3) whether the issuance of [a stay] would cause substantial harm to others; and (4) whether the public interest is served by the issuance of [a stay]."  *In re Holstine*, 458 B.R. 392, 394 (Bankr. E.D. Mich. 2011) (*citing In re Eagle-Picher Indus.*, 963 F.2d 855, 858-69 (6th Cir. 1992)).

12.     The Sixth Circuit has adopted a sliding scale with respect to the first two factors.  "The probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [movants] will suffer absent the stay.  Simply stated, more of one excuses less of the other."  *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir.

1991); *see also Service Employees Intern. Union Local 1 v. Husted*, 698 F.3d 341, 343 (6th Cir. 2012) (*quoting Griepentrog*); *In re Smith*, 501 B.R. 332, 335-36 (Bankr. E.D. Mich. 2013) (same). Consistent with this sliding scale approach, the Sixth Circuit has approved a test that provides that a stay is appropriate "where [the movant] fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the [non-moving party] if [a stay] is issued." *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985) (citations omitted); *see also Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) (affirming that an injunction may issue upon a showing of "serious questions going to the merits").

## A.      Likelihood of Success on the Merits.

13.      The District Court is likely to overrule the DIP Order for several reasons. *First*, this Court applied an improperly deferential legal standard to the DIP Facility. *Second*, this Court erred as a matter of law by concluding that the City need not affirmatively seek unsecured credit before borrowing secured credit. *Third*, this Court committed clear error by finding that Barclays acted in good faith. *Fourth*, the DIP Order improperly approves a DIP Facility that does not yet exist.

7

### 1. This Court Erred by Applying the Incorrect Legal Standard to the DIP Facility.

14.     There is no issue more fundamental to the proper administration of the City's chapter 9 case than the scope of the federal courts' authority to analyze transactions proposed by the City that invoke the powers granted by the Bankruptcy Code. Indeed, this issue will carry through to any proposed plan of adjustment. A stay is therefore necessary and appropriate to ensure that appellate courts are able to determine the novel question of the scope of the federal courts' review of municipal postpetition financing. *See, e.g.*, *In re Texas Equipment Co., Inc.*, 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002) (holding that appellant had raised substantial questions about the merits where there was no binding precedent).

15.     This Court held that section 904 of the Bankruptcy Code significantly constrains this Court's evaluation of the DIP Facility. Under the adopted standard, this Court's review is limited to evaluating (i) whether the City could obtain unsecured financing; (ii) the reasonableness of the terms of the financing; and (iii) whether the postpetition financing was negotiated in good faith. (Dec. 13 Hr'g Tr. at 42.) That standard precluded evaluation of the proposed uses of, or the need for, the Quality of Life portion of the DIP Facility.

16.     Syncora respectfully submits that the standard adopted by this Court is at odds with both precedent and the goals of chapter 9. If this Court's standard is correct, that would mean that section 904 of the Bankruptcy Code effectively

13-53846-tjt   Doc 2516   Filed 01/17/14   Entered 01/17/14 17:07:20   Page 8 of 27

transforms this Court into a "rubber stamp" for the City's proposed transactions as long as the City can satisfy that bare legal standard. Indeed, under the standard of review adopted by this Court, the City could simply continue its transaction-by-transaction approach, effectively enjoying immunity from judicial review, while engaging in its inevitable march toward its $1.25 billion reinvestment campaign from which the City will effectively "back in" to creditor recoveries. What this means is that there will have been no necessary consensus, no effective judicial review, and no plan confirmation safeguards at any meaningful point. By the time a plan is proposed, all sources of recovery will have been allocated. The inevitable result of this standard, however, is demonstrably at odds with precedent and the goals of chapter 9. Indeed, by prematurely allocating funds away from creditors, the City may be impairing its ability to propose a confirmable plan of adjustment. *See Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564-66 (9th Cir. 1940) (holding that a plan was not fair, equitable, or in the best interest of creditors where it forced creditors to effectively subsidize infrastructure improvements); *Kelly v. Everglades Drainage Dist.*, 319 U.S. 415, 418 (1943) (holding that a chapter 9 plan may be confirmed only if it is fair to creditors).

17.     Because the DIP Facility seeks to implement "plan-like" transactions, the DIP Facility should be assessed with a view toward the purposes and policies of chapter 9. *See In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007)

9

(providing that debtors cannot enter "into transactions that will, in effect, 'short circuit the requirements of chapter 11 for confirmation of a reorganization plan.'") (citations omitted); *Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (prohibiting transactions that dictate the future terms of a restructuring); *In re Swallen's, Inc.*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ("[A] bankruptcy court cannot issue orders that bypass the requirements of [the Bankruptcy Code], such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization."); *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements."); *In re Belk Props., LLC*, 421 B.R. 221, 225 (Bankr. N.D. Miss. 2009) (refusing to approve a debtor-in-possession financing facility that improperly dictated the terms of an eventual plan); *see also In re First South Sav. Ass'n*, 820 F.2d 700 (5th Cir. 1987) (holding that mandamus was appropriate where bankruptcy court erred by relying on "assumptions that appear to be part of an overall plan of reorganization whose terms are not disclosed and which obviously has not yet been tested under the standards applicable to plans.").

18.     If the City had been able to obtain financing on an unsecured basis and had not sought this Court's approval of that transaction, this Court would have been empowered to consider that postpetition transaction in the context of a plan of

adjustment. *See, e.g.*, *City of Stockton*, 486 B.R. at 199-200 (holding that the ultimate check on a municipality's decision to execute transactions without court approval is scrutiny at plan confirmation). The City plainly anticipates that this Court's effective rubber-stamping of the DIP Facility will render the DIP Facility, and its plan-like effects on creditor recoveries, unassailable at plan confirmation. And while Syncora does not concede that issue, it should never arise in the first instance. Put another way, the City should not be able to effectively immunize a transaction from review at this stage given the clear "plan-like" implications and the specific bankruptcy powers being invoked.

19. Even assuming the DIP Facility is not subject to confirmation standards, it must still be subject to scrutiny under the standards generally applicable to postpetition financing facilities where, as here, the City is asking this Court to wield the powers granted to it under the Code. *See, e.g., In re Farmland Indus., Inc.*, 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003) (enumerating factors);*In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649, *14 (Bankr. S.D.N.Y. June 16, 2009) (noting that courts must oversee the debtor-in-possession financing process). It is true that section 904 contains certain limitations on this Court's powers. Where the City consented to the Court's review, however, section 904 demands a more detailed review of the proposed transaction. *See, e.g., In re City of Stockton, Cal.*, 486 B.R. 194, 198-99 (Bankr. E.D Cal. 2013) (holding that a municipal

debtor necessarily consents to judicial interference when the municipality affirmatively seeks relief); H.R. Rep. 95-595, at 394-95 (1997) ("[W]hen the municipality needs special authority, such as subordination of existing liens, or special priority for the borrowed funds . . . the court will become involved in the authorization.").

20.     At an absolute minimum, then, the City should have been required to show that the DIP Facility is (a) in the best interests of creditors, *see In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (*citing In re Texlon Corp.*, 596 F.2d 1092, 1098-99 (2d Cir. 1979)), (b) necessary for the provision of essential services during the course of the case, *see Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 566 (9th Cir. 1940) (holding that plan could not be confirmed because creditor losses were used to subsidize unnecessary capital improvements); *In re Jefferson Cnty., Ala.*, 482 B.R. 404, 439 (Bankr. N.D. Ala. 2012) (holding, in context of section 928, that "necessary" expenses are expenses needed to keep the system running, "not improvements or enhancements"), and  (c) a sound exercise of the City's business judgment.

21.     Somewhat surprisingly, this Court did, in fact, ultimately make conclusions about certain of the *Farmland* factors.  Specifically, the Court found that the City needed the funds—whether for a working capital account or for the City's originally proposed purpose of reinvestment initiatives.  Those findings,

however, were inappropriate given this Court's exclusion of evidence regarding the needs and uses of the Quality of Life portion of the DIP Facility. Additionally, the City has not produced evidence to support the proposition that the recoveries of *existing creditors* will benefit from the "quality of life" portion of the DIP Facility beyond conclusory, unsupported statements that the reinvestment campaign *writ large* (as distinguished from the DIP Facility) will improve the City's tax base, reverse (or even slow) residents from leaving the City, or improve the City's long-term fiscal outlook. Such conclusory statements by the City, however, are not enough. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (holding that mere assertions that postpetition loan would increase value of developed property were insufficient); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (denying postpetition financing where evidence was insufficient to show increased value).

### 2. The DIP Facility Should Not Have Been Approved Because the City Did Not Seek Unsecured Financing.

22.     The DIP Facility fails to satisfy even the limited standard applied by this Court because the City failed to prove that unsecured or administrative priority financing was unavailable. *See* 11 U.S.C. § 364(c)-(d). The standard for obtaining secured postpetition financing "does not permit a debtor to purposely choose not to seek financing on better terms, on the basis that they themselves subjectively believe the financing they've obtained is the best terms possible." *In re MSR*

*Hotels & Resorts, Inc.*, Case No. 13-11512, 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013) (*quoting In re L.A. Dodgers, LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("A court 'may not approve any credit transaction under Subsection (c) [of Section 364], unless the debtor demonstrates that it has attempted, but failed, to obtain unsecured credit under Section 364(a) or (b).'"); *In re Ames Department Store*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("Although a debtor is not required to seek credit from every possible source, a debtor must show that it has made a reasonable effort to seek other sources of credit available under Section 364(a) and (b).")).

23.     The District Court is likely to hold that this Court erred as a matter of law when this Court held that *MSR*, *L.A. Dodgers*, and *Ames* were wrongly decided.  If this Court is right, any debtor could obtain secured financing simply by having their financial advisor attest to their belief that unsecured financing was unavailable.  The rule promulgated in *MSR*, *L.A. Dodgers*, and *Ames*, however, has a vital evidentiary effect:  it forces a full market test, rather than reliance on opinion testimony.   And as the Supreme Court has noted, "the best way to determine value is exposure to a market."  *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 457-58 (1999).  The terms of a financing facility are no less susceptible to market testing than the price for an asset.  Thus, requiring a debtor to demonstrate that it did, in fact, request unsecured

credit is a powerful way of ensuring that the debtor has done everything it can to get the most attractive facility available to it.

24.     Here, the City admitted that it did not affirmatively request unsecured financing from potential lenders.  (Dec. 17 Hr'g Tr. at 151-56, 179-80, 184-85; Dec. 18 Hr'g Tr. at 36-7.)  Instead, the City's position is that a letter from a single lender indicating that a facility would need to be secured, and the opinion testimony of Mr. Buckfire and Mr. Doak that unsecured financing is not available to debtors as a general matter, somehow proves that unsecured financing was unavailable to the City.  (Dec. 17 Hr'g Tr. at 152-58; Jan. 3 Hr'g Tr. at 176; Letter from J.P. Morgan, City Trial Ex. 61.)  Indeed, Mr. Orr testified that lending on an unsecured basis to a bankrupt party would be "reckless."  (Jan. 3 Hr'g Tr. at 50-51.)  Similarly, Mr. Buckfire simply asserted that "no one ever raises debtor in possession financing without collateral."  (Dec. 17 Hr'g Tr. at 185.)

25.     The subjective views of the City and its advisors do not satisfy section 364's requirements.  And the JP Morgan letter provides no further support, because it is entirely unsurprising that a lender would not offer to loan on an unsecured or administrative priority basis when the City offers up security in its initial request for a financing proposal.  Even Mr. Doak admitted that "it would be unlikely that a potential lender would remove [collateral] that went out with the City's initial proposal" (Dec. 18 Hr'g Tr. at 36-7.)  Additionally, the City has failed to address

the fact that lending on an administrative priority basis would be a perfectly rational decision in the unique chapter 9 context. Unlike the chapter 11 context upon which the City's witnesses relied, a liquidation under which even a debtor's administrative claimants are not paid is not merely unlikely in chapter 9—it is impossible. And any plan of adjustment must pay administrative claims in full.

26. Ultimately, if the evidence the City put into the record is sufficient to prove that unsecured financing was unavailable, the requirement that a debtor be unable to raise unsecured or administrative priority financing is essentially read out of the statute. *MSR*, *L.A. Dodgers*, and *Ames* were rightly decided—the City must affirmatively seek unsecured financing—and even without that requirement, advisors' subjective belief that financing under sections 364(a) and (b) are not realistic possibilities *writ large* cannot satisfy a debtor's burden under section 364(c).

### 3. There is Insufficient Evidence to Support this Court's Good Faith Finding Under Section 364(e).

27. In the Sixth Circuit, bankruptcy courts are required to explicitly find that parties have acted in good faith in order for section 364(e) to apply. *New York Life Ins. Co. v. Revco D.S., Inc. (In re Revco)*, 901 F.2d 1359, 1364 (6th Cir. 1990). In this case, there is insufficient evidence in the record to support this Court's good faith finding. Indeed, Syncora's requests to subject Barclays to discovery (*i.e.*, via a third-party deposition) were denied, meaning that Syncora had no opportunity to

investigate the good faith of the lender. It also meant that no evidence was presented from Barclays' perspective. Accordingly, the District Court is likely to reverse this Court's good faith finding.

> **4. This Court Erred By Conditionally Approving a DIP Facility that Does Not Exist.**

28. The DIP Facility, as it was proposed in the DIP Motion, contained two parts: the Swap Termination financing and the Quality of Life financing. Importantly, the Quality of Life financing—the portion conditionally approved by this Court—was to be secured by the Casino Revenues. This Court conditioned use of the Casino Revenues on a process being put into place to ensure that the Quality of Life financing would be used for purposes that are permissible under the gaming act. Alternatively, the Court suggested that the City could collateralize the DIP Facility with a different revenue stream.

29. The Court's suggestions will, one way or another, require material amendments to the DIP Facility. As an initial matter, it is far from clear that the City may move forward with any revised DIP Facility without seeking the approval of the City Council and the loan review board. Additionally, if the City goes forward with using the Casino Revenues, the City will need to demonstrate that the prepetition liens on the Casino Revenues are adequately protected pursuant to section 364(d)(1)(B) of the Bankruptcy Code. However, because the prepetition liens on the Casino Revenues were not being primed, the issue of adequate

17

protection was never presented by the DIP Motion or considered by this Court. Additionally, the Objectors' arguments that it is impermissible to use the Casino Revenues to merely collateralize a loan will need to be directly addressed, and a factually-intensive inquiry, subject to the adversary process, will need to be applied to each of the City's proposed line items. Similarly, if the City chooses to restructure the DIP Facility with a different collateral package, parties will need an opportunity to review whether the newly-proposed pledge itself complies with applicable law.

30. Ultimately, the DIP Order conditionally approved a DIP Facility that cannot exist because of this Court's denial of the Forbearance Agreement Motion. Indeed, the DIP Order is effectively an advisory opinion. This Court has effectively held that *if* the City proposes a new postpetition facility that meets certain conditions, then this Court will approve that hypothetical facility. Such an order is impermissible and will likely be reversed on appeal.

**B.     Syncora Will Suffer Significant Irreparable Harm if a Stay is not Granted.**

31. Syncora—along with other stakeholders—is likely to suffer substantial irreparable harm if the DIP Order is not stayed.

32. *First*, the Sixth Circuit has recognized that the loss of constitutional rights constitutes irreparable harm that justifies a stay. *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566 (6th Cir. 2002). As noted

above, the DIP Order is effectively an advisory opinion. And to the extent it allows the City to enter into a revised DIP Facility on new terms without an appropriate opportunity for parties to be heard *before* the DIP Facility closes, the DIP Order arguably deprives parties of their due process rights.

33. ***Second***, "irreparable harm [can] result in the form of diminished resources available to creditors." *Eagle-Picher*, 963 F.2d at 860 (discussing *A.H. Robins Co, Inc. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)). The *A.H. Robins* court held that an injunction prohibiting claims against third-party tort codefendants was appropriate because the claims would diminish the insurance proceeds available to the estate. 788 F.2d at 1007-08. Reducing funds available to the estate, in turn, would reduce funds available to support creditor recoveries. The *Eagle-Picher* court applied this same rationale. 963 F.2d at 860-61.

34. The principle expressed in *Eagle-Picher* and *A.H. Robins* is applicable here. The DIP Facility—however it is eventually amended—will likely encumber previously-unencumbered assets such as the City's income tax revenues and proceeds from asset sales (as evidenced by the structure of the original DIP Facility), which could otherwise fund creditor recoveries. Once the revised DIP Facility is approved, those reductions to creditor recoveries will be irreversible unless this Court's section 364(e) finding with respect to Barclays is reversed.

Thus, all of the City's creditors, including Syncora, will be irreparably harmed if a stay is not granted.

35.     **Fourth**, the risk of statutory and/or equitable mootness with respect to several issues subject to appeal strongly supports a stay.  *See, e.g.*, *In re Adelphia Commc'n Corp.*, 361 B.R. 337, 347-48 (S.D.N.Y. 2007) ("[W]here the denial of a stay pending appeal risks mooting *any* appeal of *significant* claims of error, the irreparable harm requirement is satisfied.") (emphasis in original); *see also Weingarten Nostat, Inc. v. Service Merchandise Co., Inc.*, 396 F.3d 737, 741 (6th Cr. 2005) (noting that the district court below determined that potential mootness of appeal likely established irreparable harm even though the district court denied the stay on other grounds).

36.     To be clear, Syncora does not concede that its appeal will be moot even if this Court's good faith finding is not overturned.  Indeed, Syncora believes that some relief may be possible notwithstanding section 364(e), and also believes that equitable mootness would be inapplicable here.  In particular, Syncora believes that if the DIP Order is overturned on appeal, this Court could require the City not to spend any remaining proceeds of the DIP Facility.  Syncora expects, however, that parties will vigorously argue that the DIP Order cannot be overturned on appeal and that the City could not be enjoined from spending any remaining proceeds even if the DIP Order was overturned.  In light of the

substantive and procedural novelty of the DIP Order, mootness should not be allowed to dictate the final outcome here.

37.     To be sure, other cases have held that mootness alone is not sufficient to show irreparable harm.  But where, as here, the claims of error are significant and Syncora will suffer irreparable harm in addition to mootness, the risk of mootness strongly supports granting a stay.  Indeed, this Court should grant a stay to preserve the jurisdiction of the appellate courts.  *See, e.g.*, *Sawyer v. Dollar*, 1951 WL 44185, *1 (S. Ct. May 22, 1951) (Vinson, C.J., in chambers) (granting a stay "necessary to preserve the jurisdiction of this Court."); *Belbacha v. Bush*, 520 F.3d 452 (D.C. Cir. 2008) (temporarily enjoining government action "in order to preserve [its] jurisdiction over the appeal").

## C.     The City and Other Interested Parties Will Not Be Substantially Harmed If a Stay is Granted.

38.     The City has failed to show that it would be significantly harmed by the imposition of a stay.  The City has not demonstrated that it has an immediate need to access cash, particularly if it delays implementation of its reinvestment initiatives (as it should, until this Court has the opportunity to weigh those initiatives against creditor recoveries in the context of a plan of adjustment).  And in light of this Court's conditional ruling, it is not even clear when the City would be able to obtain access to the funds.

39.    Additionally, it is inconceivable that the January 31, 2014, expiration of Barclays' funding commitment remains relevant given the substantial changes that will need to occur to comply with this Court's conditions.  Furthermore, even assuming Barclays would not extend its funding commitment—an entirely unrealistic assumption, particularly given the likely public reaction to Barclays taking its already-paid commitment fee and leaving the City out to dry—the record demonstrates that other financing would be readily available.  The City should not be able to inoculate the DIP Facility from appellate review by agreeing to a precipitous funding termination date—especially where, as here, it is not even clear what the structure of the DIP Facility will be.

40.    The lack of harm to the City must be contrasted with the significant benefit that will be received by all other creditors (with the exception of the Swap Counterparties) by avoiding a premature allocation of the City's distributable value.  Indeed, this case is the mirror-image of cases holding that a stay was *not* warranted because a stay would harm creditors.  *See, e.g., In re Babcock & Wilcox*, No. Civ. A.00-1410, 2000 WL 1092434 at *3 (E.D. La. Aug. 2, 2000) (finding injury to others and denying a creditor's motion for a stay pending appeal because the postpetition financing agreement was "necessary in order to avoid immediate and irreparable harm to debtors' estate" and delayed financing under the postpetition financing agreement would "significantly" harm other creditors); *In re*

*Den-Mark Const., Inc.*, No. 08-02764-8-RDD, 2008 WL 4526711 at *1 (Bankr. E.D. N.C. Oct. 2, 2008) (denying creditor's motion for an order granting a stay pending appeal and finding in dicta that creditors would be harmed by a stay, as it would postpone or disallow the debtor's postpetition financing). Moreover, the City's residents also benefit by avoiding a premature allocation of the City's distributable value that all but guarantees an endlessly contentious plan confirmation process.

**D. The Public Interest Strongly Supports Granting a Stay.**

41.    Courts generally balance the "significant public interest in vindicating the rights of the minority and preventing the will of the majority to go unchecked by appellate review" against the "swift and efficient resolution of bankruptcy proceedings" when determining whether the public interest supports a stay pending appeal. *Tribune Co.*, 477 B.R. at 476 (quoting *In re Adelphia Commc'n Corp.*, 361 B.R. at 368). Here, however, there is nothing to balance. Delayed effectiveness of the DIP Facility will not slow the progress of these chapter 9 cases. Indeed, by delaying the consummation of these "plan-like" transactions, a stay may actually help the City reach consensus with a broader group of creditors and lead to a more consensual plan of adjustment. By contrast, the DIP Facility is an open invitation to a process that is endlessly contentious.

42.     Additionally, the public's interest in having the fundamental questions raised by the DIP Facility be subject to the rigors of appeal is difficult to overstate. The scope of this Court's review in light of section 904 of the Bankruptcy Code may influence the plan process, particularly if the City continues to engage in "plan-like" transactions like the DIP Facility.  Additionally, the City's premature "renaissance" spending may make it more difficult for the City to propose a confirmable plan of adjustment.  The public interest will be served by ensuring that the appellate courts have an opportunity to evaluate these issues before the City continues on a path that prejudices its ability to approve a plan and emerge from chapter 9.

43.     Indeed, the issues presented by the DIP Order expand far beyond even this chapter 9 case.  Municipalities across the country face grave financial troubles. The administration of this chapter 9 case, and the standards applied here, are likely to have far-reaching implications in future cases.  This case, moreover, may have a profound effect on both the municipal finance market if the market determines that municipalities can use the chapter 9 process to enter into piecemeal "plan-like" transactions that eviscerate creditor rights without respect to creditor recoveries, and may influence the decision-making process of state legislatures with respect to their municipalities' rights to access chapter 9 in the first place.  Thus, the public interest will be served by further clarity being provided by the appellate courts

without the potential cloud of mootness hanging over parties' attempts to vindicate their rights.

**E.     No Bond is Necessary or Appropriate**

44.     Courts have acknowledged that a bond may not be appropriate where there is "good reason not to require the posting of a bond." *Adelphia*, 361 B.R. at 368. ***First***, the equities of this case and the public interest strongly support a stay pending appeal to ensure that the issues presented by the DIP Order are subject to full and fair appellate review.

45.     ***Second***, unlike in *Adelphia*, *Tribune*, and other cases requiring substantial bonds as a condition of a stay pending appeal, the consummation of a confirmed plan is not put at risk by a stay. Not a single creditor is being asked to stand idly by while the appellate process goes forward to address the grievances of a small number of objectors. Rather, a substantial majority of the City's stakeholders stand to benefit by ensuring rigorous appellate review of the transactions approved by this Court. Indeed, it would be inappropriate to require Syncora to post a bond where widely-dispersed stakeholders—stakeholders that are so widely dispersed that this Court relied on the impracticability of negotiations to support its position that the City is eligible for chapter 9 in the first place, many of whom have no practical way of participating in these proceedings—stand to benefit from a stay.

46.    ***Third***, the record shows that no significant harm will result from a stay pending appeal.  Thus, no bond is necessary or appropriate.  *See In re Sphere Holding Corp.*, 162 B.R. 639, 644-45 (E.D.N.Y. 1994) (holding that no bond was necessary "because little or no damage will be incurred as a result of the stay").

## Conclusion

47.    The DIP Facility should be subject to the full rigor of appeal, without the risk of mootness, and without the need to post a bond in a situation where the City will not be appreciably harmed by a stay.  For the foregoing reasons, Syncora respectfully respects that this Court approve the relief sought herein.

WHEREFORE, Syncora respectfully requests that this Court (a) enter an order substantially in the form attached hereto as <u>Exhibit 1A</u> granting a stay of the DIP Order pending appeal; or, in the alternative, enter an order substantially in the form attached hereto as <u>Exhibit 1B</u> granting a temporary stay of the DIP Order pending the District Court's evaluation of the appropriateness of a stay of the DIP Order pending appeal; and (b) grant such other relief as the Court deems necessary and appropriate under the circumstances.

Dated:  January 17, 2014

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:  (312) 862-2000
Facsimile:   (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
MCDONALD HOPKINS PLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*