# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------x

In re                          : Chapter 9

CITY OF DETROIT, MICHIGAN,    : Case No. 13-53846

               Debtor.         : Hon. Steven W. Rhodes

-------------------------------------------------------x

## CITY OF DETROIT'S
## DESIGNATION OF ADDITIONAL ITEMS
## <u>TO BE INCLUDED IN THE RECORD ON APPEAL</u>

Pursuant to Rule 8006 of the Federal Rules of Bankruptcy Procedure

(the "<u>Bankruptcy Rules</u>"), appellee City of Detroit, Michigan  hereby submits this

designation of additional items to be included in the record in response to the

December 20, 2013 Notice of Appeal From Order Authorizing the Public Lighting

Authority Transaction [Docket. No. 2273] and Appellant's Designation of the

Contents of the Record and Statement of Issues on Appeal [Doc. No. 2379] filed

by Syncora Guarantee Inc. and Syncora Capital Assurance Inc.

# DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL — DOCKET ENTRIES FROM CASE NO. 13-53846

| Item No. | Date | Docket No. | Description |
|---|---|---|---|
| 1 | 11/22/2013 | 1793 | State of Michigan's Reply in Support of Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief |
| 2 | 11/22/2013 | 1795 | Debtor's Reply to Limited Objections to Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief |
| 3 | 12/04/2013 | 1926 | Brief of the Public Lighting Authority on Supplemental Questions Requested by the Court |
| 4 | 12/04/2013 | 1927 | Debtor's Supplemental Brief in Support of Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief |
| 5 | 12/04/2013 | 1928 | State of Michigan's Response to the Issue of Representation of Parties Relating to Public Lighting Authority Transaction |
| 6 | 12/04/2013 | 1938 | Brief of Miller Canfield as Bond Counsel for PLA in Support of Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief |

Dated:  January 17, 2014       Respectfully submitted,

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

and

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

# ITEM NO. 1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

          Debtor.

Case No. 13-53846-SWR
Chapter 9
Hon. Steven W. Rhodes

_____

## STATE OF MICHIGAN'S REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

The State of Michigan, through its undersigned counsel, submits this Reply in support of the Debtor's Motion For Entry Of An Order (I) Authorizing The Debtor To Enter Into And Perform Under Certain Transaction Documents With The Public Lighting Authority And (II) Granting Other Related Relief (the "Motion") [Dkt. #1341].

## INTRODUCTION

The most fundamental function of a city is to provide for the safety and welfare of its residents. A sufficient public lighting system is essential to the fulfillment of this function.[1] For this reason, the Michigan Legislature enacted 2012 PA 392 ("PA 392"), the *Municipal Lighting Authority Act* (Mich.Comp.Laws § 123.1261 *et seq.*), to provide certain Michigan cities with

---

[1] *See*, e.g., Jennifer L. Doleac and Nicholas J. Sanders, *Stanford Institute for Economic Policy Research*, Under Cover of Darkness: Using Daylight Saving Time to Measure How Ambient Light Influences Criminal Behavior, November 5, 2012, http://siepr.stanford.edu/publicationsprofile/2495/ (suggesting that street lighting investment likely positively impacts public safety); Katy Welter, Bright Lights, Safe Cities: How Daylight Saving Fights Crime, *Frank Batten School of Leadership and Public Policy*, BATTON CONNECTION, http://www.batten.virginia.edu/content/news-events/bright-lights-safe-cities-how-daylight-saving-fights-crime/; Roger Wright, Martin Heilweil, Paula Pelletier and Karen Dickinson, The Impact of Street Lighting on Street Crime, May 1974, (unpublished, on file at http://www.popcenter.org/library/scp/pdf/197-Wright_et_al.pdf/) (finding that reductions in violent crime are linked to improved street lighting).

1

access to "an equitable and reasonable method and means of financing, operating and maintaining a lighting system to supply lighting in sufficient quantities…" Mich.Comp.Laws § 123.1265(1). PA 392 allows for the creation by certain cities of public lighting authorities that will have access to favorable credit markets, enabling these cities to obtain the financing necessary to construct, operate, and maintain public lighting systems.

Pursuant to 1990 PA 100, as amended ("PA 100"), the *City Utility Users Tax Act* (Mich.Comp.Laws § 141.1151 *et seq.*), Michigan cities that form lighting authorities in accordance with PA 392 are authorized to levy and collect a utility users tax from their utilities customers. The revenues collected in accordance with PA 100 may be used only to service bonds issued by a public lighting authority pursuant to PA 392, or, if not otherwise pledged to pay such bonds, the revenues must be used to retain or hire police officers. Mich.Comp.Laws § 141.1152(4). Thus, revenues collected pursuant to PA 100 may not be used for purposes other than the public safety of the city's residents and cannot be used to make other general fund payments or to pay the city's creditors.

In the Limited Objection, the Objectors[2] raise three objections: (1) the Motion lacks the detail necessary to evaluate the merits of the PLA Transaction[3]; (2) the City fails to explain why

---

[2] Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") filed a Limited Objection (the "Limited Objection" [Dkt. #1557]) to the Motion. Ambac Assurance Corporation ("Ambac") [Dkt. #1574], the Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (collectively, "AFSCME") [Dkt. #1603], FMS Wertmanagement AÖR ("FMS") [Dkt. #1615], Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europaische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A. (collectively, "Erste") [Dkt. #1636], and the Official Committee of Retirees (the "Committee") [Dkt. #1713], each filed Joinders in Syncora's Limited Objection. Syncora, Ambac, AFSCME, FMS, Erste, and the Committee are collectively referred to in this Reply as the "Objectors." The arguments raised in Syncora's Limited Objection are attributed to the Objectors, collectively.

[3] Capitalized terms not defined herein have the meaning ascribed in the Motion.

2

it must pledge all of the Utility Tax Revenues to the Trust instead of using these revenues to fund recoveries to creditors; and (3) the PLA Transaction can be properly proposed, and properly evaluated by the City's creditors, only as part of a plan of adjustment. Because the Utility Tax Revenues may not be used to pay the City's creditors, all of the Objectors' objections should be overruled and the Motion should be granted.

## ARGUMENT

### A. The Utility Tax Revenues may only be used for the safety and welfare of the City's residents and cannot be used to pay the City's creditors.

PA 100, § 2(1) provides that "a city having a population of 600,000 or more … may levy, assess, and collect from those users in that city a utility users tax …." Mich.Comp.Laws § 141.1152(1). Prior to 2012, PA 100 required that the Utility Tax Revenues be used exclusively to retain or hire police officers.[4] However, in 2012, PA 100 was amended[5] to provide that "*[u]nless revenues have been otherwise pledged to pay bonds issued by a lighting authority,* the revenue generated from this tax shall be placed directly in the budget of the police department of a city described in this act and shall be used exclusively to retain or hire police officers." Mich.Comp.Laws § 141.1152(4) (emphasis added).

Prior to the 2012 amendments to PA 100, the revenue generated from the Utility Users Tax was to be used exclusively to retain and hire police officers. The 2012 amendments to PA 100 effectively carved out some of the Utility Tax Revenues that were designated to be used exclusively to retain and hire police officers to allow these revenues to be used to fund

---

[4] Among other additions, PA 392 added the phrase "Unless revenues have been otherwise pledged to pay bonds issued by a lighting authority" to PA 100, §2(4), thus authorizing the Utility Tax Revenues to be pledged to pay bonds issued by the PLA in addition to being used to pay for the retention and hiring of police officers. Mich.Comp.Laws § 141.1152(4).
[5] 2012 PA 393.

repayment of bonds issued by the PLA.[6]   Subsequent to the 2012 amendments, the first $12,500,000 of the Utility Tax Revenues must be paid to the PLA for repayment of bonds issued by the PLA, and all remaining Utility Tax Revenues must be used for the exclusive purpose of funding the retention or hiring of police officers.   Mich.Comp.Laws § 141.1152(5); Mich.Comp.Laws § 123.1285(4) and (5).  Thus, PA 100 allows the Utility Tax Revenues to be used only for these two public safety purposes and thus, the Utility Tax Revenues cannot now, nor could they ever have been, used to pay the City's creditors.

**B.      PA 392 authorizes the City to pledge the Utility Tax Revenues to the Trust to be used to pay bonds issued by the PLA.**

As set out in the Motion, the City is undertaking the PLA Transaction in accordance with PA 392, § 25.  The City and the PLA will enter into the C&F Agreement "to construct, improve, enlarge, reduce or extend" the City's lighting system pursuant to § 25(1).  *Motion*, ¶ 19; Mich.Comp.Laws § 123.1285(1).   As authorized under § 25(3), the C&F Agreement contemplates that the PLA will issue the PA 392 Bonds and the City will pledge the Utility Tax Revenues to secure repayment of the bonds.  *Motion*, ¶ 19; Mich.Comp.Laws § 123.1285(3). Further, as required by § 25(3), the City will enter into the Trust Agreement with the PLA, the MFA, and the Trustee (*Motion*, p. 2; Mich.Comp.Laws § 123.1285(3)(a)(i)) which directs payment of the pledged Utility Tax Revenues to the Trustee.  *Motion*, ¶ 8; Mich.Comp.Laws § 123.1285(3)(a)(i)(B).  Finally, in accordance with § 25(4), the Trust Agreement requires the

---

[6] In order to offset the reduction in revenue to the police department, at the same time the 2012 amendments to PA 100 were enacted, the Legislature enacted 2012 PA 394 ("PA 394") to amend 1964 PA 284 ("PA 284"), the *City Income Tax Act* (Mich.Comp.Laws § 141.501 *et seq.*), to, among other things, allow the City to increase the annual income tax rates that the City is allowed to levy.  Under PA 284 (as amended by PA 394), upon the City forming the PLA, a portion of the income tax revenues generated under PA 284 must be deposited directly into the budget of the city's police department to be used exclusively to retain or hire police officers. Mich.Comp.Laws § 141.503(3).

4

Trustee to release up to the first $12,500,000 to the PLA to make debt service payment and release the pledged Utility Tax Revenues in excess of $12,500,000 (the "Excess Utility Tax Revenues") to the City free and clear of liens granted by the PLA Transaction. *Motion*, ¶ 8; Mich.Comp.Laws § 123.1285(4).

PA 392, §25(3) expressly prohibits the use of the pledged Utility Tax Revenues to pay creditors, stating that "[t]he pledged revenues are exempt from being levied upon, taken, sequestered, or applied toward paying the debts or liabilities of the local government other than for the payment of debt service on the authority bonds and related administrative costs to which the contract and trust agreement apply …." Mich.Comp.Laws § 123.1285(3)(d). Further, PA 100, § 25(4) requires that all Utility Tax Revenues not pledged to repay bonds issued by the PLA be "used exclusively to retain or hire police officers." Mich.Comp.Laws § 141.1152(4). Finally, pursuant to PA 392, § 2(5), the annual debt service for the bonds issued by the PLA for which the Utility Tax Revenues are pledged cannot exceed $12,500,000 in any one year. Mich.Comp.Laws § 123.1285(5).

## C.    The Objectors' objections are without merit.

The Objectors' first objection is that the Motion lacks the detail necessary to evaluate the PLA Transaction. The Objectors generally contend that the City failed to provide certain details the Objectors claim they need to know relating to the process by which the PLA will issue the PA 392 Bonds, the scope of the public lighting system project, and a cost/benefit analysis of the improvements to the City's public lighting system. *Limited Objection*, ¶ 17.

Contrary to the Objectors' contention, PA 392 provides sufficient detail relating to the issuance of bonds by the PLA. Mich.Comp.Laws § 123.1281. Further, PA 392 requires the PLA to prepare and submit 3-year plans that define the scope of the public lighting system project.

Mich.Comp.Laws § 123.1177.  Finally, the State has been advised by the City that all of the documents relevant to its Motion, including the transaction documents and the PLA's plan to address the serious public lighting deficiencies, have been provided.  Thus, all of the details that the Objectors seek have been provided or are specified in PA 392.

Further, because, pursuant to PA 100, the Utility Tax Revenues could *never* have been used to pay the City's creditors, the PLA Transaction does not affect the City's creditors and, with all due respect, the Objectors have no basis on which to demand a cost/benefit analysis.

The Objectors' second objection is that the City "fails to explain why it is pledging $40 million of utility tax revenues when only $12.5 million is necessary for the transaction." *Limited Objection*, ¶ 22.  Since none of the Utility Tax Revenues can be used to pay the City's creditors pursuant to state law, it is irrelevant whether all, some, or none of the Utility Tax Revenues are pledged.  Moreover, although all of the Utility Tax Revenues are being directed to the Trust, pursuant to PA 100 and PA 392, only the first $12,500,000 of the Utility Tax Revenues annually is permitted to be used for repayment of bonds issued by the PLA, and the Excess Utility Tax Revenues must be used exclusively by the City's police department.   Mich.Comp.Laws § 141.1152(5); Mich.Comp.Laws § 123.1285(4) and (5).  Thus, although all of the Utility Tax Revenues are directed to the Trust, only $12,500,000 of these revenues may actually be paid to the PLA on an annual basis.

In their third objection, the Objectors contend that "the City is attempting to restrict a revenue stream for 30 years in a way that diminishes creditor recoveries," and that "the City should have included [the PLA Transaction] as part of its plan of adjustment." *Limited Objection*, ¶ 24.

As thoroughly analyzed above, the Utility Tax Revenues could never be used to pay the City's creditors and therefore, the City is not "restricting" a revenue stream that could have been used to pay creditors. Moreover, because the PLA Transaction is funded by the Utility Tax Revenues which cannot be used to pay the City's creditors, the PLA Transaction is completely independent from any subsequent plan of adjustment proposed by the City.

**D.      Providing the means through which the City can obtain financing to fund improvements to its public lighting system is a proper exercise of the State's power to control the City.**

Section 903 of the Bankruptcy Code provides, in relevant part, that "[chapter 9] does not limit or impair the power of the State to control, by legislation or otherwise, a municipality of or in such State in exercise of the political or governmental powers of such municipality…." 11 U.S.C. § 903. Thus, Section 903 provides that the State retains its power to control the City, notwithstanding the City's filing for Chapter 9 relief.

Nothing can be more fundamental to the State's governmental power than to ensure the public safety of its cities' residents. Through PA 100 and 392, the State provides the means by which the City gains access to favorable credit markets, enabling the City to obtain the financing necessary to construct, operate, and maintain a sufficient public lighting system that is essential to the safety and welfare of the City's residents.

Moreover, the State did not simply provide access to favorable credit markets to enable the City to obtain financing for its public lighting system improvements. The State also provided a means by which the City could generate the revenues necessary to fund repayment of the financing without diminishing funds available to pay the City's creditors. In doing so, the State has required that the proceeds generated by the Utility Users Tax in fact be used for the two

7

public safety purposes described in this Reply. The filing for Chapter 9 does not limit or impair the power of the State to exercise its political and governmental powers in this manner.

## CONCLUSION

For the reasons shown above, the Objectors' objections to the Motion should be overruled and the Motion should be granted.

Respectfully submitted,

/s/ Steven G. Howell
Steven G. Howell
Special Assistant Attorney General

Dawn R. Copley
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226-3425

Matthew Schneider
Chief Legal Counsel

Margaret A. Nelson
Assistant Attorney General
P.O. Box 30758
Lansing, MI 48909
517.373.6434

Attorneys for the State of Michigan

Date: November 22, 2013

8

13-53846-tjt Doc 2517 Filed 01/17/14 Entered 01/17/14 17:16:00 Page 12 of 89
13-53846-swr Doc 1793 Filed 11/22/13 Entered 11/22/13 16:02:58 Page 3 of 89

# ITEM NO. 2

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

```
------------------------------------------------------x
                                       :
In re                                  : Chapter 9
                                       :
CITY OF DETROIT, MICHIGAN,             : Case No. 13-53846
                                       :
                    Debtor.            : Hon. Steven W. Rhodes
                                       :
                                       :
------------------------------------------------------x
```

## DEBTOR'S REPLY TO LIMITED OBJECTIONS TO MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

The City of Detroit (the "Debtor" or the "City") submits this reply

(the "Reply") to the (i) Limited Objection of Syncora Guarantee Inc. and Syncora

Capital Assurance Inc. to Debtor's Motion for Entry of an Order Authorizing the

Public Lighting Authority Transaction (Docket No. 1557) (the "Syncora

Objection") and (ii) various related joinders thereto (collectively, with the Syncora

Objection, the "Objection").[1]  The relief requested in the Debtor's Motion (Docket

No. 1341) (the "Motion") should be granted.

---

[1]     The following are the joinders filed to the Objection by other parties:
(i) Joinder of Ambac Assurance Corporation (Docket No. 1574); (ii) Joinder
of the Michigan Council 25 of the American Federation of State, County, &
Municipal Employees, AFL-CIO and SUB-Chapter 98, City of Detroit
Retirees (Docket No. 1603); (iii) Joinder of FMS Wertmanagement Aör

CHI-1912789v1

13-53846-tit  Doc 2517  Filed 01/17/14  Entered 01/17/14
13-53846-swr  Doc 1795  Filed 11/22/13  Entered 11/22/1    1353846131122000000000011

## PRELIMINARY STATEMENT

There is no dispute that the City's street lighting system is in disarray.[2]
In some areas, nearly half of the streetlights are broken.[3] According to recent
surveys and media reports, many neighborhoods plagued by widespread streetlight
outages are experiencing particularly high crime rates.[4]

---

[2]  (Docket No. 1615); and (iv) Joinder of the Official Committee of Retirees in Part in the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (Docket No. 1713). Terms capitalized but not defined herein shall have the meanings given to them in the Motion.

[2]  See, e.g., Charlie LeDuff, Detroit's Lighting System Problems are Shocking, MYFOXDETROIT.COM, Nov. 8, 2013 10:22 AM, http://www.myfoxdetroit.com/story/23899994/leduff-pays-a-visit-to-the-detroit-lighting-authority; JC Reindl, Detroit Takes First Steps to Fix Troubled Lighting, DETROIT FREE PRESS, Nov. 8, 2013, http://www.freep.com/article/20131107/NEWS01/311070196/Detroit-street-lighting-schedule-Zip-Code-Public-Lighting-Authority-work-begins

[3]  See, e.g., Joe Guillen, Survey: Nearly Half of Two Detroit Neighborhoods' Streetlights are Broken, DETROIT FREE PRESS, Oct. 22, 2013 8:59 PM, http://www.freep.com/article/20131022/NEWS01/310220167/ ("The authority studied 4,939 streetlights in the two neighborhoods during the last month and found that 2,211 of them, or about 45%, are not working."); Chris Christoff, Half of Detroit's Streetlights May go Out as City Shrinks, BLOOMBERG, May 24, 2012, http://www.bloomberg.com/news/2012-05-24/half-of-detroit-s-streetlights-may-go-out-as-city-shrinks.html ("As it is, 40 percent of the 88,000 streetlights are broken….").

[4]  See, e.g., The Public Lighting Authority of Detroit is Beginning an Audit of All the Street Lights in the City, DETROIT 20-20, September 19, 2013, http://detroit2020.com/2013/09/19/the-public-lighting-authority-of-detroit-is-beginning-an-audit-of-all-the-street-lights-in-the-city/ (quoting the Executive Director of the PLA as stating that the PLA's pilot program is targeting two sections of Detroit because "they're really high density areas. They experience a high degree of outage with lights and also, they're having high spikes in crime"); JC Reindl, Why Detroit's Lights Went Out, and How

The City has sought approval under section 364(c) of the Bankruptcy Code to enter into a financing transaction that will allow Detroit's Public Lighting Authority (the "PLA") to begin to address the street lighting problems. The PLA was established prior to the commencement of this case as a separate public entity whose sole function is to ameliorate the lighting crisis burdening City residents. To accomplish its mission, the PLA is incurring debt that will be supported by a pledge of the Utility Taxes levied by the City.

The City Council approved this transaction. The tax revenues and other amounts that the City intends to provide to the PLA to address the City's street lighting system are not otherwise available to fund distributions to creditors under a plan of adjustment. The terms of the proposed financing are reasonable and support the redress of this critical lapse in services necessary for public health and safety. The need to provide for the public's safety by turning on the lights cannot be seriously challenged, yet Syncora (and the joining objectors) would have the citizens' safety suffer into the indefinite future in an attempt to leverage better plan treatment. That result cannot be countenanced. The Objection also conflicts

---

the City Plans to Get Them Back On, DETROIT FREE PRESS, Nov. 17, 2013, http://www.freep.com/article/20131117/NEWS01/311170087/ ("[A]cross the city's 139 square miles, tens of thousands of other people are still living in the dark and with all the problems that brings — more crime and traffic accidents and a heightened sense of vulnerability that forces many to plan their lives around the setting sun for fear of getting mugged on their own streets.").

with the reservation of governmental functions to the City under Chapter 9. The

Objection and joinders should be overruled and the Motion should be granted.

## ARGUMENT

**A.      The City Has Provided Sufficient Information to Syncora**

Notwithstanding Syncora's statements to the contrary, the City has

provided Syncora with extensive information with respect to the PLA transaction.

The City attached all relevant documents to its Motion, including all transaction

documents and the PLA's plan to remediate the City's street lighting problem.  In

addition, the City's advisors met with Syncora's and other creditors' advisors

throughout the course of this case (including a two-day symposium conducted last

week) to provide additional details about the City's plans and progress in providing

adequate public services.  During last week's meetings, the City discussed details

of the PLA's plans to address the City's public lighting problem.  Specifically, the

City provided extensive information regarding:  (i) the creation, management and

operations of the PLA, (ii) each of the PLA Financing Agreements,[5] (iii)  specific

---

[5]      The "PLA Financing Agreements," as referenced herein, are:  (i) the
Interlocal Agreement for the Construction and Financing of a Public
Lighting System (the "C&F Agreement") by and between the City and the
PLA; (ii) the Amended and Restated Trust Agreement (the "Amended Trust
Agreement") by and among the City, the PLA, the Michigan Finance
Authority (the "MFA") and Wilmington Trust, N.A., each in substantially
the form attached to the Motion as Exhibits 6.2 and 6.3; and (iii) the
Interlocal Agreement for the Operation, Maintenance and Management of a
Public Lighting System (the "O&M Agreement"), an outsourcing agreement

funding sources for lighting, and (iv) the expected timeline for the implementation

of the PLA's plan.  As a result, a predicate for Syncora's Objection falls away, and

further discovery is neither necessary nor appropriate in connection with the

approval of the Motion.[6]

## B.  The PLA Utility Tax Revenues are Not Available to Fund Plan Distributions

The Syncora Objection rests on two faulty premises.  First, Syncora

impermissibly seeks to use the City's request to enter agreements effecting a

pledge and transfer of Utility Tax revenues as a vehicle to assert creditor control

over a core governmental function.  Second, Syncora ignores that the City's Utility

Tax revenue stream is wholly dedicated to public safety and not available to pay

creditor claims in this case.

The City established the PLA on February 5, 2013 in accordance with

Public Act 392 of 2012, the Municipal Lighting Authority Act, as amended, MCL

§ 123.1261, et seq. ("PA 392").  From that date forward, the PLA has had the

---

whereby the City agrees to pay the PLA to perform maintenance and other
activities that the City would otherwise have to perform.  As to the O&M
Agreement, nothing contained in the Bankruptcy Code requires that the City
obtain approval of such agreement; however, the request for approval was
made in the interest of eliminating any question regarding the City's or the
PLA's ability to perform under the O&M Agreement.

[6]  See Order Denying Motion for Clarification and Motion to Expedite Hearing
(Docket No. 1661) (denying Syncora's request to conduct discovery with
respect to the Motion).

statutory right to receive up to $12.5 million of utility tax revenues (the "<u>PLA</u>

<u>Utility Tax Revenues</u>"), as described in the Motion.[7]  To fulfill its obligation to

provide the PLA with the PLA Utility Tax Revenues, the City entered into a Trust

Agreement on August 1, 2013 (the "<u>Original Trust Agreement</u>") with the PLA and

Wilmington Trust, N.A. (the "<u>Trustee</u>").[8]  The Original Trust Agreement requires

the City to direct the entirety of the Utility Tax revenues that public utilities and

resale customers collect on the City's behalf to the Trustee.[9]  The Trustee then

delivers the PLA Utility Tax Revenues to the PLA, and all amounts in excess of

the PLA Utility Tax Revenues to the City.[10]

The PLA Financing Agreements will leave these economics unaltered.

Under the Amended Trust Agreement, the public utilities and resale customers that

collect the Utility Tax will continue to turn all of the revenues generated from this

tax over to the Trustee.[11]  The PLA Financing Agreements also require that the

Trustee provide all amounts in excess of the PLA Utility Tax Revenues to the City,

including the amounts that the City has pledged in excess of the $12.5 million per

---

[7]      <u>See</u> MCL § 141.1152(5).

[8]      The Original Trust Agreement was attached within Exhibit 6.1 of the
         Motion.

[9]      <u>See</u> Original Trust Agreement §§ 2(a)(i) and 2(b).

[10]     <u>See</u> Original Trust Agreement §§ 2(a)(ii) and 2(c).

[11]     <u>See</u> Amended Trust Agreement §§ 105(a)(i) and 105(b)(i).

year, and the PLA is not entitled to such excess under any circumstances.[12]

Syncora's focus on the trust device used to distribute the Utility Tax revenues under the PLA Financing Agreements is, thus, irrelevant.

Moreover, the amounts the City plans to pay to the PLA for the operation and maintenance of the City's lighting system are essentially the same as the amounts that the City would otherwise have to spend itself for maintenance and remediation costs for the operation of the City's street lighting system. The implementation of the PLA Financing Agreements, therefore, leaves the City and its creditors in the same economic position as they currently occupy and will not impact the funds available for distribution to creditors under a chapter 9 plan in this case.[13]

---

[12]    See Amended Trust Agreement §§ 105(a)(ii) and 105(b)(iii). ("Any amounts remaining in the Trust Fund after making the deposits as provided in Sections 105(b)(i) and 105(b)(ii) shall be transferred to the City Disbursement Fund. The Trustee is hereby authorized to disburse moneys from the City Disbursement Fund to the City for deposit to the General Fund of the City free and clear of all liens.").

[13]    Moreover, the Michigan Legislature linked the passage of PA 392 to the passage of Public Act 394 of 2012 ("PA 394"). Absent PA 394, the City would have been obligated to reduce its City income tax on residents as part of a long-term state-mandated reduction plan. Because the City created the PLA, PA 394 provides that the City's income tax rate will remain at the non-reduced rate until such time as all bonds, obligations and other indebtedness of the PLA have been paid. MCL § 141.503. Accordingly, *without this financing,* funds available for distribution to creditors will certainly be reduced.

## C.  There Is No Reason to Delay the Public Lighting Project

Syncora's argument that all of the City's efforts to provide adequate

services to residents should proceed only in conjunction with the confirmation of a

chapter 9 plan has no basis in law and would inappropriately interfere with the

provision of adequate lighting services to the City's residents, a core function of the

City.  Syncora fails to reconcile its position with the constitutional underpinnings

of chapter 9, which operates to preserve, protect and assure the ability of the City

to provide public services and adequate resources to its citizens.[14]

Indeed, chapter 9 has been drafted to carefully preserve the City's

prerogatives and obligations to provide basic services to residents without the need

to seek creditor approval.  Facilitating a lighting system to foster public safety is at

the core of what the City's obligations to its residents encompass.  Public safety

projects need not await the confirmation of a plan of adjustment.

In addition to being legally flawed, the objections also have no factual

basis.  As noted above, the City's fulfillment of its obligations under the PLA

Financing Agreements will not impact the funds available for creditor distributions

---

[14]     6 COLLIER ON BANKRUPTCY § 904.01 (Alan N. Resnick & Henry J. Sommer
eds., 16th ed. rev.) (noting that the Section 904 prohibition on court
interference with a municipal debtor's property or revenue is "absolute");
§ 904.01[2] ("Unlike a chapter 11 debtor, a municipal debtor is not restricted
in its ability to use, sell or lease its property, and the court is not to involve
itself with the day to day operations of the municipality.").

in this case. Thus, no reason exists to delay approval of the PLA Financing Agreements until plan confirmation.

Moreover, contrary to the statements in Syncora's Objection, the financing of the PLA will not wait until June 2014.[15] Instead, the PLA originally scheduled its first stage of financing (the "Interim Financing") for November 20, 2013, which has been delayed only because of the need to resolve the Syncora Objection. The Interim Financing is necessary to begin implementation of the first phase of the PLA's overall plan to address the City's lighting emergency, which will focus on improvements to the street lighting system in two specific areas of the City that suffer from severely inadequate street lighting.[16] This initial phase is a critical phase of the PLA's overall lighting plan for the City, as the experience gained in its implementation will further guide the exact methods that the PLA will

---

[15]    Syncora Objection, p. 14. Syncora's statement that the O&M Agreement is subject to material alteration also is incorrect. The City attached a copy of a substantially final version of the O&M Agreement as Exhibit 6-1 to the Motion. As such, Syncora's argument that alterations to the O&M Agreement somehow justify a delay in the PLA's implementation of its lighting plan is meritless.

[16]    See the Lighting Plan § A.3, issued by the PLA on September 9, 2013 (the "Lighting Plan"). The Lighting Plan is attached within Exhibit 6.1 of the Motion. See also Lighting Plan, Appendix G (noting that the PLA's budget – and start of the street lighting project – is based upon the assumption that the PLA obtains the Interim Financing).

utilize to implement the remainder of its lighting plan.[17]

## D. The PLA Financing Agreements Provide the Only Viable Alternative to Fix the City's Lighting Issue

Finally, Syncora argues that the financing of the PLA under the PLA Financing Agreements is improper under a list of factors set forth in a non-binding decision issued by the United States Bankruptcy Court for the Western District of Missouri in connection with a chapter 11 case.[18] The Farmland factors were used by the Farmland court to consider a modification of a previously-approved postpetition financing. It was not a situation where, as here, a city is pledging certain tax revenues to a separate public entity that was created prepetition and has a statutory right, as of the date of its creation, to receive such tax revenues. Indeed, the Farmland factors should have no application because the financing proposed

---

[17] Lighting Plan § A.3. ("The implementation of the lighting plan is being segregated into a short-term and long-term plan. Two pilot areas have been chosen for the short-term plan implementation, the outcomes of which will inform the long-term process.").

[18] See In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003). In considering a modification of previously-approved postpetition financing, the Farmland court looked to the following factors: (i) did the debtor exercise sound and reasonable business judgment; (ii) is it in the best interests of the estate and its creditors;(iii) is the transaction necessary to preserve the assets of the estate, and necessary, essential, and appropriate for the continued operation of the debtor's businesses; (iv) are the terms of the transaction fair, reasonable, and adequate, given the circumstances; and (v) was the agreement negotiated in good faith and at arm's length. Id., 294 B.R. at 881.

under the PLA Financing Agreements is necessary to afford the City and the PLA the resources needed to provide functioning streetlights — a basic service that is absolutely necessary to alleviate serious public safety concerns that now exist within the City.

Even if the Farmland factors (or some similar analysis) were relevant to the PLA Financing Agreements, the transaction contemplated under the PLA Financing Agreements would satisfy those factors by providing the City with the ability to address a major health and safety problem at the lowest financing cost possible. As supported in the Motion, the City's request for the relief set forth therein represents a sound exercise of the City's business judgment and is in the best interest of the City, its creditors and other parties in interest. This is particularly true given that the implementation of the PLA Financing Agreements will leave the City's creditors in the same economic position as they currently occupy and will not impact the funds available for distribution to creditors under a chapter 9 plan in this case.

It is clear that the financing is necessary, essential, and appropriate to support the redress of the City's critical lighting problem impeding the City's rehabilitation. It is also clear that the terms of the proposed financing are reasonable. Pledging its Utility Tax revenues in accordance with PA 392 and the PLA Financing Agreements allows the City to obtain the required improvements to

its lighting system at the interest rate available to a borrower (the MFA) in significantly better financial health than the City. Finally, as supported in the Motion, the PLA Transaction Agreements are the result of good faith, arms-length negotiations among the City, the PLA, the MFA and the initial purchasers of the MFA Bonds. Each of those entities is acting in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. As such, the City's entry into the PLA Financing Agreements is appropriate under section 364 of the Bankruptcy Code.

## CONCLUSION

As City Council recognized by voting to approve the PLA Financing Agreements and the O&M Agreement, the City has a responsibility to provide basic services to its citizens, especially those services that relate to the public's safety. Restoring the public lighting system is a matter of the public's safety that cannot be compromised, suspended or subordinated to creditor interests. For the reasons set forth herein, the City respectfully submits that the Objection should be overruled.

## RESERVATION OF RIGHTS

The City files this Reply without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the

political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

[The remainder of this page is intentionally blank]

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached as <u>Exhibit 1</u> to the Motion granting the relief sought therein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated:  November 22, 2013          Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

# ITEM NO. 3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Case No. 13-53846-SWR
Chapter 9
Hon. Steven W. Rhodes

_____

### BRIEF OF THE PUBLIC LIGHTING AUTHORITY
### ON SUPPLEMENTAL QUESTIONS REQUESTED BY THE COURT

The Public Lighting Authority (the "PLA"), through its undersigned counsel, submits this Brief on the supplemental questions requested by the Court on the City of Detroit's Motion for Entry Of An Order (I) Authorizing the Debtor to Enter Into And Perform Under Certain Transaction Documents With The Public Lighting Authority And (II) Granting Other Related Relief (the "Motion") [Dkt. #1341].

## INTRODUCTION

The Court heard oral argument on the City of Detroit's (the "City") Motion on November 27, 2013. At the motion hearing, attorney Jonathan Green of Miller Canfield, P.L.C. ("Miller Canfield") addressed the Court on behalf of the PLA. The Court raised, *sua sponte*, the issue of whether Miller Canfield's joint representation of both the City and the PLA constituted a prohibited conflict of

1353846131204000000000018

interest under Michigan Rule of Professional Conduct 1.7(a) ("Rule 1.7"), which could preclude the Court's entry of an Order under 11 U.S.C. 364 ("§364").

In response to these concerns, the Court requested briefing on two issues: (1) whether Rule 1.7 requires the mandatory disqualification of Miller Canfield from representing the PLA in the contemplated transaction, or whether such potential conflict is waivable by the parties; and (2) whether, if the conflict is waivable, the Court can find that the PLA Transactions were negotiated at arm's length and in good faith as required under §364.

The PLA submits this Brief to provide the Court with additional facts it was not privy to during the motion hearing.  We believe that the second briefing issue requested by the Court presumes the existence of a conflict.  However, it is the PLA's position that, upon clarification, the Court will be satisfied that no conflict exists under Rule 1.7, and therefore, the second issue does not require analysis.

## STATEMENT OF FACTS

The City filed the Motion on October 23, 2013, seeking the Court's approval of certain foundational documents that make up a portion of multiple transactions (collectively, the "PLA Transactions") the PLA will enter into to effectuate the

2

13-53846-tjt   Doc 2507   Filed 01/17/14   Entered 01/17/14 17:15:06   Page 30 of 89
13-53846-swr   Doc 1926   Filed 12/04/13   Entered 12/04/13 13:51:03   Page 2 of 10

issuance of its bonds under the Michigan Municipal Lighting Authority Act, 2012

PA 392, Mich.Comp.Laws §§ 123.1261 *et seq.*[1] ("Act 392").

The PLA Transactions are multi-layered transactions. The foundational

layer consists of the following documents: (1) the Interlocal Agreement for the

Construction & Finance of a Public Lighting System (the "C&F Agreement"); (2)

the Interlocal Agreement for the Operations & Maintenance of a Public Lighting

System (the "O&M Agreement"); and (3) the Amended and Restated Trust

Agreement (the "Amended Trust," collectively, the C&F Agreement, the O&M

Agreement, and the Amended Trust are referred to as the "Motion Documents")[2, 3].

The Motion Documents are the only documents presented to the Court for its

approval.

---

[1] 2012 PA 392 was one bill of a three-bill, tie-barred legislative package that collectively authorized the City to establish a lighting authority (PA 392), provided for the repayment of PLA bonds with utility users tax ("UUT") revenues (2012 PA 393)("Act 393"), and permitted the City to impose an elevated income tax to hold it harmless from the re-direction of UUT revenues to the PLA (2012 PA 394).

[2] The PLA, the City, and the Trustee entered into a Trust Agreement with an effective date of August 1, 2013 for the purpose of directing the utility users' tax revenues to the trust, and providing for the disbursement of those funds. The Amended and Restated Trust Agreement was amended for the purpose of aligning the mechanics of the trust with the bond deal. As stated in Exhibit A, the Trust Agreement was drafted by attorney Ron Liscombe of the Allen Law Group, P.C. on behalf of the PLA. The changes captured in the Amended and Restated Trust were recommended by Miller Canfield, and negotiated by all of the parties thereto.

[3] The Motion originally included the proposed Interlocal Agreement for the Operations & Maintenance of a Public Lighting System. However, to the extent the Court excludes the O&M Agreement from its Order, the PLA hereby excludes that document for purposes of this brief.

3

13-53846-tjt  Doc 2517  Filed 01/17/14  Entered 01/17/14 17:15:03  Page 31 of 89
13-53846-swr  Doc 1926  Filed 12/04/13  Entered 12/04/13 13:51:03  Page 3 of 80

The financial documents consist of several documents that are typical in bond transactions[4] (the "Bond Documents"). The Bond Documents, and any representation of the PLA in the preparation and negotiation of them, are not before the Court for its approval.

The Motion Documents are specifically required under Acts 392 and 393 in order to authorize the PLA to issue bonds secured by the pledge of a portion of the utility users' tax revenues (the C&F Agreement), while providing the framework by which those bonds will be repaid (the Amended Trust). Notably, the Motion Documents: (1) are the only documents submitted for the Court's approval pursuant to the Motion, and (2) are the only documents to which the City is a party.

As the Court is aware, the contemplated PLA Transactions[5] are structured as follows: (1) the City and the PLA must enter into the Motion Documents in order to authorize the PLA to issue its bonds to the Michigan Finance Authority (the "MFA"); (2) the PLA will sell its bond(s) to the MFA; which will then (3) sell MFA bonds under the local government loan program to the purchasers. The second and third steps of the transactions, i.e. the steps relating to the Bond

_____

[4] Such documents typically consist of a bond indenture, a bond purchase agreement, a trust indenture, and other related documents.

[5] The PLA Transactions will consist of both a short-term and long-term deal. The short-term transaction consists of a negotiated direct-placement facility with Citi Bank in the amount of sixty million dollars ($60,000,000). This short-term facility will be refunded through the contemplated execution of a long-term fixed rate facility within the next twelve months, which has not yet been negotiated.

4

13-53846-swr  Doc 2576  Filed 01/17/14  Entered 01/17/14 13:51:03  Page 32 of 89
13-53846-swr  Doc 1926  Filed 12/04/13  Entered 12/04/13 13:51:03  Page 4 of 30

Documents, are separate acts and simply effectuate the authority granted under Act 392, the City Utility Users Tax Act, Mich.Comp.Laws §§141.1151 *et seq.*, and the Motion Documents.

The Allen Law Group, P.C. ("ALG") is the primary legal counsel to the PLA. As legal counsel to the PLA, ALG acted as the principal drafter and negotiator of the Motion Documents on behalf of the PLA. (*See* Exhibit A, Affidavit of Ron Liscombe).

Jones Day represented the City in the negotiation of the Motion Documents.

The negotiation of the C&F Agreement commenced between ALG and Jones Day commenced in early July 2013, and was concluded in mid-October. The negotiation of the O&M Agreement between ALG and Jones Day commenced in mid-August, and was concluded in mid-October. Both the C&F and O&M Agreements were initially negotiated exclusively between ALG on behalf of the PLA and Jones Day on behalf of the City.

Miller Canfield's representation of the PLA has been limited to its role as bond and special counsel in the PLA's bond transaction, which consists of the drafting of the Bond Documents, the delivery of certain bond opinions, opining on certain bankruptcy-related elements of the financial transactions, and providing input into the Motion Documents specifically as they relate to the bond transactions. In this role, Miller Canfield's input into the Motion Documents was

5

13-53846-tjt Doc 2517 Filed 01/17/14 Entered 01/17/14 17:15:06 Page 33 of 89
13-53846-swr Doc 1926 Filed 12/04/13 Entered 12/04/13 13:51:03 Page 5 of 10

limited to modifications that had an effect on the bond transactions, and was only provided when the bond negotiations reached a mature stage in late September.

## ARGUMENT

i. *Miller Canfield's representation of the PLA relating to the Bond Documents does not present a conflict fatal to the relief requested because both the City and the PLA were independently represented in the negotiation of the Motion Documents.*

The Michigan Rules of Professional Conduct provide that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless: (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and (2) each client consents after consultation." MRPC 1.7(a). Under Michigan law, "… a lawyer may not, absent consent, represent two current clients with adverse interests, even if the clients' matters are unrelated." CenTra, Inc. v. Estrin, 639 F. Supp. 2d 790, 809, 2009 U.S. Dist. LEXIS 46757 (E.D. Mich. 2009) (citing MRPC 1.7 cmt. P3).

"The first step in dealing with assertions of conflicts of interest under MRPC 1.7(a) is to determine whether a lawyer's representation of a client will be 'directly adverse' to the interest of another client." Avink v. SMG, 282 Mich. App. 110, 117, 761 N.W.2d 826, 2009 Mich. App. LEXIS 97 (Mich. Ct. App. 2009). A necessary prerequisite of a conflict is a lawyer's representation of two clients with adverse interests. The first, and most evident conflict arises, when the same attorney or firm represents opposing parties with adverse interests in the

6

13-53846-tjt Doc 2517 Filed 01/17/14 Entered 01/17/14 17:15:06 Page 34 of 89
13-53846-swr Doc 1926 Filed 12/04/13 Entered 12/04/13 13:51:03 Page 6 of 10

same transaction or case.  However, a conflict can also arise if the same lawyer represents two clients with adverse interests, yet the representation is in unrelated matters.

It is axiomatic that a conflict cannot be created where one does not exist.  In the instant matter, both the City and the PLA were independently represented in the negotiation of the Motion Documents. (<u>See</u> Exhibit A).  Miller Canfield did not represent both sides of the same matter; therefore, no conflict exists and no further analysis is required.

ii. *The interests of the PLA and the City with respect to the Motion Documents are not directly adverse; therefore, Miller Canfield's representation of the parties in separate matters does not present an impermissible conflict of interest.*

In determining whether a lawyer's representation of a client will be directly adverse to the interest of another client … the term "adverse" is defined as opposed or contrary.  <u>Avink v. SMG</u>, 282 Mich. App. 110, 117, 761 N.W.2d 826, 2009 Mich. App. LEXIS 97 (Mich. Ct. App. 2009).  Further, "a lawyer may not represent multiple parties in a negotiation whose interests are fundamentally antagonistic to each other, <u>but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them</u>."  MRPC 1.7 cmt. P4 (emphasis added).

7

13-53846-tjr  Doc 2597  Filed 01/17/14  Entered 01/17/14 17:14:06  Page 35 of 89
13-53846-swr  Doc 1926  Filed 12/04/13  Entered 12/04/13 13:51:03  Page 7 of 10

While it is evident that Miller Canfield did not represent both parties to the Motion Documents, it could be argued that its dual representation of the City in the bankruptcy case and the PLA in the bond transactions creates an impermissible conflict of interest. However, this position does not stand up to scrutiny because the parties' interests are not directly adverse. The PLA has no interest in the eligibility, outcome, or proceedings of the City's bankruptcy matter. The PLA will remain in the same position notwithstanding the course of the City's case in that the PLA will still be entitled to the statutorily-required payment of $12,500,000 annually. To the extent that the Court rules favorably on the Motion, it can be argued that the interests of the PLA and the City are aligned in interest, as such a ruling would enable the PLA to securitize its annual payment to obtain access to the capital markets, thereby enabling a far greater positive impact on the City.

The PLA exists solely to serve the residents of the City. Mich.Comp.Laws § 123.1269. The City created the PLA pursuant to Act 392 for the purpose of "provid[ing] an equitable and reasonable method and means of financing, operating, and maintaining a lighting system to supply lighting in sufficient quantities to a local government." Mich.Comp.Laws § 123.1265(1) (emphasis added). The PLA's sole purpose is to provide street lights to the City. Because of the singular purpose of the PLA, it is uncontested that the interests of both the PLA and the City are unified: to obtain the most financing available on the best terms

8

13-53846-tjt   Doc 2507   Filed 01/17/14   Entered 01/17/14 17:51:06   Page 36 of 89
13-53846-swr   Doc 1926   Filed 12/04/13   Entered 12/04/13 13:51:03   Page 36 of 89

possible in order to install the best lighting system for the benefit of the City's stakeholders.

In addition to the unified interests of the PLA and the City, the Motion Documents[6] generally memorialize the rights and duties created under Act 392, rather than conveying novel substantive rights between the parties. Therefore, the interests of the parties regarding the Motion Documents are not "opposed or contrary," thereby requiring separate, adversarial representation. The Motion Documents are required to be executed by the City and the PLA under Act 392 and Act 393 prior to the issuance of the PLA bonds. Mich.Comp.Laws § 123.1281(3); Mich.Comp.Laws § 141.1152(5). The primary purposes of the Motion Documents are merely: (1) to authorize the PLA to perform work on City assets; (2) to authorize the PLA to issue bonds; (3) to grant the pledge against the utility users' tax revenues to secure the bonds; and (4) to direct the utility users' tax revenues to be routed through the trustee in conformance with state law. Because each of the functions addressed in the Motion Documents generally evidence an alignment of interests between the City and the PLA, with only slight differences of interest, separate representation would not be required, and hence, no conflict exists.

## CONCLUSION

---

[6] Arguably, the O&M Agreement conveys substantive rights between the parties but, pursuant to footnote 3, the PLA is excluding that document from this analysis to the extent the Court excludes it from its Order.

9

13-53846-swr Doc 2507 Filed 01/17/14 Entered 01/17/14 17:15:06 Page 37 of 89
13-53846-swr Doc 1926 Filed 12/04/13 Entered 12/04/13 13:51:03 Page 9 of 30

Miller Canfield's representation of the PLA as bond and special counsel in the PLA's financial transaction does not present a disqualifying conflict in the matter before the court because: (1) such representation was not directly adverse to the interests of the PLA, and (2) the PLA was independently represented in the negotiation of the Motion Documents. Because no conflict arises under the questioned representation, the Court need not consider its potential impact on the §364 question. For these reasons, the PLA respectfully requests the Court enter the relief requested in the City's Motion.

Respectfully submitted,

/s/ Ronald C. Liscombe
Ronald C. Liscombe (P68524)
Allen Law Group, P.C.
3011 West Grand Boulevard
2500 Fisher Building
Detroit, MI 48202

Dated: December 4, 2013

Attorneys for the Public Lighting Authority

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Case No. 13-53846-SWR
Chapter 9
Hon. Steven W. Rhodes

---

## AFFIDAVIT OF RONALD C. LISCOMBE

STATE OF MICHIGAN )
                        )
COUNTY OF WAYNE )

Ronald C. Liscombe, being duly sworn, testifies as follows:

1. I have first-hand knowledge of the facts set forth in this affidavit and am competent to testify about them.

2. I am an attorney at the Allen Law Group, P.C. ("Allen Law").

3. Allen Law was officially retained as primary legal counsel to the Public Lighting Authority (the "PLA") on March 27, 2013.

4. In my capacity at Allen Law, I have been the principal attorney assigned to PLA matters.

5. In my capacity at Allen Law, I authored the initial draft of the Interlocal Agreement for the Construction & Finance of a Public Lighting System (the "C&F Agreement").

6. In my capacity at Allen Law, I authored the initial draft of the Interlocal Agreement for the Operations & Maintenance of a Public Lighting System (the "O&M Agreement").

7. In my capacity at Allen Law, I authored the initial draft of the Trust Agreement between the PLA, the City of Detroit (the "City"), and the Trustee (the "Trust Agreement").

8. The Amended and Restated Trust Agreement (the "Amended Trust") is a modified version of the Trust Agreement, which adds the Michigan Finance Authority as a party and makes additional changes related to the bond transaction.

9. In my capacity at Allen Law, I led the negotiations on behalf of the PLA on the C&F Agreement, the O&M Agreement, the Trust Agreement, and the Amended Trust.

10. My negotiations on the documents referenced in Attestation number 9 were with Jones Day attorneys Brian Sedlak and Michael Austin negotiating on behalf of the City.

11. The C&F Agreement negotiations between the PLA and the City commenced in mid-July of 2013, and concluded in mid-October of 2013.

12. The O&M Agreement negotiations between the PLA and the City commenced in mid-August of 2013, and concluded in mid-October of 2013.

13. Miller Canfield received a draft C&F Agreement from Allen Law for the first time on September 20, 2013.

14. Miller Canfield received a draft O&M Agreement from Allen Law for the first time on September 26, 2013.

15. The only input Miller Canfield provided on the C&F Agreement and the O&M Agreement were recommendations that had an effect on the bond transactions. This input was reviewed, negotiated, and approved by Allen Law on behalf of the PLA.

16. Miller Canfield's input on the Amended Trust included recommendations on language that effected the bond transactions. These recommendations were reviewed, negotiated, and approved by Allen Law on behalf of the PLA.

17. The PLA, by resolution, retained Miller Canfield to represent it in the limited role of bond and special counsel on the PLA bond transaction.

**FURTHER AFFIANT SAYETH NOT.**

_____
Ronald C. Liscombe

Signed and sworn before me on this 4th day of December, 2013.

L. Nichole Hunter, Notary Public
State of Michigan, County of Wayne
My commission expires: 2/20/2015

LAQUITA NICHOLE HUNTER
Notary Public, State of Michigan
County of Wayne
My Commission Expires Feb. 20, 2015
Acting in the County of

# ITEM NO. 4

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x

|  |  |
|---|---|
| In re | : Chapter 9 |
|  | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13-53846 |
|  | : |
| Debtor. | : Hon. Steven W. Rhodes |
|  | : |
|  | : |

-----------------------------------------------------x

## DEBTOR'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

The City of Detroit, Michigan (the "Debtor" or the "City"), as the

debtor in the above-captioned case, submits this Supplemental Brief in Support of

Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform

Under Certain Transaction Documents with the Public Lighting Authority and

(II) Granting Other Related Relief.

# **INTRODUCTION**

At a hearing on the Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction (Docket No. 1341) (the "<u>Motion</u>")[1] held on November 27, 2013, this Court requested additional briefing on two issues:

    i.    Whether rule 1.7(a) of the Michigan Rules of Professional Conduct ("<u>Rule1.7(a)</u>") requires the Court to disqualify Miller Canfield from its representation of the Public Lighting Authority (the "<u>PLA</u>");[2] and

    ii.    If the answer to the above question is no, can the Court make a "good faith" finding under section 364(e) of the Bankruptcy Code given Miller Canfield's representation of the City in other matters.

---

[1] The City also filed its Reply to Limited Objections to Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief (Docket No. 1795) prior to the hearing.

[2] Rule 1.7 of the Michigan Rules of Professional Conduct states:

> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
>> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
>> (2) each client consents after consultation.

CHI-1913312v5
-2-
13-53846-swr Doc 2517 Filed 01/17/14 Entered 01/17/14 11:40:04 Page 44 of 89
13-53846-swr Doc 1927 Filed 12/04/13 Entered 12/04/13 13:40:04 Page 2 of 10

As set forth herein, the Debtor respectfully submits that the City, the Public Lighting Authority (the "PLA") and the Michigan Finance Authority (the "MFA") all possess a common interest with respect to the financing transactions described in the Motion (the "PLA Financing Transactions"), and therefore no adversity among these entities exists in regard to the PLA Financing Transactions. Further, the City believes that the Allen Law Group, and not Miller Canfield, represents the PLA on matters where the City and the PLA may possess differing interests. As a result, Rule 1.7(a) is inapplicable in the instant case.[3]

Finally, as the City believes no conflict between the City, the PLA and the MFA exists with respect to the PLA Financing Transactions, a finding of "good faith" under section 364(e) of title 11 of the United States Code (the "Bankruptcy Code") is appropriate in the instant case, because the sole party adverse to the City, the MFA and the PLA—Citibank N.A. ("Citibank")— possessed separate counsel. The adverse party's retention of separate counsel allowed for good faith and arm's-length negotiations of the PLA Financing Transactions.

## ARGUMENT

### A.    The City, the MFA and the PLA All Held a Common Interest

The City, the PLA and the MFA all hold a common interest in the two agreements that relate to the City's role in the financing of the PLA. These

---

[3]    The City, the PLA and the MFA were all aware of Miller Canfield's role in the PLA Financing Transactions and had no objection to this role.

CHI-1913312v5
-3-
13-53846-tjt  Doc 2517  Filed 01/17/14  Entered 01/17/14 11:40:34  Page 45 of 89
13-53846-swr  Doc 1927  Filed 12/04/13  Entered 12/04/13 16:40:34  Page 3 of 10

agreements are (i) the Interlocal Agreement for the Construction and Financing of a Public Lighting System (the "C&F Agreement") and (ii) the Amended and Restated Trust Agreement (the "A&R Trust Agreement" and, together with the C&F Agreement, the "PLA Financing Agreements"). Collectively, the PLA Financing Agreements are vital components of the City's and the PLA's ability to fix the problems associated with its public lighting system as contemplated under the Municipal Lighting Authority Act, Act No. 392, Public Acts of Michigan, 2012, as amended, MCL § 123.1261, *et seq*. ("PA 392").

An equally vital component is the PLA's ability to issue an initial set of bonds in the amount of $60 million (the "PLA Bonds"). The PLA Bonds will provide the capital necessary to complete the initial phase of improvements to the City's public lighting system. Under PA 392, the MFA is the sole entity that may purchase the PLA Bonds.[4] The MFA will purchase the PLA Bonds with proceeds from the sale of its own bonds (the "MFA Bonds", and together with the PLA Bonds, the "PLA Transaction Bonds") to Citibank.

The structure of the PLA Financing Transactions described above dictates that the three governmental entities involved in the PLA financing transaction (*i.e.* the City, the PLA and the MFA) all possess a unified interest—the procurement of the most cost effective financing possible that will allow the PLA

---

[4]     M.C.L. § 123.1281(7).

CHI-1913312v5                                          -4-
13-53846-swr   Doc 2517   Filed 01/17/14   Entered 01/17/14 11:40:34   Page 46 of 89
13-53846-swr   Doc 1927   Filed 12/04/13   Entered 12/04/13 16:40:54   Page 46 of 89

to make the necessary improvements to the City's public lighting system. This interest aligns directly with the stated rationale behind the enactment of PA 392: "It is the intent of this act to provide an equitable and reasonable method and means of financing, operating and maintaining a lighting system to supply lighting in sufficient quantities to a local government."[5] Moreover, none of the City, the PLA or the MFA possessed any economic incentive with respect to the issuance of the PLA Transaction Bonds other than to obtain the lowest financing costs possible for the ultimate benefit of the City and its residents.

As bond counsel to the PLA and MFA, Miller Canfield provided comments and input on the PLA Financing Agreements and the PLA Transaction Bonds, all of which focused on ensuring that the City, the PLA and the MFA drafted the PLA Financing Agreements and the PLA Transaction Bonds in a manner that would allow for the issuance of the PLA Transaction Bonds at the lowest possible interest rate.

In contrast, the sole private and for-profit entity involved in the PLA financing transaction, Citibank, held a directly competing interest from that of the City, the PLA and the MFA—the purchase of bonds that included the highest rate of return possible. Citibank engaged its own counsel, Kutak Rock, to represent

---

[5]     M.C.L. § 123.1265(1).

13-53846-swr   Doc 1927   Filed 12/04/13   Entered 12/04/13 16:40:04   Page 5 of 10

Citibank's interests with respect to the negotiation and documentation of the PLA Financing Agreements and the ultimate terms of the PLA Transaction Bonds.

While they possessed a common interest with respect to the PLA Financing Agreements and the PLA Transaction Bonds, the City and the PLA may have possessed differing interests with respect to the portions of the C&F Agreement that address the PLA's responsibilities to construct and improve the City's public lighting system and the Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System, which governs the PLA's obligation to maintain the portions of the City's public lighting system on which the PLA has completed improvements. With respect to these specific items, however, the City and its attorneys interfaced with a separate law firm, the Allen Law Group, which the City believes led the drafting and negotiation process on behalf of the PLA. To the best of the City's knowledge, the Allen Law Group is not presently representing the City in any matter.

Thus, as set forth above, the City believes Miller Canfield's role as bond counsel to the PLA and MFA in this matter does not present an adversity to the City. The PLA's interests were aligned with those of the City with respect to the matters and issues on which Miller Canfield advised the PLA and the MFA on. As such, Miller Canfield's representation of the PLA in this matter should have no impact on whether the Court approves the Motion.

**B. A Good Faith Finding Is Appropriate**

Following a similar logic, Miller Canfield's representation of the PLA and MFA in this matter in no way precludes the Court from making a finding of "good faith" under section 364(e) of the Bankruptcy Code, because the real adverse party in negotiating the PLA Financing Agreements and PLA Transaction Bonds was Citibank, which possessed its own counsel. The basic purpose of section 364(e) of the Bankruptcy Code is "to encourage postpetition financing by ... giving the lender priority.... [and] protect[ing] the authorization for priority on a lien from reversal or modification on appeal, as long as the order has not been stayed pending appeal and the creditor extended credit in good faith." In re Ellingsen MacLean Oil Co., Inc., 834 F.2d 599, 603 (6th Cir. 1987). While the Bankruptcy Code fails to define the term "good faith", the Sixth Circuit has acknowledged courts look to the definition found in the Uniform Commercial Code: "Good faith means honesty in fact in the conduct or transaction concerned." Id. at 604-605; see also In re Pan Am Corp., 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992) (examining whether factors such as fraud or collusion existed in determining whether a lender acted in "good faith" under section 364(e) of the Bankruptcy Code).

Courts have found a lack of good faith when parties fail to disclose ulterior motives or material facts to the bankruptcy court and those motives or facts

CHI-1913312v5
-7-
13-53846-swr  Doc 2517  Filed 01/17/14  Entered 01/17/14 17:14:06  Page 49 of 89
13-53846-swr  Doc 1927  Filed 12/04/13  Entered 12/04/13 13:40:04  Page 7 of 10

may impact a court's reasoning.  In re White Crane Trading Co., Inc., 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) (deciding that a party extending credit secured by certain inventory it planned to liquidate failed to act in "good faith" because the party failed to disclose it was subject to a permanent injunction that impacted its ability to conduct the sale).  A lack of "good faith" also may exist when it is "evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code."  In re EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982) (deciding that a lender lacked good faith with respect to a portion of its loan agreement that required the debtor to utilize $77,000 of the loan proceeds to pay the attorney's fees of an unsecured creditor group).

Here, Miller Canfield's role as bond counsel to the PLA and MFA provides no basis to prevent this Court from making a "good faith" finding with respect to the financing contemplated under the PLA Financing Agreements and the PLA Transaction Bonds.  As set forth above, the City's, the PLA's and the MFA's interests all were aligned in the negotiation and documentation of the PLA Financing Agreements and the PLA Transaction Bonds.  Citibank was the sole entity with an adverse position to the City, the PLA and the MFA in connection with the negotiation and documentation of the PLA Financing Agreements and the PLA Transaction Bonds.

CHI-1913312v5
-8-
13-53846-swr  Doc 2517  Filed 01/17/14  Entered 01/17/14 11:40:04  Page 50 of 89
13-53846-swr  Doc 2517  Filed 12/04/13  Entered 12/04/13 13:40:04  Page 50 of 89

The terms of the PLA Financing Agreements resulted from an arm's-length negotiation between the City, the PLA and the MFA on one side and Citibank on the other. This arm's-length negotiation between two sets of adverse parties falls squarely within the definition of "good faith" for purposes of section 364(e) of the Bankruptcy Code. Thus, a finding of "good faith" is appropriate with respect to the approval of the PLA Financing Agreements.

## CONCLUSION

For the reasons stated above, the Debtor respectfully submits approval of the Motion in its entirety is appropriate.

## RESERVATION OF RIGHTS

The City files this Supplemental Brief without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

CHI-1913312v5
-9-
13-53846-tjt Doc 2517 Filed 01/17/14 Entered 01/17/14 17:41:06 Page 51 of 89
13-53846-swr Doc 1927 Filed 12/04/13 Entered 12/04/13 16:40:04 Page 9 of 10

Dated: December 4, 2013          Respectfully submitted,


 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

and

Robert S. Hertzberg
PEPPER HAMILTON LLP
4000 Town Center
Southfield, Michigan 48075
Telephone:  (248) 359-7300
Facsimile:  (248) 359-7700
hertzbergr@pepperlaw.com

# ITEM NO. 5

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## STATE OF MICHIGAN'S RESPONSE TO THE ISSUE OF REPRESENTATION OF PARTIES RELATING TO <u>PUBLIC LIGHTING AUTHORITY TRANSACTION</u>

The State of Michigan, through its undersigned counsel, submits

this Response to the Issue of Representation of Parties Relating to the

Public Lighting Authority Transaction (the "State's Representation

Response") raised by the Court at the November 27, 2013 hearing (the

"PLA Hearing") on Debtor's Motion for Entry of an Order

(I) Authorizing the Debtor to Enter Into and Perform Under Certain

Transaction Documents with the Public Lighting Authority and

(II) Granting Other Relief (the "Motion").  [Dkt. #1341.]

## <u>RESPONSE</u>

The PLA Transaction Documents (as defined in the Motion;

capitalized terms used in the State's Representation Response and not

defined shall have the meanings set forth in the Motion) involve a transaction by and among the City, the PLA, the Michigan Finance Authority (the "MFA") and the Trustee intended to provide financing to address the public lighting problems that exist in the City of Detroit. The structure contemplated by the Municipal Lighting Authority Act (PA 392) is a conduit financing transaction involving two authorities, the PLA in one transaction and the MFA in the other. Conduit structures enable entities which otherwise may not have access to the capital markets to utilize financially stronger conduit entities to access the desirable capital markets and provide credit support to the transaction.

The State is filing this Response for purposes of full disclosure. It was originally contemplated that Miller, Canfield, Paddock and Stone, P.L.C. ("Miller Canfield") would represent both the PLA and the MFA in the PLA Transaction. The MFA was aware of this arrangement when it authorized the designation of Miller Canfield as bond counsel for the MFA. Even though the MFA is not required to do so, in light of the concerns raised at the PLA Hearing and in an abundance of caution, the MFA has asked Dickinson Wright to represent the MFA as bond

2

13-53846-tjt  Doc 2517  Filed 01/17/14  Entered 01/17/14 16:40:12  Page 55 of 89
13-53846-swr  Doc 1528  Filed 01/17/13  Entered 01/17/13 16:14:01  Page 2 of 3

counsel in the PLA Transaction. The State remains very sensitive to the need to avoid unnecessary delay, but given Dickinson Wright's involvement in this case and its familiarity with the PLA Transaction due to its preparation of the State's brief on this topic, there should be little or no delay in closing this Transaction due to the MFA's change of counsel. In addition, as in all MFA transactions, the MFA will also be represented by the Attorney General's office.

Respectfully submitted,

*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Attorney for the State of
Michigan
Michigan Department of
Attorney General

Dated: December 4, 2013

3

13-53846-tjt Doc 2517-28 Filed 01/17/14 Entered 01/17/14 18:14:00 Page 56 of 89
13-53846-swr Doc 2517-28 Filed 01/17/14 Entered 01/17/14 17:54:00 Page 3 of 89

# ITEM NO. 6

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

-------------------------------------------------------

|  |  |
|---|---|
| In re | : Chapter 9 |
|  | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13-53846 |
|  | : |
| Debtor. | : Hon. Steven W. Rhodes |
|  | : |
|  | : |

-------------------------------------------------------

## BRIEF OF MILLER CANFIELD AS BOND COUNSEL FOR PLA IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

21752959.13\060531-00072

13-53846-swr  Doc 2157  Filed 01/17/14  Entered 01/17/14
13-53846-swr  Doc 1938  Filed 12/04/13  Entered 12/04/1
1353846131204000000000028

## **INTRODUCTION**

On October 23, 2013, the City of Detroit (the "City") filed a motion in this Court seeking entry of an order authorizing the City to enter into and perform under documents that would allow the Public Lighting Authority (the "PLA") to issue debt so that it could pay for much-needed work improving the street lighting system throughout the City (the "PLA Financing Transaction").

At a hearing on the City's motion, the Court questioned whether Miller, Canfield, Paddock and Stone, P.L.C.'s ("Miller Canfield") representation of the PLA as bond counsel created an impermissible conflict of interest due to Miller Canfield's representation of the City in its currently pending Chapter 9 case requiring disqualification of Miller Canfield from representing the PLA. In short, because the PLA and the City's interests are not adverse, and are, in fact, completely aligned, no conflict exists. Indeed, the City and the PLA are a single entity for purposes of conflict analysis here, so there could not be any conflict under any circumstances. In addition, the City (through Jones Day) and the PLA (through the Allen Law Group), each had independent legal counsel throughout their good-faith negotiations who were fully informed and aware of Miller Canfield's discrete role as bond counsel at all times. And even if the Court were to find a conflict did exist, the parties, with full knowledge, functionally waived any potential conflict to Miller Canfield's role in this transaction. In fact, both the City

21752959.13\060531-00072                                    1
13-53846-swr   Doc 2557   Filed 01/17/14   Entered 01/17/14 17:13:03   Page 59 of 89
13-53846-swr   Doc 1988   Filed 12/04/13   Entered 12/04/13 22:37:43   Page 2 of 32

and the PLA have filed briefs confirming they have never objected to Miller Canfield's role and do not believe any conflict exists.

There simply is no aggrieved party here. Conflict issues deal with the relationship between law firms and their clients. The clients here are the City of Detroit, represented by Jones Day, and the PLA, represented principally by the Allen Law Group, and both clients oppose the disqualification of Miller Canfield. The State of Michigan opposes the disqualification of Miller Canfield. The purchaser of the bonds, Citibank, has not sought the disqualification of Miller Canfield, and in any case, creditors, as non-clients, have no standing to raise a conflict issue and no interests of the creditors could possibly be affected by this issue.

As Michigan and federal courts have repeatedly found, disqualification of a party's chosen attorney is an "extreme sanction" that should be used only in the most drastic of circumstances, such as where there is a "reasonable possibility that some specifically identifiable impropriety actually occurred and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain the counsel of his choice." *Cozzens v. City of Lincoln Park*, 2009 WL 701709 at *5 (E.D. Mich. Mar. 13, 2009). In this case, there was no conflict, and if the Court were to order Miller Canfield's disqualification, not only would the PLA be deprived of its chosen counsel, but the

21752959.13\060531-00072
2
13-53846-swr Doc 2507 Filed 01/17/14 Entered 01/17/14 17:13:03 Page 60 of 89
13-53846-swr Doc 1938 Filed 12/04/13 Entered 12/04/13 22:37:43 Page 60 of 82

entire transaction would be delayed while the PLA sought and educated new counsel, which counsel necessarily would take the same steps Miller Canfield is taking and would deliver essentially the same opinions. The public interest weighs heavily in allowing the City and the PLA to fix the lighting system as quickly as possible, and the Court should allow the parties to do so without any further delay.

## BRIEF FACTUAL BACKGROUND

**A.      Structure of the PLA Financing Transaction**

The City has one, and only one, interest in accomplishing the PLA Financing Transaction: to enable the borrowing of money to pay for the street light improvements. The PLA has one, and only one, purpose in the PLA Financing Transaction: to be the instrument through which the City can borrow the money to enable the PLA to make the street light improvements.

The PLA Financing Transaction consists of a double conduit financing structure. The structure is dictated by economics – specifically, by the City's insolvent financial condition. Under this structure, bonds secured by the City's utility users tax revenues will be issued by the PLA and sold to the Michigan Finance Authority (the "MFA"), as a State of Michigan conduit-partner. The MFA, in turn, will sell bonds to a private lender (in this transaction, Citibank) which will lend the funds necessary for the PLA to undertake its statutorily-defined

21752959.13\060531-00072

3

13-53846-tjt   Doc 2507   Filed 01/17/14   Entered 01/17/14 17:13:03   Page 61 of 89
13-53846-swr   Doc 1988   Filed 12/04/13   Entered 12/04/13 22:37:43   Page 61 of 89

purpose of financing and constructing improvements to the City's street lighting system.

In a conduit financing, one public entity acts as a conduit-partner for another public entity who is either unable to access the credit market itself or is only able to access the credit market at prohibitive interest rates on account of poor credit. The MFA is able to do this for local governments by providing mechanisms for creating additional statutory security which lenders find attractive, allowing the local unit to access the market and borrow money more cheaply than it can on its own. The MFA works with and on behalf of the local unit to negotiate with credit facility providers, underwriters or investors (in this case, Citibank) to finalize the terms of the borrowing with the local unit. Similar to the relationship between the City and the PLA to effectuate this financing, the MFA facilitates the PLA's access to the market and its interests are aligned with the PLA and the City.

The PLA legislation addresses the City's great need for improved lighting, providing the means for the City to access the markets in spite of the City's poor credit. The City is the principal party-in-interest. The PLA, with its own statutory security, and the MFA, are accommodation parties. The City, the PLA and the MFA are therefore the "borrower" with aligned interests in the PLA Financing Transaction, with Citibank as the lender/purchaser (the "Purchaser"), on the other side of the transaction.

21752959.13\060531-00072
4
13-53846-swr  Doc 2517  Filed 01/17/14  Entered 01/17/14 17:13:03  Page 62 of 89
13-53846-swr  Doc 1988  Filed 12/04/13  Entered 12/04/13 22:37:43  Page 6 of 32

For purposes of effectuating the financing, the City and the PLA are functionally a single entity. For approximately three years prior to the City's bankruptcy filing, the City worked to get legislation passed to authorize the establishment of an entity separate from the City to improve the City's outdated and sorely inadequate street lighting system to serve the needs of the City's residents. In 2012, the State Legislature enacted Act 392, Act 393 and Act 394[1], for the sole purpose of improving the City's street lighting system and financing the costs of such improvements. Pursuant to Act 392, on February 5, 2013, the City established and incorporated the PLA by duly adopting Articles of Incorporation by a majority vote of the City Council. Article VIII, Section 1 of the PLA's Articles of Incorporation codifies the on-going interrelationship between the City and the PLA by requiring that the PLA provide the City Council with a three-year lighting plan every two years, which may be approved or rejected by the City Council. In addition, PLA board members are appointed by the City Council and the Chief Executive Officer (MCL § 123.1273(2)), the PLA is required to submit monthly progress reports to the City (MCL § 123.1275(9)), the PLA must have its business plan approved by the City (MCL § 123.1277), and the City continues to

---

[1] Respectively, Public Act 392 of 2012, the Municipal Lighting Authority Act, as amended, MCL § 123.1261, et seq.; Public Act 393 of 2012, which amended Public Act 100 of 1990, the City Utility Users Tax Act, as amended, MCL § 141.1151, et seq.; and Public Act 394 of 2012, which amended Public Act 284 of 1964, the City Income Tax Act, as amended, MCL § 141.501, et seq.

21752959.13\060531-00072
5
13-53846-swr   Doc 2517-38   Filed 01/17/14   Entered 01/17/14 17:13:03   Page 63 of 89
13-53846-swr   Doc 1988   Filed 12/04/13   Entered 12/04/13 22:37:43   Page 6 of 32

own the lighting system. By statute and the PLA's incorporating documents, the interests of the City and the PLA are inseparable and aligned. The PLA's sole purpose is to provide a means to an end, and the end is to "supply lighting …to [the City]." MCL § 123.1265(1).

The enabling legislation (Acts 392, 393, and 394) further codifies, and tightly constricts, the relationship between the City and the PLA with respect to the financing of lighting improvements. Act 392 provides that the PLA may issue bonds to finance the improvements, secured by the City's pledge of the City utility users tax revenues levied pursuant to Act 100 for the payment of the PLA's bonds. Crucially, the enabling legislation leaves little choice to the City and the PLA with respect to the financing before the Court. Any financing terms that are negotiated are done so with the private lender (Citibank, the Purchaser). Indeed, this matter is before the Court because Citibank is requiring an order from this Court with respect to the pledge by the City, pursuant to statute, of utility users tax revenues for payment of the PLA bonds. Given the structure of this public financing and its principal and predominant reliance on applicable State law authorization and directive, there was little, if anything, to negotiate between the City and the PLA that would result in their interests not being aligned.

**B.      Miller Canfield's Discrete Role as Bond Counsel in the PLA Financing Transaction and the Separate Representation of the City (by Jones Day) and the PLA (by the Allen Law Group)**

21752959.13\060531-00072
6
13-53846-tjt   Doc 2507   Filed 01/17/14   Entered 01/17/14 17:13:03   Page 64 of 89
13-53846-swr   Doc 1938   Filed 12/04/13   Entered 12/04/13 22:37:43   Page 64 of 89

Even though the PLA's enabling legislation leaves little discretion to the City and the PLA with respect to the structure of the parties' relationship and the terms of the PLA Financing Transaction, both the City (through Jones Day) and the PLA (through the Allen Law Group) retained separate counsel responsible to negotiate what few matters remained discretionary between those two parties. In fact, the PLA has been represented by the Allen Law Group at all times since March 27, 2013. The Allen Law Group has no relationship with the City in this case other than to act as principal counsel for the PLA in the transaction before the Court. Additionally, it was the Allen Law Group that served, and continues to serve, as the primary counsel for the PLA in its negotiation and documentation of the PLA Transaction Documents[2] that are subject to the approval of this Court. Jones Day, likewise, continues to represent the City and has done so throughout the PLA Transaction.

In order to complete the PLA Financing Transaction, it became necessary to engage bond counsel, and the PLA and MFA[3] engaged Miller Canfield to perform

_____

[2] Collectively, the Interlocal Agreement for the Construction and Financing of a Public Lighting System by and between the City and the PLA; the Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System by and between the City and the PLA; and the Amended and Restated Trust Agreement by and among the City, the PLA, the MFA and Wilmington Trust, National Association, as Trustee.

[3] With the knowledge of the City, the PLA and the MFA, and their respective counsel, Miller Canfield represented the MFA as bond counsel in connection with
*Continued on next page.*

21752959.13\060531-00072                              7
13-53846-swr  Doc 2587  Filed 01/17/14  Entered 01/17/14 17:13:03  Page 65 of 89
13-53846-swr  Doc 1988  Filed 12/04/13  Entered 12/04/13 22:37:43  Page 65 of 89

this discrete role. [4]    The City and the PLA, and their respective independent attorneys, were at all times fully aware of Miller Canfield's separate role in this transaction and its simultaneous representation of the City in the pending bankruptcy proceedings.  In fact, far from objecting, the City and the PLA have filed briefs here objecting to any attempt to disqualify Miller Canfield.

Importantly, Miller Canfield has not represented *either* party in the negotiations required by Act 392 to effectuate the PLA Transaction Documents.  Further, negotiations of financing terms are carried out between the public entities and the Purchaser, and, in any event, the financing terms (such as interest rates) are determined by the market.  Miller Canfield did not, and does not, represent Citibank at any time in connection with this transaction.  Miller Canfield's engagement for the PLA was only as bond counsel, as well to ensure that any bankruptcy order approving the PLA Transaction Documents would allow the

---

*Continued from previous page.*
the PLA Financing Transaction until December 2, 2013, when the MFA retained Dickinson Wright to complete the transaction on behalf of the MFA.

[4] The role of bond counsel is to prepare the financing documents authorizing the issuance and sale of the bonds and to render an objective legal opinion with respect to the authorization and issuance of the bonds and as to the tax exempt status of the interest on the bonds under state and federal law.  In addition, bond counsel was asked to prepare and issue legal opinions on behalf of the PLA on bankruptcy issues and implications should the PLA become a Chapter 9 debtor, and provide related advice to the PLA in connection with the Citibank financing.

21752959.13\060531-00072                                              8
13-53846-swr   Doc 2517   Filed 01/17/14   Entered 01/17/14 17:13:03   Page 66 of 89
13-53846-swr   Doc 1988   Filed 12/04/13   Entered 12/04/13 22:37:43   Page 60 of 82

financing and street light improvements to be carried out by satisfying one of Citibank's conditions precedent to providing the necessary funding.

## ARGUMENT

### A. Disqualification is an Extreme Sanction That Should Only Be Used in Extreme Circumstances That Do Not Exist Here

The decision to disqualify a law firm and prevent a party from employing the counsel of its choice "is not to be dispensed with lightly. A party's right to have counsel of choice is a fundamental tenet of American jurisprudence, and therefore a court may not lightly deprive a party of its chosen counsel." *In Re: Packaged Ice Antitrust Litigation*, 2010 WL 5146384 at *2 (E.D. Mich. Dec. 13, 2010) (denying motion to disqualify for falling "well short of meeting the demanding standard for disqualification"). In fact, "disqualification is an extreme sanction that the court should employ only when there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain the counsel of his choice." *Cozzens,* 2010 WL 5146384 at *5 (internal quotation and citation omitted).

As described herein, in this case there is no justification for disqualifying Miller Canfield as there is no conflict between the PLA and the City, and to the extent the Court finds such a potential conflict exists, the parties (represented by separate counsel) functionally waived the conflict and never objected to Miller

Canfield's discrete role as bond counsel in the PLA Financing Transaction. Furthermore, the public interest favors allowing the City, through the PLA, to improve the City's outdated and inadequate street lighting system as quickly as possible. Delaying this much-needed project while the PLA engages another law firm to complete this transaction would substantially harm the very residents this Court is trying to protect without any commensurate advantage to the public interest. *See Board of Regents of Univ. of Neb. v. BASF Corp.*, 2006 WL 2385363 at *11 (D. Neb. Aug. 17, 2006) (holding disqualification unnecessary where disqualification would cause undue delay).

## B. No Conflict Exists Under Rule 1.7(a) or 1.7(b) of the Michigan Rules of Professional Conduct Because the Interests of the PLA And The City Are Not Adverse

Rule 1.7(a) of the Michigan Rules of Professional Conduct (the "MRPC") provides in relevant part that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client." Rule 1.7(b) likewise states that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." A client's interests are "directly adverse" or could be "materially limited" for example when one client sues another client. *See, e.g., Employers Mut. Cas. Co. v. Al-Mashhadi*, 2009 WL 2711963 at *12 (E.D. Mich. Aug. 24, 2009).

Furthermore, as here, where the parties' interests are aligned, there is no conflict of interest. *See Ackerman v. Miotke*, 2006 WL 859471 at *3 (Mich. Ct. App. Apr. 4, 2006) (no direct conflict in violation of Rule 1.7(a) of the MRPC between various property owners, represented by the same legal counsel, who were attempting to sell their properties to casino developers in the City). The Northern District of Ohio's decision in *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (N.D. Ohio 1977) *aff'd* 573 F.2d 1310 (6th Cir. 1977) is especially instructive. In *City of Cleveland*, the district court held the defendant's law firm should not be disqualified from representing the defendant against the city despite simultaneously serving as the city's long-time bond counsel because the bond work it provided to the city both prior to and during the litigation was performed on an ad hoc basis and was not adversarial in nature. 440 F. Supp. at 198. The fact that the Court in *City of Cleveland* found that disqualification was not warranted when the rules at that time prohibited even the *appearance* of a conflict (a much more stringent test than the one the Court must apply here) is all the more reason for the Court to allow Miller Canfield's discrete role in this case.

Indeed, not only have none of the parties identified what actual conflict could exist between the PLA and City here, but it cannot be said that Miller Canfield was unable to provide the same quality of legal services as another firm without the purported conflict. In other words, Miller Canfield was free to, and

did, provide the same advice and take the same actions with respect to its representation of the PLA as would any other firm that did not also represent the City in the Chapter 9 case could have taken. It simply cannot be shown that, as required for disqualification, that "any specifically identifiable impropriety *actually occurred*" or that there was even "a reasonable possibility of a conflict." *In Re: Packaged Ice,* 2010 WL 5146384 at *3.

The interests of the City and the PLA in this transaction are completely aligned, and all negotiations of financing terms were between the City (together with the PLA) on one side and Citibank, represented throughout by separate, independent counsel, on the other side. There simply is no conflict under the Michigan Rules of Professional Conduct.

**C.** **Even if the Court Finds a Potential Conflict Did Exist, Any Conflict Did Not Adversely Affect Miller Canfield's Representation and Both Parties Functionally Waived any Potential Conflict After Consultation With Separate, Independent Counsel**

Even where a conflict of interest exists under Rule 1.7(a) or (b), the conflict can be overcome if a conflicted lawyer reasonably believes that the representation "will not adversely affect [his] relationship with the other client" (Rule 1.7(a)(1)) and/or reasonably believes that "the representation will not be adversely affected" by "the lawyer's responsibilities to another client" (Rule 1.7(b)(1)), and the client(s) consent after consultation.

Miller Canfield strongly believes that its representation of the PLA "will not adversely affect its relationship" with the City and that its discrete role in this transaction was "not adversely affected" by its responsibilities to the City. Quite the reverse, by advancing the transaction through the PLA, the City's interest is served. As described in detail above, Miller Canfield's circumscribed role with respect to the financing before the Court could not, and did not, adversely affect its relationship to the City, including as local counsel with respect to the City's filing for protection under Chapter 9. Likewise, its representation of the City could not, and did not, adversely affect its representation of the PLA. Crucially, both the City and the PLA have filed briefs here opposing any effort to disqualify Miller Canfield, establishing that Miller Canfield's role created no adverse consequences for either the City or the PLA.

In fact, by statute and the PLA's incorporating documents, the interests of the PLA and the City in the PLA Financing Transaction are inseparable and aligned. Both parties are negotiating for the same result. It is true that as a technical detail, in order to accomplish the lighting program, the conduit financing structure is required as is the issuance of bonds, which in turn requires that there be a PLA. This is merely a matter of form, rather than a substantively adverse or competing relationship. Put simply, the City and the PLA are on the same "side" and are virtually one entity for conflict purposes. The financial terms of the bonds

21752959.13\060531-00072
13
13-53846-swr   Doc 2533   Filed 01/27/14   Entered 01/27/14 22:17:03   Page 71 of 89
13-53846-swr   Doc 2538   Filed 01/27/14   Entered 01/27/14 22:17:03   Page 71 of 89

ultimately are dictated by or negotiated with the party taking the credit risk, or in other words, the Purchaser. The Purchaser, in short, establishes the business terms for the financing, and Michigan law in any event strictly defines the terms to this transaction, so there is no adverse "negotiation" between the City and the PLA.

In addition, no violation of Rule 1.7 occurs where the parties have provided informed consent or have waived any potential conflict. *See Edgin v. Cobb*, 2008 WL 2858741 at *5 (E.D. Mich. July 23, 2008). Under the MRPC, "almost all conflicts are consentable." *See In re Packaged Ice Antitrust Litigation,* 2010 WL 5146384 at *10. Furthermore, "[i]t is axiomatic that the client's right to object to an attorney's allegedly adverse representation may be waived." *City of Cleveland,* 440 F. Supp. at 205.

In this case, even though no conflict existed, Miller Canfield took appropriate prophylactic action and obtained an informed and functional waiver of any potential conflict. This is the suggested approach in ABA/BNA Lawyers' Manual on Professional Conduct, 51:106-107. On July 3, 2013, Miller Canfield sent a letter addressed to the Portia Roberson, corporate counsel for the City of Detroit, fully informing the City of Miller Canfield's involvement as bond counsel for the PLA in this transaction. (*See* <u>Exhibit A</u>.) The letter was also sent to, among others, Kevin Orr, the City's Emergency Manger, Thomas L. Saxton, Deputy Treasurer for the State of Michigan, and Joseph L. Fielek, Executive

Director of the MFA.  (*Id.*)  Thus all parties, at all times, knew the PLA had engaged Miller Canfield, and both the City and the PLA, represented by separate, independent counsel, did not object (and does not now object) to Miller Canfield's discrete role as bond counsel in the PLA Financing Transaction.

Indeed, the Resolution of the Board of the Directors of the Public Lighting Authority authorizing the Issuance and Delivery of Public Lighting Authority Revenue Bonds, adopted by the PLA Board on November 20, 2013 (the "PLA Bond Resolution," attached as <u>Exhibit B</u>), includes a provision appointing Miller Canfield as Bond Counsel to the PLA and consenting to such representation notwithstanding Miller Canfield's representation of the City on bankruptcy and other unrelated matters.  Simply put, Miller Canfield discussed its role in the transaction with all of the parties and their counsel, and the Emergency Manager for the City had no concern with Miller Canfield's role as bond counsel to the PLA for this financing.  Furthermore, the City and the PLA have both confirmed in briefs to this Court that they have no objections to Miller Canfield's involvement and oppose any efforts to disqualify the firm.  Therefore, even if the Court were to find a conflict did exist, the parties functionally waived the conflict after informed consultations with separate counsel.  *See City of Cleveland*, 440 F. Supp. at 204-05 (holding that the open and notorious nature of law firm's representation in matters adversarial to a city left no doubt that the city had waived any objections to the

firm continuing to represent the defendant). Miller Canfield's role in this transaction is thus entirely proper.

## D. The Objectors to This Motion Have No Standing to Object to Miller Canfield's Discrete Role as Bond Counsel

Finally, the objectors to this Motion have no standing to raise an objection to Miller Canfield's discrete role in this matter. Indeed, to the extent the Court finds a conflict existed at all (which it should not), it existed between the City and the PLA, *not* with the objectors to the Motion. The objectors' interests were not, and could not have been, adversely affected by any purported conflict, and they suffered no prejudice whatsoever from Miller Canfield's representation of the City and the PLA.

This lack of prejudice is exactly why the comments to Rule 1.7 state expressly that such objections from opposing parties "should be viewed with caution" because they "can be misused as a technique of harassment." *See also Cozzens*, 2009 WL 701709 at *5, *quoting Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988) ("Unquestionably, the ability to deny one's opponent the services of capable counsel, is a potent weapon. Confronted with such a motion, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice."). Courts have repeatedly found that such challenges raised by opposing parties should be dismissed as a matter of course, and there is no

21752959.13\060531-00072
16
13-53846-swr   Doc 2533   Filed 01/17/14   Entered 01/17/14 22:17:03   Page 74 of 89
13-53846-swr   Doc 1938   Filed 12/04/13   Entered 12/04/13 12:17:03   Page 74 of 82

justification for the Court to find any differently here. *See, e.g., In re Odum,* 2008 WL 7874259 at *2 (Bankr. N.D. Ga. May 28, 2008) (opposing party lacked standing to assert conflict of interest because party could not identify how ethical rule was violated, and only offered speculation about potential future conflicts)*; Doe v. Lee,* 178 F. Supp. 2d 1239, 1243–44 (M.D. Ala. 2001) (plaintiff lacked constitutional standing to seek disqualification of defendant's attorney because she could not demonstrate a cognizable or redressable injury from the alleged conflict).

## E.   The PLA and the City Have Engaged in Arms-Length Good-Faith Negotiations

When evaluating whether the City and the PLA engaged in arms-length, good-faith negotiations, the only question this Court must answer is whether the PLA Transaction complies with Acts 392, 393 and 394.   Assuming compliance with these Acts, the City and the PLA could not "negotiate" any arrangement other than the financing structure which has been presented to the Court.   This defined statutory scheme providing for the financing of the City's lighting system improvements means that not only are the interests of the City and the PLA aligned and that representation of one party is not adverse to the other, but also the dealings between the City and the PLA to effectuate the documents and the financing are necessarily in good faith as they must track the requirements of the Acts.   Despite numerous objections, not one party asserted that the PLA Transaction violates these Acts or that it was not an arms-length, good faith

transaction. Indeed, the PLA and the City engaged in arms-length, good faith negotiations as the PLA Transaction can occur one way and one way only – pursuant to, and in accordance with, the Acts.

Unlike private entities, local governments may act, and borrow money, only as authorized by State law. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178-179 (1907) (municipal corporations are "political subdivisions of the State, created as convenient agencies for exercising such of the powers of the State as may be entrusted to them, [and the State] at its pleasure, may modify or withdraw all such powers"); *Mich. Muni. Liability & Property Pool v. Muskegon County Road Comm'n*, 235 Mich. App. 183 (1999) (standing for the general rule recognized in Michigan that local governments possess no inherent powers, but rather only those powers that are conferred by the State); *See also City of Taylor v. Detroit Edison Co.*, 475 Mich. 109 (2006). Public financings authorized by statute are very different from private, Chapter 11 transactions with which the Court and the bankruptcy community are more familiar. In the Chapter 11 context, and as a general matter in a private financing transaction, almost anything not prohibited by applicable law can be negotiated, documented and carried out by the parties.

In contrast, there is little, if any, leeway in the enabling legislation authorizing the lighting financing. That legislation tightly restricts the structure of the relationships between the public parties to effectuate the transaction. The

enabling legislation codifies, and constricts, the relationship between the City and the PLA with respect to the financing of lighting improvements. Once the City establishes the PLA and pledges the portion of utility users tax revenues to bonds issued by the PLA to finance improvements to the City's street lighting system, the City and the PLA must take the steps provided under Act 392 to effectuate the financing and the lighting improvements. Not only does Act 392 dictate the actions that the City and the PLA must take to finalize the transaction, including the terms that must be documented between the two parties, it sets forth the provisions that must be included in the agreements between the City and the PLA. Simply put, the City, the PLA and the MFA must participate in an Act 392 public lighting financing transaction to effectuate the transaction, and then only on the terms and subject to the conditions described in the legislation.

Furthermore, as argued to the Court on November 27, there is nothing negotiated or documented in the portion of the lighting transaction among the PLA, the MFA and Citibank that could adversely (or, for that matter, beneficially) affect the rights or obligations of the City or its creditors. The Acts assure that, if followed, the City and its residents will receive precisely the same amount of utility user tax revenues on an annual basis, those in excess of $12.5 million, regardless of the terms of the bonds. In this context, compliance with the State statutes governing the only State sanctioned and authorized utility tax-financed

lighting transaction, i.e. finding no illegality in the transaction, should satisfy the "good faith" requirement because nothing else matters in this context and nothing else has a bearing on the City or its creditors. If the transaction is approved by the Court, the City will have no access to $12.5 million annually of the utility tax revenues but will have an improved public lighting system. On the other hand, if the transaction is not approved, the City will have no access to the $12.5 million annually of utility tax revenues (revenues which will still go to the PLA) and will not have an improved public lighting system. The only variable to the City, its residents and its creditors is whether or not the City is going to have an improved public lighting system, and not whether they will have access to the $12.5 million annually.

Consequently, absent failure to comply with the Acts, the Court must conclude that the transaction was in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. Indeed, in a Chapter 11 case involving a private financing, the Sixth Circuit defined good faith under §364(e) to mean "honesty in fact in the conduct or transaction concerned." There is no question that such "honesty" exists here as the City and the PLA strictly complied with the Acts. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 834 F.2d 599, 605 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988).

Finally, all of the negotiations were "arms-length negotiations" and no objections were raised at the hearing to suggest otherwise. The Allen Law Group, on behalf of the PLA, had primary responsibility for preparing the PLA Transaction Documents, and all of the negotiations of the PLA Transaction Documents occurred between the City, represented by Jones Day, and the PLA, represented by the Allen Law Group. Miller Canfield did not participate in the negotiation of the PLA Transaction Documents and did not represent either the PLA or the City in those negotiations. As such, the requested finding in the City's proposed order that the PLA Transaction was the result of arms-length good faith negotiations is entirely appropriate.

## CONCLUSION

The City and the PLA simply want to turn the lights back on for thousands of Detroit residents without any further delays. Their interests are wholly and completely aligned. The PLA is merely the instrument which the Michigan Legislature has given the City with which to achieve its goal. The PLA's engagement of Miller Canfield to play a discrete role as bond counsel in facilitating this transaction did not create any conflicts of interest with Miller Canfield's representation of the City in its bankruptcy proceedings, and even if a conflict could arguably exist, both the City and the PLA, each represented by separate counsel, functionally waived the conflict. The Court should not force the

PLA to abandon its chosen counsel and delay its work while it engages new counsel. Any delay would mean that the lights will stay out that much longer. The Court should instead enter the requested order and allow this transaction to move forward with all due haste.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/Jonathan S. Green
Jonathan S. Green (P33140)
Michael W. Hartmann (P25373)
Scott A. Warheit (P71560)
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com

Dated: December 4, 2013

EXHIBIT A

# MILLER CANFIELD

Founded in 1852
by Sidney Davy Miller

MICHIGAN: Ann Arbor
Detroit • Grand Rapids
Kalamazoo • Lansing • Troy
FLORIDA: Tampa
ILLINOIS: Chicago
NEW YORK: New York
OHIO: Cincinnati
CANADA: Toronto • Windsor
CHINA: Shanghai
MEXICO: Monterrey
POLAND: Gdynia
Warsaw • Wrocław

HAROLD W. BULGER, JR.
TEL (313) 496-7507
FAX (313) 496-8450
E-MAIL bulger@millercanfield.com

**Miller, Canfield, Paddock and Stone, P.L.C.**
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
TEL (313) 963-6420
FAX (313) 496-7500
www.millercanfield.com

July 3, 2013

<u>Via fax 313-224-5505/U.S. Mail</u>

Portia Roberson, Esq.
Corporation Counsel
City of Detroit
2 Woodward Avenue – Fifth Floor
Detroit, Michigan 48226

Re:     Conflict Waiver Regarding Public Lighting Authority

Dear Ms. Roberson:

The purpose of this letter is to request that the City of Detroit ("City") waive a conflict of interest in a proposed transaction between the City, the Public Lighting Authority (the "PLA"), the Michigan Finance Authority (the "MFA") and Amalgamated Bank (the "Bank"). It is our understanding that the PLA and the MFA are exploring a note or bond transaction that will be sold to the Bank (the "Transaction"). As you may know, we represent the City in certain matters involving the City's financial restructuring, labor and employment, and other items.

In the proposed transaction, we have been asked to act as special counsel to the PLA on its obligations and bond counsel to the MFA on the proposed transaction. The obligations of the PLA are secured by revenues from the proceeds of the City's Utility User's Tax. Under the statute that created the PLA, the PLA will issue a note or bond secured by the City's Utility User's Tax revenue (the "Municipal Obligation"), which is required by law to be sold to the MFA. The MFA would acquire the Municipal Obligation with proceeds obtained by selling its own bond or note, secured by the Municipal Obligation, to the Bank. As bond counsel to the MFA and special counsel to the PLA, we would be expected to draft, comment on and/or negotiate a contract and a trust agreement securing the Municipal Obligation. We would also be expected to render opinions regarding the tax status on the Municipal Obligation, the MFA bond or note, and the potential effect a bankruptcy filing of the City would have on the Municipal Obligation, including the ability of a City to use City's Utility User Tax proceeds for purposes other than paying the Municipal Obligation in a proposed bankruptcy plan. The MFA will be acting as a conduit issuer and the MFA bond or note will be a limited obligation payable only from payments made by the PLA on the Municipal Obligation.

As a result of our past history with the City of Detroit and our current engagement by the City of Detroit, we are unable to undertake representation of the MFA or the PLA in the Transaction without consent of City. Accordingly, we request that the City waive any conflict of interest arising from our representation of the MFA or PLA in the proposed Transaction.

Under the Rules of Professional Conduct, by which we are bound, a lawyer may represent a client in a matter directly adverse to another client if (i) the lawyer reasonably believes the representation will not adversely affect the other client; and (ii) each client consents after consultation. While we represent the City on certain legal matters, we would not represent the City in connection with any matters related to the Transaction and assume the City will have its own counsel.

Because of the unrelated nature of our representation of the MFA and PLA in connection with the Transaction, we are confident that we can represent the MFA and PLA without compromising our loyalty to such parties or to the City with respect to unrelated legal matters. We therefore request that the City waive any perceived conflicts and consent to our representation. If at any time during the course of our representation of the MFA and PLA, a dispute arises between such parties and the City which cannot be amicably resolved, Miller Canfield will not represent either party with respect to such unresolved dispute.

If you have no objections to our representations as described herein, kindly confirm this by signing in the space provided below and returning this letter to the undersigned. Since time is of the essence with respect to this request, please call me if you have any questions and to let me know your decision as soon as possible. Your courtesy with respect to this request is greatly appreciated.

Very truly yours,

Miller, Canfield, Paddock and Stone, P.L.C.

By: _____
Harold W. Bulger, Jr.

**Consent and Waiver to Representation of**
**PLA and MFA in accordance with terms of this letter**

CITY OF DETROIT

By: _____
    Portia Roberson
    Corporation Counsel

Dated: July __, 2013

cc:   Kevyn D. Orr, Emergency Manager
      Thomas L. Saxton, Deputy Treasurer of the State of Michigan
      Joseph L. Fielek, Executive Director of the Michigan Finance Authority
      Floyd E. Allen, Esq.
      William J. Danhof, Esq.
      Christopher J. Dembowksi, Esq.
      David P. Massaron, Esq.

21317107.1\088888-03795

EXHIBIT B

RESOLUTION OF THE BOARD OF DIRECTORS
OF THE PUBLIC LIGHTING AUTHORITY
AUTHORIZING THE ISSUANCE AND DELIVERY OF
PUBLIC LIGHTING AUTHORITY REVENUE BONDS
AND PROVIDING FOR OTHER MATTERS RELATING THERETO

WHEREAS, the Board of Directors (the "Board") of the Public Lighting Authority, Detroit, Michigan (the "Authority") is a public municipal corporation and public body corporate existing pursuant to Municipal Lighting Authority Act, Act 392, Michigan Public Acts of 2012, as amended ("Act 392"); and

WHEREAS, the Board has determined it is in the best interests of the Authority to issue bonds in an amount not to exceed an aggregate principal amount of $60,000,000 (the "Bonds") for the purposes of constructing a public lighting system as set forth in Interlocal Agreement for the Construction and Financing of a Public Lighting System between the City of Detroit (the "City") and the Authority (the "Financing Agreement"), which Financing Agreement was previously approved by this Board and will become fully effective upon the issuance of the Bonds hereunder; and

WHEREAS, the Board has previously approved an Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System between the City and the Authority (the "Operations Agreement") and such Operations Agreement is currently effective; and

WHEREAS, an Amended and Restated Trust Agreement (the "Trust Agreement") among the Authority, the City, the Michigan Finance Authority (the "MFA"), and Wilmington Trust Company, National Association (acting pursuant to the Trust Agreement, the "Revenue Trustee") dated as of the date of the delivery of the initial series of the Bonds, pursuant to which the Revenue Trustee receives and distributes revenues received from the City Utility Users Tax Act, 1990 PA 100, MCL 141.1151 to MCL 141.1177 (the "Utility Revenues") was previously approved by the Board and will become fully effective upon the issuance of the Bonds hereunder; and

WHEREAS, the Authority will enter into a (i) Trust Indenture (the "Trust Indenture") with Wilmington Trust Company, National Association (acting pursuant to the Trust Indenture, the "Bond Trustee") dated as of November 1, 2013, pursuant to which the Bonds will be issued and secured and (ii) a Bond Purchase and Supplemental Agreement with the Michigan Finance Authority and Citibank, N.A. (the "Initial Purchaser"), dated as of the date of sale of the Bonds (the "Supplemental Agreement"); and

WHEREAS, it is necessary to authorize the Executive Director, or his designee, or the Chair, Vice Chair or Treasurer of the Board (each, an "Authorized Officer", and collectively, the "Authorized Officers") to negotiate the sale of the Bonds with the MFA and set forth the terms and conditions upon which the MFA will agree to purchase the Bonds and the interest rates thereof and the purchase price therefor.

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF DIRECTORS OF THE PUBLIC LIGHTING AUTHORITY, AS FOLLOWS:

1.     The Board hereby authorizes the issuance, execution and delivery of the Bonds in one or more series to be designated PUBLIC LIGHTING AUTHORITY REVENUE BONDS, with appropriate series designations, in the aggregate original principal amount established by an Authorized Officer, but not to exceed an aggregate principal amount of Sixty Million Dollars ($60,000,000).  The Bonds shall be dated as of the date or dates established by an Authorized Officer, and shall be issued for the purpose of providing funds which, together with other available funds, will be used to pay all or a portion of the costs of the Lighting Improvements (as hereinafter defined), including, if determined to be appropriate by an Authorized Officer, to fund a debt service reserve fund in an amount determined by an Authorized Officer and to pay costs related to the issuance of the Bonds.  The Bonds shall be serial bonds or term bonds, or both, which may be subject to redemption requirements as shall be established by an Authorized Officer, and the last maturity shall be no later than 30 years from the date of issuance.  The Bonds shall bear interest at a variable rate, determined on the basis of an index or some other recognized market procedure, or both, for all or a portion of their term, and the variable rate of interest shall not exceed the lesser of 25% per annum, the maximum rate permitted by law or the maximum rate, if any, specified in the Trust Indenture.  Interest on the Bonds shall be payable at such times as shall be specified by an Authorized Officer.  The Bonds may be subject to redemption or call for purchase prior to maturity at the times and prices and in the manner as shall be established by an Authorized Officer.  The Bonds shall be issued in fully registered form in denominations, shall be payable as to principal and interest in the manner, shall be subject to transfer and exchange, and shall be executed and authenticated, all as shall be provided in the Trust Indenture.  The Bonds shall be sold to the MFA for a price to be established by an Authorized Officer plus accrued interest, if any, from the dated date of the Bonds to the date of delivery thereof.

2.     The Authority hereby pledges any interest it has in the Utility Revenues.  The Authority ratifies and affirms the pledge of any funds to be held in accounts established under the Trust Indenture, the contents of which by that Trust Indenture are pledged to the repayment of the Bonds and to other payment obligations of the Authority to the Initial Purchaser and its successors under the Supplemental Agreement (the "Other Payment Obligations").  With respect to Other Payment Obligations, the Supplemental Agreement is hereby declared to be an Ancillary Facility within the meaning of Act 392.

The Bonds, and the obligations of the Authority thereunder, including the Supplemental Agreement, shall be revenue bonds or obligations of the Authority and not general obligations of the Authority and shall be paid exclusively from Utility Revenues and other funds held by the Trustee under the Trust Indenture.

No recourse shall be had for the payment of the principal amount of or interest or other obligations on the Bonds or the Supplemental Agreement, or any claim based thereon, against the Public Lighting Authority, or any member or agent of the Board (including, without limitation, any officer or employee of the Authority), as individuals, either directly or indirectly, or, except as specifically provided in the Trust Indenture, Trust Agreement or the instruments entered into in connection therewith.

2

3. The Authority hereby approves, and authorizes any Authorized Officer to execute and deliver, the Trust Indenture and the Supplemental Agreement in substantially the forms on file with the Authority with such changes as determined necessary and advisable by the Authorized Officer. The form of Bonds shall be in substantially the form contained in the Trust Indenture with such changes as shall be approved by the Authorized Officer. Wilmington Trust, National Association is hereby approved to act as Trustee under the Trust Indenture. As required by Section 21(3)(g) of Act 392, the Authority approves the creation of the Bond Payment Fund, Bond Issuance Fund and Construction Fund in the Trust Indenture and approves the deposit of the Utility Revenues received from the Revenue Trustee under the Trust Agreement by the Bond Trustee under the Bond Indenture for payment on the Bonds as provided thereunder and other payment obligations as provided under the Supplemental Agreement.

4. The Authority will construct, improve, enlarge and/or reduce the street lighting system supplying lighting to the City of Detroit in conformance with the Lighting Plan previously approved by the Board, as the same shall be amended from time to time (the "Lighting Improvements"). As required by Section 21(3)(c) of Act 392, the Board hereby states that the Financing Agreement and the Operations Agreement have been entered into and that such agreements provide for the services the Authority is to perform for the City.

5. As required by Act 392, the Authority hereby approves a negotiated sale of the Bonds to the Michigan Finance Authority. Either the Chair, Vice-Chair or the Treasurer of the Board, or the Executive Director is authorized, empowered and directed, in the name and on behalf of the Board, and as its corporate act and deed, to execute the Bonds by manual or facsimile signature and the Authorized Officer is authorized to deliver the Bonds to the MFA in exchange for the purchase price therefor.

6. Either the Chair, Vice-Chair and the Treasurer of the Board and the Executive Director of the Authority, and all other appropriate officers or representatives of the Board or the Authority and each one of them, are authorized to perform all acts and deeds and to execute and deliver for and on behalf of the Board a Sale Order approving the final terms of the Bonds and all other instruments and documents required by this resolution, the Trust Agreement, the Trust Indenture or the Supplemental Agreement, or necessary, expedient and proper in connection with the issuance, sale and delivery of the Bonds, as contemplated hereby.

7. Notwithstanding anything herein to the contrary, an Authorized Officer is hereby authorized to determine and adjust the final Bond details to the extent necessary or convenient to complete the transactions authorized herein, and in pursuance of the foregoing is authorized to exercise the authority and make the determinations authorized pursuant to Section 21(e) of Act 392, including, but not limited to, determinations regarding the form of the Bonds, interest rates, prices, discounts, serial and term maturities, principal amounts, denominations, dates of issuance, interest payment dates, redemption rights, the place of delivery and payment, series designations and other matters necessary to effectuate the sale and issuance of the Bonds authorized herein; provided, however, that the aggregate principal amount of the Bonds shall not exceed the principal amount authorized in Section 1 of this Resolution, the interest rate per annum on any series of Bonds shall not exceed the maximum rate provided by law, and any series of Bonds shall mature not later than 30 years from the date of issuance thereof.

8. The Authority hereby appoints Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel to the Authority for the Bonds, notwithstanding the representation by Miller, Canfield, Paddock and Stone, P.LC. of the MFA in connection with the Local Government Loan Program through which it is anticipated that the MFA will offer to purchase the Bonds. The Authority hereby acknowledges that Miller, Canfield, Paddock and Stone, P.L.C. has provided advice to the City on bankruptcy and other unrelated matters and consents to that unrelated representation.

9. No issue of Bonds shall be delivered under this Resolution to the MFA pursuant to a bond purchase agreement executed by the Authority after December 30, 2016.

10. Any resolutions or parts of resolutions or other proceedings of the Board in conflict herewith are hereby repealed insofar as such conflict exists.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

4

I hereby certify that the attached is a true and complete copy of a resolution adopted by the Board of Directors of Public Lighting Authority on November 20, 2013, in accordance with applicable law, and that the minutes of the meeting at which said resolution was adopted were kept and will be or have been made available to the public in accordance with applicable law.

I further certify as follows:

1.    Present at the meeting were the following Board members:

Maureen Stapleton, John Davis, Cedric Dargin, and Marvin Beatty (via Teleconference)

Absent from the meeting were the following Board members:

Michael Einheuser

2.    The following members of the Board voted for the adoption of the Resolution:

Maureen Stapleton, John Davis, Cedric Dargin

The following members of the Board voted against adoption of the Resolution:

None

RESOLUTION DECLARED ADOPTED.

Chairperson of the Board

21626559.7\088888-03795