UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,        .        Docket No. 13-53846
       MICHIGAN,               .
                               .        Detroit, Michigan
                               .        January 22, 2014
               Debtor.         .        10:00 a.m.
. . . . . . . . . . . . . . .  .

     MOTION OF CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO
     SECTION 105(a) OF THE BANKRUPTCY CODE APPOINTING AND
     DIRECTING THE DEBTOR TO COOPERATE WITH A COMMITTEE OF
      CREDITORS AND INTERESTED PERSONS TO ASSESS THE ART
     COLLECTION OF THE DETROIT INSTITUTE OF ARTS BASED ON
       ARMS-LENGTH MARKET TRANSACTIONS TO ESTABLISH A
                      BENCHMARK VALUATION
          BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street, Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

For Financial          Weil, Gotshal & Manges, LLP
Guaranty Insurance     By:  ALFREDO R. PEREZ
Company:               700 Louisiana Street, Suite 1600
                       Houston, TX  77002
                       (713) 546-5040


For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  RYAN BLAINE BENNETT
Syncora Guarantee,          WILLIAM E. ARNAULT
Inc., and Syncora      300 North LaSalle
Capital Assurance,     Chicago, IL  60654
Inc.:                  (312) 862-3062

APPEARANCES (continued):

```
For the Official    Dentons
Committee of        By:  SAM J. ALBERTS
Retirees:           1301 K. Street, NW
                    Suite 600, East Tower
                    Washington, DC  20005-3364
                    (202) 408-7004


Court Recorder:     Letrice Calloway
                    United States Bankruptcy Court
                    211 West Fort Street
                    21st Floor
                    Detroit, MI  48226-3211
                    (313) 234-0068

Transcribed By:     Lois Garrett
                    1290 West Barnes Road
                    Leslie, MI  49251
                    (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please

2  be seated.  Case Number 13-53846, City of Detroit, Michigan.

3    THE COURT:  Good morning.  I'd like to hear the art

4  motion first.

5    MR. PEREZ:  Good morning, your Honor.  Alfredo Perez

6  on behalf of FGIC.  Your Honor, we filed the motion

7  approximately two months ago, and much has happened since

8  that time, which I think prove the absolute necessity for

9  having such a committee.  The purpose of the motion was to

10  get a broad spectrum of creditors to be able to discuss what

11  we think is one of the largest and most significant assets

12  that the debtor has so that it can play a meaningful role in

13  connection with not only confirmation but also with the

14  mediations that are going forward.  I think it's imperative

15  that --

16    THE COURT:  Well, but you assume that the art has

17  anything to do with this case.  Why is now the right time to

18  decide that question as opposed to in the context of a

19  specific plan later?

20    MR. PEREZ:  Well, your Honor, if the Court just

21  looked at the front page article in today's Detroit press,

22  you'll know the answer to that question because there are --

23  there's stuff, whatever it is, which I'm not privy to, going

24  on with respect to the art that by the time we get to a plan,

25  just like with respect to Belle Isle, just like with respect

1  to the issue with the swaps, will have happened, and it'll be

2  presented to you as a total fait accompli, so we think it's

3  absolutely imperative --

4          THE COURT:  Well, in case you haven't noticed, I

5  don't do faits accomplis.

6          MR. PEREZ:  Absolutely, your Honor.  Absolutely,

7  your Honor.  You absolutely don't do a fait accompli, and we

8  have noticed that, and we think that this is the only

9  responsible way for that -- for us not to be faced with the

10  same situation over again.

11          THE COURT:  Well, but don't we have to decide first

12  if the art has anything to do with this case before we spend

13  the money and take the time to value it?

14          MR. PEREZ:  Well, your Honor, we're not spending the

15  money.  We're doing it on our nickel.  Okay?  And I just want

16  to --

17          THE COURT:  Why spend that money if it doesn't have

18  anything to do with the case?

19          MR. PEREZ:  But, your Honor, there's no question in

20  the June 14th proposal -- the June 14th proposal, which is

21  the premise of this case, the issue of monetization of

22  various assets, including the art, was in there.  There's no

23  question but that as we speak today and as you read in this

24  morning's paper, people are using the value of the art in

25  order to put building blocks or not building blocks with

1  respect to the case, so we absolutely think it does, and we

2  think both under --

3        THE COURT:  I think it's more likely that they are

4  doing that in order to avoid the risk of a holding that the

5  art is part of the case, not because they agree that it is.

6        MR. PEREZ:  But, your Honor --

7        THE COURT:  We've already seen the attorney general

8  say it isn't.

9        MR. PEREZ:  Yes, your Honor, and at the appropriate

10  time we will counter that opinion because we think it's

11  absolutely incorrect.

12        THE COURT:  Right.  So my question to you is, again,

13  why go to all the trouble of valuing the art before you have

14  a decision on that preliminary question?

15        MR. PEREZ:  Well, your Honor, couple of reasons.

16  Number one, valuing the art is much more complicated than you

17  would say valuing, you know, this business because there are

18  a myriad of issues that have to be explored.  Is it -- is

19  there any ability of monetizing it?  What are the

20  monetization options, not just sale, but what are the

21  monetization options?  All of this stuff takes a lot of time,

22  and, you know, we basically filed the motion in November.

23  It's now late January.  We're hearing the motion.  If we have

24  to wait until a plan is filed to begin this process, we're

25  going to be delayed endlessly.  It's going to have to happen.

1          THE COURT:  A plan is due in 37 days.

2          MR. PEREZ:  Excuse me.

3          THE COURT:  A plan is due in 37 days.

4          MR. PEREZ:  I understand that, your Honor, and if we

5    don't get started -- we thought the city would embrace this.

6    We provided it to them before we filed it.  We absolutely --

7    this is like in the situation where no good deed goes

8    unpunished.  Here is a responsible group of the largest

9    creditors completely broad-based saying let's take the steps

10   so that we don't end up in the situation where we're here on

11   discovery requests, oh, no, we want this; no, we want that.

12   We wanted to do it in a way that would allow some

13   nonlitigation thought, best thinking, on what to do with

14   this, and, your Honor, the Court asked why is this in the

15   case.  It is in the case because people look to it.  Some

16   people have looked to it.  Certainly my client looks to it as

17   an asset that can be monetized.

18         THE COURT:  Well, but the fact that you look to it

19   doesn't make it so.

20         MR. PEREZ:  It absolutely doesn't make it so, and

21   remember the committee --

22         THE COURT:  Beyond that you have to be careful what

23   you wish for here.  If you're asking for a ruling now that

24   the art is part of the case, you might not get that ruling.

25         MR. PEREZ:  But we're not asking for that, your

1  Honor, and I thought we were very clear.  What the committee
2  is going to do is develop the facts.  How can developing the
3  facts possibly hurt anyone?  That's what we're asking to do,
4  to develop the facts.  That's all it is, and it's not at the
5  debtor's expense.  And the debtor says, well, it violates --
6          THE COURT:  Does it hurt anyone to do -- to
7  undertake this massive investigation that may wind up being
8  irrelevant?
9          MR. PEREZ:  Well, your Honor, we don't think it's
10 irrelevant, and if it is, it's on our nickel.  It's on our
11 nickel because we're not asking -- we're not asking for the
12 city to pay for it.  And the city says cooperation.  You
13 can't order cooperation.  That just doesn't make any sense to
14 me.  The city, in order to --
15         THE COURT:  All right.  Well, let's focus on that.
16 How do you deal with the city's argument that this is not
17 within the scope of 1102 nor 1105?
18         MR. PEREZ:  Well, your Honor --
19         THE COURT:  I'm sorry.  105.
20         MR. PEREZ:  105.  Well, your Honor, we think it is,
21 and we've set forth the arguments in there.  We think it is
22 for a couple of reasons.  Number one, it's not just 1102 that
23 addresses this issue.  What we're basically trying to do is
24 develop facts that will be needed in connection with the plan
25 confirmation process and really, frankly, the negotiation

1    process, so the Court certainly has the ability to order
2    steps -- the Court already did, the mediation -- ability to
3    order steps that are consistent with that pursuant to 105.
4    This would be no different.  We're not asking for an official
5    status as a committee.  We're not asking for a 1102
6    committee.  We're not asking to be reimbursed.  This is a
7    very limited scope of one issue, and the Court has already,
8    in essence, used 105 to order the mediation.  It would be no
9    different than what the Court has already done, so -- and as
10   it relates to cooperation and whether that infringes on their
11   governmental function, the city had the obligation coming in
12   to negotiate in good faith.  They don't check that at the
13   door when they -- once they get in.  They still have the
14   obligation to negotiate in good faith throughout the process,
15   and the cooperation that we're talking about is absolutely --
16   is actually no different than negotiating in good faith.
17   There have been, as far as we know -- as far as my client is
18   concerned, there have been no discussions relating to the
19   art.  It's an issue.  It's in the case regardless of whether
20   we want it.  It's thrust on us every day by the front page
21   article in the paper today.  It is literally thrust on us
22   every day, so we can't say that it's not an issue and that we
23   should wait.  Things are happening, and we've already waited,
24   you know, basically 60 days for the Court to consider this.
25   The plan is due in 37 days.  We need to get going, and we've

1  done it in, I think, the absolute most responsible way that
2  doesn't infringe on the city's operating their government
3  because it doesn't.
4          THE COURT:  Thank you.
5          MR. PEREZ:  Thank you.
6          MR. BRUCE BENNETT:  I do very briefly want to talk
7  about the art, but first I want to respond to some of the
8  things we've just heard.  First of all, to the extent that
9  the motion now seeks information so that creditors -- certain
10 creditors as a group want to inform themselves about art, I'm
11 not quite sure why we're here for the appointment of an
12 official committee.  I will say this, that the city, although
13 it is not actually the repository of data relating to the DIA
14 or the city collection -- that's largely with what I call the
15 DIA Corp., which is the entity that manages the museum -- we
16 will cooperate with information requests that people have
17 with respect to the art and with respect to issues relating
18 to the art, period, end of story.
19         THE COURT:  I have to interrupt you and ask you to
20 place your appearance on the record.
21         MR. BRUCE BENNETT:  I'm sorry, your Honor.  Bruce
22 Bennett of Jones Day on behalf of the city, so -- and now
23 let's talk a little bit about what people should be looking
24 at if they want to understand this and how big a job it
25 really is.  First of all, the assertion was made that this is

1   a very hard asset to deal with, particularly hard asset to

2   deal with.  In some ways it's unusual.  That is to be sure.

3   But I think we've learned a few things -- the city has

4   learned a few things, and those creditors that have discussed

5   it with us know we've learned a few things as a result of the

6   work we've done.  First thing is is that the best way into

7   starting to deal with the art is actually books.  There are

8   two of them.  They were both available on Amazon.  One is

9   sold out.  The other one is still there.  And they're both

10  guides to the museum.  One of them covers, I think, the six

11  or 800 most prominent works.  The other one covers, I think,

12  1,200 prominent works, including -- and it'll become

13  important in a second -- some information as to providence,

14  where the museum got the individual items.

15          The other thing that we learned -- and I think the

16  Christie's report, which is criticized only as to its scope

17  in the papers, but the Christie's report taught us something

18  that I think art professionals also knew and I didn't

19  adequately appreciate that the -- that value in a collection

20  like this is confined to relatively few numbers of pieces.

21  And I think in the Christie's universe, upwards of 80 percent

22  of the value was covered -- was basically 75 works, something

23  like that, rough numbers, but that's the order of magnitude.

24  It's very, very concentrated.  So if we're interested in the

25  abstract question -- and I agree for much of the reasons that

1    your Honor hinted at that it may well be an abstract question

2    as to what the value of works of art are if the city really

3    had marketable title, could sell them free and clear, and if

4    it was appropriate to do so, all of those issues being rather

5    complex, it turns out, this isn't hard.  It's actually

6    relatively easy.  It's expensive to get people to pay

7    attention to it, and it might be hard in the first instance

8    to narrow down the universe you really want to look at, but

9    at the abstract question of -- that I just posed, which is,

10   you know, art, be able to sell free and clear of other

11   interests and appropriate to do so, these numbers are

12   accessible, and there's no difference of view that the art in

13   the art museum -- in the DIA is valuable.

14        On cooperation, I think the DIA has evidenced at

15   least to us the willingness to work with people who are

16   prepared to work discreetly, not interfere with the museum's

17   mission, to inspect works.  The city made a decision in

18   conjunction with Christie's not to take works off and subject

19   them to physical detailed examination, look at the back, you

20   know, do anything that could conceivably be invasive, and we

21   were comfortable with that, and Christie's was comfortable

22   that it didn't interfere with the project.  I'm reasonably

23   sure any creditor group that wants to go through the same

24   process will get similar levels of cooperation.  It might

25   involve showing up at the museum at hours when it's not open.

1   That's not a very big inconvenience.  Okay.  So that's that.

2          Second area which is important and, frankly, wasn't

3   mentioned in any of the papers but I think wisely mentioned

4   now, which is which art -- we talked about the fact that

5   value is pretty concentrated.  They talk in their motion

6   about the fact that the Christie's appraisal looked at a

7   relatively small part of the art, five percent of total items

8   corresponding with those which were purchased using city

9   funds.  What about the rest of it?  Well, we said in our

10  papers and it's true that the -- that value is actually

11  highly concentrated in the city-acquired portion.  There are

12  all kinds of very interesting historical reasons for that, by

13  the way, but I don't think that's within the scope of today's

14  hearing.  It turns out to be true, and so that's one reason

15  to look there.  As to the rest of it, there's a big reason

16  not to look at all of it, and that is is that the rest of it

17  came via gifts.  When art museums get gifts, they frequently

18  get -- we have an analogy in law school.  We talk about a

19  bundle of sticks being property, and each artwork can be

20  viewed as a bundle of sticks.  When the art museum gets art

21  from donors, very frequently they don't get all the sticks.

22  They get the art subject to limitations, and if the

23  limitations and restrictions aren't complied with, the art

24  goes back to the donor or someplace else.  There's actually

25  many, many variations on that theme, so it's not always quite

1    that way.  It also turns out that the more valuable the gift

2    to the museum, the more sophisticated the instrument that was

3    used to make the gift, again, not always true, but generally

4    true.  And so, accordingly, once one decides if one wants to

5    look at the rest of the collection, one has got a couple of

6    steps to think about.  It's probably a waste of time and

7    money to look at all of it, which was the suggestion in the

8    papers that were filed by Mr. Perez and his client.  It's

9    probably sensible to think about, well, what are the

10   restrictions on all these things apart from, by the way, the

11   big restriction, which is what the attorney general asserts

12   that would apply to everything.  And then you wind up

13   focusing yourself on smaller and smaller things.  Some

14   creditors have asked us for information concerning this level

15   of restrictions, and I will tell the Court, as I've told

16   creditors, this turns out to be a nightmare.  It's kind of

17   like the file room at the end of one of the "Indiana Jones"

18   movies.  It's like there's pages and pages and pages.

19   They're not terribly well-organized.  This is not something

20   the museum needs to access day-in and day-out.  The DIA has

21   been helping out the city to try to isolate the most

22   important gifts and supply us the documents on the most

23   important parts of the gifted collection.  That process is

24   taking a long time.  There's been -- that process started.

25   It's not complete.  There are privacy issues with respect to

1    these documents.  We are in the process of figuring out a

2    way -- it's taking a long time, to be sure, to figure out a

3    way to eliminate private information and make some of these

4    documents available on some basis to people who are

5    interested.

6            I want to say also a little bit about the idea that

7    there's -- that has been asserted, of course, without

8    evidence that there's been no discussions about the art.  I

9    don't remember all of my discussions with Mr. Perez, so I'm

10   not going to say that there were discussions with him about

11   the art, but there are a lot of lawyers lined up on that side

12   of the room, and many of them have been in discussions

13   concerning the art.  And, frankly, the papers that were filed

14   with your Honor essentially admit as much because the

15   assertion is that there haven't been meaningful discussions

16   about the art.  I submit to your Honor that in this context

17   the word "meaningful" means that there were discussions, but

18   the parties haven't agreed, and that's true.  And I don't

19   want to go into the substance of discussions, many of which

20   have been conducted in accordance with the mediation, but it

21   won't surprise anybody there isn't agreement on a lot of

22   things about the art, including, of course, the question your

23   Honor raised, which is is it a part of the case or is it not.

24           At any rate, maybe I'll just leave it at that.  I

25   can -- I have much more information to offer concerning all

1  of the different issues that were implicated by the way your

2  Honor started the hearing, which is how does the art fit,

3  what are all the different problems with it, what are all the

4  different issues with it.  All I'm going to say unless your

5  Honor wants more detail -- and I will provide as much detail

6  as your Honor wants -- is this is a very complicated corner

7  of the case, and there is a tremendous amount of effort that

8  is being spent on it.  And one way or another, the plan of

9  adjustment will either expressly, open paren, most likely

10 case, or by implication it will be dealt with in a plan of

11 adjustment.  It will be discussed in the plan of adjustment,

12 and it will be discussed in the disclosure statement.  And we

13 will at that time have an extensive discussion about all of

14 the complexities that are there.

15        In summary, if this really is about information

16 sharing, let's get on with it, and, as I said before, this is

17 a relatively unique circumstance.  It's really -- for the

18 most part, it's not our information, and we will do what we

19 can to facilitate cooperation with gathering the information

20 that people want subject, of course, to protecting privacy,

21 to protecting the museum, and protecting, you know, kind of

22 other legitimate interests that are most certainly involved

23 here.  Best thinking is welcome.  It's a complicated area.

24 Best thinking that comes in the form of close the museum and

25 sell everything is not necessary.  We understand that there

1    are some people who want that to happen, and, frankly, we're

2    not sure that's a sensible solution to anything.  But if

3    there really is best and creative thinking that is sensitive

4    to all of the competing interests, the problems, the

5    possibility that the art isn't part of the estate -- or

6    excuse me -- part of the city's property for purposes of

7    distribution to creditors, and, frankly, the possibility that

8    the maintenance of that museum in exactly its current

9    condition has a lot to do with the welfare of the city's

10   residents and with the possibility of the city's resurgence,

11   we are happy to have that dialogue, and I'll go out on a

12   limb, anytime and anyplace.  I'm happy to answer any

13   questions your Honor might have.

14          THE COURT:  Well, are you abandoning your 1102, 904,

15   105 legal arguments?

16          MR. BRUCE BENNETT:  No, your Honor, not by any

17   stretch of the imagination.  I thought that your Honor seemed

18   to understand them very clearly.  I mean this is -- if you

19   just read -- I have one sentence I want to read back to you.

20   In response to the position we took in our pleadings, which,

21   frankly, is a straightforward evaluation of what the law

22   really is in this area, here was the response.  It was one

23   sentence.  "Because the art committee's role will be very

24   focused and targeted and closely tied to implementation of

25   Section 943(b)(7) of the Bankruptcy Code, the creditors

1  determined that 105(a) of the Bankruptcy Code is the

2  appropriate vehicle for the relief requested," so I gather

3  the legal position is is that 943(b)(7), which, by the way,

4  that's the best interest test, which we've got that in every

5  Chapter 11 case that your Honor has dealt with and that I've

6  dealt with, that that -- the fact that the debtor has to

7  comply with the best interest test, not the creditor -- the

8  debtor has to comply with the best interest test, that is a

9  reason to suggest that 105 should be utilized to establish a

10  special committee to just evaluate the art. And remember, if

11  your Honor is at all inclined to grant the relief, what they

12  want this committee to do keeps moving around. We could go

13  through what they said in the initial papers and then what

14  they said in the next set of papers and then what they said

15  here, and it's all different, so I think that if we'd ever go

16  there, we'd want --

17      THE COURT: Well, but they'll say that it's, you

18  know, because circumstances have changed over time and events

19  have occurred.

20      MR. BRUCE BENNETT: Well, some events have occurred,

21  but circumstances really haven't changed over time because

22  even before the motion was filed, everybody knew the

23  Christie's report was in progress, and the Christie's report

24  actually came out the day after -- went completely public the

25  day after -- the second day after we received the first

1    piece, I think, and the day we received the second piece.  I

2    think that's the only thing that's changed in this area.  All

3    I would point out is is that there's now been offered to the

4    Court multiple different projects that this committee might

5    perform.  At the end of the day, the reason I think they want

6    an official committee is they want to compel the city and the

7    committee to agree on something, and, frankly, that's way

8    beyond anything contemplated by 943(b)(7) of the Bankruptcy

9    Code.  And while it will be great for the city to have lots

10   of agreements with creditors about lots of things, I think

11   mandating that the plan of adjustment include an agreement

12   between a particular committee and the debtor is so far from

13   any Bankruptcy Code provision that is applicable to this case

14   that it's stretched to the breaking point.  And so put in

15   terms that are relevant for Bankruptcy Code 105(a), which is

16   where they are -- they've conceded there's no relief under

17   any other provision -- 105 has to be implementing some other

18   statutory provision.  That's shorthand for lots of cases that

19   spill lots of ink on the subject.  The only provision they

20   found is the best interest test.  The best interest test has

21   never before been interpreted as generating a need for a

22   committee, particularly one whose charge is and the charge to

23   the debtor is to agree on and then fill in the blank.

24   Originally it was value, and I guess it's now moved, but

25   that's an inappropriate intrusion, frankly, on many of really

1    responsibilities that are put on the debtor, the

2    responsibility to formulate a plan, the responsibility to

3    deal with these questions, and ultimately the responsibility

4    to comply with the best interest test, so I think on the law

5    there is no provision that this -- that 105 is being called

6    upon to implement that we can see.  It's just not there in

7    the Bankruptcy Code, so it is a power problem, but I think

8    the other point in my argument is that even assuming this

9    Court has the power, I don't understand what we're doing.  I

10   mean I think at the end of the day, all the creditors could

11   be asking for is information, and we said fine.  We said fine

12   all along.  But I've said fine today on the record in a way

13   that will be enforced if there's any problems that develop,

14   and there won't be any.  And beyond that, I see no reason for

15   this Court to be concerned about art at the moment much less

16   for there to be a committee appointed.

17            THE COURT:  Thank you.  Any rebuttal?

18            MR. MARRIOTT:  Good morning, your Honor.  Vince

19   Marriott, Ballard Spahr, EEPK and affiliates.  I just wanted

20   to touch on two points briefly.  One is to go back to your

21   initial point.  Is it premature to be worried about this

22   because is it premature to be worried about the art at all?

23   Our concern is that the art, both its monetization and the

24   use of its monetization -- and that's an important point as

25   well -- presently contemplated to be limited to a single

1    constituency is a plan issue regardless of the fact that no

2    plan has yet been filed to formally put treatment of a

3    particular class at issue and treatment of a particular asset

4    at issue.  The fact that there's this sort of parallel

5    process outside of the plan and outside of this Court is

6    precisely what concerns us, and it particularly concerns

7    us --

8             THE COURT:  Well, but there's nothing about your

9    motion that addresses the issue of where proceeds from the

10   art go, assuming they should go anywhere.

11            MR. MARRIOTT:  True, but our view is that this

12   parallel process is both problematic in terms of how it's

13   proceeding as a structural matter, but also a problem

14   because, in our view, it's proceeding on a false premise

15   about what this art may be worth and that insofar as this

16   Court will ultimately --

17            THE COURT:  Why doesn't the plan objection process

18   give you whatever remedy you need for that concern?

19            MR. MARRIOTT:  Judge, it may give us an ultimate

20   remedy for that concern.  It's our view that valuation can

21   occur in advance of a confirmation hearing and should.  For

22   example, Mr. Bennett referenced a process that the city and

23   the DIA are going through to view whatever bundles of sticks

24   relate to whatever particular pieces of art insofar as that

25   will affect value because it may affect the ability of the

1   city to transfer, even if it were inclined to do so, rights

2   in that art.  It's very interesting that that process is

3   going on.  Why isn't there a creditor representative as part

4   of that process?  I mean we could all be part of that

5   process, which would be unduly cumbersome, or we could have a

6   designated group whose responsibility it is to be injected

7   into that process and participate.  It seems to me that it is

8   a waste of resources to have that process occur outside of

9   creditor involvement only to have creditors then in the role

10  of, once again, "Well, what did you do?  How did you do it?

11  What did you find out?"  It just seems that's inefficient.  I

12  mean at the end of the day, value is going to be an issue

13  here because we're -- the art has been injected into the plan

14  process regardless.  That is all -- that train has already

15  left the station.  Our point is to the extent that there are

16  preliminary fact issues that relate to how the art is

17  ultimately valued, which then relates to how it's ultimately

18  used and the proceeds are distributed, that's something that

19  appropriately creditor involvement would increase the

20  efficiency of that process.  So I mean whether any of us like

21  it or not, the art is in play, and whether any of us like it

22  or not, that is --

23          THE COURT:  I have to say that that is not

24  altogether clear to me at all.  It depends on what you mean

25  by "in play."  If by "in play" you mean you're making a claim

1    to it, okay, it's in play, but that doesn't make it an asset

2    of the case, and it doesn't make it an element for best

3    interest of creditors by itself.

4         MR. MARRIOTT:  It does, Judge, in our view.  Well,

5    let me just explain.  I don't mean to suggest that you have

6    your view, I have mine.  It's not as though dealing with the

7    art and keeping it in or pulling it out of the process is all

8    that's going on.  It's also talking about -- the process

9    that's in play outside of this courtroom is also talking

10   about designating whatever monetization --

11        THE COURT:  Right.

12        MR. MARRIOTT:  -- to a class of creditors, which

13   makes it a plan issue.

14        THE COURT:  Right, but you have already conceded

15   that there's nothing about what you've requested from the

16   Court here this morning that will deal with that issue at

17   all.

18        MR. MARRIOTT:  Correct, but since it will be a plan

19   issue inextricably, in our view, intertwined with it being a

20   plan issue is value.

21        THE COURT:  Okay.

22        MR. RYAN BENNETT:  Good morning, your Honor.  Ryan

23   Bennett on behalf of Syncora.  Very briefly, your Honor, I

24   just want to underscore some of the things Mr. Marriott --

25        THE COURT:  I don't need any underscoring.  If

1   there's something new and different you'd like to add, that's

2   fine, but when one motion is filed on behalf of several

3   parties, I expect one attorney to argue that.

4           MR. RYAN BENNETT:  Right.  Understood.

5           THE COURT:  I've already had two.

6           MR. RYAN BENNETT:  Understood, sir.  I think then

7   I'll go specifically to some comments that weren't made yet.

8           THE COURT:  Okay.

9           MR. RYAN BENNETT:  I think when your Honor -- Mr.

10  Perez spoke earlier about how this is a relatively limited

11  request.  I think it would be helpful to give your Honor

12  context.  When we originally discussed this pleading and the

13  implications related to the arguments you heard about plan

14  confirmation and whatnot, one of the original concepts that

15  we came up with was potentially filing a motion for a

16  scheduling for confirmation, you know, which would provide

17  for discovery, provide for briefing earlier on than even when

18  the debtor had actually filed its plan, again, knowing that

19  we had this plan hanging over us that was going to be filed

20  and knowing that, unfortunately, we weren't being part of

21  that process.

22          THE COURT:  It won't shock you to learn that I'm

23  ahead of you on that or with you on it.  When a plan is

24  filed, we'll have a conference, and we'll figure out an

25  objection schedule and a briefing schedule, and we'll figure

1   out whether the objections should be divided into the factual

2   ones and the legal ones much like we did for eligibility.

3       MR. RYAN BENNETT: Right; right. And thank you,

4   your Honor, and I think the reason why -- after some

5   deliberation, the reason why we narrowed it just to this

6   issue for now is because this is such a fact-intensive and

7   relevant issue in our minds, at least, to value, and our

8   involvement in the process up front, we believe, as Mr. Perez

9   and Mr. Marriott said, will mitigate the time and expenses

10   down the road associated with confirmation. I think if I was

11   representing the debtor here, I'd almost welcome this; right?

12   I mean if they've had this deliberative -- the deliberations

13   among the art committee and the debtor and they've gone

14   through them, and, unfortunately, for whatever reason, it

15   does not develop consensus, at least the debtor has gone

16   through those -- gone through that process and can say that

17   in the context of prosecuting its plan later on down the

18   road. Here we're looking at a scenario where, you know, the

19   debtor is proposing not to go through any of that process or

20   at least not what we've outlined in our motion, so I think

21   one other point, Judge, is at least Syncora and potentially

22   other creditors have received already indications of interest

23   from parties interested in providing value to the city on

24   account of the -- at least a portion of the art collection,

25   and this value -- the numbers we're hearing are two, three,

1  four times higher than that which is proposed by the -- what

2  we're reading about, the coalition among the foundations and

3  the state.  We can't really evaluate those indications of

4  interest or develop them further without access to

5  information and involvement in the process with the city, and

6  that's -- we really think that now is the time, and we hope

7  your Honor approves the motion.  Thank you.

8       THE COURT:  Mr. Bennett, any response?  Syncora

9  wants to sell the city's art for several times what the

10  Christie appraisal is.

11       MR. BRUCE BENNETT:  Yeah.  I don't really have a

12  legal response.  I have a response for all those listening,

13  which is that the city is being exceptionally careful and

14  diligent in its evaluation of the art, is mindful of the fact

15  that, as I indicated before, the city owns an interest in all

16  of it, but it doesn't own ownership necessarily in the

17  context that would be required to implement some of the

18  things that the other Mr. Bennett has in mind.  We are

19  mindful of all of the ways in which one can look at the art

20  in connection with the city.  We concede that if it were

21  possible and sensible to sell the art free and clear of all

22  other interests, it would be very valuable.  There's no

23  debate about that at all.  How valuable there might be a

24  debate, but we agree with your Honor that whether it is part

25  of the case is a difficult and sensitive question.  Whether

1  it should be sold is a difficult and sensitive question.  How

2  it fits with respect to the future of the city is a difficult

3  and sensitive question, and these questions are being dealt

4  with carefully, sensitively, and as quietly as possible.

5  Thank you, your Honor.

6         THE COURT:  All right.  Let's turn our attention to

7  the adversary proceeding, please.  Do you want to call that

8  case, Chris?

9         THE CLERK:  Case number 13 --

10         THE COURT:  Oh, I should -- before we go there, I'm

11  going to give you a decision on this motion regarding the art

12  at three o'clock this afternoon.

13     (Recess at 10:36 a.m., until 3:00 p.m.)

14         THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Case Number 13-53846, City of Detroit, Michigan,

16  and Case Number 14-04015, Official Committee of Retirees of

17  the City of Detroit, Michigan, versus City of Detroit,

18  Michigan.

19         THE COURT:  It appears that everyone is here.  Are

20  the members of the Official Committee of Retirees here?

21         MR. ALBERTS:  They are, your Honor.

22         THE COURT:  May I ask each of you to step forward in

23  turn and introduce yourselves?  Step forward all the way to

24  the lectern where we have a microphone.  It doesn't matter

25  the order.  Just go ahead.

1          MS. RENSHAW:  Good afternoon, your Honor.  Terri

2    Renshaw.  I'm chair of the Official Committee.

3          THE COURT:  Okay.  Whoa, whoa, whoa.  I've got a

4    couple questions for you.  And tell me what department you

5    retired from.

6          MS. RENSHAW:  The Law Department.

7          THE COURT:  The Law Department.

8          MS. RENSHAW:  Yes.

9          THE COURT:  What was your position there?

10         MS. RENSHAW:  At the time I retired, I was the

11   deputy corporation counsel.

12         THE COURT:  Okay.  Thank you.

13         MS. LIGHTSEY:  Good afternoon, your Honor.  Shirley

14   Lightsey.

15         THE COURT:  I remember you.  You testified; right?

16         MS. LIGHTSEY:  Last year, yes.

17         THE COURT:  Yes.  And remind me what your position

18   was with the city.

19         MS. LIGHTSEY:  I was a human resources manager for

20   Detroit Water and Sewerage Department.

21         THE COURT:  Thank you, ma'am.

22         MR. KAROWSKI:  Good afternoon, your Honor.  Michael

23   Karowski.  I retired from the city Law Department.  I was

24   there 15 years.  I was in the municipal affairs section most

25   of that time, and the last couple years I was in tax and

1  revenue collection.

2           THE COURT:  Um-hmm.  As a lawyer?

3           MR. KAROWSKI:  Yes.

4           THE COURT:  Yes.  Thank you, sir.

5           MR. TAYLOR:  Donald Taylor.

6           THE COURT:  Mr. Taylor, I remember you.  You also

7  testified, didn't you?

8           MR. TAYLOR:  Yes, sir.  I'm also the president of

9  the Retired Detroit and Police Fire Fighters.

10          THE COURT:  Thank you.

11          MS. WILSON:  Gail Wilson.  I receive retiree

12 benefits as a survivor.  My husband worked with the Detroit

13 Department of Transportation for 31 years.

14          THE COURT:  Okay.  Thank you, ma'am.

15          MS. TURNER:  Your Honor, Gail Turner, 33 years as a

16 Detroit police officer.  My last assignment was in charge of

17 risk management for the Detroit Police Department.

18          THE COURT:  Thank you.

19          MR. SHINSKI:  Good afternoon.  I'm Rob Shinski.  I'm

20 the treasurer with the Detroit Fire Fighters Association.  I

21 am the only active employee that's on the retiree committee.

22          THE COURT:  Do you have any insight into why you

23 were appointed even though you're not a retiree?

24          MR. SHINSKI:  Well, I am DROP'd your Honor, so I --

25          THE COURT:  You are what?

 1            MR. SHINSKI:  I am DROP'd.

 2            THE COURT:  What does that mean?  Help me out.

 3            MR. SHINSKI:  That means that I receive a pension

 4    check every month into a separate account, and I continue to

 5    work.

 6            THE COURT:  You get a pension and you work?

 7            MR. SHINSKI:  It's called the DROP program, yes.  My

 8    pension is frozen when I DROP'd.

 9            THE COURT:  Okay.  We needn't delve into the

10    details.

11            MR. SHINSKI:  Okay.

12            THE COURT:  It's beyond our scope today.  Sir.

13            MR. MCNEIL:  Good afternoon, your Honor.  Edward

14    McNeil representing Sub-Chapter 98 AFSCME.  I retired from

15    the Parks and Recreation Department of the City of Detroit,

16    was a tree officer.

17            THE COURT:  Thank you.  Yes.

18            MS. RENSHAW:  We are missing one of our members

19    today.  The UAW representative is not -- did not attend our

20    meeting today.  That's why they're not here.

21            THE COURT:  Wendy Fields-Jacobs?

22            MS. RENSHAW:  That would be correct.

23            THE COURT:  Does she regularly participate?

24            MS. RENSHAW:  Someone from the UAW does regularly

25    participate.

1      THE COURT:  Oh, who is that?

2      MS. RENSHAW:  We, under our bylaws, are allowed to

3  have alternates and proxies, and it's either Niraj Ganatra or

4  Mike Nicholson.

5      THE COURT:  All right.  Thank you.  Thank you all.

6  You may be seated.  This matter is before the Court on two

7  motions here today.  The Court will first deal with the

8  motion we have referred to as the art motion.  This is a

9  motion filed by several of the city's creditors asking this

10  Court to appoint and direct the city to cooperate with a

11  committee of creditors to appraise the value of the art

12  collection of the Detroit Institute of Arts.  The proposed

13  goal of this art committee would be to establish an agreed

14  upon benchmark valuation of the art in advance of the plan

15  confirmation process.  It is argued that reaching a consensus

16  on the value of the art now will avoid contentious litigation

17  on this issue later at the plan confirmation stage.

18      The motion specifically requests that this Court

19  direct the city to meet with the art committee as soon as

20  possible to begin developing a strategy that considers

21  potential viable options to monetize the art, to respond to

22  any of the art committee's reasonable requests for

23  information regarding the art, and, three, ultimately file a

24  valuation report with the Court which hopefully would reflect

25  the agreed-upon value of the art.

1    The creditors rely primarily on Section 105(a) of
2    the Bankruptcy Code.  This section of the Bankruptcy Code
3    provides that the Court may issue any order, process or
4    judgment that is necessary or appropriate to carry out the
5    provisions of this title.  The creditors submit that the
6    creation of the art committee is necessary and appropriate in
7    this case due to the best interest of creditors requirement
8    for plan confirmation under Section 943(b)(7) of the
9    Bankruptcy Code.  Specifically -- or more specifically, they
10   argue that in order for the city to meet its burden under
11   Section 943(b)(7), it will need to establish by a
12   preponderance of the evidence that its plan of adjustment
13   maximizes the value of the art to enhance creditor
14   recoveries.
15       The city objects to the motion on several grounds.
16   It argues that the creditors misstate the standard for
17   judging whether the best interest of creditors requirement in
18   Section 943(b)(7) has been met; that the motion amounts to a
19   premature objection to a hypothetical plan of adjustment;
20   that the relief requested violates Section 941 and 904(1) and
21   (2) of the Bankruptcy Code; that Section 105 is not a proper
22   basis for the requested relief; that the requested relief is
23   unnecessary in light of the city's valuation efforts and with
24   the valuation efforts it undertook with Christie's; and,
25   finally, that granting the relief would not eliminate the

1    potential for litigation regarding the art or its value.

2            The Court concludes that the motion must be denied

3    because it lacks the authority to grant the requested relief.

4    As the city properly points out, Section 1102(a)(2) is the

5    only provision of the Bankruptcy Code which authorizes the

6    Court to appoint creditors' committees and then only, quote,

7    "when necessary to assure adequate representation of

8    creditors," close quote.  Here the creditors make only

9    passing reference or arguments that the art committee is

10   essential to ensure adequate representation of creditors.

11   They certainly have not made a sufficient showing of that

12   fact here.  While the Court does have broad authority --

13   excuse me -- under Section 105 of the Bankruptcy Code, it is

14   inappropriate to rely on Section 105 to circumvent the

15   express requirements of other provisions in the Bankruptcy

16   Code.  In other words, the creditors may not rely on Section

17   105 to evade the adequate representation of creditors

18   requirement of Section 1102(a)(2).

19           This is particularly true given the constitutional

20   restraints on the Court's authority imposed by Section 904 of

21   the Bankruptcy Code.  That section provides, quote,

22   "Notwithstanding any power of the court, unless the debtor

23   consents or the plan so provides, the court may not interfere

24   with (1) any of the political or governmental powers of the

25   debtor; (2) any of the property or revenues of the debtor; or

1  (3) the debtor's use or enjoyment of any income-producing

2  property."  In light of these sections and the limitations

3  they impose, a request like the present one must be closely

4  scrutinized.

5          The creditors assert that the relief requested would

6  not violate these provisions because the art committee would

7  merely facilitate the calculation of an agreed-upon value of

8  the art, which the Court, the city, and the creditors could

9  then rely upon when evaluating the city's proposed treatment

10  of all of its assets during the plan confirmation phase.

11  They assert that this will save time and resources during

12  that time period and, more importantly, that reaching a

13  consensus ahead of time will enable creditors to make

14  informed and reasoned objections to a proposed plan.

15          The Court must reject these arguments if only

16  because they do not address the concern that the Court lacks

17  authority under Section 105 to do what is requested here.

18  The Court further concludes, however, that even if it did

19  have the authority and discretion to grant this motion, that

20  discretion should not be exercised here.  Any such request

21  would be determined mostly by looking at what process should

22  be crafted to best advance the case.  The Court finds that

23  the ordinary and usual process is what should be followed

24  here.  In that process, after the city files a plan and the

25  parties file their objections, we can then determine an

1  appropriate sequencing of the issues.  One of the issues that

2  is quite likely to be raised is the legal issue of what is

3  the city's interest in the art, if any, and then whether the

4  city's plan meets the best interest of creditors or that test

5  in light of that interest.  Now, however, is not the time to

6  determine those issues or any plan confirmation issues.

7         It is noteworthy that the Michigan Attorney General

8  has asserted that the art collection of the Detroit Institute

9  of Arts is held by the city in a charitable trust and, thus,

10 no piece in the collection may be sold, conveyed, or

11 transferred to satisfy the city's debts or obligations.  This

12 is a serious argument.  If that position is accepted by the

13 Court, there would, of course, be no need to appraise the

14 art.

15        But, of course, the issue of what to do with the art

16 is also tied up with feasibility.  Even if the city does have

17 control over the art and its disposition, the issue there

18 would be whether the city's long-term revitalization and the

19 feasibility of its plan would be impaired by any provision in

20 the plan that proposes a disposition of the art even for

21 substantial value.  Again, now is not the time to determine

22 any of these issues or to engage in any piecemeal litigation

23 of a potential plan objection to potential plan provisions.

24 These issues can only be determined in the broad context of a

25 comprehensive process that systematically addresses and

1   resolves all plan objections.  For this reason, the Court
2   finds that even if it did have the discretion to appoint an
3   art committee, it would still deny the motion.

4          Now, the Court is not totally unsympathetic to the
5   creditors' concerns.  The Court encourages the city to be
6   forthcoming with information regarding the art and its value
7   and the interest it has in them, and, indeed, it has offered
8   to be forthcoming here in court today.  The Court agrees,
9   however, with the city that the publication of Christie's
10  report in part went a long way towards addressing these
11  concerns.

12         At this point, the Court must also emphasize a point
13  to the creditors which it stressed in its eligibility
14  decision.  Selling assets without more will not solve the
15  city's financial problems.  Creditors would be much better
16  served by working with the city to solve its long-term
17  structural financial problems rather than on focusing on the
18  treatment or disposition of one particular asset, especially
19  an asset that is at least arguably essential for the city's
20  long-term revitalization prospects.  Accordingly, the motion
21  is denied.

22         Turning now to the motion to dismiss the adversary
23  proceeding, the Court must report that it is unable to
24  resolve this motion at this time.  It is going to take a much
25  deeper analysis of the Stockton decision and the Orange

1    County decision to determine whether this suit is barred by
2    Section 904.  The Court feels the strong need to exercise
3    extreme care with the legal issue in this case that the city
4    raises because it does appear to the Court that the potential
5    for irreparable harm, as asserted by the plaintiffs here, is
6    significant.  Of course, there is also merit to the city's
7    argument that in the absence of a recognizable claim -- that
8    is, a claim with potential merit -- no amount of irreparable
9    harm justifies a preliminary injunction under law.
10   Accordingly, the Court will adjourn this hearing to give a
11   decision next Wednesday -- that's January 28th -- at 10 a.m.
12   The parties should be prepared -- Tuesday.  Tuesday, the
13   28th?  Tuesday, the 28th -- sorry -- at 10 a.m.  The parties
14   should be prepared, however, at that time to proceed with an
15   evidentiary hearing on a motion for preliminary injunction
16   should the Court deny the motion.
17            In the meantime, the Court strongly implores the
18   parties to negotiate the OPEB issues in good faith and with
19   the sense of urgency that it deserves.  At the same time,
20   however, the Court must give one further word of caution.
21   There are, as I stated earlier, 37 days until the deadline
22   for the city to file a plan of adjustment, so this is a good
23   opportunity for the Court to express to all of you what it
24   expects in a plan.  Of course -- well, Section 943 and 1129
25   contain several requirements for the confirmation of a plan,

1   and, of course, all of these requirements are important, and
2   it will be up to the creditors to determine which, if any, of
3   these requirements to assert in objecting to the confirmation
4   of the city's plan.
5           There is, however, one requirement that is so
6   crucial that the Court will insist on proof of it even if no
7   one objects on this ground.  That requirement is the
8   requirement that the plan must be feasible.  A plan that is
9   not feasible will not meet the city's needs nor would it be
10  in the best interest or any interest of the creditors or the
11  residents of the city.  The city should, therefore, be fully
12  prepared for this issue at confirmation, and equally
13  importantly all parties must fully accept this premise in
14  their plan negotiations.  The Court must be very plain about
15  this.  Last week when the Court denied the city's motion to
16  assume the forbearance agreement, it said, and I quote, "The
17  Court stated earlier and states again that it will not
18  participate in or permit the city to perpetuate the very
19  kinds of hasty and imprudent financial decision-making that
20  led to the disastrous swaps and COPs transactions.  Those
21  practices have already caused great harm to the city's
22  creditors and to its citizens.  In the Court's view, one goal
23  of this Chapter 9 case is to end these practices so that the
24  city can truly recover from its past mistakes and move
25  forward, and the Court intends to conduct itself accordingly.

1    In this case parenthetically -- if this case needs any

2    further clarification, let me state that the Court intends to

3    carefully scrutinize the feasibility of any plan of

4    adjustment," close quote.

5         The Court later stated, quote, "In its eligibility

6    opinion, the Court found that the city had entered into a

7    series of bad deals to solve its financial problems.  The law

8    says that when the city filed this bankruptcy, that must

9    stop.  It also says that this Court must be the one to stop

10   it, if necessary.  It is necessary here.  Accordingly, that

11   motion is denied," close quote.

12        Everyone here must understand that these comments

13   were not directed only to the financial creditors.  They were

14   directed to all creditors and, indeed, to the city, all

15   creditors, including the Retiree Committee.  That's why the

16   Court ordered the members of the Retiree Committee and its

17   advisors here this afternoon.  The Court will not permit the

18   confirmation of the city's plan to be another bad deal like

19   all the previous ones the city entered into with which we are

20   now all too familiar.  The plan of adjustment must be

21   feasible, and at the confirmation hearing, the Court expects

22   the city to prove feasibility through competent and credible

23   testimony.  Feasibility is straightforward to define.  It

24   simply means that the city can pay not only its ongoing

25   operating obligations but also its revitalization expenses

and its plan obligations.  Although feasibility is easy to
define, it will undoubtedly be very challenging for the city
to actually implement.  Just last month, the Court found as a
fact that the city is service-delivery insolvent, meaning it
does not have enough revenue to pay for basic services.  To
meet the test of feasibility, the city will have to prove
that it has or will overcome that structural cash flow
insolvency and much more.

Plan feasibility may well require a fundamental and
profound change in the city's pension plan or in the city's
healthcare obligations or in the city's collective bargaining
agreements or in its obligations to its employees.  These are
issues that must be negotiated in good faith now with all of
the creativity that counsel and the other advisors in the
case can muster and all with a view toward paying creditors
what the city can pay within a feasible plan.  Now is not the
time for defiant swagger or for dismissive pound-the-table,
take-it-or-leave-it proposals that are nothing but a one-way
ticket to Chapter 18, and this is bankruptcy jargon for a
second Chapter 9.  To repeat, the Court will only confirm a
plan that the city shows is feasible.  The Court will not
confirm a plan just to get a plan confirmed and to get the
case done.  The city's successful implementation of a plan
and, indeed, its successful long-term revitalization depends
on many variables and conditions and events.  Many of them

1  are out of its control and out of our control, but the one

2  variable that we do have control over is the plan.  If the

3  plan is feasible because it promises more to creditors than

4  the city can reasonably be expected to pay, it will fail, and

5  history will judge each and every one of us accordingly.

6  This is an enormous responsibility.  Please use the next 37

7  days wisely and with that admonition in mind.  Anything

8  further?

9             MR. BRUCE BENNETT:  Nothing, your Honor.

10            MR. ALBERTS:  Your Honor, in light of the Court's

11  ruling, I just wanted to see if there was a suggested path

12  forward for the hearing and whether the Court would -- wishes

13  to perhaps abridge some of the testimony next Tuesday.  Last

14  night we received the plaintiff's -- I'm sorry -- the city's

15  opposition to the preliminary injunction.  There were four

16  declarations attached to it.  We have some issues with things

17  that have been said there in light of our request for prior

18  information.  We are going to seek to depose those four

19  individuals, but I am wondering, given also the city's

20  possible desire -- and I don't know if this is --

21            THE COURT:  Let me stop you there.

22            MR. ALBERTS:  Yeah.

23            THE COURT:  I don't want any depositions between now

24  and the preliminary injunction hearing.  I want you to spend

25  your time negotiating.

1           MR. ALBERTS:  Okay.  Well, we are at a disadvantage

2    in the hearing.  My concern is that if we do not --

3           THE COURT:  Do the best you can to prove your case,

4    and the city will do the best it can to prove its case, but

5    much more important than spending your time preparing for

6    this preliminary hearing, which, by the way, you've had

7    months to do, is negotiating.

8           MR. ALBERTS:  Well, actually, your Honor --

9           THE COURT:  I can't implore that to you strongly

10   enough.

11          MR. ALBERTS:  Your Honor, our door has been open.

12   Our attempts have been constant.

13          THE COURT:  Good.  Keep them up until next Tuesday.

14          MR. ALBERTS:  We will attempt that, but, your Honor,

15   there have been things alleged in the declarations that we

16   have asked for for months repeatedly.  Maybe what we will do

17   is file a motion to strike, and that will be the better way

18   to deal with it.  I just don't -- I just don't --

19          THE COURT:  It's not for me to tell you what to file

20   or not file, but I am strongly suggesting to you that a much

21   more effective route to get where you and your clients need

22   to go in the long term is to start with your negotiations

23   tomorrow morning at nine o'clock.  Anybody else have

24   anything?  All right.  We'll be in recess.

25          THE CLERK:  All rise.  Court is adjourned.

1    (Proceedings concluded at 3:25 p.m.)

2                              * * *


                              INDEX


<u>WITNESSES:</u>

     None

<u>EXHIBITS:</u>

     None


          I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    January 25, 2014
_____       _____
Lois Garrett