# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

    Debtor.

No. 13-53846

Chapter 9

HON. STEVEN W. RHODES

## ATTACHMENT

## APPELLANT STATE OF MICHIGAN'S AMENDED DESIGNATION OF ITEMS
## TO BE INCLUDED IN THE RECORD ON APPEAL

| Item | Date Filed | Docket # | Description |
|------|-----------|----------|-------------|
| 11. | 1/23/2014 | 2546 | Transcript of December 16, 2013 Hearing Regarding Docket #1745 (transcript) |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
          MICHIGAN,                .
                                   .          Detroit, Michigan
                                   .          December 16, 2013
                    Debtor.        .          2:30 p.m.
. . . . . . . . . . . . . . . .

HEARING RE. MOTION TO MODIFY AUTOMATIC STAY; MOTION FOR
RECONSIDERATION/REHEARING; MOTION FOR RELIEF FROM STAY
AND WAIVING THE FRBP 4001 (a)(3) RE. ALLOW CIVIL LITIGATION
TO PROCEED FOR DISCOVERY PURPOSES AND/OR TO RECOVER ANY
INSURANCE COVERAGE UNDER DEFENDANTS' HOMEOWNER'S INSURANCE
POLICIES; MOTION FOR RELIEF FROM STAY FILED BY CREDITOR
ST. MARTINS COOPERATIVE; MOTION FOR RELIEF FROM STAY
FILED BY INTERESTED PARTIES ST. JAMES COOPERATIVE, JOLIET
TOWN HOUSES COOPERATIVE ASSOCIATION, LAFAYETTE TOWN HOUSES,
INC., NICOLET TOWN HOUSES COOPERATIVE ASSOCIATION,
LASALLE TOWN HOUSES COOPERATIVE ASSOCIATION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Miller, Canfield, Paddock & Stone, PLC
                     By:  TIMOTHY FUSCO
                          MARC SWANSON
                     150 West Jefferson, Suite 2500
                     Detroit, MI  48226
                     (313) 496-8435

For Ian Mobley,      American Civil Liberties Union Fund of
et al.:                Michigan
                     By:  DANIEL S. KOROBKIN
                     2966 Woodward Avenue
                     Detroit, MI  48201
                     (313) 578-6824

For the State of     Michigan Attorney General's Office
Michigan:            By:  NICOLE A. GRIMM
                     525 W. Ottawa Street, P.O. Box 30736
                     Lansing, MI  48909
                     (517) 373-6434

APPEARANCES (continued):

| | |
|---|---|
| For Catherine Phillips, et al.: | The Sanders Law Firm, PC<br>By:  HERBERT A. SANDERS<br>615 Griswold Street, Suite 913<br>Detroit, MI  48226<br>(313) 962-0099 |
| | Sugar Law Center for Economic &<br>    Social Justice<br>By:  JOHN PHILO<br>4605 Cass Avenue, 2nd Floor<br>Detroit, MI  48201<br>(313) 993-4405 |
| | SCOTT M. MACKELA<br>P.O. Box 289<br>Lake Orion, MI  48361<br>(231) 622-5529 |
| | SHAWN D. GOLDMAN<br>4506 Jones Bridge Road<br>Bethesda, MD  20814<br>(301) 796-6861 |
| For Mr. Moore: | Jay Kalish & Associates, PC<br>By:  JAY KALISH<br>28592 Orchard Lake Road, Suite 360<br>Farmington Hills, MI  48334<br>(248) 932-3000 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker &<br>    Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI  48034<br>(248) 827-4100 |

APPEARANCES (continued):

```
For Lasalle Town      Steinberg, Shapiro & Clark
Houses Cooperative    By:  TRACY M. CLARK
Association, et        25925 Telegraph Road, Suite 203
al.:                   Southfield, MI  48033
                       (248) 352-4700

                       Pentiuk, Couvreur & Kobiljak, PC
                       By:  KERRY L. MORGAN
                       2915 Biddle Avenue, Suite 200
                       Wyandotte, MI  48192
                       (734) 281-7100


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1         THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3         THE COURT:  One moment, please.  I'd like to deal

4    first with the motion for relief from stay filed on behalf of

5    Mobley and other parties.

6         MR. KOROBKIN:  Thank you, your Honor.  Good

7    afternoon, your Honor.  Daniel Korobkin on behalf of --

8         THE COURT:  You need to stand at the lectern and

9    speak into the microphone to get your appearance on the

10   record.

11        MR. KOROBKIN:  My apologies, your Honor.  Daniel

12   Korobkin on behalf of Ian Mobley, et al., who are the movants

13   on this matter, and with me are Ron Rose from Dykema and

14   Michael Steinberg also from the ACLU.

15        THE COURT:  Okay.  You may proceed.

16        MR. KOROBKIN:  Thank you, your Honor.  Well, most of

17   the issues are briefed, but I wanted to point to several

18   aspects of the case that we believe make this motion

19   particularly compelling.  Number one, the Sixth Circuit case

20   at issue here and its outcome is completely unrelated to the

21   bankruptcy, and so it'll have no adverse impact on the

22   bankruptcy or the estate if the stay is lifted.

23        Secondly and relatedly, the Sixth Circuit case at

24   issue here has been completely briefed, so allowing the

25   appeal to proceed is not going to be expensive, time-

1  consuming for the city in any appreciable way.

2      Number three, furthermore, the plaintiffs are not

3  seeking permission to enforce a judgment or collect money

4  damages outside of the bankruptcy forum.  They're asking for

5  a limited stay -- limited relief from the stay of allowing

6  the Sixth Circuit to rule on the legal issues after which the

7  plaintiffs have agreed that the stay can be reinstated, and

8  their claim will likely proceed through the claims resolution

9  process.  And finally -- and I think this is the heart of the

10  motion and the most important point -- is this is an appeal

11  where the public interest, your Honor, in allowing the Sixth

12  Circuit to rule weighs heavily in favor of lifting the stay.

13  Mobley is an important civil rights, civil liberties case

14  that was brought to challenge a widespread practice by the

15  Detroit Police Department of arresting innocent people and

16  seizing their cars based merely on their presence at a

17  location where some other illegal activities is taking place

18  and without probable cause that those individuals are

19  actually involved in the illegal activity.

20      Now, this case was litigated for years based on the

21  plaintiff's goal, the plaintiff's goal not principally of

22  recovering a large damages award but, rather, to put an end

23  to this constitutional practice and deter the same thing from

24  happening to others.  So, in other words, this case

25  exemplifies the tradition of private parties acting in the

1   public interest by filing a Section 1983 case, investing

2   years of time and effort building an appropriate record and

3   then seeking a clear published decision by the federal

4   appellate court that will establish binding precedent for the

5   future.  And, in fact, as indicated on our brief with a very

6   lengthy quote from a U.S. Supreme Court case, the Supreme

7   Court has explicitly recognized that it's Congress' intent

8   for Section 1983 cases such as this one to vindicate

9   important public interests in civil rights and civil

10   liberties that -- and those interests themselves transcend

11   the monetary value of whatever damages award may result.  And

12   so the Supreme Court recognized that the relief a plaintiff

13   obtains in a case like this secures important social benefits

14   that are not reflected in small damages awards.  Well,

15   building on that, those social benefits are even greater.

16   They're even more obvious here when a federal appeals court,

17   which is the case here, is in a position to issue a

18   precedential decision on important matters of constitutional

19   law.  And if the stays in this case are lifted, this benefit

20   can be realized by virtue of wherever this case is at

21   procedurally at virtually no cost to the city or the estate.

22            So to summarize, the plaintiff's motion requires the

23   Court to balance the harms and equities, and we submit that

24   when one compares the tremendous interests supporting the

25   plaintiff's motion with the truly minimal expense that the

1  city might incur if the stay is lifted on an already briefed

2  appeal, it's clear that the equities favor the modest and

3  limited relief we are seeking here.

4       THE COURT:  Remind me when were the events that gave

5  rise to the claim?

6       MR. KOROBKIN:  The events occurred in 2008, your

7  Honor, so we've been working on this for five years.

8       THE COURT:  Is it your position that the city's

9  practices that you describe in your complaint or that form

10  the basis of your complaint are still going on?

11       MR. KOROBKIN:  Well, it was certainly the finding of

12  the District Court that they were widespread; that they were

13  a custom and policy and a standard operating procedure of the

14  Detroit Police Department, and although it's not a matter of,

15  I suppose, the official record, we tried to get this case

16  resolved through an agreement by the city to stop doing --

17  stop engaging in this particular act, and that attempt was

18  unsuccessful, and so it's our position -- and not only that,

19  but when we won summary judgment at the District Court level

20  where the District Court ruled that this practice was

21  widespread and unconstitutional, the defendants appealed, so

22  it seems that they have the position that they should be able

23  to continue doing this.  It's obviously our position that

24  it's unconstitutional, and this is the kind of -- this is

25  exactly the kind of case that Congress had in mind, that the

1   Supreme Court had in mind that will resolve this once and for

2   all.

3           THE COURT:  Do you have any evidence that it's still

4   going on?

5           MR. KOROBKIN:  It wasn't our -- you know, it wasn't

6   our goal to collect that evidence in terms of --

7           THE COURT:  The answer is no?

8           MR. KOROBKIN:  The answer -- well, I guess I can't

9   present it to the Court.

10          THE COURT:  Thank you.

11          MR. FUSCO:  Good afternoon, your Honor.  Timothy

12  Fusco, Miller, Canfield, Paddock & Stone, for the city.

13          THE COURT:  Is this still going on?

14          MR. FUSCO:  Pardon me?

15          THE COURT:  Is this still going on?

16          MR. FUSCO:  No, your Honor, no.  The appeal -- and

17  that's one thing I do want to correct.  We did not take the

18  appeal so we could continue the practice.  The appeal was

19  taken on the narrow issue of qualified immunity of the

20  officers.  That is one area where you can take an

21  interlocutory appeal, and, quite frankly, that was done in an

22  effort to posture the city better for negotiating a

23  resolution of the damage claim that if we were --

24          THE COURT:  But your representation to the Court is

25  that the city has stopped this practice?

1          MR. FUSCO:  I've asked the city attorney, and it is

2     not a policy of the city.

3          THE COURT:  As of when?

4          MR. FUSCO:  After Judge Roberts said we did it

5     wrong.  We're not disputing.  That's not the issue that's in

6     front of the Court of Appeals.  The issue in front of the

7     Court of Appeals is the narrow issue of whether these

8     officers reasonably believed what they were doing was

9     authorized and whether they should have personal liability

10    for the actions that they took.  They've been indemnified by

11    the city for any damage award, so the very -- we're in front

12    of the Sixth Circuit because the city appealed.  The NAACP

13    had no -- or the plaintiffs had no right to appeal this

14    action, and, in fact, if the Court were to lift stay, we

15    would likely move to withdraw our appeal.  This is an action

16    for damages.

17          Now, 1983, one of the prophylactic effects of 1983,

18    it allows you to obtain damages, which can act as a

19    deterrent, and we, I assume, will negotiate a damage award

20    with the plaintiffs as part of the alternative dispute

21    procedures, which the plaintiffs agree they must adhere to in

22    order to determine the amount of the claim.  And, again, they

23    seem to believe that the appeal in front of the Sixth Circuit

24    is the broader issue raised in the lawsuit of whether this

25    course of conduct is constitutional or not.  We have a ruling

1   on that.  It's public.  It was not.  What the city did was

2   improper and to my knowledge and what I've been told is not

3   continuing now.  In the context of the Chapter 9 case, the

4   city does not need to be put to this appeal, one that it

5   initiated and it will move to withdraw.  What we should be

6   doing is getting into the ADR process where we're faced

7   with -- we have a judgment against us.  We lost.  That's not

8   going to change on whatever the Sixth Circuit does, and

9   that's the context in which we're going to resolve the

10  monetary dispute.  This case was brought for monetary

11  damages, not for injunctive relief, and we will have to deal

12  with that, so we see no purpose in lifting stay at this

13  point.

14          THE COURT:  Thank you.  If the city --

15          MR. KOROBKIN:  Your Honor, very --

16          THE COURT:  -- has stopped the practice, where's the

17  public interest in proceeding?

18          MR. KOROBKIN:  Your Honor --

19          THE COURT:  Haven't you won?

20          MR. KOROBKIN:  What's that?

21          THE COURT:  Haven't you won?

22          MR. KOROBKIN:  Well, we did -- won in the District

23  Court, your Honor, but it was the city's position --

24          THE COURT:  Did you learn in law school that when

25  you win, you sit down?

1      MR. KOROBKIN:  If we had -- if we had won a

2  precedential decision in the Sixth Circuit that this practice

3  is unconstitutional and that were the binding precedent of

4  the Sixth Circuit, we would sit down.

5      THE COURT:  Why do you need that?

6      MR. KOROBKIN:  Because, your Honor, the city --

7  notwithstanding what Mr. Fusco said, the city has taken the

8  position not only in the District Court but even in the Sixth

9  Circuit in their brief that what they did and what, for all

10  we know, they continue to do or intend to resume in the

11  future is okay.

12      THE COURT:  It's the "for all we know" part that

13  makes it hard for the Court to justify granting relief from

14  the stay.  I asked you if you had any evidence that they were

15  still doing it, and you said no, and Mr. Fusco says we've

16  stopped.  That's the record.

17      MR. KOROBKIN:  Well, I think the -- I guess the

18  record is neither that they're doing it nor that they're not

19  doing it, but I think in the Supreme --

20      THE COURT:  Well, but you don't have any reason to

21  suspect Mr. Fusco's representation to the Court.

22      MR. KOROBKIN:  Well, I do, and not -- nothing to do

23  with Mr. Fusco, but the city's position in this case is --

24  Mr. Fusco said that it is not the city's policy.  The city's

25  position in this case has always been that this is not their

 1  policy.  The District Court found otherwise.  The city

 2  appealed, and that's one of the issues on appeal.  Now, in

 3  the --

 4          THE COURT:  Let me ask you this --

 5          MR. KOROBKIN:  Yeah.

 6          THE COURT:  -- very direct question.  If in the

 7  last five years or three years or two years or last year or

 8  six months there had been another incident like this one,

 9  wouldn't the ACLU have heard about it?

10          MR. KOROBKIN:  Yes.  We have heard --

11          THE COURT:  And you haven't?

12          MR. KOROBKIN:  No.  I wanted to be very clear with

13  your Honor that we have no evidence that we can put before

14  the Court right now that says the city is continuing a

15  practice of this.  We have certainly heard evidence of that.

16          THE COURT:  Well, then I have to ask again why do

17  you need another court to tell you this is unconstitutional

18  if the city has stopped doing it?

19          MR. KOROBKIN:  Well, for one thing because they

20  either haven't stopped doing it or they could resume doing it

21  at any time.  They've taken the legal position that they wish

22  to have it known under the law that they can do this.  And,

23  quite frankly, your Honor --

24          THE COURT:  Would it solve your problem if you hear

25  of another incident to refile a motion for relief from the

1    stay?

2          MR. KOROBKIN:  No.  Unfortunately, your Honor, I

3    don't think it would, and that's because these cases take

4    years and years to build, and the goal in building this

5    case -- because of why it's -- because of how difficult it is

6    to get injunctive relief against police misconduct, the goal

7    in building this case was to build a very clear record of

8    what happened in the past and get it on the books that this

9    is unconstitutional.  We know that when we build that record

10   and when we get a precedential ruling that that's

11   unconstitutional, that that will have a deterrent effect on

12   future conduct, but we don't know that that's the case when

13   we get a district judge -- a District Court's ruling and then

14   the city appeals.  There are law enforcement agencies all

15   over the state and possibly in other states that are waiting

16   to hear whether or not this is going to be --

17         THE COURT:  How will it help you to get a binding

18   precedent on the issue of whether the city's practice was

19   unconstitutional when that isn't even the issue before the

20   Court?

21         MR. KOROBKIN:  Yes.  Your Honor, I disagree

22   respectfully with Mr. Fusco that that's not the issue before

23   the Court.  In our reply brief we cite -- and it's in a

24   footnote, but we cite the Sixth Circuit case that talks about

25   the overlap between qualified immunity appeals and city

1  policy appeals.  And in a qualified immunity appeal, there
2  are two questions.  One is whether the plaintiff's rights
3  were violated, and the second is whether it was clearly
4  established that those were their rights.  Now, the first
5  question overlaps with the question of what -- whether the
6  city's policy or practice is unconstitutional, and that's
7  what we would be achieving with the Sixth Circuit ruling.
8  And the city's brief in the Sixth Circuit didn't -- they
9  didn't -- unlike Mr. Fusco today, they didn't say, well, we
10  know this is unconstitutional.  This is just a narrow
11  question of the officers' qualified immunity.  They said what
12  we did was perfectly fine, and we want the Court to
13  acknowledge that.  And then, of course, as their back-up
14  argument, even if it was unconstitutional, these individual
15  officers are entitled to immunity.  Well, you know, frankly,
16  your Honor, you know, if since what we've asked for from the
17  Sixth Circuit is -- or if what we asked for from this Court
18  is not an ability to enforce a judgment or collect money
19  damages outside of the bankruptcy forum, even if the Sixth
20  Circuit says it wasn't clearly established, it will be a
21  victory for civil rights in and of itself if the Sixth
22  Circuit rules in a precedential decision that this -- these
23  kinds of arrests, this kind of practice is unconstitutional.
24  It'll have an effect here in Detroit.  It'll have an effect
25  in Wayne County where the Wayne County Sheriff's Office does

 1   a lot of raids of this kind, and it'll have an effect all
 2   over the state and in other states in the Sixth Circuit as
 3   well.  I think this is an important case.  It's an important
 4   decision, and if you compare the minimal burden to the city
 5   right now of simply having to argue --
 6          THE COURT:  Where are you -- where are you if the
 7   motion is granted and the city withdraws the appeal?
 8          MR. KOROBKIN:  I suppose that's up to the city if
 9   they want to -- if they want to withdraw the appeal, but, you
10   know, they were the ones who took the appeal, so they
11   obviously wanted it to be --
12          THE COURT:  So you're nowhere.
13          MR. KOROBKIN:  I'm sorry.
14          THE COURT:  So you're nowhere.
15          MR. KOROBKIN:  Well, we're where we were at the
16   beginning of the -- before the motion was -- before the
17   motion was brought, but, of course, I think the burden should
18   be on the city to decide whether they want to continue this
19   appeal or not when the equities really favor --
20          THE COURT:  What they want to do is move this to ADR
21   and pay you some money.
22          MR. KOROBKIN:  Yes, your Honor, and we were -- we've
23   been involved in negotiations throughout this case, and, of
24   course, the sticking point was whether they were going to
25   stop this practice.  And throughout the -- throughout the

1    negotiations they said we refuse to agree or stipulate that

2    we will stop this practice, and so when your Honor asked the

3    question --

4         THE COURT:  What they refused to do was to stipulate

5    to an injunction that you didn't ask for to stop the

6    practice.

7         MR. KOROBKIN:  In fact, we asked for an injunction

8    in our complaint.  We decided not to pursue that because we

9    thought that the grounds for summary judgment on damages were

10   so great, and we were not asking for an injunction from the

11   Court.  We were asking for their stipulation to change their

12   policy, to make it an official policy of the city that they

13   were not going to do this, and they refused.  That was a

14   sticking point of the negotiations.  It didn't happen.  And

15   now I think the alterative is to get a precedential ruling

16   that what they were doing and what they apparently --

17        THE COURT:  Mr. Fusco say they've -- that the city

18   has changed its policy.

19        MR. KOROBKIN:  I mean, your Honor, there's no

20   evidence of that.  There's absolutely no evidence of that.

21        THE COURT:  Well, it seems to me that the

22   representation by an attorney on behalf of a party in a court

23   of law is really good evidence of that.

24        MR. KOROBKIN:  Your Honor --

25        THE COURT:  If not true, somebody has got some

1    'splainin' to do.

2          MR. KOROBKIN:  Well, your Honor, I'm not accusing

3    Mr. Fusco of lying, but he said it wasn't the city's policy.

4    That has always been -- that has always been the city's

5    position, that it's not their policy, but the District Court

6    found that it was their practice and they're liable for it,

7    and I believe that what they're trying to do here is make

8    sure that they don't get a precedential ruling from the Sixth

9    Circuit that says they can't continue to do this.  I suppose

10   it's their obligation as counsel for the city to try to make

11   sure that doesn't happen, but I don't think that the solution

12   is to take them at their word after five years of litigating

13   this very, very important issue.  I think that the right

14   thing to do would be to weigh the equities, to balance the

15   harms --

16          THE COURT:  Suggested that other police departments

17   around are still doing this?

18          MR. KOROBKIN:  Yes, in various forms.

19          THE COURT:  Can you recount any specific incidents?

20          MR. KOROBKIN:  I know there was recently a case

21   involving the Westland police and some sort of, you know,

22   interdepartmental task force.  There have been other -- I

23   mean there have been other incidents for sure, and we -- and

24   I'll tell you, your Honor, whenever we get a -- you know, at

25   the ACLU, when we get a phone call about something like this,

1  we say we're already working on this issue.  We've got a

2  case.  We're already working on this.  We're trying to get a

3  ruling on it.  And so it's very important when a case like

4  this is brought and it's built up over -- the record is built

5  up and lots of energy and time is spent on it year after

6  years -- after years and years --

7          THE COURT:  It's only important if it's still an

8  issue.

9          MR. KOROBKIN:  Oh, I think it's certainly still an

10  issue, your Honor.

11          THE COURT:  Well, you say that, but when I press you

12  about evidence, there isn't any.

13          MR. KOROBKIN:  Well, I suppose that I -- you know,

14  I'm not here with witnesses.  I'm not here with affidavits.

15  I'm here trying to argue a balanced --

16          THE COURT:  You're not.  You're not --

17          MR. KOROBKIN:  Yeah.

18          THE COURT:  -- you know, and if you want me to find

19  cause to grant relief from the stay because this is such an

20  important issue, I would have expected that, frankly.

21          MR. KOROBKIN:  Well, your Honor, I think if we were

22  here on a -- you know, if we wanted to bring a motion for

23  injunctive relief against the city, that would be a -- that

24  would be a separate situation, but --

25          THE COURT:  Oh, no.  You wouldn't want to do that

1  because that would violate the stay, wouldn't it?

2          MR. KOROBKIN:  I'm sorry.

3          THE COURT:  That would violate the stay, wouldn't

4  it?

5          MR. KOROBKIN:  Well, I don't know, but it would be a

6  separate -- it would be a -- it would be a case that's

7  different from this one.

8          THE COURT:  Well, let's not argue about whether that

9  would be the right thing to do or not.  Still the burden is

10  on you to present facts in support of your claim, huh?

11          MR. KOROBKIN:  Yeah.  I mean the facts are really

12  what the record -- what the record shows right now, which is

13  that, you know, what the city would have to do if the stay

14  were lifted is probably argue an appeal --

15          THE COURT:  They're not going to do that.  We know

16  that.

17          MR. KOROBKIN:  I don't know, your Honor.  I mean --

18          THE COURT:  Mr. Fusco just told you.  It's a little

19  disturbing that you continue to challenge his representations

20  here in court.

21          MR. KOROBKIN:  If the city dismisses its appeal,

22  then they dismiss their appeal, and I suppose that's it, but

23  I don't know that them saying --

24          THE COURT:  All right.  Anything further, Mr. Fusco?

25          MR. FUSCO:  No, your Honor.

1    THE COURT:  All right.  I'll take this under
2  advisement and issue a written opinion.
3    MR. KOROBKIN:  Thank you, your Honor.
4    THE COURT:  Okay.  One second.  Let's move to the
5  motion for reconsideration on the Phillips matter, please.
6    MS. GRIMM:  Good afternoon, your Honor.  Assistant
7  Attorney General Nicole Grimm appearing on behalf of the
8  state defendants in this case.  Your Honor, we have moved --
9    THE COURT:  Let's get other counsel's appearances.
10    MS. GRIMM:  Oh, I'm sorry.
11    MR. PHILO:  John Philo on behalf of the Phillips
12  plaintiffs and petitioners.
13    MR. SANDERS:  Herb Sanders on behalf of Phillips.
14    MR. MACKELA:  Scott Mackela also on behalf of the
15  petitioners.
16    MR. GOLDMAN:  Shawn Goldman on behalf of the
17  petitioners.
18    MR. FUSCO:  Timothy Fusco, Miller, Canfield, Paddock
19  & Stone, on behalf of the city.
20    THE COURT:  Okay.
21    MS. GRIMM:  I apologize, your Honor.
22    THE COURT:  Okay.
23    MS. GRIMM:  Again, Assistant Attorney General Nicole
24  Grimm.  We have moved for reconsideration of this Court's
25  order in the Phillips case, and I hope that we've laid out

1   the reasons for that in our brief, but I'll just highlight a
2   few of them.  Your Honor recognized in its order denying the
3   NAACP's motion for relief from stay and granting Phillips'
4   motion for the same that its stay extension order applied to
5   any lawsuits against the treasurer or the governor that might
6   impact Detroit's Chapter 9 bankruptcy proceedings.  In this
7   case, in the Phillips -- in the petitioners' response to our
8   motion for reconsideration, they concede that even their
9   proposed amended complaint would pose serious questions as to
10  the validity of actions taken by the emergency manager of
11  Detroit, and, in fact, it would pose the very same serious
12  questions that this Court recognized the NAACP lawsuit posed
13  when it denied their motion for relief from stay, namely the
14  lawsuit still challenges both facially and as applied in
15  several municipalities, Detroit included, the
16  constitutionality of PA 436.  And as this Court recognized in
17  its order as it pertained to the NAACP case, if PA 436 is
18  found unconstitutional, that could or this Court said would
19  result in the removal of the Detroit emergency manager, and
20  that was an effect that this Court said cannot be overstated
21  with regard to its impact on the Detroit bankruptcy
22  proceedings.  The very same thing --
23          THE COURT:  Well, hang on.  I said that in the
24  context of a challenge to PA 436 when the defendant was the
25  City of Detroit.

1      MS. GRIMM:  I don't know that in the NAACP case --

2  and I apologize.  I don't believe the City of Detroit was an

3  actual defendant in that case.

4      THE COURT:  No, but it was clearly aimed at Mr. Orr.

5      MS. GRIMM:  Okay.  Sure.  That's true.  And this

6  Court did --

7      THE COURT:  But the Phillips case is not aimed at

8  Mr. Orr, so the question is assume that the Phillips case

9  gets all the way to the Michigan Supreme Court.  Worst case

10  scenario for you, the Michigan Supreme Court holds PA 436

11  unconstitutional.  What legal impact would that have, if any,

12  in this bankruptcy?

13      MS. GRIMM:  If PA 436 was found to be

14  unconstitutional, it could result in the statute being

15  considered void from its outset, which could invalidate the

16  appointment of Kevyn Orr.

17      THE COURT:  Considered by whom and in what

18  circumstance?

19      MS. GRIMM:  In this case, it would be by Judge Steeh

20  in the first instance, and then going up on to the Michigan

21  Supreme Court, if it's held unconstitutional, then the Court

22  in its same decision could hold that the statute is void from

23  the outset.  That would be a very common thing for a court to

24  hold.

25      THE COURT:  Assume that worst case scenario.  My

1   question to you remains what impact legally would that have

2   in this bankruptcy?

3           MS. GRIMM:  Well, if you remove -- as this Court

4   said, if a finding that PA 436 is unconstitutional results in

5   the probable removal of Kevyn Orr, that would affect --

6           THE COURT:  That happen in the Phillips case?

7           MS. GRIMM:  In the Phillips case, there are, for

8   instance, facial constitutional challenges to PA 436.  If PA

9   436 is found unconstitutional, we cited just one illustrative

10  case in our motion for reconsideration, the City of

11  Maineville case, and that's a Sixth Circuit case holding that

12  anytime a statute is considered unconstitutional -- or is

13  found to be unconstitutional --

14          THE COURT:  Yeah.

15          MS. GRIMM:  -- it could be void from the outset.

16          THE COURT:  Absolutely.

17          MS. GRIMM:  So if that's the case and the statute is

18  considered void from its beginning --

19          THE COURT:  But the plaintiffs have assured me that

20  they're not going to ask for the removal of Mr. Orr.

21          MS. GRIMM:  And, respectfully, I don't think that

22  matters, your Honor, because even if the Phillips plaintiffs

23  are representing that they will somehow carve that out,

24  that's the same representation that the NAACP plaintiffs made

25  that this Court found was not sufficient because if PA 436 is

1    found unconstitutional, it could result in the removal

2    regardless.  If a statute is unconstitutional --

3            THE COURT:  Well, but none of the plaintiffs that

4    would be left in the Phillips case even have standing to ask

5    for Mr. Orr's removal.

6            MS. GRIMM:  That would be a question that could be

7    addressed in an Article III court if and when we got there.

8    It's worth noting, I think, that there would still be -- even

9    with their proposed amended complaint, I believe, six

10   residents of the City of Detroit would remain as plaintiffs,

11   so --

12           THE COURT:  Who?

13           MS. GRIMM:  They are -- I would have to look at

14   that.

15           THE COURT:  Please.

16           MS. GRIMM:  Okay.  They're the Detroit Public School

17   members and -- well, they're actually just listed as Detroit

18   Public School Board members and the president of the Detroit

19   Library Commission.  I don't see the specific names of the

20   school member board, your Honor.  I apologize.

21           THE COURT:  Right, but they're suing in their

22   capacities as such to protect those official bodies, not --

23           MS. GRIMM:  Sure.

24           THE COURT:  -- as residents of Detroit to seek

25   Mr. Orr's ouster; right?

1          MS. GRIMM:  That could be true, and that could be

2     the representation when we go and brief that in the District

3     Court, but I think it's also worth noting that your Honor

4     addressed the standing argument in the NAACP case and said

5     that while they may or may not have standing, that was an

6     issue that would be dealt with in the District Court

7     specifically, and irrespective of this Court's determination

8     on the standing issue, the fact remained that because PA 436

9     was challenged constitutionality and could result in the

10    removal of Kevyn Orr and, therefore, could leave no one to

11    prosecute the bankruptcy under Section 18, then the stay

12    needed to apply.

13          THE COURT:  Okay.  But I'm still confused about, you

14    know, suppose this goes all the way to the Sixth Circuit or

15    the Michigan Court of Appeals or the Supreme Court and you

16    get a ruling that PA 436 is unconstitutional.  I've already

17    held it is, so what happens then?  They certainly couldn't

18    move in this Court for reconsideration.  The time for that

19    has passed, and it's law of the case.

20          MS. GRIMM:  That is true as to this Court's

21    eligibility determination, but it would remain that at least

22    serious questions would be posed as to the ability of Detroit

23    to continue.

24          THE COURT:  Right.  And you said that before, and I

25    asked where would those questions be raised and in what

1  context?  You know, you speak in passive voice here.  Who
2  would raise them?  In what context?  How would it impact this
3  bankruptcy?

4          MS. GRIMM:  I'm trying my best to answer your
5  question, your Honor, and I might be just missing what the
6  question is because what I was --

7          THE COURT:  You are absolutely right that if a
8  higher court or any court rules PA 436 unconstitutional, it
9  would raise serious questions about whether Mr. Orr is
10  constitutionally serving.

11          MS. GRIMM:  Correct.

12          THE COURT:  Grant you that.  But how does that
13  impact this bankruptcy?

14          MS. GRIMM:  Because someone needs to prosecute the
15  bankruptcy even if Detroit is eligible for bankruptcy, and
16  if --

17          THE COURT:  Why would he not be prosecuting this
18  bankruptcy?

19          MS. GRIMM:  Because a statute that has been held
20  unconstitutional could be considered void from its outset,
21  which would nullify Kevyn Orr's appointment.  And if Kevyn
22  Orr is not in office, then, as this Court has recognized, no
23  one would --

24          THE COURT:  Who would do that nullification?

25          MS. GRIMM:  The court, I presume.

1         THE COURT: What court?

2         MS. GRIMM: Well, it could start with Judge Steeh,

3 Judge Steeh, who has this case in the Eastern District of

4 Michigan.

5         THE COURT: And you think he would do that even if

6 the plaintiffs are not asking for it and don't have standing

7 to request it?

8         MS. GRIMM: Well, the standing issue notwithstanding

9 because we would address the standing issue, but the point is

10 although standing may be an issue in this case as it is in

11 NAACP, Judge Steeh would have the constitutional authority to

12 hold that if he considers PA 436 unconstitutional, to hold

13 that the appointment of Kevyn Orr is invalidated because the

14 statute that allowed for his appointment is void from its

15 outset, and that's really --

16         THE COURT: Do you agree with that?

17         MS. GRIMM: That would be an issue we would have to

18 deal with in that court, but the touchstone is that, again,

19 this Court has held that anything that -- any lawsuit that

20 fits the other parameters that might impact the bankruptcy --

21 the same with the NAACP case. We don't know that PA 436 will

22 be held unconstitutional. We would argue it is

23 constitutional, but there is a chance it would be held that,

24 a chance it would be considered void.

25         THE COURT: All right. Thank you.

1          MS. GRIMM:  Thank you.

2          THE COURT:  City want to be heard?

3          MR. FUSCO:  Yes, briefly, your Honor.  First of all,

4    your Honor, with respect to parties who may have standing

5    named in the complaint -- and your Honor has referred to

6    three Detroit residents who have official positions -- it's

7    not at all clear to me that they're suing in their official

8    capacity, but there are at least three or four others,

9    Reverend Jim Holley, Reverend Charles Williams, Reverend

10   Doctor Michael Owens, who hold no official positions, and

11   they're just suing in their individual rights, and they are

12   citizens of United States and residents of the City of

13   Detroit, so I think they would clearly have standing to

14   raise --

15         THE COURT:  Okay.  Thank you.

16         MR. FUSCO:  -- that issue.  And your question about,

17   you know, who would bring -- if the plaintiffs don't bring an

18   attack against Mr. Orr or the emergency manager, who else

19   would do it, I think we've seen in this case in numerous

20   instances it's fairly easy to find a surrogate to bring the

21   action.  If you have a determination by another court that,

22   in fact, PA 436 is unconstitutional and void ab initio, to

23   believe that you're not going to find among the people

24   affected --

25         THE COURT:  Well, but any such lawsuit would be

1    stayed; right?

2            MR. FUSCO:  Perhaps, your Honor.

3            THE COURT:  Why wouldn't it be?

4            MR. FUSCO:  Here's my --

5            THE COURT:  What would be the argument that it isn't

6    stayed?  Of course it's stayed.

7            MR. FUSCO:  There's an issue that we're --

8            THE COURT:  That's what the NAACP opinion held.

9            MR. FUSCO:  There's an issue that we're forgetting.

10   We can speculate all day on what would be the practical and

11   legal effect of a ruling by a District Court or an appellate

12   court that PA 436, the worst case, void ab initio and,

13   therefore, no emergency manager in Michigan should ever have

14   been -- have ever been appointed.  Now, to believe that's not

15   going to cast a pall over this case and the entire

16   negotiations and everything else and the plan -- and it can't

17   be raised -- I don't know why it couldn't be raised in the

18   plan objection, on appeal from eligibility, on appeal from

19   plan confirmation, but these people had an opportunity.  At

20   the hearing on the NAACP motion, you invited the NAACP to

21   file an objection to eligibility and to raise the

22   constitutional issues, and the NAACP declined.

23           THE COURT:  I did, indeed, and that was part of the

24   reason for denying the NAACP's motion, but if these

25   plaintiffs do not challenge Mr. Orr's appointment but

1 challenge someone else's appointment, they wouldn't be

2 objecting to the eligibility of the City of Detroit.

3       MR. FUSCO:  Again, I think that's too narrow a

4 reading on what's happening here and what the effect of this

5 would be when this all could have been solved by filing the

6 objection and raising these and having your Honor determine

7 these constitutional issues.

8       THE COURT:  Well, but think --

9       MR. FUSCO:  And earlier this --

10       THE COURT:  Let's think about -- let's think about

11 that.

12       MR. FUSCO:  All right.

13       THE COURT:  A party who's in  -- I don't know --

14 City X where there's an emergency manager files an objection

15 to eligibility and says, "I am a resident City X.  I have no

16 standing to challenge the eligibility of the City of Detroit

17 to be in bankruptcy nor to the appointment of Mr. Orr to

18 serve as emergency manager, but I want to object because I

19 want to preserve my right to challenge PA 436 and the

20 appointment of the emergency manager in City X."  How far --

21       MR. FUSCO:  With all due respect, that's --

22       THE COURT:  How far would that eligibility objection

23 have gotten?

24       MR. FUSCO:  With all due respect, that's not what

25 happened here.  What happened here is you had --

1        THE COURT:  Maybe, maybe not, but that's what --

2   that's the question you are asking.

3        MR. FUSCO:  No, that's not the question.  We started

4   this case with a direct challenge to Mr. Orr.  What the

5   parties did --

6        THE COURT:  When you say "this case" --

7        MR. FUSCO:  -- was say, "Okay.  We will modify" --

8        THE COURT:  When you say "this case," do you mean

9   the Phillips case or --

10       MR. FUSCO:  The Phillips case, Phillips case.  We

11  started.  We had an attack on Mr. Orr as well as all the

12  others, but --

13       THE COURT:  Yeah.

14       MR. FUSCO:  -- Mr. Orr as well, and most of the

15  people here are Detroit residents, and that really was, I

16  believe, the precipitating factor in the timing for this

17  suit.  And those people could have clearly had standing to

18  bring an eligibility objection here, which would have avoided

19  all of these issues.  This morning you agreed to certify a

20  direct appeal to the Sixth Circuit.  Could have dealt with

21  these issues, and we could have had an appeal, and there

22  would have been no doubt about this bankruptcy case.  Now, if

23  a year from now someone filed in Flint, I suppose, we could

24  deal with that issue at that time, but I don't know why they

25  want to go to another court.  We could have had that issue

1  resolved here, and now the effect of a ruling -- and, first

2  of all, I think that what they're doing now still violates

3  the extended stay order.  Now, I think what you're doing if

4  you allow them to continue is you're effectively modifying

5  your earlier order, and that's, of course, your province to

6  do that.

7          THE COURT:  I granted relief from the stay or held

8  that the stay didn't apply.

9          MR. FUSCO:  Yeah, to do that, but I think that, you

10  know, we're reading this too narrowly.  The effects could be

11  catastrophic, and we could have solved this by having them

12  here.  The equities just don't lie with permitting this to go

13  forward at this time in the case.

14          THE COURT:  All right.  Thank you.

15          MR. PHILO:  Good afternoon, your Honor.  To address

16  one of the -- at the outset, to suggest that our case was

17  about Kevyn Orr is just patently not true.  We were very

18  disciplined in that complaint, and that complaint is about

19  the State of Michigan.  We have -- a majority of people are

20  government officials from outside of Detroit.  The ones who

21  are within Detroit are not City Council --

22          THE COURT:  When you say "we have," you mean the

23  plaintiffs?

24          MR. PHILO:  Yes, the plaintiffs.  The ones within

25  are school board members, correct, and a Library Commission

1    member.  There are significant issues going on with the

2    Library Commission in relation to the DPS emergency manager.

3              THE COURT:  Right.

4              MR. PHILO:  That is separate and distinct from any

5    issues with the emergency manager over the City of Detroit,

6    and, yes, we do have three people, one who is a reverend

7    of -- who represents the Rainbow Push Coalition, which has

8    members in Highland Park, has members in Pontiac, has members

9    in Flint in addition to Detroit, so they are in that

10   representative capacity.  Conceivably they could have

11   standing to challenge under the City of Detroit.  Same with

12   the minister who represents the National Action Network and

13   same with the other minister who is a representative of the

14   Baptist Council of Ministers of Detroit and Vicinity, but we

15   have represented to this Court -- we have represented in our

16   pleadings -- or our motion papers, I'm representing now we

17   are not going to seek the removal of Kevyn Orr.  I don't know

18   what I have to do to make that clear.  If there came a time

19   where there was a ruling of unconstitutionality and we were

20   going to claim some standing in that case and amend the

21   pleadings, we would be back before this Court.  We would not

22   be allowed to proceed in that court until you had ruled

23   whether we could do that, and we have an intention.  Right

24   now this case is about getting a declaration from an Article

25   III court that has had the case for five months and had

1  briefed dispositive issues before that court to make the
2  ruling on constitutionality.  It is not asking for injunctive
3  relief.  It is not an enforcement action.  If an enforcement
4  action comes after that and it involves the City of Detroit
5  to remove the emergency manager, that would be back before
6  this Court.  Steeh -- it is inconceivable that --
7          THE COURT:  Judge Steeh?
8          MR. PHILO:  -- Judge Steeh is going to run wild.
9          THE COURT:  Judge Steeh?
10         MR. PHILO:  Judge Steeh.  I'm sorry.  It is
11 inconceivable that Judge Steeh is going to run wild and make
12 rulings conflicting with your order in this case, conflicting
13 with our representations over -- contravening what we're
14 asking for on his own.  It is not going to happen.  And if it
15 does happen, they're going to have an objection.  They're
16 going to be back in this court, and then there's going to be
17 a resolution to that matter.  There is no question that if it
18 goes to that level, it comes back here.
19         You were asking where the issues would be resolved
20 because you've made some rulings on constitutionality in this
21 court, and then there would be a conflict if there's
22 something that's different in any other court with respect to
23 the other cities.  Well, then it's going to the Sixth
24 Circuit.  I don't think there's any way around that, but that
25 does not impact this bankruptcy in any way that would be

```
 1    violating the stay or that is onerous and untoward under a
 2    constitutional democracy.  I think we're forgetting to
 3    remember what this is about.  What they are effectively
 4    saying is that the constitutional rights of every citizen in
 5    the state, 300,000 who are not even in Detroit and are
 6    presently under Public Act 436 governing is -- governance is
 7    put on hold until this bankruptcy is done.  That is what is
 8    being asked.  There is no court that has said that bankruptcy
 9    stays or procedures trump constitutional rights, and that
10    would be a precedent that would be set in this case.  It
11    would be set --
12              THE COURT:  Well, it happens all the time.
13              MR. PHILO:  That it trumps constitutional rights?
14              THE COURT:  Absolutely.
15              MR. PHILO:  I don't think so, and let me just --
16              THE COURT:  The automatic stay.  The automatic stay
17    says your claim that your constitutional rights were violated
18    is stayed.  It just is.
19              MR. PHILO:  I would disagree, although I recognize
20    where you're going.
21              THE COURT:  Go find a single case that says because
22    a claim is a constitutional claim --
23              MR. PHILO:  Right.
24              THE COURT:  -- it's excepted from the stay.
25              MR. PHILO:  No.  You're right.  I think what you're
```

1    saying, at least to me, is the typical Section 483 -- or 1983

2    case, which is about money --

3              THE COURT:  That's true.

4              MR. PHILO:  -- money damages.  They're cases where

5    money damages will correct the harm or at least to the extent

6    possible correct that harm.  This is not that case.  There is

7    no money.  Michigan is on a grand experiment, and it's the

8    first state in the country and the only state in the country

9    that has this emergency manager model.  It is the only one,

10   and these circumstances were brought about by the choice of

11   the legislature to go that way.  There's been dozens and

12   hundreds of other municipalities that have gone through

13   bankruptcy before Detroit.  Not one of them has done it with

14   this model, and that's the difference here, and that's the

15   difference.  And it cannot be a model that we just say we put

16   on hold at some indefinite point in the future.  I do want

17   to --

18             THE COURT:  Is your challenge to PA 436 with respect

19   to other cities any different than the challenge to PA 436

20   that this Court already ruled on?

21             MR. PHILO:  This is very different.  To be honest

22   with you, your Honor, I've looked at those challenges.  I've

23   read your ruling.  I looked at the -- you know, I listened to

24   your transcript.  I do believe it's different.  Now, there

25   may --

1  THE COURT:  And what is the -- what is the

2  difference, sir?

3  MR. PHILO:  The difference is -- and I'm trying to

4  think of the individual creditors who filed claims.  There

5  may have been a few that referenced us, but the

6  constitutionality of our claim is saying that as applied,

7  that Public Act 436 is being applied in black communities.

8  It's over 50 percent of black communities -- or the

9  citizen -- black citizens of this state who can't effectively

10  vote in local elections.  That is the crux of an equal

11  protection argument, a Voting Rights Act argument on

12  different counts.

13  We also have an argument that is admittedly -- just

14  simply because we haven't faced this before in the nation --

15  is a 14th Amendment due process saying that if you are going

16  to give lawmaking powers -- and make no mistake, there's been

17  a transfer of lawmaking powers, legislative powers, from the

18  Michigan legislature or from City Council to the emergency

19  manager.  They have the full power to repeal ordinances,

20  change city charters, adopt ordinances.  If that is going to

21  occur in this country in a constitutional democracy, that has

22  to be an elected official.  We put constraints on

23  administrative agencies whenever they sort of tread into that

24  area.  There are no constraints on the emergency manager.

25  Michigan case law has held a city, locality, has the full

1   police power of the state at its -- in its local jurisdiction
2   except where it's been specifically pulled back where there's
3   a conflict with state law.  That's the power that's been
4   transferred to the emergency manager.  We're saying that
5   violates the 14th Amendment, and I know everyone who talks
6   about the guarantee cross-claim initially says good luck, but
7   when you --
8              THE COURT:  Initially says what?
9              MR. PHILO:  Says good luck, but we haven't faced
10  this before, and Judge Sandra Day O'Connor in one of her last
11  writings before she left the bench, said, you know, this
12  history of saying guarantee cross-claims are nonjudiciable --
13  justiciable is not right.  In fact, for many years they were
14  justiciable, and she would change it.  She was in the
15  majority in that case, and I think this case presents the set
16  of circumstances where it very well may, but, again, these
17  arguments have not been faced by a court in this country
18  before, and we think it's important -- incredibly important
19  that they're heard now.
20             I do -- you made -- you had a lot of questions about
21  what would be the impact on the bankruptcy, what might be the
22  impact on Kevyn Orr's position if we prevail.  I do not
23  concede that a ruling of constitutionality raises to the
24  level of a likelihood of removal situation.  The standard for
25  104 extension of stay is not might impact in some vague and

1   nonspecific way.  It has to be greater than that, and
2   overwhelmingly the cases that are extending the stays are
3   where the defendants are really surrogates for the city -- or
4   for the debtor.  The debtor here is the City of Detroit, is
5   not Kevyn Orr.  The debtor is who was authorized to go into
6   bankruptcy by the governor.  If Public Act 436 is held
7   unconstitutional, we have to -- they're asking you to assume
8   the entire statute is unconstitutional.  Yes, we have, in
9   part, asked that.  We've also asked for parts of it to be
10  struck, and we specify which parts we have issues with.  Not
11  one of them addresses the bankruptcy authorization section of
12  Public Act 436.  We do not -- we did not contest eligibility.
13          THE COURT:  Well, but doesn't PA 436 say that only
14  the emergency manager has the authority to conduct the
15  Chapter 9 case?
16          MR. PHILO:  It does, but if that law is not on the
17  books, then there's a question of whether PA 72 springs back
18  the way it has, and PA 72 allows an emergency manager to go
19  to bankruptcy.  It does.  I'm sorry.  I don't mean to be
20  arguing.
21          THE COURT:  You're suggesting to me that under
22  Michigan law when a law -- when a public act is held
23  unconstitutional, the act that it repealed comes back into
24  place?
25          MR. PHILO:  Oh, in fact, that's why we had Public

1   Act 72.  They argued that, and the Court of Appeals agreed
2   with them.
3            THE COURT:  No, no, no, no.  PA 4 was not held
4   unconstitutional.
5            MR. PHILO:  You're correct.
6            THE COURT:  It was rejected by the voters.  That's
7   an entirely different question, isn't it?
8            MR. PHILO:  It is.  It is.
9            THE COURT:  All right.
10           MR. PHILO:  But I'm not at all convinced it wouldn't
11  have the same outcome, but these are issues that are going to
12  have to be addressed and would be addressed in this court if
13  it related to the City of Detroit.  I don't think in any
14  sense we can say that's the outcome.  We can say that's an
15  issue that's going to be addressed, and it would have to be
16  addressed.
17           Additionally, I don't think -- and I know this is
18  troublesome and this is not expedient, but I don't think that
19  Chapter 9 necessarily protects the negotiator.  It protects
20  the debtor, and that's the City of Detroit.  Chapter 9
21  inherently involves a body of elected officials.  The
22  overwhelming majority of those cases are where elected
23  officials filed or asked to file for bankruptcy and are
24  controlling the negotiations.  The only real exceptions in
25  the past is where as a condition for the city to get into

1  bankruptcy, the state has said we get to appoint a

2  representative, but Chapter 9 contemplates that elected

3  officials are in charge.  That's what's happened over 300

4  times previously.  Elections are not suspended.  Public

5  referendums on those officials are not suspended.  It is an

6  impediment to expediency, but it is not an unforeseen one at

7  the time of drafting Chapter 9, so if Kevyn Orr is removed,

8  it does not necessarily mean that eligibility is wiped off.

9  It would be -- have a whole session of briefing before you,

10  but it's entirely conceivable that the person at the table

11  just changes, but, in any event, I think we've made clear we

12  are not seeking to remove Kevyn Orr.  Our case is not about

13  Kevyn Orr.  It's about emergency managers and that idea as a

14  whole constitutionally.  I will raise it because I think it's

15  important -- and we put it in our brief -- is the idea that

16  people -- constitutional rights are well recognized as

17  fundamental rights, and when they are being violated, it is

18  irreparable harm for every moment that it is violated.

19  That's in a nut -- that's just basic in constitutional law.

20  We do not have an alternative.  I do expect that you will say

21  because I --

22          THE COURT:  Of course, the premise of that argument

23  is that there is a constitutional violation.

24          MR. PHILO:  Certainly, certainly.

25          THE COURT:  But you don't have a constitutional

1  violation just because you allege one.

2          MR. PHILO:  Oh, right.  I agree.  But they have

3  not -- they've been -- I've been involved in four cases, your

4  Honor, with the estate on these issues first with Public Act

5  4 and now with Public Act 436.  None of those were dismissed

6  as frivolous or dismissed, in fact, you know.

7          THE COURT:  Well, all right.

8          MR. PHILO:  They've gone both ways.  Two, I do think

9  there are two important matters in that respect.  In every

10  other case where these constitutional rights have been at

11  issue under Public Act 4 or 436, not once has an individual

12  emergency manager come in and appeared separate and apart

13  from the state except where that particular emergency

14  manager's actions were at issue.  The only impact in terms of

15  draining resources is if they choose to intervene in our

16  case.  That hasn't happened.  It was pending for five months.

17  There was no --

18          THE COURT:  Well, it would be an enormous drain on

19  the resources of this city if Mr. Orr were removed in the

20  middle of the bankruptcy and it required the termination of

21  the bankruptcy.  What a waste.

22          MR. PHILO:  Well, I'm not going to dispute you of

23  that.  Yeah.

24          THE COURT:  Fair enough?

25          MR. PHILO:  That's a -- you know, it does throw a

1  huge wrench --

2      THE COURT:  That's precisely why I hear the state

3  and the city objecting to your motion.

4      MR. PHILO:  Well, that's because they're trying to

5  say we're trying to remove Kevyn Orr, which is not what we're

6  doing, but also if that's what you're saying, if that law is

7  declared unconstitutional two years after the bankruptcy

8  closes, what's the impact?

9      THE COURT:  I don't know.

10      MR. PHILO:  Yeah.

11      THE COURT:  Could somebody come in and move to

12  vacate the confirmation order?

13      MR. PHILO:  I mean we're not, but it's entirely --

14  if that logic applies, that logic applies then as well as

15  now.  That's my point, your Honor.

16      THE COURT:  That's right.

17      MR. PHILO:  I have so much to say, and I think I've

18  expended myself at the moment.

19      THE COURT:  Okay.

20      MR. PHILO:  Thank you.

21      THE COURT:  Any reply?

22      MS. GRIMM:  Just very quickly, your Honor, I would

23  point out that although the petitioners are representing that

24  this is not a lawsuit about Kevyn Orr, it's not about their

25  intent.  It's about the impact of their challenges, and I

1  looked it up.  Actually it was on page 8 of this Court's
2  opinion in the NAACP and Phillips order where this Court said
3  that if PA 436 is found unconstitutional, Kevyn Orr would be,
4  according to this Court, removed from office.  Irrespective
5  of what court that happens in, if Kevyn Orr is removed,
6  there's no one to prosecute the bankruptcy.
7         And the only other point I would very quickly raise
8  is that this Court has already addressed again in that same
9  order the public interest factors and has recognized that the
10  NAACP lawsuit and the Phillips lawsuit as well poses
11  important questions about the constitutionality of PA 436
12  and --
13         THE COURT:  Okay.  So how do I deal with the
14  argument that says the citizens of City X who are concerned
15  about the constitutionality of the service of their emergency
16  manager shouldn't be stayed for the years it will take to
17  resolve this bankruptcy case?
18         MS. GRIMM:  If the petitioners want to dismiss their
19  lawsuit and refile one that is an as applied challenge on
20  specific facts to another municipality that would not have
21  the dramatic effect or possible effect on the Detroit
22  bankruptcy and that's something to which the stay would not
23  apply, the state would not file a notice of stay in that
24  case, and that could be adjudicated.
25         THE COURT:  Well, but the challenge that the

1    citizens of City X feel they have is a challenge not as

2    applied in City X but a facial challenge to PA 436.

3              MS. GRIMM:  And if that is the case, your Honor,

4    then I would submit that that clearly falls under this

5    Court's stay extension order.

6              THE COURT:  Fair enough, but they ask in requesting

7    relief from that stay why should we be stopped from bringing

8    our constitutional challenge?  Why do we have to wait years

9    for the City of Detroit to resolve its issues for us to bring

10   this claim in vindication of our democratic rights?

11             MS. GRIMM:  And the answer to that, your Honor, from

12   our position would be, as this Court said, because it happens

13   all the time.  In bankruptcy proceedings, there's an

14   automatic stay.  In this case, there's an extension of that

15   stay.  In weighing the interests, yes, there is an interest

16   in adjudicating this lawsuit.  That's certainly true, but

17   we're not talking about having it dismissed.  We're talking

18   about having it deferred in light of the important interests

19   that this Court has recognized in completing the bankruptcy

20   proceedings, getting Detroit back on track economically, the

21   health and safety mechanisms back into action in Detroit and

22   the impact that the Detroit bankruptcy proceedings has on the

23   local and the regional and the national economy, so this

24   Court I would submit has already addressed that question.

25             THE COURT:  Thank you.

1          MS. GRIMM:  Thank you.

2          MR. FUSCO:  One brief comment, and I think your

3     Honor alluded to that.  We can't lose sight of the fact that

4     this is the largest municipal bankruptcy in the history of

5     the United States.  It is unique.

6          THE COURT:  Oh, that's on my mind all the time,

7     but --

8          MR. FUSCO:  It is absolutely on your mind.

9          THE COURT:  But the rule of decision in regard to

10    this motion would require the same result whether it's

11    Detroit or Flint or some village in some county somewhere,

12    wouldn't it?

13         MR. FUSCO:  No.  I respectfully disagree in the

14    sense that if you read the complaint and you look at many of

15    the allegations in the complaint about the percentage of

16    people of color that are subject to public acts and

17    everything, it's driven by Detroit, and that has the largest

18    minority population, and that's what is the basis of many of

19    the challenges.

20         We have a unique situation with Detroit.  As your

21    Honor notes, it is vitally important that we complete this

22    Chapter 9 reorganization and that we bring finality to the

23    process.  And my point is simply you could have

24    accomplished -- we could have accomplished both goals, giving

25    persons an opportunity to challenge PA 436 and have an

1    orderly process for the bankruptcy which will lead to a final

2    resolution by having those claims brought here.  A ruling by

3    your Honor that PA 436 is unconstitutional facially would

4    certainly give the result that the plaintiffs desire.  On the

5    other hand, reaching the different result, which would have,

6    of course, been appealed, we would now have certainty and

7    finality.  I think that's what the stay process is here to

8    do, to protect the integrity of this case.

9             THE COURT:  Anything further, sir?

10            MR. PHILO:  I really don't.

11            THE COURT:  No?  All right.  The Court will take

12   this under advisement and issue an opinion.  Thank you,

13   counsel.

14            MR. FUSCO:  Thank you, your Honor.

15            THE COURT:  Okay.  I'd like to deal now with the

16   motion for relief from stay on behalf of Thomas Gerald Moore.

17            MR. KALISH:  Good afternoon, Judge Rhodes.  Jay

18   Kalish on behalf of the movant.

19            THE COURT:  Other appearances on this motion,

20   please?

21            MR. FUSCO:   Timothy Fusco, Miller, Canfield,

22   Paddock & Stone, for the city.

23            MS. PATEK:  Barbara Patek on behalf of the Detroit

24   Police Officers Association.

25            THE COURT:  Go ahead, sir.

1          MR. KALISH:  Judge, this is our motion to lift the

2     automatic stay for the limited purpose of being able to

3     pursue the homeowners insurance of the police officers

4     involved.  This is a somewhat different situation in that the

5     defendants in this case are two -- or at least were two

6     Detroit police officers.  One of them is no longer a Detroit

7     police officer.  And it is not aimed at the City of Detroit.

8     The City of Detroit is not a party and isn't a defendant in

9     this lawsuit.

10          The only additional issues other than what we said

11    in our papers that I'd like to point out to the Court is, as

12    I indicated, Officer Headapohl is no longer a Detroit police

13    officer, and there doesn't seem to be any prejudice that I

14    can find.  The movant in this case is not looking for any

15    estate assets.  As I said, there is no --

16          THE COURT:  What makes you think there will be such

17    private insurance coverage?

18          MR. KALISH:  Well, because prior to the filing of

19    the bankruptcy case, there was discovery had in the District

20    Court case, and the movant obtained copies of the individual

21    police officers' homeowners insurance policies, and those

22    policies do not seem to preclude the malicious prosecution

23    action as a personal injury.  In other words, we believe that

24    it's a covered injury, and --

25          THE COURT:  Let's pause there.  Remind me what the

1  underlying claim is against the officers.

2         MR. KALISH:  Certainly.  The officers in September

3  of 2011 were off duty, and they went into a bar.  And there

4  was a ruckus that ensued, and they caused the bar owner to be

5  arrested and ultimately charged.  That officer -- the

6  defendant in that criminal case was acquitted, and it's the

7  movant's position that there was no basis at all for anything

8  that these police officers did.

9         THE COURT:  So that's Mr. Moore?

10         MR. KALISH:  Yes, sir.  I found it interesting that

11  in the debtor's affidavit that they attached to their answer

12  it appears that the police officers requested through the

13  normal chain of command some sort of indemnification from the

14  city, and the Detroit Police Department rejected that

15  request.

16         THE COURT:  Right.  So your client's claim -- Mr.

17  Moore's claim is abuse of process or malicious prosecution,

18  something like that?

19         MR. KALISH:  Yes, sir.  That's accurate.

20         THE COURT:  And your position further is that their

21  homeowners insurance policy would cover that.

22         MR. KALISH:  It appears to.

23         THE COURT:  Okay.

24         MR. KALISH:  And I don't have anything further to

25  add.

1          THE COURT:  Right.  Okay.

2          MR. KALISH:  I'm happy to answer any other

3    questions.

4          THE COURT:  Thank you, sir.

5          MR. KALISH:  Thank you, Judge.

6          MR. FUSCO:  Your Honor, just for the record, I

7    forgot my colleague, Marc Swanson, is here with me.  Your

8    Honor, let me just clear up the indemnification issue.  There

9    is a several-step procedure in the collective bargaining

10   agreement with respect to requests for indemnification.  It's

11   true that the police department issued a recommendation that

12   indemnification not be granted.  Next step is it's submitted

13   to the City Council.  If the City Council concurs, then there

14   is a mandatory arbitration procedure before an umpire to

15   determine if the city should indemnify.  I will say that I

16   was told by the city law department that we never win those,

17   and it's -- that it's highly likely that indemnification will

18   be granted.  But as the Court noted in --

19         THE COURT:  What's the status of that process in

20   this case at this point in time?

21         MR. FUSCO:  It's sitting there.  The parties have to

22   actually agree on the package to be submitted to the City

23   Council for review.  I think that's what's going on.  If it's

24   a denial, then within 30 days you have to have an arbitration

25   hearing, and then the arbitrator must rule within 30 days

1  after that, but we are -- under the collective bargaining

2  agreement, we are obligated to provide a defense until such

3  time as a final determination is made on indemnification, and

4  we are defending the two officers in these -- in this matter.

5          I understand Mr. Kalish saying there's no harm here

6  because we're not proceeding against the city or any asset of

7  the city, and, of course, the focus here is the -- is on

8  who's the real party in interest in this litigation, which is

9  the city, and, secondly, look at what he's trying to do.  It

10  sounds like what he's doing is trying to enforce a judgment

11  to -- if he had a judgment against the officers, he could

12  garnish any applicable policy of insurance and try and obtain

13  payment, but he would need to establish liability first.

14  That's really our principal concern.  We don't -- we've asked

15  for a copy of the policy.  I've not seen it, but he -- and

16  even he says it may or may not cover this.  You're going to

17  have to determine liability.  You're going to have to

18  determine that the officers did something that would come --

19  that would violate the plaintiff's constitutional rights and

20  that that type of claim -- or acted maliciously, which is a

21  tort, and that that is covered by the homeowners insurance.

22  Well, what you're doing then is you're litigating the entire

23  underlying complaint claim for which the city likely has

24  liability to indemnify the officers.

25          THE COURT:  Help me out with the insurance issue.

1    If there is liability found, number one, and, number two, the
2    insurance company accepts responsibility for that and pays
3    Mr. Kalish's client, under insurance law is the insurance
4    company then subrogated to its insured's right of
5    indemnification against the city?

6              MR. FUSCO:  It would be an equitable subrogation
7    with respect to that, so it could proceed back against the
8    city, and this isn't the case that we see all the time in
9    Chapter --

10             THE COURT:  So your argument is that even though
11   facially the claim is on the insurance policy, ultimately it
12   comes back to the city.

13             MR. FUSCO:  That's right.  And because we're
14   defending, too, you have issues -- you have problems with
15   issue preclusion in any determination with respect to the
16   homeowners insurance policy.  This isn't a case we see in
17   Chapter 11 all the time where a debtor has insurance and the
18   stay is lifted to let the party proceed against the insurance
19   and limit its recovery to the proceeds of insurance with no
20   liability of the debtor.  That is just not what's going to --
21   is being sought here and is what is going to happen.  This is
22   a case that we will designate to be part of the ADR
23   proceeding.

24             Now, if it's part of that, someone wants to raise
25   the issue of whether there's coverage from the homeowners

1  insurance, I assume it can.  As your Honor knows from the ADR
2  order, you can agree to anything you want.  You can raise any
3  issue in ADR.  This is a perfect case for the ADR process to
4  be utilized, and this isn't a 1983 action.  I know this
5  morning your Honor said he would consider whether you might
6  want to adopt some different procedures for 1983 cases.  This
7  is a tort.  Malicious prosecution is a tort.  Did they have
8  probable cause to do what they -- to do what they did?  So we
9  think that the -- what should happen here is that the stay
10  motion should be denied and this should just proceed in the
11  ADR process where, of course, the issue of other insurance,
12  other coverage and other things can be raised and evaluated.
13          THE COURT:  Thank you.
14          MS. PATEK:  Good afternoon, your Honor.  Again,
15  Barbara Patek for the Detroit Police Officers Association.
16  I'm going to start by saying that I hope the city is right
17  about how these arbitrations come out on the indemnification
18  issue because, as the Court heard this morning in dealing
19  with these ADR procedures, these officers, whether they are
20  current or former public safety employees, are faced with an
21  indemnification claim against the city that has the potential
22  for simply being treated as an unsecured claim under the
23  plan.  We don't know how that's going to come out at this
24  point in time, and if there's a judgment against them and not
25  some other way to satisfy it, I mean they're essentially

1    facing financial ruin.

2         THE COURT:  Well, but what are the facts here on

3    which these officers contend that they are entitled to

4    indemnification?

5         MS. PATEK:  My understanding of the underlying case

6    is that the officers' versions of the facts are significantly

7    different than the plaintiff's version of the facts and that

8    they believe they were acting -- that they were in a place

9    and they were acting as police officers.  They made an

10   arrest.  There was a prosecution that resulted.  The result

11   was an acquittal, and now there's a lawsuit against them.

12   And how that comes out is going to -- you know, however it

13   comes out, if they're wrong, if they did something --

14        THE COURT:  Well, why was the indemnification claim

15   denied?

16        MS. PATEK:  My understanding is it's not -- first of

17   all, the city was not named as a defendant in this case.  I

18   don't want to go too much into the particulars, but I think

19   it was based on the fact that the allegations were that this

20   was essentially an intentional tort, a malicious prosecution

21   case, which comes to another issue, and I don't -- I'm not --

22   I think I've answered the Court's question, but I want to

23   step forward on this insurance issue.  What we have here is

24   rank speculation that there's going to be some coverage by a

25   homeowners policy.  To our knowledge, there has not been a

1  demand on these defendants that they tender the defense.  I
2  think the only possible way you would have coverage -- I'm
3  sure there's a cooperation clause, all of those things in
4  that policy -- you're not going to come up with a judgment at
5  the end and go to the insurance company and say, "Insurance
6  company, pay this policy."  They should be in the case from
7  the beginning if that's the case.  These officers -- I
8  suspect why it hasn't been tendered is because they were and
9  have taken a strong position that they were acting in the
10 course of their employment and in the good faith performance
11 of their duties.  This is not something that would be
12 covered, and the thought that a malicious prosecution -- and
13 I've not seen any policy or other intentional tort -- would
14 be covered under any insurance policy that I know of under
15 Michigan law seems to me to be vanishingly unlikely, and we
16 are very opposed to any modification of the stay.  We think
17 this process should play itself out.  If at the end of the
18 day we're wrong and these officers are not entitled to
19 indemnification, then that may be the appropriate time to
20 bring a motion before this Court, but right now I think we're
21 entitled to the protection of the extended stay, and if we
22 can go through the ADR procedures and somehow resolve this
23 case that way, that would be our preference.
24          THE COURT:  Thank you.  Mr. Kalish, anything
25 further?

1           MR. KALISH:  Just very, very briefly, Judge.  First

2      of all, I don't believe that there's really any substantial

3      difference between the basic concept which we face in Chapter

4      11 cases when there's an insurance policy.  You still have to

5      get to liability, and you still have to deal with insurance

6      companies that are in the business of not paying claims, and

7      so without some sort of a finding that there is a basis to

8      pay a claim, you're never going to get one.

9           As to counsel's last comment, we got the insurance

10     policies just prior to the Chapter 9 case being filed, and so

11     there hasn't been any time to make any demands or anything

12     else like that, but suffice it to say that the AAA homeowners

13     insurance policy has a definition of personal injury that

14     includes malicious prosecution, and so are they going to pay

15     voluntarily?  I'm guessing probably not, but we still have to

16     get to that point, and that's the basis for our motion.

17          THE COURT:  Thank you.  The Court will take this

18     matter under advisement.

19          MR. KALISH:  Thanks, Judge.

20          THE COURT:  Let's turn our attention now to the

21     motions for relief from stay filed by St. Martins Cooperative

22     and St. James Cooperative and others.

23          MR. FUSCO:  I believe St. Martins has been resolved,

24     your Honor, as part of the --

25          THE COURT:  Okay.

1          MR. FUSCO:  -- objection process this morning that

2    we went through.  I think Lasalle is still to be heard.

3          THE COURT:  Okay.  Thank you.

4          MS. CLARK:  Your Honor, Tracy Clark appearing on

5    behalf of the movants, and that's in connection with the

6    Lasalle motion, not with respect to the St. Martins.  Also

7    present today is Kerry Morgan, who's the attorney that was

8    handling the class action previously.

9          Your Honor, the movants are housing cooperatives,

10   and they're made up of individuals who own and reside in

11   multiple-unit housing.  They are being charged commercial

12   rates, so the cooperatives being charged commercial rates,

13   where the next door neighbor might be a house and it's a

14   single-unit housing, it's being charged residential rates.

15   So as a result of this disparate treatment, the housing

16   cooperatives filed a class action to basically halt this

17   process because it's a violation of the equal protection

18   clause of both the state Constitution and the United States

19   Constitution.  The claims are for damages for having been

20   charged -- overcharged in the past as well as for injunctive

21   relief going forward.  Motions were filed to certify the

22   class, so the class has not been certified, but there was a

23   motion for class certification, and then the Detroit Water

24   Department filed a motion to dismiss the case in its

25   entirety.  There was a hearing on both of these motions, and

1    the federal District Court, Judge Drain, indicated at

2    those -- at the end of the hearing that he would be in a

3    position to determine or decide those motions at the end of

4    approximately a week, but in the meantime the bankruptcy case

5    was filed, and the stay was put in place, and the proceedings

6    were halted.

7             So we're here today asking for relief so that we

8    continue -- can continue those proceedings in front of Judge

9    Drain, and the cause that we believe provides your Honor with

10   sufficient basis for granting relief is based on balancing

11   the interests of the parties, so, first of all, we have the

12   cooperatives that have an interest in their equal protection

13   claims, and, second of all, we have the city's interest in

14   formulating a plan of reorganization, and then finally we

15   have the judicial system's interest in efficient and

16   effective administration of the cases.  And I have to submit

17   that all of these interests would be better furthered if

18   relief is granted from the stay.  And the reasons, as

19   explained in the brief, is, number one, it's been over a year

20   since the complaint was filed seeking to certify the class

21   and for the protections under the equal -- or for the

22   violation of the equal protection clause.  Discovery has

23   occurred.  Motions were heard, as I indicated.  The judge is

24   familiar with these claims, and he indicated he was ready to

25   rule in approximately seven days.  He's also familiar with

1    the substantive issues.

2         Second of all, absent a lift of the stay, I'm not

3    sure how the cooperatives can pursue their injunctive relief

4    because they want to stop the process going forward, so if

5    they're denied that, they're going to be denied their due

6    process entirely, so if a post-petition claim is required to

7    be brought, this whole process has to start anew in federal

8    District Court, and the Bankruptcy Court would not have

9    jurisdiction to determine these post-petition claims because

10   there's no nexus between the bankruptcy estate and these

11   equal protection claims.  There's no -- we're not asking the

12   debtor to have to pay anything to the cooperatives.

13        And there's a number of factors in addition to the

14   fact that there's no jurisdiction.  If the jurisdiction was

15   determined on some potential related to interest, then

16   there's a number of factors that favor withdrawal of the

17   reference.

18        And, finally, it's definitely not a core proceeding,

19   and so the Bankruptcy Court could not enter a final judgment,

20   so in the end we all get back in front of Judge Drain to

21   determine whether or not this proceeding would result in

22   favorable or unfavorable to the cooperatives.

23        So to avoid all these issues -- there's

24   jurisdiction, there's withdrawal of the reference, there's a

25   core proceeding issue -- to avoid all these issues, we could

1  lift the stay, allow the matter to go forward in front of

2  Judge Drain.  He can decide the injunctive issue as well as

3  the pre-petition claims, which would provide us with a number

4  to file a proof of claim in the Bankruptcy Court and then the

5  post-petition claims, so for that reason, your Honor, we're

6  asking for relief from the automatic stay.

7        THE COURT:  Thank you.

8        MR. FUSCO:  Your Honor, again, Timothy Fusco and

9  Marc Swanson for the City of Detroit.  Your Honor, at the

10  outset we will -- the city has elected to designate this

11  case -- this claim as part of the ADR process.  We don't

12  think it's one of the three types of claims that are

13  predesignated, but we are designating this case to be

14  submitted.  What we're dealing with --

15        THE COURT:  Well, but didn't Mr. Ellman tell me this

16  morning that ADR isn't suitable when the relief sought is

17  injunctive?

18        MR. FUSCO:  There is a provision in the arbitration

19  language which states that if you agree to arbitrate, which

20  is entirely voluntary, one of the conditions is -- and,

21  again, both parties can agree to the contrary -- one of the

22  conditions is that you cannot seek injunctive relief,

23  attorney fees, punitive damages.  I think that's what he was

24  alluding to.  It only comes into play when you reach that

25  third stage of the ADR process.  In the first stage, which is

1  the offer and counteroffer, and in the second you can ask for

2  anything you want, but you don't need injunctive relief in

3  this --

4          THE COURT:  Where's the ADR compromise on whether

5  the water rates charged to these plaintiffs should be the

6  commercial rate or the residential rate?

7          MR. FUSCO:  Well, that's part of the whole claim

8  resolution process, but if I may, let me clear up two things

9  to begin with.  Ms. Clark stated several times that she can

10  file a new District Court action, which we believe is just

11  not correct.  This is a Chapter 9 case, and this issue was

12  raised in <u>Jefferson County</u>, and several parties in that case

13  sought a determination that the automatic stay did not apply

14  to actions they sought to file against the county because the

15  claims arose post-petition.  Judge found that even though

16  post-petition claims were stayed by 362(a)(3) since they

17  sought possession of the property of the estate and to

18  exercise control of the estate.  He also looked at whether 28

19  U.S.C. 959, which authorizes suits against trustees in

20  possession, would apply and said it doesn't because those

21  parties are not trustees within the meaning of that section.

22          Third, as you know, in a plan of adjustment it

23  discharges all claims up to the date of confirmation, so all

24  of these things can be dealt with as part of the claims

25  process.

1       In addition, you don't really have, as you know, the
2 concept of administrative expenses in a Chapter 9 case
3 because you don't have a bankruptcy estate as you would in a
4 Chapter 11, in a Chapter 11 case.

5       Secondly, there are five petitioners in this case.
6 There are five parties. And I've sought class certification,
7 but it's not been granted, and it gets a little interesting
8 on how you treat class claims in a bankruptcy case. There
9 have been two significant decisions on that, one out of the
10 Southern District of New York, <u>In re. Ephedra Products</u>
11 <u>Liability Litigation</u>, and one in Texas, Northern District of
12 Texas. And where these two come out is unless the class was
13 certified pre-petition, the class representatives need to
14 file a proof of claim and move for class certification under
15 Rule 723, so until that occurs, we're dealing with five
16 people here who say we've been overcharged for our water.
17 That's something easily susceptible to resolution in ADR.

18       Now, there is an underlying issue of whether I
19 should be charged individually or whether I should be charged
20 as a commercial rate because this is a cooperative. And I
21 think where the dispute arises, just by way of background, we
22 said if you want to put in individual meters, we will allow
23 you individual rates, but the cooperative doesn't want to do
24 that. It wants to have one meter and then somehow divvy up
25 the whole thing, but it's a money issue. How much money were

1  you overcharged?

2       THE COURT:  Well, but it's an ongoing issue.

3       MR. FUSCO:  But as part of the resolution, in order

4  to determine that claim, you have to determine this

5  fundamental issue.  I mean I suppose you can reach an issue.

6  We'll pay you a hundred thousand dollars, to pick a number

7  off the top of my head, and that'll resolve it, but if you're

8  going to actually resolve the claim or if we get to the third

9  stage and this becomes a claim objection process in front of

10 your Honor, you're going to have to reach that decision.

11 You're going to have to decide should you have been charged

12 as an individual --

13      THE COURT:  Now, suppose we have a trial tomorrow

14 here on the issue of whether this is overcharged and I say,

15 yes, it was.  Where's their ongoing relief?

16      MR. FUSCO:  Well, I would assume you have the power

17 to enforce your orders, and so if the city continues to bill

18 and try to collect at a higher rate, you simply enforce your

19 order.  It's not an injunctive issue.

20      THE COURT:  They have to file a proof of claim every

21 month?

22      MR. FUSCO:  Pardon me?

23      THE COURT:  They have to file a proof of claim every

24 month?

25      MR. FUSCO:  No.  You have other remedies.

1          THE COURT:  Where is their relief post-confirmation?

2          MR. FUSCO:  You have other remedies available to

3    you.

4          THE COURT:  Where is their relief post-confirmation?

5          MR. FUSCO:  But is the whole -- does this case turn

6    on just because you've added a count for injunctive relief,

7    that because I brought this action and say I'm being

8    overcharged by "X" dollars a month and I want you to pay back

9    the money, and I want you --

10         THE COURT:  When it's a --

11         MR. FUSCO:  -- to stop doing it --

12         THE COURT:  When it's a continuing claim, why not?

13   It arises every month.

14         MR. FUSCO:  Well, it's going to --

15         THE COURT:  Every month.

16         MR. FUSCO:  -- be a continuing claim, and the plan

17   is going to deal with that if we don't resolve it in any

18   other way.  Now, the next question, okay, what happens the

19   day after the plan is confirmed.

20         THE COURT:  The plan will say I'll pay ten cents on

21   a dollar on unsecured claims.  How does that resolve the

22   problem the day after confirmation?

23         MR. FUSCO:  Well, once -- the day after

24   confirmation, the stay goes away, and I assume you can bring

25   it again if you want, but that assumes that there's no merit

1  to going through the ADR process.  You had a prior settlement

2  on part of these claims.  There's no reason to believe this

3  process would not be beneficial in doing it.  There's nothing

4  to distinguish this case from the other claims we're trying

5  to resolve.  I mean we have --

6         THE COURT:  (Inaudible) tort claim is a one-time

7  incident.

8         MR. FUSCO:  Um-hmm.  And this was an incident

9  that -- it occurred pre-petition.  The damages continue to

10  accrue, but the incident pre-petition was when the city --

11         THE COURT:  Every bill is a new claim.

12         MR. FUSCO:  Every new bill is an element of the

13  damages.  It's an element of the claim.  And that claim is

14  treated the same up until we confirm the plan of adjustment,

15  and these issues are going to be resolved as part of the

16  claims resolution process.  And you're also forgetting the

17  class action procedure if you're looking at the effect on the

18  city if we're dealing with these five claims, but what you've

19  asked for is a certification, I don't know how many co-ops

20  there are out there and how many people they supply to, but

21  this becomes inextricably intertwined with the entire

22  treatment of the Water and Sewer Department.  As your Honor

23  knows, the emergency manager is endeavoring to reach a

24  resolution of what to do with the Water and Sewer Department.

25  There are a couple of things floating around right now.  Five

1   claims may not make much, but a class certification is

2   another issue, and that's one that should be handled by you

3   and not by another court.  Rule 7023 clearly gives you the

4   right in your discretion to certify a class for claims

5   purposes.

6           THE COURT:  Do you want me to determine whether

7   these --

8           MR. FUSCO:  I think in the bankruptcy context --

9           THE COURT:  -- citizens are being overcharged?

10          MR. FUSCO:  I think the issue of whether to certify

11  the class for purposes of claim determination is within your

12  sole discretion under Rule 7023.  No court has ever referred

13  it to another court.  If you don't have a certification on

14  the day of filing, it becomes a bankruptcy issue, and it's

15  your decision, and it has to be done timely so we don't delay

16  the bankruptcy process, but the burden is on the movant to

17  come in front of you and say, "I want this claim certified as

18  a class," and then it's a discretionary judgment with you

19  whether you do that or not, which you determine in the

20  context of the normal issues we deal with in bankruptcy.  We

21  should not be ceding that to another court.  I mean I think

22  it's clear under 7023 it's your determination.  It's not the

23  District Court to determine whether we should certify this as

24  a class.  Now, are you going to have to get involved in

25  determining whether the city is properly using commercial or

1    residential?  You may have to as part of the -- as part of
2    the final stage if we can't settle.  Then it goes to
3    litigation in front of you.  This is not one of the 157
4    matters which you can't hear.  You can clearly enter a final
5    judgment and determine this, and that's the way -- we believe
6    at this point in the case that's exactly what should happen.
7    I have every confidence we will probably resolve it, but we
8    need to start the process.

9            MS. CLARK:  Your Honor, I think, based on your
10   comments, that you understand the primary concern here is the
11   injunctive relief going forward, and if we can't bring post-
12   confirmation claims, how are we going to pursue that
13   equitable relief?  Mr. Fusco keeps referring to basically
14   damage claims, and this is more than damage claims.  It's
15   ongoing constantly, and claims continue to accrue every day.

16           As far as the ADR process goes, as we indicated,
17   this not a certified class at this point.  It's not defined,
18   so I'm not sure exactly how this process would work with each
19   co-op filing their own claim and each separate claim being
20   sent to ADR and then if no -- if they don't agree --

21           THE COURT:  How many co-ops are there in the class?

22           MS. CLARK:  At this point, there's five, but
23   there's -- there could be more because it hasn't been defined
24   yet.  They get a notice process, and people can -- co-ops can
25   elect in.  There could be 30.  Then we -- if they don't agree

1    after all this ADR procedures goes through, then we're back

2    to square one, and we don't have our injunctive relief

3    availability at all.

4         THE COURT:  I wonder why the claim rises to the

5    level of a constitutional claim.  Why isn't it just a

6    question of whether the city is administering its rate

7    structure properly?

8         MS. CLARK:  Your Honor, I did not file the class

9    action lawsuit.  It was filed --

10        THE COURT:  Do you have an answer for me, sir?

11        MR. MORGAN:  Yes, your Honor.  Kerry Morgan

12   appearing on behalf of Lasalle plaintiffs.  Your Honor, this

13   case was filed an equal protection claim because there was a

14   prior Court of Appeals decision, Alexander versus City of

15   Detroit, which held that the city's classification of a rate

16   structure in another context, which said if there's four or

17   less residences within a single structure, that was

18   residential.  If there's five or more within a single

19   structure, that's treated in a commercial manner.  The Court

20   of Appeals -- Michigan Court of Appeals found that to not

21   pass the rational basis test and declared it

22   unconstitutional.

23        We came in, and we said, look, the same principle

24   applies to this classification.  They've chosen to take my

25   clients, who have structures in which some have ten

1   individual dwellings under the cooperative system, which is

2   not a condo and it's not a townhouse and it's not an

3   apartment complex, its own unique body of ownership, and

4   they've said, oh, that's more than four; therefore, it's

5   commercial and it's not residential even though it's

6   residential in every other capacity.

7           THE COURT:  So your claim is not that the city is

8   not administering its rate structure according to its terms.

9           MR. MORGAN:  No.  It is that they're --

10          THE COURT:  Right.  All right.  I understand.  Thank

11  you.

12          MR. MORGAN:  Thank you, your Honor.

13          THE COURT:  Did you have something further, Ms.

14  Clark?

15          MS. CLARK:  No.  Thank you, your Honor.

16          THE COURT:  All right.  The Court will take this

17  under advisement.  Is that our last one today?

18          MR. FUSCO:  I believe that's it.

19          THE COURT:  All right.  We will be in recess then.

20          THE CLERK:  All rise.  Court is adjourned.

21      (Proceedings concluded at 4:04 p.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None

        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett              December 19, 2013
_____        _____
Lois Garrett