# SUPPLEMENTAL EXHIBIT
## Part 2

**Order for Relief dated December 5, 2013 [Docket No. 1946]**

**Opinion Regarding Eligibility dated December 5, 2013 [Docket No. 1945]**

$129,500,000 in 2013. If these debt issuances are excluded, the City's accumulated general fund deficit would have been $700,000,000 through 2013.

In 2012, the City had a negative cash flow of $115,500,000, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80,000,000 on a secured basis. The City spent $50,000,000 of that borrowing in 2012.

In 2013, the City deferred payments on certain of its obligations, totaling approximately $120,000,000. As set forth in the next section, these deferrals were for current and prior year pension contributions and other payments. With those deferrals, the City projects a positive cash flow of $4,000,000 for 2013.

If the City had not deferred these payments, it would have run out of cash by June 30, 2013.

Absent restructuring, the City projects that it will have negative cash flows of $190,500,000 for 2014; $260,400,000 for 2015; $314,100,000 for 2016; and $346,000,000 for 2017. The City further estimates that by 2017, its accumulated deficit could grow to approximately $1,350,000,000.

### 9. Payment Deferrals

The City is not making its pension contributions as they come due. It has deferred payment of its year-end Police and Fire Retirement System contributions. As of May 2013, the City had deferred approximately $54,000,000 in pension contributions related to current and prior periods and approximately $50,000,000 on June 30, 2013 for current year PFRS pension contributions. Therefore, the City will have deferred $104,000,000 of pension contributions.

18

Also, the City did not make the scheduled $39,700,000 payments on its COPs that were due on June 14, 2013.

### B. The Causes and Consequences
### of the City's Financial Distress

A full discussion of the causes and consequences of the City's financial distress is well beyond the scope of this opinion. Still, the evidence presented at the eligibility trial did shed some important and relevant light on the issues that are before the Court. These "causes" and "consequences" are addressed together here because it is often difficult to distinguish one from the other.

### 1. Population Losses

Detroit's population declined to just over 1,000,000 as of June 1990. In December 2012, the population was 684,799. This is a 63% decline in population from its peak in 1950.

### 2. Employment Losses

From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments. The number of jobs in Detroit declined from 735,104 in 1970 to 346,545 in 2012.

Detroit's unemployment rate was 6.3% in June 2000; 23.4% in June 2010; and 18.3% in June 2012. The number of employed Detroit residents fell from approximately 353,000 in 2000 to 279,960 in 2012.

### 3. Credit Rating

The City's credit ratings are below investment grade. As of June 17, 2013, S&P and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively. Ex. 75 at 3.

19

### 4. The Water and Sewerage Department

The Detroit Water and Sewerage Department ("DWSD") provides water and wastewater services to the City and many suburban communities in an eight-county area, covering 1,079 square miles. DWSD's cost of capital is inflated due to its association with the City. This increased cost of capital, coupled with the inability to raise rates and other factors, has resulted in significant under-spending on capital expenditures.

### 5. The Crime Rate

During calendar year 2011, 136,000 crimes were reported in the City. Of these, 15,245 were violent crimes. In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000.

The City's case clearance rate for violent crimes is 18.6%. The clearance rate for all crimes is 8.7%. These rates are substantially below those of comparable municipalities nationally and surrounding local municipalities.

### 6. Streetlights

As of April 2013, about 40% of the approximately 88,000 streetlights operated and maintained by the City's Public Lighting Department were not working.

### 7. Blight

There are approximately 78,000 abandoned and blighted structures in the City. Of these, 38,000 are considered dangerous buildings. The City has experienced 11,000 – 12,000 fires each year for the past decade. Approximately 60% of these occur in blighted or unoccupied buildings.

The average cost to demolish a residential structure is approximately $8,500.

The City also has 66,000 blighted vacant lots.

20

## 8. The Police Department

In 2012, the average priority one response time for the police department was 30 minutes. In 2013, it was 58 minutes. The national average is 11 minutes.

The department's manpower has been reduced by approximately 40% over the last 10 years.

The department has not invested in or maintained its facility infrastructure for many years, and has closed or consolidated many precincts.

The department operates with a fleet of 1,291 vehicles, most of which have reached the replacement age of three years and lack modern information technology.

## 9. The Fire Department

The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed $1,000,000 annually. The fire department's fleet has many mechanical issues, contains no reserve vehicles and lacks equipment ordinarily considered standard. The department's apparatus division now has 26 employees, resulting in a mechanic to vehicle ratio of 1 to 39 and an inability to complete preventative maintenance on schedule.

In February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."

During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service. Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles and break down frequently.

21

## 10. Parks and Recreation

The City closed 210 parks during fiscal year 2009, reducing its total from 317 to 107 (66%). It has also announced that 50 of its remaining 107 parks would be closed and that another 38 would be provided with limited maintenance.

## 11. Information Technology

The City's information technology infrastructure and software is obsolete and is not integrated between departments, or even within departments. Its information technology needs to be upgraded or replaced in the following areas: payroll; financial; budget development; property information and assessment; income tax; and the police department operating system.

**Payroll.** The City currently uses multiple, non-integrated payroll systems. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category. The current cost to process payroll is $62 per check ($19,200,000 per year). This is more than four times the general average of $15 per paycheck. The payroll process involves 149 full-time employees, 51 of which are uniformed officers. This means that high cost personnel are performing clerical duties.

**Income Tax.** The City's highly manual income tax collection and data management systems were purchased in the mid-1990s and are outdated, with little to no automation capability. An IRS audit completed in July 2012, characterized these systems as "catastrophic."

**Financial Reporting.** The City's financial reporting system ("DRMS") was implemented in 1999 and is no longer supported. Its budget development system is 10 years old and requires a manual interface with DRMS. 70% of journal entries are booked manually. The systems also lack reliable fail-over and back-up systems.

## C. The City's Efforts to
## Address Its Financial Distress

The City has reduced the number of its employees by about 2,700 since 2011. As of May 31, 2013, it had approximately 9,560 employees.

The City's unionized employees are represented by 47 discrete bargaining units.[4] The collective bargaining agreements covering all of those bargaining units expired before this case was filed.[5]

The City has implemented revised employment terms, called "City Employment Terms" ("CET"), for nonunionized employees and for unionized employees under expired collective bargaining agreements. It has also increased revenues and reduced expenses in other ways. It estimates that these measures have resulted in annual savings of $200,000,000.

The City cannot legally increase its tax revenues. Nor can it reduce its employee expenses without further endangering public health and safety.

## D. A Brief History of Michigan's Emergency Manager Laws

Before reviewing the events leading to the appointment of the City's emergency manager, a brief review of the winding history of the Michigan statutes on point is necessary.

In 1990, the Michigan Legislature enacted Public Act 72 of 1990, the "Local Government Fiscal Responsibility Act." ("P.A. 72") This Act empowered the State to intervene with respect

---

[4] One of the units, Police Officers Labor Council (Health Department), has one represented employee. Two of the units have two employees. Three of the units have four employees. One of the units, the Detroit License Investigators Association, has no represented employees.
[5] The Financial and Operating Plan reports 48 collective bargaining agreements. Ex. 75 at 13. The discrepancy is not explained but is not material.

23

to municipalities facing financial crisis through the appointment of an emergency financial manager who would assume many of the powers ordinarily held by local elected officials.

Effective March 16, 2011, P.A. 72 was repealed and replaced with Public Act 4 of 2011, the "Local Government and School District Fiscal Accountability Act." ("P.A. 4")

On November 5, 2012, Michigan voters rejected P.A. 4 by referendum. This rejection revived P.A. 72. *See* Order, *Davis v. Roberts*, No. 313297 (Mich. Ct. App. Nov. 16, 2012):[6]

> Petitioner's reliance on the anti-revival statute, MCL 8.4, is unavailing. The plain language of MCL 8.4 includes no reference to statutes that have been rejected by referendum. The statutory language refers only to statutes subject to repeal. Judicial construction is not permitted when the language is unambiguous. *Driver v Naini*, 490 Mich 239, 247; 802 NW2d 311 (2011). Accordingly, under the clear terms of the statute, MCL 8.4 does not apply to the voters' rejection, by referendum, of P A 4.

*See also Davis v. Weatherspoon*, 2013 WL 2076478, at *2 (E.D. Mich. May 15, 2013); Mich. Op. Att'y Gen No. 7267 (Aug. 6, 2012), 2012 WL 3544658.

P.A. 72 remained in effect until March 28, 2013, when the "Local Financial Stability and Choice Act," Public Act 436 of 2012, became effective. ("P.A. 436") That Legislature enacted that law on December 13, 2012, and the governor signed it on December 26, 2012.

### E. The Events Leading to the Appointment of the City's Emergency Manager

The following subsections review the events leading to the appointment of the City's emergency manager.

---

[6] This order is available on the Michigan Court of Appeals website at: http://publicdocs.courts.mi.gov:81/COA/PUBLIC/ORDERS/2012/313297(9)_order.PDF

### 1. The State Treasurer's Report
### of December 21, 2011

On December 6, 2011, the Michigan Department of the Treasury began a preliminary review of the City's financial condition pursuant to P.A. 4.

On December 21, 2011, Andy Dillon, the state treasurer, reported to the governor that "probable financial stress" existed in Detroit and recommended the appointment of a "financial review team" pursuant to P.A. 4. Ex. 503 at 3. (Dkt. #11-3)  In making this finding, Dillon's report cited:

> the inability of the City to avoid fund deficits, recurrent accumulated deficit spending, severe projected cash flow shortages resulting in an improper reliance on inter-fund and external borrowing, the lack of funding of the City's other post-retirement benefits, and the increasing debt of the City[.]

More specifically, his report found:

**(a)** The City had violated § 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968) by failing to amend the City's general appropriations act when it became apparent that various line items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58,000,000, and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97,000,000.

**(b)** The City did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010.  The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "City officials either are incapable or unwilling to manage its own finances."

**(c)** The City had a "mounting debt problem" with debt service requirements exceeding $597,000,000 in 2010 and long term debt exceeding $8,000,000,000 as of June 2011, excluding the City's then-estimated $615,000,000 in unfunded actuarial pension liabilities and

$4,900,000,000 in OPEB liability. The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1, which was far greater than other identified cites.

(d) The City was at risk of a termination payment, estimated at the time to be in the range of $280,000,000 to $400,000,000, under its swap contracts.

(e) The City's long term bond rating had fallen below the BBB category and was considered "junk" - speculative or highly speculative.

(f) The City was experiencing significant cash flow shortages. The City projected a cash balance of $96,100,000 as of October 28, 2011. This was nearly $20,000,000 lower than the City's previous estimates. It would be quickly eroded and the City would experience a cash shortage of $1,600,000 in April 2012 and would end 2012 with a cash shortfall of $44,100,000 absent remedial action.

(g) The City had difficulty making its required payments to its pension plans. In June of 2005, the City issued $1,440,000,000 of new debt in the form of Pension Obligation Certificates ("COPs") to fund its two retirement systems with a renegotiated repayment schedule of 30 years.

## 2. The Financial Review Team's
## Report of March 26, 2012

Under P.A. 4, upon a finding of "probable financial stress," the governor was required to appoint a financial review team to undertake a more extensive financial management review of the City. On December 27, 2011, the governor announced the appointment of a ten member Financial Review Team. The Financial Review Team was then required to report its findings to the governor within 60-90 days.

On March 26, 2012, the Financial Review Team submitted its report to the governor. This report found that "the City of Detroit is in a condition of severe financial stress[.]" Ex. 22. This finding of "severe financial stress" was based upon the following considerations:

26

**(a)** The City's cumulative general fund deficit had increased from $91,000,000 for 2010 to $148,000,000 for 2011 and the City had not experienced a positive year-end fund balance since 2004.

**(b)** Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, primarily due to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

**(c)** The City was continuing to experience significant cash depletion. The City had proposed adjustments to collective bargaining agreements to save $102,000,000 in 2012 and $258,000,000 in 2013, but the tentative collective bargaining agreements negotiated as of the date of the report were projected to yield savings of only $219,000,000 for both years.

**(d)** The City's existing debt had suffered significant downgrades. Among the reasons cited by Moody's Investor Service for the downgrade were the City's "weakened financial position, as evidenced by its narrow cash position, its reliance upon debt financing, and ongoing negotiations with its labor unions regarding contract concessions." Ex. 22 at 10.

### 3. The Consent Agreement

In early 2012, the City and the State of Michigan negotiated a 47 page "Financial Stability Agreement," more commonly called the "Consent Agreement." Ex. 23. The Consent Agreement states that its purpose is to achieve financial stability for the City and a stable platform for the City's future growth. It was executed as of April 5, 2012. Under § 15 of P.A. 4, because a consent agreement within the meaning of P.A. 4 was negotiated and executed, no emergency manager was appointed for the City, despite the finding by the Financial Review Team that the City was in "severe financial stress."

27

The Consent Agreement created a "Financial Advisory Board" ("FAB") of nine members selected by the governor, the treasurer, the mayor and the city council. The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities. The FAB has held, and continues to hold, regular public meetings and to exercise its oversight functions set forth in the Consent Agreement.

### 4. The State Treasurer's Report
### of December 14, 2012

On December 11, 2012, the Department of Treasury commenced a preliminary review of the City's financial condition under P.A. 72. On December 14, 2012, Andy Dillon, State Treasurer sent to Rick Snyder, Governor a memorandum entitled "Preliminary Review of the City of Detroit." Ex. 24. This was after the voters had rejected P.A. 4 and P.A. 72 was revived.

Treasurer Dillon reported to the governor that, based on his preliminary review, a "serious financial problem" existed within the City. Ex. 24 at 1. This conclusion was based on many of the same findings as his earlier report of December 21, 2011. Ex. 21. In addition he reported that:

(a) City officials had violated the proscriptions in sections 18 and 19 of P.A. 2 of 1968 in applying the City's money for purposes inconsistent with the City's appropriations.

(b) The City had projected possibly depleting its cash prior to June 30, 2013. However because of problems in the financial reporting functions of the City, the projections continued to change from month to month. This made it difficult to make informed decisions regarding the City's fiscal health. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In sum, such compliance requires the ability to produce timely and accurate financial information, which City officials have not been able to produce.

(c) The City incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41,000,000 from $155,000,000 on June 30, 2010 to $196,000,000 on June 30, 2011, and is projected to increase even further for 2012. This would not have happened if the City had complied with its budgets.

### 5. The Financial Review Team's
### Report of February 19, 2013

Upon receipt of Treasurer Dillon's report, the governor appointed another Financial Review Team to review the City's financial condition on December 18, 2012. This was also done under P.A. 72.

On February 19, 2013, the Financial Review Team submitted its report to the governor, concluding, "in accordance with [P.A. 72], that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem."[7] Ex. 25.

This finding by the Financial Review Team of a "local government financial emergency" was based primarily upon the following considerations:

(a) The City continued to experience a significant depletion of its cash, with a projected $100,000,000 cumulative cash deficit as of June 30, 2013. Cost-cutting measures undertaken by the mayor and city council were too heavily weighted to one-time savings and non-union personnel.

---

[7] The Financial Review Team also submitted a "Supplemental Documentation of the Detroit Financial Review Team." Ex. 25. This supplement was "intended to constitute competent, material, and substantial evidence upon the whole record in support of the conclusion that a financial emergency exists within the City of Detroit." Id.

(b) The City's cumulative general fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326,600,000 as of 2012. If the City had not issued substantial debt, the accumulated general fund deficit would have been $936,800,000 by 2012.

(c) The City's long-term liabilities exceeded $14,000,000,000 as of June 30, 2013. Approximately $1,900,000,000 would come due over the next five years. The City had not devised a satisfactory plan to address these liabilities.

(d) The City Charter contains numerous restrictions and structural details that make it extremely difficult to restructure the City's operations in a meaningful or timely manner.

(e) The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

(f) Audits for the City's last six fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

## 6. The Appointment of an Emergency
## Manager for the City of Detroit

On March 1, 2013, after receiving the Financial Review Team Report of February 19, 2013, the governor announced his determination under P.A. 72 that a "financial emergency" existed within the City. Ex. 26. By that point, P.A. 436 had been enacted but it was not yet effective.

On March 12, 2013, the governor conducted a public hearing to consider the city council's appeal of his determination.

On March 14, 2013, the governor confirmed his determination of a "financial emergency" within the City and requested that the Local Emergency Financial Assistance Loan Board ("LEFALB ") appoint an emergency financial manager under P.A. 72.

On March 15, 2013, the LEFALB appointed Kevyn Orr as the emergency financial manager for the City of Detroit. Second Amended Final Pre-Trial Order, ¶ 42 at 11. (Dkt. #1647)

On March 25, 2013, Mr. Orr formally took office. Second Amended Final Pre-Trial Order, ¶ 43 at 11. (Dkt. #1647)

On March 28, 2013, the effective date of P.A. 436, P.A. 72 was repealed, and Mr. Orr became the emergency manager of the City under §§ 2(e) and 31 of P.A. 436. M.C.L. §§ 141.1542(e) and 141.1571.

The emergency manager acts "for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). He has "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." M.C.L. § 141.1549(2).

### F. The Emergency Manager's Activities

#### 1. The June 14, 2013 Meeting and Proposal to Creditors

On June 14, 2013, Mr. Orr organized a meeting with approximately 150 representatives of the City's creditors, including representatives of: (a) the City's debt holders; (b) the insurers of this debt; (c) the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders. At the meeting, Mr. Orr presented the June 14 Creditor Proposal,

Ex. 43, and answered questions. At the conclusion of the meeting, Mr. Orr invited creditor representatives to meet and engage in a dialogue with City representatives regarding the proposal.

This proposal described the economic circumstances that resulted in Detroit's financial condition. It also offered a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group. More specifically, the June 14, 2013 Creditor Proposal set forth:

(a) The City's plans to achieve a sustainable restructuring by investing over $1,250,000,000 over ten years to improve basic and essential City services, including: (1) substantial investment in, and the restructuring of, various City departments, including the Police Department; the Fire Department; Emergency Medical Services; the Department of Transportation; the Assessor's Office and property tax division; the Building, Safety, Engineering & Environment Department; and the 36th District Court; (2) substantial investment in the City's blight removal efforts; (3) the transition of the City's electricity transmission business to an alternative provider; (4) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created Public Lighting Authority; (5) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (6) a comprehensive review of the City's leases and contracts; and (7) a proposed overhaul of the City's labor costs and related work rules. Ex. 43 at 61-78.

(b) The City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates, and various initiatives to improve and enhance its tax and fee collection efforts. Ex. 43 at 79-82.

**(c)** The City's intention to potentially realize value from the Detroit Water and Sewerage Department ("DWSD") through the creation of a new metropolitan area water and sewer authority. This authority would conduct the operations under the City's concession or lease of the DWSD's assets in exchange for payments in lieu of taxes, lease payments, or some other form of payment. Ex. 43 at 83-86.

Regarding creditor recoveries, the City proposed:

**(a)** Treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its revenue bonds, secured unlimited and limited tax general obligation bonds, secured installment notes and liabilities arising in connection with the swap obligations. Ex. 43 at 101-109.

**(b)** The pro rata distribution of $2,000,000,000 in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax general obligation bonds; the Service Corporations (on account of the COPs); the pension systems (on account of pension underfunding); retirees (on account of OPEB benefits); and miscellaneous other unsecured claimants. The plan also disclosed the potential for amortization of the principal of such notes in the event that, for example, future City revenues exceeded certain thresholds, certain assets were monetized or certain grants were received. Ex. 43 at 101-109.

**(c)** A "Dutch Auction" process for the City to purchase the notes. Ex. 43 at 108.

At this meeting, Mr. Orr also announced his decision not to make the scheduled $39,700,000 payments due on the COPs and swaps transactions and to impose a moratorium on principal and interest payments related to unsecured debt.

### 2. Subsequent Discussions
### with Creditor Representatives

Following the June 14, 2013 meeting at which the proposal to creditors was presented,

Mr. Orr and his staff had several other meetings.[8]

On June 20, 2013, Mr. Orr's advisors met with representatives of the City's unions and

four retiree associations. In the morning they met with representatives of "non-uniformed"

employees and retirees. In the afternoon they met with "uniformed" employees and retirees. In

these meetings, his advisors discussed retiree health and pension obligations. Approximately 100

union and retiree representatives attended the two-hour morning session. It included time for

questions and answers. Approximately 35 union and retiree representatives attended the

afternoon session, which lasted approximately 90 minutes.

On June 25, 2013, Mr. Orr's advisors and his senior advisor staff members held meetings

in New York for representatives and advisors with all six of the insurers of the City's funded

bond debt; the pension systems; and U.S. Bank, the trustee or paying agent on all of the City's

bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting,

the City's advisors discussed the 10-year financial projections and cash flows presented in the

June 14 Creditor Proposal, together with the assumptions and detail underlying those projections

and cash flows; the City's contemplated reinvestment initiatives and related costs; and the retiree

benefit and pension information and proposals that had been presented to the City's unions and

pension representatives on June 20, 2013.

---

[8] The findings in this section are based on the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, (Dkt. #11) as well as his testimony and the testimony of the witnesses who attended the meetings. Mr. Orr's declaration was admitted into evidence as part of the stipulated exhibits in the pre-trial order. It was the objectors' "Common" Ex. 414.

Also on June 25, 2013, the City's advisors held a separate meeting with U.S. Bank and its advisors to discuss the City's intentions with respect to the DWSD, and the special revenue bond debt related thereto; the City's proposed treatment of its general obligation debt, including the COPs; and various other issues raised by U.S. Bank.

On June 26 and 27, 2013, Mr. Orr's advisors held individual follow-up meetings with each of several bond insurers. On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation in a 90-minute meeting. Financial Guaranty Insurance Corporation had originally requested a meeting for June 26, 2013 but subsequently cancelled. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation in a 90-minute meeting.

On July 10, 2013, the City and certain of its advisors held meetings with representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations and representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to provide additional information on the City's pension restructuring proposal and to discuss a process for reaching a consensual agreement on pension underfunding issues and the treatment of any related claims.

On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for select non-uniform unions and retiree associations, the GRS, certain uniformed unions and retiree associations, and the PFRS to discuss retiree health issues.

## G. The Prepetition Litigation

On July 3, 2013, two lawsuits were filed against the governor and the treasurer in the Ingham County Circuit Court. These suits sought a declaratory judgment that P.A. 436 violated the Michigan Constitution to the extent that it purported to authorize chapter 9 proceedings in which vested pension benefits might be impaired. They also sought an injunction preventing the defendants from authorizing any chapter 9 proceeding for the City in which vested pension benefits might be impaired. *Flowers v. Snyder*, No. 13-729-CZ July 3, 2013; *Webster v. Snyder*, No. 13-734-CZ July 3, 2013.

On July 17, 2013, the Pension Systems commenced a similar lawsuit. *General Retirement System of the City of Detroit v. Orr*, No. 13-768-CZ July 17, 2013.

## H. The Bankruptcy Filing

On July 16, 2013, Mr. Orr recommended to the governor and the treasurer in writing that the City file for chapter 9 relief. Ex. 28. (Dkt. #11-10) An emergency manager may recommend a chapter 9 filing if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists." M.C.L. § 141.1566(1).

On July 18, 2013, Governor Snyder authorized the City of Detroit to file a chapter 9 bankruptcy case. Ex. 29. (Dkt. #11-11) M.C.L. § 141.1558(1) permits the governor to "place contingencies on a local government in order to proceed under chapter 9." However, the governor's authorization letter stated, "I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency - a requirement that the plan be legally executable, 11 USC 943(b)(4)." Ex. 29. at 4. Accordingly, his authorization did not include a condition prohibiting the City from seeking to impair pensions in a plan.

At 4:06 p.m. on July 18, 2013, the City filed this chapter 9 bankruptcy case.[9] (Voluntary Petition, Dkt. #1)

## IV. The City Bears the Burden of Proof.

Before turning to the filed objections, it is necessary to point out that the City bears the burden to establish by a preponderance of the evidence each of the elements of eligibility under 11 U.S.C. § 109(c). *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009); *In re City of Stockton, Cal.*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013).

## V. The Objections of the Individuals
## Who Filed Objections Without an Attorney

As the Court commented at the conclusion of the hearing on September 19, 2013, the individuals' presentations were moving, passionate, thoughtful, compelling and well-articulated. These presentations demonstrated an extraordinary depth of concern for the City of Detroit, for the inadequate level of services that their city government provides and the personal hardships that creates, and, most clearly, for the pensions of City retirees and employees. These individuals expressed another deeply held concern, and even anger, that became a major theme of the hearing - the concern and anger that the State's appointment of an emergency manager over the City of Detroit violated their fundamental democratic right to self-governance.

The Court's role here is to evaluate how these concerns might impact the City's eligibility for bankruptcy. In making that evaluation, the Court can only consider the specific requirements of applicable law - 11 U.S.C. §§ 109(c) and 921(c). It is not the Court's role to

---

[9] The exact time of the filing becomes significant in Part XII, below.

examine this bankruptcy or these objections to this bankruptcy from any other perspective or on any other basis. For example, neither the popularity of the decision to appoint an emergency manager nor the popularity of the decision to file this bankruptcy case are matters of eligibility under the federal bankruptcy laws.

To the extent that individual objections raised arguments that do raise eligibility concerns, they are addressed through this opinion. It appears to the Court that these individuals' concerns should mostly be addressed in the context of whether the case was filed in good faith, as 11 U.S.C. § 921(c) requires. To a lesser extent, they should also be considered in the context of the specific requirement that the City was "insolvent." 11 U.S.C. § 109(c)(3). Accordingly, the Court will address these concerns in those Parts of this opinion. *See* Part XIII (insolvency) and Part XVII (good faith), below.

### VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).

With its petition, the City filed a "Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code," asserting that the City is a "municipality" as defined in 11 U.S.C. § 101(40) and as required by 11 U.S.C. § 109(c)(1). (Dkt. #14 at 8-9) In the "Second Amended Final Pre-Trial Order," the parties so stipulated. (Dkt. #1647 at 11) Accordingly, the Court finds that the City has established this element of eligibility and will not discuss it further.

38

## VII. The Bankruptcy Court Has the Authority
## to Determine the Constitutionality of Chapter 9
## of the Bankruptcy Code and Public Act 436.

### A. The Parties' Objections to the Court's
### Authority Under *Stern v. Marshall*

Several objecting parties challenge the constitutionality of chapter 9 of the bankruptcy code under the United States Constitution. Citing the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), these parties also assert that this Court does not have the authority to determine the constitutionality of chapter 9.

Several objecting parties also challenge the constitutionality of P.A. 436 under the Michigan Constitution. Some of these parties also assert that this Court does not have the authority to determine the constitutionality of P.A. 436.

The Official Committee of Retirees filed a motion to withdraw the reference on the grounds that this Court does not have the authority to determine the constitutionality of chapter 9 or P.A. 436. It also filed a motion for stay of the eligibility proceedings pending the district court's resolution of that motion. In this Court's denial of the stay motion, it concluded that the Committee was unlikely to succeed on its arguments regarding this Court's lack of authority under Stern. *In re City of Detroit, Mich.*, 498 B.R. 776, 781-87 (Bankr. E.D. Mich. 2013). The following discussion is taken from that decision.

### B. *Stern, Waldman*, and *Global Technovations*

In *Stern v. Marshall*, the Supreme Court held that the "judicial power of the United States" can only be exercised by an Article III court and "that in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 131 S. Ct. at 2608-12. The Supreme Court held that a bankruptcy court therefore lacks the constitutional authority to enter a final judgment on a

debtor's counterclaim that is based on a private right when resolution of the counterclaim is not necessary to fix the creditor's claim. 131 S. Ct. at 2611-19. The Court described the issue before it as "narrow."[10] 131 S. Ct. at 2620.

The Sixth Circuit has adhered to a narrow reading of *Stern* in the two cases that have addressed the issue: *Onkyo Europe Elect. GMBH v. Global Technovations Inc. (In re Global Technovations Inc.)*, 694 F.3d 705 (6th Cir. 2012), and *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

In *Global Technovations*, the Sixth Circuit summarized *Stern* as follows:

> *Stern's* limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id.* at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid.*

694 F.3d at 722. Based on this view of *Stern*, the *Global Technovations* court held that the bankruptcy court did have the authority to rule on the debtor's fraudulent transfer counterclaim against a creditor that had filed a proof of claim. *Id.*

In *Waldman*, the Sixth Circuit summarized the holding of *Stern* as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate—as in *Katchen* [*v. Landy*, 382 U.S. 323, 86 S. Ct. 467

---

[10] Outside of the Sixth Circuit, the scope of *Stern* has been somewhat controversial. *See generally* Joshua D. Talicska, *Jurisdictional Game Changer or Narrow Holding? Discussing the Potential Effects of Stern v. Marshall and Offering a Roadmap Through the Milieu*, 9 SETON HALL CIRCUIT REV. 31 (Spring 2013); Michael Fillingame, *Through a Glass, Darkly: Predicting Bankruptcy Jurisdiction Post-Stern*, 50 HOUS. L. REV. 1189 (Symposium 2013); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627 (Fall 2012); Hon. Joan N. Feeney, *Statement to the House of Representatives Judiciary Committee on the Impact of Stern v. Marshall*, 86 AM. BANKR. L.J. 357 (Summer 2012).

(1966)]—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline* [*v. Marathon Pipe Line Co.* 458 U.S. 50, 102 S. Ct. 2858 (1982)]; or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process[,]" 131 S. Ct. at 2618; then the bankruptcy court is constitutionally prohibited from entering final judgment. *Id.* at 2614.

698 F.3d at 919. Based on this view of *Stern*, the *Waldman* court held that the bankruptcy court lacked authority to enter a final judgment on the debtor's prepetition fraud claim against a creditor that was not necessary to resolve in adjudicating the creditor's claim against the debtor.

These cases recognize the crucial difference to which *Stern* adhered. A bankruptcy court may determine matters that arise directly under the bankruptcy code, such as fixing a creditor's claim in the claims allowance process. However, a bankruptcy court may not determine more tangential matters, such as a state law claim for relief asserted by a debtor or the estate that arises outside of the bankruptcy process, unless it is necessary to resolve that claim as part of the claims allowance process. *See City of Cent. Falls, R.I. v. Central Falls Teachers' Union (In re City of Cent. Falls), R.I.,* 468 B.R. 36, 52 (Bankr. D.R.I. 2012) ("[A]lthough the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code.").

### C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case

The issue presently before the Court is the debtor's eligibility to file this chapter 9 case. A debtor's eligibility to file bankruptcy stems directly from rights established by the bankruptcy code. As quoted above, *Waldman* expressly held, "When a debtor pleads an action under federal bankruptcy law," the bankruptcy court's authority is constitutional. 698 F.3d at 919. In this

case, the debtor has done precisely that. In seeking relief under chapter 9, it has pled "an action under federal bankruptcy law."

The parties' federal and state constitutional challenges are simply legal arguments in support of their objection to the City's request for bankruptcy relief. Nothing in *Stern*, *Waldman*, or *Global Technovations* suggests any limitation on the authority of a bankruptcy court to consider and decide any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it.

More specifically, those cases explicitly state that a bankruptcy court can constitutionally determine all of the issues that are raised in the context of resolving an objection to a proof of claim, even those involving state law.[11] For the same reasons, a bankruptcy court can also

---

[11] The Supreme Court has never squarely held that claims allowance, which is at the heart of the bankruptcy process, falls within the permissible scope of authority for a non-Article III court as a "public right" or any other long-standing historical exception to the requirement of Article III adjudication. *Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, n.11, 109 S. Ct. 2782 (1989). However, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871 (1982) (plurality opinion), the Court came tantalizingly close when it stated, "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . [and] may well be a 'public right'[.]"

No court has ever held otherwise. On the contrary, the cases have uniformly concluded that the public rights doctrine is the basis of a bankruptcy court's authority to adjudicate issues that arise under the bankruptcy code. For example, in *Carpenters Pension Trust Fund for Northern California v. Moxley*, 2013 WL 4417594, at *4 (9th Cir. Aug. 20, 2013), the Ninth Circuit held:

> [T]he dischargeability determination is central to federal bankruptcy proceedings. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L.Ed.2d 945 (2006). The dischargeability determination is necessarily resolved during the process of allowing or disallowing claims against the estate, and therefore constitutes a public rights dispute that the bankruptcy court may decide.

Similarly, in *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 n.11 (3d Cir. 1999), the Third Circuit held, "The protections afforded a debtor under the Bankruptcy Code are congressionally created public rights."

*Footnote continued . . .*

constitutionally determine all issues that are raised in the context of resolving an objection to eligibility.

### D. Applying *Stern* in Similar Procedural Contexts

No cases address *Stern* in the context of eligibility for bankruptcy. Nevertheless, several cases do address *Stern* in the context of similar contested matters - conversion and dismissal of a case. Each case readily concludes that *Stern's* limitation on the authority of a bankruptcy court is inapplicable. For example, in *In re USA Baby, Inc.*, 674 F.3d 882, 884 (7th Cir. 2012), the Seventh Circuit held that nothing in *Stern* precludes a bankruptcy court from converting a chapter 11 case to chapter 7, stating, "we cannot fathom what bearing that principle might have

---

In *Kirschner v. Agoglia*, 476 B.R. 75, 79 (S.D.N.Y. 2012), the court stated, "[After *Stern*,] bankruptcy courts still have the ability to finally decide so-called 'public rights' claims that assert rights derived from a federal regulatory scheme and are therefore not the 'stuff of traditional actions,' as well as claims that are necessarily resolved in ruling on a creditor's proof of claim (e.g., a voidable preference claim)[.]"

Other cases also conclude that various matters arising within a bankruptcy case are within the public rights doctrine. *See., e.g., In re Bataa/Kierland LLC*, 2013 WL 3805143, at *3 (D. Ariz. July 22, 2013) (scope of Chapter 11 debtor's rights under easement); *Hamilton v. Try Us, LLC*, 491 B.R. 561 (W.D. Mo. 2013) (validity and amount of common law claim against Chapter 7 debtor); *In re Prosser*, 2013 WL 996367 (D.V.I. 2013) (trustee's claim for turnover of property); *White v. Kubotek Corp.*, 2012 WL 4753310 (D. Mass. Oct. 2, 2012) (creditor's successor liability claim against purchaser of assets from bankruptcy estate); *United States v. Bond*, 2012 WL 4089648 (E.D.N.Y. Sept. 17, 2012) (trustee's claims for tax refund); *Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214 (Bankr. S.D. Tex. 2011) (violation of the automatic stay); *In re Whitley*, 2011 WL 5855242 (Bankr. S.D. Tex. Nov. 21, 2011) (reasonableness of fees of debtor's attorney); *In re Carlew*, 469 B.R. 666 (Bankr. S.D. Tex. 2012) (homestead exemption objection); *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care-Katy, L.P.)*, 465 B.R. 452, 458 (Bankr. S.D. Tex. 2011) (addressing preference actions, stating, "This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine."); *Sigillito v. Hollander (In re Hollander)*, 2011 WL 6819022 (Bankr. E.D. La. Dec. 28, 2011) (nondischargeability for fraud).

In light of the unanimous holdings of these cases, the Court must conclude that its determination regarding the City's eligibility is within the public rights doctrine and therefore that the Court does have the authority to decide the issue, including all of the arguments that the objectors make in their objections.