UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

--------------------------------------------------- x

In re:                                                  :    Chapter 9
                                                        :
CITY OF DETROIT, MICHIGAN,                               :    Case No.: 13-53846
                                                        :
                              Debtor.                   :    Hon. Steven W. Rhodes
                                                        :

--------------------------------------------------- x

## NOTICE OF APPEAL

The International Union, United Automobile, Aerospace and

Agricultural Implement Workers of America ("UAW") and Robbie Flowers,

Michael Wells, Janet Whitson, Mary Washington and Bruce Goodman, as

plaintiffs in the suit *Flowers v. Snyder*, No. 13-729 CZ (Ingham County Circuit

Court) (the "*Flowers* Plaintiffs"), appeal under 28 U.S.C. §158(a) and (d) and

Bankruptcy Rule 8001 from the Court's December 5, 2013 Order for Relief Under

Chapter 9 of the Bankruptcy Code [Dkt. No. 1946] (the "Order for Relief") and the

December 5, 2013 Opinion Regarding Eligibility [Dkt. No. 1945] (collectively, the

"Opinion and Order").

The UAW and *Flowers* Plaintiffs file this appeal jointly since their

interests are aligned, thus making joinder practicable. *See* Federal Rule of

Appellate Procedure 3(b)(1).

The names of the parties to the order appealed from and the names,

addresses and telephone numbers of their respective attorneys are set forth below.

Approximately ninety-two Individual Objectors were invited to address the

Bankruptcy Court at a hearing held on September 19, 2013 regarding their

objections to eligibility. These individuals are listed on Exhibit B attached hereto.

The Bankruptcy Matter Civil Case Cover Sheet is attached hereto as

Exhibit A.

The Order for Relief and the Opinion Regarding Eligibility are

attached hereto as Exhibits C and D, respectively.

<u>Names and Addresses of Parties to the Opinion and Order:</u>

**International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America ("UAW")**

*Represented by*

COHEN, WEISS AND SIMON LLP
Babette A. Ceccotti
Peter D. DeChiara
Thomas N. Ciantra
Joshua J. Ellison
330 West 42nd Street, 25th Floor
New York, NY 10036
Telephone: (212) 563-4100
Facsimile: (212) 695-5436
bceccotti@cwsny.com

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, MI 48214
Telephone: (313) 926-5216
Facsimile: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

**Robbie Flowers**
**Michael Wells**
**Janet Whitson**
**Mary Washington**
**Bruce Goldman**

*Represented by*

William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, MI 48025
T: (248) 644-9200
billwertheimer@gmail.com
**The City of Detroit, Michigan**

*Represented by:*

JONES DAY
Bruce Bennett (CA 105430)
555 South Flowers Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONES DAY
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226

Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

**The Police and Fire Retirement System of the City of Detroit**
**The General Retirement System of the City of Detroit**

*Represented by:*

CLARK HILL PLC
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue, Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

ARNOLD & PORTER LLP
Lisa Hill Fenning (admitted *pro hac vice*)
777 South Figueroa Street 44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com

**The Detroit Fire Fighters Association**
**The Detroit Police Officers Association**
**The Detroit Police Lieutenants & Sergeants Association**
**The Detroit Police Command Officers Association**

*Represented by:*

ERMAN, TEICHER, MILLER, ZUCKER & FREEDMAN, P.C.
Earle I. Erman (P24296)
Craig E. Zucker (P39907)
Barbara A. Patek (P34666)
400 Galleria Officentre, Suite 444

Southfield, MI 48034
Telephone: (249) 827-4100
Facsimile: (248) 827-4106
bpatek@ermanteicher.com

**International Union of Operating Engineers, Local 324**

*Represented by:*

SACHS WALDMAN, P.C.
Andrew Nickelhoff (P37990)
Mami Kato (P74237)
2211 East Jefferson Avenue, Suite 200
Detroit, MI 48207
Telephone: (313) 496-9429
Facsimile: (313) 965-4602
anickelhoff@sachswaldman.com
mkato@sachswaldman.com

**Service Employees International Union, Local 517M**

*Represented by:*

SACHS WALDMAN, P.C.
Andrew Nickelhoff (P37990)
Mami Kato (P74237)
2211 East Jefferson Avenue, Suite 200
Detroit, MI 48207
Telephone: (313) 496-9429
Facsimile: (313) 965-4602
anickelhoff@sachswaldman.com
mkato@sachswaldman.corn

**David Sole**

*Represented by:*

JEROME D. GOLDBERG, PLLC
Jerome D. Goldberg (P61678)
2921 East Jefferson, Suite 205
Detroit, MI 48207
Telephone: (313) 393-6001
Facsimile: (313) 393-6007
apclawyer@sbcglobal.net

**Krystal Crittendon**
19737 Chesterfield
Detroit, MI 48221

**The Retired Detroit Police & Fire Fighters Association**
**Donald Taylor, individually and as President of the Retired Detroit Police &**
   **Fire Fighters Association**
**The Detroit Retired City Employees Association**
**Shirley V. Lightsey, individually and as President of the Detroit Retired City**
   **Employees Association**

*Represented by:*

LIPPITT O'KEEFE, PLLC
Brian D. O'Keefe (P39603)
Ryan C. Plecha (P71957)
370 East Maple Road, 3rd Floor
Birmingham, MI 48009
Telephone: (248) 646-8292
rplecha@lippittokeefe.com

SILVERMAN & MORRIS, P.L.L.C.
Thomas R. Morris (P39141)
30500 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
Telephone: (248) 539-1330
morris@silvermanmorris.com

**Retired Detroit Police Members Association**

*Represented by:*

STROBL & SHARP, P.C.
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

**Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (AFSCME)**

*Represented by:*

LOWENSTEIN SANDLER LLP
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-6247
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

THE SANDERS LAW FIRM PC
Herbert A. Sanders, Esq.
615 Griswold St., Suite 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
jsanders@miafscme.org

MILLER COHEN, P.L.C.
Richard G. Mack, Jr., Esq.
600 West Lafayette Boulevard 4th Floor
Detroit, MI 48226

**Center for Community Justice and Advocacy**

*Represented by:*

VANESSA G. FLUKER, ESQ. PLLC
Vanessa G. Fluker, Esq. PLLC
2921 East Jefferson, Suite 200
Detroit, MI 48207
Telephone: (313) 393-6005
Facsimile: (313) 393-6007
vgflawyer@sbcglobal.net

**The Retiree Committee of the City of Detroit**

*Represented by:*

DENTONS US LLP
Carole Neville
Claude D. Montgomery (P29212)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
carole.neville@dentons.com
claude.montgomery@dentons.com

DENTONS US LLP
Sam J. Alberts
1301 K Street, NW, Suite 600,
East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399
sam.alberts@dentons.com

- 8 -

13-53846-tjt  Doc 2604-5  Filed 01/30/14  Entered 01/30/14 16:51:24  Page 8 of 194
13-53846-swr  Doc 2604-5  Filed 12/30/13  Entered 12/30/13 16:51:24  Page 8 of 194

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

Dated:  December 16, 2013

Respectfully submitted,

 /s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
Peter D. DeChiara
Thomas N. Ciantra
Joshua J. Ellison
330 West 42nd Street
New York, New York 10036-6979
T: 212-563-4100
F: 212-695-5436
bceccotti@cwsny.com
pcdechiara@cwsny.com
tciantra@cwsny.com
jellison@cwsny.com

-    and -

Niraj R. Ganatra (P63150)
Michael Nicholson
8000 East Jefferson Avenue
Detroit, Michigan 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

*Attorneys for International Union, UAW*

-    and -

 /s/ William A. Wertheimer
William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, Michigan 48025
T: (248) 644-9200
billwertheimer@gmail.com

*Attorneys for Flowers Plaintiffs*

- 10 -
13-53846-tjt   Doc 2005-1   Filed 12/16/13   Entered 12/16/13 16:54:24   Page 10 of 11
13-53846-swr   Doc 2104   Filed 12/30/14   Entered 12/30/14 14:41:04   Page 10 of 11
184

## CERTIFICATE OF SERVICE

I hereby certify that I caused a copy of the foregoing Notice of Appeal this 16th day of December 2013 to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Cohen, Weiss and Simon LLP

By:  /s/ Babette Ceccotti
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
bceccotti@cwsny.com

*Attorneys for International Union, UAW*

# Exhibit A

Bankruptcy Matter Civil Case Cover Sheet

13-53846-swr Doc 2600-1 Filed 01/30/14 Entered 01/30/14 15:41:24 Page 12 of 173
13-53846-swr Doc 2183-1 Filed 12/13/13 Entered 12/13/13 16:54:24 Page 12 of
184

<table>
<tr><td colspan="2">

**United States District Court**
**Eastern District of Michigan**
</td><td>

**Bankruptcy Matter**
**Civil Case Cover Sheet**
</td><td>

**District Court Label**
</td></tr>
</table>

In re:

**CITY OF DETROIT, MICHIGAN**          Case No.:  13-53846

                    **Debtor.**

_____/

THE INTERNATIONAL UNION,                    Adv. No.:
UNITED AUTOMOBILE, AEROSPACE
AND AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA ("UAW") and
ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON
and BRUCE GOODMAN (the "*Flowers* Plaintiffs"),

              **Appellants,**

      v.

CITY OF DETROIT, MICHIGAN
              **Appellee.**

---

**CAUSE OF ACTION/NATURE OF SUIT:**   (This matter is referred to the district court for the following reasons)

| | | |
|---|---|---|
| __X__ | [422] 28 U.S.C. 158 | Bankruptcy Appeal |
| _____ | [422] 28 U.S.C. 158 | Motion for Leave to Appeal |
| _____ | [423] 28 U.S.C. 157(d) | Motion for Withdrawal of Reference |
| _____ | [423] 28 U.S.C. 157(c) (1) | Proposed Findings of Fact and Conclusions of Law |
| _____ | [423] 28 U.S.C. 158 (c) (a) | Order of Contempt |

**Date:** <u>December 16, 2013</u>          **Name:** <u>/s/ Babette A. Ceccotti</u>

---

The names of all parties to the order appealed from and the names, addresses, and telephone numbers of their respective attorneys are set forth below, including approximately 92 individual objectors who were invited to address the Bankruptcy Court at the hearing on September 19, 2013.

<u>Name and Address of Interested Parties:</u>

**International Union, United Automobile, Aerospace and
Agricultural Implement Workers of America ("UAW")**

*Represented by*

COHEN, WEISS AND SIMON LLP
Babette A. Ceccotti
Keith E. Secular
Thomas N. Ciantra
Joshua J. Ellison
330 West 42nd Street, 25th Floor
New York, NY 10036
Telephone: (212) 563-4100
Facsimile: (212) 695-5436
bceccotti@cwsny.com

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, MI 48214
Telephone: (313) 926-5216
Facsimile: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

**Robbie Flowers
Michael Wells
Janet Whitson
Mary Washington
Bruce Goldman**

*Represented by*

William A. Wertheimer
30515 Timberbrook Lane
Bingham Farms, MI 48025
T: (248) 644-9200
billwertheimer@gmail.com

2

13-53846-swr   Doc 2600-1   Filed 01/30/14   Entered 01/30/14 16:54:24   Page 14 of 73
13-53846-swr   Doc 2600-1   Filed 01/30/14   Entered 01/30/14 16:54:24   Page 14 of 73
184

**The City of Detroit, Michigan**

*Represented by:*

JONES DAY
Bruce Bennett (CA 105430)
555 South Flowers Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

JONES DAY
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

3
13-53846-swr    Doc 2083-1    Filed 12/18/13    Entered 12/18/13 16:54:24    Page 15 of
184
13-53846-swr    Doc 2300-1    Filed 01/30/14    Entered 01/30/14 11:54:04    Page 45 of 73

**The Police and Fire Retirement System of the City of Detroit**
**The General Retirement System of the City of Detroit**

*Represented by:*

CLARK HILL PLC
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

ARNOLD & PORTER LLP
Lisa Hill Fenning (admitted *pro hac vice*)
777 South Figueroa Street 44th Floor
Los Angeles, California 90017
Telephone: (213) 243-4000
Facsimile: (213) 243-4199
lisa.fenning@aporter.com

**The Detroit Fire Fighters Association**
**The Detroit Police Officers Association**
**The Detroit Police Lieutenants & Sergeants Association**
**The Detroit Police Command Officers Association**

*Represented by:*

ERMAN, TEICHER, MILLER, ZUCKER & FREEDMAN, P.C.
Earle I. Erman (P24296)
Craig E. Zucker (P39907)
Barbara A. Patek (P34666)
400 Galleria Officentre, Suite 444
Southfield, MI 48034
Telephone: (249) 827-4100
Facsimile: (248) 827-4106
bpatek@ermanteicher.com

**International Union of Operating Engineers, Local 324**

*Represented by:*

SACHS WALDMAN, P.C.
Andrew Nickelhoff (P37990)
Mami Kato (P74237)
2211 East Jefferson Avenue, Suite 200
Detroit, MI 48207
Telephone: (313) 496-9429
Facsimile: (313) 965-4602
anickelhoff@sachswaldman.com
mkato@sachswaldman.com

**Service Employees International Union, Local 517M**

*Represented by:*

SACHS WALDMAN, P.C.
Andrew Nickelhoff (P37990)
Mami Kato (P74237)
2211 East Jefferson Avenue, Suite 200
Detroit, MI 48207
Telephone: (313) 496-9429
Facsimile: (313) 965-4602
anickelhoff@sachswaldman.com
mkato@sachswaldman.corn

**David Sole**

*Represented by:*

JEROME D. GOLDBERG, PLLC
Jerome D. Goldberg (P61678)
2921 East Jefferson, Suite 205
Detroit, MI 48207
Telephone: (313) 393-6001
Facsimile: (313) 393-6007
apclawyer@sbcglobal.net

**Krystal Crittendon**
19737 Chesterfield
Detroit, MI 48221

<u>Name and Address of Interested Parties</u> *(continued)*

**The Retired Detroit Police & Fire Fighters Association**
**Donald Taylor, individually and as President of the Retired Detroit Police & Fire Fighters**
    **Association**
**The Detroit Retired City Employees Association**
**Shirley V. Lightsey, individually and as President of the Detroit Retired City Employees**
    **Association**

*Represented by:*

LIPPITT O'KEEFE, PLLC
Brian D. O'Keefe (P39603)
Ryan C. Plecha (P71957)
370 East Maple Road, 3rd Floor
Birmingham, MI 48009
Telephone: (248) 646-8292
rplecha@lippittokeefe.com

SILVERMAN & MORRIS, P.L.L.C.
Thomas R. Morris (P39141)
30500 Northwestern Highway, Suite 200
Farmington Hills, MI 48334
Telephone: (248) 539-1330
morris@silvermanmorris.com

**Retired Detroit Police Members Association**

*Represented by:*

STROBL & SHARP, P.C.
Lynn M. Brimer (P43291)
Meredith E. Taunt (P69698)
Mallory A. Field (P75289)
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

**Michigan Council 25 of The American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (AFSCME)**

*Represented by:*

LOWENSTEIN SANDLER LLP
Sharon L. Levine, Esq.
Wojciech F. Jung, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, NJ 07068
Telephone: (973) 597-2500
Facsimile: (973) 597-6247
slevine@lowenstein.com
wjung@lowenstein.com
pgross@lowenstein.com

THE SANDERS LAW FIRM PC
Herbert A. Sanders, Esq.
615 Griswold St., Suite 913
Detroit, MI 48226
Telephone: (313) 962-0099
Facsimile: (313) 962-0044
jsanders@miafscme.org

MILLER COHEN, P.L.C.
Richard G. Mack, Jr., Esq.
600 West Lafayette Boulevard 4th Floor
Detroit, MI 48226

**Center for Community Justice and Advocacy**

*Represented by:*

VANESSA G. FLUKER, ESQ. PLLC
Vanessa G. Fluker, Esq. PLLC
2921 East Jefferson, Suite 200
Detroit, MI 48207
Telephone: (313) 393-6005
Facsimile: (313) 393-6007
vgflawyer@sbcglobal.net

7

13-53846-swt   Doc 2608-1   Filed 01/30/14   Entered 01/30/14 15:41:24   Page 8 of 9
13-53846-swr   Doc 2183-1   Filed 12/19/13   Entered 12/19/13 16:54:24   Page 19 of
184

**The Retiree Committee of the City of Detroit**

*Represented by:*

DENTONS US LLP
Carole Neville
Claude D. Montgomery (P29212)
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 768-6700
Facsimile: (212) 768-6800
carole.neville@dentons.com
claude.montgomery@dentons.com

DENTONS US LLP
Sam J. Alberts
1301 K Street, NW, Suite 600,
East Tower
Washington, DC 20005-3364
Telephone: (202) 408-6400
Facsimile: (202) 408-6399
sam.alberts@dentons.com

BROOKS WILKINS SHARKEY & TURCO PLLC
Matthew E. Wilkins (P56697)
Paula A. Hall (P61101)
401 South Old Woodward, Suite 400
Birmingham, Michigan 48009
Telephone: (248) 971-1711
Facsimile: (248) 971-1801
wilkins@bwst-law.com
hall@bwst-law.com

8
13-53846-swr   Doc 2660-1   Filed 01/30/14   Entered 01/30/14 15:41:24   Page 20 of
184
13-53846-swr   Doc 2103-1   Filed 12/13/13   Entered 12/13/13 16:54:24   Page 9 of 173

Ninety-two Individual Objectors were invited to address the Bankruptcy Court at the hearing on September 19, 2013 regarding their objections to eligibility. Their names and addresses are below.

### Name and Address of Individual Objectors

Michael Abbott
19391 Heldon Drive
Detroit, MI

The Association of Professional and Technical
Employee (APTE)
Dempsey Addison & Cecily McClellan
2727 Second Ave., Ste. 152
Detroit, MI 48201

Linda Bain
1071 Baldwin
Detroit, MI 48214

Randy Beard
16840 Strathmoor St.
Detroit, MI 48235

Russell Bellant
19619 Helen
Detroit, MI 48234

Michael G. Benson
19395 Parkside
Detroit, MI 48221

Cynthia Blair
8865 Espes
Detroit, MI 49204

Dwight Boyd
19337 Concord
Detroit, MI 48234

Charles D. Brown
1365 Joliet Place
Detroit, MI 48207

Lorene Brown
2227 Hughes Terrace
Detroit, MI 48208

Paulette Brown
19260 Lancashire
Detroit, MI 48223

Rakiba Brown
612 Clairmount St.
Detroit, MI 48202

Regina Bryant
2996 Bewick St.
Detroit, MI 48214

Mary Diane Bukowski
9000 E. Jefferson, #10-9
Detroit, MI 48214

David Bullock
701 W. Hancock
Detroit, MI 48201

Claudette Campbell
1021 Winchester Ave.
Lincoln Park, MI 48146

Johnnie R. Carr
11310 Mansfield
Detroit, MI

Sandra Carver
10110 S. Outer Dr.
Detroit, MI 48224

Raleigh Chambers
14861 Ferguson St.
Detroit, MI 48227

Alma Cozart
18331 Shaftsbury
Detroit, MI 48219

Leola Regina Crittendon
19737 Chesterfield Rd.
Detroit, MI 48221

Angela Crockett
19680 Roslyn Rd.
Detroit, MI 48221

Lucinda J. Darrah
482 Peterboro
Detroit, MI 48201

Joyce Davis
15421 Strathmoor St.
Detroit, MI 48227

Sylvester Davis
[Address Not Available
on Rule 2002 Notice List]

William Davis
9203 Littlefield
Detroit, MI 48228

Elmarie Dixon
4629 Philip St.
Detroit, MI 48215

Mary Dugans
18034 Birchcrest
Detroit, MI 48221

Lewis Dukens
1362 Joliet Pl.
Detroit, MI 48207

David Dye
19313 Ardmore
Detroit, MI 48235

Jacqueline Esters
18570 Glastonbury
Detroit, MI 48219

Arthur Evans
11391 Nottingham Rd.
Detroit, MI 48224

Jerry Ford
9750 W. Outer Drive
Detroit, MI 48223

William D. Ford
18034 Birchcrest Dr.
Detroit, MI 48221

Ulysses Freeman
14895 Faust
Detroit, MI 48223

Olivia Gillon
18832 Arleen Court
Livonia, MI 48152

Donald Glass
411 Chalmers
Detroit, MI 48215

Lavarre W. Greene
19667 Roslyn Rd.
Detroit, MI 48221

William Hickey
14910 Lamphere St.
Detroit, MI 48223

LaVern Holloway
16246 Linwood Street
Detroit, MI 48221

William J. Howard
17814 Charest
Detroit, MI 48212

Joanne Jackson
16244 Princeton
Detroit, MI 48221

Ailene Jeter
18559 Brinker
Detroit, MI 48234

Sheilah Johnson
277 King Street
Detroit, MI 48202

Stephen Johnson
31354 Evergreen Road
Beverly Hills, MI 48025

Joseph H. Jones
19485 Ashbury Park
Detroit, MI 48235

Sallie M. Jones
4413 W. Philadelphia
Detroit, MI 48204

Aleta Atchinson-Jorgan
7412 Henry St.
Detroit, MI 48214

Zelma Kinchloe
439 Henry St.
Detroit, MI 48201

Timothy King
4102 Pasadena
Detroit, MI 48238

Keetha R. Kittrell
22431 Tireman
Detroit, MI

Michael Joseph Karwoski
26015 Felicity Landing
Harrison Twp., MI 48045

Roosevelt Lee
11961 Indiana
Detroit, MI 48204

Althea Long
9256 Braile
Detroit, MI 48228

Edward Lowe
18046 Sussex
Detroit, MI 48235

Lorna Lee Mason
1311 Wyoming
Detroit, MI 48238

Deborah Moore
19485 Ashbury Park
Detroit, MI 48235

Deborah Pollard
20178 Pinchurst
Detroit, MI 48221

Larene Parrish
18220 Snowden
Detroit, MI 48255

Lou Ann Pelletier
2630 Lakeshore Road
Applegate, MI 48401

Michael K. Pelletier
1063 Lakeshore Road
Applegate, MI 48401

Heidi Peterson
Represented by:
Charles Bruce Idelsohn P36799
P.O. Box 856
Detroit, MI 48231
charlesidelsol-mattorney@yahoo.com

Helen Powers
100 Winona
Highland Park, MI 48203

Alice Pruitt
18251 Freeland
Detroit, MI 48235

Samuel L. Riddle
1276 Navarre Pl.
Detroit, MI 48207

Kwabena Shabu
2445 Lamothe St.
Detroit, MI 48226

Michael D. Shane
16815 Patton
Detroit, MI 48219

Karl Shaw
19140 Ohio
Detroit, MI 48221

Frank Sloan, Jr.
18953 Pennington Dr.
Detroit, MI 48221

Gretchen R. Smith
3901 Grand River Ave., #913
Detroit, MI 48208

Horace E. Stallings
1492 Sheridan St.
Detroit, MI 48214

Thomas Stephens
4595 Hereford
Detroit, MI 48224

Dennis Taubitz
4190 Devonshire Rd.
Detroit, MI 48226

Charles Taylor
11472 Wayburn
Detroit, MI 48224

Marzelia Taylor
11975 Indiana
Detroit, MI 48204

The Chair of St. Peter
1300 Pennsylvania Ave., N.W.
Washington, DC 20004

Dolores A. Thomas
17320 Cherrylawn
Detroit, MI 48221

Shirley Tollivel
16610 Inverness
Detroit, MI 48221

Tracey Tresvant
19600 Anvil
Detroit, MI 48205

Calvin Turner
16091 Edmore
Detroit, MI 48205

Jean Vortkamp
11234 Craft
Detroit, MI 48224

William Curtis Walton
4269 Glendale
Detroit, MI 48238

Jo Ann Watson
100 Riverfront Drive, #1508
Detroit, MI 48226

Judith West
[Address Not Available on
Rule 2002 Notice List]

Preston West
18460 Fairfield
Detroit, MI 48221

Cheryl Smith Williams
3486 Baldwin
Detroit, MI 48214

Charles Williams, II
6533 E. Jefferson, Apt. 118
Detroit, MI 48207

Floreen Williams
16227 Birwood
Detroit, MI 48221

Fraustin Williams
11975 Indiana
Detroit, MI 48204

Leonard Wilson
100 Parsons St., Apt. 712
Detroit, MI 48201

Phebe Lee Woodberry
803 Glastone
Detroit, MI 48202

Anthony G. Wright, Jr.
649 Alger St.
Detroit, MI 48202

# Exhibit B

Ninety-two Individual Objectors

Ninety-two Individual Objectors were invited to address the Bankruptcy Court at the hearing on September 19, 2013 regarding their objections to eligibility. Their names and addresses are below.

## Name and Address of Individual Objectors

Michael Abbott
19391 Heldon Drive
Detroit, MI

The Association of Professional and Technical
Employee (APTE)
Dempsey Addison & Cecily McClellan
2727 Second Ave., Ste. 152
Detroit, MI 48201

Linda Bain
1071 Baldwin
Detroit, MI 48214

Randy Beard
16840 Strathmoor St.
Detroit, MI 48235

Russell Bellant
19619 Helen
Detroit, MI 48234

Michael G. Benson
19395 Parkside
Detroit, MI 48221

Cynthia Blair
8865 Espes
Detroit, MI 49204

Dwight Boyd
19337 Concord
Detroit, MI 48234

Charles D. Brown
1365 Joliet Place
Detroit, MI 48207

Lorene Brown
2227 Hughes Terrace
Detroit, MI 48208

Paulette Brown
19260 Lancashire
Detroit, MI 48223

Rakiba Brown
612 Clairmount St.
Detroit, MI 48202

Regina Bryant
2996 Bewick St.
Detroit, MI 48214

Mary Diane Bukowski
9000 E. Jefferson, #10-9
Detroit, MI 48214

David Bullock
701 W. Hancock
Detroit, MI 48201

Claudette Campbell
1021 Winchester Ave.
Lincoln Park, MI 48146

Johnnie R. Carr
11310 Mansfield
Detroit, MI

Sandra Carver
10110 S. Outer Dr.
Detroit, MI 48224

Raleigh Chambers
14861 Ferguson St.
Detroit, MI 48227

Alma Cozart
18331 Shaftsbury
Detroit, MI 48219

Leola Regina Crittendon
19737 Chesterfield Rd.
Detroit, MI 48221

Angela Crockett
19680 Roslyn Rd.
Detroit, MI 48221

Lucinda J. Darrah
482 Peterboro
Detroit, MI 48201

Joyce Davis
15421 Strathmoor St.
Detroit, MI 48227

Sylvester Davis
[Address Not Available
on Rule 2002 Notice List]

William Davis
9203 Littlefield
Detroit, MI 48228

Elmarie Dixon
4629 Philip St.
Detroit, MI 48215

Mary Dugans
18034 Birchcrest
Detroit, MI 48221

Lewis Dukens
1362 Joliet Pl.
Detroit, MI 48207

David Dye
19313 Ardmore
Detroit, MI 48235

Jacqueline Esters
18570 Glastonbury
Detroit, MI 48219

Arthur Evans
11391 Nottingham Rd.
Detroit, MI 48224

Jerry Ford
9750 W. Outer Drive
Detroit, MI 48223

William D. Ford
18034 Birchcrest Dr.
Detroit, MI 48221

Ulysses Freeman
14895 Faust
Detroit, MI 48223

Olivia Gillon
18832 Arleen Court
Livonia, MI 48152

Donald Glass
411 Chalmers
Detroit, MI 48215

Lavarre W. Greene
19667 Roslyn Rd.
Detroit, MI 48221

William Hickey
14910 Lamphere St.
Detroit, MI 48223

LaVern Holloway
16246 Linwood Street
Detroit, MI 48221

William J. Howard
17814 Charest
Detroit, MI 48212

Joanne Jackson
16244 Princeton
Detroit, MI 48221

Ailene Jeter
18559 Brinker
Detroit, MI 48234

Sheilah Johnson
277 King Street
Detroit, MI 48202

Stephen Johnson
31354 Evergreen Road
Beverly Hills, MI 48025

Joseph H. Jones
19485 Ashbury Park
Detroit, MI 48235

Sallie M. Jones
4413 W. Philadelphia
Detroit, MI 48204

Aleta Atchinson-Jorgan
7412 Henry St.
Detroit, MI 48214

Zelma Kinchloe
439 Henry St.
Detroit, MI 48201

Timothy King
4102 Pasadena
Detroit, MI 48238

Keetha R. Kittrell
22431 Tireman
Detroit, MI

Michael Joseph Karwoski
26015 Felicity Landing
Harrison Twp., MI 48045

Roosevelt Lee
11961 Indiana
Detroit, MI 48204

Althea Long
9256 Braile
Detroit, MI 48228

Edward Lowe
18046 Sussex
Detroit, MI 48235

Lorna Lee Mason
1311 Wyoming
Detroit, MI 48238

Deborah Moore
19485 Ashbury Park
Detroit, MI 48235

Deborah Pollard
20178 Pinchurst
Detroit, MI 48221

Larene Parrish
18220 Snowden
Detroit, MI 48255

Lou Ann Pelletier
2630 Lakeshore Road
Applegate, MI 48401

Michael K. Pelletier
1063 Lakeshore Road
Applegate, MI 48401

Heidi Peterson
Represented by:
Charles Bruce Idelsohn P36799
P.O. Box 856
Detroit, MI 48231
charlesidelsol-mattorney@yahoo.com

Helen Powers
100 Winona
Highland Park, MI 48203

Alice Pruitt
18251 Freeland
Detroit, MI 48235

Samuel L. Riddle
1276 Navarre Pl.
Detroit, MI 48207

Kwabena Shabu
2445 Lamothe St.
Detroit, MI 48226

Michael D. Shane
16815 Patton
Detroit, MI 48219

Karl Shaw
19140 Ohio
Detroit, MI 48221

Frank Sloan, Jr.
18953 Pennington Dr.
Detroit, MI 48221

Gretchen R. Smith
3901 Grand River Ave., #913
Detroit, MI 48208

Horace E. Stallings
1492 Sheridan St.
Detroit, MI 48214

Thomas Stephens
4595 Hereford
Detroit, MI 48224

Dennis Taubitz
4190 Devonshire Rd.
Detroit, MI 48226

Charles Taylor
11472 Wayburn
Detroit, MI 48224

Marzelia Taylor
11975 Indiana
Detroit, MI 48204

The Chair of St. Peter
1300 Pennsylvania Ave., N.W.
Washington, DC 20004

Dolores A. Thomas
17320 Cherrylawn
Detroit, MI 48221

Shirley Tollivel
16610 Inverness
Detroit, MI 48221

Tracey Tresvant
19600 Anvil
Detroit, MI 48205

Calvin Turner
16091 Edmore
Detroit, MI 48205

Jean Vortkamp
11234 Craft
Detroit, MI 48224

William Curtis Walton
4269 Glendale
Detroit, MI 48238

Jo Ann Watson
100 Riverfront Drive, #1508
Detroit, MI 48226

Judith West
[Address Not Available on
Rule 2002 Notice List]

Preston West
18460 Fairfield
Detroit, MI 48221

Cheryl Smith Williams
3486 Baldwin
Detroit, MI 48214

Charles Williams, II
6533 E. Jefferson, Apt. 118
Detroit, MI 48207

Floreen Williams
16227 Birwood
Detroit, MI 48221

Fraustin Williams
11975 Indiana
Detroit, MI 48204

Leonard Wilson
100 Parsons St., Apt. 712
Detroit, MI 48201

Phebe Lee Woodberry
803 Glastone
Detroit, MI 48202

Anthony G. Wright, Jr.
649 Alger St.
Detroit, MI 48202

# Exhibit C

December 5, 2013 Order for Relief
[Docket No. 1946]

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                           Chapter 9
City of Detroit, Michigan,                       Case No. 13-53846
Debtor.                                          Hon. Steven W. Rhodes
_____/

### Order for Relief Under Chapter 9 of the Bankruptcy Code

The Court has determined that the City of Detroit, Michigan has met all of the applicable

requirements and is eligible to be a debtor under chapter 9 of the bankruptcy code.  The Court

has further determined that the City of Detroit, Michigan filed its chapter 9 petition in good faith.

Accordingly, the Court hereby enters this Order for Relief and grants relief to the City of

Detroit, Michigan under chapter 9 of the bankruptcy code.

.

**Signed on December 05, 2013**

                                    **/s/ Steven Rhodes**
                            **Steven Rhodes**
                            **United States Bankruptcy Judge**

# Exhibit D

December 5, 2013 Opinion Regarding Eligibility
[Docket No. 1945]

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                          Chapter 9
City of Detroit, Michigan,                      Case No. 13-53846
     Debtor.                                  Hon. Steven W. Rhodes
_____/

### Opinion Regarding Eligibility

> The Congress shall have Power To . . . establish . . . uniform Laws
> on the subject of Bankruptcies throughout the United States. . . .
>
>        Article I, Section 8, United States Constitution

> No . . . law impairing the obligation of contract shall be enacted.
>
>        Article I, Section 10, Michigan Constitution

> The accrued financial benefits of each pension plan and retirement
> system of the state and its political subdivisions shall be a
> contractual obligation thereof which shall not be diminished or
> impaired thereby.
>
>        Article IX, Section 24, Michigan Constitution

## Table of Contents

I. Summary of Opinion ................................................................................................ 1

II. Introduction to the Eligibility Objections ............................................................ 1

    A. The Process ...................................................................................................... 1

    B. Objections Filed by Individuals Without an Attorney ..................................... 3

    C. Objections That Raise Only Legal Issues ....................................................... 3

    D. Objections That Require the Resolution of Genuine Issues of Material Fact ............... 4

III. Introduction to the Facts Leading up to the Bankruptcy Filing ......................... 5

    A. The City's Financial Distress ........................................................................... 7

        1. The City's Debt ........................................................................................ 7

        2. Pension Liabilities .................................................................................... 8

        3. OPEB Liabilities ...................................................................................... 10

        4. Legacy Expenditures - Pensions and OPEB ............................................ 11

        5. The Certificates of Participation ............................................................. 11

            a. The COPs and Swaps Transaction ................................................ 11

            b. The Result ....................................................................................... 13

            c. The Collateral Agreement ............................................................... 13

            d. The City's Defaults Under the Collateral Agreement ..................... 14

            e. The Forbearance and Optional Termination Agreement ................ 14

            f. The Resulting Litigation Involving Syncora ................................... 15

            g. The COPs Debt ............................................................................... 16

        6. Debt Service ............................................................................................. 16

        7. Revenues .................................................................................................. 17

        8. Operating Deficits .................................................................................... 17

        9. Payment Deferrals .................................................................................... 18

13-53846-tjt    Doc 2624    Filed 01/30/14    Entered 01/30/14 14:49:04    Page 36 of 160
13-53846-swr    Doc 2925-1  Filed 03/06/14    Entered 03/06/14 14:54:04    Page 35 of 159
173

B. The Causes and Consequences of the City's Financial Distress ................................. 19

    1. Population Losses ................................................................. 19

    2. Employment Losses ............................................................. 19

    3. Credit Rating ...................................................................... 19

    4. The Water and Sewerage Department ................................. 20

    5. The Crime Rate .................................................................. 20

    6. Streetlights ......................................................................... 20

    7. Blight .................................................................................. 20

    8. The Police Department ....................................................... 21

    9. The Fire Department .......................................................... 21

    10. Parks and Recreation ........................................................ 22

    11. Information Technology ..................................................... 22

C. The City's Efforts to Address Its Financial Distress .................................... 23

D. A Brief History of Michigan's Emergency Manager Laws ........................................ 23

E. The Events Leading to the Appointment of the City's Emergency Manager ............. 24

    1. The State Treasurer's Report of December 21, 2011 ....................................... 25

    2. The Financial Review Team's Report of March 26, 2012 ................................ 26

    3. The Consent Agreement ..................................................... 27

    4. The State Treasurer's Report of December 14, 2012 ....................................... 28

    5. The Financial Review Team's Report of February 19, 2013 ............................ 29

    6. The Appointment of an Emergency Manager for the City of Detroit ............... 30

F. The Emergency Manager's Activities ................................................. 31

    1. The June 14, 2013 Meeting and Proposal to Creditors .................................... 31

    2. Subsequent Discussions with Creditor Representatives ................................... 34

G. The Prepetition Litigation ................................................................. 36

13-53846-swr    Doc 2024-1    Filed 01/3/2013    Entered 01/30/13 11:41:04    Page 37 of 60
13-53846-swr    Doc 2045-1    Filed 12/30/13    Entered 12/30/13 13:16:34    Page 37 of 60
174

H. The Bankruptcy Filing ................................................................................. 36

**IV. The City Bears the Burden of Proof.** ......................................................... 37

**V. The Objections of the Individuals Who Filed Objections Without an Attorney** ............ 37

**VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).** ........................... 38

**VII. The Bankruptcy Court Has the Authority to Determine the Constitutionality of Chapter 9 of the Bankruptcy Code and Public Act 436.** ................................. 39

A. The Parties' Objections to the Court's Authority Under *Stern v. Marshall* ............... 39

B. *Stern*, *Waldman*, and *Global Technovations* ................................................. 39

C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case ......................... 41

D. Applying *Stern* in Similar Procedural Contexts ............................................ 43

E. The Objectors Overstate the Scope of *Stern* ............................................... 44

    1. *Stern* Does Not Preclude This Court from Determining Constitutional Issues. 44

    2. Federalism Issues Are Not Relevant to a *Stern* Analysis. ............................... 47

F. Conclusion Regarding the *Stern* Issue .................................................... 49

**VIII. Chapter 9 Does Not Violate the United States Constitution.** ........................... 49

A. Chapter 9 Does Not Violate the Uniformity Requirement of the Bankruptcy Clause of the United States Constitution. ................................................. 49

    1. The Applicable Law ...................................................................... 50

    2. Discussion .............................................................................. 51

B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.. 52

C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution. ................................................................................. 53

    1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing. ................................................. 54

        a. Standing ............................................................................. 55

        b. Ripeness ............................................................................. 57

2. The Supreme Court Has Already Determined That Chapter 9 Is Constitutional. ................................................................................ 59

3. Changes to Municipal Bankruptcy Law Since 1937 Do Not Undermine the Continuing Validity of *Bekins*. ..................................... 62

    a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws. ...................................... 63

    b. *Asbury Park* Is Limited to Its Own Facts............................................. 64

4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins*................................ 65

    a. *New York v. United States* .................................................... 65

    b. *Printz v. United States*.......................................................... 68

    c. *New York* and *Printz* Do Not Undermine *Bekins*. ............................... 69

    d. Explaining Some Puzzling Language in *New York* ............................ 71

5. Chapter 9 Is Constitutional As Applied in This Case...................................... 73

    a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution............................. 73

    b. Under the Michigan Constitution, Pension Rights Are Contractual Rights................................................................................... 75

**IX. Public Act 436 Does Not Violate the Michigan Constitution.**........................................... 81

A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute.......... 82

B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436................................................. 84

C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.... 86

D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution................................................................................. 88

E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution. . 92

**X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.** ............................................................... 93

**XI. The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.** ........................................................................................ 94

**XII. The Judgment in *Webster v. Michigan* Does Not Preclude the City from Asserting That the Governor's Authorization to File This Bankruptcy Case Was Valid.** .................. 95

    A. The Circumstances Leading to the Judgment ............................................. 95

    B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition. ....... 99

    C. The Judgment Is Also Void Because It Violated the Automatic Stay. ...................... 101

    D. Other Issues .................................................................................. 103

**XIII. The City Was "Insolvent."** .................................................................. 104

    A. The Applicable Law ......................................................................... 104

    B. Discussion ................................................................................... 106

        1. The City Was "Generally Not Paying Its Debts As They Become Due." ...... 106

        2. The City Is Also "Unable to Pay Its Debts As They Become Due." .............. 107

        3. The City's "Lay" Witnesses ........................................................ 108

        4. The City's Failure to Monetize Assets ........................................... 109

**XIV. The City Desires to Effect a Plan to Adjust Its Debts.** ................................. 110

    A. The Applicable Law ......................................................................... 110

    B. Discussion ................................................................................... 111

**XV. The City Did Not Negotiate with Its Creditors in Good Faith.** ....................... 112

    A. The Applicable Law ......................................................................... 112

    B. Discussion ................................................................................... 116

**XVI. The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.** ...................................................................................... 119

    A. The Applicable Law ......................................................................... 119

    B. Discussion ................................................................................... 121

**XVII. The City Filed Its Bankruptcy Petition in Good Faith.** .............................. 125

13-53846-tjt   Doc 2024-1   Filed 01/30/14   Entered 01/30/14 11:41:04   Page 40 of 60
13-53846-swr   Doc 2024-1   Filed 01/30/14   Entered 01/30/14 11:41:04   Page 40 of 60
173

A. The Applicable Law ................................................................................... 126

B. Discussion ................................................................................................ 127

    1. The Objectors' Theory of Bad Faith ................................................. 127

    2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith ...... 130

    3. The City Filed This Bankruptcy Case in Good Faith. ..................................... 135

        a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief. ............................................................................................ 136

        b. The City's Reasons for Filing Are Consistent with the Remedial Purpose of Chapter 9. ....................................................................... 137

        c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail. ............................................................................. 138

        d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed. ........................................................................................ 139

C. Conclusion Regarding the City's Good Faith ............................................. 140

**XVIII. Other Miscellaneous Arguments** .................................................... 140

A. *Midlantic* Does Not Apply in This Case .................................................... 140

B. There Was No Gap in Mr. Orr's Service as Emergency Manager ............. 141

**XIX. Conclusion: The City is Eligible and the Court Will Enter an Order for Relief.** ...... 142

13-53846-tjt    Doc 2624-1    Filed 01/30/14    Entered 01/30/14 11:44:04    Page 41 of 60
13-53846-swr    Doc 1945    Filed 12/06/13    Entered 12/05/13 16:34:24    Page 41 of 50
184

# I. Summary of Opinion

For the reason stated herein, the Court finds that the City of Detroit has established that it meets the requirements of 11 U.S.C. § 109(c).  Accordingly, the Court finds that the City may be a debtor under chapter 9 of the bankruptcy code.  The Court will enter an order for relief under chapter 9.

Specifically, the Court finds that:

- The City of Detroit is a "municipality" as defined in 11 U.S.C. § 101(40).

- The City was specifically authorized to be a debtor under chapter 9 by a governmental officer empowered by State law to authorize the City to be a debtor under chapter 9.

- The City is "insolvent" as defined in 11 U.S.C. § 101(32)(C).

- The City desires to effect a plan to adjust its debts.

- The City did not negotiate in good faith with creditors but was not required to because such negotiation was impracticable.

The Court further finds that the City filed the petition in good faith and that therefore the petition is not subject to dismissal under 11 U.S.C. § 921(c).

The Court concludes that it has jurisdiction over this matter under 28 U.S.C. § 1334(a), and that the matter is a core proceeding under 28 U.S.C. § 157(b)(2).

# II. Introduction to the Eligibility Objections

The matter is before the Court on the parties' objections to the eligibility of the City of Detroit to be a debtor in this chapter 9 case under 11 U.S.C. § 109(c).

## A. The Process

By order dated August 2, 2013, the Court set a deadline of August 19, 2013 for parties to file objections to eligibility.  (Dkt. #280)  That order also allowed the Official Committee of Retirees, then in formation, to file eligibility objections 14 days after it retained counsel.

13-53846-swr   Doc 2624-1   Filed 01/30/14   Entered 01/30/14 14:40:04   Page 42 of 60
13-53846-swr   Doc 2624-1   Filed 02/03/13   Entered 02/03/13 14:40:04   Page 43 of 60
173

One hundred nine parties filed timely objections to the City's eligibility to file this bankruptcy case under § 109 of the bankruptcy code. In addition, two individuals, Hassan Aleem and Carl Williams, filed an untimely joint objection, but upon motion, the Court determined that these objections should be considered timely. (Dkt. #821, ¶ VIII, at 7) Accordingly, the total number of objections to be considered is 110.

In pursuing their eligibility objections, the parties represented by attorneys filed over 50 briefs through several rounds.

Because the constitutionality of chapter 9 was drawn into question, the Court certified the matter to the Attorney General of the United States under 28 U.S.C. § 2403(a), and permitted the United States to intervene. (Dkt. #642 at 7) The United States then filed a brief in support of the constitutionality of chapter 9 (Dkt. #1149) and a supplemental brief (Dkt. #1560).

Also, because the constitutionality of a state statute was drawn into question, the Court certified the matter to the Michigan Attorney General under 28 U.S.C. § 2403(b), and permitted the State of Michigan to intervene. The Michigan Attorney General filed a "Statement Regarding The Michigan Constitution And The Bankruptcy Of The City Of Detroit." (Dkt. #481) He also filed a brief regarding eligibility (Dkt. #756) and a supplemental response (Dkt. #1085).

In an effort to organize and expedite its consideration of these objections, the Court entered an "Order Regarding Eligibility Objections" on August 26, 2013 (Dkt. #642) and a "First Amended Order Regarding Eligibility Objections" on September 12, 2013 (Dkt. #821). Those orders divided the objections into two groups - those filed by parties with an attorney, which were, generally, organized groups (group A), and those filed by individuals, mostly without an attorney (group B). Individuals without an attorney (group B) filed 93 objections. The

remaining 17 objections were filed by parties with an attorney. The objections filed by attorneys were then further divided between objections raising only legal issues and objections that require the resolution of genuine issues of material fact.[1]

The Second Amended Final Pre-Trial Order concisely identifies which parties assert which objections. (Dkt. #1647 at 4-11) This opinion will not repeat that recitation.

## B. Objections Filed by Individuals Without an Attorney

On September 19, 2013, the Court held a hearing at which the individuals who filed timely objections without an attorney had an opportunity to address the Court. At that hearing, 45 individuals addressed the Court. These objections are discussed in Part V, below.

## C. Objections That Raise Only Legal Issues

On October 15 and 16, 2013, the Court heard arguments on the objections that raised only legal issues. These objections are addressed in Parts VII-XII, below. Summarily stated, these objections are:

1. Chapter 9 of the bankruptcy code violates the United States Constitution.

2. The bankruptcy court does not have the authority to determine the constitutionality of chapter 9 of the bankruptcy code.

---

[1] In their many briefs, some parties narrowly focused their arguments in support of their objections. Other parties, however, asserted an expansive range and number of more creative arguments in support of their objections. This opinion may not address every argument made in every brief. Nevertheless, the Court is satisfied that this opinion does address every argument that is worthy of serious consideration. To the extent an argument is not addressed in this opinion, it is overruled.

3. Public Act 436 of 2012 violates the Michigan Constitution and therefore the City was not validly authorized to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).

4. The bankruptcy court does not have the authority to determine the constitutionality of P.A. 436.

5. Detroit's emergency manager is not an elected official and therefore did not have valid authority to file this bankruptcy case, as required for eligibility by 11 U.S.C. § 109(c)(2).

6. Because the governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan Constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

7. Because of the proceedings and judgment in *Webster v. The State of Michigan*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

### D. Objections That Require the Resolution of Genuine Issues of Material Fact

Beginning on October 23, 2013, the Court conducted a trial on the objections filed by attorneys that require the resolution of genuine issues of material fact. These objections are addressed in Parts XIII-XVII, below. Summarily stated, these objections are:

8. The City was not "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C).

9. The City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).

10. The City did not negotiate in good faith with creditors, as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(B).

11. The City was not "unable to negotiate with creditors because such negotiation [was] impracticable," as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(C).

12. The City's bankruptcy petition should be dismissed under 11 U.S.C. § 921(c) because it was filed in bad faith.

In addition, in the course of the briefing, parties asserted certain new and untimely objections. These are addressed in Part XVIII, below.

### III. Introduction to the Facts
### Leading up to the Bankruptcy Filing

The City of Detroit was once a hardworking, diverse, vital city, the home of the automobile industry, proud of its nickname - the "Motor City." It was rightfully known as the birthplace of the American automobile industry. In 1952, at the height of its prosperity and prestige, it had a population of approximately 1,850,000 residents. In 1950, Detroit was building half of the world's cars.

The evidence before the Court establishes that for decades, however, the City of Detroit has experienced dwindling population, employment, and revenues. This has led to decaying infrastructure, excessive borrowing, mounting crime rates, spreading blight, and a deteriorating quality of life.

The City no longer has the resources to provide its residents with the basic police, fire and emergency medical services that its residents need for their basic health and safety.

Moreover, the City's governmental operations are wasteful and inefficient. Its equipment, especially its streetlights and its technology, and much of its fire and police equipment, is obsolete.

13-53846-swr Doc 2604-1 Filed 02/12/14 Entered 02/12/14 11:45:04 Page 46 of 150
13-53846-swr Doc 2651 Filed 02/13/14 Entered 02/13/14 16:03:24 Page 46 of 150
184

To reverse this decline in basic services, to attract new residents and businesses, and to revitalize and reinvigorate itself, the City needs help.

The following sections of this Part of the opinion detail the basic facts regarding the City's fiscal decline, and the causes and consequences of it. Section A will address the City's financial distress. Section B will address the causes and consequences of that distress. Section C will address the City's efforts to address its financial distress. Part D will address the facts and events that resulted in the appointment of an emergency manager for the City. Finally, Parts E-G will address the facts and events that culminated in this bankruptcy filing.

The evidence supporting these factual findings consists largely of the following admitted exhibits:

Exhibit 6 - the City's "Comprehensive Annual Financial Report" for the fiscal year ended June 30, 2012.

Exhibit 21 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 21, 2011;

Exhibit 22 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, March 26, 2012;

Exhibit 24 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 14, 2012;

Exhibit 25 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, February 19, 2013;

Exhibit 26 - Letter from Governor Rick Snyder to Mayor Dave Bing and Detroit City Council, March 1, 2013;

Exhibit 28 - Letter from Kevyn D. Orr, Emergency Manager, to Governor Richard Snyder and State Treasurer Andrew Dillon, July 16, 2013;

Exhibit 29 - "Authorization to Commence Chapter 9 Bankruptcy Proceeding," from Governor Richard Snyder to Emergency Manager Kevyn Orr and State Treasurer Andrew Dillon.

Exhibit 38 - Graph, "FY14 monthly cash forecast absent restructuring"

Exhibit 41 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, June 10, 2013;

Exhibit 43 - "Proposal for Creditors," City of Detroit, June 14, 2013;

Exhibit 44 - "Proposal for Creditors, Executive Summary," City of Detroit, June 14, 2013;

Exhibit 75 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, May 12, 2013;

Exhibit 414 - Declaration of Kevyn Orr in Support of Eligibility. (Dkt. #11)

The Court notes that the objecting creditors offered no substantial evidence contradicting the facts found in this Part of the opinion, except as noted below relating to the City's unfunded pension liability.

## A. The City's Financial Distress

### 1. The City's Debt

The City estimates its debt to be $18,000,000,000. This consists of $11,900,000,000 in unsecured debt and $6,400,000,000 in secured debt. It has more than 100,000 creditors.

According to the City, the unsecured debt includes:

13-53846-swr Doc 2605-1 Filed 02/13/14 Entered 02/13/14 16:04:24 Page 48 of 150
13-53846-swr Doc 2410-1 Filed 01/28/14 Entered 01/28/14 11:44:04 Page 48 of 150
173

$5,700,000,000 for "OPEB" through June 2011, which is the most recent actuarial data available. "OPEB" is "other post-employment benefits," and refers to the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan for retirees;

$3,500,000,000 in unfunded pension obligations;

$651,000,000 in general obligation bonds;

$1,430,000,000 for certificates of participation ("COPs") related to pensions;

$346,600,000 for swap contract liabilities related to the COPs; and

$300,000,000 of other liabilities, including $101,200,000 in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances; $86,500,000 in accrued workers' compensation for which the City is self-insured; $63,900,000 in claims and judgments, including lawsuits and claims other than workers' compensation claims; and $13,000,000 in capital leases and accrued pollution remediation.

As noted, the objecting parties do not seriously challenge the City's estimates of its debt, except for its estimates of its unfunded pension liability. The plans and others have suggested a much lower pension underfunding amount, perhaps even below $1,000,000,000. However, they submitted no proof of that. The Court concludes that it is unnecessary to resolve the issue at this time, because the City would be found eligible regardless of any specific finding on the pension liability that would be in the range between the parties' estimates. Otherwise, the Court is satisfied that the City's estimates of its other liabilities are accurate enough for purposes of determining eligibility, and so finds.

## 2. Pension Liabilities

The City's General Retirement System ("GRS") administers the pension plan for its non-uniformed personnel. The average annual benefit received by retired pensioners or their

beneficiaries is about $18,000. AFSCME Br. at 3 (citing June 30, 2012 General Retirement System of City of Detroit pension valuation report). (Dkt. #505) Generally these retirees are eligible for Social Security retirement or disability benefits.

The City's Police and Fire Retirement System ("PFRS") administers the pension plan for its uniformed personnel. The average annual benefit received by retired pensioners or their beneficiaries is about $30,000. Generally, these retirees are not eligible for Social Security retirement or disability benefits. Retirement Systems Br. at 5 (citing 20 C.F.R. § 404.1206(a)(8), 20 C.F.R. § 404.1212). (Dkt. #519)

The Pension Benefit Guaranty Corporation does not insure pension benefits under either plan.

For the five years ending with FY 2012, pension payments exceeded contributions and investment income by approximately $1,700,000,000 for the GRS and $1,600,000,000 for the PFRS. This resulted in the liquidation of pension trust principal.

As noted, the two pension plans and the City disagree about the level of underfunding in the plans. Gabriel Roeder Smith & Company is the funds' actuary. In its reports for the two pension plans as of June 30, 2012, it found an unfunded actuarial accrued liability ("UAAL") of $829,760,482 for the GRS. Ex. 69 at 3. It found UAAL of $147,216,398 for the PFRS. Ex. 70 at 3.

The City asserts that the actuarial assumptions underlying these estimates are aggressive. Most significantly, the City believes that the two plans project unrealistic annual rates of return on investments net of expenses - 7.9% by GRS and 8.0% by PFRS, and that therefore their estimates are substantially understated. As stated above, the City estimates the underfunding to be $3,500,000,000.

Using current actuarial assumptions, the City's required pension contributions, as a percentage of eligible payroll expenses, are projected to grow from 25% for GRS and 30% for PFRS in 2012 to 30% for GRS and 60% for PFRS by 2017. Changes in actuarial assumptions would result in further increases to the City's required pension contributions.

### 3. OPEB Liabilities

The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan. The City's OPEB obligations arise under 22 different plans, including 15 different plans alone for medical and prescription drugs. These plans have varying structures and terms. The plan is a defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees. The City generally pays for 80% to 100% of health care coverage for eligible retirees. The Health and Life Insurance Plan is totally unfunded; it is financed entirely on a current basis.

As of June 30, 2011, 19,389 retirees were eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

The Supplemental Death Benefit Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon years of creditable service. It has $34,564,960 in actuarially accrued liabilities as of June 30, 2011 and is 74.3% funded with UAAL of $8,900,000.

Of the City's $5,700,000,000 OPEB liability, 99.6% is unfunded.

13-53846-swr Doc 2605-1 Filed 02/12/14 Entered 02/12/14 11:45:04 Page 54 of 150
173

## 4. Legacy Expenditures -
## Pensions and OPEB

During 2012, 38.6% of the City's revenue was consumed servicing legacy liabilities.  The forecasts for subsequent years, assuming no restructuring, are 42.5% for 2013, 54.3% for 2014, 59.5% for 2015, 63% for 2016, and 64.5% for 2017.

## 5. The Certificates of Participation

The transactions described here are complex and confusing.  The resulting litigation is as well.  Nevertheless, a fairly complete explanation of them is necessary to an understanding of the City's severe financial distress.

### a. The COPs and Swaps Transaction

In 2005 and 2006, the City set out to raise $1.4 billion for its underfunded pension funds, the GRS and PFRS.  The City created a non-profit Service Corporation for each of the two pension funds, to act as an intermediary in the financing.  The City then entered into Service Contracts with each of the Service Corporations.  The City would make payments to the Service Corporations, which had created Funding Trusts and assigned their rights to those Funding Trusts.  The Funding Trusts issued debt obligations to investors called "Pension Obligation Certificates of Participation. ("COPs").[2]  Each COP represented an undivided proportionate interest in the payments that the City would make to the Service Corporations under the Service Contracts.

The City arranged for the purchase of insurance from two monoline insurers to protect against defaults by the funding trusts that would result if the City failed to make payments to the

---

[2] Confusingly, in some of the exhibits, these COPs are referred to as "POCs."  See, for example, Financial and Operating Plan, June 10, 2013.  Ex. 41 at 15.

Service Corporations under the Service Contracts.  This was intended to make the investments more attractive to potential investors.  One insurer was XL Capital Assurance, Inc., now known as Syncora.  The other was the Financial Guaranty Insurance Company.

Some of the COPs paid a floating interest rate.  To protect the Service Corporations from the risk of increasing interest rates, they entered into hedge arrangements with UBS A.G. and SBS Financial (the "Swap Counterparties").  Under the hedges, also known as "swaps" (bets, really), the Service Corporations and the Swap Counterparties agreed to convert the floating interest rates into a fixed payment.  Under the swaps, if the floating interest rates exceeded a certain rate, the Swap Counterparties would make payments to the Service Corporations.  But if the floating interest rates sank below a certain rate, the Service Corporations would make payments to the Swap Counterparties.  Specifically, there were eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total amount of $800,000,000.

Under the swaps, the City was also at risk if there was an "event of default" or a "termination event."  In such an event, the Swap Counterparties could terminate the swaps and demand a potentially enormous termination payment.

The Swap Counterparties also obtained protection against the risk that the Service Corporations would default on their quarterly swap payments.  The parties purchased additional insurance against that risk from Syncora and the Financial Guaranty Insurance Company. Syncora's liability for swap defaults is capped at $50,000,000, even though the Swap Counterparties' claims may be significantly greater.  This insurance is separate from the insurance purchased to protect against a default under the COPs.

## b. The Result

In 2008, interest rates dropped dramatically. As a result, the City lost on the swaps bet. Actually, it lost catastrophically on the swaps bet. The bet could cost the City hundreds of millions of dollars. The City estimates that the damage will be approximately $45,000,000 per year for the next ten years.

## c. The Collateral Agreement

As the City's financial condition worsened, the City, the Service Corporations and the Swap Counterparties sought to restructure the swap contracts. In June 2009, they negotiated and entered into a Collateral Agreement that amended the swap agreements. The Collateral Agreement eliminated the "Additional Termination Event" and the potential for an immediate demand for a termination payment. The City agreed to make the swap payments through a "lockbox" arrangement and to pledge certain gaming tax revenues as collateral. The City also agreed to increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010. It also agreed to new termination events, including any downgrading of the credit ratings for the COPs.

Two accounts were set up: 1) a "Holdback Account" and 2) a "General Receipts Subaccount." U.S. Bank was appointed custodian of the accounts. The casinos would pay developer payments and gaming tax payments to the General Receipts Subaccount daily. The City would make monthly deposits into the Holdback Account equal to one-third of the quarterly payment that the Service Corporations owed to the Swap Counterparties. When the City made that monthly payment, U.S. Bank would release to the City the accumulated funds in the General Receipts Subaccount. If the City defaulted, the Swap Counterparties could serve notice on U.S.

Bank, which would then hold or "trap" the money in the General Receipts Subaccount and not disburse it to the City.

Syncora was not a party to the Collateral Agreement.

### d. The City's Defaults Under the Collateral Agreement

In March, 2012, the COPs were downgraded, which triggered a termination event. The Swap Counterparties did not, however, declare a default.

In March, 2013, the appointment of the emergency manager for the City was another event of default. Again however, the Swap Counterparties did not declare a default.

As of June 28, 2013, the City estimated that if an event of default were declared and the Swap Counterparties chose to exercise their right to terminate, it faced a termination obligation to the Swap Counterparties of $296,500,000. This was the approximate negative fair value of the swaps at that time.

On June 14, 2013, the City failed to make a required payment of approximately $40,000,000 on the COPs. This default triggered Syncora's liability as insurer on the COPs and it has apparently made the required payments. However, the City has made all of its required payments to the Swap Counterparties through the Holdback Account. The City contends that as a result, Syncora has no liability to the Swap Counterparties on its guaranty to them.

### e. The Forbearance and Optional Termination Agreement

Following the City's defaults on the Collateral Agreement, the parties negotiated. On July 15, 2013 (three days before this bankruptcy filing), the City and the Swap Counterparties entered into a "Forbearance and Optional Termination Agreement." Under this agreement, the Swap Counterparties would forebear from terminating the swaps and from instructing U.S. Bank to trap the funds in the General Receipts Subaccount. The City may buy out the swaps at an 18-

25% discount, depending on when the payment is made. That buy-out would terminate the pledge of the gaming revenues. Syncora was not a party to this agreement.

When the City filed this bankruptcy case, it also filed a motion to assume the "Forbearance and Optional Termination Agreement." (Dkt. #17) Syncora and many other parties have filed objections to the City's motion. However, because there are serious and substantial defenses to the claims made against the City under the COPs, these objections assert that the agreement should not be approved. After several adjournments, it is scheduled for hearing on December 17, 2013.

### f. The Resulting Litigation Involving Syncora

Meanwhile, back on June 17, 2013, Syncora sent a letter to U.S. Bank declaring an event of default, triggering U.S. Bank's obligation to trap all of the money in the General Receipts Subaccount. The City responded, taking the position that because it had not defaulted in its swap payments and because Syncora has no rights under the Collateral Agreement, Syncora had no right to instruct U.S. Bank to trap the funds.

U.S. Bank did trap approximately $15,000,000. This represented a significant percentage of the City's monthly revenue.

As a result, on July 5, 2013, the City filed a lawsuit against Syncora in the Wayne County Circuit Court. It sought and obtained a temporary restraining order that resulted in U.S. Bank's release of the trapped funds to the City. On July 11, 2013, Syncora removed the action to the district court in Detroit and filed a motion to dissolve the temporary restraining order. On July 31, 2013, Syncora filed a motion to dismiss the complaint. On August 9, 2013, the district referred the matter to this Court. It is now Adversary Proceeding #13-04942. On August 28, 2013, this Court ruled that the gaming revenues are property of the City and therefore protected

by the automatic stay.  Tr. 9:17-21, August 28, 2013.  (Dkt. #692)  As a result, on September 10, 2013, the temporary restraining order was dissolved with the City's stipulation.  Syncora's motion to dismiss the adversary proceeding remains pending.  It has been adjourned due to a tolling agreement between the parties.

Adding to this drama, on July 24, 2013, Syncora filed a lawsuit against the Swap Counterparties in a state court in New York, seeking an injunction to prevent the Swap Counterparties from performing their obligations under the Forbearance and Optional Termination Agreement.  The Swap Counterparties then removed the action to the United States District Court for the Southern District of New York.  That court, at the request of the Swap Counterparties, transferred the case to the federal district court in Detroit, which then referred it to this Court.  It is Adversary Proceeding No. 13-05395.

### g. The COPs Debt

Returning, finally, to the underlying obligations - the COPS, the City estimates that as of June 30, 2013, the following amounts were outstanding:

$480,300,000 in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

$948,540,000 in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

### 6. Debt Service

Debt service from the City's general fund related to limited tax and unlimited tax GO debt and the COPs was $225,300,000 for 2012, and is projected to exceed $247,000,000 in

2013.[3] The City estimates that 38% of its tax revenue goes to debt service rather than to city services. It further estimates that without changes, this will increase to 65% within 5 years.

## 7. Revenues

Income tax revenues have decreased by $91,000,000 since 2002 (30%) and by $44,000,000 (15%) since 2008. Municipal income tax revenue was $276,500,000 in 2008 and $233,000,000 in 2012.

Property tax revenues for 2013 were $135,000,000. This is a reduction of $13,000,000 (10%) from 2012.

Revenues from the City's utility users' tax have declined from approximately $55,300,000 in 2003 to approximately $39,800,000 in 2012 (28%).

Wagering taxes receipts are about $170–$180,000,000 annually. However, the City projects that these receipts will decrease through 2015 due to the expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

State revenue sharing has decreased by $161,000,000 since 2002 (48%) and by $76,000,000 (30.6%) since 2008, due to the City's declining population and significant reductions in statutory revenue sharing by the State.

## 8. Operating Deficits

The City has experienced operating deficits for each of the past seven years. Through 2013, it has had an accumulated general fund deficit of $237,000,000. However, this includes the effect of recent debt issuances - $75,000,000 in 2008; $250,000,000 in 2010; and

---

[3] References to a specific year in the financial sections of this Part are to the City's fiscal year, July 1 to June 30.

13-53846-swr Doc 2604-1 Filed 02/12/14 Entered 02/12/14 16:44:04 Page 58 of 150
13-53846-swr Doc 2604-1 Filed 02/12/14 Entered 02/12/14 16:44:04 Page 58 of 150
173

$129,500,000 in 2013. If these debt issuances are excluded, the City's accumulated general fund deficit would have been $700,000,000 through 2013.

In 2012, the City had a negative cash flow of $115,500,000, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80,000,000 on a secured basis. The City spent $50,000,000 of that borrowing in 2012.

In 2013, the City deferred payments on certain of its obligations, totaling approximately $120,000,000. As set forth in the next section, these deferrals were for current and prior year pension contributions and other payments. With those deferrals, the City projects a positive cash flow of $4,000,000 for 2013.

If the City had not deferred these payments, it would have run out of cash by June 30, 2013.

Absent restructuring, the City projects that it will have negative cash flows of $190,500,000 for 2014; $260,400,000 for 2015; $314,100,000 for 2016; and $346,000,000 for 2017. The City further estimates that by 2017, its accumulated deficit could grow to approximately $1,350,000,000.

## 9. Payment Deferrals

The City is not making its pension contributions as they come due. It has deferred payment of its year-end Police and Fire Retirement System contributions. As of May 2013, the City had deferred approximately $54,000,000 in pension contributions related to current and prior periods and approximately $50,000,000 on June 30, 2013 for current year PFRS pension contributions. Therefore, the City will have deferred $104,000,000 of pension contributions.

Also, the City did not make the scheduled $39,700,000 payments on its COPs that were due on June 14, 2013.

### B. The Causes and Consequences of the City's Financial Distress

A full discussion of the causes and consequences of the City's financial distress is well beyond the scope of this opinion. Still, the evidence presented at the eligibility trial did shed some important and relevant light on the issues that are before the Court. These "causes" and "consequences" are addressed together here because it is often difficult to distinguish one from the other.

### 1. Population Losses

Detroit's population declined to just over 1,000,000 as of June 1990. In December 2012, the population was 684,799. This is a 63% decline in population from its peak in 1950.

### 2. Employment Losses

From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments. The number of jobs in Detroit declined from 735,104 in 1970 to 346,545 in 2012.

Detroit's unemployment rate was 6.3% in June 2000; 23.4% in June 2010; and 18.3% in June 2012. The number of employed Detroit residents fell from approximately 353,000 in 2000 to 279,960 in 2012.

### 3. Credit Rating

The City's credit ratings are below investment grade. As of June 17, 2013, S&P and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively. Ex. 75 at 3.

### 4. The Water and Sewerage Department

The Detroit Water and Sewerage Department ("DWSD") provides water and wastewater services to the City and many suburban communities in an eight-county area, covering 1,079 square miles. DWSD's cost of capital is inflated due to its association with the City. This increased cost of capital, coupled with the inability to raise rates and other factors, has resulted in significant under-spending on capital expenditures.

### 5. The Crime Rate

During calendar year 2011, 136,000 crimes were reported in the City. Of these, 15,245 were violent crimes. In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000.

The City's case clearance rate for violent crimes is 18.6%. The clearance rate for all crimes is 8.7%. These rates are substantially below those of comparable municipalities nationally and surrounding local municipalities.

### 6. Streetlights

As of April 2013, about 40% of the approximately 88,000 streetlights operated and maintained by the City's Public Lighting Department were not working.

### 7. Blight

There are approximately 78,000 abandoned and blighted structures in the City. Of these, 38,000 are considered dangerous buildings. The City has experienced 11,000 – 12,000 fires each year for the past decade. Approximately 60% of these occur in blighted or unoccupied buildings.

The average cost to demolish a residential structure is approximately $8,500.

The City also has 66,000 blighted vacant lots.

## 8. The Police Department

In 2012, the average priority one response time for the police department was 30 minutes. In 2013, it was 58 minutes. The national average is 11 minutes.

The department's manpower has been reduced by approximately 40% over the last 10 years.

The department has not invested in or maintained its facility infrastructure for many years, and has closed or consolidated many precincts.

The department operates with a fleet of 1,291 vehicles, most of which have reached the replacement age of three years and lack modern information technology.

## 9. The Fire Department

The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed $1,000,000 annually. The fire department's fleet has many mechanical issues, contains no reserve vehicles and lacks equipment ordinarily considered standard. The department's apparatus division now has 26 employees, resulting in a mechanic to vehicle ratio of 1 to 39 and an inability to complete preventative maintenance on schedule.

In February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."

During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service. Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles and break down frequently.

## 10. Parks and Recreation

The City closed 210 parks during fiscal year 2009, reducing its total from 317 to 107 (66%). It has also announced that 50 of its remaining 107 parks would be closed and that another 38 would be provided with limited maintenance.

## 11. Information Technology

The City's information technology infrastructure and software is obsolete and is not integrated between departments, or even within departments. Its information technology needs to be upgraded or replaced in the following areas: payroll; financial; budget development; property information and assessment; income tax; and the police department operating system.

**Payroll.** The City currently uses multiple, non-integrated payroll systems. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category. The current cost to process payroll is $62 per check ($19,200,000 per year). This is more than four times the general average of $15 per paycheck. The payroll process involves 149 full-time employees, 51 of which are uniformed officers. This means that high cost personnel are performing clerical duties.

**Income Tax.** The City's highly manual income tax collection and data management systems were purchased in the mid-1990s and are outdated, with little to no automation capability. An IRS audit completed in July 2012, characterized these systems as "catastrophic."

**Financial Reporting.** The City's financial reporting system ("DRMS") was implemented in 1999 and is no longer supported. Its budget development system is 10 years old and requires a manual interface with DRMS. 70% of journal entries are booked manually. The systems also lack reliable fail-over and back-up systems.

## C. The City's Efforts to
## Address Its Financial Distress

The City has reduced the number of its employees by about 2,700 since 2011. As of May 31, 2013, it had approximately 9,560 employees.

The City's unionized employees are represented by 47 discrete bargaining units.[4] The collective bargaining agreements covering all of those bargaining units expired before this case was filed.[5]

The City has implemented revised employment terms, called "City Employment Terms" ("CET"), for nonunionized employees and for unionized employees under expired collective bargaining agreements. It has also increased revenues and reduced expenses in other ways. It estimates that these measures have resulted in annual savings of $200,000,000.

The City cannot legally increase its tax revenues. Nor can it reduce its employee expenses without further endangering public health and safety.

## D. A Brief History of Michigan's Emergency Manager Laws

Before reviewing the events leading to the appointment of the City's emergency manager, a brief review of the winding history of the Michigan statutes on point is necessary.

In 1990, the Michigan Legislature enacted Public Act 72 of 1990, the "Local Government Fiscal Responsibility Act." ("P.A. 72") This Act empowered the State to intervene with respect

---

[4] One of the units, Police Officers Labor Council (Health Department), has one represented employee. Two of the units have two employees. Three of the units have four employees. One of the units, the Detroit License Investigators Association, has no represented employees.
[5] The Financial and Operating Plan reports 48 collective bargaining agreements. Ex. 75 at 13. The discrepancy is not explained but is not material.

to municipalities facing financial crisis through the appointment of an emergency financial manager who would assume many of the powers ordinarily held by local elected officials.

Effective March 16, 2011, P.A. 72 was repealed and replaced with Public Act 4 of 2011, the "Local Government and School District Fiscal Accountability Act." ("P.A. 4")

On November 5, 2012, Michigan voters rejected P.A. 4 by referendum. This rejection revived P.A. 72. *See* Order, *Davis v. Roberts*, No. 313297 (Mich. Ct. App. Nov. 16, 2012):[6]

> Petitioner's reliance on the anti-revival statute, MCL 8.4, is unavailing. The plain language of MCL 8.4 includes no reference to statutes that have been rejected by referendum. The statutory language refers only to statutes subject to repeal. Judicial construction is not permitted when the language is unambiguous. *Driver v Naini*, 490 Mich 239, 247; 802 NW2d 311 (2011). Accordingly, under the clear terms of the statute, MCL 8.4 does not apply to the voters' rejection, by referendum, of P A 4.

*See also Davis v. Weatherspoon*, 2013 WL 2076478, at *2 (E.D. Mich. May 15, 2013); Mich. Op. Att'y Gen No. 7267 (Aug. 6, 2012), 2012 WL 3544658.

P.A. 72 remained in effect until March 28, 2013, when the "Local Financial Stability and Choice Act," Public Act 436 of 2012, became effective. ("P.A. 436") That Legislature enacted that law on December 13, 2012, and the governor signed it on December 26, 2012.

### E. The Events Leading to the Appointment of the City's Emergency Manager

The following subsections review the events leading to the appointment of the City's emergency manager.

---

[6] This order is available on the Michigan Court of Appeals website at: http://publicdocs.courts.mi.gov:81/COA/PUBLIC/ORDERS/2012/313297(9)_order.PDF

## 1. The State Treasurer's Report
## of December 21, 2011

On December 6, 2011, the Michigan Department of the Treasury began a preliminary review of the City's financial condition pursuant to P.A. 4.

On December 21, 2011, Andy Dillon, the state treasurer, reported to the governor that "probable financial stress" existed in Detroit and recommended the appointment of a "financial review team" pursuant to P.A. 4. Ex. 503 at 3. (Dkt. #11-3) In making this finding, Dillon's report cited:

> the inability of the City to avoid fund deficits, recurrent accumulated deficit spending, severe projected cash flow shortages resulting in an improper reliance on inter-fund and external borrowing, the lack of funding of the City's other post-retirement benefits, and the increasing debt of the City[.]

More specifically, his report found:

**(a)** The City had violated § 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968) by failing to amend the City's general appropriations act when it became apparent that various line items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58,000,000, and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97,000,000.

**(b)** The City did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010. The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "City officials either are incapable or unwilling to manage its own finances."

**(c)** The City had a "mounting debt problem" with debt service requirements exceeding $597,000,000 in 2010 and long term debt exceeding $8,000,000,000 as of June 2011, excluding the City's then-estimated $615,000,000 in unfunded actuarial pension liabilities and

$4,900,000,000 in OPEB liability.  The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1, which was far greater than other identified cites.

**(d)** The City was at risk of a termination payment, estimated at the time to be in the range of $280,000,000 to $400,000,000, under its swap contracts.

**(e)** The City's long term bond rating had fallen below the BBB category and was considered "junk" - speculative or highly speculative.

**(f)** The City was experiencing significant cash flow shortages.  The City projected a cash balance of $96,100,000 as of October 28, 2011.  This was nearly $20,000,000 lower than the City's previous estimates.  It would be quickly eroded and the City would experience a cash shortage of $1,600,000 in April 2012 and would end 2012 with a cash shortfall of $44,100,000 absent remedial action.

**(g)** The City had difficulty making its required payments to its pension plans.  In June of 2005, the City issued $1,440,000,000 of new debt in the form of Pension Obligation Certificates ("COPs") to fund its two retirement systems with a renegotiated repayment schedule of 30 years.

## 2. The Financial Review Team's
## Report of March 26, 2012

Under P.A. 4, upon a finding of "probable financial stress," the governor was required to appoint a financial review team to undertake a more extensive financial management review of the City.  On December 27, 2011, the governor announced the appointment of a ten member Financial Review Team.  The Financial Review Team was then required to report its findings to the governor within 60-90 days.

On March 26, 2012, the Financial Review Team submitted its report to the governor. This report found that "the City of Detroit is in a condition of severe financial stress[.]"  Ex. 22. This finding of "severe financial stress" was based upon the following considerations:

**(a)** The City's cumulative general fund deficit had increased from $91,000,000 for 2010 to $148,000,000 for 2011 and the City had not experienced a positive year-end fund balance since 2004.

**(b)** Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, primarily due to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

**(c)** The City was continuing to experience significant cash depletion. The City had proposed adjustments to collective bargaining agreements to save $102,000,000 in 2012 and $258,000,000 in 2013, but the tentative collective bargaining agreements negotiated as of the date of the report were projected to yield savings of only $219,000,000 for both years.

**(d)** The City's existing debt had suffered significant downgrades. Among the reasons cited by Moody's Investor Service for the downgrade were the City's "weakened financial position, as evidenced by its narrow cash position, its reliance upon debt financing, and ongoing negotiations with its labor unions regarding contract concessions." Ex. 22 at 10.

### 3. The Consent Agreement

In early 2012, the City and the State of Michigan negotiated a 47 page "Financial Stability Agreement," more commonly called the "Consent Agreement." Ex. 23. The Consent Agreement states that its purpose is to achieve financial stability for the City and a stable platform for the City's future growth. It was executed as of April 5, 2012. Under § 15 of P.A. 4, because a consent agreement within the meaning of P.A. 4 was negotiated and executed, no emergency manager was appointed for the City, despite the finding by the Financial Review Team that the City was in "severe financial stress."

The Consent Agreement created a "Financial Advisory Board" ("FAB") of nine members selected by the governor, the treasurer, the mayor and the city council. The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities. The FAB has held, and continues to hold, regular public meetings and to exercise its oversight functions set forth in the Consent Agreement.

### 4. The State Treasurer's Report
### of December 14, 2012

On December 11, 2012, the Department of Treasury commenced a preliminary review of the City's financial condition under P.A. 72. On December 14, 2012, Andy Dillon, State Treasurer sent to Rick Snyder, Governor a memorandum entitled "Preliminary Review of the City of Detroit." Ex. 24. This was after the voters had rejected P.A. 4 and P.A. 72 was revived.

Treasurer Dillon reported to the governor that, based on his preliminary review, a "serious financial problem" existed within the City. Ex. 24 at 1. This conclusion was based on many of the same findings as his earlier report of December 21, 2011. Ex. 21. In addition he reported that:

**(a)** City officials had violated the proscriptions in sections 18 and 19 of P.A. 2 of 1968 in applying the City's money for purposes inconsistent with the City's appropriations.

**(b)** The City had projected possibly depleting its cash prior to June 30, 2013. However because of problems in the financial reporting functions of the City, the projections continued to change from month to month. This made it difficult to make informed decisions regarding the City's fiscal health. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In sum, such compliance requires the ability to produce timely and accurate financial information, which City officials have not been able to produce.

**(c)** The City incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41,000,000 from $155,000,000 on June 30, 2010 to $196,000,000 on June 30, 2011, and is projected to increase even further for 2012. This would not have happened if the City had complied with its budgets.

### 5. The Financial Review Team's Report of February 19, 2013

Upon receipt of Treasurer Dillon's report, the governor appointed another Financial Review Team to review the City's financial condition on December 18, 2012. This was also done under P.A. 72.

On February 19, 2013, the Financial Review Team submitted its report to the governor, concluding, "in accordance with [P.A. 72], that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem."[7] Ex. 25.

This finding by the Financial Review Team of a "local government financial emergency" was based primarily upon the following considerations:

**(a)** The City continued to experience a significant depletion of its cash, with a projected $100,000,000 cumulative cash deficit as of June 30, 2013. Cost-cutting measures undertaken by the mayor and city council were too heavily weighted to one-time savings and non-union personnel.

---

[7] The Financial Review Team also submitted a "Supplemental Documentation of the Detroit Financial Review Team." Ex. 25. This supplement was "intended to constitute competent, material, and substantial evidence upon the whole record in support of the conclusion that a financial emergency exists within the City of Detroit." *Id.*

**(b)** The City's cumulative general fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326,600,000 as of 2012. If the City had not issued substantial debt, the accumulated general fund deficit would have been $936,800,000 by 2012.

**(c)** The City's long-term liabilities exceeded $14,000,000,000 as of June 30, 2013. Approximately $1,900,000,000 would come due over the next five years. The City had not devised a satisfactory plan to address these liabilities.

**(d)** The City Charter contains numerous restrictions and structural details that make it extremely difficult to restructure the City's operations in a meaningful or timely manner.

**(e)** The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

**(f)** Audits for the City's last six fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

**6. The Appointment of an Emergency
Manager for the City of Detroit**

On March 1, 2013, after receiving the Financial Review Team Report of February 19, 2013, the governor announced his determination under P.A. 72 that a "financial emergency" existed within the City. Ex. 26. By that point, P.A. 436 had been enacted but it was not yet effective.

On March 12, 2013, the governor conducted a public hearing to consider the city council's appeal of his determination.

On March 14, 2013, the governor confirmed his determination of a "financial emergency" within the City and requested that the Local Emergency Financial Assistance Loan Board ("LEFALB ") appoint an emergency financial manager under P.A. 72.

On March 15, 2013, the LEFALB appointed Kevyn Orr as the emergency financial manager for the City of Detroit. Second Amended Final Pre-Trial Order, ¶ 42 at 11. (Dkt. #1647)

On March 25, 2013, Mr. Orr formally took office. Second Amended Final Pre-Trial Order, ¶ 43 at 11. (Dkt. #1647)

On March 28, 2013, the effective date of P.A. 436, P.A. 72 was repealed, and Mr. Orr became the emergency manager of the City under §§ 2(e) and 31 of P.A. 436. M.C.L. §§ 141.1542(e) and 141.1571.

The emergency manager acts "for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). He has "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." M.C.L. § 141.1549(2).

### F. The Emergency Manager's Activities

#### 1. The June 14, 2013 Meeting and Proposal to Creditors

On June 14, 2013, Mr. Orr organized a meeting with approximately 150 representatives of the City's creditors, including representatives of: (a) the City's debt holders; (b) the insurers of this debt; (c) the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders. At the meeting, Mr. Orr presented the June 14 Creditor Proposal,

Ex. 43, and answered questions. At the conclusion of the meeting, Mr. Orr invited creditor representatives to meet and engage in a dialogue with City representatives regarding the proposal.

This proposal described the economic circumstances that resulted in Detroit's financial condition. It also offered a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group. More specifically, the June 14, 2013 Creditor Proposal set forth:

(a) The City's plans to achieve a sustainable restructuring by investing over $1,250,000,000 over ten years to improve basic and essential City services, including: (1) substantial investment in, and the restructuring of, various City departments, including the Police Department; the Fire Department; Emergency Medical Services; the Department of Transportation; the Assessor's Office and property tax division; the Building, Safety, Engineering & Environment Department; and the 36th District Court; (2) substantial investment in the City's blight removal efforts; (3) the transition of the City's electricity transmission business to an alternative provider; (4) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created Public Lighting Authority; (5) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (6) a comprehensive review of the City's leases and contracts; and (7) a proposed overhaul of the City's labor costs and related work rules. Ex. 43 at 61-78.

(b) The City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates, and various initiatives to improve and enhance its tax and fee collection efforts. Ex. 43 at 79-82.

(c) The City's intention to potentially realize value from the Detroit Water and Sewerage Department ("DWSD") through the creation of a new metropolitan area water and sewer authority. This authority would conduct the operations under the City's concession or lease of the DWSD's assets in exchange for payments in lieu of taxes, lease payments, or some other form of payment. Ex. 43 at 83-86.

Regarding creditor recoveries, the City proposed:

(a) Treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its revenue bonds, secured unlimited and limited tax general obligation bonds, secured installment notes and liabilities arising in connection with the swap obligations. Ex. 43 at 101-109.

(b) The pro rata distribution of $2,000,000,000 in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax general obligation bonds; the Service Corporations (on account of the COPs); the pension systems (on account of pension underfunding); retirees (on account of OPEB benefits); and miscellaneous other unsecured claimants. The plan also disclosed the potential for amortization of the principal of such notes in the event that, for example, future City revenues exceeded certain thresholds, certain assets were monetized or certain grants were received. Ex. 43 at 101-109.

(c) A "Dutch Auction" process for the City to purchase the notes. Ex. 43 at 108.

At this meeting, Mr. Orr also announced his decision not to make the scheduled $39,700,000 payments due on the COPs and swaps transactions and to impose a moratorium on principal and interest payments related to unsecured debt.

## 2. Subsequent Discussions
## with Creditor Representatives

Following the June 14, 2013 meeting at which the proposal to creditors was presented.

Mr. Orr and his staff had several other meetings.[8]

On June 20, 2013, Mr. Orr's advisors met with representatives of the City's unions and four retiree associations. In the morning they met with representatives of "non-uniformed" employees and retirees. In the afternoon they met with "uniformed" employees and retirees. In these meetings, his advisors discussed retiree health and pension obligations. Approximately 100 union and retiree representatives attended the two-hour morning session. It included time for questions and answers. Approximately 35 union and retiree representatives attended the afternoon session, which lasted approximately 90 minutes.

On June 25, 2013, Mr. Orr's advisors and his senior advisor staff members held meetings in New York for representatives and advisors with all six of the insurers of the City's funded bond debt; the pension systems; and U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal, together with the assumptions and detail underlying those projections and cash flows; the City's contemplated reinvestment initiatives and related costs; and the retiree benefit and pension information and proposals that had been presented to the City's unions and pension representatives on June 20, 2013.

---

[8] The findings in this section are based on the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, (Dkt. #11) as well as his testimony and the testimony of the witnesses who attended the meetings. Mr. Orr's declaration was admitted into evidence as part of the stipulated exhibits in the pre-trial order. It was the objectors' "Common" Ex. 414.

Also on June 25, 2013, the City's advisors held a separate meeting with U.S. Bank and its advisors to discuss the City's intentions with respect to the DWSD, and the special revenue bond debt related thereto; the City's proposed treatment of its general obligation debt, including the COPs; and various other issues raised by U.S. Bank.

On June 26 and 27, 2013, Mr. Orr's advisors held individual follow-up meetings with each of several bond insurers. On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation in a 90-minute meeting. Financial Guaranty Insurance Corporation had originally requested a meeting for June 26, 2013 but subsequently cancelled. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation in a 90-minute meeting.

On July 10, 2013, the City and certain of its advisors held meetings with representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations and representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to provide additional information on the City's pension restructuring proposal and to discuss a process for reaching a consensual agreement on pension underfunding issues and the treatment of any related claims.

On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for select non-uniform unions and retiree associations, the GRS, certain uniformed unions and retiree associations, and the PFRS to discuss retiree health issues.

## G. The Prepetition Litigation

On July 3, 2013, two lawsuits were filed against the governor and the treasurer in the Ingham County Circuit Court.  These suits sought a declaratory judgment that P.A. 436 violated the Michigan Constitution to the extent that it purported to authorize chapter 9 proceedings in which vested pension benefits might be impaired.  They also sought an injunction preventing the defendants from authorizing any chapter 9 proceeding for the City in which vested pension benefits might be impaired.  *Flowers v. Snyder*, No. 13-729-CZ July 3, 2013; *Webster v. Snyder*, No. 13-734-CZ July 3, 2013.

On July 17, 2013, the Pension Systems commenced a similar lawsuit.  *General Retirement System of the City of Detroit v. Orr*, No. 13-768-CZ July 17, 2013.

## H. The Bankruptcy Filing

On July 16, 2013, Mr. Orr recommended to the governor and the treasurer in writing that the City file for chapter 9 relief.  Ex. 28. (Dkt. #11-10)  An emergency manager may recommend a chapter 9 filing if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists."  M.C.L. § 141.1566(1).

On July 18, 2013, Governor Snyder authorized the City of Detroit to file a chapter 9 bankruptcy case.  Ex. 29. (Dkt. #11-11)  M.C.L. § 141.1558(1) permits the governor to "place contingencies on a local government in order to proceed under chapter 9."  However, the governor's authorization letter stated, "I am choosing not to impose any such contingencies today.  Federal law already contains the most important contingency - a requirement that the plan be legally executable, 11 USC 943(b)(4)."  Ex. 29. at 4.  Accordingly, his authorization did not include a condition prohibiting the City from seeking to impair pensions in a plan.

At 4:06 p.m. on July 18, 2013, the City filed this chapter 9 bankruptcy case.[9] (Voluntary Petition, Dkt. #1)

## IV. The City Bears the Burden of Proof.

Before turning to the filed objections, it is necessary to point out that the City bears the burden to establish by a preponderance of the evidence each of the elements of eligibility under 11 U.S.C. § 109(c). *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo* (*In re City of Vallejo*), 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009); *In re City of Stockton, Cal.*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013).

## V. The Objections of the Individuals
## Who Filed Objections Without an Attorney

As the Court commented at the conclusion of the hearing on September 19, 2013, the individuals' presentations were moving, passionate, thoughtful, compelling and well-articulated. These presentations demonstrated an extraordinary depth of concern for the City of Detroit, for the inadequate level of services that their city government provides and the personal hardships that creates, and, most clearly, for the pensions of City retirees and employees. These individuals expressed another deeply held concern, and even anger, that became a major theme of the hearing - the concern and anger that the State's appointment of an emergency manager over the City of Detroit violated their fundamental democratic right to self-governance.

The Court's role here is to evaluate how these concerns might impact the City's eligibility for bankruptcy. In making that evaluation, the Court can only consider the specific requirements of applicable law - 11 U.S.C. §§ 109(c) and 921(c). It is not the Court's role to

---

[9] The exact time of the filing becomes significant in Part XII, below.

examine this bankruptcy or these objections to this bankruptcy from any other perspective or on any other basis. For example, neither the popularity of the decision to appoint an emergency manager nor the popularity of the decision to file this bankruptcy case are matters of eligibility under the federal bankruptcy laws.

To the extent that individual objections raised arguments that do raise eligibility concerns, they are addressed through this opinion. It appears to the Court that these individuals' concerns should mostly be addressed in the context of whether the case was filed in good faith, as 11 U.S.C. § 921(c) requires. To a lesser extent, they should also be considered in the context of the specific requirement that the City was "insolvent." 11 U.S.C. § 109(c)(3). Accordingly, the Court will address these concerns in those Parts of this opinion. *See* Part XIII (insolvency) and Part XVII (good faith), below.

### VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).

With its petition, the City filed a "Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code," asserting that the City is a "municipality" as defined in 11 U.S.C. § 101(40) and as required by 11 U.S.C. § 109(c)(1). (Dkt. #14 at 8-9) In the "Second Amended Final Pre-Trial Order," the parties so stipulated. (Dkt. #1647 at 11) Accordingly, the Court finds that the City has established this element of eligibility and will not discuss it further.

## VII. The Bankruptcy Court Has the Authority
## to Determine the Constitutionality of Chapter 9
## of the Bankruptcy Code and Public Act 436.

### A. The Parties' Objections to the Court's
### Authority Under *Stern v. Marshall*

Several objecting parties challenge the constitutionality of chapter 9 of the bankruptcy code under the United States Constitution. Citing the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), these parties also assert that this Court does not have the authority to determine the constitutionality of chapter 9.

Several objecting parties also challenge the constitutionality of P.A. 436 under the Michigan Constitution. Some of these parties also assert that this Court does not have the authority to determine the constitutionality of P.A. 436.

The Official Committee of Retirees filed a motion to withdraw the reference on the grounds that this Court does not have the authority to determine the constitutionality of chapter 9 or P.A. 436. It also filed a motion for stay of the eligibility proceedings pending the district court's resolution of that motion. In this Court's denial of the stay motion, it concluded that the Committee was unlikely to succeed on its arguments regarding this Court's lack of authority under Stern. *In re City of Detroit, Mich.*, 498 B.R. 776, 781-87 (Bankr. E.D. Mich. 2013). The following discussion is taken from that decision.

### B. *Stern*, *Waldman*, and *Global Technovations*

In *Stern v. Marshall*, the Supreme Court held that the "judicial power of the United States" can only be exercised by an Article III court and "that in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 131 S. Ct. at 2608-12. The Supreme Court held that a bankruptcy court therefore lacks the constitutional authority to enter a final judgment on a

debtor's counterclaim that is based on a private right when resolution of the counterclaim is not necessary to fix the creditor's claim. 131 S. Ct. at 2611-19. The Court described the issue before it as "narrow."[10] 131 S. Ct. at 2620.

The Sixth Circuit has adhered to a narrow reading of *Stern* in the two cases that have addressed the issue: *Onkyo Europe Elect. GMBH v. Global Technovations Inc.* (*In re Global Technovations Inc.*), 694 F.3d 705 (6th Cir. 2012), and *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

In *Global Technovations*, the Sixth Circuit summarized *Stern* as follows:

> *Stern's* limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id.* at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid.*

694 F.3d at 722. Based on this view of *Stern*, the *Global Technovations* court held that the bankruptcy court did have the authority to rule on the debtor's fraudulent transfer counterclaim against a creditor that had filed a proof of claim. *Id.*

In *Waldman*, the Sixth Circuit summarized the holding of *Stern* as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate—as in *Katchen* [*v. Landy*, 382 U.S. 323, 86 S. Ct. 467

---

[10] Outside of the Sixth Circuit, the scope of *Stern* has been somewhat controversial. *See generally* Joshua D. Talicska, *Jurisdictional Game Changer or Narrow Decision? Discussing the Potential Effects of Stern v. Marshall and Offering a Roadmap Through the Milieu*, 9 SETON HALL CIRCUIT REV. 31 (Spring 2013); Michael Fillingame, *Through a Glass, Darkly: Predicting Bankruptcy Jurisdiction Post-Stern*, 50 HOUS. L. REV. 1189 (Symposium 2013); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627 (Fall 2012); Hon. Joan N. Feeney, *Statement to the House of Representatives Judiciary Committee on the Impact of Stern v. Marshall*, 86 AM. BANKR. L.J. 357 (Summer 2012).

(1966)]—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline* [*v. Marathon Pipe Line Co.* 458 U.S. 50, 102 S. Ct. 2858 (1982)]; or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process[,]" 131 S. Ct. at 2618; then the bankruptcy court is constitutionally prohibited from entering final judgment. *Id.* at 2614.

698 F.3d at 919. Based on this view of *Stern*, the *Waldman* court held that the bankruptcy court lacked authority to enter a final judgment on the debtor's prepetition fraud claim against a creditor that was not necessary to resolve in adjudicating the creditor's claim against the debtor.

These cases recognize the crucial difference to which *Stern* adhered. A bankruptcy court may determine matters that arise directly under the bankruptcy code, such as fixing a creditor's claim in the claims allowance process. However, a bankruptcy court may not determine more tangential matters, such as a state law claim for relief asserted by a debtor or the estate that arises outside of the bankruptcy process, unless it is necessary to resolve that claim as part of the claims allowance process. *See City of Cent. Falls, R.I. v. Central Falls Teachers' Union* (*In re City of Cent. Falls*)*, R.I.*, 468 B.R. 36, 52 (Bankr. D.R.I. 2012) ("[A]lthough the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code.").

## C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case

The issue presently before the Court is the debtor's eligibility to file this chapter 9 case. A debtor's eligibility to file bankruptcy stems directly from rights established by the bankruptcy code. As quoted above, *Waldman* expressly held, "When a debtor pleads an action under federal bankruptcy law," the bankruptcy court's authority is constitutional. 698 F.3d at 919. In this

case, the debtor has done precisely that. In seeking relief under chapter 9, it has pled "an action under federal bankruptcy law."

The parties' federal and state constitutional challenges are simply legal arguments in support of their objection to the City's request for bankruptcy relief. Nothing in *Stern*, *Waldman*, or *Global Technovations* suggests any limitation on the authority of a bankruptcy court to consider and decide any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it.

More specifically, those cases explicitly state that a bankruptcy court can constitutionally determine all of the issues that are raised in the context of resolving an objection to a proof of claim, even those involving state law.[11] For the same reasons, a bankruptcy court can also

---

[11] The Supreme Court has never squarely held that claims allowance, which is at the heart of the bankruptcy process, falls within the permissible scope of authority for a non-Article III court as a "public right" or any other long-standing historical exception to the requirement of Article III adjudication. *Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, n.11, 109 S. Ct. 2782 (1989). However, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871 (1982) (plurality opinion), the Court came tantalizingly close when it stated, "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . [and] may well be a 'public right'[.]"

No court has ever held otherwise. On the contrary, the cases have uniformly concluded that the public rights doctrine is the basis of a bankruptcy court's authority to adjudicate issues that arise under the bankruptcy code. For example, in *Carpenters Pension Trust Fund for Northern California v. Moxley*, 2013 WL 4417594, at *4 (9th Cir. Aug. 20, 2013), the Ninth Circuit held:

> [T]he dischargeability determination is central to federal bankruptcy proceedings. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L.Ed.2d 945 (2006). The dischargeability determination is necessarily resolved during the process of allowing or disallowing claims against the estate, and therefore constitutes a public rights dispute that the bankruptcy court may decide.

Similarly, in *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 n.11 (3d Cir. 1999), the Third Circuit held, "The protections afforded a debtor under the Bankruptcy Code are congressionally created public rights."

*Footnote continued . . .*

constitutionally determine all issues that are raised in the context of resolving an objection to eligibility.

### D. Applying *Stern* in Similar Procedural Contexts

No cases address *Stern* in the context of eligibility for bankruptcy. Nevertheless, several cases do address *Stern* in the context of similar contested matters - conversion and dismissal of a case. Each case readily concludes that *Stern's* limitation on the authority of a bankruptcy court is inapplicable. For example, in *In re USA Baby, Inc.*, 674 F.3d 882, 884 (7th Cir. 2012), the Seventh Circuit held that nothing in *Stern* precludes a bankruptcy court from converting a chapter 11 case to chapter 7, stating, "we cannot fathom what bearing that principle might have

---

In *Kirschner v. Agoglia*, 476 B.R. 75, 79 (S.D.N.Y. 2012), the court stated, "[After *Stern*,] bankruptcy courts still have the ability to finally decide so-called 'public rights' claims that assert rights derived from a federal regulatory scheme and are therefore not the 'stuff of traditional actions,' as well as claims that are necessarily resolved in ruling on a creditor's proof of claim (e.g., a voidable preference claim)[.]"

Other cases also conclude that various matters arising within a bankruptcy case are within the public rights doctrine. *See., e.g.*, *In re Bataa/Kierland LLC*, 2013 WL 3805143, at *3 (D. Ariz. July 22, 2013) (scope of Chapter 11 debtor's rights under easement); *Hamilton v. Try Us, LLC*, 491 B.R. 561 (W.D. Mo. 2013) (validity and amount of common law claim against Chapter 7 debtor); *In re Prosser*, 2013 WL 996367 (D.V.I. 2013) (trustee's claim for turnover of property); *White v. Kubotek Corp.*, 2012 WL 4753310 (D. Mass. Oct. 2, 2012) (creditor's successor liability claim against purchaser of assets from bankruptcy estate); *United States v. Bond*, 2012 WL 4089648 (E.D.N.Y. Sept. 17, 2012) (trustee's claims for tax refund); *Turner v. First Cmty. Credit Union* (*In re Turner*), 462 B.R. 214 (Bankr. S.D. Tex. 2011) (violation of the automatic stay); *In re Whitley*, 2011 WL 5855242 (Bankr. S.D. Tex. Nov. 21, 2011) (reasonableness of fees of debtor's attorney); *In re Carlew*, 469 B.R. 666 (Bankr. S.D. Tex. 2012) (homestead exemption objection); *West v. Freedom Med., Inc.* (*In re Apex Long Term Acute Care-Katy, L.P.*), 465 B.R. 452, 458 (Bankr. S.D. Tex. 2011) (addressing preference actions, stating, "This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine."); *Sigillito v. Hollander* (*In re Hollander*), 2011 WL 6819022 (Bankr. E.D. La. Dec. 28, 2011) (nondischargeability for fraud).

In light of the unanimous holdings of these cases, the Court must conclude that its determination regarding the City's eligibility is within the public rights doctrine and therefore that the Court does have the authority to decide the issue, including all of the arguments that the objectors make in their objections.

on the present case."[12]  In *Mahanna v. Bynum*, 465 B.R. 436 (W.D. Tex. 2011), the court held

that *Stern* does not prohibit the bankruptcy court from dismissing the debtors' chapter 11 case.

The court concluded, "[T]his appeal is entirely frivolous, and constitutes an unjustifiable waste

of judicial resources[.]"  *Id.* at 442.  In *In re Thalmann*, 469 B.R. 677, 680 (Bankr. S.D. Tex.

2012), the court held that *Stern* does not prohibit a bankruptcy court from determining a motion

to dismiss a case on the grounds of bad faith.[13]  This line of cases strongly suggests that *Stern*

likewise does not preclude a bankruptcy court from determining eligibility.

### E. The Objectors Overstate
### the Scope of *Stern*.

Implicitly recognizing how far its objection to this Court's authority stretches *Stern*, the

objectors argue that two aspects of their objection alter the analysis of *Stern* and its application

here.  The first is that their objections raise important issues under both the United States

Constitution and the Michigan Constitution.  The second is that strong federalism considerations

warrant resolution of its objection by an Article III court.  Neither consideration, however, is

sufficient to justify the expansion of *Stern* that the objectors argue.

### 1. *Stern* Does Not Preclude This Court
### from Determining Constitutional Issues.

First, since *Stern* was decided, non-Article III courts have considered constitutional

issues, always without objection.

---

[12] *See also In re Gow Ming Chao*, 2011 WL 5855276 (Bankr. S.D. Tex. Nov. 21, 2011).
[13] *See also In re McMahan*, 2012 WL 5267017 (Bankr. S.D. Tex. Oct. 25, 2012); *In re Watts*, 2012 WL 3400820 (Bankr. S.D. Tex. Aug. 9, 2012).

Both bankruptcy courts and bankruptcy appellate panels have done so.[14]    More specifically, and perhaps more on point, in two recent chapter 9 cases, bankruptcy courts addressed constitutional issues without objection.  *Association of Retired Employees v. City of Stockton, Cal. (In re City of Stockton, Cal.)*, 478 B.R. 8 (Bankr. E.D. Cal. 2012) (holding that retirees' contracts could be impaired in the chapter 9 case without offending the constitution); *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (upholding the constitutionality of a Pennsylvania statute barring financially distressed third class cities from filing bankruptcy).

In addition, the Tax Court, a non-Article III court, has also examined constitutional issues, without objection.[15]  Likewise, the Court of Federal Claims, also a non-Article III court,

---

[14] *See, e.g.*, *Williams v. Westby (In re Westby)*, 486 B.R. 509 (10th Cir. BAP 2013) (upholding the constitutionality of the Kansas bankruptcy-only state law exemptions); *Res. Funding, Inc. v. Pacific Continental Bank (In re Washington Coast I, L.L.C.)*, 485 B.R. 393 (9th Cir. BAP 2012) (upholding the constitutionality of the final order entered by the bankruptcy court); *Richardson v. Schafer (In re Schafer)*, 455 B.R. 590 (6th Cir. BAP 2011), *rev'd on other grounds*, 689 F.3d 601 (6th Cir. 2012) (addressing the constitutionality of the Michigan bankruptcy-only state law exemptions); *Old Cutters, Inc. v. City of Hailey (In re Old Cutters, Inc.)*, 488 B.R. 130 (Bankr. D. Idaho 2012) (invalidating a city's annexation fee and community housing requirements); *In re Washington Mut., Inc.*, 485 B.R. 510 (Bankr. D. Del. 2012) (holding Oregon's corporate excise tax unconstitutional under the Commerce Clause); *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012) (upholding Georgia's bankruptcy-specific exemption scheme); *In re Fowler*, 493 B.R. 148 (Bankr. E.D. Cal. 2012) (upholding the constitutionality of California's statute fixing the interest rate on tax claims); *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (upholding the constitutionality of 11 U.S.C. § 707(b)); *Zazzali v. Swenson (In re DBSI, Inc.)*, 463 B.R. 709, 717 (Bankr. D. Del. 2012) (upholding the constitutionality of 11 U.S.C. § 106(a)); *Proudfoot Consulting Co. v. Gordon (In re Gordon)*, 465 B.R. 683 (Bankr. N.D. Ga. 2012) (upholding the constitutionality of 11 U.S.C. § 706(a)); *South Bay Expressway, L.P. v. County of San Diego (In re South Bay Expressway, L.P.)*, 455 B.R. 732 (Bankr. S.D. Cal. 2011) (holding unconstitutional California's public property tax exemption for privately-owned leases of public transportation demonstration facilities).

[15] *See, e.g.*, *Field v. C.I.R.*, 2013 WL 1688028 (Tax Ct. 2013) (holding that the tax classification on the basis of marital status that was imposed by requirement that taxpayer file joint income-tax return in order to be eligible for tax credit for adoption expenses did not violate Equal Protection clause); *Begay v. C.I.R.*, 2013 WL 173362 (Tax Ct. 2013) (holding that the relationship classification for child tax credit did not violate Free Exercise Clause); *Byers v.*

*Footnote continued . . .*

has considered constitutional claims, without objection. This was done perhaps most famously in *Beer v. United States*, 111 Fed. Cl. 592 (Fed. Cl. 2013), which is a suit by Article III judges under the Compensation Clause of the United States Constitution.

*Stern* does not change this status quo, and nothing about the constitutional dimension of the objectors' eligibility objections warrants the expansion of *Stern* that they assert. As *Stern* itself reaffirmed, "We do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute[.]" 131 S. Ct. at 2620. Expanding *Stern* to the point where it would prohibit bankruptcy courts from considering issues of state or federal constitutional law would certainly significantly change the division of labor between the bankruptcy courts and the district courts.[16]

---

*C.I.R.*, 2012 WL 265883 (Tax Ct. 2012) (rejecting the taxpayer's challenge to the authority of an IRS office under the Appointments Clause).

[16] Only one case suggests otherwise. *Picard v. Flinn Invs., LLC*, 463 B.R. 280 (S.D.N.Y. 2011). That case did state in dicta in a footnote, "If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, *a fortiori*, litigants' interest in having the Article III courts interpret the Constitution." *Id.* at 288 n.3.

This single sentence cannot be given much weight. First, it is only dicta. Second, it is against the manifest weight of the case authorities. Third, the quote assumes, without analysis, that the litigants do have an interest in having Article III courts interpret the Constitution, and thus bootstraps its own conclusion. Fourth, nothing in the *Flinn Investments* case states or even suggests that *Stern* itself prohibits a bankruptcy court from ruling on a constitutional issue where it otherwise has the authority to rule on the claim before it. Finally, the district court that issued *Flinn Investments* has now entered an amended standing order of reference in bankruptcy cases to provide that its bankruptcy court should first consider objections to its authority that parties raise under *Stern v. Marshall*. Apparently, that district court's position now is that *Stern* does not preclude the bankruptcy court from determining constitutional issues, including the constitutional issue of its own authority. The order is available at http://www.nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.

Two other cases are cited in support of the position that only an Article III court can determine a constitutional issue: *TTOD Liquidation, Inc. v. Lim* (*In re Dott Acquisition, LLC*), 2012 WL 3257882 (E.D. Mich. July 25, 2012), and *Picard v. Schneiderman* (*In re Madoff Secs.*), 492 B.R. 133 (S.D.N.Y. 2013). Both are irrelevant to the issue. *Dott Acquisition* did discuss

*Footnote continued . . .*

## 2. Federalism Issues Are Not
## Relevant to a *Stern* Analysis.

The objectors' federalism argument is even more perplexing and troubling. Certainly the objectors are correct that a ruling on whether the City was properly authorized to file this bankruptcy case, as required for eligibility under 11 U.S.C. § 109(c)(2), will require the interpretation of state law, including the Michigan Constitution.

However, ruling on state law issues is required in addressing many issues in bankruptcy cases. As the Supreme Court has observed, "[B]ankruptcy courts [] consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007). Concisely summarizing the reality of the bankruptcy process and the impact of *Stern* on it, the court in *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011), concluded:

> [*Stern*] certainly did not hold that a Bankruptcy Judge cannot ever decide a state law issue. Indeed, a large portion of the work of a Bankruptcy Judge involves actions in which non-bankruptcy issues must be decided and that 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process,' [131 S. Ct.] at 2618, for example, claims disputes, actions to bar dischargeability, motions for stay relief, and others. Those issues are likely within the 'public rights' exception as defined in *Stern*.

Other cases also illustrate the point.[17]

---

*Stern* but only in the unremarkable context of withdrawing the reference on a fraudulent transfer action. *Schneiderman* did not address a *Stern* issue at all, or even cite the case.

[17] *See, e.g.*, *Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) (quoting *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011)) ("It is clear" from *Stern v. Marshall* and other Supreme Court precedent that "the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim."); *Anderson v. Bleckner* (*In re Batt*), 2012 WL 4324930, at *2 (W.D. Ky. Sept. 20, 2012) ("*Stern* does not bar the exercise of the Bankruptcy Court's jurisdiction in any and all circumstances where a party to an adversary

*Footnote continued . . .*

The distinction is clear. While in some narrow circumstances *Stern* prohibits a non-Article III court from adjudicating a state law claim for relief, a non-Article III court may consider and apply state law as necessary to resolve claims over which it does have authority under *Stern*. The mere fact that state law must be applied does not by itself mean that *Stern* prohibits a non-Article III court from determining the matter.

Moreover, nothing about a chapter 9 case suggests a different result. In *City of Cent. Falls, R.I.*, 468 B.R. at 52, the court stated, "Nor did [*Stern*] address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy."

The troubling aspect of the objectors' federalism argument is that it does not attempt to define, even vaguely, what interest of federalism is at stake here.

In *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012), the Supreme Court stated, "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Accordingly, federalism is about the federal and state governments respecting each other's sovereignty. It has nothing to do with the requirements of Article III or, to use the phraseology of *Stern*, with the "division of labor" between the district courts and the bankruptcy courts.[18] 131 S. Ct. at 2620. *See also City of Cent. Falls, R.I.*, 468 B.R. at 52, quoted above.

---

proceeding has not filed a proof of claim, or where the issue in an adversary proceeding is a matter of state law.").

[18] Genuine federalism concerns are fully respected in bankruptcy through the process of permissive abstention under 28 U.S.C. § 1334(c)(1).

### F. Conclusion Regarding the *Stern* Issue

For these reasons, the Court concludes that it does have the authority to determine the constitutionality of chapter 9 under the United States Constitution and the constitutionality of P.A. 436 under the Michigan Constitution.

## VIII. Chapter 9 Does Not Violate
## the United States Constitution.

The objecting parties argue that chapter 9 of the bankruptcy code violates several provisions of the United States Constitution, both on its face and as applied in this case. The Court will first address the arguments that chapter 9 is facially unconstitutional under the Bankruptcy Clause of Article I, Section 8, and the Contracts Clause of Article I, Section 10 of the United States Constitution. The Court will then address the argument that chapter 9, on its face and as applied, violates the Tenth Amendment to the United States Constitution and the principles of federalism embodied therein.

### A. Chapter 9 Does Not Violate the Uniformity Requirement
### of the Bankruptcy Clause of the United States Constitution.

Article I, Section 8 of the United States Constitution provides: "The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."

The objecting parties, principally AFSCME, assert chapter 9 violates the uniformity requirement of the United States Constitution because chapter 9 "ced[es] to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states." AFSCME's Corrected Objection to Eligibility, ¶ 58 at 25 (citing M.C.L. § 141.1558). (Dkt. #505) AFSCME argues that this is particularly so in Michigan, where P.A. 436 allows the governor to exercise discretion when

determining whether to authorize a municipality to seek chapter 9 relief, and also allows the governor to "attach whichever contingencies he wishes." *Id.*

## 1. The Applicable Law

The Supreme Court has addressed the uniformity requirement in several cases. In *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S. Ct. 857 (1902), the Court held that the incorporation into the bankruptcy law of state laws relating to exemptions did not violate the uniformity requirement of the United States Constitution. The Court stated, "The general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.* at 190.

In *Stellwagen v. Clum*, 245 U.S. 605, 38 S. Ct. 215 (1918), the Court upheld the Bankruptcy Act's incorporation of varying state fraudulent conveyance statutes, despite the fact that the laws "may lead to different results in different states." *Id.* at 613.

In *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 159, 95 S. Ct. 335 (1974), the Court held, "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems."

The Supreme Court has struck down a bankruptcy statute as non-uniform only once. In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 102 S. Ct. 1169 (1982), the Court struck down a private bankruptcy law that affected only the employees of a single company. The Court concluded, "The uniformity requirement, however, prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor. To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id.* at 473.

More recently, the Sixth Circuit has addressed the uniformity requirement in two cases. In *Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008), the court concluded, "Over the last century, the Supreme Court has wrestled with the notion of geographic uniformity, ultimately concluding that it allows different effects in various states due to dissimilarities in state law, so long as the federal law applies uniformly among classes of debtors." Summarizing the Supreme Court's decisions in *Moyses*, *Stellwagen*, and *Blanchette*, the court stated, "Congress does not exceed its constitutional powers in enacting a bankruptcy law that permits variations based on state law or to solve geographically isolated problems." *Id.* at 353.

In *Richardson v. Schafer* (*In re Schafer*), 689 F.3d 601 (6th Cir. 2012), the court stated, "the Bankruptcy Clause shall act as 'no limitation upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation throughout the United States.'" *Id.* at 611 (quoting *Leidigh Carriage Co. v. Stengel*, 95 F. 637, 646 (6th Cir. 1899)). It added, "*Schultz* clarified that it is not the *outcome* that determines the uniformity, but the uniform *process* by which creditors and debtors in a certain place are treated." *Id.*

## 2. Discussion

Chapter 9 does exactly what these cases require to meet the uniformity requirement of the Bankruptcy Clause of the United States Constitution. The "defined class of debtors" to which chapter 9 applies is the class of entities that meet the eligibility requirements of 11 U.S.C. § 109(c). One such qualification is that the entity is "specifically authorized . . . to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter[.]" § 109(c)(2). As *Moyses* and *Stellwagen* specifically held, it is of no consequence in the uniformity analysis that this

requirement of state authorization to file a chapter 9 case may lead to different results in different states.

It appears that AFSCME objects to the lack of uniformity that may arise from the differing circumstances of municipalities that the governor might authorize to file a chapter 9 petition. That it not the test. Rather, the test is whether chapter 9 applies uniformly to all chapter 9 debtors. It does.

Accordingly, the Court concludes that chapter 9 satisfies the uniformity requirement of the Bankruptcy Clause of the United States Constitution.

## B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.

The Contracts Clause of the United States Constitution, which is Article I, Section 10, provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts, . . ." AFSCME argues that chapter 9 violates the Contracts Clause. This argument is frivolous. Chapter 9 is a federal law. Article I, Section 10 does not prohibit Congress from enacting a "Law impairing the Obligation of Contracts." *Id.*

As the court stated in *In re Sanitary & Imp. Dist., No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989):

> The Court further concludes that the Bankruptcy Code adopted pursuant to the United States Constitution Article 1, Section 8 permits the federal courts through confirmation of a Chapter 9 plan to impair contract rights of bondholders and that such impairment is not a violation by the state or the municipality of Article 1, Section 10 of the United States Constitution which prohibits a state from impairing such contract rights.

*Id.* at 973.

Or, more succinctly stated, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails

impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

## C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

This Amendment reflects the concept that the United States Constitution "created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395 (1991); *see also United States v. Darby*, 312 U.S. 100, 124, 61 S. Ct. 451 (1941) (The Tenth Amendment "states but a truism that all is retained which has not been surrendered.").

The Supreme Court's "consistent understanding" of the Tenth Amendment has been that "[t]he States unquestionably do retain a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *New York v. United States*, 505 U.S. 144, 156, 112 S. Ct. 2408 (1992) (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549, 105 S.Ct. 1005 (1985) (quotation marks omitted); *see also South Carolina v. Baker*, 485 U.S. 505, 511 n.5, 108 S. Ct. 1355 (1988) ("We use 'the Tenth Amendment' to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution."); *United States v. Sprague*, 282 U.S. 716, 733, 51 S. Ct. 220 (1931) ("The Tenth Amendment was intended to confirm the understanding of the people at the time the Constitution was adopted, that powers not granted to the United States were reserved to the states or to the people.").

The objecting parties argue that chapter 9 violates these principles of federalism because, in the words of AFSCME, it "allows Congress to set the rules controlling State fiscal self-management—an area of exclusive state sovereignty." AFSCME's Corrected Objection to Eligibility, ¶ 40 at 15-16. (Dkt. #505) The Court interprets this argument as a facial challenge to the constitutionality of chapter 9. The as-applied challenge, as stated by the Retiree Committee and other objecting parties, is that *if* the State of Michigan can properly authorize the City of Detroit to file for chapter 9 relief without the explicit protection of accrued pension rights for individual retired city employees, then chapter 9 "must be found to be unconstitutional as permitting acts in derogation of Michigan's sovereignty." Retiree Committee Objection to Eligibility, ¶ 3 at 1-2. (Dkt. #805)

Before addressing the merits of these arguments, however, the Court must first address two preliminary issues that the United States raised in its "Memorandum in Support of Constitutionality of Chapter 9 of Title 11 of the United States Code" – standing and ripeness. (Dkt. #1149)

### 1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing.

The United States argues that the creditors who assert that chapter 9 violates the Tenth Amendment as applied in this case lack standing and that this challenge is not ripe for adjudication at this stage in the case. [19] The Court concludes that the objecting parties do have standing and that their challenge is now ripe for determination.

_____

[19] The standing and ripeness issues are discussed here because the United States and the City framed this issue in the context of the Tenth Amendment challenge to chapter 9 of the

*Footnote continued . . .*

### a. Standing

"As a rule, a party must have a 'personal stake in the outcome of the controversy' to satisfy Article III." *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 852 (6th Cir. 2002) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703 (1962)).

In a bankruptcy case, the standing of a party requesting to be heard turns on whether the party is a "party in interest." *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011). A party in interest is one who "has a sufficient stake in the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).

11 U.S.C. § 1109(b), provides, "A party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 901(a) makes this provision applicable in a chapter 9 case.

In the chapter 9 case of *In re Barnwell County Hosp.*, 459 B.R. 903, 906 (Bankr. D.S.C. 2011), the court stated, "'Party in interest' is a term of art in bankruptcy. Although not defined in the Bankruptcy Code, it reflects the unique nature of a bankruptcy case, where the global financial circumstances of a debtor are resolved with respect to all of debtor's creditors and other affected parties."

In a chapter 9 case on point, *In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 403 (Bankr. E.D.N.Y. 2011), the court held that a party to an executory contract with a municipal debtor has standing to object to the debtor's eligibility.

---

bankruptcy code. To the extent that the argument might also be made to the other constitutional challenges to chapter 9, the same considerations would apply and would lead to the same conclusion.

Similarly, in *In re Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. 610 (D .Colo. 1992), also a chapter 9 case, the court stated, "[M]any courts have concluded that the party requesting standing must either be a creditor of a debtor . . . or be able to assert an equitable claim against the estate." *Id.* at 616 (citation and quotation marks omitted). *See also In re Addison Community Hospital Authority*, 175 B.R. 646 (Bankr. E.D. Mich. 1994) (holding that creditors are parties in interest and have standing to be heard).

Under 11 U.S.C. § 1109(b) and these cases, it is abundantly clear that the objecting parties, who are creditors with pension claims against the City, have standing to assert their constitutional claim as part of their challenge to this bankruptcy case.

Nevertheless, the United States asserts that *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992), precludes standing here. In that case, the Supreme Court adopted this test to determine whether a party has standing under Article III of the constitution:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'". Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61 (internal citations omitted). The United States asserts that the objecting parties do not meet this standard because their injury is not "imminent" at this stage of the proceedings.

The Court concludes that the contours of standing under 11 U.S.C. § 1109(b) are entirely consistent with the constitutional test for standing that the Supreme Court adopted in *Lujan*. A creditor has a direct, personal stake in the outcome of a bankruptcy case and thus has standing to

challenge the bankruptcy filing.  Accordingly, the Court concludes that every creditor of the City

of Detroit has standing to object to its eligibility to be a debtor under chapter 9.

### b. Ripeness

The United States argues that the issue of whether chapter 9 is constitutional as applied in

this case is not ripe for determination at this time.  The City joins in this argument.  City's Reply

to Retiree Committee's Objection to Eligibility at 3-5. (Dkt. #918)

The premise of the argument is that the filing of the case did not result in the impairment

of any pension claims.  Thus the United States argues that this issue will be ripe only when the

City proposes a plan that would impair pensions if confirmed.  Until then, it argues, their injury

is speculative.[20]

In *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533 (6th Cir. 2010),

the Sixth Circuit summarized the case law on the ripeness doctrine:

> The ripeness doctrine encompasses "Article III limitations on
> judicial power" and "prudential reasons" that lead federal courts to
> "refus[e] to exercise jurisdiction" in certain cases.  *Nat'l Park
> Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S. Ct.
> 2026, 155 L.Ed.2d 1017 (2003).  The "judicial Power" extends
> only to "Cases" and "Controversies," U.S. Const. art. III, § 2, not
> to "any legal question, wherever and however presented," without
> regard to its present amenability to judicial resolution.  *Warshak v.
> United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc).  And
> the federal courts will not "entangl[e]" themselves "in abstract
> disagreements" ungrounded in the here and now.  *Abbott Labs. v.
> Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L.Ed.2d 681
> (1967); see *Warshak*, 532 F.3d at 525.  Haste makes waste, and the
> "premature adjudication" of legal questions compels courts to
> resolve matters, even constitutional matters, that may with time be

---

[20] The United States agrees that the objecting parties' facial challenge to chapter 9 is
appropriate for consideration at this time.  Memorandum in Support of Constitutionality at 3.
(Dkt. #1149)

satisfactorily resolved at the local level, *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807, 123 S.Ct. 2026; *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 617 (6th Cir. 2008), and that "may turn out differently in different settings," *Warshak*, 532 F.3d at 525.

To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute "fit" for a court decision in the sense that it arises in "a concrete factual context" and involves "a dispute that is likely to come to pass"? and (2) what are the risks to the claimant if the federal courts stay their hand? *Warshak*, 532 F.3d at 525; *see Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. 1507.

*Id.* at 537.

Although the argument of the United States has some appeal,[21] the Court must reject it, largely for the same reasons that it found that the objecting parties have standing. The ultimate issue before the Court at this time is whether the City is eligible to be a debtor in chapter 9. This dispute arises in the concrete factual context of the City of Detroit filing this bankruptcy case under chapter 9 of the bankruptcy code and the objecting parties challenging the constitutionality of that very law. This dispute is not an "abstract disagreement ungrounded in the here and now." It is here and it is now.

The Court further concludes that as a matter of judicial prudence, resolving this issue now will likely expedite the resolution of this bankruptcy case. The Court notes that the parties have fully briefed and argued the merits. Further, if the Tenth Amendment challenge to chapter 9 is resolved now, the parties and the Court can then focus on whether the City's plan (to be filed shortly, it states) meets the confirmation requirements of the bankruptcy code.

---

[21] Early in the case, the Court expressed its doubts about the ripeness of this constitutional issue in the eligibility context. The Court was concerned that the issue of whether pension rights can be impaired in bankruptcy would be more appropriately considered a confirmation issue, as the United States argues now. At the request of the objecting parties, however, the Court reconsidered that position and now agrees that the issue is ripe at this point.

Accordingly, the Court concludes that the objecting parties' challenge to chapter 9 of the bankruptcy code as applied in this case is ripe for determination at this time.

## 2. The Supreme Court Has Already Determined That Chapter 9 Is Constitutional.

The question of whether a federal municipal bankruptcy act can be administered consistent with the principles of federalism reflected in the Tenth Amendment has already been decided. In *United States v. Bekins*, 304 U.S. 27, 58 S. Ct. 811 (1938), the United States Supreme Court specifically upheld the Municipal Corporation Bankruptcy Act, 50 Stat. 653 (1937), over objections that the statute violated the Tenth Amendment. *Bekins*, 304 U.S. at 53-54.

In upholding the 1937 Act, the *Bekins* court found:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law. It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power. . . . The reservation to the States by the Tenth Amendment protected, and did not destroy, their right to make contracts and give consents where that action would not contravene the provisions of the Federal Constitution.

*Bekins*, 304 U.S. at 51-2.

The Court further noted that two years earlier, it had struck down a previous version of the federal municipal bankruptcy law for violating the Tenth Amendment. *Ashton v. Cameron*

*County Water Improvement Dist. No. 1*, 298 U.S. 513, 56 S. Ct. 892 (1936).[22]  The Court found,

however, that in the 1937 Act, Congress had "carefully" amended the law "to afford no ground

for [the Tenth Amendment] objection."  *Bekins*, 304 U.S. at 50.  The Court quoted approvingly,

and at length, from a House of Representatives Committee report on the 1937 Act:

---

[22] It is interesting that Justice Cardozo did not participate in the *Bekins* decision.  304 U.S. at 54.  In his dissent in *Ashton* two years before, he made this astute observation about the economic realities of municipal bankruptcies:

> If voluntary bankruptcies are anathema for governmental units, municipalities and creditors have been caught in a vise from which it is impossible to let them out.  Experience makes it certain that generally there will be at least a small minority of creditors who will resist a composition, however fair and reasonable, if the law does not subject them to a pressure to obey the general will.  This is the impasse from which the statute gives relief. . . .  *To hold that this purpose must be thwarted by the courts because of a supposed affront to the dignity of a state, though the state disclaims the affront and is doing all it can to keep the law alive, is to make dignity a doubtful blessing.*  Not by arguments so divorced from the realities of life has the bankruptcy power been brought to the present state of its development during the century and a half of our national existence.

298 U.S. at 541 (emphasis added).  He then made this argument regarding the constitutional foundation for municipal bankruptcy law, which, arguably, the Court in *Bekins* adopted:

> The act does not authorize the states to impair through their own laws the obligation of existing contracts.  Any interference by the states is remote and indirect.  At most what they do is to waive a personal privilege that they would be at liberty to claim.  *If contracts are impaired, the tie is cut or loosened through the action of the court of bankruptcy approving a plan of composition under the authority of federal law.  There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard.*  Impairment by the central government through laws concerning bankruptcies is not forbidden by the Constitution.  Impairment is not forbidden unless effected by the states themselves.  No change in obligation results from the filing of a petition by one seeking a discharge, whether a public or a private corporation invokes the jurisdiction.  *The court, not the petitioner, is the efficient cause of the release.*

*Id.* at 541-42 (citations omitted) (emphasis added).

> There is no hope for relief through statutes enacted by the States, because the Constitution forbids the passing of State laws impairing the obligations of existing contracts.  Therefore, relief must come from Congress, if at all.  The committee are not prepared to admit that the situation presents a legislative no-man's land.  It is the opinion of the committee that the present bill removes the objections to the unconstitutional statute, and gives a forum to enable those distressed taxing agencies which desire to adjust their obligations and which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.

*Id.* at 51 (quotation marks omitted).

*Bekins* thus squarely rejects the challenges that the objecting parties assert to chapter 9 in this case and it has not been overruled.

It is well-settled that this Court is bound by the decisions of the Supreme Court.  In *Agostini v. Felton*, 521 U.S. 203, 117 S. Ct. 1997 (1997), the Court stated, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."  *Id.* at 237 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917 (1989) (quotation marks omitted)).  *See also Grutter v. Bollinger*, 288 F.3d 732, 744 (6th Cir. 2002).

Nevertheless, the objecting parties assert that subsequent amendments to the municipal bankruptcy statute and subsequent Supreme Court decisions regarding the Tenth Amendment compel the conclusion that *Bekins* is no longer good law, or at least that it is inapplicable in this case.  Specifically, in its objection, AFSCME argues that since *Bekins* was decided, "intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes, but cannot consent to any derogation of their sovereign powers."   AFSCME's

Corrected Objection to Eligibility, ¶ 44 at 17. (Dkt. #505)  Although the Court concludes that *Bekins* remains good law and is controlling here, the Court will address these arguments.

### 3. Changes to Municipal Bankruptcy Law Since 1937
### Do Not Undermine the Continuing Validity of *Bekins*.

The only relevant change to municipal bankruptcy law that AFSCME identifies is the addition of § 903 to the bankruptcy code, the substance of which was added in 1946 as § 83(i) of the 1937 Act.  That section provided, "[N]o State law prescribing a method of composition of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition, and no judgment shall be entered under such State law which would bind a creditor to such composition without his consent."

In slightly different form, § 903 of the bankruptcy code now provides:

> This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but—
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
> (2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

11 U.S.C. § 903.

AFSCME argues that this provision created a new exclusivity in chapter 9 that forces the states to adopt the federal scheme for adjusting municipal debts.  This exclusivity, the argument goes, deprives the states of the ability to enact state legislation providing for municipal debt adjustment, which is inconsistent with the principles of federalism set forth in *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), and *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997).

This argument fails on two levels. First, other than in one limited instance, *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502, 62 S. Ct. 1129 (1942), courts have always interpreted the Contracts Clause of the United States Constitution to prohibit the states from enacting legislation providing for municipal bankruptcies. The 1946 amendment that added the provision that is now § 903 did not change this law.

Second, neither *New York* nor *Printz* undermine *Bekins*. As developed above, at its core, *Bekins* rests on state consent. As will be developed below, like *Bekins*, both *New York* and *Printz* are also built on the concept of state consent. Indeed, it was the lack of state consent to the federal programs in those cases that caused the Supreme Court to find them unconstitutional.

### a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws.

The Contracts Clause of the United States Constitution, Article I, Section 10, states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"

Applying this clause, the Supreme Court has stated, "When a State itself enters into a contract, it cannot simply walk away from its financial obligations." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.14, 103 S. Ct. 697 (1983). "It long has been established that the Contracts Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17, 97 S. Ct. 1505 (1977) (citing *Dartmough College v. Woodward*, 4 L. Ed. 629 (1819); *Fletcher v. Peck*, 3 L. Ed. 162 (1810)). Section 903 simply restates this principle.

Moreover, contrary to AFSCME's assertion, it is clear that *Bekins* fully considered this issue. It found, "The natural and reasonable remedy through [bankruptcy] was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation." *Bekins*, 304 U.S. at 54.

### b. *Asbury Park* Is Limited to Its Own Facts.

As noted above, only one case, *Asbury Park*, is to the contrary. The Court concludes, however, that this case represents a very narrow departure from these principles and its holding is limited to the unique facts of that case. Indeed, the Court itself stated, "We do not go beyond the case before us." 316 U.S. at 516.

The adjustment plan at issue in *Asbury Park* was "authorized" by the New Jersey state court on July 21, 1937. This was after the federal municipal bankruptcy law was struck down in *Ashton* and before the enactment of the municipal bankruptcy act that *Bekins* approved. Moreover, in *Asbury Park*, the bonds affected by the plan of adjustment, which the Court found were worthless prior to the adjustment, were reissued without a reduction in the principal obligation and became significantly more valuable as a result of the adjustment. *Asbury Park*, 316 U.S. at 507-08, 512-13.

The limited application of *Asbury Park* to its own facts has been repeatedly recognized. The cases now firmly establish that the Contracts Clause of the United States Constitution bars a state from enacting municipal bankruptcy legislation. In U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 27, 97 S. Ct. 1505 (1977), the Supreme Court observed, "The only time in this century that alteration of a municipal bond contract has been sustained by this Court was in [*Asbury Park*]."[23]

---

[23] Interestingly, in *U.S. Trust Co.*, the Court further observed that when a State seeks to impair its own contracts, "complete deference to a legislative assessment of [the] reasonableness and necessity [of the impairment] is not appropriate because the State's self-interest is at stake." *Id.* 431 U.S. at 26. For that reason, "a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id.* at 30-31. The Constitution astutely recognizes that a federal court brings no such self-interest to a municipal bankruptcy case.

In *In re Jefferson Cnty., Ala.*, 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), *aff'd sub nom.*

*Mosley v. Jefferson Cnty.* (*In re Jefferson Cnty.*), 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012),

the court stated, "A financially prostrate municipal government has one viable option to resolve

debts in a non-consensual manner. It is a bankruptcy case. Outside of bankruptcy, non-

consensual alteration of contracted debt is, at the very least, severely restricted, if not

impossible." The court added, "There has been only one instance in this and the last century

when the Supreme Court of the United States has sustained the alteration of a municipal bond

contract outside a bankruptcy case." *Id.* at 279 n.21. It further observed that *Asbury Park* has

since been "distinguished and its precedent status, if any, is dubious." *Id.*

Accordingly, the Court concludes that the addition of § 903 to our municipal bankruptcy

law does not undermine the continuing validity of *Bekins*.

### 4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins*.

#### a. *New York v. United States*

In *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), the Supreme Court

considered a Tenth Amendment objection to the Low-Level Radioactive Waste Policy

Amendments Act of 1985, 42 U.S.C. § 2021b, *et seq*. Congress enacted that law to address the

problem of identifying storage sites for low-level radioactive waste. 505 U.S. at 152-54. The

Act provided three different incentives for each state to take responsibility over the nuclear waste

generated within its borders. *Id.*

The first was a monetary incentive to share in the proceeds of a surcharge on radioactive

waste received from other states, based on a series of milestones. 505 U.S. at 171. The Court

found this program constitutional because it was, in fact, nothing more than an incentive to the

state to regulate. Congress had "placed conditions—the achievement of the milestones—on the receipt of federal funds." *Id.* at 171. The states could choose to achieve these milestones, and receive the federal funds, or not. *Id.* at 173. "[T]he location of such choice in the States is an inherent element in any conditional exercise of Congress' spending power." *Id.*

The Court then stated, "In the second set of incentives, Congress has authorized States and regional compacts with disposal sites gradually to increase the cost of access to the sites, and then to deny access altogether, to radioactive waste generated in States that do not meet federal deadlines." *Id.* The Court held that this provision was also constitutional, again because the states retained the choice to participate in the federal program or not.

The Court explained, "Where federal regulation of private activity is within the scope of the Commerce Clause, we have recognized the ability of Congress to offer States the *choice* of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id.* at 173-74 (emphasis added). "[T]he choice remains at all times with the residents of the State, not with Congress. The State need not expend any funds, or participate in any federal program, if local residents do not view such expenditures or participation as worthwhile." *Id.* at 174.

These two provisions of the Act passed constitutional muster precisely because states could consent to participation in the federal program or withhold their consent as they saw fit. The Court held that these two programs:

> represent permissible conditional exercises of Congress' authority under the Spending and Commerce Clauses respectively, in forms that have now grown commonplace. Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command. The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.

*Id.* at 185.

In contrast, the third of these provisions - the "take title" provision" - forced the states to choose between either regulating the disposal of radioactive waste according to Congress's standards or "taking title" to that waste, thereby assuming all the liabilities of its producers. *Id.* at 174-75. The Court held that this provision violated the Tenth Amendment, because it offered the states no choice but to do the bidding of the federal government. This provision, the Court determined, did not ask for state "consent" but instead "commandeered" the states.

The Court's precedent is clear that the federal government may not require the states to regulate according to federal terms. "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id.* at 162. "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id.* at 161 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288, 101 S. Ct. 2352 (1981)).

The "take title" provision did just that. Although guised as a "so-called incentive" scheme, the Court found that the "take title" provisions offered the states no real choice at all.

> Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two.

*Id.* at 176. The "take title" provisions did not give the states what the Court deemed the constitutionally "critical alternative[.]" *Id.* at 176. "A State may not decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." *Id.* at 177.

The cornerstone of *United States v. New York*, then, is state consent.  The federal government may constitutionally encourage, incentivize, or even entice, states to do the federal government's bidding.  It may not command them to do so.

### b. *Printz v. United States*

The Supreme Court reiterated these principles in *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997), and extended them to Congressional efforts to compel state officers to act.  At issue in *Printz* were provisions of the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922, that required state and local law enforcement officers to carry out background checks for firearms dealers in connection with proposed sales of firearms.  It also required that the background checks be performed in accordance with the federal law.  *Printz*, 521 U.S. at 903-04.

The Court concluded that while state and local governments remained free to voluntarily participate in the background check program, the "mandatory obligation imposed on [law enforcement officers] to perform background checks on prospective handgun purchasers plainly runs afoul [of the Constitution]."  *Id.* at 933.  Again, the stumbling block was a lack of state consent:

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program.  Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly.  The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.

521 U.S. at 935.

### c. *New York* and *Printz*
### Do Not Undermine *Bekins*.

*Printz* acknowledged that states could volunteer to carry out federal law.  *Id.* at 910-11, 916-17 (describing the history of state officers carrying out federal law as involving "voluntary" action on the part of the states).  Concurring, Justice O'Connor added, "Our holding, of course, does not spell the end of the objectives of the Brady Act.  States and chief law enforcement officers may voluntarily continue to participate in the federal program."  *Id.* at 936.

By the same token, *New York* acknowledged that states can and do enter into voluntary contracts with the federal government whereby states agree to legislate according to federal terms in exchange for some federal benefit or forbearance.  *New York*, 505 U.S. at 166-67.

What makes those federal programs constitutionally permissible, and the commandeering at issue in *New York* and *Printz* impermissible, is consent, and nothing more.  If the state is acting voluntarily, it is free to engage with the federal government across a broad range of subject areas.  The Tenth Amendment to the United States Constitution is violated only when the state does not consent.

Chapter 9 simply does not implicate the concerns of *New York* and *Printz*.  As *Bekins* emphasized, chapter 9 "is limited to *voluntary* proceedings for the composition of debts." *Bekins*, 304 U.S. at 47 (emphasis added).  The *Bekins* Court explained:

> The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference.  The State steps in to remove that obstacle.  The State acts in aid, and not in derogation, of its sovereign powers.  It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue.  Through its cooperation with the national government the needed relief is given.  We see no ground for the conclusion that the Federal Constitution, in the interest of state sovereignty, has reduced both sovereigns to helplessness in such a case.

*Id.*, 304 U.S. at 54.

The federal government cannot and does not compel states to authorize municipalities to file for chapter 9 relief, and municipalities are not permitted to seek chapter 9 relief without specific state authorization. 11 U.S.C. § 109(c)(2). There is simply no "commandeering" involved. *New York*, 505 U.S. at 161. Chapter 9 does not compel a state to enact a specific regulatory program, as in *New York*. Nor does chapter 9 press state officers into federal service, as in *Printz*. Instead, as *Bekins* held, valid state authorization is required for a municipality to proceed in chapter 9.

Moreover, during the pendency of the chapter 9 case, § 904 of the bankruptcy code mandates that the bankruptcy court "may not . . . interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or employment of any income-producing property." 11 U.S.C. § 904. At the same time, bankruptcy code § 903 mandates, "This chapter does not limit or impair the power of a State to control . . . a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]"

Because the state and local officials must authorize the filing of a chapter 9 petition, 11 U.S.C. § 109(c)(2), and because they retain control over "the political or governmental powers" of the municipality, these state officials remain fully politically accountable to the citizens of the state and municipality. *See New York*, 505 U.S. at 186 ("The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.").

### d. Explaining Some Puzzling
### Language in *New York*

To be sure, some language in *New York* (not repeated in *Printz*) lends support to the argument that state consent cannot cure a federal law that would otherwise violate the Tenth Amendment. In *New York*, Justice O'Connor's opinion for the Court explained that federalism does not exist for the benefit of states, as such, but rather is a part of the constitutional structure whose purpose is to benefit individuals. 505 U.S. at 182. Justice O'Connor continued:

> Where Congress exceeds its authority relative to the States, . . . the departure from the constitutional plan cannot be ratified by the "consent" of state officials. . . . The constitutional authority of Congress cannot be expanded by the "consent" of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States."

*Id.*

Some of the parties in this case have seized upon this language to argue that "the Supreme Court has weakened if not rejected *Bekins'* foundation – that a State's consent can remedy any violation of the Tenth Amendment and principles of federalism as they affect individual citizens." Retiree Committee Objection to Eligibility, ¶ 37 at 19. (Dkt. #805)

The difficulty with this argument is that it proves too much. If this language from *New York* has the sweeping force that the objecting parties ascribe to it, then a state's consent could never "cure" what would otherwise be a Tenth Amendment violation. The two incentives in *New York* that were constitutionally sustained would instead have been struck down like the "take title" provision. As the Court emphasized in *New York*, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166.

Yet, despite Congress' inability to compel states to regulate according to federal standards, it may unquestionably invite, encourage, or entice the states to do so. *New York* specifically held that Congress may "encourage a State to regulate in a particular way," or "hold out incentives to the States as a method of influencing a State's policy choices." *Id.* The key is consent. *New York* further held, "Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests." *Id.* Consent to what would otherwise be an unlawful commandeering of state governments was the very basis for upholding two of the regulatory programs at issue in *New York*. *Id.* at 173-74.

It is not entirely clear, therefore, what Justice O'Connor meant when she wrote that states "cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.* at 182. In a very real sense, the holding of *New York* rests on the premise that states can do just that. Congress cannot require the states to legislate with respect to the problem of radioactive waste, but it can unquestionably hold out incentives that induce the states to consent to do so. More broadly put, states can "consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.*

The Court can only conclude that Justice O'Connor meant something else - that a state cannot consent to be compelled. As the Court saw the "choice" in *New York*, it was a choice between two unconstitutional alternatives - regulating according to federal standards or taking title to all of the low level radioactive waste produced by private parties in the state. Justice O'Connor likely concluded that the latter alternative was so unpalatable that it was really no choice at all. After all, here is where the Court found that "Congress had crossed the line distinguishing encouragement from coercion." *Id.* at 175. Understood this way, Justice

O'Connor may have been saying nothing more than that one cannot consent to have a gun held to one's head. The idea of "consent" in such a scenario is meaningless.

If this understanding is correct, it would be incumbent upon the objecting parties to identify some way in which federal authority has compelled state action here. They have not.

Whatever the intended meaning of this language, it cannot be that state consent can never "cure" what would otherwise violate the Tenth Amendment. That meaning would sweep aside the holding of *New York* itself. Nor does this language undo the holding in *Bekins*, which, as stated before, this Court must apply until the Supreme Court overrules it.

Accordingly, the Court concludes that chapter 9 is not facially unconstitutional under the Tenth Amendment.

### 5. Chapter 9 Is Constitutional
### As Applied in This Case.

Several of the objecting parties also raise "as-applied" challenges to the constitutionality of chapter 9 under the Tenth Amendment to United States Constitution. Although variously cast, the primary thrust of these arguments is that if chapter 9 permits the State of Michigan to authorize a city to file a petition for chapter 9 relief without explicitly providing for the protection of accrued pension benefits, the Tenth Amendment is violated.

The Court concludes that these arguments must be rejected.

### a. When the State Consents to a Chapter 9
### Bankruptcy, the Tenth Amendment Does Not
### Prohibit the Impairment of Contract Rights That
### Are Otherwise Protected by the State Constitution.

The basis for this result begins with the recognition that the State of Michigan cannot legally provide for the adjustment of the pension debts of the City of Detroit. This is a direct result of the prohibition against the State of Michigan impairing contracts in both the United

73

O'Connor may have been saying nothing more than that one cannot consent to have a gun held to one's head. The idea of "consent" in such a scenario is meaningless.

If this understanding is correct, it would be incumbent upon the objecting parties to identify some way in which federal authority has compelled state action here. They have not.

Whatever the intended meaning of this language, it cannot be that state consent can never "cure" what would otherwise violate the Tenth Amendment. That meaning would sweep aside the holding of *New York* itself. Nor does this language undo the holding in *Bekins*, which, as stated before, this Court must apply until the Supreme Court overrules it.

Accordingly, the Court concludes that chapter 9 is not facially unconstitutional under the Tenth Amendment.

### 5. Chapter 9 Is Constitutional
### As Applied in This Case.

Several of the objecting parties also raise "as-applied" challenges to the constitutionality of chapter 9 under the Tenth Amendment to United States Constitution. Although variously cast, the primary thrust of these arguments is that if chapter 9 permits the State of Michigan to authorize a city to file a petition for chapter 9 relief without explicitly providing for the protection of accrued pension benefits, the Tenth Amendment is violated.

The Court concludes that these arguments must be rejected.

### a. When the State Consents to a Chapter 9
### Bankruptcy, the Tenth Amendment Does Not
### Prohibit the Impairment of Contract Rights That
### Are Otherwise Protected by the State Constitution.

The basis for this result begins with the recognition that the State of Michigan cannot legally provide for the adjustment of the pension debts of the City of Detroit. This is a direct result of the prohibition against the State of Michigan impairing contracts in both the United

States Constitution and Michigan Constitution, as well as the prohibition against impairing the contractual obligations relating to accrued pension benefits in the Michigan Constitution.

The federal bankruptcy court, however, is not so constrained. As noted in Part VIII B, above, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

The state constitutional provisions prohibiting the impairment of contracts and pensions impose no constraint on the bankruptcy process. The Bankruptcy Clause of the United States Constitution, and the bankruptcy code enacted pursuant thereto, explicitly empower the bankruptcy court to impair contracts and to impair contractual rights relating to accrued vested pension benefits. Impairing contracts is what the bankruptcy process does.

The constitutional foundation for municipal bankruptcy was well-articulated in *Stockton*:

> In other words, while a state cannot make a law impairing the obligation of contract, Congress can do so. The goal of the Bankruptcy Code is adjusting the debtor-creditor relationship. Every discharge impairs contracts. While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.
>
> It follows, then, that contracts may be impaired in this chapter 9 case without offending the Constitution. The Bankruptcy Clause gives Congress express power to legislate uniform laws of bankruptcy that result in impairment of contract; and Congress is not subject to the restriction that the Contracts Clause places on states. Compare U.S. Const. art. I, § 8, cl. 4, with § 10, cl. 1.

478 B.R. at 16.

For Tenth Amendment and state sovereignty purposes, nothing distinguishes pension debt in a municipal bankruptcy case from any other debt. If the Tenth Amendment prohibits the impairment of pension benefits in this case, then it would also prohibit the adjustment any other debt in this case. *Bekins* makes it clear, however, that with state consent, the adjustment of

74

13-53846-swr  Doc 2024-1  Filed 12/06/13  Entered 12/06/13 14:04:24  Page 115 of 184
13-53846-tjt  Doc 8045-11  Filed 10/22/14  Entered 10/22/14 11:44:04  Page 116 of 160
173

municipal debts does not impermissibly intrude on state sovereignty. *Bekins*, 304 U.S. at 52. This Court is bound to follow that holding.

### b. Under the Michigan Constitution, Pension Rights Are Contractual Rights.

The Plans seek escape from this result by asserting that under the Michigan Constitution, pension debt has greater protection than ordinary contract debt. The argument is premised on the slim reed that in the Michigan Constitution, pension rights may not be "impaired or diminished," whereas only laws "impairing" contract rights are prohibited.

There are several reasons why the slight difference between the language that protects contracts (no "impairment") and the language that protects pensions (no "impairment" or "diminishment") does not demonstrate that pensions were given any extraordinary protection.

Before reviewing those reasons, however, a brief review of the history of the legal status of pension benefits in Michigan is necessary.

At common law, before the adoption of the Michigan Constitution in 1963, public pensions in Michigan were viewed as gratuitous allowances that could be revoked at will, because a retiree lacked any vested right in their continuation. In *Brown v. Highland Park*, 320 Mich. 108, 114, 30 N.W.2d 798, 800 (Mich. 1948), the Michigan Supreme Court stated:

> We are convinced that the majority of cases in other jurisdictions establishes the rule that a pension granted by public authorities is not a contractual obligation, that the pensioner has no vested right, and that a pension is terminable at the will of a municipality, at least while acting within reasonable limits. At best plaintiffs in this case have an expectancy based upon continuance of existing charter provisions.

Similarly, in *Kosa v. Treasurer of State of Mich.*, 408 Mich. 356, 368-69, 292 N.W.2d 452, 459 (1980), the court observed this about the status of pension benefits before the 1963 Constitution was adopted:

75

13-53846-swr   Doc 2024-1   Filed 12/10/13   Entered 12/10/13 14:04:24   Page 116 of 184
13-53846-swr   Doc 2024-1   Filed 12/10/13   Entered 12/10/13 14:04:24   Page 116 of 184

> Until the adoption of Const. 1963, art. 9, s 24, legislative
> appropriation for retirement fund reserves was considered to be an
> ex gratia action. Consequently, the most that could be said about
> "pre-con" legislative appropriations for retirees was that there was
> some kind of implied commitment to fund pension reserves.

*Id.* (footnote omitted).

In the 1963 Constitution, this provision enhancing the protection for pensions was included: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24.

In *Kosa*, 408 Mich. at 370 n.21, 292 N.W.2d at 459, the Michigan Supreme Court quoted the following history from the constitutional convention regarding article 9, section 24:

> "MR. VAN DUSEN: Mr. Chairman, if I may elaborate briefly on
> Mr. Brake's answer to Mr. Downs' question, I would like to
> indicate that the words 'accrued financial benefits' were used
> designedly, so that the *contractual right of the employee* would be
> limited to the deferred compensation embodied in any pension
> plan, and that we hope to avoid thereby a proliferation of litigation
> by individual participants in retirement systems talking about the
> general benefits structure, or something other than his specific
> right to receive benefits. It is not intended that an individual
> employee should, as a result of this language, be given the right to
> sue the employing unit to require the actuarial funding of past
> service benefits, or anything of that nature. *What it is designed to
> do is to say that when his benefits come due, he's got a contractual
> right to receive them.* "And, in answer to your second question, *he
> has the contractual right to sue for them.* So that he has no
> particular interest in the funding of somebody else's benefits as
> long as *he has the contractual right to sue for his.*
>
> "MR. DOWNS: I appreciate Mr. Van Dusen's comments. Again, I
> want to see if I understand this. Then he would not have a remedy
> of legally forcing the legislative body each year to set aside the
> appropriate amount, but when the money did come due this would
> be a *contractual right* for which he could sue a ministerial officer
> that could be mandamused or enjoined; is that correct?
>
> "MR. VAN DUSEN: Thats my understanding, Mr. Downs."

1 Official Record, Constitutional Convention 1961, pp. 773-774.

*Id.* (emphasis added).

Kosa also offered an explanation for the origin of the provision. "To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting *contractual status* to retirement benefits." 408 Mich. at 360, 292 N.W.2d at 455 (emphasis added).

The *Kosa* court summarized the provision, again using contract language, as follows:

> To sum up, while the Legislature's constitutional *contractual obligation* is not to impair "accrued financial benefits", even if that obligation also related to the funding system, there would be no impairment of the *contractual obligation* because the substituted "entry age normal" system supports the benefit structure as strongly as the replaced "attained age" system.

*Id.*, 408 Mich. at 373, 292 N.W.2d at 461(emphasis added).

> While counting such blessings as have come to them, public school employees are understandably still concerned about their pension security. In that regard, this opinion reminds the Legislature that the constitutional provision adopted by the people of this state is indeed a *solemn contractual obligation* between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired.

*Id.*, 408 Mich. at 382, 292 N.W.2d at 465 (emphasis added).

More recently, in *In re Constitutionality of 2011 PA 38*, 490 Mich. 295, 806 N.W.2d 683 (2011), the Michigan Supreme Court unequivocally stated, "The obvious intent of § 24, however, was to ensure that public pensions be treated as *contractual obligations* that, once earned, could not be diminished." *Id.* at 311, 806 NW.2d at 693 (emphasis added).

That historical review begins to demonstrate the several reasons why the slight difference in the language that protects contracts and the language that protects pensions does not suggest that pensions were given any extraordinary protection:

**First**, the language of article IX, section 24, gives pension benefits the status of a "contractual obligation." The natural meaning of the words "contractual obligation" is certainly inconsistent with the greater protection for which the Plans now argue.

**Second**, if the Michigan Constitution were meant to give the kind of absolute protection for which the Plans argue, the language in the article IX, section 24 simply would not have referred to pension benefits as a "contractual obligation." It also would not have been constructed by simply copying the verb from the contracts clause - "impair" - and then adding a lesser verb -"diminish" in the disjunctive.

**Third**, linguistically, there is no functional difference in meaning between "impair" and "impair or diminish." There certainly is a preference, if not a mandate, to give meaning to every word in written law. In *Koontz v. Ameritech Servs., Inc.*, 466 Mich. 304, 312, 645 N.W.2d 34, 39 (2002), the Michigan Supreme Court summarized the familiar command, "Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." The court went on to state, however, "we give undefined statutory terms their plain and ordinary meanings." *Id.*

Under *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), discussed in more detail in Part IX A, below, this Court is bound by these commands of statutory interpretation that the Michigan Supreme Court embraced in *Koontz*. But if this Court gives these terms - "diminish" and "impair" - their plain and ordinary meanings, as *Koontz* requires, those meanings would not be substantively different from each other. The terms are not

synonyms, but they cannot honestly be given meanings so different as to compel the result that the Plans now seek. "Diminish" adds nothing material to "impair." All "diminishment" is "impairment." And, "impair" includes "diminish."

**Fourth**, the Plans' argument for a greater protection is inconsistent with the Michigan Supreme Court's interpretation of the constitutional language in *Kosa* and in *In re Constitutionality of 2011 PA 38*. Those cases also used contract language to describe the status of pensions. This is important because the Sixth Circuit has held that on questions of state law, this Court is bound to apply the holdings of the Michigan Supreme Court. *See Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 706 (6th Cir. 1994).

**Fifth**, an even greater narrative must be considered here, focusing on 1963. *Bekins* had long since determined that municipal bankruptcy was constitutional. That of course meant that even though states could not impair municipal contracts, federal courts could do that in a bankruptcy case. Indeed, Michigan law then allowed municipalities to file bankruptcy.[24]

It was within that framework of rights, expectations, scenarios and possibilities that the newly negotiated, proposed and ratified Michigan Constitution of 1963 explicitly gave accrued pension benefits the status of contractual obligations. That new constitution could have given pensions protection from impairment in bankruptcy in several ways. It could have simply prohibited Michigan municipalities from filing bankruptcy. It could have somehow created a

---

[24] See Public Act 72 of 1939, MCL § 141.201(1) (repealed by P.A. 70 of 1982) ("Any . . . instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] . . . may proceed under the terms and conditions of such acts to secure a composition of its debts. . . . The governing authority of any such . . . instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress[.]").

property interest that bankruptcy would be required to respect under *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914 (1979) (holding that property issues in bankruptcy are determined according to state law).  Or, it could have established some sort of a secured interest in the municipality's property.  It could even have explicitly required the State to guaranty pension benefits.  But it did none of those.

Instead, both the history from the constitutional convention, quoted above, and the language of the pension provision itself, make it clear that the only remedy for impairment of pensions is a claim for breach of contract.

Because under the Michigan Constitution, pension rights are contractual rights, they are subject to impairment in a federal bankruptcy proceeding.  Moreover, when, as here, the state consents, that impairment does not violate the Tenth Amendment.  Therefore, as applied in this case, chapter 9 is not unconstitutional.

Nevertheless, the Court is compelled to comment.  No one should interpret this holding that pension rights are subject to impairment in this bankruptcy case to mean that the Court will necessarily confirm any plan of adjustment that impairs pensions.  The Court emphasizes that it will not lightly or casually exercise the power under federal bankruptcy law to impair pensions. Before the Court confirms any plan that the City submits, the Court must find that the plan fully meets the requirements of 11 U.S.C. § 943(b) and the other applicable provisions of the bankruptcy code.  Together, these provisions of law demand this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan.

## IX. Public Act 436 Does Not
## Violate the Michigan Constitution.

Section 109(c)(2) of the bankruptcy code requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). The evidence establishes that the City was authorized to file this case. The issue is whether that authorization was proper under the Michigan Constitution.

Section 18 of P.A. 436, M.C.L. § 141.1558, establishes the process for authorizing a municipality to file a case under chapter 9 of the bankruptcy code:

> (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision . . . . The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

M.C.L. § 141.1558(1).

On July 16, 2013, Mr. Orr gave the governor and the treasurer his written recommendation that the City be authorized to file for chapter 9 relief. Ex. 28. On July 18, 2013, the governor approved this recommendation in writing. Ex. 29. Later that day, Mr. Orr

issued a written order directing the City to file this chapter 9 case. Ex. 30. Thus the City of Detroit's bankruptcy filing was authorized under state law.

Nevertheless, several objectors assert various arguments that the City of Detroit is not authorized to file this case.

First, several objectors argue that the authorization is not valid because P.A. 436, the statute establishing the underlying procedure for a municipality to obtain authority for filing, is unconstitutional. Broadly stated, these are the challenges to P.A. 436:

The Retired Detroit Police Members Association ("RDPMA") challenges the constitutionality of P.A. 436 on the grounds that it was enacted immediately after the referendum rejection of a similar statute, P.A. 4.

The RDPMA also asserts that P.A. 436 is unconstitutional on the grounds that the Michigan Legislature added an appropriation provision for the purpose of evading the peoples' constitutional right to referendum.

Several objectors argue that P.A. 436 is unconstitutional because it fails to protect pensions from impairment in bankruptcy.

AFSCME asserts that P.A. 436 is unconstitutional because it violates the "Strong Home Rule" provisions in the Michigan Constitution.

### A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute.

The validity of P.A. 436 under the Michigan Constitution is a question of state law. Determining the several constitutional challenges to P.A. 436 requires this Court to apply state law. In *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), the Sixth Circuit provided this guidance on determining state law:

In construing questions of state law, the federal court must apply state law in accordance with the controlling decisions of the highest court of the state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir.1987). A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Similarly, in *Demczyk v. Mut. Life Ins. Co. of N.Y.* (*In re Graham Square, Inc.*), 126 F.3d 823, 827 (6th Cir. 1997), the court stated, "Where the relevant state law is unsettled, we determine how we think the highest state court would rule if faced with the same case."

The Michigan Supreme Court has not ruled directly on the validity P.A. 436. As a result, this Court must attempt to ascertain how that court would rule if it were faced with the issue.

In *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich. 295, 307-8, 806 N.W.2d 683, 692 (2011), the Michigan Supreme Court summarized its decisions on evaluating a constitutional challenge to a state law:

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v. Gate Pharm.*, 468 Mich. 1, 6, 658 N.W.2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v. Mirac, Inc.*, 470 Mich. 415, 422, 685 N.W.2d 174 (2004). "'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.'" *Id.* at 423, 685 N.W.2d 174, quoting *Cady v. Detroit*, 289 Mich. 499, 505, 286 N.W. 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with

the party challenging it[.]"  *In re Request for Advisory Opinion*
*Regarding Constitutionality of 2005 Pa. 71*, 479 Mich. 1, 11, 740
N.W.2d 444 (2007)[.]

This guidance, as well as the decisions of the Michigan Supreme Court on issues relating

to the right to referendum, home rule, and the pension clause, will inform this Court's

determinations on the objectors' challenges to P.A. 436.

### B. The Voters' Rejection of Public Act 4 Did
### Not Constitutionally Prohibit the Michigan
### Legislature from Enacting Public Act 436.

On March 16, 2011, the governor signed P.A. 4 into law.  P.A. 4 repealed P.A. 72.

However, the voters rejected P.A. 4 by referendum in the November 6, 2012 election.  Shortly

after that election, on December 26, 2012, the governor signed P.A. 436 into law.  It took effect

on March 28, 2013.

The RDPMA argues that P.A. 436 is unconstitutional because it is essentially a

reenactment of P.A. 4.  The City and the State of Michigan assert that there are several

differences between P.A. 436 and P.A. 4, such that they are not the same law.

The right of referendum is established in article 2, section 9 of the Michigan Constitution,

which provides:

> Sec. 9. The people reserve to themselves the power to propose
> laws and to enact and reject laws, called the initiative, and the
> power to approve or reject laws enacted by the legislature, called
> the referendum.  The power of initiative extends only to laws
> which the legislature may enact under this constitution.  The power
> of referendum does not extend to acts making appropriations for
> state institutions or to meet deficiencies in state funds and must be
> invoked in the manner prescribed by law within 90 days following
> the final adjournment of the legislative session at which the law
> was enacted.  To invoke the initiative or referendum, petitions
> signed by a number of registered electors, not less than eight
> percent for initiative and five percent for referendum of the total
> vote cast for all candidates for governor at the last preceding
> general election at which a governor was elected shall be required.

Referendum, approval

No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

Mich. Const. art. II, § 9.

In *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84, 610 N.W.2d 597 (2000), the Michigan Court of Appeals considered the power of the legislature to reenact a law while a referendum process regarding that law was pending. The court explained:

> [N]othing in the Michigan Constitution suggests that the referendum had a broader effect than nullification of [the 1994 act]. We cannot read into our constitution a general "preemption of the field" that would prevent further legislative action on the issues raised by the referendum. The Legislature remained in full possession of all its other ordinary constitutional powers, including legislative power over the subject matter addressed in [the 1994 act].

*Reynolds*, 240 Mich. App. at 97, 610 N.W.2d at 604-05.

This Michigan Court of Appeals decision strongly suggests that the referendum rejection of P.A. 4 did not prohibit the Michigan legislature from enacting P.A. 436, even though P.A. 436 addressed the same subject matter as P.A. 4 and contained very few changes.

As noted above, the Sixth Circuit has instructed, "A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co.*, 197 F.3d at 1181. No data, let alone any persuasive data, suggests that the Michigan Supreme Court would decide this issue otherwise. Accordingly, the RDPMA's challenge on this ground must be rejected.

### C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.

The RDPMA also contends that P.A. 436 is unconstitutional because the Michigan legislature included appropriations provisions in P.A. 436 for the sole purpose of shielding the Act from referendum. Section 34 of P.A. 436 appropriates $780,000 for 2013 to pay the salaries of emergency managers. Section 35 of P.A. 436 appropriates $5,000,000 for 2013 to pay professionals hired to assist emergency managers.

There certainly was some credible evidence in support of the RDPMA's assertion that the appropriations provisions in P.A. 436 were motivated by a desire to immunize it from referendum. For example, Howard Ryan testified in his deposition on October 14, 2013:

> Q. I'd just like to ask a follow-up to a question counsel asked you. You said that the appropriation language was put in the - early on in the process; is that correct?
> A. Yes.
> Q. Based on your conversations with the people at the time, was it your understanding that one or more of the reasons to put the appropriation language in there was to make sure that it could not - the new act could not be defeated by a referendum?
> A. Yes.
> Q. And where did you get that knowledge from?
> A. Well, having watched the entire process unfold over the past two years.
> Q. The Governor's office knew that that was the point of it?
> A. Yes.
> Q. That your department knew that that was the point of it?
> A. Yes.
> Q. The legislators you were dealing with knew that that was the point of it?
> A. Yes.

Howard Dep. Tr. 46:1-23, Oc. 14, 2013.[25]

Other evidence in support includes: a January 31, 2013 e-mail addressed from Mr. Orr to partners at Jones Day, in which he observed that P.A. 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." Ex. 403 (Dkt. #509-3) According to Mr. Orr "although the new law provides the thin veneer of a revsion (sic) it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." Ex. 403. (Dkt. #509-3)

There are, however, several difficulties with the RDPMA's argument.

The Court must conclude that the Michigan Supreme Court would not, if faced with this issue, hold that P.A. 436 is unconstitutional. In *Michigan United Conservation Clubs v. Secretary of State*, 464 Mich. 359, 367, 630 N.W.2d 297, 298 (2001), that court concisely held that a public act with an appropriations provision is not subject to referendum, regardless of motive. Concurring, Chief Justice Corrigan added that even if the motive of a legislative body could be discerned as opposed to the motives of individual legislators, "This Court has repeatedly held that courts must not be concerned with the alleged motives of a legislative body in enacting a law, but only with the end result—the actual language of the legislation." *Id.* at 367.

Similarly, in *Houston v. Governor*, 491 Mich. 876, 877, 810 N.W.2d 255, 256 (2012), the Michigan Supreme Court stated, "[T]his Court possesses no special capacity, and there are no legal standards, by which to assess the political propriety of actions undertaken by the legislative

---

[25] The parties agreed to use Ryan's deposition testimony in lieu of live testimony. However, in the pre-trial order the City had objected to this portion of testimony on the grounds of speculation, hearsay, format and foundation. (Dkt. #1647 at 118) Those objections are overruled.

13-53846-swr Doc 2024-1 Filed 12/05/13 Entered 12/05/13 14:40:24 Page 128 of 184
13-53846-swr Doc 2024-1 Filed 12/05/13 Entered 12/05/13 14:40:24 Page 128 of 184
173

branch. Instead, it is the responsibility of the democratic, and representative, processes of government to check what the people may view as political or partisan excess by their Legislature."

In *People v. Gibbs*, 186 Mich. 127, 134-35, 152 N.W. 1053, 1055 (1915), the Michigan Supreme Court stated, "Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law, but in the results of their action. Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives." S*ee also Kuhn v. Dep't of Treasury*, 384 Mich. 378, 383-84, 183 N.W.2d 796, 799 (1971).

Finally, it must also be noted that on November 8, 2013, the Sixth Circuit vacated pending rehearing *en banc* the decision on which the RDPMA heavily relies. *City of Pontiac Retired Employees Assoc. v. Schimmel*, 726 F.3d 767 (6th Cir. 2013).

Accordingly, the Court concludes that P.A. 436 is not unconstitutional as a violation of the right to referendum in article II, section 9 of the Michigan Constitution.

### D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution.

Certain objectors argue that P.A. 436 violates Article VII, Section 22 of the Michigan Constitution, which states:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.

The argument is that the appointment of an emergency manager for a municipality under P.A. 436 is inconsistent with the right of the electors to adopt and amend the City charter and the city's right to adopt ordinances. AFSCME asserts that "Michigan is strongly committed to the concept of home rule[.]" AFSCME Amended Objection at 75-91. (Dkt. #1156) "This 'strong home rule' regime reflects a bedrock principle of state law, . . . all officers of cities are to 'be elected by the electors thereof, or appointed by such authorities thereof' not by the central State Government." *Id.* (citing *Brouwer v. Bronkema*, 377 Mich. 616, 141 N.W.2d 98 (1966)). AFSCME further asserts that in authorizing the appointment of an emergency manager with broad powers that usurp the powers of elected officials, "PA 436 offends the 'strong home rule' of Detroit and that the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings." AFSCME Amended Objection at 75-91. (Dkt. #1156)

AFSCME's argument fails for the simple reason that the broad authority the Michigan Constitution grants to municipalities is subject to constitutional and statutory limits. This constitutional provision itself embodies that principle. It states, "Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*." Mich. Const. art. VII, § 22 (emphasis added).

State law recognizes the same limitation on local government authority:

> Each city may in its charter provide:
>
> (3) Municipal powers. For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns *subject to the constitution and general laws of this state*.

M.C.L. § 117.4j(3) (emphasis added).

Similarly, M.C.L. § 117.36, states, "No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

Indeed, § 1-102 of the Charter of the City of Detroit states: "The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, *subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.*" *Id.* (emphasis added). *See Detroit City Council v. Mayor of Detroit*, 283 Mich. App. 442, 453, 770 N.W.2d 117, 124 (Mich. Ct. App. 2009) ("The charter itself thus recognizes that it is subject to limitations imposed by statute.").

"Municipal corporations have no inherent power. They are created by the state and derive their authority from the state." *Bivens v. Grand Rapids*, 443 Mich. 391, 397, 505 N.W.2d 239, 241 (1993).

The Michigan case law establishes that the powers granted to municipalities by the "home rule" sections of the Michigan Constitution are subject to the limits of the power and authority of the State to create laws of general concern. *Brimmer v. Village of Elk Rapids*, 365 Mich. 6, 13, 112 N.W.2d 222, 225 (1961).

> "Municipal corporations are state agencies, and, subject to constitutional restrictions, the Legislature may modify the corporate charters of municipal corporations at will. 12 C.J. [p.] 1031. Powers are granted to them as state agencies to carry on local government. The state still has authority to amend their charters and enlarge or diminish their powers." [1] Cooley, Const. Lim. (8th Ed.), [p.] 393. * * * Its powers are plenary.

*City of Hazel Park v. Mun. Fin. Comm'n*, 317 Mich. 582, 599-600, 27 N.W.2d 106, 113-14 (1947).

> The Home Rule provision of the constitution does not deprive the legislature of its power to enact laws affecting municipalities operation under that provision except as to matters of purely local

concern. . . . *The right to pass general laws is still reserved to the l[e]gislature of the state*, and consequently it is still competent for the state through the law making body to enact measures pursuant to the police power or pursuant to other general powers inherent in the state and to require municipalities to observe the same.

*Local Union No. 876, Int'l Bhd. of Elec. Workers v. State of Mich. Labor Mediation Bd.*, 294 Mich. 629, 635-36, 293 N.W. 809, 811 (1940) (emphasis added). *See also Mack v. City of Detroit*, 467 Mich. 186, 194, 649 N.W.2d 47, 52 (2002); *American Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 377, 604 N.W.2d 330, 342 (2000) (In *Harsha we held that* "the legislature might modify the charters of municipal corporations at will and that the State still retained authority to amend charters and enlarge and diminish their powers."); *Board of Trustees of Policemen & Firemen Retirement System v. City of Detroit*, 143 Mich. App. 651, 655, 373 N.W.2d 173, 175 (Mich. Ct. App. 1985) ("Where a city charter provision conflicts with general statutory law, the statute controls in all matters which are not of purely local character."); *Oakland Cnty. Board of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n*, 456 Mich. 590, 609, 575 N.W.2d 751, 760 (1998) ("Like a municipal corporation, the road commission's existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it.").

AFSCME asserts that P.A. 436 is a "local law" because it gives the emergency manager broad authority to pass local legislation, and that therefore it violates article IV, section 29 of the Michigan Constitution. That section provides, in pertinent part, "The legislature shall pass no local or special act in any case where a general act can be made applicable[.]"

One plain difficulty with this argument is that this provision of the Michigan Constitution constrains the Michigan Legislature, not the emergency manager.

In defining a general law, the Michigan Supreme Court has stated, "'A general law is one which includes all persons, classes and property similarly situated and which come within its

limitations.'" *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 359 n.5, 604 N.W.2d

330, 334 (2000) (citing *Tribbett v. Village of Marcellus*, 294 Mich. 607, 618, 293 N.W. 872

(1940), quoting *Punke v. Village of Elliott*, 364 Ill. 604, 608-9, 5 N.E.2d 389, 393 (1936)).

Clearly, P.A. 436 is a general law, potentially applicable to all municipalities similarly

situated within the State of Michigan. According to its preamble, its purposes are: "to safeguard

and assure the financial accountability of local units of government and school districts; to

preserve the capacity of local units of government and school districts to provide or cause to be

provided necessary services essential to the public health, safety and welfare[.]"

Accordingly, the Court finds that P.A. 436 does not violate the home rule provisions of

the Michigan Constitution.

### E. Public Act 436 Does Not Violate the Pension
### Clause of the Michigan Constitution.

Many objectors argue that the bankruptcy authorization section of P.A. 436, M.C.L.

§ 141.1558, does not conform to the requirements of the pension clause of the Michigan

Constitution and is therefore unconstitutional. Accordingly, the objectors argue that P.A. 436

cannot provide the basis for authorization as required by 11 U.S.C. § 109(c)(2).

As noted, the premise of this argument is that under the Michigan constitution, pension

benefits are entitled to greater protection than contract claims. That premise, however, is, the

same as the premise of the argument that chapter 9 is unconstitutional as applied in this case.

In Part VIII C 5 b, above, the Court rejected this argument, concluding that pension

benefits are a contractual obligation of the municipality.

It follows that if a state consents to a municipal bankruptcy, no state law can protect

contractual pension rights from impairment in bankruptcy, just as no law could protect any other

types of contract rights. Accordingly, the failure of P.A. 436 to protect pension rights in a

municipal bankruptcy does not make that law inconsistent with the pension clause of the Michigan Constitution any more than the failure of P.A. 436 to protect, for example, bond debt in bankruptcy is inconsistent with the contracts clause of the Michigan Constitution. For this purpose, the parallel is perfect.

Stated another way, state law cannot reorder the distributional priorities of the bankruptcy code. If the state consents to a municipal bankruptcy, it consents to the application of chapter 9 of the bankruptcy code. This point was driven home in the *Stockton* case:

> A state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to "cherry pick," the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed. *Mission Indep. School Dist. v. Texas*, 116 F.2d 175, 176–78 (5th Cir. 1940) (chapter IX); *Vallejo*, 403 B.R. at 75–76; *In re City of Stockton*, 475 B.R. 720, 727–29 (Bankr. E.D. Cal. 2012) ("*Stockton I*"); *In re Cnty. of Orange*, 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996).
>
> While a state may control prerequisites for consenting to permit one of its municipalities (which is an arm of the state cloaked in the state's sovereignty) to file a chapter 9 case, it cannot revise chapter 9. *Stockton I*, 475 B.R. at 727–29. *For example, it cannot immunize bond debt held by the state from impairment. Mission Indep. School Dist.*, 116 F.2d at 176–78.

478 B.R. at 16-17 (emphasis added).

For these reasons, the Court concludes that P.A. 436 does not violate the pension clause of the Michigan Constitution.

## X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.

AFSCME and most of the individual objectors argue that the emergency manager did not have valid authority to file this bankruptcy case because he is not an elected official. The Court concludes that this argument is similar to, or the same as, the argument that AFSCME made that P.A. 436 violates the home rule provisions of the Michigan Constitution. See Part IX D above.

Accordingly, for the reasons stated in that Part, AFSCME's argument on this point is rejected. The Court concludes that the emergency manager's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution, even though he was not an elected official.

### XI. The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.

P.A. 436 permits the governor to "place contingencies on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1). The governor did not place any contingencies on the bankruptcy filing in this case. Ex. 29 at 4. The governor's letter did, however, state "Federal law already contains the most important contingency – a requirement that the plan be legally executable." Ex. 29 at 4.

Several of the objectors argue that the pension clause of the Michigan Constitution, article IX, section 24, obligated the governor to include a condition in his authorization that would prohibit the City from impairing pension benefits in this bankruptcy case.

In Part IX E, above, the Court concluded that any such contingency in the law itself would be ineffective and potentially invalid. For the same reason, any such contingency in the governor's authorization letter would have been invalid, and may have rendered the authorization itself invalid under 11 U.S.C. § 109(c).

Accordingly, this objection is overruled. The Court concludes that the governor's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution.

### XII. The Judgment in *Webster v. Michigan* Does Not
### Preclude the City from Asserting That the Governor's
### Authorization to File This Bankruptcy Case Was Valid.

#### A. The Circumstances Leading to the Judgment

On July 3, 2013, Gracie Webster and Veronica Thomas filed a complaint against the State of Michigan, Governor Snyder and Treasurer Dillon in the Ingham County Circuit Court. They sought a declaratory judgment that P.A. 436 is unconstitutional because it permits accrued pension benefits to be diminished or impaired in violation of article IX, section 24 of the Michigan Constitution. (Dkt. #1219) The complaint also sought a preliminary and permanent injunction enjoining Governor Snyder and State Treasurer Dillon from authorizing the Detroit emergency manager to commence proceedings under chapter 9 of the bankruptcy code.

On Thursday, July 18, 2013, the state court held a hearing, apparently jointly on a similar complaint filed by the General Retirement System of the City of Detroit. According to the transcript of the hearing, it began at 4:15 p.m. Case No.13-734-CZ, Hrg Tr. 4:2, July 18, 2013. (Dkt. #1219-9) Almost immediately, counsel for the plaintiffs advised the court that the City had already filed its bankruptcy case. Hrg Tr. 6:2-9. (It was filed at 4:06 p.m. on that day.) As a result, counsel asked for an expedited process. Hrg Tr. 7:8-18. The court responded, "I plan on making a ruling Monday. I could make a ruling tomorrow, if push came to shove, but Monday probably would be soon enough. I am confident that the bankruptcy court won't act as quickly as I will." Hrg Tr. 7:23-8:2.

The plaintiff's attorneys then asked that the hearing on their request for a preliminary injunction be advanced from the following Monday, which is when it had been set. Hrg Tr. 8:13-22. Counsel observed that it had been briefed by both sides. Hrg Tr. 9:1-10. After the Court confirmed through its law clerk that in fact the bankruptcy case had been filed, Hrg Tr.10:9-10, counsel asked to amend its requested relief so that the governor and the emergency

manager would be enjoined from taking any further action in the bankruptcy proceeding. Hrg Tr. 10:11-17. The court responded, "Granted, as to all your requests. How soon are you going to present me with an order?" Case No.13-734-CZ, Hrg Tr. 11:1-4, July 18, 2013. (Dkt. #1219-9).

At this point, it must be observed that the judge granted this extraordinary relief with no findings and without giving the state's representative any opportunity to be heard.

In any event, the plaintiffs' counsel then used a previously prepared proposed order in the case that the General Retirement System filed and modified it extensively in handwriting, most of which was legible, to change the parties, the case number, and the ordering provisions. Case No.13-734-CZ, Hrg Tr.15:7-15, July 18, 2013. (Dkt. #1219-9) It states that it was signed at 4:25 p.m., which was 10 minutes after the hearing began. Case No.13-734-CZ, Hrg Tr. 17:4-5, July 18, 2013. (Dkt. #1219-9)

A further hearing was held the next day, beginning at 11:25 a.m., on the plaintiffs' request to amend the order of the previous afternoon. Case No.13-734-CZ, Hrg Tr. 4:2, July 19, 2013. (Dkt. #1219-10) The plaintiffs' counsel had also filed a motion that morning for a declaratory judgment and asked the court to consider it. Hrg Tr.8:2-13 The state's attorney then agreed to allow the court to consider it. Hrg Tr. 8:24-25. The judge then addressed the parties. This portion of the transcript is quoted at length here because it is necessary to demonstrate an important point in section B, below, concerning Congress' purpose in granting exclusive jurisdiction to the bankruptcy court over all issues that concern the validity of a bankruptcy filing:

> You know what we're doing? We are under siege here. Well, we aren't; I'm not. Technically I am through paper, but all of you are. Detroit is. The State is. So I'm not going to go through the usual court rules and the time and all of that. You are all going to

spend your weekend doing what lawyers do, and that's a lot of homework because we're going to have that hearing Monday unless you're asking me to do it now.

I'm going to hear everything because we're not going to piecemeal this. You all know the case. I know the case: I've done the homework. I don't think myself or my staff got any sleep last night. We've been doing research. I bet if I called all of your wives and asked if you got any sleep, they'd be saying, "No. When is my husband going to get some sleep," right? So we're going to have a hearing, and I don't care if it's today or Monday. I'll come here Saturday, if you would like. I don't care. Let's get some answers, let's get a bottom line, and let's get this moving to the Court of Appeals because that's where you all are headed. I don't care what side you're on. Someone is going up, right? So I have answers for you. Tell me your story. I've got the solution. You might not like it.

Can we move on?

Case No.13-734-CZ, Hrg Tr. 11:7-12:5, July 19, 2013. (Dkt. #1219-10)

The attorneys then agreed and argued the merits. The judge then stated her decision to grant the declaratory relief that the plaintiffs requested. Case No.13-734-CZ, Hrg Tr.33:18-35:19, July 19, 2013. (Dkt. #1219-10)

Later that day, the court entered an "Order of Declaratory Relief." This is the judgment on which the objecting parties rely in asserting their preclusion argument. The judgment is quoted at length here to demonstrate both its scope and its intended impact on this bankruptcy case:

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager

under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

A copy of this Order shall be transmitted to President Obama.[26]

Order of Declaratory Judgment, *Webster v. State of Michigan*, No. 13-734-CZ (July 19, 2013).

(Dkt. #1219-8)

In their eligibility objections in this case, several of the objectors assert that this judgment

is binding upon the City under the principles of *res judicata* or collateral estoppel. Specifically,

they contend that this judgment precludes the City from asserting that P.A. 436 is constitutional

and that the governor properly authorized this bankruptcy filing. In the alternative, these parties

---

[26] The order had been prepared by plaintiffs' counsel before the hearing and was provided to the judge at its conclusion. However, this last sentence of the judgment was handwritten, apparently by the judge herself.

assert that the judgment is at least a persuasive indication of what the Michigan Supreme Court would hold on the issue of the constitutionality of P.A. 436.

The Court concludes that it is neither.

### B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition.

There is a fundamental reason to deny the declaratory judgment any preclusive effect in this bankruptcy case.

Upon the City's bankruptcy filing, federal law - specifically, 28 U.S.C. § 1334(a) - gave this Court exclusive jurisdiction to determine all issues relating to the City's eligibility to be a chapter 9 debtor. That provision states, "[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). The Sixth Circuit has explained:

> Several factors highlight the exclusively federal nature of bankruptcy proceedings. The Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8. Congress has wielded this power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts.

*Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000). The court went on to quote this from *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996):

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 et seq., demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike.

*Pertuso*, 233 F.3d at 417.

The wisdom of this grant of exclusive jurisdiction lies in the absolute necessity that any bankruptcy petition be filed, considered, and adjudicated in one court. Foreclosing the

opportunity for parties to litigate a bankruptcy petition in multiple courts eliminates the likely consequence of a confused and chaotic race to judgment, and of the associated multiplication of expenses. It also eliminates the potential for inconsistent outcomes.

Indeed, the necessity to prohibit such collateral attacks on a bankruptcy petition is grounded in the uniformity requirement of Article 1, Section 8 of the United States Constitution, as the Ninth Circuit has observed:

> Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating. . . . *The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution.*

*Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1987) (emphasis added). The Ninth Circuit continued, "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Id.* at 1036. "A state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *Id.*

The Court recognizes that Congress has granted to other courts concurrent jurisdiction over certain proceedings related to the bankruptcy case. 28 U.S.C. § 1334(b) provides, "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." However, it is not argued that this subsection applies here, and for good reason. It does not. Referring to 28 U.S.C. § 1334(b), the Ninth Circuit stated in *Gruntz v. Cnty. of Los Angeles* (*In re Gruntz*) 202 F.3d 1074, 1083 (9th

Cir. 2000) (en banc), "[N]othing in that section vests the states with any jurisdiction over a core bankruptcy proceeding[.]"

Indeed, 28 U.S.C. § 1334(b) only demonstrates that Congress knew precisely how to draw the line between those matters that should be within the exclusive jurisdiction of the federal bankruptcy court and those matters over which the jurisdiction could be shared. By denying effect to the Ingham County Circuit Court judgment in this case, this Court is enforcing that line.

The Court therefore concludes that upon the filing of this case at 4:06 p.m. on July 18, 2013, the Ingham County Circuit Court lost the jurisdiction to enter any order or to determine any issue pertaining to the City's eligibility to be a chapter 9 debtor.

The Sixth Circuit has held that a state court judgment entered without jurisdiction is void *ab initio*. *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.")

Accordingly, the state court's "Order of Declaratory Judgment" on which the objectors rely here is therefore void and of no effect, and does not preclude the City from asserting its eligibility in this Court in this case.

## C. The Judgment Is Also Void Because It Violated the Automatic Stay.

11 U.S.C. § 362(a)(3) provides that "a petition filed under section 301 . . . operates as a stay, applicable to all entities, of . . . any act . . . to exercise control over property of the estate[.]" 11 U.S.C. § 902(1) states, "In this chapter 'property of the estate', when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means property of the debtor[.]"

The Sixth Circuit has held, "[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision." *Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.* (*In re Nat'l Century Fin. Enters., Inc.*), 423 F.3d 567, 578 (6th Cir. 2005) (quoting *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 392 (2d Cir. 1997). *See also Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993).

The thrust of the plaintiffs' case in *Webster v. Michigan* was to protect the plaintiffs' pension rights by prohibiting a bankruptcy case which might allow the City to use its property in a way that might impair pensions. It does not matter that neither the City nor its officers were defendants. The suit was clearly an act to exercise control over the City's property. Accordingly, it was stayed under 11 U.S.C. § 362(a)(3) and the state court's "Order of Declaratory Relief" was entered in violation of the stay.[27]

In *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993), the court stated, "In summary, we hold that actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances."

---

[27] The Retirement Systems argue that there was no bankruptcy stay applicable to the state court litigation until July 25, 2013 when this Court entered an order extending the automatic stay to certain state officers. That order specifically included these state court cases as examples of cases that were included in the extended stay. Retirement Systems Br. at 51. (Dkt. #519)

That order, however, did not preclude the City from arguing later that the stay of 11 U.S.C. § 362(a)(3) applied as of the bankruptcy filing. Indeed, at the hearing on the motions that resulted in these orders, the Court expressly stated: "The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay." Hrg. Tr. 84:10-16, July 24, 2013. (Dkt. #188)

That issue is now squarely before the Court. For the reasons stated in the text, the Court concludes that the automatic stay of § 362(a)(3) was applicable to the Flowers, Webster and General Retirement Systems state court cases from the moment the City filed its bankruptcy petition.

In this case, no equitable circumstances suggest any reason to find that the state court's order should not be voided.  Instead, equitable circumstances suggest that it should be voided. When the plaintiffs' counsel appeared in the state court on July 18 and 19, 2013, they knew that the City had filed its bankruptcy petition, as did the judge.   The record of those proceedings establishes beyond doubt that the proceedings were rushed in order to achieve a prompt dismissal of the bankruptcy case.   The protection that the stay of 11 U.S.C. § 362(a) affords is for the benefit of both the debtor and all creditors.  *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 541 (5th Cir. 2009); *Johnson v. Smith* (*In re Johnson*), 575 F.3d 1079, 1083 (10th Cir. 2009).  Condoning the actions that the plaintiffs took in this case would open the floodgates to similar actions by creditors in other bankruptcy cases and thereby vitiate that important protection.

Accordingly, the Court concludes that the judgment in *Webster* is void because its entry violated the automatic stay of 11 U.S.C. § 362(a)(3) and no equitable circumstances suggest that it should not be voided.  For this additional reason, that judgment does not preclude the City from asserting its eligibility in this Court in this case.

### D. Other Issues

The City disputes the application of *res judicata* and collateral estoppel on several other grounds.  Specifically, it contends that the two hearings that resulted in the *Webster* judgment were confused and hurried.   It also disputes whether the State was given a full and fair opportunity to be heard, and whether the judgment is binding on it, as it was not a party to the suit.

The Court concludes that in light of its conclusions that the state court lacked jurisdiction and that its judgment is void, it is unnecessary to decide these issues.

Nevertheless, the Court does comment that the transcripts of the two post-petition state court hearings on July 18 and 19, 2013 reflect a very chaotic and disorderly "race to judgment." (Dkt. #1219-9; Dkt. #1219-10)  Those proceedings are perfect examples of the very kind of litigation the Congressional grant of exclusive jurisdiction in bankruptcy to one court was designed to control and eliminate.  Moreover, respect for the extraordinary gravity of the issues presented, as well as for the defendants in the case, would certainly have mandated a much more considered and deliberative judicial process.  Actually, so does respect for the plaintiffs, and for the City's other 100,000 creditors.

Finally, for the reasons stated in Part IX, above, the reasoning in the *Webster* declaratory judgment is neither persuasive nor at all indicative of how the Michigan Supreme Court would rule.

This objection to the City's eligibility is rejected.

### XIII. The City Was "Insolvent."

To be eligible for relief under chapter 9, the City must establish that it is "insolvent."  11 U.S.C. § 109(c)(3).  Several individual objectors and AFSCME challenge the City's assertion that it is insolvent.

### A. The Applicable Law

For a municipality, the bankruptcy code defines "insolvent" as a "financial condition such that the municipality is-- (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) is unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C).

The test under the first prong "looks to current, general non-payment."  The test under the second prong "is an equitable, prospective test looking to future inability to pay."  *Hamilton*

*Creek Metro. Dist. v. Bondholders Colo. Bondshares* (*In re Hamilton Creek Metro. Dist.*), 143 F.3d 1381, 1384 (10th Cir. 1998); *see also In re City of Stockton*, 493 B.R. 772, 788 (Bankr. E.D. Cal. 2013) ("Statutory construction rules likewise point to a temporal aspect as the § 101(32)(C)(ii) phrase 'as they become due' must mean something different than its § 101(32)(C)(i) partner 'generally not paying its debts.'").

A payment is "due" under the first prong if it is "presently, unconditionally owing and presently enforceable." *Hamilton Creek*, 143 F.3d at 1385. When a municipality is unable to meet its presently enforceable debts, it is said to be "cash insolvent." *See Stockton*, 493 B.R. at 789.

When considering the second prong, courts take into account broader concerns, such as longer term budget imbalances and whether the City has sufficient resources to maintain services for the health, safety, and welfare of the community. *Id.*; *see also In re Boise Cnty.*, 465 B.R. 156, 172 (Bankr. D. Idaho 2011) ("The test under § 101(32)(C)(ii) is a prospective one, which requires the petitioner to prove as of the petition date an inability to pay its debts as they become due in its current fiscal year, or, based on an adopted budget, in its next fiscal year.")

Although each test focuses on the City's ability to meet its financial obligations at different points in time, both are to be applied as of the time of the chapter 9 filing. *Hamilton Creek*, 143 F.3d at 1384-85 (citing *In re Town of Westlake*, 211 B.R. 860, 866 (Bank. N.D. Tex. 1997)).

Finally, the Court notes that "the theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts." *Stockton*, 493 B.R. at 788.

## B. Discussion

The Court finds that the City of Detroit was, and is, insolvent under both definitions in 11 U.S.C. § 101(32)(C). The Court has already detailed the enormous financial distress that the City faced as of July 18, 2013 and will not repeat that here. See Part III A, above.

### 1. The City Was "Generally Not Paying Its Debts As They Become Due."

Specifically, in May 2013, the City deferred payment on approximately $54,000,000 in pension contributions. On June 30, 2013, it deferred an additional $5,000,000 fiscal year-end payment. Ex. 43 at 8. The City also did not make a scheduled $39,700,000 payment on its COPs on June 14, 2013. Ex. 43 at 8. It was also spending much more money than it was receiving, and only making up the difference through expensive and even catastrophic borrowings. See Part III A 5, 8 and 9, above.

These facts establish that the City was "generally not paying its debts as they become due," as of the time of the filing. 11 U.S.C. § 101(32)(C)(i).

AFSCME asserts that this was "[t]he purposeful refusal to make a few payments comprising a relatively small part of the City's budget." AFSCME Pre-Trial Br. at 51. (Dkt. #1227)

The Court must reject this assertion. The evidence established that the nearly $40,000,000 pension-related COPs default was particularly serious because it put in jeopardy the City's access to its casino tax revenue, which was one of the City's few reliable sources of income. Eligibility Trial Tr. 185:16-186:23, Oct. 24, 2013. (Dkt. #1490)

Moreover, the City was operating on a "razor's edge" for several months prior to June 2013. Eligibility Trial Tr. 189:9-10, Oct. 24, 2013. (Dkt. #1490)

As of May 2013, the City stopped paying its trade creditors to avoid running out of cash. Eligibility Trial Tr. 189:14-15, Oct. 24, 2013. (Dkt. #1490) But for these and other deferments, the City would have completely run out of cash by the end of 2013. Ex. 75 at 2.

### 2. The City Is Also "Unable to Pay Its Debts As They Become Due."

The evidence was overwhelming that the City is unable to pay its debts as they become due.

The evidence established that there are many, many services in the City which do not function properly as a result of the City's financial state. The facts found in Parts III B 6-12, above, further firmly support this conclusion.

Most powerfully, however, the testimony of Chief Craig established that the City was in a state of "service delivery insolvency" as of July 18, 2013, and will continue to be for the foreseeable future. He testified that the conditions in the local precincts were "deplorable." Eligibility Trial Tr. 189:4-6, Oct. 25, 2013. (Dkt. #1501) "If I just might summarize it in a very short way, that everything is broken, deplorable conditions, crime is extremely high, morale is low, the absence of leadership." Tr. 188:5-7 He described the City as "extremely violent," based on the high rate of violent crime and the low rate of "clearance" of violent crimes. Tr. 190:11-191:25. He stated that the officers' low morale is due, at least in part, to "the fact that they had lost ten percent pay; that they were forced into a 12-hour work schedule," and because there was an inadequate number of patrolling officers, and their facilities, equipment and vehicles were in various states of disrepair and obsolescence. Eligibility Trial Tr. 192:20-193:3, 197:21-23, 198:10-199:18, Oct. 25, 2013. (Dkt. #1501)

In *Stockton*, the Court observed:

> While cash insolvency—the opposite of paying debts as they become due—is the controlling chapter 9 criterion under § 101(32)(C), longer-term budget imbalances [budget insolvency] and the degree of inability to fund essential government services [service delivery insolvency] also inform the trier of fact's assessment of the relative degree and likely duration of cash insolvency.

478 B.R. at 789.

Service delivery insolvency "focuses on the municipality's ability to pay for all costs of providing services at the level and quality that are required for the health, safety, and welfare of the community." *Id. at* 789. Indeed, while the City's tumbling credit rating, its utter lack of liquidity, and the disastrous COPs and swaps deal might more neatly establish the City's "insolvency" under 11 U.S.C. § 101(32)(C), it is the City's service delivery insolvency that the Court finds most strikingly disturbing in this case.

### 3. The City's "Lay" Witnesses

The objecting parties argue the City failed to establish its insolvency because it failed to present expert proof on this issue. *See* AFSCME Pre-Trial Br. at 52. (Dkt. # 1227) ("Courts in the non-chapter 9 context note that 'it is generally accepted that whenever possible, a determination of insolvency should be based on . . . expert testimony . . .'" (citing *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*, No. 03B12184, 2005 WL 3021173, at *6 (Bankr. N.D. Ill. July 14, 2005)). This argument arises from the fact that the City mysteriously declined to qualify its financial analysts as expert witnesses.

At trial, upon the request of the City, the Court determined that under Rule 701, F.R.E., these witnesses - Charles Moore, Ken Buckfire and Gaurav Malhotra - could testify as lay witnesses regarding the City's finances and their projections of the City's finances in the future. Eligibility Trial Tr. 39:20-49:8, Oct. 25, 2013. (Dkt. #1501) The Court also admitted extensive

documentary evidence of the analysts' observations and projections. Tr. 49:5-8. These determinations were based upon the Court's finding that the financial consultants "had extensive personal knowledge of the City's affairs that they acquired during . . . the course of their consulting work with the city." Eligibility Trial Tr. 48:14-19, Oct. 25, 2013. (Dkt. #1501); *see, e.g., JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525-26 (6th Cir. 2004); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685-87 (5th Cir. 2003) (discussing *In re Merritt Logan, Inc.*, 901 F.2d 349 (3rd Cir. 1990) and *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399 (3rd Cir. 1980)). While the Court questions the City's strategy here, it is clear from these cases that there is nothing improper about the City's decision not to qualify these witnesses as experts, even though it likely could have.

The witnesses testified reliably and credibly regarding their personal knowledge of the City's finances and the basis for their knowledge. In these circumstances, the Court must reject AFSCME's argument that expert testimony is essential for a finding of insolvency under 11 U.S.C. §§ 109(c)(3) and 101(32)(C).

### 4. The City's Failure to Monetize Assets

Finally, the objecting parties assert that the City could have, and should have, monetized a number of its assets in order to make up for its severe cash flow insolvency. *See e.g.,* AFSCME Pre-Trial Br. at 53. (Dkt. #1227)

However, Malhotra credibly established that sales of City assets would not address the operational, structural financial imbalance facing the City. Eligibility Trial Tr. 85:2-86:12, Oct. 25, 2013. (Dkt. #1501) Buckfire also testified similarly. Tr. 197:19-204:14. The undisputed evidence establishes that the "City's expenditures have exceeded its revenues from fiscal year 2008 to fiscal year 2012 by an average of $100 million annually." Ex. 75 at 2.

When the expenses of an enterprise exceed its revenue, a one-time infusion of cash, whether from an asset sale or a borrowing, only delays the inevitable failure, unless in the meantime the enterprise sufficiently reduces its expenses and enhances its income. The City of Detroit has proven this reality many times.

In any event, when considering selling an asset, the enterprise must take extreme care that the asset is truly unnecessary in enhancing its operational revenue.

For these reasons, the Court finds that the City has established that it is insolvent as 11 U.S.C. § 109(c)(3) requires and as 11 U.S.C. § 101(32)(C) defines that term.

## XIV. The City Desires to Effect
## a Plan to Adjust Its Debts.

To establish its eligibility for relief under chapter 9, the City must establish that it desires to effect a plan to adjust its debts. 11 U.S.C. § 109(c)(4).

### A. The Applicable Law

In *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo* (*In re City of Vallejo*), 408 B.R. 280 (B.A.P. 9th Cir. 2009), the Bankruptcy Appellate Panel surveyed the case law under § 109(c)(4):

> Few published cases address the requirement that a chapter 9 petitioner "desires to effect" a plan of adjustment. Those cases that have considered the issue demonstrate that no bright-line test exists for determining whether a debtor desires to effect a plan because of the highly subjective nature of the inquiry under § 109(c)(4). *Compare In re County of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995) (proposal of a comprehensive settlement agreement among other steps taken demonstrated efforts to resolve claims which satisfied § 109(c)(4)) *with In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 76 (Bankr. D.N.H. 1994) (post-petition submission of a draft plan of adjustment met § 109(c)(4)).

Petitioners may satisfy the subjective requirement with direct and circumstantial evidence. They may prove their desire by attempting to resolve claims as in *County of Orange*; by submitting a draft plan of adjustment as in *Sullivan County*; or by other evidence customarily submitted to show intent. *See Slatkin*, 525 F.3d at 812. The evidence needs to show that the "purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors." *See Collier* ¶ 109.04[3][d], at 109–32.

*Local 1186*, 408 B.R. at 295.

In *Stockton*, the court expanded:

> The cases equate "desire" with "intent" and make clear that this element is highly subjective. *E.g.*, *In re City of Vallejo*, 408 B.R. 280, 295 (9th Cir. BAP 2009).

> At the first level, the question is whether the chapter 9 case was filed for some ulterior motive, such as to buy time or evade creditors, rather than to restructure the City's finances. *Vallejo*, 408 B.R. at 295; 2 Collier on Bankruptcy ¶ 109.04[3][d], at p. 109–32 (Henry J. Sommer & Alan N. Resnick eds. 16th ed. 2011) (hereafter "Collier").

> Evidence probative of intent includes attempts to resolve claims, submitting a draft plan, and other circumstantial evidence. *Vallejo*, 408 B.R. at 295.

493 B.R. at 791. *See also City of San Bernardino, Cal.*, 2013 WL 5645560, at *8-12 (Bankr. C.D. Cal. 2013); *In re Boise County*, 465 B.R. 156, 168 (Bankr. D. Idaho 2011); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 272 (Bankr. S.D.N.Y. 2010).

"Since that 'plan' is to be effected by an entity seeking relief under Chapter 9, it is logical to conclude that the 'plan' referred to in section 109(c)(4) is a 'plan for adjustment of the debtor's debts' within the meaning of section 941 of the Bankruptcy Code." *In re Cottonwood Water and Sanitation Dist., Douglas County, Colo.*, 138 B.R. 973, 975 (Bankr. D. Colo. 1992).

## B. Discussion

Several objectors asserted that the City does not desire to effect a plan to adjust its debts.

The Court concludes that the evidence overwhelmingly established that the City does desire to effectuate a plan in this case.  Mr. Orr so testified.  Eligibility Trial Tr. 43:1-47:13, October 28, 2013. (Dkt. #1502)  More importantly, before filing this case, Mr. Orr did submit to creditors a plan to adjust the City's debts.  Ex. 43.  Plainly, that plan was not acceptable to any of the City's creditors.  It may not have been confirmable under 11 U.S.C. § 943, although it is not necessary to resolve that question at this time.  Still, it was evidence of the City's desire and intent to effect a plan.  There is simply no evidence that the City has an ulterior motive in pursuing chapter 9, such as to buy time or to evade creditors.

Indeed, the objecting creditors do not contend that there was any such ulterior motive.  They assert no desire on the part of the City or its emergency manager to buy time or evade creditors.  Rather, their argument is that the plan that the emergency manager has stated he intends to propose in this case is not a confirmable plan.  It is not confirmable, they argue, because it will impair pensions in violation of the Michigan Constitution.

Certainly the evidence does establish that the emergency manager intends to propose a plan that impairs pensions.  The Court has already so found.  See Part VIII C 1, above.  Nevertheless, the objectors' argument must be rejected.  As established in Part VIII C 5, above, a chapter 9 plan may impair pension rights.  The emergency manager's stated intent to propose a plan that impairs pensions is therefore not inconsistent with a desire to effect a plan.

Accordingly, the Court finds that the City does desire to effect a plan, as 11 U.S.C. § 109(c)(4) requires.

## XV. The City Did Not Negotiate with Its Creditors in Good Faith.

### A. The Applicable Law

The fifth requirement for eligibility is found in § 109(c)(5).

An entity may be a debtor under chapter 9 of this title if and only if such entity—

. . .

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5).

This section was enacted because Congress recognized that municipal bankruptcy is a drastic step and should only be taken as a last resort. *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994); 5 Norton Bankr. L. & Prac. 3d § 90:25 ("It is the policy of the Bankruptcy Code that a Chapter 9 filing should be considered only as a last resort, after an out-of-court attempt to avoid bankruptcy has failed.") Therefore, it added a requirement for pre-bankruptcy negotiation to attempt to resolve disputes.

Because § 109(c)(5) is written in the disjunctive, a debtor has four options to satisfy the requirement for negotiation: "[1] it may obtain the agreement of creditors holding a majority in amount of claims in each class [; (2)] it may show that it has negotiated with its creditors in good faith but has failed to obtain their agreement [; (3)] it may show that it is unable to negotiate with creditors because negotiation is impracticable [; or (4)] it may demonstrate that it reasonably believe[s] that a creditor may attempt to obtain a preferential transfer." *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 265–66 (Bankr. D. Colo.1992).

*In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008).

The City of Detroit asserts that it has met the requirements of § 109(c)(5)(B) or, in the alternative, § 109(c)(5)(C). City's Reply to Objections at 45-49; (Dkt. #765) City's Pre-trial Br. at 49-67. (Dkt. #1240)

The Court finds the recent case, *In re Mendocino Coast Recreation & Park Dist.*, 12-CV-02591-JST, 2013 WL 5423788 (N.D. Cal. Sept. 27, 2013), persuasive on this issue. In that case, the district court for the Northern District of California noted:

> [T]he Bankruptcy Court identified two lines of authority about 109(c)(5)(B)'s requirements. The less restrictive view, adopted by the editors of Collier, is that the debtor need not attempt to negotiate any specific plan of adjustment. *Id.* (citing 2–109 Collier on Bankruptcy ("Collier "), ¶ 109.04[3][e][ii] (16th ed.)). As the Bankruptcy Court saw the more restrictive view, adopted by *In re Cottonwood Water and Sanitation Dist.* ("Cottonwood"), 138 B.R. 973, 975 (Bankr. D. Colo.1992) and by dicta in *Vallejo*, 408 B.R. at 297, the debtor must negotiate over "the possible terms of a plan," "at least in concept."

*Mendocino Coast*, 2013 WL 5423788 at *2. After a thorough analysis of the legislative history of § 109(c)(5)(B), the court was "persuaded by the *Cottonwood* view that Section 109(c)(5)(B) requires municipalities not just to negotiate generally in good faith with their creditors, but also to negotiate in good faith with creditors over a proposed plan, at least in concept, for bankruptcy under Chapter 9." *Mendocino Coast*, 2013 WL 5423788 at *5. This Court is also persuaded by that analysis.

*Mendocino Coast* also considered how the § 109(c)(5)(B) process compares to analogous provisions in other chapters of the bankruptcy code. The court looked to 11 U.S.C. §§ 1113(b) & (c) and 1114(f)(1), which require debtors to negotiate regarding the post-petition rejection of collective bargaining agreements and pension plans in chapter 11 proceedings. The court stated:

> [T]he appropriate standard to apply [under Section 109(c)(5) ] is one that is "at least as stringent as those under §§ 1113 and 1114." 1 Norton Bankr. L. & Prac. 3d § 17:8, n.19. Those statutes require courts to, inter alia, determine whether the parties "[met] to confer in good faith in attempting to reach mutually satisfactory modifications," determine whether unions have rejected proposals "without good cause," and "balance . . . the equities." 11 U.S.C. § 1113(b)(2) & (c). In doing so, courts commonly assess both parties' conduct in negotiations.

*Mendocino Coast*, 2013 WL 5423788 at *7.   The Court reached two conclusions regarding § 109(c)(5)(B):

> First, courts may consider, based on the unique circumstances of each case and applying their best judgment, whether a debtor has satisfied an obligation to have "negotiated in good faith."   Second, while the Bankruptcy Code places the overwhelming weight of its burdens on petitioners, the provisions that call for negotiation contemplate that at least some very minimal burden of reciprocity be placed on parties with whom a debtor must negotiate.

*Mendocino Coast*, 2013 WL 5423788 at *7.

*Mendocino Coast* recognized that its case did not present the issue "of what must occur in a negotiation that satisfies 109(c)(5)(B).   It presents the issue of what information, if missing from the debtor's first attempt to negotiate, bars a municipality from filing Chapter 9 even if a creditor rejects the overture and declines to negotiate." *Id.* at *8.

This Court faces the same question, and therefore finds *Mendocino Coast*'s analysis very useful, although on the facts of this case the Court ultimately reaches the opposite conclusion.

While recognizing that a determination of what qualifies as a good-faith effort to begin negotiation can depend on several factors, *Mendocino Coast* was able to make its determination upon consideration of three factors.

> First, the greater the disclosure about the proposed bankruptcy plan, the stronger the debtor's claim to have attempted to negotiate in good faith.   A creditor might be justified in rejecting the overture of a debtor proposing a frivolous or unclearly described adjustment plan, but a creditor is less justified in ignoring a substantive proposal.
> . . .
> Second, the municipality's need to immediately disclose classes of creditors and their treatment in the first communication will depend upon how material that information would be to the creditor's decision about whether to negotiate.
> . . .
> Third, the creditor's response, and the amount of time the creditor has had to respond, may also be factors.   If a creditor has had a relatively short time to respond to the municipality's offer to

negotiate, a lack of detail in the opening communication might weigh against a municipality rushing to file. On the other hand, where a creditor has been apprised of the possibility of a debt adjustment and declined to respond after a reasonable period of time, or where the creditor has explicitly responded with a refusal to negotiate, its position as an objector is significantly weakened.

*Mendocino Coast*, 2013 WL 5423788 at *8-9.

## B. Discussion

In the present case, the City of Detroit argues that the June 14, 2013 proposal to creditors, along with its follow up meetings, was a good-faith effort to begin negotiations, and that the creditors refused to respond. It asserts, therefore, it has satisfied 11 U.S.C. § 109(c)(5)(B). City's Reply to Objections at 54-58. (Dkt. # 765)

The Court concludes, however, that the June 14 Proposal to Creditors and the follow up meetings were not sufficient to satisfy the requirements of 11 U.S.C. § 109(c)(5)(B). The first and third factors cited by *Mendocino Coast* weigh heavily against finding that the City's initial efforts satisfied the requirement of good faith negotiation. The Proposal to Creditors did not provide creditors with sufficient information to make meaningful counter-proposals, especially in the very short amount of time that the City allowed for the "discussion" period.

The City's proposal to creditors is a 128 page document. Ex. 43. The City invited many creditors or "stakeholders" to the meeting on June 14, 2013, when it presented the proposal. Its presentation was a 120 deck powerpoint presentation, providing information regarding the financial condition of the City and proposing across the board reductions in creditor obligations.

The restructuring proposal began on page 101. Addressed on page 109 are the proposed treatment of the unsecured general obligation bonds, the claims of service corporations on account of the COPs, the claims for unfunded OPEB liabilities, the claims for unfunded pension

liabilities and the claims on account of other liabilities. Ex. 43. Charitably stated, the proposal is very summary in nature.

For example, the proposed treatment for underfunded pension liabilities is three bullet points in length. The first bullet point states that the underfunding is approximately $3.5B. The second bullet point states, "Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes." The third bullet point states, "Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." Ex. 43 at 109.

This is simply not enough information for creditors to start meaningful negotiations. Brad Robins, of Greenhill & Co. LLC, financial advisor to the Retirement Systems, testified, "The note, itself, I thought was not really a serious proposal but maybe a place holder, [because it had] no maturity, no obligation for the City to pay." Eligibility Trial Tr. 129:1-11, Nov. 7, 2013. (Dkt. #1681)

The City asserts that it provided supporting data in an "electronic data room." However, several witnesses testified that the data room did not contain all the necessary data to make a meaningful evaluation of the proposal to creditors. Brad Robins testified that the data room was missing "lots of information: value of assets, different projections and build-ups." Eligibility Trial Tr. 133:7-10, Nov. 7, 2013. (Dkt. #1681) He felt that prior to the filing date, Greenhill was not given complete information to fully evaluate what was laid out in the June 14, 2013 proposal. Eligibility Trial Tr. 135:17-20, Nov. 7, 2013. (Dkt. #1681) Mark Diaz testified that he made a request to the City for additional information and did not receive a response. Eligibility Trial Tr. 192:1-5, Nov. 7, 2013. (Dkt. #1681)

Moreover, the City conditioned access to the data room on the signing of a confidentiality and release agreement. This created an unnecessary hurdle for creditors.

The creditors simply cannot be faulted for failing to offer counter-proposals when they did not have the necessary information to evaluate the City's vague initial proposal.

The proposal for creditors provided a calendar on page 113. Ex. 43. It allotted one week, June 17, 2013 through June 24, 2013, for requests for additional information. Initial rounds of discussions with stakeholders were scheduled for June 17, 2013 through July 12, 2013. The evaluation period was scheduled to be July 15, 2013 through July 19, 2013. This calendar was very tight and it did not request counter-proposals or provide a deadline for submitting them.

The City filed its bankruptcy on July 18, 2013, the day before the end of the evaluation period. Although the objecting creditors argue that in hindsight the bankruptcy filing was a forgone conclusion, they argue that the initial proposal did not make clear the City's intention to file. Regardless, the time available for creditor negotiations was approximately thirty days. Given the extraordinary complexities of the case, that amount of time is simply far too short to conclude that such a vague proposal to creditors rises to the level required to shift the burden to objectors to make counter-proposals.

In addition to the lack of detail in the initial proposal and the short response time, the Court notes that two additional factors support its conclusion.

First, the City affirmatively stated that the meetings were not negotiations. Eligibility Trial Tr. 188:22-24, 189:1-3, Nov. 7, 2013; (Dkt. #1681) Orr Dep. Tr. 129:14-18, 262:1-25, Sept. 16, 2013. The City asserts this was to clarify that the City was not waiving the suspension of collective bargaining under P.A. 436. Orr Dep. Tr. 264:23-265:7, Sept. 16, 2013 (Dkt. #1159-B); Orr Dep. Tr. 63:21-64.20, Oct. 28, 2013. (Dkt. # 1502) This explanation is inadequate,

bordering on disingenuous. The City simply cannot announce to creditors that meetings are not negotiations and then assert to the Court that those same meetings amounted to good faith negotiations.

Second, the format of the meetings was primarily presentational, to different groups of creditors with different issues, and gave little opportunity for creditor input or substantive discussion. Eligibility Trial Tr. 145:7-146:3, Nov. 4, 2013. (Dkt. #1683) For example, at the end of the June 14, 2013 meeting, creditors were permitted to submit questions via notecard. Shirley Lightsey attended the June 20, 2013, July 10, 2013 and July 11, 2013 meetings and testified that there was no opportunity to meet in smaller groups to discuss retiree-specific issues. Eligibility Trial Tr.108:19-20, 109:22-23, 111:1-3, Nov. 4, 2013. (Dkt. #1683) Mark Diaz, President of the Detroit Police Officers Association, testified there was no back and forth discussion. Eligibility Trial Tr. 187:22-25, 189:1-3, Nov. 7, 2013. (Dkt. #1681)

The City argues that these meetings were intended to start negotiations and that they expected counter-proposals from the creditors. Even as a first step, these meetings failed to reach a level that would justify a finding that negotiations had occurred, let alone good faith negotiations. Moreover, the Court finds that the lack of negotiations were not due to creditor recalcitrance. Accordingly, the Court concludes that the City has not established by a preponderance of the evidence that it has satisfied the requirement of 11 U.S.C. § 109(c)(5)(B).

### XVI. The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.

#### A. The Applicable Law

Nevertheless, the Court finds that negotiations were in fact, impracticable, even if the City had attempted good faith negotiations. "[I]mpracticability of negotiations is a fact-sensitive inquiry that 'depends upon the circumstances of the case.'" *In re New York City Off-Track*

*Betting Corp.*, 427 B.R. 256, 276-77 (Bankr. S.D.N.Y. 2010) (quoting *In re City of Vallejo*, 408

B.R. at 298); *In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008) ("There is

nothing in the language of section 109(c)(5)(C) that requires a debtor to either engage in good

faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity

requirement before determining that negotiation is impracticable under the specific facts and

circumstances of a case."). *See also In re Hos. Auth. Pierce County*, 414 B.R. 702, 713 (Bankr.

W.D. Wash. 2009) ("Whether negotiations with creditors is impracticable depends on the

circumstances of the case.").

> "Impracticable" means "not practicable; incapable of being
> performed or accomplished by the means employed or at
> command; infeasible." Webster's New International Dictionary
> 1136 (3d ed. 2002). In the legal context, "impracticability" is
> defined as "a fact or circumstance that excuses a party from
> performing an act, esp. a contractual duty, because (though
> possible) it would cause extreme and unreasonable difficulty."
> Black's Law Dictionary 772 (8th ed. 2004).

*In re Valley Health Sys.*, 383 B.R. at 163.

Congress adopted § 109(c)(5)(C) specifically "to cover situations in which a very large

body of creditors would render prefiling negotiations impracticable." *In re Cnty. of Orange*, 183

B.R. 594, 607 (Bankr. C.D. Cal. 1995) (*quoting In re Sullivan County Reg'l Refuse Disposal

Dist.*, 165 B.R. at 79 n. 55.) *See also In re New York City Off-Track Betting Corp.*, 427 B.R. at

276-77; 2 Collier on Bankruptcy ¶ 109.04[3][e][iii]. "The impracticality requirement may be

satisfied based on the sheer number of creditors involved." *Cnty. of Orange*, 183 B.R. at 607.

*See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It

certainly was impracticable for [debtor] to have included several hundred Series D Bondholders

in these conceptual discussions."); *Valley Health Sys.*, 383 B.R. at 165 (finding that the

requirement of § 109(c)(5)(C) was met where the debtor's petition disclosed not more than 5,000

creditors holding claims in excess of $100,000,000); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (over 7,000 creditors and parties in interest were set forth on the mailing matrix).

## B. Discussion

The list of creditors for the City of Detroit is over 3500 pages. Ex. 64 (Dkt. #1059) It lists over 100,000 creditors. It is divided into fifteen schedules including the following classifications: Long-Term Debt; Trade Debt, Employee Benefits; Pension Obligations, Non-Pension Retiree Obligations; Active Employee Obligations; Workers' Compensation; Litigation and Similar Claims; Real Estate Lease Obligations; Deposits; Grants; Pass-Through Obligations, Obligations to Component Units of the City; Property Tax-Related Obligations; Income Tax-Related Obligations. Ex. 64 at 2-3. (Dkt. #1059) The summary of schedules provided with the list estimates the amount of claims and percent total for each schedule where sufficient information is available to determine those amounts. (Dkt. #1059-1) Some schedules such as Workers' Compensation and Litigation and Similar Claims do not have amounts listed because they are unliquidated, contingent and often disputed claims.

Long term debt, including bonds, notes and loans, capital lease, and obligations arising under the COPs and swaps, is listed at over $8,700,000,000 or approximately 48.52% of the City's total debt. Within this category are several series of bonds where individual bondholders are not identified. Many of these bondholders are not represented by any organization. Ex. 28 at 10.

As noted above, pension obligations are estimated at almost $3,500,000,000 or 19.33% of the City's total debt. The City estimates over 20,000 individual retirees are owed pension funds.

Ex. 28 at 9.  OPEB amounts are estimated at approximately $5,700,000,000 or 31.81% of the City's total debt.

The Court is satisfied that when Congress enacted the impracticability section, it foresaw precisely the situation facing the City of Detroit.  It has been widely reported that Detroit is the largest municipality ever to file bankruptcy.  Indeed, one of the objectors stated that it is "by far the largest and most economically significant city ever to file for chapter 9 bankruptcy." AFSCME's Supplemental Br. on Good Faith Negotiations at 7.  (Dkt. #1695)  The sheer size of the debt and number of individual creditors made pre-bankruptcy negotiation impracticable – impossible, really.

There are, however, several other circumstances that also support a finding of impracticability.

First, although several unions have now come forward to argue that they are the "natural representatives of the retirees," those same unions asserted in response to the City's pre-filing inquires that they did not represent retirees.  Ex. 32.  For example, in a May 22, 2013 letter, Robyn Brooks, the President of UAW Local 2211, stated, "This union does not, however, represent current retirees and has no authority to negotiate on their behalf."  John Cunningham sent the same response on behalf of UAW Locals 412 and 212.  In a May 27, 2013 letter, Delia Enright, President of AFSCME Local 1023, stated, "Please be advised that in accordance with Michigan law, I have no authority in which to renegotiate the Pension or Medical Benefits that retired members of our union currently receive."  Several other union representatives sent similar responses.

These responses sent a clear message to the City that the unions would not negotiate on behalf of the retirees. *See Stockton*, 493 B.R. at 794 ("it is impracticable to negotiate with 2,400 retirees for whom there is no natural representative capable of bargaining on their behalf.").

Several voluntary associations, including the RDPMA, the Detroit Retired City Employees ("DRCEA"), and the Retired Detroit Police and Fire Fighters Association ("RDPFFA"), assert that they are the natural representatives of retirees. However, none assert that they can bind individual retirees absent some sort of complex class action litigation. Ex. 301 at ¶ 6; (Dkt. # 497-2) Eligibility Trial Tr. 115:15-22, Nov. 4, 2013; (Dkt. #1683) Ex. 302 at ¶6; (Dkt. #497-3) Eligibility Trial Tr.164:1-8, Nov. 4, 2013. (Dkt. #1683) Ultimately "it would be up to the individual members of the association to decide if they would accept or reject" an offer. Eligibility Trial Tr. 157:1-4, Nov. 4, 2013. (Dkt. #1683)

Further, several witnesses who testified on behalf of the retiree associations made it clear that they would not have negotiated a reduction in accrued pension benefits because they consider them to be fully protected by state law. As Shirley Lightsey testified, "The DRCEA would not take any action to solicit authority from its membership to reduce pension benefits because they're protected by the Michigan Constitution." Eligibility Trial Tr. 125:3-7, Nov. 4, 2013. (Dkt. #1683)

The answers to interrogatories from both organizations reveal a similar inflexibility. "[T]he purpose of the RDPFFA has always been and remains to protect and preserve benefits of retirees, not to reduce such benefits." Ex. 83, Answers to Interrogatories No. 4. See also Answer to Interrogatories No. 6 for similar statement by DRCEA.

Indeed, as noted above, within two weeks of the June 14, 2013 meeting, some retirees had filed lawsuits attempting to block this bankruptcy based on their state law position. (*Flowers v. Synder*, No. 13-729-CZ July 3, 2013; *Webster v. Synder* No. 13-734-CZ July 3, 2013)

It is impracticable to negotiate with a group that asserts that their position is immutable. *See Stockton*, 493 B.R. at 794 (Bankr. E.D. Cal. 2013) ("it is impracticable to negotiate with a stone wall.").

The Court concludes that the position of the several retiree associations that they would never negotiate a reduction in accrued pension benefits made negotiations with them impracticable.

Finally, the City has sufficiently demonstrated that time was quickly running out on its liquidity. Ex. 9. (Dkt. #12) The Court therefore rejects the objectors' assertions that the City manufactured any time constraints in an attempt to create impracticability. Throughout the pertinent time periods, the City was in a financial emergency.

> Courts also frequently find that negotiations are impracticable where pausing to negotiate before filing for chapter 9 protection would put the debtor's assets at risk. *See, e.g.*, *In re Valley Health Sys.*, 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets."); 2 Collier on Bankruptcy ¶ 109.04[3][e][iii] ("[W]here it is necessary to file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with creditors and risking, in the process, the assets of the municipality makes such negotiations impracticable.").

*In re New York City Off-Track Betting Corp.*, 427 B.R. at 276-77.

The majority of the City's debt is bond debt and legacy debt. Neither the pension debt nor the bond debt are adjustable except through consent or bankruptcy. Negotiations with retirees and bondholders were impracticable due to the sheer number of creditors, and because many of the retirees and bondholders have no formal representatives who could bind them, or

even truly negotiate on their behalf. Additionally, the Court finds that the City's fiscal crisis was not self-imposed and also made negotiations impracticable.

Accordingly, the Court finds that prefiling negotiations were impracticable. The City has established by a preponderance of the evidence that it meets the requirements of 11 U.S.C. § 109(c)(5)(C).

### XVII. The City Filed Its
### Bankruptcy Petition in Good Faith.

The last requirement for eligibility is set forth in 11 U.S.C. § 921(c), which provides, "After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

Unlike the eligibility requirements in § 109(c), "the court's power to dismiss a petition under § 921(c) is permissive, not mandatory." *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (citing 6 Collier on Bankruptcy ¶ 921.04[4], at 921-7); *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (citing *In re Sullivan Cnty. Reg. Refuse Disposal Dist.*, 165 B.R. 60, 79 (Bankr. D.N.H. 1994)) ("the court has discretion to dismiss a petition if it finds that the petition was not filed in good faith").

The City's alleged bad faith in filing its chapter 9 petition was a central issue in the eligibility trial. Indeed, in one form or another, all of the objecting parties have taken the position that the City did not file its chapter 9 petition in good faith and that this Court should exercise its discretion under 11 U.S.C. § 921(c) to dismiss the case.

## A. The Applicable Law

"Good faith in the chapter 9 context is not defined in the Code and the legislative history of [section] 921(c) sheds no light on Congress' intent behind the requirement." *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 278-79 (Bankr. S.D.N.Y. 2010) (quoting *In re Cnty. of Orange*, 183 B.R. at 608) (quotation marks omitted).

In *Stockton*, the Court found:

> Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief.

*Stockton*, 493 B.R. at 794.

Similarly, the court in *New York City Off-Track Betting Corp.*, 427 B.R. at 279 (quoting 6 Collier on Bankruptcy ¶ 921.04[2]), stated:

> The leading treatise lists six different factors that the courts may examine when determining whether a petition under chapter 9 was filed in good faith: (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems.

The essence of this good faith requirement is to prevent abuse of the bankruptcy process. *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. at 81.

In conducting its good faith analysis, the Court must consider the broad remedial purpose of the bankruptcy code. *See, e.g., Stockton*, 493 B.R. at 794; *see also In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr. D. Colo. 1999) ("The purpose of reorganization under

Chapter 9 is to allow municipalities created by state law to adjust their debts through a plan voted on by creditors and approved by the bankruptcy court.").

Indeed, "if all of the eligibility criteria set forth in § 109(c) as described above are satisfied, it follows that there should be a strong presumption in favor of chapter 9 relief." *Stockton*, 493 B.R. at 794. This Court agrees with the analysis set forth in the *Stockton* case on the issue of good faith under § 921(c):

> The quantum of evidence that must be produced to rebut the § 921(c) good faith presumption is appropriately evaluated in light of, first, the policy favoring the remedial purpose of chapter 9 for those entities that meet the eligibility requirements of § 109(c) and, second, the risk that City residents will be prejudiced if relief nevertheless is denied.

*Stockton*, 493 B.R. at 795.

## B. Discussion

As explained below, the Court finds that the totality of the circumstances, coupled with the presumption of good faith that arises because the City has proven each of the elements of eligibility under § 109(c)(3), establishes that the City filed its petition in good faith under § 921(c).

## 1. The Objectors' Theory of Bad Faith

In section 3, below, the Court will review the factors upon which it relies in finding that the City filed this case in good faith. First, however, it is crucial to this process for the Court to give voice to what it understands is the narrative giving rise to the objecting parties' argument that the City of Detroit did not file this case in good faith. The Court will then, in section 2, explain that there is some support in the record for that narrative.

It must be recognized that the narrative that the Court describes here is a composite of the objecting parties' positions and presentations on this issue. No single objecting party neatly laid out this precise version with all of the features described here. Moreover, it includes the perceptions of the objecting parties whose objections were filed by attorneys, as well as the many objecting parties who filed their objections without counsel. Naturally, these views on this subject were numerous, diverse, and at times inconsistent.

The Court will use an italics font for its description of this narrative, not to give it emphasis, but as a reminder that these are **not** the Court's findings. As noted, this is only the Court's perception of a composite narrative that appears to ground the objectors' various bad faith arguments:

> *According to this composite narrative of the lead-up to the City of Detroit's bankruptcy filing on July 18, 2013, the bankruptcy was the intended consequence of a years-long, strategic plan.*
>
> *The goal of this plan was the impairment of pension rights through a bankruptcy filing by the City.*
>
> *Its genesis was hatched in a law review article that two Jones Day attorneys wrote. This is significant because Jones Day later became not only the City's attorneys in the case, but is also the law firm from which the City's emergency manager was hired. The article is Jeffrey B. Ellman; Daniel J. Merrett, Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?, 27 EMORY BANKR. DEV. J. 365 (2011). It laid out in detail the legal roadmap for using bankruptcy to impair municipal pensions.*
>
> *The plan was executed by the top officials of the State of Michigan, including Governor Snyder and others in his administration, assisted by the state's legal and financial consultants - the Jones Day law firm and the Miller Buckfire investment banking firm. The goals of the plan also included lining the professionals' pockets while extending the power of state government at the expense of the people of Detroit.*
>
> *Always conscious of the hard-fought and continuing struggle to obtain equal voting rights in this country and an equal opportunity to partake of the country's abundance, some who hold to this narrative also suspect a racial element to the plan.*

The plan foresaw the rejection of P.A. 4 coming in the November 2102 election, and so work began on P.A. 436 beforehand. As a result, it only took 14 days to enact it after it was introduced in the legislature's post-election, lame-duck session.

It was also enacted in derogation of the will of the people of Michigan as just expressed in their rejection of P.A. 4.

The plan also included inserting into P.A. 436 two very minor appropriations provisions so that the law would not be subject to the people's right of referendum and would not risk the same fate as P.A. 4 had just experienced.

The plan also called for P.A. 436 to be drafted so that the Detroit emergency manager would be in office under the revived P.A. 72 on the effective date of P.A. 436. This was done so that he would continue in office under P.A. 436, M.C.L. § 141.1572, and no consideration could be given to the other options that P.A. 436 appeared to offer for resolving municipal financial crises. See M.C.L. § 141.1549(10) ("An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving immediately prior to the effective date of this act, shall be considered an emergency manager under this act and shall continue under this act to fulfill his or her powers and duties."); see also id. § 141.1547 (titled, "Local government options . . .").

The plan also saw the value in enticing a bankruptcy attorney to become the emergency manager, even though he did not have the qualifications required by P.A. 436. M.C.L. § 141.1549(3)(a).

Another important part of the plan was for the state government to starve the City of cash by reducing its revenue sharing, by refusing to pay the City millions of promised dollars, and by imposing on the City the heavy financial burden of expensive professionals.

The plan also included suppressing information about the value of the City's assets and refusing to investigate the value of its assets - the art at the Detroit Institute of the Arts; Belle Isle; City Airport; the Detroit Zoo; the Department of Water and Sewerage; the Detroit Windsor Tunnel; parking operations; Joe Louis Arena, and City-owned land.

The narrative continues that this plan also required active concealment and even deception, despite both the great public importance of resolving the City's problems and the democratic mandate of transparency and honesty in government. The purposes of this concealment and deception were to provide political cover for the governor and his administration when the City would ultimately file for bankruptcy and to advance their further political aspirations. Another purpose was to deny creditors, especially those whose retirement benefits would be at risk from such a filing, from effectively acting to protect those interests.

*This concealment and deception were accomplished through a public relations campaign that deliberately misstated the ultimate objective of P.A. 436 – the filing of this case. It also downplayed the likelihood of bankruptcy, asserted an unfunded pension liability amount that was based on misleading and incomplete data and analysis, understated the City's ability to meet that liability, and obscured the vulnerability of pensions in bankruptcy. It also included imposing an improper requirement to sign a confidentiality and release agreement as a condition of accessing the City's financial information in the "data room."*

*As the bankruptcy filing approached, a necessary part of the plan became to engage with the creditors only the minimum necessary so that the City could later assert in bankruptcy court that it attempted to negotiate in good faith. The plan, however, was not to engage in meaningful pre-petition negotiations with the creditors because successful negotiations might thwart the plan to file bankruptcy. "Check-a-box" was the phrase that some objecting parties used for this.*

*The penultimate moment that represented the successful culmination of the plan was the bankruptcy filing. It was accomplished in secrecy and a day before the planned date, in order to thwart the creditors who were, at that very moment, in a state court pursuing their available state law remedies to protect their constitutional pension rights. "In the dark of the night" was the phrase used to describe the actual timing of the filing. The phrase refers to the secrecy surrounding the filing and is also intended to capture in shorthand the assertion that the petition was filed to avoid an imminent adverse ruling in state court.*

*Another oft-repeated phrase that was important to the objectors' theory of the City's bad faith was "foregone conclusion." This was used in the assertion that Detroit's bankruptcy case was a "foregone conclusion," as early as January 2013, perhaps even earlier.*

*Finally, post-petition, the plan also necessitated the assertion of the common interest privilege to protect it and its participants from disclosure.*

The Court will now turn to its evaluation of this narrative of bad faith on the City's part in filing this case.

### 2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith

The Court acknowledges that many people in Detroit hold to this narrative, or at least to substantial parts of it.

The Court further recognizes, on the other hand, that State and City officials vehemently deny any such improper motives or tactics as this theory attributed to them. They contend that the case was filed for the proper desired and necessary purpose of restructuring the City's debt, including its pension debt, through a plan of adjustment. Indeed, in Part XIV, above, the Court has already found that the City does desire to effect a plan of adjustment.

The Court finds, however, that in some particulars, the record does support the objectors' view of the reality that led to this bankruptcy filing. It is, however, not nearly supported in enough particulars for the Court to find that the filing was in bad faith.

The evidence in support of the objectors' theory is as follows:

- The testimony of Howard Ryan, the legislative assistant for the Michigan Department of Treasury who shepherded P.A. 436 through the legislative process. He testified that the appropriations provisions in P.A. 436 were inserted to eliminate the possibility of a referendum vote on the law, and everyone knew that. Ryan Dep. Tr. 46:1-23, Oct. 14, 2013. To the same effect is Exhibit 403, a January 31, 2013 email from Mr. Orr to fellow Jones Day attorneys, stating, "By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. . . . The news reports state that opponents of the prior law are already lining up to challenge this law. Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks." Ex. 403.

- Email exchanges between other attorneys at the Jones Day law firm during the time period leading up Mr. Orr's appointment as Emergency Manager and the retention of the Jones Day law firm to represent the City. For example, Exhibit 402 contains an email dated January 31, 2013 from Corinne Ball of Jones Day to Mr. Orr, which states:

> Food for thought for your conversation with Baird and us - I understand that the Bloomberg Foundation has a keen interest in this area. I was thinking about whether we should talk to Baird about financial support for this project and in particular the EM. Harry Wilson-from the auto task force-told me about the foundation and its interest. I can ask Harry for contact info-this kind of support in ways 'nationalizes' the issue and the project.

Ex. 402 at 2. Exhibit 402 also contains an email dated January 31, 2013, from Dan T. Moss at Jones Day to Mr. Orr, which states:

Making this a national issue is not a bad idea. It provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either Bing or Snyder to look for higher callings-whether Cabinet, Senate, or corporate. Further, this would give you cover and options on the back end.

Ex. 402 at 2.

- Exhibit 403, containing an email dated February 20, 2013, from Richard Baird, a consultant to the governor to Mr. Orr, stating: "Told [Mayor Bing] there were certain things I would not think we could agree to without your review, assessment and determination (such as keeping the executive team in its entirety). *Will broker a meeting via note between you and the Mayor's personal assistant who is not FOIA ble.*" Ex. 403 (emphasis added). The Court finds that "FOIA" is a reference to the Freedom of Information Act. Generally, FOIA provides citizens with access to documents controlled by state or local governments. *See* M.C.L. § 15.231.

- The Jones Day Pitch Book. As part of its "Pitch Presentation," the Jones Day law firm presented, in part, the following playbook for the City's road to chapter 9:

    (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations, Ex. 833 at 13; 16-18; 22-23; 28;

    (ii) the EM could be used as "political cover" for difficult decisions such as an ultimate chapter 9 filing, Ex. 833 at 16;

    (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City against raising money in order to will itself into insolvency, Ex. 833 at 17; and

    (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan Constitution, Ex. 833 at 39; 41.

- The State's selection of a distinguished bankruptcy lawyer to be the emergency manager for Detroit. Orr Dep. Tr. 18:12-21:20, Sept. 16, 2013 (discussing how Mr. Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"); Baird Dep.Tr. 13:11-15:10, Oct. 10, 2013. During that pitch, Mr. Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr Dep. Tr. 21:3-6, Sept. 16, 2013; see also Bing Dep.Tr. 12:7-13:7, Oct. 14, 2013 (indicating that Baird explained to Mayor Bing that Baird was "impressed with him [Mr. Orr], that he had been part of the bankruptcy team representing

Chrysler" and that Mr. Orr primarily had restructuring experience in the context of bankruptcy).

- Jones Day provided 1,000 hours of service without charge to the City or the State to position itself for this retention. Ex. 860 at 1 (Email dated January 28, 2013, from Corinne Ball to Jeffrey Ellman, both of Jones Day, stating: "Just heard from Buckfire. . . . Strong advice not to mention 1000 hours except to say we don't have major learning curve"). *See also* Eligibility Trial Tr. 103:23-109:17, November 5, 2013; (Dkt. #1584) Ex. 844.

  Exhibit 844 provides a list of memos that attorneys at Jones Day prepared prior to June 2012, "in connection with the Detroit matter." Heather Lennox of Jones Day requested copies of these memos for a June 6, 2012, meeting with Ken Buckfire, of Miller Buckfire, and Governor Snyder. Some of the memos include:

  (1) "Summary and Comparison of Public Act 4 and Chapter 9"
  (2) "Memoranda on Constitutional Protections for Pension and OPEB Liabilities"
  (3) "The ability of a city or state to force the decertification of a public union"
  (4) "The sources of, and the ability of the State to withdraw, the City's municipal budgetary authority."
  (5) "Analysis of filing requirements of section 109(c)(5) of the Bankruptcy Code ("Negotiation is Impracticable" and "Negotiated in Good Faith")

- Exhibit 846, an email dated March 2, 2012, from Jeffrey Ellman to Corinne Ball, both of Jones Day, with two other Jones Day attorneys copied. The subject line is, "Consent Agreement," and the body of the email states:

  > We spoke to a person from Andy's office and a lawyer to get their thoughts on some of the issues. I though MB was also going to try to follow up with Andy directly about the process for getting this to the Governor, but I am not sure if that happened.
  > . . . .
  > The cleanest way to do all of this probably is new legislation that establishes the board and its powers, AND includes an appropriation for a state institution. If an appropriation is attached to (included in) the statute to fund a state institution (which is broadly defined), then the statute is not subject to repeal by the referendum process.
  >
  > Tom is revisiting the document and should have a new version shortly, with the idea of getting this to at least M[iller]B[uckfire]/Huron [Consulting] by lunchtime.

- Exhibits 201 & 202, showing that Jones Day and Miller Buckfire consulted with state officials on the drafting of the failed consent agreement with the City. They

continued to work on a "proposed new statute to replace Public Act 4" thereafter. Ex. 847, Ex. 851. *See also* Ex. 846.

- The testimony of Donald Taylor, President of the Retired Detroit Police and Fire Fighters Association. He testified about a meeting that he had with Mr. Orr on April 18, 2013: "I asked him if he was - - about the pensions of retirees. He said that he was fully aware that the pensions were protected by the state Constitution, and he had no intention of trying to modify or set aside . . . or change the state Constitution." Eligibility Trial Tr. 140:9-13, November 4, 2013. (Dkt. #1605)

- At the June 10, 2013 community meeting, Mr. Orr was asked a direct question - what is going to happen to the City employee's pensions? Mr. Orr responded that pension rights are "sacrosanct" under the state constitution and state case law, misleadingly not stating that upon the City's bankruptcy filing, his position would be quite the opposite. In response to another question about whether Mr. Orr had a "ball park estimation" of the City's chances of avoiding bankruptcy, Mr. Orr responded that, as of June 10, there was a "50/50" chance that the City could avoid bankruptcy, knowing that in fact there was no chance of that.

- State Treasurer Andy Dillon expressed concern that giving up too soon on negotiations made the filing "look[] premeditated" Ex. 626 at 2.

- The City allotted only thirty four days to negotiate with creditors after the June 14 Proposal to Creditors. Ex. 43 at 113.

The issue that this evidence presents is how to evaluate it in the context of the good faith requirement. For example, during the orchestrated lead-up to the filing, was the City of Detroit's bankruptcy filing a "foregone conclusion" as the objecting parties assert? Of course it was, and for a long time.

Even if it was a foregone conclusion, however, experience with both individuals and businesses in financial distress establishes that they often wait longer to file bankruptcy than is in their interests. Detroit was no exception. Its financial crisis has been worsening for decades and it could have, and probably should have, filed for bankruptcy relief long before it did, perhaps even years before. At what point in Detroit's financial slide did it lose the ability, without bankruptcy help, to restructure its debt in a way that would firmly ground its economic and

social revitalization?   Was it after the disastrous COPs and swaps deal in 2005?   Or even sometime before?

The record here does not permit an answer to that question.   Whatever the answer, however, the Court must conclude that Detroit's bankruptcy filing was certainly a "foregone conclusion" during all of 2013.

For purposes of determining the City's good faith, however, it hardly matters.   As noted, many in financial difficulty, Detroit included, wait too long to file bankruptcy.

Then the issue becomes what impact does it have on the good faith analysis that Detroit probably waited too long.   Perhaps it would have been more consistent with our democratic ideals and with the economic and social needs of the City if its officials and State officials had openly and forthrightly recognized the need for filing bankruptcy when that need first arose.   It is, after all, not bad faith to file bankruptcy when it is needed.

City officials also could have avoided the appearance of pretext negotiations, and the resulting mistrust, by simply announcing honestly that because negotiating with so many diverse creditors was impracticable, negotiations would not even be attempted.   The law clearly permits that, and for good reason.   It avoids the very delay, and, worse, the very suspicion that resulted here.

The Court must acknowledge some substantial truth in the factual basis for the objectors' claim that this case was not filed in good faith.   Nevertheless, for the strong reasons stated in the next section, the Court finds that this case was filed in good faith and should not be dismissed.

### 3. The City Filed This Bankruptcy Case in Good Faith.

Based on *Stockton* and *New York City Off-Track Betting Corp.*, reviewed above, the Court concludes that the following factors are most relevant in establishing the City's good faith:

a. The City's financial problems are of a type contemplated for chapter 9 relief.

b. The reasons for filing are consistent with the remedial purpose of chapter 9,

c. The City made efforts to improve the state of its finances prior to filing, to no avail.

d. The City's residents will be severely prejudiced if the case is dismissed.

### a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief.

The Court's analysis of this factor is based on its findings that the City is "insolvent" in Part XIII, above, and that the City was "unable to negotiate with creditors because such negotiation [was] impracticable" in Part XVI, above. 11 U.S.C. §§ 109(c)(3) and 109(c)(5)(C).

The City has over $18,000,000,000 in debt and it is increasing. In the months before the filing, it was consistently at risk of running out of cash. It has over 100,000 creditors.

"Profound" is the best way to describe the City's insolvency, and it simply could not negotiate with its numerous and varied creditors. *See In re Town of Westlake, Tex.*, 211 B.R. 860, 868 (Bankr. N.D. Tex. 1997) (finding the debtor filed in good faith because it faced "frozen funds, multiple litigation, and the disannexation of a substantial portion of its tax base").

It is true that the City does not have a clear picture of its assets, income, cash flow, and liabilities, likely because its bookkeeping and accounting systems are obsolete. But this only suggests the need for relief. It does not suggest bad faith. Moreover, as the City's financial analysts' subsequent months of work have sharpened the focus on the City's finances, the resulting picture has only become worse. Eligibility Trial Tr. 118:4-119:5, Nov. 5, 2013. (Dkt. #1584)

The Court finds that this factor weighs in favor of finding good faith.

### b. The City's Reasons for Filing Are Consistent with the Remedial Purpose of Chapter 9.

One of the purposes of chapter 9 is to give the debtor a "breathing spell" so that it may establish a plan of adjustment. *In re Cnty. of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995).

The Court's analysis on this factor is based on its finding that the City "desires to effect a plan to adjust such debts." 11 U.S.C. § 109(c)(4). To show good faith on this factor, "the evidence must demonstrate that 'the purpose of the filing of the chapter 9 petition [was] not simply . . . to buy time or evade creditors.'" *In re New York City Off-Track Betting Corp.*, 427 B.R. at 272 (quoting *In re City of Vallejo*, 408 B.R. at 295). Notably, this argument was not raised by the objectors in any pleadings or at trial, nor was any evidence presented to support it.

The objectors do assert that the City filed the petition to avoid "a bad state court ruling" in the *Webster* litigation. They argue this is indicative of bad faith. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 107 at 30. (Dkt. #1647) This argument is rejected. Creditor lawsuits commonly precipitate bankruptcy filings. That the suits were in vindication of an important right under the state constitution does not change this result. They were suits to enforce creditors' monetary claims against a debtor that could not pay those claims.

The objectors also argue that the City filed the petition so that its pension obligations could be impaired and that this is inconsistent with the remedial purpose of bankruptcy. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 86 at 24. (Dkt. #1647) Again, discharging debt is the primary motive behind the filing of most bankruptcy petitions. That motivation does not suggest any bad faith. That the City "chose to avail itself of a legal remedy afforded it by federal law is not proof of bad faith." *In re Chilhowee R-IV School Dist.*, 145 B.R. 981, 983 (Bankr.

W.D. Mo. 1992). This is especially true here. The evidence demonstrated that attempting to negotiate a voluntary impairment of pensions would have been futile.

Accordingly, the Court finds that this factor also weighs in favor of finding good faith.

### c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail.

Although the Court finds that the City did not engage in good faith negotiations with its creditors, Part XV, above, the Court does find the City did make some efforts to improve its financial condition before filing its chapter 9 petition. See Part III C, above.

The City's efforts are detailed in Mr. Orr's declaration filed in support of the petition. Ex. 414 at 36-49. (Dkt. #11) Those efforts include reducing the number of City employees, reducing labor costs through implementation of the City Employment Terms, increasing the City's corporate tax rate, working to improve the City's ability to collect taxes, increasing lighting rates, deferring capital expenditures, reducing vendor costs, and reducing subsidies to the Detroit Department of Transportation. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502) Despite those efforts, the City remains insolvent.

The fact that the City did not seriously consider any alternatives to chapter 9 in the period leading up to the filing of the petition does not indicate bad faith. By this time, all of the measures described in Mr. Orr's declaration had largely failed to resolve the problem of the City's cash flow insolvency. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502). In *In re City of San Bernadino, Cal.*, 499 B.R. 776, 791 (Bankr. C.D. Cal. 2013), the Court observed:

> Was there an alternative available to the City when it was faced with a $45.9 million cash deficit in the upcoming fiscal year and inevitably was going to default on its obligations as they came due? The Court answers this question 'no.' To deny the opportunity to reorganize in chapter 9 based on lack of good faith

would be to ignore fiscal reality and the general purposes of the Bankruptcy Code.

The Court finds this factor also weighs in favor of finding good faith.

### d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed.

The Court concludes that this factor is of paramount importance in this case. The City's debt and cash flow insolvency is causing its nearly 700,000 residents to suffer hardship. As already discussed at length in this opinion, the City is "service delivery insolvent." See Parts III B 6-11 and XIII B, above. Its services do not function properly due to inadequate funding. The City has an extraordinarily high crime rate; too many street lights do not function; EMS does not timely respond; the City's parks are neglected and disappearing; and the equipment for police, EMS and fire services are outdated and inadequate.

Over 38% of the City's revenues were consumed by servicing debt in 2012, and that figure is projected to increase to nearly 65% of the budget by 2017 if the debt is not restructured. Ex. 414 at 39 (Dkt. #11) Without revitalization, revenues will continue to plummet as residents leave Detroit for municipalities with lower tax rates and acceptable services.

Without the protection of chapter 9, the City will be forced to continue on the path that it was on until it filed this case. In order to free up cash for day-to-day operations, the City would continue to borrow money, defer capital investments, and shrink its workforce. This solution has proven unworkable. It is also dangerous for its residents.

If the City were to continue to default on its financial obligations, as it would outside of bankruptcy, creditor lawsuits would further deplete the City's resources. On the other hand, in seeking chapter 9 relief, the City not only reorganizes its debt and enhances City services, but it

also creates an opportunity for investments in its revitalization efforts for the good of the residents of Detroit.  Ex. 43 at 61.

This factor weighs heavily in favor of finding good faith.

## C. Conclusion Regarding
## the City's Good Faith

While acknowledging some merit to the objectors' serious concerns about how City and State officials managed the lead-up to this filing, the Court finds that the factors relevant to the good faith issue weigh strongly in favor of finding good faith.  Accordingly, the Court concludes the City's petition was filed in good faith and that the petition is not subject to dismissal under 11 U.S.C. § 921(c).

## XVIII. Other Miscellaneous Arguments

The objections addressed here were asserted in briefs after the deadline to object had passed.  Accordingly, these objections are untimely and denied on that ground.  In the interest of justice, however, the Court will briefly address their merits.

## A. *Midlantic* Does Not Apply in This Case

In its supplemental brief filed October 30, 2013, AFSCME asserts, "The rights created by the Pensions Clause should survive bankruptcy because the Pensions Clause is an exercise of the right to enact 'state or local laws designed to protect public health or safety' which cannot be disregarded by the debtor."  AFSCME's Supplemental Br. at 3-4.  (Dkt. #1467)  In support of this argument, AFSCME relies on the United States Supreme Court decision in *Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection*, 474 U.S. 494, 106 S. Ct. 755 (1986).

In *Midlantic*, the Supreme Court held that "a trustee in bankruptcy does not have the power to authorize an abandonment without formulating conditions that will adequately protect

the public's health and safety." 474 U.S. at 507, 106 S. Ct at 762. At issue in that case was

whether a trustee in bankruptcy could abandon real property pursuant to 11 U.S.C. § 544(a),

when the property was contaminated with 400,000 gallons of oil containing PCB, "a highly toxic

carcinogen." *Id.* at 497, 106 S. Ct. at 757.

The case is simply not applicable on AFSCME's point. The City has not "abandoned" its

property. Moreover, AFSCME has failed to identify how the pensions clause is a "state or local

law designed to protect public health or safety." *Id.* at 502, 106 S. Ct. at 760.

Accordingly, this objection is overruled.

### B. There Was No Gap in Mr. Orr's Service as Emergency Manager

In an objection filed on October 17, 2013 (Dkt. # 1222), Krystal Crittendon asserted that

Mr. Orr was not validly appointed because the rejection of P.A. 4 did not revive P.A. 72. This

argument is rejected for the reasons stated in Part III D, above.

In this objection, Crittendon also contended that Mr. Orr was not validly appointed

because his initial emergency manager contract expired before P.A. 436 took effect.

P.A. 436 contains a grandfathering provision which states:

> An emergency manager or emergency financial manager appointed
> and serving under state law immediately prior to the effective date
> of this act shall continue under this act as an emergency manager
> for the local government.

M.C.L. § 141.1571.

Mr. Orr's initial emergency manager contract under P.A. 72 stated that it "shall terminate

at midnight on Wednesday, March 27, 2013." Crittendon contends that therefore the contract

terminated the morning of Wednesday, March 27, and that therefore he was not in office on that

day. She asserts that because Mr. Orr's current emergency manager contract became effective

on Thursday, March 28, 2013, there was no emergency manager serving immediately prior to the March 28 effective date of P.A. 436, and the grandfathering clause does not apply.

The City contends that the parties intended for Mr. Orr's initial contract to expire at the end of the day on March 27th and that there was no gap in his service.

In *Hallock v. Income Guar. Co.*, 270 Mich. 448, 452, 259 N.W. 133, 134 (1935), the court assumed "midnight" meant the end of the day. Courts in other jurisdictions, however, have found that the term is ambiguous. *See Amer. Transit Ins. Co. v. Wilfred*, 745 N.Y.S.2d 171, 172, 296 A.D.2d 360, 361 (N.Y. 2002); *Mumuni v. Eagle Ins. Co.*, 668 N.Y.S.2d 464, 247 A.D.2d 315 (N.Y.A.D. 1998).

In *Klapp v. United Insurance Group Agency, Inc*., 468 Mich. 459, 663 N.W.2d 447 (2003), the Michigan Supreme Court noted, "'The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation.'" *Id*. at 470, 663 N.W.2d at 454 (quoting *Penzien v. Dielectric Prod. Engineering Co., Inc.*, 374 Mich. 444, 449, 132 N.W.2d 130, 132 (1965)).

The Court finds that the parties to the contracts clearly intended that there would be no gap in Mr. Orr's contracts or in his appointment. Accordingly, Mr. Orr was validly appointed under M.C.L. § 141.1572. The objection is rejected.

### XIX. Conclusion:
### The City is Eligible and the Court
### Will Enter an Order for Relief.

The Court concludes that under 11 U.S.C. § 109(c), the City of Detroit may be a debtor under chapter 9 of the bankruptcy code. The Court will enter an order for relief forthwith, as required by 11 U.S.C. § 921(d).

The Court reminds all interested parties that this eligibility determination is merely a preliminary matter in this bankruptcy case. The City's ultimate objective is confirmation of a plan of adjustment. It has stated on the record its intent to achieve that objective with all deliberate speed and to file its plan shortly. Accordingly, the Court strongly encourages the parties to begin to negotiate, or if they have already begun, to continue to negotiate, with a view toward a consensual plan.

For publication

.

**Signed on December 05, 2013**

                                        _____/s/ Steven Rhodes_____
                                        **Steven Rhodes**
                                        **United States Bankruptcy Judge**