**Section 9.3    Notice of Claims.**  If either Party becomes aware of any injury, damages, claim, demand, action, legal proceeding, or other loss that may involve the other Party, whether directly or indirectly, it shall inform the other Party in writing within fifteen (15) business days of receiving knowledge of the injury, damages, claim, demand, action, legal proceeding, or other loss.  Such notice(s) shall be provided in accordance with Section 12.7 of this Agreement.

**Section 9.4    Insurance.**  At all times during the term of this Agreement, each Party shall procure and maintain, at its sole cost and expense, the following types and amounts of insurance coverage issued by an insurance company reasonably acceptable to the other Party, unless otherwise agreed to by the Parties in writing:

(a) Commercial General Liability, covering bodily and personal injury, property damage, and contractual liability insuring the activities of the Party under this Agreement, in a minimum amount of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(b) Commercial Automobile Liability with limits of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(c) Worker's compensation insurance in amounts required in accordance with applicable laws.

(d) Errors and Omissions/Professional Liability with limits no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the annual aggregate.

The insurance required of the City by this Agreement in the amounts, with the coverage and other features herein required, may be supplied by a fully funded self-insurance program of the City or a self-insurance pool in which the City is a participant; provided that such self-insurance program or pool will provide the full coverage required herein.

### ARTICLE X
### DISPUTES

**Section 10.1    Informal Dispute Resolution.**  The Authority and the City will attempt to settle any dispute through informal good faith negotiations.  The dispute will be escalated to appropriate senior level management of the Parties, if necessary.  Except as otherwise set forth herein, if such managers are unable to resolve the dispute within fifteen (15) business days of referral (or any other mutually agreed upon timeframe), the Parties will seek resolution of such disputes pursuant to Section 10.2.

**Section 10.2    Jurisdiction and Venue.**  Except as otherwise set forth herein, in the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved any the Parties pursuant to Section 10.1, shall be submitted to the courts of the State of Michigan.

P a g e | **12 of 15**

13-53846-swr    Doc 1341-5    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 13 of 30    51

13-53846-swr    Doc 2617-5    Filed 01/31/14    Entered 01/31/14 17:09:46    Page 11 of 15
13-53846-swr    Doc 2379-2    Filed 01/03/14    Entered 01/03/14 17:41:30    Page 11 of 50

# ARTICLE XI
# MISCELLANEOUS

**Section 11.1   Amendment**. This Agreement can be modified or amended only by written agreement executed and approved by both Parties in the same manner as required for the initial effectiveness of the Agreement, as applicable.

**Section 11.2   Heirs, Successors, and Assigns**. All provisions of this Agreement are and will be binding on the heirs, executors, administrators, personal representatives, successors and assigns of the Authority and the City.

**Section 11.3   Severability**.  If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.4   Governing Law**.  The internal laws of the State of Michigan will control in the construction and enforcement of this Agreement.

**Section 11.5   Third Party Beneficiary Rights.** The Parties expressly acknowledge that the Utility Bondholders (and the Trustee on behalf of such Bondholders) are direct, intended third party beneficiaries of Article IV and Article V of this Agreement and of all other provisions of this Agreement relating to the Utility Taxes and Utility Revenues and as such, are entitled, but not obligated to enforce this Agreement and shall be afforded all remedies available hereunder or otherwise afforded by law against the Parties hereto.

**Section 11.6   Entire Agreement**.  This Agreement sets forth the entire agreement between the Parties and supersedes any and all prior agreements or understandings between them in any related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other agreements, understandings, contracts, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

**Section 11.7   Notices**. Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party by first class mail.  All such written notices shall be addressed to each other Party's signatory to this Agreement.  All correspondence shall be considered delivered to a Party as of the date that the notice is deposited with sufficient postage with the United State Postal Service.  A notice of termination shall be sent via certified mail to the address included with each Party's signature to this Agreement.  Notices shall be mailed to the following addresses:

If to the Authority:   Public Lighting Authority
                       65 Cadillac Square, Ste. 2900
                       Detroit, MI 48226

| | |
|---|---|
| If to City: | City of Detroit<br>Office of the Mayor<br>2 Woodward Avenue, 11th Floor<br>Detroit, MI 48226 |
| With a copy to: | City of Detroit<br>Office of the Emergency Manager<br>Coleman A. Young Municipal Center<br>2 Woodward Ave.<br>11th Floor<br>Detroit, MI 48226<br>Attn: Sonya Mays |

**Section 11.8 Force Majeure.** Any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure. For purposes of this Agreement, Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government, governmental acts, injunctions, labor strikes, other than those of the claiming Party or its suppliers, that prevent the claiming Party from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

**Section 11.9 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

**Section 11.10 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto. No Party to this Agreement may assign its rights under this Agreement to any other person without obtaining the written permission of the other Parties in advance, provided that the Authority's right to terminate this Agreement may be collaterally assigned by the Authority.

**Section 11.11. Limited Obligation.** Notwithstanding anything herein to the contrary, all of the Authority's obligations under this Agreement, other than the obligations which are payable out of proceeds of the insurance required to be maintained by the Authority pursuant to this Agreement, to the extent such obligations are payable out of those insurance proceeds, shall be limited obligations, payable from and expressly limited to those funds provided to the Authority in accordance with the Trust Agreement or the Amended and Restated Trust Agreement or any Bond Indenture, and not payable from any portion of the Utility Revenues needed to pay Financing Costs.

**Section 11.12 Emergency Manager Approval.** If the City is under the management of an Emergency Manager pursuant to the EM Act, at the time of a decision for which the approval of

the City, the City Council or the Mayor is required, then the approval of the Emergency Manager is hereby substituted in place of the approval of the City, the City Council or the Mayor, as applicable..

[SIGNATURE PAGE FOLLOWS]

P a g e | **15 of 15**
13-53846-swr    Doc 1341-5    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 16 of 30    54
13-53846-swr    Doc 2617-5    Filed 01/31/14    Entered 01/31/14 17:09:46    Page 4 of 15
13-53846-swr    Doc 2379-2    Filed 01/03/14    Entered 01/03/14 17:41:30    Page 4 of 50

This Agreement is executed by the Parties on the dates indicated below.

**CITY OF DETROIT**

Dated: _____  By: _____
                                          KEVYN D. ORR
                                 Its:    Emergency Manager

**PUBLIC LIGHTING AUTHORITY**

Dated: _____  By: _____
                                          ODIS JONES
                                 Its:    Executive Director

# Exhibit 1

Lighting Plan



# PUBLIC LIGHTING AUTHORITY LIGHTING PLAN



| | |
|---|---|
| **Office Location:** | **65 Cadillac Square, Suite 2900** |
| | **Detroit, MI 48226** |
| | |
| **Project Location:** | City of Detroit |
| | |
| **Executive Director:** | Odis Jones |
| | |
| **Revision:** | 10 |
| **Date Issued** | 9-9-2013 |



**TABLE OF CONTENTS:**

A – Project Information …………………………………………………………………………………... 4

    1. Project Background …………………………………………………………………………….. 4
    2. Facility Background ……………………………………………………………………………. 5
    3. Scope and Schedule …………………………………………………………………………… 5
    4. Operations & Maintenance …………………………………………………………………….. 6

B – Project Funding …………………………………………………………………………………….. 7

C – Appendices

    1. Appendix A – PLA Articles of Incorporation
    2. Appendix B – Trust Agreement
    3. Appendix C – West PLA Pilot Area
    4. Appendix D – East PLA Pilot Area
    5. Appendix E – Detroit Zip Code Map
    6. Appendix F – Project Schedule
    7. Appendix G – Cash Flow/Budget



A. Project Information

1. Project Background

The Public Lighting Authority ("PLA") was authorized by the Michigan Legislature in 2012 pursuant to a three-bill package that included: (1) the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 – MCL 123.1295 ("Act 392"), which authorized the creation of lighting authorities and granted the statutory authority for their operations; (2) an amendment to the City Utility Users' Tax Act, 1990 PA 100 as amended, MCL 141.1151 – MCL 141.1177 ("Act 100"), which required a city that creates a lighting authority to direct Twelve Million, Five Hundred Thousand Dollars ($12,500,000) to the authority from the revenues authorized under Act 100; and (3) an amendment to the City Income Tax Act, 1964 PA 284 as amended, MCL 141.501 – MCL 141.787, which authorized a city that creates a lighting authority to continue to assess an increased income tax rate in order to hold harmless the public safety departments from the mandatory diversion of revenues under Act 100.

The City Council and Mayor of the City of Detroit ("City") properly incorporated and perfected the formation of the PLA as required under Act 392, with an effective formation date of April 5, 2013. The approved Articles of Incorporation ("Articles") commit the City to the annual payment of $12.5 million to the Authority. (*See* Appendix A, Articles of Incorporation, Art. XIII, Sec. 1). The PLA and the City have executed a Trust Agreement with Wilmington Trust, N.A. as Trustee, wherein the City has irrevocably directed all of the Utility Users' Tax Revenue to the Trustee to be disbursed pursuant to the Trust terms. (See Appendix B, Trust Agreement). The disbursement terms provide that the revenues will be directed as follows: of the first $12.5 million, first to any holders of bonds or debt of the PLA and second to the PLA, if any is left; and third, to City for all of the revenues exceeding $12.5 million.

Consistent with Act 392 and the Articles, the PLA is overseen by an independent, five-member board. The PLA board includes former State Rep. Maureen Stapleton, who serves as chair, Michael Einheuser, John L. Davis, Marvin Beatty and Cedric Dargin. As stated under Act 392, the purpose of the PLA is to provide an equitable and reasonable method and means of financing, operating, and maintaining a lighting system to supply lighting in sufficient quantities to the City of Detroit. The PLA anticipates making a multi-year, large scale, city-wide investment in the public lighting infrastructure including poles, ballasts, circuits, transformers, and distribution connections. The PLA anticipates funding the improvements through: (i) a bridge loan in the amount of $60 million; and (ii) the subsequent sale of approximately $153 million in bonds. The financing will be paid back with the mandatory payment of $12.5 million per year as required under Act 100.

The PLA staff will consist of an Executive Director and support staff. DTE Energy has been selected as the owner's representative. In addition, the PLA has or will procure the services of

Page 4 of 7

13-53846-swr    Doc 1341-5    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 22 of 30    60

13-53846-swr    Doc 2316-2    Filed 01/03/14    Entered 01/03/14 17:09:40    Page 10 of 15
13-53846-swr    Doc 2379-2    Filed 01/03/14    Entered 01/03/14 17:41:50    Page 10 of 50



legal, accounting, engineering, public relations, construction, and maintenance through contracting. Gregory Terrell & Company will provide financial accounting, the Allen Law Group, P.C. will provide legal service and Berg Muirhead and Associates will provide public relations.

2. Facility Background

The Detroit street light system is in need of repair and improvement. Detroit's street light system of 88,000 lights is in disrepair, with approximately 55,000 lights being fed by DTE Electric and the remaining 33,000 being fed by Public Lighting Department (PLD). Although it is estimated that half of the lights in the system are not working, the status of the street light system is unknown and will require a survey of each light. Most of the underground fed lighting circuits within Detroit are made up of series circuits consisting of multi-generation light fixtures.

3. Scope and Schedule

The implementation of the lighting plan is being segregated into a short-term and long-term plan. Two pilot areas have been chosen for the short-term plan implementation, the outcomes of which will inform the long-term process. (*See* Appendices C and D for maps of the selected areas). Both the short and long-term plans will be implemented in several segments, specifically consisting of survey, design and construction work. All contracts will be awarded pursuant to a competitive bid process. The short-term plan implementation will commence in 2013 with completion projected in 1st quarter 2014. The field survey will include collecting status information on each pole and recording in a geographical mapping system. The owner's engineer will provide engineering, material specifications and work packages for construction. A specific improvement will be converting "series" circuits to "multiple" circuits. The overhead and underground construction contractors will perform all field installations and provide field records. Quality and safety audits will be performed throughout the project. Each area has approximately 2,500 lights, for a total of approximately 5,000 street lights.

The long term plan, scheduled from 1st quarter 2014 through 4th quarter 2016, would consist of progressive geographic implementation using Detroit zip codes, as shown on Appendix E, as improvement project areas. (*See also* Appendix F for the long term schedule of project areas). New project areas will begin approximately every other month and take approximately nine months to complete. The final number of street lights will be approximately 46,000. After the two pilot areas, contiguous areas will be addressed including those defined as high priority areas by the City of Detroit. To inform the public of changes and facilitate outage reporting, public notice will be made by way of door hangers and public meetings.

The project design criteria are as follows:
a) Lighting will remain essentially the same in densely populated areas and thoroughfares



     b) All intersections will have lighting
     c) Streets blocks greater than 600 feet long will have a street light in the middle of the block
     d) All new lamp heads should be one cost effective style
     e) All new light arms should be 6 foot in length, centering new lamp head illumination in the street
     f) Standardize on two sizes of lights for majority of fixtures (150Watt (W) High Pressure Sodium (HPS) & 250W HPS)
     g) Overhead feeds will be standard where allowable
     h) Existing lights that do not fit in the above criteria, such as alley lights, will be removed as part of the improvement model
     i) All applicable codes and regulations will be followed

4. Operation & Maintenance

The PLA has drafted a proposed operations & maintenance agreement ("O&M Agreement") with the City of Detroit. Please note that negotiations on the O&M Agreement have not commenced, therefore the information contained in this section should be considered prospective and subject to modification.

Financially, the O&M Agreement will cover two separate costs associated with operating the street light system: the cost of energy to actually light the lights, and the cost of on-going operations and maintenance of the system. The O&M Agreement contemplates the annual establishment of rates to be charged to the City for the services provided.

With respect to the purchase of energy, the O&M Agreement provides two options: one is for the City to purchase electricity directly from a third-party power provider at regulated rates, and the second is for the PLA to purchase power and pass through that purchase to the City at cost. Under either option, DTE Energy will supply the energy under the Michigan Public Service Commission-approved DTE Energy Municipal Street Lighting Rate E.1 – Option III tariff.

With respect to the ongoing operations and maintenance, it is contemplated that the PLA will enter into an agreement with DTE Energy for the duration of the project wherein DTE Energy will operate and maintain the System on a per unit cost basis. Maintenance will include replacement material and equipment as may be necessary to ensure that the refurbished street light system is fully operational with an anticipated 30 year expected useful life. This includes both preventative and reactive maintenance services. The maintenance program will also include outage notification methods with repair time requirements. Upon completion of the project, the PLA will competitively bid this service.

The estimated annual costs for these operations and maintenance services, including PLA administrative costs, is $11M to $12M based on the criteria contained in Section A.3. The



source of the City funds for the payment of rates has not been identified yet, but it should be anticipated that the source will be the City of Detroit General Fund.

**B. Project Funding**

The total estimated project cost for capital improvements is $153 million, excluding the operations and maintenance and PLA administrative costs. This is the anticipated total investment to be repaid through the Utility Users Tax of $12.5 million per year for an expected 30 years. (*See* Appendix G for the cash flow projections for the project by quarter). As stated, street light energy, operation and maintenance are not included in the project costs and will likely be supported by the City of Detroit General Fund.

A strict change control process will be deployed throughout the project.

**C. Appendices**
- a) Appendix A – PLA Articles of Incorporation
- b) Appendix B - Trust Agreement
- c) Appendix C – West PLA Pilot Area
- d) Appendix D – East PLA Pilot Area
- e) Appendix E – City of Detroit by Zip Code
- f) Appendix F – Schedule Summary
- g) Appendix G – Cash Flow/Budget

# APPENDIX A

# ARTICLES OF INCORPORATION
# OF THE
# PUBLIC LIGHTING AUTHORITY

These Articles of Incorporation are executed and adopted by the City Council of the City of Detroit for the purpose of establishing a Public Lighting Authority pursuant to Act 392 of the Public Acts of Michigan of 2012.

## Article I
## Name

The name of the corporation and Authority is the Public Lighting Authority (the "Authority").

## Article II
## Definitions

As used in these Articles of Incorporation, the following words have the following meanings:

**Section 1.** The "*Act*" means Act 392 of the Public Acts of Michigan of 2012, and such amendments as may be hereinafter adopted.

**Section 2.** "*Authority*" means the Public Lighting Authority incorporated under these Articles of Incorporation pursuant to the Act.

**Section 3.** "*Best Value*" means a contract and procurement process to be followed by an authority that encourages and considers bids from locally headquartered companies and that considers use of the local workforce.

**Section 4.** "*Board*" or "*Authority Board*" means the Board of Directors of the Authority.

**Section 5.** "*Bonds*" mean bonds and notes issued by the Authority and includes any Ancillary Facility (as defined in Act) or other financing instruments entered into by the Authority if the facilities are permitted by the contract entered into between the City and the Authority.

**Section 6.** "*City*" means the City of Detroit, located in Wayne County, Michigan.

**Section 7.** "*City Council*" means the City Council of the City of Detroit.

**Section 8.** "*Lighting System*" or "*System*" means plants, works, instrumentalities, and properties used or useful in connection with providing lighting and necessary resources and appurtenances for the System.

**Section 9.** "*Mayor*" means the Mayor of the City of Detroit.

**Section 10.** "*Utility Users Tax*" means the tax levied by the City authorized by Utility Users Tax Act.

13-53846-swr   Doc 1341-5   Filed 10/23/13   Entered 10/23/13 17:15:55   Page 27 of 30   65

13-53846-tjt   Doc 2616-5   Filed 01/31/14   Entered 01/31/14 15:09:40   Page 15 of 15
13-53846-swr   Doc 2379-2   Filed 01/03/14   Entered 01/03/14 17:41:50   Page 15 of 15