UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re<br><br>CITY OF DETROIT, MICHIGAN,<br><br>Debtor. | No. 13-53846<br><br>Chapter 9<br><br>HON. STEVEN W. RHODES |

# ATTACHMENT

# APPELLEE STATE OF MICHIGAN'S DESIGNATION OF ITEMS TO BE INCLUDED IN THE RECORD ON APPEAL

| Design-ation | Docket # | Filing Date | Description |
|---|---|---|---|
| 3. | 1795 | 11/22/2013 | Debtor's Reply to Limited Objections to Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents With the Public Lighting Authority and (II) Granting Other Related Relief |

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------------------------x
                                                      :
In re                                                 : Chapter 9
                                                      :
CITY OF DETROIT, MICHIGAN,                            : Case No. 13-53846
                                                      :
            Debtor.                                   : Hon. Steven W. Rhodes
                                                      :
                                                      :
------------------------------------------------------x

## DEBTOR'S REPLY TO LIMITED OBJECTIONS TO MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

The City of Detroit (the "Debtor" or the "City") submits this reply (the "Reply") to the (i) Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Debtor's Motion for Entry of an Order Authorizing the Public Lighting Authority Transaction (Docket No. 1557) (the "Syncora Objection") and (ii) various related joinders thereto (collectively, with the Syncora Objection, the "Objection").[1] The relief requested in the Debtor's Motion (Docket No. 1341) (the "Motion") should be granted.

---

[1] The following are the joinders filed to the Objection by other parties: (i) Joinder of Ambac Assurance Corporation (Docket No. 1574); (ii) Joinder of the Michigan Council 25 of the American Federation of State, County, & Municipal Employees, AFL-CIO and SUB-Chapter 98, City of Detroit Retirees (Docket No. 1603); (iii) Joinder of FMS Wertmanagement Aör

CHI-1912789v1
13-53846-swr  Doc 2616-15  Filed 01/31/14  Entered 01/31/14 15:09:46  Page 2 of 15
13-53846-swr  Doc 1795  Filed 11/22/13  Entered 11/22/13 15:09:46  Page 1 of 11

## **PRELIMINARY STATEMENT**

There is no dispute that the City's street lighting system is in disarray.[2] In some areas, nearly half of the streetlights are broken.[3] According to recent surveys and media reports, many neighborhoods plagued by widespread streetlight outages are experiencing particularly high crime rates.[4]

---

(Docket No. 1615); and (iv) Joinder of the Official Committee of Retirees in Part in the Limited Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (Docket No. 1713). Terms capitalized but not defined herein shall have the meanings given to them in the Motion.

[2] See, e.g., Charlie LeDuff, Detroit's Lighting System Problems are Shocking, MYFOXDETROIT.COM, Nov. 8, 2013 10:22 AM, http://www.myfoxdetroit.com/story/23899994/leduff-pays-a-visit-to-the-detroit-lighting-authority; JC Reindl, Detroit Takes First Steps to Fix Troubled Lighting, DETROIT FREE PRESS, Nov. 8, 2013, http://www.freep.com/article/20131107/NEWS01/311070196/Detroit-street-lighting-schedule-Zip-Code-Public-Lighting-Authority-work-begins

[3] See, e.g., Joe Guillen, Survey: Nearly Half of Two Detroit Neighborhoods' Streetlights are Broken, DETROIT FREE PRESS, Oct. 22, 2013 8:59 PM, http://www.freep.com/article/20131022/NEWS01/310220167/ ("The authority studied 4,939 streetlights in the two neighborhoods during the last month and found that 2,211 of them, or about 45%, are not working."); Chris Christoff, Half of Detroit's Streetlights May go Out as City Shrinks, BLOOMBERG, May 24, 2012, http://www.bloomberg.com/news/2012-05-24/half-of-detroit-s-streetlights-may-go-out-as-city-shrinks.html ("As it is, 40 percent of the 88,000 streetlights are broken….").

[4] See, e.g., The Public Lighting Authority of Detroit is Beginning an Audit of All the Street Lights in the City, DETROIT 20-20, September 19, 2013, http://detroit2020.com/2013/09/19/the-public-lighting-authority-of-detroit-is-beginning-an-audit-of-all-the-street-lights-in-the-city/ (quoting the Executive Director of the PLA as stating that the PLA's pilot program is targeting two sections of Detroit because "they're really high density areas. They experience a high degree of outage with lights and also, they're having high spikes in crime"); JC Reindl, Why Detroit's Lights Went Out, and How

CHI-1912789v1  2

13-53846-tjt   Doc 2616-15   Filed 01/31/14   Entered 01/31/14 15:00:40   Page 3 of 15
13-53846-swr   Doc 2463-3   Filed 01/25/14   Entered 01/25/14 15:12:04   Page 3 of 15

The City has sought approval under section 364(c) of the Bankruptcy Code to enter into a financing transaction that will allow Detroit's Public Lighting Authority (the "PLA") to begin to address the street lighting problems. The PLA was established prior to the commencement of this case as a separate public entity whose sole function is to ameliorate the lighting crisis burdening City residents. To accomplish its mission, the PLA is incurring debt that will be supported by a pledge of the Utility Taxes levied by the City.

The City Council approved this transaction. The tax revenues and other amounts that the City intends to provide to the PLA to address the City's street lighting system are not otherwise available to fund distributions to creditors under a plan of adjustment. The terms of the proposed financing are reasonable and support the redress of this critical lapse in services necessary for public health and safety. The need to provide for the public's safety by turning on the lights cannot be seriously challenged, yet Syncora (and the joining objectors) would have the citizens' safety suffer into the indefinite future in an attempt to leverage better plan treatment. That result cannot be countenanced. The Objection also conflicts

---

the City Plans to Get Them Back On, DETROIT FREE PRESS, Nov. 17, 2013, http://www.freep.com/article/20131117/NEWS01/311170087/ ("[A]cross the city's 139 square miles, tens of thousands of other people are still living in the dark and with all the problems that brings — more crime and traffic accidents and a heightened sense of vulnerability that forces many to plan their lives around the setting sun for fear of getting mugged on their own streets.").

CHI-1912789v1 3

13-53846-tjt  Doc 2616-15  Filed 01/31/14  Entered 01/31/14 15:00:40  Page 4 of 15
13-53846-swr  Doc 2189-3  Filed 12/23/13  Entered 12/23/13 15:12:04  Page 4 of 15

with the reservation of governmental functions to the City under Chapter 9. The Objection and joinders should be overruled and the Motion should be granted.

## ARGUMENT

**A.    The City Has Provided Sufficient Information to Syncora**

Notwithstanding Syncora's statements to the contrary, the City has provided Syncora with extensive information with respect to the PLA transaction. The City attached all relevant documents to its Motion, including all transaction documents and the PLA's plan to remediate the City's street lighting problem. In addition, the City's advisors met with Syncora's and other creditors' advisors throughout the course of this case (including a two-day symposium conducted last week) to provide additional details about the City's plans and progress in providing adequate public services. During last week's meetings, the City discussed details of the PLA's plans to address the City's public lighting problem. Specifically, the City provided extensive information regarding: (i) the creation, management and operations of the PLA, (ii) each of the PLA Financing Agreements,[5] (iii) specific

---

[5]    The "PLA Financing Agreements," as referenced herein, are: (i) the Interlocal Agreement for the Construction and Financing of a Public Lighting System (the "C&F Agreement") by and between the City and the PLA; (ii) the Amended and Restated Trust Agreement (the "Amended Trust Agreement") by and among the City, the PLA, the Michigan Finance Authority (the "MFA") and Wilmington Trust, N.A., each in substantially the form attached to the Motion as Exhibits 6.2 and 6.3; and (iii) the Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System (the "O&M Agreement"), an outsourcing agreement

CHI-1912789v1                                  4

13-53846-swr    Doc 2616    Filed 01/31/14    Entered 01/31/14 15:00:40    Page 5 of 15
13-53846-swr    Doc 2619-3    Filed 01/31/14    Entered 01/31/14 15:12:04    Page 5 of 15

funding sources for lighting, and (iv) the expected timeline for the implementation of the PLA's plan. As a result, a predicate for Syncora's Objection falls away, and further discovery is neither necessary nor appropriate in connection with the approval of the Motion.[6]

B. **The PLA Utility Tax Revenues are Not Available to Fund Plan Distributions**

The Syncora Objection rests on two faulty premises. First, Syncora impermissibly seeks to use the City's request to enter agreements effecting a pledge and transfer of Utility Tax revenues as a vehicle to assert creditor control over a core governmental function. Second, Syncora ignores that the City's Utility Tax revenue stream is wholly dedicated to public safety and not available to pay creditor claims in this case.

The City established the PLA on February 5, 2013 in accordance with Public Act 392 of 2012, the Municipal Lighting Authority Act, as amended, MCL § 123.1261, et seq. ("PA 392"). From that date forward, the PLA has had the

---

whereby the City agrees to pay the PLA to perform maintenance and other activities that the City would otherwise have to perform. As to the O&M Agreement, nothing contained in the Bankruptcy Code requires that the City obtain approval of such agreement; however, the request for approval was made in the interest of eliminating any question regarding the City's or the PLA's ability to perform under the O&M Agreement.

[6] See Order Denying Motion for Clarification and Motion to Expedite Hearing (Docket No. 1661) (denying Syncora's request to conduct discovery with respect to the Motion).

CHI-1912789v1   5

13-53846-swr   Doc 2616-15   Filed 01/31/14   Entered 01/31/14 15:00:40   Page 6 of 15
13-53846-swr   Doc 2468-3   Filed 01/25/14   Entered 01/25/14 15:12:04   Page 6 of 15

statutory right to receive up to $12.5 million of utility tax revenues (the "PLA Utility Tax Revenues"), as described in the Motion.[7] To fulfill its obligation to provide the PLA with the PLA Utility Tax Revenues, the City entered into a Trust Agreement on August 1, 2013 (the "Original Trust Agreement") with the PLA and Wilmington Trust, N.A. (the "Trustee").[8] The Original Trust Agreement requires the City to direct the entirety of the Utility Tax revenues that public utilities and resale customers collect on the City's behalf to the Trustee.[9] The Trustee then delivers the PLA Utility Tax Revenues to the PLA, and all amounts in excess of the PLA Utility Tax Revenues to the City.[10]

The PLA Financing Agreements will leave these economics unaltered. Under the Amended Trust Agreement, the public utilities and resale customers that collect the Utility Tax will continue to turn all of the revenues generated from this tax over to the Trustee.[11] The PLA Financing Agreements also require that the Trustee provide all amounts in excess of the PLA Utility Tax Revenues to the City, including the amounts that the City has pledged in excess of the $12.5 million per

---

[7] See MCL § 141.1152(5).

[8] The Original Trust Agreement was attached within Exhibit 6.1 of the Motion.

[9] See Original Trust Agreement §§ 2(a)(i) and 2(b).

[10] See Original Trust Agreement §§ 2(a)(ii) and 2(c).

[11] See Amended Trust Agreement §§ 105(a)(i) and 105(b)(i).

CHI-1912789v1        6

13-53846-swr  Doc 2616-15  Filed 01/31/14  Entered 01/31/14 15:00:40  Page 7 of 15
13-53846-swr  Doc 2489-3  Filed 01/25/14  Entered 01/25/14 15:12:04  Page 67 of 115

year, and the PLA is not entitled to such excess under any circumstances.[12] Syncora's focus on the trust device used to distribute the Utility Tax revenues under the PLA Financing Agreements is, thus, irrelevant.

Moreover, the amounts the City plans to pay to the PLA for the operation and maintenance of the City's lighting system are essentially the same as the amounts that the City would otherwise have to spend itself for maintenance and remediation costs for the operation of the City's street lighting system. The implementation of the PLA Financing Agreements, therefore, leaves the City and its creditors in the same economic position as they currently occupy and will not impact the funds available for distribution to creditors under a chapter 9 plan in this case.[13]

---

[12] See Amended Trust Agreement §§ 105(a)(ii) and 105(b)(iii). ("Any amounts remaining in the Trust Fund after making the deposits as provided in Sections 105(b)(i) and 105(b)(ii) shall be transferred to the City Disbursement Fund. The Trustee is hereby authorized to disburse moneys from the City Disbursement Fund to the City for deposit to the General Fund of the City free and clear of all liens.").

[13] Moreover, the Michigan Legislature linked the passage of PA 392 to the passage of Public Act 394 of 2012 ("PA 394"). Absent PA 394, the City would have been obligated to reduce its City income tax on residents as part of a long-term state-mandated reduction plan. Because the City created the PLA, PA 394 provides that the City's income tax rate will remain at the non-reduced rate until such time as all bonds, obligations and other indebtedness of the PLA have been paid. MCL § 141.503. Accordingly, *without this financing,* funds available for distribution to creditors will certainly be reduced.

CHI-1912789v1               7

13-53846-tjt    Doc 2616-15    Filed 01/31/14    Entered 01/31/14 15:00:40    Page 8 of 15
13-53846-swr    Doc 2618-3    Filed 01/25/14    Entered 01/25/14 15:12:04    Page 8 of 15

## C. There Is No Reason to Delay the Public Lighting Project

Syncora's argument that all of the City's efforts to provide adequate services to residents should proceed only in conjunction with the confirmation of a chapter 9 plan has no basis in law and would inappropriately interfere with the provision of adequate lighting services to the City's residents, a core function of the City. Syncora fails to reconcile its position with the constitutional underpinnings of chapter 9, which operates to preserve, protect and assure the ability of the City to provide public services and adequate resources to its citizens.[14]

Indeed, chapter 9 has been drafted to carefully preserve the City's prerogatives and obligations to provide basic services to residents without the need to seek creditor approval. Facilitating a lighting system to foster public safety is at the core of what the City's obligations to its residents encompass. Public safety projects need not await the confirmation of a plan of adjustment.

In addition to being legally flawed, the objections also have no factual basis. As noted above, the City's fulfillment of its obligations under the PLA Financing Agreements will not impact the funds available for creditor distributions

---

[14] 6 COLLIER ON BANKRUPTCY § 904.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.) (noting that the Section 904 prohibition on court interference with a municipal debtor's property or revenue is "absolute"); § 904.01[2] ("Unlike a chapter 11 debtor, a municipal debtor is not restricted in its ability to use, sell or lease its property, and the court is not to involve itself with the day to day operations of the municipality.").

in this case. Thus, no reason exists to delay approval of the PLA Financing Agreements until plan confirmation.

Moreover, contrary to the statements in Syncora's Objection, the financing of the PLA will not wait until June 2014.[15] Instead, the PLA originally scheduled its first stage of financing (the "Interim Financing") for November 20, 2013, which has been delayed only because of the need to resolve the Syncora Objection. The Interim Financing is necessary to begin implementation of the first phase of the PLA's overall plan to address the City's lighting emergency, which will focus on improvements to the street lighting system in two specific areas of the City that suffer from severely inadequate street lighting.[16] This initial phase is a critical phase of the PLA's overall lighting plan for the City, as the experience gained in its implementation will further guide the exact methods that the PLA will

---

[15] Syncora Objection, p. 14. Syncora's statement that the O&M Agreement is subject to material alteration also is incorrect. The City attached a copy of a substantially final version of the O&M Agreement as Exhibit 6-1 to the Motion. As such, Syncora's argument that alterations to the O&M Agreement somehow justify a delay in the PLA's implementation of its lighting plan is meritless.

[16] See the Lighting Plan § A.3, issued by the PLA on September 9, 2013 (the "Lighting Plan"). The Lighting Plan is attached within Exhibit 6.1 of the Motion. See also Lighting Plan, Appendix G (noting that the PLA's budget – and start of the street lighting project – is based upon the assumption that the PLA obtains the Interim Financing).

CHI-1912789v1 9

13-53846-tjt Doc 2179-15 Filed 01/31/14 Entered 01/31/14 15:09:40 Page 10 of 15
13-53846-swr Doc 1993 Filed 12/05/13 Entered 12/05/13 16:50:34 Page 10 of 15

utilize to implement the remainder of its lighting plan.[17]

D.  **The PLA Financing Agreements Provide the Only Viable Alternative to Fix the City's Lighting Issue**

Finally, Syncora argues that the financing of the PLA under the PLA Financing Agreements is improper under a list of factors set forth in a non-binding decision issued by the United States Bankruptcy Court for the Western District of Missouri in connection with a chapter 11 case.[18]  The Farmland factors were used by the Farmland court to consider a modification of a previously-approved postpetition financing.  It was not a situation where, as here, a city is pledging certain tax revenues to a separate public entity that was created prepetition and has a statutory right, as of the date of its creation, to receive such tax revenues.  Indeed, the Farmland factors should have no application because the financing proposed

---

[17]  Lighting Plan § A.3.  ("The implementation of the lighting plan is being segregated into a short-term and long-term plan. Two pilot areas have been chosen for the short-term plan implementation, the outcomes of which will inform the long-term process.").

[18]  See In re Farmland Indus., Inc., 294 B.R. 855, 879-81 (Bankr. W.D. Mo. 2003).  In considering a modification of previously-approved postpetition financing, the Farmland court looked to the following factors: (i) did the debtor exercise sound and reasonable business judgment; (ii) is it in the best interests of the estate and its creditors;(iii) is the transaction necessary to preserve the assets of the estate, and necessary, essential, and appropriate for the continued operation of the debtor's businesses; (iv) are the terms of the transaction fair, reasonable, and adequate, given the circumstances; and (v) was the agreement negotiated in good faith and at arm's length.  Id., 294 B.R. at 881.

under the PLA Financing Agreements is necessary to afford the City and the PLA the resources needed to provide functioning streetlights — a basic service that is absolutely necessary to alleviate serious public safety concerns that now exist within the City.

Even if the Farmland factors (or some similar analysis) were relevant to the PLA Financing Agreements, the transaction contemplated under the PLA Financing Agreements would satisfy those factors by providing the City with the ability to address a major health and safety problem at the lowest financing cost possible. As supported in the Motion, the City's request for the relief set forth therein represents a sound exercise of the City's business judgment and is in the best interest of the City, its creditors and other parties in interest. This is particularly true given that the implementation of the PLA Financing Agreements will leave the City's creditors in the same economic position as they currently occupy and will not impact the funds available for distribution to creditors under a chapter 9 plan in this case.

It is clear that the financing is necessary, essential, and appropriate to support the redress of the City's critical lighting problem impeding the City's rehabilitation. It is also clear that the terms of the proposed financing are reasonable. Pledging its Utility Tax revenues in accordance with PA 392 and the PLA Financing Agreements allows the City to obtain the required improvements to

its lighting system at the interest rate available to a borrower (the MFA) in significantly better financial health than the City.  Finally, as supported in the Motion, the PLA Transaction Agreements are the result of good faith, arms-length negotiations among the City, the PLA, the MFA and the initial purchasers of the MFA Bonds.  Each of those entities is acting in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.  As such, the City's entry into the PLA Financing Agreements is appropriate under section 364 of the Bankruptcy Code.

## CONCLUSION

As City Council recognized by voting to approve the PLA Financing Agreements and the O&M Agreement, the City has a responsibility to provide basic services to its citizens, especially those services that relate to the public's safety.  Restoring the public lighting system is a matter of the public's safety that cannot be compromised, suspended or subordinated to creditor interests.  For the reasons set forth herein, the City respectfully submits that the Objection should be overruled.

## RESERVATION OF RIGHTS

The City files this Reply without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the

political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

[The remainder of this page is intentionally blank]

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached as Exhibit 1 to the Motion granting the relief sought therein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated:  November 22, 2013        Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com