# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
------------------------------------------------------x
                                         :
In re                                    :  Chapter 9
                                         :
CITY OF DETROIT, MICHIGAN,               :  Case No. 13-53846
                                         :
                    Debtor.              :  Hon. Steven W. Rhodes
                                         :
                                         :
------------------------------------------------------x
                                         :
CITY OF DETROIT, MICHIGAN,               :  Chapter 9
                                         :
                    Plaintiff,           :  Adversary Proceeding No. 14-_____
                                         :
vs.                                      :  Hon. Steven W. Rhodes
                                         :
DETROIT GENERAL RETIREMENT               :
SYSTEM SERVICE CORPORATION,              :
DETROIT POLICE AND FIRE                  :
RETIREMENT SYSTEM SERVICE                :
CORPORATION, DETROIT                     :
RETIREMENT SYSTEMS FUNDING               :
TRUST 2005, and DETROIT                  :
RETIREMENT SYSTEMS FUNDING               :
TRUST 2006                               :
                                         :
                    Defendants.          :
------------------------------------------------------x
```

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, the City of Detroit, for its complaint seeking declaratory and

injunctive relief, says:

**PARTIES**

1.      The City of Detroit ("the City") is a Michigan municipal corporation located in Wayne County.  The City is a home rule city organized under PA 279 of 1909, as amended, the Home Rule City Act, MCL 117.1, *et seq*.  The City has home rule power under the State Constitution of 1963, PA 279, and the 2012 Charter of the City of Detroit, subject to the limitations on the exercise of that power contained in the State Constitution, City Charter, or imposed by statute.

2.      Defendant Detroit General Retirement System Service Corporation is a non-profit Michigan corporation created by the City in April 2005 for the ostensible purpose of providing financial assistance to the City in meeting its unfunded accrued actuarial liabilities to defendant Detroit General Retirement System.

3.      Defendant Detroit Police and Fire Retirement System Service Corporation is a non-profit Michigan corporation created by the City in April 2005 for the ostensible purpose of providing financial assistance to the City in meeting its unfunded accrued actuarial liabilities to defendant Detroit Police and Fire Retirement System.

4.      Defendant Detroit Retirement Systems Funding Trust 2005 is a trust created and existing under Michigan law for the purpose of issuing Certificates of Participation in 2005 to provide funding for the unfunded accrued actuarial

liabilities of the Detroit General Retirement System and the Detroit Police and Fire Retirement System (collectively, the "Retirement Systems").

5.       Defendant Detroit Retirement Systems Funding Trust 2006 is a trust created and existing under Michigan law for the purpose of issuing Certificates of Participation in 2006 to provide funding for the refinancing of certain 2005 Certificates of Participation.

## VENUE AND JURISDICTION

6.       This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157(b).  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  As described more fully herein, an actual case and controversy under 28 U.S.C. § 2201(a) exists between the parties.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

7.       The City of Detroit has established two pension plans for its employees.  The first, for the benefit of its uniformed police and fire fighters, is the Detroit Police and Fire Retirement System ("PFRS").  The second, for the benefit of other City employees, is the Detroit General Retirement System ("GRS").  At all relevant times, Article 9, Section 24, of the Michigan Constitution required that, outside of bankruptcy, the City's obligations to the PFRS and GRS be fully funded and paid down, in part, on an annual basis.

8.      By 2005, the City had fallen behind in making its contributions to the Retirement Systems.  As a result, according to the City's 2005 Comprehensive Annual Financial Report, the PFRS had unfunded accrued actuarial liabilities ("UAAL") of $783 million and the GRS had UAAL of $914 million, for a total of almost $1.70 billion, at the end of the 2004 fiscal year.  Facing lawsuits from the Retirement Systems to enforce its payment obligations, the City decided to raise the necessary funds by borrowing them.

9.      Like all other municipalities in Michigan, the City was subject to a strict limitation on the amount of indebtedness it could incur.  In particular, Section 4a of the Home Rule City Act ("HRCA"), MCL 117.4a, set maximum limits on a city's net indebtedness at the greater of:  (1) ten percent of the assessed value of all the real and personal property in the city; or (2) fifteen percent of the assessed value of all the real and personal property in the city if that portion of the total amount of indebtedness incurred which exceeded ten percent was or had been used solely for the construction or renovation of hospital facilities.  According to a calculation prepared by the City's Finance Department, the City had only $660 million remaining under its debt limit as of May 2, 2005.  *See* Offering Circular for $1,440,000,000 Taxable Certificates of Participation Series 2005, at B-44 (May 25, 2005) ("2005 Offering Circular"), attached hereto as Exhibit A.

10.     In 2005 and at all times since then, the sums the City of Detroit needed to borrow to satisfy its obligations to the PFRS and the GRS would have exceeded the debt limits set by Section 4a of the HRCA.  The City was therefore unable to fund its UAAL shortfall through the issuance of debt, such as the sale of bonds to the public.  Instead, the City began searching for a means of borrowing money by structuring a transaction that would evade the HRCA's debt limit.  In the end, the City—at the prompting of investment banks that would profit handsomely from the transaction—decided to embark upon transactions to sell so-called "Certificates of Participation" ("COPs") to investors.

**Structure of the COPs**

11.     Because the HRCA's debt limit prohibited the City from borrowing the amounts it needed to satisfy the UAAL of the PFRS and the GRS, the City's investment bankers convinced the City to enter into a transaction calculated to allow the City to avoid calling its new borrowings "debt."  At the investment bankers' suggestion, the City did this by (a) creating two shell entities called "Service Corporations," (b) having the Service Corporations create a trust to sell the COPs to investors, (c) requiring the Service Corporations and the trust to remit the proceeds of the COPs sale to the Retirement Systems, (d) arranging to have the Service Corporations pay the trust the monies required to service the interest upon and retire the principal of the COPs, and (e) agreeing to pay the Service

Corporations the monies they would need to satisfy their obligations to the trust. *See* 2005 Offering Circular at 1(Ex. A). The City was advised that, by characterizing its payments to the Service Corporations as contractual obligations, the funds it borrowed by issuance of the COPs would somehow not amount to debt. Four series of these COPs were sold to the public in this way, two in 2005 and two in 2006.

### Service Corporations

12.     As the first step, in April 2005, City officials incorporated two non-profit corporations—defendants Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation. The stated purpose of these Service Corporations was to provide assistance to the City in funding its UAAL to the two retirement systems. City of Detroit Ordinance No. 05-05 (Feb. 4, 2005), attached hereto as Exhibit B.

13.     The board of each Service Corporation consisted of five *ex officio* directors, all of whom were members of the City government—the City's Finance Director, Budget Director, and Corporation Counsel, plus two members of the City Council. The City ordinance establishing the Service Corporations explained that the Service Corporations were "acting as an instrumentality and enterprise of the City and performing an important public purpose by assisting the City to meet its constitutional obligations with respect to the particular Retirement System." *Id.*

But, in truth, the Service Corporations were simply pass-through entities that were created to enable the City to circumvent legal prohibitions against further borrowing. The Service Corporations' sole purpose in the COPs transaction was to make a one-time payment to the Retirement Systems to reduce the City's UAAL obligations. *See* GRS Service Contract 2005, General Terms and Conditions §§ 4.01, 4.03(a), 4.04 (May 25, 2005), attached hereto as Exhibit C. However, even this obligation was expressly conditioned upon the Service Corporations receiving sufficient funds from the next shell entity—the "Funding Trust"—that would sell the COPs to investors. *Id.* § 4.03(a). The Service Corporations, in other words, were without independent economic substance.

14.     The Service Corporations also existed only on paper. Upon information and belief, after their initial organizational meetings, the boards of the two Service Corporations never regularly met, never maintained minutes of any meetings, did not keep books and records, and observed no other formalities of corporate existence.

**The Service Contracts**

15.     On May 25, 2005, the City entered into a "Service Contract" with each Service Corporation. *See, e.g.,* GRS Service Contract 2005 (Ex. C). In the Service Contracts, the City promised to make a series of periodic payments (the "City Payments") to the Service Corporations in an amount sufficient to pay the

7

interest and principal due on the COPs. However, on the closing date of the transaction (less than ten days after they entered into the Service Contracts with the City), the Service Corporations irrevocably transferred their entire right to receive the City Payments to defendant Detroit Retirement Systems Funding Trust 2005. *See* Trust Agreement § 201 (June 2, 2005) ("2005 Trust Agreement"), attached hereto as Exhibit D. Thus, the sole ongoing function of the Service Corporations disappeared almost as soon as it was created.

16. The purpose, design, and effect of the 2005 Service Contracts was to allow the City to borrow money in violation of the HRCA and other state laws by characterizing the City Payments as "contractual obligations," rather than debt service. At the time the $1.44 billion of Certificates of Participation were issued in 2005, the City had only approximately $660 million remaining under its HRCA debt limit, and thus could not issue traditional debt to cover the $1.70 billion pension shortfall. The 2005 COPs transaction was intended to allow the City to borrow about $780 million that it was not permitted to borrow under the HRCA.

17. In addition, the Service Contracts created in the 2005 COPs transaction and the COPs themselves did not comply with the Revised Municipal Finance Act, PA 34 of 2001, MCL 141.2101, *et seq*. ("RMFA"). For example, under the RMFA, the City was required to obtain approval of the Michigan Department of Treasury before undertaking a debt financing of the magnitude and

character of the COPs. *See* MCL 141.2303(7). However, upon information and belief, the City did not obtain this approval before entering into the Service Contracts or causing the 2005 Funding Trust to issue the COPs. Nor were the Service Contracts or the COPs transaction an authorized method for financing unfunded pension obligations under the RMFA or any other state law.

**Funding Trusts**

18.     As part of their plan to circumvent the HRCA's debt limit and the RMFA's requirements, the City and its bankers interposed yet another layer between the City and the COPs. Accordingly, the Service Contracts required the Service Corporations to create a so-called "funding trust" as a conduit to actually issue, sell, and service the COPs. *See* GRS Service Contract 2005 § 4 (Ex. C).

19.     On or about June 2, 2005, the Service Corporations entered into a Trust Agreement with U.S. Bank, N.A., as Trustee, to create defendant Detroit Retirement Systems Funding Trust 2005 ("2005 Funding Trust"). *See* 2005 Trust Agreement (Ex. D).[1] In the Trust Agreement, the Service Corporations made an absolute transfer to the 2005 Funding Trust of all their rights to receive the City

_____

[1] Under a separate document called the Contract Administration Agreement, U.S. Bank was also engaged as the Contract Administrator to administer provisions of the Service Contracts and Trust Agreement. *See* Contract Administration Agreement 2005 (June 2, 2005), attached hereto as Exhibit E; Contract Administration Agreement 2006 (June 12, 2006), attached hereto as Exhibit F. Wilmington Trust Company, N.A., has since succeeded U.S. Bank as both Trustee and Contract Administrator.

Payments and directed that the Trust could not transfer or assign these rights to another party. *Id.* § 201.[2]

20.     Each COPs certificate represented a proportional interest in the stream of City Payments the 2005 Funding Trust was to receive. The 2005 Funding Trust was obligated to sell the COPs to investors, and to remit the proceeds from the sale of the COPs to the Service Corporations for onward payment to the Retirement Systems in satisfaction of the City's UAAL. Thereafter, the role of the 2005 Funding Trust was to receive the City Payments and pay the holders of the COPs the interest and principal they were due.

**Issuance of the COPs**

21.     The 2005 Trust Agreement provided for the issuance of two series of these COPs. The first was COPs Series 2005-A, which totaled $640 million and paid a fixed rate of interest. The second was COPs Series 2005-B, which totaled $800 million and paid a variable rate of interest. Each of the two series of COPs represented an undivided proportionate interest in the 2005 Funding Trust's right to receive the City Payments under the 2005 Service Contracts.

---

[2] The City was not a party to the Trust Agreements and has no direct contractual relationship with the 2005 Funding Trust or the 2006 Funding Trust. However, the 2005 and 2006 Funding Trusts are express third party beneficiaries of the 2005 and 2006 Service Contracts and have the right to enforce the City's promises under the Service Contracts. *See, e.g.*, GRS Service Contract 2005, General Terms and Conditions §§ 9.12(a)(4), (b).

22.     The two series of the 2005 COPs were sold to the public in May and

June of 2005, raising $1.44 billion, and the 2005 Funding Trust, after accounting

for the costs of the transaction and the generous fees paid to bankers and others,

turned over $1.37 billion of the proceeds to the Service Corporations, who in turn

distributed them to the PFRS and the GRS.  Shortly thereafter, the City began

making its City Payments to service the obligations of the 2005 Funding Trust

under the COPs.

23.     At the time the 2005 COPs were issued, the City's advisors justified

the COPs structure on the ground that the Service Contracts did not create

indebtedness for the City because the City Payments were being made in exchange

for future services by the Service Corporations.  However, the Service

Corporations provided no significant services to the City in the years following the

COPs transactions, and none are expected in the future.  Indeed, the Service

Contracts themselves make clear that the Service Corporations' only services to the

City consisted in acting as a conduit for paying over the proceeds of the COPs

sales to the Retirement Systems.  *See, e.g.*, GRS Service Contract 2005, General

Terms and Conditions §§ 4.01, 4.02, 4.03 (Ex. C).  The periodic City Payments

were thus not being made to compensate the Service Corporations for any ongoing

services, but rather solely to pay the principal and interest due on the COPs.

24.    City officials turned a blind eye to the requirements of state law and to the City's desperate financial condition.  The 2005 Trust Agreement was executed on behalf of both Service Corporations by Sean K. Werdlow, who was at that time the Finance Director of the City, as well as the President of both the GRS Service Corporation and the PFRS Service Corporation.  Upon information and belief, shortly after closing the 2005 COPs transaction, Mr. Werdlow left employment of the City and joined SBS Financial Products Company, LLC, one of the investment banks that engineered the 2005 COPs deal.

25.    Among investment banks, the COPs transaction was celebrated as a clever circumvention of the law.  In fact, a leading industry publication—*The Bond Buyer*—named the 2005 COPs transaction as one of the most innovative financings of the year.  *See* Elizabeth Carvlin, *Detroit Uses COPs to Shift Pension Burden and Set a Few Records*, The Bond Buyer, Dec. 29, 2005, at 28A, attached hereto as Exhibit G.  That publication explained that the City had to rely on "a unique combination of legal precedents . . . dating back to the 19th century" because it lacked the legal authority to issue the COPs without having them count against its debt limit.  *Id.*  Although these 19th century cases involved nothing like the exotic financial instruments making up the COPs transaction, the transaction was extolled within the investment banking community for its creativity in evading the state-imposed debt limits by taking the concept of a contract for future services further

than ever before.  The 2005 COPs transaction was the largest municipal financing ever offered in Michigan.  *Id.*

### 2006 COPs Transaction

26.     When the 2005 COPs were issued, the PFRS and the GRS required that the City fund any UAAL over 13 years and 20 years, respectively.  On or about February 8, 2006, and March 30, 2006, however, the governing boards of both Retirement Systems increased the amortization period of the UAAL to 30 years.  To take advantage of this longer amortization schedule, the City determined to have additional COPs issued to replace certain of the 2005 COPs.

27.     In a resolution dated April 26, 2006, the City provided for execution of new Service Contracts with the Service Corporations and approved the form of a Trust Agreement for a new funding trust, defendant Detroit Retirement Systems Funding Trust 2006 ("2006 Funding Trust").  *See, e.g.*, GRS Service Contract 2006 (June 7, 2006), attached hereto as Exhibit H; Trust Agreement (June 12, 2006), attached hereto as Exhibit I ("2006 Trust Agreement).   The function of the 2006 Funding Trust was to float a $949 million issue of two new series of 2006 COPs to fund a replacement of the full $800 million of variable rate Series 2005-B COPs and $104 million of fixed rate Series 2005-A COPs, plus the fees and costs of the transaction.

28.     As in the earlier transaction, the City entered into Service Contracts with the Service Corporations; the Service Corporations irrevocably transferred all their rights to receive payments from the City to the 2006 Funding Trust; and the Trust issued and sold new COPs to the public in two series—COPs Series 2006-A totaling $149 million and carrying a fixed rate of interest and COPs Series 2006-B totaling $800 million and carrying a variable rate of interest.  The Service Corporations used the proceeds of the sale of the 2006 COPs to refund all of the variable rate 2005 COPs, to refund a portion of the fixed rate 2005 COPs, to pay the costs of issuing the new COPs, and to pay even more fees to its lawyers and bankers.

29.     At the time the $949 million of 2006 COPs were issued, the City was already approximately $803 million over its debt limit.  *See* Offering Circular for $948,500,000 Taxable Certificates of Participation Series 2006, at B-38 (June 7, 2006), attached hereto as Exhibit J (identifying the amount available under the City's debt limit as of May 2, 2006, to be $637 million, without including the 2005 COPs).  Thus, the HRCA did not permit the City to borrow *any* of the $949 million it raised through the sale of the 2006 COPs.  In fact, even after proceeds of the 2006 COPs were used to retire the $800 million of principal outstanding on the Series 2005-B COPs and $104 million of the principal outstanding on the Series 2005-A COPs, the City was still about $848 million over its debt limit.  Moreover,

as with the 2005 COPs, the City failed to satisfy the requirements of the RMFA for the issuance of debt and was not authorized by any other state law to incur the debt.

## Effect Of The COPs Transaction Upon The City Of Detroit

30.     As of today, there is approximately $503 million in principal outstanding on the Series 2005-A COPs, which have fixed interest rates of between 4.848 and 4.948 percent and maturity dates that range between 2013 and 2025. Another $149 million in principal is outstanding on the Series 2006-A COPs, which have fixed interest rates of 5.989 percent and maturity dates that range between 2034 and 2035. Finally, about $800 million in principal is outstanding on the Series 2006-B COPs, which carry variable interest rates of 3M LIBOR plus 0.30 to 0.34 percent and maturity dates that range between 2019 and 2034. Thus, the total amount of the outstanding COPs is approximately $1.45 billion.

31.     The economic reality of the COPs transactions was that they were municipal bond offerings by the City, with the Service Corporations and the Service Contracts serving as the instrumentalities by which the City hoped to evade the requirements of state law for the issuance of that debt. The COPs sale provided the City with an immediate benefit of approximately $1.44 billion, which was used to pay the City's obligations to the two Retirement Systems and the costs of the transaction. The City, in turn, promised—by its City Payments to the

Funding Trusts through the Service Corporations—to make payments, over time, in an amount exactly sufficient to cover the interest on and principal of the COPs. There was no reason or purpose behind the convoluted structure of the COPs deals other than to avoid the HRCA's debt limit and the strictures of the RMFA.

32.     The debt burden created by the Service Contracts in the COPs transaction has put the very, fatal strains upon the City's finances that the HRCA's debt limit and the RMFA's review requirements were imposed to prevent.  In addition, to hedge the City's exposure to the floating interest rates on the 2006 COPs, the Service Corporations entered into interest rate swap contracts with some of the banks that also helped to engineer the COPs transaction.  In 2009, the City was required to directly assume the Service Corporations' obligations to the banks under the swaps, with further, disastrous financial consequences.

**Detroit's Bankruptcy**

33.     On December 6, 2011, the Michigan Department of the Treasury began a preliminary review of the City's financial condition pursuant to state law. On December 21, 2011, the State Treasurer informed the Governor that "probable financial stress" existed in the City, due to, among other things, cash-flow shortages, repeated deficit spending, and an improper reliance on borrowing.  In response, the Governor appointed a financial review team to examine the City's financial condition, which reported to the Governor on March 26, 2012, that the

City was "in a condition of severe financial stress." This finding led to the establishment of a consent agreement between the City and State of Michigan that gave certain oversight powers to a financial advisory board created for the City and placed conditions on the City's ability to borrow more funds.

34.     On February 19, 2013, a second financial review team determined that the City was in a "local government financial emergency" due to its critical cash position, its repeated deficits, and its more than $14 billion in long-term liabilities. After reviewing the report, the Governor agreed with this determination, and requested that the Local Emergency Financial Assistance Loan Board appoint an Emergency Financial Manager for the City. Kevyn D. Orr was appointed to this position on March 15, 2013.[3]

35.     Consistent with his duties under state law, Mr. Orr began a detailed review of the City's financings after being appointed. By early June 2013, it became clear to Mr. Orr that the City could not maintain adequate cash liquidity if it made the June 14 COPs payment of almost $40 million. As a result, Mr. Orr instructed that payments on the COPs be suspended along with payments on most other unsecured liabilities. The impending cash crisis and the need to

---

[3] On March 28, 2013, Kevyn D. Orr became the emergency manager (the "Emergency Manager") with respect to the City pursuant to Section 9(10) of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.* ("PA 436"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in the Bankruptcy Case. MCL 141.1558.

comprehensively restructure $18 billion in debt led the City to file a petition for bankruptcy under chapter 9 of the Bankruptcy Code, 11 U.S.C. § 901, *et seq.*, on July 18, 2013.

## COUNT I – DECLARATORY JUDGMENT

36. The City of Detroit adopts by reference the allegations of paragraphs 1 through 35.

37. The 2005 and 2006 COPs transactions were nothing more than borrowings by the City of Detroit, thinly disguised as a back-to-back series of contract payments.

38. The Service Corporations are a sham. The City has received no material services from the Service Corporations since the COPs transactions were completed and does not expect to receive any such services in the future. Similarly, the Funding Trusts were, and are, simply conduits for selling and servicing the City's debt.

39. The 2005 and 2006 COPs transactions as a whole and the 2005 and 2006 Service Contracts in particular resulted in the City incurring net indebtedness that exceeded the municipal debt ceiling established by Section 4a(2) of the HRCA. There is no judicial or statutory exception exempting the City from the limits set by Section 4a(2).

40.     The COPs transactions and the Service Contracts also resulted in the creation of City debt that was not authorized by the RMFA or any other state law.

41.     The 2005 and 2006 Service Contracts are thus illegal under Michigan law, and the Service Contracts and all other contractual or other obligations incurred by the City in connection with the COPs transactions are unenforceable and void *ab initio*.

42.     An actual and existing controversy has arisen between the parties as to their respective rights and obligations under the Service Contracts.  A declaratory judgment is necessary to guide the City of Detroit's future conduct and to preserve its legal rights.

43.     Plaintiff seeks a declaratory judgment that the Service Contracts are illegal, void, and of no effect whatsoever, and that the City has no enforceable obligation to continue making the City Payments to the Service Corporations or to the Funding Trusts.

## COUNT II – DECLARATORY JUDGMENT

44.     The City of Detroit adopts by reference the allegations of paragraphs 1 through 43.

45.     The City of Detroit filed a petition for chapter 9 bankruptcy on July 18, 2013.  The City was determined to be eligible to become a debtor under chapter 9 by an order of this Court dated December 5, 2013.

46.     On June 14, 2013, the City failed to make a payment due on the COPs, and has paid no amounts under the Service Contracts on account of the COPs since that date.  The City currently owes approximately $1.45 billion in principal on the 2005 and 2006 COPs.

47.     The Trustee of the Funding Trusts and the Contract Administrator for the 2005 and 2006 COPs transactions have appeared and participated in the City's bankruptcy case.  The transactional documents created in the 2005 and 2006 COPs transactions give the Contract Administrator the power to file a proof of claim in the City's bankruptcy case for the whole amount of the City Payments owed to the Funding Trusts.  *See* Contract Administration Agreement 2005 § 6.4.1 (Ex. E); Contract Administration Agreement 2006 § 6.4.1 (Ex. F).

48.     An actual case or controversy has arisen between the City and the Defendants regarding whether a valid and enforceable right to payment by the City exists under the Service Contracts.  A declaratory judgment is necessary to guide the City of Detroit's future conduct with regard to its chapter 9 plan of adjustment, and to preserve its legal rights in connection with demands thereunder.

49.     Plaintiff seeks a declaratory judgment that any claims based on the City's obligations to make the City Payments under the Service Contracts on account of the COPs should be disallowed pursuant to 11 U.S.C. § 502(b)(1)

because the agreements creating those obligations are unenforceable, void, and of no effect whatsoever, or other such relief as the Court deems just and appropriate.

## COUNT III – INJUNCTIVE RELIEF

50.     The City of Detroit adopts by reference the allegations of paragraphs 1 through 49.

51.     In order to ensure that complete and effective relief is afforded to the plaintiff, the City of Detroit seeks preliminary, temporary and permanent injunctive relief enjoining defendants, and each of them, from taking any act that (a) would require, or purport to require, the City to make City Payments or provide distributions under a plan of adjustment to either of the Service Corporations or either of the Funding Trusts or (b) deprive the City of any benefit it is due.

**Wherefore**, the Plaintiff prays that the Court:

A.  Enter judgment declaring the Service Contracts illegal, unenforceable, and void *ab initio* because they contemplated and effectuated the accrual of further indebtedness by the City of Detroit in violation of Section 4a(2) of the HRCA and the creation of debt not authorized by the RMFA or any other state law; and

B.  Enter orders preliminarily, temporarily, and permanently enjoining defendants, or any of them, from taking any actions to enforce or pursue any terms, claims, rights, or other obligations under the Service Contracts relating to the

COPs transactions or taking any action to interfere with any benefit that is due to the City.

Respectfully submitted,

Dated:  January 31, 2014

 /s/  Robert S. Hertzberg
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Corinne Ball
JONES DAY
222 East 41st Street
New York, NY 10017
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306
cball@jonesday.com

Thomas F. Cullen, Jr.
Gregory M. Shumaker
Geoffrey S. Stewart
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT