# EXHBIT A, PART 2

## BRIEF IN SUPPORT OF DEFENDANT'S MOTION
## TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) AND/OR 12(c)

Defendant City of Detroit respectfully requests that this Court dismiss Plaintiffs' Complaint because Plaintiffs' claims, which are allegedly common to the proposed class members, are legally and factually insufficient. Specifically, Plaintiffs' equal protection claims are barred by *res judicata* because they could have and should have been asserted in an earlier equal protection action against the City of Detroit. Further, Plaintiffs' equal protection claim fails as a matter of law because Defendant has a rational basis for charging commercial water and sewerage rates to multiple family buildings with five or more units. As such, Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and/or (12(c).

## BACKGROUND

### I.   THE PARTIES

Plaintiffs own and operate town home cooperatives and/or condominiums (the "Co-ops"). *See* Plaintiffs' Class Action Complaint ("*Plaintiffs' Complaint*"), ¶¶1 and 5-10 *[Docket Entry No. 1]*, attached as **Exhibit A**. The Co-ops contain five or more residential units (the "Co-ops"). *See* Plaintiffs' Response to Defendant's First Combined Set of Interrogatories, Requests for Production and Requests To Admit ("*Response To Combined Discovery Requests*"), Requests To Admit Nos. 4, 9, 16, 21 and 26, attached as **Exhibit B**. The Co-ops are not single family residential dwellings. *See Response To Combined Discovery*, Requests To Admit Nos. 5-8, 10-13, 17-20, 22-25 and 27-30. Unlike single family dwellings, the Co-ops do not have individual water meters or individual lawns for each unit. *Id.* Plaintiffs seek to add as class members all residential dwellings (apartment buildings, condominiums, co-ops, *etc.*) located within the City of Detroit that feature five or more residential units. *See* Plaintiffs' Motion For Class Certification ("*Plaintiffs' Motion*") at p. 1.

1

Defendant City of Detroit, acting through its Detroit Water and Sewerage Department ("Defendant" or "DWSD") provides water and sewerage to residential buildings and other buildings and facilities, including the Co-ops. *See* Defendant's Answer To Complaint, ¶2.

## II.   PLAINTIFFS' CLAIMS ASSERTED IN THIS INSTANT MATTER

Plaintiffs claim that they are charged "improper or commercial rates" rather than a "residential rate" and that these charges violate "the equal protection clause of the United States and Michigan Constitutions." *Plaintiffs' Complaint* at ¶¶ 1, 3 and 32. *See also Plaintiffs' Motion* at p. 1. Plaintiffs seek to certify a class consisting of:

> [A]ll entities or individuals owning, or acting for owners of buildings, apartment buildings, town houses, housing cooperatives and condominiums with multiple units and utilized for residential purposes whom and which have been charged at a commercial rate by the DWSD which DWSD has not previously adjusted based on prior litigation for the time period of at least six years prior to filing the instant complaint through the date of final judgment, or such longer amount of time as may be allowed by law.

*Plaintiffs' Complaint* at ¶14. *See also* Plaintiffs' Motion at p. 1.   In this matter, Plaintiffs seek to add as class members ". . . hundreds if not . . . a thousand members . . . . from a "listing of apartment accounts provided by Defendant which identifies 2,432 structures . . . ." *Plaintiffs' Motion* at pp. 3-4.

## III.   PLAINTIFFS' CLAIMS ARE BARRED BY *RES JUDICATA* BECAUSE SUCH CLAIMS WERE, OR COULD HAVE BEEN, RAISED IN THE PRIOR MATTER <u>VILLAGE CENTER, ET AL. V. CITY OF DETROIT</u>

In *Village Center Associates Limited Dividend Housing Association, et al. v. City of Detroit, acting through its Detroit Water and Sewerage Department*, Case No. 07-cv-12963 (Hon. John Feikens) ("*Village Center*"), the plaintiffs filed a class action complaint alleging, *inter alia*:

> 3.      The Defendant has created an account classification in order to determine what rate to charge to certain customers (see Exhibit A). Based upon Defendants own classifications Plaintiffs and the class of persons and entities similarly situated are classified as commercial and/or apartment buildings, as all have greater than four (4) units.

2

4.      During the class period those Plaintiffs and members of the proposed class
that were charged commercial or apartment building rates were also charged an
Industrial Waste Control charge in direct contradiction to specific ordinances
enacted pursuant to a Consent Judgment in U.S. District Court Case No. 77-1100
as amended from time to time.

*Village Center First Amended Class Action Complaint* at ¶¶ 3-4 [*Village Center Docket Entry No.*

*21, Ex. 4*] ("*Village Center Complaint*"), attached as **Exhibit C**.   The plaintiffs alleged that the

proposed class number was "in excess of 2,000 members and [could] be readily identified from

Defendant's records." *Id.* at ¶22.

The parties agreed to settle the matter and that the settlement class would include:

[A]ll persons or entities who or which on July 28, 2008 owned a residential
property consisting of more than 4 residential units which property, based on
water and sewage meters applicable to such property, was assessed sewage
charges from the Detroit Water Board and Sewerage Department Containing an
IWC (Industrial Waste Control Charge) charge at any time from and after June 1,
2001.

*Village Center Complaint* at ¶21.   *Village Center* was dismissed with prejudice, on the merits,

pursuant to a Final Judgment and Order dated February 3, 2009 ("*Village Center Final Order*")

[*Village Center Docket Entry No. 27*], attached as **Exhibit D**.   The *Village Center Final Order*

provides, in pertinent part:

. . . [P]laintiffs' agree that the lawsuit shall be dismissed with prejudice, and
Plaintiffs' and all settlement class members who do not timely exclude
themselves from the Settlement Class, including any other person acting on their
behalf or for their benefit, and including all Settlement Class members whose
mail is returned as undeliverable mail for any reason hereby releases, covenants,
not to sue, remises and forever discharges Defendant . . . from any causes of
action, claims, debts, contracts, agreements, obligations, liabilities, suits, claims,
damages, losses, or demands whatsoever ("claims"), in law or in equity, known or
unknown at this time, suspected or unsuspected with Plaintiff and the class now
have or ever had, or may in the future have, against [DWSD] . . . under any legal
theory, including but not limited to, claims under equal protection or restitution,
attorneys fees and/or costs of suit in connection with such claims, whether or not
alleged, arising out of the allegations in or subject matter of the First Amended
Class Action Complaint attached to this Preliminary Statement of Settlement
Terms.

3

*Village Center Final Order* at ¶7. *See also* Preliminary Statement of Settlement Terms at ¶8 *[Village Center Docket Entry No. 21, Ex. 2]* ("*Village Center Settlement Agreement*"), attached as **Exhibit E**. The Village Center Settlement Class had 2,310 members. It included all of the Plaintiffs in this matter and many of the proposed class members. *See* DWSD IWC Settlement Final Worksheet ("*Village Center Settlement List*"), attached as **Exhibit F**. *See also* Memorandum As To Final List of Accounts/Class Members And Pro Rata Credit *[Village Center Docket Entry No. 24]* which references the *Village Settlement List*, attached as **Exhibit G** and Attorney Affidavit of Jenice C. Mitchell Ford ("*Attorney Affidavit*"), attached as **Exhibit H**. As part of the settlement, the DWSD provided appropriate remuneration (in the form of refunds, credits or payments) to members of *Village Center* Settlement Class members. *See Village Center Settlement List*. Many of the *Village Center* Settlement Class members, like the Plaintiffs and proposed plaintiffs in this action, own or operate multiple family dwellings with five or more residential units. *Id.* *Village Center* Settlement Class members were provided notice of the settlement. *See* Affidavit of Gary Watkins dated October 10, 2008 *[Village Center Docket Entry No. 25]*, attached as **Exhibit I**.

## ARGUMENT

### I.   STANDARD OF REVIEW

The standard of review for a motion brought pursuant to Fed. R. Civ. P. 12(c) for judgment on the pleadings for failure to state a claim upon which relief can be granted, is nearly identical to that employed when reviewing a motion brought pursuant to Fed. R. Civ. P. 12(b)(6). *See EEOC v. J.H. Routh Packing, Co.*, 246 F.3d 850, 851 (6th Cir. 2001). *See also* Fed. R. Civ. P. 12(b)(6) and 12(c). When a court is presented with a Rule 12(b)(6) or 12(c) motion, "it may consider the [c]omplaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the defendant's motion to dismiss, so long as they are referred to in the

4

[c]omplaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). A court "must construe the complaint in the light most favorable to the plaintiff, accept[ing] all of the complaint's factual allegations as true." *Id.* (citation and internal quotations omitted).

Yet, to survive such a motion, a plaintiff's complaint "must contain either direct or inferential allegations respecting all the material elements [of the claim] to sustain a recovery under some viable legal theory." *First Am. Title Co. v. Devaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (internal quotation omitted). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Edison v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007). Thus, a party must make "a showing, rather than a blanket assertion of entitlement to relief" and "[f]actual allegations must be enough to raise a right to relief above the speculative level" so that the claim is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 and 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard 'for all civil actions'"). A claim must be dismissed if the legal protections invoked by a party do not provide relief for the conduct alleged in its complaint. *Golden v. City of Columbus*, 404 F.3d 950, 959 (6th Cir. 2005).

A Rule 12(c) motion "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991).

## II.   PLAINTIFFS' CLAIMS ARE BARRED BY *RES JUDICATA*

The claims of many of members of the putative class are barred under the doctrine of *res judicata* or claim preclusion. A claim will be barred by prior litigation if the following elements are present: (i) a final decision on the merits by a court of competent jurisdiction; (ii) a subsequent action between the same parties or their "privies"; (iii) an issue in the subsequent action which was

5

litigated or which should have been litigated in the prior action; and (iv) an identity of the causes of action. *Bittinger v. Tecumshe*, 123 F.3d 877, 880 (1997) *citing Kane v. Magna Mixer Co.*, 71 F.3d 555, 560 (6th Cir. 1995), *cert. denied*, 134 L. Ed. 2d 949, 116 S. Ct. 1848 (1996); *Sanders Confectionery Prods. v. Heller Financial, Inc.*, 973 F.2d 474, 480 (6th Cir.1992).

Here, all four (4) factors for claim preclusion are met. First, many potential class members were parties to *Village Center* where a final order on the merits was entered on February 3, 2009. *See Village Center Final Order*. Second, Plaintiffs seek to add these same entities to this subsequent matter. *See Plaintiffs' Complaint* at ¶14. *See also Plaintiffs' Motion* at p.1. Third, all members of the *Village Center* Settlement Class were aware that they were being charged commercial rates and could have but failed to challenge the imposition of that rate at that time. In settlement of that matter, all *Village Center* Settlement Class members waived their right to assert the claims now asserted in this matter. *See Village Center Settlement Agreement* at ¶¶1 and 8. Fourth, the claims asserted in this matter mirror those claims either asserted in the *Village Center First Amended Class Action Complaint*, waived in the *Village Center Settlement Agreement* and/or extinguished by the *Village Center Final Order*.

Even Plaintiffs acknowledge that "potential members of the proposed class may have been parties to "similar litigation in Village Center v City of Detroit, USDC #2-07-cv-12963 (2009). It may be that some Plaintiffs or potential class members' remedies in part are extinguished or modified by the Final Order in that case." *Plaintiffs' Complaint* at ¶29. Despite acknowledging this fact, Plaintiffs nonetheless seek to certify a class with approximately 2,332 structures – many if not most of whom were included in the *Village Center* Settlement Class as members or privies to members. Instead of taking measures within their control to refine the potential class, Plaintiffs rely on speculative numbers and unsupported assertions about class membership simply repeating in *Plaintiffs' Motion* what was stated in *Plaintiff's Complaint*.

6

As such, Plaintiffs have made "a blanket assertion of entitlement to relief" without raising "a right to relief above the speculative level" so that the claim is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). Under these circumstances, Plaintiffs' claims must be dismissed because the legal protections invoked by a party do not provide relief for the conduct alleged in *Plaintiffs' Complaint*. *Golden*, 404 F.3d 950, 959 (6th Cir. 2005).

For these reasons, Plaintiffs' claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and/or Fed. R. Civ. P. 12(c).

## III.   PLAINTIFFS FAIL TO STATE AN EQUAL PROTECTION CLAIM

"To state an equal protection claim, a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotations omitted). Under rational basis review, the governmental policy at issue "will be afforded a strong presumption of validity and must be upheld as long as there is a rational relationship between the disparity of treatment and some legitimate government purpose." *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000); *accord Atlas Valley Golf and Country Club, Inc. v. Village of Goodrich*, 227 Mich. App. 14, 15; 575 N.W.2d 56, 62 (1997). In other words, "a plaintiff faces a severe burden and must negate all possible rational justifications for the distinction." *Gean v. Hattaway*, 330 F.3d 758, 771 (6th Cir. 2003).

One purpose of the utility ratemaking process is to equitably apportion the cost of services to the customers who use them. *See Iroquois Properties v. City of East Lansing*, 160 Mich. App. 544, 561, 408 N.W.2d 495, 503 (1987). Courts have recognized, however, that it is often administratively impossible to measure a customer's actual use of a service. *See, e.g., Village*

7

*Green of Lansing v. Bd. of Water and Light*, 145 Mich. App. 379, 394; 377 N.W.2d 401, 409 (1985). For example, it would be unduly burdensome to determine how much electricity each individual tenant consumes in the common areas of a multiple-family dwelling. *Id.* It is likewise impossible to predict usage with mathematical formulas, since there are any number of variables that might affect why and how a customer uses a given service. *Land v. City of Grandville*, 2 Mich. App. 681, 695; 141 N.W.2d 370, 376 (1966) *citing Township of Meridian v. East Lansing,* 342 Mich. 734, 749; 71 N.W.2d 234, 237 (Mich. 1955)).

In light of these administrative difficulties, the rational-basis test does not require utility firms to perfectly measure or predict usage when apportioning the cost of services. *Atlas Valley*, 227 Mich. App. at 16-17. Instead, the Equal Protection Clause permits utility firms to classify customers based on any natural distinguishing characteristic that reasonably assists in the apportionment process. *See Alexander v. City of Detroit*, 392 Mich. 30, 35-36; 219 N.W.2d 41, 43 (1974). As such, courts have upheld a wide variety of classifications aimed at achieving equitable apportionment. *See, e.g., Land*, 2 Mich. App. at 697; 141 N.W.2d at 377 (upholding an ordinance imposing sewer charges based on the total number of residents in a dwelling unit) and *Village Green of Lansing*, 145 Mich. App. 379, 394; 377 N.W.2d 401, 409 (upholding the practice of charging commercial utility rates to the communal portions of a multi-family dwelling).

In the instant case, DWSD operates a combined sewer system that treats both stormwater and sanitary sewage. DWSD measures the usage of sanitary sewage services by metering the sewage as it leaves a given premises. It is too costly and burdensome to measure stormwater runoff, however, so DWSD apportions the costs stormwater treatment by charging higher rates to multiple family dwellings with five or more units.

The number of units in a residential complex is a natural distinguishing characteristic that rationally relates to the amount of stormwater entering a sewage system. On average, DWSD

8

incurs greater expense to provide sewerage services to multiple family units with five or more residential units than it does to multiple family units with four or less units or to five single family homes. *See* City of Detroit Water and Sewerage Department Report on Fiscal Year 1992 Water and Sewer Rates and Fiscal Year 1990 Sewer Look-Back Adjustments ("*Water and Sewer Rate Report*"), attached as **Exhibit J**. This is only logical, because the parcels of multiple family dwellings with five (5) or more units are generally larger than complexes with fewer units, and therefore have more square footage covered by roofs, driveways, parking lots and other impervious surfaces. These large impervious surfaces increase the amount of stormwater runoff and thereby increase the service costs incurred by DWSD. Thus, distinguishing between residential complexes based on the number of occupants is a rational means of apportioning the cost of utility services. *Land*, 2 Mich. App. at 697.

Plaintiffs rely on *Alexander v. City of Detroit*, 392 Mich. 30; 219 N.W.2d 41 (1974), to support their equal protection claims (and request for class certification), but that case is distinguishable. In *Alexander*, the plaintiffs raised an equal protection claim regarding a City of Detroit ordinance that required multiple dwellings of five or more units to pay a commercial waste charge for city refuse collection. *Alexander*, 392 Mich. at 34. The ordinance exempted condominiums and cooperatives and provided the Detroit City Council with discretion to make reductions or waiver of commercial waste fees. *Id*. The Michigan Supreme Court found the ordinance to be violative of the equal protection clause because its classifications and exceptions were not rationally related to cost of providing trash-collection services. In reaching that conclusion, the Supreme Court was "heavily influenced" by the trial judge's finding that "the City of Detroit did not consider the character of the waste generated in granting exemptions to dwellings with 4 units or less." *Id*. at 37. Moreover, "[t]he City of Detroit did not incur any greater expense in collecting refuse from multiple dwellings with 5 or more units than from condominiums or

9

cooperatives." *Id.* at 36-37. In the instant cases, DWSD did specifically consider the volume of stormwater produced by properties with five or more residential units and determined that, on average, those properties produced greater service costs per dwelling than other types of housing options. *See Water and Sewer Report* at p. 68 and Table S-17. DWSD also set a single rate for *all* multiple family dwellings with five or more units, and thus did not arbitrarily distinguish apartments from condominiums or cooperatives.

Accordingly, DWSD's ratemaking classifications are rationally related to the cost of providing services, and therefore do not violate the Equal Protection Clause. For this reason, Plaintiffs' Complaint should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) and/or Fed. R. Civ. P. 12(c).

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) and/or 12(c).

Respectfully submitted,

CLARK HILL PLC

By: /s/ Jenice C. Mitchell Ford
    Reginald M. Turner (P40543)
    rturner@clarkhill.com
    Scott G. Smith (P31966)
    sgsmith@clarkhill.com
    Matthew W. Heron (P61501)
    mheron@clarkhill.com
    Jenice C. Mitchell Ford  (P61511)
    jmitchellford@clarkhill.com
    Clark Hill PLC
    500 Woodward Avenue, Suite 3500
    Detroit, Michigan  48226
    (313) 965-8300
    *Counsel for Defendant*

Date: May 21, 2013

9093110.2 34596/157060

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all counsel of record.

Respectfully Submitted By:

CLARK HILL PLC

/s/ Jenice C. Mitchell Ford
Reginald M. Turner (P40543)
rturner@clarkhill.com
Scott G. Smith (P31966)
sgsmith@clarkhill.com
Matthew W. Heron (P61501)
mheron@clarkhill.com
Jenice C. Mitchell Ford  (P61511)
jmitchellford@clarkhill.com
Clark Hill PLC
500 Woodward Avenue, Suite 3500
Detroit, Michigan  48226
(313) 965-8300
*Counsel for Defendant*

11

EXHIBIT 5

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

---------------------------------------------- x

                     :

In re                  :          Chapter 9

                     :

CITY OF DETROIT, MICHIGAN,  :          Case No. 13-53846

                     :

          Debtor.        :          Hon. Steven W. Rhodes

---------------------------------------------- x

## DECLARATION OF WILLIAM WOLFSON

    1.     If called as a witness, I am competent to testify to the facts contained in this Declaration and these facts are true.

    2.     I am the Chief Operating and Compliance Officer/General Counsel of the Detroit Water and Sewerage Department ("DWSD").

    3.     On August 23, 2012, Lasalle Town Houses Cooperative Association, Joliet Town Houses Cooperative Association, and St. James Cooperative (collectively, the "Plaintiffs") filed a complaint against the City of Detroit, acting through its Detroit Water and Sewerage Department, in the United States District Court for the Eastern District of Michigan ("District Court"), commencing case number 12-13747 ("Lawsuit").

    4.     Due to the complex nature of the Lawsuit, and the limited legal resources available to the DWSD, the DWSD retained Clark Hill PLC ("Clark Hill") as its counsel.

    5.     On July 18, 2013 (the "Petition Date"), the City of Detroit filed a petition for relief ("Bankruptcy Case") in the Bankruptcy Court for the Eastern District of Michigan ("Bankruptcy Court").

    6.     Clark Hill represents the General Retirement System of the City of Detroit in connection with the Bankruptcy Case.

    7.     As a result of Clark Hill's irreconcilable conflict, in or around July 2013, the DWSD terminated Clark Hill as its counsel in the Lawsuit.

8.     If the Bankruptcy Court were to allow the Plaintiffs to proceed with the Lawsuit, the DWSD would be required to obtain new outside counsel to represent it in the Lawsuit.

9.     Hiring new outside counsel would cause the DWSD to incur substantial expenses. New outside counsel would be required to, among other things, review the numerous motions, pleadings and discovery responses filed in the Lawsuit.

10.     Further, if the Lawsuit is allowed to proceed and the DWSD's motion to dismiss is not granted by the District Court, the Lawsuit would consume large resources.  As a potential class action, the Lawsuit is a significant matter requiring considerable legal expenses.


I declare under penalty of perjury that the foregoing is true and correct. Executed on October _23_ , 2013.


William Wolfson

21634608.2\022765-00202

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
--------------------------------------------- x
                                              :
In re                                         :        Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                     :        Case No. 13-53846
                                              :
            Debtor.                           :        Hon. Steven W. Rhodes
--------------------------------------------- x
```

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 24, 2013, he caused true and correct copies of

### *DEBTOR'S OBJECTION TO MOTION FOR LIMITED RELIEF FROM AUTOMATIC STAY*

and

### *DEBTOR'S BRIEF IN OPPOSITION TO MOTION FOR LIMITED RELIEF FROM AUTOMATIC STAY*

to be served upon counsel via electronic mail and First Class United States Mail as follows:

Tracy M. Clark, Esq.
Steinberg Shapiro & Clark
25925 Telegraph Rd., Suite 203
Southfield, MI 48033

Email: clark@steinbergshapiro.com

Dated: October 24, 2013

By: /s/Timothy A. Fusco
Timothy A. Fusco
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
fusco@millercanfield.com

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,                          Case No. 13-53846-SWR
                                                    Chapter 9
               Debtor.                          Hon. Steven W. Rhodes

_____/

### MOVANTS' REPLY TO DEBTOR'S BRIEF IN OPPOSITION TO MOTION FOR LIMITED RELIEF FROM AUTOMATIC STAY

Lasalle Town Houses Cooperative Association, Nicolet Town Houses Cooperative Association, Lafayette Town Houses, Inc., Joliet Town Houses Cooperative Association, and St. James Cooperative ("Movants") are plaintiffs in a class action suit filed in U.S. District Court against the Detroit Water and Sewerage Department ("DWSD"), case no. 4:12-cv-13747 (the "Class Action"). Movants have sought relief from the automatic stay to continue prosecution of the Class Action for the limited purpose of certifying the class; establishing liability; and seeking to enjoin the DWSD from charging improper rates. The stay will remain in effect with respect to the enforcement by Movants of any pre-petition debts.

Introduction

Movants are being charged improper water rates by the Detroit Water and Sewerage Department, in violation of state and federal guarantees of equal protection. The improper charging did not cease when the City's bankruptcy was filed. And, Movants are not stayed from prosecuting their post-petition claims in the district court. By lifting the automatic stay to allow Movants to proceed with the liquidation of all their claims in one court—the district court—the parties will avoid the expense and complexity of litigating the same issues in two courts and avert the risk of inconsistent results.

<center>Class Action Merits</center>

The City argues that it should prevail on its Rule 12(b)(6) on the basis of *res judicata* and its assertion that it has not violated the equal protection clause in establishing different rate classifications. Movants maintain that the City's motion to dismiss is premature and requires the development of the factual record.

More importantly, however, Movants argue that their rate classification is unconstitutional and violates the equal protection clause. A prior classification employed by the City was found to have violated the equal protection clause. In *Alexander v City of Detroit,* 392 Mich 30; 219 NW2d 41 (1994), it was alleged that all owners of residential structures with more than four units were charged commercial waste charges in connection with garbage collection. Those charges were not imposed upon residential properties with four or fewer units. Not only was class certification found and upheld, but the City's classification failed constitutional equal protection scrutiny. *Alexander* at 45. The City has a poor track record. Movants expect the same unconstitutional result will be found in the Class Action.

More significantly from a jurisprudential point of view, Movants simply do not see how any governmental entity can plausibly argue that *Constitutional limitations* imposed upon it by the equal protection clause are unenforceable because prior litigation included a release of all future claims. This untenable position would permit any civil government by the use of a skillfully drafted release, to thereafter violate with impunity the constitutional rights of its citizens in perpetuity. Should such a breach of society's fundamental civil compact be subject to a stay? In light of its magnitude, the Class Action should move forward as proposed by Movants.

Attached as Exhibit A, is a copy of the oral argument hearing transcript dated July 11, 2013. The transcript reflects argument of counsel in connection with the City's motion to dismiss

pursuant to Rule 12(b)(6) and the Movants' motion for class certification pursuant to Rule 23.

The hearing transcript is attached to illustrate to this Court, that the district court was inclined to

deny the City's motion to dismiss and allow the parties to move forward to develop a factual

record.

> THE COURT:   And let me just say, I'm still kind of mulling this issue over, but I do
> want to indicate, even at this point, that I'm leaning towards denying it, but I haven't
> made a final decision about that, really for the reasons that have been argued, the factual
> development that needs to occur here, and I just say that off the cuff, because I haven't
> made a final decision yet, and I'm going to keep moving forward here.
> MR. GOLDSTEIN:   So, when you say you're, without binding yourself, your initial
> inclination is to deny "it", was that "it" a reference to the summary judgment motion?
> THE COURT:   Yes, the 12(b)(6).

> [Exhibit A, Transcript, p. 26, lns. 9-21.]

Moreover, in connection with the Plaintiff's motion to certify a class the district court

offered this observation:

> THE COURT: Again, I don't want to, I don't want to make a decision on this today. I am
> still mulling this over, and I'll make a final decision by order. But I will indicate my
> leaning, again, my leaning is a little toward certifying the class. That's the way I'm
> leaning. Again, I want to mull over and process these issues more, especially since the
> class cert issue is tied into the res judicata issue. So, I'm going to take this matter under
> advisement and I expect to issue an official decision probably within a week or so. All
> right.

> [Exhibit A, Transcript, p. 36, lns. 6-19.]

A reading of the City's response to the stay relief motion would suggest that the Class

Action was teetering on the verge of dismissal. But, the transcript indicates that Judge Drain isn't

as confident in the City's assessment of the case.

<div align="center">Cause for Relief</div>

Recently, this Court addressed the standard for determining if cause exists to lift the stay

imposed by the City's filing—

> "Determining cause is not a litmus test or a checklist of factors. It requires consideration of many factors and a balancing of competing interests." *Chrysler LLC v. Plastech Engineered Prods., Inc.* (*In re Plastech Engineered Prods., Inc.*), 382 B.R. 90, 109 (Bankr. E.D. Mich. 2008); *see also In re Cardinal Indus., Inc.*,116 B.R. 964, 983 (Bankr. S.D. Ohio 1990) ("In determining whether or not cause exists, the bankruptcy court must balance the inherent hardships on all parties and base its decision on the degree of hardship and the overall goals of the Bankruptcy Code.").

(See docket no. 1536-1, p. 10).

The circumstances in the instant matter are somewhat atypical because the harm (charging of improper water rates) is ongoing, so Movants have the option of bringing a post-petition lawsuit in the district court to recoup charges assessed post-petition and to enjoin the DWSD from continuing the unconstitutional practice of charging residential multi-units at commercial rates. So, the hardship that will be suffered—by Movants, the City, and the court system—if relief is not granted boils down to the time and cost of litigating a new class action based on post-petition charges while, simultaneously, addressing separate objections to each of the Movants' bankruptcy claims for pre-petition charges.

1. Relief from the stay should be granted because the harm (charging of improper rates by the DWSD) is ongoing giving rise to post-petition claims that can be brought in district court notwithstanding the bankruptcy.

The City contends that class actions are unnecessary and disfavored in the context of a bankruptcy case, and "the claims of the Plaintiffs and any other putative members of the class can be resolved most efficiently through the centralized claims resolution process…." (Docket no. 1363, p. 9). For support, the City selectively pulls a few derogatory quotes from *TL Admin.Corp v. Twinlab Corp.*

4

The issue in *Twinlab* was not whether to grant relief from the stay to allow a class action to proceed in another court, but whether to allow or expunge three class actions involving products liability claims. The court opted to expunge the class actions for two reasons: First, the class action claims were not timely presented to the court and, at the time of the opinion, "the Debtors [sic] assets have been marshaled and liquidated, all other disputed claims have been resolved (including 60 claims of personal injury or wrongful death), the plan has been confirmed, and the estate ready for distribution." *Twinlab* at 8. Second, the putative class failed to "meet the requirements of Rule 23 for class certification." *Id.*

Notably, there were three product liability class actions in *Twinlab*, all of which would require pre-certification discovery and "protracted litigation". *Twinlab* at 5. Also, *Twinlab* involved a liquidating Chapter 11, so any deterrent effect that a class action might have was lost and the claims really just boiled down to money. *Twinlab* at 7. Finally, due to the minimal amount of each class claim—averaging $30—the "only real beneficiaries of [the class action] would be the lawyers representing the class." *Twinlab* at 10 (citation omitted).

In the instant case, the district court has already heard arguments on certification and just needs to rule. The overriding issue in the Class Action is homogeneous—did the City charge the class members improper water rates? And, if so, the practice should be stopped and money damages should be assessed. In other words, this isn't just about the money. It is about putting an end to an improper practice. And, because that practice has continued post-petition, the class members have post-petition claims that are not subject to the automatic stay. *See e.g., Bellini Imports, Ltd. v. Mason & Dixon Lines, Inc.*, 944 F2d 199, 201 (4th Cir. 1990) ("The stay is limited to actions that could have been instituted before the petition was filed or that are based on

5

claims that arose before the petition was filed …[and] does not include actions arising post-petition.") (citations omitted).

If the Movants are not afforded relief to pursue the pending claims in district court, they can simply file a new action based on the post-petition charges and continued violations of the equal protection clause. Then, not only will the bankruptcy court have to determine the amount of the Movants' claims for pre-petition damages, the district court will have to start from scratch on Movants' new request for class certification, post-petition damages, and injunctive relief. Thus, judicial economy favors granting relief from the stay to allow all of the claims to be addressed in one action by the district court.

2.      Relief from the stay should be granted because the bankruptcy court lacks jurisdiction over the claims.

The Class Action seeks redress for violation of equal protection rights. By seeking relief to continue the Class Action, the Movants are not seeking to collect any money from the Debtor, only to liquidate their claims and obtain injunctive relief. If Movants are denied relief from the stay and forced to file an adversary proceeding seeking to enjoin the DWSD from charging residential units at commercial rates, the bankruptcy court would not have jurisdiction over the proceedings.

Section 1334(a) of title 11 confers on each federal district court "original and exclusive jurisdiction of all cases under title 11," except as provided in 28 U.S.C. § 1334(b). 28 U.S.C. § 1334(a). Under 28 U.S.C. § 1334(b), each district court has "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11."

6

The district court has the authority under 28 U.S.C. § 157(a) to refer to the bankruptcy judges for that district "any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11."

Under the local district rule 83.50 "all cases under Title 11 of the United States Code and any or all proceedings arising under Title 11 or arising in or related to a case under Title 11 are referred to bankruptcy judges." E.D. Mich. L.R. 83.50(1)-(3).

To determine whether the matter at issue is within § 1334(b) jurisdiction, the Court need only determine whether the matter is at least "related to" the bankruptcy. *In re Wolverine Radio Co.*, 930 F.2d 1132 (6th Cir. 1991).

The "usual articulation of the test for determining whether a civil proceeding is related to bankruptcy is whether the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *In re Dow Corning Corp.*, 86 F.3d 482, 489 (6th Cir. 1996) (citation omitted). An action is "related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Id.*

Because the Movants are seeking relief from the stay as to non-monetary issues only, there will be no effect on the Debtor's estate even if Movants' claims against the DWSD are successful. The DWSD is a separate entity whose budget is not under the City's general fund, but is based on revenues from water and sewerage rate-payers.

Even if the bankruptcy court is deemed to have "related to" jurisdiction over the non-monetary claims, it would lack authority to enter a final order, requiring action by the district court anyway. *See* 28 U.S.C. 157(c)(1).

7

Moreover, regardless of jurisdictional issues, cause would exist to withdraw the reference. The district court has discretion to withdraw the reference for "any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown." 28 U.S.C. § 157(d).

Courts have considered the following factors to determine whether cause exists to withdraw the reference: 1) judicial economy; 2) uniformity in bankruptcy administration; 3) reducing forum shopping and confusion; 4) fostering economical use of the debtor's and creditor's resources; 5) expediting the bankruptcy process; and 6) the presence of a jury demand. *In re Motions to Withdraw Reference in Various Cases*: 12-11555, 2012 U.S. Dist. LEXIS 158674, 19-20 ( E.D. Mich. Oct. 31, 2012). Because many of these factors overlap the factors considered in determining if cause exists for granting relief from the automatic stay, they will not be addressed separately here.

To put it simply, the Class Action claims would be more conveniently and speedily determined in another forum. The Class Action was pending almost a year in advance of the bankruptcy filing. The Class Action claims are non-bankruptcy related. U.S. District Court Judge Gershwin Drain has already heard and considered arguments on the motion for class certification and motion to dismiss and can dispose of these issues efficiently. Judicial economy will be furthered by allowing the case to continue in the district court where it originated, given the familiarity of the district court with the case at hand and the substantive laws governing the claims. Given the limited relief requested, there will be little, if any, interference with the bankruptcy proceeding. At the same time, the amount of any money damages resulting from the Class Action can be reduced to judgment so that Movants and the City of Detroit know the extent

8

of any claim that may be filed in the bankruptcy matter.

Thus, it makes more economic sense to grant the Movants the requested relief so that they can continue a proceeding already under way in the district court than to require the Movants to bring another suit in district court seeking the same relief but limited to post-petition conduct or to bring their equitable claims in bankruptcy court only to have those same claims later heard by the district court due to lack of jurisdiction or because the reference is withdrawn.

3.    Relief from the stay should be granted because the City will spend more defending the Movants' claims if relief from the stay is not granted.

The City contends that relief should not be granted because it will be forced to hire new counsel to represent it in the Class Action. However, as indicated above, if the Movants do not obtain relief from the stay to continue the Class Action, they can simply file a new action in the district court based on post-petition water rates assessed in violation of the equal protection clause. So, the City is going to have to hire counsel whether the stay is lifted or not. And, as indicated above, an adversary proceeding may be filed to enjoin the DSWD from continuing its practice of charging commercial rates to Movants. Jurisdiction will be an issue in the adversary proceeding, as will withdrawal of the reference and the limited ability of the bankruptcy court to enter a final order. On the other hand, none of these issues will come into play if relief is granted; thus, limiting the litigation expenses incurred by both parties.

Also, if the Movants are not allowed to liquidate their monetary claims in the Class Action, the City will have to examine every filed claim anyway. The City's Answer and Affirmative Defenses to the Class Action (docket 1363-2, Exhibit 2) indicates that the City will raise objections to each of the claims. Separate objections will have to be filed to each claim. *See*

9

Fed. R. Bankr. R. 3007. If the City objects to all of the claims on the same basis, the objections will be consolidated, and the parties will effectively litigate the same class action. *See Schuman v. Connaught Group, Ltd.* (*In re Connaught Group, Ltd.*)*,* 491 B.R. 88 (Bankr. S.D.N.Y. 2013) (citing Fed. R. Bankr. P. 9014(c) (providing *inter alia*, that Fed. R. Bankr. 7042 applies in contested matters) (finding class action superior to the claims administration process in resolving claims under the WARN act)).

<p align="center">Request for Relief</p>

Movants request that this Court modify the automatic stay to allow Movants to continue the prosecution of the Class Action for the limited purpose of pursuing class certification, establishing liability, and seeking to enjoin the DWSD from charging improper rates; and grant such further relief as the Court deems just and equitable considering the facts and circumstances of this case.

STEINBERG SHAPIRO & CLARK

/s/ Tracy M. Clark (P60262)
Attorney for Movants
25925 Telegraph Rd., Suite 203
Southfield, MI 48033
(248) 352-4700
clark@steinbergshapiro.com

Date:   November 11, 2013

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,                          Case No. 13-53846-SWR
                                                    Chapter 9
                           Debtor.                  Hon. Steven W. Rhodes
_____/

# EXHIBIT LIST

| Exhibit | Description |
| --- | --- |
| A | Transcript |

13-53846-swr   Doc 2629-2   Filed 02/03/14   Entered 02/03/14 09:03:09   Page 28 of 48
13-53846-swr   Doc 1925-2   Filed 01/06/14   Entered 01/06/14 23:43:25   Page 28 of 48
332
157

```
1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF MICHIGAN
2                   SOUTHERN DIVISION

3    LASALLE TOWN HOUSES
     COOPERATIVE ASSOCIATION, a
4    Domestic Nonprofit
     Corporation, NICOLET TOWN
5    HOUSES COOPERATIVE              No. 12-cv-13747
     ASSOCIATION, a Domestic
6    Nonprofit Corporation,
     LAFAYETTE TOWN HOUSES,
7    INC., a Domestic Nonprofit
     Corporation, and JOLIET
8    TOWN HOUSES COOPERATIVE
     ASSOCIATION, a Domestic
9    Nonprofit Corporation, ST.
     JAMES COOPERATIVE, a
10   Domestic Nonprofit
     Corporation, individually
11   and on behalf of all
     similarly situated
12   entities,

13           Plaintiffs,

14      v

15

     CITY OF DETROIT, acting
16   through its DETROIT WATER
     AND SEWERAGE DEPARTMENT,
17
             Defendant.
18   _____/

19
                      MOTION
20
        BEFORE THE HONORABLE GERSHWIN A. DRAIN
21          UNITED STATES DISTRICT JUDGE
        Theodore Levin United States Courthouse
22          231 West Lafayette Boulevard
                Detroit, Michigan
23          Thursday, July 11, 2013

24

25
```

```
 1   APPEARANCES:

 2

       For the Plaintiffs:      MR. ERIC S. GOLDSTEIN  (P45842)
 3                              Johnston, Sztykiel, Hunt,
                                Goldstein & Fitzgibbons, P.C.
 4                              3250 W. Big Beaver Road
                                Suite 500
 5                              Troy, Michigan  48084
                                (248) 641-1800
 6
       For the Defendant:       MR. REGINALD M. TURNER, JR.
 7                              (P40543)
                                Clark Hill, PLC
 8                              500 Woodward Avenue, Suite 3500
                                Detroit, Michigan  48226
 9                              (313) 965-8300

10   Reported by:              Merilyn J. Jones, RPR, CSR
                                Official Federal Court Reporter
11                              merilyn_jones@mied.uscourts.gov

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      TABLE OF CONTENTS
 2   WITNESSES:  PLAINTIFF                                PAGE
     None
 3

 4

 5

 6

 7

 8

 9   WITNESSES:  DEFENDANT
     None
10

11

12

13

14   EXHIBITS:              Identified           Received
     None
15

16

17

18

19

20

21

22

23

24

25
```

1          Detroit, Michigan

2          Thursday, July 11, 2013 - 11:02 a.m.

3          THE CLERK: All rise.   The United States

4    District Court for the Eastern District of Michigan is

5    now in session.   Honorable Gershwin Drain presiding.

6          Calling Civil Action LaSalle Town Houses

7    Cooperative Association, et al. versus City of Detroit,

8    acting through its Detroit Water and Sewerage

9    Department.   Case Number 12-cv-13747.

10          Counsel, please state your appearance for

11   the record.

12          MR. GOLDSTEIN: Good morning.  Eric Goldstein

13   on behalf of the plaintiff.

14          THE COURT:   All right.

15          MR. TURNER: Good morning.  Reginald Turner

16   on behalf of defendant.

17          THE COURT:   All right.  You can be seated,

18   gentlemen.

19          There are two motions before the Court:

20   One, a 12(b)(6) and a 12(c) motion, and then there's a

21   motion for class certification.

22          And I have -- I'm ready to proceed with the

23   arguments if you gentlemen want to argue, and I'll give

24   both sides no more than 20 minutes to argue the two

25   issues.

```
 1              So, how do you gentlemen want to proceed?
 2              MR. GOLDSTEIN: Your Honor, we had discussed
 3    that a little bit ourselves.
 4              THE COURT:  Okay.
 5              MR. GOLDSTEIN:  And our bottom line
 6    conclusion was we thought to defer to you, given the
 7    interrelationship of some of the issues.  We saw that it
 8    made sense to proceed with one motion, but just as much
 9    sense to proceed with the other, you know, and the
10    distinctions procedurally may not be that important,
11    hence, our initial call to defer to you.
12              THE COURT: Okay.
13              MR. GOLDSTEIN:  If you want us to decide, we
14    can do that.
15              THE COURT:  Well, when people defer to me,
16    sometimes I just say, I will not have any argument and
17    just rely on the briefs.  But I don't know if you all
18    want to waive argument.
19              MR. GOLDSTEIN: Well, if I may?
20              THE COURT:  Okay.
21              MR. GOLDSTEIN: Thank you.
22              Your Honor --
23              THE COURT:  Let me just say from a
24    procedural point of view, I guess, the motion to dismiss
25    would be the first one to argue and the second one class
```

1    certification.

2                MR. GOLDSTEIN: That's fine.

3                THE COURT:   Okay.

4                MR. GOLDSTEIN: We'll proceed.

5                THE COURT:   Okay.

6                MR. TURNER: Thank you, your Honor.   May it

7    please the Court, Reginald Turner on behalf of the

8    defendant, City of Detroit.   This is the time for our

9    hearing on defendant's motion to dismiss pursuant to

10   12(b)(6) and 12(c).

11               The City of Detroit seeks dismissal of the

12   plaintiffs' complaint because it fails to state a claim

13   upon which relief can be granted.

14               Plaintiff now asserts in this 2012 matter

15   issues that they could have raised in the now settled

16   2007 matter, and I'm well aware of this Court's practice

17   of reviewing the pleadings and understand that the Court

18   gave us the option to dispense with oral argument, so

19   I'll try to be as brief as possible and address the most

20   salient points.

21               The Village Center case was settled and was

22   dismissed with prejudice on the merits pursuant to a

23   final judgment and order dated February 3rd, 2009.

24   That order and all documents related to the settlement

25   are public records, which are appropriate for inclusion

1    in the record for purposes of either a 12(b) or 12(c)

2    motion.

3            Plaintiffs' claims are subject to dismissal

4    on the pleadings because all of plaintiffs' claims are

5    barred by res judicata, and it's very, very clear from

6    the plaintiffs' complaint in this matter that they

7    recognize that these are the same parties and the same

8    issues that were addressed in the earlier case.

9    They've actually pled that in the complaint.

10            And I would highlight for the Court --

11            THE COURT:  Mr. Turner, do you know who the

12   lawyers were in that case?  I don't think I came across

13   that in the reading.

14            MR. TURNER: They were not the same lawyers.

15            THE COURT:  Okay.

16            MR. TURNER:  This is a different law firm

17   that was involved.  I can't think of the names off the

18   top of my head right now, your Honor.  I could look it

19   up, but I was not familiar with any of the counsel in

20   that case.  I don't believe there are any of the same

21   lawyers involved in this case.

22            MR. GOLDSTEIN: Carl Becker was lead counsel

23   for the plaintiffs.

24            THE COURT:  Okay.

25            MR. GOLDSTEIN: And Jim, or James Noseda,

```
 1   N-O-S-E-D-A, was lead for the City.
 2             THE COURT:   Is he with corporation counsel?
 3             MR. GOLDSTEIN: That I don't know, but the
 4   address on the caption was 660 Woodward Avenue, Suite
 5   660, and that information maybe Mr. Turner knows.
 6             THE COURT:   Okay.   And, I guess, I'm
 7   curious, too, do you know how many parties were actually
 8   involved in that settlement?
 9             MR. TURNER: Well, your Honor, the entire
10   class, which was estimated to be approximately 2300
11   dwellings of five or more units were involved in the
12   settlement in that matter.
13             There is attached to our motion a copy of
14   the, of the final order as well as a listing of all of
15   the known plaintiffs in that case, and there's actually
16   a document that shows the distribution of the damages in
17   that case that is attached to our motion as Exhibit F.
18             The plaintiffs have cited Zechem
19   Incorporated versus Bristol-Meyers Squibb for the
20   proposition that a 12(b)(6) motion is not appropriate
21   for dismissal on the basis of an affirmative defense.
22   But if the Xechem case is read even cursorily, it's very
23   clear that this is appropriate, this is an appropriate
24   setting and the Xechem case, and I'll quote, says:
25             "When the plaintiff pleads itself out of
```

```
1          court; that is, 'admits all the ingredients of
2          an impenetrable defense', a complaint that
3          otherwise states a claim may be dismissed under
4          Rule 12(b)(6)."
5               So, yes, we are asking for dismissal on the
6    basis of our affirmative defense, but when our
7    affirmative defense is actually pled in the plaintiffs'
8    complaint, the Xechem case stands for the proposition
9    that it is appropriate to consider that in a 12(b)(6)
10   motion, and in this case, your Honor, it is very clear
11   on the face of the complaint, as the plaintiffs
12   themselves have indicated, that a number of the persons
13   covered in the proposed class were parties to and
14   received settlements in the Village Center case, the
15   prior case, and all of the named plaintiffs, by their
16   own admission, were involved in that case.
17               So, even if the Court did not find, as we
18   hope it will, and believe it will, that these claims are
19   barred by res judicata with respect to the entire class,
20   certainly, then, the named plaintiffs would be bound by
21   that prior settlement, your Honor, and would be
22   inappropriate representatives for any parties in the
23   proposed class who were not bound by the prior
24   settlement.
25               Your Honor, we, we also took a look at
```

1　another case that was cited in the plaintiffs' brief,

2　Browning versus Levy.  They cite that case for the

3　proposition that it is inappropriate to, to grant

4　summary disposition, summary judgment, I'm sorry, in

5　this matter.  But the Browning case actually involved

6　the confirmation of a plan of organization in a

7　bankruptcy case, and the Browning court made clear that

8　a court's confirmation of a plan submitted by the

9　parties in the case resolving that matter is tantamount

10　to a decision of a Federal District Court to approve a

11　settlement and enter a final order on a settlement as

12　occurred in the Village Center case.

13　　　　　　And, so, I'll quote Browning versus Levy,

14　which the plaintiff cited, Page 8 of their brief:

15　　　　　　"Confirmation of a plan of reorganization

16　　　　　　constitutes a final judgment in bankruptcy

17　　　　　　proceedings.  Such confirmation had the effect

18　　　　　　of a judgment by the district court and res

19　　　　　　judicata principles bar relitigation of any

20　　　　　　issues raised or could have been raised in the

21　　　　　　confirmation proceedings."

22　　　　　　So, Browning actually supports the position

23　taken by the defendant in this case that it is

24　appropriate for a court to view a final settlement order

25　on the merits, which has become the decision dismissing

1 a case with prejudice as a basis for res judicata in a

2 subsequent action where the parties are the same, the

3 issues involved in the second action were raised or

4 could have been raised in the previous action, the cause

5 of action is identical, as it is in this case, where we

6 have an equal protection claim, which was raised by the

7 plaintiffs here, as was raised by the plaintiffs in the

8 Village Center case.

9 I'd also cite a passage from another case

10 cited by plaintiffs in this case, Arizona versus

11 California, and in there, your Honor, again, with

12 respect to this question whether or not a consent

13 judgment or final order of a Federal Court may be used

14 to provide the basis for a res judicata finding in a

15 subsequent action, here again quoting from, from Arizona

16 versus California, the court said:

17 "It is recognized that consent judgments

18 ordinarily are intended to preclude any further

19 litigation on the claim presented, the claim

20 presented, but are not intended to preclude

21 further litigation on any of the issues

22 presented. Thus consent judgments ordinarily

23 support claim preclusion, but not issue

24 preclusion."

25 And that's really important in this case,

13:59:46 tir   Doc 2629-2 Filed 03/03/14 Entered 03/03/14 09:08:09 Page 39 of
13:59:46 swr   Doc 2629-2 Filed 03/03/14 Entered 03/03/14 09:08:09 Page 39 of 48   168
113
352

your Honor, because the plaintiffs seem to be conflating those two concepts in the arguments that they're making in their brief.   They seem to, to suggest that we're seeking issue preclusion in our motion for dismissal, when, in fact, we are dealing with claim preclusion. Claim preclusion is the basis for res judicata and issue preclusion is, of course, the basis for collateral estoppel.   Those are two separate legal theories, and we are only proceeding with respect to the question of claim preclusion as we present our arguments to the Court.

It is very clear that both the defendant in this case and all the named plaintiffs in this case were parties to the Village Center settlement which also bound all of the owners asserting claims in this matter.

Stated another way, the settlement class members in Village Center are plaintiffs and proposed class members in this matter.

Next, all of the members of the Village Center settlement class were aware that they were being charged commercial rates and could have, but failed to challenge those commercial rates in that case.   They actually pled in their complaint, as the plaintiffs in this case have pled in their complaint, that the department of water and sewage was charging them

1 commercial rates improperly.  That gravamen complained
2 of was present in the earlier Village Center action and
3 is present in this case.
4          So, as the court indicated in Xechem, the
5 plaintiffs themselves have pled themselves out of court
6 by acknowledging the key facts of res judicata.  Same
7 issue, same parties, final judgment, those are the key
8 questions, all of which are resolved here in favor of
9 granting summary judgment to the defendants.
10          I would also note that the plaintiffs have
11 failed to state an equal protection claim.  The rate
12 making classification of which they complain is
13 rationally related to the cost of providing sewage
14 services, and the other cases cited by the plaintiff,
15 and I won't spend a lot of time on this, your Honor, but
16 they're reliance on Alexander versus City of Detroit is
17 completely misplaced.
18          In the Alexander case the court found that
19 it was inappropriate for the City to distinguish between
20 types of dwellings with five or more units for purposes
21 of the garbage disposal charge at issue in that case.
22          Here the City is not distinguishing between
23 types of units that had five or more, or types of
24 dwellings that had five or more units in them.  They're
25 covering all of the residential buildings that had five

14

1    or more units.  So it's quite distinguishable.

2             What the court found to be the infirmity in

3    the Alexander versus City of Detroit case was that there

4    was no evidence whatsoever that the City of Detroit was

5    incurring any additional expenses on the basis of

6    whether they were picking up the garbage at a

7    condominium project versus a rental apartment project,

8    each of which would have five or more units.  The court

9    said that's not a rational distinction, and I agree, it

10   wasn't.  Here the distinction being complained of

11   relates to unit, to residential facilities that are four

12   or less units and those that are five or more units and

13   that's a very important distinction because of the way

14   that these buildings are constructed.  These large

15   residential facilities have flat roofs, large parking

16   lots, and they cause more storm water runoff into the

17   City's system.

18            So the size of the unit and the

19   configuration of these units and the amount of storm

20   water that runs off of these residential facilities with

21   five or more units is greater, and, accordingly, the

22   City incurs greater expense.

23            So, again, the plaintiffs have essentially

24   pled themselves out of court by attacking a very

25   rational classification, rational on its face that shows

```
 1   the city seeking to recover the costs of its service to
 2   these facilities.
 3              And, your Honor, just to be clear, do you
 4   want me to proceed on the class certification issue at
 5   this time as well or would you, do you want to hear
 6   plaintiffs' response to our arguments?
 7              THE COURT:   Let me hear the plaintiffs'
 8   response.
 9              MR. TURNER: Thank you.
10              THE COURT:   Yes, let's do that.
11              MR. GOLDSTEIN: Your Honor, there's much that
12   I stated in the briefing that I am not going to restate
13   now.
14              THE COURT:   Okay.
15              MR. GOLDSTEIN: But that doesn't mean that I
16   don't think it's important, and I know you appreciate
17   that.
18              THE COURT:   Okay.
19              MR. GOLDSTEIN: I've been in front of you and
20   I know you look very hard at everything.
21              THE COURT:   Okay.
22              MR. GOLDSTEIN: We are accused of failing to
23   state a claim.  If you look at our complaint on its
24   face, we have stated a claim.
25              I'm going to sidestep all of the discussions
```

in the briefing about whether it's a Rule 12 or
Conversion Rule 56 and what you consider extrinsic.  I'm
going to sidestep all that and just argue substance for
right now, but I'm not waiving those issues.

We have stated a claim.  Their contention
that we have pled ourselves out of the claim in light of
the affirmative defense of res judicata does not
withstand careful scrutiny of the prior case to which
they point.

Res judicata requires that the issues
falling within the umbrella of the bar arise out of the
same core operative facts.  There are a number of
distinctions, not the least of which is the passage of
time, and we don't even know if the storm water fee
calculation was in effect then.  So I'm not even sure
we could have known about it with due diligence then if
it did not exist.

But I'm getting a little ahead of my thought
process.  I'll come back to that.

The core operative facts on the face of the
pleadings are in the old case there was a bureaucratic
whoopsy, if I can speak colloquially for a moment.  The
water department, we have come to learn, has set up a
classification system wherein residential units with
five or more units for some purposes, but not all, are

1  considered commercial.

2          And if you look at the definitions of

3  commercial, it's not the same thing as zoning.  So it

4  kind of envelops industrial, it kind of envelops

5  business, and in the old case it was observed on the

6  water bill that there was this IWC charge appearing.

7  What is that?  An inquiry was made and it was determined

8  that's an Industrial Waste Control charge.  We're

9  residential.  Why are we being hit with an Industrial

10  Waste Control charge?  Because of this bureaucratic

11  assumption just borrowing from classifications.  It was

12  a, on top of, it was above the waterline, sea level, if

13  you will.  It was visible.  Where there's no need for

14  sonar to find out what's going on underneath the water.

15  It was right there on the top.

16          We're residential.  This charge should not

17  be put on us and the City wants, it had its attention

18  focused on the issue because of the litigation, finally

19  went, oh, yeah.

20          If you look at the docket entries in that

21  case, do you see lots of protracted litigation discovery

22  motion practice?  No.  It's not there.  Then they just

23  sat down with the mechanism of trying to fix it.

24  Finding an exit strategy that worked and they found one

25  by supplying credits, future credits because there

```
1    wasn't the cash.  That's what their focus was on, an
2    efficient resolution of a problem that was right there
3    on the horizon.  It was Industrial Waste Control.
4              Okay, that's that case.
5              This case --
6              THE COURT:  Okay.  When you say "there
7    wasn't the cash", is there cash now?
8              MR. GOLDSTEIN: That's an issue to discuss
9    later as well.  I understand -- but you know --
10             THE COURT:  I'm just --
11             MR. GOLDSTEIN: I understand that the water
12   bills generate huge cash flow and, you know, if we want
13   to discuss a prudent exit strategy, I guarantee you the
14   interest is there in finding a winning way for everyone
15   to walk away and address the issues.
16             But that's not pertinent for this motion.
17             THE COURT:  I know.  I know.  I just --
18   when you said the credit system --
19             MR. GOLDSTEIN: We all read the paper.
20             THE COURT:  -- made me, you know -- okay.
21             MR. GOLDSTEIN: Well, sure.  Every case has
22   its obstacles and we can approach them civilly as I
23   believe Mr. Turner and I have an established history of
24   being able to work civilly with each other.
25             THE COURT:  Okay.  And that's important.
```

MR. GOLDSTEIN: We share clients in our history. I mean --

THE COURT: Okay.

MR. GOLDSTEIN: The operative facts here, we're not challenging the propriety of being billed for storm water runoff. That's the key distinction here.

And the other case wasn't proper to assess the fee. Who cares how you calculate it. It's just all wrong.

Here the main distinction is the fee itself as an item is probably just fine. We're not challenging that, but the method of calculating it is the focus of our challenge. It's a completely different set of facts. It's a completely different set of issues. We're not talking about whether the fee should be charged. We're talking about the proper method of calculating it. And I submit that is a significant distinction, given the fact that there's nothing in front of you that demonstrates when this process started and if it even existed during the time of the other case. I'm not sure that's determinative, but what I'm suggesting is that's an important consideration here.

Now, I'd like to step to the question of "should have known". The IWC charge was on the bills. It was on the bills. The storm water calculation fee is

1    not on the bills.  If it is suggested that the burden,

2    or consequence for not raising what you could have with

3    due diligence, it's applied in this context.

4            Now, this is not a situation where they

5    engaged in discovery -- oh, in the old case, we see this

6    fee that shouldn't be there, and you tend to agree with

7    us that it shouldn't be there, so we're going to focus

8    on getting out, but just to be safe can you give us

9    discovery on every other possible way you're violating

10   our rights under the equal protection clause.  How are

11   we supposed to be duly diligent in that.  I'm not sure

12   how that works.  I'm not sure how they can say we should

13   have known, other than, to ask a very broad-based and

14   inflammatory question:  Can you please identify every

15   other way in which you are violating our rights under

16   the equal protection clause based on this distinct or

17   any other distinct that might apply to residential

18   structures.  And, quite frankly, being a defense

19   attorney I'm not sure I would find that a discoverable

20   answer.  I might object.  That is not pertinent to the

21   claim; that is not material to this controversy.  This

22   controversy is about this charge, this Industrial Waste

23   Control charge.  I would object to that.

24            Now, you're a judge.  You've ruled on

25   motions to compel on whether something is going to

1  amount to discovery or not.  I think that issue is

2  complicated and not easily to predict.

3          But by suggesting it, absolutely we should

4  have done that in order to discover this claim now with

5  the harsh consequence of not being allowed to sue, I

6  don't think that's strong ground, at least not strong

7  enough for a res judicata motion at the, at a 12(b)(6)

8  motion where we haven't even figured out:  How they're

9  calculating the fee.  What the difference is.  When they

10 started doing it.  Why they started doing it.  What was

11 the real basis for it.  We haven't gotten there yet.

12 But we do see from the prior case, the LaSalle case, and

13 the Alexander Waste Hauling case, Alexander v Detroit.

14          Mr. Turner and I have a different

15 characterization of what that case was about.  I think

16 it was a clean distinct between five or more or four or

17 less, but the case says what it says.

18          I think we have a demonstrated history that

19 the City has made this classification in various

20 different contexts.  They did it with the waste hauling,

21 well, violating equal protection.  They did it in

22 LaSalle -- excuse me.  They did it in the Village Center

23 case.  It was asserted to be violation of equal

24 protection, and they're doing it now.  And this, way

25 underneath the sea level manifestation.  They have done

1   this arbitrarily throughout, at least that's our

2   contention; that's our claim.  We've stated it, and I

3   don't believe it is appropriate to dismiss the case at

4   this time.

5           Let me suggest that if the fact that we did

6   not engage -- not "we" -- but if the class and the prior

7   attorneys were focused on what their litigation was

8   about are somehow prejudicing our ability to bring the

9   case now, because they stayed focused on the Industrial

10  Waste Control charge, what that really does, if it bars

11  this case, is that rewards the complexity of

12  bureaucracy, that rewards them for hiding the fee and

13  punishing us for not catching them.

14          Now, I'm not suggesting anything sinister

15  with defense counsel or the City of Detroit.  But I'm

16  looking at objectively the nature of the relief they're

17  requesting, at the time they're requesting it, and the

18  basis for it, and that's what I'm saying.

19          Shame on you for not figuring it out then

20  when you were focused on a conspicuous issue and when

21  you were not making the assumption that the City was

22  also giving it to you in other ways that you can't see.

23          Shame on us for not catching that?  That's

24  the relief they're requesting, and I have difficulty

25  with that.

1          Now, if we engage in full course discovery

2    and the case gets fully developed and we see what was

3    going on, maybe the facts generated would sustain all

4    kinds of motions, motions on our side of the caption,

5    motions on their side of the caption, but they'd be

6    based upon the real facts and the real substance and

7    that would speak to fairness.

8          I did throw you a case cite that I notice he

9    didn't turn around and use against me, and that was one

10   that suggested res judicata is not intended to be an

11   automatic machine that prohibits you from making a

12   judgment call.

13              THE COURT:   Is that the Rumery case?

14              MR. GOLDSTEIN: No, but I like that case very

15   much.

16          I'm not good at thumbing through briefs when

17   I make oral argument, but I'd be glad to identify the

18   case.

19              THE COURT:   That's okay.

20              MR. GOLDSTEIN: It is in my res judicata

21   discussion.

22              THE COURT:   That's okay on my part.

23              MR. GOLDSTEIN: It's a good case.  I like it.

24          But I, it stands for the proposition that

25   it's a judicial doctrine designed to promote efficiency

1   of litigation and to protect against serial, bad faith,

2   relitigation of issues where people are just trying to

3   hurt each other.

4           I think we have our faith -- on the face of

5   it a very good faith claim.  We've supplied for you the

6   distinctions.  This is not serial.  This is not

7   nuisance.  This is significant.

8           Here's the other impact that I think you

9   ought to give serious consideration to in considering a

10  res judicata-based dismissal.

11          THE COURT:  Okay.  You've only got a few

12  minutes left.

13          MR. GOLDSTEIN: I'll do that, and thank you

14  for the warning.

15          THE COURT:  Okay.

16          MR. GOLDSTEIN: And on this

17  undeveloped-pleading-based record that ruling would

18  conclude that because of the Village Center dismissal,

19  from now on the City of Detroit has open season on any

20  kind of equal protection violation it wants to impose

21  upon residential structures with five or more units.

22          Look at that settlement agreement they rely

23  on.  Look at the language.  Any and all equal protection

24  claims from now on.  I mean, that's the only conclusion

25  we have because we don't even have it established that

13-53846-swr   Doc 2625-2   Filed 02/03/14   Entered 02/03/14 20:48:09   Page 53 of 48
13-53846-swr   Doc 2625-2   Filed 02/03/14   Entered 02/03/14 20:48:09   Page 53 of 48
181
332

1    the storm water fee existed then.

2              Now let me make a few points about equal

3    protection, while I pick up my pen.

4              I'll say -- I've briefed it thoroughly.

5    I'll say one thing.  All we've got right now is what

6    appears to be an ex post facto justification imposed

7    upon this classification to make it seem rational.  I

8    submit on its face it is arbitrary.  Why?  Four versus

9    five.  Why not five versus six?  Why not three versus

10   four?  What is the basis for this?

11             I know you have to draw a line somewhere if

12   you need to make a classification, but that line needs

13   to be drawn with a rational basis, not an arbitrary one.

14   We've got nothing here.

15             And I'll submit that the City of Detroit,

16   like many older communities, has no shortage of old,

17   large structures that used to be single family homes

18   that have no driveway and are now broken up into

19   multiple units.  I lived in one when I attended Detroit

20   College of Law back where Comerica Park is now over

21   there in West Village, and there were lots of units in

22   that building.  It used to be a single family home, no

23   driveway, and it would be sucked into this, and that's

24   all because it's arbitrary.  This is an ex post facto

25   construction to justify it.

```
 1              If you have no questions for me, I'll go
 2   sit.
 3              THE COURT:   Okay.   But you know what, I'm
 4   going to move on to the class certification issue, and
 5   that's your motion.
 6              MR. GOLDSTEIN: May I switch folders?
 7              THE COURT:   Yes.
 8              MR. GOLDSTEIN: Thank you.
 9              THE COURT:   And let me just say, I'm still
10   kind of mulling this issue over, but I do want to
11   indicate, even at this point, that I'm leaning towards
12   denying it, but I haven't made a final decision about
13   that, really for the reasons that have been argued, the
14   factual development that needs to occur here, and I just
15   say that off the cuff, because I haven't made a final
16   decision yet, and I'm going to keep moving forward here.
17              MR. GOLDSTEIN:  So, when you say you're,
18   without binding yourself, your initial inclination is to
19   deny "it", was that "it" a reference to the summary
20   judgment motion?
21              THE COURT:   Yes, the 12(b)(6).
22              MR. GOLDSTEIN: Got you.
23              THE COURT:  And the 12(c).
24              MR. GOLDSTEIN: That's not going to impact my
25   argument now --
```

```
 1              THE COURT:   Okay.

 2              MR. GOLDSTEIN: -- anymore than the arguments

 3      that we just did will, because so much of the opposition

 4      to the motion for certification is bootstrapped with res

 5      judicata, I mean, they're inextricably intertwined.

 6              I've said what I need to say about res

 7      judicata, I think.

 8              THE COURT:  You don't need to say anything

 9      else -- oh, okay.

10              MR. GOLDSTEIN:  And, so, there is one other

11      thing I see in their motion.  It speaks to the

12      numerosity element, the number of people in the class

13      suggesting that we're only speculating, and they're

14      paralleling us to the case they cite, I don't have the

15      name of the case at my fingertips, it's in their brief,

16      and they put in a fact pattern of folks who moved into

17      apartment structures, the prior tenant or landlords

18      didn't pay the water bill, and the water company

19      wouldn't turn it on, and that was the basis of the class

20      action.

21              And the classification motion was, I don't

22      remember if it was denied or if it was granted and then

23      reversed, but that was not an adequate basis for a class

24      because it was speculative.  It was speculative because

25      there was a variable in the class definition.  The
```

1    variable was:  Did the prior tenant not pay the bill?

2    See, all they could do was present the court with a

3    number reflecting tenants.  Not tenants -- if they had

4    submitted a class with a number of tenants who were not

5    getting water because of the prior tenant or landlord,

6    that would have been fine.  But they left an open-ended

7    variable in the class definition.  And the open-ended

8    variable was, if their water had been shut off, leaving

9    it open to their remote, unlikely, but real possibility

10   objectively that there's so few of them there's no point

11   in going through the class structure, the class action

12   system.  We don't have that variable here.  Every

13   single residential structure in the City with five or

14   more units is subject to this.  No variable.

15          And if you look at the numbers from the

16   prior litigation, it's large, and if you look at the

17   materials recently exchanged in these last few months,

18   it's still large.  We're looking at thousands of units.

19          THE COURT:  Okay.  Mr. Turner, let me hear

20   what you have to say about that.

21          MR. GOLDSTEIN: Thank you.

22          THE COURT:  Okay.

23          MR. TURNER:  Thank you, your Honor.

24          May it please the court, of course, as

25   you've acknowledged, our argument against class

certification is that the named plaintiffs in this case and virtually all of the members of the class are barred from pursuing the claims in this case on the basis of the prior action, and that's the central issue here.

In response to learned counsel's rhetorical question about, what, if anything, could the plaintiffs in the previous case have inquired about in discovery, or at any point, in informal settlement discussions, to learn what other problems might exist with the rate making classifications, it's a very simple question: City of Detroit, what are the components of commercial water rates?

City of Detroit, what are the components of commercial water rates?

An attorney who failed to ask that question formally or informally during the pendency of litigation for thousands of clients being charged commercial rates as set forth in the plaintiffs' complaint in the Village Center case, and in plaintiffs' complaint in the present case, what are the components? Very simple question. They didn't make the inquiry or if they did make the inquiry, they didn't act on the results of that inquiry.

And, accordingly, they knew or should have known that the commercial rates included the storm water fees on the basis of the impermeability of the roofs and

1  lots on these large residential complexes.   It's very,

2  very straightforward, your Honor.

3        Plaintiffs haven't satisfied the class

4  certification requirements because they bear the burden

5  of establishing numerosity, commonality, typicality, and

6  adequacy of representation.

7        They have problems here because it appears

8  from the pleadings in the complaint that they seek to

9  represent the very same class that was in the Village

10  Center case, and those class members filed an equal

11  protection claim against the City of Detroit, arguing

12  that their commercial water rates, including the

13  Industrial Waste Control charge, but you can't separate

14  the two, it was commercial rates and the Industrial

15  Waste Control charge in the prior action, and the

16  current action is about commercial water rates,

17  excluding the Industrial Waste Control charge, because

18  that charge has gone away, but they, but both, in both

19  cases the plaintiffs complained about the commercial

20  rates.

21        Accordingly, plaintiffs must demonstrate in

22  this case how a class, which is barred by the doctrine

23  of res judicata, can meet the requirements of Rule 23,

24  and they have a very, very steep burden in order to meet

25  that threshold, and in determining whether or not a

2:15-cv-10038-swr   Doc. 26225-2  Filed 03/06/14  Entered 03/11/14 09:08:29   Page 58 of 48   187
2:15-cv-10038-swr   Doc. 26225-2  Filed 03/06/14  Entered 03/11/14 09:08:29   Page 58 of 48
332

1  class is appropriate under Rule 23(b), and I quote:

2        "Sometimes it may be necessary for the court

3           to probe behind the pleadings before coming to

4           rest on the certification question."

5           That's quoting Wal-Mart versus Dukes, which

6  is quoting the General Telephone Company versus Falcon,

7  and these cases are cited in our brief.

8        Class certification is proper only if the

9  trial court is satisfied after a rigorous analysis that

10 the prerequisites of Rule 23(a) have been satisfied.

11       Although the plaintiffs have cited the In Re

12 Cardizem Antitrust Litigation case, 200 Federal Rule

13 Decision 297, for the proposition that talks about class

14 certification should be resolved in favor of

15 certification, the court in that case made very clear

16 that rigorous analysis must be applied before any

17 conclusion, and I quote Cardizem:

18       "Nonetheless, the court must conduct a

19           rigorous analysis into whether the

20           prerequisites of Rule 23 are met before

21           certifying a class."

22       Plaintiffs acknowledge at Page 4 of their

23 reply brief that a district court must conduct a

24 preliminary inquiry into the merits of a suit, a class

25 certification where quote:

1      "It is necessary to determine the propriety

2          of the certification."

3          And at their brief at Page 4, they're

4    quoting the Amgen case, 133 Supreme Court 1184, and we

5    agree:

6          "To prove numerosity, the plaintiffs must

7              demonstrate that the putative case is so

8              numerous that joinder of all the members is

9              impracticable."

10          And what they say is, and I'm paraphrasing

11   Mr. Goldstein, but essentially while acknowledging that

12   the 2300 or so plaintiffs who had their claims resolved

13   in the prior action overlaps substantially with the

14   thousands of plaintiffs they seek to represent here.

15          It is possible that there are some buildings

16   that existed then that don't exist anymore.  We've had a

17   lot of demolition in our town.  It's possible that there

18   has been some new construction with dwellings with five

19   or more units during the period since 2009 when the

20   previous case was settled.

21          But, they have made no showing that

22   construction since that period has created a number of

23   dwellings, a number of new dwellings sufficient to

24   satisfy the numerosity requirement for Rule 23, and I

25   would venture to argue that we haven't had that much new

1    development in Detroit in that period of time to create

2    new dwellings not previously covered by the settlement

3    in the Village Center case that would be sufficient to

4    satisfy Rule 23.

5              With respect to commonality, again, there's

6    a real big problem.  This res judicata issue is the

7    elephant in the room.   If you knew or should have known

8    about the component of commercial water rates in 2009

9    because you participated in a settlement that became a

10   final order of the court, which final order included

11   language indicating that you are waiving any and all

12   claims against the defendant, City of Detroit, forever,

13   known or unknown, then it seems to me that the named

14   plaintiffs in this case, who were parties, have nothing

15   in common with those newer dwellings that could

16   potentially be members of the class sought to be covered

17   in this case, at least those members of class sought to

18   be covered in this case who were not barred by res

19   judicata.

20             Now, in the Golden case that we cited in our

21   brief the plaintiffs filed an equal protection claim

22   regarding the City of Columbus' denial of water

23   services, and both parties have talked about that, but

24   what, the defect in Golden, which Mr. Goldstein has ably

25   discussed, almost, because there is a distinction here,

what the, what the court was saying is, what you haven't done is show us essentially the numerosity in any precise incalculable way, and they did cite the fact that the plaintiffs in that case sought to represent every apartment tenant in the City of Columbus, and they hadn't made refinements with respect to one of the key issues in the case, but that defect applies in this case as well because, again, the plaintiffs have said, we're, we want to represent everybody who has five units or more in a residential complex without any attempt to account for the problem of res judicata. And I do keep coming back to that, your Honor, because that's the defect here. They can't, they can't talk about numerosity or commonality without addressing the elephant in the room.

Their only allegation in this respect is in the two sentences that they offer and they say:

"Preliminary discovery provided by the City demonstrates that there are easily hundreds, if not thousands in excess, if not in excess of a thousand members that meet the proposed class definition. The listing of apartment accounts provided by defendant in preliminary discovery identify 23, 2,343 structures alone."

And that's in plaintiffs' motion at Pages 3

1   and 4.

2           Well, there are 2300 plaintiffs who received

3   relief in the previous case.  So, you know, by my math,

4   I think, it was 2310, by my math that leaves about 33.

5           THE COURT:  Well, let's see, that's still

6   within the range of 21 to 40, isn't it?  Isn't that

7   within numerosity threshold --

8           MR. TURNER:  Maximum.

9           THE COURT:  -- threshold, I should say.

10          MR. TURNER:  But the plaintiff have not, the

11  plaintiffs have not made specific allegations that would

12  address the question of which, which of those dwellings

13  would not have been the subject of the previous lawsuit.

14          The final and weakest aspect of the

15  plaintiffs' proposed class action is predominance.

16  Again, they can't state that with respect to that small

17  number of dwelling units, of dwelling complexes that are

18  not barred by the previous litigation that those --

19  their -- that the named plaintiffs' situation is similar

20  enough on the key issues in the case that they would be

21  suitable to represent that smaller group of dwelling

22  complexes, and so, accordingly, this class is not

23  appropriate for certification, your Honor.  They just

24  have a very, very substantial defect on the basis of the

25  participation of the majority of the proposed plaintiff

class members in the previous litigation.

And I'll be happy to answer any questions your Honor would have.

THE COURT: I don't have any.

MR. TURNER: Thank you, your Honor.

THE COURT: Again, I don't want to, I don't want to make a decision on this today. I am still mulling this over, and I'll make a final decision by order.

But I will indicate my leaning, again, my leaning is a little toward certifying the class. That's the way I'm leaning.

Again, I want to mull over and process these issues more, especially since the class cert issue is tied into the res judicata issue.

So, I'm going to take this matter under advisement and I expect to issue an official decision probably within a week or so.

All right.

Yes, sir?

MR. GOLDSTEIN: I don't have argument, but I could not recall the name of the case you asked me about.

THE COURT: Okay.

MR. GOLDSTEIN: I looked in my brief.

1          THE COURT:   Okay.

2          MR. GOLDSTEIN: It's the Maldonado versus

3   Attorney General case on Page 12.

4          THE COURT:   Okay.

5          MR. GOLDSTEIN: Thank you.

6          THE COURT:  All right.  Then, we are

7   officially in recess, and I want to go off the record

8   for a minute.

9          (At 11:55 a.m. proceedings concluded)

10

11              C E R T I F I C A T E

12          I, Merilyn J. Jones, Official Court Reporter

13   of the United States District Court, Eastern District of

14   Michigan, appointed pursuant to the provisions of Title

15   28, United States Code, Section 753, do hereby certify

16   that the foregoing pages 1-37, inclusive, comprise a

17   full, true and correct transcript taken in the matter of

18   LaSalle Town Houses, et al versus City of Detroit, et

19   al, 12-cv-13747 on Thursday, July 11, 2013.

20

21

22              /s/Merilyn J. Jones
                Merilyn J. Jones, CSR, RPR
23              Federal Official Reporter
                231 W. Lafayette Boulevard, Suite 123
24              Detroit, Michigan  48226

25   Date: November 5, 2013

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

------------------------------------------------------x
:
In re                            :        Chapter 9
:
CITY OF DETROIT, MICHIGAN,    :        Case No. 13-53846
:
                  Debtor.    :        Hon. Steven W. Rhodes
:
:
------------------------------------------------------x


# MOTION OF DEBTOR, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS

        The City of Detroit (the "City") hereby moves the Court, pursuant to

sections 105 and 502 of title 11 of the United States Code (the "Bankruptcy Code")

for the entry of an order[1] approving alternative dispute resolution procedures to

promote the resolution of certain prepetition claims.  In support of this Motion, the

City respectfully represents as follows:

---

[1]    This Motion includes certain attachments that are labeled in accordance with
Rule 9014-1(b)(1) of the Local Rules of the Bankruptcy Court for the
Eastern District of Michigan (the "Local Rules").  Consistent with Local
Rule 9014-1(b), a copy of the proposed form of order granting this Motion is
attached hereto as Exhibit 1.  A summary identifying each included
attachment by exhibit number is appended to this Motion.

## General Background

1.       On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2.       Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950).  Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life.

3.       As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities).  As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

4.       In February 2013, a state review team determined that a local government financial emergency exists in the City.  Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq.*

("PA 436"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case. MCL § 141.1558.

## The List of Claims and the Bar Date Motion

5. On the Petition Date, the City filed its List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 16) (the "Original List of Creditors").

6. On August 1, 2013, the City filed its Amended List of Creditors Pursuant to Section 924 of the Bankruptcy Code and Bankruptcy Rule 1007 (Docket No. 258) (the "Amended List of Creditors"), which replaced the Original List of Creditors and redacted certain personal information therein.

7. On September 30, 2013, the City filed its Second Amended List of Creditors and Claims, Pursuant to Sections 924 and 925 of the Bankruptcy Code (Docket No. 1059), which supplemented and amended the information in the Amended List of Creditors and also constitutes the City's list of claims under section 925 of the Bankruptcy Code (as amended or supplemented from time to time, the "List of Claims").

8. On October 10, 2013, the City filed the Motion of Debtor, Pursuant to Sections 105, 501 and 503 of the Bankruptcy Code and Bankruptcy Rules 2002 and 3003(c), for Entry of an Order Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof (Docket

No. 1146) (the "Bar Date Motion"), in which the City requested that the Court

establish a general bar date for creditors to file proofs of claim asserting prepetition

liabilities against the City (the "General Bar Date").  The Court has scheduled a

hearing on the Bar Date Motion to be held on November 14, 2013 (Docket

No. 1335).

## Jurisdiction

9.      The Court has jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).  Venue for this matter is proper in this district pursuant to 28 U.S.C.

§§ 1408 and 1409.

## Relief Requested

10.      On October 8, 2013, the Court entered an order (Docket

No. 1114) (the "Ryan Order") denying a tort claimant's request for relief from the

automatic stay of sections 362 and 922 of the Bankruptcy Code, subject to the

City's filing, on or before November 12, 2013, "a motion for approval of an

efficient process for liquidating all of the tort claims or a motion for extension of

time to file such a motion."  Ryan Order, at 1.

11.     Consistent with the Court's comments in the Ryan Order,[2] the City hereby seeks the entry of an order, pursuant to sections 105 and 502 of the Bankruptcy Code, approving a set of mandatory alternative dispute resolution procedures (collectively, the "ADR Procedures") to promote the efficient liquidation of tort claims and other Designated Claims (as defined below).

## **The ADR Procedures**

12.     The City has developed the ADR Procedures in consultation with the Wayne County Mediation Tribunal Association (the "MTA"). The MTA is an independent nonprofit organization created in 1979 by the Third Judicial Circuit Court of Michigan to provide a pool of mediators and to administer procedures for the out-of-court resolution of certain cases brought in the Circuit Court. Since that time, the MTA's role has expanded to include varied alternative dispute resolution services including, as applicable herein, case evaluation ("Case Evaluation") and arbitration services.

13.     The MTA's leading role in providing Case Evaluation services in the Detroit area is recognized by Local Rule 16.3 of the United States District Court for the Eastern District of Michigan, which also incorporates Rule 2.403 of the Michigan Court Rules of 1985 ("MCR") setting forth various procedures for Case Evaluation. In addition, where Case Evaluation alone is unsuccessful in

---

[2]     The proposed ADR Procedures also carry out the intent of the guidelines for mediation promulgated by this Court in Local Rule 7016-2.

resolving a claim, the MTA has substantial experience facilitating and coordinating binding arbitration proceedings.

14.     The ADR Procedures are designed to promote the resolution of each Designated Claim without full-blown litigation, while safeguarding the procedural rights of the Designated Claimants (as defined below) and the City. The ADR Procedures provide a structure that will:  (a) first promote direct settlement discussions and exchange of information between the parties; and (b) absent a settlement by direct discussions of the parties, promote liquidation of the Designated Claims through Case Evaluation and, with the agreement of the parties, binding arbitration.  The City proposes to implement the ADR Procedures on the terms contained on <u>Exhibit 6</u> attached hereto and incorporated herein by reference.  A summary of the primary terms of the ADR Procedures follows:[3]

15.     <u>Claims Subject to the ADR Procedures</u>.  The City and its professionals have engaged in an extensive review and analysis of the City's actual and alleged liabilities in connection with the production of the List of Claims.

---

[3]     The description of the ADR Procedures contained herein is intended to be a summary for the convenience of the Court and parties in interest and is not intended to modify any of the ADR Procedures set forth more fully in Exhibit 6 hereto.  As such, the summary of the ADR Procedures in this Motion is qualified in all respects by the more detailed terms of the ADR Procedures.  In the event of any conflict between the text of this Motion and the ADR Procedures, the ADR Procedures shall govern.  All capitalized terms used but not defined in the Motion have the meanings given to such terms in the ADR Procedures.

The City anticipates that it will receive literally thousands of proofs of claim asserting liabilities that the City disputes, including hundreds of disputed tort claims.[4]  In addition, multiple motions to lift the automatic stay of sections 362 and 922 of the Bankruptcy Code (collectively, the "Lift Stay Motions") already have been filed in this case, which continue to burden the City and this Court.[5]  Many of these Lift Stay Motions relate to tort claims and other claims asserted against the City.  The City developed the ADR Procedures to promote the efficient liquidation of Designated Claims.[6]

16.    One of the goals of the City's review has been to determine the most efficient and appropriate manner of liquidating disputed claims.  Through these efforts, the City intends to identify certain disputed claims (collectively,

---

[4]    As of the date hereof, only approximately 118 claims have been filed against the City.  However, it is anticipated that the notice of the General Bar Date will be sent to over 120,000 potential creditors, many of which will file proofs of claims.  In addition, Schedule H to the List of Claims identifies over 1,800 parties who may hold disputed tort and other litigation claims.

[5]    See, e.g., Docket Nos. 183, 268, 308, 312, 742, 755, 800, 828, 1035, 1057, 1103, 1122, 1137, 1155, 1266, 1307, 1314, 1336, 1488.  A number of Lift Stay Motions have involved requests for nonmonetary relief from the City, including, for example, quiet-title actions and requests that the City allow proceedings to continue to strip junior City liens from property with no equity to satisfy such liens.  The City has been developing a mechanism to preemptively address and resolve such requests for nonmonetary relief to minimize the need for court involvement.

[6]    Even where the City has designed certain claims already as candidates for the ADR Procedures, the City in its sole discretion may pursue the litigation of any particular claim outside of the ADR Procedures where it deems it more appropriate.

the "Designated Claims") that it believes could be liquidated more efficiently, cost effectively and/or expeditiously through an alternative dispute resolution process, rather than by traditional litigation. The City may designate for liquidation pursuant to the ADR Procedures any proof of claim timely asserted in these cases by serving a notice (an "ADR Notice") on the applicable claimant. The Designated Claims will not include, however, claims solely asserting workers' compensation liabilities against the City, which claims the City continues to resolve in the ordinary course pursuant to its usual workers' compensation procedures.

17.     The City already has determined that certain types of claims (collectively, the "Initial Designated Claims") are appropriate for liquidation through the ADR Procedures and should be considered to be Designated Claims even in advance of the City serving an ADR Notice on the applicable claimant. The Initial Designated Claims consist of any and all timely filed prepetition: (a) personal injury tort or wrongful death claims; (b) property damage claims; or (c) claims relating to the operation of motor vehicles for which the City is self-insured pursuant to chapter 31 of Michigan's Insurance Code of 1956, M.C.L. §§ 500.3101, et seq. Notably, many of the Initial Designated Claims are personal injury tort or wrongful death claims that this Court lacks jurisdiction to liquidate pursuant to 28 U.S.C. § 157(b)(5).

18.    The proposed ADR Procedures are comprised of up to three stages: (a) offer exchange; (b) case evaluation; and (c) binding arbitration, if agreed to by the parties. The City and the holder of a Designated Claim (the "Designated Claimant") may settle a Designated Claim and terminate the ADR Procedures at any time. If the parties do not resolve the Designated Claim through the ADR Procedures, and if they have not agreed to binding arbitration of the Designated Claim, then, upon completion of the offer exchange and case evaluation stages of the ADR Procedures, the Designated Claim will proceed to litigation in an appropriate forum.

19.    Given the potentially large number of Designated Claims and the limited staff in the City Law Department,[7] immediately initiating the ADR Procedures with respect to all Designated Claims or Initial Designated Claims on the same day and on the same schedule would not be feasible. The City, therefore, has built a degree of flexibility into the ADR Procedures to allow it to implement the ADR Procedures as promptly as practicable, but in a manner that does not overwhelm the City Law Department or the MTA. Accordingly, at each stage of the ADR Procedures, the City intends to prioritize the selection of Designated Claims based upon (a) the difference between any prior settlement offers made by the City and the Designated Claimant, (b) the nature and complexity of the

---

[7]    It is anticipated that the City Law Department will be the primary group responsible for implementing the ADR Procedures for the City.

Designated Claim, (c) the status of any underlying lawsuit, (d) whether the Designated Claimant previously actively participated in settlement discussions or (e) any other considerations that the City deems relevant or appropriate in its sole discretion

20.    The Initial Injunction and the ADR Injunction.  At the outset of this process, the City requires sufficient time to initiate the ADR Procedures in a rational manner (with respect to the Initial Designated Claims, in particular) without repeated interruptions in the form of Lift Stay Motions that may be filed by certain Designated Claimants.

21.    The ADR Procedures, therefore, contemplate that, for the period commencing on the date of entry of an order approving the relief requested herein (the "ADR Order") until the date that is 119 days after the General Bar Date (the "Initial Designation Period"), any Designated Claimant holding an Initial Designated Claim (and any other person or entity asserting an interest in such claim) will be enjoined (the "Initial Injunction") from filing or prosecuting, with respect to such Initial Designated Claim, any motion (a "Stay Motion") for relief from  either (a) the automatic stay of sections 362 and 922 of the Bankruptcy Code, as modified and extended from time to time by orders of the Court (the "Stay"), or (b) any similar injunction (a "Plan Injunction") that may be imposed upon the confirmation or effectiveness of a plan of adjustment of debts in this case

(a "Chapter 9 Plan").  The Initial Injunction is separate and distinct from the ADR Injunction, as described and defined below.  Any Designated Claimant that is subject to the Initial Injunction shall instead become subject to the ADR Injunction upon service of an ADR Notice with respect to the underlying Designated Claim, whether that occurs during or after the Initial Designation Period.

22.     The City in its sole discretion (a) may elect not to send an ADR Notice to the holder of an Initial Designated Claim and (b) instead file and serve on the applicable Designated Claimant a notice that the Stay is lifted to permit the underlying claim to be liquidated in an appropriate non-bankruptcy forum.

23.     Upon service of an ADR Notice on any Designated Claimant, such Designated Claimant (and any other person or entity asserting an interest in the relevant Designated Claim) shall be enjoined (the "ADR Injunction") from filing or prosecuting any Stay Motion or otherwise seeking to establish, liquidate, collect on or enforce the Designated Claim(s) identified in the ADR Notice other than by liquidating the claim through the ADR Procedures.  The ADR Injunction shall expire with respect to a Designated Claim only when the ADR Procedures have been completed as to that Designated Claim.

24.     The Initial Injunction and the ADR Injunction shall be in addition to the Stay and any Plan Injunction.  Except as expressly set forth in the ADR Procedures or in a separate order of the Court, the expiration of the Initial

Injunction or the ADR Injunction shall not extinguish, limit or modify the Stay or any Plan Injunction, and the Stay and any Plan Injunction shall remain in place to the extent then in effect, except as otherwise provided in the ADR Procedures.

25. <u>Offer Exchange Procedures</u>. The first stage of the ADR Procedures will require the parties to exchange settlement offers (the "<u>Offer Exchange Procedures</u>"), thereby providing an opportunity to liquidate the underlying Designated Claim on a consensual basis without the need for further proceedings. At any time following the entry of the ADR Order and the filing of a proof of claim,[8] the City may designate a claim for liquidation through the ADR Procedures by serving an ADR Notice, the ADR Order and the ADR Procedures on the Designated Claimant.[9] The ADR Notice will serve as (a) notice that a claim has been designated by the City as a Designated Claim (if not already designated under the ADR Procedures as an Initial Designated Claim) and (b) notice that the Designated Claim has been submitted to the ADR Procedures. The ADR Notice will include an offer by the City to settle the Designated Claim (the "<u>Settlement Offer</u>") and may inform the Designated Claimant whether the City does or does not consent to binding arbitration of the Designated Claim if it is not

---

[8] The ADR Procedures will not be initiated with respect to a claim unless and until a timely proof of claim is filed.

[9] For transferred claims, the City also will serve a copy of the ADR Materials on the transferee identified in the notice of transfer of claim that has been filed with the Court.

settled through the Offer Exchange Procedures or subsequent Case Evaluation Procedures.

26.     The Designated Claimant is required to deliver a response (any such response, a "Permitted Response") to the City by no later than 28 days following the service of the ADR Notice.  The Permitted Response must indicate the Designated Claimant's (a) acceptance of the Settlement Offer or (b) rejection of the Settlement Offer coupled with a counteroffer (a "Counteroffer").  Any Counteroffer may only propose an amount that, if agreed upon, will liquidate the Designated Claim, subject to treatment under a confirmed Chapter 9 Plan. The Counteroffer may not exceed the amount or improve the priority set forth in the Designated Claimant's most recent timely filed proof of claim or amended proof of claim (but may liquidate any unliquidated amounts expressly referenced in a proof of claim).  The Designated Claimant also must indicate in its Permitted Response whether or not it consents to binding arbitration of the Designated Claim in the event the Designated Claim is not liquidated through the Offer Exchange Procedures or Case Evaluation.[10]  If the Designated Claimant fails to provide a Permitted Response within the time period allowed, then the Designated Claim will advance automatically to Case Evaluation, as set forth below.

---

[10]     Any attempt to refuse binding arbitration in response to the ADR Notice will be ineffective, however, if the Designated Claimant previously consented in writing — either before or after the Petition Date — to binding arbitration as a means to resolve its claim(s).

27.     The City may, within 14 days of its receipt of a Counteroffer

accept or reject the Counteroffer or request further information in support of the

Designated Claim or Counteroffer, subject to the time limitations set forth in

Section II.A.5(d) of the ADR Procedures.  The City and the Designated Claimant

may thereafter continue to exchange revised Settlement Offers and Counteroffers

for a period of up to 21 days, on which date the Offer Exchange Procedures shall

be deemed to conclude and terminate.  If the Designated Claim has not been

resolved through this process, the liquidation of the Designated Claim will proceed

to Case Evaluation, subject to the City and the Designated Claimant's ongoing right

to settle the Designated Claim by mutual consent at any time.  Any date that the

Offer Exchange Procedures conclude without a resolution is referred to herein as

the "Offer Exchange Termination Date."

28.     Case Evaluation.  The next step of the ADR Procedures is Case

Evaluation before the MTA under the procedures set forth in MCR §§ 2.403 and

2.404, as modified by the ADR Procedures.[11]  As soon as reasonably practicable

following the Offer Exchange Termination Date, the City will serve upon the

applicable Designated Claimant and the Clerk of the MTA (the "ADR Clerk"), a

---

[11]     For example, MCR §§ 2.403(A-C) (relating to the assignment of cases to
Case Evaluation) and 2.403(N-O) (relating to the posting of bonds for
frivolous claims and defenses and the awarding of costs against a party that
rejects a Case Evaluation and subsequently fails to achieve a superior result
at trial) are expressly made inapplicable to the Case Evaluation proceedings.

notice that the Designated Claim has been referred for Case Evaluation.[12]

Additional parties may intervene in the Case Evaluation solely by agreement of the

City and the applicable Designated Claimant.

29.    The fees and costs for each Case Evaluation proceeding are

$75.00 payable to the ADR Clerk by each party, except that, where one claim is

derivative of another, the claims will be treated as a single claim with one fee to be

paid and a single valuation of the claims to be made.  If for any reason, however,

the fees for any Case Evaluation proceeding exceed $75.00 per party, such fees

will be borne equally by the parties.

30.    As described in greater detail in the ADR Procedures, the

purpose of Case Evaluation is to obtain a nonbinding, confidential, monetary

valuation of the applicable Designated Claim that serves as a focal point for

ongoing settlement negotiations between the parties.  To this end, with respect to

each Designated Claim that is not liquidated consensually pursuant to the Offer

Exchange Procedures, the ADR Clerk will select a panel of three case evaluators

(the "Case Evaluation Panel") and provide the members of the Case Evaluation

---

[12]    In prioritizing among Designated Claims to refer to Case Evaluation, the
City may consider, along with any other factors that the City deems relevant
or appropriate in its sole discretion, (a) the difference between the final
offers made by the City and the Designated Claimant during the Offer
Exchange Procedures, (b) the nature and complexity of the Designated
Claim, (c) the status of any underlying lawsuit or (d) whether the Designated
Claimant returned the ADR Notice and its level of participation in the ADR
Procedures.

Panel and the parties to the Case Evaluation with at least 42 days' notice of a short hearing before the Case Evaluation Panel on the legal and factual bases for the Designated Claim (the "Case Evaluation Hearing").

31.    At least 14 days prior to the scheduled date of the Case Evaluation Hearing, the parties will serve a short case summary and supporting documents on each other and the ADR Clerk, for delivery to the members of the Case Evaluation Panel.  Oral presentation at the Case Evaluation Hearing generally is limited to 15 minutes per side with the parties relying on documentary evidence as opposed to live testimony, and statements by the attorneys are not admissible in any court or evidentiary proceeding.

32.    Within 14 days following the Case Evaluation Hearing, the Case Evaluation Panel will issue its valuation of the Designated Claim (the "Evaluation").  Within 28 days following the issuance of the Evaluation, each party to the Case Evaluation proceeding files an acceptance or rejection of the Evaluation.  If all parties accept the Evaluation with respect to all claims between them, then a settlement shall be documented and made of record.  If any party rejects the Evaluation, then the parties shall have a further 28 days to attempt to negotiate a consensual settlement of the Designated Claim.  If no settlement is reached by the end of that period (the "Case Evaluation Termination Date"), then the Designated Claim shall proceed to binding arbitration, if applicable.

33. <u>Binding Arbitration</u>. Where the parties all have agreed to binding arbitration, the City shall serve a notice of arbitration on the ADR Clerk, the Designated Claimant and any other entities that were parties to the Case Evaluation as soon as reasonably practicable following the Case Evaluation Termination Date with respect to any Designated Claim. Additional parties may intervene in the arbitration proceeding solely by agreement of the City and the other parties. If the parties have not mutually agreed to binding arbitration, then the Designated Claim shall advance in accordance with the procedures for Unresolved Designated Claims set forth below.

34. The arbitration of any Designated Claims shall be conducted by a single arbitrator selected by the ADR Clerk and shall be governed by the commercial arbitration rules of the American Arbitration Association (the "<u>AAA</u>"), as amended and effective on October 1, 2013, unless the parties agree otherwise (the "<u>Arbitration Rules</u>"), except where the Arbitration Rules are expressly modified by the terms of the ADR Procedures. The fees and costs charged by the arbitrator and the MTA will be shared equally among the parties.

35. The ADR Clerk shall select the arbitrator, subject to the parties' rights to request that the Court replace the arbitrator upon a showing of a reasonable inference of bias, and shall provide notice to the parties of his or her appointment. All arbitration hearings (the "<u>Arbitration Hearings</u>") shall be

scheduled by the arbitrator, in consultation with the parties, and shall be conducted in Detroit, Michigan.  The arbitrator shall provide written notice to the parties of the date, time and place of the Arbitration Hearings within 14 days following his or her appointment.  All fees and costs for arbitration proceedings will be shared equally between the parties (unless otherwise previously agreed) and shall be payable to the MTA.

36.     Each of the parties shall be entitled to engage in limited discovery, as set forth in the ADR Procedures, and shall submit to the arbitrator and serve on the other parties a short pre-arbitration statement by no later than 14 days prior to the first date scheduled for the applicable Arbitration Hearing, which must be held no later than 112 days after the date of appointment of the arbitrator.

37.     Any Arbitration Award shall only liquidate the applicable Designated Claim and shall not raise or purport to determine any issues relating to the potential treatment or priority of the Designated Claim in this chapter 9 case. The ADR Procedures further provide that the Arbitration Award generally may not provide the Designated Claimant with punitive damages, interest, attorneys' fees, other fees and costs, penalties, any amounts already disallowed by the Court, specific performance or other form of equitable remedy or any other relief impermissible under applicable bankruptcy and nonbankruptcy law.  The entry of

an Arbitration Award shall not grant the Designated Claimant any enforcement rights except as permitted under a Chapter 9 Plan, and the Stay and any Plan Injunction shall apply to the Arbitration Award. Any aspect of an Arbitration Award that violates the foregoing rules and limitations shall be void without further action of any court.

38. Any Arbitration Award shall be final and binding. No party shall have the right to request vacation of an Arbitration Award except to the extent that it violates (a) the ADR Procedures, (b) the Bankruptcy Code or (c) the Federal Arbitration Act.

39. <u>Approval and Satisfaction of any Settlement or Award</u>. A Designated Claimant holding a claim with respect to which settlement has been reached through the ADR Procedures will receive an allowed general unsecured nonpriority claim against the City that will be treated in accordance with the Chapter 9 Plan in the City's bankruptcy case *and not* a full cash payment of the settlement amount of the Designated Claim. Notwithstanding the foregoing, any disputes about the priority of a Designated Claim may be raised with and determined by the Court after the conclusion of the ADR Procedures.

40. The ADR Procedures do not limit, expand or otherwise modify the City's authority to settle claims or the City's authority over its property and revenues under section 904 of the Bankruptcy Code. The authority to settle

19
332
213

Designated Claims pursuant to the ADR Procedures will be in addition to, and cumulative with, any existing authority to resolve claims against the City.

   41. <u>Failure to Resolve a Designated Claim Through the ADR Procedures</u>.  Designated Claims not resolved through the ADR Procedures ("<u>Unresolved Designated Claims</u>") shall proceed to litigation for liquidation. Unless the City agrees otherwise, liquidation of any Unresolved Designated Claim shall proceed in this Court (to the extent that this Court has subject matter jurisdiction over the Unresolved Designated Claim) as soon as practicable following the date that the ADR Procedures are concluded for an Unresolved Designated Claim (the "<u>ADR Completion Date</u>").[13]  Such litigation will be initiated by the filing of a claim objection by the City (a "<u>Claim Objection</u>") within 35 days after the ADR Completion Date (the "<u>Claim Objection Deadline</u>").  Disputes over the subject matter jurisdiction of this Court shall be determined by this Court, and the Designated Claimants shall retain whatever rights they have to seek withdrawal of the reference, abstention of other procedural relief in connection with a Claim

---

[13] With respect to Unresolved Designated Claims, the ADR Completion Date will be the Case Evaluation Termination Date except where the ADR Procedures are terminated sooner, such as where Case Evaluation was conducted with respect to a Designated Claim prior to the Petition Date, and the parties do not agree to conduct a second round of Case Evaluation. In that instance, the ADR Completion Date will be the Offer Exchange Termination Date.  In this regard, the City estimates that Case Evaluation already has been conducted with respect to approximately 30% of the Initial Designated Claims.

Objection.  For the avoidance of doubt, consistent with 28 U.S.C. § 157(b)(5),

personal injury tort and wrongful death claims shall not be heard by this Court.

       42.    If the Unresolved Designated Claim cannot be adjudicated in

this Court because of lack of, or limitations upon, subject matter jurisdiction, or if

the City does not file a Claim Objection by the Claim Objection Deadline (any

such claim, a "Non-Bankruptcy Claim") then liquidation of any such Non-

Bankruptcy Claim shall proceed in either:  (a) the nonbankruptcy forum in which

the Non-Bankruptcy Claim was pending on the Petition Date, if any, subject to the

City's right to seek removal or transfer of venue or other procedural relief; or (b) if

the Non-Bankruptcy Claim was not pending in any forum on the Petition Date,

then in the United States District Court for the Eastern District of Michigan or such

other nonbankruptcy forum selected by the Designated Claimant that (i) has

personal jurisdiction over the parties, (ii) has subject matter jurisdiction over the

Non-Bankruptcy Claim, (iii) has *in rem* jurisdiction over the property involved in

the Non-Bankruptcy Claim (if applicable) and (iv) is a proper venue.

       43.    The Stay or any subsequent Plan Injunction (together,

the "Stay/Injunction") shall be deemed modified solely for the purpose of, and to

the extent necessary for, liquidating Non-Bankruptcy Claims in an appropriate

non-bankruptcy forum (if applicable under the ADR Procedures) unless, within

35 days of the ADR Completion Date, the City files a notice (a "Stay Notice") that

it intends for the Stay/Injunction to remain in effect with respect to a Non-Bankruptcy Claim. If the City files a Stay Notice as set forth above, the Stay/Injunction shall remain in place and the applicable Designated Claimant may seek relief from the Stay/Injunction under the standards set forth in section 362(d) of the Bankruptcy Code.

44. Notwithstanding anything herein, the City and any Designated Claimant may agree to terminate the ADR Procedures at any time and proceed to litigation of the applicable Designated Claim, as set forth herein.

## The Court Has Authority to Approve the ADR Procedures

45. This Court is authorized under sections 105 and 502 of the Bankruptcy Code to approve the ADR Procedures. Section 105 of the Bankruptcy Code provides that:

> [t]he court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title.

11 U.S.C. § 105(a). This provision, in conjunction with section 502 of the Bankruptcy Code, supports the use of alternative dispute resolution procedures in bankruptcy cases for the expeditious resolution of disputed claims.[14]  See Harchar

---

[14]   Section 502 of the Bankruptcy Code provides a framework for the allowance and disallowance of claims and grants bankruptcy courts broad authority to adjudicate matters within that section's ambit as core proceedings. See 11 U.S.C. § 502; 4 COLLIER ON BANKRUPTCY ¶ 502.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2013).

v. United States (In re Harchar), 694 F.3d 639, 645 (6th Cir. 2012) (Section 105 of

the Bankruptcy Code "provides the bankruptcy courts with authority to exercise

their equitable powers where necessary or appropriate to implement another

Bankruptcy Code provision."); Mitan v. Duval (In re Mitan), 573 F.3d 237, 246

(6th Cir. 2009) (noting "the broad grant of equitable power to bankruptcy courts

found within Section 105(a) [of the Bankruptcy Code]"); Cheesman v. Tenn.

Student Assistance Corp. (In re Cheesman), 25 F.3d 356, 360 (6th Cir. 1994)

("Several courts have suggested that the bankruptcy courts have broad equitable

powers to protect debtors pursuant to § 105(a) [of the Bankruptcy Code ].").[15]

     46.    In addition, bankruptcy courts are empowered to

---

[15]    See also John Richards Homes Bldg. Co. v. Adell (In re John Richards
Homes Bldg. Co.), 404 B.R. 220, 227 (E.D. Mich. 2009) ("The clear
language of 11 U.S.C. § 105(a) grants this Court significant equitable
powers as well as latitude in framing the relief necessary to carry out both
the specific provisions of the [Bankruptcy Code] as well as its philosophical
underpinnings.") (citation and quotation marks omitted); see also In re A.H.
Robins Co., 88 B.R. 742, 752 (E.D. Va. 1988) (holding that section 105 of
the Bankruptcy Code, 28 U.S.C. § 1334 and the equitable power of the court
permitted the court to approve channeling provisions, which included
alternative dispute resolution procedures, to assist in the efficient
administration of the debtors' estates and ensure an orderly and fair
distribution to claimants), aff'd sub nom. Menard-Sanford v. Mabey (In re
A.H. Robins Co.), 880 F.2d 694 (4th Cir. 1989); Lyondell Chem. Co. v.
CenterPoint Energy Gas Servs. Inc. (In re Lyondell Chem. Co.), 402 B.R.
571, 587 n.33 (Bankr. S.D.N.Y. 2009) ("[T]he Bankruptcy Court has
authority under section 105 broader than the automatic stay provisions of
section 362 and may use its equitable powers to assure the orderly conduct
of the reorganization proceedings.") (citation and quotation marks omitted).

issue an order … prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically.

11 U.S.C. § 105(d)(2).

47.     The establishment of alternative dispute resolution procedures for resolving claims is supported by a well established federal policy in favor of permitting parties to resolve disputes through arbitration.  See Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc., 383 Fed. App'x 517, 520 (6th Cir. 2010) (noting that there is "strong federal policy favoring arbitration"); Eichinger v. Kelsey-Hayes Co., No. 09-14092, 2010 WL 2720931, at *3 (E.D. Mich. July 8, 2010) (same); UPF, Inc. v. Motoman, Inc., No. 05- 74929, 2006 WL 1195825, at *2 (E.D. Mich. May 2, 2006) (same); accord Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006) ("[I]t is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy we have often and emphatically applied.") (citation and quotation marks omitted).

48.     This federal policy also applies in bankruptcy cases.  Indeed, this Court previously has ordered the establishment of mediation procedures to "promote the just, speedy and inexpensive resolution" of disputes within a large bankruptcy case.  See In re Collins & Aikman Corp., 376 B.R. 815, 815-16 (Bankr. E.D. Mich. 2007) (finding that it was "in the best interests of all of the parties" to order mediation procedures to resolve numerous adversary proceedings filed by the

litigation trust established pursuant to the debtors' confirmed plan of reorganization).[16] As one bankruptcy court has stated, "[c]onsensual resolution of litigation has been favored in the law from time immemorial, whether by the parties themselves, or through mediation or other techniques of dispute resolution." Hass v. Hass (In re Hass), 273 B.R. 45, 50 (Bankr. S.D.N.Y. 2002).

49. Numerous courts have expressed approval for alternative dispute resolution methods, including arbitration, because alternative dispute resolution may offer several practical advantages over ordinary litigation. As the United States Supreme Court has stated, "[t]he advantages of arbitration are many: it is usually cheaper and faster than litigation; it can have simpler procedural and evidentiary rules; [and] it normally minimizes hostility and is less disruptive of ongoing and future business dealings among the parties . . . ." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 280 (1995) (quoting H.R. Rep.

---

[16]   See also Spierer v. Federated Dep't Stores, Inc. (In re Federated Dep't Stores, Inc.), 328 F.3d 829, 831 (6th Cir. 2003) (where the bankruptcy court issued an order establishing alternative dispute resolution procedures for the liquidation of tort claims against the debtor, affirming a ruling of the bankruptcy court denying the motion of certain claimants to lift the automatic stay as to their claims); Willis v. Litzler (In re TIC United Corp.), 194 Fed. App'x 187, 188 (5th Cir. 2006) (affirming a bankruptcy court's order establishing mandatory alternative dispute resolution procedures for all tort claims against the debtor; holding that the bankruptcy court had subject matter jurisdiction to order such relief and that such an order was appropriate because tort claims against the debtor, such as that of the appealing claimant, threatened to deplete the debtor's estate if the automatic stay were lifted to allow claims against the debtor to proceed in nonbankruptcy forums).

No. 97-542, at 13 (1982)); Stout v. J.D. Byrider, 228 F.3d 709, 714 (6th Cir. 2000)

(noting that the Federal Arbitration Act was enacted to, among other things,

"relieve court congestion . . . and to provide parties with a speedier and less costly

alternative to litigation"); Nat'l Broad. Co. v. Bear Stearns & Co., 165 F.3d 184,

190-91 (2d Cir. 1999) ("The popularity of arbitration rests in considerable part on

its asserted efficiency and cost-effectiveness – characteristics said to be at odds

with full-scale litigation in the courts, and especially at odds with the broad-

ranging discovery made possible by the Federal Rules of Civil Procedure.") .

       50.    Consistent with these authorities and policies, courts have

approved alternative dispute resolution procedures in many other large bankruptcy

cases. See, e.g., In re Penson Worldwide, Inc., No. 13-10061 (Bankr. D. Del.

July 31, 2013) (Order Pursuant to 11 U.S.C. § 105(a) Authorizing Implementation

of Alternative Dispute Resolution Procedures, Including Mandatory Mediation);

In re Hostess Brands, Inc., No. 12-22052 (Bankr. S.D.N.Y. June 11, 2012) (Order,

Pursuant to Sections 105 and 502 of the Bankruptcy Code, Bankruptcy Rules 3007

and 9019 and Local Bankruptcy Rule 9019-1, Approving Alternative Dispute

Resolution Procedures to Promote the Resolution of Certain Prepetition Claims);

In re Great Atl. & Pac. Tea Co., No. 10-24549 (Bankr. S.D.N.Y. Oct. 21, 2011)

(Order Approving Certain Personal Injury Resolution Procedures); In re Motors

Liquidation Co., No. 09-50026 (Bankr. S.D.N.Y. Oct. 25, 2010) (Amended Order

Authorizing Implementation of Alternative Dispute Resolution Procedures); In re Dana Corp., No. 06-10354 (Bankr. S.D.N.Y. May 23, 2007) (Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019, Approving Alternative Dispute Resolution Procedures to Promote the Resolution of Certain Prepetition Claims); In re The Austin Co., No. 05-93363 (Bankr. N.D. Ohio Aug. 24, 2006) (Order Approving Debtors' Proposed (a) Claims Resolution Procedures for Contested Claims, and (b) Alternative Dispute Resolution Procedures for Liquidating Litigation Claims).

    51.    Due to the nature of factual and legal issues involved in, or other circumstances related to, the numerous disputed personal injury and other claims in this case, the City believes that the ADR Procedures will expedite the resolution of Designated Claims and limit the number of additional Lift Stay Motions filed or prosecuted against the City and, therefore, promote the efficient and expeditious liquidation of the Designated Claims and facilitate completion of the City's restructuring.

    52.    Since the Petition Date, the Stay generally has shielded the City from the burden and expense of litigating the claims of claimants who have not obtained a lifting or modification of the Stay.  The City realizes, however, that a process for liquidating disputed litigation claims is a necessary component of its restructuring, and, with respect to many of the Initial Designated Claims in

particular, the Court lacks jurisdiction to assist with the liquidation of the claims because they are personal injury tort or wrongful death claims.

53.     Moreover, particularly given the anticipated size of the disputed claims pool in this case, the City believes that a fair and efficient mechanism must be developed to liquidate disputed claims, where appropriate, short of full-blown litigation.  If the City were able to pursue the liquidation of the Designated Claims only through litigation, the administration and liquidation of these claims would result in a substantial drain on the City's limited resources.

54.     Thus, under the circumstances, the City believes that the ADR Procedures will assist the City, the Designated Claimants and the Court in the administration and liquidation of the Designated Claims, to the ultimate benefit of all stakeholders in this case.  Among other things, the ADR Procedures will:  (a) help minimize the expense, delay and uncertainty in liquidating the Designated Claims; (b) provide the City with a streamlined, well-defined and procedurally sound mechanism to pursue liquidation of many complex and significant disputed claims asserted in this case; (c) reduce the need to address the merits of the Designated Claims through full-blown litigation in this Court or other tribunals; (d) preserve the parties' respective procedural and substantive rights; and (e) provide a centralized mechanism for the liquidation of those Designated Claims that this Court lacks jurisdiction to liquidate.  Accordingly, the ADR Procedures

should be approved, and the City should be authorized to implement these procedures as described herein.

## Reservation of Rights

55.    The City files this Motion without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with (a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

## Notice

56.    Notice of this Motion has been given to (a) all entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (or their counsel if known) and (b) all entities that are parties to litigation or that have threatened litigation against the City according to the City's books and records (or their counsel if known) as set forth on Schedule H to the List of Claims.[17]  The City submits that no other or further notice need be provided.

---

[17]    The City believes that all known holders of Initial Designated Claims are among the entities identified on Schedule H to the List of Claims.

## Statement of Concurrence

57.     Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied."  Local Rule 9014-1(g).  Given the number of parties and potential parties involved in this case and the lack of known opposing parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein.  Accordingly, the City submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

## Statement Regarding Evidentiary Nature of Hearing

58.     The City believes that this Motion raises no factual issues and anticipates that an evidentiary hearing on this Motion will not be required.

## No Prior Request

59.     No prior request for the relief sought in this Motion has been made to this or any other Court.

WHEREFORE, the City respectfully requests that the Court:  (a) enter an order substantially in the form attached hereto as Exhibit 1, granting the relief

requested herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated:  November 12, 2013          Respectfully submitted,


          /s/ Heather Lennox
          David G. Heiman (OH 0038271)
          Heather Lennox (OH 0059649)
          JONES DAY
          North Point
          901 Lakeside Avenue
          Cleveland, Ohio  44114
          Telephone:  (216) 586-3939
          Facsimile:  (216) 579-0212
          dgheiman@jonesday.com
          hlennox@jonesday.com

          Bruce Bennett (CA 105430)
          JONES DAY
          555 South Flower Street
          Fiftieth Floor
          Los Angeles, California 90071
          Telephone:  (213) 243-2382
          Facsimile:  (213) 243-2539
          bbennett@jonesday.com

          Jonathan S. Green (MI P33140)
          Stephen S. LaPlante (MI P48063)
          MILLER, CANFIELD, PADDOCK AND
             STONE, P.L.C.
          150 West Jefferson
          Suite 2500
          Detroit, Michigan  48226
          Telephone:  (313) 963-6420
          Facsimile:  (313) 496-7500
          green@millercanfield.com
          laplante@millercanfield.com

          ATTORNEYS FOR THE CITY

# SUMMARY OF ATTACHMENTS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

| | |
|---|---|
| Exhibit 1 | Proposed Form of Order |
| Exhibit 2 | Notice |
| Exhibit 3 | None [Brief Not Required] |
| Exhibit 4 | Certificate of Service |
| Exhibit 5 | None [No Affidavits Filed Specific to This Motion] |
| Exhibit 6 | Proposed Alternative Dispute Resolution Procedures |

# EXHIBIT 1

## (Form of Proposed Order)

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                      :
In re                                 : Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            : Case No. 13-53846
                                      :
                         Debtor.      : Hon. Steven W. Rhodes
                                      :
                                      :
-----------------------------------------------------x
```

## ORDER, PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE, APPROVING ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS

This matter coming before the Court on the Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, For Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims (the "Motion"), filed by the City of Detroit (the "City"); the Court having reviewed the Motion and the proposed alternative dispute resolution procedures attached to the Motion as Exhibit 6 (the "ADR Procedures")[1] and having considered the statements of counsel and the evidence adduced with respect to the Motion at a hearing before the Court (the "Hearing"); the Court finding that: (a) the Court has jurisdiction over this matter pursuant to

---

[1] Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the ADR Procedures.

28 U.S.C. §§ 157 and 1334; (b) this is a core proceeding pursuant to 28 U.S.C.

§ 157(b); and (c) notice of the Motion and the Hearing was sufficient under the

circumstances; and the Court having determined that the legal and factual bases set

forth in the Motion and at the Hearing establish just cause for the relief granted

herein;

IT IS HEREBY ORDERED THAT:

1.     The Motion is GRANTED.

2.     The ADR Procedures are approved in all respects, pursuant to

sections 105 and 502 of the Bankruptcy Code.  For the avoidance of doubt, all of

the terms and provisions of the ADR Procedures are approved, whether or not such

terms and provisions are restated below.

3.     The City is authorized to take any and all actions that are

necessary or appropriate to implement the ADR Procedures.  Nothing in this Order

or the ADR Procedures, however, shall obligate the City to settle or pursue

settlement of any particular Designated Claim.  Any such settlements may be

pursued and agreed upon as the City believes are reasonable and appropriate in its

sole discretion, subject to the terms and conditions set forth in the ADR Procedures.

4.     From the date of this Order until the date that is 119 days after

the General Bar Date, the holders of the Initial Designated Claims (and any other

person or entity asserting an interest in such claim) shall be enjoined (the "Initial Injunction") from filing or prosecuting Stay Motions with respect to such Initial Designated Claims. The Initial Injunction is separate and distinct from the ADR Injunction as defined and described below

5.      Upon the service of an ADR Notice on any Designated Claimant, such Designated Claimant (and any other person or entity asserting an interest in the relevant Designated Claim) shall be enjoined (the "ADR Injunction") from filing or prosecuting any Stay Motion or otherwise seeking to establish, liquidate, collect on or enforce the Designated Claim(s) identified in the ADR Notice, other than by liquidating the claim through the ADR Procedures. The ADR Injunction shall expire with respect to a Designated Claim only when the ADR Procedures have been completed as to that claim. For the avoidance of doubt, the City may serve an ADR Notice on any Designated Claimant at any time, and the ADR Injunction shall become effective at the time of service without any further action by the Court.

6.      Except as expressly set forth in the ADR Procedures, the expiration of the Initial Injunction and/or the ADR Injunction shall not extinguish, limit or modify the Stay or any Plan Injunction, which shall remain in place to the extent then in effect, except as otherwise provided in the ADR Procedures.

The Initial Injunction and the ADR Injunction shall be in addition to the Stay and any Plan Injunction.

7.     The City in its sole discretion (a) may elect not to send an ADR Notice to the holder of an Initial Designated Claim and (b) instead file and serve on the applicable Designated Claimant a notice (a "Stay Modification Notice") that the Stay is lifted to permit the underlying claim to be liquidated in an appropriate non-bankruptcy forum.  In that event, immediately upon the filing of the Stay Modification Notice, the Stay shall be deemed modified with respect to the applicable Initial Designated Claim solely to permit the liquidation of the claim in a non-bankruptcy forum.  The liquidation of any such Initial Designated Claim shall proceed in either (a) the non-bankruptcy forum in which the Initial Designated Claim was pending on the Petition Date, if any, subject to the City's right to seek removal or transfer of venue or other procedural relief; or (b) if the Initial Designated Claim was not pending in any forum on the Petition Date, then in the United States District Court for the Eastern District of Michigan (the "District Court") or such other non-bankruptcy forum selected by the Designated Claimant that (i) has personal jurisdiction over the parties, (ii) has subject matter jurisdiction over the claim, (iii) has *in rem* jurisdiction over the property involved in the Initial Designated Claim (if applicable) and (iv) is a

proper venue. If necessary, any disputes regarding the application of the foregoing terms, conditions and limitations shall be determined by this Court; provided that disputes about the jurisdiction of a matter presented to a non-bankruptcy court may be determined by such court.

8.      The resolution of a Designated Claim pursuant to the ADR Procedures or the entry of an Arbitration Award shall not grant the Designated Claimant any enforcement rights except as permitted under a Chapter 9 Plan, and the Stay and any Plan Injunction shall apply to any such resolved Designated Claim or Arbitration Award. Any aspect of an Arbitration Award that violates the foregoing rules and limitations shall be void without further action of any court.

9.      Designated Claims not resolved through the ADR Procedures ("Unresolved Designated Claims") shall proceed to litigation to be liquidated. Unless the City agrees otherwise, liquidation of any Unresolved Designated Claim shall proceed in this Court (to the extent that this Court has subject matter jurisdiction over the Unresolved Designated Claim) as soon as practicable following the date that the ADR Procedures are concluded for an Unresolved Designated Claim (the "ADR Completion Date"). Such litigation will be initiated by the filing of a claim objection by the City (a "Claim Objection") within 35 days after the ADR Completion Date (the "Claim Objection Deadline"). Disputes over

the subject matter jurisdiction of this Court shall be determined by this Court, and the Designated Claimants shall retain whatever rights they have to seek withdrawal of the reference, abstention or other procedural relief in connection with a Claim Objection.

10.     If an Unresolved Designated Claim cannot be adjudicated in this Court because of lack of, or limitations upon, subject matter jurisdiction, or if the City does not file a Claim Objection by the Claim Objection Deadline (any such claim, a "Non-Bankruptcy Claim"), then liquidation of any such Non-Bankruptcy Claim shall proceed in either (a) the non-bankruptcy forum in which the Non-Bankruptcy Claim was pending on the Petition Date, if any, subject to the City's right to seek removal or transfer of venue or other procedural relief; or (b) if the Non-Bankruptcy Claim was not pending in any forum on the Petition Date, then in the District Court or such other nonbankruptcy forum selected by the Designated Claimant that (i) has personal jurisdiction over the parties, (ii) has subject matter jurisdiction over the Non-Bankruptcy Claim, (iii) has *in rem* jurisdiction over the property involved in the Non-Bankruptcy Claim (if applicable) and (iv) is a proper venue.  If necessary, any disputes regarding the application of the foregoing terms, conditions and limitations shall be determined

by this Court; provided that disputes about the jurisdiction of a matter presented to a non-bankruptcy court may be determined by such court.

11.     The Stay or any subsequent Plan Injunction (together, the "Stay/Injunction") shall be deemed modified solely for the purpose of, and to the extent necessary for, liquidating Non-Bankruptcy Claims in an appropriate non-bankruptcy forum (as applicable under these ADR Procedures) unless, within 35 days of the ADR Completion Date, the City files a notice (a "Stay Notice") that it intends for the Stay/Injunction to remain in effect with respect to a Non-Bankruptcy Claim.  If the City files a Stay Notice as set forth above, the Stay/Injunction shall remain in place, and the applicable Designated Claimant may seek relief from the Stay/Injunction under the standards set forth in section 362(d) of the Bankruptcy Code.

12.     Nothing contained in this Order or the ADR Procedures shall (a) prevent the City and any Designated Claimant from settling any Designated Claim at any time or (b) limit, expand or otherwise modify the City's authority to settle or pay claims or the City's authority over its property and revenues under section 904 of the Bankruptcy Code.  The authority to settle Designated Claims pursuant to the ADR Procedures will be in addition to, and cumulative with, any existing authority to resolve claims against the City.

13.     The terms of this Order shall not be deemed to preclude any party in interest from objecting to any Designated Claim to the extent such entity has standing to assert an objection in accordance with Bankruptcy Code and applicable law.

14.     This Court shall retain jurisdiction for all purposes specified in the ADR Procedures and with respect to all disputes arising from or relating to the interpretation, implementation and/or enforcement of this Order and the ADR Procedures.

# **EXHIBIT 2**

## **(Notice)**

13-53846-swr Doc 2693-2 Filed 02/20/14 Entered 02/20/14 20:08:09 Page 108 of 237
13-53846-swr Doc 2693-2 Filed 02/20/14 Entered 02/20/14 20:08:09 Page 108 of 113
332

Form B20A (Official Form 20A)
12/1/10

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**Eastern District of Michigan**

</div>

In re:

**CITY OF DETROIT, MICHIGAN,**

           **Debtor.**

**Chapter: 9**

**Case No.: 13-53846**

**Judge:  Hon. Steven W. Rhodes**

Address:  2 Woodward Avenue, Suite 1126
           Detroit, Michigan  48226

Last four digits of Social Security or
Employer's Tax Identification (EIN) No(s).(if any):  38-6004606

<div align="center">

**NOTICE OF MOTION OF DEBTOR,**
**PURSUANT TO SECTIONS 105 AND 502 OF THE BANKRUPTCY CODE,**
**FOR ENTRY OF AN ORDER APPROVING ALTERNATIVE DISPUTE RESOLUTION**
**<u>PROCEDURES TO PROMOTE THE LIQUIDATION OF CERTAIN PREPETITION CLAIMS</u>**

</div>

       The City of Detroit, Michigan (the "<u>City</u>") has filed papers with the Court seeking entry of an order, pursuant to sections 105 and 502 of the Bankruptcy Code, approving alternative dispute resolution procedures to promote the resolution of certain prepetition claims.

       **<u>Your rights may be affected</u>.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

       If you do not want the court to grant the relief sought in the motion, or if you want the court to consider your views on the motion, **on or by November 26, 2013**, you or your attorney must:

1.           File with the court a written response or an answer, explaining your position at:[1]

<div align="center">

**United States Bankruptcy Court**
211 W. Fort Street, Suite 2100
Detroit, Michigan  48226

</div>

       If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

---

[1]       Any response or answer must comply with F. R. Civ. P. 8(b), (c) and (e).

You must also mail a copy to:

David G. Heiman
Heather Lennox
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114

Bruce Bennett
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071

Jonathan S. Green
Stephen S. LaPlante
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226

2.        If a response or answer is timely filed and served, the Court will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated:    November 12, 2013                    Respectfully submitted,


                                               /s/  Heather Lennox
                                               David G. Heiman (OH 0038271)
                                               Heather Lennox (OH 0059649)
                                               JONES DAY
                                               North Point
                                               901 Lakeside Avenue
                                               Cleveland, Ohio  44114
                                               Telephone:  (216) 586-3939
                                               Facsimile:  (216) 579-0212
                                               dgheiman@jonesday.com
                                               hlennox@jonesday.com

                                               Bruce Bennett (CA 105430)
                                               JONES DAY
                                               555 South Flower Street
                                               Fiftieth Floor
                                               Los Angeles, California 90071
                                               Telephone:  (213) 243-2382
                                               Facsimile:  (213) 243-2539
                                               bbennett@jonesday.com

                                               Jonathan S. Green (MI P33140)
                                               Stephen S. LaPlante (MI P48063)
                                               MILLER, CANFIELD, PADDOCK AND
                                                  STONE, P.L.C.
                                               150 West Jefferson
                                               Suite 2500
                                               Detroit, Michigan  48226
                                               Telephone:  (313) 963-6420
                                               Facsimile:  (313) 496-7500
                                               green@millercanfield.com
                                               laplante@millercanfield.com

                                               ATTORNEYS FOR THE CITY

**EXHIBIT 4**

**(Certificate of Service)**

# CERTIFICATE OF SERVICE

I, Heather Lennox, hereby certify that the foregoing Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, for Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims was filed and served via the Court's electronic case filing and noticing system on this 12th day of November, 2013.


/s/ Heather Lennox