# Exhibit A

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re | ) In Proceedings Under Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |

### DECLARATION OF BRIAN L. SMITH IN SUPPORT OF THE OFFICIAL COMMITTEE OF RETIREE'S MOTION FOR ALLOWANCE OF AN ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO SECTION 503(B)(3)(F) OF THE BANKRUPTCY CODE[1]

I, Brian L. Smith, declare under penalty of perjury that:

1. I am the Chief Operating Officer ("COO") of Segal Select Insurance Services Inc. ("Segal Select" or the "Company"), which maintains offices at 333 W. 34th Street, New York, New York 10001-2402. I have over forty years industry experience. Further, I am authorized to execute this declaration on behalf of Segal Select. Unless otherwise stated in this declaration, I have personal knowledge of the facts set forth herein.[2]

2. This declaration is being submitted in connection with the motion (the "Motion") filed by the Official Committee of Retirees (the "Committee") of the City of Detroit (the "City" or "Debtor") seeking entry of an order allowing the Policy Premium as an administrative expense pursuant to section 503(b)(3)(F) of the Bankruptcy Code in order to permit the Committee to procure the Insurance Policy.

---

[1] Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Segal Select and are based on information provided by them.

3. Segal Select's experience is based upon more than two-hundred years of Segal Select employees' experience. I have been personally involved in placing/servicing Directors and Officers ("D&O") liability insurance for several high profile bankruptcy type cases. In the late 1980s, I was personally involved in placing and maintaining D&O insurance for a financial institution that, at that time, became the largest bank failure in U.S. history. During this same period, I helped many financial institutions and commercial corporations maintain D&O during one of the hardest D&O markets in decades. In the area of fiduciary liability insurance, one of my areas of expertise, I lead a team that has successfully placed and maintained fiduciary liability insurance for dozens of "red zone" multiemployer pension plans as well as plans that have encountered sizeable losses.

4. My unit maintains a proprietary database of fiduciary liability insurance policy information. For more than ten years, this database has provided an objective analysis of what limits of liability our clients are purchasing as well as what premiums are being paid. Currently, involving over 1,200 plans, this database provides an insight into market pricing in this insurance segment.

5. As for the instant Insurance Policy, Segal Select sought a policy intended to cover any fiduciary and/or professional responsibilities of the Committee. Upon information and belief, two national brokerage firms had explored the market without success. In my experience, this meant that most markets that I might like to approach had already been approached and had declined. In our industry, declinations are hard to reverse.

6. Upon information and belief, on a unique submission such as this, the hurdle to overturn a declination is almost insurmountable. This meant that my selection of markets had to be carefully considered and focused on finding non-traditional carriers.

7. The risk associated with the Insurance Policy is unusual. Upon information and belief, there are few, if any, equivalent scenarios. Put another way, there are no "common" underwriting variables. From an underwriter's viewpoint, there are no prior policies for comparison purposes.

8. As we discussed the scenario with Committee counsel, common Chapter 11 bankruptcies do not compare due to the differences in case law (Chapter 9 case law is scant with respect to professional liability insurance policies whereas Chapter 11 case law is more mature and established).

9. Based upon discussion with Committee counsel, the City's chapter 9 proceeding, the design of the Insurance Policy needed to include not only one or two years of active coverage but also six years of "tail" coverage.

10. Based upon my experience, many insurers would find the proposed insurance arrangement difficult to accept.

11. In fact, the first time we persuaded an insurer to agree to a seven-year prepaid program (one year active plus six years of tail coverage), it took several months of negotiation and extensive discussions with the insurer's accountants and compliance department to place the policy.

12. There is no established underwriting template that serves as a model for the Insurance Policy. Rather, the potential risk issues had to be identified through an analysis of the underwriting information provided and a series of discussions between Segal Select, Committee counsel, and eventually, with the underwriter.

13. Limits of liability were based upon conversations with Committee counsel and the underwriter. Typically, in my experience, the recommended limit of liability is a "balancing act" between what the client desires, what the underwriter is willing to offer, and the premium cost.

14. Under these circumstances, premiums are very subjective. With no historical comparisons, the premium becomes subject to certain broad industry standards and negotiation. In this instance, compounding the difficulties of the negotiation was the need for not only one to two years of active coverage but also six years of tail coverage.

15. A premium range of 1% to 4% of the limit of liability purchased is an industry norm for various types of professional liability insurance. In this instance, the Policy Premium was quoted at 2.33% of the liability purchased.

16. Similarly, the industry norm for a six-year tail policy is broad, but generally ranges between 200% to 250% at the low end and up to 300% at the high end. Currently, 300% is most commonly quoted and happens to be the amount quoted for the Insurance Policy.

17. In evaluating the reasonableness of the Policy Premium, we also take into consideration the scope of coverage under the Insurance Policy. In this instance, the underwriter was very flexible, as demonstrated by the following:

    a. an application with its imbedded warranties was waived;

    b. the definition of professional services, which is a major key in determining the scope of coverage, is based upon the bankruptcy's court order appointing the Committee (which details the Committee's role and responsibilities);

    c. the specifics of the retention have been negotiated that once the policy goes into "Tail," the retention is for any one claim and in the aggregate for all

claims. This is unique but necessary for the subject risk presented by this case; and

    d. other coverage provisions have been reviewed and, in our opinion, no unusual or onerous exclusions exist.

18. Based upon the above, and after extensive discussion and negotiation with the insurance carrier, I believe the Insurance Policy provides broad professional liability insurance that addresses the risk concerns of the Committee. We recommended that the Committee obtain the Insurance Policy.

I declare under the penalty of perjury that the forgoing is true and correct, to the best of my knowledge.

Dated: February 6, 2014

SEGAL SELECT INSURANCE SERVICES INC.

/s/ Brian L. Smith
Brian L. Smith
Chief Operating Officer

81683065\V-4