| | | |
|---|---|---|
| In re: | ) ) ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) ) ) | Case No. 13-53846 |
| Debtor. | ) ) | Hon. Steven W. Rhodes |

### CORRECTED MOTION OF THE OFFICIAL COMMITTEE OF RETIREES FOR ENTRY OF AN ORDER ALLOWING AN ADMINISTRATIVE EXPENSE CLAIM

The Official Committee of Retirees (the "Committee"), by its undersigned attorneys, files this motion (the "Motion") for entry of an order pursuant to section 503(b)(3)(F) of title 11 of the United States Code (the "Bankruptcy Code") allowing payments as an administrative expense claim for reimbursement of the Committee's purchase of an errors and omissions insurance policy in favor of the Committee Members (as defined below), in the amount of $602,250 (of which $250,000 is a refundable retention to be held in escrow) for insurance as described herein.[1] As discussed below, granting the relief sought herein is necessary for the continued operation of the Committee and the continued service of the Committee Members; the Committee Members are concerned with their exposure to frivolous litigation and believe that procuring the Insurance Policy will ensure that the Committee remains functional and balanced. Accordingly, the Insurance Policy is essential to the Committee's ability to continue functioning effectively and to the City's reorganization process generally. In support of this Motion, the Committee respectfully represents as follows:

---

[1] The amounts of the policy coverage, as well as a copy of the policy, have been disclosed to the Debtor and will be provided to the Court in camera.

**PRELIMINARY STATEMENT**

The City came to this Court, in large part, to address billions of dollars in pension and other post-employment benefit obligations owed to retired City employees. At the City's request, the Court directed the appointment of the Committee. The Committee represents the interests of the City's approximately 23,500 retirees and plays a central role in this chapter 9 proceeding. The Committee's members, some of whom are long-time advocates for the City's public employees assembled from among the City's most capable and qualified individuals and organizations, are invaluable to the Committee's efforts in this case.

Indeed, several of the Committee's members are individual retirees. They cannot risk and cannot afford the personal and financial harm from possible lawsuits for actions taken while serving on the Committee. Consequently, after an exhaustive search, the Committee found a willing insurance carrier and seeks approval to purchase an errors and omissions insurance policy for $352,250[2] with a one-year policy period (renewable for an additional year) with a six-year tail in order to indemnify the Committee members for actions (or omissions) taken while serving on the Committee. The proposed policy will mitigate the personal financial risk to the Committee's members at a reasonable price.

The policy will also help ensure the continued operations of the Committee. Many Committee members are deeply concerned about the personal financial risk they face in the absence of the insurance policy. As a result, the Committee seeks an order from this Court authorizing administrative expense priority in an amount sufficient to purchase such the policy. Without this relief, the Committee itself will struggle to function as envisioned and the City's

---

[2] There is a $250,000 reimbursable retention requirement that must be funded upon purchase of the policy and will be held in escrow. While the total cost of coverage is $352,250, the total amount of funding required is $602,250.

2

13-53846-tjt   Doc 2660   Filed 02/07/14   Entered 02/07/14 12:14:51   Page 2 of 17

reorganization will be compromised. Accordingly, the Committee respectfully requests that the Court grant the relief sought herein for the benefit of the retirees, the City, and all interested parties.

## BACKGROUND

1. On July 18, 2013 (the "Petition Date"), the City of Detroit (the "City" or the "Debtor") filed a voluntary petition for relief under chapter 9 of the Bankruptcy Code.

2. On July 19, 2013, the City filed its motion seeking entry of an order directing the appointment of an Official Committee of Retirees to ensure that the City's approximately 23,500 retirees (the "Retirees") were adequately represented in the proceeding [Docket No. 20] (the "Committee-Appointment Motion").

3. On August 2, 2013, the Bankruptcy Court granted the City's request and issued an order pursuant to section 1102(a)(2) of the Bankruptcy Code directing the appointment of the Committee (the "Committee Appointment Order") [Docket No. 279]. Thereafter, the Office of the United States Trustee, Region 9 (the "US Trustee"), began to solicit, interview, and vet certain individuals to serve as members of the Retiree Committee.

4. On August 22, 2013, after an exhaustive selection process, the US Trustee filed its notice of appointment of the Committee setting forth the individuals selected to serve thereon (the "Committee Members") [Docket No. 575].

5. The Committee selected and engaged counsel in late August (Dentons) and early September (Brooks Wilkins Sharkey & Turco).

6. The Committee selected and engaged The Segal Company ("Segal") as its actuarial consultant effective as of September 4, 2013 and pursuant to the terms of the engagement letter between the Committee and Segal dated November 26, 2013 [Docket No.

2330, Exhibit A to Proposed Order]. On December 26, 2013, the Committee filed the Notice of Submission of Revised Agreed Upon Order Regarding Application of the [Committee] Pursuant to Sections 901, 1102, and 1103 of the Bankruptcy Code and Bankruptcy Rule 2014 for Entry of an Order Authorizing the Retention and Employment of the Segal Company as Actuarial Consultant to the [Committee] Effective as of September 4, 2013 [Docket No. 2330].

7. Segal Select Insurance ("Segal Select")—an affiliate of Segal—was asked to solicit an errors and omissions insurance policy in order to indemnify the members of the Committee Members.

8. After an extensive search, Segal Select obtained a quote for a policy from Hudson Specialty Insurance Company (the "Insurance Policy"). (*See* Declaration of Brian L. Smith (the "Smith Declaration"). Segal was advised during the course of the search that two other brokers unsuccessfully tried to place the coverage obtained by the Committee, and one other insurance carrier declined to offer a policy. (*See* Smith Declaration ¶ 5.)

**9.** In general terms, the Insurance Policy will provide liability coverage to the Committee Members.[3] The policy period is one year with an option to renew for an additional year as well as a six-year tail. The total cost of procuring the Insurance Policy is $352,250 and the total amount of required funding is $602,250 (together, the "Policy Premium").[4]

## RELIEF REQUESTED

10. By this Motion, the Committee seeks allowance of an administrative expense priority claim pursuant to section 503(b)(3)(F) of the Bankruptcy Code in the amount of the

---

[3] The amount of coverage, as well as a copy of the policy, was provided to the Debtor and will be provided to the Court in camera.
[4] There is a $250,000 reimbursable retention requirement that must be funded upon purchase of the policy and will be held in escrow. While the total cost of coverage is $352,250, the total amount of funding required is $602,250.

4

Policy Premium in order to obtain the Insurance Policy and to protect the Committee Members from frivolous litigation as well as to further ensure the continued effective operation of the Committee and the continued service of the Committee Members.

## JURISDICTION AND VENUE

11. The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

## BASIS FOR RELIEF: SECTION 503(B)(3)(F) OF THE BANKRUPTCY CODE

13. In recognition of the vital role of the Committee in this chapter 9 case, the City agreed to pay the Committee's reasonable expenses. The Committee-Appointment Order reflects the City's agreement. (Committee-Appointment Order ¶ 4) ("[t]he City has agreed to pay the reasonable professional expenses of [the Committee].") Pursuant to sections 507(a)(2) and 503(b) of the Bankruptcy Code, administrative expenses are granted priority treatment.[5] An award of administrative expense priority serves to facilitate the debtor's reorganization for the benefit of all interested parties. *See, e.g., In re Globe Metallurgical, Inc.*, 312 B.R. 34, 39 (Bankr. S.D.N.Y. 2004) ("The priority that is afforded pursuant to sections 503 and 507 is provided to facilitate the debtor's reorganization efforts and to encourage third parties who may otherwise be reluctant to transact business with the debtor"). Section 503(b) sets forth a non-exclusive list of claims that are entitled to administrative-expense treatment.

14. The party seeking administrative expense priority bears the burden of demonstrating its entitlement by a preponderance of the evidence. *See In re FF Holdings Corp.*,

---

[5] Both sections 503 and 507(a)(2) of the Bankruptcy Code apply in chapter 9 cases. *See* 11 U.S.C. § 901.

5

343 B.R. 84, 87 (D. Del. 2006); *In re Alumni Hotel Corp.*, 203 B.R. 624, 630 (Bankr. E.D. Mich. 1996). Nevertheless, the decision to allow an administrative expense under section 503(b) rests within the sound discretion of the Court. *See, e.g., McDow v. Official Comm. of Equity Sec. Holders of Criimi Mae Inc. (In re Criimi Mae Inc.)*, 247 B.R. 146, 151 (D. Md. 1999) ("This broad discretion 'is justified by the bankruptcy judges superior knowledge of the case,' derived from the close"); *In re Dow Corning Corp.*, 2010 WL 3927738, at *10 (E.D. Mich. June 9, 2010).

**A. Section 503(b)(3)(F) of the Bankruptcy Code Grants Administrative Expense Priority to "Actual, Necessary Expenses" "Incurred" by Committees Appointed Under Section 1102 of the Bankruptcy Code "in the Performance of the Duties of Such Committee."**

15. Few cases have addressed the reimbursement of an official committee under section 503(b)(3)(F) of the Bankruptcy Code. In fact, only one decision, *McDow v. Official Committee of Equity Security Holders of Criimi Mae Inc.*, 247 B.R. 146 (D.Md. 1999), squarely addresses an official committee's request to allow as an administrative expense claim the cost of procuring liability insurance. Not surprisingly, the *McDow* court affirmed the bankruptcy court's decision to overrule all objections and allow the expenditure as an administrative expense claim. 247 B.R. at 148. The *McDow* court further endorsed the bankruptcy judge's view that the equity committee's participation in the proceeding served an important purpose. *See Id.* at 153 ("the bankruptcy judge noted the particular importance of [an equity committee] in this large and complex chapter 11 case due to the significant investment in the Debtor by a large body of shareholders who could not effectively participate in the case without such a committee"). The same is true of the Committee's participation in this chapter 9 case; and the same result should follow.

6

16. Before the passage of the Bankruptcy Reform Act of 1994, section 503(b) did not expressly address whether members of committees appointed under section 1102 of the Bankruptcy Code were entitled to reimbursement of expenses. Nevertheless, a majority of courts—including the Sixth Circuit—routinely allowed official section 1102 committees and their members to recover certain expenses incurred in connection with the performance of their duties. *See, e.g., In re George Worthington Co.*, 921 F.2d 626, 634 (6th Cir. 1990) ("Although we fail to find express authority for the reimbursement of an official committee's administrative expenses in the Code, we believe it is implied in the overall scheme for reorganization and in the legislative history of the Code and its amendments"); *In re Brendle's Stores, Inc.*, 164 B.R. 523, 527 (Bankr. M.D.N.C. 1994) (finding that the official committee of unsecured creditors should be reimbursed for their expenses); *In re Labine*, 42 B.R. 883, 888 (Bankr. E.D. Mich. 1984) (same).

17. After the enactment of the Bankruptcy Reform Act, a new subsection that expressly provided for the reimbursement of official committee members' expenses was added to section 503(b). *First Merch. Acceptance Corp. v. J.C. Bradford & Co. (In re First Merch. Acceptance Corp.)*, 198 F.3d 394, 397 (3d Cir. 1999). The statute now provides, in relevant part, that:

> [a]fter notice and a hearing, there *shall* be allowed administrative expenses, . . . including . . . the actual, necessary expenses . . . incurred by . . . a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee.

11 U.S.C. § 503(b)(3)(F) (emphasis added).

18. The plain language of section 503(b)(3)(F) requires claimants to establish that the expense is both (i) causally connected to the Committee Member's service on an official committee and (ii) actual and necessary to the performance of the Committee Member's duties.

7

11 U.S.C. § 503(b)(3)(F); *see, e.g., First Merch.*, 198 F.3d 394, 403 (3d Cir. 1999) (finding that section 503(b) unambiguously provides for the reimbursement of expenses incurred by committee members in connection with services provided by the committee); *McDow*, 247 B.R. at 151 (affirming allowance of the cost of purchasing liability insurance for the official committee of equity security holders as an administrative expense); *In re Summit Metals, Inc.*, 379 B.R. 40 (Bankr. D. Del. 2007) (awarding reimbursement of a committee member's travel expenses under section 503(b)(3)(F)).[6] Reimbursement of the Policy Premium is both causally connected to each Committee Member's service on the Committee and is actual and necessary to the performance of each Committee Member's duties.

### i. The Policy Premium Expense is Causally Connected to the Committee Members' Performance of Their Committee Duties

19. An expense is causally connected to the Committee Member's duties "[i]f [it] would not have been incurred but for an individual's service on a section 1102 committee." *McDow*, 247 B.R. at 151; *see generally In re Orange County*, 179 B.R. 195, 200 (Bankr. C.D. Cal. 1995) (stating that "under § 503(b)(3)(F), a member of a committee may be reimbursed for reasonable expenses incurred *in connection with* a member's performance of committee duties") (emphasis added).

20. Here, there is little doubt that the Insurance Policy and the Policy Premium is connected with the Committee Members' performance of their duties. In placing the coverage, Segal Select sought a policy intended to cover any fiduciary and/or professional responsibilities

---

[6] Unlike § 503(b)(3)(F), § 503(b)(3)(D) of the Bankruptcy Code imposes a higher burden on unofficial committees by requiring a claimant under that subsection to demonstrate a "substantial contribution" to the case. *See* 4-503 *Collier on Bankruptcy* ¶ 503.10 ("Section 503(b)(3)(F) only applies to committees officially appointed under the provision of section 1102. Members of unofficial committees are outside the scope of section 503(b)(3)(F), although the members of such committees can seek administrative expense priority under section 503(b)(3)(D) if they made a substantial contribution to the case.").

of the Committee. (Smith Memorandum, Exhibit "A", at 5.) That is, the indemnification provided by the Insurance Policy is confined to liability incurred by a given Committee Member acting in such capacity. The Insurance Policy will not indemnify or otherwise benefit Committee Members for any actions taken to further their interests as individual creditors. Accordingly, the Policy Premium will constitute an "expense[] incurred in the performance of the duties of [the Committee]," and thus, is allowable as an administrative expense pursuant to section 503(b)(3)(F). *See* 11 U.S.C. § 503(b)(3)(F).

### ii. The Policy Premium is an Actual, Necessary, and Reasonable Expense

21. Committee Members may be reimbursed for a range of expenses pursuant to section 503(b)(3)(F). *McDow*, 247 B.R. at 151 ("There is no basis in the language of subsection (F) or its legislative history for distinguishing between specific kinds of committee member expenses"). In addition to causation, the only restriction on official-committee-member expense reimbursement under section 503(b)(3)(F) is that the expense must be actual and necessary to the member's performance. In the absence of a bright-line test, bankruptcy courts may employ their expertise, in light of the complexities of the case, to determine whether an expense satisfies the requirements of subsection (F). *See Id*. The three-factor test adopted by the *McDow* court is particularly instructive, as it is the only case to date involving (and granting) administrative expense priority for an official committee insurance policy. The *McDow* court, in approving an official equity committee's request to allow the cost of procuring liability insurance (similar to the Insurance Policy here) as an administrative expense, required the committee to demonstrate that (i) the committee was beneficial to the reorganization process; (ii) the committee could not function without the expenditure relating to the insurance policy; and (iii), under the totality of the circumstances, the expense was reasonable. *Id*. at 152. Under this analytical framework, the

9

Policy Premium constitutes an actual, necessary, and reasonable expense incurred in the Committee Members' performance of their statutory duties.

### (a) The Committee is Beneficial to the City's Reorganization Process

22. The Committee is doubtless an essential component of the City's chapter 9 case. The Committee and the Committee Members represent the interests of the City's largest unsecured-creditor block, counting more than 23,000 Retirees among its constituents. The City's desire to restructure its pension and other post-employment benefit obligations lies at the root of this unprecedented chapter 9 case. Though Retirees' interests are generally aligned, they lack the resources—individually and collectively—to protect and advance those interests while simultaneously working with the City to achieve a successful resolution of its case.

23. In light of the above, the City itself sought the appointment of the Committee [Docket No. 20]. The City asked the Court to direct the US Trustee to appoint the Committee in order to, among other things, ensure adequate representation of Retirees, negotiate on behalf of Retirees, and otherwise participate in the City's bankruptcy proceeding. (Committee-Appointment Mot. ¶ 19, 23) Further, the City expressly stated that "the appointment of [the Committee] [was] critical to allow the City to restructure its liabilities effectively and administer this chapter 9 case." (*Id*. at ¶ 26) The City recognized that it could not address its obligations to the Retirees without the appointment of the Committee. Moreover, in granting the Committee-Appointment Motion this Court held that the Committee "is necessary to ensure adequate representation of the Retirees in [the City's] chapter 9 case." (Docket No. 279)

24. Inarguably, both the City and the Retirees have realized the benefit of the Committee's appointment and services rendered to date. The Committee helped streamline negotiations, crystallize important practical and legal issues, and earn key concessions for the benefit of the Retirees. For example, the Committee most recently was able to negotiate a

significant and substantial improvement to health care benefits cuts the City sought to impose on Retirees. Further, the Committee continues to facilitate the City's bankruptcy proceeding, while zealously advocating the rights of Retirees. The Committee is fully invested in the mediation process and continues to strive for a consensual resolution of all disputes. In sum, as previously recognized by the City and this Court, the Committee is not only beneficial, but is essential, to the City's reorganization process. *See George Worthington*, 921 F.2d at 634 ("[t]he official committee concept in Chapter 11 is an essential element in the Congressional redesign of the reorganization process.") (quoting amici curae).

### (b) The Committee Could Not Properly Function Without Obtaining the Insurance Policy and the Expenditure of the Policy Premium

25. Continuing to operate without an insurance policy jeopardizes the Committee's important, ongoing role in this case. If the relief requested herein is not granted, a number of Committee Members are extremely concerned with their litigation exposure, however frivolous any claims may be. (Declaration of Terri L. Renshaw, Exhibit "B") (the "Renshaw Declaration") ¶¶ 7, 13-14; Declaration of Gail M. Wilson, Exhibit "C" (the "Wilson Declaration") ¶¶ 7, 13-14). And understandably so, given the severe benefit cuts proposed by the City and the great need for the Committee to be actively involved in the plan negotiation process. Committee Members simply could not afford to defend themselves against purported claims arising out of their alleged actions—or inaction, as the case may be—as Committee Members. It should be noted that this chapter 9 case is very litigious; there is substantial litigation related to changes in benefits and pensions,[7] hundreds of and individuals objected to the City's eligibility for chapter 9

---

[7] See, e.g., *Official Committee of Retirees of the City of Detroit, Michigan v. City of Detroit, et al.*, Adv. No. 13-05244 (litigation regarding other post-employment benefits); *Flowers v. Snyder*, Case No. 13-729-cz (Ingham Cty.Cir.Ct.) (seeking declaratory and injunctive relief to prevent pension benefit impairment); *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-cz (Ingham Cty.Cir.Ct. July 3, 2013) (similar).

11

bankruptcy,[8] and there are numerous and varied tort claims and claimants in the case.[9] The possibility of vexatious litigation against the Committee is very real.

26. While the Committee would likely receive a release and exculpation upon confirmation of a chapter 9 plan of adjustment, if the case is dismissed the Committee may be left without protection. Moreover, even if a plan of adjustment is confirmed with such protections, Committee Members still need protection if only for defense costs as it is not improbable that they still may be sued.

27. Unlike many unsecured creditors' or equity holders' committees, most of the Committee Members are individuals; not financial institutions, corporate entities, or sophisticated investors. Even one frivolous suit could result in substantial financial hardship to the Committee Members, all of whom are volunteers serving without compensation. Committee Members should not be compelled to accept this risk. The Committee cannot withstand a reduction in its membership, even one of its members resigning, or a material change in its composition. Already in the throes of plan negotiations, complex mediation, and settlement talks, the Committee's ability to satisfy the Court's charge to "ensure the adequate representation of the Retirees"—not to mention its statutory duties—would be severely compromised by any such departures.

---

[8] First Amended Order Regarding Eligibility Objections, etc. at 1 and Exhibit A [Docket No. 821] (noting that 110 parties filed objections to the City's eligibility to file bankruptcy and listing parties invited to address the court).

[9] Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, for Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims [Docket No. 1665], at ¶ 15 ("The City anticipates that it will receive literally thousands of proofs of claim asserting liabilities that the City disputes, including hundreds of disputed tort claims.") (footnote omitted).

28. Importantly, the Committee Members, each of whom the US Trustee appointed after an extensive interview process, are specially qualified to serve as Committee Members and ensure that Committee counsel adequately represents the interests of the Retirees in this proceeding. The Committee Members are either representatives of, or leading figures in, the City's public-safety and municipal employee and retiree communities. After years of dedication and ardent advocacy on behalf of the City's employees and Retirees, the Committee Members have gained unique access and insight into the needs and interests of the Retirees. The Committee Members' currency and credibility among Retirees has already proven critical to the Committee's efforts. Consequently, the Committee believes the Committee Members are irreplaceable. However, like their constituents, the Committee Members are, in many cases, former City employees and of relatively modest means.

29. The Insurance Policy was sought to mitigate the risk of vexatious litigation and allay the concerns of the Committee Members, and allow the Committee to continue to be effective in the performance of its duties. The significant personal and financial risk to the Committee Members, in the absence of the Insurance Policy, is certain to affect the Committee's ability adequately perform its duties. (Renshaw Declaration ¶ 14; Wilson Declaration ¶¶ 14) Given the Committee's pivotal role, its continued functionality is essential to the City's reorganization process, particularly its ability to address its obligations to the Retirees. Thus, the Policy Premium should be allowed as an administrative expense in order to enable the Committee Members to obtain the Insurance Policy and continue to provide vital assistance to the Committee and ultimately, the City's reorganization effort.

**(c) The Policy Premium is Reasonable Under the Circumstances**

30. The Policy Premium is reasonable for three reasons. First, as discussed above, procuring the Insurance Policy is very important to the Committee's ability to function and

13

continue meaningful participation in the City's chapter 9 proceeding. Second, the Policy Premium, although not insignificant, is a justifiable expense in light of the City's improved cash flow, the potential risk faced by the Committee Members, and in comparison to the professional fees already being incurred in this case. Third, the Committee engaged in an extensive solicitation process and received only one proposal to underwrite the Insurance Policy. (*See* Smith Declaration ¶¶ 5-11) Indeed, before engaging Segal Select, two insurance brokers failed to obtain even a proposal for similar coverage. That so many insurance carriers passed on this policy further underscores the risk faced by the Committee Members.

31. Moreover, in light of the $9 billion in Debtor-scheduled obligations to retirees -- which amount is low -- obtaining insurance coverage is reasonable, and recommended by Segal Select. (*See* Smith Declaration ¶ 18.)

32. The Committee faces a unique risk and the Insurance Policy reflects that. (Smith Declaration ¶¶ 7, 12-14.) Issuance of the Insurance Policy and authorization of the Policy Premium expense is consistent with long-standing Sixth Circuit policy regarding reimbursement of committee expenses. *See George Worthington*, 921 F.2d at 634.

## NO PRIOR REQUEST

33. No prior request for the relief sought in this Motion has been made in this or any other Court.

## STATEMENT OF CONCURRENCE

34. Rule 9014-1(g) of the Local Rules for the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied."

14

Local Rule 9014-1(g). On multiple occasions beginning in December 2013 and including February 4, 2014, counsel for the Committee contacted counsel for the Debtor and counsel for the Fee Examiner with respect to the Motion. The Debtor did not agree to the relief requested herein, stating that it was statutorily prohibited from providing insurance to the Committee. The Fee Examiner stated that he was unwilling to take a position with respect to the Motion.

35. In addition to the Debtor and the Fee Examiner, and given the number of parties and potential parties involved in this case and the lack of known opposing parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the Committee to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the Committee submits that imposing the requirements of Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived with respect to additional parties.

## NOTICE

Notice of this Motion has been given to all parties registered to receive notice in this matter. As stated above, notice of the specific amounts of the policy limits and the cost of the policy has been given to the Debtor and the Fee Examiner. The Committee submits that no other or further notice need be provided.

**WHEREFORE**, the Committee respectfully requests that this Court enter an order, substantially in the form attached hereto, (i) allowing the Policy Premium as an administrative expense and (ii) granting such other and further relief as this Court deems just and proper.

Respectfully submitted,

| | |
|---|---|
| **BROOKS WILKINS SHARKEY & TURCO PLLC** | **DENTONS US LLP** |
| | Sam J. Alberts |
| By: /s/ Matthew E. Wilkins | 1301 K Street, NW |
| Matthew E. Wilkins (P56697) | Suite 600, East Tower |
| Paula A. Hall (P61101) | Washington, DC 20005-3364 |
| 401 South Old Woodward, Suite 400 | Tel: (202) 408-6400 |
| Birmingham, Michigan 48009 | sam.alberts@dentons.com |
| Tel: (248) 971-1800 | |
| wilkins@bwst-law.com | Carole Neville |
| hall@bwst-law.com | Claude D. Montgomery |
| | 1221 Avenue of the Americas |
| | New York, New York 10020 |
| | Tel: (212) 768-6700 |
| | carole.neville@dentons.com |
| *Attorneys for the Retirees' Committee* | claude.montgomery@dentons.com |

## **CERTIFICATE OF SERVICE**

      I, Matthew E. Wilkins, hereby certify that the foregoing document was filed and served via the Court's electronic case filing and noticing system on February 7, 2014.

      By:    /s/ Matthew E. Wilkins
                Matthew E. Wilkins (P56697)
                Brooks Wilkins Sharkey & Turco PLLC
                401 S. Old Woodward Avenue, Suite 400
                Birmingham, MI 48009
                (248) 971-1800; (248) 971-1801 – Facsimile
                wilkins@bwst-law.com

17

13-53846-tjt   Doc 2660   Filed 02/07/14   Entered 02/07/14 12:14:51   Page 17 of 17