UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION OF MICHIGAN

IN RE:
CITY OF DETROIT, MICHIGAN
    *Debtor.*

CHAPTER 9
CASE NO. 13-53846
HON. STEVEN W. RHODES

_____/

## MOTION FOR RELIEF FROM AUTOMATIC STAY TO PERMIT ENFORCEMENT OF JUDGMENT AGAINST CITY OF DETROIT, AND FOR RULING THAT JUDGMENT BASED ON CLAIM FOR TAKING OF PROPERTY WITHOUT JUST COMPENSATION IS NOT SUBJECT TO REDUCTION OR COMPROMISE IN BANKRUPTCY, AS TO T&T MANAGEMENT, INC., SUCCESSOR TO MERKUR STEEL SUPPLY, INC.

T&T Management, Inc. ("T&T Management"), by and through its counsel, Demorest Law Firm, PLLC, states as follows for its Motion (the "Motion") to Compel and For Relief from Automatic Stay as to T&T Management, Inc., a Florida Corporation, successor by merger to Merkur Steel Supply, Inc., a Michigan Corporation ("Merkur Steel"):

### The Inverse Condemnation Judgment

1.    Merkur Steel obtained a judgment for inverse condemnation against the City of Detroit in Wayne County Circuit court Case No. 1999-928001-CC, which was affirmed by the Michigan Court of Appeals at 261 Mich. App. 116 (2004). The Michigan Supreme Court then denied the City of Detroit's application for leave to appeal. (A copy of the Final Judgment is attached as **Exhibit 1,** and a copy of the unanimous, published opinion of the Michigan Court of Appeals is attached as **Exhibit 2**).

2.    The City of Detroit interfered with Merkur Steel's rights as a tenant of the property, because the City of Detroit had its own plans to acquire the property adjacent to Coleman A. Young International Airport (known at the time as Detroit City Airport).

3. In March 2002, the jury determined that the City of Detroit had partially inversely condemned Merkur Steel's rights as a tenant. The jury's verdict was that Merkur Steel had suffered $6.8 Million in past damages as a result of the City of Detroit's actions, and would continue to suffer damages of $3,800.00 per month in the future.

4. The Final Judgment entered on March 29, 2002, requires the City to make monthly payments of $3,800.00, continuing until such time as the City purchases the property, or releases the restrictions on the use of the property that led to the Judgment (**Exhibit 1**). The City has not purchased the property, and the restrictions on construction on the vacant portion of the property are still in place. Therefore, the $3,800 monthly payments must continue.

5. The City of Detroit made the monthly $3,800 payments required by the Judgment until 2013, when the City unilaterally stopped making payments ahead of its Chapter 9 filing on July 18, 2013.

6. T&T Management is a Florida corporation that is the successor in interest to Merkur Steel, as a result of the merger of the two companies.

## **Lifting of Automatic Stay**

7. Currently, claims against the City of Detroit are stayed pursuant to 11 U.S.C. § 362(a)(2), during which time the City of Detroit may propose a plan of adjustment modify its obligations to creditors whose claims are subject to reduction or compromise.

8.     Pursuant to 11 U.S.C. § 362(d)(1), upon the request of a party in interest, the Court

shall grant relief from the Stay enforced pursuant to 11 U.S.C. § 362(a)(2) for cause, including lack of adequate protection for the party in interest.

9.     As discussed below, the Judgment is not subject to reduction or compromise because it is based on a Constitutional claim for the taking of property without just compensation.

10.     Because the Judgment is not subject to reduction or compromise, T & T Management lacks adequate protection of its interest with the Stay in place.

11.     Furthermore, because the City of Detroit must pay the Judgment in full regardless of what reduction and compromises it makes in its plan of adjustment, the Stay on the Judgment does nothing more than delay T & T Management's Constitutional right to receive just compensation.

12.     Because the Judgment is not subject to reduction of compromise in this Chapter 9 bankruptcy proceeding, the Court should lift the automatic stay and permit enforcement of the Judgment for the past due monthly payments and all future payments.

13.     Congress may not pass laws under its Bankruptcy power that would effect a taking of private property without just compensation. *U.S. v. Security Industrial Bank*, 459 U.S. 70 (US 1982), citing *Louisville Joint Stock Land Bank v. Radford, 295 US 555 (1935)*.

14.     The Supreme Court Stated:

> The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private

> property without compensation. *Louisville Joint Stock Land Bank v. Radford, supra.* Thus, However "rational" the exercise of the bankruptcy power may be, that inquiry is quite separate from the questions whether the enactment takes property within the prohibition of the Fifth Amendment.

*459* U.S. at 75.

15.    In *Louisville Joint Stock Land Bank,* Justice Brandeis stressed the importance of preserving the Fifth Amendment despite times of hardship:

> The Fifth Amendment commands that, however great the Nation's need, private property shall not be thus taken even for a wholly public use without just compensation.

*295* U.S. at 602.

16.    In *Louisville Joint Stock Land Bank*, the Supreme Court held that the Frazier-Lemke Act violated the Takings Clause of the Fifth Amendment. The Frazier-Lemke Act was a bankruptcy act of Congress that restricted the ability of banks to repossess farms after they had been foreclosed on. The Supreme Court held the statute was void because it effected a "taking of substantive rights in specific property acquired by the Bank prior to" its enactment.

17.    Justice Brandeis noted that:

> [i]f the public interest requires, and permits, the taking of property of individual mortgagees in order to relieve the necessities of individual mortgagors, resort must be had to proceedings by eminent domain; so that, through taxation, the burden of the relief afforded in the public interest may be borne by the public.

*295* U.S. at 602.

18. Although Congress may authorize the City to impair obligation of contracts in Chapter 9 bankruptcy, it may not authorize the taking of private property without just compensation in violation of the Fifth Amendment. Therefore, the Judgment for inverse condemnation must be satisfied in full. Anything short of full payment for this Judgment would deprive T&T Management, as the successor to Merkur Steel, of just compensation in violation of the Fifth Amendment. Since the Fifth Amendment applies to both the State and Federal governments, such a reduction would be unconstitutional.

## Relief Sought

19. T&T hereby requests that this Court enter an order lifting the automatic stay to allow enforcement of the City's on-going obligations under the Judgment (**Exhibit 1**).

20. Pursuant to L.B.R. 9014-1(b)(4) (E.D. MI), a copy of the proposed Order is attached as **Exhibit 3**.

**WHEREFORE**, New Products Corporation respectfully requests that this Court enter an order lifting the automatic stay to permit enforcement of the Judgment against the City of Detroit, and also to rule that the Judgment, which is based on the taking of property without just compensation, is not subject to reduction or compromise as a result of the City of Detroit's bankruptcy.

Respectfully submitted,

/s/ Melissa L. Demorest
Mark S. Demorest (P35912)
Melissa L. Demorest (P68867)
Demorest Law Firm, PLLC
Attorneys for creditor
T&T Management, Inc.
322 West Lincoln Ave.
Royal Oak, MI 48067
248-723-5500
mark@demolaw.com
melissa@demolaw.com

Dated: February 10, 2014

City of Detroit bankruptcy:Motion for Relief from Stay 2014 02 07.docx

UNITED STATES BANKRUPTCY COURT
EASTERN DIVISION OF MICHIGAN

IN RE:                                    CHAPTER 9
CITY OF DETROIT, MICHIGAN                  CASE NO. 13-53846
    *Debtor.*                           HON. STEVEN W. RHODES

_____/

## **INDEX OF EXHIBITS**

**Exhibit**                    **Description**

1.    Final Judgment, *Merkur Steel v City of Detroit,* March 29, 2002

2.    Opinion, *Merkur Steel v City of Detroit*, 261 Mich. App. 116 (2004)

3.    Proposed Order

City of Detroit bankruptcy:Index of Exhibits.docx

# EXHIBIT 1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MERKUR STEEL SUPPLY, INC.,
a Michigan Corporation,

        Plaintiff,

v

CITY OF DETROIT, a Michigan
municipal corporation,

        Defendant.

99-928001-CC   9/03/1999
JDG: JEANNE STEMPIEN
MERKUR STEEL SUPPLY INC
vs   ‖‖‖ ‖ ‖‖ ‖‖ ‖‖ ‖ ‖ ‖‖‖ ‖‖
DETROIT CITY OF

---

Law Offices of Mark S. Demorest
MARK S. DEMOREST (P35912)
Attorneys for Plaintiff
19853 W. Outer Drive, Suite 100
Dearborn, Michigan 48124
313/565-1330

JAMES C. COBB, JR. (P23139)
Attorney for Defendant
615 Griswold, Suite 1415
Detroit, Michigan 48226
313/961-3433

---

### FINAL JUDGMENT

At a session of said Court held in the City of Detroit,
County of Wayne, State of Michigan, on: **MAR 2 9 2002**

Jeanne Stempien
_____
PRESENT: HON._____
        Circuit Court Judge

Jury trial commenced in this matter on February 25, 2002. The jury, after deliberating, reached its verdict as to liability on March 6, 2002, unanimously finding that the Defendant, City of Detroit, had inversely condemned the Plaintiff's, Merkur Steel Supply, Inc.'s, property rights as tenant as of December 1990.

Following the jury's verdict as to liability, further testimony and evidence were presented to the jury as to the issue of just compensation. On March 7, 2002, the jury, after having further deliberated, unanimously reached its verdict as to damages, finding that the Plaintiff, Merkur Steel Supply, Inc., had sustained damages as a result of the Defendant, City of Detroit's, inverse condemnation of Merkur's property rights as a tenant. The jury further decided that

Merkur is entitled to $6,800,000.00 in just compensation for the period from January 1, 1991 to the date of its verdict, March 7, 2002.

The jury also found that the Plaintiff, Merkur Steel Supply, Inc. will suffer future damages and is entitled to $3,800.00 per month from the City of Detroit in just compensation beginning March 7, 2002, until either (1) Merkur ceases to lease the property, (2) the City of Detroit acquires ownership of the property or (3) the City of Detroit takes the necessary actions to lift the restrictions preventing construction of a building on the vacant five-acre parcel.

This Complaint was filed by the Plaintiff, Merkur Steel Supply, Inc., on September 3, 1999, and the Plaintiff is entitled to interest as provided in MCLA §600.6013(6), compounded annually, from the date of the filing of the Complaint, on the sum of the $6,800,000.00 verdict amount, taxable costs and mediation sanctions awarded by the Court.

The parties having appeared before this Court on Plaintiff's Motion for Judgment Upon Jury Verdict and Plaintiff's Motion for Mediation Sanctions; the Court having heard oral arguments; and the Court being fully advised upon the premises:

## NOW, THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED AS FOLLOWS:

1.    <u>Entry of Judgment Against City of Detroit for Past Damages.</u> Judgment is hereby entered in favor of Plaintiff, Merkur Steel Supply, Inc. ("Merkur"), and against Defendant, City of Detroit, in the amount of Seven Million _Nine Hundred Eighty Eight_ Thousand _Eight_ Hundred _Fifteen_ and _60_/100 ($_7,988,815.60_ ) Dollars (the "Judgment Amount"). This amount is based on the $6,800,000.00 verdict, taxable costs in the amount of $_1,071.00_ , and accrued interest through March 29, 2002.

2.    <u>Interest.</u> Interest shall continue to accrue on the Judgment Amount as specified in MCLA §600.6013(6), until the Judgment is satisfied.

2

3. <u>Future Damages.</u> It is further ordered that the Defendant, City of Detroit, shall pay Plaintiff, Merkur Steel Supply, Inc., just compensation, on a monthly basis, rent in the amount of $3,800.00 per month, as future damages, beginning March 7, 2002. Interest will accrue at the rate prescribed in MCLA §600.6013(6), on any monthly payment that is not timely made by the City of Detroit. The monthly rent payments will continue until either (1) Merkur ceases to lease the property, (2) the City of Detroit acquires ownership of the property or (3) the City of Detroit takes the necessary actions to lift the restrictions preventing construction of a building on the vacant five-acre parcel.

4. <u>Mediation (Case Evaluation) Sanctions.</u> Plaintiff is entitled to mediation (case evaluation) sanctions pursuant to MCR 2.403. The amount of the sanctions will be determined by the Court after an evidentiary hearing on April 19, 2002 at 3:00 PM and added to the Judgment Amount (including interest accrued on the amount of mediation [case evaluation] sanctions from September 3, 1999 to March 29, 2002), unless the parties agree on the amount of the sanctions prior to that hearing.

This Judgment resolves the last pending claim in this matter and closes the case.

Jeanne Stempien

_____
Circuit Court Judge

**APPROVED AS TO FORM ONLY:**

LAW OFFICES OF MARK S. DEMOREST

_____
Mark S. Demorest (P35912)
Attorneys for Plaintiffs


_____
James C. Cobb, Jr. (P23139)
Attorneys for Defendant

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY _____ DEPUTY CLERK

P:\Demorest\Thomas, Karl\City Airport Condemnation\p-judgment.doc

3

# STATE OF MICHIGAN

## IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

MERKUR STEEL SUPPLY, INC.,
a Michigan Corporation,

        Plaintiff,

v

CITY OF DETROIT, a Michigan
municipal corporation,

        Defendant.

99-928001-CC   9/03/1999
JDG: JEANNE STEMPIEN
MERKUR STEEL SUPPLY INC
vs     |||| ||| ||| ||| ||| || || |||| |||
DETROIT CITY OF

---

Law Offices of Mark S. Demorest
MARK S. DEMOREST (P35912)
Attorneys for Plaintiff
19853 W. Outer Drive, Suite 100
Dearborn, Michigan 48124
313/565-1330

JAMES C. COBB, JR. (P23139)
Attorney for Defendant
615 Griswold, Suite 1415
Detroit, Michigan 48226
313/961-3433

---

## CERTIFICATE OF SERVICE

    Mark S. Demorest hereby certifies that on March 29, 2002, the Final Judgment, was

hand-delivered to James C. Cobb, Jr., 615 Griswold, Suite 1415, Detroit, Michigan 48226.

MARK S. DEMOREST (P35912)


P:\Demorest\Thomas, Karl\City Airport Condemnation\p-cos 0322.02.doc

# EXHIBIT 2

**MERKUR STEEL SUPPLY, INC., Plaintiff-Appellee, v CITY OF DETROIT, Defendant-Appellant.**

No. 241950

COURT OF APPEALS OF MICHIGAN

261 Mich. App. 116; 680 N.W.2d 485; 2004 Mich. App. LEXIS 672

December 16, 2003, Submitted
March 9, 2004, Decided

**SUBSEQUENT HISTORY:** Appeal denied by Merkur Steel Supply v. City of Detroit, 471 Mich. 884, 688 N.W.2d 502, 2004 Mich. LEXIS 2434 (2004)
Related proceeding at, Remanded by Hrt Enters. v. City of Detroit, 2005 Mich. App. LEXIS 1202 (Mich. Ct. App., May 12, 2005)
Related proceeding at Steel Assocs. v. City of Detroit, 2005 Mich. App. LEXIS 2553 (Mich. Ct. App., Oct. 18, 2005)

**PRIOR HISTORY:** [***1] Wayne Circuit Court. LC No. 99-928001-CC.

**DISPOSITION:** Affirmed.

**COUNSEL:** Law Offices of Mark S. Demorest (by Mark S. Demorest) for the plaintiff. Dearborn.

James C. Cobb, Jr., P.C. (by James C. Cobb, Jr.), for the defendant. Detroit.

**JUDGES:** Before: Murray, P.J., and Gage and Kelly, JJ.

**OPINION BY:** Christopher M. Murray

**OPINION:** [**489] [*118] GAGE, J.

Plaintiff Merkur Steel Supply, Inc., leases a parcel of property of approximately eleven acres in the city of Detroit. The property is adjacent to Detroit City Airport. The property contains a 188,000 square foot building and several acres of the property are vacant. For approximately ten years before this lawsuit, plaintiff attempted to expand its operations to no avail. The plans for expansion were repeatedly thwarted by city action.

Plaintiff initiated the present action against defendant city of Detroit for inverse condemnation. A jury [*119] trial resulted in a verdict in favor of plaintiff for approximately $ 7 million. The city now appeals as of right. We affirm.

I. FACTUAL BACKGROUND

To fully understand the nature of the cause of action, we must thoroughly review the relationship between the parties before us and the allegations set forth against the city.

Sometime in 1987, the city started its efforts to expand [***2] Detroit City Airport. In that year, the city signed an agreement with Southwest Airlines for Southwest to provide jet service to the airport. The agreement obligated the city to undertake a capital improvement at the airport. Apparently during this time, the city was not complying with existing Federal Aviation Administration (FAA) regulations, as some of the buildings near the airport, including plaintiff's, were too close to the existing runway. However, it appears the FAA granted temporary waivers to the city for the noncompliance.

Beginning in 1988, the city accepted grant money from the FAA and the state of Michigan to maintain and expand the airport. The grants all contained the condition that the city agree to prohibit the construction of new improvements and remove any existing hazards on the property near the airport. n1

Page 2

261 Mich. App. 116, *119; 680 N.W.2d 485, **489;
2004 Mich. App. LEXIS 672, ***2

n1 The record indicates that in 1991, the Detroit city council approved acquisition of the land surrounding the airport and the city did in fact condemn some of the properties in the area.

[**490] Around 1989, Karl Thomas and Hein Rusen, owners [***3] of plaintiff company, began contemplating constructing a 40,000 square foot addition to the existing building on their property in order to expand their business. The [*120] addition would be located on five acres that are vacant. In June 1990, plaintiff filed a notice of construction with the FAA. On December 19, 1990, the director of Detroit City Airport wrote a letter to the FAA objecting to plaintiff's building of the proposed structure. But in January 1991, the FAA issued a determination that construction of the proposed addition would not be a hazard to aviation; this determination was set to expire on August 24, 1992. In the meantime, the city filed an airport layout plan in April 1992, which put plaintiff's property directly in the way of the proposed airport expansion. In July 1992, plaintiff applied to the FAA for an extension determination, but in August 1992, the FAA revoked its "no hazard" determination because of the city's airport layout plan. Also during this time plaintiff applied for a building permit from the city, but it was denied.

In 1996, the city filed a revised layout plan showing the new airport runway going right through plaintiff's property. Apparently, because [***4] the city took no further action to condemn plaintiff's property, in September 1997, plaintiff wrote to then City Airport Director Suzette Robinson to inform her that it wished to proceed with its development. After receiving no response, plaintiff sent Robinson a second letter in October 1997, informing her that it would proceed with construction unless the city advised it that no building would be approved. Plaintiff again received no response. Thereafter, in November 1997, plaintiff hired an architectural firm to prepare plans for construction.

On July 2, 1999, the FAA issued a determination that the new building would be a hazard to aviation. On July 26, 1999, the Michigan Aeronautics Bureau issued a tall structure permit to plaintiff but attached certain conditions. The permit recognized that while the forty-foot [*121] building would not interfere with aviation, it could interfere with the city's plans to expand

the airport. It issued the permit with the condition that the proponent or any subsequent owners of the proposed building would not receive reimbursement for the building or any businesses associated with the building if the property was acquired for expansion. At this point, [***5] plaintiff alleges it considered its project dead.

Plaintiff filed the present lawsuit for inverse condemnation against the city in September 1999. In part, plaintiff alleged that the city's filing of an airport layout plan constituted a taking of plaintiff's property without just compensation. The city filed a motion for summary disposition, arguing that plaintiff's complaint failed to state a claim on which relief could be granted and that the complaint stated claims against the state and federal governments that were beyond the circuit court's jurisdiction. The trial court denied the motion for summary disposition on September 5, 2001.

Trial was bifurcated into two phases, liability and damages. At the conclusion of plaintiff's proofs, the city filed a motion for a directed verdict, arguing in part that the filing of an airport layout plan could not constitute a taking per se; that there was no evidence that any regulation imposed by the airport layout plan denied plaintiff all economically viable use of its [**491] land; that the court must apply a balancing test to determine whether a taking occurred; and that it was improper to segment the property and determine whether only the five [***6] acres on which plaintiff planned to build was taken. The trial court denied the motion.

At the conclusion of the liability phase of trial, the jury was asked to decide whether the city inversely condemned plaintiff's property and, if so, on what date the inverse condemnation occurred. The jury determined [*122] that the city's conduct amounted to a taking and that the taking occurred in December 1990. During the damages phase of trial, the jury was asked to determine: (1) whether plaintiff suffered damages, (2) the amount of just compensation to which plaintiff is entitled to date from January 1, 1991, (3) plaintiff's future damages, and (4) the amount of just compensation each month for which plaintiff is entitled to in the future. Following this phase of trial, the city again sought a directed verdict, arguing that plaintiff failed to establish the value of its property. The trial court denied the motion.

On March 7, 2002, the jury determined that plaintiff had suffered damages in the amount of $ 6.8 million and would continue to suffer damages in the amount of $

Page 3

261 Mich. App. 116, *122; 680 N.W.2d 485, **491;
2004 Mich. App. LEXIS 672, ***6

3,800 each month. The city filed a motion for judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. The trial [***7] court again denied the motion.

## II. STANDARD OF REVIEW

The city raises issues dealing with the trial court's rulings on several motions below as well as various other aspects of the trial. In its brief on appeal, the city erroneously states that the standard of review for this case is the plain error standard set forth in *People v Carines*, 460 Mich. 750; 597 N.W.2d 130 (1999). Despite the city's erroneous assertion, we will lay out the appropriate standards of review for the issues raised.

Part III(A) of this opinion addresses the city's argument that the trial court erred in denying its motion for summary disposition. While the city brought its motion for summary disposition under MCR 2.116(C)(8), the trial court reviewed the motion under both MCR 2.116(C)(8) and (10). A motion brought under MCR [*123] 2.116(C)(8) tests the legal sufficiency of a claim by the pleadings alone. *Beaudrie v Henderson*, 465 Mich. 124, 129; 631 N.W.2d 308 (2001). All factual allegations in support of the claim are accepted as true, as well as any reasonable inferences or conclusions that can be drawn from the facts, and must be construed in the light most [***8] favorable to the nonmoving party. *Maiden v Rozwood*, 461 Mich. 109, 119; 597 N.W.2d 817 (1999). A motion brought under MCR 2.116(C)(10) tests whether there is factual support for a claim. *Spiek v Dep't of Transportation*, 456 Mich. 331, 337; 572 N.W.2d 201 (1998). When deciding this motion, the court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence submitted in the light most favorable to the nonmoving party. *Ritchie-Gamester v City of Berkley*, 461 Mich. 73, 76; 597 N.W.2d 517 (1999). On appeal, the trial court's decision is reviewed de novo. *Dressel v Ameribank*, 468 Mich. 557, 561; 664 N.W.2d 151 (2003).

Parts III(B) and III(F) primarily address the city's motion for directed verdict and JNOV. A directed verdict is appropriate only when no material factual questions exist on which reasonable minds could differ. *Cacevic v Simplimatic Engineering Co (On Remand)*, 248 Mich. App. 670, 679-680; 645 N.W.2d 287 (2001). The trial court's decision on a motion for directed verdict is reviewed de novo. [***9] *Sniecinski v Blue Cross/Blue Shield of* [**492] *Michigan*, 469 Mich. 124, 131; 666

N.W.2d 186 (2003). Judgment notwithstanding the verdict should be granted only when there was insufficient evidence presented to create an issue for the jury. *Craig v Oakwood Hosp*, 249 Mich. App. 534, 547; 643 N.W.2d 580 (2002) (opinion by Cooper, P.J.). When deciding a motion for JNOV, the trial court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party and determine whether the facts [*124] presented preclude judgment for the nonmoving party as a matter of law. *Id*. A trial court's decision on a motion for JNOV is also reviewed de novo. *Sniecinski, supra*.

Part III(D) of this opinion addresses the city's argument that the trial court erred in allowing evidence of lost profits. This Court reviews a trial court's decision to admit evidence for an abuse of discretion. *Chmielewski v Xermac, Inc*, 457 Mich. 593, 613-614; 580 N.W.2d 817 (1998). As to the remaining claims, which are addressed throughout this opinion, questions of law are reviewed de novo by this Court, *Armstrong v Ypsilanti Charter Twp*, 248 Mich. App. 573, 582-583; [***10] 640 N.W.2d 321 (2001), while factual findings are reviewed for clear error, *Christiansen v Gerrish Twp*, 239 Mich. App. 380, 387; 608 N.W.2d 83 (2000).

## III. ANALYSIS OF THE CITY'S CLAIMS

At the outset, we note that the city appears to minimize and mischaracterize plaintiff's claims in this case. This is not simply a case where a company's attempt to expand its business interferes with the city's management of its airport. Instead, this is essentially a case of blight by planning. In this case, the city of Detroit wanted to expand Detroit City Airport and it needed to condemn the properties around the airport. However, the city's plans were not concrete and, for over a decade, the city has failed to actually expand the airport. While the city has condemned some of the surrounding area and has viewed it as practically uninhabited or vacant, the city has failed to formally condemn plaintiff's property. However, although the city has never formally condemned plaintiff's property, it has made it virtually impossible for plaintiff to expand its own business. Essentially, the city, in over ten years, [*125] has thrown "roadblock" after barrier to discourage [***11] the expansion of plaintiff's business.

### A. THE TRIAL COURT DID NOT ERR IN DENYING THE CITY'S MOTION FOR SUMMARY DISPOSITION

Page 4

261 Mich. App. 116, *125; 680 N.W.2d 485, **492;
2004 Mich. App. LEXIS 672, ***11

According to the city, it played no role in the FAA's determination of hazard against plaintiff's proposed building or in creating the condition in the state's tall structure permit. Thus, the city argues that the Wayne Circuit Court lacked jurisdiction over plaintiff's claims because the claims are actually claims against the state and federal governments.

Plaintiff in this case alleges a de facto taking. A de facto taking occurs when a governmental agency effectively takes private property without a formal condemnation proceeding. See *Detroit Bd of Ed v Clarke*, 89 Mich. App. 504, 508; 280 N.W.2d 574 (1979). Inverse condemnation can occur without a physical taking of the property; a diminution in the value of the property or a partial destruction can constitute a "taking." *Id*. Thus, for purposes of a de facto taking, all of the city's actions in the aggregate, as opposed to just one incident, must be analyzed to determine the extent of the taking.

Here, the city minimizes plaintiff's claims. According to the city, the [***12] circuit court lacked jurisdiction to rule that the [**493] FAA determination of hazard constituted a taking because FAA determinations are governed exclusively by federal law. The city relies on the case of *Flowers Mill Associates v United States*, 23 Cl Ct 182 (1991), for its contention that an FAA determination of hazard does not constitute a taking of property.

In this case, however, plaintiff did not bring suit against the federal government strictly on the basis of the FAA's determination of a hazard. Plaintiff brought suit against the city because of the city's filing of the [*126] airport layout plan with the FAA, *as well as* other acts plaintiff contends were taken in order to obtain the property near the airport. These other acts in part include the acquisition of properties surrounding the area and the promise, in exchange for grant money, to the FAA and the state that the city would not allow any new construction in the area. Plaintiff's primary contention was that the city wanted to acquire plaintiff's property but did not do so legally because of the significant cost, and instead condemned much of the surrounding properties and made it impossible for plaintiff to expand its [***13] business. Because plaintiff did not bring suit against the federal government strictly on the basis of the FAA's determination of a hazard, the city's reliance on *Federal Mills* is misplaced. Further, because of the city's misconceptions, its argument [**494] that the Wayne

Circuit Court lacked jurisdiction is also misplaced.

We note that even though the FAA's determination of a hazard does contribute to plaintiff's problems with its attempt to expand its operations, it is only one factor to be considered. As the city itself notes from *Flowers Mills, supra*, the FAA's hazard finding is not legally enforceable. This is why plaintiff's claim of a de facto taking cannot and does not rest merely on the FAA's determination of a hazard. Instead, plaintiff's claims are against the city for the filing of the airport layout plan, and they rest on the city's agreement to condemn the property, its condemning of some of the surrounding area, and its making it impossible for plaintiff to expand its business until the city decides whether to actually expand the airport and formally condemn plaintiff's property.

We come to a similar conclusion with regard to the city's claim that because state law regulates [***14] the issuance [*127] of tall structure permits, the condition contained in the tall structure permit issued to plaintiff cannot be imputed to the city. According to the city, plaintiff is essentially bringing suit against the state for a taking of plaintiff's property and therefore must bring suit against the state in the Court of Claims. The city is correct in its argument that the issuance of tall structure permits is regulated by the Tall Structure Act, MCL 259.481 *et seq*. This act requires a person seeking to build a structure in a runway or landmark area to obtain a permit. However, where the city's argument is misguided is in its claim that the trial court had to determine that the tall structure permit issued to plaintiff constituted a taking of its property.

Plaintiff does not claim that the condition contained in the tall structure permit constituted a taking of its property. Instead, plaintiff claims that the city's actions, in conjunction with the city's filing of the airport layout plan, constitute a taking of plaintiff's property by the city. Plaintiff alleged that in order to gain grant money, the city agreed that it would condemn [***15] the area near the airport and prohibit any persons from building in the area. It is this act that plaintiff argues contributes to a finding that the city inversely condemned plaintiff's property, not the mere fact that a condition was placed in the tall structure permit. Again, the city's argument that the Wayne Circuit Court lacked jurisdiction is misplaced.

Finally, the city claims that the mere filing of an airport layout plan, by itself, cannot constitute a taking of

Page 5

261 Mich. App. 116, *127; 680 N.W.2d 485, **494;
2004 Mich. App. LEXIS 672, ***15

plaintiff's property. The city is correct in that the mere promulgation and publication of plans does not constitute a taking of property. See *City of Muskegon v DeVries*, 59 Mich. App. 415, 419; 229 N.W.2d 479 (1975). The threats must be coupled with affirmative action, [*128] such as unreasonable delay or oppressive conduct. *Id.* Our courts have held that a city cannot deliberately act to reduce the value of private property. *Detroit Bd of Ed*, *supra* at 508, citing *In re Renewal, Elmwood Park Project*, 376 Mich. 311, 317; 136 N.W.2d 896 (1965). Actions found to be deliberate have included the published threat of condemnation, mailing letters concerning the [***16] project to area residents, refusing to issue building permits for improvements coupled with intense building inspection, reductions in city services to the area, and protracted delay and piecemeal condemnation. *Id.* at 509.

Again, in this case, plaintiff's claim does not rest on the city's publication of its plan. Plaintiff's claim rests on the fact that the city publicized its plans, started condemning the properties around plaintiff's, closed roads in the area, n2 and took action to prevent plaintiff from expanding its business. In essence, plaintiff argues that over a period of ten years, the city took steps to inhibit plaintiff's expansion of its business because the city wanted to expand the airport without having to legally and formally acquire plaintiff's property. Plaintiff argues that the city's failure to formally condemn its property constituted a taking. Plaintiff also argues that the city's failure to respond to plaintiff's inquiries and notice that it wished to proceed with its construction when the city took no action, particularly after 1996, constituted a taking. Under the circumstances, the trial court did not err in denying the city's motion for summary disposition.

> n2 Evidence indicates that in 1987, the city approved the temporary closing of a road in the area of the airport, and while the closing was supposed to be temporary, the road remained closed indefinitely.

[***17]

[*129] B. THE TRIAL COURT DID NOT IMPROPERLY FAIL TO APPLY THE BALANCING TEST TO DETERMINE WHETHER A TAKING HAD OCCURRED

According to the city, plaintiff's claim alleges a regulatory taking and, thus, the court was required to apply the balancing test set forth in *K & K Construction Inc v Dep't of Natural Resources*, 456 Mich. 570, 575 N.W.2d 531 (1998). In its argument, the city rather conclusorily states that plaintiff's claim is one of a regulatory taking, but under the facts, we cannot so conclude.

Eminent domain is an inherent right of a state to condemn private property for public use. *In re Acquisition of Land-Virginia Park*, 121 Mich. App. 153, 158; 328 N.W.2d 602 (1982). When exercising its power of eminent domain, the state, or those to whom the power has been lawfully delegated, must pay the owner just compensation. *Id.* Where the property has been damaged rather than completely taken by governmental actions, the owner may be able to recover by way of inverse condemnation. *Id.* at 158. An inverse condemnation suit is one instituted by a private property owner whose property, while not formally taken for public use, has been damaged [***18] by a public improvement undertaking or other public activity. *Id.* [**495] Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant, even though no formal exercise of the power of eminent domain has been attempted by the taking agency.'" *Id.* at 158-159 (citation omitted).

When the government takes property by formal condemnation, it must follow the procedures set out in the Uniform Condemnation Procedures Act (UCPA), MCL 213.51 *et seq.*. However, no exact formula exists concerning a de facto taking; instead, the form, intensity, [*130] and the deliberateness of the governmental actions toward the injured party's property must be examined. *In re Virginia Park*, *supra* at 160, citing *Heinrich v Detroit*, 90 Mich. App. 692, 698; 282 N.W.2d 448 (1979). The plaintiff has the burden of proving causation in an inverse condemnation action. *In re Virginia Park*, *supra* at 160-161, quoting *Heinrich, supra* at 700. A plaintiff may satisfy this burden by proving that the government's actions were a substantial [***19] cause of the decline of its property. *Id.* The plaintiff must also establish that the government abused its legitimate powers in affirmative actions directly aimed at the plaintiff's property. *Id.* Not all government actions may amount to a taking for public use. *Heinrich, supra* at 698. The mere threat of condemnation and its attendant publicity, without more, is insufficient. *Id.* Before a court

Page 6

261 Mich. App. 116, *130; 680 N.W.2d 485, **495;
2004 Mich. App. LEXIS 672, ***19

may conclude that a taking occurred, it must examine the totality of the acts alleged to determine whether the governmental entity abused its exercise of eminent domain to plaintiff's detriment. *Id.*

In contrast, a regulatory taking is one in which the government effectively "takes" a person's property by overburdening it with regulations. *K & K Constr, Inc*, supra at 576. Land use regulations effectuate a taking in two general situations: (1) where the regulation does not substantially advance a legitimate state interest, or (2) where the regulation denies an owner economically viable use of his land. *Id.*, citing [***20] *Keystone Bituminous Coal Ass'n v DeBenedictis*, 480 U.S. 470, 485; 107 S. Ct. 1232; 94 L. Ed. 2d 472 (1987). The second type of taking is further subdivided into two situations: (a) a "categorical" taking, where the owner is deprived of "all economically beneficial or productive use of land," or (b) a taking recognized on the basis of the application of the traditional "balancing test" established in *Penn Central Transportation Co v New York City*, 438 U.S. 104; [*131] 98 S. Ct. 2646; 57 L. Ed. 2d 631 (1978). *K & K Construction*, supra at 576-577. For a categorical taking, a reviewing court need not apply a case-specific analysis; instead, the owner should automatically recover for the taking of its property. *Id.* at 577, citing *Lucas v South Carolina Coastal Council*, 505 U.S. 1003, 1015; 112 S. Ct. 2886; 120 L. Ed. 2d 798 (1992). The person may recover for a physical invasion of his property by the government, or where a regulation forces an owner to "'sacrifice *all* economically beneficial uses [of his land] in the name of the common good.'" *Id.*, quoting *Lucas, supra* at 1019. In regulatory takings other than categorical takings, the court must apply a "balancing test." With [***21] regard to this balancing test, a reviewing court must engage in an "ad hoc, factual inquiry," centering on three factors: (1) the character of the government's action, (2) the economic effect of the regulation on the property, and (3) the extent by which the regulation has interfered with distinct, investment-backed expectations. [**496] *Id.*, citing *Penn Central, supra* at 124.

In this case, the city's actions cannot be definitively categorized as a regulatory taking. The city did not "take" plaintiff's property by overburdening it with regulations. Instead, the city wanted to expand the airport and inhibited plaintiff's construction because of the contemplated expansion of the airport. Here, the city actually intended to acquire plaintiff's property.

Essentially, the city wanted plaintiff's property without having to pay for it through the institution of formal condemnation proceedings. Thus, we decline to categorize the city's actions as a strict regulatory taking. Instead, under the circumstances, plaintiff had to prove a de facto taking through inverse condemnation.

Again, a de facto taking can occur without an actual physical taking of the property. [***22] *Detroit Bd of Ed, supra* [*132] at 508. In terms of a de facto taking, the form, intensity, and the deliberateness of the government actions toward the property must be examined. *In re Virginia Park, supra* at 160. All actions by the city, in the aggregate, must be analyzed. *Heinrich, supra* at 698.

Plaintiff presented evidence of a decline of its property through evidence that the city's actions prevented plaintiff from building a new building for its business. Plaintiff also presented evidence that the city had the intent to completely take plaintiff's property but failed to take the appropriate steps in over ten years. The city accepted money from the government with the promise that it would prohibit any new construction and would remove any existing hazards, which included plaintiff's business. In 1991, the Detroit city council approved the condemnation of the area around the airport. Further, there was testimony and exhibits admitted at trial that showed city acknowledgment that the area around the airport was to be condemned. Thus, plaintiff presented evidence that the city abused its legitimate powers in its actions aimed at plaintiff's property. Under the circumstances, the trial [***23] court used the correct test in determining whether plaintiff presented evidence of a taking.

C. THE TRIAL COURT DID NOT IMPROPERLY ALLOW PLAINTIFF TO SEGMENT ITS PROPERTY IN ORDER TO SHOW A TAKING

Without specifically stating the context in which it makes its argument, the city claims that the trial court allowed plaintiff to segment its property. According to the city, allowing plaintiff to segment its property violates the "nonsegmentation" rule recognized in Michigan.

> "Any injury to the property of an individual which deprives the owner of the ordinary use of it is equivalent to [*133] a taking, and entitles him to compensation.

Page 7

261 Mich. App. 116, *133; 680 N.W.2d 485, **496;
2004 Mich. App. LEXIS 672, ***23

So a partial destruction or diminution of
value of property by an act of government
which directly and not merely incidentally
affects it, is to that extent an
appropriation.'" *Peterman v Dep't of
Natural Resources*, 446 Mich. 177, 184;
521 N.W.2d 499 (1994), quoting
*Vanderlip v Grand Rapids*, 73 Mich. 522,
535; 41 NW 677 (1889), quoting
*Broadwill v City of Kansas*, 75 Mo 213,
218 (1881).]

In the context of a regulatory taking, the Court in *K & K
Construction, supra* at 578, explained, "One of the
fundamental principles of [***24] taking jurisprudence
is the 'nonsegmentation' principle. This principle holds
that when evaluating the effect of a regulation on a parcel
of property, the effect of the regulation must be viewed
with respect to the parcel as a [**497] whole." *Id.*
"Courts should not 'divide a single parcel into discrete
segments and attempt to determine whether rights in a
particular segment have been entirely abrogated.'" *Id.*,
quoting *Penn Central, supra* at 130. Instead, the court
must examine the effect of the regulation on the entire
parcel, rather than just the affected portion of the parcel.
*K & K Construction, supra* at 578-579.

In *K & K Constr*, the parties dealt with property that
was segmented into five different parcels and the parties
were claiming only the taking of some portions of several
of the parcels because of certain regulations placed on
those parcels. This case is distinguishable. This case
involves a leasehold estate. Plaintiff claimed that the city
"took" its property by precluding it from building on
several vacant acres of the property and further that the
city intended to eventually take plaintiff's property in its
entirety but was not willing to [***25] do so through the
proper avenues because of the expense. Plaintiff claimed
a partial de facto taking. See *Peterman, supra*. Under the
circumstances, the trial court [*134] did not improperly
allow plaintiff to segment its property.

## D. THE TRIAL COURT DID NOT IMPROPERLY
ALLOW EVIDENCE OF SPECULATIVE LOST
PROFITS

The city argues that the trial court improperly
allowed plaintiff to introduce evidence of speculative lost
profits as a separate and direct element of damages
instead of as evidence bearing on the value of the

leasehold interest.

Recovery can be had for the taking of a leasehold
estate. *In re Widening of Gratior Ave*, 294 Mich. 569; 293
NW 755 (1940). The purpose of just compensation is to
put the property owner in as good a position as it would
have been in had its property not been taken. *Miller Bros
v Dep't of Natural Resources*, 203 Mich. App. 674, 685;
513 N.W.2d 217 (1994), citing *State Highway Comm'r v.
Eilender*, 362 Mich. 697, 699; 108 N.W.2d 755 (1961).
The public must not be enriched at the property owner's
expense, nor should the property owner be enriched at the
public's [***26] expense. *Miller Bros, supra*. To prevent
either party from being enriched at the other's expense,
the nature of the taking at issue must be considered. *Id.* at
685-686. "In a typical condemnation case, the state takes
some affirmative action to permanently deprive a
property owner of the use of the property, and, therefore,
is required to pay compensation to the owner." *Id.* at 686.

In cases involving a temporary taking, "the best
approach is a flexible approach that will compensate for
losses actually suffered while avoiding the threat of
windfalls to plaintiffs at the expense of substantial
government liability." *Miller Bros, supra* at 687, citing
*Poirier v Grand Blanc Twp (After Remand)*, 192 Mich.
App. 539, 543; 481 N.W.2d 762 (1992). The best
approach in that case is to [*135] base the just
compensation award on the fair market value of the
property. *Id.* at 688. The Court noted in *Miller Bros* that
because the state is temporarily depriving plaintiffs of the
use of their property, much like a renter, the state should
be required to pay "rent" to plaintiffs as compensation for
the temporary taking. *Id.*

"The determination of value is not [***27] a matter
of formulas or artificial rules, but of sound judgment and
discretion based upon a consideration of all the relevant
facts in a particular case." *In re Widening of Gratiot
Avenue, supra* at 574. In estimating the value of a lease,
"it is proper to consider the location [**498] of the
premises, their special adaptability to the business there
being conducted, the length of time it has been
established, its earnings and profits, the unexpired term of
the lease, and every other fact that may affect its value.
All of these matters go to enhance the value of the lease.
They are not substantive damages in condemnation
proceedings." *In re Park Site on Private Claim 16, City of
Detroit*, 247 Mich. 1, 4; 225 NW 498 (1929).

"Damages will not be allowed in condemnation cases

Page 8

261 Mich. App. 116, *135; 680 N.W.2d 485, **498;
2004 Mich. App. LEXIS 672, ***27

unless they can be proven with reasonable certainty." *County of Muskegon v Bakale*, 103 Mich. App. 464, 468; 303 N.W.2d 29 (1981). "The loss of speculative profits, therefore, has been held not to be allowable as an element of compensation." *Id.* But it is error to not allow a property owner to present evidence of "the most profitable and advantageous [***28] use it could make of the land" even if the use was still in the planning stages and had not been executed. *Village of Ecorse v Toledo, CS&D Ry Co*, 213 Mich. 445, 447-448; 182 NW 138 (1921).

> In denying the city summary disposition, the trial court ruled:

>> In the event it should be determined that Plaintiff is entitled to recover just compensation for the de facto [*136] taking of its leasehold estate, evidence of lost profits that would have been generated from Plaintiff's development of the property, but for a de facto taking, is admissible to establish circumstantially the reasonable value of the leasehold estate wrongfully taken by Defendant.

Thus, the trial court allowed evidence of lost profits to establish the diminution in value of plaintiff's leasehold interest. This is acceptable. See, e.g., *Miller Bros, supra*. While the evidence came in the form of direct numbers of lost profits, the evidence established how much value of the leasehold was taken.

Furthermore, the evidence was not unduly speculative. Plaintiff wanted to build a new building in order to expand its business. It must be kept in mind that plaintiff wished to [***29] utilize a portion of its property that was vacant. The jury in this case visited the property site and heard testimony from several witnesses regarding plaintiff's plans to expand. Plaintiff's owners testified regarding the new operations that would be conducted in the new building as an extension of the existing operation. Plaintiff's expert witness testified regarding prices and costs. Plaintiff's president and vice-president of finance testified regarding the profitability of the expansion and the profitability of the existing business and gave specific dollar amounts. Plaintiff's financial statements were also entered into evidence, as were its tax returns. Moreover, the jury was instructed that it should not speculate. The city offered

very little to contradict plaintiff's evidence. The city called one witness to testify regarding the damages issue and while he criticized plaintiff's damages projections, on cross-examination, he admitted that if asked to make projections of lost profits of a business that is not in operation, he would do so in a similar manner as plaintiff did. Because we are dealing with a business that has not come to fruition, some degree of guesswork [*137] is necessary [***30] and the amount of damages cannot be established for certain. The evidence was not unduly speculative.

### E. THE JURY DID NOT ERR IN DETERMINING THE DATE OF TAKING

The city argues that the verdict establishing December 1990 as the date of taking is not based on evidence in the record and fails as a matter of law.

"The determination of the date of taking and the ascertainment of value is [**499] a question of fact for the jury." *Detroit Bd of Ed, supra* at 509 . The jury determined the date of the taking to be December 1990. The evidence established that on December 19, 1990, the city's airport director wrote a letter to the FAA to object to plaintiff's proposal to build. It appears that this was one of the city's first outward acts at attempting to preclude plaintiff from building its new business. And it was after this date that the city filed its airport layout plan. It was also after this date that the city took further acts at attempting to preclude plaintiff from building. n3 Although plaintiff admits that it did not have concrete plans to build and it did not realize many damages in December 1990, there is evidence in the record to support the jury determination [***31] of December 1990 as the date of taking or the date on which the taking began. "It is not within the province of this Court to review questions of fact other than to ascertain the presence of evidence that can support the verdict." *Detroit Bd of Ed, supra* at 510. "A verdict will not be disturbed so [*138] long as it is within the fair range of the testimony." *Id.*, citing *Detroit v Sherman (In re Virginia Park Neighborhood Development Program )*, 68 Mich. App. 494, 498; 242 N.W.2d 818 (1976) and *St Clair Shores v Conley*, 350 Mich. 458, 463-464; 86 N.W.2d 271 (1957). The jury did not err in its determination of the date of the taking.

> n3 Some evidence in the record indicates that the city stopped services such as trash pickup around the area and

Page 9

261 Mich. App. 116, *138; 680 N.W.2d 485, **499;
2004 Mich. App. LEXIS 672, ***31

also began dumping trash on property the city acquired. Further, plaintiff suggested that through condemnation, the city acquired some of the residential properties around the area, but let those properties become run down.

## F. THE TRIAL COURT DID NOT ERR IN FAILING TO DIRECT A VERDICT IN THE CITY'S FAVOR

The city finally argues that plaintiff presented no evidence of [***32] the value of the property allegedly taken, and without such evidence, there is no foundation on which a verdict can be based.

Again, "there is no formula or artificial measure of damages applicable to all condemnation cases. The amount to be recovered by the property owner is generally left to the discretion of the trier of fact after consideration of the evidence presented.'" *Poirier*, *supra* at 543 (citation omitted). A jury has broad discretion in determining the amount of compensation in condemnation cases. "It is not within the province of the court on appeal . . . to review questions of fact further than to see that the verdict is supported by the evidence. An appellate court should not disturb a condemnation award which was within the maximum and minimum appraisals presented by the witnesses." *Sherman*, *supra* at 498 (citations omitted).

At trial, the city argued for a verdict of no cause of action and damages of zero. Plaintiff requested a verdict of nearly $ 17 million for past losses and $ 200,000 a month for future losses. The jury awarded $ 6.8 million for past losses and $ 3,800 a month for future losses.

As the [***33] trial court noted in its denial of the city's second motion for directed verdict, the damages to which the witnesses testified related to the increased sales of plaintiff that would result from being able to [*139] add another business on their land. Witnesses testified regarding plaintiff's productivity over the years, and its past financial statements were admitted into evidence. Thus, there was evidence of how profitable plaintiff's

business was before any new expansion, which equated to its market value. Witnesses then testified about what plaintiff's increased income and production would have been with the new [**500] business. This established the diminution in value of plaintiff's property. Under the circumstances, there was sufficient evidence produced with which the jury could determine damages; thus, the trial court did not err in denying directed verdict in the city's favor or in denying the city's motion for JNOV.

## IV. CONCLUSION

Contrary to the city's assertion, plaintiff did not institute the present suit against the city simply because the city filed an airport layout plan and the FAA determined plaintiff's proposed construction a hazard to aviation. Instead, plaintiff filed the present inverse [***34] condemnation suit against the city for all of the city's acts that were taken in an attempt to thwart plaintiff's efforts at construction and for the city's attempt to "take" plaintiff's property without formally condemning it. The city approved the condemnation of the area and the area was in a state of decline because of the lack of city services and the fact that the residents anticipated condemnation. While the city intended to condemn the area, it had formally condemned few of the properties and let the majority of the properties decline and await possible future formal condemnation. In sum, this is a case of blight by planning. The city's plans to expand Detroit City Airport, possibly sometime in the future, thwarted plaintiff's attempts to run and expand its business and significantly impaired the value of [*140] plaintiff's property rights. The city made its plans clear but never followed through with its plans and never attempted to legally obtain plaintiff's property. Under the circumstances, we affirm the trial court's rulings in all respects and we affirm the jury's verdict.

Affirmed.

/s/ Christopher M. Murray

/s/ Hilda R. Gage

/s/ Kirsten Frank Kelly

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:

City of Detroit, Michigan,

Debtor.

Chapter 9
Case No. 13-53846
Hon: Steven W. Rhodes

---

## ORDER GRANTING RELIEF FROM AUTOMATIC STAY
## AND RULING THAT JUDGMENT IS NOT SUBJECT TO REDUCTION OR
## COMPROMISE IN BANKRUPTCY

This matter having come before this Court by the Motion for Relief from Automatic Stay to Permit Enforcement of Judgment Against City of Detroit, and for Ruling that Judgment Based on Claim for Taking of Property Without Just Compensation is Not Subject to Reduction or Compromise in Bankruptcy, as to T&T Management, Inc., Successor to Merkur Steel Supply, Inc. (the "Motion"), dated February 4, 2014, filed by Movant T&T Management, Inc. ("T&T Management"). The Court having reviewed the Motion and the record as a whole and having found that good cause exists to grant the relief sought in the Motion:

IT IS ORDERED:

1. The Automatic Stay is terminated as to T&T Management, which is permitted to exercise its rights as successor of Merkur Steel Supply, Inc. ("Merkur") to collect upon the Final Judgment against the City of Detroit entered by Wayne County Circuit Court in *Merkur Steel Supply, Inc. v. City of Detroit* Case No. 1999-928001-CC (the "Judgment").

2. The Judgment is an award of just compensation to T&T Management (as the successor of Merkur) for the taking of its property without just compensation by

the City of Detroit.  As a result, the Judgment is not subject to compromise or reduction in the City of Detroit's Bankruptcy.

Signed on _____, 2014

_____
Steven W. Rhodes
United States Bankruptcy Judge

City of Detroit Bankruptcy: Proposed Order Granting Relief from Stay (Merkur- T&T Management)

IN RE:                                          CHAPTER 9
CITY OF DETROIT, MICHIGAN                        CASE NO. 13-53846

      *Debtor.*                              HON. STEVEN W. RHODES

_____/

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 10, 2014, I electronically filed the following:

Notice of Motion of T&T Management, Inc. for Entry of an Order Granting Relief From Automatic Stay;

Motion for Relief From Automatic Stay to Permit Enforcement of Judgment Against City of Detroit and for Ruling That Judgment Based on Claim for Taking of Property Without Just Compensation is Not Subject to Reduction or Compromise in Bankruptcy as to T&T Management, Inc., Successor to Merkur Steel Supply, Inc.

with the Clerk of the Court using the ECF system that will send notification of such filing to all persons registered to receive e-filings in this case.

Respectfully submitted,

/s/ Melissa L. Demorest
Mark S. Demorest (P35912)
Melissa L. Demorest (P68867)
Demorest Law Firm, PLLC
322 W. Lincoln
Royal Oak, MI 48067
248-723-5500
mark@demolaw.com
melissa@demolaw.com

City of Detroit bankruptcy:COS MOTION FOR RELIEF FROM AUTOMATIC STAY.docx