EXHIBIT A

13-53846-swr Doc 2672-5 Filed 03/07/13 Entered 03/07/14 18:38:33 Page 1 of 154
13-53846-swr Doc 2725-1 Filed 03/07/13 Entered 03/07/14 18:58:59 Page 154 of
307 154

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief Negotiator
with the City of Detroit; JOSEPH VALENTI, Co-
Chief Negotiator with the Coalition of Unions of the
City of Detroit; MICHIGAN AFSCME COUNCIL
25; RUSS BELLANT, President of the Detroit
Library Commission; TAWANNA SIMPSON,
LAMAR LEMMONS, ELENA HERRADA, Detroit
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS, Pontiac City
Council Members; DUANE SEATS, DENNIS
KNOWLES, JUANITA HENRY AND MARY
ALICE ADAMS, Benton Harbor Commissioners;
WILLIAM "SCOTT" KINCAID, Flint City Council
President; BISHOP BERNADEL JEFFERSON;
PAUL JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan Chairman,
National Action Network; REV. DR. MICHAEL A.
OWENS, REV. LAWRENCE GLASS, REV. DR.
DEEDEE COLEMAN, BISHOP ALLYSON
ABRAMS, Executive Board, Council of Baptist
Pastors of Detroit and Vicinity,

No. 2:13-cv-11370

HON. GEORGE CARAM STEEH

MAG. R. STEVEN WHALEN

Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the State of
Michigan, and ANDREW DILLON, as the Treasurer
of the State of Michigan, acting in their individual
and/or official capacities,

**DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(B)(1) & (6) AND BRIEF IN SUPPORT**

Defendants.

_____

Herbert A. Sanders (P43031)
The Sanders Law Firm PC
Attorney for Plaintiffs
615 Griswold Street, Suite 913
Detroit, Michigan  48226
313.962.0099
haslaw@earthlink.net

John C. Philo (P52721)
Anthony D. Paris (P71525)
Sugar Law Center
Attorneys for Plaintiffs
4605 Cass Ave., 2nd Floor
Detroit, Michigan  48201
313.993.4505
jphilo@sugarlaw.org

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
Goodman & Hurwitz PC
Attorneys for Plaintiffs
1394 East Jefferson Avenue
Detroit, Michigan  48207
313.567.6170
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com

Darius Charney
Ghita Schwarz
Center for Constitutional Rights
Attorneys for Plaintiffs
666 Broadway, 7th Floor
New York, New York  10012
212.614.6464
dcharney@ccrjustice.org

Betram L. Marks (P47829)
Litigation Associates PLLC
Attorney for Plaintiffs
30300 Northwestern Hwy, Ste 240
Farmington Hills, Michigan  48334
248.737.4444
bertrammarks@aol.com

Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
Miller Cohen PLC
Attorneys for Plaintiffs
600 West Lafayette Blvd., 4th Floor
Detroit, Michigan  48226
313.964.4454
richardmack@millercohen.com

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
Constitutional Litigation Associates PC
Attorneys for Plaintiffs
450 West Fort St, Ste 200
Detroit, Michigan  48226
313.961.2255
conlitpc@sbcglobal.net

_____/

## DEFENDANTS' MOTION TO DISMISS

Defendants Richard D. Snyder, Governor of the State of Michigan, and Andrew Dillon,

Treasurer of the State of Michigan, move to dismiss Plaintiffs' Complaint for Declaratory and

Injunctive Relief for the following reasons:

1. Plaintiffs lack standing to bring any of their claims.

2. 2012 Mich. Pub. Acts 436, Mich. Comp. Laws § 141.1541 *et seq*. (P.A. 436), does not
   violate the Due Process Clause or U.S. Const. art. IV, § 4 (Counts 1, 2, 3).

2

3. P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11).

4. P.A. 436 does not violate Section 2 of the Voting Rights Act (Count 7).

5. P.A. 436 does not violate First Amendment free speech and petition rights (Count 8).

6. The City of Detroit emergency manager appointment of Kevin Orr does not violate the First Amendment right to petition (Count 9).

7. And P.A. 436 does not violate the Thirteenth Amendment (Count 10).

8. Defendants sought concurrence from Plaintiffs' counsel but concurrence was not given.

9. Under Fed. R. Civ. P. 12(b)(6), a complaint may be dismissed if no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. *Ludwig v. Bd of Trustees*, 123 F.3d 404, 408 (6th Cir. 1997). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not facially plausible. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

10. Fed. R. Civ. P. 12(b)(1) allows dismissal for lack of subject-matter jurisdiction. It is a plaintiffs' burden to prove jurisdiction. *Moir v. Greater Cleveland Reg'l Transit Auth*, 895 F.2d 266, 269 (6th Cir. 1990).

Applying the standard of review set out in paragraphs 9 and 10 to each argument in the brief, and for the reasons stated in this motion, Plaintiffs' Complaint fails as a matter of law. Defendants respectfully request that this Court dismiss Plaintiffs' Complaint in its entirety and with prejudice.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Assistant Attorney General
Attorney for Defendants
Email:  bartond@michigan.gov

Dated:  May 15, 2013

13-53846-swr   Doc 2672-1   Filed 03/10/13   Entered 03/10/14 18:38:39   Page 4 of 54
307
13-53846-swr   Doc 2725-1   Filed 03/10/13   Entered 03/10/14 18:38:39   Page 45 of 54   157

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief Negotiator
with the City of Detroit; JOSEPH VALENTI, Co-
Chief Negotiator with the Coalition of Unions of the
City of Detroit; MICHIGAN AFSCME COUNCIL
25; RUSS BELLANT, President of the Detroit
Library Commission; TAWANNA SIMPSON,
LAMAR LEMMONS, ELENA HERRADA, Detroit
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS, Pontiac City
Council Members; DUANE SEATS, DENNIS
KNOWLES, JUANITA HENRY AND MARY
ALICE ADAMS, Benton Harbor Commissioners;
WILLIAM "SCOTT" KINCAID, Flint City Council
President; BISHOP BERNADEL JEFFERSON;
PAUL JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan Chairman,
National Action Network; REV. DR. MICHAEL A.
OWENS, REV. LAWRENCE GLASS, REV. DR.
DEEDEE COLEMAN, BISHOP ALLYSON
ABRAMS, Executive Board, Council of Baptist
Pastors of Detroit and Vicinity,

   Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the State of
Michigan, and ANDREW DILLON, as the Treasurer
of the State of Michigan, acting in their individual
and/or official capacities,

   Defendants.

No. 2:13-cv-11370

HON. GEORGE CARAM STEEH

MAG. R. STEVEN WHALEN

_____

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

Page

Table of Contents .................................................................................................. ii

Index of Authorities ............................................................................................. iv

Concise Statement of Issues Presented ........................................................... viii

Controlling or Most Appropriate Authority .................................................... viii

Introduction ........................................................................................................... 1

Statement of Facts ................................................................................................. 1

Argument ............................................................................................................... 3

I.     Plaintiffs lack standing to bring any of their counts. ................................. 3

       A.     Individual, Non-Elected Plaintiffs Bellant, Jefferson, Jordan, Holley,
              Williams, Owens, Glass, Coleman, and Abrams lack standing to bring
              Counts 2-8 and 10–11. ..................................................................... 3

       B.     Individual, Elected Plaintiffs Simpson, Lemmons, Herrada, Watkins,
              Williams, Seats, Knowles, Henry, Adams, and Kincaid lack standing to
              bring Counts 2–8 and 10–11. ........................................................... 4

       C.     Individual Union Negotiator-Plaintiffs Phillips and Valenti lack standing. ........... 4

       D.     Council 25 lacks organizational standing to bring any claims. ........................... 5

II.    P.A. 436 does not violate the Due Process Clause or U.S. Const. art. IV, § 4
       (Counts 1, 2, 3). .............................................................................................. 6

       A.     No substantively protected right to collective bargaining is violated. ................. 6

       B.     No procedurally protected right to collective bargaining is violated. .................. 7

       C.     No substantive due-process right to elect officials who possess general
              legislative power is violated. ............................................................... 8

       D.     U.S. Const., art. IV, § 4 is not violated. ................................................. 9

III.   P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11). ................. 10

       A.     P.A. 436 does not unconstitutionally burden Plaintiffs' fundamental right
              to vote. .................................................................................... 10

1.  Plaintiffs are not similarly situated to people residing in communities that do not have an emergency manager. ........................ 11

2.  Plaintiffs have not been denied their fundamental right to vote. ............ 12

3.  Plaintiffs' fundamental right to vote has not been diluted. .................... 13

B.  P.A. 436 does not discriminate based on race. ................................................ 14

C.  P.A. 436 does not discriminate based on wealth. ............................................ 16

D.  P.A. 436 does not discriminate against local units of government with emergency managers appointed under P.A. 72 or P.A. 4. ................................ 17

IV.  P.A. 436 does not violate the Voting Rights Act (Count 7). ........................................ 19

V.  P.A. 436 does not violate the First Amendment rights of free speech and petition (Count 8). ............................................................................................................................ 20

A.  P.A. 436 does not abridge speech or prohibit Plaintiffs from petitioning the Government. ......................................................................................................... 21

1.  P.A. 436 gives local officials both voice and choice. ............................ 21

2.  Plaintiffs have no constitutional right to local self-government and an emergency manager is accountable to the State's elected officials. ..................................................................................................... 22

3.  The Petition Clause does not guarantee a particular result. ................... 24

4.  Rejection of P.A. 4 is not an abridgement of speech or petition and P.A. 436 is not the mirror image of P.A. 4. ........................................... 25

B.  P.A. 436 is also justified by local financial emergencies. ............................... 25

VI.  The appointment of Detroit's emergency manager does not violate the right to petition (Count 9). .............................................................................................................. 27

VII.  P.A. 436 does not violate the Thirteenth Amendment (Count 10). .............................. 28

Conclusion .................................................................................................................................... 29

# INDEX OF AUTHORITIES

Page

**Cases**

*ACLU of Ohio Found., Inc. v. Ashbrook*, 375 F.3d 484 (6th Cir. 2004) ........................................ 5

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ............................................................................ 20

*Anthony v. State of Michigan*, 35 F. Supp. 2d 989 (E.D. Mich. 1999) ...................................... 1, 6

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................... 4

*Avery v. Midland County*, 390 U.S. 474 (1968) .......................................................................... 32

*Baker v. Carr*, 369 U.S. 186 (1962) ........................................................................................... 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................. 4

*Biener v. Calio*, 361 F.3d 206 (3d Cir. 2004) ............................................................................ 19

*Bivens v. Grand Rapids*, 443 Mich. 391; 505 N.W.2d 239 (1993) ............................................ 13

*Buckley v. Valeo*, 424 U.S. 1 (1976) .......................................................................................... 36

*Burdick v. Takushi*, 504 U.S. 428 (1992) ................................................................................... 20

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................................................. 36

*Bush v. Gore*, 531 U.S. 98 (2000) .............................................................................................. 19

*Canfora v. Old*, 562 F.2d 363 (6th Cir. 1977) ........................................................................... 34

*Carlson v. Wiggins*, 675 F.3d 1134 (8th Cir. 2012) ................................................................... 21

*City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985)........................…..28

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ....................................................................... 6

*City of Memphis v. N.T. Green*, 451 U.S. 100 (1981)................................................................. 40

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ..................................................... 11

*Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788 (1985)................................. 36

*Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365 (6th Cir. 2011).................... 18, 27

*Doe v. Mich. Dep't of State Police*, 490 F.3d 491 (6th Cir. 2007) .............................................. 25

*FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307 (1993) ............................................................ 17, 25

*Frisby v. Schultz,* 487 U.S. 474 (1988) ................................................................................. 36

*Gomillion v. Lightfoot,* 364 U.S. 339 (1960) ........................................................................ 32

*Graham v. Connor,* 490 U.S. 386 (1989) ............................................................................... 15

*Hadley v. Jr. College Dist. Of Metro. Kansas City, Mo.,* 397 U.S. 50 (1970) ...................... 15

*Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966) .................................................. 19

*Holt v. City of Tuscaloosa*, 439 U.S. 60 (1978) ......................................................... 31, 32, 33

*Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398 (1934) ......................................... 37

*Hunter v. City of Pittsburgh,* 207 U.S. 161 (1907) ................................................ 15, 20, 31, 32

*Johnson v. Harron*, 1995 WL 319943 at 6 (N.D.NY., May 23, 1995) ................................. 39

*Jonson v. Bredesen*, 624 F.3d 742 (6th Cir. 2010) ............................................................... 25

*Kallstrom v. City of Columbus,* 136 F.3d 1055 (6th Cir.1998) ........................................... 10

*Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454 (1989) ..................................... 13

*Konigsberg v State Bar of California*, 366 U.S. 36 (1961) ................................................... 30

*Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621 (1969) ........................................ 32

*League of Women Voters v. Brunner*, 548 F.3d 463 (6th Cir. 2008) .................................... 19

*Ludwig v. Bd of Trustees*, 123 F.3d 404 (6th Cir. 1997) ........................................................ 4

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ......................................................... 5, 7

*Mack v. City of Detroit,* 467 Mich. 186; 649 N.W.2d 47(2002) ...................................... 1, 13

*Mallory v. Ohio,* 173 F.3d 377 (6th Cir. 1999) ................................................................. 1, 13

*McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802 (1969) ............................................. 19

*Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271 (1984) .................... 35

*Miyazawa v. City of Cincinnati*, 45 F.3d 126 (6th Cir. 1995) ............................................... 6

*Moir v. Greater Cleveland Reg'l Transit Auth*, 895 F.2d 266 (6th Cir. 1990) ...................... 4

*Moore v. Detroit School Reform Board*, 293 F.3d 352 (6th Cir. 2002) ............................... 23

*Morgan v. Rhodes,* 456 F.2d 608, 618-620 (6th Cir. 1972)........................................................ 23

*Palko v. Connecticut,* 302 U.S. 319 (1937) .............................................................................. 10

*Papasan v. Allain*, 478 U.S. 265 (1986) ................................................................................... 25

*Parate v. Isibor,* 868 F.2d 821 (6th Cir. 1989) ......................................................................... 11

*Perry v. McGinnis*, 209 F.3d 597 (6th Cir. 2000).................................................................... 18

*Radvansky v. City of Olmsted Falls*, 395 F.3d 291 (6th Cir. 2005)........................................ 17

*Reynolds v. Sims,* 377 U.S. 533 (1964)................................................................. 14, 21, 32, 35

*Rodriguez v. Popular Democratic Party,* 457 U.S. 1 (1982)................................................... 14

*Roth v. Bd. of Regents,* 408 U.S. 564, 572 (1978) .................................................................. 12

*Sailors v. Bd. of Ed. of Kent County,* 387 U.S. 105 (1967) ................................................ 15, 31

*San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1 (1973)................................. 14

*Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463 (1979) .................... 34

*Swekel v. City of River Rouge*, 119 F.3d 1259 (6th Cir. 1997)................................................ 36

*Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) ............................................................ 30

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) .............................................. 36

*TriHealth, Inc. v. Board of Com'rs, Hamilton County, Ohio*, 430 F.3d 783 (6th Cir. 2005)16, 18, 22, 24

*United States v. Harriss,* 347 U.S. 612 (1954) ....................................................................... 36

*Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252 (1977)............... 17, 18

*Ward v. Rock Against Racism,* 491 U.S. 781 (1989) ............................................................... 37

*Washington v. Glucksberg,* 521 U.S. 702 (1997) ............................................................. *passim*

**Statutes**

42 U.S.C. § 1973...................................................................................................... 1, 28

42 U.S.C. § 1983 ............................................................................................................. 1

Mich. Comp Laws § 141.1557................................................................................... 33

Mich. Comp. Laws § 141.1562.................................................................................. 33

Mich. Comp. Laws § 117.1 ......................................................................................... 12

Mich. Comp. Laws § 141.1201 ...................................................................................... 2

Mich. Comp. Laws § 141.1547 .............................................................................. 3, 31

Mich. Comp. Laws § 141.1549 ..................................................................... 3, 4, 20, 31

Mich. Comp. Laws § 141.1552 ............................................................................. 3, 12, 39

Mich. Comp. Laws § 423.215 ................................................................................ 12, 13

Mich. Comp. Laws §141.1549 .............................................................................. 26, 28

Public Act 4 ................................................................................................... 2, 30, 39

Public Act 72 ..................................................................................................... 2

Public Act 436 ............................................................................................... *passim*

## CONCISE STATEMENT OF ISSUES PRESENTED

1.      Should all counts be dismissed under 12(b)(1) because Plaintiffs lack standing?

2.      Should the entire Complaint be dismissed under Fed. R. Civ. P. 12(b)(6) because Plaintiffs have failed to state a claim for which relief may be granted under any asserted cause of action?

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

*Authority*:

*ACLU of Ohio Found., Inc., v. Ashbrook*
*Canfora v. Old*
*City of Cleburne v. Cleburne Living Center, Inc.*
*Ctr. For Bio-Ethical Reform, Inc. v. Napolitano*
*FCC v. Beach Commc'ns, Inc.*
*Holt v. City of Tuscaloosa*
*Home Building & Loan Ass'n v. Blaisdell*
*Hunter v. City of Pittsburgh*
*Johnson v. Harron*
*Jonson v. Bredesen*
*Kallstrom v. City of Columbus*
*Lujan v. Defenders of Wildlife*
*McDonald v. Bd of Election Comm'rs*
*Minnesota State Bd. For Community Colleges v. Knight*
*Moore v. Detroit School Reform Board*
*Morgan v. Rhodes*
*Roth v. Bd. of Regents*
*Rodriguez v. Popular Democratic Party*
*Smith v. Arkansas State Highway Employees, Local 1315*
*TriHealth, Inc. v. Board of Comm'rs, Hamilton County, Ohio*
*Village of Arlington Heights v. Metro. Housing Dev. Corp.*
*Washington v. Glucksberg*

# INTRODUCTION

The concept of an emergency manager is not new to Michigan. Indeed, both major political parties have used such managers to solve local economic difficulties for over 20 years. But in an economic environment where a disturbingly high number of local governments and school districts are teetering on the brink of financial catastrophe, more flexibility and new tools were required. The Michigan Legislature responded with 2012 Public Act 436 (P.A. 436), which replaces Michigan's previous emergency-manager law, P.A. 72.

Having lost the political battle to stop P.A. 436 on the steps of the Lansing Capitol, Plaintiffs filed this lawsuit, an action that contains no cognizable legal claims or alternative solutions to the financial problems that have plagued many communities. Because Plaintiffs' proper remedy is the political process, not the courts, the Complaint should be dismissed in its entirety.

# STATEMENT OF FACTS

## Nature of the Case

Plaintiffs bring this action under 42 U.S.C. § 1983, alleging that P.A. 436 violates the U.S. Const. art. IV, § 4 (Republican Form of Government); the First Amendment (freedom of speech and the right to petition government); the Thirteenth Amendment (vestiges of slavery); the Fourteenth Amendment (due process and equal protection); and the Voting Rights Act, 42 U.S.C. § 1973, *et seq*. (R. 1, Compl., ID# 2.) Where specific factual allegations are necessary for deciding this motion, those facts have been taken from the Complaint. Although Plaintiffs allege both facial and as-applied challenges, they make no specific applications of P.A. 436 to any factual occurrence in any paragraph of the Complaint. (Id. at, ¶¶ 122, 128, 138, 139, 151, 152, 167, 168, 182, 183, 194, 195, 206, 207, 208, 220, 229, 230 and 243, ID## 25-28, 30-31, 33-

34, 36-37, 39-40, 42, 44, 46-47, 49.)  Thus, this is only a facial challenge to the constitutionality of the Act.  And their allegations focus exclusively on the Act's emergency-manager component.

**Michigan's Emergency Financial Manager Acts**

The Legislature enacted P.A. 436 in December 2012, effective March 28, 2013.  P.A. 436 followed the period of time from August 6, 2012 to March 28, 2013, when the State and its political subdivisions operated under 1990 Mich. Pub. Acts 72 (P.A. 72), Mich. Comp. Laws § 141.1201, *et seq*. which, for purposes of this brief, will be referred to as the original act allowing the appointment of emergency managers.  P.A. 72 was the operative statute because of the referendum and rejection of the earlier fiscal responsibility legislation, 2011 Mich. Pub. Acts 4 (P.A. 4).[1]  Under P.A. 72, emergency managers had fewer powers than they previously possessed under P.A. 4, which contained more tools and authority to rectify financial emergencies in distressed local communities and school districts.

In December 2012, the Legislature passed P.A. 436—*not* to reenact P.A. 4, previously rejected by voters but to replace P.A. 72, which was in effect at the time.  The Legislature reasonably determined that local fiscal stability is necessary for the State's health, welfare, and safety, and thus, P.A. 436 was necessary to protect those interests as well as the credit ratings of the State and its political subdivisions.  Mich. Comp. Laws § 141.1543.

**Key Features of P.A. 436**

Unlike earlier laws, P.A. 436 includes two key features:  expanded local government options—chosen by the local government—to address the financial emergency; a time limit for a financial manager's appointment; and, authority to petition for removal of a financial manager.  Mich. Comp. Laws §§ 141.1547, 1549(2), 1549(11).  The statute also builds in checks on an

---

[1] See OAG, 2011-2012, No 7267, p 6 (August 6, 2012), available at
http://www.ag.state.mi.us/opinion/datafiles/2010s/op10346.htm.

emergency manager's authority.  See, e.g., Mich. Comp. Laws §§ 141.1552(1)(k) & (u)
(collective bargaining agreements and borrowing money), 1552(4) (selling or transferring public
utilities), 1555(1) (selling of assets), 1559(1) (proposed contracts, sales, and leases).

## ARGUMENT

I.   **Plaintiffs lack standing to bring any of their counts.**

This Court should dismiss all counts of Plaintiffs' Complaint for lack of standing.  To
invoke the subject matter jurisdiction of an Article III federal court, individual plaintiffs must
establish, among other things, an injury-in-fact that is concrete and particularized, not conjectural
or hypothetical.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  Because
injunctive and declaratory relief is sought, these Plaintiffs also have the heightened burden of
showing a substantial likelihood they will be injured in the future.  *City of Los Angeles,v. Lyons,*
461 U.S. 95, 105 (1983).  The Organizational Plaintiffs have standing only if (a) their members
otherwise have standing to sue in their own right; (b) the interests to be protected are germane to
the organization's purpose; and (c) neither the claim asserted nor the relief requested requires
participation of individual members in the lawsuit.  *ACLU of Ohio Found., Inc. v. Ashbrook*, 375
F.3d 484, 489 (6th Cir. 2004).  None of these requirements are met here.

A.   **Individual, Non-Elected Plaintiffs Bellant, Jefferson, Jordan, Holley,
Williams, Owens, Glass, Coleman, and Abrams lack standing to bring
Counts 2-8 and 10–11.**

This group of Plaintiffs are residents of localities with emergency managers.  (R. 1,
Compl., at ¶10, ¶¶ 21-28, ID## 5, 6-7.)  Yet, they do not allege that Defendants' actions have
injured them in a manner distinguishable from the harm incurred by any resident of any locality
with an emergency manager.

Rather, these Plaintiffs raise only general grievances regarding Defendants' policy
choices related to fiscally distressed local governments.  Their claims are strikingly similar to

3

those considered and rejected by the Supreme Court, the Sixth Circuit, and this Court for lack of

standing. *See, e.g.*, *City of Los Angeles*, 461 U.S. at 111 (resident challenging police

department's chokehold policy was "no more entitled to an injunction than any other citizen");

*Miyazawa v. City of Cincinnati*, 45 F.3d 126, 126-28 (6th Cir. 1995) (resident challenging city

charter amendment suffers "no harm, nor will she suffer any greater harm than that of any other

voter in the City of Cincinnati"); *Anthony v. State of Michigan*, 35 F. Supp. 2d 989, 1003 (E.D.

Mich. 1999) (Detroit citizens challenging consolidation of Detroit Recorder's Court did not

"articulate how they [were] *particularly* harmed as a result of the merger").

### B.   Individual, Elected Plaintiffs Simpson, Lemmons, Herrada, Watkins, Williams, Seats, Knowles, Henry, Adams, and Kincaid lack standing to bring Counts 2–8 and 10–11.

This group of Plaintiffs lack standing in the same manner as the Plaintiffs discussed in

Section A. They have met neither the irreducible constitutional requirement of a concrete and

particularized injury nor the applicable, heightened standard requiring a substantial likelihood

that they will be the unique target of future harm. See *Lujan*, 504 U.S. at 560-61; *City of Los

Angeles*, 461 U.S. at 105. Their identification as public officials for units of local government

who are subject to P.A. 436 gives them no special status and certainly no greater claim to

standing than any of the other named Plaintiffs in Section A. (R. 1, ¶ 11-20, I.D. ## 5, 6.) To

the extent they may purport to bring this action in their official capacities as members of various

local boards, commissions or councils, there is no indication in the Complaint that these local

governmental bodies have authorized any of them to act for or on their behalf.

### C.   Individual Union Negotiator-Plaintiffs Phillips and Valenti lack standing.

For the same reasons, Plaintiffs Phillips and Valenti lack standing to assert Counts 1–11.

While they purportedly belong to the Plaintiffs' labor organization, Plaintiff Michigan AFSCME

Council 25 (Council 25), neither mere union affiliation nor the factual allegations in Plaintiffs'

4

Complaint suggests that Phillips and Valenti have sustained any particularized injury vis-à-vis other residents of localities with emergency managers or union members whose collective bargaining agreements or bargaining "rights" have been impacted.

Indeed, the facts related to the Count I allegations were the basis for an earlier action by Valenti and Council 25 against the City of Detroit, Governor Snyder and Treasurer Dillon.  See, *Valenti, et. al. v. Snyder, et. al.*, USDC-ED No. 12-11461, R. 6, Amended Complaint.  The coalition of unions, for which Valenti was a negotiator and which included Council 25, had negotiated tentative employee concessions with the City of Detroit.  But these terms were never ratified by the City Council and never became effective.  Detroit Charter, §6.408.  The City's duty to collectively bargain was suspended effective April 4, 2012 with the approval of a consent agreement—the Financial Security Agreement—negotiated with the State under P.A. 4.  Thus, the allegations here do not establish any particularized injury to Phillips or Valenti.

Further, with respect to Count 9, the right to petition government, is personal and does not extend to petitioning activity on behalf of others.  C.J.S CONST. LAW § 975 (citing Const. Amend. 1 and *In re Foster*, 253 P.3d 1244 (Colo. 2011); *see also* C.J.S CONST. LAW § 973, citing *Hague v. Committee for Indus. Organization*, 307 U.S. 496 (1939).  Phillip's and Valenti's positions as union negotiators do not provide standing on this claim either.

### D.   Council 25 lacks organizational standing to bring any claims.

Council 25 also lacks standing to bring Counts 1 – 11.  None of its members have standing to sue for the alleged violations in their own right, as discussed above.  *Ashbrook*, 375 F.3d at 489.  And like Phillips and Valenti, Council 25 lacks standing to bring Count 9 in a representative capacity.

In sum, Plaintiffs collectively lack standing to bring Counts 1 - 11.  Accordingly, this Court should dismiss these Counts with prejudice under Fed. R. Civ. P. 12(b)(1).

## II.     P.A. 436 does not violate the Due Process Clause or U.S. Const. art. IV, § 4 (Counts 1, 2, 3).

### A.      No substantively protected right to collective bargaining is violated.

To properly analyze Plaintiffs' substantive due-process claim based on collective bargaining, this Court is required to carefully identify the fundamental right or liberty interest allegedly implicated. The substantive component of the Due Process Clause protects fundamental rights and liberty interests that are so "implicit in the concept of ordered liberty" that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut,* 302 U.S. 319, 326 (1937).  Only when a state law infringes these fundamental rights and interests is it subject to strict scrutiny. *Washington v. Glucksberg,* 521 U.S. 702, 721 (1997).

Those fundamental rights and interests accorded substantive protection under the Due Process Clause include matters related to marriage, family, procreation, bodily integrity, and directly related privacy interests. *Id.* at 720; *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1062 (6th Cir. 1998).  The Supreme Court is reluctant to expand the concept of substantive due-process further "because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Glucksberg,* 521 U.S. at 720 (quotation marks and citation omitted).

Here, Plaintiffs' claim is not based on a right found within the Bill of Rights or identified by the Supreme Court as "implicit in the concept of ordered liberty" or among those narrowly drawn "liberty" and privacy interests accorded substantive protection. *Id.* at 721.  It is premised on an alleged "property interest in their employment, in the terms of employment negotiated pursuant to contract, and in rights granted under state law. . . ." (R. 1, Compl., ¶ 109, ID# 23.)  And while state law property interests may give rise to a procedurally protected interest, they do not create a *substantively* protected fundamental right or interest. *Glucksberg,* 521 U.S. at 720.

6

Their substantive claim fails because their alleged substantively protected liberty interest in employment relates only to a generalized right to choose one's field of private employment—"the right of the individual . . . to engage in any of the common occupations of life"—not an expansive right of public employment or to collectively bargain for employment terms. *Roth v. Bd. of Regents,* 408 U.S. 564, 572 (1978); *Parate v. Isibor,* 868 F.2d 821, 831 (6th Cir. 1989).

Plaintiffs fail to allege any plausible substantive due-process right, any facts indicating Defendants interfered with a substantively protected interest, or that P.A. 436 facially violates substantive due process. This claim fails as a matter of law and fact and should be dismissed.

### B.    No procedurally protected right to collective bargaining is violated.

Analysis of Plaintiffs' procedural due-process claim involves a dual inquiry: (1) whether a liberty or property interest exists that the State has interfered with; and (2) whether the procedures attendant upon the deprivation were constitutionally sufficient—that is, provided at a meaningful time and in a meaningful manner. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538 (1985); *Matthew v. Eldridge,* 424 U.S. 319, 333, 349 (1976).

But no protected right or interest invoking procedural due process protection is at issue. Plaintiffs' procedural due-process claim is premised on an alleged "property interest in the terms of employment negotiated pursuant to contract, and in rights granted under state law." Plaintiffs rely on Michigan's Public Employment Relations Act (PERA) as creating this right. Mich. Comp Laws § 423.215(1). (R.1, Compl., ¶ 111, ID# 23). PERA provides, "A public employer shall bargain collectively with the representatives of its employees" and "may make and enter into collective bargaining agreements . . . ." *Id.* Yet, the Legislature has also imposed limitations on this duty to collectively bargain. Mich. Comp. Laws § 141.1567(3). See also P.A. 436 Enacting Clause 2; Mich. Comp. Laws §§ 423.215(8), 215(9).

The Michigan Legislature has the authority to define and modify the powers, duties and obligations of its local governments, which are derived from the State in the first instance. Mich. Const. 1963, art. VII, §§ 1-34; *Mack v. City of Detroit,* 467 Mich. 186, 194; 649 N.W.2d 47(2002); Michigan's Home Rule City Act reiterates this principle—all local charters, resolutions and ordinances are subject to and shall not conflict with or contravene the State's Constitution or laws. Mich. Comp. Laws. § 117.36.

State law confers a procedurally protected benefit, such as the claimed property interest here, only when it mandates specific action in a manner that constrains bureaucratic discretion. *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 463 (1989). Here, no such limitations exist. First, while a public employer "shall bargain collectively," it retains discretion: "*may* make and enter into collective bargaining agreements." Mich. Comp. Laws § 423.215(1) (emphasis added). Second, PERA does not confer a "right to bargain" that infringes the exercise of power under P.A. 436. Finally, both PERA and P.A. 436 suspend the duty to collectively bargain when the local government is in receivership. Thus, there is no protected property interest to bargain the terms of public employment and no procedural due process violation.

### C.   No substantive due-process right to elect officials who possess general legislative power is violated.

The "right to vote" is not expressly enumerated in the federal constitution. *San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 35, n. 78 (1973). Rather, the right to vote is an implicit "fundamental political right" that is "preservative of all rights." *Reynolds v. Sims,* 377 U.S. 533, 562 (1964). *Yet,* the Supreme Court has repeatedly recognized that the Fourteenth Amendment does not protect this generalized "right to vote" but instead protects a citizen's right to participate in elections on equal footing with other citizens in the jurisdiction. *Rodriguez v.*

*Popular Democratic Party,* 457 U.S. 1, 9-10 (1982); *San Antonio,* 411 U.S. at 35.  This right to equal participation is protected by the Equal Protection Clause.  *Rodriguez,* 457 U.S. at 9-10.

In this context, it is perhaps easiest to understand Plaintiffs' substantive due-process claim by first determining what it is *not* about.  (R. 1, Compl., ¶¶ 127, 128, ID## 25, 26.)  Plaintiffs do not claim a denial or impairment of their right to vote.  Nor do they claim their vote is not being counted.  Rather, their claim is premised on an undefined, unrecognized right to have the elected official continue to carry out the duties of office—here, legislative powers.  No federal court has ever recognized such a right.  *Rodriquez,* 457 U.S. at 9-10.

Dismissal of this claim is consistent with Supreme Court precedent expressing a reluctance to expand the concept of substantive due process, *Glucksberg,* 521 U.S at 720, and determining that where a more explicit textual context than the generalized Due Process Clause exists within the federal constitution, it must guide the constitutional analysis.  *Graham v. Connor,* 490 U.S. 386, 394-395 (1989).  That Court has determined that the appropriate context is the Equal Protection Clause as applied to the right of equal participation in the voting process.

### D.     U.S. Const., art. IV, § 4 is not violated.

The United States Constitution guarantees that "every State in this Union a Republican form of government."  U.S. Const., art. IV, § 4.  Generally, this guarantee does not extend to local units of government.  Political subdivisions of a State have never "been considered as sovereign entities."  Rather, they are "traditionally regarded as subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions."  *Sailors v. Bd. of Ed. of Kent County,* 387 U.S. 105, 107-108 (1967) (quoting *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178 (1907)).  Any recognition of a specific form of local government ignores the nature of this traditional relationship.  While the Supreme Court has clarified that a state cannot manipulate its political subdivisions to defeat a federally

9

protected right, the consistent theme of these court decisions is not the form of local government but protection of the "right to vote" against "dilution or debasement." *Sailors*, 387 U.S. at 108; *Hadley v. Jr. College Dist. of Metro. Kansas City, Mo.,* 397 U.S. 50, 54-55 (1970). Significantly, federal courts do not meddle in how States structure their local political subunits. Such political questions and a State's authority to define and regulate its relationship with subordinate political units are generally not justiciable. *Baker v. Carr,* 369 U.S. 186, 208-226 (1962); *Morgan v. Rhodes,* 456 F.2d 608, 618-620 (6th Cir. 1972).

In the absence of any infringement on the Plaintiffs' equal participation in the voting process, Michigan's choice to address the significant issues arising from a local government's financial distress and their temporary impact on the structure of that government do not violate any protected federal right within this Court's purview.  This claim fails as a matter of law.

## III.   P.A. 436 does not violate the Equal Protection Clause (Counts 4, 5, 6, 11).

Counts 4, 5, 6, and 11 assert that P.A. 436 violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  These claims lack merit.

### A.   P.A. 436 does not unconstitutionally burden Plaintiffs' fundamental right to vote.

The Equal Protection Clause states that no State shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  The clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).

Plaintiffs assert that P.A. 436 violates their fundamental right to vote protected by the Equal Protection Clause in two ways.  First, they argue the Act "effectively revoke[s] the right to vote by stripping governing authority from local elected officials and transferring such authority

10

to one unelected emergency manager with no accountability to local citizens." (R. 1, Compl.,¶ 148, ID# 29.) Second, they argue the Act "impermissibly dilutes citizen's right to vote in local elections where emergency managers have been appointed" because the emergency managers become vested with all governing authority, leaving local elected officials with only conditional powers and "the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their elected officials." (*Id.* at ¶¶ 149-150, ID# 29.)

### 1. Plaintiffs are not similarly situated to people residing in communities that do not have an emergency manager.

As a threshold matter, Plaintiffs must demonstrate they are similarly situated to the persons allegedly receiving more favorable treatment "in all material respects." *Ctr. for Bio–Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quotation marks omitted); *TriHealth, Inc. v. Board of Com'rs, Hamilton County, Ohio*, 430 F.3d 783, 790-791 (6th Cir. 2005). "Disparate treatment of persons is reasonably justified if they are dissimilar in some material respect." *Id.* In determining whether individuals are "similarly situated," a court should "not demand exact correlation, but should instead seek relevant similarity." *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000) (citation omitted).

Here, Plaintiffs, who are residents of local units of government under the administration of an emergency manager (Detroit, Detroit Public School District, Benton Harbor, Pontiac, and Flint), allege they are being disparately treated as compared to residents of local units of government with no emergency manager. That is not true. Each of these named local units, whether under P.A. 72 or P.A. 4, underwent a rigorous review of their financial condition, as assessed against set criteria, and were determined to be in a financial emergency by the Governor

or other executive official. The serious financial problems facing these local units of government cannot be overstated and are laid bare within each letter confirming the financial emergencies.

Plaintiffs are not similarly situated to residents of local units of government that have not been declared to be in a financial emergency. The significant financial condition of their local unit of government is the whole reason an emergency manager was appointed. Thus, comparisons to residents of local units of government in better financial condition do not advance Plaintiffs' claims. Nor do Plaintiffs identify any specific local units of government whose financial conditions are the same as or are sufficiently similar to Plaintiffs' communities that were not placed under the administration of an emergency manager after financial review. As a result, Plaintiffs have failed to make the threshold "similarly situated" showing and their equal-protection claims necessarily fail. *TriHealth, Inc*, 430 F.3d at 790.

### 2. Plaintiffs have not been denied their fundamental right to vote.

The right to vote is a "fundamental" political right. *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966), and the Equal Protection Clause applies when a state either classifies voters in disparate ways, or places restrictions on the right to vote. *League of Women Voters v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008) (citing *Bush v. Gore*, 531 U.S. 98, 104 (2000)). The specific character of the state's action and the nature of the burden on voters will determine the applicable equal-protection standard. See *Biener v. Calio*, 361 F.3d 206, 214 (3d Cir. 2004) ("The scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").

If a plaintiff asserts only that a state treated the plaintiff differently than similarly situated voters, without a reciprocal burden on the fundamental right to vote, the rational basis standard of review should apply. *McDonald v. Bd. of Election Comm'rs*, 394 U.S. 802, 807-09 (1969) (applying rational basis to a state statute prohibiting plaintiffs' access to absentee ballots where no right-to-vote burden was shown); *Biener*, 361 F.3d at 214-15 (applying rational basis absent a

showing of an "infringement on the fundamental right to vote"). But when a State's classification "severely" burdens the right to vote, strict scrutiny is appropriate. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). Where the burden is somewhere in the middle, courts apply the "flexible standard" outlined in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick*. See *Hunter v. Hamilton Cty. Bd. of Elections*, 635 F.3d 219, 238 (6th Cir. 2011) (applying the balancing test in an equal-protection challenge to the counting of provisional ballots).

Here, there is no suspect class and P.A. 436 does not burden Plaintiffs' right to vote. Residents in local units of government under an emergency manager's administration retain all their rights to exercise the franchise and vote for the candidates of their choice, including candidates for local government, and to have those votes counted. While P.A. 436 may temporarily prohibit a local unit's chief executive officer and governing body from exercising the powers of those offices during the receivership, Mich. Comp. Laws § 141.1549(2), it does not preclude residents from voting candidates into these offices, or the candidates from continuing to hold those offices during the receivership.

Plaintiffs' complaint really is that the officials they have already elected into office are prohibited (at least temporarily) from exercising some or all of the powers and duties they were elected to do—in other words, that their candidates can no longer be effective. But this is not a recognized violation of the right to vote.

### 3. Plaintiffs' fundamental right to vote has not been diluted.

Plaintiffs' claim of vote dilution is that the appointment of an emergency manager in and of itself dilutes Plaintiffs' right to vote, and/or that the appointment of an emergency manager for a particular local unit of government by the Governor, who is elected by voters statewide, dilutes the right to vote of the local residents: "The vote of citizens for their local government in

13-53846-swr   Doc 2672-5   Filed 02/17/14   Entered 02/17/14 16:20:32   Page 25 of 41
13-53846-tjt   Doc 12615   Filed 10/07/14   Entered 10/07/14 14:20:04   Page 25 of 41
154

affected localities is grossly diluted by the statewide participation of the electorate." (R. 1, Compl., ¶ 150, ID# 30.) These arguments are likewise without merit.

"[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. A vote-dilution claim invokes the principle of "one person, one vote," a requirement under the Fourteenth Amendment. See 16B CJS, Constitutional Law, § 1264 (explaining that each person's vote must count the same as any other person's); *see also Carlson v. Wiggins*, 675 F.3d 1134, 1139 (8th Cir. 2012).

P.A. 436 does not violate this requirement. As explained above, residents in local units of government under the administration of an emergency manager retain the same rights to vote for and elect candidates of their choosing, and their votes count the same as residents in other local units of government voting for their local officials. Again, Plaintiffs' real complaint is that their elected candidates will, on a temporary basis, no longer be effective or as effective in their offices. But this "injury," if it exists, does not stem from any recognized violation of the fundamental right to vote or the "one person, one vote" principle.

## B.    P.A. 436 does not discriminate based on race.

In Count 5, Plaintiffs vaguely assert that P.A. 436 discriminates based on race. They observe that the Equal Protection Clause "protects [sic] laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights." (R. 1, Compl., ¶ 161. ID# 32.) They then assert that voting in local elections is a fundamental right and that P.A. 436's provisions "effectively revoke the right to vote." *Id.,* ¶ 162, ID# 32. In paragraphs 168 and 169, Plaintiffs allege that P.A. 436 "discriminate[s] in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community" and that Defendants have

14

caused injury by exercising authority under the Act in "various municipalities comprising more than 53% of the State's [African American] population."

Initially, as noted above, Plaintiffs have failed to allege or show that they have been disparately treated compared to citizens of a different race in communities that are similarly situated financially to Plaintiffs' communities. *TriHealth, Inc.*, 430 F.3d at 790. Thus, this race-based equal-protection claim fails.

In addition, P.A. 436 does not embody a racial classification. Neither does it say or imply that voters are to be treated differently on account of their race. The purpose of the Act—resolving financial emergencies within local units of government—encompasses any local unit of government in financial distress, regardless of the racial makeup of its population. As a result, P.A. 436 is facially neutral.

"Where facially neutral legislation is challenged on the grounds that it discriminates on the basis of race, the enactment will be [analyzed under] strict scrutiny only if the plaintiff can prove that it 'was motivated by a racial purpose or object,' or 'is unexplainable on grounds other than race.'" *Moore v. Detroit School Reform Bd*, 293 F.3d 352, 369 (6th Cir. 2002) (internal quotation marks and citations omitted). So "[p]roving that a law has a racially disparate impact, without more, is [] insufficient to establish a violation of either the Fourteenth or the Fifteenth Amendment." *Id.* at 369, citing *Village of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264–65 (1977) (rejecting disproportionate impact as constitutionally infirm).

The Supreme Court has identified five factors relevant to determining whether facially neutral state action was motivated by a racially discriminatory purpose: (1) the impact on particular racial groups, (2) the historical background of the challenged decision, especially if it reveals numerous actions being taken for discriminatory purposes, (3) the sequence of events that

preceded the action, (4) procedural or substantive departures from the government's normal procedural process, and (5) the legislative or administrative history. *Village of Arlington Heights*, 429 U.S. at 266–68; see also *Moore,* 293 F.3d at 369-370 (addressing these factors in a challenge against Michigan School Reform Act and finding no equal protection violation). To the extent Plaintiffs' allegations even plead these factors, none of the allegations reveal a racially discriminatory purpose on the part of the Michigan Legislature or the Governor in enacting and signing P.A. 436. As a result, Plaintiffs fail to state a claim under a racial discrimination theory.

**C.    P.A. 436 does not discriminate based on wealth.**

In Count 6, Plaintiffs allege that P.A. 436 violates equal-protection principles by discriminating based on wealth. They assert that "[u]nder Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community." (R. 1, Compl., ¶ 181, ID#36.) They further allege that P.A. 436 has been implemented "in various municipalities with disproportionately high poverty rates." (*Id*., ¶ 184, ID# 37.) Plaintiffs thus conclude that P.A. 436 violates equal protection "through provisions of the statute that unduly revoke citizen's right to vote for local officials based on the wealth of their community and themselves . . . ." (*Id*., ¶ 183, ID# 37.)

Once again, these claims fail because Plaintiffs have failed to allege or show they have been disparately treated compared to communities or residents that are similarly situated with respect to wealth (or poverty). *TriHealth, Inc.*, 430 F.3d at 790. And P.A. 436 does not discriminate against local units of government, let alone their residents, based on wealth (or poverty). It is the overall financial condition and prognosis of a local unit of government that will subject it to review and the possible appointment of an emergency manager under P.A. 436, not its wealth or lack thereof. For example, a "wealthy" community whose financial books are in order would not be subject to review under P.A. 436, but neither would a "poor" community

16

13-53846-swr   Doc 2672-5   Filed 02/10/14   Entered 02/10/14 16:20:32   Page 28 of 41
13-53846-tjt   Doc 12615   Filed 02/07/14   Entered 02/07/14 16:20:34   Page 28 of 154   181
501

whose books are also in good order.  P.A. 436 is directed at rectifying financial mismanagement, which can occur in local units of government of any size and any degree of wealth.

In any event, P.A. 436 does not unconstitutionally burden the right to vote.  Thus, no fundamental right is at issue.  Moreover, wealth-based classifications do not discriminate against a suspect class.  *Jonson v. Bredesen*, 624 F.3d 742, 746 (6th Cir. 2010) (citing *Papasan v. Allain*, 478 U.S. 265, 283-84 (1986)).  So P.A. 436 is subject to rational basis review, if any review applies at all.  *Bredesen*, 624 F.3d at 746.  To survive rational basis scrutiny, P.A. 436 need only be "rationally related to legitimate government interests[,]" *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (internal quotation marks and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993).  "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."  *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 440 (1985) (internal citation omitted).

Michigan has a legitimate government interest in preventing or rectifying the insolvency of its political subdivisions.  The insolvency of a local unit of government threatens the health, safety, and welfare of its residents.  Mich. Comp. Laws §141.1543.  It also threatens the interests of the citizens of this State as a whole because it is detrimental to the State's overall economic condition and credit rating.  *Id.*  P.A. 436 thus survives rational basis review.

**D.     P.A. 436 does not discriminate against local units of government with emergency managers appointed under P.A. 72 or P.A. 4.**

In Count 11, Plaintiffs assert that P.A. 436 "discriminates against cities and school districts where EFMs and EM[s] have been and are currently in place," because those

17

communities will not benefit from a provision in P.A. 436 that permits local units of government to vote to remove emergency managers after 18 months.  (R. 1, Compl., ¶¶ 240-242, ID## 48.) "The law discriminates against these municipalities requiring them to suffer an additional 18 months with an EM despite their having had such officials in place much longer than this time period."  (*Id.*, ¶ 242, ID# 48.)

The provision Plaintiffs refer to is Mich. Comp. Laws §141.1549(6)(c), which allows the emergency manager, by resolution, to be removed by a 2/3 vote of the governing body of the local government, and if the local unit has a strong mayor, with strong mayoral approval. Neither P.A. 72 nor P.A. 4 had such a provision.  But P.A. 436, Mich. Comp. Laws §141.1549(10), provides that appointed emergency managers "shall be considered an emergency manager under this act [P.A. 436] and shall continue under this act to fulfill his or her powers and duties."  Thus, beginning March 28, 2013, P.A. 436's effective date, all local units of government currently under the administration of an emergency manager are eligible to use this provision at the expiration of 18 months.

Plaintiffs argue that because their affected local units of government have already been under the administration of an emergency manager longer than 18 months, it is discriminatory to make these communities wait the additional 18 months to take advantage of this section.  But again, as stated above, to prove an equal-protection claim Plaintiffs must demonstrate that they are being treated disparately as compared to similarly situated persons.  *Ctr. for Bio–Ethical Reform, Inc.*, 648 F.3d at 379.  Plaintiffs have not alleged or shown that they are similarly situated to persons in local units of government with emergency managers newly appointed under the P.A. 436 process.  Moreover, there is no fundamental right involved, and Plaintiffs do

not allege discrimination against a suspect class.  Again, the rational-basis standard applies to any review of this particular provision of P.A. 436.  *Bredesen*, 624 F.3d at 746.

The rational-basis standard is met.  The Legislature had a legitimate government interest in both setting a potential 18-month endpoint to a local unit of government's administration by an emergency manager and in not making this option immediately available to communities who have had emergency managers longer than 18 months.  This is because neither P.A. 72 nor P.A. 4 had a similar time limit, and the financial plans put in place by these pre-existing emergency managers were not likely designed to resolve a financial crisis within 18 months.  Thus, subjecting existing local units of government to the additional 18 months allows their emergency managers to modify or amend their plans in light of the new time limitation.  Moreover, P.A. 436 expressly provides these local units of government with the interim alternative of petitioning the Governor to remove an emergency manager who has served *less* than 18 months under P.A. 72.  Mich. Comp. Laws §141.1549(11).  P.A. 436 survives rational basis review, and Plaintiffs have failed to state a claim for relief.

## IV.    P.A. 436 does not violate the Voting Rights Act (Count 7).

Count 7, an alleged violation of Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, also fails to state a claim upon which relief may be granted.  To state a claim for violation of Section 2, a minority group must demonstrate what are commonly referred to as the "*Gingles* factors":  (1) "that it is sufficiently large and geographically compact to constitute a majority in a single-member district;" (compactness); (2) "that it is politically cohesive" (cohesiveness); and (3) that "the white majority votes sufficiently as a bloc to enable it – in the absence of special circumstances, such as the minority candidate running unopposed – usually to defeat the minority's preferred candidate" (white-bloc voting).  *Mallory v. Ohio*, 173 F.3d 377, 381-382 (6th Cir. 1999) (internal citations omitted).

19

First, Plaintiffs' claims should be dismissed because they have not alleged that they constitute a "minority group" capable of bringing a Section 2 claim. *Id.* Second, Plaintiffs' vote-dilution claim—predicated on the purported "statewide participation of the electorate" in their local governance—does not implicate any of the *Gingles* factors. (R. 1, Compl., ¶ 193, ID# 39.) Indeed, their Complaint is devoid of *any* allegations related to compactness, cohesiveness, or white-bloc voting. Instead, it focuses exclusively on their disagreement with Defendants' policy choice in enacting P.A. 436. Yet, the Sixth Circuit has specifically recognized that regardless of the mechanism alleged to cause vote dilution, the *Gingles* factors *must* be satisfied *Mallory*, 173 F.3d at 386. Accordingly, this Court should dismiss Count 7.

## V.   P.A. 436 does not violate the First Amendment rights of free speech and petition (Count 8).

Count 8 is brought only by individual Plaintiffs, not by Council 25. (R. 1, Compl., ¶¶ 202-203, ID# 41.) The bases for this claim is that P.A. 436 strips the local officials of all authority, mirrors P.A. 4, which was rejected by voter referendum, and improperly vests P.A. 436 powers in previously appointed emergency financial managers. (*Id.* at ¶ 206-207, ID# 42.)[2]

These claims fail for two reasons. First, P.A. 436 neither abridges Plaintiffs' speech nor prohibits them from petitioning their government for the redress of grievances. They can still vote and continue to voice their concerns to their elected officials. Second, even if this Court were to determine that an emergency manager abridges these First Amendment rights, the Act is still constitutional because the abridgement is content-neutral and justified by the financial exigencies of the local governments to which it is applicable.

_____

[2] Plaintiffs frame their First Amendment claim in part based on "speech on matters of public concern." But the "public concern" balancing test set out by the United States Supreme Court in *Pickering v. Board of Education,* 391 U.S. 563 (1968), is applicable where an public employee is being disciplined, or subjected to an adverse employment decision, for his or her speech or associations. See *Piscottano v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn., 2005) (citation omitted).

13-53846-tjt   Doc 2672-5   Filed 02/07/14   Entered 02/07/14 16:20:32   Page 32 of 41
13-53846-swr   Doc 1205-1   Filed 01/17/14   Entered 01/17/14 14:42:32   Page 32 of 41   185
1557

**A.      P.A. 436 does not abridge speech or prohibit Plaintiffs from petitioning the Government.**

The First Amendment provides in part that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const., amend. I.  Freedom of speech, though a fundamental right, is not absolute.  *Konigsberg v State Bar of California*, 366 U.S. 36, 49 (1961).  The right to petition and the right to free speech are separate guarantees, yet they are related and generally subject to the same constitutional analysis.  *Thaddeus-X v. Blatter*, 175 F.3d 378, 390 (6th Cir. 1999)

A threshold issue in any First Amendment analysis is whether there has been an abridgement of First Amendment rights.  Here, for four reasons, Plaintiffs' claims fail at the onset because there is no abridgement of free speech or petition rights.

**1.      P.A. 436 gives local officials both voice and choice.**

An emergency manager is not simply thrust on local elected officials.  Even before a preliminary review is conducted, the local governmental unit is notified and has an opportunity to provide comments to the state financial authority. Mich. Comp. Laws § 141.1544(2).  Once the local unit is under review, it then has an opportunity to provide information concerning its financial condition.  *Id*. at § 1545(2).  If after review it is determined that a financial emergency exists, the local unit may appeal this determination.  *Id.* at § 1546(3).  Once the financial emergency is confirmed, the local government has options, including a consent agreement, an emergency manager, a neutral evaluation process option, or bankruptcy.  *Id*. at § 1547(1)(a)-(d).  Thus, an emergency manager is but one of the choices available to a local unit.  Additionally, the process is only an interim one:  an emergency manager may, by resolution, be removed after 18 months, or earlier if financial conditions are corrected.  *Id.* at § 1549(6)(c), (7), (11).

21

13-53846-swr   Doc 2673-5   Filed 02/10/14   Entered 02/10/14 16:20:32   Page 33 of 41
13-53846-swr   Doc 2612-5   Filed 02/07/14   Entered 02/07/14 14:16:32   Page 33 of 41   186
507

**2.      Plaintiffs have no constitutional right to local self-government and an emergency manager is accountable to the State's elected officials.**

"'Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to *meet changing urban conditions*.'" *Holt Civil Club v. City of Tuscaloosa*, 439 U.S. 60, 74-75 (1978) (quoting *Sailors*, 387 U.S. at 110-111 (emphasis added)). Moreover, "[m]unicipal corporations are political subdivisions of the [s]tate, created as convenient agencies for exercising such of the governmental powers of the [s]tate as may be entrusted to them. . . . The number, nature, and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the [s]tate." *Hunter*, 207 U.S. at, 178-179 (1907).

Accordingly, a state may take action including destroying the municipal corporation entirely, "conditionally or unconditionally, with or without the consent of the citizens, or even against their protest," and may do so "unrestrained by any provision of the Constitution of the United States." *Id.* Thus, the U.S. Supreme Court in *Hunter v. City of Pittsburgh,* 207 U.S. 161, 178 (1907), upheld an act authorizing city consolidation and providing for temporary government and payment of the consolidated city's debts.

Although the Supreme Court has placed limitations on this expansive power—none of which apply here[3]—*Hunter* remains good law. *Hess v. Port Auth. Trans-Hudson Corp.,* 513 U.S. 30, 47 (1994) (citing *Hunter* and affirming that "ultimate control of every state-created

---

[3] Neither states nor their political subdivisions may draw boundaries that discriminate on an invidious basis, such as race or sex. *See Gomillion v. Lightfoot,* 364 U.S. 339, 341 (1960) Also, equal protection prohibits states from restricting or diluting votes in violation of the "one person, one vote" principle announced in *Reynolds v. Sims,* 377 U.S. 533 (1964), and extended to local governments in *Avery v. Midland County,* 390 U.S. 474 (1968). Too, unjustified discrimination in determining who may participate in political affairs or in the selection of public officials undermines the legitimacy of representative government. *Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626 (1969). But, as argued above, Plaintiffs have no valid equal protection or Voting Rights Act claims.

22

entity resides with the State ... [and p]olitical subdivisions exist solely at the whim and behest of their State") (internal quotation marks omitted); *Kelley v. Metropolitan County Bd. of Educ. of Nashville & Davidson County, Tenn*., 836 F.2d 986, 994 (6th Cir. 1987).

Moreover, a State's broad authority does not leave citizens without a voice or petition rights in local government affairs.  In *Holt Civil Club v. City of Tuscaloosa*, 439 U.S. at 73-74, a case upholding Alabama's decision to allow cities to exercise extraterritorial jurisdiction over nearby settlements, the Court recognized that it did not "sit to determine whether Alabama has chosen the soundest or most practical form of internal government possible."  Instead, the "[a]uthority to make those judgments resides in the state legislature, and Alabama citizens are *free to urge their proposals to that body*." *Id*. (emphasis added, citation omitted).

The same is true here.  As was true in *Holt Civil Club*, it is not for this Court to second-guess whether P.A. 436 is the most practical solution.  And as in *Holt Civic Club*, Michigan must continue to respond to evolving economic challenges and in doing so has broad authority over local units of government.  Plaintiffs are free to urge their proposals to their state elected officials—even where an emergency manager has temporarily limited the powers of their local officials.  And they *still* get to vote, *still* get to voice their views about how local government is run, and *still* can seek to replace officials with whom they are dissatisfied.

Significantly too, while the local unit of government is in receivership, emergency managers are accountable to the State's *elected* officials—who, in turn, are accountable to Plaintiffs and other voters.  At the six-month mark and each three months thereafter, the emergency manager must submit an accounting of expenditures, contracts, loans, new or eliminated positions, and his or her financial and operating plan to the Governor, the state treasurer, various legislative representatives of the local government, and the clerk of the local

23

government.  Mich. Comp Laws § 141.1557 (a)-(h).  The Governor ultimately determines whether the financial emergency has been rectified, *id.* at § 1562(2), and has the power to appoint a new emergency manager*, id..* at § 141.1564.

In sum, how local government is organized is up to the State.  And the way to change state law is through the political process, not the courts.

### 3.   The Petition Clause does not guarantee a particular result.

The Petition Clause guarantees only that an individual may "speak freely and petition openly" and that he will be free from retaliation by the government for doing so.  *Smith v. Arkansas State Highway Employees, Local 1315*, 441 U.S. 463, 464–65 (1979) (per curiam).  But it does not guarantee that the government will listen or respond, or that a particular petition will be effective.  *Id.* (holding that the state's highway commission did not violate unions' First Amendment petition rights merely because it ignored the union, which it was free to do); *Canfora v. Old*, 562 F.2d 363, 363 (6th Cir. 1977) ("[N]either in the First Amendment [or] elsewhere in the Constitution is there a provision guaranteeing that all petitions for the redress of grievances will meet with success).

Here, Plaintiffs may exercise their petition rights by informing their state elected officials—and even their local officials during the receivership under P.A. 436—of their desires with respect to the passage or enforcement of laws such as P.A. 436.  But they cannot control the outcome, and that is really the essence of their claim.  If they are unhappy with the outcome of their previous attempts to petition the government, their remedy for a law they dislike is at the polls.  *Minnesota State Bd. for Community Colleges v. Knight*, 465 U.S. 271, 285 (1984) (explaining that disagreement with public policy and disapproval of officials' responsiveness is to be registered principally at the polls).

24

4. **Rejection of P.A. 4 is not an abridgement of speech or petition and P.A. 436 is not the mirror image of P.A. 4.**

Voters exercised their speech and petition rights when they rejected P.A. 4. They also exercised their speech and petition rights when their elected officials enacted P.A. 436. P.A. 436 is not a reenactment of P.A. 4.[4] It replaces P.A. 72, which was in effect at the time. And the Legislature determined that P.A. 436 was necessary to ensure local fiscal stability.

This is the political process at work. Plaintiffs may exercise their speech and petition rights to express their discontent with current elected officials and/or elect new state officials. The Legislature's decision to vest formerly appointed emergency financial managers with P.A. 436 powers represents this same political process. If Plaintiffs are unhappy with the result of the political process, they can attempt to have their current elected state officials hear and respond to them, or they can seek to elect new officials—again, all part of the political process.

B. **P.A. 436 is also justified by local financial emergencies.**

As courts have recognized, there are free speech compromises that are not unconstitutional. E.g., *Burson v. Freeman*, 504 U.S. 191 (1992) (upholding a law prohibiting display or distribution of campaign materials within 100 feet of a polling place); *Hill v. Colorado*, 530 U.S. 703, 725 (2000) (upholding a statute making it a misdemeanor to pass out material or counsel within 8 feet of a person entering or leaving a health care facility in order to pass out material or counsel). That is why courts routinely uphold all manner of restrictions on petitioning, including registration and disclosure requirements for lobbyists, *United States v. Harriss,* 347 U.S. 612, 625 (1954); limiting access to the courts, *Swekel v. City of River Rouge*,

---

[4] However, even if P.A. 436 was a mirror image of P.A. 4, there is no legal prohibition to the Michigan Legislature re-enacting a law identical or similar to one disapproved by referendum. See, e.g. *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84; 610 N.W.2d 597 (2000).

25

119 F.3d 1259, 1263 (6th Cir. 1997); and subjecting petitioning to neutral time, place and manner restrictions consistent with public safety and order, *Buckley v. Valeo*, 424 U.S. 1 (1976).

A free speech violation occurs only when the restricted speech is constitutionally protected and when the government's justification for the restriction is insufficient. *Frisby v. Schultz,* 487 U.S. 474, 479 (1988). The test for whether a state actor violated a plaintiff's First Amendment right to free speech is: (1) whether plaintiff's speech is protected by the First Amendment; (2) the nature of the forum: public, designated or limited public, or nonpublic; and (3) whether the defendant's justifications for limiting the plaintiff's speech satisfy the requisite standard. *Cornelius v. NAACP Legal Defense & Educ. Fund,* 473 U.S. 788, 797 (1985).

Here, the requisite standard is intermediate scrutiny because P.A. 436 (if it abridges speech at all) is content-neutral. See *Ward v. Rock Against Racism,* 491 U.S. 781, 791 (1989) (quotation omitted) ("[T]he government may impose reasonable [content-neutral] restrictions on the time, place, or manner of protected speech, provided the restrictions: (1) 'serve a significant governmental interest;' (2) 'are narrowly tailored;' and (3) 'leave open ample alternative channels for communication of the information.'"). There is no indication that P.A. 436 was intended to suppress any ideas or that it has had that effect.

P.A. 436 satisfies intermediate scrutiny. The State has a significant and compelling interest in addressing the financial distress of local units of government. And the Act does not abridge more speech or petition rights than necessary to address that distress. It gives local elected officials options in solving its difficulties, and if locals choose an emergency manager, provides narrowly tailored procedures for the manager's removal. Again, Plaintiffs have ample channels to voice their concerns to their state elected officials. Moreover, the financial exigencies of the local units of government that are subject to the Act justify any temporary

26

abridgment of speech or petition rights.   Indeed, governments exercise emergency powers that allow them to temporarily suspend constitutional rights.

These emergencies are often economic.  As early as 1934, the Supreme Court addressed an economic emergency in *Home Building & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 435 (1934), and upheld Minnesota's mortgage moratorium law in response to the Great Depression.  The Court noted, "[The] principle of harmonizing the constitutional prohibition with the necessary residuum of state power has had progressive recognition in the decisions of this Court."  *Id.* "When major emergencies strike, the 'law of necessity' is the one rule that trumps all the others." William H. Rehnquist, "All the Laws But One:  Civil Liberties in Wartime" (1998).

In sum, P.A. 436 does not abridge First Amendment free-speech or petition rights, and any alleged abridgement cannot be unconstitutional.  This claim fails as a matter of law.

## VI.     The appointment of Detroit's emergency manager does not violate the right to petition (Count 9).

Count 9 is brought by Council 25, its representative and its negotiator, and alleges abridgment of the First Amendment petition right.  (R. 1, Compl., ¶ 212, 214, ID# 43.)  The basis for this claim is the appointment of the City of Detroit's Emergency Manger, Kevyn Orr, formerly the City's Emergency Financial Manager under P.A. 72.  (*Id.*, ¶ 220, ID# 44-45.) Plaintiffs allege that P.A. 436 allows the Governor and Treasurer to use their powers over local government for their own political and economic benefit.  (*Id.,* ¶ 220(f), ID# 44-45.)

For the same reasons Count 8 fails, Count 9 fails as well.  Plaintiffs have not lost the right to petition their elected state officials or even their Detroit elected officials.  They simply do not have the constitutional right to a particular result.

As to the allegations that P.A. 436 provides the opportunity for Defendants to benefit privately, politically, and economically, they are wholly conclusory.  The Act provides numerous

27

safeguards against any overreaching of power.  See, e.g., Mich. Comp. Laws §§ 141.1552(1)(k) & (u) (safeguards as to collective bargaining agreements and borrowing money), 1552(4) (safeguards for selling or transferring public utilities), 1555(1) (safeguards for selling of assets), and 1559(1) (safeguards for proposed contracts, sales, and leases).  Count 9 should be dismissed for failure to state a claim.

## VII.    P.A. 436 does not violate the Thirteenth Amendment (Count 10).

In Count 10, Plaintiffs claim that their Thirteenth Amendment rights have been violated because the communities impacted by the appointment of an emergency manager consist mostly of African-American residents.  This claim should be rejected.

The Thirteenth Amendment bars slavery and involuntary servitude and gives Congress the power to impose legislation that prohibits such actions.  U.S. Const. amend. XIII.  As an initial matter, this claim offers no greater protection than Plaintiffs' equal-protection claim and should therefore be dismissed as redundant.  See *Johnson v. Harron*, 1995 WL 319943 at 6 (N.D.NY., May 23, 1995) ("[I]n the realm of equal protection, the Thirteenth Amendment offers no protection not already provided under the Fourteenth Amendment.")

In any event, there is no violation of the Thirteenth Amendment and no legislation enacted by Congress pursuant to the Thirteenth Amendment.  The official actions challenged in this case all emanate from the impact of legislation to fix financially troubled local units of government.  P.A. 436 does not benefit white citizens within these communities in a way that it does not benefit black citizens.  Nor does P.A. 436 "place[] a burden on black citizens as an unconstitutional 'badge of slavery.'"  *City of Memphis v. N.T. Green*, 451 U.S. 100, 124 (1981).  Quite the opposite, P.A. 436's purpose is to benefit all Michigan citizens, of every race and ethnicity.  Count 10 should be dismissed for failure to state a claim.

28

## CONCLUSION

For the reasons set forth above, Plaintiffs have failed to state claims upon which relief

may be granted, and the Complaint should be dismissed in its entirety, with prejudice.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

Dated:  May 15, 2013                    Email:  bartond@michigan.gov

## CERTIFICATE OF SERVICE

I hereby certify that on May 15, 2013, I electronically filed the foregoing paper with the Clerk of
the Court using the ECF system which will send notification of such.

*s/Denise C. Barton*
Denise C. Barton (P41535)
Attorney for Defendants
E-mail:  bartond@michigan.gov

29

# EXHIBIT B

13-53846-swr   Doc 2673-5   Filed 02/07/14   Entered 02/07/14 16:52:39   Page 42 of 12
13-53846-tjt   Doc 2673-5   Filed 02/07/14   Entered 02/07/14 16:52:39   Page 135 of 154   195
507

```
                   UNITED STATES BANKRUPTCY COURT
                    EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,       .        Docket No. 13-53846
         MICHIGAN,             .
                               .        Detroit, Michigan
                               .        July 24, 2013
               Debtor.         .        10:02 a.m.
. . . . . . . . . . . . . . . .


    HEARING RE. MOTION OF DEBTOR, PURSUANT TO SECTION 105(a)
  OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING
     THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
  BANKRUPTCY CODE (DOCKET #53) AND MOTION OF DEBTOR, PURSUANT
   TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN
  ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE
    ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND
          REPRESENTATIVES OF THE DEBTOR (DOCKET #56)
         BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44114-1190
                       (216) 586-3939


For AFSCME:            Lowenstein Sandler, LLP
                       By:  SHARON L. LEVINE
                       65 Livingston Avenue
                       Roseland, NJ  07068
                       (973) 597-2374


For Syncora            Kirkland & Ellis, LLP
Guarantee and          By:  RYAN BENNETT
Syncora Capital        300 North LaSalle
Assurance:             Chicago, IL  60654
                       (312) 862-2074


For Public Safety      Erman, Teicher, Miller, Zucker &
Unions:                   Freedman, PC
                       By:  BARBARA PATEK
                       400 Galleria Officentre, Suite 444
                       Southfield, MI  48034
                       (248) 827-4100
```

APPEARANCES (continued):

| For Police and<br>Fire Retirement<br>System and<br>General Retirement<br>System of the City<br>of Detroit: | Clark Hill, PLC<br>By: ROBERT GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882 |
|---|---|
| For the UAW: | Cohen, Weiss & Simon, LLP<br>By: BABETTE CECCOTTI<br>330 West 42nd Street, 25th Floor<br>New York, NY 10036<br>(212) 356-0227 |
| For the Flowers<br>Plaintiffs: | Law Offices of William A. Wertheimer<br>By: WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>(248) 644-9200 |
| For Nathaniel<br>Brent: | In pro per<br>NATHANIEL BRENT<br>538 South Livernois<br>Detroit, MI 48209 |
| For the Phillips<br>Plaintiffs: | The Sanders Law Firm, PC<br>By: HERBERT A. SANDERS<br>615 Griswold, Suite 913<br>Detroit, MI 48226<br>(313) 962-0099 |
| For the State of<br>Michigan: | Michigan Department of Attorney General<br>By: MATTHEW SCHNEIDER<br>525 West Ottawa Street, Fl. 7<br>P.O. Box 30212<br>Lansing, MI 48909<br>(517) 241-8403 |
| For the Webster<br>Plaintiffs: | McKnight, McClow, Canzano, Smith &<br>Radtke, PC<br>By: JOHN R. CANZANO<br>400 Galleria Officentre, Suite 117<br>Southfield, MI 48034<br>(248) 354-9650 |

1    THE COURT:  All right.  So I will allow 15 minutes

2  for each of the creditors that have filed objections.  These

3  are the Michigan Council 25 of AFSCME, Syncora, the UAW

4  together with Creditors Robbie Flowers, Michael Wells, Janet

5  Whitson, Mary Washington, and Bruce Goldman, the Detroit

6  public safety unions, if I can refer them -- refer to them by

7  that, and the General Retirement System of the City of

8  Detroit and the Police and Fire Retirement System of the

9  city.  It doesn't matter to me, counsel, the order in which

10  you proceed, so I will leave that to you to work out.

11    MS. LEVINE:  I'm going to go with alphabetical.

12    THE COURT:  Okay.

13    MS. LEVINE:  Good morning, your Honor.  Sharon

14  Levine, Lowenstein Sandler, for Michigan Council 25 of the

15  American Federation of State, County, and Municipal Employees

16  or AFSCME, as it's been referred to here today.

17    Your Honor, very briefly, it's clear that your Honor

18  has read all the papers, and we very much appreciate that

19  given the short time frame that we've been before this Court.

20  Bankruptcy Code Section 105 is extraordinary relief,

21  extraordinary in that it's only used to enforce rights that

22  already exist under the Bankruptcy Code, so it's not there to

23  create new rights that don't currently exist under the Code.

24  What we have here in a Chapter 9 case, which is more

25  restrictive than, for example, a Chapter 11 case, is the

situation where if, in fact, the state has not properly
authorized the Chapter 9 filing, there are rights that don't
exist under the Bankruptcy Code.  If Chapter 9, as has
historically been seen through the unconstitutional finding
of predecessors to Chapter 9, is really being used here to
avoid state constitutional rights, then Chapter 9 in and of
itself is potentially unconstitutional.  If not, it has to be
construed narrowly in order to read it constitutionally.  We
would respectfully submit that using 105 to find rights that
don't otherwise exist, particularly of a constitutional
nature, is an extremely broad use of 105.  This isn't a
situation where we're saying to the controller or the
governor or Mr. Orr, you know, don't respond to discovery
requests in a state court action in a foreign jurisdiction
because we need your attention here.  We're taking away very
fundamental constitutional rights.

Secondly, your Honor, if, in fact --

THE COURT:  So your argument about the narrow
application of Section 105 in this case is really a result of
the fact that it's a Chapter 9.

MS. LEVINE:  Yes, your Honor.

THE COURT:  It's not an argument that's based on
Section 105, per se.

MS. LEVINE:  Yes, your Honor.  In a Chapter 11
you'll have circumstances, for example, where even in the

1   broader case of a Chapter 11, you won't use Article -- you

2   won't use Section 105 to grant a casino license or a liquor

3   license or tell a utility board they can't change rates, but

4   we have an even narrower situation here because we're in

5   Chapter 9.

6          Two, Chapter 9 can't be used if, in fact, the state

7   has not authorized under its constitution and its laws the

8   Chapter 9 filing.  The Chapter 9 filing here is arguably

9   flawed because it intends to go after the pensions.  If it

10  goes after the pensions, it arguably violates the state

11  constitution and can't be before this Court, so, again, the

12  issue with regard to whether or not we have an appropriate

13  state constitutional flaw -- sorry.  The issue with regard to

14  whether or not we have an appropriate filing is necessarily

15  limited by whether or not we have an appropriate state -- we

16  have an inappropriate state constitutional authorization.  If

17  we have an inappropriate state constitutional authorization,

18  that is not simply an implementation tool under 105.  That

19  is, in essence, a substantive right that's being creative --

20  created under 105 that does not exist in the state court.

21         In addition to that, your Honor, and also

22  importantly, three, individual citizens of the City of

23  Detroit have the absolute right to protect their own

24  constitutional rights.  If we say to them they can't go to

25  the state courts that are there for the protection of their

1  constitutional rights in part, then we are -- then we're

2  using 105 again way more broadly than it gets used in the

3  ordinary course as simply an implementation tool.  We're

4  creating more substantive rights.  And while this Court

5  has --

6        THE COURT:  Well, but why isn't the extended stay

7  that the city seeks here simply a procedural mechanism to

8  funnel such challenges to the Bankruptcy Court and,

9  therefore, does not have the effect of denying citizens or

10  other creditors of their rights to have their constitutional

11  claims heard?

12        MS. LEVINE:  Your Honor, if this Court is a court of

13  secondary jurisdiction, no disrespect, with -- but if you

14  look at federalism, comity, abstention, and the state courts

15  are the courts of primary jurisdiction, we would respectfully

16  submit that unlike, for example, determining in a Chapter 11

17  case that there's a validly perfected security interest

18  because you've looked at state law and the UCC is properly

19  filed, we have a very fundamental right here that this Court

20  is being asked to address, so what we're saying is instead of

21  going to the court that's primarily responsible, we're going

22  to come into this Court instead, and it's not as if there's

23  delay or uncertainty with regard to the fact that those

24  matters are going to get heard and considered quickly.  We

25  already have state court litigation pending, and the state

1  appellate courts are poised and ready to rule, so there's no

2  reason to divest them of that appropriate jurisdiction under

3  concepts of federalism, comity, and abstention and move that

4  here to a court of secondary jurisdiction on those issues.

5       Your Honor, fourth, with regard to the form over

6  substance, the procedural arguments with regard to 105, in

7  certain circumstances where 105 is being used for things like

8  stopping discovery or minimal things like that, that's one

9  set, but the Federal Rules of Civil Procedure are put in

10 place in order to protect parties and provide due process.

11 There can't be a more fundamental situation where you need to

12 enforce those types of rights than when you're dealing with

13 basic fundamental constitutional rights, and we respectfully

14 submit that even though there are circumstances where

15 expediency mandates the use of 105 quickly, this is not one

16 of those circumstances.

17      Your Honor, the breathing spell under 105 -- the

18 breathing spell under the Bankruptcy Code and the use of 105

19 to extend the breathing spell is only appropriate if, in

20 fact, the underlying bankruptcy is an appropriate bankruptcy.

21 The idea that there's a breathing spell to continue what is

22 potentially an unconstitutional or illegal -- not

23 intentionally, no motive or anything, your Honor, but --

24 proceeding is clearly not anything that 105 was designed to

25 implement.

1          Your Honor, we would respectfully submit that these

2   are very, very fundamental rights, and unlike a Chapter 11

3   case where you have a defined benefit plan where if, in fact,

4   it is terminated, there's federal insurance under the PBGC up

5   to $57,000, or if you have a multi-employer plan, even if an

6   employer withdraws, the beneficiaries themselves are

7   protected, here our members who participate at most are at or

8   below $19,000 a year.  Clearly there's no safety net.  These

9   issues are hard issues.  The collateral advantage to sending

10  this back to the state court for an appropriate decision is

11  that the conversations which we believe should have been

12  happening more robustly before the filing could happen now.

13  We respectfully -- we thank your Honor for the time, and we

14  appreciate your Honor's consideration.

15          THE COURT:  Thank you.  Sir.

16          MR. BENNETT:  Good morning, your Honor.  Ryan

17  Bennett of Kirkland & Ellis on behalf of Syncora Guarantee

18  and Syncora Capital Assurance.  Your Honor, as we attempted

19  to describe in our papers, my client insures, in some cases

20  owns certain securities called the certificates of

21  participation, which were taken out in 2006 to fund some of

22  the city's pension liabilities.  We also insure a swap --

23  four swaps related to those securities that are tied to the

24  interest rate, the floating interest rate associated with

25  them.

1          THE COURT:  Um-hmm.

2          MR. BRENT:  However, this is the city's option.

3     This isn't a requirement of law that they indemnify these --

4          THE COURT:  Um-hmm.

5          MR. BRENT:  -- just as -- my lawsuit is also against

6     various state actors within the State of Michigan, which --

7     but, again, their wanting to extend this to them would

8     prevent me from litigating my claims against the state

9     officials that have already been denied immunity, and it is

10    currently pending.  Those portions they've appealed to the

11    Circuit Court.  So now that they're trying to extend this

12    stay, now the Sixth Circuit Court of Appeals case of Brent

13    versus Wayne County, et al. will be stayed as well where the

14    different state defendants -- state employees have uphill

15    decision to deny their qualified and absolute immunity.

16         THE COURT:  The defendants in your particular suit

17    are both city employees and other defendants are state

18    employees?

19         MR. BRENT:  Yes, and there's also state contractors

20    involved in the lawsuit.

21         THE COURT:  Contractors also.  Thank you, sir.

22    Would anyone else like to be heard?

23         MR. SANDERS:  Good morning, your Honor.  My name is

24    Herb Sanders, and I represent the plaintiffs in the case of

25    Phillips versus Snyder pending before this Court, Case Number

13-53846-swr    Doc 2672-5    Filed 02/17/14    Entered 02/17/14 14:22:32    Page 51 of 12
13-53846-swr    Doc 2672-5    Filed 02/17/14    Entered 02/17/14 14:22:32    Page 51 of 12    204
507

1    2:13-CV-11370, before Judge Steeh.  That is a case that

2    challenges the constitutionality of PA 436.  Motions for

3    summary -- for at least one summary disposition or summary

4    judgment argument have been scheduled.  As I initially read

5    the request for stay extension motion filed by the city, it

6    appeared that the city was seeking an extension of stay

7    concerning financial matters that were being litigated, but

8    pursuant to the oral presentation of the city's attorney, it

9    concerns me when she has indicated -- and I paraphrase --

10   that she seeks relief concerning any litigation that might

11   interfere with the city's rights as a Chapter 9 debtor.  And

12   I would suggest to the Court to the extent that it might be

13   proposed or suggested that the litigation which I have

14   referenced in which the constitutionality of PA 436 is to be

15   determined by another judge in this court interferes with the

16   rights of the city as a Chapter 9 debtor, that that case not

17   be included as part of the stay order that this Court would

18   issue.  I believe it's imperative to this community, to this

19   state that those issues be determined and, in fact, should

20   probably be determined before the bankruptcy proceeds, but I

21   would encourage the Court to not give a broad order if any

22   order were to issue that would be inclusive of matters that

23   are not financial matters such as there are other matters

24   that I know that the union, AFSCME, and others are a part of

25   seeking FOIA requests from the city, injunctive relief as it

```
 1   relates to these types of matters, and I would ask the Court

 2   to consider not giving such a broad order --

 3              THE COURT:  Um-hmm.

 4              MR. SANDERS:  -- that that type of information could

 5   not be obtained and we could not have a determination as to

 6   the constitutionality of PA 436 by this Court.

 7              THE COURT:  Um-hmm.

 8              MR. SANDERS:  Thank you, your Honor.

 9              THE COURT:  Thank you.  Sir, can you just give me

10   your name again, please?

11              MR. SANDERS:  Herb Sanders.

12              THE COURT:  Mr. Sanders.  Thank you, sir.

13              MR. SCHNEIDER:  May it please the Court, Matthew

14   Schneider, chief legal counsel to the Attorney General.  I'm

15   here on behalf of the State of Michigan.  Your Honor, I'm

16   here for a very, very limited purpose.  As counsel to the

17   debtor has indicated, they are not seeking to abrogate the

18   exceptions in Section 362(b), and I know that this is a

19   motion regarding Section 362, so our position is is that if

20   the Court is, indeed, inclined to grant the motion regarding

21   the stay, that the Court's order reflect that nothing in the

22   Court -- nothing what the Court is doing will actually

23   abrogate the exceptions afforded under 362(b).

24              THE COURT:  Is there a specific exception you're

25   concerned about?
```

# EXHIBIT C

# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

```
-------------------------------------------- x
                                             :
In re                                        :          Chapter 9
                                             :
CITY OF DETROIT, MICHIGAN,                    :          Case No. 13-53846
                                             :
              Debtor.                        :          Hon. Steven W. Rhodes
                                             x
```

## DEBTOR'S BRIEF IN OPPOSITION TO PETITION FOR ORDER LIFTING STAY[1]

Six weeks after the Emergency Manager's appointment became effective, the Plaintiffs filed the Lawsuit seeking a judgment declaring not only the Emergency Manager's appointment to be invalid, but all actions he has taken, including the filing of this chapter 9 case, to be unenforceable. Yet, the Plaintiffs somehow assert that granting them relief from stay to prosecute this Lawsuit to judgment will have "no effect whatsoever on the City's ability to reorganize" because it is "completely unrelated" to the chapter 9 case.  Stay Relief Brief at 3, 8. This is not accurate nor is the timing of the Lawsuit's filing a coincidence. The Stay Relief Motion is nothing more than a thinly veiled attempt to litigate the

---

[1] Capitalized terms not defined in this Brief in Opposition, have the meanings given to them in the City's Objection to Petition for Order Lifting Stay, filed contemporaneously with this brief.

City's eligibility before a different court in circumvention of the Court's Stay Extension Order and the process this Court adopted to resolve eligibility objections. The Plaintiffs have not identified any cause, much less sufficient cause, to allow them to proceed with the Lawsuit. Accordingly, the Stay Relief Motion must be denied.

## ARGUMENT

In support of the Stay Relief Motion, the Plaintiffs advance three arguments: (1) the Stay Extension Order does not apply to the Lawsuit, either because it did not specifically identify the Lawsuit or because it cannot be read so broadly as to include the Lawsuit; (2) the Court did not have the authority to enter the Stay Extension Order; (3) the Plaintiffs have demonstrated cause for relief from the Automatic Stay. None of these arguments have any merit.

## I.      The Stay Extension Order Applies to the Lawsuit

The Plaintiffs misunderstand or misconstrue the relief granted in the Stay Extension Order. The Lawsuit is precisely the type of case that the Stay Extension Order was intended to cover and, contrary to the Plaintiffs' assertions, it does not provide the Defendants "complete immunity from all litigation." Stay Relief Brief at 9.

The Plaintiffs devote much of the Stay Relief Motion in a misguided attempt to argue that only a limited set of actions within the definition of "Prepetition

- 2 -

13-53846-swr    Doc 2678-5    Filed 02/07/14    Entered 02/07/14 14:02:02    Page 56 of 154
13-53846-tjt    Doc 2673-5    Filed 02/07/14    Entered 02/07/14 16:42:04    Page 56 of 118    209
507

Lawsuits" are covered by the Stay Extension Order. The Plaintiffs reason that, because the Lawsuit is not covered by the definition of "Prepetition Lawsuits," that case is not subject to the Stay Extension Order. Stay Relief Brief at 8.

The Plaintiffs quote only paragraph 3 of the Stay Extension Order which states: "For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed, pursuant to section 105(a) of the Bankruptcy Code, pending further order of this Court." This statement clarifies that a small group of three "Prepetition Lawsuits" are included in the relief granted and therefore are stayed. But nowhere does this statement limit the scope of the relief sought or obtained so that it would apply only to these three Prepetition Lawsuits.

The primary relief is granted in the prior paragraphs of the Stay Extension Order. Paragraph 1 states, without reservation or limitation of any kind, that the Stay Extension Motion is "granted." Paragraph 2 of the Stay Extension Order then states broadly that:

> Pursuant to section 105(a) of the Bankruptcy Code, the Chapter 9 stay hereby is extended in all respects (to the extent not otherwise applicable) to the State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), the Non-Office Employees and the City Agents and Representatives.

As such, the Stay Extension Order makes clear that the Automatic Stay was extended to the Governor and Treasurer to stay any and all cases that "have the

- 3 -

13-53846-tjt   Doc 2675-5   Filed 02/07/14   Entered 02/07/14 14:02:02   Page 57 of
13-53846-swr   Doc 2012-5   Filed 02/07/14   Entered 02/07/14 16:04:04   Page 57 of   210
157

direct or practical effect of denying the City the protections of the" Automatic Stay so as to aid the City in the administration of its bankruptcy case and ensure the City is afforded the breathing spell it needs to focus on developing and negotiating a plan for adjusting its debts. See Stay Extension Motion at ¶ 15. This District Court judge in the Lawsuit agreed, finding, after review of an objection by the Plaintiffs, that "the plain language of the stay order would apply to this lawsuit."[2] Stay Relief Motion, Exhibit A.

If the Lawsuit were to continue, and if the District Court were to grant judgment in favor of the Plaintiffs, it is almost certain that the Plaintiffs (and others) would argue before this Court that the decisions and actions of the Emergency Manager – including the filing and prosecution of this chapter 9 case – are void and of no effect. Reading the prayer for relief in the Amended Complaint is all that is necessary to reach that conclusion. Reduced to its basics, the Lawsuit is yet another vehicle to challenge the City's eligibility for chapter 9 relief or otherwise attempt to interfere with the City's restructuring efforts. Such a result

---

[2] The Plaintiffs may not re-litigate this issue in this Court. See e.g., Georgia-Pacific Consumer Products LP v. Four-U-Packaging, Inc., 701 F.3d 1093, 1098 (6th Cir. 2012) (holding that issue preclusion precludes relitigation where (1) the precise issue was raised and litigated in the prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceedings; (3) the prior proceedings resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought had a full and fair opportunity to litigate the issue in the prior proceeding).

- 4 -

13-53846-swr   Doc 2678-5   Filed 02/07/14   Entered 02/07/14 14:02:02   Page 58 of 211
13-53846-swr   Doc 2678-5   Filed 02/07/14   Entered 02/07/14 14:02:02   Page 58 of
154

would have the direct and practical effect of denying the City the protections of the Automatic Stay and "interfere with the City's activities in this chapter 9 case" (Stay Extension Motion at ¶ 20) – the precise result that the Stay Extension Order was seeking to avoid. Furthermore, this Court has assiduously and correctly endeavored to consolidate all possible objections to the eligibility of the City to seek chapter 9 relief before it and to avoid the exact result that would be occasioned if stay relief were to be granted to the Plaintiffs to permit an attack on PA 436 and all that implicates. Thus, the Plaintiffs' arguments that either the Stay Extension Order does not apply to the Lawsuit or that it is too broad to be enforced, fail. Stay Relief Brief at 9. Accordingly, as the District Court has already found, the Stay Extension Order applies to the Lawsuit.

## II. The Court Had Authority to Enter the Stay Extension Order

The Plaintiffs also argue that the Court did not have the authority to enter the Stay Extension Order. This is nothing more than a collateral attack upon the Stay Extension Order. Similar arguments were timely raised by other parties and rejected by this Court.[3] As the Plaintiffs recognize, a bankruptcy court may

---

[3] Other parties have raised similar objections to the Stay Extension Motion. <u>See</u> Dkt. No. 84 (the "<u>AFSCME Objection</u>"), ¶ 45-46 (arguing no identity of interests between the City and State Entities); Dkt. No. 141 (the "<u>Retirement Systems Objection</u>"), pp. 16-17 (same, and adding the argument that "[a] judgment obtained in any one of [certain pre-petition lawsuits against the Governor, the Emergency Manager, and others] will not be a judgment against the City. . . ."); <u>see also</u> Dkt. No. 146 (the "<u>Flowers Objection</u>"), ¶ 4 (arguing that "[a]t no point have the

*Continued on next page.*

- 5 -

13-53846-swr   Doc 2675   Filed 02/07/14   Entered 02/07/14 14:02:32   Page 59 of
                                                         154
13-53846-swr   Doc 2075-3   Filed 02/07/14   Entered 02/07/14 14:02:32   Page 59 of 212

extend the automatic stay where "there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor." In re Eagle-Picher Indus., Inc., 963 F.2d 855, 861 (6th Cir. 1992) (quoting A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 999 (4th Cir. 1986)). The Lawsuit seeks a judgment against the Defendants declaring not only the Emergency Manager's appointment to be invalid, but all actions he has taken, including the filing of this chapter 9 case, to be unenforceable. Thus, any judgment against the Defendants would in effect be a judgment or finding against the City. As a result, under well-established Sixth Circuit precedent, this Court had the authority to enter the Stay Extension Motion. The Plaintiff's arguments to the contrary must be rejected.

## III. No Cause Exists to Grant Plaintiffs Relief from the Automatic Stay

Section 362(a) of the Bankruptcy Code provides in relevant part that:

> a petition filed under . . . this title . . . operates as a stay, applicable to all entities, of . . . the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the

---

*Continued from previous page.*
*Flowers* plaintiffs sued . . . or sought any relief against" the City, its officials, or employees). The Debtor addressed these arguments in its reply (Dkt. No. 128, ¶¶ 6-8). The Plaintiffs add nothing to this issue by raising these same arguments again.

debtor that arose before the commencement of the case . .
. .

11 U.S.C. § 362(a).  The Automatic Stay "is one of the fundamental debtor

protections provided by the bankruptcy laws. It gives the debtor a breathing spell

from his creditors.  It stops all collection efforts, all harassment, and all foreclosure

actions." <u>Javens v. City of Hazel Park (In re Javens)</u>, 107 F.3d 359, 363 (6th Cir.

1997) (quoting H.R. REP. NO. 95-595, at 340 (1978), reprinted in 1978

U.S.C.C.A.N. 5787, 6296).

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to

grant relief from the Automatic Stay in limited circumstances.  <u>See</u> 11 U.S.C. §

362(d).  In particular, section 362(d)(1) of the Bankruptcy Code provides that a

party in interest may obtain relief from the Automatic Stay "for cause, including

the lack of adequate protection of an interest in property of such party in interest."

11 U.S.C. §362(d)(1).

"The Bankruptcy Code does not define 'cause' as used in [section]

362(d)(1).  Therefore, under [section] 362(d), 'courts must determine whether

discretionary relief is appropriate on a case by case basis.'"  <u>Chrysler LLC  v.

Plastech Engineered Prods., Inc. (In re Plastech Engineered Prods., Inc.)</u>, 382 B.R.

90, 106 (Bankr. E.D. Mich. 2008) (<u>quoting</u> <u>Laguna Assocs. L.P. v. Aetna  Casualty

& Surety Co. (In re Laguna Assocs. L.P.)</u>, 30 F.3d 734, 737 (6th Cir. 1994)).  The

determination of whether to grant relief from the Automatic Stay "resides within

the sound discretion of the Bankruptcy Court." Sandweiss Law Center, P.C. v.

Kozlowski (In re Bunting), No. 12-10472, 2013 WL 153309, at *17 (E.D. Mich.

Jan. 15, 2013) (quoting In re Garzoni, 35 F. App'x 179, 181 (6th Cir. 2002)).

> To guide the bankruptcy court's exercise of its discretion
> . . . the Sixth Circuit identifies five factors for the court to
> consider: (1) judicial economy; (2) trial readiness; (3) the
> resolution of the preliminary bankruptcy issues; (4) the
> creditor's chance of success on the merits; and (5) the
> cost of defense or other potential burden to the
> bankruptcy estate and the impact of the litigation on other
> creditors.

Bunting, 2013 WL 153309, at *17 (quoting Garzoni, 35 F. App'x at 181) (internal

quotation marks omitted).  In determining whether cause exists, however, "the

bankruptcy court should base its decision on the hardships imposed on the parties

with an eye towards the overall goals of the Bankruptcy Code."  Plastech, 382 B.R.

at 106 (quoting In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995)).

Here, consideration of the these factors confirms that no cause (much less

sufficient cause) exists to justify relief from the Automatic Stay to allow the

Lawsuit to proceed.  With respect to the first factor, the interests of judicial

economy weigh heavily in favor of denying the Stay Relief Motion.  Numerous

parties have raised similar eligibility issues in this chapter 9 case[4] (the Plaintiffs

not being one of them) that the Plaintiffs seek to litigate in the Lawsuit in front of

---

[4] See e.g., The City's Consolidated Reply to Objection to the Entry of an Order for
Relief at 38-44, 89, 95-96, 98. [Dkt. No. 765].

- 8 -
13-53846-tjt   Doc 2678-5   Filed 02/07/14   Entered 02/07/14 14:02:32   Page 63 of
215
13-53846-swr   Doc 2002-5   Filed 02/07/14   Entered 02/07/14 14:02:32   Page 63 of
150

the District Court.   As this Court emphasized, litigating eligibility issues in two different courts, simultaneously "does not promote judicial or party efficiency; it is the antithesis. The most efficient way to litigate eligibility in this case is in one court – the bankruptcy court – and then on appeal in the next." Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 19. [Dkt. No. 1039].  Accordingly, judicial economy dictates staying the Lawsuit so as to permit this Court to address the PA 436 Eligibility Objections in the single, unified context of the eligibility trial.

With respect to the second factor, the Lawsuit is in its preliminary stages. The Defendants' motion to dismiss remains pending.  No discovery has been taken.  Thus, the Lawsuit has not even advanced beyond the pleading stage and is not trial ready.  The third factor also weighs in favor of denying the Stay Relief Motion as the Court has not even resolved the City's eligibility for relief in this chapter 9 case.  Nothing could be more basic or preliminary to the ultimate outcome.

Further, concerning the fourth factor, as set forth in the Defendants' motion to dismiss and in the Defendants' Opposition to the Stay Relief Motion, the Plaintiffs have not demonstrated a likelihood of success on the merits.

Finally, the fifth factor weighs in favor of denying the Stay Relief Motion. Although the City is not currently a party in the Lawsuit, the impact that the

Lawsuit may have on the City and its restructuring efforts may require the City to intervene or otherwise become further involved and take other actions if the Stay Relief Motion is granted. Requiring the City to defend the Lawsuit in the District Court would distract the City from its efforts to restructure, diverting its limited resources at a time when it is both working to negotiate and deliver a plan of adjustment quickly and engaged in a substantial amount of discovery and litigation (all on its own expedited timeframe) arising in the bankruptcy case itself. The City does not need further impediments to its restructuring efforts. This Court has consistently endeavored to bring all matters which may affect the eligibility of the City before it and have the issues resolved in one forum. Allowing the Lawsuit to proceed in the District Court would cast uncertainty[5] over the eligibility and restructuring process and may chill negotiations among the parties or adversely affect the confirmation of the plan of adjustment.

In short, allowing the Lawsuit to proceed would undermine the protections of the Automatic Stay and interfere with the City's efforts to restructure. The City sought relief under chapter 9 in part to obtain the "breathing spell" afforded by the

---

[5] This Court acknowledged that the uncertainty occasioned just by the eligibility objections already before it will likely slow, if not stall entirely, the "City's progress in recovering its financial, civic, commercial, and cultural life and in revitalizing itself." Opinion and Order Denying Motion to Stay Proceedings Pending Determination of Motion to Withdraw the Reference at 23. [Dkt. No. 1039]. Having the City's eligibility adjudicated simultaneously in two courts obviously compounds that uncertainty.

13-53846-swr   Doc 2652-5   Filed 02/17/14   Entered 02/17/14 14:22:32   Page 64 of 73
13-53846-swr   Doc 2093-5   Filed 12/27/13   Entered 12/27/13 14:28:04   Page 64 of 73 217
1557

Automatic Stay and the consequent protection from its creditors while it restructures its affairs and prepares a plan of adjustment. The City's finances would be further depleted and its personnel distracted from their mission to operate the City for the benefit of its citizens and restructure its affairs if it were denied this basic protection of chapter 9 and forced to defend itself against the Plaintiffs so early in the case. Accordingly, the overall goals of chapter 9 weigh largely in favor of denying stay relief to the Plaintiffs.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Court (a) deny the Stay Relief Motion; and (b) grant such other relief to the City as the Court may deem proper.


Dated: September 26, 2013          Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com


Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .        Docket No. 13-53846
        MICHIGAN,                 .
                                  .        Detroit, Michigan
                                  .        October 2, 2013
                Debtor.           .        10:00 a.m.
. . . . . . . . . . . . . . . . .

HEARING RE. AMENDED MOTION OF CREDITOR DEBORAH RYAN,
AN INTERESTED PARTY, FOR RELIEF FROM THIS COURT'S ORDER
STAYING PROCEEDINGS; MICHIGAN COUNCIL 25 OF THE AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, MOTION FOR ENTRY OF AN ORDER MODIFYING THE
AUTOMATIC STAY SOLELY TO ALLOW ADMINISTRATIVE LAW JUDGE
TO EXECUTE HIS OPINION AND LIQUIDATE DAMAGE AWARD BEFORE
HE RETIRES ON OCTOBER 4, 2013; PETITION FOR ORDER
LIFTING STAY
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  HEATHER LENNOX
                     222 East 41st Street
                     New York, NY  10017
                     (212) 326-3837

                     Miller, Canfield, Paddock & Stone, PLC
                     By:  ERIC D. CARLSON
                          TIMOTHY FUSCO
                     150 West Jefferson, Suite 2500
                     Detroit, MI  48226
                     (313) 963-6420

For Deborah Ryan:    Goodman & Hurwitz, P.C.
                     By:  WILLIAM GOODMAN
                     1394 East Jefferson Avenue
                     Detroit, MI  48207
                     (313) 567-6170

For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

13-53846-swr  Doc 2672-5  Filed 02/17/14  Entered 02/17/14 14:22:02  Page 67 of
13-53846-swr  Doc 2673-5  Filed 02/17/14  Entered 02/17/14 14:32:04  Page 67 of 220
157

APPEARANCES (continued):

```
For AFSCME,          Miller Cohen, PLC
AFL-CIO:             By:  RICHARD G. MACK, JR.
                     6700 West Lafayette Blvd., 4th Floor
                     Detroit, MI  48226-3191
                     (313) 964-4454

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  SHANNON L. DEEBY
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5889
Retirement System
of the City of Detroit:

For Detroit Branch   MELVIN BUTCH HOLLOWELL
NAACP:               8220 Second Avenue
                     Detroit, MI  48221
                     (313) 207-3890

For Arab-American    Nabih H. Ayad & Associates, P.C.
Civil Rights         By:  NABIH H. AYAD
League, Ayad Law,    2200 North Canton Center Road, Suite 220
PLLC:                Canton, MI  48187
                     (734) 983-0500

For the State of     Michigan Department of Attorney General
Michigan:            By:  NICOLE A. GRIMM
                     525 West Ottawa Street
                     P.O. Box 30736
                     Lansing, MI  48909
                     (517) 373-6434

Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

13-53846-tjt   Doc 2672-5   Filed 02/17/14   Entered 02/17/14 14:22:02   Page 68 of
13-53846-swr   Doc 2672-5   Filed 02/17/14   Entered 02/17/14 14:22:04   Page 321 of 221
507

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  One moment, please.  Okay.  So is it

4     okay with everyone if we proceed with the motion for relief

5     from the stay filed by Deborah Ann Ryan?

6          MR. GOODMAN:  William Goodman, your Honor.  We're

7     ready.

8          THE COURT:  Okay.  Step forward, please, sir, and

9     you may begin.

10          MR. GOODMAN:  May I ask if I may have my client sit

11     closer so that she can hear the proceedings?

12          THE COURT:  Sure, sure, absolutely.

13          MR. GOODMAN:  Step forward, Ms. Ryan.

14          THE COURT:  I wonder if you could make room for Ms.

15     Ryan at counsel table there.

16          MR. GOODMAN:  Good morning, your Honor.  My name is

17     William Goodman, and I represent Mrs. Ryan, who is a

18     petitioner in this matter.  And I know the Court is

19     unfamiliar with me, but I am -- I have attended a few of

20     these proceedings, and I'm well-aware of the attention that

21     the Court has paid to other pleadings that have been filed

22     and presume that the same is true for these as well.

23          THE COURT:  Yes, sir.

24          MR. GOODMAN:  So I will not impose or reiterate

25     everything that has been said; however, I thought that for

13-53846-swr   Doc 2672-5   Filed 02/10/14   Entered 02/10/14 14:32:02   Page 69 of
13-53846-swr   Doc 2672-5   Filed 02/10/14   Entered 02/10/14 14:32:04   Page 69 of   222
501

1   just a few moments, since the issue of whether or not there

2   is a likelihood of success for the creditor, Mrs. Ryan, in

3   this case, has been put in issue, I might just address it for

4   a moment.  As Jack Webb used to say, just the facts and, more

5   pertinently, just the stark facts in this matter.

6           Mrs. Ryan is the personal representative of the

7   estate of her daughter, Patricia Williams, who was murdered

8   on September the 22nd, 2009, by her then husband, who,

9   immediately after he murdered her extremely brutally, killed

10  himself.  This is a situation which had been building up for

11  at least a couple of days.  It involves two sets of

12  defendants, those -- the police officials from these --

13  Township of Canton as well as from the City of Detroit.  At

14  first the Canton Township responded and finally eventually

15  learned the identities of the domestic violence victim and

16  the perpetrator, and the perpetrator -- both, in fact, were

17  Detroit police officers.  Canton then essentially turned the

18  matter over to Detroit and in so doing failed to enforce the

19  law as we say it should have been enforced, violated the

20  equal protection clause, we are claiming, and thereby created

21  a cause of action under Section 1983 against Canton.  That is

22  not pertinent today other than the fact that those facts are

23  so intertwined with the facts involving the City of Detroit

24  because what Canton did was turn the matter over and the

25  decision as to what to do with Mr. Williams over to the City

13-53846-tjt  Doc 2672-5  Filed 02/07/14  Entered 02/07/14 14:32:02  Page 70 of
13-53846-swr  Doc 2672-5  Filed 02/07/14  Entered 02/07/14 14:32:04  Page 70 of 223
154

1  of Detroit, which essentially, without any basis whatsoever,

2  asserted to Canton he's mentally fine.  He had left a suicide

3  note in addition to having beaten up his wife, waved a gun

4  around and consumed a bottle of alcohol in a short period of

5  time, that he was mentally fine, that he was ready to use a

6  gun -- he was going to the range, in fact, the very next

7  day -- and not to worry and to cancel the LEIN notice that

8  Canton had posted.  Canton officers have testified that had

9  that notice not been canceled, they would have tracked him

10  down -- pinged him, I think is the phrase that law

11  enforcement uses -- and thrown him into a psychiatric unit.

12        None of that happened, and, therefore, this

13  generated a 14th Amendment claim under the substantive due

14  process theory of what is called state-created danger.  And

15  we've cited the Kallstrom case, which is the leading case in

16  the Sixth Circuit on this point, with the cause -- with the

17  basis for that cause of action.

18        There are cases against two individual officers,

19  actually supervisors, Sergeant Kozloff and Inspector

20  Blackmon, and, in addition, there's a case against the City

21  of Detroit, which is called a custom and policy case, a Monel

22  case, which is based upon the fact that Detroit had -- and

23  I've attached to our papers a force investigation report,

24  which acknowledges this -- the highest ratio or the highest

25  proportion of police officer suicides in the United States.

1    Nonetheless, there was no policy.  There was no training.

2    There was no guidelines whatsoever for supervisors to deal

3    with officers who were undergoing non-duty-related stress

4    that could require hospitalization or affect their duties.

5    In fact, someone who wanted help, who wanted the lifeline of

6    the -- an assistance telephone number that the police

7    department put up to its officers, if they tried to make a

8    telephone call, that number was disconnected.

9          So this then -- and, in fact, in addition, Officer

10    Williams himself was, I think, a problematic officer.  He was

11    described by deputy chief of the Detroit Police Department,

12    James Tolbert, as someone who showed a pattern of

13    disobedience throughout his history, who was disruptive, who

14    basically refused to follow rules and regulations.  That's

15    who he was, and, nonetheless, they gave him a clean bill of

16    health and told Canton, yes, drop your LEIN notice.  That

17    is -- I think, meets the tests of the <u>Kallstrom</u> case and

18    establishes a valid state-created danger claim.  All of this,

19    by the way, has been established, as we have pointed out,

20    through extensive discovery, which we have taken, numerous

21    depositions, almost 30, and, as I indicated in our papers,

22    this matter has been teed up, in fact, argued -- we are

23    waiting for an opinion from Judge Goldsmith as to the Canton

24    defendants, and he has told us what his decision is going to

25    be, but he hasn't rendered an opinion, so I think it would be

13-53846-swr   Doc 2672-5   Filed 02/07/14   Entered 02/07/14 14:32:02   Page 72 of 225
13-53846-swr   Doc 2673-5   Filed 02/07/14   Entered 02/07/14 14:38:04   Page 72 of 225
157

1   improper for me to state that now, although if asked I would.

2        And we were just about ready to file a response to

3   the city's papers to the motion for summary judgment, and I

4   think somewhat unfairly the city points to its papers to show

5   that we have a small likelihood of success in the underlying

6   matter without our ever having had a chance to file a

7   response because we were basically cut short on that by this

8   filing in this case.  Nonetheless, as I've stated, I think

9   the facts -- every one of the facts that I asserted today and

10   many more can be documented and proven, and there's certainly

11   a factual question as to each of them.

12        Now, this motion, I think, involves an unusual claim

13   in that what we are saying here is that a stay will diminish

14   my client's rights under Section 1983 of the Civil Rights Act

15   and, therefore, directly under the 14th Amendment.  She has

16   rights to full compensation, to an orderly process, to have

17   her case heard, to not have it delayed or diminished or

18   divided up in any way.  And by extending the stay to her, her

19   rights have been affected, and, therefore, her -- in effect,

20   the stay to Mrs. Ryan, both the stay as to the City of

21   Detroit and the extended stay as to the individual Detroit

22   officers, violates her Constitutional rights.

23        And I think the argument has been elaborated fairly

24   successfully in our papers.  If the Court has any questions,

25   I'd be happy to answer them, but I will say this.  The

1  purpose of Section 1983 to pursue these kinds of actions is
2  not only to compensate victims and fully and completely
3  compensate them, but it is, too, as a mechanism that Congress
4  has created to enforce the Constitution so that people's
5  rights are not violated.  Without it, there would be,
6  Congress has determined, additional violations, further
7  violations by state officials of people's constitutional
8  rights, 14th Amendment rights, and other rights as well.

9       A stark example of this -- I think this is a stark
10  example, but perhaps a simpler example would be if some
11  benighted community somewhere, having not heard about the
12  civil rights movement or the Civil Rights Act of 1964, or
13  something else still maintained public facilities that were
14  segregated, and then that municipality goes into bankruptcy,
15  and a lawsuit is brought to -- for damages perhaps and to
16  desegregate those facility -- for injunctive relief to
17  desegregate those facilities.  The municipality could easily
18  say this is going to cost us money to undertake this kind of
19  major change in our operations at this time.  Nonetheless, it
20  would be completely violative of the 13th, 14th, and 15th
21  Amendment for a stay in bankruptcy to operate in such a way.
22  In that respect, really Mrs. Ryan's rights are no different.
23  Her rights or her daughter's rights were violated fairly
24  blatantly by actions of the City of Detroit, and, as a
25  result, we have sought relief in front of Judge Goldsmith and

1   seek to continue that relief.

2           Now, in addition to the constitutional arguments,

3   which I think I have -- as I said, I've alluded to today, and

4   I think --

5           THE COURT:  Well, but why wouldn't the law

6   distinguish between an ongoing violation that demands remedy

7   from this case?

8           MR. GOODMAN:  Well, the law does distinguish between

9   those kinds of situations.  Clearly there's different kinds

10  of relief.  There's injunctive relief.  There are damages.

11  There are distinctions obviously, and I agree with the Court

12  in that respect.  However, I do not think that the cases

13  which say that the federal courts -- Article III courts are

14  the way to proceed to enforce these rights is -- acknowledge

15  that simply because this is an action for damages, the person

16  who has been so injured can wait and that that diminution of

17  their case, the diminution of their compensation and,

18  therefore, their ability to fully enforce the Constitution is

19  acceptable.  I understand what the Court is saying, that

20  there are distinctions, of course, but the other point -- the

21  point that I made initially continues to be the case.  If law

22  enforcement officers or other public officials know that they

23  are not going to be subjected to deposition questioning,

24  judgment by judges and juries, and forced to pay

25  compensation, this is a way in which these constitutional

 1   rights will be diminished and violations will increase, so in

 2   that sense I think that there is a similarity between the

 3   two.

 4          THE COURT:  To the extent the law would recognize

 5   that concern, wouldn't it -- couldn't it be addressed by

 6   granting relief from the stay to allow you to liquidate your

 7   claim -- that is, to fix the amount of the claim -- without

 8   allowing you to actually collect on the claim against the

 9   city?

10          MR. GOODMAN:  If I understand your question, what

11   you are asking is a reiteration of an argument or something

12   that I read in the debtor's papers here, which is that

13   doesn't do Mrs. Ryan any good simply to have a new form of

14   claim in the form of a liquidated claim.  That's what I

15   understand you to be asking.  Am I more or less in the right

16   area, your Honor?

17          THE COURT:  Well, sure.

18          MR. GOODMAN:  I think I --

19          THE COURT:  I mean you suggest that her rights under

20   the 14th Amendment are or would be diminished by a stay

21   because the officers involved and the city itself wouldn't be

22   called through the evidentiary process to account for what

23   may have happened here, so my question is if that's a

24   concern, why not just allow that to proceed but with the idea

25   that the collection on the judgment, just like the collection

1  on all the other debts of all the other creditors in this
2  case, needs to wait for a confirmed plan?

3      MR. GOODMAN:  My response to that is that possibly
4  that is a very partial solution to the issues I've raised,
5  but in a broader context, there's still -- Mrs. Ryan still
6  has a claim against the Canton defendants, and as I think I
7  mentioned --

8      THE COURT:  They're not stayed, are they?

9      MR. GOODMAN:  No, they are not stayed, absolutely
10 not.  However, one of the things -- I address this in my
11 reply, and I filed it late yesterday afternoon, and I
12 apologize if it did not get to the Court in time to review
13 it.

14     THE COURT:  Oh, no.  We got it.  We read it.

15     MR. GOODMAN:  Well, what I said there in response to
16 that is that there is an additional interest here, which is
17 the interest of -- there are conflicts between these
18 defendants.  There are who's telling -- you know, who's
19 telling the --

20     THE COURT:  Right.

21     MR. GOODMAN:  -- truth, things like that, that can
22 best be resolved by having it heard in one forum, format, and
23 so on.

24     THE COURT:  Um-hmm.

25     MR. GOODMAN:  And -- well, I've already -- the Court

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 77 of
13-53846-swr   Doc 2616-5   Filed 02/17/14   Entered 02/17/14 18:08:04   Page 230 of
230
157

1   is not --

2       THE COURT:  This solution would address that concern

3   as well, wouldn't it?

4       MR. GOODMAN:  I suppose that it would.  I suppose

5   that it would address that concern.  Whether -- let me put it

6   this way.  I would accede to the Court's suggestion in this

7   regard, if it is a suggestion, but not give up the

8   opportunity to subsequently argue in the -- in light of a

9   verdict at some point that we are entitled to immediately --

10      THE COURT:  Well, let me ask you about that.  Is

11  there any case law that holds that the imposition of an

12  automatic stay violates the 14th Amendment when it delays

13  collection on a valid constitutional claim such as you assert

14  you have here?

15      MR. GOODMAN:  As the Court may know, I've practiced

16  law for almost 50 years.  I have very little familiarity with

17  this particular area of the law.  However, I have not been

18  able to find any such case.

19      THE COURT:  Okay.  Anything further, sir?

20      MR. GOODMAN:  I don't have anything further at this

21  time, your Honor.  Thank you.

22      THE COURT:  All right.  Let me hear from the city

23  then.

24      MR. CARLSON:  Your Honor, Eric Carlson from Miller

25  Canfield on behalf of the City of Detroit.

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 78 of
13-53846-swr   Doc 2616-1   Filed 02/12/14   Entered 02/12/14 14:42:04   Page 230 of   231
507

1          THE COURT:  Sir.

2          MR. CARLSON:  I, likewise, will be brief because I

3    know the Court has read the papers, but I would like to take

4    the opportunity to do three things.  I'd like to highlight a

5    few things in our objection, respond to the reply that was

6    filed late yesterday on a couple items, and then spend a

7    brief moment replying to some of the oral arguments that were

8    made.

9          As we highlighted in our objection, the automatic

10   stay is one of the fundamental principles and protections

11   afforded by bankruptcy.  It's key to give the city a

12   breathing spell, to give them the opportunity to try and put

13   together a plan of adjustment.  The city right now is engaged

14   in a significant number of activities, including eligibility

15   and discovery process that's on a very tight timeline, as the

16   Court knows.

17         THE COURT:  Well, let's pause there --

18         MR. CARLSON:  Sure.

19         THE COURT:  -- and ask whether it's the same

20   attorneys who are dealing with that tight time frame as would

21   be dealing with Ms. Ryan's claims --

22         MR. CARLSON:  You know, I don't know the --

23         THE COURT:  -- under the impression -- and correct

24   me if I'm wrong -- that it was corporate counsel's -- or

25   corporation counsel's office who would be dealing with a

1   personal injury claim or a constitutional claim like this

2   one.

3        MR. CARLSON:  That could be to some degree true;

4   however, your Honor, as you well know probably in discovery

5   proceedings, it's the city and its in-house counsel that has

6   the vast knowledge and resources to be able to gather

7   discovery information and provide it to corporate counsel

8   upon, you know, the need, so even if there is limited

9   overlap, there is clearly overlap, and there is

10  responsibility being had by in-house counsel with respect to

11  these issues.  And the distraction --

12       THE COURT:  Is it your representation to the Court

13  that the individual or individuals who would be assigned to

14  shepherd the city's defense of this injury claim, this

15  constitutional claim, through trial would have

16  responsibilities in this Chapter 9 proceeding?

17       MR. CARLSON:  I can't answer that directly, your

18  Honor.  I haven't asked my -- I haven't asked my client that

19  question, but I would assume for logical reasons that there

20  are individuals that would be involved in this case who also

21  are being asked questions on a daily basis.  For instance,

22  okay, this is Number 12, I think, of the relief from stay

23  motions.  I know I relied on this individual to defend this

24  action.  No doubt there are other actions in this bankruptcy

25  that are coming that this individual would be asked to opine

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 80 of
13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:04   Page 80 of
157   233

1  on and help assist with.

2       THE COURT:  Okay.

3       MR. CARLSON:  Tragic set of facts, your Honor, very

4  sad, but with all due respect to opposing counsel, that's not

5  the issue.  The issue for this Court to consider is cause.

6  Cause is defined in this jurisdiction or at least outlined by

7  five factors that the Court is to consider, and the facts and

8  the merits of the case are but one factor.  There are other

9  factors to consider, and as the Plastech Court stated, the

10  overall decision that this Court has to make is a weight of

11  the hardships between the two parties with the eye on the

12  overall goal of the Bankruptcy Code.  And I would submit that

13  at this premature or very early stage in this proceeding, the

14  hardship on the city outweighs the hardship on the plaintiff.

15  That said, the stay doesn't deny her her claims.  The stay

16  doesn't prohibit the claims.  The stay doesn't terminate the

17  claims.  It just stays the claims.  And at a future date

18  maybe there's a -- maybe there's justification to liquidate

19  it in the state court.  That's not the point.

20       THE COURT:  When is that?

21       MR. CARLSON:  I would submit, your Honor, that, at a

22  minimum, it would be after eligibility is determined, and

23  more likely and more logical, it would be after some sort of

24  claims resolution process has been put forth and agreed upon

25  because this is one of --

13-53846-tjt   Doc 2672-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 81 of
507
13-53846-swr   Doc 2618-1   Filed 02/07/14   Entered 02/07/14 18:02:04   Page 236 of   234

 1            THE COURT:  All right.  Let's talk about that.

 2            MR. CARLSON:  Okay.

 3            THE COURT:  I asked in our initial status conference

 4    way back when what the city's plan was to deal with tort

 5    claims, and I'm going to just sort of generically include

 6    this kind of a claim within that category.  Didn't really get

 7    an answer, and I want to ask it again.  This case is only one

 8    of --

 9            MR. CARLSON:  700.

10            THE COURT:  -- hundreds.

11            MR. CARLSON:  Um-hmm.

12            THE COURT:  What's the plan?

13            MR. CARLSON:  My understanding is it's being worked

14    along with everything else in this case right now and will be

15    set forth in a short period of time.  I can't speak directly

16    to exactly what the plan is right now because I'm personally

17    not involved in that process; however --

18            THE COURT:  Go ahead and take your time and consult

19    because I want an answer to this question.

20            MR. CARLSON:  My colleague's comment, your Honor, is

21    that there will be a process proposed after a claims bar date

22    is set, and part of the process would be to suggest engaging

23    in mediation prior to moving these claims further in

24    litigation, which obviously would save potential time and

25    costs.

 1          THE COURT:  Ms. Lennox, any idea what the city's

 2   intentions are in regard to a claims bar date?

 3          MS. LENNOX:  Your Honor, as your Honor might know --

 4   oh, I'm sorry.  For the record, Heather Lennox of Jones Day.

 5   Earlier this week, we just filed the amended list of the

 6   claims with the amounts, which was very crucial, and it took

 7   a lot of time getting through the city's system with that, so

 8   now that that is filed, we are working on a bar date motion.

 9   We would expect to have it filed promptly, hopefully for

10   hearing in October or late November, and then normally we

11   would ask for like a 60-day --

12          THE COURT:  October or early November?

13          MS. LENNOX:  That would be fine, your Honor,

14   certainly.  We can do that.  And normally we'd like to give

15   folks like 60 days, at a minimum, or whatever the Court might

16   think, certainly 30 at a -- 30 days at a minimum to 60 days

17   to get their claims on file, and then the debtor would have

18   to kind of go through them a little bit and then start the

19   process, so that's kind of our general timing that we've been

20   thinking about, your Honor.

21          THE COURT:  Thank you.  So, Mr. Carlson, apart from

22   what you've already said on the record about counsel's

23   potential involvement in both this case and other cases and

24   the Chapter 9, what other prejudice would there be to the

25   city if the Court granted relief from the stay for purposes

13-53846-swr    Doc 2612-5    Filed 02/10/14    Entered 02/10/14 14:22:32    Page 23 of
13-53846-swr    Doc 2618-5    Filed 04/07/14    Entered 04/07/14 18:02:04    Page 236 of
357
236

1    of liquidating this claim but not collecting on it?

2         MR. CARLSON:  A significant amount of time and

3    effort, your Honor.  Although this case may be ready for

4    trial, by opposing counsel's own admission, it involves a

5    highly complex area of the law.  There have been numerous

6    depositions.  I think he said less -- you know, just shy of

7    30 -- significant discovery, motions for sanctions in the

8    underlying case, I mean a significant contested -- highly

9    contested case.  And the time and energy on the city combined

10   with the costs associated with both representing the city and

11   indemnifying the individual defendants, which is another

12   issue in this motion -- the city is obligated to indemnify

13   and defend those individual defendants -- it is a -- I would

14   submit a major distraction, and as the Court has already

15   mentioned, it's one of 700, so, you know, the question, I

16   guess, I would ask at this point without having a claims

17   procedure process in place is why this one, why now.  It's

18   not -- it's just not the right time, your Honor.

19        Then briefly I'd like to just respond if I could to

20   a couple of things in the reply real quickly, and then I'll

21   address the oral argument.  With respect, real briefly, to

22   the due process argument, your Honor, we did cite to the St.

23   Vincent case in which the Court has ruled on --

24        THE COURT:  Before we move on, I have to ask on this

25   issue of prejudice that you have identified -- and I respect

13-53846-tjt   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 84 of 154
13-53846-swr   Doc 2616-5   Filed 02/10/14   Entered 02/10/14 13:03:04   Page 22 of 63   237
507

1   the fact that this is only one of several hundred,

2           MR. CARLSON:  Sure.

3           THE COURT:  Apart from your statements on the record

4   here, is there any affidavit that I've missed from the city

5   that details or specifies this prejudice that you assert?

6           MR. CARLSON:  The hardships that would be imposed

7   upon the city?

8           THE COURT:  Yes.

9           MR. CARLSON:  Not attached to the papers, no, your

10  Honor.

11          THE COURT:  Or filed at all?

12          MR. CARLSON:  There have been numerous motions and

13  numerous objections, so whether there have been in other

14  objections I can't confirm or deny.

15          THE COURT:  All right.  Go ahead.

16          MR. CARLSON:  With respect to the reply, your Honor,

17  real briefly, again, I highlighted earlier and I just wanted

18  to highlight again because it is an issue that was raised by

19  the motions, the city isn't -- the city is obligated to

20  indemnify and defend the individual defendants.  We believe

21  that the extension stay order, Docket Number 166, clearly

22  addresses and covers nonofficer employees, so the combination

23  of the indemnification as well as the extension stay order

24  clearly means that those proceedings against those

25  individuals should not go forward as well.

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 85 of 238
13-53846-swr   Doc 2618-5   Filed 02/10/14   Entered 02/10/14 16:03:04   Page 23 of
507

 1        And with that, your Honor, you know, I think our
 2    position would be that, again, the motion should be denied,
 3    and at this point it's just too early in the proceeding.
 4        THE COURT:  Any reply, sir?
 5        MR. GOODMAN:  Just briefly.  While it's true that
 6    there are -- I have no reason to disagree with 700
 7    outstanding cases, and many of them, I'm sure, are just,
 8    worthy, and in need of compensation and redress -- there is a
 9    difference analytically in our argument between cases which
10    raise issues under the United States Constitution and the
11    Civil Rights Act of 1871 and common law tort cases, and --
12        THE COURT:  Well, but isn't it true that many of the
13    1983 actions are among those that are filed in this District
14    Court?
15        MR. GOODMAN:  I'm sure that's true and in state
16    court as well, and I'm sure that there are many, although I
17    don't know the number because I don't have access to that,
18    and all we've gotten is a gross numerical accounting, and I
19    do think there's a difference.  That's the only point I would
20    like to make.
21        THE COURT:  Right.
22        MR. GOODMAN:  With regard to the Court's inquiry
23    regarding -- or information that was provided to the Court
24    regarding mediation, I understand that a mediation process in
25    this Court might be somewhat different.  However, this case

13-53846-swr   Doc 2672-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 86 of 239
13-53846-swr   Doc 2616-1   Filed 01/27/14   Entered 01/27/14 18:03:04   Page 20 of
                                    154

1  has already been mediated through -- by a magistrate in this

2  district, and the city's position was that notwithstanding --

3      THE COURT:  Well, all you need say is that the

4  mediation was not successful.

5      MR. GOODMAN:  Well, I'm not going to talk about a

6  number here.  I'm simply going to say that their position was

7  there would be no offers made until their motion for summary

8  judgment was decided, and that, of course, goes to the heart

9  of what we've tried to assert here today in court, so that

10  was all I was trying to bring to the Court's attention.

11  Thank you very much.

12      THE COURT: All right.  Thank you.  All right.  I'm

13  going to take this under advisement and issue a written

14  opinion shortly.

15      The next motion I'd like to hear, if it's okay with

16  everyone, is the motion for relief from stay filed by AFSCME,

17  please.  Is that okay with everybody?

18      MS. LEVINE:  Good morning, your Honor.  Sharon

19  Levine, Lowenstein Sandler, for AFSCME, the American

20  Federation of State, County and Municipal Employees, and Sub-

21  Chapter 98.  Your Honor, I want to clarify what may be a

22  little bit ambiguous in paragraph 22 of our motion.  All we

23  seek here today -- all we seek here today is to let the

24  administrative law judge sign his opinion, if he determines

25  to sign his opinion, before he retires on Friday, so we're

13-53846-tjt  Doc 2612-5  Filed 02/10/14  Entered 02/10/14 14:22:32  Page 27 of
13-53846-swr  Doc 1618-5  Filed 11/07/13  Entered 11/07/13 18:02:04  Page 27 of  240
157

1    not asking the city to do anything further.  We're not asking

2    this Court to do anything further.  We're not doing anything

3    further.  We understand that there's a claims reconciliation

4    process that is going to be teed up and heard by the Court in

5    due course.  We understand that with regard to the

6    eligibility issues and what's going on there, a lot of people

7    are drinking from a fire hose right now, but we don't want to

8    lose this window of opportunity to have the administrative

9    law judge, who has spent a year and a half with this matter,

10   to at least ink his opinion, and then whatever your Honor

11   determines is appropriate from that, including if your Honor

12   determines nothing is appropriate from that, we would be back

13   before this Court on that issue.

14        THE COURT:  Okay.  So, again, just to clarify here,

15   if your motion is granted, what impact would that have on the

16   timing and the deadlines associated with what would normally

17   happen in that context if the bankruptcy weren't filed?

18        MS. LEVINE:  Your Honor, our understanding is that

19   because the automatic stay -- and perhaps your Honor's order

20   could then address this directly, but our understanding is

21   that the automatic stay would toll those deadlines for that

22   period of time that the stay was imposed under 108, but if

23   we're wrong about that, your Honor could address that in the

24   order as well.

25        THE COURT:  You think I have the authority to do

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 29 of
157
13-53846-swr   Doc 2616-5   Filed 02/10/14   Entered 02/10/14 16:08:04   Page 29 of   241

1   that?

2          MS. LEVINE:  Your Honor, I think that -- your Honor,

3   I do believe that under the Bankruptcy Code there is a

4   tolling once the automatic stay is in place under Bankruptcy

5   Code Section 108, and I think that your Honor would have the

6   authority to do that, but the -- but more importantly, I'm

7   not sure that anybody is even suggesting that we go back at

8   this point in time to the MERC or to any other administrative

9   proceeding.  Really our understanding is is that the

10  administrative law judge, as part of this decision, could, if

11  he decides, issue a damage award or at least designate a

12  suggested damage award, and given all that's gone on in front

13  of him, that at some point in time in this case might prove

14  of value to the parties here.

15         THE COURT:  How much in damages -- excuse me -- is

16  your client seeking?

17         MS. LEVINE:  Your Honor, I don't recall the numbers,

18  but it's a substantial -- it's a substantial amount.  I don't

19  have all of the -- I'm not sure that we want --

20         THE COURT:  Approximately.

21         MS. LEVINE:  I'm not sure actually that we want to

22  put a number on the record here.  You know, that's part of

23  that proceeding, and we're not ready to pre-try that issue,

24  but to the extent that he inks a number, it would be a number

25  that would then come back and get treated here or to the --

1       THE COURT:  I thought you had filed a paper with a

2  number in it, and I just couldn't remember what the number

3  was.

4       MS. LEVINE:  Your Honor, I don't mean to be hedging,

5  but my understanding is -- and I'm new to this whole

6  process -- is that it's based upon the percentage of

7  investments, and we gave a range, and that's part of the

8  reason actually why we're looking for the administrative law

9  judge's guidance to the extent he wants to give it.

10       THE COURT:  And what was the range?

11       MS. LEVINE:  Our range was different, your Honor,

12  than the debtor's.  What was the debtor's -- your Honor, if I

13  can introduce to the Court my co-counsel.

14       THE COURT:  Sure.  Sir.

15       MR. MACK:  Richard Mack, your Honor.

16       THE COURT:  Richard --

17       MR. MACK:  Richard Mack, M-a-c-k.

18       THE COURT:  Yes.  Okay.

19       MR. MACK:  I'm the attorney who tried that

20  litigation.

21       THE COURT:  Yes.

22       MR. MACK:  The complication in just identifying a

23  number for your Honor is that it was based upon what were

24  determined to be excess earnings beyond the pension fund's

25  performance in the market, so if the pension fund performed

13-53846-swr   Doc 2612-5  Filed 02/10/14  Entered 02/10/14 14:22:32   Page 90 of
13-53846-swr   Doc 2618-1  Filed 02/17/14  Entered 02/17/14 16:03:04   Page 243 of
154
243

1  beyond 7.9 --

2          THE COURT:  Right.

3          MR. MACK:  -- percent in the market, then that money

4  was to be distributed three ways, as laid out --

5          THE COURT:  Right.

6          MR. MACK:  -- in our supplemental pleadings, so

7  obviously it would depend on this precise investment in the

8  market in the two years at issue here, 2011, 2012, and then

9  one of the ways that we've suggested as a means of obtaining

10  a damage award to the ALJ is assigning an average to that,

11  so --

12          THE COURT:  Yeah.  You were going to go back ten

13  years, do an average.

14          MR. MACK:  Yes.  We cited case law.

15          THE COURT:  So what was your range?

16          MR. MACK:  Well, the percentage is -- I believe it

17  was 54 percent of the excess earnings went to -- again, it

18  depends on the performance in the market in 2011, 2012.  I

19  simply don't have the number.  I think the 2011 year was 18-

20  percent performance in the market.  2012 was -- I think was

21  20-percent performance in the market.  So you would take the

22  percentages above 7.9 for those two years and then divvy up

23  that excess earnings those three ways, so --

24          THE COURT:  Forgive me for not remembering, but did

25  your paper that you filed with the ALJ not calculate all of

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 91 of
13-53846-swr   Doc 2616-1   Filed 02/12/14   Entered 02/12/14 13:02:04   Page 246 of 244
507

```
1   that and come to a bottom line request?  I thought it did.
2           MR. MACK:  We came to a bottom line request on the
3   percentages.
4           THE COURT:  Right.  What was it?
5           MR. MACK:  On the percentages.
6           THE COURT:  Oh, on the percentage.
7           MR. MACK:  Yes.
8           THE COURT:  Not on the amount.
9           MR. MACK:  No.
10          THE COURT:  All right.
11          MR. MACK:  Not on the amount.
12          THE COURT:  Well, then I won't pin you down any
13  further.  Thank you, sir.
14          MS. LEVINE:  Sorry, your Honor, that we don't have a
15  definitive number.  I was hoping maybe it was just outside
16  what I --
17          THE COURT:  In any event, you're not seeking
18  collection of that now.  That's what you're telling the Court
19  and the city.
20          MS. LEVINE:  Your Honor, we're actually seeking less
21  than not even seeking collection of that now.  In other
22  words, my understanding is that once the AL -- once the
23  administrative law judge inks his decision, there's potential
24  for supplemental proceedings outside of this Court's
25  jurisdiction that might further impact that number.  We're
```

13-53846-swr   Doc 2612-5   Filed 04/10/14   Entered 04/10/14 14:22:32   Page 92 of
13-53846-swr   Doc 2618-5   Filed 04/17/14   Entered 04/17/14 14:33:04   Page 92 of   245
507

1   not even asking for that and haven't made any decision, and

2   we're assuming that the state hasn't made any -- and the city

3   hasn't made any decision about any further proceedings

4   either.  Literally we just became aware that the

5   administrative law judge was retiring on Friday, and we're

6   just seeking stay relief till Saturday so that if, in fact,

7   he's inclined to issue this opinion, for whatever we all

8   determine it's worth at a later date, we don't lose the

9   benefit of giving him that opportunity.

10        THE COURT:  Though you're not even sure it's going

11  to happen.

12        MS. LEVINE:  No.  I wouldn't presume to know exactly

13  what the judge will or will not want to do, but I -- but we

14  do understand that this Court -- this case was filed right as

15  he was at the point in that process where we ordinarily would

16  have expected that the opinion would have been issued.

17        THE COURT:  Assuming the opinion is issued and it's

18  consistent with his oral opinion a few months back, what

19  impact would that have or could that have on any ongoing

20  obligation of the city?

21        MS. LEVINE:  Your Honor, our -- your Honor, we

22  suspect it depends what happens after the Chapter 9 and what

23  happens in the plan of adjustment.  In other words, once we

24  all have that knowledge in front of us, we'll be able to

25  react to it, but most importantly, what we --

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:22:32   Page 23 of
13-53846-swr   Doc 2618-1   Filed 02/17/14   Entered 02/17/14 13:08:04   Page 24 of   246
307

1    THE COURT:  Well, let me be more specific.  Will it

2  be your client's position that following the close of this

3  2013 calendar year, the city will have an obligation

4  consistent with what the ALJ has proposed in his oral

5  decision and presumably will memorialize in his written

6  decision?

7    MS. LEVINE:  The answer is, your Honor, that was the

8  position that we took in connection with that litigation.

9  Obviously this is just a recommendation, and then it would go

10  back through a process, and all that is predicated on the

11  fact that obviously it's our view that the pensions can't be

12  adjusted during this proceeding, but, you know, we have yet

13  to see what will come out of the plan of adjustment process,

14  but we're not here waiving any rights with regard to

15  prospective rights, especially prospective rights that we

16  would have had had the stay not been lifted and the

17  administrative law judge not retired.  In other words, our --

18  you know, our expectation is that all we're really looking to

19  do here is take a snapshot of a particular piece of

20  information that may become useful at a future point in time

21  simply because we're not going to have it available to us at

22  that future point in time.

23    THE COURT:  Well, if there's no reason to believe

24  that the written opinion will vary in any significant respect

25  either in terms of result or rationale from what the judge

1   said on the record, why do you need the written opinion?

2          MS. LEVINE:  Two reasons, your Honor.  Number one,

3   we don't know that for a fact.  He has the ability to

4   reconsider whatever it is he would like to reconsider as part

5   of issuing that written opinion, so that could be useful to

6   know.  And, number two, with the supplemental filings, it's

7   my understanding -- and I'm admitting I'm an onlooker as

8   well, but with the supplemental filings, it's possible that

9   we get more clarity with regard to the dollar amount of

10  awards that could be useful or probative should we determine

11  to use them in connection with claims reconciliation and

12  other issues in this case.

13         THE COURT:  The union's underlying claim here was

14  that the city was required to but failed to negotiate this

15  issue.  Yes?

16         MS. LEVINE:  Yes, in part, your Honor, and that --

17  but that there was also damages that flowed from that.

18         THE COURT:  Are you, by which, of course, I mean the

19  union -- is the union and the city still obligated by law to

20  negotiate this issue?

21         MS. LEVINE:  Your Honor, we would hope so, but part

22  of what we're working through in the mediation --

23         THE COURT:  What is your position on whether the law

24  requires negotiation of this issue?

25         MS. LEVINE:  We believe that the law does require

13-53846-swr   Doc 2612-5   Filed 02/07/14   Entered 02/07/14 14:22:32   Page 95 of
13-53846-swr   Doc 2612-5   Filed 02/07/14   Entered 02/07/14 14:22:32   Page 25 of
157
248

1  negotiation of this issue, your Honor, but that is,

2  frankly --

3          THE COURT:  And so you fully intend to still do

4  that?

5          MS. LEVINE:  On a go-forward basis?  Depends upon

6  what kind of stay relief we would get, and we're not asking

7  your Honor to address that issue now.

8          THE COURT:  Well, for example, as part of the claims

9  resolution process.

10          MS. LEVINE:  Well, that's beyond the scope of what

11  we're looking for today.  In other words, it's --

12          THE COURT:  I want your assurance that if the law

13  requires you to negotiate this, you'll do that.

14          MS. LEVINE:  We would be happy to do that, your

15  Honor.

16          THE COURT:  Excellent.

17          MS. LEVINE:  I thought that you were -- I didn't

18  want to go beyond what your -- what we were asking for in

19  terms of the relief.

20          THE COURT:  I get that.  I feel compelled to ask one

21  more question here, and if you want to defer to Mr. Mack,

22  feel free.  Was there anything in writing anywhere, in a

23  contract, in the pension documents, in a city ordinance, in

24  the city charter, that explicitly authorized the pension

25  trustees to make these so-called 13th payments?

13-53846-swr   Doc 2612-5   Filed 02/07/14   Entered 02/07/14 14:23:04   Page 96 of
13-53846-swr   Doc 2618-5   Filed 02/10/14   Entered 02/10/14 16:48:04   Page 250 of
507   249

1       MR. MACK:  Mr. Mack again, your Honor.  Yes.  Our

2   position was that both in the city charter as well as in the

3   contract itself as well as the --

4       THE COURT:  What was the language in them that

5   authorized this?

6       MR. MACK:  It's part of the pleadings, your Honor.

7   If you want, I can take a moment and --

8       THE COURT:  Just summarize.

9       MR. MACK:  It essentially gave the board discretion

10  to establish payments as it saw fit beyond a certain level of

11  estimated earnings in the pension investment system, so what

12  would happen is each year an actuary --

13      THE COURT:  I know what happened.  That wasn't my

14  question.  My question was what authorized what happened.

15      MR. MACK:  Yes.  The charter and the contract.

16      THE COURT:  All right.  Thank you, sir.  Are you all

17  set?

18      MS. LEVINE:  Thank you, your Honor.

19      THE COURT:  Okay.

20      MS. LENNOX:  Good morning, your Honor.  Again,

21  Heather Lennox of Jones Day for the city, for the record.  At

22  first blush, your Honor, this request -- the request that's

23  posed in AFSCME's motion does seem pretty innocuous, but upon

24  further reflection and upon further analysis of the city, we

25  think it has very far-reaching implications for this case and

1   its creditors and the city going forward.  And why is that?
2   First, the practice of the 13th check program and we think
3   the deleterious effects that it's had on the city and on the
4   pension plans themselves has been pretty well-documented, and
5   I don't need to go into it now.  The practice, which in the
6   past was wholly discretionary and we think financially and
7   actuarially unsound, has caused the pension plans to lose as
8   much as 1.9 billion in asset value over the years.  That was
9   in a report presented from an actuary to City Council in
10  2008.  As an investigation of this practice -- an
11  investigation of the practice and the past practices of this
12  has been ordered by the emergency manager, and that
13  investigation is ongoing, but the preliminary report was
14  issued, and it's pretty grim.  We did attach that report,
15  which is a public document, as Exhibit C to our objection.
16  So the City Council finally abolished this discretionary
17  practice in 2011.  As your Honor --
18          THE COURT:  Is that $1.9 billion figure in that
19  report?
20          MS. LENNOX:  It is in the report of Exhibit A to our
21  motion, yes, sir, the report presented to City Council in
22  2008, at page 9, I believe.  As your Honor knows, the pension
23  underfunding issue is one of the most critical issues in this
24  case.  Any claims that may be asserted with respect to the
25  underfunding or claims related to pension benefits are claims

13-53846-swr   Doc 2612-5   Filed 02/10/14   Entered 02/10/14 14:33:04   Page 28 of
13-53846-swr   Doc 2616-5   Filed 02/10/14   Entered 02/10/14 16:02:04   Page 28 of   251
507

1     in this case that we think ultimately should be resolved by

2     this Court.

3           Now, one could take the counter-argument and say,

4     well, look, the administrative law judge heard argument on

5     this issue seven and a half months ago, why not just let him

6     commit it to paper, and maybe it could help the Court decide

7     this issue. Here's why not. The hearing on this issue

8     before the administrative law judge was in February of 2013.

9     That was a full month before the emergency manager was

10     appointed for the city. Since that time, several other

11     relevant things have happened. The collective bargaining

12     agreement has expired. The Michigan Supreme Court has

13     reversed a decision relied on by the administrative law

14     judge. The parties have been permitted several months after

15     that hearing to file additional briefs on which no hearing

16     has been held, and this is important because both parties in

17     their briefs -- and those briefs were attached as exhibits to

18     our objection, your Honor -- both parties recognized the

19     changes in circumstances and the changes in the law since

20     that hearing. In its paper, AFSCME argues for brand new

21     remedies that are inconsistent with past practices because it

22     feared -- and it states this openly -- it feared what an

23     emergency manager might do to affect its claim. The city

24     pointed out that the Michigan Supreme Court reversed the key

25     case that was relied on by the administrative law judge, so

1  it is clear from the papers themselves, your Honor, that

2  neither party would view what the administrative law judge

3  must do here or what is being requested by this relief as

4  simply memorializing what happened and what he said on --

5  February 2013.  AFSCME is arguing for new claim relief, and

6  the city has new legal arguments.  This would have to be a

7  new ruling on new facts with new law without the benefit of a

8  hearing plus, your Honor, I would say that the Michigan

9  Supreme Court's decision in Macomb County versus AFSCME calls

10  into doubt whether the administrative law judge even has

11  jurisdiction or is the proper forum for hearing and resolving

12  this matter.

13       If AFSCME wants to assert and liquidate its claim

14  against the city, we believe it should do so in this forum

15  and in this Court because perhaps the most important thing

16  that has changed since February 2013 is that the city has now

17  filed a Chapter 9 case, but we don't even need to decide this

18  issue today.  The request in the motion, as Ms. Levine

19  pointed out, is narrow.  It is for relief from the stay for

20  the administrative law judge to issue a recommendation.

21       I just enumerated a host of reasons why that

22  shouldn't happen, and I can add another.  That

23  recommendation, if issued, doesn't fully or finally resolve

24  anything, which is one of the factors that the Court should

25  consider when seeking to lift the stay.  Exemptions and

13-53846-swr   Doc 2172-1   Filed 02/10/14   Entered 02/10/14 14:02:24   Page 100 of
13-53846-swr   Doc 2213-1   Filed 02/10/14   Entered 02/10/14 14:02:24   Page 100 of
154   253

1    cross-exemptions could be filed to the MERC.  It may even be

2    dismissed because that may be an improper forum for hearing

3    the matter, so there is no full resolution that can happen.

4    If AFSCME has a claim, it will still be out there, and they

5    can still assert it in this Court or if your Honor should

6    decide at some point some other forum, but we believe it

7    should be this Court.  They will not be harmed one whit by

8    the maintenance of the stay, but this relief, if there's --

9    if there's something that is definitive and if something

10   becomes binding, it's exceedingly far-reaching for the city,

11   and it goes beyond relief for AFSCME, it would apply -- the

12   reasoning of it certainly would apply to all of the unions

13   and all of the pension plans, so we think, your Honor, while

14   the relief does appear innocuous, it is ill-advised, and we

15   think the Court should deny the motion.

16        THE COURT:  Well, if this limited stay relief is

17   granted and the deadlines for subsequent action, whatever

18   that might be, are tolled, how would the city be prejudiced?

19        MS. LENNOX:  I think it would be prejudiced -- well,

20   again, our position is is that he can't rule.  He's got new

21   facts, new laws, no hearing.

22        THE COURT:  Is that for me to decide, or is that for

23   him to decide?

24        MS. LENNOX:  I think -- as a matter of due process,

25   I think it would be important for the city to have a new

 1  hearing, and, frankly, his retirement is of no moment.  There

 2  can be another administrative law judge to pick this up and

 3  have that hearing.

 4       THE COURT:  But, again, I ask you is that for him to

 5  decide, or is that for me to decide?

 6       MS. LENNOX:  Well, I think in the first -- I don't

 7  think you have to decide that question, per se, your Honor,

 8  but what you're being asked to do is to lift the stay to

 9  allow something to happen, something that we don't know as we

10  all sit here in the courtroom here, if the stay is lifted,

11  what will happen.  Will that decision that was issued on the

12  record in February simply be committed to paper, and, if so,

13  what happens with the subsequent facts and briefing?  Will

14  those be taken into account?  Will they not?  Will we have to

15  have another proceeding in front of another administrative

16  law judge to untangle that later?  We don't know as we stand

17  here today because you're right, that is not for anybody in

18  this courtroom to figure out, but lifting the stay could set

19  those activities in motion.

20       THE COURT:  Well, but that wouldn't happen if the

21  relief from the stay were as limited as Ms. Levine asks for

22  here.

23       MS. LENNOX:  If the relief -- what we don't know as

24  we stand here today is what would happen if the relief, as

25  limited as Ms. Levine asks for, happens.  We don't know

1    whether Administrative Law Judge O'Connor would simply write

2    down on a piece of paper that which is already contained in

3    the transcript.  If he would consider further the papers that

4    have been filed and the subsequent facts, in which case he

5    would have done so without a hearing, we just don't know

6    that.

7            THE COURT:  All right.  Thank you.

8            MS. LEVINE:  Your Honor, just briefly.

9            THE COURT:  Yes.

10           MS. LEVINE:  Your Honor, we'd respectfully submit

11   actually for the whole litany of issues that were just raised

12   by the debtor that the limited stay relief is more

13   compelling, not less compelling, especially if the tolling

14   applies, and we would confirm right now that we would consent

15   to tolling to the extent that's an issue, and the debtor can

16   consent on the other side.

17           This administrative law judge has had this in front

18   of him for a year and a half.  He's had the hearings.  He's

19   had the briefing.  And we're assuming that in his mind he has

20   something that he wants to do, which may, in fact, be nothing

21   because that, in effect, is something for these purposes.

22   What we don't want to do is lose that, and if we -- and if we

23   have this limited relief, come Monday we'll all know what

24   that is.  And some appropriate time in the future, we can

25   decide if or when or how that something should be utilized by

```
 1   this Court, if at all, but if we don't let this judge, you

 2   know, do what it is he feels appropriate here with the

 3   deliberation and the time and the effort and the judicial

 4   resources that he has already expended on this matter, it's

 5   potentially disadvantageous to all of us in this process.

 6          THE COURT:  Do I understand correctly that the

 7   process is that this administrative law judge simply proposes

 8   a recommended order or judgment, whatever it's called --

 9          MS. LEVINE:  I'm shaking my head, for the record.

10          THE COURT:  -- to the Michigan --

11          MS. LEVINE:  Yes.

12          THE COURT:  I'm sorry.

13          MS. LEVINE:  I was shaking my head.  The answer is

14   yes.  He issues a recommendation.  It's not a --

15          THE COURT:  To the Michigan Employment --

16          MS. LEVINE:  Yes.

17          THE COURT:  -- Commission.

18          MS. LEVINE:  Yes.  And we're not asking for

19   proceedings before the MERC, the Michigan Employment

20   Commission.  We're just asking that this judge be able to do

21   whatever it is he would feel appropriate between now and his

22   retirement on Friday.

23          THE COURT:  So as a recommendation, does it have --

24   if that's all that came out of this relief from stay, would

25   that have any binding effect on anyone?
```

```
 1          MS. LEVINE:  Your Honor, our understanding -- and my
 2    co-counsel can correct me if I'm wrong, but my understanding
 3    is that it's an issue that could be considered de novo by the
 4    MERC but that it is something that is useful for the MERC to
 5    have when it makes those deliberations.  We respectfully
 6    submit that if it comes here, as the potentially now
 7    appropriate Court, that it could be useful here as well.
 8          THE COURT:  Again, a process question about MERC
 9    that you could feel free to defer to Mr. Mack, but how do you
10    deal with the city's argument -- or at this point it's just a
11    concern -- that because of this Michigan Supreme Court
12    decision from Macomb County in the meantime, there may not
13    even be jurisdiction?
14          MS. LEVINE:  Your Honor, we're dealing with
15    jurisdictional issues here as well.  That doesn't mean that
16    at the appropriate time by the appropriate tribunal having
17    this piece of paper signed between now and Friday wouldn't
18    help.  If it turns out that he lacked jurisdiction or that
19    the decision should not be considered, that's fine, but if
20    we're wrong about that, then we've lost this window of
21    opportunity.
22          THE COURT:  Did you want to add something to that,
23    sir?
24          MR. MACK:  If you wish.
25          THE COURT:  No.  It's up to you.
```

 1      MR. MACK:  The Macomb County case that was
 2  referenced was not appropriately interpreted in the city's
 3  pleading, so just for purposes of -- there is no
 4  jurisdictional issue raised by the Macomb County court case.
 5      MS. LEVINE:  Your Honor, obviously we have views on
 6  the Macomb County case, but we're not even asking this Court
 7  to consider those.  Win, lose, or draw, we're seeking just
 8  very narrow relief that may, in fact, be useful.  And if it's
 9  not, so be it, but if it would have been, then we've lost it,
10  and that's really all we're asking for today.  Thank you.
11      THE COURT:  Okay.  Oh, did you want to be heard,
12  too?
13      MS. DEEBY:  Yes, please.  For the record, your
14  Honor, Shannon Deeby of Clark Hill.  I represent both the
15  General Retirement System of the City of Detroit and the
16  Police and Fire Retirement System of the City of Detroit.
17  For today's purposes, we're just addressing the issues
18  related to the GRS.  What we would say, your Honor, is that
19  to the extent that AFSCME's motion is seeking very limited
20  relief enabling it to liquidate a damage claim or a damage
21  amount, we would not oppose the motion.  However, if, as the
22  city suggests in their responsive pleadings and as were
23  raised apparently in the supplemental briefing filed by
24  AFSCME that they were requesting a recommendation that the
25  board be reconstituted as of 2011, 2012, we would oppose any

 1  kind of impact on board composition, board governance, or the
 2  governance of the systems.  We think it would be wholly
 3  inappropriate.
 4          THE COURT:  What's your client's position, since you
 5  have stood up here, on whether the Retirement Systems
 6  distribution of this 13th check for all these decades was
 7  legal?
 8          MS. DEEBY:  As I understand it, your Honor, the
 9  board acted completely within their discretion pursuant to
10  the governing laws and their contracts.
11          THE COURT:  All right.  Thank you.  Because of the
12  urgency of this, I want to give you a decision today, so I'll
13  commit to do that, say, 30 minutes after the conclusion of
14  the next hearing --
15          MS. LEVINE:  Thank you.
16          THE COURT:  -- on the record here.
17          MS. LEVINE:  Thank you very much.
18          MR. MACK:  Thank you, your Honor.
19          MS. LEVINE:  Your Honor, with the Court's
20  permission, there's court-ordered mediation that I'm supposed
21  to be in downstairs.  May I be excused pending coming back to
22  hear the decision?
23          THE COURT:  Of course.
24          MS. LENNOX:  Your Honor, I might make that same
25  request.  I'm supposed to --

1          THE COURT:  Of course.  Go.

2          MS. LENNOX:  Is there a particular time your Honor

3     would like us back in the courtroom?

4          THE COURT:  That would be easier for you, wouldn't

5     it?  All right.  Let's just pin a time on it, and let's say

6     one o'clock.

7          MS. LENNOX:  One.  Thank you, your Honor.

8          MS. LEVINE:  Thank you.

9          THE COURT:  The final matter on the Court's docket

10    today is the motion for relief from stay filed by the NAACP.

11         MR. HOLLOWELL:  Good morning, your Honor.

12         THE COURT:  And you may proceed.

13         MR. HOLLOWELL:  Thank you, Judge.  Melvin Hollowell,

14    general counsel on behalf of the NAACP, and my co-counsel

15    here, Nabih Ayad, as well, and we'll address a couple issues

16    for you this morning.  Good morning, Judge.

17         THE COURT:  Yes, sir.  Go ahead.

18         MR. HOLLOWELL:  Again, this is our request of relief

19    from extension of the stay entered by the Court, and first I

20    wanted to deal with just the substance, if I could, just very

21    briefly, of our case that, you know, the case is -- it's not

22    about debtor-creditor issues.  It's about voting rights.  And

23    Public Act 436, the emergency manager law, creates, in our

24    view, two classes of voters.  I guess it's best put in a

25    nutshell.  It creates a superior class of voters where votes

1   for elected officials and those elected have full powers and

2   duties and an inferior class of voters where you can vote,

3   but your vote doesn't have the full authority that it should.

4   And these separate and unequal classes of voters violates the

5   14th Amendment, and we've cited in our brief _Bush_ versus _Gore_

6   and the doctrine of equal dignity of each vote in Headnote 4.

7        It constitutes a fundamental and irreparable harm,

8   as we demonstrated in our pleadings, that now since the law

9   has gone into effect, over 50 percent, 50.4 percent to be

10  exact, of all African Americans now in the State of Michigan

11  are under emergency managers versus 1.3 percent of the

12  state's white population.

13       We further would say that we have long been at this

14  issue.  I think, as this Court knows, Judge, we have fully

15  litigated the question of whether this should have been on

16  the ballot.  We won that case in front of the Michigan

17  Supreme Court.  As this Court knows, that the voters of this

18  state voted by 53 percent to reject the emergency manager

19  law, and yet just five weeks after that it was overturned by

20  a lame duck session of the Michigan legislature and a new

21  emergency manager law was put into place.

22       So our view on this is, Judge, that, as the NAACP

23  has done throughout a hundred years, you know, we look at

24  questions of equal access to quality education and criminal

25  justice reform and certainly the rights of voters.  Those

1  have been the wheelhouse issues for the NAACP for the better
2  part of a century, and this case goes directly to that.  And,
3  you know, the language, again, in Public Act 436 is pretty
4  striking in respect to the evisceration of the powers and
5  duties of elected officials, so it decapitates them.  And so
6  what you have in the nine jurisdictions that are under
7  emergency managers, Detroit but one of them, their powers are
8  advisory, and so they have the authority to meet, but that's
9  pretty much it.  And in our view, that triggers, particularly
10  with the disparate impact on African American voters, a
11  fundamental constitutional right to vote, which is preeminent
12  over all other rights to vote, and I would just draw the
13  Court's attention to the U.S. Supreme Court's decision in
14  Reynolds versus Sims where the Court indicated that the right
15  to exercise the franchise in a free and unimpaired manner is
16  preservative of all other basic rights.

17         Further, in the Elrod versus Burns case -- and
18  that's the 427 U.S. at 373 case -- that goes to ongoing
19  constitutional deprivations, and it says that particularly as
20  it relates to the right to vote, the loss of constitutionally
21  protected freedoms for even minimally periods of time
22  constitutes irreparable injury, quote, unquote.  And so our
23  argument is that not just in the City of Detroit but in all
24  of the other eight jurisdictions across the State of
25  Michigan, these constitutional deprivations are ongoing and

13-53846-swr  Doc 2272-1  Filed 02/10/14  Entered 02/10/14 16:22:34  Page 110 of 263
13-53846-swr  Doc 2273-1  Filed 02/10/14  Entered 02/10/14 16:22:34  Page 110 of
507

1   deserve to be litigated fully and fairly in front of Judge

2   Steeh where the case has been filed.

3         Second, if I could just briefly issue -- or address

4   the issue of collateral attack, and notwithstanding the

5   allegation that this is a collateral attack, this is not a

6   collateral attack on the Detroit bankruptcy.  It's really

7   a -- it's a direct attack on the constitutionality of Public

8   Act 436.  And, you know, the timeline is very important in

9   connection with this.  I think I talked just a moment ago

10   about 2011 and how we, you know, certainly gathered petitions

11   to get this matter in front of the voters in 2011, 2012

12   litigation, as this Court knows, and about the results of

13   that, but then as we get into 2013, the March 28 effective

14   date of the statute and then the emergency manager was

15   appointed, the NAACP brought its suit on May 13th, and so --

16   and we amended the complaint on June 27th.  And there was

17   some allegation in the pleadings as to, well, you know, you

18   amended it, you know, later.  The reason we amended the

19   complaint was because in the interim between May 13th and

20   June 27th, as this Court I know is aware, the U.S. Supreme

21   Court decided the Shelby County versus Holder case.  We

22   had -- our case is predicated upon the 14th Amendment.  We

23   have one provision which deals with the Voting Rights Act,

24   and so we supplemented Section 5 and 4, which was ruled

25   unconstitutional by the U.S. Supreme Court in the Shelby

1   County case, and substituted Section 3 of the Voting Rights
2   Act, but the claims, other than that, and the relief sought
3   was the same.  This was the NAACP's filing, therefore, on May
4   13th was well in advance of the July 18th bankruptcy hearing,
5   and, furthermore, well before the July 25th Bankruptcy Court
6   order regarding stay.

7          We did not learn of the extension of the stay until
8   into August.  We were not on the certificate of notice.
9   Defendants, State of Michigan, certainly should have noticed
10  us.  That was Docket Entry Number 140.  We were not on that
11  certificate.  There was no reason for us to know.  The first
12  notice we received was in the U.S. District Court in front of
13  Judge Steeh.  Upon notice we moved expeditiously to ask for
14  relief from that stay, so it is not, in our view, our burden
15  here.  It, rather, is on the state and the city as it relates
16  to that as to why we were not noticed.  And we certainly
17  would have liked to have been in front of this Court when
18  there was the initial argument as it relates to this, but,
19  again, we were not noticed and not brought in for those
20  proceedings.

21         And let me just, lastly, address the stay issue
22  itself, Judge, and I would direct the Court's attention to
23  Section Roman Numeral III of the city's brief where it talks
24  about automatic stay and then says in dealing with the -- I
25  think it's a Javens versus Hazel Park case, the Sixth Circuit

1    case, that the automatic stay, quote, "gives the debtor a

2    breathing spell from its creditors," gives the debtor a

3    breathing spell from its creditors.  Well, we are not a

4    creditor.  That is not us.  We are -- we seek no money

5    damages.  We did not name the city.  We did not name --

6         THE COURT:  You could have filed an objection to

7    eligibility.

8         MR. HOLLOWELL:  We don't take a position on the

9    eligibility.  Our position is that we should be allowed to

10   prosecute our case on the constitutional issues, and the city

11   is free to move forward on its --

12        THE COURT:  So your position is there was nothing

13   about the filing of this case that violated the United States

14   Constitution.  Is that your position?

15        MR. HOLLOWELL:  There's nothing about the filing of

16   this case that violated the --

17        THE COURT:  Is that your position, sir?

18        MR. HOLLOWELL:  I'm not sure I understand the

19   question.  Our case says that --

20        THE COURT:  I need an answer to my question.

21        MR. HOLLOWELL:  I'm not sure I understand the

22   question, Judge.

23        THE COURT:  Detroit filed Chapter 9.

24        MR. HOLLOWELL:  Yes.

25        THE COURT:  Your clients did not file eligibility

 1    objections.  They could have.  They didn't.  Is it your

 2    position that there is nothing about this filing, this

 3    Chapter 9 filing, that violated the Constitution?

 4         MR. HOLLOWELL:  Our position is that we don't take a

 5    position on the Chapter 9 filing.  We do not take a position

 6    on the Chapter 9 filing, so our position is --

 7         THE COURT:  Okay.  So whatever argument you could

 8    have made about the constitutionality of this filing you

 9    waived by not filing a timely objection?

10         MR. HOLLOWELL:  No.  Judge, we would respectfully

11    say that we were not a party to that case nor were we noticed

12    in the docket entry as it relates to parties in that case

13    that the parties in that case, in our view, would have had an

14    obligation to have given us notice for the opportunity to

15    present at that hearing.  Our belief is that --

16         THE COURT:  When you say "that hearing," what

17    hearing are you referring to because we have not had a

18    hearing on eligibility yet?

19         MR. HOLLOWELL:  The matters in front of the judge,

20    the previous matters in front of the judge as it relates to

21    the city's initial filing, and --

22         THE COURT:  You're not seriously contending you

23    weren't aware that the City of Detroit filed bankruptcy?

24         MR. HOLLOWELL:  Certainly was.  We certainly were,

25    but we filed before the city filed, Judge.  That's the point,

1   and the point is that our case is separate and distinct from

2   the city's case and that the city --

3           THE COURT:  Well, but the question that the city

4   raises is can it be separate.

5           MR. HOLLOWELL:  Yes.  That is the question that the

6   city raises, and we said we see no reason why it cannot be

7   separate and follow a separate track.  Again, it does not --

8           THE COURT:  Isn't it the case, though, that the

9   relief you seek, if granted, would terminate the emergency

10  manager, yes?

11          MR. HOLLOWELL:  Yes.

12          THE COURT:  And what impact would that have on this

13  case?

14          MR. HOLLOWELL:  Well, it would be speculative as to

15  where it would go from there, but certainly the elected mayor

16  of the City of Detroit certainly would have the powers and

17  authority to move forward with the bankruptcy if he so chose.

18  That's the point.  Our point is that not just the City of

19  Detroit but all those other cities have had irreparable harm.

20  We are in front of Judge Steeh, and we should have the

21  authority to proceed in front of Judge --

22          THE COURT:  Of course, none of your individual

23  plaintiffs are from any of those other cities, are they?

24          MR. HOLLOWELL:  No.  The individual plaintiffs

25  are --

13-53846-swr   Doc 2172-1  Filed 02/10/14  Entered 02/10/14 14:02:34  Page 115 of 268
13-53846-swr   Doc 2172-1  Filed 02/10/14  Entered 02/10/14 14:02:34  Page 116 of 268
507

 1          THE COURT:  This case is about Detroit, isn't it?

 2          MR. HOLLOWELL:  No.  Well, we also have the Michigan

 3   branch of the NAACP, which represents individuals all

 4   throughout the State of Michigan.

 5          THE COURT:  Right, but none of the members of the

 6   state branch who live in those other cities are named as

 7   plaintiffs; right?

 8          MR. HOLLOWELL:  The state branch of the NAACP --

 9          THE COURT:  Am I right about that, sir?

10          MR. HOLLOWELL:  Well, if I could say the state

11   branch represents all NAACP residents throughout the State of

12   Michigan.

13          THE COURT:  Am I right about my question?

14          MR. HOLLOWELL:  Well, the individual plaintiffs,

15   yes.  However, if the judge would take a look at the actual

16   complaint, the complaint is very specific in terms of

17   alleging the harms in each one of those other cities, so it's

18   not like it was just about the City of Detroit.  It was about

19   a lot of different cities, not -- eight other cities, to be

20   specific, and we looked at the individual conduct in each one

21   of those cities, and we pled that, and we put that in the

22   complaint.  And that has been a part of our pleading from the

23   very beginning.

24          As I would also say is that -- Judge, that on the

25   automatic stay issue where it casts uncertainty over the

1  bankruptcy case, we would also argue the reverse, that the

2  bankruptcy casts uncertainty over the fundamental

3  constitutional protections which were filed before the

4  Bankruptcy Court and before bankruptcy and which can and

5  should be addressed by Judge Steeh, so we would finally say

6  that we are not litigating or contesting eligibility, which

7  is what, again, the Garzoni case deals with.  And even if it

8  did apply, again, we were saying that we -- when you look at

9  particularly the hardship upon other --

10  THE COURT:  Okay.  So when you say you're not

11  objecting to eligibility, isn't that same thing as saying you

12  have waived any objections to eligibility that you might

13  have?

14  MR. HOLLOWELL:  We have not taken any position on

15  eligibility.  As Mr. Goodman said earlier, this is -- our

16  case is in federal District Court, and we are pursuing our

17  rights and remedies under the federal District Court, not

18  under the Bankruptcy Court, and we believe that we should be

19  allowed to proceed in the Article III court.

20  THE COURT:  I'm sorry.  I had another question for

21  you, sir.

22  MR. HOLLOWELL:  Oh, yes.

23  THE COURT:  Is there any way your lawsuit can be

24  tailored or permitted to proceed that would not have an

25  impact on this bankruptcy case?

 1          MR. HOLLOWELL:  Yes.  We don't object to

 2    eligibility.  We are not alleging any pecuniary interest.

 3    We're not seeking money damages.  There's no claim against

 4    the city.  There's no --

 5          THE COURT:  So if I gave you a period of time to

 6    file an eligibility objection that was based on the claims

 7    you make in your complaint or any other grounds, for that

 8    matter, you wouldn't file that objection?

 9          MR. HOLLOWELL:  We would not file an objection.

10          THE COURT:  All right.  Thank you, sir.

11          MR. HOLLOWELL:  Thank you, Judge.

12          MR. AYAD:  Good morning, Judge.  For the record,

13    Attorney Nabih Ayad on behalf of the NAACP, Stallworth, State

14    Representative Rashida Tlaib, and the rest of the

15    complainants in this particular matter.  Judge, just to echo

16    brother counsel, Butch Hollowell's, position that we are not

17    objecting to eligibility.  We are not objecting.  And to

18    answer your -- answer this Court's question, Judge, yes, we

19    could move forward.  We could move forward.  You know, what

20    we were asking in our initial complaint before Judge Steeh,

21    Judge, was the issue of an injunctive relief, and we're

22    asking that we could move forward.  Everything that's

23    happened in the past, that's still okay with us, Judge.

24    We're not contesting eligibility.  We're not saying that the

25    emergency manager did not have the power and authority under

 1   PA 436 to file for bankruptcy.  We're not contesting that,

 2   Judge.  And the powers of this Court and the powers of the

 3   Judge Steeh's court in the District Court has the ability to

 4   say, you know, we're not going to, you know, repurchase Belle

 5   Isle back.  We're not going to repurchase certain items back.

 6   We're not going to cut those contracts that we're in and

 7   replace them and everything else.  We're saying, Judge,

 8   moving forward, moving forward on this particular -- the

 9   judge could limit it.  Your Honor could limit it.  So does

10   the Judge Steeh in the District Court can limit the powers,

11   let's say, that moving forward on a prospective injunctive

12   order that PA 436 may be unconstitutional, but what has

13   already happened we're not going to touch.  You know what?

14   Quite frankly, Judge, we're okay with that.  We're more

15   concerned about the abilities of -- more than half of the

16   African Americans in this state lack the ability to vote, a

17   vote fundamental of all fundamental rights across this

18   country.  It is fundamental and basic in our society of fair

19   play and in a democratic society that we have the right for

20   individuals to vote, and the Supreme Court of this land, so

21   has the Sixth Circuit, Judge, spoken about the ability -- the

22   dilution of the vote even on a much, much lower standard, was

23   found to be unconstitutional.  Here we don't have one

24   plaintiff, two plaintiffs, a hundred plaintiffs.  We have

25   hundreds of thousands.  The majority of African Americans in

1  this state can no longer basically represent -- can no longer

2  vote for their state -- for their local elections, Judge.

3  THE COURT:  Let me just interrupt you there, sir,

4  and ask you how you deal with the state's argument that

5  everyone who wanted to vote did vote and their votes counted?

6  MR. AYAD:  Judge, I think that would insult the

7  intelligence of the Court.  It would insult my intelligence

8  as a civil rights attorney, Judge.

9  THE COURT:  I need to hear you articulate your

10  response.

11  MR. AYAD:  I'll tell you exactly why, Judge.  I can

12  vote for a bird.  Doesn't mean that bird is going to be able

13  to do anything, Judge.  If I vote for my city councilman, has

14  no powers -- inherent in each vote in the state is the power,

15  Judge.

16  THE COURT:  One second.  For technical reasons, I've

17  been asked to ask you to move like six inches back from the

18  microphone because --

19  MR. AYAD:  I'm sorry.

20  THE COURT:  -- what happens is our system gets

21  overloaded if it's too loud, and then it cuts out, and then

22  the people in the other rooms can't hear you.

23  MR. AYAD:  Well, I definitely want to be heard,

24  Judge, so --

25  THE COURT:  Okay.

 1          MR. AYAD:  -- I'll back up a little bit.  Thank you.
 2   Your Honor, you know, inherent in every vote, it's a
 3   fundamental constitutional -- it defies all sense of logic
 4   that when I vote someone, there is inherent in that vote the
 5   right that I'm saying I want you to represent me.  I want you
 6   to take -- there's inherent the power of that vote to give to
 7   this individual to represent me as a constituent of this
 8   region, of the state, and of this country.  When you take
 9   away that, if I give you that power and your power is no
10   good, it's a misnomer, Judge.  There is no real power.  There
11   is no real vote.  You're striking the vote.  How about if
12   legislation comes out from the national -- from the Congress
13   and the Senate says -- in the Senate, Judge, and across this
14   nation says each and every one of us have a right to vote.
15   You can vote.  Go ahead and vote whoever you want, but guess
16   what?  We're still going to control everything that we want
17   to do, and we're going to place whoever we want to place in
18   that thing.  It's a misnomer, Judge.  It insults the
19   intelligence of the ordered society.  It insults the
20   intelligence of any democratic society.  That's not the right
21   to vote.  That's not what vote was inherent, and --
22          THE COURT:  How do you --
23          MR. AYAD:  -- that's not what our framers of our
24   Constitution envisioned, Judge.
25          THE COURT:  How do you deal with the state's

1　argument that the people who made the decision to substitute

2　the emergency manager for the mayor and the City Council, to

3　the extent he did, were elected by the vote of the people?

4　　　　MR. AYAD:  Well, Judge, I would have to say -- let's

5　talk about that a little bit.

6　　　　THE COURT:  Please.

7　　　　MR. AYAD:  In fact, that when you guys tried to

8　shove this down our throat and not even put on the ballot, we

9　have to actually fight you and go up to the Supreme Court on

10　it, and the Supreme Court ruled in favor of the individuals

11　to basically put it on that ballot, and it was put on the

12　ballot.  And guess what, Judge?  The majority, the majority

13　who, again, Judge, are not majority African American in the

14　state, voted that they don't want the PA 436, but instead,

15　Judge, what this basically state representatives did is

16　shoved it down the people's throat, Judge,

17　unconstitutionally.  I would still have -- and I'll still

18　have an argument in front of Judge Steeh, Judge --

19　　　　THE COURT:  Is there a constitutional right that

20　people have to have their legislators only enact laws that

21　the people agree with?

22　　　　MR. AYAD:  That's a very good question, Judge.  It's

23　going right to the heart of the argument.  Not necessarily,

24　Judge, but the people do have some kind of right, and that's

25　called the constitution and the bill of rights and the First

13-53846-swr  Doc 2572-1 Filed 02/10/14  Entered 02/10/14 16:02:24  Page 123 of 275
13-53846-swr  Doc 2273-1 Filed 01/08/14  Entered 01/08/14 16:08:24  Page 123 of
507

1  Amendment rights and the fundamental rights, the right to

2  vote, Judge, across this country, and that trumps all the

3  legislations.  If we look throughout history, Judge, the

4  legislations have been overruled under certain bills and

5  statutes and state statutes, and this is one of those types

6  of situations where they will be overruled on this particular

7  matter.

8          THE COURT:  Right, but they've never been

9  overruled --

10         MR. AYAD:  That's what we think the likelihood of

11  success is strong.

12         THE COURT:  -- because there's evidence that the law

13  was not supported by a majority of the people.

14         MR. AYAD:  No.  It was supported by the majority of

15  the people, Judge.  That's the thing.  It was actually just

16  voted by the --

17         THE COURT:  No, no, no.  My question is broader than

18  that.  No law has ever been held unconstitutional based on

19  evidence that that law was not supported by a majority of

20  people; right?

21         MR. AYAD:  Maybe so, Judge, but the fact of the

22  matter is I know, Judge, and I think we all could understand

23  the importance of a fundamental -- of the most fundamental of

24  rights.  We're not talking about any kind of right, Judge.

25  We're not talking about your ability to have a 30-day hearing

```
 1 │ before a certain thing or relief.  We're talking about the
 2 │ right to vote, Judge.  What is this society -- what is the
 3 │ American society, the democratic society, without the ability
 4 │ to vote?  You strip that away, Judge, I don't know what is
 5 │ more fundamental.  I really don't know what's more
 6 │ fundamental.
 7 │       THE COURT:  Right, but to the extent that argument
 8 │ works as against PA 436 --
 9 │       MR. AYAD:  Correct.
10 │       THE COURT:  -- the fact that the people supported or
11 │ didn't support PA 436 is irrelevant, isn't it?
12 │       MR. AYAD:  I think it is relevant, Judge, to a
13 │ certain extent because the will of the people was not
14 │ followed.  That's one.  But, second, Judge, will of the
15 │ people are not -- it is a overall will of the Constitution of
16 │ the United States.  It was a strong component in all the will
17 │ of the people, and that is the U.S. Constitution.  The U.S.
18 │ Constitution and the -- all the affirmants thereafter just
19 │ says the individual should have the right.  One vote, one
20 │ person, Judge, under the Constitution, and that is so
21 │ fundamental.  People's lives -- wars were battled over these
22 │ particular rights, and we shouldn't allow it to be stripped
23 │ away by the simple PA 436.  I would still be here arguing or
24 │ I'd be arguing before Judge Steeh had the people not voted
25 │ for a majority as to pass that particular legislation because
```

1    it draws on -- blocks off the minority.

2            THE COURT:  Let's bring this back to the bankruptcy

3    case.

4            MR. AYAD:  Yes, I will do that, Judge.  If I may,

5    Judge, you know --

6            THE COURT:  Well, let me focus you on this specific

7    question, which you started to touch on, and so did Mr.

8    Hollowell.  Assume you win tomorrow in the District Court and

9    you get the prospective relief that you seek.

10           MR. AYAD:  Correct.

11           THE COURT:  The emergency manager is out of office.

12   The mayor and the City Council are back in.  What's the

13   impact of that on this bankruptcy?

14           MR. AYAD:  And here it comes, and that's a very

15   important question, Judge, and I agree with you.  And we

16   considered this, Judge, and we considered -- again, we were

17   very careful, Judge.  Our arguments are strictly the Voting

18   Rights Act, the Constitutional fundamental right of the

19   voting rights.  What we're saying is, Judge, there is too

20   many contingencies.  There are two many ifs out there.  Let

21   me give you an example.  First of all, if you lift the stay,

22   we go back before Judge Steeh.  Judge Steeh could rule that

23   PA 436 is constitutional.  That issue for a moment.  Either

24   way, party -- either party is going to appeal to the Sixth

25   Circuit.  We appeal to the Sixth Circuit.  Whether we say

 1  it's unconstitutional or constitutional, the Sixth Circuit

 2  can rule, another if that it's constitutional or

 3  unconstitutional.  Then there may be a certiorari before the

 4  Supreme Court.  Brother counsel is going to be arguing before

 5  the Supreme Court in a month -- less than a month from now,

 6  Judge, on the affirmative action situation, but we may go up

 7  to the Supreme -- then that argument, then it comes back

 8  down -- say the City Council or the mayor -- the mayor may

 9  say, you know, this is in the best interest -- again, another

10  if and contingency, Judge, that the mayor may say I want this

11  bankruptcy, not -- maybe the new City Council or the new

12  mayor may say I want this bankruptcy.

13          Lastly, Judge, and this is very important and

14  fundamental, Judge.  We should not, Judge, base our rulings

15  and our positions on such an important fundamental right.  No

16  right -- no bankruptcy rule should ever trump the right of an

17  independent constituent of this nation to be able to vote for

18  their local elections.  That's a very dangerous, dangerous

19  route.  There is no more right more fundamental of all

20  fundamental rights, Judge, as the right to vote, and the

21  bankruptcy rules should not establish that.

22          Then lastly, Judge, I want to add, too, again, like

23  we argued earlier, the judge -- again, we're asking for

24  injunctive order, Judge.  We're not saying, you know, apply

25  it retroactively.  We're not saying apply it a month ago or

```
1    two months ago.  We're saying just rule that PA 436 is
2    unconstitutional.  That state judge, Judge Steeh -- that
3    federal judge, Judge Steeh, can still rule proactively going
4    forward that it's unconstitutional, but yet you are not to
5    basically take away from what's already happened because
6    we're too down in the line for it.  And I heard yesterday
7    they were leasing -- they've already leased the Belle Isle to
8    the state, Judge.  Again, we're not going backward, Judge.
9    We're moving forward.  We're not contesting the eligibility
10   of the particular bankruptcy.  We're saying if PA 436 is
11   constitutional, absolutely, Judge.  You know, the emergency
12   manager is within his right basically to file for bankruptcy
13   because the state statute gives him that powers and duties.
14   We're not contesting that.  Our argument, just like so many
15   different of these arguments, you're not going to see one
16   particular case in this Court, Judge, that has our particular
17   arguments, and our arguments are very, very simple.  We're
18   not creditors.  We're not debtors.  We're not contractual.
19   We're not asking for service or money damages.  We're simply
20   saying this is a fundamental constitutional civil rights
21   issue as to the voting rights of these individuals in this
22   state.  That's it.  We don't want nothing further, Judge, on
23   that particular matter.  And with all due respect to this
24   Court, Judge, we feel that this is not the proper forum for
25   this, not -- and I agree with your Honor on your previous
```

1  rulings.  You've indicated that you could decide civil rights

2  issues, and I agree with that.  I'm not contesting that.  But

3  I challenge brother and sister counsels on this particular

4  matter to show me a case where strictly -- only strictly

5  constitutional issues were presented to a Bankruptcy Court as

6  opposed to dual issues where there's a creditor or the City

7  of Detroit is a defendant or debtor and there may be

8  collateral constitutional issues.  This is not the case.

9  This is not the forum.  This is not the situation here,

10 Judge.  We understand that sometimes judges, for instance, in

11 a criminal case, may be called upon to rule on civil rights

12 issues, you know, seizures and what have you, but this is not

13 the case, Judge.  This is strictly, strictly a constitutional

14 civil rights issue to vote.  We don't want nothing from the

15 city.  We haven't named the city.  We haven't named the

16 emergency manager.  We don't want nothing from them, Judge,

17 as to that.

18         THE COURT:  All right.  Let me ask you to wrap up,

19 sir.

20         MR. AYAD:  I'm sorry.

21         THE COURT:  Let me ask you to wrap up, please.

22         MR. AYAD:  All right, Judge.  I will wrap up.  And

23 lastly, Judge, I would say where does an individual that has

24 ongoing constitutional violations incurred such as the

25 majority of African Americans in this state, Judge, where do

1  they go for relief?  If we were to adopt their position, then

2  they're saying basically we should come to the Bankruptcy

3  Court to address our civil rights issues, Judge.  Where do we

4  go for -- where do we go for relief?  Is there a petition?

5  Is there a door that we can go knock on and say, "Give me my

6  relief.  I'm being violated"?  If we were to adopt the

7  opposing's position, Judge, what we would be saying is that

8  if I was arrested as a resident of the City of Detroit and be

9  put in jail the next day, I technically cannot even grieve

10  the City of Detroit, what have you, because the City of

11  Detroit has filed for bankruptcy.  It's too broad.  It's too

12  overwhelming, Judge.  It defies all notions of the --

13  inherent in any democratic society and civil society, Judge,

14  that we have an ability, an ability to ask for relief from

15  when we are grieved, Judge.  And here I don't see unless your

16  Honor allows us to move forward before Judge Steeh and

17  address those simple constitutional issues -- again, Judge,

18  emergency manager, PA 436, that's only one of the powers he

19  has is to file bankruptcy.  He has many powers.  He can sell,

20  fire, discharge.  He can -- you know, he can order supplies,

21  toilet paper, whatever the case may be.  These are just but

22  one of the inherent powers that he has.  We're not

23  challenging those, Judge.  What we're challenging is PA 436

24  as being unconstitutional.

25            THE COURT:  Let me hear from the city.  Thank you.

1    MR. AYAD:  Thank you, Judge.

2    THE COURT:  Or the state.

3    MR. FUSCO:  Good morning, your Honor.  Timothy

4    Fusco, Miller Canfield, on behalf of the City of Detroit.

5    Your Honor, I'll be brief and try to focus on the bankruptcy

6    issues that are presented by this motion.

7    First of all, as your Honor referenced in his

8    questions to counsel, the NAACP was fully aware of the filing

9    and on August 5th filed an appearance in the case.  There's

10   no question that the NAACP could have raised a constitutional

11   objection, which, as your Honor determined in his opinion

12   denying the motion for stay by the Retirees' Committee, is

13   something justiciable before this Court if it relates to the

14   question of eligibility.

15   The plaintiff devotes much of its brief and its

16   reply to two issues that it seems to have abandoned today,

17   first that this case was not contemplated by the extension

18   order and that the extension order entered by your Honor did

19   not deal with this case because it was not one of the

20   enumerated cases.  That issue was, as the plaintiffs note,

21   brought before Judge Steeh, and he made a decision that the

22   plain language of the stay order would apply to this lawsuit.

23   I don't think that's --

24   THE COURT:  I have to ask why the city didn't

25   include this litigation in its motion to extend the stay.

1    MR. FUSCO:  I asked the question myself, and I think

2    the question at that point was just one of visibility at that

3    point.  It may have -- it just slipped under the radar.  It

4    certainly wasn't an intent to exclude this case from the

5    ambit of the extension order.  Second, the --

6    THE COURT:  NAACP litigation in federal court didn't

7    have visibility?

8    MR. FUSCO:  Well, not as much visibility as a judge

9    in Ingham County enjoining people and sending orders to the

10   President, no, it didn't quite have that much visibility.

11   The second issue is this Court didn't have authority

12   to enter the stay order.  Again, that's nothing more than an

13   attempt to relitigate the motion brought before this Court to

14   obtain the extension.  I think it's been decided, and for the

15   same reasons that your Honor referenced in granting the

16   relief initially, it's applicable here, but the real issue is

17   the one --

18   THE COURT:  Are there any other lawsuits out there

19   that lack visibility?

20   MR. FUSCO:  If they're not visible, then they

21   probably don't, no.

22   THE COURT:  That was a serious question.

23   MR. FUSCO:  We're not aware --

24   THE COURT:  Are there any other lawsuits out there

25   that we should know about that are similar to this one?

1    MR. FUSCO:  Well, there's a motion that's been filed

2  in the Phillips matter.  I don't know if that was referenced

3  in the order or not.  And we'll be dealing with that shortly.

4  I'm not aware at this point of any other constitutional

5  challenges, if that's what you're asking.

6    THE COURT:  Well, let me just pin the question down.

7  Are there any other lawsuits out there that are pending,

8  federal court or state court, in which the city is going to

9  contend that issues raised in them should be raised here in

10  the context of eligibility?

11    MR. FUSCO:  We're not aware of any right now.  The

12  state may be, your Honor, and that's a question you might

13  want to pose to the state since the defendants in these cases

14  have been --

15    THE COURT:  Fair enough.

16    MR. FUSCO:  -- state officers rather than the city.

17  When you get to -- and the issue that you did ask counsel,

18  which is isn't this really an eligibility objection, and the

19  question was continually, I think, not answered, in Michigan

20  we have one procedure for the filing of a Chapter 9 case,

21  and, of course, as your Honor obviously knows, the

22  municipality has to be authorized by the state in order to

23  file.  The only way you can file a Chapter 9 is through the

24  appointment of an emergency manager, the emergency manager

25  seeking authority from the governor, then the emergency

1  manager exercising his discretion or her discretion to file

2  the case.  The notion that if the plaintiffs prevail in

3  having the EM law declared unconstitutional -- and what the

4  plaintiff asked for in the complaint is not simply that but a

5  preliminary and permanent injunction prohibiting any EM from

6  exercising any authority and a preliminary and permanent

7  order that actions exercised by the emergency manager under

8  PA 436 are unenforceable.  So at that point, your Honor, I

9  think it's pretty clear we don't have the basis for a filing.

10  We have no EM.  We have no one else that can authorize a

11  filing or continue with the case, so the notion that the

12  mayor and council just suddenly slip into the place of the

13  emergency manager is just not consistent with the statute.

14  This is just as much an objection to eligibility as all the

15  other constitutional objections that were filed and that are

16  being heard by this Court.

17           THE COURT:  Let's pin this down because I want to

18  make sure I understand what you're saying.  You're saying

19  that if prospectively the emergency manager appointment is

20  held unconstitutional and enjoined, that would have the

21  impact or the result of, what, voiding this bankruptcy

22  because under law only the emergency manager can pursue the

23  bankruptcy?

24           MR. FUSCO:  Yes.  And I think if you asked him --

25           THE COURT:  Is that what the emergency manager law

```
 1    says --

 2             MR. FUSCO:  No.

 3             THE COURT:  -- or does it say that only an emergency

 4    manager can file a bankruptcy case?

 5             MR. FUSCO:  It says only an emergency manager can

 6    file the case, but we have --

 7             THE COURT:  Well, that's been done, and if the NAACP

 8    is not seeking to avoid that act, what's the problem?

 9             MR. FUSCO:  Well, the problem is the NAACP also asks

10    that all the actions taken by the emergency manager are

11    unenforceable.

12             THE COURT:  Well, all right.  Assume for a minute

13    there's been a retraction of that and all they seek is

14    prospective relief.

15             MR. FUSCO:  Well, then I think we have the

16    interference with the bankruptcy case that your Honor is so

17    concerned about and why you've tried to consolidate --

18    arduously tried to consolidate all of the possible issues

19    affecting the bankruptcy case before this Court.  You have at

20    that point a great deal of uncertainty.  Who decides that

21    issue?  If it stays with Judge Steeh, is it he?  Does the

22    issue come back here?  We're trying right now.  In fact, Ms.

23    Lennox is down right now in mediation trying to reach

24    agreements with creditors, and if this case and others like

25    it are allowed to proceed in different forums, we have the
```

```
 1   risk of inconsistent results.  We have the result of
 2   uncertainty.  It's going to have a significantly deleterious
 3   effect to this case and how it -- and how it proceeds.  And,
 4   your Honor, we're not depriving -- we're not depriving the
 5   plaintiff of the right to assert these claims.  As your Honor
 6   noted, you said, "Well, what if I allow you to file a late
 7   objection to eligibility?"  And the NAACP wasn't interested
 8   in that, but why not?  File that and have it heard here.
 9   Your Honor has already determined you have jurisdiction to
10   hear that.
11           THE COURT:  Right.  The answer to that that I heard
12   was their case isn't only about Detroit.
13           MR. FUSCO:  Um-hmm.
14           THE COURT:  There are, what, eight other entities --
15           MR. FUSCO:  There are.
16           THE COURT:  -- that have these emergency managers.
17   Where does the NAACP go to bring its claim as to them?
18           MR. FUSCO:  Why wouldn't the result here have the
19   same effect on those as it does on Detroit?  If your Honor
20   determines --
21           THE COURT:  Didn't understand that answer.
22           MR. FUSCO:  If your Honor determines that PA 436 is,
23   indeed, unconstitutional, why wouldn't that have -- be
24   dispositive of the emergency managers in those other
25   jurisdictions as well?  Same statute; same issues.  It's no
```

13-53846-swr    Doc 2272-51    Filed 02/10/14    Entered 02/10/14 16:32:24    Page 135 of 288
13-53846-swr    Doc 2213-1    Filed 02/07/14    Entered 02/07/14 16:03:24    Page 135 of
157

 1  different than if Judge Steeh sitting in Detroit says, "Well,
 2  yes, I'm going to declare it invalid."  Presumably that would
 3  affect all of them.  You're hearing the same issue.
 4       THE COURT:  Well, but isn't it the difference that
 5  in this case I can only hear from people who have an interest
 6  in the outcome of this case, which would not include the
 7  residents of Pontiac, Flint, Benton Harbor, the other
 8  jurisdictions that have emergency managers?  There's a
 9  process question here.
10       MR. FUSCO:  Well, except none of those people are
11  involved in this lawsuit now.  They have not claimed --
12       THE COURT:  Well, all right.  I asked that question,
13  didn't I, and the answer I got was that the state NAACP
14  represents --
15       MR. FUSCO:  And that party is here.
16       THE COURT:  -- across the state.
17       MR. FUSCO:  And that party is here, and that party
18  can well participate in this case raising the eligibility
19  objection and make the same exact arguments.  It's a question
20  right now of forum and whether you're going to be able to do
21  what you've tried so hard to do, which is centralize all of
22  these issues before this Court.  I mean I'd, indeed, argue
23  that you're going to get a faster result here than you
24  would -- than you would in front of -- in front of Judge
25  Steeh, so I see -- and when you balance it, if you leave the

1   stay in place right now and the NAACP elects not to file an

2   eligibility objection, once the stay is terminated either

3   because you could, "A," say the city is not eligible -- and

4   we all agree in that case that the matter may go forward --

5   or plan of adjustment is confirmed, and the stay goes away.

6   You can still proceed with the case.  This is no different

7   than any other matter in which we're simply delaying.  Now,

8   it's even better than the tort case.

9       THE COURT:  You wouldn't have any objection if the

10  NAACP filed a second lawsuit seeking relief on the emergency

11  manager law in all of the other municipal entities other than

12  Detroit?

13      MR. FUSCO:  I think what you're asking is what

14  happens if the NAACP files a brand new lawsuit.  It may have

15  to procedurally dismiss this one before it does that, but it

16  files an action in Flint or even better in the Western

17  District for Benton Harbor.

18      THE COURT:  Doesn't matter where it files.

19      MR. FUSCO:  And it files a suit alleging the same

20  claims and saying the emergency manager in Benton Harbor is

21  unconstitutional.  If your first question is do we think the

22  stay would apply to that, the answer is yes.

23      THE COURT:  You do?

24      MR. FUSCO:  We do, um-hmm.  Now, but what would

25  happen --

1          THE COURT:  What are the grounds for that?

2          MR. FUSCO:  Well, why is it any different than any

3     of the other actions?  The outcome in that case would have a

4     direct result and effect on this bankruptcy.

5          THE COURT:  Why is that?

6          MR. FUSCO:  Because that's the decision that your

7     Honor made when you extended the stay.  It's going to be a

8     suit against state officers involving a matter that could

9     adversely affect the bankruptcy case.

10          THE COURT:  And that's the question I'm asking.

11     What's the adverse effect if another judge somewhere holds

12     that the appointment of an emergency manager in Benton

13     Harbor -- and, of course, we don't mean to pick on Benton

14     Harbor -- is unconstitutional?  What's the effect on this

15     case?

16          MR. FUSCO:  Well, it's the same effect as if the

17     plaintiffs prevail in this case.

18          THE COURT:  What is the effect?

19          MR. FUSCO:  The effect is if the Court rules it's --

20     PA 436 is unconstitutional and we don't have an emergency

21     manager statute, then it's our position there's no procedure

22     for the filing of a bankruptcy case.

23          THE COURT:  Well, but that ruling is binding only on

24     the parties in that case.

25          MR. FUSCO:  Well, if it's in the Eastern District,

1   it presumably would be binding on your Honor, but I know the

2   District Court, Bankruptcy Court issue, but we can still have

3   the --

4           THE COURT:  For the record --

5           MR. FUSCO:  Yes.

6           THE COURT:  -- the Bankruptcy Court is not bound by

7   decisions of the --

8           MR. FUSCO:  I know.

9           THE COURT:  -- District Court except as they are on

10  appeal in the case.

11          MR. FUSCO:  Or the law of the case.  That's correct.

12  That's correct.  But think about the effect on the bankruptcy

13  itself, and we're talking right now -- let's look at where we

14  are in the status in this case.  We're very early in both

15  cases.  We're early in the case before Judge Steeh, and we're

16  early in the case here.  There's been no determination of

17  eligibility, and there's been nothing in the District Court

18  case other than cross -- motion to dismiss and a response

19  filed to a motion to dismiss.  Now, you're moving this case

20  forward at an accelerated pace, one that is faster than any

21  other Chapter 9 that I've seen.  We have not even had a

22  determination of eligibility.  You're trying to create an

23  atmosphere where parties are negotiating and endeavoring to

24  reach a consensual plan of adjustment, which obviously is

25  what's in the best interest of everybody in this case.

13-53846-swr  Doc 2723-1  Filed 02/10/14  Entered 02/10/14 16:22:24  Page 139 of
292
13-53846-swr  Doc 2723-1  Filed 02/10/14  Entered 02/10/14 16:22:24  Page 139 of
151

```
 1    Putting this case on hold -- and, indeed, the NAACP --

 2            THE COURT:  I don't think that's so obvious to the

 3    NAACP.

 4            MR. FUSCO:  Well, it alluded to that in its reply

 5    where --

 6            THE COURT:  I think what it thinks is in the best

 7    interest of the case is to have the elected mayor and City

 8    Council be the one who do that negotiation.

 9            MR. FUSCO:  Um-hmm.  And there's absolutely no

10    certainty that's what's going to happen.  In fact, I would

11    argue that I think it's highly likely that's not what's going

12    to happen.  And the next -- the first thing you're going to

13    see after that ruling is a motion to dismiss this case.

14            THE COURT:  I was only challenging your assertion

15    that it's obvious that the mediation is in the best interest

16    of everyone.  I'm not sure everyone would share that view.

17            MR. FUSCO:  Well, consensual resolution --

18            THE COURT:  I agree with you.  That's why I ordered

19    mediation, but --

20            MR. FUSCO:  Yes.

21            THE COURT:  -- not everyone agrees with that.

22            MR. FUSCO:  And one result that might be appropriate

23    here is to continue the stay at this point, and if you

24    determine the city is eligible, we can revisit it.

25            THE COURT:  Revisit what?
```

 1          MR. FUSCO:  The stay motion and file another motion,

 2   or we can revisit that.  My point is at this point in both

 3   cases, it's early.

 4          THE COURT:  Why would your position be any different

 5   after eligibility than it is now?

 6          MR. FUSCO:  I don't know what the --

 7          THE COURT:  Argue the same deleterious effect if the

 8   mayor came in with the City Council in this case in place of

 9   the emergency manager.

10          MR. FUSCO:  We'd have a much better idea where the

11   case is going, I think, at that point.

12          THE COURT:  Well, the same is true after plan

13   confirmation, too, assuming there's --

14          MR. FUSCO:  Yes.

15          THE COURT:  -- confirmation.  All right.  Anything

16   further?

17          MR. FUSCO:  No.

18          MR. HOLLOWELL:  Briefly, Judge --

19          THE COURT:  One second.  You represent the state;

20   right?

21          MS. GRIMM:  I do, your Honor.  Good morning.

22          THE COURT:  All right.  So we're going to hear from

23   the state, and then we'll get back to you.

24          MR. HOLLOWELL:  Thank you.

25          MS. GRIMM:  For the record, Assistant Attorney

1  General Nicole Grimm appearing on behalf of the State of

2  Michigan.  I would simply reiterate most of what the city

3  said.  Our position, I think, is laid out in the briefing

4  before this Court.  I would want to emphasize that it was

5  stated in the beginning repeatedly that this is about voting

6  rights and not debtor creditor, but, again, the relief sought

7  in the second amended complaint -- or I'm sorry -- the first

8  amended complaint would absolutely eviscerate Detroit's

9  bankruptcy filing, and as counsel for the city made clear,

10 that -- having an emergency manager file for bankruptcy is

11 the only way for that filing to happen, so it's difficult to

12 discern how either this Court did not have discretion in the

13 first instance, which I think petitioners imply, at least in

14 their first pleading before this Court, or how now the stay

15 cannot be extended to include this case when it is, I think,

16 axiomatically related to the bankruptcy proceeding.

17       THE COURT:  Well, is it the attorney general's

18 reading of PA 436 that only an emergency manager can

19 prosecute the Chapter 9 case once having filed it?

20       MS. GRIMM:  I would agree with the Court that as far

21 as I know --

22       THE COURT:  It's only a question.  There's

23 nothing --

24       MS. GRIMM:  Right.

25       THE COURT:  -- to agree with or disagree with.

 1          MS. GRIMM:  Okay.  Well --

 2          THE COURT:  Just a question.  What's the attorney

 3    general's reading?

 4          MS. GRIMM:  As far as I know, the emergency manager

 5    law states only that the emergency manager is the one that

 6    has to file it.

 7          THE COURT:  Um-hmm.

 8          MS. GRIMM:  In terms of prosecution, though, I think

 9    that if a law is ruled unconstitutional, then all of the

10    actions taken under that law are null and void, and that's

11    certainly the relief sought in the petitioner's lawsuit.

12          THE COURT:  It's a complex question, but if I heard

13    counsel for the NAACP correctly, they're only seeking

14    prospective relief.

15          MS. GRIMM:  Right.  And that's something new.

16    That's new today and not appearing in any papers that have

17    been filed, but, again, I would --

18          THE COURT:  That solve the problem?

19          MS. GRIMM:  Well, I would question whether that is

20    actually something that's possible because they are not

21    backing off from seeking a declaration that PA 436 is

22    unconstitutional.  If it's unconstitutional now, then I

23    believe, as a matter of law, necessarily, actions taken under

24    it would also have been unconstitutional and void, and that

25    would include the filing for bankruptcy.

```
 1              THE COURT:  Well --

 2              MS. GRIMM:  That's my understanding.

 3              THE COURT:  Do you remember the case of the attorney

 4    who came before the Court seeking relief from the stay so he

 5    could get his attorney fees because the state judge had found

 6    the Open Meetings Act violation?

 7              MS. GRIMM:  Yes.

 8              THE COURT:  Davis.

 9              MS. GRIMM:  Yes.  I'm familiar with that case.

10              THE COURT:  Thank you, staff.

11              MS. GRIMM:  Yes.

12              THE COURT:  Okay.  So he had all this law, right,

13    which said that, you know, even if it's -- even if the

14    appointment is found to be illegal, the actions taken in the

15    meantime are still valid.  He had all that law.

16              MS. GRIMM:  Okay.

17              THE COURT:  Doesn't all that law save whatever Mr.

18    Orr has done in the meantime and especially given the

19    representation made on the record here today?

20              MS. GRIMM:  Can I just ask just which representation

21    the Court is referring to?  The representation that only --

22              THE COURT:  The representation that the relief they

23    seek is only prospective, yes, that.

24              MS. GRIMM:  I don't know if I can speak definitively

25    to that.
```

1          THE COURT:  Okay.

2          MS. GRIMM:  My reading would be I'm not very sure

3    that you could --

4          THE COURT:  You're concerned.  Okay.

5          MS. GRIMM:  Yeah.  I am concerned about that.  Other

6    than that, I think at least what petitioners have stated in

7    their papers is that they're seeking to invalidate Kevyn

8    Orr's appointment and everything he's done pursuant to it,

9    and we would adopt the city's position as well.

10         THE COURT:  Okay.

11         MS. GRIMM:  Thank you.

12         THE COURT:  Thank you.  All right.  For rebuttal,

13   I'm going to ask one or the other of you to speak.

14         MR. HOLLOWELL:  That's fine, Judge.

15         THE COURT:  Take your choice.

16         MR. HOLLOWELL:  Thank you.  Wrap it up, Judge.

17   Again, Melvin Hollowell on behalf of the NAACP.  So as it

18   relates to the Court's inquiry, the federalism republican

19   form of democracy question about the legislature also being

20   elected and how does that work as it relates to a vote of the

21   people, well, that was actually addressed by the Sixth

22   Circuit in the League of Women Voters versus Brunner case,

23   which we cited in our brief today, 458 F.3d 16.

24         THE COURT:  What did they say?

25         MR. HOLLOWELL:  And they said it's part of the

```
 1   inquiry to determine whether or not the statute is
 2   unconstitutional.  That is part of a several-prong test.
 3            THE COURT:  Um-hmm.
 4            MR. HOLLOWELL:  Was there a vote of the people?  And
 5   they look at were there ordinances in place, you know, were
 6   those ordinances voted on by the people, were there state
 7   referenda, were there -- so that is actually part of what the
 8   Sixth Circuit says you have to look at.
 9            THE COURT:  Um-hmm.
10            MR. HOLLOWELL:  So it's part of the case.  The
11   second thing is I would refer the Court to our complaint and
12   Section 61 through 66 very specifically where we outline the
13   jurisdictions outside of the City of Detroit.
14            THE COURT:  Right.
15            MR. HOLLOWELL:  And, third, as it relates to
16   counsel's I think condescending comment that the NAACP's case
17   lacked visibility, it was a nationally -- I think it was
18   pretty condescending.  We're a hundred-year-old organization.
19   It was authorized by the national NAACP.  U.S. Labor
20   Secretary Robert Reich weighed in.
21            THE COURT:  You heard me --
22            MR. HOLLOWELL:  I did.
23            THE COURT:  -- express similar skepticism --
24            MR. HOLLOWELL:  I did.
25            THE COURT:  -- about that response --
```

1    MR. HOLLOWELL:  Incredibly condescending.

2    THE COURT:  -- so I think we can just let it go at

3  that.

4    MR. HOLLOWELL:  Yeah.  We'll let it go at that.  And

5  then as it relates to prospective -- certainly not obvious to

6  us that mediation is the best.  The best for us is democratic

7  rule, and the Court focused in like a laser beam on what we

8  saw as well, is that Public Act 436 is silent with respect to

9  moving forward.  It only talks about filing, but it doesn't

10  say, okay, after filing, and so we're saying we'll sign an

11  order.  We will sign an order saying that we are going to

12  contest anything prior to today or whenever the Court rules

13  relative to --

14    THE COURT:  No.  If you win your lawsuit before

15  Judge Steeh, if that goes ahead, your next step won't be to

16  come into this Court and file a motion to dismiss on the

17  grounds that the filing was unconstitutional.

18    MR. HOLLOWELL:  That's exactly right, and we would

19  sign an order to that effect, Judge.  And, you know, by the

20  same token, you know, in Pontiac they sold the Silverdome to

21  some folks in Canada.  We're not saying go find those folks

22  in Toronto and return the Silverdome back.  The relief is

23  prospective, and so, again, as we've said before, not name

24  the city, there's no debtor creditor issues.  This is purely

25  a voting rights issue.  And for the reasons stated on the

1    record, we would ask that the stay -- that we have an

2    exception to the extension of the stay.

3         Is it okay if he just says what he was going to say

4    to me in my ear?

5         THE COURT:  Okay.

6         MR. AYAD:  Just to give credence that this is not

7    new information, Judge, we indicated on Docket Number 29 and

8    35 in our response to the motion to dismiss before Judge

9    Steeh one of the options is bankruptcy.  We've never ruled

10   that out.  In fact, after we said that, two weeks later they

11   filed for bankruptcy, Judge, so that was something that was

12   contemplated.

13        MR. HOLLOWELL:  Thank you, Judge.

14        THE COURT:  All right.  Everybody all set?

15        MS. GRIMM:  Your Honor, if I may briefly point out

16   something about the Emergency Manager Act?  It does actually

17   say -- in MCL 141.1558, Section 18, it says that the

18   emergency manager is the only one empowered to act

19   exclusively on the local government's behalf in any such case

20   under Chapter 9, so it is not only the filing of the

21   bankruptcy but also the prosecution of it.

22        THE COURT:  All right.  All right.  The Court will

23   take this under advisement and issue a written decision.  I

24   think that's it for our docket today, so we will be in

25   recess --

13-53846-swr   Doc 2723-1   Filed 02/10/14   Entered 02/10/14 14:02:34   Page 148 of 301
13-53846-swr   Doc 2723-1   Filed 02/10/14   Entered 02/10/14 14:02:34   Page 148 of 154
507

1          THE CLERK:  All rise.

2          THE COURT:  -- until one o'clock.

3          THE CLERK:  Court is in recess.

4       (Recess at 11:54 a.m., until 1:10 p.m.)

5          THE CLERK:  Court is in session.  Please be seated.

6    Recalling Case Number 13-53846, City of Detroit, Michigan.

7          THE COURT:  The record should reflect counsel are

8    here.  My apologies to you, counsel, for being a few minutes

9    late here, and I need another minute to get organized here.

10   Okay.

11         On September 24, 2013, AFSCME filed a motion for

12   entry of an order modifying the automatic stay solely to

13   allow administrative law judge to execute his opinion and

14   liquidate damage award before he retires on October 4, 2013.

15   It also requested an expedited hearing on this matter, which

16   the Court granted and set for hearing today.  In the

17   meantime, the City of Detroit did file an objection to the

18   motion and a brief.

19         AFSCME asserts that the matter before the Michigan

20   Employment Relations Commission, MERC, has been fully

21   briefed, and, in fact, the administrative law judge, ALJ,

22   is -- has already given an oral opinion in the matter.  The

23   record also reflects that prior to the bankruptcy petition,

24   the parties submitted supplemental briefs to the ALJ

25   regarding the appropriate remedy and other matters.

1   Therefore, AFSCME asserts that all that remains for the ALJ

2   to do is to issue a written opinion.  It asserts that

3   allowing the ALJ to issue a written opinion will simply

4   create a snapshot of the ALJ's recommendation.  It further

5   asserts that this modification of the automatic stay will not

6   prejudice the city or drain city resources or distract the

7   city from the pending Chapter 9 proceedings before the

8   Bankruptcy Court because there is nothing for it left to do

9   in the litigation before the ALJ.

10          A decision whether or not to lift the automatic stay

11  resides within the sound discretion of the Bankruptcy Court.

12  In re. Garzoni, 35 Federal Appendix 179, 181, Sixth Circuit,

13  2002, citing Laguna Associates Partnership v. Aetna Casualty

14  & Insurance Company, In re. Laguna Associates Limited

15  Partnership, 30 F.3d 734, 737, Sixth Circuit, 1994.  The

16  Garzoni court stated on the same page, quote, "Bankruptcy

17  Code Section 362(d)(1) provides that the bankruptcy court may

18  grant relief from the automatic stay for cause.  See 11

19  U.S.C., Section 362(d)(1).  The bankruptcy court considers

20  the following factors in deciding whether to lift a stay:

21  (1) judicial economy; (2) trial readiness; (3) resolution of

22  preliminary bankruptcy issues; (4) the creditor's chance of

23  success on the merits; and (5) the cost of defense or other

24  potential burden to the bankruptcy estate and the impact of

25  the litigation on other creditors."  Bankruptcy courts have

13-53846-swr   Doc 2272-1   Filed 02/10/14   Entered 02/10/14 14:02:04   Page 150 of 303
13-53846-swr   Doc 2472-1   Filed 02/10/14   Entered 02/10/14 14:02:04   Page 150 of
154

 1 held that it may be appropriate to lift the automatic stay

 2 when another court, quote, "already had all of the

 3 documentation and evidence in its hands in order to rule in

 4 the matter and a decision could be made almost immediately,"

 5 close quote, In re. Bunting, 2013 Westlaw 153309, Eastern

 6 District of Michigan, January 15th, 2013.

 7         After reviewing all of these factors, the Court

 8 concludes that they weigh in favor of modifying the automatic

 9 stay to allow entry of the ALJ's written opinion.  In the

10 Court's view, the most important matter -- or factor is that

11 it does not appear that there will be any prejudice to the

12 city if the relief sought by the moving party, AFSCME, is

13 granted and if all we allow is for the ALJ to issue a written

14 decision.

15         In particular, AFSCME's proposed order only seeks to

16 allow the ALJ to execute his recommended decision before he

17 retires on October 4th, 2013.  In this regard, the Court must

18 state for the record that the fact that the ALJ -- the ALJ's

19 retirement is imminent is, in the Court's view, largely

20 irrelevant.  The Court should decide whether it's appropriate

21 to grant this limited relief from the stay regardless of

22 whether the ALJ happens to be retiring imminently or not.

23 The Court notes that the proposed order also waives the stay

24 of the order as provided for in Bankruptcy Rule 4001(a)(3),

25 and that's appropriate here as well.

1    The Court does acknowledge and recognize that the

2  city takes the position that there is much more process that

3  is required before the ALJ and also before MERC before this

4  matter is finalized.  The Court concludes, however, that it

5  is not for this Court to decide whether the ALJ has completed

6  all of the process necessary for him to issue a decision.

7  It's for the ALJ to decide.  And, of course, in that regard,

8  if the city determines that its procedural or substantive

9  rights have been prejudiced by any action of the ALJ that

10  flows from or results from this order or otherwise, those

11  objections are, of course, fully preserved to be presented as

12  appropriate in future proceedings.

13    Accordingly, the Court does grant relief from the

14  automatic stay but only until 11:59 p.m. on October 4th,

15  2013, for the sole purpose of allowing the administrative law

16  judge to -- the opportunity to issue a written recommendation

17  should he decide that it is appropriate to do so.  This

18  relief that the Bankruptcy Court is granting is neither a

19  request for the ALJ to issue a recommendation or an order to

20  do so.  And just to be crystal clear about this, if the ALJ

21  feels that more process is required for any reason, whether

22  it's the arguments made in the post-hearing briefs or the

23  events that have occurred post-hearing, relief from stay is

24  not granted to allow for any other or further process or

25  procedures.

1       The parties have agreed on the record and the Court

2   does order that all dates and deadlines that would otherwise

3   flow under state law from any opinion or recommendation that

4   the ALJ issues are tolled and will be tolled indefinitely

5   pending a further order of this Court.

6       Finally, the Court feels compelled to state on the

7   record that it has taken the time to articulate on the record

8   here this very narrow ruling so that it is clear that this

9   case should not be considered precedent for other parties'

10  motions for relief from the stay because the facts and

11  circumstances here are unusual or unique, to say the least.

12  The Court will prepare an appropriate order.  Anything

13  further?

14          MS. LEVINE:  Thank you.

15          MS. LENNOX:  No, your Honor.  Thank you.

16          THE COURT:  All right.  We'll be in recess then.

17          THE CLERK:  All rise.  Court is adjourned.

18      (Proceedings concluded at 1:20 p.m.)

INDEX


WITNESSES:

    None

EXHIBITS:

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 8, 2013
_____        _____
Lois Garrett