# IN THE UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
----------------------------------------------- x
                                                 :
In re                                            :          Chapter 9
                                                 :
CITY OF DETROIT, MICHIGAN,                       :          Case No. 13-53846
                                                 :
              Debtor.                            :          Hon. Steven W. Rhodes
----------------------------------------------- x
```

## DEBTOR'S OBJECTION AND BRIEF IN OPPOSITION TO MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY JESSIE PAYNE

### I.    INTRODUCTION

Jessie Payne ("Movant") seeks relief from the automatic stay to assert a claim for the payment of two personal injury judgments against City of Detroit ("City") bond proceeds held in escrow ("Escrowed Funds," defined below). Movant's claim rests entirely on the mistaken belief that the Escrowed Funds do not constitute "property of this bankruptcy estate."[1] Motion ¶ 6. Because the City retains an interest in the Escrowed Funds, the Escrowed Funds constitute property of the City and are subject to the automatic stay. Movant has not demonstrated

---

[1] Filing a chapter 9 bankruptcy case does not create an "estate." *In re N.Y. City Off-Track Betting Corp.*, 434 B.R. 131, 141-42 (Bankr. S.D.N.Y. 2010). Bankruptcy Code § 902(1) defines references to "property of the estate" to mean "property of the debtor" when used in a section made applicable to a case under chapter 9, such as Bankruptcy Code § 362(d).

cause for relief from the stay to assert prepetition judgments against this property of the City. The Motion should be denied.

## II. <u>BACKGROUND</u>

Knowing the origin and tracing the history of the Escrowed Funds is the key to understanding why this money, despite presently being held in escrow, is (and, in fact, has always been) property of the City. The Escrowed Funds began as the City's money, continue to be the City's money and are held for the City's benefit – to be used for the payment of the City's expenses at the City's request.

### A. Consent Agreement and the Self-Insurance Bond Issuance

In early 2012, the City and the State of Michigan negotiated the Financial Stability Agreement, more commonly called the "Consent Agreement." Opinion Regarding Eligibility at 27. [Doc. No. 1945]. *See* Ex. 1. Paragraph 2.5(a) of the Consent Agreement, entitled "Cash stabilization transaction" provides:

> The Treasury Department will assist with the structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012. The anticipated aggregate size of the financing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses. Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

In connection with the cash stabilization transaction set forth in the Consent Agreement, the Detroit City Council and the Mayor approved a resolution ("Resolution") authorizing the issuance and sale of bonds to, among other things, provide cash to the "Risk Management Fund previously established by the City for the purpose of defraying losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure…" *See* Ex. 2, Resolution, Section 201. After making certain deposits required by the Resolution, "the remainder of the proceeds of the sale of the Series 2012(A) Bonds shall be deposited in the Risk Management Escrow Fund created under the Restricted Escrow Agreement." Resolution, Section 505.

The Restricted Escrow Agreement was entered into on or about March 1, 2012, between the City and U.S. Bank National Association, Detroit, Michigan ("Escrow Trustee"). *See* Ex. 3. The Department of Treasury of the State of Michigan ("Treasury Department") acknowledged execution of the Restricted Escrow Agreement. Ex. 3 at 8. The net proceeds of the Distributable State Aid Second Lien Self-Insurance Bonds (Limited Tax General Obligation) Series 2012 ("Self Insurance Bonds") were placed into the Self-Insurance Escrow Account.[2] Restricted Escrow Agreement § 2.01.

---

[2] The terms "Risk Management Escrow Fund" in the Resolution and "Self-Insurance Escrow Account" and "Self-Insurance Bond Account" in the Restricted Escrow

The City's finance director may requisition moneys from the Self-Insurance Escrow Account by filing a completed requisition certificate, in the form attached to the Restricted Escrow Agreement, with the Escrow Trustee. Restricted Escrow Agreement § 3.02. Thus, funds from the Self-Insurance Escrow Account may only be released at the City's request and only to pay the City's obligations.

The Michigan Department of Insurance and Financial Services ("DIFS") and the Treasury Department executed the Memorandum of Understanding in May and June, 2013 ("MOU"). Under the MOU, the DIFS agreed to issue a certificate of self-insurance to the City and the Treasury Department agreed that at least $15.2 million ("Escrowed Funds") of the funds in the Self-Insurance Escrow Account would be available to pay Motor Vehicle Claims (as defined below) if the City is unable or fails to pay a Motor Vehicle Claim. Motion, Exhibit C ¶ II.1.

### B.    The City's Bankruptcy Case and Movant's Claim

On July 18, 2013 ("Petition Date"), the City filed a petition for relief in this Court. On August 20, 2013, the Movant filed two claims: claim number 11 in the amount of $495,392.00 and claim number 12 in the amount of $3,000,000.00. On December 24, 2013, this Court entered the Order, Pursuant to Sections 105 and 502 of the Bankruptcy Code, Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims ("ADR

Agreement are used interchangeably. For purposes of this Objection, the account will be referred to as the "Self-Insurance Escrow Account."

Order") which approved the Alternative Dispute Resolution Procedures ("ADR Procedures") attached to the ADR Order as Annex 1. [Doc. No. 2302]. ADR Order ¶ 6 The ADR Procedures provide that "claims, to the extent not satisfied in the ordinary course, relating to the operation of motor vehicles for which the City is self-insured pursuant to chapter 31 of Michigan's Insurance Code of 1956, M.C.L. §§ 500.3101 et seq." ("Motor Vehicle Claims") constitute Initial Designated Claims. On February 21, 2014, the City filed its Plan for the Adjustment of Debts ("Plan") and related disclosure statement. [Doc. Nos. 2708 & 2709]. Under the Plan, Motor Vehicle Claims are afforded the same treatment as "Other Unsecured Claims." Plan, Article I.A. ¶ 184.

## III. ARGUMENT

### A. The City Holds Legal Title to the Funds in the Escrow Account

The City holds legal title to the funds in the Self-Insurance Escrow Account. The general rule in most states is that legal title to property placed into escrow remains with the grantor until the conditions of the escrow have been satisfied. *Musso v. N.Y.S. Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.)*, 157 B.R. 932, 940 (Bankr. E.D.N.Y. 1993) ("In New York, as in most other states, legal title to property placed in escrow remains with the grantor pending the fulfillment of the conditions agreed upon in the escrow agreement."); *Albrecht v. Brais*, 754 N.E.2d 396, 399 (Ill. Ct. App. 2001) ("A trustee holds legal title to property for the

welfare of the beneficiary, who holds equitable title. An escrow agent, on the other hand, is not vested with title to the property, though he may be entrusted with possession and he may have power to pass title."). This is the rule in Michigan as well. *Slesinger v. Willeke*, 271 Mich. 707, 710 (1935); *Frankiewicz v. Konwinski*, 246 Mich. 473, 477 (1929) (holding that grantor bore risk of escrow agent's disappearance with grantor's escrowed evidence of title); *City Bank & Trust Co. v. Kwaske Bros. Constr. Co.*, 69 Mich. App. 271, 274 (1976) (distinguishing between the roles of trustee and escrow agent).[3] Here, the City continues to hold legal title to the Escrowed Funds. The City's money funded the Self-Insurance Escrow Account and under the Restricted Escrow Agreement, the funds in the Self-Insurance Escrow Account may not be released unless and until the City requests that they be released. Further, the condition in the MOU for the release of the

---

[3] While not a section incorporated into Chapter 9, the definition of property of the estate under Bankruptcy Code § 541 is instructive as to what constitutes property of the City. Under § 541(a)(1), property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent...." *Segal v. Rochelle,* 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966). "In fact, every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative, is within the reach of § 541." *In re Yonikus,* 996 F.2d 866, 869 (7th Cir.1993). Even a bare possessory interest such as a tenancy at sufferance, is "an interest in real property within the scope of the estate in bankruptcy under section 541." *Convenient Food Mart No. 144, Inc. v. Convenient Industries of America, Inc. (In re Convenient Food Mart No. 144, Inc.),* 968 F.2d 592, 594 (6th Cir.1992) (citations omitted). *See also In re Plastech Engineered Products, Inc.,* 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008). The City's interest in the Escrowed Funds is more direct, more apparent and certainly more concrete than these examples.

Escrowed Funds has not been satisfied because the triggering event has yet to come to pass: whether the City is "unable to or fails to pay a judgment or claim pursuant to the law." MOU, ¶ II.2. While the City has filed its Plan, it continues to evaluate and negotiate with creditors and a final determination has not been made with respect to the treatment of Motor Vehicle Claims or the Escrowed Funds.

At the very least, under the terms of the Restricted Escrow Agreement, the City retains a residual or contingent interest in the Escrowed Funds. Pursuant to Exhibit A of the Restricted Escrow Agreement, the City may reimburse itself for payments "made not earlier than July 1, 2011 from the General Fund of the City." For these reasons, among others, the Escrowed Funds constitute property of the City.

### B. The Automatic Stay Applies to the Funds in the Escrow Account

Even a debtor's "bare possessory interest" in property subjects the property to the automatic stay. *In re Plastech Engineered Prods., Inc.*, 382 B.R. 90, 106 (Bankr. E.D. Mich. 2008). Here, the City has more than a bare possessory interest because the City holds legal title to the Escrowed Funds, and this interest is sufficient to invoke the provisions of the automatic stay of Bankruptcy Code against enforcement of the Movant's prepetition judgments. See particularly, Bankruptcy Code § 362(a)(2).

## C. No Basis Exists to Grant the Movant Relief From Stay

The sole basis asserted by the Movant for relief from stay is that the Escrowed Funds are not property of the City. Because, as demonstrated above, the Escrowed Funds are property of the City, the Motion must be denied. The Movant has not pled any facts or cited any law which would lead to a different result.

If, however, the Court were to consider whether cause exists to lift the automatic stay (which it has not yet been asked to do), the Court must find that cause does not exist where the Movant has provided no basis to proceed outside the claims resolution processes established by this Court and the Bankruptcy Code. Until the Plan is confirmed, the City does not know whether some, all or none of the Escrowed Funds will be used to pay Motor Vehicle Claims. In the meantime, the ADR Procedures will be used to liquidate other Motor Vehicle Claims. Then, once the treatment of Motor Vehicle Claims is finally determined, all of these claims will be treated equally under the Plan without discrimination. While the City considers how to deal with the Escrowed Funds under the Plan, the automatic stay will assure Movant as well as all other claimants that available assets are being dealt with equitably and fairly. On the other hand, adopting the Movant's "first come, first served" approach to the Escrowed Funds would likely prejudice not only other holders of Motor Vehicle Claims but also other creditors of the City.

The Movant should not be exempted from the Chapter 9 claims adjustment and Plan confirmation process.

Finally, and as set forth above, the provisions of the MOU which could result in use of the Escrowed Funds to pay Motor Vehicle Claims are not operative because it is yet to be determined whether the City will be unable to or will fail to pay Motor Vehicle Claims. The City and the State of Michigan are also continuing to discuss the future of the City's insurance status and self-insurance certificate and any requirements that may be necessary for its continuation. Granting the Movant relief from stay prior to the resolution of these issues is premature and likely prejudicial to other creditors. For all of these reasons, there is no cause to grant relief and the Motion must be denied.

## IV.   <u>CONCLUSION</u>

WHEREFORE, the City respectfully requests that this Court: (a) deny the Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: March 3, 2014          Respectfully submitted,

By: /s/Stephen S. LaPlante
Jonathan S. Green (P33140)
Stephen S. LaPlante (P48063)
Timothy A. Fusco (P13768)
MILLER, CANFIELD, PADDOCK AND
STONE, P.L.C.
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com
fusco@millercanfield.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

ATTORNEYS FOR THE CITY OF DETROIT

21,957,222.6\022765-00202

# FINANCIAL STABILITY AGREEMENT

WHEREAS, the City of Detroit (the "City"), like many industrial cities throughout the United States, has experienced a prolonged period of economic change stretching over several decades which has eroded the quality of life of the City's residents and businesses; and

WHEREAS, the City currently confronts daunting challenges characterized by persistent and systemic fiscal imbalances and deficit conditions, aggravated by the deterioration in revenues received from property taxes, income taxes, interest earnings, utility revenues, and intergovernmental revenues resulting from the recent serious recession in the U.S. and Michigan economies; by the growth in the City's legacy costs concurrently with the City's diminished ability to carry such costs; and by the difficulty in rapidly restructuring the City's operations so as to bring short-term and long-term expenditures in line with current and projected revenues; and

WHEREAS, a financially stable and vibrant City is important as a catalyst for the State of Michigan's overall image and success in economic development, business attractiveness, quality of life, and a host of other factors; and

WHEREAS, fundamentally changing the City's current trajectory can restore the quality of life which families, businesses and visitors have a right to expect and enjoy; and

WHEREAS, the City, through the Mayor and City Council, seeks to pursue this long-term vision by achieving, first, financial stability for the City, and, second, a sustainable and stable platform for growth ensuring the City's financial integrity in a manner that enables the City to grow, prosper and thrive; and

WHEREAS, the People of the State of Michigan have required the establishment of the Department of Treasury as a principal department of state government under Section 3 of Article V of the State Constitution of 1963 (the "Treasury Department") and provided that the State Treasurer, a constitutional officer appointed by the Governor with the advice and consent of the Michigan Senate (the "State Treasurer"), shall serve as the head of the Department, which is vested with responsibilities related to local government finance, budgeting and administration under state law; and

WHEREAS, the City is a political subdivision of the State of Michigan organized as a body corporate under Act 279, Public Acts of Michigan, 1909, as amended, the Home Rule City Act ("Act 279"), with the People of Detroit having created and provided for their continuing control of the municipal government of the City by adopting a Home Rule Charter of the City of Detroit (the "Charter"), and the People of the State of Michigan conferring comprehensive home rule power to the City through the State Constitution of 1963, subject to the limitations on the exercise of that power contained in the Constitution or the Charter, or imposed by statute;

WHEREAS, the Treasury Department desires to undertake jointly with the City efforts for the betterment of the residents of the City and the State of Michigan (the "State") as a whole through the adoption of this Financial Stability Agreement (this "Agreement"); and

WHEREAS, as a commitment to the long-term cooperative process established in this Agreement, the Mayor and the City Council desire to authorize and perform certain initial restructuring actions detailed herein with the Treasury Department; and

-2-

WHEREAS, the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas; and

WHEREAS, this Agreement contains the terms and conditions authorizing a cooperative undertaking between public agencies for efficiently restructuring the City's operations and tackling the City's systemic issues and accumulated deficit with the goals of (i) ensuring that the City remains a safe and secure environment where residents and visitors can live and work, (ii) promoting the delivery of quality, efficient, and effective public services to residents and businesses, and (iii) creating a civic culture and environment that attracts as well as retains investment, businesses, jobs and new residents to the City and the State; and

WHEREAS, approval of this Agreement is intended to reaffirm the role of the City's executive and legislative branches under the Charter in the development of the strategy, policies and long-term vision of a revitalized City; and

WHEREAS, under this Agreement the City and the Treasury Department agree to jointly exercise powers relating to public finance, budgeting, and administration that they share in common and that each may exercise separately, including, but not limited to, the powers, privileges and authorities of the Treasury Department to protect the credit of the State and municipalities in the State, and to aid, advise and consult with the municipalities with respect to fiscal questions and certain other matters under Act 34,

-3-

Public Acts of Michigan, 2001, as amended, the Revised Municipal Finance Act ("Act 34"), and to require local units of government to agree to plans to correct deficit conditions under Act 140, Public Acts of Michigan, 1971, as amended, the Glenn Steil State Revenue Sharing Act of 1971 ("Act 140"), and under other applicable law; and the power and authority of the City under Act 34 and Act 140 in respect of the foregoing, and the comprehensive home rule and other powers, privileges and authority of the City to enter into contracts on matters of municipal concern including, but not limited to, under Act 279, the Charter, and other applicable law; and

WHEREAS, under Act 140 the City previously has submitted to the Treasury Department a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140; and

WHEREAS, this Agreement shall update, supplement and restate the City's deficit elimination plan currently on file with the Treasury Department, as the same may be modified from time to time, and constitutes the City's request that the Treasury Department assist and cooperate with the City in the joint formulation of the financial plan to correct the City's deficit condition.

NOW, THEREFORE, the parties hereby agree as set forth below. Without limiting the foregoing, the City, through its Mayor (the holder of such office at any given time, the "Mayor") and the City Council of the City of Detroit (the holders of such offices, collectively, at any given time, the "City Council"), hereby agree and promise to undertake the steps outlined in this Agreement in consideration of and reliance upon: (i) subject to the terms of this Agreement, the Treasury Department maintaining existing discretionary state revenue sharing initiatives and agreements under Act 140; (ii) subject to the terms of this Agreement, the City's continuing ability to issue new

-4-

municipal securities with appropriate approvals under Act 34 until such time as the City achieves "qualified status;" (iii) subject to the terms of this Agreement, the City's ability to obtain additional financing pursuant to Act 243, Public Acts of Michigan, 1980, as amended, the Emergency Municipal Loan Act ("Act 243") with appropriate approvals; and (iv) the other agreements and commitments made herein by and on behalf of the Treasury Department.

## 1. FINANCIAL ADVISORY BOARD

### 1.1. Establishment and Purpose.

(a)  Pursuant to this Agreement and applicable law, a financial advisory board (the "Financial Advisory Board") shall be immediately established to administer and execute this Agreement.  The Financial Advisory Board shall be a public body politic and an intergovernmental entity that is neither a commission, board or council of the City nor a commission, board or council of the State.

(b)  The parties agree that the City is in need of specific and targeted operational and technical support and consultation in such areas as information technology, payroll and accounting, financial recordkeeping and reporting, internal controls, data management and analytics, enterprise application implementation, actuarial analysis and benefits management, State and federal grant management, revenue assessment and forecasting, and other areas the City may identify from time to time (the "Support Subjects").  In response to those needs, the Financial Advisory Board is charged with: (a) consulting with and assisting the City regarding implementation of systems and improvements in the Support Subjects; (b) monitoring and reporting upon the City's ongoing financial performance; (c) making certain findings and recommendations to and assisting the City with the City's preparation,

-5-

implementation and execution of an annual Triennial Budget and General Appropriations Act (as described in Section 3.7 of this Agreement, the "Triennial Budget"), which shall include the City's annual Budget (defined below); (d) assisting the City in achieving Financial Stability (defined below); (e) monitoring compliance with this Agreement; and (f) taking certain actions respecting, and pursuing remedies for, non-compliance with this Agreement as provided in this Agreement.

    1.2.  <u>Composition</u>.  The Financial Advisory Board shall be composed of nine members, each of whom shall possess professional qualifications in the Support Subjects and character suitable for the rendering of well-informed judgments within the context of highly complex transactions. The initial Financial Advisory Board shall be appointed by the Governor of the State of Michigan (the holder of such office at any given time, the "<u>Governor</u>"), the Mayor, the City Council, and the State Treasurer (for purposes of this Section 1.2, each respectively an "<u>Appointing Entity</u>") as follows:

(a)    Three individuals appointed by the Governor;

(b)    Two individuals appointed by the Mayor;

(c)    Two individuals appointed by the City Council;

(d)    One individual appointed jointly by the Governor and the Mayor and subject to confirmation by the City Council; and

(e)    One individual appointed by the State Treasurer.

Each member of the Financial Advisory Board (any such member, a "<u>Member</u>") shall possess at least ten years' experience with one or more of (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, or (e) local government management with government units having consolidated revenues of $250

-6-

million or more. Prior to appointment of an individual as a Member, the Appointing Entity shall request independent confirmation that the individual possesses the qualifications required under this Section 1.2 from the Michigan Association of Certified Public Accountants or the Michigan Government Finance Officers Association.

Members shall not be officers or employees of the City or the State, or of the Mayor's executive staff, or a member or former member of the City Council. The terms of all Members shall be three years, provided that of the members initially appointed (a) of the Members identified in Section 1.2(a), one shall be appointed for an initial 24-month term and one shall be appointed for an initial 12-month term; (b) of the Members identified in Section 1.2(b), one shall be appointed for an initial 24-month term; (c) of the Members identified in Section 1.2(c), one shall be appointed for an initial 12-month term; and (d) the Member identified in Section 1.2(d) shall be appointed for an initial 12-month term; and provided further that one of the Members identified in Section 1.2(c) and the Member identified in Section 1.2(e) shall be appointed to and serve at the will of the respective Appointing Entity (the "At-Will Members"). After the initial appointments, subsequent appointments shall be made in the same manner as the original appointment. Vacancies shall be filled by the Appointing Entity for the balance of the unexpired term. Excepting the At-Will Members, Members may only be removed by the respective Appointing Entity for Cause. "Cause" means misfeasance, malfeasance, gross neglect of duty, corrupt conduct in office, pleading to or conviction of a felony, absence from 3 consecutive meetings without being formally excused, or at the discretion of the Appointing Entity, absence from more than 15% of meetings within a calendar year. Upon the formation of the Financial Advisory Board and thereafter, the Governor and the Mayor shall jointly designate a Member to serve as the Chair of the

-7-

Financial Advisory Board (the "Board Chair"). The Board Chair shall serve as such officer at the will of the Governor and the Mayor.

1.3    Compensation. Members shall be entitled to annual compensation in the amount of $25,000.00 (such compensation, the "Annual Compensation") during their terms of service, provided that (a) such Annual Compensation shall be payable in four equal installments on a quarterly basis, (b) such Annual Compensation shall be prorated as necessary in the event that a Member serves less than a full quarter for any reason, and (c) a Member may elect to serve without compensation by notifying the Board Chair of the election in writing within 30 days of his or her appointment and while serving without compensation shall not be considered employed by the Board, the City or the Treasury Department.

. All Members shall be entitled to reimbursement of actual, reasonable, necessary and documented expenses in accordance with applicable standards in force for State employees and appointees (including, but not limited to, expenses related to travel, meals and lodging) incurred in connection with their service as Members of the Financial Advisory Board (such expenses, the "Reimbursable Expenses"). The City shall be responsible for the payment of each Member's Annual Compensation, with 50% of each Member's Annual Compensation reimbursed by the Treasury Department. The City shall be responsible for the payment of each Member's Reimbursable Expenses of up to $3,000.00 each, with 50% of each Member's Reimbursable Expenses of up to $3,000.00 reimbursed by the Treasury Department. Reimbursable Expenses for each Member in excess of $3,000.00 may be 100% reimbursed by the Treasury Department but only with the approval of the State Treasurer. Reimbursement shall be made by the Treasury Department no later than the earlier of (a) 45 days after

-8-

the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made and (ii) incorporated in the Budget (defined below), provided that neither the State, the City, the Treasury Department nor any other entity shall be responsible for the payment of any Reimbursable Expense that is not evidenced by a copy of the corresponding receipt. The Financial Advisory Board shall adopt procedures and policies having the objective of using current technology, communication and other means to constrain Reimbursable Expenses to the extent reasonably practicable.

### 1.3a Standards of Conduct, Conflicts of Interest and Ethics

(a)     Members of the Financial Advisory Board are public officials in a position of public trust. Upon appointment, each Member shall take the constitutional oath of office under Article XI, § 1 of the State Constitution of 1963.

(b)     Members of the Financial Advisory Board are public servants subject to the provisions of Act 317, Public Acts of Michigan, 1968, as amended ("Act 317"), pertaining to contracts of public servants with public entities.

(c)     Within thirty (30) days of its initial meeting, the Financial Advisory Board shall adopt a Standards of Conduct, Conflicts of Interest and Ethics Policy ("Policy"). The Policy shall be designed to assure that governmental decisions are made in the public's best interest by prohibiting members of the Board and its employees and contractors from participating in matters that affect their personal or financial interests. The Policy shall be no less stringent than requirements under (a) Act 317; (b) Act 196, Public Acts of Michigan, 1973, as amended; and (c) Section 2-106 et seq. of the Charter. The Policy also shall include, without limitation, all of the following:

(i)     Provision for the reasonable disclosure of substantial financial interests held by any Member or employee of the Board who regularly exercises significant authority over the approval or renewal of any contracts.

(ii)    Standards of conduct designed to assure the ethical behavior of Members and employees and contractors of the Board.

(iii)   A Member or employee or agent of the Board shall discharge the duties of his or her position in a nonpartisan manner, with good faith, and with that degree of diligence, care, and skill which an ordinarily prudent person would exercise under similar circumstances in a like position. In discharging the duties, a Member or an employee or agent, when acting in good faith, may rely upon the opinion of counsel for the Board, upon the report of an independent appraiser selected with reasonable care by the Board, or upon financial statements of the Board or the City represented to the Member or employee or agent of the Board to be correct by the person having charge of its books or account, or stated in a written report by a certified public accountant or firm of certified public accountants fairly to reflect the financial condition of the Board or the City.

(iv)    A Member shall not make, participate in making, or in any way attempt to use his or her position as a Member to influence a decision providing a personal, family or business benefit to the Member.

(v)     A Member or employee or agent of the Board shall not engage in any conduct that constitutes a conflict of interest and shall immediately advise the Board Chair in writing of the details of any incident or circumstances that may present the existence of a conflict of interest with respect to the performance of the Board-related

work or duty of the member, employee, or agent. The Board Chair will immediately advise the Treasurer and the Mayor of any personal conflict of interest.

(vi)     A Member with a conflict of interest related to any matter before the Board shall disclose the conflict of interest before the Board takes any action with respect to the matter, which disclosure shall become a part of the record of the Board's official proceedings. The member with the conflict of interest shall refrain from doing all of the following with respect to the matter that is the basis of the conflict of interest:

(A) Voting in the Board's proceedings related to the matter.

(B) Participating in the Board's discussion of and deliberation on the matter.

(C) Being present at the meeting of the Board when the discussion, deliberation, and voting on the matter take place.

(D) Discussing the matter with any other Member.

(vii)    Members may not directly or as a result of their affiliation with other organizations do business with the City, have any contracts with the City, respond to any RFPs or seek or be seeking any no-bid contracts (pending or future), nor have immediate family or "close kin" relationships with officers or employees of the City.

(ix)     Members may not have or acquire financial interest in any property or asset owned by the City, nor have an interest in any provider of goods and services to the City, unless such interest comes through ownership of publicly-traded shares constituting not more than 0.1% ownership in such provider.

(x)      Members will be required to formally attest to their independence and understanding of the Standards of Conduct, Conflicts of Interest and Ethics Policy.

(xi)     Except as otherwise provided by applicable law, Members or employees or agents of the Board shall not knowingly:

-11-

A. Willfully or grossly neglect the discharge of his or her duties;

B. Use or disclose confidential information concerning the property, government or affairs of the Board not available to members of the public and gained by reason of his or her official position;

C. Engage in or accept private employment or render services when such employment or service is in conflict or incompatible with the proper discharge of his or her official duties or would tend to impair his or her independence of judgment or action in the performance of official duties;

D. Represent a private person, business or organization in any action or proceeding pending before the Board or the City or any office, department or agency thereof.

E. Vote or otherwise participate in the approval of any contract, or any other type of transaction, with any business entity in which he or she or an immediate family member has a financial interest; or

F. Use his or her official position, in violation of applicable law, to improperly influence a decision of the Board, the Mayor, City Council members, City Clerk, appointees or other City employees.

G. Attempt to influence any decision to fill a position in City government with an immediate family member.

(xii)    A Member shall not accept gifts, gratuities, honoraria, or other things of value from any person or company doing business or seeking to do business with the City or the Board, is seeking official action from the City or the Board, has interests that could be substantially affected by the performance of the person's official duties, except as specifically provided in the Policy.

(xiii)   The Policy may, by reference, incorporate ethics policies of the City that impact the Board.

(xiv)   By a vote of six members of the Board, the Board may waive a portion of this Policy on a case-by-case basis when the Board determines a waiver is in the public interest.

1.4   <u>Board Organizational Matters</u>.  The Financial Advisory Board may:

(a)   Adopt rules of procedure governing the conduct of its business, including, but not limited to, the (i) identification of the responsibilities of the Board Chair (which will include the role of chairing Revenue Conferences (defined below)), (ii) appointment of its officers as necessary and appropriate and (iii) adoption of specific procedures governing the Board's performance of its purposes described in this Agreement.

(b)   Hire, employ, appoint and/or supervise professional staff to assist in the completion of its duties and to assist State and local officials. The City shall be responsible for the payment of all reasonable fees and expenses incurred by the Financial Advisory Board in connection with such professionals' services up to an annual maximum of not more than $250,000.00 or such other amount as shall be agreed to by the City and the Treasury Department, with 50% of all such payments by the City to be (i) reimbursed by the Treasury Department no later than the earlier of (a) 45 days after the submission by the City of an invoice for such reimbursement to the Treasury Department or (b) the close of the same State fiscal year in which such payments are made; and (ii) incorporated in the Budget (defined below).

(c)   Enter into contracts to assist in the completion of its duties and sue and be sued in its own name.

(d)   Obtain appropriate levels of insurance for its Members, including director and officer insurance or its equivalent. The Treasury Department shall be responsible for the payment of all reasonable premiums and expenses incurred by the Financial Advisory Board in connection with such insurance.

1.5   <u>Board Authority</u>. Consistent with this Agreement and applicable law, the Financial Advisory Board shall have authority to do all of the following:

(a)   Recommend financial and operational metrics by which the City's financial performance and operations shall be monitored and evaluated consistent with best management practices for local government entities.

-13-

(b) Monitor the City's financial and operational performance and the timely implementation of the Triennial Budget consistent with the terms of this Agreement and periodically advise the Governor, the Mayor, and the City Council of the Board's conclusions. Reports of the Financial Advisory Board under this subsection shall be made available to the public.

(c) Evaluate the City's existing debt structure and recommend means of achieving rating and credit improvements; and, from and after July 20, 2012, receive from the Mayor, and review, assist, and advise prior to submission to City Council by the Mayor, (i) any material capital markets transaction (including transactions involving new or existing swaps) proposed to be entered into by the City (including, but not limited to, any proposed exchange offers), and (ii) any proposed changes to the City's debt structure or restructuring of the City's outstanding debt; and assist, advise and provide technical support to the City in respect to ratings presentations and other presentations to third-party capital markets participants.

(d) With respect to debt instruments, securities, financing leases, installment contracts and other financial instruments or securities which are not otherwise subject to Treasury Department approval under Act 34, review and approve or disapprove the issuance of such instruments following City Council approval of appropriate authorizing resolutions or ordinances.

(e) Provide assistance, advice and technical support to the City in respect of the Support Subjects and in the preparation of the City's annual proposed operating and capital budgets (any such budget a "Budget") and the Triennial Budget. The Budget shall be prepared on a consistent basis with the Triennial Budget.

(f) As part of the Revenue Estimation process under Sections 3.1 and 3.2 of and Annex C to this Agreement, review and approve the Revenue Estimation, including any Set-Aside (defined below) for deficit reduction or budget stabilization, to be included in the Budget to be prepared by the Mayor.

(g) Review, assist, advise and comment to the Mayor and City Council on the financial impact of (i) any proposed amendment or modification to any material contracts to which the City is party (including, but not limited to, the Support Subjects), (ii) any proposed sale of any material asset of the City, and (iii) any other proposed action by the City that could have a material impact on the financial condition of the City.

(h) Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding any plan or proposed transaction related to the consolidation, disposition or elimination of City departments, including with respect to the impact of such transactions on the Triennial Budget.

(i) Receive from the Mayor or City Council, and review, assist, advise and make recommendations regarding proposed changes to the organizational

-14-

structure of the City involving any positions appointed by or that report directly to the Mayor or City Council.

(j)     Receive from the Mayor, and review, evaluate, analyze and comment on proposed judgment levies before submission to a court pursuant to Public Act 236 of 1961, the Revised Judicature Act of 1961.

(k)     Monitor the performance by the City and the Treasury Department of compliance with this Agreement.

(l)     Take remedial steps set forth in Section 6.3 of this Agreement in the event of a determination by the Board of a material breach of this Agreement under Section 6.2 of this Agreement; supervise the Program Management Director's (defined below) actions in the event of a Reform Default (defined below) as provided in Section 6.4 of this Agreement; and exercise the authority assigned to it by the Mayor and the City Council to take certain additional actions under this Agreement in the event of a material breach of this Agreement.

(m)     Consent to the approval of City settlements of claims as provided in Section 5.1 of this Agreement.

1.6     Quorum and Voting. A majority of the members of the Financial Advisory Board appointed and serving shall constitute quorum. Except as otherwise provided in this Agreement, the Financial Advisory Board may act by a majority vote of its Members present and voting, provided that a declaration of a default under Section 6.2 of this Agreement or of a Reform Default under Section 6.4 of this Agreement shall require a majority vote of all Members then in office.

1.7     Meetings. The Financial Advisory Board shall be subject to and comply with Act 267, Public Acts of Michigan, 1976, as amended, the Open Meetings Act.

1.8.     Procurement. The Financial Advisory Board shall adopt rules and/or regulations governing its procurement practices. As an intergovernmental entity, the Financial Advisory Board is not subject to City rules and/or regulations governing procurement activities or requirements applicable to procurement by State departments or agencies. The City's and Treasury Department's aggregate obligation for all costs and expenses incurred by the Financial Advisory Board, inclusive of procurement, shall

-15-

not exceed $1,000,000.00 each per year unless otherwise expressly agreed to by the Mayor, the City Council and the Treasury Department.

    1.9.   <u>Taxes and Incurring Debt</u>.  The Financial Advisory Board is not authorized under this Agreement to levy any type of tax within the boundaries of the City or to in any way indebt the City, except as otherwise expressly authorized in this Agreement. The Financial Advisory Board is not authorized under this Agreement to in any way indebt the Treasury Department or the State.

## 2.    THE MAYOR AND CITY COUNCIL

    2.1   <u>Powers and Authority</u>.  The Mayor and the City Council shall continue to exercise all such powers, privileges and authorities as are granted to each under the Charter and applicable law.  The Mayor and the City Council each have determined, in the exercise of their discretion and in furtherance of the joint exercise of power and cooperative undertaking detailed in this Agreement, to restrain their respective exercise of powers, privileges and authorities in certain circumstances as provided in this Agreement.

    2.2   <u>Chief Financial Officer</u>.

    (a)    Within 7 days after the effective date of this Agreement, the Mayor shall create the position of Chief Financial Officer as a group executive within the executive office of the Mayor.  The Chief Financial Officer shall supervise all finance and budget activities of the City, shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor.  The Chief Financial Officer shall directly assist the Chief Operating Officer, the Program Management Director and other Directors, senior executive staff and financial staff on all strategic and tactical matters as they relate to budget management, financial management, financial reporting, cost benefit analysis,

-16-

forecasting needs, the securing of new funding, and adherence to the Budget and the Triennial Budget. The Chief Financial Officer shall be responsible for completing a comprehensive examination of the Budget in order to improve services and promote efficiency. The Directors of the Budget Department and the Finance Department shall report directly to the Chief Financial Officer. The Chief Financial Officer shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Chief Financial Officer shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving.

(b)   Not more than 30 days after the creation of the position of Chief Financial Officer, the Mayor shall appoint a Chief Financial Officer from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have substantial experience with at least 2 of the following disciplines: (a) sophisticated municipal financial transactions, (b) Support Subjects in the context of distress and transition environments, (c) complex, multi-dimensional governmental restructurings, (d) governmental labor relations, health care benefits and/or pension matters, and (e) local government management with government units having aggregated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Chief Financial Officer. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Chief Financial Officer. In the event of a vacancy in the office of Chief Financial Officer, the Mayor immediately shall appoint an interim Chief

Financial Officer with substantially the same qualifications as required by this Section 2.2(b) for the Chief Financial Officer. Within 60 days of the occurrence of the vacancy, the Mayor shall appoint a successor Chief Financial Officer from a list of 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor as set forth above. The Chief Financial Officer from time to time may propose amendments to the projects, priorities and timing set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department. The Chief Financial Officer's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor and the City Council shall approve such amendments to the City's 2011-2012 Official Compensation Schedule (the "White Book") as necessary to reflect the agreed-to compensation.

2.3     Program Management Office; Director.

(a)     Within 7 days after the effective date of this Agreement, the Mayor shall create the Program Management Office within the executive office of the Mayor, headed by the position of Program Management Director as a group executive. The Program Management Office shall implement the Reform Program (defined below) projects set forth on Annex B, as amended and updated from time to time (the "Reform Initiatives" and each a "Reform Initiative"). The Program Management Director shall report directly to the Mayor, and shall be physically housed in the executive office of the Mayor. The Program Management Director shall supervise each Reform Initiative and shall have primary responsibility for designing, developing, managing, implementing and executing each Reform Initiative, including acting in the place and stead of the Mayor and the City Council with respect to a Reform Initiative in the event that the Financial Advisory Board

-18-

finds a Reform Default of this Agreement in respect of a Reform Initiative, as provided in and subject to Section 6.4 of this Agreement. The Program Management Director shall coordinate implementation of the Reform Initiatives with the Chief Operating Officer and the Chief Financial Officer to minimize disruptions in City services resulting from the Reform Initiatives. The Program Management Director from time to time may propose amendments to the projects set forth on Annex B to the Mayor, the City Council and the Financial Advisory Board for consideration, with notice to the Treasury Department.

(b)     Not more than 30 days of the creation of the position of Program Management Director, the Mayor shall appoint an individual as Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. Candidates shall have not less than fifteen years' experience with 1 or more of (a) Support Subjects in the context of distress and transition environments, (b) complex, multi-dimensional governmental restructurings, or (c) local government management with government units having consolidated revenues of $250 million or more. No then currently serving or former elected official of the City or currently serving elected official of the State may be appointed Program Management Director. No then currently serving appointee of the Mayor's executive office, of the Governor's executive office, or of the City Council may be appointed Program Management Director.

(c)     The Program Management Director shall directly assist the Chief Operating Officer, the Chief Financial Officer and other Directors and senior executive staff, and shall be treated as a "Director" for purposes of Sec. 5-103 of the Charter provided that the Program Management Director shall be appointed for a term of 5 years and shall be removed by the Mayor only for Cause. Removal shall be subject to

the consent of the City Council and the Financial Advisory Board, in each case acting by a majority vote of the members then elected or appointed and serving. In the event of a vacancy in the office of Program Management Director, the Mayor, within 60 days of the occurrence of the vacancy, shall appoint a successor Program Management Director from a list of not less than 3 candidates agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor. The Program Management Director's compensation shall be agreed to between the Mayor and the State Treasurer as constitutional appointee of the Governor, and the City Council shall approve such amendments to the White Book as necessary to reflect the agreed-to compensation.

(d)     The Program Management Director shall make periodic reports to the City Council, as requested by the City Council but no less often than monthly, in respect of the Reform Initiatives.

2.4     Implementation of Phase I Reform.

(a) The City desires to implement a number of actions in fiscal years 2012 and 2013 including, but not limited to, the development and implementation of the City's "Operational Reform Program" attached hereto as Annex B (the "Phase I Reform"). The Mayor and/or City Council may make modifications to Annex B from time to time, and shall promptly make modifications which are required to efficiently accomplish the Reform Program (defined below), including establishing measurable outcomes and metrics and establishing specific program timelines, with the approval of the Financial Advisory Board. In the event that the Mayor and City Council cannot agree to modifications to Annex B, the Financial Advisory Board may modify Annex B but only with the consent of either the Mayor or the City Council.

(b)   By approval of this Agreement, the City Council has approved of the "Operational Reform Program" attached hereto as Annex B and authorized its implementation. The City Council shall make such other changes in ordinances and resolutions and coordinate its staff as may be necessary or convenient to fully implement Annex B as contemplated by this Agreement, as well as approve other actions consistent with the Reform Program.

2.5.   <u>Support of Phase I Reform</u>.   Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the Phase I Reform actions taken by the City under Sec. 2.4:

(a)   <u>Cash stabilization transaction</u>:  The Treasury Department will assist with structuring and will grant relevant approvals for the City to complete a refinancing or refinancings of certain of the City's outstanding indebtedness so as to provide liquidity prior to June 30, 2012.  The anticipated aggregate size of the refinancing(s) is approximately $137 million, of which approximately $33 million will be used to refinance existing debt, and approximately $104 million will be placed in an escrow account and used to pay for costs of the Reform Program and for City operating expenses.  Draws from the escrow account shall be as and when approved by the State Treasurer in the State Treasurer's discretion.

(b)   <u>Technical and financial assistance</u>:  The Treasury Department shall provide the City with technical assistance (which may include in-kind financial assistance) and support to the City in rapidly implementing the following information technology projects:

(1)   Completion of a payroll system upgrade.

(2)   Integration of budgeting, accounting and financial reporting systems.

(3)   Implementation of a new grants management system.

(c)   <u>Income tax collection</u>:  The Treasury Department will assist the City in maximizing revenues collected under the City income tax. This will include technical assistance to modernize processing, enhance enforcement, and

-21-

improve collections. The Treasury Department will assist the City in preparation of draft legislation to require withholding of City Income Taxes for City residents working outside the City. Additionally, the Treasury Department will explore the possibility of enabling the collection and distribution of the City income tax in conjunction with the collection and distribution of the State income tax.

(d) <u>Legislative assistance</u>: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.4 (Phase I Reform) objectives, including, but not limited to legislation:

    (1)    Enabling PLD changes;

    (2)    Enabling Bus Rapid Transit legislation;

    (3)    If determined appropriate by the Financial Advisory Board, enabling the long-term funding of unfunded pension and other post-employment benefit liabilities.

    (4)    Enabling appropriations proportional to the City's progress in achieving Reform Initiatives.

The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase I Reform objectives.

2.6   <u>Implementation of Phase II Reform—Following Actions</u>. Consistent with Mayor's and City Council's development of the strategy, policies and long-term vision of a revitalized City and to preserve financial integrity, following the implementation of the Phase I Reform actions detailed in Section 2.4, the City intends to implement a number of additional actions (the "<u>Phase II Reform</u>"), including, but not limited to, the development and implementation of plans related to (a) the further consolidation, disposition or elimination of City departments, (b) grants management restructuring, (c) property management review, and (d) the implementation of "best practices" with respect to the City's pension and other post-employment benefits in consultation with the Financial Advisory Board and in furtherance of the long-term vision. (The Phase I

Reform and the Phase II Reform are referred to collectively in this Agreement as the "Reform Program.")

2.7 Support of Phase II Reform. Cooperating with the City, the Treasury Department, in addition to the supportive activities of the Treasury Department and the State described in Annex E, will undertake the following actions in support of the City's Phase II Reform actions taken under Sec. 2.6:

(a) Legislative assistance: The parties agree that legislation may be required to give the City the tools to achieve part of its Section 2.6 (Phase II Reform) objectives, including but not limited to legislation enabling greater intergovernmental cooperation. The Treasury Department agrees to draft for presentation to the Governor for recommendation to the Legislature as a recommended measure under Section 17 of Article V of the State Constitution of 1963 such legislation as the City and State reasonably agree is necessary or appropriate to enable the City to achieve its Phase II Reform objectives.

(b) Health plan and post-employment benefits: The Treasury Department agrees to work cooperatively with the City in formulating options for statewide medical plan designs, retiree health care, and other post-employment benefits funding management and consolidation to achieve administrative simplicity and economies of scale.

(c) Demolition of structures: The Treasury Department, at the City's request, will provide technical assistance and support to the City in pursuing and administering federal grant funds to pay for the demolition of abandoned structures.

(d) Real estate management: The Treasury Department, at the City's request, will provide technical assistance and support in respect of the City's real estate management efforts.

2.8 Reporting Requirements.

(a) In addition to any other reporting requirements herein, the Chief Financial Officer shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding (a) the City's financial performance in respect of the financial and operational metrics recommended under Section 1.5(a) and (b) the City's adherence to the Budget and the

-23-

Triennial Budget.  Any such updates shall be reported in writing to the Financial Advisory Board and the Treasury Department and shall be posted to the City's website.

(b)    In addition to any other reporting requirements herein, the Program Management Director shall periodically (and not less often than monthly) update the Mayor, the City Council, the Financial Advisory Board and the Treasury Department regarding the status of Reform Initiatives and completion of Annex B projects.  Any such updates shall be reported in writing to the Financial Advisory Board and shall be posted to the City's website.

(c)    Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall submit to the Treasury Department a detailed listing of all accounts payable in amounts of $250,000.00 or more, together with the total aggregate amount of all accounts payable, which are more than 30 days beyond each respective due date.  For each detailed account payable, the listing shall specify the date upon which payment originally was due, the amount of the payment due including any accrued interest, the name of the person, business, unit of government, or other entity to which payment is due, and a proposed schedule for timely payment. The detailed listing required by this paragraph shall be in a format prescribed by the Treasury Department.

(d)    Within 45 days of the effective date of this Agreement, and on a monthly basis thereafter, the City shall prepare and maintain a forecast of monthly cash demands to meet the expenditures planned in the Budget.  The cash flow forecast, prepared in a format acceptable to the Treasury Department, shall be updated and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.  A monthly report

-24-

of actual revenues and expenditures, prepared in a format acceptable to the Treasury Department, shall be prepared and submitted to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department within the first 10 days following the end of each month.

2.9 <u>Appropriation; Limitation</u>. The Treasury Department's obligation to provide financial assistance in the form of money to the Reform Program under this Agreement shall at all times be subject to the mandate under Section 17 of Article IX of the State Constitution of 1963 that no money may be paid out of the state treasury except in pursuance of appropriations made by law.

## 3. FINANCIAL AND BUDGET PROCESS; REVENUE CONFERENCES; TRIENNIAL BUDGET

3.1 <u>Revenue Conferences; Conduct</u>.

(a) Consistent with Section 8-213 of the Charter, the Directors of the Finance Department, Budget Department, Auditor General and City Council's Fiscal Analysis Division shall hold a revenue estimating conference ("<u>Revenue Conference</u>") each January and July, or such other dates as shall be determined by the Board Chair of the Financial Advisory Board or agreed to by the participants in the Revenue Conference, for the purpose of arriving at a consensus estimate of revenues to be available for the then current fiscal year of the City and the next fiscal year beginning the following July 1st (such estimate, a "<u>Revenue Estimation</u>"). The Board Chair of the Financial Advisory Board or his or her designee and the Chief Financial Officer shall attend and participate in the revenue estimating conference. The Board Chair of the Financial Advisory Board shall set the meeting dates of the Revenue Conference and shall preside over the Revenue Conference or, in the absence of the Board Chair, the Chief Financial Officer

shall preside. The revenues under consideration shall include all general fund, solid waste fund, and risk-management fund revenues, revenues of enterprise agencies that require a general fund subsidy, and all other revenues of the City. The parties shall also compile and consider any and all outstanding delinquent receivables in the possession of City agencies, departments and entities and, in conjunction with Corporation Counsel, recommend to the Mayor, the Chief Financial Officer, the City Council and the Financial Advisory Board the most efficient means to collect this revenue, which may include collection procedures undertaken by the Law Department. Revenue Conference reports should adhere to the reporting standards recommended by the City Council's Fiscal Analysis Division except as otherwise determined by the Financial Advisory Board.

(b)     At or in connection with a Revenue Conference, the Revenue Conference may (a) take testimony from persons with municipal finance, budgetary, economic or related expertise and (b) request and receive from all public officers, departments, agencies and authorities of the City or the Treasury Department any assistance and information necessary to arrive at a Revenue Estimation (together with all other information considered by the Revenue Conference, such testimony, assistance and information, the "Revenue Estimation Evidence").

(c)     The Revenue Estimation shall include a determination by the Revenue Conference of the amount of revenue to be applied to reduce any accumulated deficit or, if there is no accumulated deficit, to a budget stabilization account (the "Set-Aside").

(d)     The Revenue Estimation, including any Set-Aside, shall be reviewed and approved by the Financial Advisory Board as provided in Section 1.5(f) and thereafter shall be effective and binding for the Budget period to which it applies.

-26-

(e)    For purposes of the City's fiscal year 2013 Budget, and in lieu of the foregoing procedure, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the applicable Revenue Estimation and Set-Aside, which shall be provided to the State Treasurer for approval in lieu of approval by the Financial Advisory Board.

3.2    Revenue Conferences; Limitation on Adjournment.    A Revenue Conference shall not be adjourned until the Board Chair, in the Board Chair's discretion, determines that either (a) a consensus regarding the Revenue Estimation based upon reasonable assumptions (economic and otherwise) has been reached or (b) sufficient Revenue Estimation Evidence exists to allow for a Revenue Estimation, despite any inability to reach a consensus with respect to such Revenue Estimation. A Revenue Estimation shall set forth discrete revenue estimates from each of the City's major revenue sources, in a form consistent with Treasury Department pronouncements, including all of the following: (a) property taxes; (b) income taxes; (c) casino gaming taxes; (d) State revenue sharing and other State grants; (e) federal grants; (f) licenses, fees, and permits; (g) interest income; (h) proceeds from the sale or lease of any City-owned assets; (i) operating transfers or reimbursements from other funds; and (i) other funds if required by the Charter.  If a consensus cannot be reached with respect to a Revenue Estimation within 14 days after the beginning of the Revenue Conference, the Revenue Estimation Evidence shall be submitted by the Board Chair to the State Treasurer, who shall determine the Revenue Estimation, including any Set-Aside, for the upcoming Budget period.

3.3    Limitation on Mayor's Budget Proposal. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the Mayor shall not develop or propose

a Budget or any amendment to a Budget that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 (as defined below) or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.4     <u>Limitation on City Council's Budget Approval</u>. Except for the Transitional Period as set forth in Section 6.7(b) of this Agreement, the City Council shall not approve a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that (a) reflects revenues in excess of the Revenue Estimation, net of any Set-Aside, approved by the Financial Advisory Board for the corresponding Budget year, (b) reflects the collection of revenue from sources not approved by the Financial Advisory Board, (c) fails to comply with the requirements of Act 2 or other applicable law; or (d) incorporates payments not approved by the Financial Advisory Board as part of the Budget.

3.5.     <u>Budget Proceedings and Adoption</u>. The Budget adopted for each fiscal year for the City shall comply with the following requirements:

(a)     Subject to Sections 3.1 to 3.4 of this Agreement, each Budget shall be prepared and presented, and each appropriations act proposed by the City shall be adopted, in accordance with the provisions of Act 2, Public Acts of Michigan, 1968, as amended, the Uniform Budgeting and Accounting Act ("<u>Act 2</u>"), applicable provisions of the Charter, and Secs. 18-2-16 through 18-2-25 of the Detroit City Code, as amended from time to time.  The milestones for annual Budget adoption, including Revenue Conferences, are set forth on <u>Annex C</u> hereto.

(b)     Beginning with the first Budget adopted after the execution of this Agreement, the proposed Budget for each fiscal year shall be transmitted by the Mayor to the Financial Advisory Board not later than March 29 of each year.

-28-

(c)     During the period covered by any Budget, the Mayor shall propose such amendments to the existing Budget as are necessary (e.g., the reduction of budgeted expenditures under Section 3.6 of this Agreement; the adjustment of quarterly allotments) on a timely basis so as to prevent an expenditure from being made for which adequate revenues are unavailable or are projected to be unavailable (e.g., on account of a shortfall in actual revenue, or unusual or extraordinary expenditures) or otherwise to support the initiatives in the Triennial Budget.    No amendments or modifications proposed by the Mayor to any proposed or approved Budget or approved by City Council shall become effective unless such amendments are consistent with the Triennial Budget, as certified by the Chief Financial Officer.

(d)     Each Budget shall be designed to ensure that the City shall not end the relevant fiscal year with an operating deficit in any fund (any such deficit, an "Operating Deficit"), provided that, upon the recommendation of the Financial Advisory Board, the Mayor shall have the authority to propose, and the City Council shall have the authority to approve, Operating Deficits proposed in Budgets or amendments thereto in the Financial Advisory Board's sole discretion.

(e)     If, during a fiscal year, it appears to the Mayor, the Chief Financial Officer or the City Council that the actual and probable revenues from taxes and other sources in a fund are less than the estimated revenues, including an available surplus upon which appropriations from the fund were based and other proceeds permitted by law, and will be insufficient to satisfy projected expenditures, the Mayor, within 30 days of notification of such revenue shortfall, shall present to the City Council the Chief Financial Officer's recommendations which, if adopted, would prevent expenditures from exceeding available revenues for that current fiscal year. The recommendations shall include proposals for reducing appropriations from the fund for budgetary centers in a manner that would cause the total of appropriations to not be greater than the total of revised estimated revenues of the fund, or proposals for measures necessary to provide revenues sufficient to meet expenditures of the fund, or both.

(f)     During the term of this Agreement, no officer or employee of the City shall make or authorize any obligation or other liability (i) not authorized by the Budget or (ii) in excess of any amount authorized in the Budget unless approved by the Mayor and the Financial Advisory Board in compliance with applicable law.

(g)     If during a fiscal year the Chief Financial Officer becomes aware of a proposed contract, financial transaction or settlement of claim which, in the Chief Financial Officer's judgment, will have a material adverse impact on the Budget or on City's long-term ability to achieve and maintain Financial Stability, the Chief Financial Officer shall report the Chief Financial Officer's concerns respecting the proposed contract, transaction

-29-

or settlement to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department.

3.6    Budget Reductions; Ordinance; Impasse.  Within 60 days of the effective date of this Agreement, the City Council shall adopt an amendment to the Finance and Taxation Ordinance or other appropriate provisions of the Detroit City Code providing that if the Chief Financial Officer reports to the Mayor, or if the Council Fiscal Analysis Director reports to the City Council and the Chief Financial Officer concurs, that expenditures during a fiscal year have exceeded or are likely to exceed appropriated levels, (i) the Mayor, consistent with Section 3.5(e) of this Agreement, shall submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit; and the City Council promptly shall amend appropriations to avoid the deficit; and further if City Council fails to so amend the appropriation ordinance to avoid the deficit within 30 days after the submittal of the proposed appropriation amendment, then the requested appropriation amendment submitted by the Mayor becomes effective; and further (ii) if the Mayor fails to so submit a proposed appropriation amendment to the City Council decreasing budgeted appropriations in amounts sufficient to avoid the deficit within 30 days of notice by the Chief Financial Officer, the Council may introduce and adopt such an amendment on its own motion.  The powers and actions authorized by this Section 3.6 shall be granted pursuant to MCL 141.1514a and MCL 141.1519(1)(b) to the extent necessary to implement this Section 3.6, but only to the limited extent and limited time necessary to implement this Section 3.6.

3.7    Triennial Budget.    (a) As a means of addressing the City's fiscal imbalances and accumulated deficit and to permit continuous planning at least three

fiscal years in the future, beginning with fiscal year 2013 the City, in consultation with the Financial Advisory Board, shall develop and maintain a Triennial Budget for adoption by the City Council. The Triennial Budget shall contain specific and realistic operational metrics, expenditure reductions, revenue set-asides, or specific and realistic revenue enhancements, or any combination of them, in an amount sufficient to address, within a period of not to exceed 5 years, any current or accumulated deficit in any fund maintained by the City. The Financial Advisory Board may approve modifications to the period within which the accumulated deficit will be eliminated. In addition, the Triennial Budget shall provide for the liquidation of all significant inter-fund payables and receivables, not regularly settled, in not to exceed 5 years from the date of this Agreement. The Financial Advisory Board may approve modifications to the period within which the inter-fund payables and receivables will be settled. The Triennial Budget shall include details of the budget appropriation, reductions in employee salary, wages, employee retirement systems, other fringe benefits, debt retirement, and operating expenditures or revenue enhancements.

(b) The initial Triennial Budget shall be prepared and adopted prior to the end of the Transition Period (defined below), or such other date determined by the Chief Financial Officer and reported to the Financial Advisory Board and the Treasury Department, and shall include the subjects set forth on <u>Annex A-1</u> hereto. When adopted by the City and approved by the Treasury Department, the initial Triennial Budget shall be attached as <u>Annex A-2</u> hereto. The Triennial Budget shall be a "financial plan" (sometimes referred to as a "deficit elimination plan") within the meaning of Act 140, provided that the Treasury Department shall review compliance with the Triennial Budget annually, and shall retain full discretion under law to annually approve

-31-

of or disapprove of the then-current Triennial Budget as a satisfactory deficit elimination plan.

(c) Beginning with the City's fiscal year 2014 Budget, a copy of the proposed Triennial Budget shall be filed with the Treasury Department not later than April 12 of each year concurrently with submittal of the Mayor's annual Budget to City Council under the City's Finance and Taxation Ordinance. The City shall approve of and amend the Budget from time to time as necessary to give full effect to the Triennial Budget. The Chief Financial Officer shall have primary responsibility under the Mayor for the development of and adherence to the Triennial Budget. The Triennial Budget shall be posted on the City's website.

## 4. COLLECTIVE BARGAINING AGREEMENTS

4.1 <u>Authority</u>. The Mayor shall have the authority to negotiate, renegotiate, execute, amend, modify, reject or terminate collective bargaining agreements to the fullest extent authorized by law and subject to the terms of this Agreement.

4.2 <u>Collective Bargaining Agreements; Restriction</u>. The parties hereto agree that the Mayor shall not propose or execute, and the City Council shall not approve, any instrument which modifies, amends, extends, supplements or replaces the terms or conditions of, or is a successor agreement to, any collective bargaining agreement in effect as of the effective date of this Agreement or thereafter unless such modification, amendment, extension, supplement, replacement or successor agreement satisfies the requirements of <u>Annex D</u> as determined by the Financial Advisory Board or if a modification, amendment, extension, supplement, or replacement is required by law. For purposes of this Section 4.2, "collective bargaining agreement" includes an

arbitration award, excepting an arbitration award resulting from an arbitration proceeding concluded prior to the effective date of this Agreement.

4.3 <u>Collective Bargaining Agreements; Approval.</u> The Labor Relations Division shall negotiate and administer collective bargaining contracts in consultation with the Program Management Director. Upon the prior approval of the Financial Advisory Board following consultation with the Program Management Director, the head of the Labor Relations Division shall deliver to the Mayor any proposed collective bargaining agreement which satisfies the requirements of Section 4.2 of this Agreement for consideration and transmittal to the City Council in accordance with Sec. 6-408 of the Charter. The Mayor shall not approve and transmit to the City Council, and the City Council shall not approve of, any collective bargaining agreement which does not satisfy the requirements of Section 4.2 of this Agreement. If the City Council fails to approve a collective bargaining agreement as proposed by the Mayor and approved by the Financial Advisory Board within 30 days after the submittal of the proposed collective bargaining agreement, then the Program Management Director may approve the collective bargaining agreement in the place and stead of the City Council. The powers and actions of the Program Management Director authorized by this Section 4.3 shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i), or other applicable law, to the extent necessary to implement this Section 4.3, but only to the limited extent and limited time necessary to implement this Section 4.3.

4.4. <u>Duty to Bargain.</u> It is the State Treasurer's determination pursuant to MCL 141.1514a(10) that beginning 30 days after the effective date of this Agreement, the City is not subject to Sec. 15(1) of Act 336, Public Acts of Michigan, 1947, as amended, MCL 423.215, for the remaining term of this Agreement.

-33-

## 5. PENDING LITIGATION REPORT

5.1　_Report; Filing_.　Beginning on July 15, 2012, and continuing thereafter on a quarterly basis, the City's Law Department shall submit to the Financial Advisory Board a report (the "Pending Litigation Report") identifying all pending lawsuits or other legal actions or proceedings (including, but not limited to, lawsuits, actions or proceedings related to workers' compensation claims) to which the City is a party (any such lawsuit, action or proceeding, a "Pending Action").　Each Pending Litigation Report shall identify, with respect to each Pending Action:　(a) all plaintiffs; (b) all defendants; (c) the court and judge before which the Pending Action is pending; (d) legal counsel representing the City (if other than the Law Department); (e) the specific cause(s) of action; (f) the length of time the Pending Action has been pending; (g) an estimate as to the budgetary impact upon the City (if any) from a disposition of the Pending Action unfavorable to the City; (h) the applicability of any liability insurance maintained by the City; (i) an assessment of the likely outcome of such Pending Action (which section of the Pending Litigation Report shall remain subject to any and all applicable privileges); and (j) any proposed settlement or disposition of any Pending Action.　The City shall not settle or otherwise dispose of any Pending Action in an amount of $250,000.00 or more without the prior written consent of the Financial Advisory Board under Section 1.5(m) of this Agreement or, prior to the first meeting of the Financial Advisory Board, the State Treasurer.　For purposes of the Pending Litigation Report, the Financial Advisory Board shall be the client of the City's Law Department and shall be entitled to the attorney-client privilege, the attorney work product privilege, and all other privileges and duties afforded to clients under the Michigan Rules of Professional Conduct.

# 6. DEFAULTS AND REMEDIES

6.1 <u>Obligations of the parties.</u> (a) The City, through its officers and the City Council and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement. Timely achievement of the Reform Program and performance of the financial and operational requirements set forth in this Agreement are of the essence of this Agreement. The Mayor and the City Council (and all departments, agencies and other entities organized within, and all officers acting on behalf of, the Mayor and the City Council, including in particular the Program Management Director and the Program Management Office) shall provide the Financial Advisory Board with access to all information, documentation and personnel as may be reasonably requested by the Financial Advisory Board from time to time, with respect to all matters related to the Reform Program and/or addressed in this Agreement. During the term of this Agreement, no officer or employee of the City shall knowingly (a) take any action in violation of the terms of, or shall fail or refuse to take any action reasonably required by, this Agreement; or (b) prepare, present or certify any information (including any projections or estimates) or report for the Mayor, the Chief Financial Officer, the Program Management Office, the City Council, the Revenue Conference or the Financial Advisory Board that is false or misleading in any material respect, or, upon learning that any such information is false or misleading in a material respect, shall fail promptly to advise the Financial Advisory Board or the Mayor, the Chief Financial Officer and the Program Management Director thereof. The parties intend that this Agreement may be deemed and function as an agreement entered into under MCL 141.1513.

(b)     The Treasury Department, through the State Treasurer and applicable law, is bound by the obligations set forth in, and shall adhere to, this Agreement, consistent with applicable law.

6.2     Material Breach; Default. (a) For purposes of this Agreement, a breach of the obligations set forth in this Agreement, if uncured, shall be considered a material breach of this Agreement if, in the judgment of the Financial Advisory Board, the breach (i) materially impairs the timely and complete implementation of the Reform Program, (ii) materially impairs the Financial Advisory Board's ability to exercise its express responsibilities under this Agreement, or (iii) materially adversely affects the completion of 1 or more Reform Initiatives. Without limiting the foregoing, the obligations set forth in Section 1 (Financial Advisory Board), Section 2 (The Mayor and City Council), Section 3 (Financial and Budget Process; Revenue Conferences; Triennial Budget), Section 4.2, Annex B and Annex D shall be considered of primary importance in the achievement of the Reform Program whose performance is essential to the achievement of this Agreement's urgent public purposes.

(b)     If the Financial Advisory Board determines that a material breach of this Agreement has occurred or is occurring, the Financial Advisory Board shall immediately notify the Mayor, the City Council and the Treasury Department of its determination. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the material breach within 30 days, or, if the material breach is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.  The Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the cure or attempted cure by the

-36-

Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the material breach and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the material breach has been adequately cured. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement. A declaration that a default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

6.3 <u>Default; Remedies</u>. A declaration of default on account of a material uncured breach of this Agreement as provided in Section 6.2 may result in (a) the suspension by the Treasury Department of (i) discretionary State revenue sharing initiatives and agreements between the Treasury Department or the State and the City pursuant to Act 140 and/or (ii) Economic Vitality Incentive Program payments or other intergovernmental assistance between the Treasury Department or the State and the City pursuant to Act 140 and other applicable law, in each case to the extent permitted by law; (b) the withholding by the Treasury Department of approvals to enter the capital markets under Act 34; (c) accelerating or exercising other rights and remedies by the Treasury Department for collection of any existing loans from the State to the City under, <u>e.g.</u>, Act 243 or other applicable law; (d) the filing of court proceedings by the Financial Advisory Board or the State Treasurer in the Circuit Court for Wayne County, Michigan, or the U.S. District Court for the Eastern District of Michigan seeking mandamus, an injunction, appointment of a referee, or other equitable relief consistent with the urgent public purposes of this Agreement so as to cause the obligations of this

-37-

Agreement to be fully and timely performed; (e) the placement by the State Treasurer of the City in receivership as provided in MCL 141.1515; and/or (f) other remedies available to the Treasury Department or under State law. The remedies provided in this Section 6.3 shall be cumulative.

6.4 <u>Program Management Director; Board; Reform Initiative Remedies</u>. Timely achievement of the Reform Program being of the essence of this Agreement, in addition to the other remedies provided in this Agreement, the City and the Treasury Department agree that the following provisions shall apply in respect of individual Reform Initiatives:

(a) If in the judgment of the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department a breach in the provisions of this Agreement, including the Annexes, has occurred or is imminently likely to occur which is materially frustrating or will materially frustrate the timely implementation of one or more Reform Initiatives (a "<u>Reform Default Condition</u>"), the Program Management Director shall provide written notice of the Reform Default Condition to the Mayor, the City Council, the Financial Advisory Board and the Treasury Department. Upon receipt of the notice, the Mayor and the City Council, or either of them, shall take all lawful steps necessary to cure the Reform Default Condition within 30 days, or, if the Reform Default Condition is of a nature which cannot be cured within 30 days, shall commence and diligently pursue a cure, and shall report the steps taken to the Financial Advisory Board and the Treasury Department.

(b) Upon receipt of the notice of a Reform Default Condition, the Financial Advisory Board shall investigate the circumstances and shall evaluate the efficacy of the

cure or attempted cure by the Mayor or City Council. The Mayor or the City Council shall have the opportunity to present evidence and argument to the Financial Advisory Board as to any aspect of the Reform Default Condition and the efficacy of any cure. Following the expiration of the 30-day cure period, the Financial Advisory Board shall make a determination as to whether the Reform Default Condition has been adequately cured so as to prevent a material breach of this Agreement respecting one or more Reform Initiatives. Following its investigation and the receipt of evidence and argument, the Financial Advisory Board shall make a declaration as to whether a default in the performance of the obligations under this Agreement in respect of one or more Reform Initiatives has occurred (a "Reform Default"). A declaration that a Reform Default has occurred shall require a vote of the Financial Advisory Board pursuant to Section 1.6 of this Agreement.

(c)     In the event of a determination of a Reform Default by the Financial Advisory Board, and immediately upon the approval of the declaration that a Reform Default has occurred, the Mayor shall be deemed to have delegated his executive authority with respect of the Reform Initiative or Initiatives for which a Reform Default has been declared, but only in respect of such Reform Initiative or Initiatives, to the Program Management Director; and the City Council, by approval of this Agreement, shall be deemed to have given full legislative approval and authority to proceed with the implementation and execution of such Reform Initiative or Initiatives, but only in respect of such Reform Initiative or Initiatives. The Program Management Director thereafter shall exercise all lawful authority of the City in respect of the accomplishment, implementation and execution of the Reform Initiative or Initiatives for which the Reform Default was declared, provided that the Program Management Director shall be under

-39-

the supervision of, and shall report frequently, but not less often than monthly, to the Financial Advisory Board, the Treasury Department, the Mayor and the City Council in respect of the Program Management Director's actions, and the Financial Advisory Board shall review and approve or disapprove the proposed actions of the Program Management Director, including specifically the approval of any contracts proposed to be executed by the Program Management Director. The powers and actions of the Program Management Director authorized by this Section 6.4(c) additionally shall be granted pursuant to MCL 141.1514a, MCL 141.1519(1)(g) and 141.1519(dd)(i) to the extent necessary to implement this Section 6.4(c), but only to the limited extent and limited time necessary to implement this Section 6.4(c).

(d)     Upon the earlier of (i) the accomplishment of the Reform Initiative or Initiatives for which the Financial Advisory Board had declared a Reform Default or (ii) the elimination or cure of the event or condition which was the basis of the Reform Default, the Financial Advisory Board, upon the recommendation of the Program Management Director or on its own motion, shall, by majority vote, declare the Reform Default terminated. The Financial Advisory Board also may consider a declaration that the Reform Default is terminated upon petition by the Mayor or the City Council. Immediately upon such declaration, the executive authority of the Mayor and the legislative approval of the City Council temporarily empowering the Program Management Director in respect of the specific Reform Initiative or Initiatives shall be deemed restored to the Mayor and City Council and the grants under Section 6.4(c) shall be withdrawn.

6.5     <u>Additional Forbearance by Treasury Department</u>.     Provided that this Agreement remains in effect and there is no material failure to comply with, or adhere

to, this Agreement on the part of the City, the Treasury Department and the Financial Advisory Board shall forbear from exercising any of its respective remedies under Section 6.3.

6.6    Obligation Not Discharged by Contingencies.  The obligations of the City as expressed and agreed to herein are not subject to release or discharge due to any contingencies within the City's reasonable control, including, but not limited to, clerical errors, computer failures, late mailings or the failure to comply with reporting due dates or other scheduled due dates excepting due to adverse weather, acts of God, acts of third parties or compliance with court orders.  If the due date for a report, listing or other document falls on a weekend or legal holiday, then the report, listing, or other document shall be due on the first day thereafter that is not a weekend or legal holiday.

6.7    Transitional Provisions.

(a)  The parties acknowledge that on account of inadequate systems and other operational constraints, the City will be unable to satisfy the reporting and budgeting requirements set forth in this Agreement as of the effective date of this Agreement.  The parties agree that from the effective date of this Agreement until 60 days after the date that the Chief Financial Officer commences serving (the "Transitional Period"), the City will make every effort to comply with the reporting requirements set forth in this Agreement, but any failure to comply with the any such reporting requirements during the Transitional Period shall not be deemed to be a material breach of this Agreement.

(b)    The parties acknowledge that as of the effective date of this Agreement and during the Transitional Period, the City will be in the midst of its budget preparation process for the fiscal year 2013 Budget, and that therefore the Budget provisions of this Agreement, including the responsibilities of the Financial Advisory Board and the

adoption of the initial Triennial Budget, cannot be fully accomplished for the fiscal year 2013 Budget. The City and the Treasury Department agree that during the Transitional Period, the City will make every effort to comply with the Budget process requirements set forth in this Agreement, and any failure to comply with any such Budget process requirements during the Transitional Period may be waived by the State Treasurer. Until the Board Chair of the Financial Advisory Board has been appointed and the Chief Financial Officer has commenced serving, the City's Revenue Conference under Section 8-213 of the Charter shall arrive at the Revenue Estimation for fiscal year 2013, and State Treasurer shall approve of the Revenue Estimation in lieu of the Financial Advisory Board under Sections 3.1 and 3.2 of this Agreement, which shall form the basis of the Mayor's proposed fiscal year 2013 Budget submitted pursuant to Section 3.3 of this Agreement and the City Council's approved fiscal year 2013 Budget pursuant to Section 3.4 of this Agreement. Notwithstanding the provisions of this Section 6.7(b), the Mayor and the City Council shall fully perform their respective obligations under Act 2 and the Charter in respect of the fiscal year 2013 Budget preparation and shall cause the fiscal year 2013 Budget and the 2013 general appropriations ordinance to be in effect as of July 1, 2012. During the Transitional Period, the Mayor shall not propose, and the City Council shall not approve, a Budget, any amendment to a budget, a general appropriations ordinance or any amendment to a general appropriations ordinance that reflects revenues in excess of, or collected from sources not included in, the applicable Revenue Estimation, net of any Set-Aside, for the 2013 Budget year.

## 7. AMENDMENT; WAIVER OF PROVISIONS

7.1 _Amendment; Waiver._ This Agreement and the Annexes hereto may be amended only in writing by the mutual consent of the Financial Advisory Board, the

-42-

State Treasurer and the City (or their respective successors or permitted assigns), evidenced by all necessary and proper authority. By agreement of the parties, the Financial Advisory Board, in its sole discretion, may waive or forbear from any provision of this Agreement that requires an act by the City, provided that, for the avoidance of doubt, no entity other than the Financial Advisory Board shall be permitted to waive or forbear from any provision hereof that otherwise relates to a power reserved for the Financial Advisory Board. No waiver of or forbearance from any provision of this Agreement shall arise from any action or inaction of the Financial Advisory Board, except pursuant to an instrument in writing expressly waiving or forbearing from the provision executed by the party entitled to the benefit of the provision. The parties anticipate that Annex B to this Agreement will be amended and updated from time to time to reflect the dynamic nature of the Reform Program. Amendments to Annex B may be adopted by the Mayor and City Council with the approval of the Financial Advisory Board, as set forth in Section 2.4(a) of this Agreement. Amendments to Annex B may be proposed by the Mayor, the City Council, the Chief Financial Officer, the Program Management Director, the Financial Advisory Board or the Treasury Department.

8.    **DURATION OF AGREEMENT; RELEASE**

    8.1    Duration of Agreement; Termination; City's Release from Obligations. This Agreement shall remain in effect until both of the following occur ("Financial Stability"):

    (a)    The date of the earlier of:

        (i)    the end of the third consecutive fiscal year of the City in which each of the following conditions have been satisfied: (A) the City's audited financial statements indicate, on the basis of accounting

principles generally accepted in the United States, that the City general fund, excluding any revenues derived from borrowed funds, is not in a deficit condition; and (B) the City's accumulated deficit has been eliminated; or

(ii) the City has achieved and maintained for at least two consecutive calendar years a credit rating by two or more nationally recognized securities rating agencies (without regard to any third party credit enhancement) on the City's outstanding long-term unsubordinated debt in any of the four highest long-term debt rating categories of such rating agency (BBB/Baa or higher), without regard to any refinement or gradation of such rating category by numerical modifier or otherwise; and

(b)     The date that the State Treasurer certifies to the Governor that no material condition exists within the City, and that no action has been taken, or is being contemplated, by City officials, that would (A) implicate the need for a deficit elimination plan under Sec. 21 of Act 140, excepting for fund deficits of an immaterial nature; or (B) require implementation of the Treasury Department's authority under Sec. 802 of Act 34.

(c)     The Mayor, with the approval of the City Council, may apply to the Financial Advisory Board to be released from the terms and conditions of this Agreement. If the financial conditions set forth in Section 8.1(a) and (b) have been satisfied by the City, the Financial Advisory Board shall release the City from the terms and conditions of this Agreement.

(d)     Notwithstanding the provisions of subsections 8.1(a), (b) and (c) of this Section 8.1, this Agreement shall be earlier terminated by the Financial Advisory Board, with the consent of the State Treasurer, if requested by the Mayor and the City Council on behalf of City or by the Treasury Department.

## 9. CONTINUING EFFECT; EMPLOYEES; SEVERABILITY

9.1    Continuing Effect.  This Agreement shall remain in effect until terminated or until the Financial Advisory Board has released the City from the terms and conditions of this Agreement pursuant to Sections 8.1(c) or 8.1(d).

9.2    Joint Exercise of Power; Transfer.  While this Agreement represents a joint exercise of power by the City and the Treasury Department, this Agreement does not transfer functions or services from the City or the Treasury Department to the Financial Advisory Board.   Nothing in this Agreement prohibits the City from subsequently entering into a contract with the Financial Advisory Board for the transfer of functions or services from the City to the Financial Advisory Board, to the extent authorized under 1967 (Ex Sess) PA 8, as amended, MCL 124.531 to 124.536.  The City and the Treasury Department intend that this Agreement be construed as an agreement between the City and the Treasury Department authorized under Act 7, Public Acts of Michigan, Extra Session of 1967, as amended, the Urban Cooperation Act of 1967, with the exception of the provisions of this Agreement authorized solely under MCL 141.1501 to 141.1531.

9.3    Employees. In no event shall this Agreement direct, permit or enable the transfer of employees or groups of employees from the City to the Financial Advisory Board or otherwise to merge or create a "workforce" of the Financial Advisory Board.. Nothing in this Agreement creates an employment relationship between the employees of the City or the Treasury Department and the Financial Advisory Board. The City shall function as the employer of personnel and staff of the City needed for the joint exercise of power under this Agreement.   The Treasury Department shall function as the employer of personnel and staff of the Treasury Department needed for the joint

exercise of power under this Agreement. The Financial Advisory Board shall function as the employer of any personnel and staff of the Financial Advisory Board not otherwise employed by the City or the Treasury Department needed for the joint exercise of power under this Agreement. No employees of the City or the Treasury Department are transferred from the City or the Treasury Department to the Financial Advisory Board under this Agreement.

9.4  Management and Direction.  The Financial Advisory Board has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Financial Advisory Board performed or exercised by the Financial Advisory Board under this Agreement. The City has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the City performed or exercised by the City under this Agreement. The State Treasurer has the responsibility, authority, and right to manage and direct on behalf of the public the functions or services of the Treasury Department performed or exercised by the Treasury Department under this Agreement.  The functions or services of the Financial Advisory Board, the City, and the Treasury Department, respectively, under this Agreement are deemed to be in the interests of the public health, safety and welfare, and the accomplishment of the objectives of this Agreement is an urgent public purpose.

9.5  Severability.  If any provision of this Agreement, or its application to any person, party or circumstance, is determined to be invalid or unenforceable for any reason, the remainder of this Agreement and its application to other persons, parties or circumstances shall not be affected and shall remain enforceable to the full extent permitted by law.  On account of the urgent public purpose and the protection of the

public health, safety and welfare sought to be accomplished by this Agreement, It is the intent of the parties to continue to implement the provisions of this Agreement, in whole or in part, to the fullest extent possible under applicable law.

## 10. COUNTERPARTS

10.1 <u>Counterparts; Signatures</u>. This Agreement may be executed in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Execution may be accomplished by delivery of original or electronic copies of the signature page hereto (e.g., by facsimile or email).

## 11. EFFECTIVE DATE

11.1 <u>Effective Date.</u> The effective date ("<u>Effective Date</u>") for this Agreement and the joint exercise of power under this Agreement shall be the date on which the last of all of the following have occurred: (a) the Agreement is approved and executed by the Mayor; (b) the Agreement is approved by the City Council, (c) the Agreement is approved and executed by the State Treasurer; (e) the Agreement is approved by the Governor; (d) the Agreement is filed with the Clerk for the Charter County of Wayne, Michigan, (e) the Agreement is filed with the Clerk for the County of Ingham, Michigan; and (f) the Agreement is filed in the Office of the Great Seal, Michigan Department of State.

IN WITNESS WHEREOF, the parties, by their designated representatives, have signed and executed this Agreement on this ___4th___ day of ___April___, 2012.

**ON BEHALF OF THE CITY OF DETROIT:**

_____

Kirk J. Lewis, Deputy Mayor  (Acting As Mayor)


_____

Dave Bing, Mayor



**ON BEHALF OF THE MICHIGAN DEPARTMENT OF TREASURY:**

_____

Andy Dillon, State Treasurer

Consistent with my duty under Section 8 of Article V of the State Constitution to take care that the laws be faithfully executed, I find that this Agreement is in proper form, and is compatible with the laws of the State of Michigan.


Dated: 4/5/12

Richard D. Snyder, Governor

## CERTIFICATION

I, Janice M. Winfrey, City Clerk for the City of Detroit, hereby certify that the foregoing Agreement has been duly authorized by resolution adopted by the City Council of the City of Detroit, County of Wayne, State of Michigan, at a Special Session held on April 4, 2012, that said resolution remains in effect, and that the foregoing meeting was conducted and public notice of said meeting was given pursuant to and in full compliance with the Open Meetings Act, being Act 267, Public Acts of Michigan, 1976, and that the minutes of said meeting were kept and will be or have been made available as required by said Act.

Janice M. Winfrey, City Clerk

Date of Certification: April 9, 2012

Time of Certification: 4:27 , p.m.

**BY THE FINANCIAL REVIEW TEAM FOR THE CITY OF DETROIT:**

_____
Andy Dillon

_____
Glenda D. Price

_____
Frederick Headen

_____
Irvin D. Reid

_____
Jack Martin

_____
Doug Ringler

_____
Conrad Mallett, Jr.

_____
Shirley R. Stancato

_____
Isaiah McKinnon

_____
Brom Stibitz

**APPROVED AS STATE FINANCIAL AUTHORITY:**

_____
Andy Dillon, State Treasurer

## ANNEX A-1

The Triennial Budget and General Appropriations Act shall, at a minimum, include all of the following:

(a)    A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that, subject to exceptions, the City's general fund expenditures will not exceed its general fund revenues and that any existing deficits will be eliminated during the projected budget period.

(b)    A cash flow projection for the budget period.

(c)    An operating plan for the budget period.

(d)    A plan showing reasonable and necessary maintenance and capital expenditures for the budget period.

(e)    An evaluation of the costs associated with pension and postemployment health care obligations for which the City is responsible and a plan for how those costs will be addressed over the budget period.

(f)    A provision for submitting quarterly compliance reports to the Financial Advisory Board demonstrating compliance with the Triennial Budget.

The Triennial Budget shall be updated annually as part of the approval of the annual Budget under Act 2 and the Charter.

## ANNEX A-2

*[Initial Triennial Budget to be included pursuant to Section 3.7(b)
upon approval following appointment of CFO]*

-5-

## ANNEX B

### City's Operational Reform Program

**(Prioritization and timing to be mutually agreed upon by Mayor and Council and approved by Financial Advisory Board as provided in the Agreement)**

1. Public safety initiatives;
2. Lighting Department Changes;
3. DDOT Changes;
4. Income tax collection;
5. Implementation of payroll system upgrade if needed – following a review of other options that streamline payroll process and implement;
6. Implementation of new grants management system to streamline requisition and monitoring process of grants;
7. Integration of budgeting, accounting and financial reporting system with appropriate process mapping;
8. Demolition of structures;
9. Implementation of medical and pension changes;
10. Labor reform to streamline and consolidate number of collective bargaining agreements into single template and evaluating integration with statewide plans as available;
11. Health and Wellness Department changes;
12. Human Services Department changes;
13. Real estate management;
14. Workers Compensation Reform;
15. Employee Training;
16. Bank Project to improve AR and AP process;
17. Fire Authority review;
18. Permits;
19. Planning and Development to DEGC;
20. Claim/Risk Management for reducing claims costs;
21. Long-Term Liability Restructuring;

## ANNEX C

### Revenue Estimation and Budget Approval Calendar

| Date (on or before) | Action |
|---|---|
| December 8 | All officers, departments, commissions and boards of the City are required to transmit to the Budget Director their estimates of the amounts of money required for each activity within their respective Departments for the ensuing fiscal year. |
| January 31* | Semi-annual Revenue Conference |
| February 22 | The Budget Director shall transmit to the Mayor an estimated Budget showing the Budget Director's estimate of the total amount of money required to be raised for each of the City's funds. |
| March 15 | Revenue Estimation for next fiscal year established by Financial Advisory Board following Revenue Conference. |
| March 29 | The Mayor shall complete a revision of the Budget and return the Budget to the Budget Director for tabulation. The Mayor shall submit the proposed Budget and Triennial Budget to Financial Advisory Board |
| April 12 | The Mayor shall transmit the Budget (including Triennial Budget) to City Council. The Mayor shall transmit the Triennial Budget to the Treasury Department. |
| May 24 | The City Council shall complete its consideration of the Budget. |
| May 27 | The City Council shall transmit the Budget to the Mayor for the Mayor's approval or rejection. |
| May 27 + 3 business days | The Mayor shall return the Budget to the City Council with the Mayors' approval, or, if the Mayor shall disapprove the whole or any item or items, with a statement of reasons for the disapproval. |
| Later of 3 calendar days or 2 business days following maximum return date of the Budget by the Mayor | The City Council shall act upon any item that shall have been disapproved by the Mayor. |
| July 1 | Beginning of Fiscal Year |
| July 31* | Semi-annual Revenue Conference |

\*  Or as otherwise determined by the Revenue Confernce or Financial Advisory Board

-7-

## ANNEX D

## Required Provisions of Collective Bargaining Agreements

On or before July 16, 2012, the City shall have either negotiated or imposed new labor agreements with those Unions whose contracts have expired or will expire on or about June 30, 2012. The newly negotiated agreements shall include among other items the following terms and conditions, which shall set the pattern for future agreements:

1.     Uniformity goal: All new labor agreements will be structured so as to achieve the goal of creating a common base form of agreement enabling a known, measurable basis for cost evaluation and comparison.

2.     Joint committees, if any, will be patterned in structure and role after the committees included in the contracts recently negotiated between the State and unions representing State employees.

3.     Outsourcing will be permitted where service improvements or cost savings can be achieved. Language shall require the City to provide advance notice of competitive bids to its Unions and enabling Unions to bid on the work.

4.     Departmental consolidation shall be permitted where service improvements or cost savings can be achieved.

5.     There may be no snap-back provisions during the term or at expiration of the agreement. Wage increases shall be subject to negotiation.

6.     New hires will have a defined contribution retirement health care benefit.

7.     Merit-based promotions shall be permitted for certain key positions (specific positions to be defined by the common agreement form).

8.     Current resources should be maximized, therefore to exercise bumping rights an employee must have current or prior year service in the classification into which they are bumping and employees shall be permitted to work outside their classification.

9.     Existing favorable concessions negotiated in the TAs shall remain, especially those dealing with wages, benefits and pension multipliers, as approved by the Project Management Director, Labor Relations Director, and the Financial Advisory Board.

10.    Multi-year term of the new agreement to be determined by the Labor Relations Director, Project Management Director, and Financial Advisory Board as required to support the City's financial restructuring.

11.    Dispute resolution procedures shall be made simpler and the process expedited to achieve predictability for both sides.

12.    The parties will agree to address work rule modifications during the first year of the new agreement where changes will support the City's financial restructuring, achieve efficient use of labor resources, and/or improve cost-effective service.

-8-

## SUPPORTIVE ACTIVITIES OF TREASURY DEPARTMENT AND STATE

### Introduction
The Treasury Department and the State remain committed to the overall growth and health of Michigan cities, and particularly so with the city of Detroit, the State's largest municipality. Ways to ensure this growth and health are emerging through a number of supportive initiatives.

Supportive activities already in process include:

### Improve Quality of Life and Safety for Detroiters
- *Street lighting* – Improve public lighting by working with the city to create a separate authority to manage and finance streetlights. State legislation can create a new option for separate governmental authorities (similar to those for sewers) that allow for independent bonding authority against revenue as well as general funds. Detroit can then create such an entity to make financing more attractive to bondholders and thus lower the overall cost of the upgrades. This group would also have to develop multi-year lighting plans with the revenue to support them.
- *Law Enforcement* – As discussed in the governor's public safety message, over the next two years MSP will graduate two trooper classes – meaning approximately 180 troopers will be added, and will support our strategy to increase law enforcement resources in four Michigan cities, including Detroit.
- *Demolition* – Streamline, coordinate and accelerate demolition activities in the city.
- *Land Stewardship* – Improve the state's stewardship of its own land in the city with an emphasis on redevelopment, including undertaking a full review to determine what land can be redeveloped effectively and responsible ways to transition other parcels to successional landscapes.
- *Client Service* – The state will continue to enhance its presence within the city to better serve the client base for both DHS assistance and unemployment insurance.
- *Auto insurance* – Reduce auto insurance costs for residents through the Michigan Automobile Insurance Placement Facility, creating a base rate that reflects a more neutral score, resulting in noticeable rate reductions.

### Enhance Education
- *K-12* – Ensure a quality school for every Detroit child through continued reforms of DPS, a strong start for the Education Achievement Authority, and support for Excellent Schools Detroit. Continue to drive a philanthropic agenda to provide post-secondary scholarship funding to Detroit graduates.
- *Early Childhood Education* – Ensure high quality early childhood education through a partnership with the Office of Great Start and increased collaboration with private and non-profit entities involved in providing these services to Detroiters.
- *Foundations for Learning* – Provide better access to services that enhance a child's learning process by moving DHS family independence specialists out of county offices and stationing them within 50 Detroit elementary schools. This will help eligible families access resources immediately, before barriers such as transportation, child care, housing instability, food insecurity, and access to healthcare impede a child's learning process.

**Invest in Transportation Infrastructure**
- Move ahead with the New International Trade Crossing project.
- Expand and facilitate the Detroit Intermodal Freight Terminal, ensuring that southeast Michigan has regional facilities with sufficient capacity and interconnectivity to provide for existing and future intermodal demand and reducing time, monetary costs, and congestion.
- Establish the authority and board for, and develop a funding mechanism for, the new Regional Transit Authority. Invest in a regional, multi-modal system including BRT, bike paths and walkability.
- Working with CN and Amtrak, create a commuter rail station and stop at the former state fairgrounds, expand the West Grand Blvd. station to include better facilities for transfers and assist in the rebuilding of the Royal Oak and Troy stops.
- Accelerate a capacity improvement project for I-94 from I-96 to Conner Avenue, supporting more than 13,000 jobs between 2012 and 2020.
- Complete final engineering and start construction this summer for the West Detroit Junction Railroad Project to provide a shorter, faster route for intercity passenger trains, relieve congestion for freight trains, and help lay the groundwork for future commuter rail service between Ann Arbor and Detroit.

**Invest in Physical Assets and Economic Drivers**
- *Citywide* –
  - Consolidate the planning and economic development functions for the city within the Detroit Economic Growth Corporation to avoid duplication, enable the development of unified strategy and execution, and simplify the process for new economic development within the city.
  - Coordinate and/or consolidate the state, Wayne County and city land banks to ensure the creation and execution of a common plan.
  - Devote $3 million of state funds to clearing title on parcels identified by DEGC to ready them for speedy economic development.
- *Eastern Market* – Contribute to the revitalization of Eastern Market by investing in the conversion of Shed 1 (including incubator kitchens, entrepreneurial training, and business start-ups) and the renovation of Shed 5 into a full-scale grocery. Position the market as a Regional Food Innovation Cluster, focusing on science, technologies and enhanced management practices that will reshape food production and business. Assist the market in applying for a federal TIGER grant to create a seamless trail system from the Riverfront through the Eastern Market, Brush Park, and Wayne State University areas.
- *Riverfront* – Develop the Globe Building, expand Milliken State Park, dedicate a new launch for citizens near Riverfront Park and assist DEGC with resources and talent to transform Hart Plaza.
- *Belle Isle* – Create park funding for Belle Isle while ensuring continued City ownership by designating Belle Isle as a part of a cooperative relationship with Milliken State Park. This would include a long-term lease that would accrue the cost of the park's maintenance and improvements out of the Park Endowment Fund. We will partner with Belle Isle Conservancy and the City to implement a master plan for the Island.
- *Fairgrounds* – Transfer ownership of the former state fairgrounds to the State Land Bank and create a neighborhood and commercial center on the site.
- *Cobo Center* – Encourage its continued expansion in coordination with the Metropolitan Detroit CVB, and support improvements.

- *Midtown* – Continue to be a key partner in local efforts to create a Regional Innovation Cluster in Midtown through MEDC investments in the incubation and growth of small business, as well as support for residential, commercial and retail development projects.
- *Community Ventures* – A public-private partnership will identify employers willing to create new jobs and organizations that can provide training and other job readiness services for the structurally unemployed. For the first time, state agencies like MEDC, Workforce Development Agency and Department of Human Services will bring together employers, job readiness partners and private funders in a comprehensive and measurable program to assist young people aged 15 to 29 and ex-offenders. The outcome will create new, long-term jobs in Detroit.
- *Detroit-Focused Economic Gardening* – Use a comprehensive set of tools for accelerating entrepreneurship, business growth, access to capital, placemaking and talent enhancement.
- *Detroit Works Project* – Support concentrated services of blight elimination and rehabilitation for four city-targeted neighborhoods contiguous to important economic development anchors. This will be supported through coordination with MSHDA's Neighborhood Stabilization Program and the MEDC's Community Revitalization Program.

**Improve Detroit's Capacity to Collect Tax Revenues**
- Enhance city revenue collection capacity as requested by city of Detroit through technical assistance for collections, audit and city income tax administration.
- *Create a common assessment template* – Move the property assessment function from the city to the county to allow for efficiencies, commonality of method and improvements in communication between taxing entities as well as between property owners.

**Municipal Assistance/Services Authority**
- The Department of Treasury will partner with municipal governments in this state to establish the Municipal Assistance/Services Authority. The Authority will function as a center of best practices for the delivery of local government services and provide enhanced opportunities for local governments in Michigan to engage in service sharing and consolidation of activities, with State support.

-11-

# TRUE COPY CERTIFICATE

Form C of D—16-CE

STATE OF MICHIGAN,
City of Detroit } ss.

### CITY CLERK'S OFFICE, DETROIT

I, *Janice M. Winfrey*, City Clerk of the City of Detroit, in said State, do hereby certify that the annexed paper is a **TRUE COPY OF** **RESOLUTION**

adopted (passed) by the City Council at session of

March 27, 20 12

and approved by Mayor

March 28, 20 12

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the original, and the same is a correct transcript therefrom, and of the whole of such original.

In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at Detroit, this 23rd

day of August A.D. 20 12

CITY CLERK



CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313·224·3491
FAX 313·224·4466
WWW.DETROITMI.GOV

TO:      Honorable City Council

FROM:    Cheryl R. Johnson, Finance Director

DATE:     March 27, 2012

RE:       **RESOLUTION AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $105,000,000 DISTRIBUTABLE STATE AID SECOND LIEN SELF-INSURANCE BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(A1) AND DISTRIBUTABLE STATE AID THIRD LIEN SELF-INSURANCE BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012 (A2)**

The attached Resolution authorizes the issuance and sale of the subject Bonds for the purpose of (i) funding a deposit to the Risk Management Fund previously established by the City for the purpose of defraying losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure, (ii) to pay capitalized interest on the Bonds, as determined by the Finance Director at the time of sale; and (iii) to pay costs of issuance for the Bonds.

The attached Resolution has been prepared by Bond Counsel and I recommend its adoption by your Honorable Body, with waiver of reconsideration, at your next formal session.

Respectfully submitted,

cc:    Irvin Corley, Fiscal Analyst
      David Whitaker, RAD
      Denise Gardner, Mayor's Office

3-27-12 Received @ table

RESOLUTION OF THE CITY COUNCIL OF THE CITY OF DETROIT, COUNTY OF WAYNE, STATE OF MICHIGAN, AUTHORIZING THE ISSUANCE BY THE CITY OF DETROIT OF NOT TO EXCEED $105,000,000 IN AGGREGATE PRINCIPAL AMOUNT DISTRIBUTABLE STATE AID SECOND LIEN SELF-INSURANCE BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(A1) AND DISTRIBUTABLE STATE AID THIRD LIEN SELF-INSURANCE BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012 (A2) FOR THE PURPOSE OF FUNDING THE RISK MANAGEMENT FUND OF THE CITY ESTABLISHED FOR THE PURPOSE OF DEFRAYING LOSSES FOR WHICH INSURANCE COVERAGE COULD BE PROVIDED BUT FOR WHICH THE CITY HAS DETERMINED TO SELF INSURE, AND NOT TO EXCEED $35,000,000 IN AGGREGATE PRINCIPAL AMOUNT DISTRIBUTABLE STATE AID SECOND LIEN SELF-INSURANCE REFUNDING BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(B1) AND DISTRIBUTABLE STATE AID THIRD LIEN SELF-INSURANCE REFUNDING BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(B2) FOR THE PURPOSE OF REFUNDING CERTAIN OF THE OUTSTANDING SELF-INSURANCE BONDS (LIMITED TAX GENERAL OBLIGATION), OF THE CITY OF DETROIT; AUTHORIZING A THIRD SUPPLEMENT TO THE OUTSTANDING MASTER DEBT RETIREMENT TRUST INDENTURE TO SECURE REPAYMENT OF SAID BONDS; AND AUTHORIZING AND DELEGATING TO THE FINANCE DIRECTOR THE AUTHORITY TO MAKE CERTAIN DETERMINATIONS AND TO TAKE CERTAIN ACTIONS IN CONNECTION WITH THE SALE AND DELIVERY OF SAID BONDS.

BY COUNCIL MEMBER: _____:

WHEREAS, Act 279, Public Acts of Michigan, 1909, as amended ("Act 279") and the City Charter of the City of Detroit, County of Wayne, State of Michigan (the "City") authorizes the City to issue bonds for any purpose permitted by law; and

WHEREAS, Section 513 of Act 34, Public Acts of Michigan, 2001, as amended ("Act 34") authorizes the City to borrow money and issue its general obligation bonds for the purpose of establishing funds, reserves, or accounts in amounts determined by the City to defray losses for which insurance coverage could be provided by an insurer but for which the City has determined to self-insure; and

WHEREAS, Act 34 authorizes the City to issue its general obligation bonds to establish self-insurance funds, without a vote of the City's electors, and to irrevocably pledge the limited tax, full faith, credit and resources of the City for the prompt payment of the principal of and interest on the bonds; and

WHEREAS, Act 279 authorizes the City to issue its general obligation bonds to establish self-insurance funds without requiring notice to the City's electors or providing a right of referendum on the issuance of such bonds; and

WHEREAS, pursuant to Act 279 and Act 34, on October 2, 2003, the City issued $98,895,000 of its Self-Insurance Bonds (Limited Tax General Obligation), Series 2003 (Federally Taxable) (the "Series 2003 Bonds") and on September 9, 2004 the City issued $62,285,000 of its General Obligation Self-Insurance Bonds (Limited Tax), Series 2004 (Federally Taxable) (the "Series 2004 Bonds" and, together with the Series 2003 Bonds, the "Prior Bonds") to fund the City's Risk Management Fund (the "RMF"); and

WHEREAS, on March 18, 2010, pursuant to Act 80, Public Acts of Michigan, 1981, as amended ("Act 80"), the City issued $249,790,000 of its Distributable State Aid General Obligation Limited Tax Bonds, Series 2010 (the "DSA Bonds") secured by and payable from money received or to be received by the City derived from the imposition of taxes by the State of Michigan (the "State") and returned or to be returned to the City as provided by law ("Distributable Aid"); and

WHEREAS, in connection with the issuance of the DSA Bonds, the City entered into a Master Debt Retirement Trust Indenture (the "Master Indenture") and a First Supplemental Debt Retirement Trust Indenture, each dated as of March 1, 2010, (the "First Supplemental Indenture") between the City and U.S. Bank National Association, Detroit, Michigan, as master trustee (the "Master Trustee" or the "Trustee"), that provides for the escrow of Distributable Aid payments received by the Trustee on behalf of the City to pay the debt service on obligations of the City secured by Distributable Aid (the "Distributable Aid Obligations"); and

WHEREAS, pursuant to Act 80, Public Acts of Michigan, 1981, as amended, the Master Indenture and the First Supplemental Indenture, the DSA Bonds have a statutory first lien and trust on the City's Distributable Aid to secure the payment of the DSA Bonds and to provide for the direct payment to the Master Trustee of the Distributable Aid to be held in trust and used solely for payment of principal of and interest on Distributable Aid Obligations, the City, the Master Trustee and the State Treasurer of the State of Michigan (the "State Treasurer") entered into an Agreement dated as of March 1, 2010 (the "DSA Bonds Deposit Agreement"); and

WHEREAS, on December 16, 2010, pursuant to the City Charter, Act 279 and Act 34, the City issued $100,000,000 Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable-Recovery Zone Economic Development Bonds-Direct Payment) (the "2010 UTGO Bonds") and sold them to the Michigan Finance Authority (the "MFA") under Act 227, Public Acts of Michigan, 1985, as amended ("Act 227"); and

WHEREAS, the 2010 UTGO Bonds are secured by the unlimited tax full faith and credit of the City and pursuant to Act 227 are additionally secured by and payable from Distributable Aid; and

WHEREAS, in connection with the issuance of the 2010 UTGO Bonds, the City entered into a Second Supplemental Debt Retirement Trust Indenture, dated as of December 1, 2010 (the "Second Supplemental Indenture", collectively with the Master Indenture and the First Supplemental Indenture, the "Indenture") with the Trustee, to further provide for the security and payment of the 2010 UTGO Bonds with the unlimited tax levy and a statutory second lien and trust on Distributable Aid; and

WHEREAS, pursuant to Act 227, in order to provide for the direct payment of Distributable Aid to the Trustee to pay the debt service on the 2010 UTGO Bonds, the City, the MFA, the State Treasurer entered into an Agreement to Deposit Distributable State Aid with the Master Trustee for Payment of the 2010 UTGO Bonds (the "UTGO Bonds Deposit Agreement"); and

WHEREAS, the Council deems it advisable and necessary at this time to authorize the issuance of self-insurance bonds and self-insurance refunding bonds in one or more series and sub-series of bonds (hereinafter collectively defined as the "Bonds") in an aggregate amount not to exceed $140,000,000, secured by Distributable Aid on a second or third lien basis, bearing interest at fixed and/or variable rates, subject to conversion and subject to mandatory tender and redemption, all as determined by the Finance Director of the City (the "Finance Director") within the parameters of this Resolution and confirmed at the time of sale or conversion of such Bonds in an order of the Finance Director (any orders related to the sale or conversion of the Bonds, a "Sale Order") and supplements to the Master Indenture, to fund the City's Risk Management Fund and to refund all or a portion of the Prior Bonds, respectively, all as determined and confirmed by the Finance Director in the Sale Order; and

WHEREAS, based on the recommendation of the Finance Director, the Council has determined to structure the sale of the Bonds through Bank of America Merrill Lynch ("BAML") and to sell the Bonds by negotiated sale to the MFA pursuant to one or more bond purchase contracts (each a "Bond Purchase Agreement") between the City and the MFA; and

WHEREAS, the Finance Director recommends that the Bonds be secured by pledges of Distributable Aid subordinate to the lien securing the DSA Bonds and on a parity second lien basis with the Series 2010 UTGO Bonds or on a subordinate third lien basis to the second lien securing the 2010 UTGO Bonds under the Indenture and all as determined by the Finance Director in a Sale Order and supplements to the Master Indenture, in addition to a pledge of the City's limited tax full faith and credit, in order to obtain the most economically advantageous interest rates on the Bonds; and

WHEREAS, the MFA may directly place and/or publicly solicit offers to purchase bonds or obligations to be issued by the MFA for the purpose of providing funds to purchase the Bonds, by distributing one or more private placement memoranda (together with any supplements thereto, each a "Private Placement Memorandum"); or preliminary official statements (together with any supplements thereto, each a "Preliminary Official Statement") and final official statements (together with any supplements thereto, each an "Official Statement"), respectively; and

WHEREAS, the Council desires to authorize the submission of disclosure information to the MFA and BAML, as applicable, in connection with the distribution of a Private Placement Memorandum in connection with a direct placement of bonds sold by MFA, or a Preliminary Official Statement and Official Statement in connection with the public offering for sale of bonds sold by MFA.

WHEREAS, the MFA will submit to the City, through the Finance Director, a proposed offer or offers to purchase the Bonds which shall be detailed in the Bond Purchase Agreement; and

WHEREAS, the MFA will require, as a condition precedent to purchasing the Bonds, that the City agree to provide disclosure to the MFA if the bonds sold by the MFA to BAML are privately placed or continuing disclosure to the MFA as required by Section (b)(5) of Rule 15c2-12 promulgated by the Securities and Exchange Commission under the Securities and Exchange Act of 1934, as amended if the bonds sold by the MFA to BAML are publicly sold ; and

WHEREAS, pursuant to the authority of Section 315(1)(d) of Act 34, the Council desires to delegate to the Finance Director the authority to make certain determinations with respect to the Bonds, within the parameters of this Resolution and to authorize the Finance Director, among other things, (i) to determine the principal amounts of the Bonds to be issued on a fixed or variable interest rate basis, on a second or third lien basis with respect to Distributable Aid to the DSA Bonds and on a tax exempt or taxable basis; (ii) to determine the interest rate provisions, tender and other requirements for Bonds issued on a fixed or variable rate basis, and redemption provisions for the Bonds; (iii) to determine which of the Prior Bonds are to be refunded; (iv) to negotiate the terms for the sale of the Bonds with the MFA; (v) to cause the Preliminary Official Statement and the final Official Statement for the Bonds to be prepared and circulated; (vi) to file a qualifying statement and/or application for full approval to issue the Bonds, as necessary, and to make such other filings with and to pay any post issuance fees to the Michigan Department of Treasury as required by Act 34, and (vii) to take such other actions and make such other determinations as may be necessary to accomplish the sale and delivery of the Bonds and the transactions contemplated by this Resolution, as shall be confirmed by the Finance Director in the Sale Order.

NOW, THEREFORE, BE IT RESOLVED BY THE CITY COUNCIL OF THE CITY OF DETROIT, WAYNE COUNTY, MICHIGAN, PURSUANT TO THE CHARTER, ACT 34 AND ACT 279 AS FOLLOWS:

## ARTICLE I

## DEFINITIONS AND INTERPRETATION

Section 101. Definitions. The words and terms defined in the preambles and recitals hereof and the following words and terms as used in this Resolution shall have the meanings ascribed therein or herein to them unless a different meaning clearly appears from the context:

"Act 34" means Act 34, Public Acts of Michigan, 2001, as amended.

"Act 80" means Act 80, Public Acts of Michigan, 1981, as amended.

"Act 227" means Act 227, Public Acts of Michigan, 1985, as amended.

"Act 279" means Act 279, Public Acts of Michigan, 1909, as amended.

"Authorized Officers" means the Mayor and the Finance Director of the City, and "Authorized Officer" means either of them.

"Bond Counsel" means Miller, Canfield, Paddock and Stone, P.L.C., attorneys of Detroit, Michigan, or such other nationally recognized firm of attorneys experienced in matters

-4-

pertaining to municipal bonds and appointed to serve in such capacity by the City with respect to the Bonds.

"Bond" or "Bonds" means singularly or collectively, the Series 2012(A) Bonds and the Series 2012(B) Bonds, or bonds bearing such other designations as determined by an Authorized Officer, evidencing the limited tax full faith and credit general obligation of the City, authorized to be issued pursuant to Act 279, Act 34, this Resolution and the Sale Order.

"Bond Insurer" means the issuer of the Municipal Bond Insurance Policy with respect to the Bonds, if any, named in the Sale Order.

"Bond Issuance Fund" means the fund so designated and established under Section 501 hereof.

"Bond Purchase Agreement" means one or more purchase contracts negotiated by the Finance Director between the City and either the MFA or the Underwriters, acting through the Representative, as the case may be, providing for the terms and conditions of the initial purchase of all or portions of the Bonds.

"Bond Registry" means the books for the registration of Bonds maintained by the Paying Agent.

"Bondowner", "Owner" or "Registered Owner" means, with respect to any Bond, the person in whose name such Bond is registered in the Bond Registry.

"Business Day" means a day which is not (a) a Saturday, Sunday or other day on which banking institutions in the city in which the principal office of the Trustee is located or the principal office of BAML is located or (b) a day on which the payment system of the Federal Reserve System is not operational.

"Charter" means the Charter of the City, as amended from time to time.

"City" means the City of Detroit, County of Wayne, State of Michigan.

"Closing Date" means the date or dates upon which there is an exchange of all or portions of the Bonds for the proceeds representing the purchase price of such Bonds paid by the Underwriters.

"Code" means the Internal Revenue Code of 1986, as amended.

"Constitution" means the Constitution of the State of Michigan of 1963, as amended.

"Conversion Date" means the Business Day on which the interest rate on Bonds initially issued with Short Term Rates shall convert to Fixed Rates, as specified in a Bond Purchase Agreement and approved in a Sale Order.

"Council" means the City Council of the City of Detroit, Michigan.

"Distributable Aid" has the meaning given in Act 80.

"DSA Agreement" means the DSA Bonds Deposit Agreement and the UTGO Bonds Deposit Agreement.

"DSA Bonds" means the City's $249,790,000 original principal amount Distributable State Aid General Obligation Limited Tax Bonds, Series 2010.

"DSA Bonds Deposit Agreement" has the meaning ascribed thereto in the preambles hereof.

"Finance Director" means the Finance Director of the City or her deputy or designee.

"First Supplemental Indenture" means the First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, between the City and the Master Trustee, providing for the escrow of Distributable Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the DSA Bonds.

"Fiscal Year" means the fiscal year of the City as in effect from time to time.

"Fixed Rate" means an interest rate or rates borne by Bonds which are fixed upon initial issuance or upon a Conversion Date for Bonds issued initially with Short Term Rates.

"Interest Payment Date" has the meaning given such term in Section 302.

"Master Trust Indenture" means the Master Debt Retirement Trust Indenture dated as of March 1, 2010, between the City and the Master Trustee, providing for the escrow of Distributable Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the DSA Bonds, the 2010 UTGO Bonds, the Bonds and any other additional obligations of the City secured by Distributable Aid, if any.

"Master Trustee" means U.S. Bank National Association, Detroit, Michigan, and successors to the Master Trustee, substituted in its place pursuant to the provisions of the Indenture.

"Maximum Aggregate Principal Amount" has the meaning given such term in Section 201.

"Maximum Interest Rate" means the rate of eighteen per centum per annum or such higher rate of annual interest as permitted by law.

"MFA" means the Michigan Finance Authority, as successor to The Michigan Municipal Bond Authority.

"Municipal Bond Insurance Policy" means the municipal bond insurance policy, if any, issued by the Bond Insurer insuring the payment when due of the principal of and interest on the Bonds determined to be insured as set forth in the Sale Order.

"Non-Arbitrage and Tax Compliance Certificate" means the Non-Arbitrage and Tax Compliance Certificate of the City, dated the Closing Date, regarding rebate requirements and

other tax responsibilities of the City relating to Bonds issued on a tax-exempt basis under the Code.

"Outstanding" when used with respect to the Bonds, means, as of the date of determination, the Bonds theretofore authenticated and delivered under this Resolution, except:

(A)   Bonds alleged to have been destroyed, lost or stolen which have been paid or replaced pursuant to this Resolution or otherwise pursuant to law; and

(B)   Bonds deemed paid as provided in Section 801.

"Prior Bonds" means the bonds so defined in the preambles hereof.

"Refunded Bonds" means all or a portion of the Prior Bonds, determined to be refunded by the Finance Director and confirmed by the Finance Director in the Sale Order.

"Refunding Escrow Agreement" means the agreement between the City and the Refunding Escrow Trustee providing for the Refunding Escrow Fund.

"Refunding Escrow Fund" means the separate trust fund established with the Refunding Escrow Trustee for the Refunded Bonds pursuant to the Refunding Escrow Agreement as provided in Section 501.

"Refunding Escrow Trustee" means the escrow agent and holder of the Refunding Escrow Fund pursuant to the Refunding Escrow Agreement.

"Regular Record Date" has the meaning given such term in Section 302.

"Resolution" means this Resolution as supplemented by the Sale Order, and as amended from time to time pursuant to Article VII.

"Restricted Escrow Agreement" means the agreement among the City, the State Treasurer and the Master Trustee related to the deposit and release of proceeds of the Series 2012(A) Bonds to fund the Risk Management Fund and the deposit and release of certain other escrowed money to the City's General Fund.

"Risk Management Escrow Fund" means the separate trust fund established under Section 501 and the Restricted Escrow Agreement.

"Risk Management Fund" means the City's Risk Management Fund created by the City under its Ordinance No. 16-95.

"Sale Order" means the order or orders of the Finance Director approving the sale of Bonds and making certain determinations and/or confirming the final details of the Bonds upon the sale or conversion of Bonds in accordance with the parameters of this Resolution and the terms of the Bond Purchase Agreement.

"Second Supplemental Indenture" means the Second Supplemental Debt Retirement Trust Indenture, dated as of the date of issuance of the Series 2010 UTGO Bonds, between the

City and the Master Trustee providing for the escrow of unlimited tax levies, delinquent taxes, interest subsidies and Distributable Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the 2010 UTGO Bonds.

"Series 2010 UTGO Bonds" means the City's $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) (Taxable Recovery Zone Economic Development Bonds – Direct Payment).

"Series 2012 DSA Agreement" means the Agreement among the City, the Master Trustee, the MFA and the State Treasurer, related to the deposit of Distributable Aid to pay debt service on the Bonds.

"Series 2012 (A) Bonds" means, collectively, the Series 2012(A1) Bonds and the Series 2012(A2) Bonds.

"Series 2012(A1) Bonds" means the Self-Insurance Distributable State Aid Second Lien Bonds (Limited Tax General Obligation), Series 2012(A1), authorized by Article III of this Resolution.

"Series 2012(A2) Bonds" means the Self-Insurance Distributable State Aid Third Lien Bonds (Limited Tax General Obligation), Series 2012(A2), authorized by Article III of this Resolution.

"Series 2012(B) Bonds" means, collectively, the Series 2012(B1) Bonds and the Series 2012(B2) Bonds.

"Series 2012(B1) Bonds" means the Self-Insurance Distributable State Aid Second Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B1), authorized by Article III of this Resolution.

"Series (B2)) Bonds" means the Self-Insurance Distributable State Aid Third Lien Refunding Bonds (Limited Tax General Obligation), Series 2012(B2), authorized by Article III of this Resolution.

"Series 2012 Escrow Fund" means the fund so designated and established under Section 501 hereof.

"Short Term Rate" means the initial interest rate or rates borne by Bonds subject to mandatory tender until a Conversion Date.

"State" means the State of Michigan.

"State Treasurer" means the Treasurer of the State.

"Supplemental Indenture" means a supplemental indenture entered into by the City and the Master Trustee and issued by the City pursuant to the Master Trust Indenture.

"Third Supplemental Indenture" means the Third Supplemental Debt Retirement Trust Indenture, dated as of the date of issuance of the Bonds, between the City and the Master Trustee

-8-

providing for the escrow of Distributable Aid payments received by the Master Trustee on behalf of the City to pay the debt service on the Bonds.

"UTGO Bonds Deposit Agreement" has the meaning ascribed thereto in the preambles hereof.

Section 102. <u>Interpretation</u>. (a) Words of the feminine or masculine genders include the correlative words of the other gender or the neuter gender.

(b)     Unless the context shall otherwise indicate, words importing the singular include the plural and vice versa, and words importing persons include corporations, associations, partnerships (including limited partnerships), trusts, firms and other legal entities, including public bodies, as well as natural persons.

(c)     Articles and Sections referred to by number mean the corresponding Articles and Sections of this Resolution.

(d)     The terms "hereby, "hereof", "hereto", "herein", "hereunder" and any similar terms as used in this Resolution, refer to this Resolution as a whole unless otherwise expressly stated.

## ARTICLE II

## DETERMINATIONS

Section 201. <u>Finding, and Declaration of Need to Borrow</u>. The Council hereby finds and declares that it is necessary for the City to borrow hereunder such sum as shall be determined by the Finance Director not in excess of an aggregate amount of $140,000,000 and to evidence such borrowing by the issuance of the Bonds not in excess, in aggregate principal amount, of such amount (the "Maximum Aggregate Principal Amount"), in minimum denominations of $5,000 or such greater minimum denominations as determined by the Finance Director, pursuant to the Charter and in accordance with the provisions hereof, for the purposes of providing funds (i) to fund the Risk Management Fund previously established by the City for the purpose of defraying losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure, including reimbursement to the City for certain amounts spent for Risk Management Fund purposes; (ii) to refund a portion of the Prior Bonds; (iii) to provide capitalized interest, if any; (iv) to establish a reserve fund and to pay for a Municipal Bond Insurance Policy, if necessary; and (v) to pay legal, financial, accounting, printing and other expenses related to the issuance of the Bonds, all as finally confirmed by the Finance Director in the Sale Order.

Section 202. <u>Declaration of Borrowing</u>. The City shall borrow, under this Resolution on the authority of and in accordance with the provisions of the Charter, Act 34 and Act 279, a sum not to exceed the Maximum Aggregate Principal Amount and the Bonds shall bear interest on a fixed and/or variable rate and tax-exempt and/or taxable basis as provided herein and in the Sale Order. The City shall issue the Bonds as hereinafter provided, secured by Distributable Aid on a second and/or third lien basis to the DSA Bonds as confirmed in a Sale Order and a Supplemental Indenture, and further secured by the limited tax full faith, credit and resources of

the City which will be payable from ad valorem taxes levied on all taxable property within the City, subject to applicable constitutional, statutory and charter tax rate limitations.

## ARTICLE III

## AUTHORIZATION, REDEMPTION AND ASSIGNMENT OF THE BONDS

Section 301.  Authorization of Bonds and Pledge.  (a)  The City hereby authorizes the issuance of the Bonds in such series and in such principal amounts as shall be confirmed in the Sale Order, not in excess of the Maximum Aggregate Principal Amount.  Pursuant to authorization provided in Act 227, the City hereby pledges for the payment of principal of and interest and any redemption premiums on the Bonds, Distributable Aid payments that the City is eligible to receive, which pledge and priority of lien on Distributable Aid shall be on a second lien basis and/or third lien basis to the outstanding DSA Bonds for such portions of the Bonds as the Finance Director shall determine in the Sale Order and a Supplemental Indenture.  The Finance Director is hereby authorized and directed to negotiate, approve and execute the Third Supplemental Indenture and such additional Supplemental Indentures, if necessary, for and on behalf of the City with U.S. Bank National Association, Detroit, Michigan, as Master Trustee, to provide for second and/or third lien pledges of Distributable Aid to secure payment of the Bonds or series of Bonds.  Nothing in this Resolution shall restrict or be construed as restricting the City's ability to make additional pledges or assignments of Distributable Aid as security for current or future bonds or obligations of the City, subject to the requirements for the issuance of additional bonds and obligations set forth in the Master Trust Indenture.  As additional security for the Bonds, the City hereby pledges its limited tax full faith and credit for the payment of the principal of and interest on the Bonds, including the proceeds of an annual levy of ad valorem taxes on all taxable property in the City, subject to applicable constitutional, statutory and charter tax rate limitations.

(b)  Bonds of the City aggregating the principal amount of not to exceed One Hundred Five Million Dollars ($105,000,000), shall be issued for the purposes of (i) funding a deposit to the Risk Management Fund previously established by the City for the purpose of defraying losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure, (ii) to pay capitalized interest on the Bonds, as determined by the Finance Director at the time of sale, and (iii) to pay costs of issuance for the Bonds.  Unless issued in more than one series as determined by the Finance Director in the Sale Order for such series and designated as provided in Section 302(a) hereof, the Series 2012(A1) Bonds shall be designated "SELF-INSURANCE DISTRIBUTABLE STATE AID SECOND LIEN BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(A1)" and the Series 2012(A2) Bonds shall be designated "SELF-INSURANCE DISTRIBUTABLE STATE AID THIRD LIEN BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(A2)".

(c)  Bonds of the City aggregating the principal amount of not to exceed Thirty-Five Million Dollars ($35,000,000) shall be issued in the discretion of the Finance Director for the purposes of (i) refunding the Refunded Bonds; (ii) to pay capitalized interest on the Bonds as determined by the Finance Director at the time of sale; and (iii) to pay the costs of issuance of such series of Bonds.  Unless issued in more than one series as determined by the Finance Director in the Sale Order for such series and designated as provided in Section 302(a) hereof,

the Series 2012(B1) Bonds shall be designated "SELF-INSURANCE DISTRIBUTABLE STATE AID SECOND LIEN REFUNDING BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(B1)" and the Series 2012(B2) Bonds shall be designated "SELF-INSURANCE DISTRIBUTABLE STATE AID THIRD LIEN REFUNDING BONDS (LIMITED TAX GENERAL OBLIGATION), SERIES 2012(B2)".

Section 302. <u>Designations, Dates, Interest Rates, Maturities, Redemption, Conversion and Other Terms of the Bonds.</u>

(a)     The Series 2012(A) Bonds and Series 2012(B) Bonds shall be designated as provided in Section 301 and may bear such later or earlier dates and additional or alternative designations as the Finance Director may determine in the Sale Order, shall be issued in fully registered form and shall be consecutively numbered from "RA1-1", "RA2-1", "RB1-1" and "RB2-1" upwards, respectively, unless otherwise provided by the Finance Director in the Sale Order. The Bonds shall be dated and issued in such denominations all as determined by the Finance Director and confirmed by the Finance Director in the Sale Order.

(b)     The Bonds shall mature on such dates and shall bear interest at such rates on a fixed and/or variable and tax-exempt and/or taxable basis not exceeding the Maximum Interest Rate, payable on such dates and subject to mandatory tender and redemption on such dates as shall be determined by the Finance Director and confirmed by the Finance Director in the Sale Order. Unless otherwise provided by the Finance Director in the Sale Order, interest on the Bonds shall be calculated on the basis of a 360 day year consisting of twelve, 30 day months. Notwithstanding the foregoing, the Finance Director is authorized to determine and confirm in the Sale Order whether all or any portion of the Bonds shall be issuable as capital appreciation bonds. The Bonds shall be payable, as to principal and interest, in lawful money of the United States of America.

(c)     Bonds or sub-series of Bonds shall initially bear interest at Fixed Rates or Short Term Rates as determined by the Finance Director in a Sale Order. Bonds which bear interest at Short Term Rates shall be subject to mandatory tender and conversion to Fixed Rates upon a Conversion Date as specified by the Finance Director in a Sale Order, subject to the following:

(i)     On the Conversion Date, the Finance Director shall deliver Bonds bearing interest at Fixed Rates to the MFA in exchange for the return by the MFA and cancellation by the Trustee of Bonds that bear interest at Short Term Rates.

(ii)     In the event for any reason the conversion of Bonds bearing interest at Short Term Rates does not take place on the Conversion Date, such Bonds shall be immediately subject to mandatory redemption by the City, from all available Distributable Aid in the Subordinate Lien Escrow Fund, as defined in and provided by Section 204 of the Master Trust Indenture. In accordance with Section 205 of the Master Trust Indenture, the Master Trustee shall withdraw from the Series 2012 Escrow Fund of the Subordinate Lien Escrow Fund, an aggregate amount of the Distributable Aid deposits sufficient to pay the principal of and accrued interest on the Bonds subject to the failed conversion in full, and in any case by not later than January 15, 2013, unless provided otherwise in a Sale

Order, prior to the release of any deposits of Distributable Aid from the Series 2012 Escrow Fund to the City.

(iii)　Anything in this Section 302 to the contrary notwithstanding, in no event shall a conversion of a Short Term Rate to a Fixed Rate become effective unless the City shall file with the Trustee, the MFA and BAML on or before the Conversion Date (i) a favorable opinion of Bond Counsel to the effect that the conversion is authorized and permitted by this Resolution and will not in and of itself, have an adverse effect on the exclusion of interest on the Bonds from gross income for federal income tax purposes; and (ii) an Undertaking, as defined in Section 1003 hereof, in the form of Exhibit A hereto.

(d)　In making the determinations set forth in this Resolution with respect to the Sale Order for the issuance and sale of the Bonds, the Finance Director shall be limited to the parameters as follow:

(1)　The first maturity date or mandatory sinking fund redemption date for the Bonds shall not be later than ten (10) years from the date of issuance (except for Bonds issued in more than one series, which shall have first maturity dates not later than ten (10) years from the date of issuance as determined by the Finance Director at the time of sale thereof), and the final maturity dates for the Bonds shall not be later than thirty (30) years from their dated date.

(2)　Unless the Finance Director determines to issue all or a part of the Bonds as capital appreciation bonds, the amount of any original issue discount with respect the Bonds shall not exceed 10% of the original principal amount of the related series of Bonds.

(3)　To the extent permitted by applicable law, each series of the Bonds may be sold with an original issue premium in an amount as determined by the Finance Director.

(4)　The compensation to be paid to BAML to structure and place the Bonds shall not exceed 2.0% of the aggregate principal amount of the Bonds issued.

(e)　In connection with the sale of the Bonds to the MFA, the following additional provisions shall apply:

(1)　Each series of Bonds shall be in the form of a single fully-registered, nonconvertible bond in the denomination of the full principal amount thereof, dated as of the date of delivery of the Bonds, payable in principal installments serially as finally determined at the time of sale of the Bonds and approved by the MFA and the Authorized Officer. Final determination of the principal amount of a series and the payment dates and amounts of principal installments of a series of Bonds shall be evidenced by execution of a Bond Purchase Agreement between the City and the MFA providing for sale of the Bonds, and an Authorized Officer is authorized and directed to negotiate the

terms of, approve the form of and to execute and deliver the Bond Purchase Agreement when it is in final form and to make the determinations set forth above. An Authorized Officer is authorized and directed to approve of a series designation with respect to each series of Bonds.

(2)     The Bonds or principal installments thereof will be subject to prepayment prior to maturity in the manner and at the prices and times as provided in the form of the Bonds contained in this Resolution or as may be approved by an Authorized Officer in a Sale Order at the time of sale of the Bonds or by the MFA at the time of prepayment.

(3)     The Bonds shall bear interest at a rate specified in the Bond Purchase Agreement and approved as evidenced by execution of the Bond Purchase Agreement, but in any event not to exceed the Maximum Interest Rate, and an Authorized Officer shall deliver the Bonds in accordance with the delivery instructions of the MFA.

(4)     The Bonds shall not be convertible or exchangeable into more than one fully-registered bond. Principal of and interest on the Bonds shall be payable as provided in the Bond form in this Resolution as the same may be amended to conform to MFA requirements.

(5)     The Master Trustee shall record on the registration books payment by the City of each installment of principal or interest or both when made and the cancelled checks or other records evidencing such payments shall be returned to and retained by the City Treasurer.

(6)     Upon payment by the City of all outstanding principal of and interest on a Bond, the MFA shall deliver the respective Bond to the City for cancellation.

Section 303.  Execution, Authentication and Delivery of Bonds.  The Bonds shall be executed in the name of the City by the manual or facsimile signatures of the Mayor and the Finance Director and authenticated by the manual signature of the Finance Director, and the seal of the City (or a facsimile thereof) shall be impressed or imprinted on the Bonds. After the Bonds have been executed and authenticated for delivery to the original purchaser thereof, they shall be delivered by the Finance Director to the purchasers thereof upon receipt of the purchase price.

Section 304.  Authentication of the Bonds.  Anything in this Resolution to the contrary notwithstanding, the Bonds bearing the manual or facsimile signatures of the Mayor and the Finance Director shall require no further authorization. The Authorized Officer is authorized to deliver the Bonds in accordance with the delivery instructions of the MFA.

Section 305.  The MFA's Depository.  Notwithstanding any other provision herein to the contrary, as long as the MFA is the owner of the Bonds, the Bonds are payable as to principal, premium, if any, and interest at the corporate trust office of U.S. Bank National Association, Lansing, Michigan, or such other qualified bank or financial institution as shall be designated in

writing to the City by the Authority (the "Authority's Depository"). The City will deposit with the Authority's Depository payments of the principal of, premium, if any, and interest on the Bonds in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise. Written notice of any redemption of the Bonds shall be given by the City and received by the Authority's Depository at least 40 days prior to the date on which such redemption is to be made.

Section 306. Mutilated, Destroyed, Stolen or Lost Bonds. (a) Subject to the provisions of Act 354, Public Acts of Michigan, 1972, as amended and any other applicable law, if (i) any mutilated Bond is surrendered to the City, and the City receives evidence to its satisfaction of the destruction, loss or theft of any Bond and (ii) there is delivered to the City such security or indemnity as may be required by it to save the City harmless, then, in the absence of notice to the City that such Bond has been acquired by a bona fide purchaser, the City shall execute and deliver in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Bond, a new Bond of like tenor and principal amount, bearing a number not contemporaneously outstanding.

(b)     If any such mutilated, destroyed, lost or stolen Bond has become or is about to become due and payable, the City in its discretion may, instead of issuing a new Bond, pay such Bond.

(c)     Any new Bond issued pursuant to this Section in substitution for a Bond alleged to be mutilated, destroyed, stolen or lost shall constitute an original additional contractual obligation on the part of the City, and shall be equally secured by and entitled to equal proportionate benefits with all other Bonds of like tenor issued under this Resolution.

Section 307. Form of the Bonds. The Bonds shall be in substantially the following form with such insertions, omissions, substitutions and other variations as shall not be inconsistent with this Resolution or required by the Michigan Attorney General and the MFA or permitted by the Sale Order or as approved by an Authorized Officer and Bond Counsel:

[Form of Bond]

United States of America
State of Michigan
County of Wayne

CITY OF DETROIT
SELF-INSURANCE DISTRIBUTABLE STATE AID
[SECOND/THIRD] LIEN [REFUNDING] BOND
(LIMITED TAX GENERAL OBLIGATION, SERIES 2012(A/B)

REGISTERED OWNER:      Michigan Finance Authority

PRINCIPAL AMOUNT:      _____ Dollars ($_____)

DATE OF ORIGINAL ISSUE:     _____, 2012

     The CITY OF DETROIT, County of Wayne, State of Michigan (the "City"), for value received, hereby promises to pay to the Michigan Finance Authority (the "Authority"), or registered assigns, the Principal Amount shown above, as shall have been advanced to the City pursuant to a Bond Purchase Agreement between the City and the Authority [and a Supplemental Agreement by and among the City and the Authority], in lawful money of the United States of America, unless prepaid prior thereto as hereinafter provided.

     The Principal Amount shall be payable on the dates and in the annual principal installment amounts set forth in Schedule A attached hereto and made a part hereof, as such Schedule may be adjusted if a portion of the Principal Amount is prepaid as provided below, with interest on said principal installments from the date each said installment is delivered to the holder hereof until paid at the rate of _____ percent (_____%) per annum. Interest is first payable on _____ 1, 201_, and semiannually thereafter on the first day of _____ and _____ of each year, as set forth in the Bond Purchase Agreement.

     Notwithstanding any other provision of this bond, as long as the Authority is the owner of this bond, (a) this bond is payable as to principal, premium, if any, and interest at the corporate trust office of U.S. Bank National Association, Lansing, Michigan, or at such other place as shall be designated in writing to the City by the Authority (the "Authority's Depository"); (b) the City agrees that it will deposit with the Authority's Depository payments of the principal of, premium, if any, and interest on this bond in immediately available funds at least five business days prior to the date on which any such payment is due whether by maturity, redemption or otherwise; and (c) written notice of any redemption of this bond shall be given by the City and received by the Authority's Depository at least 40 days prior to the date on which such redemption is to be made.

<u>Additional Interest</u>

In the event of a default in the payment of principal or interest hereon when due, whether at maturity, by redemption or otherwise, the amount of such default shall bear interest (the "additional interest") at a rate equal to the rate of interest which is two percent above the Authority's cost of providing funds (as determined by the Authority) to make payment on the bonds of the Authority issued to provide funds to purchase this bond but in no event in excess of the maximum rate of interest permitted by law. The additional interest shall continue to accrue until the Authority has been fully reimbursed for all costs incurred by the Authority (as determined by the Authority) as a consequence of the City's default. Such additional interest shall be payable on the interest payment date following demand of the Authority. In the event that (for reasons other than the default in the payment of any municipal obligation purchased by the Authority) the investment of amounts in the reserve account established by the Authority for the bonds of the Authority issued to provide funds to purchase this bond fails to provide sufficient available funds (together with any other funds which may be made available for such purpose) to pay the interest on outstanding bonds of the Authority issued to fund such account, the City shall and hereby agrees to pay on demand only the City's pro rata share (as determined by the Authority) of such deficiency as additional interest on this bond.

This bond is a single, fully-registered, non-convertible bond in the principal sum of $\_\_\_,000, issued pursuant to and in accordance with Act 34, Public Acts of Michigan, 2001, as amended, and Act 279, Public Acts of Michigan, 1909, as amended, Act 227, Public Acts of Michigan, 1985, as amended ("Act 227") and pursuant to and in accordance with a Resolution duly adopted by the City Council of the City on _____, 2012 and a Sale Order of the Finance Director of the City issued on _____, 2012 (collectively, the "Resolution"). [The Bonds are issued for the purpose of defraying the cost of capitalizing the Risk Management Fund established by the City. Concurrently with the issuance of the Bonds of this series, pursuant to the Resolution, the City is issuing $_____ of its Self-Insurance Distributable State Aid [Second/Third] Lien Refunding Bonds (Limited Tax General Obligation), Series 2012[(B1/2)] (the "Series 2012[(B1/2)] Bonds").] [The Bonds are issued for the purpose of refunding portions of the City's outstanding Self-Insurance Bonds (Limited Tax General Obligation), Series 2003 (Federally Taxable) and General Obligation Self-Insurance Bonds (Limited Tax), Series 2004 (Federally Taxable). Concurrently with the issuance of the Bonds of this series, pursuant to the Resolution, the City is issuing $_____ of its Self-Insurance Distributable State Aid [Second/Third] Lien Bonds (Limited Tax General Obligation), Series 2012[(A1/2)] (the "Series 2012(A(1/2)) Bonds.)] Capitalized terms used herein and not defined herein shall have the meanings ascribed to them in the Resolution.

[Bonds bearing interest at Short Term Rates shall be subject to mandatory tender and conversion to Fixed Rates or mandatory redemption upon a failed conversion on a Conversion Date as provided in the Resolution.]

[Bonds may be subject to optional redemption prior to maturity by the City only with the prior written consent of the Authority and on such terms as may be required by the Authority.]

[*Extraordinary Mandatory Redemption*. Commencing March 1, 2017, and each March 1 thereafter (each, an "Extraordinary Redemption Date") the Bonds shall be subject to extraordinary mandatory redemption, and the City shall redeem the Bonds in whole, unless not

less than 60 days prior to each Extraordinary Redemption Date, the City (i) elects in writing to the Trustee to redeem none or less than the entire outstanding principal amount of the Bonds and (ii) delivers to the Trustee an opinion ("Continuing Exclusion Opinion") of nationally recognized bond counsel ("Bond Counsel") to the effect that in the sole opinion of such Bond Counsel the failure to redeem the Bonds that shall remain outstanding after the next succeeding Extraordinary Redemption Date, will not adversely affect the exclusion of interest on the Bonds from gross income for federal income tax purposes. In the event that less than all of the outstanding Bonds must be redeemed in order for Bond Counsel to deliver the Continuing Exclusion Opinion to the Trustee, the City shall direct the Trustee to redeem the Bonds selected by the City in its sole discretion, in any order of maturity, and by lot within a maturity. Any such redemption will occur at redemption prices expressed as percentages of the par amount being redeemed, plus interest accrued to the date fixed for redemption as follows:

| Extraordinary Redemption Date | Redemption Price |
|---|---|
| _____, 2017 | ___% |
| _____, 2018 | ___% |
| _____, 2019 | ___% |
| _____, 2020 | ___% |
| _____, 2021 | ___% |
| _____, 2022 | Par |

Under the Trust Indenture (as hereinafter defined), the Trustee has covenanted, commencing [November 1, 2016] and each [November 1] thereafter so long as the Bonds are outstanding, to send the Finance Director of the City notice requesting the City to engage Bond Counsel to provide the Continuing Exclusion Opinion. The Finance Director has covenanted under the Trust Indenture, that upon receipt of such notice from the Trustee, the City shall cause Bond Counsel to provide the Continuing Exclusion Opinion as required above. The Trust Indenture provides that the City may conclusively rely on such Continuing Exclusion Opinion in complying with the provisions therein. In the event the City fails to obtain the Continuing Exclusion Opinion, or Bond Counsel determines that the conditions necessary to provide the Continuing Exclusion Opinion for the Bonds that remain outstanding after the next succeeding Extraordinary Redemption Date do not exist, the City shall redeem the Bonds in accordance with the provisions above.

Notwithstanding the foregoing, if the City obtains an opinion of Bond Counsel to the effect that no further action is required to maintain the exclusion of interest on the Bonds from gross income for federal income tax purposes, the Bonds shall no longer be subject to extraordinary mandatory redemption prior to maturity. The City may conclusively rely on such opinion of Bond Counsel in complying with the provisions of the Trust Indenture.]

*General Redemption Provisions.* In case less than the full amount of an outstanding Bond is called for redemption, the Trustee, upon presentation of the Bond called for redemption, shall register, authenticate and deliver to the registered owner of record a new Bond in the principal amount of the portion of the original Bond not called for redemption.

Notice of redemption shall be given to the registered owners of Bonds or portions thereof called for redemption by mailing of such notice not less than forty (40) days but not more than sixty (60) days prior to the date fixed for redemption to the registered address of the registered owner of record. Bonds or portions thereof so called for redemption shall not bear interest after the date fixed for redemption, whether presented for redemption or not, provided funds are on hand with the Trustee to redeem such Bonds.

This Bond is payable out of the City's Debt Retirement Fund for this issue and the City is obligated to levy annually sufficient taxes to provide for the payment of the principal of and interest on the bonds of this issue as they mature on all taxable property in the City subject to applicable constitutional, statutory and charter tax rate limitations.

As additional security for the City's obligation to pay the principal of and interest and any premiums on the Bonds, pursuant to Act 227 the City has pledged the payments that the City is eligible to receive from the State of Michigan under Act 140, Public Acts of Michigan, 1971, as amended ("Distributable Aid"), and certain monies in the funds and accounts established by the City with U.S. Bank National Association, as trustee (the "Trustee"), pursuant to the terms and conditions of a Master Debt Retirement Trust Indenture dated as of March 1, 2010, between the City and the Trustee, as supplemented by a First Supplemental Debt Retirement Trust Indenture dated as of March 1, 2010, a Second Supplemental Debt Retirement Trust Indenture dated as of December 1, 2010 and a Third Supplemental Debt Retirement Trust Indenture dated as of _____, 2012 (collectively, the "Trust Indenture"). The pledge and lien on Distributable Aid securing the Bonds is on a [second][third] lien basis to a statutory lien and trust on Distributable Aid securing the City's $249,790,000 original principal amount Distributable State Aid General Obligation Bonds, Series 2010 (the "DSA Bonds"). The Bonds and the Series [2012(A/B)] Bonds have a [parity second][third] lien on Distributable Aid with the City's $100,000,000 original principal amount Distributable State Aid Second Lien Bonds (Unlimited Tax General Obligation), Series 2010(A) [and the City's $_____ original principal amount General Obligation Distributable State Aid [Second][Third] Lien Capital Improvement Refunding Bonds, Series 2012(A) issued concurrently with the Bonds (the "Series 2012 CIRBs"]. [The City has reserved the right to make additional pledges or assignments of Distributable Aid on a subordinate basis with the pledge of Distributable Aid securing the DSA Bonds or on a parity or subordinate basis with the Series 2010(A) Bonds, the Series 2012(B) Bonds, the Series 2012 CIRBs and the Bonds as security for future bonds or obligations of the City, subject to the requirements for the issuance of additional bonds and obligations as provided in the Trust Indenture.]

This bond is transferable only upon the registration books of the City by the registered owner of record in person, or by the registered owner's attorney duly authorized in writing, upon the surrender of this bond together with a written instrument of transfer satisfactory to the City duly executed by the registered owner or the registered owner's attorney duly authorized in writing, and thereupon a new registered bond or bonds in the same aggregate principal amount and of the same maturity shall be issued to the transferee in exchange therefor as provided in the resolution authorizing this bond and upon the payment of the charges, if any, therein prescribed.

It is hereby certified and recited that all acts, conditions and things required by law to be done, precedent to and in the issuance of this bond and the series of bonds of which this is one,

exist and have been done and performed in regular and due form and time as required by law, and that the total indebtedness of the City, including this bond and the series of bonds of which this is one, does not exceed any constitutional, statutory or charter debt limitation.

IN WITNESS WHEREOF, the City of Detroit by authority of its City Council, has caused this bond to be signed for and on its behalf and in its name by the manual or facsimile signature of the Mayor of the City and the manual or facsimile signature of its Finance Director and the official seal of the City to be impressed hereon, all as of the Date of Original Issue.

**CITY OF DETROIT**
County of Wayne
State of Michigan

By_____

Its Mayor

(SEAL)

By_____

Its Finance Director

# ARTICLE IV

## SPECIAL COVENANTS

Section 401. <u>Tax Exemption Covenant for Tax-Exempt Bonds</u>. The City covenants that it will not take any action, or fail to take any action required to be taken, if taking such action or failing to take such action would adversely affect the general exclusion from gross income of interest on any Bonds and any bonds of the City sold concurrently with the Bonds ("Other Bonds") and issued on a tax-exempt basis, from federal income taxation under the Code.

Section 402. <u>Arbitrage Covenant</u>. (a) The City will not directly or indirectly (1) use or permit the use of any proceeds of any Bonds and Other Bonds issued on a tax-exempt basis or other funds of the City or (2) take or omit to take any action required by Section 148(a) of the Code in order to maintain the exclusion from gross income of the interest on any Bonds and Other Bonds issued on a tax-exempt basis for federal income tax purposes. To that end, the City will comply with all requirements of Section 148 of the Code to the extent applicable to the Bonds and Other Bonds and the requirements set forth in the Non-Arbitrage and Tax Compliance Certificate of the City.

(b)     Without limiting the generality of subsection (a), above, the City agrees that there shall be paid by the City from time to time all amounts, if any, required to be rebated to the United States pursuant to Section 148(f) of the Code. This covenant shall survive payment in full or defeasance of the Bonds and Other Bonds.

(c)     Notwithstanding any provision of this Section, if the City obtains an opinion of Bond Counsel to the effect that any action required under this Section is no longer required, or that some further action is required, to maintain the exclusion from gross income of the interest of any Bonds and Other Bonds issued on a tax-exempt basis for federal income tax purposes pursuant to Section 103 of the Code, the City may conclusively rely on such opinion in complying with the provisions hereof.

# ARTICLE V

## FUNDS AND ACCOUNTS; DISPOSITION OF BOND PROCEEDS

Section 501. <u>Establishment of Accounts and Funds</u>. The City hereby establishes and creates the following special, separate and segregated accounts and funds which shall be held for and on behalf of the City by a bank or banks or other financial institution which the Finance Director or Treasurer of the City designates as depository of the City; provided that the Debt Retirement Fund and the Series 2012 Escrow Fund shall be held in trust by the Master Trustee for the benefit of the Bondholders:

  A. Debt Retirement Fund;
  B. Series 2012 Escrow Fund;
  C. Bond Issuance Fund;
  D. Risk Management Escrow Fund; and
  E. Refunding Escrow Fund.

The Finance Director is hereby authorized to establish such accounts, subaccounts or funds as shall be required for the Bonds, if any, to accommodate the requirements of such series of Bonds, including, but not limited to, such accounts, subaccounts or funds necessary to facilitate the allocation and use of bond proceeds as described in this Resolution or the purchase and payment of variable rate bonds. The Finance Director is authorized to allocate any net original issue premium, if any, received upon the sale of the Bonds to such accounts and in such amounts as permitted by applicable law and the Code for Bonds issued on a tax-exempt basis.

Section 502. <u>Debt Retirement Fund-All Bonds</u>. From the proceeds of the sale of the Bonds there shall be set aside in the Debt Retirement Fund the accrued interest, capitalized interest and premium, if any, received from the purchasers of the Bonds at the time of delivery of the Bonds. General funds of the City, proceeds of all taxes levied pursuant to Section 301 hereof, and any amounts transferred from the Refunding Escrow Fund under Section 506 hereof shall be used to pay the principal of and interest on the Bonds when due. The foregoing amounts shall be placed in the Debt Retirement Fund and held in trust by the Master Trustee, and so long as the principal of or interest on the Bonds shall remain unpaid, no moneys shall be withdrawn from the Debt Retirement Fund except to pay such principal and interest. Any amounts remaining in the Debt Retirement Fund after payment in full of the Bonds shall be retained by the City to be used for any lawful purpose.

Section 503. <u>Debt Retirement Fund – Series 2012 Escrow Fund</u>. As additional security for Bonds, Distributable Aid payments to be received by the City from time to time shall be distributed by the State Treasurer to the Master Trustee pursuant to the DSA Agreement and the Series 2012 DSA Agreement and deposited by the Master Trustee in the Debt Retirement Fund (to be designated the Distributable State Aid – Common Debt Retirement Fund" in the Master Indenture), and allocated and set-aside by the Master Trustee into the Series 2012 Escrow Fund in accordance with the provisions of the Master Indenture and the related Third Supplemental Indenture for the payment of the principal of and interest on the Bonds when due. Any amounts remaining in the Debt Retirement Fund after the setting aside of the amounts necessary to satisfy the Deposit Date Balance Requirements (defined in the Master Indenture) of all DSA Escrow Funds (defined in the Master Indenture), shall be released to the City for deposit to the General Fund of the City.

Section 504. <u>Bond Issuance Fund</u>. From the proceeds of the Bonds there shall be set aside in the Bond Issuance Fund a sum sufficient to pay the costs of issuance of the Bonds. Moneys in the Bond Issuance Fund shall be used solely to pay expenses of issuance of the related series of Bonds. Any amounts remaining in the Bond Issuance Fund after payment of issuance expenses shall be transferred to the Debt Retirement Fund.

Section 505. <u>Risk Management Escrow Fund</u>. On or prior to the date the Bond Purchase Agreement is executed, the City, and the Master Trustee shall enter into a Restricted Escrow Agreement (the "Restricted Escrow Agreement") in a form approved by the State Treasurer. Pursuant to the Restricted Escrow Agreement, the City shall advance from its General Fund to the Master Trustee the debt service payments coming due on a portion of the Prior Bonds on April 1, 2012 and May 1, 2012 as determined by the Finance Director (the "Advance"). The Advance shall be deposited by the Master Trustee into the Restricted Escrow Fund created under the Restricted Escrow Agreement and released by the Master Trustee to the City's General Fund, subject to the terms and conditions of the Restricted Escrow Agreement. The Council hereby

authorizes the Finance Director to negotiate the terms and approve the form of and to execute the Restricted Escrow Agreement for and on behalf of the City.

After making the deposits required by Sections 502 and 504, the remainder of the proceeds of the sale of the Series 2012(A) Bonds shall be deposited in the Risk Management Escrow Fund created under the Restricted Escrow Agreement. Pursuant to the Restricted Escrow Agreement, with the prior written approval of the State Treasurer, the Master Trustee shall release from time to time portions of the proceeds of the Series 2012 (A) Bonds to the City for deposit in the Risk Management Fund previously created by the City pursuant to Ordinance No. 16-95 (the "Ordinance"), to be used solely for the purpose of funding and maintaining (together with the current Risk Management Fund balance) a reserve not less than the Minimum Required Balance (as defined in the Ordinance) to pay for any losses for which insurance coverage could be provided by an insurer, but for which the City has determined to self-insure.

Section 506. <u>Refunding Escrow Fund</u>. After making the deposits required by Sections 502 and 504, there shall be deposited from the remainder of the proceeds of the sale of the Series 2012(B) Bonds and any moneys transferred by the City at the time of delivery of the Series 2012(B) Bonds from the debt retirement funds for the Refunded Bonds, into the Refunding Escrow Fund (which shall be maintained in cash or invested in direct obligations of or obligations guaranteed by the United States of America, not redeemable at the option of the issuer), an amount, as hereinafter described, sufficient to pay the principal of and interest on the Refunded Bonds as they become due and, except as otherwise herein provided, shall be used only for such purposes. The Refunding Escrow Fund shall be irrevocably held by U.S. Bank National Association, Detroit, Michigan as escrow agent or escrow trustee (the "Escrow Trustee") in trust pursuant to an escrow deposit agreement between the City and the Refunding Escrow Trustee (the "Refunding Escrow Agreement"), which Refunding Escrow Agreement shall irrevocably direct the Refunding Escrow Trustee to take all necessary steps to pay the principal of and interest on the Refunded Bonds when due and to call for redemption the Refunded Bonds in whole or in part, as and when specified in the Refunding Escrow Agreement. The amounts, including the investments thereof, held in the Refunding Escrow Fund shall be such that the cash and investments and income received thereon will be sufficient, without any reinvestment, to pay the principal of and interest on the Refunded Bonds when due at maturity or by redemption as required by this Section. Any balance remaining in the Refunding Escrow Fund after payment in full of principal and interest on the Refunded Bonds shall be applied as provided in the Refunding Escrow Agreement.

The Refunding Escrow Trustee means and includes any company into which the Refunding Escrow Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Refunding Escrow Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a trust company or bank which is qualified to be a successor to the Refunding Escrow Trustee as determined by the Finance Director, shall be authorized by law to perform all the duties imposed upon it by this Resolution, shall be the successor to the Refunding Escrow Trustee without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.

The Council hereby authorizes the Finance Director to approve the form of and to execute the Refunding Escrow Agreement with the Refunding Escrow Trustee for and on behalf of the City.

Section 507. <u>Investment of Monies in the Funds and Accounts</u>. (a) The Finance Director shall direct the investment of monies on deposit in the Funds and Accounts established hereunder and under the Restricted Escrow Agreement, and the Master Trustee, upon written direction or upon oral direction promptly confirmed in writing by the Finance Director, shall use its best efforts to invest monies on deposit in the Funds and Accounts and under the Restricted Escrow Agreement in accordance with such direction.

(b) Monies on deposit in the Funds and Accounts may be invested in such investments and to the extent permitted by applicable law.

## ARTICLE VI

## THE MASTER TRUSTEE

Section 601. <u>Master Trustee</u>. Except as otherwise required by the MFA, the Master Trustee for the Bonds shall act as bond registrar, transfer agent and trustee for the Bonds, and shall be initially U.S. Bank National Association, Detroit, Michigan, or such other bank or trust company located in the State of Michigan which is qualified to act in such capacity under the laws of the United States of America or the State of Michigan. The Master Trustee means and includes any company into which the Master Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Master Trustee may sell or transfer all or substantially all of its corporate trust business, provided, that such company shall be a trust company or bank which is qualified to be a successor to the Master Trustee as determined by the Finance Director, shall be authorized by law to perform all the duties imposed upon it by this Resolution, and shall be the successor to the Master Trustee without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding. The Finance Director is authorized to enter into third supplement to the Master Trust Indenture in the form of a Third Supplemental Indenture with such a bank or trust company, and from time to time as required, may designate a similarly qualified successor Master Trustee and enter into an agreement therewith for such services.

Section 602. <u>Master Trust Indenture</u>. The Mayor and the Finance Director are each hereby authorized and directed on behalf of the City to take any and all other actions and perform any and all acts that shall be required, necessary or desirable to enter into and implement the Third Supplemental Indenture and such additional Supplemental Indentures as required by this Resolution, with the Master Trustee, including, but not limited to, entering into the Series 2012 DSA Agreement with the Trustee, the MFA and State Treasurer, in accordance with Act 227, to provide for the direct payment of Distributable Aid by the State Treasurer to the Master Trustee as additional security for the Bonds.

# ARTICLE VII

## SUPPLEMENTAL RESOLUTIONS

Section 701. <u>Supplemental Resolutions Not Requiring Consent of Holders of the Bonds</u>. The City may without the consent of any Bondowner adopt resolutions supplemental to this Resolution for any one or more of the following purposes:

(i)     to confirm or further assure the security hereof or to grant or pledge to the holders of the Bonds any additional security;

(ii)    to add additional covenants and agreements of the City for the purposes of further securing the payment of the Bonds;

(iii)   to cure any ambiguity or formal defect or omission in this Resolution;

(iv)    to amend provisions in the Resolution relating to rebate to the United States Government or otherwise, which in the opinion of Bond Counsel are required in order to maintain the exclusion of interest on the Bonds from gross income for federal income tax purposes; and

(v)     such other action not materially, adversely and directly affecting the security of the Bonds;

provided that the effectiveness of any supplemental resolution is subject to Section 702 to the extent applicable.

Section 702. <u>Opinion and Filing Under Act 34</u>. Before any supplemental resolution under this Article shall become effective, a copy thereof shall be filed with the Master Trustee and as provided in Act 34, if applicable, together with an opinion of Bond Counsel that such supplemental resolution is authorized or permitted by this Article; provided that Bond Counsel in rendering any such opinion shall be entitled to rely upon certificates of the Finance Director or other City official, and opinions or reports of consultants, experts and other professionals retained by the City to advise it, with respect to the presence or absence of facts relative to such opinion and the consequences of such facts.

# ARTICLE VIII

## DEFEASANCE

Section 801. <u>Defeasance</u>. Bonds shall be deemed to be paid in full upon the deposit in trust of cash or direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America, or any combination thereof, not redeemable at the option of the issuer thereof, the principal and interest payments upon which, without reinvestment thereof, will come due at such times and in such amounts, as to be fully sufficient to pay when due, the principal of such Bonds and interest to accrue thereon, as confirmed by a verification report prepared by an independent certified public accountant; provided, that if any of such Bonds are to be called for redemption prior to maturing, irrevocable

instructions to call such Bonds for redemption shall be given only with the prior written consent of the MFA and on such terms as may be required by the MFA. Such cash and securities representing such obligations shall be deposited with a bank or trust company and held for the exclusive benefit of the Owners of such Bonds. After such deposit, such Bonds shall no longer be entitled to the benefits of this Resolution (except for any rights of transfer or exchange of Bonds as therein or herein provided for) and shall be payable solely from the funds deposited for such purpose and investment earnings, if any, thereon, and the lien of this Resolution for the benefit of such Bonds shall be discharged.

## ARTICLE IX

## REIMBURSEMENT PROVISIONS

Section 901. <u>Advancement of Funds to Risk Management Fund</u>. At the direction of the Finance Director, the City may advance certain costs of the Risk Management Fund from the City's General Fund prior to the issuance of the Series 2012(A) Bonds. The City intends to reimburse itself for any costs of the Risk Management Fund paid or incurred by the City from its General Fund during the current Fiscal Year 2012, with a portion of the proceeds of the Series 2012(A) Bonds deposited into the Risk Management Escrow Fund under Section 505 hereof, as determined by the Finance Director in the Sale Order.

## ARTICLE X

## OTHER PROVISIONS OF GENERAL APPLICATION

Section 1001. <u>Credit Enhancement; Remarketing Agreement</u>. (a) There is hereby authorized to be obtained municipal bond insurance or other credit enhancement or a combination thereof to secure the payment of all or part of the Bonds, if, and provided that, it shall be determined by the Finance Director that such cost of such Municipal Bond Insurance Policy or other credit enhancement or a combination thereof is less than the interest rate savings therefrom or otherwise that it is in the best interest of the City. Such municipal bond insurance or other credit enhancement providers may be afforded certain rights and remedies to direct the proceedings with respect to the enforcement of payment of the Bonds as shall be provided in the documents relating thereto. In the event a commitment for a Municipal Bond Insurance Policy is obtained or a commitment for other credit enhancement is obtained, the Finance Director is hereby authorized, to approve the terms, perform such acts and execute such instruments that shall be required, necessary or desirable to effectuate the terms of such commitment and the transactions described therein and in this Resolution and the Sale Order provided that such terms are not materially adverse to the City.

(b) In the event that any of the Bonds are issued bearing interest on a variable rate basis and are subject to tender for purchase from time to time by the holders thereof as determined in the Sale Order, the Finance Director is authorized in her discretion to enter into a remarketing agreement for tendered bonds with a qualified firm, chosen by the Finance Director, as remarketing agent. The Finance Director is also authorized to negotiate and enter into an auction agent agreement, broker-dealer agreement or such other agreements with such qualified firms chosen by the Finance Director as may be necessary to accomplish the sale and delivery of

the Bonds as determined by the Finance Director within the parameters of this Resolution and confirmed in the Sale Order.

(c)     In connection with the execution of any of the agreements authorized by this Section, the Finance Director is authorized to include therein such covenants as shall be appropriate.

Section 1002.  Approval of Other Documents and Actions; Treasury Approval.  The Mayor, the Finance Director, the Treasurer and the City Clerk are hereby authorized and directed on behalf of the City to take any and all other actions, perform any and all acts and execute any and all documents that shall be required, necessary or desirable to implement this Resolution.

The Finance Director is authorized to file applications with and to pay the related fees, if any, to the Michigan Department of Treasury at her discretion under Act 34 for an Order or Orders of Approval to issue all or a portion of the Bonds, and to enter into one or more remarketing agreements, letters of credit and reimbursement agreements, and such waivers or other Treasury approvals as necessary to implement the sale, delivery and security for the Bonds, and as required by the Michigan Department of Treasury and Act 34.  The Finance Director is authorized and directed to pay any post closing filing fees required by Act 34 to the Michigan Department of Treasury or other specified agency, as a cost of issuance or from other legally available funds.

Section 1003.  Continuing Disclosure Undertaking.  The City shall enter into a continuing disclosure undertaking pursuant to Rule 15c2-12 promulgated by the Securities and Exchange Commission (the "Rule") for the benefit of the MFA and the holders and beneficial owners of the bonds issued by the MFA for the purchase of the Bonds as to which the Rule is applicable, as more specifically set forth in Exhibit A hereto (the "Undertaking"); provided, however, that the terms of the Undertaking are subject to completion and modification prior to delivery of the Bonds by the Finance Director to such extent as the Finance Director shall deem necessary to comply with law or market requirements of the Underwriters.  The Finance Director is authorized to execute and deliver the Undertaking after completion and modification as provided in this Resolution and the Sale Order.

Section 1004.  Delegation of City to, and Authorization of Actions of the Mayor and the Finance Director.  (a) Prior to the sale date for the Bonds, the Mayor and/or the Finance Director may cause the preparation and approve the form and distribution of necessary City disclosure for any Preliminary Official Statement or Official Statement of the MFA and other offering materials to be used in conjunction with the sale or offering of the Bonds, and the Mayor or Finance Director shall deem the City's disclosure "final" for purposes of Rule 15c2-12 of the Securities and Exchange Commission.

(b)     The Finance Director is hereby authorized and directed to do and perform any and all acts and things with respect to the Bonds which are necessary and appropriate to carry into effect, consistent with this Resolution, the authorizations therein and herein contained, including without limitation, the securing of ratings by bond rating agencies, if cost effective, the negotiation for and acquisition of bond insurance and/or other credit enhancement, if any, to further secure the Bonds or any portions thereof, the acquisition of an irrevocable surety bond to fulfill the City's obligation to fund any reserve account, the printing of the Bonds and the

incurring and paying of reasonable fees, costs and expenses incidental to the foregoing and other costs of issuance of the Bonds including, but not limited to fees and expenses of bond counsel, financial advisors, accountants and others, from Bond proceeds or other available funds, for and on behalf of the City.

(c) Except as otherwise provided herein, all determinations and decisions of the Finance Director with respect to the issuance and sale of the Bonds as permitted or required by this Resolution shall be confirmed by this Finance Director in a Sale Order or Sale Orders, and such confirmations shall constitute determinations that any conditions precedent to such determinations and decisions of the Finance Director have been fulfilled.

Section 1005. Act 34 Approval of the Bonds. The Bonds shall neither be sold nor issued unless and only so long as the issuance of the Bonds as provided herein shall have been authorized and approved in accordance with the applicable provisions of Act 34.

Section 1006. Approving Legal Opinions with Respect to the Bonds. Sale of the Bonds shall be conditioned upon receiving, at the time of delivery, the approving opinion of Bond Counsel, approving legality of the Bonds and, with respect to Bonds determined by the Finance Director to be issued on a tax-exempt basis, the exclusion from gross income of the interest paid thereon from federal and State income taxation only.

Section 1007. Sale of Bonds. (a) Pursuant to Section 309(1) of Act 34 the Council determines to sell the Bonds at a negotiated sale. The Bonds shall be sold by negotiated sale to the MFA or to the Underwriters as represented by the Representative, all as determined by the Finance Director in the applicable Bond Purchase Agreement, at prices and on terms and conditions provided in the Bond Purchase Agreement approved by the Finance Director within the parameters established hereby, and confirmed by this Finance Director in the Sale Order. The reasons for choosing a negotiated sale instead of a competitive sale include the belief of Council based on recommendation of the Finance Director and the City's Financial Advisors that a negotiated sale will allow the Bonds to be offered to investors in the most efficient manner possible while also allowing sufficient flexibility to adjust to market structuring and timing demands in order to result in the lowest possible borrowing costs for the City. Sale may be on a forward delivery basis if determined by the Finance Director to be beneficial to the City, on the terms and conditions contained in the Bond Purchase Agreement.

(b) Subject to the foregoing, the Bond Purchase Agreement shall be dated the date of the sale of the Bonds. The Finance Director is hereby authorized and directed to execute the Bond Purchase Agreement for and on behalf of the City.

Section 1008. Delivery of Bonds. Subject to the approval of the Sale Order, the Finance Director is hereby authorized to deliver the Bonds to the MFA upon receiving the purchase price therefor in lawful money of the United States.

Section 1009. Refunding Escrow Agreement and Verification Agent. The Finance Director is hereby authorized and directed to negotiate with the Refunding Escrow Trustee the terms of the Refunding Escrow Agreement and, if necessary, to select and retain a verification agent to verify the mathematical sufficiency of the securities and cash amounts to be deposited in the Refunding Escrow Fund.

13-53846-tjt    Doc 2804    Filed 03/03/14    Entered 03/03/14 20:55:07    Page 100 of 118

Section 1010. <u>Official Statement</u>. The Finance Director is hereby authorized to execute the Official Statement or other offering materials with respect to the Bonds in the form approved by her with such changes as the Finance Director may authorize. Such Official Statement or other offering materials to be used in conjunction with the sale or offering of the Bonds are hereby authorized to be printed and used by the MFA or the Underwriters in connection with the sale of the Bonds to the public. Circulation of the Preliminary Official Statement, if any, or other preliminary offering materials by the Underwriters is hereby approved.

Section 1011. <u>Appointment of Bond Counsel; Engagement of Other Parties.</u> The appointment by the Finance Director of the law firm of Miller, Canfield, Paddock and Stone, P.L.C. of Detroit, Michigan, as Bond Counsel for the Bonds is hereby ratified and confirmed, notwithstanding the periodic representation by Miller, Canfield, Paddock and Stone, P.L.C., in unrelated matters of other parties and potential parties to the issuance of the Bonds. The fees and expenses of Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel including fees related to the preparation of any special bankruptcy disclosure for the Official Statement or for the delivery of special bankruptcy opinions and other accumulated bond related fees and expenses shall be payable as a cost of issuance from proceeds of the Bonds or other available funds in accordance with the letter of such firm on file with the Finance Director.

The Finance Director is authorized to engage other consultants, financial advisors, or other parties as he deems necessary and appropriate in connection with the sale, issuance and delivery of the Bonds and to pay the fees and expenses thereof from the proceeds of the Bonds or other available funds.

Section 1012. <u>Parties in Interest</u>. Nothing in this Resolution, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person or entity, other than the City, the Master Trustee and the MFA, any right, remedy or claim under or by reason of this Resolution or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Resolution contained by and on behalf of the City, or the MFA shall be for the sole and exclusive benefit of the City and the MFA.

Section 1013. <u>No Recourse Under Resolution</u>. All covenants, agreements and obligations of the City contained in this Resolution shall be deemed to be the covenants, agreements and obligations of the City and not of any councilperson, member, officer or employee of the City in his or her individual capacity, and no recourse shall be had for the payment of the principal of or interest on the Bonds or for any claim based thereon or on this Resolution against any councilperson, member, officer or employee of the City or any person executing the Bonds in his or her official individual capacity.

Section 1014. <u>Severability</u>. If any one or more sections, clauses or provisions of this Resolution shall be determined by a court of competent jurisdiction to be invalid or ineffective for any reason, such determination shall in no way affect the validity and effectiveness of the remaining sections, clauses and provisions hereof.

Section 1015. <u>Cover Page, Table of Contents and Article and Section Headings</u>. The cover page, table of contents and Article and Section headings hereof are solely for convenience of reference and do not constitute a part of this Resolution, and none of them shall affect its meaning, construction or effect.

Section 1016. <u>Conflict</u>. All resolutions or parts of resolutions or other proceedings of the City in conflict herewith shall be and the same hereby are repealed insofar as such conflict exists.

Section 1017. <u>Governing Law and Jurisdiction</u>. This Resolution shall be governed by and construed in accordance with the laws of the State.

Section 1018. <u>Resolution and Sale Order are a Contract</u>. The provisions of this Resolution and the Sale Order shall constitute a contract between the City, the MFA, and the Bond Insurer, if any.

Section 1019. <u>Effective Date</u>. This Resolution shall take effect immediately upon its adoption by the Council.

Section 1020. <u>Notices</u>. All notices and other communications hereunder shall be in writing and given by United States certified or registered mail, expedited courier overnight delivery service or by other means (including facsimile transmission) that provides a written record of such notice and its receipt. Notices hereunder shall be effective when received and shall be addressed to the address set forth below or to such other address as any of the below persons shall specify to the other persons:

If to the City, to:
City of Detroit
Finance Department
1200 Coleman A. Young Municipal Center
Detroit, Michigan 48226
Attention: Finance Director

If to the Master Trustee, to:
U.S. Bank National Association
535 Griswold, Suite 550 Buhl Bldg.
Detroit, MI 48226
Attention: Corporate Trust Dept.

If to the MFA, to:
Michigan Finance Authority
Austin Building, 1st Floor
430 W. Allegan
Lansing, MI 48922

<u>EXHIBIT A</u>

## FORM OF CONTINUING DISCLOSURE UNDERTAKING

This Continuing Disclosure Undertaking (the "Undertaking") is executed and delivered by the City of Detroit, County of Wayne, State of Michigan (the "City") in connection with bonds issued by the City, purchased or to be purchased with funds from the Michigan Finance Authority Local Government Loan Program Revenue Bonds, Series [2012], of the Type designated City of Detroit Limited Tax General Obligation Local Project Bonds (the "Local Project Municipal Obligations") by the Michigan Finance Authority (the "MFA"). The City covenants and agrees for the benefit of the Bondholders, as hereinafter defined, as follows:

(a) *Definitions*. The following terms used herein shall have the following meanings:

"Audited Financial Statements" means the annual audited financial statement pertaining to the City prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"Bondholders" shall mean the MFA and the registered owner of any MFA Bond or any person which (a) has the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any MFA Bond (including any person holding an MFA Bond through a nominee, depository or other intermediary), or (b) is treated as the owner of any MFA Bond for federal income tax purposes.

"EMMA" shall mean the MSRB's Electronic Municipal Market Access System or such other system, Internet Web Site, or repository hereafter prescribed by the MSRB for the submission of electronic filings pursuant to the Rule.

"MFA Bond" means any bond issued by the MFA which is secured in whole or in part by payments to be received on the Local Project Municipal Obligations.

"MSRB" means the Municipal Securities Rulemaking Board.

"Rule" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"SEC" means the United States Securities and Exchange Commission.

(b) *Continuing Disclosure*. The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to the MSRB through EMMA no later than 270 days after the end of its fiscal year the following annual financial information and operating data, commencing with the fiscal year ended June 30, 2012 in an electronic format as prescribed by the MSRB, the Audited Financial Statements and updates of certain financial and operating data of the City appearing under the headings and tables in the Official Statement of

the MFA dated _____, 2012 relating to the MFA Bonds as follows: [Tables 1 through 32, inclusive, and 42 in Appendix II to the Official Statement ("Annual Financial Information").]

If the fiscal year of the City is changed, the City shall send notice of such change to the MSRB through EMMA prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

In the event that the Audited Financial Statements are not available by the date specified above, they will be provided when available and Unaudited Financial Statements will be filed by such date and the Audited Financial Statements will be filed as soon as available.

Such annual financial information and operating data described above are expected to be provided directly by the City by specific reference to documents available to the public through EMMA or filed with the SEC.

(c)     *Notice of Failure to Disclose.* The City agrees to provide or cause to be provided, in a timely manner, to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     *Occurrence of Events.* The City agrees to provide or cause to be provided to the MSRB through EMMA, in an electronic format as prescribed by the MSRB, in a timely manner not in excess of ten business days after the occurrence of the event, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Local Project Municipal Obligations:

(1)     principal and interest payment delinquencies;

(2)     non-payment related defaults, if material;

(3)     unscheduled draws on debt service reserves reflecting financial difficulties;

(4)     unscheduled draws on credit enhancements reflecting financial difficulties;

(5)     substitution of credit or liquidity providers, or their failure to perform;

(6)     adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Local Project Municipal Obligations, or other material events affecting the tax status of the Local Project Municipal Obligations;

(7)     modifications to rights of Bondholders, if material;

(8)     bond calls, if material, and tender offers;

(9)     defeasances;

(10)    release, substitution, or sale of property securing repayment of the Local Project Municipal Obligations, if material;

(11)    rating changes;

(12) bankruptcy, insolvency, receivership or similar event of the City, which is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for the City in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the City, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the City;

(13) the consummation of a merger, consolidation, or acquisition involving the City or the sale of all or substantially all of the assets of the City, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; or

(14) appointment of a successor or additional trustee or the change of name of a trustee, if material.

(e) *Materiality Determined Under Federal Securities Laws.* The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f) *Termination of Reporting Obligation.* The City reserves the right to terminate their obligation to provide annual financial information and notices of material events, as set forth above, if and when the City is no longer an "obligated person" with respect to the MFA Bonds within the meaning of the Rule, including upon legal defeasance of all MFA Bonds.

(g) *Identifying Information.* All documents provided to the MSRB through EMMA shall be accompanied by the identifying information prescribed by the MSRB.

(h) *Benefit of Bondholders.* The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Bondholders and shall be enforceable by any Bondholder; provided that, the right to enforce the provisions of this undertaking shall be limited to a right to obtain specific enforcement of the City's obligations hereunder and any failure by the City to comply with the provisions of this undertaking shall not constitute a default or an event of default with respect to the Bonds.

(i) *Amendments to the Undertaking.* Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the City, provided that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference. Such interpretations currently include the requirements that (a)

the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the City or the type of activities conducted thereby, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the MFA Bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Bondholders, as determined by parties unaffiliated with the City (such as independent legal counsel), but such interpretations may be changed in the future. If the accounting principles to be followed by the City in the preparing of the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations. A notice of the change in accounting principles shall be sent to the MSRB through EMMA.

(j) *Municipal Advisory Council of the State of Michigan.* The City shall also file by electronic or other means any information or notice required to be filed with the MSRB through EMMA pursuant to this Undertaking in a timely manner with the Municipal Advisory Council of the State of Michigan.

CITY OF DETROIT
County of Wayne
State of Michigan

By_____

Its: Finance Director

Dated: _____, 2012

19,907,151.3\022765-00200

# RESTRICTED ESCROW AGREEMENT

## CITY OF DETROIT
## COUNTY OF WAYNE
## STATE OF MICHIGAN

---

THIS RESTRICTED ESCROW AGREEMENT (this "Agreement"), dated as of the 1st day of March 2012, made by and between the City of Detroit, County of Wayne, State of Michigan (the "City") and U.S. Bank National Association, Detroit, Michigan (the "Escrow Trustee").

### W I T N E S E T H :

WHEREAS, pursuant to the Resolutions (hereinafter defined), the City has determined to issue its Self-Insurance Refunding Bonds (Limited Tax General Obligation) Series 2012, (the "Self-Insurance Refunding Bonds"), Distributable State Aid Second Lien Self-Insurance Bonds (Limited Tax General Obligation) Series 2012 (the "Self-Insurance Bonds") in one or more series and its General Obligation Distributable Aid Second Lien Capital Improvement Refunding Bonds (Limited Tax) Series 2012, (the "Capital Improvement Refunding Bonds" and collectively with the Self-Insurance Refunding Bonds, the "Refunding Bonds"); and

WHEREAS, the Department of Treasury of the State of Michigan (the "Department") as a condition for approving the issuance of the Bonds pursuant to the applicable provisions of 2001 PA 34, as amended, has required that (a) the net proceeds of the Self-Insurance Bonds and (b) certain other moneys on hand in the City's General Fund and set aside to pay the debt service payments on the outstanding bonds to be refunded by the Refunding Bonds (such other monies constituting the "Refunding Deposit"), to be deposited into escrow until certain conditions are satisfied by the City, and

WHEREAS, the City desires to provide for the deposit of the net proceeds of its Self-Insurance Bonds and the Refunding Deposit with the Escrow Trustee to fulfill the requirements of the Department; and

WHEREAS, the City desires to enter into this Agreement with the Escrow Trustee to provide for the safekeeping, investment, reinvestment, administration and disposition of any such deposits, upon such terms and conditions herein set forth; and

WHEREAS, pursuant to the Resolutions the City has duly authorized the execution of this Agreement, certified copies of which Resolutions have been filed with the Escrow Trustee.

NOW, THEREFORE, in consideration of the mutual undertakings, promises and agreements herein contained, the sufficiency of which hereby are acknowledged, the City and the Escrow Trustee mutually undertake, promise, and agree for themselves and their respective representatives and successors, as follows:

# ARTICLE I

## DEFINITIONS AND INTERPRETATIONS

Section 1.01. Definitions. Unless the context clearly indicates otherwise, the following terms shall have the meanings assigned to them below when they are used in this Agreement:

"City" means the City of Detroit, County of Wayne, Michigan.

"Department" means the Department of Treasury of the State of Michigan.

"Escrow Fund" means the City of Detroit 2012 Restricted Escrow Fund created and described in Section 3.01 of this Agreement.

"Escrow Trustee" means U.S. Bank National Association, Detroit, Michigan, and its successors as Escrow Trustee under this Agreement.

"Finance Director" means the Finance Director of the City or a deputy or designee of the Finance Director.

"Permitted Investments" means investments permitted to be made by the City pursuant to the Resolutions and applicable law as shall be directed in writing by the Finance Director.

"Resolutions" means the Resolution duly adopted by the City Council of the City on March 27 2012, as supplemented by the Sale Order of the Finance Director dated March 28, 2012 authorizing the issuance of the Self-Insurance Bonds, and the Self-Insurance Refunding Bonds and the Resolution duly adopted by the City Council of the City on March 27, 2012, as supplemented by the Sale Order of the Finance Director dated March 28, 2012, authorizing issuance of the Capital Improvement Refunding Bonds..

Section 1.02. Interpretations. The titles and headings of the articles and sections of this Agreement have been inserted for convenience and reference only and are not to be considered a part hereof and shall not in any way modify or restrict the terms hereof. This Agreement and all of the terms and provisions hereof shall be liberally construed to effectuate the purposes set forth herein in accordance with applicable law.

# ARTICLE II

## DEPOSIT OF FUNDS AND ESCROWED SECURITIES

Section 2.01. Deposits in the Escrow Fund. The City hereby irrevocably agrees to deposit the Refunding Deposit in the Refunding Bond Account of the Escrow Fund established in Section 3.01 below. The Refunding Deposit shall be made in two installments with $19 million deposited not later than April 2, 2012 and $17 million deposited not later than May 1,

2

Restricted Escrow Agreement

2012. On the date of issuance of the Self-Insurance Bonds the City irrevocably agrees that it will deposit or cause to be deposited all net proceeds of the Self-Insurance Bonds into the Self-Insurance Bond Account of the Escrow Fund.

Section 2.02. Funds Deposited. The City represents and warrants that the Refunding Deposit and the proceeds of the Self-Insurance Bonds to be deposited into the Escrow Fund will be free and clear of other liens and encumbrances. The City further represents and warrants that monies on deposit in the Escrow Fund will be requisitioned only for the purposes permitted by this Agreement, including Exhibit A hereto.

Section 2.03. General Representations. The City hereby represents that it has all necessary power and authority to enter into this Agreement and undertake the obligations and responsibilities imposed upon it herein and that it will carry out all of its obligations hereunder.

ARTICLE III

CREATION AND OPERATION OF ESCROW FUND

Section 3.01. Escrow Fund. The Escrow Trustee has created and shall maintain on its books a special escrow fund to be known as the City of Detroit 2012 Restricted Escrow Fund. The Escrow Trustee has created and shall maintain within the Escrow Fund two separate accounts to be known as the Refunding Bonds Account and the Self-Insurance Account. The Escrow Trustee hereby acknowledges that there has been deposited to the credit of such Escrow Fund the beginning cash balance as described in Section 2.01. The Escrow Fund including all proceeds resulting from the investment of the Escrow Fund shall be the property of the Escrow Fund, and shall be applied only in strict conformity with the terms and conditions of this Agreement.

The Escrow Trustee accepts the money deposited pursuant to this Agreement. The deposit of the money shall constitute an irrevocable deposit of the money for the purposes described herein. The Escrow Trustee shall hold the moneys deposited pursuant to this Agreement at all times as special and separate trust funds solely for the purposes described herein, wholly segregated from other funds and securities on deposit with it, shall never commingle moneys in the Escrow Fund with other funds or securities owned or held by the Escrow Trustee in any capacity other than as Escrow Trustee hereunder, and shall never at any time apply, transfer, redeem, use, loan, or borrow the moneys in the Escrow Deposit Fund in any way other than as provided in this Agreement.

Section 3.02. Payment from the Escrow Fund. Certain conditions, set forth in Exhibit A and incorporated herein by reference (the "Escrow Conditions") must be satisfied by the City before it is entitled to requisition release of moneys from the Self-Insurance Account or the Refunding Bond Account of the Escrow Fund. Upon satisfaction of the Escrow Conditions or waiver of any unsatisfied Escrow Conditions by the Department, the Finance Director may requisition moneys from the Escrow Fund by filing a completed requisition certificate in the

form attached as Exhibit B with the Escrow Trustee. No moneys shall be released from the Escrow Fund unless the requisition certificate requesting such release has been approved by the Department. The City shall provide to the Escrow Trustee a signature identification form acceptable to the Escrow Trustee for the Finance Director and any deputy or designee of the Finance Director who is authorized to sign Requisition Certificates for the City.

The City acknowledges and agrees that the City has no authority to extend the full faith and credit of the State of Michigan or to create any obligation, direct or indirect, general, special or moral on the part of the State of Michigan. This Agreement does not create any pecuniary obligation or liability, direct or indirect, general, special or moral, on the part of the Department or the State of Michigan or other political subdivisions thereof.

ARTICLE IV

INVESTMENTS

Section 4.01. General Prohibition. Moneys in the Escrow Fund shall be invested only in Permitted Investments as directed by the Finance Director in writing.

ARTICLE V

RECORDS AND REPORTS

Section 5.01. Records. The Escrow Trustee will keep books of record and account in which complete and correct entries shall be made of all transactions relating to the receipts, disbursements, allocations and application of the money deposited in the Escrow Fund and investment thereof, and such books shall be available for inspection at reasonable hours and under reasonable conditions by the City and the Department.

Section 5.02. Reports. For each monthly period beginning on the date hereof and ending on the final disbursement of moneys from the Escrow Fund, the Escrow Trustee shall prepare and send to the Finance Director of the City within thirty (30) days following the end of such period a written report summarizing all transactions relating to the Escrow Fund during such period, including without limitation, credits to the Escrow Fund as a result of interest payments on or maturities of the Permitted Investments and transfers from the Escrow Fund, together with a detailed statement of all Permitted Investments held in the Escrow Fund, and the cash balance on deposit in the Escrow Fund as of the end of such period.

ARTICLE VI

CONCERNING THE ESCROW TRUSTEE

Section 6.01. Representations. The Escrow Trustee hereby represents that it has all necessary power and authority to enter into this Agreement and undertake the obligations and responsibilities imposed upon it herein and that it will carry out all of its obligations hereunder.

4
Restricted Escrow Agreement

Section 6.02. <u>Limitation on Liability</u>. The Escrow Trustee is not a party to the Resolutions and is not responsible for nor bound by any of the provisions thereof. In its capacity as Escrow Trustee it is agreed that the Escrow Trustee need look only to the terms and provisions of this Agreement.

The Escrow Trustee makes no representations as to the value, conditions or sufficiency of the Escrow Fund, or any part thereof, or as to the title of the City thereto, or as to the security afforded thereby or hereby, and the Escrow Trustee shall not incur any liability or responsibility in respect to any of such matters.

It is the intention of the parties hereto that the Escrow Trustee shall never be required to use or advance its own funds or otherwise incur personal financial liability in the performance of any of its duties or the exercise of any of its rights and powers hereunder.

The Escrow Trustee shall not be liable for any action taken or neglected to be taken by it in good faith in any exercise of reasonable care and believed by it to be within the discretion or power conferred upon it by this Agreement, nor shall the Escrow Trustee be responsible for the consequences of any error of judgment; and the Escrow Trustee shall not be answerable except for its own action, neglect or default hereunder, nor for any loss unless the same shall have been through its gross negligence or want of good faith hereunder.

The Escrow Trustee has no duty to determine or inquire into the happening or occurrence of any event or contingency or the performance or failure of performance of the City with respect to arrangements or contracts with others, with the Escrow Trustee's sole duty hereunder being to safeguard the Escrow Fund, to dispose of and deliver the same in accordance with this Agreement. If, however, the Escrow Trustee is called upon by the terms of this Agreement to determine the occurrence of any event or contingency, the Escrow Trustee shall be obligated, in making such determination, only to exercise reasonable care and diligence, and in event of error in making such determination the Escrow Trustee shall be liable only for its own willful misconduct or its gross negligence. In determining the occurrence of any such event or contingency the Escrow Trustee may request from the City or any other person such reasonable additional evidence as the Escrow Trustee in its discretion may deem necessary to determine any fact relating to the occurrence of such event or contingency, and in this connection may make inquiries of, and consult with, among others, the City at any time.

Section 6.03. <u>Compensation</u>. The City has caused to be paid to the Escrow Trustee an acceptance fee of $2,500.00. In the event that the Escrow Trustee is requested to perform any extraordinary services hereunder, the City hereby agrees to pay reasonable fees to the Escrow Trustee for such extraordinary services, and the Escrow Trustee hereby agrees to look only to the City for the payment of such fees and reimbursement of such expenses. The Escrow Trustee hereby agrees that in no event shall it ever assert any claim or lien against the Escrow Fund for any fees for its services, whether regular or extraordinary, as Escrow Trustee or in any other capacity, or for reimbursement for any of its expenses.

Section 6.04. Successor Escrow Trustees. If at any time the Escrow Trustee or its legal successor or successors should become unable, through operation of law or otherwise, to act as Escrow Trustee hereunder, or if its property and affairs shall be taken under the control of any state or federal court or administrative body because of insolvency or bankruptcy or for any other reason, a vacancy shall forthwith exist in the office of Escrow Trustee hereunder. In such event the City, by appropriate resolution, shall promptly appoint an Escrow Trustee to fill such vacancy. Anything in this Section to the contrary notwithstanding, any resignation or removal of the Escrow Trustee and appointment of a successor Escrow Trustee shall become effective only following consent to the appointment of the successor in writing by the Department and upon acceptance of appointment by the successor Escrow Trustee.

Any successor Escrow Trustee shall be a corporation or association organized and doing business under the laws of the United States or the State of Michigan, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $50,000,000 and subject to the supervision or examination by federal or state authority.

Any successor Escrow Trustee shall execute, acknowledge and deliver to the City and the Escrow Trustee an instrument accepting such appointment hereunder, and the Escrow Trustee shall execute and deliver an instrument transferring to such successor Escrow Trustee, subject to the terms of this Agreement, all the rights, powers and trusts of the Escrow Trustee hereunder. Upon the request of any such successor Escrow Trustee, the City shall execute any and all instruments in writing for more fully and certainly vesting in and confirming to such successor Escrow Trustee all such rights, powers and duties.

Any company into which the Escrow Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Escrow Trustee may sell or transfer all or substantially all of its corporate trust business shall be the successor to the Escrow Trustee without the execution of filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.

## ARTICLE VII

## MISCELLANEOUS

Section 7.01. Notice. Any notice, authorization, request, or demand required or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given when mailed by registered or certified mail with return receipt or overnight mail with courier receipt, postage prepaid and addressed as follows:

6
Restricted Escrow Agreement

|  |  |
|---|---|
| To the City: | To the Department: |
| City of Detroit | Michigan Department of Treasury |
| Finance Department | Richard H. Austin Building |
| 1200 City County Building | 430 W. Allegan Street |
| Detroit, Michigan 48226 | Lansing, MI 48901 |
| Attention: Finance Director | Attention: |

To the Escrow Trustee:

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Corporate Trust Dept.

The United States Post Office registered or certified mail receipt or overnight courier receipt showing delivery of the aforesaid shall be conclusive evidence of the date and fact of delivery. Any party hereto may change the address to which notices are to be delivered by giving to the other party not less than ten (10) days prior notice thereof.

Section 7.02. Termination of Responsibilities. Upon the taking of all the actions as described herein by the Escrow Trustee and upon final disbursement of moneys held in the Escrow Fund, the Escrow Trustee shall have no further obligations or responsibilities hereunder to the City, the Department or any other person or persons in connection with this Agreement and this Agreement shall be discharged.

Section 7.03. Binding Agreement. This Agreement shall be binding upon the City and the Escrow Trustee and their respective successors and legal representatives.

Section 7.04. Severability. In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Agreement, but this Agreement shall be construed as if such invalid or illegal or unenforceable provisions had never been contained herein.

Section 7.05. Michigan Law Governs. This Agreement shall be governed exclusively by the provisions hereof and by the applicable laws of the State of Michigan.

Restricted Escrow Agreement

Section 7.06. <u>Termination or Amendment</u>. This Agreement is made for the benefit of the City , the Escrow Trustee, and the Department and it shall not be repealed, revoked, altered or amended without the written consent of the Department and the written consent of the parties hereto.

Section 7.07. <u>Execution in Counterparts</u>. This Agreement may be executed in counterparts.

EXECUTED as of the date first written above.

CITY OF DETROIT
COUNTY OF WAYNE
STATE OF MICHIGAN
   As City

By _____
     Its Finance Director

U.S. BANK NATIONAL ASSOCIATION
   As Escrow Trustee

By _____
     Its Vice President

The Department of Treasury of the State of Michigan (the "Department") hereby acknowledges the execution of this Restricted Escrow Agreement between the City of Detroit and U.S. Bank National Association as Escrow Trustee. The Department agrees that it will provide to the Escrow Trustee a signature authorization form designating individuals from the Department who have been authorized to acknowledge Requisition Certificates pursuant to this Restricted Escrow Agreement.

STATE TREASURER
STATE OF MICHIGAN

By _____
     Thomas F. Saxton
     Its Deputy Treasurer

8
Restricted Escrow Agreement

## EXHIBIT A

## ESCROW CONDITIONS

1.    The following conditions must be satisfied by the City prior to the requisition of moneys from the Refunding Escrow Account.

    A.    Funds on deposit in the Refunding Escrow Account may only be requisitioned for the payment of amounts due from the General Fund of the City for which other funds of the City are not available. The requisition of funds shall be subject to the review and approval of the Department of Treasury and compliance with the terms of this Agreement..

2.    The following conditions must be satisfied by the City prior to the requisition of moneys from the Self-Insurance Escrow Account.

    A.    Funds on deposit in the Self-Insurance Escrow Account may only be requisitioned for the payment of amounts that would be payable from the Risk Management Fund created by the City pursuant to its Ordinance No. 16-95 for which other funds of the City are not available including reimbursement to the City for payments made not earlier than July 1, 2011 from the General Fund of the City. The requisition of funds shall be subject to the review and approval of the Department of Treasury and compliance with the terms of this Agreement.

**EXHIBIT B**

**REQUISITION CERTIFICATE FORM**

TO:        U.S. Bank National Association, as Trustee

CC:        Michigan Finance Authority (the "Authority")

FROM:     The City of Detroit (the "City")

SUBJECT:  City of Detroit Restricted Escrow Agreement dated as of March 1, 2012

This represents Requisition Certificate No. __ in the total amount of $_____, from the _____ Account of the Escrow Fund.

The undersigned does certify that:

1.     The conditions specified in Exhibit A of the Escrow Agreement for the release of moneys to the City requested by this Certificate have been satisfied or, for the purpose of this Requisition only, those conditions have been waived by the Department of Treasury.

2.     Such expenses for which this requisition is being made have not been included in any previous Requisition Certificate.

3.     The receipt and expenditures of the monies requested in this Requisition Certificate will be properly recorded in accordance with state and federal law and generally accepted accounting principles for municipalities.

4.     The monies requested herein are necessary to pay the following categories of current expenses of the City expected to be paid within the next fifteen (15) days (complete for all that apply, detailing individual major vendor expenditures greater than $5 million ("Major Vendors") by attachment hereto as needed):

**Refunding Escrow Account**

☐   $_____   Payroll
☐   $_____   Major Vendors (identify): _____
      $_____   Major Vendors (identify): _____
      $_____   Major Vendors (identify): _____
☐   $_____   Other (identify): _____

**Self-Insurance Escrow Account**

☐   $_____   (Attach description of purpose for payment and payment

B-1
Restricted Escrow Agreement

recipient)

The undersigned further certifies that the City has spent or reasonably expects to spend within the next thirty (30) days, all monies it received pursuant to any previous Requisition Certificate.

5.      Payments requisitioned by this certificate are requested to be paid as follows:

_____

_____ (insert appropriate account wire transfer information.)

6.      To the undersigned's best knowledge, the City is not in default under the provisions of its Bonds sold to the Authority or its related Purchase Contract and nothing has occurred to the knowledge of the undersigned, after due inquiry, that would prevent the performance of its obligations under its Bonds or the Purchase Contract.


Signed this _____ day of _____, _____.


THE CITY OF DETROIT

By:      _____
         Finance Director

_____

The Department of Treasury of the State of Michigan acknowledges that the conditions for the release of moneys from the Escrow Fund covered by this Certificate have been satisfied or waived.

MICHIGAN DEPARTMENT OF TREASURY


By:      _____

Dated: _____

20,003,077.3\147515-00004

B-2
Restricted Escrow Agreement