UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                                .        Detroit, Michigan
                                .        March 5, 2014
                    Debtor.     .        10:00 a.m.
. . . . . . . . . . . . . . .


     HEARING RE. CORRECTED MOTION OF THE OFFICIAL COMMITTEE OF
          RETIREES FOR ENTRY OF AN ORDER ALLOWING AN
             ADMINISTRATIVE EXPENSE CLAIM (DKT#2660)
             BEFORE THE HONORABLE STEVEN W. RHODES
              UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:         Jones Day
                        By:  HEATHER LENNOX
                        222 East 41st Street
                        New York, NY  10017
                        (212) 326-3837

For the Official        Dentons US, LLP
Committee of            By:  SAM J. ALBERTS
Retirees:               1301 K Street, NW, Suite 600, East Tower
                        Washington, DC  20005
                        (202) 408-7004

                        Dentons
                        CHRISTOPHER D. SOPER
                        233 South Wacker Drive, Suite 7800
                        Chicago, IL  60606-6404
                        (312) 876-2573

                        Brooks, Wilkins, Sharkey & Turco, PLLC
                        By:  MATTHEW WILKINS
                        401 South Old Woodward Avenue, Suite 400
                        Birmingham, MI  48009
                        (248) 971-1711

Also Present:           Brian Smith
                        Terri Renshaw
                        Gail Wilson

```
Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1           THE CLERK:  All rise.  Court is in session.  Please

2   be seated.  Case Number 13-53846, City of Detroit, Michigan.

3           MR. WILKINS:  Good morning, your Honor.  Matthew

4   Wilkins on behalf of the Retiree Committee.  I have an

5   attorney admission this morning, your Honor.

6           THE COURT:  Okay.

7           MR. WILKINS:  Please meet Christopher Soper --

8           MR. SOPER:  Good morning, your Honor.

9           MR. WILKINS:  -- from the Dentons office.

10          THE COURT:  Mr. Soper.

11          MR. WILKINS:  He works in Illinois and Minnesota and

12  is a licensed attorney in good standing in the courts of New

13  York, Illinois, and Minnesota.  And we've been up to the

14  District Court, paid the fee and everything and --

15          THE COURT:  Okay.

16          MR. WILKINS:  -- fees for him and --

17          THE COURT:  Are you prepared to take the oath of

18  admission to the Bar of this Court?

19          MR. SOPER:  I am.

20          THE COURT:  Please raise your right hand.  Do you

21  affirm that you will conduct yourself as an attorney and

22  counselor of this Court with integrity and respect for the

23  law, that you have read and will abide by the civility

24  principles approved by the Court, and that you will support

25  and defend the Constitution and laws of the United States?

1          MR. SOPER:  I do.

2          THE COURT:  Welcome, sir.

3          MR. SOPER:  Thank you.

4          THE COURT:  We will take care of your paperwork.

5          MR. WILKINS:  Thank you, your Honor.

6          THE COURT:  All right.  Let's proceed with the

7    argument, please.

8          MR. ALBERTS:  Good morning, your Honor.  Sam Alberts

9    on behalf of the Retiree Committee from Dentons.  Your Honor,

10   we're here on the committee's motion for entry of an order

11   allowing administrative expense claim.  It appears at ECF

12   Number 2656, and the corrected version filed on February 7th,

13   a day later, is at 2660.  Your Honor, we've received one

14   opposition to the request -- that was by the city -- which

15   appears at ECF 2705, and their brief in opposition, which is

16   2706, ECF number.  Both of those were filed on February 20th.

17   The Court entered this notice of hearing on the 25th, and we

18   have filed a reply, which appears at 2782.

19         Your Honor, at bottom what we are requesting is a

20   determination and order of this Court that the committee's

21   request for a subject errors and omission policy -- or really

22   it's technically a miscellaneous policy -- for committee

23   members is actual and necessary under Section 503(b)(3)(F)

24   and that the city should be directed to pay this amount in

25   compliance with the fee review order that was entered on

1   September 9th, 2013.

2           Let me give a little background, your Honor.  I'll

3   get into the arguments.  And we also have with us today the

4   people who had submitted affidavits -- Ms. Renshaw, who is

5   the committee chair; Ms. Gail Wilson, who sits on the

6   committee -- I think who both can give flavor as to why this

7   request is being made and the environment in which they are

8   working on the committee now and the community in which they

9   live.  We also have brought the insurance broker, Brian

10  Smith, who can testify as to how the policy was placed and

11  why we believe that the amount for the policy and the terms

12  are reasonable.

13          The one thing we have not provided the Court is the

14  actual letter agreement or the specimen policy.  It's a form

15  policy, which would be populated, assuming this Court

16  approves it.  The letter agreement with all of the terms, the

17  material terms, has been shared with the city.  We are happy

18  to share that with the Court.  We would ask that that be done

19  in camera because the one thing we don't want to do is

20  disclose, if possible, the amount of coverage that is being

21  sought.  That amount is known to the city, and we can discuss

22  elements of it without getting a specific number.  I notice

23  that the press is in the court today, and we would rather

24  that the amount not be let out because, quite candidly, we

25  don't want to invite litigation for seeking those proceeds.

1          THE COURT:  Doesn't the very existence of insurance

2    do that?

3          MR. ALBERTS:  No.  In fact, your Honor, what you

4    will hear is that --

5          THE COURT:  Oh?

6          MR. ALBERTS:  -- the -- well, our hope, your Honor,

7    we have set this policy up in a way so that it was really

8    designed to cover defense costs.  Okay.  If we really thought

9    there was legitimacy behind any suit that could be brought,

10   the amount of the policy that would have been requested would

11   have been substantially more.  In fact, you will hear the

12   testimony.

13         THE COURT:  Is there a -- is there an actual

14   liability element to the insurance coverage?

15         MR. ALBERTS:  Yes, there is.

16         THE COURT:  There is.

17         MR. ALBERTS:  Yeah.

18         THE COURT:  Okay.

19         MR. ALBERTS:  Yeah, there is, but it's a very low

20   coverage amount relative to the nine billion, eleven billion,

21   whatever the amount of money of claims that the Retiree

22   Committee is being asked to navigate in this case.

23         Your Honor, just in terms of background, on July

24   19th, the very day after the petition was filed, the city in

25   this case moved for the appointment of the Retiree Committee.

1    That's ECF Number 20.

2            THE COURT:  I don't need background.  What I need

3    you to do is deal with the city's objections.

4            MR. ALBERTS:  Okay.  All right.  Very good.  Well,

5    let me start then with -- what I would like to do then is

6    start with the city's arguments or objection that this Court

7    does not have authority over the matter; that the city cannot

8    be compelled to pay this.  What I'd like to do is hand up --

9    it is attached to our reply as Exhibit Number 1, I believe,

10   but I have a copy here.

11           THE COURT:  I have it.  That's all right.

12           MR. ALBERTS:  Okay.  It's the fee review order, and,

13   in particular, if you would turn to page 2 of that order,

14   paragraph H, what it says is that the city has expressly

15   consented to the relief provided in paragraphs 11, 24, and

16   27.  Okay.  You move on to paragraph 11.  What that paragraph

17   provides for is the city's payment of Retiree Committee

18   expenses a hundred percent, and then there's a process later

19   on in paragraph 24 which talks about if there's a dispute, we

20   come to court.  Your Honor, I believe quite clearly that the

21   city has consented to the payment of reasonable committee

22   expenses.  Now, they have said, well, what we meant by that

23   was food maybe and parking and other things.  I would say,

24   your Honor, that insurance in this case is a reasonable and

25   necessary expense for the committee to do its job, and so as

1  to the 904 issue, your Honor, I think that -- even if one

2  assumes that 904 would apply in this case, I don't think it

3  applies to this issue because the city has already consented

4  to payment of committee member expenses as well as committee

5  professional fees.  In fact, your Honor, as you may recall,

6  at the hearing on this, there was a big concern raised by the

7  U.S. Trustee and other parties about whether the city would

8  agree to pay for the expenses and fees of the committee, and

9  if they would not consent to that, then there was a real

10  concern that no committee could be formed because there would

11  not be representation and other things that a committee would

12  need to do.  I would argue again, your Honor, this is

13  something that while -- and the city is correct in this.

14  There are not a lot of cases where a committee has sought

15  insurance, especially in a Chapter 9.  That doesn't mean it

16  can't happen, and this is a very unique case in a

17  jurisdiction which, unfortunately, has a reputation for being

18  quite litigious.  And that is really what is driving this,

19  your Honor is committee member concern about being sued even

20  if it is a frivolous suit.  Now --

21         THE COURT:  Doesn't the Barton Doctrine protect the

22  members of the committee?

23         MR. ALBERTS:  Your Honor, the problem with the issue

24  of qualified immunity is that even if we go a step further

25  and the city were to provide in its plan the normal

1   exculpations and releases for committee members, that would

2   not necessarily protect a committee member who is actually

3   sued.  They would still need to hire counsel.  Now, we

4   actually -- in pricing this policy, we assumed that at the

5   end of the day, the city would put in a plan a release and

6   exculpation.  What the committee members' concerns was, well,

7   that's great, and we believe we're not doing anything wrong,

8   but what if somebody sues us?  And we've lived in the city

9   long enough to know that's a real possibility.

10          THE COURT:  Well, but the Barton Doctrine is a

11   little bit different from qualified immunity, isn't it?

12          MR. ALBERTS:  I thought -- I understood the Barton

13   Doctrine would apply to trustees in their trust capacity and

14   would require somebody to come back into the court where the

15   trustee is to sue.  Your Honor, that may be the case.  In

16   fact, there may be a retention of jurisdiction provision in

17   the plan that does something similar.  That doesn't mean

18   somebody is not going to file a suit out in state court.

19   That is the problem we're dealing with.  We're dealing with

20   nine members, seven of whom were retained on the committee in

21   their individual capacity.  I have the appointment notice

22   here which shows that.  There are only two, one for the UAW

23   and one for AFSCME, who were appointed as part of their

24   organizations.  These other seven members are doing this in

25   their individual capacity.  Now, yes, a few of the others do

1   have affiliations with associations, but there's no guarantee

2   that those associations will step in or can afford to step in

3   to help them.  And at least three of the members, two of

4   which are here today, are here strictly as committee members

5   in their individual capacities, so they still are going to

6   need somebody to step forward in a state court and try to

7   remove it here.

8          THE COURT:  Wait.  Certainly it's uncomfortable

9   being sued even if the suit is frivolous.

10          MR. ALBERTS:  Yes.  And, your Honor --

11          THE COURT:  But $600,000 is several police officers.

12   It's several EMS.  It's several fire.  And the people they

13   get serve -- people who they service are more than

14   uncomfortable when they need service and don't get it.

15          MR. ALBERTS:  Your Honor, we understand the plight

16   of what the city is going through and the residents of --

17          THE COURT:  The city is service delivery insolvent.

18   I've already held that.  Every dollar that goes to an

19   insurance policy is one less dollar that the city can spend

20   for essential services.  How do I deal with that?

21          MR. ALBERTS:  Well, there are a couple of points in

22   response, your Honor.  One, the policy is actually $352,000.

23   There's a $250,000 deductible.

24          THE COURT:  The city gets back when?

25          MR. ALBERTS:  When the policy term expires, which is

1  at the end of eight years.  Okay?  They could -- I mean --

2          THE COURT:  That's that many police officers they

3  can't hire in the meantime.

4          MR. ALBERTS:  Well, your Honor, in terms of cost, we

5  all know in this case there have been expenditures, some very

6  large, for dealing with things.  For example, just the

7  commitment fee for Barclays was over $4 million for the DIP.

8  Now, and, in addition, unlike Barclays, which the city agreed

9  to indemnify --

10          THE COURT:  I have to cut you off.

11          MR. ALBERTS:  Okay.

12          THE COURT:  The fact that the city has spent money

13  in the ways you are about to tell me does not justify

14  spending more ways -- more money in ways that aren't

15  justified --

16          MR. ALBERTS:  Your Honor, I think --

17          THE COURT:  -- in principle; right?

18          MR. ALBERTS:  Two wrongs don't make a right, but one

19  of these is not a wrong.

20          THE COURT:  I've already said at some point the city

21  has to stop making bad financial decisions.  Now is the time.

22          MR. ALBERTS:  Well, I think this is actually a very

23  wise financial decision.

24          THE COURT:  Okay.  Let's talk about that.

25          MR. ALBERTS:  Okay.

1    THE COURT:  Let's not talk about the Barclays money

2  or any other money we can possibly identify.

3    MR. ALBERTS:  All right.  Let's talk about why this

4  is wise.

5    THE COURT:  Okay.

6    MR. ALBERTS:  The city wanted this Retiree Committee

7  because it wanted a counterparty to negotiate billions of

8  dollars in reduction to retirement benefits, OPEB, and

9  pension.  They got their committee.  They got the party.  We

10  are negotiating with them.  We have negotiated with them in

11  good faith.  We've even brought -- resolved a very difficult

12  issue concerning OPEB for 2014.  These committee members are

13  prepared to testify the amount of blowback they've received

14  just on that, the anger that settlement has brought.  Their

15  concerns about being sued are not etherial.  They are real.

16  They want to complete their duty in this case, but they are

17  very concerned about their personal financial well-being.

18  And quite candidly, your Honor, we can't lose a single

19  committee member, and I fear that if this Court were to deny

20  the motion, we would lose one if not more committee members.

21  And my concern is, as a result of that, the very delicate

22  balance that was created by this committee by the U.S.

23  Trustee for having three individuals, three people associated

24  with associations, and three people associated with unions,

25  would fall out of whack.  I think the city wants a strong

1    committee.  They want us to negotiate.  They realize that

2    while we have not seen eye to eye on all issues and we may

3    not going forward, we have negotiated in good faith, and we

4    have been very constructive to the process.  And this case

5    needs the committee to continue to function in a strong way,

6    and if that's --

7              THE COURT:  In your motion you --

8              MR. ALBERTS:  Yes.

9              THE COURT:  -- state at the bottom of page 2 and the

10   top of page 3, "Without this relief, the committee itself

11   will struggle to function as envisioned, and the city's

12   reorganization will be compromised."  What do you mean by

13   that?

14             MR. ALBERTS:  Well, your Honor, as I mentioned,

15   there is a real concern that committee members will resign if

16   they are not protected by insurance or indemnity, and the

17   city has said that they will not indemnify the committee

18   members, so they then have a choice.  Do they go forward or

19   do they -- or do they resign or leave or are their decisions

20   somehow clouded because they're looking over the shoulder of

21   what is -- of possibly being sued for compromising with the

22   city?  Okay.  As a result of that, your Honor, I think that

23   it creates a more inviting environment for the committee

24   members to do their job, and they are working really hard.  I

25   asked Ms. Renshaw how many hours she's put into this case

1   already, and the amount is somewhere between 600 and 800

2   hours since being brought on.  That's a lot of time for

3   somebody who's not compensated for it.  All they want is to

4   know that if they're sued, a lawyer is going to be there to

5   protect them.  I don't think that is a lot to ask of this

6   Court or of the city.

7           THE COURT:  It feels like you can buy a lot of

8   lawyers' time for $600,000 especially if the Barton Doctrine

9   protects them.

10          MR. ALBERTS:  Your Honor, I don't know --

11          THE COURT:  If there's a suit in state court, you

12  file a removal paper to bring it to the Bankruptcy Court, and

13  it's done.

14          MR. ALBERTS:  Your Honor, there was never a

15  discussion, never a -- nothing from the city that indicated

16  they would put 600 or 700 or $800,000, and, quite frankly,

17  your Honor --

18          THE COURT:  No.  I'm sure that's so.  It just sounds

19  like the premium is grossly disproportionate to the work

20  that's required.

21          MR. ALBERTS:  Oh, I don't think so, your Honor, and

22  that's why we want insurance.

23          THE COURT:  Why is it any more than just filing a

24  notice of removal?

25          MR. ALBERTS:  Your Honor, we have nine committee

1    members.  There could be class action upon class action.

2           THE COURT:  Any of which can be removed to this

3    Court and dismissed for failure to abide by the Barton

4    Doctrine.

5           MR. ALBERTS:  Your Honor, somebody has got to

6    prepare the papers.  Somebody has got to be familiar with the

7    case.

8           THE COURT:  $600,000?

9           MR. ALBERTS:  Your Honor, actually, when you're

10   dealing with a tail policy for six years, yes.  I think

11   that -- and you know what?

12          THE COURT:  That only has to be done once, and then

13   it's --

14          MR. ALBERTS:  Your Honor, you've seen people file

15   multiple pleadings in this case who you have stricken their

16   pleadings.  They refile and refile and refile.  Why should we

17   assume that it would be any different for these committee

18   members?

19          THE COURT:  I'm still not hearing $600,000.

20          MR. ALBERTS:  Your Honor, the amount of the

21   insurance -- there is a formula.

22          THE COURT:  You tell me.  How long does it take to

23   prepare a notice of removal, a one-page notice of removal?

24   Fifteen minutes, twenty minutes?

25          MR. ALBERTS:  Your Honor, I --

1          THE COURT:  An hour if you really stretch it?

2          MR. ALBERTS:  Your Honor, I think that, you know,

3 the insurance is also there in case somebody -- you, I

4 understand, may not be on the bench.  I don't know what

5 bankruptcy judge -- what the next bankruptcy judge may or may

6 not do.

7          THE COURT:  We're insuring against my retirement?

8          MR. ALBERTS:  We're insuring for your retirement,

9 and it's $350,000, your Honor.  The deductible would not be,

10 you know --

11          THE COURT:  The deductible is used to pay the first

12 expenses; right?

13          MR. ALBERTS:  Right.

14          THE COURT:  So it's $600,000 if the suits that you

15 foresee do get filed.

16          MR. ALBERTS:  If they do get -- well, if they do get

17 filed and you drain the retainer by that much, yes, but, you

18 know what?  The good news is if you go beyond that amount, at

19 least you've got coverage to protect for the overage.  And I

20 don't see a mechanism where the city is saying, "Oh, we'll

21 agree to pay your legal fees."  We've asked for the

22 indemnity.  They said they can't do it.  Well, actually they

23 can do it.  They did it for Barclays.  I realize I shouldn't

24 raise Barclays, but they did put in there an indemnification

25 provision.  And our committee members before filing this

1  motion, in fact, before shopping for this insurance asked for
2  that indemnity, and the city said, "We can't provide it."  So
3  what else did they have to do as an option?  They didn't say,
4  "I'm going to resign."  They didn't say, "Well, I'm not going
5  to do any work until I get some protection."  They said,
6  "Shop for the best policy you can," and that's what we did,
7  and we found a policy that fits within the guidelines of what
8  these policies go for given the amount.  I have the witnesses
9  here.  I don't know if you need to hear from them or not.  I
10 don't know if you have any other questions for me, but, your
11 Honor, I do think that, you know, under the standards that
12 have been announced, including the McDow case, this is a
13 situation, while, yes, you know, first in Chapter 9, not the
14 first in bankruptcy, and, quite candidly, very warranted
15 under the circumstances of this case.
16          THE COURT:  Thank you, sir.
17          MS. LENNOX:  Good morning, your Honor.  Heather
18 Lennox of Jones Day on behalf of the city.  I'm not going to
19 repeat everything that we've put in our papers.  I know your
20 Honor has read it.  We have agreed to pay the reasonable
21 expenses of the members of the committee, and so when we were
22 evaluating this particular request, we looked at the actual
23 words of Section 503(b)(3)(F) of the Bankruptcy Code that the
24 expense be an actual necessary expense incurred by a member
25 of the committee appointed under Section 1102 if the expense

1   is incurred in the performance of the duty of such committee.
2   So if you parse the actual words and you look at a little bit
3   of the legislative history, we believe that these types of
4   expenses are contemplated to be de minimis out-of-pocket
5   expenses.  The legislative history of this section
6   references, and I'm quoting from the House report, quote,
7   "reimbursement of their out-of-pocket expenses such as travel
8   and lodging." Collier's similarly, in explaining this
9   section, refers to the types of expenses that should be
10  reimbursed as, quote, "travel expenses to attend meetings,"
11  and, quote, "reimbursement for telephone charges, postage,
12  messenger services, and the like."  Payment of over a half a
13  million dollars of insurance premiums and retentions is not
14  commonly understood as an out-of-pocket expense.
15          It is also, your Honor, this expense is an expense
16  of the committee as a whole and not an expense of an
17  individual committee member, so in this vein, to the extent
18  that the committee relies on McDow, even if that case were
19  factually apposite, which, as we state in our papers, we
20  don't believe it is, we think it's been wrongly decided
21  because an expense like this just does not fall within the
22  statute's specific and plain meaning.  In addition, even if
23  it did, we don't believe it meets the tests of actual and
24  necessary or reasonable.  As your Honor pointed out, the
25  Barton Doctrine exists.  Qualified immunity exists.  The

1   members joined the committee without insurance. They've

2   acted in good faith for seven months without insurance,

3   including, as Mr. Alberts pointed out, concluding a difficult

4   agreement to modify healthcare benefits.

5         THE COURT: Let's pause there.

6         MS. LENNOX: Yes, sir.

7         THE COURT: What I heard Mr. Alberts say -- and I

8   invite his comment if I heard him wrong -- was that with this

9   insurance, the members of the committee would feel freer to

10   negotiate with the city and make the kinds of deals that the

11   city feels it needs.

12         MS. LENNOX: Sure.

13         THE COURT: Is that worth $600,000?

14         MS. LENNOX: I have two responses to that, your

15   Honor. One is more factual, and one is along the lines of

16   what we've told the committee. We do recognize the

17   difficulty of this case. We recognize the high-profile

18   nature of this case. However, if we allow insurance to be

19   purchased for a committee in this case, there are a lot of

20   other high-profile very contentious cases that involve

21   Retiree Committees in Chapter 9 or Chapter 11 across the

22   country. This is a dangerous precedent to set that insurance

23   must be purchased in every case because every committee is

24   going to want it. What the factors that --

25         THE COURT: Well, but that's not your concern --

1          MS. LENNOX:  Well --

2          THE COURT:  -- nor mine actually.

3          MS. LENNOX:  Not for this particular case, but it is

4    an issue.  Where courts have found in the highly rare cases,

5    as McDow stated, is where members have actually resigned.  In

6    McDow three members had resigned.  The two that were

7    testifying had threatened to resign.  We don't have that in

8    this case.  I understand the discomfort, and to address the

9    discomfort, which is all we've heard about -- we haven't

10   heard about resignations, and we also haven't heard that the

11   U.S. Trustee couldn't appoint people even if there were

12   resignations.  Nevertheless, we fully expect that if the

13   committee continues its fulfillment of its fiduciary duties,

14   the parties and this Court will include in the plan of

15   adjustment additional protections for the committee that were

16   referenced in their motion, and there can be additional

17   protections beyond exculpation.  The city has conveyed this

18   view repeatedly to counsel to the committee that discussions

19   about what's going on here should be dealt with in the

20   context of negotiating the terms of a plan of adjustment.  In

21   fact, in the reply that the committee filed in Footnote 5

22   where they listed plans that include that, that's the whole

23   point.  These provisions were included in the plan that had

24   been developed, had been finalized, and had been negotiated.

25          THE COURT:  Well, but none of those plan provisions

1  nor qualified immunity nor the Barton Doctrine, as Mr.

2  Alberts points out, protects an individual committee member

3  when they get service of process.

4         MS. LENNOX:  No.  That's --

5         THE COURT:  They'll have to find a lawyer, at least

6  presumably, to file whatever should be filed, whether it's a

7  notice of removal or a motion to dismiss or whatever it is,

8  and that costs them money which --

9         MS. LENNOX:  Yes.

10        THE COURT:  -- they don't have.  What do we do about

11  that?

12        MS. LENNOX:  That is where I have discussed with Mr.

13  Alberts trying to figure out ways to protect his committee

14  members for the good faith performance of their duties in

15  whatever we determine should go into the plan of adjustment.

16        THE COURT:  What might it be?

17        MS. LENNOX:  It could be, for example, setting aside

18  a little pot of money for defense costs.  It could be -- you

19  know, there are other things that creative lawyers and the

20  Court can come up with.  We should talk about those things,

21  but it doesn't require the city taking $600,000 out of its

22  coffers to buy an insurance policy.

23        THE COURT:  I thought Mr. Alberts reported that the

24  city had determined that it was not able to do that.

25        MS. LENNOX:  Mr. Alberts reported that the city

1   thought it could not indemnify.  There are other things that

2   the city can do, and we've always told Mr. Alberts that we'd

3   be willing to talk about them in the context of plan

4   negotiations.

5         THE COURT:  Well, how about in the context of trying

6   to resolve this motion?

7         MS. LENNOX:  What we were told --

8         THE COURT:  Are you willing to do that?  Are you

9   willing to do that?

10        MS. LENNOX:  Sure.  What we were told in -- what we

11  were told is -- and it says it in the motion -- that it

12  doesn't matter what protections they get in the plan.  It

13  doesn't matter if there's exculpation provisions.  It doesn't

14  matter if there are other protections.  They want the

15  insurance policy because they want the comfort of an

16  insurance policy.  That was stated directly in the motion, so

17  we think -- you know, as your Honor knows, there's mediation

18  going on.  We think that that's an appropriate time to deal

19  with this issue.  And, your Honor, that's actually going

20  above and beyond because -- and it's only because of the

21  unique circumstances of this case because Retiree Committees

22  serve all the time in highly contentious cases without

23  insurance or indemnification or protections other than

24  qualified immunity and the Barton Doctrine, but the city -- I

25  mean, look --

1          THE COURT:  So you discount the credibility of Mr.

2     Alberts' assertion that because of the extremely high-profile

3     nature of the committee's work, they are more susceptible to

4     suit than your average even --

5          MS. LENNOX:  I don't --

6          THE COURT:  -- average large Chapter 11 case?

7          MS. LENNOX:  I don't discount that, but I also don't

8     believe that the law permits the purchase of an insurance

9     policy under 503(b)(3)(F).  That's not to say that in the

10    context of a negotiated solution involving a plan there can't

11    be other things that can be discussed.  I don't think that

12    the purchase of an insurance policy is permitted under the

13    statute.  I don't think -- I think your Honor understands our

14    reasonableness position, and I don't mean to belabor it, so

15    for the reasons that we've set forth in our papers and we've

16    discussed today, we think this motion should be denied, your

17    Honor.

18         THE COURT:  I'd like to talk to Mr. Smith, please.

19         MR. SMITH:  Good morning.

20         MR. SOPER:  Good morning again, your Honor.

21    Christopher Soper for the committee.  The committee would

22    call Brian Smith to the stand.

23         THE COURT:  Actually, I'm just going to talk to him.

24         MR. SOPER:  Okay.  That's fine.

25         MR. SMITH:  Good morning, your Honor.  Do you want

1    me here?

2            THE COURT:  That's fine.

3            MR. SMITH:  Okay.

4            THE COURT:  I want to talk to you about this thing

5    called the Barton Doctrine.  Have you ever heard those words

6    before this morning?

7            MR. SMITH:  No, sir.

8            THE COURT:  So you don't know what it is?

9            MR. SMITH:  I have a guess, but I don't know, sir.

10           THE COURT:  Okay.  So it's fair to say that when you

11   were negotiating the extent of the coverage and the price for

12   the coverage, the premium, this issue of the Barton Doctrine

13   was not brought up at all.  Is that fair to say?

14           MR. SMITH:  What was brought up, your Honor --

15           THE COURT:  Is that fair to say, sir?

16           MR. SMITH:  The term "Barton Doctrine" was not

17   brought up, sir.

18           THE COURT:  Okay.  I assume that the concept of

19   qualified immunity was discussed.

20           MR. SMITH:  Yes, sir.

21           THE COURT:  Okay.  The Barton Doctrine is a very

22   different doctrine.  It's a doctrine which says that before a

23   party is sued -- and I'll define the scope of this in a

24   second, but before a certain group of parties are sued, the

25   party that wants to bring that suit has to come to -- excuse

1    me -- come to the Court and get permission to file that suit,

2    and generally the doctrine applies to court-appointed

3    receivers, court-appointed trustees, but it has also been

4    extended to creditors' committees and others who act in a

5    representative capacity in a bankruptcy case, and you can see

6    why.  The Bankruptcy Court itself must have the exclusive

7    jurisdiction to define what the duties of the representatives

8    are in a bankruptcy case.  It can't be for another court

9    somewhere else to decide what those duties are and if that

10   person violated those duties, so the Supreme Court in this

11   case called Barton -- that's where the name Barton Doctrine

12   comes from -- held that the court in which the

13   representative, the defendant, is appointed must give its

14   permission before a suit can be filed.  That's the Barton

15   Doctrine.

16        In your educated experience with insurance, which I

17   accept and respect, would discussions of the Barton Doctrine

18   have had any impact on either the scope of coverage or the

19   price of the coverage?

20        MR. SMITH:  Implicitly, without using that term, I

21   think a lot of that concept was discussed.  We were told by

22   legal counsel that during the active period of this Chapter 9

23   proceeding, the probability of any lawsuits being brought

24   would be very, very small, if not none, because of the

25   protection of the Bankruptcy Court.

```
1              THE COURT:  Um-hmm.
2              MR. SMITH:  The concern that was really expressed to
3    us was during the period after the resolution, what we were
4    referring to as a statute of limitations --
5              THE COURT:  Um-hmm.
6              MR. SMITH:  -- where the access to the court or
7    access to a means to pay for attorney from the city or from
8    whatever other sources would be much more questionable, so
9    when we were discussing with underwriters, the primary focus
10   of exposure was the post-Chapter 9 proceeding period on the
11   assumption that during the proceedings, the Court would
12   protect them.
13             THE COURT:  Um-hmm.  Okay.  So you didn't
14   contemplate the concept that even after confirmation, court
15   permission would be required to file a lawsuit; is that
16   right?
17             MR. SMITH:  No, sir.  That was not discussed --
18             THE COURT:  That was not discussed.
19             MR. SMITH:  -- in the tail period.
20             THE COURT:  Okay.  Thank you, sir.  You may sit
21   down.  And I'd like to talk to the two members of the
22   committee who are here, please.
23             MS. RENSHAW:  At the podium, your Honor?  At the
24   podium?
25             THE COURT:  Yes, please.  And what is your name?
```

1          MS. RENSHAW:  Terri Renshaw.

2          THE COURT:  And what is your name, please?

3          MS. WILSON:  Gail Wilson.

4          THE COURT:  Okay.  Ms. Renshaw, let's see.  You

5    submitted one of the two declarations --

6          MS. RENSHAW:  Yes, sir.

7          THE COURT:  -- in support.

8          MS. RENSHAW:  Um-hmm.

9          THE COURT:  And you did, too.  Both of you did.

10          MS. WILSON:  Yes.

11          THE COURT:  Yes.  Okay.  I take it neither of you

12    have been sued.

13          MS. RENSHAW:  That's correct.

14          MS. WILSON:  That is correct.

15          THE COURT:  Okay.

16          MS. RENSHAW:  As far as we know as of today.

17          THE COURT:  Fair enough.  You're right.  It's

18    possible that you don't know, but as far as you know, you

19    haven't been sued.

20          MS. RENSHAW:  Right.

21          THE COURT:  Okay.  Let me just ask you directly.

22    Have any of -- have either of you -- either of the two of you

23    received any specific threats of lawsuits?

24          MS. RENSHAW:  I have not.

25          MS. WILSON:  No, I have not.

1          THE COURT:  You have not.  I know this is hearsay,
2    but I'm going to ask it anyway because I'm the judge.  Have
3    you heard from other members of the committee whether they
4    have been sued or whether they have received any overt
5    threats of being sued?

6          MS. RENSHAW:  I have not heard that any other
7    committee member has been sued, and I have not heard from any
8    other committee member that they have been threatened with
9    suit.

10          THE COURT:  Um-hmm.

11          MS. WILSON:  I have not heard that any committee
12    member has actually been sued.  I have heard from various
13    committee members that individuals have alleged that they
14    would sue, have threatened that they would sue.

15          THE COURT:  Um-hmm.  Which members of the committee
16    made those suggestions to you?

17          MS. WILSON:  Gail Turner --

18          THE COURT:  Um-hmm.

19          MS. WILSON:  -- and Ed McNeil.

20          THE COURT:  Um-hmm.  And remind me who they are or
21    who they represent or what their capacity is on the
22    committee.

23          MS. WILSON:  Gail Turner is a member, but she also
24    serves with an association, which I believe is the Detroit
25    Police --

1          THE COURT:  Um-hmm.

2          MS. WILSON:  -- Command Officers --

3          THE COURT:  One of the association.

4          MS. WILSON:  I'm not quite sure of the name.

5          THE COURT:  Okay.

6          MS. WILSON:  Ed McNeil serves as the representative

7   for AFSCME --

8          THE COURT:  Yes, of course.

9          MS. WILSON:  -- the retiree chapter.

10         THE COURT:  Okay.  Can you give me or did they give

11  you any more specifics about what those threats involved or

12  what they were, or it was just a general statement?

13         MS. WILSON:  I was not there when the threats were

14  made.

15         THE COURT:  I'm asking you what they told you about

16  them.

17         MS. WILSON:  Essentially after the most recent OPEB

18  settlement, individuals were concerned and angry and

19  indicated that additional actions may be taken.

20         THE COURT:  Um-hmm.  Would it address your very

21  understandable concerns about being sued in this environment

22  if the city were to set aside a fund of money to pay lawyers

23  to represent you?

24         MS. RENSHAW:  Depending on the amount of the fund --

25         THE COURT:  Assuming it was sufficient, yes.

1      MS. RENSHAW:  It certainly would go a long way of

2   addressing our concerns and my personal concerns.

3      THE COURT:  Um-hmm, yeah.  I'm asking you

4   personally.

5      MS. RENSHAW:  And my personal concerns, yes.

6      THE COURT:  Ms. Wilson.

7      MS. WILSON:  The same for me as long as there was

8   some proviso that should for some reason the fund be

9   depleted, that there --

10      THE COURT:  Um-hmm; right.

11      MS. WILSON:  -- was some consideration for

12   additional.

13      THE COURT:  Right.  Mr. Alberts, Ms. Lennox, I want

14   to see you at the side of the bench.

15      MS. RENSHAW:  Are you finished with us, sir?

16      THE COURT:  Yes.

17      MS. RENSHAW:  Thank you.

18      THE COURT:  Thank you.  I'm sorry.  I should have

19   said that.  You're all set.  Let's talk over here.

20      (Side bar conference at 10:37 a.m., until 10:39 a.m.)

21      THE COURT:  All right.  I'm going to adjourn this

22   matter not until next Wednesday but next Tuesday at ten

23   o'clock, and I will give you a decision then.  Anything

24   further at this time?  If not, I will see, I assume, some of

25   you at 2:30.

1          MS. LENNOX:  Correct, your Honor.

2          THE COURT:  All right.

3          MS. LENNOX:  Nothing further at this time.

4          MR. ALBERTS:  Thank you, your Honor.

5          THE CLERK:  All rise.  Court is in recess.

6      (Proceedings concluded at 10:39 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett             March 10, 2014
_____     _____
Lois Garrett