UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) **Re: Docket No. 2921** |

**OBJECTION TO THE NOTICE OF PRESENTMENT OF FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

The creditors and parties in interest identified in footnote 1 (the "Objectors")[1] submit this objection (the "Objection") to the *Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status, and (III) Modifying Automatic Stay* (the "Notice") [D.I. 2921].[2] As more fully explained herein, the City seeks approval of a new loan through the Notice and, as a result, the City should be required to seek authorization of such new loan by filing a new motion, providing creditors and parties in interest with all of the material terms of the new loan and a complete set of the loan documents which the City proposes to execute and deliver, and proving through competent evidence that the

---

[1] The creditors and parties in interest submitting this objection are: Hypothekenbank Frankfurt AG; Hypothekenbank Frankfurt International S.A.; Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.; FMS Wertmanagement AoR; Syncora Guarantee Inc.; Syncora Capital Assurance Inc.; and Wilmington Trust, National Association, as Successor Contract Administrator.

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Initial Financing Motion (as hereinafter defined). All references to "Section" are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532. All references to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure, as presently in effect.

1

new loan meets the requirements of the Bankruptcy Code. The Objectors should also be permitted to take discovery to test the City's assertions with respect to the same. The City should not be permitted to short-circuit the motion, notice, discovery, and evidentiary hearing processes mandated by the Bankruptcy Code, the Bankruptcy Rules, and due process by submitting a proposed order, supported only by a notice that fails to disclose the material terms of the new financing and only some of the new loan documents. The City should not be permitted to rely on a record developed more than two months ago, at a time the proposed loan did not exist, and with respect to a loan that had materially different terms. In support of the Objection, the Objectors respectfully state as follows:

## I. BACKGROUND

**A. The City Seeks Approval of the Initial Financing Facility.**

1. On July 18, 2013, the City filed a *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019 and (III) Granting Related Relief* [D.I. 17], seeking approval of a Forbearance and Optional Termination Agreement (the "Swap Settlement Agreement") and authorization to settle various disputes with the Swap Counterparties (as corrected on July 24, 2013 [D.I. 157] and together with a supplement filed on December 27, 2013 [D.I. 2341], the "Swap Settlement Motion").

2. On November 5, 2013, the City filed a *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* (the "Initial Financing Motion,"

2

13-53846-tjt    Doc 3012    Filed 03/13/14    Entered 03/13/14 16:07:49    Page 2 of 15

and together with the Swap Settlement Motion, the "Contested Motions") [D.I. 1520], seeking approval of $350 million in post-petition financing (the "Initial Financing Facility") with Barclays Capital, Inc. as lender ("Barclays").

3. The Initial Financing Facility was proposed for two purposes: funding of the termination payment under the Swap Settlement Agreement and purportedly funding of certain proposed capital improvement projects in the City, but in fact, as the City admitted at the Combined Hearing (as hereinafter defined), the funding of general working capital (the "Original Quality of Life Facility"). (Dec. 17, 2013 Tr. at 203:1-7 & 203: 8-16 (K. Buckfire testimony stating that proceeds are really intended to provide "adequate working capital," that Barclay's financing is a "true working capital facility," and admitting that "the title of this loan as a quality of life loan is actually not the best choice of words" because it should have been called a "working capital loan…").)

4. The Initial Financing Facility was later reduced to $285 million—$165 million for the Swap Termination Bonds and $120 million for the Original Quality of Life Facility.

**B. The Court Denies Approval of the Swap Settlement Agreement and Swap Termination Financing.**

5. On December 17–18, 2013, and January 3 and 13, 2014, this Court held hearings (the "Combined Hearing") on the Contested Motions.

6. On January 16, 2014, this Court issued a bench opinion and entered minute entries denying the Swap Settlement Motion and declining to approve the Initial Financing Facility insofar as it was to be used to fund the swap termination payment. The Court, however, conditionally approved the Initial Financing Motion to the extent it sought approval of the Original Quality of Life Facility. Specifically, the Court's approval of the Original Quality of

Life Facility was conditioned on the City demonstrating that any proposed use of the Original Quality of Life Facility complies with Michigan law. (Jan. 16, 2014 Tr. at 25:25–26:4.)

7. To that end, the Court said that if the City intended to secure the Original Quality of Life Financing with gaming revenues, a process would need to be put into place to ensure that any use by the City of the proceeds of the Original Quality of Life Financing was in compliance with the Michigan Gaming Control and Revenue Act (the "Gaming Act").

> To enforce this state statutory limitation, the Court will condition this approval on a process by which the city gives 14 days' written and filed notice of its intent to use the proceeds during which interested parties can object on the grounds that the proposed use is not consistent with the Gaming Act. The Court would then schedule a prompt hearing and promptly resolve the objection. Consistent with Section 904, however, the Court will not review any aspect of the use of the proceeds other than its compliance with the Gaming Act.

(*Id.* at 26:21–27:5.) Alternatively, the Court suggested that, subject to Barclays' approval, the City could secure the Original Quality of Life Financing Facility with an alternative source of collateral that was not subject to a similar state law restriction. (*Id.* at 27:6–12.) If the City pursued that route, the Court would not impose the notice requirements noted above. (*Id.*)

8. The Court, however, did not suggest that, if the City negotiated and sought approval of a new financing facility on materially different terms months after the hearing concluded, the City could proceed by simply providing notice of a proposed order in the event it reached a new deal with Barclays and obtain entry of that order without disclosing all of the material terms of the new loan. Nor did the Court suggest that parties-in-interest should not be afforded an opportunity to evaluate such financing facility, the process in which the City engaged to obtain such loan, and the other alternatives for financing available to the City, and, following that evaluation, present evidence, after proper discovery, to the Court as to whether the new loan meets the requirements for approval of the relief that the City seeks.

4

**C.  The City Is Improperly Seeking Entry of a Final Order Approving a New and Materially Different Quality of Life Financing Facility.**

9. Because this Court denied the Swap Settlement Motion, the City admits that the previous structure of the Original Quality of Life Facility is no longer viable as the City is not in a position to deliver an undisputed first lien in the gaming revenues. (Notice at ¶ 15.)

10. As a result, the City has negotiated an entirely new financing facility with Barclays (the "New QOL Financing Facility"). (*Id.* at ¶ 16.) While the City describes the changes to the collateral package effected through the New QOL Financing Facility, the City provides no evidentiary support to meet the requirements under Section 364 of the Bankruptcy Code, including disclosing the actual amount of fees and costs associated with the New QOL Financing Facility, the interest rate of such facility, whether the New QOL Financing Facility is subject to market flex provisions (and, if so, what the terms of the market flex provisions are), and what steps, if any, the City took to determine if alternate lenders would provide funding on better terms or offer facilities that were unsecured or secured by less collateral. The City cannot implicitly rely on its investigation last August and September that led to Barclays being selected as a lender of $350 million.

11. Six months have elapsed since the City ran that process. It provides insufficient support for the presently proposed $120 million financing and no indication of the best, or any alternative, terms that are currently available. The Notice is silent as to all of these critical aspects of the New QOL Financing Facility and makes no effort to quantify the actual cost of the New QOL Financing Facility to the City.[3]

---

[3] The only information the City provides in the Notice is that the excessive $4.35 million commitment fee that the City paid to Barclays in connection with the Initial Financing Facility has been reduced to $3.375 million. However, given the reduced size of the now proposed financing compared to the Initial Financing Facility, this commitment fee is actually an even larger percentage of the financing's principal balance, which matures *only* five months from now.

12. Moreover, the City did not provide a blackline comparing the New QOL Financing Facility with the documents governing the Original Quality of Life Facility. Without additional information, it is impossible to divine whether the New QOL Financing Facility is on the same terms, better terms, or worse terms than the Original Quality of Life Facility. The Objectors presume that if the terms of the New QOL Financing Facility were better, the City would have heralded that fact in the Notice. However, until the City provides a blackline comparison of the financing documents, and provides a detailed explanation of the material terms of the New QOL Financing Facility, it is impossible for the Objectors, any other parties in interest, or the Court to make an informed decision whether the New QOL Financing Facility is an appropriate deal for the City and meets the requirements of the Bankruptcy Code.

13. Finally, the City omits a schedule of quality of life expenditures and budgets. The City has provided no explanation for why it needs these funds now and no details about how it plans to use these funds. The Notice provides no justification whatsoever for the City's rush to consummate yet another ill-conceived deal that harms creditors.

## II. OBJECTION

### A. The City Must File a New Motion Seeking Authorization to Enter Into the New QOL Financing Facility.

14. It is settled law that before a debtor obtains post-petition financing, notice of intent to incur such financing must be given to all creditors and parties-in-interest, and a hearing thereon must be held by the bankruptcy court. *See* 11 U.S.C. § 364(c) ("the court, ***after notice and hearing***, may authorize the obtaining of credit. . . .") (emphasis supplied); 11 U.S.C. § 901(a) (making Section 364(c) applicable to chapter 9 cases).

15.     Here, rather than file a motion seeking this Court's approval of the new financing facility—the New QOL Financing Facility—the City simply lodged a proposed final order approving the new loan. In an effort to justify its noncompliance with the "notice and hearing" requirement under Section 364, the City contends that the New QOL Financing Facility is consistent with this Court's ruling on January 16, 2014 and, thus, no further hearing is necessary. The City's position is wrong.

16.     After extensive briefing and hearings, this Court approved the terms of a deal that the City concedes it no longer has—*i.e.,* the Original Quality of Life Facility.

> . . . the Court finds that the city has established by a preponderance of the evidence that this loan [*i.e.,* the Initial Financing Facility] is in the best interest of the city; that it needs the money; that the terms are market terms and the best available to the city; that they were negotiated in good faith; and that they were negotiated at arm's length. Indeed, the Court finds that there was no substantial contradictory evidence on these points.

(Jan 16, 2014 Tr. at 23:9–16.)

17.     Although the Objectors respectfully disagree with this Court's findings, there can be no dispute that this Court's ruling only pertained to the Original Quality of Life Facility under the specific terms of the Initial Financing Facility. Indeed, until the City submits a motion seeking approval of the New QOL Financing Facility, it would be impossible for this Court to make any findings with respect to this new deal, including, among other things, the good faith of Barclays and that negotiations were at arm's length. Simply put, this Court's January 16 ruling did not provide the City with *carte blanche* authority to lodge final orders for any "new deal" without the appropriate disclosure and review by the Court and parties-in-interest of the terms of that new deal. The City's rationale that the new deal is purportedly consistent with the Court's January 16 ruling will not suffice to satisfy the clear requirements of Section 364(c). The City has not simply removed the offending funding for the Swap Termination Bonds from the Initial

7

Financing Facility; it has entered into an entirely new agreement with potentially substantially different terms in the New QOL Financing Facility.

18. To the extent there is any doubt that the New QOL Financing Facility is a new loan, the City's concession in the Notice that it must seek new approval of the New QOL Financing Facility from the Emergency Manager, City Council (which, under Michigan law, has the right to propose an alternative facility), and the Emergency Loan Board should be determinative. Notice at ¶ 19. If the New QOL Financing Facility was not a new financing facility (materially different than the one this Court approved), then obtaining such approvals under Michigan law would not be necessary. It would be a very unusual result if the City had to go through the process for obtaining approval and authorization from these various municipal and state bodies to enter into the New QOL Financing Facility but could avoid review by creditors, other parties in interest (whose rights and claims are most directly affected), and this Court (which will actually be imposing the liens and super-priority administrative claim) simply by submitting a proposed order under a shortened notice procedure and relying on an evidentiary record developed months ago for a loan with a different collateral package and potentially with financing terms and conditions that are materially different and worse than what this Court previously approved.

19. Because the deal conditionally approved by this Court in January 2014 no longer exists and the City is seeking approval of a new loan (one that did not exist at the time of this Court's ruling in January 2014 and one that was not the subject of any of the evidentiary record developed at that hearing), it would be improper to rely on the evidentiary record developed in connection with the Initial Financing Motion or this Court's previous ruling to justify the City's noncompliance with the "notice and hearing" requirement of Section 364.

8

20. Simply put, if the City desires to enter into the New QOL Financing Facility, this Court should require the City to seek authorization by filing a new motion and offering competent evidence that the New QOL Financing Facility meets the requirements imposed by the Bankruptcy Code for approval.

**B.     The Notice Does Not Comply With Bankruptcy Rule 4001.**

21. Bankruptcy Rule 4001(c)(1)(A) provides that a motion for approval of post-petition financing ". . . shall be accompanied by a copy of the agreement and a proposed form of order." Fed. R. Bankr. P. 4001(c)(1)(A).

22. Here, the City failed to provide final copies of the documents that will be executed and delivered in connection with the New QOL Financing Facility. In particular, there are a number of exhibits that were not attached to the proposed financing documents. The City also failed to provide any budget detailing expenditures or forecasting funding needs for the New QOL Financing Facility. The lack of this information and the failure to comply with Bankruptcy Rule 4001(c) goes to the heart of the due process rights afforded to creditors and parties in interest before liens may be granted on tax revenues, asset proceeds, or other sources that might otherwise be sources available to make distributions to creditors and parties in interest under a plan. Moreover, the description of tax revenues and asset proceeds is vague, making it impossible to determine whether all real estate owned by the City will now be encumbered to support a loan that, by its terms, matures upon plan confirmation.

23. As a result, the Objectors, as well as other parties in interest, have not been (and will not be) afforded an opportunity to review the final and complete loan terms.

24. Moreover, Bankruptcy Rule 4001(c)(1)(B) requires a debtor to provide "a concise statement of the relief requested … that lists or summarizes, and sets out the location within the

9

relevant documents of, all material provisions of the proposed credit agreement and proposed form of order, including interest rate, maturity, events of default, liens, borrowing limits, and borrowing conditions." Fed. R. Bankr. P. 4001(c)(1)(B). Despite the basic nature of this requirement, the City makes virtually no effort to comply with it.

25. Thus, if the Notice is characterized as a motion for authorization to enter into the New QOL Financing Facility, the relief requested by the City must be denied until the City complies with all of the requirements set forth in Bankruptcy Rule 4001 and applicable local rules of this Court, and a proper evidentiary hearing is conducted to determine whether this new loan meets all of the requirements for approval by this Court.

**C.  The City Continues to Pursue Ill-Advised Transactions on an Expedited Basis that Waste Parties' and this Court's Resources.[4]**

26. As discussed above, the City intends to seek Emergency Loan Board and City Council approval of the transaction, but not before presenting this proposed financing to the Court. There is no reason for this Court to waste its time and the time of creditors during the crucial plan of adjustment approval process to review an incomplete deal. (*See* Dec. 17, 2013 Tr. at 217:15-17, 218:3-4 ("[I]f there's any chance that [the Emergency Loan Board is] not going to approve [the Initial Financing Facility] and we're wasting three days of trial with really expensive lawyers … it's unfair to everyone in the courtroom …"); Dec. 18, 2013 Tr. At 7:22-23, 8:10-12 ("Why wasn't [the Emergency Loan Board approval] done before this [Initial Financing Facility] hearing? … Someone actually made the decision to potentially risk wasting the Court's time and all of the attorney fees in this case?").)

---

[4] In fact, this Court has noted on various occasions the City's hasty financial actions and decision making and there are no circumstances here with the Notice and New QOL Financing requiring (or permitting) the City's current short cut to obtaining post-petition financing.

27. Even the urgency of post-petition financing is questionable. While a loan last fall arguably would have enabled the Debtor to get a head start on quality of life projects prior to plan confirmation, the New QOL Financing Facility will mature in only a few months, at the time of plan confirmation. The Court should reject the City's vague proposal to encumber asset proceeds and tax revenues that would otherwise be available to creditors under a plan of adjustment.

### III. RESERVATION OF RIGHTS

28. As demonstrated herein, the City's attempt to circumvent Bankruptcy Rule 4001 is improper. Until the City complies with the "notice and hearing" requirement of Section 364, and the procedural requirements set forth in Bankruptcy Rule 4001, the Objectors should not be required to specify all of their objections to the terms of the New QOL Financing Facility in order to preserve such objections. The Objectors reserve all their rights with respect to the Notice and the New QOL Financing Facility, including with respect to supplementing and amending this Objection and introducing evidence at any hearing for a motion seeking the approval of the New QOL Financing Facility.

### IV. CONCLUSION

29. For the foregoing reasons, the Objectors respectfully request that this Court not allow the City to circumvent the requirements of Bankruptcy Rule 4001, that the relief sought by the City be denied, and that this Objection be sustained.

Dated: March 13, 2014.　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　/s/ Howard S. Sher
　　　　　　　　　　　　　　　　　　　Howard S. Sher, Esquire (P38337)
　　　　　　　　　　　　　　　　　　　Jacob & Weingarten, P.C.
　　　　　　　　　　　　　　　　　　　Somerset Place
　　　　　　　　　　　　　　　　　　　2301 W. Big Beaver Road, Suite 777
　　　　　　　　　　　　　　　　　　　Troy, Michigan 48084
　　　　　　　　　　　　　　　　　　　Tel: (248) 649-1200
　　　　　　　　　　　　　　　　　　　Fax: (248) 649-2920
　　　　　　　　　　　　　　　　　　　E-mail: howard@jacobweingarten.com

　　　　　　　　　　　　　　　　　　　Vincent J. Marriott, III, Esquire
　　　　　　　　　　　　　　　　　　　Ballard Spahr LLP
　　　　　　　　　　　　　　　　　　　1735 Market Street, 51st Floor
　　　　　　　　　　　　　　　　　　　Philadelphia, Pennsylvania 19103
　　　　　　　　　　　　　　　　　　　Tel: (215) 864-8236
　　　　　　　　　　　　　　　　　　　Fax: (215) 864-9762
　　　　　　　　　　　　　　　　　　　E-mail: marriott@ballardspahr.com

　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　Matthew G. Summers, Esquire
　　　　　　　　　　　　　　　　　　　Ballard Spahr LLP
　　　　　　　　　　　　　　　　　　　919 North Market Street, 11th Floor
　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　　Tel: (302) 252-4428
　　　　　　　　　　　　　　　　　　　Fax: (302) 252-4466
　　　　　　　　　　　　　　　　　　　E-mail: summersm@ballardspahr.com

　　　　　　　　　　　　　　　　　　　*Attorneys for Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.*

/s/ J. Mark Fisher
Rick. L. Frimmer, Esquire
J. Mark Fisher, Esquire
Michael W. Ott, Esquire
Jeffrey D. Eaton, Esquire
Schiff Hardin LLP
233 South Wacker Drive
Suite 6600
Chicago, IL 60606
Tel: (312) 258-5500
Fax: (312) 258-6500
E-mail: rfrimmer@schiffhardin.com
mfisher@schiffhardin.com
mott@schiffhardin.com
jeaton@schiffhardin.com

*Attorneys for FMS Wertmanagement AoR*


/s/ Stephen C. Hackney
James H.M. Sprayregen, P.C.
Ryan Blaine Bennett, Esquire
Stephen C. Hackney, Esquire
Kikland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
Fax: (312) 862-2200

-and-

David A. Agay, Esquire
Joshua Gadharf, Esquire
McDonald Hopkins LLC
39533 Woodward Avenue
Bloomfield Hills, MI 48304
Tel: (248) 646-5070
Fax: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. And Syncora Capital Assurance Inc.*

13

>  */s/ Heath D. Rosenblat*
> Heath D. Rosenblat, Esquire
> Kristin K. Going, Esquire  (Application Pending)
> Drinker Biddle & Reath LLP
> 1177 Avenue of the Americas, 41st Floor
> New York, New York 10036-2714
> E-mail: Heath.Rosenblat@dbr.com
> E-mail: Kristin.Going@dbr.com
> Tel: (212) 248-3140
> Fax:   (212) 248-3141
>
> *Counsel for Wilmington Trust, National Association, as Successor Contract Administrator*

## **CERTIFICATE OF SERVICE**

I, Lynnea Koerber, state that on March 13, 2014, I filed a copy of the foregoing Objection To The Notice Of Presentment Of Final Order Pursuant To 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(F), 503, 507(A)(2), 904, 921 And 922 (I) Approving Post-Petition Financing, (II) Granting Liens And Providing Superpriority Claim Status And (III) Modifying Automatic Stay with the Clerk of Court using the Court's ECF system and I hereby certify that the Court's ECF system has served all registered users that have appeared in the above-captioned case. I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

/s/ *Lynnea Koerber*
E-mail: howard@jacobweingarten.com