# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: ) | Chapter 9 | |
| ) | | |
| CITY OF DETROIT, MICHIGAN, ) | Case No. 13-53846 | |
| ) | | |
| ) | Hon. Steven W. Rhodes | |
| Debtor. ) | | |
| | Related to Doc. No. 2802 | |

## LIMITED OBJECTION OF
## THE DETROIT RETIREMENT SYSTEMS
## TO THE MOTION OF DEBTOR FOR ENTRY OF AN ORDER,
## PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE
## AND BANKRUPTCY RULE 9019, APPROVING A SETTLEMENT AND
## PLAN SUPPORT AGREEMENT AND GRANTING RELATED RELIEF

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (together, the "Retirement Systems") hereby file this limited objection to the Motion of Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief (the "Settlement Motion") [Dkt. No. 2802], filed by the City of Detroit (the "City" or the "Debtor"), seeking approval of a proposed settlement (the

"Settlement") between the City and the Swap Counterparties.[1]  In support hereof, the Retirement Systems state as follows:

## Preliminary Statement

1.     The Retirement Systems abstain and do not hereby object to the economic terms of the Settlement.  However, the Retirement Systems reserve the right to object to any treatment of the claims and interests of the Retirement Systems and their beneficiaries proposed under any plan of adjustment or otherwise, including without limitation that such treatment is inequitable relative to the treatment of the claims of the Swap Counterparties under the Settlement.

2.     The Retirement Systems, however, hereby object to the City's proposal to once again attempt to secure its financial obligations to the Swap Counterparties under the Settlement by pledging its gaming tax revenue.  As an initial matter, this Court should not approve a Settlement which calls for the Court to approve a pledge of collateral that is impermissible under state law (specifically, prohibited by the Gaming Act, defined below).  Other income streams, such as the City's income tax revenue, are unencumbered and could be utilized to secure the City's obligations under the Settlement, if approved.  Moreover, the collateral structure poses other practical concerns.  Rather than pledge the income tax revenue to secure the claims of the Swap Counterparties under the Settlement, the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Settlement Motion.

City has stated that it instead plans to pledge the income tax revenue as security for its newly resurrected $120 million "Quality of Life" Loan ("QOL Loan").[2] By keeping the gaming tax revenue out of the collateral package for the new QOL Loan, the City ostensibly intends to enjoy full and unrestricted use of the loan proceeds, with essentially no Court oversight. The City should not be permitted to encumber the gaming tax revenue in violation of the Michigan Gaming Control and Revenue Act, M.C.L. §§ 432.201 *et seq*. (the "Gaming Act"), so that its other income streams remain available to secure the QOL Loan—which may in turn enable the City to use the QOL Loan proceeds to accelerate the payoff of the Swap Counterparties under the Settlement, rather than to fund Quality of Life initiatives in the City.

3. The Retirement Systems also assert certain objections to specific provisions of the proposed Order, as discussed below.

## Objection

### I. The Proposed Collateralization of the Settlement Is Problematic

4. On January 16, 2014, this Court denied the City's motion to approve a settlement with the Swap Counterparties worth approximately $169 million, finding that the settlement amount was "just too high a price to pay" given the

---

[2] *See* Notice of Presentment of Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Revised Financing Order"), Dkt. No. 2921, ¶ 17.

- 3 -
200385614.2 14893/165083
13-53846-tjt    Doc 3028    Filed 03/17/14    Entered 03/17/14 13:22:18    Page 3 of 10

strength of the City's potential claims against the Swap Counterparties. Bench Op., Jan. 16, 2014, Hrg. Tr. 21:21-22. In particular, the Court recognized the questionable validity of the Swap Counterparties' liens on the gaming tax revenue under the Collateral Agreement in light of section 432.212 of the Gaming Act. *Id.* at 18:22-25. That section provides that gaming tax revenue may only be used by the City for the specific, enumerated purposes listed therein, none of which encompass pledging the gaming tax revenue to secure payment obligations under a settlement agreement. *See* M.C.L. § 432.212(3)(a).

5. It is therefore puzzling that, notwithstanding the Court's previous determination that "the city is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act,"[3] the City now seeks to have this Court approve a new settlement which again pledges the gaming tax revenue as security for its obligations to the Swap Counterparties.

6. Specifically, the Settlement Motion states that the Settlement shall provide the Swap Counterparties with allowed claims "against the City secured by valid and enforceable liens . . . on the collateral pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City . . . ." *See* Settlement Motion, p. 19. The collateral pledged by the City under the Collateral Agreement is the City's gaming tax revenue. *Id.* at p. 10.

---

[3] Bench Op., Jan. 16, 2014, Hrg. Tr. 18:22-25.

7. In terms of compliance with the Gaming Act, there is no distinction between pledging the gaming tax revenue to secure the City's obligations to the Swap Counterparties under this proposed Settlement and pledging the gaming tax revenue to secure the City's swap payments under the Collateral Agreement—both pledges constitute impermissible uses of gaming tax revenue.

8. Accordingly, this Court should not approve this Settlement with its proposed collateral structure. The Retirement Systems are unaware of any provision of the Bankruptcy Code that would excuse a chapter 9 debtor from using its property or revenues in accordance with state law. Indeed, in regard to post-petition financing, the Court has stated that "nothing in Section 364 suggests that a Court can allow a municipality to use its property in violation of state law." Bench Op., Jan. 16, 2014, Hrg. Tr. 26:7-9. Similarly, Bankruptcy Code section 903 would appear to prohibit the Court from approving and granting liens in violation of State legislation.

9. The collateral structure of the Settlement is particularly problematic given the City's recent Revised Financing Order. The Revised Financing Order seeks to revive the $120 million QOL Loan initially proposed in the Debtor's initial November 5, 2013 motion seeking approval of post-petition financing (the "Initial Financing Motion") [Dkt. No. 1520]. However, while the Initial Financing Motion proposed securing the QOL Loan with, among other things, the City's

- 5 -
200385614.2 14893/165083
13-53846-tjt    Doc 3028    Filed 03/17/14    Entered 03/17/14 13:22:18    Page 5 of 10

gaming tax revenue, the Revised Financing Order contemplates securing the new QOL Loan with the City's income tax revenue and the Asset Proceeds Collateral, as such latter term is defined in the Revised Financing Order. *See* Revised Financing Order, ¶¶ 4, 17.

10. By not pledging the gaming tax revenue to secure the new QOL Loan, the City will not be limited in the use of the loan proceeds to the enumerated purposes in section 432.212(3)(a) of the Gaming Act. Rather, the City could conceivably use the QOL Loan proceeds to accelerate the payoff of the outstanding amount due to the Swap Counterparties under the Settlement, rather than devoting those loan proceeds to Quality of Life initiatives in the City.

11. While the Settlement Motion provides that the City intends to seek exit financing for purposes of paying off the outstanding amounts owed to the Swap Counterparties on the Effective Date, the City does not provide any additional information with respect to such exit financing, such as the likelihood of obtaining it, the contemplated amount of the facility, or the other proposed uses, if any, of its proceeds.

12. The Settlement's term sheet contemplates the possibility that the Swap Counterparties' allowed claims may be fully paid in advance of the Effective Date. *See* Settlement Motion, Ex. 6, p. 5. Such a result arguably is only likely to occur if the QOL Loan proceeds are used to accelerate such payoff, contrary to the

- 6 -
200385614.2 14893/165083
13-53846-tjt    Doc 3028    Filed 03/17/14    Entered 03/17/14 13:22:18    Page 6 of 10

stated purpose of the loan - - a result that would benefit the Swap Counterparties at the expense of the City's revitalization efforts. To avoid this occurrence, the City could secure the Swap Counterparties' allowed claims pursuant to the Settlement with its income tax revenue, which the City's Initial Financing Motion makes clear would easily be sufficient to secure an approximately $85 million obligation. With its income tax revenue pledged as security for its Settlement obligations, the City could then pledge the gaming tax revenue as security for the QOL Loan, which, by virtue of the restrictions in the Gaming Act, would ensure that the City actually uses the QOL Loan proceeds to improve the quality of life in the City of Detroit.

13. As stated, the Court has already determined that the City can pledge the gaming tax revenue to secure a loan "only if the proceeds of the loan that are so secured are used as limited by state law." Bench Op., Jan. 16, 2014, Hrg. Tr. 26:11-12. The Court should not allow the City to circumvent this requirement by permitting the City to arbitrarily secure its obligations to the Swap Counterparties with the gaming tax revenue while securing its QOL Loan with its income tax revenue.

## II. Certain Provisions of the Proposed Order Are Problematic

14. Paragraph 9 of the proposed Order approving the Settlement Motion provides that the payments to be made pursuant to the Settlement "shall be adequate protection payments pursuant to section 361 of the Bankruptcy Code to

protect against diminution of UBS's and MLCS's interest in the collateral (the "Pledged Property") pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City." This provision, again, runs afoul of this Court's ruling that "the city is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act."[4] To insert a finding into the Order that characterizes the proposed Settlement payments as "adequate protection payments" under the original Collateral Agreement essentially seeks a *de facto* determination that the liens in gaming tax revenues granted under the Collateral Agreement are indeed valid. This is inappropriate and overreaching. The Settlement is just that - - a settlement, and there is no judicial determination being made here that the liens purportedly granted under the parties' earlier Collateral Agreement are valid. As stated, the Court in fact has indicated quite to the contrary.

15. Paragraph 18 of the proposed Order appears to imply that the Swap Counterparties retain substantial rights under the Collateral Agreement. However, this concept is in conflict with the concept that there is a Settlement proposed here, and any rights of the Swap Counterparties under the Collateral Agreement must be circumscribed by the terms of the new Settlement Agreement. Indeed, that is

---

[4] Bench Op., Jan. 16, 2014, Hrg. Tr. 18:22-25.

- 8 -
200385614.2 14893/165083
13-53846-tjt    Doc 3028    Filed 03/17/14    Entered 03/17/14 13:22:18    Page 8 of 10

precisely what paragraph 31 of the Order appears to provide. Thus, paragraph 9 should be struck or clarified in its scope and intent.

WHEREFORE, based on the foregoing, the Retirement Systems respectfully request that the Settlement Motion be approved only as modified to adequately accommodate the concerns articulated herein, or otherwise be denied.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: March 17, 2014

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

200385614.2 14893/165083

**CERTIFICATE OF SERVICE**

The undersigned certifies that on March 17, 2014, the *Limited Objection of the Detroit Retirement Systems to the Motion of Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief* was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

        CLARK HILL PLC

        /s/ Robert D. Gordon
        Robert D. Gordon (P48627)
        151 South Old Woodward Avenue, Suite 200
        Birmingham, Michigan 48009
        Telephone: (248) 988-5882
        Facsimile: (248) 988-2502
        rgordon@clarkhill.com

Dated: March 17, 2014        *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*