| | |
|---|---|
| In re: | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**OBJECTION OF THE OFFICIAL COMMITTEE OF RETIREES
TO THE MOTION OF DEBTOR FOR ENTRY OF AN ORDER,
PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE AND
BANKRUPTCY RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF**

The Official Committee of Retirees (the "Committee"), objects to the motion filed by the City of Detroit, Michigan (the "City") for entry of an order purportedly pursuant to section 105 of the Bankruptcy Code and Bankruptcy Rule 9019, approving a settlement with UBS AG, SBS Financial Products Company LLC and Merrill Lynch Capital Services, (defined in the motion collectively as the "Swap Counterparties")(Docket No.2806). In support of its objection, the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

This is the third attempt by the City to have the Court approve a settlement with the Swap Counterparties. The Committee's objection with respect to the new proposed settlement terms is not focused on the price of settlement, except to the extent that the $85 million settlement amount includes consideration for the Plan Support Agreement, as defined in the settlement term sheet. Rather, the Committee objects to settlement for the following reasons:

> * The Court should not allow the Swap Counterparties a secured claim against the City under 11 U.S.C.§506;

1

* The settlement requires the Court to approve a pledge of the casino revenue to secure payment of the settlement amount to the Swap Counterparties in violation of Michigan law

* The settlement purports to artificially impair the newly created secured claim for the Swap Counterparties for voting purposes;

*The Court should not defer to the City's suspect business judgment with the Plan Support Agreement;

For these reasons discussed more fully below, the City cannot meet the legal test for its approval under the Bankruptcy Rule 9019 as a fair and equitable settlement.[1]

## FACTUAL BACKGROUND

The City has been trying to push through an agreement with the Swap Counterparties from the first days of the chapter 9 case. The following history of the City's efforts and the universal creditor opposition thereto highlights the problems with the City's latest efforts.

**A.    The Assumption Motion**

On July 24, 2013, the City filed a motion for entry of an order (i) authorizing the assumption of a Forbearance and Optional Termination Agreement (the "Forbearance Agreement"), dated as of July 15, 2013, by and among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, and the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and Swap Counterparties., on the other, pursuant to section 365(a) of title 11 of the United States Code (the "Bankruptcy Code"), and (ii) approving the Forbearance Agreement pursuant to Bankruptcy Rule 9019 of the Federal Rules of Bankruptcy Procedure. (the "Assumption Motion") (Docket No. 157). The Forbearance Agreement was the only agreement the City had reached prior to the filing of the Chapter 9 petition.

---

[1] The City has not yet provided the parties with a copy of the Settlement Agreement and no discovery has taken place. Accordingly, the Committee reserves its rights to amend and/or supplement this objection.

In the Assumption Motion the City sought to assume the Forbearance Agreement, which represented a slight modification of the payment terms of the underlying agreements among the parties and in all other respects, preserved the underlying documents determining the rights of the parties pursuant to their terms. The City and the Service Corporations agreed (a) not to take any actions to set aside, avoid, reject, modify, terminate, disapprove, limit or render ineffective the underlying transaction documents, and (b) to ratify and agree to comply with all provisions of the underlying transaction documents and take certain steps to assure that the transaction documents continue in full force and effect as binding obligations. The City used the formula in the swap contracts as the basis for calculating the payment, i.e. 75% of the then mid-market value of the swaps if the termination option was exercised between the date of the Agreement and October 31, 2013, 77% if the option was exercised after October 31, 2013, but on or before November 15, 2013, and 82% if exercised after November 15, 2013 and on or before March 13, 2014. In addition, the City agreed to pay any unpaid amounts then owing under the swap contracts and to the extent the forbearance period terminated in certain situations, the City agreed support the reasonable actions of the Swap Parties in realizing upon the pledged collateral. Finally, the City agreed to schedule the Swap Parties Claim as a fully secured claim.

To implement the promises to the Swap Parties and the obligations under the underlying documents, the Emergency Manager agreed to, among other things, exercise his authority under applicable law (i) to cause the City and the Service Corporations to perform all covenants, obligations and duties of the City and the Service Corporations, under the transaction documents and to pay the City Payments, (ii) to cause the City or the Service Corporations to avoid the occurrence of certain Forbearance Period Termination Events, (iii) to cause the City to make all City Payments as and when required under the Collateral Agreement and, to the extent necessary, to make appropriations or amendments to then-existing appropriations in amounts that are

13-53846-tjt    Doc 3032    Filed 03/17/14    Entered 03/17/14 15:01:26    Page 3 of 17

sufficient to pay in full the required City payments, and (iv) following the occurrence of both the termination of the Forbearance Period and the swap contracts, to make appropriations or amendments to then existing appropriations of the pledged property in amounts that are sufficient to pay in full the obligations owing to the Swap Parties. In sum, the Forbearance Agreement was simply an agreed-upon reduction to the termination payment.

The City touted the advantages of the Forbearance Agreement, including freeing up the casino revenue, termination of the swap contracts at an 18-25% discount and the settlement of potentially protracted and expensive litigation. Nevertheless, the motion to assume the Forbearance Agreement drew the objections of both financial creditors and retiree representatives, who called into question the validity of the underlying agreements, and in particular the 2009 pledge of casino revenue in the Collateral Agreement.[2] The Committee objected on the grounds that the Forbearance Agreement elevated the Swap Parties to secured creditor status in the Chapter 9 case although they were not granted and did not possess any direct security interest in pre-petition City property under the relevant underlying documents and statutes. Ambac Assurance Corp. ("Ambac") contended that the swap contracts themselves were not properly issued in accordance with the Michigan Revised Municipal Finance Act ("Act 34") (Mich. Com Laws Ann § 141.2101). The Retirement Systems questioned whether the alleged lien survived the filing under section 552 of the Bankruptcy Code (Docket No. 370 p.10).

As a practical matter, implementation of the Forbearance Agreement was entirely dependent on the City's finding debtor-in-possession financing to pay the hefty sum the parties had negotiated as a termination payment. Accordingly, the hearing on the Assumption Motion

---

[2] *See e.g.,* Retired Detroit Police and Fire Fighters Association (Docket No. 329), AMBAC Assurance Corporation (Docket No. 348); National Public Finance Guarantee Corporation (Docket No. 353); Assured Guaranty Municipal Corp. (Docket No. 357); Financial Guaranty Insurance Company (Docket No. 360); David Sole (Docket No. 361); certain holders of the COPS (Docket No. 364); Syncora (Docket No. 366); the Retirement Systems (Docket No. 370) and the Committee (Docket No. 74).

was adjourned on September 23, 2013 while the City sought financing to pay off the claim. The City efforts to secure financing to implement the Forbearance Agreement generated a new round of objections. On October 25, 2013, the Detroit City Council adopted a resolution regarding the Emergency Manager's proposed post petition financing to refinance the swap contracts and voted to disapprove the transaction, raising among other issues, the impropriety of pledging the casino revenue to collateralize obligations under the Swap contracts. (Docket No. 1396). The resolution stated:

> This post petition financing appears to be an attempt to keep the Swaps out of the bankruptcy proceeding instead of challenging the Swaps counterparties' tenuous status as secured creditors. The counterparties senior creditor status was achieved by pledging the casino wagering taxes to collateralize the underlying Swap agreements. According to MCL 432.212(2), the use of the casino wagering taxes for such a pledge appears impermissible. Rather than seeking a declaration of this position by the Court, this deal would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline.

Despite the City Council's rejection of the financing, on November 5, 2013, the City filed the Motion of the Debtor For a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Superpriority Claim Status and (III) Modifying the Automatic Stay (the "Financing Motion") (Docket No. 1520) in which it sought authority to obtain secure post-petition financing in the amount of up to $350 million. Part of the financing was to be used to exercise termination rights in connection with the Swap Agreements (the "Swap Termination Bonds") and part of financing was to be used to finance quality of life initiatives (the "Quality of Life Bonds"). Apparently in recognition that the casino revenues should only be pledged for limited purposes consistent with Michigan law, the casino revenue was to serve as collateral only for the Quality of Life Bonds. The Financing Motion and the Assumption Motion were scheduled for hearing in December, 2013.

On December 16, 2013, the City and certain objectors entered into the Amended Statement of Stipulated Facts Regarding Motion of the Debtor for Entry of an Order (I) Authorizing the Assumption of That Forbearance and Optional Termination Agreement Pursuant to Section 365 of the Bankruptcy Code, (II) Approving such Agreement to Rule 9019, and (III) Granting Related Relief (Docket No 2186), which described the historical transactions and agreements and preserved the parties' objections. At this point, most of the facts relevant to the transactions are undisputed. An evidentiary hearing on the Assumption Motion and approval of the financing began on December 17, 2013. However, the Court did not approve assumption of the Forbearance Agreement then. Instead, the parties were ordered to mediation on December 23 and 24, 2013 (Docket No. 2251).

The mediation produced a modification to the Forbearance and Optional Termination Agreement agreed to by the City and the Swap Counterparties and no other party. The only real change to the Forbearance Agreement was another reduction of the termination payment from the contractual formula to $165 million and breakage cost of $4.2 million (Docket No. 2341). The City reduced the DIP financing to $285 million to reflect the reduced termination payment (Docket No 2353).

The modification did not win the support of the objecting creditors. On January 2, 2014, Ambac filed a supplemental objection labeling the compromise "still far too rich given the strong and unrefuted arguments that the Swap Obligations and the pledge of Casino Revenue to the Swap Counterparties are void *ab initio*." (Docket No. 2354, ¶ 1) Ambac and others argued that because the pledge violated the Michigan Gaming and Revenue Act, Mich. Comp. Laws §432.201 *et seq.* and was therefore void *ab initio*, "the Swap Counterparties can only collect – even assuming they can obtain a judgment on which to collect – from the allegedly meager amounts available to the City's general unsecured creditors." *Id.* at ¶32.

On January 16, 2014, the Court denied approval of the Debtor's Forbearance Motion and an Order was entered on January 17, 2014. (Docket No.) After evaluating the factors under Rule 9019 and arguments for and against approval of the settlement, the Court concluded: "the City is reasonably likely to succeed on its challenges to the collateral agreement under the Gaming Act and the Bankruptcy Code." *See* Transcript of Hearing January 16, 2014, attached to the Declaration of Carole Neville as Exhibit A. In addition, the Court concluded "the City is reasonably likely to succeed on its challenge to the swap agreements under PA 34. " *Id.* at 19. The Court recognized that what the City was requesting was "the Court's approval to replace its old obligations under the swap agreements and the collateral agreement, which the City concedes as to which it has litigable claims against the enforcement of them, with new obligations that would be fully protected both by security interests and by court approval." *Id.* at 20. In fact, the new settlement motion filed on March 4, 2014 is attempting to do just what the Court previously described as unacceptable.

On March 4, 2014, the City filed its Motion of the Debtor for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code and Rule 9019 Approving a Settlement and Plan Support Agreement and Granting Relating Relief (the "New Settlement Agreement"). In the New Settlement Agreement the City set forth the terms of a new agreement with the Swap Parties on completely new payment terms and contract terms (the "Settlement Agreement") (Docket No. 2806). Under the Settlement Agreement, the City will make payments to the Swap Parties up to the aggregate sum of $85 million in cash—less a credit of approximately $8.4 million that is currently deposited in the lockbox structure—in full satisfaction of the claims between the parties. Each Swap Party will receive an allowed claim against the City purportedly secured by valid and enforceable liens on the same collateral pledged by the City under the Collateral

Agreement and/or Ordinance No. 05-09 of the City that has been challenged by a number of parties and questioned by the Court.

Although the Settlement Agreement with the Swap Parties purports to keep the swaps intact and leave the Swap Parties' rights under the swaps contracts unaltered, the term sheet indicates that the terms of the new agreement are not at all the same as the old swap contract terms. Whereas the Forbearance Agreement preserved the rights of the Swap Parties to exercise their rights with respect to the collateral and on termination, under the Settlement Agreement: "the termination or invalidation of any swap will not modify (a) the obligations of the Swap Counterparties pursuant to the Agreement to forbear and support the City's access to the casino revenues or (b) the amounts or timing of the City's payment obligations under the Collateral Agreement in accordance with the Agreement." New Settlement Motion at 19. The City is apparently not seeking to assume or preserve the underlying transaction documents or implement obligations thereunder in accordance with their terms as it did in the Assumption Motion.

The settlement also contains an entirely new plan support agreement by the Swap Counterparties to vote their claims in favor of a plan of adjustment. The City's motive for entering into the Plan Support Agreement is not the least bit disguised: "The existence of a significant impaired accepting class will, provided the City can satisfy the cramdown and other applicable confirmation standards, allow the City to confirm a plan of adjustment over a dissenting class vote. This ability will assist the City's efforts to adjust its debts and reach resolution with other creditors, which the City views as a material benefit." (New Settlement Motion No. 2806 ¶6) It is unclear from the motion or the annexed term sheet what consideration the Swap Parties received for the agreement.

The City treats the claim as both directly secured in assets of the City and impaired based on its assessment of the payment as a reduction of 70% on an estimated $288 million liability.

However, the claim afforded the Swap Parties has all the features of a new claim, scheduled to be paid in accordance with its terms over a period of time. The claim is not being calculated based upon the formula in the swap contracts, the payment schedule is not based upon a termination event, and the Swap Counterparties' enforcement rights will be governed by the Settlement Agreement, not the swap contracts.[3] Because the Settlement Agreement creates a new claim that will be paid according to its terms, it is not impaired within the meaning of section 1124[4]. Impairment in this case is no more than a label. The claim, then, is artificially impaired for voting purposes.

Although the validity of claim, its classification, priority and treatment are issues that may arise in connection with confirmation of the City's plan, the proposed order approving the Settlement Agreement is designed to foreclose any later confirmation challenge regarding impairment or the lawful grant of a security interest in the pledged casino revenues. *See e.g.* Proposed Order ¶¶ 1,3,6,10, 21, and 22. It is, therefore, timely to address the issues relating to the secured nature of the claim and the Plan Support Agreement in connection with approval of the Settlement Agreement.

---

[3] The substitution the parties' original rights and obligations by new contractual obligations is, in effect, a novation. Michigan law requires the following four elements to establish novation, each of which is present here: (1) parties capable of contracting; (2) a valid prior obligation to be displaced; (3) the consent of all parties to the substitution based upon sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one. *Leila Hosp. & Health Center v. Xonics Medical Systems, Inc.*, 948 F.2d 271 (6th Cir. 1991); *National Premium Budget Plan Corp v Siegel Agency, Inc.*, 43 Mich. App. 29, 35; 204 NW 2d 30 (1972), *Harrington-Wiard Co. v Blomstrom Manufacturing Co.*, 166 Mich. 276, 286-288; 131 NW 559 (1911).

[4] Pursuant to Section 1124(a)(1) a claim is not impaired if a plan that "leaves unaltered the legal, equitable and contractual rights to which such claim or interest entitles the holder." 11 U.S.C. §1124(a)(1).

# ARGUMENT

A.   **The Swap Counterparties' Claim Should Not Be Allowed As A Secured Claim**

The Swap Counterparties should not be granted an allowed secured claim against the City for two reasons. First, the obligations to the Swap Counterparties may be void as a matter of law. The Court has heard the arguments that the swap contracts (and related documents) were not issued in compliance with Michigan Act 34 and should be treated as void *ab initio. See e.g.* Ambac Objection (Docket No. 2354). Similarly, the pledge of casino revenue to secure the swap contracts may be void *ab initio* as a violation of the Michigan Gaming Act or cut off by operation of Bankruptcy Code provisions as argued by the objecting parties. The Committee incorporates those arguments by reference herein and will not burden the Court by repeating them in full again.

Assuming, however, that the pledge and Collateral Agreement dated as of June 15, 2009 could survive the challenges under the Bankruptcy Code and Michigan law and sets forth the City's obligations to the Service Corporations and the Swap Counterparties, the Collateral Agreement does not include a direct pledge of City property to the Swap Counterparties. Under the Collateral Agreement, a copy of which is annexed to the Neville Declaration as Exhibit B, the City pledge of security is made directly to the Service Corporations. The agreement defines the City's obligations "City Hedge Payable Related Obligations" as "the City's obligation, whether now existing or hereafter arising, to pay to each Service Corporation under the respective Service Contract the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable." (Collateral Agreement, Section 1.2). The obligations under the agreement are characterized as purely contractual obligations: "The City Hedge Payables Related Obligations and all obligations of the City under this Agreement are contractual obligations, enforceable in the same manner as any other contract of the City and are not general

10
13-53846-tjt    Doc 3032    Filed 03/17/14    Entered 03/17/14 15:01:26    Page 10 of 17

obligations of the City to which the City has pledged its full faith and credit or ad valorem taxing power." (Collateral Agreement, Section 3.3(a)). The pledge of City property under both the ordinance and the Collateral Agreement is made to the Service Corporations:

> (a) The City Pledge as set forth in the Authorizing Ordinance, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.
>
> (b) The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations (the City Pledge).
> (Collateral Agreement, Section 4.1)

The only other grant of a security interest under the Collateral Agreement runs from the Service Corporation to the Swap Counterparties: "Each Service Corporation grants a security interest to the Counterparties in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge (the Service Corporation Property), in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge and all other amounts owing to the Counterparties under this Agreement (the Service Corporation Security Interest)". (Collateral Agreement, Section 4.2).

Based upon the above, the Swap Counterparties would not have had a direct lien on the casino revenues under the Collateral Agreement. Accordingly, the Settlement Agreement elevates the claim of the Swap Counterparties, if any, to secured creditor status with a direct pledge to the Swap Counterparties without any legal justification and therefore, should not be approved to that extent.

B.  **The Court Should Not Approve The Pledge Of The Casino Revenue**

As described above, in the January 16, 2014 Bench Ruling, the Court concluded that the challenges to the pledge under the Michigan Gaming Act and the Bankruptcy Code would likely

11
13-53846-tjt    Doc 3032    Filed 03/17/14    Entered 03/17/14 15:01:26    Page 11 of 17

be successful. Those arguments are set forth in the Ambac objection and others referred to above and are incorporated by reference herein. The Settlement Agreement proposes to secure the City's obligation with the same collateral. However, the Settlement Agreement cannot be approved by its terms because the Court is being asked to bless a grant of a security interest in apparent violation of Michigan law.

C. **The Claim Is Artificially Impaired and its Classification Should Not Be Approved**

As stated above, the claim created by the Settlement Agreement is a new claim, which will be afforded treatment by its terms under the Plan. The claim is unimpaired under the literal reading of section 1124 of the Bankruptcy Code. The City labels the claim impaired to create a right to vote, ensure an accepting class, and thereby, meet the requirement of section 1129 (10). Merely labeling the claim impaired under these circumstances constitutes artificial impairment.

There are at least two views in various circuits on whether artificial impairment of claims are improper. The more widely held view rejects the proposition that an artificially impaired class can meet the requirement of section 1129(a)(10). Other courts view section 1124 literally and turn to the good faith requirement in section 1129(a)(3) to determine whether a vote will meet the confirmation requirements. In either case, the agreement here fails to meet the standards of sections 1129(a)(3) and (a)(10), both of which are applicable in chapter 9 cases by virtue of 11 U.S.C.§901.

In *Windsor on the River Assoc. v Balcor Real Estate Fin. (In re Windsor on the River Assoc.)* 7 F.3d 127 (8th Cir. 1993) the Eighth Circuit took a strong position against confirmation of a plan secured by manufactured or artificial impairment of claims to satisfy the section 1129(a)(10) requirement that the plan be accepted by at least one impaired class:

> Finally, such an outcome [confirmation by means of an artificially impaired class] would directly undermine one of the primary functions of bankruptcy law: to discourage "side dealing" between the shareholders of a

> corporation and some creditors to the detriment of other creditors. See Posner, Economic Analysis of Law 375. A similarly situated debtor, with the knowledge that impairment under section 1129(a)(10) might be manufactured, would be encouraged to make arrangements with small, unsecured creditors, and to seek their approval when a plan is filed that leaves their interests only marginally affected. It is exactly such "side dealing" that prompted the adoption of a bankruptcy code, and to allow it would defeat "'the purposes Congress sought to serve.'" Norfolk Redevelopment, 464 U.S. at 36, quoting Chapman, 441 U.S. at 608. Accordingly, we hold that, for purposes of 11 U.S.C. § 1129(a)(10), a claim is not impaired if the alteration of rights in question arises solely from the debtor's exercise of discretion.

*Id.* at 132. see also *In re Combustion Engineering, Inc.*, 391 F.3d 190, 2343-44 (3rd Cir. 2004); *Fannie Mae v. Village Green I, GP*, 483 B.R. 807 (W.D.Tenn 2012) (confirmation order reversed and case remanded to determine whether impairment of two unsecured claims satisfied requirements of sections 1129(a)(10) and (a)(3); *In re Crosscreek Apts.*, 213 B.R. 521, 535 (Bankr. E.D. Tenn 1997) ("[T]he majority of courts do not permit the satisfaction of section 1129(a)(10) through impairment of a class that was tactically motivated and not substantively necessary.) (citation omitted); *In re Demming Hospitality, LLC,* No. 11-12-13377(TA), 2013 Bankr. Lexis 1428. *18-19( Bankr. D.N.M Apr.5 2013)(same). The City's purely tactical motivation with respect to the claim treatment in the Settlement Agreement is not at all disguised. This agreement appears to be an example of the side-dealing about which the Eighth Circuit was most concerned.

Courts in other Circuits have also held that a debtor's motive and methods for meeting the requirement of section 1129 (a)(10) should be scrutinized under the rubric of section 1129(a)(3), which requires the debtor to establish that the plan has been proposed in good faith and not by any means prohibited by law. *See e.g. Western Real Estate Equities, LLC v. Vill. At Camp Bowie I, L.P. ( In re Village at Camp Bowie I, L.P.)*, 710 F.3d 239, 247 (5th Cir. 2013). Although the City would like an order of the Court blessing all of its actions contemplated by the Settlement

Agreement, the agreement with the Swap Counterparties appears tainted. The City plans to use an $85 million claim to cram down on any of its $18 billion of debt that rejects the plan. For no apparent reason that is tied to any legitimate interest of the Swap Counterparties, they have agreed to be used as the tool for this threat.

D.  **The Plan Support Agreement Should Not Be Approved**

The latest effort to garner approval of a settlement with the Swap Counterparties adds for the first time an agreement, called the Plan Support Agreement, for the Swap Counterparties to serve as the threat against the majority of the City's creditors by casting its vote for the Plan in order to allow the City to cram down its other creditors.

There is no authority under the Bankruptcy Code for plan support agreements and hence no Code guidelines to test the bona fides of such an agreement. Plan support/lockup agreements are typically tool in out-of-court workouts and so-called "prenegotiated" or "prearranged" Chapter 11 cases. They memorialize the material terms of a restructuring proposal (often simply a term sheet) that has been agreed upon between a debtor and most of its major stakeholder classes and provides that the debtor and the other signatories will support the implementation of the restructuring proposal so that it can be quickly implemented through a chapter 11 pre negotiated plan. Post-petition plan support agreements have been approved in situations where (a) a negotiated resolution is supported by a majority of creditors, and (b) enhanced recoveries for the debtor's creditors. See e.g. *In re Residential Capital, LLC*, 2013 Bankr. LEXIS 2601, *70 (Bankr.S.D.N.Y June 27, 2013). The Plan Support Agreement does not involve a substantial majority or even a substantial legitimate creditor of the City.

Agreements that attempt to confer unfair advantage or are used to gain leverage over other creditors, like the one in the Settlement Agreement, have not been approved. In *In re Innkeepers USA Trust*, 442 B.R. 227 (Bankr. S.D.N.Y. 2010) the court declined to approve a

14
13-53846-tjt    Doc 3032    Filed 03/17/14    Entered 03/17/14 15:01:26    Page 14 of 17

post petition plan support agreement with a single creditor on the grounds that the debtor failed to meet the business judgment test. The court found there was a lack of transparency in the process, the agreement was premature, and the economic benefit conferred upon the debtor was outweighed by the amount of power the agreement conferred upon the creditor. The court pointed out that the plan support agreement, like the agreement here, locked up only a small percentage of the outstanding debt--$200 million out of a total $1.4 billion--"only one creditor among the critical mass of creditors needed to support a successful restructuring…." *Id.* at 236.

The Committee has not been able to find any case that attempts, as this agreement does, to lock up a vote so that the debtor can cram down on all its remaining creditors. In fact, in a case where votes were induced by economic advantage to the disadvantage of the majority of creditors, the court designated the votes pursuant to section 1126(e). *See e.g. In re Quigley Company, Inc*. 437 B.R. 102, 129-132 Bankr. S.D.N.Y. 2010). In that case, Pfizer, the sole shareholder of Quigley, sought to use the chapter 11 case to take advantage of the channeling injunction and limit its own liability at the same time. In order to ensure acceptance, Pfizer entered into settlement agreements with numerous asbestos defense law firms on behalf of their clients. These settlement agreements called for an initial payment followed by a second, which would only be made upon confirmation of a plan meeting certain criteria. The settlement agreements and plan also created nominal stub claims for the settling claimants to ensure that they would vote in favor of the plan. Several parties in interest objected on various grounds. Based on these facts, the Court found, among other things that the plan was not proposed in good faith under section 1129(a)(3) because it created an artificially impaired class to ensure confirmation. Furthermore, the court designated the claims finding that they were not procured in good faith. In relevant parts, the Court noted:

13-53846-tjt    Doc 3032    Filed 03/17/14    Entered 03/17/14 15:01:26    Page 15 of 17

The cases have generally recognized two types of bad faith: (1) where a claimholder attempts to extort a personal advantage not available to other creditors, or (2) where the claimholder has an "ulterior motive." *DBSD*, 421 B.R. at 138; *Dune Deck Owners Corp.*, 175 B.R. at 844. While the decisions have typically focused on the voting creditor's motive, the statute is broader: it provides a basis to designate, without regard to the creditor's motive, where the vote is "solicited or procured" in bad faith. In this sense, the test substantially overlaps with the type of bad faith vote manipulation presented in this case.

More significantly, Pfizer's argument ignores the "procuring" language in § 1126(e). "Procurement" refers to "[t]he act of getting or obtaining something or of bringing something about." BLACK'S LAW DICTIONARY 1327 (9th ed. 2009); accord *In re V & M Mgmt., Inc.*, 215 B.R. 895, 903 (Bankr. D. Mass. 1997) (relying on similar definition in earlier edition of Black's Law Dictionary to interpret "procured" as used in 11 U.S.C. §1144); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1809 (1981) (defining "procure," inter alia to mean "to get possession of," "to cause to happen or be done: bring about," and "to prevail upon to do something indicated."). While an improper motive often results from an improper procurement, it is not necessary to classify the Settling Claimants' voting motive as wrongful; it is sufficient to conclude that rather than leave it to chance, Pfizer bought their votes for the purpose of obtaining the benefit of the channeling injunction. See *In re Wiston XXIV, Ltd. P'ship*, 153 B.R. 322, 326 (Bankr. D. Kan.1993) (finding bad faith procurement and solicitation by mortgagee who, opposing the plan and seeking to foreclose, offered consideration to another creditor that was dependent on rejection of the plan); *In re Featherworks Corp.,* 25 B.R. 634, 641 (Bankr. E.D.N.Y.1982) (accepting vote by creditor who was paid $25,000 by plan funder to induce creditor to change its original rejecting vote was not "solicited, procured, or given in good faith" and "will not be allowed"), aff'd, 36 B.R. 460 (E.D.N.Y. 1984).

The facts underlying the Plan Support Agreement are not yet fully developed. However, it appears that the City rejected the opportunity to avoid the swap contracts (although it has taken on that battle with COPs) in order to procure the Swap Counterparties' votes as a coercive measure against all of its other creditors. Under the circumstances, the Court should not agree to the proposed order approving the Settlement Agreement to the extent it does not preserve the right to designate the Swap Counterparties votes.

## CONCLUSION

For the reasons stated above, the Committee respectfully request that Court deny the relief requested by the City for a third time.

Dated: March 17, 2014

        DENTONS US LLP

        By:  */s/ Carole Neville*
        Carole Neville
        Claude D. Montgomery
        1221 Avenue of the Americas
        New York New York 10020
        Tel: (212) 768-6700
        Fax: (212) 768-6800
        carole.neville@dentons.com

        and

        Sam J. Alberts
        DENTONS US LLP
        1301 K Street, NW
        Suite 600, East Tower
        Washington, DC 20005-3364
        Tel: (202) 408-6400
        Fax: (202) 408-6399
        sam.alberts@dentons.com

        and

        Matthew E. Wilkins
        Paula A. Hall
        BROOKS WILKINS SHARKEY & TURCO
        401 South Old Woodward, Suite 400
        Birmingham, Michigan 48009
        Direct: (248) 971-1800
        Fax: (248) 971-1801
        wilkins@bwst-law.com
        hall@bwst-law.com

        *Attorneys for the Committee*