# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## OBJECTION OF CERTAIN COPS HOLDERS TO
## DEBTOR'S MOTION TO APPROVE SETTLEMENT AND
## PLAN SUPPORT AGREEMENT WITH SWAP COUNTERPARTIES

The creditors and parties in interest identified in footnote 1[1] ("**Objectors**") submit this objection (the "**Objection**") to the Debtor's Motion for Entry of an Order, Pursuant to Section 105(A) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief [Dkt. No. 2802] (the "**Motion**").[2] The settlement proposed in the Motion will be referred to herein as the "Proposed Settlement."

The Objectors do not question the validity of the swap agreements (collectively, the "**Swap**"), nor do the Objectors question the validity of the Collateral Agreement (the "**Collateral Agreement**") pledging casino revenues ("Casino Revenues") entered into in 2009. Rather, the Objectors are objecting to the Motion solely because neither UBS AG nor Merrill Lynch Capital Services, Inc. (by assignment from SBS Financial Products Company LLC ) (together, the "**Swap Counterparties**") has a secured claim against the City of Detroit ("**City**"). To the extent that the Proposed Settlement purports to "settle" a secured claim, there is simply no secured claim to settle. Each of the Swap Counterparties is merely an unsecured creditor of the

---

[1] The creditors and parties in interest submitting this objection are: Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., FMS Wertmanagement AöR, and Dexia Crédit Local and Dexia Holdings, Inc.

[2] Capitalized terms used in this Objection but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

City and each of their unsecured claims should be considered along with any other unsecured claim in any plan of adjustment in this Case.

Consistent with the law applicable to the approval of settlements generally, and with this Court's prior ruling on January 16, 2014 (the "**Prior Ruling**")[3] on the Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief [Dkt. No. 17] (together with a supplement filed on December 27, 2013 [Dkt. No. 2341], the "**Prior Settlement Motion**"), the current Motion should be denied on three principal grounds:

- The Proposed Settlement is outside the lowest range of reasonableness and is not in the best interest of creditors because, as with the Prior Settlement, the City is certain to succeed in litigation to invalidate the security interest under the Collateral Agreement for the City's obligations relating to the Swap under Sections 552 and 928 of the Bankruptcy Code.

- The Proposed Settlement, which by its terms is integrally related with the confirmation of the City's proposed Plan of Adjustment (the "**Plan**"), should be approved, if at all, only as part of the Plan process as are other settlements already embedded in the pending Plan, such as those with the State of Michigan, the Detroit Institute of Art, and holders of COPs, GRS, and PFRS Claims.

- If the Proposed Settlement were considered as part of the Plan, it would impermissibly violate the unfair discrimination, best interests of creditors and the third-party release on discharge limitations applicable to the confirmation of the Plan.

In support of their objection, Objectors state as follows:

## BACKGROUND

*Transaction Background*

1.      The facts here are all too familiar to the Court and are stated again for ease of reference by the City in its Motion in paragraphs 15-35 thereof.  In brief terms, in 2005 and 2006,

---

[3] A copy of the transcript of the Prior Ruling is attached hereto as <u>Exhibit A</u>.

the Service Corporations entered into the Swap with the Swap Counterparties to hedge against fluctuation of interest rates on those certificates of participation ("**COPs**") issued in 2005 and 2006 that bear interest at a variable rate. The City was obligated under its service contracts (the "Service Contracts") with the Service Corporations to fund the payments to the Swap Counterparties (the "**Hedge Payables**"). By early 2009, the Service Corporations were in default under the Swap and entered into negotiations with the Swap Counterparties to avoid a declaration of a default under the Swap.

2.      On June 26, 2009, the City, the Service Corporations, and Swap Counterparties entered into a Collateral Agreement, wherein the City pledged certain revenues and other assets, primarily taxes on the gross receipts of certain casinos located in the City (together, the "**Casino Revenues**") as collateral to the Service Corporations for the payment by the City of the Hedge Payables, who in turn assigned such pledge to the Swap Counterparties as collateral for the obligations of the Service Corporations under the Swap.

3.      The City Council of the City authorized the City's entry into the Collateral Agreement by passing Ordinance 05-09 on May 26, 2009 (the "**Ordinance**"), adding Article 16 to Chapter 18 of the City Code, "for the purpose of implementing the transactions contemplated by the [T]erm [S]heet [for the Collateral Agreement]." City Code § 18-16-4(n). The Ordinance went on to state that "all obligations of the city under this ordinance and the definitive documents are contractual obligations." *Id*. at § 18-16-12.

4.      The Ordinance did not create a new lien upon all transactions involving the casinos or other city revenue sources. Rather, by its terms, it merely authorized the City to enter into the Collateral Agreement and pledge existing revenues to the Service Corporations for further assignment to the Swap Counterparties under the terms of the Collateral Agreement.

*Motion Background*

5.     This Proposed Settlement does not come before the Court without history. The Court's Prior Ruling rejected the City's prior attempt to settle potential litigation with the Swap Counterparties, by having the City exercise an "optional termination right" given to the Swap Counterparties in the Swap by paying the Swap Counterparties $165 million plus so-called breakage costs of $4.2 million.  Bench Op., Jan. 16, 2014 Hrg. Tr. 8:5-8.  This Court rejected the Prior Settlement by applying the undisputed standards for approving settlements and concluding, among other things, that the City had a "reasonable" likelihood of success in cutting off the lien of the Swap Counterparties on future Casino Revenues under Sections 552(a) and 928 of the Bankruptcy Code, and observing that litigation on this issue could have been resolved by summary judgment at "relatively insignificant cost", with few issues of collectability.  *Id*. at 6:5 - 20:8.

6.     In light of nearly unanimous creditor opposition, the Court held that the best interest of creditors was against replacing clearly avoidable "old obligations under the swap agreements and the collateral agreement, which the City concedes as to which (sic) it has litigable claims against the enforcement of them, with new obligations that would be fully protected both by security interests and by court approval." *Id*. at 20:12-16.

7.     The City is back with a retooled settlement that fails for the same reasons. The Proposed Settlement purports to concede a secured claim to the Swap Counterparties and to pay them $85,000,000 in cash with respect to such claim and, if the City can get exit financing by the effective date of the Plan, in a matter of months.  Yet, every other unsecured creditor will receive nominally 20 cents on the dollar under the Plan as proposed (in fact, likely much less in net present value), and solely based upon a 30-year note that pays no interest for five years and whose repayment is totally speculative. Invalidating the secured claim of the Swap Counterparties, on the other hand, would free up Casino Revenues without the payment of this ransom.

8.      Moreover, elements of the Proposed Settlement are worse than the Prior Settlement for the City.   The Proposed Settlement does not terminate the Swap, but allows the Swap Counterparties to retain their alleged security interest and continue to receive payments of $4.2 million a month in addition to the $8.4 million already paid.   It allows the Swap Counterparties to charge what amounts to a penalty rate of interest if the balance of the $85 million settlement payment is not paid on the effective date of the Plan.   Instead of recovering money for creditors, the City is buying the votes of the Swap Counterparties by giving them unfairly favorable treatment.   Under the Proposed Settlement, the Swap Counterparties stand to receive a major cash payment instead of deeply subordinated notes.   The Proposed Settlement also purports to grant the Swap Counterparties releases and third-party releases of claims that they could not receive under a plan.

## ARGUMENT

### I.      THE PROPOSED SETTLEMENT FAILS UNDER THE STANDARDS APPLIED BY THE COURT TO REJECT THE PRIOR SETTLEMENT.

9.      This Court's Prior Ruling aptly states the standards for approving or rejecting the Proposed Settlement.   Although the City is entitled to use its "business judgment" in reaching a settlement, the Court must consider four additional factors in determining whether to approve the Proposed Settlement:

> First is the likelihood of the success of any potential litigation that might result if the settlement is denied. The second is the complexity, expense, and delay of such litigation. The third is any collection issues that appear, and the fourth involves the interests of the city's creditors and its residents.

Bench Op., Jan. 16, 2014 Hrg. Tr. 6:8-13.   The Court should apply a similar analysis to this

Proposed Settlement since, in the Court's own words:

> the Sixth Circuit's decision in *In re MQV[P], Inc.*, 477 Federal
> Appendix 310, 313 (6th Cir. 2012), is cited, quoted, "When
> determining whether to approve a proposed settlement, the
> bankruptcy court may not rubber stamp the agreement or merely
> rely on the trustee's word that the settlement is reasonable.
> *Reynolds v. Commissioner of Internal Revenue*, 861 F.2d 469, 473
> (6th Cir. 1988). Rather, the bankruptcy court is charged with an
> affirmative obligation to apprise itself of the underlying facts and
> to make an independent judgment as to whether the compromise is
> fair and equitable," In *In re Rankin*, 438 Federal Appendix 420,
> 426, (6th Cir. 2011), the Court quoted at some length from the
> Supreme Court's decision in *Protective Committee for Independent
> Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414
> (1968). "There can be no informed and independent judgment as to
> whether a proposed compromise is fair and equitable until the
> bankruptcy judge has appraised -- apprised himself of all of the
> facts necessary for an intelligent and objective opinion of the
> probabilities of ultimate success should the claim be litigated.
> Further, the judge should form an educated estimate of the
> complexity, expense, and likely duration of such litigation, the
> possible difficulties of collecting on any judgment which might be
> obtained, and all other factors relevant to a full and fair assessment
> of the wisdom of the proposed compromise. Basic to this process
> in every instance, of course, is the need to compare the terms of the
> compromise with the likely rewards of litigation.

*Id*. at 6:19-7:22.

10. Moreover, since the Proposed Settlement affects the rights and claims of third

parties, the Court must consider those legal rights and the fairness of the decree to those affected.

*See Williams v. Vukovich*, 720 F.2d 909, 921 (6th Cir. 1983)). This is particularly true since the

Proposed Settlement is coming on the eve of the Plan confirmation process and patently implicates

many of the protections of creditors in the type of cram down confirmation that the Plan-support

aspect of the Proposed Settlement aims to facilitate. Since the interest of creditors is paramount,

the reasonable views of creditors are also entitled to deference. *In re Fodale*, 2013 WL 663729 at

* 6, No. 10-69502 (Bankr. E.D. Mich. Feb. 21, 2013). Since the Court's Prior Ruling on the last

three factors of (i) complexity, expense, and delay of such litigation, (ii) collection issues, and (iii)

the interests of the city's creditors and its residents are clearly identical in application to the present circumstances, Objectors will focus on the first factor of likelihood of success of litigation.

**A.** **The Prepetition Liens of the Swap Counterparties Do Not Extend to the City's Post-Petition Casino Revenues.**

11.　As previously argued before this Court, the City and the Swap Counterparties have again completely failed to address the fact that the City's post-petition receipts received from Casino Revenues are simply not subject to the liens created by the Collateral Agreement by operation of Section 552 of the Bankruptcy Code.　Section 552(a) of the Bankruptcy Code provides in relevant part that "property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."　11 U.S.C. §§ 552(a); 901(a) (making Section 552 applicable to chapter 9 proceedings).

**1.** **The Swap Counterparties' Liens are not Statutory Liens.**

12.　Section 552(a) applies only to liens arising out of any "security agreements," and not to other liens such as statutory liens. *Alliance Capital Mgmt. L.P. v. County of Orange (In re County of Orange)*, 189 B.R. 499, 502 (C.D. Cal. 1995).　The City argues that the Ordinance created a statutory lien that exempts the Collateral Agreement from Section 552 of the Bankruptcy Code.　(Motion, ¶¶ 38, 39.)　However, such an interpretation of the Collateral Agreement and the Ordinance is contrary to the plain language of the Bankruptcy Code, its legislative history, and case law.

13.　The Bankruptcy Code defines statutory liens as "a lien arising solely by force of a statute on specified circumstances or conditions, … but does not include [a] security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute."　11 U.S.C. § 101(53).　The

automatic attaching or creation of a lien pursuant to a statute, without more, therefore, is critical to the definition of a statutory lien — a lien "dependent upon an agreement" between parties or consent between two parties is a security interest subject to Section 552, "even though there is a statute which may govern many aspects of the lien." *See County of Orange*, 189 B.R. at 502 (quoting 2 COLLIER ON BANKRUPTCY (16th Ed.), ¶ 101.53, at 101-150.51); ("a statutory lien is only one that arises automatically, and is not based on an agreement to give a lien," citing S. REP. NO. 95-989 (1978).

14.     The Collateral Agreement — even though approved by the Ordinance — is nothing more than a consensual, prepetition security agreement between the City (as authorized by the City Council) and the Swap Counterparties (as assignees of the Service Corporations) to grant the Swap Counterparties a lien in certain of its prepetition revenues.  The Ordinance can in no way rise to the level of a statutory lien.  In fact, the Ordinance states that "all obligations of the city under this ordinance and the definitive documents are contractual obligations."  City Code § 18-16-12.

**2.     The Casino Revenues Are Not Special Revenues Under Section 928.**

15.     Nor is any lien on the Casino Revenues excepted from the general rule of Section 552(a) as a lien on "special revenues acquired by the debtor after the commencement of the case …." 11 U.S.C. § 928(a).    Although a lien attaches to post-petition "special revenues" notwithstanding Section 552(a), the City has acknowledged that the Casino Revenues could qualify as "special revenues," if at all, only under Section 902(2)(B), as "special excise taxes imposed on particular activities or transactions,"  Bench Op., Jan. 16, 2014 Hrg. Tr. 12:10 – 13:6. This section does not apply to the Casino Revenues, which at most are a general excise tax, which Section 928 does not protect.

16.    The phrase "special excise taxes" is not defined in the Bankruptcy Code.[4]    The legislative history of the 1988 Amendment to the Bankruptcy Code ("**1988 Amendment**")[5] illustrates the difference between an excise tax and a <u>special</u> excise tax.    The limiting word "special" was added before "excise tax" in Section 902(2)(B) to express Congress' intention to apply Section 928(a) only to special revenues <u>that secure payment of special revenue bonds</u>.    *See* H.R. REP. NO. 100-1011 at 4 (1988).    Congress thus limited the application of Section 928(a) to its intended purpose of protecting project financing that encumbers excise tax revenue derived from the project itself.    "According to Congress, the 'intent is to define special revenues to include the revenues derived from a project or from a specific tax levy where such revenues are meant to serve as security to the bondholders.'"    *In re Heffernan Mem. Hosp. Dist.*, 202 B.R. 147, 148-49 (Bankr. S.D. Cal. 1996) (citing H.R. REP. NO. 100-1011 at 6-7 (1988)).

17.    Section 928 only protects special revenues pledged to pay these special revenue bonds.    COLLIER ON BANKRUPTCY, ¶ 902.03[1] (16th ed. 2013).    "Special excise taxes" are taxes specifically identified and pledged in the bond financing documents and are not "generally" available to all creditors under state law.    Thus, a general state sales tax would not be a special excise tax.    COLLIER ON BANKRUPTCY, ¶ 902.03[2] (16th ed. 2013) (quoting S. REP. NO. 100-506 (1988)).    The narrowness of the safe harbor derived from the expectations of the bondholders and general creditors of the municipality that when a "municipality approves financing though a revenue bond or program … it has made the assumption that the project or program will generate

---

[4] "Excise tax" is undefined in the Bankruptcy Code, but it has been defined with respect to section 507(a) as: "an indirect tax, one not directly imposed upon persons or property … and is one that is 'imposed on the performance of an act, the engaging in any occupation, or the enjoyment o[f] a privilege.'"    *New Neighborhoods, Inc. v. West Va. Workers' Compensation Fund*, 886 F.2d 714, 719 (4th Cir. 1989) (quoting *In re Tri-Manufacturing & Sales Co.*, 82 B.R. 58, 60 (Bankr. S.D. Ohio 1988)).    The Ordinance only stated that it was an excise tax, which, as noted below, is not the same thing as a "special" excise tax.
[5] The 1988 Amendment added Section 928 and the definition of special revenues in Section 902(2) to the Bankruptcy Code.

adequate revenue to repay the bondholders and operate the project or program without any general financial obligation on the part of the municipality." S. REP. NO. 100-506 at 5 (1988). Congress enacted Sections 902 and 928 to prevent a municipality's general unsecured creditors from seeking payment from the revenue pledged to special revenue bondholders. *Id.* The legislative history of the 1988 Amendment illustrates the limited situations in which special excise taxes are considered special revenues.

> "Hotel-motel taxes, meal taxes, and license fees are included in special excise taxes. They are often imposed for particular purposes. For example, a hotel-motel excise or a meal tax might be imposed in a particular area of a municipality or throughout a city to finance the construction and operation of a convention center. Bonds secured by the special excise tax are issued to finance the construction …. However, where the revenue may be used for other purposes, it should not constitute 'special revenues.'"

Richard B. Levin and Lawrence P. King, "Report of the National Bankruptcy Conference on Proposed Municipal Bankruptcy Amendments," included in the Hearings before the Subcommittee on Courts and Administrative Practice of the Committee on the Judiciary, 100th Cong., 2d Sess. at 553 (S. Hrg. 100-1067, June 10, 1988). Where general revenues are used to finance a variety of municipal activities and are not, for instance, created specifically for any particular purpose or project, they are just that, *general. Id.*

18.     The Casino Revenues cannot meet the restrictive definition of "special excise tax" or the narrow purpose for which the 1988 Amendment was enacted. See COLLIER ON BANKRUPTCY, ¶ 902.03[1] (16th ed. 2013), *County of Orange*, at 192 (stating that Section 928 was narrowly crafted to apply only to special revenue bonds). The definition must be viewed as it relates to the actual purpose behind the 1988 Amendment and Section 928 of the Bankruptcy Code. *Id.* The Casino Revenues are, instead, a prime example of general revenue raised from a general excise tax. The Casino Revenues are generated from the enactment of Michigan's Gaming

Revenue Act MCL § 432.212 (the "**Gaming Act**") and a wagering tax imposed by the City in 1999, seven years prior to the execution of the Swap and ten years prior to the execution of the Collateral Agreement. Section 12(3)(a) of the Gaming Act identifies eight general categories of purposes for which a wagering tax may be used by a city. The Gaming Act does not identify a specific purpose or project for which the proceeds of a wagering tax must be used. Similarly, Section 18-14-3 of the City Code creates the wagering tax levy as "an excise tax upon the adjusted gross receipts of a casino licensee" from which the Casino Revenues are generated. City Code § 18-14-3 (emphasis added). Section 18-14-10, entitled "Use of Proceeds," does not limit the use of the proceeds from this levy on gaming revenue to any specific project, nor to the satisfaction of the City's obligations under the Swap or Collateral Agreement. Instead, it states: "Proceeds from the levy of the wagering tax that is imposed pursuant to section 18-14-3 of this Code shall be used by the city for the purposes authorized by the [Act]." City Code § 18-14-10.

19.     Moreover, neither the Swap nor the Collateral Agreement were executed in connection with the development and construction of the casinos used to generate the Casino Revenues, further distancing the security interest at issue from the intended policy goal of Section 928(a) to encourage bond-financing investment in municipal programs. See 6-928 COLLIER ON BANKRUPTCY, ¶ 928.01 (16th Ed. 2013) (the "effect [of Section 928] is to prevent special revenues that secure an issue of revenue bonds from being diverted to be available from the municipality's general expenses or obligations"); *County of Orange*, 179 B.R. at 191-192 (defining goal of Section 928(a) to remove risk that revenue bondholders would be stripped of their liens on postpetition revenue); *In re Las Vegas Monorail Co.*, 429 B.R. 770, 782 (Bankr. D. Nev. 2010) (acknowledging that Section 928(a) recognizes the difference between industrial or revenue bonds, on the one hand, and general municipal bond financing, on the other hand).

20.     For these reasons, Casino Revenues constitute general excise taxes — as the City Code itself defines them — and general revenues.  They are not "special excise taxes" and, accordingly, not "special revenues" as defined in Section 902(2) of the Bankruptcy Code and are therefore not subject to exception from the operation of Section 552 by Section 928(a) of the Bankruptcy Code.   There can simply be no question about this and thus, there is no possibility that the Swap Counterparties have any secured claim.  The City is, in fact, awarding a secured claim to the Swap Counterparties and unabashedly doing so only to place the Swap Counterparties' claims in a separate, "secured" class, to impair the claim, and to afford itself an accepting impaired class for purposes of an eventual cram down of its Plan.

**B.     Inapplicability of Section 560 of the Bankruptcy Code.**

**1.     Section 560 Does Not Guaranty Full Payment of the Swap Counterparties' Claims, Just the Right To Terminate and Net Promptly After a Bankruptcy Filing.**

21.     Section 560 of the Bankruptcy Code does not protect the Swap Counterparties in this case.[6]  The plain meaning of Section 560 shows that it only applies to termination rights:

> **§ 560 Contractual right to liquidate, terminate, or accelerate a swap agreement**
>
> The *exercise of any contractual right of any swap participant ... to cause the liquidation, termination, or acceleration* of one or more swap agreements because of a condition of a kind specified in section 365 (e)(1) of this title or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by

---

[6] Objectors do not concede that the assignment of the City's pledge of Casino Revenues and third-party beneficiary rights of the Swap Counterparties under the Service Contracts and pledge of the "City Pledge" and "City Hedge Payables Related Obligations" under the Collateral Agreement bring them within the protection of Section 560, because the Service Contracts and Collateral Agreement are not "swap agreements" and the City is not a "swap counterparty" within the meaning of that section.  The interposition of the Service Companies is another reason why Section 560 does not apply to preserve any lien of the Swap Counterparties in the Casino Revenues from the application of Section 552.

> any provision of this title or by order of court or administrative
> agency in any proceeding under this title ....

11 U.S.C. § 560 (emphasis added). By its terms, Section 560 does not protect security interests securing any termination payment from the provisions of Section 552(a). Section 560 is merely a safe harbor that protects the counterparty's right to terminate the swap, notwithstanding Section 365(e)(1)(B), based on an *ipso facto* clause and, thereafter, to net and close out all positions with the debtor notwithstanding Section 362(a). See 11 U.S.C. § 362(b)(17); *In re Lehman Brothers Holdings, Inc., et al*., 2009 WL 6057286 (No. 08–13555 (JMP), Bankr. S.D.N.Y. Sept. 17, 2009) and Transcript of Proceedings dated September 15, 2009 at 106:24-107:8 (filed as Dkt. No. 5261 in *Lehman* and attached hereto as <u>Exhibit B</u>).

22.     Section 560 also does not require that the termination amount[7] be paid in full. It, at best, permits all amounts mutually owing between the counterparty and the debtor to be netted without regard to the automatic stay. The Court suggested in its Prior Ruling the possibility that Section 560 of the Bankruptcy Code would require the termination claim of the Swap Counterparties to be paid in full even if it were unsecured. Bench Op., Jan. 16, 2014 Hrg. Tr. 18:1-3. With respect to the Court, this issue was not briefed. Indeed, the City notes in the Motion that it disagrees with the Court's suggestion. Motion, p.31, ¶55.The Objectors agree with the City on this point.

23.     As noted above, Section 560 deals with termination rights, not the claims that may result from termination or rejection or their characterization for Bankruptcy Code purposes. Nothing in the legislative history indicates that, beyond the ability to terminate and close out

---

[7] The City claims in the Motion that the termination amount would have been approximately $288 million on the petition date (Motion, p. 14, ¶32). The City admits that, under the Swap, it is the City that must, via Hedge Payables under the Service Contracts, make monthly net payments to the Swap Counterparties of approximately $4.2 million per month. (Motion, p.27, ¶49)

positions notwithstanding the automatic stay, Congress granted any special priority to, or protection of a swap counterparty's claim. *See* S. REP. NO. 101-285 (1990). Congress wanted to preserve termination rights, not claims in bankruptcy,

> in order to preserve the functioning of the market and to eliminate any concern that Code provisions could be read to preclude the exercise of contractual rights of prebankruptcy netting or setoff. This is particularly important to swap participants since netting is the normal, intended course of dealing in swap transactions unlike ordinary commercial transactions where setoff is an extraordinary remedy.

S. REP. NO. 101-285, at 3.[8] The claims of the Swap Participants are not guaranteed to be paid in full by Section 560, but are subject to compromise, if and when they are matured and liquidated unsecured claims.

> **2.** **The Automatic Stay Applies to the Swap Counterparties' Exercise of Termination and Netting Against the Collateral.**

24. Because the Swap Counterparties failed to timely terminate the Swap and net against the collateral upon the filing of the City's bankruptcy case, their claims are not liquidated or matured at present. Before termination, the Swap "is just another ordinary executory contract."

---

[8]Although the Objectors' do not press the argument here, as the Court noted in the Prior Ruling, the City also had a reasonable likelihood of prevailing on its theory that the grant of a security interest in Casino Revenues was void under the Michigan Gaming Act, MCL §432.212. Bench Op., Jan. 16, 2014 Hrg. Tr. 9:6-11:16; 18:22-25. However, to the extent that there is any question about whether Section 560 would otherwise bestow a "full payment" requirement on whatever termination payment would otherwise be due to the Swap Counterparties, the Objectors do not disagree with the Court's analysis under the Gaming Act, which would be fatal to the Proposed Settlement. If the Court declared the Swap Counterparties' security interest to be void *ab initio* under the Gaming Act, Section 560 and other safe harbors of the Bankruptcy Code would clearly be inapplicable. As one court aptly put it respecting Section 546 of the Bankruptcy Code:

> *Where a transaction is rendered void by state law, it is a nullity. Thus, the purpose of subsection 546(g) is not implicated. The transaction is void and there is no recognized financial instrument to protect from the uncertainties regarding [its treatment] under the Bankruptcy Code.* Rather, the treatment of the financial instrument is the result of state law voiding the entire transaction. If it is determined that the transaction violated [state] law, the agreement would be a nullity and have no legal effect. As a consequence, the transfer would not have been made under or in connection with a swap agreement and it would not be protected from avoidance under Section 546(g) of the Bankruptcy Code.

*In re Enron Corp.*, 323 B.R. 857, 876, 878 (Bankr. S.D.N.Y. 2005) (emphasis added).

*In re Enron Corp.*, 01 B 16034 (AJG), 2005 WL 3874285 (Bankr. S.D.N.Y. Oct. 5, 2005). Simply put, the Swap Counterparties have no matured right to payment at the present time – just bilateral performance obligations on executory contracts.

25.    The discussion of claims in the Motion is hypothetical unless and until the Swap Counterparties get relief from the stay and terminate the Swap or the City rejects the Swap. The Proposed Settlement does not trigger a matured claim against the City because it does not permit the Swap Counterparties to terminate the Swap or require the rejection thereof by the City. If and when a debtor rejects an executory contract, "[t]he other party then holds a general unsecured claim for rejection damages against the debtor." *In re O.P.M. Leasing Services*, 56 B.R. 678, 682-83 (Bankr. S.D.N.Y. 1986). That claim is calculated by netting the parties' offsetting claims. *In re Enron Corp.*, 349 B.R. at 106 (noting that to do otherwise would entitle the non-debtor counterparty to receive more than what it bargained for). See also *Lehman Brothers, supra* and Tr. of Proceedings, Exhibit B, at 111:23 – 112:2. As with any other executory contract, only rejection of a swap agreement is treated as a breach immediately prior to the petition date. *In re Enron Corp.*, 349 B.R. 96, 106 (Bankr. S.D.N.Y. 2006). The City has not elected to terminate the Swap. The automatic stay precludes the Swap Counterparties from doing so at this late date.

26.    In *Lehman Brothers*, the swap counterparty ceased performing and, after one year following the filing of the bankruptcy, the debtor sued to compel performance and to enforce the automatic stay. The Court ordered the counterparty to perform the swap agreements because nonperformance was "simply unacceptable and contrary to the spirit of these provisions of the Bankruptcy Code." *Lehman Brothers* at 110:23-25.

> Moreover, legislative history evidences Congress's intent to allow for the prompt closing out or liquidation of open accounts upon the commencement of a bankruptcy case. Citation is to the Congressional history of this, H.R. Rep. 97-420 at 1 (1982), as well as its stated rationale that the immediate termination for default and the netting provisions are critical aspects of swap transactions and are necessary for the protection of all parties in light of the potential for rapid changes in the financial markets. Citation to the Senate Report number 101-285 at 1 (1990).
>
> The safe harbor provisions specifically permit termination solely, quote, "because of a condition of the kind specified in Section 365(e)(1) that is the insolvency or financial condition of the debtor and the commencement of a bankruptcy case. See also *In re Enron Corp.*, 2005. WL 3874285, at *4, Judge Gonzalez's case, 2005. Noting that a counterparty's action under the safe harbor provisions must be made fairly contemporaneously with the bankruptcy filing, less the contract be rendered just another ordinary executory contract.
>
> The Court finds that Metavante's window to act promptly under the safe harbor provisions has passed, and while it may not have had the obligation to terminate immediately upon the filing of LBHI or LBSF, its failure to do so, at this juncture, constitutes a waiver of that right at this point.

*Lehman Brothers* at 111:3- 112:2.  Good reasons exist for this judicial requirement that Section 560 only applies to protect termination and netting rights that are exercised promptly after a bankruptcy case is filed.  Otherwise, swap counterparties otherwise could game the system by waiting until market movements improved some or all of their positions before pulling the trigger on termination.  Once the swap counterparty delays exercising its right to close out its swap, then it knowingly undertakes the risk of the bankruptcy stay.  Under those circumstances, the policy of giving the debtor the protection of the stay and the right to assume or reject the executory swap agreement should take precedence.

27.     Here, the Swap Counterparties did not terminate the Swap pre-petition or in the nine months since the City filed bankruptcy.  Nor are they terminating the Swap under the Proposed Settlement.  Just like the swap counterparty in *Lehman Brothers*, they unquestionably

failed to exercise their contractual right to terminate "promptly" after the commencement of this bankruptcy case. As a result, the Swap Counterparties should be deemed to have waived their rights under Section 560 of the Bankruptcy Code. The automatic stay under Section 362 of the Bankruptcy Code now prevents them from terminating the Swap and netting against the Casino Revenues. Under established law, the Swap Counterparties must continue to perform until the City elects to assume or reject those agreements. *NLRB v. Bildisco & Bildisco*, 465 US 513, 531 (1984). As noted above, an unterminated swap agreement "is just another ordinary executory contract." *In re Enron Corp.*, 01 B 16034 (AJG), 2005 WL 3874285 at *4 (Bankr. S.D.N.Y. October 5, 2005); *In re Enron Corp.*, 349 B.R. at 106 (Bankr. S.D.N.Y. 2006).

28. At best, the Swap Counterparties have unmatured and unliquidated unsecured claims against the Service Corporations and the City. As noted above, the postpetition Casino Revenues do not secure the claims. These claims would arise on exercise of the right to terminate the Swap (if termination and netting against the Casino Revenues is no longer stayed)[9] or upon rejection of the Collateral Agreement, the Service Contracts or even the Swap (if permitted under Section 365 of the Bankruptcy Code). These claims should be treated under the Plan in a class with other unsecured claims. Because the Swap Counterparties' claims can never be more than unsecured claims, the City should not be paying the Swap Counterparties any monthly payments and should be refunded the $8.4 million already paid.

---

[9] To the extent that the Swap Counterparties contend that the Section 560 applies because the Swap is an obligation of the City, then (i) the automatic stay under Section 362 of the Bankruptcy Code would block such termination and netting against the Casino Revenues because that the Swap Counterparties' waived the application of Section 560 by delaying the exercise of their termination rights for nine months since the commencement of this Chapter 9 case and (ii) the City has the right to assume or reject the Swap. See ¶¶ 25-26 above.

II. **THE PROPOSED SETTLEMENT SHOULD NOT BE APPROVED OUTSIDE THE PLAN PROCESS, AND WOULD NOT BE APPROVED AS PART OF THAT PROCESS**.

    A.    **The Proposed Settlement with the Swap Counterparties Should Be Embedded in the Plan Along with the Many Other Settlements Contained Therein.**

29.    The Proposed Settlement is inextricably linked to the Plan process, which is well underway to a prompt resolution. This Court's Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment, dated March 6, 2014 (the "**Scheduling Order**"), has placed the Plan process on an expedited track to confirmation hearings in mid-July.

30.    The Proposed Settlement should be incorporated into the Plan, not handled separately on the eve of the Plan. The Proposed Settlement implicates many Plan processes because it involves plan support, depends on "exit" financing at plan confirmation to pay the bulk of the settlement payment due, compromises on the amount of the claim and requires a release of the City's claims at or after the effective date of the Plan and piggy backs on exculpation based on similar protections that may be granted to creditors under the Plan. Motion at pp. 17 - 20.

31.    The City's Plan in fact is packed with similar settlements. For example, there is a proposed settlement with the State of Michigan, certain funding foundations and the Detroit Institute of Arts to fund pensions. Proposed Disclosure Statement at pp. 4, 98. The failure to close those settlements is a risk factor disclosed in all capital letters. *Id.*, p. 4. The Plan proposes numerous other settlements with numerous classes of creditors, including proposed settlement terms for claims in classes 5, 9, 10 and 11 thereunder. *Id.* at pp. 14-17 and Plan sections cited. Indeed, there was a placeholder in the Plan and Disclosure Statement for this Proposed Settlement.

32.    Other than the payoff required by the Swap Counterparties in order to lock in their "early vote," there is no reason for them to be treated outside of the Plan. As noted above, the

Swap Counterparties are subject to litigation that is likely to eliminate their security and confirm their treatment as general unsecured creditors (to the extent they have any claim at all as result of the rejection of the Swap).

      **B.**      **The Proposed Settlement Should Be Rejected Because It Would "Unfairly Discriminate" In Favor of the Swap Counterparties and Not Be "Fair and Equitable".**

33.      The Proposed Settlement obfuscates the greatly enhanced treatment that the Swap Counterparties will receive. It provides the Swap Counterparties with a total of $85 million in cash from payments that are escrowed every month and a lump sum payment. While the City has not disclosed the current termination payment or buyout payment under the Swap, this is between 30% - 36% of the various "termination" or "buyout" numbers mentioned in the Motion. Motion, ¶ 32. Further, the Swap Counterparties are receiving cash – with cash interest if they are not paid out completely within 180 days of the effective date of the Plan. *Id.*, ¶ 40 ("**Liquidity Event**").

34.      In contrast, Objectors will receive at best a nominal 20 cents on the dollar, which almost certainly overstates the present value of their actual recovery. The consideration offered to the Objectors and other classes of unsecured creditors is not payable in cash, but in the form of a pro rata share of New B Notes, which are subject to grave execution risk relating to the City's post-confirmation financial performance. The notes do not bear interest at all for the first five years after the effective date of the Plan, receive "payment in kind" interest for the next five years and do not begin amortization or cash interest payments until the 11th through the 30th years after Plan confirmation. Plan, Exhibit I.A.160. This is grossly disparate from the cash payment due to Swap Counterparties under the Proposed Settlement. Most other impaired creditors are likely to have similar complaints about the discrimination that unfairly favors the Swap Counterparties.

35.      The Motion admits that the purpose of the Proposed Settlement is to create an impaired accepting class so that the Plan can be crammed down under Section 1129(b) of the

Bankruptcy Code. However, this section requires that the Court conclude that "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. §1129(b). Objectors submit that this differential treatment of the Swap Counterparties would fail this test if it were applied in the plan confirmation context.

36. This Court should not allow the City's subterfuge by approving a settlement that would not be permitted under Section 1129 of the Bankruptcy Code. One Circuit Court has held that the "fair and equitable" standard for approval of a settlement generally prohibits a debtor from violating the absolute priority rule in connection with a pre-plan settlement and that a bankruptcy court abuses its discretion in approving a pre-plan settlement unless the bankruptcy court ensures that the absolute priority rule is not violated. *United States v. AWECO, Inc. (In re AWECO, Inc.)*, 725 F.2d 293, 298 (5th Cir. 1984) (establishing bright-line test). Other courts considering settlements have looked to the requirements of confirmation as a guide. *In re Iridium Operating LLC*, 478 F.3d 452, 463 (2d Cir. 2007) approved a settlement but remanded for a further determination of whether a settlement satisfied the absolute priority rule. The *Iridium* court held that settlements must be "fair and equitable" in a general sense and noted that "whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be a dispositive factor." *Id*. at 464. *In re Warren*, No. 10-1110, 2011 WL 3299819 at p. 5 (9th Cir. B.A.P. March 15, 2011) also recognized the importance of a settlement being fair and equitable to all creditors because the Bankruptcy Code "provides the textual basis for the fundamental principle that creditors of equal priority should receive pro rata shares of the debtor's property." *See also TSIC, Inc*., 393 B.R. 71 (Bankr. D. Del. 2008) and *In re World Health Alternatives, Inc*., 344 B.R.

291 (Bankr. D. Del. 2006) (approving settlements over objections raising violation of absolute priority rule because assets are coming from outside debtors' estates).

37.     The Proposed Settlement does not involve any additional funds coming into the City's estate.  It merely gives the Swap Counterparties a distribution which is in cash and is disproportionately large.  The settlement payments consume scarce cash that should be available to creditors generally.  If the payments were in fact made, the Plan does not provide for a fair distribution to other creditors. Hence, the Proposed Settlement would unfairly discriminate and be unfair and inequitable – – the direct opposite of what is required by Section 1129(b).

**C.     The Proposed Settlement Should Be Rejected Because It Involves Impermissible Third-Party Releases.**

38.     Finally, the Proposed Settlement includes broad and largely undefined provisions for the release by "City Releasors" of, and injunction against claims by "all persons" against, the Swap Counterparties and their affiliates.  Motion at ¶ 40 ("Releases and Bar Order").  This would appear to impact the rights of nondebtor entities; namely the Service Corporations, the Funding Trust, the COPs holders and insurers.

39.     The third-party releases and bar order required by the Proposed Settlement could not be coerced under a Plan.  *In re Dow Corning Corporation*, 280 F.3d 648, 658 (6th Cir. 2002) is the controlling authority in the Sixth Circuit regarding non-consensual third-party releases as part of a plan.  *Dow Corning* requires the satisfaction of all of the following seven factors: (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free of indirect suits against parties who would have indemnity or contribution claims against the

debtor; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the Plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) the Plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) the bankruptcy court made a record of specific factual findings that support its conclusions. *Dow Corning*, 280 F.3d at 658.

40.     It is clear that the proposed settlement could not satisfy factors (1) through (6). "Even if a settlement is fair and equitable to the parties to the settlement, approval is not appropriate if the rights of others who are not parties to the settlement will be unduly prejudiced." *Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.),* 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001) (approving settlement agreement only after it was modified to avoid prejudice to third parties). Ignoring the effect of a settlement on rights of third parties "contravenes a basic notion of fairness." *AWECO*, 725 F.2d at 298 (holding that bankruptcy court abused discretion in approving settlement without considering fairness of settlement agreement to third parties); *In re Sportstuff, Inc.*, 430 B.R. 170, 177 (8th Cir. BAP 2010) (holding proposed settlement that dispossessed vendors which were not parties to the settlement from bringing bad faith claims against insurers was not fair and equitable because it improperly impaired significant rights of third parties without compensation or consent); *Rafool v. The Goldfarb Corp. (In re Fleming Packaging Corp.)*, No. 04-8166, 2007 WL 4556981 (Bankr. C.D. Ill., Dec. 20, 2007) (rejecting settlement agreement that prejudiced third parties). Once again, this Court should not permit the Debtor to proceed by a separate motion and settlement to avoid the limitations of confirmation of a plan.

## CONCLUSION

WHEREFORE, for the reasons set forth above, Objectors respectfully request that the Court deny the Motion and grant such other and further relief as may be just and proper.

Dated: March 17, 2014            Respectfully submitted,

                                 **SCHIFF HARDIN LLP**

                          By:    */s/ J. Mark Fisher*
                                 Rick L. Frimmer
                                 J. Mark Fisher
                                 Michael W. Ott
                                 SCHIFF HARDIN LLP
                                 233 South Wacker Drive
                                 Suite 6600
                                 Chicago, IL 60606
                                 Tel. 312-258-5500
                                 Fax. 312-258-6500
                                 rfrimmer@schiffhardin.com
                                 mfisher@schiffhardin.com
                                 mott@schiffhardin.com

                                 *Attorneys for FMS Wertmanagement AöR*

/s/ Howard S. Sher
Howard S. Sher (P38337)
Email:  howard@jacobweingarten.com
JACOB & WEINGARTEN, P.C.
Somerset Place
2301 West Big Beaver Road, Suite 777
Troy, MI 48084
Tel:  248/649-1200

Vincent J. Marriott III
E-mail:  marriott@ballardspahr.com
Matthew A. White
E-mail:  whitema@ballardspahr.com
Benjamin M. Schmidt
E-mail:  schmidtb@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103
Tel:  215/665-8500

Matthew G. Summers
E-mail:  summersm@ballardspahr.com
BALLARD SPAHR LLP
919 North Market Street, 11th Floor
Wilmington, DE 19801
Tel:  302/252-4428

*Counsel for Hypothekenbank
Frankfurt International, S.A.,
Erste Europäische Pfandbrief- und
Kommunalkreditbank Aktiengesellschaft in
Luxemburg S.A.*

/s/ Deborah L Fish
Deborah L Fish
E-mail:  dfish@allardfishpc.com
ALLARD & FISH, P.C.
2600 Buhl Building
535 Griswold
Detroit, MI 48226
Tel.:  313/309-3171

Thomas Moers Mayer
E-mail:  tmayer@kramerlevin.com
Jonathan M. Wagner
E-mail:  jwagner@kramerlevin.com
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Tel:  212/715-9169

*Counsel for Dexia Crédit Local and Dexia
Holdings, Inc.*

CH2\14352197.13