UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,      .      Docket No. 13-53846
       MICHIGAN,           .
                       .      Detroit, Michigan
                       .      January 16, 2014
          Debtor.      .      2:00 p.m.
. . . . . . . . . . . . . .

BENCH OPINION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                    By:  GREGORY SHUMAKER
                    51 Louisiana Avenue, N.W.
                    Washington, D.C.  20001-2113
                    (202) 879-3768

                    Jones Day
                    By:  CORINNE BALL
                    222 East 41st
                    New York, NY  10017-6702
                    (212) 326-7844

                    Pepper Hamilton, LLP
                    By:  ROBERT S. HERTZBERG
                    4000 Town Center, Suite 1800
                    Southfield, MI  48075-1505
                    (248) 359-7333

For UBS and Bank    Warner, Norcross & Judd, LLP
of America          By:  SCOTT WATSON
Merrill Lynch:      111 Lyon Avenue, NW - Suite 900
                    Grand Rapids, MI  49503
                    (616) 752-2465

For UBS AG:         Bingham McCutchen, LLP
                    By:  JARED R. CLARK
                    399 Park Avenue
                    New York, NY  10022-4689
                    (212) 705-7770

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP By:  WILLIAM E. ARNAULT 300 North LaSalle Chicago, IL  60654 (312) 862-3062 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC By:  JENNIFER K. GREEN 500 Woodward Avenue, Suite 3500 Detroit, MI  48226 (313) 965-8300 |
| | Clark Hill, PLC By:  ROBERT D. GORDON 151 South Old Woodward, Suite 200 Birmingham, MI  48009 (248) 988-5882 |
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP By:  VINCENT J. MARRIOTT, III 1735 Market Street, 51st Floor Philadelphia, PA  19103-7599 (215) 864-8236 |
| For David Sole: | Jerome D. Goldberg, PLLC By:  JEROME D. GOLDBERG 2921 East Jefferson, Suite 205 Detroit, MI  48207 (313) 393-6001 |
| For Financial Guaranty Insurance Company: | Williams, Williams, Rattner & Plunkett, PC By:  MARK R. JAMES 380 N. Old Woodward Ave., Suite 300 Birmingham, MI  48009 (248) 642-0333 |
| For Ambac Assurance Corporation: | Arent Fox, LLP By:  CAROLINE TURNER ENGLISH 1717 K Street, NW Washington, DC  20036-5342 (202) 857-6178 |
| For FMS Wertmanagement: | Schiff Hardin, LLP By:  RICK FRIMMER 233 South Wacker Drive, Suite 6600 Chicago, IL  60606 (312) 258-5573 |

APPEARANCES (continued):

```
For Detroit Retired   Lippitt O'Keefe, PLLC
City Employees        By:  RYAN C. PLECHA
Association,          370 East Maple Road, 3rd Floor
Retired Detroit       Birmingham, MI  48009
Police and Fire       (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:
```

```
Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068
```

```
Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Counsel, may I ask you to put your

4    appearances on the record at the lectern, please?

5          MS. BALL:  Good afternoon, your Honor.  Corinne

6    Ball, Jones Day, for the City of Detroit.

7          MR. SHUMAKER:  Good afternoon, your Honor.  Greg

8    Shumaker of Jones Day for the City of Detroit.

9          MR. HERTZBERG:  Robert Hertzberg, Pepper Hamilton,

10   City of Detroit.

11         MS. ENGLISH:  Good afternoon, your Honor.  Caroline

12   Turner English from Arent Fox for Ambac.

13         MR. ARNAULT:  Good afternoon, your Honor.  Bill

14   Arnault from Kirkland & Ellis on behalf of Syncora.

15         MR. MARRIOTT:  Good afternoon, your Honor.  Vince

16   Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

17         MR. GORDON:  Good afternoon, your Honor.  Robert

18   Gordon and Jennifer Green, Clark Hill, on behalf of the

19   Detroit Retirement Systems.

20         MR. JAMES:  Good afternoon, your Honor.  Mark James

21   of Williams, Williams, Ratter & Plunkett on behalf of

22   Financial Guaranty Insurance Company.

23         MR. GOLDBERG:  Good afternoon, your Honor.  Jerome

24   Goldberg on behalf of interested party, David Sole.

25         MR. CLARK:  Your Honor, Jared Clark, Bingham

1  McCutchen, UBS AG.

2        MR. PLECHA:  Good afternoon, your Honor.  Ryan

3  Plecha from Lippitt O'Keefe on behalf of the retiree

4  association parties.

5        THE COURT:  Anyone here on behalf of Bank of America

6  Merrill Lynch?

7        MR. WATSON:  Good afternoon, your Honor.  Scott

8  Watson, Warner, Norcross & Judd, on behalf of UBS and Bank of

9  America Merrill Lynch.

10        THE COURT:  Okay.  Thank you, sir.  Is there anyone

11  on the phone that would like to place an appearance on the

12  record?

13        MR. FRIMMER:  Your Honor, this is Rick Frimmer from

14  Schiff Hardin on behalf of FMS.

15        THE COURT:  Did we get that?  Okay.  This matter is

16  before the Court on two motions.  The first is the motion to

17  approve the city's assumption of its optional termination

18  agreement -- forbearance agreement and optional termination

19  agreement with the swap counterparties.  This was negotiated

20  in large part pre-petition and then amended post-petition.

21  The second matter that's before the Court is a motion to

22  approve the city's request for certain post-petition

23  financing.  The Court will address that first motion first.

24        The motion is a bit of a hybrid motion in that it is

25  a motion to assume an executory contract and also to approve

1  a settlement under Rule 9019.  Of course, the motion to
2  approve the assumption is to be adjudged under Section 365 of
3  the Bankruptcy Code.  It's unnecessary to linger over the --
4  whether the standards of Section 365 apply or Rule 9019
5  applies.  The Court concludes it's the same business judgment
6  test regardless.  It is appropriate, therefore, to consider
7  the following factors upon which the Court notes the parties
8  appear to agree.  The first is the likelihood of the success
9  of any potential litigation that might result if the
10 settlement is denied.  The second is the complexity, expense,
11 and delay of such litigation.  The third is any collection
12 issues that appear, and the fourth involves the interests of
13 the city's creditors and its residents.
14      The parties have cited to the Court several cases
15 that describe in more detail the Court's obligation when
16 approval of a settlement is requested.  In particular, those
17 authorities cited by Ms. English, Ambac's attorney, appear to
18 concisely state what the Court's burden is, so, for example,
19 the Sixth Circuit's decision in In re. MQV, Inc., 477 Federal
20 Appendix 310, 313, Sixth Circuit, 2012, is cited, quoted,
21 "When determining whether to approve a proposed settlement,
22 the bankruptcy court may not rubber stamp the agreement or
23 merely rely on the trustee's word that the settlement is
24 reasonable.  Reynolds versus Commissioner of Internal
25 Revenue, 861 F.2d 469, 473, Sixth Circuit, 1988.  Rather, the

1  bankruptcy court is charged with an affirmative obligation to

2  apprise itself of the underlying facts and to make an

3  independent judgment as to whether the compromise is fair and

4  equitable," close quote.

5          In In re. Rankin, 438 Federal Appendix 420, 426,

6  Sixth Circuit, 2011, the Court quoted at some length from the

7  Supreme Court's decision in Protective Committee for

8  Independent Stockholders of TMT Trailer Ferry, Inc. v.

9  Anderson, 390 U.S. 414, 1968.  Quote, "There can be no

10  informed and independent judgment as to whether a proposed

11  compromise is fair and equitable until the bankruptcy judge

12  has appraised -- apprised himself of all of the facts

13  necessary for an intelligent and objective opinion of the

14  probabilities of ultimate success should the claim be

15  litigated.  Further, the judge should form an educated

16  estimate of the complexity, expense, and likely duration of

17  such litigation, the possible difficulties of collecting on

18  any judgment which might be obtained, and all other factors

19  relevant to a full and fair assessment of the wisdom of the

20  proposed compromise.  Basic to this process in every

21  instance, of course, is the need to compare the terms of the

22  compromise with the likely rewards of litigation."

23          In light of these authorities, the Court has

24  undertaken the required inquiry.  It has gone to some length

25  to form an intelligent and objective opinion of the

1   probabilities of the ultimate success of any proposed
2   litigation that the city might undertake, and the Court will
3   review that in a moment.
4           First, to review the proposed settlement in the
5   forbearance and optional termination agreement, this
6   agreement permits the termination of the swap agreements upon
7   payment by the city of $165 million plus so-called breakage
8   costs of $4.2 million.  The counterparties agree to forbear
9   from terminating the swaps and from trapping gaming revenues
10  prior to the city's optional termination.  The total
11  termination liability on the swaps as of December 31st, 2013,
12  was $247 million.  The $165 million settlement amount
13  represents approximately 67 percent of that amount.  The
14  termination liability, of course, is dependent upon interest
15  rates, which have changed from time to time during the course
16  of these proceedings and even, of course, since December
17  31st, 2013.  Regardless, under the most recent settlement
18  that the city asked the Court to approve, the settlement
19  amount remains at this $165 million amount or $169.2 million
20  amount.  The agreement would allow the city continued access
21  to the casino revenues of approximately $15 per month and
22  permits it to unwind the swap contracts at this discounted
23  price.  It also obviously eliminates potential litigation
24  between the city and the swap counterparties, UBS and Bank of
25  America Merrill Lynch.

1    So the Court will now review the likelihood of

2  success of any of the various claims that the city might make

3  against the swap counterparties and those swap

4  counterparties' various defenses in that litigation all in

5  the event, of course, that this motion is denied.

6    Initially, the city might well claim that the swap

7  counterparties' lien on the casino revenue pursuant to the

8  2009 collateral agreement is void under state law because the

9  purpose for which the casino revenue was pledged is not a

10  permissible purpose under MCL Section 432.212, the Michigan

11  Gaming Control and Revenue Act.  Under that Act, the

12  permissible uses are, (i) The hiring, training, and

13  deployment of street patrol officers; (ii) Neighborhood and

14  downtown economic development programs designed to create

15  local jobs; (iii) Public safety programs such as emergency

16  medical services, fire department programs, and street

17  lighting; (iv) Anti-gang and youth development programs; (v)

18  Other programs that are designed to contribute to the

19  improvement of the quality of life in the city; (vi) Relief

20  to the taxpayers of the city from one or more taxes or fees

21  imposed by the city; (vii) The costs of capital improvements;

22  and, (viii) Road repairs and improvements.

23    The city might claim, therefore, that this statute

24  does not permit gaming revenues to be used as security for a

25  loan, especially as security for a loan that does not fit one

1    of these permissible uses under the Gaming Act.

2          In defense to this claim, the swap counterparties

3    might well argue that the pledge of the casino revenue here

4    in this case was permissible under Subpart (v) of MCL Section

5    432.212 as a program designed to contribute to the

6    improvement of the quality of life in the city and Subpart

7    (vi) as relief to the taxpayers of the city from one or more

8    taxes or fees imposed by the city.  They would argue that

9    this is evidenced by Detroit City Code Sections 18-16-1

10   through 4.  These municipal code sections provide that the

11   pledge was necessary because the city was in default on the

12   swap agreement in January of 2009 and was facing the threat

13   of a large termination payment.  Moreover, Section 4(k)

14   specifically provides that, one -- quote, "one, pledging the

15   wagering tax property will improve the quality of life in the

16   city beyond what it would be in the absence of such action;

17   and, two, pledging the wagering tax property will

18   increase" -- sorry -- "will reduce taxes levied or imposed by

19   the city or to be levied or imposed by the city from what

20   they would be in the absence of such action," close quote.

21         In addition to these City Council findings, the

22   executive director of the Michigan Gaming Control Board

23   stated in a 2009 letter to the city's outside gaming counsel

24   that, "Upon review of this matter, I do not find any

25   compliance issues at this time."  Finally, in addition, the

1   swap counterparties would point to an opinion letter from

2   Lewis & Munday, a law firm retained by the city in 2009,

3   stating that the pledge of the casino revenue, quote, "will

4   constitute authorized purposes," close quote, under the

5   Michigan Gaming and Control Act.

6          Now, to these responses by the swap counterparties,

7   the city might respond that the connection between curing the

8   default under the swap agreement in 2009 and improving the

9   quality of life of the city -- of the citizens of Detroit is

10  a tenuous connection.  They would -- or the city would

11  further argue that it is not at all clear that the

12  legislative findings by the Detroit City Council or the

13  opinion letters of the attorneys can validate the collateral

14  agreement if it otherwise represents an impermissible use of

15  the casino revenues under the Michigan Gaming and Control

16  Act.  In a second claim that the city might make, the city

17  might argue that the casino revenue lien did not survive the

18  filing of the bankruptcy petition, so under this claim, the

19  city would argue that even if the swap counterparties' lien

20  on the casino revenues is valid under state law, that lien

21  does not survive the bankruptcy filing under Section 552(a)

22  of the Bankruptcy Code because it is not a statutory lien and

23  is not proceeds.

24          In response, the swap counterparties might argue

25  that the collateral agreement did create a statutory lien in

1    the casino revenue because it was created by the enactment of

2    the City Council of Municipal Code Sections 18-16-1 through

3    7.  In response to that argument by the swap counterparties,

4    the city might respond that the City Council only enacted

5    these sections to effectuate the terms of the collateral

6    agreement to which the parties had already agreed.  For

7    example, Section 18-16-12 states, quote, "All obligations of

8    the city under this ordinance and the definitive documents

9    are contractual obligations," close quote.

10          The city would further argue here that even if the

11   lien does survive -- or excuse me -- does not survive the

12   filing of the petition under Section 552 -- I'm sorry.  I

13   have my party wrong here.  The swap counterparties would

14   argue that even if the lien does not survive the filing of

15   the petition under Section 552, the lien would survive the

16   filing of the bankruptcy petition under Section 928 of the

17   Bankruptcy Code.  That section provides, quote,

18   "Notwithstanding section 552(a), special revenues acquired by

19   the debtor after the commencement of this case shall remain

20   subject to any lien resulting from any security agreement

21   entered into by the debtor before the commencement of the

22   case"; thus, the swap counterparties would argue that the

23   lien may survive if the casino revenues constitute special

24   revenues.

25          In response to that, the city would argue that the

1  definition of "special revenues" in Section 902(2)(B) does

2  not apply to casino revenues because casino revenues were not

3  created specifically for the purpose of financing the

4  collateral agreement.  Special revenues, the city would note,

5  include special excise taxes under Section 902(b)(2), but the

6  casino revenues constitute general excise taxes.

7          The city would further argue that the Bankruptcy

8  Code safe harbors for swap agreements in several sections of

9  the Bankruptcy Code, including Section 362(b)(17) and Section

10  560, do not apply to either the swap agreement or to the 2009

11  collateral agreement.  Thus, the city would argue that the

12  swap counterparties may not trap the casino revenue during

13  the pendency of the bankruptcy case.  Section 362(b)(17)

14  provides in pertinent part that the automatic stay does not

15  operate as a stay of the exercise by a swap participant or a

16  financial participant of any contractual right related to any

17  swap agreement.  Similarly, Section 560 provides in pertinent

18  part that the exercise of any contractual right of any swap

19  participant to cause the liquidation, termination, or

20  acceleration of one or more swap agreements shall not be

21  stayed, avoided, or otherwise limited by operation of any

22  provision of this title or by any order of a court or

23  administrative agency in any proceeding under this title.

24  The city would claim that these safe harbors do not apply,

25  however, because the safe harbors only protect swap

1    participants, as that term is defined in Section 101(53C),

2    quote, "An entity that, at the time of the filing of the

3    petition, has an outstanding swap agreement with the debtor,"

4    close quote.  The city would claim that if the swap

5    counterparties had a valid swap agreement with anyone, it was

6    with the service corporations, not the city.

7         The swap counterparties would respond in defense to

8    this claim that they were actually in an agreement with the

9    city.  The city controlled the service corporations, they

10   would maintain, and remains responsible for any of the

11   service corporations' obligations under the swap agreement

12   and the collateral agreement.

13        The city would also claim that the swap harbors do

14   not apply if the swap agreement and the collateral agreement

15   are void ab initio; that is to say, from the beginning.  The

16   idea is here that if the agreements are void from the

17   beginning, ab initio, under state law, they are simply not

18   swap-related -- there are simply no swap-related contractual

19   rights to enforce.  Moreover, if the swap counterparties'

20   alleged rights are avoided, it will be by operation of state

21   law, not by any court proceeding under the Bankruptcy Code.

22        On the other hand, the swap counterparties would

23   argue in defense that this argument by the city ignores the

24   purpose of the safe harbors, which is to protect the

25   nationwide derivatives markets from the bankruptcy of a

1   single party.  In response to that, the city would argue that
2   the problem with this defense is a logic problem.  They would
3   ask how can the safe harbors protect contractual rights that
4   do not exist under state law?  While a distinction must be
5   drawn or may be drawn between void and voidable agreements,
6   the city argues that it has litigable claims that the swap
7   agreement and the collateral agreement are void and have been
8   from the outset.

9          Of course, the advantageous result to the city and
10  the reason to pursue this claim is that if its claim to
11  invalidate the collateral agreement is sustained, it would
12  free up the gaming revenue for use in providing city services
13  and also perhaps to allow this property -- these revenue --
14  these gaming revenues to serve as collateral for loans.

15         In the absence of the settlement, the city might
16  also pursue a potential claim challenging the underlying swap
17  agreements themselves.  The city would argue that the swaps
18  themselves are invalid because the city did not comply with
19  the Revised Municipal Finance Act called Act 34, MCL Section
20  141.2101 and following.  Specifically, MCL Section 141.2317,
21  which governs swap transactions entered into by
22  municipalities, requires either (a) that the interest under
23  the agreement constitutes a limited tax full faith and credit
24  pledge from the general funds of the municipality or (b)
25  subject to any existing contracts, the interest under the

1   agreement shall be payable from any available money or

2   revenue sources, including revenues that shall be specified

3   in the agreement, securing the municipal security in

4   connection with which the agreement is entered into.  And the

5   city would contend that neither of those conditions for a

6   city to enter into a swap transaction were met here.

7           In response, the swap counterparties would assert

8   that Act 34 does not apply because the swap agreements were

9   between the swap counterparties and the service corporations,

10  not the city.  In response to that, the city might argue that

11  the service corporations are a sham and should be

12  disregarded, and they would also assert that the agreement

13  between the city and the service corp. is itself a swap

14  agreement as that term is broadly defined in the Bankruptcy

15  Code.

16          In response -- in partial response to at least the

17  argument that service corporations are a sham, the swap

18  counterparties might argue the doctrine of in pari delicto or

19  unclean hands may prevent the city from arguing that the

20  service corporations should be disregarded.  As noted, the

21  city might also claim that the agreements between the service

22  corporations and the city were themselves swap agreements

23  covered by Act 34 but that the service contracts are

24  themselves unenforceable because they, too, fail to comply

25  with Act 34.  The swap counterparties might argue that the

1    city has powers under the Home Rule Act which could

2    independently authorize the swap agreements, and, of course,

3    the swap counterparties would certainly argue that the same

4    safe harbor provisions of the Bankruptcy Code that the Court

5    discussed earlier in connection with the city's challenge to

6    the collateral agreement apply to protect the swap agreements

7    themselves.

8          The city's challenge to invalidate the swap

9    agreements has potentially very advantageous consequences for

10    the city.  If successful, not only would the city be released

11    from any obligation to the swap counterparties, but the city

12    might also recover the alleged $300 million that it has

13    already paid to the swap counterparties.  In response, of

14    course, the swap counterparties might have an in pari delicto

15    defense to that claim.

16          As we drill down further here, we find a question

17    that the parties did not actually address, and that is what

18    if the collateral agreement is found to be void under the

19    Michigan Gaming Act or that it does not survive the

20    bankruptcy filing under Sections 552 and 928 but that the

21    swap agreement is enforceable?  The question may become will

22    the city then be able to treat the termination liability as

23    an unsecured claim and impair it in the plan process, or will

24    the safe harbor provisions require the city to pay the claim

25    in full even though it's unsecured?  It appears to the Court

1    that it is more likely that Section 560 of the Bankruptcy
2    Code does require the termination claim to be paid in full
3    even if it is unsecured.  This makes much higher, of course,
4    the stakes of the city's claim that the swap agreements are
5    void under Act 34.
6            There is also, as Mr. Goldberg argued, a potentially
7    broader series of challenges to the swap agreements and the
8    collateral agreement, for that matter, as well, that they
9    were induced by fraud, are subject to equitable
10   subordination, or that they were unconscionable.  And, of
11   course, the readily identifiable defense to these by the swap
12   counterparties would be that the city was well-represented in
13   these transactions, that these transactions were negotiated
14   at arm's length, and that there was no fraud or coercion or
15   undue influence or any wrongdoing on their part.
16           The Court must emphasize, having outlined these
17   various claims and defenses, that it is not for the Court at
18   this time to decide these issues, and that's true even though
19   the depth of the parties' presentations on them were just
20   about as if motions for summary judgment were before the
21   Court.  Rather, the Court is simply to evaluate the
22   likelihood of success.  The Court has carefully considered
23   that question and has determined that the city is reasonably
24   likely to succeed on its challenges to the collateral
25   agreement under the Gaming Act and the Bankruptcy Code.  The

1  Court further concludes that the city is reasonably likely to
2  succeed on its challenge to the swap agreements under PA 34.
3  As to the city's other potential claims, while they are
4  certainly not frivolous, their likelihood of success is less
5  apparent on the record before the Court at this time.

6       The Court will now review the other factors to be
7  taken into account in determining whether to approve this
8  settlement.  Addressing the delay, complexity, and cost of
9  the litigation, the Court must conclude, of course, that
10 these are substantial considerations here.  Certainly the
11 issue of the validity of the trap of the casino revenues can
12 be promptly resolved by this Court through summary judgment.
13 It is less clear, of course, how quickly appeals would be
14 resolved.  The same can be said concerning the city's
15 challenge to the swap agreements under Public Act 34.  Any
16 other challenges, however, that the city might pursue are
17 very fact-intensive and would require substantial discovery,
18 some perhaps even international in scope, and that litigation
19 might take years if the city decides to pursue that.  The
20 expenses, especially the legal expenses, of filing a lawsuit
21 challenging the collateral agreement and the underlying swap
22 agreements, for filing a motion for a preliminary injunction,
23 and for filing a motion for summary judgment on the legal
24 issues involved in challenging these agreements would be
25 undoubtedly substantial but, given the amount of money at

1  stake, relatively insignificant.

2      Addressing now the issue of collectibility, the

3  Court concludes that nothing in the record suggests that this

4  is any issue here except that, as noted earlier, if the swap

5  counterparties are unsecured and if their claims are not

6  protected by Section 560 of the Bankruptcy Code, their

7  termination fee may be subject to impairment through the plan

8  of adjustment.

9      Addressing now the interest of the public and

10 creditors, in weighing this factor, the Court considers the

11 fact that the city is requesting the Court's approval to

12 replace its old obligations under the swap agreements and the

13 collateral agreement, which the city concedes as to which it

14 has litigable claims against the enforcement of them, with

15 new obligations that would be fully protected both by

16 security interests and by court approval.  The Court stated

17 earlier and states again that it will not participate in or

18 permit the city to perpetuate the very kinds of hasty and

19 imprudent financial decision-making that led to the

20 disastrous swaps and COPs transactions.  Those practices have

21 already caused great harm to the city's creditors and to its

22 citizens.  In the Court's view, one goal of this Chapter 9

23 case is to end these practices so that the city can truly

24 recover from its past mistakes and move forward, and the

25 Court intends to conduct itself accordingly.  In case

1   parenthetically this dicta needs any further clarification,

2   let me state that the Court intends to carefully scrutinize

3   the feasibility of any plan of adjustment.

4          At the same time, it is also true that the residents

5   of the city have an interest in city leadership that focuses

6   all of its attention on the city's future and its

7   revitalization.  This is, indeed, a very important

8   consideration, as the Court has previously emphasized.  And

9   let there be no doubt that litigation can be very

10  distracting, and the Court must also consider that several

11  creditors have objected to this motion, and their views and

12  the depth of their views are very important in the Court's

13  analysis.

14         On balance, the Court concludes that the motion to

15  assume the forbearance agreement should be denied.  The Court

16  rationally balances the city's claims against the swap

17  parties with the swap parties' defenses to those claims,

18  considers the complexity of the litigation and the expense

19  and time of it and the interests of the city's residents and

20  creditors.  In so doing, it must conclude that the $169

21  million settlement to the swap counterparties is just too

22  high a price to pay for the city to put this issue behind it.

23  It is higher than the highest reasonable number.  If it were

24  close, the Court would approve it, but by any rational

25  analysis, it's not close.  The Court looked for every way it

could to approve the settlement.  As the city argued, the law prefers settlements.  But it could not find a way.  It's just too much money, and the Court must insist that any settlement be rational, as the law itself requires.  In its eligibility opinion, the Court found that the city had entered into a series of bad deals to solve its financial problems.  The law says that when the city filed this bankruptcy, that must stop.  It also says that this Court must be the one to stop it, if necessary.  It is necessary here.  Accordingly, the motion is denied.  In these circumstances, it is unnecessary to address the consent rights issue.

Turning now to the motion for post-petition financing, 11 U.S.C., Section 364(c), provides, "If a trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt - (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or section 507(b) of this title; (2) secured by a lien on property of the estate that is not otherwise subject to a lien."  The city seeks to borrow $285 million from Barclay and to grant Barclay a lien in casino revenues, income tax revenues, utility tax revenues, and water and sewerage revenue.  Of that amount, $165 million was proposed to go to the swap counterparties to settle that

1    claim or those claims, and $120 million would go for quality

2    of life improvements, which may include increase in police

3    staffing, purchase of emergency vehicles, blight removal, and

4    updating the city's technology resources.  Because the motion

5    to assume the forbearance agreement and settlement agreement

6    is denied, the request for the loan to fund that settlement

7    must be denied as well.  However, the Court finds that the

8    request for approval to borrow $120 million on a secured

9    basis should be granted with conditions.  Specifically, the

10   Court finds that the city has established by a preponderance

11   of the evidence that this loan is in the best interest of the

12   city; that it needs the money; that the terms are market

13   terms and the best available to the city; that they were

14   negotiated in good faith; and that they were negotiated at

15   arm's length.  Indeed, the Court finds that there was no

16   substantial contradictory evidence on these points.

17           The objecting parties raise these arguments:  one,

18   the city did not attempt to obtain an unsecured loan; two,

19   the city did not provide the City Council with sufficient

20   information to evaluate the loan and did not comply with the

21   legal requirements for disclosure to the City Council; three,

22   the city has not adequately explained the proposed use of the

23   quality of life loan proceeds; and, four, this approval

24   should await the plan confirmation process.

25           With respect to the first objection, the Court

1  concludes that the city has adequately established that the

2  unsecured credit would not have been available to the city.

3  The objecting parties cite cases holding that the city was

4  required to actually attempt to obtain unsecured credit and

5  that the city did not do that here.  The Court finds these

6  cases unpersuasive because they impose a requirement that is

7  simply not in the statutory language of Section 364(c).  That

8  section simply requires the Court to find that the debtor has

9  established by a preponderance of the evidence that it is

10 unable to obtain unsecured credit.  There are, of course,

11 many ways to prove that fact.  Showing that the debtor

12 actually attempted and failed to do that is only one way to

13 prove it.  In this case, the Court concludes that there was

14 credible evidence that the city is unable to obtain unsecured

15 credit.  That evidence makes sense, in the Court's

16 experience, and it was uncontradicted in the evidence.

17 Accordingly, the Court finds that the city has established by

18 a preponderance of the evidence that it is unable to obtain

19 unsecured credit.

20        With respect to the second objection, Public Act

21 436, Sections 19(1) and (2), require the emergency manager to

22 submit his proposed action to the City Council.  The City

23 Council then has a period of time to propose comparable or

24 better terms for the action.  Plainly, the adequacy of the

25 disclosure to the City Council should be determined based on

1  whether the disclosure by the emergency manager allowed the
2  city to take advantage of its statutory opportunity to
3  propose an alternative.  Here the Court concludes that the
4  disclosures that the city made to City Council, especially as
5  they pertained to the proposed interest rates, were
6  sufficient to permit it to evaluate the loan and for the City
7  Council to go out into the marketplace to attempt to obtain
8  an alternative.  Accordingly, the Court concludes that there
9  was substantial compliance with PA 436, and this objection is
10 overruled.

11         It is next asserted that the city has not adequately
12 explained the uses of the loan proceeds.  In the Court's
13 view, this objection overlaps with the question of the
14 conditions that the Court has determined must be placed on
15 the loan.  The problem arises because the record is
16 contradictory on what the proceeds of this loan would be used
17 for.  In recognition of the limitations on the use of gaming
18 revenues under state law, some evidence suggests that the
19 city will use the proceeds for, quote, "quality of life,"
20 close quote, purposes.  Other evidence, however, suggests
21 that the proceeds will simply be working capital.  The city
22 contends that even if gaming revenue is provided as security,
23 the limitations of the Gaming Act do not apply because
24 Section 364 authorizes this Court to approve the loan without
25 regard for any state law limitations.  The Court rejects this

1   view of its authority under Section 364 and concludes that

2   any offer of security for a loan under Section 364 must

3   comply with state law unless, of course, Section 364

4   expressly provides otherwise.  As the city points out, the

5   Court can, under Section 364, give a senior or priming lien

6   to existing liens which might be or would be in derogation of

7   state law; however, nothing in Section 364 suggests that a

8   Court can allow a municipality to use its property in

9   violation of state law.  The Court does conclude that

10  offering gaming revenue as security for a loan would comply

11  with the Gaming Control Act but only if the proceeds of the

12  loan that are so secured are used as limited by state law.

13  Accordingly, if this loan is secured by gaming revenues, the

14  proceeds must be used for the purposes identified in the

15  Gaming Act.  The Court must caution the city here, however.

16  While the Act does permit the use of gaming revenues to

17  improve quality of life in the city, that authorization

18  cannot be applied so broadly that it effectively eliminates

19  the statutorily imposed limitations.  Specifically, nothing

20  in the Act authorizes proceeds to be used for working

21  capital.  To enforce this state statutory limitation, the

22  Court will condition this approval on a process by which the

23  city gives 14 days' written and filed notice of its intent to

24  use the proceeds during which interested parties can object

25  on the grounds that the proposed use is not consistent with

1   the Gaming Act.  The Court would then schedule a prompt

2   hearing and promptly resolve the objection.  Consistent with

3   Section 904, however, the Court will not review any aspect of

4   the use of the proceeds other than its compliance with the

5   Gaming Act.

6            In the alternative, of course, subject to Barclays'

7   approval, the city could use as security other property for

8   this loan such as other revenue streams that carry with them

9   no such restrictions under state law.  In that event, the

10  Court -- excuse me.  In that event, the process that the

11  Court outlined would not be necessary and would not be

12  imposed.

13           The Court further cautions the city that if it does

14  decide to pursue only the quality of life loan at this time,

15  it may want to consider whether under state law it is

16  necessary to present the revised loan to the City Council

17  under PA 436 and to the Emergency Loan Board for its

18  approval.  This caution, however, is not intended to be a

19  ruling on this issue.

20           Finally, the Court will overrule the objection that

21  this loan should be approved only in the context of plan

22  confirmation.  The city has determined out of necessity to

23  pursue this loan now.  Section 364 of the Bankruptcy Code

24  certainly permits the city to do that.  Under Section 904 it

25  is not for this Court to review the city's political and

1  governmental decisions, which pursuing this loan plainly is.

2  Accordingly, this objection is overruled.

3       Finally, the Court must emphasize that the parties

4  should not interpret this Court's denial of this particular

5  settlement to mean that they should not continue to attempt

6  to resolve these issues through negotiations.  They

7  absolutely should.  The Court agrees that the settlement of

8  the swaps claims is better for everyone than litigation and

9  hopes that everyone still agrees with that.  If the city

10  feels the need to pursue immediate litigation, so be it, but

11  even so, litigation and negotiation can and should be pursued

12  at the same time.  In any event, the Court strongly

13  encourages the parties to continue to negotiate.

14       At this time, the Court is going to conduct a closed

15  conference with counsel, and so I'm going to ask everyone in

16  the courtroom who is not an attorney in the case to leave the

17  courtroom.  We're also going to shut down the closed circuit

18  feeds and turn off CourtCall.

19       (Proceedings concluded at 2:49 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                     January 18, 2014
_____        _____
Lois Garrett