## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) **Re: Docket No. 2802** |

### JOINDER TO OBJECTION OF CERTAIN COPS HOLDERS AND LIMITED OBJECTION OF WILMINGTON TRUST, NATIONAL ASSOCIATION, AS SUCCESSOR CONTRACT ADMINISTRATOR, TO MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, APPROVING SETTLEMENT AND PLAN SUPPORT AGREEMENT AND GRANTING RELATED RELIEF

Wilmington Trust, National Association, not individually, but in its capacity as successor trustee and contract administrator (the "Contract Administrator")[1], hereby joins in the *Objection of Certain COPs Holders to Debtor's Motion to Approve Settlement and Plan Support Agreement With Swap Counterparties* (the "COPs Objection") (Docket No. 3040) and files this limited objection (this "Limited Objection") to the *Motion of the Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief* (the "Motion") (Docket

---

[1]  Wilmington Trust, National Association, serves as successor to U.S. Bank National Association ("U.S. Bank"), as: (a) Trustee under that certain Trust Agreement, dated June 2, 2005, by and among the Detroit General Retirement System Service Corporation (the "GRS Corporation"), the Detroit Police and Fire Retirement System Service Corporation (the "PFRS Corporation"), and U.S. Bank, and Contract Administrator under that certain Contract Administration Agreement, dated June 2, 2005, by and among the Detroit Retirement Systems Funding Trust (the "2005 Funding Trust"), the GRS Corporation, the PFRS Corporation, and U.S. Bank, regarding the issuance of Certificates of Participation Series 2005-A by the 2005 Funding Trust and the transactions contemplated thereby; and (b) Trustee under that certain Trust Agreement, dated June 12, 2006, by and among the GRS Corporation, the PFRS Corporation, and U.S. Bank, and as the Contract Administrator under that certain Contract Administration Agreement, dated June 12, 2006 (the "Contract Administrator Agreement"), by and among the Detroit Retirement Systems Funding Trust 2006 (the "2006 Funding Trust"), the GRS Corporation, the PFRS Corporation and U.S. Bank, in each case, regarding the issuance of Certificates of Participation Series 2006-A and 2006-B by the 2006 Funding Trust and the transactions contemplated thereby.

No. 2802). In support of this Limited Objection, the Contract Administrator respectfully states as follows:

## I.     <u>PRELIMINARY STATEMENT</u>

1.     The Motion seeks approval of a purported agreement settling claims between the City and UBS A.G. and Merrill Lynch Capital Services, Inc. (UBS and Merrill Lynch collectively, the "<u>Swap Counterparties</u>"), but no such agreement is attached to the Motion. Instead, the purported agreement is summarily described in a column-format-term sheet ("<u>Term Sheet</u>"), similar to that normally contained as a summary of an "actual documented agreement" in a standard settlement motion. Not attaching an actual agreement is significant for several reasons.

2.     First, it is in sharp contrast to the City's first attempt to settle with the Swap Counterparties, whereby the actual agreement between the parties was attached to the City's motion. Second, the lack of definitive agreement leaves this Court and creditors in the dark about how the City's payment of $85 million is characterized under the swap transaction documents, the effect of the payments on the swap transaction documents, and the obligations of the City and the Swap Counterparties going forward. And third, the failure to attach and seek approval of a definitive settlement agreement contradicts the very Term Sheet that was attached to the Motion.

3.     Specifically, the Term Sheet provides: "upon approval by the Bankruptcy Court by final order in form and substance satisfactory to the Parties under Bankruptcy Rule 9019 of ***a definitive agreement*** [] implementing the terms set forth in the term sheet . . . ." Yet no definitive agreement has been filed (only the Term Sheet) and, as such, there is no definitive agreement before this Court to be approved.

4.     Based upon the Term Sheet, it is clear the City and the Swap Counterparties intended to seek Court approval of a definitive agreement, not just a term sheet.  Unless and until a definitive agreement is filed, and all parties-in-interest are provided ample time to review the definitive agreement, moving forward with a hearing on the Motion is a waste of this Court's, and all parties involved, time and resources.

5.     While the City failed to attach the proposed form of agreement to the Motion, rendering a comprehensive evaluation difficult, if not impossible, a review of the so-called "key provisions" summarized in the Term Sheet raises several red flags.  Apparently the City believes that it can move forward on the purported settlement based purely on the optics of a reduced payment amount and a mere term sheet – that is wrong.  The proposed settlement amount has been reduced; however, the terms of this settlement, while a lower dollar number, are significantly worse for the City and its creditors.

6.     If ultimately approved, the settlement proposed in the Motion does not terminate the Swap Agreements, and therefore does not completely resolve the City's obligations that arise as a result of the Swap Agreements, leaving the City exposed to further payment obligations.

7.     Finally, the third-party releases and injunctions proposed are unprecedented in their sweeping scope and constitute an improper non-consensual release of the non-settling parties' third-party claims under Sixth Circuit law.

8.     Based on the foregoing and for the reasons set forth below, the Motion should be denied.

## II.     RELEVANT BACKGROUND

9.     Although the Court is no doubt familiar with the factual background surrounding the relevant transactions, and how the City reached the point where it believed it owed hundreds

of millions of dollars to the Swap Counterparties, it is important to consider the contracts that form the basis for these obligations.

10.      In 2005, the GRS Corporation and the PFRS Corporation (collectively, the "Service Corporations") entered into certain *ISDA Master Agreements, Transaction Transfer Agreements, related Schedules and Credit Support Annex* (collectively, the "Swap Agreements") with Merrill Lynch Capital Services, Inc. and SBS Financial Products Company, LLC, which subsequently transferred its obligations under the Swap Agreements to UBS A.G (*i.e.*, the Swap Counterparties).  Notably, the City was not, and is not a party to **any** of the Swap Agreements.

11.      The Swap Agreements specify how any amounts owed by the Service Corporations shall be paid to the Swap Counterparties.  Specifically, the respective schedules to the Swap Agreements state (capitalized terms used in this paragraph have the meanings ascribed to them in the Swap Agreements):

> Sources of Payment.    As provided in the Contract Administration Agreement, all payments due under this Agreement from [the Service Corporations] to [the Swap Counterparties] are payable from and secured by amounts owing by the City of Detroit to the [Service Corporations] pursuant to the Service Contract in respect of Hedge Payables.  Such amounts are payable by the City of Detroit from all available revenues of the City of Detroit's General Fund (as delineated in the City's audited financial statements).  If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, [the Swap Counterparties] (or the Contract Administrator, if authorized by [the Swap Counterparties] to so act on [the Swap Counterparties] behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it.  If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act. No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount.

Schedule, Part 4, b(ii).

12.     On June 15, 2009, the City and the Service Corporations (severally and not jointly) entered into that certain *Collateral Agreement* dated June 15, 2009 (the "<u>Collateral Agreement</u>") with the Swap Counterparties.  Under the Collateral Agreement, the City pledged to the Service Corporations a first priority lien on all the City's right, title and interest in pledged property to secure the City's Hedge Payables Related Obligations (as defined in those certain service contracts between the respective Service Corporation and the City).  Detroit City Council authorized the City's entry into the Collateral Agreement by passing Ordinance No. 05-09, which added Article 16 to Chapter 18 of the City Code, "for the purpose of implementing the transactions contemplated by the [T]erm [S]heet [for the Collateral Agreement]."  City Code § 18-16-4(n).  Ordinance No. 05-09 also provided that "all obligations of the city under this ordinance and the definitive documents are contractual obligations."  *Id*. at § 18-16-12.

13.     Finally, on July 15, 2013, the City, the Service Corporations and the Swap Counterparties entered into that certain *Forbearance and Optional Termination Agreement* dated July 15, 2013 (the "<u>Forbearance Agreement</u>"), whereby the City reiterated its contractual obligation to make payments to the Service Corporations and its pledge of a first priority lien to the Service Corporations on all of the City's right title and interest in certain pledged property.

14.     Despite the fact that the Swap Agreements are between the Swap Counterparties and the Service Corporations (not the City), the City brings the Motion and provides a summary of terms in the Term Sheet, one of which notably is that the Service Corporations are not a party to this proposed settlement.  Notably, the Service Corporations were a party to the Forbearance Agreement, which formed the basis of the City's first attempt to settle with the Swap Counterparties.

- 5 -

### III. <u>LEGAL STANDARD</u>

15.     When determining whether to approve a settlement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), "[t]he court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is reasonable." *Id.* (internal citations omitted). *See Reynolds v. Comm'r*, 861 F.2d 469, 473 (6th Cir. 1988). Rather, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable." *Id.* The need for such a safeguard is obvious, as "[a]ny settlement between the debtor and one of his individual creditors necessarily affects the rights of other creditors by reducing the assets of the estate available to satisfy other creditors' claims." *Id.* Here, the Court is unable to inform itself of all the facts because it has not been given the proposed settlement agreement, rather it has only been provided with a basic description of some of the settlement terms.

16.     In *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968), the Supreme Court of the United States opined that:

> There can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated. Further, the judge should form an educated estimate of the complexity, expense, and likely duration of such litigation, the possible difficulties of collecting on any judgment which might be obtained, and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise. Basic to this process in every instance, of course, is the need to compare the terms of the compromise with the likely rewards of litigation.

17.     Guided by the Supreme Court's decision in *TMT*, the Sixth Circuit distilled four factors for the bankruptcy court to consider in connection with a motion under

- 6 -

Bankruptcy Rule 9019 for approval of a settlement: (1) the probability of success in the litigation; (2) the difficulties, if any, to be encountered in the matter of collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors and a proper deference to their reasonable views in the premises. *In re MQVP, Inc.*, 477 Fed. App'x 310, 312-13 (6th Cir. 2012) (citing *In re Bard*, 49 Fed. App'x 528, 530 (6th Cir. 2002)).

18.     Further, where, as here, the proposed settlement includes an injunction or decree impacting the rights and claims of third parties, the Court must consider those legal rights of the fairness of the decree to the affected parties. *See In re Greektown*, 728 F.3d 567, 576 (6th Cir. 2013).

## IV.     ARGUMENT

### A.     The Motion Must Be Denied Because the Term Sheet Is Not Fair or Equitable, or in the Best Interest of the City's Creditors

19.     Under *Bard*, a bankruptcy court must evaluate four (4) factors to determine whether a settlement is fair and equitable, and in the best interests of the debtor and its creditors. But since no agreement between the City and Swap Counterparties has been filed, the Court is unable to conduct the basic analysis discussed in *TMT Trailer Ferry*, "the need to compare the terms of the compromise with the likely rewards of litigation." *TMT Trailer Ferry*, 390 U.S. at 424-425.  However, were the Court to apply these four (4) factors to the terms of the Term Sheet, the Court would still conclude that the proposed settlement is not fair or equitable, or in the best interests of the City's creditors.  Therefore, the Court should not approve the Motion and the Term Sheet.

### 1. The Probability of Success in the Litigation

20.     As this Court has already acknowledged, it believes there will be a high probability that the City would prevail in a cause of action against the Swap Counterparties. Bench Op., Jan. 16, 2014 Hrg. Tr. 18:22-25 – 19:1-2. Furthermore, while the Swap Agreements are contracts between the Service Corporations and the Swap Counterparties, the Service Corporations are not a party to the Term Sheet.

21.     And the City is not a party to the Swap Agreements. Furthermore, this Court has previously determined that "the City is reasonably likely to succeed on its challenge to the swap agreements under Act 34." Bench Op., Jan. 16, 2014 Hrg. Tr. 19:1-2.

### 2. Difficulties in the Matter of Collection

22.     In the Motion, the City states that it "does not believe the 'matter of collection' prong of the *Bard* test is an important factor under the circumstances," Motion at ¶ 59, conceding that it would not encounter any difficulties relating to collection if it obtained a judgment against the Swap Counterparties. Thus, this factor does not weigh in favor of approval of the Term Sheet.

### 3. The Complexity of the Litigation, and the Related Expense, Inconvenience and Delay

23.     The third factor bankruptcy courts consider when evaluating a proposed settlement is the complexity of the litigation involved, as well as the expense, inconvenience and delay necessarily attending it. Here, the issues are predominantly legal, not fact-based, and could conceivably be resolved on the papers without substantial expense, inconvenience or delay. As the Court previously found, "[c]ertainly the issue of the validity of the trap of the casino revenues can be promptly resolved by the Court through summary judgment." *See* Bench. Op., Jan. 16, 2014, Hrg. Tr. 19:10-12. While the Court went on to note that other, more fact-intensive

claims may require substantial discovery, the Term Sheet does nothing to limit the scope of such discovery, or eliminate the possibility of a lengthy appellate process. In fact, the Term Sheet does not propose to resolve all issues with the Swap Agreements or the Swap Counterparties, and any possible future liabilities that will be owed to the Swap Counterparties should be factored into this Court's consideration of the settlement.

> ### 4. The Paramount Interest of the Creditors and Proper Deference to Their Reasonable Views

24. The fourth factor – the paramount interest of creditors – weighs heavily against approving the Term Sheet and unequivocally demonstrates its failure to meet the fair and equitable standard. For the reasons set forth in the COPs Objection, the Swap Counterparties are general unsecured creditors of the City and their claims should be considered with and ultimately treated the same as any other unsecured claim in the Plan of Adjustment. The Term Sheet unquestionably fails, in all respects, to satisfy the fourth factor.

25. Furthermore, the Term Sheet leaves many questions unanswered. Under the Term Sheet, the Swap Agreements are not terminated, and appear to continue after the effective date of any plan. As such, the City would have ongoing obligations under the Swap Agreements. And while the liens under the Collateral Agreement are released pursuant to the Term Sheet, it appears the City would still be at risk of triggering enormous default or termination payments under the terms of the Swap Agreements.

26. In fact, in the City's motion to approve the Forbearance Agreement, the City conceded that:

> . . . it is unworkable that the Swap Contracts would continue to be in effect during the pendency of the case. As set forth above, the Swap Contracts were originally entered into in order to hedge interest rate exposure on certain variable interest rate COPs. Pursuant to section 502(b)(2) of the Bankruptcy Code, claims for unmatured interest are not allowable against

- 9 -

the City. Thus, the original intent of the Swap Contracts, namely, to hedge interest rate exposure for the COPs, has disappeared. On a post-bankruptcy basis, the hedge the Swap Contracts were intended to provide is no longer needed.

Forbearance Agreement at fn. 4.

27.     Thus, by the City's own admission in the Forbearance Agreement, approval of the Term Sheet will leave the City in a position where it has to make further payments when the Swap Agreements are ultimately terminated as is clearly contemplated by the City.

**B.      The Third-Party Releases and Bar Order Are
         <u>Inappropriate and Unfair to Non-Settling Parties</u>**

28.     Pursuant to the Motion and the Term Sheet, the City is seeking the approval of releases of claims against, and injunctions benefitting, the Swap Counterparties. Additionally, the Term Sheet proposes to enjoin the Service Corporations, which are not a party to the Term Sheet, from participating in litigation commenced by the City regarding the COPs (the "<u>COPs Adversary Proceeding</u>"). Given that the Service Corporations are not even a party to the settlement, there is no legal basis for such an injunction. The form of order also attempts to bar third parties from pursuing both contractual and tort claims against the Swap Counterparties. Specifically, the proposed form of Order purports to bar all persons from asserting any non-contractual indemnity or contribution claim against the Swap Counterparties (the "<u>Bar Order</u>"). However, the practical effect of the Bar Order is to limit the claims available to the Service Corporations and COPs holders, based on contract or tort claims, while simultaneously affording the Swap Counterparties the opportunity to join the COPs Adversary Proceeding and assert direct claims against these parties. Under Sixth Circuit law, the Bar Order represents an improper non-consensual release of the non-settling parties' third-party claims.

- 10 -

29.     In *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002), the Sixth Circuit held that enjoining a non-consenting creditor's claim against a non-debtor is only appropriate in "unusual circumstances."  Under *Dow Corning*, the controlling authority in the Sixth Circuit regarding non-consensual third-party releases, the Bar Order can only be approved if ***all*** of the following seven (7) factors are met:  (1) there is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction; (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full; and (7) the bankruptcy court makes a record of specific factual findings that support its conclusions. *Id.* at 658.

30.     The Term Sheet clearly fails to satisfy factors (1) though (6) of the "unusual circumstances" test.  With respect to the first factor, the City does not allege that there is any identity of interests between the City and Swap Counterparties, in indemnity or otherwise, such that a lawsuit against the Swap Counterparties would, in essence, be a suit against the City.

31.     The Term Sheet also fails to satisfy the second factor in that the Swap Counterparties are not providing any assets to the reorganization.  The City alleges three benefits to be derived from the Term Sheet: (1) continued access to the Casino Revenues; (2) the Swap Counterparties' support of the Plan; and (3) avoidance of litigation over the Swap Contracts and

- 11 -

liens with the Swap Counterparties. Motion at ¶ 39. While the first and third benefits, if substantiated, are arguably "assets to the reorganization," here they are speculative and unsubstantiated at best.

32.     To date, the Swap Counterparties have not taken any action to "trap" the Casino Revenues or otherwise prevent the City's access to those funds. Notwithstanding, the Term Sheet purports to free up the Casino Revenues. For merely continuing to use the Casino Revenues as it has throughout the pendency of this case, the City proposes to pay the Swap Counterparties $85 million, presumably from funds or assets that are currently available to unsecured creditors, but are being protected and channeled away from them.

33.     Similarly, the avoidance of litigation provides no benefit to the bankruptcy estate. By releasing claims that the Court previously found to be "reasonably likely to succeed," Bench Op., Jan. 16, 2014 Hrg. Tr. 18:22-25 – 19:1-2, the Term Sheet is likely to result in a smaller pool of funds ultimately available for distribution to creditors.

34.     With respect to the third factor, the City fails to explain how enjoining the claims of non-consenting creditors against the Swap Counterparties is essential to the City emerging from this Chapter 9 proceeding. In the Motion, the City makes the conclusory assertion that the Bar Order is somehow "integral to the compromise" between the City and the Swap Counterparties. However, aside from obtaining the Swap Counterparties' support of the Plan of Adjustment by providing them with unfairly favorable treatment at expense of the City's other creditors, it is entirely unclear how the Term Sheet is in any way essential to the City's ultimate success. While the City represents that the Bar Order would prevent "the City from indirectly obtaining relief from the Swap Counterparties," the relevant standard is the avoidance of litigation against the debtor, not the settling third-party. *See Dow Corning*, 280 F.3d at 658.

35.     In connection with the fourth factor, the Term Sheet is truly a Plan of Adjustment settlement issue, and should be considered in the context of confirmation.

36.     As for the fifth factor, as discussed above, the Plan of Adjustment does not provide a mechanism to pay for all, or substantially all, of the class 9 COPs claims, just one of the classes impacted by the Bar Order.  Rather, as discussed above, the City improperly proposes to pay creditors similarly situated to the Swap Counterparties a fraction of the payment contemplated by the Term Sheet.

37.     The sixth factor requires the Bar Order "to ensure an opportunity for those claimants who choose not to settle to recover in full."  *See Dow Corning*, 280 F.3d at 659.   The City will no doubt argue that this factor is satisfied by the judgment reduction provision of the Bar Order, pursuant to which any judgment against a barred party will be reduced in amount proportionate to its fault.  In the Motion, the City asserts that the judgment reduction provision is not prejudicial and produces the "same economic result" as a contribution claim.  Motion at ¶ 67.  However, such judgment reduction provisions are of no effect because of the form of relief requested by the City in the COPs Adversary Proceeding.

38.     By virtue of the Bar Order, the Swap Counterparties will be released from claims brought by third parties that arise outside the context of the proposed settlement with the City.  Such an outcome is grossly unfair and contrary to numerous decisions of bankruptcy courts throughout the country.  *See, e.g. Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.),* 261 B.R. 619, 623 (Bankr. W.D. Pa. 2001) (approving settlement agreement only after it was modified to remove prejudicial bar order); *In re Sportstuff, Inc.*, 430 B.R. 170, 177 (8th Cir. BAP 2010) (holding that proposed settlement that dispossessed non-settling parties of bad faith claims against insurers was not fair and equitable because it improperly impaired significant

rights of non-settling parties without compensation or consent); *Rafool v. The Goldfarb Corp. (In re Fleming Packaging Corp.)*, No. 04-8166, 2007 WL 4556981 (Bankr. C.D. Ill., Dec. 20, 2007) (rejecting settlement agreement that prejudiced third parties).

39.     Based on the foregoing, the City has failed to satisfy the standards for approval of the non-consensual release of third-party claims and the language set forth in the proposed order attached to the Motion, including but not limited to the proposed language for the Bar Order, and; thus, the Motion should be denied and the order rejected accordingly.

### V.     RESERVATION OF RIGHTS

40.     The Contract Administrator hereby reserves and preserves all of its rights, remedies, and arguments in connection with this Limited Objection to the Motion and reserves all rights to supplement this Limited Objection and to be heard before the Court with regard to the arguments set forth in this Limited Objection, as well as reserves the right to make any other applicable arguments, including those raised in other objections and/or other joinders to the objections raised by other parties with respect to the Motion.   Nothing contained herein is intended to contravene or supersede any arguments or positions that have been made or taken, or that may be made or taken, by any holders (as contemplated in the relevant agreements set forth in footnote no. 1).

- 14 -

## VI.  CONCLUSION

41.    For the foregoing reasons, the Contract Administrator respectfully requests that

the Court deny the Motion.

Dated:  March 17, 2014
        New York, New York

RESPECTFULLY SUBMITTED,

DRINKER BIDDLE & REATH LLP


*/s/ Heath D. Rosenblat*
Heath D. Rosenblat, Esq.
Kristin K. Going Esq. (Application Pending)
1177 Avenue of the Americas, 41st Floor
New York, New York 10036-2714
E-mail: Heath.Rosenblat@dbr.com
E-mail: Kristin.Going@dbr.com
Telephone: (212) 248-3140

            -and-

Dirk H. Beckwith, Esq. (P35609)
FOSTER SWIFT COLLINS & SMITH, P.C.
32300 Northwestern Highway, Suite 230
Farmington Hills, Michigan 48334-1471
Telephone: (248) 539-9918
E-mail: dbeckwith@fosterswift.com

*Counsel for Wilmington Trust, National*
*Association, as Successor Contract Administrator*

FP01/ 7157551.11

- 15 -

## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |
| | ) |

### CERTIFICATE OF SERVICE

I, Heath D. Rosenblat, an attorney in the law firm of Drinker Biddle & Reath LLP, certify that on this 17th day of March 2014, I caused the foregoing **Joinder to Objection of Certain COPs Holders and Limited Objection of Wilmington Trust, National Association, as Successor Contract Administrator, to Motion of Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving Settlement and Plan Support Agreement and Granting Related Relief** to be filed and served by operation of the CM/ECF system for the Eastern District of Michigan Bankruptcy Court upon all registered users thereof.


__/s/ Heath D. Rosenblat_____
Heath D. Rosenblat

NY01/ 7355941.1