## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

### OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO CORRECTED MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT AGREEMENT AND GRANTING RELATED RELIEF

In support of their Objection to the *Corrected Motion of the Debtor for Entry of an Order, Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019, Approving a Settlement and Plan Support Agreement and Granting Related Relief*, [Docket No. 2806] (the "Settlement Motion"), Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") state as follows:

### Preliminary Statement

1.     The Court should deny the Settlement Motion because it asks the Court to grant relief it cannot grant and, in the process, asks the Court to approve an (as-of-yet unexecuted and undisclosed) settlement agreement that (a) does not yield the anticipated benefits; and (b) impermissibly impairs the rights of third parties like Syncora.

2.     Though the City portrays the new settlement as merely an improved version of its prior deal, this is not the case.  In fact, the City and the Swap Counterparties have dramatically changed the nature of their proposed settlement. The prior settlement agreement purported to terminate the Swap in exchange for a payment of approximately $237 million.  In the process, the Swap Counterparties agreed to release Swap Insurer Syncora from its obligations under its Swap Insurance.  As a result of this termination of the Swaps and the attendant certification by the Swap Counterparties that they had been paid in full, the Collateral Agreement terminated by its own terms.  This in turn released the liens that presently exist on the Gaming Revenue.

3.     The new transaction (the "Proposed Settlement") is radically different. Because the City is now of the view that the Service Corporations are shams, it has decided to leave them out of the most recent settlement.  This has profound structural implications for the new agreement.  Unlike before, the Swap now does not terminate.  Nor is the City relieved of its Swap-related payment obligations to the Service Corporations under the Service Contracts.  Nor is Syncora's insurance released.[1]  In short, the *claims* being settled are very different this time around.

---

[1] Syncora maintains that the Swap Counterparties' actions have materially prejudiced Syncora and, for various reasons, compromised the Swap Counterparties' ability to claim under the Swap Insurance in the future. Because, however, the Swap Counterparties have taken the position that Syncora's insurance obligations remain in place, Syncora assumes *arguendo*

And this is particularly important when one recalls that the Swap Counterparties do not have a secured claim against the City. Though the City portrays this as a simple reprise of its prior settlement, it is not.

4.     The missing link here is the Service Corporations. They are the ones with liens from the City — not the Swap Counterparties. And their absence from the Agreement, coupled with the contractual provisions of the Collateral Agreement, means that the new settlement <u>cannot</u> achieve the goal of freeing up the Casino Revenues.

5.     The City and the Swap Counterparties attempt to solve this problem by having the Court's Order simply release the liens on the Gaming Revenue — with no explanation of how that release is achieved. The Motion is thus problematic for three principal reasons.

6.     *First*, nothing in the Bankruptcy Code gives the Bankruptcy Court the power to vaporize the liens granted by the Collateral Agreement. It is well-established that the Bankruptcy Code neither expands nor contracts the rights of a debtor. For the Court to order the release of all liens granted by the Collateral Agreement (as the Proposed Order has it doing in Paragraph 14), it must be based on a finding that there is a contractual basis to do so. The Court does not have the

that the Swap Insurance is not released for purposes of the instant objection. Syncora reserves all rights on this issue.

3

organic legal authority to destroy liens simply because the Swap Counterparties and the City want it to do so.

7.      *Second*, the Proposed Order directing the release of <u>all</u> liens on the Pledged Property operates as a termination or amendment of the Collateral Agreement — a fact that the City and the Swap Counterparties studiously avoid mentioning in any of their papers.  But this termination directly contravenes the plain language of the Collateral Agreement, which provides that it only terminates upon "the termination or expiration of the Hedges <u>and</u> each Counterparty's delivery of confirmation to the Custodian of the payment in full of <u>all</u> obligations of the Service Corporations and the City to each Counterparty thereunder and hereunder."  (Collateral Agreement ("<u>CA</u>"), Ex. A at Section 14.4(a) (emphasis added).)  Because the Swap is not being terminated — and because the Swap Counterparties' obligations from the Service Corporations remain outstanding — the Collateral Agreement does not terminate as a result of the proposed transaction.  And nor do the liens granted by the Collateral Agreement.  (*See id.* at Section 14.4(b).)  Nor can the Collateral Agreement be amended without Syncora's (and the Service Corporations') consent.  (*Id.* at Section 14.5.)

8.      The release of the liens on the gaming revenues operates an obvious impairment of Syncora's rights.   And that impairment translates into direct economic prejudice because the Swap Counterparties claim that Syncora insures

the Swap obligation that is indirectly secured by the lien granted by the City to the Service Corporations.

9.    *Third*, other provisions of the Settlement Agreement and Proposed Order violate either the Bankruptcy Code or the underlying contracts.    For example, the plan support agreement requires the Swap Counterparties to vote in favor of the City's proposed Plan of Adjustment.   But this pledge of support violates Syncora's right to "control all actions that may be taken by any Specified Hedge Counterparty that is the beneficiary of such Credit Insurance…" (Contract Administration Agreement ("CAA"), Ex. B at § 6.9.2(2).)   As with the Collateral Agreement above, the proposed action does not merely *prejudice* Syncora — it works an actual alteration to contractual rights Syncora has that cannot be altered without its consent.   And this places the proposed "settlement" on all fours with the type found invalid in *In re SportStuff*, where the Eighth Circuit held that a settlement agreement between parties A and B may not destroy contractual rights possessed by party C.  430 B.R. 170, 177 (B.A.P. 8th Cir. 2010).

10.    In addition, the over-reaching release and third-party suit injunction appear to bar non-parties from suing the Swap Counterparties for their actions in connection with the issuance of the Certificates of Participation (or "COPs"). Neither of these two provisions complies with the Sixth Circuit standard set forth in *In re Dow Corning Corp.*  280 F.3d 648 (6th Cir. 2002).

11.     The Court should deny the Settlement Motion.  In submitting this Objection, Syncora reserves all rights, claims, remedies, and defenses it has to the Swap Counterparties' and the City's actions.

## Background

### I.    The Terms and Structure of the Instant Settlement Agreement Are Materially Different from the Terms and Structure of the Forbearance Agreement

12.     At the outset, Syncora notes that the City has not actually executed a settlement with the Swap Counterparties.  The Term Sheet attached to its motion makes clear that it is "merely for discussion purposes" and is "not intended to be a commitment by any Party."  Syncora submits that starting a Rule 9019 motion by first actually entering into a settlement agreement would be a more efficient way for all involved to proceed.  Syncora reserves the right to supplement its objection if and when the City and the Swap Counterparties actually ink a settlement.  This objection is based on Syncora's attempt to construct what a settlement agreement would look like based on the Term Sheet and the Proposed Order.

13.     Though the City suggests that the Term Sheet settles the claims-at-issue in the Forbearance Agreement on more favorable terms, there are, in fact, material differences between these two settlements — both in the structure of the settlement and the claims that are being settled.

## A.    The Terms and Structure of the Forbearance Agreement

14.    On July 15, 2013, the City, the Swap Counterparties, and the Service Corporations executed the Forbearance Agreement.  At its core, the Forbearance Agreement purported to do three things.

15.    First, it required the Swap Counterparties to waive their right to trap cash under the Collateral Agreement.  (Forbearance Agreement ("FA"), Ex. C at § 1.1.)  Second, it provided the City with the right to direct the Swap Counterparties to terminate the Swaps.   (FA § 3.1.)   Third, it provided for a discounted termination payment to the Swap Counterparties of approximately $237 million.  (FA § 3.5.)

16.    Had the City been allowed to perform under the Forbearance Agreement, both the Swaps and the Collateral Agreement would have terminated. The termination of the Collateral Agreement, coupled with the Swap Counterparties' certification that they had been paid in full by the Service Corporations, would have operated to terminate the Collateral Agreement and thereby release the liens on the Gaming Revenue.  In addition, Syncora and FGIC would have been released from their obligations as Swap Insurers.  (FA § 3.2(c).)

## B.    The Terms and Structure of the Proposed Settlement Agreement

17.    In paragraph 53 of its Motion, the City implies that the Term Sheet settles claims that are identical to those settled by the Forbearance Agreement.

(Settlement Mot. at ¶ 53 ("In light of the four-day evidentiary hearing and closing argument and more than half-dozen pre-trial hearings and status conferences on the [Forbearance Agreement] . . . this Court is already familiar with the issues being compromised and claims being released through the proposed Agreement.").)  This is not the case.

18.     The key difference between the Term Sheet and the Forbearance Agreement is the absence of the Service Corporations as parties.  The Service Corporations were signatories to the Forbearance Agreement and were of sufficient vitality that Mr. Orr assumed they had engaged in arms-length negotiations of their own with Mr. Buckfire.  (Orr Dep., Ex. D at 75:18–20, Aug. 30, 2013.)  This is important because, Mr. Orr testified, one of the benefits of the Forbearance Agreement was that it "released all claims that the swap counterparties, the service corporations, and the city may have against one another."  (Hr'g Tr., Ex. E at 110:1–5 Jan. 3, 2014.)

19.     In the interim, the City has decided that the Service Corporations are mere shams and filed a suit to invalidate the COPs on this basis.  (*See* COP Invalidation Complaint, Ex. F at ¶ 38.)  The City and the Swap Counterparties thus no longer propose to enter into a settlement with the Service Corporations.

20.     As a result of the omission of the Service Corporations, the structure of the anticipated settlement — and the nature of the claims settled — has changed

dramatically.   Under the to-be-executed settlement agreement, the following differences exist from the Forbearance Agreement:

- The Swaps do <u>not</u> terminate.

- The Service Corporations' rights to receive swap-related payments under the Service Contracts live on.

- The Swap Insurers are not released.

21.    Without the Service Corporations, the new settlement is structurally amorphous.   The City pays the Swap Counterparties $85 million.   The Swap Counterparties release "any and all claims . . . related to the Swaps, the Certificates of Participation, the Service Corporations, any and all transactions related to the Swaps, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, or the Chapter 9 Proceedings."  (Term Sheet at 8.)  What these claims are, precisely, goes unmentioned.  And this is particularly relevant when one recalls that the Swap Counterparties have <u>not</u> been granted a lien by the City, but rather by the Service Corporations who are now absent from the deal.

22.    In addition, the new transaction proposes the following pieces of consideration not contained in the Forbearance Agreement:

- The City gets a plan support agreement from the Swap Counterparties.

- The Swap Counterparties get a sweeping third-party release and suit injunction against <u>all</u> parties with contribution or indemnity claims against the Swap Counterparties arising from <u>anything</u> related to the COPs/Swap structure.

9

- New liens are placed on the Casino Revenues, meaning that the City will not have unfettered access to those revenues upon emergence from bankruptcy.

23.     The crucial question, as always, relates to the status of the liens granted by the Collateral Agreement.  On this front, the Term Sheet is silent, other than providing that the Order approving the settlement will operate to release them. (Term Sheet at 6.)  The Proposed Order included with the motion subtly does so without explicitly stating as much.  (Proposed Order ¶ 14) ("ORDERED that, upon full payment by the City . . . all liens on the Pledged Property, including without limitation the Liens, shall be released without any further action or agreement by UBS, MLCS, the Custodian, or any other person.")  In the lengthy and detailed Proposed Order, this is the only mention of what happens to the liens granted by the Collateral Agreement.  The subtle reference and use of the passive voice is no accident — instead, it reflects an attempt by the Swap Counterparties and the City to simply skirt the question of what happens to the Collateral Agreement.

24.     Finally, while the new settlement releases all of the Swap Counterparties' claims against the City, it allows the Swap Counterparties to retain all rights, claims, and remedies against both the Service Corporations and the Swap Insurers.  (Settlement Mot. at 23.)  The new settlement further provides that the insurers cannot (a) acquire an allowed secured claim for reimbursement or (b) be

10

subrogated to the Swap Counterparties' purportedly secured claim. (Term Sheet at 11.)

### Objection

25.  In its third attempt to craft a settlement agreement with the Swap Counterparties, the City has created a structure that radically differs from what was in place under the Forbearance Agreement. Specifically, the new structure does not terminate the Swaps or the Collateral Agreement or include the Service Corporations as signatory. Nor does it release Syncora from its Swap Insurance.

26.  Instead, the City and the Swap Counterparties assume that the Court has the ability to release the liens granted under the Collateral Agreement. In addition, the City wraps into this settlement a plan support agreement that manufactures a new secured claim for the Swap Counterparties against the City. As described below, the new settlement fails for two principal reasons.

27.  *First*, the new settlement assumes that the Court has the organic power to release the liens created by the Collateral Agreement — even though doing so would conflict with the governing documents.

28.  *Second*, the new settlement modifies and amends the documents governing the Swap transaction. By doing so, the City and the Swap Counterparties are attempting to impair Syncora's third-party rights — a result that is expressly forbidden by *SportStuff*.

11

29.     More generally, the problem with the City's approach is that it is attempting to craft a bilateral solution to a multi-lateral problem.  In the spirit of compromise, Syncora has offered to consent to the settlement if it is released from its Swap Insurance, as it was under the prior settlement, thus foregoing its other arguments about the importance of the Swaps and the Collateral Agreement to the COPs.  The Swap Counterparties have rejected this offer.

## I.     Legal Standard

### A.     Bankruptcy Rule 9019 is Not a Vehicle for the Destruction of Third-Party Rights.

30.     Under Bankruptcy Rule 9019, a bankruptcy court may approve a settlement only if that settlement is fair and equitable and in the best interests of the estate.  *In re SportStuff, Inc.*, 430 B.R. 170, 177 (B.A.P. 8th Cir. 2010); *see also In re Bard*, 49 Fed. App'x. 528, 530 (6th Cir. 2002); *In re Martin*, 212 B.R. 316, 319 (B.A.P. 8th Cir. 1997) (stating that the standard for compromise and approval of a settlement is whether the settlement is fair and equitable and in the best interests of the estate) *citing In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D. Mo. 1988).  Before embarking on that analysis, however, the bankruptcy court must first be certain that the Proposed Settlement does not impair or extinguish the independent contractual rights of third parties.  *In re SportStuff, Inc.*, 430 B.R. at 177.  If the settlement does so, the bankruptcy court lacks the authority to approve the settlement-at-issue.  *Id.* at 178; *see also In re Forty-Eight Insulations*, 133 B.R.

973, 979 (Bankr. N.D. Ill. 1991) (finding that court lacked authority under bankruptcy and non-bankruptcy law to approve a settlement and enter an order that impaired a non-debtor's contractual rights against another non-debtor).

31.     *SportStuff* illustrates this well-established principle.   In that case, a debtor manufacturer was the subject of multiple personal injury claims relating to one of its defective products. 430 B.R. 170, 174 (B.A.P. 8th Cir. 2010).   The debtor filed an adversary proceeding seeking injunctive and declaratory relief against claimants who had suits against the debtor, its insurers, its vendors, and other indemnitees.  *Id.*  After the filing of this adversary proceeding, the debtor executed several settlements with its insurers that it submitted for approval under Bankruptcy Rule 9019.  *Id.*  The settlement agreements contained provisions, *inter alia*, releasing the insurer from any obligation to defend and indemnify the third-party vendors — none of whom were parties to the settlement agreements.  *Id.* at 175.  The vendors objected to the settlement agreements on the grounds that the settlement abrogated the separate contractual rights and state law causes of action the vendors possessed against the insurers.  *Id.*  The bankruptcy court overruled these objections and approved the settlements.  *Id.*

32.     On appeal, the Eighth Circuit Bankruptcy Appellate Panel reversed the bankruptcy court.   Analyzing the various insurance contracts and the relationships between the parties, the appellate panel found that the settlements

impaired the vendors' independent contractual rights to assert claims against the insurer. *Id.* at 178-79. Because the settlements deprived the vendors of contractual rights without their compensation or consent, the appellate panel held that the bankruptcy court did not have jurisdiction to approve the settlement. *Id.* at 179 ("The bankruptcy court did not have the jurisdiction or authority to impair or extinguish these independent contractual rights.").

**B.    A Debtor Does Not Obtain Additional Rights in Bankruptcy.**

33.    It is axiomatic that a debtor does not have more rights in bankruptcy than it does outside of bankruptcy. *In re ExpressTrak, L.L.C.*, 03-67235, 2004 WL 3735126 (Bankr. E.D. Mich. Jan. 20, 2004) ("[W]hatever rights the debtor has in property at the commencement of the case continue in bankruptcy—no more, no less.") *quoting* 8 *Collier on Bankruptcy* ¶ 365.03[2] (15th ed. rev. 2003). As a result, bankruptcy is not intended to confer new and superior rights for the debtor, nor impair the operation of state laws governing the debtor's contracts. *Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L. Ed. 2d 136 (U.S.N.C. 1979) ("Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a windfall merely by reason of the happenstance of bankruptcy.") (internal quotations and citations omitted). For this reason, the equitable power of a bankruptcy court does not and cannot extend so far as to

14

manufacture new rights for the debtor. *In re Dow Corning Corp.*, 456 F.3d 668, 679 (6th Cir. 2006) ("Despite the equitable nature of bankruptcy proceedings, the bankruptcy judge does not have free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness.") (quotation omitted).

## II. The Proposed Settlement Agreement Improperly Attempts to Expand the Court's Power and Destroy Third-Party Rights.

34.     The Proposed Settlement fails for two separate reasons.  First, it attempts to effectuate a release of the liens that (a) the Court does not have the power to order and (b) is at odds with the governing documents.  Second, it would impair many of the rights that Syncora was provided under the Swaps, the Collateral Agreement, and the Contract Administration Agreement, which is impermissible under *SportStuff*.

### A. The Court Lacks the Organic and Contractual Power to Destroy Liens.

#### 1. The Bankruptcy Does Not Have the Power to Effectuate the Release Contemplated by the Proposed Settlement and Order.

35.     The Collateral Agreement created two different liens on the Casino Revenues — the City's pledge to the Service Corporations and the Service Corporation's grant of a security interest in that pledge to the Swap

Counterparties.[2]  Thus, the City grants only one lien under the Collateral Agreement, and it grants that lien to the Service Corporations.  The City has never granted a direct lien to the Swap Counterparties.

36.  At the center of the Proposed Settlement is the City's and Swap Counterparties' request that the Court enter an order releasing both of these liens. (Proposed Order ¶ 14) ("[U]pon full payment by the City to UBS and MLCS of the Distribution Amount, <u>all</u> liens on the Pledged Property,[3] including without limitation the Liens, shall be released <u>without any further action</u> or agreement by UBS, MLCS, the Custodian or any other person . . . ."  (Proposed Order ¶ 14 (emphasis added).)  Notably though, in support of this request, the City and the Swap Counterparties do not rely on any provision in the Collateral Agreement to explain the release of those liens.   And they do not purport to terminate the Collateral Agreement (because they cannot).  Instead, they simply assume — in

---

[2]  Section 4.1(b) of the Collateral Agreement states that "[t]he City pledges <u>to the Service Corporations</u> and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations."  Section 4.2 states that the "[e]ach Service Corporation grants a security <u>to the Counterparties</u> in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge."

[3]  The proposed Order defines "Pledged Property" as "the collateral . . . pledged by the City under the Collateral Agreement and/or Ordinance No. 05-09 of the City."  (Proposed Order ¶ 9.)

both the Motion and the proposed Order — that the Court has the organic legal authority to release the liens in aid of their settlement.

37.    As noted above, however, a debtor does not have more rights in bankruptcy than it does outside of bankruptcy.  Despite this limitation, that is exactly what the City and the Swap Counterparties are seeking to accomplish here — namely, they are attempting to release the liens held by the Service Corporations even though the Service Corporations have <u>not</u> provided their consent to the release of the liens and are <u>not</u> parties to the new agreement.  In short, the City and the Swap Counterparties are attempting to accomplish via court Order what they could not accomplish contractually — a clear violation on the restrictions on a debtor's rights in bankruptcy.

## 2.    The Purported Operation of the Proposed Settlement is at Odds with the Governing Documents.

38.    Throughout its Motion, the City is careful to characterize its requested relief — the release of <u>all</u> liens on the Pledged Property — as a termination of the "lockbox structure" or the satisfaction of a "secured claim," and never as a termination of the Collateral Agreement.  The reason for this smokescreen is simple — though the City and the Swap Counterparties recognize that the termination of the Collateral Agreement (and the related liens) is a critical aspect of the Proposed Settlement, they also recognize that their attempt to terminate the

Collateral Agreement is impossible under the documents without the consent of Syncora and the Service Corporations.

39.　Under the Collateral Agreement, a termination occurs only upon "the termination or expiration of the Hedges <u>and</u> each Counterparty's delivery of confirmation to the Custodian of the payment in full of <u>all</u> obligations of the Service Corporations and the City to each Counterparty thereunder and hereunder." (CA § 14.4(a) (emphasis added).)　The Proposed Settlement provides, however, that the Swaps (the "<u>Hedges</u>") will <u>not</u> be terminated.　Nor does the Proposed Settlement contemplate the satisfaction of the Service Corporations' obligations.

40.　As a result, the Service Corporations' obligations to make the Swap payments to the Swap Counterparties remain in place.　(Term Sheet at 3.)　Thus, as it is currently constructed, the Proposed Settlement does not meet the two termination requirements under section 14.4(a) of the Collateral Agreement because it does not obtain the consent of the Service Corporations.　As a result, the Collateral Agreement does not terminate.

41.　An alternative pathway to the release of the liens would be to amend the Collateral Agreement.　But the Collateral Agreement requires that any amendments or modifications to its terms — including the terms governing termination — be consented to in writing by all the parties to the agreement and the Swap Insurers.　(CA § 14.5.)　However, the Service Corporations (which are

signatories to the Collateral Agreement) are not parties to the Proposed Settlement and thus cannot have consented to the numerous modifications of the Collateral Agreement. Nor has Syncora. Thus, in addition to the two technical requirements in section 14.4(a), the Proposed Settlement's attempt to terminate the Collateral Agreement also fails if viewed as an attempted amendment.

42. Because the Collateral Agreement does not terminate, the liens granted by that agreement to the Service Corporations and the Swap Counterparties also survive the Proposed Settlement. Yet, as noted above, the central purpose of the Proposed Settlement is the release of these liens in exchange for the City's $85 million payment. Under the current structure though, the casino revenues continue to be subject to a lien held by the Service Corporations. As a result, the only benefit of the Proposed Settlement is the City paying $85 million for a plan support agreement from a party that does not possess a secured claim against the City, and that is not empowered to release any secured claim under the Proposed Settlement.

43. The City and the Swap Counterparties are thus in a box — either the Proposed Order violates the law by releasing liens that cannot be released or the liens are not released and the Settlement makes no sense.

**B.  The Provisions of the New Settlement Impair Syncora's Third-Party Rights.**

44. The Proposed Settlement has three primary elements. First, it requires the Swap Counterparties to vote in favor of the City's proposed Plan of

Adjustment. Second, it provides the City with access to the Casino Revenues by modifying the automatic cash-trapping provision in the Collateral Agreement. Third, it attempts to effectuate a broad third-party release. Each of these elements, however, is at odds with Syncora's consent and control rights under the governing documents.

### 1. The Plan Support Agreement Impairs Syncora's Right to Control the Actions of the Swap Counterparties

45. As part of the Proposed Settlement, the Swap Counterparties have agreed to enter into a plan support agreement requiring them to vote in favor of the City's Plan of Adjustment in exchange for the $85 million payment. (Term Sheet at 1–2.) In so doing, the Swap Counterparties have placed control of their purported voting rights in the hands of the City (to the extent they have any).

46. The Contract Administration Agreement provides, however, that Syncora, as an insurer, shall "control all actions that may be taken by any Specified Hedge Counterparty that is the beneficiary of such Credit Insurance, including for purposes of actions permitted to be taken by such Specified Hedge Counterparty under this Agreement <u>and for the purposes of giving all other directions, consents and waivers that such Specified Hedge Counterparty may give</u>." (CAA § 6.9.2(2) (emphasis added).) The plain language of this section therefore permits Syncora to direct the actions of the Swap Counterparties when, for example, they attempt to

compromise or diminish their claims under the Swaps — the payment of which Syncora purportedly insures.

47.     Nevertheless, the plan support agreement requires the Swap Counterparties to vote in favor of the City's proposed plan — seemingly irrespective of Syncora's direction.   Because the plan support agreement purportedly deprives Syncora of its ability to control the Swap Counterparties' vote, it violates section 6.9.2(2) of the Contract Administration Agreement.[4]  As a result, Syncora's rights under the Contract Administration Agreement are not merely *prejudiced*, they are *impaired* without Syncora's consent.  This is precisely the type of impairment that *SportStuff* forbids.  *See SportStuff*, 430 B.R. at 180.

### 2.     The Proposed Settlement Modifies the Collateral Agreement and Swap Agreement.

48.      Under the Swaps and the Collateral Agreements, Syncora possesses a number of rights.  For example, the Collateral Agreement provides Syncora with the right to consent to any amendment of the Collateral Agreement that affects Syncora's rights, obligations, or remedies.  (CA § 14.5.)  Under this provision, Syncora has consent rights regarding any amendments to the Collateral Agreement that operate to its detriment — for example, a change to the nature of the security

---

[4]   Syncora reserves all rights to object to the plan support agreement during plan confirmation proceedings on the grounds that, *inter alia*, the plan support agreement cannot be signed or carried out by the Swap Counterparties.

granted to the Swap Counterparties.  The rationale for these provisions is clear —

Syncora, as the Swap insurer, could ultimately be liable and therefore must consent

to any amendments to the documents that effect its rights as a subrogee.  Syncora

is a third-party beneficiary of the Collateral Agreement under New York law.

*Septembertide Pub., B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 679 (2d Cir. 1989)

(finding that a party was a third-party beneficiary where the recognition of a right

of performance is appropriate to effectuate the intention of the parties as evidenced

by the language of the contract, and the "the timing, language, and financial

obligations" created by the contract indicate that the parties' intent was to benefit

the third party).

49.     Similarly, the Swaps provide Syncora with the right to consent, in

writing, to (a) any "waivers, modifications, or amendments" to the Swaps or the

Collateral Agreement; and (b) any terminations of the Swap due to the existence of

termination events and events of default.  (Amended and Restated Schedule to the

Swap Agreement ("A&R"), Ex. G at Part 5(i), 8(b).)  The Swaps agreement also

allows Syncora to subrogate to the all of the rights of the Swap Counterparties to

extent of Syncora's payments.  (*Id*. at Part 5(xiii).)  Finally, the Swaps expressly

state that Syncora is a third-party beneficiary.  (*Id*. at Part 5(xi).)

50.    Despite the consent provisions contained in the Collateral Agreement and the Swaps, the Proposed Settlement attempts to amend and modify these agreements without Syncora's consent.  Such modifications include the following:

- The Proposed Settlement allows the Casino Revenues to flow out of the General Receipts Subaccount.  (Settlement Mot. p. 18.)  This provision modifies the plain language of the Collateral Agreement, which requires <u>automatic</u> trapping upon the occurrence of certain events.  (CA § 5.4.)

- The Proposed Settlement provides the Swap Counterparties with liens on the collateral pledged by the City under the Collateral Agreement and/or City Ordinance No. 05-09.  (Settlement Mot. p. 19.)  This provision conflicts with the Collateral Agreement, which states that the City may not grant liens on the Pledged Property that are equal or senior in status to those created by the Collateral Agreement.  (CA §§ 9.1–9.2.)

- The Proposed Settlement operates to amend the Collateral Agreement without the written consent of the Service Corporations or Syncora.  (Term Sheet at 1.)  This provision conflicts with the provision in the Collateral Agreement requiring that all amendments be signed by <u>all</u> parties to the agreement.  (CA § 14.5 *and* ISDA Master Agreement ("<u>ISDA MA</u>"), Ex. H at § 8(b).)

- The Proposed Settlement provides the Swap Counterparties with the option to terminate the Swaps.  (Term Sheet at 3–4.)  This provisions conflicts with the provisions in the Swaps requiring Syncora's consent before the termination of the Swaps.  (ISDA MA § 6(e); A&R § 5(iv).)

51.    Thus, as in *SportStuff*, the City's Proposed Settlement attempts to prevent Syncora from exercising its right to consent to modifications and amendments of contracts that govern obligations that it insures — and for which it purportedly remains liable under the Proposed Settlement.  In so doing, the

23

Proposed Settlement attempts to extinguish many of Syncora's rights under the Swaps transaction documents — and thus goes well beyond mere "prejudice" to a creditor. Most significantly, the Proposed Settlement has a detrimental effect on Syncora's rights as a subrogee as it unsecures Syncora's insurance obligations under the Swaps (to the extent those insurance obligations remain). Accordingly, the instant settlement, like the settlement in *SportStuff*, should not be approved.

### 3. The Broad Third-Party Release Contained in the Proposed Settlement Violates Sixth Circuit Law.

52. As part of the Proposed Settlement, the City provides the Swap Counterparties with a broad third-party release and suit injunction against <u>all</u> parties with contribution or indemnity claims against the Swap Counterparties arising from <u>anything</u> related to the COPs/Swaps structure. This provision does not, however, satisfy the rigorous standard that the Sixth Circuit applies to non-consensual third-party releases.

53. Under *In re Dow Corning Corp.*, the Sixth Circuit held that "enjoining a non-consenting creditor's claim is only appropriate in unusual circumstances. 280 F.3d 648, 659 (6th Cir. 2002) (internal quotations omitted). To determine whether an injunction is appropriate the following seven factors must be present:

- There is an identity of interests between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate;

- The non-debtor has contributed substantial assets to the reorganization;

- The injunction is essential to the reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against the parties who would have indemnity or contribution claims against the debtor;

- The impacted class, or classes, has overwhelmingly voted to accept the plan;

- The plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction;

- The plan provides an opportunity for those claimants who choose not to settle to recover in full; and

- The bankruptcy court made a record of specific factual findings that support its conclusions.

*Id.*

54.    Though these factors are tailored to the plan context, they also provide a useful guide to the propriety of a non-consensual third-party release in the 9019 context, which provides much less in the way of creditor protections. Nevertheless, in this situation, the Proposed Settlement does not meet the factors set forth in *In re Dow Corning Corp.*

55.    Most significantly, while the Proposed Settlement affects Syncora, there is no mechanism that would allow Syncora to be paid in full. In fact, the Proposed Settlement explicitly states that "neither UBS nor MLCS will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Insurer in connection with the Swap Insurance Policies that results in the Swap

Insurer acquiring an allowed claim for reimbursement, or an allowed secured claim by way of subrogation, against the City." (Proposed Order ¶ 19.)

56. In addition, there is no evidence that the injunction is essential to reorganization or that the Swap Counterparties have contributed substantial assets to the City's proposed Plan of Adjustment. In fact, if the settlement is approved, Syncora intends to argue that the Swap Counterparties' claim has been manufactured for plan confirmation purposes.[5]

57. Accordingly, Syncora submits that the broad third-party injunction is improper and is yet another example of the City and the Swap Counterparties attempting to impair Syncora's rights.

## Reservation Of Rights

58. In submitting this Objection, Syncora reserves all rights, claims, remedies, and defenses it has to the Swap Counterparties and the City's actions.

## Conclusion

59. For the foregoing reasons, Syncora respectfully respects that the Court deny the City's motion to approve the Settlement Agreement pursuant to Bankruptcy Rule 9019.

---

[5] Syncora reserves its right to argue that the Swap Counterparties do not possess a secured claim for purposes of plan confirmation in the absence of an actual termination of the Swaps, which, as noted above, does not occur under the Proposed Settlement.

Dated: March 17, 2014

/s/ Ryan Blaine Bennett

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

*Attorneys for Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone:   (312) 280-0111
Facsimile:    (312) 280-8232

*Local Counsel to Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*