# EXHIBIT A

**Collateral Agreement**

# Collateral Agreement

among

## The City of Detroit,

## Detroit General Retirement System Service Corporation

and

## Detroit Police and Fire Retirement System Service Corporation,

severally and not jointly,

## U.S. Bank National Association,

as Custodian

and the

## Other Persons Party Hereto

Dated as of June 15, 2009

# Table of Contents

**Article I. Definitions and Related Matters** .................................................................................1
 Section 1.1. Certain Definitions.................................................................................1
 Section 1.2. Definitions in Authorizing Ordinance ..................................................8
 Section 1.3. Definition of *Counterparty* ........................................................................9
 Section 1.4. Definition of *Developer Payments* and Ancillary Definitions .......................9
 Section 1.5. Definition of *Holdback Requirement* and Ancillary Definitions....................11
 Section 1.6. Definition of *Wagering Tax Property* and Ancillary Definitions...................12
 Section 1.7. Time 12
 Section 1.8. Business Days........................................................................................12
 Section 1.9. Interpretation.........................................................................................12

**Article II. Effectiveness of this Agreement**...........................................................................13
 Section 2.1. Closing Date ..........................................................................................13
 Section 2.2. Satisfaction of Conditions Precedent........................................................13
 Section 2.3. Factual Conditions Precedent .................................................................13
 Section 2.4. Documentary Conditions Precedent ........................................................13

**Article III. General Provisions; Irrevocable Instructions**....................................................13
 Section 3.1. Appropriation.........................................................................................13
 Section 3.2. No Indebtedness......................................................................................14
 Section 3.3. Contractual Obligations ..........................................................................14
 Section 3.4. Irrevocable Instructions ..........................................................................14
 Section 3.5. Payments from Accounts ........................................................................15

**Article IV. Pledges and Grant of Security Interests**...........................................................15
 Section 4.1. City Pledge............................................................................................15
 Section 4.2. Service Corporation Grant of Security Interests.........................................15
 Section 4.3. Alternative Service Corporation Pledge ..................................................16

**Article V. Certain Payments**.................................................................................................16
 Section 5.1. Payment of Revenues .............................................................................16
 Section 5.2. Monthly Payments by City ......................................................................17
 Section 5.3. Payments to City from General Receipts Subaccount....................................17
 Section 5.4. When Payments from General Receipts Subaccount Prohibited....................18
 Section 5.5. Payments to City from Holdback Account.................................................18
 Section 5.6. Payments by City to Holdback Account.....................................................19
 Section 5.7. Payments to the Counterparties and the Custodian from Holdback Account .19
 Section 5.8. Payment Determinations...........................................................................19

**Article VI. Representations and Warranties of the City**......................................................20
 Section 6.1. General Representations and Warranties....................................................20
 Section 6.2. Revenues.................................................................................................21
 Section 6.3. Developer Agreements and Guaranties .....................................................21
 Section 6.4. No Other Liens, Charges or Encumbrances ...............................................21
 Section 6.5. No Control Granted .................................................................................22

**Article VII. Representations and Warranties of Service Corporations** ...............................22
 Section 7.1. General Representations and Warranties....................................................22
 Section 7.2. Concerning the Security Interests.............................................................23

**Article VIII. The Accounts**......................................................................................**24**
Section 8.1.    Establishment of Accounts .................................................................24
Section 8.2.    Developer Subaccounts .....................................................................25
Section 8.3.    Receipt of Revenues ..........................................................................25
Section 8.4.    Transfer of Revenues to General Receipts Subaccount....................25
Section 8.5.    Receipt of City Payments .................................................................26
Section 8.6.    General Receipts Account .................................................................26
Section 8.7.    Holdback Account .............................................................................26
Section 8.8.    Investments .......................................................................................26

**Article IX. City Covenants**.....................................................................................**26**
Section 9.1.    No Senior or Parity Pledges or Liens ...............................................26
Section 9.2.    Junior Pledges or Liens.....................................................................26
Section 9.3.    Further Assurances ............................................................................27
Section 9.4.    No Control Granted ...........................................................................27
Section 9.5.    Excluded Property .............................................................................27
Section 9.6.    No Development Agreement Amendments........................................27

**Article X. Service Corporation Covenants**............................................................**28**
Section 10.1.   No Pledges of Liens of Service Corporation Property ....................28
Section 10.2.   No Control Granted ...........................................................................28
Section 10.3.   Excluded Property .............................................................................28
Section 10.4.   Alternative Taxes..............................................................................28
Section 10.5.   Alternative Payment of Developer Payments...................................28
Section 10.6.   Further Assurances ............................................................................28

**Article XI. Remedies**..............................................................................................**29**
Section 11.1.   Remedies under Hedges ....................................................................29
Section 11.2.   Remedies as Secured Party ...............................................................29
Section 11.3.   Limitation on Remedies.....................................................................30
Section 11.4.   Failure to Appropriate.......................................................................30
Section 11.5.   Indemnity...........................................................................................30
Section 11.6.   *Specified Event* means any of the following events: .....................31

**Article XII. The Custodian** ....................................................................................**33**
Section 12.1.   No Fiduciary Duties or Responsibilities............................................33
Section 12.2.   Duties and Responsibilities................................................................33
Section 12.3.   Certain Rights of Custodian...............................................................34
Section 12.4.   May Hold 2006 Pension Funding Securities. ...................................34
Section 12.5.   Reporting of City Payments...............................................................35
Section 12.6.   Weekly Reports .................................................................................35
Section 12.7.   Monthly Holdback Compliance Notice .............................................35
Section 12.8.   Quarterly Accounting ........................................................................35
Section 12.9.   Coverage Reports...............................................................................35
Section 12.10.  Compensation, Reimbursement and Indemnification.......................36
Section 12.11.  Prior Payment of Regular Custodian Payments.................................37
Section 12.12.  Corporate Custodian Required; Eligibility. .....................................37
Section 12.13.  Replacement of Custodian.................................................................37
Section 12.14.  Merger, Consolidation and Succession to Business. ........................38

**Article XIII. Interest Rate Limitation** ...................................................................................**38**

**Article XIV. Miscellaneous** ...............................................................................................**39**

Section 14.1.    Addresses for Notices ...........................................................................39
Section 14.2.    Copies of Notices .................................................................................40
Section 14.3.    Expenses ...............................................................................................40
Section 14.4.    Termination...........................................................................................40
Section 14.5.    Amendment............................................................................................41
Section 14.6.    Rights of Insurer ...................................................................................41
Section 14.7.    No Waiver .............................................................................................41
Section 14.8.    Binding Obligation ...............................................................................41
Section 14.9.    Assignment ...........................................................................................41
Section 14.10.   Governing Law .....................................................................................41
Section 14.11.   Venue ....................................................................................................41
Section 14.12.   WAIVERS OF JURY TRIAL......................................................................42
Section 14.13.   Headings and Table of Contents...........................................................42
Section 14.14.   Entire Agreement ..................................................................................42
Section 14.15.   Counterparts..........................................................................................42

1974.114.0093/423069

**Collateral Agreement**, dated as of June 15, 2009 (the ***Agreement***), among the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the ***City***), the **Detroit General Retirement System Service Corporation** (the ***GRS Service Corporation***) and the **Detroit Police and Fire Retirement System Service Corporation** (the ***PFRS Service Corporation***), each a nonprofit corporation organized and existing under the laws of the State of Michigan, acting severally and not jointly, **U.S. Bank National Association**, a national banking association with its principal place of business in Minneapolis, Minnesota (the ***Custodian***), **UBS AG** (***UBS***), **SBS Financial Products Company, LLC** (***SBS*** and collectively with UBS, the ***2006 Counterparties***) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS and, upon the occurrence of certain events, successor to SBS,.

## W̲I̲T̲N̲E̲S̲S̲E̲T̲H̲:

**Whereas**, in January 2009, the 2006 Counterparties notified the City, the GRS Service Corporation and the PFRS Service Corporation (each, a ***Service Corporation*** and collectively, the ***Service Corporations***) that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the ***2006 Additional Termination Event***) under the respective interest rate swap agreements (each, a ***2006 Hedge*** and collectively, the ***2006 Hedges***) entered into by the Service Corporations and the 2006 Counterparties as part of the 2006 Transaction (the ***2006 Transaction***) described in Ordinance No. 05-09 (the ***Authorizing Ordinance***) undertaken by the City as part of its Pension System Funding Program described in therein;

**Whereas**, also as part of the 2006 Transaction the City entered into a Service Contract (a ***2006 Service Contract***) with each Service Corporation (collectively, the ***2006 Service Contracts***), which, among other things, provided for the City to make payments to the Service Corporations sufficient to pay amounts owing by the Service Corporations under their respective 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties pursuant to the Definitive Documents;

**Now, Therefore,** in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the below defined Closing Date, and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

## Article I. Definitions and Related Matters

### Section 1.1.    Certain Definitions

***Account*** means an account established by **Section 8**.

***Accrued Service Charges*** has the meaning given that term in the Service Contracts.

***Additional Termination Event*** has the meaning given that term in the Hedges.

*Additional Wagering Taxes* has the meaning given that term in **Section 1.6**.

*Affected Party* has the meaning given that term in the Hedges.

*Agreement* has the meaning given that term in the first paragraph of this instrument as it may be modified or amended pursuant to the terms hereof.

*Alternative Taxes* has the meaning given that term in **Section 1.6**.

*Article 9* has the meaning given that term in **Section 1.2**.

*Authorized Investments* means (i) Any of the following to the extent an authorized investment of City funds at the time of investment:

> (A)    full faith and credit obligations of the United States of America maturing (or subject to redemption at the option of the holder) on or before the first anniversary of the investment,

> (B)    shares or other undivided interests in First American U.S. Treasury Money Market Fund,

> (C)    shares or other undivided interests in First American Treasury Obligation Fund, and

> (ii)    such other investments to the extent authorized investments of City funds at the time of investment that are acceptable to the Counterparties.

*Authorizing Ordinance* has the meaning given that term in the preamble hereto.

*Business Day* means a day on which the Custodian is open for the transaction of business in the City and State of New York and the City is open for business in Detroit, Michigan.

*Casino Licensee* has the meaning given that term in **Section 1.2**.

*City* has the meaning given that term in the preamble hereto.

*City Charter* means the Charter of the City of Detroit, Michigan.

*City Hedge Payables Related Obligations* has the meaning given that term in **Section 1.2**.

*City Payment* has the meaning given that term in **Section 5.2**.

*City Pledge* has the meaning given that term in **Section 4.1**.

*Closing* means the satisfaction of the conditions precedent to the effectiveness of this Agreement as evidenced by the Closing Certificate.

*Closing Certificate* means the certificate identified as such in **Exhibit 2.4**.

*Closing Date* means the date on which the Closing occurs.

*Contract Administration Agreement* has the meaning given that term in the Service Contracts.

*Contract Administrator* has the meaning given that term in the Service Contracts.

*Counterparty* has the meaning given that term in **Section 1.3**.

***Custodian*** means the Person identified in the first paragraph of this Agreement as the "Custodian" *unless and until* a successor is appointed successor Custodian pursuant to applicable provisions of this Agreement; *thereafter*, ***Custodian*** means such successor.

***Custodian Payment*** means any amount to which the Custodian is entitled pursuant to **Section 12.10**.

***Defaulting Party*** has the meaning given that term in the Hedges.

***Definitive Documents*** means:

> (i) this Agreement,
>
> (ii) the Service Contract Amendments,
>
> (iii) the Hedge Amendments and
>
> (iv) the Irrevocable Instructions.

***Detroit Entertainment Subaccount*** means the Developer Subaccount with respect to Detroit Entertainment, L.L.C.

***Developer*** has the meaning given that term in **Section 1.4**.

***Developer Payments*** has the meaning given that term in **Section 1.4**.

***Developer Subaccount*** means a subaccount established in the Receipts Account with respect to a Developer.

***Development Agreement*** has the meaning given that term in **Section 1.4**.

***Event of Default*** has the meaning given that term in the Hedges.

***Excluded Indebtedness*** means any obligations of the City payable from receipts derived from the ownership, operation or disposition of projects or systems (such as the City's Water Supply System or Sewerage Disposal System Bonds) or other special revenues as defined in Bankruptcy Code Section 902.

***Excluded Property*** means:

> (i) Revenues, and proceeds thereof, paid to the City from the General Receipts Subaccount, or released to the City from the Holdback Account, pursuant to this Agreement and
>
> (ii) the right of the City to receive any such amounts as and when paid or released.

***Existing Casino*** has the meaning given that term in **Section 1.4.**

***Existing Developer*** has the meaning given that term in **Section 1.4.**

***Existing Development Agreement*** has the meaning given that term in **Section 1.4.**

***Existing Payment Section*** has the meaning given that term in **Section 1.4.**

***Final Payment*** means, as of a Term Period End Date or the date that an Unqualified Hedge Event occurs, the sum of:

> (i) any Custodian Payment then due and owing to the Custodian *plus*

(ii)  in the case of:

(A)  a Term Period End Date, the balance of any unpaid amounts (including, but not limited to, any Hedge Termination Payables) owing to the Counterparties under the Hedges and this Agreement *plus* an amount equal to any interest at the Interest Rate owing to the Counterparties under the Hedges; or

(B)  an Unqualified Hedge Event, the payment of any unpaid amounts (including, but not limited to, any Hedge Termination Payables) owing to the Counterparties under the Hedges and this Agreement.

***Finance Director*** means the Finance Director of the City or any other person authorized or permitted by law to fulfill functions of the Finance Director during any period of absence or incapacity of the Finance Director.

***Fiscal Year*** means the City's fiscal year, which currently commences on July 1 and ends on the following June 30.

***Fixed Amounts*** has the meaning given that term in the Hedges.

***Fixed Rate Payer Period End Date*** means a March 15, June 15, September 15 or December 15.

***Floating Amounts*** has the meaning given that term in the Hedges.

***General Receipts Subaccount*** means the subaccount established in the Receipts Account pursuant to **Section 8.1**.

***Greektown Subaccount*** means the Developer Subaccount with respect to Greektown Casino, L.L.C.

***GRS Service Corporation*** means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

***Government Exception*** has the meaning given that term in **Section 4.3**.

***Guaranty*** means any agreement or form of credit enhancement that protects the City against loss by reason of the failure of a Developer to make Developer Payments, whether by guaranty, assurance, subrogation, setoff, indemnity, insurance, collateral, security or otherwise.

***Hedge*** means each of the 2006 Hedges as amended by the Hedge Amendments and as may be further amended in accordance with the terms thereof, including in the case of the 2006 Hedge with SBS, the Transaction Transfer Agreement and, upon a Transfer Party Accession Event, the related Transfer Hedge.

***Hedge Amendments*** means the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

***Hedge Event*** means the occurrence of a Termination Event or the continuance of an Event of Default under a Hedge (as such terms are defined in such Hedge) where the City is obligated to pay a termination payment to one or more Counterparties.

***Hedge Payables*** has the meaning given that term in **Section 1.2**.

***Hedge Periodic Payables*** has the meaning given that term in **Section 1.2**.

***Hedge Termination Payable*** has the meaning given that term in the Service Contracts.

***Holdback Account*** means the Account by that name established pursuant to **Section 8.1**.

***Holdback Requirement*** has the meaning given that term in **Section 1.5**.

***Insurer*** means, as the context may require, Financial Guaranty Insurance Corporation or Syncora Guaranty Inc, or any successor of either of them to the insurance obligations of its predecessor with respect to the insurance of the payment obligations of a Service Corporation under a Hedge.

***Interest Rate*** means the "Specified Default Rate" (as such term is defined in the Hedges).

***Irrevocable Instruction*** has the meaning given that term in **Section 3.4**.

***Limitation on Remedies*** has the meaning given that term in **Section 11.3**.

***MGM Grand Subaccount*** means the Developer Subaccount established with respect to MGM Grand Detroit, L.L.C.

***Month*** means one of three months of a Quarterly Period, each of which has substantially equal days and ends on the 15th day (whether or not a Business Day) of the corresponding calendar month.

***Monthly Coverage*** has the meaning given that term in **Section 12.9**.

***Monthly Coverage Report*** has the meaning given that term in **Section 12.9**.

***Monthly Holdback Compliance Notice*** has the meaning given that term in **Section 12.7**.

***New Developer*** has the meaning given that term in **Section 1.4.**

***New Development Agreement*** has the meaning given that term in **Section 1.4.**

***New Payment Section*** has the meaning given that term in **Section 1.4.**

***Notional Holdback Amount*** means the amount that would have been payable under clause (ii) of the definition of Standard Holdback Requirement had a Termination Event not occurred.

***Obligor*** has the meaning given that term in **Section 3.4(c)**.

***Outside Supplemental Appropriations Date*** means the date which is the earlier to occur of:

>    (i) the 120th day following the date on which the termination of any Hedge occurs and

>    (ii) the expiration of the first 60 calendar days during which the City Council is in regular session following the date on which the termination of any Hedge occurs.

***Payment Date*** means the earlier to occur of (i) second Business Day preceding the end of a Month or (ii) the Term Period End Date.

***Payment Section*** has the meaning given that term in **Section 1.4**.

***Payment Time*** means 2:00 p.m.

***Permitted Liens*** has the meaning given that term in **Section 9.2**.

*Person* means any natural person, firm, association, corporation, trust, partnership, joint venture, joint-stock company, municipal corporation, public body or other entity, however organized.

*PFRS Service Corporation* means the Person so defined in the first paragraph of this Agreement and the successors of such Person.

*Pledged Property* has the meaning given that term in **Section 1.2**.

*Predecessor Developer* has the meaning given that term in **Section 8.2**.

*Public Act* means a statute of the State of Michigan.

*Qualified Hedge Event* means a Hedge Event that arises because of a Specified Additional Termination Event.

*Quarterly Accounting* has the meaning given that term in **Section 12.8**.

*Quarterly Coverage* has the meaning given that term in **Section 12.9**.

*Quarterly Coverage Report* has the meaning given that term in **Section 12.9**.

*Quarterly Payment* means, as to any Quarterly Period, the amount of all City Payments due and owing as of the last day of such Quarterly Period.

*Quarterly Period* means a period of days from and including each Fixed Rate Payer Period End Date but excluding the next succeeding Fixed Rate Payer Period End Date (whether or not such date is a Business Day).

*Ratings Downgrade* has the meaning given that term in **Section 1.5**.

*Ratings Upgrade* has the meaning given that term in **Section 1.5**.

*Ratings Upgrade Period* has the meaning given that term in **Section 1.5**.

*Receipts Account* means the Account by that name established pursuant to **Section 8.1** and includes the General Receipts Subaccount and each Developer Subaccount established pursuant to **Section 8.2**.

*Receipt Day* means a Business Day on which the Custodian receives an amount of money at or before the Payment Time *or if* the Custodian receives an amount of money on any day after the Payment Time, *then* the following Business Day.

*Reduced Holdback Requirement* has the meaning given that term in **Section 1.5**.

*Regular Custodian Payments* means any amount to which the Custodian is entitled pursuant to **Section 12.10(a)**.

*Regular Scheduled Payments* has the meaning given that term in the Service Contracts.

*Release Date* has the meaning given such term in **Section 5.5**.

*Relevant Amount* means, for any Month during the Term Payment Period, an amount equal to the sum of the following:

> (i) any Regular Custodian Payment due and owing to the Custodian during such Month;

(ii) *plus* the greater of:

  (A) $4,228,081.30 and

  (B) the Notional Holdback Amount;

(iii) *plus*, subject to **Section 5.2(e)**, an amount equal to any interest at the Interest Rate owing to the Counterparties under the Hedges.

***Reporting Period*** has the meaning given that term in **Section 12.9.**

***Revenues*** has the meaning given that term in **Section 1.2.**

***SBS*** means SBS Financial Products Company, LLC and its successors and assigns.

***Service Charges*** has the meaning given that term in the Service Contracts.

***Service Contract*** means each of the 2006 Service Contracts as amended by the Service Contract Amendments and as each may be further amended in accordance with the terms thereof.

***Service Contract Amendments*** means the amendments to the 2006 Service Contracts with an effective date that corresponds to the Closing Date.

***Service Corporation*** means the GRS Service Corporation or the PFRS Service Corporation, as the context may require.

***Service Corporation Pledge*** has the meaning given that term in **Section 4.3**.

***Service Corporation Property*** has the meaning given that term in **Section 4.2**.

***Service Corporation Security Interest*** has the meaning given that term in **Section 4.2**.

***Settlement Transaction*** means, collectively, the terms contained in each of the following agreements: this Agreement, the Hedge Amendments, the Service Contract Amendments and any other substantive agreement or documents (including, but not limited to, the Irrevocable Instructions and, to the extent not listed in the foregoing, the Definitive Documents) delivered as part of the Closing. For the avoidance of doubt, "substantive agreement" does not include any certificate or opinion delivered as part of the Closing.

***Sinking Fund Installments*** has the meaning given that term in the Service Contracts.

***Specified Additional Termination Event*** means has the meaning given that term in each of the Hedges.

***Specified Event*** has the meaning given that term in **Section 11.6**.

***Standard Holdback Requirement*** has the meaning given that term in **Section 1.5**.

***Subject Month*** has the meaning given that term in **Section 12.9**.

***Subject Quarter*** has the meaning given that term in **Section 12.9**.

***Supplemental Appropriation*** means, with respect to any Fiscal Year in which a Qualified Hedge Event occurs, the amount necessary, when added to amounts previously appropriated and unexpended during such Fiscal Year, to pay the Relevant Amount each Month during such Fiscal Year.

***Termination Event*** has the meaning given that term in the Hedges.

**Term Payment Period** means a period beginning on the day that a Qualified Hedge Event occurs and ending on Term Period End Date.

**Term Period End Date** means, as to a Qualified Hedge Event and corresponding Term Payment Period, the earlier to occur of (i) the seventh anniversary of such Qualified Hedge Event and (ii) the date on which occurs a Specified Event.

**Threshold** means ad valorem property taxes levied by the City, whether pursuant to the City Charter or Section 6093 *et seq.* of Public Act 236 of 1961, as amended, of 3 mills in any Fiscal Year in excess of 19.952 mils of ad valorem taxes levied by the City for general City purposes pursuant to the City Charter for the Fiscal Year ending on June 30, 2009.

**Transfer Hedge** has meaning given that term in the Service Contracts.

**Transfer Party** has the meaning given that term in the Service Contracts.

**Transfer Party Accession Event** has the meaning given that term in the Contract Administration Agreement.

**2006 Funding Trust** means the Detroit Retirement Systems Funding Trust 2006 established by the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee, as amended in accordance with its terms.

**2006 Hedge** has the meaning given that term in the preamble hereto.

**2006 Pension Funding Securities** means the Certificates of Participation issued by the 2006 Funding Trust.

**2006 Service Contract** has the meaning given that term in the preamble hereto.

**2006 Transaction** has the meaning given that term in the preamble hereto.

**UCC** means the Uniform Commercial Code as in effect in the State of Michigan.

**Unqualified Hedge Event** means a Hedge Event *other* than a Qualified Hedge Event.

**Wagering Tax Property** has the meaning given that term in **Section 1.6**.

**Wagering Tax Revenue Statute** has the meaning given that term in **Section 1.2**.

**Wagering Taxes** has the meaning given that term in **Section 1.6**.

**Section 1.2.  Definitions in Authorizing Ordinance**

The following terms are defined in the <u>Authorizing Ordinance</u>, as in effect on the date hereof, and are used herein as therein defined as of the date hereof.  Such terms are set forth below for convenience of reference:

**Article 9** means the Michigan Uniform Commercial Code – Secured Transactions, being MCL 440.9101 *et seq.*

**Casino Licensee** has the same meaning given such term in <u>Section 18-14-2</u> of the <u>Detroit City Code</u>.

**City Hedge Payables Related Obligations** mean the City's obligation, whether now existing or hereafter arising, to pay to each Service Corporation under the respective Service Contract

the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable.

**Hedge Payables** means, collectively, the Hedge Payables as defined in each Service Contract.

**Hedge Periodic Payables** means, collectively, the Hedge Periodic Payables as defined in each Service Contract.

**Pledged Property** means the Revenues, any investments made from time to time thereof, the Receipts Account and the Holdback Account, all amounts standing to the credit thereof from time to time, and any and all proceeds of any thereof.

**Revenues** means, collectively, Developer Payments and Wagering Tax Property.

**Wagering Tax Revenue Statute** means the Michigan Gaming Control and Revenue Act, being MCL 432.201 *et seq.*, MSA 18.969(201), *et seq.*, as amended.

### Section 1.3. Definition of *Counterparty*

(a) **Counterparty** means a Person designated as "Party A" in a Hedge, and any successor thereto or assignee of, or subrogee under, such Hedge pursuant to the terms thereof, except as otherwise provided in **this Section**.

(b) The definition of Counterparty includes the Transfer Party:

(i) for the purpose of executing and delivering this Agreement.

(ii) for purposes of receiving notices and giving any consent that is provided to be given by the Counterparties hereunder and

(iii) for all purposes of this Agreement on and after a Transfer Party Accession Event.

(c) The definition of Counterparty does not include SBS for any purpose of this Agreement on and after a Transfer Party Accession Event *except* for the purpose of executing and delivering this Agreement.

(d) The Custodian may conclusively presume in the absence of actual knowledge to the contrary that a Transfer Party Accession Event has not occurred unless and until it has received notice that a Transfer Party Accession Event has occurred from a Person entitled to give such notice under a Service Contract.

### Section 1.4. Definition of *Developer Payments* and Ancillary Definitions

The following terms are defined in the Authorizing Ordinance, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

(a) **Developer Payments** means:

(i) amounts payable under each Existing Payment Section,

(ii) as of any particular date, the aggregate amounts payable under any New Payment Section up to but not exceeding the aggregate amounts that would have been payable under the applicable Existing Payment Section as of such date,

(iii) any interest payable, in respect of amounts payable under each Payment Section, and

(iv) any amounts payable under any Guaranty or in respect of any amounts payable under any Payment Section.

For the avoidance of doubt, ***Developer Payments*** does not include any other payments or rights to reimbursement made or to be made under any Development Agreement.

(b) <u>Ancillary Definitions</u>

***Developer*** means any Existing Developer and any New Developer.

***Development Agreement*** means any Existing Development Agreement and any New Development Agreement.

***Existing Casino*** means any of the following casinos as the context may require:

(i) the casino currently known as the Greektown Casino and currently located at 555 E. Lafayette Boulevard in Detroit, Michigan;

(ii) the casino currently known as the MGM Grand Detroit Casino and currently located at 1300 John C. Lodge in Detroit, Michigan; and

(iii) the casino currently known as the MotorCity Casino and currently located at 2901 Grand River Avenue in Detroit, Michigan.

***Existing Developer*** means each of Detroit Entertainment, L.L.C., Greektown Casino, L.L.C., MGM Grand Detroit, L.L.C. and any successor to any of them or assignee of any of their respective Existing Development Agreements.

***Existing Development Agreement*** means any of the Revised Development Agreements among the City, The Economic Development Corporation of the City of Detroit and an Existing Developer, as in effect on the effective date of the <u>Authorizing Ordinance</u>, as such Revised Development Agreement may be modified or revised from time to time thereafter, and any substitute for such Revised Development Agreement with an Existing Developer.

***Existing Payment Section*** means each of the following sections and any substitute for any such section in an Existing Development Agreement:

(i) <u>Section 3.16(a)(iv)</u> of the <u>Existing Development Agreement</u> with Greektown Casino, L.L.C. as the Existing Developer,

(ii) <u>Section 3.16(a)(iv)</u> of the <u>Existing Development Agreement</u> with MGM Grand Detroit, L.L.C. as the Existing Developer, and

(iii) <u>Section 3.14(a)(iv)</u> of the <u>Existing Development Agreement</u> with Detroit Entertainment, L.L.C. as the Existing Developer.

***New Developer*** means a Person (that is not a public body) other than an Existing Developer.

***New Development Agreement*** means an agreement with respect to an Existing Casino to which the City and a New Developer are parties and which contains a New Payment Section.

**New Payment Section** means a section in a New Development Agreement that provides for the calculation of payments similar to the calculation of payments made under an Existing Payment Section.

**Payment Section** means any Existing Payment Section and any New Payment Section.

### Section 1.5. Definition of *Holdback Requirement* and Ancillary Definitions.

(a) **Holdback Requirement** means:

(i) for any Month *except* a Month occurring in a Ratings Upgrade Period, an amount equal to the Standard Holdback Requirement for such Month and

(ii) for any Month occurring in a Ratings Upgrade Period, means an amount equal to the Reduced Holdback Requirement for such Month.

(b) Definitions Related to the Amount of the Holdback Requirement

**Reduced Holdback Requirement** means an amount equal to the Regular Custodial Payment for the applicable Month.

**Standard Holdback Requirement** means the sum of:

(i) the Regular Custodian Payment payable during such Month *plus*

(ii) one-third of the aggregate of the Fixed Amounts payable by the Service Corporations under the Hedges during the Quarterly Period in which such Month falls without giving effect to any netting for the Floating Amounts due from the Counterparties under the Hedges.

(c) Definitions Related to a Ratings Upgrade Period

**Ratings Downgrade** means, after a Ratings Upgrade, (i) a reduction of the unenhanced ratings of the 2006 Pension Funding Securities to below BBB by Standard & Poor's or to below Baa2 by Moody's Investors Service, or (ii) the unenhanced rating of the 2006 Pension Funding Securities has been withdrawn or suspended by either Standard & Poor's or Moody's Investors Service.

**Ratings Upgrade** means the reinstatement of the unenhanced ratings of the 2006 Pension Funding Securities to not less than A- by Standard & Poor's and to not less than A3 by Moody's Investors Service.

**Ratings Upgrade Period** means a period of days beginning on (and including) the day that a Ratings Upgrade occurs and ending on (and including) the day on which the earlier of the following occur:

(i) a Ratings Downgrade or

(ii) a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party.

### Section 1.6.    Definition of *Wagering Tax Property* and Ancillary Definitions

The following terms are defined in the Authorizing Ordinance, as in effect on the date hereof, and are used herein as therein defined as of the date hereof. Such terms are set forth below for convenience of reference:

(a) *Wagering Tax Property* means, collectively, the Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, including any interest and penalties thereon as provided for under Detroit City Code Section 18-14-6(c) and any and all proceeds of any thereof. For the avoidance of doubt, *Wagering Tax Property* does not include any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Wagering Tax Revenue Statute.

(b) Ancillary Definitions

*Additional Wagering Taxes* means taxes collected or to be collected by the City pursuant to Section 12(5) of the Wagering Tax Revenue Statute.

*Alternative Taxes* means all proceeds of taxes to which the City is at any time or from time to time entitled under Section 12(1) of the Wagering Tax Revenue Statute on account of the City rescinding or otherwise being unable to exercise its option to collect Wagering Taxes and all other amounts payable to the City pursuant to Section 12 of the Wagering Tax Revenue Statute.

*Wagering Taxes* means taxes levied or imposed or to be levied or imposed by Detroit City Code Section 18-14-3 pursuant to Section 12(4)(b) of the Wagering Tax Revenue Statute.

### Section 1.7.    Time

*Unless* otherwise indicated, all references to time herein refer to such time in Detroit, Michigan.

### Section 1.8.    Business Days

If this Agreement requires an act to be performed on a day that is not a Business Day then such act shall be performed on the first day thereafter that is a Business Day with the same effect as if such act were performed on the day that such act was otherwise required to be performed.

### Section 1.9.    Interpretation

(a) Capitalized terms used herein have the meanings given or provided for such terms herein *unless* the context clearly otherwise requires.

(b) Words of the masculine gender include correlative words of the feminine and neuter genders.

(c) Unless the context otherwise indicates, words importing the singular include the plural and vice versa.

(d) Articles, Sections and Exhibits referred herein refer to the corresponding Articles and Sections of this Agreement and Exhibits to this Agreement *unless* otherwise provided.

(e) The terms *hereby, hereof, hereto, herein, hereunder* and any similar terms used in this Agreement refer to this Agreement as a whole and not to any particular portion thereof.

(f) The word *or* is not exclusive.

(g) The enumeration of things after the word *including* is to be interpreted as illustrative and not as restrictive.

(h) References herein or in the preamble hereto to any Public Act, or codification thereof, or any section, subsection or paragraph thereof include any amendments to such Public Act, or codification thereof, or to any section, subsection or paragraph thereof and any substitute therefor.

(i) References herein or in the preamble hereto to any section, subsection or paragraph of either the Wagering Tax Revenue Statute or the Detroit City Code include any amendments to such section, subsection or paragraph as the same may be amended from time to time and any substitute therefor.

## Article II.  Effectiveness of this Agreement

### Section 2.1.  Closing Date

The Closing shall occur on a date on or before June 26, 2009.

### Section 2.2.  Satisfaction of Conditions Precedent

This Agreement shall become effective on and after the Closing Date.

### Section 2.3.  Factual Conditions Precedent

(a) The Existing Developers shall have received the Irrevocable Instructions.

(b) The Service Corporations and the Counterparties shall have entered into the Hedge Amendments.

(c) The City, the Service Corporations and the Counterparties shall have entered into the Service Contract Amendments.

(d) The Third Party Beneficiaries (as defined in the 2006 Service Contracts) shall have consented to the Service Contract Amendments and the Hedge Amendments.

(e) The Custodian has established the Accounts.

(f) The City Council shall have adopted a resolution to implement the Authorizing Ordinance and authorize the Definitive Documents.

### Section 2.4.  Documentary Conditions Precedent

The parties hereto shall have received and then hold such instruments, other documents and opinions in form and substance acceptable to each of the parties.

## Article III.  General Provisions; Irrevocable Instructions

### Section 3.1.  Appropriation

(a) The payment by the City of the City Payments and amounts payable pursuant to **Section 5.6** (if not appropriated at the time thereby required to be paid) are subject to appropriation by the City Council.

(b) The City Pledge, the Irrevocable Instructions and the deposit of Revenues in the Receipts Account are not subject to appropriation by the City Council.

## Section 3.2. No Indebtedness

The obligations of the City under this Agreement shall not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act, being Act 279 of the Public Acts of Michigan of 1909, as amended, or any Michigan constitutional or other non-tax statute or City Charter limitation.

## Section 3.3. Contractual Obligations

(a) The City Hedge Payables Related Obligations and all obligations of the City under this Agreement are contractual obligations, enforceable in the same manner as any other contract of the City and are not general obligations of the City to which the City has pledged its full faith and credit or ad valorem taxing power.

(b) **This Section** does not impair any lien or security interest in any Pledged Property.

## Section 3.4. Irrevocable Instructions

(a) The City shall give effect to its obligations contained in **Section 5.1(a)** by means of the Irrevocable Instructions in the form attached hereto as **Exhibit 3.4** as modified with the consent of the Counterparties to take into account whether the addressee is a Casino Licensee, Developer or Obligor (the *Irrevocable Instructions*).

(b) The City shall deliver an Irrevocable Instruction to each Casino Licensee and each Existing Developer on or before the Closing Date. *If* a Casino Licensee and a Developer are the same Person *then* the Irrevocable Instruction as to Wagering Tax Property and Developer Payments may be combined in a single Irrevocable Instruction.

(c) The City shall deliver an Irrevocable Instruction on or before the Closing Date to each Person who is an obligor (an *Obligor*) under a Guaranty and from whom payment is required in lieu of or in substitution for an amount otherwise payable by a Developer as a Developer Payment

(d) The City shall deliver an Irrevocable Instruction to each New Developer on or before the date of effectiveness of each New Development Agreement.

(e) Upon reasonable request by any Counterparty during the term of this Agreement and in any event when requested by a Counterparty following the occurrence of a Hedge Event, the City also shall deliver or redeliver an Irrevocable Instruction to any Developer, Casino Licensee or Obligor, as identified by the Counterparty.

(f) Each Casino Licensee, Developer or Obligor owing any Revenues to the City, when notified by the Irrevocable Instructions, shall be discharged *pro tanto* by making payment in accordance with the Irrevocable Instructions.

(g) The City shall not revoke or otherwise act to effect any change to an Irrevocable Instruction without the prior written consent of each Counterparty.

(h) The City shall take all actions necessary to ensure that Irrevocable Instructions remain in effect during the term of this Agreement, including with respect to any Wagering Tax

Property or Developer Payments payable by any Developer or Obligor, whether or not an addressee of the Irrevocable Instructions.

(i) The failure of a Casino Licensee, Developer or Obligor to comply with an Irrevocable Instruction shall not relieve the City of its obligations contained in **Section 5.1**.

### Section 3.5.    Payments from Accounts

Any amount paid to the City from the General Receipts Subaccount or released to the City from the Holdback Account, in each case, pursuant to the terms of this Agreement shall be free and clear of any pledge or lien created by this Agreement.

## Article IV. Pledges and Grant of Security Interests

### Section 4.1.    City Pledge

(a) The City Pledge as set forth in the Authorizing Ordinance, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(b) The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations (the *City Pledge*).

(c) The City Pledge shall be valid, binding and enforceable as of the Closing Date, and the Pledged Property and other property pledged pursuant to the City Pledge shall immediately be subject to the lien of the City Pledge without any physical delivery thereof or further act.

(d) The lien of the City Pledge shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against the City irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the City Pledge.

(e) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the City Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

### Section 4.2.    Service Corporation Grant of Security Interests

(a) Each Service Corporation grants a security interest to the Counterparties in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge (the *Service Corporation Property*), in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge and all other amounts owing to the Counterparties under this Agreement (the *Service Corporation Security Interest*).

(b) The Service Corporation Security Interest is an essential term of this Agreement.

### Section 4.3.    Alternative Service Corporation Pledge

(a) **This Section** is applicable *if and to the extent* that a Service Corporation is deemed a "governmental unit" or a "governmental subdivision or agency" as such terms are used in Article 9 (the ***Government Exception***)

(b) The Service Corporation Pledge as set forth in the <u>Authorizing Ordinance</u>, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(c) Each Service Corporation pledges to the Counterparties and creates a first priority lien upon all of the Service Corporation's right, title and interest in, to and under the Service Corporation Property, in order to secure the payment of the Hedge Payables as the same may now or hereafter become due and payable by such Service Corporation under its respective Hedge (the ***Service Corporation Pledge***).

(d) The Service Corporation Pledge shall be valid, binding and enforceable as of the Closing Date, and the Service Corporation Property shall immediately be subject to the lien of the Service Corporation Pledge without any physical delivery thereof or further act.

(e) The lien of the Service Corporation Pledge of each Service Corporation shall be valid, binding and enforceable as against all parties having claims of any kind in tort, contract or otherwise against such Service Corporation irrespective of whether such claims are voluntary or involuntary or any such claimants have notice of the Service Corporation Pledge.

(f) Neither the Authorizing Ordinance nor this Agreement nor any other document or any statement, or instrument by which the Service Corporation Pledge is created or evidenced nor any financing statement or other notice need be recorded or filed.

## Article V.  Certain Payments

### Section 5.1.    Payment of Revenues

(a) The City shall pay all Revenues to the Custodian.

(b) The City shall not take any action to redirect the payment of the Revenues contrary to the Irrevocable Instructions.

(c) *If* the City shall receive any Revenues from or on behalf of a Casino Licensee or Developer or an Obligor under a Guaranty notwithstanding the giving of the Irrevocable Instructions, *then* the City shall transfer such Revenues to the Custodian for deposit to the credit of the Developer Subaccount within two Business Days following the earlier to occur of:

(i) the Finance Director having actual knowledge of such payment and

(ii) receipt by the City of notice from the Custodian that such payment was erroneously paid to the City.

(d) Until the Pledged Property has been released from the lien of the City Pledge, the City shall not transfer to the revenue division of the Michigan Department of Treasury, pursuant to <u>Detroit Code Section 18-14-6(a)</u>, the responsibility and function of administering and collecting Revenues on behalf of the City.

## Section 5.2.   Monthly Payments by City

(a)  Monthly, on or before the Payment Date of such Month, the City shall pay to the Custodian in one or more payments an aggregate amount from the City's general fund (collectively, a *City Payment*) for deposit to the credit of the Holdback Account as provided below:

(1)  *Except* as provided in **paragraph (2)** or **(3)**, **below**, the City Payment shall equal the Holdback Requirement for the Month in which such City Payment is made.

(2)  *Subject* to **Section 5.2(e)**, the City Payment shall equal the Relevant Amount for each Month during the Term Payment Period.

(3)  The City Payment shall equal the amount of the Final Payment for the Month in which occurs an Unqualified Hedge Event or the Term Period End Date.

(b)  The City shall make the City Payment at or before the Payment Time on the date such payment is made.

(c)  The City has no obligation to make more than one City Payment in any Month *except* as otherwise provided in **subsection (d)**, **below**.

(d)  *If* the City has made a City Payment equal to the Holdback Requirement in any Month and after making such payment the City becomes obligated to make a City Payment equal to the Relevant Amount or Final Payment during such Month, *then* on or before the Payment Date of such Month, the City shall pay a City Payment equal to the difference between the Holdback Requirement already paid by the City during such Month and the amount of such Relevant Amount or Final Payment, as the case may be.

(e)  To the extent that, following the commencement of the Term Payment Period, payment of the amount referred to in **clause (iii)** of the **definition of "Relevant Amount"** requires a Supplemental Appropriation, the City may defer the payment of such amount until the earliest to occur of:

(i)  the date on which the Supplemental Appropriation is obtained,

(ii)  the Outside Supplemental Appropriations Date,

(iii)  the date on which an Unqualified Hedge Event occurs and

(iv)  the Term Period End Date.

For each Month in the deferral period, the amount so deferred shall not be included in the Relevant Amount, or as a City Payment, for that Month, *but* upon the expiration of the deferral period, an amount equal to the interest at the Interest Rate accrued and remaining unpaid to the Counterparties under the Hedges from the commencement of the deferral period shall be included in the Relevant Amount, and as a City Payment, in the Month in which the deferral period expires.

## Section 5.3.   Payments to City from General Receipts Subaccount

(a)  Payments shall be made to the City from the General Receipts Subaccount as follows *except* during a Ratings Upgrade Period or as provided in **Section 5.4**:

(1)  For any Month in which the Custodian receives the full amount of a City Payment required by **Section 5.2**, the Custodian shall, without notice to or consent by the Coun-

terparties, pay to the City an amount from the General Receipts Subaccount equal to such City Payment.

(2) Beginning on the second Business Day following the date on which the Custodian gives its Monthly Holdback Compliance Notice to the City and the Counterparties, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during the Month covered by such Monthly Holdback Compliance Notice.

(b) *Except* as provided in **Section 5.4**, the Custodian shall remit daily to the City all amounts standing to the credit of the General Receipts Subaccount during a Ratings Upgrade Period.

## Section 5.4. When Payments from General Receipts Subaccount Prohibited

(a) No payment shall be made to the City from the General Receipts Subaccount

(i) on and after the Term Period End Date or

(ii) on or after the occurrence of a Termination Event under a Hedge where the related Counterparty is not the sole Affected Party *except* as otherwise permitted by **subsection (b), below** or

(iii) while an Event of Default is continuing under a Hedge where the related Counterparty is not the sole Defaulting Party.

(b) No payment shall be made to the City from the General Receipts Subaccount on or after a Qualified Hedge Event *unless and until* the (i) City enacts the correlative Supplemental Appropriation and (ii) the Finance Director delivers to the Custodian and the Counterparties a certification that such Supplemental Appropriation has been duly enacted and is in the amounts required by this Agreement.

## Section 5.5. Payments to City from Holdback Account

(a) *Except* as otherwise provided in **subsection (b), below**, on each Release Date, the Custodian shall pay to the City the balance in excess of $5,000 standing to the credit of the Holdback Account at the end of the correlative Quarterly Period.

(b) No payment shall be made to the City from the Holdback Account if at the time a Final Payment is due and owing.

(c) *Release Date* means, as to any Quarterly Period, the latest to occur of:

(i) the date on which all payments to the Counterparties and the Custodian required by **Section 5.7** have been paid,

(ii) the date of the delivery by the Custodian, in accordance with **Section 12.9**, of the Quarterly Coverage Report for the immediately ended Quarterly Period and

(iii) the date of delivery by the Custodian, in accordance with **Section 12.9**, of the Monthly Coverage Report for the last Month in the immediately ended Quarterly Period.

### Section 5.6.  Payments by City to Holdback Account

(a)  *If* a Quarterly Accounting shows that amounts standing to the credit of the Holdback Account are not sufficient to make all payments to the Counterparties and the Custodian required by **subsections (a)** through **(d) of Section 5.7**, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(b)  *If* at any time amounts standing to the credit of the Holdback Account are not sufficient to pay all Regular Custodian Payments and City Payments due at the time, then the City shall then pay to the Custodian an amount from its general fund equal to the amount of such insufficiency.

(c)  All amounts received by the Custodian from the City pursuant to **this Section** shall be deposited to the credit of the Holdback Account and applied to the insufficiency giving rise to the reason for such payment.

### Section 5.7.  Payments to the Counterparties and the Custodian from Holdback Account

(a)  The Custodian shall pay to the Counterparties from the Holdback Account:

(i)  at the end of each Quarterly Period, except during the Term Payment Period or after the occurrence of an Unqualified Hedge Event or the Term Period End Date, an amount equal to all Hedge Periodic Payables payable for such Quarterly Period; and

(ii)  at the end of each Month during the Term Payment Period, an amount equal to the Relevant Amount for the Month, excluding the amount of any Regular Custodian Payment included in the Relevant Amount;

(b)  Upon the occurrence of an Unqualified Hedge Event or the Term Period End Date, the Custodian shall pay the Final Payment from the Holdback Account.

(c)  All amounts paid to the Counterparties pursuant to **Section 5.7(a)(ii)** shall be credited toward payment by the City of the amounts due and owing to the Counterparties under the Hedges as to which payment is deferred during the Term Payment Period due to the Limitation on Remedies.

(d)  At the end of the Quarterly Period or at such other time or times as the payments are then due and owing, the Custodian shall pay to itself from the Holdback Account all Regular Custodial Payments then due and owing.

(e)  If the funds in the Holdback Account are not sufficient to make the payments required by this **Section 5.7**, the amounts referred to in **Section 5.7(d)** shall be paid first, and any balance shall be paid to the Counterparties.

### Section 5.8.  Payment Determinations

(a)  For purposes of the Custodian determining the amount or timing of payments to be made under this **Article V**, the Custodian may rely upon the written notice delivered by either Counterparty as to the occurrence of any Rating Upgrade, Rating Downgrade, Unqualified Hedge Event, Qualified Hedge Event, Outside Supplemental Appropriation Date, Term Period End Date or any other event affecting the determination of the amount or timing of payment under this **Article V**.

1974114.0093/425069

(b) Any such notice or determination shall not affect the right of the City to seek a re-fund or other payment from the Counterparties based on the City's belief that the information contained in the notice was incorrect.

## Article VI. Representations and Warranties of the City

The City makes the representations and warranties contained in **this Article** for the bene-fit of the Custodian, the Service Corporations and the Counterparties on and as of the Closing Date.

### Section 6.1.    General Representations and Warranties

(a) Organization and Existence

(1) The City is a municipal corporation of the State of Michigan, with home rule powers, duly existing under the laws of the State of Michigan and pursuant to the City Char-ter.

(2) The City Charter and all amendments thereto were duly approved by a majority of the City electors voting thereon, and the City Charter and any such amendments have not been rescinded in whole or in part.

(b) Valid and Binding Agreement, Obligations and City Pledge

(1) This Agreement and each other Definitive Document to which the City is a party, constitutes a valid and binding agreement of the City enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2) The obligations of the City under the Authorizing Ordinance constitute a valid and binding agreement of the City enforceable in accordance with its terms except as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(3) The City Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bank-ruptcy, insolvency or similar laws affecting the rights of creditors generally.

(c) Corporate and Governmental Authorization; No Contravention

(1) The execution, delivery and performance by the City of this Agreement and each other Definitive Document to which the City is a party are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a de-fault under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(2) Article XIV of Chapter 18 of the Detroit City Code and the Authorizing Ordi-nance are in full force and effect in accordance with all applicable City Charter, constitu-tional and statutory requirements, are within the City's powers, require no action by or in re-spect of, or filing with any governmental body, agency or official, and do not contravene or constitute a default under any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City.

(3) The representation regarding performance set forth in **paragraph (1)**, above is qualified to the extent that appropriations are required as set forth in **Section 3.1**.

(d) No Litigation

There is no action, suit or proceeding pending against, or to the knowledge of the City threatened against, or affecting the City, the Authorizing Ordinance or the Pledged Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the City to perform its obligations under this Agreement or any other Definitive Document to which the City is a party or the Authorizing Ordinance or which in any manner questions the validity of this Agreement or any other Definitive Document to which the City is a party, the Authorizing Ordinance or the City Pledge.

(e) Conditions Precedent

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the City exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the City.

## Section 6.2.    Revenues

(a) The use and application of the Revenues as provided in the Authorizing Ordinance and this Agreement are in compliance with the Development Agreements and the Wagering Tax Revenue Statute.

(b) The statement of Revenues delivered with and as referenced in the Closing Certificate is a true and complete statement of all Revenues collected by the City for each year from 2003 – 2008 and for the year to date period in 2009 showing as to each Developer: (1) Wagering Taxes, (2) Alternative Taxes, (3) Additional Wagering Taxes, and (4) Developer Payments.

## Section 6.3.    Developer Agreements and Guaranties

(a) A true and complete copy of each Development Agreement (including all amendments thereto) has been delivered with the Closing Certificate as referenced therein.

(b) A true and complete copy of each Guaranty (including all amendments to each such Guaranty) has been delivered with the Closing Certificate as referenced therein.

(c) There are no Guaranties or Development Agreements *except* the Guaranties and Development Agreements delivered with the Closing Certificate.

## Section 6.4.    No Other Liens, Charges or Encumbrances

(a) The Pledged Property is not subject to any lien, charge or encumbrance *except* the City Pledge and either the Service Corporation Pledge (if the Government Exception is applicable) or the Service Corporation Security Interest (if the Government Exception is not applicable) granted by this Agreement.

(b) No financing statement is on file in any public office covering any of the Pledged Property *except* in favor of the Counterparties.

### Section 6.5.  No Control Granted

The City has not granted control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property, or any account in which the Pledge Property is held, to any Person other than the Custodian.

## Article VII.  Representations and Warranties of Service Corporations

Each Service Corporation makes the representations and warranties contained in **this Article** for the benefit of the City, the Custodian, the other Service Corporation and the Counterparties on and as of the Closing Date.

### Section 7.1.  General Representations and Warranties

(a) Corporate Existence and Power

The Service Corporation is a nonprofit corporation duly incorporated, validly existing and in good standing under the laws of the State of Michigan.

(b) Corporate and Governmental Authorization; Contravention

The execution, delivery and performance by the Service Corporation of this Agreement and each other Definitive Document to which the Service Corporation is a party are within the Service Corporation's corporate powers, have been duly authorized by all necessary corporate action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the articles of incorporation or bylaws of the Service Corporation or of any agreement, judgment, injunction, order, decree or other instrument binding upon the Service Corporation.

(c) Valid and Binding Agreement and Service Corporation Pledge

(1) This Agreement and each other Definitive Document to which the Service Corporation is a party, constitutes a valid and binding agreement of the Service Corporation enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(2) If the Government Exception is applicable, the Service Corporation Pledge as set forth in the Authorizing Ordinance and herein is valid, binding and enforceable in accordance with its terms *except* as may be limited by bankruptcy, insolvency or similar laws affecting the rights of creditors generally.

(d) No Litigation

There is no action, suit or proceeding pending against, or to the knowledge of the Service Corporation threatened against, or affecting the Service Corporation or the Service Corporation Property before any court or arbitrator or any governmental body, agency or official in which there is a reasonable possibility of an adverse decision which could materially adversely the ability of the Service Corporation to perform its obligations under this Agreement or any other Definitive Document to which the Service Corporation is a party or which in any manner questions the validity of this Agreement or any other Definitive Document to which the Service Corporation is a party, the Service Corporation, the Service Corporation Security Interest, or the Service Corporation Pledge.

(e) No Taxation

The Service Corporation is not subject to federal income tax or taxation by the State of Michigan.

(f) Not an Investment Company

The Service Corporation is not an "investment company" within the meaning of the Investment Company Act of 1940, as amended.

(g) Conditions Precedent

All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the Service Corporation exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the Service Corporation.

## Section 7.2.    Concerning the Security Interests

(a) Corporate Name

The Service Corporation's name as indicated on the signature page of this Agreement is such Service Corporation's name as indicated on the public record of the Service Corporation's jurisdiction of organization which shows the Service Corporation to have been organized.

(b) Registered Organization

The Service Corporation is a "registered organization," within the meaning of Article 9 of the UCC, of the type and organized under the laws of the State of Michigan.

(c) Place of Business

Section 9.04 of the respective Service Contract accurately sets forth the Service Corporation's place of business or, if more than one place of business, its chief executive office as well as such Service Corporation's mailing address if different and such Service Corporation has not had any other place of business or, if more than one place of business, any other chief executive office since its formation.

(d) Corporate Identification

Each Service Corporation represents only as to its own organizational identification number as follows:

(1) The organizational identification number of GRS Service Corporation is 793781.

(2) The organizational identification number of PFRS Service Corporation is 793782.

(e) Validity, Perfection and Priority of Security Interest

(1) As of the Closing Date, the security interest granted to the Counterparties in the Service Corporation Property is a valid security interest to the extent of the rights of such Service Corporation's interests therein, and such security interest is a perfected, first priority security interest.

(2) The Service Corporation Security Interest is valid, binding and enforceable as of the Closing Date, and the Service Corporation Property is immediately subject to the Service Corporation Security Interest without any physical delivery thereof or further act.

(3) The Service Corporation shall not be in breach of the representation contained in **paragraph (1) above** by reason of the Government Exception.

(f) No Other Liens, Charges or Encumbrances

(1) The Service Corporation's interest in the Service Corporation Property is not subject to any lien, charge or encumbrance *except* the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(2) No financing statement is on file in any public office covering any Service Corporation Property.

(g) No Control Granted

The Service Corporation has not granted control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Counterparties.

## Article VIII. The Accounts

### Section 8.1.    Establishment of Accounts

(a) There is established with the Custodian the following accounts to be held as custodial accounts:
- Receipts Account
- Holdback Account

(b) The Custodian shall establish the Developer Subaccounts as required by **Section 8.2** in the Receipts Account.

(c) The Custodian shall establish the General Receipts Subaccount in the Receipts Account.

(d) The Accounts shall be held at an office of the Custodian located in the City and State of New York.

## Section 8.2.    Developer Subaccounts

(a) The Custodian shall establish a Developer Subaccount in the Receipts Account with respect to each Developer.

(b) The initial Existing Developers and the initial Developer Subaccounts to be established with respect thereto are:
- Detroit Entertainment Subaccount with respect to Detroit Entertainment, L.L.C.
- Greektown Subaccount with respect to Greektown Casino, L.L.C.
- MGM Grand Subaccount with respect to MGM Grand Detroit, L.L.C.

(c) The Custodian shall establish a new Developer Subaccount in the Receipts Account for each assignee of an Existing Developer and for each New Developer.

(d) **_Predecessor Developer_** means, as the context may require, (i) an Existing Developer that is the assignor of an Existing Development Agreement or (ii) an Existing Developer of an Existing Casino for which there is a New Developer.

(e) Upon the establishment of a new Developer Subaccount, the Custodian shall take the following actions.

(1) All amounts, if any, standing to the credit of the Developer Subaccount established in respect of the Predecessor Developer shall be deposited to the credit of the General Receipts Subaccount.

(2) Upon making such deposit, if any, such Developer Subaccount established in respect of the Predecessor Developer shall be closed.

(f) For the avoidance of doubt, the Developer Subaccounts are established for the purpose of convenience of administering this Agreement, and the establishment thereof does not give the Developers any rights to the respective Developer Subaccount or the amounts or investments credited thereto.

## Section 8.3.    Receipt of Revenues

(a) Promptly upon receipt of any Revenues in respect of a Developer on a Receipt Day, the Custodian shall deposit the same to the credit of the Developer Subaccount established in respect of such Developer.

(b) Revenues that consist of investment earnings of amounts credited to the General Receipts Subaccount or Holdback Account shall be a part of, respectively, the General Receipts Subaccount or Holdback Account and shall not be deposited to the credit of any Developer Subaccount.

## Section 8.4.    Transfer of Revenues to General Receipts Subaccount

Upon the deposit of any Revenues to the credit of a Developer Subaccount, the Custodian shall promptly thereafter transfer the same to the General Receipts Subaccount.

**Section 8.5.   Receipt of City Payments**

Whenever the Custodian receives an amount as a City Payment or portion thereof, the Custodian shall deposit the same to the credit of the Holdback Account.

**Section 8.6.   General Receipts Account**

The Custodian shall make the payments to the City from the General Receipts Subaccount at the times and in the amounts provided in **Article V**.

**Section 8.7.   Holdback Account**

(a) The Custodian shall not deposit any amounts to the credit of the Holdback Account other than amounts paid by the City from its general fund.

(b) The Custodian shall make the payments to the Counterparties from the Holdback Account at the times and in the amounts provided in **Section 5.7**.

(c) The Custodian shall make the payments to the City from the Holdback Account at the times and in the amounts provided in **Section 5.5**.

**Section 8.8.   Investments**

(a) Amounts standing to the credit of either Account shall be held in cash *unless* invested in Authorized Investments as provided in **subsection (b), below**.

(b) Amounts standing to the credit of either Account shall be invested by the Custodian at the direction of the Finance Director in Authorized Investments maturing on or before the date and in such amounts as will be needed to provide for amounts to be expended for the purposes for which the particular Account was established.

(c) The investment of amounts credited to an Account shall be held by the Custodian and shall be deemed at all times a part of such Account, and the interest accruing thereon and any profit realized therefrom shall be credited thereto, and any losses resulting from such investment shall be charged thereto.

(d) The Custodian may make such investments through its own investment or bond department.

## Article IX.  City Covenants

The City covenants with the other parties hereto as provided in **this Article**.

**Section 9.1.   No Senior or Parity Pledges or Liens**

The City shall not grant or permit to exist any pledge of or other lien on, or security interest in, the Pledged Property that is senior to or of an equal priority with the City Pledge.

**Section 9.2.   Junior Pledges or Liens**

The City may pledge or otherwise grant a lien on, or security interest in the Pledged Property that is junior to the pledge and lien granted by this Agreement *if, but only if,* (i) such pledge, lien or security interest is authorized by ordinance or resolution of the City Council and

(ii) as a condition to the grant, be subject to intercreditor arrangements satisfactory to the Counterparties (***Permitted Liens***).

### Section 9.3. Further Assurances

(a) The City shall furnish to the Counterparties all information regarding the Pledged Property that any Counterparty from time to time may reasonably request.

(b) To the extent permitted by law, the City shall sign, file, or record all agreements and documents and shall take all other actions, that either Service Corporation or a Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(c) In the event that the City receives conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the City may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Service Corporation's security interest in the Pledged Property.

(d) The City authorizes each of the Service Corporations to file in any Uniform Commercial Code recording office a financing statement in favor the Service Corporation as secured party and covering the collateral under the City Pledge.

### Section 9.4. No Control Granted

The City shall not grant control (for purposes of Article 8 and, if applicable, Article 9 of the UCC) over the Pledged Property or any Account other than to the Custodian or the Counterparties.

### Section 9.5. Excluded Property

(a) For the avoidance of doubt, Excluded Property is not subject to **Sections 9.1** through **9.4**, inclusive.

(b) No pledge of or other lien on, or security interest in, Excluded Property shall be granted by the City *except* pursuant to ordinance or resolution of City Council.

### Section 9.6. No Development Agreement Amendments

The City will not enter into any amendment, supplement or other modification of any Development Agreement without the consent of the Counterparties that:

(i) changes the formula for calculating any Developer Payment, which change has the effect of reducing the amount of any Developer Payment or

(ii) has the effect of changing the frequency of any Developer Payment or

(iii) affects the making of Developer Payments in accordance with the Irrevocable Instructions.

# Article X.  Service Corporation Covenants

Each Service Corporation covenants with the other parties hereto as provided in **this Article**.

## Section 10.1.  No Pledges of Liens of Service Corporation Property

(a) No Service Corporation shall grant or permit to exist a pledge or lien on, or security interest in, any Service Corporation Property other than the Service Corporation Security Interest or, if the Government Exception is applicable, the Service Corporation Pledge.

(b) For the avoidance of doubt, **this Section** does not apply to Excluded Property.

## Section 10.2.  No Control Granted

The Service Corporation shall not grant control (for purposes of Articles 8 and 9 of the UCC) over the Service Corporation Property, or any bank account or securities account in which the Service Corporation Property or any proceeds thereof are held, to any Person other than the Custodian or the Counterparties.

## Section 10.3.  Excluded Property

No Service Corporation shall grant a pledge of or lien on, or security interest in, Excluded Property *except* pursuant to ordinance or resolution of the City Council.

## Section 10.4.  Alternative Taxes

(a) *If and when* Alternative Taxes become payable, the City shall, effective on or before the date of first payment, enter into an agreement with the State of Michigan providing for the payment of Alternative Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b) Such agreement shall be in form and substance acceptable to the Counterparties.

## Section 10.5.  Alternative Payment of Developer Payments

(a) *If and when* a Developer begins to pay Additional Wagering Taxes to the State of Michigan, the City shall, effective on or before the date of first payment enter into an agreement with the State of Michigan providing for the payment of such Additional Wagering Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b) Such agreement shall be in form and substance acceptable to the Counterparties.

## Section 10.6.  Further Assurances

(a) The Service Corporations shall furnish to the Counterparties all information regarding the Service Corporation Property that either Counterparty from time to time reasonably requests.

(b) The Service Corporations shall sign, file or record all agreements and documents and shall take all other actions, that either Counterparty reasonably considers necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparty's security interest in the Service Corporation Property.

(c) In the event that the Service Corporations receive conflicting instructions from the Counterparties regarding an action to be taken pursuant to **subsection (b), above**, the Service Corporations may rely upon advice of counsel to the City whether such action is necessary or appropriate to perfect, to continue perfection of, or to maintain first priority of, the Counterparties' security interest in the Service Corporation Property.

(d) Each of the Service Corporations authorizes each of the Counterparties to file in any Uniform Commercial Code recording office (i) a financing statement in favor the Counterparty as secured party and covering the collateral under the Service Corporation Pledge and the Service Corporation Security Interest and (ii) an assignment to the Counterparty of any financing statement in favor of the Service Corporation covering collateral under the City Pledge.

## Article XI. Remedies

### Section 11.1. Remedies under Hedges

Following the occurrence of a Termination Event or Event of Default under a Hedge, the respective Counterparty (or the Service Corporations, if a Counterparty is the sole Affected Party or Defaulting Party in respect of such Termination Event or Event of Default under such respective Hedge), has all remedies available to it under its Hedge or otherwise by contract or applicable law *except* with respect to the exercise of remedies against the Pledged Property as provided in **Section 11.3**.

### Section 11.2. Remedies as Secured Party

(a) In addition to a Counterparty's remedies under a Hedge, following the occurrence of a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, each Counterparty has the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge. Such remedies of the Counterparties as secured parties under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated.

(b) Such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts.

(c) *Subject* to such appropriation as may be required, judicial remedies shall be available to the extent necessary for the Counterparties to recognize all the rights and benefits of a first priority secured party with respect to the Service Corporation Property and the Pledged Property, including, as appropriate, by writ of mandamus or other equitable remedy that would result in release of funds from the Accounts to be applied to the obligations owing to the Counterparties under the Hedges and this Agreement.

(d) In exercising remedies the Counterparties may act jointly or independently of each other.

## Section 11.3. Limitation on Remedies

(a) *If* any Hedge is terminated by the respective Counterparty on account of any Specified Additional Termination Event *then* such Counterparty shall forbear (such forbearance being hereinafter referred to as the ***Limitation on Remedies***) from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(b) The Limitation on Remedies does not apply on or after a Term Period End Date.

## Section 11.4. Failure to Appropriate

In the event that the City fails to make an appropriation in the City's final annual budget adopted by the City Council pursuant to and in compliance with the City Charter for any Fiscal Year, and to maintain such provision without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis and as a "first budget" obligation, an amount that is sufficient to pay in full, and which may be used exclusively for payment of, the City Payments for a particular Fiscal Year, mandamus may be an appropriate remedy for the Counterparties.

## Section 11.5. Indemnity

(a) To the extent permitted by law, the City shall defend and hold harmless the Counterparties from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a liability) by either Counterparty arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in **paragraph 4 of Section 11.6**.

(b) *If*, for so long as this Agreement is in effect, a Counterparty has actual notice or knowledge of any claim or loss for which indemnification by the City is asserted, the Counterparty shall give to the City written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. *However*, any delay or failure of the Counterparty to give the notice shall not affect the City's indemnification obligations except to the extent that the City was prejudiced by the delay or failure.

(c) *If* a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, *then* the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(d) In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, the City shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(e) *Notwithstanding* the City's assumption of the defense, the Counterparty shall have the right to employ separate counsel and to participate in the defense of such action, and the City shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel *if*:

> (i) other than under **Paragraph (4)** of **Section 11.6**, a Termination Event or Event of Default under a Hedge has occurred other than or resulting from a Specified Event,

(ii) other than under **Paragraph (4)** of **Section 11.6**, the Term Period End Date has occurred,

(iii) the result of the use of counsel chosen by the City to represent the Counterparty would present such counsel with a conflict of interest;

(iv) the actual or potential defendants in, or targets of, any such action include the Counterparty and the Counterparty shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the City,

(v) the City shall not have employed counsel reasonably satisfactory to the Counterparty to represent the Counterparty within a reasonable time after notice of the institution of such action or

(vi) the City, in its discretion, shall authorize the Counterparty to employ separate counsel at the City's expense.

The City shall not be liable under this Agreement for any amount paid by the Counterparty to settle any claims or actions if the settlement is entered into without the City's consent, which may not be unreasonably withheld or delayed.

**Section 11.6.** *Specified Event* means any of the following events:

(1) The City fails to pay any Relevant Amount to the Custodian as required by **Section 5.2**.

(2) The City fails to make an appropriation by the Outside Supplemental Appropriations Date in the City's final annual budget for the then current Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout the balance of such Fiscal Year, on a line item basis and as a "first budget" obligation, of any supplemental amount necessary to provide exclusively for the payment of the Relevant Amount each Month during the balance of such Fiscal Year to the extent that there is not an appropriation then in effect.

(3) Commencing with the Fiscal Year beginning on July 1, 2009, the City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year subsequent to the Fiscal Year in which the termination of the Hedges occurs and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to:

(i) the *greater* of (x) \$50,736,975 and (y) the sum of the Notional Holdback Amounts for the Months ending in such Fiscal Year,

(ii) *plus* an amount equal to interest at the Interest Rate to accrue and to be payable during such Fiscal Year to the Counterparties under the Hedges,

(iii) *plus* the Regular Custodian Payments to be paid during such Fiscal Year.

(4) The City, a Service Corporation, or a third party commences litigation or takes any other judicial action, or any legislative action is taken, to set aside or avoid or limit the

2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction. This **paragraph (4)** does not apply to the City challenging the release of funds from the General Receipts Subaccount for payment of the obligations owing to the Counterparties under the Hedges if such challenge (i) is based solely on the grounds that such amounts have not yet been appropriated by the City for such purpose and (ii) does not challenge the "first budget" obligation of the City to make such appropriation.

(5) The Authorizing Ordinance or any part thereof is amended (without the consent of the Counterparties), revoked, rescinded, nullified or suspended for any reason.

(6) The City rescinds, reduces or ceases to impose the tax imposed as of the Closing Date pursuant to Section 18-14-3 of the Detroit City Code or if the City, within two Business Days following the earlier to occur of (i) notice from the Custodian that a taxpayer has inadvertently or erroneously paid Wagering Tax Property directly to the City or (ii) the Finance Director learning of such payment, the City fails to transfer by wire transfer in same day funds to the Custodian for deposit to the credit of the General Receipts Subaccount such payment. *However*, the rescinding of such tax shall not cause the expiration of the Term Payment Period if the such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax currently imposed is paid to the Custodian under arrangements satisfactory to the Counterparties.

(7) The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments and Sinking Fund Installments as and when due and payable under either Service Contract.

(8) The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $5,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both.

(9) The City fails to pay any judgment or judgments aggregating $5,000,000 or more, *excluding* judgments:

(i) on appeal and being contested in good faith or

(ii) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Threshold and with which agreement the City is in compliance or

(iii) for which the City is diligently making arrangements for payment *and* the delay in payment will not result in the City being held in contempt of court for non-payment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes above the Threshold or

(iv) in favor of the Counterparties on any unpaid amounts owing to the Counterparties under the Hedges and this Agreement.

(10) The occurrence of an Unqualified Hedge Event.

(11) The City:

(i) commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure or

(ii) consents to an order of relief in any such proceeding or to the filing of any such petition or

(iii) seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors.

(12) The Governor of the State of Michigan determines that a financial emergency exists in the City.

## Article XII. The Custodian

### Section 12.1. No Fiduciary Duties or Responsibilities

The Custodian has no fiduciary duty or responsibility to any other party hereto or to any other Person.

### Section 12.2. Duties and Responsibilities

(a) The Custodian undertakes to perform such duties and only such duties as are specifically set forth in this Agreement, and no implied covenants or obligations shall be read into this Agreement against the Custodian and no permissive power or authority available to the Custodian shall be considered a duty.

(b) In the absence of bad faith on its part, the Custodian may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Custodian and conforming to the requirements of this Agreement; *but* in the case of any such certificates, documents, other instruments or opinions which by any provision hereof or thereof are specifically required to be furnished to the Custodian, the Custodian is under a duty to examine the same to determine whether or not they conform to the requirements of this Agreement.

(c) No provision of this Agreement shall be construed to relieve the Custodian from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except* as provided below.

(1) The Custodian is not be liable for any error of judgment made in good faith by an authorized officer of the Custodian, *unless* it is proved that the Custodian was negligent in ascertaining the pertinent facts;

(2) The Custodian is not liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Counterparties and

(3) No provision of this Agreement requires the Custodian to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for

believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

### Section 12.3.   Certain Rights of Custodian.

(a)  The Custodian may rely and is protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture. or other paper or document believed by it to be genuine and to have been signed or presented by the proper party or parties.

(b)  Whenever in the administration of this Agreement the Custodian deems it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Custodian (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of a representative of a Counterparty.

(c)  The Custodian may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Custodian hereunder in good faith and in reliance thereon.

(d)  The Custodian is under no obligation to exercise any of the rights or powers vested in it by this Agreement at the request or direction of any of the Counterparties pursuant to this Agreement, *unless* such Counterparties shall have offered to the Custodian reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

(e)  The Custodian is not required to make any investigation into the existence or occurrence of any facts referred to herein but is entitled to rely upon a certificate delivered by a representative of a Counterparty.

(f)  The Custodian is not obligated to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, or other paper or document, *but* the Custodian, in its sole discretion, may make such further inquiry or investigation into such facts or matters as it may see fit.

(g)  The Custodian may execute any of its powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Custodian shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

(h)  The Custodian has no duty to see to the recording, filing or registration of any instrument or document (including financing or continuation statements or filings under tax or security laws) or any rerecording, refiling or re-registration.

(i)  The Custodian shall have the right at any time to seek instructions concerning the administration of this Agreement from any court of competent jurisdiction.

### Section 12.4.   May Hold 2006 Pension Funding Securities.

The Custodian, in its individual or any other capacity, may become the owner or pledgee of 2006 Pension Funding Securities with the same rights it would have if it were not Custodian.

### Section 12.5. Reporting of City Payments

Within one Business Day after the Custodian deposits the full amount of a City Payment to the credit of the Holdback Account, the Custodian shall notify the City and the Counterparties of such deposit.

### Section 12.6. Weekly Reports

On the second Business Day of a calendar week, the Custodian shall deliver to the City and the Counterparties a report setting forth the amount of Revenues received in the General Receipts Subaccount during the preceding calendar week.

### Section 12.7. Monthly Holdback Compliance Notice

On the Business Day in a Month on which the Holdback Requirement has been met for such Month, the Custodian shall give notice (a *Monthly Holdback Compliance Notice*) to the City and the Counterparties that such Holdback Requirement has been met.

### Section 12.8. Quarterly Accounting

By the second Business Day preceding the end of a Quarterly Period, the Custodian shall notify the Counterparties, the City and the Service Corporations whether the Custodian has on deposit in the Holdback Account an amount sufficient to pay the Quarterly Payment (a *Quarterly Accounting*).

### Section 12.9. Coverage Reports

(a) The Custodian shall provide a report to the Counterparties and the City no later than 4:00 p.m. on the second Business Day following the last day (whether or not a Business Day) of each Month (a *Monthly Coverage Report*) and of each Quarterly Period (a *Quarterly Coverage Report*) and at such other time or times as are reasonably requested by any Counterparty or the City for an immediately prior Reporting Period.

(b) *Reporting Period* means:

(i) for a Monthly Coverage Report, the Month immediately ended (the *Subject Month*) and

(ii) for a Quarterly Coverage Report, the Quarterly Period immediately ended (the *Subject Quarter*).

(c) *Monthly Coverage* means, as to any Subject Month, the total amount of Revenues received by the Custodian during such Subject Month *divided* by the *sum* of:

(i) one-third of the Hedge Periodic Payables (without giving effect to any netting) payable by the Service Corporations during the Quarterly Period in which such Subject Month falls and

(ii) any Hedge Periodic Payables remaining unpaid from any Quarterly Period.

(d) *Quarterly Coverage* means, as to any Subject Quarter, the total amount of Revenues received by the Custodian during the immediately preceding three Months *divided* by the *sum* of:

(i)  Hedge Periodic Payables payable by the Service Corporations during such three month period (without giving effect to any netting) and

(ii)  any Hedge Periodic Payables remaining unpaid from any prior Subject Quarter.

(e)  Each Monthly Coverage Report and each Quarterly Coverage Report shall meet the requirements of **this subsection**.

(1)  Each Monthly Coverage Report and Quarterly Coverage Report shall include:

(i)  the total Revenues received by the Custodian during the Reporting Period,

(ii)  the total amount of Wagering Tax Property received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iii)  the total amount of Developer Payments received by the Custodian during the Reporting Period, with respect to each casino that provides such information,

(iv)  the balance of each Account as of the end of the Reporting Period and as of the end of the immediately preceding Reporting Period and

(v)  any disbursements from each Account made during the Reporting Period in reasonable detail.

(2)  In addition to the requirements of **paragraph (1), above**, each Monthly Coverage Report shall include:

(i)  the Monthly Coverage for the Subject Month and

(ii)  the Quarterly Coverage for the three immediately preceding three Months.

(3)  In addition to the requirements of **paragraph (1), above**, each Quarterly Coverage Report shall set forth any amounts to be released from the Holdback Account to the City or a Service Corporation in respect of the Subject Quarter.

(f)  The Custodian shall provide a copy of each Monthly Coverage Report and Quarterly Coverage Report to the Insurers concurrently with providing such Monthly Coverage Report and Quarterly Coverage Report to the Counterparties.

## Section 12.10. Compensation, Reimbursement and Indemnification

(a)  The Custodian is entitled to payment or reimbursement by the City:

(i)  from time to time for reasonable compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a Custodian of an express trust); and

(ii)  *except* as otherwise expressly provided herein, upon its request, for all reasonable expenses, disbursements and advances incurred or made by the Custodian in accordance with any provision of this Agreement (including, without limitation, the reasonable compensation and the expenses and disbursements of its agents and counsel), *except* any such expense, disbursement or advance as may be attributable to the Custodian's negligence, willful misconduct or bad faith.

(b)  The Custodian is also entitled to indemnification by the City for, and to be held harmless by the City against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of the this Agreement, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder.

### Section 12.11. Prior Payment of Regular Custodian Payments

The Custodian is entitled to payment for Regular Custodian Payments prior to any payment to the Counterparties from any Accounts.

### Section 12.12.  Corporate Custodian Required; Eligibility.

(a)  There shall at all times be a Custodian hereunder which is a bank eligible to be a depositary of City funds with (i) an office located in the City and State of New York and (ii) a combined capital and surplus of at least $50,000,000.  *If* such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, *then* for the purposes of **this Section**, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published.

(b)  The Custodian shall resign promptly in the manner and with the effect specified in **this Article** if it becomes ineligible under **this Section**.

### Section 12.13.  Replacement of Custodian.

(a)  No Vacancy

No resignation or removal of the Custodian and no appointment of a successor Custodian pursuant to this Article shall be effective until the successor Custodian accepts its appointment as provided in **subsection (f), below**.

(b)  Resignation

The Custodian may resign at any time, but such resignation shall become effective only in accordance with **subsection (f), below**.  A resigning Custodian shall give notice of its resignation to each Insurer and each of the parties hereto.

(c)  Removal by Counterparties

(1)  The Counterparties acting together may remove the Custodian by so notifying the Custodian.

(2)  If the Custodian becomes ineligible under **Section 12.12**, any Counterparty may petition a court of competent jurisdiction for the appointment of a successor.

(d)  Appointment of Successor

(1)  The retiring Custodian or the City may appoint a successor at any time prior to the date on which a successor Custodian takes office *provided* that the Counterparties have provided their prior written consent to the appointment of such successor Custodian.

(2) If a successor Custodian does not take office within 45 days after the retiring Custodian resigns or is removed, the City or any Counterparty may petition a court of competent jurisdiction for the appointment of a successor Custodian.

(3) Within one year after a successor Custodian appointed by the retiring Custodian, the City or a court of competent jurisdiction takes office, the Counterparties acting together may appoint a successor Custodian to replace such successor Custodian.

(e) Acceptable to the City and the Counterparties

No appointment of a successor Custodian shall be effective *unless* such successor Custodian is acceptable to the Finance Director and to each Counterparty, as evidenced by prior written consent.

(f) Acceptance of Appointment

(1) A successor Custodian shall deliver written acceptance of its appointment to the retiring Custodian, each of the other parties hereto and to each Insurer. Thereupon the resignation or removal of the retiring Custodian shall be effective, and the successor Custodian shall have all the rights, powers and duties of the Custodian hereunder.

(2) Upon the appointment of a successor Custodian becoming effective as provided in **this subsection**, the retiring Custodian shall promptly transfer all property held by it as Custodian to the successor Custodian.

**Section 12.14. Merger, Consolidation and Succession to Business.**

If the Custodian consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Custodian *if* such successor corporation is eligible under **Section 12.12**.

## Article XIII. Interest Rate Limitation

The following provisions apply only if any amount (a ***Stated Amount***) payable by the City under this Agreement is limited by a maximum rate of interest permitted to be paid by the City under applicable law:

(a) The term ***Permitted Amount***, as used in **this Article**, means the maximum amount that could be paid by the City during any Month without exceeding the interest rate limitation. The Permitted Amount in any Month may be greater or less than the Stated Amount.

(b) Subject to **subsections (c)** and **(d) below**, if the Permitted Amount payable by the City during any Month (the ***Current Month***) is less than the Stated Amount payable during the Current Month, the City may satisfy its obligation to pay the Stated Amount for the Current Month by paying the Permitted Amount.

(c) The amount payable by the City during the Current Month under **subsection (b)** shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month and

(2) the aggregate excess of the total of the Permitted Amounts for all prior Months over the aggregate of the Stated Amounts for the prior Months, minus the sum of all amounts that the City has previously paid pursuant to **this subsection (c)**.

(d) The amount payable by the City during all Months subsequent to the Current Month up to the time of determination shall be increased, to the extent permitted by the applicable law, by the lesser of:

(1) the difference between the Stated Amount for the Current Month and the Permitted Amount for the Current Month, and

(2) the aggregate excess of the total of the Permitted Amounts for all subsequent Months up to the time of determination over the aggregate of the Stated Amounts for the subsequent Months, minus the sum of all amounts that the City has previously paid pursuant to **subsection (c)** and **this subsection (d)**.

(e) **This Article** shall not affect the legal interpretation of whether any amount payable by the City hereunder is or is not "interest" to which any law limiting interest would apply.

## Article XIV. Miscellaneous

### Section 14.1. Addresses for Notices

(a) All notices and other communications provided for hereunder shall be in writing unless otherwise stated herein mailed, sent or delivered:

(1) if to the City, at its address set forth in a Service Contract

(2) if to the City Law Department, at
City of Detroit Law Department
First National Building, Suite 1650
660 Woodward Avenue
Detroit, Michigan 48226
Attention: Corporation Counsel

(3) if to a Service Corporation, at its address set forth in the respective Service Contract

(4) if to the Custodian, at
U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

(5) if to Financial Guaranty Insurance Company at
125 Park Avenue
New York, NY 10017
Attention: Risk Management

(6) if to Syncora Guaranty Inc. at
1221 Avenue of the Americas
New York, NY 10020
Attention: Surveillance

(7) if to a Counterparty, at its address shown beneath its signature on a signature page hereto,

or to such other address as such Person may specify to the other Person and shall be effective (i) if given by mail, three Business Days after such communication is deposited in the mails with first class postage prepaid or (ii) if given by any other means, when delivered at the address specified in or pursuant to **this Section**.

## Section 14.2. Copies of Notices

A copy of each notice given hereunder shall be given contemporaneously to the City's Law Department.

## Section 14.3. Expenses

(a) Each of the City and the Counterparties shall pay its own fees and expenses in connection with consummating the Settlement Transaction, including outside legal fees and expenses and outside consulting fees.

(b) *Except* in connection with consummating the Settlement Transaction, each of the City and the Counterparties shall continue to be responsible for the payment of any fees and expenses that it is required to pay under the Hedges, either Service Contract or the Contract Administration Agreement.

(c) The City shall pay the fees and expenses of the Service Corporations in connection with consummating the Settlement Transaction, including outside legal fees and expense and outside consulting fees.

(d) The City shall pay all of its fees and expenses and the fees and expenses of the Service Corporations (including outside legal fees and expense and outside consulting fees of any of them) in connection with the administration and enforcement of this Agreement.

(e) The City shall pay all compensation, reimbursement and indemnification to which the Custodian is entitled pursuant to **Section 12.10.**

## Section 14.4. Termination

(a) This Agreement shall terminate upon the termination or expiration of the Hedges and each Counterparty's delivery of confirmation to the Custodian of the payment in full of all obligations of the Service Corporations and the City to each Counterparty thereunder and hereunder.

(b) The City Pledge and, as applicable, the Service Corporation Security Interest or the Service Corporation Pledge shall terminate upon the termination of this Agreement.

(c) Upon the termination of this Agreement, the Custodian shall:

(i) pay to the City all amounts standing to the credit of each Account and

(ii) give notice to the Developers and Obligors that the Irrevocable Instructions are no longer in effect.

(d) The obligations of the City to pay amounts owing to the Service Corporations or the Custodian shall survive the termination of this Agreement.

### Section 14.5.  Amendment

No amendment of this Agreement shall be effective for any purpose unless it is made by written instrument signed by all of the parties hereto and consented to by each Insurer *provided* that the consent of an Insurer shall only be required to the extent that an amendment affects the rights, remedies or obligations of such Insurer.

### Section 14.6.  Rights of Insurer

An Insurer may exercise any right or power given it by this Agreement *only if* it is not then in default under its Credit Insurance (as defined in the Service Contracts).

### Section 14.7.  No Waiver

No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right.

### Section 14.8.  Binding Obligation

This Agreement is binding upon the parties hereto and their successors and their assigns to the extent permitted by **Section 14.8**.

### Section 14.9.  Assignment

(a)  No transfer by any party of its interests herein without the consent of the other parties hereto shall be valid *except* that a Counterparty may assign its rights hereunder as provided in **subsection (b), below**.

(b)  Any Counterparty may transfer its rights hereunder in connection with a transfer of its Hedge to the same extent and under the same conditions as the transfer of the Hedge is permitted by the terms thereof.

### Section 14.10. Governing Law

(a)  The rights and obligations of the parties under this Agreement shall be governed by and construed in accordance with the laws of the State of New York; provided, however, that the corporate powers and legal capacity of the City and each Service Corporation shall be governed by and construed in accordance with the laws of the State of Michigan.

(b)  Notwithstanding anything to the contrary contain in **subsection (a), above**, the governing law for purposes of the UCC is the law of the State of Michigan determined without reference to its conflicts of law rules.

### Section 14.11. Venue

With respect to any suit, action or proceedings relating to this Agreement, each party irrevocably submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

## Section 14.12. WAIVERS OF JURY TRIAL

TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

## Section 14.13. Headings and Table of Contents

Article and Section headings herein and the table of contents hereto are included herein for convenience of reference only and do not constitute a part of this Agreement for any other purpose.

## Section 14.14. Entire Agreement

(a) This Agreement, the Definitive Documents, and the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, contain the entire agreement among the parties with respect to the subject matter hereof, and supersedes all prior and contemporaneous oral and written agreements and discussions with respect thereto, and none of the parties shall be bound by any conditions, inducements or representations with respect thereto other than as expressly provided for herein.

(b) There are no agreements, understandings, representations or warranties between the parties with respect to the subject matter hereof other than those set forth or referred to herein.

(c) All of the terms and conditions of the Definitive Documents and of the Hedges, the Service Contracts and the Contract Administration Agreement, as modified by the Definitive Documents, shall remain in full force and effect.

(d) This Section does not apply to any rights or obligations of the Insurers.

## Section 14.15. Counterparts

(a) This Agreement may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence one and the same original. It is not necessary in making proof of this Agreement to produce or account for more than one counterpart.

(b) Delivery of an executed counterpart of this Agreement by facsimile or other method of electronic transmission shall be equally effective as delivery of a manually executed counterpart.

**In Witness Whereof**, the parties hereto have set their respective hands on and as of the date first written above.

*[Signatures appear on pages S-1 et seq.]*

*[**Signature Page** to the Collateral Agreement among the **City of Detroit,** the **Detroit General Retirement System Service Corporation**, the **Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association** and other Persons]*

**CITY OF DETROIT**

By _____

Norman L. White
Finance Director

*[Exhibit to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**U.S. Bank National Association,**
as Custodian

By _____

Susan T. Brown
Vice President

S - 2

*[**Signature Page** to the Collateral Agreement among the **City of Detroit,** the **Detroit General Retirement System Service Corporation**, the **Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association** and other Persons]*

DETROIT GENERAL RETIREMENT SYSTEM
SERVICE CORPORATION

By _____

Norman L. White
President

DETROIT POLICE AND FIRE RETIREMENT SYSTEM
SERVICE CORPORATION

By _____

Norman L. White
President

[*Signature Page* to the Collateral Agreement among the *City of Detroit*, the *Detroit General Retirement System Service Corporation*, the *Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association* and other Persons

**UBS AG**

By _____
               Authorized Signatory

By _____
               Authorized Signatory

UBS notice address is:

UBS Securities LLC
677 Washington Boulevard
Stamford, CT 06901
Attn: Municipal Derivatives
Tel: 203-719-1689
Fax: 203-719-1417

and with a copy to:

UBS AG, Stamford Branch
677 Washington Boulevard
Stamford, CT 06901
Attn: Legal Department
Fax: 203-719-0680

S-4

*[Signature Page to the Collateral Agreement among the City of Detroit, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, U.S. Bank National Association and other Persons]*

**SBS FINANCIAL PRODUCTS COMPANY, LLC**

By _____

Authorized Signatory

SBS Financial Products Company, LLC notice address is:

SBS Financial Products Company, LLC
100 Wall Street, 22ND Floor
New York, New York 10005
Attention: John Carter
Facsimile: (646) 576-9684

*[Signature Page to the Collat-
eral Agreement among the City
of Detroit, the Detroit General
Retirement System Service
Corporation, the Detroit Police
and Fire Retirement System
Service Corporation, U.S. Bank
National Association and other
Persons]*

MERRILL LYNCH CAPITAL SERVICES, INC.

By _____
                    Authorized Signatory

Merrill Lynch Capital Services, Inc. notice address is:

Merrill Lynch Capital Services, Inc.
Merrill Lynch World Headquarters
4 World Financial Center, 18TH Floor
New York, New York 10080
Attention: Swap Group
Facsimile: (646) 805-0218

with a copy to:

GMI Counsel
Merrill Lynch World Headquarters
4 World Financial Center, 12TH Floor
New York, New York 10080
Attention: Swaps Legal
Facsimile: (212) 449-6993

Exhibit 3.4

## Form of Irrevocable Instructions

June ●, 2009

[Developer]
[Developer's Address]
Attention: ●

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir/Madam:

**1. References to *You* and *Your***

    1.1. [Name of Developer] is hereinafter referred to as *you*. *Your* has the correlative meaning.

    1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

**2. Applicability of these Instructions**

These Instructions are applicable with respect to the casino currently known as _____ and currently located at _____ in Detroit, Michigan.

**3. Certain Definitions**

    3.1. ***Development Agreement*** means the Revised Development Agreement, dated [_____,] among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

    3.2.   Gaming Act means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

    3.3. ***Wagering Tax Revenue Statute*** means Section 12 of the Gaming Act, being MCL 432.212, as amended.

**4. Payments Subject to these Instructions**

    4.1. The following payments (collectively, the ***Payments***)only are subject to these Instructions:

        4.1.1. taxes payable pursuant to <u>Detroit City Code Section 18-14-3</u> pursuant to the <u>Wagering Tax Revenue Statute</u>; and

        4.1.2. interest and penalties payable pursuant to <u>Detroit City Code Section 18-14-6(c);</u> and

4.1.3. amounts payable pursuant to Section **[3.14(a)(iv) for Detroit Entertainment, 3.16(a)(iv) for Greektown Casino, 3.16(a)(iv) for MGM]** of the Development Agreement

4.2. For the avoidance of doubt, ***Payments*** does not include:

4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the ***Custodian***) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

Wiring Instructions:  ●

Account Number:  ●

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

7.2. The initial Counterparties are:

7.2.1. UBS AG

7.2.2. SBS Financial Products Company, LLC

7.2.3. Merrill Lynch Capital Services, Inc.

7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7**

and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

    (1) if to the Custodian, at

          U.S. Bank National Association
          535 Griswold, Suite 550
          Detroit, Michigan 48226
          Attention: Susan T. Brown

    (2) if to you at

          [Address]
          Detroit, Michigan ●[Zip Code]●
          Attention: ●

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to **this Section**.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

**CITY OF DETROIT**

By _____

               Norman L. White
               Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201

Attn: Rhonda Cohen, Chief Operating Officer

Re:  Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
     to the Revised Development Agreement, dated August 2, 2002 among the
     City, Economic Development Corporation of the City of Detroit and
     MotorCity Casino Hotel

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

**IRREVOCABLE INSTRUCTIONS**

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

June 23, 2009

MotorCity Casino Hotel
2901 Grand River
Detroit, MI 48201

Attention: Rhonda Cohen, Chief Operating Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Madam:

1. **References to *You* and *Your***

   1.1. MotorCity Casino Hotel is hereinafter referred to as *you*. *Your* has the correlative meaning.

   1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

2. **Applicability of these Instructions**

   These Instructions are applicable with respect to the casino currently known as MotorCity Casino Hotel and currently located at 2901 Grand River in Detroit, Michigan.

3. **Certain Definitions**

   3.1. ***Development Agreement* means** the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

   3.2. ***Gaming Act* means** the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

   3.3. ***Wagering Tax Revenue Statute* means** Section 12 of the Gaming Act, being MCL 432.212, as amended.

4. **Payments Subject to these Instructions**

   4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

      4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

      4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

      4.1.3. amounts payable pursuant to Section 3.14(a)(iv) of the Development Agreement

   4.2. For the avoidance of doubt, *Payments* does not include:

      4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

      4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

      Wiring Instructions: ABA=U.S. BANK, Minneapolis (091000022)
                      FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.
                      AC=180121167365
                      Trust # 132742003 Detroit (MotorCity) Revenues
                      Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2. The initial Counterparties are:

      7.2.1. UBS AG

      7.2.2. SBS Financial Products Company, LLC

      7.2.3. Merrill Lynch Capital Services, Inc.

  7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

    (a) if to the Custodian, at

> U.S. Bank National Association
> 535 Griswold, Suite 550
> Detroit, Michigan 48226
> Attention: Susan T. Brown

    (b) if to you at

> MotorCity Casino Hotel
> 2901 Grand River
> Detroit, MI 48201
> Attention: Chief Financial Officer

> with copies to:

> MotorCity Casino Hotel
> 2901 Grand River
> Detroit, MI 48201
> Attention: General Counsel

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

City of Detroit

By _____

Norman L. White
Finance Director

1122685_1.DOC

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:     Norman L. White, Finance Director
        City of Detroit


The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to MotorCity Casino Hotel, a copy of which is attached hereto.

Dated: June 23, 2009

MOTORCITY CASINO HOTEL

By: _~Beverly T. Clark, Paralegal_
        signature

_Beverly L. Cook_
(please print name)

1122741_1.DOC

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313·224·3491
FAX 313·224·4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI  48226

Attn:  Cliff Vallier, Chief Financial Officer

Re:    Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
       to the Revised Development Agreement, dated August 2, 2002 among the
       City, Economic Development Corporation of the City of Detroit and
       Greektown Casino

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313·224·3491
FAX 313·224·4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION                 **IRREVOCABLE INSTRUCTIONS**

June 23, 2009

Greektown Casino
555 East Lafayette
Detroit, MI 48226

Attention: Cliff Vallier, Chief Financial Officer

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

## 1. References to *You* and *Your*

1.1. Greektown Casino is hereinafter referred to as *you*. *Your* has the correlative meaning.

1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

## 2. Applicability of these Instructions

These Instructions are applicable with respect to the casino currently known as Greektown Casino and currently located at 555 East Lafayette in Detroit, Michigan.

## 3. Certain Definitions

3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.,* as amended.

3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

## 4. Payments Subject to these Instructions

4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

4.1.3. amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

4.2. For the avoidance of doubt, *Payments* does not include:

      4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

      4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

      Wiring Instructions:     ABA=U.S. BANK, Minneapolis (091000022)
                                      FBO=FOR FURTHER CREDIT TO U.S. BANK, N.A.
                                      AC=180121167365
                                      Trust # 132742002 Detroit (Greektown) Revenues
                                      Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2. The initial Counterparties are:

      7.2.1. UBS AG

      7.2.2. SBS Financial Products Company, LLC

      7.2.3. Merrill Lynch Capital Services, Inc.

  7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10.**

Page 2 of 3 Pages

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

.

      (a) if to the Custodian, at

            U.S. Bank National Association
            535 Griswold, Suite 550
            Detroit, Michigan 48226
            Attention: Susan T. Brown

      (b) if to you at

            Greektown Casino
            555 East Lafayette
            Detroit, MI 48226

            Attention: Cliff Vallier, Chief Financial Officer

            with copies to:

            Andrea Hansen, Esq.
            222 N. Washington Square, Suite 400
            Lansing, MI 48933

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to **this Section.**

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

*City of Detroit,*

By _____

               Norman L. White
               Finance Director

1122670_1.DOC

Page 3 of 3 Pages

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:  Norman L. White, Finance Director
     City of Detroit

The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated June 23, 2009, addressed to Greektown Casino, a copy of which is attached hereto.

Dated: June 23, 2009

GREEKTOWN CASINO

By: _____
          signature

_____
(please print name)

1122742_1.DOC

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

Attn: Ronald K. Holloway, V.P. and General Counsel

Re:   Payments to be made to the City of Detroit, Michigan (the *City*) pursuant
      to the Revised Development Agreement, dated August 2, 2002 among the
      City, Economic Development Corporation of the City of Detroit and MGM
      Grand Detroit, LLC.

Reference is made to the IRREVOCABLE INSTRUCTIONS, attached, that
payments to be paid to the City shall be paid to U.S. Bank N.A. (the Custodian)
for the benefit of the City.

**The new wire instructions should be used for wires beginning on
Wednesday, June 24, 2009.**

Should you have any questions, do not hesitate to call (313 224-3491.

Very truly yours,

Norman L. White
Finance Director

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION          **IRREVOCABLE INSTRUCTIONS**

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313•224•3491
FAX 313•224•4466
WWW.DETROITMI.GOV

June 23, 2009

MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

Attention: Ronald K. Holloway, Vice President and General Counsel

**Re: Payments to be made to the City of Detroit (the *City*) in respect of the below identified Casino**

Dear Sir:

### 1. References to *You* and *Your*

1.1. MGM Grand Detroit, LLC is hereinafter referred to as *you*. *Your* has the correlative meaning.

1.2. As used herein, "you" and "your" also refer to your successors, if any, and any assigns of the below identified Development Agreement.

### 2. Applicability of these Instructions

These Instructions are applicable with respect to the casino currently known as MGM Grand Detroit, LLC and currently located at 1777 3rd Street in Detroit, Michigan.

### 3. Certain Definitions

3.1. *Development Agreement* means the Revised Development Agreement, dated August 2, 2002 among the City, The Economic Development Corporation of the City of Detroit and you, any amendments thereto and any substitute for such Development Agreement.

3.2. *Gaming Act* means the Michigan Gaming Control and Revenue Act, MCL 432.201, *et seq;* MSA 18.969(201), *et seq.*, as amended.

3.3. *Wagering Tax Revenue Statute* means Section 12 of the Gaming Act, being MCL 432.212, as amended.

### 4. Payments Subject to these Instructions

4.1. The following payments (collectively, the *Payments*)only are subject to these Instructions:

4.1.1. taxes payable pursuant to Detroit City Code Section 18-14-3 pursuant to the Wagering Tax Revenue Statute; and

4.1.2. interest and penalties payable pursuant to Detroit City Code Section 18-14-6(c); and

4.1.3. amounts payable pursuant to Section 3.16(a)(iv) of the Development Agreement

4.2. For the avoidance of doubt, *Payments* does not include:

       4.2.1. any payments pursuant to any other section of the Development Agreement or rights to reimbursement made or to be made under any Development Agreement; and

       4.2.2. any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Gaming Act.

  4.3. References to such sections of the Gaming Act, Wagering Tax Revenue Statute, Detroit City Code or the Development Agreement include any amendments thereto or any substitutes therefor.

## 5. Place and Manner of Payment

  5.1. All Payments to be paid to the City shall be paid to U.S. Bank National Association (the *Custodian*) for the benefit of the City by wire transfer in immediately available funds at the office of the Custodian in New York, New York, for credit to the below identified account.

      Wiring Instructions:  ABA=U.S. BANK, Minneapolis (091000022)
                        FBO=FOR FURTHER CREDIT TO U.S. BANK, N:A.
                        AC=180121167365
                        Trust # 132742001 Detroit (MGM Grand) Revenues
                        Contact: Renee Poradek (651) 495-4132

## 6. Discharge of Liability

Payments made to the Custodian pursuant to these Instructions shall have the same force and effect as if made to the City, and you shall have no further liability with respect to such Payments if made as herein provided.

## 7. Changes to these Instructions

  7.1. No change to these Instructions shall be effective for any purpose without the prior written consent of the Counterparties.

  7.2. The initial Counterparties are:

       7.2.1. UBS AG

       7.2.2. SBS Financial Products Company, LLC

       7.2.3. Merrill Lynch Capital Services, Inc.

  7.3. As used herein, "Counterparties" includes any successors of the initial Counterparties and any assigns of certain interest rate swap agreements.

  7.4. You are entitled to rely on any consent stating that it is signed by a financial institution stating that it is a "Counterparty" as such term is used herein without making any independent investigation.

## 8. Instructions are Irrevocable

These Instructions are irrevocable and shall continue in full force and effect unless changed in writing by the City with the prior written consent of the Counterparties as provided in **Section 7** and you have received prior written notice of such change from the City and copies of the written consents of each Counterparty delivered as set forth in **Section 10**.

## 9. Termination

These Instructions shall terminate upon written notice of the Custodian to you as set forth in Section 10 stating that the Custodial Agreement has terminated.

## 10. Communications and Notices

All communications and Notices hereunder shall be in writing and, unless otherwise stated herein, mailed, sent or delivered:

(a) if to the Custodian, at

U.S. Bank National Association
535 Griswold, Suite 550
Detroit, Michigan 48226
Attention: Susan T. Brown

(b) if to you at

Mr. Ronald K. Holloway
Vice President and General Counsel
MGM Grand Detroit, LLC
1777 3rd Street
Detroit, MI 48226

or to such other address as may be specified to the other in accordance with the provisions of this Section and shall be effective (i) if given by mail, three business days after such communication is deposited in the mail with first class postage prepaid or (ii) if given by overnight courier or personally delivered, when delivered to the person identified at the address specified in or pursuant to this Section.

## 11. Binding Effect

These Instructions are binding on you, your successors, if any, and any assigns of the Development Agreement.

## 12. Captions

The captions of the sections of these Instructions are for convenience of reference and do not affect the meaning of these Instructions.

**City of Detroit,**

By _____

Norman L. White
Finance Director

1122690_1.DOC

**Receipt re:**
**Irrevocable Instructions**
**dated June 23, 2009**

TO:    Norman L. White, Finance Director
       City of Detroit

The undersigned hereby acknowledges receipt of certain Irrevocable Instructions dated

June 23, 2009, addressed to MGM Grand Detroit, LLC, a copy of which is attached hereto.

Dated: June 23, 2009

MGM GRAND DETROIT, LLC

By: _____
       signature   LOIS GRECCO

       for  Kon Holloway
    (please print name)
                      6-23 09

1122744_1.DOC



JENNIFER M. GRANHOLM
GOVERNOR

STATE OF MICHIGAN
**MICHIGAN GAMING CONTROL BOARD**
DETROIT

RICHARD S. KALM
EXECUTIVE DIRECTOR

June 18, 2009

Mr. Michael Shaller
Shefsky & Froelich, Ltd.
111 East Wacker Dr., Suite 2800
Chicago, IL  60601

RE:    Irrevocable Instructions directing the three licensed Detroit casinos to
electronically transfer City taxes to a custodial account

Dear Mr. Schaller:

We are in receipt of a letter from Shefsky & Froelich Ltd., the City's outside gaming
counsel, (i) transmitting to and advising the Board of certain irrevocable instructions (the
"Irrevocable Instructions") directing the three licensed Detroit casinos to electronically transfer
(the "Transfer") the portion of the City's money due under the Gaming Act and the Revised
Development Agreement to a custodial account (the "Account") held by U.S. Bank National
Association (the "Custodian") in connection with a certain Collateral Agreement dated as of
June 15, 2009, by and among the City of Detroit, the Detroit General Retirement System
Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, the
Custodian and certain counterparties; and (ii) advising the Board that the City Council of the City
of Detroit has enacted an ordinance and taken all related action necessary to direct the three
licensed Detroit casinos to make the Transfer to the Account.

Upon review of this matter, I do not find any compliance issues at this time and since no
goods or services are being provided to the casinos, no licensing is required.

Sincerely,

Richard S. Kalm
Executive Director

RSK/db

Cc: Cindy Bliss, MGM Grand Detroit, LLC
Mike Roy & Cheryl Scott Dube, MotorCity Casino, LLC
Olisaeloka Dallah, Greektown Casino, LLC
John Page, MGCB
Andrea Hansen, Honigman, Miller, Schwartz & Cohn, LLP
Peter Ellsworth, Dickinson Wright, PLLC