# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                       : Chapter 9
:
CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
:
             Debtor.     : Hon. Steven W. Rhodes
:
:
:
-----------------------------------------------------x

**OMNIBUS REPLY OF THE CITY OF DETROIT TO OBJECTIONS
TO THE MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT
TO SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF**

# TABLE OF CONTENTS

**Page**

I.     PRELIMINARY STATEMENT ...................................................................1

II.    ARGUMENT....................................................................................................2

    A.     Objections As to the Validity of the Swap Agreements and/or
         Casino Revenue Liens................................................................................2

    B.     Plan Objections.........................................................................................6

         1.     Classification....................................................................................7

         2.     Impairment.......................................................................................8

         3.     Plan Support Agreement.................................................................11

    C.     Syncora's "Consent Rights" Objection..................................................13

    D.     Objections to the Limited Bar, Service Corporations Injunction
         and Release of Liens................................................................................17

         1.     The Limited Bar Order...................................................................17

         2.     The Service Corporations Injunction.............................................20

         3.     The Release of Liens Granted Through the Service
            Corporations...................................................................................22

    E.     Miscellaneous Objections ......................................................................25

         1.     COPs Holders' Arguments ............................................................25

         2.     U.S. Bank's Reservation of Rights ...............................................28

         3.     Deferral of Consideration of the Settlement Until
            Confirmation ..................................................................................28

III.   CONCLUSION................................................................................................29

# TABLE OF AUTHORITIES

**Page**

CASES

*Bank of Am., N.A. v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000) ...................................................17

*Beneficial Commercial Corp. v. Railserv Mgmt. Corp.*, 563 F. Supp. 114 (E.D. Pa. 1983) ......................................................................24

*Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43 (Bankr. N.D. Ga. 2006) ...................................17

*Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.)*, 957 F.2d 1020 (2d Cir. 1992) ...............................................................18

*Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir. 1995) ....................................................................................18

*Fed. Nat. Mortgage Ass'n v. Vill. Green I, GP*, 483 B.R. 807 (W.D. Tenn. 2012) ....................................................................10

*Harris v. Agrivest Ltd. Partnership II*, 818 F.Supp. 1042 (E.D. Mich. 1993) ...............................................................18

*In re Bard*, 49 Fed. Appx. 528 (6th Cir. 2002).........................................................................2

*In re Braniff Airways, Inc.*, 25 B.R. 216 (Bankr. N.D. Tex. 1982)..............................................................30

*In re Cascade Grain Products, LLC*, No. 09-30508, 2009 WL 2843365 (Bankr. D. Or. Aug. 31, 2009) ...............7, 13

*In re Claremont Towers Co.*, 175 B.R. 157 (Bankr. D.N.J. 1994) ....................................................................8

*In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004) .............................................................................10

*In re Commercial W. Fin. Corp.*, 761 F.2d 1329 (9th Cir. 1985) .......................................................................8

*In re Conseco, Inc.*,
  301 B.R. 525 (Bankr. N.D. Ill. 2003) ..................................................21

*In re Crosscreek Apartments, Ltd.*,
  213 B.R. 521 (Bankr. E.D. Tenn. 1997) ..............................................10

*In re DBSD N. Am., Inc.*,
  419 B.R. 179 (Bankr.S.D.N.Y. 2009).................................................21

*In re Demming Hospitality, LLC*,
  No. 11-12-13377(TA), 2013 Bankr. Lexis 1428 (Bankr. D. N.M. Apr. 5,
  2013) ......................................................................................................10

*In re Dow Corning Corp.*,
  280 F.3d 648 (6th Cir. 2002) ........................................................8, 20

*In re Drexel Burnham Lambert Grp., Inc.*,
  134 B.R. 499 (Bankr. S.D.N.Y. 1991)............................................4, 12

*In re Fodale*,
  No. 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013) ............1, 5

*In re Greektown Holdings, LLC*,
  728 F.3d 567 (6th Cir. 2013) ..............................................................20

*In re Homesteads Cmty. at Newtown LLC*,
  2012 Bankr. LEXIS 3828 (Bankr. D. Conn. Aug. 21, 2012) ...............3

*In re Indianapolis Downs, LLC.*,
  486 B.R. 286 (Bankr. D. Del. 2013)...................................................21

*In re Innkeepers USA Trust*,
  442 B.R. 227 (Bankr. S.D.N.Y. 2010).................................................11

*In re International Wireless Communs. Holdings, Inc.*,
  1999 Bankr. LEXIS 1853 (Bankr. D. Del. Mar. 26, 1999) ..................1

*In re L & J Anaheim Associates*,
  995 F.2d 940 (9th Cir. 1993) ................................................................9

*In re Monclova Care Ctr., Inc.*,
  254 B.R. 167 (Bankr. N.D. Ohio 2000)................................................9

*In re Northwest Airlines Corp.*,
  366 B.R. 270 (Bankr. S.D.N.Y. 2007) ................................................................29

*In re Orlando Investors, L.P.*,
  103 B.R. 593 (Bankr. E.D. Pa. 1989) ................................................................21

*In re Quigley Company, Inc.*,
  437 B.R. 102 (Bankr. S.D.N.Y. 2010) ........................................................11, 12

*In re Residential Capital, LLC*,
  497 B.R. 720 (Bankr. S.D.N.Y. 2013) ................................................................15

*In re Seasons Apartments, Ltd. P'ship*,
  215 B.R. 953 (Bankr. W.D. La. 1997) ..................................................................8

*In re Sportstuff, Inc.*,
  430 B.R. 170 (8th Cir. BAP 2010) ...............................................................14, 19

*In re Sullivan*,
  26 B.R. 677 (Bankr. W.D.N.Y. 1982) ...................................................................8

*In re Taddeo*,
  685 F.2d 24 (2d Cir. 1982) ....................................................................................9

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ...................................................................18

*In re Tribune Co.*,
  08-13141 (Bankr. D. Del.) ...................................................................................18

*In re Vill. at Camp Bowie I, L.P.*,
  710 F.3d 239 (5th Cir. 2013) ...............................................................................10

*In re Windsor on the River Associates, Ltd.*,
  7 F.3d 127 (8th Cir. 1993) ...................................................................................10

*Jones v. Titus*,
  175 N.W. 257 (Mich. 1919) .................................................................................23

*Kane v. Johns-Manville Corp.*,
  843 F.2d 636 (1988) .............................................................................................21

*Lucas v. Dynegy Inc. (In re Dynegy Inc.)*,
No. 12 Civ. 8908(JGK), 2013 WL 2413482 (S.D.N.Y. June 4, 2013) .............21

*Matter of Munford, Inc.*,
97 F.3d 449 (11th Cir. 1996) ................................................................................18

*Prime Fin. Serv. v. Vinton*,
761 N.W.2d 694 (Mich. Ct. App. 2008)..............................................................23

*Rafool v. The Goldfarb Corp. (In re Fleming Packaging Corp.)*,
No. 04-8166, 2007 WL 4556981 (Bankr. C.D. Ill., Dec. 20, 2007)...................19

*Rebenstock v. Fruehauf Trailer Corp.*,
Case No. 92 CV 77050 DT, 1995 U.S. Dist. LEXIS 22089 (E.D. Mich.
Aug. 18, 1995) .....................................................................................................18

*Sav. Bank v. Sommer*,
8 N.Y.3d 318 (2007) ............................................................................................15

*Six W. Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.*,
286 B.R. 239 (S.D.N.Y. 2002) ..............................................................................3

*Talmadge v. United States Shipping Board, Emergency Fleet Corp.*,
54 F.2d 240 (2d Cir.1932) (L. Hand, J.)..............................................................24

*Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.)*,
261 B.R. 619 (Bankr. W.D. Pa. 2001)..................................................................19

STATUTES

11 U.S.C. § 101(5) .....................................................................................................27

11 U.S.C §§ 502(b) and (c) .......................................................................................27

11 U.S.C §§ 560 .........................................................................................................27

11 U.S.C.§ 1122(a) ...............................................................................................15, 16

11 U.S.C. § 1124(1) ...................................................................................................17

11 U.S.C. § 1126(c) ...................................................................................................25

Det. City Code § 18-5-120(i) ...................................................22

MCL § 440.9203(7) .................................................................23

MCL § 440.9607 .....................................................................24

**OTHER AUTHORITIES**

Rule 9019 ...........................................................................passim

13-53846-tjt    Doc 3145    Filed 03/21/14    Entered 03/21/14 19:01:53    Page 7 of 38

## I. PRELIMINARY STATEMENT

The City's proposed settlement and plan support agreement with the Swap Counterparties (the "Settlement") is much simpler than the objecting parties would have the Court believe. The only question that the Court is being called upon to decide here is whether the settlement of a disputed secured claim that provides the City with a 70% price discount, the ability to pay over time, full releases and unfettered access to its casino revenues "falls within the reasonable range of litigation possibilities." *See In re International Wireless Communs. Holdings, Inc.*, 1999 Bankr. LEXIS 1853 (Bankr. D. Del. Mar. 26, 1999). It is clear that it does.

Not a single Objector has raised a valid argument showing that the settlement agreement is not within that reasonable range. Rather, the Objectors insist that because the settlement is not, in their view, the best of all possible worlds, this Court must substitute its business judgment for the City's and require the City to litigate rather than compromise. The Objectors' Panglossian view ignores the very real risks and costs of litigation, which the City has taken fully into account in reaching this settlement. Because the settlement is well above the lowest point in the range of reasonableness, *In re Fodale*, No. 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013), it should be approved.

## II.  ARGUMENT

The Objections fall generally into four principal categories: (1) Objections arguing that the Settlement cannot be approved because either the swap transactions or casino revenue liens, or both, are invalid and the City should be *required* to litigate rather than compromise; (2) Objections raising plan-related concerns over the classification, impairment and voting of the Swap Counterparties' claims; (3) Syncora's well-worn Objection that no settlement may be approved without its consent; and (4) Objections arguing that the Settlement cannot be approved because it contains a limited bar order and injunction against the Service Corporations. Each category of Objections is addressed in detail below.

### A.  Objections As to the Validity of the Swap Agreements and/or Casino Revenue Liens

The gist of these Objections is that because this Court previously found that the City was *reasonably likely* to succeed on its claims to invalidate the swap agreements and the casino revenue liens, the City has no business compromising those claims and instead should be forced to litigate them, regardless of risk, cost or the impact on the City's efforts to stabilize its finances and emerge from bankruptcy. This line of argument appears to be directed to the fourth *Bard*[1] factor, the paramount interest of creditors, suggesting that creditors

---

[1] *In re Bard*, 49 Fed. Appx. 528, 530 (6th Cir. 2002).

would be better served by litigation. Objectors raising this argument seem to have confused a "reasonable likelihood" of success with an "absolute certainty." But a ruling on the probability of success on the merits is not the same as a ruling on the merits. *See* Ex. A, Bench Op., Jan. 16, 2014 Hrg. Tr. 18:17-22 ("[I]t is not for the Court at this time to decide these issues…. Rather, the Court is simply to evaluate the likelihood of success.").

A corollary to this argument is that the Settlement cannot be approved because it unfairly discriminates against unsecured creditors by allowing the Swap Counterparties to leapfrog ahead of them, when the Swap Counterparties' own claims are "really" unsecured. Even if unfair discrimination were the appropriate standard under Rule 9019 (and it is not), this argument fails because it assumes the very conclusion it seeks to prove: that the swaps are unsecured.

Implicit in this circular argument is the equally problematic premise that a debtor in bankruptcy can never compromise a dispute regarding a creditor's secured status because, if litigated to conclusion, such creditor's rights might be found to be invalid. That makes no sense and is not the law. *See, e.g.*, *Six W. Retail Acquisition, Inc. v. Loews Cineplex Entm't Corp.*, 286 B.R. 239, 247-48 (S.D.N.Y. 2002) (affirming bankruptcy court's approval of settlement that, among other things, validated disputed liens); *In re Homesteads Cmty. at Newtown LLC*, 2012 Bankr. LEXIS 3828, at *95 (Bankr. D. Conn. Aug. 21, 2012) (approving, as a

sound exercise of the trustee's business judgment, settlement that provided a discounted recovery to holder of a contested lien).

Furthermore, it is well established that bankruptcy favors compromise over conflict. *In re Drexel Burnham Lambert Grp., Inc.*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also* Ex. A, Bench Op., Jan. 16, 2014 Hrg. Tr. 28:8-9 ("The Court agrees that the settlement of the swaps claims is better for everyone than litigation and hopes that everyone still agrees with that."). And under Rule 9019, "a Court may approve a settlement even if it believes that the [debtor] ultimately would be successful at trial." *Drexel*, 134 B.R. at 505.

To be clear: all parties to the negotiations were well aware of the Court's view of the City's likelihood of success on the merits regarding the validity of the swaps and the liens. Indeed, it is unlikely that the City could have reached the current Settlement without the Court's findings in the prior proceeding. Lawyers know that once there is an initial ruling on the probability of success on the merits, a case tends to settle. The reason is obvious: that determination sends a clear signal to the litigants as to their respective chances of success before the trial court. Here, that signal has helped drive the settlement number. It does not mean, though, that there should be no compromise.

As will be demonstrated at the hearing on the City's Motion, the City carefully considered the Court's views, its own assessment of the strengths and

weaknesses of its claims, the risks and costs of litigation (including the certainty of appeals), and the consequences to the City, its residents and its other creditors if, in the end, the City lost. The City then made a reasoned business decision that the best interest of all constituents would be served by reaching a reasonable deal.

Ultimately, the City struck not just a reasonable deal with the Swap Counterparties, but a good one – and that, under the case law, is more than enough. *Fodale*, 2013 WL 663729. Through the Settlement, the City will be able to resolve allegedly secured, safe-harbored claims in excess of $285 million for approximately thirty cents on the dollar.[2] Moreover, the City need not satisfy such claims all at once, but rather will have the ability to pay over time, thereby avoiding the need for any incremental post-petition financing. Finally, the City will be assured access to the casino revenues, which has been one of the City's primary objectives from the very beginning of this case. The Settlement's steep reduction of the City's potential liability on the swaps, flexibility in payments and assurance

---

[2] Wilmington Trust Company argues that the Settlement "does not propose to resolve all issues with the Swap Agreement or the Swap Counterparties, and any possible future liabilities that will be owed to the Swap Counterparties should be factored into this Court's consideration of the settlement." Docket No. 3049, ¶ 23. This objection is based on a fundamental misunderstanding of the Settlement. As is plainly set forth in the Term Sheet and the proposed form of Order, the City will receive a full release from the Swap Counterparties for all claims relating to the swaps. Regardless of whether the swaps remain in existence, the City's liabilities thereunder are fully resolved by the Settlement.

of access to critically-needed cash represent an important step forward in the City's rehabilitative efforts.

## B. Plan Objections

Several Objections raise concerns about the classification of the Swap Counterparties' claims under the City's plan of adjustment, as well as the impairment of those claims and the Swap Counterparties' agreement to vote in favor of the plan. As the City explained during the hearing on the Retiree Committee's discovery requests, these issues are not before the Court on this Motion; they are issues for confirmation (and may never need to be argued at all). The City is not seeking a ruling on classification, impairment or any other aspect of its plan in connection with this Motion. In fact, to give comfort to the Objectors that no one's rights with respect to plan objections will be foreclosed by the Court's approval of the Settlement, the City has agreed to include the following language in the proposed order:

> ORDERED that nothing in this Order constitutes a finding or ruling with respect to impairment under section 1124 of the Bankruptcy Code or classification under section 1122 of the Bankruptcy Code or prejudices (i) any party's right to object to any plan of adjustment proposed in the City's bankruptcy case on the basis that the Secured Claims are not properly classified therein or are not impaired under section 1124 of the Bankruptcy Code or (ii) any party's right to contest any such objection[.]

Revised Proposed Order, ¶ 43. This revised language renders moot the plan-related Objections to the Settlement and preserves them for the discovery and briefing procedures that this Court has established in connection with the plan confirmation process.

However, in the event that the Court determines that it would be appropriate to consider any of the plan-related Objections at this time, the City submits the following responses, which it intends to brief more fully, to the extent necessary, in connection with plan confirmation. *Cf. In re Cascade Grain Products, LLC*, No. 09-30508, 2009 WL 2843365 (Bankr. D. Or. Aug. 31, 2009) ("Plan confirmation issues should and will be dealt with during the plan confirmation process. The focus here is on whether to approve the settlement.").

### 1. Classification

Certain retiree parties argue that the plan's classification of the Swap Counterparties in a separate class is inappropriate. The City strains to see how this issue is ripe for today. The plan of adjustment, not the Settlement, places claims into classes. To be sure, certain results may logically flow from these contested settlement proceedings. But claim classification is not one of them.

While this issue is not ripe in the City's view, the City notes that the Objections are misplaced because separate classification of the claims of the Swap Counterparties is not only appropriate, but mandatory. Section 1122(a) provides

that "a plan may place a claim or an interest in a particular class **only if** such claim or interest is substantially similar to the other claims or interests of such class." 11 U.S.C.§ 1122(a) (emphasis added). This section "does not demand that all similar claims be in the same class." *In re Dow Corning Corp.*, 280 F.3d 648, 661 (6th Cir. 2002). However, by its plain terms, it does prohibit claims from being placed in a class together if they are not substantially similar. 11 U.S.C § 1122(a).

Because the swap claims are the only secured claims with liens on the casino revenues, the City is prohibited by the Bankruptcy Code from classifying them with any other claims. *See, e.g.*, *In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1338 (9th Cir. 1985) (creditors with claims against different property are entitled to separate classification); *In re Claremont Towers Co.*, 175 B.R. 157, 168 (Bankr. D.N.J. 1994) (holding that "secured claim must be separately classified because the nature and extent of each lien is necessarily different"); *In re Sullivan*, 26 B.R. 677, 678 (Bankr. W.D.N.Y. 1982) (same).

## 2.    Impairment

Notwithstanding the clear language in the proposed order that preserves this issue for plan confirmation, the City sets forth below, in a *summary* fashion only, why the claims of the Swap Counterparties are impaired.

First, the Bankruptcy Code creates a presumption of impairment. *See In re Seasons Apartments, Ltd. P'ship*, 215 B.R. 953, 958 (Bankr. W.D. La. 1997)

("[C]laims are presumed to be impaired (and thus generally entitled to vote on the plan) unless one of the conditions in 11 U.S.C. § 1124 are met."); *In re Monclova Care Ctr., Inc.*, 254 B.R. 167, 178-79 (Bankr. N.D. Ohio 2000) ("claims are presumed to be impaired so as to enable a creditor to vote on acceptance of the plan"), *modf'd in part*, 266 B.R. 792 (N.D. Ohio 2001), *aff'd*, 59 F. App'x 660 (6th Cir. 2003).

Absent reinstatement, a claim is unimpaired *only if* a proposed plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . . ." *See* 11 U.S.C. § 1124(1). The term "impairment" in section 1124 is defined in the "broadest possible terms," and therefore, *any* alteration of a creditor's rights constitutes impairment, even a negligible one. *See, e.g.*, *In re L & J Anaheim Associates*, 995 F.2d 940, 942 (9th Cir. 1993) ("It is well established that, with this language, 'Congress define[d] impairment in the broadest possible terms.'" (citation omitted; alterations in original)); *In re Taddeo*, 685 F.2d 24, 28 (2d Cir. 1982) ("[Congress] defined impairment in the broadest possible terms"); *Monclova*, 254 B.R. at 176 (impairment is "very broad" and thus "any" alteration constitutes impairment).

Here, the significant impairment of the swap claims is more than merely negligible (though negligible would suffice). Despite the pervasive nature of the impairment and the fact that this Settlement was not driven by an effort at

"manufacturing" an impaired class, however, the Retiree Committee asserts that the Swap Counterparties are being "artificially impaired." The City does not concede that such a doctrine is or would be recognized in the Sixth Circuit. To the extent it does exist, however, it clearly does not apply on the facts here. Each of the cases cited by the Retiree Committee in support of their "artificial impairment" argument is highly distinguishable or actually supports a finding of impairment in this case.

- *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 243 (3d Cir. 2004) (remanding for good faith determination and noting artificial impairment can occur where "plan imposes an insignificant or *de minimis* impairment on a class of claims");

- *In re Windsor on the River Associates, Ltd.*, 7 F.3d 127, 132 (8th Cir. 1993) (denying confirmation over concerns of collusive agreements with *de minimis* creditors where such creditor's rights are only "marginally affect[ed]");

- *Fed. Nat. Mortgage Ass'n v. Vill. Green I, GP*, 483 B.R. 807, 818 (W.D. Tenn. 2012) (remanding to determine whether or not delaying payment to two *de minimis* creditors owed just hundreds of dollars in order to cramdown millions of dollars of claims constituted artificial impairment);

- *In re Vill. at Camp Bowie I, L.P.*, 710 F.3d 239, 243 (5th Cir. 2013) (***overruling*** "artificial impairment" objection even though total impairment equated to only about $900 in economic impairment);

- *In re Crosscreek Apartments, Ltd.*, 213 B.R. 521, 536 (Bankr. E.D. Tenn. 1997) (***overruling*** "artificial impairment" objection on the ground that paying a creditor in full on the effective date is still impairment);

- *In re Demming Hospitality, LLC*, No. 11-12-13377(TA), 2013 Bankr. Lexis 1428 (Bankr. D. N.M. Apr. 5, 2013) (***overruling*** objection that plan was

patently unconfirmable due to artificial impairment where class consisting of $10,554.73 of claim was being paid $7,916.04 despite the fact that debtor was receiving a $150,000 infusion from equity).

In short, not a single case cited comes close to approaching the facts here and, indeed, courts have even found impairment based on *de minimis* changes to a creditor's rights that are a far cry from the significant impairment here. As stated above, the City intends to fully brief these issues if, and when, they become ripe for determination. At this time, the City respectfully submits that such issues are premature.

### 3.    Plan Support Agreement

The Retiree Committee also argues that the Settlement should not be approved because it includes a plan support agreement. The precise legal basis for this argument is not clear, but the Retiree Committee cites to *In re Innkeepers USA Trust,* 442 B.R. 227 (Bankr. S.D.N.Y. 2010) and *In re Quigley Company, Inc.*, 437 B.R. 102 (Bankr. S.D.N.Y. 2010) for this proposition.

While the Retiree Committee suggests that the *Innkeepers* case involved facts similar to the ones presented here, that could not be further from the truth. *Innkeepers* involved a motion to assume an egregious prepetition plan support agreement with an insider that the court found (a) sharply curtailed the debtors' fiduciary duties, (b) provided the insider with the reorganized equity of all debtors even though the insider had liens on only 20 of the 92 debtors, (c) placed

onerous plan support agreement milestones on the debtors, (d) took place under a shadow of nondisclosure, (e) was entered into in the context of the debtors' investment banker being told not to seek alternatives to the deal, while the debtors themselves did neither a valuation nor appropriate diligence, (f) was not entered into in good faith, (g) did not provide the debtors sufficient value in exchange for what they were giving up, and (h) ceded significant control of the case to a loan creditor representing $200 million out of a total $1.4 billion capital structure. Based on these radically different facts, the court denied the motion.

Likewise, the facts in *Quigley* have no resemblance to the facts here. *Quigley* involved a case of straightforward vote buying—the debtors' sole shareholder effectively paid creditors to vote for a plan that gave the shareholder a release. *See Quigley*, 437 B.R. 102 ("Pfizer bought their votes for the purpose of obtaining the benefit of the channeling injunction"). That is not what is happening here. In fact, in *Quigley*, the Court expressly distinguished Pfizer's vote buying from a plan support agreement. These cases are extreme and irrelevant.

There is nothing unusual or untoward about a settlement and plan support agreement. "[T]he law favors compromise." *Drexel*, 134 B.R. at 505. And agreements that both settle contested claims and provide support for a plan, like the one here, are completely appropriate. For example, in *Cascade Grain*, 2009 WL 2843365, Bankruptcy Judge Perris approved a contested Rule 9019 settlement that

resolved a substantial secured claim and contained a provision requiring the holders of such claims to vote for and support a reorganization plan. *Id.* at *1. Among other facts, the court found that the "settlement will resolve potentially *costly* litigation with the Sponsor and the Loan Creditors, and will pave the way to provide debtor with relief from a $124 million obligation to the Loan Creditors." *Id.* at *8 The Court found nothing nefarious about the inclusion of a provision that required plan support and, instead, lauded the settlement for "pav[ing] the way to reorganization and the eventual restarting of production of ethanol." *Id.* The Retiree Committee's objections to the plan support provisions in the Settlement are thus entirely without merit.

### C. Syncora's "Consent Rights" Objection

Like the plan objections, Syncora's argument that it has overriding contractual consent rights is an issue that is not before this Court. The question the Court must decide is whether the Settlement represents a settlement within the range of reasonable litigation outcomes. Syncora's alleged consent rights are irrelevant to that decision. If Syncora believes that its insureds, the Swap Counterparties, have breached their obligations to it, Syncora is free to pursue litigation against them.

Even if the Court were inclined to determine Syncora's consent rights (as it has ample authority to do), Syncora's objection fails both legally and

13-53846-tjt    Doc 3145    Filed 03/21/14    Entered 03/21/14 19:01:53    Page 20 of 38

factually. Syncora repeatedly invokes *In re SportStuff*, 430 B.R. 170 (B.A.P. 8th Cir. 2010) for the proposition that settlements can never impact third party rights. Of course, that is neither the law nor what *SportStuff* held.

*SportStuff* involved a debtor manufacturer facing numerous product liability lawsuits. *Id.* at 173. The debtor sought approval under Rule 9019 of several settlements with its insurers. *Id.* at 175. Under the settlements, the insurers agreed to pay to the estate the remainder of the insurance policy limits in exchange for an injunction that, among other things, barred all claims against them by vendors in the chain of distribution – vendors that were co-insureds and were themselves subject to actual or threatened lawsuits. *Id.* The vendors successfully argued on appeal that the settlements were improper because the vendors had independent, direct claims against the insurers for defense and indemnification that would be enjoined by the settlements. *Id.*

Here, unlike in *SportStuff*, the Settlement does not seek to enjoin Syncora from pursuing any claims or rights it might have. More to point, however, Syncora has no such rights under the facts here. First, contrary to Syncora's arguments, the Settlement does not represent an amendment or modification of Syncora's rights in contravention of the Collateral Agreement or Swap Agreements. The case law demonstrates that the Settlement here is a compromise of claims, not an amendment to an existing contract. Thus, it cannot trigger

Syncora's alleged consent rights. *See, e.g., In re Residential Capital, LLC*, 497 B.R. 720, 748 (Bankr. S.D.N.Y. 2013) ("the Settlement Agreement is not an amendment to the Governing Agreements; it is a resolution of a claim").

None of the three supposed "amendments" of Syncora's rights that it identifies can withstand scrutiny. First, the Settlement's continuation of the *status quo* with respect to the casino revenues changes nothing at all. Syncora is already barred from trapping the revenues by the automatic stay,[3] so there is no alteration in Syncora's rights, and the Swap Counterparties' promise to forbear from seeking to trap the cash is by its nature and terms a forbearance, not an amendment. *See, e.g., Sav. Bank v. Sommer*, 8 N.Y.3d 318, 330 (2007) (distinguishing "forbearance" on the one hand and "amendment, modification or waiver" on the other and rejecting a lender's argument that its rights had been "constructively waived" without its consent when a majority of the lenders entered into a settlement that required forbearance with respect to contractual remedies).

Second, Syncora argues that the proposed Settlement provides the Swap Counterparties with new liens on the collateral and "the City may not grant liens on the Pledged Property that are equal or senior in status to those created by the Collateral Agreement." Docket No. 3051, ¶ 50. Syncora is mistaken as to what

---

[3]     *Op. Re. Stay Issue*, Aug. 28, 2013 Hrg. Tr. at 9:17-21.

the Settlement does: it merely continues the existing liens on the casino revenues and does not create new ones.

Third, Syncora argues that "[t]he Proposed Settlement provides the Swap Counterparties with the option to terminate the Swaps." *Id.* That is not true either. The Settlement preserves whatever rights the Swap Counterparties have to terminate the swaps in accordance with applicable law – it does not create any new rights with respect to termination. The Term Sheet provides that the Swap Counterparties will "retain" their rights to terminate. Term Sheet, p.3. The proposed form of order states that the agreement and order "shall not impair the rights of UBS and MLCS to terminate any Swap Agreement *in accordance with the terms and conditions of such Swap Agreement and applicable law*." Order, ¶¶ 18 and 20 (emphasis added).

Thus, whatever consent rights Syncora may have with respect to an amendment of the contracts, those rights plainly are not implicated by the Settlement.

Nor does Syncora have the right to control the Swap Counterparties' vote on a plan of adjustment.[4] Even assuming that an agreement allowing Syncora

---

[4]    The City notes that Syncora insures 1/3 or less of the amount of the swaps and, thus, even if Syncora could control the vote with respect to its swap contracts, the Swap Counterparties would nonetheless carry the class. *See* 11 U.S.C. § 1126(c).

to vote the Swap Counterparties' claim were enforceable,[5] that is simply not what the contract here provides. The language cited by Syncora allows it to make certain "directions, consents and waivers" with respect to the *contract administrator under the contract administration agreement*. Contract Administration Agreement, § 6.9.2. But nothing in the Contract Administration Agreements authorizes anyone to either file proofs of claim on behalf of the Swap Counterparties or vote the Swap Counterparties' claims.

Where the Contract Administration Agreement intends to refer to a vote in connection with a plan of adjustment, it uses the words "vote" and "plan of adjustment." *See* Contract Administration Agreement, § 6.4.2 (addressing the voting rights of COPs holders under a plan of adjustment). The parties' failure to use similar language in the section relied upon by Syncora clearly indicates that they did not intend to give Syncora the rights it now claims for itself.

**D.     Objections to the Limited Bar, Service Corporations Injunction and Release of Liens**

**1.     The Limited Bar Order**

None of the parties objecting to the limited bar order has explained how the bar order is at all prejudicial to it. This is unsurprising, since the judgment

---

[5]     *Compare Bank of Am., N.A. v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship)*, 246 B.R. 325 (Bankr. N.D. Ill. 2000) (agreement unenforceable) *with Blue Ridge Investors, II, LP v. Wachovia Bank, N.A. (In re Aerosol Packaging, LLC)*, 362 B.R. 43 (Bankr. N.D. Ga. 2006) (agreement enforceable).

reduction provision contained in the bar order, which is the economic equivalent of the contribution or indemnification claim that is barred, fully compensates a barred party. Thus, any barred party should be indifferent to the bar order. Rather than showing any harm from the limited bar order – because none exists – the Objectors argue vaguely that the bar order is "unprecedented," *see* Wilmington Trust Obj. Docket No. 3049, and does not satisfy applicable law.

First, the precedent for such relief is amply set forth in the Motion,[6] and indeed, the bar order requested here tracks very closely the relief granted in other cases. *See*, *e.g.*, Confirmation Order, *In re Tribune Company et al.*, 08-13141 (Bankr. D. Del.) at pp.30-33. Not a single one of the Objectors attempts to respond to, distinguish or even acknowledge the case law cited in the Motion with respect to the bar order. Such silence is deafening.

Further, the few cases cited by the Objectors with respect to the bar order actually support the relief requested here. Each of those cases stands for the proposition that when an order prevents third parties from pursuing indemnity and contribution claims against a released party, the barred parties should be

---

[6]     *See* Motion, ¶ ¶ 68-70, citing, *inter alia*, *In re Tribune Co.*, 464 B.R. 126, 176 (Bankr. D. Del. 2011); *Matter of Munford, Inc.*, 97 F.3d 449, 455 (11th Cir. 1996)*; Cullen v. Riley (In re Masters Mates & Pilots Pension Plan and IRAP Litig.)*, 957 F.2d 1020, 1028 (2d Cir. 1992); *Eichenholtz v. Brennan*, 52 F.3d 478, 487 (3d Cir. 1995); *Harris v. Agrivest Ltd. Partnership II*, 818 F.Supp. 1042, 1042 (E.D. Mich. 1993); *Rebenstock v. Fruehauf Trailer Corp.*, Case No. 92 CV 77050 DT, 1995 U.S. Dist. LEXIS 22089, at *7 (E.D. Mich. Aug. 18, 1995).

compensated for the claims they are prohibited from pursuing – for instance, by an appropriate judgment reduction provision such as the one currently before the Court.

In two of the three cases cited by the Objectors, in which the courts found injunctions to be improper, the orders contained no judgment reduction or compensation whatsoever.[7] In the third case, the problem was not the lack of a judgment reduction provision, but rather the fact that the bar order prohibited not only claims for contribution or indemnity, but also direct claims. Thus, the judgment reduction provision did not fully compensate the barred persons for their harm. *See Walsh v. Hefren-Tillotson, Inc. (In re Devon Capital Mgmt., Inc.)*, 261 B.R. 619, 626 (Bankr. W.D. Pa. 2001) ("Prohibiting objectors from asserting any claims *other than for contribution* … would be highly prejudicial." (emphasis added)). These cases support the bar order here, which is narrowly tailored to bar only claims for indemnity and contribution, and which fully compensates barred persons for the loss of those claims through a judgment reduction mechanism.

Lastly, the objectors' citation to *Dow Corning* and its associated non-exclusive factors is not on point. The Sixth Circuit in *Greektown* determined that

---

[7] *See Sportstuff*, 430 B.R. at 177 (denying third-party release where it was provided "without compensation or consent"); *Rafool v. The Goldfarb Corp. (In re Fleming Packaging Corp.)*, No. 04-8166, 2007 WL 4556981 (Bankr. C.D. Ill., Dec. 20, 2007) (rejecting equivalent of bar order where it provided "no consideration").

the *Dow Corning* factors were of "little help" in determining the appropriateness of a bar order in a Rule 9019 settlement. *In re Greektown Holdings, LLC*, 728 F.3d 567, 576 (6th Cir. 2013). Likewise, the application of such factors makes little sense here;[8] rather, the appropriate inquiry is whether the barred persons are being fully compensated. As set forth above, no party has or can coherently articulate how it might suffer any harm from the entry of such an order. And the Sixth Circuit has held that bar orders of this nature are inherently fair. *Id.* at 576 n.7. Accordingly, the Objections to the bar order are without merit.

### 2. The Service Corporations Injunction

Contrary to the statements of the Objectors, the proposed order does not contain wide-ranging third-party injunctions. On the contrary, the injunctive provisions of the proposed Order are extremely narrow and do not impact the rights of any of the Objectors, but rather only affect the Service Corporations. As a threshold matter, the Objectors lack standing to assert the Service Corporations' rights. It is axiomatic that a party only has standing to complain about how its *own rights* are affected. *See*, *e.g.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 644 (1988) (present asbestos claimant did not have standing to challenge third-party injunction against future asbestos claimants); *In re Indianapolis Downs, LLC.*, 486 B.R. 286, 304 (Bankr. D. Del. 2013) ("the third party release does not affect any of

---

[8] To the extent the *Dow Corning* factors applied, the bar order would meet them.

the Oliver Parties' direct interests, given that they are not releasing any Released Parties. As a result, the Oliver Parties lack standing to object to the third party releases and their objection in this regard is overruled."); *Lucas v. Dynegy Inc. (In re Dynegy Inc.)*, No. 12 Civ. 8908(JGK), 2013 WL 2413482, *9 (S.D.N.Y. June 4, 2013) ("[F]or all practical purposes, the appellant is a lone plaintiff attempting to exercise the rights of nonparties by attempting to opt out of or object to the Release on their behalf. Such action runs afoul of the prohibition against third party standing."); *In re Orlando Investors, L.P.*, 103 B.R. 593, 597 (Bankr. E.D. Pa. 1989) (party did not have standing to object to releases by other parties).

The Service Corporations have been given notice of the Settlement and the Motion. They have not objected and thus have effectively acquiesced in the relief sought. *See, e.g., Indianapolis Downs* 486 B.R at 305 (a party may be deemed to consent to a third-party release by failing to opt out); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218–19 (Bankr. S.D.N.Y. 2009) *aff'd in part, rev'd in part*, 634 F.3d 79 (2d Cir. 2011) (same); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (same). That being the case, the Objectors cannot use an injunction against another party as a pretext to try to derail a settlement that the Objectors simply don't like.

Furthermore, the injunction is appropriate because it does not enjoin a true "third party." The Service Corporations are mere shell entities. They were

created as part of the 2005 and 2006 COPs transactions as a means of evading the City's statutory debt limit and Michigan laws regulating the issuance of municipal debt. The Service Corporations do not have a separate existence from the City itself. They do not have (and never have had) employees, have never held regular Board meetings, and have not otherwise observed corporate formalities. The authorizing ordinance and organizational documents expressly provide that the Service Corporations are an instrumentality of the City and that they constitute an integral part of the City for tax purposes. *See* Det. City Code § 18-5-120(i). Thus, the injunction against them in substance is nothing more than an injunction against the City itself, to which the City clearly consents.

### 3. The Release of Liens Granted Through the Service Corporations

In a related argument, Syncora asserts that the Court cannot order the release of liens as provided under the Settlement because those liens run from the City to the Service Corporations and from the Service Corporations to the Swap Counterparties. The Service Corporations are, in Syncora's words, the proverbial "missing link." Docket No. 3051, ¶ 4. But the reasoning proffered by Syncora in support of this argument is contrary to law as well as to Syncora's own prior arguments before this Court. A necessary component of Syncora's argument is that the Swap Counterparties do not have a lien on the casino revenues and that such lien belongs exclusively to and is solely enforceable by the Service Corporations.

Under the Collateral Agreement, the City purported to grant a lien on the casino revenues to the Service Corporations, and at the same time and in the same document, the Service Corporations pledged that lien onward to the swap counterparties. According to Syncora's objection, this structure means that "the Swap Counterparties do not have a secured claim against the City." Docket No. 3051, ¶¶ 3 and 42. But Syncora cites *nothing* in support of this conclusion.

The Collateral Agreement provides that the Service Corporations granted the Swap Counterparties a lien on their claim against the City *and* on the pledge of the casino revenues. Collateral Agreement, § 4.2. Even absent this contractual pledge, applicable law provides that when a party pledges a right to payment, the collateral securing such right to payment follows. *See* MCL § 440.9203(7); *see also Prime Fin. Serv. v. Vinton*, 761 N.W.2d 694, 704 (Mich. Ct. App. 2008), *app. denied*, 757 N.W.2d 472 (2008) (mortgage transfers with claim); *Jones v. Titus*, 175 N.W. 257, 259 (Mich. 1919) (same).

Where a right to payment is pledged, the pledgee has the right under the Michigan Uniform Commercial Code and common law to enforce that right to payment upon default, including enforcing any accompanying liens.

> Sec. 9607. (1) If so agreed, and in any event after default, a secured party may do 1 or more of the following:
>
> (a) Notify an account debtor or other person obligated on collateral to make payment or otherwise render performance to or for the benefit

of the secured party.

. . .

(c) Enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance to the debtor, and with respect to any property that secures the obligations of the account debtor or other person obligated on the collateral.

MCL § 440.9607. Indeed, several cases suggest that not only is the assignee for security a real party in interest capable of enforcing the lien, but that it is the ***only*** party capable of doing so. *See*, *e.g.*, *Talmadge v. United States Shipping Board, Emergency Fleet Corp.*, 54 F.2d 240 (2d Cir.1932) (L. Hand, J.) (holding an unconditional assignee for collateral security is the only real party in interest with standing to assert claim); *Beneficial Commercial Corp. v. Railserv Mgmt. Corp.*, 563 F. Supp. 114, 116 (E.D. Pa. 1983) (same), *aff'd*, 729 F.2d 1445 (3d Cir. 1984).

Even putting aside the above legal principles, here, the Collateral Agreement expressly provides that "each [Swap] Counterparty has the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the *City Pledge*." Collateral Agreement,

§ 11.2(a) (emphasis added).  Indeed, in prior proceedings, Syncora acknowledged the Swap Counterparties' liens.[9]

Syncora's new position that the "the Swap Counterparties do not have a secured claim against the City," Docket No. 3051, ¶ 3, is completely inconsistent with its past assertions, as well as with its proofs of claim, which assert that Syncora has substantial claims against the City that are secured by the City's casino revenues. *See*, *e.g.*, Proof of Claim # 1352 ("Syncora has various claims relating to the Swaps, which are described in detail below. These claims are secured by the pledge of Casino Revenues."). That is, Syncora's sworn proof of claim asserts that Syncora, as an insurer subrogated to the rights of the Swap Counterparties, has a secured claim directly against the City. Syncora should be estopped from asserting the very opposite position here.

### E.    Miscellaneous Objections

#### 1.    COPs Holders' Arguments

The COPs holders raise several new arguments relating to the safe harbors that they did not raise in prior proceedings.[10]  At the outset, the COPs

---

[9]     *See*, *e.g.*, Syncora Objection to Post-Petition Financing, Docket No. 1870, ¶ 17 (arguing against the incurrence of post-petition financing and referring to the existing "liens of the Swap Counterparties on the casino tax").

[10]    The City does not respond here to paragraphs 11-20 of the COPs holders' Objection. These arguments were thoroughly considered by the Court in the prior settlement proceedings, and the Court has already made determinations with respect to probability of success on these issues.

holders argue that section 560 of the Bankruptcy Code does not guaranty full payment of the Swap Counterparties' claims. The City, of course, agrees with the COPs holders with respect to this argument. Nonetheless, the City acknowledges that this Court has already ruled that the Swap Counterparties are "more likely" to succeed on such an argument. *See* Bench Op., Jan. 16, 2014 Hrg. Tr. 17:21-25 – 18:1-3. In litigation, the City would attempt to persuade the Court that it should reconsider its preliminary views on this issue. Undoubtedly, the Swap Counterparties would be endeavoring just as hard to convince this Court to reconsider its preliminary views on the Act 34 and lien validity issues, and to maintain its position with respect to section 560. The COPs holders' argument here, however, reinforces the notion that, in litigation, all of the arguments of the parties will be revisited by this Court as well as by an appellate court or – more likely – multiple appellate courts. Accordingly, while the City agrees with the substantive legal position advanced by the COPs holders with respect to the appropriate interpretation of section 560 of the Bankruptcy Code, the City believes that this point serves to underscore that this Court's prior ruling should not be treated as a guaranty of success on the merits.

The COPs holders and (by incorporation by reference) Wilmington Trust also argue that (a) the swap agreements are executory contracts of the City that are subject to assumption or rejection, (b) the City's automatic stay extends to

protect against the Swap Counterparties' attempts to terminate such executory contracts,[11] (c) due to waiver, the Swap Counterparties cannot avail themselves of the safe harbor exceptions to the automatic stay to terminate the swaps, and (d) since the Swap Counterparties cannot now terminate, their claims are unmatured and unliquidated.

Even if the COPs holders were correct with respect to each of these arguments (despite defenses that could be raised by the Swap Counterparties), their objection is still unavailing. Unliquidated and unmatured claims are allowable in bankruptcy. *See* 11 U.S.C. §§ 101(5), 502(b) and (c). Further, absent a settlement, the City believes that the Swap Counterparties would attempt to trap the City's casino revenues, regardless of whether or not the swap claims are terminated, matured or liquidated.[12] The City admits that the Collateral Agreement gives the Swap Counterparties the contractual right to trap the casino revenues if the City defaults in certain respects. The City, of course, does not concede that they can enforce this right under Michigan law or in bankruptcy – while the Swap Counterparties, on the other hand, have argued that section 560 would allow them

---

[11]     Curiously, the COPs holders appear to take the position here that the Service Corporations should be regarded as interchangeable with the City, such that sections 362 and 365 would apply to agreements between the Service Corporations and the Swap Counterparties. This is diametrically opposed to their position in the City's adversary proceeding against the Service Corporations, in which certain of the COPs holders have sought to intervene.

[12]     Indeed, this position has already been and is currently being advanced by Syncora. *See* Docket No. 3051, ¶ 50 (arguing for automatic cash trapping today).

to do just that. Therefore, the COPs holders' argument that the swap claims are unmatured and unliquidated is irrelevant as it simply begs the question as to whether or not the Collateral Agreement is enforceable in accordance with its terms – one of the very issues being compromised, favorably and for good reason.

### 2. U.S. Bank's Reservation of Rights

The City intends to make certain changes to the proposed form of order that should substantially resolve U.S. Bank National Association's reservation of rights.

### 3. Deferral of Consideration of the Settlement Until Confirmation

While the City believes that several of the issues raised by the Objections are plan-related issues that are not ripe and better addressed in the confirmation process, that does not mean that the Court must or should postpone ruling on this Motion until the plan confirmation process. If Congress had intended for settlements to be approved only as part of a plan of adjustment, it could have very easily made that restriction clear, but that is not the case. Large transactions are frequently conducted in bankruptcy proceedings in advance of a plan of reorganization or adjustment, including litigation and settlements.

The objecting parties' argument is functionally similar to arguing that assumption or rejection of a contract should await confirmation of a plan. Such arguments have been made in chapter 11 cases based upon the possibility that the

debtor may not be able to confirm a plan. Those arguments, however, are commonly rejected by courts because assumption or rejection— much like a 9019 settlement—does not first require plan confirmation. *See*, *e.g.*, *In re Northwest Airlines Corp.*, 366 B.R. 270, 272 (Bankr. S.D.N.Y. 2007) (debtor rejected collective bargaining agreement prior to proposing a plan; "although the possibility always exists that a debtor's financial condition may change, neither § 1113 nor § 365 requires a debtor to wait until the end of a Chapter 11 case to move to assume or reject"); *In re Braniff Airways, Inc.*, 25 B.R. 216, 220-221 (Bankr. N.D. Tex. 1982) (rejection of collective bargaining agreement approved prior to consideration of chapter 11 plan).

The City believes it would be detrimental to wait until the plan process completes to obtain certainty with respect to its casino revenues and liquidity position. The City needs certainty with respect to its access to its casino revenues now in order to provide essential services to its residents and move forward with its reinvestment and rehabilitation efforts.

## III.    CONCLUSION

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached to the Motion granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

March 21, 2014                          Respectfully submitted,

                                        /s/ Robert S. Hertzberg
                                        Robert S. Hertzberg (P30261)
                                        Deborah Kovsky-Apap (P68258)
                                        PEPPER HAMILTON LLP
                                        4000 Town Center, Suite 1800
                                        Southfield, MI 48075
                                        (248) 359-7300 - Telephone
                                        (248) 359-7700 - Fax
                                        hertzbergr@pepperlaw.com
                                        kovskyd@pepperlaw.com

                                        Corinne Ball
                                        JONES DAY
                                        222 East 41st Street
                                        New York, New York 10017
                                        Telephone: (212) 326-3939
                                        Facsimile:  (212) 755-7306
                                        cball@jonesday.com

                                        Thomas F. Cullen, Jr.
                                        Gregory M. Shumaker
                                        Geoffrey S. Stewart
                                        JONES DAY
                                        51 Louisiana Avenue, N.W.
                                        Washington, D.C. 20001.2113
                                        Telephone:  (202) 879-3939
                                        Facsimile:   (202) 626-1700
                                        tfcullen@jonesday.com
                                        gshumaker@jonesday.com
                                        gstewart@jonesday.com

                                        *ATTORNEYS FOR THE CITY OF DETROIT*

-30-

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---------------------------------------------------x
                                                  :
In re                                             : Chapter 9
                                                  :
CITY OF DETROIT, MICHIGAN,                         : Case No. 13-53846
                                                  :
                        Debtor.                   : Hon. Steven W. Rhodes
                                                  :
                                                  :
                                                  :
---------------------------------------------------x

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 21, 2014, I caused the foregoing

*Omnibus Reply Of The City Of Detroit To Objections To The Motion Of Debtor For*

*Entry Of An Order, Pursuant To Section 105(A) Of The Bankruptcy Code And*

*Bankruptcy Rule 9019, Approving A Settlement And Plan Support Agreement And*

*Granting Related Relief* to be filed with the Court via ECF, which will send

electronic notification to all parties registered to receive service in this case.


March 21, 2014                    /s/ Robert S. Hertzberg
                                  Robert S. Hertzberg (P30261)