# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**STATEMENT OF MERRILL LYNCH CAPITAL SERVICES, INC. AND UBS AG
IN SUPPORT OF THE MOTION OF DEBTOR FOR ENTRY
OF AN ORDER PURSUANT TO SECTION 105(A) AND BANKRUPTCY RULE 9019,
APPROVING A SETTLEMENT AND PLAN SUPPORT AGREEMENT,
AND IN REPLY TO THE OBJECTIONS TO THE MOTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................iv

PRELIMINARY STATEMENT ..............................................................................................1

BACKGROUND ......................................................................................................................2

    A.   The 2005-2006 Transactions .................................................................................2

        1.   The 2005 Financing Transaction .............................................................2

        2.   The 2006 Financing Transaction .............................................................3

        3.   The Insurers ..............................................................................................4

        4.   Representations Concerning the Financing Transactions ........................4

    B.   The 2009 Amendments ..........................................................................................5

ARGUMENT ............................................................................................................................8

POINT I.
THE CITY HAS SATISFIED BANKRUPTCY RULE 9019 ...................................................8

    A.   The City's Likelihood of Success in Litigation Is Uncertain Because the Swap
    Counterparties Have Strong Arguments that the Transactions Are Lawful ..........................9

        1.   The Swap Counterparties Have a Strong Argument that the City Lawfully
        Created the Service Corporations Pursuant to Its Broad Home Rule Powers ...................9

        2.   The Michigan Debt Limit Is Inapplicable ...........................................10

        3.   The City's Payments Under the Service Contracts Are Not Debt.........12

        4.   Even If the Service Corporations Were Not Independent of the City, the
        City Did Not Incur New or Additional Debt...................................................13

        5.   The Swap Counterparties Have Strong Arguments that the Swaps Are Valid .......13

            (a)   The Swaps Do Not Constitute Debt................................................14

            (b)   The Swaps Are Not Governed by Act 34.........................................14

            (c)   Even If Act 34 Were to Apply, It Does Not Preempt Detroit's Home Rule
            Power ...................................................................................................15

    (d)   Even Assuming Section 317(4) of Act 34 Were to Apply, the Swaps Are in Compliance with the Statutory Provision ............................................................. 18

   6.     The City's Decision to Pledge Gaming Revenues in 2009 Was Proper ................. 18

   7.     Any Claims the City Might Bring Against the Swap Counterparties Are Unlikely to Succeed .................................................................................................. 19

    (a)   Any Claims by the City Against the Swap Counterparties Based on the 2005 and 2006 Transactions Are Time-Barred ........................................................ 19

    (b)   Any Claim by the City to Invalidate the Transactions Would Be Barred for Reasons of Equity ............................................................................................... 20

    (c)   Any Claim by the City Against the Swap Counterparties Has No Merit ............. 24

B.   The City's Likelihood of Success in a Litigation Must Be Weighed Against the Expense and Delay that Would Be Associated with Any Litigation .................................. 25

POINT II.
THE OBJECTIONS TO THE SETTLEMENT LACK MERIT ............................................ 26

A.   The Swap Counterparties' Lien on the Gaming Revenues Extends to Gaming Revenues Received Post-Petition ......................................................................................... 26

   1.     The Swap Counterparties Have a Statutory Lien, Unaffected by Section 552(a) ........................................................................................................................ 26

   2.     The Swap Counterparties' Lien Is Protected Under Section 928 Because It Secures "Special Revenues" as Defined in Section 902(2)(B) ....................................... 28

B.   The Bankruptcy Code's Safe Harbor Provisions Override Any Restriction in Section 552(a) ...................................................................................................................... 31

   1.     The Swap Counterparties Have Preserved Their Rights ....................................... 31

   2.     Section 560 Preserves Liens and Security Interests, Not Just Termination Rights ...................................................................................................................... 32

   3.     The Swap Counterparties Qualify for Safe Harbor Protection .............................. 33

C.   The Structure of the Settlement Is Lawful and Appropriate ........................................ 35

D.   The Order Approving This Settlement Would Not Create a New Lien in Violation of Michigan Law ................................................................................................. 37

E.    The Arguments Concerning Whether the City Has Created an Impaired Class Are Either Incorrect or Premature ..........................................................................................38

F.    The City Can Exercise Its Business Judgment to Enter Into a Settlement Now and Need Not Wait for Plan Confirmation ...........................................................................42

G.    Because the Releases and Bar Order Are Necessary and Customary, the Motion Should Be Granted .....................................................................................................................43

H.    David Sole's Objection Lacks Merit .........................................................................46

I.    Syncora's Arguments Are Unfounded and Do Not Justify Denying the Motion .........47

    1.    The Differences Between the Settlement and the FOTA Are Irrelevant for Purposes of the Court's Approval of the Motion Under Rule 9019..................................47

    2.    Syncora Incorrectly Asserts that It Must Consent to the Settlement ......................48

        (a)   The Settlement Is Not an Amendment, Modification, Waiver, or Termination of the Transaction Documents and, as Such, Does Not Require Syncora's Consent ..............................................................................................................48

        (b)   Syncora Is Not a Necessary Party to the Settlement and Cannot Properly Prevent the City and the Swap Counterparties from Resolving Disputes Between Them..............................................................................................................50

        (c)   Because the Swap Counterparties Are Merely Exercising Their Rights Under the Collateral Agreement and Applicable Law, Syncora Has No Consent or Control Rights ...............................................................................................................52

        (d)  To the Extent that Syncora Might Otherwise Have Had Any Consent Rights, It Has Forfeited Those Rights by Acting in Bad Faith ....................................56

CONCLUSION................................................................................................................58

APPENDIX A...............................................................................................................A-1

# TABLE OF AUTHORITIES

**Page**

**Cases**

Adams Outdoor Adv. v. City of E. Lansing,
439 Mich. 209, 483 N.W.2d 38 (1992)....................................................................................9

Adams Outdoor Adv., Inc. v. City of Holland,
234 Mich. App. 681, 600 N.W.2d 339 (1999) ............................................15, 18-19

Adams v. City of Detroit,
232 Mich. App. 701, 591 N.W.2d 67 (1998) ........................................................23

Alliance Capital Mgmt. L.P. v. Cnty. of Orange (In re Cnty. of Orange),
189 B.R. 499 (C.D. Cal. 1995)............................................................................27

Azaar v. Grand Rapids,
No. 260438, 2005 Mich. App. LEXIS 2299 (Mich. Ct. App. Sept 22, 2005) .........................16

Bacon v. City of Detroit,
232 Mich. 150, 275 N.W. 800 (1937)................................................................11, 12

Bank of Am., N.A. v. GREC Homes IX, LLC,
No. 13-21718-Civ, 2014 U.S. Dist. LEXIS 8316 (S.D. Fla. Jan. 23, 2014) ..........................25

Capital Credit & Collection Serv., Inc. v. Armani,
227 Or. App. 574, 206 P.3d 1114 (2009)..............................................................49

Carvel Corp. v. Diversified Mgmt. Grp. Inc.,
930 F.2d 228 (2d Cir. 1991).............................................................................54

Charles E. Austin Inc. v. Sec'y of State,
321 Mich. 426, 32 N.W.2d 694 (1948)................................................................23

Chickasaw Nation v. United States,
534 U.S. 84 (2001) .......................................................................................28

City of Brighton v. Twp. of Hamburg,
260 Mich. App. 345 677 N.W.2d 349 (2004) .........................................................16

City of Detroit v. Qualls,
434 Mich. 340, 454 N.W.2d 374 (1990)..............................................................19

City of Walla Walla v. Walla Walla Water Co.,
172 U.S. 1 (1898) ...................................................................................13

Coit v. City of Grand Rapids,
115 Mich. 493, 73 N.W. 811 (1898) ....................................................20

Colville v. McCollister,
No. 223249, 2002 Mich. App. LEXIS 867 (Mich. Ct. App. June 18, 2002)...........................23

Conn. Nat. Bank v. Germain,
503 U.S. 249 (1992) ...............................................................................30

Conroy v. City of Battle Creek,
314 Mich. 210, 22 N.W.2d 275 (1946)..................................................12

Council of City of Hamtramck v. Matulewicz,
285 Mich. 390, 280 N.W. 801 (1938)....................................................13

Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc.,
970 F.2d 199, 202-03 (6th Cir. 1992)....................................................12

Hatch v. Maple Valley Twp. Unit Sch.,
310 Mich. 516, 17 N.W.2d 735 (1945)..................................................21

Hughes v. McCarthy,
734 F.3d 473 (6th Cir. 2013).................................................................30

Huyler's v. Ritz-Carlton Rest. & Hotel Co.,
1 F.2d 491 (D. Del. 1924);.....................................................................55

In re Bond Issuance of Greater Wenatchee Reg'l Events Ctr. Pub. Facilities Dist.,
175 Wn.2d 788, 287 P.3d 567 (Wash. 2012)........................................13

In re Cascade Grain Prods., LLC,
No. 09-30508-elp11, 2009 Bankr. LEXIS 2565 (Bankr. D. Ore. Aug. 31, 2009).......40, 41, 42

In re Cnty. of Orange,
179 B.R. 185 (Bankr. C.D. Cal. 1995) aff'd & remanded 189 B.R. 499 (C.D. Cal. 1995).....30

In re Dalen,
259 B.R. 586 (Bankr. W.D. Mich. 2001)...............................................43

In re Delta,
    370 B.R. 537 (Bankr. S.D.N.Y. 2007)......................................................................50

In re Dow Corning Corp.,
    280 F.3d 648 (6th Cir. 2002)............................................................... 44, 45, 46

In re Dow Corning,
    198 B.R. 214 (Bankr. E.D. Mich. 1996) .............................................................50

In re Energy Conversion Devices, Inc.,
    474 B.R. 503 (Bankr. E.D. Mich. 2012) .............................................................39

In re Fitterer Eng'g Assocs., Inc.,
    27 B.R. 878 (Bankr. E.D. Mich. 1983) ...............................................................27

In re Fodale,
    No. 10-69502, 2013 Bankr. LEXIS 914 (Bankr. E.D. Mich. Feb. 21, 2013) .........................47

In re Forty-Eight Insulations, Inc.,
    133 B.R. 973 (N.D. Ill. 1992) ...........................................................................51

In re Heffernan Mem'l Hosp. Dist.,
    202 B.R. 147 (Bankr. S.D. Cal. 1996) ................................................................29

In re Jefferson County, Ala.,
    474 B.R. 228 (Bankr. N.D. Ala.), aff'd,
    2012 U.S. Dist. LEXIS 121961 (N.D. Ala. Aug. 28, 2012) ...................................................31

In re Madoff,
    848 F. Supp. 2d 469 (S.D.N.Y. 2012) ................................................................50

In re McKenzie Energy Corp.,
    228 B.R. 854 (Bankr. S.D. Tex. 1998) ...............................................................52

In re Palmer,
    No. 10-60099-7, 2012 Bankr. LEXIS 1269 (Bankr. D. Mont. Mar. 26, 2012) .......................52

In re Quigley Co., Inc.,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010)................................................................42

In re Request for Advisory Opinion Enrolled Senate Bill 558,
    400 Mich. 311, 254 N.W.2d 544 (1977)........................................................ 10, 14

In re Residential Capital LLC,
   497 B.R. 720 (Bankr. S.D.N.Y. 2013) .................................................................49, 50

In re Residential Capital, LLC,
   No. 12-12020, 2013 Bankr. LEXIS 2601 (Bankr. S.D.N.Y. June 27, 2013) .....................39, 40

In re Sportstuff, Inc.,
   430 B.R. 170 (B.A.P. 8th Cir. 2010) ...................................................................51, 52

In re Vitek, Inc.,
   51 F.3d 530 (5th Cir. 1995) ...............................................................................50

ITT Corp. v. LTX Corp.,
   926 F.2d 1258 (1st Cir. 1991) .............................................................................49

J.F. Cavanaugh & Co. v. City of Detroit,
   126 Mich. App. 62, 337 N.W.2d 605 (1983) ........................................................17

Johnson v. General Mut. Ins. Co.,
   24 N.Y.2d 42, 246 N.E. 2d 713 (1969) ................................................................58

Katz v. Holzberg,
   No. 13-1726 (FSH), 2013 U.S. Dist. LEXIS 142989 (D.N.J. Oct. 2, 2013) .........................12

Kelton Corp. v. Cnty. of Worcester,
   426 Mass. 355, 688 N.E.2d 941 (1997) ...............................................................36

Kenton County Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.),
   374 B.R. 516 (S.D.N.Y. 2007),
   aff'd, 309 F. App'x 455 (2d Cir. 2009) ...............................................................50

Kittinger v. Kittinger,
   319 Mich. 145, 29 N.W.2d 267 (1947) ................................................................23

Klager v. Robert Meyer Co.,
   415 Mich. 402, 329 N.W.2d 721 (1982) ..........................................................11, 12

Lindell Bank & Tr. Co. v. Rucci,
   87 S.W.3d 354 (Ct. App. Mo. 2002) ...................................................................49

Ludington Water-Supply Co. v. City of Ludington,
   119 Mich. 480, 78 N.W. 558 (1899) ..............................................................12-13

Matter of Prudential Prop. & Cas. Ins. Co.,
    604 N.Y.S.2d 136, 137, 198 A.D.2d 421, 422 (2d Dep't 1993) .............................................57

Meritage Homes Corp. v. JPMorgan Chase Bank, N.A.,
    474 B.R. 526 (Bankr. S.D. Ohio 2012)...................................................................................39

Mich. State Housing Dev. Auth. v. Lehman Bros. Derivative Prods., Inc.,
    502 B.R. 383 (Bankr. S.D.N.Y. 2013)................................................................................32, 33

Moran v. LTV Steel Co. (In re LTV Steel Co.),
    560 F.3d 449 (6th Cir. 2009)..................................................................................................45

Newcrete Prods. v. City of Wilkes-Barre,
    37 A.3d 7, 2012 Pa. Commw. LEXIS 48 (Pa. Commw. Ct. 2012)........................................12

NML Capital, Ltd. v. Republic of Arg.,
    727 F.3d 230 (2d Cir. 2013)....................................................................................................45

Orzel v. Scott Drug Co.,
    449 Mich. 550, 557, 537 N.W.2d 208,212-13 (1995) ...........................................................23

Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC),
    728 F.3d 567, 575 (6th Cir. 2013) ..........................................................................................43

Pavia v. State Farm Mutual Auto. Ins. Co.,
    82 N.Y.2d 445, 452, 626 N.E.2d 24, 27 (1993). ..............................................................57, 58

People v. Llewellyn,
    401 Mich. 314, 257 N.W.2d 902 (1977)...............................................................................16

People v. Sell,
    310 Mich. 305, 17 N.W.2d 193 (1945)...................................................................................9

Presnell v. Board of Cty. Rd. Com'rs of Wayne Cnty.,
    105 Mich. App. 362, 306 N.W.2d 516 (1981) ......................................................................36

Protection Mut. Ins. Co. v. Silgan Plastics Corp.,
    No. 96-Civ-4493, 2000 U.S. Dist. LEXIS 11200 (S.D.N.Y. Aug. 17, 2000).........................58

Rose v. Nat'l Auction Grp., Inc.,
    466 Mich. 453, 646 N.W. 2d 453 (2002)...............................................................................21

Rust v. Conrad,
   47 Mich. 449, 11 N.W. 265 (1882) ....................................................................23

Sagadahoc Land Co. v. Ewing,
   65 F. 702 (6th Cir. 1895) ...............................................................................23

Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.,
   198 F.3d 415 (3d Cir. 1999)...........................................................................55

Spier v. City of Kalamazoo,
   138 Mich. 652, 101 N.W. 846 (1904)..............................................................20

St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Guaranty Co.,
   43 N.Y.2d 977, 375 N.E.2d 733, 404 N.Y.S.2d 552 (1978).................................57

St. Paul v. Dual Parking Meter Co.,
   229 Minn. 217, 228, 39 N.W.2d 174, 180 (1949)..............................................21

Standard Steel, LLC v. Buckeye Energy, Inc.,
   No. Civ. A. 04-538, 2005 U.S. Dist. LEXIS 22378 (W.D. Pa. Sept. 29, 2005) ......49

Stratton v. City of Detroit,
   246 Mich. 139, 224 N.W. 649 (1929)..............................................................21

Twp. of Cumming v. Ogemaw Cnty.,
   100 Mich. 567, 59 N.W. 240 (1894) ..........................................................21, 23

United States v. Yeagle,
   299 F. Supp. 257 (E.D. Ky. 1969)...................................................................28

United States v. Perry,
   360 F.3d 519 (6th Cir. 2004)..........................................................................56

Village of Portland v. Citizens' Tel. Co.,
   206 Mich. 632, 173 N.W. 382 (1919)..............................................................21

Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co.,
   1 N.Y.3d 470, 807 N.E.2d 876, 775 N.Y.S.2d 765 (2004).................................56

Walinske v. Detroit-Wayne Joint Bldg. Auth.,
   325 Mich. 562, 39 N.W.2d 73 (1949)..............................................................11

Warrenville State Bank v. Farmington Twp.,
    81 F. Supp. 101 (E.D. Mich. 1948), aff'd, 185 F.2d 260 (6th Cir. 1950)..............................20

Webb v. Wakefield Twp.,
    239 Mich. 521, 215 N.W. 43 (1927) .................................................................................20

## Statutes & Rules

11 U.S.C. § 101.............................................................................................................27, 34

11 U.S.C. § 102......................................................................................................................29

11 U.S.C. § 362......................................................................................................................33

11 U.S.C. § 365......................................................................................................................14

11 U.S.C. § 546......................................................................................................................33

11 U.S.C. § 552.................................................................................................. 26, 27, 30, 33

11 U.S.C. § 560.............................................................................................................. 32, 33

11 U.S.C. § 902................................................................................................................28, 29

11 U.S.C. § 928................................................................................................................28, 29

15 U.S.C. § 77m....................................................................................................................19

26 U.S.C. § 4401...................................................................................................................28

28 U.S.C § 1658(b) ...............................................................................................................19

Detroit City Code § 18-14-3(a).............................................................................................29

Detroit City Code § 18-16-4(e).............................................................................................18

Detroit City Code § 18-16-8..................................................................................................27

Detroit City Code § 18-16-14...............................................................................................27

Detroit, Mich., Home Rule Charter § 1-102 ................................................................9

Fed. R. Bankr. P. 9019 ..........................................................................................39, 50

Mich. Comp. Laws § 117.4a ....................................................................................10

Mich. Comp. Laws § 117.4j(3) .................................................................................15

Mich. Comp. Laws § 117.4o .............................................................................9-10, 14

Mich. Comp. Laws § 141.422b(5)(b) ........................................................................17

Mich. Comp. Laws § 141.424 ...................................................................................17

Mich. Comp. Laws § 141.2101 ..................................................................................14

Mich. Comp. Laws § 141.2103 .............................................................................15, 17

Mich. Comp. Laws § 141.2201 ..................................................................................15

Mich. Comp. Laws § 141.2301 .............................................................................16, 17

Mich. Comp. Laws § 141.2317 .........................................................................14, 16, 18

Mich. Comp. Laws § 432.212 ...................................................................................18

Mich. Comp. Laws § 436.1201 ..................................................................................16

Mich. Comp. Laws § 440.9203 ..................................................................................35

Mich. Comp. Laws § 440.9607 ..................................................................................36

Mich. Comp. Laws § 600.5805 ..................................................................................19

Mich. Comp. Laws § 600.5807 ..................................................................................19

Mich. Comp. Laws § 600.5813 ..................................................................................19

Mich. Comp. Laws § 600.5827 ..................................................................................19

## Constitutional Provisions

Mich. Const. art. VII, § 21 ......................................................................................10

Mich. Const. art. VII, § 22 ......................................................................................15

Mich. Const. art. VII, § 34 ........................................................................................9

Mich. Const. art. IX, § 24 .......................................................................................13

## Other Authorities

9 Mich. Civ. Jur. Estoppel § 17 (2014) ...................................................................23

28 Am. Jur. 2d Estoppel and Waiver § 27 (2014) ..................................................22

5-560 Collier on Bankruptcy ¶ 560.01 (2014) .......................................................14

Black's Law Dictionary (9th ed. 2009) ...................................................................27

H.R. Rep. No. 1011, 100th Cong., 2d Sess. (1988) ...................................... 28, 29, 31

H.R. Rep. No. 95-595 (1977) ..................................................................................29

S. Rep. No. 100-506, 100th Cong., 2d Sess. (1988) ...................................... 28, 29, 30

Merrill Lynch Capital Services, Inc. and UBS AG (together, the "Swap Counterparties") respectfully submit this statement in support of the City's motion (the "Motion") for an order approving the settlement and plan support agreement (the "Settlement") and in response to the objections (the "Objections").

## PRELIMINARY STATEMENT

The Settlement should be approved for multiple reasons:

- Under the Settlement, the City will make payments to the Swap Counterparties totaling 70 percent less than the secured, $288 million termination payment the City would owe the Swap Counterparties.

- The 70 percent discount appropriately credits all the City's potential claims.

- The Settlement allows the City to pay over time, eliminating the City's need for incremental post-petition financing to settle its differences with the Swap Counterparties.

- The Settlement definitively frees up the City's wagering taxes and developer payments, improving the City's cash flow and providing needed certainty.

- If the Settlement is not approved, costly and hotly contested litigation will ensue that will likely take years to resolve.

Conversely, the objections are not a barrier to approval:

- The Settlement is not an amendment, modification, or waiver that requires the consent of the insurers. Rather, the Swap Counterparties are exercising and resolving their existing contractual and legal rights and remedies, which are theirs alone.

- The Proposed Order – which is being modified in response to certain creditor concerns – makes clear that whether the Swap Counterparties will be treated as impaired or properly classified under a plan of adjustment is not before the Court. Rather, those issues (if they *ever* become relevant or contested given the City's continuing plan negotiations) will, of course, be addressed at confirmation.

1

- The limited releases and carefully crafted bar order in the Settlement are commonplace and comply fully with applicable law.

In sum, the Settlement reflects very substantial concessions by the Swap Counterparties and far exceeds the minimum requirement for reasonableness. The City has met its burden, and the Swap Counterparties respectfully submit that the Motion should be granted.

## BACKGROUND

The following background is limited to facts not previously presented and those essential to considering the merits of the City's Motion.[1]

### A. The 2005-2006 Transactions

#### 1. The 2005 Financing Transaction

The City entered into a transaction in 2005 to address an existing $1.7 billion funding obligation to its police and fire department pension funds. The City created two nonprofit corporations (the "Service Corporations"), which then created funding trusts to issue and sell instruments known as Certificates of Participation or "COPs." (Ex. B (Stipulated Facts at 2).) The COPs were a mix of fixed and floating-rate certificates, the latter of which were more appealing to investors and could more easily be refinanced, but also exposed the City to the risk of rising interest rates. (Ex. A (2005 Offering Circular at 1); Ex. B (Stipulated Facts at 1-2).)

To address the City's cash flow and interest-rate risks on the floating rate COPs, the Service Corporations also entered into swap agreements with the Swap Counterparties (the "Swap Agreements"). (Ex. B (Stipulated Facts at 5-6); Ex. B (Stipulated Facts at 2).)[2] The

---

[1] During the March 5, 2014 hearing, the Court ruled that the evidence submitted in connection with the hearing on the City's motion to approve an earlier proposed settlement with the Swap Counterparties (the "FOTA Motion") would be adopted in its entirety for purposes of the hearing on the instant Motion.

[2] The original counterparties to the Swap Agreements were UBS and SBS Financial Products Company, LLC ("SBS"), with MLCS serving as credit support provider. On July 19, 2013, SBS assigned its rights and obligations under the Swap Agreements to MLCS.

transaction met all of the City's goals: it satisfied pressing funding obligations to retirees, was protected from the interest rate exposure, and was in a position to cost effectively refinance the COPs should the periods for paying the amounts owed to the retirement systems be extended. The rates paid on the COPs and swaps were also estimated to lower the City's pension costs by nearly 200 basis points from the rates assessed on its retirement obligations, (Ex. A (2005 Offering Circular at 1, 5)), saving the City tens of millions of dollars annually.

When entering into the swaps, the Swap Counterparties entered into symmetrical hedges with independent counterparties. Thus, any gains or losses on the City's side of the swaps largely passed through the Swap Counterparties to the third parties, and vice versa. The Swap Counterparties would not be the beneficiaries of a windfall in the event of termination if paid in full. A termination payment is not profit or loss, but is designed to protect the non-defaulting party by leaving it in the position it would have been had the parties fully performed. It is a standard clause in swap agreements that requires a mark-to-market payment following specified termination events. Thus, amounts owed following termination of the swaps here are not "profit" to the Swap Counterparties, but merely the amounts projected to be needed to replace the terminated hedge.

2.    **The 2006 Financing Transaction**

In 2006, the City realized significant financial benefits by calling the existing floating-rate COPs. The Service Corporations terminated them and, because of prevailing interest rates, received approximately $50 million from the Swap Counterparties. (Ex. C (2006 Offering Circular at 8-9); see also Ex. B (Stipulated Facts at 2).) The Service Corporations then issued and sold new COPs and entered into a new set of swaps with the Swap Counterparties. (Ex. B (Stipulated Facts at 2, 6).) Together, the 2005 and 2006 transactions have performed precisely as expected. The City has paid only the fixed rate it agreed to, has not been exposed to the risk of

higher interest rates, and has received precisely the benefits it bargained for. Indeed, there is no allegation, nor has there ever been, that the COP and Swap transactions did not operate as designed, or that the Swap Counterparties did not disclose to the City all material aspects and risks of the transactions.

### 3. The Insurers

The Swap Counterparties secured swap insurance from two monoline insurers, FGIC and Syncora (the "Swap Insurers"). (Ex. B (Stipulated Facts at 7).) The policies make clear that Syncora's obligations are, among other things, unconditional:

> The obligations of [Syncora] under this Policy are <u>irrevocable, primary, absolute and unconditional</u>, subject to satisfaction of the conditions for making a claim under the Policy, and neither the failure of any Person to perform any covenant or obligation in favor of [Syncora] (or otherwise), nor the failure or omission to make a demand permitted hereunder, nor the failure of any assignment or grant of any security interest, nor the commencement of any Insolvency Proceeding <u>shall in any way affect or limit [Syncora's] obligations under this Policy</u>.

(Ex. D (Syncora Policy No. CA03049B at 8) (emphasis added). The Swap insurers also agreed to waive defenses, set-offs, and counterclaims of "any kind." (<u>See, e.g.</u>, <u>id.</u> at 7).)[3]

### 4. Representations Concerning the Financing Transactions

The City made multiple representations to the Swap Counterparties and to the public concerning the validity of these transactions. The underwriting documents represented that the City had full legal authority to enter into the transactions and had complied with all applicable Michigan laws. (Ex. E (2005 COPs Underwriting Agreement § J); <u>see also</u> Ex. F (2006 COPs

---

[3] The Syncora policies also provide, in relevant part, that: "No defenses (including the defense of fraud in the inducement or fraud in the fact), set-offs and counterclaims of any kind available to [Syncora] so as to deny payment of any amount due in respect of this Policy will be valid and [Syncora] hereby waives and agrees not to assert any and all such defenses (including, without limitation, defense of fraud in the inducement or fact, or any other circumstances which would have the effect of discharging a surety in law or in equity), set-offs and counterclaims, including, without limitation, any such rights acquired by subrogation, assignment or otherwise." (Ex. D (Syncora Policy No. CA03049B at 7).)

Underwriting Agreement § J).)  The City made similar representations in the Service Contracts. (Ex. G (GRS Service Contract, Terms & Conditions § 3.02); see also Ex. H (PFRS Service Contract, Terms & Conditions § 3.02).)  And the Detroit City Council formally and publicly approved the transactions through a series of ordinances attesting to the transactions' validity and that the transactions were in the City's best interests.  (Exs. I, J, K (Ordinances 03-05, 04-05, 05-05).)

Multiple legal representatives for the City also advised the Swap Counterparties that the transactions were valid.  Lewis & Munday, the City's longtime bond counsel, opined that: (1) the Service Corporations were valid under Michigan law and had the authority to enter into the Swap Agreements; (2) the Service Contracts were "valid and binding agreement[s] of [the] Service Corporation[s] and the City and [are] enforceable in accordance with [their] terms"; and (3) the Swap Agreements were valid.  (Ex. N (Lewis & Munday 2006 Swap Opinion at 2 and Lewis & Munday 2006 Approval Opinion at 2).)  In addition, the City of Detroit's Law Department represented that the City had authority "to undertake the activities described in and contemplated by the Offering Circular, the Authorizing Ordinances, the Service Contracts, . . . [and] to cause the creation of the Service Corporations."  (Ex. O (2006 Corporation Counsel Opinion at 1-2).) These opinions were incorporated by reference into the Offering Circular (Ex. C (2006 Offering Circular at 23); Ex. A (2005 Offering Circular at 21).)

**B.  The 2009 Amendments**

In early 2009, at least in part as a result of the unprecedented and unforeseen financial crisis, two defaults occurred under the Swap Agreements: first, the debt rating of the 2006 COPs was reduced below investment grade; and second, the Swap Insurers were downgraded.  (Id. at 9.)  These events would have permitted the Swap Counterparties to declare an "Early

Termination Date" and be owed an immediate mark-to-market payment of between $300 million and $400 million under then-prevailing interest rates. (Id.)

The City then contacted the Swap Counterparties to propose a pledge of certain wagering taxes and developer payments (the "Gaming Revenues") as security for its obligations under the Swap Agreements and in an effort to avoid termination. The City also provided the Swap Counterparties with several presentations and memoranda detailing the proposed pledge and its validity under Michigan law, including the Michigan Gaming Act.[4]

Ultimately, the Swap Counterparties entered into this proposed collateral agreement with the City and the Service Corporations (the "Collateral Agreement"). (Ex. B (Stipulated Facts at 9-10).) The City agreed to a "lockbox" for the wagering taxes and developer payments that secured the City's obligations under the Service Contracts to make payments to the Service Corporations. (Id. at 9-10.) Although they were not made parties to the Collateral Agreement (Ex. R), the Swap Insurers consented to the 2009 amendments. (Exs. P, Q (Syncora Consent, FGIC Consent).)

In the 2009 transaction documents, the City again made multiple representations and warranties, including as to the validity of the Collateral Agreement and the 2005 and 2006 transactions. (Ex. R (Collateral Agreement § 6.1(b), (e)).) The City Council also formally and publicly approved the transactions. (Ex. S (Ordinance 05-09).) In so doing, it reiterated its earlier findings that the 2005 and 2006 transactions were valid and proper, and set forth its legislative findings concerning the validity of the 2009 amendments, including the pledge of the

---

[4] As discussed below, the Gaming Act specifies permissible uses for wagering revenues, including "programs that are designed to contribute to the improvement of the quality of life in the city."

Gaming Revenues.[5]  (Id. §§ 18-16-2, 18-16-3, 18-16-4 (providing, <u>inter alia</u> that "in the interest

of avoiding fees and expenses of litigation, the City, the Service Corporations and the [Swap]

Counterparties have agreed in principle to the Terms for Settlement . . . .").)

Once again, multiple legal representatives of the City and the Service Corporations

opined to the Swap Counterparties and public that each component of these transactions was

lawful.  The opinions were unqualified and unambiguous:

- "The City has the power to enter into the Documents to which it is a party."

- "The City Pledge, including the lien of the City Pledge (i) has been validly established, in favor of the Service Corporations, . . . (ii) is valid, binding and enforceable against all parties . . . and (iii) is a valid lien in the pledged property . . ."

 (Ex. T (Lewis & Munday 2009 Opinion at 1-2).)  The City of Detroit Law Department also

issued an unqualified opinion to the Swap Counterparties concerning the transaction's validity.

(Ex. U (2009 Corporate Counsel Opinion).)  Finally, Orrick, Herrington & Sutcliffe LLP, special

counsel to the City and the Service Corporations, issued an opinion to the Swap Counterparties,

and others, in which it concluded that "the City and the Service Corporations were authorized to

execute and deliver that certain Collateral Agreement" and "that if the matter were properly

briefed and presented to a court, the court would hold that the Wagering Taxes constitute 'special

---

[5] The City also agreed to the following condition precedent, which was consistent with its repeated assertions concerning the propriety of the various transactions:

> All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the City exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the City.

(Ex. R (Collateral Agreement § 6.1(e)).)

revenues' under Section 902(2) of the Bankruptcy Code." (Ex. V (Orrick 2009 Opinion at 2, 7).)

Appendix A hereto contains a detailed list of the representations, warranties, and unqualified

legal opinions provided to the Swap Counterparties by either the City or its advisors in

connection with the 2009 Amendments.

## ARGUMENT

The Court should grant the City's Motion because the Settlement satisfies the applicable

test under Section 105 of the Bankruptcy Code and falls well within the range of reasonableness

that Bankruptcy Rule 9019 requires. In reaching the Settlement, the parties heeded this Court's

admonition that "the settlement of the swaps claims is better for everyone than litigation and

hopes [] everyone still agrees with that." (Ex. W (Jan. 16, 2014 Hearing Tr. at 28).)

### POINT I.
### THE CITY HAS SATISFIED BANKRUPTCY RULE 9019

Most of the Objections do not take issue with the Settlement consideration, but instead

target specific provisions of the Settlement, such as confirmation of the existing lien on casino

revenues, or the (misunderstood) scope of the bar order. The few Objectors that still argue that

the City is giving up too much all assume the City is <u>certain</u> to win a complete victory on all

issues. (Notably, Ambac – the party that previously asserted that the FOTA was not reasonable

because the City was likely to succeed on the merits if litigated – did not file an objection here.)

The objections ignore both the risks and the costs of complex and lengthy litigation. A

settlement that discounts the City's obligation by approximately 70 percent, eliminates all risk of

cash trapping, and pays the Swap Counterparties over an extended period, is reasonable.[6]

---

[6] In this section, the Swap Counterparties set forth some of the arguments, defenses and claims they would advance in any litigation with the City in the absence of the Settlement. Certain of the Objectors have done the same in their pleadings. Needless to say, the Swap Counterparties understand that the City would take a different position as to many of these points in any such litigation with the Swap Counterparties, and that it already has done so in the litigation concerning the COPs. For the avoidance of doubt, nothing in this section should be construed as a concession by the City as to the validity of any fact or legal argument.

**A.    The City's Likelihood of Success in Litigation Is
Uncertain Because the Swap Counterparties
Have Strong Arguments that the Transactions
Are Lawful**

The Swap Counterparties have many strong arguments – claims, defenses, or

counterclaims – concerning the validity of the swaps and related transactions.  These arguments

are not only colorable, they are consistent with the City's multiple representations and legal

opinions, and are supported by Michigan law and other authority.  Given the Court's focus on the

validity of the transactions at the hearing concerning the FOTA, the Swap Counterparties

respectfully set forth some of the claims and defenses that they would assert to provide a more

complete picture of the risks to the City and complexity of any litigation in the absence of a

settlement.

**1.    The Swap Counterparties Have a Strong Argument that the City Lawfully
Created the Service Corporations Pursuant to Its Broad Home Rule Powers**

The City lawfully created the Service Corporations using the "comprehensive home rule

power conferred upon it by the Michigan Constitution."  Detroit, Mich., Home Rule Charter § 1-

102 (Jan. 1, 2012).  A municipality's exercise of its home rule powers is presumed valid and

entitled to great deference.  Mich. Const. art. VII, § 34  ("The provisions of this constitution and

law concerning counties, townships, cities and villages shall be liberally construed in their

favor."); People v. Sell, 310 Mich. 305, 213-13, 17 N.W.2d 193, 195 (1945) ("Considering its

purpose, [the Home Rule City Act] should be construed liberally and in a home rule spirit."); see

also Adams Outdoor Adv. v. City of E. Lansing, 439 Mich. 209, 235, 483 N.W.2d 38, 42 (1992)

(despite lack of express authority, the home rule power enabled the City of East Lansing to issue

ordinance outlawing nonconforming billboards) (internal citations and quotations omitted).

Pursuant to its home rule powers, the City has the power to form nonprofit corporations,

such as the Service Corporations.  Mich. Comp. Laws § 117.4o (2013) ("The legislative body of

9

a city may by ordinance or resolution authorize the formation of a nonprofit corporation under the nonprofit corporation act. . . ."). The City properly exercised that authority through ordinances. (Exs. I, J, K (Ordinances 03-05, 04-05, 05-05).) The City and its legal advisors made dozens of representations that the Service Corporations were valid when formed, when issuing the COPs, and when executing other related transaction agreements. See supra at 4-7; infra at App'x A. Indeed, the City previously noted to the Court that the validity of the Service Corporations is a complex, disputed issue and the outcome in litigation is "far from clear." (Omnibus City Reply in Support of FOTA Motion [Doc. No. 2106] ("City FOTA Reply") at 55.)

The City's creation of the Service Corporations is also consistent with financing arrangements throughout the state of Michigan. Detroit alone has formed eleven similar corporations to assist with carrying out its civic mission, as have several other Michigan cities, including Flint and Grand Rapids.[7]

## 2. The Michigan Debt Limit Is Inapplicable

The debt limit is inapplicable because it governs only borrowings by the City itself. See In re Request for Advisory Opinion Enrolled Senate Bill 558, 400 Mich. 311, 313, 254 N.W.2d 544, 547 (1977) (holding that the debt limit's only application is to "limit the power of the Legislature to borrow money and issue evidence of the debt thereby incurred"); see also Mich. Const. art. VII, § 21 ("The legislature shall provide by general laws for the incorporation of cities and villages. Such laws shall . . . restrict the powers of cities and villages to borrow money and contract debts."); Mich. Comp. Laws § 117.4a (addressing Michigan's computation of municipal debt limits). The Funding Trusts – not the City – issued the COPs (Ex. B (Stipulated Facts ¶¶ 2,

---

[7] See City of Detroit, Mich., Comprehensive Annual Financial Report 68–69 (2012), available at http://www.detroitmi.gov/Portals/0/docs/finance/CAFR/Final%202012%20Detroit%20Financial%20Statements.pdf; City of Flint, Comprehensive Annual Financial Report 3, 36 (2012), available at http://www.cityofflint.com/finance/CAFR/ 2012/CoFCAFR2012.pdf; City of Grand Rapids, Mich., Comprehensive Annual Financial Report iv (2012), available at http://grcity.us/city-comptroller/Documents/CAFR%202012%20PDF%20final.pdf.

3)) and the Service Corporations are legally separate entities from the City. Exs. L, M (GRS & PFRS Articles of Incorporation, Article II (2)); Ex. K (Ordinance 05-05 § 18-5-126(a)(1)).) The only way to conclude that the <u>City</u> violated the debt limit is to wholly disregard the legal structure of the Service Corporations, which should not occur for three reasons.

First, "[i]t has long been the policy of Michigan courts that the corporate veil may be pierced only if the corporate form is being used to perpetrate fraud" and formal legal structures must be respected absent evidence that a plaintiff was "victimized by an abuse of corporate form." <u>Klager v. Robert Meyer Co.</u>, 415 Mich. 402, 413-15, 329 N.W.2d 721, 726-27 (1982) ("[Plaintiff] may not seek to disregard the corporate entity when he is fully aware of the character of the corporation with which he deals [and is] not victimized by an abuse of the corporate form."). No facts exist sufficient to establish fraud here; indeed, the City's myriad representations on these large public financing transactions show just the opposite.

Indeed, the Michigan Supreme Court has held that a structure used by the City to fund a project – while avoiding constitutional debt limits – was lawful absent proof of actual fraud. <u>Bacon v. City of Detroit</u>, 232 Mich. 150, 175, 275 N.W. 800, 803 (1937) (rejecting challenge to transaction where county applied for a grant and a loan on behalf of the City, whose prior loan application was rejected in light of the debt limit, on the condition that the City was to enter into a 10-year service contract with the county). "There is no fraud in reaching a desired end by legal means even though other means to the end would be illegal." <u>Id.</u>; <u>accord</u> <u>Walinske v. Detroit-Wayne Joint Bldg. Auth.</u>, 325 Mich. 562, 581, 39 N.W.2d 73, 80 (1949) ("The fact that [a] proposed plan might be termed an evasion of the Constitution would not condemn it unless such evasion was illegal. It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it.").

Second, substantial legal authority opposes disregarding the validity of a corporation formed by a municipality. See, e.g., Foster Wheeler Energy Corp. v. Metro. Knox Solid Waste Auth., Inc., 970 F.2d 199, 202-03 (6th Cir. 1992) (municipal authority's corporate veil could not be pierced absent fraud); Katz v. Holzberg, No. 13-1726 (FSH), 2013 U.S. Dist. LEXIS 142989, at *13 (D.N.J. Oct. 2, 2013) (plaintiff "does not provide a single case . . . supporting the application of corporate veil-piercing theory or parent-subsidiary law to the public authority context" and citing contrary authority); Newcrete Prods. v. City of Wilkes-Barre, 37 A.3d 7, 13, 2012 Pa. Commw. LEXIS 48 (Pa. Commw. Ct. 2012) ("the doctrine of piercing the corporate veil is wholly inapplicable to the relationship between redevelopment authorities and municipalities").

Third, respecting corporate structures serves "important social policies by creating an incentive to pool resources and to channel them into productive activity." See Klager, 329 N.W.2d 721, 725. Disregarding the formal legal structure of the Service Corporations would be at odds with these policies and would create substantial uncertainty among municipalities and their funding sources across the state.

### 3. The City's Payments Under the Service Contracts Are Not Debt

Another argument that the Swap Counterparties would likely advance absent a settlement is that the Service Contracts are contracts for services and are not debt. See, e.g., Bacon, 275 N.W. at 802 ("[a] contract for future services, to be paid for as rendered, is not an incurring of indebtedness." (internal citation and quotation omitted)); Conroy v. City of Battle Creek, 314 Mich. 210, 224, 22 N.W.2d 275, 279-80 (1946) ("[A] contract for future services is not incurring an indebtedness within the charter limitations."); Ludington Water-Supply Co. v. City of Ludington, 119 Mich. 480, 491, 78 N.W. 558, 562 (1899) ("[T]he rule . . . that a contract for future services, to be paid for as rendered, is not an incurring of indebtedness, is supported by

abundant authority."); see also City of Walla Walla v. Walla Walla Water Co., 172 U.S. 1, 19 (1898) (noting "distinction between a debt and a contract for a future indebtedness to be incurred").[8] Here, the Service Corporations agreed to, among other things, facilitate the funding of the City's constitutionally mandated pension obligations. Mich. Const. art. IX, § 24; (see also Exs. G, H (GRS & PFRS Service Contacts § 4.01).)

### 4. Even If the Service Corporations Were Not Independent of the City, the City Did Not Incur New or Additional Debt

Even if the Service Corporations were invalidated, the Michigan debt limit would be inapplicable. The COPs merely changed or refinanced the form of an existing obligation and did not create new or additional debt. Under the existing debt doctrine, issuing bonds to fund an existing obligation does not create new debt for purposes of the Michigan debt limit. See Council of City of Hamtramck v. Matulewicz, 285 Mich. 390, 400, 280 N.W. 801, 805 (1938) (holding that issuing bonds to fund previously issued bonds did not create new indebtedness). When the Service Corporations were formed in 2005, the City faced a $1.7 billion pension funding obligation that it was required to meet under the Michigan constitution. The funds the City raised to pay towards its preexisting pension obligation therefore do not implicate the debt limit.

### 5. The Swap Counterparties Have Strong Arguments that the Swaps Are Valid

The Swap Counterparties have many strong arguments concerning the validity of the swaps, four of which are set forth below in brief.

---

[8] Although the Michigan courts have not recently revisited this legal issue, the Supreme Court of Washington State recently cited the decision in Walla Walla with approval for this proposition. In re Bond Issuance of Greater Wenatchee Reg'l Events Ctr. Pub. Facilities Dist., 175 Wn.2d 788, 799, 287 P.3d 567, 573 (Wash. 2012).

### (a)       The Swaps Do Not Constitute Debt

The Michigan debt limit is inapplicable because the swaps were entered into by the Service Corporations, not the City, for the reasons discussed above.  Moreover, even if the City were party to the Swap Agreements, swaps do not constitute debt because the transactions do not involve borrowing money, the key characteristic of "debt" under Michigan law.  See In re Request for Advisory Opinion Enrolled Senate Bill 558, 254 N.W.2d at 547 (holding that the debt limit only constrains the power "to borrow money and issue evidence of the debt thereby incurred").[9]  The record shows that the City benefited from the services performed by the Swap Counterparties, including the interest rate hedges that were essential to funding the City's pension obligations.  (Exs. G, H (GRS & PFRS Service Contacts § 8(a)) ("The City acknowledges that it derives a direct benefit from the [Swaps] by reducing the Funding Cost volatility of the [payments on the floating rate 2006 COPs].").)  Indeed, even if Act 34 applied to the swaps – and it does not – Section 317 of Act 34 expressly provides that swaps are not debt. Mich. Comp. Laws § 141.2317(3) (2014) ("An agreement entered into pursuant to this section [on swap, hedge, or similar agreements] shall not be included within the total debt of a municipality for any statutory or charter or other debt limitation purpose").

### (b)       The Swaps Are Not Governed by Act 34

The swaps are also not governed by Act 34, the statute that regulates certain municipal financial transactions.  Mich. Comp. Laws § 141.2101.  Michigan's Home Rule City Act expressly provides that Act 34 does not apply to nonprofit corporations, such as the Service Corporations, formed by home rule cities.  Mich. Comp. Laws § 117.4o(2) ("A nonprofit

---

[9] It is well settled under bankruptcy law as well that swaps are executory contracts capable of assumption by a debtor, and therefore not contracts to "make a loan, or extend other debt financing or financial accommodations."  11 U.S.C. § 365 (c)(2); see generally 5-560 Collier on Bankruptcy ¶ 560.01 (2014) (stating that, absent the safe harbors in the code, swaps "could be assumed or rejected by the debtor pursuant to section 365").

corporation formed under subsection (1) is not subject to the municipal finance act . . . or its successor act."). Thus, Act 34 would not apply to the swaps unless the corporate form of the Service Corporations was disregarded, which, as discussed above, is not supported by law or fact.

**(c)      Even If Act 34 Were to Apply, It Does Not Preempt Detroit's Home Rule Power**

Even if the Service Corporations were invalidated, the Swap Agreements are not barred by Act 34.  As an initial matter, the City previously noted to the Court that it "has extensive powers under the Home Rule Act which, arguably, could independently justify the [swap] transactions."  (City FOTA Reply at 55.)  Under the Michigan Constitution and the Michigan Home Rule City Act, a home rule city has all powers not expressly prohibited, Mich. Const. art. VII, § 22; Mich. Comp. Laws § 117.4j(3), and a city's exercise of its home rule powers is entitled to "every presumption of validity."  Adams Outdoor Adv., Inc. v. City of Holland, 234 Mich. App. 681, 691-99, 600 N.W.2d 339, 342-48 (1999).  Moreover, the City lacks standing to enforce Act 34, see Mich. Comp. Laws Ann. § 141.2201 ("The department is authorized and directed to protect the credit of this state and its municipalities, and to enforce the provisions of this act . . . ."), an argument that the City itself acknowledged in recent court filings.  See City's Memorandum in Support of Motion to Dismiss at 7-11, Nat'l Pub. Fin. Guarantee Corp. v. City of Detroit, Adv. Proc. No. 13-05309 (SWR) (Bankr. E.D. Mich. Jan. 17, 2014) [Doc. No. 55-3].

In addition, the Swap Counterparties have a strong argument that Act 34 does not "occupy the field" of swap transactions.  To determine if a statute "occupies the field" such that it preempts home rule powers, Michigan courts apply a four-factor test and evaluate whether: (1) state law expressly provides that the State's authority to regulate in a specified area is exclusive; (2) preemption of a field of regulation can be implied from legislative history; (3) the

15

state regulatory scheme is so pervasive as to support a finding of preemption; and (4) the nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the State's purpose. People v. Llewellyn, 401 Mich. 314, 323, 257 N.W.2d 902, 905 (1977); see also City of Brighton v. Twp. of Hamburg, 260 Mich. App. 345, 351, 677 N.W.2d 349, 358 (2004).

First, Act 34 does not in any way provide that it is the exclusive authority for a Michigan municipality to enter into an interest rate swap. Section 317, the only section of the Act 34 that addresses interest rate swaps, contains no such statement of exclusivity with respect to interest rate swaps. Mich. Comp. Laws § 141.2317. By contrast, other sections of Act 34 explicitly use exclusive language. See, e.g., Mich. Comp. Laws § 141.2301 ("[A] municipality shall not issue a municipal security except in accordance with this act."). Moreover, the Michigan legislature has clearly expressed its intent that a statute occupy a field in other statutes. See, e.g., Michigan Liquor Control Code of 1998, Mich. Comp. Laws Ann. § 436.1201 ("Except as otherwise provided in this act, the commission shall have the sole right, power, and duty to control the alcoholic beverage traffic and traffic in other alcoholic liquor within this state, including the manufacture, importation, possession, transportation and sale thereof."). In the absence of such language, the court "may not read into a statute what is not within the Legislature's intent, as derived from the statutory language." Azaar v. City of Grand Rapids, No. 260438, 2005 Mich. App. LEXIS 2299, at *6 (Mich. Ct. App. Sept 22, 2005).

Second, the legislative history of Act 34 does not support a finding of an intent to preempt the field of interest rate swaps. Indeed, there are statements in the legislative history that show a lack of such intent. See, e.g., Ex. X (Senate Fiscal Agency, Revised Municipal S.B. 29 (S-3): Floor Analysis (Apr. 16, 2001) at 2) (explaining a narrow and limited impact on home

rule powers); Ex. Y (Senate Fiscal Agency, Revised Municipal S.B. 29 (S-2): Summary (2001) at 7-9) (discussing a specific example of Act 34's impact on a home rule city's powers).

Third, Act 34 is not so pervasive that it supports a finding of preemption for all municipal interest rate swap contracts. Act 34 focuses on "municipal securities," as that term is defined in Mich. Comp. Laws §§ 141.2103(l), 141.2301. It does not regulate every facet of municipal borrowing – in fact, it only addresses interest rate swaps in one limited section. Moreover, Act 34 is not the only place where the Michigan legislature addresses swap contracts. The Uniform Budgeting and Accounting Act includes swap contracts in the definition of "derivative instrument or product," and it goes on to explain how to budget and account for these products. Mich. Comp. Laws §§ 141.424, 141.422b(5)(b). If Act 34 were in fact all-encompassing and occupied the field for swap contracts, then there would be no need for other Michigan statutes to regulate swap contracts. Cf. J.F. Cavanaugh & Co. v. City of Detroit, 126 Mich. App. 627, 636, 337 N.W.2d 605, 610 (1983) (holding that state civil rights laws did not preempt local civil rights laws and reasoning that "[t]he coexistence of federal and state statutes protecting civil rights strongly indicates that no single comprehensive scheme of legislation . . . was intended by the Legislature").

Fourth, the nature of swap contracts does not demand exclusive state regulation. Municipalities and service corporations often enter into contracts, even in the absence of specific legislative authority. Just like other municipal contracts, swap contracts do not require uniform regulation at the state level under Act 34.

For all of these reasons, the Swap Counterparties have strong arguments that Act 34 does not preempt the City's authority or ability to enter into interest rate swaps, either directly or through the Service Corporations.

17

      **(d)**       **Even Assuming Section 317(4) of Act 34 Were to Apply, the Swaps Are in Compliance with the Statutory Provision**

Certain objectors have referenced an objection to the FOTA Motion that argued that the swaps violate Section 317(4) of Act 34. However, Section 317(4) does not impose any statutory requirements on swaps, and Section 317(1) contains expansive language that allows municipalities to enter into "an interest rate exchange or swap, hedge, or similar agreement or agreements in connection with the issuance or proposed issuance of debt or in connection with its then outstanding debt." Mich. Comp. Laws § 141.2317(1). Rather, Section 317(4) provides statutory benefits (in the form of security and/or a limited tax full faith and credit pledge) that apply as a matter of law to interest rate swaps issued in connection with debt that voters did not approve. See generally Mich. Comp. Laws § 141.2317(4).

      **6.**       **The City's Decision to Pledge Gaming Revenues in 2009 Was Proper**

The City itself proposed and then lawfully pledged the casino revenues as security for the Swap Agreements in 2009. (No party challenges the City's pledge of the developer revenues.) The Gaming Act permits casino revenues to be used to avoid tax increases that would have negatively impacted the quality of life in the City and that would have placed the City's residents under a severe financial burden. See Mich. Comp. Laws § 432.212(3)(a)(v, vi). The City Council enacted an ordinance stating that the anticipated tax burden if the Swap Agreements were terminated would "be destructive of the quality of life in the city and will place its residents under a severe financial burden," Detroit City Code § 18-16-4(e) (emphasis added), and that Gaming Revenue Pledge was authorized by Section 12(3)(a) of the Wagering Tax Revenue Statute. (Ex. S (Ordinance 05-09); see also Appendix A (collecting representations).) The express legislative findings and determinations of compliance in the Municipal Ordinance No. 05-09 must be afforded great deference. See Adams Outdoor Adv., Inc. v. City of Holland, 600

N.W.2d at 344 ("The policy and philosophical decisions of the legislative branch must be respected unless unconstitutional or contrary to law"). Indeed, the City's pledge is presumptively valid because it was enacted by ordinance. See City of Detroit v. Qualls, 434 Mich. 340, 364, 454 N.W.2d 374, 385 (1990). Moreover, the City's outside legal counsel, Lewis & Munday, and its Corporation Counsel offered unqualified opinions that the Gaming Revenue Pledge was valid under Michigan law. (Ex. T (Lewis & Munday 2009 Opinion); Ex. U (2009 Corporate Counsel Opinion at 1).)

> 7. **Any Claims the City Might Bring Against the Swap Counterparties Are Unlikely to Succeed**

The release of the City's potential claims against the Swap Counterparties is reasonable because the City would be unlikely to prevail. The claims are time-barred, the City is estopped from disavowing the legality of these many transactions by virtue of its prior representations and the benefits it received and retained. The claims also lack merit because, among other things, the transactions worked precisely as designed.

> (a) **Any Claims by the City Against the Swap Counterparties Based on the 2005 and 2006 Transactions Are Time-Barred**

In Michigan, the statute of limitations for an action "runs from the time . . . the wrong upon which the claim is based was done regardless of the time when damage results." Mich. Comp. Laws § 600.5827. Any claim the City could bring based on the 2005 and 2006 transactions was time-barred no later than June 2012. Mich. Comp. Laws § 600.5805(10) (negligence claims have a three-year statute of limitation); Mich. Comp. Laws § 600.5807(8) (six years for contract); Mich. Comp. Laws § 600.5813 (six years for fraud). The same is true under federal securities laws. 15 U.S.C. § 77m (three years for claims under the 1933 Act); 28 U.S.C § 1658(b) (five years for claims under the 1934 Act).

> **(b)    Any Claim by the City to Invalidate the Transactions Would Be Barred for Reasons of Equity**

The City is estopped from seeking to invalidate the Service Contracts and Collateral Agreement or from claiming damages against the Swap Counterparties after eight years of performance through which the City has received and retained significant benefits.

> **(i)    The City Cannot Retain the Benefit of the COPs and Swaps While Seeking to Invalidate the Service Contracts**

Another argument that the Swap Counterparties would advance absent a settlement is that Michigan law does not permit the City, on the facts here, to avoid contractual obligations when it has received and retained the benefit of its bargain. See, e.g., Webb v. Wakefield Twp., 239 Mich. 521, 528, 215 N.W. 43, 45 (1927). The Michigan Supreme Court has held that where a plaintiff and city enter into a contract in good faith, the city retains benefits under the contract, and the city does not "offer to restore the consideration, or place plaintiffs in statu[s] quo," the contract is enforceable and the city is estopped from denying its validity. Coit v. City of Grand Rapids, 115 Mich. 493, 498, 73 N.W. 811, 813 (1898). Similarly, in Spier v. City of Kalamazoo, 138 Mich. 652, 655-57, 101 N.W. 846, 847 (1904), because the city retained a benefit in the form of a deed for a street, the court concluded that the debt obligation incurred to acquire the deed was enforceable even though it was in excess of the city's debt limit. And the Sixth Circuit has held that a municipality was properly estopped from seeking to escape its bond obligations after it assured bondholders that the bonds complied with applicable statutes. Warrenville State Bank v. Farmington Twp., 81 F. Supp. 101, 107 (E.D. Mich. 1948), aff'd, 185 F.2d 260 (6th Cir. 1950).

The COPs provided the City with over $1.4 billion to fund its constitutionally mandated pension obligations, and the swaps enabled the COPs to be marketed on terms attractive to investors, while protecting against interest rate risk. And the swaps provided flexibility,

allowing the Service Corporations to pay the COPs down early without penalty, a benefit that would not have been available if all the COPs had been issued at fixed rates. Because the City received a substantial benefit from the pension funding transactions, it cannot now be heard to complain that those transactions were invalid from inception.

For the same reason, even if the swaps were found to be void <u>ab initio</u>, the City could not seek disgorgement of the amounts it has paid under the swaps. While Michigan law, in extremely limited circumstances, allows a municipality to claw back funds it has paid out under a contract that was beyond its statutory authority, <u>see, e.g.</u>, <u>Stratton v. City of Detroit</u>, 246 Mich. 139, 146, 224 N.W. 649, 652 (1929), it cannot do so when, as here, it got the benefit of the bargain. <u>See, e.g.</u>, <u>Twp. of Cumming v. Ogemaw Cnty.</u>, 100 Mich. 567, 569, 59 N.W. 240, 241 (1894) (although the plaintiff township's deal to refinance its debt was void <u>ab initio</u>, five years later "it ha[d] been partially carried out, and the township has had its debts paid, to that extent; and, so far as paid . . . the township cannot now be heard to complain, and is in no position to recover its money back.").

Furthermore, the doctrines of <u>quantum meruit</u>, <u>in pari delicto</u>, and unclean hands would prevent the City from prevailing on a claim for disgorgement, as it made the key representations that made the transactions possible and has repeatedly affirmed the validity of these transactions. <u>See, e.g.</u>, <u>Rose v. Nat'l Auction Grp., Inc.</u>, 466 Mich. 453, 465-67, 646 N.W. 2d 453, 470-75 (2002) (finding plaintiff's agreement to go along with fake auction scheme barred plaintiff from asserting contractual claims against defendant); <u>Hatch v. Maple Valley Twp. Unit Sch.</u>, 310 Mich. 516, 525-26, 17 N.W.2d 735, 739 (1945); <u>Village of Portland v. Citizens' Tel. Co.</u>, 206 Mich. 632, 644, 173 N.W. 382, 386 (1919) (finding plaintiff village <u>in pari delicto</u> and thus entitled to no relief in the tort negligence context); <u>see also</u> <u>St. Paul v. Dual Parking Meter Co.</u>,

229 Minn. 217, 228, 39 N.W.2d 174, 180 (1949) (finding municipality was <u>in pari delicto</u> with contractor and barring action to recover payments made to the contractor). Significantly, only one objector to the settlement (David Sole) has suggested that the City has a potentially viable disgorgement claim, but has done so in conclusory terms and without addressing the legal infirmities to which such a claim would be subject. (<u>See</u> Sole Objection ¶ 16.)

(ii) **The City Cannot Retain the Benefit of the Gaming Revenue Pledge While Seeking to Invalidate that Pledge**

The City is also estopped from repudiating its Gaming Revenue Pledge. The Swap Counterparties were contractually entitled to terminate the swaps in 2009. Had they done so, they would have been owed more than $300 million in termination payments and could have secured an additional lien on any related judgments. Instead, at the City's behest, the Swap Counterparties agreed to forbear from terminating the swaps. In exchange, the Swap Counterparties received security in the form of a lien on the City's Gaming Revenue. As described in detail above, it was the <u>City</u> that approached the Swap Counterparties with the idea of pledging the Gaming Revenue. In agreeing to restructure the 2006 swaps to incorporate the Gaming Revenue pledge, the Swap Counterparties relied on repeated representations made by the <u>City</u> that the Pledge was valid and fully enforceable. The City's Corporation Counsel and its outside counsel both issued opinions that this transaction complied with all Michigan laws. (See Ex. U (2009 Corporate Counsel Opinion at 1); Ex. T (2009 Lewis & Munday Opinion at 2).)

Having received the benefit of that agreement, the City cannot seek to invalidate <u>its own legislative action</u> so that it can avoid honoring its financial obligations. In forbearing from exercising their 2009 termination rights, the Swap Counterparties relied on the City's representations that the Gaming Revenue Pledge was valid. A party is estopped from disavowing a position it previously held when another party reasonably relied on that position

and would suffer prejudice if it were now reversed.  See Adams v. City of Detroit, 232 Mich.

App. 701, 708, 591 N.W.2d 67, 70 (1998); see also 28 Am. Jur. 2d Estoppel and Waiver § 27

(2014).  This estoppel principle is "an act of simple justice in the law to hold a party to the truth

of something he has asserted . . . ."  Kittinger v. Kittinger, 319 Mich. 145, 151, 29 N.W.2d 267,

270 (1947) (internal quotation and citation omitted); see also 9 Mich. Civ. Jur. Estoppel § 17

(2014) (Estoppel "rests on broad principles of justice . . . .").

(iii)    **The City Is Barred by Laches from Bringing Any Claims**

Laches prevents a party to a contract from seeking to invalidate it after having already

performed because this would cause prejudice to the counterparty that had materially changed its

position in reliance on the contract.  Sagadahoc Land Co. v. Ewing, 65 F. 702, 704–05 (6th Cir.

1895); Colville v. McCollister, No. 223249, 2002 Mich. App. LEXIS 867, at *2-3 (Mich. Ct.

App. June 18, 2002).  This is no less true where a municipality alleges that a contract is wholly

void.  See, e.g., Twp. of Cumming, 59 N.W. at 241.  Here, the City received the $1.4 billion

benefit of funding its constitutional pension obligation in 2005 and 2006.  It cannot wait until

2014 to claim that the arrangement has been void ab initio.  As in Cumming, after receiving a

substantial benefit and performing under the arrangement for almost eight years, the City "cannot

now be heard to complain."  Id.

(iv)    **The City's Role in Structuring the Transactions Prevents It
from Now Seeking to Invalidate Them**

The City would also not be entitled to relief because it was an active participant in

planning and structuring the transactions.  "No citation of authority is necessary to establish that

one who seeks the aid of equity must come in with clean hands."  Charles E. Austin Inc. v. Sec'y

of State, 321 Mich. 426, 435, 32 N.W.2d 694, 697 (1948); see also Orzel v. Scott Drug Co., 449

Mich. 550, 557, 537 N.W.2d 208, 212-13 (1995).  "[I]f there are any indications of overreaching

or unfairness on [the plaintiff's] part, the court will refuse to entertain his case . . . ." <u>Rust v.</u> <u>Conrad,</u> 47 Mich. 449, 454, 11 N.W. 265, 267 (1882). In this case, the City cannot be heard to complain that the Service Contracts, the swaps, or the Gaming Revenue pledge are void because <u>the City</u> is responsible for the creation of the void contracts and unlawful debt, not the Swap Counterparties. According to its own allegations, the City is at least equally responsible for the very wrong it would assert, but for the Settlement. (<u>See</u> Ex. Z (Complaint, City of Detroit v. Detroit Gen. Ret. Sys. Serv. Corp., Adv. Proc. No. 14-04112 (Bankr. E.D. Mich.) [Doc. No. 2621] ¶¶ 8, 10, 12, 15, 24, 26-29).)

### (c) Any Claim by the City Against the Swap Counterparties Has No Merit

The City would not have a claim against the Swap Counterparties because the Swap Counterparties engaged in no actionable conduct. Neither UBS nor MLCS made any representations as to the City's ability to legally enter into the transactions. To the contrary, it was the City that made multiple representations to the Swap Counterparties as to the City's ability to enter into these transactions. (Ex. E (2005 COPs Underwriting Agreement § J); Ex. F (2006 COPs Underwriting Agreement § J).) Additionally, there is no potential claim based on the structure or operation of the COPs, the swaps, or the 2009 amendments: each of those transactions has operated as designed to fulfill the City's financial objectives. Thus, for example, the swaps have operated to hedge against interest rate fluctuations exactly as intended and the 2009 amendments enabled the City to avoid a large termination payment.

In addition, the City has suffered no legally cognizable injury attributable to the transactions. That the City, with the benefit of hindsight, would have paid less had it not hedged interest rate risk – or had interest rates gone up not down – does not establish that the Swap Counterparties engaged in any actionable wrongdoing. <u>See Bank of Am., N.A. v. GREC Homes</u>

IX, LLC, No. 13-21718-Civ, 2014 U.S. Dist. LEXIS 8316, at *30-31 (S.D. Fla. Jan. 23, 2014) (holding that the purchaser of interest rate swaps in connection with a floating rate instrument had received a benefit despite interest rates falling because it was protected against the possibility that rates could have risen, and gained certainty about its payments by securing a fixed rate). Nor can the City claim any injury arising from the pledge of the Gaming Revenues, because that, at most, required the City to continue making payments that it was already legally obligated to make under the swaps.

**B.      The City's Likelihood of Success in a Litigation Must Be Weighed Against the Expense and Delay that Would Be Associated with Any Litigation**

The Settlement before the Court is in the best interests of the City, its creditors, and its residents because the Settlement avoids the need for costly and time-consuming litigation and appeals at a time when the City is working to obtain consensus among other creditors to confirm its plan of adjustment. Moreover, the City's residents have a compelling interest in seeing a resolution of this bankruptcy and certainty as to the City's cash flows, which is unlikely to happen in the near-term absent a settlement of the claims – and of the many counterclaims that could be asserted by the Swap Counterparties. As the Court noted in its January 16, 2014 ruling on the FOTA Motion, some of the claims at issue "would require substantial discovery . . . and that litigation might take years." (Ex. W (Jan. 16, 2014 Hearing Tr. at 17-19).)

The Settlement before the Court is the product of tough arms-length negotiation and the exercise of the City's sound business judgment to settle – at a massive discount – what the Swap Counterparties maintain is a valid, secured claim of nearly $300 million. This Court's approval will allow City leadership to get on with the business of the City's revitalization, and the City's

Gaming Revenues – and developer payments – would be unencumbered and available to aid in those efforts.

## POINT II.
## THE OBJECTIONS TO THE SETTLEMENT LACK MERIT

Apart from the arguments concerning the validity of the transactions, the Objectors assert several objections to specific provisions of the Settlement. For the reasons discussed below, each of these arguments is without merit.

**A.    The Swap Counterparties' Lien on the Gaming
Revenues Extends to Gaming Revenues Received
Post-Petition**

Some Objectors argue that even if the Swap Counterparties' lien on the Gaming Revenues is otherwise valid, it does not extend to Gaming Revenues acquired post-petition by virtue of the Bankruptcy Code's general prohibition on security interests in after-acquired property under section 552(a),[10] effectively rendering the Swap Counterparties unsecured creditors. (See COPs Objection at ¶¶ 12-13; Official Retiree Comm. Objection at 11.) This position ignores certain exceptions to this general rule. The Swap Counterparties' lien on the Gaming Revenues is a statutory lien to which section 552(a) does not apply. And special protections under chapter 9 of the Bankruptcy Code and the Code's safe harbor provisions would trump section 552(a), even if it were applicable here.

**1.    The Swap Counterparties Have a Statutory Lien, Unaffected by Section
552(a)**

As the Objectors concede, section 552(a) does not apply to a statutory lien, defined under the Bankruptcy Code as a "lien arising solely by force of a statute on specified circumstances or

---

[10] Section 552(a) provides, in pertinent part, that: "[e]xcept as provided in [552(b)], property acquired by the . . . debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a).

conditions." (COPs Objection at ¶¶ 12-14 (citing 11 U.S.C. § 101(53)); see also In re Fitterer

Eng'g Assocs., Inc., 27 B.R. 878, 882-83 (Bankr. E.D. Mich. 1983). On May 26, 2009, the City

passed an ordinance creating a lien on the Gaming Revenues to secure payments under the Swap

Agreements. See Detroit City Code §§ 18-16-8; 18-16-14.[11] Because a valid city ordinance has

the same force and effect as a state law statute, the Swap Counterparties' lien is a statutory lien

exempt from section 552(a). See Black's Law Dictionary 1542 (9th ed. 2009) (defining a

"statute" as "[a] law passed by a legislative body").

The Objectors contend that the Swap Counterparties' lien on the Gaming Revenues is not

a statutory lien because the lien was granted under the Collateral Agreement. (See COPs

Objection at ¶¶ 12-14). However, Section 4.1 of the Collateral Agreement simply recognizes the

lien granted by the authorizing ordinance as being "an essential term of the agreement," and

Section 4.2 then recites the City's pledge verbatim from the ordinance.

In addition, the objectors' argument fails as a matter of law. The existence of a

contractual lien does not alter the lien's statutory nature, provided that a statute creates the lien.

See Alliance Capital Mgmt. L.P. v. Cnty. of Orange (In re Cnty. Of Orange), 189 B.R. 499, 503

(C.D. Cal. 1995) ("The statutory nature of the lien is not changed by the fact that there was an

agreement between the parties . . . . The creation of the lien is not dependent upon the

agreement.") (emphasis in original). Because a valid City ordinance created the Swap

---

[11] Section 18-16-8 of the Detroit City Code provides that "[t]he city pledges to the service corporations and creates a first priority lien upon all of the city's right, title and interest in, to and under the pledged property, whether received or to be received, in order to secure the payment of all city hedge payables related obligations (the city pledge)." Detroit City Code § 18-16-8(a). Section 18-16-14(a) further provides that "[e]ach service corporation pledges to the counterparties and creates a first priority lien upon all of the service corporation's right, title and interest in, to and under the city hedge payables related Obligations and the city pledge, in order to secure the payment of the hedge payables as the same may now or hereafter become due and payable by such service corporation under its respective hedge (collective[ly], the service corporation pledge)." Id. § 18-16-14(a).

Counterparties' lien, that statutory lien extends to Gaming Revenues received post-petition, notwithstanding section 552(a).

### 2. The Swap Counterparties' Lien Is Protected Under Section 928 Because It Secures "Special Revenues" as Defined in Section 902(2)(B)

The Swap Counterparties also enjoys special protection in Chapter 9.[12]  Section 928(a) provides that "[n]otwithstanding section 552(a) . . . , special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 928(a).  The intent of section 928(a) is "to negate [s]ection 552(a) in the municipal context" and provide distinctive protections to creditors holding consensual prepetition liens on "special revenues."  See S. Rep. No. 100-506, 100th Cong. at 12-13 (1988).

The term "special revenues" is defined in section 902(2)(B) as "special excise taxes imposed on particular activities or transactions."  11 U.S.C. § 902(2)(B).  Although the Bankruptcy Code does not define "special excise tax," the legislative history makes clear that the term encompasses a broad range of taxes on particular activities.  See H.R. Rep. No. 1011 at 4120 (1988) ("[S]ubsection (2)(B) covers special excise taxes imposed on particular activities or transactions – such as an excise tax on hotel or motel rooms . . . or an excise tax on the sale of alcoholic beverages.").[13]  The use of the word "special" in section 902(2)(B) is meant to distinguish from "general"  (COPs Objection at ¶¶ 17-18, 20.)  See, e.g., H.R. Rep. No. 1011 at

---

[12] A small portion of the Gaming Revenues include the developer revenues, which include the right to payments under so-called "developer agreements."  (Ex. B (Stipulated Facts at 9).)  These agreements preceded the parties' entry into the Collateral Agreement and, therefore, any post-petition payments made on account of such developer revenues are "proceeds" of the pre-petition collateral and protected under section 552(b)(1) of the Bankruptcy Code.

[13] The term "special excise tax" is a phrase commonly applied to a broad range of taxes on particular activities, such as wagering, without further conditions or limitations on such phrase (such as a link between the tax and a particular project or form of financing).  See Chickasaw Nation v. United States, 534 U.S. 84, 87 (2001) (referencing "the special excise tax" on wagering imposed by 26 U.S.C. § 4401); United States v. Yeagle, 299 F. Supp. 257, 258 (E.D. Ky. 1969) (same).

4120 (1988) ("A general sales tax, which is not imposed on particular activities or transactions, would not be a special revenue."). The Gaming Revenues plainly qualify as "special revenues" under section 902(2)(B) because they derive from excise taxes imposed on a particular activity – namely, gaming. See S. Rep. No. 100-506, 100th Congress at 21 (1988).

Furthermore, the City enacted legislation expressly codifying the legal status of the Gaming Revenues as an "excise tax" pursuant to Detroit City Code § 18-14-3(a) (imposing an "excise tax upon the adjusted gross receipts of casino licensee"). The opinion letter of the City's counsel affirms that the Gaming Revenues "constitute 'special revenues' under 902(2) of the Bankruptcy Code." (See Ex. V (Orrick 2009 Opinion at 7) (emphasis added).)

The COPs Holders try to avoid the obvious protection afforded to the Gaming Revenues under section 902(2)(B) by trying to read into it a separate requirement found in subsection 902(2)(E) – they contend that the Gaming Revenues must have been enacted to finance specific public works projects.[14] Subsections (A) through (E) of section 902(2) set forth five separate types of municipal revenues that each, independently, constitutes "special revenues." Significantly, section 902(2) is phrased in the disjunctive, as indicated by the use of the word "or" between subsections (D) and (E). See 11 U.S.C. § 902(2)(D), (E); § 102(5) (providing that "'or' is not exclusive"); see also H.R. Rep. No. 95-595, at 315 (1977) ("if a party 'may do (A) or (B),' then the party may do either or both . . . ."). To give full effect to the plain meaning of the disjunctive "or" in section 902(2), the Gaming Revenues need only satisfy one of the five independent categories to constitute "special revenues," and they clearly qualify under subsection (B).

---

[14] The COPs Holders' reliance on In re Heffernan Mem'l Hosp. Dist., 202 B.R. 147, 149 (Bankr. S.D. Cal. 1996) is misplaced because that decision (see COPs Objection ¶ 16.) addresses the scope of section 902(2)(**E**) – **not** section 902(2)(**B**) – which provides that "special revenues" include "taxes specifically levied to finance one or more projects or systems . . . levied to finance the general purposes of the debtor." 11 U.S.C. § 902(2)(E).

Finally, perhaps recognizing the difficulty of characterizing the Gaming Revenues as anything other than "special revenues," some Objectors erroneously argue that section 928 applies only to "special revenues" securing special revenue bonds. (See, e.g., COPs Objection at ¶¶ 16-20.) There is no basis in the plain language of the statute for this contention – which attempts to rewrite the section.

First, the plain text of section 928(a) refers only to "special revenues," not to "special revenues pledged exclusively to secure special revenue bonds."[15] See, e.g., Hughes v. McCarthy, 734 F.3d 473, 486 (6th Cir. 2013) (citing Conn. Nat'l Bank v. Germain, 503 U.S. 249, at 253-54 ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete."). Indeed, the only requirement imposed on the protection that section 928 affords to liens on special revenues is that such liens must be granted under a "security agreement," a requirement satisfied here.

Second, while one of the purposes of enacting sections 928 and 902 was to facilitate the issuance of "revenue bonds," the legislation more fundamentally supports municipal financing generally, including the ability of a distressed municipality to raise financing by pledging a special revenue stream. See S. Rep. 100-506, at 2d Sess. at 1 (1988). At its core, section 928 allows a municipality to obtain credit, typically by pledging specific revenues sources. Without the protections of section 928(a), lenders would undoubtedly be reluctant to lend (or do so only

---

[15] The objecting COPs Holders incorrectly hinge their argument that section 928 applies only to special revenues bonds on In re Cnty. of Orange, 179 B.R. 185 (Bankr. C.D. Cal. 1995) aff'd & remanded 189 B.R. 499 (C.D. Cal. 1995). County of Orange concerns bonds secured by general, not special, revenues. Thus, the court was simply indicating that general revenue bonds do not enjoy the same protections under section 928 as special revenue bonds. See, e.g., 179 B.R. at 192 ("Congress could have made [section] 928 applicable to all municipal bonds, but it chose to limit its application. Section 552(a) is, therefore, still applicable to general revenue bonds like [those at issue in County of Orange].").

at higher rates) if a chapter 9 filing cut off the pledge. Section 928 ensures that lenders receive the benefit of their bargain by eliminating this concern. See H.R. Rep. No. 1011 at 4116 (1988). Nothing in the legislative history contradicts the plain language of the statute, demonstrating Congress' intent to protect special revenue lenders, while giving municipalities flexibility to obtain credit. See, e.g., In re Jefferson County, Ala., 474 B.R. 228, 236-38 (Bankr. N.D. Ala.) (applying special revenues exception to warrants) aff'd, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).

**B.    The Bankruptcy Code's Safe Harbor Provisions
          Override Any Restriction in Section 552(a)**

The COPs Holders advance three erroneous arguments as to why the Bankruptcy Code's safe harbor provisions do not protect the Swap Counterparties' lien on the Gaming Revenues.

**1.    The Swap Counterparties Have Preserved Their Rights**

The COPs Holders argue that the Swap Counterparties somehow have no secured claim against the City because (i) the Swap Counterparties purportedly waived their safe-harbored right to terminate the swap agreements without court approval by waiting too long to do so, and (ii) absent termination or rejection, their claims are unliquidated and unmatured. (COPs Objection at ¶¶ 24-26.) To the contrary, the Swap Counterparties preserved their rights while forbearing from exercising them under the various settlements with the City, and they have a secured claim for all payments to become due under the swaps.

Lehman Brothers is wholly inapposite. (See COPs Objection at ¶¶ 25-26.) In Lehman, the court held that non-debtor swap counterparty Metavante's decision to withhold performance to the debtor for nearly a year without terminating its swap agreement resulted in a waiver of its safe-harbored right to terminate the agreement in the future. (See Ex. AA (Metavante Sept. 15, 2009 Hr'g Tr. at 110:21-25, 111:23-112:2).) The result was based, in part, on the court's finding

that Metavante had tried to ride out the market in the hope of enhancing its position facing the debtor. Id. at 110:21-25. Here, the City expressly contracted for the Swap Counterparties' forbearance from exercising their termination rights, even before the commencement of the bankruptcy case. The FOTA both memorialized the forbearance agreement and expressly preserved the Swap Counterparties' safe harbor rights (Ex. BB (FOTA §§ 1.1(a); (5)).) The Swap Counterparties were not "lying in wait" or improperly "playing the market" – they had reached agreement with the City.

**2.      Section 560 Preserves Liens and Security Interests, Not Just Termination Rights**

The COPs Holders contend that the Bankruptcy Code's safe harbor provisions merely protect a swap counterparty's right to "terminate" a swap agreement free from the automatic stay, but do not preserve the entirety of a swap counterparty's collateral.  (See COPs Objection at ¶¶ 24-28.)  This argument contravenes the plain text of section 560, which by its terms also protects a counterparty's liquidation rights.  Specifically, section 560 provides that "[t]he exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any . . . payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title." 11 U.S.C. § 560 (emphasis added.)

The Swap Counterparties' remedies as secured parties under the Collateral Agreement with respect to the Gaming Revenues constitute "liquidation" rights within the meaning of section 560.  See Mich. State Housing Dev. Auth. v. Lehman Brs. Derivative Prods., Inc., 502

B.R. 383, 393 (Bankr. S.D.N.Y. 2013) ("[T]he right to cause the liquidation of a swap agreement must mean the right to determine the exact amount due and payable under the swap agreement…by following the liquidation methodology specified in the swap agreement."). "This right of the non-defaulting to rely upon <u>contractual norms for disposing of collateral</u> is an integrated aspect of what it means to cause the liquidation of a swap agreement and necessarily is protected by the language of Section 560 of the Bankruptcy Code. To rule otherwise…would strip away the defining characteristics of a contractual right to liquidation . . . ." <u>Id.</u> at 386. Thus, the Swap Counterparties' contractual rights as secured parties under the Collateral Agreement constitute contractual "liquidation" rights that section 560 protects.

Part and parcel of section 560's protection is that it overrides "any other provision of [the Bankruptcy Code]," such as section 552(a), or any "order of a court." 11 U.S.C. § 560. And for good reason: Enabling the parties "to liquidate collateral in a contractually prescribed manner" "promotes the systemic goals of the safe harbor – to provide stability and certainty to the markets upon the insolvency of a counterparty." <u>Mich. State Housing Dev. Auth.</u>, 502 B.R. at 394. If swap counterparties could not be certain of the scope of their collateral in bankruptcy, the policy rationale for the safe harbors would be dramatically undermined. Section 560 is consistent with other provisions of the Bankruptcy Code that insulate from avoidance collateral transfers related to safe harbored contracts. <u>See, e.g.</u>, 11 U.S.C. §§ 546(g), 362(b)(17), 362(o). Because the Swap Counterparties' right to foreclose on the Gaming Revenues is a protected "liquidation" right under Section 560, Section 552(a) cannot limit the nature, scope or exercise of that right.

### 3. The Swap Counterparties Qualify for Safe Harbor Protection

The COPs Holders also assert that the Collateral Agreement and Service Contracts do not qualify as "swap agreements," and thus that the Swap Counterparties are not "swap participants,"

within the meaning of the Bankruptcy Code. (COPs Objection at 12 n.6.) That is roundly incorrect.

The 2005 and 2006 Swap Agreements plainly constitute "swap agreements" under the Bankruptcy Code. See 11 U.S.C. § 101(53B)(A)(i)(I) (2006) (defining "swap agreement" to include any agreement for an "interest rate swap"). Through a back-to-back pledge of security interests, the Collateral Agreement ensured that a stream of cash would be available to fund payments owing by the Service Corporations to the Swap Counterparties in connection with the 2005 and 2006 Swap Agreements. Moreover, the City's payment obligations to the Service Corporation were designed to give the Service Corporations ample liquidity to meet their obligations to the Swap Counterparties. As a result, the Collateral Agreement as well as the Service Contracts qualify as "swap agreements" under the plain language of the Bankruptcy Code. See id. § 101(53B)(A)(vi) (defining "swap agreement" to include any "security agreement or arrangement," or other "credit enhancement" relating to a swap agreement); id. §§ 101(50), 101(51) ("security agreement" is an "agreement that creates or provides for a security interest").

The Swap Counterparties and Service Corporations qualify as "swap participants" – an entity that at any time before the filing of the petition, has an outstanding swap agreement with the debtor – as defined in the Bankruptcy Code. 11 U.S.C. § 101(53C). The Swap Counterparties and Service Corporations are swap participants because they are party, with the City, to the prepetition Collateral Agreement, which, as stated above, is a "swap agreement" under section 101(53B) of the Bankruptcy Code. Moreover, as major participants in the derivatives and other financial markets, the Swap Counterparties plainly are "financial participants" entitled to the protections of section 560 and the other safe harbor provisions. See id. § 101(22A).

C.    **The Structure of the Settlement Is Lawful and Appropriate**

Syncora insists the Settlement must fail because this Court and the Swap Counterparties do not have the "organic legal authority" to release the liens on the Gaming Revenues, which Syncora asserts were granted by the City to the Service Corporations, not to the Swap Counterparties. (Syncora Objection ¶¶ 6, 27, 35-37.[16]) However, the Collateral Agreement and operation of applicable law give the Swap Counterparties an interest in, and the right to compromise the lien over, the Gaming Revenues pledged as collateral to the Service Corporations. Accordingly, the Swap Counterparties have the right to compromise and settle their claims and liens.

The transaction agreements expressly so provide. Under the Collateral Agreement and the City ordinance, the City granted the Service Corporations, among other things, a security interest in the Gaming Revenues to secure its payment obligations. The Service Corporations then expressly granted the Swap Counterparties a security interest in their rights to payment from the City and in their lien in the Gaming Revenues. (Ex. R (Collateral Agreement § 4.2).) Moreover, under the UCC, the back-to-back pledge of the receivable automatically results in an attachment in favor of the Swap Counterparties in the Service Corporations' lien in the Gaming Revenues. See Mich. Comp. Laws Ann. § 440.9203(7) ("The attachment of a security interest in a right to payment . . . secured by a security interest or other lien on real or personal property is also attachment of a security interest . . . or other lien.").

Moreover, Section 11.2 of the Collateral Agreement states that the Swap Counterparties' remedies "include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge." (Ex. R (Collateral Agreement

---

[16] The Committee of Retirees advances a similar argument." (Retiree Committee Objection at 11.)

§ 11.2(a)).[17]) This authority provides the Swap Counterparties with the ability to exercise any rights the Service Corporations have, including the right to enter into a commercially reasonable settlement with the City. This contractual right is in perfect accord with UCC § 9-607(c), which expressly provides that the Swap Counterparties may "enforce the obligations of [the City]" and "exercise the rights of the [Service Corporations] with respect to the obligation of [the City] . . . and with respect to any property that secures the obligation of [the City]." Mich. Comp. Laws Ann. § 440.9607(c). The right to enforce these obligations includes the right to settle or compromise such claims. Mich. Comp. Laws Ann. § 440.9607 cmt. 9 ("These rights include the right to settle and compromise claims against [the City]."); Presnell v. Board of Cnty. Rd. Comm'rs of Wayne Cnty., 105 Mich. App. 362, 367, 306 N.W.2d 516, 519 (1981) (right to sue implies the right to compromise or settle); Kelton Corp. v. Cnty. of Worcester, 426 Mass. 355, 359, 688 N.E.2d 941, 944 (1997) (the right to sue includes the right to settle).

This result makes perfect sense, as the City Pledge is intended exclusively to benefit the Swap Counterparties and provide credit support for the Service Corporations' obligations to the Swap Counterparties under the swaps. (See Ex. R (Collateral Agreement § 4.1) (confirming that the City Pledge was made "in order to secure the payment of all [payments owed by the City to the Service Corporations in respect of the swaps]"); see also id. § 11.2 ("[E]ach [Swap] Counterparty has the remedies available to it as a secured party to enforce . . . the City Pledge. Such remedies of the [Swap] Counterparties . . . shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge . . . .").).) The Swap Counterparties and the City are well within the bounds of their

---

[17] Section 11.1 also provides that each Swap Counterparty shall have "all remedies available to it under its Hedge or otherwise by contract or applicable law." (Ex. R (Collateral Agreement § 11.1).)

contractual rights and applicable law to compromise and settle the Swap Counterparties' secured claims.

**D.    The Order Approving This Settlement Would Not Create a New Lien in Violation of Michigan Law**

Certain Objectors assert that the Settlement cannot be approved because the Court is being asked to approve a new lien on the Gaming Revenues in violation of Michigan law. (Retirement Systems Objection at ¶¶ 4-9; Retiree Committee Objection at 11-12; Retiree Association Objection (joining in the Retirement Systems Objection).) These objections lack merit. First, as explained above, this Court is <u>not</u> being asked to approve or impose a new lien, but merely to recognize that, as part of the Settlement and a greatly reduced claim that will be paid over time, the Swap Counterparties shall have an allowed secured claim as a result of liens created five years ago. (Motion, Ex. 1 (Proposed Order ¶ 10).)

Second, as further demonstrated above, the pledge of Gaming Revenues in 2009 was permissible under the Gaming Act. <u>See</u> <u>infra</u> 18-19. This position of the Swap Counterparties is not only in keeping with Michigan law, it is consistent with the position of the City, its Law Department, and its outside counsel.

In all events, the Court is not prevented from issuing an order approving and implementing a settlement that addresses and resolves rights to collateral as part of a compromise and a greatly reduced claim. It is entirely customary for settlements to be reached between debtors and creditors asserting secured claims that provide for an allowed secured claim as a compromise even where the debtor may otherwise have taken the position that the creditor's lien was invalid or otherwise unenforceable. <u>Cf.</u> Order Approving Revised Settlement with Financing Party Defendants, <u>Official Committee of Unsecured Creditors v. Citibank, N.A. (In re: Lyondell Chemical Co.)</u>, Ad. Pro. No. 09-01375 (REG) (Bankr. S.D.N.Y. Mar. 11, 2010) (Ex.

EE [Doc. No. 371]) (approving settlement regarding fraudulent transfer action against secured lenders that, inter alia, validated liens in exchange for a portion of the collateral being made available to unsecured creditors). The Court may authorize the parties to act consistent with their agreed compromise without running afoul of state law, given that the Proposed Order does create "new" liens nor does it require the Court to make any conclusions of law.

The Retirement Systems' preference that the Swap Counterparties' claim be secured by different collateral is unworkable. (Retirement Systems Objection at ¶¶ 1-2.) As an initial matter, the Swap Counterparties – who have agreed to reduce their claim by 70 percent – bargained for and received the City's agreement to keep in place the lien on the Gaming Revenues with respect to that reduced amount. This is especially critical because the $85 million claim might be paid during a period that could, based on the expected amount of quarterly payments, stretch into 2016. The Retirement Systems may not rewrite individual terms of the Settlement simply because they would have preferred a different bargain. Moreover, the Retirement Systems fail to recognize that other revenues, such as the City's income tax revenue, are not unencumbered. Those revenues are to be pledged as security for the debtor-in-possession financing for which the City is currently seeking approval.

E.    **The Arguments Concerning Whether the City
       Has Created an Impaired Class Are Either
       Incorrect or Premature**

The COPs Holders, the Retiree Committee, the Retiree Association, David Sole, and AFSCME express the concern that the City is using this Settlement to create an impaired, accepting class so that the City can confirm a cram down plan over the objections of other creditors. (Retiree Committee Objection at 14; COPs Objection at ¶¶ 20, 35; Sole Objection ¶ 24; AFSCME Objection ¶¶ 1-2, 4; Stephens Objection ¶ 6(d).) These concerns are misplaced.

First, all parties – including the City – appear to agree that the Court need not and should not make any findings now regarding classification or impairment. It is wholly premature for the Court to address in the context of a settlement under Bankruptcy Rule 9019 whether the City will be able to satisfy the requirements of Section 1129(a)(10) during its plan confirmation hearings. (Cf. Retiree Committee Objection at 12-14.) The sole question before the Court today is whether the Settlement should be approved. Fed. R. Bankr. P. 9019.

To the extent that there is or was ambiguity concerning the scope of the Court's review in connection with the Settlement, the City and the Swap Counterparties are amending the proposed order to make clear that nothing in the proposed order "constitutes a finding or ruling with respect to impairment under section 1124 of the Bankruptcy Code or classification under section 1122 of the Bankruptcy Code or prejudices (i) any party's right to object to any plan of adjustment proposed in the City's bankruptcy case on the basis that the Secured Claims are not properly classified therein or are not impaired under section 1124 of the Bankruptcy Code or (ii) any party's right to contest any such objection." Accordingly, any Objection on these grounds should be resolved (and, in any event, is premature and not ripe).

Second, while some of the Objectors argue that plan support agreements, like the one included in the Settlement, are atypical and suspect (e.g., Retiree Committee Objection at 14), nothing could be further from the truth. Plan support agreements are a routine component of complex bankruptcy cases. See, e.g., In re Residential Capital, LLC, No. 12-12020, 2013 Bankr. LEXIS 2601, at *67 (Bankr. S.D.N.Y. June 27, 2013) (holding that "[p]lan support agreements, or 'lock-up agreements,' have generally been approved by courts in this and other districts"); In re Energy Conversion Devices, Inc., 474 B.R. 503 (Bankr. E.D. Mich. 2012) (Tucker, J.) (noting existence of pre-petition plan support agreement); Meritage Homes Corp. v. JPMorgan Chase

Bank, N.A., 474 B.R. 526 (Bankr. S.D. Ohio 2012) (same). Indeed, in Residential Capital, the court approved the plan support agreement and offered lengthy observations about the importance of such agreements:

> Without the [plan support agreement ("PSA")] this case would return to square one. The PSA and attached term sheets, if they ultimately result in a confirmed plan, embody numerous settlements and resolutions of extremely complicated legal and factual disputes that must be resolved to achieve a confirmable plan in this case. . . . The real impact of the PSA, after nearly one year with little progress in this large and complicated case, is that the case will move forward towards possible resolution. Make no mistake about it, many difficult unresolved issues remain to be settled or adjudicated; some of those issues could prevent a plan on the proposed terms from being confirmed. . . . The parties need to continue working diligently to reach consensual resolution of as many issues as possible. That is how the chapter 11 process should work. The PSA is an important step in the process; it is far from the last step.

Residential Capital, 2013 Bankr. LEXIS 2601, at *7, *19 (emphasis omitted). Here too, this settlement constitutes an important step forward in a larger, complicated, and often contentious bankruptcy case. It is entirely reasonable for the City to not only agree to a compromise of a complex litigation, but to also be assured that those counterparties will vote for any plan that is consistent with that compromise – after proper solicitation.

Finally, some objectors have suggested that the City acted improperly by considering the importance of obtaining plan support in agreeing to the Settlement. (See, e.g., Retiree Committee Objection at 14-16.) Courts have observed the opposite. In re Cascade Grain Prods., LLC, No. 09-30508-elp11, 2009 Bankr. LEXIS 2565, at *1 (Bankr. D. Or. Aug. 31, 2009) (Perris, J.), the debtor, Cascade Grain Products, LLC, sought approval of its settlement with two creditors, Berggruen Holdings Ltd. ("Sponsor") and its pre-petition lenders (the "Loan Creditors"). Under the proposed settlement, the Sponsor would pay the debtor $10 million,

which would then be paid to the Loan Creditors and the Loan Creditors would vote in favor of the debtor's proposed chapter 11 plan. <u>Id.</u> at *2.

Judge Perris overruled the objections to the settlement, holding that "[t]he settlement resolves th[e] disputes among the three parties and helps pave the way for the debtor to obtain confirmation of its chapter 11 plan of reorganization." <u>Id.</u> at *1-2. In so ruling, the court considered and rejected the argument that the debtor received "no consideration under the Settlement Agreement . . . [and] that the only possible benefits the debtor could gain are saved litigation costs and the Loan Creditors' commitment to vote in favor of the chapter plan . . ." <u>Id.</u> at *12. In rejecting this argument, the court reasoned that there was "consideration for the settlement agreement, which included the Loan Creditors' "support of the plan." <u>Id.</u> at *13. The court also rejected the argument that the settlement "completely disregards the views of other creditors, . . . diverts significant value away from the estate into hands of second-priority, if not wholly unsecured, creditors, and circumvents the plan confirmation process." <u>Id.</u> at *21. In rejecting the argument, the court held:

> This settlement will resolve potentially costly litigation with the Sponsor and the Loan Creditors, and will pave the way to provide debtor with relief from a $124 million obligation to the Loan Creditors. <u>It will also pave the way to reorganization and the eventual restarting of production of ethanol.</u> This was a negotiation among parties with varying interests. Debtor has demonstrated that the settlement will benefit the estate by eliminating potential litigation and a large secured (and likely large undersecured) debt. <u>Debtor has not disregarded the interests of [the objector] in this settlement, but has found a resolution with the Loan Creditors and Sponsor that will benefit everyone if the settlement is approved and the plan, which is contingent on the settlement, can be approved.</u>

Id. at 21-22 (emphasis added). As in Cascade, this Settlement, which provides certainty as to material revenues and reduces a secured claim by more than $200 million, is a critical milestone on the path toward the City's successful reorganization.[18]

**F.     The City Can Exercise Its Business Judgment to Enter Into a Settlement Now and Need Not Wait for Plan Confirmation**

The COPs Holders argue that that the Settlement "should be approved, if at all, only as part of the Plan process." (COPs Objection at 2, ¶¶ 29-32.) The COPs Holders, however, have offered no basis to supplant the City's business judgment with their own faulty reasoning. Nor is there any legal basis for barring a debtor from settling under Rule 9019. In fact, resolving these issues now, as opposed to at the plan confirmation stage, is critical. Key settlements often facilitate settlements with other parties, either through the mediation process, other dispute resolution channels, or private agreement. Moreover, if no settlement is approved in the near term, there will be the very real prospect of a complex and costly litigation concerning the Swap Counterparties' secured claims before any other aspect of the plan – including its feasibility – could move forward. Given the size and complexity of the Swap Counterparties' claims, the City can ill afford further litigation to complicate and delay an already contentious and complex plan process.

---

[18] The Retiree Committee's reliance on In re Quigley Company, Inc., 437 B.R. 102, 129-32 (Bankr. S.D.N.Y. 2010) is misplaced. (Retiree Committee Objection at 15-16.) In Quigley, the court held that Pfizer, as sole shareholder of Quigley, acted in bad faith by entering into settlements with various law firms representing asbestos claimants and only securing releases for itself (and not for Quigley). Id. at 129. Pfizer then structured the claims in a way that incentivized the claimants to vote in favor of Quigley's plan of reorganization for Pfizer's benefit. The court held that the plan was not submitted in good faith under section 1129 because the plan was only "designed to free Pfizer Protected Parties from derivative liability, and only incidentally, to reorganize Quigley to the extent necessary to confirm the plan." Id. at 126-27. Unlike in Quigley, the City did not settle claims to the detriment of a related entity, nor did it manufacture tens of thousands of creditors for the purpose of ensuring plan confirmation.

Finally, it is well-settled that a debtor is entitled to evaluate and select among options it believes are reasonable, and that a court should not substitute a single creditor's judgment for that of a fiduciary to all creditors.  See In re Dalen, 259 B.R. 586, 609-14 (Bankr. W.D. Mich. 2001) (holding that business judgment rule applies to analysis of settlement by debtor and explaining rationale).  Although the COPs Holders might prefer that evaluation of the Settlement be deferred until plan confirmation, the City was entitled to select the existing structure and timing, especially where, as here, the alternative proposed by the COPs Holders creates a real risk of substantial economic harm and risk to the City.

**G.      Because the Releases and Bar Order Are Necessary and Customary, the Motion Should Be Granted**

Syncora, Wilmington Trust, the COPs Holders, and AFSCME challenge the Settlement because it purportedly contains an "improper non-consensual release of the non-settling parties' third-party claims" against the Swap Counterparties.  (Wilmington Trust Objection ¶¶ 28-39; Syncora Objection ¶¶ 52-57; COPs Objection ¶¶ 38-40.)  This argument at best misreads the terms of the Settlement; at worst, it deliberately misstates those terms to manufacture a legal challenge.

The Settlement includes three provisions that the Objectors address interchangeably, all of which have abundant support in the law.  The first provision is the mutual releases between the City and the Swap Counterparties that become effective upon the City's payment of $85 million or the Effective Date.  (Motion, Ex. 6 (Term Sheet at 10).)  Mutual releases between parties to a settlement are exceedingly common and are an essential part of the Settlement.

The second provision is the bar order, which would prevent other defendants in litigation brought by the City from asserting a claim for contribution or non-contractual indemnity against the Swap Counterparties.  (Id.)  The City made abundantly clear in its memorandum in support

of the Motion that the bar order "is limited to claims for contribution and non-contractual indemnity, and does not affect any other third-party claims against the Swap Counterparties." (Motion at 36.)  The City likewise identified the applicable precedent for the provision, a recent Sixth Circuit decision, Papas v. Buchwald Capital Advisors, LLC (In re Greektown Holdings, LLC), 728 F.3d 567, 575 (6th Cir. 2013).

The Objectors cite an earlier, inapplicable Sixth Circuit decision, In re Dow Corning Corp., 280 F.3d 648, 658 (6th Cir. 2002). The releases at issue in the Dow Corning case have no relationship to those at issue here – they involved provisions that provided for the non-consensual release of hundreds of thousands of third-party personal injury tort claims and were not limited to claims for non-contractual indemnity or contribution in connection with claims brought by the City.  Id. at 655.  The Sixth Circuit itself recognized that these are two very different paradigms, noting that "[u]pon close inspection none of these decisions [including Dow] helps us here."  Greektown, 728 F.3d at 575.  Consistent with Greektown, no court has ever applied Dow Corning to analyze a bar order provision in a settlement that releases only contribution and non-contractual indemnity claims, and the Objectors do not identify any law or reason for doing so here.[19]

The third provision is a narrow injunction that applies to the Service Corporations only. (Motion, Ex. 6 (Term Sheet at 10-11).[20])  As an initial matter, to the extent the Objectors take

---

[19] As the City explained in the Motion, the purpose of a bar order is to "prevent other defendants in litigation brought by the City from asserting a claim for contribution or non-contractual indemnity against the Swap Counterparties with respect to any liability that the City is releasing under the Agreement."  (Motion at 36.) According to the City, "[b]ar orders such as this one help to promote the settlement of complex disputes involving numerous parties."  (Id. at 37.)

[20] The provision provides, in relevant part: "[T]he City will not cause or permit the Service Corporation to commence any litigation or take any other action that the Service Corporation would not have been able to commence or take if the Service Corporation were a party to the Agreement and obligated to the same extent as the City under the Agreement including making or pursuing any Released Claim.  In addition, in any event, the order

issue with the injunction applicable to the Service Corporations, they lack standing to do so.

A party must have a "direct interest" that is "adversely affected pecuniarily" by an order to have

standing to object. Moran v. LTV Steel Co. (In re LTV Steel Co.), 560 F.3d 449, 452 (6th Cir.

2009) (under the "person aggrieved" doctrine, a party appealing a bankruptcy order does not

have standing "unless that party is directly and adversely affected pecuniarily by the order")

(internal quotation and citation omitted). None of the Objectors provide any explanation for how

the injunction, which applies only to the Service Corporations, would directly affect their

pecuniary interests. See NML Capital, Ltd. v. Republic of Arg., 727 F.3d 230, 240 (2d Cir.

2013) (certain creditors lacked standing to challenge injunctions because the creditors' interests

were not cognizably affected by an injunction that applied to a different creditor).[21]

    Next, even if the court were to look to Dow Corning for guidance as to the Service

Corporation injunction, the considerations set forth therein are satisfied here. Syncora and

Wilmington Trust assert that the injunction is not essential to the City's reorganization (Syncora

Objection ¶ 56; Wilmington Objection ¶ 34) – but, as the City has already noted, the limited

injunction against the Service Corporations is a "necessary and integral component" of the

settlement because without it, the Swap Counterparties would remain exposed to the Service

Corporations for the very same claims the City has agreed to release. (Motion at ¶ 71.) Thus,

absent the injunction against the Service Corporations, there is no Settlement.

    The second argument under Dow Corning, that the Swap Counterparties are not

contributing assets to the City's Plan of Adjustment (Syncora Objection ¶ 56), is belied by the

---

approving the Agreement will bar either Service Corporation from at any time commencing such litigation or taking any such other action." (Motion, Ex. 6 (Term Sheet at 10-11).)

[21] The Service Corporations are the only party with a direct interest and standing to challenge the injunction, and they have declined to do so. If the Service Corporations have concerns about the injunction, the Swap Counterparties are ready and willing to discuss a negotiated resolution of their concerns.

Swap Counterparties' agreement to compromise for $85 million – paid over a long period – their

right to approximately $288 million owed under the Swap Agreements (and to give up their right

to seek to trap 100 percent of the City's critical Gaming Revenues until paid the $288 million).

The third argument is that the Objectors would be prejudiced by the Settlement because

there is "no mechanism" that would allow them to be paid in full (Syncora Objection ¶ 55;

Wilmington Objection ¶¶ 36-38). But the limited injunction applies only to the Service

Corporations and has no impact on payments of any claims held by the Objectors. [22]

Finally, if the City prevails in its litigation concerning the validity of the Service

Corporations, then the Service Corporations cease to have a valid corporate existence, and the

provision either overlaps entirely with the City's release or it becomes moot.

## H.    David Sole's Objection Lacks Merit

The objections of David Sole boil down to his disagreement with the basic judgment of

the City and its legal advisors over what claims to further investigate and pursue. Significantly,

Mr. Sole acknowledges in his January 6, 2014 objection that the City has considered various

additional claims against the Swap Counterparties. The City is, of course, in best position to

evaluate the strengths and weaknesses of those claims. Mr. Sole, his sincerely and strongly held

beliefs notwithstanding, does not have an adequate basis for making a reasoned calculus about

the relative benefits of litigating or settling.

It bears emphasis that the Swap Counterparties strongly deny any of the wrongdoing

attributed to them by Mr. Sole and that they would have strong defenses to these claims. The

---

[22] Moreover, this Dow Corning factor, which asks the court to consider whether "the plan provides a mechanism to pay for all, or substantially all, of the class or classes affected by the injunction" illustrates why, as discussed above, these factors should not be applied in the settlement context. 280 F.3d at 659. There is no reason to expect a settlement to provide a "mechanism" for the payment of claims, which is ordinarily part of a plan of reorganization. Yet, the Objectors suggest that the lack of a payment mechanism in the settlement (as opposed to in the plan of adjustment) somehow suggests that the settlement should be denied.

City would have enormous difficulty in proving liability, causation or damages. And – very importantly – the complexity of the issues Mr. Sole urges the City to pursue guarantees a protracted (and likely ultimately fruitless) litigation campaign, for which the City would have to pay, and which would delay the much-needed resolution of this bankruptcy case.

The Settlement achieved by the City already reflects the value of the additional claims the City could have pursued. No showing has been made by Mr. Sole that the Settlement "falls below the lowest point in the range of reasonableness." In re Fodale, No. 10-69502, 2013 Bankr. LEXIS 914, at *31 (Bankr. E.D. Mich. Feb 21, 2013).[23]

## I. Syncora's Arguments Are Unfounded and Do Not Justify Denying the Motion

Syncora asserts multiple reasons for denying the Motion, each of which is wholly without merit.[24]

### 1. The Differences Between the Settlement and the FOTA Are Irrelevant for Purposes of the Court's Approval of the Motion Under Rule 9019

Syncora spends five pages detailing the differences between the terms and conditions of the FOTA and those of the Settlement. (Syncora Objection at 6-10.) Syncora implies that the mere fact that the two settlements differ should alter the manner in which the Court evaluates the Settlement, and that contrasting the FOTA with the Settlement will somehow serve to debase the

---

[23] Finally, in Mr. Sole's objection, he mischaracterizes the terms of the Settlement. (See, e.g., Sole Objection at ¶ 13 (misstating applicable interest rates).) The actual terms of the Settlement confer far more substantial benefits on the City than Mr. Sole elects to recognize.

[24] Syncora asserts that it offered to consent to the Settlement in exchange for a release of its obligations under the policies. (Syncora Objection ¶ 29). Along with other conduct by Syncora, this (partial and misleading) reference to confidential settlement discussions is very troubling.

In contrast, Financial Guaranty Insurance Company ("FGIC"), has not objected to the Settlement (as it did to the FOTA) and is not trying to prevent the Swap Counterparties from mitigating their losses as to the City. Nor has FGIC demanded that the Swap Counterparties commute FGIC's potential liability under the insurance policies to zero as the "price" for not objecting, as Syncora has done. The Swap Counterparties and FGIC have instead agreed that each party's rights under the insurance documents are reserved and that FGIC's failure to object here will not be used against FGIC in future litigation.

47

13-53846-tjt   Doc 3153   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 60 of 77

new agreement between the City and the Swap Counterparties. Syncora is wrong. An objective comparison of the two agreements makes clear that the Settlement provides the City with terms materially more favorable than did the FOTA – most significantly, a reduction of the payment amount from $165 million to $85 million, with an extended payment schedule. The City no longer needs incremental financing to perform under the Settlement and can even stretch out the payments for months post-emergence in certain circumstances.

### 2. Syncora Incorrectly Asserts that It Must Consent to the Settlement

In its Objection, Syncora also argues that the Motion should be denied because the Settlement would impair Syncora's consent and control rights under the Collateral Agreement and the other transaction documents governing the swaps. (Syncora Objection at 19-24.) However, that issue is not appropriate for resolution in connection with this Motion or in this bankruptcy case. The proposed order seeks no findings regarding Syncora's consent, and Syncora's rights to sue the Swap Counterparties for breach of contract or any other claim are not prejudiced in any way by the proposed order. Indeed, they are expressly preserved. (See Motion, Ex. 1 (Proposed Order at 8).[25]) In any event, Syncora's consent arguments lack merit.

### (a) The Settlement Is Not an Amendment, Modification, Waiver, or Termination of the Transaction Documents and, as Such, Does Not Require Syncora's Consent

Syncora asserts that the Settlement "amends" or "modifies" the Collateral Agreement and the other transaction documents and that the eventual release of the liens is a termination of, or an amendment to, the Collateral Agreement. (Syncora Objection ¶ 50 (citing Collateral Agreement §§ 5.4, 9.1-9.2, 14.5; Swap §§ 6(e), 8(b) and Part 5(iv)); see also id. ¶¶ 7, 38-43, 48-51.) This is wrong. The Settlement does not amend, modify, waive, or terminate the Collateral

---

[25] Likewise, the Swap Counterparties' right to sue Syncora for insurance coverage are also not addressed by the Settlement. (Motion, Ex. 6 (Term Sheet).)

Agreement or any other transaction document. Rather, the City and the Swap Counterparties have settled a dispute over the amount of the Swap Counterparties' secured claim, and once that amount is paid in full, the liens securing that claim will be released. (Motion, Ex. 6 (Term Sheet).)

It is well-settled that settlements are not amendments, modifications, or waivers of an underlying contract. See, e.g., ITT Corp. v. LTX Corp., 926 F.2d 1258, 1267 (1st Cir. 1991) (settlement was not a "modification" of the original sales contract); In re Residential Capital, LLC, 497 B.R. 720, 748 (Bankr. S.D.N.Y. 2013) (settlement was not an "amendment" to the underlying agreements); Capital Credit & Collection Serv., Inc. v. Armani, 227 Or. App. 574, 579, 206 P.3d 1114, 1118 (2009) (settlement was not a modification of a guaranty); Standard Steel, LLC v. Buckeye Energy, Inc., No. Civ. A. 04-538, 2005 U.S. Dist. LEXIS 22378, at *30 (W.D. Pa. Sept. 29, 2005) (settlement not subject to a "no oral modifications" clause); Lindell Bank & Trust Co. v. Rucci, 87 S.W.3d 354 (Ct. App. Mo. 2002) (settlement not a modification to the underlying deed of trust).

Residential Capital is instructive. There, the court examined a bond trustee's authority to enter into a settlement agreement with the debtor and its insurers. In approving the settlement, the Court held that: "the Settlement Agreement is not an amendment to the Governing Agreements; it is a resolution of a claim against an insurer in an insolvency proceeding." 497 B.R. at 748 (emphasis added). The Court continued that, through the settlement, the bond trustees "have simply agreed to the form of impaired payment which the FGIC Insured Trusts will receive from the Debtors and from FGIC." Id.

Here too, the City and the Swap Counterparties are not amending the underlying transaction documents, but rather taking permissible steps to "agree to the form of impaired

payment" that arose by virtue of the bankruptcy of the City, a provider of credit support to the Service Corporations.  Id.  In contexts such as this, even an express prohibition on impairing a prepetition obligation is "meaningless . . . because, unless the debtor is solvent and able to pay all creditors 100 cents, all creditors are impaired whether they consent or not."  In re Delta, 370 B.R. 537, 549 (Bankr. S.D.N.Y. 2007).

For these reasons, Syncora's position that the settlement constitutes an amendment, modification or termination over which it possesses consent rights lacks merit, and the Court's analysis of Syncora's objection can end there.

> **(b)** **Syncora Is Not a Necessary Party to the Settlement and Cannot Properly Prevent the City and the Swap Counterparties from Resolving Disputes Between Them**

While the Court need not reach Syncora's other arguments, it can quickly dispense with them.  There is no "missing link" in the Settlement, and no necessary party has failed to consent. As discussed above, Section 11.2 of the Collateral Agreement grants the Swap Counterparties the right to enter into a compromise with the City – and Syncora is not even a third-party beneficiary to the Collateral Agreement, let alone a party to it.  Syncora's other arguments boil down to a claim that it can block the Settlement because the agreement may eventually cost Syncora money.  But mere economic impact does not give a third party the right to block a settlement.  In re Vitek, Inc., 51 F.3d 530 (5th Cir. 1995); In re Dow Corning, 198 B.R. 214, 238-39 (Bankr. E.D. Mich. 1996).[26]

---

[26] Though not the case here, courts routinely approve settlements even when they have an adverse effect on third parties, see In re Madoff, 848 F. Supp. 2d 469, 489-91 (S.D.N.Y. 2012) (affirming approval of settlement notwithstanding objections relating to injunction that barred lawsuits by certain objecting parties); Kenton Cnty. Bondholders Comm. v. Delta Air Lines, Inc. (In re Delta Air Lines, Inc.), 374 B.R. 516 (S.D.N.Y. 2007) (affirming approval of settlement notwithstanding objections by insurers concerning non-impairment rights), aff'd, 309 F. App'x 455 (2d Cir. 2009) (Summary Order); In re Residential Cap. LLC, 497 B.R. 720, 751-52 (Bankr. S.D.N.Y. 2013) (approving settlement notwithstanding argument that the ability of objecting party – certain junior secured noteholders – to sue trustees would be impaired).

50

The cases cited by Syncora do not support a different conclusion. Each involves factual circumstances far different from those at issue here. In re Sportstuff, Inc., 430 B.R. 170 (B.A.P. 8th Cir. 2010), cited more than a dozen times by Syncora (Syncora Objection ¶¶ 9, 28, 30-31, 34, 47, 51), involved a debtor manufacturer that filed for Chapter 11 protection after "an onslaught of personal injury, wrongful death, and property damage claims stemming from" the sale of one of the watersports products that it manufactured. Id. at 173. The debtor brought an adversary proceeding seeking to stay the pre-petition litigation against it and, after commencing the adversary proceeding, the debtor executed several settlements with its insurers that it submitted for approval under Bankruptcy Rule 9019. Id. at 175. Under the terms of the settlements, the insurers agreed to remit to the estate the remainder of the respective policy limits in exchange for an injunction barring any party, including the debtor, personal injury claimants, and vendors. Id. The vendors objected to the settlement agreements on the grounds that they were additional insureds under the policies and, as such, their independent contractual and common law rights would be extinguished without their consent. Id. The bankruptcy court overruled these objections and, on appeal, the Bankruptcy Appellate Panel reversed the bankruptcy court, holding that the settlements impaired the vendors' independent rights to be defended and indemnified by the insurers. Id. at 175-76.[27]

---

[27] In re Forty-Eight Insulations, Inc., 133 B.R. 973 (N.D. Ill. 1992), also cited by Syncora (Syncora Objection ¶ 30), involves similar facts. There, a manufacturer of asbestos-based insulation had been named as a defendant in approximately 26,000 asbestos-related pre-petition lawsuits, and as a result filed for Chapter 11 protection. Id. at 974. Thereafter, the debtor reached an agreement with several of its insurers, and filed a motion seeking approval of the settlement, which sought to release claims against the insurers by the debtor and by "any other person." A wholly-owned non-debtor subsidiary objected to the settlement on the grounds that it would extinguish its rights as an additional insured under the policies at issue. Id. at 975. The court refused to approve the settlement because, as in Sportstuff, "not only is this Court being asked to enjoin tort claimants from asserting claims against the settling insurers, but this Court is also being asked to enjoin a named insured, who is neither a debtor in this bankruptcy nor a creditor of the Debtor, from asserting claims under an insurance policy that it contracted and paid for." Id. at 976.

Unlike in Sportstuff, which involved a non-consensual release and channeling injunction against a co-insured, the Settlement here contains no provisions that would impair Syncora's rights – either directly or at all.  Other courts have recognized this distinction.  For example, in In re Palmer, No. 10-60099-7, 2012 Bankr. LEXIS 1269 (Bankr. D. Mont. Mar. 26, 2012) the court rejected an objection based on Sportstuff because the objecting party could still pursue any claims it held for breach of contract.  Likewise, in In re McKenzie Energy Corp., 228 B.R. 854, 870 (Bankr. S.D. Tex. 1998) the court rejected a similar argument because, like in this case, the settlement did not deprive any non-party of the right to bring claims on their own behalf.  Any argument that the Settlement impairs Syncora's (supposed) rights simply fails to acknowledge the specific terms of the Settlement and the explicit reservation of Syncora's rights.

Syncora nowhere acknowledges the fact that the Settlement will leave Syncora in a better economic position than it would be in the absence of a consensual resolution.  The $85 million settlement amount limits, rather than increases, Syncora's exposure under the policies and actually limits the Swap Counterparties' claims against Syncora to those that would not give rise to an allowed secured reimbursement or subrogation claim against the City.

> (c)     **Because the Swap Counterparties Are Merely Exercising Their Rights Under the Collateral Agreement and Applicable Law, Syncora Has No Consent or Control Rights**

Syncora also argues that it has a contractual right of consent and applicable control rights.  Both of these arguments are wrong.  Indeed, the Settlement makes clear that the Swap Counterparties are properly exercising their rights here.  The parties have agreed to settle the Swap Counterparties' secured claims under the Collateral Agreement.  (Motion, Ex. 6 (Term Sheet).)  The Collateral Agreement permits the Swap Counterparties to exercise the exact remedies they are exercising as secured parties, which is to compromise and settle their secured claims.  (Ex. R (Collateral Agreement at § 11.2) ("[F]ollowing the occurrence of a Termination

Event . . . each Counterparty has the remedies available to it as a secured party . . . [s]uch remedies . . . .shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge . . .").)

The Swap Counterparties are also free to forbear from exercising other remedies under the Collateral Agreement without such action constituting a waiver, as made clear by the terms of the Collateral Agreement.  (Id. § 14.7) ("No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof. . . .").)  As such, the provision in the Settlement that requires the Swap Counterparties to forbear from exercising other remedies is consistent with – and certainly not a waiver of – the Collateral Agreement. Specifically, the Swap Counterparties' agreement to forbear from seeking trapping of the Gaming Revenues – which Syncora argues constitutes a modification of the trapping provisions of Section 5.4 of the Collateral Agreement (Syncora Objection ¶ 50) – is a forbearance from exercising certain remedies under the Collateral Agreement.[28]

Additionally, while the Settlement does not provide for the present termination of the swaps, the Settlement confirms that the Swap Counterparties will retain their existing contractual right to terminate the swaps.  Syncora argues that this conflicts with its rights to consent before the swaps are terminated.  (Syncora Objection ¶ 50.)  But Syncora's contention is negated by the plain terms of the Settlement, which neither expands nor contracts the rights of the Swap Counterparties to terminate the swaps, whatever those rights are.  Nor does it effect a termination.  Moreover, the  Swap Counterparties already have the right to terminate the swaps

---

[28] This Court has previously determined that the Gaming Revenues are protected by the automatic stay [ECF 670], a conclusion that moots Syncora's position that the trapping of the Gaming Revenues should occur automatically.

pursuant to certain Insurer-related defaults or pursuant to the swaps' Optional Early Termination provision. (Ex. CC (2009 Swap Schedule, Parts 5(b), 5(t)).)

Syncora is also not a party to the Collateral Agreement and is not identified as a third-party beneficiary thereunder. Syncora asserts that it is an intended third-party beneficiary under the Collateral Agreement, but that is not the case. (Syncora Objection ¶ 48.) Syncora is expressly given third-party beneficiary rights with respect to other transaction documents but not the Collateral Agreement. The Insurers have specific, limited rights under the Collateral Agreement, none of which is made applicable by the Settlement. When the transaction documents were amended in 2009, insurer consent was sought and granted for the amendments to the swaps and the Service Contracts, because the Insurers are express third-party beneficiaries under those agreements. No such consent was sought or demanded in connection with the execution of the Collateral Agreement.

Syncora also relies extensively on the control rights provided to it under Section 6.9.2(2) of the 2006 Contract Administration Agreement. That reliance is misplaced.[29] (Syncora Objection ¶¶ 9, 46-47 (citing Contract Administration Agreement § 6.9.2).[30]) Syncora argues, for example, that this provision requires the Swap Counterparties to seek its approval for

---

[29] Syncora's reliance on Section 8(b) and Part 5(d) of the swaps is likewise misplaced. As set forth above, the Settlement is not an amendment, modification or waiver of the Collateral Agreement. Moreover, because the City is not a party to the swaps, it cannot be bound by any of the provisions in the swaps. Even if the Settlement could be construed as an amendment, modification or waiver of the Collateral Agreement – which it is not – Syncora's consent rights would therefore not extend to the City's inherent ability to allow claims against it pursuant to the Settlement. Syncora is free to sue the Swap Counterparties for any breach of contract or other claim they believe is worth pursuing.

[30] Section 6.9.2 of the Contract Administration Agreement provides, in relevant part, that: "Notwithstanding any other provision hereof, any Insurer not then in default under its Credit Insurance shall . . . control all actions that may be taken by any Specified Hedge Counterparty that is the beneficiary of such Credit Insurance, including for . . . purposes of giving all other directions, consents and waivers that such Specified Hedge Counterparty may give." (Ex. DD (Contract Administration Agreement § 6.9.2).)

purposes of the plan support requirement of the Settlement or for any actions that compromise the Swap Counterparties' claims under the swaps. (Syncora Objection ¶ 50.)

Read properly, Section 6.9.2(2) is limited to those contexts that implicate majority control of actions under the Contract Administration Agreement. Because the Settlement reflects an exercise of express remedies provided to the Swap Counterparties under the 2009 Collateral Agreement, Syncora's control rights under the 2006 Contract Administration Agreement simply are not implicated.

Additionally, applicable law does not justify the position that Section 6.9.2 of the Contract Administration Agreement applies to actions taken under the Collateral Agreement. Whether multiple agreements should be integrated depends on whether they were "executed at the same time, by the same parties, for the same purpose and in the course of the same transaction." See Carvel Corp. v. Diversified Mgmt. Grp. Inc., 930 F.2d 228, 233 (2d Cir. 1991). Here, the Collateral Agreement was executed in 2009, while the Contract Administration Agreement was executed three years earlier and was not amended in 2009. Furthermore, Syncora is not a party to the Collateral Agreement and the agreements should not be construed together.

In any event, "[t]he application of the [integration] rule does not result in actual consolidation of the several contracts." Huyler's v. Ritz-Carlton Rest. & Hotel Co., 1 F.2d 491, 492 (D. Del. 1924); see also Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc., 198 F.3d 415, 425 (3d Cir. 1999) (reasoning that that "even when several instruments pertaining to one transaction are considered together, the instruments do not become a single document for all purposes"). For that reason, a limited provision in the 2006 Contract Administration Agreement

regarding actions thereunder cannot and should not be imported into and deemed to override the specific and clear contract provisions of the 2009 Collateral Agreement.

Canons of contract interpretation lead to the same conclusion because "a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision." United States v. Perry, 360 F.3d 519, 535 (6th Cir. 2004) (reasoning that "a more specific provision takes precedence over a more general one"). Thus, the general rights of Syncora under Section 6.9.2 of a different contract executed three years prior cannot trump the rights specifically designated to the Swap Counterparties to exercise rights and remedies under the 2009 Collateral Agreement.

That canon of construction is not the only one that would yield the conclusion that Section 6.9.2 is inapposite. In fact, the principle that a court should not import a provision into an agreement where the parties omitted that language is similarly applicable. See Vt. Teddy Bear Co., Inc. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 807 N.E.2d 876, 879, 775 N.Y.S.2d 765, 767-68 (2004). Here, the parties omitted the control provision from the later Collateral Agreement and instead granted Syncora only a limited right to consent to certain amendments.[31]

      **(d)     To the Extent that Syncora Might Otherwise Have Had Any Consent Rights, It Has Forfeited Those Rights by Acting in Bad Faith**

In addition to all of the points above, Syncora has forfeited any rights it might otherwise have had through its repeated bad faith conduct. Syncora has now objected to both the FOTA and to the Settlement, notwithstanding that the FOTA would have commuted Syncora's obligations at no cost to it, and the present Settlement is in Syncora's economic interest *in its*

---

[31] Syncora's argument ironically proves too much. If Section 6.9 of the CAA gave Syncora blanket control under the Collateral Agreement, Syncora's right to consent to certain amendments to the Collateral Agreement would be completely superfluous.

*capacity as swap insurer.* The Swap Counterparties have repeatedly advised Syncora about its negotiations with the City and – while noting that the parties have different views concerning the existence of Syncora's consent rights – repeatedly sought Syncora's consent to the Settlement (which expressly preserves its rights). Under New York law, which governs the relevant agreement between Syncora and these Swap Counterparties, insurers must demonstrate a good faith reason for their refusal to consent to a proposed settlement. See, e.g., Matter of Prudential Prop. & Cas. Ins. Co., 604 N.Y.S.2d 136, 137, 198 A.D.2d 421, 422 (1993) (an insurer "cannot arbitrarily withhold consent") (collecting cases); St. Paul Fire & Marine Ins. Co. v. United States Fidelity & Guaranty Co., 43 N.Y.2d 977, 978-79, 375 N.E.2d 733, 733, 404 N.Y.S.2d 552, 553 (1978) (insurer's refusal to settle insured's claim violated obligation to manage its insureds' defense in good faith).

Moreover, New York courts have held that one of the purposes underlying the duty of good faith is to prevent insurers from advancing their own interests to the detriment of their insureds' interests – which is exactly what is going on here. In Pavia v. State Farm Mutual Automobile Insurance Company, the New York Court of Appeals reasoned that "whenever an insurer is presented with a settlement offer within policy limits a conflict arises between, on the one hand, the insurer's interest in minimizing its payments and on the other hand, the insured's interest in avoiding liability beyond the policy limits." 82 N.Y.2d 445, 452, 626 N.E.2d 24, 27 (1993). The court reasoned that "[b]y refusing to settle within the policy limits, an insurer risks being charged with bad faith on the premise that it has advanced its own interests by compromising those of its insured." Id. (internal citations and quotations omitted).

Here, Syncora has breached its duty to its insureds. Not only has Syncora stood in the way of reasonable settlements (including one that permanently commuted its liability <u>at no cost</u>),

Syncora has conceded that the motivation for its objections is its own economic self-interest as a holder of the COPs, making clear that its decision to try to block the proposed settlements is not in good faith – and that Syncora is not wearing its swap-insurer-hat at precisely the time it must do so under the law.  See Pavia, 82 N.Y.2d at 452.

Insured parties are entitled to act in their best interests when their insurer casts coverage in doubt, see Protection Mut. Ins. Co. v. Silgan Plastics Corp., No. 96-Civ-4493, 2000 U.S. Dist. LEXIS 11200, at *11-12, *31-32 (S.D.N.Y. Aug. 17, 2000), and indeed have a duty to mitigate damages.  Johnson v. Gen. Mut. Ins. Co., 24 N.Y.2d 42, 51, 246 N.E. 2d 713, 717 (1969); 11 Couch on Insurance § 168:9.  By entering into the Proposed Settlement under the circumstances at bar, the Swap Counterparties are properly mitigating their risks.  Syncora's liability will be decided another day.

## CONCLUSION

For the foregoing reasons, the Swap Counterparties respectfully request that the Court grant the Motion and approve the Settlement.

Dated:   New York, New York
         March 21, 2014

DAVIS POLK & WARDWELL LLP

By: _____/s/ Marshall S. Huebner_____

Marshall S. Huebner
Damian S. Schaible
Elliot Moskowitz
James I. McClammy
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
marshall.huebner@davispolk.com
damian.schaible@davispolk.com
elliot.moskowitz@davispolk.com
james.mcclammy@davispolk.com

Attorneys for Defendant Merrill Lynch Capital
   Services, Inc.

PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP

By: _____/s/ Richard A. Rosen_____

Daniel J. Kramer
Richard A. Rosen
Kelley A. Cornish
Stephen J. Shimshak
1285 Avenue of the Americas
New York, New York 10019
(212) 373-3000
dkramer@paulweiss.com
rrosen@paulweiss.com
kcornish@paulweiss.com
sshimshak@paulweiss.com

Attorneys for Defendant UBS AG

WARNER NORCROSS & JUDD LLP

By:       /s/ Stephen B. Grow

Stephen B. Grow
Charles Ash, Jr.
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, Michigan 49503
sgrow@wnj.com
cash@wnj.com

Attorneys for Defendants Merrill Lynch Capital
   Services, Inc. and UBS AG

| Representations and Warranties Made by the City of Detroit / Legal Opinions Issued by City Counsel | | |
|---|---|---|
| Document | Date | Relevant Language |
| Representations by City of Detroit | | |
| City Ordinance 05-09 Ex. S | May 26, 2009 | "In January 2009, the 2006 Counterparties notified the Service Corporations and the City that they believed that the 2006 Trigger Event had occurred and that they were permitted by the terms of the 2006 Hedges to declare a 2006 Additional Termination Event thereunder." Sec. 18-6-4(a) |
| | | "The declaration of the 2006 Additional Termination Event in January 2009 could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations (the Hedge Termination Payment) under the [] Service Contracts in the range of $300 million to $400 million" Sec. 18-6-4(b) |
| | | "The [Swap] Counterparties may seek judicial recourse if the City fails to make immediate payment of the Hedge Termination Payment." Sec. 18-6-4(c) |
| | | "Such judicial recourse may result in judgment liability forcing the City to raise taxes without limit as to rate or amount." Sec. 18-6-4(d) |
| | | "Such taxes will be destructive of the quality of life in the City and will place its residents under a severe financial burden." Sec. 18-6-4(e) |
| | | "In lieu of declaring the 2006 Additional Termination Event and in the interest of avoiding fees and expenses of litigation, the City, the Service Corporations and the [Swap] Counterparties have agreed in principle to the Terms for Settlement . . . ." Sec. 18-6-4(f) |
| | | "The Term Sheet provides for the pledge of certain revenues and certain other assets, now or hereafter receivable by the City, . . . to secure payment of the 2006 Hedge Payables as and when the same become due under the [] Service Contracts." Sec. 18-6-4(h) |
| | | "The Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended [], authorizes the City to levy certain taxes pursuant to Section 12 thereof." Sec. 18-6-4(j) |

| Representations and Warranties Made by the City of Detroit / Legal Opinions Issued by City Counsel | | |
|---|---|---|
| **Document** | **Date** | **Relevant Language** |
| Collateral Agreement Ex. R | June 15, 2009 | "City Hedge Payables Related Obligations means the City's obligation, whether now existing or hereafter arising, to pay to each Service Corporation under the respective Service Contract the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable." § 1.2 |
| | | "[t]he City pledge[d] to the Service Corporations and create[d] a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations" § 4.1(b) |
| | | "[e]ach Service Corporation grant[ed] a security interest to the Swap Counterparties in all of the Service Corporation's right, title and interest in, to and under the City Hedge Payables Related Obligations and the City Pledge . . . in order to secure the payment of the Hedge Payables . . . ." § 4.2(a) |
| | | "All acts, conditions and things required by the Michigan Constitution, the City Charter, the Detroit City Code and laws of the State of Michigan to exist, to have happened and to have been performed precedent to and in the execution and delivery of this Agreement and the other Definitive Documents by the City exist, have happened and been performed in due time, form and manner required by the Michigan Constitution, the City Charter, the Detroit City Code or laws of the State of Michigan in order to make this Agreement a valid and binding obligation of the City." § 6.1(e) |
| | | "[F]ollowing the occurrence of a Termination Event . . . each Counterparty has the remedies available to it as a secured party . . . [s]uch remedies . . . shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge . . ." § 11.2 |
| | | "No failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof; nor shall any single or partial exercise of any right hereunder preclude any other further exercise thereof or the exercise of any other right." § 14.7 |

| Representations and Warranties Made by the City of Detroit / Legal Opinions Issued by City Counsel | | |
|---|---|---|
| **Document** | **Date** | **Relevant Language** |
| *Legal Opinions* | | |
| Legal Opinion Issued by Lewis & Munday Ex. T | June 26, 2009 | "Each of the Authorizing Ordinance and Resolution was duly adopted in accordance with state law and the requirement of the Charter of the City . . . " |
| | | "Each Service Corporation validly exists as a nonprofit corporation under the laws of the State of Michigan and has the corporate power to enter into the Documents to which it is a Party." |
| | | "The City has the power to enter into the Documents to which it is a party." |
| | | "The City Pledge, including the lien of the City Pledge (i) has been validly established, in favor of the Service Corporations, . . . (ii) is valid, binding and enforceable against all parties . . . and (iii) is a valid lien in the pledged property . . ." |
| | | "The pledge and use of [Gaming Revenues] as contemplated in the Settlement Transaction constitute authorized purposes under the Wagering Tax Revenue Statute (including, without limitation, Section (3)(a) of the Wagering Tax Revenue Statute, and if applicable, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code." |
| | | "The pledge and use of the [Gaming Revenues] as contemplated by the Settlement Transaction does not and shall not 'supplant existing . . . local expenditures' as prohibited by Section 12(14) of the Wagering Tax Revenue Statute." |
| Legal Opinion Issued by City Law Department | June 26, 2009 | "The City is a municipal corporation of the State of Michigan, with home rule powers duly existing under the laws of the State of Michigan and pursuant to the City Charter." |

| Representations and Warranties Made by the City of Detroit / Legal Opinions Issued by City Counsel | | |
|---|---|---|
| **Document** | **Date** | **Relevant Language** |
| (continued from above)<br><br>Ex. U | | "The execution, delivery and performance by the City of the Collateral Agreement and each other Definitive Document to which the City is a party are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or . . . or other instrument binding upon the City." |
| | | "The execution, delivery and performance by the City of the Collateral Agreement and each other Definitive Document to which the City is a party are within the City's powers, have been duly authorized by all necessary action, require no action by or in respect of, or filing with, any governmental body, agency or official and do not contravene, or constitute a default under, any provision of applicable law or regulation or of the City Charter or of any agreement, judgment, injunction, order, decree or other instrument binding upon the City." |
| Legal Opinion Issued by Orrick, Herrington & Sutcliffe LLP<br><br>Ex. V | June 26, 2009 | "[T]he City and the Service Corporations were authorized to execute and deliver that certain Collateral Agreement." |
| | | "[The Gaming Revenues] constitute 'special revenues' under 902(2) of the Bankruptcy Code." |