# EXHIBIT A

*This Offering Circular provides information about the Certificates. Information on this cover page is for ready reference. A prospective investor should read the entire Offering Circular to make an informed investment decision.*

**$1,440,000,000**
## TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2005
**issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2005**
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between
## CITY OF DETROIT, MICHIGAN
**and**
## DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
**and**
## DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION
**$640,000,000 SERIES 2005-A (FIXED RATE)**
**$800,000,000 SERIES 2005-B (FLOATING RATE)**

**Dated:** Date of Delivery                                                                 **Due:** June 15 as shown on the inside cover

| | |
|---|---|
| **Ratings** | *See page 20* |
| **Interest Payment Dates** | *Series 2005-A:* December 15, 2005 and each June 15 and December 15 thereafter<br>*Series 2005-B:* September 15, 2005 and the 15th day of each December, March, June and September thereafter |
| **Redemption** | Series 2005-A Certificates maturing in 2020 and 2025 are subject to *pro rata* mandatory sinking fund redemption at par. *—See page 9*<br>Series 2005-A Certificates are subject to optional redemption on any date with a make-whole premium. *—See pages 9-10*<br>Series 2005-B Certificates maturing in 2014 and 2025 are subject to *pro rata* mandatory sinking fund redemption at par. *—See pages 12-13*<br>Series 2005-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2007. *—See page 13* |
| **Source of Payment** | Principal of and interest on the Certificates are payable, when due, solely from COP Service Payments to be paid by the City under the Service Contracts.*—See pages 7-8* |
| **Insurance** | The scheduled payment of principal of and interest on the Certificates will be guaranteed under the insurance policies (as specifically indicated on the inside cover of this Offering Circular with respect to particular Certificates) to be issued concurrently with the delivery of the Certificates by Financial Guaranty Insurance Company and XL Capital Assurance Inc. |
| | FGIC <span style="font-size:small">Financial Guaranty Insurance Company</span>                                    **XL** CAPITAL ASSURANCE |
| **Tax Matters** | Interest on the Certificates is subject to U.S. federal income tax and State of Michigan income tax. |
| **Purpose** | The Certificates are being issued to provide moneys to fund certain unfunded accrued actuarial liabilities of each Retirement System of the City.*—See pages 5-7* |
| **Denominations** | *Series 2005-A:* Multiples of $5,000<br>*Series 2005-B:* $25,000 and multiples of $1,000 in excess thereof |
| **Closing** | On or about June 2, 2005 |
| **Global Book-Entry System** | Clearance is expected to be available through The Depository Trust Company (the depository for the Certificates), Clearstream, and Euroclear. |
| **Global Offering** | The Certificates are offered globally for sale in jurisdictions where it is lawful to make such offers.*—See page 19* |
| **Stock Exchange Listing** | Application will be made for the Certificates to be listed on the Luxembourg Stock Exchange. There can be no assurance that this listing will be obtained. The issuance and settlement of the Certificates is not conditioned on the listing of the Certificates on the Luxembourg Stock Exchange. |
| **Certificate Counsel** | Lewis & Munday, A Professional Corporation—*See page 21* |
| **Trustee** | U.S. Bank National Association |

*Book-Running Manager*
## UBS Financial Services Inc.

*Co-Senior Managers*

**Citigroup Global Markets** *(Series A only)*          **Loop Capital Markets, LLC** *(Series A & B)*
**Merrill Lynch & Co.** *(Series A & B)*          **Morgan Stanley** *(Series A & B)*
**Siebert, Brandford, Shank & Co., LLC** *(Series A only)*

*Co-Managers for Series 2005-A Certificates Only*

ABN AMRO Financial Services, Inc.  A.G. Edwards & Sons Inc.  Bear, Stearns & Co. Inc.  Capital Management Group Securities, LLC
Comerica Securities          First Albany Capital          JPMorgan          Lehman Brothers          M.R. Beal & Company
Oppenheimer & Co. Inc.          Popular Securities, Inc.          Raymond James & Associates, Inc.

This Offering Circular is dated: May 25, 2005

MATURITIES, PRINCIPAL AMOUNTS, INTEREST RATES, YIELDS, AND PRICES

$1,440,000,000

# TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2005
### issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2005
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

# CITY OF DETROIT, MICHIGAN
and

## DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
and

## DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION
**$640,000,000 SERIES 2005-A (FIXED RATE)**
**$800,000,000 SERIES 2005-B (FLOATING RATE)**

### $640,000,000 Series 2005-A Certificates

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Yield at Issuance | Price at Issuance |
|---|---|---|---|---|---|---|---|
| 25113PAC9 | US25113PAC95 | 022114417 | 2007* | $10,845,000 | 4.004% | 4.004% | 100% |
| 25113PAD7 | US25113PAD78 | 022114492 | 2008* | 13,905,000 | 4.154% | 4.154% | 100% |
| 25113PAE5 | US25113PAE51 | 022114549 | 2009* | 17,310,000 | 4.234% | 4.234% | 100% |
| 25113PAF2 | US25113PAF27 | 022114565 | 2010* | 20,950,000 | 4.314% | 4.314% | 100% |
| 25113PAG0 | US25113PAG00 | 022114638 | 2011* | 24,880,000 | 4.404% | 4.404% | 100% |
| 25113PAH8 | US25113PAH82 | 022114735 | 2012* | 29,095,000 | 4.453% | 4.453% | 100% |
| 25113PAJ4 | US25113PAJ49 | 022114859 | 2013* | 33,720,000 | 4.503% | 4.503% | 100% |
| 25113PAK1 | US25113PAK12 | 022114891 | 2014* | 38,680,000 | 4.563% | 4.563% | 100% |
| 25113PAL9 | US25113PAL94 | 022115324 | 2015** | 33,275,000 | 4.613% | 4.613% | 100% |
| 25113PAM7 | US25113PAM77 | 022115669 | 2020** | 188,485,000 | 4.813% | 4.813% | 100% |
| 25113PAN5 | US25113PAN50 | 022115774 | 2025** | 228,855,000 | 4.948% | 4.948% | 100% |

### $800,000,000 Series 2005-B Certificates

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Price at Issuance |
|---|---|---|---|---|---|---|
| 25113PAA3 | US25113PAA30 | 022114077 | 2014* | $250,615,000 | Three-month LIBOR plus 0.18% | 100% |
| 25113PAB1 | US25113PAB13 | 022114174 | 2025** | 549,385,000 | Three-month LIBOR plus 0.28% | 100% |

The Series 2005-A Certificates maturing in 2020 and 2025 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE CERTIFICATES – The Series A Certificates (Fixed Rate) - Mandatory Sinking Fund Redemption."

The Series 2005-B Certificates maturing in 2014 and 2025 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE CERTIFICATES – The Series B Certificates (Floating Rate) - Mandatory Sinking Fund Redemption.

---

* Insured by XL Capital Assurance Inc.

** Insured by Financial Guaranty Insurance Company.

† CUSIP, ISIN and Euroclear and Clearstream Common Code data herein are set forth herein for convenience of reference only. Neither the Funding Trust, the Service Corporations, the City nor the Underwriters assume responsibility for the accuracy of such information.

This document, the Offering Circular, contains the only authorized information about the offering of the Certificates. This document is not an offer or solicitation for the Certificates, and no unlawful offer, solicitation, or sale may occur through the use of this document or otherwise. This document is not a contract, and it provides no investment advice. Prospective investors should consult their advisors and legal counsel with questions about this document, the Certificates, and anything else related to the offering.

This document provides prospective investors with information that may be important in making an investment decision. It may not be used for any other purpose without the City's permission. The City is the author of this document and is responsible for its accuracy and completeness. The Underwriters are not the authors of this document. In accordance with their responsibilities under the securities laws of the United States of America, the Underwriters are required to review the information in this document and must have a reasonable basis for their belief in the accuracy and completeness of its key representations.

The estimates, forecasts, projections, and opinions in this document are not hard facts, and no one guarantees them. Some of the people who prepared, compiled or reviewed this information had specific functions that covered some aspects of the offering but not others. For example, financial staff focused on quantitative financial information, and legal counsel focused on specific documents or legal issues assigned to them.

No dealer, broker, sales representative, or other person has been authorized to give any information or to make any representations about the Certificates other than what is in this document. The information and expressions of opinion in this document may change without notice. Neither the delivery of this document nor any sale of the Certificates implies that there has been no change in the other matters contained in this document since its date. Material referred to in this document is not part of this document unless expressly included.

Other than information concerning Financial Guaranty Insurance Company contained in APPENDIX E, none of the information in this Offering Circular has been supplied or verified by Financial Guaranty Insurance Company, and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the Certificates.

Other than information concerning XL Capital Assurance Inc. contained in the APPENDIX F, none of the information in this Offering Circular has been supplied or verified by XL Capital Assurance Inc., and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the Certificates.

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................................................... 1
No Pledge of Retirement System Assets or of Proceeds of the Certificates ............................................................. 2
Investment Considerations....................................................................................................................................... 2
THE CITY ................................................................................................................................................................ 2
PLAN OF FINANCE ............................................................................................................................................... 5
Constitutional, Statutory and Ordinance Authority for Payment of Unfunded Accrued Actuarial Liabilities
and Issuance of the Certificates ............................................................................................................................... 5
Swap Agreements..................................................................................................................................................... 7
Sources and Uses of Funds....................................................................................................................................... 7
SOURCES OF PAYMENT AND SECURITY FOR THE CERTIFICATES ........................................................... 7
THE CERTIFICATES.............................................................................................................................................. 8
The Series A Certificates (Fixed Rate) .................................................................................................................... 8
The Series B Certificates (Floating Rate) .............................................................................................................. 10
Selection of Certificates for Redemption............................................................................................................... 13
Notice of Redemption............................................................................................................................................ 14
Global Book-Entry System.................................................................................................................................... 14
Registration and Payment of Certificates .............................................................................................................. 14
FISCAL YEAR COP SERVICE PAYMENTS ...................................................................................................... 14
CERTIFICATE INSURANCE............................................................................................................................... 16
SERVICE CONTRACT ADMINISTRATION....................................................................................................... 16
UNDERWRITING ................................................................................................................................................. 19
Global Plan of Distribution.................................................................................................................................... 19
Reference Information about the Certificates ......................................................................................................... 20
RATINGS............................................................................................................................................................... 20
FINANCIAL ADVISORS....................................................................................................................................... 20
INDEPENDENT ACCOUNTANTS....................................................................................................................... 20
LEGAL MATTERS ............................................................................................................................................... 21
LITIGATION ......................................................................................................................................................... 21
UNITED STATES FEDERAL TAX CONSIDERATIONS ................................................................................... 23
Tax Status of the Funding Trust ............................................................................................................................ 24
Tax Status of the COP Service Payments under the Service Contracts .................................................................. 24
Agreements Regarding Tax Status of the Funding Trust and COP Service Payments under the Service
Contracts................................................................................................................................................................ 24
Tax Status of the Service Corporations .................................................................................................................. 25
U.S. Certificateholders .......................................................................................................................................... 25
Non-U.S. Certificateholders................................................................................................................................... 26
Information Reporting and Backup Withholding ................................................................................................... 26
State and Other Tax Consequences ........................................................................................................................ 27
ERISA Considerations........................................................................................................................................... 27
CONTINUING DISCLOSURE.............................................................................................................................. 29
APPENDIX A: Summary of Certain Provisions of the Service Contracts, the Contract Administration Agreement and
the Trust Agreement ........................................................................................................................ A-1
APPENDIX B: Information Concerning the City of Detroit, Michigan..................................................................................B-1
APPENDIX C: Audited Basic Financial Statements of the City of Detroit, Michigan
for the Fiscal Year Ended June 30, 2004 .........................................................................................................C-1
APPENDIX D: Global Book-Entry System.......................................................................................................................... D-1
APPENDIX E: Information about Financial Guaranty Insurance Company, including Form of its Certificate Insurance Policy.........E-1
APPENDIX F: Information about XL Capital Assurance Inc., including Form of its Certificate Insurance Policy...............F-1
APPENDIX G: Expected Form of Legal Opinion of Certificate Counsel..............................................................................G-1
APPENDIX H: Continuing Disclosure Undertaking...... ................................................................................. ....................H-1

# OFFERING CIRCULAR

### $1,440,000,000

# TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2005
### issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2005
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

## CITY OF DETROIT, MICHIGAN
### and
### DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
### and
### DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION
#### $640,000,000 SERIES 2005-A (FIXED RATE)
#### $800,000,000 SERIES 2005-B (FLOATING RATE)

### INTRODUCTION

This Offering Circular sets forth information concerning the Certificates of Participation Series 2005-A in the original aggregate principal amount of $640,000,000 (**Series A Certificates**) and the Certificates of Participation Series 2005-B in the original aggregate principal amount of $800,000,000 (**Series B Certificates**, and collectively with the Series A Certificates, **Certificates**) issued by the Detroit Retirement Systems Funding Trust 2005 (**Funding Trust**) to be formed under the Trust Agreement described below.

The Certificates evidence individual undivided proportionate interests in the rights to receive certain payments (**COP Service Payments**) to be made by the City of Detroit, Michigan (**City**) under two Service Contracts of the City, namely, its (i) Detroit General Retirement System Service Contract 2005 (**GRS Service Contract**) with the Detroit General Retirement System Service Corporation, and (ii) Detroit Police and Fire Retirement System Service Contract 2005 with the Detroit Police and Fire Retirement System Service Corporation (**PFRS Service Contract**, and together with the GRS Service Contract, **Service Contracts**).

The Certificates are being issued to provide moneys to fund on the date of original delivery of the Certificates (**Closing Date**) specific amounts of the unfunded accrued actuarial liabilities (**Subject UAAL**) of the City's General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS,** and collectively with the GRS, **Retirement Systems**), and to pay certain related ancillary amounts set forth in the Service Contracts (**Ancillary Amounts**), including the costs of issuance of the Certificates and capitalized interest. The Certificates are issued pursuant to Ordinance No. 05-05 of the City (**Funding Ordinance**), the Service Contracts and the Trust Agreement dated the Closing Date among Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation (each a **Service Corporation**) and U.S. Bank National Association, as Trustee (**Trust Agreement**). U.S. Bank National Association will also serve as the Contract Administrator under the Contract Administration Agreement described below.

In their respective Service Contracts, the Service Corporations have agreed to perform the service in the current year and in future years of reducing the financial burden of the Subject UAAL of the GRS or PFRS, as applicable, by funding a specified amount of such Subject UAAL and related Ancillary Amounts on the Closing Date. In return for such present and future services, the City has agreed in the Service Contracts to make the COP Service Payments and certain additional payments (collectively, **Contract Payments**). On the Closing Date, the Service Corporations, severally and not jointly, will enter into the Trust Agreement with the Trustee, establishing the Funding Trust and irrevocably assigning to it all of their rights under the Service Contracts to receive, collect and enforce all COP Service Payments to become due thereunder. On the Closing Date, the Funding Trust will issue and sell the Certificates and irrevocably fund the Subject UAAL on behalf of the City by depositing Certificate proceeds with the GRS and the PFRS in amounts equal to their specified portions of the Subject UAAL.

1

THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE SERVICE CONTRACTS ARE UNSECURED CONTRACTUAL OBLIGATIONS OF THE CITY. NEITHER THE FAITH AND CREDIT, THE TAXING POWER NOR ANY SPECIAL REVENUES OF THE CITY ARE PLEDGED TO THE COP SERVICE PAYMENTS COMING DUE UNDER THE SERVICE CONTRACTS. THE SERVICE CONTRACTS AND THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE SERVICE CONTRACTS DO NOT CONSTITUTE "INDEBTEDNESS" WITHIN THE MEANING OF ANY LIMITATION CONTAINED IN THE CONSTITUTION AND NON-TAX STATUTES OF THE STATE OF MICHIGAN OR IN THE CITY CHARTER.

### No Pledge of Retirement System Assets or of Proceeds of the Certificates

Although the proceeds of the Certificates will be used to fund the Subject UAAL, no Retirement System assets and no proceeds of the Certificates will either secure or be available to pay the Certificates (except capitalized interest payable from such proceeds). See "PLAN OF FINANCE" and "SOURCES OF PAYMENT AND SECURITY FOR THE CERTIFICATES."

### Investment Considerations

This is a new financing structure which is being used for the first time in the State of Michigan. The City's unconditional contractual obligation to make COP Service Payments is not "subject to appropriation" (*i.e.*, the contractual obligation is not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year). The City is legally bound to make all COP Service Payments for the full term of both Service Contracts, and statutory remedies exist to enforce the City's obligations. See "PLAN OF FINANCE" and its first subheading "Constitutional, Statutory and Ordinance Authority for Payment of Unfunded Accrued Actuarial Liabilities and Issuance of the Certificates."

### Defined Terms

All capitalized terms used in this Offering Circular, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement and the Contract Administration Agreement. See "DEFINITIONS OF CERTAIN TERMS" in APPENDIX A.

### Underlying Documents

The descriptions and summaries of various documents set forth below do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each such document. Copies of the Service Contracts, the Trust Agreement and the Contract Administration Agreement are available in reasonable quantities upon request to the Contract Administrator.

## THE CITY

### Governmental Structure

Pursuant to the Michigan Constitution of 1963, as amended (**State Constitution**), and the Home Rule City Act (Act No. 279 of the Michigan Public Acts of 1909, as amended), the City is a home rule city with significant independent powers. The City provides the following services: public protection, public works, cultural and recreational, civic center, health, physical and economic development, public lighting, transportation, water supply and sewage disposal, human services, airport, and parking. In accordance with the City Charter, the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 6, 2001, in which Kwame M. Kilpatrick was elected as Mayor, and six incumbent members and three new members of the City Council were elected. JoAnn Watson was subsequently elected in a special election held as a result of the death of City Council member Brenda Scott. A City Council vacancy currently exists due to the death of Council member Kay Everett in November 2004. There are no

limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the judicial branch of State government.

The City Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify certain ordinances enacted by the City by referendum. The period within which voters of the City could, under the City Charter, petition for a referendum to nullify the Funding Ordinance or either of the Alternative Funding Mechanism Ordinances (referred to below under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of Unfunded Accrued Actuarial Liabilities and Issuance of the Certificates") has lapsed without any such petitions being filed.

**Economic Characteristics**

Detroit is located in Wayne County, which is in the southeastern section of the lower peninsula of Michigan. The City covers approximately 138 square miles and is the largest city in Michigan, accounting for nearly half of the population of the County. According to the U.S. Census Bureau, the City is now the nation's tenth largest city and is the center of the nation's eighth largest consolidated metropolitan statistical area. The City is internationally known for its automobile manufacturing and trade. The southeastern border of the City is on the Detroit River, an international waterway, which is linked via the St. Lawrence Seaway to seaports around the world. The City is the commercial capital of Michigan and a major economic and industrial center of the nation. The City has eight diverse industrial parks, and more than 50 firms have world headquarters within the confines of the City. See APPENDIX B - "Information Concerning the City of Detroit, Michigan" for information about the City's economic condition and outlook.

**Current Fiscal Situation**

Similar to many large urban governmental units, the City has faced and continues to face fiscal challenges. In the past three years, the five major revenue categories of the City's General Fund decreased 6.35% from $992 million to $929 million while the five major expenditure categories of the General Fund increased 8.03% from $859 million to $928 million (fiscal 2002 compared to fiscal 2004). This contributed to the City reporting year-end General Fund deficits for fiscal years 2001, 2003 and 2004. The primary causes for these past results include a declining population base and its adverse effects on tax revenues, increases in health care and pension benefit costs, and a disproportionate number of City employees compared to the population served. The City has consistently sought to reduce expenditures and increase revenues in any fiscal year in which estimates and actual results may not coincide with budgeted assumptions. The City has in the past utilized various one-time revenue enhancement strategies in an attempt to balance year-end deficits (e.g., issuance of fiscal stabilization bonds and exhausting the remaining balance in the Budget Stabilization Fund). The City has also taken steps to significantly reduce budgeted positions by over 4,000 employees since fiscal 2002 to reverse the disproportion of the number of employees to resident population.

For the year ended June 30, 2004, the City recorded an unexpected unreserved General Fund deficit of $95 million that carried into the current fiscal year. The fiscal 2004 deficit was primarily attributable to below budgeted income tax and utility users tax collections, tax penalties and interest for remitting payroll withholding taxes late to the Internal Revenue Service, cash-funding capital costs for an 800 MHz communication system, and loss of a lawsuit to the Police and Fire Retirement System (currently under appeal; see "LITIGATION" and also "RETIREMENT SYSTEMS - Pending Pension Litigation" in APPENDIX B). In March 2005, the City administration implemented additional mid-year layoffs, salary reductions for certain employees and other expenditure reductions. Based on these initiatives, the expected reimbursement of the cash-funded capital costs from an upcoming bond issue and the City's current projections of revenues and expenditures, the 2006 Executive Budget estimates a lower year-end deficit of approximately $67 million for the current fiscal year ending June 30, 2005.

The City administration, in presenting on April 12, 2005 its proposed balanced fiscal 2006 Executive Budget, addressed many of the fiscal realities resulting from the sluggish State and local economies and higher costs for items such as health care and pensions that have resulted in deficits. The City Council adopted

amendments to the fiscal 2006 Executive Budget on May 24, 2005, based on certain different assumptions and approaches as to various revenue sources and expenditure reductions. There is the possibility of a Mayoral veto of the amendments by June 2, 2005 and of a City Council vote to override any such veto. See "FINANCIAL PROCEDURES - Budget Process" in APPENDIX B. Regardless of these possibilities, a definitive balanced budget is required to be adopted by June 6, 2005.

The proposed fiscal 2006 Executive Budget and the City Council amendments are both designed to halt the decline in the General Fund balance over the past four years. See "Components of Fund Balance" under "FINANCIAL OPERATIONS" in APPENDIX B. Both result in a fiscal 2006 budget of approximately $1.4 billion, representing a 10.6% decrease from the City's fiscal 2005 Budget. The fiscal 2006 Executive Budget includes proposed new tax revenue sources, expenditure reductions, further employee reductions and re-engineering of several large departments. The City Council amendments increase the estimated carryover deficit from fiscal 2005 to approximately $101 million, remove new tax revenue sources, and restore subsidies for certain non-General Fund operations. The City Council amendments balance the fiscal 2006 budget primarily by instituting additional expenditure reductions and wage cuts in the Police and Fire Departments. If the Executive Budget is finally adopted, several of the fiscal 2006 Executive Budget initiatives will require State legislative and local electorate approval. For both the Executive Budget and the City Council amendments, certain expenditure reductions will require labor union support. If some or all of these initiatives are not realized, the City administration has power under the City Charter and state law to take required actions and believes it would achieve a balanced budget predominantly through additional employee reductions. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund-Proposed Fiscal 2006 Budget" in APPENDIX B for more detail and assumptions associated with the budgeted figures.

To prevent recurring fiscal challenges in future years, the City administration believes that the City must continue taking steps to correct a structural imbalance between its current level of revenues and expenditures. This may involve gaining additional permanent revenue sources, such as those discussed in "Proposed Fiscal 2006 Executive Budget" under "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" in APPENDIX B. In addition, the City administration believes that the City must continue to address and reduce its basic level of ongoing General Fund expenditures. Any such reductions would most likely be accomplished primarily through further reductions in the number of employees and their employee benefits as well as reducing or terminating certain services.

**Financial Controls and Accounting**

Prior to the start of each fiscal year the City prepares an annual budget which constitutes the financial plan for such fiscal year. Reference to a fiscal year refers to the fiscal year ended or ending on June 30 of the year indicated. The budget is required to set forth estimated revenues from all sources and all appropriations. The appropriation for every function of each City department is a fixed expenditure and may not exceed the original appropriation without City Council approval. The City estimates a prior year surplus or deficit for the General Fund that reflects the ending financial position for the prior year. Subject to certain limitations, one half of any surplus realized at the end of any fiscal year is credited to a Budget Stabilization Fund with the remainder being included as revenue available for appropriation in the budget for the next succeeding fiscal year. Any deficit realized at the end of any fiscal year is entered into the budget for the next succeeding fiscal year as an appropriation in accordance with the City Charter. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted by the Mayor and adopted by City Council is a balanced budget. See "FINANCIAL PROCEDURES - Budget Process" and "- Budget Stabilization Fund" in APPENDIX B.

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and, except for entity-wide statements and the enterprise and pension funds, reflect the modified accrual basis of accounting. See "FINANCIAL PROCEDURES - Accounting System" and "- Accounting Methods" in APPENDIX B. The audited basic financial statements of the City as of and for the year ended June 30, 2004, are included in APPENDIX C.

## PLAN OF FINANCE

The Certificates will be issued as part of the City's first use of its recently authorized alternative funding mechanism for meeting its constitutional and statutory obligation to fund an approximately $1.37 billion portion of outstanding unfunded accrued actuarial liabilities (**Subject UAAL**) of its two Retirement Systems. Rather than paying the Subject UAAL in annual installments, with interest, directly to the Retirement Systems over the next 13-20 years, the City instead has entered into a separate Service Contract with each of two Michigan nonprofit corporations it has caused to be formed for this purpose (**Service Corporations**) and has contractually obligated itself to make periodic COP Service Payments to them in return for their agreeing to perform the service in the current year and in future years of reducing the financial burden of the Subject UAAL.

The Service Corporations will form the Funding Trust under the Trust Agreement on the Closing Date and irrevocably sell, assign and convey to the Funding Trust all of their rights to receive, collect and enforce all COP Service Payments to become due under the Service Contracts. The Funding Trust and the Service Corporations will also enter into the Contract Administration Agreement with U.S. Bank National Association, as Contract Administrator (in such capacity, **Contract Administrator**), along with certain other parties. See "SERVICE CONTRACT ADMINISTRATION." The Service Corporations are not expected to have a significant active role with regard to any outstanding Certificates after the Closing Date.

The Funding Trust in turn will issue and sell the Certificates on the Closing Date and irrevocably deposit Certificate proceeds with the Retirement Systems in amounts equal to their respective outstanding portions of the Subject UAAL. Upon such deposit with the Retirement Systems, those Certificate proceeds will irrevocably fund the Subject UAAL and become assets solely of the Retirement Systems. Those proceeds will never be available to pay, nor serve as security for payment of, COP Service Payments due from the City under the Service Contracts or the Certificateholders' undivided proportionate interests in the right to receive the principal and interest portions of those COP Service Payments. The Retirement Systems will have nothing to do with the Certificates except to receive those proceeds on the Closing Date; they are not a party to the Service Contracts or the Trust Agreement.

### Constitutional, Statutory and Ordinance Authority for Payment of Unfunded Accrued Actuarial Liabilities and Issuance of the Certificates

The Home Rule City Act permits the City to provide in its Charter for the establishment and maintenance of a pension plan for its employees. Pursuant to that authority, the City has established by Charter and maintains pursuant to ordinances two employee pension systems – its General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS**). The two Retirement Systems were established in 1938 and 1941, respectively, by amendments to the Detroit City Charter of 1918, and exist for the purpose of providing retirement allowances and death and survivor benefits for eligible City employees and their beneficiaries. Each Retirement System is governed by its own Retirement Board, which invests and administers the System's assets as trust funds solely for the benefit of its participants, retirees and their beneficiaries. The assets of each Retirement System are separate and distinct from assets of the City, are outside the City's control and are not available to pay any obligation or expense of the City. See "RETIREMENT SYSTEMS" in APPENDIX B.

Article 9, Section 24 of the State Constitution obligates the City to contribute sufficient funds to the GRS and PFRS to maintain their actuarial integrity. The Michigan Supreme Court has held that this constitutionally obligates a Michigan municipality to fund its employee retirement systems to a level which includes pension benefit liabilities incurred in the current year and any existing unfunded accrued actuarial liabilities (**UAAL**). *Shelby Township Police and Fire Retirement Board* v. *Shelby Township*, 438 Mich. 247 (1991). The Court noted that the State Constitution does not provide specifics for how a municipality must meet its constitutionally-imposed UAAL funding obligations.

Michigan's Public Employees Retirement System Investment Act provides more specificity. That statute, which applies to both the GRS and PFRS, prescribes (in MCL §38.1140m) that a Michigan municipality's required annual contribution to its employee retirement system must be an actuarially determined contribution amount, consisting of (1) a current service cost payment, (2) a payment of at least the annual accrued amortized interest on any UAAL and (3) a payment of the annual accrued amortized portion of the unfunded principal liability.

It is customary for Michigan cities to provide detailed specifics for meeting their UAAL funding obligations in their city ordinances. The City's GRS and PFRS ordinances have long specified a traditional funding mechanism for the City to meet its constitutional and statutory obligation to provide funding for each System's UAAL through required annual payments. The City recently authorized an alternative funding mechanism for such UAAL through new enabling legislation duly enacted by the Detroit City Council, Ordinances No. 03-05 and 04-05 (**Alternative Funding Mechanism Ordinances**) amending the City's GRS and PFRS ordinances. The Alternative Funding Mechanism Ordinances, together with the Funding Ordinance (No. 05-05), enable the City, the Service Corporations and the Trustee to provide for the issuance and sale of the Certificates and the use of the Certificate proceeds to fund the Subject UAAL of both Retirement Systems on the Closing Date.

Each Retirement System receives an annual actuarial report from its consulting actuary as of each June 30, providing actuarial valuations of its vested benefits, prior service costs and unfunded accrued liabilities. Each Retirement Board uses those actuarial valuations, together with certain actuarial assumptions, to determine the annual contribution amounts requested from the City to fulfill its constitutional and statutory pension funding obligations. As part of their regular, periodic review of the actuarial assumptions used to administer their respective Retirement Systems, the GRS and PFRS Retirement Boards may receive recommendations from time to time to increase or decrease the interest rate and to change other actuarial assumptions.

The most recent annual actuarial reports available for the Retirement Systems are as of June 30, 2004. Although the GRS and PFRS had assets actuarially valued at $2,470,243,470 and $3,074,516,589, respectively, as of that date, they also had estimated UAAL of $913,683,202 and $782,976,693, respectively, as of that date, as determined by their actuary. $739,793,898 of GRS UAAL and $630,829,189 of PFRS UAAL are the "**Subject UAAL**" to be funded in full from Certificate proceeds on the Closing Date.

The Subject UAAL is a major part, but not all, of the existing UAAL of the Retirement Systems. The funding of the Subject UAAL from Certificate proceeds is not intended to and will not fund the entire existing UAAL of either or both Retirement Systems.

Under the Retirement Boards' current actuarial assumptions and the traditional funding mechanism, the City would be required to amortize the Subject UAAL over a remaining period of 13 years for the PFRS and 20 years for the GRS. In each year that the City has outstanding UAAL, it is assessed interest thereon (currently at annual rates of 7.9% on GRS UAAL and 7.8% on PFRS UAAL).

By arranging through the alternative funding mechanism for the Subject UAAL to be funded (in effect, prepaid) on the Closing Date, the City will avoid further interest accrual on the amount thus funded; and the Retirement Systems will have possession and control of those funds (including the exclusive right to invest and receive all investment earnings on those funds) much sooner than they would under the traditional funding mechanism. The Alternative Funding Mechanism Ordinances impose certain technical restrictions on the Retirement Systems' uses of those funds, but neither rescind any substantive rights, entitlements or obligations with respect to benefits earned or accrued of members, retirees or beneficiaries of the Retirement Systems nor affect the validity or enforceability of the Service Contracts or the City's payment obligations thereunder.

The financing plan reflects the expectation that by prepaying the Subject UAAL, the City will reduce its costs and better ensure the timely and full payment of retirement benefits. As a practical matter, it is

6

expected that amounts that otherwise would have been expended by the City for the annual amortization of the Subject UAAL (under the traditional funding mechanism) will be sufficient to offset all of the Contract Payments to be made by the City under the Service Contracts. Those Contract Payments are intended to replace payments the City would otherwise make to meet its constitutional obligation to amortize the Subject UAAL.

Apart from the Subject UAAL, other unfunded accrued actuarial liabilities of the Retirement Systems may exist and arise in the ordinary course of the City's operations, which the City may elect to fund by utilizing the traditional funding mechanism or the alternative funding mechanism. Any utilization of the alternative funding mechanism for such other unfunded accrued actuarial liabilities would, however, require (i) separate authorization by a future enabling ordinance of the City enacted for that purpose; (ii) a new funding trust separate and distinct from the Funding Trust; (iii) one or more new service contracts separate and distinct from the Service Contracts; and (iv) issuance of new certificates of participation unrelated to the Certificates.

### *Swap Agreements*

It is expected that the Service Corporations will enter into interest rate exchange agreements or similar agreements (**Swap Agreements**) before or at the time of issuance of the Series B Certificates, to hedge variable-rate exposure under the Service Contracts, and they may do so from time to time with respect to any rate exposure under the Service Contracts. Payments under a Swap Agreement may include net payments based on the interest rates exchanged. Under the Swap Agreements, the Service Corporations will be obligated in certain instances to make periodic payments to the Swap Agreement counterparty, and should a Swap Agreement be terminated, under certain circumstances the Service Corporations may be required to pay a termination payment. The Service Corporations' obligation to make all payments under the Swap Agreements will be payable from moneys paid by the City under the Service Contracts. In applying moneys so received from the City, the Contract Administrator will be required to treat any termination payment owing to a Swap Agreement counterparty as subordinated in right of payment to the prior payment in full of any Scheduled Payments and Service Charges (corresponding to principal of and interest on Certificates) then due and unpaid.

### *Sources and Uses of Funds*

The proceeds from the sale of the Certificates are expected to be used as follows:

**Sources of Funds**

| | |
|---|---|
| Principal Amount of Series A Certificates | $ 640,000,000 |
| Principal Amount of Series B Certificates | 800,000,000 |
| TOTAL SOURCES | $1,440,000,000 |
| **Uses of Funds** | |
| Subject UAAL | $1,370,623,087 |
| Capitalized Interest | 23,014,439 |
| Costs of Issuance* | 46,362,474 |
| TOTAL USES | $1,440,000,000 |

* Includes premiums on Certificate insurance policies, underwriters' discount and other costs of issuance.

## SOURCES OF PAYMENT AND SECURITY FOR THE CERTIFICATES

The Certificates are payable solely from all COP Service Payments which may be received by the Trustee pursuant to the Service Contracts. Such COP Service Payments will include all Scheduled Payments and Service Charges payable by the City under the Service Contracts, corresponding to the principal of and interest on the Certificates, respectively. The City's obligations to make COP Service Payments are unsecured contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City. **Such payment obligations of the City are not general obligations of the City, and neither the faith and credit, taxing power nor any specific revenues of the City are pledged to the COP Service Payments coming due under the Service Contracts.**

The City's unconditional contractual obligation to pay all COP Service Payments is not "subject to appropriation," as is customary with many certificate of participation transactions entered into by municipalities in the United States. The City's Service Contracts are not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year. The City is legally bound to make all COP Service Payments for the full term of both Service Contracts, and statutory remedies exist to enforce the City's obligations.

To secure the payment of the Certificates, the Service Corporations will irrevocably sell, assign and convey to the Funding Trust all of their rights to receive, collect and enforce all COP Service Payments to become due under the Service Contracts. As further security for the payment of the Certificates, although the parties intend that such sale, assignment and conveyance be an absolute transfer of those rights under the Service Contracts, in the Trust Agreement the Service Corporations will additionally grant a security interest in their right to receive COP Service Payments to the Funding Trust for the benefit of the Certificateholders. That security interest will be a perfected first security interest in such property under the Michigan Uniform Commercial Code.

The Service Contracts additionally require the City to make certain other payments, such as general corporate expenses of the Service Corporations, fees and expenses of the Trustee and the Contract Administrator, and certain amounts payable to one or more Swap Agreement counterparties. The amounts paid by the City for such additional purposes do not constitute part of the COP Service Payments and are not pledged for the payment of the Certificates.

If the City were to fail to pay any COP Service Payment when due, the Contract Administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. This is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism described above under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of Unfunded Accrued Actuarial Liabilities and Issuance of the Certificates."

The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of COP Service Payments except at the request of Certificateholders representing at least 25% of the outstanding principal amount of Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all Certificates. See "SERVICE CONTRACT ADMINISTRATION - Enforcement."

## THE CERTIFICATES

The Certificates are being issued in two series, as described below.

### *The Series A Certificates (Fixed Rate)*

The Series A Certificates will be dated the date of their issuance. Interest from that date will be payable on each Series A Certificate on December 15, 2005 and semiannually thereafter on each June 15 and December 15 until its maturity or earlier redemption. The interest on the Series A Certificates will be computed at the rates shown on the inside cover of this Offering Circular, on the basis of a 30-day month and a 360-day year. The Series A Certificates are issued as fully registered Certificates, in principal denominations of $5,000 or multiples thereof.

Mandatory Sinking Fund Redemption

All Series A Certificates maturing in 2020 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series A Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series A Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "THE CERTIFICATES – The Series A Certificates (Fixed Rate) - Optional Redemption with Make-Whole Premium," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2016 | $36,950,000 |
| 2017 | 40,965,000 |
| 2018 | 45,270,000 |
| 2019 | 31,035,000 |
| 2020[a] | 34,265,000 |

[a] Stated Maturity

All Series A Certificates maturing in 2025 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series A Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series A Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "THE CERTIFICATES – The Series A Certificates (Fixed Rate) - Optional Redemption with Make-Whole Premium," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2021 | $37,730,000 |
| 2022 | 41,475,000 |
| 2023 | 45,490,000 |
| 2024 | 49,785,000 |
| 2025[a] | 54,375,000 |

[a] Stated Maturity

Optional Redemption with Make-Whole Premium

The Series A Certificates are subject to optional redemption prior to their maturity from Scheduled Payments prepaid by the City, in whole or in part (and if in part, as described below under "THE CERTIFICATES – Selection of Certificates for Redemption") on any date, at a redemption price equal to the greater of:

- 100% of the principal amount of the Series A Certificates to be redeemed, or

- the sum of the present values of the remaining scheduled payments of principal and interest on the Series A Certificates to be redeemed (exclusive of interest accrued to the date fixed for redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate (defined below) plus 12.5 basis points,

plus in each case, accrued and unpaid interest on the Series A Certificates being redeemed to the date fixed for redemption.

For the purpose of determining the Treasury Rate, the following definitions apply:

**Treasury Rate** means, with respect to any redemption date for a particular Series A Certificate, the rate per annum, expressed as a percentage of the principal amount, equal to the semiannual equivalent yield to maturity or interpolated maturity of the Comparable Treasury Issue, assuming that the Comparable Treasury Issue is purchased on the redemption date for a price equal to the Comparable Treasury Price, as calculated by the Designated Treasury Dealer.

**Comparable Treasury Issue** means, with respect to any redemption date for a particular Series A Certificate, the U.S. Treasury security or securities selected by the Designated Treasury Dealer which has an actual or interpolated maturity comparable to the remaining average life of the Series A Certificate to be redeemed, and that would be utilized in accordance with customary financial practice in pricing new issues of debt securities of comparable maturity to the remaining average life of the Series A Certificate to be redeemed.

**Comparable Treasury Price** means, with respect to any redemption date for a particular Series A Certificate, (1) if the Designated Treasury Dealer receives at least four Reference Treasury Dealer Quotations, the average of such quotations for such redemption date, after excluding the highest and lowest Reference Treasury Dealer Quotations, or (2) if the Designated Treasury Dealer obtains fewer than four Reference Treasury Dealer Quotations, the average of all such quotations.

**Designated Treasury Dealer** means one of the Reference Treasury Dealers designated by the Contract Administrator.

**Reference Treasury Dealer** means UBS Financial Services Inc. or its successor, and four other firms, selected by the Contract Administrator from time to time, that are primary U.S. Government securities dealers in the City of New York (each a **Primary Treasury Dealer**); *provided, however,* that if any of them ceases to be a Primary Treasury Dealer, the Contract Administrator will substitute another Primary Treasury Dealer.

**Reference Treasury Dealer Quotations** means, with respect to each Reference Treasury Dealer and any redemption date for a particular Series A Certificate, the average, as determined by the Designated Treasury Dealer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Treasury Dealer by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third business day preceding such redemption date.

### The Series B Certificates (Floating Rate)

The Series B Certificates will be dated the date of their issuance and mature on the dates set forth on the inside cover of this Offering Circular. The Series B Certificates are issued as fully registered Certificates, in principal denominations of $25,000 and integral multiples of $1,000 in excess thereof.

Interest will be payable on the Series B Certificates from the delivery date at a floating rate determined in the manner provided below, payable on September 15, 2005 and the 15th day of each December, March, June and September thereafter (each an **Interest Payment Date**) to the persons in whose name the Series B Certificates were registered at the close of business on the 15th day (whether or not a business day) preceding the respective Interest Payment Date, subject to certain exceptions.

The per annum interest rate on the Series B Certificates (**Interest Rate**) in effect during an Interest Period (as defined below) will be equal to the Three Month LIBOR plus the margin indicated on the inside cover of this Offering Circular, and interest on the Series B Certificates will accrue on the outstanding

10

principal balance of the Certificates as shown below. The outstanding principal balance is computed based upon the reduction of the principal balance of each Series B Certificate by the amount of the mandatory sinking fund prepayment on the specific dates set forth under the next subheading "Mandatory Sinking Fund Redemption" below.

| Dates | 2014 Maturity Outstanding Principal Balance (Weighted Average Life: 6.12 Years) | 2025 Maturity Outstanding Principal Balance (Weighted Average Life: 13.87 Years) |
|---|---|---|
| June 2, 2005 - June 15, 2006 | $250,615,000 | $549,385,000 |
| June 16, 2006-June 15, 2007 | 250,615,000 | 549,385,000 |
| June 16, 2007-June 15, 2008 | 232,355,000 | 549,385,000 |
| June 16, 2008-June 15, 2009 | 210,629,000 | 549,385,000 |
| June 16, 2009-June 15, 2010 | 184,999,000 | 549,385,000 |
| June 16, 2010-June 15, 2011 | 155,213,000 | 549,385,000 |
| June 16, 2011-June 15, 2012 | 120,928,000 | 549,385,000 |
| June 16, 2012-June 15, 2013 | 81,836,000 | 549,385,000 |
| June 16, 2013-June 15, 2014 | 37,437,000 | 549,385,000 |
| June 16, 2014-June 15, 2015 | | 536,754,000 |
| June 16, 2015-June 15, 2016 | | 469,774,000 |
| June 16, 2016-June 15, 2017 | | 393,937,000 |
| June 16, 2017-June 15, 2018 | | 308,400,000 |
| June 16, 2018-June 15, 2019 | | 212,464,000 |
| June 16, 2019-June 15, 2020 | | 192,050,000 |
| June 16, 2020-June 15, 2021 | | 168,750,000 |
| June 16, 2021-June 15, 2022 | | 142,285,000 |
| June 16, 2022-June 15, 2023 | | 112,441,000 |
| June 16, 2023-June 15, 2024 | | 78,961,000 |
| June 16, 2024-June 15, 2025 | | 41,585,000 |

For the initial Interest Period which begins on the Closing Date and ends on (but does not include) September 15, 2005, the Contract Administrator will set the Interest Rate on the Closing Date and will determine the LIBOR rate by reference to straight line interpolation between Three Month LIBOR and four month LIBOR based on the actual number of days in the initial Interest Period. The Interest Rate for each subsequent Interest Period for the Series B Certificates will be set on September 15, 2005 and the 15th day of each December, March, June and September thereafter (each an **Interest Rate Adjustment Date**) until the principal on the Series B Certificates is paid or made available for payment. If any Interest Rate Adjustment Date (other than the initial Interest Rate Adjustment Date occurring on the Closing Date) and Interest Payment Date for the Series B Certificates would otherwise be a day that is not a LIBOR Business Day, such Interest Rate Adjustment Date and Interest Payment Date shall be the next succeeding LIBOR Business Day.

**LIBOR Business Day** means any day on which the City, the Trustee and banks in both London and New York City are open for the transaction of business. **Interest Period** means the period from and including the Closing Date or the most recent Interest Payment Date to but excluding the next succeeding Interest Payment Date on which interest on the outstanding Series B Certificates was paid in full.

The **Three Month LIBOR** for each Interest Period means the rate determined in accordance with the following provisions:

(i)     On the second LIBOR Business Day before the Closing Date and each subsequent Interest Rate Adjustment Date (each such date an **Interest Determination Date** for the ensuing Interest Period), the Contract Administrator will determine the Three Month LIBOR which shall be the London interbank offered

rate for deposits in U.S. dollars with a three-month maturity that appears on Telerate Page 3750 as of 11:00 a.m., London time, on such Interest Determination Date. **Telerate Page 3750** means the display page so designated on Moneyline Telerate, Inc. (or such other page as may replace that page on that service or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits). If the Three Month LIBOR on such Interest Determination Date does not appear on the Telerate Page 3750, the Three Month LIBOR will be determined as described in paragraph (ii) below.

(ii)     With respect to an Interest Determination Date for which the Three Month LIBOR does not appear on Telerate Page 3750 as specified in paragraph (i) above, the Three Month LIBOR will be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on such Interest Determination Date to prime banks in the London interbank market by at least three leading banks engaged in transactions in Eurodollar deposits in the international Eurocurrency market (the **Reference Banks**) selected by the Contract Administrator. The Contract Administrator shall request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of the rates quoted by three major banks in New York City, selected by the Contract Administrator, at approximately 11:00 a.m., New York City time, on such Interest Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity; provided, however, that if the banks in New York City selected by the Contract Administrator are not then quoting rates for such loans, the relevant Interest Rate for the Interest Period commencing on the Interest Rate Adjustment Date following such Interest Determination Date will be the Interest Rate in effect on such Interest Determination Date.

The amount of interest for each day that the Series B Certificates are outstanding (the **Daily Interest Amount**) will be calculated by dividing the Interest Rate in effect for such day by 360 and multiplying the result by the principal amount of the Series B Certificates. The amount of interest to be paid on the Series B Certificates for any Interest Period will be calculated by adding the Daily Interest Amounts for each day in such Interest Period.

The Interest Rate on the Series B Certificates will in no event be higher than the maximum rate permitted by Michigan law as the same may be modified by United States law of general application.

The Interest Rate and amount of interest to be paid on the Series B Certificates for each Interest Period will be determined by the Contract Administrator. All calculations made by the Contract Administrator shall in the absence of manifest error be conclusive for all purposes and binding on the Funding Trust and the Holders of the Series B Certificates.

Mandatory Sinking Fund Redemption

All Series B Certificates maturing in 2014 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts specified below, except that the principal amount of the Series B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series B Certificates (Floating Rate) - Optional Redemption*," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2007 | $18,260,000 |
| 2008 | 21,726,000 |
| 2009 | 25,630,000 |
| 2010 | 29,786,000 |
| 2011 | 34,285,000 |
| 2012 | 39,092,000 |
| 2013 | 44,399,000 |
| 2014[a] | 37,437,000 |

[a] Stated Maturity

All Series B Certificates maturing in 2025 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series B Certificates (Floating Rate)* - Optional Redemption," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2014 | $12,631,000 |
| 2015 | 66,980,000 |
| 2016 | 75,837,000 |
| 2017 | 85,537,000 |
| 2018 | 95,936,000 |
| 2019 | 20,414,000 |
| 2020 | 23,300,000 |
| 2021 | 26,465,000 |
| 2022 | 29,844,000 |
| 2023 | 33,480,000 |
| 2024 | 37,376,000 |
| 2025[a] | 41,585,000 |

[a] Stated Maturity

Optional Redemption

The Series B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2007, in whole or in part (and if in part, as described below under "THE CERTIFICATES – *Selection of Certificates for Redemption*") .

### *Selection of Certificates for Redemption*

If some but less than all of the Certificates of either Series A or Series B are to be redeemed on any date, the Contract Administrator, at the direction of the City, will select the maturity or maturities to be redeemed. Within a maturity, the particular Certificates of a Series to be redeemed shall be redeemed *pro rata* as described below.

So long as the Certificates of either Series are in the book-entry-only system, the securities depository will administer the prorating of partial redemptions among beneficial owners of the Certificates of that Series. See "THE CERTIFICATES - Global Book-Entry System."

### *Notice of Redemption*

The Trustee will mail a notice to the registered owner of each Certificate to be redeemed in whole or in part at the address for the registered owner shown in the registration books (the securities depository so long as the book-entry-only system is in effect). The notice will be mailed at least 30 days but not more than 45 days prior to the redemption date. Failure to give a notice of redemption or a defect in it will not affect the validity of the proceedings for the redemption of any Certificates for which proper notice was given.

### *Global Book-Entry System*

Payments of principal and interest for each Certificate will be paid to the registered owner of the Certificates. The Certificates are being issued initially in book-entry-only form, so the registered owner will be a securities depository—a nominee of The Depository Trust Company (**DTC**). Clearance is expected to be available through DTC and also through Clearstream and Euroclear, which will hold omnibus positions on behalf of their participants in the books of their respective depositories. For more information about the global book-entry system, see APPENDIX D. Under certain conditions the Certificates may be issued in certificated form.

The Trustee is the registrar and paying agent for the Certificates and may be contacted as follows:

| | |
|---|---|
| *Contact:* | U.S. Bank National Association |
| *Attn:* | Trust Finance Management |
| *Phone:* | 651-495-3713 |
| *Mail:* | Corporate Trust Services |
| | U.S. Bank National Association |
| | 60 Livingston Avenue |
| | St. Paul, MN 55107 |
| | Mail Station EP-MN-WS3T |

### *Registration and Payment of Certificates*

How the Certificates are paid depends on whether or not they are in book-entry-only form.

While the Certificates are in book-entry-only form (as they are initially), payment of principal will be made by wire transfer to the securities depository or its nominee. Payment of interest will be made by wire transfer to the securities depository or its nominee on the payment date.

If the Certificates are not in book-entry-only form, payment of principal will be made by check or draft issued upon the presentation and surrender of the Certificates at the designated office of the Trustee. Payment of interest due on the Certificates will be made by check or draft mailed to the registered owner shown in the registration book at the close of business on the 15th day (whether or not a business day) preceding the respective interest payment date.

## FISCAL YEAR COP SERVICE PAYMENTS

The following table sets forth the contractual obligations of the City under the Service Contracts in each fiscal year for payment of Scheduled Payments and Service Charges, corresponding to the principal of and interest on the Certificates, respectively.

FISCAL YEAR COP SERVICE PAYMENTS

| Maturity (June 15) | Series A | | | Series B | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest [1] | Total [1] | Principal | Interest [1,2] | Total [1,2] | Principal | Interest [1,2] | Total [1,2] |
| 2006 | $ — | $ 21,345,691 | $ 21,345,691 | $ — | $ 27,777,564 | $ 27,777,564 | $ — | $ 49,123,255 | $ 49,123,255 |
| 2007 | 10,845,000 | 30,253,736 | 41,098,736 | 18,260,000 | 39,369,775 | 57,629,775 | 29,105,000 | 69,623,511 | 98,728,511 |
| 2008 | 13,905,000 | 29,819,502 | 43,724,502 | 21,726,000 | 38,522,511 | 60,248,511 | 35,631,000 | 68,342,013 | 103,973,013 |
| 2009 | 17,310,000 | 29,241,888 | 46,551,888 | 25,630,000 | 37,514,425 | 63,144,425 | 42,940,000 | 66,756,313 | 109,696,313 |
| 2010 | 20,950,000 | 28,508,983 | 49,458,983 | 29,786,000 | 36,325,193 | 66,111,193 | 50,736,000 | 64,834,176 | 115,570,176 |
| 2011 | 24,880,000 | 27,605,200 | 52,485,200 | 34,285,000 | 34,943,122 | 69,228,122 | 59,165,000 | 62,548,322 | 121,713,322 |
| 2012 | 29,095,000 | 26,509,485 | 55,604,485 | 39,092,000 | 33,352,298 | 72,444,298 | 68,187,000 | 59,861,783 | 128,048,783 |
| 2013 | 33,720,000 | 25,213,884 | 58,933,884 | 44,399,000 | 31,538,430 | 75,937,430 | 78,119,000 | 56,752,314 | 134,871,314 |
| 2014 | 38,680,000 | 23,695,473 | 62,375,473 | 50,068,000 | 29,478,316 | 79,546,316 | 88,748,000 | 53,173,789 | 141,921,789 |
| 2015 | 33,275,000 | 21,930,504 | 55,205,504 | 66,980,000 | 27,112,342 | 94,092,342 | 100,255,000 | 49,042,846 | 149,297,846 |
| 2016 | 36,950,000 | 20,395,528 | 57,345,528 | 75,837,000 | 23,761,922 | 99,598,922 | 112,787,000 | 44,157,450 | 156,944,450 |
| 2017 | 40,965,000 | 18,617,125 | 59,582,125 | 85,537,000 | 19,967,481 | 105,504,481 | 126,502,000 | 38,584,605 | 165,086,605 |
| 2018 | 45,270,000 | 16,645,480 | 61,915,480 | 95,936,000 | 15,686,691 | 111,622,691 | 141,206,000 | 32,332,170 | 173,538,170 |
| 2019 | 31,035,000 | 14,466,634 | 45,501,634 | 20,414,000 | 10,884,531 | 31,298,531 | 51,449,000 | 25,351,165 | 76,800,165 |
| 2020 | 34,265,000 | 12,972,920 | 47,237,920 | 23,300,000 | 9,838,722 | 33,138,722 | 57,565,000 | 22,811,641 | 80,376,641 |
| 2021 | 37,730,000 | 11,323,745 | 49,053,745 | 26,465,000 | 8,645,063 | 35,110,063 | 64,195,000 | 19,968,808 | 84,163,808 |
| 2022 | 41,475,000 | 9,456,865 | 50,931,865 | 29,844,000 | 7,289,261 | 37,133,261 | 71,319,000 | 16,746,126 | 88,065,126 |
| 2023 | 45,490,000 | 7,404,682 | 52,894,682 | 33,480,000 | 5,760,352 | 39,240,352 | 78,970,000 | 13,165,034 | 92,135,034 |
| 2024 | 49,785,000 | 5,153,837 | 54,938,837 | 37,376,000 | 4,045,172 | 41,421,172 | 87,161,000 | 9,199,009 | 96,360,009 |
| 2025 | 54,375,000 | 2,690,475 | 57,065,475 | 41,585,000 | 2,130,400 | 43,715,400 | 95,960,000 | 4,820,875 | 100,780,875 |
| Totals | $640,000,000 | $383,251,636 | $1,023,251,636 | $800,000,000 | $443,943,568 | $1,243,943,568 | $1,440,000,000 | $827,195,204 | $2,267,195,204 |

---

[1] Net of capitalized interest.

[2] Series B interest calculated at fixed swap rates

15

## CERTIFICATE INSURANCE

The scheduled payment of principal of and interest on the particular Certificates specifically identified on the inside cover of this Offering Circular as the "FGIC-insured Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the FGIC-insured Certificates by Financial Guaranty Insurance Company (**Financial Guaranty**). Information provided by Financial Guaranty about its operations and financial condition is included as APPENDIX E, as is the form of its insurance policy.

The scheduled payment of principal of and interest on the particular Certificates specifically identified on the inside cover of this Offering Circular as the "XLCA-insured Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the XLCA-insured Certificates by XL Capital Assurance Inc. (**XLCA**). Information provided by XLCA about its operations and financial condition is included as APPENDIX F, as is the form of its insurance policy.

In addition, Financial Guaranty and XLCA are expected to provide insurance policies that cover payments required to be made by the Service Corporations under the Swap Agreements that the Service Corporations are expected to enter into before or at the time of issuance of the Series B Certificates.

## SERVICE CONTRACT ADMINISTRATION

On the Closing Date, the Funding Trust, the Service Corporations, severally and not jointly, and the Swap Agreement counterparties and a backing provider for one of them, will enter into the Contract Administration Agreement (**Administration Agreement**) with U.S. Bank National Association, as Contract Administrator. U.S. Bank National Association will also be the Trustee under the Trust Agreement. The Administration Agreement will permit the substitution of a different Contract Administrator if a conflict of interest were to arise from the same institution serving in both roles.

Under the Administration Agreement, each of the Service Corporations and the Trustee on behalf of the Funding Trust will appoint the Contract Administrator as its respective agent to collect COP Service Payments, as well as periodic or termination payment amounts received from the City under the Service Contracts (**Hedge Payables**) or received from a Swap Agreement counterparty (**Hedge Receivables**), and will require the Contract Administrator to determine in accordance with prescribed priorities and prorating provisions to whom they must be disbursed. Also under the Administration Agreement, the Trustee on behalf of the Funding Trust will appoint the Contract Administrator as its agent to enforce the payment of COP Service Payments. Additionally, under the Administration Agreement, each Service Corporation will appoint the Contract Administrator as its agent if directed by the Service Corporation to enforce the payment of Hedge Receivables and Hedge Payables.

### *Payments to the Trustee or Others*

On any date that principal or interest is due and payable on any Certificates, the applicable Certificateholders are entitled to receive the amount due from the Trustee in accordance with the Trust Agreement. The Trustee is dependent on receiving from the Contract Administrator, as the agent of each Corporation, the proceeds of COP Service Payments collected by the Contract Administrator for that purpose. In the event that on such date the Trustee has insufficient moneys to pay the full aggregate amount thus due, the Trustee is required by the Trust Agreement to disburse all of the available moneys it then holds to the entitled Certificateholders on a *pro rata* basis.

The Contract Administrator is required to distribute the moneys it receives from the City as Service Payments (which term includes not only COP Service Payments but also payments for fees, expenses and indemnification of the Contract Administrator and amounts in respect of periodic Hedge Payables and termination Hedge Payables) in accordance with the following priorities of payment among specific categories of payments, as prescribed in each Service Contract:

**First:** any Contract Administrator Payments owing to the Contract Administrator under the Contract Administration Agreement are payable to it,

**Second:** all theretofore due and unpaid Service Charges (corresponding to interest due and unpaid to Certificateholders) and amounts in respect of periodic Hedge Payables due and unpaid to a Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Third:** all then due and about to become due Service Charges (corresponding to interest to Certificateholders) and amounts in respect of periodic Hedge Payables to a Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fourth:** all theretofore due and unpaid regular Scheduled Payments and Sinking Fund Installments (corresponding to principal due and unpaid to Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fifth:** all then due or about to become due regular Scheduled Payments and Sinking Fund Installments (corresponding to principal to Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Sixth:** all theretofore due and unpaid amounts in respect of termination Hedge Payables to a Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Seventh:** all then due and about to become due amounts in respect of termination Hedge Payables to a Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the final priority, namely,

**Eighth:** all then due and about to become due Optional Prepayment Amounts (corresponding to optional prepayments of principal to Certificateholders) and Accrued Service Charges.

For purposes of the above priorities, an amount is "about to become due" (i) in the case of amounts which are payable not more frequently than once each calendar week, when there are six or fewer days before its due date, or (ii) for amounts which are payable more frequently than once each calendar week, the day after its most recent due date.

The Administration Agreement requires the Contract Administrator, before paying any COP Service Payment proceeds to the Trustee for pass through to Certificateholders on any payment date, to determine which priorities are then due and owing, whether on that date or in arrears, and to apply those moneys according to the priorities described above. Thus, if after satisfying the First priority, the Contract Administrator has insufficient moneys to pay all amounts then owing among the next priorities, it shall use the available moneys first to pay amounts owing in the Second priority on a parity between Service Charges (payable by the Contract Administrator to the Trustee) and periodic Hedge Payables (payable to a Swap Counterparty); and in that event, Certificateholders may receive on that date less than the full amount then owing to them. If that occurred, however, the affected Certificateholders would have the benefit of the applicable Certificate insurance. See "CERTIFICATE INSURANCE."

*Enforcement*

Promptly after any failure of the City to pay any COP Service Payment when due, the Contract Administrator is required to give written notice by mail to all Certificateholders and others, except that such notice shall be given to the insurer of particular Certificates rather than those Certificateholders as long as the insurer is not in default under its insurance policy. The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of COP Service Payments except at the request of Certificateholders representing at least 25% of the outstanding principal amount of Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all Certificates, and only if they shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might by incurred by it in compliance with such request.

## THE SERVICE CORPORATIONS AND THE FUNDING TRUST

The two Service Corporations are Michigan nonprofit corporations incorporated by the City pursuant to the Home Rule City Act, Ordinance No. 05-05 of the City and the Michigan Nonprofit Corporation Act. They are organized primarily for the purpose of assisting the City in carrying out its constitutionally mandated obligation to maintain the actuarial integrity of its two Retirement Systems through performing the services of reducing the financial burden of the unfunded accrued actuarial liabilities of the GRS or PFRS, as applicable, by funding specified amounts thereof. They will do this with respect to the Subject UAAL by entering into and performing their obligations under the two respective Service Contracts, the Trust Agreement, the Contract Administration Agreement and the Swap Agreements. The Service Corporations are not expected to have a significant active role with regard to any outstanding Certificates after the Closing Date.

The governing body of each respective Service Corporation is its Board of Directors, comprised of five directors. The Articles of Incorporation of each Service Corporation prescribe that its Board of Directors shall consist of three officials of the City – the Finance Director, the Budget Director and the Corporation Counsel – plus two members of the Detroit City Council appointed by the City Council. The current Board of Directors of each Service Corporation is comprised of these same five individuals:

| | |
|---|---|
| Sean K. Werdlow | Finance Director of the City |
| Roger Short | Budget Director of the City |
| Ruth Carol Carter | Corporation Counsel of the City |
| Kenneth V. Cockrel, Jr. | City Council member |
| Sharon McPhail | City Council member |

The officers of both Service Corporations are: Mr. Werdlow, President; Mr. Short, Treasurer; and Ms. Carter, Secretary.

Detroit Retirement Systems Funding Trust 2005 (the **Funding Trust**) is a grantor trust that will be established and existing under Michigan law beginning on the Closing Date. It will be created by the Service Corporations, severally and not jointly, by their entering into the Trust Agreement on that date with U.S. Bank National Association, as Trustee. The purposes of the Funding Trust are to purchase and accept from the Service Corporations their assignment of the rights to receive all COP Service Payments payable by the City under the Service Contracts solely with respect to the Subject UAAL, to issue and sell the Certificates in accordance with the Trust Agreement and, acting through the Trustee, to pay all received COP Service Payments to the Certificateholders. In the event that at any future time either Service Corporation enters into a service contract with the City to provide for refunding any of the Subject UAAL or funding a particular amount of unfunded accrued actuarial liabilities of the City other than the Subject UAAL, the Funding Trust will have nothing to do with those transactions and the Service

Corporation would have to create one or more other funding trusts to issue any certificates of participation for those transactions.

## UNDERWRITING

The Series A Certificates are being purchased by certain underwriters (**Series A Underwriters**), and UBS Financial Services Inc. is serving as representative for the Series A Underwriters. The Series A Underwriters have agreed, subject to certain conditions, to purchase the Series A Certificates from the Funding Trust at an aggregate purchase price of $634,994,605.52 (reflecting underwriters' discount of $5,005,394.48).

The Series B Certificates are being purchased by certain underwriters (**Series B Underwriters**), and UBS Financial Services Inc. is serving as representative for the Series B Underwriters. The Series B Underwriters have agreed, subject to certain conditions, to purchase the Series B Certificates from the Funding Trust at an aggregate purchase price of $794,512,639.73 (reflecting underwriters' discount of $5,487,360.27).

The Underwriters have agreed to reoffer the Certificates at the public offering prices or yields set forth on the inside cover of this Offering Circular. The Certificates may be offered and sold to certain dealers (including dealers depositing the Certificates into investment trusts) at prices lower than such public offering prices, and such prices may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions, and they will be obligated to purchase all the Certificates if any Certificates are purchased.

The Underwriters may engage in over-allotment, stabilizing transactions, syndicate covering transactions, and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934. Over-allotment involves syndicate sales in excess of the offering size, which creates a syndicate short position. Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specific maximum. Syndicate covering transactions involve purchases of the Certificates in the open market after the distribution has been completed in order to cover syndicate short positions. Penalty bids permit an Underwriter to reclaim a selling concession from a syndicate member when the Certificates originally sold by such syndicate member are purchased in a syndicate covering transaction to cover syndicate short positions. Such stabilizing transactions, syndicate covering transactions, and penalty bids may cause the price of the Certificates to be higher than it would otherwise be in the absence of such transactions. Such transactions, if commenced, may be discontinued at any time.

Affiliates of one or more of the Underwriters may also be counterparties in Swap Agreements entered into by the Service Corporations in connection with the Service Contracts.

### *Global Plan of Distribution*

The Certificates are offered by the Underwriters for sale in those jurisdictions in the United States, Europe, Asia, and elsewhere where it is lawful to make such offers. Each Underwriter has undertaken that it will not offer, sell, or deliver, directly or indirectly, any of the Certificates or distribute this Offering Circular or any other material relating to the Certificates, in or from any jurisdiction except under circumstances that will, to the best of its knowledge and belief, result in compliance with the applicable laws and regulations thereof and not impose any obligations on the City, the Service Corporations or the Funding Trust except as contained in the underwriting agreement among the City, the Service Corporations and the Underwriters. Persons who receive this Offering Circular are required to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell, or deliver the Certificates or have in their possession, distribute, or publish any offering material relating to the Certificates, in all cases at their own expense.

*Reference Information about the Certificates*

The table on the inside cover of this Offering Circular provides information about the Certificates. The CUSIP, ISIN and Euroclear and Clearstream Common Code numbers for each maturity have been obtained from sources the City and the Service Corporations believe to be reliable, but the City, the Service Corporations, the Trustee and the Underwriters are not responsible for the correctness of the CUSIP, ISIN and Euroclear and Clearstream Common Code numbers or other identifying numbers assigned to the Certificates. The Underwriters have provided the reoffering yields and prices. The yield at issuance is the yield to maturity.

## RATINGS

At the City's and the Service Corporations' request, several rating agencies have rated the Certificates as set forth in the table below with the understanding that, upon delivery of the Certificates, the insurance policies described under "CERTIFICATE INSURANCE" will be issued.

| Insured Rating | | Rating Agency |
|---|---|---|
| Series A Certificates | Series B Certificates | |
| AAA | AAA | Fitch Ratings |
| Aaa | Aaa | Moody's Investors Service, Inc. |
| AAA | AAA | Standard & Poor's Ratings Services |

In addition, at the City's request, several rating agencies have assigned an underlying rating to the Certificates (the rating that would apply to the Certificates if the insurance policies were not issued) as set forth in the table below.

| Underlying Rating | | Rating Agency |
|---|---|---|
| Series A Certificates | Series B Certificates | |
| BBB+ | BBB+ | Fitch Ratings |
| Baa1 | Baa1 | Moody's Investors Service, Inc. |
| Aa1 | Aa1 | Moody's Investors Service, Inc. (corporate equivalent rating) |
| BBB | BBB | Standard & Poor's Ratings Services |

Any explanation of what a rating means may only be obtained from the rating agency assigning the rating. There is no assurance that a rating assigned to the Certificates will continue for any period of time. A rating agency may lower or withdraw the rating it assigns if in its judgment circumstances so warrant. Any downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the Certificates. The Funding Trust, the Service Corporations and City make no representations as to the appropriateness of the ratings.

## FINANCIAL ADVISORS

Robert W. Baird & Co. and Scott Balice Strategies, LLC have been employed by the City to perform professional services in the capacity of financial advisor with respect to the Service Contracts and the Certificates.

## INDEPENDENT ACCOUNTANTS

The basic financial statements of the City, as of and for the fiscal year ended June 30, 2004, included in APPENDIX C, have been audited by the firm of KPMG LLP, independent accountants, to the extent indicated in their report thereon, which also appears in APPENDIX C.

KPMG LLP's qualified report dated March 21, 2005 states the financial statements of the Detroit Housing Commission Component Unit did not include a liability to the Department of Housing and Urban Development in the amount of $14,236,946 related to unallowable costs claimed for federal reimbursement.

Accounting principles generally accepted in the United States of America require that all liabilities that are probable and can be estimated should be recorded as liabilities, which would increase expenses and decrease net assets.

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, and sale of the Certificates are subject to the approval of Lewis & Munday, A Professional Corporation, Detroit, Michigan, Certificate Counsel, whose approving opinion, substantially in the form shown in APPENDIX G, will be delivered on the date of issuance of the Certificates. In the event certificated Certificates are issued, the opinion will be printed on the reverse side of each Certificate.

Certain legal matters will be passed upon for the Underwriters by their counsel, Honigman Miller Schwartz and Cohn LLP, Detroit, Michigan.

A legal opinion addressing the United States federal income tax characterization of the Funding Trust, the Scheduled Payments and Service Charges to be received by the Funding Trust under the Service Contracts, and the income to be earned by the Service Corporations pursuant to the transactions described in this Offering Circular will be delivered by Mayer, Brown, Rowe & Maw LLP, New York, New York, as special U.S. federal tax counsel. A legal opinion on certain State of Michigan tax considerations relating to the purchase, ownership and disposition of the Certificates will be delivered by Honigman Miller Schwartz and Cohn LLP, as special Michigan tax counsel.

## LITIGATION

The City is a defendant in numerous lawsuits and is also subject to other claims. It has been the City's experience that lawsuits and claims are settled for amounts less than the stated demand. While it is not possible to determine the final outcome of these lawsuits and claims exactly, the City and its Law Department have estimated that the liability for all such litigation and claims approximates $121.9 million for governmental activities as of June 30, 2004.

The following are significant General Fund litigation matters which remain pending or have arisen since June 30, 2004.

*City of Detroit v Detroit Plaza Limited Partnership*. This is a condemnation action that was filed in September of 2000. The property owners in this case initially challenged the necessity of the acquisition. The City and the property owners ultimately reached an agreement for withdrawal of the necessity challenge, which allowed the case to proceed only on the question of valuation of the property. The respective appraised values for the property have served as the basis for the City's estimated just compensation and the property owners claims, and would indicate that a material expense to the City might result from any adverse verdict. The matter was tried in April 2004. A verdict of $25,000,000 was rendered by the jury. The City's estimated just compensation was $13,712,500, which had been previously paid by the City. The increase was approximately $11,287,500. A judgment was entered in May 2004. Motions for new trial, judgment notwithstanding the verdict and remittitur, along with the property owners' motion for attorneys fees, costs and case evaluation sanctions have been heard by the trial court. The trial court denied the City's motions for new trial and judgment notwithstanding the verdict, and granted the property owners motions for attorneys fees and costs. A claim of appeal was timely filed on October 12, 2004, and the trial transcripts have been ordered. The City intends to continue to vigorously prosecute this matter through appeal. The City believes that the trial court made a number of evidentiary rulings that were in error, but the ultimate outcome is difficult to assess at this time.

*Estate of Theodore Laroque*. This lawsuit arose out of a September 13, 1998 fatal police shooting by off-duty police officer Anthony Goree. After arguing with Officer Goree and his wife in front of the Goree

home, the decedent attempted to run down Officer Goree with his vehicle, at which time Officer Goree drew and fired his weapon four times, fatally wounding the decedent. The case was tried before a Wayne County Circuit Court jury in April 2001 on a 42 USC Sec. 1983 claim against Officer Goree. The City of Detroit was dismissed from the lawsuit as a result of prior dispositive motions. In May 2001, after a five-week trial, the jury rendered a verdict against Officer Goree in the amount of $6,000,000. No punitive damages were awarded. While the judgment was under appeal, with interest, costs and attorney fees the judgment was expected to approximate $10,000,000. With the City obligated to indemnify the defendant, the Detroit City Council has approved a signed agreement to settle the case for $5,000,000, and an order of dismissal has been entered in the Court of Appeals.

*Estate of Lamar Grable v Eugene Brown.* The suit arises out of a shooting incident in which the plaintiff's decedent died after being shot by Officer Brown. Both Officer Brown and his partner testified at trial that the decedent fired his weapon twice and struck Brown twice in his abdominal area. Judgment was entered on a jury verdict of $4,000,000 plus taxable costs of $18,510 and attorney fees of $255,055, against City of Detroit police officer Eugene Brown and in favor of the plaintiff. An appeal has been taken and is being vigorously pursued. The brief on behalf of Brown has been filed but the plaintiff-appellee's brief has not yet been filed.

*HRT Enterprises, et al v City of Detroit.* These consolidated inverse condemnation cases have two plaintiffs: HRT Enterprises, a Michigan partnership, the fee owner of the industrial property in question; and Steel Associates, Inc., a sub-tenant. The fee owner of the property seeks to compel the City to purchase the subject buildings. A separate case against the City was filed by Steel Associates, Inc. on July 8, 2002. The cases were consolidated for trial scheduled for November 5, 2003. The combined damages sought for the plaintiffs totaled $20,000,000. The court granted the City's summary disposition motion against HRT Enterprises, but allowed Steel Associates to proceed to trial. On November 17, 2003 a jury returned a verdict in Steel Associate's favor in the amount of $4,000,000 exclusive of statutory interest and costs. In addition, the court entered an order for case evaluation sanctions in the amount of $85,714, which is to be added to the judgment amount. The City's motion for new trial or judgment notwithstanding the verdict was denied on January 30, 2004. On December 23, 2003, HRT Enterprises filed a timely claim of appeal of right to the Michigan Court of Appeals from the trial court's grant of summary disposition in favor of the City. On February 19, 2004, the defendant City of Detroit filed a timely claim of appeal of right to the Michigan Court of Appeals from the jury verdict of $4,000,000 awarded to plaintiff Steel Associates, Inc. in its case. Steel Associates filed a cross-appeal from the trial court Order Denying Attorneys Fees and Costs under the Uniform Condemnation Procedures Act. Trial transcripts have been filed and this matter has been briefed in the Court of Appeals. The parties are awaiting a hearing date and ultimately issuance of an opinion by the Court of Appeals in this matter.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v City of Detroit, et al.* (two lawsuits). These are two similar lawsuits filed in July 2003 and July 2004 by the Retirement Board of the Police and Fire Retirement System over the contested amount of the City's required contribution obligation to the System for fiscal years 2002-2003 and 2003-2004, respectively. In the earlier case, the Wayne County Circuit Court ruled that the City must pay an additional $35 million into the System for fiscal 2002-2003, and in the later case the Court ruled, based primarily on the *collateral estoppel* effect of its prior decision, that the City must pay an additional $10 million into the System for fiscal year 2003-2004. The City appealed both decisions, which have been consolidated for hearing in the Michigan Court of Appeals. Oral argument occurred on May 3, 2005, and the cases have been submitted for decision. The City has meanwhile paid the disputed $35 million amount to the PFRS pursuant to a written agreement with the Retirement Board that if the decision is ultimately reversed on appeal, the payment will be refunded to the City with interest at the actuarially determined rate. In the consolidated pending appeals, the City claims that under applicable state law, City Charter and City ordinance provisions, its contribution obligation should be the amount determined by the System's consulting actuary, using the entry age normal actuarial methodology that permits an offset for any actuarial "excess" funding. The Board alleges that the City must instead pay the amount set by the Board, without any credit.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v. the City of Detroit.* The Retirement Board of the Police and Fire Retirement System of the City of Detroit filed this action in June 2004 for a declaratory judgment that the Board can impose a shorter amortization period for the City's funding of the System's unfunded accrued actuarial liabilities (UAALs) than that set forth in a 1974 City Ordinance, codified at Section 52-4-6(c) of the City Code. The ordinance and Section 52-4-6(c) prescribe a 30-year amortization period, to be reduced by one year each subsequent year until reaching, and thereafter maintaining, a 20-year amortization period. The Board alleged that the ordinance provision is permissive only, and that under an agreement entered into in 1992, the Board has the authority to establish amortization periods of less than 20 years. The Board, accordingly, had adopted a declining amortization policy such that the amortization period for computing the City's contribution for UAALs due June 30, 2006 would be 13 years. The City denied that there was such an agreement, and argued that under the City Code there cannot be an amortization period shorter than 20 years. Both sides moved for summary disposition, and on May 16, 2005, the Court granted summary disposition to the City and closed the case. The effect of the Court's decision is to require the City's contribution obligation to be determined using a 20-year amortization period, substantially longer than the amortization period imposed by the Board, resulting in a lower required annual contribution amount from the City than if the Board had prevailed. The period during which the Board may file an appeal has not yet expired, and no appeal was filed before the date of this Offering Circular.

*George Marshall Grace, et al v City of Detroit.* This is a class action lawsuit filed in April 1990 arising from the City of Detroit's residency requirement. The United States District Court held that the City unconstitutionally discriminated against applicants for employment who were not residents of the City of Detroit at the time they made application. The City ceased requiring residency upon application for employment and subsequently state law enacted in March 2000 now prohibits residency requirements in most respects. The claims of over four hundred class members have been adjudicated with a finding of liability in ninety-four of those claims. The Court ruled in favor of the City on the issue of mitigation of damages, but permitted the class to file an interlocutory appeal to the Sixth Circuit Court of Appeals, pursuant to *28 U.S.C. §1292b*. This relief is permissive and may or may not be granted by the Court of Appeals. In the interim, the District Court has ordered the parties to continue resolving the liability claimants, pending the outcome of the potential appeal. Because the Court found liability pursuant to *42 U.S.C. §1983*, the Court will award attorneys fees and costs to class counsel and the court-appointed special master. There have been no requests for attorneys fees or special master fees since the inception of this case. It is anticipated that these fees alone will exceed $2.5 million.

## UNITED STATES FEDERAL TAX CONSIDERATIONS

The following is a general discussion of certain U.S. federal tax considerations relating to the purchase, ownership and disposition of the Certificates. The discussion below does not deal with all U.S. federal tax considerations applicable to all categories of investors, some of which may be subject to special rules. In addition, this discussion is generally limited to investors who will hold Certificates as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the U.S. Internal Revenue Code of 1986, as amended (the **Code**), and who would be treated as holding the Funding Trust's right to receive COP Service Payments under the Service Contracts as a capital asset if they held such right directly. This discussion is limited to initial purchasers of Certificates. **Investors (including subsequent purchasers of Certificates) are strongly urged to consult their own tax advisors about the U.S. federal, state (including State of Michigan), local and other tax consequences of the purchase, ownership and disposition of Certificates.**

This discussion is based on the Code, administrative pronouncements, judicial decisions and existing and proposed U.S. Department of Treasury regulations. Prospective purchasers should note that no rulings have been or will be sought from the Internal Revenue Service (**IRS**) with respect to any of the U.S. federal tax consequences discussed below, and no assurance can be given that the IRS will not take contrary positions. Mayer, Brown, Rowe & Maw LLP has opined on none of the tax consequences discussed below except as expressly indicated below.

23

As used below, the term **"U.S. Certificateholder"** means a beneficial owner of a Certificate who is a citizen or resident of the United States or a U.S. domestic corporation, or a Certificateholder who otherwise will be subject to U.S. federal income taxation on a net basis in respect of the Certificates; and the term **"Non-U.S. Certificateholder"** means a beneficial owner of a Certificate other than a U.S. Certificateholder. Except as stated below, the following discussion does not address any tax consequences that apply specifically to a Non-U.S. Certificateholder.

### *Tax Status of the Funding Trust*

In the opinion of Mayer, Brown, Rowe & Maw LLP, the Funding Trust will be classified as a grantor trust within the meaning of Sections 671 through 679 of the Code. Accordingly, each Certificateholder will be treated for U.S. federal income tax purposes as the owner of an undivided *pro rata* interest in the payments in respect of the Service Contracts received or accrued by the Funding Trust that are attributable to the specific maturity of such Certificateholder's Certificate.

### *Tax Status of the COP Service Payments under the Service Contracts*

In the opinion of Mayer, Brown, Rowe & Maw LLP, payments (Scheduled Payments and Service Charges) in respect of the Service Contracts received by the Funding Trust will constitute payments in respect of indebtedness for U.S. federal income tax purposes. Accordingly, the Service Charges received by the Funding Trust under the Service Contracts will constitute interest in respect of indebtedness for U.S. federal income tax purposes.

### *Agreements Regarding Tax Status of the Funding Trust and*
### *COP Service Payments under the Service Contracts*

The City. In a written agreement the City agrees that, for all federal, state and local income, business, franchise and modified value added tax purposes, the Scheduled Payments and Services Charges are, and shall be treated by the City as, payments in respect of indebtedness for all such tax purposes (but the City expressly acknowledges and agrees that the Service Charges and Scheduled Payments made by the City under the Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or City charter limitation).

The Service Corporations. In the Trust Agreement for U.S. federal, state and local income, business, franchise and modified value added tax purposes, the Service Corporations agree that (i) the Funding Trust is a grantor trust under the Code, (ii) each Certificateholder of a Certificate will be treated as the owner of an undivided pro rata interest in the portion of the grantor Trust Estate attributable to such Certificateholder's Certificate(s), and (iii) the Funding Trust Receivables will constitute payments in respect of indebtedness (but the Service Corporations will expressly acknowledge and agree that the Services Charges and Scheduled Payments made by the City under the Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or City charter limitation).

Investors and Certificateholders. By purchasing or acquiring a Certificate, each investor and Certificateholder agrees that for all U.S. federal, state and local income, business, franchise and modified value added tax purposes, (i) the investor or Certificateholder will treat the Funding Trust as a grantor trust under the Code, (ii) each Certificateholder will be treated as the owner of an undivided pro rata interest in the portion of the grantor Trust Estate attributable to such Certificateholder's Certificate(s), and (iii) the investor or Certificateholder will treat the Funding Trust Receivables as payments in respect of indebtedness (and will thereby also acknowledge that the Services Charges and Scheduled Payments made by the City under the Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or City charter limitation).

## Tax Status of the Service Corporations

In the opinion of Mayer, Brown, Rowe & Maw LLP, the Service Corporations will either be treated as an integral part of the City or their gross income from the transactions described in this Offering Circular will constitute gross income described in Section 115 of the Code. Accordingly, the Service Corporations will not be subject to U.S. federal income taxation in respect of any income derived by the Service Corporations from the transactions described in this Offering Circular.

## U.S. Certificateholders

Interest Income. A U.S. Certificateholder will be required to recognize its allocable share of the Service Charges payable under the Service Contracts as interest income in accordance with the Certificateholder's method of tax accounting. Accordingly, a cash method U.S. Certificateholder will recognize its allocable share of the Service Charges as interest income at the time the Service Charges are received by the Funding Trust. An accrual method U.S. Certificateholder will recognize its allocable share of the Service Charges at the time the Service Charges are accrued by the Funding Trust.

Original Issue Discount. In the event that the face amount of a Certificate exceeds its issue price, the excess constitutes original issue discount (**OID**) provided that such excess equals or exceeds 0.25% of the face amount of the Certificate multiplied by the number of complete years to maturity of the Certificate (such Certificates being **OID Certificates**). The issue price of OID Certificates of a particular maturity is the first price at which a substantial amount of the OID Certificates of that maturity are sold (excluding sales to bond houses, brokers or underwriters). The issue price of Series A Certificates of each maturity is expected to be the amount set forth on the inside cover of this Offering Circular, but is subject to change based on actual sales.

With respect to a U.S. Certificateholder that purchases in the initial offering an OID Certificate, the amount of OID that accrues in respect of the OID Certificate during any accrual period equals (i) the adjusted issue price of the OID Certificate at the beginning of the accrual period, multiplied by (ii) the yield to maturity of the OID Certificate, less (iii) the stated interest payable on the OID Certificate during the accrual period. The "accrual periods" of an OID Certificate generally correspond to the six-month intervals ending on the June 15 and December 15 interest payment dates on the OID Certificate, with a first long accrual period from the Closing Date to December 15, 2005. The "adjusted issue price" of an OID Certificate at the beginning of any accrual period equals the issue price of the OID Certificate, plus the amount of OID that has accrued on the OID Certificate on a constant-yield basis in all prior accrual periods, minus the amount of any Scheduled Payments received on the OID Certificate in prior accrual periods. The "yield to maturity" of an OID Certificate is determined on the basis of compounding at the end of each accrual period and properly adjusted for the length of the accrual period.

The amount of OID so accrued on an OID Certificate during a particular accrual period will be divided by the number of days in the accrual period to derive a "daily portion." A U.S. Certificateholder who owns an OID Certificate must include as ordinary income the daily portions of OID that accrue on the OID Certificate for each day during the taxable year on which the U.S. Certificateholder owns the OID Certificate. Such an inclusion in advance of receipt of the cash attributable to the income is required even if the U.S. Certificateholder is on the cash method of accounting for U.S. federal income tax purposes. The amount of OID includible in a U.S. Certificateholder's income will increase the U.S. Certificateholder's tax basis in the OID Certificate for purposes of determining the U.S. Certificateholder's gain or loss upon a sale, exchange or redemption of the OID Certificate.

Trustee's Fees and Expenses. In general, each U.S. Certificateholder will be entitled to deduct, consistent with its method of tax accounting, its *pro rata* share of fees and expenses, if any, paid or incurred by the Funding Trust as provided in Sections 162 or 212 of the Code. The U.S. federal income tax treatment of the Trustee's fees is unclear, and prospective U.S. Certificateholders should consult their own tax advisors regarding such treatment, including the effect of the possible treatment of the Trustee's fees as having been

25

constructively received by the Funding Trust from the City (followed by the constructive payment of such fees by the Funding Trust).

If a U.S. Certificateholder is an individual, estate or trust, the deduction for the Certificateholder's share of the fees and expenses, if any, paid or incurred by the Funding Trust, including the Trustee's fees, will be allowed only to the extent that all of the Certificateholder's miscellaneous itemized deductions exceed 2% of the Certificateholder's adjusted gross income. In addition, in the case of U.S. Certificateholders who are individuals, certain otherwise allowable itemized deductions will be subject generally to additional limitations on itemized deductions under the applicable provisions of the Code.

Sale or Other Disposition of a Certificate. Upon the sale, exchange or redemption of a Certificate owned by a U.S. Certificateholder, the Certificateholder will recognize gain or loss in an amount generally equal to the difference between the amount realized by the Certificateholder on the sale, exchange or redemption and the Certificateholder's adjusted tax basis in its Certificate. A U.S. Certificateholder's adjusted tax basis in its Certificate will equal the price paid by the Certificateholder for the Certificate (excluding the portion of such price, if any, attributable to accrued interest on the Certificate), increased by any amounts includible in income by the Certificateholder as OID on the Certificate, and reduced by the Certificateholder's allocable share of Scheduled Payments received by the Funding Trust under the Service Contracts. In general, any such gain or loss recognized by a U.S. Certificateholder would be capital gain or loss, and will be long-term capital gain or loss if the Certificateholder held the Certificate for more than one year.

### Non-U.S. Certificateholders

A Non-U.S. Certificateholder that has no connection with the United States other than holding a Certificate will not be subject to U.S. withholding or income tax with respect to the Certificate; provided, with respect to interest (including OID), that the Funding Trust's rights to receive COP Service Payments under the Service Contracts are considered "portfolio debt investments" (as defined in Sections 871(h) and 881(c) of the Code) and that such Certificateholder provides an appropriate statement (generally on IRS Form W-8BEN), signed under penalties of perjury, identifying the Non-U.S. Certificateholder and stating, among other things, that such Certificateholder is a non-U.S. person. Special certification rules may apply to non-U.S. partnerships or trusts (or entities that are so treated for U.S. federal tax purposes). If these conditions are not met, a 30% withholding tax will apply to interest (including OID) unless an income tax treaty reduces or eliminates such tax or unless the interest is effectively connected with the conduct of a trade or business within the United States by such Certificateholder and certain other requirements are met. In the latter case, the Non-U.S. Certificateholder will be subject to U.S. federal income tax with respect to all income attributable to the Certificate at regular rates then applicable to U.S. taxpayers (and, in the case of corporations, possibly also the branch profits tax). A Non-U.S. Certificateholder will not be considered engaged in a United States trade or business solely by reason of holding a Certificate.

### Information Reporting and Backup Withholding

Information reporting to the IRS generally will be required with respect to amounts distributed by the Funding Trust to Certificateholders other than corporations and other exempt recipients. A "backup" withholding tax at the rates described below will apply to those payments if such Certificateholder fails to provide certain identifying information (such as the Certificateholder's taxpayer identification number) to the Trustee. Non-U.S. Certificateholders generally will be required to comply with applicable certification procedures to establish that they are not U.S. Certificateholders in order to avoid the application of such information reporting requirements and backup withholding. Any amount withheld under the backup withholding rules will be allowable as a credit against the Certificateholder's U.S. federal income tax, provided that the required information is provided to the IRS. The current backup withholding rate of 28% applies to payments made through the year 2010. For payments made after the year 2010, the backup withholding rate will be increased to 31%.

26

### *State and Other Tax Consequences*

In addition to the U.S. federal income tax consequences described above, potential investors should consider the state, local and foreign tax consequences of the acquisition, ownership and disposition of the Certificates offered under this Offering Circular. State tax law may differ substantially from the corresponding U.S. federal tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state, local, foreign or other jurisdiction. **Each Certificateholder is strongly urged to consult its own tax advisor with respect to all aspects of the U.S. federal, state (including State of Michigan), local and foreign tax treatment of the purchase, ownership and disposition of a Certificate.**

### *ERISA Considerations*

The Employee Retirement Income Security Act of 1974, as amended (**ERISA**), imposes certain fiduciary and prohibited transaction restrictions on employee pension and welfare benefit plans subject to ERISA (**ERISA Plans**). Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on, among other things, tax-qualified retirement plans described in Section 401(a) of the Code (**Qualified Retirement Plans**) and on Individual Retirement Accounts described in Sections 408(a) and (b) and 408A of the Code (collectively, **Tax-Favored Plans**).

Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA) and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA requirements. Accordingly, assets of such plans may be invested in Certificates without regard to the ERISA considerations described below, subject to the provisions of applicable federal and state law. Any such plan which is a Qualified Retirement Plan and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in the Code.

In addition to the imposition of general fiduciary requirements (including those of investment prudence and diversification, and the requirement that a plan's investment be made in accordance with the documents governing the plan), Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of ERISA Plans, Tax-Favored Plans and entities whose underlying assets include plan assets by reason of ERISA Plans or Tax-Favored Plans investing in such entities (collectively, **Benefit Plans**) and persons who have certain specified relationships to the Benefit Plans (**Parties in Interest** or **Disqualified Persons**), unless a statutory or administrative exemption is available. Certain Parties in Interest (or Disqualified Persons) that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed pursuant to Section 502(i) of ERISA (or Section 4975 of the Code) unless a statutory or administrative exemption is available.

Certain transactions involving the purchase, holding, or transfer of Certificates might be deemed to constitute prohibited transactions under ERISA and the Code if assets of the City or the Funding Trust were deemed to be assets of a Benefit Plan. Under a regulation issued by the United States Department of Labor (**Plan Asset Regulation**), the assets of the City, the Service Corporations or the Funding Trust would be treated as plan assets of a Benefit Plan for the purposes of ERISA and the Code only if the Benefit Plan acquires an "equity interest" in the City, the Service Corporations or the Funding Trust and none of the exceptions contained in the Plan Assets Regulation is applicable.

An equity interest is defined under the Plan Asset Regulation as an interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Although there can be no assurances in this regard, it appears that the Certificates should be treated as debt without substantial equity features for purposes of the Plan Asset Regulation. Although also not free from doubt, it also appears that, so long as the Certificates retain a rating of at least investment grade, they should continue to be treated as indebtedness without substantial equity features for the purposes of the Plan Asset Regulation.

13-53846-tjt   Doc 3153-2   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 32 of 100

However, without regard to whether the Certificates are treated as an equity interest for such purposes, the acquisition or holding of Certificates by or on behalf of a Benefit Plan could be considered to give rise to a prohibited transaction if the City, the Service Corporations or the Funding Trust, or any of their affiliates, is or becomes a Party in Interest or a Disqualified Person with respect to such Benefit Plan. A prohibited transaction could also occur in the event that a Benefit Plan transfers a Certificate to a Party in Interest or a Disqualified Person. In such case, certain exemptions from the prohibited transaction rules could be applicable depending on the type and circumstances of the plan fiduciary making the decision to acquire a Certificate. Included among these exemptions are: Prohibited Transaction Class Exemption (**PTCE**) 96-23, regarding transactions effected by "in-house asset managers;" PTCE 90-1, regarding investments by insurance company pooled separate accounts; PTCE 95-60, regarding transactions effected by "insurance company general accounts;" PTCE 91-38, regarding investments by bank collective investment funds; and PTCE 84-14, regarding transactions effected by "qualified professional assets managers."

A transferee (including any purchaser in the initial transfer of the Certificates) of the Certificates or any interest therein, who is a trustee of or is acting on behalf of a Benefit Plan or who is using Benefit Plan assets to effect such transfer, will be deemed to represent that: (i) at the time of such transfer the Certificates are rated at least investment grade and such transferee believes that the Certificates are properly treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulation, and agrees to so treat the Certificates, or (ii) such transferee's acquisition and holding of the Certificates do not result in a violation of the prohibited transaction rules of Section 406 of ERISA or Section 4975 of the Code because the transaction is covered by an applicable exemption, including PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. In addition such transferee will be deemed to represent that neither the City, either Service Corporation or any provider of credit support nor any of their affiliates is a Party in Interest with respect to such Benefit Plan.

Alternatively, a prospective transferee of the Certificates or any interest therein who is a trustee of, or who is acting on behalf of, a Benefit Plan, or who is using Benefit Plan assets to effect such transfer, may provide the City, the Service Corporations or the Funding Trust, as applicable, an opinion of counsel satisfactory to such trustee, which opinion will not be at the expense of the City, the Service Corporations or the Funding Trust, that the purchase, holding and transfer of the certificates or interests therein is permissible under applicable law, and will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject the City, the Service Corporations or the Funding Trust to any obligation in addition to those undertaken in the Service Contracts or the Trust Agreement, as applicable.

Any ERISA Plan fiduciary considering whether to purchase Certificates on behalf of an ERISA Plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code to such investment and the availability of any of the exemptions referred to above. Persons responsible for investing the assets of Tax-Favored Plans that are not ERISA Plans should seek similar counsel with respect to the prohibited transaction provisions of the Code. Moreover, each Benefit Plan fiduciary should take into account, among other considerations:

- whether the fiduciary has the authority to make the investment;

- whether the investment constitute a direct or indirect transaction with a Party in Interest

- the diversification by type of the assets in the Benefit Plan's portfolio;

- the Benefit Plan's funding objectives;

- the tax effect of the investment; and

- whether under the general fiduciary standards of investment procedure and diversification an investment in the securities is appropriate for the Benefit Plan, taking into account the overall investment policy of the Plan and the composition of the Benefit Plan's investment portfolio.

## CONTINUING DISCLOSURE

The City will undertake, for the benefit of the beneficial owners of the Certificates, to provide an annual report presenting certain financial information and operating data about the City (**Annual Report**). By about January 26 of each year, the City will send the Annual Report to each nationally recognized municipal securities information repository (**NRMSIR**) and Michigan's State Information Depository (**SID**), in each case as designated from time to time by the United States Securities and Exchange Commission (the **SEC**). The City will also provide notices of the occurrence of certain events specified in the undertaking to each NRMSIR, or the Municipal Securities Rulemaking Board (**MSRB**), and to any SID. A copy of the undertaking is set forth in APPENDIX H.

In order to provide continuing disclosure with respect to the Certificates in accordance with such undertaking and with Rule 15c2-12 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, the City has entered into a Disclosure Dissemination Agent Agreement (**Disclosure Dissemination Agreement**) for the benefit of the beneficial owners of the Certificates with Digital Assurance Certification, L.L.C. (**DAC**), under which the City has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent that the City has provided such information to the Disclosure Dissemination Agent as required by the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the contents of any disclosures made or notice given pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Report, any audited financial statements, notice or voluntary report, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the beneficial owners of the Certificates or any other party. The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent any specified event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

Copies of the notices may be obtained from:

| | |
|---|---|
| *Mail:* | DAC Digital Assurance Certification<br>390 N. Orange Avenue, 17th Floor<br>Orlando, FL 32801 |
| *Attn:* | Jenny Emami<br>Client Service Manager |
| *Phone:* | 407-515-1100 |
| *E-mail:* | jemami@dacbond.com |
| *Web site:* | www.dacbond.com |

The undertaking also describes the consequences if the City fails to provide any required information. A failure by the City to comply with the undertaking must be reported by the City in accordance with Rule 15c2-12 and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the Certificates in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of the Certificates and the market price therefor.

29

Since its fiscal year ended June 30, 1999, the City has been unable to meet its obligation to provide annual financial information within the periods specified in the applicable continuing disclosure agreements. The annual financial information for the fiscal years ended June 30, 1999 through 2004 was filed on May 10, 2000, May 28, 2001, May 31, 2002, March 10, 2003, February 9, 2004 (for water supply system bonds and sewage disposal bonds), March 1, 2004 (for other bonds), February 16, 2005 (for water supply system bonds and sewage disposal bonds), and May 5, 2005 (for other bonds).

Dated: May 25, 2005

**CITY OF DETROIT**

By:     __/S/ Sean K. Werdlow_____

Its:    Finance Director

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:     __/S/ Sean K. Werdlow_____

Title:  President

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

By:     __/S/ Sean K. Werdlow_____

Title:  President

## APPENDIX A

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS, THE CONTRACT ADMINISTRATION AGREEMENT AND THE TRUST AGREEMENT

The summaries of certain provisions of the Service Contracts, the Contract Administration Agreement and the Trust Agreement set forth below do not purport to be complete and are qualified by reference to the complete text of such documents. All capitalized terms used in this APPENDIX A, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement, the Contract Administration Agreement and the forepart of this Offering Circular.

## DEFINITIONS OF CERTAIN TERMS

All capitalized terms that are defined in the Offering Circular which precedes this APPENDIX A have the same meaning in this Appendix, unless the context otherwise indicates. All other capitalized terms used in this Appendix, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement and the Contract Administration Agreement. Certain of those terms are defined as follows, unless the context clearly otherwise requires.

**Additional Service Payments** means such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporations as authorized or permitted by the Funding Ordinance plus compensation, expenses and indemnification due the Trustee under the Trust Agreement and certain amounts payable by the Corporation to the Enforcement Officer and the Insurers under the Contract Administration Agreement.

**Authorized Denominations** means (a) for Series A Certificates, denominations of $5,000 and any multiple thereof; and (b) for Series B Certificates, denominations of $25,000 and multiples of $1,000 in excess thereof.

**Authorized Investments** means direct obligations of, or obligations unconditionally guaranteed by, the United States of America (**US Governments**) and repurchase agreements whereby the counterparty agrees to repurchase US Governments so long as the obligations to be repurchased are under the exclusive "control" (as defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) of the Service Corporation. STRIPS issued by the United States Treasury are **Authorized Investments,** but private proprietary stripped US Governments, whether interest or principal strips, are not Authorized Investments.

**Beneficial Owner** means any Person who indirectly owns Certificates pursuant to Part 5 of Article 8 of the Michigan Uniform Commercial Code.

**Certificates** or **Certificates of Participation** mean the Certificates of Participation issued by the Funding Trust representing beneficial interests in the Service Payments other than Hedge Payables, Contract Administrator Payments and Additional Service Payments (*i.e.*, beneficial interests in the Funding Trust Receivables only).

**Contract Administrator Payments** means amounts equal to amounts payable as fees, expenses and indemnification of the Contract Administrator in accordance with the Contract Administration Agreement, including reasonable fees and expenses of its counsel, in connection with any waiver or consent thereunder or any amendment thereof or of a Service Contract, or in connection with the enforcement thereof.

**Credit Insurance** means any insurance intended to protect owners of Certificates from loss arising from a failure of the City to timely pay Service Charges or Scheduled Payments. **Credit Insurance** also means any financial arrangement intended to protect a Hedge Counterparty from a failure of a Service Corporation to timely pay any Hedge Payable.

**Creditor Lien** means any lien or security interest granted by the Contract Administration Agreement in the amounts payable by the City under the Service Contracts in respect of Hedge Payables, including rights to proceeds and rights of enforcement, and granted by the Trust Agreement in Funding Trust Receivables.

**Deficiency** means any unsatisfied amount under the following clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - Preservation of Parity among Service Contracts" below in this Appendix: **First** (to the extent of any fees, expenses and indemnity is at the time due and unpaid to the Contract Administrator), **Second**, **Fourth** and **Sixth**.

**Enforcement Officer** means the same entity who is acting as the Contract Administrator but in its separate capacity as the Enforcement Officer under provisions of the Contract Administration Agreement which apply only if and when all Insurers are in default under their respective Credit Insurance.

**Fixed Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Fixed Rate Service Charges.

**Fixed Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a fixed rate methodology.

**Funding** means the Service Corporation's funding the Stated Funding Amount by the provision of money through the issuance of Certificates.

**Funding Costs** has the meaning given within the definition of "Service Charges" below.

**Funding Rate Portion** means the Fixed Rate Funding Portion or the Variable Rate Funding Portion as the context may require.

**Funding Trust Receivables** means any Principal Related Receivables or Interest Related Receivables. (This corresponds to the right to receive COP Service Payments payable by the City under each Service Contract.)

**Hedge Amount** means, in connection with any Optional Prepayment of Scheduled Payments, the amount, if any, of any Hedge Termination Payable that will be owed by the Service Corporation pursuant to any Stated Hedge relating to the Scheduled Payments being prepaid as a result of any required reduction in the notional amount of such Stated Hedge due to such prepayment and the Hedge Periodic Payable, if any, accrued to the date of termination.

**Hedge Counterparty** means the particular counterparty as to any Stated Hedge.

**Hedge Payable** means, after giving effect to any netting under the particular Stated Hedge, any Hedge Periodic Payable or any Hedge Termination Payable as the context may require.

**Hedge Periodic Payable** means, after giving effect to any netting under the particular Stated Hedge, a periodic amount owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Periodic Receivables** means, after giving effect to any netting under the particular Stated Hedge, periodic payments owing by the Hedge Counterparty under a Stated Hedge.

**Hedge Receivable** means any Hedge Periodic Receivable or Hedge Termination Receivable as the context may require.

**Hedge Termination Payable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Termination Receivable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Hedge Counterparty under a Stated Hedge.

**Insurer** means the Person obligated under Credit Insurance to make payments with respect to Certificates or a Stated Hedge.

**Interest Related Receivable** means an amount owing by the City as a Service Charge, including any Accrued Service Charges. (This corresponds to interest on the Certificates.)

**Participant** means any Person whose ownership of Certificates and other securities is shown on books of the Securities Depository.

**Payment Time** means 12:00 noon, Detroit, Michigan time.

**Principal Related Receivable** means an amount owing by the City as a Scheduled Payment (whether a Regular Scheduled Payment or a Sinking Fund Installment) or an Optional Prepayment Amount exclusive on any prepayment premium. (These correspond to principal of the Certificates.)

**Scheduled Payments** means the payments specified and so defined in each Service Contract Specific Terms. (These correspond to principal of the Certificates.)

**Service Charge Class** means all Scheduled Payments that have the same methodology for determining related Service Charges..

**Service Charges** means the amounts payable under the Service Contract by the City to the Service Corporation on Service Charge Payment Dates sufficient to pay the periodic costs of capital (**Funding Costs**) incurred by the Funding Trust for the particular Funding. (This corresponds to interest on the Certificates.) **Service Charges** do not include Hedge Payables.

**Service Contract Priority Sections** means those particular numbered clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - Preservation of Parity among Service Contracts" below in this Appendix.

**Service Payments** has the meaning given under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Service Payments*" below.

**Stated Funding Amount** means the total amount to be funded by the Service Corporation in the Initial Funding or in an Additional Funding, as applicable.

**Stated Hedge** means a variable to fixed interest rate swap agreement permitted by the Funding Ordinance and specified in a Service Contract, entered into between a Service Corporation and a Hedge Counterparty.

**Trust Estate** means the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all proceeds of the foregoing.

**Variable Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Variable Rate Service Charges.

**Variable Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a variable rate methodology.

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS

There are two separate and distinct Service Contracts. One is called the General Retirement System Service Contract 2005, between Detroit General Retirement Service Corporation (the **GRS Service Corporation**) and the City of Detroit. The other is called the Police and Fire Retirement System Service

Contract 2005, between Detroit General Retirement Service Corporation (the **PFRS Service Corporation**) and the City of Detroit. Each Service Contract is comprised of its own two documents, called the General Terms (dated as of May 1, 2005) and the Specific Terms (dated May 25, 2005), which operate together as if they were combined in a single document.

Although separate and distinct, the two Service Contracts are similar in form and substance, and the summary below fits each Service Contract. The ways in which the two Service Contracts differ from each other (*e.g.*, they provide for funding the different Subject UAAL amounts of two different Retirement Systems and consequently have different Service Corporations as a party and different Funding Amounts) are not affected by the generality of the summary below. This summary should be read in the context of describing either one of the two Service Contracts, and not in the context of describing both of them collectively. Thus, for example, the term "the Service Corporation" when used in the summary below means the GRS Service Corporation if the summary is read in the context of describing its Service Contract, or otherwise means the PFRS Service Corporation if the summary is read in the context of describing its Service Contract. Similarly, for example, the term "Subject UAAL" when used in the summary below means the Subject UAAL of the General Retirement System of the City of Detroit if the summary is read in the context of describing the GRS Service Corporation's Service Contract, or otherwise means the Subject UAAL of the Police & Fire Retirement System of the City of Detroit if the summary is read in the context of describing the PFRS Service Corporation's Service Contract.

### Service and Funding Arrangements

#### *Provision of Services*

The services of the Service Corporation consist of reducing the financial burden of the Subject UAAL to the City in the current and in future years. The Service Corporation agrees in the Service Contract to provide its services through taking the following actions: (a) the Service Corporation shall fund the Stated Funding Amount on the Closing Date (the **Initial Funding**) and, in addition, if applicable, (b) the Service Corporation shall fund any Hedge Termination Payable in whole or in part as requested of the City and approved by the City Council, and/or (c) the Service Corporation shall fund a reduction or rescheduling (or both) of Service Payments as requested by the City and approved by City Council (funding pursuant to this clause (c) or the preceding clause (b), an **Additional Funding**). An Additional Funding may include such things in the nature of Costs of Issuance, Prepaid Service Charges and Underwriters' Discount as authorized or permitted by the approval of the City Council of the Additional Funding.

"Funding" as used above means the provision of money through the issuance of Certificates and does not mean or imply any further authorization of the City to make any Contract Payment other than Contract Payments in connection with any Additional Funding.

#### *Payment Obligation*

The City agrees to make Contract Payments to the Service Corporation in return for the present and future services of the Service Corporation as and when Contract Payments become due and payable. The obligations of the City under the Service Contract, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City, and are not general obligations of the City to which the City has pledged its full faith and credit.

#### *Funding Obligation*

The obligation of the Service Corporation to provide the Initial Funding or any Additional Funding is subject to the receipt by the Service Corporation of proceeds sufficient for the Funding from the sale of Certificates. The Service Corporation shall use its best efforts to cause the consummation of the offering and sale by the Underwriters of Certificates to provide sufficient proceeds for the particular

Funding. For the Initial Funding, the Service Corporation shall cause a portion the proceeds of the sale of Certificates in an amount equal to the Subject UAAL to be paid to the applicable Retirement System on the Closing Date and shall apply the balance of such proceeds to pay costs of issuance of the Certificates and other Ancillary Amounts.

**Scheduled Payments**

### *Scheduled Payments*

The City agrees to pay the Scheduled Payments of each Funding Rate Portion to the Service Corporation on the respective Scheduled Payment Dates for such Funding Rate Portion. (Scheduled Payments do not include Hedge Payables.)

### *Mandatory Prepayment by Sinking Fund Installments*

The City agrees to prepay Scheduled Payments of each Funding Rate Portion in specified amounts (**Sinking Fund Installments**) and on specified dates (**Sinking Fund Installment Dates**).

### *Optional Prepayment of Scheduled Payments*

The City shall not voluntarily prepay any Scheduled Payments of a Funding Rate Portion (an **Optional Prepayment**) in whole or in part except as expressly permitted in the Service Contract. The City shall exercise its option to make any Optional Prepayment by delivering a prior written **Prepayment Notice** at least 45 days (or fewer days as acceptable to the Service Corporation) before the Optional Prepayment Date on which the City shall pay the Total Prepayment Amount to the Service Corporation in connection with such Optional Prepayment, stating: (a) the Scheduled Payments of the particular Funding Rate Portion to be prepaid in whole or in part by such Optional Prepayment and the date on which such Scheduled Payments are to be prepaid (**Optional Prepayment Date**), subject to the following:

(1)   a Scheduled Payment may be selected by the City only if it is permitted by the Service Contract to be prepaid on the particular Optional Prepayment Date and

(2)   a Scheduled Payment may be selected by the City for partial prepayment only in an amount of at least $100,000 unless otherwise provided in the Service Contract;

(b) the amount of prepayment premium, if any, required by the Service Contract in connection with the prepayment of any selected Scheduled Payments (such prepayment premium, if any, together with the amount of Scheduled Payments selected to be prepaid, the **Optional Prepayment Amount**); (c) if an Optional Prepayment Date is not a Service Charge Payment Date, the amount of Service Charges accrued on the amount of the Scheduled Payment to be prepaid from the last Service Charge Payment Date before the Optional Prepayment Date to the Optional Prepayment Date (**Accrued Service Charges**); (d) the Hedge Amount, if any, and (e) such information in tabular or other form so as to readily permit the Service Corporation to identify (i) the Scheduled Payments of the particular Funding Rate Portion selected for prepayment, (ii) the provisions of the Service Contract authorizing or permitting such prepayment, (iii) the prepayment premium, if any, required to be paid in connection with the prepayment of each such Scheduled Payment, (iv) Accrued Service Charges, if any due in connection with such prepayment, and (v) the Hedge Amount, if any, due in connection with such prepayment.

If a Hedge Amount would be due in connection with an Optional Prepayment, it is a condition precedent to the City giving an Optional Prepayment Notice that the City provide reasonable evidence satisfactory to the Service Corporation that such Hedge Amount will be paid when due and such prepayment will not cause the Service Corporation to be in default under any agreement to which it is a party in connection with the particular Funding.

A-5

The delivery by the City of a Prepayment Notice to the Service Corporation is a statement of the City's intention to pay the Total Principal Amount to the Corporation on the day before the Optional Prepayment Date stated therein (**Prepayment Receipt Day**). The City is prohibited from paying the Total Prepayment Amount to the Service Corporation on any day prior to the Prepayment Receipt Day. Its delivery of a Prepayment Notice does not obligate the City to pay the Total Prepayment Amount, and no default shall occur by its not paying the Total Prepayment Amount or by the Optional Prepayment not otherwise being effected on the Prepayment Receipt Date.

*Satisfaction of Scheduled Payments by Delivery of Certificates*

The City may deliver or cause to be delivered Certificates to the Service Corporation in satisfaction (whether in whole or in part) of Scheduled Payments at any time and in any denomination upon 45 day's prior notice to the Service Corporation (or fewer days as acceptable to the Service Corporation) (a **Delivery Notice**) subject to the following limitations. A Scheduled Payment may be satisfied by delivery of Certificates entitled to payment from such Scheduled Payment (**Eligible Certificates**). The amount of a Scheduled Payment deemed paid shall be equal to the denominations of the particular Eligible Certificates.

No Certificate shall be delivered in payment in whole or in part of the respective Scheduled Payment (whether as payment of a Sinking Fund Installment or as other prepayment) more than 45 days before the respective due date if at the time of such delivery the City has not paid all Service Payments then and theretofore due. No Scheduled Payment shall be satisfied by the delivery of Certificates until such Certificates have been delivered to the Trustee.

If Sinking Fund Installments are to be satisfied (whether in whole or in part) by the delivery of Eligible Certificates, the City shall indicate in the respective Delivery Notice the particular Sinking Fund Installments and amounts thereof to be so satisfied. All Certificates so received by the Service Corporation in payment of Scheduled Payments shall be immediately delivered to the Trustee for cancellation.

**Service Charges**

*Agreement to Pay Service Charges; Funding Costs*

The City agrees to pay Service Charges to the Service Corporation on Service Charge Payment Dates sufficient to pay the Funding Costs incurred by the Funding Trust for the particular Funding. (Service Charges do not include Hedge Payables.) Funding Costs shall be determined by the particular Funding Rate Methodology (fixed or variable). Funding Costs for a Variable Rate Funding Portion shall be periodically determined in accordance with the Variable Rate Funding Methodolog, and the corresponding periodic Service Charges shall be **Variable Rate Service Charges**.

*Prepaid Service Charges; Hedge Receivables*

Prepaid Service Charges shall be used to meet the City's obligation to pay the first occurring Service Charges and Hedge Periodic Receivables Payables of the Service Corporation except as otherwise may be provided in the Service Contract Specific Terms. Hedge Receivables received by the Service Corporation shall be used to satisfy the City's obligation in respect of then existing Deficiencies or then current Service Charges not otherwise paid.

**Fixed Rate Funding Methodology**

The provisions summarized under this heading constitute the **Fixed Rate Funding Methodology**. The particular Service Contract Specific Terms shall state the dates (**Fixed Rate Service Charge Payment**

**Dates**) on which the Fixed Rate Service Charges are payable. The Fixed Rate Service Charges applicable to the Fixed Rate Funding Portion shall be set forth for the respective Scheduled Payments comprising the Fixed Rate Funding Portion (**Fixed Rate Scheduled Payments**). Fixed Rate Service Charges may be different for different Scheduled Payment Dates in the Fixed Rate Funding Portion.

Fixed Rate Service Charges shall be computed as if the Fixed Rate Scheduled Payments bore interest at the respective rates at which Fixed Rate Service Charges are determined and computed on the basis of a 360-day year consisting of twelve 30-day months. On each Fixed Rate Service Charge Payment Date, the City shall pay a Fixed Rate Service Charge equal to the Fixed Rate Service Charge accrued on the respective unpaid Fixed Rate Scheduled Payments from the later of the Closing Date or the last Fixed Rate Service Charge Payment Date on which Fixed Rate Service Charges were paid in full by the City.

**Variable Rate Funding Methodology**

The provisions summarized under this heading constitute the **Variable Rate Funding Methodology**. The periodic Variable Rate Service Charge for each Scheduled Payment specified for a particular type of Service Charge Class in the Variable Rate Funding Portion (**Variable Rate Scheduled Payments**) shall be determined in accordance with the particular Variable Rate Funding Type. Each Service Contract Specific Terms shall provide for a procedure by which the Variable Rate Service Charges are determined for the particular Variable Rate Funding Type and shall further provide:

- **Variable Rate Service Charge Payment Dates**: the dates on which the Variable Rate Service Charges are payable for such Type;

- **Service Charge Determination Dates**: the dates on which the Variable Rate Service Charges of such Type are determined;

- **Service Charge Adjustment Dates**: the dates on which the Variable Rate Service Charges of such Type are adjusted; and

- **Day Count Convention**: the number of days in a month and in a year used to determine the amount of the Variable Rate Funding Service Charges of such Type.

Variable Rate Service Charges for each Variable Rate Funding Type in the Variable Rate Funding Portion shall be computed as if the Variable Rate Scheduled Payments of the particular Variable Rate Type bore interest at a rate (i) determined as of each Service Charge Determination Date for such Type and effective as of the respective Service Charge Adjustment Date for such Type and (ii) computed using the applicable Day Count Convention for such Type. On each Variable Rate Service Charge Payment Date for a particular Type the City shall pay a Variable Rate Service Charge equal to the applicable Variable Rate Funding Costs accrued on the unpaid Variable Rate Funding Scheduled Payments of that Type from the later of the Closing Date or the last applicable Variable Rate Funding Service Charge Payment Date on which the Variable Rate Funding Service Charges of that Type were paid in full by the City.

**General Provisions Governing Service Payments**

*City's Payment Times*

The City shall make all Service Payments other than Contract Administrator Payments by the Payment Time on the day before the date when due. The City shall make all Contract Administrator Payments on the date when due. The City shall pay the amount of any Hedge Payable to the Service Corporation promptly upon receipt of notice thereof from the Service Corporation; provided, that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

A-7

### Subrogation

No payment of any amount to a Certificateholder or a Hedge Counterparty made from an amount paid by an Insurer under its Credit Insurance (a **Credit Insurance Payment**) shall discharge the City's obligation to pay any Service Payment in respect of which such Credit Insurance Payment was paid (a **Related Service Payment**). An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders or a Hedge Counterparty, as the case may be, to receive the Related Service Payment and shall be entitled to exercise all rights that the Person to which it is the subrogee would have otherwise been entitled to exercise.

### Investment

The Service Corporation shall not invest any amounts received by it under the Service Contract except as summarized under this heading. **Invest** means the transfer, disposition or other use of such amounts in expectation of gain. **Investable Funds** (being amounts representing Costs of Issuance and Prepaid Service Charges) shall be invested by the Service Corporation in Authorized Investments that mature in the amounts and at the times the related Investable Funds are needed to make the payments for which such funds were received by the Service Corporation. Investments shall be made by Funding Rate Portion but may be commingled for investment purposes so long as records are kept showing each particular Funding Rate Portion and the gain and loss attributable to it. No Authorized Investment shall be sold prior to its maturity. Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it.

All Investments shall be made directly by the Service Corporation having exclusive control over the related securities Component (as such terms are defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) except that Investments may also be made through one or more investment companies registered under the Investment Companies Act of 1940, as amended, if (i) such investment company has a rating by Standard & Poor's Corporation or any national statistical ratings organization (as defined by the Securities and Exchange Act of 1934, as amended, or any successor to it) at least equal to the rating of the Authorized Investment and (ii) such registered investment company invests only in debt instruments.

Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it. Gain shall be paid to the City when realized to the extent it is not needed to satisfy any then existing Deficiency or satisfy any then current Service Payment. The City is responsible for all such loss and shall reimburse the Service Corporation for such loss upon its demand.

### Binding Obligation

The Service Contract is a continuing obligation of the City and shall until the date on which all amounts due and owing thereunder are paid in full (a) be binding upon the City and its successors and (b) inure to the benefit of and be enforceable by the Service Corporation, its successors and permitted assigns, and by Third Party Beneficiaries.

### Satisfaction of Service Payments

### Service Payments

**Service Payments** consist of the following components (each a separate **Component** or **Service Payment Component**):

- Contract Administrator Payments
- Service Charges (regardless of the Funding Rate Methodology)
- Regular Scheduled Payments

- Sinking Fund Installments
- amounts in respect of Hedge Periodic Payables
- amounts in respect of Hedge Termination Payables
- Optional Prepayments
- Accrued Service Charges

*Preservation of Parity among Service Contracts*

As used in the summary under this heading:

- **all Service Contracts** means the Service Contract and the Other Service Contract;

- **each Service Contract** means the Service Contract or the Other Service Contract as the context may require;

- **each Service Corporation** means the Service Corporation or the Other Service Corporation as the context may require;

- **the Other Service Contract** means the service contract between the City and the Other Service Corporation for the funding of unfunded accrued actuarial liability of the City with respect to a different pension system maintained by the City, certain payments under which Other Service Contract are part of the Trust Estate; and

- **the Other Service Corporation** means the service corporation party to the Other Service Contract (*i.e.*, if "the Service Corporation" is the GRS Service Corporation, then "the Other Service Corporation" is the PFRS Service Corporation, and *vice versa*).

All Service Payments payable under a Service Contract shall be made and each Service Corporation shall be entitled to receive such payments on a *pro rata* basis with the Service Payments under the Other Service Contract so that each Service Contract Component having a specified priority (described below) is made on a *pro rata* basis with the Service Payment Components having the same defined term under the Other Service Contract, and no Service Payment Component shall be satisfied until all Service Payment Components under all Service Contracts having the same defined term but having a greater priority under each Service Contract are first satisfied in full.

Also as used in the summary under this heading, an amount is **about to become due**:

- in the case of amounts which are payable not more frequently than once each calendar week, when there are six or fewer days before its due date; and

- for amounts which are payable more frequently than once each calendar week, the day after its most recent due date.

Service Payments under all Service Contracts shall be satisfied in the following order and priority (the **Service Contract Priority Sections**):

**First:** Contract Administrator Payments; then

**Second:** all theretofore due and unpaid Service Charges (regardless of the Funding Rate Methodology) and amounts in respect of Hedge Periodic Payables; then

**Third:** all then due and about to become due Service Charges and amounts in respect of Hedge Periodic Payables; then

**Fourth:** all theretofore due and unpaid Regular Scheduled Payments and Sinking Fund Installments; then

**Fifth:** all then due or about to become due Regular Scheduled Payments and Sinking Fund Installments; then

**Sixth:** all theretofore due and unpaid amounts in respect of Hedge Termination Payables ; then

**Seventh:** all then due and about to become due amounts in respect of Hedge Termination Payables to ; then

**Eighth:** all then due and about to become due Optional Prepayment Amounts and Accrued Service Charges.

## Acceleration on Bankruptcy

If the City shall (i) commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, (ii) consent to the institution of any such proceeding or the filing of any such petition or (iii) make a general assignment for the benefit of creditors, then all payments due under the Service Contract shall become immediately due and payable without presentment, demand, protest or notice of any kind.

## Termination or Assignment of Stated Hedges

At the request of the City and with the prior written consent of the Insurer that has Credit Insurance in respect of the particular Stated Hedge, the Service Corporation shall terminate any Stated Hedge or assign its interest in any Stated Hedge to a Person that agrees to perform and observe all of the duties and obligations of the Hedge Counterparty to such Stated Hedge. Any such substitute Hedge Counterparty shall have at least the rating required by Act 34 of the Michigan Public Acts of 2001, as amended, as if the City were a party to the particular Stated Hedge. No such termination or substitution of a Hedge Counterparty shall take effect unless each Rating Agency that at the time has a rating of the Certificates in effect confirms its rating of the particular Certificates.

## Required Ratings of Hedge Counterparties

The Service Corporation shall only enter into Hedges with Persons who have, on the date the Hedge is entered into, or whose Hedge obligations are guaranteed by a Person who has on that date, a rating of its long-term, senior secured debt at least "A-" by Standard & Poor's Corporation and at least "A3" by Moody's Investors Service.

## Amendment of the Service Contract

The Service Contract may be amended only by written instrument signed by the parties thereto except that no amendment shall be valid: (a) if such amendment diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary; (b) unless the Trustee of the Funding Trust that is a transferee of or successor to any rights or Components under the Service Contract and that received an opinion of counsel in connection with the organization of such Funding Trust to the effect that such Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, shall have received an opinion reasonably acceptable in form and substance to such Trustee of counsel reasonably acceptable to such Trustee to the effect that such amendment shall not result in such Funding Trust being treated as other than such a grantor trust; (c) unless the Trustee has received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to such Trustee to the effect that such

amendment shall not result in the Funding Trust Receivables failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes; and (d) unless every Insurer who is not in default under its Credit Insurance at the time has consented to the amendment.

**Expenses Payable by the City and the Service Corporation**

The City shall pay such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporation as authorized or permitted by the Funding Ordinance, as and when they become due. The Service Corporation shall pay compensation due the Trustee in accordance with the Trust Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent thereunder or any amendment thereof, or in connection with the enforcement thereof. The Service Corporation also shall pay compensation, expenses and indemnification due the Contract Administrator and compensation and expenses due the Enforcement Officer, if any, in accordance with the Contract Administration Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent under the Service Contract or any amendment of the Contract Administration Agreement or of the Service Contract, or in connection with the enforcement of the Service Contract.

**Permitted Assignment.**

The Service Contract shall be binding upon the parties thereto and their respective successors and permitted assigns. No assignment by either party of its interests therein shall be valid except as follows. The Service Corporation may transfer the Scheduled Payments and Service Charges to the Funding Trust in accordance with the Service Contract. No assignment of the Service Contract or any amounts receivable thereunder shall include the right to receive Additional Service Payments, Contract Administrator Payments or Hedge Payables, except that the Service Corporation may assign or grant a security interest in amounts received by it as payment of amounts in respect of Hedge Payables to the Hedge Counterparties.

**Third Party Beneficiaries**

The Persons, including the Trustee and the Contract Administrator, originally entitled to Additional Service Payments or Contract Administrator Payments and their respective successors are third party beneficiaries of the Service Contract as to the City's promises to pay Additional Service Payments or Contract Administrator Payments to them. Hedge Counterparties, and their respective successors and subrogees, are third party beneficiaries of the Service Contract as to the City's promises to pay amounts in respect of Hedge Payables to the Service Corporation. Insurers are third party beneficiaries of the Service Contract. Third Party Beneficiaries have the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them. If and when an Insurer is the subrogee of another Third Party Beneficiary, such Insurer may enforce the promises made in the Service Contract to such other Third Party Beneficiary in its right and stead.

**SUMMARY OF CERTAIN PROVISIONS OF
THE CONTRACT ADMINISTRATION AGREEMENT**

**Collection of Receivables**

Each of the Service Corporations, the Trustee on behalf of the Funding Trust, and the Specified Hedge Counterparties appoints the Contract Administrator as its respective agent and attorney-in-fact to receive Service Payments.

**Appointment by Funding Trust**

On behalf of the Funding Trust, the Trustee appoints the Contract Administrator as its agent and attorney-in-fact to take such actions and exercise such rights and remedies as to Funding Trust Receivables as the Funding Trust is or may become entitled to exercise under law and in equity to enforce the payment thereof and otherwise realize Funding Trust Receivables.

**Appointment by Each Service Corporation**

Each Service Corporation appoints the Contract Administrator as its agent and attorney-in-fact to enforce such Service Corporation's rights and remedies under the Stated Hedges, including the collection of Hedge Receivables from the Specified Hedge Counterparties under the respective Stated Hedges, and to take all such actions and exercise such rights and remedies as the respective Service Corporation is or may become entitled to exercise under the particular Stated Hedge and otherwise at law or in equity. Each Service Corporation further appoints the Contract Administrator to invest amounts received by the Contract Administrator as Costs of Issuance and Prepaid Service Charges in Authorized Investments in accordance with the Service Contract.

**Distributions of Service Payments**

On each Distribution Date, the Contract Administrator shall distribute the amount of the Service Payment Components satisfied since the last such Distribution Date to the respective Entitled Persons. If the Entitled Person is the Funding Trust, the amounts of satisfied Components shall be distributed to the Funding Trust to be applied in accordance with the Trust Agreement.

As used in this Appendix:

- references to "clause **Second**," "clause **Third**," "clause **Fourth**," "clause **Fifth**" or "clause **Eighth**" mean those particular clauses set forth in the Service Contract Priority Sections (see "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - Preservation of Parity among Service Contracts" above in this Appendix);

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges and Accrued Service Charges described in clause **Second** shall be identified to the Trustee as *Deficit Interest Related Payments*;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments described in clause **Fourth** shall be identified to the Trustee as *Deficit Principal Related Payments*;

- amounts distributed to the Trustee representing satisfied Components constituting Sinking Fund Installments described in clause **Fourth** shall be identified to the Trustee as *Deficit Principal Related Payments*;

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges described in clause **Third** shall be identified to the Trustee as *Interest Related Payments*;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments and Sinking Fund Installments described in clause **Fifth** shall be identified to the Trustee as, respectively, *Principal Related Payments* and *Sinking Fund Related Payments*; and

- amounts distributed to the Trustee representing satisfied Components constituting Optional Prepayment Amounts and Accrued Service Charges described in clause **Eighth** shall be identified to the Trustee as *Redemption Related Payments*.

If the Entitled Persons are the Specified Hedge Counterparties, the amounts of satisfied Components constituting amounts in respect of Hedge Payables shall be paid to the Specified Hedge Counterparties to whom such amounts are owing in proportion to the amounts owed to each under the respective Stated Hedges. If distributions are to be made on the same Distribution Date for two or more different priorities of Components (pursuant to clauses **First** through **Eighth**), no distribution shall be made in respect of a lower priority to the extent that each of the higher priorities is not satisfied in full.

## Service Corporation Covenants

Each Service Corporation covenants with the Contract Administrator, the Funding Trust, the Specified Hedge Counterparties and the Other Corporation as follows:

(a)     The Service Corporation shall not convey, transfer or assign Funding Trust Receivables under its Service Contract or any interest therein to any Person other than the Funding Trust as provided in the Trust Agreement;

(b)     the Service Corporation shall not convey, transfer or assign Hedge Payables under its Service Contract or any interest therein to any Person other than the Specified Hedge Counterparties as provided in the Contract Administration Agreement; and

(c)     the Service Corporation shall not convey, transfer or assign any Stated Hedge or any interest therein to any Person other than as provided in the Service Contract;

## Events of Default; Remedies

It will be an "Event of Default" under the Contract Administration Agreement if the City: (a) fails to pay any Funding Trust Receivable as and when the same shall become due, (b) commences any proceeding or files any petition seeking relief under Title 11 of the United States Code, (c) consents to the institution of any such proceeding or the filing of any such petition or (d) makes a general assignment for the benefit of creditors.

Upon the occurrence and during the continuance of an Event of Default, the Contract Administrator may and shall, at the request of the Certificateholders representing either (i) 25% in principal amount of Outstanding Certificates, the payments on which have not been made as a result of such Event of Default (**Affected Certificates**), or (ii) at least 50% in principal amount of all Outstanding Certificates, enforce the Service Contract under which the Event of Default occurred by such remedies as are available to the Contract Administrator.  Any money collected or received by the Contract Administrator from pursuing such remedies shall be applied in the order of the Service Contract Priority Sections, subject to any Creditor Lien.

## No Duty of Inquiry

The Contract Administrator has no duty to inquire into the performance by a Service Corporation of its obligations under its Service Contract, but if the Contract Administrator receives notice (a **Default Notice**) from Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates, specifying the failure of the City to pay Funding Trust Receivables, then the Contract Administrator shall give notice of such failure to the  City and demand that such failure be remedied.  Upon receipt of any Default Notice, the Contract Administrator shall give notice to all Certificateholders and the Specified Hedge Counterparties that did not join in such Default Notice.

## Notice of Defaults

Promptly upon obtaining actual knowledge of the occurrence of any Event of Default, the Contract Administrator shall give written notice of such Event of Default by mail to all Certificateholders,

Specified Hedge Counterparties and Rating Agencies unless such Event of Default has been cured or waived.

Any Insurer who is not then in default under its Credit Insurance shall be entitled to receive all notices in respect of Certificates insured by it, and no notices under the prior paragraph shall be sent to the Holders of such Certificates.

**Limitation on Suits by Certificateholders**

No Certificateholder shall have any right to institute any proceeding, judicial or otherwise, under or with respect to the Service Contract unless:

(a)    such Holder has previously given written notice to the Contract Administrator of an Event of Default that is then continuing;

(b)    the Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates have made written request to the Contract Administrator to institute proceedings in respect of such Event of Default in its own name as Contract Administrator;

(c)    such Holder or Holders have offered to the Contract Administrator satisfactory indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d)    the Contract Administrator for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e)    in the case of a written request from the Holders of at least 25% in principal amount of the Outstanding Affected Certificates, no direction inconsistent with such written request has been given to the Contract Administrator during such 30-day period by the Holders of a greater percentage in principal amount of the Outstanding Affected Certificates;

it being understood and intended that no one or more Holders of Certificates shall have any right in any manner to affect, disturb or prejudice the interest of the parties to the Contract Administration Agreement or the rights of any other Certificateholders, or to obtain or to seek to obtain priority or preference over any other Certificateholders or to enforce any right under any Service Contract, except in the manner therein provided and for the equal and ratable benefit of all Entitled Persons.

**Control by Majority**

The Holders of a majority in principal amount of the Outstanding Certificates have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator to exercise any power exercisable by the Contract Administrator, provided that such direction is not in conflict with any rule of law or the Contract Administration Agreement.

Any Insurer not then in default under its Credit Insurance shall be treated as the Holder of Outstanding Certificates equal to the principal amount of Certificates insured by it for the purposes of actions thus permitted to be taken by Certificateholders and for the purpose of giving all other consents, directions and waivers that Certificateholders may give.

**Actions by Beneficial Owners**

For the purpose of providing any consent, waiver or instruction to the Contract Administrator, the terms **Holder** and **Certificateholder** include a Person who provides the Contract Administrator an affidavit of beneficial ownership of a Certificate together with satisfactory indemnity against any loss, liability or expense to the Contract Administrator to the extent that it acts on the affidavit of beneficial

ownership (including any consent, waiver or instruction given by a Person providing such affidavit and indemnity). The principal amount of Outstanding Certificates owned by a Beneficial Owner satisfying the preceding sentence shall be deemed held by such Beneficial Owner and not held by Certificateholders for the purposes of providing any consent, waiver or instruction to the Contract Administrator.

**Concerning the Contract Administrator**

The Contract Administrator undertakes to perform such duties and only such duties as are specifically set forth in the Contract Administration Agreement, and no implied covenants or obligations shall be read into that Agreement against the Contract Administrator. In the absence of bad faith on its part, the Contract Administrator may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Contract Administrator and conforming to the requirements of the Contract Administration Agreement or the Service Contract; but in the case of any such certificates, documents, other instruments or opinions which by any provision thereof are specifically required to be furnished to the Contract Administrator, the Contract Administrator is under a duty to examine the same to determine whether or not they conform to the requirements of the Contract Administration Agreement.

If an Event of Default occurs and is continuing, the Contract Administrator shall exercise such of the rights and powers in respect of Funding Trust Receivables and use the same degree of care and skill in their exercise as a prudent corporate trustee would exercise or use under the circumstances.

No provision of the Contract Administration Agreement shall be construed to relieve the Contract Administrator from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that: (a) the Contract Administrator shall not be liable for any error of judgment made in good faith by an authorized officer of the Contract Administrator, unless it is proved that the Contract Administrator was negligent in ascertaining the pertinent facts; (b) the Contract Administrator shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in Outstanding principal amount of the Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator, or exercising any trust or power conferred upon the Contract Administrator, by or under the Contract Administration Agreement; and (c) no provision of the Contract Administration Agreement shall require the Contract Administrator to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

The Contract Administrator may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Contract Administrator may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Contract Administrator in good faith and in reliance thereon.

The Contract Administrator is under no obligation to exercise any of the rights or powers vested in it by the Contract Administration Agreement at the request or direction of any of the Certificateholders pursuant to that Agreement, unless such Certificateholders shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

A-15

**Compensation and Reimbursement**

The Contract Administrator is entitled to payment or reimbursement from time to time for reasonable compensation for all services rendered by it under the Contract Administration Agreement. The Contract Administrator is also entitled to indemnification for, and to be held harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of that Agreement or the exercise of it powers hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder. The compensation of the Contract Administrator shall be an Additional Service Payment under the Service Contracts.

The Contract Administrator shall not have any lien on any funds held by it under the Contract Administration Agreement.

**Enforcement of Rights**

Every provision of the Contract Administration Agreement relating to the enforcement of rights and remedies by any of the parties thereto is subject to particular provisions in the Contract Administration Agreement that would apply if, but only if, all Insurers are then in default under their respective Credit Insurance.

**Third Party Beneficiaries**

The covenants of each Service Corporation made in the Contract Administration Agreement are also made for the benefit of each of the Third Party Beneficiaries, each of whom may enforce then same as if it were a party thereto.

<u>**SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT**</u>

The Trust Agreement is comprised of two documents, called the General Terms (dated as of May 1, 2005) and the Specific Terms (dated the Closing Date), which operate together as if they were combined in a single document. The parties to the Trust Agreement are the Detroit General Retirement Service Corporation and the Detroit Police and Fire Retirement Service Corporation (each a **Service Corporation**), severally and not jointly, and U.S. Bank National Association, as Trustee (in such capacity, the **Trustee**). The Trust Agreement establishes the Detroit Retirement Systems Funding Trust 2005 (the *Funding Trust*) for the purpose of funding the Subject UAAL of the Detroit General Retirement System (**GRS**) and the Detroit Police and Fire Retirement System (**PFRS**).

**Conveyance of Funding Trust Receivables; Grant of Security Interest**

Effective the Closing Date, each Service Corporation transfers, assigns and conveys to the Funding Trust all of its right, title and interest in and to the Funding Trust Receivables under its respective Service Contract, all monies due or to become due with respect thereto and all proceeds of such Funding Trust Receivables. Each Service Corporation intends that such sale, assignment and conveyance be an absolute transfer of such property for all purposes. However, to preserve rights if such sale, assignment and conveyance is deemed a pledge of such property, each Service Corporation also grants a security interest in such property to the Funding Trust for the benefit of the Certificateholders.

The Trust Estate consists of the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all proceeds of the foregoing.

**Contract Administration Agreement**

The Trustee is directed in the Trust Agreement to enter into the Contract Administration Agreement in the name and on behalf of the Funding Trust. See "Summary of Certain Provisions of the Contract Administration Agreement" in this APPENDIX A.

**No City Indebtedness**

The Funding Trust and the Funding Trust Receivables paid to the Funding Trust do not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act or any Michigan constitutional or other non-tax statutory or City charter limitation.

**Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers**

Except to the extent otherwise provided in the Trust Agreement, each Service Corporation has entered into the Trust Agreement, the Certificates will be issued and the Funding Trust will acquire the Funding Trust Receivables, with the intention that for federal, state and local income, business, franchise and modified value added tax purposes: (a) the Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended; (b) each Beneficial Owner of Certificates will be treated as the owner of an undivided *pro rata* interest in the portion of the Trust Estate attributable to such Beneficial Owner's Certificates; and (c) the Funding Trust Receivables constitute payments in respect of indebtedness. In furtherance of such intention, except to the extent otherwise provided in the Trust Agreement, the Trustee shall not have the power to vary the investment of the Beneficial Owners of the Certificates within the meaning of U.S. Treasury regulations §301.7701-4(c) or to engage in any business unless the Trustee shall have received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such activity will not cause the Funding Trust to fail to be treated as such a grantor trust.

Each Service Corporation and the Trustee by entering into the Trust Agreement and each Certificateholder by its acceptance of its Certificate agrees to treat the Funding Trust, the Certificates and the Funding Trust Receivables in accordance with the intention expressed in the preceding paragraph (or any alternative intention expressed in the Trust Agreement) for federal, state and local income, business, franchise and modified value added tax purposes.

**Authentication and Delivery of Certificates by Trustee; Disposition of Certificate Proceeds**

The Funding Trust shall issue Certificates as fully registered securities in the form prescribed by the Trust Agreement. The Trustee shall authenticate and deliver the Certificates in accordance with a written order of each Service Corporation stating the amount of Certificate proceeds to be received by the Trustee in respect of that Service Corporation and providing for the disposition of such proceeds as provided in its Service Contract (in major part into the Accrued Liability Fund of each Retirement System in satisfaction of its respective Subject UAAL). The Certificates evidence the entire beneficial interest in the Trust Estate.

**Payment of Interest on Certificates**

Interest payable on any Series A Certificate or Series B Certificate and paid on an Interest Payment Date shall be paid to the Person in whose name that Certificate (or a Predecessor Certificate) is registered at the close of business on the Regular Record Date for such Series.

Interest payable on any Certificate and not paid on an Interest Payment Date when due shall be not be paid to the registered Holder on the relevant Regular Record Date by virtue of being such Holder, but rather shall be payable as a Deficit Interest Related Payment to the Person in whose name such Certificate (or a

Predecessor Certificate) is registered at the close of business on a Special Record Date for the payment of such Deficit Interest Related Payment.

If an amount is payable as all or part of a Deficit Interest Related Payment received by the Trustee, the Trustee shall establish a day for the payment of such amount to Certificateholders not less than 10 days after its receipt of such amount and establish a Special Record Date which shall be not more than 15 nor fewer than 10 days before the date set for payment of such amount. The Trustee shall mail notice of a Special Record Date to the Certificateholders at least 10 days before such Special Record Date.

Subject to the foregoing three paragraphs, each Certificate delivered under the Trust Agreement upon transfer of, in exchange for or in lieu of any other Certificate shall carry all the rights to Interest accrued and unpaid, and to accrue, which were carried by such other Certificate.

**Registration, Exchanges and Transfers**

The Trustee shall keep at its designated corporate trust office a register for the registration of Certificates and for the registration of transfers of Certificates, subject to such reasonable regulations as the Trustee may prescribe. Upon surrender of any Certificate for transfer of the registration thereof, the Trustee shall authenticate and register in the name of the designated transferee(s) one or more new Certificates of the same tenor in any authorized denomination in like aggregate principal amount.

At the option of the Holder, Certificates may be exchanged for other Certificates of the same tenor in any authorized denomination in like aggregate principal amount, upon surrender of the Certificates to be exchanged at the designated corporate trust office of the Trustee. Whenever any Certificates are surrendered for exchange, the Trustee shall authenticate and deliver the Certificates that the Certificateholder making the exchange is entitled to receive.

All Certificates issued upon any transfer of registration or exchange of Certificates shall constitute valid evidences of beneficial interests in the Trust Estate evidencing the same beneficial interests and entitled to the same benefits under the Trust Agreement as the Certificates surrendered in such transfer or exchange.

No service charge may be made for any transfer of registration or exchange of Certificates, but the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect such transfer or exchange. The Trustee may make the payment of such tax, fee or other governmental charge and the cost of preparing each new Certificate delivered in such transfer or exchange a condition precedent to making any transfer of registration or exchange of any Certificate, to be paid by the Person requesting such transfer or exchange, unless otherwise provided in the Trust Agreement.

The Trustee shall not be required to (a) to transfer or exchange any Certificate during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of such Certificate and ending at the close of business on the day of such mailing, or (b) to transfer or exchange any Certificate selected for redemption in whole or in part, during a period beginning at the opening of business on any Regular Record Date for such Certificates and ending at the close of business on the relevant Interest Payment Date therefor.

**Persons Deemed Owners**

The Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate, whether payments with respect to such Certificate shall be overdue or not, for the purpose of receiving payment of the principal thereof, premium, if any, and (except as otherwise provided in the Trust Agreement) Interest thereon and for all other purposes whatsoever.

**Book-Entry Certificates; Securities Depository**

While Certificates are registered in the name of a Securities Depository or its nominee, the Trustee shall not have any responsibility or obligation to any Participant or to any Beneficial Owner with respect to: (a) the accuracy of the records of the Securities Depository, its nominee or any Participant with respect to any ownership Interest in the Certificates; (b) the delivery to any Participant, and Beneficial Owner or any other Person, other than the Securities Depository of any notice with respect to the Certificates, including any notice of redemption; or (c) the payment to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository of any amount with respect to the principal of or premium, if any, or Interest on the Certificates.

The Trustee shall pay all principal (and premium, if any) of and Interest on such Certificates only to or upon the order of the Securities Depository, and all such payments shall be valid and effective fully to satisfy and discharge the Funding Trust's obligations with respect to the principal (and premium, if any) of, and Interest on such Certificates to the extent of the sum or sums so paid.

Upon discontinuance of the use of the Book-Entry Only System maintained by the Securities Depository and upon receipt of notice from the Securities Depository containing sufficient information, the Trustee shall authenticate and deliver Certificates in certificated form to Beneficial Owners in exchange for the beneficial interests of such Beneficial Owners in corresponding principal amounts and in any authorized Denomination.

Notwithstanding anything to the contrary in the Trust Agreement, so long as any Certificate is registered in the name of the Securities Depository or its nominee: (a) all payments with respect to the Principal and Interest on such Certificate and all notices of redemption and otherwise with respect to such Certificate shall be made and given, respectively, to the Securities Depository as provided in the representation letter with respect to such Certificates; (b) if less than all such Certificates of a maturity and series are to be redeemed *pro rata*, then the particular Certificates or portions of Certificates of such maturity and series to be redeemed shall be so determined by the Securities Depository; and (c) all payments with respect to Principal of such Certificate and premium, if any, and Interest on such Certificate shall be made in such manner as shall be prescribed by the Securities Depository.

**Redemption of Certificates**

### *Selection of Certificates to be Redeemed*

Whenever any Certificates of a series are to be redeemed, the Trustee shall select the maturity or maturities that correspond to the prepaid Scheduled Payments giving rise to such redemption. Whenever Certificates of less than all of a maturity are to be redeemed, the Trustee shall select the particular Certificates to be redeemed from the Outstanding Certificates of such maturity and series that have not previously been called for redemption in such manner as results in *pro rata* redemption among all Holders of Certificates of the maturity being redeemed. All Certificates of the same series and having the same maturity shall constitute a class for purposes of *pro rata* redemption. The Trustee shall select Certificates for redemption *pro rata* within each class. In the case of any maturity of Certificates for which Sinking Fund Installments have been established, any optional redemption of such Certificates shall be credited among such Sinking Fund Installments pro rata in accordance with the unpaid amounts thereof.

### *Notice of Redemption*

When any Certificates are to be redeemed, notice of any such redemption shall be given by the Trustee by first class mail, no fewer than 30 days and no more than 45 days before the Redemption Date to each Holder of Certificates to be redeemed at his/her last address in the Registry. All notices of redemption shall be dated and shall state: (a) the Redemption Date; (b) the Redemption Price; (c) if less than all Outstanding Certificates are to be redeemed, the identification number, maturity dates and, in the case of a partial

redemption of Certificates, the respective principal amounts of the Certificates to be redeemed; (d) that on the Redemption Date the Redemption Price will become due and payable upon each such Certificate or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date; (e) the place where the Certificates to be redeemed are to be surrendered for payment of the Redemption Price, which place of payment shall be the designated corporate trust office of the Trustee or other Paying Agent; and (f) the proposed redemption (except in the case of a redemption from Sinking Fund Installments) is conditioned on the Trustee having received a Redemption Related Payment on the Prepayment Receipt Day sufficient to pay the full Redemption Price of the Certificates to be redeemed.

The failure of the Holder of any Certificate to receive notice of redemption given as provided above, or any defect therein, shall not affect the sufficiency of the proceedings for the redemption of any Certificates as to which no failure or deficiency occurred.

The Trustee shall provide additional notice that provides material compliance with Securities Exchange Act Release No. 34-23856 (Dec. 3, 1985) as the same may be amended or supplemented from time to time by the Securities and Exchange Commission or by generally accepted practice of corporate trustees. No failure to give such additional notice or defect therein or in the manner in which given shall affect the sufficiency of the proceedings for the redemption of any Certificates.

### Certificates Payable on Redemption Date

Notice of redemption having been given as aforesaid, the Holders of the Certificates so to be redeemed shall be entitled, on the Redemption Date, to payment of an amount equal to the Redemption Price therein specified and from and after such date (unless the full amount of the Redemption Price is not distributed) the Holders of such Certificates shall cease to be entitled to any further payment in respect of Interest. Upon surrender of any such Certificate for redemption in accordance with said notice, the Holder of such Certificate shall be paid by the Trustee an amount equal to the Redemption Price. Installments of Interest with a due date on or prior to the Redemption Date shall be payable to the Holders of the Certificates as of the relevant Record Dates.

If any Certificate called for redemption shall not be so paid upon surrender thereof for redemption, the principal (and premium, if any) shall, until paid, bear Interest from the Redemption Date at the rate prescribed in the Certificate.

### Certificates Redeemed in Part

Any Certificate which is to be redeemed only in part may, at the option of the Holder: (a) be presented for notation thereon by the Trustee of the payment as of the Redemption Date of the redeemed portion of the principal thereof; or (b) be surrendered at the place of payment therefor (with, if the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Trustee duly executed by, the Holder or his attorney or legal representative duly authorized in writing), and the Trustee shall authenticate and deliver to such Holder, without service charge, a new Certificate or Certificates of the same maturity and series of any authorized denomination or denominations as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Certificate so surrendered.

### Payments to Certificateholders

### Deficiency Payments

On the day the Trustee receives a <u>Deficit Interest Related Payment</u> from the Contract Administrator, the Trustee shall establish a Special Record Date and pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests. On the day the Trustee receives a Deficiency Payment,

other than a Deficit Interest Related Payment, from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests.

### Other Payments

On each Interest Payment Date for which the Trustee has received an Interest Related Payment from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Interest by the terms of their Certificates as of the Regular Record Date in accordance with their relative Percentage Interests. On each Principal Payment Date for which the Trustee has received a Principal Related Payment from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled to such Principal Related Payment by the terms of their Certificates in accordance with their relative Percentage Interests. On each Sinking Fund Installment Date for which the Trustee has received a Sinking Fund Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Sinking Fund Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

On each Redemption Date that is also an Interest Payment Date for which the Trustee has received a Redemption Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Redemption Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed. On each Redemption Date that is not also an Interest Payment Date for which the Trustee has received a Redemption Related Payment that includes associated Accrued Service Charges from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Redemption Related Payment and Accrued Service Charges by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

## The Trustee

### Certain Duties and Responsibilities

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement, and no implied covenants or obligations shall be read into the Trust Agreement against the Trustee. In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Trustee and conforming to the requirements of the Trust Agreement or the Service Contract; in the case of any such certificates, documents, other instruments or opinions which by any provision thereof are specifically required to be furnished to the Trustee, the Trustee is under a duty to examine the same to determine whether or not they conform to the requirements of the Trust Agreement.

No provision of the Trust Agreement or the Service Contract shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, *except* that (a) the Trustee shall not be liable for any error of judgment made in good faith by an authorized officer of the Trustee, *unless* it is proved that the Trustee was negligent in ascertaining the pertinent facts; (b) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under the Trust Agreement or the Service Contract; and (c) no provision of the Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

### Certain Rights of Trustee

The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, order, or other document believed by it to be genuine and to have been signed or presented by the proper parties. Whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action under the Trust Agreement, the Trustee (unless other evidence is specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of the Contract Administrator. The Trustee may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Trustee hereunder in good faith and in reliance thereon.

The Trustee is under no obligation to exercise any of the rights or powers vested in it by the Trust Agreement at the request or direction of any of the Certificateholders pursuant to the Trust Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, opinion, notice, request, consent, order, or other document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit. The Trustee may execute any of its trusts or powers or perform any of its duties either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it.

The Trustee shall not have any lien on any funds held by it under the Trust Agreement.

### Not Responsible for Recitals or Issuance of Certificates

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement, in a Service Contract or in the Certificates except the certificate of authentication on the Certificates. The Trustee makes no representations as to the value or condition of the Trust Estate or any part thereof, or as to the title thereto or as to the security afforded thereby, or as to the validity or sufficiency of the Trust Agreement or of the Certificates.

### Corporate Trustee Required; Eligibility

There shall at all times be a Trustee under the Trust Agreement which is a trust company or bank with trust powers organized under the laws of the United States of America or of any state of the United States with a combined capital and surplus of at least $50,000,000. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. The Trustee shall resign immediately in the manner and with the effect specified in the Trust Agreement if it becomes ineligible under this paragraph,.

### Replacement of Trustee

No resignation or removal of the Trustee and no appointment of a successor Trustee shall be effective until the successor Trustee accepts its appointment. The Trustee may resign at any time, but such resignation shall become effective only in accordance with the preceding sentence. The Holders of a majority in principal amount of Outstanding Certificates may remove the Trustee by so notifying the Trustee. If the Trustee becomes ineligible, any Certificateholder may petition a court of competent jurisdiction for the appointment of a successor. The retiring Trustee or the Service Corporations may appoint a successor at any time prior to the date on which a successor Trustee takes office. If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, any Certificateholder may petition a court of

A-22

competent jurisdiction for the appointment of a successor Trustee. Within one year after a successor Trustee appointed by the Service Corporations or a court of competent jurisdiction takes office, the Holders of a majority in principal amount of Outstanding Certificates may appoint a successor Trustee to replace such successor Trustee.

### Acceptance of Appointment

A successor Trustee shall deliver written acceptance of its appointment to the retiring Trustee and to each Service Corporation. Thereupon the resignation or removal of the retiring Trustee shall be effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under the Trust Agreement. The successor Trustee shall mail a notice of its succession to the Certificateholders. Upon the appointment of a successor Trustee becoming effective, the retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

### Merger, Consolidation and Succession to Business

If the Trustee consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee if such successor corporation is eligible under the Trust Agreement. The successor Trustee may adopt the authentication of Certificates authenticated by the predecessor Trustee and deliver such Certificates with the same effect as if the successor Trustee had authenticated such Certificates.

### ERISA

The Trustee acknowledges and agrees that, in the event that assets of the Funding Trust are deemed to be plan assets of a Certificateholder that is an employee benefit plan subject to Title I of ERISA (an ***ERISA Plan***), the Trustee is a fiduciary to such ERISA Plan with respect to such ERISA Plan's undivided interests in the Trust Estate, and the Trust Agreement shall be deemed to be the management agreement between the Trustee and such ERISA Plan.

## Supplemental Trust Agreements

### Supplemental Trust Agreements without Consent of Certificateholders

Without the consent of any Certificateholders, the Service Corporations and the Trustee may from time to time enter into one or more Trust Agreements supplemental to the Trust Agreement (a ***Supplemental Trust Agreement***) for any of the following purposes:

b) to correct or amplify the description of Trust Estate, or better to assure, convey and confirm unto the Trustee any of the Trust Estate or the lien of the Trust Agreement thereon, or to add to the Trust Estate subject to the lien of the Trust Agreement additional property;

c) to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the issue, authentication and delivery of the Certificates, thereafter to be observed;

d) to evidence a successor trustee under the Trust Agreement;

e) to add to rights, powers and remedies of the Trustee for the benefit of the Certificateholders;

f) to cure any ambiguity, or correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision;

g) to provide for the issuance of Additional Certificates; or

h) to make any other change that does not adversely affect the rights of Certificateholders.

With the consent of the Holders of not less than a majority in principal amount of the Certificates then Outstanding, the Trustee may enter into one or more Supplemental Trust Agreements for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Trust Agreement or of modifying in any manner the rights of Certificateholders under the Trust Agreement; provided, however, that no such Supplemental Trust Agreement shall, without the consent of the Holder of each Outstanding Certificate affected thereby, change any Principal Payment Date or Interest Payment Date of any Certificate, or reduce the principal amount thereof or Sinking Fund Installment or the Interest thereon or any premium payable upon the redemption thereof, or change any place of payment where any Certificate or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the Redemption Date), or reduce the percentage in principal amount of the Outstanding Certificates, the consent of whose Holders is required for any such Supplemental Trust Agreement, or the consent of whose Holders is required for any waiver of compliance with certain provisions of the Trust Agreement or certain defaults thereunder and their consequences; or modify any provisions summarized under the above subheadings "No City Debt or Other Obligation" or "Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers" under the heading "SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT" or certain other provisions, except to increase any percentage provided thereby or to provide that certain other provisions of the Trust Agreement cannot be modified or waived without the consent of each Holder affected thereby.

### *Execution of Supplemental Trust Agreements*

Prior to executing, or accepting the additional trusts created by, any permitted Supplemental Trust Agreement or the modification thereby of the trusts created by the Trust Agreement, the Trustee shall be entitled to receive and be fully protected in relying upon an opinion of counsel addressed to the Trustee to the effect that the execution of such Supplemental Trust Agreement is authorized or permitted by the Trust Agreement and the Supplemental Trust Agreement will be a valid and binding agreement of each Service Corporation upon the execution and delivery thereof.

### *Preconditions to Effectiveness*

If the Trustee received a Qualifying Opinion in connection with the formation of the Funding Trust, then no Supplemental Trust Agreement shall become effective unless and until the Trustee receives an opinion in form and substance reasonably satisfactory to it of counsel reasonably acceptable to the Trustee to the effect that such supplement will not cause the Funding Trust to fail to be treated as such a grantor trust. Each Supplemental Trust Agreement is subject to the prior written consent of any Insurer.

### **Miscellaneous Provisions**

### *Notices to Certificateholders; Waiver*

Where the Trust Agreement provides for the publication of notice to Certificateholders, such notice shall be sufficiently given (unless otherwise expressly provided in the Trust Agreement) if in writing and mailed, first-class postage prepaid, to each Certificateholder at his address as it last appears in the Registry, no later than the latest date and no earlier than the earliest date permitted for the first publication of such notice. Where the Trust Agreement provides for notice in any manner, such notice may be waived by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice shall be filed with the Trustee, *but* such filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

*Payments Due on Saturdays, Sundays and Holidays*

In any case where the date fixed for payment of the Certificates shall not be a Business Day, *then* such payment need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on the date fixed for such payment.

[THIS PAGE INTENTIONALLY LEFT BLANK]

## Appendix B

## INFORMATION CONCERNING THE CITY OF DETROIT, MICHIGAN

### TABLE OF CONTENTS

| | Page |
|---|---|
| GOVERNMENTAL STRUCTURE | B-2 |
| Executive Branch | B-2 |
| Legislative Branch | B-4 |
| District Court | B-4 |
| Principal Governmental Services and Work Force | B-4 |
| Related City Entities | B-6 |
| Other Governmental Entities | B-8 |
| FINANCIAL PROCEDURES | B-8 |
| Accounting System | B-8 |
| Accounting Methods | B-9 |
| Cash Management | B-9 |
| Budget Process | B-10 |
| Budget Stabilization Fund | B-11 |
| Risk Management | B-11 |
| FINANCIAL OPERATIONS | B-12 |
| Overview | B-12 |
| Revenues and Expenditures of the General Fund | B-12 |
| Fund Balance of the General Fund | B-15 |
| Components of Fund Balance | B-15 |
| General Fund Revenue Categories | B-16 |
| Recent Budget Results of the General Fund | B-23 |
| Other Funds of the City | B-32 |
| ASSESSED VALUATION AND PROPERTY TAXES | B-34 |
| Property Valuation and Tax Rate | B-34 |
| Industrial Facilities Tax | B-35 |
| Payment and Lien | B-36 |
| Personal Property Tax Assessments and Appeals | B-36 |
| Valuations | B-36 |
| Valuation by Type of Property | B-37 |
| Valuation and Tax Levies | B-37 |
| Tax Levies and Collections | B-39 |
| Largest Taxpayers | B-40 |
| Tax-Exempt Property | B-40 |
| INDEBTEDNESS OF THE CITY AND RELATED ENTITIES | B-40 |
| Capital Financing Policies | B-40 |
| Overlapping Debt | B-42 |
| Summary of Debt Statement | B-43 |
| Legal Debt Margin | B-43 |
| Short-Term Indebtedness | B-47 |
| Prospective Indebtedness | B-47 |
| EMPLOYEE BARGAINING UNITS | B-48 |
| RETIREMENT SYSTEMS | B-48 |
| Recent Pension Litigation | B-51 |
| CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION | B-52 |
| General | B-52 |
| Population | B-52 |
| Employment and Economic Base | B-53 |
| Construction | B-55 |
| Housing Characteristics | B-55 |
| Largest Employers | B-56 |
| Port of Detroit | B-57 |
| Transportation Network | B-58 |
| Major Projects and Developments | B-58 |

## GOVERNMENTAL STRUCTURE

Pursuant to the provisions of the State Constitution, the City is a home rule city with significant independent powers. In accordance with the City Charter (the "Charter"), the governance of the City is organized in two branches: the Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is composed of the City Council and its agencies. The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify ordinances enacted by the City by referendum. However, these powers do not extend to the budget or any ordinance for the appropriation of money, and the referendum power does not extend to an emergency ordinance. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 6, 2001, in which the Mayor, and six incumbent members and three new members of the City Council were elected. In January 2002, the Mayor and the newly constituted City Council commenced their new terms. JoAnn Watson was subsequently elected in a special election held as a result of the death of City Council member Brenda Scott. A City Council vacancy currently exists due to the death of Council member Kay Everett in November 2004. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the 36th District Court. See "GOVERNMENTAL STRUCTURE – District Court." Following is a description of the duties and responsibilities of the branches of the City government.

### *Executive Branch*

The Mayor is the chief executive of the City and has control of and is accountable for the Executive Branch of City government. The Charter grants the Mayor broad managerial powers, including the authority to appoint all department directors and deputy directors. The Charter also delegates the responsibility for the implementation of most programs, services and activities solely to the Executive Branch.

**Kwame M. Kilpatrick, Mayor,** was elected in November 2001 and assumed office January 1, 2002. Prior to his election as Mayor of the City, he served two terms representing Detroit's 9th District in the Michigan House of Representatives, including serving as House Democratic Leader. Prior to his tenure as a state legislator, he served as a teacher, mentor and basketball coach in the Detroit Public Schools and also taught high school in Tallahassee, Florida. Mayor Kilpatrick is chair of the Democratic Leadership Council's locally elected officials network. Mayor Kilpatrick graduated from Florida A&M University with a Bachelor of Science degree in Political Science, as well as his teacher certification. He received his Juris Doctor degree from Detroit College of Law.

**Anthony Adams, Deputy Mayor,** was appointed in January 2005. Prior to his appointment, he was General Counsel for the School District of the City of Detroit since January 2003, with responsibilities for supervising a staff of 20 and managing more than 25 outside firms to coordinate the legal defense of the District and serving as its Chief Legal Compliance Officer. Before that, he served as Chief Development Attorney for the District since July 2002, with responsibilities for coordinating all development projects and business contracts for the District, including its $1.5 billion capital improvement program. Earlier, he had a private law practice primarily in real estate development and finance. From 1991 to 1993, Mr. Adams was of counsel to the Dykema Gossett law firm in Detroit, Michigan. From 1985 to 1991, he served as an Executive Assistant to the Mayor of Detroit. He has a Bachelor of Science degree in Urban Management and Planning from the University of Cincinnati, and a law degree from Georgetown University Law Center in Washington, D.C.

Financial operations of the City are carried out through the appointed positions of Finance Director and Budget Director. The Finance Director oversees most financial functions of the City, including coordinating debt issuance activities, collecting and disbursing funds, investing City funds (excluding pensions), directing accounting procedures, purchasing goods and services and assessing of property in the City. The Budget Director is responsible for controlling and supervising the expenditure of funds and assisting the Mayor in the preparation of the City's annual budget and long-term capital agenda.

**Sean K. Werdlow, Finance Director**, was appointed in January 2002. Prior to his appointment, he was the Vice President of Finance and Treasurer of The Detroit Medical Center ("DMC") with responsibilities over system-wide cash management, short and long term capital budgeting, coordination of external working capital funding, issuance of debt, and various other financial planning and related activities. Prior to the DMC, Mr. Werdlow served as Executive Assistant Director of the City of Detroit Finance Department for nearly six years where he oversaw debt issuance and the investment of all City funds (excluding pension). Mr. Werdlow holds a Bachelor of Science degree in Finance from Wayne State University. He is a member of the Treasury Management Association and the Michigan Municipal Finance Officers Association. Mr. Werdlow serves on the boards of the City of Detroit Downtown Development Authority, the Detroit Brownfield Redevelopment Authority, the City of Detroit Building Authority, The Economic Development Corporation of the City of Detroit, the Greater Detroit Resource Recovery Authority, Detroit Transportation Corporation, the General Retirement System and the Charles H. Wright Museum of African American History.

**Roger Short, Budget Director**, was appointed in September 1999 and re-appointed by Mayor Kilpatrick in January 2002. Mr. Short has been employed by the City for approximately 21 years. Prior to his current appointment, Mr. Short served as Deputy Director of the Finance Department, with responsibilities that included issuing the City's Comprehensive Annual Financial Report, implementing a city-wide financial reporting and accounting system, and implementing an income tax reporting and collection system. He also held a 10-year appointed position as Auditor General for the City of Detroit. Mr. Short, a certified public accountant, holds a Bachelor of Arts degree and a Master of Arts degree in Public Policy from the University of Michigan.

**Carolyn Williams Meza, Chief Operating Officer**, was appointed in June 2002 and assumed her duties July 1, 2002 overseeing Detroit's public works, water and sewerage, public lighting, recreation, transportation, health and cultural departments. Ms. Williams Meza was formerly chief executive officer of the Chicago Park District of the City of Chicago, Illinois, the largest municipal system in the United States, for which she worked in several capacities since 1994. She was Assistant Commissioner at the City of Chicago's Department of General Services, and also worked as Executive Assistant in Chicago Mayor Daley's office from 1988 to 1989. Prior to her work in the public sector, she spent 13 years in the corporate arena. Ms. Williams Meza earned a Masters of Management degree from the Kellogg Graduate School at Northwestern University in 1975.

**Walter C. Watkins Jr., Chief Development Officer and Director of the City Planning and Development Department**, was appointed in February 2002. Mr. Watkins was formerly President of Bank One, Michigan. In addition to serving on the board of the Detroit Black Chamber of Commerce and the City of Detroit Downtown Development Authority, Mr. Watkins is a member of the boards of Fisk University, The Wellness Plan (HMO), the Detroit Medical Center and TEC Foods Inc. He also serves on the advisory board of Black Family Development Inc. and is a member of the Leadership Detroit Alumni Association and 100 Black Men of Greater Detroit. He received a bachelor's degree in Business Administration from Fisk University and a Master in Business Administration degree from Wayne State University.

**Ruth Carol Carter, Corporation Counsel**, was appointed in January 2002and heads a staff of more than 100 lawyers, with responsibilities for city contracts, advising the Mayor and City Council on legal issues, supervising preparation of ordinances and resolutions, and defending and prosecuting all city lawsuits. Prior to her appointment, she had been an Assistant Prosecuting Attorney for Wayne County, Michigan since July 1988, and before that she was a trial attorney in private practice. Ms. Carter serves as an Arts Commission Board member for the Detroit Institute of Arts, an Advisory Board member of the American Civil Liberties Union, and a member of the boards of the Detroit Cable Communications Commission, the Legal Defense Fund and the Michigan Association of Municipal Attorneys. She is a graduate of Dillard University in New Orleans, Louisiana, and has a law degree from Howard University School of Law.

### Legislative Branch

The City Council, composed of nine members elected at large for four-year terms, is the City's legislative body. The City Council has the power to override the Mayor's veto of City Council changes to the annual budget with a two-thirds majority of its members. The three agencies that aid the City Council in the performance of its duties are described below.

The Auditor General is appointed for a term of 10 years by a majority of City Council members and may be removed for cause by a two-thirds majority. Any person who has held the position of Auditor General is not eligible for reappointment. By Charter, the principal duty of the Auditor General is to audit the financial transactions of all City agencies. However, since 1980 the City has retained independent accounting firms to perform that function. As required by State law, audits are performed annually; they are only required every two years by the Charter. The Auditor General may investigate the administration and operation of any City agency and prepares various reports including an annual analysis for the City Council of the Mayor's proposed budget.

The Ombudsman is appointed for a term of 10 years by a two-thirds majority of City Council members for the purpose of investigating any official act of any agency (except elected officers) which aggrieves any person.

The City Planning Commission, consisting of nine members appointed by the City Council for 3-year terms, advises the City Council on such matters as the annual capital budget, certain development or renewal projects and proposals for the demolition, disposition or relinquishment of, or encroachment upon, public real property or public interests in real property.

### District Court

The 36th District Court is responsible for adjudicating certain legal matters that arise within the City, including state felony arraignments and preliminary examinations, state misdemeanor and City ordinance violations, civil litigation for claims of $25,000 or less, and landlord / tenant disputes. From the creation of the 36th District Court in 1981, through September 30, 1996, when Public Act 374 of 1996 became effective, the State of Michigan and the City of Detroit were responsible for shared funding of the 36th District Court.

In July 1996, the State of Michigan enacted Public Act 374 of 1996, which required that, effective October 1, 1996, the City assume the cost, in excess of fines collected by the Court, for the operations of the 36th District Court, including payroll for non-judicial 36th District Court personnel, except to the extent the City is reimbursed by an allocation from the State's so-called "hold harmless fund" during a five-year transition period. The "hold harmless fund" consisted of a statewide amount of $20 million for the state's fiscal year beginning October 1, 1996, and was phased out, annually, in $4 million increments during the next four state fiscal years.

On January 12, 1997, the State of Michigan enacted Public Act 524 of 1996. Public Act 524 amended Act 374 by changing the calculation for determining the City's initial share of the so-called "hold harmless fund." When the "hold harmless fund" terminated on September 30, 2001, the City became solely responsible for all funding of the 36th District Court, except for judicial salaries.

### Principal Governmental Services and Work Force

The following table sets forth the major services provided to City residents, the governmental unit responsible for providing that service, and the revenue source of City-provided services as indicated in the City's proposed Executive Budget for the fiscal year ending June 30, 2006. The City's budget contains both operating revenues and expenditures, and capital sources and expenditures.

B-4

**Table 1–Services Provided: Governmental Unit and Revenue Sources**

| | | **Percent Supported by:** | | | | |
|---|---|---|---|---|---|---|
| | **Responsibility** | **General Fund(1)** | **Self-Supported(2)** | **State Grants(3)** | **Federal Grants(3)** | **Other Revenue(4)** |
| Police and fire ................... | City | 80.7% | 13.7% | 1.0% | 0.9% | 3.7% |
| Education .......................... | Independent School District (totally funded by other than City sources) | | | | | |
| Sanitation and streets ........ | City | 57.6 | 10.5 | 30.7 | - | 1.1 |
| Parks and recreation.......... | City | 73.0 | 6.8 | 5.6 | - | 14.5 |
| Water and Sewer (5)(7)..... | City | - | 100.0 | - | - | - |
| Court .................................. | City/State | 39.8 | 56.6 | 3.7 | - | - |
| Transportation: | | | | | | |
| Port (6) ........................... | City/County/State | 100.0 | - | - | - | - |
| Bus (7) ............................ | City | - | 62.8 | 30.5 | - | 6.7 |
| Airports: | | | | | | |
| City (7)............................ | City | - | 100.0 | - | - | - |
| Metropolitan.................... | County (totally funded by other than City sources) | | | | | |
| Housing (8) ....................... | Independent (totally funded by other than City sources) | | | | | |
| Planning and | | | | | | |
| Development (9) .............. | City | (50.6) | 65.9 | - | 83.1 | 1.6 |
| Health................................ | City | 16.7 | 9.3 | 25.4 | 48.6 | 1.0 |
| Hospital............................. | Private (totally funded by other than City sources) | | | | | |
| Welfare ............................. | State (totally funded by other than City sources) | | | | | |
| Public Lighting (10).......... | City | 22.5 | 68.4 | 5.0 | - | 4.0 |
| Parking(7) ......................... | City | - | 100.0 | - | - | - |

SOURCE: Proposed fiscal year 2006 Executive Budget; may be different from actual. Totals may not add up to 100% due to rounding.

---

(1)   Represents the net tax cost to the City.
(2)   Includes revenues derived from sale of services to other City departments and self-supporting agencies.
(3)   Includes mass transportation and housing capital grant revenues.
(4)   Includes both bond proceeds and Federal project note borrowings.
(5)   Provides water supply and sewage disposal services for the Southeastern Michigan region. Accounted for separately in two enterprise funds.
(6)   Although the Port facilities are privately owned, the Detroit/Wayne County Port Authority's budget is derived from City, Wayne County, and State contributions.
(7)   Accounted for in an enterprise fund.
(8)   See "FINANCIAL OPERATIONS-Other Funds of the City–Enterprise Funds" herein. The Detroit Housing Commission ("DHC") is no longer an enterprise fund of the City. As such, the fiscal year 2006 budget does not include funding for the DHC.
(9)   Department revenues exceed appropriations resulting in net contributions to the General Fund
(10)  Provides power through a City-owned public utility for City-owned buildings, streets, certain other governmental units and some private customers. Revenues are derived from the sale of power to these governmental units and private customers.

The following table sets forth the City's budgeted employee positions for the fiscal years ended or ending June 30, 2002 through 2006, according to those positions that are tax-supported and those positions that are supported by other revenues.

### Table 2–City of Detroit Budgeted Employee Positions

| | Fiscal Year Ended or Ending On June 30, | | | | | | | | | |
| | 2002 | | 2003 | | 2004 | | 2005 | | 2006 | |
| | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** |
| Tax supported: | | | | | | | | | | |
| General City | 8,419 | 40% | 8,104 | 40% | 7,929 | 40% | 7,448 | 40% | 6179 | 37% |
| Police and fire | 5,812 | 28 | 5,694 | 28 | 5,704 | 29 | 5,695 | 30 | 5,482 | 33 |
| Library | 537 | 3 | 475 | 2 | 476 | 2 | 485 | 3 | 465 | 3 |
| Total tax supported | 14,768 | 70 | 14,273 | 70 | 14,109 | 72 | 13,628 | 73 | 12,126 | 72 |
| Revenue supported: | | | | | | | | | | |
| Transportation | 1,861 | 9% | 1,838 | 9% | 1,838 | 9% | 1,716 | 9% | 1,534 | 9% |
| Water | 2,420 | 12 | 2,411 | 12 | 2,097 | 11 | 2,097 | 11 | 1,916 | 11 |
| Sewage | 1,499 | 7 | 1,477 | 7 | 1,301 | 7 | 1,302 | 7 | 1,189 | 7 |
| Housing (1) | 442 | 2 | 442 | 2 | 357 | 2 | - | - | - | - |
| Total revenue supported | 6,222 | 30 | 6,168 | 30 | 5,593 | 28 | 5,115 | 27 | 4,639 | 28 |
| Total | 20,990 | 100% | 20,441 | 100% | 19,702 | 100% | 18,743 | 100% | 16,765 | 100% |

SOURCE: City's Budgets for fiscal years ended or ending June 30, 2002 through 2005, and proposed Executive Budget for fiscal year ending June 30, 2006. Totals may not add up to 100% due to rounding.

_____

(1) Housing (the Detroit Housing Commission) is no longer a City Department. Separation was finalized through judicial action in fiscal 2004.

The following table sets forth the departmental budgeted appropriations as a percentage of total City general agency appropriations for the fiscal years ended or ending June 30, 2002 through 2006:

### Table 3–Departmental Appropriations

| | Fiscal Year Ended or Ending On June 30, | | | | |
| | **2002** | **2003** | **2004** | **2005** | **2006** |
| Police | 19% | 20% | 23% | 25% | 24% |
| Fire | 8% | 9% | 10% | 11% | 10% |
| Public works (sanitation and streets). | 13% | 12% | 11% | 11% | 9% |
| Public lighting | 4% | 4% | 4% | 4% | 4% |
| Health | 5% | 5% | 5% | 5% | 5% |
| Recreation | 3% | 3% | 3% | 3% | 2% |
| Planning and development | 4% | 4% | 4% | 3% | 4% |
| Other departments | 26% | 25% | 24% | 22% | 22% |
| Non-departmental: | | | | | |
| Enterprise fund contributions (1) | 5% | 5% | 4% | 4% | 4% |
| Other | 13% | 12% | 11% | 13% | 17% |
| General agency budget (millions) | $1,933.2 | $1,816.0 | $1,877.3 | $1,935.1 | $1,776.2 |

SOURCE: Budget Department. Totals may not add up to 100% due to rounding.

_____

(1) The City has provided financial support for the Transportation Fund. See "FINANCIAL OPERATIONS – Other Funds of the City."

### Related City Entities

Other entities have been established by the City, in certain cases with the County and with the City of Highland Park, principally for the purpose of providing capital financing (normally through the sale of bonds

or through special tax levies) for various improvements, services or major construction projects. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Tax Supported and Revenue Debt" and "-Overlapping Debt." Below is a description of certain entities and their functions.

*City of Detroit Downtown Development Authority.* This authority (the "DDA") was established by the City to help halt property value deterioration and to promote economic growth in the City's downtown district. The DDA has issued tax increment bonds to partially finance various downtown projects. Its administrative operations are financed by a one-mill property tax levy assessed on property in the downtown district. The DDA last issued debt in 1998.

*City of Detroit Tax Increment Finance Authority.* This authority (the "TIFA") was established for the purpose of preparing development and tax increment financing plans in the City other than in the Downtown District. The authority sold tax increment bonds and assisted in the financing of a portion of the Central Industrial Park Project, which includes a 3 million square foot General Motors plant in operation since 1985. Because of a sunset provision in the legislation creating this entity, this authority does not have the ability to issue additional debt.

*City of Detroit Local Development Finance Authority.* This authority (the "LDFA") was established for the purpose of assisting in the financing of development projects in the City. The authority is authorized to sell tax increment bonds and sold $42 million in tax increment bonds to finance a portion of the cost of the City's Jefferson/Conner Redevelopment Project. The LDFA last issued debt in 1998.

*The Economic Development Corporation of the City of Detroit.* This corporation (the "EDC") was established for the purpose of assisting industrial and commercial enterprises in various endeavors that would benefit Detroit residents. It has various statutory powers, including the ability to issue project revenue bonds. The EDC has $63.9 million of bonds outstanding as of May 1, 2005 that were issued to refund the bonds issued to finance pollution control equipment that was installed at the Greater Detroit Resource Recovery Authority ("GDRRA") Facility described below. The EDC last issued debt in 2001.

*Detroit Economic Growth Corporation.* This corporation is a private, non-profit corporation established in 1978 as a liaison between the public and private sector to promote economic growth and development. The corporation is governed by a board made up of prominent Detroit business, political and labor leaders and has a full-time staff. The corporation's operations are financed from private contributions and City and State grants. In addition to providing assistance to private firms, the corporation provides staff services to the DDA, the EDC, the TIFA and the LDFA.

*Greater Detroit Resource Recovery Authority.* GDRRA was created by the cities of Detroit and Highland Park for the purpose of financing and supervising construction and operations of a waste-to-energy facility located in the City (the "Facility"). GDRRA has $183.0 million of bonds outstanding as of May 1, 2005, which were issued to refund the bonds issued to finance construction of the Facility. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES."

*Detroit Transportation Corporation.* This corporation was formed by the City in 1985 to complete construction and manage operations of the Downtown People Mover. Capital costs associated with the project were provided from Federal and State sources and operating funds are derived from fare box revenues and General Fund subsidies. The corporation's finances are accounted for as a discretely presented component unit enterprise operation of the City. See "FINANCIAL OPERATIONS – Other Funds of the City – Enterprise Funds."

*City of Detroit Building Authority.* The Building Authority was established by the City for the purpose of financing and managing the construction of various publicly owned buildings, parking lots and structures, recreational facilities and related sites to be leased to the City. The Building Authority financed the Joe Louis Arena and Joe Louis Arena Garage and the acquisition of and repairs to municipal parking facilities in downtown Detroit. The Building Authority also directs numerous other construction projects in the City. The Building Authority last issued debt in 1999.

*Detroit-Wayne Joint Building Authority.* This authority was established by a joint effort of the City and the County for the purpose of constructing and maintaining buildings that would serve both City and County residents. This authority financed the construction of both the Coleman A. Young Municipal Center (formerly known as the City-County Building) and the Frank A. Murphy Hall of Justice Building, and improvements to court-related facilities in the Coleman A. Young Municipal Center, through bonds that have since been retired.

*Detroit/Wayne County Stadium Authority.* This authority is a public body incorporated by Wayne County pursuant to Act 31, Public Acts of Michigan, 1948 (First Extra Session), as amended. It is governed by a 6-member board of directors appointed by the County Executive of Wayne County, three of which are nominated by the Mayor of the City. The purpose of the Detroit/Wayne County Stadium Authority is to acquire, build, furnish, equip, own, improve, enlarge, operate and/or maintain one or more stadia, together with appurtenant properties and facilities, including parking. The Detroit/Wayne County Stadium Authority acquired the land necessary for the two side-by-side stadiums, appurtenant facilities, and parking constructed in downtown Detroit. The first stadium project, Comerica Park and its appurtenant facilities and parking, was completed in 2000 and is presently occupied and utilized by Major League Baseball's Detroit Tigers. The second stadium and its affiliated facilities, Ford Field, was completed in 2002 and is occupied and utilized by the Detroit Lions of the National Football League. In March 1997, the Detroit/Wayne County Stadium Authority issued $85,815,000 in stadium bonds.

*Detroit/Wayne County Port Authority.* This authority was created in 1979 for the purpose of promoting and facilitating the development of Detroit as a major international trade location. The Port Authority works in conjunction with State and local government and private investors to serve as a catalyst on projects that have a public purpose in the areas of international trade and freight transportation. The Port Authority conducts marketing and promotional activities in international and freight transportation. The Port Authority issued $11 million of bonds in fiscal 2004 for development. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION - Port of Detroit," and "- Major Projects and Developments."

*City of Detroit Brownfield Redevelopment Authority.* The City's Brownfield Redevelopment Authority (the "DBRA") was established by the City to promote the redevelopment of and private investment in certain environmentally distressed properties within the City. The DBRA has various statutory powers, including the authority to issue bonds and other evidence of indebtedness, acquire and dispose of certain property and permit the use of certain tax increment financing. Since its inception, the DBRA has approved more than 80 brownfield redevelopment plans.

### Other Governmental Entities

Services are provided to residents of the City by other governmental entities such as Wayne County, the School District of the City of Detroit, Wayne County Community College and the Wayne County Regional Educational Service Agency. All of these entities are funded through their own taxing powers and other sources independent of the City.

## FINANCIAL PROCEDURES

### Accounting System

The City's fiscal year begins on July 1 and ends on June 30. The City uses an Oracle financial management system, which provides the general ledger, purchasing, accounts payable, accounts receivable, fixed assets, and project accounting applications. These Oracle core financial applications are integrated with third-party Oracle-approved software providers for budget preparation, work order, and inventory applications to provide a complete financial reporting system.

The City uses a Legacy human resources/payroll application for employee compensation. Preliminary funding has been approved to begin planning the replacement of the Legacy system with Oracle human

resources/payroll modules. The complete integration of the Oracle human resources/payroll application with the Oracle core financial applications is expected to take three to four years to completion.

The City's financial statements are prepared based substantially upon the financial information contained in the Oracle software. The City's basic financial statements and entity-wide financial statements for fiscal year 2004 were audited by independent accountants hired by the Auditor General's Office, and are the most recent audited City financial statements available.

### *Accounting Methods*

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America. Except for the City's Enterprise Funds and Pension Funds (which are accounted for on the accrual basis), the City's funds and accounts are maintained and reported on the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recognized when they are susceptible to accrual, *i.e.*, measurable and available to finance expenditures of the current fiscal year. Municipal income taxes are accrued for income tax withholdings estimated by the City as collected by employers but not yet remitted to the City. Estimated refunds for income tax returns received and in process, on which payment has not yet been made, are recorded as a reduction of revenues. Although the City recognizes revenues from sources when susceptible to accrual, the City also establishes reserves from time to time against certain of the revenues so recognized, to reflect its judgment of collectibility.

The City records expenses when goods and services are received and encumbers the amounts required by purchase orders and contracts at the time the purchase orders and contracts are issued. The encumbrances are liquidated when the goods and services are received. While the City is not required to carry unliquidated encumbrances past the end of the fiscal year, it sets aside, within each respective fund balance, an amount equal to the unliquidated encumbrances that the City wishes to carry forward. In the succeeding year, the budget is increased by an amount sufficient to cover the unliquidated encumbrances and these encumbrances are reinstated. Unliquidated appropriations represent amounts appropriated for liquidation of encumbrances and for other commitments not liquidated by year-end and carried forward to the succeeding year's budget. Any remaining balance constitutes an unappropriated surplus. In accordance with a City ordinance, one-half of any unappropriated surplus is transferred to a Budget Stabilization Fund with the balance being available for other appropriations in the following fiscal year. Any unappropriated deficit is funded in the succeeding fiscal year.

The Capital Projects Fund accounts for all funds used for the construction, acquisition, and renovation of capital facilities. The City maintains 12 funds within the Capital Projects Fund, which account for all capital improvements including those financed by the City's general obligation bond issues, gifts, governmental grants, transfers from other funds and special assessments. The City maintains detailed accounting records by individual projects within these funds. Revenues and expenditures are recorded in specific cost centers which list the sources of revenue and type of expenditure. Uncollected estimated revenues and unexpended appropriations are brought forward until completion of a capital project. Revenues must be used on the specific capital projects for which they were designated. Included as APPENDIX C are the audited basic financial statements of the City for the fiscal year ended June 30, 2004. The latest audited comprehensive annual financial report of the City is for the fiscal year ended June 30, 2004, and is available by request to the City's Finance Director or on the City's website at www.ci.detroit.mi.us/finance.

### *Cash Management*

A cash flow forecast is prepared annually to assist in formulating cash management strategy and is revised as necessary. The City maintains one bank account for General Fund receipts and disbursements, excluding general obligation bond proceeds, which are kept in a separate account. Capital Projects Fund moneys are also maintained in separate accounts.

All funds are invested in accordance with State law. The City may invest in direct obligations of the United States, obligations of an agency or instrumentality of the United States, certain grades of commercial

paper, bankers acceptances of United States banks, certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation, and certain municipal bonds.

The City's investment policy is to provide for effective cash management. The City's investment policy attempts to maintain and protect invested principal while striving to maximize total return on the portfolio consistent with limitations pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended ("Act 20"). The City has not experienced material investment-related losses in any City-managed funds. As of May 1, 2005, the composition of the City's investment portfolio was as follows:

### Table 4–Composition of General Fund Investment Portfolio
#### May 1, 2005

| | |
|---|---|
| Certificate of Deposit | 4.02% |
| Pooled investment funds* | 56.58 |
| United States Government securities | 39.40 |
| Total | 100.00% |

* Consists only of permitted investments.

In accordance with Act 20, Public Acts of Michigan, 1943, as amended, no investments may have a maturity longer than 10 years from the date of investment. As of May 1, 2005, the longest investment of the City's General Fund had a maturity of August 15, 2011.

### Table 5–General Fund Investments

| | |
|---|---|
| Average monthly investment balance, fiscal 2005 | $101,509,287 |
| Investment earnings, fiscal 2004 | $ 1,467,561 |
| Investment earnings, fiscal 2003 | $ 1,556,451 |

### *Budget Process*

The general content and process of developing the City's annual budget are prescribed by the City Charter. The City's annual budget constitutes a financial plan for the next fiscal year which is required to set forth estimated revenues from all sources and all appropriations. Proposed capital appropriations are included. Any deficit during the preceding year is entered into the budget for the next fiscal year as an appropriation in accordance with the City Charter. One-half of any surplus is credited to the Budget Stabilization Fund with the remainder being included as a revenue in the following year. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted is a balanced budget.

The adoption of the budget provides for: (1) appropriations of specified amounts from funds indicated, (2) a specified levy of the property tax and (3) provision for the issuance of bonds specified in the capital program. The budget document as adopted becomes the basis for establishing revenues and expenditures for the fiscal year following the fiscal year of passage. The appropriation for every function of each City department is a fixed expenditure and may not exceed the original appropriation without City Council approval. If, during the fiscal year, the Mayor advises the City Council that there are available for appropriation revenues in excess of those estimated in the budget, the City Council may make supplemental appropriations for the year up to the amount of the excess. In the case of revenue shortfalls, the Mayor may request that the City Council decrease certain appropriations. The Mayor is under no obligation to spend an entire appropriation. Also, at any time during the fiscal year the City Council, upon written request by the Mayor, may transfer all or part of any unencumbered appropriation balance among programs, services or activities within an agency or from one agency to another.

Prior to the December submission of budget requests to the Budget Director, seven departments are required to attend a public meeting where input is received on programs and objectives for the coming year are

B-10

addressed. These departments include Police, Fire, Public Works, Public Lighting, Health, Recreation and Water and Sewerage. The initial budget proposal, which includes all department estimates of revenues and expenditures for the fiscal year beginning July 1, is submitted to the Mayor by the Budget Department on or before the preceding February 22. The Mayor may revise the budget prior to submitting it to the City Council on or before April 12, the date for budget submission to the City Council established by City ordinance.

Prior to approval of the budget, the City Council holds hearings with various department and agency heads and also holds a public hearing. In addition, the Auditor General prepares an analysis of the proposed budget for the City Council. The City Council may amend the budget as presented by the Mayor on or before May 24. The Mayor may veto any City Council amendment, but must do so by the third business day after May 27. Any Mayoral veto of City Council amendments to the budget may be overridden by the City Council by a two-thirds vote of the members serving; provided, however that the Council must act on or before the third calendar day or the second business day (whichever will provide the greater number of business days) following the maximum return date of the budget by the Mayor.

### Budget Stabilization Fund

In 1978, the State Legislature authorized municipalities to establish budget stabilization funds for the purpose of providing a method to stabilize financial operations. Prior to that time, municipalities were required to allocate any budget surplus to the following fiscal year. Accordingly, in 1979, the City, by ordinance, established the Budget Stabilization Fund of the City to cover General Fund deficits, to restore a reduction in the number of employees (under certain circumstances) and to cover expenses arising because of a natural disaster. One-half of the General Fund surplus, up to the lesser of either 15% of the City's most recent General Fund budget or 15% of the average of the City's five most recent General Fund budgets, is transferred to the Budget Stabilization Fund each year a surplus is experienced. The Budget Stabilization Fund had a balance of $8.5 million as of June 30, 2003, which was used to reduce the City's General Fund deficit in fiscal year 2004, and the Budget Stabilization Fund has had a zero balance since that time. See "FINANCIAL OPERATIONS – Overview" and "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund."

### Risk Management

The City is self-insured with respect to property damage, liability risks and worker's compensation claims. The City assumes the risk for many loss exposures, using generally accepted standards with regard to self-assumption of risk. Provisions are made for assumed losses by a combination of annual budgetary appropriations and liquid reserve funds. Insurance has been obtained for catastrophic loss exposures when insurance has been a feasible alternative. Contract liability losses and tort and negligence liability losses are covered by a combination of a Public Liability Reserve Fund and a Risk Management Fund ("RMF"). The City issued self-insurance bonds in 2003 and 2004 to make loss payments.

The following schedule indicates the amounts paid from appropriations for the fiscal years ended June 30, 2000 through 2004. The schedule reflects both General Fund and Transportation Fund payments. As discussed under "FINANCIAL OPERATIONS - Other Funds of the City–Enterprise Funds," the General Fund has typically made substantial transfers to the Transportation Fund, in part to cover liability claims payable from that fund.

**Table 6-Liability Claims Paid**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** |
| Damage and liability claims ..... | $32,324,513 | $22,984,376 | $26,079,282 | $31,902,082 | $31,471,943 |
| Vehicle claims .......................... | 7,270,904 | 5,973,490 | 8,235,563 | 8,784,362 | 27,963,846 |
| Worker compensation claims ... | 20,189,525 | 21,363,664 | 17,876,181 | 14,695,446 | 16,042,338 |
| Total..................................... | $59,784,942 | $50,321,530 | $52,191,026 | $55,381,890 | $75,478,127 |

SOURCE: Finance Department.

## FINANCIAL OPERATIONS

### *Overview*

This section contains a detailed account of various important financial matters. See especially "FINANCIAL OPERATIONS–Recent Budget Results of the General Fund" and "–Other Funds of the City."

### *Revenues and Expenditures of the General Fund*

The tables below and on the next page set forth a comparison of revenues, expenditures and other financing sources and uses of the General Fund by major classification.

**Table 7-Revenues and Expenditures of the General Fund**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** (in millions) | **2003** | **2004** |
| **REVENUES:** | | | | | |
| Taxes, assessments, interest and penalties: | | | | | |
| Property taxes | $ 155.7 | $ 152.8 | $ 169.7 | $ 166.3 | $ 184.8 |
| Municipal income tax | 378.3 | 341.0 | 323.5 | 310.9 | 290.6 |
| Utility User's Tax | 54.5 | 54.3 | 52.1 | 55.3 | 50.5 |
| Wagering Taxes | 53.4 | 85.8 | 109.4 | 111.3 | 116.1 |
| Other Taxes | 10.8 | 12.5 | 13.4 | 13.5 | 12.0 |
| Assessments, interest and penalties on taxes | 9.4 | 8.0 | 10.8 | 9.3 | 14.0 |
| Total Taxes, assessments, interest & penalties | 662.1 | 654.4 | 678.9 | 666.6 | 668.0 |
| Total licenses, permits and inspection charges | 29.8 | 10.1 | 9.2 | 8.4 | 9.4 |
| Shared taxes: | | | | | |
| State revenue sharing | 332.7 | 333.3 | 333.8 | 319.1 | 286.5 |
| Other shared taxes | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Total shared taxes | 333.2 | 333.8 | 334.3 | 319.6 | 287.0 |
| Grants: | | | | | |
| State equity package | 1.9 | 3.6 | 3.6 | 2.1 | 1.0 |
| Other grants | 83.6 | 73.7 | 70.7 | 63.9 | 78.6 |
| Total grants | 85.5 | 77.3 | 74.3 | 66.0 | 79.6 |
| Sales and charges for services | 176.9 | 185.9 | 198.0 | 171.1 | 176.0 |
| Other revenues | 81.9 | 107.4 | 175.8 | 148.2 | 155.0 |
| Total revenues | 1,369.4 | 1,368.9 | 1,470.5 | 1,379.9 | 1,375.0 |
| **OTHER FINANCING SOURCES:** | | | | | |
| Bond proceeds | 11.0 | - | - | - | - |
| Debt proceeds-General Obligation Limited Tax | - | - | 50.3 | 56.0 | 209.9 |
| Project borrowings (loan proceeds) | 23.7 | - | - | - | - |
| Transfer from Community Development Block Grants | 24.4 | 16.6 | 21.4 | - | - |
| Transfer from Federal Employment & Training Funds | - | - | - | - | - |
| Transfer from Major & Local Street Funds | 53.6 | 41.3 | 44.8 | 48.9 | 56.2 |
| Transfer from Capital Projects Fund | - | - | 0.8 | - | - |
| Transfer from trust and agency funds | - | 0.3 | - | - | - |
| Transfer from Sewage Disposal Funds | - | - | - | - | - |
| Transfer from Water Fund | - | - | - | - | - |
| Transfer from component units | 8.0 | 32.2 | - | - | - |
| Transfer from Transportation Fund | 11.4 | - | - | - | - |
| Total other financing sources | 132.1 | 90.4 | 117.3 | 104.9 | 266.1 |
| **Special Item**-Casino Development Revenue | - | - | - | 63.8* | 38.3* |
| **TOTAL REVENUES AND OTHER FINANCING SOURCES** | $1,501.5 | $1,459.3 | $1,587.8 | $1,548.6 | $1,679.4 |

\* Non-recurring

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** |
| **EXPENDITURES:** | | | (in millions) | | |
| Executive agencies: | | | | | |
| Department of Public Works .................................... | $ 224.9 | $ 203.5 | $ 226.9 | $ 188.0 | $ 168.1 |
| Fire................................................................................ | 141.3 | 155.4 | 151.2 | 161.2 | 182.2 |
| Health............................................................................ | 98.0 | 89.0 | 97.9 | 102.2 | 88.9 |
| Police............................................................................ | 332.5 | 382.5 | 362.5 | 362.4 | 462.6 |
| Lighting ........................................................................ | 56.9 | 70.8 | 64.4 | 61.9 | 64.5 |
| Recreation..................................................................... | 49.0 | 48.1 | 53.9 | 59.3 | 53.6 |
| All other ........................................................................ | 274.2 | 231.8 | 254.4 | 237.2 | 274.5 |
| Total executive agencies......................................... | 1,176.8 | 1,181.1 | 1,211.2 | 1,172.2 | 1,294.4 |
| Legislative agencies...................................................... | 12.7 | 14.3 | 16.3 | 16.0 | 18.1 |
| Judicial agencies............................................................ | 44.1 | 44.8 | 47.0 | 47.7 | 45.4 |
| Non-departmental(1)....................................................... | 136.1 | 82.6 | 167.0 | 227.8 | 259.8 |
| Total expenditures .................................................. | 1,369.7 | 1,322.8 | 1,441.5 | 1,463.7 | 1,617.7 |
| | | | | | |
| **OTHER FINANCING USES:** | | | | | |
| Transfer to Community Dev. Block Grant Fund .......... | - | - | - | 1.3 | - |
| Transfer to Construction Code Fund............................. | - | 6.4 | 3.0 | 6.0 | 4.0 |
| Transfer to Detroit Building Authority ......................... | - | 0.5 | 0.5 | 0.4 | 0.3 |
| Transfer to Human Services Fund ................................. | 3.6 | 4.5 | 4.0 | 6.5 | 5.7 |
| Transfer to Federal Employment & Training Funds..... | - | 0.1 | - | - | - |
| Transfer to Major Street Fund ...................................... | - | - | - | - | - |
| Transfer to general debt service funds (2) .................... | 53.0 | 46.0 | 40.3 | 44.2 | 51.3 |
| Transfer to Capital Projects Fund ................................. | 2.2 | 6.6 | 1.7 | - | - |
| Transfer to Urban Renewal Fund................................... | - | - | - | - | - |
| Transfer to Airport Fund (3) ......................................... | 1.9 | 1.9 | 3.6 | 2.5 | 2.8 |
| Transfer to Housing Fund ............................................. | - | - | 2.1 | 1.3 | - |
| Transfer to trust and agency funds............................... | 0.8 | - | - | - | - |
| Transfer to Transportation Fund (3) ............................. | 53.4 | 74.2 | 79.3 | 75.5 | 74.3 |
| Transfer to component units ......................................... | 15.5 | 25.7 | - | - | - |
| Payment to refunded debt escrow ................................. | 11.0 | - | 49.4 | - | - |
| Total other financing uses...................................... | 141.4 | 165.9 | 183.9 | 137.7 | 138.4 |
| | | | | | |
| **TOTAL EXPENDITURES AND OTHER** | | | | | |
| **FINANCING USES** ....................................................... | $1,511.1 | $1,488.7 | $1,625.4 | $1,601.4 | $1,756.1 |

SOURCE: Derived by the Finance Department from audited financial statements. Totals may not add up due to rounding.

(1) Non-departmental includes items such as payment of damage claims, self insurance fund contributions and other expenses that are not allocated on a departmental basis.
(2) Reflects refunding of certain limited tax obligations. See "FINANCIAL OPERATIONS – General Fund Revenue Categories."
(3) The City has made transfers to certain enterprise funds for operating purposes. See "FINANCIAL OPERATIONS – Other Funds of the City – Enterprise Funds."

13-53846-tjt   Doc 3153-2   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 75 of 100

### Fund Balance of the General Fund

An analysis of changes in Fund Balance of the General Fund for the fiscal years ended June 30, 2000 through 2004 is as follows:

### Table 8-General Fund Balance

|  | Fiscal Year Ended June 30, | | | | |
|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Fund balance at beginning of year previously reported before restatement | $ 234.3 | $ 217.1 | $ 218.1 | $ 206.2 | $ 140.3 |
| Fund balance restatement (1) | - | 32.9 | 19.7 | - | - |
| Fund balance at beginning of year, as restated | 234.3 | 250.0 | 237.8 | 206.2 | 140.3 |
| Revenues and other financing sources | 1,501.5 | 1,459.3 | 1,587.8 | 1,548.6 | 1,679.5 |
| Expenditures and other financing uses | (1,511.1) | (1,488.7) | (1,625.4) | (1,601.4) | (1,757.4) |
| Increase (decrease) in reserve for other assets | (7.6) | (2.5) | 6.0 | (13.1) | 6.9 |
| Fund balance at end of year | $ 217.1 | $ 218.1 | $ 206.2 | $ 140.3 | $ 69.2 |

SOURCE: Derived by the Finance Department from audited financial statements.

_____

(1)  The General Fund has been restated to reflect the adoption of Governmental Accounting Standards Board ("GASB") Interpretation Number 6, "Recognition and Measurement of Certain Liabilities and Expenditures in Governmental Fund Financial Statements."

### Components of Fund Balance

An analysis of the components of Fund Balance of the General Fund for the fiscal years ended June 30, 2000 through 2004 is as follows:

## Table 9-Components of General Fund

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** (in millions) | **2003** | **2004** |
| Reserved Fund balance: | | | | | |
| Reserve for Encumbrances................................. | $108.8 | $98.0 | $59.2 | $96.8 | $48.9 |
| Reserve for the Budget Stabilization Fund ...... | - | 34.1 | 7.7 | 8.5 | - |
| Reserve for Risk Management Operations........ | 36.1 | 44.8 | 51.8 | 50.5 | 35.9 |
| Reserve for BC/BS Insured Program (1).......... | - | - | - | 21.7 | - |
| Reserve for Motor Vehicle Fund...................... | - | - | - | - | 39.3 |
| Reserve for Inventories ..................................... | 39.3 | 36.7 | 42.8 | 29.7 | 36.5 |
| Reserve for Advances and Loans...................... | 3.1 | 6.0 | 2.2 | 2.2 | 3.6 |
| Total reserved fund balance ...................... | 187.3 | 219.6 | 163.7 | 209.4 | 164.2 |
| Unreserved Fund balance: | | | | | |
| Designated: | | | | | |
| For Accrued Compensated Absences.......... | - | - | 17.5 | - | - |
| For BC/BS insured program (1).................. | 27.5 | 24.8 | 23.4 | - | - |
| Total Designated fund balance................. | 27.5 | 24.8 | 40.9 | - | - |
| Undesignated: | | | | | |
| From Operations .......................................... | 2.3 | (26.4) | 1.6 | (69.1) | (95.0) |
| Funded by Fiscal Stabilization Bonds......... | - | - | - | - | - |
| Total Undesignated fund balance............. | 2.3 | (26.4) | 1.6 | (69.1) | (95.0) |
| Total Unreserved fund balance (deficit)........... | 29.8 | (1.6) | 42.5 | (69.1) | (95.0) |
| Total Fund balance | $217.1 | $218.1 | $206.2 | $140.3 | $69.2 (2) |

(1)     The Blue Cross/Blue Shield Reserve component of the General Fund decreased from $21.7 million at June 30, 2003 to $-0- at June 30, 2004 as the result of a settlement agreement with the City's Retirement Systems. $15.7 million was transferred to the Employee Benefit Fund (a fiduciary fund), and the remaining $6.0 million was used to defray heath care costs during fiscal 2004.

(2)     See "FINANCIAL PROCEDURES – Recent Budget Results."

SOURCE:   Derived by the Finance Department from audited financial statements.

### General Fund Revenue Categories

The City's General Fund derives revenues from various sources. The following table shows the percentage that various sources of General Fund revenues have contributed to total General Fund revenues for the fiscal years ended June 30, 2000 through 2004.

**Table 10-Major General Fund Revenue and Other Financing Sources**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** |
| | | | (Percent to Total) | | |
| Property tax | 11.4% | 11.2% | 11.5% | 12.1% | 13.4% |
| Municipal income tax | 27.6 | 24.9 | 22.0 | 22.5 | 21.4 |
| Utility users tax | 4.0 | 4.0 | 3.5 | 4.0 | 3.6 |
| Wagering excise tax | 3.9 | 6.3 | 7.4 | 8.1 | 8.4 |
| State shared revenues | 24.3 | 24.3 | 22.7 | 23.1 | 20.8 |
| State equity package | 0.1 | 0.3 | 0.2 | 0.2 | - |
| Sales and charges for services | 12.9 | 13.6 | 13.5 | 12.4 | 12.8 |
| Other revenue, grants and financing sources (1) | 15.8 | 15.4 | 19.2 | 17.6 | 19.6 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE:     Derived by the Finance Department from audited financial statements.

_____

(1)   See "FINANCIAL OPERATIONS–General Fund Revenue Categories–Other Revenue, Grants and Other Financing Sources" for a discussion of the sources of revenue included in this category.

The following is a description of the major General Fund revenue sources of the City.

Property Taxes

The City reports revenue from real and personal property taxes when measurable and available. Available is defined as "due and receivable within the current period, and collected within the current period or expected to be collected within sixty days thereafter."

The City's Taxable Value (defined in "ASSESSED VALUATION AND PROPERTY TAXES – Property Valuation and Tax Rate" below) has increased an average of 4.3% during each of the five fiscal years ended June 30, 2005.    The City contracted with MBIA Muniservices, Inc. to collect certain real property tax delinquencies existing prior to March 1, 2004.  The MBIA contract expires in fiscal 2006.  Beginning March 1, 2004, Wayne County began collection of the City's delinquent real property taxes.  Effective December 29, 2003, Public Act 246 of 2003 allows for the Treasurer of a City with a first class school district to return (transfer) all uncollected delinquent taxes levied on real property after December 31, 2004 to the County Treasurer on the March 1st immediately following the year in which the taxes are levied.  On March 1, 2004, the City transferred to the Wayne County Treasurer the uncollected 2003 real property taxes.  In June 2004, the City received from Wayne County a total of $37.4 million that was due to the General Fund and the Debt Service Fund which represented 2003 real property taxes that had been collected.    See "ASSESSED VALUATION AND PROPERTY TAXES – Tax Levies and Collections" herein.   Since 1994, the State Legislature has enacted various statutes pertaining to assessments and assessment procedures.  These changes have restricted the rate of growth on Taxable Value of property throughout the State.  See "ASSESSED VALUATION AND PROPERTY TAXES."  During fiscal year 2001, the State Tax Commission issued new valuation multipliers that may be used by local assessors to value personal property, including certain contested utility personal property assessments in the City.    See "ASSESSED VALUATION AND PROPERTY TAXES – Personal Property Tax Assessments and Appeals."

Municipal Income Taxes

The City levies an annual income tax, pursuant to State enabling legislation.  The maximum rate consists of a tax of 2.5% on income earned and received (investment income included) by residents of the City, 1.2% on corporate income earned in the City and 1.25% on income earned in the City by non-residents.  The

City has contracted with MBIA Muniservices, Inc. to collect certain tax delinquencies. See "–Tax Levies and Collections" herein.

In 1999, legislation was approved by the State, which requires a reduction in both the resident and non-resident city income tax rate. The resident income tax rate at the time of 3% was required to be reduced by 0.1% on each July 1, beginning July 1, 1999, until it reaches 2%. The non-resident income tax rate was required to be reduced to maintain it at one-half of the resident income tax rate. This rate reduction schedule may be suspended under certain circumstances if at least three of the following four conditions exist: (1) funds have been withdrawn from the City's Budget Stabilization Fund for two or more consecutive fiscal years or the City's Budget Stabilization Fund balance falls to zero; (2) the City's inflation adjusted income tax revenue growth rate over the prior year is 0.95 or less; (3) the City's tax base growth rate is 80% or less of the state-wide tax base growth rate over a two year period; or (4) the City's unemployment rate is 10% or higher. If three of these four conditions exist, the next scheduled rate reduction will be suspended until the following July 1, and the suspension may be extended if these conditions continue. Accordingly, the full implementation of the rate reduction may be delayed past July 1, 2008.

The Michigan House of Representatives and the Michigan Senate have passed amendments to the 1999 income tax reduction legislation. These amendments provide for: (i) the resident tax rate to be ultimately reduced to 1.8% rather than 2%, with the non-resident tax rate continuing at one-half the resident rate; (ii) suspension of the rate reduction schedule under certain circumstances if two rather than three of the conditions described above exist; and (iii) a temporary roll back in income tax rate reduction from January 1, 2004 through June 30, 2005. Under the roll back provision, the income tax rates for calendar year 2004 were the rates in effect on January 1, 2003. From January 1, 2005 through June 30, 2005, the rates are those which were in effect July 1, 2003. The income tax rate for the 2005 fiscal year is 2.5% for residents and 1.25% for non-residents.

The 1999 legislation also reduced the population threshold for levying local income taxes at rates in excess of 2% from 1,000,000 to 750,000. In addition, the then current Mayor proposed to City Council a phase-out of the corporate income tax over a similar 10-year period at the end of calendar 1999. The reduction of 0.2% became effective on January 1, 2000, with subsequent reductions on each January 1 following the scheduled July 1 reduction in the individual income tax rate, until the corporate income tax is eliminated by January 1, 2009, or such later date as may be applicable. The corporate income tax rate for fiscal years 2004 and 2005, however, remained the same at 1.2%. The scheduled reduction for fiscal 2005 was frozen and did not take effect.

### Utility Users Tax

The utility users tax is a 5% excise tax on utility bills within the City, and may be levied only by cities with a population in excess of 750,000 (legislation reduced this number from 1,000,000). The City recognizes utility users tax revenues collected during the fiscal year and accrues cash received within 60 days of the fiscal year end, which is related to utility usage during the fiscal year. Pursuant to State law, the first $45 million of revenue generated by the utility users tax is used exclusively to retain and hire police officers. Revenue in excess of $45 million is used exclusively to retain or hire uniformed police personnel over the level of police officers employed on November 1, 1984.

### Wagering Tax

Act 69 imposes a State tax on adjusted gross receipts from casino operations ("AGR") of 8.1%. Act 69 also imposed a State annual assessment fee of $25 million in the first year of casino operations, the payment of which was shared by the three licensees, and which is adjusted annually by the State in line with the City's Consumer Price Index (CPI), but in no event greater than one-third of the combined State annual assessment fee as adjusted by the City's CPI, for any one licensee. In addition, as permitted by Act 69, in November 1997, the City's voters approved the imposition of a local tax of 9.9% on AGR. Also pursuant to Act 69, the City has imposed a municipal service fee of 1.25% of AGR, or $4 million per licensee, whichever is greater, to

pay for the provision of municipal services. Act 306, Public Acts of Michigan, 2004, effective September 2, 2004, imposed an additional wagering tax of 6% of AGR, one-third of which is allocated to the City and two-thirds of which is allocated to the State. Thus, the City currently collects a total of 11.9% on AGR as the wagering tax. As a result of the taxes and fees described above, the City collected revenues of $53.4 million from the gaming facilities in fiscal year 2000, $85.8 million in fiscal year 2001, $109.5 million in fiscal year 2002, $111.3 million in fiscal year 2003 and $116.1 in fiscal year 2004. The City's budget for fiscal year 2005 anticipates revenues of $117.6 million from gaming facilities. Actual collections for 2005 are estimated at $139.0 million. Effective January 1, 2006, a 1% increase in the tax on AGR will be imposed. Also effective January 1, 2006, an additional 1% tax on AGR will be imposed on casinos that achieve at least $400 million in annual AGR.

The finalization of the permanent casino development agreements with the City had been an issue of controversy since the initial award of casino licenses.. The Lac Vieux Desert Band of Chippewa Indians ("Lac Vieux"), which did not submit a proposal for a license to operate a casino in the City of Detroit, filed suit challenging the system by which the City granted three casino licenses. The Michigan Attorney General and the two casino developers that allegedly benefited from the preferences intervened in the lawsuit as defendants. In November 2003, two of the three developers entered into a settlement agreement with Lac Vieux. On February 13, 2004, the Sixth Circuit Court of Appeals remanded the case to the U.S. District Court for consideration of the settlement, and the parties filed position papers with that court relative to approval of the settlement. The District Court later approved the settlement, and on April 28, 2005 the U.S. Circuit Court of Appeals for the Sixth Circuit affirmed it, lifted the injunction that had prevented construction of the permanent casinos, and dismissed the appeals. Lac Vieux has since announced its decision not to pursue any further appeal of the case. Consequently, the long-delayed construction in the City of the three permanent casinos and their planned hotel facilities can now begin. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION – Major Projects and Developments."

Following a settlement with the State of Michigan, reached in 2002, the Sault Ste. Marie Tribe of Chippewa Indians sought Congressional approval of a $350 million casino, resort and convention center in Romulus, Michigan, approximately 20 miles from downtown Detroit (the "Romulus Casino"). Legislation to secure federal approval of a casino license for the tribe has been introduced in Congress. The effect, if any, that competition from the Romulus Casino would have on the City's existing gaming facilities, and the resulting effect on the City's anticipated revenues from gaming facilities, is unknown.

In the November 2004 election, Michigan voters approved a constitutional amendment which requires approval of any form of gambling, other than Indian tribal gaming and gambling in up to three casinos in the City, by a majority of State voters as well as a majority of voters in the city or township where the gambling will take place.

### State Revenue Sharing (Distributable Aid)

Distributable Aid consists of State-shared revenues that can be used by a local unit of government for any purpose it deems appropriate. As permitted by State law, the City has secured certain debt obligations with a pledge of Distributable Aid. As of May 1, 2005, the City had approximately $283.7 million of such debt outstanding, the highest aggregate annual debt service on which amounts to approximately $91.8 million. The City also has certain contingent obligations and may issue additional debt obligations in the future, which may be secured by Distributable Aid both on a parity or subordinate basis. See "FINANCIAL OPERATIONS – Other Funds of the City" and "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES." The receipts under the Distributable Aid program are based upon components as shown in the table below. Of the components, only the sales tax distribution is mandated by the State Constitution. The other components are authorized by legislative action and distribution is subject to annual State appropriation by the State legislature, and may be reduced or delayed by Executive Order during any fiscal year in which the Governor, with the approval of the legislature's appropriation committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based. Legislative changes have been made that reduced the

overall level of Distributable Aid statewide and the City's share. See "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund."

**Table 11-Distributable State Aid Revenue**

| | \multicolumn{5}{c}{Fiscal Year Ended June 30,} |
| | **2000** | **2001** | **2002** | **2003** | **2004** |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Revenue sharing | | | | | |
| Sales tax-constitutional.............................. | $ 69.6 | $ 61.2 | $ 61.8 | $ 62.9 | $62.2 |
| Sales tax-statutory ..................................... | 262.3 | 270.7 | 270.2 | 255.0 | 223.5 |
| Total state revenue sharing........................ | 331.9 | 331.9 | 332.0 | 317.9 | 285.7 |
| Total Distributable State Aid...................... | $332.7 | $333.3 | $333.8 | $319.1 | $285.7 |

SOURCE: Derived by the Finance Department from audited financial statements.

Since the original 1971 legislation creating the State revenue sharing program, both the formula determining the amount of revenues allocated and the basis of distribution have been changed. These changes have resulted in recent fluctuations in the revenue components and amounts received under the formula as shown above.

Prior to the 1996-1997 fiscal year of the State, which ended on September 30, 1997, revenue sharing distributions were made to each city, township and village as follows: (a) distributions from sales tax revenues were made to each city, township and village on the basis of population as mandated by the State Constitution; (b) distributions from personal income taxes and the intangibles replacement and inventory growth components of the single business tax were made on the basis of population as adjusted by a relative tax effort factor (the "RTE Formula"); and (c) distributions from the inventory reimbursement component of the single business tax were annual payments equal to the product of the state equalized value of fiscal year 1975 inventories that were exempted from local taxation following adoption of the single business tax, multiplied by the municipality's property tax millage rate for the then preceding fiscal year.

In June 1996, the State legislature changed the distribution formula for State shared revenues, and the sources of revenue distributed, by enacting Act 342, Public Acts of Michigan, 1996 ("Act 342"), which amended the State Revenue Sharing Act of 1971 and repealed portions of the single business tax act and the income tax act. Consequently, sales tax revenues became the sole source of revenue sharing distributions beginning with the 1996-1997 fiscal year of the State, and revenues from personal income taxes and single business taxes are no longer being distributed. The allocation of sales tax revenues to be distributed as revenue sharing payments has been increased to compensate for elimination of the other revenues; however, while the total amount of gross revenues distributed to municipalities state-wide has risen, it reflects a reduction of over $80 million from what the previous formula would have yielded.

The sales tax revenues come from a 6% State levy on retail sales (other than sales of certain exempt items, such as food and drugs). The State Constitution limits the sales tax rate to 6%, and dedicates one-third of these taxes to the State school aid fund. The State Constitution mandates that 15% of the balance be distributed to townships, cities, and villages (the "Constitutionally Mandated Share"). Beginning in the State's 1996-1997 fiscal year, in addition to the Constitutionally Mandated Share of sales tax collections, the legislature allocated 21.3% of additional revenues from collections of sales taxes levied at a rate of 4% to revenue sharing payments to be distributed to townships, cities, villages, and counties (the "Additional Share").

In statutory amendments related to revenue sharing in December 1998 (the "1998 Amendments"), the State Legislature adopted a new distribution formula for the Additional Share. With respect to the City, the legislation provided that a total fixed annual amount of $333.9 million was to be paid to the City through June 30, 2007. This amount included both the City's Constitutionally Mandated Share and its allocation of the

Additional Share. For other cities, villages and townships, a formula taking into account size and type of government, relative taxable value and a partial "tax yield" equalization is used. The formula was intended to be in effect until June 30, 2007, at which time a new distribution formula would be required.

*Recent Developments*

Revenue sharing payments were distributed in accordance with the 1998 Amendments until December 2002. Consistent with the downturn in the national economy, however, the State began experiencing financial difficulties as a result of reductions in sales tax revenues for State fiscal year 2003. In response, outgoing Governor John Engler issued Executive Order No. 2002-22 implementing certain spending reductions in order to bring the State's fiscal year 2003 general fund budget into balance. The Executive Order included a $53.1 million reduction in revenue sharing payments to local governments, including a 3.5% reduction in previously appropriated revenue sharing payments, as well as an additional $9.9 million reduction in certain grants to local governments in respect of statutory revenue sharing shortfalls. On December 31, 2002, Governor Engler signed into law Act 679, Public Acts of Michigan, 2002 ("Act 679"), a corresponding amendment to the Revenue Sharing Act to codify the reduction in statutory revenue sharing payments to local governments otherwise established by the 1998 Amendments. Act 679 resulted in the following:

- Adjusted the distribution to be received by the City in State fiscal year 2002-03 only, from a combined constitutional and statutory payment of $333.9 million (the 1997-98 levels) to a combined payment of $322.2 million. Combined distributions for each fiscal year thereafter until September 30, 2007 were frozen at $333.9 million.

- For State fiscal year 2002-03 only, adjusted the distribution to be received by all other cities, villages, townships and counties to 96.5% of the amount the local units would have received if the 1998 formula were applied to calculate the 2002-03 distributions.

- Capped the total amount of revenue sharing payments available for distribution to cities, villages and townships at $936.2 million, and the total amount available for distribution to all counties at $204.1 million.

- Extended the sunset of the statute from June 30, 2007 until September 30, 2007, so as to make it consistent with the end of the State's fiscal year.

- Did not otherwise adjust formulas for distribution approved under the 1998 Amendments.

On February 19, 2003, in response to continuing declines in the State's revenue estimates, Governor Jennifer Granholm issued Executive Order No. 2003-03 which approved of a further $145 million in spending reductions in order to again bring the State's fiscal year 2003 general fund budget into balance. No further reductions to payments to local governments were included within Executive Order No. 2003-03.

On August 11, 2003, the Revenue Sharing Act was further amended by enactment of Act 168, Public Acts of Michigan, 2003 ("Act 168"). Act 168 re-adjusted the 2002-03 distribution formula approved by Act 679. The reductions enacted in Act 679 contemplated uniform reductions for all local units of approximately 3.5%; based upon lower-than-estimated sales tax receipts, however, the actual payments reflected a 3.5% reduction for the City and a larger than 3.5% reduction for all other local units. Act 168 marginally reduced the combined constitutional and statutory payment for the City for State fiscal year 2002-03 from $322.2 million to $319.7 million, and increased payments to all other local units by 0.2%. For State fiscal year 2003-04, based on then-current estimates, Act 168 further provided for a 3.0% reduction in the combined constitutional and statutory payments for the City and all other local units from the statutory payment the City and each local unit received in State fiscal year 2002-03. Act 168 further provided for a reduction in payments by more than 3.0% should State sales tax receipts fall below forecasts.

13-53846-tjt    Doc 3153-2    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 82 of 100

State estimates for actual revenues for fiscal 2004 continued to fall below the revenue estimates upon which the appropriations for the fiscal year were based. As a result, on December 10, 2003, Governor Granholm issued Executive Order No. 2003-23 implementing additional spending reductions in order to bring the State's fiscal year 2004 general fund budget into balance. The Executive Order included an additional $72 million reduction in payments to local governments, including a 3.0% reduction in revenue sharing payments previously appropriated by the Legislature in respect of statutory revenue sharing shortfalls. Governor Granholm indicated that the Executive Order was predicated on the State legislature's enactment of proposed amendments to Act 281, Public Acts of Michigan, 1967, as amended (the "Income Tax Act"), to delay until July 1, 2004, a previously authorized rollback of the State's income tax (from 4% to 3.9%) scheduled to take effect on January 1, 2004. Accordingly, on December 23, 2003 the Governor signed into law Act 239, Public Acts of Michigan, 2003 ("Act 239") to effectuate the delay of the authorized income tax rollback on January 1, 2004. Act 239, together with the Executive Order; bring the State's fiscal year 2004 general fund budget back into balance.

The City's revenue sharing payments for the fiscal year ended June 30, 2004 totaled $285.7 million.

The State's ability to make revenue sharing payments to the City in the amounts and at the times anticipated could be affected by the State's financial condition and its ability to finance any temporary cash flow deficiencies. The distribution of sales tax revenues to the City may also be affected by changes in the City's population after 2007.* It is also possible that future legislative changes could reduce revenue sharing distributed to the City.

State Equity Package

The State Equity Package was initiated in fiscal 1977 to reimburse the City and, subsequently, other municipalities for providing services determined to be of general benefit to residents of the State, including many cultural, educational and recreational services provided by and located in and around the City. The program was subject to annual appropriation by the State, and funding for the program was reduced after 1990. In 1996, this program was discontinued and replaced with a statewide art and cultural grants program. It is anticipated that only the Detroit Institute of Arts, the Detroit Historical Museum and the Detroit Zoological Institute (the "Detroit Zoo") will receive significant levels of future funding from such program. However, the Detroit Main Library grant is still being received from an alternate funding program provided by the State. The following table shows the amounts received from the State Equity Package and successor programs for the fiscal years ended June 30, 2000 through 2004.

**Table 12-State Equity Package Revenues**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2000** | **2001** | **2002** | **2003** | **2004** |
| | | | (in millions) | | |
| Main Library [1] | $7.1 | $7.8 | $8.3 | $7.7 | $6.6 |
| Detroit Historical Museum | 0.4 | - | - | 0.2 | 0.3 |
| Police (special events) | - | - | - | 0.9 | 0.2 |
| Detroit Zoo | 1.1 | - | - | 1.0 | 1.6 |
| Total | $8.6 | $7.8 | $8.3 | $9.8 | $8.7 |

SOURCE: Derived by the Finance Department from audited financial statements.

[1] Not accounted for in the General Fund.

* SOURCE: Michigan State Senate Fiscal Agency: http://senate.michigan.gov/sfa/

<u>Sales and Charges for Services</u>

Receipts for sales and charges for services include such items as maintenance and construction charges, electrical fees, recreation fees, property tax collection fees and personal service fees. Actual receipts decreased from $176.9 million in fiscal year 2000 to $176.0 million in fiscal year 2004.

<u>Other Revenue, Grants and Other Financing Sources</u>

Other revenue and other financing sources generally consist of fines, inspection fees, interest on investments, real estate rentals, sales of property and transfers.

General Fund expenditures include the federal share of the cost of services for personnel employed in various General Fund agencies. The Community Development Block Grants and a small amount under the Job Training Partnership Act fund the federal share.

The grants listed under "Other Grants" (which are usually for health-related activities or community development projects) are generally received on a drawdown basis. Increases or decreases in expenditures would not have a direct effect on fund balances, since revenues would likewise be increased or decreased. The annual budget contains the full amount of an expected grant even though total expenditures may not be anticipated during the year.

### *Recent Budget Results of the General Fund*

The General Fund results for fiscal 2002, 2003 and 2004 and the General Fund Budget for fiscal 2005 are discussed below. The proposed fiscal 2006 Executive Budget and amendments to it adopted by the City Council on May 24, 2005, as well as the possibilities of a Mayoral veto of the amendments and of a City Council vote to override such veto, also are discussed below.

<u>Fiscal 2002</u>

The fiscal 2002 General Fund Budget of $1.5 billion represented a 6.7% increase over 2001. At the time the budget was adopted, the City believed that revenues were set to attainable levels. Based on the City's economic forecasting model, income tax receipts were estimated to increase 2.4% over fiscal 2001 estimates. The continued slowdown in local economic activity challenged the City's efforts to achieve its income tax collection goal. Due to the severity of the economic slowdown, actual income tax collections of $323 million were 16% lower than budgeted estimates of $385 million. Income tax rates were statutorily reduced by 0.1% for residents and 0.05% for non-residents. Corporate tax rates were also reduced by 0.1%.

Property tax receipts were expected to increase 6.6% over fiscal 2001 collections, reflecting the higher taxable values in the City. Actual property tax receipts were $170 million, representing a 2.3% decrease from the final budgeted 2002 property tax receipts of $174 million, but an 11.2% increase over actual collections for 2001. State Revenue Sharing funds were frozen in fiscal 2002 at $332 million. Gaming excise tax to be collected from licensed casinos was budgeted at $95.8 million, but additional wagering taxes of $13.7 million over this amount were collected.

The fiscal 2002 Budget provided funding to accommodate wage adjustments with the City's bargaining units. Additions were made to city-supported positions where additional revenues would support the position or additional resources were necessary to enhance service delivery. The Budget included an additional 43 positions in Health for the Lead Abatement Program and to address State accreditation; 22 positions in the Fire Department for 2 additional EMS units; and 20 positions in the Police Department for the operation of the 311 non-emergency phone service.

The fiscal 2002 Budget provided for technology funding, including $4.2 million for a Fixed Assets Module of Detroit Resource Management System ("DRMS") and general replacement of computers. The fiscal 2002 Budget also provided for new Vehicle Management and Facilities Management programs.

The fiscal 2002 Budget again made contributions to certain City Enterprise Funds. The subsidy to the Transportation Fund and the Detroit Transportation Corporation of $84.8 million in fiscal 2002 represented amounts necessary to provide service at existing levels. Of this amount, $11.4 million in fiscal 2002 was allocated to support the Detroit Transportation Corporation, operator of the Detroit People Mover. This subsidy was increased from prior years due to discontinuation of funding from the City of Detroit Downtown Development Authority and increasing maintenance demands on the system. The Budget also provided a subsidy of $2.1 million to the Detroit City Airport.

At the beginning of fiscal 2002, it became clear that the income tax receipt projections would not be achieved due to worsening economic conditions. To compensate for this shortfall citywide expenditures were reduced by 5%, a reduction in staff overtime was implemented, a delinquent property tax amnesty program was initiated for the month of April, and encumbrances were reviewed and adjusted where appropriate. As a result of these changes, the General Fund for fiscal 2002 ended with a small surplus of $1.6 million.

### Fiscal 2003

The fiscal 2003 General Fund Budget of $1.4 billion represented a 5.9% decrease over the fiscal 2002 budget. The Budget was based on conservative revenue estimates due to a downturn in the economy, continuation of the cap on State Revenue Sharing (the City's second largest revenue source) and controlled spending assumptions. Detroit's State Revenue Sharing payment, including the Library's share, set by statute at $333.9 million, was cut with the passage of Public Act 679 of 2002, to $322.2 million and was further reduced by passage of Act 168 to $319.1 million.

Income tax was budgeted at $323.5 million, a less than 1% decrease from fiscal year 2002 projections. This was due to an anticipated stabilization in the economy and the $1/10^{th}$ of 1% decrease in the income tax rate. The actual income tax collected was $310.9 million.

Property tax was budgeted at $174.7 million, an increase of 11.02% over the fiscal 2002 estimates. This was based on a 4.4% increase on the ad valorem roll and assumed a 5.1% overall increase when industrial facilities and neighborhood enterprise zone rolls were included. The actual property tax receipts were $166.3 million.

The wagering tax was budgeted at $105.0 million, which was 9.6% higher than the fiscal 2002 projections. Actual wagering tax receipts for fiscal 2003 amounted to $111.3 million, a 1.6% increase over fiscal 2002 results.

The fiscal 2003 Budget did not include provisions for a wage adjustment with the City's bargaining units. In general, vacant positions were eliminated from the Budget, reflecting 549 fewer budgeted positions than fiscal 2002. The Airport budget reflected a reduction of 17 positions due to the loss of an air carrier. The Police Department budget reflected a net reduction of 121 uniform positions, primarily due to loss in grant funding. The Library Department lost 61 positions due to reduction in State funding.

The fiscal 2003 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.4 million, a $360,000 increase over fiscal 2002, also due to the loss of a major carrier. The subsidy to the Department of Transportation was $4.6 million less, at $69.4 million, than fiscal 2002, due primarily to an increase in fares of 25 cents. The Detroit People Mover subsidy also decreased by $568,000, to $10.8 million.

The City's Housing Fund accounted for the public housing function administered through the Detroit Housing Commission ("DHC"). In June 2003, the Michigan Supreme Court unanimously affirmed the opinion of the Michigan Court of Appeals in ruling that the 1996 amendments to the Michigan Housing Facilities Act severed by operation of law the City's employment relationship with personnel assigned to and employed by the DHC, to be effective July 1, 2003. This confirmed DHC's status as a separate and autonomous entity without need for legislative action by the Detroit City Council.

Two post-year end events contributed $55 million of the $69 million deficit: a write off of $18 million of account receivable owed by the Detroit Housing Commission, then an enterprise fund, and an additional $37 million contribution (representing a $35 million judgment plus $2 million in interest) to the Police and Fire Pension Funds as a result of a lawsuit. Should the judgment be overturned on appeal, the entire amount, plus accrued interest, will be returned to the City. See "LITIGATION" in the Offering Circular which precedes this Appendix. A deficit elimination plan was filed with the State of Michigan and actions were undertaken in fiscal 2004 to eliminate the deficit.

### Fiscal 2004

The fiscal 2004 General Fund Budget of $1.5 billion represented a 5.5% increase over the fiscal 2003 Budget. The fiscal 2004 Budget was based on assumptions of continuing slow growth in the local economy, cuts in State Revenue Sharing and controlled spending. Detroit's total revenue sharing payments for fiscal 2004 were expected to amount to $290.3 million. This was a $43.6 million or 13.1% reduction from the prescribed amount pursuant to the 1998 Amendments. Actual payments received for fiscal 2004 were $287.4 million.

Income tax collections for fiscal 2004 were budgeted at $300.4 million, representing a 3.4% decrease from the prior year, reflecting once again the economic challenges in the City's and State's economies, as well as the $1/10^{th}$ of 1% reduction in the income tax rate. In December 2003, the City requested and received approval from the State of Michigan to suspend its income tax rate reduction for a one-year period concluding July 1, 2005. Actual payments received for fiscal 2004 were $290.6 million.

Property tax was budgeted at $188.2 million, a 7.7% increase over fiscal 2003. The City contracted with an outside collection firm to collect delinquent property taxes, income taxes and water/sewerage bills. Property tax collections for fiscal 2004 amounted to $184.8 million, which included the payment of $37.4 million received from Wayne County upon the transfer of fiscal 2003 delinquent real property taxes to Wayne County for collection.

The wagering tax was budgeted for a small increase of $5 million or 4.8% over the fiscal 2003 budget. Actual wagering tax collections for fiscal 2004 were $116.1 million, a $4.8 million increase from actual collections in fiscal 2003.

While budget expenditures were reduced in a number of major categories, there were some significant adjustments related to personnel costs. The fiscal 2004 Budget included a proposed wage increase of 5% for uniformed employees, a 2% increase for civilian employees and special pay adjustments for certain employee categories. Employee benefits experienced a significant increase due to higher health insurance costs and pension contributions for both uniform and civilian employees. Offsetting these increases was the overall reduction of 138 General Fund budgeted positions.

The fiscal 2004 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.8 million, a $258,000 increase over 2003, reflecting increased personnel costs. The subsidy to the Department of Transportation remained at $68.2 million. The Detroit People Mover subsidy decreased by $0.5 million to $10.3 million.

There were some positive steps contained in the fiscal 2004 Budget. A Program Management Office was established to assist the City administration in managing large projects as well as restructuring city operations in order to improve efficiency and effectiveness of City services. The Grants Acquisition Office was established to help coordinate and improve the City's efforts in identifying, applying for, and securing grants.

For fiscal 2004, the City administration withdrew $8.5 million from its Budget Stabilization Fund, reducing it to a zero balance, sold $61 million in Fiscal Stabilization Bonds, and reported for fiscal 2004 a budget deficit of $95 million. This fiscal 2004 deficit amount is not cumulative with the prior year's deficit, but represents a new deficit which, in total, is $26 million larger than the deficit reported in fiscal 2003. This

deficit increase was a result of revenue shortfalls in income tax, utility user's tax and state revenue sharing collections, in addition to unexpected increases in pension and employee benefits, and unbudgeted expenses related to the 800-megahertz radio system. A budget deficit elimination plan was filed with the State of Michigan and actions were undertaken in fiscal 2005 to eliminate the deficit, as described below.

Fiscal 2005 Budget

The fiscal year 2005 General Fund Budget of $1.6 billion reflected the continuing slow growth in the local economy, cuts in State revenue sharing and controlled spending assumptions. The City's total revenue sharing payments for fiscal 2005 were budgeted at $287.7 million. This was a $46.2 million or 13.8% reduction from the amounts prescribed pursuant to the 1998 Amendments. The fiscal 2005 Budget included a $61.1 million financing to fund a payment to the Risk Management Fund and an $80.1 million benefit from the potential issuance of the Certificates of Participation that are the subject of the Offering Circular which precedes this Appendix.

Income tax collections for fiscal 2005 were budgeted at $311 million, a 3.5% increase over the prior fiscal year. This increase was due to a one-year suspension of the $1/10^{th}$ of 1% rate reduction permitted under Act 500, Public Acts of Michigan, 1998, if the City met three out of four conditions set forth in such Act for the year. However, income tax collections continued to decline and are expected to yield $275.5 million for fiscal 2005.

Property tax revenues were budgeted at $215.7 million, an increase of 14.6% over fiscal 2004. This increase is due primarily to the transfer of delinquent real property taxes to Wayne County. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes." Fiscal 2005 Taxable Value has increased by 6.3% on the ad valorem roll and decreased 5.9% on the industrial facilities and neighborhood enterprise zone tax rolls. The fiscal 2005 Budget included an additional $3.5 million from a personal property tax audit.

The wagering tax was budgeted at $117.6 million, a $7.6 million increase over the prior fiscal year, but is expected to yield approximately $139 million in fiscal 2005. Based on a comparative study by consultants hired by the City which recommended increases in various user fees charged by the City, the fiscal 2005 Budget includes an increase of $4 million in user fees.

On the expenditure side, the fiscal 2005 Budget reflects a reduction of 997 positions, including 377 layoffs, elimination of 263 vacant positions, and 357 housing positions no longer reflected in the City's budget. The fiscal 2005 Budget included a pay raise of 2% for civilian employees and 5% for uniform employees. Pension and health care costs increased. Contractual services, operating supplies and capital equipment were reduced by a total of $14.2 million (9.6%) from the prior fiscal year. The fiscal 2005 Budget includes contributions to certain Enterprise Funds. The Airport subsidy was $2.5 million, a reduction of $200,000 from fiscal 2004. The Detroit People Mover subsidy was reduced by $2.5 million from fiscal 2004. The Buildings and Safety Engineering Department subsidy of $1.9 million has been eliminated. The Transportation Department subsidy was $71.2 million, an increase of $3.4 million.

The fiscal 2005 Budget also included many new initiatives. The Department of Administrative Hearings was established to strengthen code enforcement efforts by assessing and collecting civil fines and costs for blight violations. This Budget reflects a reduction of 57% in take-home vehicles. A new policy was implemented that provided vehicles to employees on an economic and business basis rather than as a fringe benefit. Professional facility managers are conducting a review of citywide leases with a view towards consolidating and re-negotiating a number of the City's leases.

In response to the recognition of a projected deficit for fiscal 2005, additional mid-year layoffs of 686 employees were implemented in March 2005, as well as the elimination of 237 vacant positions. Additional cuts in salaries expenses were instituted beginning with a 10% reduction in salary for mayoral appointees and non-union employees. The 10% salary reduction for non-union employees, while approved, has not yet been

put into effect. Vendors were asked to take a 10% reduction in contractual costs. Other expenditure reductions were made, including overtime costs; the elimination of non-essential purchases and restrictions on travel. $71 million from the sale of bonds will be applied to fund expenditures accrued in fiscal 2004 and 2005 on the 800-megahertz radio system. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Prospective Indebtedness." Assuming the accuracy of the City's revenue and expenditure estimates and the sale of these bonds, the City estimates that it will finish fiscal 2005 with a General Fund deficit of approximately $67 million or approximately $28 million lower than the $95 million deficit for fiscal 2004.

### Proposed Fiscal 2006 Budget

On April 12, 2005, the Mayor presented a proposed fiscal 2006 Executive Budget to the City Council. On May 24, 2005, the City Council amended the budget presented by the Mayor by adopting amendments to the Executive Budget (the "Council Amendments") by a unanimous vote of 8-0.

The Mayor may veto the Council Amendments, in whole or in part, in his discretion by June 2, 2005. If the Mayor vetoes any Council Amendments, the City Council may override the veto by a two-thirds vote of all its members by the third calendar day or second business day (whichever provides the greater number of business days) following the date of the Mayoral veto. If there is no Mayoral veto of any Council Amendments, or if the City Council overrides a Mayoral veto of any Council Amendments, such Council Amendments will become effective as part of the City's fiscal 2006 Budget. See "FINANCIAL PROCEDURES – Budget Process."

As of the date of the Offering Circular which precedes this Appendix, the Mayor has publicly declared his intention to exercise his line-item veto powers with respect to the Council Amendments, but it is not possible to know precisely what will be the City's fiscal 2006 Budget. The fiscal 2006 Budget is required to be adopted by June 6, 2005, and by law it must be a balanced budget.

Summaries of both the proposed fiscal 2006 Executive Budget and the Council Amendments are set forth below.

#### *Proposed Fiscal 2006 Executive Budget*

On April 12, 2005, the City administration presented a proposed fiscal 2006 Executive Budget to City Council that confronts a carryover undesignated General Fund deficit from fiscal 2005 of $67 million. The fiscal 2006 Executive Budget projects a balanced budget that includes broad-based expenditure reductions, the introduction of new revenue sources and the reorganization of City government.

The fiscal 2006 Executive Budget of $1.4 billion represents a 10.6% decrease from the fiscal 2005 Budget. The 2006 Executive Budget assumes continued slow growth in the local economy, lower estimated tax revenues and controlled spending assumptions. The City's total revenue sharing payments for fiscal 2006 are estimated to be $285.1 million. This is a $2.6 million, or 0.9%, reduction from the fiscal 2005 Budget, even though no additional cuts were proposed in the State of Michigan's Executive Budget for revenue sharing in fiscal year 2006. The fiscal 2006 Executive Budget includes new tax revenues of $15 million from a proposed prepared food tax and a proposed property transfer tax. Both of these new taxes require State Legislature and local electorate approval. The administration will implement additional expenditure reductions if these revenues are not realized.

Income tax collections for fiscal 2006 are budgeted at $272.6 million, a 12.3% decrease from the prior fiscal year. This decrease reflects the continued decline in the local economy and employment. The City was again granted by the State a one-year suspension of the $1/10^{th}$ of 1% income tax rate reduction permitted under Act 500, Public Acts of Michigan, 1998. Also included in the fiscal 2006 income tax revenue estimate is a reduction of the personal exemption from $750 to $600.

Property tax is budgeted at $188.2 million, a decrease of 12.8% from fiscal 2005 due to a reduction in estimated delinquent tax collections. Taxable valuation estimates have increased by 5.0% on the ad valorem

B-27

roll, a decrease of 11.5% on the industrial facilities roll and an increase of 19.3% on the neighborhood enterprise zone tax roll. The fiscal 2006 Executive Budget includes delinquent tax collections from Wayne County and from professional collectors.

The wagering tax is budgeted at $153 million, a $35 million increase over the prior year's budgeted amount due to a State increase in the wagering tax of 2% as of September 1, 2004, and the receipt of an additional 1%, commencing January 1, 2006, pursuant to agreements with the casinos in the City.

The fiscal 2006 Executive Budget includes plans for sweeping reductions of expenditures to address escalating costs. A total of 1,978 budgeted positions, including 686 mid-fiscal 2005 layoffs, were eliminated from fiscal 2005 to fiscal 2006. A 10% reduction in salary costs is proposed for fiscal 2006 for non-uniformed employees, and no wage increases are included in the fiscal 2006 Executive Budget for either civilian or uniformed employees. The 10% salary reduction is to be achieved for the City's unionized civilian employees by requiring days off without pay. A study of health care benefits was performed by the Mercer Group, which identified cost savings in the areas of hospitalization, dental and vision benefits. The renegotiation of employee health care benefits is expected to generate significant cost savings of $47 million. These proposed salary and health care reductions must be approved by the City's unions. The City administration has determined that if the proposals are not approved, it will further reduce the City's work force to realize the necessary savings. The issuance in fiscal 2005 of the Certificates of Participation that are the subject of the Offering Circular which precedes this Appendix provides additional savings to address rising pension requirements.

The fiscal 2006 Executive Budget continues reductions in take-home vehicles; a total of 62 general assigned vehicles have been eliminated, as well as 100 police general assigned vehicles. All eliminated vehicles are scheduled to be sold at auction. In addition, no appropriations were recommended in the General Fund for vehicle fleet replacement.

The City administration has completed its study of the re-engineering of several large departments begun in the previous fiscal year and with this fiscal 2006 Executive Budget implements the consolidation and reorganization of these activities. The Department of Public Works, Department of Environmental Affairs and the Public Lighting Department are consolidated as the new Municipal and Environmental Services Department. This action is expected to increase efficiencies in future years as administrative and support functions are streamlined. All agency security staff in the fiscal 2006 Executive Budget are consolidated under the Office of Homeland Security to provide a more strategic and standardized approach to securing municipal facilities and city borders. The Recreation, Senior Citizens, Culture Arts and Tourism-Eastern Market and arts grants activity, as well as the Human Services Department-Youth Advocacy grant program, are all to be merged into the Community Services Department. This action is expected to improve the focus of the department on core programs and community outreach. A new General Services Department is created with the fiscal 2006 Executive Budget that centralizes facilities and ground management functions from various City agencies. The park maintenance activity is transferred from the Recreation Department and the fleet management and the 311-call center are to be transferred from the Department of Public Works in order to achieve efficiencies and allow agencies to focus on their core business. Also included in the fiscal 2006 Executive Budget is business process redesign involving a new centralized mailroom to achieve savings in postage costs across the City, centralization of document production and the elimination of bulk refuse collection during slow winter months based on a best practices study.

Anticipated in the fiscal 2006 Executive Budget is the reduction of subsidies (a savings of approximately $5.5 million) to agencies that will be spun off to others' control. This assumes increased support from nonprofit support societies and will help eliminate the need for General Fund subsidies to the Detroit Historical Museum and the Detroit Zoological Institute. The Health and Wellness Promotion Department anticipates for fiscal 2006 the creation of an intergovernmental agreement with Wayne County to enforce food sanitation standards, including licensing and issuance of violations. A memorandum of agreement with the Michigan Humane Society is being sought in this fiscal 2006 Executive Budget for the collection of stray animals.

B-28

The fiscal 2006 Executive Budget includes contributions to some Enterprise Funds. The Transportation Department subsidy is $62.7 million, a decrease of $8.5 million from the fiscal 2005 budgeted amount, which assumes the creation of a regional authority to absorb the cost for operating the Department of Transportation. This is also assumed for the operations of the Civic Center-Cobo Hall convention facility, a $6 million reduction in appropriations. There is no Detroit City Airport subsidy for fiscal 2006, a decrease of $2.5 million. The fiscal 2006 Executive Budget assumes the management of airport operations under a leasing agent.

### *City Council Amendments to Proposed Fiscal 2006 Executive Budget*

By its action adopting the Council Amendments on May 24, 2005, the City Council has accepted the proposed fiscal 2006 Executive Budget except as thus specifically amended. The Council Amendments result in an $18.5 million net reduction from the overall Executive Budget.

The Council Amendments revise the Executive Budget's projected $67 million carryover undesignated General Fund deficit from fiscal 2005 and increase it by $34.4 million to $101.4 million. The fiscal 2005 deficit is required to be covered by an appropriation in the fiscal 2006 Budget.

The following descriptions of particular changes effected by the Council Amendments are always in comparison to (*i.e.*, always describe changes from) the fiscal 2006 Executive Budget presented by the Mayor to the City Council on April 12, 2005.

The Council Amendments delete new tax revenues totaling $15 million from the proposed prepared food tax and proposed property transfer tax included in the fiscal 2006 Executive Budget. For the Utility Users Tax, the Council Amendments change the projected revenues, reducing the collections by $6.3 million due to the City Council's budgeted reductions of police personnel. See "Utility Users Tax" under "FINANCIAL OPERATIONS – General Fund Revenue Categories." The Council Amendments delete $1.6 million of projected revenues for the Detroit Historical Museum (referred to further below). The Council Amendments include no other changes to the revenues included in the fiscal 2006 Executive Budget.

There are additional reductions in expenditures in the Council Amendments beyond those included in the Executive Budget, affecting primarily the Police Department and Fire Department. The Council Amendments include a $22.9 million (10%) reduction in wage costs for uniformed police and fire personnel, which is not included in the Executive Budget. These wage reductions must be approved by the police and fire unions and are further subject to arbitration under the State compulsory arbitration act. In addition to the foregoing, the Council Amendments reduce the funding for the Police and Fire Departments, by $53.7 million in the Police Department budget and $15.1 million in the Fire Department budget, which does not require approval by the police or fire unions.

The Council Amendments increase the subsidies for agencies which the Executive Budget plans will be transferred to the control of others. The subsidy for the Detroit Historical Museum is restored by $1.6 million and the food sanitation inspection function is maintained by the City at a cost of $0.5 million. The Council Amendments restore $20.8 million of the General Fund subsidy to the Department of Transportation, based on the assumption that a regional transportation authority will not be created during fiscal 2006. Further, subsidies are restored for the Civic Center-Cobo Hall convention facility at $4.5 million and for the Detroit City Airport at $2.5 million, based on the assumption that these operations will remain with the City for the full 2006 fiscal year.

In addition, the Council Amendments remove the Mayor's proposed reorganization of several large City departments pending future receipt and approval by the City Council of an Executive Organization Plan.

Additional City Council actions include increasing by $12.5 million the deposit to the City's self-insurance fund and restoring $4.2 million in appropriations for the 36th District Court. Five of the ten Neighborhood City Halls under the Mayor's Office and other expenses of the Mayor's Office are eliminated

for a reduction of $2.4 million. The planning and development agencies are reduced by an additional $2.1 million.

The following table compares budgeted and actual revenues and expenditures for certain major General Fund categories for the fiscal years ended June 30, 2001 through 2004. Also included are the budget amounts for fiscal years 2005 and 2006 (based on the proposed fiscal 2006 Executive Budget before the Council Amendments).

(Balance of this page intentionally left blank)

Table 13-Comparison of Major Budget Classifications-General Fund

| | 2002 | | 2003 | | 2004 | | 2005 | 2006 |
|---|---|---|---|---|---|---|---|---|
| | | | | Fiscal Year Ended or Ending On June 30 | | | | |
| | **Budget** | **Actual** | **Budget** | **Actual** | **Budget** | **Actual** | **Budget (1)** | **Budget (3)** |
| **Category** | | | | | | | | |
| Revenues | | | | | | | | |
| Property tax.............. | $ 174.0 | $ 169.7 | $ 174.7 | $ 166.3 | $ 188.2 | $ 184.8 | $ 215.7 | $ 188.2 |
| Municipal income tax........... | 384.8 | 323.5 | 323.5 | 310.9 | 300.4 | 290.6 | 311.0 | 272.6 |
| State revenue sharing........... | 332.0 | 333.8 | 332.0 | 319.1 | 310.8 | 286.5 | 286.1 | 283.5 |
| Utility Users Tax........... | 54.6 | 52.1 | 54.7 | 55.3 | 54.6 | 50.5 | 55.0 | 56.0 |
| Wagering tax............. | 95.8 | 109.4 | 105.0 | 111.3 | 110.0 | 116.1 | 117.6 | 153.0 |
| State equity package.......... | 2.5 | 3.6 | 2.5 | 2.1 | .2 | .2 | 3.5 | .0 |
| Total | $1,043.7 | $ 992.1 | $ 992.4 | $ 965.0 | $ 964.2 | $ 928.7 | $ 988.9 | $ 953.9 |
| Total General Fund Revenues | $1,508.6 | $1,470.5 | $1,419.4 | $1,379.9 | $1,497.8 | $1,375.1 | $1,587.5 | $1,419.2 |
| % of Total General Fund | 69.2% | 67.5% | 69.9% | 69.9% | 64.4% | 67.5% | 62.3% | 67.2% |
| Expenditures | | | | | | | | |
| Police............. | $412.2 | $362.5 | $349.5 | $362.4 | $ 418.0 | $462.6 | $470.9 | $405.4 |
| Department of Public Works............. | 266.4 | 226.9 | 203.3 | 188.0 | 171.6 | 168.1 | 174.6 | 114.5 |
| Fire.............. | 158.6 | 151.2 | 147.2 | 161.2 | 182.7 | 182.2 | 205.4 | 181.5 |
| Public Lighting............. | 65.4 | 64.4 | 66.1 | 61.9 | 64.7 | 61.5 | 61.5 | 66.6 |
| Recreation ............. | 66.0 | 53.9 | 73.1 | 59.3 | 51.6 | 53.5 | 46.7 | 22.5 |
| Total ............. | $ 968.6 | $858.9 | $ 839.2 | $ 832.8 | $ 888.6 | $ 927.9 | $ 959.1 | $ 790.4 |
| Total General Fund Revenues | $1,508.6 | $1,441.5 | $1,419.4 | $1,463.6 | $1,497.8 | $1,577.6 | $1,587.5 | $1,419.2 |
| % of Total General Fund | 64.2% | 59.6% | 59.1% | 56.9% | 59.3% | 58.8% | 60.4% | 55.7% |

SOURCE:  Budget Department and Finance Department.

(1)  City's Budget as adopted.  The City's Budget is revised from time to time to reflect carry-forward amounts, as well as amendments during the course of the year.  Property Taxes budget was amended in fiscal year 2005 to reflect the revenues from Wayne County as current instead of delinquent property tax revenues.

(2)  City's Executive Budget as submitted to City Council.  The City's Budget is to be adopted on or before June 6, 2005.  Departments have been reorganized and/or consolidated, and so expenditure categories may no longer be comparable.

B-31

***Other Funds of the City***

<u>General Debt Service Funds</u>

Debt service on limited tax general obligation bonds is funded from property taxes levied within constitutional, statutory and Charter limitations or other unrestricted moneys of the City. Debt service on unlimited tax general obligation bonds is funded from ad valorem property taxes levied without limitation as to rate or amount specifically for that purpose. The City, by State law, must provide a separate fund for debt retirement moneys. All general City property taxes are collected by the Treasurer and deposited in the general and debt service accounts according to the proper distribution percentage.

<u>Enterprise Funds</u>

The City currently has seven enterprise funds of which three are or are intended to be self-supporting, and four generally need some level of General Fund support. The revenues of the enterprise funds are not available to pay principal of and interest on bonds other than those issued by or on behalf of a particular enterprise operation. Individual financial statements for the enterprise funds described below have not been included in this Official Statement. The Comprehensive Annual Financial Reports of the City (which contain complete financial statements for the enterprise funds) are available on the City's web site.

The self-supporting funds include Water Supply and Sewage Disposal. The Sewage Disposal and Water Supply Systems, which serve a significant portion of Southeastern Michigan, have an aggregate of approximately $4.17 billion in outstanding revenue bonds (net revenue pledge). The General Fund bears no liability for funding any expenses not covered by self-generated revenues for these systems and has never made a subsidy payment to the Water or Sewage Disposal Systems.

The City's Parking System is intended to be, but since fiscal 2003 has not been, self-sufficient. The City is legally responsible for payment of operation and maintenance expenses of the system, and the General Fund is reimbursed for payment of such expenses from funds generated from the system, if available. System revenues were inadequate to make such reimbursement in full in fiscal years 2003 and 2004. The City is not in compliance with its continuing bond covenant to maintain parking system rates at a level sufficient to pay or reimburse the City for payment of Parking System operating, maintenance, and repair expenses, but the City is complying with the related remedial bond covenant.

Other funds receiving General Fund support are Transportation, Airport, Detroit Transportation Corporation and GDRRA. The Transportation Fund accounts for the operation of the Transportation Department that operates the bus-oriented mass transit system, and receives a substantial portion of its operating revenues from regional allocation of federal and State moneys and from self-generated revenues. However, as a result of a continuing gap between operating revenues and rising expenditures, the fund has also received General Fund subsidies. Prior to 1986, the General Fund advanced moneys to the Transportation Fund to ease cash flow problems created by the lag in receipt of moneys from the State and federal governments. In recent years, because of the significant amount of General Fund subsidy, no "cash flow" advances were required. The following table indicates the amount of General Fund subsidy since fiscal 2000.

B-32

## Table 14-Transportation Fund Subsidies

| Fiscal Year ended June 30, | Subsidy (in millions) |
|---|---|
| 2000 | $53.4 |
| 2001 | $74.2 |
| 2002 | $79.4 |
| 2003 | $75.5 |
| 2004 | $74.3 |

SOURCE:  Finance Department.

The City's Airport Fund accounts for the operations of Detroit City Airport. The Airport is capable of accommodating commercial jet carrier service although no commercial airline currently provides passenger service. The Airport is currently not self-sufficient and has required General Fund subsidies ranging between $1 million and $2.5 million per year.

In addition, the General Fund provides significant financial support to two discretely presented component unit enterprise operations: the GDRRA and the Detroit Transportation Corporation. GDRRA receives monies from the General Fund through tipping fees paid for disposal of waste collected by the City. The City's obligation to pay such tipping fees is a full faith and credit, limited tax, general obligation of the City. It is also secured by Distributable Aid. See "FINANCIAL PROCEDURES - Other Funds of the City." The GDRRA is responsible for disposal of essentially all residential solid waste and a small fraction of commercial waste collected in the City.

Since 1991, the GDRRA waste incineration facility (the "Facility") has been operating in conformance with its operating permits. Previous to that time, however, the Facility experienced certain operational problems during the start up and testing phase. The Facility was originally scheduled to be complete and fully operational in 1989. Additional pollution control equipment was financed from proceeds of revenue bonds issued by The Economic Development Corporation of the City of Detroit ("EDC"), and the outstanding balance was refinanced in the first quarter of fiscal year 2002. The retrofit was completed in 1996 and the Facility is operating well within all permit restrictions.

GDRRA has approximately $183.0 million of bonds outstanding as of May 1, 2005, which were issued to refund bonds originally issued to finance construction of the Facility. GDRRA is responsible for making payments to the EDC for debt service on $63.9 million of bonds outstanding as of May 1, 2005, which were issued to refund bonds originally issued to finance additional pollution control equipment. Both debt obligations are payable primarily from energy revenues to be paid by DTE Energy for the purchase of electricity and moneys to be paid by the City as tipping fees for waste disposal.

The Facility essentially covers operating expenses through the sale of steam and electricity and from revenue sources other than the City. The City's tipping fee payments have been, and are expected to remain, approximately equal to the debt service requirements on the outstanding GDRRA bonds and the GDRRA related EDC bonds. The operations and performance of the Facility are guaranteed in certain respects by the lessee of the Facility; however, the City assumes the risk of environmental law changes and of insufficient quantity of, and in certain circumstances the composition of, waste. Approximately half of the expenses of GDRRA are currently being supported from revenue sources other than the City. The gross future tipping fees to be paid by the City are expected to be stable and, if GDRRA's revenues remain stable, approximately equal to debt service on the GDRRA bonds.

While the City has no reason to believe that the Facility will not operate as designed in the future, additional restrictions could be imposed by regulatory agencies and those restrictions could adversely impact financial operations of the Facility. Under certain extraordinary circumstances (such as the Facility being permanently closed or destroyed beyond repair), GDRRA (and therefore the City) could be subject to special

B-33

annual payment obligations. While such an event is thought to be very remote, the amount of such annual payments that are secured by Distributable Aid could be as high as approximately $10.21 million at an assumed interest rate of 18%. The Facility is currently operating as expected.

In 1986, the City, through the Detroit Transportation Corporation (a non-profit corporation formed by the City), took over responsibility for the Downtown People Mover. Construction of the project was funded primarily through a combination of federal and State transportation moneys. At this time, the project is not self-supporting and approximately $6.2 million was budgeted for fiscal year 2006 to support its operations.

<u>Other Funds</u>

The following table lists the other funds of the City and their revenues and expenditures for fiscal year 2004. For audited basic financial information as of and for the fiscal year ended June 30, 2004, see APPENDIX C.

**Table 15-Revenues and Expenditures of Other Funds**

**Fiscal Year Ended June 30, 2004**

| **Funds** | **Revenues/ Expenditures** ($ in millions) | **Purpose** | **Major Funding Sources** (in millions) |
|---|---|---|---|
| **Special Revenue Funds** | | | |
| Community Development Block Grant | 60.5 / 51.1 | Economic Development | Federal Government - 59.7 |
| Construction Code Fund | 20.3 / 31.1 | Building Permit and Inspections | User Fees - 15.7 |
| Detroit Building Authority | 1.2 / 1.2 | Special Maintenance | Other Income - 1.2 |
| Drug Law Enforcement | 5.0 / 2.7 | Narcotics Law Enforcement | Fines and Forfeitures - 3.8 |
| Employment & Training | 95.6 / 95.6 | Work Force Development | Federal Government - 90.1 |
| Empowerment Zone | 15.0 / 15.0 | Economic Development | Federal Government - 20.3 |
| Targeted Business Development | - / - | Casino Agreements | Casinos - 30.0 |
| Major and Local Streets | 77.0 / 80.0 | Infrastructure Improvements | Gas and Weight Tax – 77.0 |
| Human Services | 77.0 / 77.0 | Social Welfare Programs | Federal Government - 3.2 |
| Supportive housing and homeless initiatives | 7.1 / 7.1 | Help of the Homeless | Federal Government - 4.9 |
| Capital projects including Urban Renewal) | 45.6 / 115.9 | Capital Projects | GO Bonds – 45.0 |
| **Fiduciary Funds** | | | |
| Pension Funds | 952.2 / 510.3 | Employee Retirement and Benefits | City Contributions – 418.0 Plan Member Contributions – 57.7 |

SOURCE:   Derived by Finance Department from audited fiscal year 2004 financial statements.

**ASSESSED VALUATION AND PROPERTY TAXES**

*Property Valuation and Tax Rate*

Article IX, Section 3, of the Michigan Constitution provides that the proportion of true cash value at which property shall be assessed shall not exceed 50% of true cash value. The Michigan Legislature, by statute, has provided that property shall be assessed at 50% of its true cash value. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize ad valorem taxes on a non-uniform basis. The legislation implementing this constitutional amendment added a new measure of property value known as "Taxable Value." Beginning in 1995, taxable property has two valuations–State Equalized Valuation ("SEV") and Taxable Value. Property taxes are levied on Taxable Value. Generally, Taxable Value of property is the lesser of (a) the Taxable Value of the property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the net percentage change in the property's SEV, or the inflation rate, or 5%, plus additions, or (b) the property's current SEV. Therefore, the Taxable Value of property may be different from the same property's SEV.

This constitutional amendment and the implementing legislation based the Taxable Value of existing property for the year 1995 on the SEV of that property in 1994. Beginning with the taxes levied in 1995, an increase, if any, in Taxable Value of existing property is limited to the lesser of the percentage net change in SEV from the preceding year to the current year, 5% or the inflation rate. When property is sold or transferred, Taxable Value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The Taxable Value of new construction is equal to current SEV. Taxable Value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the City Assessor. Any property owner may appeal the assessment to the City Assessor, the Board of Review and ultimately to the Michigan Tax Tribunal.

The Michigan Constitution also mandates a system of equalization for assessments. Although the City Assessor is responsible for actually assessing at 50% of true cash value, adjusted for Taxable Value purposes, the final SEV and Taxable Value are arrived at through several steps. The City Assessor establishes assessments initially. City assessments are then equalized to the 50% levels as determined by the County's department of equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining Taxable Value for the purpose of levying *ad valorem* property taxes, because of its indirect measure of total true cash value contained in the City, its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits. Property that is exempt from property taxes, *e.g.*, churches, government property and public schools, is not included in the SEV and Taxable Value. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended ("Act 198"), is recorded on separate tax rolls while subject to tax abatement. The valuation of tax-abated property is based upon SEV but is not included in either the SEV or Taxable Value data in the Official Statement except as noted. The assessments of, and the tax levies on abated properties are not reflected in Table 18, "Tax Rates and Levies," below.

### *Industrial Facilities Tax*

Act 198 provides significant property tax incentives to industry to renovate and expand aging industrial facilities and to build new industrial facilities in Michigan. Under the provisions of Act 198, qualifying cities, villages and townships may establish districts in which industrial firms are offered certain property tax incentives to encourage restoration or replacement of obsolete industrial facilities and to attract new industrial facilities.

Property owners situated in such districts pay an Industrial Facilities Tax ("IFT") in lieu of ad valorem property taxes on plant and equipment for a period of up to 12 years. For rehabilitated plant and equipment, the IFT is determined by calculating the product of the state equalized valuation of the replacement facility in the year before the effective date of the abatement certificate multiplied by the total mills levied by all taxing units in the current year. New plant and equipment that received an abatement certificate prior to January 1, 1994 are taxed at one-half the total mills levied by all taxing units, other than mills levied for local school district operating purposes or under the State Education Tax Act, plus one-half of the number of mills levied for local school district operating purposes in 1993. For new facility tax abatements granted after 1993, new plants and equipment are taxed at one-half of the total mills levied as ad valorem property taxes by all taxing units except mills levied under the State Education Tax Act, plus the number of mills levied under the State Education Tax Act. For new facility tax abatements granted after 1993, the State Treasurer may permit

abatement of all, none or one-half of the mills levied under the State Education Tax Act. Ad valorem property taxes on land are not reduced in any way since land is specifically excluded under Act 198.

### Payment and Lien

Property taxes are due on July 1 of the fiscal year and are payable in full without penalty either on or before August 31 or, at the taxpayer's option, one-half may be paid on or before August 15, with the other half paid on or before January 15. Pursuant to Act 246, Public Acts of Michigan, 2003, the City returns uncollected delinquent property taxes levied after December 31, 2002 to the County for collection on each March 1. The City receives full funding for such taxes from the County's delinquent tax revolving fund. If such delinquent real property taxes remain uncollected after three years from the date on which such taxes become delinquent, the County may charge the respective amount of such taxes back to the City. Delinquent real property taxes for tax year 2003 will be collected in accordance with Act 123, Public Acts of Michigan, 1999, which may result in foreclosure if not paid by March 31, 2006. Tangible personal property may also be seized and sold to satisfy a personal property tax lien.

As shown in Table 19, "Tax Levies and Collections" below, the rate of current collections to the adjusted levy has increased from 89.39% in fiscal year 2000 to 95.81% in fiscal year 2004. The City has taken steps designed to improve collections, including a more aggressive foreclosure policy and the implementation of a program that offers negotiated payment plans to delinquent taxpayers. Additionally, the City may attach personal property of real property owners to satisfy real property delinquencies of such owners.

### Personal Property Tax Assessments and Appeals

Since the 1960s, Michigan personal property tax assessments have been based on the use of one or more of several different multiplier tables, formulated by the State Tax Commission, against taxpayer-reported original cost, depending upon the assessor's view of the average life of the personal property. The State Tax Commission has approved revisions to the State's personal property tax tables which became effective for the year 2000 and which may reduce overall personal property tax revenues in some jurisdictions. The State Tax Tribunal has informally indicated that it may allow the new multipliers to be applied retroactively in pending personal property tax appeals. In anticipation of the new multiplier, many personal property taxpayers filed appeals of their existing tax assessments. In an unpublished, non-precedential opinion, the Michigan Court of Appeals, in *Valassis Communications v. City of Livonia*, affirmed a decision of the State Tax Tribunal that the personal property multipliers, which became effective in 2000, could be retroactively applied and used to determine the true cash value of the subject property for the 1999 tax year. In its unpublished opinion, the court held that the controlling factor is whether the method used most accurately reflects the property's true cash value. The court in *Valassis* determined that based upon the facts of the case, the old multipliers (in effect for the 1999 tax year) did not accurately reflect the property's true cash value and that the 2000 multipliers more accurately reflected the property's true cash value. In January 2004, the Michigan Court of Appeals, in *County of Wayne v. Michigan State Tax Commission*, affirmed the use of at least one of the revised multiplier tables by the State Tax Tribunal in determining personal property tax appeals. The Court of Appeals upheld a recent Tax Tribunal ruling authorizing the use of the revised multiplier developed by the State Tax Commission to determine the true cash value of public-utility electric transmission and distribution property on the grounds that the multiplier tables, as finalized, did not violate the State constitutional requirements for personal property tax valuation. The financial impact of the revised public-utility multiplier, changes in other multipliers and any appeals, if successful, on the City's general operating revenues is unknown at this time. The City intends to make certain adjustments as necessary to maintain a balanced budget.

### Valuations

The following table shows State Equalized Valuations and Taxable Valuations for the most recent five fiscal years. Because the State has applied an equalization factor of 1.0x for each of these years, SEV is equal to the valuations as determined by City assessing officials.

**Table 16--State Equalized Valuations and Taxable Valuations**

| Fiscal Year | Real Property | Personal Property | Total | % Annual Change | Total Valuation | % Annual Change |
|---|---|---|---|---|---|---|
| | **State Equalized Valuation** | | | | **Taxable Valuation(1)** | |
| 2001 | $ 8,106,178,450 | $1,718,118,920 | $ 9,824,297,370 | 13.9% | $7,204,381,125 | 5.1% |
| 2002 | $ 9,319,364,300 | $1,656,437,990 | $10,975,802,290 | 11.7% | $7,639,805,283 | 6.0% |
| 2003 | $10,298,344,200 | $1,749,983,210 | $12,048,327,410 | 9.8% | $7,976,048,523 | 4.4% |
| 2004 | $10,668,533,845 | $1,373,222,411 | $12,041,756,256 | -0.1% | $7,844,209,593 | -1.7% |
| 2005 | $11,177,226,045 | $1,536,422,432 | $12,713,648,477 | 5.6% | $8,335,777,304 | 6.3% |

SOURCE:    Finance Department, Assessments Division.

(1) Limited by State law.  See "ASSESSED VALUATION AND PROPERTY TAXES - Property Valuation and Tax Rate."

*Valuation by Type of Property*

**Table 17--Breakdown of State Equalized Valuation**

| | **Fiscal Year Ended June 30** | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| By Use (Real Property only) | | | | | |
| Residential ................................ | 65.7% | 65.6% | 65.8% | 65.6% | 64.5% |
| Commercial............................. | 23.5% | 24.3% | 24.1% | 21.9% | 22.0% |
| Industrial ................................. | 10.8% | 10.1% | 10.1% | 12.5% | 13.5% |
| Total........................................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| By Class (Total State Equalized Valuation) | | | | | |
| Real property ........................... | 82.5% | 85.0% | 85.5% | 88.5% | 87.9% |
| Personal property .................... | 17.5% | 15.0% | 14.5% | 11.5% | 12.1% |
| Total........................................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE:  Finance Department, Assessments Division.  Totals may not add up due to rounding.

*Valuation and Tax Levies*

The following table shows the tax rates and levies in the City for City, School and County purposes for the last five fiscal years.

B-37

Table 18–Tax Rates and Levies (1)

TAXING ENTITY:

| | Fiscal Year 2001 | | Fiscal Year 2002 | | Fiscal Year 2003 | | Fiscal Year 2004 | | Fiscal Year 2005 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Millage | Levy | Millage | Levy | Millage | Levy | Millage | Levy | Millage | Levy |
| **CITY OF DETROIT** | | | | | | | | | | |
| General Fund | 19.962 | $143,813,856 | 19.962 | $152,505,793 | 19.962 | $159,217,881 | 19.962 | 156586112 | 19.962 | $166,399,036 |
| Debt Service | 8.722 | 62,836,612 | 8.9437 | 68,328,127 | 7.9217 | 63,183,864 | 7.9245 | 62,161,439 | 7.4796 | 62,348,373 |
| Garbage Levy | 2.994 | 21,572,078 | 2.994 | 22,875,869 | 2.9943 | 23,882,682 | 2.9943 | 23,487,917 | 2.9943 | 24,959,855 |
| Library | 3.633 | 26,174,237 | 3.633 | 27,256,177 | 3.6331 | 28,977,782 | 3.6331 | 28,498,798 | 3.6331 | 30,84,758 |
| Total City | 35.311 | $254,396,784 | 35.533 | $271,465,965 | 34.5111 | $275,262,208 | 34.5139 | $270,734,265 | 34.069 | $283,992,022 |
| **SCHOOLS** | | | | | | | | | | |
| Debt Service | 7.000 | 50,430,668 | 7.740 | 59,132,093 | 12.990 | $103,608,870 | 13.000 | $101,974,725 | 13.000 | $108,365,267 |
| Judgment | - | - | - | - | 0.200 | 1,595,210 | 0.800 | 6,275,368 | - | |
| Non-Homestead Tax | 18.000 | 82,357,628 | 18.000 | 82,357,628 | 18.000 | 143,568,873 | 18.000 | 141,195,773 | 18.000 | 150044,216 |
| Total Schools | 25.000 | $132,788,296 | 25.740 | $141,489,721 | 31.19 | $248,772,953 | 31.800 | $249,445,865 | 31.000 | $258,409,484 |
| **STATE EDUCATION TAX** | 6.000 | 43,226,287 | 6.000 | 45,838,832 | 6.000 | 47,856,291 | 6.000 | 47,065,258 | 6.000 | 50,014,739 |
| **WAYNE COUNTY** | | | | | | | | | | |
| General Fund | 6.665 | 48,017,921 | 6.656 | 50,847,488 | 6.6380 | 52,945,010 | 6.6380 | 52,069,863 | 6.6380 | 55,332,973 |
| Regional Educational Service Operational Agency | 1.979 | 14,256,750 | 1.975 | 15,090,907 | 3.4643 | 27,631,425 | 3.4643 | 27,174,695 | 3.4643 | 28,877,677 |
| Community College | 1.000 | 7,204,381 | 2.500 | 19,095,693 | 2.4862 | 19,830,052 | 2.4862 | 19,502,274 | 2.4844 | 20,709,436 |
| Wayne County Parks | 0.248 | 1,784,525 | 0.247 | 1,889,324 | 0.2459 | 1,961,310 | 0.2459 | 1,928,891 | 0.2459 | 2,049,771 |
| Huron–Clinton Metro Authority | 0.220 | 1,586,405 | 0.219 | 1,669,843 | 0.2170 | 1,730,803 | 0.2161 | 1,695,134 | 0.2154 | 1,795,529 |
| Public Safety | 0.945 | 6,805,258 | 0.943 | 7,205,864 | 0.9381 | 7,482,331 | 0.9381 | 7,358,653 | 0.9381 | 7,819,804 |
| Total Wayne County | 11.057 | $79,655,240 | 12.540 | $95,799,120 | 13.9895 | $111,580,931 | 13.9886 | $109,729,510 | 13.9861 | $116,585,190 |
| **Total Tax Rate and Levy** | 77.368 | $510,066,607 | 79.813 | $554,593,638 | 85.691 | $683,472,384 | 86.303 | $676,974,898 | 71.069 | $709,001,434 |
| **Total Homestead Rate** | 59.368 | | 61.813 | | 67.691 | | 68.303 | | 53.069 | |
| **Total Non-Homestead Rate** | 77.368 | | 79.813 | | 85.691 | | 86.303 | | 71.069 | |

SOURCES:  Finance Department, Assessments Division and Wayne County Treasurer's Office.  Totals may not add up due to rounding.

### Tax Levies and Collections

The following table shows tax collections of current taxes during each fiscal year and collections of current and delinquent taxes, penalties and interest for City operating, refuse collection and disposal, debt service and library purposes for each of the past five fiscal years.

### Table 19–Tax Levies and Collections–2000 to 2004

| Year Ended June 30, | Adjusted Tax Levy(1) | Collections of Current Levy During Year | | Total Collections Through Fiscal Year Ended June 30, 2004 | |
|---|---|---|---|---|---|
| | | Amount | Ratio to Adj. Levy | Amount | Ratio to Adj. Levy |
| | | (all dollars in thousands) | | | |
| 2000 ............... | $235,818 | $210,805 | 89.39% | $228,411 | 96.86% |
| 2001 ............... | $249,917 | $218,915 | 87.60% | $234,769 | 93.94% |
| 2002 ............... | $238,517 | $212,435 | 88.39% | $235,868 | 98.89% |
| 2003 ............... | $241,183 | $207,628 | 86.08% | $224,291 | 95.99% |
| 2004 ............... | $241,824 | $231,696 | 95.81% | $249,373 | 103.12% |

SOURCE: Finance Department, Treasury Division.

(1) The levy is adjusted from the original levy for cancellations and assessment adjustments.

In an effort to increase its realization of tax revenues, the City entered into a three-year contract with MBIA Muniservices, Inc. ("MBIA") to collect its delinquent property taxes, and income taxes. The MBIA contract expires in FY 2006. MBIA also collects water and sewer receivables for the City. In addition, the collection of real property taxes was transferred to Wayne County in fiscal 2003 for collection of fiscal 2003 and future taxes. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes."