# EXHIBIT C

*This Offering Circular provides information about the 2006 Certificates. Information on this cover page is for ready reference. A prospective investor should read the entire Offering Circular to make an informed investment decision.*

**$948,540,000**

**TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006**

issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006

evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

**CITY OF DETROIT, MICHIGAN**

and

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

and

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

**$148,540,000 SERIES 2006-A (FIXED RATE)**
**$800,000,000 SERIES 2006-B (FLOATING RATE)**

**Dated: Date of Delivery**                                    **Due: June 15 as shown on the inside cover**

| | |
|---|---|
| *Ratings* | *See pages 22-23* |
| *Interest Payment Dates* | *Series 2006-A:* December 15, 2006 and each June 15 and December 15 thereafter |
| | *Series 2006-B:* September 15, 2006 and the 15th day of each December, March , June and September thereafter |
| *Redemption* | Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory sinking fund redemption at par. |
| | Series 2006-A Certificates are subject to optional redemption on any date with a make-whole premium.—*See pages 11-12* |
| | Series 2006-B Certificates maturing in 2029 and 2034 are subject to *pro rata* mandatory sinking fund redemption at par. |
| | Series 2006-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2011.—*See page 12-16* |
| *Source of Payment* | Principal of and interest on the 2006 Certificates are payable, when due, solely from 2006 COP Service Payments to be paid by the City under the 2006 Service Contracts.—*See pages 9-10* |
| *Insurance* | The scheduled payment of principal of and interest on 2006 Certificates will be guaranteed under insurance policies (as specifically indicated on the inside cover of this Offering Circular with respect to particular 2006 Certificates) to be issued concurrently with delivery of the 2006 Certificates by Financial Guaranty Insurance Company and XL Capital Assurance Inc. |
| | FGIC                                    XL CAPITAL ASSURANCE |
| *Tax Matters* | Interest on the 2006 Certificates is subject to U.S. federal income tax and State of Michigan income tax. |
| *Purpose* | The 2006 Certificates are being issued to provide moneys to fund the optional redemption of certain certificates of participation and the purchase and cancellation of certain other certificates of participation that were issued in 2005 to fund certain then existing unfunded accrued actuarial liabilities of each Retirement System of the City.—*See pages 5-9* |
| *Denominations* | *Series 2006-A:* Multiples of $5,000 |
| | *Series 2006-B:* $25,000 and multiples of $1,000 in excess thereof |
| *Closing* | On or about June 12, 2006 |
| *Global Book-Entry System* | Clearance is expected to be available through The Depository Trust Company (the depository for the 2006 Certificates), Clearstream, and Euroclear. |
| *Global Offering* | The 2006 Certificates are offered globally for sale in jurisdictions where it is lawful to make such offers.—*See page 22* |
| *Stock Exchange Listing* | Application will be made for the 2006 Certificates to be listed on the Luxembourg Stock Exchange. There can be no assurance that this listing will be obtained. The issuance and settlement of the 2006 Certificates is not conditioned on the listing of the 2006 Certificates on the Luxembourg Stock Exchange. |
| *2006 Certificate Counsel* | Lewis & Munday, A Professional Corporation—*See page 23* |
| *Trustee* | U.S. Bank National Association |

**UBS Investment Bank**                    **Siebert Brandford Shank & Co., LLC**

*Co-Managers for Series 2006-A Certificates Only*

Bear, Stearns & Co. Inc.          Citigroup Global Markets          M.R. Beal & Company          Popular Securities

This Offering Circular is dated June 7, 2006.

## MATURITIES, PRINCIPAL AMOUNTS, INTEREST RATE, YIELDS, AND PRICES

**$948,540,000**

**TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006**
issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006
evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between

**CITY OF DETROIT, MICHIGAN**
and

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**
and

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**
$148,540,000 SERIES 2006-A (FIXED RATE)
$800,000,000 SERIES 2006-B (FLOATING RATE)

### $148,540,000 Series 2006-A Certificates

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Yield at Issuance | Price at Issuance |
|---|---|---|---|---|---|---|---|
| 251228AA0 | US251228AA03 | 025779533 | 2035* | $148,540,000 | 5.989% | 5.989% | 100% |

### $800,000,000 Series 2006-B Certificates

| CUSIP† | ISIN† | Euroclear and Clearstream Common Code† | Maturing (June 15) | Principal Amount | Interest Rate | Price at Issuance |
|---|---|---|---|---|---|---|
| 251228AB8 | US251228AB85 | 025766539 | 2029** | $299,155,000 | Three-month LIBOR plus 0.30% | 100% |
| 251228AC6 | US251228AC68 | 025766610 | 2034* | 500,845,000 | Three-month LIBOR plus 0.34% | 100% |

The Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE 2006 CERTIFICATES – The Series 2006-A Certificates (Fixed Rate) - Mandatory Sinking Fund Redemption."

The Series 2006-B Certificates maturing in 2029 and 2034 are subject to *pro rata* mandatory sinking fund redemption. For a schedule of the mandatory sinking fund redemption payments, see "THE 2006 CERTIFICATES – The Series 2006-B Certificates (Floating Rate) - Mandatory Sinking Fund Redemption.

---

\* Insured by Financial Guaranty Insurance Company.

\** Insured by XL Capital Assurance Inc.

† CUSIP, ISIN and Euroclear and Clearstream Common Code data herein are set forth herein for convenience of reference only. Neither the 2006 Funding Trust, the Service Corporations, the City nor the Underwriters assume responsibility for the accuracy of such information.

This document, the Offering Circular, contains the only authorized information about the offering of the 2006 Certificates. This document is not an offer or solicitation for the 2006 Certificates, and no unlawful offer, solicitation, or sale may occur through the use of this document or otherwise. This document is not a contract, and it provides no investment advice. Prospective investors should consult their advisors and legal counsel with questions about this document, the 2006 Certificates, and anything else related to the offering.

This document provides prospective investors with information that may be important in making an investment decision. It may not be used for any other purpose without the City's permission. The City is the author of this document and is responsible for its accuracy and completeness. The Underwriters are not the authors of this document. In accordance with their responsibilities under the securities laws of the United States of America, the Underwriters are required to review the information in this document and must have a reasonable basis for their belief in the accuracy and completeness of its key representations.

The estimates, forecasts, projections, and opinions in this document are not hard facts, and no one guarantees them. Some of the people who prepared, compiled or reviewed this information had specific functions that covered some aspects of the offering but not others. For example, financial staff focused on quantitative financial information, and legal counsel focused on specific documents or legal issues assigned to them.

No dealer, broker, sales representative, or other person has been authorized to give any information or to make any representations about the 2006 Certificates other than what is in this document. The information and expressions of opinion in this document may change without notice. Neither the delivery of this document nor any sale of the 2006 Certificates implies that there has been no change in the other matters contained in this document since its date. Material referred to in this document is not part of this document unless expressly included.

Other than information concerning Financial Guaranty Insurance Company contained in APPENDIX E, none of the information in this Offering Circular has been supplied or verified by Financial Guaranty Insurance Company, and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the 2006 Certificates.

Other than information concerning XL Capital Assurance Inc. contained in the APPENDIX F, none of the information in this Offering Circular has been supplied or verified by XL Capital Assurance Inc., and it makes no representation or warranty, express or implied, as to the accuracy or completeness of such information or the validity of the 2006 Certificates.

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................................. 1
    No Pledge of Retirement System Assets or of Proceeds of the 2006 Certificates ............................ 2
    Investment Considerations ................................................................................................................. 3
    Defined Terms ................................................................................................................................... 3
    Underlying Documents ...................................................................................................................... 3
THE CITY ............................................................................................................................................ 3
    Governmental Structure .................................................................................................................... 3
    Economic Characteristics .................................................................................................................. 3
    Current Fiscal Situation ..................................................................................................................... 4
    Financial Controls and Accounting ................................................................................................... 5
PLAN OF FINANCE ............................................................................................................................ 5
    Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates ................. 6
    Swap Agreements .............................................................................................................................. 8
    Sources and Uses of Funds ................................................................................................................ 9
SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES ................................. 9
THE 2006 CERTIFICATES ................................................................................................................. 10
    The Series 2006-A Certificates (Fixed Rate) ................................................................................... 10
    The Series 2006-B Certificates (Floating Rate) ............................................................................... 12
    Selection of 2006 Certificates for Redemption ................................................................................ 15
    Notice of Redemption ........................................................................................................................ 16
    Global Book-Entry System ................................................................................................................ 16
    Registration and Payment of 2006 Certificates ................................................................................ 16
2006 COP SERVICE PAYMENTS ...................................................................................................... 16
2006 CERTIFICATE INSURANCE ..................................................................................................... 18
2006 SERVICE CONTRACT ADMINISTRATION ............................................................................. 18
THE SERVICE CORPORATIONS AND THE 2006 FUNDING TRUST ............................................. 20
UNDERWRITING ............................................................................................................................... 21
    Global Plan of Distribution ............................................................................................................... 22
    Reference Information about the 2006 Certificates ........................................................................... 22
RATINGS ............................................................................................................................................ 22
FINANCIAL ADVISORS .................................................................................................................... 23
INDEPENDENT ACCOUNTANTS ...................................................................................................... 23
TRUSTEE AND CONTRACT ADMINISTRATOR ............................................................................. 23
LEGAL MATTERS .............................................................................................................................. 23
LITIGATION ....................................................................................................................................... 24
UNITED STATES FEDERAL TAX CONSIDERATIONS .................................................................... 26
    Tax Status of the 2006 Funding Trust ............................................................................................... 27
    Tax Status of the 2006 COP Service Payments under the 2006 Service Contracts ........................... 27
    Agreements Regarding Tax Status of the 2006 Funding Trust and 2006 COP Service Payments under the 2006
        Service Contracts .......................................................................................................................... 27
    Tax Status of the Service Corporations ............................................................................................. 28
    U.S. 2006 Certificateholders ............................................................................................................ 28
    Non-U.S. 2006 Certificateholders ..................................................................................................... 29
    Information Reporting and Backup Withholding ............................................................................... 30
    State and Other Tax Considerations .................................................................................................. 30
    ERISA Considerations ....................................................................................................................... 31
CONTINUING DISCLOSURE ............................................................................................................. 33
APPENDIX A:  Summary of Certain Provisions of the 2006 Service Contracts, the Contract Administration Agreement and
            the Trust Agreement ................................................................................................................. A-1
APPENDIX B:  Information Concerning the City of Detroit, Michigan ................................................................ B-1
APPENDIX C:  Comprehensive Annual Financial Report of the City of Detroit, Michigan for the Fiscal Year Ended June 30, 2005,
            including Audited Basic Financial Statements of the City for Such Fiscal Year ............................. C-1
APPENDIX D:  Global Book-Entry System ......................................................................................................... D-1
APPENDIX E:  Information about Financial Guaranty Insurance Company, including Form of its 2006 Certificate Insurance
            Policy ........................................................................................................................................ E-1
APPENDIX F:  Information about XL Capital Assurance Inc., including Form of its 2006 Certificate Insurance Policy ........... F-1
APPENDIX G:  Expected Form of Legal Opinion of 2006 Certificate Counsel ..................................................... G-1
APPENDIX H:  Continuing Disclosure Undertaking ............................................................................................ H-1

# OFFERING CIRCULAR

### $948,540,000

## TAXABLE CERTIFICATES OF PARTICIPATION SERIES 2006
### issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006
**evidencing undivided proportionate interests
in the rights to receive certain payments
pursuant to two Service Contracts between**

## CITY OF DETROIT, MICHIGAN
### and
### DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION
### and
### DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION
**$148,540,000 SERIES 2006-A (FIXED RATE)
$800,000,000 SERIES 2006-B (FLOATING RATE)**

### INTRODUCTION

This Offering Circular sets forth information concerning the Certificates of Participation Series 2006-A in the original aggregate principal amount of $148,540,000 (**Series 2006-A Certificates**) and the 2006 Certificates of Participation Series 2006-B in the original aggregate principal amount of $800,000,000 (**Series 2006-B Certificates**, and collectively with the Series 2006-A Certificates, **2006 Certificates**) issued by the Detroit Retirement Systems Funding Trust 2006 (**2006 Funding Trust**) to be formed under the Trust Agreement described below.

The 2006 Certificates evidence individual undivided proportionate interests in the rights to receive certain payments (**2006 COP Service Payments**) to be made by the City of Detroit, Michigan (**City**) under two Service Contracts of the City, namely, its (i) Detroit General Retirement System Service Contract 2006 (**2006 GRS Service Contract**) with the Detroit General Retirement System Service Corporation, and (ii) Detroit Police and Fire Retirement System Service Contract 2006 with the Detroit Police and Fire Retirement System Service Corporation (**2006 PFRS Service Contract**, and together with the 2006 GRS Service Contract, **2006 Service Contracts**).

As authorized by Ordinance No. 05-05 of the City (**Funding Ordinance**), the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (each a **Service Corporation**) were incorporated in 2005. They were created for the purposes of providing services to assist the City in meeting its obligation to provide funding, over an applicable period of years, of unfunded accrued actuarial liabilities (**UAAL**) of the City's General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS**, and collectively with the GRS, **Retirement Systems**).

On May 25, 2005 (**2005 Contract Date**) and pursuant to the Funding Ordinance, the City entered into its first service contract with each Service Corporation (together, **2005 Service Contracts**), and certificates of participation (**2005 COPs**) were issued on June 2, 2005 evidencing undivided proportionate interests in the rights to receive certain payments (**2005 COP Service Payments**) to be made by the City under those 2005 Service Contracts through June 15, 2025. The 2005 COPs were issued to provide moneys to fund specific amounts of UAAL of the GRS and the PFRS (**2005 Subject UAAL**) and to pay certain related ancillary amounts set forth in the 2005 Service Contracts. The 2005 Subject UAAL was irrevocably funded in full on June 2, 2005 from proceeds of the 2005 COPs, and the 2005 COPs, the 2005 Service Contracts and the City's contractual obligation thereunder to pay the 2005 COP Service Payments, when due, all remain currently in effect.

Michigan law entitles each Retirement System to have its UAAL funded over a specified period (**Amortization Period**), which may be duly changed up to a 30-year maximum. Each 2005 Service Contract required the City to make 2005 COP Service Payments over a period that was limited to the PFRS or GRS

1

Amortization Period then applicable (13 years for the PFRS and 20 years for the GRS). The Funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 COP Service Payments over a similarly lengthened period.

On February 8, 2006, the governing board of the GRS (**GRS Board**) extended the Amortization Period for GRS UAAL from 20 to 30 years. On March 30, 2006, the governing board of the PFRS (**PFRS Board**) extended the Amortization Period for PFRS UAAL from 13 to 30 years. Accordingly, as part of the services that the Service Corporations agreed in their 2005 Service Contracts to provide, the 2006 Certificates are being issued to enable the City to replace certain scheduled payment obligations that it incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable over the extended 30-year periods under the 2006 Service Contracts, and to provide moneys to pay costs of issuance of the 2006 Certificates and related amounts. This will enable the City to achieve financial benefits such as would have been available under the 2005 Service Contracts if it could have utilized then the now longer Amortization Period of each Retirement System.

In their respective 2006 Service Contracts, the Service Corporations have agreed to perform the above-described services, to assist the City in extending the period for its scheduled payments incurred to provide funding of the 2005 Subject UAAL, in the current year and in future years. In return for such present and future services, the City has agreed in the 2006 Service Contracts to make the 2006 COP Service Payments and certain additional payments.

The 2006 Certificates are issued pursuant to the Funding Ordinance, an authorizing Resolution adopted by the Detroit City Council on April 26, 2006 (the **Resolution**), the 2006 Service Contracts and the Trust Agreement, dated the date of original delivery of the 2006 Certificates (**2006 Closing Date**), among the Service Corporations and U.S. Bank National Association, as Trustee (**Trust Agreement**). U.S. Bank National Association will also serve as the Contract Administrator under the Contract Administration Agreement described below.

On the 2006 Closing Date, the Service Corporations, severally and not jointly, will enter into the Trust Agreement with the Trustee, establishing the 2006 Funding Trust and irrevocably selling and assigning to it all of their rights under the 2006 Service Contracts to receive, collect and enforce all 2006 COP Service Payments to become due thereunder. On the 2006 Closing Date, the 2006 Funding Trust will issue and sell the 2006 Certificates and then apply the proceeds in part to optionally redeem certain outstanding 2005 COPs, Series 2005-A (**Series 2005-A COPs**) and in part to purchase and cancel certain outstanding 2005 COPs, Series 2005-B (**Series 2005-B COPs**).

THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE 2006 SERVICE CONTRACTS ARE UNSECURED CONTRACTUAL OBLIGATIONS OF THE CITY. NEITHER THE FAITH AND CREDIT, THE TAXING POWER NOR ANY SPECIAL REVENUES OF THE CITY ARE PLEDGED TO THE 2006 COP SERVICE PAYMENTS COMING DUE UNDER THE 2006 SERVICE CONTRACTS. THE 2006 SERVICE CONTRACTS AND THE PAYMENT OBLIGATIONS OF THE CITY UNDER THE 2006 SERVICE CONTRACTS DO NOT CONSTITUTE "INDEBTEDNESS" WITHIN THE MEANING OF ANY LIMITATION CONTAINED IN THE CONSTITUTION AND NON-TAX STATUTES OF THE STATE OF MICHIGAN OR IN THE CITY CHARTER.

### No Pledge of Retirement System Assets or of Proceeds of the 2006 Certificates

No Retirement System assets and no proceeds of the 2006 Certificates will either secure or be available to pay the 2006 Certificates. See "PLAN OF FINANCE" and "SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES."

## Investment Considerations

This is a relatively new financing structure which is being used for the second time in the State of Michigan (**State**). The City's unconditional contractual obligation to make 2006 COP Service Payments is not "subject to appropriation" (*i.e.*, the contractual obligation is not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year). The City is legally bound to make all 2006 COP Service Payments for the full term of both 2006 Service Contracts, and statutory remedies exist to enforce the City's obligations. See "PLAN OF FINANCE" and its first subheading "Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates."

## Defined Terms

All capitalized terms used in this Offering Circular, unless otherwise defined or the context otherwise indicates, have the same meaning as in the 2006 Service Contracts, the Trust Agreement and the Contract Administration Agreement. See "DEFINITIONS OF CERTAIN TERMS" in APPENDIX A.

## Underlying Documents

The descriptions and summaries of various documents set forth below do not purport to be comprehensive or definitive, and reference is made to each document for the complete details of all terms and conditions. All statements herein are qualified in their entirety by reference to each such document. Copies of the 2006 Service Contracts, the Trust Agreement and the Contract Administration Agreement are available in reasonable quantities upon request to the Contract Administrator.

## THE CITY

### Governmental Structure

Pursuant to the Michigan Constitution of 1963, as amended (**State Constitution**), and the Home Rule City Act (Act No. 279 of the Michigan Public Acts of 1909, as amended), the City is a home rule city with significant independent powers. The City provides the following services: public protection, public works, cultural and recreational, civic center, health, physical and economic development, public lighting, transportation, water supply and sewage disposal, human services, airport, and parking. In accordance with the City Charter (**Charter**), the governance of the City is organized into two branches: an Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is comprised of the City Council and its agencies. The Mayor and the members of the City Council are elected every four years. The last regular election for these positions was on November 8, 2005, in which Kwame M. Kilpatrick was re-elected as Mayor, and five incumbent members and four new members of the City Council were elected. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the judicial branch of State government.

The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify certain ordinances enacted by the City by referendum. The period within which voters of the City could, under the Charter, petition for a referendum to nullify the Funding Ordinance or either of the Alternative Funding Mechanism Ordinances (referred to below under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates") lapsed without any such petitions being filed.

### Economic Characteristics

Detroit is located in Wayne County, which is in the southeastern section of the lower peninsula of Michigan. The City covers approximately 138 square miles and is the largest city in Michigan, accounting for nearly half of the population of the County. According to the U.S. Census Bureau, the City is now the nation's eleventh largest city and is the center of the nation's eighth largest consolidated metropolitan statistical area. The City is internationally known for its automobile manufacturing and trade. The southeastern border of the City is on the Detroit River, an international waterway, which is linked via the St. Lawrence Seaway to

seaports around the world. The City is the commercial capital of Michigan and a major economic and industrial center of the nation. The City has eight diverse industrial parks, and more than 50 firms have world headquarters within the City. See APPENDIX B - "Information Concerning the City of Detroit, Michigan" for information about the City's economic condition and outlook.

**Current Fiscal Situation**

Similar to many large urban governmental units, the City has faced and continues to face fiscal challenges. In the past three fiscal years (having a June 30 fiscal year-end), the five major revenue categories of the City's General Fund decreased 3.1% from $965 million to $935 million while the five major expenditure categories of the General Fund increased 18.0% from $832 million to $982 million (fiscal 2003 compared to fiscal 2005). This contributed to the City reporting year-end General Fund deficits for fiscal 2001, 2003, 2004 and 2005. The primary causes for these past results include a declining population base and its adverse effects on tax revenues, increases in health care and pension benefit costs, and a disproportionate number of City employees compared to the population served. The City has consistently sought to reduce expenditures and increase revenues in any fiscal year in which estimates and actual results may not coincide with budgeted assumptions. The City also has utilized various one-time revenue enhancement strategies in an attempt to balance year-end deficits (e.g., issuance of fiscal stabilization bonds and exhausting the remaining balance in the Budget Stabilization Fund). In addition, the City has taken steps to significantly reduce budgeted positions by over 5,500 employees since fiscal 2002, including 3,300 in its General Fund to reverse the disproportion of the number of employees to resident population. The reductions represent 26% and 39% overall and in the General Fund respectively.

For the fiscal year ended June 30, 2004, the City recorded an unexpected unreserved General Fund deficit of $95 million that it carried, as required, into fiscal 2005. The fiscal 2004 deficit was primarily attributable to below budgeted income tax and utility users tax collections; tax penalties and interest for remitting payroll withholding taxes late to the Internal Revenue Service; capital costs for an 800-megahertz communication system; and payment resulting from the loss of a lawsuit to the PFRS. In March 2005, the City administration implemented mid-year layoffs, salary reductions for certain employees and other expenditure reductions. Such actions were taken to bring the budget into balance.

The Fiscal Year 2006 Budget was built upon significant cuts in existing City departments, broad-based expenditure reductions and provisions for a then anticipated carryover of undesignated General Fund deficit from fiscal 2005 estimated at $101.7 million. As required, the estimated fiscal 2005 deficit was appropriated as an expenditure in the balanced Fiscal Year 2006 Budget. The City's actual carryover fiscal 2005 deficit was $155.4 million.

As a result of the higher than expected fiscal 2005 deficit and not gaining its unions' approval of proposed health care benefit reductions that the City had expected would generate approximately $47 million of cost savings, the City administration implemented further reductions to the City's work force and other cost saving initiatives during the current fiscal year. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund – Fiscal Year 2006" in APPENDIX B for more detail and assumptions regarding the budgeted figures.

The City administration believes that the steps the City has already taken together with those outlined in the Fiscal Year 2007 Executive Budget will correct the structural imbalance between its current level of revenues and expenditures. This involves gaining additional permanent revenue sources, such as the refuse collection fee discussed under the heading "Fiscal 2007 Budget" in "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" in APPENDIX B. In addition, the City administration believes that the City must continue to control its basic level of ongoing General Fund expenditures. Such expenditure control measures will be accomplished through reducing the number of employees and their employee benefits, additional efficiency measures and reducing or terminating certain services.

The City administration currently estimates that it will complete fiscal 2006 with a reported $63 million deficit. This is a significant reduction from the $155.4 million deficit it reported in fiscal 2005.

While the City is pursuing steps to reduce this deficit even further, the estimated $63 million deficit has been appropriated as an expenditure, as required, in the balanced Fiscal Year 2007 Executive Budget. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund – Fiscal 2007 Budget" in APPENDIX B.

### Financial Controls and Accounting

Prior to the start of each fiscal year the City prepares an annual budget which constitutes the financial plan for such fiscal year. Reference to a fiscal year refers to the fiscal year ended or ending on June 30 of the year indicated. The budget is required to set forth estimated revenues from all sources and all appropriations. The appropriation for every function of each City department is a fixed expenditure and may not exceed the original appropriation without City Council approval. The City estimates a prior year surplus or deficit for the General Fund that reflects the projected ending financial position for the prior year. Subject to certain limitations, one half of any surplus realized at the end of any fiscal year is credited to a Budget Stabilization Fund with the remainder being included as revenue available for appropriation in the budget for the next succeeding fiscal year. Any deficit realized at the end of any fiscal year is entered into the budget for the next succeeding fiscal year as an appropriation in accordance with the Charter. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted by the Mayor and adopted by City Council is a balanced budget. See "FINANCIAL PROCEDURES - Budget Process" and "- Budget Stabilization Fund" in APPENDIX B.

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America and, except for entity-wide statements and the enterprise and pension funds, reflect the modified accrual basis of accounting. See "FINANCIAL PROCEDURES - Accounting System" and "- Accounting Methods" in APPENDIX B. The audited basic financial statements of the City as of and for the year ended June 30, 2005, are included in APPENDIX C.

### PLAN OF FINANCE

The 2006 Certificates are being issued to provide moneys to fund the optional redemption of $104,055,000 aggregate principal amount of Series 2005-A COPs of certain maturities and the purchase and cancellation of $800,000,000 aggregate principal amount of Series 2005-B COPs of certain maturities, as shown in the table below. This is the second issuance of certificates of participation in connection with the City's use of its alternative funding mechanism authorized last year for meeting its State constitutional and statutory obligation to fund an approximately $1.37 billion portion of outstanding unfunded accrued actuarial liabilities (**2005 Subject UAAL**) of its two Retirement Systems. In using the alternative funding mechanism last year, rather than paying the 2005 Subject UAAL in annual installments, with interest, directly to the Retirement Systems over the ensuing 13-20 years (the UAAL Amortization Periods then in effect for the PFRS and GRS, respectively), the City instead entered into a separate 2005 Service Contract with each of two Service Corporations it had caused to be formed for this purpose and contractually obligated itself to make periodic 2005 COP Service Payments to them over the same 13-20 years in return for their agreeing to perform the services in the current year and in future years of reducing the financial burden of the 2005 Subject UAAL.

As part of the services the Service Corporations agreed in their 2005 Service Contracts to provide if the existing UAAL Amortization Periods of the PFRS and GRS were later extended and if requested by the City and approved by the City Council, the 2006 Certificates will be issued to enable the City to replace certain scheduled payment obligations it originally incurred to provide funding for the 2005 Subject UAAL with new scheduled payment obligations payable under the 2006 Service Contracts over the recently extended 30-year Amortization Periods, and to pay costs of issuance of the 2006 Certificates and related amounts. This will enable the City to achieve financial benefits as would have been available originally under the 2005 Service Contracts if it could have utilized the now longer Amortization Period of each Retirement System on the 2005 Contract Date.

The Service Corporations will form the 2006 Funding Trust under the Trust Agreement on the 2006 Closing Date and irrevocably sell, assign and convey to the 2006 Funding Trust all their rights to receive, collect and enforce all 2006 COP Service Payments to become due under the 2006 Service Contracts. The 2006 Funding Trust and the Service Corporations will enter into the Contract Administration Agreement with U.S. Bank National Association, as Contract Administrator (**Contract Administrator**), and other parties. See "2006 SERVICE CONTRACT ADMINISTRATION." The Service Corporations are not expected to have a significant active role with regard to any outstanding 2006 Certificates after the 2006 Closing Date. The Retirement Systems will not be a party to the 2006 Service Contracts, the Trust Agreement or the Contract Administration Agreement.

The 2006 Funding Trust will issue and sell the 2006 Certificates on the 2006 Closing Date and apply the proceeds, with other available funds, in part to optionally redeem certain outstanding Series 2005-A COPs and in part to purchase and cancel certain outstanding Series 2005-B COPs. The Series 2005-B COPs to be purchased will be procured by a tender offer conducted by the Service Corporations. All such purchased Series 2005-B COPs of the same maturity will be purchased at the same price in relation to their principal amount, but no minimum principal amount of Series 2005-B COPs is required to be either tendered or purchased.

Upon issuance of the 2006 Certificates and such optional redemption of certain Series 2005-A COPs and such purchase and cancellation of Series 2005-B COPs which are tendered by their holders to the Service Corporations for that purpose, some 2005 COPs will still remain outstanding concurrently with the 2006 Certificates. The 2005 COPs and the 2006 Certificates are wholly independent of each other. The City's contractual payment obligations underlying the 2006 Certificates are totally separate and distinct from its contractual payment obligations underlying the 2005 COPs. Holders of 2006 Certificates will have no rights or interests in the City's payment obligations under the 2005 Service Contracts, and holders of 2005 COPs will have no rights or interests in the City's payment obligations under the 2006 Service Contracts.

The following Series 2005-A COPs will be optionally redeemed, and the following tendered Series 2005-B COPs will be purchased and canceled, from proceeds of the 2006 Certificates.

| Series 2005-A COPs Optionally Redeemed | | Series 2005-B COPs Purchased and Canceled | |
|---|---|---|---|
| **Maturity (June 15)** | **Principal Amount** | **Maturity (June 15)** | **Principal Amount** |
| 2007 | $10,845,000 | 2014 | $250,615,000 |
| 2008 | 13,905,000 | 2025 | 549,385,000 |
| 2009 | 17,310,000 | | |
| 2010 | 16,200,000 | | |
| 2011 | 13,925,000 | | |
| 2012 | 12,220,000 | | |
| 2013 | 10,615,000 | | |
| 2014 | 9,035,000 | | |

### Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates

Pursuant to the Funding Ordinance, the City and Service Corporations entered into the 2005 Service Contracts and 2005 COPs were issued as a means of enabling the City to fulfill its State constitutional and statutory obligations to provide funding for the 2005 Subject UAAL of its Retirement Systems. The periods for the City's scheduled payment obligations under the 2005 PFRS Service Contract and the 2005 GRS Service Contract were limited to 13 and 20 years, respectively, the Amortization Periods then in effect for the PFRS and GRS. The Funding Ordinance anticipated the possible future extension of the PFRS and GRS Amortization Periods and authorized the Service Corporations, in that event, to assist the City in gaining the financial benefits of making its 2005 COP Service Payments over a similarly lengthened period. Now that the PFRS and GRS Amortization Periods have been extended to 30 years currently, the City and Service Corporations are entering into the 2006 Service Contracts and the 2006 Certificates are being issued, as

anticipated and authorized in the Funding Ordinance, as a means of enabling the City to utilize the permitted longer payment period for the obligations it incurred to fulfill its constitutional and statutory obligations to provide such funding for the 2005 Subject UAAL.

The constitutional, statutory and ordinance authority for the funding of the 2005 Subject UAAL through issuance of the 2005 COPs, and for funding the optional redemption of certain 2005 COPs and the purchase and cancellation of other 2005 COPs through issuance of the 2006 Certificates to enable the City to extend its payment period for the obligations it incurred for funding the 2005 Subject UAAL, is described below.

The Home Rule City Act permits the City to provide in its Charter for the establishment and maintenance of a pension plan for its employees. Pursuant to that authority, the City has established by Charter and maintains pursuant to ordinances two employee pension systems – its General Retirement System (**GRS**) and Police and Fire Retirement System (**PFRS**). The two Retirement Systems were established in 1938 and 1941, respectively, by amendments to the 1918 Detroit City Charter, and exist for the purpose of providing retirement allowances and death and survivor benefits for eligible City employees and their beneficiaries. Each Retirement System is governed by its own Board, which invests and administers the System's assets as trust funds solely for the benefit of its participants, retirees and their beneficiaries. The assets of each Retirement System are separate and distinct from assets of the City, are outside the City's control and are not available to pay any obligation or expense of the City. See "RETIREMENT SYSTEMS" in APPENDIX B.

Article 9, Section 24 of the State Constitution obligates the City to contribute sufficient funds to the GRS and PFRS to maintain their actuarial integrity. The Michigan Supreme Court has held that this constitutionally obligates a Michigan municipality to fund its employee retirement systems to a level which includes pension benefit liabilities incurred in the current year and any existing unfunded accrued actuarial liabilities (**UAAL**). *Shelby Township Police and Fire Retirement Board* v. *Shelby Township*, 438 Mich. 247 (1991). The Court noted that the State Constitution does not provide specifics for how a municipality must meet its constitutionally-imposed UAAL funding obligations.

Michigan's Public Employees Retirement System Investment Act provides more specificity. That statute, which applies to both the GRS and PFRS, prescribes (in MCL §38.1140m) that a Michigan municipality's required annual contribution to its employee retirement system must be an actuarially determined contribution amount, consisting of (1) a current service cost payment, (2) a payment of at least the annual accrued amortized interest on any UAAL and (3) a payment of the annual accrued amortized portion of the unfunded principal liability.

The City's GRS and PFRS ordinances have long specified a traditional funding mechanism for the City to meet its constitutional and statutory obligation to provide funding for each System's UAAL through required annual payments. The City last year authorized an alternative funding mechanism for such UAAL through new enabling legislation duly enacted by the Detroit City Council, Ordinances No. 03-05 and 04-05 (**Alternative Funding Mechanism Ordinances**) amending the City's GRS and PFRS ordinances. The Alternative Funding Mechanism Ordinances, together with the Funding Ordinance (No. 05-05), enabled the City, the Service Corporations and a corporate trustee to provide for the issuance and sale of the 2005 COPs and the use of the 2005 COPs proceeds to fund the 2005 Subject UAAL of both Retirement Systems on the date of delivery of the 2005 COPs (**2005 Closing Date**).

Each Retirement System receives an annual actuarial report from its consulting actuary as of each June 30, providing actuarial valuations of its vested benefits, prior service costs and unfunded accrued liabilities. Each Retirement System Board uses those actuarial valuations, together with certain actuarial assumptions, to determine the annual contribution amounts requested from the City to fulfill its constitutional and statutory pension funding obligations. As part of their regular, periodic review of the actuarial assumptions used to administer their respective Retirement Systems, the GRS and PFRS Boards may receive recommendations from time to time to increase or decrease the interest rate and to change other actuarial assumptions.

7

The most recent annual actuarial reports available for the Retirement Systems when the 2005 Service Contracts were entered into were as of June 30, 2004. Although the GRS and PFRS had assets actuarially valued at $2,470,243,470 and $3,074,516,589, respectively, as of that date, they also had estimated UAAL of $913,683,202 and $782,976,693, respectively, as of that date, as determined by their actuary. $739,793,898 of GRS UAAL and $630,829,189 of PFRS UAAL were designated the "Subject UAAL" that was funded in full from 2005 COPs proceeds on the 2005 Closing Date.

The 2005 Subject UAAL was a major part, but not all, of the existing UAAL of the Retirement Systems on the 2005 Closing Date. The funding of the 2005 Subject UAAL from 2005 COPs proceeds was not intended to and did not fund the entire then existing UAAL of either or both Retirement Systems.

When the 2005 Service Contracts were entered into on May 25, 2005, under the Boards' current actuarial assumptions and the traditional funding mechanism, the City would have been required to amortize the 2005 Subject UAAL over a remaining period of 13 years for the PFRS and 20 years for the GRS. In each year that the City has outstanding UAAL, it is assessed interest thereon (in May 2005 and still currently, at annual rates of 7.9% on GRS UAAL and 7.8% on PFRS UAAL).

By arranging through the alternative funding mechanism for the 2005 Subject UAAL to be funded (in effect, prepaid) on the 2005 Closing Date, the City avoided further interest accrual on the amount thus funded; and the Retirement Systems gained complete possession and control of those funds (including the exclusive right to invest and receive all investment earnings on those funds) sooner than they would under the traditional funding mechanism. The Alternative Funding Mechanism Ordinances impose certain technical restrictions on the Retirement Systems' uses of those funds, but neither rescind any substantive rights, entitlements or obligations with respect to benefits earned or accrued of members, retirees or beneficiaries of the Retirement Systems nor affect the validity or enforceability of the 2005 Service Contracts or the 2006 Service Contracts or the City's payment obligations thereunder.

The financing plan for the first use of the alternative funding mechanism on the 2005 Closing Date reflected the expectation that by prepaying the 2005 Subject UAAL, the City reduced its costs and better ensured the timely and full payment of retirement benefits. As a practical matter, it also was expected that amounts that otherwise would have been expended by the City for the annual amortization of the 2005 Subject UAAL (under the traditional funding mechanism) would be sufficient to offset all the contractual payments to be made by the City under the 2005 Service Contracts. Those contractual payments in effect replaced payments the City would have otherwise had to make to meet its constitutional obligation to amortize the 2005 Subject UAAL.

Apart from the 2005 Subject UAAL, other UAAL of the Retirement Systems may exist and arise in the ordinary course of the City's operations, which the City may elect to fund by utilizing the traditional funding mechanism or the alternative funding mechanism. Any utilization of the alternative funding mechanism for such other UAAL would, however, require (i) separate authorization by a future enabling ordinance or resolution of the City enacted for that purpose; (ii) a new funding trust separate and distinct from the 2006 Funding Trust and the different funding trust which exists with respect to the 2005 Service Contracts and the 2005 COPs; (iii) one or more new service contracts separate and distinct from the 2006 Service Contracts and the 2005 Service Contracts; and (iv) issuance of new certificates of participation unrelated to the 2006 Certificates and the 2005 COPs.

### Swap Agreements

The Service Corporations are parties to interest rate exchange agreements (**2005 Swap Agreements**) they entered into to hedge variable-rate exposure under the 2005 Service Contracts in regard to the Series 2005-B COPs. The Service Corporations expect to terminate, in whole or in part, the 2005 Swap Agreements corresponding to the Series 2005-B COPs purchased and canceled as described under "PLAN OF FINANCE" above. Such 2005 Swap Agreement terminations are expected to entitle the Service Corporations to receive certain termination payments from the 2005 Swap Agreement counterparties. A portion of the proceeds of

such termination receivables will be used as shown under "Sources and Uses of Funds" below. The balance of such termination receivables will be paid to the City in accordance with the 2005 Service Contracts.

It also is expected that the Service Corporations will enter into interest rate exchange agreements or similar agreements **(2006 Swap Agreements)** before or at the time of issuance of the Series 2006-B Certificates, to hedge variable-rate exposure under the 2006 Service Contracts, and they may do so from time to time with respect to any rate exposure under the 2006 Service Contracts. Each Service Corporation will enter into one or more 2006 Swap Agreements with each of UBS AG and with SBS Financial Products Company, LLC, as the counterparties. Payments under a 2006 Swap Agreement may include net payments based on the interest rates exchanged. Under the 2006 Swap Agreements, the Service Corporations will be obligated in certain instances to make periodic payments to the 2006 Swap Agreement counterparty, and should a 2006 Swap Agreement be terminated, under certain circumstances the Service Corporations may be required to pay a termination payment. The Service Corporations' obligation to make all payments under the 2006 Swap Agreements will be payable from moneys paid by the City under the 2006 Service Contracts. In applying moneys so received from the City, the Contract Administrator will be required to treat any termination payment owing to a 2006 Swap Agreement counterparty as subordinated in right of payment to the prior payment in full of any Scheduled Payments and Service Charges (corresponding to principal of and interest on 2006 Certificates) then due and unpaid.

### *Sources and Uses of Funds*

The proceeds from the sale of the 2006 Certificates are expected to be used as follows:

**Sources of Funds**

| | |
|---|---|
| Principal Amount of Series 2006-A Certificates | $148,540,000.00 |
| Principal Amount of Series 2006-B Certificates | 800,000,000.00 |
| Swap Termination Receivables | 36,051,234.67 |
| TOTAL SOURCES | $984,591,234.67 |

**Uses of Funds**

| | |
|---|---|
| Optional redemption of certain 2005-A COPs [1] | $107,149,970.44 |
| Purchase (for cancellation) of tendered Series 2005-B COPs [2] | 815,594,283.37 |
| Premiums of insurance policies on 2006 Certificates and 2006 Swap Agreements | 50,642,427.28 |
| Costs of Issuance [3] | 11,204,553.58 |
| TOTAL USES | $984,591,234.67 |

---

[1] Includes prepayment premiums, Service Charges due after closing and prior to optional redemption date, and accrued interest to the date of redemption.

[2] Includes tender premiums, accrued interest to the date of purchase, and tender fees and expenses.

[3] Includes underwriters' discount and costs for legal counsel, financial and swap advisors, rating agencies, trustee, offering circular distribution and miscellaneous expenses incidental to issuance of the 2006 Certificates.

## SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES

The 2006 Certificates are payable solely from all 2006 COP Service Payments which may be received by the Trustee pursuant to the 2006 Service Contracts. Such 2006 COP Service Payments will include all Scheduled Payments and Service Charges payable by the City under the 2006 Service Contracts, corresponding to the principal of and interest on the 2006 Certificates, respectively. The City's obligations to make 2006 COP Service Payments are unsecured contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City. **Such payment obligations of the City are not general obligations of the City, and neither the faith and credit, taxing power nor any specific revenues of the City are pledged to the 2006 COP Service Payments coming due under the 2006 Service Contracts.**

The City's unconditional contractual obligation to pay all 2006 COP Service Payments is <u>not</u> "subject to appropriation," as is customary with many certificate of participation transactions entered into by

municipalities in the United States. The City's 2006 Service Contracts are not subject to termination if the City were to fail to appropriate sufficient amounts for the required payments in any single year. The City is legally bound to make all 2006 COP Service Payments for the full term of both 2006 Service Contracts, and statutory remedies exist to enforce the City's obligations.

To secure the payment of the 2006 Certificates, the Service Corporations will irrevocably sell, assign and convey to the 2006 Funding Trust all of their rights to receive, collect and enforce all 2006 COP Service Payments to become due under the 2006 Service Contracts. As further security for the payment of the 2006 Certificates, although the parties intend that such sale, assignment and conveyance be an absolute transfer of those rights under the 2006 Service Contracts, in the Trust Agreement the Service Corporations will additionally grant a security interest in their right to receive 2006 COP Service Payments to the 2006 Funding Trust for the benefit of the 2006 Certificateholders. That security interest will be a perfected first security interest in such property under the Michigan Uniform Commercial Code.

The 2006 Service Contracts additionally require the City to make certain other payments, such as general corporate expenses of the Service Corporations, fees and expenses of the Trustee and the Contract Administrator, and certain amounts payable to one or more 2006 Swap Agreement counterparties. The amounts paid by the City for such additional purposes do not constitute part of the 2006 COP Service Payments and are not pledged for the payment of the 2006 Certificates.

If the City were to fail to pay any 2006 COP Service Payment when due, the Contract Administrator could file a lawsuit against the City to enforce that contractual obligation, a right that is available to all parties entering into valid enforceable contracts with the City. The City would be required to pay any resulting judgment against it, the same as any other. If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount. This is the same remedy that the Retirement Systems would have against the City if it failed to make its required annual payment to fund UAAL under the traditional funding mechanism described above under "PLAN OF FINANCE - Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006 Certificates." It also is the same remedy that the contract administrator with respect to the 2005 Service Contracts would have against the City if it were to fail to pay any 2005 COP Service Payment when due.

The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of 2006 COP Service Payments except at the request of 2006 Certificateholders representing at least 25% of the outstanding principal amount of 2006 Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all 2006 Certificates. See "2006 SERVICE CONTRACT ADMINISTRATION – Enforcement."

## THE 2006 CERTIFICATES

The 2006 Certificates are being issued in two series, as described below.

### *The Series 2006-A Certificates (Fixed Rate)*

The Series 2006-A Certificates will be dated the date of their issuance. Interest from that date will be payable on each Series 2006-A Certificate on December 15, 2006 and semiannually thereafter on each June 15 and December 15 until its maturity or earlier redemption. The interest on the Series 2006-A Certificates will be computed at the rates shown on the inside cover of this Offering Circular, on the basis of a 30-day month and a 360-day year. The Series 2006-A Certificates are issued as fully registered 2006 Certificates, in principal denominations of $5,000 or multiples thereof.

Mandatory Sinking Fund Redemption

All Series 2006-A Certificates maturing in 2035 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series 2006-A Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-A Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "THE 2006 CERTIFICATES – The Series 2006-A Certificates (Fixed Rate) - Optional Redemption with Make-Whole Premium," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2034 | $ 36,255,000 |
| 2035 [(a)] | 112,285,000 |

[(a)] Stated Maturity

Optional Redemption with Make-Whole Premium

The Series 2006-A Certificates are subject to optional redemption prior to their maturity from Scheduled Payments prepaid by the City, in whole or in part (and if in part, as described below under "THE 2006 CERTIFICATES – Selection of 2006 Certificates for Redemption") on any date, at a redemption price equal to the greater of:

- 100% of the principal amount of the Series 2006-A Certificates to be redeemed, or

- the sum of the present values of the remaining scheduled payments of principal and interest on the Series 2006-A Certificates to be redeemed (exclusive of interest accrued to the date fixed for redemption) discounted to the date of redemption on a semiannual basis (assuming a 360-day year consisting of twelve 30-day months) at the Treasury Rate (defined below) plus 12.5 basis points,

plus in each case, accrued and unpaid interest on the Series 2006-A Certificates being redeemed to the date fixed for redemption.

For the purpose of determining the Treasury Rate, the following definitions apply:

**Treasury Rate** means, with respect to any redemption date for a particular Series 2006-A Certificate, the rate per annum, expressed as a percentage of the principal amount, equal to the semiannual equivalent yield to maturity or interpolated maturity of the Comparable Treasury Issue, assuming that the Comparable Treasury Issue is purchased on the redemption date for a price equal to the Comparable Treasury Price, as calculated by the Designated Treasury Dealer.

**Comparable Treasury Issue** means, with respect to any redemption date for a particular Series 2006-A Certificate, the U.S. Treasury security or securities selected by the Designated Treasury Dealer which has an actual or interpolated maturity comparable to the remaining average life of the Series 2006-A Certificate to be redeemed, and that would be utilized in accordance with customary financial practice in pricing new issues of debt securities of comparable maturity to the remaining average life of the Series 2006-A Certificate to be redeemed.

**Comparable Treasury Price** means, with respect to any redemption date for a particular Series 2006-A Certificate, (1) if the Designated Treasury Dealer receives at least four Reference Treasury Dealer Quotations, the average of such quotations for such redemption date, after excluding

the highest and lowest Reference Treasury Dealer Quotations, or (2) if the Designated Treasury Dealer obtains fewer than four Reference Treasury Dealer Quotations, the average of all such quotations.

**Designated Treasury Dealer** means one of the Reference Treasury Dealers designated by the Contract Administrator.

**Reference Treasury Dealer** means UBS Securities LLC or its successor, and four other firms, selected by the Contract Administrator from time to time, that are primary U.S. Government securities dealers in the City of New York (each a **Primary Treasury Dealer**); *provided, however,* that if any of them ceases to be a Primary Treasury Dealer, the Contract Administrator will substitute another Primary Treasury Dealer.

**Reference Treasury Dealer Quotations** means, with respect to each Reference Treasury Dealer and any redemption date for a particular Series 2006-A Certificate, the average, as determined by the Designated Treasury Dealer, of the bid and asked prices for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Designated Treasury Dealer by such Reference Treasury Dealer at 3:30 p.m., New York City time, on the third business day preceding such redemption date.

### *The Series 2006-B Certificates (Floating Rate)*

The Series 2006-B Certificates will be dated the date of their issuance and mature on the dates set forth on the inside cover of this Offering Circular. The amount of interest for each day that the Series 2006-B Certificates are outstanding will be calculated by dividing the Interest Rate in effect for such day by 360 and multiplying the result by the outstanding principal amount of the Series 2006-B Certificates. The Series 2006-B Certificates are issued as fully registered 2006 Certificates, in principal denominations of $25,000 and integral multiples of $1,000 in excess thereof.

Interest will be payable on the Series 2006-B Certificates from the delivery date at a floating rate determined in the manner provided below, payable on September 15, 2006 and the 15th day of each December, March, June and September thereafter (each an **Interest Payment Date**) to the persons in whose name the Series 2006-B Certificates were registered at the close of business on the 15th day (whether or not a business day) preceding the respective Interest Payment Date, subject to certain exceptions.

The per annum interest rate on the Series 2006-B Certificates (**Interest Rate**) in effect during an Interest Period (as defined below) will be equal to the Three Month LIBOR plus the margin indicated on the inside cover of this Offering Circular, and interest on the Series 2006-B Certificates will accrue on the outstanding principal balance of the Series 2006-B Certificates as shown below. The outstanding principal balance is computed based upon the reduction of the principal balance of each Series 2006-B Certificate by the amount of the mandatory sinking fund prepayment on the specific dates set forth under the next subheading "Mandatory Sinking Fund Redemption" below.

| Dates | 2029 Maturity Outstanding Principal Balance (Weighted Average Life: 19.945 Years) | 2034 Maturity Outstanding Principal Balance (Weighted Average Life: 25.949 Years) |
|---|---|---|
| June 12, 2006 – June 15, 2007 | $299,155,000 | $500,845,000 |
| June 16, 2007 – June 15, 2008 | 299,155,000 | 500,845,000 |
| June 16, 2008 – June 15, 2009 | 299,155,000 | 500,845,000 |
| June 16, 2009 – June 15, 2010 | 299,155,000 | 500,845,000 |
| June 16, 2010 – June 15, 2011 | 299,155,000 | 500,845,000 |
| June 16, 2011 – June 15, 2012 | 299,155,000 | 500,845,000 |
| June 16, 2012 – June 15, 2013 | 299,155,000 | 500,845,000 |
| June 16, 2013 – June 15, 2014 | 299,155,000 | 500,845,000 |
| June 16, 2014 – June 15, 2015 | 299,155,000 | 500,845,000 |
| June 16, 2015 – June 15, 2016 | 299,155,000 | 500,845,000 |
| June 16, 2016 – June 15, 2017 | 299,155,000 | 500,845,000 |
| June 16, 2017 – June 15, 2018 | 299,155,000 | 500,845,000 |
| June 16, 2018 – June 15, 2019 | 299,155,000 | 500,845,000 |
| June 16, 2019 – June 15, 2020 | 284,526,000 | 500,845,000 |
| June 16, 2020 – June 15, 2021 | 270,722,000 | 500,845,000 |
| June 16, 2021 – June 15, 2022 | 257,875,000 | 500,845,000 |
| June 16, 2022 – June 15, 2023 | 246,107,000 | 500,845,000 |
| June 16, 2023 – June 15, 2024 | 235,569,000 | 500,845,000 |
| June 16, 2024 – June 15, 2025 | 226,419,000 | 500,845,000 |
| June 16, 2025 – June 15, 2026 | 218,827,000 | 500,845,000 |
| June 16, 2026 – June 15, 2027 | 153,696,000 | 500,845,000 |
| June 16, 2027 – June 15, 2028 | 84,511,000 | 500,845,000 |
| June 16, 2028 – June 15, 2029 | 11,020,000 | 500,845,000 |
| June 16, 2029 – June 15, 2030 | | 433,799,000 |
| June 16, 2030 – June 15, 2031 | | 350,849,000 |
| June 16, 2031 – June 15, 2032 | | 262,705,000 |
| June 16, 2032 – June 15, 2033 | | 169,041,000 |
| June 16, 2033 – June 15, 2034 | | 69,512,000 |

For the initial Interest Period which begins on the 2006 Closing Date and ends on (but does not include) September 15, 2006, the Contract Administrator will set the Interest Rate on the 2006 Closing Date and will determine the LIBOR rate by reference to straight line interpolation between Three Month LIBOR and four month LIBOR based on the actual number of days in the initial Interest Period. The Interest Rate for each subsequent Interest Period for the Series 2006-B Certificates will be set on September 15, 2006 and the 15th day of each December, March, June and September thereafter (each an **Interest Rate Adjustment Date**) until the principal on the Series 2006-B Certificates is paid or made available for payment. If any Interest Rate Adjustment Date (other than the initial Interest Rate Adjustment Date occurring on the 2006 Closing Date) and Interest Payment Date for the Series 2006-B Certificates would otherwise be a day that is not a LIBOR Business Day, such Interest Rate Adjustment Date and Interest Payment Date shall be the next succeeding LIBOR Business Day.

**LIBOR Business Day** means any day on which the City, the Trustee and banks in both London and New York City are open for the transaction of business. **Interest Period** means the period from and including the 2006 Closing Date or the most recent Interest Payment Date to but excluding the next succeeding Interest Payment Date on which interest on the outstanding Series 2006-B Certificates was paid in full.

The **Three Month LIBOR** for each Interest Period means the rate determined in accordance with the following provisions:

(i)        On the second LIBOR Business Day before the 2006 Closing Date and each subsequent Interest Rate Adjustment Date (each such date an **Interest Determination Date** for the ensuing Interest Period), the Contract Administrator will determine the Three Month LIBOR which shall be the London interbank offered rate for deposits in U.S. dollars with a three-month maturity that appears on Telerate Page 3750 as of 11:00 a.m., London time, on such Interest Determination Date. **Telerate Page 3750** means the display page so designated on Moneyline Telerate, Inc. (or such other page as may replace that page on that service or such other service or services as may be nominated by the British Bankers' Association for the purpose of displaying London interbank offered rates for U.S. dollar deposits). If the Three Month LIBOR on such Interest Determination Date does not appear on the Telerate Page 3750, the Three Month LIBOR will be determined as described in paragraph (ii) below.

(ii)       With respect to an Interest Determination Date for which the Three Month LIBOR does not appear on Telerate Page 3750 as specified in paragraph (i) above, the Three Month LIBOR will be determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on such Interest Determination Date to prime banks in the London interbank market by at least three leading banks engaged in transactions in Eurodollar deposits in the international Eurocurrency market (the **Reference Banks**) selected by the Contract Administrator. The Contract Administrator shall request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three Month LIBOR on such Interest Determination Date will be the arithmetic mean of the rates quoted by three major banks in New York City, selected by the Contract Administrator, at approximately 11:00 a.m., New York City time, on such Interest Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity; provided, however, that if the banks in New York City selected by the Contract Administrator are not then quoting rates for such loans, the relevant Interest Rate for the Interest Period commencing on the Interest Rate Adjustment Date following such Interest Determination Date will be the Interest Rate in effect on such Interest Determination Date.

The amount of interest for each day that the Series 2006-B Certificates are outstanding (the **Daily Interest Amount**) will be calculated by dividing the Interest Rate in effect for such day by 360 and multiplying the result by the outstanding principal amount of the Series 2006-B Certificates. The amount of interest to be paid on the Series 2006-B Certificates for any Interest Period will be calculated by adding the Daily Interest Amounts for each day in such Interest Period.

The Interest Rate on the Series 2006-B Certificates will in no event be higher than the maximum rate permitted by Michigan law as the same may be modified by United States law of general application.

The Interest Rate and amount of interest to be paid on the Series 2006-B Certificates for each Interest Period will be determined by the Contract Administrator. All calculations made by the Contract Administrator shall in the absence of manifest error be conclusive for all purposes and binding on the 2006 Funding Trust and the Holders of the Series 2006-B Certificates.

Mandatory Sinking Fund Redemption

All Series 2006-B Certificates maturing in 2029 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts specified below, except that the principal amount of the Series 2006-B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series 2006-B Certificates (Floating Rate) - Optional Redemption*," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2019 | $14,629,000 |
| 2020 | 13,804,000 |
| 2021 | 12,847,000 |
| 2022 | 11,768,000 |
| 2023 | 10,538,000 |
| 2024 | 9,150,000 |
| 2025 | 7,592,000 |
| 2026 | 65,131,000 |
| 2027 | 69,185,000 |
| 2028 | 73,491,000 |
| 2029[a] | 11,020,000 |

[a] Stated Maturity

All Series 2006-B Certificates maturing in 2034 are subject to *pro rata* mandatory redemption prior to maturity, at a redemption price equal to par (100% of the principal amount to be redeemed), together with accrued interest to the redemption date, on June 15 of each of the years, and in the respective amounts, specified below, except that the principal amount of the Series 2006-B Certificates to be redeemed on each such redemption date will be reduced by a *pro rata* portion of the principal amount of any Series 2006-B Certificates that have been purchased by the Trustee and canceled by the Trustee, or redeemed as described below under "*The Series 2006-B Certificates (Floating Rate)* - Optional Redemption," at least 45 days before the redemption date:

| Redemption Date (June 15) | Principal Amount |
|---|---|
| 2029 | $67,046,000 |
| 2030 | 82,950,000 |
| 2031 | 88,144,000 |
| 2032 | 93,664,000 |
| 2033 | 99,529,000 |
| 2034[a] | 69,512,000 |

[a] Stated Maturity

<u>Optional Redemption</u>

The Series 2006-B Certificates are subject to optional redemption on any Interest Payment Date at par, beginning June 15, 2011, in whole or in part (and if in part, as described below under "THE 2006 CERTIFICATES – *Selection of 2006 Certificates for Redemption*") .

### *Selection of 2006 Certificates for Redemption*

If some but less than all of the 2006 Certificates of either Series 2006-A or Series 2006-B are to be redeemed on any date, the Contract Administrator, at the direction of the City, will select the maturity or maturities to be redeemed. Within a maturity, the particular 2006 Certificates of a Series to be redeemed shall be redeemed *pro rata* as described below.

So long as the 2006 Certificates of either Series are in the book-entry-only system, the securities depository will administer the prorating of partial redemptions among beneficial owners of the 2006 Certificates of that Series. See "THE 2006 CERTIFICATES - Global Book-Entry System."

### *Notice of Redemption*

The Trustee will mail a notice to the registered owner of each 2006 Certificate to be redeemed in whole or in part at the address for the registered owner shown in the registration books (the securities depository so long as the book-entry-only system is in effect). The notice will be mailed at least 30 days but not more than 45 days prior to the redemption date. Failure to give a notice of redemption or a defect in it will not affect the validity of the proceedings for the redemption of any 2006 Certificates for which proper notice was given.

### *Global Book-Entry System*

Payments of principal and interest for each 2006 Certificate will be paid to the registered owner of the 2006 Certificates. The 2006 Certificates are being issued initially in book-entry-only form, so the registered owner will be a securities depository, a nominee of The Depository Trust Company (**DTC**). Clearance is expected to be available through DTC and also through Clearstream and Euroclear, which will hold omnibus positions on behalf of their participants in the books of their respective depositories. For more information about the global book-entry system, see APPENDIX D. Under certain conditions the 2006 Certificates may be issued in certificated form.

The Trustee is the registrar and paying agent for the 2006 Certificates and may be contacted as follows:

| | |
|---|---|
| Contact: | U.S. Bank National Association |
| Attn: | Trust Finance Management |
| Phone: | 651-495-3713 |
| Mail: | Corporate Trust Services |
| | U.S. Bank National Association |
| | 60 Livingston Avenue |
| | St. Paul, MN 55107 |
| | Mail Station EP-MN-WS3T |

### *Registration and Payment of 2006 Certificates*

How the 2006 Certificates are paid depends on whether or not they are in book-entry-only form.

While the 2006 Certificates are in book-entry-only form (as they are initially), payment of principal will be made by wire transfer to the securities depository or its nominee. Payment of interest will be made by wire transfer to the securities depository or its nominee on the payment date.

If the 2006 Certificates are not in book-entry-only form, payment of principal will be made by check or draft issued upon the presentation and surrender of the 2006 Certificates at the designated office of the Trustee. Payment of interest due on the 2006 Certificates will be made by check or draft mailed to the registered owner shown in the registration book at the close of business on the 15th day (whether or not a business day) preceding the respective interest payment date.

### 2006 COP SERVICE PAYMENTS

The following table sets forth the contractual obligations of the City under the 2006 Service Contracts in each fiscal year for payment of Scheduled Payments and Service Charges, corresponding to the principal of and interest on the 2006 Certificates, respectively.

# 2006 COP SERVICE PAYMENTS SCHEDULE

| Maturity (June 15) | Series 2006-A | | | Series 2006-B | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | Principal | Interest | Total | Principal | Interest[1] | Total[1] | Principal | Interest[1] | Total[1] |
| 2007 | $— | $8,970,194 | $8,970,194 | $— | $40,260,733 | $40,260,733 | $— | $49,230,928 | $49,230,928 |
| 2008 | — | 8,896,061 | 8,896,061 | — | 45,328,000 | 45,328,000 | — | 54,224,061 | 54,224,061 |
| 2009 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2010 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2011 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2012 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2013 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2014 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2015 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2016 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2017 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2018 | — | 8,896,061 | 8,896,061 | — | 49,936,975 | 49,936,975 | — | 58,833,035 | 58,833,035 |
| 2019 | — | 8,896,061 | 8,896,061 | 14,629,000 | 49,936,975 | 64,565,975 | 14,629,000 | 58,833,035 | 73,462,035 |
| 2020 | — | 8,896,061 | 8,896,061 | 13,804,000 | 49,026,612 | 62,830,612 | 13,804,000 | 57,922,673 | 71,726,673 |
| 2021 | — | 8,896,061 | 8,896,061 | 12,847,000 | 48,167,589 | 61,014,589 | 12,847,000 | 57,063,650 | 69,910,650 |
| 2022 | — | 8,896,061 | 8,896,061 | 11,768,000 | 47,368,120 | 59,136,120 | 11,768,000 | 56,264,181 | 68,032,181 |
| 2023 | — | 8,896,061 | 8,896,061 | 10,538,000 | 46,635,798 | 57,173,798 | 10,538,000 | 55,531,858 | 66,069,858 |
| 2024 | — | 8,896,061 | 8,896,061 | 9,150,000 | 45,980,018 | 55,130,018 | 9,150,000 | 54,876,079 | 64,026,079 |
| 2025 | — | 8,896,061 | 8,896,061 | 7,592,000 | 45,410,613 | 53,002,613 | 7,592,000 | 54,306,674 | 61,898,674 |
| 2026 | — | 8,896,061 | 8,896,061 | 65,131,000 | 44,938,163 | 110,069,163 | 65,131,000 | 53,834,224 | 118,965,224 |
| 2027 | — | 8,896,061 | 8,896,061 | 69,185,000 | 40,885,061 | 110,070,061 | 69,185,000 | 49,781,122 | 118,966,122 |
| 2028 | — | 8,896,061 | 8,896,061 | 73,491,000 | 36,579,679 | 110,070,679 | 73,491,000 | 45,475,739 | 118,966,739 |
| 2029 | — | 8,896,061 | 8,896,061 | 78,066,000 | 32,006,334 | 110,072,334 | 78,066,000 | 40,902,394 | 118,968,394 |
| 2030 | — | 8,896,061 | 8,896,061 | 82,950,000 | 27,127,818 | 110,077,818 | 82,950,000 | 36,023,878 | 118,973,878 |
| 2031 | — | 8,896,061 | 8,896,061 | 88,144,000 | 21,940,436 | 110,084,436 | 88,144,000 | 30,836,496 | 118,980,496 |
| 2032 | — | 8,896,061 | 8,896,061 | 93,664,000 | 16,428,241 | 110,092,241 | 93,664,000 | 25,324,301 | 118,988,301 |
| 2033 | — | 8,896,061 | 8,896,061 | 99,529,000 | 10,570,845 | 110,099,845 | 99,529,000 | 19,466,906 | 118,995,906 |
| 2034 | 36,255,000 | 8,896,061 | 45,151,061 | 69,512,000 | 4,346,675 | 73,858,675 | 105,767,000 | 13,242,735 | 119,009,735 |
| 2035 | 112,285,000 | 6,724,749 | 119,009,749 | — | — | — | 112,285,000 | 6,724,749 | 119,009,749 |
| Totals | $148,540,000 | $255,888,579 | $404,428,579 | $800,000,000 | $1,152,307,457 | $1,952,307,457 | $948,540,000 | $1,408,196,036 | $2,356,736,036 |

[1] Series 2006-B interest calculated at fixed swap rates.

17

## 2006 CERTIFICATE INSURANCE

The scheduled payment of principal of and interest on the particular 2006 Certificates specifically identified on the inside cover of this Offering Circular as the "FGIC-insured 2006 Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the FGIC-insured 2006 Certificates by Financial Guaranty Insurance Company (**Financial Guaranty**). Information provided by Financial Guaranty about its operations and financial condition is included as APPENDIX E, as is the form of its insurance policy.

The scheduled payment of principal of and interest on the particular 2006 Certificates specifically identified on the inside cover of this Offering Circular as the "XLCA-insured 2006 Certificates" will be guaranteed under an insurance policy to be issued concurrently with the delivery of the XLCA-insured 2006 Certificates by XL Capital Assurance Inc. (**XLCA**). Information provided by XLCA about its operations and financial condition is included as APPENDIX F, as is the form of its insurance policy.

In addition, Financial Guaranty and XLCA are expected to provide insurance policies that cover payments required to be made by the Service Corporations under the 2006 Swap Agreements that the Service Corporations are expected to enter into before or at the time of issuance of the Series 2006-B Certificates.

## 2006 SERVICE CONTRACT ADMINISTRATION

On the 2006 Closing Date, the 2006 Funding Trust, the Service Corporations, severally and not jointly, and the 2006 Swap Agreement counterparties and a guarantor for one of them, will enter into the Contract Administration Agreement (**Administration Agreement**) with U.S. Bank National Association, as Contract Administrator. U.S. Bank National Association will also be the Trustee under the Trust Agreement. The Administration Agreement will permit the substitution of a different Contract Administrator if a conflict of interest were to arise from the same institution serving in both roles.

Under the Administration Agreement, each of the Service Corporations and the Trustee on behalf of the 2006 Funding Trust will appoint the Contract Administrator as its respective agent to collect 2006 COP Service Payments, as well as periodic or termination payment amounts received from the City under the 2006 Service Contracts (**Hedge Payables**) or received from a 2006 Swap Agreement counterparty (**Hedge Receivables**), and will require the Contract Administrator to determine in accordance with prescribed priorities and prorating provisions to whom they must be disbursed. Also under the Administration Agreement, the Trustee on behalf of the 2006 Funding Trust will appoint the Contract Administrator as its agent to enforce the payment of 2006 COP Service Payments. Additionally, under the Administration Agreement, each Service Corporation will appoint the Contract Administrator as its agent if directed by the Service Corporation to enforce the payment of Hedge Receivables and Hedge Payables.

Although (i) another contract administration agreement and another trust agreement, which created another funding trust, exist with respect to the 2005 Service Contracts and the 2005 COPs, (ii) U.S. Bank National Association also is both the contract administrator under that contract administration agreement and the trustee under that trust agreement and (iii) that other trust agreement, funding trust and contract administration agreement, as well as the 2005 Service Contracts and certain of the 2005 COPs, will continue to exist after the 2006 Closing Date, all of the foregoing are totally separate and distinct from the 2006 Certificates, the 2006 Funding Trust, the 2006 Service Contracts, the related new Trust Agreement and Administration Agreement, and U.S. Bank National Association's serving as Trustee under the new Trust Agreement and as Contract Administrator under the new Administration Agreement. Similarly all funds paid, received, held or disbursed under the 2006 Service Contracts, Administration Agreement, Trust Agreement and 2006 Certificates are totally separate and distinct from all funds paid, received, held or disbursed under the 2005 Service Contracts, the related 2005 contract administration agreement and trust agreement and the 2005 COPs.

### Payments to the Trustee or Others

On any date that principal or interest is due and payable on any 2006 Certificates, the applicable 2006 Certificateholders are entitled to receive the amount due from the Trustee in accordance with the Trust Agreement. The Trustee is dependent on receiving from the Contract Administrator, as the agent of each Service Corporation, the proceeds of 2006 COP Service Payments collected by the Contract Administrator for that purpose. In the event that on such date the Trustee has insufficient moneys to pay the full aggregate amount thus due, the Trustee is required by the Trust Agreement to disburse all of the available moneys it then holds to the entitled 2006 Certificateholders on a *pro rata* basis.

The Contract Administrator is required to distribute the moneys it receives from the City as Service Payments (which term includes not only 2006 COP Service Payments but also payments for fees, expenses and indemnification of the Contract Administrator and amounts in respect of periodic Hedge Payables and termination Hedge Payables) in accordance with the following priorities of payment among specific categories of payments, as prescribed in each 2006 Service Contract:

**First:** any fees, expenses and indemnification then owing to the Contract Administrator under the Contract Administration Agreement, including reasonable fees and expenses of its counsel, in connection with any waiver or consent thereunder or any amendment thereof or of a 2006 Service Contract, or in connection with the enforcement thereof, are payable to it,

**Second:** all theretofore due and unpaid Service Charges (corresponding to interest due and unpaid to 2006 Certificateholders) and amounts in respect of periodic Hedge Payables due and unpaid to a 2006 Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Third:** all then due and about to become due Service Charges (corresponding to interest to 2006 Certificateholders) and amounts in respect of periodic Hedge Payables to a 2006 Swap Counterparty are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fourth:** all theretofore due and unpaid regular Scheduled Payments and Sinking Fund Installments (corresponding to principal due and unpaid to 2006 Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Fifth:** all then due or about to become due regular Scheduled Payments and Sinking Fund Installments (corresponding to principal to 2006 Certificateholders) are payable on a parity, before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Sixth:** all theretofore due and unpaid amounts in respect of termination Hedge Payables to a 2006 Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the next priority, namely,

**Seventh:** all then due and about to become due amounts in respect of termination Hedge Payables to a 2006 Swap Counterparty are payable before the Contract Administrator can pay any available moneys then held by it to the final priority, namely,

**Eighth:** all then due and about to become due Optional Prepayment Amounts (corresponding to optional prepayments of principal to 2006 Certificateholders) and Accrued Service Charges.

For purposes of the above priorities, an amount is "about to become due" (i) in the case of amounts which are payable not more frequently than once each calendar week, when there are six or fewer days before its due date, or (ii) for amounts which are payable more frequently than once each calendar week, the day after its most recent due date.

The Administration Agreement requires the Contract Administrator, before paying any 2006 COP Service Payment proceeds to the Trustee for pass through to 2006 Certificateholders on any payment date, to determine which priorities are then due and owing, whether on that date or in arrears, and to apply those moneys according to the priorities described above. Thus, if after satisfying the First priority, the Contract Administrator has insufficient moneys to pay all amounts then owing among the next priorities, it shall use the available moneys first to pay amounts owing in the Second priority on a parity between Service Charges (payable by the Contract Administrator to the Trustee) and periodic Hedge Payables (payable to a 2006 Swap Counterparty); and in that event, 2006 Certificateholders may receive on that date less than the full amount then owing to them. If that occurred, however, the affected 2006 Certificateholders would have the benefit of the applicable 2006 Certificate insurance. See "2006 CERTIFICATE INSURANCE."

### *Enforcement*

Promptly after any failure of the City to pay any 2006 COP Service Payment when due, the Contract Administrator is required to give written notice by mail to all 2006 Certificateholders and others, except that such notice shall be given to the insurer of particular 2006 Certificates rather than those 2006 Certificateholders as long as the insurer is not in default under its insurance policy. The Contract Administrator has no duty under the Contract Administration Agreement to pursue any remedy against the City for nonpayment of 2006 COP Service Payments except at the request of 2006 Certificateholders representing at least 25% of the outstanding principal amount of 2006 Certificates, the payments on which have not been made when due, or at least 50% of the outstanding principal amount of all 2006 Certificates, and only if they shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might by incurred by it in compliance with such request.

## THE SERVICE CORPORATIONS AND THE 2006 FUNDING TRUST

The two Service Corporations are Michigan nonprofit corporations incorporated by the City pursuant to the Home Rule City Act, the Funding Ordinance and the Michigan Nonprofit Corporation Act. They are organized primarily for the purpose of assisting the City in carrying out its constitutionally mandated obligation to maintain the actuarial integrity of its two Retirement Systems through performing the services of reducing the financial burden of the unfunded accrued actuarial liabilities of the GRS or PFRS, as applicable, by funding specified amounts thereof and by funding a reduction or rescheduling (or both) of certain related contractual payment obligations of the City as contemplated by the Funding Ordinance. They did this with respect to the 2005 Subject UAAL by entering into and undertaking their obligations under the two respective 2005 Service Contracts and related agreements including a trust agreement, a contract administration agreement and certain swap agreements. Similarly, they will do this again by entering into and performing their obligations under the two respective 2006 Service Contracts, the Trust Agreement, the Contract Administration Agreement and the 2006 Swap Agreements. The Service Corporations are not expected to have a significant active role with regard to any outstanding 2006 Certificates after the 2006 Closing Date.

The governing body of each respective Service Corporation is its Board of Directors, comprised of five directors. The Articles of Incorporation of each Service Corporation prescribe that its Board of Directors shall consist of three officials of the City – the Finance Director, the Budget Director and the Corporation Counsel – plus two members of the Detroit City Council appointed by the City Council. The current Board of Directors of each Service Corporation is comprised of these same five individuals:

| Roger Short | Interim Finance Director of the City |
| Pamela Scales | Budget Director of the City |
| John E. Johnson, Jr. | Corporation Counsel of the City |
| Kenneth V. Cockrel, Jr. | City Council member |
| Alberta Tinsley-Talabi | City Council member |

The officers of both Service Corporations are: Mr. Short, President; Ms. Scales, Treasurer; and Mr. Johnson, Secretary.

Detroit Retirement Systems Funding Trust 2006 (the **2006 Funding Trust)** is a grantor trust that will be established and existing under Michigan law beginning on the 2006 Closing Date. It will be created by the Service Corporations, severally and not jointly, by their entering into the Trust Agreement on that date with U.S. Bank National Association, as Trustee. The purposes of the 2006 Funding Trust are to purchase and accept from the Service Corporations their assignment of the rights to receive all 2006 COP Service Payments payable by the City under the 2006 Service Contracts, to issue and sell the 2006 Certificates in accordance with the Trust Agreement and, acting through the Trustee, to pay all received 2006 COP Service Payments to the 2006 Certificateholders. In the event that at any future time either Service Corporation enters into a service contract with the City to provide for funding a particular amount of unfunded accrued actuarial liabilities of the City other than the 2005 Subject UAAL, the 2006 Funding Trust will have nothing to do with those transactions and the Service Corporation would have to create one or more other funding trusts to issue any certificates of participation for those transactions.

## UNDERWRITING

The Series 2006-A Certificates are being purchased by certain underwriters (**Series 2006-A Underwriters)**, and UBS Securities LLC is serving as representative for the Series 2006-A Underwriters. The Series 2006-A Underwriters have agreed, subject to certain conditions, to purchase the Series 2006-A Certificates from the 2006 Funding Trust at an aggregate purchase price of $147,333,422.10 (reflecting underwriters' discount of $1,206,577.90).

The Series 2006-B Certificates are being purchased by certain underwriters (**Series 2006-B Underwriters)**, and UBS Securities LLC is serving as representative for the Series 2006-B Underwriters. The Series 2006-B Underwriters have agreed, subject to certain conditions, to purchase the Series 2006-B Certificates from the 2006 Funding Trust at an aggregate purchase price of $793,501,667.42 (reflecting underwriters' discount of $6,498,332.58).

The Underwriters have agreed to reoffer the 2006 Certificates at the public offering prices or yields set forth on the inside cover of this Offering Circular. The 2006 Certificates may be offered and sold to certain dealers (including dealers depositing the 2006 Certificates into investment trusts) at prices lower than such public offering prices, and such prices may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions, and they will be obligated to purchase all the 2006 Certificates if any 2006 Certificates are purchased.

The Underwriters may engage in over-allotment, stabilizing transactions, syndicate covering transactions, and penalty bids in accordance with Regulation M under the Securities Exchange Act of 1934. Over-allotment involves syndicate sales in excess of the offering size, which creates a syndicate short position. Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specific maximum. Syndicate covering transactions involve purchases of the 2006 Certificates in the open market after the distribution has been completed in order to cover syndicate short positions. Penalty bids permit an Underwriter to reclaim a selling concession from a syndicate member when the 2006 Certificates originally sold by such syndicate member are purchased in a syndicate covering transaction to cover syndicate

short positions. Such stabilizing transactions, syndicate covering transactions, and penalty bids may cause the price of the 2006 Certificates to be higher than it would otherwise be in the absence of such transactions. Such transactions, if commenced, may be discontinued at any time.

Affiliates of one or more of the Underwriters may also be counterparties in 2006 Swap Agreements entered into by the Service Corporations in connection with the 2006 Service Contracts.

### *Global Plan of Distribution*

The 2006 Certificates are offered by the Underwriters for sale in those jurisdictions in the United States, Europe, Asia, and elsewhere where it is lawful to make such offers. Each Underwriter has undertaken that it will not offer, sell, or deliver, directly or indirectly, any of the 2006 Certificates or distribute this Offering Circular or any other material relating to the 2006 Certificates, in or from any jurisdiction except under circumstances that will, to the best of its knowledge and belief, result in compliance with the applicable laws and regulations thereof and not impose any obligations on the City, the Service Corporations or the Funding Trust—except as contained in the underwriting agreement among the City, the Service Corporations and the Underwriters. Persons who receive this Offering Circular are required to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell, or deliver the 2006 Certificates or have in their possession, distribute, or publish any offering material relating to the 2006 Certificates, in all cases at their own expense.

### *Reference Information about the 2006 Certificates*

The table on the inside cover of this Offering Circular provides information about the 2006 Certificates. The CUSIP, ISIN and Euroclear and Clearstream Common Code numbers for each maturity have been obtained from sources the City and the Service Corporations believe to be reliable, but the City, the Service Corporations, the Trustee and the Underwriters are not responsible for the correctness of the CUSIP, ISIN and Euroclear and Clearstream Common Code numbers or other identifying numbers assigned to the 2006 Certificates. The Underwriters have provided the reoffering yields and prices. The yield at issuance is the yield to maturity.

## RATINGS

At the City's and the Service Corporations' request, several rating agencies have rated the 2006 Certificates as set forth in the table below with the understanding that, upon delivery of the 2006 Certificates, the insurance policies described under "2006 CERTIFICATE INSURANCE" will be issued.

| Insured Rating | | Rating Agency |
|---|---|---|
| Series 2006-A Certificates | Series 2006-B Certificates | |
| AAA | AAA | Fitch Ratings |
| Aaa | Aaa | Moody's Investors Service, Inc. |
| AAA | AAA | Standard & Poor's Ratings Services |

In addition, at the City's request, several rating agencies have assigned an underlying rating to the 2006 Certificates (the rating that would apply to the 2006 Certificates if the insurance policies were not issued) as set forth in the table below.

| Underlying Rating | | Rating Agency |
|---|---|---|
| Series 2006-A Certificates | Series 2006-B Certificates | |
| BBB | BBB | Fitch Ratings |
| Baa2 | Baa2 | Moody's Investors Service, Inc. |
| Aa2 | Aa2 | Moody's Investors Service, Inc. (corporate equivalent rating) |
| BBB- | BBB- | Standard & Poor's Ratings Services |

Any explanation of what a rating means may only be obtained from the rating agency assigning the rating. There is no assurance that a rating assigned to the 2006 Certificates will continue for any period of time. A rating agency may lower or withdraw the rating it assigns if in its judgment circumstances so warrant. Any downward revision or withdrawal of a rating may have an adverse effect on the trading value and the market price of the 2006 Certificates. The 2006 Funding Trust, the Service Corporations and City make no representations as to the appropriateness of the ratings.

## FINANCIAL ADVISORS

Robert W. Baird & Co. and Scott Balice Strategies, LLC each have been employed by the City to perform professional services in the capacity of financial advisors with respect to the 2006 Service Contracts and the 2006 Certificates.

## INDEPENDENT ACCOUNTANTS

The basic financial statements of the City, as of and for the fiscal year ended June 30, 2005, included in APPENDIX C, have been audited by the firm of KPMG LLP, independent accountants, to the extent indicated in their report thereon, which also appears in APPENDIX C.

KPMG LLP's qualified report dated May 13, 2006, which is based on the reports of other auditors, states that the financial statements of the Detroit Housing Commission Component Unit (**Housing**) included in the City's basic financial statements have not been audited and that KPMG LLP was not engaged to audit the financial statements of Housing as part of the City's basic financial statements. Housing's financial activities are included in the City's financial statements as a discretely presented component unit and represent 3.1%, 37.8% and 1.2% of the assets, net assets and revenues, respectively, of the City's aggregate discretely presented component units.

## TRUSTEE AND CONTRACT ADMINISTRATOR

U.S. Bank National Association will be the Trustee under the Trust Agreement which creates the 2006 Funding Trust pertaining to the 2006 Certificates and also the Contract Administrator under the Administration Agreement pertaining to the 2006 Service Contract, the 2006 Swap Agreements and related matters. U.S. Bank National Association also is the trustee under another trust agreement which created another funding trust pertaining to the 2005 COPs and also the contract administrator under another contract administration agreement pertaining to the 2005 Service Contracts, the 2005 Swap Agreements and related matters. See "2006 SERVICE CONTRACT ADMINISTRATION."

## LEGAL MATTERS

Legal matters incident to the authorization, issuance, and sale of the 2006 Certificates are subject to the approval of Lewis & Munday, A Professional Corporation, Detroit, Michigan, 2006 Certificate Counsel, whose approving opinion, substantially in the form shown in APPENDIX G, will be delivered on the date of issuance of the 2006 Certificates. In the event certificated 2006 Certificates are issued, the opinion will be printed on the reverse side of each 2006 Certificate.

Certain legal matters will be passed upon for the Underwriters by their counsel, Honigman Miller Schwartz and Cohn LLP, Detroit, Michigan.

A legal opinion addressing certain labor law matters will be delivered by Sullivan, Ward, Asher & Patton, P.C., of Southfield, Michigan, as special labor counsel to the City.

A legal opinion addressing the United States federal income tax characterization of the 2006 Funding Trust, the Scheduled Payments and Service Charges to be received by the 2006 Funding Trust under the 2006

Service Contracts, and the income to be earned by the Service Corporations pursuant to the transactions described in this Offering Circular will be delivered by Mayer, Brown, Rowe & Maw LLP, New York, New York, as special U.S. federal tax counsel. A legal opinion on certain State of Michigan tax considerations relating to the transactions described in this Offering Circular will be delivered by Honigman Miller Schwartz and Cohn LLP, as special Michigan tax counsel.

## LITIGATION

The City is a defendant in numerous lawsuits and is also subject to other claims. Among these are the following matters which relate to the administration of the City's pension plans.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v City of Detroit.* The governing board (**PFRS Board**) of the City's Police and Fire Retirement System (**PFRS**) filed this action in June 2004 for a declaratory judgment that the PFRS Board can impose a shorter amortization period for the City's funding of the unfunded accrued actuarial liabilities (**UAAL**) of the PFRS than set forth in a 1974 City ordinance, codified in the City Code. That ordinance and City Code section prescribed a 30-year amortization period, to be reduced by one year each subsequent year until reaching, and thereafter maintaining, a 20-year amortization period. The PFRS Board alleged that such ordinance provision is permissive only, and that under an agreement entered into in 1992, the PFRS Board has the authority to establish amortization periods of less than 20 years. The PFRS Board, accordingly, had adopted a declining amortization policy such that the amortization period for computing the City's annual contribution for PFRS UAAL due June 30, 2006 would be 13 years. The City denied that there was such an agreement, and argued that under the City Code there cannot be an amortization period shorter than 20 years. Both sides moved for summary disposition, and on May 16, 2005, the Court granted summary disposition to the City. The PFRS Board appealed to the Michigan Court of Appeals, which on February 28, 2006 reversed the lower court decision and granted "the Board's declaratory judgment that it has the authority under applicable law to set the amortization period." On April 11, 2006, the City applied for leave to appeal this decision to the Michigan Supreme Court, which has not yet ruled on the application.

After such lower court decision in the City's favor and before such Michigan Court of Appeals decision in the PFRS Board's favor, the City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for the funding of PFRS UAAL. After the Michigan Court of Appeals decision, on March 30, 2006, the PFRS Board adopted a resolution also establishing a 30-year amortization period for the funding of PFRS UAAL (the **Board Amortization Resolution**).

*Detroit Police Officers Association, Charging Party, and City of Detroit, Respondent (*Employment Relations Commission, Michigan Department of Labor & Economic Growth (**MERC**)). An unfair labor practice charge was filed against the City by the Detroit Police Officers Association (**DPOA**) on April 19, 2006, with the Employment Relations Commission. The DPOA in its charge asserts that the establishment of the PFRS amortization schedule is a mandatory subject of bargaining and that the City engaged in an unfair labor practice by representatives of the City, acting as trustees of the PFRS Board, voting in favor of the Board Amortization Resolution. The period over which the City's scheduled payment obligations are payable under the 2006 PFRS Service Contract is determined with reference to action of the PFRS Board in its Board Amortization Resolution.

The City's special labor counsel, Sullivan, Ward, Asher & Patton, P.C., of Southfield, Michigan (**Labor Counsel**), has reviewed the DPOA's charge, the Board Amortization Resolution and applicable MERC and court decisions. While recognizing that the outcome of any litigation or administrative proceeding cannot be predicted with certainty, Labor Counsel will deliver its opinion that the establishment of the PFRS amortization schedule is not a mandatory subject of bargaining and that the DPOA's charge is wholly without merit. Certificate Counsel will deliver its approving opinion, substantially in the form shown in APPENDIX G, on the date of issuance of the 2006 Certificates.

The following are significant General Fund litigation matters which remain pending or have arisen since June 30, 2005. It has been the City's experience that lawsuits and claims are settled for amounts less than the stated demand. While it is not possible to determine the final outcome of these lawsuits and claims exactly, the City and its Law Department have estimated that the liability for all such litigation and claims approximates $132.9 million for governmental activities as of June 30, 2005.

*City of Detroit v Detroit Plaza Limited Partnership.* This is a condemnation action that was filed in September of 2000. The property owners in this case initially challenged the necessity of the acquisition. The City and the property owners ultimately reached an agreement for withdrawal of the necessity challenge, which allowed the case to proceed only on the question of valuation of the property. The respective appraised values for the property have served as the basis for the City's estimated just compensation and the property owners claims, and would indicate that a material expense to the City might result from any adverse verdict. The matter was tried in April 2004. A verdict of $25,000,000 was rendered by the jury. The City's estimated just compensation was $13,712,500, which had been previously paid by the City. The increase was approximately $11,287,500. A judgment was entered in May 2004. Motions for new trial, judgment notwithstanding the verdict and remittitur, along with the property owners' motion for attorneys fees, costs and case evaluation sanctions have been heard by the trial court. The trial court denied the City's motions for new trial and judgment notwithstanding the verdict, and granted the property owners motions for attorneys' fees and costs. A claim of appeal was timely filed on October 12, 2004, and the parties have filed their briefs on appeal. The City intends to continue to vigorously prosecute this matter through appeal. The City believes that the trial court made a number of evidentiary rulings that were in error, but the ultimate outcome is difficult to assess at this time.

*Estate of Lamar Grable v Eugene Brown.* The suit arises out of a shooting incident in which the plaintiff's decedent died after being shot by Officer Brown. Both Officer Brown and his partner testified at trial that the decedent fired his weapon twice and struck Brown twice in his abdominal area. Judgment was entered on a jury verdict of $4,000,000 plus taxable costs of $18,510 and attorney fees of $255,055, against City police officer Eugene Brown and in favor of the plaintiff. The Michigan Court of Appeals upheld the judgment. An application for leave to appeal to the Michigan Supreme Court has been filed and is pending before that Court.

*HRT Enterprises, et al v City of Detroit.* These consolidated inverse condemnation cases have two plaintiffs: HRT Enterprises, a Michigan partnership, the fee owner of the industrial property in question; and Merkur Steel Supply, Inc., a sub-tenant. The fee owner of the property seeks to compel the City to purchase the subject buildings. After the trial court granted the City's summary disposition motion against HRT Enterprises and Merkur Steel Supply, Inc, they filed on December 23, 2003, a timely claim of appeal of right to the Michigan Court of Appeals from the trial court's grant of summary disposition in favor of the City. On May 12, 2005, the Court of Appeals reversed the trial court's decision on the HRT claim and affirmed its decision on the Merkur claim. The HRT matter proceeded to trial on September 6, 2005 and the jury returned a verdict in favor of the City. HRT filed post-judgment motions, which were denied by the trial court on January 19, 2006. HRT's appeal to the Michigan Court of Appeals, filed on February 8, 2006, is pending in that Court.

*Trustees of the Policemen and Firemen Retirement System of the City of Detroit v City of Detroit, et al.* The PFRS Board filed this lawsuit in August 2005 seeking payment of $53 million for the City's unpaid contribution obligation to the PFRS due June 30, 2005. The PFRS Board has since adopted a resolution approving the City's proposed settlement terms, and the lawsuit has been inactive by mutual agreement of the parties pending completion of the settlement. Under the approved settlement terms, the balance of the June 30, 2005 required City contributions to the PFRS will be paid with interest at 7.8% per annum no later than June 30, 2006, and the required City contributions to the PFRS due June 30, 2006 will be paid with interest at 7.8% per annum no later than June 30, 2007.

*George Marshall Grace, et al v City of Detroit.* This is a class action lawsuit filed in April 1990 arising from the City's residency requirement. The United States District Court held that the City unconstitutionally discriminated against applicants for employment who were not residents of the City at the time they made application. The City ceased requiring residency upon application for employment and subsequently state law enacted in March 2000 now prohibits residency requirements in most respects. The claims of over four hundred class members have been adjudicated with a finding of liability in ninety-four of those claims. The Court ruled in favor of the City on the issue of mitigation of damages, but permitted the class to file an interlocutory appeal to the Sixth Circuit Court of Appeals, pursuant to 28 U.S.C. §1292b. This relief is permissive and may or may not be granted by the Court of Appeals. In the interim, the District Court has ordered the parties to continue resolving the liability claimants, pending the outcome of the potential appeal. Because the Court found liability pursuant to 42 U.S.C. §1983, the Court will award attorneys fees and costs to class counsel and the court-appointed special master.

*800-Megahertz Communication System Cost Allocation Lawsuit.* This is litigation brought by three southeastern Michigan counties (Wayne, Oakland and Macomb Counties (collectively **Counties**)) against the City in late 2005, within the proceedings of a longstanding case in the U.S. District Court involving the City and its Detroit Water and Sewerage Department (**DWSD**), an enterprise fund department of the City. The Counties are wholesale sewerage customers of DWSD and claim that the allocation to DWSD of 60% of the $64.4 million capital (*i.e.*, infrastructure) costs of the City's 800-megahertz communication system (**800-MHz System**), passed on, in part, to the Counties through DWSD's rates, is improper. The City recently completed construction of the 800-MHz System, which provides communication capabilities to all City departments for both day-to-day operations and emergency response. The total cost of the 800-MHz System was approximately $128 million. In May 2003, the City Budget Department, on behalf of all General Fund departments, and the DWSD entered into a Memorandum of Understanding under which (a) DWSD took the lead in contracting for and overseeing the construction of the 800-MHz System, and (b) DWSD paid 60% of the project's infrastructure costs and the General Fund departments paid the other 40%. The 60/40 allocation was based on DWSD's larger service area (approximately 1,000 square miles, including the City) compared to the approximately 100 square-mile area of the City served by the General Fund departments, and on the understanding that 15 of the 29 communications towers needed to support the 800-MHz System would be constructed outside the City. Accordingly, of the total infrastructure costs of $64.4 million, DWSD paid $38.6 million and the General Fund departments paid the balance. The Counties argue in their court briefs that DWSD's allocated share of the infrastructure costs should have been closer to 6-8%, rather than 60%, based on DWSD's actual air time use of the 800-MHz System. The City intends to vigorously defend the original allocation, but cannot predict the outcome of the litigation.

## UNITED STATES FEDERAL TAX CONSIDERATIONS

**NOTICE PURSUANT TO IRS CIRCULAR 230: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) THIS OFFERING CIRCULAR IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a general discussion of certain U.S. federal tax considerations relating to the purchase, ownership and disposition of the 2006 Certificates. The discussion below does not deal with all U.S. federal tax considerations applicable to all categories of investors, some of which may be subject to special rules. In addition, this discussion is generally limited to investors who will hold 2006 Certificates as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the U.S. Internal Revenue Code of 1986, as amended (the **Code**), and who would be treated as holding the 2006 Funding Trust's right to receive 2006 COP Service Payments under the 2006 Service Contracts as a capital asset if they held such right directly. This discussion is limited to initial purchasers of 2006 Certificates. **Investors (including subsequent purchasers of 2006 Certificates) are strongly urged to consult their own tax advisors about the U.S. federal, state (including State of Michigan), local and other tax consequences of the purchase, ownership and disposition of 2006 Certificates.**

This discussion is based on the Code, administrative pronouncements, judicial decisions and existing and proposed U.S. Department of Treasury regulations. Prospective purchasers should note that no rulings have been or will be sought from the Internal Revenue Service (**IRS**) with respect to any of the U.S. federal tax considerations discussed below, and no assurance can be given that the IRS will not take contrary positions. Mayer, Brown, Rowe & Maw LLP has opined on none of the tax considerations discussed below except as expressly indicated below.

As used below, the term "**U.S. 2006 Certificateholder**" means a beneficial owner of a 2006 Certificate who is a citizen or resident of the United States or a U.S. domestic corporation, or a 2006 Certificateholder who otherwise will be subject to U.S. federal income taxation on a net basis in respect of the 2006 Certificates; and the term "**Non-U.S. 2006 Certificateholder**" means a beneficial owner of a 2006 Certificate other than a U.S. 2006 Certificateholder. Except as stated below, the following discussion does not address any tax considerations that apply specifically to a Non-U.S. 2006 Certificateholder.

### Tax Status of the 2006 Funding Trust

In the opinion of Mayer, Brown, Rowe & Maw LLP, the 2006 Funding Trust will be treated as a grantor trust under Subpart E, Part I of Subchapter J of the Code, and each 2006 Certificateholder will be treated for U.S. federal income tax purposes as the owner of an undivided *pro rata* interest in the payments in respect of the 2006 Service Contracts received by the 2006 Funding Trust that are attributable to the specific maturity of such 2006 Certificateholder's 2006 Certificate.

### Tax Status of the 2006 COP Service Payments under the 2006 Service Contracts

In the opinion of Mayer, Brown, Rowe & Maw LLP, payments in respect of the 2006 Service Contracts received by the 2006 Funding Trust will constitute payments in respect of indebtedness for U.S. federal income tax purposes. Accordingly, the Service Charges received by the 2006 Funding Trust under the 2006 Service Contracts will constitute interest in respect of indebtedness for U.S. federal income tax purposes.

### Agreements Regarding Tax Status of the 2006 Funding Trust and 2006 COP Service Payments under the 2006 Service Contracts

The City. In a written agreement the City agrees that, for all federal, state and local income, business, franchise and modified value added tax purposes, the City shall treat Scheduled Payments and Services Charges as payments in respect of indebtedness for all such tax purposes (but the City expressly acknowledges and agrees that the Service Charges and Scheduled Payments made by the City under the 2006 Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

The Service Corporations. In the Trust Agreement each Service Corporation agrees, for U.S. federal, state and local income, business, franchise and modified value added tax purposes, to treat the 2006 Funding Trust, the 2006 Certificates and the 2006 COP Service Payments in accordance with the Service Corporation's intention that (i) the 2006 Funding Trust will qualify as a grantor trust under the Code, (ii) each 2006 Certificateholder will be treated as the owner of an undivided *pro rata* interest in the portion of the grantor Trust Estate attributable to such 2006 Certificateholder's 2006 Certificate(s), and (iii) the 2006 COP Service Payments will constitute payments in respect of indebtedness (but the Service Corporations expressly acknowledge and agree that the 2006 Funding Trust and the 2006 COP Service Payments do not constitute or create any indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

2006 Certificateholders. By purchasing or acquiring a 2006 Certificate, each 2006 Certificateholder agrees that for all U.S. federal, state and local income, business, franchise and modified value added tax purposes, (i) 2006 Certificateholder will treat the 2006 Funding Trust as a grantor trust under the Code, (ii) each 2006 Certificateholder will be treated as the owner of an undivided *pro rata* interest in the portion of the grantor Trust Estate attributable to such 2006 Certificateholder's 2006 Certificate(s), and (iii) 2006 Certificateholder will treat the 2006 COP Service Payments as payments in respect of indebtedness (and will thereby also acknowledge that the Services Charges and Scheduled Payments made by the City under the 2006 Service Contracts do not constitute indebtedness of the City for purposes of any State of Michigan constitutional or non-tax statutory or Charter limitation).

### *Tax Status of the Service Corporations*

In the opinion of Mayer, Brown, Rowe & Maw LLP, the Service Corporations will either be treated as an integral part of the City or their gross income from the transactions described in this Offering Circular will constitute gross income described in Section 115 of the Code, and the Service Corporations will not be subject to U.S. federal income tax in respect of any income derived by the Service Corporations from the transactions described in this Offering Circular.

### *U.S. 2006 Certificateholders*

Interest Income. A U.S. 2006 Certificateholder will be required to recognize its allocable share of the Service Charges payable under the 2006 Service Contracts as interest income in accordance with the 2006 Certificateholder's method of tax accounting. Accordingly, a cash method U.S. 2006 Certificateholder will recognize its allocable share of the Service Charges as interest income at the time the Service Charges are received by the 2006 Funding Trust. An accrual method U.S. 2006 Certificateholder will recognize its allocable share of the Service Charges at the time the Service Charges are accrued by the 2006 Funding Trust.

Original Issue Discount. In the event that the face amount of a 2006 Certificate exceeds its issue price, the excess constitutes original issue discount (**OID**) provided that such excess equals or exceeds 0.25% of the face amount of the 2006 Certificate multiplied by the number of complete years to maturity from the issue date of the 2006 Certificate (such 2006 Certificates being **OID 2006 Certificates**). The issue price of 2006 Certificates of a particular maturity is the first price at which a substantial amount of the 2006 Certificates of that maturity are sold (excluding, without limitation, sales to bond houses, brokers or underwriters). The issue price of Series 2006-A Certificates of each maturity is expected to be the amount set forth on the inside cover of this Offering Circular, but is subject to change based on actual sales.

With respect to a U.S. 2006 Certificateholder that purchases in the initial offering an OID 2006 Certificate, the amount of OID that accrues in respect of the OID 2006 Certificate during any accrual period equals (i) the adjusted issue price of the OID 2006 Certificate at the beginning of the accrual period, multiplied by (ii) the yield to maturity of the OID 2006 Certificate, less (iii) the amount of any stated interest payable on the OID 2006 Certificate allocable to the accrual period. The "accrual periods" of an OID 2006 Certificate generally correspond to the six-month intervals ending on the June 15 and December 15 interest payment dates on the OID 2006 Certificate, with a first long accrual period from the 2006 Closing Date to December 15,

2006. The "adjusted issue price" of an OID 2006 Certificate at the beginning of any accrual period equals the issue price of the OID 2006 Certificate, plus the amount of OID that has accrued on the OID 2006 Certificate on a constant-yield basis in all prior accrual periods, minus the amount of any Scheduled Payments received on the OID 2006 Certificate in prior accrual periods. The "yield to maturity" of an OID 2006 Certificate is determined on the basis of compounding at the end of each accrual period and properly adjusted for the length of the accrual period.

The amount of OID so accrued on an OID 2006 Certificate during a particular accrual period will be divided by the number of days in the accrual period to derive a "daily portion." A U.S. 2006 Certificateholder who owns an OID 2006 Certificate must include as ordinary income the daily portions of OID that accrue on the OID 2006 Certificate for each day during the taxable year on which the U.S. 2006 Certificateholder owns the OID 2006 Certificate. Such an inclusion in advance of receipt of the cash attributable to the income is required even if the U.S. 2006 Certificateholder is on the cash method of accounting for U.S. federal income tax purposes. The amount of OID includible in a U.S. 2006 Certificateholder's income will increase the U.S. 2006 Certificateholder's tax basis in the OID 2006 Certificate for purposes of determining the U.S. 2006 Certificateholder's gain or loss upon a sale, exchange or redemption of the OID 2006 Certificate.

Trustee's Fees and Expenses. In general, each U.S. 2006 Certificateholder will be entitled to deduct, consistent with its method of tax accounting, its *pro rata* share of fees and expenses, if any, paid or incurred by the 2006 Funding Trust as provided in Sections 162 or 212 of the Code. The U.S. federal income tax treatment of the Trustee's fees is unclear, and prospective U.S. 2006 Certificateholders should consult their own tax advisors regarding such treatment, including the effect of the possible treatment of the Trustee's fees as having been constructively received by the 2006 Funding Trust from the City (followed by the constructive payment of such fees by the 2006 Funding Trust).

If a U.S. 2006 Certificateholder is an individual, estate or trust, the deduction for the 2006 Certificateholder's share of the fees and expenses, if any, paid or incurred by the 2006 Funding Trust, including the Trustee's fees, will be allowed only to the extent that all of the 2006 Certificateholder's miscellaneous itemized deductions exceed 2% of the 2006 Certificateholder's adjusted gross income. In addition, in the case of U.S. 2006 Certificateholders who are individuals, certain otherwise allowable itemized deductions will be subject generally to additional limitations on itemized deductions under the applicable provisions of the Code.

Sale or Other Disposition of a 2006 Certificate. Upon the sale, exchange or redemption of a 2006 Certificate owned by a U.S. 2006 Certificateholder, the 2006 Certificateholder will recognize gain or loss in an amount generally equal to the difference between the amount realized by the 2006 Certificateholder on the sale, exchange or redemption and the 2006 Certificateholder's adjusted tax basis in its 2006 Certificate. A U.S. 2006 Certificateholder's adjusted tax basis in its 2006 Certificate will equal the price paid by the 2006 Certificateholder for the 2006 Certificate (excluding the portion of such price, if any, attributable to accrued interest on the 2006 Certificate), increased by any amounts includible in income by the 2006 Certificateholder as OID on the 2006 Certificate, and reduced by the 2006 Certificateholder's allocable share of Scheduled Payments received by the 2006 Funding Trust under the 2006 Service Contracts. In general, any such gain or loss recognized by a U.S. 2006 Certificateholder would be capital gain or loss, and will be long-term capital gain or loss if the 2006 Certificateholder held the 2006 Certificate for more than one year.

### *Non-U.S. 2006 Certificateholders*

A Non-U.S. 2006 Certificateholder that has no connection with the United States other than holding a 2006 Certificate will not be subject to U.S. withholding or income tax with respect to the 2006 Certificate; provided, with respect to interest (including OID), that the 2006 Funding Trust's rights to receive 2006 COP Service Payments under the 2006 Service Contracts are considered "portfolio debt investments" (as defined in Sections 871(h) and 881(c) of the Code) and that such 2006 Certificateholder provides an appropriate statement (generally on IRS Form W-8BEN), signed under penalties of perjury, identifying the Non-U.S. 2006 Certificateholder and stating, among other things, that such 2006 Certificateholder is a non-U.S. person.

Special certification rules may apply to non-U.S. partnerships or trusts (or entities that are so treated for U.S. federal tax purposes). If these conditions are not met, a 30% withholding tax will apply to interest (including OID) unless an income tax treaty reduces or eliminates such tax or unless the interest is effectively connected with the conduct of a trade or business within the United States by such 2006 Certificateholder and certain other requirements are met. In the latter case, the Non-U.S. 2006 Certificateholder will be subject to U.S. federal income tax with respect to all income attributable to the 2006 Certificate at regular rates then applicable to U.S. taxpayers (and, in the case of corporations, possibly also the branch profits tax). A Non-U.S. 2006 Certificateholder will not be considered engaged in a United States trade or business solely by reason of holding a 2006 Certificate.

### *Information Reporting and Backup Withholding*

Information reporting to the IRS generally will be required with respect to amounts distributed by the 2006 Funding Trust to 2006 Certificateholders other than corporations and other exempt recipients. A "backup" withholding tax at the rates described below will apply to those payments if such 2006 Certificateholder fails to provide certain identifying information (such as the 2006 Certificateholder's taxpayer identification number) to the Trustee. Non-U.S. 2006 Certificateholders generally will be required to comply with applicable certification procedures to establish that they are not U.S. 2006 Certificateholders in order to avoid the application of such information reporting requirements and backup withholding. Any amount withheld under the backup withholding rules will be allowable as a credit against the 2006 Certificateholder's U.S. federal income tax, provided that the required information is provided to the IRS. The current backup withholding rate of 28% applies to payments made through the year 2010. For payments made after the year 2010, the backup withholding rate will be increased to 31%.

### *State and Other Tax Considerations*

In addition to the U.S. federal income tax considerations described above, potential investors should consider the state, local and foreign tax consequences of the acquisition, ownership and disposition of the 2006 Certificates offered under this Offering Circular. Such other tax laws may differ substantially from the corresponding U.S. federal income tax law, and the discussion above does not purport to describe any aspect of the tax laws of any state, local, foreign or other jurisdiction.

Under existing Michigan law, the State's single business tax (**SBT**) act will be automatically repealed for tax years that begin after December 31, 2009. The SBT is a general tax on business activity conducted in Michigan. In 2005, the State Governor announced an SBT reform proposal to amend and continue the SBT beyond December 31, 2009. The State Legislature has passed alternative tax reforms, some of which the Governor has signed into law. Such recent enacted State tax reforms did not amend or change any provisions of the SBT applicable to the issuance, purchase, holding or disposition of the 2005 COPs or the 2006 Certificates.

On May 30, 2006, petitions were filed with the Michigan Secretary of State for a proposal to be placed on the ballot for the State-wide general election in November 2006, to initiate legislation to repeal the SBT on December 31, 2007 and to encourage the State Legislature to enact unspecified replacement taxes on business. The State Senate Majority Leader and the State House Speaker have established a Senate-House committee to recommend a replacement State business tax proposal by December 1, 2006, with plans for a vote on the replacement proposal in the State Legislature before the year-end. They announced plans for the State Legislature to enact the petitioners' proposed December 31, 2007 repeal of the SBT after the petitions are certified by the Secretary of State, which legislation would not be subject to the Governor's veto. It is not possible to predict whether the petitions will be certified, whether or when such or other SBT reform legislation will be enacted into law in the State, whether or when a replacement State tax on business conducted in Michigan will be enacted into law, or the provisions and effect of any such potential legislation.

**Each 2006 Certificateholder is strongly urged to consult its own tax advisor with respect to all aspects of the U.S. federal, state (including State of Michigan), local and foreign tax treatment of the purchase, ownership and disposition of a 2006 Certificate.**

### *ERISA Considerations*

The Employee Retirement Income Security Act of 1974, as amended (**ERISA**), imposes certain fiduciary and prohibited transaction restrictions on employee pension and welfare benefit plans subject to ERISA (**ERISA Plans**). Section 4975 of the Code imposes essentially the same prohibited transaction restrictions on, among other things, tax-qualified retirement plans described in Section 401(a) of the Code (**Qualified Retirement Plans**) and on Individual Retirement Accounts described in Sections 408(a) and (b) and 408A of the Code (collectively, **Tax-Favored Plans**).

Certain employee benefit plans, such as governmental plans (as defined in Section 3(32) of ERISA) and, if no election has been made under Section 410(d) of the Code, church plans (as defined in Section 3(33) of ERISA), are not subject to ERISA requirements. Accordingly, assets of such plans may be invested in 2006 Certificates without regard to the ERISA considerations described below, subject to the provisions of applicable federal and state law. Any such plan which is a Qualified Retirement Plan and exempt from taxation under Sections 401(a) and 501(a) of the Code, however, is subject to the prohibited transaction rules set forth in the Code.

In addition to the imposition of general fiduciary requirements (including those of investment prudence and diversification, and the requirement that a plan's investment be made in accordance with the documents governing the plan), Section 406 of ERISA and Section 4975 of the Code prohibit a broad range of transactions involving assets of ERISA Plans, Tax-Favored Plans and entities whose underlying assets include plan assets by reason of ERISA Plans or Tax-Favored Plans investing in such entities (collectively, **Benefit Plans**) and persons who have certain specified relationships to the Benefit Plans (**Parties in Interest** or **Disqualified Persons**), unless a statutory or administrative exemption is available. Certain Parties in Interest (or Disqualified Persons) that participate in a prohibited transaction may be subject to a penalty (or an excise tax) imposed pursuant to Section 502(i) of ERISA (or Section 4975 of the Code) unless a statutory or administrative exemption is available.

Certain transactions involving the purchase, holding, or transfer of 2006 Certificates might be deemed to constitute prohibited transactions under ERISA and the Code if assets of the City or the 2006 Funding Trust were deemed to be assets of a Benefit Plan. Under a regulation issued by the United States Department of Labor (**Plan Asset Regulation**), the assets of the City, the Service Corporations or the 2006 Funding Trust would be treated as plan assets of a Benefit Plan for the purposes of ERISA and the Code only if the Benefit Plan acquires an "equity interest" in the City, the Service Corporations or the 2006 Funding Trust and none of the exceptions contained in the Plan Assets Regulation is applicable.

An equity interest is defined under the Plan Asset Regulation as an interest in an entity other than an instrument which is treated as indebtedness under applicable local law and which has no substantial equity features. Although there can be no assurances in this regard, it appears that the 2006 Certificates should be treated as debt without substantial equity features for purposes of the Plan Asset Regulation. Although also not free from doubt, it also appears that, so long as the 2006 Certificates retain a rating of at least investment grade, they should continue to be treated as indebtedness without substantial equity features for the purposes of the Plan Asset Regulation.

However, without regard to whether the 2006 Certificates are treated as an equity interest for such purposes, the acquisition or holding of 2006 Certificates by or on behalf of a Benefit Plan could be considered to give rise to a prohibited transaction if the City, the Service Corporations or the 2006 Funding Trust, or any of their affiliates, is or becomes a Party in Interest or a Disqualified Person with respect to such Benefit Plan. A prohibited transaction could also occur in the event that a Benefit Plan transfers a 2006 Certificate to a Party in Interest or a Disqualified Person. In such case, certain exemptions from the prohibited transaction rules

could be applicable depending on the type and circumstances of the plan fiduciary making the decision to acquire a 2006 Certificate. Included among these exemptions are: Prohibited Transaction Class Exemption (**PTCE**) 96-23, regarding transactions effected by "in-house asset managers;" PTCE 90-1, regarding investments by insurance company pooled separate accounts; PTCE 95-60, regarding transactions effected by "insurance company general accounts;" PTCE 91-38, regarding investments by bank collective investment funds; and PTCE 84-14, regarding transactions effected by "qualified professional assets managers."

A transferee (including any purchaser in the initial transfer of the 2006 Certificates) of the 2006 Certificates or any interest therein, who is a trustee of or is acting on behalf of a Benefit Plan or who is using Benefit Plan assets to effect such transfer, will be deemed to represent that: (i) at the time of such transfer the 2006 Certificates are rated at least investment grade and such transferee believes that the 2006 Certificates are properly treated as indebtedness without substantial equity features for purposes of the Plan Asset Regulation, and agrees to so treat the 2006 Certificates, or (ii) such transferee's acquisition and holding of the 2006 Certificates do not result in a violation of the prohibited transaction rules of Section 406 of ERISA or Section 4975 of the Code because the transaction is covered by an applicable exemption, including PTCE 96-23, 95-60, 91-38, 90-1 or 84-14. In addition such transferee will be deemed to represent that neither the City, either Service Corporation or any provider of credit support nor any of their affiliates is a Party in Interest with respect to such Benefit Plan.

Alternatively, a prospective transferee of the 2006 Certificates or any interest therein who is a trustee of, or who is acting on behalf of, a Benefit Plan, or who is using Benefit Plan assets to effect such transfer, may provide the City, the Service Corporations or the 2006 Funding Trust, as applicable, an opinion of counsel satisfactory to such trustee, which opinion will not be at the expense of the City, the Service Corporations or the 2006 Funding Trust, that the purchase, holding and transfer of the 2006 Certificates or interests therein is permissible under applicable law, and will not constitute or result in any non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and will not subject the City, the Service Corporations or the 2006 Funding Trust to any obligation in addition to those undertaken in the 2006 Service Contracts or the Trust Agreement, as applicable.

Any ERISA Plan fiduciary considering whether to purchase 2006 Certificates on behalf of an ERISA Plan should consult with its counsel regarding the applicability of the fiduciary responsibility and prohibited transaction provisions of ERISA and the Code to such investment and the availability of any of the exemptions referred to above. Persons responsible for investing the assets of Tax-Favored Plans that are not ERISA Plans should seek similar counsel with respect to the prohibited transaction provisions of the Code. Moreover, each Benefit Plan fiduciary should take into account, among other considerations:

- whether the fiduciary has the authority to make the investment;

- whether the investment constitutes a direct or indirect transaction with a Party in Interest or Disqualified Person;

- the diversification by type of the assets in the Benefit Plan's portfolio;

- the Benefit Plan's funding objectives;

- the tax effect of the investment; and

- whether under the general fiduciary standards of investment procedure and diversification an investment in the securities is appropriate for the Benefit Plan, taking into account the overall investment policy of the Plan and the composition of the Benefit Plan's investment portfolio.

## CONTINUING DISCLOSURE

The City will undertake, for the benefit of the beneficial owners of the 2006 Certificates, pursuant to a Continuing Disclosure Undertaking to be delivered on the 2006 Closing Date (**Disclosure Undertaking**), to provide an annual report presenting certain financial information and operating data about the City (**Annual Report**). The City will agree to send the Annual Report, by about January 26 of each year, to each nationally recognized municipal securities information repository (**NRMSIR**) and Michigan's State Information Depository (**SID**), in each case as designated from time to time by the United States Securities and Exchange Commission (the **SEC**). The City will also agree to provide notices of the occurrence of certain events specified in the undertaking to each NRMSIR, or the Municipal Securities Rulemaking Board (**MSRB**), and to any SID. A copy of the undertaking is set forth in APPENDIX H.

In order to provide continuing disclosure with respect to the 2006 Certificates in accordance with such undertaking and with Rule 15c2-12 promulgated by the Securities and Exchange Commission pursuant to the Securities Exchange Act of 1934, as amended, the City has entered into a Disclosure Dissemination Agent Agreement (**Disclosure Dissemination Agreement**) for the benefit of the beneficial owners of the 2006 Certificates with Digital Assurance Certification, L.L.C. (**DAC**), under which the City has designated DAC as Disclosure Dissemination Agent.

The Disclosure Dissemination Agent has only the duties specifically set forth in the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent's obligation to deliver the information at the times and with the contents described in the Disclosure Dissemination Agreement is limited to the extent that the City has provided such information to the Disclosure Dissemination Agent as required by the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty with respect to the contents of any disclosures made or notice given pursuant to the terms of the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent has no duty or obligation to review or verify any information in the Annual Report, any audited financial statements, notice or voluntary report, or any other information, disclosures or notices provided to it by the City and shall not be deemed to be acting in any fiduciary capacity for the City, the beneficial owners of the 2006 Certificates or any other party. The Disclosure Dissemination Agent has no responsibility for the City's failure to report to the Disclosure Dissemination Agent any specified event or a duty to determine the materiality thereof. The Disclosure Dissemination Agent shall have no duty to determine or liability for failing to determine whether the City has complied with the Disclosure Dissemination Agreement. The Disclosure Dissemination Agent may conclusively rely upon certifications of the City at all times.

Copies of the notices may be obtained from:

| | |
|---|---|
| *Mail:* | DAC Digital Assurance Certification<br>390 N. Orange Avenue, 17th Floor<br>Orlando, FL 32801 |
| *Attn:* | Jenny Emami<br>Client Service Manager |
| *Phone:* | 407-515-1100 |
| *E-mail:* | jemami@dacbond.com |
| *Web site:* | www.dacbond.com |

The undertaking also describes the consequences if the City fails to provide any required information. A failure by the City to comply with the undertaking must be reported by the City in accordance with Rule 15c2-12 and must be considered by any broker, dealer or municipal securities dealer before recommending the purchase or sale of the 2006 Certificates in the secondary market. Consequently, such failure may adversely affect the marketability and liquidity of the 2006 Certificates and the market price therefor.

Since its fiscal year ended June 30, 1999, the City has been unable to meet its obligation to provide annual financial information within the periods specified in the applicable continuing disclosure agreements. Annual financial information for fiscal 1999 through 2004 was filed on May 10, 2000, May 28, 2001, May 31, 2002, March 10, 2003, February 9, 2004 (for water supply system bonds and sewage disposal system bonds), March 1, 2004 (for other bonds), February 16, 2005 (for water supply system bonds and sewage disposal system bonds), May 5, 2005 (for other bonds) and June 1, 2006.

Dated: June 7, 2006            **CITY OF DETROIT**

By    /s/ Roger Short
       Roger Short
Its:    Interim Finance Director

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By    /s/ Roger Short
       Roger Short
Its:    President

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

By    /s/ Roger Short
       Roger Short
Its:    President

# APPENDIX A

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS, THE CONTRACT ADMINISTRATION AGREEMENT AND THE TRUST AGREEMENT

The summaries of certain provisions of the Service Contracts, the Contract Administration Agreement and the Trust Agreement set forth below do not purport to be complete and are qualified by reference to the complete text of such documents. All capitalized terms used in this APPENDIX A, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement, the Contract Administration Agreement and the forepart of this Offering Circular.

## DEFINITIONS OF CERTAIN TERMS

All capitalized terms that are defined in the Offering Circular which precedes this APPENDIX A have the same meaning in this Appendix, unless the context otherwise indicates. All other capitalized terms used in this Appendix, unless otherwise defined or the context otherwise indicates, have the same meaning as in the Service Contracts, the Trust Agreement and the Contract Administration Agreement. Certain of those terms are defined as follows, unless the context clearly otherwise requires.

**Additional Service Payments** means such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporations as authorized or permitted by the Act of Council plus compensation, expenses and indemnification due the Trustee under the Trust Agreement and certain amounts payable by the Corporation to the Enforcement Officer and the Insurers under the Contract Administration Agreement.

**Authorized Denominations** means (a) for Series 2006-A Certificates, denominations of $5,000 and any multiple thereof; and (b) for Series 2006-B Certificates, denominations of $25,000 and multiples of $1,000 in excess thereof.

**Authorized Investments** means direct obligations of, or obligations unconditionally guaranteed by, the United States of America (**US Governments**) and repurchase agreements whereby the counterparty agrees to repurchase US Governments so long as the obligations to be repurchased are under the exclusive "control" (as defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) of the Service Corporation. STRIPS issued by the United States Treasury are **Authorized Investments,** but private proprietary stripped US Governments, whether interest or principal strips, are not Authorized Investments.

**Beneficial Owner** means any Person who indirectly owns Certificates pursuant to Part 5 of Article 8 of the Michigan Uniform Commercial Code.

**Certificates** or **Certificates of Participation** mean the Certificates of Participation issued by the 2006 Funding Trust representing beneficial interests in the Service Payments other than Hedge Payables, Contract Administrator Payments and Additional Service Payments (*i.e.*, beneficial interests in the Funding Trust Receivables only).

**Contract Administrator Payments** means amounts equal to amounts payable as fees, expenses and indemnification of the Contract Administrator in accordance with the Contract Administration Agreement, including reasonable fees and expenses of its counsel, in connection with any waiver or consent thereunder or any amendment thereof or of a Service Contract, or in connection with the enforcement thereof.

**Credit Insurance** means any insurance intended to protect owners of Certificates from loss arising from a failure of the City to timely pay Service Charges or Scheduled Payments. **Credit Insurance** also means any financial arrangement intended to protect a Hedge Counterparty from a failure of a Service Corporation to timely pay any Hedge Payable.

**Creditor Lien** means any lien or security interest granted by the Contract Administration Agreement in the amounts payable by the City under the Service Contracts in respect of Hedge Payables, including rights to proceeds and rights of enforcement, and granted by the Trust Agreement in Funding Trust Receivables.

**Enforcement Officer** means the same entity who is acting as the Contract Administrator but in its separate capacity as the Enforcement Officer under provisions of the Contract Administration Agreement which apply only if and when all Insurers are in default under their respective Credit Insurance.

**Fixed Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Fixed Rate Service Charges.

**Fixed Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a fixed rate methodology.

**Funding** means the Service Corporation's funding the Stated Funding Amount by the provision of money through the issuance of Certificates.

**Funding Costs** has the meaning given within the definition of "Service Charges" below.

**Funding Rate Portion** means the Fixed Rate Funding Portion or the Variable Rate Funding Portion as the context may require.

**Funding Trust Receivables** means any Principal Related Receivables or Interest Related Receivables. (This corresponds to the right to receive 2006 COP Service Payments payable by the City under each Service Contract.)

**Hedge Amount** means, in connection with any Optional Prepayment of Scheduled Payments, the amount, if any, of any Hedge Termination Payable that will be owed by the Service Corporation pursuant to any Stated Hedge relating to the Scheduled Payments being prepaid as a result of any required reduction in the notional amount of such Stated Hedge due to such prepayment and the Hedge Periodic Payable, if any, accrued to the date of termination.

**Hedge Counterparty** means the particular counterparty as to any Stated Hedge.

**Hedge Payable** means, after giving effect to any netting under the particular Stated Hedge, any Hedge Periodic Payable or any Hedge Termination Payable as the context may require.

**Hedge Periodic Payable** means, after giving effect to any netting under the particular Stated Hedge, a periodic amount owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Periodic Receivables** means, after giving effect to any netting under the particular Stated Hedge, periodic payments owing by the Hedge Counterparty under a Stated Hedge.

**Hedge Receivable** means any Hedge Periodic Receivable or Hedge Termination Receivable as the context may require.

**Hedge Termination Payable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by a Service Corporation under a Stated Hedge to the respective Hedge Counterparty.

**Hedge Termination Receivable** means, after giving effect to any netting under the particular Stated Hedge, any termination payment owing by the Hedge Counterparty under a Stated Hedge.

**Insurer** means the Person obligated under Credit Insurance to make payments with respect to Certificates or a Stated Hedge.

**Interest Related Receivable** means an amount owing by the City as a Service Charge, including any Accrued Service Charges. (This corresponds to interest on the Certificates.)

**Non-Tender Amount** means an amount sufficient to pay to all entitled beneficial owners of the Series 2005-A COPs being optionally prepaid by the Service Corporation: (i) all of the Scheduled Payments and any applicable premiums that the City is obligated to pay under the 2005 Service Contract with respect to the optional prepayment of such Series 2005-A COPs, and (ii) accrued Service Charges to the prepayment date.

**Participant** means any Person whose ownership of Certificates and other securities is shown on books of the Securities Depository.

**Payment Time** means 12:00 noon, Detroit, Michigan time.

**Principal Related Receivable** means an amount owing by the City as a Scheduled Payment (whether a Regular Scheduled Payment or a Sinking Fund Installment) or an Optional Prepayment Amount exclusive on any prepayment premium. (These correspond to principal of the Certificates.)

**Scheduled Payments** means the payments specified and so defined in each Service Contract Specific Terms. (These correspond to principal of the Certificates.)

**Service Charge Class** means all Scheduled Payments that have the same methodology for determining related Service Charges..

**Service Charges** means the amounts payable under the Service Contract by the City to the Service Corporation on Service Charge Payment Dates sufficient to pay the periodic costs of capital (**Funding Costs**) incurred by the 2006 Funding Trust for the particular Funding. (This corresponds to interest on the Certificates.) **Service Charges** do not include Hedge Payables.

**Service Contract Deficiency** means any unsatisfied amount under the following clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" below in this Appendix: **First, Second, Fourth** and **Sixth**.

**Service Contract Priority Sections** means those particular numbered clauses set forth under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" below in this Appendix.

**Service Payments** has the meaning given under "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Service Payments*" below.

**Stated Funding Amount** means the total amount to be funded by the Service Corporation in the Initial Funding or in an Additional Funding, as applicable.

**Stated Hedge** means a variable to fixed interest rate swap agreement permitted by the Act of Council and specified in a Service Contract, entered into between a Service Corporation and a Hedge Counterparty.

**Tender Amount** means an amount sufficient to pay to all entitled beneficial owners of the tendered Series 2005-B COPs being purchased by the Service Corporation: (i) all of the Scheduled Payments and accrued Service Charges that the City is obligated to pay under the 2005 Service Contract with respect to such tendered Series 2005-B COPs, and (ii) any applicable premiums.

**Trust Estate** means the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all proceeds of the foregoing.

**2005 Trustee** means the trustee under the Trust Agreement dated June 2, 2005, under which the Series 2005-A COPs were issued.

**Variable Rate Funding Portion** means all the portion, if any, of the Stated Funding Amount to be funded in a particular Funding equal to the total of the Scheduled Payments set forth for Variable Rate Service Charges.

A-3

**Variable Rate Service Charge Class** means all Scheduled Payments that have related Service Charges determined by a variable rate methodology.

## SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS

There are two separate and distinct Service Contracts. One is called the General Retirement System Service Contract 2006, between Detroit General Retirement System Service Corporation (the **GRS Service Corporation**) and the City. The other is called the Police and Fire Retirement System Service Contract 2006, between Detroit Police and Fire Retirement System Service Corporation (the **PFRS Service Corporation**) and the City. Each Service Contract is comprised of its own two documents, called the General Terms (dated as of June 1, 2006) and the Specific Terms (dated June __, 2006), which operate together as if they were combined in a single document.

Although separate and distinct, the two Service Contracts are similar in form and substance, and the summary below fits each Service Contract. The ways in which the two Service Contracts differ from each other (*e.g.*, they have different Service Corporations as a party and different Funding Amounts) are not affected by the generality of the summary below. This summary should be read in the context of describing either one of the two Service Contracts, and not in the context of describing both of them collectively. Thus, for example, the term "the Service Corporation" when used in the summary below means the GRS Service Corporation if the summary is read in the context of describing its Service Contract, or otherwise means the PFRS Service Corporation if the summary is read in the context of describing its Service Contract.

**The two Service Contracts mentioned and summarized in this Appendix A are called the "2006 Service Contracts" in the forepart of this Offering Circular. They should be distinguished from two different service contracts which are called the "2005 Service Contracts" in the forepart of this Offering Circular. All references to a "Service Contract" or "Service Contracts" in this Appendix A are always to such 2006 Service Contracts and never to such 2005 Service Contracts.**

**Service and Funding Arrangements**

*Provision of Services*

The services of the Service Corporation consist of further relieving the financial burden of the 2005 Subject UAAL to the City in the current and in future years by assisting the City in realizing financial benefits that would have been available on the effective date of the 2005 Service Contracts if the City could have then utilized a 30-year period for payment of its scheduled 2005 COP Service Payments rather than a 13-year period under the 2005 PFRS Service Contract and a 20-year period under the 2005 GRS Service Contract, corresponding to the amortization periods then in effect for amortization of PFRS UAAL and GRS UAAL respectively. Given that each such amortization period has since been extended to 30 years, the Service Corporation agrees in the Service Contract to provide its services through taking the following actions: (a) the Service Corporation shall fund the Stated Funding Amount on the Closing Date (the **Initial Funding**), (b) the Service Corporation shall fund any Hedge Termination Payable in whole or in part as requested of the City and approved by the City Council, and (c) the Service Corporation shall fund payment of some or all Service Payments as requested by the City and approved by City Council (funding pursuant to this clause (c) or the preceding clause (b), an **Additional Funding**). An Additional Funding shall be accomplished under one or more other service contracts, not under the Service Contract. An Additional Funding may include such things in the nature of Costs of Issuance, Prepaid Service Charges and Underwriters' Discount as authorized or permitted by the approval of the City Council of the Additional Funding.

"**Funding**" as used above means the provision of money through the issuance of Certificates and does not mean or imply any further authorization of the City to make any Contract Payment other than Contract Payments in connection with any Additional Funding.

### *Payment Obligation*

The City agrees to make Contract Payments to the Service Corporation in return for the present and future services of the Service Corporation as and when Contract Payments become due and payable. The obligations of the City under the Service Contract, including its obligation to make Contract Payments, are contractual obligations of the City, enforceable in the same manner as any other contractual obligation of the City, and are not general obligations of the City to which the City has pledged its full faith and credit.

### *Funding Obligation*

The obligation of the Service Corporation to provide the Initial Funding or any Additional Funding is subject to the receipt by the Service Corporation of proceeds sufficient for the Funding from the sale of Certificates. The Service Corporation shall use its best efforts to cause the consummation of the offering and sale by the Underwriters of Certificates to provide sufficient proceeds for the particular Funding. For the Initial Funding, the Service Corporation shall cause a portion of the proceeds of the sale of Certificates in an amount equal to the Tender Amount to be irrevocably deposited on the Closing Date in the Tender Account, an escrow account held by the Contract Administrator and invested in US Governments, and cause a portion of the proceeds of the sale of Certificates in an amount equal to the Non-Tender Amount to be irrevocably deposited on the Closing Date in the Non-Tender Escrow Account, an escrow account held by the Contract Administrator and invested in US Governments, and shall apply the balance of such proceeds to pay costs of issuance of the Certificates and other Ancillary Amounts.

## Scheduled Payments

### *Scheduled Payments*

The City agrees to pay the Scheduled Payments of each Funding Rate Portion to the Service Corporation on the respective Scheduled Payment Dates for such Funding Rate Portion. (Scheduled Payments do not include Hedge Payables.)

### *Mandatory Prepayment by Sinking Fund Installments*

The City agrees to prepay Scheduled Payments of each Funding Rate Portion in specified amounts (**Sinking Fund Installments**) and on specified dates (**Sinking Fund Installment Dates**).

### *Optional Prepayment of Scheduled Payments*

The City shall not voluntarily prepay any Scheduled Payments of a Funding Rate Portion (an **Optional Prepayment**) in whole or in part except as expressly permitted in the Service Contract. The City shall exercise its option to make any Optional Prepayment by delivering a prior written **Prepayment Notice** at least 45 days (or fewer days as acceptable to the Service Corporation) before the Optional Prepayment Date on which the City shall pay the Total Prepayment Amount to the Service Corporation in connection with such Optional Prepayment, stating: (a) the Scheduled Payments of the particular Funding Rate Portion to be prepaid in whole or in part by such Optional Prepayment and the date on which such Scheduled Payments are to be prepaid (**Optional Prepayment Date**), subject to the following:

(1)  a Scheduled Payment may be selected by the City only if it is permitted by the Service Contract to be prepaid on the particular Optional Prepayment Date and

(2)  a Scheduled Payment may be selected by the City for partial prepayment only in an amount of at least $100,000 unless otherwise provided in the Service Contract;

(b) the amount of prepayment premium, if any, required by the Service Contract in connection with the prepayment of any selected Scheduled Payments (such prepayment premium, if any, together with the amount of Scheduled Payments selected to be prepaid, the **Optional Prepayment Amount**); (c) if an Optional

Prepayment Date is not a Service Charge Payment Date, the amount of Service Charges accrued on the amount of the Scheduled Payment to be prepaid from the last Service Charge Payment Date before the Optional Prepayment Date to the Optional Prepayment Date (**Accrued Service Charges**); (d) the Hedge Amount, if any, and (e) such information in tabular or other form so as to readily permit the Service Corporation to identify (i) the Scheduled Payments of the particular Funding Rate Portion selected for prepayment, (ii) the provisions of the Service Contract authorizing or permitting such prepayment, (iii) the prepayment premium, if any, required to be paid in connection with the prepayment of each such Scheduled Payment, (iv) Accrued Service Charges, if any due in connection with such prepayment, and (v) the Hedge Amount, if any, due in connection with such prepayment.

If a Hedge Amount would be due in connection with an Optional Prepayment, it is a condition precedent to the City giving an Optional Prepayment Notice that the City provide reasonable evidence satisfactory to the Service Corporation that such Hedge Amount will be paid when due and such prepayment will not cause the Service Corporation to be in default under any agreement to which it is a party in connection with the particular Funding.

The delivery by the City of a Prepayment Notice to the Service Corporation is a statement of the City's intention to pay the Total Principal Amount to the Corporation on the day before the Optional Prepayment Date stated therein (**Prepayment Receipt Day**). The City is prohibited from paying the Total Prepayment Amount to the Service Corporation on any day prior to the Prepayment Receipt Day. Its delivery of a Prepayment Notice does not obligate the City to pay the Total Prepayment Amount, and no default shall occur by its not paying the Total Prepayment Amount or by the Optional Prepayment not otherwise being effected on the Prepayment Receipt Date.

### *Satisfaction of Scheduled Payments by Delivery of Certificates*

The City may deliver or cause to be delivered Certificates to the Service Corporation in satisfaction (whether in whole or in part) of Scheduled Payments at any time and in any denomination upon 45 day's prior notice to the Service Corporation (or fewer days as acceptable to the Service Corporation) (a **Delivery Notice**) subject to the following limitations. A Scheduled Payment may be satisfied by delivery of Certificates entitled to payment from such Scheduled Payment (**Eligible Certificates**). The amount of a Scheduled Payment deemed paid shall be equal to the denominations of the particular Eligible Certificates.

No Certificate shall be delivered in payment in whole or in part of the respective Scheduled Payment (whether as payment of a Sinking Fund Installment or as other prepayment) more than 45 days before the respective due date if at the time of such delivery the City has not paid all Service Payments then and theretofore due. No Scheduled Payment shall be satisfied by the delivery of Certificates until such Certificates have been delivered to the Trustee.

If Sinking Fund Installments are to be satisfied (whether in whole or in part) by the delivery of Eligible Certificates, the City shall indicate in the respective Delivery Notice the particular Sinking Fund Installments and amounts thereof to be so satisfied. All Certificates so received by the Service Corporation in payment of Scheduled Payments shall be immediately delivered to the Trustee for cancellation.

**Service Charges**

### *Agreement to Pay Service Charges; Funding Costs*

The City agrees to pay Service Charges to the Service Corporation on Service Charge Payment Dates sufficient to pay the Funding Costs incurred by the 2006 Funding Trust for the particular Funding. (Service Charges do not include Hedge Payables.) Funding Costs shall be determined by the particular Funding Rate Methodology (fixed or variable). Funding Costs for a Variable Rate Funding Portion shall be periodically

determined in accordance with the Variable Rate Funding Methodology, and the corresponding periodic Service Charges shall be **Variable Rate Service Charges**.

### *Prepaid Service Charges; Hedge Receivables*

Prepaid Service Charges shall be used to meet the City's obligation to pay the first occurring Service Charges and Hedge Periodic Payables of the Service Corporation except as otherwise may be provided in the Service Contract Specific Terms. Hedge Receivables received by the Service Corporation shall be used to satisfy the City's obligation in respect of then existing Deficiencies or then current Service Charges not otherwise paid.

## Fixed Rate Funding Methodology

The provisions summarized under this heading constitute the **Fixed Rate Funding Methodology**. The particular Service Contract Specific Terms shall state the dates (**Fixed Rate Service Charge Payment Dates**) on which the Fixed Rate Service Charges are payable. The Fixed Service Charge Rates applicable to the Fixed Rate Funding Portion shall be set forth for the respective Scheduled Payments comprising the Fixed Rate Funding Portion (**Fixed Rate Scheduled Payments**). Fixed Service Charge Rates may be different for different Scheduled Payment Dates in the Fixed Rate Funding Portion.

Fixed Rate Service Charges shall be computed as if the Fixed Rate Scheduled Payments bore interest at the respective rates at which Fixed Rate Service Charges are determined and computed on the basis of a 360-day year consisting of twelve 30-day months. On each Fixed Rate Service Charge Payment Date, the City shall pay a Fixed Rate Service Charge equal to the Fixed Rate Service Charge accrued on the respective unpaid Fixed Rate Scheduled Payments from the later of the Closing Date or the last Fixed Rate Service Charge Payment Date on which Fixed Rate Service Charges were paid in full by the City.

## Variable Rate Funding Methodology

The provisions summarized under this heading constitute the **Variable Rate Funding Methodology**. The periodic Variable Rate Service Charge for each Scheduled Payment specified for a particular type of Service Charge Class in the Variable Rate Funding Portion (**Variable Rate Scheduled Payments**) shall be determined in accordance with the particular Variable Rate Funding Type. Each Service Contract Specific Terms shall provide for a procedure by which the Variable Rate Service Charges are determined for the particular Variable Rate Funding Type and shall further provide:

- **Variable Rate Service Charge Payment Dates**: the dates on which the Variable Rate Service Charges are payable for such Type;

- **Service Charge Determination Dates**: the dates on which the Variable Rate Service Charges of such Type are determined;

- **Service Charge Adjustment Dates**: the dates on which the Variable Rate Service Charges of such Type are adjusted; and

- **Day Count Convention**: the number of days in a month and in a year used to determine the amount of the Variable Rate Funding Service Charges of such Type.

Variable Rate Service Charges for each Variable Rate Funding Type in the Variable Rate Funding Portion shall be computed as if the Variable Rate Scheduled Payments of the particular Variable Rate Type bore interest at a rate (i) determined as of each Service Charge Determination Date for such Type and effective as of the respective Service Charge Adjustment Date for such Type and (ii) computed using the applicable Day Count Convention for such Type. On each Variable Rate Service Charge Payment Date for a particular Type the City shall pay a Variable Rate Service Charge equal to the applicable Variable Rate Funding Costs accrued

on the unpaid Variable Rate Funding Scheduled Payments of that Type from the later of the Closing Date or the last applicable Variable Rate Funding Service Charge Payment Date on which the Variable Rate Funding Service Charges of that Type were paid in full by the City.

**General Provisions Governing Service Payments**

### *City's Payment Times*

The City shall make all Service Payments other than Contract Administrator Payments by the Payment Time on the day before the date when due. The City shall make all Contract Administrator Payments on the date when due. The City shall pay the amount of any Hedge Payable to the Service Corporation promptly upon receipt of notice thereof from the Service Corporation; provided, that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

### *Subrogation*

No payment of any amount to a Certificateholder or a Hedge Counterparty made from an amount paid by an Insurer under its Credit Insurance (a **Credit Insurance Payment**) shall discharge the City's obligation to pay any Service Payment in respect of which such Credit Insurance Payment was paid (a **Related Service Payment**). An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders or a Hedge Counterparty, as the case may be, to receive the Related Service Payment and shall be entitled to exercise all rights that the Person to which it is the subrogee would have otherwise been entitled to exercise.

### *Investment*

The Service Corporation shall not invest any amounts received by it under the Service Contract except as summarized under this heading. **Invest** means the transfer, disposition or other use of such amounts in expectation of gain. **Investable Funds** (being amounts representing Costs of Issuance and Prepaid Service Charges) shall be invested by the Service Corporation in Authorized Investments that mature in the amounts and at the times the related Investable Funds are needed to make the payments for which such funds were received by the Service Corporation. Investments shall be made by Funding Rate Portion but may be commingled for investment purposes so long as records are kept showing each particular Funding Rate Portion and the gain and loss attributable to it. No Investment shall be sold prior to its maturity.

All Investments shall be made directly by the Service Corporation having exclusive "control" over the related "securities entitlement" (as such terms are defined in Article 8 of the applicable Uniform Commercial Code or correlative Treasury Regulations) except that Investments may also be made through one or more investment companies registered under the Investment Companies Act of 1940, as amended, if (i) such investment company has a rating by Standard & Poor's Corporation or any national statistical ratings organization (as defined by the Securities and Exchange Act of 1934, as amended, or any successor to it) at least equal to the rating of the Authorized Investment and (ii) such registered investment company invests only in debt instruments.

Gain and loss from Investments shall be attributed to the type of Investable Funds giving rise to it. Gain shall be paid to the City when realized to the extent it is not needed to satisfy any then existing Service Contract Deficiency or satisfy any then current Service Payment. The City is responsible for all such loss and shall reimburse the Service Corporation for such loss upon its demand.

### *Binding Obligation*

The Service Contract is a continuing obligation of the City and shall until the date on which all amounts due and owing thereunder are paid in full (a) be binding upon the City and its successors and (b) inure

to the benefit of and be enforceable by the Service Corporation, its successors and permitted assigns, and by Third Party Beneficiaries.

**Satisfaction of Service Payments**

*Service Payments*

**Service Payments** consist of the following components (each a separate **Component** or **Service Payment Component**):

- Contract Administrator Payments
- Service Charges (regardless of the Funding Rate Methodology)
- Regular Scheduled Payments
- Sinking Fund Installments
- amounts in respect of Hedge Periodic Payables
- amounts in respect of Hedge Termination Payables
- Optional Prepayments
- Accrued Service Charges

*Preservation of Parity among Service Contracts*

As used in the summary under this heading:

- **all Service Contracts** means the Service Contract and the Other Service Contract (referring always to the "2006 Service Contracts" and never to the "2005 Service Contracts," as those terms are defined in the forepart of this Offering Circular);

- **each Service Contract** means the Service Contract or the Other Service Contract as the context may require;

- **each Service Corporation** means the Service Corporation or the Other Service Corporation as the context may require;

- **the Other Service Contract** means the service contract between the City and the Other Service Corporation, certain payments under which Other Service Contract are part of the Trust Estate;

- **the Other Service Corporation** means the service corporation party to the Other Service Contract (*i.e.*, if "the Service Corporation" is the GRS Service Corporation, then "the Other Service Corporation" is the PFRS Service Corporation, and *vice versa*); and

- an amount is **about to become due** on the Business Day before its due date.

All Service Payments payable under a Service Contract shall be made and each Service Corporation shall be entitled to receive such payments on a *pro rata* basis with the Service Payments under the Other Service Contract so that each Service Contract Component having a specified priority (described below) is made on a *pro rata* basis with the Service Payment Components having the same defined term under the Other Service Contract, and no Service Payment Component shall be satisfied until all Service Payment Components under all Service Contracts having the same defined term but having a greater priority under each Service Contract are first satisfied in full.

Service Payments under all Service Contracts shall be satisfied in the following order and priority (the **Service Contract Priority Sections**):

**First:** Contract Administrator Payments; then

**Second:** all theretofore due and unpaid Service Charges (regardless of the Funding Rate Methodology) and amounts in respect of Hedge Periodic Payables; then

**Third:** all then due and about to become due Service Charges and amounts in respect of Hedge Periodic Payables; then

**Fourth:** all theretofore due and unpaid Regular Scheduled Payments and Sinking Fund Installments; then

**Fifth:** all then due or about to become due Regular Scheduled Payments and Sinking Fund Installments; then

**Sixth:** all theretofore due and unpaid amounts in respect of Hedge Termination Payables; then

**Seventh:** all then due and about to become due amounts in respect of Hedge Termination Payables; then

**Eighth:** all then due and about to become due Optional Prepayment Amounts and Accrued Service Charges.

## Acceleration on Bankruptcy

If the City shall (i) commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, (ii) consent to the institution of any such proceeding or the filing of any such petition or (iii) make a general assignment for the benefit of creditors, then all payments due under the Service Contract shall become immediately due and payable without presentment, demand, protest or notice of any kind.

## Termination or Assignment of Stated Hedges

At the request of the City and with the prior written consent of the Insurer that has Credit Insurance in respect of the particular Stated Hedge, the Service Corporation shall terminate any Stated Hedge or assign its interest in any Stated Hedge to a Person that agrees to perform and observe all of the duties and obligations of the Hedge Counterparty to such Stated Hedge. Any such substitute Hedge Counterparty shall have at least the rating required by Act 34 of the Michigan Public Acts of 2001, as amended, as if the City were a party to the particular Stated Hedge. No such termination or substitution of a Hedge Counterparty shall take effect unless each Rating Agency that at the time has a rating of the Certificates in effect confirms its rating of the particular Certificates.

## Required Ratings of Hedge Counterparties

The Service Corporation shall only enter into Hedges with Persons who have, on the date the Hedge is entered into, or whose Hedge obligations are guaranteed by a Person who has on that date, a rating of its long-term, senior secured debt at least "A-" by Standard & Poor's Corporation and at least "A3" by Moody's Investors Service.

## Amendment of the Service Contract

The Service Contract may be amended only by written instrument signed by the parties thereto except that no amendment shall be valid: (a) if such amendment diminishes the rights and remedies of any Third Party Beneficiary without the prior written consent of such Third Party Beneficiary; (b) unless the Trustee of the 2006 Funding Trust that is a transferee of or successor to any rights or entitlements under the Service Contract and that received an opinion of counsel in connection with the organization of the 2006 Funding Trust to the effect that the 2006 Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, shall have received an opinion reasonably

13-53846-tjt   Doc 3153-5   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 49 of 65

acceptable in form and substance to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment shall not result in the 2006 Funding Trust being treated as other than such a grantor trust; (c) unless the Trustee has received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such amendment shall not result in the Funding Trust Receivables failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes; and (d) unless every Insurer who is not in default under its Credit Insurance at the time has consented to the amendment.

### Expenses Payable by the City and the Service Corporation

The City shall pay such periodic amounts as may be necessary to provide for the general administrative expenses of the Service Corporation as authorized or permitted by the Act of Council, as and when they become due. The Service Corporation shall pay compensation due the Trustee in accordance with the Trust Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent thereunder or any amendment thereof, or in connection with the enforcement thereof. The Service Corporation also shall pay compensation, expenses and indemnification due the Contract Administrator and due the Enforcement Officer, if any, in accordance with the Contract Administration Agreement, including reasonable fees and expenses of counsel, in connection with any waiver or consent under the Service Contract or any amendment of the Contract Administration Agreement or of the Service Contract, or in connection with the enforcement of the Service Contract.

### Permitted Assignment.

The Service Contract shall be binding upon the parties thereto and their respective successors and permitted assigns. No assignment by either party of its interests therein shall be valid except as follows. The Service Corporation may transfer the Scheduled Payments and Service Charges to the 2006 Funding Trust in accordance with the Service Contract. No assignment of the Service Contract or any amounts receivable thereunder shall include the right to receive Additional Service Payments, Contract Administrator Payments or Hedge Payables, except that the Service Corporation may assign or grant a security interest in amounts received by it as payment of amounts in respect of Hedge Payables to the Hedge Counterparties.

### Third Party Beneficiaries

The Persons, including the Trustee and the Contract Administrator, originally entitled to Additional Service Payments or Contract Administrator Payments and their respective successors are third party beneficiaries of the Service Contract as to the City's promises to pay Additional Service Payments or Contract Administrator Payments to them. Hedge Counterparties, and their respective successors and subrogees, are third party beneficiaries of the Service Contract as to the City's promises to pay amounts in respect of Hedge Payables to the Service Corporation. Insurers are third party beneficiaries of the Service Contract. The 2006 Funding Trust is a third party beneficiary of the Corporation's promises in respect of Service Charges and Scheduled Payments. Third Party Beneficiaries have the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them.

## SUMMARY OF CERTAIN PROVISIONS OF
## THE CONTRACT ADMINISTRATION AGREEMENT

**Application of Tender Account**

The Contract Administrator shall pay the moneys held in the Tender Account to the Service Corporation's tender agent for the purchase of the tendered Series 2005-B COPs being purchased by the Service Corporation, in such amounts and at such times as necessary for the tender agent to pay the purchase price for such purchased Series 2005-B COPs to the sellers entitled thereto, and all such purchased Series 2005-B COPs shall be delivered to the 2005 Trustee for cancellation.

**Notice of Redemption of Certain Series 2005-A COPs; Application of Non-Tender Escrow Account**

On the Closing Date, on behalf of the Service Corporation, the Contract Administrator shall direct the 2005 Trustee to give notice to the registered holders of the Series 2005-A COPs to be optionally redeemed from proceeds of the Certificates of the call for redemption of such Series 2005-A COPs. The Contract Administrator shall pay the moneys held in the Non-Tender Escrow Account to the contract administrator for the Series 2005-A COPs in such amounts and at such times as necessary for such contract administrator to effectuate the optional redemption of such Series 2005-A COPs in accordance with their terms.

**Collection of Receivables**

Each of the Service Corporations, the Specified Hedge Counterparties and the 2006 Funding Trust appoints the Contract Administrator as its respective agent and attorney-in-fact to receive Service Payments.

**Appointment by 2006 Funding Trust**

The 2006 Funding Trust appoints the Contract Administrator as its agent and attorney-in-fact to take such actions and exercise such rights and remedies as to Funding Trust Receivables as the 2006 Funding Trust is or may become entitled to exercise under law and in equity to enforce the payment thereof and otherwise realize Funding Trust Receivables.

**Appointment by Each Service Corporation**

Each Service Corporation appoints the Contract Administrator as its agent and attorney-in-fact to enforce such Service Corporation's rights and remedies under the Stated Hedges, including the collection of Hedge Receivables from the Specified Hedge Counterparties under the respective Stated Hedges, and to take all such actions and exercise such rights and remedies as the respective Service Corporation is or may become entitled to exercise under the particular Stated Hedge and otherwise at law or in equity. Each Service Corporation further appoints the Contract Administrator to invest amounts received by the Contract Administrator as Costs of Issuance and Prepaid Service Charges in Authorized Investments in accordance with the Service Contract.

**Distributions of Service Payments**

On each Distribution Date, the Contract Administrator shall distribute the amount of the Service Payment Components satisfied since the last such Distribution Date to the respective Entitled Persons. If the Entitled Person is the 2006 Funding Trust, the amounts of satisfied Components shall be distributed to the 2006 Funding Trust to be applied in accordance with the Trust Agreement.

As used in this Appendix:

- references to "clause **Second**," "clause **Third**," "clause **Fourth**," "clause **Fifth**" or "clause **Eighth**" mean those particular clauses set forth in the Service Contract Priority Sections (see "SUMMARY OF CERTAIN PROVISIONS OF THE SERVICE CONTRACTS - Satisfaction of Service Payments - *Preservation of Parity among Service Contracts*" above in this Appendix);

A-12

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges and Accrued Service Charges described in clause **Second** shall be identified to the Trustee as ***Deficit Interest Related Payments***;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments described in clause **Fourth** shall be identified to the Trustee as ***Deficit Principal Related Payments***;

- amounts distributed to the Trustee representing satisfied Components constituting Sinking Fund Installments described in clause **Fourth** shall be identified to the Trustee as ***Deficit Principal Related Payments***;

- amounts distributed to the Trustee representing satisfied Components constituting Service Charges described in clause **Third** shall be identified to the Trustee as ***Interest Related Payments***;

- amounts distributed to the Trustee representing satisfied Components constituting Regular Scheduled Payments and Sinking Fund Installments described in clause **Fifth** shall be identified to the Trustee as, respectively, ***Principal Related Payments*** and ***Sinking Fund Related Payments***; and

- amounts distributed to the Trustee representing satisfied Components constituting Optional Prepayment Amounts and Accrued Service Charges described in clause **Eighth** shall be identified to the Trustee as ***Redemption Related Payments***.

If the Entitled Persons are the Specified Hedge Counterparties, the amounts of satisfied Components constituting amounts in respect of Hedge Payables shall be paid to the Specified Hedge Counterparties to whom such amounts are owing in proportion to the amounts owed to each under the respective Stated Hedges. If distributions are to be made on the same Distribution Date for two or more different priorities of Components (pursuant to clauses **First** through **Eighth**), no distribution shall be made in respect of a lower priority to the extent that each of the higher priorities is not satisfied in full.

## Service Corporation Covenants

Each Service Corporation covenants with the Contract Administrator, the 2006 Funding Trust, the Specified Hedge Counterparties and the Other Corporation as follows:

(a) The Service Corporation shall not convey, transfer or assign Funding Trust Receivables under its Service Contract or any interest therein to any Person other than the 2006 Funding Trust as provided in the Trust Agreement;

(b) the Service Corporation shall not convey, transfer or assign Hedge Payables under its Service Contract or any interest therein to any Person other than the Specified Hedge Counterparties as provided in the Contract Administration Agreement; and

(c) the Service Corporation shall not convey, transfer or assign any Stated Hedge or any interest therein to any Person other than as provided in the Service Contract.

## Events of Default; Remedies

It will be an "Event of Default" under the Contract Administration Agreement if the City: (a) fails to pay any 2006 Funding Trust Receivable as and when the same shall become due, (b) commences any proceeding or files any petition seeking relief under Title 11 of the United States Code, (c) consents to the institution of any such proceeding or the filing of any such petition or (d) makes a general assignment for the benefit of creditors.

Upon the occurrence and during the continuance of an Event of Default, the Contract Administrator may and shall, at the request of the Certificateholders representing either (i) 25% in principal amount of

Outstanding Certificates, the payments on which have not been made as a result of such Event of Default (**Affected Certificates**), or (ii) at least 50% in principal amount of all Outstanding Certificates, enforce the Service Contract under which the Event of Default occurred by such remedies as are available to the Contract Administrator. Any money collected or received by the Contract Administrator from pursuing such remedies shall be applied in the order of the Service Contract Priority Sections, subject to any Creditor Lien.

### No Duty of Inquiry

The Contract Administrator has no duty to inquire into the performance by a Service Corporation of its obligations under its Service Contract, but if the Contract Administrator receives notice (a **Default Notice**) from Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates, specifying the failure of the City to pay Funding Trust Receivables, then the Contract Administrator shall give notice of such failure to the City and demand that such failure be remedied. Upon receipt of any Default Notice, the Contract Administrator shall give notice to all Certificateholders and the Specified Hedge Counterparties that did not join in such Default Notice.

### Notice of Defaults

Promptly upon obtaining actual knowledge of the occurrence of any Event of Default, the Contract Administrator shall give written notice of such Event of Default by mail to all Certificateholders, Specified Hedge Counterparties and Rating Agencies unless such Event of Default has been cured or waived.

Any Insurer who is not then in default under its Credit Insurance shall be entitled to receive all notices in respect of Certificates insured by it, and no notices under the prior paragraph shall be sent to the Holders of such Certificates.

### Limitation on Suits by Certificateholders

No Certificateholder shall have any right to institute any proceeding, judicial or otherwise, under or with respect to the Service Contract unless:

(a) such Holder has previously given written notice to the Contract Administrator of an Event of Default that is then continuing;

(b) the Holders of either (i) at least 25% in principal amount of the Outstanding Affected Certificates or (ii) at least 50% in principal amount of all Outstanding Certificates have made written request to the Contract Administrator to institute proceedings in respect of such Event of Default in its own name as Contract Administrator;

(c) such Holder or Holders have offered to the Contract Administrator satisfactory indemnity against the costs, expenses and liabilities to be incurred in compliance with such request;

(d) the Contract Administrator for 30 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding; and

(e) in the case of a written request from the Holders of at least 25% in principal amount of the Outstanding Affected Certificates, no direction inconsistent with such written request has been given to the Contract Administrator during such 30-day period by the Holders of a greater percentage in principal amount of the Outstanding Affected Certificates;

it being understood and intended that no one or more Holders of Certificates shall have any right in any manner to affect, disturb or prejudice the interest of the parties to the Contract Administration Agreement or the rights of any other Certificateholders, or to obtain or to seek to obtain priority or preference over any other Certificateholders or to enforce any right under any Service Contract, except in the manner therein provided and for the equal and ratable benefit of all Entitled Persons.

## Control by Majority

The Holders of a majority in principal amount of the Outstanding Certificates have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator to exercise any power exercisable by the Contract Administrator, provided that such direction is not in conflict with any rule of law or the Contract Administration Agreement.

Any Insurer not then in default under its Credit Insurance shall be treated as the Holder of Outstanding Certificates equal to the principal amount of Certificates insured by it for the purposes of actions thus permitted to be taken by Certificateholders and for the purpose of giving all other consents, directions and waivers that Certificateholders may give.

## Actions by Beneficial Owners

For the purpose of providing any consent, waiver or instruction to the Contract Administrator, the terms **Holder** and **Certificateholder** include a Person who provides the Contract Administrator an affidavit of beneficial ownership of a Certificate together with satisfactory indemnity against any loss, liability or expense to the Contract Administrator to the extent that it acts on the affidavit of beneficial ownership (including any consent, waiver or instruction given by a Person providing such affidavit and indemnity). The principal amount of Outstanding Certificates owned by a Beneficial Owner satisfying the preceding sentence shall be deemed held by such Beneficial Owner and not held by Certificateholders for the purposes of providing any consent, waiver or instruction to the Contract Administrator.

## Concerning the Contract Administrator

The Contract Administrator undertakes to perform such duties and only such duties as are specifically set forth in the Contract Administration Agreement, and no implied covenants or obligations shall be read into that Agreement against the Contract Administrator. In the absence of bad faith on its part, the Contract Administrator may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Contract Administrator and conforming to the requirements of the Contract Administration Agreement or the Service Contract; but in the case of any such certificates, documents, other instruments or opinions which by any provision thereof are specifically required to be furnished to the Contract Administrator, the Contract Administrator is under a duty to examine the same to determine whether or not they conform to the requirements of the Contract Administration Agreement.

If an Event of Default occurs and is continuing, the Contract Administrator shall exercise such of the rights and powers in respect of Funding Trust Receivables and use the same degree of care and skill in their exercise as a prudent corporate trustee would exercise or use under the circumstances.

No provision of the Contract Administration Agreement shall be construed to relieve the Contract Administrator from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that: (a) the Contract Administrator shall not be liable for any error of judgment made in good faith by an authorized officer of the Contract Administrator, unless it is proved that the Contract Administrator was negligent in ascertaining the pertinent facts; (b) the Contract Administrator shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in Outstanding principal amount of the Certificates relating to the time, method and place of conducting any proceeding for any remedy available to the Contract Administrator, or exercising any trust or power conferred upon the Contract Administrator, by or under the Contract Administration Agreement; and (c) no provision of the Contract Administration Agreement shall require the Contract Administrator to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

The Contract Administrator may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, or other document believed by it to be genuine and to have been signed or presented by the proper party or parties. The Contract Administrator may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Contract Administrator in good faith and in reliance thereon.

The Contract Administrator is under no obligation to exercise any of the rights or powers vested in it by the Contract Administration Agreement at the request or direction of any of the Certificateholders pursuant to that Agreement, unless such Certificateholders shall have offered to the Contract Administrator reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

**Compensation and Reimbursement**

The Contract Administrator is entitled to payment or reimbursement from time to time for reasonable compensation for all services rendered by it under the Contract Administration Agreement. The Contract Administrator is also entitled to indemnification for, and to be held harmless against, any loss, liability or expense incurred without negligence, willful misconduct or bad faith on its part, arising out of or in connection with the acceptance or administration of that Agreement or the exercise of it powers thereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties thereunder. The compensation of the Contract Administrator shall constitute Contract Administrator Payments, a Component of Service Payments under the Service Contracts.

The Contract Administrator shall not have any lien on any funds held by it under the Contract Administration Agreement.

**Enforcement of Rights**

Every provision of the Contract Administration Agreement relating to the enforcement of rights and remedies by any of the parties thereto is subject to particular provisions in the Contract Administration Agreement that would apply if, but only if, all Insurers are then in default under their respective Credit Insurance.

**Third Party Beneficiaries**

The covenants of each Service Corporation made in the Contract Administration Agreement are also made for the benefit of each of the Third Party Beneficiaries, each of whom may enforce the same as if it were a party thereto.

## SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT

The Trust Agreement is comprised of two documents, called the General Terms (dated as of May 1, 2005) and the Specific Terms (dated the Closing Date), which operate together as if they were combined in a single document. The parties to the Trust Agreement are the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (each a **Service Corporation**), severally and not jointly, and U.S. Bank National Association, as Trustee (in such capacity, the **Trustee**). The Trust Agreement establishes the Detroit Retirement Systems Funding Trust 2006 (the *2006 Funding Trust*) for the purpose of funding the optional redemption of certain Series 2005-A COPs and the purchase and cancellation of certain tendered Series 2005-B COPs.

**Conveyance of Funding Trust Receivables; Grant of Security Interest**

Effective the Closing Date, each Service Corporation transfers, assigns and conveys to the 2006 Funding Trust all of its right, title and interest in and to the Funding Trust Receivables under its respective Service Contract, all monies due or to become due with respect thereto and all proceeds of such Funding Trust

A-16

Receivables. Each Service Corporation intends that such sale, assignment and conveyance be an absolute transfer of such property for all purposes. However, to preserve rights if such sale, assignment and conveyance is deemed a pledge of such property, each Service Corporation also grants a security interest in such property to the 2006 Funding Trust for the benefit of the Certificateholders.

The Trust Estate consists of the Funding Trust Receivables arising under the GRS Service Contract, the Funding Trust Receivables arising under the PFRS Service Contract, and all proceeds of the foregoing.

**Contract Administration Agreement**

The Trustee is directed in the Trust Agreement to enter into the Contract Administration Agreement in the name and on behalf of the 2006 Funding Trust. See "Summary of Certain Provisions of the Contract Administration Agreement" in this APPENDIX A.

**No City Indebtedness**

The 2006 Funding Trust and the Funding Trust Receivables paid to the 2006 Funding Trust do not constitute or create any indebtedness of the City within the meaning of the limitation of The Home Rule City Act or any Michigan constitutional or other non-tax statutory or City charter limitation.

**Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers**

Except to the extent otherwise provided in the Trust Agreement, each Service Corporation has entered into the Trust Agreement, the Certificates will be issued and the 2006 Funding Trust will acquire the Funding Trust Receivables, with the intention that for federal, state and local income, business, franchise and modified value added tax purposes: (a) the 2006 Funding Trust will qualify as a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended; (b) each Beneficial Owner of Certificates will be treated as the owner of an undivided *pro rata* interest in the portion of the Trust Estate attributable to such Beneficial Owner's Certificates; and (c) the Funding Trust Receivables constitute payments in respect of indebtedness. In furtherance of such intention, except to the extent otherwise provided in the Trust Agreement, the Trustee shall not have the power to vary the investment of the Beneficial Owners of the Certificates within the meaning of U.S. Treasury regulations §301.7701-4(c) or to engage in any business unless the Trustee shall have received an opinion in form and substance reasonably satisfactory to the Trustee of counsel reasonably acceptable to the Trustee to the effect that such activity will not cause the 2006 Funding Trust to fail to be treated as such a grantor trust.

Each Service Corporation and the Trustee by entering into the Trust Agreement and each Certificateholder by its acceptance of its Certificate agrees to treat the 2006 Funding Trust, the Certificates and the Funding Trust Receivables in accordance with the intention expressed in the preceding paragraph (or any alternative intention expressed in the Trust Agreement) for federal, state and local income, business, franchise and modified value added tax purposes.

**Authentication and Delivery of Certificates by Trustee; Disposition of Certificate Proceeds**

The 2006 Funding Trust shall issue Certificates as fully registered securities in the form prescribed by the Trust Agreement. The Trustee shall authenticate and deliver the Certificates in accordance with a written order of each Service Corporation stating the amount of Certificate proceeds to be received by the Trustee in respect of that Service Corporation and providing for the disposition of such proceeds as provided in its Service Contract (in major part into the Tender Account for application to purchase tendered Series 2005-B COPs and into the Non-Tender Escrow Account for application to optionally redeem certain Series 2005-A COPs). The Certificates evidence the entire beneficial interest in the Trust Estate.

13-53846-tjt    Doc 3153-5    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 56 of 65

**Payment of Interest on Certificates**

Interest payable on any Certificate and paid on an Interest Payment Date shall be paid to the Person in whose name that Certificate (or a Predecessor Certificate) is registered at the close of business on the Regular Record Date for such Series.

Interest payable on any Certificate and not paid on an Interest Payment Date when due shall be not be paid to the registered Holder on the relevant Regular Record Date by virtue of being such Holder, but rather shall be payable as a Deficit Interest Related Payment to the Person in whose name such Certificate (or a Predecessor Certificate) is registered at the close of business on a Special Record Date for the payment of such Deficit Interest Related Payment.

If an amount is payable as all or part of a Deficit Interest Related Payment received by the Trustee, the Trustee shall establish a day for the payment of such amount to Certificateholders not less than 10 days after its receipt of such amount and establish a Special Record Date which shall be not more than 15 nor fewer than 10 days before the date set for payment of such amount. The Trustee shall mail notice of a Special Record Date to the Certificateholders at least 10 days before such Special Record Date.

Subject to the foregoing three paragraphs, each Certificate delivered under the Trust Agreement upon transfer of, in exchange for or in lieu of any other Certificate shall carry all the rights to Interest accrued and unpaid, and to accrue, which were carried by such other Certificate.

**Registration, Exchanges and Transfers**

The Trustee shall keep at its designated corporate trust office a register for the registration of Certificates and for the registration of transfers of Certificates, subject to such reasonable regulations as the Trustee may prescribe. Upon surrender of any Certificate for transfer of the registration thereof, the Trustee shall authenticate and register in the name of the designated transferee(s) one or more new Certificates of the same tenor in any Authorized Denomination in like aggregate principal amount.

At the option of the Holder, Certificates may be exchanged for other Certificates of the same tenor in any Authorized Denomination in like aggregate principal amount, upon surrender of the Certificates to be exchanged at the designated corporate trust office of the Trustee. Whenever any Certificates are surrendered for exchange, the Trustee shall authenticate and deliver the Certificates that the Certificateholder making the exchange is entitled to receive.

All Certificates issued upon any transfer of registration or exchange of Certificates shall constitute valid evidences of beneficial interests in the Trust Estate evidencing the same beneficial interests and entitled to the same benefits under the Trust Agreement as the Certificates surrendered in such transfer or exchange.

No service charge may be made for any transfer of registration or exchange of Certificates, but the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect such transfer or exchange. The Trustee may make the payment of such tax, fee or other governmental charge and the cost of preparing each new Certificate delivered in such transfer or exchange a condition precedent to making any transfer of registration or exchange of any Certificate, to be paid by the Person requesting such transfer or exchange, unless otherwise provided in the Trust Agreement.

The Trustee shall not be required (a) to transfer or exchange any Certificate during a period beginning at the opening of business 15 days before the day of the mailing of a notice of redemption of such Certificate and ending at the close of business on the day of such mailing, or (b) to transfer or exchange any Certificate selected for redemption in whole or in part, during a period beginning at the opening of business on any Regular Record Date for such Certificates and ending at the close of business on the relevant Interest Payment Date therefor.

**Persons Deemed Owners**

The Trustee may treat the Person in whose name any Certificate is registered as the owner of such Certificate, whether payments with respect to such Certificate shall be overdue or not, for the purpose of receiving payment of the principal thereof, premium, if any, and (except as otherwise provided in the Trust Agreement) Interest thereon and for all other purposes whatsoever.

**Book-Entry Certificates; Securities Depository**

While Certificates are registered in the name of a Securities Depository or its nominee, the Trustee shall not have any responsibility or obligation to any Participant or to any Beneficial Owner with respect to: (a) the accuracy of the records of the Securities Depository, its nominee or any Participant with respect to any ownership Interest in the Certificates; (b) the delivery to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository of any notice with respect to the Certificates, including any notice of redemption; or (c) the payment to any Participant, any Beneficial Owner or any other Person, other than the Securities Depository of any amount with respect to the principal of or premium, if any, or Interest on the Certificates.

The Trustee shall pay all principal (and premium, if any) of and Interest on such Certificates only to or upon the order of the Securities Depository, and all such payments shall be valid and effective fully to satisfy and discharge the 2006 Funding Trust's obligations with respect to the principal (and premium, if any) of, and Interest on such Certificates to the extent of the sum or sums so paid.

Upon discontinuance of the use of the Book-Entry Only System maintained by the Securities Depository and upon receipt of notice from the Securities Depository containing sufficient information, the Trustee shall authenticate and deliver Certificates in certificated form to Beneficial Owners in exchange for the beneficial interests of such Beneficial Owners in corresponding principal amounts and in any Authorized Denomination.

Notwithstanding anything to the contrary in the Trust Agreement, so long as any Certificate is registered in the name of the Securities Depository or its nominee: (a) all payments with respect to the Principal and Interest on such Certificate and all notices of redemption and otherwise with respect to such Certificate shall be made and given, respectively, to the Securities Depository as provided in the representation letter with respect to such Certificates; (b) if less than all such Certificates of a maturity and series are to be redeemed *pro rata*, then the particular Certificates or portions of Certificates of such maturity and series to be redeemed shall be so determined by the Securities Depository; and (c) all payments with respect to Principal of such Certificate and premium, if any, and Interest on such Certificate shall be made in such manner as shall be prescribed by the Securities Depository.

**Redemption of Certificates**

*Selection of Certificates to be Redeemed*

Whenever any Certificates of a series are to be redeemed, the Trustee shall select the maturity or maturities that correspond to the prepaid Scheduled Payments giving rise to such redemption. Whenever Certificates of less than all of a maturity are to be redeemed, the Trustee shall select the particular Certificates to be redeemed from the Outstanding Certificates of such maturity and series that have not previously been called for redemption in such manner as results in *pro rata* redemption among all Holders of Certificates of the maturity being redeemed. All Certificates of the same series and having the same maturity shall constitute a class for purposes of *pro rata* redemption. The Trustee shall select Certificates for redemption *pro rata* within each class. In the case of any maturity of Certificates for which Sinking Fund Installments have been established, any optional redemption of such Certificates shall be credited among such Sinking Fund Installments *pro rata* in accordance with the unpaid amounts thereof.

13-53846-tjt    Doc 3153-5    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 58 of 65

## Notice of Redemption

When any Certificates are to be redeemed, notice of any such redemption shall be given by the Trustee by first class mail, no fewer than 30 days and no more than 45 days before the Redemption Date to each Holder of Certificates to be redeemed at his/her last address in the Registry. All notices of redemption shall be dated and shall state: (a) the Redemption Date; (b) the Redemption Price; (c) if less than all Outstanding Certificates are to be redeemed, the identification number, maturity dates and, in the case of a partial redemption of Certificates, the respective principal amounts of the Certificates to be redeemed; (d) that on the Redemption Date the Redemption Price will become due and payable upon each such Certificate or portion thereof called for redemption, and that interest thereon shall cease to accrue from and after said date; (e) the place where the Certificates to be redeemed are to be surrendered for payment of the Redemption Price, which place of payment shall be the designated corporate trust office of the Trustee or other Paying Agent; and (f) the proposed redemption (except in the case of a redemption from Sinking Fund Installments) is conditioned on the Trustee having received a Redemption Related Payment on the Prepayment Receipt Day sufficient to pay the full Redemption Price of the Certificates to be redeemed.

The failure of the Holder of any Certificate to receive notice of redemption given as provided above, or any defect therein, shall not affect the sufficiency of the proceedings for the redemption of any Certificates as to which no failure or deficiency occurred.

The Trustee shall provide additional notice that provides material compliance with Securities Exchange Act Release No. 34-23856 (Dec. 3, 1985) as the same may be amended or supplemented from time to time by the Securities and Exchange Commission or by generally accepted practice of corporate trustees. No failure to give such additional notice or defect therein or in the manner in which given shall affect the sufficiency of the proceedings for the redemption of any Certificates.

## Certificates Payable on Redemption Date

Notice of redemption having been given as aforesaid, the Holders of the Certificates so to be redeemed shall be entitled, on the Redemption Date, to payment of an amount equal to the Redemption Price therein specified and from and after such date (unless the full amount of the Redemption Price is not distributed) the Holders of such Certificates shall cease to be entitled to any further payment in respect of Interest. Upon surrender of any such Certificate for redemption in accordance with said notice, the Holder of such Certificate shall be paid by the Trustee an amount equal to the Redemption Price. Installments of Interest with a due date on or prior to the Redemption Date shall be payable to the Holders of the Certificates as of the relevant Record Dates.

If any Certificate called for redemption shall not be so paid upon surrender thereof for redemption, the principal (and premium, if any) shall, until paid, bear Interest from the Redemption Date at the rate prescribed in the Certificate.

## Certificates Redeemed in Part

Any Certificate which is to be redeemed only in part may, at the option of the Holder: (a) be presented for notation thereon by the Trustee of the payment as of the Redemption Date of the redeemed portion of the principal thereof; or (b) be surrendered at the place of payment therefor (with, if the Trustee so requires, due endorsement by, or a written instrument of transfer in form satisfactory to the Trustee duly executed by, the Holder or his attorney or legal representative duly authorized in writing), and the Trustee shall authenticate and deliver to such Holder, without service charge, a new Certificate or Certificates of the same maturity and series of any Authorized Denomination or Authorized Denominations as requested by such Holder in aggregate principal amount equal to and in exchange for the unredeemed portion of the principal of the Certificate so surrendered.

**Payments to Certificateholders**

*Deficiency Payments*

On the day the Trustee receives a <u>Deficit Interest Related Payment</u> from the Contract Administrator, the Trustee shall establish a Special Record Date and pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests. On the day the Trustee receives a Deficiency Payment, other than a Deficit Interest Related Payment, from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled thereto in accordance with their respective Percentage Interests.

*Other Payments*

On each <u>Interest Payment Date</u> for which the Trustee has received an Interest Related Payment from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Interest by the terms of their Certificates as of the Regular Record Date in accordance with their relative Percentage Interests. On each <u>Principal Payment Date</u> for which the Trustee has received a Principal Related Payment from the Contract Administrator, the Trustee shall pay the same to the Certificateholders entitled to such Principal Related Payment by the terms of their Certificates in accordance with their relative Percentage Interests. On each <u>Sinking Fund Installment Date</u> for which the Trustee has received a Sinking Fund Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Sinking Fund Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

On each <u>Redemption Date</u> that is also an Interest Payment Date for which the Trustee has received a Redemption Related Payment from the Contract Administrator, the Trustee shall pay the same to Holders of Outstanding Certificates entitled to such Redemption Related Payment by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed. On each <u>Redemption Date</u> that is not also an Interest Payment Date for which the Trustee has received a Redemption Related Payment that includes associated Accrued Service Charges from the Contract Administrator, the Trustee shall pay the same to the Holders of Outstanding Certificates entitled to such Redemption Related Payment and Accrued Service Charges by reason of the redemption of their Certificates in accordance with their relative Percentage Interests of Certificates being redeemed.

**The Trustee**

*Certain Duties and Responsibilities*

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Trust Agreement, and no implied covenants or obligations shall be read into the Trust Agreement against the Trustee. In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates, documents, other instruments or opinions furnished to the Trustee and conforming to the requirements of the Trust Agreement or the Service Contract; but in the case of any such certificates, documents, other instruments or opinions which by any provision thereof or of the Trust Agreement are specifically required to be furnished to the Trustee, the Trustee is under a duty to examine the same to determine whether or not they conform to the requirements of the Trust Agreement.

No provision of the Trust Agreement or the Service Contract shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that (a) the Trustee shall not be liable for any error of judgment made in good faith by an authorized officer of the Trustee, *unless* it is proved that the Trustee was negligent in ascertaining the pertinent facts; (b) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Holders of a majority in principal amount of the Outstanding Certificates

relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under the Trust Agreement or the Service Contract; and (c) no provision of the Trust Agreement shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties thereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

### *Certain Rights of Trustee*

The Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, opinion, notice, request, consent, order, or other document believed by it to be genuine and to have been signed or presented by the proper parties. Whenever in the administration of the Trust Agreement the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action under the Trust Agreement, the Trustee (unless other evidence is specifically prescribed) may, in the absence of bad faith on its part, rely upon a certificate of the Contract Administrator. The Trustee may consult with counsel, and the written advice of such counsel is full and complete authorization and protection in respect of any action taken, suffered or omitted by the Trustee thereunder in good faith and in reliance thereon.

The Trustee is under no obligation to exercise any of the rights or powers vested in it by the Trust Agreement at the request or direction of any of the Certificateholders pursuant to the Trust Agreement, unless such Certificateholders shall have offered to the Trustee reasonable security or indemnity against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction.

The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, opinion, notice, request, consent, order, or other document, but the Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit. The Trustee may execute any of its trusts or powers or perform any of its duties either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it.

The Trustee shall not have any lien on any funds held by it under the Trust Agreement.

### *Not Responsible for Recitals or Issuance of Certificates*

The Trustee assumes no responsibility for the correctness of the recitals contained in the Trust Agreement, in a Service Contract or in the Certificates except the certificate of authentication on the Certificates. The Trustee makes no representations as to the value or condition of the Trust Estate or any part thereof, or as to the title thereto or as to the security afforded thereby, or as to the validity or sufficiency of the Trust Agreement or of the Certificates.

### *Corporate Trustee Required; Eligibility*

There shall at all times be a Trustee under the Trust Agreement which is a trust company or bank with trust powers organized under the laws of the United States of America or of any state of the United States with a combined capital and surplus of at least $50,000,000. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of such supervising or examining authority, then the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. The Trustee shall resign immediately in the manner and with the effect specified in the Trust Agreement if it becomes ineligible under this paragraph.

### Replacement of Trustee

No resignation or removal of the Trustee and no appointment of a successor Trustee shall be effective until the successor Trustee accepts its appointment. The Trustee may resign at any time, but such resignation shall become effective only in accordance with the preceding sentence. The Holders of a majority in principal amount of Outstanding Certificates may remove the Trustee by so notifying the Trustee and any Insurer. If the Trustee becomes ineligible, any Certificateholder may petition a court of competent jurisdiction for the appointment of a successor. The retiring Trustee or the Service Corporations may appoint a successor at any time prior to the date on which a successor Trustee takes office. If a successor Trustee does not take office within 45 days after the retiring Trustee resigns or is removed, any Certificateholder may petition a court of competent jurisdiction for the appointment of a successor Trustee. Within one year after a successor Trustee appointed by the Service Corporations or a court of competent jurisdiction takes office, the Holders of a majority in principal amount of Outstanding Certificates may appoint a successor Trustee to replace such successor Trustee.

### Acceptance of Appointment

A successor Trustee shall deliver written acceptance of its appointment to the retiring Trustee and to each Service Corporation. Thereupon the resignation or removal of the retiring Trustee shall be effective, and the successor Trustee shall have all the rights, powers and duties of the Trustee under the Trust Agreement. The successor Trustee shall mail a notice of its succession to the Certificateholders. Upon the appointment of a successor Trustee becoming effective, the retiring Trustee shall promptly transfer all property held by it as Trustee to the successor Trustee.

### Merger, Consolidation and Succession to Business

If the Trustee consolidates, merges or converts into, or transfers all or substantially all its corporate trust business to, another corporation, the successor corporation without any further act shall be the successor Trustee if such successor corporation is eligible under the Trust Agreement. The successor Trustee may adopt the authentication of Certificates authenticated by the predecessor Trustee and deliver such Certificates with the same effect as if the successor Trustee had authenticated such Certificates.

### ERISA

The Trustee acknowledges and agrees that, in the event that assets of the 2006 Funding Trust are deemed to be plan assets of a Certificateholder that is an employee benefit plan subject to Title I of ERISA (an *ERISA Plan*), the Trustee is a fiduciary to such ERISA Plan with respect to such ERISA Plan's undivided interests in the Trust Estate, and the Trust Agreement shall be deemed to be the management agreement between the Trustee and such ERISA Plan.

## Supplemental Trust Agreements

### Supplemental Trust Agreements without Consent of Certificateholders

Without the consent of any Certificateholders, the Service Corporations and the Trustee may from time to time enter into one or more Trust Agreements supplemental to the Trust Agreement (a *Supplemental Trust Agreement*) for any of the following purposes:

b) to correct or amplify the description of Trust Estate, or better to assure, convey and confirm unto the Trustee any of the Trust Estate or the lien of the Trust Agreement thereon, or to add to the Trust Estate subject to the lien of the Trust Agreement additional property;

c) to add to the conditions, limitations and restrictions on the authorized amount, terms or purposes of the issue, authentication and delivery of the Certificates, thereafter to be observed;

d) to evidence a successor trustee under the Trust Agreement;

e)   to add to rights, powers and remedies of the Trustee for the benefit of the Certificateholders;

f)   to cure any ambiguity, or correct or supplement any provision in the Trust Agreement which may be inconsistent with any other provision;

g)   to provide for the issuance of Additional Certificates; or

h)   to make any other change that does not adversely affect the rights of Certificateholders.

### *Supplemental Trust Agreements with Consent of Certificateholders*

With the consent of the Holders of not less than a majority in principal amount of the Certificates then Outstanding, the Trustee may enter into one or more Supplemental Trust Agreements for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of the Trust Agreement or of modifying in any manner the rights of Certificateholders under the Trust Agreement; provided, however, that no such Supplemental Trust Agreement shall, without the consent of the Holder of each Outstanding Certificate affected thereby, change any Principal Payment Date or Interest Payment Date of any Certificate, or reduce the principal amount thereof or Sinking Fund Installment or the Interest thereon or any premium payable upon the redemption thereof, or change any place of payment where any Certificate or the interest thereon is payable, or impair the right to institute suit for the enforcement of any such payment on or after the stated maturity thereof (or, in the case of redemption, on or after the Redemption Date), or reduce the percentage in principal amount of the Outstanding Certificates, the consent of whose Holders is required for any such Supplemental Trust Agreement, or the consent of whose Holders is required for any waiver of compliance with certain provisions of the Trust Agreement or certain defaults thereunder and their consequences; or modify any provisions summarized under the above subheadings "No City Debt or Other Obligation" or "Tax Treatment Agreed to by Certificateholders; Restriction on Trustee's Powers" under the heading "SUMMARY OF CERTAIN PROVISIONS OF THE TRUST AGREEMENT" or certain other provisions, except to increase any percentage provided thereby or to provide that certain other provisions of the Trust Agreement cannot be modified or waived without the consent of each Holder affected thereby.

### *Execution of Supplemental Trust Agreements*

Prior to executing, or accepting the additional trusts created by, any permitted Supplemental Trust Agreement or the modification thereby of the trusts created by the Trust Agreement, the Trustee shall be entitled to receive and be fully protected in relying upon an opinion of counsel addressed to the Trustee to the effect that the execution of such Supplemental Trust Agreement is authorized or permitted by the Trust Agreement and the Supplemental Trust Agreement will be a valid and binding agreement of each Service Corporation upon the execution and delivery thereof.

### *Preconditions to Effectiveness*

If the Trustee received a Qualifying Opinion in connection with the formation of the 2006 Funding Trust, then no Supplemental Trust Agreement shall become effective unless and until the Trustee receives an opinion in form and substance reasonably satisfactory to it of counsel reasonably acceptable to the Trustee to the effect that such supplement will not cause the 2006 Funding Trust to fail to be treated as such a grantor trust. Each Supplemental Trust Agreement is subject to the prior written consent of any Insurer.

**Miscellaneous Provisions**

### *Notices to Certificateholders; Waiver*

Where the Trust Agreement provides for the publication of notice to Certificateholders, such notice shall be sufficiently given (unless otherwise expressly provided in the Trust Agreement) if in writing and mailed, first-class postage prepaid, to each Certificateholder at his address as it last appears in the Registry, no

later than the latest date and no earlier than the earliest date permitted for the first publication of such notice. Where the Trust Agreement provides for notice in any manner, such notice may be waived by the Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice shall be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

### *Payments Due on Saturdays, Sundays and Holidays*

In any case where the date fixed for payment of the Certificates shall not be a Business Day, then such payment need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on the date fixed for such payment.

[THIS PAGE INTENTIONALLY LEFT BLANK]