# APPENDIX B

## INFORMATION CONCERNING THE CITY OF DETROIT, MICHIGAN

### TABLE OF CONTENTS

Page

GOVERNMENTAL STRUCTURE ........................................................................2
  Executive Branch ........................................................................2
  Legislative Branch ........................................................................3
  District Court ........................................................................4
  Principal Governmental Services and Work Force ........................................................................4
  Related City Entities ........................................................................7
  Other Governmental Entities ........................................................................8
FINANCIAL PROCEDURES ........................................................................8
  Accounting System ........................................................................8
  Accounting Methods ........................................................................8
  Cash Management ........................................................................9
  Budget Process ........................................................................10
  Budget Stabilization Fund ........................................................................10
FINANCIAL OPERATIONS ........................................................................11
  Overview ........................................................................11
  Revenues and Expenditures of the General Fund ........................................................................11
  Fund Balance of the General Fund ........................................................................14
  Components of Fund Balance ........................................................................15
  General Fund Revenue Categories ........................................................................15
  Recent Budget Results of the General Fund ........................................................................21
  Other Funds of the City ........................................................................28
  Risk Management ........................................................................31
ASSESSED VALUATION AND PROPERTY TAXES ........................................................................32
  Property Valuation and Tax Rate ........................................................................32
  Industrial Facilities Tax ........................................................................33
  Payment and Lien ........................................................................33
  Personal Property Tax Assessments and Appeals ........................................................................33
  Valuations ........................................................................34
  Valuation by Type of Property ........................................................................34
  Tax Rates and Levies ........................................................................34
  Tax Levies and Collections ........................................................................36
  Largest Taxpayers ........................................................................37
  Tax-Exempt Property ........................................................................37
  Legal Debt Margin ........................................................................37
INDEBTEDNESS OF THE CITY AND RELATED ENTITIES ........................................................................38
  Capital Financing Policies ........................................................................38
  Overlapping Debt ........................................................................40
  Summary of Debt Statement ........................................................................41
  Short-Term Indebtedness ........................................................................44
  Prospective Indebtedness ........................................................................44
EMPLOYEE BARGAINING UNITS ........................................................................45
RETIREMENT SYSTEMS ........................................................................45
  In General ........................................................................45
  Payment Obligations under Retirement System Service Contracts ........................................................................48
  Constitutional, Statutory and Ordinance Authority for Payment of UAAL and Issuance of the 2006
  Certificates ........................................................................48
  Recent Pension Litigation ........................................................................49
CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION ........................................................................50
  General ........................................................................50
  Population ........................................................................50
  Employment and Economic Base ........................................................................52
  Construction ........................................................................54
  Housing Characteristics ........................................................................54
  Largest Employers ........................................................................55
  Port of Detroit ........................................................................56
  Transportation Network ........................................................................57
  Major Projects and Developments ........................................................................57

## GOVERNMENTAL STRUCTURE

Pursuant to the provisions of the Constitution of the State of Michigan (the "State"), the City is a home rule city with significant independent powers. In accordance with the City Charter (the "Charter"), the governance of the City is organized in two branches: the Executive Branch, which is headed by the Mayor, and the Legislative Branch, which is composed of the City Council and its agencies. The Charter provides that the voters of the City reserve the power to enact City ordinances by initiative and to nullify ordinances enacted by the City by referendum. However, these powers do not extend to any ordinance for the appropriation of money, and the referendum power does not extend to an emergency ordinance. The Mayor and the members of the City Council are elected every four years. During the most recent general election that was conducted on November 8, 2005, Kwame M. Kilpatrick was re-elected for a second term as Mayor, and five incumbent members were re-elected and four new members were elected to the City Council. There are no limits as to the number of terms that may be served by City elected officials. In addition, the City is the District Control Unit responsible for certain duties relating to the 36th District Court. See "GOVERNMENTAL STRUCTURE – District Court." Following is a description of the duties and responsibilities of the branches of the City government.

### *Executive Branch*

The Mayor is the chief executive of the City and has control of and is accountable for the Executive Branch of City government. The Charter grants the Mayor broad managerial powers, including the authority to appoint all department directors and deputy directors. The Charter also delegates the responsibility for the implementation of most programs, services and activities solely to the Executive Branch.

Financial operations of the City are carried out through the appointed positions of Finance Director and Budget Director. The Finance Director oversees most financial functions of the City, including coordinating debt issuance activities, collecting and disbursing funds, investing City funds (excluding pensions), directing accounting procedures and financial reporting, purchasing goods and services, and assessing property in the City. The Budget Director is responsible for controlling and supervising the expenditure of funds and assisting the Mayor in the preparation of the City's annual budget and long-term capital agenda.

**Kwame M. Kilpatrick, Mayor**, assumed office January 1, 2002. He was re-elected Mayor on November 8, 2005 for a second four-year term commencing on January 1, 2006. Prior to his election as Mayor, he served two terms representing Detroit's 9th District in the Michigan House of Representatives, including serving as House Democratic Leader. Prior to his tenure as a State legislator, he served as a teacher, mentor and basketball coach in the Detroit Public Schools and also taught high school in Tallahassee, Florida. Mayor Kilpatrick is chair of the Democratic Leadership Council's locally elected officials' network. Mayor Kilpatrick graduated from Florida A&M University with a Bachelor of Science degree in Political Science, as well as his teacher certification. He received his Juris Doctor degree from Detroit College of Law.

**Anthony Adams, Deputy Mayor**, was appointed in January 2005. Mr. Adams has the role of Chief Operating Officer along with his other duties. Prior to his appointment, he was General Counsel for the School District of the City of Detroit (the "District") since January 2003, with responsibilities for supervising a staff of 20 and managing more than 25 outside firms to coordinate the legal defense of the District and serving as its Chief Legal Compliance Officer. Before that, he served as Chief Development Attorney for the District since July 2002, with responsibilities for coordinating all development projects and business contracts for the District, including its $1.5 billion capital improvement program. Earlier, he had a private law practice primarily in real estate development and finance. From 1991 to 1993, Mr. Adams was of counsel to the Dykema Gossett law firm in Detroit. From 1985 to 1991, he served as an Executive Assistant to the Mayor of Detroit. He has a Bachelor of Science degree in Urban Management and Planning from the University of Cincinnati, and a Juris Doctor degree from Georgetown University Law Center.

**Roger Short, Interim Finance Director**, was appointed in February 2006. Prior to this appointment, he served the City as Budget Director for six years. His current responsibilities include providing the Mayor and the City Council with long-term and short term financial planning data, assisting in the preparation of the City's operating and capital budgets, monitoring City financial operations and supervising and controlling the expenditure of funds. Previously, Mr. Short served the City as Chief Accounting Officer/Deputy Finance Director for four years, Auditor General for ten years and in other positions. Mr. Short is a Certified Public Accountant and holds a Masters degree in Public Policy Studies and a Bachelor of Arts degree from the University of Michigan. Currently he is an adjunct instructor at the University of Phoenix and Wayne County Community College. He is a member of the Government Finance Officers Association. Mr. Short also serves on the boards of the Detroit Building Authority, Detroit Transportation Corporation, the Downtown Development Authority and the Greater Detroit Resource Recovery Authority.

**Pamela C. Scales, Budget Director**, was appointed in February 2006. Prior to her current appointment, Ms. Scales served as Deputy Budget Director. She has more than 19 years of service with the City. During her service as Deputy Budget Director, the City has received nine Distinguished Budget Awards from the Government Finance Officers Association. Ms. Scales is a faculty member of the University of Phoenix, teaching graduate and undergraduate Finance courses. She holds a Bachelor of Arts degree in Economics from the University of Michigan and a Master of Business Administration degree from the University of Detroit–Mercy. She is a member of the Government Finance Officers Association, the Michigan Municipal Finance Officers Association and the Association of Government Accountants.

**George W. Jackson, Jr., Chief Development Officer**, was appointed in March 2006. He also has served as President & CEO of the Detroit Economic Growth Corporation (DEGC) since February 2002. Previously he had been Director of Customer Marketing for DTE Energy, where he worked for 27 years. His additional prior experience includes personnel and human resources responsibilities in the U.S. Navy and teaching on the adjunct faculty at Lawrence Technological University School of Management Mr. Jackson has a Bachelor of Science degree in Human Resource Development from Oakland University and a Master of Arts degree in Management – Business Management from Central Michigan University.

**John E. Johnson, Corporation Counsel**, was appointed in February 2006 and heads a staff of more than 90 lawyers, with responsibilities for City contracts, advising the Mayor and City Council on legal issues, supervising preparation of ordinances and resolutions, and defending and prosecuting all City lawsuits. From 1999 to 2005, he was Deputy Executive Director and Chief Operating Officer of Legal Aid & Defender Association, Inc. in Detroit. He served as Executive Director of the Detroit Branch of the National Association for the Advancement of Colored People (NAACP) from 1997 to 1999. His previous employers included Wayne County Neighborhood Legal Services, the National Consumer Law Center, and UAW Legal Services Plans. Mr. Johnson has a Bachelor of Arts degree in Political Science and Journalism from Howard University and a Juris Doctor degree from Valparaiso University School of Law.

### *Legislative Branch*

The City Council, composed of nine members elected at large for four-year terms, is the City's legislative body. The City Council has the power to override the Mayor's veto of City Council changes to the annual budget with a two-thirds majority of its members. The three agencies that aid the City Council in the performance of its duties are described below.

The Auditor General is appointed for a term of 10 years by a majority of City Council members and may be removed for cause by a two-thirds majority. Any person who has held the position of Auditor General is not eligible for reappointment. By Charter, the principal duty of the Auditor General is to audit the financial transactions of all City agencies. However, since 1980 the City has retained independent accounting firms to perform that function. As required by State law, audits are performed annually; they are only required every two years by the Charter. The Auditor General may investigate the administration and operation of any City agency and prepares various reports, including an annual analysis for the City Council of the Mayor's proposed budget.

The Ombudsman is appointed for a term of 10 years by a two-thirds majority of City Council members for the purpose of investigating any official act of any agency (except elected officers) which aggrieves any person.

The City Planning Commission, consisting of nine members appointed by the City Council for three-year terms, advises the City Council on such matters as the annual capital agenda, certain development or renewal projects and proposals for the demolition, disposition or relinquishment of, or encroachment upon, public real property or public interests in real property.

### *District Court*

The 36th District Court is responsible for adjudicating certain legal matters that arise within the City, including State felony arraignments and preliminary examinations, State misdemeanor and City ordinance violations, civil litigation for claims of $25,000 or less, and landlord / tenant disputes. The City is responsible for all funding of the 36th District Court in excess of fines collected by the Court, except for judicial salaries, which are funded by the State.

### *Principal Governmental Services and Work Force*

The following table sets forth the major services provided to City residents and businesses, the governmental unit responsible for providing that service, and the revenue source of City-provided services as indicated in the proposed Executive Budget for the fiscal year ending June 30, 2007. The City's budget contains both operating revenues and expenditures, and capital sources and expenditures.

**(Balance of this page intentionally left blank)**

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 4 of 60

# Table 1 – Services Provided: Governmental Unit and Revenue Sources

## Services Provided and Funded by the City in Whole or in Part

| | Responsibility | General Fund(1) | Self-Supported(2) | State Grants(3) | Federal Grants(3) | Other Sources(4) |
|---|---|---|---|---|---|---|
| | | | | **Percent Supported by:** | | |
| Police and fire .................... | City | 79.0% | 14.7% | 1.1% | 1.0% | 4.2% |
| Sanitation and streets ........ | City | 59.1 | 8.3 | 31.5 | - | 1.1 |
| Parks and recreation.......... | City | 75.2 | 8.5 | 0.9 | - | 15.4 |
| Water and Sewer (5)(6)..... | City | - | 100.0 | - | - | - |
| Court ................................. | City/State | 43.0 | 53.5 | 3.5 | - | - |
| Transportation: | | | | | | |
| Port (7) ........................... | City/County/State | 25.0 | - | 50.0 | - | 25.0 |
| Bus (6) ............................ | City | - | 67.3 | 26.8 | - | 5.9 |
| City Airport (6) .............. | City | - | 100.0 | - | - | - |
| Planning and | | | | | | |
| Development (8) .............. | City | - | 12.5 | - | 85.8 | 1.7 |
| Health................................. | City | 17.9 | 10.1 | 24.7 | 47.3 | - |
| Public Lighting (9)............ | City | 23.5 | 67.5 | 5.0 | - | 4.0 |
| Parking (6) ........................ | City | - | 100.0 | - | - | - |

## Services Provided and Totally Funded Other than by the City

| | |
|---|---|
| Education ........................... | School District of the City of Detroit |
| Detroit/Wayne County Metropolitan Airport......... | County |
| Housing (10)...................... | Independent |
| Hospital............................. | Private |
| Welfare ............................. | State |

SOURCE:    Budget Department. Totals may not add up to 100% due to rounding. See "Fiscal 2007 Budget" under "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein for further discussion of the Fiscal Year 2007 Executive Budget.

(1)    Represents the net tax cost to the City.
(2)    Includes revenues derived from sale of services to other City departments, self-supporting agencies and outside users.
(3)    Includes mass transportation, health and other grant revenues.
(4)    Includes both bond proceeds and Federal project note borrowings.
(5)    Provides water supply and sewage disposal services for the southeastern Michigan region. Accounted for separately in two enterprise funds.
(6)    Accounted for in an enterprise fund.
(7)    Although the Port facilities are privately owned, the Detroit/Wayne County Port Authority's budget is funded by City, Wayne County and State contributions.
(8)    Department revenues exceed appropriations resulting in net contributions to the General Fund
(9)    Provides power through a City-owned public utility for City-owned buildings, streets, certain other governmental units and some private customers. Revenues are derived from the sale of power to these governmental units and private customers.
(10)    See "FINANCIAL OPERATIONS-Other Funds of the City–Enterprise Funds" herein. Starting in fiscal 2004, the Detroit Housing Commission ("DHC") became an autonomous enterprise separate from the City. Therefore, the proposed Fiscal Year 2007 Executive Budget does not include funding for the DHC.

The following table sets forth the City's budgeted employee positions for fiscal 2003 through 2007, according to those positions that are tax-supported and those positions that are supported by other revenues.

**Table 2 – City of Detroit Budgeted Employee Positions**

| | Fiscal Year Ended or Ending June 30, | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **2003** | | **2004** | | **2005** | | **2006** | | **2007** | |
| | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** | **Number** | **%** |
| Tax supported: | | | | | | | | | | |
| General City................ | 8,104 | 40% | 7,929 | 40% | 7,448 | 40% | 6,139 | 39% | 5,467 | 37% |
| Police and fire............. | 5,694 | 28 | 5,704 | 29 | 5,695 | 30 | 4,508 | 29 | 4,422 | 30 |
| Library ........................ | 475 | 2 | 476 | 2 | 485 | 3 | 465 | 3 | 465 | 3 |
| Total tax supported ........... | 14,273 | 70 | 14,109 | 72 | 13,628 | 73 | 11,112 | 71 | 10,354 | 69 |
| Revenue supported: | | | | | | | | | | |
| Transportation.............. | 1,838 | 9% | 1,838 | 9% | 1,716 | 9% | 1,534 | 10% | 1,534 | 10% |
| Water ........................... | 2,411 | 12 | 2,097 | 11 | 2,097 | 11 | 1,916 | 12 | 1,900 | 13 |
| Sewage......................... | 1,477 | 7 | 1,301 | 7 | 1,302 | 7 | 1,189 | 8 | 1,176 | 8 |
| Housing (1) ................. | 442 | 2 | 357 | 2 | - | - | - | - | - | - |
| Total revenue supported.... | 6,168 | 30 | 5,593 | 28 | 5,115 | 27 | 4,639 | 29 | 4,610 | 31 |
| Total........................... | 20,441 | 100% | 19,702 | 100% | 18,743 | 100% | 15,751 | 100% | 14,964 | 100% |

SOURCE: City's Budgets for fiscal 2003 through 2005 and Amended Budget for fiscal 2006. Fiscal 2007 data reflect the proposed Executive Budget for fiscal 2007. Totals may not add up to 100% due to rounding. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein.

_____

(1)     Housing, through the DHC, is no longer a City Department. Its separation was finalized through judicial action in fiscal 2004.

The following table sets forth the departmental budgeted appropriations as a percentage of total General Fund appropriations for fiscal 2003 through 2007.

**Table 3 – Departmental Appropriations**

| | Fiscal Year Ended or Ending June 30, | | | | |
|---|---|---|---|---|---|
| | **2003** | **2004** | **2005** | **2006** | **2007** |
| Police................................... | 20% | 23% | 25% | 22% | 23% |
| Fire ...................................... | 9 | 10 | 11 | 10 | 10 |
| Public works (sanitation and streets). | 12 | 11 | 11 | 10 | 10 |
| Public lighting ..................... | 4 | 4 | 4 | 4 | 4 |
| Health.................................. | 5 | 5 | 5 | 5 | 5 |
| Recreation............................ | 3 | 3 | 3 | 2 | 1 |
| Planning and development ................ | 4 | 4 | 3 | 3 | 3 |
| Other departments ............................. | 25 | 24 | 22 | 16 | 21 |
| Non-departmental: | | | | | |
| Enterprise fund contributions ........ | 5 | 4 | 4 | 5 | - |
| Other (1) .............................. | 12 | 10 | 13 | 23 | 23 |
| General agency budget (millions) ..... | $1,816.0 | $1,877.3 | $1,935.1 | $1,764.9 | $1,812.9 |

SOURCE: City's Budgets for fiscal 2003 through 2005, Amended Budget for fiscal 2006 and proposed Executive Budget for fiscal 2007. Totals may not add up to 100% due to rounding. See "FINANCIAL OPERATIONS - Recent Budget Results of the General Fund" herein.

_____

(1) Includes contributions to the Transportation Fund.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 6 of 60

### Related City Entities

Other entities have been established by the City, in certain cases with the County of Wayne (the "County") and with the City of Highland Park, or by the State, principally for the purpose of providing capital financing (normally through the sale of bonds or through special tax levies) for various improvements, services or major construction projects. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Tax Supported and Revenue Debt" and "-Overlapping Debt." Below is a description of certain entities and their functions.

**Detroit Brownfield Redevelopment Authority** ("DBRA"). The DBRA was created by a City Council resolution and approved by the Mayor in April 1998, under the provisions of Act 381, Public Acts of Michigan, 1996. The DBRA was established to create Brownfield redevelopment zones and promote the revitalization, redevelopment, and reuse of certain property, including, but not limited to, tax-reverted, blighted or functionally obsolete property. This is the first year of substantial financial activity for this authority.

**Detroit Public Library** ("DPL"). The DPL is a statutory body created by the State. The DPL was created to provide reference materials, research information, and publications to residents of the City and the County. Funding is provided by an *ad valorem* tax of 3.63 mills in real and personal property taxes in the City. In addition, DPL receives grants and endowments from private organizations. City Council is responsible for approving DPL's annual budget.

**Downtown Development Authority** ("DDA"). The DDA was created to promote and develop economic growth in the City's downtown business district. Funding is provided by an *ad valorem* tax of 1.0 mill on real and personal property in the downtown development district, a levy on the increased assessed value of the tax increment district, and issuance of revenue and tax increment bonds.

**Economic Development Corporation** ("EDC"). The EDC was established to create and implement project plans for designated project areas within the City, and thus encourage the location and expansion of industrial and commercial enterprises within the City. The EDC is primarily funded by means of grants from the City.

**Detroit Housing Commission** ("DHC"). The DHC was established in 1933 under the authority of the Housing Facilities Act, Act 18, Public Acts of Michigan, 1933 (Ex. Sess.), Section 2 of the act provided that any city or incorporated village with population of over 500,000 was authorized "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare." The DHC is an autonomous enterprise separate from the City.

**Local Development Finance Authority** ("LDFA"). The LDFA was created to finance certain improvements for local public roads in the vicinity of the Chrysler Jefferson Avenue Assembly Plant. Incremental portions of the City and the County property taxes funded LDFA.

**Charles H. Wright Museum of African American History** ("MAAH"). The MAAH was created to provide research, compilation, presentation, publication, and dissemination of knowledge relating to the history, growth, development, heritage and culture of people of African descent and the human struggle for freedom. The MAAH is primarily funded by means of private grants and grants from the City.

**School District of the City of Detroit** ("District"). The District is a statutory body created by the State and functions under the provisions of the Michigan School Code. Funding is provided by an *ad valorem* tax of 13.19 mills (homestead properties) and 31.19 mills (non-homestead) on real and personal property in the City and a "foundation allowance" provided by the State.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 7 of 60

**Tax Increment Finance Authority** ("TIFA"). The TIFA was created to acquire property and provide financing for residential and commercial development programs through issuance of long-term debt secured by tax increment financing.

**Detroit Transportation Corporation** ("DTC"). The DTC was established in 1985 to oversee construction and operation of the Central Automated Transit System (People Mover) in downtown Detroit. The DTC is primarily funded by means of grants from the City.

**Greater Detroit Resource Recovery Authority** ("GDRRA"). The GDRRA was established by the Cities of Detroit and Highland Park for the acquisition, construction and operation of a waste-to-energy facility. The financing was provided by the issuance of revenue bonds.

### *Other Governmental Entities*

Services are provided to residents and businesses of the City by other governmental entities such as the County, the School District of the City of Detroit, Wayne County Community College and the Wayne County Regional Educational Service Agency. All of these entities are funded through their own taxing powers and other sources independent of the City.

## FINANCIAL PROCEDURES

### *Accounting System*

The City's fiscal year begins on July 1 and ends on June 30. The City uses a computer software financial management system which provides general ledger, purchasing, accounts payable, accounts receivable, fixed assets and project accounting applications. These core financial applications are integrated with third-party software providers for budget preparation, work order and inventory applications to provide a complete financial reporting system.

The City uses a legacy human resources/payroll application for employee compensation. Preliminary funding has been approved to begin planning the replacement of the legacy system with computer software human resources/payroll modules. The complete integration of these applications with the core financial applications is expected to be completed in late 2007.

The City's financial statements are prepared based substantially upon the financial information contained in the financial management system. The City's basic financial statements and entity-wide financial statements for fiscal 2005 were audited by independent accountants hired by the Auditor General's Office, and are the most recent audited City financial statements available.

### *Accounting Methods*

The City's financial statements are prepared in conformity with accounting principles generally accepted in the United States of America. Except for the City's Enterprise Funds and Pension Funds (which are accounted for on the accrual basis), the City's funds and accounts (General, Special Revenues and Debt Service Funds) are maintained and reported on the modified accrual basis of accounting. Under the modified accrual basis of accounting, revenues are recognized when they are susceptible to accrual, *i.e.*, measurable and available to finance expenditures of the current fiscal year. Accrued municipal income taxes are estimated by the City as collected (*i.e.*, withheld) by employers but not yet remitted to the City. Estimated refunds for income tax returns received and in process, on which payment has not yet been made, are recorded as a reduction of revenues. The City establishes reserves against certain of the revenues so recognized, to reflect its judgment of collectibility.

The City records expenditures when goods and services are received and encumbers the amounts required by purchase orders and contracts at the time the purchase orders and contracts are issued. The encumbrances are liquidated when the goods and services are received. While the City is not required to carry

unliquidated encumbrances past the end of the fiscal year, it sets aside, within each respective fund balance, an amount equal to the unliquidated encumbrances that it plans to carry forward. In the succeeding fiscal year, the budget is increased by an amount sufficient to cover the unliquidated encumbrances and those encumbrances are reinstated. Unliquidated appropriations represent amounts appropriated for encumbrances and for other commitments not liquidated by year-end and carried forward to the succeeding year's budget. Any remaining balance constitutes an unappropriated surplus (see "Budget Stabilization Fund" below). Any unappropriated deficit is funded in the succeeding fiscal year.

The Capital Projects Funds account for all funds used for the construction, acquisition and renovation of capital facilities. The City maintains 12 sub-funds within the Capital Projects Funds, which account for all capital improvements (other than water supply and sewage disposal facilities) including those financed by the City's general obligation bond issues, gifts, governmental grants, transfers from other funds and special assessments. The City maintains detailed accounting records by individual projects within these funds. Revenues and expenditures are recorded in specific cost centers which list the sources of revenue and type of expenditure. Uncollected estimated revenues and unexpended appropriations are brought forward until completion of a capital project. Revenues must be used on the specific capital projects for which they were designated.

Included as APPENDIX C is the comprehensive annual financial report ("CAFR") of the City for the fiscal year ended June 30, 2005, which includes the audited financial statements of the City for that fiscal year.

### *Cash Management*

A cash flow forecast is prepared annually to assist in formulating cash management strategy and is revised as necessary. The City maintains one bank account for General Fund receipts and disbursements, excluding general obligation bond proceeds, which are kept in a separate account. Capital Projects Funds moneys are also maintained in separate accounts.

All funds are invested in accordance with State law. The City may invest in direct obligations of the U.S., obligations of an agency or instrumentality of the U.S., certain grades of commercial paper, bankers acceptances of U.S. banks, certificates of deposit, savings accounts or depository receipts of savings and loan associations or member banks of the Federal Deposit Insurance Corporation, and certain municipal bonds.

The City's investment policy is to provide for effective cash management. The goal of the City's investment policy is to maintain and protect invested principal while striving to maximize total return on the portfolio consistent with limitations pursuant to guidelines set forth in Act 20, Public Acts of Michigan, 1943, as amended ("Act 20"). The City has not experienced material investment-related losses in any City-managed funds. As of April 1, 2006, the composition of the City's investment portfolio was as follows:

### Table 4 – Composition of General Fund Investment Portfolio
### April 1, 2006

| | |
|---|---|
| Pooled investment funds (1) | 57.30% |
| U.S. Government securities | 42.70 |
| Total | 100.00% |

_____
(1) Consists only of permitted investments.

In accordance with Act 20, no investments may have a maturity longer than 10 years from the date of investment. As of April 1, 2006, the longest investment of the City's General Fund had a maturity of August 15, 2011.

### Table 5 – General Fund Investments (1)

Average monthly investment balance, Fiscal Year 2006 ............................ $149,503,164
Investment earnings, Fiscal Year 2005 ........................................... $   3,353,721
Investment earnings, Fiscal Year 2004 ........................................... $   1,467,561

_____

(1) Includes an average monthly balance of approximately $70 million which is considered restricted.

### *Budget Process*

The general content and process of developing the City's annual budget are prescribed by the Charter. The City's annual budget constitutes a financial plan for the next fiscal year which is required to set forth estimated revenues from all sources and all appropriations, including proposed capital appropriations. Any deficit during the preceding year is entered into the budget for the next fiscal year as an appropriation in accordance with the Charter. The total of proposed expenditures cannot exceed the total of estimated revenues so that the budget as submitted is a balanced budget.

The adoption of the budget provides for: (1) appropriations of specified amounts from funds indicated, (2) a specified levy of the property tax and (3) provision for the issuance of bonds specified in the capital agenda. The budget document, as adopted, becomes the basis for establishing revenues and expenditures for the fiscal year. The appropriation for every function of each City department is fixed, and expenditures may not exceed the original appropriation without City Council approval. If, during the fiscal year, the Mayor advises the City Council that there are available for appropriation revenues in excess of those estimated in the budget, the City Council may make supplemental appropriations up to the amount of the excess. In the case of revenue shortfalls, the Mayor may request that the City Council decrease certain appropriations. The Mayor is under no obligation to spend an entire appropriation. Also, at any time, upon written request by the Mayor, the City Council may transfer all or part of any unencumbered appropriation balance among programs, services or activities within an agency or from one agency to another.

Prior to the December submission of budget requests to the Budget Director, seven departments are required to attend a public meeting where input is received on programs and objectives for the coming fiscal year are addressed. These departments include Police, Fire, Public Works, Public Lighting, Health, Recreation, and Water and Sewerage. The initial budget proposal, which includes all department estimates of revenues and expenditures for the next fiscal year, is submitted to the Mayor by the Budget Department on or before the preceding February 22. The Mayor may revise the budget prior to submitting it to the City Council on or before April 12, the date for budget submission to the City Council established by City ordinance.

Prior to approval of the budget, the City Council holds hearings with various department and agency heads and also holds a public hearing. In addition, the Auditor General prepares an analysis of the proposed budget for the City Council. The City Council may amend the budget as presented by the Mayor on or before May 24. The Mayor may veto any City Council amendment, but must do so by the third business day after May 27. Any Mayoral veto of City Council amendments to the budget may be overridden by the City Council by a two-thirds vote of the members serving; provided, however, that the Council must act on or before the third calendar day or the second business day (whichever will provide the greater number of business days) following the maximum return date of the budget by the Mayor.

### *Budget Stabilization Fund*

In 1978, the State Legislature authorized municipalities to establish budget stabilization funds for the purpose of providing a method to stabilize financial operations. Prior to that time, municipalities were required to allocate any budget surplus to the following fiscal year. Accordingly, in 1979, the City by ordinance established the Budget Stabilization Fund to cover General Fund deficits, to restore a reduction in the number of employees (under certain circumstances) and to cover expenses arising because of a natural disaster.

In accordance with a City ordinance, one-half of any unappropriated General Fund surplus, up to the lesser of either 15% of the City's most recent General Fund budget or 15% of the average of the City's five most recent General Fund budgets, is transferred to the Budget Stabilization Fund in each fiscal year that a surplus is experienced, with the balance being available for other appropriations in the following fiscal year. The Budget Stabilization Fund had a balance of $8.5 million as of June 30, 2003, which was used to reduce the City's General Fund deficit in fiscal 2004, and the Budget Stabilization Fund has had a zero balance since that time. See "FINANCIAL OPERATIONS – Overview" and " – Recent Budget Results of the General Fund."

## FINANCIAL OPERATIONS

### *Overview*

This section contains a detailed description of various important financial matters. See especially "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund" and "–Other Funds of the City."

### *Revenues and Expenditures of the General Fund*

The following tables set forth a comparison of revenues, expenditures and other financing sources and uses of the General Fund by major classification.

**(Balance of this page intentionally left blank)**

## Table 6 – Revenues and Expenditures of the General Fund

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** (in millions) | **2004** | **2005** |
| **REVENUES:** | | | | | |
| Taxes, assessments, interest and penalties: | | | | | |
| Property taxes | $ 152.8 | $ 169.7 | $ 166.3 | $ 184.8 | $ 179.0 |
| Municipal income tax | 341.0 | 323.5 | 310.9 | 290.6 | 282.5 |
| Utility users tax | 54.3 | 52.1 | 55.3 | 50.5 | 52.9 |
| Wagering taxes | 85.8 | 109.4 | 111.3 | 116.1 | 138.0 |
| Other taxes | 12.5 | 13.4 | 13.5 | 12.0 | 11.0 |
| Assessments, interest and penalties on taxes | 8.0 | 10.8 | 9.3 | 14.0 | 11.5 |
| Total taxes, assessments, interest and penalties | 654.4 | 678.9 | 666.6 | 668.0 | 674.9 |
| Total licenses, permits and inspection charges | 10.1 | 9.2 | 8.4 | 9.4 | 11.1 |
| Shared taxes: | | | | | |
| State revenue sharing | 333.3 | 333.8 | 319.1 | 286.5 | 282.9 |
| Other shared taxes | 0.5 | 0.5 | 0.5 | 0.5 | 0.6 |
| Total shared taxes | 333.8 | 334.3 | 319.6 | 287.0 | 283.5 |
| Grants: | | | | | |
| State equity grant | 3.6 | 3.6 | 2.1 | 1.0 | 1.1 |
| Other grants | 73.7 | 70.7 | 63.9 | 78.6 | 66.4 |
| Total grants | 77.3 | 74.3 | 66.0 | 79.6 | 67.5 |
| Sales and charges for services | 185.9 | 198.0 | 171.1 | 176.0 | 178.1 |
| Other revenues | 107.4 | 175.8 | 148.2 | 155.0 | 141.9 |
| Total revenues | 1,368.9 | 1,470.5 | 1,379.9 | 1,375.0 | 1,357.0 |
| **OTHER FINANCING SOURCES:** | | | | | |
| Debt proceeds-General Obligation Limited Tax | - | 50.3 | 56.0 | 209.9 | 248.4 |
| Transfer from Community Development Block Grants | 16.6 | 21.4 | - | - | - |
| Transfer from Major & Local Street Funds | 41.3 | 44.8 | 48.9 | 56.2 | 33.1 |
| Transfer from Capital Projects Funds | - | 0.8 | - | - | - |
| Transfer from Trust and Agency Funds | 0.3 | - | - | - | - |
| Transfer from Component Units | 32.2 | - | - | - | - |
| Total Other Financing Sources | 90.4 | 117.3 | 104.9 | 266.1 | 281.5 |
| **Special Item**-Casino Development Revenue* | - | - | 63.8 | 38.3 | - |
| **TOTAL REVENUES AND OTHER FINANCING SOURCES** | $1,459.3 | $1,587.8 | $1,548.6 | $1,679.4 | $1,638.5 |

* Nonrecurring

13-53846-tjt   Doc 3153-6   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 12 of 60

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| | | | (in millions) | | |
| **EXPENDITURES:** | | | | | |
| Executive agencies: | | | | | |
| Public Works | $ 203.5 | $ 226.9 | $ 188.0 | $ 168.1 | $ 185.2 |
| Fire | 155.4 | 151.2 | 161.2 | 182.2 | 202.2 |
| Health | 89.0 | 97.9 | 102.2 | 88.9 | 87.9 |
| Police | 382.5 | 362.5 | 362.4 | 462.6 | 454.6 |
| Public Lighting | 70.8 | 64.4 | 61.9 | 61.4 | 69.1 |
| Recreation | 48.1 | 53.9 | 59.3 | 53.6 | 67.5 |
| All other | 231.8 | 254.4 | 237.2 | 274.5 | 193.6 |
| Total executive agencies | 1,181.1 | 1,211.2 | 1,172.2 | 1,291.3 | 1,260.1 |
| Legislative agencies | 14.3 | 16.3 | 16.0 | 18.1 | 21.3 |
| Judicial agencies | 44.8 | 47.0 | 47.7 | 45.4 | 45.5 |
| Non-departmental(1) | 82.6 | 167.0 | 227.8 | 222.8 | 165.6 |
| Total expenditures | 1,322.8 | 1,441.5 | 1,463.7 | 1,577.6 | 1,492.5 |
| | | | | | |
| **OTHER FINANCING USES:** | | | | | |
| Transfer to Community Dev. Block Grant Fund | - | - | 1.3 | - | - |
| Transfer to Construction Code Fund | 6.4 | 3.0 | 6.0 | 4.0 | 0.5 |
| Transfer to Detroit Building Authority | 0.5 | 0.5 | 0.4 | 0.3 | 1.0 |
| Transfer to Human Services Fund | 4.5 | 4.0 | 6.5 | 5.7 | 4.3 |
| Transfer to Federal Employment & Training Funds | 0.1 | - | - | - | - |
| Transfer to Targeted Business Development Fund | - | - | - | - | 2.5 |
| Transfer to Debt Service Funds | 46.0 | 40.3 | 44.2 | 51.3 | 38.8 |
| Transfer to Capital Projects Funds | 6.6 | 1.7 | - | - | - |
| Transfer to Airport Fund (2) | 1.9 | 3.6 | 2.5 | 2.8 | 2.6 |
| Transfer to Housing Fund | - | 2.1 | 1.3 | - | - |
| Transfer to Transportation Fund (2) | 74.2 | 79.3 | 75.5 | 74.3 | 77.4 |
| Transfer to Municipal Parking Fund (2) | - | - | - | - | 9.6 |
| Transfer to Component Units | 25.7 | - | - | - | - |
| Payment to Refunded Debt Escrow (3) | - | 49.4 | - | 41.4 | 96.8 |
| Total Other Financing Uses | 165.9 | 183.9 | 137.7 | 179.8 | 233.5 |
| | | | | | |
| **TOTAL EXPENDITURES AND OTHER** | | | | | |
| **FINANCING USES** | $1,488.7 | $1,625.4 | $1,601.4 | $1,757.4 | $1,726.0 |

SOURCE: Derived by the Finance Department from audited financial statements. Totals may not add up exactly due to rounding.

(1) Non-departmental includes items such as payment of damage claims, self-insurance fund contributions and other expenses that are not allocated on a departmental basis.

(2) The City has made transfers to certain enterprise funds for operating purposes. See "FINANCIAL OPERATIONS – Other Funds of the City – Enterprise Funds."

(3) Reflects refunding of certain limited tax obligations. See "FINANCIAL OPERATIONS – General Fund Revenue Categories."

## Fund Balance of the General Fund

An analysis of changes in Fund Balance of the General Fund for fiscal 2001 through 2005 is as follows:

### Table 7 - General Fund Balance

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| Fund balance at beginning of year previously reported before restatement | $ 217.1 | $ 218.1 | $ 206.2 | $ 140.3 | $ 69.2 |
| Fund balance restatement [1] | 32.9 | 19.7 | - | - | - |
| Fund balance at beginning of year, as restated | 250.0 | 237.8 | 206.2 | 140.3 | 69.2 |
| Revenues and other financing sources | 1,459.3 | 1,587.8 | 1,548.6 | 1,679.5 | 1,638.5 |
| Expenditures and other financing uses | (1,488.7) | (1,625.4) | (1,601.4) | (1,757.4) | (1,726.0) |
| Increase (decrease) in reserve for other assets | (2.5) | 6.0 | (13.1) | 6.9 | (15.4) |
| Fund balance at end of year | $ 218.1 | $ 206.2 | $ 140.3 | $ 69.2 | $ (33.6) |

SOURCE: Derived by the Finance Department from audited financial statements.

---

[1] The General Fund has been restated to reflect the adoption of Governmental Accounting Standards Board ("GASB") Interpretation Number 6, "Recognition and Measurement of Certain Liabilities and Expenditures in Governmental Fund Financial Statements."

**(Balance of this page intentionally left blank)**

### *Components of Fund Balance*

An analysis of the components of Fund Balance of the General Fund for fiscal 2001 through 2005 is as follows:

### Table 8 - Components of General Fund Balance

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| | | | (in millions) | | |
| Reserved Fund balance: | | | | | |
| Reserved for Encumbrances............................ | $ 98.0 | $ 59.2 | $ 96.8 | $48.9 | $35.3 |
| Reserved for the Budget Stabilization Fund..... | 34.1 | 7.7 | 8.5 | - | - |
| Reserved for Risk Management Operations..... | 44.8 | 51.8 | 50.5 | 35.9 | 29.2 |
| Reserved for BC/BS Insured Program (1)......... | - | - | 21.7 | - | - |
| Reserved for Motor Vehicle Operations ......... | - | - | - | 39.3 | 23.4 |
| Reserved for Inventory.................................... | 36.7 | 42.8 | 29.7 | 36.5 | 21.2 |
| Reserved for Short-Term Loans | | | | | |
| and Advances to Other Funds ........................... | 6.0 | 2.2 | 2.2 | 3.6 | 12.7 |
| Total Reserved Fund balance.................. | 219.6 | 163.7 | 209.4 | 164.2 | 121.8 |
| Unreserved Fund balance: | | | | | |
| Designated: | | | | | |
| For Accrued Compensated Absences.......... | - | 17.5 | - | - | - |
| For BC/BS Insured Program........................ | 24.8 | 23.4 | - | - | - |
| Total Designated Fund Balance ............... | 24.8 | 40.9 | - | - | - |
| Undesignated: | | | | | |
| Total Undesignated Fund Balance........... | (26.4) | 1.6 | (69.1) | (95.0) | (155.4) |
| Total Unreserved Fund Balance (Deficit) ........ | (1.6) | 42.5 | (69.1) | (95.0) | (155.4) |
| Total Fund Balance | $218.1 | $206.2 | $140.3 | $69.2 | $( 33.6) |

SOURCE:   Derived by the Finance Department from audited financial statements.

(1) The Blue Cross/Blue Shield Reserve component of the General Fund decreased from $21.7 million at June 30, 2003 to $-0- at June 30, 2004 as the result of a settlement agreement with the City's Retirement Systems, with $15.7 transferred to the Employee Benefit Fund (a fiduciary fund), and the remaining $6.0 million used to defray heath care costs during fiscal 2004.

### *General Fund Revenue Categories*

The City's General Fund derives revenues from various sources. The following table shows the percentage that various sources of General Fund revenues have contributed to total General Fund revenues for fiscal 2001 through 2005.

**(Balance of this page intentionally left blank)**

## Table 9 - Major General Fund Revenue and Other Financing Sources

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| | (Percentage of Total) | | | | |
| Property taxes ................................................... | 11.2% | 11.5% | 12.1% | 13.4% | 13.2% |
| Municipal income tax ......................................... | 24.9 | 22.0 | 22.5 | 21.1 | 20.8 |
| Utility users tax ................................................ | 4.0 | 3.5 | 4.0 | 3.7 | 3.9 |
| Wagering taxes ................................................... | 6.3 | 7.4 | 8.1 | 8.4 | 10.2 |
| State shared revenues ........................................ | 24.3 | 22.7 | 23.1 | 20.8 | 20.8 |
| State equity grant .............................................. | 0.3 | 0.2 | 0.2 | 0.1 | 0.1 |
| Sales and charges for services .......................... | 13.6 | 13.5 | 12.4 | 12.8 | 13.1 |
| Other revenue, grants and financing sources (1) ....... | 15.4 | 19.2 | 17.6 | 19.7 | 17.9 |
| Total ................................................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE:    Derived by the Finance Department from audited financial statements.

_____
(1) See "FINANCIAL OPERATIONS – General Fund Revenue Categories – Other Revenue, Grants and Other Financing Sources" for a discussion of the sources of revenue included in this category.

The following is a description of the major General Fund revenue sources of the City.

### Property Taxes

The City reports revenue from real and personal property taxes when measurable and available. Available is defined as "due and receivable within the current period, and collected within the current period or expected to be collected within sixty days thereafter."

The City's Taxable Value (defined in "ASSESSED VALUATION AND PROPERTY TAXES – Property Valuation and Tax Rate" below) has increased an average of 4.0% during each of the last five fiscal years ending June 30, 2007. The City contracted with a nationally recognized collection agency to collect certain real property tax delinquencies existing prior to March 1, 2004. The contract expires in fiscal 2006 and will not be renewed. Beginning March 1, 2004, the County began collection of the City's delinquent real property taxes. Act 246, Public Acts of Michigan, 2003, effective December 29, 2003, allows for the Treasurer of a city with a first class school district to return (transfer) all uncollected delinquent taxes levied on real property after December 31, 2004 to the county Treasurer on the March 1st immediately following the year in which the taxes are levied. On March 1, 2004, the City transferred to the County Treasurer the uncollected 2003 real property taxes. In June 2004, the City began receiving annual payments from the County for the General Fund and the Debt Service Fund which represent 2003 and later real property taxes that had been turned over to the County as delinquent. Taxes which remain uncollected are ultimately charged to the City as an offset against future payments and are reserved in accordance with City management estimates. See "ASSESSED VALUATION AND PROPERTY TAXES – Tax Levies and Collections." Since 1994, the State Legislature has enacted various statutes pertaining to assessments and assessment procedures. These changes have restricted the rate of growth on Taxable Value of property throughout the State. See "ASSESSED VALUATION AND PROPERTY TAXES." During fiscal 2001, the State Tax Commission issued new valuation multipliers that may be used by local assessors to value personal property, including certain contested utility personal property assessments in the City. See "ASSESSED VALUATION AND PROPERTY TAXES – Personal Property Tax Assessments and Appeals."

### Municipal Income Taxes

The City levies an annual income tax, pursuant to State enabling legislation. The maximum rate consists of a tax of 2.5% on income earned and received (investment income included) by residents of the City,

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 16 of 60

1.2% on corporate income earned in the City and 1.25% on income earned in the City by non-residents. The City has contracted with an outside collection firm to collect certain income tax delinquencies. The contract expires in fiscal 2006 and will not be renewed. See "ASSESSED VALUATION AND PROPERTY TAXES – Tax Levies and Collections."

Effective January 12, 1999, Act 500, Public Acts of Michigan, 1998 ("Act 500"), required a reduction in both resident and non-resident City income tax rates. The City's resident income tax rate of 3% was required to be reduced by 0.1% on each July 1, beginning July 1, 1999, until reaching 2%. The non-resident income tax rate was required to be reduced to maintain it at one-half of the resident income tax rate. Act 500 permits this statutory rate reduction schedule to be suspended under certain circumstances if at least three of the following four conditions exist: (1) funds have been withdrawn from the City's Budget Stabilization Fund for two or more consecutive fiscal years or the City's Budget Stabilization Fund balance falls to zero; (2) the City's inflation adjusted income tax revenue growth rate over the prior year is 0.95% or less; (3) the City's tax base growth rate is 80% or less of the State-wide tax base growth rate over a two-year period; or (4) the City's unemployment rate is 10% or higher. If three of these four conditions exist, the next scheduled rate reduction will be suspended until the following July 1, and the suspension may be extended if these conditions continue. Accordingly, the full implementation of the rate reduction may be delayed past July 1, 2008.

Act 500 also reduced the population threshold for levying local income taxes at rates in excess of 2% from 1,000,000 to 750,000. In addition, the then current Mayor proposed to City Council a phase-out of the corporate income tax over a similar 10-year period at the end of calendar 1999. The reduction of 0.2% became effective on January 1, 2000, with subsequent reductions on each January 1 following the scheduled July 1 reduction in the individual income tax rate, until the City's corporate income tax is eliminated by January 1, 2009, or such later date as may be applicable. Under City ordinance, the income tax rate reduction for corporations is also suspended whenever a suspension is granted by the State for resident and non-resident rates. Because of two successive one-year suspensions of the 0.1% resident income tax rate reduction granted to the City by the State pursuant to Act 500, the City corporate income tax rate for fiscal 2004 and 2005 remained the same at 1.2%. The scheduled reduction for fiscal 2005 was frozen and did not take effect. The City income tax rate for fiscal 2005 and 2006 is 2.5% for residents and 1.25% for non-residents. In December 2005, the City received a third suspension of its income tax rate reduction, effective for the period July 1, 2006 through June 30, 2007.

### Utility Users Tax

The Utility Users Tax is a 5% excise tax on utility bills within the City, and may be levied only by cities with a population in excess of 750,000. The City recognizes Utility Users Tax revenues collected during the fiscal year and accrues cash received within 60 days of the fiscal year end, which is related to utility usage during the fiscal year. Act 197, Public Acts of Michigan, 2005, provides that all Utility Users Tax revenues shall be used to hire and retain police officers.

### Wagering Taxes

There currently are three casino licensees operating casinos in the City. As permitted by Act 69, Public Acts of Michigan, 1997, in November 1997 the City's voters approved the imposition of a local tax of 9.9% on adjusted gross receipts from casino operations ("AGR") in the City. Also pursuant to Act 69, the City has imposed a municipal service fee of 1.25% of AGR, or $4 million per licensee, whichever is greater, to pay for the provision of municipal services. Act 306, Public Acts of Michigan, 2004, effective September 2, 2004, imposed an additional wagering tax of 6% of AGR, which is allocated one-third to the City and two-thirds to the State. Thus, the City currently collects a total of 11.9% on AGR as the wagering taxes in addition to such municipal service fee.

As a result of the taxes and fees described above, the City collected revenues from gaming facilities of $85.8 million in fiscal 2001, $109.4 million in fiscal 2002, $111.3 million in fiscal 2003, $116.1 in fiscal 2004 and $138.0 in fiscal 2005. Effective January 1, 2006, pursuant to an agreement with the three casinos in the

City, an additional payment to the City of 1% of each casino's AGR was imposed on the casinos. Also pursuant to the same agreement and effective January 1, 2006, an additional payment to the City of 1% of AGR was imposed on casinos that achieve at least $400 million in annual AGR. The City's Amended Fiscal Year 2006 Budget anticipated total revenues of $153 million from gaming facilities, which is expected to be realized.

Certain litigation which challenged the system by which the City had granted three casino licenses continued over several years, delaying both the finalization of the permanent casino development agreements and the construction of three permanent casinos and related hotel facilities in the City. The litigation was finally resolved in 2005, and two of the three casinos have now commenced such construction. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION – Major Projects and Developments."

Following a settlement with the State reached in 2002, the Sault Ste. Marie Tribe of Chippewa Indians sought U.S. Congressional approval of a casino, resort and convention center in Romulus, Michigan, approximately 20 miles from downtown Detroit (the "Romulus Casino"). Legislative efforts to secure federal approval of a casino license for the Tribe have been pursued, but no action has been taken in the Congress. The potential effect, if any, of competition from the Romulus Casino on the City's existing gaming facilities, and the resulting effect on the City's revenues from gaming facilities, are unknown.

In the November 2004 election, Michigan voters approved a constitutional amendment which requires approval of any form of gaming, other than Indian tribal gaming and gaming in up to three casinos in the City, by a majority of State voters as well as a majority of voters in the city or township where the gaming will take place.

State Revenue Sharing

The City receives State revenue sharing payments from the State under the State Constitution and the State Revenue Sharing Act of 1971, as amended (the "Revenue Sharing Act"). State revenue sharing payments are State-shared revenues that can be used by a local unit of government for any purpose it deems appropriate. As permitted by State law, the City has secured certain debt obligations with a pledge of its revenue sharing payments (sometimes called "Distributable Aid"). As of May 2, 2006, the City had approximately $36.76 million of such secured debt outstanding, the maximum aggregate annual debt service on which is approximately $13.6 million. The City also has certain contingent obligations and expects to issue additional debt obligations in the future, including short-term debt for cash flow purposes, which will be secured by Distributable Aid both on a parity or subordinate basis. See "FINANCIAL OPERATIONS – Other Funds of the City" and "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES."

The City's receipts under the State revenue sharing program are based upon components as shown in the table below. Of the components, only the sales tax distribution is mandated by the State Constitution. The other components are authorized by legislative action and distribution is subject to annual State appropriation by the State Legislature, and may be reduced or delayed by Executive Order during any fiscal year in which the Governor, with the approval of the Legislature's appropriation committees, determines that actual revenues will be less than the revenue estimates on which appropriations were based. See "FINANCIAL OPERATIONS – Recent Budget Results of the General Fund."

The table below shows State revenue sharing distributions received by the City during fiscal 2001 through 2005.

**Table 10 - State Revenue Sharing**

| | Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** (in millions) | **2004** | **2005** |
| Revenue sharing | | | | | |
| Sales tax-constitutional.............................. | $ 61.2 | $ 61.8 | $ 62.9 | $ 62.7 | $ 63.7 |
| Sales tax-statutory ..................................... | 270.7 | 270.2 | 255.0 | 223.8 | 219.2 |
| Total State revenue sharing ........................ | $331.9 | $332.0 | $317.9 | $286.5 | $282.9 |

SOURCE: Derived by the Finance Department from audited financial statements.

The State's ability to make revenue sharing payments to the City in the amounts and at the times anticipated in the City's budgets could be affected by the State's financial condition and its ability to finance any temporary cash flow deficiencies. The distribution of sales tax revenues to the City may also be affected by changes in the City's population after 2007. It is also possible that future legislative changes could reduce revenue sharing distributed to the City.

State Equity Grant

The Detroit Main Library received substantially reduced funding in fiscal 2005, compared to prior years, from a State equity grant program which is phasing out. The Detroit Main Library received $0.8 million from such program in fiscal 2005, compared to grant amounts of $7.8 million, $8.3 million, $7.7 million and $6.6 million received in fiscal 2001, 2002, 2003 and 2004, respectively.

Sales and Charges for Services

Receipts for sales and charges for services include such items as maintenance and construction charges, electrical fees, recreation fees, property tax collection fees and personal service fees. Actual receipts decreased from $185.9 million in fiscal 2001 to $178.1 million in fiscal 2005.

Other Revenue, Grants and Other Financing Sources

Other revenue and other financing sources generally consist of fines, inspection fees, interest on investments, real estate rentals, sales of property and transfers.

General Fund expenditures include the federal share of the cost of services for personnel employed in various General Fund agencies. The Community Development Block Grants and a small amount under the Job Training Partnership Act fund the federal share.

The grants listed under "Other Grants" (which are usually for health-related activities or community development projects) are generally received on a drawdown basis. Increases or decreases in expenditures would not have a direct effect on fund balances, since revenues would likewise be increased or decreased. The annual budget contains the full amount of an expected grant even though total expenditures may not be realized.

The following table compares budgeted and actual revenues and expenditures for certain major General Fund categories for fiscal 2003 though 2005. Also included are the budget amounts for fiscal 2006 and 2007.

**Table 11 - Comparison of Major Budget Classifications-General Fund**

| | | | | | Fiscal Year Ended or Ending June 30, | | | 2006 | 2007 |
| | 2003 | | 2004 | | 2005 | | | Budget (1) | Budget (2) |
| Category | Budget | Actual | Budget | Actual | Budget | Actual | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | |
| Property tax | $ 174.7 | $ 166.3 | $ 188.2 | $ 184.8 | $ 215.7 | $179.0 | | 188.2 | $ 168.8 |
| Municipal income tax | 323.5 | 310.9 | 300.4 | 290.6 | 319.0 | 282.5 | | 275.1 | 271.4 |
| State revenue sharing | 332.0 | 319.1 | 310.8 | 286.5 | 286.1 | 282.9 | | 283.5 | 282.6 |
| Utility Users Tax | 54.7 | 55.3 | 54.6 | 50.5 | 55.0 | 52.9 | | 49.7 | 56.0 |
| Wagering taxes | 105.0 | 111.3 | 110.0 | 116.1 | 117.6 | 138.0 | | 153.0 | 178.2 |
| State equity grant | 2.5 | 2.1 | 0.2 | 0.2 | 1.2 | 1.1 | | 0.8 | 0.0 |
| Total | $ 992.4 | $ 965.0 | $ 964.2 | $ 928.7 | $ 994.6 | $ 936.4 | | $ 950.3 | $957.0 |
| Total General Fund Revenues | $1,419.4 | $1,379.9 | $1,497.8 | $1,375.1 | $1,587.5 | $1,357.0 | | $1,400.4 | $1,435.1 |
| | | | | | | | | | |
| % of Total General Fund | 69.9% | 69.9% | 64.4% | 67.5% | 62.7% | 69.0% | | 67.9% | 66.7% |
| | | | | | | | | | |
| **Expenditures** | | | | | | | | | |
| Police | $349.5 | $362.4 | $ 418.0 | $462.6 | $475.2 | 454.6 | | $337.1 | $394.8 |
| Department of Public Works | 203.3 | 188.0 | 171.6 | 168.1 | 183.4 | 185.2 | | 125.4 | 112.8 |
| Fire | 147.2 | 161.2 | 182.7 | 182.2 | 207.4 | 202.2 | | 162.9 | 170.8 |
| Public Lighting | 66.1 | 61.9 | 64.7 | 64.5 | 65.9 | 69.1 | | 67.5 | 66.5 |
| Recreation | 73.1 | 59.3 | 51.6 | 53.6 | 50.0 | 67.5 | | 32.7 | 18.5 |
| Total | $ 839.2 | $ 832.8 | $ 888.6 | $ 931.0 | $ 981.9 | $ 978.6 | | $ 725.6 | $ 763.4 |
| Total General Fund Revenues | $1,419.4 | $1,463.6 | $1,497.8 | $1,577.6 | $1,587.5 | $1,492.5 | | $1,400.4 | $1,435.1 |
| | | | | | | | | | |
| % of Total General Fund | 59.1% | 56.9% | 59.3% | 59.0% | 61.9% | 65.6% | | 51.8% | 53.2% |

SOURCE: Budget Department and Finance Department.

(1) City's Budget as adopted. The City's Budget is revised from time to time to reflect carry-forward amounts, as well as amendments during the course of the year. Property Taxes budget was amended in fiscal 2005 to reflect the revenues from the County as current instead of delinquent property tax revenues.
(2) City's Fiscal Year 2007 Executive Budget.

### Recent Budget Results of the General Fund

The General Fund results for fiscal 2003, 2004 and 2005 and the General Fund Budget for fiscal 2006 are discussed below. The proposed Fiscal Year 2007 Executive Budget submitted by the Mayor for City Council consideration on April 12, 2006 also is discussed below.

#### Fiscal Year 2003

The Fiscal Year 2003 Budget of $1.4 billion represented a 5.9% decrease over the Fiscal Year 2002 budget. The Budget was based on conservative revenue estimates due to a downturn in the economy, continuation of the cap on State Revenue Sharing (the City's largest revenue source) and controlled spending assumptions. Detroit's State Revenue Sharing payment, including the Library's share, set by statute at $333.9 million, was cut with the passage of Act 679, Public Acts of Michigan, 2002, to $322.2 million and was further reduced by passage of Act 168 to $319.1 million.

Income tax was budgeted at $323.5 million, a less than 1% decrease from fiscal 2002 projections. This was due to an anticipated stabilization in the economy and the 0.1% decrease in the income tax rate. The actual income tax collected was $310.9 million.

Property tax was budgeted at $174.7 million, an increase of 11.02% over the fiscal 2002 estimates. This was based on a 4.4% increase on the *ad valorem* roll and assumed a 5.1% overall increase when industrial facilities and neighborhood enterprise zone rolls were included. The actual property tax receipts were $166.3 million.

The wagering taxes were budgeted at $105.0 million, which was 9.6% higher than the fiscal 2002 projections. Actual wagering taxes receipts for fiscal 2003 amounted to $111.3 million, a 1.6% increase over fiscal 2002 results. The City also received an additional payment from the casinos aggregating $63.8 million in fiscal 2003 related to the renegotiation of the location (no longer on the riverfront) and hotel size of the permanent casino facilities (each reduced to 400, instead of 800, rooms).

The Fiscal Year 2003 Budget did not include provisions for a wage adjustment with the City's bargaining units. In general, vacant positions were eliminated from the Budget, reflecting 549 fewer budgeted positions than for fiscal 2002. The Airport budget reflected a reduction of 17 positions due to the loss of an air carrier. The Police Department budget reflected a net reduction of 121 uniform positions, primarily due to loss in grant funding. The Library Department lost 61 positions due to reduction in State funding.

The Fiscal Year 2003 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.4 million, a $360,000 increase over fiscal 2002, also due to the loss of a major carrier. The subsidy to the Detroit Department of Transportation ("DDOT") was $4.6 million less, at $69.4 million, than in fiscal 2002, due primarily to an increase in fares of 25 cents. The Detroit People Mover subsidy also decreased by $568,000, to $10.8 million.

The City's Housing Fund accounted for the public housing function administered through the Detroit Housing Commission ("DHC"). In June 2003, the Michigan Supreme Court unanimously affirmed the opinion of the Michigan Court of Appeals in ruling that the 1996 amendments to the Michigan Housing Facilities Act severed by operation of law the City's employment relationship with personnel assigned to and employed by the DHC, to be effective July 1, 2003. This confirmed DHC's status as a separate and autonomous entity without need for legislative action by the Detroit City Council.

Two post-year end events contributed $55 million of the $69 million deficit: a write-off of $18 million of accounts receivable owed by the DHC, which was then an enterprise fund of the City, and an additional $37 million contribution (representing a $35 million judgment plus $2 million in interest) to the Police and Fire Retirement System Funds as a result of a lawsuit. The City filed a deficit elimination plan with the State and took action in fiscal 2004 to eliminate the deficit.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 21 of 60

Fiscal Year 2004

The Fiscal Year 2004 Budget of $1.5 billion represented a 5.5% increase over the Fiscal Year 2003 Budget. The Fiscal Year 2004 Budget was based on assumptions of continuing slow growth in the local economy, cuts in State Revenue Sharing and controlled spending. The City's total revenue sharing payments for fiscal 2004 were expected to amount to $290.3 million. This was a $43.6 million or 13.1% reduction from the prescribed amount pursuant to the 1998 Amendments. Actual payments received for fiscal 2004 were $286.5 million.

Income tax collections for fiscal 2004 were budgeted at $300.4 million, representing a 7.1% decrease from the prior year, reflecting once again the economic challenges in the City's and State's economies, as well as the 0.1% reduction in the income tax rate. In December 2003, the City requested and received approval from the State to suspend its income tax rate reduction for a one-year period concluding July 1, 2005. Actual income taxes received for fiscal 2004 were $290.6 million.

Property tax was budgeted at $188.2 million, a 7.7% increase over fiscal 2003. The City contracted with an outside collection firm to collect delinquent property taxes owed for years prior to fiscal 2003, income taxes and water/sewerage bills. Although actual collections were less than expected, property tax collections for fiscal 2004 amounted to $184.8 million, which included the payment of $37.4 million received from the County upon the transfer of fiscal 2003 delinquent real property taxes to the County for collection.

The wagering taxes were budgeted for a small increase of $5 million or 4.8% over the Fiscal Year 2003 Budget. Actual wagering taxes collections for fiscal 2004 were $116.1 million, a $4.8 million (4.3%) increase from actual collections in fiscal 2003. The City also received a nonrecurring additional payment from the casinos aggregating $38.3 million in fiscal 2004 related to the renegotiation of the location (no longer on the riverfront) and hotel size of the permanent casino facilities (each reduced to 400, instead of 800, rooms).

While budget expenditures were reduced in a number of major categories, there were some significant adjustments related to personnel costs. The Fiscal Year 2004 Budget included a proposed wage increase of 5% for uniformed employees, a 2% increase for civilian employees and special pay adjustments for certain employee categories. Employee benefits experienced a significant increase due to higher health insurance costs and pension contributions for both uniform and civilian employees. Offsetting these increases was the overall reduction of 138 General Fund budgeted positions.

The Fiscal Year 2004 Budget again included contributions to some enterprise funds. The Airport subsidy was $2.8 million, a $258,000 increase over fiscal 2003, reflecting increased personnel costs. The subsidy to the DDOT remained at $68.2 million. The Detroit People Mover subsidy decreased by $0.5 million to $10.3 million.

The Fiscal Year 2004 Budget contained a number of management initiatives. A Program Management Office was established to assist the City administration in managing large projects as well as restructuring City operations in order to improve efficiency and effectiveness of City services. The Grants Acquisition Office was established to help coordinate and improve the City's efforts in identifying, applying for and securing grants.

For fiscal 2004, the City administration withdrew $8.5 million from its Budget Stabilization Fund, reducing its balance to zero, sold $61 million in Fiscal Stabilization Bonds and reported a budget deficit of $95 million. This fiscal 2004 deficit amount was $26 million larger than the deficit reported in fiscal 2003. The deficit increase was a result of revenue shortfalls in income tax, utility users' tax and state revenue sharing collections, in addition to unexpected increases in pension and employee benefits, and unbudgeted expenses related to the 800-megahertz communication system. The City filed a deficit elimination plan with the State and took action in fiscal 2005 to eliminate the deficit.

## Fiscal Year 2005

The Fiscal Year 2005 Budget of $1.6 billion reflected the continuing slow growth in the local economy, cuts in State revenue sharing and controlled spending assumptions. The City's total revenue sharing payments for fiscal 2005 were budgeted at $286.1 million, actual payments totaled $282.9 million. The Fiscal Year 2005 Budget included a $61.1 million financing to fund a payment to the Risk Management Fund and an $80.1 million benefit from the issuance of pension certificates of participation during fiscal 2005.

Income tax collections for fiscal 2005 were budgeted at $319 million, a 6.2% increase over the prior fiscal year. This increase was due to a one-year suspension of the 0.1% rate reduction permitted under Act 500, Public Acts of Michigan, 1998 ("Act 500"), if the City met three out of four conditions set forth in such Act for the year. However, income tax collections continued to decline and yielded $282.5 million for fiscal 2005.

Property tax revenues were budgeted at $215.7 million, an increase of 14.6% over fiscal 2004. This increase was due primarily to the transfer of delinquent real property taxes to the County. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes." Fiscal 2005 Taxable Value increased by 6.3% on the *ad valorem* roll and decreased 5.9% on the industrial facilities and neighborhood enterprise zone tax rolls. Actual property tax receipts totaled $179.0 million. The Fiscal Year 2005 Budget included an additional $3.5 million from a personal property tax audit. The audit was the result of a two-year grant program funded by the State. The outcome of the program was an increase in personal property taxable valuations beginning with the 2005 tax year.

The wagering taxes were budgeted at $117.6 million, a $7.6 million increase over the prior fiscal year, but yielded approximately $138.0 million in fiscal 2005. This significantly increased wagering taxes revenue was primarily due to tax rate increases enacted in Act 306, Public Acts of Michigan, 2004, from which the City received a 2% increase in its wagering taxes rate, bringing the City's total wagering taxes rate to 11.9%.

Based on a comparative study by consultants hired by the City, which recommended increases in various user fees charged by the City, the Fiscal Year 2005 Budget included an increase of $4 million in user fees.

On the expenditure side, the Fiscal Year 2005 Budget reflected a reduction of 997 positions, including 377 layoffs, elimination of 263 vacant positions, and 357 DHC positions no longer reported in the City's budget. The Fiscal Year 2005 Budget included a pay raise of 2% for civilian employees and 5% for uniform employees. Pension and health care costs increased. Contractual services, operating supplies and capital equipment were reduced by a total of $14.2 million (9.6%) from the prior fiscal year. The Fiscal Year 2005 Budget included contributions to certain Enterprise Funds. The Airport subsidy was $2.5 million, a reduction of $200,000 from fiscal 2004. The Buildings and Safety Engineering Department subsidy of $1.9 million was eliminated. The DDOT subsidy was $71.2 million, an increase of $3.4 million.

The Fiscal Year 2005 Budget also included many new initiatives. The Department of Administrative Hearings was established to strengthen code enforcement efforts by assessing and collecting civil fines and costs for blight violations. This Budget implemented a reduction of 57% in City employee take-home vehicles through a new policy that provided vehicles to employees on an economic and business basis rather than as a fringe benefit. Professional facility managers conducted a review of City-wide leases with a view toward consolidation and renegotiation.

In response to the recognition of a projected deficit for fiscal 2005, additional mid-year layoffs of 686 employees were implemented in March 2005, as well as the elimination of 237 vacant positions. Additional cuts in salary expenses were instituted beginning with a 10% reduction in salary for mayoral appointees and non-union employees. The 10% salary reduction for non-union employees was put into effect beginning July 1, 2005. Vendors were asked to take a 10% reduction in contractual costs, with limited success. Other

expenditure reductions were made, including overtime costs, the elimination of non-essential purchases and restrictions on travel. In addition, $71 million from the sale of bonds was applied to fund capital expenditures accrued in fiscal 2004 and 2005 on the 800-megahertz communication system. The City estimated for Fiscal Year 2006 Budget purposes that it would finish fiscal 2005 with a General Fund deficit of approximately $101.7 million. The actual fiscal 2005 deficit was $155.4 million, or $60.4 million higher than the deficit reported in fiscal 2004. This deficit was a result of revenue shortfalls principally in property tax, income tax, sales and charges for services and sale of real property offset somewhat by increase in wagering taxes. The City addressed these shortfalls by reducing expenditures by $91.4 million (net of grant receipts and expenditures). The City filed a deficit elimination plan with the State and took action in fiscal 2006 to eliminate the deficit.

Fiscal Year 2006

On May 24, 2005, City Council adopted a balanced budget for fiscal 2006 that built upon significant cuts in existing City departments, broad-based expenditure reductions and provisions for an anticipated carryover of undesignated General Fund deficit from fiscal 2005 estimated at $101.7 million, which was required to be funded by an appropriation in the Fiscal Year 2006 Budget. The actual carryover 2005 deficit was $155.4 million.

The Fiscal Year 2006 Budget of $1.4 billion represents a 11.79% decrease from the Fiscal Year 2005 Budget. The Fiscal Year 2006 Budget assumed continued slow growth in the local economy, lower estimated tax revenues and continued controlled spending assumptions. The City budgeted $283.5 million in revenue sharing payments, based on the State projected payments. The City currently estimates that revenue sharing payments will total $280.8 million.

Income tax collections for fiscal 2006 were budgeted at $275.1 million, an 11.5% decrease from the prior fiscal year. This decrease reflects actual fiscal 2005 income tax collections and the continued decline in the local economy and employment. The City was again granted by the State a one-year suspension of the 0.1% income tax rate reduction permitted under Act 500. The City estimates that income tax collections will total $273.5 million in fiscal 2006. The City will continue to petition the State to suspend additional income tax reductions in future years as allowed. Under City ordinance, the income tax rate reduction for corporations is also suspended whenever a suspension is granted for resident and non-resident rates. Also included in the fiscal 2006 income tax revenue estimate is a reduction of the personal exemption from $750 to $600 that was approved by City Council.

General Property taxes were budgeted at $188.2 million, a decrease of 12.7% from fiscal 2005 due to a reduction in estimated delinquent tax collections. Taxable valuation estimates have increased by 5.0% on the *ad valorem* tax roll, decreased by 11.5% on the industrial facilities roll and increased by 19.3% on the neighborhood enterprise zone tax roll. The Fiscal Year 2006 Budget includes delinquent tax collections from the County and from an outside collection firm. Actual property tax collections for fiscal 2006 are now estimated at $185.1 million.

The wagering taxes were budgeted at $153 million, a $35 million increase over the prior fiscal year's budgeted amount. The budgeted increase was due to a State increase in the wagering taxes rate of 2% as of September 1, 2004, and the City's receipt of 1% of all AGR plus an additional 1% of AGR of individual casinos reaching $400 million in annual AGR, commencing January 1, 2006, pursuant to agreements between the City and the three casinos in the City. See "FINANCIAL OPERATIONS - General Fund Revenue Categories – Wagering Taxes" above. Two of the three casinos are expected to reach $400 million of AGR by November or December 2006. The City estimates that the wagering taxes for fiscal 2006 will total $157.1 million.

The Fiscal Year 2006 Budget included plans for sweeping reductions of expenditures. A total of 2,992 budgeted positions, including 686 mid-fiscal 2005 layoffs, were eliminated in the Fiscal Year 2006

Budget in addition to a proposed 10% reduction in salary costs for non-uniformed employees. The 10% salary reduction was to be achieved for the City's unionized civilian employees by requiring days off without pay. While the non-union reduction was achieved, the City was unable to reach agreements with its unions for that portion of the reduction. No wage increases were included in the Fiscal Year 2006 Budget for either civilian or uniformed employees.

A study of health care benefits was performed by a nationally recognized consulting firm, which identified cost savings in the areas of hospitalization, dental and vision benefits. The renegotiation of employee health care benefits was expected to generate significant cost savings of $47 million. The City's unions have not approved salary and health care reductions and an agreement has not yet been reached with all of them. In January, the City administration determined that because the proposals were not approved, further reductions to the City's work force were required to realize the necessary savings and it implemented an additional 414 layoffs to help meet this savings goal.

The Fiscal Year 2006 Budget continued reductions in take-home vehicles; a total of 62 general assigned vehicles were eliminated, as well as 100 police general assigned vehicles. All eliminated vehicles were sold at auction. In addition, no appropriations were recommended in the General Fund for vehicle fleet replacement.

Also included in the Fiscal Year 2006 Budget was business process redesign involving a new centralized mailroom to achieve savings in postage costs across the City, centralization of document production and the elimination of bulk refuse collection during slow winter months based on a best practices study. On January 31, 2006, the City eliminated all bulk pick up, resulting in an annual savings of $20 million.

The Fiscal Year 2006 Budget anticipated the reduction of the subsidy for the Detroit Zoological Institute. On March 1, 2006, the City Council approved an operating agreement transferring Detroit Zoological Institute operations to the Detroit Zoological Society, eliminating an estimated $5 million annual net cost to the City. The City also transferred operations of the Detroit Historical Museum to the Detroit Historical Society, eliminating another $1.6 million annual subsidy.

The Fiscal Year 2006 Budget included contributions to certain Enterprise Funds. The DDOT subsidy was $83.5 million, an increase of $4.1 million from the fiscal 2005 budgeted amount. Also included was a $2.6 million subsidy for the Detroit City Airport.

Five of the 10 Neighborhood City Halls under the Mayor's Office and other expenses of the Mayor's Office were eliminated in fiscal 2006 for a reduction of $2.4 million. An additional $2.1 million was reduced from the fiscal 2006 budgets for certain of the City's planning and development agencies.

Additional reductions in fiscal 2006 expenditures were adopted by City Council for the Police and Fire Departments. The City Council approved a $22.9 million (10%) reduction in wage costs for uniformed police and fire personnel. These wage reductions required approval of the police and fire unions and are further subject to arbitration under the State compulsory arbitration act. In addition to the foregoing, the City Council approved reduced funding of $53.7 million in the Police Department budget and $15.1 million in the Fire Department budget, which does not require approval by the police or fire unions.

In June 2005, the Mayor proposed amendments to the Fiscal Year 2006 Budget to restore $23.4 million in cuts to the Police and Fire Departments. This $23.4 million cut would have resulted in the layoff of 182 police officers and 73 firefighters. To maintain a balanced budget, the restoration of funding for the Police and Fire Department cuts were provided from a reduction to the payment to the Risk Management Fund of $12.5 million. In addition, the Utility Users Tax revenue was increased by $6.3 million. The State passed legislation in October 2005 that eliminated the staffing requirements for officers which would have required a reduction in the Utility Users Tax rate if required staffing levels were not maintained. The General

Fund subsidy of $2.6 million to the Detroit City Airport was eliminated, as well as $2 million for 36th District Court operations at the same time.

On June 27, 2005, City Council approved the Mayor's proposed amendments. The amendment also restored funding of $540,000 for the Department of Homeland Security that was initially cut in the Adopted 2006 budget.

At the end of August 2005 the Mayor and the Chief of Police presented a plan to reorganize the Police Department. The plan recommended 150 layoffs. In addition, the Mayor and the Fire Commissioner presented a plan for the Fire Department that resulted in 75 layoffs. The Fire Department layoffs were delayed by the Firefighters' Union which obtained an injunction to prevent implementation. Ultimately, the City layed off 61 firefighters.

Both reorganization plans proposed by the Mayor called for fewer layoffs than the City Council had contemplated when it passed the Fiscal Year 2006 Budget, resulting in a funding shortfall for both the Police and Fire Departments, which the Mayor addressed along with other negative variances by a series of budget amendments and several initiatives that impacted a significant number of the General Fund departments, excluding the Police and Fire Departments. The most significant was the closing of nine Recreation facilities with about 150 accompanying layoffs. A second significant item reduced the General Fund subsidy to the DDOT by $8 million. This is the same amount that the City Council provided in additional funding to the DDOT during its budget deliberations.

The Fiscal Year 2006 Budget contained salary and health related concessions from employee unions which have failed to receive union approval. As a result, in July 2005 the City issued layoff notices to 209 employees, representing an annualized savings of $8.3 million. Because of this failure to reach agreement, the City will incur $17.5 million in unbudgeted costs by the end of fiscal 2006. In addition, the health care concessions are not expected to be approved by fiscal year-end, which will cost the City an additional $42 million. The adopted Fiscal Year 2006 Budget also contained an increase of $15 million for pension funding obligations, which will be eliminated by the fiscal 2006 year-end as a result of the transaction described in the next paragraph.

The governing boards of the City's two pension systems voted on February 8 and March 30, 2006 to extend the amortization periods for funding their respective unfunded actuarial accrued liabilities ("UAAL") to 30 years (instead of 20 and 12 years, respectively). As a result, the City will replace certain scheduled contractual payment obligations that it incurred to provide funding for UAAL of the pension systems with new contractual obligations payable over a longer period to match their extended amortization periods. The transaction will result in a fiscal 2006 benefit to the General Fund of approximately $20 million.

To further address the above fiscal challenges, the City administration implemented $23.5 million of budget initiatives including additional departmental cuts and other initiatives. The Municipal Parking Department, an enterprise fund of the City, sold its Greektown Parking Garage to the Greektown Casino owners. The net proceeds to the General Fund from this sale, after providing for the retirement of related bond obligations, were approximately $28 million. The City is currently exploring other opportunities to divest itself of non-core assets.

The City has experienced a reduction in risk management expenditures as a result of changes in risk management practices resulting in the ability to reduce transfers to the Risk Management Fund by $30 million.

As a result of the reduction in City staff, the City is in the process of selling excess inventory and expects to realize $10 million from such sales.

The City's grant-funded departments have identified $2 million in General Fund costs that are eligible for reimbursement from grant dollars. Utilizing a matching grant from the State and a consulting firm with

expertise in the personal property tax area, the City engaged in a two year study to identify unreported personal property in order to collect the related personal property taxes. Another major initiative is the City's decision to proceed through a "fact finding" process relating to employee pay. This process, which is provided for in State law, will allow the City to impose on its civilian unions the City's last best offer of a 10% pay cut. While the City strongly feels it will be successful, this process will take several months, as a result it is estimated that it cannot be implemented until after the end of fiscal 2006.

The City now estimates that it will complete fiscal 2006 with a deficit of $63.0 million which it has budgeted for elimination in fiscal 2007. This represents a reduction of over $90 million from the fiscal 2005 deficit of $155.4 million. The City continues to pursue expenditure controls, property sales, collection of delinquent taxes, revenue securitization and other initiatives in order to reduce this deficit further.

Fiscal 2007 Budget

On April 12, 2006, the Mayor submitted a balanced Fiscal Year 2007 Executive Budget for consideration by the City Council that included a provision for an estimated $63 million deficit carryover from fiscal 2006. The City administration believes that Fiscal Year 2007 Executive Budget is based upon management's conservative revenue and expenditure assumptions.

The proposed Fiscal Year 2007 Executive Budget of $1.4 billion is essentially unchanged in the total from the Fiscal Year 2006 Budget. The City's total revenue sharing payments are budgeted at $282.6 million, a decrease of $0.3 million versus fiscal 2005 revenue sharing receipts of $282.9 million.

Income tax collections for fiscal 2007 are budgeted at $271.4 million, a $3.6 million decrease from the amount budgeted budgeted for fiscal 2006 and a decrease of $2.1 million from estimated fiscal 2006 income tax receipts. Fiscal 2007 collections assume the continuing suspension by the State of a statutory 0.1% income tax rate reduction as permitted under Act 500.

General Property Tax receipts are budgeted at $168.5 million, a decrease of $19.5 million from the amount budgeted in fiscal 2006. This reflects taxable valuation growth offset by the implementation of the Mayor's initiative to change the way refuse collection and disposal is funded. Under this initiative, the City will cease collecting three mills of its property taxes which are dedicated to refuse collection and instead begin charging a fee for service of $300 annually per home with provisions for hardships and senior discounts. Billing is expected to occur on a quarterly basis and any delinquent accounts will be added to the property tax bill and become a lien on real property. The City estimates that $67.2 million will be generated by the fee, $40 million more than had been collected from the three mills.

The wagering taxes receipts are budgeted at $178.3 million versus a Fiscal Year 2006 Budget amount of $153.0 million reflecting a full year of collections of the additional 1% under the City's agreements with the three casinos in the City, as well as additional revenues based on an increase in casino gross receipts.

Significant savings are anticipated in the Fiscal Year 2007 Executive Budget from three initiatives. First, the administration expects to impose days off without pay on union employees in July pursuant to provisions in State law which allow it to impose its last best offer after fact finding and the lapse of a 60-day "cooling off" period, which will lapse in July 2006. This initiative is budgeted to save $11.0 million. Second, the City has budgeted $58 million in savings through changes in health care design, employee contribution increases and reduction in administrative fees and rates. These plan changes will be imposed pursuant to the provisions of State law. Third, approximately $20 million in savings are expected to result from the City's replacing certain scheduled contractual payment obligations that it incurred to provide funding for unfunded accrued actuarial liabilities of its pension systems with new contractual obligations payable over a longer period to match the recent extensions of the amortization periods for funding the systems' UAAL.

Other budget items include an additional 77 layoffs to take place on July 1, 2006 and the expenditure of $20 million to replace vehicles throughout the fleet. The Detroit Historical Society will be granted an operational subsidy of $500,000 and the Detroit Zoological Society will receive $900,000 for insurance and security pursuant to its operating agreement with the City. The Charles H. Wright Museum of African American History will receive a $1.4 million subsidy increased from $1.0 million. Public Lighting will save a net $8 million in reduced fuel costs by implementing a VAR (Volt Amphere Reactive) program, which will reduce fuel utilization. The DDOT subsidy will be reduced by $7.1 million and revenues increase by $2.7 million through the imposition of a $0.75 fare for disabled riders. The Greater Detroit Resource Recovery Authority ("GDRRA") tipping fee of $85.5 million reflects a $5.2 million increase including $2.8 million toward reducing a prior year deficit. The budget includes no subsidy for the airport.

Another of the Mayor's initiatives is the establishment of the General Services Department through the transfer of 629 positions from various agencies including DPW, Recreation, Public Lighting, Health, Civic Center and Elections. The department consolidates fleet management, skilled trades, security, building and grounds maintenance, and inventory management. This consolidation is expected to save $4.5 million through such things as coordinated purchasing and inventory management.

The City believes that the annualized effect of cuts it has already implemented combined with initiatives proposed in the Fiscal Year 2007 Budget will bring its financial operations into structural balance.

On May 24, 2006 the City Council, by a 6-3 vote, approved a balanced Fiscal Year 2007 Budget with certain amendments to the Fiscal Year 2007 Executive Budget. The resulting Fiscal Year 2007 Budget, as amended, is currently in effect. The principal amendment restored quarterly bulk trash pick-up at an estimated $9 million cost to the City. This additional expenditure was offset by increasing the estimate of wagering taxes receipts by $4 million, reducing deposits to the Targeted Business Fund by $5 million and increasing user charges in the Police Department and the Department of Public Works by $1.5 million. The City Council also reduced the Mayor's proposed $0.75 bus fare for disabled riders to $0.50, and offset that change by adding a $0.50 bus fare for seniors. Together with other minor changes, the City Council's amendments increased the total Fiscal Year 2007 Executive Budget by less than 1%.

### *Other Funds of the City*

#### Debt Service Funds

The City, by State law, must provide a separate fund for debt retirement moneys. Debt service on unlimited tax general obligation bonds is funded from *ad valorem* property taxes levied without limitation as to rate or amount specifically for that purpose. Debt service on limited tax general obligation bonds is funded from property taxes levied within constitutional, statutory and Charter limitations or other unrestricted moneys of the City. All City property taxes are collected by the Treasurer and deposited in the appropriate funds according to the proper distribution percentage.

#### Enterprise Funds

The City currently has five enterprise funds. The revenues of the enterprise funds are not available to pay principal of and interest on bonds other than those issued by or on behalf of a particular enterprise operation. Individual financial statements for the enterprise funds described below have not been included in this Official Statement. The fiscal 2005 CAFR of the City (which contains audited financial results for the enterprise funds) is available on the City's web site.

The Sewage Disposal and Water Supply Systems, which serve a significant portion of southeastern Michigan, have an aggregate of approximately $4.7 billion in outstanding revenue bonds (net revenue pledge). The General Fund bears no liability for funding any expenses not covered by self-generated revenues for these systems and has never made a subsidy payment to the Sewage Disposal or Water Supply Systems.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 28 of 60

The City's Parking System is intended to be, but during fiscal 2003 and 2004 was not, self-sufficient. The City is legally responsible for payment of operation and maintenance expenses of the system, and the General Fund is reimbursed for payment of such expenses from funds generated from the system, if available. System revenues were inadequate to make such reimbursement in full in fiscal 2003 and 2004; and as a result, the City was not in compliance with its continuing bond covenant to maintain parking system rates at a level sufficient to pay or reimburse the City for payment of Parking System operating, maintenance and repair expenses, but was complying with the related remedial bond covenant. The City is now in compliance with all of its bond covenants.

Other enterprise funds which have received General Fund support are DDOT and Detroit City Airport. The Transportation Fund accounts for the operation of the DDOT that operates the bus-oriented mass transit system, and receives a substantial portion of its operating revenues from regional allocation of federal and State moneys and from self-generated revenues. However, as a result of a continuing gap between operating revenues and rising expenses, the fund has received General Fund subsidies. The following table indicates the amount of General Fund subsidy since fiscal 2001.

**Table 12 - Transportation Fund Subsidies**

| Fiscal Year ended June 30, | Subsidy (in millions) |
| --- | --- |
| 2001 | $74.2 |
| 2002 | $79.4 |
| 2003 | $75.5 |
| 2004 | $74.3 |
| 2005 | $77.4 |

SOURCE: Finance Department.

The City's Airport Fund accounts for the operations of Detroit City Airport. The Airport is capable of accommodating commercial jet carrier service although no commercial airline currently provides passenger service. The Airport has not been self-sufficient and has required General Fund subsidies ranging between $1 million and $2.5 million per year. The Mayor has proposed no operating subsidy for the Airport in his Fiscal 2007 Executive Budget.

### Component Units of the City

In addition, the General Fund provides significant financial support to two discretely presented component units: the GDRRA and the Detroit Transportation Corporation ("DTC"). The GDRRA receives moneys from the General Fund through tipping fees paid for disposal of waste collected by the City. The City's obligation to pay such tipping fees is a full faith and credit, limited tax, general obligation of the City. It is also secured by Distributable Aid. See "FINANCIAL PROCEDURES - Other Funds of the City." The GDRRA is responsible for disposal of essentially all residential solid waste and a small fraction of commercial waste collected in the City.

Since 1991, the GDRRA waste incineration facility (the "Facility") has been operating in conformance with its operating permits. Previous to that time, however, the Facility experienced certain operational problems during the start up and testing phase. The Facility was originally scheduled to be complete and fully operational in 1989. Additional pollution control equipment was financed from proceeds of revenue bonds issued by the EDC, and the outstanding balance was refinanced in the first quarter of fiscal 2002. The retrofit was completed in 1996 and the Facility is operating well within all permit restrictions.

The GDRRA has approximately $145.5 million of bonds outstanding as of May 2, 2006, which were issued to refund bonds originally issued to finance construction of the Facility. The GDRRA is responsible for

making payments to the EDC for debt service on $49.8 million of bonds outstanding as of May 2, 2006, which were issued to refund bonds originally issued to finance additional pollution control equipment.

The Facility essentially covers operating expenses through the sale of steam and electricity and from revenue sources other than the City. The City's tipping fee payments have been, and are expected to remain, approximately equal to the debt service requirements on the outstanding GDRRA bonds and the GDRRA-related EDC bonds. The operations and performance of the Facility are guaranteed in certain respects by the lessee of the Facility; however, the City assumes the risk of environmental law changes and of insufficient quantity of, and in certain circumstances the composition of, waste. Approximately half of the expenses of the GDRRA are currently being supported from revenue sources other than the City. The gross future tipping fees to be paid by the City are expected to be stable and, if the GDRRA's revenues remain stable, approximately equal to debt service on the GDRRA bonds.

While the City has no reason to believe that the Facility will not operate as designed in the future, additional restrictions could be imposed by regulatory agencies and those restrictions could adversely impact financial operations of the Facility. Under certain extraordinary circumstances (such as the Facility being permanently closed or destroyed beyond repair), the GDRRA (and therefore the City) could be subject to special annual payment obligations. While such an event is thought to be very remote, the amount of such annual payments that are secured by the City's State revenue sharing payments could be as high as approximately $10.2 million at an assumed annual interest rate of 18%. The Facility is currently operating as expected.

In 1986, the City, through the DTC, took over responsibility for the Downtown People Mover. Construction of the project was funded primarily through a combination of federal and State transportation moneys. At this time, the project is not self-supporting and approximately $6.2 million was budgeted for fiscal 2006 to support its operations.

<u>Other Funds</u>

The following table lists the other funds of the City and their revenues and expenditures for fiscal 2005. For audited basic financial information as of and for the fiscal year ended June 30, 2005, see APPENDIX B.

**(Balance of this page intentionally left blank)**

**Table 13 - Revenues and Expenditures of Other Funds**

**Fiscal Year Ended June 30, 2005**

| Funds | Revenues/ Expenditures ($ in millions) | Purpose | Major Funding Sources ($ in millions) |
|---|---|---|---|
| **Special Revenue Funds** | | | |
| Community Development Block Grant | 64.9 / 55.5 | Economic Development | Federal Government - 59.8 |
| Construction Code Fund | 24.5 / 35.4 | Building Permit and Inspections | User Fees – 23.9 |
| Detroit Building Authority | 2.2 / 2.0 | Special Maintenance | Other Income – 2.2 |
| Drug Law Enforcement | 4.2 / 2.7 | Narcotics Law Enforcement | Fines and Forfeitures - 3.7 |
| Empowerment Zone | 11.5 / 11.5 | Economic Development | Federal Government – 11.5 |
| Detroit Workforce Development Department | 73.8 / 73.8 | Work Force Development | Federal Government – 73.8 |
| Targeted Business Development | - / - | Casino Agreements | Casinos - 30.0 |
| Major and Local Streets | 75.3 / 46.3 | Infrastructure Improvements | Gas and Weight Tax – 63.5 |
| Human Services | 77.5 / 81.8 | Social Welfare Programs | Federal Government – 74.3 |
| Supportive housing and homeless initiatives | 5.8 / 5.8 | Help of the Homeless | Federal Government – 5.8 |
| **Capital projects** (including Urban Renewal) | 60.4 / 160.1 | Capital Projects | Other Revenues – 26.1 |
| **Fiduciary Funds** | | | |
| Pension Funds | 2,346.3 / 848.1 | Employee Retirement and Benefits | City Contributions – 1,743.6 Plan Member Contributions – 54.1 |

SOURCE:   Derived by Finance Department from audited fiscal 2005 financial statements.

### Risk Management

The City is self-insured with respect to property damage, liability risks and workers' compensation claims. The City assumes the risk for loss exposures, using generally accepted standards with regard to self-assumption of risk. Provisions are made for assumed losses by a combination of annual budgetary appropriations and liquid reserve funds. Insurance has been obtained for catastrophic loss exposures when insurance has been a feasible alternative. Contract liability losses and tort and negligence liability losses are covered by a combination of a Public Liability Reserve Fund and a Risk Management Fund. The City issued self-insurance bonds in fiscal 2003 and 2004 to make loss payments.

The following schedule indicates the amounts paid from appropriations for the fiscal years ended June 30, 2001 through 2005. The schedule reflects both General Fund and Transportation Fund payments. As discussed under "FINANCIAL OPERATIONS - Other Funds of the City - Enterprise Funds," the General Fund has typically made substantial transfers to the Transportation Fund, in part to cover liability claims payable from that fund.

## Table 14 - Liability Claims Paid
### Fiscal Year Ended June 30,

|  | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| Damage and liability claims ..... | $22,984,376 | $26,079,282 | $31,902,082 | $31,471,943 | $47,292,944 |
| Vehicle claims ........................... | 5,973,490 | 8,235,563 | 8,784,362 | 27,963,846 | 8,696,371 |
| Worker compensation claims ... | 21,363,664 | 17,876,181 | 14,695,446 | 16,042,338 | 12,657,646 |
| Total.................................... | $50,321,530 | $52,191,026 | $55,381,890 | $75,478,127 | $68,646,961 |

SOURCE: Finance Department.

## ASSESSED VALUATION AND PROPERTY TAXES

### *Property Valuation and Tax Rate*

Article IX, Section 3, of the Michigan Constitution provides that the proportion of true cash value at which property shall be assessed shall not exceed 50% of true cash value. The Michigan Legislature, by statute, has provided that property shall be assessed at 50% of its true cash value. The Michigan Legislature or the electorate may at some future time reduce the percentage below 50% of true cash value.

On March 15, 1994, the electors of the State approved an amendment to the Michigan Constitution permitting the Legislature to authorize *ad valorem* taxes on a non-uniform basis. The legislation implementing this constitutional amendment added a new measure of property value known as "Taxable Value." Beginning in 1995, taxable property has two valuations–State Equalized Valuation ("SEV") and Taxable Value. Property taxes are levied on Taxable Value. Generally, Taxable Value of property is the lesser of (a) the Taxable Value of the property in the immediately preceding year, adjusted for losses, multiplied by the lesser of the net percentage change in the property's SEV, or the inflation rate, or 5%, plus additions, or (b) the property's current SEV. Therefore, the Taxable Value of property is likely to differ from the same property's SEV.

This constitutional amendment and the implementing legislation based the Taxable Value of existing property for the year 1995 on the SEV of that property in 1994. Beginning with the taxes levied in 1995, an increase, if any, in Taxable Value of existing property is limited to the lesser of the percentage net change in SEV from the preceding year to the current year, 5% or the inflation rate. When property is sold or transferred, Taxable Value is adjusted to the SEV, which under existing law is 50% of the current true cash value. The Taxable Value of new construction is equal to current SEV. Taxable Value and SEV of existing property are also adjusted annually for additions and losses.

Responsibility for assessing taxable property rests with the City Assessor. Any property owner may appeal the assessment to the City Assessor, the Board of Review and ultimately to the Michigan Tax Tribunal.

The Michigan Constitution also mandates a system of equalization for assessments. Although the City Assessor is responsible for actually assessing at 50% of true cash value, adjusted for Taxable Value purposes, the final SEV and Taxable Value are arrived at through several steps. The City Assessor establishes assessments initially. City assessments are then equalized to the 50% levels as determined by the County's department of equalization. Thereafter, the State equalizes the various counties in relation to each other. SEV is important, aside from its use in determining Taxable Value of real estate for the purpose of levying *ad valorem* property taxes, because of its indirect measure of total true cash value contained in the City, its role in the spreading of taxes between overlapping jurisdictions, the distribution of various State aid programs, State revenue sharing and in the calculation of debt limits. Property that is exempt from property taxes, *e.g.*, churches, government property and public schools, is not included in the SEV and Taxable Value. Property granted tax abatements under Act 198, Public Acts of Michigan, 1974, as amended ("Act 198"), is recorded on separate tax rolls while subject to tax abatement. The valuation of tax-abated property is based upon SEV but is not included in either the SEV or Taxable Value data in the Official Statement except as noted. The assessments of, and the tax levies on abated properties are not reflected in Table 17, "Tax Rates and Levies," below.

### Industrial Facilities Tax

Act 198 provides significant property tax incentives to industry to renovate and expand aging industrial facilities and to build new industrial facilities in Michigan. Under the provisions of Act 198, qualifying cities, villages and townships may establish districts in which industrial firms are offered certain property tax incentives to encourage restoration or replacement of obsolete industrial facilities and to attract new industrial facilities.

Property owners situated in such districts pay an Industrial Facilities Tax ("IFT") in lieu of *ad valorem* property taxes on plant and equipment for a period of up to 12 years. For rehabilitated plant and equipment, the IFT is determined by calculating the product of the state equalized valuation of the replacement facility in the year before the effective date of the abatement certificate multiplied by the total mills levied by all taxing units in the current year. New plants and equipment that received an abatement certificate prior to January 1, 1994 are taxed at one-half the total mills levied by all taxing units, other than mills levied for local school district operating purposes or under the State Education Tax Act, plus one-half of the number of mills levied for local school district operating purposes in 1993. For new facility tax abatements granted after 1993, new plants and equipment are taxed at one-half of the total mills levied as *ad valorem* property taxes by all taxing units except mills levied under the State Education Tax Act, plus the number of mills levied under the State Education Tax Act. For new facility tax abatements granted after 1993, the State Treasurer may permit abatement of all, none or one-half of the mills levied under the State Education Tax Act. *Ad valorem* property taxes on land are not reduced in any way since land is specifically excluded under Act 198.

### Payment and Lien

Property taxes are due on July 1 of the fiscal year and are payable in full without penalty either on or before August 31 or, at the taxpayer's option, one-half may be paid on or before August 15, with the other half paid on or before January 15. For taxes levied prior to December 31, 2002, the City collected its own delinquent property taxes. Pursuant to Act 246, Public Acts of Michigan, 2003, the City began returning uncollected delinquent property taxes levied after December 31, 2002 to the County for collection on each March 1. The City receives full funding for such taxes from the County's delinquent tax revolving fund. If such delinquent real property taxes remain uncollected after three years from the date on which such taxes become delinquent, the County may charge the respective amount of such taxes back to the City. Thus, delinquent real property taxes for tax year 2003 will be collected in accordance with Act 123, Public Acts of Michigan, 1999, which may result in foreclosure if not paid by March 31, 2006. Tangible personal property may also be seized and sold to satisfy a personal property tax lien.

As shown in Table 17, "Tax Levies and Collections" below, the rate of current collections to the adjusted levy has increased from 87.60% in fiscal 2001 to 95.01% in fiscal 2005 primarily as a result of the change in tax collections described above. The City has taken steps designed to improve collections, including a more aggressive foreclosure policy and the implementation of a program that offers negotiated payment plans to delinquent taxpayers. Additionally, the City may attach personal property of real property owners to satisfy real property delinquencies of such owners.

### Personal Property Tax Assessments and Appeals

Since the 1960s, Michigan personal property tax assessments have been based, among other things, on the use of one or more depreciation schedules formulated by the State Tax Commission. The schedule used against the taxpayer-reported cost depends upon the assessor's view of the appropriate depreciation table to adopt for valuation of the affected personal property. The State Tax Tribunal revised its depreciation schedules beginning with the 2000 tax year. The revisions had the effect of reducing personal property tax revenues in some jurisdictions. The revisions were effective beginning with City's fiscal year ended June 30, 2001.

## *Valuations*

The following table shows SEV and Taxable Valuations for the most recent five fiscal years. Because the State has applied an equalization factor of 1.0x for each of these years, SEV is equal to the valuations as determined by City assessing officials.

**Table 15 – State Equalized Valuations and Taxable Valuations**

| Fiscal Year | State Equalized Valuation | | | | Taxable Valuation(1) | |
| | Real Property | Personal Property | Total | % Annual Change | Total Valuation | % Annual Change |
|---|---|---|---|---|---|---|
| 2003 | $10,298,344,200 | $1,749,983,210 | $12,048,327,410 | 9.8% | $7,976,048,523 | 4.4% |
| 2004 | $10,668,533,845 | $1,391,662,381 | $12,060,196,226 | 0.1% | $7,844,209,593 | -1.7% |
| 2005 | $11,267,123,205 | $1,563,037,762 | $12,830,160,967 | 6.4% | $8,435,770,261 | 7.5% |
| 2006 | $11,757,967,595 | $1,654,260,635 | $13,412,228,230 | 4.5% | $8,872,251,228 | 5.2% |
| 2007 | $11,799,821,408 | $1,637,281,517 | $13,437,102,925 | 0.2% | $9,280,134,952 | 4.6% |

SOURCE: Finance Department, Assessments Division.

(1) Limited by State law. See "ASSESSED VALUATION AND PROPERTY TAXES - Property Valuation and Tax Rate."

## *Valuation by Type of Property*

**Table 16 – Components of State Equalized Valuation**

| | Fiscal Year Ended or Ending June 30, | | | | |
| | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| By Use (Real Property only) | | | | | |
| Residential ............................... | 65.6% | 65.8% | 65.6% | 64.5% | 72.7% |
| Commercial............................... | 24.3% | 24.1% | 21.9% | 22.0% | 19.4% |
| Industrial ................................. | 10.1% | 10.1% | 12.5% | 13.5% | 7.9% |
| Total...................................... | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |
| By Class (Total State Equalized Valuation) | | | | | |
| Real property ............................ | 85.0% | 85.5% | 88.5% | 87.9% | 87.8% |
| Personal property ..................... | 15.0% | 14.5% | 11.5% | 12.1% | 12.2% |
| Total........................................ | 100.0% | 100.0% | 100.0% | 100.0% | 100.0% |

SOURCE: Finance Department, Assessments Division.

## *Tax Rates and Levies*

The following table shows the tax rates and levies in the City for City, School and County purposes for the last five fiscal years.

## Table 17 – Tax Rates and Levies

**TAXING ENTITY:**

| CITY OF DETROIT | Fiscal 2007 Millage | Levy | Fiscal 2006 Millage | Levy | Fiscal 2005 Millage | Levy | Fiscal 2004 Millage | Levy | Fiscal 2003 Millage | Levy |
|---|---|---|---|---|---|---|---|---|---|---|
| General Fund | 19.952 | $ 181,184,272 | 19.952 | $ 174,576,611 | 19.962 | $ 166,399,036 | 19.962 | $ 156,586,112 | 19.962 | $ 159,217,881 |
| Debt Service | 8.3951 | 76,235,970 | 7.0753 | 61,907,673 | 7.4796 | 62,348,373 | 7.9245 | 62,161,439 | 7.9217 | 63,183,864 |
| Garbage Levy | - | - | 2.9928 | 26,186,492 | 2.9943 | 24,959,855 | 2.9943 | 23,487,917 | 2.9943 | 23,882,682 |
| Library | 4.6307 | 42,051,424 | 4.6307 | 40,517,839 | 3.6331 | 30,284,758 | 3.6331 | 28,498,798 | 3.6331 | 28,977,782 |
| Total City | 32.9778 | $ 299,471,666 | 34.6508 | $ 303,188,615 | 34.069 | $ 283,992,022 | 34.5139 | $ 270,734,265 | 34.5111 | $ 275,262,208 |
| **SCHOOLS** | | | | | | | | | | |
| Debt Service | NA | NA | 13.000 | $ 113,747,792 | 13.000 | $ 108,365,267 | 13.000 | $ 101,974,725 | 12.990 | $ 103,608,870 |
| Judgement | NA | NA | 0.070 | 583,505 | 0.000 | - | 0.800 | 6,275,368 | 0.200 | 1,595,210 |
| Non-Homestead Tax | NA | NA | 17.554 | 146,323,120 | 18.000 | 150,044,216 | 18.000 | 141,195,773 | 18.000 | 143,568,873 |
| Total Schools | NA | NA | 30.624 | 267,951,299 | 31.000 | 258,409,484 | 31.800 | 249,445,865 | 31.19 | 248,772,953 |
| **STATE EDUCATION TAX** | 6.000 | 54,486,048 | 6.000 | 52,498,981 | 6.000 | 50,014,739 | 6.000 | 47,065,258 | 6.000 | 47,856,291 |
| **WAYNE COUNTY** | | | | | | | | | | |
| General Fund | NA | NA | 4.7552 | $ 41,607,192 | 6.6380 | $ 55,332,973 | 6.6380 | $ 52,069,863 | 6.6380 | 52,945,010 |
| Regional Educational Service | NA | NA | | 0 | | 0 | | | | |
| Operational Agency | NA | NA | 3.4643 | 30,312,037 | 3.4643 | 28,877,677 | 3.4643 | 27,174,695 | 3.4643 | 27,631,425 |
| Community College | NA | NA | 2.4769 | 21,672,454 | 2.4844 | 20,709,436 | 2.4862 | 19,502,274 | 2.4862 | 19,830,052 |
| Wayne County Parks | NA | NA | 0.2459 | 2,151,583 | 0.2459 | 2,049,771 | 0.2459 | 1,928,891 | 0.2459 | 1,961,310 |
| Huron-Clinton Metro Authority | NA | NA | 0.2146 | 1,877,714 | 0.2154 | 1,795,529 | 0.2161 | 1,695,134 | 0.2170 | 1,730,803 |
| Public Safety | NA | NA | 0.9381 | 8,208,216 | 0.9381 | 7,819,804 | 0.9381 | 7,358,653 | 0.9381 | 7,482,331 |
| Total Wayne County | NA | NA | 12.0950 | $ 105,829,196 | 13.9861 | $ 116,585,190 | 13.9886 | $ 109,729,510 | 13.9895 | 111,580,931 |
| Total Levy | | NA | | $ 729,468,091 | | $ 709,001,434 | | $ 676,974,898 | | $ 683,472,384 |
| Total Homestead Rate | | NA | | 55.6036 | | 67.0551 | | 68.303 | | 67.691 |
| Total non-Homestead Rate | | NA | | 73.1572 | | 85.0551 | | 86.303 | | 85.691 |

SOURCE: Finance Department, Assessments Division and Wayne County Treasurer's Office.

*Tax Levies and Collections*

The following table shows tax collections of current taxes during each fiscal year and collections of current and delinquent taxes, penalties and interest for City operating, refuse collection and disposal, debt service and library purposes for each of the past five fiscal years.

### Table 18 – Tax Levies and Collections–Fiscal Years 2001 to 2005

| Fiscal Year Ended June 30, | Adjusted Tax Levy(1) | Collections of Current Levy During Year | | Total Collections Through Fiscal Year Ended June 30, 2005 | |
|---|---|---|---|---|---|
| | | Amount | Ratio to Adj. Levy | Amount | Ratio to Adj. Levy |
| | | (all dollars in thousands) | | | |
| 2001 ............... | $249,917 | $218,915 | 87.60% | $237,892 | 95.19% |
| 2002 ............... | $238,517 | $212,435 | 89.06% | $225,277 | 94.45% |
| 2003 ............... | $241,183 | $207,628 | 86.09% | $218,474 | 90.58% |
| 2004 ............... | $241,824 | $231,696 | 95.81% | $231,696 | 95.81% |
| 2005 ............... | $250,556 | $238,059 | 95.01% | $238,059 | 95.01% |

SOURCE: Finance Department, Treasury Division.

---

(1) The levy is adjusted from the original levy for cancellations and assessment adjustments.

In an effort to increase its realization of tax revenues, the City entered into a three-year contract with an outside collection firm to collect its delinquent property taxes, and income taxes. The contract expires in fiscal 2006 and will not be renewed. The same firm also collects City water and sewer receivables. The collection of City real property taxes was transferred to the County in fiscal 2003 for collection of fiscal 2003 and future taxes. See "FINANCIAL OPERATIONS – General Fund Revenue Categories: Property Taxes."

**(Balance of this page intentionally left blank)**

*Largest Taxpayers*

Listed below are the ten largest property taxpayers in the City and their Taxable Valuations.

### Table 19 – Ten Largest Taxpayers

### Fiscal Year Ended June 30, 2005

| | Taxable Valuation | | |
|---|---|---|---|
| | **Real Estate** | **Personal Property** | **Total** |
| DaimlerChrysler AG (1)........................................ | $ 128,767,660 | $ 610,099,600 | $ 738,867,260 |
| DTE Energy.............................................................. | 51,269,238 | 308,229,060 | 359,498,298 |
| General Motors Corporation (1) ............................ | 49,134,783 | 129,078,070 | 178,212,853 |
| Michigan Consolidated Gas.................................... | 1,655,473 | 145,681,702 | 147,337,175 |
| Riverfront Holdings Inc......................................... | 123,150,856 | - | 123,150,856 |
| American Axle & Manufacturing........................... | 16,901,259 | 75,052,600 | 91,953,859 |
| One Detroit Center................................................. | 53,207,221 | 108,030 | 53,315,251 |
| Cingular Wireless................................................... | - | 47,738,424 | 47,738,424 |
| Kewadin Greektown Casino.................................... | 28,426,871 | 11,949,480 | 40,376,351 |
| Detroit Entertainment LLC..................................... | 16,854,374 | 20,290,190 | 37,144,564 |
| Total....................................................................... | $ 469,367,735 | $ 1,348,227,156 | $ 1,817,594,891 |
| | | | |
| Total City Taxable Valuation ................................ | $6,828,590,407 | $ 1,507,199,386 | $ 8,335,789,793 |
| Ten Largest Taxpayers as a % of Total City Taxable Valuation ............................................... | 6.87% | 89.45% | 21.80% |

SOURCE:  Derived by the Finance Department from audited financial statements.

(1)  Includes Rehabilitation Districts.

### *Tax-Exempt Property*

A significant amount of real property (such as government facilities, schools, churches and hospitals) located within the City is exempt from taxation.  In addition to tax-exempt real property, much personal property is also exempt, including household property, licensed motor vehicles, manufacturing tools held for use, mechanic's tools, pollution control facilities, property stored while in transit and business inventory, as well as the property of publicly owned and tax-exempt private institutions.  The only major items of personal property subject to property taxation in the City are commercial and industrial furniture, fixtures and equipment.

### INDEBTEDNESS OF THE CITY AND RELATED ENTITIES

### *Legal Debt Margin*

Article VII, Section 21 of the State Constitution establishes the authority, subject to constitutional and statutory prohibitions, for municipalities to incur debt for public purposes.  In accordance with the authority granted to the State Legislature, Act 279, Public Acts of Michigan, 1909, as amended  ("Act 279" or the "Home Rule City Act") was enacted.  Pursuant to the power conferred by Act 279, the electorate of the City adopted the Charter.  The Charter provides that the City may borrow money for any purpose within the scope of its power, may issue bonds or other evidence of indebtedness therefor, and may, when permitted by law, pledge the full faith, credit and resources of the City for the payment of those obligations.  Act 279 limits the debt a city may have outstanding at any time by providing that the net indebtedness incurred for all public purposes may

B-37

not exceed the greater of 10% of the assessed value of all the real and personal property in the City or 15% of the assessed value of all the real and personal property in the City if that portion of the total amount of indebtedness incurred which exceeds 10% is or has been used solely for the construction or renovation of hospital facilities. The definition of assessed value for the debt limit computation under Act 279 includes certain assessed value equivalents not otherwise included in assessed valuation.

Pursuant to Act 279, significant exclusions to the debt limitations have been permitted for the following purposes: special assessment bonds and motor vehicle highway fund bonds, even though they are a general obligation of the City; revenue bonds payable from revenues only, whether or not secured by a mortgage; bonds, contract obligations or assessments incurred to comply with an order of the Water Resources Commission of the State or a court of competent jurisdiction; obligations incurred for water supply, sewage, drainage, refuse disposal or resource recovery projects necessary to protect the public health by abating pollution; bonds issued to acquire housing for which certain rent subsidies will be received by the City or an agency thereof; bonds issued to refund money advanced or paid for certain special assessments; and self-insurance bonds.

The maximum amount of general obligation debt (both unlimited tax and limited tax) the City may have outstanding at any time is limited by State law. The limit is set at 10% of the City's SEV (adjusted for certain assessed value equivalents) or 15% if that portion which exceeds 10% is used solely for construction or renovations of hospital facilities. However, certain general obligation debt (including the GDRRA and Self-Insurance Bonds debt) is excluded from this limit. The limit and the outstanding general obligation debt subject to the limit are shown in the following table:

### Table 20 – Legal Debt Margin Subject to State Limitation
### As of May 2, 2006

| | | |
|---|---:|---:|
| SEV Fiscal Year 2006-07 | $13,437,102,925 | |
| Add: Allowance under Act 228, Mich. Public Acts, 1975 | 718,498,590 | |
| Allowance under Act 198, Mich. Public Acts, 1974 | 291,589,256 | |
| Allowance under Act 147, Mich. Public Acts, 1992 | 42,671,942 | |
| Allowance under Act 146, Mich. Public Acts, 2000 | 27,430,736 | |
| | 14,517,293,449 | |
| General Purpose Limit (10% x $14,517,293,449) | | $1,451,729,345 |
| | | |
| Less Outstanding Debt: | | |
| General Obligation Bonds | $564,480,000 | |
| Distributable State Aid Bonds | 36,775,000 | |
| Limited Tax Bonds | 205,445,000 | |
| Detroit Building Authority (District Court Madison Center Bonds) | 8,322,163 | 815,002,163 |
| General Debt Margin | | 636,727,182 |
| Additional Hospital Limit (5% x $14,152,525,671) | | 707,626,284 |
| Total Legal Debt Margin (General and Hospital) | | $1,344,353,466 |

SOURCE: Finance Department.

### *Capital Financing Policies*

#### Unlimited Tax Bonds

In accordance with the State Constitution, unlimited tax general obligation bonds must be voter-approved before issuance. General Fund departments have traditionally relied on unlimited tax general obligation bonds of the City for capital programs. In accordance with State law, the City is obligated to levy and collect taxes without regard to any constitutional, statutory or Charter tax rate

limitations for payment of such obligations. The City has followed a policy of scheduling bond referenda to coincide with regularly scheduled elections. The City has issued and expects to continue to issue unlimited tax general obligation bonds annually as described in "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES–Prospective Indebtedness" below. The following table shows the City's authorized but unissued unlimited tax general obligation debt for capital programs as of May 2, 2006.

### Table 21 – Authorized but Unissued Debt
### As of May 2, 2006

| General Obligation (Unlimited Tax) Bonds | Date of Voter Approval | Remaining Authorization |
|---|---|---|
| Sewer Construction (1) | 08/02/1960 | $24,000,000 |
| Public Safety | 11/02/2004 | 99,025,000 |
| Municipal Facilities | 11/07/2000 | 3,120,000 |
| Neighborhood/Economic Development | 11/07/2000 | 3,105,000 |
| Neighborhood/Economic Development | 11/02/2004 | 19,000,000 |
| Public Lighting | 11/07/2000 | 5,135,000 |
| Public Lighting | 11/02/2004 | 22,000,000 |
| Recreation, Zoo, and Cultural | 11/07/2000 | 12,395,000 |
| Recreation, Zoo, and Cultural | 11/02/2004 | 22,000,000 |
| Detroit Institute of Arts | 11/07/2000 | 150,000 |
| Detroit Historical Museum | 11/06/2001 | 17,200,000 |
| MAAH | 04/29/2003 | 500,000 |
| Transportation | 11/02/2004 | 22,000,000 |
| | | $249,630,000 |

SOURCE: Finance Department.

(1) Not expected to be issued.

Limited Tax Bonds

The City may issue limited tax general obligation bonds or other obligations without the vote of the electors. However, taxes may not be levied in excess of constitutional, statutory or Charter limitations for the payment thereof. Such bonds are payable from general non-restricted moneys of the City. Certain of such limited tax obligations are secured with a first lien on specific revenues such as Distributable Aid. The City has utilized limited tax obligations to finance vehicle purchases, general capital improvements, deficit elimination and the City's Risk Management Fund. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES – Tax Supported and Revenue Debt" below.

Revenue Bonds

There are generally no voter approval requirements for the issuance of revenue bonds. The City issues revenue bonds to finance and refinance various capital projects for water supply, sewage disposal and convention facilities and, through the City of Detroit Building Authority, parking facilities. Additional revenue bonds may be issued for these systems provided certain specific additional bonds tests are met under applicable bond documents.

### Other Capital Financing Sources

The City also receives State and federal funds which finance certain construction and capital projects. These include State Gas and Motor Vehicle Registration for street improvements, federal Community Development Block Grant revenues largely for continuing urban renewal projects and funds through the State and federal government for transportation purposes. In addition, the City periodically receives capital grants as a result of certain tax supported and revenue debt.

The following table sets forth the outstanding direct tax-supported and revenue indebtedness of the City.

### Table 22 – Statement of Direct Tax-Supported and Revenue Indebtedness
#### May 2, 2006

| | | |
|---|---:|---:|
| **Tax Supported Debt:** | | |
| Unlimited Tax | | |
| General Obligation Bonds (general purpose) | $ 564,480,000 | |
| Distributable State Aid General Obligation Bonds | 36,755,000 | $ 601,235,000 |
| Limited Tax | | |
| Self-Insurance Bonds | 146,595,000 | |
| General Obligation Bonds (limited tax) | 205,445,000 | |
| Greater Detroit Resource Recovery Authority Bonds | 145,485,000 | |
| Detroit Building Authority Bonds (Madison Center) | 8,322,163 | |
| Economic Development Corporation (Resource Recovery) | 49,805,000 | 555,652,163 |
| Total tax supported debt | | $1,156,887,163 |
| **Revenue and Other Debt:** | | |
| Water Supply System Bonds | $ 1,967,020,000 | |
| Sewage Disposal System Bonds | 2,698,719,306 | |
| Detroit Building Authority Bonds (Parking & Arena System) | 54,230,000 | |
| Federal Section 108 Loans (1) | 26,515,000 | |
| Convention Facility Revenue Bonds (Cobo Hall Expansion) | 114,183,138 | |
| DDA Tax Increment Bonds | 155,293,198 | |
| LDFA Tax Increment Bonds (Chrysler Project) | 82,840,000 | |
| Total revenue and other projects | | 5,098,800,642 |
| **Gross Direct Debt** | | 6,255,687,805 |
| Deductions | | |
| Revenue and Other Debt | 5,098,800,642 | |
| Greater Detroit Resource Recovery Authority | | |
| Bonds–Reserve Account Balance (1) | 26,251,172 | |
| Total Deductions | | 5,125,051,814 |
| **Net Direct Debt** | | $1,130,635,991 |

SOURCE:   Finance Department.

_____

(1) As of April 3, 2006.

#### *Overlapping Debt*

Property in the City is taxed for a proportionate share of outstanding general obligation debt of overlapping governmental entities including the School District of the City of Detroit, Wayne County, Regional Educational Service Agency, Wayne County Community College and the Detroit-Wayne Joint Building Authority. The table below shows the City's share of outstanding tax-supported overlapping debt as of May 31, 2006. See "GOVERNMENTAL STRUCTURE – Other Governmental Entities."

B-40

**Table 23 – City's Share of Overlapping Debt**
**As of May 31, 2006**

| | Outstanding | Detroit's Share | |
|---|---|---|---|
| **Issuer** | **Debt** | **Percentage** | **Amount** |
| School District of the City of Detroit............................... | $1,409,709,975 | 100.00% | $1,409,709,975 |
| Wayne County (1) ........................................................ | 105,142,320 | 18.37 | 19,314,644 |
| Wayne County Community College............................... | 59,165,000 | 29.06 | 17,193,349 |
| Net Overlapping Debt..................................................... | | | $1,466,217,968 |

SOURCE: Municipal Advisory Council of Michigan.

_____

(1) This debt is a general obligation of the County but is payable from assessments against municipalities in the County, other than the City, as well as from the County General Fund.

### *Summary of Debt Statement*

The following table shows the City's net direct as of May 2, 2006 and overlapping debt as of May 31, 2006.

### Table 24 – Direct and Overlapping Debt

| | | |
|---|---|---|
| Direct debt: | | |
|     Gross principal amount............................................ | $6,255,687,805 | |
|     Less amount payable from other sources ................ | 5,125,051,814 | |
|     Net direct debt ......................................................... | | $1,130,635,991 |
| Overlapping debt: | | |
|     Net overlapping debt ............................................... | | 1,466,217,968 |
| Net direct and overlapping debt...................................... | | $2,596,853,959 |

SOURCE:   Finance Department and Municipal Advisory Council of Michigan.

**(Balance of this page intentionally left blank)**

**Table 25 - General Obligation Cumulative Principal Amortization**
**As of May 2, 2006**

| Fiscal Year Ending June 30, | Unlimited Tax GO Principal ($) | Percent Retired | Limited Tax GO Principal ($) | Percent Retired | Total GO Debt Principal ($) | Percent Retired |
|---|---|---|---|---|---|---|
| 2007 | 34,330,000 | 5.71% | 95,007,163 | 17.10% | 129,337,163 | 11.18% |
| 2008 | 38,230,000 | 12.07% | 99,970,000 | 35.09% | 138,200,000 | 23.13% |
| 2009 | 42,515,000 | 19.14% | 135,380,000 | 59.45% | 177,895,000 | 38.50% |
| 2010 | 44,825,000 | 26.60% | 31,015,000 | 65.04% | 75,840,000 | 45.06% |
| 2011 | 44,345,000 | 33.97% | 32,365,000 | 70.86% | 76,710,000 | 51.69% |
| 2012 | 41,920,000 | 40.94% | 33,850,000 | 76.95% | 75,770,000 | 58.24% |
| 2013 | 41,350,000 | 47.82% | 35,360,000 | 83.32% | 76,710,000 | 64.87% |
| 2014 | 35,130,000 | 53.66% | 18,420,000 | 86.63% | 53,550,000 | 69.50% |
| 2015 | 32,700,000 | 59.10% | 5,695,000 | 87.66% | 38,395,000 | 72.82% |
| 2016 | 29,435,000 | 64.00% | 5,925,000 | 88.72% | 35,360,000 | 75.87% |
| 2017 | 30,950,000 | 69.15% | 6,195,000 | 89.84% | 37,145,000 | 79.08% |
| 2018 | 31,370,000 | 74.36% | 6,475,000 | 91.00% | 37,845,000 | 82.36% |
| 2019 | 30,960,000 | 79.51% | 6,800,000 | 92.23% | 37,760,000 | 85.62% |
| 2020 | 31,830,000 | 84.81% | 7,130,000 | 93.51% | 38,960,000 | 88.99% |
| 2021 | 32,700,000 | 90.25% | 7,865,000 | 94.92% | 40,565,000 | 92.49% |
| 2022 | 24,400,000 | 94.30% | 6,570,000 | 96.11% | 30,970,000 | 95.17% |
| 2023 | 16,570,000 | 97.06% | 6,840,000 | 97.34% | 23,410,000 | 97.19% |
| 2024 | 12,675,000 | 99.17% | 7,210,000 | 98.64% | 19,885,000 | 98.91% |
| 2025 | 5,000,000 | 100.00% | 7,580,000 | 100.00% | 12,580,000 | 100.00% |
| | $601,235,000 | | $555,652,163 | | $1,156,887,163 | |

SOURCE:  Finance Department.

**(Balance of this page intentionally left blank)**

# Table 26 – Total Outstanding Debt Service Requirement Schedule

| Fiscal Year Ending June 30 | General Obligation Bonds | | | | | | Revenue and Other Bonds [1][2] | | | Total General Obligation, Revenue and other Bonds |
|---|---|---|---|---|---|---|---|---|---|---|
| | Unlimited Tax | | | Limited Tax | | | | | | |
| | Principal | Interest | Total | Principal | Interest | Total | Principal | Interest | Total | |
| 2007 | $34,350,000 | $30,535,102 | $64,885,102 | $95,007,165 | $26,805,766 | $121,812,929 | $110,554,128 | $225,671,195 | $336,225,323 | $239,891,291 |
| 2008 | 38,230,000 | 28,804,747 | 67,034,747 | 99,970,000 | 21,842,585 | 121,812,585 | 120,365,000 | 218,904,071 | 339,269,071 | 258,565,000 |
| 2009 | 42,515,000 | 26,851,072 | 69,366,072 | 135,380,000 | 16,159,700 | 151,539,700 | 126,052,471 | 213,352,549 | 339,405,020 | 303,847,471 |
| 2010 | 44,835,000 | 24,676,383 | 69,501,382 | 31,015,000 | 10,593,881 | 41,608,881 | 131,398,483 | 207,816,658 | 339,203,141 | 207,726,483 |
| 2011 | 44,345,000 | 22,459,252 | 66,804,252 | 32,365,000 | 9,231,399 | 41,596,399 | 127,626,694 | 203,427,938 | 331,054,632 | 204,316,694 |
| 2012 | 41,920,000 | 20,331,984 | 62,251,984 | 33,850,000 | 7,739,943 | 41,589,943 | 128,627,224 | 201,818,199 | 330,445,423 | 204,397,224 |
| 2013 | 41,350,000 | 18,226,250 | 59,576,250 | 35,360,000 | 6,220,816 | 41,580,816 | 131,240,242 | 194,241,657 | 325,481,879 | 207,950,242 |
| 2014 | 55,130,000 | 16,109,301 | 51,239,301 | 18,420,000 | 4,553,172 | 22,993,172 | 131,075,954 | 193,950,743 | 325,026,697 | 184,625,954 |
| 2015 | 32,700,000 | 14,305,916 | 47,005,916 | 5,695,000 | 3,667,022 | 9,362,022 | 135,839,826 | 189,215,725 | 325,055,551 | 174,334,826 |
| 2016 | 29,435,000 | 12,614,269 | 42,049,269 | 5,925,000 | 3,408,287 | 9,333,287 | 134,964,562 | 179,575,459 | 314,540,021 | 170,324,562 |
| 2017 | 30,950,000 | 11,088,398 | 42,038,398 | 6,195,000 | 3,135,894 | 9,330,894 | 140,144,293 | 174,189,721 | 314,334,014 | 177,189,293 |
| 2018 | 31,370,000 | 9,533,170 | 40,893,170 | 6,475,000 | 2,835,920 | 9,310,920 | 146,804,899 | 168,444,389 | 314,249,288 | 183,649,899 |
| 2019 | 30,960,000 | 7,888,679 | 38,848,679 | 6,800,000 | 2,522,326 | 9,322,326 | 150,461,533 | 162,834,863 | 313,296,396 | 188,211,533 |
| 2020 | 31,830,000 | 6,313,866 | 38,143,866 | 7,130,000 | 2,192,926 | 9,322,926 | 154,728,035 | 156,192,572 | 310,920,607 | 193,688,035 |
| 2021 | 32,700,000 | 4,695,891 | 37,395,891 | 7,865,000 | 1,847,470 | 9,712,470 | 159,175,788 | 151,191,357 | 310,367,145 | 199,740,788 |
| 2022 | 24,400,000 | 3,047,191 | 27,447,191 | 6,570,000 | 1,445,873 | 8,015,873 | 166,104,137 | 136,846,498 | 303,040,635 | 197,164,137 |
| 2023 | 16,570,000 | 1,743,073 | 18,313,073 | 6,840,000 | 1,109,018 | 7,949,018 | 174,225,495 | 129,753,343 | 303,978,838 | 197,655,495 |
| 2024 | 12,675,000 | 897,835 | 13,572,835 | 7,210,000 | 758,318 | 7,968,318 | 181,054,111 | 122,379,574 | 303,433,685 | 200,939,111 |
| 2025 | 5,000,000 | 250,000 | 5,250,000 | 7,580,000 | 388,645 | 7,968,645 | 189,149,770 | 113,856,172 | 303,005,942 | 201,729,770 |
| 2026 | | | | | | | 197,960,000 | 102,898,594 | 300,858,594 | 197,960,000 |
| 2027 | | | | | | | 207,325,000 | 93,654,621 | 300,379,621 | 207,325,000 |
| 2028 | | | | | | | 217,465,000 | 83,011,964 | 300,476,964 | 217,465,000 |
| 2029 | | | | | | | 222,340,000 | 73,311,886 | 294,551,886 | 222,340,000 |
| 2030 | | | | | | | 230,425,000 | 63,469,443 | 293,894,443 | 230,425,000 |
| 2031 | | | | | | | 239,630,000 | 52,667,436 | 292,297,436 | 239,630,000 |
| 2032 | | | | | | | 249,885,000 | 41,625,607 | 291,510,607 | 249,885,000 |
| 2033 | | | | | | | 260,920,000 | 31,652,074 | 292,552,074 | 260,920,000 |
| 2034 | | | | | | | 206,495,000 | 20,516,180 | 227,011,180 | 206,495,000 |
| 2035 | | | | | | | 216,820,000 | 10,353,970 | 227,173,970 | 216,820,000 |
| | $601,265,000 | $260,362,378 | $861,597,378 | $555,652,165 | $126,488,961 | $682,141,124 | $4,987,835,645 | $3,914,304,438 | $8,902,040,083 | $6,114,722,303 |

(1) Includes debt service for the Water and Sewerage Systems and for the Detroit Building Authority (Parking System), DDA, LDFA, Cobo Hall revenue debt. Includes SRF debt calculated at the amount approved and not at the actual amount borrowed.

(2) The Water and Sewerage system revenue bond debt service is presented in a manner consistent with the respective bond ordinances.

B-43

**Table 27 – Per Capita Debt and Debt Ratios**

| As of June 30, | Population Estimate[1] | Net Direct Debt | | | Net Direct and Overlapping Debt | | |
|---|---|---|---|---|---|---|---|
| | | Net Amount (000) | Per Capita Net Amount | Ratio to True Cash Value[2] | Total (000) | Per Capita | Ratio to True Cash Value[2] |
| 2001 | 933,827 | $ 983,080 | $1,005 | 4.8% | $1,427,995 | $1,529 | 7.3% |
| 2002 | 921,759 | 962,133 | 1,044 | 4.4 | 1,452,048 | 1,575 | 6.6 |
| 2003 | 911,402 | 909,624 | 998 | 3.8 | 2,717,110 | 2,981 | 11.3 |
| 2004 | 900,198 | 1,104,034 | 1,226 | 4.6 | 2,625,218 | 2,916 | 10.9 |
| 2005 | 900,198 | 1,209,104 | 1,343 | 4.8 | 1,253,998 | 1,393 | 4.9 |

SOURCE: Finance Department.

(1) Population estimates are from the U.S. Department of Commerce, Bureau of Census, Current Population Reports. The 2004 population estimate is the latest available from the U.S. Census Bureau.

(2) By law, SEV represents 50% of True Cash Value. True Cash Value used is based on the SEV set on December 31 of the fiscal year which determines property taxes levied in the following year, and is referred to as the following year's SEV. See "ASSESSED VALUATION AND PROPERTY TAXES."

### Short-Term Indebtedness

Under the provisions of State law, a municipality, by resolution of its governing body and without a vote of its electors, but subject to the prior approval of the Michigan Department of Treasury or an exception therefrom, may borrow money and issue its notes in anticipation of the collection of the taxes and certain other revenues for its current fiscal year or its next succeeding fiscal year. In addition, a municipality, by resolution of its governing body and without a vote of its electors, may borrow money and issue its notes in anticipation of the receipt of payments under the provisions of the State Revenue Sharing Act for its current fiscal year or its next succeeding fiscal year. Tax anticipation notes and revenue sharing anticipation notes issued under this Act are limited tax general obligations of a municipality. The City did not issue short-term debt in fiscal 2000 through 2004. In fiscal 2005 the City issued $54,445,000 of revenue sharing anticipation notes secured by Distributable Aid for cash flow purposes. In fiscal 2006, the City expects to issue approximately $47 million in revenue sharing anticipation notes secured by Distributable Aid and $82 million in tax anticipation notes secured by property tax receipts for cash flow purposes.

### Prospective Indebtedness

*Unlimited and Limited Tax Obligations.* The City expects to issue unlimited tax general obligation bonds in future years to finance its continuing capital improvement program. The City currently plans an annual unlimited tax bonding program averaging approximately $50 million. The City also expects to issue approximately $40 million of limited tax bonds in fiscal 2007. See "INDEBTEDNESS OF THE CITY AND RELATED ENTITIES–Capital Financing Policies" and "–Legal Debt Margin."

*Revenue Obligations.* The City intends to issue revenue bonds periodically to finance improvements to self-supporting systems, including its Water Supply System and its Sewage Disposal System.

**(Balance of this page intentionally left blank)**

## EMPLOYEE BARGAINING UNITS

The City budgeted 15,750 employees (including part-time and seasonal employees) for fiscal 2006. Approximately 10% of these employees are non-union, and the remaining 90% are represented by one of the City's 49 bargaining units. The largest bargaining units are: The American Federation of State, County and Municipal Employees ("AFSCME"); the Detroit Police Officers Association ("DPOA"); the Detroit Fire Fighters Association ("DFFA"); the Teamsters; and the Amalgamated Transit Union ("ATU"). The collective bargaining agreements for AFSCME and the other non-uniform unions and nearly all other City bargaining units expired on June 30, 2005, and the City has been engaged in negotiations toward successor contracts. The City is seeking to reduce its labor costs, particularly in the area of health care, and has reached agreement with two of its unions on a successor three-year agreement. The City has recently engaged in a non-binding fact finding proceeding with AFSCME, its largest union. Historically, the City's other non-uniform (*i.e.*, not police or fire) unions have followed the AFSCME contract, with only minor variations.

The City's most recent agreement with DPOA expired on June 30, 2004. As the parties did not reach a new agreement, the City and DPOA are in the final stages of an Act 312 binding arbitration proceeding for a successor agreement. Meanwhile, they continue to operate in accordance with the expired DPOA agreement. (Act 312, Public Acts of Michigan, 1969 ("Act 312"), provides for compulsory arbitration of labor disputes in municipal police and fire departments when negotiations reach an impasse, since the options of a strike or lockout are forbidden with respect to such workers essential to public safety.)

Historically, the DFFA agreements provide for automatic parity of DFFA with DPOA with respect to wages and benefits. Accordingly, although there has been no effective DFFA agreement since June 30, 2001, DFFA members continue to receive the same wage and health care and pension benefits as in the DPOA agreement that expired June 30, 2004. The City and DFFA also are in an Act 312 mandatory binding arbitration proceeding for a successor agreement. The Lieutenants and Sergeants Association ("LSA") agreement expires June 30, 2006.

The City has no reason to believe that its outstanding labor negotiations will result in any interruption of service from the unionized work force.

## RETIREMENT SYSTEMS

### *In General*

The City has two retirement systems. The General Retirement System ("GRS") covers all employees other than policemen and firemen, who are covered by the Police and Fire Retirement System ("PFRS"). Each system is governed by its own Retirement Board ("GRS Board" and "PFRS Board," respectively), which invests and administers the system's assets as trust funds solely for the benefit of its participants, retirees and their beneficiaries. The assets of each Retirement System are separate and distinct from assets of the City, are outside the City's control and are not available to pay any obligation or expense of the City.

Each Retirement System receives an annual actuarial report from its consulting actuary as of each June 30, providing actuarial valuations of its vested benefits, prior service costs and UAAL. Each Retirement Board uses those actuarial valuations, together with certain actuarial assumptions, to determine the annual contribution amounts requested from the City to fulfill its constitutional and statutory pension funding obligations. As part of their regular, periodic review of the actuarial assumptions used to administer their respective Retirement Systems, the GRS Board and the PFRS Board may receive recommendations from time to time to increase or decrease the interest rate and to change other actuarial assumptions.

The most recent annual actuarial reports available for the Retirement Systems are as of June 30, 2005. As of June 30, 2005, the two Systems had combined total net assets held for benefits of approximately $6.98 billion and covered 14,619 active employees and 19,772 retirees and their beneficiaries. According to

the actuarial study of Gabriel, Roeder, Smith and Company ("Actuary") the GRS and PFRS also had estimated combined UAAL of $147.55 million as of June 30, 2005.

Actuarial studies are done annually by the Actuary, and the Charter provides that the assumptions used to value the liabilities of both Systems are to be studied in depth every five years. Actuarial assumptions were revised following the 1997-2002 in-depth experience study. Both Systems use the entry age normal actuarial cost methodology to determine age and service liabilities, vested liabilities, casualty liabilities and normal cost. As of the June 30, 2005 actuarial reports, the following significant assumptions are utilized in calculating the present value of vested benefits and the actuarially determined prior service cost: (1) the future investment return rate is assumed to be 7.9% per annum for the GRS and 7.8% per annum for the PFRS; (2) the GRS assumes that total active member payroll expense will increase 4% annually, while the PFRS assumes that payroll expense will increase 4.8% annually; and (3) the GRS UAAL and the PFRS UAAL both are amortized over a period of 30 years. Both Systems amortize their respective UAAL to produce contribution amounts (principal and interest) which are a level percentage of payroll contributions.

The GRS Board has historically established or changed the amortization period for the funding of GRS UAAL by resolution from time to time. On February 8, 2006, the GRS Board adopted a resolution establishing a 30-year amortization period for funding GRS UAAL. The City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for funding PFRS UAAL. In an appeal over whether the City or the PFRS Board has authority to determine the appropriate amortization period for funding PFRS UAAL, the Michigan Court of Appeals ruled in the PFRS Board's favor on February 28, 2006, granting a declaratory judgment that the PFRS Board has the authority under applicable law to set the amortization period for the PFRS. On March 30, 2006, the PFRS Board adopted a resolution establishing a 30-year amortization period for funding PFRS UAAL. On April 11, 2006, the City applied for leave to appeal the Michigan Court of Appeals decision to the Michigan Supreme Court, which has not yet ruled on the application. See "Recent Pension Litigation" below.

The mortality table for both Systems is 90% of the 1983 Group Annuity Mortality Table (adopted June 30, 1998 for the PFRS, and June 30, 2003 for the GRS), and the probabilities of retirement and separation from service (including death in service and disability) were revised (based on the 1997-2002 in-depth experience study) for the June 30, 2003 valuations for both Systems. Valuation assets recognize investment returns above or below the actuarial assumed rate over a three-year period.

The following table sets forth the contributions of the City to the GRS and the PFRS for fiscal 2001 through 2005.

**Table 28 – Annual City Contributions to Retirement Systems**

| | For the Fiscal Year Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005**[1] |
| **GRS** | $68,139,535 | $67,791,488 | $72,859,246 | $95,876,076 | $781,483,426 |
| **PFRS** | 14,443,382 | 8,449,645 | 66,843,029 | 69,475,202 | 682,431,785 |

[1] The City's increased contributions to the GRS and PFRS in fiscal 2005 as compared to fiscal 2004 resulted from its funding nearly all of the existing UAAL of both the GRS and the PFRS on June 2, 2005. See "Payment Obligations under Retirement System Service Contracts" below.

SOURCE:   Finance Department

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 46 of 60

The following table sets forth the actuarial valuation results for the GRS and the PFRS for the 2001 through 2005 actuarial valuations by the City's consulting actuary.

**Table 29 – Summary of Retirement System Actuarial Valuation Results**

| | Actuarial Valuation Date – June 30, | | | | |
|---|---|---|---|---|---|
| | **2001** | **2002** | **2003** | **2004** | **2005** |
| **General Retirement System:** | | | | | |
| Number of Active Employees | 12,744 | 12,639 | 12,833 | 11,791 | 9,820 |
| Number of Retirees and Beneficiaries | 11,450 | 11,363 | 11,322 | 11,311 | 11,396 |
| Number of Deferred Vested Beneficiaries | 1,635 | 1,439 | 1,424 | 1,442 | 1,109 |
| Accrued Actuarial Liabilities (Millions) | $3,179.6 | $3,276.6/$3,250.5[3] | $3,270.6 | $3,383.9 | $3,347.4 |
| Available for Benefits (Millions) | 2,912.1 | 2,761.2 | 2,537.7 | 2,470.2 | 3,222.4 |
| Assets as % of Accrued Actuarial Liabilities | 91.6% | 84.3%/84.9%[3] | 77.6% | 73.0% | 96.3%[1] |
| City Contributions (% of Payroll) | | | | | |
| - Applicable Fiscal Year[2] | 2003 | 2004 | 2005 | 2006 | 2007 |
| - Normal Cost | 9.2% | 9.2%/8.7%[3] | 8.8% | 9.0% | 9.3% |
| - UAAL Amortization Amount | 5.1% | 9.8%/9.3%[3] | 13.9% | 14.2%/11.1%[4] | 1.8% |
| - Total % of Payroll City Contribution | 14.3% | 19.1%/18.1%[3] | 22.7% | 23.2%/20.1%[4] | 11.1% |
| **Police and Fire Retirement System:** | | | | | |
| Number of Active Employees | 5,585 | 5,382 | 5,257 | 5,060 | 4,799 |
| Number of Retirees and Beneficiaries | 8,166 | 8,179 | 8,277 | 8,328 | 8,376 |
| Number of Deferred Vested Beneficiaries | 41 | 35 | 35 | 32 | 24 |
| Accrued Actuarial Liabilities (Millions) | $3,463.2 | $3,523.4/$3,632.0[3] | $3,721.6 | $3,857.5 | $3,780.4 |
| Available for Benefits (Millions) | 3,900.0 | 3,635.1 | 3,205.5 | 3,074.5 | 3,757.9 |
| Assets as % of Accrued Actuarial Liabilities | 112.6% | 103.2%/100.1%[3] | 86.1% | 79.7% | 99.4%[1] |
| City Contributions (% of Payroll) | | | | | |
| - Applicable Fiscal Year[2] | 2003 | 2004 | 2005 | 2006 | 2007 |
| - Normal Cost | 27.2% | 27.7%/23.4%[3] | 24.8% | 24.8% | 25.0% |
| - UAAL Amortization Amount | (14.2%) | (3.9%)/(0.1%)[3] | 19.1% | 29.6%/15.9%[4] | 0.5% |
| - Total % of Payroll City Contribution | 13.0% | 23.8%/23.3%[3] | 43.9% | 54.4%/40.7%[4] | 25.5% |

---

[1] The increase in Assets as a % of Accrued Actuarial Liabilities as of June 30, 2005 compared to June 30, 2004 resulted from the City's funding nearly all of the existing UAAL on June 2, 2005. See "Payment Obligations under Retirement System Service Contracts" below.

[2] City contribution percentages calculated and published in each annual actuarial valuation apply to the second following fiscal year.

[3] Due to a change in actuarial assumptions during the fiscal year, the first and second numbers represent the values under the prior assumptions and the new assumptions, respectively.

[4] Due to a change in UAAL amortization periods, the first and second numbers represent the contribution rates assuming the previously-effective amortization periods of 20/13 years for GRS/PFRS and the newly-adopted 30-year amortization periods, respectively.

SOURCE:   Derived by Finance Department from annual actuarial reports.

### *Payment Obligations under Retirement System Service Contracts*

The City is a party to two Service Contracts, dated May 25, 2005 and June __, 2006, with the Detroit General Retirement System Service Corporation, and two other Service Contracts, dated May 25, 2005 and June __, 2006, with the Detroit Police and Fire Retirement System Service Corporation. Those two Service Contracts dated May 25, 2005 are called the "2005 Service Contracts" below, and those two Service Contracts dated June __, 2006 are called the "2006 Service Contracts" below. The GRS and the PFRS are not parties to any of the Service Contracts.

Pursuant to Ordinance No. 05-05 of the City (the "Funding Ordinance"), the City entered into the 2005 Service Contracts as a means to fulfill its State constitutional and statutory obligations to provide funding for an approximately $1.37 billion portion of outstanding unfunded accrued actuarial liabilities (the "2005 Subject UAAL") of the City's two retirement systems, the GRS and the PFRS. On June 2, 2005, a funding trust created by the two Service Corporations issued and sold Certificates of Participation Series 2005-A and 2005-B ("Series 2005-A COPs" and "Series 2005-B COPs," respectively, and collectively "2005 COPs"), evidencing undivided proportionate interests in the rights to receive certain payments ("2005 Scheduled Payments" and "2005 Service Charges," and collectively "2005 COP Service Payments") to be made by the City under the 2005 Service Contracts. A portion of the proceeds of the 2005 COPs was irrevocably paid to the GRS and the PFRS, fully funding the 2005 Subject UAAL on June 2, 2005.

The periods for payment of the City's scheduled 2005 COP Service Payments under the 2005 Service Contracts were limited to 13 and 20 years in regard to the PFRS and GRS, respectively, the amortization periods then in effect for PFRS UAAL and GRS UAAL. Pursuant to the Funding Ordinance and an authorizing resolution of the City Council adopted on April 26, 2006, the City will enter into the 2006 Service Contracts, as anticipated and authorized in the Funding Ordinance, as a means of enabling the City to utilize a now permitted longer payment period for the obligations it incurred to fulfill its constitutional and statutory obligations to provide such funding for the 2005 Subject UAAL. A new funding trust to be created by the two Service Corporations will issue and sell Certificates of Participation Series 2006-A and 2006-B ("Series 2006-A Certificates" and "Series 2006-B Certificates," respectively, and collectively "Series 2006 Certificates"), evidencing undivided proportionate interests in the rights to receive certain payments ("2006 Scheduled Payments" and "2006 Service Charges," and collectively "2006 Certificate Service Payments") to be made by the City under the 2006 Service Contracts. A portion of the proceeds of the 2006 Certificates will be used to optionally redeem certain outstanding Series 2005-A COPs and to purchase and cancel certain outstanding Series 2005-B COPs, thereby extinguishing the City's obligations to pay the 2005 COP Service Payments related to the 2005 COPs thus redeemed or purchased and canceled. The Series 2005-B COPs to be purchased will be procured by a tender offer conducted by the Service Corporations.

Upon issuance of the 2006 Certificates and such optional redemption of certain Series 2005-A COPs and such purchase and cancellation of Series 2005-B COPs which are tendered by their holders to the Service Corporations, some 2005 COPs will still remain outstanding concurrently with the 2006 Certificates. The 2005 COPs and the 2006 Certificates are wholly independent of each other. The City's contractual payment obligations underlying the 2006 Certificates are totally separate and distinct from its contractual payment obligations underlying the 2005 COPs. Holders of 2006 Certificates will have no rights or interests in the City's payment obligations under the 2005 Service Contracts, and holders of 2005 COPs will have no rights or interests in the City's payment obligations under the 2006 Service Contracts.

The following table sets forth the combined annual amounts of 2005 Scheduled Payments and 2005 Service Charges (*i.e.*, 2005 COP Service Payments) that the City that will be obligated to pay under the 2005 Service Contracts, and the combined annual amounts of 2006 Scheduled Payments and 2006 Service Charges (*i.e.*, 2006 Certificate Service Payments) that the City that will be obligated to pay under the 2006 Service Contracts, upon the issuance of the 2006 Certificates and the optional redemption of the Series 2005-A COPs to be redeemed from proceeds of the 2006 Certificates and the purchase and cancellation of the tendered Series 2005-B COPs to be purchased from proceeds of the 2006 Certificates.

**Table 30 – 2005 COP Service Payments and 2006 Certificate Service Payments**

| Twelve months ending June 15, | 2005 COP Service Payments | 2006 Certificate Service Payments [1] | Total [1] |
|---|---|---|---|
| 2007 | $25,762,441 | $49,230,928 | $74,993,368 |
| 2008 | 25,762,441 | 54,224,061 | 79,986,501 |
| 2009 | 25,762,441 | 58,833,035 | 84,595,476 |
| 2010 | 30,512,441 | 58,833,035 | 89,345,476 |
| 2011 | 36,512,526 | 58,833,035 | 95,345,561 |
| 2012 | 41,950,067 | 58,833,035 | 100,783,103 |
| 2013 | 47,428,624 | 58,833,035 | 106,261,659 |
| 2014 | 52,928,206 | 58,833,035 | 111,761,241 |
| 2015 | 55,205,504 | 58,833,035 | 114,038,540 |
| 2016 | 57,345,528 | 58,833,035 | 116,178,564 |
| 2017 | 59,582,125 | 58,833,035 | 118,415,160 |
| 2018 | 61,915,480 | 58,833,035 | 120,748,515 |
| 2019 | 45,501,634 | 73,462,035 | 118,963,670 |
| 2020 | 47,237,920 | 71,726,673 | 118,964,593 |
| 2021 | 49,053,745 | 69,910,650 | 118,964,395 |
| 2022 | 50,931,865 | 68,032,181 | 118,964,046 |
| 2023 | 52,894,682 | 66,069,858 | 118,964,540 |
| 2024 | 54,938,837 | 64,026,079 | 118,964,915 |
| 2025 | 57,065,475 | 61,898,674 | 118,964,149 |
| 2026 | – | 118,965,224 | 118,965,224 |
| 2027 | – | 118,966,122 | 118,966,122 |
| 2028 | – | 118,966,739 | 118,966,739 |
| 2029 | – | 118,968,394 | 118,968,394 |
| 2030 | – | 118,973,878 | 118,973,878 |
| 2031 | – | 118,980,496 | 118,980,496 |
| 2032 | – | 118,988,301 | 118,988,301 |
| 2033 | – | 118,995,906 | 118,995,906 |
| 2034 | – | 119,009,735 | 119,009,735 |
| 2035 | – | 119,009,749 | 119,009,749 |
| Totals | $878,291,981 | $2,356,736,036 | $3,235,028,017 |

---

[1] Series 2006-B COPs' interest calculated at fixed swap rates.

### Recent Pension Litigation

In May 2005, the Wayne County Circuit Court granted summary disposition in the City's favor in a lawsuit with the PFRS Board over whether that Board or the City has authority to determine the appropriate amortization period for funding PFRS UAAL. On February 28, 2006, the Michigan Court of Appeals reversed the lower court decision and granted the PFRS Board a declaratory judgment that it has the authority under applicable law to set the amortization period for the PFRS. On April 11, 2006, the City applied for leave to appeal that decision to the Michigan Supreme Court, which has not yet ruled on the application. After the lower court decision and before the Michigan Court of Appeals decision, the City Council adopted an ordinance which became effective on February 8, 2006, establishing a 30-year amortization period for funding PFRS UAAL. On March 30, 2006, the PFRS Board adopted a resolution also establishing a 30-year amortization period for funding PFRS UAAL. Thus, a 30-year amortization period is currently in effect for funding PFRS UAAL, supported by a duly adopted PFRS Board resolution and a duly adopted City ordinance.

The City has a pending application seeking leave to appeal to the Michigan Supreme Court from a recent Michigan Court of Appeals decision that arose from an Act 312 arbitration involving the City and one

of its employee unions, the Detroit Police Officers Association ("DPOA"). The arbitration ruling, in 2003, required changing the composition of the PFRS Board by replacing two of its 11 members and adding a twelfth. Before those changes, the prescribed PFRS Board composition had been six union representatives and five City representatives. The City argued in the arbitration proceeding that the police and fire unions used their majority status on the 11-member PFRS Board to obtain benefits that could not be gained through the standard collective bargaining process. The changes under the arbitration decision resulted in a PFRS Board equally divided between City and union representatives, as required of jointly managed boards under the federal Taft-Hartley Act. Though the arbitration involved only the DPOA, the contract governing the Detroit Police Lieutenants and Sergeants Association expressly adopted the conditions of the DPOA agreement, to maintain parity with it. However, the two other unions whose members also are participants in the PFRS have contracts with other language. The City filed this suit to seat a 12-member PFRS Board that would be binding on all four unions whose members are participants in the PFRS. The trial court granted the defendants' motion for summary disposition, concluding that it would deny due process to the two unions that did not participate in the Act 312 arbitration to bind them by it. The City appealed, and the Michigan Court of Appeals affirmed the lower court decision that application of the arbitration ruling to the two non-participating unions would be a violation of their constitutional right to due process of law because their contracts did not require parity with the DPOA agreement. The City has applied for leave to appeal that decision to the Michigan Supreme Court, which has not yet ruled on the application.

The PFRS Board filed a lawsuit in August 2005 seeking payment of $53 million for the City's unpaid contribution obligation to the PFRS due June 30, 2005. The PFRS Board has since adopted a resolution approving the City's proposed settlement terms, and the lawsuit has been inactive by mutual agreement of the parties pending completion of the settlement. Under the approved settlement terms, the balance of the June 30, 2005 required City contributions to the PFRS will be paid with interest at 7.8% per annum no later than June 30, 2006, and the required City contributions to the PFRS due June 30, 2006 will be paid with interest at 7.8% per annum no later than June 30, 2007.

## CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION

### *General*

Detroit is located in Southeastern Michigan and is the nation's 11th largest city. It is the central city of a metropolitan area that has a population of over four million people. Detroit is the largest city in Michigan and comprises almost one-half of Wayne County's population. Established in 1701 and incorporated in 1815, Detroit encompasses an area of 138 square miles. Like many other older, major cities in the Northeast, Detroit has experienced a significant decline in population since 1950, and an erosion of its economic base. Since the mid-1970s, the City, as well as private interests, have made substantial investments which have led to additional economic diversification and development during the last several years. The City is a major manufacturing center for the United States, and a regional center of finance, commerce and tourism. The City is located in a regional economy that, although diversifying, remains susceptible to swings in the national economy due to its concentration of employment in the durable goods industries, particularly the automobile industry.

Economically, Detroit relates primarily to the Tri-County area of Wayne, Oakland and Macomb counties. Officially, however, it is a part of a Primary Metropolitan Statistical Area (the "Detroit PMSA") that includes the Tri-County area, plus Monroe, Livingston, Lapeer and St. Clair counties.

### *Population*

The City's population count (established by U.S. Census) determines its legislative apportionment in Congress and in the State Legislature, and has a direct impact on Federal and State programs allocated in whole or in part on a *per capita* basis. While population growth in the Detroit PMSA significantly outpaced the national rate in the 1950s, the region's total population expanded more slowly in the 1960s and contracted (reflecting a significant net out-migration) in the 1970s and 1980s. Net population losses in the region were

primarily concentrated in the City. The remainder of the Detroit PMSA continued to experience population growth throughout the 1970s and 1980s. Originally consisting of the Tri-County Area, the region considered the metropolitan area was expanded geographically for U.S. statistical purposes, as population and industry dispersed, to add Lapeer, Livingston and St. Clair counties in 1973 and Monroe County in 1983.

Between 1950 and 2000, the City experienced substantial changes in the characteristics of its population, with differing migration patterns resulting in a net decline of 49% of its total population during the 50-year period. Detroit's share of total State and metropolitan area population also fell significantly.

### Table 31 – Population Trends, 1950-2000

| | City of Detroit | | Wayne County | | Detroit PMSA[1] | | U.S. |
|---|---|---|---|---|---|---|---|
| Year | Population | % Change | Population | % Change | Population | % Change | % Change |
| 1950 | 1,849,568 | - | 2,435,235 | - | 3,169,649 | - | - |
| 1960 | 1,670,144 | -9.70% | 2,666,297 | 9.49% | 4,050,840 | 27.80% | 18.50% |
| 1970 | 1,511,482 | -9.50 | 2,666,751 | 0.02 | 4,549,869 | 12.32 | 13.40 |
| 1980 | 1,203,339 | -20.39 | 2,337,891 | -12.33 | 4,488,072 | -1.36 | 11.40 |
| 1990 | 1,027,974 | -14.57 | 2,111,687 | -9.68 | 4,382,299 | -2.36 | 10.20 |
| 2000 | 951,270 | -7.46 | 2,061,162 | -2.39 | 4,441,551 | 1.35 | 13.20 |

SOURCE: U.S. Department of Commerce, Bureau of the Census.

----

(1) Consists of Lapeer, Livingston, Macomb, Monroe, Oakland, St. Clair and Wayne counties in Michigan.

### Table 32 – Distribution of Population by Age, 2000

| Age in Years | Population | % of Total |
|---|---|---|
| Under 5 | 76,232 | 8.0% |
| 5 to 9 | 93,882 | 9.9 |
| 10 to 14 | 83,361 | 8.8 |
| 15 to 19 | 68,707 | 7.2 |
| 20 to 24 | 65,654 | 6.9 |
| 25 to 34 | 144,323 | 15.2 |
| 35 to 44 | 136,695 | 14.4 |
| 45 to 54 | 115,971 | 12.2 |
| 55 to 59 | 38,045 | 4.0 |
| 60 to 64 | 29,344 | 3.1 |
| 65 to 74 | 52,863 | 5.6 |
| 75 to 84 | 35,213 | 3.7 |
| 85 years and over | 10,980 | 1.2 |
| Total | 951,270 | 100.0% |

SOURCE: U.S. Department of Commerce, Bureau of the Census.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 51 of 60

## Table 33 – Households by Type, 1970-2000

| Type of Household | 1970 No. of Households | 1970 % of Total | 1980 No. of Households | 1980 % of Total | 1990 No. of Households | 1990 % of Total | 2000 No. of Households | 2000 % of Total |
|---|---|---|---|---|---|---|---|---|
| | | | (number of households in thousands) | | | | | |
| Family | 370.0 | 74.3% | 289.3 | 66.7% | 244.3 | 65.3% | 218.5 | 64.9% |
| Married-couple | 286.8 | 57.6 | 173.2 | 40.0 | 109.8 | 29.4 | 89.7 | 26.7 |
| Single male head | 16.4 | 3.3 | 18.4 | 4.2 | 21.2 | 5.7 | 22.4 | 6.6 |
| Single female head | 66.8 | 13.4 | 97.7 | 22.5 | 113.2 | 30.3 | 106.4 | 31.6 |
| Non-family | 127.8 | 25.7 | 144.2 | 33.3 | 129.7 | 34.7 | 117.9 | 35.1 |
| Living alone | N.A. | N.A. | 125.3 | 28.9 | 111.3 | 29.8 | 99.9 | 29.7 |
| Total households | 497.8 | 100% | 433.5 | 100% | 374.1 | 100% | 336.4 | 100% |

SOURCE: U.S. Department of Commerce, Bureau of the Census.

NOTE: N.A. = Not Available. Family households consist of two or more related persons. Data may not add up to totals due to rounding.

### *Employment and Economic Base*

The economy of the City is influenced by trends in the durable goods industry and in particular the domestic automobile industry. Over the past two decades, all three major automotive companies have, at times, experienced financial problems adversely affecting the economy of the Detroit area. General Motors and DaimlerChrysler represent over 11% of the City's Taxable Valuation and are major employers in the City. Among the complex factors affecting the automotive industry are: national consumer spending patterns (related, among other things, to consumer confidence and perception, disposable income, credit availability and interest rates); the value of the U.S. dollar relative to foreign currencies; foreign trade restrictions; federal and state regulatory policies with respect to auto imports, safety, fuel efficiency and pollution emissions; the availability and price of gasoline; and organizational demand for fleet or specialized vehicles.

The following table sets forth certain information on total employment by industry group for the Detroit PMSA and the U.S. The region has in the past consistently maintained a greater percentage of persons employed in the manufacturing sector of the economy than the nation as a whole, which reflected the area's dependence on the automotive industry. The high percentage, however, has shown a decline in recent years such that the PMSA employment breakdown now is more similar to national statistics.

**(Balance of this page intentionally left blank)**

## Table 34 – Annual Average Wage and Salary Employment
### by Place of Work (Non-Agricultural)

| | Detroit-Warren-Livonia MSA | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2002** | | **2003** | | **2004** | | **2005** | |
| | **(000s)** | **%** | **(000s)** | **%** | **(000s)** | **%** | **(000s)** | **%** |
| **Industry Group** | | | | | | | | |
| Natural Resources & Mining | 90 | 4.3 | 85 | 4.1 | 86 | 4.2 | 85 | 4.1 |
| Construction | 12 | 0.6 | 11 | 0.5 | 11 | 0.5 | 11 | 0.5 |
| Manufacturing | 329 | 15.6 | 309 | 14.9 | 298 | 14.4 | 285 | 13.9 |
| Trade, Transportation & Utilities | 396 | 18.8 | 388 | 18.6 | 383 | 18.6 | 380 | 18.5 |
| Information | 38 | 1.8 | 37 | 1.8 | 36 | 1.8 | 35 | 1.7 |
| Financial Activities | 117 | 5.6 | 119 | 5.7 | 117 | 5.7 | 118 | 5.7 |
| Professional and Business Service | 368 | 17.5 | 364 | 17.5 | 358 | 17.3 | 372 | 18.1 |
| Educational & Health Services | 250 | 11.9 | 253 | 12.1 | 256 | 12.4 | 264 | 12.8 |
| Leisure & Hospitality | 178 | 8.4 | 181 | 8.7 | 182 | 8.8 | 182 | 8.8 |
| Other Services | 96 | 4.6 | 97 | 4.6 | 99 | 4.8 | 91 | 4.4 |
| Government | 232 | 11.0 | 238 | 11.4 | 237 | 11.5 | 234.0 | 11.4 |
| Totals | 2,104 | 100.0 | 2,083 | 100.0 | 2,062 | 100 | 2,057 | 100 |

| | U.S. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2002** | | **2003** | | **2004** | | **2005** | |
| | **(000s)** | **%** | **(000s)** | **%** | **(000s)** | **%** | **(000s)** | **%** |
| **Industry Group** | | | | | | | | |
| Natural Resources & Mining | 583 | 0.4 | 572 | 0.4 | 591 | 0.4 | 625 | 0.5 |
| Contruction | 6,716 | 5.2 | 6,735 | 5.2 | 6976 | 5.3 | 7,277 | 5.5 |
| Manufacturing | 15,259 | 11.7 | 14,510 | 11.2 | 14315 | 10.9 | 14,232 | 10.7 |
| Trade, Transportation & Utilities | 25,497 | 19.6 | 25,287 | 19.5 | 25533 | 19.4 | 25,909 | 19.4 |
| Information | 3,395 | 2.6 | 3,188 | 2.5 | 3118 | 2.4 | 3,066 | 2.3 |
| Financial Activities | 7,847 | 6.0 | 7,977 | 6.1 | 8031 | 6.1 | 8,141 | 6.1 |
| Professional and Business Service | 15,997 | 12.3 | 15,985 | 12.3 | 16395 | 12.5 | 16,882 | 12.6 |
| Educational & Health Services | 16,199 | 12.4 | 16,588 | 12.8 | 16953 | 12.9 | 17,342 | 13.0 |
| Leisure & Hospitality | 11,986 | 9.2 | 12,173 | 9.4 | 12493 | 9.5 | 12,802 | 9.6 |
| Other Services | 5,372 | 4.1 | 5,401 | 4.2 | 5309 | 4.0 | 5,386 | 4.0 |
| Government | 21,513 | 16.5 | 21,583 | 16.6 | 21621 | 16.5 | 21,803 | 16.3 |
| Totals | 130,364 | 100 | 129,999 | 100 | 131335 | 100 | 133,465 | 100 |

Notes: Totals may not addd due to rounding.
SOURCE: Michigan Department of Labor & Economic Growth, Office of Labor Market Informantion for
Detroit-Warren-Livonia MSA; U.S. Department of Labor, Bureau of Labor Statistics for U.S.

The following table shows the annual average unemployment rates for the City, the Detroit-Warren-Livonia CBSA, and the U.S. from 2001 to 2005.

**Table 35 – Civilian Unemployment Rates, 2001 to 2005**

|  | City of Detroit | Detroit-Warren-Livonia CBSA | U.S. |
|---|---|---|---|
| 2001 ............ | 9.8% | 5.4% | 4.8% |
| 2002 ............ | 11.9% | 6.4% | 5.8% |
| 2003 ............ | 14.6% | 7.2% | 6.0% |
| 2004 ............ | 14.0% | 7.1% | 5.5% |
| 2005 ............ | 14.1% | 7.2% | 4.9% |

SOURCE: Michigan Department of Labor & Economic Growth; U.S. Department of Labor, Bureau of Labor Statistics.

The following table shows a breakdown of manufacturing wage and salary employment by type for the Detroit-Warren-Livonia MSA for calendar years 2001 through 2005.

**Table 36 – Manufacturing Wage and Salary Employment**

| Industry Group: | 2001 | 2002 | 2003 | 2004 | 2005 |
|---|---|---|---|---|---|
| | | | (In Thousands) | | |
| Durable goods industries................................. | 305.1 | 280.8 | 262.6 | 253.0 | 244.6 |
| Nondurable goods industries | 50.8 | 48.6 | 46.8 | 44.7 | 44.2 |
| Total manufacturing employment................. | 355.9 | 329.4 | 309.4 | 297.7 | 288.8 |

SOURCE: Michigan Department of Labor & Economic Growth, Office of Labor Market Information.

### Construction

The following data shows trends in construction permits in the City.

**Table 37 – Trends in Construction Permits, 2001 to 2005**

| | Value (in millions) | | | |
|---|---|---|---|---|
| | New Construction | | Alterations/Additions | |
| | Residential | Non-Residential | Residential | Non-Residential |
| 2001 ..................... | $ 34.3 | $ 336.6 | $ 122.9 | $ 575.3 |
| 2002 ..................... | $ 10.6 | $ 385.8 | $ 75.9 | $ 622.2 |
| 2003 ..................... | $ 55.2 | $ 339.8 | $ 86.9 | $ 467.4 |
| 2004 ..................... | $ 71.0 | $ 280.1 | $ 124.0 | $ 330.8 |
| 2005 ..................... | $ 81.4 | $ 243.4 | $ 92.2 | $ 398.1 |

SOURCE: City of Detroit Department of Buildings and Safety Engineering.

NOTE: Residential includes single and multiple family dwellings.

### Housing Characteristics

Trends in the housing stock of the City have a direct impact on the City's levy and collection of *ad valorem* property taxes, because residential real property accounts for more than two-thirds of the valuation of

all real property in the City (see "ASSESSED VALUATION AND PROPERTY TAXES–Valuation by Type of Property" above).

The number of housing units in the City fell 29% between 1970 and 2000. Net losses have been concentrated in owner-occupied units, 16% of which were lost to the housing market in the 1970s, 21% of which were lost in the 1980s and 7% lost in the 1990s. Owner occupancy rates in the City declined from 60.0% in 1970 to 49% in 2000. Since 1990, the City has experienced a significant increase in the construction of new housing units. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION – Major Projects and Developments." Trends in the housing stock of the City have a direct impact on the City's collection of *ad valorem* property taxes, because residential real property accounts for more than two-thirds of the valuation of all real property in the City (see "ASSESSED VALUATION AND PROPERTY TAXES – Valuation by Type of Property" above).

#### Table 38 – Housing Inventory, 1970 to 2000

| Occupancy Status | 1970 | 1980 | 1990 | 2000 |
|---|---|---|---|---|
| | | (in thousands) | | |
| Owner-occupied | 298.6 | 250.9 | 197.9 | 184.6 |
| Renter-occupied | 199.1 | 182.6 | 176.1 | 151.8 |
| Vacant | 31.3 | 37.7 | 36.0 | 38.7 |
| Total housing units | 529.0 | 471.2 | 410.0 | 375.1 |

SOURCE: U.S. Department of Commerce, Bureau of the Census.

NOTE: Data may not add up due to independent recording. Excludes seasonal housing.

#### Table 39 – Housing Characteristics, 2000

| | City of Detroit | Wayne County | Detroit PMSA | United States |
|---|---|---|---|---|
| Percent owner-occupied | 54.9% | 66.6% | 72.4% | 66.2% |
| Rental vacancy | 8.3% | 7.2% | 6.4% | 6.8% |
| Median value of owner-occupied units | $ 63,600 | $ 96,200 | $ 127,800 | $119,600 |
| Median contract rent | $ 486 | $ 428 | $ 502 | $ 602 |
| Persons per household | 2.77 | 2.64 | 2.58 | 2.59 |

SOURCE: U.S. Department of Commerce, Bureau of Census.

NOTE: Value of Owner-Occupied Units is a self-reported estimate of the then-current market value, and therefore is not directly comparable to the SEV.

#### *Largest Employers*

Below is a listing of the largest private sector employers by company and by number of employees actually or estimated to be employed within the City at the end of calendar year 2005. The City and the School District are each major Detroit employers, employing approximately 14,619 and 20,162, respectively, as of June 30, 2005.

**Table 40 – Largest Private Employers**

**June 30, 2005**

| Company | Detroit Employment |
|---|---|
| Detroit Medical Center ............................................ | 10,617 |
| DaimlerChrysler AG................................................ | 9,900 |
| Henry Ford Health System ...................................... | 7,404 |
| General Motors Corporation..................................... | 6,311 |
| St. John Health System............................................ | 4,821 |
| American Axle & Manufacturing Holdings Inc. ..... | 4,309 |
| DTE Energy Co. ...................................................... | 3,987 |
| Compuware Corp...................................................... | 3,946 |
| Motor City Casino ................................................... | 2,800 |
| Blue Cross and Blue Shield of Michigan ............... | 2,694 |

SOURCE: Crain's *Book of Lists, 2006 Edition*, December 2005.

### *Port of Detroit*

The Detroit/Wayne County Port Authority ("DWCPA") is a public agency responsible for promoting trade and freight transportation through the Port of Detroit (the "Port"), which provides direct water service to world markets via the Great Lakes/St. Lawrence Seaway. The Port has five privately-owned and operated full-service terminals, a liquid bulk terminal and bulk facility, and a single dock facility with capacity for 14 ocean-going vessels. In addition, more than 30 industries located on the Detroit and Rouge Rivers have their own port facilities. A variety of ship repair services are available. The Detroit area, which is the largest foreign trade zone in the United States, provides financial advantages related to federal taxes and customs duties at subzones throughout the City and region. The Port is a principal port of entry for trade with Canada via bridge, vehicular tunnel, rail tunnel and barge service. Steel and scrap steel are the principal export products of the Port, handled for the three local steel mills. General cargo constitutes a minor portion of total tonnage due to the lack of regularly scheduled shipping service. See "CERTAIN ECONOMIC AND DEMOGRAPHIC INFORMATION - Major Projects and Developments."

**Table 41 – Waterborne Commerce of the Port of Detroit**
**(millions of short tons of 2,000 pounds)**

| FISCAL YEARS | Foreign | | | Domestic Total | Grand Total |
|---|---|---|---|---|---|
| | Canadian | Overseas | Total | | |
| 1993 ............... | 2.4 | 0.9 | 3.3 | 13.9 | 17.2 |
| 1994 ............... | 4.5 | 1.5 | 6.0 | 12.7 | 18.7 |
| 1995 ............... | 2.6 | 1.0 | 3.7 | 15.2 | 18.9 |
| 1996 ............... | 4.6 | 1.7 | 6.3 | 12.3 | 18.6 |
| 1997 ............... | 4.8 | 1.3 | 6.1 | 12.0 | 18.1 |
| 1998 ............... | 5.0 | 1.9 | 6.9 | 12.5 | 19.4 |
| 1999 ............... | 3.5 | 1.1 | 4.6 | 12.3 | 16.9 |
| 2000 ............... | 4.1 | 1.1 | 5.2 | 12.0 | 17.2 |
| 2001 ............... | 4.3 | 0.4 | 4.7 | 12.3 | 17.0 |
| 2002 ............... | 3.7 | 0.7 | 4.4 | 12.9 | 17.3 |
| 2003 ............... | 3.5 | 0.4 | 3.9 | 10.4 | 14.3 |

SOURCE:        Detroit/Wayne County Port Authority.

### Transportation Network

Five major rail lines provide direct service to the Detroit area by such railroad companies as Conrail, Norfolk Southern, Grand Trunk Western, Canadian Pacific and CSX Transportation. Major cargoes handled by the rail lines in the Detroit area include automobiles, auto parts, steel, chemicals and food products.

Air transportation service is provided to the City at the Detroit City Airport, with general aviation, cargo and scheduled passenger services, and at the Detroit Metropolitan Wayne County Airport, the nation's 10th largest international airport and the largest hub for Northwest Airlines. More than 30 other scheduled airlines provided domestic and international service with more than 1 million annual passenger enplanements and 137,000 tons of annual enplaned cargo.

This area's extensive toll-free highway system, which includes the I-94, I-75, I-96 and I-696 interstate highways and Canadian 401, provides one-day access, based on a 500-mile day, to 48% (by population) of the U.S. market and to the Province of Ontario, Canada.

### Major Projects and Developments

A number of major developments have been completed during the past three years, and others are in various stages of construction in the City. Most of the projects represent joint efforts between the public and private sectors Below are brief descriptions of the major developments, including announced financing sources.

#### Merchants Row

Merchants Row, a $30 million redevelopment project of eight 1910 era buildings adjacent to the corporate offices of Compuware Corporation, includes 163 loft condominiums, a 264-space parking garage and 28,400 square feet of retail and restaurant space.

#### 1001 Woodward

This 26-story, twin office tower, adjacent to the Campus Martius project, has undergone a $20 million renovation, along with the addition of a $10 million 500-space parking structure.

#### Downtown YMCA

The YMCA of Metropolitan Detroit recently completed the construction of the 5-story Boll Family YMCA at a cost of $35 million. The new facility houses an auditorium, two swimming pools, a health and fitness center, a wellness center and a childcare center.

#### Woodward Millennium

A $37 million mixed-use development is nearing completion in the medical center area. The development will include 180 units of loft-style condominiums and garden-style apartments, a parking garage and retail space.

#### St. Anne's Gate

This new housing development is located in southwest Detroit near the Ambassador Bridge and consists of new single and multi-family homes. The total project cost is expected to be $41 million.

#### Tri-Centennial Village

A $19 million housing development is being constructed on Detroit's west side. The development will include 165 single-family homes, 85 of which will be constructed by Habitat for Humanity.

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 57 of 60

### Woodward Place at Brush Park

Woodward Place at Brush Park – Phase II. Construction will continue over the next three years, ultimately adding up to 700 new housing units. The project also involves the renovation of several historic homes for residential use. The total cost of the project is $75 million.

### Brush Park Manor

A 91,000 square foot senior apartment residence on 3.3 acres of land on Brush Street was recently completed. The 3-story complex consists of 113 apartments. The estimated cost of the project is $9.9 million.

### Greyhaven Marina Village

Greyhaven Marina Village is being constructed in phases on a 15-acre site on the Detroit River. Phase one consisted of 190 apartments and town homes overlooking the Detroit River. Phase two consists of 144 condominium units. The total cost of the development was $21 million. A third phase under development is the $25 million Shorepoint Village consisting of 57 single-family homes.

### Woodbridge Estates

The $98 million project includes 247 rental units, 101 new homes, town homes and duplex condominiums and 297 enhanced service units on a former public site. In addition, the project will include retail space and a community center. The project is being funded with both public and private funds.

### Federal Reserve Bank

The $79.5 million, 220,000-square foot Detroit branch northeast of downtown was recently completed to handle check clearing, currency processing, economic analysis and conferences, and serves Michigan's Lower Peninsula.

### New Center Lofts

This $14.28 million residential project includes 102 loft-style, two-story townhouses located in northwest Detroit. Later phases will include three-story townhouses.

### Morningside Commons

Located on the City's east side, this $30 million housing development is being constructed in phases. The first phase of the development consisted of 40 new single-family homes. The second phase consisted of a 64-unit multi-family townhouse development. Currently under construction, phase three will consist of the construction of 50 new single-family homes and the rehabilitation of 10 existing single-family homes.

### Lombardo Heritage

A $197.7 million housing complex is being constructed in phases on a 10.5-acre parcel on the City's east side. Upon completion, the complex will include 126 condominium homes with basements.

### Palmer Street Redevelopment

Located near the Wayne State University district, this $10 million project consists of the rehabilitation of nine existing buildings and the construction of new townhouses into a total of 115 housing units.

### River Park Village Senior Apartments

The 15-story Whittier building will be converted into a $66 million development of 80 senior apartments, other loft-style apartments and retail space.

### The PricewaterhouseCoopers Building

The accounting firm PricewaterhouseCoopers is nearing completion of a $26 million 115,000-square foot, five-story office building adjacent to Ford Field football stadium. PricewaterhouseCoopers will occupy the first four floors of the building, with the fifth floor available for lease to a future tenant. A 1,200-stall parking garage has been constructed immediately north of the building on an adjacent parcel of land.

### St. John Hospital and Medical Center

St. John Hospital is constructing a $12 million, 62,000-square foot medical office building on its Riverview hospital campus. The health care provider will also build a $141 million hospital tower and a $15 million emergency department expected to open in 2008 at its eastside location in the City.

### The Salvation Army Southeast Adult Rehabilitation Center

The Salvation Army Southeast Adult Rehabilitation Center in downtown Detroit completed a $26 million renovation that added 100 beds, renovated offices, added a dining room and moved its thrift store.

### Detroit-Wayne County Port Authority

The Detroit/Wayne County Port Authority ("DWCPA") financed a $43 million mixed-use facility on the east riverfront in downtown Detroit. The project consists of 18,000 square feet of ground floor retail space and upper floors and a parking garage with 1,174 parking spaces.

### Kennedy Square Office Building

This $54 million project is being built on top of an existing underground garage in the downtown area. Expected to be completed in June 2006, the 10-story, 240,000-square foot office building will offer ground floor retail space and house up to 1,300 workers.

### Casino Development

A recent court settlement has paved the way for the construction of three permanent casinos in the City. Each casino will expand in or near its current temporary location at a cost of about $200 million each. Each casino will have a minimum of 100,000 square feet of gaming space, a 400-room hotel and additional parking and restaurants. See "FINANCIAL OPERATIONS - General Fund Revenue Categories."

13-53846-tjt    Doc 3153-6    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 59 of 60

[THIS PAGE INTENTIONALLY LEFT BLANK]