g. Long-term Obligations activity for the Year Ended June 30, 2005:

| | Balance June 30, 2004 | Increase | Decrease | Balance June 30, 2005 | Amount Due Within One Year |
|---|---|---|---|---|---|
| **Governmental Activities:** | | | | | |
| **Long-Term Obligations, Notes, Loans and POC's:** | | | | | |
| Convention Facility-Cobo Center | $135,368,138 | - | $10,355,000 | $125,013,138 | $10,830,000 |
| Exposition Revenue Bonds | 11,613,826 | - | 1,691,873 | 9,921,953 | 1,599,790 |
| Detroit Building Authority Bonds | 47,295,000 | - | 10,540,000 | 36,755,000 | 14,585,000 |
| Distributable State Aid Bonds | 98,895,000 | 62,285,000 | - | 161,180,000 | 30,855,000 |
| Self-Insurance Limited Tax Bonds | 523,355,000 | 192,730,000 | 184,400,000 | 531,685,000 | 30,855,000 |
| General Obligation Tax Bonds | 157,825,000 | 98,815,000 | 18,365,000 | 238,275,000 | 22,795,000 |
| Total general fund bonds | 974,151,964 | 353,830,000 | 225,151,873 | 1,102,830,091 | 80,664,790 |
| Federal Note — Casino Pharmaceutical Project | 5,208,000 | - | 942,000 | 4,266,000 | 990,000 |
| Federal Note — Ferry Project | 2,900,000 | - | 85,000 | 2,815,000 | 90,000 |
| Federal Note — Garfield Project | 1,945,000 | - | 105,000 | 1,840,000 | 105,000 |
| Federal Note — Michigan Repacking Project | 1,290,000 | - | 1,290,000 | - | 80,000 |
| Federal Note — Riverfront Project | 1,150,000 | - | 80,000 | 1,070,000 | 80,000 |
| Federal Note — Stoudamire Project | 300,000 | - | - | 315,000 | 15,000 |
| Federal Note — New Amsterdam Project | 9,700,000 | - | - | 9,700,000 | 15,000 |
| Federal Note — Mexicantown Welcome Center | - | 7,289,000 | - | 7,289,000 | - |
| Loan Payable to Downtown Development Authority | 33,600,000 | - | - | 33,600,000 | - |
| Loans Payable-GE Capital - Schedule-009 | 2,327,537 | - | 435,355 | 1,892,182 | 492,242 |
| Loans Payable-GE Capital - Schedule-010 | 176,130 | - | 34,884 | 141,246 | 39,464 |
| Loans Payable-GE Capital - Schedule-011 | 14,320,318 | - | 6,860,798 | 7,459,520 | 2,697,231 |
| Loans Payable-GE Capital - Schedule-012 | 491,400 | - | 106,899 | 384,501 | 95,235 |
| Loans Payable-GE Capital - Schedule-013 | 1,285,029 | - | 106,148 | 1,178,881 | 111,474 |
| Loans Payable-GE Capital - Schedule-014 | 529,661 | - | 90,765 | 438,896 | 103,018 |
| Loans Payable-GE Capital - Schedule-015 | - | 149,320 | 27,764 | 121,556 | 48,902 |
| Loans Payable-GE Capital - Schedule-021 | - | 166,031 | 12,850 | 153,181 | 53,728 |
| Total Governmental Notes and Loans | 75,253,075 | 8,104,350 | 10,192,463 | 73,164,963 | 4,291,293 |
| Pension Obligation Certificates | - | 1,170,607,622 | - | 1,170,607,622 | - |
| Total Long-Term Bonds, Notes, and Pension Obligation Certificates | 1,049,405,039 | 1,532,541,972 | 235,344,336 | 2,346,602,676 | 85,586,083 |
| **Other Long-Term Obligations:** | | | | | |
| Accrued Compensated Absences | 140,471,015 | 19,527,492 | 3,000,213 | 156,998,294 | 112,401,028 |
| Claims and Judgments | 121,872,574 | 20,419,251 | 9,349,644 | 132,942,181 | 5,033,133 |
| Accrued Public Liability and Workers' Compensation | 65,411,378 | 11,939,999 | 12,657,666 | 64,693,711 | 12,080,784 |
| Total Other Long-Term Obligations | 327,760,967 | 51,886,242 | 25,007,503 | 354,639,706 | 129,516,945 |
| Total General Long-Term Obligations | $1,377,166,006 | $1,584,428,014 | $260,351,839 | $2,701,242,182 | $215,103,028 |

---

| | Balance June 30, 2004 | Increase | Decrease | Balance June 30, 2005 | Amount Due Within One Year |
|---|---|---|---|---|---|
| **Business-type Activities:** | | | | | |
| **Long-term Debt and Obligations:** | | | | | |
| **Sewage Disposal Fund:** | | | | | |
| Bonds Payable | 2,375,152,599 | 430,838,974 | (141,355,000) | 2,653,636,573 | 50,035,000 |
| Pension Obligation Certificates Payable | 12,158,263 | 8,760,811 | (495,531) | 8,760,811 | 5,550,011 |
| Accrued Compensated Absences | 5,206,684 | 478,827 | (964,545) | 4,723,969 | 895,835 |
| **Transportation Fund:** | | | | | |
| Capital Lease-for Buses | | 33,110,926 | - | 33,110,926 | 2,577,808 |
| Pension Obligation Certificates Payable | 103,083,553 | - | - | 103,083,553 | 3,039,331 |
| Accrued Compensated Absences | 3,730,161 | 69,003 | (318,586) | 3,799,164 | 982,272 |
| **Water Fund:** | | | | | |
| Bonds Payable | 3,548,100 | 1,731,846 | (148,435,000) | 4,981,360 | |
| Bonds Payable | 1,713,435,000 | 426,605,060 | (1,376,814) | 1,991,615,900 | 24,595,060 |
| Pension Obligation Certificates Payable | 15,989,521 | 4,203,965 | (4,205,530) | 157,548,214 | 8,604,763 |
| Accrued Compensated Absences | 15,778,254 | 7,593,612 | | 18,413,672 | 3,470,751 |
| **Automobile Parking Fund:** | | | | | |
| Bonds Payable | 67,180,000 | 360,000 | (6,615,000) | 18,711,346 | 6,615,000 |
| Accrued Compensated Absences | 443,093 | 112,098 | | 60,845,000 | 251,636 |
| **Non-Major Fund:** | | | | | |
| Accrued Compensated Absences | 463,278 | 11,154 | (108,895) | 559,191 | 62,456 |
| Accrued Public Liability and Workers' Compensation | 122,649 | 19,863 | (53,236) | 80,386 | 21,726 |
| Total Bonds and Leases Payable | 4,155,687,999 | 879,104,900 | (296,595,000) | 4,238,397,899 | 83,523,088 |
| Total POC's Payable | 33,392,916 | 360,392,578 | (1,984,342) | 369,392,578 | 15,514,197 |
| Total Accrued Compensated Absences | 24,655,687 | 6,633,296 | (5,586,874) | 37,059,370 | 3,579,074 |
| Total Public Liability and Workers' Compensation | | 9,412,148 | | 28,485,961 | |
| Total Long-Term Debt and Obligations of City of Detroit | 4,212,735,602 | 1,164,569,922 | (203,966,116) | 5,073,330,808 | 108,716,979 |
| **Component Units:** | | | | | |
| **School District of the City of Detroit:** | | | | | |
| Bonds, Notes and Leases Payable | 1,589,256,609 | 210,922,343 | (88,813,100) | 1,711,275,743 | 47,733,281 |
| Accrued Compensated Absences | 147,602,684 | 3,663,000 | (33,156,393) | 118,419,291 | 6,308,877 |
| **Other Component Units:** | | | | | |
| Bonds, Notes and Leases Payable | 56,401,699 | 140,676,611 | (155,067,664) | 41,910,846 | 16,390,913 |
| Accrued Compensated Absences | 1,792,530,992 | 355,261,954 | (277,136,666) | 1,871,595,880 | 70,533,071 |
| Bonds, Notes and Leases Payable | 799,152,416 | 798,815,416 | (72,580,831) | 686,362,385 | 68,844,523 |
| Accrued Compensated Absences | 3,185,104 | 1,043,852 | | 4,228,956 | 1,462 |
| Accrued Public Liability and Workers' Compensation | 587,812 | | (123,841) | 724,899 | 353,255 |
| Total Component Units | $764,925,332 | $1,843,852 | $(17,982,341) | $691,664,420 | $69,338,661 |

(Continued)

(Continued)

13-53846-tjt    Doc 3153-8    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 1 of 54

C-61

## 5. Derivatives not reported at fair value

The City is party to derivative financial instruments consisting of interest rate swaps that are intended to effectively convert variable-rate financings to fixed-rate financings. These are not reported at fair value on the Statement of Net Assets at June 30, 2005.

*Objective of the swaps.* In order to better manage its interest rate exposure and to reduce the overall costs of its financings, the City has entered into 31 separate fixed-payor interest rate swaps.

*Terms, fair values, and credit risk.* Certain key terms, fair market values, and counterparty credit ratings relating to the outstanding swaps as of June 30, 2005, are presented below. The notional amounts of the swaps, except those with effective dates of 9/1/06, and 3/1/07, match the principal amounts of the outstanding financings. The swaps with effective dates of 9/1/06, and 3/1/07, were entered into to hedge future interest rate risk and will be associated with financings expected to be issued prior to the effective dates. Except as discussed under rollover risk, the City's swap agreements contain scheduled reductions to outstanding notional amounts that match scheduled or anticipated amortization of associated financings.

*Market access risk.* The City is exposed to market access risk in its hedge swaps or forward starting swaps in the event that it will not be able to enter credit markets in the event that the credit will become more costly.

(Continued)

---

| Associated Financing Issue | Notional Amounts (1) | Effective Date | Fixed Rate Paid | Variable Rate Received | Fair Values | Swap Termination Date | Final Maturity of Bonds | Counterparty Credit Rating |
|---|---|---|---|---|---|---|---|---|
| Building Authority Series 1998-A | $28,300,000 | 10/21/1999 | 7.48% | LIBOR BBA IMF+.29% | $-12,994,248 | 7/1/2029 | 7/1/2029 | Aa1/AA-/AA+ |
| Sewage 1998-A | 68,000,000 | 12/10/1998 | 4.51% | BMA (2) | -8,544,876 | 7/1/2033 | 7/1/2033 | Aa2/AA-/NR |
| Sewage 1998-B | 67,900,000 | 12/10/1998 | 4.51% | BMA | -8,570,700 | 7/1/2033 | 7/1/2033 | Aa2/AA-/NR |
| Water 2001-C (1) | 47,723,000 | 6/7/2001 | 4.07% | BMA | -499,637 | 1/20/06 | 7/1/2029 | Aaa/AA-/NR |
| Water 2001-C (2) | 50,053,000 | 6/7/2001 | 5.42% | BMA | -2,263,911 | 7/1/2011 | 7/1/2029 | Aaa/AA-/NR |
| Water 2001-C (3) | 47,628,000 | 1/1/2006 | 5.42% | BMA | -4,882,486 | 7/1/2011 | 7/1/2029 | Aaa/AA-/NR |
| Water 2001-C | 114,150,000 | 6/7/2001 | 4.50% | BMA | -20,866,778 | 7/1/2026 | 7/1/2029 | Aa2/A+/AA+ |
| Sewage 2001-C-1 | 124,500,000 | 10/23/2001 | 4.43% | BMA | -21,294,338 | 7/1/2027 | 7/1/2029 | Aa2/AA+/AAA |
| Sewage 2001-C-2 | 124,500,000 | 10/23/2001 | 4.47% | BMA | -18,778,403 | 7/1/2029 | 7/1/2029 | Aa2/AA+/AA |
| Water 2003-B | 1,980,000 | 1/30/2003 | 3.02% | CPI + 1.01% | 48,504 | 7/1/2009 | 7/1/2009 | Aa3/A+/AA- |
| Water 2003-B | 2,290,000 | 1/30/2003 | 3.31% | CPI + 1.17% | 37,487 | 7/1/2010 | 7/1/2010 | Aa3/A+/AA- |
| Water 2003-B | 2,500,000 | 1/30/2003 | 3.55% | CPI + 1.25% | 36,336 | 7/1/2011 | 7/1/2011 | Aa3/A+/AA- |
| Water 2003-B | 2,175,000 | 1/30/2003 | 3.74% | CPI + 1.33% | 16,814 | 7/1/2012 | 7/1/2012 | Aa3/A+/AA- |
| Water 2003-C | 2,800,000 | 1/30/2003 | 3.87% | CPI + 1.34% | 22,993 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA- |
| Water 2003-C | 2,505,000 | 1/30/2003 | 4.00% | CPI + 1.34% | 28,815 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA- |
| Water 2003-C | 2,905,000 | 1/30/2003 | 3.87% | CPI + 1.34% | 15,887 | 7/1/2013 | 7/1/2013 | Aa3/A+/AA- |
| Water 2003-C | 3,320,000 | 1/30/2003 | 4.00% | CPI + 1.34% | -961 | 7/1/2014 | 7/1/2014 | Aa3/A+/AA- |
| Sewage 2002-D | 150,865,000 | 2/9/2003 | 4.06% | BMA | -15,909,255 | 7/1/2031 | 7/1/2033 | Aa2/AA-/NR |
| Sewage 2002-B | 150,000,000 | 5/23/2003 | 4.14% | BMA | -4,737,686 | 7/1/2023 | 7/1/1933 | Aa2/AA+/AAA |
| Water 2004-A | 77,610,000 | 5/13/2004 | 3.94% | BMA | -6,144,865 | 7/1/2025 | 7/1/2025 | Aa2/AA-/NR |
| Water 2004-B | 161,545,000 | 5/13/2004 | 3.85% | BMA | -10,637,488 | 7/1/2033 | 7/1/2033 | Aa2/AA-/NR |
| Sewage Hedge Swap | 125,000,000 | 9/1/2006 | 4.95% | BMA | 21,213,900 | 7/1/2036 | N/A | Aa3/AA+/AAA |
| Pension Obligation Certicates-GRS | 161,400,000 | 6/2/2005 | 5.17% 3 MTH LIBOR +.28% | | 6,185,075 | 6/15/2025 | 6/15/2025 | Aa3/AA+/AAA |
| Pension Obligation Certicates-GRS | 150,349,000 | 6/2/2005 | 4.64% 3 MTH LIBOR +.18% | | 2,096,842 | 6/15/2014 | 6/15/2014 | Aa3/AA+/AAA |
| Pension Obligation Certicates-GRS | 168,251,000 | 6/2/2005 | 4.98% 3 MTH LIBOR +.28% | | 4,783,333 | 6/15/2018 | 6/15/2018 | Aa3/AA+/AAA |
| Pension Obligation Certicates-GRS | 33,800,000 | 6/2/2005 | 5.17% 3 MTH LIBOR +.28% | | -2,072,384 | 6/15/2025 | 6/15/2025 | Aa3/AA+/AAA |
| Pension Obligation Certicates-PFRS | 50,123,000 | 6/2/2005 | 4.64% 3 MTH LIBOR +.18% | | -700,403 | 6/15/2014 | 6/15/2014 | Aa3/AA+/AAA |
| Pension Obligation Certicates-PFRS | 56,077,000 | 6/2/2005 | 4.98% 3 MTH LIBOR +.28% | | -1,581,174 | 6/15/2014 | 6/15/2014 | Aa3/AA+/AAA |
| Pension Obligation Certicates-PFRS | 53,800,000 | 6/2/2005 | 5.17% 3 MTH LIBOR +.28% | | -3,033,307 | 6/15/2025 | 6/15/2025 | Aa3/AA+/AAA |
| Pension Obligation Certicates-PFRS | 50,123,000 | 6/2/2005 | 4.64% 3 MTH LIBOR +.18% | | -659,624 | 6/15/2014 | 6/15/2014 | Aa3/AA+/AAA |
| Pension Obligation Certicates-PFRS | 56,077,000 | 6/2/2005 | 4.98% 3 MTH LIBOR +.28% | | -1,553,680 | 6/15/2018 | 6/15/2018 | Aa3/AA+/AAA |

1. Notional amount balance as of July 1, 2005
2. The Bond Market Association Municipal Swap Index ™
3. Denotes that the swap termination date does not match the final maturity of the financings.

**Fair Value:** Because interest rates have generally declined since the time the swaps were negotiated, many of the City's swaps have a negative fair value as of June 30, 2005. The negative fair values may be countered by lower total interest payments required under the variable-rate financing, creating lower synthetic interest rates.

(Continued)

**Credit Risk:** As of June 30, 2005, the City was not significantly exposed to net credit risk on the swaps as the majority of the swaps had positive fair values. However, should interest rates change and fair values of the swaps become positive, the City would be exposed to credit risk in the amount of the derivatives' positive fair value.

The swap agreements contain varying collateral agreements with the counterparties. The swaps require full collateralization of the fair value of the swap should the counterparty's credit rating fall below certain rating levels by Fitch Ratings, Standard & Poor's, and/or Moody's Investors Service. Collateral on all swaps is to be in the form of U.S. government securities held by a third-party custodian.

**Basis Risk:** The City is not exposed to significant basis risk on its swaps because most of the variable payments received are based on the BMA index. The CPI indexed swaps are associated with CPI indexed financings and thus create no basis risk. The LIBOR based swap has basis risk on $28.3 million of swaps.

**Termination Risk:** The City or counterparty may terminate any of the swaps if the other party fails to perform under the terms of the contract. In most cases, the City may owe or be due a termination payment depending on the value of the swap at that time. In addition, the City is exposed to termination risk, but not termination payments, on certain of the City's swaps related to Water Series 2001C, Water Series 2001D, Water Series 2004-A, Water Series 1998A, Sewer Series 1998B, Sewer Series 2001-C-1, Sewer Series 2001-C-2, and Sewer Series 2001-B. These swaps provide the counterparty with the option to terminate the swap agreement beginning on 1/01/2010, 7/02/2011, 7/01/2005, 7/01/2008, 7/01/2008, 1/01/2010, 1/01/2010, and 7/01/2013, respectively, upon the passing of certain BMA thresholds. If any of these swaps are terminated, the associated variable-rate financings would no longer carry synthetic interest rates, but there would be no termination payment.

**Rollover Risk:** The City is exposed to rollover risk on swaps that mature or may be terminated prior to the maturity of the associated financings. When these swaps terminate, or in the case of the termination option, if the counterparty exercises its option, the City will not realize the synthetic rate offered by the swaps on the underlying issues.

**Swap Termination Payment:** During the year ended June 30, 2005, the Sewage Disposal Fund and its counterparty terminated a swap existing in anticipation of the issuance of debt in fiscal year 2005. The Fund paid a termination payment in the amount of $11,750,000 that has been reserved to offset future debt service. The payment will be recognized over the life of the debt using the straight-line method.

**6. Other Information**

**Automobile Parking Fund**

The City has covenanted in bond authorizing documents to charge for the use of and services provided by the City of Detroit Building Authority Parking Area System (the System) for each fiscal year of the City such that the gross revenues collected and remitted to the trustee (1) will be at least sufficient to at all times pay when due the principal, interest, and sinking fund installments on the revenue bonds without recourse to the Debt Reserve Account, to pay or provide for all operating expenses, to maintain the System in good repair without recourse to the Operating and Maintenance Reserve Fund, and to replenish the Debt Reserve Account (so as to satisfy the corresponding reserve requirement) and the Operating and Maintenance Reimbursement Fund, and (2) will, after replenishment of any deficit in the Debt Reserve Account, Operating and Maintenance Reimbursement Fund, and the Operating and Maintenance Reimbursement Fund, be equal to or greater than 175% of the amount payable in such fiscal year as the principal of and interest installments for the interest on all revenue bonds, net of amounts capitalized for interest payable during the construction period.

The City has covenanted further that if the fees and charges collected in any fiscal year are not sufficient to produce such revenues, the City will employ a consulting expert to submit recommendations as to revision of its schedule of fees then in effect and the City will thereafter change and collect fees in accordance with such recommendations. The schedule of charges for the System may not be revised for a period of two years (unless (1) such revision is for purpose of complying with the provisions of any covenant contained in the bond authorizing documents or (2) such revision is the subject of a consultant report stating the opinion that if such revision had been in effect during the whole of the next fiscal year immediately prior thereto, the revenues collected during such fiscal year would not have been diminished, and (2) at the time of any reduction in charges, the amounts in the Debt Reserve Account and Operating and Contingency Reserve Fund equal or exceed the reserve requirements.

(Continued)

---

The revenue bond documents specify that additional bonds may be issued by the Fund for the purpose of financing additions, replacements, and improvements to the City of Detroit Building Authority Parking Area System, provided that the trustee shall have received all legally required authorized opinions and certificates and that the estimated gross revenues (as defined in the bond authorizing documents) for the five years following completion of the facilities will be at least (1) 175% of annual debt service on all parity outstanding bonds, or (2) the sum of annual debt service on all parity outstanding bonds (including the Additional Bonds) plus the amount necessary to make all required payments to the various funds maintained by the trustee, whichever is greater. Other than as described above, the Parking Fund may not issue any obligations secured by gross revenues from the System unless any resulting lien on the System's gross revenues is expressly subordinate to liens for the bondholders' or trust's benefit as described above.

**Sewage Disposal and Water Funds Construction Programs**

The Sewage Disposal Fund is engaged in a variety of projects that are part of a five-year Capital Improvement Program (the Program). The total cost of this Program is anticipated to be approximately $2.1 billion through fiscal year 2007. The Program is being primarily financed from revenues of the Sewer Fund and proceeds from the issuance of revenue bonds.

The Sewage Disposal Fund total construction contract commitments outstanding at June 30, 2005 were approximately $453 million.

The Water Fund is engaged in a variety of projects that are part of a Program. The total cost of this Program is anticipated to be approximately $1.6 billion through fiscal year 2007. The Program is being primarily financed from revenues of the Water Fund and proceeds from the issuance of revenue bonds.

The Water Fund total construction contract commitments outstanding at June 30, 2005 were approximately $101 million.

**Pension Plans**

The City of Detroit Retirement System consists of the General Retirement System (GRS) and the Policemen and Firemen Retirement System (PFRS). Each system is a single-employer plan composed of a Defined Benefit Plan and a Defined Contribution Annuity Plan. The plans provide retirement, disability, and death benefits to plan members and beneficiaries. The Systems issued publicly available financial reports that include financial statements and the required supplementary information. The reports can be obtained from City of Detroit Retirement Systems, 2 Woodward Avenue, Coleman A. Young Municipal Center, Room 908, and Detroit, Michigan 48226.

These plans are administered in accordance with the City Charter and union contracts, which assign the authority to establish and amend contributions and benefit provisions to each plan's Board of Trustees. The Systems' investment policies are governed in accordance with the State Public Act 314 of 1965, as amended.

The plans' financial statements are prepared using the accrual basis of accounting. Plan member contributions are recognized in the period in which the contributions are due. Employer contributions are recognized when due and the City has made a formal commitment to provide the contributions. Benefits and refunds are recognized when due and payable, in accordance with the terms of each plan.

Plan investments are reported at fair value. Short-term investments are reported at cost, which approximates fair value. Securities traded on a national or international exchange are valued at last reported sales price at current exchange rates. Mortgages are valued on the basis of seeking road installments for the interest on all revenue bonds. For investments that do not have an established market are reported at estimated fair value.

The City's policy is to fund normal costs and amortization of prior service costs. The City is required to contribute as an actuarially determined rate the current rate is up to 27.54% of active annual payroll for the General Retirement System (depending on the bargaining unit) and 27.68% of active annual payroll for the Policemen and Firemen Retirement System. Contributions from City funds and the Detroit Public Library fund, including accounts receivable for the year ended June 30, 2005, amounted to $776,281,023 and $693,967,089 for the General Retirement System and the Policemen and Firemen Retirement System, respectively.

(Continued)

---

Employee contributions for annuity savings are as follows:

- General Retirement System — Employees may elect to contribute 3%, 5%, or 7% of the first $87,900 of annual compensation and 5% or 7% of any excess over $87,900. Contributions are voluntary for all union and non-union employees.

- Policemen and Firemen Retirement System — Mandatory contributions are 5% of base compensation until eligibility for retirement is reached.

Contributions received from employees during the year ended June 30, 2005 amounted to $22,648,662 and $10,430,854 respectively.

The contribution requirements of plan members and the City are established and may be amended by the Board of Trustees in accordance with the City Charter, union contracts, and plan provisions.

Members may retire with full benefits after attaining 30 years of service; age 55 with 30 years of service if hired after January 1, 1996; age 60 with 10 years of service; or age 65 with 8 years of service. Employees may retire after 25 years of service and collect an actuarially reduced retirement benefit. Monthly pension benefits, which are subject to certain minimum and maximum amounts, are determined according to fixed rates per year of credited service.

Members of the General Retirement System who separated prior to July 1, 1981, met the age and service requirements, and who did not withdraw their accumulated annuity contributions are generally eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1981 are not required to leave their accumulated annuity contributions in the System. Pension benefits for all members of the GRS are increased annually by 2.25% of the original amount.

Police officers and firefighters hired prior to January 1, 1969 may retire after 25 years of service with full benefits and an escalator clause for future increases. Police officers and firefighters hired after January 1, 1969 may retire after 25 years of service with full benefits and a yearly cost-of-living adjustment of 2.25%. For those members of the PFRS who were hired after January 1, 1969, pension benefits are increased annually by 2.25% of the original pension. Police officers and firefighters hired before January 1, 1969 may elect at retirement increases based upon pay increases of active members or annual increases of 2.25% of the original pension.

Members of the Policemen and Firemen Retirement System who separated prior to July 1, 1982, met the age and service requirements, and who did not withdraw their accumulated annuity contributions are generally eligible for a pension at the time they would have been eligible had they continued in City employment. Members who separate after July 1, 1982 and meet the age and service requirements are able to withdraw their accumulated contributions and remain eligible for a benefit.

Employee contributions to both systems for annuity savings may be withdrawn upon separation from the City. At retirement, members have the option to withdraw all or part of their accumulated annuity contributions plus interest in either a lump sum or to receive monthly annuity payments. Employees in both systems may withdraw their annuity balance if they have accumulated 25 years of service. The following details the schedule of employer contributions (in millions):

**General Retirement System**

| Year Ended June 30 | Annual Pension Costs | Percentage Contributed | Net Pension Asset |
|---|---|---|---|
| 2003 | 72.9 | 100 | — |
| 2004 | 95.9 | 100 | — |
| 2005 | 106.4 | 754 | $695.6 |

**Policemen and Firemen Retirement System**

| Year Ended June 30 | Annual Pension Costs | Percentage Contributed | Net Pension Asset |
|---|---|---|---|
| 2003 | 66.8 | 100 | — |
| 2004 | 69.5 | 100 | — |
| 2005 | 98.8 | 754 | $595.1 |

(Continued)

---

The annual pension costs and net pension assets as of the City June 30, 2005 are as follows:

| | PAFRS Governmental Activities | GRS Governmental Activities | GRS Business-Type Activities Transportation Fund | GRS Business-Type Activities Sewage Disposal Fund | GRS Business-Type Activities Water Fund | Total Primary Government |
|---|---|---|---|---|---|---|
| Annual required contributions (ARC) | $ 98,842,261 | $ 63,430,814 | $ 15,992,663 | $ 6,309,722 | $ 17,571,543 | $ 202,217,003 |
| Annual pension cost | 691,067,989 | 480,048,802 | 113,098,169 | 14,210,050 | 668,024,061 | 1,670,348,114 |
| Contributions made (employer) | | | | | | |
| Changes in net pension asset | 595,124,828 | 416,597,988 | 98,005,506 | 7,850,281 | 150,652,508 | 1,268,031,111 |
| Net pension asset, beginning of year | | | | | | |
| Net pension asset, end of year | $ 595,124,828 | $ 416,597,988 | $ 98,005,506 | $ 7,850,281 | $ 150,652,508 | $ 1,268,031,111 |

The annual pension costs and net pension assets of the component units of the City as of June 30, 2005 are as follows:

| | Component Unit Detroit Public Library (GRS) |
|---|---|
| Annual required contributions | $ 2,990,354 |
| Annual pension cost | 25,643,892 |
| Contributions made (employer) | 22,653,538 |
| Changes in net pension asset | — |
| Net pension asset, beginning of year | — |
| Net pension asset, end of year | $ 22,653,538 |

| | Defined Benefit | | Defined Annuity Contributions | |
|---|---|---|---|---|
| | GRS | PFRS | GRS | PFRS |
| Retirees and beneficiaries receiving benefits | 11,396 | 8,465 | 1,521 | 1,335 |
| Terminated plan members entitled to but not yet receiving benefits | 1,109 | 25 | 231 | 46 |
| Active plan members | 9,820 | 4,652 | 9,249 | 4,195 |

(Continued)

Significant actuarial assumptions used in preparing the accompanying Systems' financial statements for the year ended June 30, 2005 (the latest date available) are as follows:

| | General Retirement System June 30, 2005 | Policemen and Firemen Retirement System June 30, 2005 |
|---|---|---|
| Valuation Date (latest date available) | | |
| Actuarial Cost Method | Entry Age | Entry Age |
| Amortization Method | Level Percent | Level Percent |
| Remaining Amortization Period | 30 years | 12 years closed |
| Asset Valuation Method | 3-year Smoothed Market | 3-year Smoothed Market |
| Actuarial Assumptions: | | |
| Investment Basis of Return | 7.9% | 7.8% |
| Projected Salary Increases | 4.0% - 9.5% | 5.8% - 10.8% |
| Includes Inflation | 4.0% | 4.0% |
| Cost-of-Living Adjustments | 2.25% | 2.25% |

Factors that significantly affect the identification of trends in the amounts reported include, for example, changes in benefit provisions, the size or composition of the population covered by the plans, or the actuarial methods and assumptions used.

Investment loss presented in the Statements of Net Assets in Fiduciary Funds for the Retirement Systems consist of interest income, dividend income, net depreciation, and investment expenses. GRS and PFRS were unable to break down each component by reserve fund as required in GASB Statement No. 25, *Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*; however, the Systems were able to present components in total:

| Investment Gain, Net: | GRS | PFRS |
|---|---|---|
| Dividend Income | $ 18,472,422 | $ 33,856,957 |
| Interest Income | 110,870,114 | 97,801,386 |
| Net Appreciation | 160,852,269 | 140,792,494 |
| Investment Expense | (13,780,153) | (12,581,933) |
| Total | $ 276,414,652 | $ 259,868,904 |

**Other Post-employment Benefits:** In addition to the pension benefits described above, the City provides post-retirement benefits to its retirees, which include hospitalization, dental care, eye care, and life insurance. The number of City retirees at June 30, 2005 is 22,451. Costs are accounted for in accordance with GASB Statement No. 12, *Disclosures of Information on Post-retirement Benefits Other Than Pension Benefits by State and Local Governmental Employers.* The benefits are provided in accordance with the City Charter and union contracts. The cost of benefits, which are financed on a pay-as-you-go basis, for the year ended June 30, 2005, are as follows:

| Benefit | City Cost | Retiree Cost | Total Cost |
|---|---|---|---|
| Hospitalization | $ 137,864,782 | $ 13,960,235 | $ 151,825,017 |
| Dental | 5,547,455 | — | 5,547,455 |
| Eye Care | 2,134,951 | — | 2,134,951 |
| Life Insurance | 167,444 | — | 167,444 |
| Total | $ 145,714,632 | $ 13,960,235 | $ 159,674,867 |

**Component Units**

The GDRRA is authorized to charge user fees for services provided to residents in the event either the tipping fees or supplemental tipping fees paid by the City and other revenues generated are not sufficient to pay its operating costs. It is required to produce revenues equal to at least 100% of the maximum annual debt service requirement, lease obligations, and operating costs.

(Continued)

Supplemental tipping fees are provided from certain taxes collected by the State of Michigan which are payable to the City (Distributable Aid). The City's obligation to pay tipping fees and supplemental tipping fees is a full faith and credit limited tax general and unconditional obligation whether or not the facility is operating. For the year ended June 30, 2005, topping fees and supplemental tipping fees paid by the City to the GDRRA are as follows:

| | |
|---|---|
| Tipping Fees | $ 65,993,555 |
| Supplemental Tipping Fees | 16,530,000 |
| Total | $ 82,223,555 |

**NOTE IV. SUBSEQUENT EVENTS**

On July 7, 2005, the Mayor signed a Cooperative Endeavor Agreement with the United States Department of Housing and Urban Development (HUD) for the benefit of the Detroit Housing Commission (DHC). The agreement calls for the City to transfer all of DHC's assets, projects, and programs to HUD and for HUD to manage the day-to-day operations and reporting requirements of Free DHC. The agreement dissolves the DHC's Board of Commissioners. The agreement has an initial term of two years, and is renewable in one-year increments thereafter. The Detroit Housing Commission will not be presented in the City's CAFR for the fiscal year ending June 30, 2006.

On September 22, 2005 the Water Supply System issued $25,975,000 SRF Junior Lien Revenue Bonds. The bonds begin to mature October 1, 2007 and will be fully matured in the year 2026.

In November 2005, Standard & Poor's revised the City's Unlimited Tax General Obligation Bond rating from BBB+ to BBB, the City's Limited Tax General Obligation Bond rating from BBB to BBB- and revised the outlook from stable to negative.

In November 2005, Moody's Investors Service revised the City's Unlimited Tax General Obligation Bonds rating from Baa1 to Baa2, the City's Limited Tax General Obligation Bond rating from Baa2 to Baa3 and revised the outlook from negative to stable.

In November 2005, a general election referendum was passed which transfers control of the School District of City of Detroit to a newly elected eleven (11) member School Board, effective January 1, 2006. The 11 Board members will consist of 7 members, one from each district, who will serve 2-year terms, and 4 at-large members representing the entire city who will serve 4-year terms. Thus the District will not be presented in the City's CAFR for June 30, 2006.

In December 2005, Fitch Ratings revised the City's Unlimited Tax General Obligation Bond rating from BBB+ to BBB, the City's Limited Tax General Obligation Bond rating from BBB+ to BBB and revised the outlook from stable to negative.

In December 2005, the City issued $82,565,000 Unlimited Tax General Obligation Bonds and Unlimited Tax General Obligation Refunding Bonds. Proceeds of $39.9 million were used to refund previously issued debt, resulting in present value savings of $913,916 or 3.0% of the refunded par amount. The bonds mature beginning April 1, 2006 and will be fully matured in the year 2025.

On March 1, 2006 the City entered into an agreement with the Detroit Zoological Society, a Michigan nonprofit corporation, to manage the operations of the Detroit Zoological Institute through June 30, 2020, a period of fifteen (15) years, with an option to renew of ten (10) years. The City retains ownership of all assets of the Detroit Zoological Institute, which includes the Detroit Zoological Park and the Belle Isle Nature Zoo. The agreement between the City and Zoological Society provides for the payment of capital funds in the amount of five million dollars ($5,000,000) in fiscal year 2006 and an additional Five million dollars ($5,000,000) payment in fiscal year 2007. Upon transfer of the $5,000,000 payment in fiscal year 2006, the Zoological Society will transfer ownership of the new Ford Education Center to the City. The City also agreed to pay an operating subsidy for certain operating costs, insurance and security, totaling $900,000 per year for the first 2-years of the agreement, fiscal year 2006 and fiscal year 2007.

On March 22, 2006, the City entered into an agreement with the Detroit Historical Society, a Michigan nonprofit corporation, to manage the operations of the Detroit Historical Museums through June 30, 2015, a period of ten (10) years, with an option to renew of ten years. The City retains ownership of all the assets of the Detroit Historical Museums, which includes the

(Continued)

# REQUIRED

# SUPPLEMENTARY

# INFORMATION

# OTHER THAN

# MANAGEMENT'S

# DISCUSSION &

# ANALYSIS

# (MD&A)

iii

---

Detroit Historical Museum, the Dossin Great Lakes Museum and Historic Fort Wayne (including the Collections Resource Center). The City will retain the management of the operations of Historic Fort Wayne. The agreement between the City and Society provides for an annual operating subsidy of five hundred thousand dollars ($500,000) for the first three fiscal years of the agreement, fiscal years 2006, 2007 and 2008. For fiscal year 2006, the City agreed to pay all outstanding contractual obligations for operating services at the time of the transfer. The City also grants the Historical Society access to capital funds through the City's annual capital budget process. Currently, the City has authorization from the electorate to sell up to $20.02 million in general obligation bonds for capital improvements to the Detroit Historical Museum facilities.

110

(Continued)

City of Detroit, Michigan
COMPREHENSIVE ANNUAL FINANCIAL REPORT
FOR THE YEAR ENDED JUNE 30, 2005

REQUIRED

SUPPLEMENTARY

INFORMATION-

GENERAL FUND

STATEMENT OF REVENUES

AND EXPENDITURES

-BUDGET TO ACTUAL

112

## City of Detroit
### STATEMENT OF REVENUES, EXPENDITURES, AND CHANGES IN FUND BALANCE — BUDGET AND ACTUAL
### GENERAL FUND
#### For the Year Ended June 30, 2005

| | Budgeted Amounts Original | Final | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| **REVENUES:** | | | | |
| **Taxes:** | | | | |
| Property Taxes | $ 215,696,048 | $ 215,696,048 | $ 178,957,463 | $ (36,739,485) |
| Municipal Income Tax | 319,088,000 | 319,088,000 | 282,501,875 | (36,586,125) |
| Utility User Tax | 55,000,000 | 55,000,000 | 52,939,839 | (2,060,161) |
| Wagering Taxes | 117,640,000 | 117,640,000 | 137,970,347 | 20,370,347 |
| Other Taxes and Assessments | 11,569,766 | 11,569,766 | 10,961,886 | (608,880) |
| Interest and Penalties on Taxes | 9,800,000 | 9,800,000 | 11,491,470 | 1,691,470 |
| Total Taxes, Assessment, Interest and Penalties | 728,674,714 | 728,674,714 | 674,823,880 | (53,850,834) |
| **Licenses, Permits and Inspection Charges:** | | | | |
| Business Licenses | 1,595,585 | 1,839,155 | 1,892,283 | 53,128 |
| Permits | 1,255,832 | 1,255,832 | 1,697,773 | 441,941 |
| Inspection Charges | 9,866,419 | 9,866,419 | 7,442,358 | (2,424,061) |
| Other Licenses | 96,157 | 96,157 | 28,641 | (67,516) |
| Total Licenses, Permits and Inspection Charges | 12,813,993 | 13,057,563 | 11,061,055 | (1,996,508) |
| **Shared Taxes:** | | | | |
| Liquor and Beer License | 545,000 | 545,000 | 602,582 | 57,582 |
| State Shared Tax | 286,938,418 | 286,938,418 | 282,914,217 | (4,024,201) |
| Total Shared Taxes | 287,483,418 | 287,483,418 | 283,516,799 | (3,966,619) |
| **Intergovernmental:** | | | | |
| Federal | 5,402,963 | 5,029,661 | 26,522,887 | 21,493,226 |
| State | 54,495,391 | 12,735,431 | 23,511,241 | 10,775,810 |
| State Equity Grant | 1,170,400 | 1,170,400 | 1,076,931 | (93,469) |
| Other Grants | 3,739,549 | 179,117,798 | 16,346,773 | (162,771,025) |
| Total Grants | 64,808,303 | 198,053,290 | 67,457,832 | (130,595,458) |
| **Sales and Charges for Services:** | | | | |
| Maintenance and Construction | 1,234,846 | 1,234,846 | 1,509,134 | 274,288 |
| Other Labor and Materials | 300,000 | 300,000 | 347,868 | 47,868 |
| Electrical | 47,840,000 | 47,840,000 | 40,506,888 | (7,333,112) |
| Steam | 955,000 | 955,000 | 851,310 | (103,690) |
| Sanitation Charges | 823,897 | 823,897 | 662,841 | (161,056) |
| Recreation Fees | 7,020,797 | 7,020,797 | 5,175,375 | (1,845,422) |
| Collection Fees | 7,284,190 | 7,314,190 | 7,076,021 | (238,169) |
| Other Fees | 39,464,496 | 42,490,796 | 40,107,965 | (2,382,831) |
| Personal Services | 61,801,228 | 62,138,133 | 57,761,903 | (4,376,230) |
| Sales of Non-Capital Assets | | | | |
| Other Departmental Sales | 30,047,894 | 37,317,941 | 24,109,898 | (13,208,043) |
| Total Sales and Charges for Services | 196,746,648 | 207,535,600 | 178,109,203 | (29,426,397) |
| Ordinance Fines | 29,504,878 | 27,219,663 | 23,273,726 | (3,945,937) |
| **Revenue from Use of Assets:** | | | | |
| Earnings on Investments | 3,887,000 | 2,801,531 | 2,388,653 | (428,878) |
| Real Estate Rentals | 9,160,886 | 9,160,886 | 7,414,207 | (1,746,679) |
| Concession Sales | 5,054,456 | 5,054,456 | 2,837,924 | (2,216,532) |
| Sale of Real Property | 33,410,000 | 33,410,000 | 6,013,792 | (27,396,298) |
| Total Revenue from Use of Assets | 50,712,342 | 50,426,873 | 18,646,576 | (31,780,297) |
| Other Revenue | 40,813,259 | 60,388,979 | 100,134,090 | 39,745,111 |
| Total Revenues | 1,411,559,555 | 1,573,240,100 | 1,357,023,161 | (216,216,939) |

(Continued)

113

| | Budgeted Amounts | | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| | Original | Final | | |
| **EXPENDITURES:** | | | | |
| **Public Protection:** | | | | |
| Consumer Affairs | 1,314,654 | 1,556,813 | 1,210,811 | (346,002) |
| Fire | 207,441,391 | 209,926,211 | 202,172,068 | (7,754,143) |
| Human Rights | 2,359,312 | 2,352,587 | 2,081,368 | (271,219) |
| Ombudsperson | 1,457,978 | 1,452,693 | 1,457,015 | 4,922 |
| Parking Enforcement | 9,793,095 | 9,700,247 | 9,074,181 | (626,066) |
| Police | 475,234,439 | 507,793,222 | 454,000,253 | (53,192,969) |
| Detroit Office of Homeland Security | 620,254 | 8,664,317 | 677,849 | (7,986,377) |
| 36th District Court | 49,470,664 | 49,511,893 | 45,454,181 | (4,057,712) |
| Total Public Protection | 747,691,387 | 790,957,383 | 716,727,817 | (74,229,566) |
| Department of Health | 97,473,647 | 100,732,152 | 87,862,830 | (12,869,322) |
| **Recreation and Culture:** | | | | |
| Culture, Arts and Tourism | 1,681,885 | 2,398,072 | 1,152,913 | (1,245,159) |
| Historical | 3,579,640 | 3,566,321 | 2,995,693 | (570,628) |
| Recreation | 50,012,927 | 47,416,336 | 49,924,814 | 2,508,478 |
| Senior Citizens | 1,294,920 | 2,118,668 | 932,042 | (1,186,026) |
| Zoological Institute | 14,029,490 | 14,357,011 | 12,492,833 | (1,864,178) |
| Total Recreation and Culture | 70,628,772 | 69,875,808 | 67,498,395 | (2,377,413) |
| Economic Development – Civic Center | 26,863,409 | 25,310,350 | 23,541,123 | (1,769,227) |
| **Housing Supply and Conditions:** | | | | |
| Planning and Development | 11,433,365 | 23,773,549 | 12,486,977 | (11,286,572) |
| Total Housing Supply and Condition | 11,433,365 | 23,773,549 | 12,486,977 | (11,286,572) |
| **Physical Environment:** | | | | |
| Environmental Affairs | 2,594,658 | 4,503,223 | 2,319,583 | (2,183,640) |
| Public Lighting | 65,907,104 | 65,462,349 | 69,060,774 | 3,598,425 |
| Public Works | 183,411,745 | 183,717,019 | 185,239,556 | 1,522,537 |
| Total Physical Environment | 251,913,507 | 253,682,591 | 256,619,913 | 2,937,322 |
| **Development and Management:** | | | | |
| Auditor General | 3,299,800 | 3,298,236 | 2,669,338 | (628,898) |
| Budget | 3,426,505 | 3,423,757 | 3,086,852 | (336,905) |
| City Clerk | 4,417,596 | 4,373,775 | 3,770,777 | (602,998) |
| City Council | 18,819,661 | 18,683,380 | 14,780,744 | (3,902,636) |
| Communications & Creative Services | 2,598,588 | 2,899,883 | 2,467,503 | (432,380) |
| Elections | 10,773,348 | 10,764,128 | 10,611,156 | (152,972) |
| Finance | 48,630,999 | 49,876,683 | 40,501,832 | (9,374,851) |
| Law | 27,121,937 | 28,396,285 | 26,884,967 | (1,511,318) |
| Mayor's Office | 11,356,692 | 11,995,397 | 9,653,665 | (2,341,732) |
| Human Resources | 32,330,117 | 32,291,316 | 25,904,262 | (6,387,054) |
| Information Technology Services | 31,361,734 | 31,385,622 | 24,294,443 | (7,091,179) |
| Board of Zoning Appeals | 973,677 | 971,884 | 844,025 | (127,859) |
| Dept. of Administrative Hearings | 2,000 | 685,311 | 1,124 | (684,187) |
| Detroit Workforce Development Department | 2,265,667 | 2,266,167 | 898,772 | (1,367,395) |
| Non Departmental | 14,164,289 | 171,392,092 | 31,501,316 | (139,890,776) |
| Total Development and Management | 211,326,610 | 371,563,716 | 197,808,776 | (173,754,940) |
| Capital Outlay | 69,436,133 | 97,531,721 | 124,712,800 | 27,181,079 |
| (Continued) | | | | |

114

City of Detroit
STATEMENT OF REVENUES, EXPENDITURES, AND
CHANGES IN FUND BALANCE – BUDGET AND ACTUAL
GENERAL FUND
For the Year Ended June 30, 2005

| | Budgeted Amounts | | Actual Amounts | Variance Actual Over (Under) Budget |
|---|---|---|---|---|
| | Original | Final | | |
| **Debt Service:** | | | | |
| Bond Issuance Costs | | 24,000 | 24,000 | |
| Total Debt Service | 24,000 | 24,000 | 5,192,701 | 5,168,701 |
| Total Expenditures | 1,486,784,830 | 1,733,651,270 | 1,492,451,332 | (241,199,938) |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | (75,325,375) | (160,211,170) | (135,438,171) | 24,772,999 |
| **OTHER FINANCING SOURCES (USES):** | | | | |
| **Sources:** | | | | |
| Transfers from Other Funds: | | | | |
| Transfers In | 119,091,664 | 121,743,983 | 33,051,546 | (88,692,437) |
| Proceeds of Capital Leases | 315,351 | 315,351 | 315,351 | - |
| Premium on Capital Related Debt | 5,974,832 | 5,974,832 | 5,974,832 | - |
| Sale of General Obligation Bonds | 141,215,335 | 223,167,013 | 242,150,000 | 18,982,987 |
| Total Other Financing Sources | 266,597,182 | 351,201,179 | 281,491,729 | (69,709,450) |
| **Uses:** | | | | |
| Transfers to Other Funds: | | | | |
| Transfers Out | 182,677,300 | 182,377,868 | 136,651,053 | (45,726,815) |
| Principal Paid to Bond Agent for Refunded Bonds | 57,357,145 | 57,357,145 | 92,640,000 | 35,282,855 |
| Interest Paid On Refunded Bonds | 4,213,845 | 4,131,379 | 4,213,845 | 82,466 |
| Total Other Financing Uses | 244,248,290 | 243,866,392 | 233,504,898 | (10,361,494) |
| Total Other Financing Sources and Uses | 22,348,892 | 107,334,787 | 47,986,831 | (59,347,956) |
| Net Change in Fund Balance | (52,876,383) | (52,876,383) | (87,441,340) | (34,564,957) |
| Fund Balance at Beginning of Year | 52,876,383 | 52,876,383 | 69,216,269 | 16,339,886 |
| Increase (Decrease) in Inventories | | | (15,369,363) | (15,369,363) |
| Fund Balance at End of Year | $ - | $ - | $ (33,594,434) | $ (33,594,434) |

See accompanying independent auditors' report

115

C-68

REQUIRED

SUPPLEMENTARY

INFORMATION-

HISTORIC PENSION DATA

# REQUIRED SUPPLEMENTARY INFORMATION
## HISTORIC PENSION DATA - UNAUDITED

### Schedule of Employer Contributions (In millions):

**General Retirement System:**

| Year Ended June 30 | Annual Required Contributions | Percentage Contributed | Net Pension Asset |
|---|---|---|---|
| 2001 | $68.1 | 100% | |
| 2002 | 67.8 | 100 | |
| 2003 | 72.9 | 100 | |
| 2004 | 95.9 | 100 | |
| 2005 | 106.4 | 754 | $695.6 |

**Policemen and Firemen Retirement System:**

| Year Ended June 30 | Annual Required Contributions | Percentage Contributed | Net Pension Asset |
|---|---|---|---|
| 2001 | 14.4 | 100% | |
| 2002 | 8.4 | 100 | |
| 2003 | 66.8 | 100 | |
| 2004 | 69.5 | 100 | |
| 2005 | 98.8 | 702 | $595.1 |

### Schedule of Funding Progress (In millions):

**General Retirement System:**

| Actuarial Valuation Date June 30 | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Funded Ratio | Unfunded AAL (UAAL) | Covered Payroll | UAAL as a Percentage of Payroll |
|---|---|---|---|---|---|---|
| 2001 (a) (b) | $2,912.1 | $3,179.6 | 91.6% | $267.5 | $439.6 | 60.8% |
| 2002 | 2,761.2 | 3,276.6 | 84.3 | 515.4 | 440.7 | 117.0 |
| 2003 | 2,537.7 | 3,270.6 | 77.6 | 733.0 | 448.6 | 163.4 |
| 2004 | 2,470.2 | 3,383.9 | 73.0 | 913.7 | 444.6 | 205.5 |
| 2005 | 3,222.4 | 3,347.4 | 96.3 | 125.0 | 390.6 | 32.0 |

**Policemen and Firemen Retirement System:**

| Actuarial Valuation Date June 30 | Actuarial Value of Assets | Actuarial Accrued Liability (AAL) | Funded Ratio | Unfunded AAL (UAAL) | Covered Payroll | UAAL as a Percentage of Payroll |
|---|---|---|---|---|---|---|
| 2001 (a) (b) | $3,900.0 | $3,465.2 | 112.6% | $(434.8) | $253.3 | - |
| 2002 (a) | 3,635.1 | 3,523.4 | 103.2 | (111.7) | 248.7 | - |
| 2003 | 3,205.5 | 3,721.6 | 86.1 | 516.1 | 248.7 | 207.5 |
| 2004 | 3,074.5 | 3,857.5 | 79.7 | 783.0 | 258.7 | 302.7 |
| 2005 | 3,757.9 | 3,780.4 | 99.0 | 22.6 | 250.5 | 9.0 |

a) After changes in actuarial assumptions.
b) Plan amended.

See accompanying independent auditors' report.

116

117

# COMBINING

# FINANCIAL

# INFORMATION –

# NON-MAJOR

# GOVERNMENTAL

# FUNDS

---

## SPECIAL REVENUE FUNDS

ARE ESTABLISHED TO ACCOUNT FOR THE PROCEEDS OF SPECIFIC REVENUE SOURCES
(OTHER THAN CERTAIN MAJOR CAPITAL FACILITIES) THAT ARE RESTRICTED BY LAW
AND ADMINISTRATIVE ACTION TO EXPENDITURES FOR SPECIFIED PURPOSES

**Community Development Block Grant Funds**
To account for activities financed by Federal Government Grants under Title I of the Housing and Community Development Act of 1974.

**Construction Code Fund**
In accordance with State of Michigan Public Act No. 245 of 1999, to account for financing activities related to the acts and services performed by the Building and Safety Fund including, without limitation, issuance of building permits, examination of plans and specifications, inspection of construction undertaken pursuant to a building permit, the issuance of certificates of use and occupancy, and hearing appeals in accordance with this act.

**Detroit Building Authority Fund**
To account for financing activities associated with acquiring, improving, operating and maintaining buildings and other structures for public purposes.

**Drug Law Enforcement Fund**
To account for forfeited narcotics proceeds that are used for the enhancement of narcotics enforcement.

**Empowerment Zone Fund**
To account for activities financed by Federal Government Grants under provision of Section 2007 of Title XX of the Social Security Act as amended.

**Detroit Workforce Development Department**
To account for employment and training program grants received from government sources.

**Human Services Fund**
To account for Federal and State Grant revenues that are used to finance certain social service programs.

**General Retirement Systems Service Corporation**
To account for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005.

**Police and Fire Retirement Systems Service Corporation**
To account for the proceeds and service payments related to the issuance of the Pension Obligation Certificates in June of 2005.

**Major and Local Street Funds**
To account for Michigan State Gas and Weight Tax revenues and other related grants used for the construction and maintenance of major and local streets.

**Supportive Housing Programs and Homeless Initiatives Funds**
To account for financing activities of Supportive Housing Programs for the Homeless received from the Federal Government.

**Targeted Business Development Fund**
To account for revenue received via the casino development agreements earmarked to foster the presence of minority businesses in the City.

## CAPITAL PROJECTS FUNDS

CAPITAL PROJECTS FUNDS ARE ESTABLISHED TO ACCOUNT FOR FINANCIAL RESOURCES TO BE USED FOR THE ACQUISITION OR CONSTRUCTION OF MAJOR CAPITAL FACILITIES (OTHER THAN THOSE FINANCED BY SPECIAL REVENUE FUNDS AND PROPRIETARY FUNDS)

**Capital Projects Fund**
To account for all funds used for the construction, acquisition and renovation of Capital facilities by the General Fund.

**Urban Renewal Fund**
To account for funding received from the City of Detroit and the Federal Government earmarked for the acquisition and site preparation of property for future development.

## DEBT SERVICE FUND

DEBT SERVICE FUND IS ESTABLISHED TO ACCOUNT FOR THE ACCUMULATION OF RESOURCES FOR THE PAYMENT OF DEBT AND PRINCIPAL AND INTEREST OF CERTAIN PROPRIETARY FUNDS' GENERAL OBLIGATIONS

## PERMANENT FUNDS

ACCOUNT FOR PRINCIPAL TRUST AMOUNTS RECEIVED AND RELATED INTEREST INCOME. THE INTEREST PORTION OF THE TRUST IS USED TO MAINTAIN THE COMMUNITY CEMETERY.

PERPETUAL CARE – BEQUEST FUND
TO ACCOUNT FOR INCOME AND DISBURSEMENTS OF BEQUESTS ACCEPTED BY THE CITY.

---

THIS PAGE LEFT BLANK INTENTIONALLY

# City of Detroit, Michigan
## COMBINING BALANCE SHEET
## NON-MAJOR GOVERNMENTAL FUNDS
### June 30, 2005

| ASSETS | Special Revenue Funds | Debt Service Fund | Capital Projects Funds | Permanent Funds Bequest Fund | Total |
|---|---|---|---|---|---|
| **Current Assets** | | | | | |
| Cash | $ 20,607,161 | $ 7,688 | $ 2,221,942 | $ 47,344 | $ 22,884,135 |
| Investments | 88,647,216 | 1,280,865 | 136,063,006 | 1,097,814 | 227,088,911 |
| Accounts and Contracts Receivable: | | | | | |
| Due from Other Funds | 4,651,893 | | 1,977,302 | | 6,629,195 |
| Due from Other Governmental Agencies | 29,986,385 | | 567,116 | | 30,553,501 |
| General Taxes Receivable on Real and Personal Property (Net) | | 28,478,737 | | | 28,478,737 |
| Other Receivables | 881,466 | | 354,558 | | 1,236,024 |
| Total Accounts and Contracts Receivable | 35,501,744 | 28,478,737 | 2,898,976 | | 58,879,457 |
| Allowance for Uncollectible Accounts | (428,532) | (16,475,000) | (188,000) | | (17,091,532) |
| Total Accounts and Contracts Receivable—Net | 35,073,212 | 4,003,737 | 2,710,976 | | 41,787,925 |
| Taxes, Interest and Penalties—Net | | 2,005,000 | | | 2,005,000 |
| Current Special Assessment Receivable | | 347,225 | | | 347,225 |
| Prepaid Expenditures | 127,636 | | | | 127,636 |
| Inventory—Forfeited Property | 259,975 | | | | 259,975 |
| Other Inventory | 671,208 | | | | 671,208 |
| Total Current Assets | 145,383,318 | 7,217,290 | 141,343,149 | 1,145,158 | 295,088,915 |
| **Restricted Assets:** | | | | | |
| Cash | 1,001,831 | 12,203,497 | 30,234,856 | 108,465 | 63,548,649 |
| Total Assets | $ 146,385,149 | $ 39,420,787 | $ 171,578,005 | $ 1,253,623 | $ 358,637,564 |
| | | | | | |
| **LIABILITIES AND FUND BALANCES** | | | | | |
| **Liabilities:** | | | | | |
| Accounts and Contracts Payable | $ 17,004,472 | $ 2,328,825 | $ 26,352,524 | $ | $ 43,353,996 |
| Due to Other Funds | 9,992,489 | | 4,181,436 | | 16,414,741 |
| Due to Other Governmental Agencies | 145,674 | | 850,000 | | 995,674 |
| Advance from Other Funds | 5,149,400 | 704,821 | | | 5,851,271 |
| Deposits from Vendors and Customers | 2,847,640 | | | | 2,847,640 |
| Accrued Salaries and Wages Payable | 1,957,814 | | | | 1,957,814 |
| Other Liabilities | 13,506,749 | | 124,113 | | 13,630,749 |
| Deferred Revenue | 1,547,110 | 7,225,737 | 256,000 | | 1,471,213 |
| Total Liabilities | 54,541,872 | 10,259,383 | 31,765,123 | | 96,666,378 |
| **Fund Balances:** | | | | | |
| Reserved for Inventory | 930,683 | | | | 930,683 |
| Reserved for Encumbrances | 14,018,549 | | | 1,253,623 | 14,018,549 |
| Reserved for Endowments and Trusts | | | | | 1,253,623 |
| Reserved for Debt Service | | 29,061,404 | | | 29,061,404 |
| Reserved for Capital Projects | | | 139,812,882 | | 139,812,882 |
| Undesignated | 76,896,045 | | 139,812,882 | | 76,896,045 |
| Total Fund Balances | 91,845,277 | 29,061,404 | 139,812,882 | 1,253,623 | 261,971,186 |
| Total Liabilities and Fund Balances | $ 146,385,149 | $ 39,420,787 | $ 171,578,005 | $ 1,253,623 | $ 358,637,564 |

See accompanying independent auditors' report.

# City of Detroit, Michigan
## COMBINING STATEMENT OF REVENUES, EXPENDITURES AND CHANGES IN FUND BALANCES
## NON-MAJOR GOVERNMENTAL FUNDS
### For the Year Ended June 30, 2005

| | Special Revenue Funds | Debt Service Fund | Capital Projects Funds | Permanent Funds Bequest Fund | Total |
|---|---|---|---|---|---|
| **REVENUES:** | | | | | |
| **Taxes:** | | | | | |
| Property Taxes | $ | $ 59,813,679 | $ | $ | $ 59,813,679 |
| Other Taxes and Assessments | | 1,492,232 | | | 1,492,232 |
| State Hotel and Liquor Tax | | 16,310,767 | | | 16,310,767 |
| Licenses, Permits and Inspection Charges | 23,945,463 | | | | 23,945,463 |
| **Intergovernmental:** | | | | | |
| Federal | 225,212,352 | | 24,637,235 | | 249,849,887 |
| State | 13,586,534 | | | | 13,586,534 |
| Gas and Weight Tax | 63,476,425 | | | | 63,476,425 |
| Sales and Charges for Services | 5,185,630 | | | | 5,185,630 |
| Ordinance Fines | 4,287,916 | | | | 4,287,916 |
| Revenue from Use of Assets | | 516,134 | | | 516,134 |
| Earnings on Investments | 1,810,610 | 1,276,084 | 9,673,367 | | 11,990,031 |
| Other Revenue | 3,337,774 | 2,605,164 | 24,318,864 | 20,803 | 31,632,882 |
| Total Revenues | 339,750,304 | 82,506,030 | 60,321,666 | 20,803 | 482,780,803 |
| **EXPENDITURES:** | | | | | |
| **Current:** | | | | | |
| Public Protection | 38,159,175 | | | | 38,159,175 |
| Health | 81,781,875 | | | | 81,781,875 |
| Economic Development | 68,937,809 | | | | 73,103,409 |
| Educational Development | 73,837,899 | | | | 73,837,899 |
| Housing and Conditions | 5,795,925 | | | | 5,795,925 |
| Transportation | 46,272,594 | | | | 46,272,594 |
| **Debt Service:** | | | | | |
| Principal | | 73,544,336 | | | 73,544,336 |
| Interest | | 51,482,245 | | | 51,482,245 |
| Bond Issuance Costs | | | 1,299,818 | | 1,299,818 |
| **Capital Outlay** | | | 157,832,908 | | 157,832,908 |
| Total Expenditures | 314,785,457 | 129,172,251 | 160,132,726 | | 604,090,434 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | 24,964,907 | (46,588,211) | (99,781,060) | 20,803 | (121,303,031) |
| **OTHER FINANCING SOURCES (USES):** | | | | | |
| **Sources:** | | | | | |
| **Transfers In:** | | | | | |
| General Fund | 8,234,889 | 38,830,809 | | | 47,065,748 |
| General Debt Service Fund | | | 37,469,125 | | 37,469,125 |
| Special Revenue Fund | 19,668,169 | 3,811,110 | | | 23,489,370 |
| Total Transfers In | 27,903,149 | 42,651,969 | 37,469,125 | | 108,024,243 |
| Proceeds of Federal Notes | | | | | 7,789,000 |
| Proceeds from Capital Bond Issuance | | | 111,080,000 | | 111,080,000 |
| Premium on General Obligation Bonds Issued | | | 7,039,843 | | 7,039,843 |
| Total Other Financing Sources | 35,692,149 | 42,651,969 | 156,188,968 | | 234,533,086 |
| **Uses:** | | | | | |
| **Transfers Out:** | | | | | |
| General Fund | 33,085,547 | | | | 33,085,547 |
| Capital Projects Fund | 3,821,110 | 37,469,125 | | | 37,469,125 |
| Debt Service Fund | 19,668,169 | | | | 3,821,110 |
| Special Revenue Fund | | | 19,668,169 | | 19,668,169 |
| Total Transfers Out | 56,540,917 | 37,469,125 | | | 94,010,042 |
| Principal Paid to Bond Agent for Refunded Bonds | (33,048,768) | | 69,160,000 | | 69,160,000 |
| Interest Paid to Bond Agent for Refunded Bonds | 6,651,675 | | 6,651,575 | | 6,651,575 |
| Total Other Financing Uses | 4,116,970 | 5,181,844 | 75,811,575 | | 169,821,617 |
| Net Change in Fund Balances | (35,652,461) | (41,465,777) | (13,323,667) | 20,803 | 64,711,469 |
| Fund Balances at Beginning of Year | 87,812,776 | 70,466,781 | 159,136,549 | 1,232,830 | 318,648,924 |
| Revenues in Investments | (85,579) | | | | (85,579) |
| Fund Balances at End of Year | $ 91,845,277 | $ 29,061,404 | $ 139,812,882 | $ 1,253,623 | $ 261,971,186 |

See accompanying independent auditors' report.

**City of Detroit, Michigan**
**COMBINING BALANCE SHEET**
**NON-MAJOR GOVERNMENTAL FUNDS - SPECIAL REVENUE FUNDS**
**June 30, 2005**

| ASSETS | Community Development Block Grant Funds | Construction Code Fund | Detroit Building Authority Fund | Drug Law Enforcement Fund | Empowerment Zone Fund | Detroit Workforce Development Department | Human Services Fund | Street Funds | Supportive Housing Programs and Homeless Initiative Funds | Targeted Business Development Fund | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Current Assets:** | | | | | | | | | | | |
| Cash | $ 1,388,485 | $ 3,082,545 | $ 2,146,303 | $ 355,187 | $ 1,157,520 | $ 5,472,495 | $ 5,633,144 | $ 1,271,792 | $ 99,980 | | $ 20,607,165 |
| Investments | | | | 17,147,226 | | | | 39,000,000 | | 32,500,000 | 88,647,226 |
| Accounts and Contracts Receivable: | | | | | | | | | | | |
| Due from Other Funds | 2,887,629 | 348,209 | 179,985 | | 61,189 | 206,080 | 1,674,934 | 93,867 | | | 4,651,893 |
| Due from Other Governmental Agencies | 7,522,442 | 59,077 | | | 4,802,196 | 5,183,204 | | 11,936,751 | 465,715 | | 29,968,385 |
| Other Receivables | 401,667 | 419,257 | | | | | | 60,442 | | | 881,466 |
| Total Accounts and Contracts Receivable | 10,811,738 | 826,543 | 179,985 | | 4,863,385 | 5,389,284 | 1,674,934 | 12,091,060 | 465,715 | | 35,501,744 |
| Allowance for Uncollectible Accounts | (27,608) | (345,200) | | | | | | (45,724) | | | (428,532) |
| Total Accounts and Contracts Receivable - Net | 9,974,130 | 480,443 | 179,985 | | 4,863,385 | 5,389,284 | 1,674,934 | 12,045,336 | 465,715 | | 35,073,212 |
| Prepaid Expenditures | | | | | | 127,636 | | | | | 127,636 |
| Inventory—Forfeited Property | | | | 250,875 | | | | | | | 250,875 |
| Other Inventory | | 48,609 | | | | | | 628,199 | | | 677,208 |
| **Total Current Assets** | 11,362,615 | 3,530,967 | 2,326,288 | 17,753,288 | 6,020,905 | 10,989,325 | 7,288,078 | 53,046,327 | 565,615 | 32,500,000 | 145,383,318 |
| **Restricted Assets:** | | | | | | | | | | | |
| Cash | 1,001,831 | | | | | | | | | | 1,001,831 |
| **Total Assets** | $ 12,364,446 | $ 3,530,967 | $ 2,326,288 | $ 17,753,288 | $ 6,020,905 | $ 10,989,325 | $ 7,288,078 | $ 53,046,327 | $ 565,615 | $ 32,500,000 | $ 146,385,149 |
| **LIABILITIES, AND FUND BALANCES** | | | | | | | | | | | |
| **Liabilities:** | | | | | | | | | | | |
| Accounts and Contracts Payable | 2,856,612 | 34,212 | 341,170 | 496,565 | 68,898 | 7,765,575 | 2,980,772 | 3,101,578 | 156,090 | | 17,801,472 |
| Due to Other Funds | 4,757,090 | 1,233,348 | 912,027 | 31,670 | 953,677 | 863,213 | 628,102 | 499,743 | 23,710 | | 9,902,480 |
| Advances from Other Funds | | | | | | 145,674 | | | | | 145,674 |
| Due to Other Governmental Agencies | | 4,487 | | | | 1,363,974 | 427,962 | 3,484,514 | | | 5,196,455 |
| Deposits from Vendors and Customers | | 623,145 | | 2,842,153 | | | | | | | 2,347,660 |
| Accrued Salaries and Wages Payable | 571,927 | 1,378,968 | | 21,199 | 29,307 | 412,607 | 280,539 | 1,865,741 | 385,815 | | 4,937,814 |
| Accrued Liabilities | 3,654,544 | | | 300,246 | 4,968,933 | 438,282 | 572,220 | | | | 13,564,749 |
| Other Liabilities | 1,324,273 | | | | | | | | | | 1,547,110 |
| Deferred Revenue | | | 222,837 | | | | 2,398,483 | | | | 2,398,483 |
| **Total Liabilities** | 12,364,446 | 3,273,060 | 1,476,034 | 3,692,833 | 6,020,905 | 10,989,325 | 7,288,078 | 8,871,576 | 565,615 | | 54,541,872 |
| **Fund Balances:** | | | | | | | | | | | |
| Reserved for Inventory | | 48,609 | | | | | | 628,199 | | | 928,083 |
| Reserved for Encumbrances | | 208,969 | 858,254 | 258,875 | | | | 43,545,662 | | | 14,018,549 |
| Undesignated | | 257,907 | | 13,809,580 | | | | | | 32,500,000 | 76,896,645 |
| **Total Fund Balance** | | 257,907 | 858,254 | 14,068,455 | | | | 44,173,661 | | 32,500,000 | 91,843,277 |
| **Total Liabilities and Fund Balances** | $ 12,364,446 | $ 3,530,967 | $ 2,326,288 | $ 17,753,288 | $ 6,020,905 | $ 10,989,325 | $ 7,288,078 | $ 53,046,327 | $ 565,615 | $ 32,500,000 | $ 146,385,149 |

See accompanying independent auditors' report.

124

City of Detroit, Michigan
COMBINING STATEMENT OF REVENUES, EXPENDITURES AND
CHANGES IN FUND BALANCES
NON-MAJOR GOVERNMENTAL FUNDS - SPECIAL REVENUE FUNDS
For the Year Ended June 30, 2005

| | Community Development Block Grant Fund | Construction Code Fund | Detroit Building Authority | Drug Law Enforcement Fund | Empowerment Zone Fund | Detroit Workforce Development Department | Human Services Fund | Street Funds | Supportive Housing Programs and Homeless Initiatives Funds | Targeted Business Development Fund | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **REVENUES:** | | | | | | | | | | | |
| Licenses, Permits and Inspection Charges | | 23,945,463 | | | | | | | | | 23,945,463 |
| Intergovernmental: | | | | | | | | | | | |
| Federal | 59,785,281 | | | | 11,464,565 | 73,837,899 | 74,328,682 | | | 5,795,925 | 225,212,352 |
| State | | | | | | | 2,885,506 | 10,470,628 | | | 13,356,134 |
| Gas and Weight Tax | | | | | | | | 63,476,425 | | | 63,476,425 |
| Sales and Charges for Services | 5,112,710 | 72,920 | | | | | | | | | 5,185,630 |
| Ordinance Fines and Forfeitures | | 584,880 | | 3,703,036 | | | | | | | 4,287,916 |
| Earnings on Investments | | | | 306,083 | | | | 722,527 | | | 1,028,610 |
| Other Revenue | | | 2,189,455 | 224,273 | | | 300,000 | 624,046 | | | 3,337,774 |
| **Total Revenues** | 64,897,991 | 24,603,263 | 2,189,455 | 4,233,392 | 11,464,565 | 73,837,899 | 77,514,188 | 75,293,626 | 5,795,925 | | 339,830,304 |
| **EXPENDITURES:** | | | | | | | | | | | |
| Current: | | | | | | | | | | | |
| Public Protection | | 35,413,572 | | 2,745,603 | | | | | | | 38,159,175 |
| Health | | | | | | | 81,781,875 | | | | 81,781,875 |
| Economic Development | 55,495,894 | | 1,977,530 | | 11,464,565 | | | | | | 68,937,989 |
| Educational Development | | | | | | 73,837,899 | | | | | 73,837,899 |
| Housing and Conditions | | | | | | | | | 5,795,925 | | 5,795,925 |
| Transportation Facilitation | | | | | | | | 46,272,594 | | | 46,272,594 |
| **Total Expenditures** | 55,495,894 | 35,413,572 | 1,977,530 | 2,745,603 | 11,464,565 | 73,837,899 | 81,781,875 | 46,272,594 | 5,795,925 | | 314,785,457 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | 9,402,097 | (10,890,369) | 211,925 | 1,487,789 | | | (4,267,687) | 29,021,032 | | | 25,044,847 |
| **Other Financing Sources:** | | | | | | | | | | | |
| Proceeds of Federal Note | 7,789,000 | | | | | | | | | | 7,789,000 |
| Transfers in: | | | | | | | | | | | |
| General Fund | | 461,186 | 1,006,096 | | | | 4,267,687 | | | 2,500,000 | 8,224,889 |
| Community Development Block Grant Fund | | 10,668,260 | | | | | | | | | 10,668,260 |
| Major Street Fund | | | | | | | | 9,000,000 | | | 9,000,000 |
| Total Transfers In | | 11,129,366 | 1,006,096 | | | | 4,267,687 | 9,000,000 | | 2,500,000 | 27,893,149 |
| Total Other Financing Sources | 7,789,000 | 11,129,366 | 1,006,096 | | | | 4,267,687 | 9,000,000 | | 2,500,000 | 35,692,149 |
| **Other Financing Uses:** | | | | | | | | | | | |
| Transfers Out: | | | | | | | | | | | |
| Construction Code Fund | 10,668,260 | | | | | | | | | | 10,668,260 |
| General Fund | 2,701,727 | | | | | | | 30,349,820 | | | 33,051,547 |
| General Debt Service Funds | 3,821,110 | | | | | | | | | | 3,821,110 |
| Local Street Fund | | | | | | | | 9,000,000 | | | 9,000,000 |
| Total Transfers Out | 17,191,097 | | | | | | | 39,349,820 | | | 56,540,917 |
| Total Other Financing Uses | 17,191,097 | | | | | | | 39,349,820 | | | 56,540,917 |
| Net Other Financing Sources (Uses) | (9,402,097) | 11,129,366 | 1,006,096 | | | | 4,267,687 | (30,349,820) | | 2,500,000 | (20,848,768) |
| Net Change in Fund Balances | | 239,077 | 1,218,021 | 1,487,789 | | | | (1,328,788) | | 2,500,000 | 4,116,079 |
| Fund Balances (Deficit) at Beginning of Year | 239,057 | 979,544 | | 12,604,359 | | | | 46,302,577 | | 30,000,000 | 87,812,776 |
| Increase (Decrease) in Inventory | 18,850 | (367,767) | | (31,693) | | | | 312,365 | | | (85,578) |
| Fund Balances at End of Year | 257,907 | 850,854 | | 14,060,455 | | | | 45,286,154 | | 32,500,000 | 91,843,277 |

See accompanying independent auditors' report.

# City of Detroit, Michigan
## COMBINING BALANCE SHEET
### NON-MAJOR CAPITAL PROJECTS FUNDS
#### June 30, 2005

| ASSETS | Capital Projects | Urban Renewal | Total |
|---|---|---|---|
| Cash | $ 1,111,215 | $ 1,110,727 | $ 2,221,942 |
| Investments | 120,122,776 | 15,940,230 | 136,063,006 |
| Accounts and Contracts Receivable: | | | |
| Due from Other Funds | 1,973,651 | 3,651 | 1,977,302 |
| Due from Other Governmental Agencies | 567,116 | | 567,116 |
| Other Receivable - Trade | 354,558 | | 354,558 |
| Total Accounts and Contracts Receivable | 2,895,325 | 3,651 | 2,898,976 |
| Allowance for Uncollectible Accounts | (188,000) | | (188,000) |
| Total Accounts and Contracts Receivable - Net | 2,707,325 | 3,651 | 2,710,976 |
| Current Special Accounts Receivable | 347,225 | | 347,225 |
| Restricted Cash and Cash Equivalents | 30,234,856 | | 30,234,856 |
| Total Assets | $ 154,523,397 | $ 17,054,608 | $ 171,578,005 |
| **LIABILITIES AND FUND BALANCES** | | | |
| Liabilities: | | | |
| Accounts and Contracts Payable | $ 25,845,179 | $ 507,345 | $ 26,352,524 |
| Due to Other Funds | 3,261,705 | 921,731 | 4,183,436 |
| Advance from General Fund | 850,000 | | 850,000 |
| Other Liabilities | 34,376 | 89,737 | 124,113 |
| Deferred Revenue | 243,335 | 11,715 | 255,050 |
| Total Liabilities | 30,234,595 | 1,530,528 | 31,765,123 |
| Fund Balances: | | | |
| Undesignated Fund Balance | 124,288,802 | 15,524,080 | 139,812,882 |
| Total Fund Balances | 124,288,802 | 15,524,080 | 139,812,882 |
| Total Liabilities and Fund Balances | $ 154,523,397 | $ 17,054,608 | $ 171,578,005 |

See accompanying independent auditors' report.

# City of Detroit, Michigan
## COMBINING STATEMENT OF REVENUES,
## EXPENDITURES AND CHANGES IN FUND BALANCES
### NON-MAJOR CAPITAL PROJECTS FUNDS
#### For the Year Ended June 30, 2005

| | Capital Projects | Urban Renewal | Total |
|---|---|---|---|
| Revenue: | | | |
| Grant | $ 961,891 | $ 23,669,344 | $ 24,637,235 |
| Earnings on Investment | 1,988,745 | 7,864,822 | 9,673,567 |
| Other Revenues | 26,110,864 | | 26,120,864 |
| Total Revenues | 28,897,500 | 31,534,166 | 60,431,666 |
| Expenditures: | | | |
| Bond Insurance Cost | 2,299,818 | | 2,299,818 |
| Capital Outlay | 173,399,637 | 34,412,271 | 157,812,908 |
| Total Expenditures | 125,590,455 | 34,412,271 | 160,132,726 |
| Excess (Deficiency) of Revenues Over (Under) Expenditures | (96,792,955) | (2,908,165) | (99,701,060) |
| Other Financing Sources: | | | |
| Transfers In: | | | |
| General Debt Service Fund | 37,469,125 | | 37,469,125 |
| Proceeds from Bonds | 111,680,000 | | 111,680,000 |
| Premium on Bonds Issued | 7,039,843 | | 7,039,843 |
| Total Other Financing Sources | 156,188,968 | | 156,188,968 |
| Other Financing Uses: | | | |
| Principal Paid to Bond Agent for Refunded Bonds | 69,160,900 | | 69,160,900 |
| Interest Paid to Bond Agent for Refunded Bonds | 6,651,575 | | 6,651,575 |
| Total Other Financing Uses | 75,811,575 | | 75,811,575 |
| Total Other Financing Sources (Uses) | 80,377,393 | | 80,377,393 |
| Net Change in Fund Balance | (16,415,562) | (2,908,165) | (19,323,467) |
| Fund Balances at Beginning of Year | 140,704,364 | 18,432,185 | 159,136,549 |
| Fund Balances at End of Year | $ 124,288,802 | $ 15,524,080 | $ 139,812,882 |

See accompanying independent auditors' report.

## City of Detroit, Michigan
## COMBINING BALANCE SHEET
## NON-MAJOR PERMANENT FUNDS
## BEQUEST FUNDS
## June 30, 2005

| | Permanent Funds | | |
| | Bequest Funds | | |
| ASSETS | Other Trust | Cemetery Trust | Total |
|---|---|---|---|
| Cash | $        - | $   47,344 | $   47,344 |
| Restricted Cash | - | 108,465 | 108,465 |
| Investments | 42,958 | 1,054,856 | 1,097,814 |
| Total Assets | $ 42,958 | $ 1,210,665 | $ 1,253,623 |
| **LIABILITIES, AND FUND BALANCES** | | | |
| Liabilities: | | | |
| Total Liabilities | $        - | $        - | $        - |
| Fund Balances: | | | |
| Reserved for Restricted Assets | 42,958 | 1,210,665 | 1,253,623 |
| Total Fund Balances | 42,958 | 1,210,665 | 1,253,623 |
| Total Liabilities and Fund Balances | $ 42,958 | $ 1,210,665 | $ 1,253,623 |

See accompanying independent auditors' report.

130

## City of Detroit, Michigan
## STATEMENT OF REVENUES, EXPENDITURES, AND
## CHANGES IN FUND BALANCES
## NON-MAJOR PERMANENT FUNDS
## BEQUEST FUNDS
## For the Year Ended June 30, 2005

| | Permanent Funds | | |
| | Bequest Funds | | |
| | Other Trust | Cemetery Trust | Total |
|---|---|---|---|
| Revenues: | | | |
| Investment Income | $   814 | $   19,989 | $   20,803 |
| Total Revenues | 814 | 19,989 | 20,803 |
| Expenditures: | | | |
| Total Expenditures | | | |
| Total Revenues Over Expenditures | 814 | 19,989 | 20,803 |
| Fund Balance, Beginning | 42,144 | 1,190,676 | 1,232,820 |
| Fund Balance, Ending | $ 42,958 | $ 1,210,665 | $ 1,253,623 |

See accompanying independent auditors' report.

131

**City of Detroit**
**COMBINING STATEMENT OF NET ASSETS AND LIABILITIES**
**AGENCY FUNDS**
**For the Year Ended June 30, 2005**

| | Condemnation Award Fund | Fire Insurance Escrow Fund | Other Agency Funds | Total |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash | $ 1,285,578 | $ 354,816 | $ 733,223 | $ 2,510,419 |
| Investments | | 8,639,787 | | 8,639,787 |
| Due from Other Funds | | 186,281 | | 186,281 |
| Total Assets | $ 1,285,578 | $ 9,176,894 | $ 733,223 | $ 11,335,695 |
| **LIABILITIES** | | | | |
| Accounts Payable | $ | $ 62,743 | $ | $ 62,743 |
| Award Escrow | 1,425,578 | | | 1,425,578 |
| Advance from Outside Sources | | 8,875,746 | | 8,875,746 |
| Taxes Payable | | | 733,223 | 733,223 |
| Due to Other Funds | | 238,405 | | 238,405 |
| Total Liabilities | $ 1,425,578 | $ 9,176,894 | $ 733,223 | $ 11,335,695 |

See accompanying independent auditors' report.

132

---

**City of Detroit**
**COMBINING STATEMENT OF CHANGES IN ASSETS AND LIABILITIES**
**AGENCY FUNDS**
**For the Year Ended June 30, 2005**

| | Balance June 30, 2004 | Additions | Deductions | Balance June 30, 2005 |
|---|---|---|---|---|
| **Condemnation Award Fund** | | | | |
| *Assets* | | | | |
| Cash | $ 1,464,630 | $ | $ 39,052 | $ 1,425,578 |
| Total Assets | $ 1,464,630 | $ | $ 39,052 | $ 1,425,578 |
| *Liabilities* | | | | |
| Accounts and Contracts Payable | $ 1,464,630 | $ | $ 39,052 | $ 1,425,578 |
| Total Liabilities | $ 1,464,630 | $ | $ 39,052 | $ 1,425,578 |
| **Fire Insurance Escrow Fund** | | | | |
| *Assets* | | | | |
| Cash | $ 203,890 | $ 4,596,800 | $ 4,448,873 | $ 351,826 |
| Investments | 7,108,506 | 2,816,281 | 1,285,000 | 8,639,787 |
| Due from Other Funds | 185,281 | | | 185,281 |
| Total Assets | $ 7,497,677 | $ 7,413,069 | $ 5,733,873 | $ 9,176,894 |
| *Liabilities* | | | | |
| Accounts and Contracts Payable | $ 254,185 | $ 1,327,667 | $ 1,049,109 | $ 62,743 |
| Due to Other Funds | 117,215 | 167,377 | 46,186 | 238,406 |
| Other Liabilities | 7,086,276 | 3,538,731 | 1,289,261 | 8,875,746 |
| Total Liabilities | $ 7,497,676 | $ 5,443,775 | $ 3,784,556 | $ 9,176,895 |
| **Other Agency Funds** | | | | |
| *Assets* | | | | |
| Cash | $ 730,208 | $ 3,014 | $ | $ 733,222 |
| Total Assets | $ 730,208 | $ 3,014 | $ | $ 733,222 |
| *Liabilities* | | | | |
| Other Liabilities | $ 730,208 | $ 3,014 | $ | $ 733,222 |
| Total Liabilities | $ 730,208 | $ 3,014 | $ | $ 733,222 |
| **Total Agency Funds** | | | | |
| *Assets* | | | | |
| Cash | $ 2,398,728 | $ 4,599,823 | $ 4,487,974 | $ 2,510,627 |
| Investments | 7,108,506 | 2,816,281 | 1,285,000 | 8,639,787 |
| Due from Other Funds | 185,281 | | | 185,281 |
| Total Assets | $ 9,692,515 | $ 7,416,104 | $ 5,772,924 | $ 11,335,695 |
| *Liabilities* | | | | |
| Accounts and Contracts Payable | $ 1,758,815 | $ 1,275,665 | $ 2,008,161 | $ 1,488,321 |
| Investments | 117,215 | 167,377 | 46,186 | 238,405 |
| Other Liabilities | 7,816,484 | 2,541,745 | 1,749,261 | 9,608,968 |
| Total Liabilities | $ 9,692,514 | $ 5,446,789 | $ 3,803,608 | $ 11,335,695 |

See accompanying independent auditors' report.

133

# STATISTICAL

## The Statistical Section contains:

General Governmental Revenues by Source— Last Ten Fiscal Years

General Governmental Expenditures by Function—
  Last Ten Fiscal Years

Property Tax Levies and Collections — Last Ten Fiscal Years

Adjusted Tax Levies and Tax Collections by Levies —
  Last Ten Fiscal Years

Assessed and Estimated Actual Value of Taxable Property —
  Last Ten Fiscal Years

Property Tax Rates and Levies — All Overlapping Governments —
  Last Ten Fiscal Years

Special Assessment Additions and Deductions — Last Ten
  Fiscal Years

Ratio of Net General Bonded Debt to Assessed Value and Net Bonded Debt
  per Capita —Last Ten Fiscal Years

Legal Debt Margin

Computation of Direct and Overlapping Debt—
  General Obligation Bonds

Ratio of Annual Debt Service Expenditures for
  General Bonded Debt to Total General Governmental Expenditures
  —Last Ten Fiscal Years

Revenue Bond Coverage — Last Ten Fiscal Years

Real Property Value, Construction Permits and Bank Deposits —
  Last Ten Fiscal Years

Principal Taxpayers

Largest Private Employers

Miscellaneous Statistics

CITY OF DETROIT



In preparation for the Major League All-Star Game in July, emergency responders participate in a **homeland security** emergency response exercise in May at Comerica Park.

THIS PAGE LEFT BLANK INTENTIONALLY

CITY OF DETROIT



Shoppers marvel at the breathtaking array of flowers at Eastern Market's **Flower Day** in May. Flower Day is a much-anticipated annual rite of spring for thousands of metro Detroiters.



Runners speed to the finish line at the **Heat the Streets Run and Walk for Warmth** last February to raise money to assist low-income residents with their utility costs.

Table 1

**City of Detroit, Michigan**
**GENERAL GOVERNMENTAL REVENUES BY SOURCE (1)**
**Last Ten Fiscal Years**
**(Amounts Expressed in Thousands)**
**Unaudited**

| Revenue Classification (2) | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|
| Taxes, Assessments Interest and Penalties | | | | | | | | | | |
| Licenses, Permits and Inspection Charges | | | | | | | | | | |
| Shared Taxes and Grants | | | | | | | | | | |
| Sales and Charges for Services | | | | | | | | | | |
| Ordinance Fines | | | | | | | | | | |
| Revenues from Use of Assets | | | | | | | | | | |
| Other Revenues | | | | | | | | | | |
| Total Revenues | | | | | | | | | | |

(1) Includes general, special revenue, debt service, capital projects, and permanent funds.
(2) Library revenues have been removed for all years. Prior to 2002 the Detroit Public Library was included in the Special Revenue Funds of the City; it is now being reported as a Component Unit.

Table 2

**City of Detroit, Michigan**
**GENERAL GOVERNMENTAL EXPENDITURES BY FUNCTION (1)**
**Last Ten Fiscal Years**
**(Amounts Expressed in Thousands)**
**Unaudited**

| Expenditure Classification (2) | 2005 | 2004 | 2003 | 2002 | 2001 | 2000 | 1999 | 1998 | 1997 | 1996 |
|---|---|---|---|---|---|---|---|---|---|---|
| Public Protection | | | | | | | | | | |
| Health | | | | | | | | | | |
| Recreation and Culture | | | | | | | | | | |
| Economic Development | | | | | | | | | | |
| Educational Development | | | | | | | | | | |
| Physical Development | | | | | | | | | | |
| Transportation | | | | | | | | | | |
| Development and Management | | | | | | | | | | |
| Debt Service | | | | | | | | | | |
| Capital Outlay | | | | | | | | | | |
| Total Expenditures | | | | | | | | | | |

(1) Includes general, special revenue, debt service, capital projects, and permanent funds.
(2) Library expenditures have been removed for all years. Prior to 2002 the Detroit Public Library was included in the Special Revenue Funds of the City; it is now being reported as a Component Unit.

13-53846-tjt    Doc 3153-8    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 20 of 54

Table 3

City of Detroit, Michigan
Property Tax Levies and Collections
Last Ten Fiscal Years
(Amounts Expressed in Thousands)
Unaudited

| Fiscal Year | Total Tax Levy | Current Tax Collections | Percent of Levy Collected | Delinquent Tax Collections | Total Tax Collections | Percent of Total Tax Collection to Tax Levy | Current and Prior Years' Adjustments (2) | Outstanding Delinquent Taxes | Percent of Delinquent Taxes to Tax Levy |
|---|---|---|---|---|---|---|---|---|---|
| 1996 (1) | 201,228 | 180,615 | 89.85 | 11,949 | 192,564 | 95.79 | (13,336) | 77,730 | 38.69 |
| 1997 (1) | 203,646 | 189,097 | 92.67 | 15,028 | 204,125 | 97.88 | (3,585) | 78,642 | 37.71 |
| 1998 (1) | 218,533 | 193,586 | 88.56 | 15,998 | 209,584 | 95.87 | (6,408) | 79,267 | 36.27 |
| 1999 (1) | 224,248 | 199,594 | 89.01 | 14,302 | 213,896 | 95.38 | (8,701) | 80,858 | 36.06 |
| 2000 (1) | 231,210 | 210,565 | 91.14 | 17,686 | 228,411 | 98.75 | (6,939) | 76,896 | 33.24 |
| 2001 (1) | 254,397 | 218,915 | 86.05 | 15,884 | 234,799 | 92.28 | (1,349) | 85,285 | 37.46 |
| 2001 (3) | 243,710 | 211,435 | 87.17 | 23,433 | 235,868 | 96.78 | (15,938) | 76,136 | 32.47 |
| 2003 (3) | 246,284 | 207,628 | 84.39 | 16,663 | 224,291 | 91.07 | (10,925) | 93,204 | 36.63 |
| 2004 (3) | 242,235 | 231,696 | 95.65 | 17,677 | 249,373 | 102.95 | (2,945) | 80,111 | 33.08 |
| 2005 (3) | 254,533 | 238,835 | 93.53 | 8,942 | 247,001 | 97.04 | (6,488) | 81,565 | 32.34 |

(1) Includes General, Library and Debt Service Funds.
(2) Includes additions, deductions, cancellations and adjustments.
(3) Fiscal Years 2001-2004 do not include Library amounts.

Table 4

City of Detroit, Michigan
Adjusted Tax Levies and Tax Collections by Levies
Last Ten Fiscal Years
(Amounts Expressed in Thousands)
Unaudited

| Fiscal Year | Total Tax Levy | Net Additions Deductions to (from) Tax Levy | Less Cancellations and Adjustments | Net Taxes Receivable | Collections to June 30, 2005 Amount | Ratio to Adjusted Tax Levy |
|---|---|---|---|---|---|---|
| 1996 (1) | 201,028 | - | (5,922) | 195,106 | 193,450 | 99.15 |
| 1997 (1) | 208,546 | - | (4,995) | 203,551 | 201,136 | 98.81 |
| 1998 (1) | 218,833 | - | (6,416) | 212,417 | 208,358 | 98.70 |
| 1999 (1) | 224,248 | - | (5,227) | 219,021 | 215,165 | 98.24 |
| 2000 (1) | 231,310 | - | 4,508 | 235,818 | 229,895 | 97.48 |
| 2001 (1) | 254,397 | - | (4,480) | 249,917 | 237,852 | 95.19 |
| 2002 (3) | 243,710 | - | (5,193) | 238,517 | 225,277 | 94.45 |
| 2003 (3) | 246,284 | - | (5,101) | 241,183 | 218,474 | 90.58 |
| 2004 (3) | 242,235 | - | (411) | 241,824 | 231,096 | 95.81 |
| 2005 (3) | 254,533 | - | (3,577) | 250,956 | 238,659 | 95.81 |

(1) Includes General, Library and Debt Service Funds.
(2) Fiscal Years 2002-2005 do not include Library amounts.

138

139

Table 5

Table 6

## City of Detroit, Michigan
### PROPERTY TAX RATES AND LEVIES — ALL OVERLAPPING GOVERNMENTS —
### Last Ten Fiscal Years
### (Amounts Expressed in Thousands)
### Unaudited

**Tax Rates — Mills**

| Fiscal Year | City (Note A) | Library | School | County (Note B) | State | Total |
|---|---|---|---|---|---|---|
| 1997 | 31.2830 | 2.6400 | 25.5000 | 11.3800 | 6.0000 | 76.8030 |
| 1998 | 31.2380 | 2.6400 | 25.5000 | 11.3700 | 6.0000 | 76.8380 |
| 1999 | 31.1750 | 2.6400 | 24.4500 | 11.3200 | 6.0000 | 75.5850 |
| 2000 | 31.0950 | 2.6400 | 23.9000 | 11.1390 | 6.0000 | 74.7740 |
| 2001 | 31.6783 | 3.6531 | 25.0001 | 11.0565 | 6.0000 | 77.3679 |
| 2002 | 31.9000 | 3.6531 | 28.5000 | 12.5395 | 6.0000 | 82.5726 |
| 2003 | 30.8780 | 3.6531 | 31.1900 | 13.9895 | 6.0000 | 85.6906 |
| 2004 | 30.8808 | 3.6531 | 31.8000 | 13.9886 | 5.0000 | 85.3025 |
| 2005 | 30.4359 | 3.6531 | 31.0000 | 13.9861 | 6.0000 | 85.0551 |
| 2006 | 30.0201 | 4.6397 | 30.6236 | 12.0950 | 6.0000 | 83.3694 |

**Tax Levies**

| Fiscal Year | City (Note A) | Library | School | County (Note B) | State | Total |
|---|---|---|---|---|---|---|
| 1997 | $ 192,316 | 16,230 | $ 116,328 | $ 69,960 | $ 36,885 | $ 431,719 |
| 1998 | 201,503 | 17,030 | 123,999 | 73,343 | 38,703 | 454,578 |
| 1999 | 206,741 | 17,507 | 119,113 | 75,070 | 39,790 | 458,221 |
| 2000 | 213,208 | 18,102 | 119,281 | 76,375 | 41,140 | 468,106 |
| 2001 | 228,223 | 24,174 | 132,788 | 79,655 | 43,226 | 510,066 |
| 2002 | 243,710 | 27,756 | 166,268 | 95,799 | 45,839 | 579,372 |
| 2003 | 246,284 | 28,577 | 193,491 | 111,581 | 47,856 | 628,099 |
| 2004 | 242,135 | 28,498 | 192,090 | 109,730 | 39,221 | 611,774 |
| 2005 | 254,533 | 30,284 | 258,469 | 116,585 | 50,015 | 799,826 |
| 2006 | 262,670 | 40,518 | 267,951 | 105,829 | 52,499 | 729,467 |

Note A — Includes millage to pay cash rentals to the City of Detroit Building Authority to cover principal and interest on authority bonds issued to finance construction of a new Detroit General Hospital and to pay Wayne County for debt service on County Drainage District Bonds issued for Detroit No. 1 thru 1994.

Note B — The County tax rates and tax levies shown are against properties situated within the City of Detroit. The total assessed valuation used in determining the County tax rate recognizes adjustments in assessed valuation made after the City tax rate is determined.

## City of Detroit, Michigan
### ASSESSED AND ESTIMATED ACTUAL VALUE OF TAXABLE PROPERTY
### Last Ten Fiscal Years
### (Amount Expressed in Thousands)
### Unaudited

| Fiscal Year | Real Property (Notes A and B) | | | Personal Property (Notes A, B and C) | | | Total (Notes A, B and C) | | |
|---|---|---|---|---|---|---|---|---|---|
| | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value | State Equalized Value (Notes D and E) | Taxable Value | Estimated Actual Value |
| 1997 | $ 4,943,227 | $ 4,703,635 | $ 9,886,454 | $ 1,443,983 | 1,443,983 | $ 2,887,966 | $ 6,387,210 | $ 6,147,618 | $ 12,774,420 |
| 1998 | 5,251,875 | 4,847,236 | 10,503,750 | 1,033,241 | 1,033,241 | 2,066,577 | 6,485,577 | 6,021,466 | 13,939,432 |
| 1999 | 5,540,261 | 5,095,631 | 11,080,482 | 1,026,585 | 1,026,585 | 2,053,170 | 6,631,616 | 6,133,572 | 13,133,572 |
| 2000 | 6,093,962 | 5,219,230 | 13,591,924 | 1,437,482 | 1,437,482 | 2,874,964 | 6,856,682 | 7,226,588 | 74,740 |
| 2001 | 6,106,178 | 5,486,242 | 16,212,356 | 1,718,119 | 1,718,119 | 3,436,238 | 7,204,381 | 7,526,379 | 19,648,594 |
| 2002 | 9,219,564 | 5,983,367 | 18,638,728 | 1,656,438 | 1,656,438 | 3,312,876 | 10,875,882 | 7,639,805 | 21,951,604 |
| 2003 | 10,298,314 | 6,226,845 | 20,596,608 | 1,743,083 | 1,743,083 | 3,495,966 | 11,384,317 | 7,979,968 | 24,092,664 |
| 2004 | 10,666,533 | 6,478,867 | 21,337,066 | 1,373,222 | 1,373,222 | 2,746,444 | 12,041,755 | 7,844,289 | 24,083,510 |
| 2005 | 11,177,226 | 6,628,991 | 22,354,452 | 1,507,199 | 1,507,199 | 3,014,398 | 12,684,425 | 8,335,790 | 25,368,850 |
| 2006 | 11,463,864 | 7,168,723 | 23,295,330 | 1,581,401 | 1,581,401 | 3,222,962 | 13,256,545 | 8,749,830 | 26,513,899 |

Note A — Excludes qualified real and personal properties exempted from ad valorem property taxes but subject to a specific Industrial Facilities tax under the State Plant Rehabilitation and Industrial Development Districts Act of 1974.

Note B — Beginning with fiscal year 1995/1996 taxable values cannot exceed the statewide rate of inflation of the prior year or a per parcel basis, except where increases are due to physical changes in the parcel (P.A.415 of 1994). This represents the taxable amount of the state equalized value.

Note C — Excludes inventories which are exempted from the assessed values by the State Single Business Tax Act of 1974.

Note D — State Equalized Value (50% of true cash value).

Note E — Assessment Date—December 31 preceding year of levy.

13-53846-tjt    Doc 3153-8    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 23 of 54
C-83

Table 7

## City of Detroit, Michigan
### SPECIAL ASSESSMENTS ADDITIONS AND DEDUCTIONS
#### Last Ten Fiscal Years
#### Unaudited

| Fiscal Year | Beginning Balance | Additions | Deductions | | Ending Balance |
|---|---|---|---|---|---|
| | | | Collections | Cancellations and Adjustments | |
| 1996 | 2,066,651 | - | 119,976 | 58,180 | 1,887,495 |
| 1997 | 1,887,495 | - | 213,336 | 105,500 | 1,558,659 |
| 1998 | 1,558,659 | 231,733 | 84,578 | 22,655 | 1,662,767 |
| 1999 | 1,662,767 | 4,897,716 | 250,378 | 473,697 | 5,836,408 |
| 2000 | 5,836,408 | 39,622 | 19,831 | 152,117 | 5,704,102 |
| 2001 | 5,704,102 | - | 80,553 | 362,034 | 5,261,515 |
| 2002 | 5,261,515 | 19,427 | 116,793 | 184,382 | 4,997,947 |
| 2003 | 4,977,947 | 23,865,641 | 363,457 | 75,529 | 28,407,642 |
| 2004 | 28,407,642 | 529,969 | 340,692 | 803,396 | 27,794,423 |
| 2005 | 27,794,423 | - | 176,851 | 1,574,915 | 26,044,687 |

Table 8

## City of Detroit, Michigan
### RATIO OF NET GENERAL BONDED DEBT TO ASSESSED VALUE AND NET BONDED DEBT PER CAPITA
#### Last Ten Fiscal Years
#### (Dollars Expressed in Thousands)
#### Unaudited

| Fiscal Year | Net Debt | Taxable Assessed Value (Note A) | Ratio of Net Debt to Taxable Assessed Value | Population (Note B) | Net Debt Per Capita |
|---|---|---|---|---|---|
| 1996 (C) | $1,123,872 | $5,537,234 | 19.04 | 1,020,272 | $1,121 |
| 1997 (C) | 1,101,070 | 6,147,618 | 17.91 | 1,020,272 | 1,100.72 |
| 1998 (C) | 1,068,048 | 6,450,576 | 16.56 | 1,020,272 | 1,067.76 |
| 1999 (C) | 1,042,641 | 6,631,616 | 15.72 | 1,000,272 | 1,042.36 |
| 2000 (C) | 1,021,005 | 6,856,682 | 14.89 | 951,270 | 1,073.31 |
| 2001 (C) | 938,880 | 7,304,381 | 13.02 | 951,270 | 986.13 |
| 2002 (C) | 962,133 | 7,639,895 | 12.59 | 951,270 | 1,011.42 |
| 2003 (C) | 909,624 | 7,976,048 | 11.40 | 951,270 | 956.22 |
| 2004 (C) | 1,104,634 | 7,844,210 | 14.07 | 951,270 | 1,160.60 |
| 2005 (C) | 1,209,104 | 8,335,790 | 14.50 | 951,270 | 1,271.05 |

Note A - Assessed Values are the State equalized valuations.

Note B - Population estimates are from U.S. Department of Commerce, Bureau of Census Current Population Reports. The population count for the City released by the U.S. Bureau of census figure for 2000 was 951,270. Subsequent years are from the U.S. Census Bureau March census estimates. The 2000 population count not available.

Note C - Beginning with Fiscal Year 1995-96, taxable values current reflect the statewide rate of inflation of the prior year on a parcel basis, except where increases are due to physical changes in the parcel (P.A. 415 of 1994).

Table 9

## City of Detroit, Michigan
## LEGAL DEBT MARGIN
### June 30, 2005
### Unaudited

|  | Net Debt | Percent of Assessed Value | Amount | Legal Debt Margin |
|---|---|---|---|---|
| Assessed Value Fiscal Year 2004-05 (State Equalized) | $ 12,713,648,477 | | | |
| Add: Allowance under Act 198, Mich. 1974 | 361,731,938 | | | |
| Allowance under Act 328, Mich. 1976 | 718,496,940 | | | |
| Allowance under Act 147, Mich. 1992 | 24,933,794 | | | |
| Allowance under Act 147, Mich. 1994 | 86,672,803 | | | |
| Total Assessed Value Fiscal Year 2004-05 | $ 13,907,485,952 | | | |
| Net Direct Debt Subject to General Debt Limitation | | | | |
| General Obligation Bonds (Note A) | $ 579,850,000 | | | |
| General Bonds - Limited Tax | 159,660,000 | | | |
| Total Assessed Value Fiscal Year 2004-05 | | 10.00% | $ 1,290,748,959 | |
| Limited Obligation Economic Development Bonds - District | | | | |
| Court, Madison Center Project | | | 8,916,510 | |
| Total Net Direct Debt Subject to General Debt Limitation | | | $ 1,290,748,959 | $ 663,520,849 |
| Net Direct Debt Not Subject to General Debt Limitation (Note B): | | | | |
| Direct Debt: | | | | |
| General Obligations | | | | |
| General Detroit Resource Recovery Bonds | $ 156,900,986 | | | |
| Limited Obligation Economic Development Bonds | 63,980,000 | | | |
| Resource Recovery Project | 98,895,000 | | | |
| Self-Insurance Bonds - Limited Tax | | | | |
| Revenue Bonds: | | | | |
| Cobo-Arena Facility - Cobo Center Expansion | 95,603,230 | | | |
| Detroit Building Authority - Parking and Arena System | 52,686,236 | | | |
| Local Development Finance Authority Tax Increment Bonds | | | | |
| Jefferson-Center Revitalization Project | 78,970,582 | | | |
| Sewage Disposal System | 2,489,960,575 | | | |
| Tax Increment Finance Authority Tax Increment Bonds - DDA | 142,820,561 | | | |
| Sewage Disposal System | 1,843,160,414 | | | |
| Water Supply System | 2,000,000 | | | |
| Resource Development Authority - Trapper's Alley Project | 4,266,000 | | | |
| Federal Note - Caraco Pharmaceutical Project | 2,835,000 | | | |
| Federal Note - Ferry Street | 1,840,000 | | | |
| Federal Note - Riverfront Project | 1,070,000 | | | |
| Federal Note - Statcenter Project | 315,000 | | | |
| Federal Note - Motorstown Welcome Center | 2,799,000 | | | |
| Federal Note - New Amsterdam Project | 9,700,000 | | | |
| Revenue Anticipation Notes, Series 2005 | 54,445,000 | | | |
| Total Net Debt Not Subject to General Debt Limitation | $ 5,055,539,712 | | | |

Note A — General Obligation Bonds are subject to the general debt limitation, as established under State Law. After the effective date (December 23, 1978) of an amendment to the State Constitution, the City may not issue general obligation bonds payable from taxes levied for debt service without a vote of the electorate.

Note B — Pursuant to State Law, certain exclusions to the debt limitations are permitted for the following purposes (special assessment bonds only, whether secured by a mortgage or not; bonds, contract obligations or assessments incurred to comply with an order of the Water Resources Commission of the State of Michigan or a court of competent jurisdiction; obligations incurred for water supply, sewage, drainage, refuse disposal or resource recovery projects necessary to protect the public health by abating pollution; bonds issued to acquire housing for which certain rent subsidies will be received by the City or an agency thereof; and bonds issued to refund money advanced or paid for certain special assessments.)

144

---

TABLE 10

## City of Detroit, Michigan
## COMPUTATION OF DIRECT AND OVERLAPPING DEBT
### June 30, 2005
### Unaudited

|  | Gross Debt | Less Redemption Funds | Net Debt | % Applicable To Detroit | Detroit Share |
|---|---|---|---|---|---|
| Direct Debt: | | | | | |
| General Obligation: | | | | | |
| General Bonds - Unlimited Tax | $ 579,850,000 | $ — | $ 579,850,000 | | $ — |
| General Bonds - Limited Tax | 399,455,000 | | 399,455,000 | | |
| Detroit Building Authority Bonds | | | | | |
| Madison Center Project | 9,921,954 | 1,303,444 | 8,618,510 | | |
| Greater Detroit Resource Authority Bonds | 183,600,000 | 26,899,014 | 156,900,986 | | |
| Limited Obligation Economic Development Bonds - | | | | | |
| Resource Recovery Project | 63,980,000 | | 63,980,000 | | |
| Total General Obligation | 1,236,806,954 | 27,602,458 | 1,209,410,496 | 100.00% | $ 1,209,104,496 |
| Revenue Bonds: | | | | | |
| Cobo-Arena Facility - Cobo Center Expansion | 125,013,138 | 30,009,930 | 95,003,208 | | |
| Detroit Building Authority - Parking and Arena System | 60,845,000 | 8,238,764 | 52,606,236 | | |
| Local Development Finance Authority Tax Increment | | | | | |
| Bonds - Jefferson-Center Revitalization Project | 86,310,000 | 7,380,498 | 78,929,502 | | |
| Sewage Disposal System (Note C) | 2,656,428,571 | 167,305,998 | 2,489,065,575 | | |
| Tax Increment Finance Authority Bonds - DDA | 166,473,198 | 23,444,097 | 142,829,561 | | |
| Water Supply System (Note C) | 1,991,615,000 | 146,459,086 | 1,845,116,312 | | |
| Total Revenue Bonds | 5,086,982,909 | 383,333,173 | 4,703,649,736 | 100.00% | 4,703,649,736 |
| Total Direct Debt | 6,323,789,863 | 410,935,631 | 5,912,854,232 | | |
| Overlapping Debt: | | | | | |
| School District of the City of Detroit General | | | | | |
| Obligation Bonds and Notes | 1,477,035,000 | 1,464,816,577 | 10,218,423 | 100.00% | 10,218,423 |
| Wayne County Bonds (Note A) | 122,525,693 | 20,390,966 | 101,136,327 | 18.03% | 18,234,275 |
| Wayne County Community College Bonds (Note A) | 76,105,000 | 19,770,728 | 56,334,272 | 28.97% | 16,321,756 |
| Total Overlapping Debt | 1,676,665,693 | 1,507,385,471 | 168,380,322 | | 44,809,594 |
| Debt Net Pledging the Faith and Credit of the City: | | | | | |
| Federal Note - Caraco Pharmaceutical Project (Note A) | 4,266,000 | | 4,266,000 | | |
| Federal Note - Ferry Street Project (Note A) | 2,835,000 | | 2,835,000 | | |
| Federal Note - Riverfront Project (Note A) | 1,840,000 | | 1,840,000 | | |
| Federal Note - Garfield Project (Note A) | 1,070,000 | | 1,070,000 | | |
| Federal Note - Statcenter Project (Note A) | 315,000 | | 315,000 | | |
| Federal Note - Motorstown Welcome Center (Note A) | 2,799,000 | | 2,799,000 | | |
| Federal Note - New Amsterdam Project (Note A) | 9,700,000 | | 9,700,000 | | |
| Revenue Anticipation Notes, Series 2005 | 54,445,000 | | 54,445,000 | | |
| Loans Payable to GE Capital - Schedule 001 | 1,892,181 | | 1,892,181 | | |
| Loans Payable to GE Capital - Schedule 001 | 142,246 | | 142,246 | | |
| Loans Payable to GE Capital - Schedule 001 | 7,459,520 | | 7,459,520 | | |
| Loans Payable to GE Capital - Schedule 001 | 384,581 | | 384,581 | | |
| Loans Payable to GE Capital - Schedule 002 | 1,186,716 | | 1,186,716 | | |
| Loans Payable to GE Capital - Schedule 002 | 428,096 | | 428,096 | | |
| Loans Payable to GE Capital - Schedule 003 | 121,536 | | 121,536 | | |
| Loans Payable to GE Capital - Schedule 003 | 111,153,268 | | 111,153,268 | | |
| Loans Payable to GE Capital - Schedule 004 | 14,796,211 | | 14,796,211 | | |
| Loans Payable to GE Capital - Schedule 005 | 6,925,886 | | 6,925,886 | | |
| Loans Payable to GE Capital - Schedule 008 | 8,637,048 | | 8,637,048 | | |
| Loans Payable to GE Capital - Schedule 009 | 153,181 | | 153,181 | | |
| Total Debt Not Pledging the Faith and Credit of the City | 132,101,010 | | 132,101,010 | | |
| Total Debt | $ 8,130,566,056 | $ 1,917,821,102 | $ 6,213,044,954 | | $ 5,957,548,183 |

Note A — Note is serviced by future Block Grant Revenues.

Note B — Amount shown is Cash funded redemption funds; additionally secured by surety bonds.

145

Table 12

**Table 11**

# City of Detroit, Michigan
## RATIO OF ANNUAL DEBT SERVICE EXPENDITURES FOR
## GENERAL BONDED DEBT TO TOTAL GENERAL GOVERNMENTAL EXPENDITURES
### Last Ten Fiscal Years
### (Dollars Expressed in Thousands)
### Unaudited

| Year Ending June 30, | Principal | Interest | Other Expenditures | Total Debt Service | Total General Governmental Expenditures | Ratio of Total Debt Service to Total General Governmental Expenditures |
|---|---|---|---|---|---|---|
| 1996 | $ 44,219 | $ 47,828 | $ — | $ 92,047 | $ 1,365,376 | 6.74% |
| 1997 | 71,736 | 51,736 | — | 123,472 | 1,450,723 | 8.51% |
| 1998 | 56,375 | 59,774 | 100 | 116,249 | 1,535,771 | 7.57% |
| 1999 | 53,842 | 57,737 | 100 | 116,679 | 1,568,382 | 7.35% |
| 2000 | 71,041 | 55,008 | 100 | 126,169 | 1,730,590 | 7.29% |
| 2001 | 79,319 | 47,584 | 78 | 126,981 | 1,739,481 | 7.30% |
| 2002 | 78,569 | 42,443 | 2,571 | 124,583 | 1,961,846 | 6.38% |
| 2003 | 86,770 | 43,761 | 1,652 | 132,183 | 1,981,446 | 6.67% |
| 2004 | 86,898 | 47,444 | 4,546 | 138,888 | 2,169,055 | 6.40% |
| 2005 | 73,544 | 51,452 | 5,193 | 130,199 | 2,072,153 | 6.28% |

**Table 12**

# City of Detroit, Michigan
## REVENUE BOND COVERAGE
### Last Ten Fiscal Years
### Unaudited

| Type | Fiscal Year | Gross Revenue | Direct Operating Expenses (1) | Net Revenue Available for Debt Service | Debt Service Requirements | | | Coverage |
|---|---|---|---|---|---|---|---|---|
| | | | | | Principal | Interest | Total | |
| Automobile Parking | 1996 | $ 15,227,762 | $ 7,972,813 | $ 7,254,949 | $ 2,875,950 | $ 3,206,667 | $ 5,951,647 | 1.21 |
| | 1997 | 15,994,234 | 7,585,410 | 8,378,833 | 3,234,314 | 3,324,314 | 4,929,514 | 1.68 |
| | 1998 | 17,001,295 | 8,036,833 | 8,964,426 | 2,725,620 | 2,517,377 | 5,242,377 | 1.71 |
| | 1999 | 17,879,661 | 8,592,315 | 9,287,346 | 3,420,000 | 3,618,093 | 7,038,093 | 1.33 |
| | 2000 | 19,001,117 | 9,406,793 | 9,594,890 | 4,011,282 | 5,211,381 | 9,211,381 | 1.68 |
| | 2001 | 18,326,140 | 9,482,285 | 9,598,806 | 3,146,809 | 6,588,455 | 10,735,135 | 1.90 |
| | 2002 | 20,043,291 | 9,654,607 | 11,132,366 | 5,249,650 | 5,264,515 | 10,514,153 | 1.95 |
| | 2003 | 19,353,514 | 11,155,995 | 8,597,519 | 5,900,655 | 5,115,695 | 10,470,405 | 0.76 |
| | 2004 | 19,478,319 | 16,199,958 | 3,842,361 | 3,515,000 | 4,255,219 | 10,819,239 | 0.13 |
| | 2005 | 23,017,491 | 16,609,302 | (2,371,741) | 6,019,000 | 4,053,120 | 18,006,120 | (0.37) |
| Sewerage | 1996 | $ 191,471,994 | $ 129,840,773 | $ 61,494,822 | $ 9,495,000 | $ 26,168,538 | $ 35,655,558 | 1.73 |
| | 1997 | 201,577,524 | 148,262,972 | 55,289,582 | 19,416,700 | 30,665,573 | 51,082,429 | 1.10 |
| | 1998 | 211,156,570 | 152,983,431 | 59,083,533 | 19,959,700 | 26,886,895 | 50,846,895 | 1.15 |
| | 1999 | 216,009,469 | 156,676,750 | 59,332,659 | 23,595,280 | 23,846,096 | 44,222,376 | 1.23 |
| | 2000 | 232,923,491 | 169,848,641 | 62,074,805 | 20,635,000 | 48,098,953 | 68,553,353 | 0.91 |
| | 2001 | 252,238,659 | 172,382,205 | 80,089,175 | 22,121,900 | 42,568,077 | 58,064,095 | 1.15 |
| | 2002 | 262,951,886 | 179,104,670 | 88,098,835 | 24,889,174 | 50,215,142 | 83,893,356 | 1.06 |
| | 2003 | 280,111,145 | 157,245,024 | 118,524,339 | 33,068,610 | 58,213,606 | 100,915,946 | 1.11 |
| | 2004 | 310,826,913 | 183,583,583 | 120,855,758 | 37,761,819 | 93,082,616 | 126,424,676 | 1.08 |
| | 2005 | 312,698,329 | 183,489,354 | 150,397,971 | 32,998,600 | 82,518,951 | 185,002,901 | 1.26 |
| Water | 1996 | $ 156,565,806 | $ 113,237,963 | $ 43,311,184 | $ 7,675,000 | $ 21,973,674 | $ 29,644,576 | 1.46 |
| | 1997 | 162,897,417 | 123,273,865 | 39,535,962 | 10,115,000 | 27,267,396 | 37,384,386 | 1.66 |
| | 1998 | 171,039,391 | 136,252,495 | 43,536,786 | 11,615,000 | 26,014,934 | 38,053,054 | 1.40 |
| | 1999 | 185,962,509 | 138,697,932 | 48,187,582 | 11,135,088 | 27,607,083 | 38,742,083 | 1.55 |
| | 2000 | 191,545,224 | 143,609,135 | 46,786,169 | 16,975,888 | 58,663,173 | 66,444,173 | 0.78 |
| | 2001 | 194,444,059 | 144,791,164 | 49,650,895 | 17,572,588 | 46,655,095 | 64,644,095 | 0.69 |
| | 2002 | 209,227,559 | 153,246,916 | 55,983,893 | 18,841,098 | 59,898,580 | 71,088,819 | 0.69 |
| | 2003 | 244,703,041 | 139,344,230 | 105,465,698 | 19,608,096 | 64,416,959 | 62,664,955 | 0.97 |
| | 2004 | 285,673,183 | 152,561,771 | 103,886,417 | 20,649,090 | 67,214,995 | 82,359,860 | 1.38 |
| | 2005 | 266,633,035 | 165,952,619 | 103,690,387 | 22,646,200 | 85,928,893 | 109,268,893 | 0.96 |

(1) Operating Expenses Excluding Depreciation.

C-86

## Table 13

**City of Detroit, Michigan**
**REAL PROPERTY VALUE, CONSTRUCTION PERMITS AND BANK DEPOSITS**
Last Ten Fiscal Years
(Dollars Expressed in Millions)
Unaudited

| Final Year | Real Property Value (Note 1) | | | New Construction (Note 2) | | | | Alterations/Additions (Note 2) | | | | Commercial Bank Deposits (Note 3) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Residential | Commercial | Exempt | Residential No. of Bldg. | Value | Non-Residential No. of Bldg. | Value | Residential No. of Bldg. | Value | Non-Residential No. of Bldg. | Value | |
| 1996 | $ 3,116 | $ 1,488 | N/A | 53 | $ 17.49 | 213 | $ 237.07 | 2,319 | $ 37.06 | 685 | $ 255.53 | 10.51 |
| 1997 | 3,145 | 1,555 | N/A | 69 | 7.59 | 378 | 222.53 | 3,414 | 91.49 | 890 | 253.46 | 10.30 |
| 1998 | 3,217 | 1,660 | N/A | 90 | 117.72 | 343 | 256.37 | 4,091 | 77.02 | 818 | 413.88 | 16.38 |
| 1999 | 3,334 | 1,677 | N/A | 129 | 47.69 | 376 | 281.64 | 4,732 | 53.46 | 823 | 381.65 | 11.80 |
| 2000 | 3,442 | 1,789 | N/A | 149 | 79.78 | 331 | 479.38 | 5,983 | 93.17 | 864 | 592.20 | 11.20 |
| 2001 | 3,505 | 1,996 | N/A | 116 | 36.21 | 282 | 336.62 | 5,520 | 122.33 | 984 | 570.30 | N/A |
| 2002 | 3,595 | 2,078 | N/A | 84 | 19.63 | 240 | 288.82 | 5,687 | 75.48 | 1,053 | 421.18 | N/A |
| 2003 | 4,197 | 2,828 | N/A | 244 | 55.18 | 290 | 330.78 | 5,815 | 86.00 | 1,414 | 457.34 | N/A |
| 2004 | 4,239 | 2,169 | N/A | 483 | 76.96 | 338 | 280.69 | 5,388 | 125.96 | 1,897 | 339.84 | N/A |
| 2005 | 4,343 | 2,354 | N/A | 611 | 83.54 | 368 | 247.35 | 5,418 | 94.34 | 915 | 392.99 | N/A |

Note 1 Source: City of Detroit 2004-2005 Budget
Note 2 Source: City of Detroit Department of Buildings and Safety Engineering
Note 3 Source: The Sheshunoff Data Report for all years prior to 2001. N/A=Data not available.

## Table 14

**City of Detroit, Michigan**
**PRINCIPAL TAXPAYERS**
For the Year Ended June 30, 2005
Unaudited

| Taxpayer | Type of Business | Real Estate Taxable Valuation | % of Total | Personal Property Taxable Valuation | % of Total | Total Taxable Valuation | % of Total |
|---|---|---|---|---|---|---|---|
| DaimlerChrysler Corporation | Automotive | $ 136,735,666 | 1.89 % | $ 613,091,605 | 40.04 % | $ 749,827,360 | 8.06 % |
| Detroit Edison | Utility | 76,393,528 | 0.75 | 380,377,040 | 24.45 | 299,490,284 | 4.31 |
| Central Motors Corporation | Automotive | 69,674,783 | 0.77 | 113,078,070 | 8.85 | 178,221,863 | 2.14 |
| Michigan Consolidated Gas | Utility | 1,695,613 | 0.02 | 165,081,593 | 9.62 | 175,353,156 | 1.77 |
| Riverfront Holdings Inc. | Real Estate | 121,306,898 | 1.30 | | 0.05 | 121,190,896 | 1.48 |
| Ameritech | Auto Supplier | 16,951,259 | 0.25 | 75,052,660 | 4.90 | 91,903,919 | 1.10 |
| General Motors Corp L.P. | Real Estate | 53,207,721 | 0.78 | 108,030 | 0.01 | 53,315,251 | 0.54 |
| Capstan Workers LLC | Utility | | 0.00 | 47,304,411 | 3.12 | 47,558,424 | 0.57 |
| Greektown Casino LLC | Gaming | 28,425,871 | 0.43 | 11,547,480 | 0.75 | 40,376,351 | 0.48 |
| Detroit Entertainment LLC | Casino | 10,681,632 | 0.25 | 23,290,890 | 1.01 | 27,161,564 | 0.45 |
| **Total** | | **$ 495,317,124** | **6.42 %** | **$ 1,542,127,126** | **89.48 %** | **$ 1,857,794,371** | **12.68 %** |
| **Total City Taxable Value Final Year 2004-05** | | | | | | **$ 4,156,790,772** | |

149

148

Table 15

**City of Detroit, Michigan**
**LARGEST PRIVATE EMPLOYERS**
**June 30, 2005**
**Unaudited**

| Company | Detroit Employment |
|---|---|
| Detroit Medical Center | 10,617 |
| DaimlerChrysler AG | 9,900 |
| Henry Ford Health System | 7,464 |
| General Motors Corporation | 6,311 |
| St. John Health System | 4,821 |
| American Axle & Manufacturing Holdings Inc. | 4,309 |
| DTE Energy Co. | 3,987 |
| Compuware Corp. | 3,946 |
| Motor City Casino | 2,850 |
| Blue Cross and Blue Shield of Michigan | 2,594 |

SOURCE: Crain's Book of Lists, 2006 Edition, December 2005.

THIS PAGE LEFT BLANK INTENTIONALLY

151

150

Table 16

**City of Detroit, Michigan**
**MISCELLANEOUS STATISTICS**
**June 30, 2005**
**Unaudited**

| | |
|---|---:|
| Year Founded | 1701 |
| Year of Incorporation | 1806 |
| Year of Adoption of Present City Charter | 1996 |
| Form of Government: Nonpartisan - Mayor and Nine-Member Council | |
| Area | 137.9 |
| Miles of Shore Line on Detroit River (Excluding Belle Isle) | 10.66 |
| **Population (United States Census):** | |
| 1940 | 1,568,662 |
| 1950 | 1,623,452 |
| 1960 | 1,849,568 |
| 1970 | 1,670,144 |
| 1980 | 1,511,482 |
| 1990 | 1,203,339 |
| 2000 | 951,270 |
| **Building Permits:** | |
| Number of Building Permits Issued | 7,233 |
| Estimated Cost of Construction | $ 815,077,078 |
| **Election of November 2005:** | |
| Number of Registered Voters | 657,870 |
| Number of Ballots Cast | 338,530 |
| Percentage of Registered Voters Voting | 51.50 % |
| **Fire Department:** | |
| Number of Fire Stations | 49 |
| Number of Employees | 1,796 |
| Number of Fire Fighting Vehicles | 238 |
| Number of Fire Hydrants | 38,000 |
| Responses to Fire Alarms (Including 12,454 False Alarms) | 34,160 |
| Responses to Special Calls and Emergency Medical Service Calls | 151,285 |
| Estimated Fire Loss of Property (FYE 6/30/2002) | $ 1,921,197,080 |
| **Health Department:** | |
| Number of Employees | 568 |
| Birth Rate per Thousand (2003) | 14.8 |
| Death Rate per Thousand (2003) | 9.5 |
| Infant Mortality Rate per Thousand Live Births (2003) | 16.3 |
| **Libraries:** | |
| Number of Libraries (Including Two Bookmobiles) | 27 |
| Estimated Number of Books | 3,497,242 |
| Circulation | 981,689 |
| Number of City Owned Vehicles (Excluding 548 Transportation Department Purpose Vehicles) | 276 |
| Fire Department Vehicles (Includes 48 EMS Vehicles) | 2,142 |
| **Police Department:** | |
| Transportation Department non–revenue vehicles | 213 |
| All Other Departments (Passenger Vehicles, Commercial Vehicles and Trucks) | 833 |
| **Police Department:** | |
| Number of Stations (Including 16 Mini-Stations) | 28 |
| Number of Employees (Uniform) | 4,673 |
| Number of Traffic Violations Issued (Including 507,573 Parking Tickets) | 736,131 |
| Number of Ordinance Violations Issued | 46,121 |
| Number of Arrests (Traffic 16,415) + (Other 48,124) | 79,852 |
| **Public Works Department:** | |
| Number of Employees | 1,316 |
| Miles of Streets (Paved 2,769) + (Unpaved 15) | 2,784 |
| Miles of Alleys (Paved 598.12) + (Unpaved 685.46) | 1,284 |
| Miles of Sidewalks | 4,265 |

(Continued)

---

Table 16

| | |
|---|---:|
| **Public Lighting:** | |
| **Electric Plant:** | |
| Number of Street Lights | 87,500 |
| Number of Revenue Customers | 179 |
| Size of Generating Station in Kilowatts | 184,000 |
| Kilowatt Hours Generated (Net) | 308,391,000 |
| Kilowatt Hours Delivered to System | 567,529,080 |
| Steam Heating Plant - Steam Produced in Pounds | 71,853,887 |
| **Recreation Department:** | |
| Number of Parks, Ornamental Areas, Playfields and Playgrounds Owned (5,108 Acres) | 391 |
| Number of Summer Camps (199 Acres) | 1 |
| Number of Recreation Centers, Playgrounds and School Facilities Operated | 30 |
| Number of Skating Rinks | 1 |
| Number of Swimming Pools | 17 |
| Number of Municipal Beaches | 1 |
| Total Playing Permits Issued at 6 Municipal Golf Courses | 269,870 |
| **Sewage Disposal System:** | |
| Number of Sewage Disposal Plants | 1 |
| Number of Pumping Stations | 12 |
| Miles of (Trunk Line 1,125) + (Lateral 2,258) Sewers | 3,383 |
| **Transportation Department:** | |
| Number of Employees | 1,750 |
| Number of Revenue Vehicles | 561 |
| Seating Capacity | 22,865 |
| Number of Route Miles | 1,198 |
| Total Number of Passengers (Estimated) | 36,000,000 |
| Regular Fare | $ 1.50 |
| Tickets | 5 for $6.50 |
| Transfers | 0.25 |
| **Water System:** | |
| Number of Customer Accounts | 281,104 |
| Average Pumpage - Million of Gallons per Day | 640.0 |
| Greatest Pumpage for a Single Day During Fiscal Year (6-30-04) - July 31, 2003 Gallons | 1,060,500,000 |
| Greatest Pumpage for a Single Hour During Fiscal Year (6-39-04) - July 31, 2003 9 pm Gallons | 52,288,000 |
| Filtration Plant Rated Capacity - Millions of Gallons per Day | 1,670.0 |
| Number of Miles of Water Mains | 3,840 |
| Average Cost (Includes Domestic, Industrial and Commercial) per 1,000 Cubic Feet | $ 11.49 |
| **Employees on Payroll as on June 30, 2005:** | |
| Classified (Tax Supported 5,420) + (Revenue Supported 4,243) | 9,663 |
| Elective (Tax Supported 41) + (Revenue Supported 0) | 41 |
| Appointive (Tax Supported 320) + (Revenue Supported 6) | 326 |
| Uniform Police (Tax Supported 5,237) + (Revenue Supported 0) | 5,237 |
| Total Employees (Tax Supported 13,187) + (Revenue Supported 5,742) | 15,267 |
| Total Pensioners as of June 30, 2005 | 20,290 |

The miscellaneous statistics are for the most part compiled by the respective City Departments.

## Honorable Maryann Mahaffey
## Member Detroit City Retires



In September 2005, Detroit Council Member Maryann Mahaffey, A.C.S.W announced that she would not run for another term to begin January 2006. Mrs. Mahaffey was elected to Detroit City Council in 1974. She served as Council President Pro Tem (1978-1982 and 1998-2001) and as President (1990-1998) and (2002-2005). She is a Professor Emeritus at the School of Social Work, Wayne State University where she taught from 1965 to 1990. Maryann served 8 terms on City Council.

A native of Burlington, Iowa, she received her undergraduate degree from Cornell College, Iowa, and her Masters of Social Work degree from the University of Southern California. She has been awarded an honorary Doctor of Humane Letters Degree from Cornell College.

As a Detroit City Council member, Maryann designed the first Rape Crisis Center in the Police Department and chaired the City Council Housing Task Force with an emphasis on housing for low-income people. Some of the ordinances she is responsible for include: Emergency Homeless Shelter Licensing Ordinance, Family Child Care Zoning Laws, Home Rental Registration, Repair to Own Home Ordinance, Handgun Safety Training Ordinance, Sexual Harassment Ordinance, and an ordinance barring smoking in city-owned buildings. She authored the Policy on Homelessness for New Detroit, Inc. and the American Orthopsychiatric Association.

The City of Detroit sincerely thanks Councilmember Maryann Mahaffey for her many contributions and untiring years of faithfully serving the citizens of Detroit.

154

THIS PAGE LEFT BLANK INTENTIONALLY



CITY OF DETROIT

Kwame M. Kilpatrick
Mayor

DETROIT CITY COUNCIL

Kenneth V. Cockrel Jr., President
Monica Conyers, President Pro-Tem
JoAnn Watson
Sheila M. Cockrel
Barbara-Rose Collins
Kwame Kenyatta
Alberto Tinsley-Talabi
Martha Reeves
Brenda Jones

Janice M. Winfrey, City Clerk

Our Special Thanks To:

## City of Detroit, Michigan
www.ci.detroit.mi.us

### Finance Department

**Financial Reporting and
Grants Management Sections**
and Staff
Almon G. Turner Jr, MSA, Manager II

Wolinski and Company, CPA's
and Staff

**General Accounting Section**
and Staff
Richard E. Williams, Manager II
Saied S. Rouhani, Manager I
David Capobres Jr. Manager I
Cynthia Lampkin, Manager I
and all Finance Department staff for their commitment and
dedicated service in the preparation of this report

**City of Detroit - Agencies**
for their full cooperation in providing all the necessary
information needed to compile this report

**Detroit Resource Management System**
and staff
Joan Moss, General Manager

**Communications and Creative Services Department**
Chris Kopicko, Supervising Publicist
Kwabea Shabu, Supervising Photographer

**KPMG LLP**
and staff

**Alan C. Young & Associates, P.C.**
and Staff

**BOWNE of Detroit**
for printing this report

# APPENDIX D

## GLOBAL BOOK-ENTRY SYSTEM

### *General*

The description that follows of the procedures for record keeping about beneficial ownership of the Certificates, payment of principal of and interest on the Certificates, confirmation and transfer of beneficial ownership interests in the Certificates, and other securities-related transactions is based solely on information furnished by The Depository Trust Company (**DTC**), Clearstream and Euroclear and has not been independently verified by the City, the Service Corporations, the 2006 Funding Trust or the Underwriters.

Beneficial owners of the Certificates may hold their certificates through DTC, which is located in the United States (**U.S.**), or Clearstream or Euroclear, which are in Europe, if they are participants of one of those systems, or indirectly through organizations that are participants in any of those systems.

DTC will act as a securities depository for the Certificates. Clearstream and Euroclear will hold omnibus positions, on behalf of their respective participants, through customers' securities accounts in Clearstream's and Euroclear's names on the books of their respective depositories, which in turn will hold such positions in customers' securities accounts in the names of their respective depositories on the books of DTC.

### *DTC*

DTC is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the U.S. Securities Exchange Act of 1934. DTC holds securities that DTC's participants (**Direct Participants**) deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("**DTCC**"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly (**Indirect Participants**). The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission.

Transfers between DTC Participants will occur in accordance with DTC rules. Transfers between Clearstream Participants and Euroclear Participants will occur in the ordinary way in accordance with their applicable rules and operating procedures.

Cross-market transfers between persons holding directly or indirectly through DTC, on the one hand, and directly or indirectly through Clearstream Participants or Euroclear Participants, on the other, will be effected in DTC in accordance with DTC rules on behalf of the relevant European international clearing system by its depository; however, such cross-market transactions will require delivery of instructions to the relevant European international clearing system by the counterparty in such system in accordance with its rules and procedures and within its established deadlines based on European time. The relevant European

international clearing system will, if the transaction meets its settlement requirements, deliver instructions to its depository to take action to effect final settlement on its behalf by delivering or receiving securities in DTC, and making or receiving payment in accordance with normal procedures for same-day funds settlement applicable to DTC. Clearstream Participants and Euroclear Participants may not deliver instructions directly to the depositories.

Because of time-zone differences, credits of securities in Clearstream or Euroclear as a result of a transaction with a DTC Participant will be made during the subsequent securities settlement processing, dated the business day following the DTC settlement date, and such credits or any transactions in such securities settled during such processing will be reported to the relevant Clearstream Participant or Euroclear Participant on such business day. Cash received in Clearstream or Euroclear as a result of sales of securities by or through a Clearstream Participant or a Euroclear Participant to a DTC Participant will be received with value on the DTC settlement date but will be available in the relevant Clearstream or Euroclear cash account only as of the business day following settlement in DTC. Day traders who use Clearstream or Euroclear and who purchase the Certificates from DTC Participants for delivery to Clearstream Participants or Euroclear Participants should note that these trades may fail on the sale side unless affirmative actions are taken. Participants should consult with their clearing system to confirm that adequate steps have been taken to assure settlement.

Purchases of Certificates under the DTC system must be made by or through DTC Participants, which will receive a credit for the Certificates on DTC's records. The ownership interest of each actual owner of a Certificate (**Beneficial Owner**) is in turn to be recorded on the Direct Participants' and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase, but Beneficial Owners are expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct Participant or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Certificates are to be accomplished by entries made on the books of Direct or Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interest in Certificates, except when use of the book-entry system for the Certificates is discontinued.

To facilitate subsequent transfers, all Certificates deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of Certificates with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Certificates; DTC's records reflect only the identity of the Direct Participants to whose accounts such Certificates are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Certificates may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Certificates, such as redemptions, tenders, defaults, and proposed amendments to the Certificate documents. For example, Beneficial Owners of Certificates may wish to ascertain that the nominee holding the Certificates for their benefit has agreed to obtain and transmit notices to Beneficial Owners. Any failure of DTC to advise any Direct Participant, or of any Direct Participant or Indirect Participant to advise a Beneficial Owner, of any notice of redemption or its content or effect will not affect the validity of the redemption of Certificates called for redemption or any other action premised on such notice.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Certificates unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the issuer as soon as possible after the record date. The Omnibus

Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Certificates are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Because DTC can only act on behalf of DTC Participants, who in turn act on behalf of Indirect Participants and some other banks, the Beneficial Owner of a Certificate may be limited in its ability to pledge Certificates to persons or entities that do not participate in the DTC system, or to otherwise take actions with respect to those Certificates due to the lack of a physical certificate for those Certificates.

Principal and interest payments on the Certificates will be made to DTC. DTC's practice is to credit the accounts of the DTC Participants, upon DTC's receipt of funds and corresponding detail information from the Trustee, on payment dates in accordance with their respective holdings shown on the records of DTC. Payments by DTC Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name" and will be the responsibility of such DTC Participant and not of DTC, the Trustee or the 2006 Funding Trust, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal and interest to DTC is the responsibility of the Trustee, disbursement of such payments to DTC Participants will be the responsibility of DTC, and disbursement of such payments to Beneficial Owners will be the responsibility of DTC Participants and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Certificates at any time by giving reasonable notice to the Trustee. Under such circumstances, if a successor securities depository is not obtained, Certificate certificates are required to be prepared and delivered. The 2006 Funding Trust may decide to discontinue use of the system of book-entry transfers through DTC, or a successor Securities depository. In that event, Certificate certificates will be delivered to the Beneficial Owners of the Certificates.

### *Clearstream*

Clearstream Banking, société anonyme (**Clearstream**) is a limited liability company organized under Luxembourg law and is registered as a bank in Luxembourg. Clearstream holds securities for its Participants and facilitates the clearance and settlement of securities transactions between Clearstream Participants through electronic book-entry changes in accounts of Clearstream Participants, thereby eliminating the need for physical movement of certificates. Clearstream provides to Clearstream Participants, among other things, services for safekeeping, administration, clearance, and settlement of internationally traded securities and securities lending and borrowing. Clearstream Participants are financial institutions around the world, including underwriters, securities brokers and dealers, banks, trust companies, and clearing corporations. Indirect access to Clearstream is also available to others, such as banks, brokers, dealers, and trust companies that clear through or maintain a custodial relationship with a Clearstream Participant, either directly or indirectly.

### *Euroclear*

Euroclear was created in 1968 to hold securities for its participants and to clear and settle transactions between its participants through simultaneous electronic book-entry delivery against payment, thereby eliminating the need for physical movement of certificates and any risk from lack of simultaneous transfers of securities and cash. The Euroclear System is owned by Euroclear plc and operated through a license agreement by Euroclear Bank S.A./N.V., a bank incorporated under the laws of the Kingdom of Belgium (**Euroclear Operator**).

The Euroclear Operator holds securities and book-entry interests in securities for participating organizations and facilities the clearance and settlement of securities transactions between Euroclear Participants, and between Euroclear Participants and Participants of certain other securities intermediaries through electronic book-entry changes in accounts of such Participants or other securities intermediaries.

The Euroclear Operator provides Euroclear Participants, among other things, with safekeeping, administration, clearance and settlement, securities lending and borrowing, and related services. Non-Participants of Euroclear or any other securities intermediary that holds a book-entry interest in the Certificates through one or more securities intermediaries standing between such other securities intermediary and the Euroclear Operator.

The Euroclear Operator is regulated and examined by the Belgian Banking and Finance Commission and the National Bank of Belgium.

Securities clearance accounts and cash accounts with the Euroclear Operator are governed by the Terms and Conditions Governing Use of Euroclear and the related Operating Procedures of the Euroclear System, and applicable Belgian law (collectively, **Terms and Conditions**). The Terms and Conditions govern transfers of securities and cash within Euroclear, withdrawals of securities and cash from Euroclear, and receipts of payments with respect to securities in Euroclear. All securities in Euroclear are held on a fungible basis without attribution of specific certificates to specific securities clearance accounts. The Euroclear Operator acts under the Terms and Conditions only on behalf of Euroclear Participants and has no record of or relationship with Persons holding through Euroclear Participants.

### Initial Settlement

All global securities will be held in book-entry form by DTC in the name of Cede & Co. as nominee of DTC. Investors' interests in the global securities will be represented through financial institutions acting on behalf of their participants through their respective depositaries, which in turn will hold such positions in accounts as participants of DTC.

Investors electing to hold their global securities through DTC will follow the settlement practices applicable to prior asset-backed certificates issues. Investor securities custody accounts will be credited with their holdings against payment in same-day funds on the settlement date.

Investors electing to hold their global securities through Clearstream, Luxembourg or Euroclear accounts will follow the settlement procedures applicable to conventional Eurobonds, except that there will be no temporary global security and no "lock-up" or restricted period. Global securities will be credited to the securities custody accounts on the settlement date against payment in same-day funds.

### Secondary Market Trading

Since the purchaser determines the place of delivery, it is important to establish at the time of the trade where both the purchaser's and seller's accounts are located to ensure that settlement can be made on the desired value date.

*Trading between Participants of DTC.* Secondary market trading between participants of DTC will be settled using the procedures applicable to prior asset-backed certificates issues in same-day funds.

*Trading between Clearstream, Luxembourg and/or Euroclear Participants.* Secondary market trading between Clearstream, Luxembourg or Euroclear participants will be settled using the procedures applicable to conventional Eurobonds in same-day funds.

*Trading between DTC Seller and Clearstream, Luxembourg or Euroclear Purchaser.* When global securities are to be transferred from the account of a participant of DTC to the account of a Clearstream, Luxembourg or Euroclear participant, the purchaser will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear participant at least one business day prior to settlement. Clearstream, Luxembourg or Euroclear will instruct the respective depositary, as the case may be, to receive the global securities against payment. Payment will include interest accrued on the global securities from and including the last coupon payment date to and excluding the settlement date, on the basis of the

actual number of days in such accrual period and a year assumed to consist of 360 days, or a 360-day year of twelve 30-day months, as applicable. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. Payment will then be made by the respective depositary of the account of the participant of DTC against delivery of the global securities. After settlement has been completed, the global securities will be credited to the respective clearing system and by the clearing system, in accordance with its usual procedures, to the Clearstream, Luxembourg or Euroclear participant's account. The securities credit will appear the next day (European time) and the cash debt will be back-valued to, and the interest on the global securities will accrue from, the value date (which would be the preceding day when settlement occurred in New York). If settlement is not completed on the intended value date (*i.e.*, the trade fails), the Clearstream, Luxembourg or Euroclear cash debt will be valued instead as of the actual settlement date.

Clearstream, Luxembourg and Euroclear participants will need to make available to the respective clearing systems the funds necessary to process same-day funds settlement. The most direct means of doing so is to preposition funds for settlement, either from cash on hand or existing lines of credit, as they would for any settlement occurring within Clearstream, Luxembourg or Euroclear. Under this approach, they may take on credit exposure to Clearstream, Luxembourg or Euroclear until the global securities are credited to their accounts one day later.

As an alternative, if Clearstream, Luxembourg or Euroclear has extended a line of credit to them, Clearstream, Luxembourg or Euroclear participants can elect not to preposition funds and allow that credit line to be drawn upon the finance settlement. Under this procedure, Clearstream, Luxembourg or Euroclear participants purchasing global securities would incur overdraft charges for one day, assuming they cleared the overdraft when the global securities were credited to their accounts. However, interest on the global securities would accrue from the value date. Therefore, in many cases the investment income on the global securities earned during that one-day period may substantially reduce or offset the amount of such overdraft charges, although this result will depend on each Clearstream, Luxembourg or Euroclear participant's particular cost of funds.

Since the settlement is taking place during New York business hours, participants of DTC can employ their usual procedures for sending global securities to the respective European depositary for the benefit of Clearstream, Luxembourg or Euroclear participants. The sale proceeds will be available to DTC seller on the settlement date. Thus, to participants of DTC a cross-market transaction will settle no differently than a trade between two participants of DTC.

*Trading between Clearstream, Luxembourg or Euroclear Seller and DTC Purchaser.* Due to time zone differences in their favor, Clearstream, Luxembourg and Euroclear participants may employ their customary procedures for transactions in which global securities are to be transferred from the respective clearing system, through the respective depositary, to a participant of DTC. The seller will send instructions to Clearstream, Luxembourg or Euroclear through a Clearstream, Luxembourg or Euroclear participant at least one business day prior to settlement. In these cases, Clearstream, Luxembourg or Euroclear will instruct the depositary, as appropriate, to deliver the global securities to the account of the participant of DTC against payment. Payment will include interest accrued on the global securities from and including the last coupon payment to and excluding the settlement date on the basis of the actual number of days in such accrual period and a year assumed to consist of 360 days, or a 360-day year of twelve 30-day months, as applicable. For transactions settling on the 31st of the month, payment will include interest accrued to and excluding the first day of the following month. The payment will then be reflected in the account of the Clearstream, Luxembourg or Euroclear participant the following day, and receipt of the cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account would be back-valued to the value date (which would be the preceding day when settlement occurred in New York). Should the Clearstream, Luxembourg or Euroclear participant have a line of credit with its respective clearing system and elect to be in debt in anticipation of receipt of the sale proceeds in its account, the back-valuation will extinguish any overdraft incurred over that one-day period. If settlement is not completed on the intended value date (*i.e.*, the trade fails), receipt of the

cash proceeds in the Clearstream, Luxembourg or Euroclear participant's account would instead be valued as of the actual settlement date.

Finally, day traders that use Clearstream, Luxembourg or Euroclear and that purchase global securities from participants of DTC for delivery to Clearstream, Luxembourg or Euroclear participants should note that these trades would automatically fail on the sale side unless affirmative action were taken. At least three techniques should be readily available to eliminate this potential problem:

- Borrowing through Clearstream, Luxembourg or Euroclear for one day (until the purchase side of the day trade is reflected in their Clearstream, Luxembourg or Euroclear accounts) in accordance with the clearing system's customary procedures;

- Borrowing the global securities in the U.S. from a participant of DTC no later than one day prior to settlement, which would give the global securities sufficient time to be reflected in their Clearstream, Luxembourg or Euroclear accounts in order to settle the sale side of the trade; or

- Staggering the value dates for the buy and sell sides of the trade so that the value date for the purchase from the participant of DTC is at least one day prior to the value date for the sale to the Clearstream, Luxembourg or Euroclear participant.

### *Certain U.S. Federal Income Tax Documentation Requirements*

**NOTICE PURSUANT TO IRS CIRCULAR 230: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE INTERNAL REVENUE SERVICE, YOU ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX CONSIDERATIONS IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE UNITED STATES INTERNAL REVENUE CODE; (B) THIS OFFERING CIRCULAR IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS DISCUSSED HEREIN; AND (C) YOU SHOULD SEEK ADVICE BASED ON YOUR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

**This summary does not deal with all aspects of U.S. Federal income tax withholding that may be relevant to foreign holders of the global securities. Investors are advised to consult their own tax advisors for specific tax advice concerning their holding and disposing of the global securities as well as the application of the U.S. Treasury regulations relating to tax documentation requirements.**

A beneficial owner of global securities holding securities through Clearstream, Luxembourg or Euroclear (or through DTC if the holder has an address outside the U.S.) will be subject to the 30% U.S. withholding tax that generally applies to payments of interest (including original issue discount) on registered debt issued by U.S. Persons, unless (i) each clearing system, bank or other financial institution that holds customers' securities in the ordinary course of its trade or business in the chain of intermediaries between such beneficial owner and the U.S. entity required to withhold tax complies with applicable certification requirements and (ii) such beneficial owner takes one of the following steps to obtain an exemption or reduced tax rate.

*Exemption for Non-US. Persons (Form W-8BEN).* Beneficial owners of global securities that are non-U.S. Persons can obtain a complete exemption from the withholding tax by filing a signed Form W-8BEN (Certificate of Foreign Status of Beneficial Owner for United States Withholding Tax). If the information shown on Form W-8BEN changes, a new Form W-8BEN must be filed within 30 days of such change.

*Exemption for Non-U.S. Persons with Effectively Connected Income (Form W-8ECI). A* non-U.S. Person including a non-U.S. corporation or bank with a U.S. branch, for which the interest income is effectively connected with its conduct of a trade or business in the U.S., can obtain an exemption from the

withholding tax by filing Form W-8ECI (Exemption from Withholding of Tax on Income Effectively Connected with the Conduct of a Trade or Business in the United States).

*Exemption or Reduced Rate for Non-U.S. Persons Resident in Treaty Countries (Form W-8BEN).* Non-U.S. Persons that are security owners residing in a country that has a tax treaty with the U.S. can obtain an exemption or reduced tax rate (depending on the treaty terms) by filing Form W-8BEN (including Part II thereof).

*Exemption for U.S. Persons (Form W-9).* U.S. Persons can obtain a complete exemption from the withholding tax by filing Form W-9 (Payer's Request for Taxpayer Identification Number and Certification).

*U.S. Federal Income Tax Reporting Procedure.* The owner of a global security files by submitting the appropriate form to the person through whom it holds (the clearing agency, in the case of persons holding directly on the books of the clearing agency). Form W-8BEN and Form W-8ECI are effective until the third calendar year from the date the form is signed.

The term "**U.S. Person**" means:

- a citizen or resident of the U.S.;

- a corporation or partnership, or other entity taxable as such, organized in or under the laws of the U.S. or any state (including the District of Columbia);

- an estate the income of which is includible in gross income for U.S. tax purposes, regardless of its source; or

- a trust, if a court within the U.S. is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of the trust.

*Custody*

Investors who are Euroclear Participants may acquire, hold, or transfer interests in the securities by book-entry to accounts with Euroclear Operator. Investors who are not Participants of Euroclear may acquire, hold, or transfer interests in the securities by book-entry to accounts with a securities intermediary who holds a book-entry interest in the securities through accounts with Euroclear.

*Custody Risks*

Investors that acquire, hold, and transfer interest in the securities by book-entry through accounts with the Euroclear Operator or any other securities intermediary are subject to the laws and contractual provisions governing their relationship with their intermediary, as well as the laws and contractual provisions governing the relationship between such an intermediary and each other intermediary, if any, standing between themselves and the individual securities.

The Euroclear Operator has advised as follows:

Under Belgian law, investors that are credited with securities on the records of the Euroclear Operator have a co-property right in the fungible pool of interests in securities on deposit with the Euroclear Operator in an amount equal to the amount of interests in securities credited to their accounts. In the event of the solvency of the Euroclear Operator, Euroclear Participants would have a right under Belgian law to the return of the amount and type of interests in securities credited to their accounts with the Euroclear Operator. If the Euroclear Operator did not have a sufficient amount of interests in securities on deposit of a particular type to cover the claims of all Euroclear Participants credited with such interests in securities on the Euroclear Operator's records, all Euroclear Participants having an amount of interests in securities of such type credited to their accounts with the Euroclear Operator would have the right under Belgian law to the return of their *pro rata* share of the amount of interests in securities actually on deposit.

Under Belgian law, the Euroclear Operator is required to pass on the benefits of ownership in any interests in securities on deposit with it (such as dividends, voting rights, and other entitlements) to any person credited with such interests in securities on its records.

### *Distributions*

Distributions with respect to Certificates held through Clearstream or Euroclear will be credited to the cash accounts of Clearstream Participants or Euroclear Participants in accordance with the relevant system's rules and procedures, to the extent received by its depository. Such distributions will be subject to tax reporting in accordance with relevant U.S. tax laws and regulations. See "UNITED STATES FEDERAL TAX CONSIDERATIONS - Information Reporting and Backup Withholding" in the Offering Circular which precedes this Appendix. Clearstream or the Euroclear Operator, as the case may be, will take any other action permitted to be taken by a beneficial owner of the Certificates under the Trust Agreement on behalf of a Clearstream Participant or Euroclear Participant only in accordance with its relevant rules and procedures and subject to its depository's ability to effect such actions on its behalf through DTC.

DTC, Clearstream, and Euroclear are under no obligation to perform or continue to perform the foregoing procedures, and such procedures may be discontinued at any time.

No one can give any assurance that DTC, Clearstream, or Euroclear, or any of their direct or indirect Participants, will promptly transfer payments or notices received with respect to the Certificates. The 2006 Funding Trust, the Trustee, the Service Corporations and the City are not responsible for the failure of any of those parties to transfer to the Beneficial Owner payments or notices received with respect to the Certificates.

Similarly, no one can give any assurance that any depository will abide by its procedures or that its procedures will not be changed. In the event the 2006 Funding Trust designates a successor securities depository for the Certificates, the successor may establish different procedures

## APPENDIX E

## INFORMATION ABOUT FINANCIAL GUARANTY

*Financial Guaranty has supplied the following information for inclusion in this APPENDIX E. No representation is made by the 2006 Funding Trust, the Service Corporations, the City or the Underwriters as to the accuracy or completeness of this information.*

**Payments Under the FGIC Policy**

Concurrently with the issuance of the FGIC-insured Certificates, Financial Guaranty Insurance Company ("Financial Guaranty") will issue its Municipal Certificate New Issue Insurance Policy for the FGIC-insured Certificates (the "FGIC Policy"). The FGIC Policy unconditionally guarantees the payment of that portion of the principal and interest on the FGIC-insured Certificates which has become due for payment, but shall be unpaid by reason of nonpayment of the FGIC-insured Certificates by the 2006 Funding Trust (the "Issuer"). Financial Guaranty will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal or interest (as applicable) is due or on the business day next following the day on which Financial Guaranty shall have received notice (in accordance with the terms of the FGIC Policy) from an owner of FGIC-insured Certificates or the trustee or paying agent (if any) of the nonpayment of such amount by the Issuer. The Fiscal Agent will disburse such amount due on any FGIC-insured Certificate to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal or interest (as applicable) shall be vested in Financial Guaranty. The term "nonpayment" in respect of a FGIC-insured Certificate includes any payment of principal or interest (as applicable) made to an owner of a FGIC-insured Certificate which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Policy is non-cancellable by Financial Guaranty. The FGIC Policy covers failure to pay principal of the FGIC-insured Certificates on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC-insured Certificates may have been otherwise called for redemption, accelerated or advanced in maturity. The FGIC Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the FGIC-insured Certificates is accelerated, Financial Guaranty will only be obligated to pay principal and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, Financial Guaranty will become the owner of the FGIC-insured Certificate, appurtenant coupon or right to payment of principal or interest on such FGIC-insured Certificate and will be fully subrogated to all of the FGIC-insured Certificateholder's rights thereunder.

The FGIC Policy does not insure any risk other than Nonpayment by the Issuer, as defined in the FGIC Policy. Specifically, the FGIC Policy does not cover: (i) payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure FGIC-insured Certificates, Financial Guaranty may be granted certain rights under the FGIC-insured Certificate documentation. The specific rights, if any, granted to Financial Guaranty in connection with its insurance of the FGIC-insured Certificates may be

set forth in the description of the principal legal documents appearing elsewhere in the Offering Circular which precedes this Appendix, and reference should be made thereto.

The FGIC Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

## Financial Guaranty Insurance Company

Financial Guaranty is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. Financial Guaranty is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands and the United Kingdom.

Financial Guaranty is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At March 31, 2006, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of The Blackstone Group L.P. – 23%; and affiliates of The Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of Financial Guaranty or any claims under any insurance policy, including the FGIC Policy, issued by Financial Guaranty.

Financial Guaranty is subject to the insurance laws and regulations of the State of New York, where Financial Guaranty is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, Financial Guaranty is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At March 31, 2006, Financial Guaranty had net admitted assets of approximately $3.603 billion, total liabilities of approximately $2.454 billion, and total capital and policyholders' surplus of approximately $1.149 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The unaudited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of March 31, 2006, and the audited consolidated financial statements of Financial Guaranty and subsidiaries, on the basis of GAAP, as of December 31, 2005 and 2004, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Appendix. Any statement contained herein under the heading "APPENDIX E" in the Offering Circular, or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by Financial Guaranty with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Appendix or the Offering Circular. All financial statements of Financial Guaranty (if any) included in documents filed by Financial Guaranty with the NRMSIRs subsequent to the date of the Offering Circular

and prior to the termination of the offering of the FGIC-insured Certificates shall be deemed to be included by specific reference into this Appendix and to be a part hereof from the respective dates of filing of such documents.

The **New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although Financial Guaranty prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to Financial Guaranty's SAP financial statements.**

Copies of Financial Guaranty's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. Financial Guaranty's telephone number is (212) 312-3000.

### Financial Guaranty's Credit Ratings

The financial strength of Financial Guaranty is rated "AAA" by Standard & Poor's, a Division of The McGraw-Hill Companies, Inc., "Aaa" by Moody's Investors Service, and "AAA" by Fitch Ratings. Each rating of Financial Guaranty should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of Financial Guaranty. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC-insured Certificates, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC-insured Certificates. Financial Guaranty does not guarantee the market price or investment value of the FGIC-insured Certificates nor does it guarantee that the ratings on the FGIC-insured Certificates will not be revised or withdrawn.

**Neither Financial Guaranty nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Offering Circular which precedes this Appendix or any information or disclosure that is provided to potential purchasers of the FGIC-insured Certificates, or omitted from such disclosure, other than with respect to the accuracy of information with respect to Financial Guaranty or the FGIC Policy herein under the heading "APPENDIX E" in the Offering Circular. In addition, Financial Guaranty makes no representation regarding the FGIC-insured Certificates or the advisability of investing in the FGIC-insured Certificates.**



# **XL** CAPITAL ASSURANCE

1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 478-3400

## MUNICIPAL BOND
## INSURANCE POLICY

**ISSUER:** [        ]                     **Policy No:** [        ]

**BONDS:** [        ]                      **Effective Date:** [        ]

**XL Capital Assurance Inc. (XLCA)**, a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy (which includes each endorsement attached hereto), hereby agrees unconditionally and irrevocably to pay to the trustee (the "Trustee") or the paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the benefit of the Owners of the Bonds or, at the election of XLCA, to each Owner, that portion of the principal and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment.

XLCA will pay such amounts to or for the benefit of the Owners on the later of the day on which such principal and interest becomes Due for Payment or one (1) Business Day following the Business Day on which XLCA shall have received Notice of Nonpayment (provided that Notice will be deemed received on a given Business Day if it is received prior to 10:00 a.m. New York time on such Business Day; otherwise it will be deemed received on the next Business Day), but only upon receipt by XLCA, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in XLCA. Upon such disbursement, XLCA shall become the owner of the Bond, any appurtenant coupon to the Bond or the right to receipt of payment of principal and interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by XLCA hereunder. Payment by XLCA to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of XLCA under this Policy.

In the event the Trustee or Paying Agent has notice that any payment of principal or interest on a Bond which has become Due for Payment and which is made to an Owner by or on behalf of the Issuer of the Bonds has been recovered from the Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such Owner within the meaning of any applicable bankruptcy law, such Owner will be entitled to payment from XLCA to the extent of such recovery if sufficient funds are not otherwise available.

The following terms shall have the meanings specified for all purposes of this Policy, except to the extent such terms are expressly modified by an endorsement to this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment", when referring to the principal of Bonds, is when the stated maturity date or a mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity, unless XLCA shall elect, in its sole discretion, to pay such principal due upon such acceleration; and, when referring to interest on the Bonds, is when the stated date for payment of interest has been reached. "Nonpayment" means the failure of the Issuer to have provided sufficient funds to the Trustee or Paying Agent for payment in full of all principal and interest on the Bonds which are Due for Payment. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to XLCA which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

XLCAP-005 Form of Municipal Policy [Specimen]

XLCA may, by giving written notice to the Trustee and the Paying Agent, appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy. From and after the date of receipt by the Trustee and the Paying Agent of such notice, which shall specify the name and notice address of the Insurer's Fiscal Agent, (a) copies of all notices required to be delivered to XLCA pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to XCLA and shall not be deemed received until received by both and (b) all payments required to be made by XLCA under this Policy may be made directly by XLCA or by the Insurer's Fiscal Agent on behalf of XLCA. The Insurer's Fiscal Agent is the agent of XLCA only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of XLCA to deposit or cause to be deposited sufficient funds to make payments due hereunder.

Except to the extent expressly modified by an endorsement hereto, (a) this Policy is non-cancelable by XLCA, and (b) the Premium on this Policy is not refundable for any reason. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Bond, other than at the sole option of XLCA, nor against any risk other than Nonpayment. This Policy sets forth the full undertaking of XLCA and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto.

THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, XLCA has caused this Policy to be executed on its behalf by its duly authorized officers.

Name: _____                    Name: _____
Title:                                            Title:

XLCAP-005
Form of Municipal Policy [Specimen]

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX G

Upon the issuance and delivery of the Certificates, Certificate Counsel, Lewis & Munday, A Professional Corporation, proposes to deliver its opinion in substantially the following form.

June ●, 2006

Detroit Retirement Systems Funding Trust 2006
   c/o U.S. Bank National Association, as trustee
Detroit, Michigan

Ladies and Gentlemen:

We acted as Certificate Counsel in connection with the issuance by the Detroit Retirement Systems Funding Trust 2006 (the *Funding Trust*) of the Certificates of Participation Series 2006-A and the Certificates of Participation Series 2006-B, (collectively, the *Certificates*) and in that capacity we examined a transcript of the proceedings relating to the issuance of the Certificates.

The Funding Trust was created by the Trust Agreement, dated June ●, 2006 (the *Trust Agreement*), between the Detroit General Retirement System Service Corporation (the *GRS Service Corporation*) and the Detroit Police and Fire Retirement System Service Corporation (the *PFRS Service Corporation*), severally and not jointly, and U.S. Bank National Association, as trustee (the *Trustee*). Each of the GRS Service Corporation and the PFRS Service Corporation is herein called a *Service Corporation* and collectively the *Service Corporations*.

The Certificates are issued pursuant to the below defined Resolution and the Service Contracts and under the Trust Agreement. The Certificates evidence undivided, proportionate interests in the rights to receive certain payments (*Funding Trust Receivables*) to be made by the City of Detroit, Michigan (the *City*), under (i) the Detroit General Retirement System Service Contract 2006, dated June 7, 2006, between the City and the GRS Service Corporation and (ii) the Detroit Police and Fire Retirement System Service Contract 2006, dated June 7, 2006, between the City and the PFRS Service Corporation (each, a *Service Contract* and collectively, the *Service Contracts*). The Service Corporations were created pursuant to Ordinance No. 05-05 of the City. The Service Contracts, the formation of the Funding Trust by the Service Corporations and the issuance of certificates of participation thereunder were authorized by resolution of the City Council of the City, adopted on April 26, 2006 (the *Resolution*).

The Service Contracts are administered for the Service Corporations and the Funding Trust by U.S. Bank National Association (the *Contract Administrator*), separately and not as Trustee, pursuant to the Contract Administration Agreement, dated June ●, 2006 (the *Contract Administration Agreement*), among the Funding Trust, each of the Service Corporations, severally and not jointly, and the Contract Administrator and other parties named therein.

The Certificates are issued for the purpose of funding (i) the prepayment of certain payments otherwise required to be made by the City under the service contracts it entered into with the Service Corporations on May 25, 2005 (the *2005 Service Contracts*), and (ii) the purchase of certain certificates of participation issued on June 2, 2005 (the *2005 Certificates*). The 2005 Certificates evidence undivided, proportionate interests in certain payments to be made under the 2005 Service Contracts.

The 2005 Service Contracts were entered into by the City with the Service Corporations for the purpose of funding specific amounts of the unfunded accrued actuarial liabilities (*Subject UAAL*) of each of the City's General Retirement System (the *GRS*) and Police and Fire Retirement System (the *PFRS* and with the GRS, the *Retirement Systems*). The effect of funding the Subject UAAL under the 2005 Service Contract was to reduce the financial burden of the Retirement Systems to the City in the present and future years. The 2006 Certificates are intended to have effect of restructuring certain payments under the 2005 Service Contracts and thereby assist the City in fulfilling its constitutional obligations with respect to the Retirement Systems. In consideration for such assistance by the Service Corporations, the City agreed in each Service Contract to pay the Funding Trust Receivables, which include, as service charges, the funding costs of the Service Corporations in obtaining the capital represented by the Certificates.

The City's special labor counsel, Sullivan Ward Asher & Patton PC, rendered an opinion on certain matters of labor law relative to the opinions expressed herein. That opinion is included in the transcript of proceedings.

Based on our examination of the transcript of the proceedings, we are of the opinion that:

1.     Each Service Corporation validly exists as a nonprofit corporation under the laws of the State of Michigan and has the corporate power to enter into its Service Contract and the Trust Agreement. The City has the power to enter into the Service Contracts.

2.     Each Service Contract was validly authorized, executed and delivered by the respective Service Corporation and the City and is a valid and binding agreement of such Service Corporation and the City and is enforceable in accordance with its terms. Neither the faith and credit nor the taxing power nor any special revenues of the City are pledged to the payment of Funding Trust Receivables, and the obligation of the City to pay Funding Trust Receivables does not constitute indebtedness within the meaning of any limitation of Michigan law applicable to the City.

3.     The Contract Administration Agreement was validly authorized, executed and delivered by each of the Service Corporations and, assuming valid authorization, execution and delivery by the Trustee on behalf of the Funding Trust and by the Contract Administrator, is a valid and binding agreement of each of the Service Corporations, enforceable in accordance with its terms.

4.     The Trust Agreement was validly authorized, executed and delivered by each of the Service Corporations and, assuming valid authorization, execution and delivery by the Trustee, is a valid and binding agreement of each of the Service Corporations, enforceable in accordance with its terms.

5.    The Funding Trust was validly created by the Trust Agreement and has the power to issue and deliver the Certificates.

6.    The Certificates were validly issued and delivered by the Funding Trust and represent undivided interests in the Funding Trust Receivables in accordance with their terms.

The enforceability of the Service Contracts, the Contract Administration Agreement and the Trust Agreement may be limited or affected by bankruptcy, insolvency, reorganization, moratorium, and other similar laws affecting creditors' rights generally heretofore or hereafter enacted to the extent constitutionally applicable and may also be subject to the exercise of judicial discretion in accordance with general principles of equity.

Very truly yours,

[THIS PAGE INTENTIONALLY LEFT BLANK]

## APPENDIX H

## CONTINUING DISCLOSURE UNDERTAKING

This Continuing Disclosure Undertaking ("**Undertaking**") is executed and delivered by the City of Detroit, County of Wayne, State of Michigan ("**City**") in connection with the issuance of the $148,540,000 Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A and $800,000,000 Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B (collectively, "**Certificates**"). The City covenants and agrees for the benefit of the Certificateholders (as defined below) as follows:

(a) **Definitions**. The following terms used in this Undertaking have the following meanings:

"*Audited Financial Statements*" means the City's audited financial statements prepared by an individual or firm of independent certified public accountants as required by Act 2, Public Acts of Michigan, 1968, as amended, which presently requires preparation in accordance with generally accepted accounting principles.

"*Certificateholder*" means the registered owner of any Certificate or any person (a) with the power, directly or indirectly, to vote or consent with respect to, or to dispose of ownership of, any Certificate (including any person holding a Certificate through a nominee, depository or other intermediary) or (b) treated as the owner of any Certificate for federal income tax purposes.

"*Disclosure Representative*" means the Finance Director of the City or his designee, or such other officer, employee or agent as the City shall so designate from time to time in writing.

"*MSRB*" means the Municipal Securities Rulemaking Board.

"*NRMSIR*" means each nationally recognized municipal securities information repository as designated by the SEC in accordance with the Rule.

"*Rule*" means Rule 15c2-12 promulgated by the SEC pursuant to the Securities Exchange Act of 1934, as amended.

"*SEC*" means the United States Securities and Exchange Commission.

"*SID*" means the state information depository for the State of Michigan, if any, then designated by the SEC in accordance with the Rule, being the Michigan Municipal Advisory Council as of the date of this Undertaking.

(b) **Continuing Disclosure**. The City hereby agrees, in accordance with the provisions of the Rule, to provide or cause to be provided to each NRMSIR and to the SID, on or before the 210th day after the end of the fiscal year of the City, commencing with the fiscal year ended June 30, 2006, the Audited Financial Statements, and updates of certain financial and operating data of the City appearing under the headings and tables in the Offering Circular for the Certificates, as follows: Tables 1 through 31, inclusive in Appendix B to the Offering Circular.

. Such annual financial information described above is expected to be provided directly by the City and in subsequent Official Statements of the City filed with the MSRB.

In the event that the Audited Financial Statements are not available by the date specified above, they will be provided when available and unaudited financial statements in a format similar to the financial statements contained in the Offering Circular will be filed by such date and the Audited Financial Statements will be filed as soon as available.

If the fiscal year of the City is changed, the City shall send notices of such change to each NRMSIR or the MSRB, and to the SID, prior to the earlier of the ending date of the fiscal year prior to such change or the ending date of the fiscal year as changed.

(c)     **Notice of Failure to Disclose**.  The  City agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or the MSRB and (ii) the SID, notice of a failure by the City to provide the annual financial information with respect to the City described in subsection (b) above on or prior to the dates set forth in subsection (b) above.

(d)     **Occurrence of Events**.  The City agrees to provide or cause to be provided, in a timely manner, to (i) each NRMSIR or the MSRB and (ii) the SID, notice of the occurrence of any of the following events listed in (b)(5)(i)(C) of the Rule with respect to the Certificates, if applicable, if material:

> (1)     principal and interest payment delinquencies;
> (2)     non-payment related defaults;
> (3)     unscheduled draws on debt service reserves reflecting financial difficulties;*
> (4)     unscheduled draws on credit enhancements reflecting financial difficulties;
> (5)     substitution of credit or liquidity providers, or their failure to perform;
> (6)     adverse tax opinions or events affecting the tax-exempt status of the Certificates;*
> (7)     modifications to rights of holders of the Certificates;
> (8)     Certificate calls;
> (9)     defeasances;
> (10)    release, substitution, or sale of property securing repayment of the Certificates; and
> (11)    rating changes.

> \* (Events listed in clauses (3) & (6) above are not applicable to the Certificates.)

(e)     **Materiality Determined Under Federal Securities Laws**.  The City agrees that its determination of whether any event listed in subsection (d) is material shall be made in accordance with federal securities laws.

(f)     **Termination of Reporting Obligation**.  The obligation of the City to provide annual financial information and notices of material events, as set forth above, shall be terminated if and when the City no longer remains an "obligated person" with respect to the Certificates within the meaning of the Rule, specifically not including upon economic (as distinct from legal) defeasance of all Certificates.

(g)     **Benefit of Certificateholders**.  The City agrees that its undertaking pursuant to the Rule set forth in this Section is intended to be for the benefit of the Certificateholders and shall be enforceable by any Certificateholder; *provided,* that the right to enforce the provisions of this Undertaking shall be limited to a right to obtain specific enforcement of the City's obligations hereunder and any failure by the City to comply with the provisions of this Undertaking shall not constitute a default or an event of default with respect to the Certificates or under the Trust Agreement or Service Contracts mentioned in the Certificates.

(h)     **Amendments to the Undertaking**.  Amendments may be made in the specific types of information provided or the format of the presentation of such information to the extent deemed necessary or appropriate in the judgment of the Disclosure Representative on behalf of the City; *provided,* that the City agrees that any such amendment will be adopted procedurally and substantively in a manner consistent with the Rule, including any interpretations thereof by the SEC, which, to the extent applicable, are incorporated herein by reference.   Such interpretations currently include the requirements that (a) the amendment may only be made in connection with a change in circumstances that arises from a change in legal requirements, change in law or change in the identity, nature or status of the City or the type of activities conducted by it, (b) the undertaking, as amended, would have complied with the requirements of the Rule at the time of the primary offering of the Certificates, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances, and (c) the amendment does not materially impair the interests of Certificateholders, as determined by parties unaffiliated with the City (such as independent legal counsel), *but* such interpretations may be changed in the future.  If the accounting principles to be followed by the City in preparing the Audited Financial Statements are modified, the annual financial information for the year in which the change is made shall present a comparison between the financial statements as prepared on the prior basis and the statements as prepared on the new basis, and otherwise shall comply with the requirements of the Rule, in order to provide information to investors to enable them to evaluate the ability of the City to meet its obligations.  A notice of the change in accounting principles shall be sent to each NRMSIR or the MSRB and the SID.

IN WITNESS WHEREOF, the City of Detroit has caused this Undertaking to be executed by its authorized officer.

CITY OF DETROIT
County of Wayne
State of Michigan

By  _____
        Roger Short
Its:   Interim Finance Director

Dated as of _____, 2006

[THIS PAGE INTENTIONALLY LEFT BLANK]

Since its fiscal year ended June 30, 1999, the City has been unable to meet its obligation to provide annual financial information within the periods specified in the applicable continuing disclosure agreements. Annual financial information for fiscal 1999 through 2004 was filed on May 10, 2000, May 28, 2001, May 31, 2002, March 10, 2003, February 9, 2004 (for water supply system bonds and sewage disposal system bonds), March 1, 2004 (for other bonds), February 16, 2005 (for water supply system bonds and sewage disposal system bonds), May 5, 2005 (for other bonds) and June 1, 2006.

Dated: June 7, 2006

**CITY OF DETROIT**

By _____
    Roger Short

Its:   Interim Finance Director

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By _____
    Roger Short

Its:   President

**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

By _____
    Roger Short

Its:   President

Offering Circular dated June 7, 2006

34