# EXHIBIT F

**$148,540,000 CERTIFICATES OF PARTICIPATION SERIES 2006-A**
**and**
**$800,000,000 CERTIFICATES OF PARTICIPATION SERIES 2006-B**

**issued by the DETROIT RETIREMENT SYSTEMS FUNDING TRUST 2006**
**and evidencing undivided proportionate interests**
**in the rights to receive certain payments**
**pursuant to two Service Contracts between**
**CITY OF DETROIT, MICHIGAN**
**and**
**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**
**and**
**DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION**

**UNDERWRITING AGREEMENT**

June 7, 2006

TO:     City of Detroit,
        Detroit General Retirement System Service Corporation, and
        Detroit Police and Fire Retirement System Service Corporation

Ladies and Gentlemen:

UBS Securities LLC (the "*Representative*"), on behalf of itself and the other underwriters listed in **Appendices I** and **II** attached hereto (collectively, the "*Underwriters*"), hereby offers to enter into this Underwriting Agreement with the City of Detroit, Michigan (the "*City*"), Detroit General Retirement System Service Corporation (the "*GRS Service Corporation*"), and Detroit Police and Fire Retirement System Service Corporation (the "*PFRS Service Corporation*"), for the purchase by the Underwriters and the sale by the Detroit Retirement Systems Funding Trust 2006 (the "*Funding Trust*" or "*Issuer*") of the particular Certificates of Participation (also called COPs) specified below, evidencing undivided proportionate interests in the rights to receive Scheduled Payments and Service Charges (collectively sometimes called "*COP Service Payments*" or "*Funding Trust Receivables*") payable by the City under (i) the Detroit General Retirement System Service Contract 2006 ("*GRS Service Contract*") between the GRS Service Corporation and the City and (ii) the Detroit Police and Fire Retirement System Service Contract 2006 between the PFRS Service Corporation and the City ("*PFRS Service Contract*"), both dated the date of this Underwriting Agreement (collectively, the "*2006 Service Contracts*"), which rights are to be sold, assigned and conveyed, without recourse, by the GRS Service Corporation and the PFRS Service Corporation, respectively, to the Funding Trust on the Closing Date (as defined below). This offer is made subject to acceptance thereof by the GRS Service Corporation and the PFRS Service Corporation (collectively, the "*Service Corporations*") and the City prior to 2:00 P.M., prevailing time in Detroit, Michigan, on the date of this Underwriting Agreement, and, upon such acceptance, evidenced by the signature of a duly authorized officer of each Service Corporation and of the City in the spaces provided below, this Underwriting Agreement shall be in full force and effect in accordance with its terms and shall be binding upon each Service Corporation, the City, and the Underwriters.

The Service Corporations, the City, and the Representative acknowledge and agree that:

(w) the Issuer will not exist until the Closing Date and thus cannot sign this Underwriting Agreement;

(x) the Issuer is to be created by the Service Corporations on the Closing Date by their entering into the Trust Agreement dated that date (the *"Trust Agreement"*) with U.S. Bank National Association, as trustee (the *"Trustee"*);

(y) consequently, such covenants as would ordinarily be made by an issuer in a typical underwriting agreement will be made in this Underwriting Agreement by the Service Corporations, always severally and not jointly (regardless of the context), in lieu of and in regard to the Issuer, and/or by the City; and

(z) because neither Service Corporation has or will have any staff and the Funding Trust will have no staff, the City may take certain actions under this Underwriting Agreement on behalf of itself, the Service Corporations and/or the Funding Trust.

A. Purchase Price.

1.  a. Upon the terms and conditions and upon the basis of the representations and warranties herein set forth, the Underwriters listed in attached **Appendix I** (the *"Series A Underwriters"*) hereby agree to purchase from the Issuer, and the Service Corporations hereby agree to cause the Issuer to sell to the Series A Underwriters, all (but not less than all) of the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A in the original aggregate principal amount of $148,540,000 (the *"Series A COPs"*), at an aggregate purchase price of $147,333,422.10 (the *"Series A COPs Purchase Price"*; representing the aggregate principal amount of the Series A COPs, less underwriters' discount of $1,206,577.90.

    b. Upon the terms and conditions and upon the basis of the representations and warranties herein set forth, the Underwriters listed in attached **Appendix II** (the *"Series B Underwriters"*) hereby agree to purchase from the Issuer, and the Service Corporations hereby agree to cause the Issuer to sell to the Series B Underwriters, all (but not less than all) of the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B in the original aggregate principal amount of $800,000,000 (the *"Series B COPs"*), at an aggregate purchase price of $793,501,667.42 (the *"Series B COPs Purchase Price"*; representing the aggregate principal amount of the Series B COPs, less underwriters' discount of $6,498,332.58.

2.  The GRS COPs and the PFRS COPs (collectively, the *"COPs"*) shall be dated the date of delivery of and payment for the COPs (the *"Closing Date"*), shall mature on the dates (subject to prior redemption as described in the Offering Circular mentioned below) and shall bear interest from the Closing Date at the rates set forth in the Offering Circular, and shall be payable at the times and in the manner, and shall otherwise have the terms and provisions, set forth in the Offering Circular.

B.  Delivery of and Payment for the COPs.

1.  At or prior to 11:00 a.m., prevailing time in Detroit, Michigan, on the Closing Date, or at such other time or date as shall have been mutually agreed upon by the City and the Representative, the Service Corporations will cause the Issuer to deliver or cause to be delivered to the Representative the COPs, in definitive form, duly authenticated by the Trustee, together with the other documents mentioned below; and, subject to the conditions contained herein, the Representative will accept such delivery and pay the GRS Purchase Price and the PFRS Purchase Price by wire transfer of immediately available funds, payable to the order of the U.S. Bank National Association, as the Contract Administrator under the Administration Agreement (as defined below).

2.  The Service Corporations, the City, and the Representative agree that there shall be a preliminary closing held at the offices of Lewis & Munday, A Professional Corporation (*"Certificate Counsel"*), in Detroit, Michigan, commencing at least 24 hours prior to the Closing Date, or at such other time or place as the City and the Representative shall agree.

3.  Delivery of the definitive COPs as aforesaid shall be made at the offices of The Depository Trust Company (*"DTC"*) in New York, New York, or at such other location as may be designated by the Representative at least two business days prior to the Closing Date. Payment for the COPs shall be made as set forth in Section B.1. hereof and delivery of the other documents shall be made at the offices of Certificate Counsel. Such payment and the related delivery are herein called the *"Closing."* The COPs will be delivered as fully-registered COPs, bearing proper CUSIP, ISIN and Euroclear and Clearstream Common Code numbers, and registered in the name of Cede & Co., as nominee of DTC, which will act as securities depository for the COPs. (Clearstream and Euroclear will hold omnibus positions, on behalf of their respective participants, through customers securities accounts in Clearstream's and Euroclear's names on the books of their respective depositories, which in turn will hold such positions in customers' securities accounts in the names of their respective depositories on the books of DTC.)

4.  After authentication by the Trustee, the COPs shall be held in safe custody by the Trustee or any authorized agent for the Trustee. The Trustee shall release or authorize the release of the COPs from safe custody at the Closing upon receipt of payment for the COPs by the Contract Administrator as aforesaid.

C.  Offering Circular.

1.  The Service Corporations and the City hereby consent to and confirm the prior use by the Underwriters of the Preliminary Offering Circular (in printed or electronic form) dated May 31, 2006 (the *"Preliminary Offering Circular"*), in connection with the public offering of the COPs by the Underwriters, and further confirm the authority of the Underwriters to use, and consent to the use of, a final Offering Circular (in printed or electronic form) with respect to the COPs, to be dated the date of this Underwriting Agreement, and any amendments or supplements thereto that shall be approved by the Service Corporations and the City (as so amended and supplemented, the *"Offering Circular"*) in connection with the public offering and sale of the COPs. The Service Corporations and the City hereby represent and warrant that the Preliminary Offering Circular previously furnished to the Representative was "deemed final" by them as of its date for purposes of Rule 15c2-12 (*"Rule 15c2-12"*) promulgated by the Securities and Exchange of the United States (the *"SEC"*) under the Securities Exchange Act of 1934, as amended (the *"Exchange Act"*) except for the omission of such information as is specified in Rule 15c2-12(b)(1).

2.  The City will provide, or cause to be provided, to the Representative within seven business days after the date of this Underwriting Agreement or three business days prior to the Closing, whichever comes first, ten executed counterparts of the Offering Circular, and conformed copies of a final Offering Circular in sufficient quantity to permit the Underwriters to comply with Rule 15c2-12, and other applicable rules of the SEC and the Municipal Securities Rulemaking Board (the "*MSRB*").

3.  The City hereby authorizes the Representative to file, and the Representative hereby agrees to file, the Offering Circular with (i) at least one of the nationally recognized municipal securities information repositories designated by the SEC (a "*NRMSIR*") and (ii) the MSRB, or its designee.

D.  Amendments to Offering Circular. The City covenants with the Underwriters that it will promptly notify the Representative if, during the Update Period (as defined below), any event shall occur or information comes to the attention of the City that either signifies the Offering Circular is reasonably likely to contain, or would cause the Offering Circular (whether or not previously supplemented or amended) to contain, any untrue statement of a material fact or to omit to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, and if in the opinion of the Representative such event or information requires the preparation and distribution of a supplement or amendment to the Offering Circular, to prepare and furnish to the Representative, at the City's expense, such number of copies of the supplement or amendment to the Offering Circular, in form and substance agreed upon by the City and approved by the Representative, as the Representative may reasonably request and if such notification shall be given subsequent to the Closing Date, such additional legal opinions, certificates, instruments and other documents as the Representative may reasonably deem necessary to evidence the truth and accuracy of any such supplement or amendment to the Offering Circular.

E.  Public Offering. The Series A Underwriters and the Series B Underwriters intend to make an initial public offering of all of the Series A COPs and all of the Series B COPs respectively, at a price not in excess of the initial offering price or prices set forth in the Offering Circular; provided, however, that such Underwriters may change such initial offering price or prices as they deem necessary in connection with the offering of the COPs without any requirement of prior notice, and may offer and sell the COPs to certain institutions at prices lower than those stated in the Offering Circular.

F.  End of Underwriting Period. For purposes of this Underwriting Agreement, the "*end of the Underwriting Period*" shall mean the earlier of the Closing Date, unless the City has been notified to the contrary by the Representative on or prior to the Closing Date, or the date on which the "end of the underwriting period" for the COPs has occurred under Rule 15c2-12.

1.  The Representative shall provide to the City upon request such information as it may reasonably require in order to determine whether the "end of the underwriting period" for the COPs has occurred under Rule 15c2-12 with respect to the unsold balance of COPs that are held by any Underwriters for sale to the public within the meaning of Rule 15c2-12.

2.  As soon as practicable following receipt thereof, the Representative shall deliver the Offering Circular and any supplement or amendment thereto to a NRMSIR.

G. Plan of Financing.

1. The COPs shall be as described in, and shall be issued under and secured pursuant to the provisions of, the Trust Agreement, substantially in the form delivered to the Representative, with only such changes therein as shall be mutually agreed upon among the Service Corporations and the Representative prior to Closing.

2. The net proceeds from the sale of the COPs will be applied on or reasonably soon after the Closing Date to enable the City to replace (i) certain of the scheduled payment obligations which it incurred under two earlier service contracts with the same Service Corporations in 2005 ("*2005 Service Contracts*") to provide funding for specified amounts of unfunded accrued actuarial liabilities ("*2005 Subject UAAL*") of the City's General Retirement System ("*GRS*") and Police and Fire Retirement System ("*PFRS*"), with (ii) new scheduled payment obligations payable over recently permitted longer periods under the 2006 Service Contracts, specifically including without limitation to pay the optional redemption price of certain of the certificates of participation issued on June 2, 2005 pursuant to the Funding Ordinance (as defined below) ("*2005 COPs*") and to purchase and cancel certain other of the 2005 COPs which are tendered by their holders to the Service Corporations for that purpose.

3. Payment of the principal of and interest on the COPs of particular series and maturities when due will be insured by either a financial guaranty insurance policy to be issued by Financial Guaranty Insurance Company (those being the "*FGIC-insured COPs*") or a financial guaranty insurance policy to be issued by XL Capital Assurance Inc. (those being the "*XLCA-insured COPs*") simultaneously with the delivery of the COPs (the "*Certificate Insurance*").

4. The Funding Trust and the Service Corporations, severally and not jointly, will enter into the Contract Administration Agreement (the "*Administration Agreement*") with U.S. Bank National Association, as Contract Administrator, and the Specified Hedged Counterparties named therein, substantially in the form delivered to the Representative, with only such changes therein as shall be mutually agreed upon among those parties and the Representative prior to Closing. Under the Administration Agreement, among other things, each Service Corporation and the Trustee, on behalf of the Funding Trust, will appoint the Contract Administrator as its respective agent to collect COP Service Payments or certain periodic or termination payment amounts with respect to any *Stated Hedge* (as defined in the 2006 Service Contracts) and in turn to disburse such moneys in accordance with the Administration Agreement.

H. Representations and Warranties of the Service Corporations.

Each Service Corporation hereby agrees with, and makes the following representations and warranties (solely as to itself and not the other Service Corporation) to the Underwriters, as of the date of this Underwriting Agreement and as of the Closing Date, which representations and warranties shall survive the Closing:

1. The Service Corporation is a nonprofit corporation duly incorporated, organized, and existing under the laws of the State of Michigan (the "*State*") and has, and at the Closing Date will have, full corporate power and authority pursuant to the resolutions adopted by its Board of Directors on February 28, 2006 ("*its Resolutions*") to (i) enter into this Underwriting Agreement, its respective 2006 Service Contract, any *Stated Hedge* (and both Service Corporations' respective Stated Hedges are collectively called the "*Hedge Agreements*"), the Trust Agreement, and the Administration Agreement, (ii) sell, assign, and convey to the Issuer the right to receive the COP Service Payments to become due under its 2006 Service Contract, (iii) grant a security interest in

the right to receive the COP Service Payments to become due under its 2006 Service Contract to the Trustee, and (iv) carry out and consummate the transactions contemplated by this Underwriting Agreement, the Trust Agreement, its 2006 Service Contract, the Administration Agreement, its Hedge Agreements, and the Offering Circular.

2.  On and as of the date of this Underwriting Agreement and, unless an event of the nature described in Section D hereof subsequently occurs, at all times during the period from the date of this Underwriting Agreement to and including the date which is 25 days following the end of the Underwriting Period (the "*Update Period*"), the information in the Offering Circular with respect to the Service Corporation or the Issuer and its affairs does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

3.  By official action of the Service Corporation's Board of Directors prior to or concurrently with the acceptance hereof, the Service Corporation has duly authorized and approved the distribution of the Preliminary Offering Circular and the execution, delivery, and distribution of the Offering Circular, and has duly authorized and approved the issuance and sale of the COPs upon the terms set forth herein and in the Trust Agreement and the Offering Circular, and the execution and delivery of, and the performance by the Service Corporation and the Issuer of their respective obligations (if any) in, the Service Corporation's 2006 Service Contract, any Hedge Agreements, the COPs, the Trust Agreement, the Administration Agreement, and this Underwriting Agreement. The Service Corporation further represents and warrants that each Hedge Agreement to which it is a party was duly executed by the Service Corporation and is in full force and effect and shall provide a synthetic fixed rate of interest for the variable rate Service Charges payable under the 2006 Service Contracts for the duration of such Hedge Agreement.

4.  The Service Corporation is not in breach of or in default under its Articles of Incorporation or Bylaws, or any applicable law or administrative regulation of the State or the United States or any applicable judgment or decree or any loan agreement, note, resolution, agreement, or other instrument to which the Service Corporation is a party or is otherwise subject; or by which it or its properties may be bound, and the issuance and sale of the COPs upon the terms set forth herein and in the Trust Agreement and the Offering Circular, and the execution and delivery by the Service Corporation of its 2006 Service Contract, any Hedge Agreements, the Trust Agreement, the Administration Agreement, and this Underwriting Agreement, and its compliance with the provisions of each thereof, will not conflict with or constitute a breach of or default under its Articles of Incorporation or Bylaws, or any law, administrative regulation, judgment, decree, indenture, loan agreement, note, resolution, agreement, or other instrument to which the Service Corporation is a party or is otherwise subject.

5.  All approvals, consents, and orders of any governmental authority, board, agency, or commission having jurisdiction that would constitute a condition precedent to the performance by the Service Corporation of its obligations hereunder, or to the execution and delivery and performance by the Service Corporation of its 2006 Service Contract, any Hedge Agreements, the Trust Agreement, and the Administration Agreement, have been obtained or will be obtained prior to the Closing.

6.  The COPs, when issued, authenticated, and delivered in accordance with the Trust Agreement and sold to the Underwriters as provided herein, will be the legal, valid, and binding limited obligations of the Issuer, issued in conformity with and entitled to the benefit and security of the Trust Agreement.

7.  The terms and provisions of the Trust Agreement will comply in all respects with the requirements of the City's Ordinance No. 05-05 (the "*Funding Ordinance*") and the related Resolution adopted by the City Council on April 26, 2006 (the "*Authorizing Resolution*") and, when executed and delivered by the parties thereto, the Trust Agreement will constitute the legal, valid, and binding obligation of the Issuer enforceable in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, and other laws affecting creditors' rights generally from time to time in effect, and rights of acceleration, indemnity, and contribution, and the availability of equitable remedies may be limited by equitable principles.

8.  There is no action, suit, proceeding, inquiry, or investigation, at law or in equity, before or by any court, public board or body, pending or, to the knowledge of the Service Corporation, threatened against the Service Corporation or the Issuer, affecting the existence of the Service Corporation or the Issuer or the titles of its officers to their respective offices or seeking to prohibit, restrain, or enjoin the issuance, sale, or delivery of the COPs or the collection of the Service Payments of the City pledged or to be pledged to pay the principal of and interest on the COPs, or the pledge thereof, or in any way contesting or affecting the validity or enforceability of the COPs, the Trust Agreement, the Administration Agreement, or this Underwriting Agreement or contesting in any way the completeness or accuracy of the Preliminary Offering Circular or the Offering Circular, or any amendment or supplement thereto, or contesting the power or authority of (a) the Service Corporation to execute and deliver its 2006 Service Contract, any Hedge Agreements, the Trust Agreement, the Administration Agreement, or this Underwriting Agreement, or (b) the Issuer to issue the COPs or to execute and deliver the Administration Agreement, or wherein an unfavorable decision, ruling, or finding would materially adversely affect the validity or enforceability of the COPs, the Trust Agreement, the Administration Agreement, or this Underwriting Agreement.

9.  The proceeds received from the sale of the COPs shall be used in accordance with the Funding Ordinance, the Authorizing Resolution and the Trust Agreement and as set forth in the 2006 Service Contracts and the Offering Circular.

10. Any certificate signed by an authorized officer of the Service Corporation and delivered to the Representative shall be deemed a representation and warranty of the Service Corporation to the Underwriters as to the statements made therein.

I.  Covenants of the Service Corporation. Each Service Corporation hereby covenants for itself with the Underwriters that:

1.  The Service Corporation shall not supplement or amend the Offering Circular or cause the Offering Circular to be supplemented or amended without the prior written consent of the Representative.

2.  The Service Corporation shall not amend, terminate, or rescind, and will not agree to any amendment, termination, or rescission of, its Resolutions or the Trust Agreement, its 2006 Service Contract, any Hedge Agreements to which it is or becomes a party, the Administration Agreement, or this Underwriting Agreement without the prior written consent of the Representative prior to the Closing Date.

3.  The Service Corporation shall promptly advise the Representative by written notice of any matter arising or discovered after the date of this Underwriting Agreement and prior to the Closing Date that, if existing or known at the date of this Underwriting Agreement, would render any of the representations or warranties set forth herein to be untrue or misleading or that might adversely

affect the correctness or completeness of any statement of material fact regarding the Service Corporation or the Issuer contained in the Offering Circular; or any developments that affect the accuracy and completeness of the key representations (within the meaning of Rule 15c2-12) regarding the Service Corporation or the Issuer contained in the Offering Circular that may occur during the Update Period.

4. Prior to the Closing Date, the Service Corporation shall not create, assume, or guarantee any indebtedness payable from, or pledge or otherwise encumber, the revenues, assets, properties, funds, or interests that will be pledged pursuant to the Trust Agreement.

5. The Service Corporation shall not voluntarily undertake any course of action inconsistent with satisfaction of the requirements applicable to the Service Corporation as set forth in this Underwriting Agreement.

6. The Service Corporation shall cooperate with the Underwriters in the qualification of the COPs for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Representative may designate; provided, however, that the Service Corporation shall not be required to consent to service of process in connection therewith.

J. <u>Representations and Warranties of the City.</u> The City hereby agrees with, and makes the following representations and warranties to, the Underwriters, as of the date of this Underwriting Agreement and as of the Closing Date, which representations and warranties shall survive the Closing:

1. The City is a municipal body corporate under the Home Rule City Act, Act 279, Public Acts of Michigan, 1909, as amended (the "*Home Rule Act*"), and has full legal right, power and authority: (i) to adopt the Funding Ordinance and Ordinances No. 03-05 and 04-05 (such three ordinances collectively, the "*Authorizing Ordinances*") and for its City Council to adopt the Authorizing Resolution; (ii) to cause the creation of the Service Corporations; (iii) to execute, deliver and perform its obligations under the 2006 Service Contracts; (iv) to enter into this Underwriting Agreement and the Continuing Disclosure Undertaking of the City, dated the Closing Date, a form of which is attached as APPENDIX H to the Offering Circular (the "*Continuing Disclosure Undertaking*"); (v) to execute and deliver the Offering Circular and to authorize the distribution thereof by the Underwriters; (vi) to enter into a commitment for separate financial guaranty insurance policies for the COPs and for certain swap termination risk (collectively, the "*Certificate Insurance*") with Financial Guaranty Insurance Company and XL Capital Assurance Inc. (the "*Insurers*"); and (vi) to carry out and to consummate all other transactions contemplated by this Underwriting Agreement, the Authorizing Ordinances, the Authorizing Resolution, the Trust Agreement, the Continuing Disclosure Undertaking, the 2006 Service Contracts, and the Offering Circular.

2. With respect to the execution and delivery of the 2006 Service Contracts and causing the creation of the Service Corporations, the City has in all respects complied with the Home Rule Act, the City Charter and the Authorizing Documents and in all material respects with all other laws of the State of Michigan applicable thereto. The City further represents and warrants that each Stated Hedge was duly authorized by the City and shall provide a synthetic fixed rate of interest for the variable rate Service Charges payable under the 2006 Service Contracts for the duration of the Stated Hedges.

3. By the Authorizing Ordinances or the Authorizing Resolution, the City has duly authorized the execution and delivery of this Underwriting Agreement, the Offering Circular, the 2006 Service Contracts and the Stated Hedges, and has authorized the taking of any and all such action as may

be required on the part of the City to carry out, give effect to and consummate the transactions contemplated by the Authorizing Ordinances, the Authorizing Resolution, this Underwriting Agreement, the Offering Circular, the 2006 Service Contracts and the Stated Hedges.

4. The Offering Circular and the 2006 Service Contracts will be in substantially the forms heretofore submitted to and approved by the Representative with only such changes therein or modifications thereof reasonably acceptable to both the Representative and the City. The 2006 Service Contracts, when executed and delivered as herein provided and as provided in the Authorizing Ordinances and the Authorizing Resolution, will have been duly authorized and issued and will constitute valid and binding contractual obligations of the City as described in the Offering Circular.

5. The Offering Circular is on this date true and correct in all material respects. The Offering Circular does not on this date contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. Unless an event of the nature described in Section K.3. hereof subsequently occurs, at all times during the Update Period the information in the Offering Circular with respect to the City and its affairs does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading.

6. At the time of the City's acceptance hereof there is, and on the Closing Date there will be, no action, suit, proceeding, inquiry or investigation, at law or in equity, before or by any court, public board or body, other than as indicated in the Offering Circular, pending or known to be threatened against the City: (i) affecting the creation, organization, or existence of the City or the title of its officers to their respective offices; (ii) seeking to prohibit, restrain, or enjoin the execution and delivery of the 2006 Service Contracts or the issuance or delivery of the COPs; (iii) seeking to prohibit, restrain, or enjoin the issuance, sale, or delivery of the COPs by the Issuer or the Issuer's execution and delivery of the Trust Agreement, the 2006 Service Contracts, the Administration Agreement, or this Underwriting Agreement; (iv) in any way contesting or affecting the validity or enforceability of the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts, this Underwriting Agreement, the Offering Circular, the Stated Hedges or any other agreement or instrument relating thereto or used or contemplated for use in the consummation of the transactions contemplated by this Underwriting Agreement or by the Offering Circular; (v) contesting in any material respect the completeness or accuracy of the Preliminary Offering Circular or the Offering Circular; or (vi) contesting the power or authority of (1) the City to enact any of the Authorizing Ordinances or to execute and deliver the Continuing Disclosure Undertaking, the 2006 Service Contracts, or this Underwriting Agreement, or (2) the City Council to adopt the Authorizing Resolution, or (3) the Issuer to issue the COPs or to execute and deliver the 2006 Service Contracts, the Trust Agreement, the Administration Agreement, the Continuing Disclosure Undertaking, or this Underwriting Agreement, or any amendment or supplement thereto; or wherein an unfavorable decision, ruling, or finding would materially adversely affect the validity or enforceability of the COPs, the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts, the Trust Agreement, the Administration Agreement, the Continuing Disclosure Undertaking, or this Underwriting Agreement.

7. The City is not, in any material respect, in breach of or in default under its Charter, any applicable law or administrative regulation of the State of Michigan or the United States or any applicable judgment or decree or any agreement or other instrument to which the City is a party or by which

it or any of its properties is bound, other than as indicated in the Offering Circular, and the issuance and sale of the COPs upon the terms set forth herein and in the 2006 Service Contracts, the Trust Agreement and the Offering Circular, and the execution and delivery or adoption of the Authorizing Ordinances, the Authorizing Resolution, this Underwriting Agreement, the Offering Circular, the Continuing Disclosure Undertaking, and the 2006 Service Contracts, and compliance with the provisions of each thereof, will not, in any material respect, conflict with or constitute a breach of or default under its Charter, any applicable law or administrative regulation of the State of Michigan or the United States or any applicable judgment or decree or any agreement or other instrument to which the City is a party or by which it or any of its properties are bound.

8.  No consent, approval, authorization or order of or filing, registration or declaration with any court or governmental agency or body, the absence of which would materially adversely affect the performance by the City of its obligations under the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts or this Underwriting Agreement, is required for the execution and delivery of the 2006 Service Contracts or the issuance, delivery or sale of the COPs, except such as may be required under the Blue Sky or other securities laws or regulations of any jurisdiction in connection with the offer and sale of the COPs by the Underwriters (as to which laws and regulations no representation or warranty is made) or, if any such consent, approval or authorization is required, the City will use its reasonable efforts to obtain it prior to the Closing Date and will provide evidence to the Representative that the same has been obtained.

9.  The audited basic financial statements of the City included in the Offering Circular as Appendix C (the "*Financial Statements*"), fairly present the financial condition of the City as of the dates thereof and the results of its operations for the periods shown therein. There has been no material adverse change in the financial condition or affairs of the City since June 30, 2005, except as disclosed in the Offering Circular.

10. The 2006 Service Contracts, when executed and delivered by the City and the Service Corporations, will be the legal, valid, and binding unconditional contractual obligation of the City, enforceable against the City in accordance with their terms.

11. The COPs, when issued, authenticated, and delivered in accordance with the Trust Agreement and sold to the Underwriters as provided herein, will be the legal, valid, and binding limited obligations of the Issuer, issued in conformity with and entitled to the benefit and security of the Trust Agreement.

12. The terms and provisions of the Trust Agreement will comply in all respects with the requirements of the Funding Ordinance and the Authorizing Resolution and, when executed and delivered by the parties thereto, the Trust Agreement will constitute the legal, valid, and binding obligation of the Issuer enforceable in accordance with its terms except as the same may be limited by bankruptcy, insolvency, reorganization, and other laws affecting creditors' rights generally from time to time in effect, and rights of acceleration, indemnity, and contribution, and the availability of equitable remedies may be limited by equitable principles.

13. The proceeds received from the sale of the COPs shall be used in accordance with the Funding Ordinance, the Authorizing Resolution and the Trust Agreement and as set forth in the 2006 Service Contracts and the Offering Circular.

14. Any certificate signed by an authorized officer of the City and delivered to the Representative shall be deemed a representation and warranty of the City to the Underwriters as to the statements made therein.

15. The City has entered or will enter, in accordance with Rule 15c2-12, into a written agreement or contract for the benefit of bondholders to provide to each NRMSIR and to the appropriate state information depository, if any, or the MSRB (where applicable) (a) certain annual financial information, including audited financial statements and operating data, generally consistent with the information contained or incorporated by reference in the Offering Circular, (b) timely notice of any of the eleven events identified in Rule 15c2-12 with respect to the securities being offered in the offering, if material, and (c) timely notice of any failure of any obligated person to provide the required annual information on or before the date specified in the written agreement.

14. The City has not failed during the previous five years to comply in all material respects with any previous undertakings in a written continuing disclosure contract or agreement under Rule 15c2-12, except as disclosed in the Offering Circular.

K. Covenants of the City. The City hereby covenants with the Underwriters that:

1. The City shall not supplement or amend the Offering Circular or cause the Offering Circular to be supplemented or amended without the prior written consent of the Representative.

2. The City shall not amend, terminate, or rescind, and will not agree to any amendment, termination, or rescission of, the Funding Ordinance, the Authorizing Resolution, the 2006 Service Contracts, the Hedge Agreements, or this Underwriting Agreement without the prior written consent of the Representative prior to the Closing Date.

3. The City shall promptly advise the Representative by written notice of any matter arising or discovered after the date of this Underwriting Agreement and prior to the Closing Date that, if existing or known at the date of this Underwriting Agreement, would render any of the representations or warranties set forth herein to be untrue or misleading or that might adversely affect the correctness or completeness of any statement of material fact regarding the City or the Issuer contained in the Offering Circular; or any developments that affect the accuracy and completeness of the key representations (within the meaning of Rule 15c2-12) regarding the City or the Issuer contained in the Offering Circular that may occur during the Update Period.

4. The City shall not voluntarily undertake any course of action inconsistent with satisfaction of the requirements applicable to the City as set forth in this Underwriting Agreement.

5. The City shall cooperate with the Underwriters in the qualification of the COPs for offering and sale and the determination of their eligibility for investment under the laws of such jurisdictions as the Representative may designate.

6. The City will undertake, pursuant to a Continuing Disclosure Undertaking, to provide annual reports and notices of certain events in compliance with Rule 15c2-12. A copy of this undertaking is set forth in the Preliminary Offering Circular and will also be set forth in the final Offering Circular.

L. Accountants' Letter. Prior to the execution of this Underwriting Agreement, the Representative represents that it has received a letter from KPMG LLP, the City's independent certified public accountants, consenting to the inclusion of KPMG LLP's report on the Financial Statements for the

fiscal year ended June 30, 2005 in the Preliminary Offering Circular and in the final Offering Circular.

M. <u>Certain Conditions to Underwriters' Obligations.</u>  The Underwriters have entered into this Underwriting Agreement in reliance upon the representations, warranties, and agreements of the Service Corporations and the City contained herein and upon the accuracy of the statements to be contained in the documents and instruments to be delivered at the Closing. Accordingly, the Underwriters' obligations under this Underwriting Agreement to purchase, accept delivery of, and pay for the COPs are subject to the performance by the Issuer, the Service Corporations, and the City of their respective obligations hereunder required to be performed at or prior to the Closing Date, and to the following additional conditions precedent:

1.  On the Closing Date, the representations and warranties of the Service Corporations and the City contained herein shall be true, complete, and correct as if made on and as of the Closing Date; the Offering Circular shall have been executed and delivered by the City; the Trust Agreement, the Continuing Disclosure Undertaking, the 2006 Service Contracts and the Administration Agreement shall have been duly executed and delivered by the appropriate parties thereto, shall be in full force and effect, and shall not have been amended, modified, or supplemented, except as may be agreed to in writing by the Representative; the proceeds of the sale of the COPs shall have been paid to the Contract Administrator, as agent of the Funding Trust, for deposit and use as described in the Offering Circular and in the Trust Agreement; and the Service Corporations shall have adopted and there shall be in full force and effect such resolutions as, in the opinion of Certificate Counsel and counsel for the Underwriters, shall be necessary in connection with the transactions contemplated hereby.

2.  The Underwriters shall have the right to cancel their obligation to purchase the COPs if between the date of this Underwriting Agreement and the Closing:

    a)  there shall exist any event or circumstance that in the Representative's reasonable judgment either makes untrue or incorrect in any material respect any statement or information in the Offering Circular or is not reflected in the Offering Circular but should be reflected therein in order to make any statement of material fact therein not misleading in any material respect; or

    b)  there shall have occurred (i) an outbreak or escalation of hostilities involving the United States or the declaration by the United States of a national emergency or war occurs; or (ii) the occurrence of any other calamity or crisis or any change in the financial, political, or economic conditions in the United States or elsewhere, if the effect of any such event specified in clause (i) or (ii), in the Representative's reasonable judgment, makes it impracticable or inadvisable to proceed with the offering or the delivery of the COPs on the terms and in the manner contemplated in the Preliminary Offering Circular or the Offering Circular; or

    c)  there shall be in force a general suspension of trading on the New York Stock Exchange, or minimum or maximum prices for trading shall have been fixed and be in force, or maximum ranges for prices for securities shall have been required and be in force on the New York Stock Exchange, whether by virtue of determination by that Exchange or by order of the SEC or any other governmental authority having jurisdiction that, in the Representative's reasonable judgment, makes it impracticable for the Underwriters to market the COPs or enforce contracts for the sale of the COPs; or

d) a general banking moratorium shall have been declared by federal or state authorities having jurisdiction and be in force that, in the Representative's reasonable judgment, makes it impracticable for the Underwriters to market the COPs or enforce contracts for the sale of the COPs; or

e) legislation shall be enacted or be proposed or actively considered for enactment, or a decision by a court of the United States shall be rendered, or a ruling, regulation, proposed regulation, or statement by or on behalf of the SEC or other governmental agency having jurisdiction of the subject matter shall be made, to the effect that the COPs or any comparable securities of the Issuer, any obligations of the general character of the COPs, the Trust Agreement, the Continuing Disclosure Undertaking, or either 2006 Service Contract is not exempt from the registration, qualification, or other requirements of the Securities Act of 1933, as amended and as then in effect (the "*Securities Act*") or of the Trust Indenture Act of 1939, as amended and as then in effect, or otherwise, or would be in violation of any provision of the federal securities laws; or

f) there shall have been any material adverse change in the affairs of the Issuer, the Service Corporations or the City that in the Representative's reasonable judgment will materially adversely affect the market for the COPs (whether in or outside the United States) or the ability of the Underwriters to enforce contracts for the sale of the COPs; or

g) there shall be established any new restriction on transactions in securities materially affecting the free market for securities (including the imposition of any limitation on interest rates) or the extension of credit by, or a change to the net capital requirements of, underwriters established by the New York Stock Exchange, the SEC, any other federal or state agency or the Congress of the United States, or by Executive Order; or

h) a stop order, release, regulation, or no-action letter by or on behalf of the SEC or any other governmental agency having jurisdiction of the subject matter shall have been issued or made to the effect that the issuance, offering, or sale of the COPs, including all the underlying obligations as contemplated hereby or by the Offering Circular, or any document relating to the issuance, offering, or sale of the COPs is or would be in violation of any provision of the federal securities laws at the Closing Date, including the Securities Act, the Exchange Act, and the Trust Indenture Act of 1939, as amended; or

i) there shall have occurred, after the signing hereof, a default with respect to the debt obligations of the City or proceedings under the Local Government Fiscal Responsibility Act (Act No. 72, Public Acts of 1990, as amended) of the State shall have been instituted by the State Treasurer or the Governor of the State, in either case the effect of which, in the reasonable judgment of the Representative, is such as to materially and adversely affect the market price or the marketability of the COPs (whether in or outside the United States) or the ability of the Underwriters to enforce contracts of the sale of the COPs.

3. At or prior to the Closing, the Representative shall receive the following:

a) the unqualified approving opinion of Lewis & Munday, A Professional Corporation, Certificate Counsel, dated the Closing Date and in substantially the form attached as Appendix G to the Offering Circular, and a letter from Certificate Counsel dated the Closing Date and addressed to the Underwriters, the City, the Service Corporations, and the Funding Trust (collectively, the "*Reliance Addressees*"), to the effect that the Reliance Addressees may rely on such Certificate Counsel's approving opinion as if it were addressed to them;

b) a supplemental opinion of Certificate Counsel dated the Closing Date and addressed to the Underwriters, the City, the Service Corporations, and the Funding Trust, and in form and substance satisfactory to the Representative, substantially to the effect that: **(i)** this Underwriting Agreement has been duly authorized, executed and delivered by the Service Corporations and the City and constitutes the legal, valid and binding agreement of the Service Corporations and the City, enforceable against each of them in accordance with its terms, except to the extent that the enforceability thereof may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws now or hereafter enacted affecting the enforcement of creditors' rights and the unavailability of equitable remedies or other application thereto of general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); **(ii)** the Administration Agreement has been duly authorized, executed and delivered by the Service Corporations and, assuming due authorization, execution and delivery by the other parties thereto, constitutes the legal, valid and binding agreement of the Service Corporations, enforceable against each of them in accordance with its terms, except to the extent that the enforceability thereof may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws now or hereafter enacted affecting the enforcement of creditors' rights and the unavailability of equitable remedies or other application thereto of general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); **(iii)** no approval or other action is required to be obtained by either Service Corporation or the City from any governmental authority or agency in connection with the issuance and sale of the COPs, the execution by the Service Corporations and the City of the 2006 Service Contracts or the Offering Circular, the execution by the City of this Underwriting Agreement, or the execution by the Service Corporations of the Trust Agreement, any Hedge Agreements, the Administration Agreement, or this Underwriting Agreement, that has not already been obtained or taken, except that the offer and sale of the COPs in certain jurisdictions may be subject to compliance with the provisions of the securities or blue sky laws of such jurisdictions (as to which no opinion need be expressed); **(iv)** the COPs are securities that are exempt from registration pursuant to Section 3(a)(2) of the Securities Act of 1933, as amended, and the Trust Agreement is exempt from qualification under the Trust Indenture Act of 1939, as amended; **(v)** no enactment of state legislation was necessary for the valid adoption by the City Council of the Funding Ordinance and the Authorizing Resolution; **(vi)** the obligations of the City to pay Contract Payments (not limited to Funding Trust Receivables) under the 2006 Service Contracts do not constitute indebtedness within the meaning of any limitation of Michigan law applicable to the City; and **(vii)** assuming due authorization, execution and delivery by the Trustee of the Trust Agreement, the Funding Trust has the power to apply the proceeds from its sale of the COPs pursuant to the 2006 Service Contracts and the Trust Agreement; **and in addition,** Certificate Counsel shall state in its letter containing the foregoing opinions or in a separate letter addressed to the Underwriters, the City, the Service Corporations, and the Funding Trust that: **(1)** the information contained in the Offering Circular under the headings "INTRODUCTION," "PLAN OF FINANCE," "SOURCES OF PAYMENT AND SECURITY FOR THE 2006 CERTIFICATES," "THE 2006 CERTIFICATES" (except for the information under the subheading "Global Book-Entry System," as to which no opinion needs to be expressed), "2006 SERVICE CONTRACT ADMINISTRATION," "THE SERVICE CORPORATIONS AND THE FUNDING TRUST," and "CONTINUING DISCLOSURE" (except for the information regarding the Disclosure Dissemination Agent (as there defined) and its disclosure dissemination agreement with the City, as to which no opinion need be expressed), and in Appendices A and G, are fair and accurate summaries of the matters described therein, and **(2)** based solely such counsel's examination of the proceedings of the City and each Service Corporation in connection with their approving opinions as to the validity of the 2006

Service Contracts and the COPs, their participation in certain meetings and conference calls at which representatives of and counsel for the City, the City's Financial Advisors, the Representative, inhouse counsel to the Representative, counsel to the Underwriters, Special U.S. Federal Tax Counsel and Special Michigan Tax Counsel (as such terms are defined below) were at various times present for the preparation of the Offering Circular, and in reliance on certain certificates of the Interim Finance Director and Budget Director of the City and certain opinions of the City's Corporation Counsel and of Special U.S. Federal Tax Counsel and Special Michigan Tax Counsel, and such other certificates, opinions, and documents as they deem necessary, and except as to the information contained under the headings set forth above, and without having undertaken to determine independently the accuracy or completeness of the statements contained in the Offering Circular or the Appendices thereto, nothing has come to their attention which would cause them to believe that the Offering Circular, as of its date and as of the date of the Closing, respectively, contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; (except for the information contained in Appendices B, C, D, E and F of the Offering Circular, the other financial, economic, demographic, and statistical data contained therein, the information relating to the Insurers and their insurance policies, the information relating to Digital Assurance Certification, L.L.C. and its disclosure dissemination agreement with the City, and the information relating to DTC, Clearstream and Euroclear and the book-entry system, as to which no opinion needs to be expressed);

c)  an opinion of Corporation Counsel of the City dated the Closing Date and addressed to the Underwriters, and in form and substance satisfactory to the Representative, to the effect that: (i) the City is duly existing as a municipality organized under and by virtue of the laws of the State of Michigan, with full legal right, power and authority to undertake the activities described in and contemplated by the Offering Circular, the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts, this Underwriting Agreement and the Continuing Disclosure Undertaking, to cause the creation of the Service Corporations, and to execute and deliver the documents and agreements described in the Offering Circular as documents and agreements to which the City is a party; (ii) the Authorizing Ordinances and the Authorizing Resolution have been duly adopted, and the 2006 Service Contracts, the Continuing Disclosure Undertaking, and the Offering Circular have been duly authorized, executed and delivered by the City and, assuming due authorization, execution and delivery by the other parties hereto and thereto as applicable, are valid and binding obligations of the City, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or similar laws from time to time in effect affecting the enforceability of creditors' rights generally and to general principles of equity, regardless of whether considered in a proceeding in equity or at law; (iii) the adoption of the Authorizing Ordinances and the Authorizing Resolution and the execution and delivery of the 2006 Service Contracts, this Underwriting Agreement, and the Offering Circular and compliance with the provisions hereof and thereof, do not and will not conflict with or constitute on the part of the City a breach or default under any existing law, regulation, court order, or consent decree to which the City is subject, or, to the best of such counsel's knowledge after due inquiry, any agreement or instrument to which the City is a party or by which the City is bound; (iv) all actions on the part of the City necessary for the making and performance of the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts, this Underwriting Agreement, and the Continuing Disclosure Undertaking, and the actions on the part of the City contemplated hereby and thereby, including causing the formation of the Service Corporations and the authentication and delivery of the COPs, have been duly and effectively taken and no consent, authorization or approval of, or filing or

registration with, any governmental or regulatory officer or body not already obtained is required to be obtained by the City for the making and performance of the Authorizing Ordinances, the Authorizing Resolution, the 2006 Service Contracts, the Continuing Disclosure Undertaking, and this Underwriting Agreement, or the actions on the part of the City contemplated hereby and thereby, including causing the formation of the Service Corporations and the authentication and delivery of the COPs, except that the offer and sale of the COPs in certain jurisdictions may be subject to compliance with the provisions of the securities or blue sky laws of such jurisdictions (as to which no opinion need be expressed); **(v)** no litigation before or by any court, public board or body, other than as indicated in the Offering Circular, is pending or, to the best of such counsel's knowledge, threatened against the City **(1)** affecting the creation, organization, or corporate existence of the City or the title of its present City Council members to their respective offices, **(2)** seeking to prohibit, restrain, or enjoin the execution and delivery of the 2006 Service Contracts or the issuance or delivery of the COPs, **(3)** in any way contesting or affecting the validity or enforceability of the 2006 Service Contracts, the Authorizing Ordinances, the Authorizing Resolution, the Continuing Disclosure Undertaking, or this Underwriting Agreement, or **(4)** contesting in any material respect the completeness or accuracy of the Offering Circular; **(vi)** the City was not required by a court order or judgment to levy a tax in the fiscal year ended June 30, 2005; and **(vii)** the City has not been found by a court of competent jurisdiction to be in violation of any finance or tax-related state or federal statutes during the preceding fiscal year ended June 30, 2005; **(viii)** the distribution of the Preliminary Offering Circular and the execution, delivery, and distribution of the Offering Circular have been duly authorized by the City, and the Offering Circular has been duly executed and delivered by the City; and the representations and warranties of the City as set forth in this Underwriting Agreement and the 2006 Service Contracts are, as to all matters of law, true and accurate on and as of the Closing Date as if made on the Closing Date; **and in addition,** such opinion shall also indicate that such counsel has reviewed the information contained in the Offering Circular under the caption "LITIGATION" and such information does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances, under which they were made, not misleading, and based on the foregoing, that the City is not unreasonable in its opinion that any litigation not described in the Offering Circular which is pending against the City, and of which such counsel is aware, is litigation incidental to the operations of the City and unlikely to have a material effect on the power or authority of the City to satisfy its obligations under the 2006 Service Contracts; **and in addition,** such counsel shall state in his letter containing the foregoing opinion, or in a separate letter addressed to the Underwriters and dated the Closing Date, that although he has not verified and is not passing upon and assumes no responsibility for the accuracy, completeness, or fairness of the statements contained in the Offering Circular, based upon his participation in the preparation of the Offering Circular as counsel to the City, he has no reason to believe that the Offering Circular, as of its date and as of the Closing Date, contained or contains any untrue statement of a material fact or omitted or omits to state a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading (except that no opinion or belief need be expressed with respect to the financial statements and other financial and statistical data included in the Offering Circular, the information included therein relating to the Insurers or their insurance policies, the information relating to DTC, Clearstream or Euroclear and the book-entry system, or the information relating to the Disclosure Dissemination Agent).

d) the opinion of Honigman Miller Schwartz and Cohn LLP, counsel to the Underwriters, dated the Closing Date, to the effect that: (i) the COPs and the 2006 Service Contracts are exempt

from registration under the Securities Act of 1933; **(ii)** the Trust Agreement is exempt from qualification under the Trust Indenture Act of 1939, as amended; and **(iii)** the form of the Continuing Disclosure Undertaking meets the requirements of Rule 15c2-12 as to form; **and in addition,** such counsel shall state in its letter containing the foregoing opinions or in a separate letter addressed to the Underwriters that, without having undertaken to determine independently, or to assume responsibility for, the accuracy, completeness or fairness thereof, and based solely on their participation in certain meetings and conference calls at which representatives of and counsel for the City, the City's Financial Advisors, the Representative, inhouse counsel to the Representative, and Special U.S. Federal Tax Counsel were at various times present for the preparation of the Offering Circular, and in reliance on certain certificates of the Interim Finance Director and Budget Director of the City and certain opinions of Certificate Counsel, the City's Corporation Counsel, Special U.S. Federal Tax Counsel, and other counsel, and without having undertaken to determine independently the accuracy or completeness of the statements contained in the Offering Circular or the Appendices thereto as of its date and as of the date of the Closing, respectively, nothing has come to their attention which would lead them to believe that the information and statements in the Offering Circular (excluding the financial statements and the other financial, economic, demographic, and statistical data included in the Offering Circular, the information with respect to Financial Guaranty Insurance Company and XL Capital Assurance Inc. and their insurance policies, the information with respect to DTC, Euroclear, and Clearstream and the book-entry system, or the information relating to the Disclosure Dissemination Agent in the Offering Circular, as to which no view or opinion need be expressed) contained or contains any untrue statement of a material fact or omitted or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading;

e) an opinion of Bodman LLP, counsel to the Trustee and the Contract Administrator, dated the Closing Date, in form and substance satisfactory to the Representative and Certificate Counsel, with respect to: **(i)** the due authorization, execution, validity and enforceability of the Trust Agreement (as defined below) against the Trustee; **(ii)** the due authorization, execution, validity and enforceability of the Administration Agreement against the Contract Administrator; and **(iii)** the execution and delivery of and performance by the Trustee of its duties under the Trust Agreement and the execution and delivery of and performance by the Contract Administrator of its duties under the Administration Agreement not contravening its Articles of Association or Bylaws or any law of the State of Michigan or of the United States of America or any rule or regulation thereunder governing it;

f) an opinion of Mayer, Brown, Rowe & Maw LLP, as special U.S. federal tax counsel (*"Special U.S. Federal Tax Counsel"*), dated the Closing Date, addressing the United States federal income tax characterization of the Funding Trust, the Scheduled Payments and Service Charges to be received by the Funding Trust under the 2006 Service Contracts, and the income to be earned by the Service Corporations;

g) an opinion of Honigman Miller Schwartz and Cohn LLP, as special Michigan tax counsel (*"Special Michigan Tax Counsel"*), on certain State of Michigan tax considerations relating to the purchase, ownership, and disposition of the COPs;

h) an opinion of Certificate Counsel dated the Closing Date and addressed to the Swap Providers and the Hedge Guarantor (as such terms are defined below), the Underwriters, the City, and the Service Corporations, in form and substance satisfactory to the Swap Providers, the Hedge Guarantor and the Representative, substantially to the effect that: **(i)** the Hedge

Agreements have been duly authorized, executed and delivered by the Service Corporations and constitute the legal, valid and binding agreements of the Service Corporations, enforceable against each of them in accordance with their terms, except to the extent that the enforceability thereof may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, and other laws now or hereafter enacted affecting the enforcement of creditors' rights and the unavailability of equitable remedies or other application thereto of general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law); and (ii) no approval or other action is required to be obtained by either Service Corporation from any governmental authority or agency in connection with the execution by the Service Corporations of the Hedge Agreements, that has not already been obtained or taken;

i)    separate opinions of Fraser Trebilcock Davis & Dunlap, P.C. ("*Labor Counsel*"), addressed to the Underwriters, the City, the Service Corporations, the Insurers, the Trustee, Certificate Counsel and counsel to the Underwriters, dated the Closing Date, in form and substance satisfactory to the Representative and Certificate Counsel, that neither any of the Authorizing Ordinances or the Authorizing Resolution nor the City's execution, delivery and performance of either of the 2006 Service Contracts conflicts or will conflict with or constitutes or will constitute a violation or breach of or default under any of the City's existing collective bargaining agreements with any labor unions, and otherwise in form and substance satisfactory to the Representative and Certificate Counsel; provided, that (x) one such opinion shall relate to the GRS Service Contract and employee bargaining units interested in the GRS and may rely as to certain factual matters on an attached certificate signed by the acting (or interim) Labor Relations Director of the City, and shall also address certain matters concerning the resolution adopted by the GRS Board establishing a 30-year amortization period for unfunded accrued actuarial liabilities ("*UAAL*") of the GRS, while (y) the other such opinion shall relate to the PFRS Service Contract and employee bargaining units interested in the PFRS and shall not rely on any attached certificate of facts, and shall not address any matters concerning the resolution adopted on March 30, 2006 by the PFRS Board establishing a 30-year amortization period for PFRS UAAL ("*PFRS Board Amortization Resolution*");

j)    an opinion of Sullivan, Ward, Asher & Patton, P.C. ("*Special Labor Counsel*"), addressed to the Underwriters, the City, the Service Corporations, the Insurers, the Trustee, Certificate Counsel and counsel to the Underwriters, dated the Closing Date, in form and substance satisfactory to the Representative and Certificate Counsel, with respect to certain matters concerning the PFRS Board Amortization Resolution, including that the establishment of the amortization period of PFRS UAAL is not a mandatory subject of bargaining and that the unfair labor charge filed against the City by the Detroit Police Officers Association with respect to the PFRS Board Amortization Resolution is wholly without merit;

k)    opinions of the respective counsel for each Swap Provider addressed to the Underwriters, the City, the Service Corporations and the Trustee, dated the dated the Closing Date, in form and substance satisfactory to the Representative and Certificate Counsel, with respect to the due execution, validity and enforceability of the respective Stated Hedge [and the Intercreditor Agreement (as defined below)] against the respective Swap Provider;

l)    an opinion of counsel for the Hedge Guarantor, dated the Closing Date, in form and substance satisfactory to the Representative and Certificate Counsel, with respect to the due execution, validity and enforceability of the Hedge Guaranty (as defined below) against the Hedge Guarantor;

m) a certificate dated the Closing Date by the Interim Finance Director of the City to the effect that: the representations and warranties of the City contained herein are true and correct in all material respects on and as of the Closing Date with the same effect as if made on the Closing Date; and the City has complied with all agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing;

n) a certificate dated the Closing Date by the Budget Director of the City to the effect that he has reviewed the portions of Appendix B to the Offering Circular containing information provided by the Budget Department of the City, and that such portions of such Appendix B do not contain any untrue statement of a material fact or omit to state a material fact that is necessary to make the statements made, in the light of the circumstances under which they were made, not misleading;

o) a certificate dated the Closing Date by the Secretary of each Service Corporation to the effect that: the respective representations and warranties of each Service Corporation contained herein are true and correct in all material respects on and as of the Closing Date with the same effect as if made on the Closing Date; each Service Corporation has complied with all agreements and satisfied all the conditions on its part to be performed or satisfied at or prior to the Closing; and no litigation before or by any court, public board or body, other than as indicated in the Offering Circular, is pending or, to the best of his knowledge, threatened against either Service Corporation (1) affecting the creation, organization, or corporate existence of the Service Corporation or the title of its present directors and officers to their respective offices or that would affect the existence of either Service Corporation in a materially adverse way, (2) seeking to prohibit, restrain, or enjoin the execution and delivery of the 2006 Service Contracts or the issuance or delivery of the COPs, (3) in any way contesting or affecting the validity or enforceability of the 2006 Service Contracts or this Underwriting Agreement, or (4) contesting in any material respect the completeness or accuracy of the Offering Circular;

p) a certificate of an officer of the Trustee, acceptable to the Representative, dated the Closing Date, to the effect that: (i) the Trust Agreement has been duly authorized, executed, and delivered by the Trustee; and (ii) the COPs have been duly authenticated in accordance with the Trust Agreement by one or more duly authorized officers or signatories of the Trustee; and an incumbency certificate of the Trustee, in form and content acceptable to the Representative and Certificate Counsel, dated the Closing Date, with respect to the officers or other signatories of the Trustee who have executed, authenticated, and delivered the COPs, the Trust Agreement, and all other transaction documents to be signed by the Trustee;

q) a certificate of an officer of the Contract Administrator, acceptable to the Representative, dated the Closing Date, to the effect that the Administration Agreement has been duly authorized, executed, and delivered by the Contract Administrator; and an incumbency certificate of the Contract Administrator, in form and content acceptable to the Representative and Certificate Counsel, dated the Closing Date, with respect to the officers or other signatories of the Contract Administrator who have executed, authenticated, and delivered the Administration Agreement and all other transaction documents to be signed by the Contract Administrator;

r) letters from Standard & Poor's Rating Services, Moody's Investors Service, Inc. and Fitch Ratings, (i) rating the COPs "AAA," "Aaa," and "AAA," respectively, based on the Certificate Insurance, which ratings remain in effect on the Closing Date, and (ii) assigning underlying ratings (the ratings that would apply if the Insurers' insurance policies were not

issued) to the COPs of "BBB-," "Baa2" and "BBB," respectively; and a letter from Moody's Investors Service, Inc. assigning a corporate equivalent rating to the COPs of "Aa2";

s) executed counterparts of the Trust Agreement, the 2006 Service Contracts, the Administration Agreement, the Continuing Disclosure Undertaking, and the Disclosure Dissemination Agreement executed by the parties thereto, and specimens of the COPs;

t) the Offering Circular, executed on behalf of each Corporation and the City by a duly authorized officer thereof;

u) Michigan UCC-1 financing statements executed by each Service Corporation, as debtor, covering the Funding Trust Receivables under the related 2006 Service Contract;

v) Michigan UCC-1 financing statements executed by each Service Corporation, as debtor, covering the Hedge Receivables under the related 2006 Service Contract;

w) a copy of the following: the Articles of Incorporation of each Service Corporation, as amended, certified by the Director of the Bureau of Commercial Services of the Department of Labor and Economic Growth of the State as of a date not more than ten business days prior to the Closing Date; and copies of the Bylaws of the each Service Corporation as amended through the Closing Date, and of the resolutions of the Board of Directors of each Service Corporation authorizing the execution and delivery of the Trust Agreement, the Service Corporation's 2006 Service Contract, any Hedge Agreements, and this Underwriting Agreement, all certified by the Secretary or another authorized officer of such Service Corporation;

x) executed counterparts of: (A) all Hedge Agreements between (i) between each Service Corporation and UBS AG, as the swap provider counterparty, and (ii) between each Service Corporation and Siebert Financial Products, as swap provider counterparty (and together with UBS AG, the "*Swap Providers*"); (B) the Transaction Transfer Agreement(s) among SBS Financial Products Company, LLC, each Service Corporation and Merrill Lynch Capital Services, Inc.; (C) the guaranty agreement(s) of Merrill Lynch & Co. (the "*Hedge Guarantor*") with respect to the Hedge Agreements with Siebert Financial Products (collectively, the "*Hedge Guaranty*")[; and (D) the Intercreditor Agreement among the Swap Providers (the "*Intercreditor Agreement*")];

y) a certified copy of (i) the Certificate Insurance policy of Financial Guaranty Insurance Company respecting the FGIC-Insured COPs and (ii) the Certificate Insurance policy of XL Capital Assurance Inc. respecting the XLCA-insured COPs, and any other documents executed in connection therewith;

z) a certified copy of (i) the swap agreement insurance policy of Financial Guaranty Insurance Company respecting certain Stated Hedges and (ii) the swap agreement policy of XL Capital Assurance Inc. respecting certain Stated Hedges, and any other documents executed in connection therewith;

aa) an opinion of (i) counsel to Financial Guaranty Insurance Company and (ii) counsel to XL Capital Assurance Inc., each dated the Closing Date, addressed to the Underwriters, and in form and substance satisfactory to the Representative; and

bb) a certificate of (i) Financial Guaranty Insurance Company and (ii) XL Capital Assurance Inc., each dated the Closing Date, signed by an authorized officer of such insurer, and to the effect

that the information with respect to such insurer contained in APPENDIX E or F (as applicable) to the Offering Circular (and additionally, in the certificate of XL Capital Assurance Inc., contained under the caption "CERTIFICATE INSURANCE" in the Offering Circular) is true and correct in all material respects, and that the specimen of the certificate insurance policy contained in APPENDIX E or F (as applicable) to the Offering Circular is a true and correct specimen of the policy being issued by such insurer with respect to the FGIC-insured COPs or the XLCA-insured COPs (as applicable).

If the Issuer, the Service Corporations, or the City shall be unable to satisfy the conditions to the obligations of the Underwriters contained in this Underwriting Agreement, or if the obligations of the Underwriters shall be terminated for any reason permitted by this Underwriting Agreement, this Underwriting Agreement shall terminate and neither the Underwriters nor the Issuer, the Service Corporations, or the City shall have any further obligations hereunder, except as provided in Sections M. and Q. hereof. However, the Representative may in its discretion waive one or more of the conditions imposed by this Underwriting Agreement for the protection of the Underwriters and proceed with the Closing.

M. Payment of Expenses.

   1. The Underwriters shall be under no obligation to pay, and the Issuer shall pay from available funds or direct the Trustee under the Trust Agreement to pay from the proceeds of the COPs (to the extent permitted under applicable law), and otherwise the City shall pay pursuant to the 2006 Service Contracts, certain expenses set forth in this Section that are incidental to the performance of the Issuer's, the Service Corporations', and the City's obligations hereunder, including but not limited to: all expenses in connection with the printing of the Preliminary Offering Circular, the Offering Circular, and any amendment or supplement to either thereof; all expenses in connection with the printing, issuance, and delivery of the COPs; all premiums for the Certificate Insurance; fees and disbursements of Certificate Counsel, Special Tax Counsel, Labor Counsel, Special Labor Counsel, Financial Guaranty Insurance Company and its counsel, XL Capital Assurance Inc. and its counsel, and auditors; the fees and disbursements of the Trustee and its counsel; all expenses in connection with obtaining a rating or ratings for the COPs; all expenses of the Issuer in connection with the preparation, printing, execution, and delivery, and any recording or filing required by Certificate Counsel, of the Trust Agreement, the Continuing Disclosure Undertaking, the 2006 Service Contracts, the Administration Agreement, this Underwriting Agreement, and any Michigan Uniform Commercial Code financing statements or notices with respect thereto; the Issuer's administrative fees; all fees and expenses in connection with any interest rate swap agreement and related transactions; all fees and expenses in connection with listing the COPs on the Luxembourg Stock Exchange; and all other expenses and costs of the Issuer incident to its obligations in connection with the authorization, issuance, sale, and distribution of the COPs.

   2. The Representative shall pay the costs of qualifying the COPs for sale in various states chosen by the Representative, all advertising expenses in connection with the public offering of the COPs, and all other expenses incurred by it or the other Underwriters in connection with the public offering and distribution of the COPs, including the fees and disbursements of their counsel.

N. Blue Sky Qualification. The Service Corporations and the City agree to cooperate, and the Service Corporations agree to cause the Issuer to cooperate, with the Underwriters and their counsel in any endeavor to qualify the COPs for offering and sale under the securities or blue sky laws of such jurisdictions within or outside the United States as the Representative may request; provided, that neither the Issuer, either Service Corporation nor the City shall be required to qualify as a foreign entity or corporation in, or to submit to the general jurisdiction of, any other state or nation. The

Service Corporations and the City consent, and the Service Corporations agree to cause the Issuer to consent, to the use of the Preliminary Offering Circular and the Offering Circular by the Representative in obtaining such qualification.

O. <u>Notices</u>. All notices provided for in this Underwriting Agreement shall be made in writing either by actual delivery of the notice into the hands of the parties entitled thereto, by confirmed facsimile transmission, or by sending the notice by air courier or mailing by certified or registered mail, return receipt requested, in the United States mail to the address as stated below (or at such other address as may have been designated by written notice) of the party entitled thereto. The notice shall be deemed to be received: in case of actual delivery, on the date of its actual receipt by the party entitled thereto; in case of delivery by facsimile, on the date receipt is confirmed; in case of delivery by air courier, on the date of delivery; and in case of mailing, on the date of receipt by United States mail, postage prepaid. All communications hereunder, except as herein otherwise specifically provided, shall be in writing and mailed or delivered at the following address:

If to the City, to:

>   City of Detroit
>   1200 Coleman A. Young Municipal Center
>   Detroit, Michigan 48226
>   Attention: Interim Finance Director

If to the GRS Service Corporation, to:

>   Detroit General Retirement System Service Corporation
>   1200 Coleman A. Young Municipal Center
>   Detroit, Michigan 48226
>   Attention: President

If to the PFRS Service Corporation, to:

>   Detroit Police and Fire Retirement System Service Corporation
>   1200 Coleman A. Young Municipal Center
>   Detroit, Michigan 48226
>   Attention: President

If to the Underwriters, to:

>   UBS Securities LLC
>   1285 Avenue of the Americas, 15th Floor
>   New York, New York 10019
>   Attention: Jeffrey M. Scruggs, Managing Director

P. <u>Governing Law</u>. This Underwriting Agreement shall be governed by and construed in accordance with the laws of the State of Michigan.

Q. <u>Miscellaneous</u>. This Underwriting Agreement is made solely for the benefit of the signatories hereto (including the successors or assigns of the Underwriters) and no other person shall acquire or have any right hereunder or by virtue hereof. The term "successor" shall not include any holder of any COPs merely by virtue of such holding. All representations, warranties and agreements contained in

this Underwriting Agreement shall remain operative and in full force and effect, regardless of delivery of and payment for the COPs, and any termination of this Underwriting Agreement.

(the rest of this page intentionally left blank)

R. **Counterparts**.  This Underwriting Agreement may be executed in counterparts with the same force and effect as if all signatures appeared on a single instrument.

Very truly yours,

UBS SECURITIES LLC, on behalf of itself and as Representative of the other underwriters listed in Appendices I and II hereto

By: _____
Jeffrey M. Scruggs
Title:  Managing Director

By: _____
Freda J. Wang
Title:  Managing Director

ACCEPTED:

CITY OF DETROIT, MICHIGAN

By: _____
Roger Short
Title:  Interim Finance Director

DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
Roger Short
Title:  President

DETROIT POLICE AND FIRE RETIREMENT SYSTEM SERVICE CORPORATION

By: _____
Roger Short
Title:  President

24

**APPENDIX I**
to
Underwriting Agreement

Listed below are all of the underwriters with respect to the
Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A
(the "*Series A Underwriters*")

UBS Securities LLC.
Siebert Brandford Shank & Co., LLC
Bear, Stearns & Co. Inc.
Citigroup Global Markets
M.R. Beal & Company
Popular Securities, Inc.

**APPENDIX II**
to
Underwriting Agreement

Listed below are all of the underwriters with respect to the
Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B
(the *"Series B Underwriters"*)

UBS Securities LLC.
Siebert Brandford Shank & Co., LLC

DETROIT.2071071.7