# REVISED CONFIRMATION

## (Police and Fire Retirement System/Syncora)

To:     Detroit Police and Fire Retirement System Service Corporation
Detroit, Michigan
Attention: Norman L. White

Date:   June 26, 2009

Our Reference No. SBSFPC-0011

      The purpose of this letter agreement (the "Revised Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between us on the Trade Date specified below. This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

      The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between the Definitions and this Revised Confirmation, this Revised Confirmation will govern. Each party represents and warrants to the other that (i) it is duly authorized to enter into this Transaction and to perform its obligations hereunder, (ii) the Transaction and the performance of its obligations hereunder do not violate any material obligation of such party, and (iii) the person executing this Revised Confirmation is duly authorized to execute and deliver it.

      **1.**     This Revised Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement between us, dated May 25, 2005, as amended and supplemented from time to time (the "Agreement"). All provisions contained in the Agreement govern this Revised Confirmation except as expressly modified below.

      **2.**     The terms of the particular Transaction to which this Revised Confirmation relates are as follows:

| | |
|---|---|
| Party A: | SBS Financial Products Company, LLC |
| Party B: | Detroit Police and Fire Retirement System Service Corporation |
| Insurer | Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.) ("Insurer") |
| Notional Amount: | Initially $104,325,500, thereafter amortizing as set forth on Exhibit A hereto. |
| Trade Date: | June 7, 2006 |
| Effective Date: | June 12, 2006 |

| | |
|---|---|
| Termination Date: | June 15, 2029, or such earlier date upon which the Agreement terminates. |
| Business Days | New York and London |
| FIXED AMOUNTS: | |
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Business Day Convention specified below. |
| Period End Dates: | March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, with No Adjustment. |

Fixed Rate:

| From and Including | To and Excluding | Rate (per annum) |
|---|---|---|
| Effective Date | June 15, 2007 | 4.991% |
| June 15, 2007 | June 15, 2008 | 5.666% |
| June 15, 2008 | July 1, 2010 | 6.223% |
| July 1, 2010 | Termination Date | 6.323% |

| | |
|---|---|
| Fixed Rate Day Count Fraction: | 30/360 |
| Business Day Convention: | Preceding. |
| FLOATING AMOUNTS: | |
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the |

2

Preceding Business Day Convention.

| | |
|---|---|
| Floating Rate Option: | USD – LIBOR – BBA. |
| Period End Dates: | Each March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Designated Maturity: | Three Months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply |
| Method of Averaging: | Inapplicable. |
| Spread: | 0.300 percent per annum. |
| Reset Date: | Initially, the Effective Date and thereafter, on each March 15, June 15, September 15 and December 15, from and including the September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Compounding: | Inapplicable. |

### 3.   Swap Advisor Fees

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of Party B, a fee of USD 78,389.35 is being paid by Party A in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by Party B hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the 2006 Pension Funding Securities |

OHS East:160571631.5

4. **Account Details**

    **Payments to Party A:**
    Account for payments in USD:
    Favour: Deutsche Bank, NY
    ABA/Bank No.: 021-001-033
    Account No.: 01419647
    Reference: SBS Swap
    Attention: Safet Kalabovic

    **Payments to Party B:**
    ABA=U.S. BANK, Minneapolis
    (091000022)
    FBO=FOR FURTHER CREDIT
    TO U.S. BANK, N.A.
    AC=180121167365
    REF: Detroit COPS GRS
    Trust #: 794367002
    Contact: Jill Ling 651-495-3712

5. **Optional Termination.** With the prior consent of the Insurer, Party B shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to Party A of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by Party A, shall be payable by Party A or the Party B, as the case may be, in respect of such termination. If such amount is not acceptable to Party B, then Party A shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Party B is the sole Affected Party. For purposes of the Transaction Transfer Agreement by and between Party A, Party B and Merrill Lynch Capital Services, Inc., as Credit Support Provider of Party A, dated as of May 25, 2005 (the "Transaction Transfer Agreement"), any partial optional termination pursuant to this Paragraph 5 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

6. **Adjustment Event** If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

    (a) the term "Related Principal Amount" means Party A's Swap Percentage of Party B's Allocable Share of the aggregate principal amount of the outstanding Syncora-Insured Floating Rate Certificates;

(b)     the term "Party A's Swap Percentage" means at any time 50 percent;

(c)     the term "Party B's Allocable Share" means (1) the outstanding Regular Scheduled Payments to be made by Party B in respect of Syncora-Insured Floating Rate Certificates divided by (2) the sum of such Regular Scheduled Payments to be made by Party B and the outstanding Regular Scheduled Payments to be made by Detroit Police and Fire Retirement System Service Corporation in respect of Syncora-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "Syncora-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.).

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by Party A as if (i) a Termination Event occurred in respect of Party B, (ii) Party B was the only Affected Party with respect to such Termination Event, Party A was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the Related Principal Amount on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having Party A provide a single quotation, provided, however, if Party B disputes such quotation, Party A shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Party B will pay an amount equal to such Adjustment Payment to Party A; if an Adjustment Payment is a negative number, Party A will pay an amount equal to the absolute value of such Adjustment Payment to Party B. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Party B will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A and the Swap Insurer that (i) such Adjustment Payment will be made by Party B on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Party B to be in violation of, or in default under the documentation relating to the 2006 Pension Funding Securities.

(g)     For purposes of the Transaction Transfer Agreement, an Adjustment Event pursuant to this Paragraph 6 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

7.     **Relationship between Parties** Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a)     Non-Reliance. Each party is acting for its own account, and has made its own

5

independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b)     Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c)     Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

**8.     Risk Considerations**.

Party B acknowledges receipt from Party A, at or prior to the time of Party B's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

**9.     Custodian**.

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

[SIGNATURE PAGE FOLLOWS]

OHS East:160571631.5

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

SBS FINANCIAL PRODUCTS COMPANY,
LLC, a Delaware limited liability company

By: _____

Name: John Carter
Title: President

Accepted and Confirmed as of the
date first above written:

DETROIT POLICE AND FIRE
RETIREMENT SYSTEM SERVICE CORPORATION

By: _____

Name: Norman L. White
Title: President

Detroit Police (Syncora)/Revised Confirmation Letter

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By:_____
    Name:
    Title:

Accepted and Confirmed as of the
date first above written:g

**DETROIT POLICE AND FIRE
RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
    Name: Norman L. White
    Title: President

**Exhibit A**

| Period Start Date (From and Including) | Period End Date (Unadjusted, to and Excluding) | Outstanding Notional During Period |
|---|---|---|
| Effective Date | June 15, 2019 | 104,325,500 |
| June 15, 2019 | June 15, 2020 | 97,011,000 |
| June 15, 2020 | June 15, 2021 | 90,109,000 |
| June 15, 2021 | June 15, 2022 | 83,685,500 |
| June 15, 2022 | June 15, 2023 | 77,801,500 |
| June 15, 2023 | June 15, 2024 | 72,532,500 |
| June 15, 2024 | June 15, 2025 | 67,957,500 |
| June 15, 2025 | June 15, 2026 | 64,161,500 |
| June 15, 2026 | June 15, 2027 | 44,825,500 |
| June 15, 2027 | June 15, 2028 | 24,286,500 |
| June 15, 2028 | Termination Date | 2,469,500 |

A-1

**EXHIBIT G**

Revised Confirmation between UBS and GRS

 **UBS**

| | |
|---|---|
| Date: | 26 June 2009 |
| To: | Detroit General Retirement System Service Corporation ("Counterparty") |
| Attn: | Norman L. White, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref:     37380291 |
| | Counterparty Ref:   GRS - Syncora |

Dear Mr. Short:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Revised Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 7 June 2006, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Revised Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Revised Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Revised Confirmation, this Revised Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between of the definitions listed above and this Revised Confirmation, this Revised Confirmation will govern.

The terms of the particular Swap Transaction to which this Revised Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Insurer: | Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.) |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2029 |
| Notional Amount: | Initially USD 45,252,000 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

OHS East:160571729.5

**Fixed Amounts**

Fixed Rate Payer:        Counterparty

Fixed Rate:          In accordance with the following schedule:

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | 1 July 2010 | 6.223 |
| 1 July 2010 | Termination Date | 6.323 |

Fixed Rate Day Count Fraction:   30/360

Fixed Rate Payer Payment Dates:  Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:       Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer:      UBS AG

Floating Rate Option:     USD-LIBOR-BBA

Designated Maturity:     Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply

Spread:          Plus 30 Basis Points

Floating Rate Day Count Fraction:  Actual/360

Floating Rate Payer Payment Dates: Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:       Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates:        Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in accordance with the Modified

OHS East:160571729.5

UBS AG Ref  **37380291**               Page 2
C/P Ref:    GRS - Syncora

13-53846-tjt  Doc 3153-24  Filed 03/21/14  Entered 03/21/14 23:44:31  Page 12 of 39

Following Business Day Convention.

Compounding:                                   Inapplicable

## Amortization Schedule

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2025 | 45,252,000 |
| 15-Jun-2025 | 15-Jun-2026 | 45,252,000 |
| 15-Jun-2026 | 15-Jun-2027 | 32,022,500 |
| 15-Jun-2027 | 15-Jun-2028 | 17,969,000 |
| 15-Jun-2028 | Termination Date | 3,040,500 |

## Optional Termination by Counterparty

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.\

## Adjustment Event

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding Syncora Insured Floating Rate Certificates;

(b)     the term "UBS AG's Swap Percentage" means at any time 50 percent;

(c)     the term "Counterparty's Allocable Share" means (1) the total Regular Scheduled Payments to be made by Counterparty in respect of Syncora Insured Floating Rate Certificates divided by (2) the total Regular Scheduled Payments to be made by Counterparty and Detroit Police and Fire Retirement System Service Corporation in respect of Syncora Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "Syncora-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.)

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined

OHS East:160571729.5

by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 36,273.25 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the Related Certificates |

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

OHS East:160571729.5

---

(b)  Assessment and Understanding.  Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c)  Status of the Parties.  Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

## Custodian

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

## Account Details

UBS Account Details

Account for payments in USD:
| | |
|---|---|
| Bank: | UBS AG, Stamford |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No.: | 091000022 |
| Account No.: | 180121167365 |
| Ref: | Detroit COPS GRS |
| Trust #: | 789710000 |
| Contact: | Jill Ling 651-495-3712 |

## Offices

The office of UBS AG for the Swap Transaction is Stamford, CT;  and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

| | | |
|---|---|---|
| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |

OHS East:160571729.5

Address:                UBS AG
677 Washington Boulevard
Stamford, CT 06901

[Intentionally left blank.  Signature page follows.]

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491.**

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By _Marie-Anne Clarke_                    By _[signature]_

Name :       Marie-Anne Clarke          Name:       James B. Fuqua
Title:       Executive Director and Counsel   Title :      Managing Director and Counsel
             Region Americas Legal                       Region Americas Legal
             Fixed Income Section

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name        Norman L. White
Title :     President

---

UBS AG Ref    **37380291**                                            Page 7
C/P Ref:      GRS - Syncora

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                                          By




Name :                                                    Name:
Title:                                                      Title :


Acknowledged and agreed by the Detroit General Retirement System Service Corporation as of the Trade Date specified above:

By:

Name          Norman L. White
Title :          President

---

UBS AG Ref        **37380291**                                                          Page 7
C/P Ref:           GRS - Syncora

**EXHIBIT H**

Revised Confirmation between UBS and PFRS

 **UBS**

| | |
|---|---|
| Date: | 26 June 2009 |
| To: | Detroit Police and Fire Retirement System Service Corporation ("Counterparty") |
| Attn: | Norman L. White, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref: 37380351 |
| | Counterparty Ref: PFRS - Syncora |

Dear Mr. White:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Revised Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Revised Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Revised Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Revised Confirmation, this Revised Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between of the definitions listed above and this Revised Confirmation, this Revised Confirmation will govern.

The terms of the particular Swap Transaction to which this Revised Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Insurer: | Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.) |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2029 |
| Notional Amount: | Initially USD 104,325,500 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

OHS East:160571704.5

**Fixed Amounts**

Fixed Rate Payer:    Counterparty

Fixed Rate:    In accordance with the following schedule:

| From<br>(and including) | To<br>(but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | 1 July 2010 | 6.223 |
| 1 July 2010 | Termination Date | 6.323 |

Fixed Rate Day Count Fraction:    30/360

Fixed Rate Payer Payment Dates:    Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer:    UBS AG

Floating Rate Option:    USD-LIBOR-BBA

Designated Maturity:    Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply.

Spread:    Plus 30 Basis Points

Floating Rate Day Count Fraction:    Actual/360

Floating Rate Payer Payment Dates:    Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2029, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:    Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates:    Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in

OHS East:160571704.5

accordance with the Modified Following Business Day Convention.

Compounding:             Inapplicable

**Amortization Schedule**

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2019 | 104,325,500 |
| 15-Jun-2019 | 15-Jun-2020 | 97,011,000 |
| 15-Jun-2020 | 15-Jun-2021 | 90,109,000 |
| 15-Jun-2021 | 15-Jun-2022 | 83,685,500 |
| 15-Jun-2022 | 15-Jun-2023 | 77,801,500 |
| 15-Jun-2023 | 15-Jun-2024 | 72,532,500 |
| 15-Jun-2024 | 15-Jun-2025 | 67,957,500 |
| 15-Jun-2025 | 15-Jun-2026 | 64,161,500 |
| 15-Jun-2026 | 15-Jun-2027 | 44,825,500 |
| 15-Jun-2027 | 15-Jun-2028 | 24,286,500 |
| 15-Jun-2028 | Termination Date | 2,469,500 |

**Optional Termination by Counterparty**

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

**Adjustment Event**

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

    (a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding Syncora-Insured Floating Rate Certificates;

    (b)     the term "UBS AG's Swap Percentage" means at any time **50 percent**;

    (c)     the term "Counterparty's Allocable Share" means (1) the total Scheduled Payments (as such term is defined in the PFRS Service Contract 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City of Detroit) to be made by Counterparty in respect of Syncora-Insured Floating Rate Certificates divided by (2) the total Scheduled Payments to be made by Counterparty and Detroit General Retirement System Service Corporation in respect of Syncora-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Scheduled Payments in connection with the circumstances of the Adjustment Event; and

OHS East:160571704.5

(d)    the term "Syncora-Insured Floating Rate Certificates" means any Detroit Retirement System Funding Trust 2006 Taxable Certificates of Participation Series 2006-B (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc.).

(e)    Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number UBS AG will pay an amount equal to the absolute value of such Adjustment Payment' to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)    Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

**Swap Advisor Fee**

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 78,389.35 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the Related Certificates |

OHS East:160571704.5

13-53846-tjt   Doc 3153-24   Filed 03/21/14   Entered 03/21/14 23:44:31   Page 23 of 39

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms; conditions and risks of this Transaction Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

## Custodian

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

## Account Details

UBS Account Details

Account for payments in USD:
| | |
|---|---|
| Bank: | UBS AG, Stamford |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No.: | 091000022 |
| Account No.: | 180121167365 |
| Ref: | Detroit COPS PFRS |

OHS East:160571704.5

UBS AG Ref 37380351
C/P Ref: PFRS - Syncora

Trust #:                              789710000
Contact:                              Jill Ling 651-495-3712

**Offices**

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

| | | |
|---|---|---|
| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank.  Signature page follows.]

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By *Marie-Anne Clarke*                    By

Name :     Marie-Anne Clarke                Name:     James B. Fuqua
Title:       Executive Director and Counsel     Title :    Managing Director and Counsel
             Region Americas Legal                        Region Americas Legal
             Fixed Income Section

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name      Norman L. White
Title :     President

---

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                                    By

Name :                                              Name:
Title:                                               Title :

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name       Norman L. White
Title :      President

**EXHIBIT I**

Amendment to the Detroit General Retirement System Service Contract

# First Amendment to GRS Service Contact 2006

## THIS AMENDMENT IS ENTERED INTO FOR SETTLEMENT PURPOSES

**First Amendment to GRS Service Contract 2006** (the *Amendment*), dated as of June 15, 2009, between the **Detroit GRS Retirement System Service Corporation**, a Michigan nonprofit corporation (the *Service Corporation*), and the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the *City*),

## W I T N E S S E T H:

**Whereas**, the Service Corporation entered into the GRS Service Contract 2006, dated as of June 7, 2006 (the *Service Contract*), with the City as part of the 2006 Transaction (the *2006 Transaction*) described in Ordinance No. 05-09 (the *Authorizing Ordinance*) undertaken by the City as part of its Pension System Funding Program (the *Pension System Funding Program*) described therein;

**Whereas**, also as part of the 2006 Transaction the Service Corporation entered into certain interest rate swap agreements (each, a *2006 Hedge* and collectively, the *2006 Hedges*) with **UBS AG** (*UBS*), **SBS Financial Products Company, LLC** (*SBS* and collectively with UBS, the *2006 Counterparties*) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS as part of the 2006 Transaction;

**Whereas**, the Service Contract, among other things, provided for the City to make payments to the Service Corporation sufficient to pay amounts owing by the Service Corporation under the 2006 Hedges;

**Whereas**, in January 2009, the 2006 Counterparties notified the City and the Service Corporation that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the *2006 Additional Termination Event*) under the 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties;

**Whereas**, this amendment to the Service Contract is one of the documents contemplated by the Authorizing Ordinance;

**Whereas**, the Corporation was created as part of the Pension System Funding Program to reduce the City's burdens of government by meeting and managing the City's obligations under the Michigan Constitution to maintain the actuarial integrity of the GRS Retirement System of the City of Detroit (the *GRS Retirement System*), in respect of which the Corporation was established;

**Whereas**, the declaration of the 2006 Additional Termination Event would substantially impair the City's ability to meet its constitutional obligations with respect to the GRS Retirement System;

**Now, Therefore**, in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the date on which the transaction of which this Amendment is a part closes (the *Closing Date*), and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

## Section 1. Definitions

Capitalized terms not defined in this Amendment and defined in the Service Contract are used herein as therein defined.

## Section 2. Amendments to Service Contract

(a) Amendments to Section 1.01 of the General Terms

(1) The following definition is added to Section 1.01 of the General Terms in proper alphabetical order:

*Collateral Agreement* means the Collateral Agreement, dated as of June 15, 2009, among the City, the Corporation and the other parties thereto.

(2) The definition of "Service Payment" appearing in Section 1.01 of the General Terms is amended by adding the language indicated thus and as amended shall read as follows:

*Service Payment* means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require. *Service Payment* does not include any amounts payable or paid under the Collateral Agreement.

(3) The definition of "Stated Hedge" appearing in Section 1.01 of the General Terms is amended to read as follows:

*Stated Hedge* means a Hedge identified in the Specific Terms as a "Stated Hedge" as amended by the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

(b) Amendments to Section 7.02 of the General Terms

Section 7.02 of the General Terms is amended by adding the subsection designation and language indicated thus and as amended shall read as follows:

2

### Section 7.02 Hedge Payables

(a) The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

(b) The City's obligation to pay the amount of any Hedge Payable to the Corporation includes an obligation to pay to the Corporation the amount of any interest, enforcement costs or expenses and indemnification payments for which the Corporation may be liable to the Hedge Counterparty or any successor under the Stated Hedge or the Collateral Agreement.

(c) The City shall receive a credit for any Hedge Payable to the extent of any amount paid in respect of such Hedge Payable under the Collateral Agreement.

## Section 3. Validity of Amendments

The validity of the amendments set forth in **Section 2** hereof are subject to Section 9.05 of the General Terms.

## Section 4. Ratification of Service Contract

The Service Contract as amended by **Section 2** hereof is ratified and confirmed.

## Section 5. Governing Law

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

## Section 6. Headings

The Section and subsection headings herein are included for convenience of reference only and do not constitute a part of the this Amendment for any other purpose.

## Section 7. Counterparts

This Amendment may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

**In Witness Whereof,** the parties hereto have set their respective hands on the date first set forth above.

*[Signatures appear on pages S-1 et seq.]*

3

**City of Detroit,**

By _____

Norman L. White
Finance Director

S-1

*[[Signature Page to the First Amendment to the XRS Service Contract 2006 between the City of Detroit and the GRS Retirement System Service Corporation]*

**GRS Retirement System Service Corporation**

By _____

Norman L. White
President

S-2

**EXHIBIT J**

Amendment to the Detroit Police and Fire Retirement System Service Contract

# First Amendment to PFRS Service Contact 2006

## THIS AMENDMENT IS ENTERED INTO FOR SETTLEMENT PURPOSES

**First Amendment to PFRS Service Contract 2006** (the *Amendment*), dated as of June 15, 2009, between the **Detroit PFRS Retirement System Service Corporation**, a Michigan nonprofit corporation (the *Service Corporation*), and the **City of Detroit**, a municipal corporation organized and existing under the laws of the State of Michigan (the *City*),

## W I T N E S S E T H:

**Whereas**, the Service Corporation entered into the PFRS Service Contract 2006, dated as of June 7, 2006 (the *Service Contract*), with the City as part of the 2006 Transaction (the *2006 Transaction*) described in Ordinance No. 05-09 (the *Authorizing Ordinance*) undertaken by the City as part of its Pension System Funding Program (the *Pension System Funding Program*) described therein;

**Whereas**, also as part of the 2006 Transaction the Service Corporation entered into certain interest rate swap agreements (each, a *2006 Hedge* and collectively, the *2006 Hedges*) with **UBS AG** (*UBS*), **SBS Financial Products Company, LLC** (*SBS* and collectively with UBS, the *2006 Counterparties*) and **Merrill Lynch Capital Services, Inc.**, as credit support provider to SBS as part of the 2006 Transaction;

**Whereas**, the Service Contract, among other things, provided for the City to make payments to the Service Corporation sufficient to pay amounts owing by the Service Corporation under the 2006 Hedges;

**Whereas**, in January 2009, the 2006 Counterparties notified the City and the Service Corporation that they believed that an event had occurred which entitled them to declare a certain "additional termination event" (the *2006 Additional Termination Event*) under the 2006 Hedges;

**Whereas**, the declaration of the 2006 Additional Termination Event could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations in the range, estimated in January 2009, of $300 million to $400 million;

**Whereas**, the City Council adopted the Authorizing Ordinance on May 26, 2009, in contemplation of settlement with the Counterparties;

**Whereas**, this amendment to the Service Contract is one of the documents contemplated by the Authorizing Ordinance;

**Whereas**, the Corporation was created as part of the Pension System Funding Program to reduce the City's burdens of government by meeting and managing the City's obligations under the Michigan Constitution to maintain the actuarial integrity of the PFRS Retirement System of the City of Detroit (the *PFRS Retirement System*), in respect of which the Corporation was established;

**Whereas**, the declaration of the 2006 Additional Termination Event would substantially impair the City's ability to meet its constitutional obligations with respect to the PFRS Retirement System;

**Now, Therefore**, in exchange for a waiver of the rights of each Counterparty to declare the 2006 Additional Termination Event and for a rescission of any declaration of the 2006 Additional Termination Event by a Counterparty made through the date on which the transaction of which this Amendment is a part closes (the **Closing Date**), and in the interest of avoiding fees and expenses of litigation and the delays that would result should litigation ensue, the parties hereto agree as follows:

## Section 1. Definitions

Capitalized terms not defined in this Amendment and defined in the Service Contract are used herein as therein defined.

## Section 2. Amendments to Service Contract

(a) Amendments to Section 1.01 of the General Terms

(1) The following definition is added to Section 1.01 of the General Terms in proper alphabetical order:

*Collateral Agreement* means the Collateral Agreement, dated as of June 15, 2009, among the City, the Corporation and the other parties thereto.

(2) The definition of "Service Payment" appearing in Section 1.01 of the General Terms is amended by adding the language indicated thus and as amended shall read as follows:

*Service Payment* means any Contract Administrator Payment, Service Charge (regardless of Funding Rate Methodology), Regular Scheduled Payment or Sinking Fund Installment, amounts in respect of any Hedge Payable, Optional Prepayment or Accrued Service Charge as the context may require. *Service Payment* does not include any amounts payable or paid under the Collateral Agreement.

(3) The definition of "Stated Hedge" appearing in Section 1.01 of the General Terms is amended to read as follows:

*Stated Hedge* means a Hedge identified in the Specific Terms as a "Stated Hedge" as amended by the amendments to the 2006 Hedges with an effective date that corresponds to the Closing Date.

(b) Amendments to Section 7.02 of the General Terms

Section 7.02 of the General Terms is amended by adding the subsection designation and language indicated thus and as amended shall read as follows:

2

### Section 7.02 Hedge Payables

(a) The City agrees to pay the amount of any Hedge Payable to the Corporation promptly upon receipt of notice thereof from the Corporation; *provided* that the City is not required to pay such amount before the Payment Time on the day before the due date of the particular Hedge Payable.

(b) The City's obligation to pay the amount of any Hedge Payable to the Corporation includes an obligation to pay to the Corporation the amount of any interest, enforcement costs or expenses and indemnification payments for which the Corporation may be liable to the Hedge Counterparty or any successor under the Stated Hedge or the Collateral Agreement.

(c) The City shall receive a credit for any Hedge Payable to the extent of any amount paid in respect of such Hedge Payable under the Collateral Agreement.

## Section 3. Validity of Amendments

The validity of the amendments set forth in **Section 2** hereof are subject to Section 9.05 of the General Terms.

## Section 4. Ratification of Service Contract

The Service Contract as amended by **Section 2** hereof is ratified and confirmed.

## Section 5. Governing Law

The rights and obligations of the parties hereunder shall be governed by and construed in accordance with the law of the State of Michigan exclusive of its conflicts of law rules.

## Section 6. Headings

The Section and subsection headings herein are included for convenience of reference only and do not constitute a part of the this Amendment for any other purpose.

## Section 7. Counterparts

This Amendment may be executed in multiple counterparts, *but* all such counterparts taken together shall evidence by one and the same original.

**In Witness Whereof,** the parties hereto have set their respective hands on the date first set forth above.

*[Signatures appear on pages S-1 et seq.]*

3

**City of Detroit,**

By _____

Norman L. White
Finance Director

S-1

*[[Signature Page to the **First Amendment to the XRS Service Contract 2006** between the **City of Detroit** and the **PFRS Retirement System Service Corporation**]*

**PFRS Retirement System Service Corporation**

By _____

Norman L. White
President