# EXHIBIT S

**Exhibit Q**

**Ordinance No. 05-09**

# TRUE COPY CERTIFICATE

Form C of D—16-CE

STATE OF MICHIGAN,
   City of Detroit } ss.

## CITY CLERK'S OFFICE, DETROIT

I,     *Janice M. Winfrey*     , City Clerk of the City of Detroit, in said

**ORDINANCE**

State, do hereby certify that the annexed paper is a TRUE COPY OF_____

adopted (passed) by the City Council at session of

_____ May 26, _____ 20__ 09

and approved by Mayor

_____ June 3, _____ 20__ 09

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid;
that I have compared the same with the original, and the same is a correct transcript therefrom, and of the
whole of such original.

In Witness Whereof, I have hereunto set my hand
and affixed the corporate seal of said City, at

Detroit, this_____ 26th _____

day of_____ June _____ 'A.D. 20__ 09

CITY CLERK

CITY OF DETROIT
FINANCE DEPARTMENT
ADMINISTRATION

MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1200
DETROIT, MICHIGAN 48226
PHONE 313·224·3491
FAX 313·224·4466
WWW.DETROITMI.GOV

May 5, 2009

Honorable City Council:

Re:    Ordinance with regard to Pension Funding Program

The Proposed Ordinance will add a new article to Chapter 18 with regard to the Pension Funding Program initiated by Ordinances Nos. 03-05 and 05-05.

The ordinance authorizes a settlement with the swap counterparties in connection with certain interest rate swap agreements; pledges wagering taxes and certain payments receivable by the City under revised development agreements with the developers of the casinos and a related pledge by the nonprofit Service Corporations; authorizes a collateral agreement; an increase in the fixed rate payable; authorizes other actions in connection with such settlement and makes certain amendments to Sections 18-1-2, 18-1-3, 18-1-4, 18-3-2, 18-3-4, 18-3-5 and 18-14-5.

Bond Counsel has prepared the attached Ordinance and I recommend its adoption by your Honorable Body.

Respectfully submitted,

Joseph L. Harris
Finance Director

JLH/dc

Cc:    Londell Thomas
       Irvin Corley
       David Whitaker
       Patricia Luckett

Ordinance No. ●-09
Chapter 18
To Add a New Article as Article XVI to Chapter 18 which Recognizes and Makes
Findings with Regard to the Pension Funding Program Initiated by Ordinances
Nos. 03-05 and 05-05; which Makes Findings with regard to the Use of Wagering
Taxes Imposed by the City Pursuant to Section 18-14-3; which Finds that the Terms
of Settlement with the Counterparties in connection with Certain Interest Rate
Swap Agreements entered into in connection with the Pension Funding Program are
Acceptable; which Authorizes and Provides for a Pledge in Favor of such Counter-
parties of such Wagering Taxes and Certain Payments Receivable by the City under
Revised Development Agreements with the Developers of the Casinos and a Related
Pledge by the Nonprofit Service Corporations Created Pursuant to Ordinance No.
05-05 as a part of such Settlement; which Authorizes a Collateral Agreement as part
of such Settlement; which Authorizes an Increase in the Fixed Rate Payable under
such Interest Rate Swap Agreements as part of such Settlement; and which Author-
izes other Actions in connection with Such Settlement; and to Make Certain Amend-
ments to Sections 18-1-2, 18-1-3, 18-1-4, 18-3-2, 18-3-4, 18-3-5 and 18-14-5.

It is hereby ordained by the People of the City of Detroit that:

Section 1. Chapter 18 of the 1984 Detroit City Code is amended by adding Article 16 as
follows:

Article XVI
Pension System Funding Program

Division 1
Findings, Definitions and Interpretation

Sec. 18-16-1. Legislative Findings — Pension System Funding Program

The Detroit City Council expressly finds and determines that:

(a) Article 9, Section 24 of the 1963 Michigan Constitution of the State of
Michigan obligates the City to maintain the actuarial integrity of its General Re-
tirement System (the *GRS*) and its Police and Fire Retirement System (the *PFRS*
and together with the GRS, the *Pension System*).

(b) Maintaining the actuarial integrity of the Pension System is both a con-
stitutional obligation and an important public purpose of the City, and, to that end,
the City undertook the 2005 Transaction and the 2006 Transaction, as hereinafter
described in Sections 18-16-2 and 18-16-3, respectively (the *Pension System
Funding Program*).

(c) The Pension System Funding Program contributes to the quality of life
in the City of Detroit (the *City*, whether referring to the Michigan municipal cor-
poration by that name or the territory within the boundaries thereof) by providing

a source of income to the City's public service employees through funding of certain of the City's pension obligations.

(d) The Pension System Funding Program further contributes to the quality of life in the City by reducing the financial requirements of the Pension System and permitting tax receipts to be used for other purposes.

(e) Due to certain events affecting the hereinafter defined Insurers and the City, it is necessary that the City pledge Revenues, as described in Section 18-16-4, as an incident of the Pension Funding Program.

## Sec. 18-16-2. Legislative Findings — 2005 Transaction

The Detroit City Council expressly finds and determines that the following actions constitute the *2005 Transaction*, undertaken by the City as part of its Pension System Funding Program.

(a) By Ordinance No. 03-05 the City provided an alternative funding mechanism for, respectively, the GRS and the PFRS (each, an *Alternative Funding Mechanism*) to provide for unfunded accrued actuarial liability (*UAAL*) of the GRS (*GRS UAAL*) and UAAL of the PFRS (*PFRS UAAL* and together with the GRS UAAL, *Pension System UAAL*).

(b) By Ordinance No. 05-05 (the *Funding Ordinance*) the City provided for incorporation of two service corporations, the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (each, a *Service Corporation* and collectively, the *Service Corporations*) to serve as the means to fund Pension System UAAL.

(c) The Funding Ordinance also provided for the execution by the City of a service contract with each of the Service Corporations (collectively, the *2005 Service Contracts*), and it approved the form of the Contract Administration Agreement and the trust agreement (the *2005 Funding Trust*) which provided for the issuance of the taxable certificates of participation, series 2005 (the *2005 COPs*).

(d) The Service Corporations sold their rights to receive certain payments (*2005 Service Payments*) under the 2005 Service Contracts to the 2005 Funding Trust, and the 2005 COPs represented undivided interests in the 2005 Service Payments.

(e) Because certain of the 2005 COPs had components of the Service Payments based on variable rates (the *Variable Rate 2005 COPs*), the Service Corporations entered into interest rate swap agreements (collectively, the *2005 Hedges*) with UBS AG (*UBS*), SBS Financial Products Company LLC (*SBS*) and an additional counterparty in order to hedge payments due under the 2005 Service Contracts in respect of the Variable Rate 2005 COPs.

(f) Under certain circumstances Merrill Lynch Capital Services Inc. agreed to assume the obligations under the 2005 Hedges to which SBS was a party. Each of UBS, the additional counterparty, SBS and Merrill Lynch Capital Services Inc. are herein called a *2005 Counterparty* and collectively, the *2005 Counterparties*.

(g) The City approved the 2005 Hedges in the Funding Ordinance and acknowledged the risks associated with them, including the risk that "unforeseen events may occur which may have material adverse effects on present expectations."

(h) The City agreed in the 2005 Service Contracts to make payments (*2005 Hedge Payables*) to the Service Corporations sufficient to pay amounts owing by the Service Corporations under the 2005 Hedges.

(i) The obligations of the Service Corporations under certain of the 2005 Service Contracts, including the obligations to pay 2005 Hedge Payables under certain of the 2005 Hedges, were insured by Financial Guaranty Insurance Company (*FGIC*), and the obligations of the Service Corporations under the remaining 2005 Service Contracts were insured by XL Capital Assurance Inc. (now known as Syncora Guarantee Inc., *Syncora*, and together with FGIC, the *Insurers*).

(j) The 2005 Hedges provided that an additional termination event (the *2005 Additional Termination Event*) would occur if two events occurred: (i) the ratings of Insurers were reduced below a certain level by certain of the rating agencies rating the 2005 COPs and (ii) such rating agencies also reduced, although not necessarily contemporaneously, the rating of the 2005 COPs below investment grade (the *2005 Trigger Event*).

(k) The *2005 Additional Termination Event* permitted the 2005 Counterparties to terminate the 2005 Hedges and pay or receive the net termination value determined by the respective value of the Service Corporations' and the 2005 Counterparties' obligations under the 2005 Hedges.

(l) Proceeds of the 2005 COPs were provided to GRS and PFRS for application in accordance with the respective Alternative Funding Mechanism.

### Sec. 18-16-3. Legislative Findings — 2006 Transaction

The Detroit City Council expressly finds and determines that the following actions constitute the *2006 Transaction*, undertaken by the City as part of its Pension System Funding Program.

(a) The 2006 Transaction was undertaken in connection with the increase in the amortization period of UAAL by both GRS and PFRS to 30 years and was entered into to reduce the annual funding costs of the Pension System UAAL funded by the 2005 Transaction and thereby advance the purposes of the Pension System Funding Program.

(b) The 2006 Transaction was structured substantially similar to the 2005 Transaction.

(1) By resolution adopted on April 26, 2006 (the *2006 Resolution*), the City provided for the execution by the City of a service contract with each of the Service Corporations (collectively, the *2006 Service Contracts*), and it approved the form of the Contract Administration Agreement and the trust agreement (the *2006 Funding Trust*) which provided for the issuance of the taxable certificates

of participation, series 2006 (the *2006 COPs*) to refund the Variable Rate 2005 COPs.

(2)     The Service Corporations sold their rights to receive certain payments (*2006 Service Payments*) under the 2006 Service Contracts to the 2006 Funding Trust, and the 2006 COPs represented undivided interests in the 2006 Service Payments.

(3)     Because certain of the 2006 COPs had components of the 2006 Service Payments based on variable rates (the *Variable Rate 2006 COPs*), the Service Corporations entered into interest rate swap agreements (collectively, the *2006 Hedges*) with UBS and SBS in order to hedge payments due under the 2006 Service Contracts in respect of the Variable Rate 2006 COPs.

(4)     Under certain circumstances Merrill Lynch Capital Services Inc. agreed to assume the obligations under the 2006 Hedges to which SBS was a party. Each of UBS, SBS and Merrill Lynch Capital Services Inc. are herein called a *2006 Counterparty* and collectively, the *2006 Counterparties*.

(5)     The City approved the 2006 Hedges in the 2006 Resolution and acknowledged the risks associated with them, including the risk that "unforeseen events may occur which may have material adverse effects on present expectations."

(6)     The City agreed in the 2006 Service Contracts to make payments of the 2006 Hedge Payables (defined below) to the Service Corporations sufficient to pay all amounts owing by the Service Corporations under the 2006 Hedges.

(7)     The obligations of the Service Corporations under the 2006 Service Contracts, including the obligations to pay 2006 Hedge Payables were insured by the Insurers.

(8)     As in the 2005 Transaction, the 2006 Hedges provided that an additional termination event (the *2006 Additional Termination Event*) would occur if two events occurred: (i) the ratings of Insurers were reduced below a certain level by certain of the rating agencies rating the 2006 COPs <u>and</u> (ii) such rating agencies also reduced, although not necessarily contemporaneously, the rating of the 2006 COPs below investment grade (the *2006 Trigger Event*).

(9)     The *2006 Additional Termination Event* permits the 2006 Counterparties to terminate the 2006 Hedges and pay or receive the net termination value determined by the respective value of the Service Corporations' and the 2006 Counterparties' obligations under the 2006 Hedges.

(10)     The 2005 Hedges were terminated with termination values in favor of the City, and proceeds of the 2006 COPs were used to refund the Variable Rate 2005 COPs.

### Sec. 18-16-4. Legislative Findings — Pledged Property

The City Council expressly finds and determines as follows:

(a) In January 2009, the 2006 Counterparties notified the Service Corporations and the City that they believed that the 2006 Trigger Event had occurred and that they were permitted by the terms of the 2006 Hedges to declare a 2006 Additional Termination Event thereunder.

(b) The declaration of the 2006 Additional Termination Event in January 2009 could have resulted in the imposition of an immediate obligation on the City to make a combined payment to the Service Corporations (the *Hedge Termination Payment*) under the 2006 Service Contracts in the range of $300 million to $400 million.

(c) The 2006 Counterparties may seek judicial recourse if the City fails to make immediate payment of the Hedge Termination Payment.

(d) Such judicial recourse may result in judgment liability forcing the City to raise taxes without limit as to rate or amount.

(e) Such taxes will be destructive of the quality of life in the City and will place its residents under a severe financial burden.

(f) In lieu of declaring the 2006 Additional Termination Event and in the interest of avoiding fees and expenses of litigation, the City, the Service Corporations and the 2006 Counterparties have agreed in principle to the Terms for Settlement (the *Term Sheet*), which are confidential and non-binding.

(g) The non-binding terms set forth in the Term Sheet are acceptable to the City and the Service Corporations and provide the only feasible alternative available to the City to avoid the declaration of the 2006 Termination Event.

(h) The Term Sheet provides for the pledge of certain revenues and certain other assets, now or hereafter receivable by the City, referred to below as *Pledged Property*, to secure payment of the 2006 Hedge Payables as and when the same become due under the 2006 Service Contracts.

(i) The Michigan Gaming Control and Revenue Act, being MCL 432.201 *et seq.*, MSA 18.969(201), *et seq.*, as amended (the *Wagering Tax Revenue Statute*), authorizes the City to levy certain taxes pursuant to Section 12 thereof.

(j) The Pledged Property shall include:

(i) taxes levied or imposed or to be levied or imposed by Detroit City Code Section 18-14-3 pursuant to Section 12(4)(b) the Wagering Tax Revenue Statute (*Wagering Taxes*);

(ii) taxes collected or to be collected by the City pursuant to Section 12(5) of the Wagering Tax Revenue Statute (*Additional Wagering Taxes*);

(iii) all proceeds of taxes to which the City is at any time or from time to time entitled under Section 12(1) of the Wagering Tax Revenue Statute on account of the City rescinding or otherwise being unable to exercise its option to collect Wagering Taxes and all other amounts payable to the City pursuant to Section 12 of the Wagering Tax Revenue Statute (*Alternative Taxes*); and

(iv) Developer Payments (defined below) payable to the City under the Development Agreements (defined below).

(k) The use and application of the Wagering Tax Property as herein provided is for purposes authorized by Section 12(3)(a) of the Wagering Tax Revenue Statute (and any regulation or ordinance relating thereto), in particular, but not exclusively, as follows:

(1)   Pledging the Wagering Tax Property will improve the quality of life in the City beyond what it would be in the absence of such action; and

(2)   Pledging the Wagering Tax Property will reduce taxes levied or imposed by the City or to be levied or imposed by the City from what they would be in the absence of such action.

(l) The use and application of the Wagering Tax Property as herein provided will not supplant existing state appropriations or local expenditures and therefore will not be used in violation of Section 12(14) of the Wagering Tax Revenue Statute.

(m) No pledge of or lien upon the Pledged Property has been previously created.

(n) This Ordinance is adopted for the purpose of implementing the transactions contemplated by the Term Sheet, and when this Ordinance becomes effective and implemented by one or more resolutions as herein provided and the Definitive Documents (defined below) are executed and delivered, the complete agreement of the City and the 2006 Counterparties shall be expressed thereby.

### Sec. 18-16-5. Definitions

(a) The following terms have the following respective meanings unless the context otherwise clearly requires.

*Account* means either the Holdback Account or the Receipts Account, as the context may require.

*Article 9* means the Michigan Uniform Commercial Code – Secured Transactions, being MCL 440.9101 *et seq*.

*Casino Licensee* has the same meaning given such term in Section 18-14-2 of the Detroit City Code.

*City Hedge Payables Related Obligations* mean the City's obligation, whether now existing or hereafter arising, to pay to each Service Corporation under the respective Service Contract the amounts of the Hedge Payables as such amounts may now or hereafter become due and payable.

*City Payment* means payments made by the City from the City's general fund to the Holdback Account in such amounts as are necessary to pay the Holdback Obligations.

*City Pledge* has the meaning given that term in **Section 18-16-8.**

*Collateral Agreement* means an agreement to be entered into by the City, the Custodian, each Service Corporation and each Counterparty for the purpose of securing the City's obligation under the Service Contracts to pay Hedge Payables (as defined below) to the Service Corporations.

*Counterparty* means any 2006 Counterparty and any successor thereto or assignee of its Hedge pursuant to the terms thereof.

*Custodian* means a bank eligible to be a depositary of City funds that is serving as "Custodian" under the Collateral Agreement.

*Definitive Documents* has the meaning given that term in **Section 18-16-18.**

*Developer* has the meaning given that term in **Section 18-16-6.**

*Developer Payments* has the meaning given that term in **Section 18-16-6.**

*Development Agreement* has the meaning given that term in **Section 18-16-6.**

*Excluded Property* means Revenues, and proceeds thereof, paid to the City from the Receipts Account, or released to the City from the Holdback Account, pursuant to the Collateral Agreement, together with the right of the City to receive any such amounts as and when paid or released.

*Finance Director* means the Finance Director of the City.

*Hedge* means any 2006 Hedge amended as provided in **Section 18-16-23.**

*Hedge Payables* means, collectively, the Hedge Payables as defined in each Service Contract.

*Hedge Periodic Payables* means, collectively, the Hedge Periodic Payables as defined in each Service Contract.

*Holdback Account* means an account to be established in the Collateral Agreement into which shall be deposited such amounts as are appropriated pursuant to **Section 18-16-16** by the City Council from the City's General Fund for the payment of each City Payment.

*Holdback Obligations* means the scheduled fees and expenses of the Custodian to be paid each fiscal year *plus* the *greater* of:

(i) all Hedge Periodic Payables (without giving effect to any netting) payable by the Service Corporations during such fiscal year *and*

(ii) for the fiscal year commencing July 1, 2009, the amount of $49,936,975 and, for each subsequent fiscal year, the amount of $50,736,975,

as adjusted upon or following the occurrence of certain additional termination events as contemplated in the Term Sheet and to be provided for in the Collateral Agreement.

*Irrevocable Instruction* means the instruction of the City to each Casino Licensee and Developer to pay directly to the Custodian all Wagering Tax Prop-

erty and Developer Payments, respectively, and meeting the requirements of **Section 18-16-24**.

   *Payment Section* has the meaning given that term in **Section 18-16-6**.

   *Permitted Liens* has the meaning given that term in **Section 18-16-21**.

   *Pledged Property* means the Revenues, any investments made from time to time thereof, the Accounts, all amounts standing to the credit thereof from time to time, and any and all proceeds of any thereof.

   *Receipts Account* means an account to be established in the Collateral Agreement into which Revenues shall be deposited as received by the Custodian.

   *Revenues* means, collectively, Developer Payments and Wagering Tax Property.

   *Service Contract* means any 2006 Service Contract as amended pursuant to **Section 18-16-22**.

   *Service Corporation Pledge* has the meaning given such term in **Section 18-16-14**.

   *Wagering Tax Property* means, collectively, the Wagering Taxes, Additional Wagering Taxes and Alternative Taxes, including any interest and penalties thereon as provided for under Detroit City Code Section 18-14-6(c) and any and all proceeds of any thereof. For the avoidance of doubt, *Wagering Tax Property* does not include any municipal service fees authorized to be imposed by the City pursuant to Section 13 of the Wagering Tax Revenue Statute.

   (b) The terms defined in the legislative findings (being **Sections 18-16-1** through **18-16-4**) are used herein as therein defined unless the context otherwise clearly requires. Such terms include:

| | |
|---|---|
| Additional Wagering Taxes | 2006 Counterparties |
| Alternative Taxes | 2006 Hedges |
| City | 2006 Service Contracts |
| Insurers | 2006 Transaction |
| SBS | UBS |
| Service Corporations | Wagering Tax Revenue Statute |
| 2006 COPs | |

### Sec. 18-16-6. Definitions related to Developer Payments

   The following terms have the following respective meanings unless the context otherwise clearly requires

   *Developer* means any Existing Developer and any New Developer.

   *Developer Payments* means:

      (i) amounts payable under each Existing Payment Section,

      (ii) as of any particular date, the aggregate amounts payable under any New Payment Section up to but not exceeding the aggregate amounts that

would have been payable under the applicable Existing Payment Section as of such date,

(iii) any interest payable, in respect of amounts payable under each Payment Section, and

(iv) any amounts payable under any guaranty or other credit enhancement, in respect of any amounts payable under any Payment Section.

For the avoidance of doubt, *Developer Payments* does not include any other payments or rights to reimbursement made or to be made under any Development Agreement.

*Development Agreement* means any Existing Development Agreement and any New Development Agreement.

*Existing Casino* means any of the following casinos as the context may require:

(i) the casino currently known as the Greektown Casino and currently located at 555 E. Lafayette Boulevard in Detroit, Michigan;

(ii) the casino currently known as the MGM Grand Detroit Casino and currently located at 1300 John C. Lodge in Detroit, Michigan; and

(iii) the casino currently known as the MotorCity Casino and currently located at 2901 Grand River Avenue in Detroit, Michigan.

*Existing Developer* means each of Detroit Entertainment, L.L.C., Greektown Casino, L.L.C., MGM Grand Detroit, L.L.C. and any successor to any of them or assignee of any of their respective Existing Development Agreements.

*Existing Development Agreement* means any of the Revised Development Agreements among the City, The Economic Development Corporation of the City of Detroit and an Existing Developer, as in effect on the effective date of this **Ordinance,** as such Revised Development Agreement maybe modified or revised from time to time hereafter, and any substitute for such Revised Development Agreement with an Existing Developer.

*Existing Payment Section* means each of the following sections and any substitute for any such section in an Existing Development Agreement:

(i) Section 3.16(a)(iv) of the Existing Development Agreement with Greektown Casino, L.L.C. as the Existing Developer,

(ii) Section 3.16(a)(iv) of the Existing Development Agreement with MGM Grand Detroit, L.L.C. as the Existing Developer, and

(iii) Section 3.14(a)(iv) of the Existing Development Agreement with Detroit Entertainment, L.L.C. as the Existing Developer.

*New Developer* means a Person (that is not a public body) other than an Existing Developer.

# AFFIDAVIT OF PUBLICATION

**Summary of Ordinance No. 05-09**
**Adopted by the Detroit City Council**
**on May 26, 2009**
**and**
**Summary of Resolution**
**Adopted by the Detroit City Council**
**on June 23, 2009**

Ordinance No. 05-09 (the "Authorizing Ordinance"), summarized below, was adopted by 2/3's vote of the Detroit City Council on May 26, 2009, and will become effective upon publication of this summary pursuant to Section 3(k) of The Home Rule City Act, being Act 279 of 1909, as amended. A resolution (the "Resolution") was adopted by 2/3's vote of the Detroit City Council on June 23, 2009, to implement the Authorizing Ordinance

Copies of the Authorizing Ordinance, the Resolution and the Definitive Documents authorized to be executed pursuant to the Resolution are available for inspection during normal business hours at:

City of Detroit Finance Department
1200 Coleman A. Young Municipal
Center, 12th Floor
2 Woodward Avenue
Detroit, Michigan

Summary of the Authorizing Ordinance

The Authorizing Ordinance adds a new article, Article XVI, to Chapter 18 of the Detroit City Code. Article XVI recognizes and makes findings with regard to the City of Detroit Pension Funding Program initiated by Ordinance Nos. 03-05 and 05-05. Article XVI also makes findings with regard to the use wagering taxes imposed by the City pursuant to Section 18-14-3 and further finds that the terms of settlement (the "Settlement") with the parties (the "Counterparties") to interest rate swap agreements (the "Hedges") entered into in connection with the Pension Funding Program are acceptable. Article XVI authorizes and provides for a pledge in favor of the Counterparties of such wagering taxes and certain payments receivable by the City under the Revised Development Agreements with the Developers of the Casinos and a related pledge by the nonprofit service corporations (the "Service Corporations") created pursuant to Ordinance No. 05-05 as a part of the Settlement. Article XVI also authorizes a Collateral Agreement as part of the Settlement and an increase in the fixed rate payable under the Hedges as part of such settlement. Article XVI further authorizes other actions in connection with the Settlement.

The Authorizing Ordinance makes certain amendments to sections 18-1-2, 18-1-3, 18-1-4, 18-3-2, 18-3-4, 18-3-5 and 18-14-5

Summary of the Resolution

The Resolution finds that the forms of the Definitive Documents presented to the City Council are acceptable and authorizes and directs the Finance Director to execute and deliver the Definitive Documents on behalf of the City and to take further actions in respect of the Settlement.

The Definitive Documents consist of:
· The Collateral Agreement
· The Service Contract Amendments
· The Hedge Amendments

STATE OF MICHIGAN

County of ___Wayne___

Christina Jacobs _____ being duly sworn, deposes and says the annexed printed copy of a notice was taken from:

The Detroit Legal News

a newspaper printed and circulated in said State and County

___June 26___

A.D. 2009 ____ that she is the agent of the printers of said newspaper, and knows well the facts stated herein.

*(signature)*

Christina Jacobs

Subscribed and sworn to before me this

26th ____ day of ___June___ A.D. 2009 ____

*(signature)*

PUSHPA JAYAPRAKASH
NOTARY PUBLIC OAKLAND CO., MI
MY COMMISSION EXPIRES APR. 4, 2011
ACTING IN WAYNE COUNTY, MI