# EXHIBIT AA

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 08-13555(JMP)

Case No. 08-01420(JMP)(SIPA)

Adv. Case No. 09-01258

Adv. Case No. 08-01743

Adv. Case No. 09-01242

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS, INC., et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                    Debtor.

- - - - - - - - - - - - - - - - - - - -x

NEUBERGER BERMAN, LLC,

                    Plaintiff,

          -against-

PNC BANK, NATIONAL ASSOCIATION,

LEHMAN BROTHERS INC., AND LEHMAN

BROTHERS COMMERICAL CORPORATION,

                    Defendants.

- - - - - - - - - - - - - - - - - - - -x

1 - - - - - - - - - - - - - - - - - - -x

2 STATE STREET BANK AND TRUST COMPANY,

3       Plaintiff,

4 LEHMAN COMMERCIAL PAPER INC.,

5    -against-

6       Defendant.

7 - - - - - - - - - - - - - - - - - - -x

8 LEHMAN BROTHERS SPECIAL FINANCING INC.,

9       Plaintiff,

10 BNY CORPORATE TRUSTEE SERVICES, LTD.,

11    -against-

12       Defendant.

13 - - - - - - - - - - - - - - - - - - -x

14

15     U.S. Bankruptcy Court

16     One Bowling Green

17     New York, New York

18

19     September 15, 2009

20     10:03 a.m.

21

22 B E F O R E:

23 HON. JAMES M. PECK

24 U.S. BANKRUPTCY JUDGE

25

1

2   RE: CASE NOS. 08-13555(JMP) and 08-01420(JMP)(SIPA)

3   HEARING re Interim Applications for Allowance of Compensation

4   for Professional Services Rendered and for Reimbursement of

5   Actual and Necessary Expenses [Docket No. 4839]

6

7   HEARING re Motion of Wells Fargo, NA for Relief from the

8   Automatic Stay [Docket No. 4640]

9

10  HEARING re Motion of Wells Fargo, NA for Relief from the

11  Automatic Stay [Docket No. 4671]

12

13  HEARING re Motion of Washington Mutual Bank f/k/a Washington

14  Mutual Bank, FA. For Relief from the Automatic Stay [Docket No.

15  4759]

16

17  HEARING re Motion of A/P Hotel, LLC for Relief from the

18  Automatic Stay [Docket No. 4950]

19

20  HEARING re Motion for Authorization to Assume an Interest Rate

21  Swap with MEG Energy Corp. [Docket No. 5012]

22

23

24

25

1

2      HEARING re Debtors' Motion for Establishment of Procedures for

3      the Debtors to Transfer Their Interests in Respect of

4      Residential and Commercial Loans Subject to Foreclosure to

5      Wholly-Owned Non-Debtor Subsidiaries [Docket No. 4966]

6

7      HEARING re Debtors' Motion for Establishment of Procedures for

8      the Debtors to Compromise Claims of the Debtors in Respect of

9      Real Estate Loans [Docket No. 4942]

10

11     HEARING re Motion of Landwirtschaftliche Rentenbank for 2004

12     Examination [Docket No. 4800]

13

14     HEARING re Debtors' Motion for Authorization to Implement

15     Alternative Dispute Resolution Procedures for Affirmative

16     Claims of Debtors Under Derivative Contracts [Docket No. 4453]

17

18     HEARING re Debtors' Motion to Compel Performance of Metavante

19     Corporation's Obligations Under an Executory Contract and to

20     Enforce the Automatic Stay [Docket No. 3691]

21

22     HEARING re Motion of DnB Nor Bank ASA for Allowance and Payment

23     of Administrative Expense Claim and Allowing Setoff of Such

24     Claim [Docket No. 4054]

25

1

2    HEARING re Motion of William Kuntz, III for Review of Dismissal

3    of Appeal [Docket No. 1261]

4

5    RE: ADV. CASE NO. 09-01258:

6    PRE-TRIAL CONFERENCE

7

8    RE: ADV. CASE NO. 08-01743:

9    PRE-TRIAL CONFERENCE

10

11   RE: ADV. CASE NO. 09-01242:

12   Motion of BNY Corporate Trustee Services Limited to Stay

13   Further Proceedings Pending Disposition of its Motion for Leave

14   to Appeal the August 12, 2009 Order Denying BNY's Motion to

15   Dismiss and any Disposition of the Merits of that Appeal

16

17

18

19

20

21

22

23

24   Transcribed by:  Clara Rubin

25                    Pnina Eilberg

1

2     A P P E A R A N C E S :

3     WEIL, GOTSHAL & MANGES, LLP

4            Attorneys for Debtors

5            767 Fifth Avenue

6            New York, NY 10153

7

8     BY:   HARVEY R. MILLER, ESQ.

9            ROBERT J. LEMONS, ESQ.

10           MARK I. BERNSTEIN, ESQ.

11           RICHARD P. KRASNOW, ESQ.

12           PETER GRUENBERGER, ESQ.

13           DENISE ALVAREZ, ESQ.

14           HOWARD B. COMET, ESQ.

15           RICHARD W. SLACK, ESQ.

16

17    WEIL, GOTSHAL & MANGES, LLP

18           Attorneys for Plaintiffs/Movants Lehman Brothers

19            Holdings, Inc. ("LBHI") and Lehman Brothers

20            Special Financing, Inc. ("LBSF")

21           1300 I Street, N.W.

22           Suite 900

23           Washington, DC 20005

24

25    BY:   RALPH I. MILLER, ESQ.

```
 1

 2    WEIL, GOTSHAL & MANGES, LLP

 3         Attorneys for Plaintiffs/Movants Lehman Brothers

 4          Holdings, Inc. ("LBHI") and Lehman Brothers

 5          Special Financing, Inc. ("LBSF")

 6         8911 Capital of Texas Highway

 7         Building One, Suite 1350

 8         Austin, TX 78759

 9

10    BY:   MEREDITH B. PARENTI, ESQ.

11

12    ANDREWS KURTH LLP

13         Attorneys for EPCO Holdings, Inc.

14         450 Lexington Avenue

15         New York, NY 10017

16

17    BY:   PETER S. GOODMAN, ESQ.

18

19    BINGHAM MCCUTCHEN LLP

20         Attorneys for State Street Bank and Trust

21         One Federal Street

22         Boston, MA 02110

23

24    BY:   ANDREW C. PHELAN, ESQ.

25
```

1

2     BUCHANAN INGERSOLL & ROONEY PC

3           Attorneys for PNC

4           One Oxford Centre

5           301 Grant Street, 20th Floor

6           Pittsburgh, PA 15219

7

8     BY:   STANLEY YORSZ, ESQ.

9

10

11    CADWALADER, WICKERSHAM & TAFT LLP

12          Attorneys for Lehman Re Ltd.

13          One World Financial Center

14          New York, NY 10281

15

16    BY:   INGRID BAGBY, ESQ.

17          ELIZABETH BUTLER, ESQ.

18          JONATHAN M. HOFF, ESQ.

19          GREGORY M. PETRICK, ESQ.

20

21

22

23

24

25

1

2  CLEARY GOTTLIEB STEEN & HAMILTON LLP

3         Attorneys for D.E. Shaw Composite Portfolios LLC, D.E.

4          Shaw Oculus Portfolios LLC, and Affiliates, and Wachovia

5         One Liberty Plaza

6         New York, NY 10006

7

8  BY:   JEFFREY A. ROSENTHAL, ESQ.

9         DAVID Y. LIVSHIZ, ESQ. (admitted pro hac vice)

10

11  CLEARY GOTTLIEB STEEN & HAMILTON LLP

12         Attorneys for Barclays Capital, Inc.

13         One Liberty Plaza

14         New York, NY 10006

15

16  BY:   LUKE A. BAREFOOT, ESQ.

17

18  DEWEY & LEBOEUF, LLP

19         Attorneys for Royal Bank of Scotland PLC and Its

20          Affiliates

21         1301 Avenue of the Americas

22         New York, NY 10019

23

24  BY:   MARTIN J. BIENENSTOCK, ESQ.

25         IRENA M. GOLDSTEIN, ESQ.

1

2    HOGAN & HARTSON LLP

3         Attorneys for Landwirtschaftliche Rentenbank

4         875 Third Avenue

5         New York, NY 10022

6

7    BY:   LYNDON M. TRETTER, ESQ.

8

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for the James W. Giddens, SIPA Trustee

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:   JEFFREY S. MARGOLIN, ESQ.

16        JEFFREY M. GREILSHEIMER, ESQ.

17

18

19   JENNER & BLOCK LLP

20        Attorneys for Anton R. Valukas, Examiner

21        919 Third Avenue

22        37th Floor

23        New York, NY 10022

24

25   BY:   PATRICK J. TROSTLE, ESQ.

1

2     KIRKLAND & ELLIS LLP

3          Attorneys for Lehman Re

4          300 North LaSalle Street

5          Chicago, IL 60654

6

7     BY:    ANDREW R. MCGAAN, ESQ.

8

9     MAYER BROWN LLP

10         Attorneys for Societe Generale and Certain of its

11          Affiliates, and CIBC and Certain of its Affiliates

12         1675 Broadway

13         New York, NY 10019

14

15    BY:    AMIT K. TREHAN, ESQ.

16

17    MILBANK, TWEED, HADLEY & MCCLOY, LLP

18         Attorneys for the Official Committee of

19          Unsecured Creditors

20         One Chase Manhattan Plaza

21         New York, NY 10005

22

23    BY:    DENNIS C. O'DONNELL, ESQ.

24         DENNIS F. DUNNE, ESQ.

25         EVAN R. FLECK, ESQ.

1

2    MILBANK, TWEED, HADLEY & MCCLOY, LLP

3          Attorneys for the Official Committee of

4           Unsecured Creditors

5          International Square Building

6          1850 K Street, NW

7          Washington, DC 20006

8

9    BY:   DAVID S. COHEN, ESQ.

10

11   MILLER & MARTIN PLLC

12          1200 One Nashville Place

13          150 Fourth Avenue North

14          Nashville, TN 37219

15

16   BY:   W. NEAL MCBRAYER, ESQ.

17

18   O'MELVENY & MYERS LLP

19          Attorneys for Oceania Cruises, Inc.

20          Times Square Tower

21          7 Times Square

22          New York, NY 10036

23

24   BY:   SHANNON LOWRY NAGLE, ESQ.

25

1

2    PACHULSKI STANG ZIEHL & JONES

3        780 Third Avenue

4        36th Floor

5        New York, NY 10017

6

7    BY:   ROBERT J. FEINSTEIN, ESQ.

8

9

10   PILLSBURY WINTHROP SHAW PITTMAN LLP

11       Attorneys for Embarcadero Aircraft Securitization Trust

12       1540 Broadway

13       New York, NY 10036

14

15   BY:   RICK B. ANTONOFF, ESQ.

16

17

18   QUINN EMANUEL URQUHART OLIVER & HEDGES LLP

19       Special Counsel to the Official Creditors' Committee

20       51 Madison Avenue

21       22nd Floor

22       New York, NY 10010

23

24   BY:   JAMES G. TECCE, ESQ.

25

1

2    REED SMITH, LLP

3         Attorneys for BNY Corporate Trustee Services, Bank of

4          New York Mellon

5          599 Lexington Avenue

6          New York, New York 10022

7

8    BY:   ERIC A. SCHAFFER, ESQ.

9

10

11   RICHARDS KIBBE & ORBE LLP

12         One World Financial Center

13         New York, NY 10281

14

15   BY:   MICHAEL FRIEDMAN, ESQ.

16

17

18   SALANS LLP

19         Attorneys for Swedbank AB

20         Rockefeller Center

21         620 Fifth Avenue

22         New York, NY 10020

23

24   BY:   CLAUDE D. MONTGOMERY, ESQ.

25

1

2    SHEARMAN & STERLING LLP

3        Attorneys for Bank of America and Merrill Lynch and Their

4         Affiliates

5        599 Lexington Avenue

6        New York, NY 10022

7

8    BY:   DANIEL H.R. LAGUARDIA, ESQ.

9          NED S. SCHODEK, ESQ.

10

11

12   SHEARMAN & STERLING LLP

13        Attorneys for Nomura International plc

14        599 Lexington Avenue

15        New York, NY 10022

16

17   BY:   SOLOMON J. NOH, ESQ.

18

19   STROOCK & STROOCK & LAVAN LLP

20        Attorneys for Omnibus Derivative Counterparties

21        180 Maiden Lane

22        New York, NY 10038

23

24   BY:   CLAUDE G. SZYFER, ESQ.

25

1

2  STROOCK & STROOCK & LAVAN LLP

3      Attorneys for Neuberger Berman

4      180 Maiden Lane

5      New York, NY 10038

6

7  BY:  DEREK I. A. SILVERMAN, ESQ.

8

9

10  SULLIVAN & CROMWELL LLP

11      Attorneys for Defendant Barclays Bank PLC and Long Island

12       International

13      125 Broad Street

14      New York, NY 10004

15

16  BY:  ROBINSON B. LACY, ESQ.

17

18

19  WHITE & CASE, LLP

20      Attorneys for Ad Hoc Group of Creditors

21      1155 Avenue of the Americas

22      New York, NY 10036

23

24  BY:  LISA THOMPSON, ESQ.

25

1

2   WHYTE HIRSCHBOECK DUDEK S.C.

3        Attorneys for Creditor Metavante Corporation

4        555 East Wells Street

5        Suite 1900

6        Milwaukee, WI 53202

7

8   BY:   BRUCE G. ARNOLD, ESQ.

9

10

11  WINTHROP COUCHOT PC

12       660 Newport Center Drive

13       Fourth Floor

14       Newport Beach, CA 92660

15

16  BY:   SEAN A. O'KEEFE, ESQ.

17

18

19  U.S. DEPARTMENT OF JUSTICE

20       Office of the United States Trustee

21       33 Whitehall Street, 21st Floor

22       New York, NY 10004

23

24  BY:   LINDA A. RIFFKIN, ESQ.

25

1

2   U.S. DEPARTMENT OF JUSTICE

3        U.S. Attorney's Office, Southern District of New York

4        86 Chambers Street

5        3rd Floor

6        New York, NY 10007

7

8   BY:   JOSEPH N. CORDARO, ESQ.

9

10  SELTZER CAPLAN MCMAHON VITEK

11       Attorneys for Lusardi Construction Co.

12       2100 Symphony Towers

13       750 B Street

14       San Diego, CA 92101

15

16  BY:   DENNIS J. WICKHAM, ESQ. (TELEPHONICALLY)

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

1

2      THE COURT:  Be seated, please.  Good morning.

3      Mr. Miller.

4      MR. MILLER:  Good morning, Your Honor.  Harvey Miller,

5  Weil, Gotshal & Manges, on behalf of the debtors.  I have to

6  note, Your Honor, that this morning is a much quieter morning

7  than it was a year ago today on this date.  We seem to have

8  survived a year.

9      THE COURT:  We've survived a year, although I'll tell

10  you that a year ago today it was completely quiet here.

11      MR. MILLER:  Not in my life, Your Honor.  In any

12  event, we're prepared to go forward, Your Honor, with another

13  omnibus hearing, and the first matter on the calendar, Your

14  Honor, under uncontested matters are the second round of

15  interim applications for allowances of compensation for

16  professional services rendered and for reimbursement of actual

17  and necessary expenses.

18      In connection with the applications, Your Honor, that

19  have been filed to date and in accordance with the fee

20  protocol, the fee committee has filed two reports on fee

21  applications.  The first report pertained to the first interim

22  fee applications, and more recently on September 10, 2009 the

23  fee committee filed its second report concerning the second

24  interim fee applications.

25      If I may, Your Honor, with respect to the first

1   interim fee applications, the report addresses the first

2   interim fee applications that were considered by the Court at

3   an earlier hearing.  At the time of the consideration of those

4   fee applications, the fee committee had made interim

5   recommended deductions, where pertinent, to certain of their

6   first interim fee applications.

7           In the fee committee report dated September 10, 2009,

8   the committee has submitted final recommended deductions as to

9   those fee applications.  The report recommends that such

10  deductions be applied against the ten percent holdback amount

11  relating to the first interim fee applications.  The report

12  sets out the first recommended deduction and the final

13  recommended deductions at pages 2, 3, 4 and 5 of the report.

14          The final recommended reductions applicable to the

15  first round of interim fee applications totals $186,660.08.

16  Assuming that each of the retained professionals agrees to the

17  final recommended deduction, the fee committee recommends that

18  after application of those deductions the balance of the ten

19  percent holdback amount relating to the first interim fee

20  applications be released to the respective retained

21  professionals.

22          I do note, Your Honor, that as to one retained

23  professional, Houlihan Lokey Howard Zukin Capital, Inc., the

24  final recommended deduction has been deferred.  The applicant

25  and the fee committee will be in further discussions concerning

1    the recommended deduction.

2         As to all of the other retained professionals who

3    agreed to the final recommended deductions, we request that the

4    Court allow the payment of the balance of the ten percent

5    holdback amount to each of the retained professionals.

6         As to the second interim fee applications, Your Honor,

7    the fee committee report, in the same fashion, used the process

8    that was applied as to the first set of interim fee

9    applications.  It's -- the report sets forth the process used

10   by the fee committee and its professionals in reviewing the

11   second interim fee applications and sets forth that each

12   retained professional has been sent an individual summary sheet

13   setting forth in detail the deductions recommended in the fees

14   and allowances by the committee.  This is essentially the same

15   process that was used in connection with the first interim fee

16   applications.

17        The second interim fee applications cover the period

18   from February 1 through May 31, 2009.  There are eighteen

19   applications for allowances of interim compensation and

20   reimbursement of expenses.

21        The requested fees, Your Honor, total $115,193,605.42.

22   The reimbursement of expenses requested totals $4,036,840.23.

23        I note for the Court's consideration that during the

24   period covered by the second interim fee applications the

25   investigation into the affairs of the debtors expanded, caused

1    both by the appointment of an examiner and his professionals,

2    as well as the expansion of professional services performed on

3    behalf of the creditors' committee.  Those facts account for

4    the increase in the aggregate total of the requested allowances

5    of compensation and reimbursement of expenses.

6        Of the eighteen applications filed by retaining

7    professionals, twelve are for retained professionals that were

8    engaged by the debtors-in-possession for the applicants or

9    professionals retained by the unsecured creditors' committee,

10   and the remaining two applications are professionals retained

11   by the examiner.

12       The fee committee recommendation as to the second

13   interim applications:  The fee committee has recommended

14   deductions applicable to the second interim fee applications

15   totaling $2,512,685.76, comprised of requested fees and

16   expenses.  The committee also recommends that the twenty

17   percent holdback amounts in respect of the second interim fee

18   applications be reduced to ten percent pending the resolution

19   of the issues that had been set forth by the committee in the

20   individual summary sheets provided to each of the retained

21   professionals.

22       Based upon the fee committee report and all of the

23   proceedings which have taken place, it is requested that the

24   Court allow the second interim fee applications, consistent

25   with the fee committee report, and direct the payment of such

1      allowed fees and expenses subject to the ten percent holdback

2      amounts to cover remaining outstanding issues and further order

3      of the Court.

4              And again, Your Honor, I note that these are interim

5      allowances and will be reconsidered at the time of final

6      applications.

7              So that is the requested relief at this time, Your

8      Honor.

9              THE COURT:  That's understood.  I have read the fee

10     committee report dated September 10 which you have just

11     summarized, and I find that it's very helpful in not only

12     summarizing the nature of the committee's review of the

13     applications filed by the various retained professionals but

14     also in noting areas of concern with respect to future

15     applications to be filed.

16             One thing that I did note, and I don't know to what

17     extent this is a subject for concern or not, is that the amount

18     recommended for disallowance seems to have grown.  I'm not sure

19     if it has grown as an overall percentage of the fees or if it's

20     just that because the overall fees are a higher number, that we

21     ended up with a higher number for proposed disallowance.  I

22     can't tell to what extent that reflects some change in the way

23     these applications are being presented.  And because this is

24     not broken out on a professional-by-professional basis, I can't

25     tell whether or not this is an across-the-board problem or a

1    problem that relates to a particular professional.

2         But I do appreciate the fact that this is a process

3    which, at least as I'm observing it, seems to be working quite

4    well.  And I'll simply ask if there's anyone --

5         MR. MILLER:  I would just add, Your Honor --

6         THE COURT:  -- who's a member of the committee, who

7    wishes to be heard on this.

8         MR. MILLER:  The recommended deductions:  In the

9    individual summary sheets, Your Honor, the committee sets forth

10   in great detail what is the issue with respect to a particular

11   item in a fee application.  Thereafter there are -- I wouldn't

12   call them negotiations -- discussions with the committee

13   representatives, and either the applicant explains

14   satisfactorily whatever the comment is or that will be the

15   final recommended deduction.

16        THE COURT:  I understand --

17        MR. MILLER:  Okay.

18        THE COURT:  -- that's the way it works.  The way this

19   is developed in terms of my own involvement, however, is that

20   I'm not seeing those individual sheets.  It may be that I

21   should see those sheets so that I have a better understanding

22   as to where the problems appear to be among the various

23   professionals.  If the committee would prefer not to do that,

24   I'm not going to make an issue of it.  But I do note that, at

25   least as I'm reviewing this report, I'm only seeing broad

1  numbers except for the review on an application-by-application

2  basis of the first interim report and how that has been

3  reconciled.  But I'm unable to tell, other than the gross

4  number, what the committee has come up with to get to the

5  $1,975,451.68 recommended disallowance as to fees in the

6  aggregate.

7          So I'm going to make the suggestion, if the committee

8  is willing to do this, that I would like to see, for in-camera

9  review at the time of the next report, copies of the individual

10 proposed disallowances by applicant.  I also think that it

11 would be useful for me to see the sheet applicable to this

12 report on a professional-by-professional basis.  It doesn't

13 affect my determination of today's applications.  I'm prepared

14 to approve them consistent with the report, and I'm also

15 prepared to approve the reduction in the holdback from twenty

16 percent to ten percent, pending resolution of any ongoing

17 disputes with affected professionals.

18         MR. MILLER:  I would just add, Your Honor, that the

19 committee has worked very diligently.  And I think Mr. Feinberg

20 said at our last meeting that he actually didn't realize what

21 he was getting into when he accepted the position.

22         THE COURT:  I was confident that was true when he

23 accepted the position.

24         MR. MILLER:  He has now realized it, Your Honor.

25         THE COURT:  And I'm glad that he's hard at work.

1          So those applications are all allowed --

2          MR. MILLER:  Thank you, Your Honor.

3          THE COURT:  -- subject to the comments just made.

4          MR. MILLER:  Going on with the calendar, Your Honor,

5   items 2, 3, 4 and 5, Your Honor, as well as 6, are all subject

6   to stipulations and agreed orders that will be submitted to the

7   Court.  And I don't believe, Your Honor, we need to go through

8   that since the parties have agreed, unless Your Honor wants to

9   go into each one of those items.

10          THE COURT:  Well, the one item that I am actually most

11  interested in hearing some more about, even though we're going

12  through this in summary fashion, is number 6, which is the

13  motion for authorization to assume an interest rate swap with

14  MEG Energy.

15          MR. MILLER:  Yes, sir.

16          THE COURT:  I'm astounded that this was unopposed in

17  the result of the stipulated order, particularly since we have

18  on the calendar later today a matter involving Metavante, which

19  is substantially --

20          MR. MILLER:  Yes.

21          THE COURT:  -- similar in terms of its legal issues.

22  How did this stipulated order come about?

23          MR. MILLER:  I will defer to Mr. Lemons, Your Honor.

24          May we consider, Your Honor, the other items, 2, 3, 4

25  and 5, as submitted?

1          THE COURT:  Yes.

2          MR. MILLER:  Thank you.

3          MR. LEMONS:  Good morning, Your Honor.  Robert Lemons

4     from Weil, Gotshal & Manges, on behalf of Lehman Brothers.

5     Your Honor, shortly after we filed the motion seeking

6     authorization to assume the ISDA and the interest rate swaps

7     under it, my understanding is MEG Energy and Lehman Brothers

8     engaged in discussions where MEG indicated that it would be

9     actually willing to allow Lehman to assume the contract

10    pursuant to a stipulation, with the one proviso that Lehman

11    agree in the stipulation that it will purchase an interest rate

12    cap that will generate cash flows equal to any amounts that

13    Lehman would have to pay in the future under the contract.

14         THE COURT:  What about payment of the 9.7 million

15    dollars in dispute?

16         MR. LEMONS:  MEG Energy is going to pay that amount,

17    plus an additional amount that represents interest that's

18    incurred on it, within three business days of entry of the

19    stipulation.

20         THE COURT:  That's a good stipulation.

21         MR. LEMONS:  And, additionally, just to complete the

22    record, Your Honor, the parties have also agreed that all

23    existing defaults, including as caused by the bankruptcy

24    filings, are cured upon the assumption and that LBHI shall no

25    longer be a guarantor under the agreement.

1           THE COURT:  Okay, thank you.

2           MR. LEMONS:  So we'll be submitting that later today

3      for Your Honor.  Thank you.

4           MR. BERNSTEIN:  Good morning, Your Honor.  Mark

5      Bernstein from Weil, Gotshal & Manges, on behalf of the

6      debtors.  The next two motions on the agenda relate to omnibus

7      procedures that the debtors are seeking to establish to enable

8      them to officially manage and monetize their portfolio of

9      commercial and residential mortgage loans.  The debtors believe

10     that the transactions entered into pursuant to these two

11     motions are transactions of the ordinary course of their

12     business.  However, the debtors worked over the last few months

13     with the creditors' committee to come up with procedures that

14     would increase the transparency and formalize a protocol for

15     the approval of such transactions between the debtors and the

16     committee.

17          The first motion, which is item number 7 on the

18     agenda, seeks to establish procedures by which they may

19     transfer residential or commercial mortgage loans immediately

20     prior to foreclosure into wholly-owned subsidiaries of the

21     applicable debtor and then procedures by which that subsidiary

22     may sell such loan and then distribute the cash back up to the

23     applicable debtor.

24          The purpose that -- the purpose for which the debtors

25     want to enter into these types of transactions, which are

1   typical in the mortgage lending field, are that acquiring

2   properties pursuant to a foreclosure makes the debt -- makes

3   the -- that entity subject to liabilities, tort or

4   environmental or other type, by acquiring the property.  So by

5   putting the property down into an SPE, it shields the debtors'

6   assets from those liabilities while at the same time retaining

7   the economic benefit.

8           The second motion, which is number 8, and we can take

9   these together or take them apart since they are somewhat

10  similar --

11          THE COURT:  Why don't we take it together.

12          MR. BERNSTEIN:  Sure.  The second motion, number 8,

13  relates to the acceptance of the debtors of discounted payoffs

14  or modifying the terms of residential mortgage loans.  In many

15  instances, entering into these transactions is an economic

16  benefit to the debtors rather than risking nonpayment of such

17  loans or letting such loans go into default and foreclosure.

18          The procedures were put in place, as I said, in

19  cooperation with the creditors' committee, and there are

20  various thresholds or triggers which require creditors'

21  committee approval prior to entering into such transaction.

22          THE COURT:  I noted the statements of the committee in

23  support of both of these motions as well as the ad hoc group of

24  Lehman Brothers creditors, sometimes referred to as the hedge

25  funds.  And that suggests, to me at least, that this is a

1    process that has been openly vetted with the constituencies

2    that you need to deal with, and these procedures appear to be

3    appropriate.

4          MR. BERNSTEIN:  I would just add one more thing, Your

5    Honor.  There have been a couple comments and conversations the

6    debtors have had since we filed the motions, and we've made

7    some slight changes to the motions providing for some public

8    disclosure at the request of the ad hoc group of Lehman

9    Brothers creditors.  It is a quarterly report that just

10   provides the number of loans and the aggregate of all those

11   loans for which such transactions were entered into.  And in

12   the motion and the order -- proposed order for number 7 on the

13   agenda, which relates to the transfer of loans and special-

14   purpose entities, we also added provisions relating to the

15   preservation of rights of parties who may have other interests

16   in these loans, such as participations or pledges, saying that

17   this -- these procedures don't diminish their interest in any

18   way.

19         THE COURT:  Okay.  This is uncontested.  I'll just

20   ask, because there were statements of support, if anyone wishes

21   to be heard with respect to either number 7 or 8 on the agenda.

22         MR. O'DONNELL:  Good morning, Your Honor.  Dennis

23   O'Donnell, Milbank, Tweed, Hadley & McCloy, on behalf of the

24   official committee.  I'll simply concur with Mr. Bernstein's

25   remarks about these motions.  We have worked closely together

1    for the past couple of months and we have, I think, improved

2    the procedures as originally proposed to ensure that there are

3    protections against transactions with insiders, transactions

4    with multiple purchases, transactions to various sorts, and

5    ensure that the committee will be able to have a full and

6    complete review of these transactions before they go forward

7    or -- and to the extent that they hit certain thresholds that

8    actually come to the Court as well.  And based on what has been

9    an open and cooperative process, we believe that this motion --

10   both these motions should be approved.

11          THE COURT:  Fine.  They're both approved.

12          MR. MILLER:  The next matter on the calendar, Your

13   Honor, under contested matters is the motion of the Rentenbank

14   and for authority to conduct Rule 2004 examinations.

15          MR. TRETTER:  Good morning, Your Honor.  Lyndon

16   Tretter of Hogan & Hartson, for Rentenbank.  We're here on a

17   2004 discovery application.  And what we've been accused of

18   doing in the opposition papers is supposedly advancing our

19   defense in a U.K. action.  It's absolutely not true, Your

20   Honor.  We wish that U.K. action did not exist.

21          What we're trying to pursue here is the question of

22   substantive consolidation.

23          THE COURT:  Why do you need to pursue that now?

24          MR. TRETTER:  Well, Your Honor, it's been a year, and

25   the question will be --

1        THE COURT:  It's hardly before the Court at this

2   point.

3        MR. TRETTER:  Well --

4        THE COURT:  It's been a year.  You're saying that it's

5   now September 15, 2009 and that it means that it's time for

6   individual creditors to take discovery with respect to

7   substantive consolidation months before the examiner completes

8   his work?

9        MR. TRETTER:  Well --

10       THE COURT:  You must be kidding.

11       MR. TRETTER:  I'm not kidding, Your Honor.

12       THE COURT:  I think you must be.

13       MR. TRETTER:  Okay.  If you're saying --

14       THE COURT:  Why do you need this discovery now if it's

15   unrelated to the U.K. action?

16       MR. TRETTER:  Well, Your Honor, some --

17       THE COURT:  Is it related to the U.K. action or not?

18       MR. TRETTER:  No, Your Honor.  We are --

19       THE COURT:  Then why do you need it now?

20       MR. TRETTER:  We don't need it this second, but we

21   need to start it at some point, and some point this --

22       THE COURT:  That some point will not be now.  Your

23   motion's denied without prejudice.

24       MR. TRETTER:  Thank you, Your Honor.

25       (Pause)

1     MR. GRUENBERGER:  Good morning, Your Honor.

2     THE COURT:  Good morning.

3     MR. GRUENBERGER:  Peter Gruenberger, Weil, Gotshal &

4  Manges, for the debtors.  May it please the Court.  I rise

5  again in support of the debtors' motion for the Court to

6  implement derivatives ADR procedures and to enter a proposed

7  order that includes mediation as a major component of ADR.

8     Your Honor was absolutely correct on August 15th to

9  continue this hearing until today.  The debtors and the

10  creditors' committee in fact did make a great deal of progress

11  with derivatives counterparties and indentured trustees to make

12  further changes to the proposed order.

13     In my supplemental declaration filed last Friday, we

14  put forth the report Your Honor requested that the debtors and

15  creditors' committee file concerning that progress and the

16  results we obtained from further negotiations and discussions

17  in that almost three-week period.  That report details the

18  great efforts we made and the many accommodations we gave

19  that -- as many as we reasonably could, to derivatives

20  counterparties and indentured trustees regarding further

21  substantive changes to the revised proposed order compared with

22  the one that was before you on August 26th.

23     To that end, we distributed three separate post-

24  hearing revised orders to all remaining objectors, and there

25  were fifty-six such remaining objectors left.  Those changes

1  reflected twenty-two new changes that were made to the August

2  26 form of proposed order, and those changes were in addition

3  to the original twenty-two changes we had made to the original

4  proposed order we had attached to our motion.  Thus, there were

5  forty-four substantive changes, different ones made by us, in

6  the proposed orders.  Those three new revised orders are

7  attached to my supplemental declaration as Exhibits A, C and G.

8       In addition, we sent e-mails to every remaining

9  objector, whether counterparty or indentured trustee, asking

10  them to inform us whether they were withdrawing their

11  objections in toto and, if withdrawn in part only, which

12  grounds remained.  And we asked those remaining objectors for

13  suggested substantive language changes to aid in the process.

14  Those e-mails were attached to my supplemental declaration as

15  Exhibits B, D and F.

16       In aggregate, of the fifty-six objectors remaining as

17  of the August 26th hearing, as of this morning forty-one

18  objectors have withdrawn their objections entirely, leaving

19  fifteen remaining counterparty objectors.  And all indentured

20  trustees have withdrawn their objections entirely.

21       Further, as of August 26th, all objectors had asserted

22  in aggregate a total of sixty-eight different grounds of

23  objection.  That number has been reduced to approximately

24  forty-five different grounds remaining as of today.  Those

25  results are reflected in Exhibit G to my supplemental

1 declaration, which is the same chart that we presented to Your

2 Honor on August 26, except we now added two columns on the

3 right side of Exhibit G to reflect the original number of

4 objectors and remaining number of objectors per each ground of

5 stated objection.

6     All the modifications we made between August 26 and

7 September 14 are cumulatively shown in the final post-hearing

8 revised order we filed with the Court yesterday in both

9 blacklined and clean versions.

10     So much for the good news, Your Honor.  Now the not-

11 so-good news.  I too was correct, Your Honor, on August 26 in

12 predicting that no matter what debtors and creditors' committee

13 did, there would be some counterparties who would dig in.  That

14 in fact turned out to be the case.  In that regard, seven

15 counterparties of the remaining fifteen objectors simply have

16 ignored our three requests for some kind of response.  They

17 just failed to respond to us altogether.  An additional four of

18 the fifteen remaining counterparties objectors have not told us

19 which of their asserted grounds of objection remain.

20     So eleven out of fifteen objectors remaining, or about

21 seventy-five percent of them, have kept us all in the dark.  We

22 don't know whether they still object on all or any of their

23 asserted grounds.  Not one of these remaining eleven objectors

24 stood up on August 26 to say anything in response to Your

25 Honor's request that day that asked whether waiting until

1    September 15th would be fruitless.  They said nothing.  We

2    interpreted that silence as being a very good sign, and for a

3    vast majority of the objectors it was a good sign.  For these

4    eleven, however, we were wrong in our estimation of what that

5    silence meant.

6         At this point I'd like to thank the vast, vast

7    majority of counterparties who, despite their differences with

8    us and with the creditors' committee -- for having acted in a

9    fair, balanced and responsive manner to the charge Your Honor

10   gave all of us to go back and do the best job we could.  I

11   think we've done it.

12        Before turning to the remaining fifteen objections,

13   Your Honor, I am sure the creditors' committee wishes to be

14   heard, and I would hope that Your Honor would allow any

15   objectors who have withdrawn their objections entirely to

16   speak, if they wish to do so, about the process and the

17   experiences we had.  And we can come back to the remaining

18   objections if Your Honor will allow us to do that.

19        THE COURT:  Okay, I'll hear from the committee,

20   although it seems to me that in the end it's going to be more

21   important for me to hear from those parties who are still

22   pressing their objections.

23        MR. GRUENBERGER:  Yes, of course, Your Honor.

24        MR. COHEN:  Good morning, Your Honor.  David Cohen

25   with Milbank, Tweed, Hadley & McCoy, here on behalf of the

1  official committee of unsecured creditors. As Mr. Gruenberger

2  noted, the committee has worked with the debtors since the

3  inception of the idea for ADR. The committee strongly believes

4  it's necessary and appropriate. We've worked with the debtors,

5  both before filing the original motion and after the subsequent

6  hearings, to come up with procedures that were largely

7  consensual. I think we're there as far as we can get. There

8  are very few remaining objections.

9        There is one remaining objection to the participation

10  of the committee; I'm happy to address that now or after that

11  party makes the objection.

12        THE COURT: Well, you're standing. Why don't you

13  address it now?

14        MR. COHEN: Certainly. The committee has already

15  played an important role in this process. The committee has

16  brought together a number of counterparties and the debtors.

17  In my own conversations with a number of derivatives

18  counterparties as a result of these negotiations, they took

19  great comfort in the fact that the committee would be part of

20  this process and would serve as a check on concerns involving

21  fears that the debtors would somehow act improperly.

22        A specific example of this is paragraph 3A of the

23  revised proposed order, which deals with termination and which

24  transactions can be channeled through ADR. Several objectors

25  wanted it made clear that the expectation is that the

1 termination language is largely intended to apply to

2 counterparties, that there may be certain instances where the

3 debtors have termination rights.

4     In exchange for me making that statement and that

5 clarification here on the record, two derivatives

6 counterparties were willing to withdraw their objection:

7 Oceania actually withdrew, and the Hebron Academy, whose

8 objection is at docket number 4572, has told me that it

9 should -- I can represent to the Court that it does not oppose

10 entry of the revised order.

11     Clearly, the committee has played, and will continue

12 to play, an important role here. Second, the committee's

13 duties under Section 1103 and its right to be heard under

14 Section 1109 of the Bankruptcy Code make clear that the

15 committee should be part of the process. The ADR envisioned by

16 this motion in the revised proposed order involves hundreds of

17 transactions and hundreds of millions of dollars. Excluding

18 the committee from this process would effectively prevent the

19 committee from exercising its statutory obligations and its

20 rights.

21     THE COURT: Let me ask you a question --

22     MR. COHEN: Certainly.

23     THE COURT: -- just about what the committee's role is

24 going to be as you envision it. Are you there as a cheering

25 section for the debtor, are you there as an extra mediator to

1  act as a go-between, or are you there as an observer?  Or do I

2  have it wrong as to all of those categories?

3          MR. COHEN:  It is actually much more fluid than the

4  Court just suggested.  Under the revised proposed order, the

5  committee would consult with the debtor in setting the initial

6  demand.  The committee would also have a consultive (sic) role

7  in responding to any counteroffer.  So it would work like the

8  December derivative settlement order where the committee plays

9  a role in determining what is an acceptable range with which to

10  settle.  And so it's got two consultive roles:  one, with the

11  initial demand, and second, with the counteroffer.

12          With respect to the actual mediation itself, the

13  committee may participate but it's not required to participate.

14  So what the committee envisions is that it would not be sitting

15  at every mediation.  There would be some where the dollar

16  amounts or the legal issues were significant that the committee

17  felt it was appropriate that it be part of that process.  And

18  the committee, having weighed in formally both on the initial

19  offer and the counteroffer, would then be in a position to

20  agree if a settlement were achieved as the result of a

21  mediation, whether the committee was there or not, as to

22  whether it was appropriate to be settled under the December

23  derivative settlement order.

24          THE COURT:  Okay.  Thanks for that.

25          MR. COHEN:  So we also think the fact that there are

1   three ways to settle disputes as a result of mediation under

2   the December order, the January assignment order or a 9019

3   suggests that the committee should be involved.  If the

4   committee is not involved in mediation, then effectively every

5   settlement that comes out of mediation has to come before the

6   Court on a 9019 motion.  The committee then would have to,

7   after the fact, look at the facts, the legal arguments and the

8   merits and be revisiting the debtors' business judgment.  We

9   think that that hinders efficiency, overly burdens the Court

10  and is unnecessary.

11      The other concern that certain counterparties have

12  raised is that the committee's participation somehow undermines

13  the confidentiality of mediation.  We think this argument is

14  frivolous.  The committee would be bound by the confidentiality

15  provisions just as every other party to the mediation.

16      We think that the revised proposed order is necessary

17  and appropriate, and we would request that the Court enter that

18  order.

19      THE COURT:  Okay, thank you for your statement of

20  position.

21      MR. COHEN:  Thank you.

22      THE COURT:  Mr. Gruenberger --

23      MR. GRUENBERGER:  Your Honor --

24      THE COURT:  -- do you have a suggestion for managing

25  this process now?

1          MR. GRUENBERGER:  Yes, Your Honor.  I don't know if

2     there's any counterparty or indentured trustee here today that

3     wants to say something in support of the order or not.  If not,

4     Your Honor --

5          THE COURT:  Well, some people are jumping up.  All of

6     a sudden your invitation has --

7          MR. GRUENBERGER:  I'm sorry?

8          THE COURT:  -- has gotten some traction out there.

9          MR. GRUENBERGER:  I see Eric Schaffer, Your Honor.

10          MR. SCHAFFER:  Your Honor, Eric Schaffer, Reed Smith,

11     for BNY Corporate Trustee Services, Bank of New York Mellon.

12     As we were one of the focuses of the discussion at the last

13     hearing on this, I want to confirm everything that Mr.

14     Gruenberger said.  We did have a very good give-and-take.  We

15     resolved all of our issues to our mutual satisfaction.

16          THE COURT:  Good.

17          MR. ANTONOFF:  Good morning, Your Honor.  Rick

18     Antonoff from Pillsbury Winthrop, on behalf of the Embarcadero

19     Asset (sic) Securitization Trust, known as EAST, which is a

20     derivatives counterparty.  We filed a -- well, we terminated

21     our swap agreement soon after our counterparty commenced its

22     bankruptcy case, and there was a dispute as to the calculation

23     of our settlement amount.  There's been some correspondence but

24     there's still a gap in terms of resolving that dispute.

25          We did file a limited objection.  We certainly have no

1    objection to there being mediation, and we actually welcome a

2    fair and efficient method of resolving our dispute as well as

3    the many other derivatives disputes.  Our concern -- and I

4    should say that in our limited objection we raised about a half

5    a dozen issues, all of which, except for the committee's

6    participation, has been resolved.

7           And I -- with apologies, we are one of the parties

8    that did not respond to the e-mails that came since the August

9    26th hearing.  But I do have a concern -- we have not withdrawn

10    our objection.  I do have a concern with the committee's

11    participation along the lines, I think, that the Court was

12    questioning committee counsel, but I think a question that I

13    would want answered is whether the committee intends to file

14    papers and to present argument to the mediator.  We have no

15    objection to the committee attending mediation, consulting with

16    the debtor.  We do think that that is an efficient process and

17    a way to avoid having to bring 9019 motions and so forth.  And

18    certainly the scope of the existing derivatives orders that

19    have been entered -- this, what I'm suggesting, would be

20    consistent with the previous orders.  And I don't read either

21    1103(c) or 1109(b) as giving the committee the right to be

22    heard in a mediation since it's an alternative to court

23    litigation.

24           And so I would just ask that the -- any order that is

25    entered allow the committee the consultative observation type

1   of rule that they ought to have in order to keep the process

2   efficient but that they not be permitted to file papers and

3   address the mediator in argument, as I think that that amounts

4   to essentially a piling-on, which would make the process

5   unfair.  Thank you.

6           THE COURT:  Okay.

7           Are there any other parties who wanted to respond to

8   Mr. Gruenberger's invitation to come up and tell me what a good

9   job Mr. Gruenberger and his people have been doing?

10          MR. GRUENBERGER:  Thanks for the endorsement.

11  Turning --

12          THE COURT:  Apparently very few people want to do

13  that --

14          MR. GRUENBERGER:  Yeah, I --

15          THE COURT:  -- Mr. Gruenberger.

16          MR. GRUENBERGER:  -- I expected that.  As to the

17  remaining fourteen, now, objections, Your Honor, we will of

18  course abide by your decision of how to handle it and approach

19  those.  You can determine who those fourteen are if you would

20  look, please, at item 10 on today's agenda at pages 6 and 7.

21  And the remaining objectors are designated by letters A through

22  G, and I through P, except for Embarcadero, which just

23  withdrew.

24          So my recommendation, Your Honor, if you'll permit

25  me --

1          MR. ANTONOFF:  We did not withdraw, just --

2          MR. GRUENBERGER:  Excuse me?

3          MR. ANTONOFF:  We did not withdraw.

4          MR. GRUENBERGER:  Withdraw subject to what was argued

5    by counsel.

6          Sorry.

7          THE COURT:  Just so the record is clear, when you said

8    "I withdraw", would you just re-identify yourself for the

9    record?

10          MR. ANTONOFF:  Yes, I'm sorry.  It's Rick Antonoff

11   with Pillsbury Winthrop, on behalf of the Embarcadero Asset

12   Securitization Trust.  Thank you, Your Honor.

13          THE COURT:  Okay.

14          Anybody else who would like to stand up and withdraw

15   is welcome to do that.  I just want to know who's still an

16   active objector.  Why don't -- if there's anybody who's out

17   there -- and I don't mean to put any pressure on anybody who's

18   objecting -- who wants now to be off the list of objectors,

19   this is a good time to do that.

20          MR. GRUENBERGER:  Embarcadero, Your Honor, is objector

21   number D on page 6.  So the remaining objectors so far are A

22   through C, E through G, and I through P.

23          THE COURT:  I think we have one --

24          MR. GRUENBERGER:  Do we have a candidate?

25          MR. LAGUARDIA:  Yeah.

1        Your Honor, Daniel Laguardia, Sherman & Sterling, for

2   Bank of America.  We informed the debtors before the hearing

3   began that we would withdraw our objections as well.

4        THE COURT:  Fine.

5        MR. GRUENBERGER:  Yeah, they were 8, Your Honor.  I

6   had counted them in the --

7        THE COURT:  Okay.  So let's just --

8        MR. GRUENBERGER:  -- fifteen.

9        THE COURT:  -- let's just go down the list in the

10  order in which --

11       MR. GRUENBERGER:  Right.  Yeah.

12       THE COURT:  -- they're listed.

13       MR. GRUENBERGER:  That was my recommendation, Your

14  Honor, that we go down the list and we see what's left in order

15  of what's on the agenda, if that's okay with Your Honor, and

16  let them come up and tell us --

17       THE COURT:  Okay, Wellmont --

18       MR. GRUENBERGER:  -- and then we can respond.

19       THE COURT:  -- Wellmont Health Systems.  Is anybody

20  here or in person or on the phone?

21       The objection is denied for lack of prosecution.

22       EPCO Holdings?  Mr. Goodman?

23       MR. GOODMAN:  Good morning, Your Honor.  Peter

24  Goodman, Andrews & Kurth, on behalf of EPCO Holdings, Inc.

25  Your Honor, EPCO Holdings noted in its response that it did not

1    object to the concept of mediation.  Rather, it submitted that

2    certain of the procedures proposed by the debtors were overly

3    burdensome, unnecessarily complicated and would not facilitate

4    mediation.  We believe even after the modification some of

5    those issues exist.  Mediation is designed to be a flexible and

6    cooperative process.

7        THE COURT:  What are the specific problems that you

8    have?

9        MR. GOODMAN:  Okay, Your Honor, I'll get to that.  We

10   did respond to Mr. Gruenberger on September 1st and then again

11   to Mr. Sinn (ph.) on September 6.  One of our concerns is the

12   sanction provisions.  Under the sanction provisions, the

13   remedies include basically giving the debtors the relief that

14   they are requesting in their notice.  We do not believe that

15   that is proper to put in the mediation order.  Rather, we

16   believe that the debtors should rely on general order M-143,

17   which is already encompassed in the proposed order and does

18   allow for sanctions, which would be determined by Your Honor

19   without specifying what those sanctions will be.

20       In a sense, the parties are agreeing up front that

21   that is a possible remedy, and we don't believe that that is

22   really appropriate for this mediation --

23       THE COURT:  Actually, nobody's agreeing to that.

24   That's going to be, if it's included in the order, an order.

25   So it's, I think, therefore in terrorem effect, and it is

1    precisely the fact that there is an adverse consequence that

2    may make the process that much more efficient and workable.  If

3    parties to this recognize that they are at risk of actually

4    losing, they'll probably show up.  I suspect your client will

5    show up if they recognize that there's that risk.

6           MR. GOODMAN:  Our party -- my client does intend to

7    show up --

8           THE COURT:  Great.

9           MR. GOODMAN:  -- and participate in the mediation.

10          THE COURT:  Okay.  I'm just going to mention to you

11   that I have no problem with the sanctions as proposed.  I've

12   reviewed the order and I'm satisfied with the order in its

13   present form.

14          MR. GOODMAN:  I understand, Your Honor.  Thank you.

15   The next issue is the situs of the mediation.  We believe that

16   the situs of the mediation should be left up to the mediator.

17   My client is based in Houston.  I note that Weil Gotshal has

18   offices in Houston.  And rather than setting the mediation in

19   New York, unless other parties agree otherwise --

20          THE COURT:  Well, the adversary proceeding is going to

21   be in New York, so why not the mediation?  If your client

22   doesn't agree, you're going to end up in a litigation in this

23   bankruptcy court.  This is not a bankruptcy that is happening

24   in Houston --

25          MR. GOODMAN:  I understand.

1        THE COURT:  -- or Los Angeles or Chicago or Maine or

2   Florida.  It's happening here.

3        MR. GOODMAN:  I understand, Your Honor, but the

4   mediation -- this is mediation and it's not an adversary

5   proceeding.

6        THE COURT:  I understand, but it's in lieu of an

7   adversary proceeding; hopefully in lieu of.

8        MR. GOODMAN:  The next item, Your Honor, is, we

9   believe, the revised proposed order retains unnecessary time

10  constraints on the initial settlement conference.  I noticed

11  that the debtor did amend the time to respond to its request

12  where the debtors would give certain dates for mediation from

13  two business days to four business days, but the order still

14  provides that the parties -- the responding party must respond

15  to one of the dates listed in what the debtors propose by one

16  of the dates that the debtors propose, which is five days from

17  the earliest request.

18        Again, I just think that this process should be more

19  flexible, particularly with the dates for initial settlement

20  conference.  We would like to participate in that conference,

21  and I just asked -- we requested that the debtors give greater

22  flexibility in the timing of that settlement conference.

23        Lastly, Your Honor, the selection of the mediators.

24  We believe that the counterparties involved in the mediation

25  should have input in the decision-making process of who the

1    mediator should be out of the pool.  That often happens in

2    mediation; in fact, every mediation that I've participated in,

3    the counterparty or the other party to the mediation is

4    involved in the selection process.

5         THE COURT:  Mr. Goodman, I understand your point, and

6    I'm reminded of a case that we had together when I was still in

7    practice that involved the selection of a mediator, and it took

8    months because of conflicts of interest and problems of getting

9    mediators to be willing to participate in that dispute.

10        This is not standard mediation.  This is global

11   mediation.  This is an order that will be a one-size-fits-all.

12   That means that the particulars that your client wishes are

13   just wishes.  They can't be the rule of the game that the least

14   common denominator becomes what derails the process.  In

15   effect, what you're suggesting -- and I appreciate the fact

16   that you're the first person to stand up and formally object

17   after a process that has been designed to make objections like

18   yours go away.  I'm disappointed that your objection has not

19   gone away, as I am with respect to the rest of the alphabet

20   that I'm about to hear.

21        I believe that the process that has been run to get us

22   to this point is a fair one, that the order which has resulted

23   from this process is perhaps not perfect for everyone but it

24   represents an extraordinary achievement under the circumstances

25   and one that I'm prepared to enter.

1    I'm going to hear everybody's objection as I have

2  heard yours, but just to shorten the process a little bit,

3  everybody should recognize that flexibility is going to destroy

4  the process unless it's for good cause shown within the context

5  of a mediation which has been started consistent with the

6  order.

7    I am confident that for mediation to work requires

8  give and take, reasonable behavior on the part of everyone

9  who's involved.  But to deconstruct the proposed order at the

10  outset is to make the mediation process anything but efficient.

11  And to have mediations happening all over the country,

12  including Houston, or to have mediations with different

13  mediators, each one of which is going to have to get up to

14  speed on the nature of an industry that is itself pretty

15  complex, to me is a recipe for complexity and delay.

16    For that reason, I don't find any of your arguments

17  compelling.  I'm letting you know that now.

18    MR. GOODMAN:  All right.  I understand, Your Honor.

19  Thank you.

20    THE COURT:  Okay.

21    Easton Investments?

22    UNIDENTIFIED SPEAKER:  Easton Investments?

23    THE COURT:  Is there anyone here for Easton?

24    It's denied for lack of prosecution.

25    Royal Bank of Scotland?  Mr. Bienenstock, good

1  morning.

2      MR. BIENENSTOCK:  Good morning, Your Honor.  Martin

3  Bienenstock of Dewey & LeBoeuf, for Royal Bank of Scotland PLC

4  and its affiliates.  Your Honor, we'd certainly listen to what

5  Your Honor has said.  And hopefully the reason I still rose to

6  come to the podium to ask Your Honor to give us relief in

7  respect of three points is because of the following.  We did

8  not object to the concept of mediation, ADR, et cetera, the

9  Court's power, et cetera.  Our objections at all times were

10 designed, number one, for -- to maximize the likelihood of

11 success, and number two, to maintain evenhandedness and

12 fairness.  And those are the things that I'm -- the three

13 things that I'm going to be asking Your Honor about now.

14      There is a provision in the order that goes -- the

15 proposed order, that basically says that participation in the

16 process shall be without prejudice to any parties, jury trial

17 rights, forum selection rights, et cetera.  We did respond to

18 Mr. Gruenberger's e-mail, and we made the following comment:

19 Simply add, after "without prejudice to jury trial rights",

20 "Article 3 rights", because a party may not want a jury trial

21 but may still want an Article 3 Court for whatever purpose.

22 That was simply rejected.

23      In the debtors' response to our initial rejection, it

24 responded specifically to us to say, well, Royal Bank of

25 Scotland filed two proofs of claim attached as exhibits to

their pleading, so they can't even raise this issue because
they wouldn't have Article 3 rights.  Actually, Your Honor,
their attachment of the two proofs of claim proves our point.
We have many entities and affiliates:  ABN AMRO Bank, ABN AMRO
Incorporated, Sempra Energy, et cetera.  There are no proofs of
claim attached for those entities.  The entities that are owed
money by the various debtors' estates in many cases are
different from the entities they contend owe money to them.

So we have not -- with a lot of bravado, they tried to
reject our proposal.  But the bottom line is we have not waived
our Article 3 rights by filing proofs of claim for most all of
the entities that I'm here representing that are affiliates.
And it's certainly just basic fairness to add the words "or
Article 3 rights" to their reservation of parties' rights on
jury trial, et cetera.  That's point number one.

Point number two, Your Honor, is, in our initial
objection, we asked that the debtor provide counterparties with
the same questionnaire answers as the debtor was requesting
that counterparties provide when they file proofs of claim.
And we were here in August when Your Honor rightly observed
that civilized people were at the beach.  And we heard Mr.
Gruenberger say that that's wrong, the Court ruled on that in
another context that we shouldn't get that.

So we tried -- although we don't agree with Mr.
Gruenberger's comments, it is important, if this process is

1    going to be successful, that the counterparties being asked to

2    pay money have information on which to base their request.

3        The debtors explained the contrast in their initial

4    pleading by saying, well, they need the information because

5    they have a statutory duty under the Bankruptcy Code to review

6    proofs of claim. There's sort of a negative implication that

7    the rest of us responsible to boards of directors and

8    shareholders can just write checks without information, which

9    of course is wrong. So how can we forward the process with the

10   information?

11       I would also point out, Your Honor, that although the

12   debtor takes great comfort in advising the Court that it's

13   working off of this Court's mediation order, the order, Your

14   Honor, in section 3.1, talks in terms of a Court being able to

15   send things to mediation before the Court's final evidentiary

16   hearing. In other words, the mediation order, the standing

17   order of this Court, contemplates an extant contested matter or

18   adversary proceeding in which discovery is available, and then

19   the Court can send things to mediation, whereby we don't have

20   that process here. We have the ADR mediation process before

21   there's a pending adversary proceeding or contested matter. So

22   there's no proceeding in which to ask for discovery.

23       So we ask -- in deference to Mr. Gruenberger's

24   statements, even though we don't agree with them, we ask for

25   the following: that if a party gets an ADR notice which is

1  attached as Exhibit A to their proposed order, which, as Your

2  Honor will see, doesn't require them to provide virtually any

3  data whatsoever except what they voluntarily decide to provide,

4  that a party can respond by saying we can't make a counteroffer

5  without the information that would have been answered in the

6  questionnaire.  And before the party gets hauled into a

7  mediation, with the time and expense that that involves, the

8  debtor should provide that information so hopefully then the

9  counterparty has enough to make a counteroffer.  We think

10  that's designed to make this process work as opposed to make

11  sure that it doesn't work.

12        Now, of course the debtor can say, well, if you ask us

13  for information, why wouldn't we provide it?  Well, they can

14  provide information that you think of asking for but not the

15  full range in the questionnaire or not -- it's much more

16  comforting to a party if there's a set of information they must

17  provide so you know you're not missing something by some

18  accident.  And it's designed to make this work in advance of

19  going to mediation.

20        So we can't -- finally, Your Honor, appearances.  It

21  just doesn't look right from a process point of view.  From

22  a -- we hope from a judicial point of view that, when parties

23  file a proof of claim, they have to provide these questionnaire

24  answers, but when the debtors want money from other par -- and

25  that's when -- parties are filing proofs of claim to get

1  bankruptcy dollars; you know, whatever cents on the dollar are

2  ultimately going to be given.  But when they want a hundred

3  cent cash, U.S. dollars, from the rest of us, they don't have

4  to give us information?  It just doesn't -- it doesn't seem

5  fair; it doesn't appear fair.

6  So we think, for all those reasons, there ought to be

7  this safety mechanism in the process where, if a party says I

8  need the information before I make the counteroffer, they have

9  to give it.

10  My last point, Your Honor, is the committee.  As the

11  committee just explained, it deems frivolous, as it just said,

12  counterparties' concerns for confidentiality in having the

13  committee out of the room because the committee is bound by the

14  confidentiality order.  Well, Your Honor, the committee has

15  entities on -- financial entities on it that are in the same

16  financial derivatives trading space.  They can't keep things

17  confidential from themselves.

18  So, again, in deference to respecting the role of the

19  committee, generally we suggested a middle-ground sensible

20  approach where the committee can participate, but if in

21  certain -- if in discussions and mediation the counterparty

22  determines that it really wants to tell the debtor something

23  but it's proprietary information, it's sort of like a trade

24  secret trading strategy; they can ask that the committee leave

25  the room.  That's just reasonable, and we should have that

1    right, because there's no way the committee members can keep

2    information confidential from themselves.  They'll have it.

3         Those are our three points, Your Honor.  We think

4    they're each designed to promote the likely success, not to

5    detract from it.  We think it will promote the appearance of

6    fairness here, and we think it will promote the protection of

7    all parties vis-a-vis the Article 3 point.

8         THE COURT:  Yeah, let me find out from Mr. Gruenberger

9    why he disagrees, if he does, with the things you've just

10   stated.

11        MR. BIENENSTOCK:  Thank you, Your Honor.

12        MR. GRUENBERGER:  I have a direct answer for that

13   question, Your Honor:  I disagree one hundred percent with

14   everything that Mr. Bienenstock said, everything.

15        THE COURT:  Why am I not surprised?

16        MR. GRUENBERGER:  I didn't want to surprise anybody.

17   Mr. Bienenstock's opening remark this morning was that he had

18   no question about the Court's power, he was just going to talk

19   about three things.  Yet he managed to get seven of his

20   original fourteen objections, many of which had to do with the

21   Court's power, into his later statements that belied his

22   opening remark.

23        Mr. Bienenstock failed to tell us which of his

24   arguments -- there were fourteen of them -- grounds of

25   objection were withdrawn.  I still don't know which are

1    withdrawn and which are not.

2         His objection stated that counterparties are entitled

3    to have matters heard by an Article 3 judge.  That's flatly

4    wrong.  Mr. Bienenstock should know better.  He and I

5    participated together in a mediation process in Enron.  There

6    was no Article 3 judge involved.  Article -- an Article 1 judge

7    created M-143; that was Judge Lifland.  An Article 1 judge

8    signed the mediation orders, two of them in Enron; that was

9    Judge Gonzalez.  M-143, in its very title and its very words in

10   section 1.3, says you don't have to have any kind of adversary

11   proceeding, any matter a judge -- any dispute an Article 1

12   judge can send to mediation.  That is undisputed.

13        Mr. Bienenstock says it's a simple fix, just stick in

14   "Article 3" into paragraph 14 along with jury trials.  If Mr.

15   Bienenstock has a right to an Article 3 judge at any point for

16   any one of his clients or subsidiaries or affiliates, all he

17   has to do is use Article -- I'm sorry, paragraph 5 on page 5 of

18   the order.  It says "All rights, remedies, claims and defenses

19   of a derivatives counterparty and a debtor, in good-faith

20   compliance with the ADR procedures, shall not be impaired,

21   waived or comprised in any further proceedings.  In these

22   cases, should no settlement or compromise result from

23   participation in the ADR."  That preserves whatever Article 3

24   rights he thinks he has.

25        Appearances:  For appearances' sake, the debtors ought

1    to file questionnaire answers.  Well, what we tried to do in

2    these procedures, Your Honor, was to have each party, the

3    debtors' side and the counterparties' side and indentured

4    trustee's side, give a brief explanation of what the parties'

5    position is.  Not evidence; it's noticed pleading.  And we

6    attached forms that gave each side the same amount of

7    information.

8         Now, Mr. Bienenstock makes an assumption that he wants

9    to create the same exact tit-for-tat goose-for-the-gander

10   proposal that was denied in the bar date order proceedings.

11   The debtors were asked to provide the same things then; didn't

12   happen.  Court said no, and now through the side door he wants

13   it.

14        But let's look at what really in reality this means.

15   Let's assume a counterparty doesn't have a claim at all, never

16   files the questionnaire.  We're supposed to file the same

17   questionnaire material for that counterparty?  For what

18   purpose?

19        THE COURT:  Well, let me break in and just ask a

20   question about how you envision this process to work, because

21   as I was hearing Mr. Bienenstock's argument on the

22   questionnaire information, he was suggesting that as part of

23   this order there should be some requirement that the debtor, in

24   effect, provide discovery to the counterparty so that the

25   counterparty is informed in a manner that is roughly congruent

1    with the information that the debtor will have when a proof-of-

2    claim questionnaire has been filed in the case by the bar date.

3           My impression of how a mediation of this sort needs to

4    function if it's to be successful is that there will

5    necessarily be, if not discovery in the sense that that term is

6    used in an adversary proceeding, the consensual sharing,

7    subject to confidentiality restrictions of information

8    sufficient to support positions.

9           MR. GRUENBERGER:  Absolutely right.  Absolutely right.

10          THE COURT:  I assume that there is nothing within the

11   order, as it is presently framed and as it may be reasonably

12   construed, that would limit the ability of the mediator and the

13   parties during the mediation to share such information as is

14   appropriate to facilitate the process.

15          MR. GRUENBERGER:  On the contrary, Your Honor, the

16   order, as it now is constituted, promotes the exchange of

17   information; I'll explain, if I may, how.

18          THE COURT:  I think that would be a useful thing for

19   us --

20          MR. GRUENBERGER:  Right now --

21          THE COURT:  -- to have on the record now.

22          MR. GRUENBERGER:  Right now, if a particular dispute

23   is chosen for mediation, the debtors, in consultation with the

24   creditors' committee, will send what's called an ADR notice.

25   That notice has a couple of things in it.  It says here's our

1  demand for settlement, here's the basis for our demand, and

2  there's a form that is presumptively good that we attach for

3  ease.  They don't have to use the form but that's a

4  presumptively good form.

5       Thirty days -- within thirty days, the counterparty

6  who received an ADR notice responds.  That response -- again,

7  we have a form that's a presumptively good form -- says give a

8  brief explanation of either why you don't agree or what more

9  you need, or counteroffer or do anything.

10      So let's assume an ADR counterparty sends back a

11  response that says I'd love to have a little more information.

12  Now, are we going to go now and try to force a mediation with

13  somebody who says in good faith that they have insufficient

14  information?  Of course not.  That never happened once in the

15  seventy-seven mediations I had with Mr. Bienenstock in Enron,

16  never once.  We didn't have a bar to entry the mediation with

17  discovery.  The mediator, a good one, will ask how far the

18  parties are apart; that's one of his first questions after

19  hello, who are you.  A good mediator says that.  I know that.

20  And if one party says I really don't know what the other side's

21  talking about, we're wasting our time.

22      So, again, what I said on August 26, in Mr.

23  Bienenstock's presentation there's a presumption that we're in

24  bad faith, that we are going to waste everybody's time.  Of

25  course not.  We have -- after the thirty days goes by, we're

1    supposed to have settlement talks.  And in the settlement

2    talks, if someone says look, I really don't have the

3    information that you have, help us out, we should have our

4    number-crunchers talking to each other's number-crunchers to

5    make sure that we are on the same page.  Every mediation I've

6    been to or I've been party to goes that way.  Never has there

7    been a bar to entry like this one, never.  And I've never seen

8    an order to that effect at all.

9         So that's how it's going to work, Your Honor.  And to

10   require this gate-keeping role of discovery in advance will

11   impede.  We'll have fights about the discovery, we'll have

12   fights -- Your Honor will be bombarded, we won't get anywhere,

13   and we'll be back in the ADR -- I'm sorry, we will be replacing

14   ADR with discovery disputes in an adversary proceeding context.

15   That's exactly what we want to avoid.

16        Now, once again -- I hope I've answered --

17        THE COURT:  You have.

18        MR. GRUENBERGER:  -- Your Honor's question.

19        THE COURT:  Thank you.

20        MR. GRUENBERGER:  With respect to Mr. Bienenstock's

21   last point about the UCC, they of course will, and will very

22   well, speak for themselves.

23        But again, from experience, the unsecured creditors'

24   committee plays a good role in mediation.  They played that

25   role in Enron.  They were not barred.  There was no

1    confidentiality breach.  There was no such concern then.  I

2    think it's a red herring, totally.  They should be involved so

3    that we can get ahead of ourselves, not get behind ourselves,

4    in terms of settlements.  That's the purpose of mediation.  And

5    to bar them, for reasons that I don't understand -- it's

6    probably beyond my ken to understand that -- I think should be

7    overruled.

8         So I think all of Mr. Bienenstock's objections should

9    be overruled.

10        MR. BIENENSTOCK:  May I reply briefly, Your Honor?

11        THE COURT:  Yes, and I don't know -- I'm trying to

12   find out if the person who is now anxious to speak is anxious

13   to speak in connection with the Royal Bank of Scotland matter

14   or something else.

15        MR. SZYFER:  Well, Your Honor -- Claude Szyfer on

16   behalf of omnibus derivative counterparties.  We also filed an

17   objection with respect to the information balance point.  And

18   so I thought, to streamline things, if I could maybe add a

19   couple of comments after Mr. Bienenstock that that would

20   streamline the process, rather than have me go forward maybe a

21   half hour or an hour now and bring up points that may have

22   already been discussed.

23        MR. GRUENBERGER:  Mr. Szyfer's number 10, Your Honor,

24   with one having been eliminated in front.  So there's only a

25   few between Mr. Bienenstock and Mr. Szyfer.

1    THE COURT:  Why don't we give Mr. Bienenstock an

2    opportunity to respond.  And I think I'm just going to continue

3    to run down the agenda letter by letter.  If it's an issue that

4    we've already covered thoroughly, you may not have that much to

5    say.

6    MR. BIENENSTOCK:  Your Honor, on the first point on

7    Article 3, number one, at no time -- contrary to Mr.

8    Gruenberger's statement, at no time did we say every

9    counterparty is entitled to an Article 3 Court.  What we said

10   was some are if you haven't filed a proof of claim, as a for-

11   instance.

12   But, bottom line, what Mr. Gruenberger is now saying

13   to the Court after saying he disagrees totally with what I

14   said, he said my Article 3 preservation right is in paragraph 5

15   of the order as opposed to paragraph 14, which specifically

16   preserves jury trial rights and forum selection clauses, et

17   cetera.

18   One way of doing this is for me to, at the appropriate

19   time, carry around a copy of the order and this transcript.

20   There certainly is a question why the other rights in paragraph

21   14 would not similarly be included in paragraph 5.

22   So I think (audio distorted) rights in paragraph 14.

23   That said, we could defer to the less good lawyering and use

24   this transcript and Mr. Gruenberger's admission as a solution

25   to the first issue.

1          THE COURT:  Why don't we just defer to the Court on

2     this.  And I'm going to tell you that I accept what Mr.

3     Gruenberger has said is the intention of the drafter in respect

4     of paragraph 5 on page 5.  And even if it weren't the intent of

5     the drafter, since it's to become the order of this Court, it's

6     my view that the purpose of the global ADR procedures to be

7     made applicable to these various derivative claims are not

8     intended in any respect to alter substantive rights of the

9     parties as they exist today, or tomorrow for that matter.  The

10     only way those rights will be altered is if parties enter into

11     binding settlements by virtue of the process that we're now

12     initiating.  Whether there are Article 3 rights that a

13     particular counterparty may have, I have no idea.  And there's

14     certainly nothing in the order that, at least in my intention,

15     is designed to abridge those rights.

16          MR. BIENENSTOCK:  Thank you, Your Honor.  Okay, point

17     number two was the questionnaire.  Most of the debtors' reply,

18     Your Honor, really went to providing information in the

19     mediation.  Our aspiration was to get the information provided

20     in the first process so you maybe never have to get into the

21     mediation.  And certainly there were preparatory statements by

22     the debtor just now that I guess they amounted in sum and

23     substance to the notion that, well, if asked, we'll probably

24     want to provide information, et cetera.

25          We do not believe that the process should depend on

1    that in this adversary process. Even though it's an ADR,

2    parties are adversaries. And we think it would be much better

3    if the order expressly protected the counterparties' rights to

4    get that basic information.

5         We're not talking, Your Honor, about extensive

6    discovery. We're talking about what collateral did you have,

7    what valuation technique did you use to determine your damage

8    claim, what other costs are you referring to; really basic

9    things that we set out in our proposed questionnaire, which

10   was, as Your Honor mentioned, was an analogue to the debtors'

11   questionnaire.

12        And then -- well, the committee hasn't responded to

13   our last request, so I obviously don't have a reply to that.

14        THE COURT: Okay.

15        MR. BIENENSTOCK: One other point, Your Honor, which I

16   think goes -- further supports all of our requests, on page 1

17   of the debtors' proposed order, the debtors are asking Your

18   Honor to make a finding that there are a lot of common-fact

19   issues in the ADR proceedings that would be initiated under

20   this matter. That itself presents an issue as to, well, when

21   you're called into this ADR, if there are -- and there are

22   going to be setoff issues, I'm sure, that are common -- they

23   mention that in their proposed order as one of the common

24   issues, valuation issues, et cetera -- do you want to settle

25   this before or after the Court gives its rulings on these

1    issues?

2          I think if the data is given to the parties that we

3    request in our questionnaire, parties will be much better able

4    to make an educated decision as to whether they're better off

5    settling before this Court determines the so-called common

6    issues or after.  So --

7          THE COURT:  This is part of every bankruptcy case, and

8    perhaps it's particularly true of this case given its size,

9    complexity and the number of parties who are involved.  We have

10   an example of that very issue today on this morning's docket.

11   A matter was settled as an uncontested matter as item number 6,

12   and I'm about to issue a decision with respect to a contested

13   matter which is appearing after we're done with all of the

14   objections on this list.

15         Parties take their risks in the flow of a bankruptcy

16   case and they take their risks in the flow of a mediation to

17   make informed judgments as to whether it makes good sense

18   economically to settle or to take your chances behind door

19   number 3 or door number 601.

20         The ADR procedures do necessarily involve common

21   issues, but just because those common issues are setoff,

22   termination, valuation, computation of termination payments and

23   notice, to list the items that are in the order, doesn't

24   necessarily mean, by the way, that that's the only list of

25   common issues, nor does it necessarily mean that, just because

that's an issue of law or fact to be determined, that it's the

kind of thing that will be differently determined if it ends up

in litigation.  In fact, informed judgment would suggest that

you settle something because you're reasonably confident that a

thoughtful finder of fact and law will find it a certain way

even if it's not the way you want it to be.  And --

MR. BIENENSTOCK:  That's my point, Your Honor, that

you want to have that data that goes to those issues --

THE COURT:  Necessarily that data will have to be in

front of the parties to the mediation if they're going to reach

an agreement, assuming they're represented by you.

Now, I don't know who's going to represent every

counterparty.  I don't know whether any of these issues in

every -- are even pertinent to some of these disputes.  Some of

these disputes may simply be ornery obdurate behavior, the

behavior of parties who need to pay, who want to hold onto

their cash for as long as possible.  Indeed, I suspect that

that is the principal common issue of law or fact that unites

all of these disputes.

Like every other bankruptcy case you've ever been in,

when you owe money, hold onto it for as long as you can.  It's

better in your pocket than the debtor's.  It's not written down

anywhere, but that's how people behave.  That's the behavior

we're seeking to get to right now, to get to an ADR process

that encourages parties to write checks, because the money's in

1    fact owed.  And even if you can come up with some creative

2    reasons as to why the number might be different, get to the

3    table quickly.

4          So with that being what I consider the most important

5    common issue, I think these ADR procedures are quite

6    appropriately framed.

7          Now, as to the discovery issue which you mentioned, I

8    believe the mediator is the best party to coordinate the

9    sharing of information.  And I see absolutely no reason why

10   there need to be black-letter requirements for disclosure from

11   the debtor, particularly in cases, and I'm not suggesting that

12   this is true of any of your clients or, frankly, any other

13   client represented in the room, but particularly in cases where

14   the only issue is delay.

15         There really aren't any major issues of dispute.  This

16   is a process designed to facilitate the kind of settlement that

17   was achieved in item number 6 on today's agenda.  Nine-plus

18   million dollars is being paid over to the estate that should

19   have been paid a while ago.  I think there are a lot of

20   counterparties that should take heed, and they can save money

21   ultimately by not participating in ADR but simply writing

22   checks.  I'm not suggesting, by the way, that anybody should do

23   that in a situation in which there's a good-faith dispute.

24   That dispute can be resolved in mediation; and if not, here;

25   and if not here, some higher court.

1          So as to the discovery issue, I'm not moved by your

2     argument.  As to the confidentiality issue, I need to hear more

3     from the committee.

4          MR. BIENENSTOCK:  Thank you, Your Honor.

5          MR. COHEN:  Your Honor, as to the confidentiality

6     issue, the committee does not trade in derivatives; it's a

7     statutory fiduciary.  As such, it's involved in derivatives

8     issues in these cases every day.  The committee members

9     themselves regularly recuse themselves, as appropriate, where

10    they have a competitive interest in the matter at issue.

11         Further, the expectation is, with respect to those

12    mediations where the committee actually does appear, it would

13    be the committee's professionals rather than the actual

14    members.

15         Finally, under section 10(b) of the proposed order,

16    the mediator has the broadest possible discretion.  In a

17    certain situation, if a counterparty has an issue that it

18    believes should be excluded from the presentation to the

19    committee, it has the power to go to the mediator and ask for

20    that relief.  We think it would be inappropriate to give

21    counterparties unilateral right to exclude the committee.

22         THE COURT:  Thank you.

23         As to the confidentiality issue, I'm satisfied that

24    the committee, for reasons just expressed, as an estate

25    fiduciary, can be bound to confidentiality and in fact, in most

1    every case that I'm involved in, orders are entered at the

2    outset of the case relating to the sharing of confidential

3    information with the committee and between the committee and

4    third parties, not only in this case but in virtually every

5    other large Chapter 11 in this district.

6         I'm also persuaded that having the committee actively

7    involved in this process, in a manner that I don't wish to

8    circumscribe by words now but that I think needs to be adjusted

9    on a case-by-case basis, will contribute to the fairness and

10   overall efficiency of the process.  So as to that concern, I

11   overrule that objection.

12        As to the Article 3 issue, which is the first point

13   I've already covered, but with the exception of making clear

14   that Article 3 rights are preserved within the order, the

15   objections of Royal Bank of Scotland are overruled.

16        The next is Highland Capital Management.

17        UNIDENTIFIED SPEAKER:  Highland Capital Management.

18        THE COURT:  Is anyone here for Highland?

19        If no one is here to press those objections, those

20   objections are denied for failure to prosecute.

21        UNIDENTIFIED SPEAKER:  Next one is EXCO, Your Honor,

22   E-X-C-O.

23        EXCO?

24        THE COURT:  EXCO Operating Company, LP?

25        No response.  Denied for the same reason.

1      Now we get to omnibus objection of derivative

2  counterparties.

3      UNIDENTIFIED SPEAKER:  Yes, Mr. Szyfer.

4      MR. SZYFER:  Thank you, Your Honor, and I'm mindful of

5  what -- the comments that Your Honor just made, so I will keep

6  my comments brief.  I have a great deal of respect for Mr.

7  Gruenberger, but with all due respect, I'm still a little

8  skeptical on the information point.  And if I can elaborate on

9  an example, I have a client who, as Your Honor has said, has

10  already paid the undisputed amount.  We sent a 6(d) letter

11  under the ISDA agreement and said that 5.2 million was due.  We

12  were told that that was not the right number, that their number

13  was higher, but we paid the amount.  And when I have asked for

14  the information and said, well, let me find out what your

15  numbers are and let me find out what the difference is.  I

16  haven't received that information.

17      And that's why I'm concerned, and that's why I would

18  echo Mr. Bienenstock's concerns that there should be something

19  in the order, whether it's that the mediator has the ability to

20  grant this information or requiring that the debtors at least

21  provide us with the terminated transaction detail that they

22  wanted with respect to the derivative questionnaire so that at

23  least we can have the same opportunity, as Mr. Gruenberger said

24  at the last hearing, to scrub the number.  That's really all

25  we're looking for.  And the earlier the debtors give that to

1    us, the more expeditious the process will be.

2         The debtors are going to give us one raw number

3    pursuant to the derivatives ADR procedures; well, that's what

4    they've done in my case.  They've said our number is about

5    750,000 dollars higher.  So it's a small portfolio.  But that

6    being said, when I've asked to see where the differences are, I

7    haven't received the same cooperation.

8         I've provided to the debtors voluntarily to help

9    expedite the process to avoid having to mediate as many

10   mediations as I think I'm going to have to participate in.  But

11   that being said, I haven't received the same cooperation, and

12   that's really why I rise, that's why I'm skeptical and that's

13   why I do want something in the order.

14        THE COURT:  Mr. Gruenberger, you've been --

15        MR. GRUENBERGER:  Your Honor --

16        THE COURT:  -- you've been lauded for being someone

17   that is greatly respected, but there's a huge "but" associated

18   with it.

19        MR. GRUENBERGER:  Yes, Rocky Marciano used to smile

20   before the left hook also; I remember that well.

21        Mr. Szyfer never asked me for any information.  He

22   may -- his client may have asked the debtors in the pre-

23   mediation world; I don't know.  I assure you, if one of Mr.

24   Szyfer's nineteen clients -- I think there are nineteen -- that

25   he represents on this proceeding gets sent an ADR notice and

1    they say we don't have the information in good faith, they'll

2    get it.

3           THE COURT:  I'm confident that's true and recognize

4    that that's an essential aspect of the process.  To some

5    extent, I gather that objections that have not gone away are

6    durable in part because of some lack of trust that, if it isn't

7    precisely written down in an order that everybody can look to,

8    that the mediations will be one-sided or in some way biased.

9           I believe that virtually every order that I enter is

10   imperfect in one way or another, largely because I enter so

11   many, largely because even when a document is thoroughly and

12   carefully lawyered there are opportunities for disagreement as

13   to what is intended and because it is the nature of an

14   adversary system to vigorously and zealously pursue claims and

15   defenses in an atmosphere in which while we trust each other

16   there is also a strong desire to win.  And so if it is not

17   precisely described, sometimes information is not shared,

18   particularly the information that's embarrassing or that might

19   not support a position.

20          That being said, I believe that it is important that

21   the mediators be the parties who are most actively involved in

22   managing this process and that we not attempt, by means of a

23   requirement in an order, to impose disclosure or other

24   obligations that frankly are a natural part of the give-and-

25   take in the mediation itself.

1          To the extent that there is a 750,000 dollar delta

2     between what has already been collected and what might be

3     collected, provided the debtor were to provide information to

4     support the higher number, I must say I'm surprised that there

5     has been any delay in providing the information that would lead

6     to the payment of the 750,000 dollars which is due and owing

7     from an apparently solvent entity that might pay it.

8          So it's with that understanding that -- Gordon Gekko

9     said it many years ago -- the natural desire of a debtor to

10    collect as much money as it can collect will be the ultimate

11    lubricant for this process.  I believe that the debtor will

12    provide information that supports its claims in good faith and

13    that those in a position to respond will seek to contradict or

14    supplement so as to make clear what the right amount is when

15    there's an active dispute.  And I leave it to the mediator to

16    not only encourage compromise but to be a voice of reason in

17    the discovery process.

18          So I see no reason to modify the order formally.

19          MR. GRUENBERGER:  Thank you, Your Honor.  I just would

20    like to add a philosophical twist, if I might.  One of the

21    benefits of mediation, and there's no benefit in winning

22    because nobody wins in mediation, the benefit to have

23    principals present is for them to hear the other side.  So if

24    these side's principals hear the other sides', they come

25    closer; it's inevitable.

1     And my clients are in the audience today.  They've

2     listened to what you've said.  I hope the counterparties'

3     principals are listening as well, because that's the only way

4     it's going to work.  Winning is not the game.  And I agree with

5     Your Honor.  Thank you.

6          THE COURT:  Okay.

7          So I've overruled that objection.

8          D.E. Shaw?

9          MR. ROSENTHAL:  Good morning, Your Honor.  My name is

10    Jeff Rosenthal of Cleary Gottlieb Steen & Hamilton.  I actually

11    had not come here to argue on behalf of D.E. Shaw, but my

12    associate, David Livshiz, had planned to.  His Southern

13    District admission was scheduled for this morning as well.

14    He's admitted in New York State Court, and with the Court's

15    indulgence I'd like to orally move that he be accepted pro hac

16    to be able to make the argument for D.E. Shaw.

17         THE COURT:  I accept that oral motion and welcome your

18    colleague to the Southern District of New York.

19         MR. ROSENTHAL:  Thank you.  I do have one comment; if

20    I could just do it out of turn on behalf of Wachovia, who I was

21    here on behalf of.  We do plan, in light of the comments the

22    Court has made this morning, to withdraw the objection of

23    Wachovia.  Almost all of it had been resolved.  There had been

24    one minor clarification we had sought, but we do take the

25    Court's statements to heart and do withdraw that, and we don't

1    need the time.

2         THE COURT:  All right, fine.  Thank you for that.

3         MR. LIFSHIZ:  Thank you, Your Honor.

4         THE COURT:  Just to be clear, you still have to be

5    formally admitted, you understand that.

6         MR. LIFSHIZ:  I am being admitted next Tuesday.  Thank

7    you, Your Honor.  I'm here on behalf of D.E. Shaw Composite

8    Portfolios and D.E. Shaw Oculus Portfolios and their respective

9    affiliates.

10        I've listened very carefully what Your Honor has said

11   today, especially on the sanctions issue which is the one

12   narrow issue on which we have objected, and I rise only because

13   I was here in August and I'm here today, and I've listened

14   carefully, and I haven't heard anyone specifically mention the

15   type of objection that we have.  And in two rounds of Mr.

16   Gruenberger's declarations, I have not seen a response

17   specifically to our very narrow objection.  And so I wanted to

18   bring it to Your Honor's attention.

19        Our objection is extremely narrow.  We are not

20   objecting to having sanctions in the order.  We understand why

21   it's necessary, we understand Your Honor's explanation that

22   having some skin at the line will help parties reach a process.

23   Our objection is on the small point of who should drive the

24   sanction process in the event that a party is not acting in

25   good faith, and we believe -- and we're objecting to the order,

1  as drafted, because it allows the parties themselves to

2  initiate the sanctions process, rather than a third-party

3  mutual mediator, who's supposed to be there to promote

4  compromise and which is what is provided for in the standing

5  mediation order in this district, and which is the only thing

6  that has been ordered in the two cases which the debtors have

7  cited as precedent in this case.  We think that allowing

8  parties to push sanctions on the basis of a nebulous standard

9  as good faith is simply an invitation for more litigation, not

10  less litigation.  And therefore, it would undermine the goals

11  of efficiency that Your Honor has articulated today.

12         THE COURT:  Mr. Gruenberger, do you have a response to

13  that?

14         MR. GRUENBERGER:  Yes, Your Honor.  Good faith, like

15  obscenity, you know it when you see it.

16         THE COURT:  You got a delayed -- you got a delayed

17  laugh.

18         MR. GRUENBERGER:  I'd like to see the person who can

19  write the encyclopedic definition of good faith in a meaningful

20  way in under 4,000 pages.  People know what good faith is.

21  People know what bad faith is.  We don't have to write a

22  legislative embodiment.  If you're in good faith, nothing's

23  going to happen.  But if you blow off the process, if you don't

24  respond to an ADR notice, if you don't show up for a mediation,

25  if you don't return a phone call, that's bad faith.  Now, this

1    can happen even before a mediator gets involved. How does the

2    Court know?

3        There's going to be no sanctions, as Your Honor has

4    said and as the order, as proposed, states. There will be no

5    sanctions unless there's a hearing on notice and Your Honor

6    makes the decision. Whose to tell Your Honor that that's

7    happened? The mediator might, if he's been involved, sure.

8    But a lot of this can happen before the mediation.

9        So I don't think that the objection has any substance

10    whatsoever and should be overruled.

11        THE COURT: I'm going to overrule the objection not

12    necessarily because I'm equating good faith with obscenity,

13    because I'm not, but because the only way that a motion for

14    sanctions can be properly pressed, if it's going to have any

15    reasonable prospect of succeeding, is if there are credible,

16    demonstrable, pretty horrific facts that support the motion.

17    Because it is clear to me that the goal of this ADR process,

18    which has been crafted with considerable care by the debtor in

19    cooperation with the creditors' committee and which currently

20    reflects considerable compromise as a result of the various

21    responses received from counterparties, is a process which is

22    designed to work. As I said earlier today, there may be some

23    imperfections; there always are in documents. But the spirit

24    that underlies this effort is to get people to the table so

25    they can talk to each other with the facilitation of an

1    independent, neutral party who will help to interpret what the

2    parties are saying to each other.  I don't pretend to know how

3    each of these mediations will work, but I do know how mediation

4    generally works, and I have, myself, served as a mediator from

5    time to time.  I agree with Mr. Gruenberger that you can tell

6    when a party to a mediation is not acting in good faith.  You

7    can tell when a party to a mediation doesn't want to settle.

8    Just because a party doesn't want to settle doesn't mean that

9    it's sanctionable.  In fact, it's clearly not sanctionable.

10    This is a consensual process.  But if a party is willful and

11    obdurate, unwilling to participate, refuses to show up at a

12    mediation, or acts like Serena Williams at the mediation, that

13    might be sanctionable.

14        With apologies to Serena, the objection is overruled.

15        MR. GRUENBERGER:  The next one is Taconic Capital

16    Partners, LP.  Taconic?

17        THE COURT:  Taconic's objection is overruled for

18    failure to prosecute Barclays Bank, PLC.

19        MR. LACY:  Good morning, Your Honor.  Robinson Lacy

20    from Sullivan & Cromwell for Barclays Bank.  My main reason for

21    being here is to secure the right of noteholders of CDOs to

22    participate in these mediations.  The -- some background is

23    required, although the Court is familiar with the basic

24    structure.  We're concerned about derivatives where Lehman's

25    counterparty is a special-purpose entity, typically a Cayman

1   Island entity.  All of the economic interest in that entity is

2   held by noteholders, purchasers of notes issued by that entity.

3   But the entity itself is the swap counterparty; it's the one

4   that terminates or does not terminate the swap.  There is

5   normally an indentured trustee on the scene which holds most of

6   the assets as collateral for the notes and has some

7   responsibilities for making payments pursuant to the indenture.

8   Okay?  So we're talking about a situation where we have three

9   players on the counterparty side:  we have the issuer itself,

10  which is a shell, typically, we have an indentured trustee,

11  which is a bank, somewhere, with no money in the game, and we

12  have the noteholders.  Now, in general, in the deals I'm

13  interested in, the noteholders I'm talking about are not people

14  who bought a thousand dollars worth of something to put in an

15  IRA.  Barclays owns hundreds of millions of these notes.  The

16  notes are issued in classes, and it's normal for the indenture

17  to provide that the senior class is the controlling class,

18  meaning that the majority of the holders of that class can tell

19  the trustee what to do under certain circumstances.  There are

20  a number of situations where Barclays owns a majority of the

21  controlling class, so it single-handedly is in a position to

22  tell the indenture what to do.  And I am sure that there are

23  many other similar structures where there is another noteholder

24  that I don't know about who is also in a position to tell the

25  indentured trustee what to do.

1    These big noteholders are, for all practical purposes,

2    the principals, the business principals of the counterparty.

3    And every argument that has been presented, all of which we

4    subscribe to for why the principal should be in the room in a

5    mediation, apply to these noteholders.  There are going to be

6    noteholders who are out of the money, who are not interested

7    and shouldn't be there.  But if a noteholder is big enough to

8    be interested, to want to turn up, the noteholder should be

9    allowed to turn up.

10    Now, I thought this would not be controversial.  The

11    debtors' omnibus response says on page 17, and I quote, "the

12    participation of trustees, collateral agents, security

13    holders" -- and I assume that means noteholders -- "or other

14    parties that act on behalf of special-purpose entities are

15    necessary and appropriate for meaningful mediation."  We could

16    not agree more.  We could not agree more that the committee

17    should be involved in these mediations because they have an

18    economic interest in the outcome of these things.  The revised

19    order that was issued, I think, shortly after the last hearing

20    modified the confidentiality provisions to allow the indentured

21    trustees to tell the noteholders what had happened in the

22    mediation but did not allow the noteholders into the room.

23    Remember that these procedures contemplate,

24    essentially, two types of conversations.  There is supposed to

25    be an initial settlement conference by telephone, and then

1  there is supposed to be, if that doesn't work, some sort of a

2  sit-down meeting, okay?  And as this thing was drafted, the

3  confidentiality provisions shut out of the room anyone other

4  than the derivatives counterparty as defined, the Lehman

5  entity.  Now, the indentured trustee has been let in, but so

6  far, there's a question about the noteholders.  Just within the

7  last week, I think it is, there is now a provision concerning

8  an indentured trustee without authority, that is, a trustee

9  that does not have authority to act on behalf of the

10  noteholders, inviting the noteholders to participate.  There's

11  still no corresponding provision saying they can actually

12  participate.  But there is apparently, still, in Lehman's mind,

13  a class of indentured trustees with authority.  Now, one of the

14  ways you get authority under this order is by soliciting

15  instructions from noteholders.

16       And the Court should be aware that in some of these

17  structures, a Lehman entity claims to be the controlling

18  noteholder by reason of owning unfunded contingent-funding

19  notes that were issued for the purpose of funding payments

20  under swaps that have been terminated.  So there is a Lehman

21  entity out there on some of these deals that has no economic

22  exposure on the CDO side, but which it claims, under the

23  documents, is entitled to instruct the trustee and make that

24  trustee a trustee with authority.  It is obviously the

25  perspective of the noteholders who have actually put money into

1   the deal that they're not content to be represented by that

2   sort of a trustee.  We would like to be in the room ourself.

3       I proposed to Mr. Gruenberger that we put in a few

4   words that said -- well, you have to have some provision for

5   telling the noteholders this is happening.  That's pretty much

6   been drafted already, but it only applies to the noteholders

7   without -- the trustees without authority.  So our proposal is

8   that just as the trustees without authority are now required to

9   notify the noteholders and invite them to participate, all

10  indentured trustees should be required to go through that

11  process -- doesn't require any additional drafting -- and then

12  there should simply be a provision saying any noteholder is

13  permitted but not required to participate as if it were a

14  party.  Should be able to be on the telephone calls, should be

15  able to be in the meeting, and this is simply to make sure that

16  the actual economic interest in the CDO is heard when you try

17  to negotiate the settlement.

18      There are two other smaller points.  The first is that

19  in the process of negotiating out the objections for the

20  indentured trustees, the proposed order now has a dual set of

21  deadlines which we submit are unworkable and prejudicial to

22  noteholders.  If one of the commencing documents, I guess it's

23  called a notice, is served on the issuer and the indentured

24  trustee -- and they're required to be served on both -- of one

25  of these vehicles, then the issuer is required to respond in

1    thirty days, the indentured trustee is not required to respond

2    for forty-five days, and the process for giving notice to the

3    noteholders won't necessarily have played out even at that

4    point.  So you may have the issuer putting in a response which

5    will affect the right of the noteholders before the noteholders

6    are on the scene and before the indentured trustee is

7    participating.  And then, in the what have become very

8    complicated provisions regarding the scheduling of the initial

9    telephone call, the initial settlement conference, it's now set

10   up so that a party other than an indentured trustee will get

11   through that process in no more than twenty-four business days.

12   But if it is an indentured trustee asking for a settlement

13   conference, it can take -- it can actually take forty business

14   days, eight weeks, before you actually get to the conference.

15   It makes no sense to have these separate schedules; presumably,

16   there should be one conference involving everybody, and it

17   shouldn't happen until after the noteholders have had a chance

18   to get there.  I think the simple thing is these are big deals.

19   If there's an indentured trustee on the scene, there's a lot of

20   money at stake; the issues are complicated.  You should just

21   take the indentured trustee schedule and apply it to everybody

22   for those.

23        The final point is a simple one.  The general order

24   that now applies to mediations in this district says that a

25   Court can send something to mediation any time, but if a party

1    wants to make a motion to send something to mediation, which is

2    how the party invokes the procedure, it has to be made promptly

3    after the filing of the first piece of paper in the contested

4    matter or adversary proceeding.  The entire motion is

5    presenting mediation as an alternative to litigation, and of

6    course, that's what it's supposed to be.  One of the

7    innovations that Barclays agrees with is that the order makes

8    clear that a mediation can be commenced before there is any

9    litigation pending, before any motion has been made or before

10   any complaint has been filed, and that should allow plenty of

11   time for this process.  Barclays objects, however, to the

12   change in the existing procedures that is accomplished by the

13   proposed order that it now allows the debtors to start this

14   process at any time during the pendency of an adversary

15   proceeding.  Our suggestion is that they should be subject to

16   essentially the same deadline that applies now, that is, no

17   later than shortly after the filing of the initial paper

18   starting litigation.

19          As you've just heard from the schedule, these

20   mediations can take a while.  Our experience is it's

21   extraordinarily difficult for the Court to be called upon to

22   actually make substantive decisions or try cases in the middle

23   of a mediation.  So either the mediations started late in the

24   case will be pointless or they will delay the case, and neither

25   is a satisfactory outcome.  There is no good reason for not

1    requiring that any mediation be begun prior to the commencement

2    of litigation or immediately after the commencement of

3    litigation, and we'd like to see the order modified to

4    accomplish that.

5          THE COURT:  So you're looking for a sunset date with

6    respect to the effectiveness of the order?

7          MR. LACY:  Not with respect to the order.

8          THE COURT:  In terms of -- as it applies to a

9    mediation in any particular dispute.

10         MR. LACY:  The idea is that this -- of course, the

11   Court can send something to mediation.  The precise thing that

12   I proposed to Mr. Gruenberger is that if someone wants to start

13   a mediation after the deadline set out in the general order,

14   which is immediately after the commencement of the formal

15   litigation, that person should have to apply to the Court to

16   get permission to start.

17         THE COURT:  Well, maybe I'm missing something, and

18   it's your last point of a number of points.

19         MR. LACY:  That's the last point.

20         THE COURT:  So let me just react to the last point,

21   and then give Mr. Gruenberger an opportunity.  My notion as to

22   how these procedures are intended to work is that, largely,

23   they will be deployed prior to the commencement of any

24   adversary proceeding and that an adversary proceeding will be

25   the default mechanism of a failed mediation process.  That

1    doesn't necessarily mean that after an adversary proceeding has

2    been commenced, that a return to mediation might not be

3    possible.  Nor does it mean, necessarily, that as to certain

4    disputes that may not be subject to ADR, once an adversary

5    proceeding has been commenced, at some point in that process,

6    mediation may turn out to be desirable, either pursuant to

7    M-143, pursuant to this order, or pursuant to an order that's

8    crafted for the particular dispute before me.

9         I don't understand why you're concerned about this.

10    Are you concerned that at some point we get deeply into an

11    adversary proceeding and you're concerned about delay with

12    respect to that adversary proceeding?

13         MR. LACY:  Both delay and some informal discovery

14    requiring us to disclose our litigation strategy.  Yes, Your

15    Honor.  If we get to the eve of trial, under these procedures,

16    unlike the general order, the debtor has complete discretion to

17    start one of these proceedings.  And we would prefer not to

18    have it in the arsenal of the people we are litigating against

19    to force us into a meeting where we had a discussion concerning

20    our views of the case shortly before we're preparing for trial,

21    both because that's unfair, and also because it is likely to

22    delay the disposition of the case.

23         THE COURT:  Okay, I understand your position on that.

24    Mr. Gruenberger, what do you say about all this?

25         MR. GRUENBERGER:  Mr. Lacy did indeed make proposals

1    to me under Federal Rule of Evidence 408, so I wasn't going to

2    comment about our discussions.  But since he has chosen to

3    breach 408, I will respond.  Let's take the last point.

4         THE COURT:  Well, this isn't evidence.  We're just

5    having an argument.  We're just having an argument in which I'm

6    trying to get through a long list of objections, and this is

7    not the last one.

8         MR. GRUENBERGER:  I'll take his last point, first,

9    Your Honor, and I appreciate the caution.

10        143, M-143, the standing mediation order, which Mr.

11   Lacy uses when he likes it but doesn't use it when he doesn't

12   like it, provides a procedure in itself, paragraph 3.6, that

13   says if a party wants out of a mediation because it's

14   inappropriate for any reason for cause shown, he shall make an

15   application to get out of it.  Again, you heard the presumption

16   that we're going to do something in bad faith in the middle of

17   a case, like Ballyrock, which Mr. Lacy's client is a party in,

18   and therefore, either delay it or use mischief on discovery.

19   That should not control this, Your Honor.  143 gives a way to

20   get out.  We shouldn't have another gate-keeping barrier to

21   starting a mediation.

22        However, and I think Your Honor answered that question

23   appropriately, and I'll move on to his other two points.  On

24   September 2nd, which is almost two weeks ago, we resolved, with

25   the indentured trustees, that Mr. Lacy talks about.  We

1    incorporated a new provision, 5B, into the order.  It's on page

2    5 and 6.  And there it said if an indentured trustee receives

3    an ADR notice, the debtors and that trustee sit down and look

4    at the governing documents.  If the indentured trustee has

5    authority to participate and settle on behalf of noteholders,

6    then we go forward.  If, however, there is no authority through

7    those documents, then the indentured trustee has some

8    obligations to perform in good faith, and that's to advise all

9    those holders of the dispute, advise them that we have this ADR

10   notice, invites them to participate in the procedures as an

11   alternative to litigation, and encourages them to communicate

12   with the debtors, and offers to take the noteholders' direction

13   in terms of participation and settlement.

14         I don't know what more noteholders could get than

15   that.  The indentured  trustees -- you've heard this many

16   times and in many different contexts, already -- have

17   responsibilities.  We try to meet those concerns and those

18   responsibilities to get the noteholders in, and they are in.

19   There's nothing more we can do with respect to that,

20   whatsoever, Your Honor.

21         In terms of the time periods, this is another case of

22   no good deed goes unpunished.  So we doubled all the time

23   periods for everybody, and gave the indentured trustees extra

24   time so they could do this communications with the noteholders

25   to protect the trustees and the noteholders.  That's not good

1    enough. Again, some noteholders seem to want more. We'll be

2    into next July before we can even start a mediation if we keep

3    extending these deadlines. Everyone of these deadlines was

4    increased at the request of people. We can't go further

5    because it won't work.

6          And I have nothing more to say about Mr. Lacy's

7    objections.

8          MR. LACY: May I reply, very briefly, Your Honor?

9          THE COURT: Yes, very briefly.

10          MR. LACY: On the last point, the proposal I made

11    concerning the timetable would not extend the mediation process

12    at all. I'm simply saying that the issuer would have the same

13    amount that they have already given to the indentured trustee

14    to respond to the ADR notice. So it's not as if they're going

15    to go ahead and do this mediation or get it down immediately

16    after the issuer turns in his thirty-day response. They're

17    obviously going to wait the forty-five days for the indentured

18    trustee. Why not give the issuer the same forty-five days?

19    They can't do anything in the meantime. I'm not proposing any

20    delay at all.

21          And on the first point, all we're asking for is that

22    the noteholders get the same treatment for -- when there is an

23    indentured trustee with authority -- that they have provided

24    when the indentured trustee lacks authority. Because whatever

25    the legal documents say, the indentured trustees are the

1   principal.  They are the ones with the economic interest.  It

2   is Mr. Gruenberger's assertion --

3          THE COURT:  You don't -- you mean the noteholders are

4   the parties with the economic interest.

5          MR. LACY:  I'm sorry, what did I say?

6          THE COURT:  You said the indentured trustees.

7          MR. LACY:  I'm sorry, the noteholders, that's correct,

8   are the parties with the economic interest.

9          THE COURT:  Are you just seeing if I'm listening after

10  the --

11         MR. LACY:  I have to say, you're more alert than I am,

12  Your Honor.

13         THE COURT:  All right.

14         MR. LACY:  The provision that Mr. Gruenberger just

15  told you about only applies -- and we're completely happy with

16  this procedure -- but it only applies to an indentured trustee

17  that lacks authority.  There is no good reason not to make the

18  same procedure apply to an indentured trustee that has

19  authority to ensure that the noteholders with the real economic

20  interest are in the room.

21         MR. GRUENBERGER:  There is a very good reason, Your

22  Honor, and this is what it is.  Their authority was given by

23  the noteholders to the trustee that says trustee, I trust you.

24  You do the job for me.  You're getting paid for this, you're

25  careful, I trust you.  Now, we're going to have that trustee

```
 1    have to battle his own noteholders in the same proceeding

 2    because they're in there, too, second-guessing, creating who

 3    knows what kind of at least noise, time, effort, and maybe

 4    chaos.  What does authority mean?  It's meaningless when they

 5    have to attend to piling it on the debtors.  I think that's the

 6    only answer that counts.

 7         THE COURT:  But what I'm hearing may be chaos because,

 8    if I understand what Mr. Lacy is saying on behalf of his

 9    nonclients, the noteholders, because he represents Barclays

10    Bank, PLC, but he's here saying we're concerned in our capacity

11    as indentured trustee in a variety of transactions -- is that

12    right?

13         MR. LACY:  Your Honor, Barclays Bank is a noteholder.

14    I'm here on behalf of a noteholder.

15         THE COURT:  But are you also concerned about Barclays

16    in respect of any other --

17         MR. LACY:  No, Barclays is not, as far as I know, an

18    indentured trustee.

19         THE COURT:  Okay.

20         MR. LACY:  We're here entirely on behalf of

21    noteholders.

22         THE COURT:  But you're speaking only as Barclays may

23    represent the interest of other noteholders, or are you

24    speaking about Barclays?  Because obviously you know what --

25         MR. LACY:  No, I'm speaking about Barclays.  I want
```

1    Barclays to be in the room for the mediations affecting its

2    CDOs.

3         THE COURT:  Okay.  I misunderstood.  I thought you

4    were speaking on behalf of Barclays but also speaking about a

5    class of undefined noteholders in different transactions.

6         MR. LACY:  Barclays owns hundreds of millions of

7    dollars of notes issued by CDOs that are counterparties to

8    derivatives with Lehman.  Barclays feels, like any principal,

9    that if its money is being talked about, it would like a chance

10   to participate in the process.

11        THE COURT:  What does that have to do with this order,

12   though?  I mean, if you -- if you send a letter to debtors'

13   counsel and say listen, we have major economic interests here,

14   and we want to be heard in any mediation that involves the

15   following CDOs --

16        MR. LACY:  Um-hum.

17        THE COURT:  -- whatever they may be, so if there's a

18   mediation, we want to be in the room, just like the creditors'

19   committee, and we'll sign confidentiality agreements if that's

20   necessary, I suppose there are two responses to that.  One is,

21   come on in.  The other is, you're just a lot of noise; you have

22   no legal right to be here.  I'm not sure what the answer's

23   going to be.  But presumably, if the debtor is motivated to

24   have a process that leads to a yes, as opposed to a no at the

25   end of the mediation, they're going to want a party that has a

1    significant influence over the outcome, or perhaps the ability

2    to bind a trustee, to be in the room.  Correct?

3          MR. LACY:  At the moment, the confidentiality

4    provisions of the order prohibit anyone -- would prohibit the

5    noteholders from being in the room.  Are you saying that we

6    should just count on the debtors to waive that?

7          THE COURT:  No, I'm suggesting that, first of all, you

8    are objection L in a list of objections that started with A,

9    and it's just about noon time.

10          MR. LACY:  Your Honor, I will sit down.

11          THE COURT:  No, I'm not asking you to sit down.  I'm

12    just trying to understand the issue that's before me right now

13    and why you're pressing this hard, and why the debtor is

14    pressing hard against you.  The idea is for the ADR procedures

15    that we're adopting to be productive and workable.  The number

16    of objections that this proposal produced suggests that this is

17    a subject as to which reasonable people may differ, have

18    differed.  We're now down to a fairly narrow issue that

19    particularly affects your client, but also others similarly

20    situated to your client, i.e., noteholders in CDOs that are

21    either known or unknown.  You happen to be a known noteholder.

22          MR. LACY:  Um-hum.

23          THE COURT:  I don't know, for purposes of whatever the

24    dispute may be that is the subject of an ADR request in the

25    future, whether or not it is desirable or undesirable for you

1   or people like you to be in the room.  I just don't know.  I

2   assume that it would be desirable, if you have hundreds of

3   millions of dollars worth of notes and are in a position in

4   various structures to direct activity, and that presumably, if

5   it gets in the way of progress for you to not be in the room,

6   you'll be invited in, and if it gets in the way of progress for

7   you to be in the room and to make noise, you won't be invited

8   in.  I'm just assuming that.  Mr. Gruenberger, do I understand

9   this or don't I?

10          MR. GRUENBERGER:  I think you do very well, Your

11  Honor.  I'm not predicting, yes or no, whether there will be

12  noise.  I just posited a situation where there could be noise.

13  And I'm not asking that Mr. Lacy's client fire all their

14  trustees, either, in order to get into the room.  I'm not

15  suggesting that at all.  But let's see what happens when the

16  trustee with authority responds to an ADR notice and what

17  happens if Mr. Lacy does, in fact, take up Your Honor's

18  suggestion to notify us, saying they would like to attend.  I'm

19  not an unreasonable person, as a lawyer, and I don't think my

20  client --

21          THE COURT:  None of the --

22          MR. GRUENBERGER:  -- will be unreasonable, either.

23          THE COURT:  And --

24          MR. GRUENBERGER:  Or as a person.

25          THE COURT:  This is a federal court you're saying this

1  in, you realize that?  Okay, and I think it's true that most of

2  us view ourselves as being not unreasonable.  I'm going to

3  overrule the objection of Barclays Bank with the observation

4  that this is less about whether or not particular language ends

5  up in the current iteration of this order, and more about

6  getting the attention of the right people who need to

7  participate in the process and make decisions that are well-

8  informed and that are designed to efficiently dispose of

9  disputes prior to litigation.  I hope that these procedures

10  will be interpreted in that spirit and because I know that

11  these transcripts are carefully reviewed after the fact for

12  hidden meaning, let me be clear that there's no hidden meaning

13  in this comment, that I expect that the procedures will be

14  applied in a manner designed to expedite and facilitate the

15  resolution of disputes in good faith and that parties will not

16  be kept away arbitrarily if their involvement may facilitate

17  such positive outcomes.

18          By the same token, this is not a free-for-all.  And

19  the structures about which we are now making room in the order

20  and trying to accommodate are, themselves, extraordinarily

21  complex.  And I'm unable to tell you now whether or not the CDO

22  indentures are all cut from the same cloth or cut from

23  different cloth.  And to the extent that these are different

24  complex highly-structured vehicles, I think it is really not a

25  good idea to try to pick arbitrary deadlines or parties for

1  purposes of an efficient process.  Once again, I think this is

2  a matter that can be left to the informed discretion of the

3  mediator once the mediator has a dispute before him and her.

4       In that spirit, I overrule the Barclays Bank

5  objection.

6       M is a limited objection of CIBC and Societe Genera --

7       MR. GRUENBERGER:  Societe Generale and CIBC together.

8       MR. TREHAN:  Good afternoon, Your Honor.  Amit Trehan,

9  Mayer Brown LLP, for Societe Generale and certain of its

10  affiliates, CIBC and certain of its affiliates.  We'd like to

11  clarify that the objection, our objection, was previously fully

12  withdrawn with respect to certain affiliates thanks to the

13  communicative and open efforts of the debtors and we take your

14  comments fully to heart and would withdraw the objection with

15  respect to the remaining objectors as part of our objection.

16       THE COURT:  Okay.

17       MR. TREHAN:  Thank you.

18       THE COURT:  Fine, thank you.  Next is N, objection of

19  Lai Mei Chan and others.

20       MR. GRUENBERGER:  These are the Wong mini-bonds

21  plaintiff, Your Honor.

22       THE COURT:  Is there anyone here on behalf of that

23  purported class of plaintiffs?  Apparently not; that objection

24  is denied for failure to prosecute.

25       MR. GRUENBERGER:  Compass Bank.

1      THE COURT:  Again, I hear no comment on behalf of

2  Compass.  That objection is overruled for failure to prosecute.

3  And we're down to --

4      MR. GRUENBERGER:  There are none left, Your Honor.

5      THE COURT:  -- we're down to P, which was already

6  dealt with.  And so we've gotten through the list and I'm

7  prepared to enter the order.

8      MR. GRUENBERGER:  Your Honor, I'd like to hand up the

9  order.  There is one matter, however, that we have not yet been

10  able to fill in, and that is the identity of the mediators.

11  And it is still blank in paragraph 10, and I will hand up the

12  order.  And whatever Your Honor wishes to do in that regard in

13  communicating with us the identities is fine.  But, I leave

14  that to Your Honor.

15      THE COURT:  All right, thank you.

16      MR. GRUENBERGER:  May I approach?

17      THE COURT:  Please approach.

18      MR. GRUENBERGER:  This is an unblacklined version,

19  Your Honor.

20      THE COURT:  It's an unblacklined version of a document

21  that doesn't have a disc attached to it, so it's of no use.

22      MR. GRUENBERGER:  We have a disc, Your Honor.

23      THE COURT:  Okay, fine.  All right, it's ten after 12,

24  and I have indicated my intention to enter the alternative

25  dispute resolution procedures order substantially in the form

1   that it has been presented and will make some judgments as to

2   the identity of the mediators in consultation with counsel for

3   the debtors and for the creditors' committee who have been so

4   active in developing these procedures.

5       I recognize that a lot of people who are in court at

6   this moment are here for the ADR procedures, and I'm going to

7   give people who want to leave an opportunity to leave.  I'm

8   also going to give everybody an opportunity for a break.  But

9   because of the congestion of this docket, I think I'm going to

10  go until 1 o'clock.  So let's take a break for ten minutes, and

11  then resume, and then go until 1 o'clock and then break for

12  lunch.  We're adjourned until then.

13      MR. GRUENBERGER:  Thank you, Your Honor.

14      (Recess from 12:12 p.m. to 12:28 p.m.)

15      THE COURT:  Be seated please.  Number 11, Metavante.

16      MR. SLACK:  Your Honor, Richard Slack from Weil,

17  Gotshal for the debtors.  We're here on the debtors' motion to

18  compel performance of Metavante Corporation.  As Your Honor

19  knows, two months ago we had argument, after fully briefing the

20  issue.  Your Honor is in receipt of letters from both

21  Metavante's counsel and from the debtors, which I think

22  provides the status of where we are in terms of discussions,

23  which is, essentially, that the parties have not had

24  substantial discussions, as the letters which are docketed

25  state.

1      The debtors were requested to make a proposal to

2  resolve it, which we did.  We have not received a proposal from

3  Metavante in the two months since the hearing, and Metavante

4  has not responded to our proposal that we've made.

5      Your Honor has mentioned Metavante a couple of times

6  today, and so Your Honor may have a plan for the conference,

7  but it is the debtors' position that this matter should be

8  considered and decided, at the Court's discretion, obviously.

9      THE COURT:  Understood.  I'm ready to rule today.

10     MR. ARNOLD:  May it please the Court, mindful of that

11  comment, I want you to know why we wrote the letter, so that

12  you have in mind that parties do take into account the risks of

13  not settling, and you were quite clear at the hearing on July

14  14th that there was an opportunity for the parties to consider

15  resolving this matter.

16     For the Court's information, neither Lehman nor its

17  counsel have been obdurate, ornery, or in any fashion

18  unprofessional.  Our dealings have been quite, to the contrary,

19  exceptional throughout the history of our relationships.  I

20  reached out to counsel for the debtors to explain how it is

21  that an impending transaction which will close on October 1st

22  would, in my judgment, have a favorable impact on the

23  likelihood of this matter resolving consensually.  That was the

24  singular purpose for us writing the letter to the Court.  We

25  are not here today to reargue the motion.  The Court heard

1  extensive oral argument.  It has been well briefed.  The issues

2  have come up again in, frankly, in other instances and motions

3  and adversary proceedings.  I wanted the Court to know that it

4  was not by design, neglect or deliberately ignoring your

5  comments on July 14th that the settlement has not proceeded

6  further than it has.  About a week ago we received a settlement

7  proposal.  I am authorized to state by both Fidelity and

8  Metavante that post-closing of the merged entity we expect to,

9  and intend to, and will make a settlement proposal, but we're

10  also mindful that it hasn't been settled, and if it is the

11  Court's desire to rule on the matter today, we govern ourselves

12  accordingly.  I just wanted the Court to know what I've done

13  since July 14th to try to move this matter on.

14          THE COURT:  Okay.  Thank you for that update.

15          MR. ARNOLD:  Thank you, Your Honor.

16          THE COURT:  The Metavante matter consumed the better

17  part of an afternoon's oral argument.  My best recollection is

18  that we specially listed it on the afternoon before the July

19  omnibus hearing.  Candidly, I don't recall why it was specially

20  listed all by itself, but it's just as well that it happened,

21  because it took a lot of time.

22          It's correct that I encouraged the parties to attempt

23  to resolve this consensually, and I appreciate the fact that

24  large enterprises, particularly those that are involved in

25  major transactions in which acquisitions are literally weeks

1   away from being consummated, may be distracted or may have

2   other priorities.  But I also believe that when I suggested

3   that this be listed for the September 15th omnibus hearing it

4   was with the notion that, in effect, time would be up.

5          I'm also mindful of the fact that on today's calendar

6   a matter very similar to this, item 6, has been consensually

7   resolved, involving the payment of fifty percent more dollars

8   to the debtors than are at issue in this current dispute.

9          I am prepared to rule and will do so now.  Recognize

10  that what I'm about to do will take some time and will probably

11  take us to the lunch hour.  If there is anyone here who doesn't

12  want to hear the ruling in this case I'd like you to be free to

13  both leave, because I won't be offended, or, if at some point

14  during my rendition of this ruling you say to yourself this is

15  something I don't need to hear, you're also free to leave at

16  that point.

17         LBSF requests that the Court compel Metavante to

18  perform its obligations under that certain 1992 ISDA Master

19  Agreement dated as of November 20, 2007, defined as the "Master

20  Agreement".  And that certain trade confirmation dated December

21  4, 2007, defined as the "Confirmation", and together with the

22  Master Agreement, the "Agreement".

23         The Master Agreement provides the basic terms of the

24  parties' contractual relationship and contemplates being

25  supplemented by trade confirmations that provide the economic

1    terms of the specific transactions agreed to by the parties.

2    Under the Master Agreement, Metavante and LBSF entered into an

3    interest rate swap transaction, the terms of which were

4    documented pursuant to the Confirmation.

5         LBHI is a credit support provider for LBSF's payment

6    obligations under the Agreement.

7         Due to declining interest rates the value of LBSF's

8    position under the Agreement has increased.  As of May 2009,

9    under the payment terms of the Agreement, Metavante owed LBSF

10   in excess of 6 million dollars, representing quarterly payments

11   due November, 2008, February, 2009 and May, 2009, plus default

12   interest in excess of 300,000 dollars.

13        It is possible that due to current market conditions

14   and to the quarterly payment schedule prescribed by the

15   Agreement the amounts that Metavante owes to LBSF as of today

16   are even higher than those stated in the motion.  Metavante has

17   refused to make any payments to LBSF.  In fact, it has refused

18   to perform its obligations under the Agreement, as of November

19   3, 2008.  Instead, Metavante claims that LBSF and LBHI, via the

20   filing of their respective Chapter 11 cases, each caused an

21   event of default under the Agreement.

22        Metavante argues that due to such events of default it

23   has the right, but not the obligation, under the safe harbor

24   provisions of the Bankruptcy Code, to terminate all outstanding

25   derivative transactions under the Agreement.  Metavante also

1 maintains that it is not otherwise required to perform under

2 the Agreement.

3     The parties presented their arguments to the Court at

4 a hearing held on July 14, 2009. Notably at the hearing

5 counsel to Metavante stated that, quote, "the opportunity to

6 settle the matter", is a possibility. The reference in the

7 transcript is page 58, lines 18 to 19. The Court took the

8 matter under advisement and suggested that it be calendared for

9 the September 15, 2009 omnibus hearing for purposes of either a

10 bench ruling or a status conference on any progress the parties

11 may have made towards a resolution.

12     I want to make clear that I am proceeding with this

13 ruling because I view the letter described by counsel for

14 Metavante, which talked about a possible settlement

15 counterproposal occurring sometime after the closing of a

16 merger on October 1, as being an insufficient commitment to a

17 timely settlement.

18     On September 14, 2009 the Court received letters from

19 counsel to each of the parties. Counsel to Metavante requests

20 an adjournment to October 14. Counsel states that an

21 adjournment will facilitate the parties' settlement

22 negotiations but explains that Metavante may not make a

23 counterproposal to LBSF's September 5, 2009 settlement proposal

24 until after the proposed October 1, 2009 closing of a merger.

25 Counsel also suggests that an adjournment will allow the Court

1  to put the motion on the same track as two other motions

2  currently pending before the Court.  Which motions, counsel

3  claims, raise similar issues to the motion?  Counsel to LBSF

4  and LBHI maintain that inasmuch as Metavante has done nothing

5  since July 14, 2009 to settle this matter other than asking

6  LBSF and LBHI to make a settlement proposal, the parties are no

7  closer to settlement than they were at the hearing, and,

8  therefore, the status conference should go forward as planned.

9       While each of the matters reference by counsel to

10  Metavante may have overlapping issues with those presented in

11  the current dispute, each matter involves its own distinct set

12  of fats.  Moreover, each of the two referenced matters is in

13  its infancy.  No response has been filed in either one, which

14  may further delay resolution here.

15       This is a dispute that has been fully briefed and

16  argued and is ripe for determination.  Moreover, I note that

17  the settlement that was achieved with MEG Energy that was

18  referenced this morning indicates that parties who are willing

19  to settle can, and do.

20       Under the Agreement LBSF is obligated to pay the

21  floating three month USD LIBOR BBA interest rate on a notional

22  amount of 600 million dollars, which notional amount declines

23  over time, beginning in May, 2010.  Metavante, in turn, is

24  obligated to pay a fixed interest rate, 3.865 percent, on the

25  notional amount.  The Agreement is set to expire on February 1,

2012.  The Agreement defines event of default to include the

bankruptcy of any party or credit support provider.  Under the

terms of the Agreement, upon an event of default the non-

defaulting party may designate an early termination date.  Upon

termination a final payment is calculated and paid in order to

put the parties into the same economic position as if the

termination had not occurred.

In the instant case Metavante has refused to perform

under the Agreement on account of the event of default that has

occurred, and is continuing, on account of the bankruptcies of

LBSF and LBHI.  Metavante has not, however, attempted to

terminate the Agreement.  Instead, Metavante entered into a

replacement hedge covering the period from November 3, 2008

through February 1, 2010.

LBSF and LBHI argue that the Agreement is an executory

contract because material performance, specifically payment

obligations, remain due by both LBSF and Metavante.  Under

Bankruptcy Code Section 365(a) a debtor in possession may,

"subject to the court's approval, assume or reject any

executory contract".  The case law makes clear, however, that

while a debtor determines whether to assume or reject an

executory contract the counterparty to such contract must

continue to perform.

LBSF and LBHI further argue that the safe harbor

provisions do not excuse Metavante's failure to perform.

1    Indeed, the safe harbor provisions permit qualifying non-debtor

2    counterparties to derivative contracts to exercise certain

3    limited contractual rights triggered by, among other things, a

4    Chapter 11 filing.  They're available, however, only to the

5    extent that a counterparty seeks to one, liquidate, terminate

6    or accelerate its contracts or two, net out its positions.  All

7    other uses of ipso facto provisions remain unenforceable under

8    the Bankruptcy Code.

9         Notably, Metavante does not dispute that it has failed

10   to perform under the Agreement.  Instead, Metavante argues that

11   the occurrence of an event of default under the Agreement gives

12   rise to its right, as the non-defaulting party, to terminate

13   under the safe harbor provisions.  According to Metavante the

14   occurrence of an event of default does not, however, create the

15   obligation for it to terminate under the safe harbor

16   provisions.  Metavante emphasizes the term, quote, "condition

17   precedent" set forth in Sections 2(a), 1 and 3 of the

18   Agreement, which subject payment obligations to the condition

19   precedent that no event of default with respect to the party

20   has occurred and is continuing.

21        Metavante argues that under New York State contract

22   law a failure of a condition precedent excuses a party's

23   obligation to perform.  Metavante states that its unequivocal

24   right to suspend payments until the termination of the

25   Agreement is fundamental to the manner in which swap parties

1  government themselves.  Metavante takes issue with LBSF and

2  LBHI in asking the Court to treat the Agreement like a garden

3  variety executory contract, arguing that it cannot be compelled

4  to pay because LBSF and LBHI cannot provide the essential item

5  of value Metavante bargained for, namely an effective

6  counterparty.

7       Metavante further argues on information and belief

8  that LBSF and LBHI also are in default under certain

9  unspecified indebtedness that allegedly may have created a

10 cross default under the Agreement, asserting, as a result, an

11 alleged need to engage in the discovery process.

12      It is clear that the filing of bankruptcy petitions by

13 LBHI and LBSF constitute events of default under the Agreement.

14 Specifically, Section 5(a)(vii) of the Agreement provides that

15 it shall constitute an event of default should a party to the

16 Agreement or any credit support provider of such party

17 institute a proceeding seeking a judgment of insolvency or

18 bankruptcy, or any other relief under any bankruptcy insolvency

19 law or similar law affecting creditors' rights.

20      Section 2(a)(i) and 3 of the Agreement, in turn,

21 subject payment obligations to the condition precedent that no

22 event of default with respect to the other party has occurred

23 and is continuing.  It is also clear, however, that the safe

24 harbor provisions, primarily Bankruptcy Code Sections 560 and

25 561, protect a non-defaulting swap counterparty's contractual

1    rights solely to liquidate, terminate or accelerate one or more

2    swap agreements because of a condition of the kind specified in

3    Section 365(e)(1), or to "offset or net out any termination

4    values or payment amounts arising under or in connection with

5    the termination, liquidation or acceleration of one or more

6    swap agreements".  That language comes from Section 560.

7           In the instant matter Metavante has attempted neither

8    to liquidate, terminate or accelerate the Agreement, nor to

9    offset or net out its position as a result of the events of

10   default caused by the filing of bankruptcy petitions by LBHI

11   and LBSF.  Metavante simply is withholding performance, relying

12   on the conditions precedent language in Sections 2(a)(i) and

13   (iii) under the Agreement.

14          The question presented in this matter and the issue

15   that was argued by the parties at the hearing is whether

16   Metavante's withholding of performance is permitted, either

17   under the safe harbor provisions or under terms of the

18   Agreement itself.  It is not.

19          Although complicated at its core the Agreement is, in

20   fact, a garden variety executory contract, one for which there

21   remains something still to be done on both sides.  Each party

22   to the Agreement still is obligated to make quarterly payments

23   based on a floating or fixed interest rate of a notional

24   amount, it being understood that the net obligor actually makes

25   a payment after the parties respective positions are calculated

1   on a quarterly basis, in February, May, August and November of

2   each calendar year.

3        Under relevant case law it is clear that while an un-

4   assumed executory contract is not enforceable against a debtor,

5   see NLRB v. Bildisco & Bildisco, 465 US 513 at 531, such a

6   contract is enforceable by a debtor against the counterparty.

7   See McLean Industries, Inc. v. Medical Laboratory Automation,

8   Inc., 96 B.R. 440 at 449 (Bankr. S.D.N.Y. 1989).  Metavante

9   relies on In re Lucre, Inc., 339 BR 648 (WD Mich.) for the

10  proposition that a debtor's uncured pre-petition breach of its

11  executory contract, here the event of default caused by the

12  bankruptcy filings of LBHI and LBSF, will, in and of itself,

13  justify continued nonperformance by the non-debtor

14  counterparty, and mere commencement of bankruptcy proceedings

15  and the imposition of the automatic stay does not empower the

16  debtor to compel performance from a non-debtor party.

17       The Court rejects the Lucre decision as nonbinding and

18  non-persuasive.  While Metavante's argument for the events of

19  default caused by the bankruptcy filings of LBHI and LBSF do

20  create an obligation for it to terminate the Agreement under

21  the safe harbor provisions, that's a tenable argument.  Its

22  conduct of riding the market for the period of one year, while

23  taking no action whatsoever, is simply unacceptable and

24  contrary to the spirit of these provisions of the Bankruptcy

25  Code.

1          First, inasmuch as the Bankruptcy Code trumps any

2     state law excuse of nonperformance, Metavante's reliance on New

3     York contract law is misplaced.  Moreover, legislative history

4     evidences Congress's intent to allow for the prompt closing out

5     or liquidation of open accounts upon the commencement of a

6     bankruptcy case.  Citation is to the Congressional history of

7     this, H.R. Rep. 97-420 at 1 (1982), as well as its stated

8     rationale that the immediate termination for default and the

9     netting provisions are critical aspects of swap transactions

10    and are necessary for the protection of all parties in light of

11    the potential for rapid changes in the financial markets.

12    Citation to the Senate Report number 101-285 at 1 (1990).

13         The safe harbor provisions specifically permit

14    termination solely, quote, "because of a condition of the kind

15    specified in Section 365(e)(1) that is the insolvency or

16    financial condition of the debtor and the commencement of a

17    bankruptcy case.  See also In re Enron Corp., 2005. WL 3874285,

18    at *4, Judge Gonzalez's case, 2005.  Noting that a

19    counterparty's action under the safe harbor provisions must be

20    made fairly contemporaneously with the bankruptcy filing, less

21    the contract be rendered just another ordinary executory

22    contract.

23         The Court finds that Metavante's window to act

24    promptly under the safe harbor provisions has passed, and while

25    it may not have had the obligation to terminate immediately

1    upon the filing of LBHI or LBSF, its failure to do so, at this

2    juncture, constitutes a waiver of that right at this point.

3          Metavante's references to defaults under certain

4    unspecified indebtedness that allegedly may have created a

5    cross default under the Agreement are of no moment.  First,

6    Metavante failed to set forth the basis, either in its papers

7    or at the hearing, for its information and belief that such a

8    default may have occurred.  Its assertion that such a default

9    may have occurred indicates that Metavante is not aware of any

10   such default, and, therefore, did not rely on that default in

11   its refusal to perform under the Agreement or lacks knowledge

12   of what that default may be.

13         Additionally, the argument that LBSF or LBHI may have

14   defaulted under other specified indebtedness, as that term is

15   defined in the Agreement, relies upon the financial condition

16   of bankruptcy debtors to withhold performance.  That is also

17   unenforceable as an ipso facto clause that may not be enforced

18   under the Bankruptcy Code Section 365(e)(1)(A).

19         LBSF and LBHI are entitled to continued receipt of

20   payments under the Agreement.  Metavante's attempts to control

21   LBSF's right to receive payment under the Agreement constitute,

22   in effect, an attempt to control property of the estate.  See

23   In re Enron Corp., 300 B.R. 201 at 212 (S.D.N.Y. 2003),

24   recognizing that contract rights are property of the estate and

25   that therefore those rights are protected by the automated

1    stay.

2         This is a violation of the automatic stay imposed by

3    Code Section 362.  Accordingly, for the reasons set forth in

4    LBSF's and LBHI's papers, for the reasons stated on the record

5    at the hearing and for the reasons stated on the record today,

6    pursuant to Bankruptcy Code Sections 105(a), 362 and 365,

7    Metavante is directed to perform under the Agreement until such

8    time as LBSF and LBHI determine whether to assume or reject.

9    That's the ruling of the Court.

10        MR. KRASNOW:  Good afternoon, Your Honor.  Richard

11   Krasnow, Weil, Gotshal & Manges, for the Chapter 11 debtors.

12   We are close to the end of this morning's agenda, but not quite

13   there as yet.  The next item, Your Honor, is number 12.  It is

14   the motion of DnB Nor Bank described in the agenda.  Your

15   Honor, that matter has been fully submitted to the Court, fully

16   briefed, arguments held on November 5th, and today is the

17   scheduled status conference.

18        THE COURT:  Okay.  I'm ready to rule on that, but

19   given the hour I'm not going to take the time to do that now.

20   But we'll issue a short memorandum in due course.  So as to not

21   create any undue suspense for those parties who are here in

22   connection with the DnB Nor matter, I am deciding that in favor

23   of the debtors and against DnB Nor, denying DnB Nor's motion

24   for allowance of an administrative expense claim, substantially

25   for the reasons set forth in the committee's papers.

1    I have considered the supplemental briefs relating to

2  the question that I had raised at the last hearing concerning

3  the right of a secured party to adequate protection in respect

4  of diminution resulting from currency exchange rate

5  fluctuations.  Following my consideration of those supplemental

6  submissions I concluded that there was no need for my ruling to

7  deal with that question because I was able, more narrowly, to

8  decide the question simply on the basis of DnB Nor's failure to

9  have timely requested adequate protection in its original

10  motion with respect to the setoff and based upon my conclusion

11  that the November 5 status conference hearing was a hearing

12  that resulted in the grant of adequate protection prospectively

13  and not retrospectively.

14    For that reason I believe that the request for

15  administrative expense claim treatment as a superpriority claim

16  and for adequate protection in respect of currency exchange

17  fluctuations made in June, after adequate protection was

18  already granted in November, was insufficient to provide for a

19  claim within the period from September 17, 2008 to November 5,

20  2008, nor was it sufficient in respect of any other date within

21  the September to November time frame.  That's effectively my

22  ruling, but if you need more I will provide a memorandum

23  decision consistent with what I've just said.

24    MR. KRASNOW:  Thank you, Your Honor.  Your Honor,

25  last, but not least, item 13 on the agenda is the motion of

1   William Kuntz, III for review of the dismissal of his appeal.

2           THE COURT:  Mr. Kuntz?

3           MR. KUNTZ:  Thank you, Your Honor.  I believe my

4   express mail papers reached the Court late yesterday afternoon.

5   I got an electronic message from the service company last

6   Thursday indicating --

7           THE COURT:  I have your reply papers --

8           MR. KUNTZ:  Right.  I just wasn't sure in terms of

9   tracking it if they actually arrived.

10          THE COURT:  I received them and read them with

11  interest.

12          MR. KUNTZ:  Saturday I went to look for the physical

13  papers that should have come.  They didn't come, but I'm

14  waiving any problem in terms of that so that this long-standing

15  matter can go ahead.  And what I have to simply say is there's

16  two questions in my mind.  Will the debtor's counsel admit they

17  had a deep involvement with Grand Union?  I mean, Mr. Miller is

18  not here, but, I mean, Mr. Krasnow, I believe, should now be

19  aware that in the third Grand Union bankruptcy case Weil,

20  Gotshal was the co-counsel in New Jersey before Judge Winfield.

21  Which is -- the problem that I have is because there was an

22  escrow account that apparently was applied to a loan that

23  Lehman Commercial Paper had.  Without Judge Winfield's order,

24  or Judge Walsh's order back from the '95 case, and, I believe,

25  that was done because there was an apprehension that if it had

1   come up before Judge Winfield that Judge Winfield would have

2   ruled in my favor instead of this debtor's favor now.

3          Secondly, in terms of lifting the stay, it's not that

4   I'm trying to reach the funds in this estate.  But I have other

5   matters.  For instance, the New York State Comptroller's Office

6   is holding funds of Grand Union Capital Corp., and they take

7   the position that without a judgment I can't have those funds.

8   And as I understand it, if I, for instance, proceeded in

9   Westchester County without relief here, which is, in part, on

10  appeal, if I was correct that Lehman is improperly holding

11  these funds, if I received a judgment in state court that

12  would, in essence, be a constructive lien upon funds that are

13  at least being held by the debtor, whether they're funds of the

14  debtor's estate or not.  I haven't been able to determine.

15  I've been asking for a long time just for the simple documents.

16  Nothing has been volunteered by the debtor.  C&S Wholesalers up

17  in New Hampshire, I've called them and called them and written

18  them and faxed them and that's, basically, in a nutshell, what

19  I'm here for.

20          THE COURT:  Okay.  We'll --

21          MR. KUNTZ:  Thank you, Your Honor.

22          THE COURT:  But before you sit down I just want to

23  understand something that's more technical.  About eleven

24  months ago, at a status conference/omnibus hearing, your motion

25  was heard.

1    MR. KUNTZ:  And denied.

2    THE COURT:  And I remember it pretty vividly.  It was

3 mid-October.  You were in the back of the courtroom.  The case

4 was called, and you said that you were going to just rely on

5 the papers.

6    MR. KUNTZ:  The courtroom was packed, Your Honor.  It

7 was the first omnibus hearing.

8    THE COURT:  I remember it.

9    MR. KUNTZ:  Thank you, Your Honor.

10    THE COURT:  I remember it.  And I remember seeing you.

11 And I remember what you said.  And I, having looked at your

12 papers thoroughly, I concluded that you had not established

13 cause for relief from the automatic stay under the very same

14 legal standard that I have applied in every motion for stay

15 relief that has been applied in this case and in every other

16 case that is before me, which is the Sonnax case, which is a

17 Second Circuit case that lays out a list of approximately

18 twelve standards that Courts consider in deciding whether or

19 not to grant relief from the automatic stay.

20    MR. KUNTZ:  I understand that, Your Honor.

21    THE COURT:  And --

22    MR. KUNTZ:  The issue was, and I think I put this

23 forward, was the order was with prejudice.  I probably could

24 have, without a prejudice denial I probably would have just let

25 the matter sit.

1    THE COURT:  So is the only -- just so I'm clear.  The

2    only issue that brings you back to Court on a Rule 60 motion is

3    that you believe that the motion that you had filed should have

4    been simply denied without prejudice as opposed to being denied

5    with prejudice.

6        MR. KUNTZ:  That's what I would have thought last

7    fall.  Things have developed a little bit more since then.

8        THE COURT:  What's before me now?  Is it the with

9    prejudice/without prejudice language or are you seeking other

10   relief?

11       MR. KUNTZ:  I believe I'm seeking whatever is on the

12   papers.  I'm really not, I mean, this all came up in three days

13   notice to me.  So I put together a very -- I didn't even have a

14   chance to even read in details the debtors' counsels' papers.

15       THE COURT:  Look, here's my understanding of where we

16   are procedurally.  I ruled from the bench in October.

17       MR. KUNTZ:  Yes, Your Honor.

18       THE COURT:  You requested reconsideration under Rule

19   60, and you also appealed the denial of your motion for relief

20   from the automatic stay to the district court.

21       MR. KUNTZ:  That's correct, Your Honor.

22       THE COURT:  There was a hearing that took place before

23   Judge Rakoff in the Southern District of New York.

24       MR. KUNTZ:  It was a conference.

25       THE COURT:  I only read the transcript of that

1   hearing, and, apparently, because of the pendency in the

2   Bankruptcy Court of your Rule 60 motion --

3           MR. KUNTZ:  That -- Mr. Krasnow brought that up in

4   court, yes.

5           THE COURT:  Well, appropriately --

6           MR. KUNTZ:  Yes.

7           THE COURT: -- because it's jurisdictional.  Judge

8   Rakoff determined that the district court did not have

9   jurisdiction of the appeal because there was a pending and

10  unresolved Rule 60 motion that was still in the Bankruptcy

11  Court.

12          MR. KUNTZ:  That's correct, Your Honor.

13          THE COURT:  As a result this matter has been listed

14  for today, as I understand it, solely for purposes of dealing

15  with the Rule 60 motion that was filed shortly after my denial

16  of your motion last year for stay relief.  Correct?

17          MR. KUNTZ:  Based, apparently, upon the affidavit that

18  I filed subsequent to the conference in district court.  But,

19  yes, in essence, yes, Your Honor.

20          THE COURT:  Okay.  So I haven't heard you make an

21  argument yet as to why you're entitled to relief from the order

22  that was entered in October denying your motion for stay

23  relief.

24          MR. KUNTZ:  I haven't read the Sonnax opinion, Your

25  Honor.

1          THE COURT:  Excuse me?

2          MR. KUNTZ:  I haven't read the Sonnax opinion, Your

3     Honor.

4          THE COURT:  Okay.

5          MR. KUNTZ:  It, you know, I look at it in terms of a

6     pragmatic situation.  The people who know best what happened to

7     this money, the 4 or 5 million dollars, are sitting right here.

8     And they, up until I put in Judge Martin's (ph.) decision,

9     which listed Weil, Gotshal as co-counsel in Grand Union, they

10    basically are just, sort of, like, the three moneys sitting

11    there.  We don't know.  This said, you know --

12         MR. KRASNOW:  Objection, Your Honor.

13         MR. KUNTZ:  And then, in the -- may I finish, Mr.

14    Krasnow?

15         THE COURT:  The -- at --

16         MR. KUNTZ:  And then in the --

17         THE COURT:  Mr. Kuntz.

18         MR. KUNTZ:  -- WorldCom fee application --

19         THE COURT:  Mr. Kuntz.  Let me just break in.  We're

20    having, and I know you're pro se --

21         MR. KUNTZ:  Pro se has nothing to do with this, Your

22    Honor.  This is a misrepresentation by this firm, to this

23    Court, on matters of record in New Jersey and in this district.

24         THE COURT:  But let me just stop you.

25         MR. KUNTZ:  Thank you, Your Honor.

1    THE COURT:  This is a very narrow legal question.  And

2    even though you're pro se I need to keep it narrow.  We're not

3    talking about Weil, Gotshal's role, if any, in another

4    bankruptcy case.

5        MR. KUNTZ:  It's --

6        THE COURT:  Nor are we talking about Weil, Gotshal's

7    role in this case.  The only thing we're talking about is

8    whether you have cause to prevail in connection with a motion

9    under a particular, narrowly construed, federal rule that

10   allows someone relief from an order or judgment after it has

11   been entered.

12       MR. KUNTZ:  I understand perfect, Your Honor.  That's

13   why we're here today.

14       THE COURT:  Okay.  That's what I want to limit the

15   discussion to.

16       MR. KUNTZ:  Well, when I am confronted with a rolling

17   reference to a case in Oklahoma that has -- it is totally

18   unrelated to the simple issues of if this debtor is holding or

19   not holding millions of dollars taken from an escrow account.

20   I'm not dealing with a Visa card account or not dealing with an

21   eminent domain case in that.  If those issues had been fairly

22   addressed last year I wouldn't be standing here now.  I simply

23   would have, as Your Honor may note, filed my proof of claim and

24   waited for the claims objection to come.

25       THE COURT:  Have you filed a proof of claim?

1          MR. KUNTZ:  Yes, I have.  And I amended them this

2     morning again.

3          THE COURT:  Okay.  If you have filed a proof of claim,

4     and I don't get to the merits of that --

5          MR. KUNTZ:  I understand, Your Honor.

6          THE COURT: -- at today's hearing, you have submitted

7     the very same matter that is the subject of your earlier motion

8     for stay relief to the claims administration process in the

9     bankruptcy, have you not?

10          MR. KUNTZ:  In part, Your Honor.  My problem is, is

11     that the -- that the -- there is no direct contractual

12     relationship between Grand Union Capital Corp. and this debtor.

13          THE COURT:  Then you may have no claim at all.

14          MR. KUNTZ:  That may be, Your Honor, but the --

15          THE COURT:  In which case we're spending a lot of time

16     talking --

17          MR. KUNTZ:  That may --

18          THE COURT: -- about something that --

19          MR. KUNTZ:  That may be, Your Honor.

20          THE COURT: -- doesn't relate to Lehman.

21          MR. KUNTZ:  But, you know, I'm hesitant to institute a

22     proceeding in Westchester County State Court that might operate

23     as a theoretical or practical lien upon these funds.  And this

24     is why I'm being overly careful.  Most people would have paid

25     no attention to it until they got the boom lowered on them.  I

1    know better.

2    THE COURT:  Well --

3    MR. KUNTZ:  I've said enough, Your Honor.  Thank you.

4    THE COURT:  Whether you are proposing some kind of

5    litigation in New York State Supreme Court in Westchester that

6    may implicate the automatic stay in this bankruptcy case, I do

7    not know.  The only thing I can comment on is what's before me

8    now, which is a motion under Rule 60(b) for relief from the

9    order entered last October, 2008 denying your motion for stay

10    relief, which was a bench ruling followed by an order that was

11    entered of record.  I'm going to let debtors' counsel speak to

12    the issue, and then I'll rule on the 60(b) motion and we'll go

13    to lunch.

14    MR. KRASNOW:  Your Honor, Richard Krasnow, Weil,

15    Gotshal & Manges.  I stood to object to some of Mr. Kuntz's

16    characterizations.  I continue to object to them.  Having said

17    that, Your Honor, we rely on our pleadings and for the reasons

18    set forth request that the Court deny the application.  Thank

19    you, Your Honor.

20    THE COURT:  I've considered the papers filed,

21    including Mr. Kuntz's reply, which I did receive yesterday, and

22    I've considered the oral argument that has been presented by

23    Mr. Kuntz on his own behalf.  I understand his sensitivity to

24    not wanting to violate the automatic stay.  That sensitivity

25    will continue as a result of this ruling.  I am not revisiting

1    today the determination made last October to deny Mr. Kuntz's

2    request for relief from the automatic stay.

3         The nature of Mr. Kuntz's claim as against the Lehman

4    estate remains obscure to me, even as a result of the

5    representations made concerning a possible constructive trust

6    over assets that belong to the estate of another debtor, Grand

7    Union Company.  As I said previously, I know nothing about that

8    case.  I had no involvement in that case.  I have not studied

9    the docket or decisions from that case.  I'm simply dealing

10   with the case which is before me, which is the Lehman Brothers

11   case.

12        It's apparent that Mr. Kuntz, based upon the papers

13   filed, has not stated good cause for relief from the earlier

14   order denying his motion for relief from the automatic stay.

15   As a result that order stands, and from a procedural

16   perspective this means that the 60(b) motion, having been

17   resolved, is not longer pending in this court, which presumably

18   means that to the extent there is an appealable right, and I'm

19   not saying that there is one, that Mr. Kuntz can exercise to go

20   back to the district court, the fact that there is a pending

21   60(b) motion no longer is an impediment to such procedure.

22   Whether or not it is available, however, given the passage of

23   time, is something that I don't comment on, nor am I asking

24   anyone else to comment on.

25        MR. KRASNOW:  Thank you, Your Honor.  I believe we

1  have covered all of the matters for this morning.

2          THE COURT:  Those who are coming back I will see at

3  2 o'clock.

4          MR. KRASNOW:  Thank you, Your Honor.

5          THE COURT:  We're adjourned till then.

6      (Proceedings recessed from 1:15 p.m. until 2:04 p.m.)

7          THE COURT:  Be seated, please.

8          MR. SLACK:  Good afternoon, Your Honor.  Richard Slack

9  from Weil Gotshal, for the debtors.  In the first adversary

10 proceeding on for this afternoon is the matter of Neuberger

11 Berman v. PNC Bank and others.  It is an interpleader action,

12 Your Honor, and we're here on a pre-trial conference.

13         Briefly, Your Honor, what this case involves is a

14 series of transactions that were back to back essentially where

15 Neuberger Berman and a Lehman entity entered into a swap.  It

16 was -- there was another swap with another Lehman entity and

17 then finally with PNC.  There are -- there's a litigation, as

18 Your Honor may know, in Pennsylvania that's ongoing, and

19 Neuberger instituted this action which is an interpleader,

20 essentially saying to this Court that it knows it has to pay

21 the money and it's not sure to who.

22         There's a number of motions that have been filed and

23 have been essentially put off because the parties are in fact

24 in very serious negotiations over a settlement.  It has taken a

25 fair amount of time because there's a lot of moving pieces.

1  More recently, we've brought the committee into that process to

2  work with us in trying to reach a settlement.  I think, again,

3  in all fairness, it's something that has moved slower than

4  anybody thought, but the negotiations are in fact ongoing and,

5  I think, have a great chance of being fruitful.

6          THE COURT:  Good.

7          MR. SLACK:  With that, Your Honor, I think that, from

8  the debtors' point of view, even though we're here on a pre-

9  trial, we think that the Court should recognize the efforts of

10  all the parties in trying to reach agreement here and

11  essentially put everything off until the next omnibus to give

12  the parties a chance to reach agreement.

13          THE COURT:  Does everybody concur in that assessment

14  that time is helpful to the process?

15          MR. COHEN:  Good afternoon, Your Honor.  David Cohen

16  with Milbank Tweed, here on behalf of the committee.  We agree

17  with that recommendation.

18          MR. YORSZ:  Your Honor, Stan Yorsz for PNC Bank.  We

19  were the entity who started this with the case in the Western

20  District of Pennsylvania.  And I --

21      (Noise over loudspeaker.)

22          THE COURT:  I don't think that was you.

23          MR. YORSZ:  I agree that --

24          THE COURT:  You agree it wasn't you.

25          MR. YORSZ:  I agree it wasn't me.  I would have

1    prefaced that by saying "Your Honor".  I didn't mean any --

2        I agree that we have made considerable strides, and in

3    fact there are draft stipulations circulating.

4        THE COURT:  Good.

5        MR. YORSZ:  We, PNC, wanted to get before Your Honor

6    primarily because we believe LBCC has had some time now to

7    determine what its position is.  They had originally asked for

8    an extension of time to answer or respond to July 22nd; that's

9    been long gone.  And we would just appreciate if we could get

10   some indication from LBCC when they are going to provide some

11   information to us on where they believe they stand, because I

12   think the parties have been trying to effect a settlement, and

13   we think it is an adversary proceeding that is imminently

14   settlable.

15       The judge in the Western District of Pennsylvania has

16   been cooperative in extending time for us to try to work it out

17   up here because this is the lynchpin, but we would appreciate

18   some guidance from either LBCC or the Court on, instead of

19   simply saying let's put this over, if we could have some type

20   of time within the next ten days, two weeks, when we could get

21   some type of response from LBCC as to what its position is.

22       THE COURT:  What kind of response are you looking for?

23       MR. YORSZ:  We're -- well, we're looking for a

24   response that LBCC has decided that it does not have an

25   interest in what is essentially six million dollars that

1    Neuberger Berman has agreed that it would owe to PNC Bank if it

2    were found liable.  Ideally, that is a response, but at the

3    very least, we'd like a response that they think they do have

4    an interest in it and we can get started with this.

5            THE COURT:  Isn't that part of the settlement process,

6    or am I missing something?

7            MR. YORSZ:  No, no, it is, but we have -- we've been

8    at this for about --

9            THE COURT:  And you're saying this is a missing

10   ingredient --

11           MR. YORSZ:  Yes.

12           THE COURT:  -- that will help --

13           MR. YORSZ:  We've been at this for a month and a --

14           THE COURT:  -- that will help heal the settlement?

15           MR. YORSZ:  Yes, yes.  We've been at this for a month

16   and a half, and at least from my client's point of view we

17   don't seem to be making much progress, at least with regard to

18   the LBCC position.  So they would like, if possible, some

19   indication of when we can get a response other than simply

20   saying let's put it off, because unfortunately it may be if we

21   put it off to the next month we're going to be here in the same

22   position.

23           So, again, we would just like, if we could, get from

24   LBCC some indication that okay, we've looked at everything, in

25   ten days we'll tell you.

1    THE COURT:  I think, as a result of being here today

2  and making that presentation, you will not be in the same

3  position next month.  I don't know what position you'll be in,

4  but it's not unreasonable to expect parties who are involved

5  actively in settlement discussions to commit to a position

6  between now and the time that a settlement is reached.  What's

7  the problem from LBCC's perspective?  Is there a problem?

8    MR. SLACK:  Your Honor, I'm a little surprised by that

9  presentation.  And we have been, I think, fairly clear with

10  parties in a settlement context, which I think is the point of

11  having settlement discussions, about what our positions are --

12    THE COURT:  By the way, the settlement discussions are

13  not going to be the subject of this conference, that's for

14  sure.  I don't want to hear anybody comment on something that's

15  supposed to part of an ongoing and privileged and private

16  discussion.

17    MR. SLACK:  Your Honor, and that's exactly the point

18  I'm making is that the only thing we haven't done is answer the

19  interpleader complaint publicly.  On a, what I'll call, private

20  basis, we have had discussions.  And I think that's reflected

21  by the fact in the presentation that we just heard that there

22  have been stipulations that have been -- gone back and forth.

23  I mean, the parties are not far apart, I believe, in this.

24  That doesn't mean you'll reach settlement, Your Honor.  I

25  understand that there still is some gap, and gaps sometimes

1  don't get filled, but I think it would not be beneficial for

2  LBCC to be taking a public position in papers while settlement

3  negotiations are ongoing.

4      THE COURT:  I appreciate what you've said.  I don't

5  think I heard counsel request that anything be done publicly.

6  I think it was a line in the sand for my benefit as much as for

7  anybody else's to say that this process should not be allowed

8  to go from month to month without meaningful progress.  And I

9  believe that I heard it suggested that if LBCC could express

10  privately a position that it's prepared to live with with

11  respect to whatever this missing piece is of the puzzle.  And I

12  know nothing about these discussions and will, as a result,

13  make any number of stupid remarks between now and the end of

14  this conference.

15      But my suggestion is that between now and the next

16  status hearing we simply calendar it forward; there seems to be

17  no objection to that.  The parties acknowledge that ongoing

18  discussions appear productive.  There's a statement of concern

19  that this may not be a month well spent unless certain

20  positions are committed to privately by LBCC with respect to

21  this dispute, I believe that's what I heard, and I would

22  encourage that, although I'm not directing it, to the extent

23  that's helpful to get this to a satisfactory conclusion.  And I

24  would hope that by calendaring this in October no one's going

25  to want to be standing up and saying, well, we wasted a month.

1    So I suggest you use the month productively, and if

2  you get to a settlement, do that.  If you can't get to a

3  settlement, I think you need to realistically assess the

4  durability and difficulty of the dispute and whether or not

5  it's something that can be effectively resolved by more time,

6  by a mediator or by starting your engines and actually actively

7  litigating the dispute here.  It seems to me that next month is

8  not a bad time for you to make that assessment.  Does that make

9  sense?

10    MR. SLACK:  That certainly makes sense to us, Your

11  Honor.

12    THE COURT:  Incredible, because I don't know what I'm

13  saying to you other than what I've heard you say, and I'm kind

14  of repeating it back to you.

15    So if that makes sense, let's proceed on that basis.

16    MR. YORSZ:  Thank you, Your Honor.

17    THE COURT:  So that'll be on the October calendar,

18  whenever we're hearing adversaries in October.

19    Next is State Street v. Lehman Commercial Paper.

20    MR. PHELAN:  Good afternoon, Your Honor.  Andrew

21  Phelan on behalf of State Street Bank.  This is a matter, Your

22  Honor, that has not been in front of the Court in quite some

23  time, not unlike the Neuberger case we have been put off from

24  month to month on continuing the initial pre-trial conferences

25  and status conferences.

1    I thought I would take just a couple of minutes to let

2  you know where we are in the overall proceeding --

3    THE COURT:  Okay.

4    MR. PHELAN:  -- and to indicate where we are going in

5  the next proceeding and likely schedule another initial pre-

6  trial conference in October, as in Neuberger.

7    In this original complaint -- you may remember it,

8  because we were surprised at how well you remembered it the

9  last time we were in court -- State Street filed a --

10    THE COURT:  I actually remember it vividly.

11    MR. PHELAN:  -- State Street filed an adversary

12  complaint regarding a repo transaction, a one billion dollar

13  repo transaction, as a result of which State Street has

14  purchased thirty-six loans.

15    We -- and the complaint was made up of two parts:  one

16  addressing those thirty-six loans and difficulties State Street

17  alleged it was having with regard to getting cooperation and

18  principal interest payments and such, and then the second part

19  of that adversary complaint regarded a thirty-seventh loan

20  involving 340 Madison, which State Street alleged was

21  improperly taken out or converted from its repo account on the

22  eve of the Lehman bankruptcy.  And so State Street was

23  proceeding with trying to recover that asset under a

24  conversion-type theory.

25    In the months since November, the parties have been

1    cooperating and they have made substantial progress on the

2    first half of the complaint as well as some significant

3    progress on the second half.  And on the first half, originally

4    there were thirty-six loans; six of them were resolved -- or

5    four were resolved in an exchange agreement that this Court

6    signed, and then a total of twenty-five or twenty-six others

7    have been the subject of A&As (ph.) that this Court has signed.

8    So the parties have been able to make substantial part of the

9    case.

10        The -- State Street has not come in and amended its

11   complaint every time a new A&A has been filed.  So the original

12   complaint still stands as to that part of the case.

13        As the Court might expect, the easier ones, the Lola

14   Hane (ph.) group, were the ones that were resolved through the

15   A&As and through the proceedings so far, and the more difficult

16   are the ones before that the parties are grappling with now.

17   This is the second bucket.  So the first bucket is the thirty-

18   some-odd loans that have been resolved; for the most part there

19   are no pending disputes with regard to that.

20        The second bucket is the ones that are -- have a

21   little bit of hair on them that the parties are trying to

22   resolve and are continuing their efforts to do so.  There is no

23   current indication that we are going to be involved in drawing

24   the line in the sand and going forward with litigation on

25   those, although we may need the Court's assistance if we can't

1   get some kind of discovery disclosure on some of them.  But I

2   will work on that with Mr. Comet and with the other real estate

3   counsel that are involved for both sides.

4       The final bucket is the 340 Madison loan, which is one

5   that has been carved out because it is not reasonably likely

6   that the parties are going to settle their dispute with regard

7   to that loan.  We say it should have been in our repo pool;

8   their position is that it should not have been.  So never the

9   twain shall meet on that issue unless we have some litigation

10  and get some discovery on that point.

11      THE COURT:  Where does that loan reside at this

12  moment?

13      MR. PHELAN:  It now resides with Lehman -- I believe

14  it's Lehman Brothers Holdings, Inc., not LCPI, but that's as

15  far as I know so far.

16      Now, Mr. Comet and I have been working together on

17  electronic discovery issues, which have taken six or eight

18  weeks.  The parties have been going back and forth to try to

19  identify what's needed to find search times and such that I

20  won't trouble you with, but progress is being made there,

21  albeit somewhat slow progress.

22      The parties then -- we also served a subpoena on

23  Trimount (ph.), which is a third-party service server, and some

24  delays -- there are some brief delays there, but I believe that

25  productions will start within a week or so in that matter.

1    This brings us to where we are now with regard to the

2    340 Madison dispute.  State Street in June or July amended its

3    complaint as to the 340 Madison loan, and LCPI has answered

4    that complaint just as to the 340 Madison loan part.  So we're

5    in a bit of a bifurcated situation where part of the adversary

6    complaint is just remaining in a holding pattern as the parties

7    work through and another part of it is proceeding.

8    We're at the point now that we need to develop and

9    agree to a scheduling order or a trial schedule, discovery

10   schedule, expert schedule in that matter.  And I raised this,

11   after we continued hearings month after month after month, a

12   little bit late with Mr. Comet.  So we have not finalized a

13   schedule.  We are in the neighborhood/in the ballpark, I

14   believe, of having agreements on a schedule, which is why

15   nothing yet has been submitted to the Court.

16   One issue that would be of assistance to State Street

17   at least and, I believe, to LCPI is to understand where the

18   Court is scheduling trials and what kind of a time frame we are

19   looking for, because that's one of the issues that is keeping

20   the parties apart a little bit.  They want a period that's

21   one -- or two to three months shorter than what State Street

22   has proposed, and I don't want to build in too little time for

23   the discovery that is needed in the event that we have more

24   delays in getting the discovery that's needed to proceed with

25   the action.

1    So the framework we're looking at now would have

2    discovery closing in this matter next June, June of 2010, with

3    expert discovery following -- for the following -- I believe

4    it's two months, and motion or a pre-trial order coming in -- I

5    believe it's September or October of 2010 under the schedule

6    that Mr. Comet and I have discussed.

7    THE COURT:  That's a pretty prolonged work plan.  I'm

8    not going to micromanage how much time is necessary to get to

9    be trial-ready, and I appreciate your update.  I don't

10   understand at this moment what's going on with 340 Madison, nor

11   do I understand why this is a dispute that can't be compromised

12   globally.  Part of what I need to understand from Mr. Comet, I

13   think, is what it is about 340 Madison in particular that

14   differentiates it from the other loans within the pool.  I also

15   need to know if there are any other similarly disruptive pieces

16   of loan collateral that might be time-consuming.

17   And, and this is really my overarching question, it

18   seems me that the parties up to this point have been quite

19   effective in working out, through exchange agreements and

20   otherwise, commercial solutions in reference to the pool of

21   assets that are the subject of this repo transaction.

22   I'm not understanding why there is a need for ongoing

23   litigation that includes a close of pre-trial activity a year

24   from now in a dispute where parties have been so apparently

25   effective in working with each other in resolving various

1    trades of assets to match, as I recall, certain assets that

2    belong together that weren't there in the first place when the

3    music stopped last year.

4            So my overarching question is, what makes this dispute

5    so hard to resolve since you've been able to resolve so many

6    little pieces of it up till now?

7            MR. PHELAN:  I think -- and I'll answer the first part

8    of it and have Mr. Comet provide what input he has on it.  With

9    regard to the 340 Madison, that's one loan that we know very

10   little about except for the fact that it was taken out --

11           (Dialing noise over loudspeaker.)

12           THE COURT:  Can you click that off?

13           MR. PHELAN:  -- except that it was taken out of our

14   repo pool on the eve of the Lehman Brothers bankruptcy.  We

15   also have, and we allege in our complaint -- not allege; we

16   have recordings of communications about needing more assets for

17   our repo loan and individuals on behalf of Lehman saying that

18   they will be getting us more and better assets, because what

19   was in there was not sufficient.

20           We don't know the details of what went on and how --

21   who was valuing the Lehman loans.  There are some things that

22   we don't know that we need to know, I believe, that would

23   assist in opening up the discussions to see if there can be a

24   resolution of that or not.  But it's what we don't know that we

25   don't know, so we can't make much progress until we get that.

1    I am anticipating that the parties should, within the

2 next month, be producing -- or hopefully two weeks -- be

3 starting to produce their electronic records, the e-mail

4 traffic, which may very well be the most relevant evidence here

5 as to what was happening and why the 340 Madison was taken out.

6 That's -- that would be my answer:  I just don't know enough on

7 that issue.

8    THE COURT:  Okay.

9    Mr. Comet, can you help me on this too?

10    MR. COMET:  Yes.  Howard Comet, Weil, Gotshal &

11 Manges, for the debtors, Your Honor.  To explain the situation

12 regarding the 340 Madison loan, Your Honor, I need to just

13 spend a moment explaining the overall structure of this

14 arrangement.  As Mr. Phelan said, this was a -- well, the

15 repurchase agreement under which Lehman agreed to provide

16 essentially a billion dollars' worth of loans with a certain

17 margin above that to State Street, and this was a pool of

18 loans.

19    If you parse through the agreements, I think it's

20 quite clear and unambiguous that the agreements gave Lehman

21 essentially complete right to decide what loans would be in

22 this pool at any given point in time to take loans out, put

23 loans in.  And they did that regularly.  And as long as they

24 maintained the required valuation, that was all that they were

25 required to do.

1        The 340 Madison loan was taken out of the pool on

2  September 15th of last year, actually one year ago today, which

3  was, as the Court of course knows, one day before the

4  bankruptcy of the parent company, although the particular

5  contracting party here, LCPI, did not file until, I believe,

6  sometime in early October.

7        THE COURT:  I think the dates are September 15th and

8  October 3rd, I think, so that I'm not sure that you could have

9  moved assets on September 15 because the bankruptcy was filed

10  early in the morning on September 15, which was last year a

11  Monday morning.

12        MR. COMET:  Well, this -- well, this has -- the LCPI

13  was not in bankruptcy, but -- and I may have the dates off by

14  one, Your Honor, but it was --

15        THE COURT:  Well, LCPI was not in bankruptcy --

16        MR. COMET:  Right.

17        THE COURT:  -- I believe, until October 3.

18        MR. COMET:  Right.  Exactly.

19        THE COURT:  5?  October 5.  I got a hand signal from a

20  cooperative Weil Gotshal partner.

21        MR. COMET:  The -- so I'm not -- there was no notice

22  of default here from State Street until September 17th; I'm

23  pretty confident of that date.  And so I -- the bankruptcy is

24  an issue -- and the notice of default was not based on the

25  bankruptcy filing; it was based on other grounds.

1      So the issue of the bankruptcy here is simply, I

2  think, that State Street has a supposition that because of the

3  eminency of the bankruptcy filing this loan was taken out.

4      As far as we know, this had gone on, as I said,

5  regularly, Your Honor.  Loans were taken in and out of this

6  pool based on the valuations that were placed on it.  The

7  Lehman records show that when this loan was taken out the

8  required valuation continued to exist in the loan pool.  And we

9  know of no reason to think there was anything unusual about

10 this.

11     I think there's no conceivable contract claim here

12 that there was anything improper about taking a loan out

13 because the contracts gave Lehman complete discretion.  In

14 fact, the operative language in the -- there's a series of

15 agreements; each one supersedes the other in terms of any

16 conflict.  The operative language in the controlling agreement

17 says "Seller", that's Lehman here, "shall have the unlimited

18 right to substitute and/or withdraw purchased securities."  And

19 the agreement's also very clear that if Lehman withdraws a

20 security, that terminates any interest that State Street has in

21 a security, whether it's considered an ownership interest or a

22 security interest, because the agreements all speak in terms of

23 the possibility that it might be one or the other.

24     If -- what it says is "Upon" -- this is actually in

25 the custodial agreement where the loan documents are kept:

1    "Upon transfer from the Buyer", that would be State Street's

2    custodial account, "the Leased Assets shall cease to be

3    purchased assets for all purposes hereunder, and without

4    further action the security interest granted by the Seller to

5    the Buyer with respect to such purchased assets shall be

6    automatically released."

7        So State Street has, I believe, no contract claim.

8    They have a separate claim that, to the extent the loans

9    they've now received are ultimately received, or at whatever

10    the appropriate date is, value less than a billion dollars,

11    they have a deficiency -- a potential deficiency claim for

12    which they could file a proof of claim. But what they're

13    seeking to do in this action is say even though the contract

14    may have said that you can take loans in and out, we somehow

15    continue to own this 340 Madison loan notwithstanding this

16    contract language.

17        And I think what the action is is in many ways a

18    fishing expedition to find a basis to support that claim. We

19    seriously considered filing a motion to dismiss but thought

20    that, since in many cases a motion to dismiss is met with

21    response, at least we should get some chance to find out the

22    facts through discovery, that we would go forward at least

23    initially with discovery. And I am becoming very concerned

24    that the discovery process seems to be a lot more burdensome,

25    onerous and extended than we had expected.

1          I -- we do have a dispute with State Street about the

2     length of the process.  I've suggested that we have a much

3     significantly shorter discovery schedule and trial schedule

4     than Mr. Phelan has suggested.  I think we seem to be heading

5     towards disputes on numbers of depositions and things of that

6     sort as well.

7          And it may yet be the case, Your Honor, that we move

8     for a judgment on the pleadings in order to get a determination

9     whether there really is any legal issue here.  I mean, the

10    legal theories advanced are conversion, but I think that

11    assumes the ownership interest that's in dis -- that we say

12    under the contract clearly doesn't exist, constructive trust,

13    but that is of course the usual last resort of somebody to try

14    to create an ownership interest and depends upon proof of a

15    fiduciary relationship, which I think is highly unlikely here.

16         So I think there's some serious issues about the case

17    and the discovery, Your Honor, and whether it makes sense in

18    that respect.

19         From the commercial perspective, Your Honor, the

20    diff -- we've been able to resolve the other loans because

21    they're really -- there's no dispute as to the other loans that

22    remained in the pool, that Lehman had transferred something to

23    State Street in connection with those loans.  There could have

24    been a dispute potentially as to whether it was ownership or a

25    security interest, but it seemed not worth litigating that

1  because, even if they ended up as just holders of a security

2  interest, it'd essentially be the same position.

3          THE COURT:  Is 340 Madison the only problem loan that

4  we're talking about?

5          MR. COMET:  It's the only one of this sort, Your

6  Honor.  There are no others that -- there's -- where there's

7  any question that they were in the pool.  As Mr. Phelan said,

8  there are a few that we're working on.  There's one, for

9  example, I know of that the documentation has all been prepared

10  for State Street to simply take it over, and State Street has

11  decided they may not want it and is waiting for that reason.

12         THE COURT:  And what's the assumed value, unless

13  that's a really loaded question, of the 340 Madison loan?

14         MR. COMET:  The -- I don't have a today valuation,

15  Your Honor.

16         THE COURT:  Is this all worth fighting about?  That's

17  what I'm trying to figure out.

18         MR. COMET:  Right.  At the time that the loan was

19  removed from the pool, it -- depending on how you look at it,

20  it was valued at, I'd say, approximately twenty-five million

21  dollars.  There's one valuation that puts it at twenty-eight;

22  there's another that puts it with a haircut involved in the

23  margin at twenty-four something.  So it's in -- I shouldn't

24  have said twenty-eight; twenty-six, and then there's another,

25  twenty-four.  So it's in the neighborhood of twenty-five

1    million dollars.

2          THE COURT:  It's in the mid-twenties, whatever it is.

3          MR. COMET:  Yes.  Which in the context of a billion

4    dollar loan pool is relatively small.  I think --

5          THE COURT:  That's my point:  Why are we fighting for

6    a year over a rounding error?

7          MR. COMET:  I agree, Your Honor.  I think there may be

8    opportunities for the parties to sit down and, in conjunction

9    perhaps even with some of the other loans that remain to be

10   fully dealt with, to see if this can be factored in some kind

11   of resolution of it.  The -- you know, the issue is that

12   twenty-five million dollars, Your Honor, obviously is a

13   significant amount of money even --

14         THE COURT:  I'm not by any means suggesting that

15   twenty-five million dollars is not a significant amount of

16   money; it is.  And this is an estate in which, while we throw

17   around big numbers at each hearing, twenty-five million dollars

18   is real money and it's clearly worth fighting over not only

19   because of the notional amount but because of the principal

20   that's involved.  I don't know that State Street's repo

21   transaction is the only repo transaction we need to be

22   concerned with.  We're drawing bright lines that matter for

23   purposes of estate assets and the assets of counterparties.

24         My only reason for referencing the relative value of

25   the 340 Madison loan is that I have observed during the life of

1    this litigation what I view as constructive and cooperative

2    behavior exhibited by counsel for State Street and counsel for

3    LCPI in connection with the transfer of underlying assets,

4    matching assets up and working out agreements.  All I'm

5    suggesting is that if 340 Madison is but one of thirty-seven

6    total loans, thirty-six being indisputably in the pool and this

7    one being disputably either in or out, it seems to be a

8    universe that can be tackled.

9            MR. COMET:  I think you're right, Your Honor, at least

10    certainly the effort should be made.  I suspect, given the real

11    estate market and so on and without having an actual valuation,

12    that we're probably really talking less than twenty-five

13    million in actual value today in any event; but as I said, we

14    don't have a current appraisal.

15            THE COURT:  Would mediation be helpful to the parties?

16    I spent the entire morning dealing with alternative dispute

17    resolution issues for in-the-money derivative transactions.

18    The order applies only to those, but the concept applies across

19    the board to all disputes in this case.  The only thing that

20    distinguishes this from the other potential disputes is that

21    this is a real dispute.  And there are real orders involved,

22    and I could, if I wanted to, direct that you mediate.  Would

23    that be useful?

24            MR. COMET:  It may be, Your Honor.  One shortcoming I

25    have in responding is that a lot of the discussions that have

1    gone on about this I have not been involved in.  As Mr. Phelan,

2    I think, suggested, the real estate lawyers have been

3    talking -- on each side, have been talking to each other

4    directly.  And I would like, if I could, to consult with them

5    and then talk with, I guess, Mr. Phelan maybe.  And I think it

6    may well be helpful.  Could we -- I guess my question would be,

7    could we advise the Court on that after checking with our

8    clients and so forth?

9         THE COURT:  My suggestion, based upon this dialogue,

10   is that we put this over to the October adversary omnibus date

11   and that between now and next month that the parties at least

12   explore the following things:  First, there has to be a way to

13   deal with what seems to be a relatively narrow dispute in less

14   than a year's worth of discovery.  That seems to me to be a

15   prolonged period not justified by my understanding of this

16   dispute.  So come up with a much shorter period if this thing

17   has to be litigated, or come up with a justification for a

18   longer period, because I haven't heard one.

19        Secondly, I believe that from what I've heard this is

20   a dispute that's capable of resolution by the parties

21   themselves or by the parties with the assistance of a mediator

22   if the parties can't.  Past behavior suggests an ability to

23   reach agreements on at least portions of the pool.  I see no

24   reason why agreements can't be reached on the entirety of the

25   pool.  But whether or not it can or cannot be achieved, the

1    process of attempting to achieve such a settlement may help the

2    parties narrow the issues or at least reach partial settlement.

3        So I would suggest that that at least be explored

4    within the month, and I'd like a status report on your efforts

5    next month.  At the next status conference, we should set a

6    pre-trial order if you're unable to reach an agreement either

7    on a settlement or means to achieve a settlement.  And I'm

8    going to treat this much like the previous case involving

9    Neuberger Berman as a matter that's going to go to next month

10   with a progress report to be made, and then we can set dates in

11   October.

12       MR. COMET:  Very good, Your Honor.

13       THE COURT:  Sound reasonable to both of you?

14       MR. PHELAN:  That is acceptable, Your Honor.  Thank

15   you.

16       THE COURT:  Okay, fine.

17       MR. COMET:  Thank you.

18       THE COURT:  Next is BNY Corporate Trustee Services.

19       (Pause)

20       THE COURT:  This really does seem to be the perpetual

21   litigation.

22       MR. SCHAFFER:  Indeed.

23       THE COURT:  That's my pun of the afternoon.

24       MR. SCHAFFER:  Your Honor, Eric Schaffer, Reed Smith

25   for BNY Corporate Trustee Services.

1    Your Honor, we're not hear to reargue the motion to

2    dismiss, we lost.  We're here for the limited purpose of

3    dealing with the issues raised in the motion for a stay.  We're

4    seeking a stay only until the district court can determine

5    whether or not to accept -- to deal with our motion for leave

6    to appeal.  If it denies that it's a very short stay we're

7    talking about.  If it accepts that appeal, leave is granted, we

8    would ask for a stay to continue.

9    One thing that occurred to me earlier today, Your

10   Honor, is that a stay does not have to interfere with briefing

11   summary judgment.  As you know, we're going to be here anyway

12   in the AFLAC case dealing with similar issues so I think it

13   would be inappropriate for me to say let's stay that also.  But

14   we do ask that the decision on summary judgment, if there were

15   to be one, be stayed.  My reason for proceeding with the motion

16   today is that while theoretically we might have raised it

17   closer to the summary judgment argument, I don't want to be in

18   a situation where someone says you should have been here in

19   September, you're too late.

20   Your Honor, one other preliminary matter.  LBSF says

21   that we didn't tell the Court we were going to appeal.  Your

22   Honor, we said we might appeal and I want to offer my sincere

23   apologies to the Court if you were looking for something more.

24   Certainly no desire on our part to offend the Court.

25        THE COURT:  I'm not offended.

1          MR. SCHAFFER:  Well, I'm pleased of that Your Honor

2     and I don't think --

3          THE COURT:  I'm disappointed but I'm not offended.

4          MR. SCHAFFER:  Your Honor, I made a point of saying

5     that we might appeal and again, if you were looking for

6     something more that was my misunderstanding and --

7          THE COURT:  Well, the only reason -- the only reason

8     that I raised the issue, and this is something that's been

9     coming up from time to time in the Lehman case, and frankly

10    some of my other cases as well, I'm just going to make this

11    observation it's unrelated to the specifics of your situation,

12    but you're in the envelope that's affected by it.  Partly

13    because of the number of contested matters, adversary

14    proceedings and other disputes that require adjudications from

15    this Court, not only in the Lehman case but in a variety of

16    other cases that are currently pending and that are assigned to

17    me.

18          When a matter is to be appealed, I prefer, to the

19    extent that parties are able to accommodate me, to be able to

20    give the district court a coherent statement of my reasoning in

21    any particular matter.  So that in reviewing the bankruptcy

22    court's decision the district court has more than what may be a

23    less than coherent transcript or an inaccurate transcript.

24    Because there are times when I know that certain words that I

25    use end up in the transcript, not the words I used but

1    something that sounded like a word I used.

2         For that reason, I would like very much to have an

3    opportunity to get it right, assuming I have the time to do

4    that.  At least get it right as far as I see it.  Somebody else

5    may ultimately say I got it wrong.

6         MR. SCHAFFER:  Your Honor-

7         THE COURT:  I'm not quite done.  So for that reason I

8    had requested that if there was to be an appeal, and candidly

9    I'm surprised.  You have your right to pursue whatever relief

10   you think appropriate.  I'm surprised, given the argument that

11   took place in connection with this matter last month, that you

12   chose to pursue an appeal because it is an instrument for

13   delay.  And we have been involved in a process which has been

14   designed to expedite proceedings here and to coordinate, to the

15   extent possible, those proceedings with those related

16   proceedings that are going on in the High Court in London.

17        I received, yesterday, correspondence from the High

18   Court in reference to a letter that I had written requesting

19   cooperation.  And I believe that all parties in the Perpetual

20   litigation received, or were supposed to have received, copies.

21        MR. SCHAFFER:  Not yet.

22        THE COURT:  And it's a very lovely letter and very

23   elegantly typed.  And I appreciate the fact that the High Court

24   is paying attention to what's going on in the bankruptcy court

25   for the Southern District of New York.

1     But my understanding of the timing considerations and

2   of the procedure is that we still have timing pressure in order

3   to coordinate this case with the perpetual case in the UK, that

4   part of that case is on appeal to the appellate court in

5   England.  That part of the case has been retained at the trial

6   court level relating to indemnity issues.  That's about as much

7   as I know but I am under the distinct impression that the

8   process you are undertaking on behalf of your client, and I'm

9   not trying to discourage you in any way from doing what you

10   think best for your client, could turn out to be a recipe for

11   delay that will be most detrimental to LBSF if this ends up in

12   what could turn out to be a prolonged process in the district

13   court.

14     Now I don't mean to suggest that the district court is

15   not timely in disposing of bankruptcy appeals because, on

16   occasion, the district court judge assigned the case may be

17   quite adept at processing an appeal.  But my experience is that

18   it will take some time, assuming you're granted leave to appeal

19   at the district court.  So I'm a little concerned about your

20   motives.

21     MR. SCHAFFER:  Your Honor, if I may speak to that.

22   Your Honor, we are not interested in delay.  Our goal today is

23   the same as it was at the initial pre-trial, indeed the same as

24   it was when LBSF came here asking for leave to file a summary

25   judgment.  We do not want to be in a situation where we're

1    dealing with conflicting orders of court.

2         In terms of the timing of the district court, we've

3    been checking with the clerk in this court on a daily basis to

4    find out when it will be transmitted.  And our understanding

5    is, our papers have not yet been transmitted.  I don't

6    understand why but they say they're waiting for a thirty-nine

7    dollar fee to be paid by Lehman.  And I'm hoping to understand

8    more about that because I can pay that on the way out if it

9    would expedite things.

10        But let me focus on coordination.  All right.  I

11   haven't had the benefit of seeing the chancellor's response to

12   your letter.  I am hoping that the coordination proves to --

13   proves to do a lot to resolve my issues.  But coordination, in

14   and of itself, is not a silver bullet.  Until the English

15   court, if it's inclined to do so, agrees to accept and to defer

16   to this court's decision on the issues of bankruptcy law, we

17   remain at risk of having conflicting orders.

18        And indeed, I think the concern is all the more real

19   because, well Lehman says the English court is waiting for this

20   court's decision.  Let's remember, the English court said it

21   would consider requests, it did not say it would defer.  When

22   LBSF asked for a stay of the English proceedings so that it

23   could proceed here in the first instance, that request for a

24   stay was denied.  Had the High Court agreed to defer to this

25   court, we wouldn't have a conflict; we wouldn't be concerned at

1    all.

2         The English court did agree, as we understand it, to

3    give the U.S. court time and space to consider issues under

4    U.S. law. And of course the issues we raised under Rule 19 and

5    comity are part of U.S. law. We have no reason to believe that

6    the English court would disregard this Court's request for more

7    time or that it would object to letting an appeal proceed if

8    the district court were so inclined. And indeed the High Court

9    in England has to wait for the decision of the court of appeals

10   in England.

11        In some ways, Your Honor, it may be that Lehman

12   benefits most from an appeal because the High Court granted

13   Lehman leave to appeal on an expedited basis so that this Court

14   would have the benefit of the decision on English law after

15   which it could, and I quote, "determine what sort of requests

16   it would wish this court," the English court, "to consider".

17   So I don't think we've got a situation where coordination deals

18   with all of the concerns.

19        Now, this Court is very much aware that there is

20   another somewhat similar case involving AFLAC. And if LBSF is

21   looking for a precedential decision, that might be the decision

22   and that certainly could be communicated without putting us

23   into this conflict. It's a conflict that LBSF said, in England

24   at the beginning of that litigation; they said it would be

25   wholly wrong for us to be subject, for BNY to be subject, to

1     conflicting orders.  And yet here we have them seeking a

2     decision that would be in direct conflict to what the High

3     Court decided and that's not coordination.

4          So from our standpoint, requesting leave to appeal is

5     wholly consistent with the goals of coordination with respect

6     for both courts and with avoiding conflicting decisions.

7          Your Honor having said that, maybe it would be useful

8     for me to just address the standards of review and the record

9     you have before you on this particular motion.

10         Judge Gerber, in the General Motors case, noted that

11    different cases state the factors applicable to such a motion

12    differently but we think they're all variations on a theme.

13    And while the suggestion has been made that we're relying on

14    the wrong cases, I think that there is substantial overlap in

15    the factors.

16         The first is, under Judge Gerber's decision, is there

17    a substantial possibility, although less than a likelihood of

18    success on the merits?  And while LBSF says that we have not

19    addressed the merits, we did file a substantial brief in

20    support of our motion for leave.  And while they talk a lot

21    about the standards, we don't think they're really arguing with

22    the cases, with the issues as we set them forth in that motion.

23    They wrote a thirty-page brief, I don't believe they view our

24    request for leave as being frivolous.

25         Now this Court saw the crux of the matter that was

raised by our motion as to whether BNY is a fair representative

capable of litigating in Perpetual's absence.  And you found

that we were an adequate representative capable of litigating.

But the question we pose on appeal, if it's permitted, is not

whether we're capable of litigating but whether requiring us to

do so would be contrary to Rule 19 or comity.  Should we be

compelled to undertake a representation that threatens to

create a prejudice that otherwise wouldn't exist.  That's

really the question, should we be compelled to do that?  And I

think that Congress and the courts have looked at Rule 19 as a

prime example of an issue where interlocutory review is

appropriate, this sort of due process issue should be taken on

at an early state.

Now, is there a substantial possibility of different

opinions here?  Well again, we've got extensive briefs on the

motion for leave.  I think that, in and of itself, suggests

that there are substantial possibilities.

Now Your Honor, you will understand that we

respectfully disagree with your determination that we serve as

a fiduciary, although the Court recognized that we have been

given a right to indemnification in England.  We don't have

that indemnification and until we have that, until we have a

satisfactory indemnification in place, it is our position,

looking at the language of the documents, which I won't rehash,

that we have no obligation.

1    One other point I would make with regard to the

2 citation of the FDIC case in LBSF's papers, we think that's

3 entirely irrelevant because here we have not been acting on

4 behalf of Perpetual.  We have no duty and indeed we've been

5 antagonistic to Perpetual.

6    A last point on the merits, we think there is a

7 substantial possibility that a district court would see a

8 conflict between this Court's decision and the decision of the

9 court of appeals in Rappaport.  So an immediate review might

10 materially advance termination because if it turns out that on

11 appeal we are correct in our reading of Rule 19 on our

12 invocation of comity, this case goes away.

13    Now LBSF says, this case really is too complicated for

14 interlocutory review.  But this Court said, during oral

15 argument on the motion to dismiss, "We're not dealing with

16 discovery or witnesses or evidence.  We're dealing purely with

17 legal issues."

18    We may have novel issues of bankruptcy law here but

19 those are reasons, if anything, to let threshold procedural

20 issues, due process issues, go first.  We think these can be

21 addressed quickly and cleanly.  But if the district court

22 thinks it's too complicated, presumably it'll say so, and we

23 won't be permitted to proceed with an appeal.

24    Irreparable injury.  Well, if we are compelled to

25 defend Perpetual's position without indemnification in place we

1    may be second guess and worse, again, we may face conflicting

2    judgments, a very real risk.

3         Of course, if LBSF prevails on summary judgment or

4    after trial, there could be appellate review of these same

5    issues if the case would go up in its entirety.  My concern

6    then, though, is that a decision on the merits, if LBSF were to

7    win, would actualize the conflict.  Until such time as we might

8    see a different decision from the appellate court, we would

9    have the conflict.  Again, that assumes that the chancellor is

10   upheld on appeal in England.

11        I won't spend much time on the irreparable harm to

12   Perpetual; I think the Court understands that.  Let me,

13   instead, talk about whether there is any prejudice to a stay

14   from Lehman's perspective.  The assets aren't going anywhere.

15   The AFLAC case is not going to be stayed.  There is a chance

16   for LBSF to seek its precedential decision there.

17        Now, why do we need a stay if we're going to be here

18   anyway briefing issues in the AFLAC case?  Well, it's to

19   prevent conflicting judgments in the perpetual case.  AFLAC

20   doesn't present that risk and, Your Honor, during the argument

21   on the motion to dismiss you had a colloquy with Mr. Miller

22   where you said -- you observed that AFLAC's different.  There

23   the holder is in court.  We have direction and indemnification,

24   we only have one court.

25        Again, there's no reason to think the English court

1    would not wait.  And again, it can't act now because Lehman has

2    filed an appeal of the chancellor's decision.

3           Your Honor, last of the factors here is the public

4    interest.  The Supreme Court has noted that there is a

5    substantial public interest in Rule 19 issues.  It's important

6    to know that you have the right parties and to have effective

7    disposition of threshold due process issues.  We think that a

8    stay promotes an orderly process and voids what might be this

9    Court inappropriately reaching the merits.

10          If the district court grants the motion for leave,

11   presumably it sees the real issue, in which case public

12   interest favors having the benefit of the district court's

13   thinking.

14          Your Honor, again, I'm not looking to reargue the

15   motion to dismiss so let me just conclude by saying you

16   recognize there might be an interlocutory appeal for the

17   reasons we've set forth in our papers, in our argument.  We

18   believe it warrants a stay pending the district court's

19   determination on our motion for leave.

20          THE COURT:  All right.  Thank you.

21          MR. MILLER:  Good afternoon, Your Honor.  Ralph Miller

22   from Weil, Gotshal & Manges here on behalf of Lehman Brothers

23   Special Financing, Inc., known as LBSF.

24          This motion for stay should be denied because movant

25   BNY can't show any of the four elements that are required in

1    the Second Circuit for the extraordinary remedy of a stay while

2    a motion for leave to file an interlocutory appeal is pending.

3          I can be brief because the Court has already

4    highlighted some of the key points and because I think our

5    opposition made some things clear.  But I do want to clarify

6    some confusion that may have been generated in the argument

7    that we just heard.

8          First of all, if I might approach the Court with a

9    couple of case copies?

10         THE COURT:  Sure.

11    (Pause)

12         MR. MILLER:  Your Honor, the three cases I passed out

13    are the General Motors case that was just cited, recently

14    decided by Judge Gerber.  A case that was cited in our

15    opposition papers from the appellate panel, and I'm not sure

16    how to pronounce it but I call it Bijon Serrif (ph.) and then

17    finally a case that was not cited in the briefs but seemed to

18    be implicated by some of the argument we had just now, which is

19    a Fourth Circuit decision in a case called the Rockel (ph.)

20    case.  And it deals with the right to appeal Rule 19 rulings.

21         If we -- the first thing that was interesting was that

22    Mr. Schaffer changed the order of the factors listed by Judge

23    Gerber in General Motors.  He said the first factor listed, and

24    these are listed on page 6 and highlighted, I believe Your

25    Honor, in this copy.  He said the first factor listed was the

1  substantial possibility of success.  Actually, the first factor

2  listed was the irreparable injury factor, which is also the

3  first factor listed in the last page of the Bijon Serrif

4  opinion.  And these are essentially the same four factors that

5  need to be used.  These are different from the factors that

6  were listed in the motion that was filed by BNY.  And we

7  pointed out in our opposition that these are the correct

8  factors.

9        The irreparable harm factor by itself actually

10  determines this question, I think, because the normal reason

11  for an interlocutory appeal is that there's going to be some

12  reason that the normal appellate process does not deal with the

13  issue.  And as Mr. Schaffer pointed out, the money is under the

14  control of BNY.  So we don't have a situation where some other

15  party, outside of BNY's control, is going to do something with

16  the race of the case, so to speak, with the factors.

17        The other critical point, Your Honor, and this is why

18  I passed out Rockel case, is that courts recognize that Rule 19

19  is an interlocutory issue that can be brought up after final

20  judgment.  If you turn to page 3 of that opinion, it says that

21  should the GW II defendants, suffer an adverse ruling on the

22  merits we could review the Rule 19 issue in an appeal from that

23  judgment.

24        So the idea that there's going to be a summary

25  judgment that is going to become binding and they're not going

1    to have a right to raise Rule 19 in the normal fashion simply

2    doesn't apply here.  There is absolutely no possibility of an

3    irreparable harm showing.  What he said, and I wrote it down,

4    was that this could actualize the conflict.  I don't know what

5    that means but the point is that a summary judgment ruling

6    would actually focus the issues for coordination.  I have to

7    admit it's possible it would eliminate them if the Court ruled

8    against LBSF.  If the Court ruled for LBSF and clarified U.S.

9    bankruptcy law, that would greatly aid coordination.

10        We believe -- so the first factor, which was listed

11   and is listed first in most of the cases, really dooms this

12   motion.  And I might note, Your Honor, that the cases recognize

13   that there has to be a showing on all four of these factors.

14   There's some difference in the language about whether it's a

15   balancing test or every factor has to be shown.  But clearly

16   the irreparable harm factor is critical.

17        With regard to the substantial possibility of success,

18   that has to be shown twice here.  It has to be shown first on

19   leave to appeal and then it has to be shown on the merits of

20   the appeal.  I'm not going to spend any time on the merits, the

21   Court; I think has already provided a very compelling

22   explanation on the merits.  On the issue of leave to appeal,

23   the standard in this circuit is that there has to be a

24   controlling issue of law on which there is a likelihood of

25   disagreement.

1          And here, Your Honor, we don't believe that there is a

2     controlling issue of law.  There is a question of how the law

3     should be applied to the facts in this record but the case law

4     is pretty clear that an interlocutory appeal is not appropriate

5     if the Court has to go into the record on appeal to try to find

6     out if the district court or the bankruptcy court correctly

7     applied the law to the record.  And here this record includes

8     not only this proceeding but understanding the AFLAC case and

9     understanding the Perpetual case.  And we don't believe that

10    this is a case that meets any of the elements, frankly, for

11    leave to grant an interlocutory appeal.  So we think they have

12    not made a showing on the element of a substantial possibility

13    of the leave to appeal.  And then even if they got the leave to

14    appeal, there's no showing of a substantial possibility that

15    the appeal will be meritorious.

16         The third element the Court has already touched on and

17    that is the injury to other parties.  And if the stay is

18    granted, it is quite certain that one set or the other of

19    parties besides BNY will be injured.  As the Court points out,

20    whether it was the intent of BNY or not if the stay is granted

21    it would delay the resolution of these bankruptcy issues in

22    this group of cases, at least in this case, in a way that could

23    go back to the London court and that could be used to allow the

24    coordination process.

25         That has the real possibility that the London court,

which as Mr. Schaffer points out has not promised to stay and
has not promised to defer, it simply allowed some time, may
determine, and we understand that court operates under some
mandates of expedited processing that it must rule.  And if it
does rule then it's possible that LBSF will lose its right to
have these bankruptcy issues decided before an order is entered
which could direct BNY to comply.  And at that point there is
irreparable harm.  Once this money is paid out, ever getting it
back becomes very problematic and maybe impossible.  So LBSF
actually faces a risk of irreparable harm from the delay that
this could produce.

If the English court should defer and there is a delay
then Perpetual and Belmont, which have been urging that court
to act promptly will suffer a delay.  So either way the delay
is going to injure somebody other than BNY.  And BNY, as it
keeps pointing out, it says more or less a stakeholder; it's in
the middle here.  So it's not actually being hurt as long as
it's not asked to pay the money twice, which I don't think
anybody has ever suggested as a realistic risk.

The final factor has to do with public interest and I
think it merges, to some extent, with the interest of the other
parties.  But in this particular case coordination and comity
is in the public interest.  And the issues that are being
presented in this case are of importance to litigants not only
in this matter but in a number of other matters pending, not

1  pending but matters that are in dispute around the globe.  And

2  delay in having the U.S. bankruptcy issues resolved so that

3  that resolution will be before the English court and it can

4  take them into account could affect many, many other parties.

5  So the public interest is not benefitted by the delay that is

6  inherent in this kind of stay.

7       So for all these reasons, Your Honor, we believe that

8  BNY has not shown any of the elements and it certainly has not

9  made the necessary showing either under a balancing approach or

10  under the requirement.  It must show all of the elements and

11  the motion for stay should be denied.

12       I'd be happy to answer any questions, Your Honor.

13       THE COURT:  I don't have any questions.  Mr. Schaffer,

14  do you have anything more?

15       MR. SCHAFFER:  Your Honor, I think I covered

16  everything in my initial remarks.

17       THE COURT:  Okay.  Based upon, not only this argument

18  but my familiarity with the issues, that were debated

19  extensively on the record last month in connection with the

20  Rule 19 issues and the BNY motion to dismiss I find no basis to

21  stay proceedings, at least at this juncture.

22       I also think that it's difficult for me to even apply

23  the factors outlined by Judge Gerber in the General Motors

24  decision in this setting, in as much as the record on the

25  motion for leave to appeal hasn't even left the building.  The

1   option remains that a district court judge may, upon review of

2   the papers submitted on the merits of that motion for leave to

3   appeal, find merit in BNY's position.  I don't want anything

4   that I say now to indicate, one way or the other, how the

5   district court should rule to the extent that the transcript of

6   these remarks end up before that judge.

7          But based upon my familiarity with the underlying

8   dispute here and in fact counsel's admitted involvement in the

9   AFLAC case, which involves virtually identical issues that will

10  be presented to this Court on BNY's behalf, it is difficult for

11  me to fathom how the issues presented in the Perpetual case

12  rise to the level of importance assigned to them by BNY's

13  counsel.

14         This is really all about BNY's efforts to protect

15  itself.  No more, no less.  And doing everything within reason

16  to make sure that conflicting results in the U.K. and in the

17  United States do not expose BNY to an impossible dilemma.  I

18  recognize that but that highly contingent and potential future

19  risk does not constitute cause to stay these proceedings now.

20  The motion is denied.

21         Is there more?

22    (Pause)

23    MR. MILLER:  Your Honor, Ralph Miller again.  I am

24  advised that this completes the agenda for the debtors in the

25  Lehman Chapter 11 proceedings.  I don't know if there's

1    anything else on the agenda for other parties.

2         THE COURT:  Well let me just supplement some remarks I

3    just made.  I want it to be clear that my ruling in connection

4    with BNY Corporate Trust Services' request for a stay is

5    predicated upon not only the remarks I made but upon the

6    comments that Mr. Miller made referencing Judge Gerber's

7    decision and the four factors that are the standard factors for

8    granting or denying a stay pending appeal.  And I'm satisfied

9    that those standards are not satisfied.

10        I believe that there is a recognition hearing in the

11   Lehman Re Chapter 15 case, which is scheduled to commence

12   immediately at the conclusion of this afternoon's omnibus

13   hearing.  We'll take a ten minute break and start with Lehman

14   Re.  We're adjourned for ten minutes.

15        MR. SCHAFFER:  Thank you, Your Honor.

16        MR. MILLER:  Thank you, Your Honor.

17        (Proceedings concluded at 3:14 PM)

18

19

20

21

22

23

24

25

1

2                        I N D E X

3

4                      R U L I N G S

5   DESCRIPTION                              PAGE      LINE

6   Interim applications for allowance of      26         1

7   compensation for professional services

8   rendered and for reimbursement of actual

9   and necessary expenses approved

10  Motion of Wells Fargo, NA for relief from  27         1

11  the automatic stay [Docket No. 4640]

12  approved

13  Motion of Wells Fargo, NA for relief from  27         1

14  the automatic stay [Docket No. 4671]

15  approved

16  Motion of Washington Mutual Bank f/k/a     27         1

17  Washington Mutual Bank, FA for relief from

18  the automatic stay [Docket No. 4759]

19  approved

20  Motion of A/P Hotel, LLC for relief from   27         1

21  the automatic stay approved

22  Motion for authorization to assume an      27        20

23  interest rate swap with MEG Energy Corp.

24  approved

25

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Debtors' motion for establishment of procedures for the debtors to transfer their interests in respect of residential and commercial loans subject to foreclosure to wholly-owned non-debtor subsidiaries approved | 31 | 11 |
| Debtors' motion for establishment of procedures for the debtors to compromise claims of the debtors in respect of real estate loans approved | 31 | 1 |
| Motion of Landwirtschaftliche Rentenbank for 2004 examination denied without prejudice | 32 | 23 |
| Objection of Wellmont Health Systems Denied for lack of prosecution | 45 | 21 |
| Objection of Easton Investments denied For lack of prosecution | 50 | 24 |
| Objections of Royal Bank of Scotland overruled | 70 | 15 |
| Objections of Highland Capital Management denied for failure to prosecute | 70 | 20 |
| Objections of EXCO Operating Company, LP denied for failure to prosecute | 70 | 25 |

| DESCRIPTION | PAGE | LINE |
|---|---|---|
| Motion of Cleary Gottlieb Steen & Hamilton for pro hac vice admission of David Livshiz granted | 75 | 17 |
| Debtors' motion for authorization to implement alternative dispute resolution procedures for affirmative claims of debtors under derivative contracts granted | 98 | 24 |
| Debtors' motion to compel performance of Metavante Corporation's obligations under an executory contract and to enforce the automatic stay granted | 113 | 7 |
| Motion of DnB Nor Bank ASA for allowance and payment of administrative expense claim and allowing setoff of such claim denied | 113 | 23 |
| Motion of William Kuntz, III for review of dismissal of appeal denied | 124 | 13 |
| Motion of BNY Corporate Trustee Services Limited to stay further proceedings pending disposition of its motion for leave to appeal the August 12, 2009 order denying BNY's motion to dismiss and any disposition of the merits of that appeal denied | 165 | 20 |

1

2                     C E R T I F I C A T I O N

3

4      I, Clara Rubin, certify that the foregoing transcript is a true

5      and accurate record of the proceedings.

6

7      _____

8      Clara Rubin

9      AAERT Certified Electronic Transcriber (CET**D-491)

10     Also transcribed by:    Pnina Eilberg (CET**D-488)

11

12     Veritext LLC

13     200 Old Country Road

14     Suite 580

15     Mineola, NY 11501

16

17     Date: September 17, 2009

18

19

20

21

22

23

24

25