# EXHIBIT CC

**AMENDED AND RESTATED SCHEDULE
DATED AS OF JUNE 26, 2009
TO THE
1992 ISDA MASTER AGREEMENT
LOCAL CURRENCY SINGLE JURISDICTION
DATED AS OF
JUNE 7, 2006**

(General Retirement System/Syncora)

**BETWEEN**

| | | |
|---|---|---|
| **SBS FINANCIAL PRODUCTS COMPANY, LLC,** a Delaware limited liability company | and | **DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION,** a not-for-profit corporation organized under the laws of the State of Michigan |
| ("Party A") | | ("Party B") |

**Part 1.**

**Termination Provisions**

In this Agreement:

(a)  "*Specified Entity*" means in relation to Party A for the purpose of:

|  |  |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

and in relation to Party B for the purpose of:

|  |  |
|---|---|
| Section 5(a)(v), | NONE |
| Section 5(a)(vi), | NONE |
| Section 5(a)(vii), | NONE |
| Section 5(b)(ii), | NONE |

(b)  "*Specified Transaction*" will have the meaning specified in Section 12 of this Agreement.

(c)  The "*Cross Default*" provisions of Section 5(a)(vi) of this Agreement, as modified below, will apply to Party A and to Party B.  Section 5(a)(vi) of this Agreement is hereby amended by the addition of the following at the end thereof:

"*provided, however*, that notwithstanding the foregoing, an Event of Default shall not occur under either (1) or (2) above if, as demonstrated to the reasonable satisfaction of the other party, (a) the event or condition referred to in (1) or the failure to pay referred to in (2) is a failure to pay caused by an error or omission of an administrative or operational nature; and (b) funds were available to such party to enable it to make the relevant payment when due; and (c) such relevant payment is made within three Business Days following receipt of written notice from an interested party of such failure to pay."

If such provisions apply:

"*Specified Indebtedness*" means any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of any money.

"*Threshold Amount*" means:

(i)     with respect to Party A, an amount equal to 2% of shareholders' equity (howsoever described) of Party A as shown on the most recent annual audited financial statements of Party A and

(ii)     with respect to Party B, $10,000,000.

(d)     The "*Credit Event Upon Merger*" provisions of Section 5(b)(ii) will apply to Party A and Party B, amended as follows:

"Credit Event Upon Merger" shall mean that a Designated Event (as defined below) occurs with respect to a party, any Credit Support Provider of the party or any applicable Specified Entity (any such party or entity, "X"), and such Designated Event does not constitute an event described in Section 5(a)(viii) but the creditworthiness of X, or, if applicable, the successor, surviving or transferee entity of X, is materially weaker than that of X immediately prior to such event.  In any such case the Affected Party shall be the party with respect to which, or with respect to the Credit Support of which, the Designated Event occurred, or, if applicable, the successor, surviving or transferee entity of such party.  For purposes hereof, a Designated Event means that, after the date hereof:

(i)     X consolidates, amalgamates with or merges with or into, or transfers all or substantially all its assets to, or receives all or substantially all the assets or obligations of, another entity; or

(ii)     any person or entity acquires directly or indirectly the beneficial ownership of equity securities having the power to elect a majority of the board of directors of X or otherwise acquires directly or indirectly the power to control the policy-making decisions of X."

(e)     The "*Automatic Early Termination*" provision of Section 6(a) will not apply to Party B and will apply to Party A; *provided, however*, that with respect to a party, where the Event of Default specified in Section 5(a)(vii)(1), (3), (4), (5), (6) or to the extent analogous thereto, (8) is governed by a system of law which does not permit termination to take place after the occurrence

of the relevant Event of Default, then the Automatic Early Termination provisions of Section 6(a) will apply to such party or Party B.

(f)     *"Payments on Early Termination"*.  For the purpose of Section 6(e) of this Agreement:

    (i)     Market Quotation will apply.

    (ii)    The Second Method will apply, except as modified as provided in Parts 6 and 7 hereof.

(g)     "Termination Currency" means U.S. Dollars.

(h)     There shall be added to Section 5(a) of the Agreement the following Events of Default:

    "(ix)   Authority; Repudiation.  Party B shall cease to have authority to make payments under this Agreement or any Transaction subject to this Agreement, or any government entity having jurisdiction over Party B shall enact any legislation which would have the effect of repudiating this Agreement or any Transaction subject to this Agreement."

    "(x)    Amounts payable by Party B to Party A hereunder shall cease to be payable and secured in accordance with the terms specified in Part 4(b)(ii)(g) of this Schedule."

(i)     *"Additional Termination Event"* will apply to Party A and to Party B.  In addition to the Additional Termination Events set forth in Part 5 of this Schedule, the following shall constitute Additional Termination Events.

    (i)     *Party A Additional Termination Events.*  Party A or its Credit Support Provider's long-term senior unsecured debt rating from (a) S&P is withdrawn, suspended or falls below "BBB-", or (b) Moody's is withdrawn, suspended or falls below "Baa3".

For purposes of the foregoing Termination Event in this Part 1(i)(i), the sole Affected Party shall be Party A and all Transactions shall be Affected Transactions.

    (ii)    *Party B Additional Termination Events.*

        (1)     The City Payments made in any Month, in aggregate, are less than the Holdback Requirement for such Month; or

        (2)     The City fails to make an appropriation in the City's final annual budget adopted pursuant to and in compliance with the City Charter prior to the commencement of any Fiscal Year and to maintain such appropriation without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis authorizing exclusively payment of the City Payments and as a "first budget" obligation, of an amount at least equal to the Regular Custodian Payments scheduled to become due during the Fiscal Year plus an amount equal to *the greater* of (X) the amount of the Hedge Periodic Payables under the Hedges scheduled to become due during the Fiscal Year without giving effect to any netting and (Y) for the first Fiscal Year

commencing July 1, 2009, $49,936,975 and, for each subsequent Fiscal Year thereafter, $50,736,975; or

(3)    The Quarterly Coverage as of the end of any Month is less than 1.75; or

(4)    Either (1) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P falls below "BB" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's falls below "Ba2" and as of the immediately preceding Month's end the Quarterly Coverage is 2.15 or less, or (2) the unenhanced rating on the 2006 Pension Funding Securities assigned by S&P is withdrawn, suspended or reduced below "BB-" or the unenhanced rating on the 2006 Pension Funding Securities assigned by Moody's is withdrawn, suspended or reduced below "Ba3"; or

(5)    At any time following a Ratings Upgrade, the unenhanced rating on the 2006 Pension Funding Securities is withdrawn, suspended or reduced below "BBB-" by S&P or withdrawn, suspended or reduced below "Baa3" by Moody's; or

(6)    The City, a Service Corporation, or a third party shall commence litigation or take any other judicial action, or any legislative action is taken, to set aside or avoid or limit the 2006 Transaction, the City Pledge, the Service Corporation Security Interest, or the Service Corporation Pledge or any other part of the Definitive Documents or the Settlement Transaction (other than with respect to a Developer Agreement), or if the Authorizing Ordinance or any part thereof shall be amended (without the consent of Party A), revoked, rescinded, nullified or suspended for any reason; or

(7)    The City shall rescind, reduce or cease to impose the tax currently imposed as of the Amendment Effective Date by Section 18-14-3 of the Detroit City Code or the City, within two Business Days following the earlier to occur of notice from the Collateral Agreement Custodian that a taxpayer has inadvertently or erroneously paid the Wagering Tax Property directly to the City or the Finance Director learning of such payment, shall fail to transfer by wire transfer in same day funds to the Collateral Agent Custodian for deposit into the General Receipts Subaccount such payment. However, the rescinding of such tax shall not result in a Termination Event hereunder if such tax is then collected by the State of Michigan pursuant to Section 12(1) of the Wagering Tax Revenue Statute and an amount of such collections equal to or greater than the tax imposed as of the Amendment Effective Date is paid to the Collateral Agreement Custodian under arrangements satisfactory to Party A; or

(8)    The City fails to pay any Service Charges, Accrued Service Charges, Regular Scheduled Payments or Sinking Fund Installments as and when due and payable under either Service Contract; or

(9)      The City fails to pay when due any principal of, or interest on, any indebtedness for borrowed money, other than Excluded Indebtedness, aggregating $1,000,000 or more or any other event shall occur the effect of which is to cause, or to permit the holder or holders of such indebtedness (or a trustee or agent on behalf of such holder or holders) to cause such indebtedness to become due, or to be prepaid in full (whether by redemption, purchase, offer to purchase or otherwise), prior to its stated maturity, in each case after giving effect to any applicable grace period requiring notice or the lapse of time or both; or

(10)    The City fails to pay any judgment or judgments aggregating $1,000,000 or more, excluding judgments (1) on appeal and being contested in good faith, (2) for which the City has reached an agreement with the judgment creditor as to the timing and manner of payment that does not involve the imposition of any additional ad valorem property taxes above the Property Tax Threshold and with which agreement the City is in compliance or (3) for which the City is diligently making arrangements for payment and the delay in payment will not result in the City being held in contempt of court for nonpayment or in the imposition of a lien on the City's general funds or the imposition of any additional ad valorem property taxes in excess of the Property Tax Threshold; or

(11)    The City commences a case or files a petition seeking relief under the Bankruptcy Code or any other insolvency law or procedure, consents to an order of relief in any such proceeding or to the filing of any such petition, seeks or is subject to the appointment of a receiver or an emergency financial manager for all or any substantial part of its assets or makes an assignment for the benefit of its creditors, or if the Governor of the State of Michigan determines that a financial emergency exists in the City.

For purposes of the foregoing Termination Events in this Part 1(i)(ii), the sole Affected Party shall be Party B and all Transactions shall be Affected Transactions.

(j)    ***Default Rate.***  Notwithstanding anything to the contrary in the Agreement, the Default Rate applicable to any amount owed by Party B to Party A during the Term Payment Period shall be LIBOR plus 9% (the "Specified Default Rate"), where "LIBOR" is determined (i) with respect to the remainder of the first Fiscal Year following a Specified Additional Termination Event, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of the three calendar months immediately preceding such Specified Additional Termination Event and, (ii) with respect to each subsequent Fiscal Year, as the arithmetic average of USD-LIBOR-BBA (as defined in the 2006 ISDA Definitions, with a Designated Maturity of three months) as of the close of business on the fifteenth (15th) day of March, April and May of the immediately preceding Fiscal Year.

(k) **Remedies.** In addition to all other remedies available hereunder and which remain unaffected hereby, following the designation of an Early Termination Date hereunder resulting from an Event of Default or Termination Event with respect to which Party B is the Defaulting Party or sole Affected Party, as the case may be, Party A shall have the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge. Such remedies of Party A as a secured party under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to Party A hereunder up to the amounts then appropriated. Furthermore, such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Swap Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Swap Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Swap Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts; provided, however, that if an Early Termination Date is designated by Party A hereunder as a result of a Specified Additional Termination Event, Party A shall forbear from exercising any remedies as a secured party against the Pledged Property during the Term Payment Period.

(l) **Waiver and Rescission.** As of the Amendment Effective Date, Party A waives its right to declare an Early Termination Date, and hereby rescinds any previously delivered notice of Termination Event and/or designation of an Early Termination Date, in connection with the Additional Termination Event set forth, prior to the Amendment Effective Date, in Part 5(b)(ii)(3) of the Schedule to this Agreement.

(m) **Amendment Effective Date Representations of Party B.** Party B hereby further represents that, as of the Amendment Effective Date:

    (i) The City has given an Irrevocable Instruction to each Casino Licensee and Developer.

    (ii) No action, proceeding or investigation has been instituted, nor has any order, judgment or decree been issued or proposed to be issued by any court, agency or authority to set aside, restrain, enjoin or prevent the consummation of any transaction contemplated hereby or seeking material damages against the City, a Service Corporation or either Swap Counterparty in connection with the amendment and restatement of the Schedule to this Agreement or the Settlement Transaction.

(n) **Indemnification.**

    (i) To the extent permitted by law, Party B shall defend and hold harmless Party A from and against any and all losses, damages, liabilities, and expenses incurred and paid (each, a "liability") by Party A arising out of or resulting from the commencement or continuation of any litigation, judicial action, or legislative action of the kind described in Part 1(i)(ii)(6) hereof.

(ii)     If, for so long as this Agreement is in effect, Party A has actual notice or knowledge of any claim or loss for which indemnification by Party B is asserted, Party A shall give to Party B written notice within such time as is reasonable under the circumstances, describing such claim or loss in reasonable detail. However, any delay or failure of Party A to give the notice shall not affect Party B's indemnification obligations except to the extent that Party B was prejudiced by the delay or failure.

(iii)    If a demand or claim for indemnification is made hereunder with respect to losses the amount or extent of which is not yet known or certain, then the notice of demand for indemnification shall so state, and, where practicable, shall include an estimate of the amount of the losses.

(iv)    In the case of actual notice of indemnification hereunder involving any litigation, arbitration or legal proceeding, Party B shall have responsibility to, and shall employ counsel, and shall assume all expense with respect to, the defense or settlement of such claim.

(v)     Notwithstanding Party B's assumption of the defense, Party A shall have the right to employ separate counsel and to participate in the defense of such action, and Party B shall bear the reasonable out of pocket fees, costs and expenses of such separate counsel if:

    (1)     other than under Part 1(i)(ii)(6) hereof, a Termination Event or Event of Default has occurred hereunder, other than a Specified Additional Termination Event;

    (2)     other than under Part 1(i)(ii)(6) hereof, the Term Period End Date has occurred;

    (3)     the result of the use of counsel chosen by Party B to represent Party A would present such counsel with a conflict of interest;

    (4)     the actual or potential defendants in, or targets of, any such action include Party A and Party A shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to Party B;

    (5)     Party B shall not have employed counsel reasonably satisfactory to Party A to represent Party B within a reasonable time after notice of the institution of such action; or

    (6)     Party B, in its discretion, shall authorize Party A to employ separate counsel at Party B's expense.

Party B shall not be liable under this Agreement for any amount paid by Party A to settle any claims or actions if the settlement is entered into without Party B's consent which

may not be unreasonably withheld or delayed. Each of Party A and Party B hereby agrees and acknowledges that any amount in respect of indemnification payable by Party B to Party A in accordance with this Part 1(n) is an expense that may not be claimed and is not payable under the Swap Insurance Policy.

## Part 2.

## Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of this Agreement, each party agrees to deliver the following documents:

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party A and Party B | Evidence of the authority and true signatures of each official or representative signing this Agreement or, as the case may be, a Confirmation, on its behalf. | On or before execution of this Agreement and each Confirmation forming a part of this Agreement. | Yes |
| Party A | Opinion of Counsel to Party A in a form reasonably satisfactory to Party B. | On or before execution of this Agreement. | No |
| Party B | Covered Indenture as hereinafter defined. | On or before execution of this Agreement. | Yes |
| Party B | Certified copy of the resolution of Party B's Board of Directors (or equivalent authorizing documentation) authorizing the execution and delivery of this Agreement and each Confirmation and performance of its obligation hereunder. | On or before execution of this Agreement. | Yes |
| Party B | A copy of Party B's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United | On or before the 365th day after the end of Party B's fiscal year. | Yes |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | States. | | |
| Party B | A copy of the City's audited annual financial statements prepared in accordance with generally accepted accounting principles within the United States. | Within 15 days of public availability, but in any case no later than 365 days after the end of the City's fiscal year. | Yes |
| Party B | A copy of the City's quarterly financial statements. | If and when the City prepares such quarterly reports, when such quarterly reports become publicly available. | Yes |
| Party B | Opinion of legal counsel to Party B in form and substance satisfactory to Party A. | On or before execution of this Agreement. | No |
| Party B | Commitment to issue each Swap Insurance Policy (as such term is defined in Part 4 hereof). | On or before the execution of this Agreement with respect to the initial Insured Rate Swap Transaction hereunder, and thereafter on or before the Trade Date of each subsequent Insured Rate Swap Transaction. | No |
| Party B | Swap Insurance Policy and the Opinion of counsel to the Swap Insurer with respect to such Swap Insurance Policy in form and substance satisfactory to Party A. | On or before the delivery of the related 2006 Pension Funding Securities to the underwriters with respect to the initial Insured Rate Swap Transaction hereunder, and | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | | thereafter on or before execution of the Confirmation evidencing each subsequent Insured Rate Swap Transaction. | |
| Party B | Confirmations, updates and additional documentation concerning the opinion of counsel, board resolutions and certificates delivered pursuant to each of the foregoing documents to be delivered as Party A may reasonably request. | Prior to the Effective Date of each Transaction after the initial Transaction hereunder. | Yes |
| Party B | Certified copy of the Service Contract together with an opinion of Certificate Counsel in form and substance satisfactory to Party A which addresses each of the Sources of Payment set forth in Section 3(g) of this Agreement. | On or before execution of the Service Contract. | No |
| Party B | Authorizing Ordinance | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Lewis & Munday, a Professional Corporation, special counsel to the City and Party B, in form and substance satisfactory to Party A, including customary opinions given in connection with municipal financing transactions and addressing the items identified on Exhibit | On or prior to the Amendment Effective Date | No |

| Party required to deliver document | Form/Document/Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| | A hereto next to such counsel's name | | |
| Party B | An opinion of the City Corporation Counsel, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of Orrick, Herrington & Sutcliffe LLP, special counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | An opinion of special tax counsel to the City, in form and substance satisfactory to Party A, addressing the items identified on Exhibit A hereto next to such counsel's name. | On or prior to the Amendment Effective Date | No |
| Party B | To the extent not duplicative with any other document to be delivered in this Part 2, each document required to be delivered under Section 2.4 of the Collateral Agreement. | On or prior to the Amendment Effective Date | Yes |

**Part 3.**

**Miscellaneous**

(a)  *Addresses for Notices.* For the purposes of Section 10(a) of this Agreement:

(i)  All notices or communications to Party A shall, with respect to a particular Transaction, be sent to the address, telex number, or facsimile number reflected in the Confirmation of that Transaction, and any notice for purposes of Sections 5 or 6 shall be sent to:

SBS Financial Products Company, LLC
Wall Street, 22nd Floor
New York, NY 10005
Attention: John Carter
Telephone: (646) 775-4880
Facsimile: (646) 576 - 9684

(ii)     All notices or communications to Party B shall be sent in care of the Contract Administrator to the address as set forth in Section 10.1 of the Contract Administration Agreement.

(iii)     A copy of all notices or communications to either Party A or Party B shall be sent to the address, or facsimile number reflected below:

Syncora Guarantee Inc.
(formerly known as XL Capital Assurance Inc.)
1221 Avenue of the Americas
New York, New York  10020
Attention:  Surveillance
Telephone: (212) 478-3400
Facsimile:  (212) 478-3597

(b)     *Offices*.  Party A, if it enters into a Transaction through an Office other than its head or home office represents to Party B that, notwithstanding the place of booking office or jurisdiction of incorporation or organization, the obligations of Party A are the same as if it had entered into the Transaction through its head or home office.  This representation will be deemed to be repeated by Party A on each date on which a Transaction is entered into.

(c)     *Calculation Agent.*  The Calculation Agent is Party A, unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(d)     *Credit Support Document.*  With respect to Party A:  (i) the Credit Support Annex dated the date hereof between Party B and Merrill Lynch Capital Services, Inc. ("MLCS"); (ii) the Transaction Transfer Agreement (the "Transfer Agreement") dated the date hereof between Party A, Party B and MLCS; and (iii) the Guarantee of Merrill Lynch & Co., Inc. ("ML&Co.") with respect to the Transfer Agreement.  With respect to Party B: (i) the Service Contracts and the Contract Administration Agreement (collectively, the "Covered Indenture") and (ii) the Collateral Agreement.

(e)     *Credit Support Provider.*  Credit Support Provider means:  With respect to Party A, MLCS and ML&Co. and with respect to Party B, none.

(f)     *Governing Law.*  This Agreement will be governed by and construed in accordance with the laws of the State of New York; *provided*, *however*, that the corporate powers and legal capacity of Party B shall be governed by and construed in accordance with the laws of the State of Michigan.

(g) **Jurisdiction.** Section 11(b)(i) of this Agreement is deleted in its entirety and replaced by the following:

> (i) submits to the extent permitted by law to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

(h) **Waiver of Immunities.** Section 11(c) of this Agreement is deleted in its entirety and replaced by the following:

> "**Waiver of Immunities.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues, all immunity on the grounds of sovereignty or other similar grounds from (i) suit in a breach of contract action, (ii) relief by way of injunction, order for specific performance or for recovery of property and (iii) execution or enforcement of any judgment to which it or its revenues might otherwise be entitled in any Proceedings, and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any such Proceedings."

(i) **Netting of Payments.** Subparagraph (ii) of Section 2(c) of this Agreement will apply.

(j) **"Affiliate"** will have the meaning specified in Section 12 of this Agreement.

## Part 4.

## Other Provisions

(a) **Intentionally Omitted.**

(b) **Additional Representations.**

> (i) The first sentence of Section 3 is amended to read in its entirety as follows:

> > "Each party represents to each other party (which representations will be deemed to be repeated on each date on which a Transaction is entered into and, in the case of the representations in Section 3(a), (e) and (f) of this Agreement, at all times until the termination of this Agreement) the following:"

> (ii) Section 3 is amended by adding the following subsections (e), (f) and (g) thereto:

> > (e) <u>Non-Speculation.</u> Party B represents and warrants to Party A that this Agreement has been, and each Transaction hereunder will be, entered into for purposes of managing of its borrowings or investments or in connection with a line of

business and not for the purpose of speculation;

(f)   Eligible Contract Participant.   Each party is an "eligible contract participant" under, and as defined in, Section 1a(12) of the Commodity Exchange Act, as amended (7 U.S.C. § 1a(12)); and

(g)   Sources of Payment.   As provided in the Contract Administration Agreement, all payments due under this Agreement from Party B to Party A are payable from and secured by amounts owing by the City to Party B pursuant to the Service Contract in respect of Hedge Payables.  Such amounts are payable by the City from all available revenues of the City's General Fund (as delineated in the City's audited financial statements).  If the City were to fail to pay any amount owing in respect of a Hedge Payable when due, Party A (or the Contract Administrator, if authorized by Party A to so act on Party A's behalf) could pursue remedies against the City to enforce that contractual obligation and the City would be required to pay any resulting judgment against it.  If the City were to fail to provide for payment of any such judgment, a court can compel the City to raise the payment through the levy of taxes, as provided in the Revised Judicature Act of 1961, Act No. 236 of the Michigan Public Acts of 1961, as amended (Michigan Compiled Laws Section 600.6093), without limit as to rate or amount.  In addition, all amounts due from Party B hereunder are secured by and payable from the Pledged Property (including, but not limited to, amounts held in the Holdback Account) in accordance with the terms of the Collateral Agreement.

(c)   **Additional Agreements.**

Compliance with Covered Indenture.  Party B will observe, perform and fulfill each provision in the Covered Indenture applicable to Party B. Party B hereby agrees not to amend, supplement, modify or waive any provision of the Covered Indenture without the consent of Party A if such amendment, supplement, modification or waiver would: (i) change any of the payment times, amounts, obligations, terms or any other payment-related provision in any Service Contract applicable to the City; (ii) impair any right Party B may have under the Service Contract to enforce payments from the City, or impair any right Party A may have under the Covered Indenture to enforce its security interest granted therein or any other right thereunder; or (iii) permit the creation of any new lien ranking prior to or on a parity with, or terminate, or deprive Party A of the security afforded to it by Sections 8.02 and 8.03 of the Service Contracts or Section

2.4 of the Contract Administration Agreement (collectively, the "Incorporated Provisions"). The Incorporated Provisions are hereby incorporated by reference and made a part of this Agreement to the same extent as if such provisions were set forth herein. Any amendment, supplement, modification or waiver of any of the Incorporated Provisions without the prior written consent of the other party hereto shall have no force and effect with respect to this Agreement. Any amendment supplement or modification for which such consent is obtained shall be part of the Incorporated Provisions for purposes of this Agreement. Party B shall not assign or transfer its right or obligations under the Covered Indenture without the prior written consent of the other party hereto and the Swap Insurer.

(d) **_Relationship Between Parties._** Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) <u>Non-Reliance.</u> It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) <u>Assessment and Understanding.</u> It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) <u>Status of Parties.</u> The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(e) **_Waiver of Jury Trial._** **EACH PARTY WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDINGS RELATING TO THIS AGREEMENT OR ANY CREDIT SUPPORT DOCUMENT.**

(f) **_Consent to Recording._** Each party (i) consents to the recording of all telephone conversations between trading, operations and marketing personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction; (ii) agrees to give notice to such personnel of it and its Affiliates that their calls will be recorded; and (iii) agrees that in any Proceedings, it will not object to the introduction of such recordings in evidence on grounds that consent was not properly given.

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East:160553167.11            15

13053846-tjt    Doc 3153-37    Filed 03/21/14    Entered 03/21/14 23:44:31    Page 16 of 33

(g)     *Scope of Agreement.*  The Transactions entered into between the parties June 6, 2006 and June 2, 2005 and any other specific Specified Transactions designated in writing by the parties hereto after the date hereof, shall be subject to the terms hereof.

(h)     *Indemnification Limited to Extent of Applicable Law.*   The parties acknowledge that Party B's authority to indemnify Party A, as required by Section 9 of the Agreement, for expenses, fees and taxes may be limited by Michigan law and Party B's obligation to indemnify Party A could be limited to the extent of applicable law.

(i)     *Additional Definitions.*     Section 12 is hereby amended by adding the following definitions:

"2006 Funding Trust" shall have the meaning specified in the Collateral Agreement.

"2006 Pension Funding Securities" shall have the meaning specified in the Collateral Agreement.

"2006 Transactions" shall have the meaning specified in the Collateral Agreement.

"Accounts" shall have the meaning specified in the Collateral Agreement.

"Accrued Service Charges" shall have the meaning specified in the Service Contracts.

"Amendment Effective Date" means June 26, 2009.

"Authorizing Ordinance" shall have the meaning specified in the Collateral Agreement.

"Bankruptcy Code" means Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

"Casino Licensee" shall have the meaning specified in the Collateral Agreement.

"City" means the City of Detroit, Michigan.

"City Charter" means the Charter of the City of Detroit, Michigan.

"City Clerk" means the Clerk of the City of Detroit, Michigan.

"City Council" means the Council of the City of Detroit, Michigan.

"City Payment" shall have the meaning specified in the Collateral Agreement.

"City Pledge" shall have the meaning specified in the Collateral Agreement.

"Closing Date" shall have the meaning specified in the Collateral Agreement.

"Collateral Agreement" means that certain Collateral Agreement dated as of June 15, 2009, among Party A, Party B, PFRS, UBS, the City, U.S. Bank National Association and Merrill Lynch Capital Services, Inc.

"Collateral Agreement Custodian" means the person identified as the "custodian" under the Collateral Agreement and any successor thereto.

"Contract Administration Agreement" means the Contract Administration Agreement 2006 dated June 12, 2006 among Detroit Retirement Systems Funding Trust 2006, Detroit General Retirement System Service Corporation and Detroit Police and Fire Retirement System Service Corporation, severally and not jointly, U.S. Bank National Association, separately and not as Trustee of the Detroit Retirement Systems Funding Trust 2006 and the Hedge Counterparties Named Therein.

"Counterparty(ies)" shall have the meaning specified in the Collateral Agreement.

"Covered Indenture" means the Service Contracts together with the Contract Administration Agreement.

"Definitive Documents" shall have the meaning specified in the Collateral Agreement.

"Detroit General Retirement System Service Contract" means the Detroit General Retirement System Service Contract dated June 7, 2006 between Party B and the City.

"Detroit Police and Fire Retirement System Service Contract" means the PFRS Service Contract dated June 7, 2006 between the Detroit Police and Fire Retirement System Service Corporation and the City.

"Developer" shall have the meaning specified in the Collateral Agreement.

"Developer Agreement" shall have the meaning specified in the Collateral Agreement.

"Excluded Indebtedness" shall have the meaning specified in the Collateral Agreement.

"Finance Director" shall have the meaning specified in the Collateral Agreement.

"Fiscal Year" shall have the meaning specified in the Collateral Agreement.

"General Receipts Subaccount" shall have the meaning specified in the Collateral Agreement.

"Hedge" shall have the meaning specified in the Collateral Agreement.

"Hedge Payable" shall have the meaning specified in the Service Contracts.

"Hedge Periodic Payables" shall have the meaning specified in the Service Contracts.

"Holdback Account" shall have the meaning specified in the Collateral Agreement.

"Holdback Requirement" shall have the meaning specified in the Collateral Agreement.

"Irrevocable Instructions" shall have the meaning specified in the Collateral Agreement.

"MCL" means the Michigan Compiled Laws.

"Month" shall have the meaning specified in the Collateral Agreement.

"Moody's" means Moody's Investors Service, Inc.

"Office" means a branch or office of a party, which may be such party's head or home office.

"PFRS" means the Detroit Police and Fire Retirement System Service Corporation.

"Pledged Property" shall have the meaning specified in the Collateral Agreement.

"Property Tax Threshold" shall have the meaning specified for the "Threshold" in the Collateral Agreement.

"Quarterly Coverage" shall have the meaning specified in the Collateral Agreement.

"Ratings Upgrade" shall have the meaning specified in the Collateral Agreement.

"Regular Custodian Payment" shall have the meaning specified in the Collateral Agreement.

"Regular Scheduled Payments" shall have the meaning specified in the Service Contracts.

"Revenues" shall have the meaning specified in the Collateral Agreement.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Service Charges" shall have the meaning specified in the Service Contracts.

"Service Contracts" means the Detroit General Retirement System Service Contract and the Detroit Police and Fire Retirement System Service Contract.

"Service Corporations" means Party B and PFRS.

"Service Corporation Pledge" shall have the meaning specified in the Collateral Agreement.

"Service Corporation Security Interest" shall have the meaning specified in the Collateral Agreement.

"Settlement Transaction" shall have the meaning specified in the Collateral Agreement.

"Sinking Fund Installments" shall have the meaning specified in the Service Contracts.

"Specified Additional Termination Event" means each of the Additional Termination Events specified in Parts 1(i)(ii)(3), 1(i)(ii)(4), 1(i)(ii)(5), 1(i)(ii)(9) and 1(i)(ii)(10) of this Amended and Restated Schedule.

"Specified Event" shall have the meaning specified in the Collateral Agreement.

"Swap Counterparties" means, collectively, Party A and UBS and their respective successors and assigns.

"Swap Insurance Policy" means the Syncora Guarantee Inc. Insurance Policy issued by the Swap Insurer with respect to the Transaction(s) between Party A and Party B entered into pursuant to this Agreement.

"Swap Insurer" means Syncora Guarantee Inc. (formerly known as XL Capital Assurance Inc).

"Term Payment Period" shall have the meaning specified in the Collateral Agreement.

"Term Period End Date" shall have the meaning specified in the Collateral Agreement.

"UBS" means UBS AG.

"Wagering Taxes" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Property" shall have the meaning specified in the Collateral Agreement.

"Wagering Tax Revenue Statute" means the Michigan Gaming Control and Revenue Act, being MCL 432.201 et seq., MSA 18.969(201), et seq., as amended.

## Part 5.

### Insurer Provisions

The following provisions shall apply to any Transactions for which the Swap Insurance Policy has been issued by the Swap Insurer, for the account of Party B, as principal, and Party A, as beneficiary (the "Insured Rate Swap Transactions"):

(a)   *Designation of Early Termination Date.* Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

(i)   Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

(ii)   Termination Event (other than the Additional Termination Events set forth in Part 5(b) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

(b)   *Party B Additional Termination Events.* The following shall each constitute an Additional Termination Event:

Detroit/Amended and Restated Schedule GRS-SBS (Syncora)
OHS East:160553167.11                    19

(i)     the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to the Swap Insurer under the Swap Insurance Policy; or

(ii)    the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; *provided*, *however*, that additionally:

> (1)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or
>
> (2)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

(iii)   An Insurer Event has occurred and is continuing; *provided*, *however*, that additionally:

> (1)    an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or
>
> (2)    a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

Any of the following shall be considered an "Insurer Event":

> (1)    the Swap Insurer is in conservation, liquidation or receivership under the New York Insurance Laws; or
>
> (2)    the Swap Insurer (a) fails to have (1) a claims-paying ability rating of at least "AAA" from S&P, or (2) a financial strength rating of at least "Aaa" from Moody's; and (b) fails to pay obligations for indebtedness for money borrowed or to meet then-current policy obligations for which claims have been properly presented in a aggregate amount in excess of $100,000,000, which failure to make payment (in whole or in part) is not due to:  (u) administrative error; (v) Swap Insurer action to contest a claim; (w) an order from, or action by, a regulator of the Swap Insurer which forbids, delays or impedes such payment, except in connection with a Swap Insurer insolvency, conservation or receivership; (x) the occurrence of an act of God which prevents such payment; (y) the usual mechanisms or channels employed to make such payment being unavailable to the Swap Insurer through no fault of the Swap Insurer; (z) a statute, rule or order (including, but not limited to exchange controls) which forbids, delays or impedes either (i) such payment, other than in connection with a Swap Insurer insolvency, conservation or receivership, or (ii) the acquisition of, or payment in, a currency required in order to make such payment.

For purposes of any Additional Termination Event described under this Part 5(b), the sole "Affected Party" shall be Party B.

(c)     **Insurer Directed Termination.** Notwithstanding anything in this Agreement, if an Event of Default under this Agreement occurs with respect to Party B as the Defaulting Party or any Termination Event under this Agreement occurs with respect to Party B as the Affected Party, then the Swap Insurer (so long as it has not failed to make any payment under the terms and conditions of the Swap Insurance Policy) shall have the right (but not the obligation) upon notice to Party A to designate an Early Termination Date with respect to Party B with the same effect as if such designation were made by Party A. For purposes of the foregoing sentence, an Event of Default with respect to Party B shall be considered to be continuing, notwithstanding any payment by the Swap Insurer under the Swap Insurance Policy. Party A and Party B acknowledge that, except as the Swap Insurance Policy may be otherwise endorsed, unless (x) the Swap Insurer designates an Early Termination Date (as opposed to merely consenting to such designation by one of the parties) or (y) an Additional Termination Event specified in Part 5(b)(i) or (ii) has occurred, payments due from Party B because an Early Termination Date has been designated will not be insured. In any event, the parties acknowledge that pursuant to the Swap Insurance Policy that (i) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by the Swap Insurer shall not be limited in amount, and (ii) the amount payable by the Swap Insurer in respect of payments due from Party B because an Early Termination Date has been designated by Party A shall not exceed the amount specified in the Swap Insurance Policy.

(d)     **Amendments.** Section 8(b) of the Agreement is hereby amended by (A) adding the words "or any Credit Support Document" after the word "Agreement" in the first line thereof and (B) adding the phrase "and the Swap Insurer" following the words "parties" in the third line thereof.

(e)     **Transfers/Assignments.** Notwithstanding Section 7 of the Agreement, except as provided in Part 6(c) hereof, neither party may transfer, assign or delegate its rights or duties with respect to an Insured Rate Swap Transaction under the Agreement, unless it receives the prior written consent of the Swap Insurer; *provided, however,* that Party A may assign or delegates its rights and duties without the Swap Insurer's prior written consent to a party (a) that meets the definition of "Reference Market Maker" (other than the ratings requirement set forth therein) and that has long-term senior unsecured debt ratings at least in the single –A category from Moody's and S&P or the Credit Support Provider of such party has claims paying ability ratings or financial strength ratings at least in the single –A category from Moody's and S&P and (b) that assumes the rights and duties of Party A pursuant to a master agreement that is substantially similar to this Agreement and in form and substance satisfactory to the Swap Insurer; and *provided, further,* that Party A may make such an assignment or delegation to an affiliate of Party A if Party A or its Credit Support Provider, provides a guarantee of the Insured Rate Swap Transaction that is reasonably acceptable in form and substance to the Swap Insurer.

(f)     **No Suspension of Payments.** Notwithstanding Section 2(a)(iii) of this Agreement, Party A shall not suspend any payments due under an Insured Rate Swap Transaction under Section 2(a)(iii) of the Agreement unless Party A has designated an Early Termination Date pursuant to the terms hereof.

(g)     *No Netting.* Notwithstanding Section 2(c) of this Agreement, in no event shall either Party A or Party B be entitled to net its payment obligations in respect of the Insured Rate Swap Transactions against the payment obligations of the other party in respect of other Transactions under this Agreement if such Transactions are not Insured Rate Swap Transactions, nor may either Party A or Party B net the payment obligations of the other party under Transactions that are not Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other Transactions. Section 6(e) of this Agreement shall apply to all Insured Rate Swap Transactions with the same effect as if the Insured Rate Swap Transactions constituted a single master agreement. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transactions shall be determined without regard to any Transactions other than the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other Transactions unless otherwise agreed to in writing by the Swap Insurer.

(h)     *No Set-off for Counterclaim.* In no event shall either Party A or Party B be entitled to set-off its payment obligations in respect of an Insured Rate Swap Transaction against the payment obligations of the other party (whether by counterclaim or otherwise) under any other agreement(s) between Party A and Party B or instrument(s) or undertaking(s) issued or executed by one party to, or in favor of, the other party, if such obligations are not Insured Rate Swap Transactions, or net the payment obligations of the other party that are not with respect to Insured Rate Swap Transactions against the payment obligations of such party under Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under Insured Rate Swap Transactions be treated separate and apart from all other obligations. Notwithstanding Section 6(e) of this Agreement, the amount payable under Section 6(e) of this Agreement upon the termination of any Insured Rate Swap Transaction shall be determined without regard to any obligation other than those under the Insured Rate Swap Transactions, it being the intention of the parties that their payment obligations under the Insured Rate Swap Transactions be treated separate and apart from all other obligations unless otherwise specified in such other obligation and agreed to in writing by the Swap Insurer.

(i)     *Party A – Notice of Rating Downgrade, Suspension or Withdrawal.* Party A shall provide written notice to Party B and to the Swap Insurer of any downgrade, withdrawal or suspension of Party A's Credit Support Provider's long-term senior unsecured debt rating, within 15 Business Days of the occurrence of such event. Failure of Party A to provide such notice shall not constitute an Event of Default under this Agreement.

(j)     *Representations and Agreements.* Each party agrees that each of its representations and agreements in this Agreement is expressly made to and for the benefit of the Swap Insurer.

(k)     *Third-party Beneficiary.* Party A and Party B hereby each acknowledge and agree that the Swap Insurer shall be an express third-party beneficiary (and not merely an incidental third-party beneficiary) of this Agreement and of the obligations of each such party under any Insured Rate Swap Transaction, and as such, entitled to enforce the Agreement and the terms of any such

Insured Rate Swap Transaction against such party on its own behalf and otherwise shall be afforded all remedies available hereunder or otherwise afforded by law against the parties hereto to redress any damage or loss incurred by the Swap Insurer including, but not limited to, fees (including professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from any breach by such party of its obligations hereunder.

(l)     *Policy Coverage.* Party A and Party B hereby acknowledge and agree that the Swap Insurer's obligation with respect to Insured Rate Swap Transactions shall be limited to the terms of the Swap Insurance Policy. Notwithstanding Section 2(d) or any other provision of this Agreement, the Swap Insurer shall not have any obligation to pay interest on any amount payable by Party B under this Agreement.

(m)     *Subrogation.* Party A and Party B hereby acknowledge that to the extent of payments made by the Swap Insurer to Party A under the Swap Insurance Policy, the Swap Insurer shall be fully subrogated to the rights of Party A against Party B under the Insured Rate Swap Transaction to which such payments relate, including, but not limited to, the right to receive payment from Party B and the enforcement of any remedies. Party A hereby agrees to assign to the Swap Insurer its right to receive payment from Party B under any Insured Rate Swap Transaction to the extent of any payment thereunder by the Swap Insurer to Party A. Party B hereby acknowledges and consents to the assignment by Party A to the Swap Insurer of any rights and remedies that Party A has under any Insured Rate Swap Transaction or any other document executed in connection herewith.

(n)     *Isolation of Insured Rate Swap Transactions in Designating an Early Termination Date.*

> (i)     Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of non-Swap Insurer Insured Rate Swap Transactions by Party A or Party B shall not apply to any Insured Rate Swap Transactions under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer.

> (ii)     Notwithstanding Section 6 of this Agreement, any designation of an Early Termination Date in respect of the Insured Rate Swap Transactions by the Swap Insurer or by Party A or Party B shall apply only to the Insured Rate Swap Transactions and not to any other Transaction under this Agreement, unless expressly provided in such designation and agreed to in writing by the Swap Insurer. Nothing contained in this Part 5(n) shall affect the rights of Party A under this Agreement to designate an Early Termination Date in respect of any Transaction that is not an Insured Rate Swap Transaction, which designation shall not apply to the Insured Rate Swap Transactions.

(o)     *Expenses.* Party B agrees to reimburse the Swap Insurer immediately and unconditionally upon demand for all reasonable expenses incurred by the Swap Insurer in connection with the issuance of the Swap Insurance Policy and the enforcement by the Swap Insurer of Party B's obligations under this Agreement and any other documents executed in connection with the execution and delivery of this Agreement, including, but not limited to, fees (including

professional fees), costs and expenses incurred by the Swap Insurer which are related to, or resulting from, any breach by Party B of its obligations hereunder.

(p) **Notices.** A copy of each notice or other communication between the parties with respect to this Agreement must be forwarded to the Swap Insurer by the party distributing such notice or other communication and any such notice or other communication shall not be effective as to the parties hereto until it has been received by the Swap Insurer.

(q) **Reference Market-makers.** The definition of "Reference Market-makers" set forth in Section 12 of the Agreement shall be amended in its entirety to read as follows:

"Reference Market-makers" means four (4) leading dealers in the relevant swap market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time of deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among dealers having an office in the same metropolitan area. The rating classification assigned to any outstanding long-term senior debt securities of such dealers shall be at least (1) "A1" or higher as determined by Moody's, (2) "A+" or higher as determined by S&P or if not rated by one of S&P or Moody's, (3) an equivalent investment grade rating determined by a nationally-recognized rating service acceptable to both parties; *provided, however,* that in any case, if Market Quotations cannot be determined by four (4) such dealers, the party making the determination of the Market Quotation may designate, with the consent of the other party and the Swap Insurer, one (1) or more leading dealers whose long-term senior debt bears a lower investment grade rating or the parties may agree, with the consent of the Swap Insurer, to use fewer than four (4) leading dealers.

(r) **Party A Delivery of Legal Opinion.** Party A will be required to deliver a legal opinion with respect to its power and authority to enter into the Agreement and to the enforceability of the Agreement, satisfactory in form and substance to the Swap Insurer, with the Swap Insurer as an addressee.

(s) **Additional Representations of Party B.** Party B hereby further represents to Party A (which representations will be deemed to be repeated by Party B at all times until the termination of this Agreement) that:

(i) This Agreement has been, and each Transaction hereunder will be (and, if applicable, has been), entered into for the purposes of managing its borrowings and not for purposes of speculation.

(ii) Party B has taken all steps necessary or advisable to create the security and source of payment for Party B's obligations hereunder described in Section 4(f) of the Agreement.

(iii) Any Transaction entered into pursuant to this Agreement together with any transactions that Party B has or may enter into with Party A and/or with any or all other parties does not and will not violate or exceed any limits or restrictions contained in any

authorizations, approvals or resolutions of the board of directors, shareholders or other authorized body of Party B.

(iv) The execution and delivery by Party B of this Agreement, each Confirmation and any other documentation relating hereto, and the performance of Party B of its obligations hereunder and thereunder, are in furtherance, and not in violation, of the municipal purposes for which Party B is organized pursuant to the laws of the State of Michigan.

(v) This Agreement and each Transaction hereunder do not constitute any kind of investment by Party B that is proscribed by any constitution, charter, law, rule, regulation, government code, constituent or governing instrument, resolution, guideline, ordinance, order, writ, judgment, decree, charge, or ruling to which Party B (or any of its officials in their respective capacities as such) or its property is subject.

(t) **Optional Early Termination.** Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date"). On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method and Loss applied. For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(t), other than any Unpaid Amounts.

## Part 6.

## Transaction Transfer Provisions.

(a) **Bankruptcy Code.** It is the express intention of Party A, Party B and each Credit Support Provider of any party that (i) this Agreement and all Transactions hereunder, the Transaction Transfer Agreement (including, without limitation, the option granted therein), and any Credit Support Annex that may be entered into between Party B and the Credit Support Provider shall collectively constitute a single agreement; (ii) the foregoing, together with the Transfer Swap Agreement and Transfer Transactions thereunder (as such terms are defined in the Transaction Transfer Agreement) shall each constitute a "swap agreement" as defined in section 101(53B) of Title 11 of the United States Code, Sections 101-1330 (the "Bankruptcy Code"); and (iii) each of the parties constitutes a "swap participant" under section 101(53C) of the Bankruptcy Code, in each case subject to and entitled to the exemptions and protections afforded by, among other things, sections 362(b)(17), 546(g), 548(d) and 560 of the Bankruptcy Code.

(b) **Transaction Transfer Agreement.** Notwithstanding anything contained herein to the contrary, neither Credit Support Provider shall have any obligations under this Agreement (other

than as a result of the operation of Part 6(c) below, if applicable) and shall only have such obligations as are expressly provided for in the Transaction Transfer Agreement. The parties hereto agree that the Credit Support Providers shall be express third party beneficiaries of this Agreement, including but not limited to all of the representations, covenants, agreements and other obligations of the parties to this Agreement. Additionally, notwithstanding anything contained herein to the contrary, the parties hereby agree that in the event Credit Support Providers are replaced as the "Credit Support Provider" by a Substitute Credit Support Provider (as defined in the Transaction Transfer Agreement) under the Transaction Transfer Agreement in accordance with the terms thereof, then the Substitute Credit Support Provider shall be deemed to be the Credit Support Provider hereunder and all references herein to either Credit Support Provider or both shall be deemed to be references to such Substitute Credit Support Provider.

(c)     *Assignment.*

(i)     Notwithstanding Part 5 of this Agreement, Party B, Party A and the Swap Insurer (by its delivery of the Swap Insurance Policy is deemed to have agreed) each hereby acknowledges and agrees that (A) provided that Party A is not a Defaulting Party or the sole Affected Party, Party A shall have at any time, other than following the occurrence of an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party or any event which with the giving of notice and/or the passage of time would constitute an Event of Default under this Agreement where Party B is the Defaulting Party or a Termination Event under this Agreement where Party B is the Affected Party, the right to transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and the Credit Support Providers specifying the effective date (such effective date, the "Assignment Date") of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party), and (B) MLCS shall have the right, at any time and for any reason in its sole discretion, to request that Party A transfer and assign all of Party A's rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS by written notice to Party B and Party A specifying the Assignment Date of such transfer and assignment (and such transfer and assignment shall automatically occur as of the Assignment Date without the need for further action by any party).

(ii)    Upon the Assignment Date of any transfer and assignment specified in accordance with Part 6(c)(i) above, (A) the Provider shall be deemed to have transferred and assigned all of its rights, interests and obligations in, to and under this Agreement and all Transactions hereunder to MLCS, (B) MLCS shall have all the rights that the Provider would have under this Agreement and all Transactions hereunder, (C) MLCS shall be obligated to perform all existing and unperformed obligations of the Provider under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (D) Party B shall remain obligated to perform all of its existing and unperformed

obligations under this Agreement and all Transactions hereunder, including those obligations arising before the Assignment Date but not yet performed, (E) the Provider and Party B shall be released and discharged from all obligations to each other with respect to this Agreement and all Transactions hereunder, and their respective rights and obligations hereunder and thereunder shall be cancelled with no payments owed by either party to the other, (F) on and after the Assignment Date, the provisions set forth in Exhibit B to the Transaction Transfer Agreement shall be applicable to this Agreement and all Transactions hereunder, (G) the Transaction Transfer Agreement shall simultaneously automatically terminate without the need for further action by any party thereto, and (H) the guarantee of ML & Co. (as set forth in the Transaction Transfer Agreement) shall apply to the Agreement as assigned (and shall no longer apply to the terminated Transaction Transfer Agreement).

(iii)   Party B, Party A and Credit Support Provider shall execute such instruments of assignment, assumption and release or discharge, of a ministerial nature, as any of them may reasonably request to evidence or effectuate the provisions in this Part 6(c).

## Part 7.

## Credit Support Provisions.

(a)     In the event that a Settlement Amount would be payable by Party A to Party B, Party B agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement (as defined in Paragraph 2 of the Transaction Transfer Agreement) with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by Party A to pay such Settlement Amount to MLCS in consideration of MLCS entering into such Transfer Swap Agreement (and Party A hereby agrees to pay such Settlement Amount); *provided,* that the Transaction Transfer Agreement shall be effective irrespective of the nonpayment of such Settlement Amount by Party A to MLCS, and (iii) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), shall constitute full satisfaction of any payment otherwise owing from Party A to Party B pursuant to Section 6(e) of this Agreement, and that Party A shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iii) of the preceding sentence would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(b)     In the event that a Settlement Amount would be payable by Party B to Party A, Party A agrees that (i) the termination of this Agreement concurrently with the entry by MLCS into a Transfer Swap Agreement with Party B in accordance with Paragraph 2 of the Transaction Transfer Agreement, (ii) the agreement by MLCS to pay such Settlement Amount to Party B in

consideration of Party B entering into such Transfer Swap Agreement (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement), (iii) the absolute assignment by Party B to Party A of Party B 's right to receive such Settlement Amount from Credit Support Provider, and (iv) the payment by MLCS to Party B of any net Unpaid Amounts owing to Party B (which MLCS agrees to pay pursuant to the Transaction Transfer Agreement) shall constitute full satisfaction of any payment otherwise owing from Party B to Party A pursuant to Section 6(e) of this Agreement, and that Party B shall be fully discharged from any and all obligations under Section 6(e) of this Agreement. In accordance with clause (iii) of the preceding sentence, Party B hereby assigns to Party A, absolutely and not for purposes of security, all of Party B's right to receive any such Settlement Amount from MLCS pursuant to clause (ii) of the preceding sentence, and Party A agrees that only MLCS shall be obligated to pay such Settlement Amount to Party A, and that Party A shall have no recourse to Party B with respect thereto. In the event that any net Unpaid Amounts would be owing by Party B to Party A (such that clause (iv) of the first sentence of this Part 7(b) would not be applicable), Party A hereby assigns to MLCS, absolutely and not for purposes of security, all of Party A's right to receive any such net Unpaid Amounts from Party B, and Party A agrees that only MLCS shall be entitled to receive any such net Unpaid Amounts from Party B, and that Party A shall have no recourse to Party B with respect thereto.

(c)    In the event that a Settlement Amount is to be determined, the parties agree that such Settlement Amount shall be determined by MLCS on behalf of, and for the benefit of, the Non-defaulting Party or the party which is not the Affected Party (as applicable), and that such Settlement Amount shall be conclusive. For purposes of determining such Settlement Amount, MLCS shall not be obligated to obtain quotations from more than one Reference Market-maker, which Reference Market-maker may be MLCS. Notwithstanding the foregoing, if an Event of Default or Termination Event shall have occurred with respect to which Party A is the Defaulting Party or an Affected Party, and such Event of Default or Termination Event (x) is triggered by the occurrence of an event which, by definition of such Event of Default or Termination Event, occurs with respect to MLCS or the Credit Support Document, and (y) arises solely by reason of an event or condition that is directly attributable to MLCS under this Agreement or the Transaction Transfer Agreement, then Party B, and not Credit Support Provider, shall determine such Settlement Amount.

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION**

By:_____

    Name:  Norman L. White
    Title:   President


**SBS FINANCIAL PRODUCTS COMPANY,
LLC**, a Delaware limited liability company


By:_____

    Name:
    Title:

Please confirm your agreement to the terms of the foregoing Schedule by signing below.

**DETROIT GENERAL RETIREMENT
SYSTEM SERVICE CORPORATION**

By:_____
      Name:  Norman L. White
      Title:   President


**SBS FINANCIAL PRODUCTS COMPANY,
LLC**, a Delaware limited liability company

By:_____
      Name:  *John Carter*
      Title:   *President*

## SCHEDULE OF OPINIONS

| Lewis & Munday, a Professional Corporation | <ul><li>The Settlement Transaction will not cause the City to violate or exceed any applicable debt limit or constitute or create any "indebtedness" of the City within the meaning of any limitation of the Home Rule City Act (Act 279 of the Public Acts of Michigan of 1909, as amended) or any Michigan constitutional or other non-tax statutory or City Charter limitation,</li><li>the Authorizing Ordinance was duly adopted in accordance with state law and City Charter requirements, is in effect as of the Closing Date, has not been amended, and is valid, binding, and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the City Pledge, including the lien of the City Pledge established pursuant to the Authorizing Ordinance, is valid, binding and enforceable and the Service Corporation Pledge is valid, binding, enforceable and perfected (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the definitive agreements entered into in connection with the Settlement Transaction are valid, binding and enforceable (subject, in each case, to bankruptcy and other customary exceptions),</li><li>the pledge and use of Pledged Property as contemplated in the Settlement Transaction will constitute authorized purposes under the Wagering Tax Revenue Statute (including, if applicable at the time, any regulation or ordinance, other than the Authorizing Ordinance, relating thereto), the Authorizing Ordinance and Section 18-14-1 et seq. of the Detroit City Code,</li><li>the pledge and use of the Pledged Property as contemplated by the Settlement Transaction does not and shall not "supplant existing…local expenditures" as prohibited by Section 12(14) of the Wagering Tax Revenue Statute,</li><li>the Settlement Transaction and any other transactions to be consummated in connection therewith are not subject to approval by vote of the electors of the City and are not subject to any right of referendum by City electors; and</li></ul> |
|---|---|

| | |
|---|---|
| | • any actions taken by the City Council, in connection with the Settlement Transaction, by resolution, in lieu of ordinance, are fully valid, binding and enforceable against the City, notwithstanding that such actions were taken by resolution instead of by ordinance (subject, in each case, to bankruptcy and other customary exceptions). |
| Orrick, Herrington & Sutcliffe LLP | The Wagering Tax Property constitute "special revenues" as defined in Bankruptcy Code §902(2) with respect to any case under Chapter 9 of the Bankruptcy Code in which the City or a Service Corporation is the debtor (subject to assumptions, qualifications, and limitations as are customary for bankruptcy opinions). |
| Special tax counsel to the City | Consummation of the Settlement Transaction (including any amendments of the Service Contracts in connection therewith) will not result in (i) the 2006 Funding Trust being treated as other than a grantor trust under Subpart E, Part I of Subchapter J of the Internal Revenue Code of 1986, as amended, (ii) the Service Charges and Regular Scheduled Payments failing to constitute payments in respect of indebtedness for U.S. federal income tax purposes, or (iii) otherwise any modifications, adverse to the City, the Service Corporations, the holders of the 2006 Pension Funding Securities or the Counterparties, to the conclusions reached in the tax opinions given in connection with the outstanding transactions. |
| City Corporation Counsel | Relying upon certifications of the City Clerk, the City Charter and any amendments thereto were duly approved by a majority of the City electors voting thereon and the City Charter and any such amendments have not been rescinded in whole or in part as of the Closing Date (subject to bankruptcy and other customary exceptions). |

Capitalized terms used but not otherwise defined in this Exhibit A shall have the meanings ascribed to them in them in the Collateral Agreement.