# EXHIBIT EE

## Order With Excerpted Exhibits

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                                    :
In re:                                              :
                                                    :          Chapter 11
LYONDELL CHEMICAL COMPANY, et al.,                  :          Case No. 09-10023 (REG)
                                                    :
                    Debtors.                        :          Jointly Administered
                                                    :
-------------------------------------------------------------x
OFFICIAL COMMITTEE OF UNSECURED                     :
CREDITORS, on behalf of the Debtors'                :
Estates,                                            :
                    Plaintiff,                       :         Adversary Proceeding
          v.                                        :          No. 09-01375 (REG)
                                                    :
CITIBANK, N.A., et. al.,                            :
                    Defendants.                     :
-------------------------------------------------------------x

## ORDER APPROVING REVISED SETTLEMENT
## WITH FINANCING PARTY DEFENDANTS IN COMMITTEE
## LITIGATION PURSUANT TO BANKRUPTCY RULE 9019

Upon the joint amended motion dated March 6, 2010 (the "Joint Amended

Motion")[1] of Lyondell Chemical Company and its affiliated debtors and debtors in possession in

the above-captioned chapter 11 cases (collectively, the "Debtors") and the Official Committee of

Unsecured Creditors (the "Committee") for approval, pursuant to Rule 9019 of the Federal Rules

of Bankruptcy Procedure (the "Bankruptcy Rules"), of the revised settlement with respect to the

above-captioned adversary proceeding (the "Committee Litigation"), as more fully set forth in

the Joint Amended Motion; and the Court having jurisdiction to consider the Joint Amended

Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and

consideration of the Joint Amended Motion and the relief requested therein being a core

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed thereto in the Joint
Amended Motion or the Revised Settlement.

proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to

28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Initial Motion and the Joint

Amended Motion having been provided, and it appearing that no other or further notice need be

provided; and the Court having reviewed the Joint Amended Motion and any opposition thereto

and statements submitted in connection therewith; and the Court having reviewed the record of

the Committee Litigation; and upon the hearing held before the Court on March 11, 2010 (the

"Hearing"); and the Court having determined that the legal and factual bases set forth in the Joint

Amended Motion and at the Hearing establish just cause for the relief granted herein; and the

Court having overruled any objections filed with regard to the Joint Amended Motion; and the

relief requested in the Joint Amended Motion being in the best interests of the Debtors, their

estates and their creditors; and upon all of the proceedings had before the Court and after due

deliberation and sufficient cause appearing therefor, it is

ORDERED that the Joint Amended Motion seeking approval of the revised

settlement, in the executed form as filed on March 10, 2010 (attached as Exhibit A, the "Revised

Settlement") is granted in its entirety, and any objections to the Joint Amended Motion not

previously withdrawn, waived or settled, and all reservation of rights included therein, are hereby

overruled with prejudice; and it is further

ORDERED that any objections to the Initial Motion shall be suspended as of the

date hereof and, on the Payment Date, shall be deemed withdrawn with prejudice; and it is

further

ORDERED that, pursuant to Bankruptcy Rule 9019, the Revised Settlement is

approved in its entirety and all of its terms are incorporated herein by reference as if fully set

forth herein (and the failure to specifically describe or include herein any particular provision of

the Revised Settlement shall not diminish or impair the effectiveness of any such provision); and

it is further

ORDERED that the Debtors are authorized and directed to execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate, complete, execute, and implement the Revised Settlement in accordance with the terms and conditions thereof; and it is further

ORDERED that the manner in which notice of the Initial Motion and the Joint Amended Motion was provided to all parties entitled to such notice is found to have been adequate, appropriate, reasonable and sufficient for all purposes and is approved; and it is further

ORDERED that this Order (including the Revised Settlement incorporated herein) is and shall be binding on all parties in interest in the Debtors' chapter 11 cases (including, but not limited to, any subsequently appointed chapter 11 or chapter 7 trustee or any representative of the Debtors' estates appointed pursuant to 11 U.S.C. § 1123), except with respect to any provisions regarding allocation or distribution of settlement consideration to or among holders of Allowed General Unsecured Claims, which shall be binding only on the Parties until confirmation of the Revised Plan or an Alternative Plan, and thereafter on all parties in interest, and in each case, on each of their predecessors or successors; and it is further

ORDERED that the settlement and compromises set forth in the Revised Settlement, and the execution and delivery of the Revised Settlement by the Parties, are approved; and it is further

ORDERED that the settlement and compromises set forth in the Revised Settlement are fair and reasonable to, and are in the best interests of, the Debtors and their

estates, the Secured Lenders, the 2015 Noteholders, the Specified Millennium Noteholders, other

holders of Millennium Notes Claims and the Debtors' other unsecured creditors and in entering

into the Revised Settlement, the Debtors, the Committee, the Financing Party Defendants, the

2015 Notes Trustee, the members of the 2015 Notes Ad Hoc Group and the Millennium Notes

Trustee have exercised their respective rights and powers, and used the same degree of care and

skill in their exercise, as a prudent person would exercise or use under the circumstances; and it

is further

ORDERED that upon entry of this Order, the 2015 Notes Claims shall be deemed

(a) Allowed in the amount of $1,351,695,059.96 (excluding fees and expenses of the 2015 Notes

Trustee) for purposes of the Revised Plan or an Alternative Plan and the Revised Settlement,

(b) not subject to avoidance, subordination, recharacterization, recovery, attack, offset,

counterclaim, defense or "claim" (as defined in the Bankruptcy Code) under applicable

provisions of the Bankruptcy Code (including sections 510, 544, 547 and 548) or state law, and

(c) not subject to disallowance under any provision of the Bankruptcy Code, including section

502(d) thereof; provided, however, that the foregoing provision shall have no application or

effect (and shall retroactively be null and void) in the event that any one or more of the

conditions set forth in the definition of "2015 Notes Plan Conditions" is not satisfied (or in the

case of clause (a)(1) thereof, waived as provided in the Revised Settlement) or the Payment Date

does not occur; and it is further

ORDERED that upon entry of the Approval Order, the Millennium Notes Claims

shall be deemed (a) Allowed in the amount of $244,058,317.71 (excluding fees and expenses of

the Millennium Notes Trustee) for purposes of the Revised Plan or an Alternative Plan and the

Revised Settlement, (b) not subject to avoidance, subordination, recharacterization, recovery,

attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) under

applicable provisions of the Bankruptcy Code (including sections 510, 544, 547 and 548) or state

law, and (c) not subject to disallowance under any provision of the Bankruptcy Code, including

section 502(d) thereof; <u>provided</u>, <u>however</u>, that the foregoing provision shall have no application

or effect (and shall retroactively be null and void) in the event that any one or more of the

conditions set forth in the definition of "Millennium Notes Plan Conditions" is not satisfied or

the Payment Date does not occur; and it is further

ORDERED that the mutual releases contained in the Revised Settlement shall be

effective as of the Payment Date, and each Party shall be deemed fully and forever to have

released and to be permanently enjoined from asserting, pursuing or prosecuting in any manner

and in any forum any and all claims released pursuant to the Revised Settlement, including, but

not limited to, claims arising from the negotiation of or entry into the Revised Settlement or the

Initial Settlement; and it is further

ORDERED that on the Payment Date, the releases contained in the Revised

Settlement with respect to State Law Avoidance Claims shall be binding on all parties in interest,

including the Debtors, the Committee, the Trustees, the 2015 Notes Trustee, the 2015 Notes

Holders, the holders of Allowed General Unsecured Claims, the holders of Senior Facility

Claims, the holders of Bridge Loan Facility Claims, the holders of Senior/Bridge Deficiency

Claims, the Secured Lenders, the Millennium Notes Trustee, the Specified Millennium

Noteholders, other holders of Millennium Notes Claims and each of the Debtors' other creditors

and each of their respective predecessors, successors and assigns, and each such party shall be

permanently enjoined from asserting, pursuing or prosecuting in any manner and in any forum

any and all State Law Avoidance Claims released pursuant to the Revised Settlement; and it is further

ORDERED that prosecution of the claims asserted or that could have been asserted in the complaint in the Committee Litigation [09-01375 Docket No. 1] or the Proposed Amended Committee Complaint (and any claims that could have been asserted by the 2015 Notes Trustee, the Millennium Notes Trustee or any other party as a result of actual or potential intervention in the Committee Litigation), as against the Financing Party Defendants and Secured Lenders (in any capacity for which they have been sued), shall be stayed pending the Payment Date, at which time such complaint and claims (including the Committee's motion for leave to amend such complaint [09-01375 Docket No. 65], as against the Financing Party Defendants and Secured Lenders) shall be deemed dismissed with prejudice, effective as of the Payment Date, and the Debtors shall be authorized to file a notice of such dismissal on or after the Payment Date; and it is further

ORDERED that, consistent with the Arco and Equistar Settlement, prosecution of the claims asserted or that could have been asserted in the complaint in intervention of Bank of New York Mellon, as indenture trustee under the ARCO Indenture, and Bank of New York Mellon Trust Company, N.A., as indenture trustee under the Equistar Indenture (together "BNY Mellon") in the Committee Litigation [09-01375 Docket No. 150], as against the Lender Releasees, which BNY Mellon has been required to suspend by order of the Bankruptcy Court dated February 17, 2010, shall be and remain stayed pending the Payment Date, at which time such complaint and claims shall be dismissed with prejudice, effective as of the Payment Date, and the Debtors shall be authorized to file a notice of such dismissal on or after the Payment Date; and it is further

ORDERED that prosecution of the claims asserted or that could have been asserted in the complaint in the 2015 Notes Litigation [09-01501 Docket No. 1], as against the defendants named therein, shall be stayed pending the Payment Date, at which time such complaint and claims shall be deemed dismissed with prejudice, effective as of the Payment Date, and the Debtors shall be authorized to file a notice of such dismissal on or after the Payment Date; and it is further

ORDERED that prosecution or filing of objections or other oppositions to the Debtors' complaint in the Debtors' Injunction Litigation [09-01459 Docket No. 1] shall be suspended or enjoined pending the Payment Date, at which time any such objections or oppositions shall be deemed withdrawn with prejudice, effective as of the Payment Date, and the Debtors shall be authorized to file a notice of such withdrawal on or after the Payment Date; and it is further

ORDERED that prosecution of the Pending STN Motions shall be suspended pending the Payment Date, at which time such motions shall be deemed withdrawn with prejudice, effective as of the Payment Date, and the Debtors shall be authorized to file a notice of such withdrawal on or after the Payment Date; and it is further

ORDERED that, except to the extent inconsistent with the exercise of their fiduciary duties, the Debtors shall not propose or support any plan that is inconsistent with or does not effectuate the Revised Settlement; and it is further

ORDERED that, except as expressly provided in the Revised Settlement, upon entry of this Order, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group and the Millennium Notes Trustee shall be deemed to have withdrawn without prejudice, and shall promptly withdraw without prejudice, all pending objections to the Debtors' plan of

reorganization dated December 23, 2009 [09-10023 Docket No. 3489], its associated disclosure statement [09-10023 Docket No. 3488], and the Debtors' pending motion to approve the Equity Commitment Agreement [09-10023 Docket No. 3487] subject to refiling only in the event this Order is vacated, reversed, modified or amended prior to the Payment Date; and it is further

ORDERED that each of the Non-Settling Defendants is hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Lender Releasee (including any other non-contractual claim against the Lender Releasees, whether or not denominated as for contribution or indemnity, where the injury to the Non-Settling Defendant is the Non-Settling Defendant's liability to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in the Committee Litigation, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Non-Settling Defendant is entitled to the judgment reduction provisions set forth herein.  This Order (the "Bar Order") is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim.

> (a) If (i) any person acting on behalf of the Debtors' estates, including any successor to the Debtors including any chapter 7 trustee, any committee appointed in the Bankruptcy Case, any trustee of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code or (ii) any trustee of the Creditor Trust (any of the above, a "Plaintiff"), obtains a judgment or award (a "Judgment") against a Non-Settling Defendant or other party with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim then, with respect to any actual, potential or asserted liability of a Lender Releasee to a Non-Settling Defendant or other party for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar

Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Non-Settling Defendant or other party in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Revised Settlement by the Lender Releasee(s) against whom there would have been a Barred Claim in the absence of this Bar Order, provided that for purposes of this clause (i), the Parties and Non-Settling Defendants reserve all rights with respect to the determination of the amount of the consideration provided pursuant to the Revised Settlement that should be deemed allocable to such Lender Releasee(s) and to such Barred Claim for purposes of judgment reduction; or (ii) the amount equal to the Judgment against such Non-Settling Defendant or other party times the aggregate proportionate share of fault (expressed as a percentage) of the Lender Releasee(s) against whom there would have been a Barred Claim in the absence of this Bar Order.  In the event that Judgment shall be entered against a Non-Settling Defendant or other party without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim.

(b) In the event such Plaintiff asserts any claim or cause of action against any Non-Settling Defendant or other party in any court or tribunal other than this Court, or in the event that any proceeding before this Court with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim, is (1) removed or transferred from this Court to any other court or tribunal, (2) adjudicated to judgment in this Court and enforcement proceedings are brought in any other court or tribunal; or (3) adjudicated to judgment in this Court but a Barred Claim is brought in a proceeding in any other court or tribunal; such Plaintiff shall, to the extent it is a party to such proceeding or has notice thereof, provide notice of such proceeding to the applicable Lender Releasee and shall take any additional steps, as are reasonably directed by such Lender Releasee, for the enforcement of this Bar Order by such other court or tribunal.  Notwithstanding the foregoing, in the event such other court or tribunal declines to enforce this Bar Order or declines to rule on or determine any Barred Claim, and Judgment is entered by such a court or tribunal against a Non-Settling Defendant or other party without a prior or concurrent determination of and reduction for Barred Claims with respect to such Judgment, then: (i) such Judgment shall not prejudice the rights of any Non-Settling Defendant or other party to seek or obtain a judgment credit or reduction in accordance with applicable law or this Order; (ii) such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and (iii) in the event that the Litigation Trust collects proceeds on account of such Judgment, such proceeds shall be retained by the Litigation Trust and not distributed until the earlier of (x) expiration of the applicable statute of limitations period with respect to any potential Barred Claim in respect of such Judgment; or (y) final determination, after all available appeals are taken and exhausted, of all Barred Claims in respect of such Judgment. In the event that a Lender Releasee is adjudged liable for any

Barred Claim by a final, non-appealable order, then, to the extent proceeds have been collected by the Litigation Trust in respect of the Judgment underlying such Barred Claim, such proceeds shall be distributed from the Litigation Trust to the applicable Non-Settling Defendant or other party in satisfaction of such judgment; provided that such proceeds shall instead be distributed by the Litigation Trust to the applicable Lender Releasee(s) to the extent any amounts previously have been paid by the Lender Releasee(s) in satisfaction of such judgment.  Notwithstanding the foregoing, if the reason that such court or tribunal has declined to adjudicate a Barred Claim is the absence of the Lender Releasee from the jurisdiction and the refusal of such Lender Releasee to submit to its jurisdiction, then such Lender Releasee shall forfeit its rights to a reduction in any Judgment rendered otherwise provided for hereby, except that such Lender Releasee shall not forfeit such rights if it declines to appear in any subsequent action for contribution that such Non-Settling Defendant or other party may commence in a court or tribunal that lacks jurisdiction over such Lender Releasee or otherwise lacks authority to enter a valid and enforceable Judgment against such Lender Releasee.

(c) The Lender Releasees acknowledge that any Plaintiff that obtains a Judgment subject to reduction based on a Barred Claim is a party in interest with respect to any action or proceeding for the adjudication of such Barred Claim and shall have the right to intervene in such action or proceeding and that the consent of such Plaintiff shall be required for the settlement or compromise of any Barred Claim; in addition, the Plaintiff shall be deemed to consent to the right of intervention of any Lender Releasee in any action or proceeding for the adjudication of such Barred Claim; and it is further

ORDERED that if any Plaintiff enters into a settlement with a Non-Settling Defendant or other party with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

ORDERED that each of the Lender Releasees is hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against

any Non-Settling Defendant (including any other non-contractual claim against the Non-Settling

Defendants, whether or not denominated as for contribution or indemnity, where the injury to the

Lender Releasee is the Lender Releasee's liability to the plaintiffs), arising out of or reasonably

flowing from the claims or allegations in the Committee Litigation, whether arising under state,

federal or foreign law as claims, cross-claims, counterclaims, or third-party claims.  This Order is

without prejudice to the position of any party as to the existence, in the absence of this Bar

Order, of any such claim; and it is further

ORDERED that nothing herein shall prejudice or operate to preclude the rights of

any Non-Settling Defendant to (i) obtain judgment credit or reduction to the fullest extent

available under applicable law on any applicable grounds whatsoever; provided that the Plaintiff

reserves the right to dispute any such claimed right to judgment credit or reduction; or (ii) assert

claims, other than Barred Claims, against any party.  For the avoidance of doubt, the provisions

of this Order, including the judgment reduction provisions set forth herein, shall not apply to (i)

any contractual indemnity or (ii) any claim asserted in the Committee Complaint or the Proposed

Amended Committee Complaint or in any other Complaint filed by any Plaintiff in this Court or

in any other court or tribunal for which joint liability does not exist as a matter of law, equity or

fact as between any Non-Settling Defendant and any Lender Releasee, including, by way of

example, the claims asserted in Count XIV and Count XVII and the equitable subordination of

claims sought in Count XV of the Committee Complaint; and it is further

ORDERED that, as of the Payment Date, the Committee (and each of its

members) shall irrevocably be divested of standing to pursue claims on behalf of the Debtors'

estates against the Financing Party Defendants and the Secured Lenders (in each case, in any

capacity for which they have been or could have been sued), and any request for standing to

pursue claims on behalf of the Debtors' estates against any of the Financing Party Defendants or Secured Lenders (in each case, in any capacity for which any of them were or could have been sued) by any other party (including, without limitation, the 2015 Notes Trustee, BNY Mellon, as indenture trustee under the ARCO Indenture and the Equistar Indenture, and the Millennium Notes Trustee) shall hereby be denied; and it is further

ORDERED that, on the Payment Date, any rights of the Committee or any other party to assert, prosecute or seek standing to assert or prosecute a Lender Claim (as defined in the DIP Financing Order), in each case whether affirmatively, as a defense, or in any other manner, shall irrevocably and automatically terminate, and any and all extant Lender Claims shall be, and shall be deemed, irrevocably dismissed with prejudice, it being acknowledged that, unless otherwise released hereunder or in the Revised Settlement or in the Revised Plan or any Alternative Plan, the rights of the Committee, the Litigation Trust or the Creditor Trust to assert or prosecute a Non-Settling Defendant Claim, Assigned Preference Claim or State Law Avoidance Claim, as applicable, will survive and will be unaffected by the foregoing; and it is further

ORDERED that, consistent with Section 3.13 of the Revised Settlement, the DIP Financing Order is hereby modified to eliminate the $250,000 limitation for "Capped Activities" of the Committee's professionals contained in paragraph 23 thereof, and compensation of the Committee's professionals for their reasonable fees and expenses for such activities shall be subject to final application (to be submitted to the Debtors in the same manner as the Committee's professionals have done to date), objection, allowance and reimbursement consistent with the Bankruptcy Code and prior orders of the Court; provided, that upon entry of this Order (i) the Committee's professionals shall be entitled to be paid, no Party shall object to

the payment of, and the Debtors shall pay, the Committee's professionals fees and expenses for "Capped Activities" allowed but not awarded to date pursuant to Bankruptcy Court orders approving the First Interim Fee Application [09-10023 Docket No. 2505] and the Second Interim Fee Application [09-10023 Docket No. 3416], and (ii) the Committee's professionals shall be entitled to be paid, and the Debtors shall pay, the Committee's professionals fees and expenses for "Capped Activities" requested or to be requested for each of the months of September, October, November and December 2009 pursuant to monthly fees submissions, and any additional periods as the case may be, pursuant to the Interim Compensation Procedures Order and not otherwise objected to except for the reason that such fees and expenses were for "Capped Activities," subject only to applicable holdbacks, provided that the Notice Parties (as defined in the Interim Compensation Procedures Order) shall have 15 days from entry of this Order during which to review and object to the reasonableness of the amounts addressed in subsection (ii) of this paragraph, that no compensation shall be paid by the Debtors for any professionals of any subcommittee of the Committee and that the foregoing shall not expand any other reimbursement obligations of the Debtors' estates under the Revised Settlement; and it is further

ORDERED that the Senior Agent, the Bridge Agent and the Collateral Agent shall not be liable to any party on account of actions taken by the Senior Agent, the Bridge Agent or the Collateral Agent in good faith (other than as finally judicially determined by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Senior Agent, the Bridge Agent or the Collateral Agent, as applicable), to effectuate the transactions contemplated by the Revised Settlement, including, without limitation, the release of any Liens securing Senior Secured Claims or Bridge Loan Facility Claims or the Claims of any party; and it is further

ORDERED that the Debtors shall indemnify and hold harmless the Senior Agent, the Bridge Agent and the Collateral Agent from and against any and all losses, claims, damages, liabilities and reasonable expenses, joint or several, to which the Senior Agent, the Bridge Agent and the Collateral Agent may become subject arising out of or in connection with any claim, challenge, litigation, investigation or proceeding with respect to effectuating the transactions contemplated in the Revised Plan, any Alternative Plan or the Revised Settlement including, without limitation, the "Enforcement Sale" contemplated in the Revised Plan and the release of Liens and related transactions contemplated in the Revised Settlement, and shall promptly reimburse the Senior Agent, the Bridge Agent and the Collateral Agent for reasonable legal or other reasonable out-of-pocket expenses as they are incurred in connection with investigating, responding to or defending any of the foregoing, provided that the foregoing indemnification shall not apply to losses, claims, damages, liabilities or expenses finally judicially determined by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct on the part of the Senior Agent, the Bridge Agent or the Collateral Agent, as applicable. If for any reason (other than for the reasons set forth in the proviso to the previous sentence) the foregoing indemnification is unavailable to either the Senior Agent, the Bridge Agent or the Collateral Agent or insufficient to hold either the Senior Agent, Bridge Agent or the Collateral Agent harmless, then the Debtors shall contribute to the amount paid or payable by the Senior Agent, the Bridge Agent or the Collateral Agent as a result of such loss, claim, damage, liability or expense. Such indemnification obligations shall survive and shall not be discharged by any plan of reorganization in these chapter 11 cases; and it is further

ORDERED that the Debtors (and after the Effective Date, the Reorganized Debtors) shall continue to pay and reimburse to (i) Citibank, N.A. and its Affiliates, in their

various current and former agent capacities under the Senior Facility and the Bridge Loan

Facility, (ii) Deutsche Bank Trust Company Americas and its Affiliates, in its capacity as the

Senior Agent, and (iii) Merrill Lynch Capital Corporation and its Affiliates, in its capacity as

administrative agent under the Bridge Loan Facility, the reasonable expenses incurred by them

thereunder (including the reasonable, actual and documented fees and disbursements of counsel),

and, such expenses (but only such expenses (including the reasonable, actual and documented

fees and disbursements of counsel), and not any other claims or rights under the Senior Facility

or the Bridge Loan Facility agreement) shall not be discharged under the Revised Plan or any

Alternative Plan.  Notwithstanding the foregoing, the Debtors (and after the Effective Date, the

Reorganized Debtors) shall continue to honor their indemnification obligations under the Senior

Facility and Bridge Loan Facility to the Senior Agent, the Bridge Agent and Collateral Agent or

as set forth herein, in the Revised Settlement, the Revised Plan or any Alternative Plan, and such

indemnification obligations shall not be discharged under the Revised Plan or any Alternative

Plan; and it is further

ORDERED that the 2015 Notes Plan Support Agreement and the Millennium

Notes Plan Support Agreement each shall be enforceable, respectively,[2] against the parties

thereto and each of their respective direct and indirect, initial and subsequent successors and

assigns in accordance with the terms and conditions contained therein, as applicable, and any

assignment or transfer of (a) 2015 Notes by any signatory to a 2015 Notes Plan Support

Agreement or any Subsequent Transferee, or (b) Millennium Notes by any Specified Millennium

Noteholder or any Subsequent Transferee, shall be null and void ab initio and the transferor shall

---

[2] The Court having reviewed the forms of such confidential plan support agreements, which were provided to the Court for *in camera* review.

remain subject to and liable under its respective plan support agreement unless (i) such signatory

to a 2015 Notes Plan Support Agreement, Specified Millennium Noteholder, or Subsequent

Transferee, as the case may be, has provided a copy of this Order and the applicable plan support

agreement to such prospective assignee or transferee; (ii) such assignee or transferee has

executed a joinder in the form attached as Exhibit B hereto, which shall provide, inter alia, that

(x) such assignee or transferee agrees to abide by and not contest any of the provisions of this

Order, including, without limitation, the exclusive jurisdiction of the Bankruptcy Court to

enforce the Millennium Notes Plan Support Agreement or the 2015 Notes Plan Support

Agreement, as the case may be, and any amendments and joinders thereto and the remedy of

specific performance set forth in the Millennium Notes Plan Support Agreement or the 2015

Notes Plan Support Agreement, as the case may be, and (y) to the extent permitted by applicable

law and as set forth in the applicable plan support agreement, such assignee or transferee shall

pay the Debtors and any third party beneficiary with respect to the Millennium Notes Plan

Support Agreement or the 2015 Notes Plan Support Agreement, as the case may be, any fees and

expenses (including, without limitation, reasonable attorneys' fees) expended by such parties to

specifically enforce the terms of the Millennium Notes Plan Support Agreement or the 2015

Notes Plan Support Agreement, as the case may be; and (iii) such selling signatory to a 2015

Notes Plan Support Agreement, Specified Millennium Noteholder, or Subsequent Transferee has

provided electronic notice of such assignment or transfer (by providing a sellers' notice in the

form attached as Exhibit C hereto), and the prospective transferee has provided electronic notice

of such purchase (by providing an executed copy of such joinder), to the Debtors (Attn: Peter M.

Friedman (*peter.friedman@cwt.com*) and George A. Davis (*george.davis@cwt.com*)) within the

earlier of (x) five business days after such assignment or transfer or (y) two business days after execution of the joinder; and it is further

ORDERED that to the extent of any inconsistency between this Order and the Revised Settlement incorporated herein by reference, on the one hand, and any plan of reorganization confirmed in these chapter 11 cases, on the other hand, the terms of this Order and the Revised Settlement, as applicable, shall govern; and it is further

ORDERED that this Order shall constitute findings of fact and conclusions of law and, notwithstanding the possible applicability of any provision of the Bankruptcy Rules, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry; and it is further

ORDERED that the provisions and effect of this Order, any actions taken pursuant to this Order or the Revised Settlement and the Parties' respective rights, obligations, remedies and protections provided for herein and in the Revised Settlement shall survive the conversion, dismissal or closing of these chapter 11 cases, appointment of a trustee herein, confirmation of a plan or plans of reorganization, or the substantive consolidation of these chapter 11 cases with any other case or cases, and the terms and provision of this Order and the Revised Settlement shall continue in full force and effect notwithstanding the entry of any such order; and it is further

ORDERED that the Revised Settlement and the Order constitute and evidence the valid and binding obligations of the Parties, which obligations shall be enforceable against each Party in accordance with the terms of the Revised Settlement and this Order; and it is further

ORDERED that this Court shall retain continuing jurisdiction with respect to all matters related to or arising from this Order and the Revised Settlement or their implementation.

Dated: New York, New York
        **_March 11, 2010_**

                                    **_s/ Robert E. Gerber_**
                                    ROBERT E. GERBER
                                    UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT A

EXECUTION VERSION

AMENDED AND RESTATED
SETTLEMENT AGREEMENT RELATING TO COMMITTEE LITIGATION
(*OFFICIAL COMMITTEE OF UNSECURED CREDITORS v. CITIBANK, N.A.,* et. al.,
ADV. P. NO. 09-01375 (REG) (BANKR. S.D.N.Y.))

This Amended and Restated Settlement Agreement (the "Settlement Agreement") is entered into as of March 10, 2010, by and among (i) LyondellBasell Industries AF S.C.A., ("LBIAF") on behalf of itself and its affiliates listed on Schedule A hereto ("Lyondell"); (ii) the Official Committee of Unsecured Creditors (the "Committee"); (iii) Citibank, N.A., Citibank International plc, and Citigroup Global Markets Inc. ("Citibank"), Goldman Sachs Credit Partners, L.P. and Goldman Sachs International ("Goldman"), Merrill, Lynch, Pierce, Fenner & Smith and Merrill Lynch Capital Corporation ("Merrill"), ABN AMRO Inc. and The Royal Bank of Scotland, N.V., f/k/a ABN Amro Bank N.V. ("ABN AMRO"), UBS Securities LLC and UBS Loan Finance LLC ("UBS") (collectively, Citibank, Goldman, Merrill, ABN AMRO and UBS are referred to as the "Arranger Bridge Lenders"); (iv) LeverageSource III S.à.r.l. ("LeverageSource"), Ares Management LLC ("Ares"), Bank of Scotland, DZ Bank AG ("DZ Bank"), Kolberg Kravis Roberts & Co. (Fixed Income) LLC ("KKR") and UBS AG (each of LeverageSource, Ares, Bank of Scotland, DZ Bank and KKR, individually and with certain of their respective affiliates signatory hereto, and UBS AG, individually, referred to as an "Ad Hoc Defendant," and together with the Ad Hoc Group, defined below, and the Arranger Bridge Lenders, the "Financing Party Defendants"); (v) Wilmington Trust Company, not individually but solely in its capacity as Successor Trustee for the holders of the 2015 Notes (the "2015 Notes Trustee" which definition shall not include any prior trustees); (vi) Law Debenture Trust Company of New York, not individually, but solely in its capacity as successor trustee for the holders of the Millennium Notes (the "Millennium Notes Trustee");[1] and (vii) Arrowgrass Master Fund Ltd., Arrowgrass Distressed Opportunities Fund Limited, Basso Credit Opportunities Holding Fund Ltd., Basso Fund Ltd., Basso Multi-Strategy Holding Fund Ltd., Columbus Hill Partners, L.P., Columbus Hill Overseas, Ltd. ("Columbus Hill Overseas"), CQS Directional Opportunities Master Fund Limited ("CQS"), Kivu Investment Fund Limited, Mariner LDC, Caspian Capital Partners, LP, Caspian Select Credit Master Fund, Ltd., CVI GVF (Lux) Master S.a.r.l., Fortelus Special Situations Master Fund Ltd., and Panton Master Fund, L.P., as holders of 2015 Notes (collectively, the "2015 Notes Ad Hoc Group," and together with the Debtors, the Committee, the Financing Party Defendants, the 2015 Notes Trustee, and the Millennium Notes Trustee, the "Parties").

---

[1] The Millennium Notes Trustee shall become a Party only upon execution of Millennium Notes Plan Support Agreements by the Specified Millennium Noteholders (each term as defined herein), and all provisions hereof relating to the treatment of Millennium Notes Claims and the rights of holders thereof and of the Millennium Notes Trustee shall be of no force or effect until such time as the Millennium Notes Trustee becomes a Party. For the avoidance of doubt, this Settlement Agreement shall be fully enforceable and in full force and effect as to all other Parties in the event that the Millennium Notes Trustee does not become a party hereto.

Recitals

WHEREAS, Lyondell Chemical Company ("Lyondell Chemical") and certain of its Affiliates filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") on January 6, 2009 (the "Petition Date"), and LBIAF and certain other of Lyondell Chemical's Affiliates filed thereafter[2] (Lyondell Chemical, LBIAF and all such Affiliates, collectively, as debtors and debtors in possession, the "Debtors") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"); and

WHEREAS, the Debtors' chapter 11 cases are being jointly administered as *In re Lyondell Chemical Company, et al.*, Chapter 11 Case No. 09-10023 (REG) (the "Bankruptcy Case"); and

WHEREAS, certain of the Debtors are obligated under that certain Senior Facility (as defined below) and under the Bridge Loan Facility (as defined below); and

WHEREAS, certain Claims against the Obligor Debtors (as defined below) have been filed by or on behalf of, *inter alia*, the Financing Party Defendants pursuant to the Senior Facility and Bridge Loan Facility; and

WHEREAS, the Ad Hoc Defendants and certain Arranger Bridge Lenders are owners of Claims comprising approximately 50 percent of the outstanding amounts due and owing under the Senior Facility; and

WHEREAS, the Arranger Bridge Lenders are owners of Claims comprising approximately 85 percent of the outstanding amounts due and owing under the Bridge Loan Facility; and

WHEREAS, the members of the 2015 Notes Ad Hoc Group are owners of Claims comprising approximately 62 percent of the outstanding amounts due and owing under the 2015 Notes Indenture; and

WHEREAS, the Specified Millennium Noteholders are owners of Claims comprising more than 50 percent of the outstanding amounts due and owing under the Millennium Notes Indenture; and

WHEREAS, on June 15, 2009, the Committee filed a motion (the "STN Motion") [09-10023 Docket No. 2018] for standing to pursue certain alleged claims that constitute property of certain of the Debtors' estates against certain of the Financing Party Defendants and

---

[2] After the Petition Date, certain Debtors including LBIAF filed for chapter 11 protection on April 24, 2009 under case numbers 09-12518 and 09-12519, and on May 8, 2009 under case numbers 09-12940 through 09-12955. On April 30, 2009, the Bankruptcy Court entered an interim order [09-10023 Docket No. 1658] making certain orders and other pleadings entered or filed in the jointly administered case number 09-10023 applicable to the case numbers 09-12518 and 09-12519, and the Debtors have moved for similar relief for case numbers 09-12940 through 09-12955 [09-10023 Docket No. 1693].

other defendants and appended a draft complaint to the motion (the "Draft Committee Complaint"); and

WHEREAS, on July 21, 2009, the Bankruptcy Court granted the STN Motion authorizing the Committee to pursue the claims set forth in the Draft Committee Complaint on behalf of the Debtors' estates, and on July 22, 2009 the Committee commenced an adversary proceeding styled *Official Committee of Unsecured Creditors v. Citibank, N.A., et al.*, Adv. P. 09-01375 (REG) (Bankr. S.D.N.Y.) (the "Committee Litigation") by filing a complaint against various defendants named therein (the "Committee Complaint") [09-01375 Docket No. 1]; and

WHEREAS, on August 4, 2009, the Bankruptcy Court issued a Case Management Order (the "CMO") with respect to the Committee Litigation, which CMO was subsequently amended by order of the Bankruptcy Court [09-01375 Docket No. 124]; and

WHEREAS, the Ad Hoc Group of Secured Lenders, consisting of certain lenders who had purchased and continued to hold interests in the Senior Facility and presently including, among others, the Ad Hoc Defendants (the "Ad Hoc Group"), intervened in the Committee Litigation on August 20, 2009 [09-01375 Docket No. 60]; and

WHEREAS, on August 21, 2009, the Committee moved for leave to amend the Committee Complaint and filed with the Court a proposed amended complaint (the "Proposed Amended Committee Complaint") [09-01375 Docket No. 65], and the Financing Party Defendants opposed such Motion [09-01375 Docket No. 80], and argument on such motion has not been heard; and

WHEREAS, on August 28, 2009, the Debtors initiated an adversary proceeding styled *Lyondell Chemical Company, et al. v. Wilmington Trust Company, as Trustee*, Adv. P. No. 09-01459 (REG) (Bankr. S.D.N.Y.) (the "Debtors' Injunction Litigation") by filing a complaint (the "Debtors' Injunction Complaint") [09-01459 Docket No. 1] against the 2015 Notes Trustee, seeking to enjoin the 2015 Notes Trustee from any attempts to enforce any rights or exercise any remedy under the 2015 Notes against the Debtors' non-debtor Affiliates; and

WHEREAS, on October 1, 2009, the 2015 Notes Trustee initiated an adversary proceeding styled *Wilmington Trust Company, as Trustee, v. LyondellBasell Industries AF S.C.A., et al.*, Adv. P. No. 09-01501 (REG) (Bankr. S.D.N.Y.) (the "2015 Notes Litigation") by filing a complaint (the "2015 Notes Complaint") [09-01501 Docket No. 1] against the defendants named therein; and

WHEREAS, The Bank of New York Mellon, as indenture trustee under the ARCO Indenture, and the Bank of New York Mellon Trust Company, N.A., as indenture trustee under the Equistar Indenture, and the Millennium Notes Trustee, filed motions (collectively, the "Pending STN Motions") [09-01375 Docket Nos. 154 and 163, and 09-10023 Docket No. 3073, respectively] seeking authority to pursue claims that the Debtors' estates may have relating to the granting by certain Obligor Debtors of guarantees to the 2015 Notes Trustee for the benefit of the 2015 Noteholders; and

WHEREAS, the Phase I Trial (as defined in the CMO) was scheduled to begin on December 10, 2009; and

WHEREAS, on December 4, 2009, the Debtors and the Financing Party Defendants agreed to a settlement with respect to the Committee Litigation subject to definitive documentation of terms; and

WHEREAS, as of December 23, 2009, the Debtors and the Financing Party Defendants executed that certain Settlement Agreement Relating To Committee Litigation (*Official Committee Of Unsecured Creditors v. Citibank, N.A., et. al.*, Adv. P. No. 09-01375 (REG) (Bankr. S.D.N.Y.)) (the "Original Settlement Agreement"); and

WHEREAS, on or about December 23, 2009, the Debtors filed a motion pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Original Committee Litigation 9019 Motion") [09-01375 Docket No. 284] seeking approval of the Original Settlement Agreement; and

WHEREAS, between December 23, 2009 and February 13, 2010, certain Parties produced numerous documents and participated in 17 depositions in response to discovery requests made in connection with the Original Committee Litigation 9019 Motion; and

WHEREAS, on January 9, 2010, the Financing Party Defendants filed a memorandum of law joining the Debtors' Original Committee Litigation 9019 Motion (the "Financing Party Defendants' Joinder") [09-01375 Docket No. 295]; and

WHEREAS, on January 29, 2010, the Committee submitted an objection (the "Committee Objection") [09-01375 Docket No. 330] to the Original Committee Litigation 9019 Motion; and

WHEREAS, on January 29, 2010, Columbus Hill Capital Management, L.P. (as investment manager for certain funds that it manages, "Columbus Hill") filed an objection [09-01375 Docket No. 323] to the Original Committee Litigation 9019 Motion, and CQS filed a joinder thereto [09-01375 Docket No. 327];

WHEREAS, on January 29, 2010, the Millennium Notes Trustee filed an objection [09-01375 Docket No. 322] to the Original Committee Litigation 9019 Motion;

WHEREAS, on February 10, 2010, the Debtors filed an omnibus reply to objections to the Original Committee Litigation 9019 Motion (the "Debtors' Reply") [09-01375 Docket No. 339]; and

WHEREAS, on February 10, 2010, the Financing Party Defendants filed a reply memorandum of law in further support of the Debtors' Reply (the "Financing Party Defendants' Reply") [09-01375 Docket No. 338]; and

WHEREAS, on February 16, 2010, the Parties (other than the Millennium Notes Trustee) presented to the Bankruptcy Court the terms of an agreement in principle as evidenced by an *Outline of Terms for Amendment to Settlement Agreement Relating to Committee Litigation* (the "Term Sheet") embodying the significant terms of a revised settlement with respect to the Committee Litigation, subject to, *inter alia*, definitive documentation of the agreed-upon modifications to the Original Settlement Agreement; and

WHEREAS, the Debtors and the Committee will file a joint motion to approve this Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure:

<u>Agreement</u>

NOW, THEREFORE, for and in sufficient consideration of the promises and the mutual covenants contained herein, and subject to Bankruptcy Court approval, the Parties hereby agree as follows:

1.  <u>Amended and Restated Settlement Agreement</u>.  The Settlement Agreement amends and restates in its entirety the Original Settlement Agreement.  Upon the Approval Order becoming a Final Order (each, as defined below), the Original Settlement Agreement will be of no further force or effect and will be deemed superseded in its entirety by the Settlement Agreement.  In addition, upon the filing of the 9019 Motion, prosecution of all objections to approval of the Original Settlement Agreement filed by the Committee, Columbus Hill, CQS and the Millennium Notes Trustee, and any related filings, including the Debtors' Reply, the Financing Party Defendants' Joinder and the Financing Party Defendants' Reply, shall be suspended, and on the Payment Date, shall be deemed withdrawn with prejudice.

2.  <u>Definitions</u>.  As used in this Settlement Agreement, the following terms have the respective meanings indicated in this Section 2. Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Revised Plan (as defined below) in the form attached hereto as <u>Exhibit A</u>.

    2.1.  "<u>2015 Noteholder</u>" means a holder of 2015 Notes.

    2.2.  "<u>2015 Notes</u>" means, collectively, the 8.375% senior notes due 2015 in the principal amounts of $615 million and €500 million issued pursuant to the 2015 Notes Indenture.

    2.3.  "<u>2015 Notes Ad Hoc Group</u>" has the meaning set forth in the recitals to this Settlement Agreement, and is an informal group of holders (and/or their respective investment managers) of 2015 Notes (whose members are listed in the recitals to this Settlement Agreement) that, among other things, has the ability to and is directing the 2015 Notes Trustee to execute this Settlement Agreement (it being understood that although Columbus Hill is technically not a member of the 2015 Notes Ad Hoc Group, for purposes of this Settlement Agreement, reference to the term "2015 Notes Ad Hoc Group" and the members thereof shall be deemed to include Columbus Hill).

    2.4.  "<u>2015 Notes Claim</u>" means all Claims arising under the 2015 Notes and the 2015 Notes Indenture including all accrued but unpaid interest thereon.

    2.5.  "<u>2015 Notes Indenture</u>" means the indenture, dated as of August 10, 2005, among LyondellBasell Industries AF S.C.A. (formerly Nell AF S.à.r.l.), as the Company, the guarantor parties thereto, Wilmington Trust Company (successor to The Bank of New York), as Trustee, Registrar, Paying Agent, Transfer Agent and Listing

Agent; Citibank, N.A. (successor to ABN Amro Bank N.V.), as Security Agent; and AIB/BNY Fund Management, as Irish Paying Agent.

2.6.  "2015 Notes Litigation" has the meaning set forth in the recitals to this Settlement Agreement.

2.7.  "2015 Notes Plan Conditions" means, subject to Section 7.7 hereof, the following conditions: (a) (1) the class of 2015 Notes Claims has voted to accept the Revised Plan or an Alternative Plan, (2) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to or appealed the approval of this Settlement Agreement, and (3) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to confirmation of the Revised Plan or an Alternative Plan, or appealed the order confirming such plan; and (b) (1) the 2015 Notes Trustee has taken no further action, directly or indirectly, to prosecute the 2015 Notes Litigation, and (2) neither the 2015 Notes Trustee nor any member of the 2015 Notes Ad Hoc Group has objected to any motions filed by the Debtors in the Debtors' Injunction Litigation or taken any further action either in the Debtors' Injunction Litigation or in the Bankruptcy Case with regard to the Debtors' Injunction Litigation.  In the event holders of at least 66 % in principal amount of the 2015 Notes Claims execute a 2015 Notes Plan Support Agreement, and so long as the holders of 2015 Notes Claims signatory to such plan support agreement(s) have not breached or terminated such agreement(s), clause (a)(1) of these 2015 Notes Plan Conditions shall be of no force and effect.

2.8.  "2015 Notes Plan Support Agreement" means the plan support agreement(s), in form and substance satisfactory to the Waiving Parties and the signatories thereto, to be executed by holders of 2015 Notes Claims, including all members of the 2015 Notes Ad Hoc Group.

2.9.  "2027 Notes" means the 8.1% fixed rate guaranteed notes due March 15, 2027 in the principal amount of $300 million, issued by Basell Finance, Inc.

2.10.  "9019 Motion" means an amendment to the Original Committee Litigation 9019 Motion, to be filed with the Bankruptcy Court jointly by the Debtors and the Committee, for an order approving this Settlement Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure.

2.11.  "Abandoned Claims" means the claims and causes of action brought on behalf of the Debtors' estates pursuant to section 544 of the Bankruptcy Code against former shareholders of Lyondell Chemical (but solely in their capacity as such) pursuant to Count IV of the Committee Complaint, other than (i) claims against Access, Nell Limited, or any of their respective affiliates (as that term is defined in section 101(2) of the Bankruptcy Code, replacing "debtor" with "Access" or "Nell Limited," as applicable, and replacing "corporation" with "entity"), which claims shall continue to be prosecuted as contemplated by the Committee Litigation or the Litigation Trust, (ii) claims against those parties that are released by the Debtors hereunder or under the Revised Plan or an Alternative Plan, and

(iii) claims against the Directors, Officers, and Subsidiary Directors (as defined in the Committee Complaint).

2.12. "Account Holder" means any Person that, directly or indirectly, held or was the beneficial owner or holder of shares of Lyondell Chemical in an account or otherwise through or with any Lender Releasees, where as a result of the conversion, upon the merger of BIL Acquisition Holdings Limited into Lyondell Chemical on December 20, 2007, of formerly outstanding shares of Lyondell Chemical into the right to receive $48 per share, such Person received Merger Consideration.

2.13. "Acquired Third Party Preference Claim" means any Preference Claim with respect to a Claim (other than a Senior Secured Claim or Bridge Loan Facility Claim) that a Lender Releasee has acquired or may acquire from a Non-Settling Defendant or unaffiliated third party that was not a defendant in the Committee Litigation.

2.14. "Affiliate" means, as to any specified Person, any other Person that, directly or indirectly through one or more intermediaries or otherwise, controls, is controlled by or is under common control with the specified Person.  As used in this definition, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person (whether through ownership of equity of that Person, by contract or otherwise).

2.15. "Allowed General Unsecured Claim" means any general unsecured Claim against an Obligor Debtor, Millennium US Opco, MPI or MSC, that is allowed under the Revised Plan, an Alternative Plan or in a chapter 7 case or cases under the Bankruptcy Code (in the event of conversion of the Bankruptcy Case thereto), (a) including, for the avoidance of doubt, (i) allowed General Unsecured Claims against Obligor Debtors, (ii) allowed General Unsecured Claims against Millennium Chemicals Inc., Millennium Worldwide Holdings I Inc., Millennium America Holdings Inc., Millennium America Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals, LP, Millennium US Opco, MPI and MSC, including  allowed Millennium Notes Claims, but excluding Senior/Bridge Guarantee Claims, and (iii) allowed 2015 Notes Claims, but (b) excluding Senior/Bridge Deficiency Claims.

2.16. "Alternative Plan" means any plan of reorganization other than the Revised Plan that is proposed by or for the Debtors and is consistent with and effectuates the terms of this Settlement Agreement.

2.17. "Approval Order" means an order entered by the Bankruptcy Court in the Bankruptcy Case, approving all of the terms of this Settlement Agreement, in form and substance reasonably satisfactory to (a) the Debtors, the Committee, and each Financing Party Defendant party hereto, and (b) (i) the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group (acting by members holding a majority in aggregate principal amount of the 2015 Notes represented on the 2015 Notes Ad

Hoc Group), and (ii) the Millennium Notes Trustee, but only as it relates to any provision of this Settlement Agreement (or absence of a provision in this Settlement Agreement) that has a direct effect on such Parties or, in the case of the 2015 Notes Trustee and the Millennium Notes Trustee, their respective constituents, and including, in substance, the following findings, holdings and terms:

a.    the manner in which notice of the 9019 Motion and the Original Committee Litigation 9019 Motion was provided to all parties entitled to such notice is adequate, appropriate, reasonable and sufficient for all purposes and is approved;

b.    the Approval Order and this Settlement Agreement incorporated therein is and shall be binding on all parties in interest in the Bankruptcy Case (and the chapter 7 trustee, in the event the Bankruptcy Case is converted into a case or cases under chapter 7 of the Bankruptcy Code) (except for any provisions regarding allocation or distribution of Settlement Consideration, which shall be binding only on the Parties until confirmation of the Revised Plan or an Alternative Plan, and thereafter on all parties in interest), and in each case, on each of their respective predecessors or successors;

c.    the execution and delivery of this Settlement Agreement by the Parties and the settlement and compromises set forth in this Settlement Agreement are approved;

d.    the compromises and settlement set forth in this Settlement Agreement are fair and reasonable to, and are in the best interests of, the Debtors' estates, and, in entering into this Settlement Agreement, the Debtors and the Committee have exercised their rights and powers, and used the same degree of care and skill in their exercise, as a prudent person would exercise or use under the circumstances;

e.    the mutual releases contained in this Settlement Agreement shall be effective as of the Payment Date, and each Party shall be deemed to have released and to be permanently enjoined from asserting, pursuing or prosecuting in any manner and in any forum any and all claims released pursuant to the Settlement Agreement, including, but not limited to, claims arising from the negotiation of or entry into this Settlement Agreement or the Original Settlement Agreement;

f.    the releases with respect to State Law Avoidance Claims in this Settlement Agreement shall be binding as of the Payment Date on all parties in interest, including the Debtors, the Committee, the Trustees, the 2015 Notes Trustee, the 2015 Notes Holders, the Millennium Notes Trustee, the Specified Millennium Noteholders, other holders of Millennium Notes Claims, the holders of Allowed General Unsecured Claims, the holders of

Senior Facility Claims, the holders of Bridge Loan Facility Claims, the holders of Senior/Bridge Deficiency Claims, the Secured Lenders and each of the Debtors' other creditors and each of their respective predecessors, successors and assigns, and each such party shall be deemed to have released and to be permanently enjoined from asserting, pursuing or prosecuting in any manner and in any forum any and all State Law Avoidance Claims released pursuant to the Settlement Agreement;

g.      prosecution of the claims in the Committee Complaint (and any claims that could have been brought by the 2015 Notes Trustee or the Millennium Notes Trustee as a result of intervention in the Committee Litigation), as against the Financing Party Defendants and the Secured Lenders, shall be stayed, pending the Payment Date, at which time such claims and complaint shall be deemed dismissed with prejudice;

h.      prosecution of the claims in the complaint in intervention of The Bank of New York Mellon in the Committee Litigation, as against the Lender Releasees, which the Bank of New York Mellon has been required to suspend by order of the Bankruptcy Court dated February 17, 2010, shall be and remain stayed, pending the Payment Date, at which time such claims and complaint shall be dismissed with prejudice in accordance with the terms of the Arco and Equistar Settlement;

i.      prosecution of the claims in the 2015 Notes Complaint, as against the defendants named therein, shall be suspended, pending the Payment Date, at which time such claims and complaint shall be deemed dismissed with prejudice;

j.      prosecution of the Pending STN Motions shall be suspended, pending the Payment Date, at which time such motions shall be deemed withdrawn with prejudice;

k.      filing or prosecution by any Party of objections to the Debtors' Injunction Complaint shall be enjoined or, as the case may be, suspended pending the Payment Date, at which time any such objections shall be deemed withdrawn with prejudice;

l.      on the Payment Date, any rights of the Committee or any other party to assert, prosecute or seek standing to assert or prosecute a Lender Claim (as defined in the DIP Financing Order), in each case whether affirmatively, as a defense, or in any other manner, shall irrevocably and automatically terminate, and any and all extant Lender Claims shall be, and shall be deemed, irrevocably dismissed with prejudice, it being acknowledged that, unless otherwise released hereunder or in the Revised Plan or under any Alternative Plan, the rights of the Committee, the Litigation Trust or the Creditor Trust to assert or prosecute a Non-Settling Defendant Claim,

Assigned Preference Claim or State Law Avoidance Claim, as applicable, will survive and will be unaffected by the foregoing;

m.    neither the Senior Agent nor the Collateral Agent shall incur any liability to any Person for any actions it takes to effectuate the release of Liens and other transactions contemplated by the Settlement Agreement;

n.    the Bar Order set forth in Section 5.3 hereof; and

o.    the conditions for valid transfer of Claims by signatories to the 2015 Notes Plan Support Agreement(s) and the Millennium Notes Plan Support Agreement(s) set forth in Section 7.6 hereof.

2.18.    "<u>Arco and Equistar Settlement</u>" means the separate settlement reached between the Debtors and The Bank of New York Mellon, as indenture trustee under the ARCO Indenture, and The Bank of New York Mellon Trust Company, N.A., as indenture trustee under the Equistar Indenture, approved by an order of the Bankruptcy Court entered on February 17, 2010.

2.19.    "<u>Assigned Preference Claim</u>" means, subject to Section 5.1 hereof, any Preference Claim, other than (i) any Non-Settling Defendant Claim, (ii) any Preference Claim (other than an Acquired Third Party Preference Claim) against any Lender Releasee (iii) any Preference Claim against any other party that is released by the Debtors under the Revised Plan or an Alternative Plan, and in the case of (ii) and (iii) above, including any of such party's professionals, agents, representatives or attorneys (each, in such capacities), and (iv) any Preference Claim that the Debtors, in consultation with the Committee (and subject to the right of the Committee (or post-Payment Date, the Litigation Trust, as the case may be) to object), waive or settle as part of any settlement of a contested Administrative Expense that the Debtors believe to be in the best interests of their estates, <u>provided</u> that the Debtors shall not waive or settle any Non-Settling Defendant Claim in connection with their settlement of a contested Administrative Expense.

2.20.    "<u>Bankruptcy Case</u>" has the meaning set forth in the recitals to this Settlement Agreement.

2.21.    "<u>Bankruptcy Code</u>" has the meaning set forth in the recitals to this Settlement Agreement.

2.22.    "<u>Bankruptcy Court</u>" has the meaning set forth in the recitals to this Settlement Agreement.

2.23.    "<u>Barred Claim</u>" has the meaning set forth in Section 5.3 hereof.

2.24.    "<u>Base Claim Amount</u>" means, with respect to any Allowed General Unsecured Claim, the amount of such Allowed General Unsecured Claim calculated as of the

Petition Date and excluding any interest or other charges subsequent to the Petition Date.

2.25. "<u>Beneficial Holder</u>" means any entity that was party to a binding trade not yet settled to acquire debt under the Senior Facility (including the portion of the Senior Facility that qualifies as DIP Roll-Up Loans) or the Bridge Loan Facility on December 23, 2009, but does not include any entity that was party to a binding trade not yet settled to sell all of its holdings of such debt on December 23, 2009.

2.26. "<u>Bridge Loan Facility</u>" means the credit facility provided pursuant to the Bridge Loan Agreement, dated as of December 20, 2007 (as amended or restated through the date hereof and including all of the ancillary documents relating thereto), among LyondellBasell Finance Company, the Obligor Debtors, and certain non-Debtor affiliates of LyondellBasell Finance Company; Merrill Lynch Capital Corporation, as administrative agent; Citibank, N.A., as collateral agent; Merrill Lynch, Pierce, Fenner & Smith Inc., Goldman Sachs Credit Partners, L.P., Citigroup Global Markets Inc., ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and the lenders from time to time party thereto.

2.27. "<u>Bridge Loan Facility Claims</u>" means all Claims, claims against guarantors, liens, rights and interests arising under the Bridge Loan Facility, including  all accrued but unpaid interest thereon and any claims arising under section 507(b) of the Bankruptcy Code.

2.28. "<u>Claim</u>" means "claim" as defined in section 101(5) of the Bankruptcy Code.

2.29. "<u>Collateral Agent</u>" means Citibank, N.A. and its Affiliates or any successor thereto, as collateral agent under the Senior Facility and the Bridge Loan Facility or as security agent under the December 20, 2007 Intercreditor Agreement.

2.30. "<u>Committee</u>" has the meaning set forth in the recitals to this Settlement Agreement; <u>provided</u>, reference to the "Committee" shall be deemed to include each member of the Committee solely in its capacity as such, and each advisor to the Committee.

2.31. "<u>Committee Complaint</u>" has the meaning set forth in the recitals to this Settlement Agreement.

2.32. "<u>Committee Litigation</u>" has the meaning set forth in the recitals to this Settlement Agreement.

2.33. "<u>Covered Professionals</u>" means representatives, agents, financial advisors, industry experts/advisors, and attorneys, in each case only to the extent that such Person represented or provided services in connection with the Merger (including the financing thereof), the Senior Secured Facility, the Bridge Loan Facility, the DIP Financing, the Bankruptcy Case or any matter that is or could have been the subject of the Committee Complaint.

2.34.   "Creditor Representative" means the representative selected by the Committee and employed pursuant to terms set forth in the Plan Supplement in the sole discretion of the Committee, to administer funds under Section 3.7 hereof and to monitor resolution of disputed General Unsecured Claims.

2.35.   "Creditor Trust" means a trust to be established pursuant to the Revised Plan or an Alternative Plan to which the State Law Avoidance Claims shall be contributed, and which shall hold and prosecute the State Law Avoidance Claims and distribute the net proceeds of any recoveries on the State Law Avoidance Claims in accordance with Section 3.4 hereof.

2.36.   "Creditor Trust Agreement" means the trust agreement governing the Creditor Trust, substantially in the form contained in the Plan Supplement and in all respects in a form acceptable to the Committee and otherwise consistent with this Settlement Agreement; provided that such trust agreement will include (i) a provision stating that, after the Excess Recovery Trigger Date, the holders of Senior/Bridge Deficiency Claims shall have sole control over and, subject to Section 3.6 hereof with respect to the right of the holders of Allowed General Unsecured Claims to receive their Post-Effective Date Interest Amount, shall be entitled to any property or assets of the Creditor Trust and (ii) a provision to be agreed upon among the Financing Party Defendants that shall govern the manner in which the Creditor Trust may be modified after the Excess Recovery Trigger Date.

2.37.   "Debtors" has the meaning set forth in the recitals to this Settlement Agreement; provided that wherever the context so requires, reference to the "Debtors" shall mean (or shall also mean, as the case may be) the Reorganized Debtors.

2.38.   "Debtor Released Claims" has the meaning set forth in Section 5.1 hereof.

2.39.   "Debtors' Injunction Complaint" has the meaning set forth in the recitals to this Settlement Agreement.

2.40.   "Debtors' Injunction Litigation" has the meaning set forth in the recitals to this Settlement Agreement.

2.41.   "Debtors' Reply" has the meaning set forth in the recitals to this Settlement Agreement.

2.42.   "December 20, 2007 Intercreditor Agreement" means the Intercreditor Agreement, dated December 20, 2007 originally among LyondellBasell Industries AF S.C.A. (formerly Basell AF S.C.A.); the Obligor Debtors and certain non-Debtor affiliates; Deutsche Bank Trust Company America (successor to Citibank, N.A.), as senior agent; Citibank, N.A., as security agent and ABL agent; Merrill Lynch Capital Corporation, as interim facility agent; The Bank of New York, as high yield notes trustee and trustee of those certain ARCO Notes and Equistar Notes; and certain other parties, as second lien notes trustee, original hedging banks, and investors, among others.

2.43. "DIP Financing Order" means the Final Order (I) Authorizing Debtors (A) to Obtain Post-Petition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e), (B) to Utilize Cash Collateral Pursuant to 11 U.S.C. § 363 and (C) to Purchase Certain Assets Pursuant to 11 U.S.C. § 363 and (II) Granting Adequate Protection to Pre-Petition Secured Parties Pursuant To 11 U.S.C. §§ 361, 362, 363 and 364, entered March 1, 2009 [09-10023 Docket No. 1002].

2.44. "DIP Roll-Up Loans" means the dollar-for-dollar roll-up portion of the loans under the Debtor-in-Possession Credit Agreement, dated as of March 3, 2009, among LBIAF, Lyondell Chemical, Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, Millennium Chemicals Inc., Millennium Petrochemicals Inc., UBS AG, Stamford Branch, as administrative agent and collateral agent, and the lenders from time to time party thereto (as amended, modified or supplemented from time to time).

2.45. "Disputed Excluded Person" has the meaning set forth in Section 3.3 hereof.

2.46. "Equity Commitment Agreement" means that certain Equity Commitment Agreement dated December 11, 2009 among the Debtors (other than the Schedule III Debtors and LyondellBasell AF GP S.à.r.l.), New Topco and the Rights Offering Sponsors (as defined therein) (as the same may be amended or modified from time to time).

2.47. "Excess Recoveries" means all recoveries of the Creditor Trust and the Litigation Trust, in the aggregate (net of the Creditor Representative's and Trusts' costs and expenses), after any distributions made to the Reorganized Debtors from the Litigation Trust pursuant to Section 3.3 (which, after the Excess Recovery Trigger Date, will be one-third of all Assigned Preference Claims instead of 10%) that are in excess of the amount required to pay to the holders of the Allowed General Unsecured Claims their allowed Base Claim Amounts, in cash or Class A Shares (as described in Section 3.2 hereof), after giving effect to other distributions made to holders of Allowed General Unsecured Claims under the Revised Plan or an Alternative Plan, this Settlement Agreement or pursuant to distributions from the Creditor Trust or Litigation Trust, or from a chapter 7 trustee in the event the Bankruptcy Case is converted into a case or cases under chapter 7 of the Bankruptcy Code.

2.48. "Excess Recovery Trigger Date" means the later of both of the following: (i) the date on which distributions to holders of Allowed General Unsecured Claims have been made, in the aggregate, sufficient to pay such holders their allowed Base Claim Amounts, in cash or Class A Shares (as described in Section 3.2 hereof), after giving effect to other distributions made to holders of Allowed General Unsecured Claims under the Revised Plan or an Alternative Plan, this Settlement Agreement or pursuant to distributions from the Creditor Trust or Litigation Trust, or from a chapter 7 trustee in the event the Bankruptcy Case is converted into a case or cases under chapter 7 of the Bankruptcy Code, and (ii)

the date on which the Creditor Representative's and Trusts' costs and expenses incurred through the date set forth in (i) above have been paid in full.

2.49.    "Excluded Person" has the meaning set forth in Section 3.3 hereof.

2.50.    "Existing Plan Support Agreement" means the Plan Support Agreement dated as of December 23, 2009, as updated by any amendments, modifications or consents entered into prior to the date hereof, by and among the Debtors, the members of the Ad Hoc Group (including, as applicable, certain of their respective affiliated entities and managed funds) and the Arranger Bridge Lenders signatory thereunder.

2.51.    "Final Order" means, with respect to an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to subject matter, that such order has not been reversed, stayed, modified, or amended, and that the time to appeal or seek certiorari with respect to such order has expired and no appeal or petition for certiorari has been timely taken, or that in the event that any appeal has been taken or any petition for certiorari has been or may be filed with respect to such order, there has not been a stay of such order, or such appeal or petition for certiorari has been withdrawn or dismissed or has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; provided, however, that the possibility that a timely motion under Rule 9024 of the Federal Rules of Bankruptcy Procedure, or any applicable analogous rule, may be filed with respect to such order shall not prevent such order from being a Final Order.

2.52.    "Financing Party Defendants" has the meaning set forth in the recitals to this Settlement Agreement.

2.53.    "Financing Party Defendant Releasees" means the Financing Party Defendants and each of their respective direct and indirect parent companies, subsidiaries and Affiliates (including funds managed by Financing Party Defendants or by Affiliates of Financing Party Defendants or Affiliates of any such funds), each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers and Covered Professionals.

2.54.    "Financing Party Defendants' Joinder" has the meaning set forth in the recitals to this Settlement Agreement.

2.55.    "Financing Party Defendants' Reply" has the meaning set forth in the recitals to this Settlement Agreement.

2.56.    "Fixed Settlement Plan Consideration" has the meaning set forth in Section 3.2 hereof.

2.57.    "Interim Compensation Procedures Order" means the Amended Order Establishing Procedures for Interim Compensation and Reimbursement of

Expenses for Professionals and Committee Members [09-10023 Docket No. 2838].

2.58.  "Lender Releasees" means Financing Party Defendant Releasees and Secured Lender Releasees.

2.59.  "Lien" means any lien securing a claim under the Senior Facility or the Bridge Loan Facility.

2.60.  "Litigation Trust" means any trust or trusts established pursuant to the Revised Plan or an Alternative Plan that is or are assigned (a) ownership of Non-Settling Defendant Claims and/or (b) ownership of Assigned Preference Claims, and which shall hold and prosecute such Claims and distribute the net proceeds of any recoveries thereon in accordance with Section 3.3 hereof.

2.61.  "Litigation Trust Agreement" means the trust agreement governing the Litigation Trust, substantially in the form contained in the Plan Supplement and in all respects in a form acceptable to the Committee, and the Debtors (but only as to provisions affecting or binding the Debtors), and otherwise consistent with this Settlement Agreement; provided that such trust agreement will include (i) a provision stating that, after the Excess Recovery Trigger Date, the Debtors and the holders of Senior/Bridge Deficiency Claims shall have sole control over and, subject to Section 3.6 hereof with respect to the right of the holders of Allowed General Unsecured Claims to receive their Post-Effective Date Interest Amount, shall be entitled to any property or assets of the Litigation Trust and (ii) a provision to be agreed upon between and among the Debtors and the Financing Party Defendants that shall govern the manner in which the Litigation Trust may be modified after the Excess Recovery Trigger Date.

2.62.  "Merger Consideration" means funds paid in respect of the conversion, upon the merger of BIL Acquisition Holdings Limited into Lyondell Chemical on December 20, 2007, of formerly outstanding shares of Lyondell Chemical into the right to receive $48 per share.

2.63.  "Millennium Notes" means the 7.625% senior unsecured notes due 2026 of Millennium America Inc., issued pursuant to the Millennium Notes Indenture.

2.64.  "Millennium Notes Claims" means the general unsecured Claims of holders of the Millennium Notes, in the principal amount of $241 million plus accrued and unpaid prepetition interest.

2.65.  "Millennium Notes Indenture" means the indenture, dated as of November 27, 1996, between Millennium America Inc. and Law Debenture Trust Company of New York, as successor to The Bank of New York, pursuant to which the Millennium Notes were issued, and all of the ancillary documents and Instruments relating thereto, as amended, supplemented, modified or restated as of the Petition Date.

2.66. "<u>Millennium Notes Plan Conditions</u>" means, subject to Section 7.7 hereof, the following conditions: (a) the Specified Millennium Noteholders have executed Millennium Notes Plan Support Agreements before 9:45 a.m. on March 11, 2010 and such Millennium Notes Plan Support Agreements have not been breached or terminated thereafter by a Specified Millennium Noteholder; (b) the Millennium Notes Trustee has not objected to or appealed the approval of this Settlement Agreement; (c) the Millennium Notes Trustee has not objected to confirmation of the Revised Plan or an Alternative Plan, or appealed the order confirming such plan; and (d) the Millennium Notes Trustee has taken no further action, directly or indirectly, to prosecute its Pending STN Motion.

2.67. "<u>Millennium Notes Plan Support Agreement</u>" means the plan support agreement(s), in form and substance satisfactory to the Debtors, the Ad Hoc Group, the Majority Arrangers and the Specified Millennium Noteholders, to be executed by the Specified Millennium Noteholders, under which the Specified Millennium Noteholders (each, only in its capacity as a holder of any Claim or interest other than, in the case of funds managed by Aurelius Capital Management, LP, a Claim or interest on account of Arco Notes, Equistar Notes or 2027 Notes) shall agree, among other things, (a) to (i) vote to accept the Revised Plan or an Alternative Plan (subject to proper solicitation by the Debtors after approval of a disclosure statement), (ii) undertake the same commitments as undertaken by the Millennium Notes Trustee pursuant to Sections 3.1(a) and 3.1(c), 3.17(i), 3.17(ii), 3.17(iii)(b) and 3.17(iv), 3.19(b), and 3.21 hereof, (iii) provide releases as set forth in Sections 5.1 and 5.2 hereof, and (iv) comply with the claim transfer conditions set forth in Section 7.6 hereof and in the Approval Order; and (b) not to (i) object to or appeal the approval of this Settlement Agreement, (ii) object to confirmation of the Revised Plan or an Alternative Plan, or appeal the order confirming such plan, (iii) take any action, directly or indirectly, to prosecute the Pending STN Motion of the Millennium Notes Trustee.

2.68. "<u>Millennium US Opco</u>" means Millennium US Opco, LLC.

2.69. "<u>Modified Plan Support Agreement</u>" means the Existing Plan Support Agreement, as amended and restated to evidence support of the Revised Plan, in form and substance satisfactory to the parties thereto.

2.70. "<u>MPI</u>" means Millennium Petrochemicals, Inc.

2.71. "<u>MSC</u>" means Millennium Specialty Chemicals, Inc.

2.72. "<u>New Topco</u>" means LyondellBasell Industries N.V., a public limited liability corporation formed under the laws of The Netherlands.

2.73. "<u>Non-Obligor Debtor</u>" means all Debtors other than Obligor Debtors and Millennium US Opco, MPI and MSC.

2.74.  "Non-Settling Defendant" means any defendant in the Committee Litigation (including each of its direct and indirect parent companies, subsidiaries, Affiliates, members, partners and joint ventures, each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors and managers) other than Lender Releasees.

2.75.  "Non-Settling Defendant Claims" means all claims and causes of action (other than Abandoned Claims) that have been asserted in (or arise from the same transaction or occurrences as alleged in) the Committee Litigation against one or more Non-Settling Defendants, to the extent such claims and causes of action are not released pursuant to the Revised Plan or an Alternative Plan.

2.76.  "Obligor Debtor" means Basell Finance USA Inc., Basell Germany Holdings GmbH, Basell North America Inc., Basell USA Inc., Equistar Chemicals, LP, Houston Refining LP, LBI Acquisition LLC, LBIH LLC, Lyondell (Pelican) Petrochemical L.P. 1, Inc., Lyondell Chemical Company, Lyondell Chemical Delaware Company, Lyondell Chemical Espana Co., Lyondell Chemical Europe, Inc., Lyondell Chemical Nederland, Ltd., Lyondell Chemical Products Europe, LLC, Lyondell Chemical Technology 1 Inc., Lyondell Chemical Technology Management, Inc., Lyondell Chemical Technology, L.P., Lyondell Chimie France LLC, Lyondell Europe Holdings Inc., Lyondell Houston Refinery Inc., Lyondell LP3 GP, LLC, Lyondell LP3 Partners, LP, Lyondell LP4 Inc., Lyondell Petrochemical L.P. Inc., Lyondell Refining Company LLC, Lyondell Refining I LLC, LyondellBasell Finance Company, LyondellBasell Industries AF S.C.A., Lyondell-Equistar Holdings Partners, Millennium America Holdings Inc., Millennium America Inc., Millennium Chemicals Inc., Millennium Petrochemicals GP LLC, Millennium Petrochemicals Partners, LP, Millennium Worldwide Holdings I Inc. and Nell Acquisition (US) LLC.

2.77.  "Original Committee Litigation 9019 Motion" has the meaning set forth in the recitals to this Settlement Agreement.

2.78.  "Original Settlement Agreement" has the meaning set forth in the recitals to this Settlement Agreement.

2.79.  "Other Allowed General Unsecured Claims"  means Allowed General Unsecured Claims other than the Unsecured Funded Debt Claims.

2.80.  "Parties" has the meaning set forth in the recitals to this Settlement Agreement.

2.81.  "Payment Date" means the first date upon which the Approval Order is a Final Order to occur on or after either (i) the effective date of the Revised Plan or an Alternative Plan, or (ii) if the Bankruptcy Case is converted into a case or cases under chapter 7 of the Bankruptcy Code, the date on which $450 million in cash is transferred to the chapter 7 trustee for distribution to the holders of Allowed General Unsecured Claims, pursuant to a valid instruction to the Collateral Agent,

in accordance with the terms of the Senior Facility and the Bridge Loan Facility, to release Liens on collateral sufficient to allow such transfer.

2.82. "Pending STN Motions" has the meaning set forth in the recitals to this Settlement Agreement.

2.83. "Person" means any natural person, entity, estate, trust, union or employee organization or governmental authority.

2.84. "Petition Date" has the meaning set forth in the recitals to this Settlement Agreement.

2.85. "Plan" means the *Second Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors*, dated December 23, 2009 [09-10023 Docket No. 3489].

2.86. "Post-Effective Date Interest Amount" means, with respect to any Allowed General Unsecured Claim, the aggregate amount of simple interest at the annual rate of 5% that accrues on the unpaid portion of the allowed Base Claim Amount of such Allowed General Unsecured Claim from the effective date of a Revised Plan or any Alternative Plan or, in the event the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, from the date of such conversion until the date that the allowed Base Claim Amount of such Allowed General Unsecured Claim is paid in full.

2.87. "Preference Claims" means any and all claims of the Debtors' estates that could be brought under section 547 of the Bankruptcy Code or in the alternative based upon the same underlying facts under section 548 of the Bankruptcy Code, and the right to recover on account of any such claim under section 550 of the Bankruptcy Code.

2.88. "Proposed Amended Committee Complaint" has the meaning set forth in the recitals to this Settlement Agreement.

2.89. "Pro Rata" means (a) with reference to Claims within a single Class of Claims or across more than one Class of Claims, in the proportion that the amount of any Claim in such Class or Classes bears to the aggregate amount of all Claims in such Class or Classes and (b) with reference to Claims against a particular Debtor, in the proportion that the amount of any Claim against such Debtor bears to the aggregate amount of all Claims against such Debtor; provided, however, that, in making any calculation hereunder contemplated by the terms "Pro Rata" and "Pro Rata share" (when used in relation to a distribution to or an allocation among holders of Allowed General Unsecured Claims), such calculation shall take into account only a single, primary Claim of a claimant against an Obligor Debtor and shall not take into account any other primary or guaranty claim of such claimant against a different Obligor Debtor that arises from the same transaction giving rise to such primary Claim.

2.90.  "Revised Plan" means the *Third Amended Joint Chapter 11 Plan of Reorganization for the LyondellBasell Debtors*, in the form attached hereto as Exhibit A, as the same may be amended, modified, restated or supplemented from time to time in accordance with the provisions thereof and applicable bankruptcy law and in a manner consistent with and that effectuates this Settlement Agreement.

2.91.  "Rights Offering" means the rights offering provided for in the Revised Plan.

2.92.  "Secured Lenders" means the past, present and future lenders under the Senior Facility (including the portion of the Senior Facility that qualifies as DIP Roll-Up Loans) and the Bridge Loan Facility, and their successors and assigns, but each only in its respective capacity as a lender whether under the Senior Facility or the Bridge Loan Facility, or both if applicable (it being understood that each Beneficial Holder of debt under the Senior Facility (including the portion of the Senior Facility that qualifies as DIP Roll-Up Loans) or Bridge Loan Facility shall be deemed a Secured Lender).

2.93.  "Secured Lender Releasees" means the Secured Lenders and each of their respective direct and indirect parent companies, subsidiaries and Affiliates (including funds managed by Secured Lenders or by Affiliates of Secured Lenders or Affiliates of any such funds), each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers and Covered Professionals.

2.94.  "Senior Agent" means Deutsche Bank Trust Company Americas and its Affiliates or any successor thereto, as administrative agent under the Senior Facility and senior agent under the December 20, 2007 Intercreditor Agreement.

2.95.  "Senior/Bridge Deficiency Claim" means that portion of the Senior Secured Claims and Bridge Loan Facility Claims secured by a lien on property in which the estate has an interest that is determined, pursuant to section 506(a) of the Bankruptcy Code or through agreement, to exceed the value of the claimant's interest in such property.

2.96.  "Senior Facility" means the credit facility provided pursuant to the Senior Secured Credit Agreement, dated as of December 20, 2007 (as amended or restated through the date hereof and including all of the ancillary documents relating thereto), among LBIAF, Lyondell Chemical and the other borrowers thereto; the Obligor Debtors; certain non-Debtor affiliates of LBIAF; Deutsche Bank Trust Company Americas (successor to Citibank, N.A.), as primary administrative agent; Deutsche Bank Trust Company Americas (successor to Citibank International plc), as European administrative agent; Citigroup Global Markets Inc., Goldman Sachs Credit Partners, L.P., Merrill Lynch, Pierce, Fenner & Smith Inc., ABN AMRO Inc., and UBS Securities LLC, as joint lead arrangers; and the lenders from time to time party thereto.

2.97. "Senior Facility Claims" means all Claims, claims against guarantors, liens, rights and interests arising under the Senior Facility, including all accrued but unpaid interest thereon and any claims arising under section 507(b) of the Bankruptcy Code.

2.98. "Senior Secured Claims" means, collectively, Arco Notes Claims, Equistar Notes Claims, and Senior Facility Claims.

2.99. "Settlement Agreement" has the meaning set forth in the preamble hereof.

2.100. "Settlement Consideration" shall mean the aggregate of the Fixed Settlement Plan Consideration and the rights to proceeds available for distribution to holders of Allowed General Unsecured Claims from the Creditor Trust and the Litigation Trust.

2.101. "Specified Millennium Noteholders" means (i) all funds managed by Aurelius Capital Management, LP, each only in its capacity as a holder of (or on behalf of a holder of) any Claim or interest other than a Claim or interest on account of Arco Notes, Equistar Notes or 2027 Notes and (ii) Appaloosa Management LP, on behalf of the funds for which it acts as investment advisor, each in its capacity as a holder of (or on behalf of a holder of) any Claim or interest, which collectively hold a majority in principal amount of the Millennium Notes.

2.102. "Specified Secured Lenders" means (i) those Persons that were Secured Lenders, but only if such Persons were Secured Lenders (disregarding the reference to past and future lenders contained in the definition of Secured Lenders) on the close of business on December 23, 2009, and (ii) the Financing Party Defendants.

2.103. "Specified Secured Lender Releasees" means the Specified Secured Lenders and each of their respective direct and indirect parent companies, subsidiaries and Affiliates (including funds managed by Specified Secured Lenders or by Affiliates of Specified Secured Lenders or Affiliates of any such funds), each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers and Covered Professionals.

2.104. "Standstill" means the "High Yield Notes Standstill Period," as referred to and described in the December 20, 2007 Intercreditor Agreement and the Debtors' Injunction Complaint and extended pursuant to paragraph 3 of each of the Stipulations, filed in the Debtors' Injunction Litigation, respectively dated September 12, 2009 [09-01459 Docket No. 9], October 8, 2009 [09-01459 Docket No. 15], November 20, 2009 [09-01459 Docket No. 19], January 6, 2010 [09-01459 Docket No. 27], and February 10, 2010 [09-01459 Docket No. 28].

2.105. "State Law Avoidance Claims" means any and all claims, rights and causes of action arising under state law against former shareholders of Lyondell Chemical and their respective successors and assigns, based on the receipt by any such Persons of Merger Consideration, other than claims against those parties that are

released by the Debtors hereunder or under the Revised Plan or under an Alternative Plan, or claims against the Directors, Officers, and Subsidiary Directors (as defined in the Committee Complaint).

2.106. "STN Motion" has the meaning set forth in the recitals to this Settlement Agreement.

2.107. "Subsequent Transferee" means any direct or indirect, initial or subsequent transferee, successor or assignee with respect to (i) Millennium Notes held at any time by any Specified Millennium Noteholder, or (ii) 2015 Notes held at any time by any signatory to a 2015 Notes Plan Support Agreement, or (iii) the Millennium Notes or 2015 Notes held by such direct or indirect, initial or subsequent transferee, successor or assignee referred to in clauses (i) or (ii) above, as applicable.

2.108. "Trusts" means the Creditor Trust and the Litigation Trust.

2.109. "Trustees" means the trustees for the Creditor Trust and the Litigation Trust.

2.110. "Unsecured Funded Debt Claims" means the 2015 Notes Claims and Millennium Notes Claims.

2.111. "Waiving Parties" has the meaning set forth in Section 7.5 hereof.

2.112. Other Terms. As used in this Settlement Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise. The words "include," "includes" and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine, or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires. The words "this Settlement Agreement," "herein," "hereof," "hereby," "hereunder" and words of similar import refer to this Settlement Agreement as a whole and not to any particular subdivision unless expressly so limited.

3.    Settlement of Committee Litigation.

In return for the consideration provided herein:

3.1.    The Debtors, the Committee (solely with respect to (b) and (c), but not (a) below, the 2015 Notes Trustee, the members of the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee (a) hereby acknowledge the validity of the Liens and the guarantees and agree to the allowance of the Claims of the Financing Party Defendants and the Secured Lenders (as well as any Liens, guarantees and Claims granted to any lenders under the Senior Facility whose Liens, guarantees and Claims were converted to postpetition obligations as part of the DIP Roll-Up Loans under the DIP Financing Order) against the Obligor Debtors, Obligor Non-

Debtors, Millennium US Opco, MPI and MSC to the fullest extent permitted by the applicable credit documents; (b) shall (i) in the case of each of the Debtors and the Committee, do all things reasonably necessary and proper to seek and obtain approval of the 9019 Motion and entry of the Approval Order (including in the case of the Committee, seek dismissal with prejudice, effective as of the Payment Date, of all claims asserted against any Secured Lender or any Financing Party Defendant in the Committee Litigation) and to prosecute and defend any appeals relating to the Approval Order, (ii) in the case of each of the 2015 Notes Trustee and the Millennium Notes Trustee, support the 9019 Motion by filing a written statement with the Bankruptcy Court declaring its support for the 9019 Motion and its desire that the Bankruptcy Court approve the 9019 Motion and enter the Approval Order, and (iii) in the case of the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group, seek dismissal with prejudice, effective as of the Payment Date, of all claims asserted against any defendant in the 2015 Notes Litigation; and (c) shall release the Lender Releasees as set forth in Section 5.1 hereof.

3.2.    On the Payment Date, $450 million in consideration shall be made available from the Debtors' estates (the "Fixed Settlement Plan Consideration") (i) for distribution under the Revised Plan or an Alternative Plan on a Pro Rata basis (except as otherwise required to implement Sections 3.9 and 3.30(b) hereof) to holders of Allowed General Unsecured Claims, or (ii) in the event the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, to the chapter 7 trustee for distribution on a Pro Rata basis (except as otherwise required to implement Sections 3.9 and 3.30(b) hereof) to holders of Allowed General Unsecured Claims. This consideration will be made available as follows: (i) under the Revised Plan, (A) $300 million in cash, to be funded from a portion of the proceeds received from the Rights Offering, plus (B) $150 million in the form of Class A Shares of New Topco (with the determination of the number of shares to be done on a fully diluted basis as of the Effective Date of the Revised Plan, *i.e.*, after giving effect to the Rights Offering, but subject to dilution on account of the Equity Compensation Plan and the New Warrants),[3] based on the Debtors' valuation set forth in the disclosure statement for the Revised Plan (but not less than $14.5 billion and not more than $15.2 billion of total enterprise value), which $150 million is to be funded by the reallocation of $75 million of Class A Shares (as determined in the first parenthetical of this sentence) otherwise distributable to the holders of Senior Facility Claims, and the reallocation of $75 million of Class A Shares (as determined in the first parenthetical of this sentence) otherwise distributable to the holders of Bridge Loan Facility Claims, provided that, consistent with the Arco and Equistar Settlement, such reallocation

---

[3] For the avoidance of doubt, the distribution of Class A Shares as described in this Section 3.2 does not (x) include any right to purchase a corresponding Rights Offering Pro Rata Share of Class B Shares or (y) reduce any right to purchase Class B Shares that is otherwise distributable to holders of Senior Facility Claims on account of their Claims.

in the distribution of Class A Shares from the Senior Secured Claim class shall not reduce or otherwise adversely impact the recovery of the Arco Notes Claims and the Equistar Notes Claims as such recovery was set forth in the draft plan of reorganization filed with the Bankruptcy Court on February 16, 2010 in connection with the Arco and Equistar Settlement; or (ii) in the event that an Alternative Plan is confirmed or the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, pursuant to Section 7.11 hereof, the Collateral Agent shall release Liens on collateral sufficient to allow $450 million in cash to be paid over for distribution to holders of Allowed General Unsecured Claims; _provided_ that, notwithstanding the foregoing, and in all events, distributions to the holders of 2015 Notes Claims shall be made only upon satisfaction of the 2015 Notes Plan Conditions, or in the case of clause (a)(1) thereof, waiver pursuant to Section 7.5 hereof, and upon the failure of any of such conditions, any distributions otherwise intended for distribution to the holders of the 2015 Notes Claims shall be made to the Reorganized Debtors (in the case of Fixed Settlement Plan Consideration or Assigned Preference Claims) or the holders of remaining Allowed General Unsecured Claims (in the case of any other recoveries).    In the event that the Bankruptcy Court determines that the distribution of the Settlement Consideration, or any portion thereof, to or for the benefit of holders of Allowed General Unsecured Claims must be made on a basis other than Pro Rata (except as otherwise required to implement Sections 3.9 and 3.30(b) hereof), the 2015 Notes Trustee and the members of the 2015 Notes Ad Hoc Group, at their election, may take any position regarding such basis for distributions and notwithstanding Section 3.17 hereof, may object to the Revised Plan or an Alternative Plan, but solely on such grounds.  In the event that (a) the Debtors or any party on behalf of the Debtors seek confirmation of an Alternative Plan, (b) the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, or (c) the Debtors' total enterprise value as determined by the Bankruptcy Court at confirmation of the Revised Plan or an Alternative Plan is less than $14.5 billion or more than $15.2 billion, then, in such event, all intercreditor issues among holders of the Senior Facility Claims and the Bridge Loan Facility Claims with respect to any and all distributions to them from the Debtors' estates (including the allocation from such distributions of the Fixed Settlement Plan Consideration to be provided pursuant to, and as set forth in, this Section 3.2) shall be determined at such time, and the holders of the Senior Facility Claims and the Bridge Loan Facility Claims reserve all of their rights with respect thereto, and further agree not to assert that the fact that the Fixed Settlement Plan Consideration is to be paid from the proceeds of collateral is relevant to the determination of such allocation and distribution issues.

3.3.    Pursuant to the Revised Plan or an Alternative Plan, on the Payment Date, the Non-Settling Defendant Claims and the Assigned Preference Claims shall be assigned to the Litigation Trust.  The Litigation Trust will be authorized under the Revised Plan or an Alternative Plan to prosecute the Non-Settling Defendant Claims for the benefit of holders of Allowed General Unsecured Claims, who shall receive a Pro Rata share of any net recoveries on Non-Settling Defendant Claims (subject to Section 3.6 hereof with respect to any Excess Recoveries).

The Litigation Trust will be authorized under the Revised Plan or an Alternative Plan to prosecute the Assigned Preference Claims for the benefit of (i) holders of Allowed General Unsecured Claims, who shall receive a Pro Rata share of 90% of any net recoveries on Assigned Preference Claims, and (ii) the Reorganized Debtors, who shall receive 10% of any net recoveries on Assigned Preference Claims;[4] provided that, following the Excess Recovery Trigger Date, all Assigned Preference Claims against present or former employees of the Debtors shall be extinguished. Notwithstanding the assignment of the Assigned Preference Claims to the Litigation Trust, the Litigation Trust shall not assert or prosecute any Assigned Preference Claim against certain customers, suppliers, vendors, lenders, officers, directors and employees of the Reorganized Debtors, or other Persons with whom the Reorganized Debtors, in good faith, have, or reasonably intend to have, a continuing relationship following the Confirmation Date (each an "Excluded Person"). To assist the Litigation Trust with respect to its initial analysis of Assigned Preference Claims, the Debtors shall provide to the Committee and the Financing Party Defendants a "preliminary preference report" by March 20, 2010, identifying potential preference payments and recipients. Notwithstanding the contents of such "preliminary preference report," prior to making any demand to collect or commencing any legal action to collect an Assigned Preference Claim, the Litigation Trust shall confirm with the Reorganized Debtors, in writing, whether the target of any such demand or action is an Excluded Person. The Parties agree that should the Litigation Trust dispute the reasonableness of the Debtors' designation of a Person as an Excluded Person (a "Disputed Excluded Person"), the Bankruptcy Court shall retain jurisdiction to resolve such dispute and the Parties waive their appellate rights concerning the Bankruptcy Court's decision thereon, provided that, pending the Bankruptcy Court's resolution of the dispute, claims and causes of action against the Disputed Excluded Person shall be expressly preserved for the benefit of the Litigation Trust and shall not be released under any pending plan of reorganization. The Debtors and the Committee shall work together to finalize procedures for resolution of such disputes, which procedures shall be included in the Plan Supplement. Subject to Section 3.6 hereof, to the extent the Litigation Trust obtains recoveries based upon Non-Settling Defendant Claims or Assigned Preference Claims, and solely with respect to such recoveries, the Financing Party Defendants and the Secured Lenders agree that their Senior/Bridge Deficiency Claims may be satisfied only from Excess Recoveries (if at all), and for the avoidance of doubt, in no event shall the holders of Senior Secured Claims, Bridge Loan Facility Claims or Senior/Bridge Deficiency Claims be third party or other beneficiaries of the Trusts prior to the Excess Recovery Trigger Date. To the extent the Debtors obtain net recoveries from any Preference Claims between the date hereof and the Payment Date, such net recoveries shall be allocated as follows: (i) 90% to be held by the Debtors, not subject to any lien, claim or

---

[4] The Reorganized Debtors' share of net recoveries from Assigned Preference Claims shall be deemed to derive from only such claims that do not implicate the Debtors' insurance.

encumbrance and not subject to any equitable interest of the Debtors, for the benefit of holders of Allowed General Unsecured Claims, and (A) transferred upon the Payment Date to the Litigation Trust for distribution to holders of Allowed General Unsecured Claims or (B) in the event the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, distributed by the chapter 7 trustee to the holders of Allowed General Unsecured Claims, and (ii) 10% to the Debtors for the benefit of their estates.

3.4.    Pursuant to the Revised Plan or an Alternative Plan, on the Payment Date, the Abandoned Claims will be discontinued by the Debtors and the Committee without prejudice and the Debtors shall furthermore be deemed to have abandoned, pursuant to section 554 of the Bankruptcy Code, any and all right to further pursue the Abandoned Claims. Upon the effectiveness of the aforesaid discontinuance and abandonment, (i) each holder of an Allowed General Unsecured Claim, (ii) each holder of a Senior/Bridge Deficiency Claim, and (iii) each holder of a Senior/Bridge Guarantee Claim shall assign and contribute to the Creditor Trust any and all State Law Avoidance Claims. The Creditor Trust shall be authorized to prosecute the State Law Avoidance Claims that are contributed to the Creditor Trust for the benefit of holders of Allowed General Unsecured Claims who contribute such Claims to the Creditor Trust, who shall receive a Pro Rata share of any net recoveries on the State Law Avoidance Claims, subject to Section 3.6 hereof.

3.5.    The Debtors, the Committee, the Ad Hoc Group and the Millennium Notes Trustee hereby agree that, under the Revised Plan or an Alternative Plan, the maximum value distributable to holders of Allowed General Unsecured Claims against Millennium US Opco shall be $0, against MPI shall be $213,935,341, and against MSC shall be $71,578,926 (or such other value as may be ascribed to these entities by the Bankruptcy Court at the Confirmation Hearing); provided that any such distributable amount shall in no way reduce, modify or otherwise adversely impact the value of the recovery to the holders of Bridge Loan Facility Claims. The Debtors, the Committee, the Ad Hoc Group and the Millennium Notes Trustee further agree (without making any admissions) that, under the Revised Plan or an Alternative Plan, in compromise and settlement of any and all disputes they may have regarding the Millennium Notes Indenture, the Allowed General Unsecured Claims against Millennium US Opco, MPI or MSC shall receive, in the aggregate, Class A Shares valued at no more than approximately $90 million (with the allocation of the amounts to be provided to each entity, if any, to be determined by the Debtors and the Committee) and the holders of Senior/Bridge Guarantee Claims against Millennium US Opco, MPI or MSC shall receive, in the aggregate Class A Shares valued at no less than approximately $195 million (it being understood that notwithstanding this sentence, any Class A Shares distributed to holders of Allowed General Unsecured Claims of Millennium US Opco, if any, are being provided only as an overall compromise and settlement of any and all claims regarding the Millennium Notes Indenture, and that after satisfaction of the unsecured claims at MPI and MSC, there is no distributable value remaining for unsecured claimholders of Millennium US

Opco).  For the avoidance of doubt, Allowed General Unsecured Claims as set forth in the preceding sentence shall not include the Millennium Notes and the 2015 Notes.  Notwithstanding anything to the contrary contained herein, holders of Allowed General Unsecured Claims against Millennium US Opco, MPI and MSC, in addition to receiving the value set forth above, shall participate in the Settlement Consideration but only until such time as they are paid in full their allowed Base Claim Amount plus, subject to Section 3.6 hereof, their Post-Effective Date Interest Amount; thereafter, Settlement Consideration will be allocated only among remaining holders of Allowed General Unsecured Claims. For the avoidance of doubt, (i) the distributions set forth in this Section 3.5 may be increased or decreased, as applicable, pursuant to the provisions of Section 3.30 hereof, and (ii) to the extent the Bankruptcy Court ascribes a different value to Millennium Us Opco, MPI, or MSC than that listed in the first sentence of this Section 3.5, the distributions set forth in the second sentence of this Section 3.5 shall be adjusted proportionately.

3.6.    Following the Excess Recovery Trigger Date, holders of Senior Secured Claims, Bridge Loan Facility Claims and, solely to the extent of their Post-Effective Date Interest Amount, holders of Allowed General Unsecured Claims shall be entitled to share in Excess Recoveries.  Until the holders of Allowed General Unsecured Claims (taking into account all distributions previously received by them after the Excess Recovery Trigger Date) are paid their Post-Effective Date Interest Amount in full, Excess Recoveries shall be paid one-third to the holders of Senior/Bridge Deficiency Claims on account of Senior Secured Claims, one-third to the holders of Senior/Bridge Deficiency Claims on account of Bridge Loan Facility Claims and one-third to the holders of Allowed General Unsecured Claims.  Thereafter, until the holders of Senior Secured Claims (taking into account all distributions previously received by them) are paid in full, Excess Recoveries shall be paid 50% to the holders of Senior/Bridge Deficiency Claims on account of Senior Secured Claims and 50% to the holders of Senior/Bridge Deficiency Claims on account of Bridge Loan Facility Claims.  Thereafter, Excess Recoveries shall be paid 100% to holders of Bridge Loan Facility Claims.  Notwithstanding anything to the contrary in this Settlement Agreement, neither the Creditor Trust, the Litigation Trust, the Trustees, nor the Creditor Representative, or their respective professionals and agents shall owe any fiduciary or other duty to the holders of Senior Secured Claims or Bridge Loan Facility Claims and shall have no obligation to consult with any holders of the Senior Secured Claims or Bridge Loan Facility Claims with respect to prosecution or settlement of any claims being prosecuted by the Creditor Trust or the Litigation Trust; provided that after the Excess Recovery Trigger Date, the governance of the Trusts may be modified by provisions of the Creditor Trust Agreement and the Litigation Trust Agreement, as applicable, that are satisfactory to the Financing Party Defendants (and, in the case of the Litigation Trust, the Reorganized Debtors).

3.7.    On the Payment Date, and provided that the Bankruptcy Case has not been converted to a case or cases under chapter 7 of the Bankruptcy Code, the Debtors shall fund, as a grant, an aggregate of $20 million to the Trusts to pay for the

costs, fees and expenses of prosecution of claims by the Trusts and the costs of administration of the Trusts. The allocation and disbursement of this $20 million grant as between the Trusts shall be determined in accordance with procedures established by the Committee. To the extent that a portion of the grant allocated to the Creditor Trust or to the Litigation Trust is not needed or used to defray the costs and expenses of that Trust, it shall be available first for use by the other Trust, second for distribution to holders of Allowed General Unsecured Claims, and third as provided for in Section 3.6 hereof with respect to any amounts that would be Excess Recoveries. In the event that the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, the Collateral Agent, pursuant to Section 7.11 hereof, shall release, as a grant, Liens on collateral sufficient to allow said $20 million to be paid over to the chapter 7 trustee to fund its prosecution of the Non-Settling Defendant Claims and the Assigned Preference Claims.

3.8.    The Creditor Trust and the Litigation Trust shall be established on the Payment Date pursuant to the Revised Plan or an Alternative Plan and shall be controlled and governed by the Creditor Trust Agreement and the Litigation Trust Agreement, respectively.

3.9.    To facilitate interim distributions under the Revised Plan and from the Trusts, the Debtors will propose in the Revised Plan the following distribution mechanism:

Until all claims constituting General Unsecured Claims become Allowed Claims (or are disallowed), the distributions of the Settlement Consideration shall be divided into three tranches: (i) one tranche for the benefit of holders of 2015 Notes Claims, (ii) one tranche for the benefit of holders of Millennium Notes Claims and (iii) one tranche for the benefit of holders of all other Allowed General Unsecured Claims. Subject to the provisions of this Section regarding the estimation of disputed claims, holders of 2015 Note Claims, holders of Millennium Notes Claims and holders of Allowed General Unsecured Claims, in each case whose claims have been Allowed on or before the Effective Date, shall receive their Pro Rata distribution of Fixed Settlement Plan Consideration on the Effective Date or as soon as practical thereafter, subject to adjustment as necessary to account for the distributions to the holders of Millennium Notes Claims as described in Section 3.30(b) hereof. The distributions of the Settlement Consideration shall be allocated to each tranche to reflect (A) the relative amount of the Allowed Claims of the creditors falling within each of tranches (i) and (ii) above, and (B) the relative estimated amount of the Allowed Claims of the creditors falling within tranche (iii) above as calculated by the Debtors in good faith, in consultation with the Committee; provided, however, that the Allowed amount of all other Allowed General Unsecured Claims in Class 7-A, Class 7-C and Class 7-D shall be estimated by the Debtors, in consultation with the Committee, taking into account the Debtors' high-end estimates for the ultimate Allowed amount of such Claims based on the information available to the

Debtors prior to the Confirmation Date.  If, after all Disputed General Unsecured Claims become Allowed Claims (or are disallowed), there is insufficient Fixed Settlement Plan Consideration to provide all holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) eligible to receive Fixed Settlement Plan Consideration the same Pro Rata distributions of the Fixed Settlement Plan Consideration, then the Litigation Trust shall use its first available net proceeds from the claims it is entitled to pursue as is required to true-up distributions to such holders.

The parties intend that this mechanism should be used to permit interim distributions to be made of Fixed Settlement Plan Consideration, to the extent reasonably practical, as of the date other effective date distributions are being made pursuant to the Revised Plan or an Alternative Plan.  Once all claims constituting general unsecured claims become Allowed General Unsecured Claims (or disallowed), distributions of Fixed Settlement Plan Consideration shall be made to holders of Allowed General Unsecured Claims (other than Millennium Notes Claims) as may be required to true-up distributions as among such holders and then, Pro Rata thereafter among holders of Allowed General Unsecured Claims (other than Millennium Notes Claims); provided, however, that nothing herein is intended to provide holders of 2015 Notes Claims with true-up distributions on account of the Fixed Settlement Plan Consideration reallocated from the holders of the 2015 Notes Claims to the holders of Millennium Notes Claims pursuant to Section 3.30(b) hereof.  Settlement Consideration in the form of cash or Class A Shares held after the Effective Date for the benefit of holders of General Unsecured Claims (other than Millennium Notes Claims) whose Claims have not yet been Allowed (or disallowed) shall be held by the Creditor Representative in a separate, interest-bearing escrow account for the benefit of such holders of disputed General Unsecured Claims (other than Millennium Notes Claims).  The Debtors shall have no equitable interest in such escrow account, which shall not be subject to claims, liens or encumbrances.

3.10.   Pursuant to the Revised Plan or an Alternative Plan, all reasonable, actual and documented costs and expenses incurred by the 2015 Notes Trustee, solely in its capacity as 2015 Notes Trustee (including the reasonable, actual and documented fees of legal counsel), and all reasonable, actual and documented legal fees and expenses incurred by members of the 2015 Notes Ad Hoc Group shall be treated and paid as Allowed Administrative Expenses; provided, that such costs and expenses shall be submitted to the Debtors in the form of summary invoices of the relevant law firms and institution; provided further, that the total amount of all of such costs and expenses through and including February 16, 2010 shall not exceed in the aggregate $3.5 million;[5] provided further, that the Debtors' estates shall not pay any fees and expenses incurred by members of the 2015 Notes Ad

---

[5] To be increased to $5.1 million throughout this Section 3.10 in the event all of the Millennium Notes Plan Conditions are satisfied.

Hoc Group after February 16, 2010; provided further, that the Debtors shall have no obligation to pay any fees or expenses (including any legal fees and expenses) of members of the 2015 Notes Ad Hoc Group if any member of the 2015 Notes Ad Hoc Group objects to (i) the 9019 Motion or the settlement set forth in this Settlement Agreement, (ii) the motion to approve the Equity Commitment Agreement [09-10023 Docket No. 3487], or any other pleading filed in support of the Equity Commitment Agreement (as amended from time to time), (iii) approval of the Disclosure Statement, or (iv) confirmation of the Revised Plan or an Alternative Plan. All of the members of the 2015 Notes Ad Hoc Group agree that they shall not assert any claim or request payment of any administrative expense for fees and expenses (including any legal fees or expenses) incurred after February 16, 2010. For the avoidance of doubt, it is understood that (a) the 2015 Notes Trustee shall not receive payment for any fees and expenses incurred on or before February 16, 2010, unless such fees and expenses are included within the $3.5 million cap set forth in the second proviso of the first sentence of this paragraph, (b) such $3.5 million cap shall not apply to the fees and expenses of the 2015 Notes Trustee incurred after February 16, 2010, and (c) such $3.5 million cap shall not apply to the fees and expenses of the 2015 Notes Trustee paid before February 16, 2010. Nothing herein shall waive, release or impair any rights or interests that the 2015 Notes Trustee has under the 2015 Notes Indenture or otherwise to the recovery and/or reimbursement of its fees and expenses (including the fees and expenses of counsel) from any distribution of recoveries to the holders of the 2015 Notes (which distributions, if any, shall be made through the 2015 Notes Trustee pursuant to the Revised Plan or an Alternative Plan), whether in the nature of a charging lien or otherwise. The fees and expenses that are allocable to the $3.5 million cap provided in this Section 3.10 shall be allocated to the following fees and expenses in the indicated priority: first, to the 2015 Notes Trustee's fees and expenses (other than outside counsel fees and expenses); second, to the fees and expenses of Seward & Kissel LLP on behalf of the 2015 Notes Trustee; third, to the fees and expenses of the members of the 2015 Notes Ad Hoc Group; and fourth, to the fees and expenses of Kasowitz, Benson, Torres & Friedman LLP on behalf of the 2015 Notes Trustee.

3.11.  Pursuant to the Revised Plan or an Alternative Plan, all reasonable, actual and documented costs and expenses incurred by the Millennium Notes Trustee, solely in its capacity as Millennium Notes Trustee (including the reasonable, actual and documented fees of Dewey & LeBoeuf and Golenbock Eiseman as legal advisors to the Millennium Notes Trustee), and the reasonable, actual and documented legal fees and expenses of Greenberg Traurig as advisor to one or more of the Specified Millennium Noteholders, shall be treated and paid as Allowed Administrative Expenses; provided, that such costs and expenses shall be submitted to the Debtors in the form of summary invoices of the relevant law firms and institution; provided further, that the total amount of all of such costs and expenses shall not exceed in the aggregate $3.0 million (of which the fees and expenses of Greenberg Traurig shall not exceed $100,000); and provided further, that the Debtors shall have no obligation to pay any fees or expenses (including any legal fees and expenses) of the Millennium Notes Trustee or any Specified

Millennium Noteholders if the Millennium Notes Plan Conditions are not met. The Millennium Notes Trustee agrees that it shall not assert any claim or request payment of any administrative expense for fees and expenses (including any legal fees or expenses) incurred above the $3.0 million cap listed in this Section 3.11; provided, however, that nothing herein shall waive, release or impair any rights or interests that the Millennium Notes Trustee has under the Millennium Notes Indenture or otherwise to the recovery and/or reimbursement of its fees and expenses (including the fees and expenses of counsel) from any distribution of recoveries to the holders of the Millennium Notes (which distributions, if any, shall be made through the Millennium Notes Trustee pursuant to the Revised Plan or an Alternative Plan), whether in the nature of a charging lien or otherwise.

3.12.    The release and exculpation provisions contained in the Revised Plan or an Alternative Plan shall cover (i) in the same manner provided for in the Plan, all Parties and their respective counsel, advisors, experts and consultants, and any conduct related to the Original Settlement Agreement, this Settlement Agreement and the Committee Litigation, and (ii) (a) any employee or officer employed by any of the Debtors on or after December 15, 2009 who was not named individually as a defendant in the Committee Litigation, and (b) those individuals named as defendants in the Committee Litigation identified on Schedule B hereto. For the avoidance of doubt, the Revised Plan or an Alternative Plan shall not provide releases from any cause of action that has been asserted in (or arises from the same transaction or occurrences as alleged in) the Committee Litigation for any individually named defendant who served as an officer or director of either Lyondell Chemical Company or its subsidiaries or as a director or member of a supervisory board of Basell AF SCA or its subsidiaries in the Committee Litigation not identified on Schedule B. Notwithstanding anything to the contrary contained herein, the Millennium Notes Trustee and the Specified Millennium Noteholders shall receive the benefits of the release and exculpation provisions contained in the Revised Plan or an Alternative Plan only if the Millennium Notes Plan Conditions are satisfied and remain so as of the Payment Date.[6]

3.13.    Subject to entry of the Approval Order, the Debtors, the Financing Party Defendants, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee agree that the $250,000 limitation for "Capped Activities" of the Committee's professionals as proscribed in the DIP Financing Order shall be eliminated, and the Parties agree to use their commercially reasonable efforts to obtain the consent of the DIP Lenders to a modification of the DIP Financing Order to eliminate this limitation. This modification will be included in the Approval Order. Compensation of the Committee's professionals for their reasonable fees and expenses for such activities shall be subject to final

---

[6] Subject to satisfaction of the Millennium Notes Plan Conditions, the Specified Millennium Noteholders shall be third party beneficiaries of the release and exculpation provisions set forth in this Section 3.12. Unless expressly provided herein, the Specified Millennium Noteholders shall not be beneficiaries or third party beneficiaries with respect to any other provision of this Settlement Agreement.

application, objection, allowance and reimbursement consistent with the Bankruptcy Code and orders of the Bankruptcy Court entered in the Bankruptcy Case, and shall be submitted to the Debtors in the same manner as the Committee's professionals have done to date; provided, that upon entry of the Approval Order (i) the Committee's professionals shall be entitled to be paid, no Party shall object to the payment of, and the Debtors shall pay, the Committee's professionals fees and expenses for "Capped Activities" allowed but not awarded to date pursuant to Bankruptcy Court orders approving the First Interim Fee Application [09-10023 Docket No. 2505] and the Second Interim Fee Application [09-10023 Docket No. 3416], and (ii) the Committee's professionals shall be entitled to be paid, and the Debtors shall pay, the Committee's professionals fees and expenses for "Capped Activities" requested or to be requested for each of the months of September, October, November and December 2009 pursuant to monthly fees submissions, and any additional periods as the case may be, pursuant to the Interim Compensation Procedures Order and not otherwise objected to except for the reason that such fees and expenses were for "Capped Activities," subject only to applicable holdbacks, which amounts are approximately $6.55 million for Brown Rudnick, $2.03 million for Mesirow Financial Consulting, $0.871 million for Peter J. Solomon Company, $1.33 million for Chemical Market Associates, Inc., and $8,247.76 for Wildgen Partners in Law as set forth in the previously served fee applications, it being understood that each such professional may not yet have submitted invoices or fee applications covering all prior periods, provided that the Notice Parties (as defined in the Interim Compensation Procedures Order) shall have 15 days from entry of the Approval Order during which to review and object to the reasonableness of the amounts addressed in this subsection.  For the avoidance of doubt, the Parties agree that no compensation shall be paid by the Debtors for any professionals of any subcommittee of the Committee and this Section does not expand the estate's reimbursement obligations under Sections 3.10 and 3.11 herein.

3.14.    The Debtors shall continue to pay and reimburse to (i) Citibank, N.A. and its Affiliates, in their various current and former agent capacities under the Senior Facility and the Bridge Loan Facility, (ii) Deutsche Bank Trust Company Americas and its Affiliates, in its capacity as administrative agent under the Senior Facility, and (iii) Merrill Lynch Capital Corporation and its Affiliates, in its capacity as administrative agent under the Bridge Loan Facility, the reasonable expenses incurred by them thereunder (including the reasonable, actual and documented fees and disbursements of counsel), and such expenses (but only such expenses (including the reasonable, actual and documented fees and disbursements of counsel), and not any other claims or rights under the Senior Facility or the Bridge Loan Facility agreement) shall not be discharged under the Revised Plan or an Alternative Plan.  Notwithstanding the foregoing, the Debtors shall continue to honor their indemnification obligations under the Senior Facility and Bridge Loan Facility to the Collateral Agent, and under the Senior Facility to the Senior Agent, for any and all acts taken by such Collateral Agent or Senior Agent to effectuate the releases of Liens and related transactions contemplated

hereunder, and such indemnification obligations shall not be discharged under the Revised Plan or an Alternative Plan.

3.15.    The Debtors and the Committee will file the 9019 Motion and use their reasonable best efforts to seek approval of the Approval Order, and the Financing Party Defendants shall support the 9019 Motion.

3.16.    Upon entry of the Approval Order, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee shall be deemed to have withdrawn without prejudice, and promptly will withdraw without prejudice, all pending objections to the Plan, its associated disclosure statement, and the Debtors' pending motion to approve the Equity Commitment Agreement [09-10023 Docket No. 3487], subject to refiling only if the Approval Order is vacated, reversed, modified, or amended prior to the Payment Date.

3.17.    Subject to entry of the Approval Order, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee shall support (and the 2015 Notes Ad Hoc Group shall direct the 2015 Notes Trustee to support) confirmation of the Revised Plan or an Alternative Plan, by (among other things): (i) not opposing or objecting to such plan or the disclosure statement therefor; (ii) not seeking the appointment of, or the expansion of the scope of investigation of, any examiner under the Bankruptcy Code, or opposing the adequate protection payments made or to be made to the holders of Senior Facility Claims or Bridge Loan Facility Claims; (iii) subject to approval by the Bankruptcy Court of such disclosure statement, (a) (1) in the case of the Committee, encouraging members or constituents to vote to accept such plan, including by providing a written statement in support of such plan for inclusion with the Debtors' plan solicitation materials, (2) in the case of the 2015 Notes Ad Hoc Group, directing the 2015 Notes Trustee, in accordance with the provisions of the 2015 Notes Indenture, to provide to the Debtors a written statement in support of such plan for inclusion with the Debtors' plan solicitation materials and including a copy of such written statement in a notice to be sent by the 2015 Notes Trustee to the 2015 Noteholders concerning such plan and the solicitation of votes thereon, (3) in the case of the 2015 Notes Trustee, accepting such direction of the 2015 Notes Ad Hoc Group and including a copy of such written statement in such notice to be sent by the 2015 Notes Trustee to the 2015 Noteholders, and (4) in the case of the Millennium Notes Trustee, providing to the Debtors a written statement in support of such plan for inclusion with the Debtors' plan solicitation materials and including a copy of such written statement in a notice to be sent by the Millennium Notes Trustee to the holders of Millennium Notes concerning such plan and the solicitation of votes thereon, and (b) to the extent entitled to vote, voting to accept such plan of reorganization and not withdrawing or revoking any properly solicited vote to accept such a plan of reorganization; and (iv) not supporting or encouraging, directly or indirectly, any other or different plan of reorganization, unless a third party makes a higher and better proposal or offer relating to an alternative plan of reorganization which the

Debtors have determined to accept in the exercise of their fiduciary duties and have provided written notice of such determination to the Parties.

3.18.  Except to the extent inconsistent with the exercise of their fiduciary duties, the Debtors shall only propose or support a plan of reorganization that is the Revised Plan or an Alternative Plan.

3.19.  Upon entry of the Approval Order, (a) the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group will (i) suspend all challenges to the December 20, 2007 Intercreditor Agreement, (ii) agree to the extension of the Standstill with respect to any effort by it for itself or the 2015 Noteholders to enforce rights under the 2015 Notes Indenture or with respect to the 2015 Notes through the Payment Date, and (iii) take such action reasonably requested by the Debtors to memorialize such agreement concerning the Standstill in connection with the Debtors Injunction Litigation.  Upon the occurrence of the Payment Date, the 2015 Notes Trustee will waive, with prejudice, all challenges to the December 20, 2007 Intercreditor Agreement, will dismiss, with prejudice, the 2015 Notes Complaint, and will consent to the permanent injunction (to the extent necessary) of any claims it may have at Obligor Non-Debtors; and (b) each of the Committee, 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee agrees that it shall not take, directly or indirectly, any action to oppose, interfere with, or challenge the Enforcement Sale contemplated by the Revised Plan (including pursuant to Section 5.4 thereof) or an Alternative Plan, or the intended consequences thereof (including the release of liens, claims and guarantees), and shall provide any reasonable cooperation requested by the Debtors or their Affiliates in effectuating the terms of the Revised Plan, an Alternative Plan, and the Enforcement Sale.

3.20.  The 2015 Notes Trustee and the 2015 Notes Ad Hoc Group agree that the recoveries on account of the 2015 Notes Claims set forth in the Revised Plan or an Alternative Plan shall be the sole and exclusive recovery available for the holders of 2015 Notes Claims (or any other claim or cause of action) on account of the 2015 Notes or any rights arising in connection therewith from any Debtor, Reorganized Debtor, Lender Releasee or other defendant named in the 2015 Notes Complaint or any Affiliate of any of the foregoing, and none of the 2015 Notes Trustee or the 2015 Notes Ad Hoc Group shall pursue any claim or cause of action against any such parties.  For the avoidance of doubt, such recoveries shall be distributed to holders of 2015 Notes Claims only upon satisfaction (or, as applicable, waiver pursuant to Section 7.5 hereof) of the conditions set forth in the Revised Plan or an Alternative Plan and the occurrence of the Payment Date.

3.21.  The Millennium Notes Trustee agrees that the recoveries on account of the Millennium Notes Claims set forth in the Revised Plan or an Alternative Plan shall be the sole and exclusive recovery available for the holders of Millennium Notes Claims (or any other claim or cause of action) on account of the Millennium Notes or any rights arising in connection therewith from any Debtor, Reorganized Debtor, Lender Releasee or any Affiliate of any of the foregoing,

and the Millennium Notes Trustee shall not pursue any claim or cause of action against any such parties. For the avoidance of doubt, the recoveries and treatment set forth in Sections 3.11 and 3.30 hereof shall be distributed to holders of Millennium Notes Claims only upon satisfaction of the Millennium Notes Plan Conditions and the occurrence of the Payment Date.

3.22. Contemporaneous with execution of this Settlement Agreement, the Debtors and the Financing Party Defendants will enter into the Modified Plan Support Agreement.

3.23. Upon written request from the applicable Trustee (or its professionals), the Reorganized Debtors will take reasonable steps to provide such Trustee with access to information regarding the Assigned Preference Claims, including documents in the possession of, or witnesses under the control of, the Reorganized Debtors, to the extent that the Trustee could obtain the same by subpoena, notice of deposition or other permissible discovery request (a "discovery request"), without the need for the Trustee to serve upon the Reorganized Debtors such discovery request. Upon the request of the Trustee, the Reorganized Debtors also will require witnesses under their control to appear at any trial of the causes of action asserted in the Assigned Preference Claims, without the need for the Trustee to serve a trial subpoena upon such witness, but only to the extent that the Trustee could obtain testimony from that witness by subpoena or deposition or under a treaty governing the taking of testimony abroad. The Debtors also will negotiate in good faith a cooperation agreement with the Committee with respect to Assigned Preference Claims, which will be included in the Plan Supplement. In addition, to the extent the Debtors identify General Unsecured Claims that are materially inconsistent with the Debtors' books and records or otherwise objectionable, the Debtors shall object to any such claim in consultation in good faith with the Committee and the Creditor Representative, as applicable. On and after entry of the Approval Order, the Debtors shall have the authority to compromise, settle, otherwise resolve or withdraw any objection to a General Unsecured Claim that is disputed, subject to the Amended Order Establishing Procedures for (I) Omnibus Objections to Proofs of Claim and (II) Comprising Disputed Proofs of Claim [09-10023 Docket No. 2495] entered in the Bankruptcy Case, but otherwise without approval of the Bankruptcy Court, provided that the Reorganized Debtors shall consult with the Creditor Representative, on terms to be agreed upon with the Committee, concerning the Reorganized Debtors' proposed compromise, settlement, resolution or withdrawal of any objection to a General Unsecured Claim that is disputed, and the Parties agree that if the Creditor Representative has an objection to the proposed compromise, settlement, resolution or withdrawal, it shall give notice of such objection to the Reorganized Debtors and a hearing shall be scheduled before the Bankruptcy Court to resolve the objection.

3.24. Each of the Committee, the 2015 Notes Trustee, the members of the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee agrees that neither it nor its professionals will make any disparaging or negative statements or comments to

the press regarding the Financing Party Defendants with respect to the Debtors, their estates or the Committee Litigation, including the claims that are being settled against the Financing Party Defendants pursuant to this Settlement Agreement.  Notwithstanding the foregoing, if contacted by the press regarding this Settlement Agreement, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group, and the Millennium Notes Trustee may refer the press to this Settlement Agreement for its terms and conditions, other pleadings filed with the Court in connection with this Settlement Agreement, and the transcript of the hearing on the 9019 Motion.

3.25.    Except as expressly set forth herein or in the Revised Plan or an Alternative Plan (upon its effective date), nothing herein shall affect the claims of any Party, including the Claims of the Financing Party Defendants or Secured Lenders, against any unencumbered assets of Obligor Debtors, Non-Obligor Debtors, Obligor Non-Debtors, Millennium US Opco, MSC or MPI available for distribution under the Revised Plan.

3.26.    Except as expressly set forth herein or in the Revised Plan or an Alternative Plan (upon its effective date), nothing herein shall affect any Person's Liens, guarantees or Claims against Non-Obligor Debtors.

3.27.    On the Payment Date, (i) the Secured Lenders shall be deemed to have transferred and assigned to the Debtors all of their rights, remedies, claims and interests with respect to turnover of money and other property that may be received by the 2015 Noteholders and subordination of the 2015 Notes Claim, as set forth in the December 20, 2007 Intercreditor Agreement (including Sections 13, 14 and 20 thereof), and (ii) subject to the satisfaction or, pursuant to Section 7.5 hereof, waiver of the 2015 Notes Plan Conditions, the Debtors and the Secured Lenders shall be deemed to have waived, extinguished and agreed not to exercise or enforce against the 2015 Notes Trustee or the 2015 Noteholders, as to any and all cash, stock, property or other distributions that may be paid to the 2015 Notes Trustee on behalf of the 2015 Noteholders, or to the 2015 Noteholders directly, pursuant to the Revised Plan or any Alternative Plan, as applicable, or in connection with any case under chapter 7 of the Bankruptcy Code to which the Bankruptcy Case may be converted, any and all such rights, remedies, claims and interests concerning turnover of money and other property and subordination of the 2015 Notes Claim.  For the avoidance of doubt, the purpose of this provision is to ensure that, notwithstanding the provisions of the December 20, 2007 Intercreditor Agreement, the 2015 Noteholders, subject to the satisfaction of the 2015 Notes Plan Conditions (or in the case of clause (a)(1) thereof, waiver pursuant to Section 7.5 hereof) and the occurrence of the Payment Date, receive and retain any and all distributions that may be paid on their behalf to the 2015 Notes Trustee or to them directly pursuant to the Revised Plan, any Alternative Plan or any chapter 7 case, as applicable.

3.28.    If after the Approval Order is entered, the Bankruptcy Case is converted to a case or cases under chapter 7 of the Bankruptcy Code, the chapter 7 trustee shall take

all steps necessary to preserve the intent of the Parties under this Settlement Agreement, including by the prosecution of all claims that were, in the absence of a conversion, (i) to be discontinued and abandoned pursuant to Section 3.4 hereof, or (ii) to be assigned to the Litigation Trust; and shall distribute the proceeds of such claims Pro Rata to the holders of Allowed General Unsecured Claims, and the holders of any Senior/Bridge Deficiency Claims shall only receive a distribution from such proceeds after the Excess Recovery Trigger Date.

3.29.   Provided that none of the 2015 Notes Plan Conditions have been breached, and for so long as they remain satisfied (or, as applicable, waived pursuant to Section 7.5 hereof), (i) the Debtors agree to object to, oppose and contest, and (ii) the other Parties hereto agree not to support, the Pending STN Motions.

3.30.   Subject to satisfaction of the Millennium Notes Plan Conditions, the holders of the Millennium Notes Claims shall receive, on the Payment Date, distributions under the Revised Plan or an Alternative Plan in an amount equal to $85.420 million, which shall be provided 50% in cash and 50% in Class A Shares.[7]   To effect this $85.420 million distribution:[8]

   (a)   The holders of the Millennium Notes Claims shall receive their Pro Rata share of the Fixed Settlement Plan Consideration pursuant to Section 3.2 hereof;

   (b)   In compromise and settlement of the objection made by the Millennium Notes Trustee to the Lender Litigation Settlement at the February 16, 2010 hearing before the Bankruptcy Court, the Debtors, the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group agree, and the Revised Plan or Alternative Plan shall provide, that (1) in the event the Bankruptcy Court confirms a plan of reorganization, which plan is consummated, under which the holders of the 2015 Notes Claims receive the distributions contemplated hereunder as their sole distributions from the Debtors and their Affiliates, collectively, on account of the 2015 Notes Claims, $15 million in cash of the Fixed Settlement Plan Consideration otherwise allocated to the holders of 2015 Note Claims in accordance with Section 3.2 hereof shall be distributed to the holders of the Millennium Notes Claims as part of the interim distributions to be made in accordance with Section 3.9 hereof (for the avoidance of doubt, it is understood that except for the $15 million reallocation set forth in this sub-paragraph, holders of

---

[7] For the avoidance of doubt, the distribution of Class A Shares as described in this Section 3.30 does not (x) include any right to purchase a corresponding Rights Offering Pro Rata Share of Class B Shares or (y) reduce any right to purchase Class B Shares that is otherwise distributable to holders of Senior Facility Claims on account of their Claims.

[8] It is understood for purposes of this Section 3.30 that the valuations of the Class A Shares agreed to herein are those represented in the Debtors' disclosure statement filed contemporaneously with the execution of this Settlement Agreement.

2015 Note Claims will receive their distributions on a Pro Rata basis in accordance with Sections 3.2 and 3.9 hereof), and (2) in the event the 2015 Notes Plan Conditions are not satisfied  (or in the case of clause (a)(1) thereof, waived pursuant to Section 7.5 hereof), the Debtors may elect to distribute on the Payment Date, in accordance with the terms of the Revised Plan or an Alternative Plan, to the holders of Millennium Notes Claims, in lieu of the treatment set forth in sub-clause (1) above, the sum of $15 million in cash; and

(c)     In further compromise and settlement of any and all disputes they may have regarding the Millennium Notes Indenture, and in compromise and settlement of the intercompany claims between Millennium America Inc. and MPI and between Millennium America Inc. and MSC, the Debtors, the Committee, the Ad Hoc Group, and the Millennium Notes Trustee agree that, under the Revised Plan or an Alternative Plan, (1) the holders of Allowed General Unsecured Claims against MPI shall receive Class A Shares valued at $57.6 million, (2) the holders of Allowed General Unsecured Claims against MSC shall receive Class A Shares valued at $4.4 million, (3) the holders of Senior/Bridge Guarantee Claims against MPI or MSC shall receive in the aggregate Class A Shares valued at $195 million, and (4) the holders of Millennium Notes Claims shall receive Class A Shares valued at $28 million; provided, however, that the amount to be received by the holders of Millennium Notes Claims pursuant to the preceding clause (the "MPI/MSC Allocation") shall be adjusted such that the amount distributed pursuant to Section 3.30(a), plus $15 million (pursuant to Section 3.30(b)), plus the MPI/MSC Allocation equals $85.420 million and compensating adjustments shall be made on a proportional basis to the amounts to be received by holders of Allowed General Unsecured Claims against MPI and by holders of Allowed General Unsecured Claims against MSC; provided further that (i) in the event the Allowed General Unsecured Claims against MPI are less than $89 million, the value of Class A Shares to be distributed to holders of such Claims shall be reduced by $20.00 for every $100.00 that such Claims are less than $89 million, and such reduction shall increase the number of Class A Shares to be received by the holders of Senior/Bridge Guarantee Claims against MPI, and (ii) in the event the Allowed General Unsecured Claims against MSC are less than $19 million, the value of Class A Shares to be distributed to holders of such Claims shall be reduced by $20.00 for every $100.00 that such Claims are less than $19 million, and such reduction shall increase the number of Class A Shares to be received by the holders of Senior/Bridge Guarantee Claims against MSC; provided further that if the Millennium Notes Plan Conditions are not satisfied pursuant to the terms of this Settlement Agreement, holders of Allowed General Unsecured Claims against MPI shall receive Class A Shares valued at $60.4 million, holders of Allowed General Unsecured Claims against MSC shall receive Class A Shares valued at $14.6 million, and holders of Senior/Bridge Guarantee Claims against MPI or MSC shall

receive, in the aggregate, Class A Shares valued at $210 million, and the reductions contemplated in the preceding proviso in the event that Allowed General Unsecured Claims are below stated amounts shall not apply.

In addition, the holders of Millennium Notes Claims shall also receive a Pro Rata share of the Creditor Trust, the Litigation Trust and the Millennium Custodial Trust. To the extent the Millennium Notes Plan Conditions are not satisfied, holders of Allowed Millennium Notes Claims shall be entitled to the same treatment as holders of Allowed General Unsecured Claims under this Settlement Agreement and the Revised Plan or an Alternative Plan, and for avoidance of doubt, may receive the treatment described in subsection (a) above, but not the treatment described in subsections (b) or (c) above.

4.      <u>Equity Commitment Agreement and Distribution Mechanism Not a Conditions Precedent to Settlement</u>.

4.1.    All Parties shall be bound by this Settlement Agreement without regard to whether (i) the Equity Commitment Agreement proposed by the Debtors is approved by the Bankruptcy Court or (ii) the Revised Plan is confirmed.

4.2.    The obligations of the Parties shall not be contingent on the right of any Financing Party Defendant or any Affiliate of a Financing Party Defendant to participate as a sponsor or purchaser of equity in the Reorganized Debtors in the Rights Offering or any other equity rights offering the Debtors may propose.

4.3.    The obligations of the Parties hereunder shall not be contingent on the distribution mechanism described in Section 3.9 hereof being included in any plan of reorganization ultimately confirmed in the Bankruptcy Case.

5.      <u>Releases</u>.

5.1.    On the Payment Date, for the good and valuable consideration provided herein, each Debtor, its respective estate and any subsequent chapter 7 trustee, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group (including its members in their capacity as holders of any Claim or interest other than on account of 2027 Notes), and the Millennium Notes Trustee (but only if the Millennium Notes Plan Conditions are satisfied), each on behalf of itself and, as applicable, its direct and indirect, past and present subsidiaries, members, partners, representatives, agents, financial advisors, industry experts/advisors, attorneys, and joint venturers, and each of their respective predecessors, successors and assigns, fully and forever releases and shall be deemed to have fully and forever released the Lender Releasees, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group (including its members in their capacity as such), and the Specified Millennium Noteholders and the Millennium Notes

Trustee (but only if the Millennium Notes Plan Conditions are satisfied),[9] and each of their respective direct and indirect parent companies, subsidiaries and Affiliates, each of their respective predecessors, successors, and assigns, and all of each of their respective past and present employees, general partners, officers, directors, managers and Covered Professionals, from any and all claims (including in respect of any derivative claim by any third party), obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, matters, liens, mortgages, security interests, pledges, encumbrances, privileges, priorities or issues, from the beginning of the world until the Payment Date, that arise from, or are based on, connected with, alleged in or related to the Committee Litigation, the 2015 Notes Litigation or the Debtors' Injunction Litigation (including claims that were asserted or could have been asserted in the Committee Complaint, the Proposed Amended Committee Complaint, the 2015 Notes Complaint, the Debtors' Injunction Complaint, or any amended such complaint) or that arise from, in whole or in part, or relate to the transactions, occurrences or facts alleged in the Committee Complaint, the Proposed Amended Committee Complaint, the 2015 Notes Complaint, or the Debtors' Injunction Complaint, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, foreseeable or unforeseeable, in law, equity or otherwise, and fully and forever releases and shall be deemed to have fully and forever released the Lender Releasees from any and all Preference Claims other than, in the case of the Committee, in respect of any Acquired Third Party Preference Claims (collectively, the "Debtor Released Claims"), which in each case are fully and forever discharged, waived, released and settled. Notwithstanding the foregoing but subject to the provisions of the Revised Plan, nothing herein shall prevent the Debtors from conducting a good faith review of any proofs of claim filed by any of the Secured Lender Releasees. Notwithstanding anything to the contrary contained herein: (a) no release is being granted in this Section 5.1 to any Non-Settling Defendant with respect to any claim of any kind, except as otherwise provided in Section 3.12(ii) hereof; (b) the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group shall not benefit from the release in this Section 5.1 unless the 2015 Notes Plan Conditions are satisfied (or in the case of clause (a)(1) thereof, waived pursuant to Section 7.5 hereof); (c) the Millennium Notes Trustee and any Specified Millennium Noteholder shall not benefit from the release in this Section 5.1 unless the Millennium Notes Plan Conditions are satisfied; (d) no release is being granted in this Section 5.1 with respect to any Abandoned Claims or State Law Avoidance Claims to any natural person unless such natural person is or was (i) an employee, general partner, officer, director or manager of any Lender Releasee at any time between December 23, 2009 and the Payment Date

---

[9] For purposes of this sentence, subject to satisfaction of the Millennium Notes Plan Conditions, the Specified Millennium Noteholders (and any Subsequent Transferees, to the extent the applicable Millennium Notes Plan Support Agreements are in full force and effect) shall be released as provided herein and shall be third party beneficiaries with respect to this Section 5.1. Unless expressly provided herein, the Specified Millennium Noteholders (and any Subsequent Transferees) shall not be third party beneficiaries with respect to any other provision of this Settlement Agreement.

or (ii) a Specified Secured Lender; for the avoidance of doubt, nothing in this clause (d) shall release any Non-Settling Defendant with respect to any claims of any kind; (e) no release is being granted in this Section 5.1 to any Secured Lender Releasee with respect to any Abandoned Claims or State Law Avoidance Claims unless such Person is a Specified Secured Lender Releasee; and (f) no release is being granted in this Section 5.1 to any Account Holder unless such Account Holder is a Lender Releasee (and, with respect to any Abandoned Claims or State Law Avoidance Claims, such Account Holder is also a Specified Secured Lender Releasee). For the avoidance of doubt, clause (f) of the preceding sentence is to ensure that no Person is released from any Preference Claims or State Law Avoidance Claims solely because such Person is an Account Holder.

5.2.    On the Payment Date, for the good and valuable consideration provided herein, each of the Financing Party Defendants, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group (including its members in their capacity as holders of any Claim or interest other than on account of 2027 Notes), and the Millennium Notes Trustee (but only if the Millennium Notes Plan Conditions are satisfied) (in each case, only in its capacity as such), and each of their respective representatives and agents (in each case, only in their capacity as such), fully and forever releases and shall be deemed to have fully and forever released, the Debtors, the Committee, the 2015 Notes Trustee, the 2015 Notes Ad Hoc Group (including its members in their capacity as such), and the Specified Millennium Noteholders and the Millennium Notes Trustee (but only if the Millennium Notes Plan Conditions are satisfied)[10] (in each case, only in their capacity as such), in each case including, as applicable, its direct and indirect, past and present subsidiaries, members, partners, representatives, agents, financial advisors, industry experts/advisors, attorneys, and joint venturers, and each of their respective predecessors, successors and assigns (in each case, only in their capacity as such), except with respect to fees and expenses owed or any other contractual or other obligation that the Debtors have agreed to in connection with this Settlement Agreement or the Revised Plan, from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities, matters, liens, mortgages, security interests, pledges, encumbrances, privileges, priorities or issues, from the beginning of the world until the Payment Date, that arise from, or are based on, connected with, alleged in or related to the Committee Litigation, the 2015 Notes Litigation or the Debtors' Injunction Litigation (including claims that were asserted or could have been asserted in the Committee Complaint, the Proposed Amended Committee Complaint, the 2015 Notes Complaint, the Debtors' Injunction Complaint, or any amended such

---

[10] For purposes of this sentence, subject to satisfaction of the Millennium Notes Plan Conditions, the Specified Millennium Noteholders (and any Subsequent Transferees, to the extent the applicable Millennium Notes Plan Support Agreements are in full force and effect) shall be released as provided herein and shall be third party beneficiaries with respect to this Section 5.2. Unless expressly provided herein, the Specified Millennium Noteholders (and any Subsequent Transferees) shall not be third party beneficiaries with respect to any other provision of this Settlement Agreement.

complaint) or that arise from, in whole or in part, or relate to the transactions, occurrences or facts alleged in the Committee Complaint, the Proposed Amended Committee Complaint, the 2015 Notes Complaint, or the Debtors' Injunction Complaint, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, foreseeable or unforeseeable, in law, equity or otherwise; provided that such releases shall not release the Debtors from their obligations under this Settlement Agreement, deprive any Financing Party Defendant or Secured Lender of its rights under the Revised Plan or the DIP Financing Order or waive any Claims of any Financing Party Defendant or Secured Lender against the Obligor Debtors, Millennium US Opco, MSC, MPI or their Affiliates on account of the Senior Facility or the Bridge Loan Facility (except as set forth herein); and provided further that such releases shall not deprive any Secured Lender or any Financing Party Defendant of its right to assert any defense or counterclaim to any existing or future claim by a Non-Settling Defendant asserted against any such Secured Lender or any such Financing Party Defendant.  Notwithstanding anything to the contrary contained herein, (a) the 2015 Notes Trustee and the 2015 Notes Ad Hoc Group shall not benefit from the release in this Section 5.2 unless the 2015 Notes Plan Conditions are satisfied (or in the case of clause (a)(1) thereof, waived pursuant to Section 7.5 hereof), and (b) the Millennium Notes Trustee and any holder of Millennium Notes shall not benefit from the release in this Section 5.2 unless the Millennium Notes Plan Conditions are satisfied.  For the avoidance of doubt, the release of the Debtors in this Section 5.2 does not impair or limit the ability of the Creditor Trust to pursue or collect on State Law Avoidance Claims or the Litigation Trust to pursue or collect on Assigned Preference Claims and Non-Settling Defendant Claims except as otherwise specifically set forth in this Settlement Agreement.

5.3.    The Parties shall request that the Approval Order will provide, among other things (it being understood and agreed that the inclusion of such language is a condition to the effectiveness of this Settlement Agreement):

> "ORDERED that each of the Non-Settling Defendants is hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Lender Releasee (including any other non-contractual claim against the Lender Releasees, whether or not denominated as for contribution or indemnity, where the injury to the Non-Settling Defendant is the Non-Settling Defendant's liability to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in the Committee Litigation, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"), and with respect to the Barred Claims, the Non-Settling Defendant is entitled to the judgment reduction provisions set forth herein.  This Order (the "Bar Order") is

without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any Barred Claim.

"(a) If (i) any person acting on behalf of the Debtors' estates, including any successor to the Debtors including any chapter 7 trustee, any committee appointed in the Bankruptcy Case, any trustee of the Litigation Trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code or (ii) any trustee of the Creditor Trust (any of the above, a "Plaintiff"), obtains a judgment or award (a "Judgment") against a Non-Settling Defendant or other party with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim then, with respect to any actual, potential or asserted liability of a Lender Releasee to a Non-Settling Defendant or other party for the Barred Claims in respect of such Judgment, the Plaintiff shall, prior to or in connection with the entry of such Judgment, provide notice of this Bar Order to the court or tribunal in which such Judgment was obtained, and the court or tribunal shall reduce such Judgment against such Non-Settling Defendant or other party in an amount that is the greater of (i) the amount of the consideration provided pursuant to the Revised Settlement by the Lender Releasee(s) against whom there would have been a Barred Claim in the absence of this Bar Order, provided that for purposes of this clause (i), the Parties and Non-Settling Defendants reserve all rights with respect to the determination of the amount of the consideration provided pursuant to the Revised Settlement that should be deemed allocable to such Lender Releasee(s) and to such Barred Claim for purposes of judgment reduction; or (ii) the amount equal to the Judgment against such Non-Settling Defendant or other party times the aggregate proportionate share of fault (expressed as a percentage) of the Lender Releasee(s) against whom there would have been a Barred Claim in the absence of this Bar Order.  In the event that Judgment shall be entered against a Non-Settling Defendant or other party without a prior or concurrent determination as to the existence of a Barred Claim (and, in the event of a determination of the existence of a Barred Claim, without a reduction of such Judgment), such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim.

"(b) In the event such Plaintiff asserts any claim or cause of action against any Non-Settling Defendant or other party in any court or tribunal other than this Court, or in the event that any proceeding before this Court with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim, is (1)

removed or transferred from this Court to any other court or tribunal, (2) adjudicated to judgment in this Court and enforcement proceedings are brought in any other court or tribunal; or (3) adjudicated to judgment in this Court but a Barred Claim is brought in a proceeding in any other court or tribunal; such Plaintiff shall, to the extent it is a party to such proceeding or has notice thereof, provide notice of such proceeding to the applicable Lender Releasee and shall take any additional steps, as are reasonably directed by such Lender Releasee, for the enforcement of this Bar Order by such other court or tribunal. Notwithstanding the foregoing, in the event such other court or tribunal declines to enforce this Bar Order or declines to rule on or determine any Barred Claim, and Judgment is entered by such a court or tribunal against a Non-Settling Defendant or other party without a prior or concurrent determination of and reduction for Barred Claims with respect to such Judgment, then: (i) such Judgment shall not prejudice the rights of any Non-Settling Defendant or other party to seek or obtain a judgment credit or reduction in accordance with applicable law or this Order; (ii) such Judgment shall not, and shall be deemed not to, give rise to any Barred Claim; and (iii) in the event that the Litigation Trust collects proceeds on account of such Judgment, such proceeds shall be retained by the Litigation Trust and not distributed until the earlier of (x) expiration of the applicable statute of limitations period with respect to any potential Barred Claim in respect of such Judgment; or (y) final determination, after all available appeals are taken and exhausted, of all Barred Claims in respect of such Judgment. In the event that a Lender Releasee is adjudged liable for any Barred Claim by a final, non-appealable order, then, to the extent proceeds have been collected by the Litigation Trust in respect of the Judgment underlying such Barred Claim, such proceeds shall be distributed from the Litigation Trust to the applicable Non-Settling Defendant or other party in satisfaction of such judgment; provided that such proceeds shall instead be distributed by the Litigation Trust to the applicable Lender Releasee(s) to the extent any amounts previously have been paid by the Lender Releasee(s) in satisfaction of such judgment. Notwithstanding the foregoing, if the reason that such court or tribunal has declined to adjudicate a Barred Claim is the absence of the Lender Releasee from the jurisdiction and the refusal of such Lender Releasee to submit to its jurisdiction, then such Lender Releasee shall forfeit its rights to a reduction in any Judgment rendered otherwise provided for hereby, except that such Lender Releasee shall not forfeit such rights if it declines to appear in any subsequent action for contribution that such Non-Settling Defendant or other party may commence in a court or tribunal that lacks jurisdiction over such Lender Releasee

or otherwise lacks authority to enter a valid and enforceable Judgment against such Lender Releasee.

"(c) The Lender Releasees acknowledge that any Plaintiff that obtains a Judgment subject to reduction based on a Barred Claim is a party in interest with respect to any action or proceeding for the adjudication of such Barred Claim and shall have the right to intervene in such action or proceeding and that the consent of such Plaintiff shall be required for the settlement or compromise of any Barred Claim; in addition, the Plaintiff shall be deemed to consent to the right of intervention of any Lender Releasee in any action or proceeding for the adjudication of such Barred Claim; and it is further

"ORDERED that if any Plaintiff enters into a settlement with a Non-Settling Defendant or other party with respect to one or more causes of action based upon, arising from, or related to the Debtor Released Claims or any transaction underlying any Debtor Released Claim, then such Plaintiff shall cause to be included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement; and it is further

"ORDERED that each of the Lender Releasees is hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Non-Settling Defendant (including any other non-contractual claim against the Non-Settling Defendants, whether or not denominated as for contribution or indemnity, where the injury to the Lender Releasee is the Lender Releasee's liability to the plaintiffs), arising out of or reasonably flowing from the claims or allegations in the Committee Litigation, whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims. This Order is without prejudice to the position of any party as to the existence, in the absence of this Bar Order, of any such claim; and it is further

"ORDERED that nothing herein shall prejudice or operate to preclude the rights of any Non-Settling Defendant to (i) obtain judgment credit or reduction to the fullest extent available under applicable law on any applicable grounds whatsoever; provided that the Plaintiff reserves the right to dispute any such claimed right to judgment credit or reduction; or (ii) assert claims, other than Barred Claims, against any party. For the avoidance of doubt, the provisions of this Order, including the judgment reduction provisions set forth herein, shall not apply to (i) any contractual indemnity or (ii) any claim asserted in the Committee Complaint or the Proposed Amended Committee Complaint or in any other Complaint filed

by any Plaintiff in this Court or in any other court or tribunal for which joint liability does not exist as a matter of law, equity or fact as between any Non-Settling Defendant and any Lender Releasee, including, by way of example, the claims asserted in Count XIV and Count XVII and the equitable subordination of claims sought in Count XV of the Committee Complaint; and it is further

"ORDERED that this Court shall retain continuing jurisdiction with respect to all matters concerning this Order."

6.    <u>Representations</u>.

6.1.    Each Party represents to the other Parties that: (i) it is authorized to execute and deliver this Settlement Agreement and perform its obligations hereunder (and in the case of LBIAF, on behalf of itself and the Debtors, subject to Bankruptcy Court approval) and (ii) all claims waived or released pursuant to this Settlement Agreement by that Party have not been assigned or otherwise transferred (other than as provided in the order granting the STN Motion).

7.    <u>Miscellaneous</u>.

7.1.    This Settlement Agreement shall be construed in accordance with, and governed by, the laws of the State of New York, excluding and without regard to the conflict of laws rules thereof.

7.2.    The Bankruptcy Court shall retain jurisdiction to resolve any dispute arising out of or relating to this Settlement Agreement.

7.3.    Upon the Approval Order becoming a Final Order, this Settlement Agreement and the plan support agreements referenced herein and executed in connection herewith constitute the entire agreement among the Parties on the subjects addressed herein.  Upon the Approval Order becoming a Final Order, the Settlement Agreement supersedes in its entirety the Original Settlement Agreement, and supersedes any term sheet (including but not limited to the Term Sheet), the oral agreement reached among the Parties relating to settlement of the Committee Litigation on December 4, 2009 and any subsequent written or oral descriptions of the settlement, including, the Original Settlement Agreement.  No supplement, modification, amendment, waiver or termination of this Settlement Agreement shall be binding unless executed in writing by each of the Parties (or their successors and assigns) to be bound thereby, or by their authorized counsel; <u>provided</u>, <u>however</u>, that any modification, amendment, waiver or termination may be made to any provision of this Settlement Agreement without the consent of (a) the 2015 Notes Trustee or the 2015 Notes Ad Hoc Group to the extent such modification, amendment, waiver or termination does not have a direct effect on the 2015 Notes Trustee, the 2015 Noteholders or the 2015 Notes Ad Hoc Group, or (b) the Millennium Notes Trustee to the extent such modification, amendment, waiver or termination does not have a direct effect on the Millennium Notes

Trustee or the Millennium Noteholders. This Settlement Agreement is executed without reliance on any representations by any person or entity concerning the nature, cause or extent of injuries, or legal liability therefor, or any other representations of any type or nature except as set forth herein. No contrary or supplementary oral agreement shall be admissible in a court to contradict, alter, supplement, or otherwise change the meaning of this Settlement Agreement. This Settlement Agreement has been negotiated by the Parties adequately represented by counsel, none of whom shall be deemed the "drafter" of the agreement, and no provision of this Settlement Agreement shall be applied or interpreted by reference to any rule construing provisions against the drafter.

7.4.   Nothing in this Settlement Agreement shall be construed as an admission of liability or fault by any Party, which liability and fault are expressly denied.

7.5.   The 2015 Notes Trustee and the members of the 2015 Notes Ad Hoc Group shall not be bound under this Settlement Agreement in the event that clause (a)(1) of the 2015 Notes Plan Conditions has not been satisfied or compliance therewith has not been waived by the Debtors, the Majority Arrangers (as defined in the Revised Plan), and the Ad Hoc Group (collectively, the "Waiving Parties"), and as a result thereof, the 2015 Notes Claims do not receive a distribution under the Revised Plan or an Alternative Plan. In order to waive compliance with clause (a)(1) of the 2015 Notes Plan Conditions, the Waiving Parties shall give notice of such waiver to the 2015 Notes Trustee within two (2) business days after the final results of voting on the Revised Plan or an Alternative Plan have been given by the Debtors' voting agent to the Debtors and the Financing Party Defendants. For the avoidance of doubt, if the 2015 Notes Claims do not receive a distribution under the Revised Plan or an Alternative Plan as a result of the failure of any of the 2015 Notes Plan Conditions other than clause (a)(1) to be satisfied or waived hereunder, each of the 2015 Notes Trustee and the members of the 2015 Notes Ad Hoc Group shall remain bound under this Settlement Agreement.

7.6.   The 2015 Notes Plan Support Agreement and the Millennium Notes Plan Support Agreement each shall be enforceable, respectively, against the parties thereto and each of their respective direct and indirect, initial and subsequent successors and assigns in accordance with the terms and conditions contained therein, as applicable, and any assignment or transfer of (a) 2015 Notes by any signatory to a 2015 Notes Plan Support Agreement or any Subsequent Transferee, or (b) Millennium Notes by any Specified Millennium Noteholder or any Subsequent Transferee, shall be null and void ab initio and the transferor shall remain subject to and liable under its respective plan support agreement unless (i) such signatory to a 2015 Notes Plan Support Agreement, Specified Millennium Noteholder, or Subsequent Transferee, as the case may be, has provided a copy of the Approval Order and the applicable plan support agreement to such prospective assignee or transferee; (ii) such assignee or transferee has executed a joinder in the form approved in the Approval Order, which shall provide, inter alia, that (x) such assignee or transferee agrees to abide by and not contest any of the provisions of the Approval Order, including, without limitation, the exclusive jurisdiction of the

Bankruptcy Court to enforce the Millennium Notes Plan Support Agreement or the 2015 Notes Plan Support Agreement, as the case may be, and any amendments and joinders thereto and the remedy of specific performance set forth in the Millennium Notes Plan Support Agreement or the 2015 Notes Plan Support Agreement, as the case may be, and (y) to the extent permitted by applicable law, such assignee or transferee shall pay the Debtors and any third party beneficiary with respect to the Millennium Notes Plan Support Agreement or the 2015 Notes Plan Support Agreement, as the case may be, any fees and expenses (including, without limitation, reasonable attorneys' fees) expended by such parties to specifically enforce the terms of the Millennium Notes Plan Support Agreement or the 2015 Notes Plan Support Agreement, as the case may be; and (iii) such selling signatory to a 2015 Notes Plan Support Agreement, Specified Millennium Noteholder, or Subsequent Transferee has provided electronic notice of such assignment or transfer, and an executed copy of such joinder, to the Debtors (Attn: Peter M. Friedman (*peter.friedman@cwt.com*) and George A. Davis (*george.davis@cwt.com*)) within the earlier of (x) 5 business days after such assignment or transfer or (y) 2 business days after execution of the joinder.

7.7.    Notwithstanding anything to the contrary contained in this Settlement Agreement, in the event a Subsequent Transferee takes any action (or fails to take any action) such that the 2015 Notes Plan Conditions or the Millennium Notes Plan Conditions, as applicable, would fail to be met or satisfied as a result thereof, such action (or inaction) shall not cause the failure of the satisfaction of the 2015 Notes Plan Conditions or the Millennium Notes Plan Conditions, as applicable, for the purposes of this Settlement Agreement.

7.8.    Upon entry of the Approval Order, the 2015 Notes Claims shall be deemed (a) Allowed in the amount of $1,351,695,059.96 (excluding fees and expenses of the 2015 Notes Trustee) for purposes of the Revised Plan or an Alternative Plan and this Settlement Agreement, (b) not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) under applicable provisions of the Bankruptcy Code (including sections 510, 544, 547 and 548) or state law, and (c) not subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof, and the Approval Order shall so provide; provided, however, that the foregoing provision shall have no application or effect (and shall retroactively be null and void) in the event that any one or more of the conditions set forth in the definition of "2015 Notes Plan Conditions" is not satisfied (or in the case of clause (a)(1) thereof, waived pursuant to Section 7.5 hereof) or the Payment Date does not occur.

7.9.    Upon entry of the Approval Order, the Millennium Notes Claims shall be deemed (a) Allowed in the amount of $244,058,317.71 (excluding fees and expenses of the Millennium Notes Trustee) for purposes of the Revised Plan or an Alternative Plan and this Settlement Agreement, (b) not subject to avoidance, subordination, recharacterization, recovery, attack, offset, counterclaim, defense or "claim" (as defined in the Bankruptcy Code) under applicable provisions of the Bankruptcy

Code (including sections 510, 544, 547 and 548) or state law, and (c) not subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof, and the Approval Order shall so provide; provided, however, that the foregoing provision shall have no application or effect (and shall retroactively be null and void) in the event that any one or more of the conditions set forth in the definition of "Millennium Notes Plan Conditions" is not satisfied or the Payment Date does not occur.

7.10.    The provisions of this Settlement Agreement shall be breached and a cause of action accrued thereon immediately upon any Party's commencement of any action contrary to this Settlement Agreement, and in any such action this Settlement Agreement may be asserted both as a defense and as a counterclaim or crossclaim.

7.11.    With respect to any provision of this Settlement Agreement under which the Collateral Agent is obligated to take any action, the Financing Party Defendants (with respect to the Senior Facility) and the Arranger Bridge Lenders (with respect to the Bridge Loan Facility) hereby irrevocably authorize and instruct the respective administrative agents under such facilities, upon the occurrence of circumstances that give rise to such obligation, to instruct the Collateral Agent to take such action; provided that nothing contained in this Section 7.11 shall be deemed to impair (a) any indemnification obligations of the lenders under the Senior Facility or Bridge Loan Facility or (b) any other indemnification rights of the Collateral Agent and the administrative agents under the Senior Facility and the Bridge Facility with respect to any actions taken to effectuate the release of Liens and related transactions contemplated hereunder, in each case pursuant to the terms of the Senior Facility and Bridge Loan Facility, as applicable.   Any obligation of the Collateral Agent hereunder to take any such action is subject to the terms and conditions of the Senior Facility and the Bridge Loan Facility, as applicable, including the receipt by the Collateral Agent of a valid instruction to take such action from the administrative agent under the applicable facility.

7.12.    In the event of any conflict between this Settlement Agreement and the terms of the Revised Plan or an Alternative Plan, the terms of this Settlement Agreement shall govern.

7.13.    Facsimile or other electronic copies of signatures on this Agreement are acceptable, and a facsimile or other electronic copy of a signature on this Agreement is deemed an original.

7.14.    This Agreement may be executed in counterparts, each of which is deemed an original, but when taken together constitute one and the same document.

7.15.    This Settlement Agreement shall be binding on the Parties, their successors, assigns, transferees, any subsequent chapter 7 trustee appointed in the Bankruptcy Case upon or after conversion to a case or cases under chapter 7 of the Bankruptcy Code, and any other Persons who have asserted or seek to assert claims on behalf of or against the Debtors' estates.  For the avoidance of doubt,

from and after the date of this Settlement Agreement, any assignee or transferee of any Claim held by any member of the 2015 Notes Ad Hoc Group (or its Affiliates) shall be bound to this Settlement Agreement as though it were a signatory hereto, and each member of the 2015 Notes Ad Hoc Group agrees that neither it nor any of its Affiliates shall sell, assign or transfer any such Claim without first obtaining the agreement of the applicable assignee or transferee to be bound hereunder.   The Debtors shall obtain, prior to the Payment Date, any consents or approvals from the Obligor Non-Debtors listed on <u>Schedule A</u> that may be necessary or desirable to ensure that this Settlement Agreement, including the obligations and releases contained herein, is effective against, and binding upon, such Obligor Non-Debtors.

7.16.    The Parties acknowledge and agree that a breach of the provisions of this Settlement Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Settlement Agreement, including but not limited to Section 3.17 hereof, shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.   Such remedies shall, however, be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Settlement Agreement or otherwise. Notwithstanding the foregoing, nothing herein shall impair the Debtors' ability to act in accordance with their fiduciary duties to maximize the value of their estates.

7.17.    No failure or delay by any party in exercising any right or remedy provided by law under or pursuant to this Settlement Agreement shall impair such right or remedy or be construed as a waiver or variation of it or preclude its exercise at any subsequent time, and no single or partial exercise of any such right or remedy shall preclude any other or further exercise of it or the exercise of any other right or remedy.

7.18.    If (i) the Bankruptcy Court declines to approve this Settlement Agreement, or (ii) the Approval Order is vacated, reversed, modified, or amended prior to the Payment Date, then this Settlement Agreement shall be null and void and the Parties shall revert to their respective positions on the date immediately prior to entry into this Settlement Agreement, and in such event the Parties shall not refer to nor rely on the Settlement Agreement, nor to any of the negotiations that resulted in the Settlement Agreement, nor to any objections filed with respect to the Settlement Agreement, in any further proceedings in connection with the matters that are being settled in connection with the Settlement Agreement.

7.19.    The provisions of this Settlement Agreement are integrated, essential and non-severable terms of this Settlement Agreement.

[SIGNATURE PAGES FOLLOW]