# United States Bankruptcy Court
# Eastern District of Michigan
# Southern Division –Detroit

In the Matter of
City of Detroit

_____Debtor

Case No. 13-53846-swr
Chapter 9
Hon. Steven W. Rhodes

## OBJECTION TO CITY OF DETROIT'S PLAN OF ADJUSTMENT
## DOCKET 2708

_____

## FILED BY: <u>Marie L. Thornton</u>

_____hereby states her OBJECTION TO:
CITY OF DETROIT'S PLAN OF ADJUSTMENT

For the following reasons:

1. I am interested in the Bankruptcy of the City of Detroit because I am a resident that, have resided in the City of Detroit for 63 years. In pursuant with Blighted Area Rehabilitation, PA 344 of 1945, PA 189 and G62, I am a candidate for Mid-City Concerned Citizen's District Council. The election will be held on April 8, 2014, at 33 East Forest, In Detroit, Michigan 48201, First Congregation Church. I am interested in the outcome of U.S. biggest municipal bankruptcy plan for the City of Detroit.

2. I object to the above filing because: The Detroit Plan of Adjustment is not in Compliance with Public Act 344 of 1945 as amended in 1968, which establish a method for participation and representation by residents of a district and person (s) that would demonstrates interest in an area where rehabilitation and development activities are proposed to take place by the public sector. The electoral process for all stakeholders has been totally ignored by Emergency Manager because lack of funding to support Citizen' District Council and being replaced by quasi governmental agencies' and/or profit making

organizations( i.e. Detroit future City). The purpose of the Citizens District Council is to a State Statute to allow for public participation of residents and person(s) with substantial and demonstrable interest in the planning, property acquisitions, disposition and financing of rehabilitation of the designated area. Kevyn Orr, Emergency Manager has usurped the power of the 28 designated Citizens District Councils by establishing quasi government agencies/organizations to carry out blight and urban renewal activities to control funding from state and federal government in the City of Detroit. I Kevyn Orr refuse to follow the process in PA 344 of 945. I object to the Emergency Manager proposing that the City of Detroit spend $520.3 million over the course of the next six fiscal years through 2019 to clean up blight within the city without input from the Citizen District Council and follow the State Statue.

3. The Detroit City Council is attempting rush a process through to establish an electoral process to usurp the Citizens Advisory Council (CAC) that would to limit public participation in the above mentioned matter set forth in the State Statue(known as PA 344 of 1945). The proposed CAC would limit the role of the Citizen's District Council to interact with the public sector related to PA 344 of 1945. Kevyn Orr's Plan of Adjustment is a violate Section 125.83 of the Statute.

4. The Detroit's Adjustment Plan is an attempted to relocate residents from Detroit Neighborhoods marked for demolition and to avoid the process known as eminent domain. Orr's Plan would replace residents with others (i.e. Immigration Plan).

5. Kevyn Orr is attempting to devise a forcible restricting Plan in a legal process known as a "cram down". On March 25, 2014, Kevyn Orr appeared at a Manhattan Institute for Policy Research Conference and totally ignore the process for PA 344 of 1945.

6. I have attached additional sheets to explain and establish my position.

I hereby certify that the statement made herein are true and correct under penalty of perjury and contempt of Court under the laws of the United States of America.

Wherefore I request the Court will deny relief sought in said filing.

Name: _Marie Lynette Thornton_

Signatures: _Marie Lynette Thornton_

Address: _99 E, Forest Apt 909_

_Detroit MI 48201_

E-mail: _Tylynn95@yahoo.Com_

# ATTACHMENTS

March 17, 2014 Letter from City of Detroit, Department of Election

Copy of Official Ballot for Midtown Concerned Citizens' District Council

CDC Official Candidate Ballot List

Mid-City Concerned Area Sec. 2-10-22

Blighted Area Rehabilitation, Section 125.83 Power deemed additional

Research Study--Citizens' District Councils in Detroit: The Promise and limits of Using Planning Advisory Boards to promote Citizens Participation

# City of Detroit
### DEPARTMENT OF ELECTIONS

WILLIE G. WESLEY JR., PMP
Director

JANICE M. WINFREY, City Clerk
Chairperson, Election Commision

GINA C. AVERY, Deputy Director

2978 W. Grand Blvd.
Detroit, Michigan 48202-3069

(313) 876-0190    Fax(313) 876-0053

March 17, 2014

Marie L. Thornton
99 e. Forest Ave.  Apt. 909
Detroit, MI  48201

#### Mid-City Concerned Citizens' District Council

Dear Candidate:

Upon canvassing your nominating petition(s) for the office of Citizen's District Council member for the election of April 8, 2014, it has been determined that you meet the eligibility requirements for candidacy.

Therefore, your name will be placed on the ballot.  Enclosed is a proof copy duly mailed to you for approval or possible corrections.

If you have any questions regarding this matter, feel free to contact Gwen Hunter at (313) 876-9083 or Alecia Brown  at (313) 876-0833 **by Wednesday, March 19, 2014, before 4:00 p.m.**

Sincerely,

**DEPARTMENT OF ELECTIONS**

Enclosure

GA/gh

# OFFICIAL BALLOT



MID-CITY CONCERNED

## CITIZENS' DISTRICT COUNCIL
## ELECTION
### TUESDAY, APRIL 08, 2014
### City of Detroit

**TO VOTE:** Completely darken the oval opposite each choice as shown:

**IMPORTANT:** To mark your ballot, use only a black or blue ink pen. DO NOT USE RED INK!

**WRITE-IN:** To vote for a person whose name is not printed on the ballot, write the name and address of that person in the blank space provided and completely darken the oval.

**WHEN YOU HAVE COMPLETED VOTING:** Place the ballot in the secrecy sleeve so that votes cannot be seen and the numbered stub is visible. Return the ballot to the election official stationed at the tabulator. (If voting by absentee ballot, follow the instructions provided by the clerk for returning the ballot.)

**NOTE:** If you make a mistake, return your ballot to the election official and obtain a new ballot. Do not attempt to erase or correct any marks made in error.

**CAUTION:** Note the Council for each section. Names improperly placed will not be valid.

### MID-CITY CONCERNED
VOTE FOR NOT MORE THAN SIX

MARIE L. THORNTON
99 E. Forest Ave. Apt. 909. Detroit, MI 48201

Typ:01 Seq:0014 Spl:01

7.3.0.0 / 012503-14  © Election Systems & Software, Inc. 1981, 2009

Printed by Authority of the Detroit Election Commission

# CDC OFFICIAL CANDIDATE BALLOT LIST

## APRIL 08, 2014

**ART CENTER**
NONE

**ASH MYRTLE-HUMBOLDT**
NONE

**BRUSH PARK**
JEFFREY S. COWIN
82 Alfred St. Detroit, MI. 48201

BRENDA L. GALLOWAY
2900 Brush Park St. Apt. 127 Detroit, MI. 48201

HARRY HUNTER, JR.
2562 John R. St. Detroit, MI. 48201

MONA ROSS-GARDNER
234 Winder St. Detroit, MI. 48201

**CORKTOWN**
NONE

**DOWNTOWN**
MICHAEL KILGORE
2305 Park Ave. Apt. 1109 Detroit, MI. 48201

**EIGHT MILE-WYOMING**
NONE

**ELMWOOD PARK III**
BARBARA J. JOHNSON
1933 Campau Farms Cir. Detroit, MI . 48207

SHARON E. MATTIC
3166 Woods Circle Dr. Detroit, MI. 48207

PATRICIA L. MILLENDER
3170 Woods Circle Dr. Detroit, MI. 48207

**FOREST PARK I & II**
NONE

**HUBBARD-RICHARD**
NONE

**JEFFERSON-CHALMERS**
JAMES CZARSKI
432 Alter Rd. Detroit, MI. 48215

INGRID DAVIS
522 Algonquin St. Detroit, MI. 48215

**KERCHEVAL-MCCLELLAN**
NONE

**MCDOUGALL-HUNT**
JAMES BILLINGS
3300 BENSON ST.,  Detroit, MI.  48207

THADDAEUS WESTBROOKS
3441 Benson St.  Detroit, MI.  48207

**MEDICAL CENTER**
NONE

**MID-CITY CONCERNED**
MARIE L. THORNTON
99 E. Forest Ave.  Apt. 909  Detroit, MI.  48201

**SOUTHEAST**
VERL JEAN PITTMAN
250 E. Harbortown Dr.  Apt. 708  Detroit, MI.  48207

**UNIVERSITY CITY "A"**
NONE

**VIRGINIA PARK**
NONE

**WEST JEFFERSON INDUSTRIAL**
NONE

**WOODBRIDGE**
ELAINE A. CRAWFORD
5148 Commonwealth St.  Detroit, MI.  48208

REBECCA L. DERMINER
5130 Commonwealth St.  Detroit, MI.  48208

WOODROW LEATHERWOOD
5142 Commonwealth St.  Detroit, MI.  48208

MAURICE TEDDER
3860 Avery St.  Detroit, MI.  48208



MID-CITY

Sec. 2-10-22. Mid-City district area.

There shall be designated a district area in the city to be known as the Mid-City district area, description as follows:

Beginning at the alley between E. Alexandrine and E. Willis at the intersection of Woodward Avenue; thence easterly along the centerline of the alley between E. Alexandrine and E. Willis to the intersection with John R Avenue; thence northerly along the centerline of John R Avenue to the intersection with E. Canfield Avenue; thence easterly along the centerline of E. Canfield to the intersection with Brush Street; thence northerly along the centerline of Brush Street to the intersection with E. Warren Avenue; thence westerly along the centerline of E. Warren Avenue to the intersection with Woodward Avenue; thence southerly along the centerline of Woodward Avenue to the alley between E. Alexandrine and E. Willis which is the point of beginning.

The proposed district area includes a development area known as the Mid-City Rehabilitation Project. (Ord. No. 210-H, § 1.)



6-78



(Map Width: 1mi., Map Height: 0.8mi)

E. WARREN

E. HANCOCK

E. FOREST

GARFIELD

E. CANFIELD

E. WILLIS

ALLEY

WOODWARD

JOHN R.

BRUSH

2-82

COMMUNITY
& ECONOMIC



**125.83 Powers deemed additional.**

Sec. 13. The powers granted in this act shall be in addition to powers granted to municipalities, the local legislative bodies thereof and other officials and bodies thereof under the statutes and local charters. Nothing herein contained shall be construed to amend or repeal any of the provisions of Act No. 18 of the Public Acts of 1933 as amended.

**History:** 1945, Act 344, Imd. Eff. May 31, 1945;—CL 1948, 125.83.

**Compiler's note:** "Act No. 18 of the Public Acts of 1933" evidently should read "Act No. 18 of the Public Acts of 1933, Ex. Sess." See MCL 125.651 et seq.

13-53846-tjt    Doc 3249    Filed 03/26/14    Entered 03/27/14 12:41:23    Page 12 of 34

*COMM-ORG Papers*

*2003*

*http://comm-org.wisc.edu/papers.htm*

# Citizens' District Councils in Detroit: The Promise and Limits of Using Planning Advisory Boards to Promote Citizen Participation

**Robert Mark Silverman, Associate Professor**

**Department of Urban and Regional Planning**

**State University of New York, Buffalo**

rms35@buffalo.edu

## Contents

~Abstract

~Citizen Participation and Planning Advisory Boards

~Data and Methods

~Citizens' District Councils in Detroit

~The Promise of Advisory Boards

~The Limits of Advisory Boards

~Policy Recommendations

~References

~Acknowledgements

~About the Author

# Abstract

This article examines the promise and limits of using planning advisory boards to augment citizen participation. The article is based on a series of telephone interviews with members of citizens' district councils in Detroit, Michigan. The findings from the research indicate that this type of advisory board has the potential to play an important role in community development and local planning. However, the potential impact of citizens' district councils is limited by the scope of their power as advisory boards, as well as budget and staff constraints. In light of these findings, policy recommendations are forwarded to strengthen these and similar organizations in a manner that promotes grassroots planning and community development.

# Citizen Participation and Planning Advisory Boards

This article examines the promise and limits of using planning advisory boards to augment citizen participation. Specifically, a case study of citizens' district councils in Detroit, Michigan is examined. Citizens' district councils are local planning advisory boards composed of elected and appointed members which were formed in response to inequities growing out of Urban Renewal and resulting inequities and civil unrest in the city and the nation. Citizens' district councils were created in the state of Michigan in 1969 through a series of amendments to Public Act 344 and 189 which initiated Urban Renewal in the state. The role of citizens' district councils was further defined in a series of Detroit's city ordinances adopted in 1968 and 1971. Initially, citizens' district councils were created to function as planning advisory boards for Model Neighborhood areas established under the Model Cities program. When the Model Cities program was phased out, and replaced with community development block grants (CDBG) and other policies under the Housing and Community Development Act of 1974, citizens' district councils continued to function as planning advisory boards in the City of Detroit's designated Urban Renewal areas. Citizens' district councils were consulted about design elements, land use decisions, and

the financing of proposed development projects. As a result, citizens' district councils have been institutionalized as a mechanism to augment citizen participation in the City of Detroit for over three decades.

Given the historic role of citizens' district councils as a mechanism to promote citizen participation in Detroit, this research was conducted with two purposes in mind. First, data was gathered to evaluate the degree to which citizens' district councils expand citizen participation in community development and local planning. Second, the findings from this research were used to forward policy recommendations aimed at strengthening the capacity of planning advisory boards and other community-based organizations in a manner that promotes grassroots decision-making and local community development.

Before discussing the findings of this research, it is important to consider the issues raised in this study in the context of past scholarship that examines advisory boards and citizen participation. The most widely cited research in this area was Arnstien's (1969) study of citizen participation in the Model Cities program. In this study, Arnstien developed a *ladder of citizen participation* in which eight levels of participation were identified. Each level reflected an increased degree of control residents had over local policy making. Using this ladder, Arnstien indicated that advisory boards typically represented a form of tokenism, where local residents were consulted by elected officials and public administrators about policy issues without direct control of the local decision-making process. At the core of her argument was the notion that citizen participation is reduced to various degrees of tokenism and manipulation in the absence of direct citizen control. This theme is rearticulated and expanded upon in subsequent research on advisory board and citizen participation.

In their discussion of citizen participation in the municipal budgeting process, Simonsen and Robbins (2000: 14-15) indicate that advisory boards have traditionally been used by local government to inform decisions makers of the views of local experts. This is a particular tendency of advisory boards where members are appointed rather than elected. Moreover, advisory boards are considered to have a low level of political power, since decision makers are not required to act upon

their recommendations. The willingness of local elected officials to listen to the recommendations of advisory boards is a key factor in their success as a mechanism for augmenting citizen participation. Like Simonsen and Robbins, Callahan (2000) highlights this point in her analysis of citizen participation in the local budgeting. Her findings show that the work of citizen advisory boards can be frustrated by a lack of cooperation from local administrators, leading to a drop in participation by advisory board members. Similarly Berner (2001) found that the scope of citizen participation in local government budgeting and the degree to which citizen input ultimately influenced the budgeting process was strongly influenced by the level of support for citizen involvement coming from elected officials and local administrators.

In addition to identifying the need for institutional support for citizen participation, Murphy and Cunningham (2003) describe how low-income residents can be blocked out of the citizen participation process by more affluent residents and their limited access to resources. Murphy and Cunningham point out that more affluent community members of a community can dominate the policy process when the interests of the working class and the poor are not incorporated into a citizen participation strategy. They also point out that the poor can be blocked out of the citizen participation process due to a lack of material resources and technical expertise necessary to participate fully in local decision-making. As a result, citizen participation strategies need to incorporate mechanisms for infusing resources into community-based organizations that focus on the interests of working class and poor residents.

Bockmeyer's (2001) analysis of the Empowerment Zone (EZ) process in Detroit reached similar conclusions about the citizen participation process. Her research examined citizen participation at the organizational level, focusing on the role of community development corporations in municipal planning. It indicated that the participation by community development corporations was limited in the EZ process since these organizations had fewer resources to draw from when compared to governmental and private sector organizations. Bockmeyer also pointed out that the participation of community development

corporations was highly dependent on the willingness of local officials to grant them access to the EZ process. She concludes that inequalities in the availability of resources and access to decision-making led to less effective participation. Silverman (2003) reached a similar conclusion in his analysis of citizen participation in community development corporations. He found that citizen participation was limited in local community development due to resource constraints faced by community-based organizations and weak mandates for citizen participation coming from governmental sources. As a result, the scope of citizen participation remained underdeveloped, particularly in economically distressed urban communities.

Given this situation, the ability of advisory boards to promote grassroots decision-making is lessened. For instance, arguments that advisory boards can produce consensus and advance the broader community interest (Thomas 1994) are weakened when the level of support for citizen participation coming from governmental actors and the political economy of poor communities is considered. On a broader scale, expanded grassroots action and community organizing, whether it takes the form recommended by scholars like Peterman (2000) or an activist form in the Alinsky (1969, 1971) tradition, requires that citizen participation be considered in the context of broader institutional structures. In part, this means that citizen participation is dependent on the degree to which citizens have control of stable and autonomous resources to guarantee access to local decision-making.

## Data and Methods

The data for this article come from a series of telephone interviews with chairpersons of citizens' district councils in Detroit, Michigan. Chairpersons were focused upon as respondents in interviews since they had detailed knowledge of the activities of citizens' district councils. Also, chairpersons were the most accessible members of these organizations, given the voluntary nature of this type of advisory board. Interviews were conducted between June 2002 and April 2003. During the interviews, respondents were asked a series of open-ended questions about the role of citizen participation in citizens' district councils. The questions were drawn from an interview guide that consisted of 10

items and 16 probes. This research instrument focused on a core set of questions which related to the issues under examination. Of particular interest to this article were elements of the research instrument which focused on the role of citizen participation in these organizations and their decision-making processes. In addition to this information, data were collected concerning the demographic characteristics of each citizens' district council's membership. The interviews ranged from 20 minutes to 1 hour in length. In addition, archival materials, census data, and documents from the City of Detroit related to citizens' district councils were collected during the course of the research for later analysis.

Efforts were made to conduct interviews with chairpersons from all of the citizens' district councils in the city. To accomplish this, a systematic methodology employing grounded theory and theoretical sampling techniques like those described by Glaser and Strauss (1967), and Strauss and Corbin (1998) were used during data collection and analysis to ensure representativeness. In total, a population of 17 citizens' district councils was identified in Detroit. Of those, there were 3 that did not have chairpersons during the time data collection was conducted, and contact information for other members of those citizens' district councils was not available. The chairpersons from the remaining 14 citizens' districts councils were approached for interviews, and 11 of these individuals agreed to be interviewed. Several attempts were made to schedule interviews with the chairpersons of the 3 remaining citizens' district councils, however they were unavailable. As a result, only secondary data were obtainable for analysis related to these organizations and those without chairpersons. Upon examination of this information, it was determined that the characteristics of these 6 organizations paralleled those of the 11 others that were interviewed. As a result, it was concluded that a point of theoretical saturation had been reached and data analysis could continue.

## Citizens' District Councils in Detroit

Detroit's citizens' district councils have been shaped by the environment in which they are embedded. They were originally created to address inequities that grew out of the Urban Renewal process of the mid-

1900s. Although the Urban Renewal and Model Cities eras technically ended by the mid-1970's, citizens' district councils continued to function as planning advisory boards since redevelopment continued in Detroit's old Urban Renewal areas. This was justified under state law and municipal ordinances that remained in place after the remnants of the Model Cities program were folded into the Housing and Community Development Act of 1974. The continuation of citizens' district councils was also justified by the persisting threat of displacement due to redevelopment efforts in the old Urban Renewal areas, and the socioeconomic distress that these areas faced. The depth of distress faced by communities located within the boundaries of citizens' district councils is illustrated in Table 1.

| Table 1: Descriptive Statistics for City of Detroit and Citizens' District Council Boundaries* | | | | | | |
|---|---|---|---|---|---|---|
| | City of Detroit 1990 | City of Detroit 2000 | City of Detroit Change 1990-2000 | Council Boundaries 1990 | Council Boundaries 2000 | Council Boundaries Change 1990-2000 |
| **Total Population:** | 1,027,974 | 951,270 | -76,704 | 36,284 | 34,197 | -2,087 |
| % Female | 53.03 | 52.72 | -0.31 | 45.94 | 50.87 | +4.93 |
| % White | 22.18 | 12.24 | -9.94 | 25.01 | 18.51 | -6.50 |
| % Black | 74.94 | 81.77 | +6.83 | 71.06 | 74.61 | +3.55 |
| % Below Poverty Level | 31.95 | 27.84 | -4.11 | 36.83 | 29.76 | -7.07 |
| % Age 25 & Above without a High School Diploma | 39.45 | 31.71 | -7.74 | 38.52 | 29.54 | -8.98 |
| **Total Households:** | 373,857 | 336,482 | -37,375 | 17,280 | 15,844 | -1,436 |
| Median Income - US$ | $19,281 | $28,928 | + $9,647 | $18,919 | $23,795 | + $4,876 |
| % Receiving Public Assistance | 27.44 | 12.25 | -15.19 | 28.70 | 10.41 | -18.29 |
| % Receiving Social Security | 29.08 | 26.64 | -2.44 | 27.48 | 22.97 | -4.51 |
| **Total Housing Units** | 410,027 | 375,096 | -34,931 | 21,972 | 19,245 | -2,727 |
| Median Value - US$ | $24,991 | $60,457 | + $35,466 | $23,633 | $66,072 | + $42,439 |
| % Owner (in | 51.11 | 52.16 | +1.05 | 23.99 | 23.20 | -0.79 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Occupied Units) | | | | | | |
| % Renter (in Occupied Units) | 48.89 | 47.84 | -1.05 | 76.01 | 76.80 | +0.79 |
| % Vacant | 9.00 | 11.13 | +2.13 | 18.51 | 19.86 | +1.35 |
| * Sources: U.S. Department of Commerce, Bureau of the Census. (1990) *1990 Census of Population and Housing Summary Tape File 3A*. Washington D.C.: Data User Services Division; U.S. Department of Commerce, Bureau of the Census. (2000) *2000 Census of Population and Housing Summary Tape File 3A*. Washington D.C.: Data User Services Division | | | | | | |

Table 1 highlights the degree to which the citizens' district councils examined in this research faced barriers to redevelopment and entrenched problems associated with the legacy of Urban Renewal. The data in the table illustrates how the problems of communities within citizens' district council boundaries were more complex than the City of Detroit as a whole. For example, Table 1 shows that these communities were losing population and housing units over a protracted period of time. Table 1 also indicates that the percent of residents living below the poverty level was higher in these communities than in the city as a whole. Moreover, median household income growth was lower in these communities than the city as a whole. At the same time, the percent of residents receiving public assistance and social security income declined at a higher rate than the city as a whole. In essence, poverty remained more concentrated in communities located within citizens' district council boundaries during the contemporary period, while residents absorbed the deepest cuts in the social welfare safety net.

Interestingly, the percent of residents living in citizens' district council communities who were black was lower than in the city as a whole. This appears to be the result of two processes. The first involved the displacement of African Americans during the Urban Renewal era, a process that Anderson (1964) labeled as *Negro removal*. The second involved a rise in gentrification in these communities beginning the 1980s. The unique nature of housing problems is illuminated in Table 1 when housing values and tenure are examined. Despite modest growth in household incomes, housing costs in the communities within citizens' district council boundaries outpaced the city as a whole. This seems to be the result of high rates of housing abandonment and demolitions in these communities, as well as the gentrification of remaining units. In

addition to these factors, vacancy rates for the remaining housing units in the communities located within citizens' district council boundaries continued to rise in the contemporary period, and the population of renters far outpaced homeowners. In short, the City of Detroit witnessed a growing housing crisis during the contemporary period, and this crisis was experienced to a greater degree by communities located within citizens' district council boundaries. The housing crisis was characterized by stagnant rates of homeownership, increased levels of abandonment, rising vacancy rates, an overall decline in the number of housing units, and rising housing costs.

In the wake of these socioeconomic and development obstacles, citizens' district councils continued to function, providing residents of distressed communities with a voice in local planning and development decisions. In terms of citizen participation, questions arise concerning the degree to which the citizens' district councils reflected the views of the communities they represented. The data in Table 2 provides three key insights into the degree to which citizens' district councils are representative bodies. First, the vast majority of the members of citizens' district councils were residents of the local community, and they were selected by their peers in regular elections. The dominance of elected members provided the citizens' district councils with a great deal of legitimacy at the community level and in the city. The smaller group of non-elected members on citizens' district councils were local entrepreneurs appointed by the Mayor. Second, Table 2 indicates that there were relatively equal numbers of men and women who served as members of the citizens' district councils. The presence of a cross-section of the community along gender lines added to the legitimacy of the citizens' district councils. Finally, the racial composition of the citizens' district councils seem to reflect the demographics of these communities. Like gender, the representative nature of citizens' district councils along racial lines added to their legitimacy. Moreover, citizens' district councils served as one meaningful source of representation in local policymaking for working class and poor African Americans.

| Table 2: Characteristics of Citizens' District Council Membership (N=17) | | |
|---|---|---|
| | District Council Average Number | Percent of Total Members |
| Selection: | | |
| | | |

| | | |
|---|---|---|
| Elected | 12 | 86.4 |
| Appointed | 1.9 | 13.6 |
| **Gender:** | | |
| Female | 7.5 | 45.8 |
| Male | 6.4 | 54.2 |
| **Race:*** | | |
| Black | 10.4 | 72.9 |
| White | 3.9 | 27.1 |
| *This information was reported for a subset of the District Councils (n=9) | | |

On the surface, citizens' district councils seem to provide a form of representative democracy to distressed inner city neighborhoods. In particular, they created an access point for working class, poor, and minority residents who faced potential displacement due to urban redevelopment efforts. In this narrow sense, citizens' district councils appeared to augment the level of citizen participation in local planning and community development decisions. However, questions concerning the scope and impact of citizen participation that emerged from citizens' district councils requires further discussion. These questions are addressed in the following two sections.

## The Promise of Advisory Boards

One of the most important attributes citizens' district councils possess is their legitimacy in the community and with city officials. This stems from the community-based orientation of the citizens' district councils and their specific role in poor communities. Although they function mainly as advisory boards, citizens' district councils have a specific charter to represent the interests of working class and poor residents in communities facing development pressures from major institutions in the public and private sector. In an interview, this focus was described by one of the chairpersons:

> In an area where there isn't a citizens district
> council, the people are pretty much self-sufficient,
> and they're not threatened with displacement, or
> they haven't been displaced. So, they don't have the
> same needs as the people who are under attack or
> threatened with being uprooted or already been

thrown out of the community.

It was common for chairpersons to identify equity issues related to redevelopment and displacement as core foci of their citizens' district councils. The emphasis on these issues has served to enhance their legitimacy.

This emphasis was well established in the citizens' district councils during their formation in the early 1970s. For instance, an educational handout used in a 1973 workshop of a citizens' district council title, "The District Council's Role in the Development Process" stated that:

> The District Council Automatically inherits the role of watchdog over developers by virtue of Public Act 344 and 189, and City Ordinance 622-G which collectively give the District Council review authority over development proposals made in their areas. Usually this authority is confined to the approval of a developer based on the conformance of his proposal with the goals and objectives expressed by the Council, but can expand to include a working relationship with the developer over the course of packaging, designing and financing the project.

The watchdog role of citizens' district councils supported their role as independent advisory boards and to some degree it prevented them from being marginalized in the urban planning process. The emphasis that citizens' district councils placed on serving the interests of working class and poor residents in their communities also encouraged them to expand their activities. The chairpersons interviewed in this research described how the citizens' district councils were engaged in community development work which went beyond the scope of their chartered mission as a planning advisory board. For example, some of the citizens' district councils provided residents with application materials for low-income redevelopment loans, organized neighborhood watch programs, reported abandoned cars and property to the city, and organized efforts to clean up graffiti and vacant lots in

their communities. Other chairpersons described how their citizens'
district councils delivered regular newsletters to residents and organized
community block parties.

In addition to these activities, chairpersons described how their
organizations provided an important liaison function to residents and
developers. In a narrow sense, this meant that citizens' district councils
assisted individuals in navigating the city's bureaucracy as it related to
the development process. For example, one of the chairpersons made
these comments about how his citizens' district council functioned as a
liaison to developers:

> A lot of us, including myself, went through the
> process before I even knew there was a citizens'
> district council. When we built our building,
> actually both buildings. So, we know some of the
> frustration involved with developing in the city.
> We want to try and smooth that out as much as we
> can, and give them as much information, so they
> have to do it once, instead of twice. Going through
> the process with them, so they're familiar with the
> process up to the point of getting the city to sell
> them the property.

The liaison function filled by citizens' district councils made them
important gatekeepers in the local development process. If a citizens'
district council supported a developer's proposal, it could be a key
player in the land acquisition process. This type of assistance goes
beyond the advisory role of the citizens' district councils, and it results
in an expanded scope of influence on the local development process.

Although citizens' district councils could act as liaisons to developers, it
was more common for them to provide assistance to residents.
However, the extent to which they could function as community
liaisons was resource driven. Only one of the citizens' district councils
interviewed had a full-time staff. The rest relied on volunteer workers.
As a result, the level of assistance available to residents was
inconsistent across the citizens' district councils. Yet, all of the

chairpersons interviewed indicated that providing such assistance to residents was a goal of theirs. In the case of the citizens' district council with a full-time staff, acting as a liaison between residents and the city was considered a central function of the organization. The chairperson of this citizens' district council describe this aspect of its mission in this manner:

> We basically help a lot of people in the neighborhood so they don't have to deal with the city. It's like a maze of bureaucracy. So, it's kind of our job to know the maze. Not that any of us fully do, because it's still a maze. But, we have a little bit more access to it. And, a lot of times, the people in the city are available from 8:30am until 4:30pm, and that's not necessarily convenient to all citizens. So, our mission statement is to basically work between the neighborhood and the city, particularly in issues of zoning and development.... We do that, but we also, we're here 40 hours a week, so we're actually dealing with the city, we're actually dealing with the state and our elected officials directly, rather than having to rely on a volunteer board to do those kind of things. It's the difference between any nonprofit with just a volunteer board versus that next step where you have staff. We do the basic clerical stuff, we have to file a monthly report with the city, stuff like that. But then we also put out a newsletter that goes to 600 people, we have a website that's updated every month, and we host events monthly.

This citizens' district council serves as an example of the promise of an advisory board with adequate resources to take on an expanded mission. Of course, most of the citizens' district councils in Detroit fall short of this promise. Because of this, a more detailed discussion of the limits of using citizens' district councils to augment citizen participation is warranted.

# The Limits of Advisory Boards

The most obvious limitation of using citizens' district councils as mechanisms to promote citizen participation is their advisory role. This role limits the political power of citizens since elected officials and public administrators are not required to implement the recommendations of citizens' district councils. This characteristic has led scholars to view advisory boards as a weak form of citizen participation that mainly entails some level of consultation with citizens about urban development and policy proposals. In extreme cases where the recommendations of advisory boards are ignored by elected officials and administrators, citizens can become disenchanted and alienated from the public decision-making process. However, it is arguable that when advisory boards are well institutionalized and composed of elected representatives from a community, they will be perceived as more legitimate, causing elected officials and administrators to take their recommendations more seriously. Despite this possible outcome, the chairpersons of Detroit's citizens' district councils sometimes described their advisory role as a "stumbling block," particularly in instance where they tried to expand the scope of their activities.

Another obstacle faced by the citizens' district councils was the lack of predictability in the political and fiscal environment in which they were embedded. For example, the chairpersons indicated that political support and resources began to dry up beginning in the late 1990s, during Mayor Denise Archer's administration. On chairperson made this comment on the shift that took place with political regimes change:

> Our role over the years has changed. When we first
> got started, in addition to the citizens district
> council we had a nonprofit housing corporation.
> We bought, rehabilitated homes, rented homes. We
> had contracts with the City of Detroit to clear
> vacant lots within the community and those kinds
> of things. We had our own office staff, we had our
> work staff, and we had property managers during
> that time. That was during the Young

http://comm-org.wisc.edu/papers2003/silverman.htm

administration. During the Archer administration
the role of what the citizens' district councils were
involved in was kind of restricted, and it was
strictly an advisory role where if a developer
approaches the city about wanting to do something
within the community, the developer is obligated as
it relates to our advisory role. He presents his
proposal to the citizens district council for input.
The citizens district council in turn asks questions,
tries to get information so that the residents of the
community can be informed about the particular
proposal.

Other chairpersons recanted similar stories and added that during this
period the city most of the citizens' district councils lost their funding.
For example, only two citizens' district councils received CDBG and
Neighborhood Opportunity Fund monies in the City of Detroit during
the 2001-2002 budget cycle. During that same period, no monies were
appropriated by the city for annual citizens' district council elections.
Some of this funding was restored with the election of a new Mayor,
Kwame Kilpatrick. However, a number of chairperson indicated that
although the new Mayor was supportive, he was slow to make
appointments to their citizens' district councils. This caused some of
them to operate without a quorum for a portion of the first year of the
Kilpatrick administration.

Political and fiscal instability hamstrung Detroit's citizens' district
councils, but the most significant change involved the creation of a
centralized office for them in 2001. At the end of the Archer
administration, citizens district councils lost most of their funding, what
remained was redirected to a centralized office which was to provide all
of the unfunded citizens' district councils with staff support and
technical assistance. The chairpersons had a variety of opinions about
the transition from in-house staff to a centralized staff. Most felt that
the central office did the best it could with the limited resources
provided by the city. Others were indifferent and indicated that the
central office offered limited clerical support. Regardless of their
opinions about the central office, all of the chairpersons of citizens'

district councils said that they would prefer to have their own in-house staff. In the following comment, one chairperson expressed a more critical view of the budget cuts that led to the creation of the central office and their impact on Detroit's citizens' district councils:

> I don't have a problem with the staff, I think the people want to do their job, but the statues that govern Urban Renewal prohibit that. And really, they serve as a satellite office for the city and it's not providing, while they might document that they're doing a lot of stuff, they are not. I think they paid them $1.4 million or they gave them a contract, but it's not serving the purpose the law intended. In fact, it's a conflict of interest. Because the law says there will be a citizens' district council within the jurisdictional boundaries of each Urban Renewal area, and that citizens' district council will be accessible to the residents. Now, that doesn't mean a citizens' district council board, it means an office and a staff. And, while they say they don't have to have a citizens' district council office and staff, they do if they truly want it to serve the people. But what happened was the funding was taken from the citizens' district councils at a critical time when people were being displaced and removed from their property, and they had nowhere to go for help. Then, to justify it they set up [the central office]. To me the city should have funded the citizens' district councils, not just this one, but the other ones so they could provide the services as the law intended. Because the law requires that the citizens' district council is the official spokesperson for the community, the law mandates that the citizens' district councils exist in an Urban Renewal area. So, to me, they should have funded the citizens' district councils so they could provide the services the law intended, so the CDBG money is allocated to the community to implement and plan

things the community wanted. But what they did is
they dumped the community out and planned
things for new people. But, the people who were
here first, not only have they been displaced, but
the plans they wanted were not implemented
because the citizens' district council was not in
place.

In short, without adequate funding and access to staff resources to assist
elected members of citizens' district councils with the day-to-day
activities in their communities, the equity goals of the statutes and
ordinances that created citizens' district councils were not met.
Increasingly, Detroit's citizens' district councils run the risk of being
reduced to ineffectual advisory boards with little internal capacity to
influence municipal decision-making or engage in local community
development.

## Policy Recommendations

The findings from this research identify a number of areas where
planning advisory boards can be improved in order to expand the scope
of citizen participation in municipal decision-making and local
community development. Specifically, the policy recommendations
growing out of this research focus on suggested modifications in three
areas: expanding the political power of planning advisory boards,
creating stable and autonomous resources for them, and broadening the
communities that they represent.

The first modification that is suggested for planning advisory boards
entails an expansion of their political power. This is particularly
justified when planning advisory boards are predominantly composed
of members who are elected by residents in a community, as was the
case with Detroit's citizens' district councils. The main critique of
advisory boards is the fact that the recommendations they make to
elected officials and public administrators are not binding. In order to
give advisory board more influence, state statutes and municipal
ordinances should be amended to grant advisory boards veto power
over local development projects. In cases where this would be

impractical, states and municipalities should give advisory boards one vote at the planning commission or city council level on projects that impact the communities they represent. These types of progressive reforms would strengthen local democracy, bringing a grassroots emphasis to local decision-making.

The second modification that is suggested entails creating a stable revenue stream of autonomous resources for planning advisory boards. This recommendation focuses on the manner in which shifts in political regimes and public finance strategies impact local democracy. The discussion of Detroit's citizens' district councils highlighted how political support and budget instability can affect staffing decision on advisory boards, as well as the scope of citizen participation. In order to address these issues, planning advisory boards need greater political and fiscal autonomy. Rather than relying exclusively on CDBG funds and other fiscal support from local government, planning advisory boards should have tax revenues earmarked to them for staff and operating expenses. The source of these revenues should come from an increment of existing tax revenues generated in the communities that the boards represent. Depending on local revenue streams, earmarked funds could be pooled across communities or calculated for individual communities. This type of funding mechanism could be modeled after those used in Maryland's community benefits districts (Baer and Marando 2001, Hyde et. al. 2002), where a portion of local property taxes are redirected to community-based organizations in designated areas. The stabilization of revenues would allow planning advisory boards, as well as other community-based organizations, to maintain in-house staff to work on an expanded scope of activities. Revenue stabilization would also provide a foundation for the development of what are sometimes referred to as "community planning centers" (Klein 1994). These are places, "where citizens can meet to develop plans, examine maps and data, and convene to discuss [community development] goal and objectives" (Klein 1994: 168).

The final modification that is suggested entails broadening the communities that planning advisory boards represent. This is a crucial issue since organizations like Detroit's citizens' district councils run the risk of becoming increasingly isolates. In order for planning advisory

boards to benefit from the entire pool of resources, skills, and experiences in a city, the boundaries of the communities they represent should be drawn to include a broadened socioeconomic spectrum. Creating communities with mixed socioeconomic and class boundaries would bring a number of benefits to planning advisory boards. Among other things, these include a larger tax base from which to earmark revenues for staff and operating costs, and added constituents with expertise and professional networks. Arguments for drawing boundaries in this manner are supported by past research on participation (Scavo 1993, Baer and Marando 2001, Hyde et. al. 2002). Deliberately creating mixed socioeconomic and class boundaries also curbs patterns of race and class segregation that have the potential to undermine democratic institutions.

In summary, the findings from this research indicate that planning advisory boards have the potential to evolve into nodes for grassroots planning and community development. However, their promise is often cut short by limited organizational capacity, a lack of political power, municipal budget constraints, and shifting political regimes. As a result, recommendations have been forwarded to expand the political power of planning advisory boards, provide them with stable and autonomous resources, and broadening the communities that they represent. Two additional points should be made. First, many of the constraints faced by planning advisory boards are also faced by other community-based organizations. As a result, many of the recommendations offered in this article can be applied to other types of community-based organizations. Second, planning advisory boards should not be viewed as organizations that operate in a vacuum. They interact with a variety of other organizations at the community and neighborhood level. Given this situation, the next challenge for scholars and practitioners is to begin to formulate comprehensive strategies for expanding democratic processes in community-based organizations and develop stable and autonomous mechanism to finance their activities.

# References

Alinsky, Saul. 1969. *Reville for Radicals*. New York: Vintage Books.

Alinsky, Saul. 1971. *Rules for Radicals*. New York: Vintage Books.

Anderson, Martin. 1964. *The Federal Bulldozer: A Critical Analysis of Urban Renewal, 1949-1962*. Cambridge, MA: M.I.T. Press.

Arnstein, Sherry R. 1969. A Ladder of Citizen Participation. *Journal of the American Institute of Planners*, 35.4: 216-224.

Baer, Susan E. and Vincent L. Marando. 2001. The Subdistricting of Cities: Applying the Polycentric Model. *Urban Affairs Review*, 36.5: 721-733.

Berner, Maureen. 2001. Citizen Participation in Local Government Budgeting. *Popular Government*, Spring:23-30.

Bockmeyer, Janice L. 2000. A Culture of Distrust: The Impact of Local Political Culture on Participation in the Detroit EZ. *Urban Studies*, 37.13: 2417-2440.

Callahan, Kathe. 2000. Citizen Participation Run Amok. *Public Productivity and Management Review*, 23.3:394-398.

Glaser, Barney G. and Anslem L. Strauss. 1967. *The Discovery of Grounded Theory: Strategies for Qualitative Research*. New York: Aldine De Gruyter.

Hyde, Cheryl, Megan Meyers, and Dick Cook. 2002. A New Twist in Nonprofit, For-Profit, and Public Sector Relationships: The Community Benefits District. *International Journal of Sociology and Social Policy*, 22.9/10: 55-76.

Klein, William R. 1994. Citizen Participation: Whose Vision Is It? Pp. 159-172 in *Planning and Community Equity*, edited by the American Planning Association. Chicago: Planners Press.

Murphy, Patricia Watkins and James C. Cunningham. 2003. *Organizing for Community Controlled Development: Renewing Civil Society*. Thousand Oaks, CA: Sage Publications.

Peterman, William. 2000. *Neighborhood Planning and Community-*

*Based Development: The Potential and Limits of Grassroots Action.* Thousand Oaks, CA: Sage Publications.

Scavo, Carmine. 1993. The Use of Participative Mechanisms by Large US Cities. *Journal of Urban Affairs*, 15.1: 93-109.

Silverman, Robert Mark. 2003 (forthcoming). Progressive Reform, Gender, and Institutional Structure: A Critical Analysis of Citizen Participation in Detroit's Community Development Corporations (CDCs). *Urban Studies*.

Simonsen, William and Mark D. Robbins. 2000. *Citizen Participation in Resource Allocation.*

Boulder, CO: Westview Press.Strauss, Anslem and Juliet Corbin. (1998) *Basics of Qualitative Research: Techniques and Procedures for Developing Grounded Theory, Second Edition*. Thousand Oaks, CA: Sage Publications.

The District Council's Role in the Development Process. Ruth M. Tenney Collection. 1964-1974. Box 10, Folder 7. Walter P. Reuther Library of Labor and Urban Affairs, Wayne State University, Detroit, Michigan.

Thomas, John Clayton.1995. *Public Participation in Public Decisions: New Skills and Strategies for Public Managers*. San Francisco: Jossey-Bass Publishers.

# Acknowledgments

This research was partially supported by a Resident Scholarship in the Humanities Center at Wayne State University and a College of Liberal Arts Research & Inquiry Grant at Wayne State University. A revised and expanded version of this working paper has been accepted for publication in volume 92.4 of the National Civic Review.

## About the Author:

Robert Mark Silverman is an Associate Professor in the Department of Urban and Regional Planing and a Senior Research Associate in the Center for Urban Studies at SUNY-Buffalo. His research focuses on community-based organizations, citizen participation, race relations, and urban inequality. He is the author of Doing Business in Minority Markets: Black and Korean Entrepreneurs in Chicago's Ethnic Beauty Aids Industry (Garland Publishing 2000)and the editor of Community-Based Organizations: The Intersection of Social Capital and Local Context in Contemporary Urban Society (Wayne State University Press 2004 - forthcoming). He is also the moderator for the Cyberhood website (http://www.thecyberhood.net).