# EXHIBIT 6

**SETTLEMENT AND PLAN SUPPORT AGREEMENT**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 9 PLAN; ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT**

This SETTLEMENT AND PLAN SUPPORT AGREEMENT (this "Agreement") is entered into as of March __, 2014, among the City of Detroit (the "City"), UBS AG ("UBS") and Merrill Lynch Capital Services, Inc. ("MLCS"). The City, UBS and MLCS are referred to herein individually as a "Party" and collectively as the "Parties".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation");

**WHEREAS**, MLCS and UBS and the Service Corporations are parties to swap transactions under certain ISDA Master Agreements as set forth in Schedule A attached to this Agreement (as applicable, the "UBS Swap Agreements" and the "MLCS Swap Agreements"; the UBS Swap Agreements and MLCS Swap Agreements are referred to collectively herein as the "Swap Agreements") ;

**WHEREAS**, the City, the Service Corporations, U.S. Bank National Association, as custodian (the "Custodian"), MLCS and UBS are party to a Collateral Agreement dated as of June 15, 2009 (the "Collateral Agreement");

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013, that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "Emergency Manager") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013, the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing Bankruptcy Case No. 13-53846 (the "Bankruptcy Case") before the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court");

1

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation, the Swap Agreements and the Collateral Agreement;

**WHEREAS**, on March 3, 2014, the City filed with the Bankruptcy Court, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), a motion (the "<u>Approval Motion</u>") to approve this Agreement;

**WHEREAS**, the Approval Motion was filed with a term sheet evidencing the key terms of this Agreement and also with the form of Approval Order attached thereto; and

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1**          <u>**Definitions and Interpretations.**</u>

**1.1     Definitions.**  The following terms have the respective meanings set forth below for all purposes of this Agreement.

"<u>2005 Pension Funding Securities</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Pension Funding Securities</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2005 Pension Funding Trust</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Pension Funding Trust</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Transaction</u>" means the 2006 transaction described in the Authorizing Ordinance.

"<u>Agreement</u>" has the meaning ascribed to it in the preamble hereof.

"<u>Approval Motion</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Approval Order</u>" means an order entered by the Bankruptcy Court in the form attached to the Approval Motion approving, pursuant to Bankruptcy Rule 9019, all of the terms of this Agreement with only such changes to such order as are acceptable to each of the Parties.

"<u>Authorizing Ordinance</u>" means Ordinance No. 05-09 adopted by the City Council on May 26, 2009.

"<u>Bankruptcy Case</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Bankruptcy Code</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Bankruptcy Court</u>" has the meaning ascribed to it in the recitals hereof.

2

"Bankruptcy Rules" has the meaning ascribed to it in the recitals hereof.

"Business Day" means a day on which the Custodian is open for the transaction of business in the city and State of New York and the City is open for business in Detroit, Michigan.

"Certificates of Participation" has the meaning ascribed to it in the recitals hereof.

"City" has the meaning ascribed to it in the preamble hereof.

"City Council" means the Council of the City.

"City Payment" has the meaning ascribed to it in the Collateral Agreement.

"City Pledge" has the meaning ascribed to it in the Collateral Agreement.

"City Releasors" has the meaning ascribed to it in Section 8.2 hereof.

"Collateral Agreement" has the meaning ascribed to it in the recitals hereof.

"COPs Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Serv. Corp.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich.), filed in the Bankruptcy Case on January 31, 2014.

"Custodian" has the meaning ascribed to it in the recitals hereof.

"Custodian Liquidity Event" has the meaning ascribed to it in Section 5.1(a) hereof.

"Counterparty Released Parties" has the meaning ascribed to it in Section 8.2 hereof.

"Definitive Documents" has the meaning ascribed to it in the Collateral Agreement.

"DGRS" has the meaning ascribed to it in the recitals hereof.

"Distribution Amount" has the meaning ascribed to it in Section 3.1 hereof.

"Early Termination Date" has the meaning ascribed to it in the Swap Agreements.

"Effective Date" means the effective date of any Plan.

"Emergency Manager" has the meaning ascribed to it in the recitals hereof.

"Event of Default" has the meaning ascribed to it in the Swap Agreements.

"Funding Trusts" means, collectively, the 2005 Pension Funding Trust and the 2006 Pension Funding Trust.

"General Receipts Subaccount" has the meaning ascribed to it in the Collateral Agreement.

3

"<u>Hedge Event</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>Hedge Periodic Payables</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>Holdback Account</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>Holdback Requirement</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>LIBOR</u>" means the *greater* of (i) the rate per annum equal to the London Interbank Offered Rate (or if such rate is unavailable, a comparable or successor rate agreed to by the Parties) for deposits in U.S. dollars for a period of three (3) months, as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as agreed to by the Parties) at or about 11:00 a.m., London time on the second London Banking Day prior to the commencement of the three-month period, with the rate being calculated for each successive three-month period during which interest accrues and (ii) 1.0%.

"<u>Liens</u>" has the meaning ascribed to it in Section 3.2 hereof.

A "<u>Liquidity Event</u>" shall be deemed to occur only if the City has at all times complied with Section 4.2(b) hereof but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

"<u>London Banking Day</u>" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"<u>MLCS</u>" has the meaning ascribed to it in the preamable hereof.

"<u>MLCS Swap Agreements</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Month</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>Monthly Holdback Compliance Notice</u>" has the meaning ascribed to it in the Collateral Agreement.

"<u>Monthly Payments</u>" has the meaning ascribed to it in Section 4.1(a) hereof.

"<u>Net Amount</u>" means the Distribution Amount less the sum of all Quarterly Payments received by UBS and MLCS since January 1, 2014.

"<u>Party</u>" has the meaning ascribed to it in the preamble hereof.

"<u>PFRS</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Plan</u>" means any plan of adjustment for the City.

"<u>Pledged Property</u>" has the meaning ascribed to it in the Collateral Agreement.

"Post-Petition Facility" means up to $120 million in principal amount (plus all interest and fees) of the City's quality-of-life post-petition financing facility described in the Notice of Presentment of Final Order Approving Post-Petition Financing [Dkt. No. 2921].

"Post-Petition Rate" has the meaning ascribed to it in Section 4.3(c) hereof.

"Potential Event of Default" has the meaning ascribed to it in the Swap Agreements.

"Quarterly Payments" has the meaning ascribed to it in Section 4.1(a) hereof.

"Related Persons" means, with respect to any party, such party's (i) officers, (ii) directors, (iii) employees, (iv) members, (v) managers, (vi) partners and (vii) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

"Released Claims" has the meaning ascribed to it in Section 8.2 hereof.

"SBS" means SBS Financial Products Company, LLC.

"Secured Claims" has the meaning ascribed to it in Section 3.1 hereof.

"Service Contract" has the meaning ascribed to it in the Collateral Agreement.

"Service Corporation" has the meaning ascribed to it in the recitals hereof.

"Service Corporation Pledge" has the meaning ascribed to it in the Collateral Agreement.

"Service Corporation Security Interest" has the meaning ascribed to it in the Collateral Agreement.

"Settlement Transaction" has the meaning ascribed to it in the Collateral Agreement.

"Specified Plan" means a Plan that:

(a) provides the following treatment for the Secured Claims:

(i) solely if the City has complied with Section 4.1(a) hereof through the Effective Date, payment of the Net Amount in full in cash within thirty days following the Effective Date; *provided* that until paid in cash in full, the Secured Claims will remain secured by the Pledged Property; *or*

(ii) solely in the case of a Liquidity Event and solely if the City has complied with Section 4.1(a) hereof through the Effective Date, payment of the Net Amount in cash in full within 180 days following the Effective Date; *provided* that (1) other than with respect to net proceeds used to repay the Post-Petition Facility, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (A) supported by the full faith and credit of the City or (B) payable from the

general fund of the City, will be used to pay the Net Amount, (2) the City will continue to comply with its obligations under Section 4.1(a) hereof and otherwise under this Agreement and the Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, the Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the Post-Petition Rate plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (5) UBS and MLCS will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them;

(b) to the extent any creditor of the City is exculpated under such Plan for acts and omissions in connection with the Bankruptcy Case, exculpates the Counterparty Released Parties for acts and omissions in connection with the Bankruptcy Case and this Agreement; *and*

(c) except as provided in clause (a) above, treats the rights and claims of UBS and MLCS no less favorably than the terms of this Agreement and the Approval Order.

"Standard Holdback Requirement" has the meaning ascribed to it in the Collateral Agreement.

"Swap Agreements" has the meaning ascribed to it in the recitals hereof.

"Swap Insurance Policies" means, collectively, each "Swap Insurance Policy" as such term is defined under each Swap Agreement.

"Swap Insurers" has the meaning ascribed to it in Section 10.2 hereof.

"Syncora" has the meaning ascribed to it in Section 10.2 hereof.

"Termination Event" has the meaning ascribed to it in the Swap Agreements.

"Transaction Documents" means, collectively, the Collateral Agreement, the Swap Insurance Policies, the Swap Agreements, the 2006 Transactions, the City Pledge, the Service Corporation Security Interest, the Service Corporation Pledge, the Authorizing Ordinance, the Definitive Documents and the Settlement Transaction.

"UBS" has the meaning ascribed to it in the preamble hereof.

"UBS Swap Agreements" has the meaning ascribed to it in the recitals hereof.

**1.2    Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular.  Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import.  References to any statute shall be deemed

6

to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

## Section 2        The Plan.

**2.1     Plan Support**.  So long as (i) UBS and MLCS have been properly solicited by the City pursuant to the Bankruptcy Code after approval of a disclosure statement by the Bankruptcy Court, (ii) the Plan is a Plan that the City may propose in accordance with Section 2.2 hereof and (iii) the Plan either (x) is a Specified Plan or (y) treats the rights and claims of UBS and MLCS in accordance with this Agreement and the Approval Order, each of UBS and MLCS agrees that (a) it will timely vote or cause to be voted its portion of the Secured Claims in acceptance of such Plan and (b) it will not, in its capacity as holder of the Secured Claims, object to such Plan.

**2.2     No Less Favorable Plan Treatment**.  The City will not propose or support any Plan that (i) treats the Secured Claims any less favorably than as provided in this Agreement or the Approval Order, unless such treatment is as provided by a Specified Plan or (ii) has a material adverse effect (as compared to this Agreement) on UBS, MLCS, any of their affiliates, or any of their and their affiliates' respective Related Persons, relating to the Secured Claims, the Swap Agreements or the Certificates of Participation (it being understood that treatment as provided by a Specified Plan is not, in itself, a material adverse effect).

**2.3     No Solicitation**.  This Agreement is not a solicitation of votes for the acceptance or rejection of any chapter 9 plan for the purposes of Bankruptcy Code sections 1125 and 1126 or otherwise.  No securities of the City are being offered or sold hereby, and this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of the City.

**2.4     Exculpatory Provisions**.  To the extent any creditor of the City is exculpated under any Plan for acts and omissions in connection with the Bankruptcy Case, any Plan proposed or supported by the City will also exculpate the Counterparty Released Parties (as defined below) for acts and omissions in connection with the Bankruptcy Case and this Agreement.

## Section 3        Secured Claims and Distribution Amount.

**3.1     Secured Claims Generally**.  Upon entry of the Approval Order by the Bankruptcy Court, each of UBS and MLCS will be granted an allowed secured claim against the City (together, the "Secured Claims"), which, solely for purposes of distributions from the City, will be in the principal amount of $42,500,000 for UBS and $42,500,000 for MLCS, plus any interest as provided in this Agreement, payable in cash in the manner set forth herein (together, the "Distribution Amount").

**3.2     Liens; Continued Validity of Secured Claims and Liens**.  Upon entry of the Approval Order, the Secured Claims will continue to be secured by liens on the Pledged Property (the "Liens"), and the Secured Claims and the Liens will be valid, binding, enforceable and perfected without further action by, or notice to, any party.  Unless and until the Secured Claims are satisfied and discharged as set forth herein, no termination, invalidation or avoidance of any Swap Agreement, Service Contract obligation, lien securing any Service Contract obligation or lien granted by either of the Service Corporations, disregard or veil piercing of either Service Corporation, substantive consolidation of either Service Corporation with the City, invalidation or avoidance of any of the Certificates of Participation or any similar or other event or circumstance will affect the allowance, amount, validity or enforceability of the Secured Claims, the Liens or the Parties' obligations under this Agreement.  Except as reduced by payments as set forth in this Agreement and the Approval Order, the Secured Claims and the Liens will not be subject to avoidance, reduction, subordination, reconsideration, merger, recharacterization, consolidation, recoupment, recovery, deduction, attack, offset, objection, defense, claim (as defined in the Bankruptcy Code) or counterclaim under applicable provisions of the Bankruptcy Code or state law or in equity; and will not be subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof.

**Section 4          Satisfaction of Secured Claims.**

**4.1     Collateral Agreement Payments**.

(a)     During the term of this Agreement, until the Net Amount is paid in full in cash, the City will (i) timely make the monthly Holdback Requirement payments in the manner provided by and on the terms set forth under Section 5.2(a)(1) and (b) of the Collateral Agreement (the "Monthly Payments") and (ii) use its best efforts to ensure that UBS and MLCS timely receive the quarterly payments in an amount equal to all Hedge Periodic Payables required to be paid to them in the manner provided by and on the terms set forth under Section 5.7(a)(i) of the Collateral Agreement (the "Quarterly Payments").

(b)     For purposes of Section 4.1(a) hereof, "best efforts" will not include any action that would, in the commercially reasonable judgment of the City, impose material costs, expenses or burden on the City, it being understood that professional fees incurred in connection with legal proceedings are not material costs, expenses or burden, or impose material liability on the City.

(c)     The Quarterly Payment made to each of UBS and MLCS on March 14, 2014 will be held by each in a segregated account at UBS and MLCS, respectively, until the earlier of (a) the approval of this Agreement by the Bankruptcy Court and (b) further order of the Bankruptcy Court with respect to such payment (including as such order may be modified by reconsideration, appeal or certiorari).

(d)     In addition to constituting amounts paid and payable under and pursuant to the Collateral Agreement, the Monthly Payments and the Quarterly Payments will be adequate protection payments pursuant to section 361 of the Bankruptcy Code to protect against diminution of UBS's and MLCS's interests in the Pledged Property.

(e)     Neither (i) any termination or invalidation of any Swap Agreement nor (ii) the occurrence of any Hedge Event will modify the amounts or timing of the City's payment obligations under this Agreement, the Approval Order or the Collateral Agreement, and for such purposes all Monthly Payments and all Quarterly Payments will be made in the manner provided by and in accordance with the terms of the Collateral Agreement as if such Swap Agreement had not been terminated or invalidated, or such Hedge Event had not occurred.

**4.2     Payment of Balance of Distribution Amount**.

(a)     On or promptly following the Effective Date, the City will pay the Net Amount to UBS and MLCS in cash in satisfaction and discharge of the Secured Claims.

(b)     The City will use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible.

(c)     The City will provide written notice of a Liquidity Event to UBS and MLCS at least fifteen Business Days prior to the Effective Date.

(d)     The Parties agree that (i) if any Swap Agreement is terminated, the payments due from the City to UBS and MLCS as provided in Section 4.1(a) of this Agreement will be applied to amounts payable by the City to UBS and MLCS under the Collateral Agreement and (ii) any payment of the Net Amount in excess of any then-due Quarterly Payment, shall be deemed a prepayment of any amounts that become owed by the City to UBS and MLCS under the Collateral Agreement.

**4.3     Satisfaction of Secured Claims**.

(a)     The Secured Claims will also be satisfied and discharged if, prior to the Effective Date or following dismissal of the Bankruptcy Case, UBS and MLCS have received, in cash, Quarterly Payments since January 1, 2014 equal to the Distribution Amount.

(b)     The Approval Order will provide that upon the full payment in cash by the City to UBS and MLCS of the Distribution Amount, all liens on the Pledged Property, including, without limitation, the Liens, will be released without any further action or agreement by UBS, MLCS, the Custodian or any other person.  Once the Secured Claims have been satisfied and discharged in accordance with this Agreement and the Approval Order, any Monthly Payments then held by the Custodian will be returned to the City by the Custodian.

(c)     If the Secured Claims are not fully satisfied and discharged in accordance with the terms of this Agreement by October 15, 2014, then, on and after October 15, 2014, the unpaid Net Amount will bear interest at the rate applicable to obligations under the Post-Petition Facility (the "Post-Petition Rate").

**Section 5**        <u>**Certain Other Agreements of the Parties.**</u>

    **5.1**    **Forbearance by UBS and MLCS; Custodian Liquidity Event**.

    (a)    For purposes of this section a "<u>Custodian Liquidity Event</u>" means that (i) the City has not received payment of the amounts under the Collateral Agreement that would have been paid to the City from the General Receipts Subaccount or Holdback Account under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4 of the Collateral Agreement, to withhold or delay such payments, or (ii) the Custodian has stated in writing that it will not (A) make payment to the City from the General Receipts Subaccount equal to the City Payment for such Month if the City were to pay the Custodian for deposit to the credit of the Holdback Account an amount equal to the Standard Holdback Requirement, (B) issue a Monthly Holdback Compliance Notice, or (C) remit to the City daily all amounts standing to the credit of the General Receipts Subaccount after issuance of a Monthly Holdback Compliance Notice.

    (b)    So long as the City is not in breach of this Agreement, until the earlier of (i) the termination of this Agreement pursuant to Section 9.1 or Section 9.2 hereof and (ii) the release of the Liens in accordance with the Approval Order, UBS and MLCS will (x) not seek to prevent the City from obtaining payments from the General Receipts Subaccount and (y) if a Custodian Liquidity Event has occurred and is continuing, use their best efforts to take any action reasonably requested by the City to cure such Custodian Liquidity Event.

    (c)    For purposes of Section 5.1(b)(ii) hereof, "best efforts" will not include any action that would, in the commercially reasonable judgment of UBS or MLCS, (i) impose material costs, expenses or burden on UBS, MLCS, any of their respective affiliates, or any of their and their affiliates' respective Related Persons (it being understood that professional fees incurred in connection with legal proceedings are not material costs, expenses or burden), or impose material liability on UBS, MLCS, any of their respective affiliates, or any of their and their affiliates' respective Related Persons, (ii) adversely affect the respective rights or interests of UBS or MLCS under any of the Swap Agreements and the Collateral Agreement or (iii) result in a breach or nullification of the Swap Insurance Policies.

    **5.2**    **Litigation**.

    (a)    Subject to Section 10.5 hereof, the City will not commence or prosecute any litigation (or directly or indirectly cause either Service Corporation or any other person to or support either Service Corporation or any other person in commencing or prosecuting any litigation) against UBS, MLCS or their respective affiliates, or any of the foregoing's respective Related Persons, relating to the Swap Agreements, the Secured Claims, the collateral securing the Secured Claims or the Certificates of Participation, and if either Service Corporation or any other person commences any such litigation, the City will cooperate with and support the defense of the litigation by the UBS or MLCS defendant.

    (b)    This Agreement will not preclude the City from continuing the COPs Litigation.  However, to the extent that the City at any time on or after the execution of this

10

Agreement has the ability to control the actions of either Service Corporation, the City will not cause or permit such Service Corporation to commence any litigation or take any other action that such Service Corporation would not have been able to commence or take if the Service Corporation were a party to this Agreement and obligated to the same extent as the City under this Agreement or the Approval Order, including making or pursuing any claim released under the Approval Order.

5.3     **Pledged Property and Liens.**  The City will (a) not commence or prosecute any litigation (or directly or indirectly cause or support any other person in commencing or prosecuting any litigation) to challenge the Secured Claims or any liens on the Pledged Property, (b) defend the Secured Claims and the validity, perfection and priority of such liens against any challenge by any other person and (c) not cause or permit any other liens to be senior to or *pari passu* with such liens until the Net Amount has been paid in cash in full.

5.4     **Public Statements.**  The City will not (and the Emergency Manager by the execution of this Agreement on behalf of the City agrees that the Emergency Manager will not), and will not cause or permit its professionals to, make any disparaging or negative statements or comments to the press regarding UBS and MLCS, including with respect to the claims that are being settled pursuant to this Agreement.

## Section 6       <u>Representations and Warranties.</u>

6.1     **Representations and Warranties of the City**.  The City represents to each of MLCS and UBS that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)     Other than the approval of the Bankruptcy Court solely with respect to those provisions hereof whose effectiveness is conditioned upon entry of the Approval Order, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

6.2     **Representations and Warranties of UBS and MLCS**.  Each of UBS and MLCS represents to the City that:

(a)     It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)     It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)     All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)     Neither it, nor any of its affiliates, holds any Certificates of Participation for, as applicable, its or its affiliates' own account.

**Section 7          Concerning the Swap Agreements.**

**7.1     Preservation of the Swap Agreements**.  The provisions and effect of the Approval Order and this Agreement, and any actions taken by the Parties pursuant to the Approval Order or this Agreement, including, without limitation, (i) the allowance of the Secured Claims; (ii) the payment of the Monthly Payments and the Quarterly Payments; (iii) the payment of the Distribution Amount or the Net Amount and (iv) the release of the Liens in accordance with the Approval Order, will not impair the rights of UBS and MLCS to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law.

**7.2     Swap Agreement Termination by UBS or MLCS**.  The Parties acknowledge that the entry into this Agreement does not terminate the Swap Agreements.  However, each of UBS and MLCS retain the option at any time to terminate one or more of its Swap Agreements, either by declaring a Termination Event or Event of Default or, in consideration for the Secured Claims relating to a Swap Agreement, by exercising any optional termination provision in any such Swap Agreement.

**Section 8          Tolling, Releases, Injunction and Bar Order.**

**8.1     Tolling.**  From January 31, 2014 until the earlier of (i) termination of this Agreement as provided in Section 9.1 or Section 9.2 of this Agreement and (ii) satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, all statutes of limitation on claims to be released under the Approval Order and any limitation on the time in which UBS or MLCS may exercise contractual rights under the Bankruptcy Code "safe harbors" related to the Swap Agreements will be tolled.

**8.2 Releases**. Upon the earlier of the (i) Effective Date and (ii) satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, and without further action, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) the City and, if at any time any entity, including either Service Corporation, is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City, that entity (collectively, the "City Releasors"), shall automatically and without further action release unconditionally, and be deemed to forever and unconditionally release, waive and discharge UBS, MLCS and their affiliates and each of their respective present and former Related Persons (collectively, the "Counterparty Released Parties") and (b) UBS and MLCS shall automatically and without further action release unconditionally, and be deemed to forever and unconditionally release, waive and discharge the City Releasors and their affiliates and each of their respective present and former Related Persons (excluding, to the extent not a City Releasor, the Service Corporations), of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, all claims relating to the Swap Agreements, the Certificates of Participation or the Service Corporations) whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the effective date of the Plan related to the Swap Agreements, the Certificates of Participation, the Service Corporations, any and all transactions related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, or the Bankruptcy Case or the Plan (collectively, the "Released Claims"); *provided* that the Released Claims will not include any claims with respect to enforcement of this Agreement, including with respect to the Secured Claims and the Liens to the extent not satisfied and discharged pursuant to the Approval Order and this Agreement.

**8.3 Withdrawal of Affiliate Claims.** Upon or promptly following satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, each of UBS and MLCS will cause any of its affiliates and any of their respective Related Persons to withdraw any proofs of claim filed by them against the City related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts. Furthermore, to the extent any party has filed or files a proof of claim against the City on behalf of UBS, MLCS or any of its affiliates related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, each of UBS and MLCS agree to return any funds in excess of the Distribution Amount received by it or its affiliates from the City on account of such proof of claim. In addition, each of UBS and MLCS will cause its affiliates not to vote any claims related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts to reject any Plan that UBS and MLCS are required to vote their respective Secured Claims to accept under Section 2.1 hereof.

**8.4 Injunction and Bar Order.** The Approval Order will include the following language, with only such changes as are acceptable to each of the Parties, in its sole discretion:

"ORDERED that the Service Corporations are hereby barred from commencing any litigation or taking any other action that the Service Corporations would not have been able to commence or take if the Service Corporations were a party to the Agreement and

obligated to the same extent as the City under the Agreement, including making or pursuing any Released Claim; *provided* that this paragraph shall not apply to any actions taken by the Service Corporations in respect of Hedge Receivables (as defined in the Service Contracts) that, on or after the date of entry of this Order, become due and payable to the Service Corporations from UBS or MLCS pursuant to any Swap Agreement; provided, further that each of UBS and MLCS shall retain its right to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law"

"ORDERED that all persons (the "Barred Persons") are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Counterparty Released Party, arising out of or relating to or reasonably flowing from the claims or allegations in any of the Released Claims, whether or not denominated as for contribution or indemnity, where the injury to the person is the liability of such person to any Plaintiff (as defined below), whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"); and if a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Counterparty Released Party to a Barred Person but for this Order, the Barred Persons shall be entitled to the judgment reduction provisions set forth in this Order"

"ORDERED that in the event that the City or either Service Corporation, or any person acting on behalf of, or asserting derivative claims of, the City or either Service Corporation, including any successor to the City or either Service Corporation, including any trustee, any committee appointed in the Chapter 9 case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a "Plaintiff"), asserts a claim against any Barred Person based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claim (the "Action"), then, prior to entry of any judgment or arbitration award ("Judgment") in the Action, the Plaintiff shall provide notice of this Order to the court or tribunal hearing the Action; and such court or tribunal shall determine whether the Action gives rise to Barred Claims on which Counterparty Released Parties would have been liable to the Barred Persons in the absence of this Order; and, if the court or tribunal so determines, it shall reduce any Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Counterparty Released Party or Parties that would have been liable on a Barred Claim in the absence of this Order expressed as a percentage of the aggregate fault of (i) the Barred Person; (ii) such Counterparty Released Party or Parties and (iii) all other persons determined by such court or tribunal to be liable to the Barred Person in connection with the Action, whether or not such Persons are sued in such Action"

"ORDERED that if any Plaintiff enters into a settlement with any person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be

included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement"

"ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any non-settling party in any manner that fails to conform to the terms of this Order, including, without limitation, the proportionate judgment reduction provision set forth in this Order"

**8.5     Certain Claims Unaffected.**  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement releases, discharges or affects any rights, claims, counterclaims or defenses related to (1) any claims held by any Counterparty Released Party not for such party's own account or (2) other than any Certificates of Participation, any municipal securities of the City or securities issued by any affiliate of the City, or (3) any claim that is not a Released Claim.

## Section 9             Termination and Remedies.

**9.1     Termination by any Party**.  Subject to Section 9.3 hereof, any Party may terminate this Agreement upon three Business Days' prior written notice to the other Parties if (a) the Bankruptcy Court denies the Approval Motion, (b) the Bankruptcy Court approves the Approval Motion, but fails to enter the Approval Order or (c) if the Approval Order is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party.

**9.2     Termination by the City**.  Subject to Section 9.3 hereof, the City may terminate this Agreement upon three Business Days' prior written notice to the other Parties if:

(a)     the City is prevented from obtaining payments from the General Receipts Subaccount because of the actions of any person, other than MLCS or UBS, claiming an interest in the Pledged Property on account of the liens granted by the City thereon under the Collateral Agreement and the City's access to the payments is not subsequently restored within a period of twenty days after access was so prevented; or

(b)     UBS or MLCS fails to comply with its obligations under Section 5.1 above and the failure has not been cured by the end of such three Business Day period after receiving from the City a written notice of such failure.

**9.3     Otherwise No Termination.**  Subsequent to payment in full of the Distribution Amount and the release of the Liens, no Party may terminate this Agreement.

**9.4     Effect of Termination**.  In the event that this Agreement is terminated in accordance with Section 9.1 or Section 9.2 hereof, and only in such event, then neither this Agreement, nor any motion or other pleading filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any *res judicata* or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement, including, without limitation, the allowance of the Secured Claims and the releases and injunctions set forth in this

Agreement and in the Approval Order; *provided* that Sections 4.1(c), 8.1, 10.1 and 10.3 of this Agreement will survive any termination of this Agreement.

**9.5    Remedies upon Breach.**  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.  Subject to Section 9.4 of this Agreement, such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise.  The Parties further agree to waive any requirement to post a bond in connection with remedies exercised under this Section 9.5 of this Agreement.

**9.6    Automatic Stay.**  The City agrees that it will not assert that UBS's or MLCS's enforcement of its respective rights under this Agreement violates the automatic stay applicable in the Bankruptcy Case.

**Section 10       No Waiver, Admission, Etc.**

**10.1    General.**  Except as provided in this Agreement, each Party reserves the right to exercise at any time any rights or remedies that the Party has or to which the Party is entitled under any Transaction Document.  One or more Events of Default, Potential Events of Default or Termination Events may have occurred under the Transaction Documents and may occur from time to time after the date hereof.  Except as provided in this Agreement, this Agreement preserves, and does not constitute a waiver of any right, power or privilege that any of the Parties is entitled to exercise as a result of any the Event of Default, Potential Event of Default or Termination Event.  The failure of a Party to exercise at any time any rights or remedies that it has or to which it is entitled under any of the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, the Transaction Document (including, without limitation, the Custodian) will not be an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**10.2    Preservation of Recourse on the Swap Insurance Policies.**  UBS and MLCS reserve and retain all rights, claims and remedies related to the Swap Agreements or the Swap Insurance Policies against any person that is not a Party, including, without limitation, against either Service Corporation, Syncora Guarantee Inc., Syncora Capital Assurance Inc. (together with Syncora Guarantee Inc., "Syncora") or Financial Guaranty Insurance Company (together with Syncora, the "Swap Insurers"); *provided* that neither UBS nor MLCS will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Insurance Policies that results in the Swap Insurer acquiring an allowed secured claim for reimbursement, or an allowed secured claim by way of subrogation, against the City; *provided further* that the provisions of this Section 10.2 will not apply with respect to a Service Corporation if such Service Corporation is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City.

**10.3    Preservation of Certain Intervention Rights.**  Neither the Approval Order nor this Agreement will impair any rights that UBS, MLCS or any of UBS's or MLCS's respective affiliates may have to intervene in the COPs Litigation.

**10.4    No Admission.**  This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties and their respective affiliates and Related Persons.   If this Agreement is terminated, this Agreement will not be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding.   However, this Agreement and all negotiations relating hereto will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact.

**10.5    Preservation of Certain City Defenses.**  Except as provided in Sections 5.3 and 5.4 hereof, nothing herein shall limit the City's ability to (a) object to, defend itself against, oppose or dispute on any ground or basis, including the invalidity of any Transaction Document, any claim asserted against it by any person, provided that the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, any Counterparty Released Party in any way related to a Released Claim and (b) defend itself against, oppose or dispute any allegations, counterclaims, cross claims, defenses or claims for relief propounded by or on behalf of UBS, MLCS or any of their affiliates or any of their respective Related Persons arising in or relating to the COPs Litigation so long as the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, UBS, MLCS or any of their affiliates or any of their respective Related Persons.

**10.6    Intercreditor Arrangements**.  This Agreement will not affect any intercreditor arrangements between UBS and MLCS *inter se*.

**Section 11          Effectiveness of this Agreement; Approval Order Obligations**

**11.1    Effectiveness of this Agreement**.   This Agreement will become effective immediately upon entry of the Approval Order, except that Sections 1.1, 1.2, 4.1(a), (b), (c), and (e), 5.1, 5.2, 5.3, 5.4, 6, 7, 8.1, 9, 10, 11 and 12 of this Agreement will become effective immediately upon execution of this Agreement by the Parties and without the consent or approval of any other party.

**11.2    Approval Order Obligations**.  The Parties agree to diligently (i) pursue entry of the Approval Order and (ii) defend any appeals related thereto.

**Section 12          Miscellaneous.**

**12.1    Execution of this Agreement**.  This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same

17

agreement. Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**12.2    Binding Obligation; Successors and Assigns**. This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees. This Agreement grants no rights to any third party.

**12.3    Certificates of Participation Purchases**. UBS and MLCS will not, and will cause their affiliates not to, purchase any Certificates of Participation for, as applicable, its or its affiliates' own account.

**12.4    Complete Agreement; Interpretation**. This Agreement and the Approval Order constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto. This Agreement is the product of negotiation by and among the Parties. Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner. There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

**12.5    Non-Severability**. Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

**12.6    Amendment, Modification and Waiver**. This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party. No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

**12.7    Notices**. All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

<u>If to the City</u>:

Office of the Emergency Manager
2 Woodward Avenue, Suite 1126
Detroit, MI 48226
Attn:  Emergency Manager
orrk@detroitmi.gov

with copies (which shall not constitute notice) to:

Jones Day
222 East 41st Street
New York, NY 10017-6702
Attn: Corinne Ball (cball@JonesDay.com)

18

and

Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075-1505
Attn: Robert S. Hertzberg (Hertzber@pepperlaw.com)

If to MLCS:

Bank of America, Merrill Lynch
One Bryant Park
New York, NY 10036
Attn: James E. Nacos (james.nacos@baml.com)

with copies (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Marshall S. Huebner (marshall.huebner@davispolk.com) and
       Damian S. Schaible (damian.schaible@davispolk.com)

and

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington D.C. 20001
Attn: Mark C. Ellenberg (mark.ellenberg@cwt.com)

If to UBS:

UBS AG
677 Washington Boulevard
Stamford, CT 06901
Attn: James B. Fuqua (bert.fuqua@ubs.com) and
       David A. Travin (david.travin@ubs.com)

with copies (which shall not constitute notice) to:

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
Attn: Edwin E. Smith (edwin.smith@bingham.com) and
       Jared Clark (jared.clark@bingham.com)

and

Paul, Weiss, Rifkind, Wharton & Garrison LLP

1285 Avenue of the Americas
New York, NY 10019
Attn: Daniel Kramer (DKramer@paulweiss.com) and
  Kelley A. Cornish (KCornish@paulweiss.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by telecopier will be effective upon oral or machine confirmation of transmission. Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

**12.8    Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

**12.9    Governing Law and Jurisdiction**.    THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement.  Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 12.7 hereof.  Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

**12.10  Waiver of Jury Trial**.    TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

20

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.


THE CITY OF DETROIT


By:_____
    Name:
    Title:

MERRILL LYNCH CAPITAL SERVICES, INC.


By:_____
   Name:
   Title:

UBS AG

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

SCHEDULE A

SCHEDULE OF SWAP AGREEMENTS

1.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

2.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

3.  ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

4.  ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

5.  ISDA Master Agreement between DGRS and UBS, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented to the date hereof).

6.  ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 as amended, modified or supplemented to the date hereof).

7.  ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 as amended, modified or supplemented to the date hereof).

8.  ISDA Master Agreement between DGRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations

thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 as amended, modified or supplemented to the date hereof).

**SETTLEMENT AND PLAN SUPPORT AGREEMENT**

**THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF ANY CHAPTER 9 PLAN; ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT APPROVES A DISCLOSURE STATEMENT**

This SETTLEMENT AND PLAN SUPPORT AGREEMENT (this "Agreement") is entered into as of March __, 2014, among the City of Detroit (the "City"), UBS AG ("UBS") and Merrill Lynch Capital Services, Inc. ("MLCS"). The City, UBS and MLCS are referred to herein individually as a "Party" and collectively as the "Parties".

**WHEREAS**, the Detroit General Retirement System Service Corporation, a Michigan nonprofit corporation ("DGRS"), and the Detroit Police and Fire Retirement System Service Corporation, a Michigan nonprofit corporation ("PFRS" and, together with DGRS, each a "Service Corporation" and collectively the "Service Corporations") created each of (i) the Detroit Retirement Systems Funding Trust 2005 (the "2005 Pension Funding Trust") pursuant to the Trust Agreement, dated June 2, 2005, among the Service Corporations and U.S. Bank National Association as trustee and (ii) the Detroit Retirement Systems Funding Trust 2006 (the "2006 Pension Funding Trust") pursuant to the Trust Agreement, dated June 12, 2006, among the Service Corporations and U.S. Bank National Association as trustee;

**WHEREAS**, the 2005 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2005 (the "2005 Pension Funding Securities") and the 2006 Pension Funding Trust issued certain Taxable Certificates of Participation Series 2006 (the "2006 Pension Funding Securities" and collectively with the 2005 Pension Funding Securities, the "Certificates of Participation");

**WHEREAS**, MLCS and UBS and the Service Corporations are parties to swap transactions under certain ISDA Master Agreements as set forth in Schedule A attached to this Agreement (as applicable, the "UBS Swap Agreements" and the "MLCS Swap Agreements"; the UBS Swap Agreements and MLCS Swap Agreements are referred to collectively herein as the "Swap Agreements") ;

**WHEREAS**, the City, the Service Corporations, U.S. Bank National Association, as custodian (the "Custodian"), MLCS and UBS are party to a Collateral Agreement dated as of June 15, 2009 (the "Collateral Agreement");

**WHEREAS**, the Governor of the State of Michigan determined on March 1, 2013, that a financial emergency existed in the City, and the Emergency Manager (together with any successors, the "Emergency Manager") was appointed for the City on March 14, 2013;

**WHEREAS**, on July 18, 2013, the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing Bankruptcy Case No. 13-53846 (the "Bankruptcy Case") before the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court");

1

**WHEREAS**, the Parties and their representatives have engaged in good faith, arm's length settlement discussions regarding a consensual resolution of their disputes under or in respect of the Certificates of Participation, the Swap Agreements and the Collateral Agreement;

**WHEREAS**, on March 3, 2014, the City filed with the Bankruptcy Court, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), a motion (the "<u>Approval Motion</u>") to approve this Agreement;

**WHEREAS**, the Approval Motion was filed with a term sheet evidencing the key terms of this Agreement and also with the form of Approval Order attached thereto; and

**NOW, THEREFORE**, in consideration of the foregoing and the promises, mutual covenants, and agreements set forth herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

**Section 1**        <u>**Definitions and Interpretations.**</u>

    **1.1**     **Definitions.** The following terms have the respective meanings set forth below for all purposes of this Agreement.

"<u>2005 Pension Funding Securities</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Pension Funding Securities</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2005 Pension Funding Trust</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Pension Funding Trust</u>" has the meaning ascribed to it in the recitals hereof.

"<u>2006 Transaction</u>" means the 2006 transaction described in the Authorizing Ordinance.

"<u>Agreement</u>" has the meaning ascribed to it in the preamble hereof.

"<u>Approval Motion</u>" has the meaning ascribed to it in the recitals hereof.

"<u>Approval Order</u>" means an order entered by the Bankruptcy Court in the form attached to the Approval Motion approving, pursuant to Bankruptcy Rule 9019, all of the terms of this Agreement with only such changes to such order as are acceptable to each of the Parties.

"<u>Authorizing Ordinance</u>" means Ordinance No. 05-09 adopted by the City Council on May 26, 2009.

"Bankruptcy Case" has the meaning ascribed to it in the recitals hereof.

"Bankruptcy Code" has the meaning ascribed to it in the recitals hereof.

"Bankruptcy Court" has the meaning ascribed to it in the recitals hereof.

"Bankruptcy Rules" has the meaning ascribed to it in the recitals hereof.

"Business Day" means a day on which the Custodian is open for the transaction of business in the city and State of New York and the City is open for business in Detroit, Michigan.

"Certificates of Participation" has the meaning ascribed to it in the recitals hereof.

"City" has the meaning ascribed to it in the preamble hereof.

"City Council" means the Council of the City.

"City Payment" has the meaning ascribed to it in the Collateral Agreement.

"City Pledge" has the meaning ascribed to it in the Collateral Agreement.

"City Releasors" has the meaning ascribed to it in Section 8.2 hereof.

"Collateral Agreement" has the meaning ascribed to it in the recitals hereof.

"COPs Litigation" means the adversary proceeding captioned as *City of Detroit, Michigan v. Detroit General Retirement System Serv. Corp.*, Adv. Proc. No. 14-04112 (Bankr. E.D. Mich.), filed in the Bankruptcy Case on January 31, 2014.

"Custodian" has the meaning ascribed to it in the recitals hereof.

"Custodian Liquidity Event" has the meaning ascribed to it in Section 5.1(a) hereof.

"Counterparty Released Parties" has the meaning ascribed to it in Section 8.2 hereof.

3

"Definitive Documents" has the meaning ascribed to it in the Collateral Agreement.

"DGRS" has the meaning ascribed to it in the recitals hereof.

"Distribution Amount" has the meaning ascribed to it in Section 3.1 hereof.

"Early Termination Date" has the meaning ascribed to it in the Swap Agreements.

"Effective Date" means the effective date of any Plan.

"Emergency Manager" has the meaning ascribed to it in the recitals hereof.

"Event of Default" has the meaning ascribed to it in the Swap Agreements.

"Funding Trusts" means, collectively, the 2005 Pension Funding Trust and the 2006 Pension Funding Trust.

"General Receipts Subaccount" has the meaning ascribed to it in the Collateral Agreement.

"Hedge Event" has the meaning ascribed to it in the Collateral Agreement.

"Hedge Periodic Payables" has the meaning ascribed to it in the Collateral Agreement.

"Holdback Account" has the meaning ascribed to it in the Collateral Agreement.

"Holdback Requirement" has the meaning ascribed to it in the Collateral Agreement.

"LIBOR" means the *greater* of (i) the rate per annum equal to the London Interbank Offered Rate (or if such rate is unavailable, a comparable or successor rate agreed to by the Parties) for deposits in U.S. dollars for a period of three (3) months, as published on the applicable Reuters screen page (or such other commercially available source providing such quotations as agreed to by the Parties) at or about 11:00 a.m., London time on the second London Banking Day prior to the commencement of the three-month period, with the rate being calculated for each successive three-month period during which interest accrues and (ii) 1.0%.

"Liens" has the meaning ascribed to it in Section 3.2 hereof.

4

A "Liquidity Event" shall be deemed to occur only if the City has at all times complied with Section 4.2(b) hereof but, notwithstanding such compliance, is unable to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date.

"London Banking Day" means any day on which commercial banks are open for international business (including dealings in U.S. dollar deposits) in London, England.

"MLCS" has the meaning ascribed to it in the preamable hereof.

"MLCS Swap Agreements" has the meaning ascribed to it in the recitals hereof.

"Month" has the meaning ascribed to it in the Collateral Agreement.

"Monthly Holdback Compliance Notice" has the meaning ascribed to it in the Collateral Agreement.

"Monthly Payments" has the meaning ascribed to it in Section 4.1(a) hereof.

"Net Amount" means the Distribution Amount less the sum of all Quarterly Payments received by UBS and MLCS since January 1, 2014.

"Party" has the meaning ascribed to it in the preamble hereof.

"PFRS" has the meaning ascribed to it in the recitals hereof.

"Plan" means any plan of adjustment for the City.

"Pledged Property" has the meaning ascribed to it in the Collateral Agreement.

"Post-Petition Facility" means up to $120 million in principal amount (plus all interest and fees) of the City's quality-of-life post-petition financing facility described in the Notice of Presentment of Final Order Approving Post-Petition Financing [Dkt. No. 2921].

"Post-Petition Rate" has the meaning ascribed to it in Section 4.3(c) hereof.

"Potential Event of Default" has the meaning ascribed to it in the Swap Agreements.

"Quarterly Payments" has the meaning ascribed to it in Section 4.1(a) hereof.

5

"Related Persons" means, with respect to any party, such party's (i) officers, (ii) directors, (iii) employees, (iv) members, (v) managers, (vi) partners and (vii) attorneys, attorneys-in-fact and other advisors, in each case solely in their capacity as such.

"Released Claims" has the meaning ascribed to it in Section 8.2 hereof.

"SBS" means SBS Financial Products Company, LLC.

"Secured Claims" has the meaning ascribed to it in Section 3.1 hereof.

"Service Contract" has the meaning ascribed to it in the Collateral Agreement.

"Service Corporation" has the meaning ascribed to it in the recitals hereof.

"Service Corporation Pledge" has the meaning ascribed to it in the Collateral Agreement.

"Service Corporation Security Interest" has the meaning ascribed to it in the Collateral Agreement.

"Settlement Transaction" has the meaning ascribed to it in the Collateral Agreement.

"Specified Plan" means a Plan that:

(a) provides the following treatment for the Secured Claims:

(i) solely if the City has complied with Section 4.1(a) hereof through the Effective Date, payment of the Net Amount in full in cash within thirty days following the Effective Date; *provided* that until paid in cash in full, the Secured Claims will remain secured by the Pledged Property; *or*

(ii) solely in the case of a Liquidity Event and solely if the City has complied with Section 4.1(a) hereof through the Effective Date, payment of the Net Amount in cash in full within 180 days following the Effective Date; *provided* that (1) other than with respect to net proceeds used to repay the Post-Petition Facility, to the extent permitted by law but without taking into consideration any limitations imposed by the City, including in any ordinance or resolution of the City, the first dollars of any net cash proceeds of any financing or refinancing consummated in connection with, or subsequent to, the consummation of such Plan and either (A) supported by the full faith and credit of the City or (B) payable from the general fund of the City, will be used to pay the Net Amount, (2) the City will continue to

6

comply with its obligations under Section 4.1(a) hereof and otherwise under this Agreement and the Approval Order until the Net Amount is paid in cash in full, (3) until paid in cash in full, the Secured Claims will remain secured by the Pledged Property, (4) from and after the Effective Date, the unpaid Net Amount will accrue interest at the Post-Petition Rate plus 1.5% with the interest obligation likewise being secured by the Pledged Property, and (5) UBS and MLCS will receive from the City on the Effective Date a deferral fee in cash equal to 1.0% of the Net Amount to be shared equally between them;

(b) to the extent any creditor of the City is exculpated under such Plan for acts and omissions in connection with the Bankruptcy Case, exculpates the Counterparty Released Parties for acts and omissions in connection with the Bankruptcy Case and this Agreement; *and*

(c) except as provided in clause (a) above, treats the rights and claims of UBS and MLCS no less favorably than the terms of this Agreement and the Approval Order.

"Standard Holdback Requirement" has the meaning ascribed to it in the Collateral Agreement.

"Swap Agreements" has the meaning ascribed to it in the recitals hereof.

"Swap Insurance Policies" means, collectively, each "Swap Insurance Policy" as such term is defined under each Swap Agreement.

"Swap Insurers" has the meaning ascribed to it in Section 10.2 hereof.

"Syncora" has the meaning ascribed to it in Section 10.2 hereof.

"Termination Event" has the meaning ascribed to it in the Swap Agreements.

"Transaction Documents" means, collectively, the Collateral Agreement, the Swap Insurance Policies, the Swap Agreements, the 2006 Transactions, the City Pledge, the Service Corporation Security Interest, the Service Corporation Pledge, the Authorizing Ordinance, the Definitive Documents and the Settlement Transaction.

"UBS" has the meaning ascribed to it in the preamble hereof.

"UBS Swap Agreements" has the meaning ascribed to it in the recitals hereof.

**1.2    Other Definitional and Interpretive Provisions.**  The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  References to Sections and Schedules are to Sections and Schedules of this Agreement unless otherwise specified.  Any

7

singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. References to any statute shall be deemed to refer to such statute as amended from time to time and to any rules or regulations promulgated thereunder. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all applicable law.

## Section 2      The Plan.

**2.1      Plan Support**.  So long as (i) UBS and MLCS have been properly solicited by the City pursuant to the Bankruptcy Code after approval of a disclosure statement by the Bankruptcy Court, (ii) the Plan is a Plan that the City may propose in accordance with Section ~~2.1~~2.2 hereof and (iii) the Plan either (x) is a Specified Plan or (y) treats the rights and claims of UBS and MLCS in accordance with this Agreement and the Approval Order, each of UBS and MLCS agrees that (a) it will timely vote or cause to be voted its portion of the Secured Claims in acceptance of such Plan and (b) it will not, in its capacity as holder of the Secured Claims, object to such Plan.

**2.2      No Less Favorable Plan Treatment**.  The City will not propose or support any Plan that (i) treats the Secured Claims any less favorably than as provided in this Agreement or the Approval Order, unless such treatment is as provided by a Specified Plan or (ii) has a material adverse effect (as compared to this Agreement) on UBS, MLCS, any of their affiliates, or any of their and their affiliates' respective Related Persons, relating to the Secured Claims, the Swap Agreements or the Certificates of Participation (it being understood that treatment as provided by a Specified Plan is not, in itself, a material adverse effect).

**2.3      No Solicitation**.  This Agreement is not a solicitation of votes for the acceptance or rejection of any chapter 9 plan for the purposes of Bankruptcy Code sections 1125 and 1126 or otherwise.  No securities of the City are being offered or sold hereby, and this Agreement does not constitute an offer to sell or a solicitation of an offer to buy any securities of the City.

**2.4      Exculpatory Provisions**.  To the extent any creditor of the City is exculpated under any Plan for acts and omissions in connection with the Bankruptcy Case, any Plan proposed or supported by the City will also exculpate the Counterparty Released Parties (as defined below) for acts and omissions in connection with the Bankruptcy Case and this Agreement.

## Section 3      Secured Claims and Distribution Amount.

**3.1      Secured Claims Generally**.  Upon entry of the Approval Order by the Bankruptcy Court, each of UBS and MLCS will be granted an allowed secured claim against the City (together, the "Secured Claims"), which, solely for purposes of distributions from the City, will be in the principal amount of $42,500,000 for UBS and $42,500,000 for MLCS, plus any

interest as provided in this Agreement, payable in cash in the manner set forth herein (together, the "Distribution Amount").

**3.2    Liens; Continued Validity of Secured Claims and Liens**.  Upon entry of the Approval Order, the Secured Claims will continue to be secured by liens on the Pledged Property (the "Liens"), and the Secured Claims and the Liens will be valid, binding, enforceable and perfected without further action by, or notice to, any party.  Unless and until the Secured Claims are satisfied and discharged as set forth herein, no termination, invalidation or avoidance of any Swap Agreement, Service Contract obligation, lien securing any Service Contract obligation or lien granted by either of the Service Corporations, disregard or veil piercing of either Service Corporation, substantive consolidation of either Service Corporation with the City, invalidation or avoidance of any of the Certificates of Participation or any similar or other event or circumstance will affect the allowance, amount, validity or enforceability of the Secured Claims, the Liens or the Parties' obligations under this Agreement.  Except as reduced by payments as set forth in this Agreement and the Approval Order, the Secured Claims and the Liens will not be subject to avoidance, reduction, subordination, reconsideration, merger, recharacterization, consolidation, recoupment, recovery, deduction, attack, offset, objection, defense, claim (as defined in the Bankruptcy Code) or counterclaim under applicable provisions of the Bankruptcy Code or state law or in equity; and will not be subject to disallowance under any provision of the Bankruptcy Code, including section 502(d) thereof.

**Section 4          Satisfaction of Secured Claims.**

**4.1    Collateral Agreement Payments**.

(a)       During the term of this Agreement, until the Net Amount is paid in full in cash, the City will (i) timely make the monthly Holdback Requirement payments in the manner provided by and on the terms set forth under Section 5.2(a)(1) and (b) of the Collateral Agreement (the "Monthly Payments") and (ii) use its best efforts to ensure that UBS and MLCS timely receive the quarterly payments in an amount equal to all Hedge Periodic Payables required to be paid to them in the manner provided by and on the terms set forth under Section 5.7(a)(i) of the Collateral Agreement (the "Quarterly Payments").

(b)       For purposes of Section (a)4.1(a) hereof, "best efforts" will not include any action that would, in the commercially reasonable judgment of the City, impose material costs, expenses or burden on the City, it being understood that professional fees incurred in connection with legal proceedings are not material costs, expenses or burden, or impose material liability on the City.

(c)       The Quarterly Payment made to each of UBS and MLCS on March 14, 2014 will be held by each in a segregated account at UBS and MLCS, respectively, until the earlier of (a) the approval of this Agreement by the Bankruptcy Court and (b) further order of the Bankruptcy Court with respect to such payment (including as such order may be modified by reconsideration, appeal or certiorari).

9

(d)     In addition to constituting amounts paid and payable under and pursuant to the Collateral Agreement, the Monthly Payments and the Quarterly Payments will be adequate protection payments pursuant to section 361 of the Bankruptcy Code to protect against diminution of UBS's and MLCS's interests in the Pledged Property.

(e)     Neither (i) any termination or invalidation of any Swap Agreement nor (ii) the occurrence of any Hedge Event will modify the amounts or timing of the City's payment obligations under this Agreement, the Approval Order or the Collateral Agreement, and for such purposes all Monthly Payments and all Quarterly Payments will be made in the manner provided by and in accordance with the terms of the Collateral Agreement as if such Swap Agreement had not been terminated or invalidated, or such Hedge Event had not occurred.

**4.2    Payment of Balance of Distribution Amount**.

(a)     On or promptly following the Effective Date, the City will pay the Net Amount to UBS and MLCS in cash in satisfaction and discharge of the Secured Claims.

(b)     The City will use its best efforts to secure sufficient exit financing to pay the Net Amount on or promptly following the Effective Date, and failing that, as soon thereafter as possible.

(c)     The City will provide written notice of a Liquidity Event to UBS and MLCS at least fifteen Business Days prior to the Effective Date.

(d)     The Parties agree that (i) if any Swap Agreement is terminated, the payments due from the City to UBS and MLCS as provided in Section 4.1(a) of this Agreement will be applied to amounts payable by the City to UBS and MLCS under the Collateral Agreement and (ii) any payment of the Net Amount in excess of any then-due Quarterly Payment, shall be deemed a prepayment of any amounts that become owed by the City to UBS and MLCS under the Collateral Agreement.

**4.3    Satisfaction of Secured Claims**.

(a)     The Secured Claims will also be satisfied and discharged if, prior to the Effective Date or following dismissal of the Bankruptcy Case, UBS and MLCS have received, in cash, Quarterly Payments since January 1, 2014 equal to the Distribution Amount.

(b)     The Approval Order will provide that upon the full payment in cash by the City to UBS and MLCS of the Distribution Amount, all liens on the Pledged Property, including, without limitation, the Liens, will be released without any further action or agreement by UBS, MLCS, the Custodian or any other person.  Once the Secured Claims have been satisfied and discharged in accordance with this Agreement and the Approval Order, any Monthly Payments then held by the Custodian will be returned to the City by the Custodian.

(c)     If the Secured Claims are not fully satisfied and discharged in accordance with the terms of this Agreement by October 15, 2014, then, on and after October 15, 2014, the

unpaid Net Amount will bear interest at the rate applicable to obligations under the Post-Petition Facility (the "Post-Petition Rate").

## Section 5    Certain Other Agreements of the Parties.

### 5.1    Forbearance by UBS and MLCS; Custodian Liquidity Event.

(a)    For purposes of this section a "Custodian Liquidity Event" means that (i) the City has not received payment of the amounts under the Collateral Agreement that would have been paid to the City from the General Receipts Subaccount or Holdback Account under the Collateral Agreement but for the application, or alleged application, of Section 5.4 of the Collateral Agreement or but for any action by the Custodian, whether or not such action has been purported to have been taken pursuant to Section 5.4 of the Collateral Agreement, to withhold or delay such payments, or (ii) the Custodian has stated in writing that it will not (A) make payment to the City from the General Receipts Subaccount equal to the City Payment for such Month if the City were to pay the Custodian for deposit to the credit of the Holdback Account an amount equal to the Standard Holdback Requirement, (B) issue a Monthly Holdback Compliance Notice, or (C) remit to the City daily all amounts standing to the credit of the General Receipts Subaccount after issuance of a Monthly Holdback Compliance Notice.

(b)    So long as the City is not in breach of this Agreement, until the earlier of (i) the termination of this Agreement pursuant to Section 9.1 or Section 9.2 hereof and (ii) the release of the Liens in accordance with the Approval Order, UBS and MLCS will (x) not seek to prevent the City from obtaining payments from the General Receipts Subaccount and (y) if a Custodian Liquidity Event has occurred and is continuing, use their best efforts to take any action reasonably requested by the City to cure such Custodian Liquidity Event.

(c)    For purposes of Section 5.1(b)(ii) hereof, "best efforts" will not include any action that would, in the commercially reasonable judgment of UBS or MLCS, (i) impose material costs, expenses or burden on UBS, MLCS, any of their respective affiliates, or any of their and their affiliates' respective Related Persons (it being understood that professional fees incurred in connection with legal proceedings are not material costs, expenses or burden), or impose material liability on UBS, MLCS, any of their respective affiliates, or any of their and their affiliates' respective Related Persons, (ii) adversely affect the respective rights or interests of UBS or MLCS under any of the Swap Agreements and the Collateral Agreement or (iii) result in a breach or nullification of the Swap Insurance Policies.

### 5.2    Litigation.

(a)    Subject to Section 10.5 hereof, the City will not commence or prosecute any litigation (or directly or indirectly cause either Service Corporation or any other person to or support either Service Corporation or any other person in commencing or prosecuting any litigation) against UBS, MLCS or their respective affiliates, or any of the foregoing's respective Related Persons, relating to the Swap Agreements, the Secured Claims, the collateral securing the Secured Claims or the Certificates of Participation, and if either Service Corporation or any

11

other person commences any such litigation, the City will cooperate with and support the defense of the litigation by the UBS or MLCS defendant.

(b)     This Agreement will not preclude the City from continuing the COPs Litigation.  However, to the extent that the City at any time on or after the execution of this Agreement has the ability to control the actions of either Service Corporation, the City will not cause or permit such Service Corporation to commence any litigation or take any other action that such Service Corporation would not have been able to commence or take if the Service Corporation were a party to this Agreement and obligated to the same extent as the City under this Agreement or the Approval Order, including making or pursuing any claim released under the Approval Order.

**5.3     Pledged Property and Liens**.  The City will (a) not commence or prosecute any litigation (or directly or indirectly cause or support any other person in commencing or prosecuting any litigation) to challenge the Secured Claims or any liens on the Pledged Property, (b) defend the Secured Claims and the validity, perfection and priority of such liens against any challenge by any other person and (c) not cause or permit any other liens to be senior to or *pari passu* with such liens until the Net Amount has been paid in cash in full.

**5.4     Public Statements.**  The City will not (and the Emergency Manager by the execution of this Agreement on behalf of the City agrees that the Emergency Manager will not), and will not cause or permit its professionals to, make any disparaging or negative statements or comments to the press regarding UBS and MLCS, including with respect to the claims that are being settled pursuant to this Agreement.

**Section 6          Representations and Warranties.**

**6.1     Representations and Warranties of the City**.  The City represents to each of MLCS and UBS that:

(a)     It is a municipal corporation of the State of Michigan.

(b)     It has the power to execute and deliver this Agreement and to perform its obligations hereunder and it has taken all necessary action to authorize such execution, delivery and performance.

(c)     Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)     Other than the approval of the Bankruptcy Court solely with respect to those provisions hereof whose effectiveness is conditioned upon entry of the Approval Order, all governmental and Emergency Manager consents and approvals that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents and approvals have been complied with.

**6.2    Representations and Warranties of UBS and MLCS.**  Each of UBS and MLCS represents to the City that:

(a)    It is duly organized and validly existing under the laws of the jurisdiction of its organization or incorporation and in good standing.

(b)    It has the power to execute this Agreement, to deliver this Agreement and to perform its obligations under this Agreement and it has taken all necessary action to authorize such execution, delivery and performance.

(c)    Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets.

(d)    All governmental consents that are required to have been obtained by it with respect to this Agreement have been obtained and are in full force and effect and all conditions of any such consents have been complied with.

(e)    Neither it, nor any of its affiliates, holds any Certificates of Participation for, as applicable, its or its affiliates' own account.

**Section 7        Concerning the Swap Agreements.**

**7.1    Preservation of the Swap Agreements**.    The provisions and effect of the Approval Order and this Agreement, and any actions taken by the Parties pursuant to the Approval Order or this Agreement, including, without limitation, (i) the allowance of the Secured Claims; (ii) the payment of the Monthly Payments and the Quarterly Payments; (iii) the payment of the Distribution Amount or the Net Amount and (iv) the release of the Liens in accordance with the Approval Order, will not impair the rights of UBS and MLCS to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law.

**7.2    Swap Agreement Termination by UBS or MLCS.**    The Parties acknowledge that the entry into this Agreement does not terminate the Swap Agreements.  However, each of UBS and MLCS retain the option at any time to terminate one or more of its Swap Agreements, either by declaring a Termination Event or Event of Default or, in consideration for the Secured Claims relating to a Swap Agreement, by exercising any optional termination provision in any such Swap Agreement.

**Section 8        Tolling, Releases, Injunction and Bar Order.**

13

**8.1** **Tolling.** From January 31, 2014 until the earlier of (i) termination of this Agreement as provided in Section 9.1 or Section 9.2 of this Agreement and (ii) satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, all statutes of limitation on claims to be released under the Approval Order and any limitation on the time in which UBS or MLCS may exercise contractual rights under the Bankruptcy Code "safe harbors" related to the Swap Agreements will be tolled.

**8.2** **Releases**.  Upon the earlier of the (i) Effective Date and (ii) satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, and without further action, for good and valuable consideration, the adequacy of which is hereby confirmed, (a) the City and, if and at any time any entity, including either Service Corporation, is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City, that entity (collectively, the "City Releasors"), shall automatically and without further action release unconditionally, and be deemed to forever and unconditionally release, waive and discharge UBS, MLCS and their affiliates and each of their respective present and former Related Persons (collectively, the "Counterparty Released Parties") and (b) UBS and MLCS shall automatically and without further action release unconditionally, and be deemed to forever and unconditionally release, waive and discharge the City Releasors and their affiliates and each of their respective present and former Related Persons (excluding, to the extent not a City Releasor, the Service Corporations), of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever (including, without limitation, all claims relating to the Swap Agreements, the Certificates of Participation or the Service Corporations) whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, existing or hereafter arising, in law, equity, or otherwise, that are or may be based in whole or in part upon any act, omission, transaction, event or other occurrence taking place or existing on or prior to the effective date of the Plan related to the Swap Agreements, the Certificates of Participation, the Service Corporations, any and all transactions related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, or the Bankruptcy Case or the Plan (collectively, the "Released Claims"); *provided* that the Released Claims will not include any claims with respect to enforcement of this Agreement, including with respect to the Secured Claims and the Liens to the extent not satisfied and discharged pursuant to the Approval Order and this Agreement.

**8.3** **Withdrawal of Affiliate Claims.**  Upon or promptly following satisfaction and discharge of the Secured Claims and the release of the Liens in accordance with the Approval Order, each of UBS and MLCS will cause any of its affiliates and any of their respective Related Persons to withdraw any proofs of claim filed by them against the City related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts.  Furthermore, to the extent any party has filed or files a proof of claim against the City on behalf of UBS, MLCS or any of its affiliates related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts, each of UBS and MLCS agree to return any funds in excess of the Distribution Amount received by it or its affiliates from the City on account of such proof of claim.  In addition, each of UBS and MLCS will cause its affiliates not to vote any claims related to the Swap Agreements, the Certificates of Participation, the Service Corporations and/or the Funding Trusts to reject any Plan that UBS and MLCS are required to vote their respective Secured Claims to accept under Section 2.1 hereof.

**8.4** **Injunction and Bar Order.**  The Approval Order will include the following language, with only such changes as are acceptable to each of the Parties, in its sole discretion:

"ORDERED that the Service Corporations are hereby barred from commencing any litigation or taking any other action that the Service Corporations would not have been able to commence or take if the Service Corporations were a party to the Agreement and

15

obligated to the same extent as the City under the Agreement, including making or pursuing any Released Claim; *provided* that this paragraph shall not apply to any actions taken by the Service Corporations in respect of Hedge Receivables (as defined in the Service Contracts) that, on or after the date of entry of this Order, become due and payable to the Service Corporations from UBS or MLCS pursuant to any Swap Agreement; provided, further that each of UBS and MLCS shall retain its right to terminate any Swap Agreement in accordance with the terms and conditions of such Swap Agreement and applicable law"

"ORDERED that all persons (the "Barred Persons") are hereby permanently barred, enjoined and restrained from commencing, prosecuting, or asserting in this Court, in any federal or state court, or in any other court, arbitration proceeding, administrative agency, or other forum in the United States or elsewhere any claim for non-contractual indemnity or contribution against any Counterparty Released Party, arising out of or relating to or reasonably flowing from the claims or allegations in any of the Released Claims, whether or not denominated as for contribution or indemnity, where the injury to the person is the liability of such person to any Plaintiff (as defined below), whether arising under state, federal or foreign law as claims, cross-claims, counterclaims, or third-party claims (collectively, the "Barred Claims"); and if a court or tribunal determines that Barred Claims exist that would have given rise to liability of any Counterparty Released Party to a Barred Person but for this Order, the Barred Persons shall be entitled to the judgment reduction provisions set forth in this Order"

"ORDERED that in the event that the City or either Service Corporation, or any person acting on behalf of, or asserting derivative claims of, the City or either Service Corporation, including any successor to the City or either Service Corporation, including any trustee, any committee appointed in the Chapter 9 case, any trustee of a litigation trust or any estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code (any of the above, a "Plaintiff"), asserts a claim against any Barred Person based upon, arising from, or related to the facts, allegations, or transactions underlying any Released Claim (the "Action"), then, prior to entry of any judgment or arbitration award ("Judgment") in the Action, the Plaintiff shall provide notice of this Order to the court or tribunal hearing the Action; and such court or tribunal shall determine whether the Action gives rise to Barred Claims on which Counterparty Released Parties would have been liable to the Barred Persons in the absence of this Order; and, if the court or tribunal so determines, it shall reduce any Judgment against such Barred Person in an amount equal to (a) the amount of the Judgment against any such Barred Person times (b) the aggregate proportionate share of fault (expressed as a percentage) of the Counterparty Released Party or Parties that would have been liable on a Barred Claim in the absence of this Order expressed as a percentage of the aggregate fault of (i) the Barred Person; (ii) such Counterparty Released Party or Parties and (iii) all other persons determined by such court or tribunal to be liable to the Barred Person in connection with the Action, whether or not such Persons are sued in such Action"

"ORDERED that if any Plaintiff enters into a settlement with any person with respect to one or more causes of action based upon, arising from, or related to the Released Claims or any transaction underlying any Released Claim, then such Plaintiff shall cause to be

included, and in all events, the settlement shall be deemed to include, a dismissal, release and waiver of any Barred Claims with respect to such settlement"

"ORDERED that each Plaintiff is hereby enjoined and restrained from seeking relief or collecting judgments against any non-settling party in any manner that fails to conform to the terms of this Order, including, without limitation, the proportionate judgment reduction provision set forth in this Order"

**8.5     Certain Claims Unaffected.**  Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement releases, discharges or affects any rights, claims, counterclaims or defenses related to (1) any claims held by any Counterparty Released Party not for such party's own account or (2) other than any Certificates of Participation, any municipal securities of the City or securities issued by any affiliate of the City, or (3) any claim that is not a Released Claim.

**Section 9          Termination and Remedies.**

**9.1     Termination by any Party**.  Subject to Section 9.3 hereof, any Party may terminate this Agreement upon three Business Days' prior written notice to the other Parties if (a) the Bankruptcy Court denies the Approval Motion, (b) the Bankruptcy Court approves the Approval Motion, but fails to enter the Approval Order or (c) if the Approval Order is vacated or reversed on appeal or, after entry, is modified without the terminating Party's consent, in any matter considered by the terminating Party to be adverse to the terminating Party.

**9.2     Termination by the City**.  Subject to Section 9.3 hereof, the City may terminate this Agreement upon three Business Days' prior written notice to the other Parties if:

(a)     the City is prevented from obtaining payments from the General Receipts Subaccount because of the actions of any person, other than MLCS or UBS, claiming an interest in the Pledged Property on account of the liens granted by the City thereon under the Collateral Agreement and the City's access to the payments is not subsequently restored within a period of twenty days after access was so prevented; or

(b)     UBS or MLCS fails to comply with its obligations under Section 5.1 above and the failure has not been cured by the end of such three Business Day period after receiving from the City a written notice of such failure.

**9.3     Otherwise No Termination.**  Subsequent to payment in full of the Distribution Amount and the release of the Liens, no Party may terminate this Agreement.

**9.4     Effect of Termination**.  In the event that this Agreement is terminated in accordance with Section 9.1 or Section 9.2 hereof, and only in such event, then neither this Agreement, nor any motion or other pleading filed with the Bankruptcy Court with respect to the approval of this Agreement, will have any *res judicata* or collateral estoppel effect or be of any force or effect, and each of the Parties' respective interests, rights, remedies and defenses will be restored without prejudice as if this Agreement had never been executed and the Parties will be automatically relieved of any further obligations under this Agreement, including, without

limitation, the allowance of the Secured Claims and the releases and injunctions set forth in this Agreement and in the Approval Order; *provided* that Sections 4.1(c), 8.1, 10.1 and 10.3 of this Agreement will survive any termination of this Agreement.

**9.5     Remedies upon Breach.**  The Parties acknowledge and agree that a breach of the provisions of this Agreement by any Party would cause irreparable damage to the other Parties and that such other Parties would not have an adequate remedy at law for such damage. Therefore, the obligations of the Parties set forth in this Agreement shall be enforceable by a decree of specific performance issued by any court of competent jurisdiction, and appropriate injunctive relief may be applied for and granted in connection therewith.  Subject to Section 9.4 of this Agreement, such remedies shall be cumulative and not exclusive and shall be in addition to any other remedies that the Parties may have under this Agreement or otherwise.  The Parties further agree to waive any requirement to post a bond in connection with remedies exercised under this Section 9.5 of this Agreement.

**9.6     Automatic Stay.**  The City agrees that it will not assert that UBS's or MLCS's enforcement of its respective rights under this Agreement violates the automatic stay applicable in the Bankruptcy Case.

**Section 10          No Waiver, Admission, Etc.**

**10.1     General.**  Except as provided in this Agreement, each Party reserves the right to exercise at any time any rights or remedies that the Party has or to which the Party is entitled under any Transaction Document.  One or more Events of Default, Potential Events of Default or Termination Events may have occurred under the Transaction Documents and may occur from time to time after the date hereof.  Except as provided in this Agreement, this Agreement preserves, and does not constitute a waiver of any right, power or privilege that any of the Parties is entitled to exercise as a result of any the Event of Default, Potential Event of Default or Termination Event.  The failure of a Party to exercise at any time any rights or remedies that it has or to which it is entitled under any of the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, the Transaction Document (including, without limitation, the Custodian) will not be an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**10.2     Preservation of Recourse on the Swap Insurance Policies.**  UBS and MLCS reserve and retain all rights, claims and remedies related to the Swap Agreements or the Swap Insurance Policies against any person that is not a Party, including, without limitation, against either Service Corporation, Syncora Guarantee Inc., Syncora Capital Assurance Inc. (together with Syncora Guarantee Inc., "Syncora") or Financial Guaranty Insurance Company (together with Syncora, the "Swap Insurers"); *provided* that neither UBS nor MLCS will exercise any right, claim or remedy against a Swap Insurer in connection with the Swap Insurance Policies that results in the Swap Insurer acquiring an allowed secured claim for reimbursement, or an allowed secured claim by way of subrogation, against the City; *provided further* that the provisions of this Section 10.2 will not apply with respect to a Service Corporation if such

Service Corporation is collapsed into, disregarded, veil-pierced, substantively consolidated with or similarly treated with respect to the City.

**10.3     Preservation of Certain Intervention Rights.**  Neither the Approval Order nor this Agreement will impair any rights that UBS, MLCS or any of UBS's or MLCS's respective affiliates may have to intervene in the COPs Litigation.

**10.4     No Admission.**  This Agreement is a proposed settlement of claims and disputes among the Parties and is the product of good faith, arm's length negotiations among the Parties and their respective affiliates and Related Persons.  If this Agreement is terminated, this Agreement will not be an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating hereto will not be admissible into evidence in any proceeding.  However, this Agreement and all negotiations relating hereto will be admissible into evidence in any proceeding to obtain court approval of this Agreement or to enforce or interpret the terms of this Agreement, and, subject to any otherwise applicable rules in the Federal Rules of Evidence (other than Federal Rule of Evidence 408), this Agreement may be admitted into evidence in any proceeding arising as a result of or in connection with a Party's breach of this Agreement or in which breach of this Agreement is alleged as a relevant fact.

**10.5     Preservation of Certain City Defenses.**  Except as provided in Sections 5.3 and 5.4 hereof, nothing herein shall limit the City's ability to (a) object to, defend itself against, oppose or dispute on any ground or basis, including the invalidity of any Transaction Document, any claim asserted against it by any person, provided that the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, any Counterparty Released Party in any way related to a Released Claim and (b) defend itself against, oppose or dispute any allegations, counterclaims, cross claims, defenses or claims for relief propounded by or on behalf of UBS, MLCS or any of their affiliates or any of their respective Related Persons arising in or relating to the COPs Litigation so long as the City is not seeking any affirmative recovery from, or otherwise advocating for any affirmative liability of, UBS, MLCS or any of their affiliates or any of their respective Related Persons.

**10.6     Intercreditor Arrangements**.  This Agreement will not affect any intercreditor arrangements between UBS and MLCS *inter se*.

**Section 11          Effectiveness of this Agreement; Approval Order Obligations**

**11.1     Effectiveness of this Agreement**.  This Agreement will become effective immediately upon entry of the Approval Order, except that Sections 1.1, 1.2, 4.1(a), (b), (c), and (e), 5.1, 5.2, 5.3, 5.4, ~~Section 6~~Section 6, Section 6, 7, 8.1, ~~Section~~ 9, ~~Section~~ 10, 11 and ~~Section~~ 12 of this Agreement will become effective immediately upon execution of this Agreement by the Parties and without the consent or approval of any other party.

**11.2     Approval Order Obligations**.  The Parties agree to diligently (i) pursue entry of the Approval Order and (ii) defend any appeals related thereto.

**Section 12      Miscellaneous.**

**12.1    Execution of this Agreement**.  This Agreement may be executed and delivered (by facsimile, PDF, or otherwise) in any number of counterparts, each of which, when executed and delivered, will be deemed an original, and all of which together will constitute the same agreement.  Each individual executing this Agreement on behalf of a Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said Party.

**12.2    Binding Obligation; Successors and Assigns**.  This Agreement is a legally valid and binding obligation of the Parties, enforceable in accordance with its terms, and will inure to the benefit of the Parties and their respective successors, assigns and transferees.  This Agreement grants no rights to any third party.

**12.3    Certificates of Participation Purchases**.  UBS and MLCS will not, and will cause their affiliates not to, purchase any Certificates of Participation for, as applicable, its or its affiliates' own account.

**12.4    Complete Agreement; Interpretation**.  This Agreement and the Approval Order constitute the complete agreement among the Parties with respect to the subject matter hereof and supersedes all prior agreements, oral or written, among the Parties with respect thereto.  This Agreement is the product of negotiation by and among the Parties.  Any Party enforcing or interpreting this Agreement will interpret it in a neutral manner.  There will be no presumption concerning whether to interpret this Agreement for or against any Party by reason of that Party having drafted this Agreement, or any portion thereof, or caused it or any portion thereof to be drafted.

**12.5    Non-Severability**.  Each of the provisions of this Agreement is an integrated, essential and non-severable part of this Agreement.

**12.6    Amendment, Modification and Waiver**.  This Agreement may be modified, altered, amended, or supplemented only by an agreement in writing signed by each Party.  No waiver of any provision of this Agreement will be effective unless made in a writing signed by the Party making the waiver, nor will the waiver be extend to any other right, claim or remedy.

**12.7    Notices**.  All notices and other communications required under this Agreement will be given in writing and delivered, if sent by telecopy, electronic mail, courier, or by registered or certified mail (return receipt requested) to the following addresses and telecopier numbers (or at such other addresses or telecopier numbers as will be specified by like notice):

If to the City:

Office of the Emergency Manager
2 Woodward Avenue, Suite 1126
Detroit, MI 48226
Attn:  Emergency Manager
orrk@detroitmi.gov

20

with copies (which shall not constitute notice) to:

Jones Day
222 East 41st Street
New York, NY 10017-6702

Attn: Corinne Ball (cball@JonesDay.com)


and

Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI 48075-1505
Attn: Robert S. Hertzberg (Hertzber@pepperlaw.com)


If to MLCS:

Bank of America, Merrill Lynch
One Bryant Park
New York, NY 10036

Attn: James E. Nacos (james.nacos@baml.com)


with copies (which shall not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Marshall S. Huebner (marshall.huebner@davispolk.com) and
       Damian S. Schaible (damian.schaible@davispolk.com)

and

Cadwalader, Wickersham & Taft LLP
700 Sixth Street, N.W.
Washington D.C. 20001

Attn: Mark C. Ellenberg (mark.ellenberg@cwt.com)


If to UBS:

UBS AG
677 Washington Boulevard

Stamford, CT 06901
Attn: James B. Fuqua (bert.fuqua@ubs.com) and
        David A. Travin (david.travin@ubs.com)


with copies (which shall not constitute notice) to:

Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022
Attn: Edwin E. Smith (edwin.smith@bingham.com) and
        Jared Clark (jared.clark@bingham.com)


and

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, NY 10019
Attn: Daniel Kramer (DKramer@paulweiss.com) and
        Kelley A. Cornish (KCornish@paulweiss.com)

Any notice given by delivery, mail, or courier will be effective when received. Any notice given by telecopier will be effective upon oral or machine confirmation of transmission.  Any notice given by electronic mail will be effective upon oral or machine confirmation of receipt.

    **12.8    Headings**.  The headings of all sections of this Agreement are inserted solely for the convenience of reference and are not a part of and are not intended to govern, limit, or aid in the construction or interpretation of any term or provision hereof.

    **12.9    Governing Law and Jurisdiction**.    THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN, WITHOUT REGARD TO ANY PRINCIPLES OF CONFLICTS OF LAW THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANOTHER JURISDICTION.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees that any dispute with respect to this Agreement will be resolved by the Bankruptcy Court to the extent that the Bankruptcy Court then has jurisdiction and power to enforce the terms of this Agreement.  Each of the Parties irrevocably consents to service of process by mail at the addresses listed for such Party in Section 12.7 hereof.  Each of the Parties agrees that its submission to jurisdiction and consent to service of process by mail is made for the sole and express benefit of each of the other Parties to this Agreement.

    **12.10  Waiver of Jury Trial**.    TO THE EXTENT PERMITTED BY LAW, THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT.

[Signature Pages Follow]

23

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date first above written.

THE CITY OF DETROIT

By:_____
     Name:
     Title:

MERRILL LYNCH CAPITAL SERVICES,
INC.

By:_____
   Name:
   Title:

UBS AG

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

## SCHEDULE A
## SCHEDULE OF SWAP AGREEMENTS

1. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005, between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0010) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

2. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between PFRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0011) and the related Transaction Transfer Agreement by and among PFRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

3. ISDA Master Agreement (including the Schedule thereto) dated as of May 25, 2005 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0009) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

4. ISDA Master Agreement (including the Schedule thereto) dated as of June 7, 2006 between DGRS and SBS and the Confirmation thereunder dated June 7, 2006 (bearing Reference No. SBSFPC-0012) and the related Transaction Transfer Agreement by and among DGRS, SBS and MLCS (as amended, modified or supplemented to the date hereof).

5. ISDA Master Agreement between DGRS and UBS, dated as of June 7, 2006, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380291 (as amended, modified or supplemented to the date hereof).

6. ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS AG Reference No. 37380351 as amended, modified or supplemented to the date hereof).

7. ISDA Master Agreement between PFRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380313 as amended, modified or supplemented to the date hereof).

8. ISDA Master Agreement between DGRS and UBS, dated as of May 25, 2005, including the Schedule and Credit Support Annex thereto and the Confirmations thereunder, dated June 7, 2006, bearing UBS Reference No. 37380341 as amended, modified or supplemented to the date hereof).