## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| In re | : Chapter 9 |
|  | : Case No. 13-53846 |
|  | : |
| CITY OF DETROIT, MICHIGAN, | : Hon. Steven W. Rhodes |
|  | : |
| Debtor, | : |
|  | : |

## REPLY OF THE DEBTOR TO OBJECTIONS TO NOTICE OF
## PRESENTMENT OF ORDER APPROVING POSTPETITION FINANCING

The City of Detroit (the "City") hereby files this reply (the "Reply") to the

two objections (the "Objections")[1] to the City's Notice of Presentment (the "NOP")

[Docket No. 2921], which contained a revised order for the City's proposed quality

of life financing with Barclays.[2]  The Court previously approved this financing in

its January 16, 2014 ruling in open court, subject to submission by the City of a

revised order consistent with that ruling.

1.      Both Objections complain that blacklines of the financing documents

were not filed with the NOP, making it "impossible" to determine what changes

were made to those documents since they last were filed with the Court.  The City

promptly filed such blacklines (Docket No. 3031), thus rendering this objection

---

[1]  The Objections are at Docket No. 3012 (the "Unsecured Lender
Objection") and Docket No. 3015 (the "Retirement Systems Objection").

[2]  Capitalized terms not defined herein have the meanings given to them in
the NOP.

moot.  The Retirement Systems Objection essentially did not raise any other

points.[3]

2.      The remainder of the Unsecured Lender Objection relies on the faulty

premise that the Amended QOL Financing constitutes an "entirely new agreement"

(Unsecured Lender Objection at ¶ 17) with "materially different" terms than the

financing approved by the Court (Unsecured Lender Objection at ¶ 8).  Thus, it

argues, a new motion must filed with this Court to approve the "new" financing,

whereby the objectors would be afforded yet another round of expensive

discovery, more delay and additional days of contested evidentiary hearings.[4]

3.      The Unsecured Lender Objection fails to offer a single example of

where the Amended QOL Financing differs materially from the quality of life

portion of the Initial PPF Financing previously approved by the Court, nor could it.

The only material change is the reduction in collateral supporting the loan — an

amendment expressly contemplated by this Court in its January 16 ruling (see Jan.

---

[3]      The Retirement Systems Objection did complain that it is unclear
whether the proceeds of the Amended QOL Financing will be used to fund any
amended settlement between the City and certain swap counterparties, should such
a settlement be approved by this Court.  The City represents that the proceeds from
the Amended QOL Financing will not be used to fund any such swap settlement.

[4]  The Unsecured Lender Objection thus ironically asserts that the Amended
QOL Financing differs "materially" from the Initial PPF Financing while at the
same time arguing that it is "impossible" to determine the terms of the Amended
QOL Financing.

16, 2014 Hearing Transcript (attached hereto as <u>Exhibit A</u>) at p. 27, 6-12). Instead of pledging both gaming and income tax revenue for the loan, the City now is pledging only income tax revenue, an amendment that benefits the City.[5]

4.     The Unsecured Lender Objection argues that the City has failed to disclose the "actual amount" of fees and costs associated with the Amended QOL Financing; the interest rate; whether the Amended QOL Financing is subject to market flex; and the marketing process undertaken in connection with the Amended QOL Financing. These assertions are mistaken, as all of such information is contained in the documents attached to the NOP. The fees and costs are unchanged (except for the $1 million refund to the City), as is the interest rate, which is subject to the same market flex as previously disclosed. In any case, in further response to this point, and in connection with the Court's request in its order dated March 24, 2014 (the "<u>March 24 Order</u>") [Docket No. 3173], attached hereto as <u>Exhibits C</u> and <u>D</u> are (1) a term sheet of the material terms of the Amended QOL Financing and (2) a comparison chart setting forth the differences

---

[5]     One other revision, reflected in the Letter Agreement attached to the NOP, relates to the commitment fee paid by the City to Barclays. At closing $1.0 million of that fee will be refunded to the City, again a benefit to the City.

in the material terms of the Initial PPF Financing and the Amended QOL Financing.[6]

5.  Ultimately, the Amended QOL Financing is the same loan approved by this Court on January 16, 2014, when the Court found that the financing was the best available for the City.  See Jan. 16, 2014 Hearing Transcript at 23, 9-15 ("Specifically, the Court finds that the city has established by a preponderance of the evidence that this loan is in the best interest of the city; that it needs the money; that the terms are market terms and the best available to the city; that they were negotiated in good faith; and that they were negotiated at arm's length.").  The evidentiary record on these points was well established, and nothing has changed.

6.  Because the Amended QOL Financing is not a new transaction, no further discovery in connection with the proposed financing order is appropriate.[7] E.D. Mich. L.R. 9021-1(a)(4), which permits orders to be presented to the Court for entry following a ruling in open court, is not designed to "re-open" every issue that may have been relevant in connection with the underlying motion.  The 7-day objection period contemplated under E.D. Mich. L.R. 9021-1(a)(4) is to allow

---

[6]    Also set forth on Exhibit B hereto is a summary of the City's compliance with the March 24 Order.

[7]    In any case, given that the NOP has been on file for over three weeks and no party has sought discovery notwithstanding an upcoming hearing on the NOP, discovery should be deemed waived.

parties to object to the proposed order on the basis that it does not comport with the Court's ruling. The Court has ruled on the factual and legal issues underlying the City's request to have the Amended QOL Financing approved. The amendments to the transaction, as noted above, were simply made to further comply with the Court's ruling.[8]

7. In another puzzling objection, the Unsecured Lender Objectors argue that the NOP fails to comply with Bankruptcy Rule 4001 because, although the City attached all of the relevant financing documents to the NOP, there "are a number of exhibits that were not attached to the proposed financing documents." See Unsecured Lender Objection at ¶ 22. Bankruptcy Rule 4001 only applies to motions seeking approval of postpetition financing. The NOP is not a motion, and, thus, the requirements set forth in Bankruptcy Rule 4001 are inapplicable. In any case, the City attached five transaction documents to the NOP, which comprise the material documents that govern the Amended QOL Financing, including the Indenture, Bond Purchase Agreement, Supplemental Indenture, DACA and Letter

---

[8] Similarly, contrary to the assertions in the Unsecured Lender Objection (see ¶ 26), the efforts by the City to obtain Detroit City Council and Local Emergency Financial Assistance Loan Board approval for the Amended QOL Financing simply comport with the Court's suggestion in its January 16, 2014 ruling that seeking such approvals might be appropriate (see Jan. 16, 2014 Hearing Transcript at p. 27, 13-19). Such approvals now have been obtained by the City.

CHI-1924165v8

Agreement.  Additionally, the Proposed Order was also attached to the NOP.

Thus, the NOP more than complies with Bankruptcy Rule 4001.

      8.     Finally, the Unsecured Lender Objection contends that the City has

failed to provide a "schedule of quality of life expenditures and budgets" and has

provided "no detail about how it plans to use these funds." <u>See</u> Unsecured Lender

Objection at ¶ 13.  On December 13, 2013, following extensive briefing, the Court

ruled that:

> On the debtor in possession financing motion under Section
> 364, the Court basically agrees with the city's position that
> Section 904 of the Bankruptcy Code prohibits any review of
> what the city proposes to do with the proceeds of the loan and
> actually prohibits any review beyond the narrow review that
> Section 364 itself requires to determine the reasonableness of
> the terms of the borrowing given the current market conditions
> for similar kinds of loans and the other technical requirements
> of Section 364, including the city's inability to obtain a loan on
> any better terms.

<u>See</u> Dec. 13, 2013 Hearing Transcript at 42, 3-16 (attached hereto as <u>Exhibit E</u>).

As such, the information requested is not relevant to approval of the financing.

Nonetheless, pursuant to the Court's March 24 Order, attached hereto as <u>Exhibit F</u>

is information regarding the proposed uses of Amended QOL Financing proceeds.

In addition, as was agreed by the City previously, the City will make available to

creditors a schedule of spending as set forth in paragraph 17 of the Proposed Order.

9. It should be noted that the Unsecured Lender Objection does also question the need of the City to borrow at all (Unsecured Lender Objection at ¶¶ 13, 27). Again, however, on this point, the Court has already spoken:

> Finally, the Court will overrule the objection that this loan should be approved only in the context of plan confirmation. The city has determined out of necessity to pursue this loan now. Section 364 of the Bankruptcy Code permits the city to do that. Under Section 904 it is not for this Court to review the city's political and governmental decisions, which pursuing this loan plainly is.

See Jan. 16, 2014 Hearing Transcript at pp. 27-28, 24-25 and 1-2. As such, the objection is without merit.

## CONCLUSION

Therefore, for the reasons set forth above, the City submits that the Objections should be overruled and the Proposed Order entered.

Dated: March 28, 2014        Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601
Telephone:  (312) 269-3939
Facsimile:  (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Reply of the Debtor to Objections to Notice of Presentment of Order Approving Postpetition Financing was filed and served via the Court's electronic case filing and noticing system on this 28th day of March, 2014.

/s/ David G. Heiman

# EXHIBIT A

CHI-1924165v8

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE: CITY OF DETROIT,          .        Docket No. 13-53846
      MICHIGAN,                     .
                         .        Detroit, Michigan
                         .        January 16, 2014
            Debtor.          .        2:00 p.m.
. . . . . . . . . . . . . . . .


BENCH OPINION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:          Jones Day
                      By:  GREGORY SHUMAKER
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (202) 879-3768

                      Jones Day
                      By:  CORINNE BALL
                      222 East 41st
                      New York, NY  10017-6702
                      (212) 326-7844

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For UBS and Bank        Warner, Norcross & Judd, LLP
of America              By:  SCOTT WATSON
Merrill Lynch:          111 Lyon Avenue, NW - Suite 900
                      Grand Rapids, MI  49503
                      (616) 752-2465

For UBS AG:             Bingham McCutchen, LLP
                      By:  JARED R. CLARK
                      399 Park Avenue
                      New York, NY  10022-4689
                      (212) 705-7770

APPEARANCES (continued):

| | |
|---|---|
| For Syncora Holdings, Ltd., Syncora Guarantee, Inc., and Syncora Capital Assurance, Inc.: | Kirkland & Ellis, LLP<br>By:  WILLIAM E. ARNAULT<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-3062 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By:  JENNIFER K. GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8300<br><br>Clark Hill, PLC<br>By:  ROBERT D. GORDON<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5882 |
| For Erste Europaische Pfandbrief-und Kommunalkreditbank Aktiengesellschaft in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By:  VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA  19103-7599<br>(215) 864-8236 |
| For David Sole: | Jerome D. Goldberg, PLLC<br>By:  JEROME D. GOLDBERG<br>2921 East Jefferson, Suite 205<br>Detroit, MI  48207<br>(313) 393-6001 |
| For Financial Guaranty Insurance Company: | Williams, Williams, Rattner &<br>  Plunkett, PC<br>By:  MARK R. JAMES<br>380 N. Old Woodward Ave., Suite 300<br>Birmingham, MI  48009<br>(248) 642-0333 |
| For Ambac Assurance Corporation: | Arent Fox, LLP<br>By:  CAROLINE TURNER ENGLISH<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 857-6178 |
| For FMS Wertmanagement: | Schiff Hardin, LLP<br>By:  RICK FRIMMER<br>233 South Wacker Drive, Suite 6600<br>Chicago, IL  60606<br>(312) 258-5573 |

APPEARANCES (continued):

```
For Detroit Retired    Lippitt O'Keefe, PLLC
City Employees         By:   RYAN C. PLECHA
Association,           370 East Maple Road, 3rd Floor
Retired Detroit        Birmingham, MI  48009
Police and Fire        (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:



Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1   could to approve the settlement.  As the city argued, the law

2   prefers settlements.  But it could not find a way.  It's just

3   too much money, and the Court must insist that any settlement

4   be rational, as the law itself requires.  In its eligibility

5   opinion, the Court found that the city had entered into a

6   series of bad deals to solve its financial problems.  The law

7   says that when the city filed this bankruptcy, that must

8   stop.  It also says that this Court must be the one to stop

9   it, if necessary.  It is necessary here.  Accordingly, the

10  motion is denied.  In these circumstances, it is unnecessary

11  to address the consent rights issue.

12          Turning now to the motion for post-petition

13  financing, 11 U.S.C., Section 364(c), provides, "If a trustee

14  is unable to obtain unsecured credit allowable under section

15  503(b)(1) of this title as an administrative expense, the

16  court, after notice and a hearing, may authorize the

17  obtaining of credit or the incurring of debt - (1) with

18  priority over any or all administrative expenses of the kind

19  specified in section 503(b) or section 507(b) of this title;

20  (2) secured by a lien on property of the estate that is not

21  otherwise subject to a lien."  The city seeks to borrow $285

22  million from Barclay and to grant Barclay a lien in casino

23  revenues, income tax revenues, utility tax revenues, and

24  water and sewerage revenue.  Of that amount, $165 million was

25  proposed to go to the swap counterparties to settle that

1  claim or those claims, and $120 million would go for quality
2  of life improvements, which may include increase in police
3  staffing, purchase of emergency vehicles, blight removal, and
4  updating the city's technology resources.  Because the motion
5  to assume the forbearance agreement and settlement agreement
6  is denied, the request for the loan to fund that settlement
7  must be denied as well.  However, the Court finds that the
8  request for approval to borrow $120 million on a secured
9  basis should be granted with conditions.  Specifically, the
10  Court finds that the city has established by a preponderance
11  of the evidence that this loan is in the best interest of the
12  city; that it needs the money; that the terms are market
13  terms and the best available to the city; that they were
14  negotiated in good faith; and that they were negotiated at
15  arm's length.  Indeed, the Court finds that there was no
16  substantial contradictory evidence on these points.
17        The objecting parties raise these arguments:  one,
18  the city did not attempt to obtain an unsecured loan; two,
19  the city did not provide the City Council with sufficient
20  information to evaluate the loan and did not comply with the
21  legal requirements for disclosure to the City Council; three,
22  the city has not adequately explained the proposed use of the
23  quality of life loan proceeds; and, four, this approval
24  should await the plan confirmation process.
25        With respect to the first objection, the Court

1   concludes that the city has adequately established that the
2   unsecured credit would not have been available to the city.
3   The objecting parties cite cases holding that the city was
4   required to actually attempt to obtain unsecured credit and
5   that the city did not do that here.  The Court finds these
6   cases unpersuasive because they impose a requirement that is
7   simply not in the statutory language of Section 364(c).  That
8   section simply requires the Court to find that the debtor has
9   established by a preponderance of the evidence that it is
10  unable to obtain unsecured credit.  There are, of course,
11  many ways to prove that fact.  Showing that the debtor
12  actually attempted and failed to do that is only one way to
13  prove it.  In this case, the Court concludes that there was
14  credible evidence that the city is unable to obtain unsecured
15  credit.  That evidence makes sense, in the Court's
16  experience, and it was uncontradicted in the evidence.
17  Accordingly, the Court finds that the city has established by
18  a preponderance of the evidence that it is unable to obtain
19  unsecured credit.
20          With respect to the second objection, Public Act
21  436, Sections 19(1) and (2), require the emergency manager to
22  submit his proposed action to the City Council.  The City
23  Council then has a period of time to propose comparable or
24  better terms for the action.  Plainly, the adequacy of the
25  disclosure to the City Council should be determined based on

1   whether the disclosure by the emergency manager allowed the

2   city to take advantage of its statutory opportunity to

3   propose an alternative.  Here the Court concludes that the

4   disclosures that the city made to City Council, especially as

5   they pertained to the proposed interest rates, were

6   sufficient to permit it to evaluate the loan and for the City

7   Council to go out into the marketplace to attempt to obtain

8   an alternative.  Accordingly, the Court concludes that there

9   was substantial compliance with PA 436, and this objection is

10  overruled.

11        It is next asserted that the city has not adequately

12  explained the uses of the loan proceeds.  In the Court's

13  view, this objection overlaps with the question of the

14  conditions that the Court has determined must be placed on

15  the loan.  The problem arises because the record is

16  contradictory on what the proceeds of this loan would be used

17  for.  In recognition of the limitations on the use of gaming

18  revenues under state law, some evidence suggests that the

19  city will use the proceeds for, quote, "quality of life,"

20  close quote, purposes.  Other evidence, however, suggests

21  that the proceeds will simply be working capital.  The city

22  contends that even if gaming revenue is provided as security,

23  the limitations of the Gaming Act do not apply because

24  Section 364 authorizes this Court to approve the loan without

25  regard for any state law limitations.  The Court rejects this

1   view of its authority under Section 364 and concludes that

2   any offer of security for a loan under Section 364 must

3   comply with state law unless, of course, Section 364

4   expressly provides otherwise.  As the city points out, the

5   Court can, under Section 364, give a senior or priming lien

6   to existing liens which might be or would be in derogation of

7   state law; however, nothing in Section 364 suggests that a

8   Court can allow a municipality to use its property in

9   violation of state law.  The Court does conclude that

10  offering gaming revenue as security for a loan would comply

11  with the Gaming Control Act but only if the proceeds of the

12  loan that are so secured are used as limited by state law.

13  Accordingly, if this loan is secured by gaming revenues, the

14  proceeds must be used for the purposes identified in the

15  Gaming Act.  The Court must caution the city here, however.

16  While the Act does permit the use of gaming revenues to

17  improve quality of life in the city, that authorization

18  cannot be applied so broadly that it effectively eliminates

19  the statutorily imposed limitations.  Specifically, nothing

20  in the Act authorizes proceeds to be used for working

21  capital.  To enforce this state statutory limitation, the

22  Court will condition this approval on a process by which the

23  city gives 14 days' written and filed notice of its intent to

24  use the proceeds during which interested parties can object

25  on the grounds that the proposed use is not consistent with

1  the Gaming Act.  The Court would then schedule a prompt

2  hearing and promptly resolve the objection.  Consistent with

3  Section 904, however, the Court will not review any aspect of

4  the use of the proceeds other than its compliance with the

5  Gaming Act.

6        In the alternative, of course, subject to Barclays'

7  approval, the city could use as security other property for

8  this loan such as other revenue streams that carry with them

9  no such restrictions under state law.  In that event, the

10  Court -- excuse me.  In that event, the process that the

11  Court outlined would not be necessary and would not be

12  imposed.

13        The Court further cautions the city that if it does

14  decide to pursue only the quality of life loan at this time,

15  it may want to consider whether under state law it is

16  necessary to present the revised loan to the City Council

17  under PA 436 and to the Emergency Loan Board for its

18  approval.  This caution, however, is not intended to be a

19  ruling on this issue.

20        Finally, the Court will overrule the objection that

21  this loan should be approved only in the context of plan

22  confirmation.  The city has determined out of necessity to

23  pursue this loan now.  Section 364 of the Bankruptcy Code

24  certainly permits the city to do that.  Under Section 904 it

25  is not for this Court to review the city's political and

1  governmental decisions, which pursuing this loan plainly is.
2  Accordingly, this objection is overruled.
3         Finally, the Court must emphasize that the parties
4  should not interpret this Court's denial of this particular
5  settlement to mean that they should not continue to attempt
6  to resolve these issues through negotiations.  They
7  absolutely should.  The Court agrees that the settlement of
8  the swaps claims is better for everyone than litigation and
9  hopes that everyone still agrees with that.  If the city
10 feels the need to pursue immediate litigation, so be it, but
11 even so, litigation and negotiation can and should be pursued
12 at the same time.  In any event, the Court strongly
13 encourages the parties to continue to negotiate.
14         At this time, the Court is going to conduct a closed
15 conference with counsel, and so I'm going to ask everyone in
16 the courtroom who is not an attorney in the case to leave the
17 courtroom.  We're also going to shut down the closed circuit
18 feeds and turn off CourtCall.
19     (Proceedings concluded at 2:49 p.m.)

INDEX

WITNESSES:

    None

EXHIBITS:

    None

      I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                     January 18, 2014
_____      _____
Lois Garrett

## EXHIBIT B

## Summary of Compliance with March 24 Order

| March 24 Order | City's Compliance |
|---|---|
| Provide Final copies of the documents that will be executed and delivered in connection with the financing | Final copies of the material transaction documents (the "Transaction Documents") that will be executed and delivered in connection with the financing were filed with the Court on March 6, 2014 with the NOP (see Docket No. 2921).[1] The Transaction Documents include the Indenture, Supplemental Indenture, Bond Purchase Agreement and Account Control Agreement. |
| Clear disclosure of all material terms of the loan | All material terms of the loan were publicly disclosed on March 6, 2014 when the Transaction Documents were filed with the NOP. For ease of reference, however, the City has filed, as Exhibit C to the Reply, a term sheet summarizing the material terms of the Amended QOL Financing. |
| Comparison of the material terms of the proposed final quality of life financing with the terms of the initial quality of life financing preliminarily approved by the Court on January 16, 2014 | The City filed blacklines of the Indenture and relevant Bond Purchase Agreement on March 17, 2014 (see Docket No. 3031), which showed the changes in the material terms of the Amended QOL Financing from the Initial PPF Financing. Additionally, the City has filed, as Exhibit D to the Reply, a comparison chart showing the differences between the two proposed transactions. |
| Disclosure of information regarding the specific use of loan proceeds | A chart summarizing the proposed uses of loan proceeds is attached to the Reply as Exhibit F. |

---

[1]     Minor technical revisions to the Indenture and Account Control Agreement have been made since the March 6, 2014 filing, which are not material and, thus, have not been filed with the Court.  Blacklines of these documents may be made available to parties in interest upon request to counsel for the City.

**EXHIBIT C**

CHI-1924165v8

<u>City of Detroit</u>
<u>$120,000,000 Post-Petition Bond Financing</u>
<u>Summary of Terms and Conditions</u>

*Set forth below is a summary of certain key terms for the Bonds (as defined below). This summary of indicative terms and conditions (this "<u>Term Sheet</u>") does not purport to summarize all terms of the Bonds and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "<u>City</u>"). On July 18, 2013 (the "<u>Petition Date</u>"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "<u>Bankruptcy Code</u>"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "<u>Bankruptcy Court</u>"). The City's bankruptcy case bears case number 13-53846 (the "<u>Bankruptcy Case</u>") and has been assigned to the Honorable Steven W. Rhodes. On December 5, 2013, the Bankruptcy Court entered an order granting the City chapter 9 bankruptcy relief (the "<u>Order for Relief</u>") [Docket No. 1945].

Purchaser and Sole Lead Arranger:

Barclays Capital Inc.

Agent:

Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Bond Purchase Agreement governing the one-time purchase of financial recovery bonds (the "<u>Bonds</u>") as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "<u>Post-Petition Facility</u>") in an aggregate principal amount of up to $120,000,000 (the "<u>Facility Amount</u>").

Purposes:

Proceeds from the issuance of the Bonds shall be used to fund expenditures that are designed to contribute to the improvement of the quality of life in the City.

Maturity:

The Bonds will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Bonds is accelerated pursuant to the Bond Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "<u>Maturity Date</u>").

| | |
|---|---|
| Tax-exemption of Interest: | Interest on the Bonds may be exempt from gross income for federal and state income tax purposes subject to usual and customary qualifications. |
| Closing Date: | The Closing Date shall be not later than the third business day (or as soon thereafter as practical) after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "<u>Post-Petition Financing Order</u>"), authorizing the Post-Petition Facility, authorizing the City to enter into the Bond Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser and (ii) the date on which all conditions precedent to the issuance of the Bonds under the Bond Documents are satisfied. |
| Bond Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Market Flex and the Default Interest Rate set forth below. |
| Bond Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum, subject to the terms of the Market Flex. |
| Market Flex | The Bond Interest Rate shall be subject to market flex as follows, in order to achieve a Successful Syndication within 90 days of the closing date:<br><br>- The LIBOR Floor may be increased by up to 1.00% per annum; and<br><br>- The Spread may be increased by up to 2.00% per annum |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Bonds in full on the Maturity Date, the Spread shall automatically be increased by 200 basis points. |

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Bonds (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Bonds may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Bond Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which proceeds do not constitute Asset Proceeds Collateral (as defined below) may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net cash proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds exceeding $10 million (the "Asset Proceeds Collateral") to redeem the Bonds on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Asset Proceeds Collateral shall not include assets owned by the City, or assets in which the City holds an interest which, in either case, are held by the Detroit Institute of Arts.

Principal outstanding in respect of the Bonds will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Bonds to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Bonds without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

Collateral:

The obligations owing by the City under the Post-Petition Facility shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on (i) the income tax revenues of the City (the "<u>Pledged Income Tax Revenue</u>") and (ii) the Asset Proceeds Collateral (together with the Pledged Income Tax Revenue, collectively, the "<u>Collateral</u>").

The Bond Documents will require that the Pledged Income Tax Revenue be deposited into a bank account (the "<u>Income Tax Revenue Account</u>"), which bank account shall be subject to a control agreement in favor of the Indenture Trustee, provided, however, that the Bond Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Bonds during the continuation of an Event of Default to $4 million per month, all of which shall be applied to the payment of amounts due under the Bonds until the Bonds are paid in full. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default, subject to the requirement that the City maintain not less than $5 million on deposit at all times in the Income Tax Revenue Account.

Under no circumstances shall the Collateral include revenues of the Detroit water and sewer systems or any other assets pledged to secure Water/Sewer Bonds (as defined in the Post-Petition Financing Order).

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of the Bonds:

Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Bonds shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims.

Events of Default:    Usual for municipal financings, and others to be reasonably
specified by the Purchaser, including, without limitation,
nonpayment of principal, interest or other amounts; non-
performance of covenants and obligations and such non-
performance is not remedied within fifteen (15) days following
receipt of notice from the Indenture Trustee; incorrectness of
representations and warranties in any material respect as of the
time of such representation or warranty; cross default in respect of
a payment of post-petition debt exceeding $25 million or cross
acceleration in respect of post-petition debt in an outstanding
aggregate principal amount exceeding $25 million (subject to
applicable grace periods); material post-petition judgments, which
are final and non-appealable, involving liability in an amount
exceeding $25 million and such judgments are not paid within
thirty (30) days of such judgments becoming nonappealable; a
court of competent jurisdiction finds that any of the Bond
Documents are invalid or unenforceable and such finding is not
stayed pending appeal; written assertion by an authorized officer of
the City that any Bond Document or court order with respect
thereto is invalid or otherwise not binding on the City and such
written assertion is not retracted or otherwise disavowed within
five (5) days of publication; dismissal of the Bankruptcy Case and
the order dismissing the Bankruptcy Case is not stayed pending
appeal; reversal or modification in a manner adverse to the
Registered Owners of the Order for Relief by entry of an order that
is not stayed; the City's filing of, consent to or lack of timely
opposition to a motion seeking dismissal of the Bankruptcy Case
within the applicable times established by the Bankruptcy Court
for filing a response to such dismissal motion; granting of any
super-priority claim (other than as permitted under the Bond
Documents); if there is (i) entry of an order by a court of
competent jurisdiction, without the prior written consent of the
registered owners of the Bonds holding 51% of the outstanding
amount of the Bonds, amending, supplementing or otherwise
modifying the Post-Petition Financing Order in a manner adverse
to such owners, or (ii) an order of a court of competent jurisdiction
reversing, vacating or staying the effectiveness of the Post-Petition
Financing Order, and in either (i) or (ii), such order is not stayed
pending appeal; cessation of liens or super-priority claims granted
in respect of the Bonds to be valid, perfected and enforceable in all
respects with the priority described herein; failure of (i) the
Pledged Income Tax Revenue to maintain a minimum level of
receipts of $30 million for all consecutive 3-month periods
measured in complete calendar months or (ii) the Income Tax
Revenue Accounts to maintain a minimum aggregate value of $5
million at all times, and in the case of either (i) or (ii), such failure

is not cured within two (2) business days; and the City ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Registered Owners holding 51% of the Outstanding amount of the Bonds to ensure continued financial responsibility shall have been established.

| | |
|---|---|
| Remedies: | Upon any Event of Default, the Indenture Trustee may declare the principal of the Bonds to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month plus any Asset Proceeds Collateral. |
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the Collateral. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Bonds. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Bond Documents: | Each in form and substance satisfactory to the Purchaser: |

- Bond Purchase Agreement
- DTC-eligible Bonds, issued in denominations of not less than $100,000
- State and bankruptcy law opinions in form and substance agreed among the parties
- Local emergency financial assistance loan board approval of the terms and conditions of the Bonds
- All necessary approvals from the Bankruptcy Court for the Bonds and security interests in the Collateral, including lifting of automatic stay and "good faith" finding
- Account control agreement with respect to the Pledged Income Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of the Bonds, entry into Bond Documents and grant of Pledged Income Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law

- Other financing documents to be determined by Purchaser's counsel and City's counsel

The Indenture and Bond Purchase Agreement contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions.

The foregoing documents are collectively referred to herein as the "Bond Documents".

| | |
|---|---|
| Conditions Precedent: | Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the Bond Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in the form and substance agreed upon among the parties; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; accuracy of representations and warranties in all material respects; and absence of defaults. |
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent, pursuant to Bankruptcy Code section 904, to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Indenture Trustee, upon the consent of all bondholders, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall |

retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any Bond Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case.

| | |
|---|---|
| **Absence of Fiduciary Relationship:** | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| **Yield Protection, Taxes and Other Deductions:** | The Bond Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| **Expenses and Commitment Fee:** | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the Bond Documents, except as provided herein. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the Bond Documents. Additionally, the City will be responsible to Purchaser for any reasonable legal fees and legal expenses incurred by Purchaser solely to the extent that such legal fees and legal expenses are incurred by Purchaser as a result of third-party discovery or third-party litigation, in each case directed at |

Purchaser in its capacity as lender, in connection with the City's efforts to obtain approval of the Post-Petition Facility in the Bankruptcy Court. Purchaser hereby agrees that as of the date hereof, the City is not liable, in any respect, for any professional fees or expenses incurred to date by Purchaser in connection with the Post-Petition Facility or otherwise. Finally, the parties agree that if the closing of the Post-Petition Facility has not occurred as of April 15, 2014 and not as a result of any action or inaction of Purchaser, then it is the expectation of Purchaser that it will not be requested to close the Post-Petition Facility unless the City reimburses it for transactional legal fees and expenses incurred after April 15, 2014 and through the date of closing; provided, however, that the City will not actually be liable for any such legal fees or expenses after April 15, 2014 unless there is a further written agreement between the parties evidencing such obligation.

The City has paid to Purchaser a commitment fee of $4.375 million (the "Commitment Fee") in connection with the Post-Petition Facility. The Purchaser has agreed to refund the City $1 million of the Commitment Fee at the closing of the Post-Petition Facility.

Indemnification: To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Bond proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director |
| | James Saakvitne, Managing Director |
| | Peter Joyce, Director |
| | Barclays Capital Inc. |
| | 745 Seventh Avenue, 19th Floor |
| | New York, NY 10019 |
| | 212 526 3466 |
| | john.gerbino@barclays.com |
| | james.saakvitne@barclays.com |
| | peter.joyce@barclays.com |

Purchaser Counsel:  Purchaser's counsel will be responsible for drafting the Bond Purchase Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:  Ann D. Fillingham, Esq.
James P. Kiefer, Esq.
Courtney F. Kissel, Esq.
Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
517 374 9100
F 517 374 9191
AFillingham@dykema.com
jkiefer@dykema.com
ckissel@dykema.com

Governing Law:  Michigan.

Jurisdiction and Venue:  The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

# EXHIBIT D

CHI-1924165v8

# CITY OF DETROIT
# POST-PETITION FINANCING

Comparison of Key Terms of the Quality of Life Notes

March 26, 2014

# SELECTED ECONOMIC TERMS OF THE QOL NOTES

| | QOL NOTE - DECEMBER 2013 | QOL NOTE - MARCH 2014 |
|---|---|---|
| **FACILITY SIZE & STRUCTURE** | ■ $120 million Note | ■ Same |
| **COMMITMENT** | ■ Fully underwritten: Subject to terms, Barclays has committed to fund the full amount of the Financing | ■ Same |
| **MATURITY** | ■ Earliest of (i) dismissal of the Chapter 9 case, (ii) effective date of a Plan of Adjustment under Chapter 9, and (iii) 30 months from Closing of the Financing | ■ Same |
| **AMORTIZATION** | ■ None prior to maturity | ■ Same |
| **OPTIONAL REDEMPTION** | ■ Year 1: Redeemable at par plus a make-whole through end of Year 1<br>■ Thereafter: Redeemable at par | ■ Same |
| **PRICING** | ■ LIBOR + 250 bps (100 bps LIBOR floor)<br>■ Market flex provisions allow up to 200 bps increase in interest rate and 100 bps increase in LIBOR floor to facilitate a successful syndication<br>■ Tax exemption of interest to be determined (most likely tax-exempt) | ■ Same |
| **FEES** | ■ Commitment Fee of 1.25% ($4.37 million on entire $350 million commitment); extended commitment expired on January 31<br>■ Exit Fee of 0.50% if investment grade; 0.75% otherwise | ■ No further commitment fees; expectation of closing by April 15<br>■ $1 million returned to City on closing<br>■ Same Exit Fees |
| **EXPENSES** | ■ City responsible for its out-of-pocket expenses; Barclays responsible for its own expenses | ■ Same, except City responsible for certain Barclays expenses related to litigation or post-April 15 closing |

1

# SELECTED LEGAL TERMS OF THE QOL NOTES

| | QOL NOTE - DECEMBER 2013 | QOL NOTE - MARCH 2014 |
|---|---|---|
| **COLLATERAL** | ■ Priority lien on wagering tax revenues and a second priority lien, behind Swap Termination Note, on income tax revenues<br>  – In a Default, Noteholders can collect up to $4 million a month to pay interest and principal<br>■ Asset Proceeds Collateral (see below) | ■ Priority lien on income tax revenues<br><br>■ Same default payment provisions and Asset Proceeds Collateral (other than exemption of DIA treatment in POA) |
| **COLLATERAL ADMINISTRATION** | ■ City shall deposit all pledged tax revenues in a lockbox account | ■ Same |
| **MANDATORY PREPAYMENTS** | ■ Asset monetization net proceeds in excess of $10 million<br>■ Asset monetizations are not required and cannot be forced by the Noteholders<br>■ Maturity accelerates following an event of default | ■ Same |
| **SELECTED COVENANTS** | ■ City income tax revenue must be above $30 million for any rolling three-month period<br>■ City cannot cease to be under control of an Emergency Manager for a period of thirty days, unless a Transition Advisory Board or a consent agreement with the State has been established<br>■ $5 million minimum balance in pledged income tax account | ■ Same |
| **MATERIAL CLOSING CONDITIONS** | ■ Approval by Emergency Manager in compliance with Act 436 and Act 279<br>■ Emergency Loan Board authorization under 36a | ■ Same |

2

**EXHIBIT E**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,         .        Docket No. 13-53846
        MICHIGAN,                .
                                 .        Detroit, Michigan
                                 .        December 13, 2013
                    Debtor.      .        10:01 a.m.
. . . . . . . . . . . . . . . .

        HEARING RE. MOTION TO ADJOURN HEARING; MOTION TO COMPEL
         THE PRODUCTION OF PRIVILEGE LOG; PRETRIAL CONFERENCE
              BEFORE THE HONORABLE STEVEN W. RHODES
              UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  ROBERT W. HAMILTON
                     325 John H McConnell Blvd., Suite 600
                     Columbus, OH  43215
                     (614) 469-3939

                     Jones Day
                     By:  GREGORY M. SHUMAKER
                     51 Louisiana Avenue, N.W.
                     Washington, DC  20001-2113
                     (202) 879-3679

For Syncora          Kirkland & Ellis, LLP
Guarantee and        By:  STEPHEN HACKNEY
Syncora Capital      300 North LaSalle
Assurance:           Chicago, IL  60654
                     (312) 862-2074

For Erste            Ballard Spahr, LLP
Europaische          By:  VINCENT J. MARRIOTT, III
Pfandbrief-und       1735 Market Street, 51st Floor
Kommunalkreditbank   Philadelphia, PA  19103-7599
Aktiengesellschaft   (215) 864-8236
in Luxemburg, S.A.:

For UBS:             Bingham McCutchen, LLP
                     By:  JARED R. CLARK
                     399 Park Avenue
                     New York, NY  10022-4689
                     (212) 705-7770

APPEARANCES (continued):

```
For Detroit          Clark Hill, PLC
Retirement Systems-  By:  JENNIFER GREEN
General Retirement   500 Woodward, Suite 3500
System of Detroit,   Detroit, MI  48226
Police and Fire      (313) 965-8300
Retirement System
of the City of
Detroit:

For David Sole:      Jerome D. Goldberg, PLLC
                     By:  JEROME GOLDBERG
                     2921 East Jefferson, Suite 205
                     Detroit, MI  48207
                     (313) 393-6001

For FGIC:            Weil, Gotshal & Manges, LLP
                     By:  KELLY DIBLASI
                     767 5th Avenue
                     New York, NY  10153
                     (212) 310-8032

For Ad Hoc COP       Allard & Fish, PC
Holders:             By:  DEBORAH L. FISH
                     535 Griswold, Suite 2600
                     Detroit, MI  48226
                     (313) 961-6141


Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1        All right.  I think that's as much as I want to say
2    about the 9019, 365 motion.
3        On the debtor in possession financing motion under
4    Section 364, the Court basically agrees with the city's
5    position that Section 904 of the Bankruptcy Code prohibits
6    any review of what the city proposes to do with the proceeds
7    of the loan and actually prohibits any review beyond the
8    narrow review that Section 364 itself requires to determine
9    the reasonableness of the terms of the borrowing given the
10   current market conditions for similar kinds of loans and the
11   other technical requirements of Section 364, including the
12   city's inability to obtain a loan on any better terms.  And,
13   of course, the Court welcomes any evidence on the issue of
14   whether the debtor in possession financing was negotiated in
15   good faith, but the city's proposed use of the proceeds is
16   not a matter for this Court's consideration next week.
17       Having concluded all of that, the Court must
18   conclude that the record fails to establish cause for any
19   adjournment.  Accordingly, it is denied.
20       Now, can we move to the final pretrial conference on
21   this?  Did you all prepare a joint pretrial statement?
22       MR. SHUMAKER:  Good morning, your Honor.  Greg
23   Shumaker of Jones Day for the City of Detroit.  Yes, your
24   Honor, we did prepare a joint statement of facts in
25   connection with the -- what we've referred to as the

**EXHIBIT F**

CHI-1924165v8

## Proposed Uses of Amended QOL Loan Proceeds

| City Department | Proposed Budget | Selected Initiatives |
|---|---|---|
| **Police Department** | $36.2 million | — Purchasing fleet vehicles<br>— Construction of new precincts and training facility<br>— Upgrades to IT systems<br>— Hiring to reach adequate levels of staffing<br>— Purchase of equipment (i.e., radios, vests, tasers, cameras) |
| **Blight Removal** | $35.6 million | — Residential blight removal |
| **Fire Department** | $28.5 million | — Purchasing fleet vehicles and maintenance<br>— Repairs and maintenance to existing facilities<br>— Upgrades to IT system<br>— Hiring to reach adequate levels of staffing |
| **Finance Department** | $25.4 million | — Hiring to reach adequate levels of staffing<br>— IT systems data back-up solution<br>— Upgrades to IT systems |
| **General Services Department** | $24.8 million | — Park upgrades and ground maintenance fleet replacement<br>— City-wide facility improvements and repairs<br>— Hiring to reach adequate levels of staffing |
| **Department of Health and Wellness Promotion** | $5.1 million | —Demolition of Herman Kiefer Building |
| **Planning & Development** | $4.5 million | —Facility consolidation |

CHI-1925066v4

| Department | | — Hiring City planning and other labor resources |
|---|---|---|
| **City Wide Training** | $3.4 million | — Cost for training City-wide employees |
| **Department of Transportation** | $2.7 million | — Facility improvements and upgrades<br>— Costs associated with increased department services |
| **Recreation Department** | $3.2 million | — Repair and maintenance of recreation facilities<br>— Park and recreation facility improvements |
| **Legal Department** | $1.6 million | — Hiring to reach adequate levels of staffing |
| **Elections Department** | $0.8 million | — Deferred maintenance and improvements |
| **Human Resources** | $0.6 million | — Hiring to reach adequate levels of staffing |
| **Airport Capital Expenditures** | $0.5 million | — Hiring employees to comply with applicable law |
| **Other** | $6.1 million | — Multiple miscellaneous initiatives |
| **Total** | **$179.0 million** | |

The project categories and the total proposed expenditures set forth herein are based on current needs and priorities of the City in the near-term. The allocation of expenditures set forth herein are for illustrative purposes only. The City reserves the right to re-allocate spending within project categories based on the evolving needs of the City, project readiness and availability of funds.