# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| In re | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## SYNCORA CAPITAL ASSURANCE INC. AND SYNCORA GUARANTEE INC.'S FIRST REQUEST FOR THE PRODUCTION OF DOCUMENTS TO THE CITY OF DETROIT

Pursuant to Federal Rules of Civil Procedure 26 and 34, made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 7026 and 7034, Syncora Capital Assurance Inc. and Syncora Guarantee Inc. ("Syncora") file these requests for the production of documents and request that the Debtor, the City of Detroit (the "City"), produce for Syncora's inspection and copying all documents and tangible things requested herein in accordance with the Definitions and Instructions set forth below at the offices of their counsel, Kirkland & Ellis LLP, at 300 N. LaSalle, Chicago, IL 60654. These requests are made pursuant to the Second Amended Order Establishing Procedures, Deadlines and Hearing Dates Relating to the Debtor's Plan of Adjustment [Doc. No. 2755]. Each of the following requests is continuing in nature, such that if the City obtains or discovers additional responsive documents and things at a later date, such documents and things are to be made available to Syncora for inspection and copying.

# INSTRUCTIONS

1. Production shall be made as the records are kept in the usual course of business, or shall be organized and labeled to correspond with the categories of this request.

2. If any documents are not available for production because they have been misplaced, discarded, or destroyed, identify which documents cannot be produced for these reasons, and state fully in writing the reasons that the documents are unavailable.

3. If any document cannot be produced in full, it shall be produced to the maximum extent possible and the City shall specify in writing the reasons for its inability to produce the remainder.

4. If any documents are available but are not produced because of an objection, including an objection based on privilege, identify such documents with particularity as to date, subject matter and the nature of the objection or privilege claim.

5. If documents called for are not available to you because they are in the custody or control of a third person, identify such documents and the third person in whose possession or control said documents are to be found.

2

6. Produce original documents whenever such documents are available to you.

7. Produce all documents available by virtue of being in possession of your attorneys or other agents.

8. In accordance with Fed. R. Bankr. P. 7026, where a claim of privilege is asserted in objecting to any document request or part thereof, and production is not provided on the basis of such assertion, the following information should be provided in the objection: (a) the type of document; (b) the general subject matter of the document; (c) the date of the document; (d) the nature of the privilege that is being claimed; and (e) such other information as is sufficient to identify the document, including, where appropriate, the author, addressee, custodian, and any other recipient of the document, and, where not apparent, the relationship of the author, addressee, custodian, and any other recipient to each other.

9. The present tense includes the past and future tenses. The singular includes the plural, and the plural includes the singular. "All" means "any and all." "Any" means "any and all." "Including" means "including but not limited to." "And" and "or" encompasses both "and" and "or." Words in the masculine, feminine or neutral shall include each of the other genders.

10.     Unless otherwise stated, the time period applicable to the documents called for is January 1, 1883, through the date of this document request, subject to the City's ongoing obligation to supplement its responses under the applicable rules.

## DEFINITIONS

As used in these document requests, the following terms are to be interpreted in accordance with these definitions:

1.     The term "Attorney General" means the Attorney General of the State of Michigan, as well as the departments, officials, agents, affiliates, attorneys, advisors, professionals, and representatives employed by the Attorney General's office and all other persons acting or purporting to act on the Attorney General's behalf.

2.     The term "City" shall mean the City of Detroit, Michigan, as well as any of its past or present divisions, such as, but without limitation, the Detroit Arts Commission, and departments, officials, trustees, agents, affiliates, employees, attorneys, advisors, professionals, representatives, advisors, and all other persons acting or purporting to act on their behalf, including Kevyn D. Orr acting as Emergency Manager and any successors.

3.     The term "Christie's" shall mean Christie's Appraisals, Inc., and all affiliates or subsidiaries thereof.

4.     The term "Christie's Valuation" means the appraisal, letter, and fair market value report conducted and issued by Christie's Appraisals, Inc. for the City of Detroit, on or about December 17, 2013, as amended, supplemented, or modified, and including any draft letters and reports.

5.     The term "Collection" shall mean the collection of over 60,000 works of art displayed or stored at the Detroit Institute of Arts museum located at 5200 Woodward Avenue, Detroit, Michigan 48202, and on-site and off-site storage facilities.

6.     The term "Collections Management Policy" shall mean the current Detroit Institute of Arts Collection Management Policy and all amendments or modifications thereto.

7.     "Concerning" means relating to, referring to, describing, evidencing, reflecting, embodying, or constituting.

8.     The term "DIA Corp." shall mean the Detroit Institute of Arts, a nonprofit corporation organized under the laws of the State of Michigan and any and all of its predecessors.

9.     The term "DMA" shall mean the Detroit Museum of Arts.

10.     The term "Documents" and "Document" have the same full meaning as in Rule 34 of the Federal Rules of Civil Procedure and Rule 7034 of the Federal Rules of Bankruptcy Procedure and includes the original, any draft (whether disseminated or not) and any copy, regardless of origin or location, of any correspondence, letter, memorandum, electronic mail (e-mail), statement, summary, outline, contract, agreement, book, pamphlet, periodical, telegram, telecopy, telefax, wire, cable, record, study, report, schedule, diary, desk calendar, organizer, appointment book, photograph, reproduction, map, survey, drawing, chart, model, index, tape, data sheet or data processing card, computerized information, data base or disk (including without limitation hard, soft, floppy, or compact), invoice, purchase order, ledger, journal, check (front and back), check stub, note, bond, assignment, transfer, account statement, tax report, tax schedule, financial statement, workpaper, business form, timesheet, log, inventory, print-out, computer tape and notes of meetings, conferences, conversations or telephone conversations and any and all other written, printed, telecopied, telefaxed, transcribed, punched, taped, stored, filmed and graphic matter, however produced or reproduced, and specifically includes any preliminary note, outline, or draft of any of the foregoing in your custody, possession, or control.

11.     The term "Foundations" refers to any entity that is a contributing party to the DIA Settlement, other than the City of Detroit or State of Michigan.

12.     The term "DIA Settlement" refers to the settlement set forth in the City's Plan of Adjustment regarding the Collection.

13.     The term "State Settlement" refers to the settlement set forth in the City's Plan of Adjustment regarding the State.

14.     The term "Founders Society" shall mean the Detroit Museum of Arts Founders' Society and all successors in interest thereto.

15.     The term "1997 Operating Agreement" means the Operating Agreement for the Detroit Institute of Arts between the City and the DIA Corp. (formerly known as the Founders Society or the Founders Society Detroit Institute of Arts), City Contract No. 77009, initially approved on or about November 26, 1997, together with all exhibits, schedules, supplements, amendments, and modifications thereto.

16.     "You" or "Your" mean the parties to whom this request is directed, and shall include anyone acting on behalf of those parties, over whom the parties have control, or which is, or may be subrogated to the parties' interests, including,

without limitation, any officer, agent, servant, employee, attorney, insurance company, investigator, independent adjusting company, or other person or entity.

17.     The term "Service Corporations" means the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation.

18.     The term "UAAL" means unfunded actuarial accrued liability.

19.     The term "DGRS" means the Detroit General Retirement System.

20.     The term "DPFRS" means the Detroit Police and Fire Retirement System.

21.     The term "Milliman" means the company Milliman, Inc.

22.     The term "Plan" means the City's filed Plan of Adjustment [Doc. No. 2755].

23.     The term "Disclosure Statement" means the City's filed Disclosure Statement [Doc. No. 2709]

24.     The term "COPs" means, collectively, (a) the Detroit Retirement Systems Funding Trust 2005 Certificates of Participation Series 2005-A, issued by the Detroit Retirement Systems Funding Trust 2005 pursuant to the 2005 COPs

Agreement, in an initial principal amount of $640 million, bearing interest at 4.0% to 4.948%, (b) the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-A, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $148.5 million, bearing interest at 5.989%; and (c) the Detroit Retirement Systems Funding Trust 2006 Certificates of Participation Series 2006-B, issued by the Detroit Retirement Systems Funding Trust 2006 pursuant to the 2006 COPs Agreement, in an initial principal amount of $800 million, bearing interest at a floating rate.

## Document Requests

1.      All inventories created in the past five years of the objects and works of art in the Collection.

2.      All documents and communications relating to the conveyance of the DMA assets from the DMA to the City of Detroit in 1919, including, but not limited to, contracts, deeds, and other DMA records.

3.      Provenance listings for every object and work of art in the Collection.

4.       All documents and communications relating to any restrictions on the objects and works of art in the Collection, including, but not limited to, restrictions on exhibition, storage, conservation, deaccession, sale, exchange, or loan.

9

5.     Documents sufficient to identify any work of art in the Collection that was commissioned by the DIA Corp., the Founders Society, or the City.

6.     All documents and communications relating to the deaccession, sale, exchange, auction, or disposal of any object or work of art held or owned by DIA Corp., the Founders Society, or the City, including, but not limited to, all documents and communications relating to any indications of interest in bidding on any pieces in the Collection if they were sold or offered for sale.

7.     All communications that the City (including its advisors and investment bankers) had with any individuals, investors, art collectors, or corporations relating to the sale or purchase of the Collection or any pieces in the Collection.

8.     All documents and communications provided to the Internal Revenue Service that relate to the deaccession, auction, sale, exchange, loan, or other disposition of any object or work of art by DIA Corp., the Founders Society, or the City, including, but not limited to, any IRS Forms 8282.

9.      All documents, communications, and notifications sent to any donor or settlor that relate to the deaccession, sale, auction, exchange, or disposal of any of the objects or works of art by DIA Corp., the Founders Society, or the City.

10.     All documents, communications, and notifications sent to or received from the Attorney General that relate to the deaccession, sale, auction, exchange, or disposal of any object or work of art by DIA Corp., the Founders Society, or the City.

11.     The 1997 Operating Agreement.

12.     The Collections Management Policy.

13.     All documents and communications relating to the procedures of the City, the Founders Society, or DIA Corp. for accepting or rejecting restricted donations, gifts, and bequests of works of art or funds.

14.     All documents and communications relating to the procedures for the deaccession, auction, exchange, sale, loan, or other disposition of any object or work of art held or owned by DIA Corp., the Founders Society, or the City that is subject to restrictions on deaccession, auction, exchange, sale, loan, or other form of alienation.

15.     Documents sufficient to show the attendance at DIA Corp. on a yearly and monthly basis.

16.     Documents sufficient to show the attendance at special exhibits or demonstrations held by DIA Corp.

11

17.     Documents sufficient to show all past and present members of DIA Corp.

18.     All visitor surveys, participation surveys, audience surveys, population surveys, or visit surveys relating to DIA Corp.

19.     All documents relating to the Christie's valuation.

20.     All external and internal communications relating to the Christie's Valuation, including, but not limited to, communications with Christie's, DIA Corp., the Foundations, or the Attorney General.

21.     All past and current insurance policies that relate to the Collection, including, but not limited to, all insurance policies obtained by DIA Corp. pursuant to sections F(15)(a) and (b) of the 1997 Operating Agreement.

22.     Documents sufficient to identify any object or work of art in the Collection that has been appraised or valued for $1 million or more.

23.     Any and all valuations or appraisals of any object or work of art in the Collection.

24.     All documents and communications relating to Attorney General Opinion No. 7272.

25.    All documents and communications relating to the Plan GRS Settlement, as that term is defined in the Plan.

26.    All documents and communications relating to the Plan PFRS Settlement, as that term is defined in the Plan.

27.    All documents and communications relating to the registration of any object or work of art in the Collection, or any object or work of art previously owned or held by DIA Corp., the City, or the Founders Society, as a charitable trust.

28.    Any and all petitions or other court filings that relate to the deaccession, sale, auction, exchange, loan or other disposition of any object or work of art in the Collection or that was previously owned or held by DIA Corp., the City, or the Founders Society.

29.    All governing documents that relate to the DIA Settlement, including, but not limited to, those documents that will be attached to the Plan as Exhibit I.A.71.

30.    All communications relating to the DIA Settlement, including, but not limited to, all communications with the Foundations, the DGRS, the DPFRS,

the State, DIA Corp., or the Community Foundation for Southeast Michigan relating to the DIA Settlement.

31.     All documents and communications that relate to the transfer of the Collection to DIA Corp. pursuant to the DIA Settlement.

32.     All documents and communications that relate to any alternative efforts to realize any value for the "DIA Assets," as defined by the Plan, or the Collection, aside from the DIA Settlement.

33.     All documents and communications relating to DIA Corp.'s role in the revitalization of midtown Detroit.

34.     All documents relating to each judgment against the City under the Revised Judicature Act (MCL 600.93).

35.     All documents relating to each judgment paid by the City under the Revised Judicature Act (MCL 600.93).

36.     All documents relating to any prior or potential sales of the City's assets in excess of $1 million including, but not limited to, Belle Isle, the Detroit-Windsor Tunnel, the Veterans' Memorial Building, any City parking facilities, and Coleman Young Airport.

37. All documents relating to or containing any analysis conducted by the City regarding the consequences of not filing for bankruptcy.

38. All documents created between January 1, 2013 and the present containing calculations or analysis regarding the City's future income tax revenues, including, but not limited to, the assumptions underlying any such calculations or analysis (*i.e.*, population growth in the City, employment and property ownership in the City, and income rates in the City).

39. All documents created between January 1, 2013 and the present relating to the effects of raising taxes, assessments, or fees on the City and/or its residents.

40. All documents created between January 1, 2013 and the present relating to the relative tax burden in the City compared to surrounding areas.

41. All documents relating to any analysis of the City's creditors' recoveries outside of chapter 9.

42. All documents relating to the City's $1.5 billion reinvestment initiative, including, but not limited to, the specific initiatives that make up the $1.5 billion reinvestment initiative, the steps the City has taken to implement any of its restructuring and revitalization initiatives, the steps that the City intends to take to

15

implement its restructuring and revitalization efforts, all financial projections and assumptions related to the reinvestment initiatives, and the City's analyses regarding the revenue generated by the reinvestment initiatives.

43.    All documents and communications relating to any partnerships between the City and private organizations regarding the City's proposed restructuring and revitalization efforts.

44.    All prior drafts of the City's 10-year projections, attached as Exhibit J to the City's Disclosure Statement [Doc. No. 2709].

45.    Documents sufficient to show all of the assumptions in the City's 10-year projections, attached as Exhibit J to the City's Disclosure Statement [Doc. No. 2709], and the basis for each of these assumptions.

46.    All documents and communications relating to the City's claim that the DGRS and DPFRS understated their UAAL.

47.    All analyses regarding the size of the OPEB Claim, as that term is defined in the Plan.

48.    All analyses regarding the vesting of OPEB Benefits, as that term is defined in the Plan.

49. All documents, communications, and data exchanged with Milliman in 2013.

50. All actuarial reports as of the last valuation date for each of the City's pension plans.

51. All Certified Audited Financial Reports.

52. All of the documents governing each of the City's pension plans, including, but not limited to, any amendments or statutes governing each of the City's pension plans.

53. The most recent experience study relating to the City's pension plans.

54. Any plan design studies, including reports, letters, and presentations, that relate to the City's pension plans that were conducted between January 1, 2008 and the present.

55. All of the currently operative employee handbooks and summaries relating to each of the City's pension plans.

56. All actuarial data for the following categories of individuals:

   a. Active Participants (*i.e.*, those still accruing benefits). Actuarial data should include the following:

      i. Name

    ii.   Social Security Number

   iii.   Code identifying benefit structure applicable to participant

   iv.   Date of birth

    v.   Date of hire

   vi.   Date of participation

  vii.   Gender

 viii.   Benefit service

   ix.   Vesting service

    x.   Ten-year compensation history for active participants

   xi.   Accrued benefits

  xii.   Employee contribution account balance

 xiii.   Employee contribution rate

b. Termination Vested Participants and Active Participants with Frozen Benefits. Actuarial data should include the following:

    i.   Name

   ii.   Social Security Number

  iii.   Code identifying benefit structure applicable to participant

  iv.   Date of birth

   v.   Date of hire

  vi.   Date of participation

 vii.   Date of termination

viii.   Gender

  ix.   Accrued benefits

          x.     Vesting service

          xi.    Employee contribution account balance

    c.   Retirees and Disabled Participants.  Actuarial data should include the following:

          i.     Name

          ii.    Social Security Number

          iii.   Code identifying benefit structure applicable to participant

          iv.   Date of birth

          v.     Gender

          vi.   Form of benefit

          vii.  Beneficiary date of birth (if form provides survivorship benefits)

57.    For each plan's actuarial assumptions, all documents relating to (a) the annual salary increase assumption by age; (b) the probabilities of retirement by age for each benefit class; (c) the turnover rates by age, sex, and benefit class; and (d) disability rates by age.

58.    The value of any deferred retirement option plans ("DROP") account balances.

59.    All documents and communications relating to the City's analysis and estimate of recoveries for COPs under the Plan of Adjustment, including, but not limited to, the City's analyses and underlying assumptions.

60.     All documents and communications relating to any claims that the Service Corporations have against the City.

61.     Documents sufficient to show all of the operational improvements that the City intends to implement.

62.     All communications between the Service Corporations and the City.

63.     All documents created between January 1, 2005 and the present relating to the City's revenue-sharing arrangements with the State of Michigan.

64.     All communications between the City and the State of Michigan regarding State-funding, -taxation, or -revenue-sharing for the time period January 1, 2005 to the present.

65.     All documents relating to funding received by the City from the State of Michigan for any purpose from the time period January 1, 2005 to the present.

66.     All documents and communications relating to any federal, state, or private money that the City of Detroit either (a) has received since January 1, 2010 or (b) expects to receive.

67.     All City budgets from 2008 through the present.

68.     All City financial statements from 2008 through the present.

69.     All documents, minutes, communications, testimony, presentations, or other records that relate to the DPFRS's or the DGRS's decision to support the COPs transactions.

70.     All documents, facts, information, and data that the City's expert witnesses consider or rely upon.

71.     For every revenue line item in Exhibit H to the Disclosure Statement, provide the following documents or data:

    a. In Microsoft Excel format, comparable data for every fiscal year from 1980 through 2007;

    b. Documents sufficient to show the related tax rates, as applicable, from 1980 to 2013;

    c. Documents sufficient to show forecasted tax rates, as applicable, through 2017, and all assumptions and computations upon which those forecasted tax rates were based;

    d. Documents sufficient to show all changes in any tax provision or computational element that influenced revenue (*e.g,* assessed property values) from 1980 through 2013;

    e. Documents sufficient to show all forecasted changes in any tax provision or computational element that would influence revenue through 2017, and the effective date of each such change;

    f. Documents sufficient to show the forecasted revenue impact of any forecasted changes in any tax provision or computational element, broken down by each year through 2017, and all assumptions and

computations upon which those forecasted revenue impacts were based;

g. Documents sufficient to identify any variables that were assumed when determining revenue, and, for each such variable, documents sufficient to identify (a) their historical and forecasted values from 1980 to 2017 and (b) the sources of those historical and forecasted values;

h. All documents relating to the methodology by which the revenues were calculated or forecast;

i. If an econometric, regression, or other statistical model was used to derive any forecasts from 1980 to the present, documents sufficient to show (i) the related regression or other equations; (ii) definitions of each explanatory and dependent variable in those equations; (iii) the historical values of those variables over the time periods studied; (iv) the sources of those historical values; (v) the forecasted values of those variables; (vi) the sources of those forecast values; and (vii) all output describing the performance of the equations or models in question.

72. For the time period 1980 to the present, documents sufficient to show (a) the number of taxpayers who complied with their City income tax obligations and (b) the number of taxpayers who did not comply with their City income tax obligations.

73. For the time period 1980 to the present, documents sufficient to show (a) the number of taxpayers who complied with their City property tax obligations and (b) the number of taxpayers who did not comply with their City property tax obligations.

74. For the time period 1980 to the present, documents sufficient to show (a) the total payments due based on the City's income tax and (b) the total payments due but uncollected based on the City's income tax.

75. For the time period 1980 to the present, documents sufficient to show (a) the total payments due based on the City's property tax and (b) the total payments due but uncollected based on the City's property tax.

76. For the City's property tax revenue, documents sufficient to show (a) the current and forecasted aggregate taxable values; (b) the current and forecasted aggregate market value; and (c) the aggregate taxable-to-market ratios.

77. For the City's property tax revenue, a current property tax roll in Microsoft Excel format indicating, on a parcel-by-parcel basis, (a) estimated market value; (b) taxable value; (c) total millage rate; and (d) total annual assessment.

78. Documents sufficient to show the City's methodology for determining the forecasted revenue from state revenue sharing for the years 2013 to 2017.

79. All documents and communications relating to and supporting the City's forecasted revenue from state revenue sharing.

80.    All revenue forecasts prepared by the City, Ernst & Young, or any other City consultant or advisor from January 1, 2009 to the present and the following information for each forecast:

   a.  All documents and communications relating to each revenue forecast;

   b.  Documents sufficient to show the issue date of each forecast;

   c.  Documents sufficient to show the author or authors of each forecast; and

   d.  Documents sufficient to show the purpose for each forecast.


Dated:  March 28, 2014          /s/ *Stephen C. Hackney*
                                James H.M. Sprayregen, P.C.
                                Ryan Blaine Bennett
                                Stephen C. Hackney
                                KIRKLAND & ELLIS LLP
                                300 North LaSalle
                                Chicago, Illinois 60654
                                Telephone:  (312) 862-2000
                                Facsimile:    (312) 862-2200

                                *Attorneys for Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
300 North LaSalle
Suite 2100
Chicago, Illinois 60654
Telephone: (312) 280-0111
Facsimile: (312) 280-8232

*Local Counsel to Syncora Holdings Ltd., Syncora Guarantee Inc., and Syncora Capital Assurance Inc.*