# EXHIBIT A

IN RE:  CITY OF DETROIT,          .         Docket No. 13-53846
        MICHIGAN,                 .
                                  .         Detroit, Michigan
                                  .         March 5, 2014
                   Debtor.        .         2:30 p.m.
. . . . . . . . . . . . . . . . .

HEARING RE. MOTION OF THE CITY OF DETROIT FOR ENTRY OF
AN ORDER (I) ESTABLISHING PROCEDURES FOR SOLICITATION
AND TABULATION OF VOTES TO ACCEPT OR REJECT PLAN OF
ADJUSTMENT AND (II) APPROVING NOTICE PROCEDURES RELATED
TO CONFIRMATION OF THE PLAN OF ADJUSTMENT (DKT#2789);
CONCURRENCE OF THE RETIREE ASSOCIATION PARTIES IN THE
SUPPLEMENTAL COMMENTS OF THE OFFICIAL COMMITTEE OF
RETIREES TO THE FIRST AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES RELATING TO THE
DEBTOR'S PLAN OF ADJUSTMENT (DKT#2781) (DKT#2793);
RESPONSE OF INTERNATIONAL UNION, UAW, TO FIRST AMENDED
ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING DATES
RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT (DKT#2791);
COMMENT TO THE FIRST AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES RELATING TO THE
DEBTOR'S PLAN OF ADJUSTMENT (DKT#2780); SUPPLEMENTAL COMMENTS
OF THE OFFICIAL COMMITTEE OF RETIREES TO THE FIRST AMENDED
ORDERS ESTABLISHING PROCEDURES, DEADLINES AND HEARING
DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
(DKT#2781); RESPONSE OF THE CITY OF DETROIT TO THE COURT'S
FIRST AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES
AND HEARING DATES RELATING TO THE DEBTOR'S PLAN OF
ADJUSTMENT (DKT#2787); OBJECTION TO THE COURT'S FIRST
AMENDED ORDER ESTABLISHING PROCEDURES, DEADLINES AND
HEARING DATES RELATING TO THE DEBTOR'S PLAN OF
ADJUSTMENT (DKT#2778); THE WATER AND SEWER BOND
TRUSTEE'S LIMITED OBJECTION TO THE FIRST AMENDED
ORDER ESTABLISHING PROCEDURES, DEADLINES AND HEARING
DATES RELATING TO THE DEBTOR'S PLAN OF ADJUSTMENT
(DKT#2794); JOINDER OF WILMINGTON TRUST, NATIONAL
ASSOCIATION, AS SUCCESSOR CONTRACT ADMINISTRATOR, TO
(A) COMMENT TO THE FIRST AMENDED ORDER ESTABLISHING
PROCEDURES, DEADLINES AND HEARING DATES AND (B) THE
WATER AND SEWER BOND TRUSTEE'S LIMITED OBJECTION TO
THE FIRST AMENDED ORDER ESTABLISHING PROCEDURES,
DEADLINES AND HEARING DATES RELATING TO THE DEBTOR'S
PLAN OF ADJUSTMENT (DKT#2796); STATUS HEARING RE.
MOTION OF DEBTOR FOR ENTRY OF AN ORDER, PURSUANT TO
SECTION 105(a) OF THE BANKRUPTCY CODE AND BANKRUPTCY
RULE 9019, APPROVING A SETTLEMENT AND PLAN SUPPORT
AGREEMENT AND GRANTING RELATED RELIEF (DKT#2802)

BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jones Day<br>By:  HEATHER LENNOX<br>222 East 41st Street<br>New York, NY  10017<br>(212) 326-3837 |
| | Pepper Hamilton, LLP<br>By:  ROBERT S. HERTZBERG<br>4000 Town Center, Suite 1800<br>Southfield, MI  48075<br>(248) 359-7333 |
| For Erste<br>Europaische<br>Pfandbrief-und<br>Kommunalkreditbank<br>Aktiengesellschaft<br>in Luxemburg, S.A.: | Ballard Spahr, LLP<br>By:  VINCENT J. MARRIOTT, III<br>1735 Market Street, 51st Floor<br>Philadelphia, PA  19103-7599<br>(215) 864-8236 |
| For Syncora<br>Holdings, Ltd.,<br>Syncora Guarantee,<br>Inc., and Syncora<br>Capital Assurance,<br>Inc.: | Kirkland & Ellis, LLP<br>By:  STEPHEN C. HACKNEY<br>300 North LaSalle<br>Chicago, IL  60654<br>(312) 862-3062 |
| For Financial<br>Guaranty Insurance<br>Company: | Weil, Gotshal & Manges, LLP<br>By:  KELLY DIBLASI<br>767 Fifth Avenue<br>New York, NY  10153<br>(212) 310-8032 |
| For the Official<br>Committee of<br>Retirees: | Dentons US, LLP<br>By:  CAROLE NEVILLE<br>     CLAUDE D. MONTGOMERY<br>1221 Avenue of the Americas, 25th Floor<br>New York, NY  10020-1089<br>(312) 632-8390 |
| For Ambac<br>Assurance<br>Corporation: | Arent Fox, LLP<br>By:  CAROLINE TURNER ENGLISH<br>1717 K Street, NW<br>Washington, DC  20036-5342<br>(202) 857-6178 |

APPEARANCES (continued):

| | |
|---|---|
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By: BABETTE A. CECCOTTI<br>330 West 42nd Street, 25th Floor<br>New York, NY 10036-6976<br>(212) 356-0227 |
| For National Public Finance Guarantee Corporation: | Sidley Austin, LLP<br>By: GUY S. NEAL<br>1501 K Street, N.W.<br>Washington, DC 20005<br>(202) 736-8041 |
| For Bank of America: | Davis Polk & Wardwell, LLP<br>By: MARSHALL S. HUEBNER<br>450 Lexington Avenue<br>New York, NY 10017<br>(212) 450-4099 |
| For UBS AG: | Paul, Weiss, Rifkind, Wharton & Garrison, LLP<br>By: DANIEL J. KRAMER<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br>(212) 373-3020 |
| | Bingham McCutchen, LLP<br>By: EDWIN E. SMITH<br>399 Park Avenue<br>New York, NY 10022-4689<br>(212) 705-7044 |
| For US Bank as Trustee: | Waller Lansden Dortch & Davis, LLP<br>By: DAVID E. LEMKE<br>511 Union Street, Suite 2700<br>P.O. Box 198966<br>Nashville, TN 37219-8966<br>(615) 850-8655 |
| For Berkshire Hathaway Assurance Corporation: | Garan Lucow Miller, PC<br>By: CHRISTOPHER P. JELINEK<br>1000 Woodbridge<br>Detroit, MI 48207<br>(313) 446-1530 |
| For Ad Hoc Bondholder Committee: | Mintz Levin Cohn Ferris Glovsky and Popeo, PC<br>By: WILLIAM W. KANNEL<br>One Financial Center<br>Boston, MA 02111<br>(617) 348-1665 |

APPEARANCES (continued):

| | |
|---|---|
| For Wilmington Trust Company, N.A.: | Drinker, Biddle & Reath, LLP<br>By:  HEATH ROSENBLAT<br>1177 Avenue of the Americas, 41st Floor<br>New York, NY  10036-2714<br>(212) 248-3248 |
| For General Police and Retirement Systems: | Clark Hill, PLC<br>By:  JENNIFER K. GREEN<br>500 Woodward Avenue, Suite 3500<br>Detroit, MI  48226<br>(313) 965-8300 |
| | Clark Hill, PLC<br>By:  SHANNON L. DEEBY<br>151 South Old Woodward, Suite 200<br>Birmingham, MI  48009<br>(248) 988-5889 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Zucker &<br>   Freedman, P.C.<br>By:  BARBARA A. PATEK<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For FMS Wertmanagement: | Schiff Hardin, LLP<br>By:  RICK FRIMMER<br>233 South Wacker Drive, Suite 6699<br>Chicago, IL  60606-7643<br>(312) 258-5511 |
| For Ad Hoc COPs Holders: | Allard & Fish, PC<br>By:  DEBORAH L. FISH<br>2600 Buhl Building<br>535 Griswold<br>Detroit, MI  48226<br>(313) 961-6141 |
| For Assured Guaranty Municipal Corp.: | Chadbourne & Parke, LLP<br>By:  SAMUEL S. KOHN<br>30 Rockefeller Plaza<br>New York, NY  10012<br>(212) 408-1140 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Lippitt O'Keefe, PLLC By:  RYAN C. PLECHA 370 East Maple Road, 3rd Floor Birmingham, MI  48009 (248) 723-6263 |
| For David Sole: | Jerome D. Goldberg, PLLC By:  JEROME GOLDBERG 2921 East Jefferson, Suite 205 Detroit, MI  48207 (313) 393-6001 |
| For AFSCME: | Lowenstein Sandler, LLP By:  PHILLIP J. GROSS 65 Livingston Avenue Roseland, NJ  07068 (973) 597-6246 |
| Court Recorder: | Letrice Calloway United States Bankruptcy Court 211 West Fort Street 21st Floor Detroit, MI  48226-3211 (313) 234-0068 |
| Transcribed By: | Lois Garrett 1290 West Barnes Road Leslie, MI  49251 (517) 676-5092 |

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2    be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  May we have appearances for the record,

4    please?

5          MS. LENNOX:  Good afternoon, your Honor.  Heather

6    Lennox from Jones Day on behalf of the city.  With me in the

7    courtroom are my partners, Tim Cullen, David Heiman, and Bob

8    Hertzberg from Pepper Hamilton.

9          THE COURT:  Thank you.

10          MR. MARRIOTT:  Good afternoon, your Honor.  Vince

11    Marriott, Ballard Spahr, on behalf of EEPK and affiliates.

12          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

13    Hackney on behalf of Syncora.

14          MS. DIBLASI:  Good afternoon, your Honor.  Kelly

15    DiBlasi, Weil, Gotshal, Manges, on behalf of Financial

16    Guaranty Insurance Company.

17          MS. NEVILLE:  Good afternoon, your Honor.  Carole

18    Neville from Dentons on behalf of the Retiree Committee, and

19    with me is Claude Montgomery.

20          MS. ENGLISH:  Good afternoon, your Honor.  Caroline

21    English from Arent Fox on behalf of Ambac Assurance

22    Corporation.

23          MS. CECCOTTI:  Good afternoon, your Honor.  Babette

24    Ceccotti, Cohen, Weiss & Simon, LLP, for the autoworkers.

25          MR. NEAL:  Good afternoon, your Honor.  Guy Neal,

1  Sidley Austin, National Public Finance Guarantee Corporation.

2      MR. HUEBNER:  Good afternoon, your Honor.  I'm

3  Marshall Huebner of Davis, Polk & Wardwell on behalf of Bank

4  of America.

5      MR. KRAMER:  Your Honor, Dan Kramer from Paul, Weiss

6  for UBS.

7      MR. LEMKE:  Your Honor, David Lemke with Waller

8  Lansden here for US Bank as trustee for the water and sewer

9  bonds.

10      MR. JELINEK:  Good afternoon, your Honor.

11  Christopher Jelinek, Garan, Lucow, Miller, on behalf of

12  Berkshire Hathaway Assurance Corporation.

13      MR. KANNEL:  Good afternoon, your Honor.  William

14  Kannel, Mintz Levin, on behalf of the ad hoc committee of

15  water and sewer bondholders.

16      MR. ROSENBLAT:  Good afternoon, your Honor.  Heath

17  Rosenblat of Drinker, Biddle & Reath on behalf of Wilmington

18  Trust National Association.

19      MS. PATEK:  Good afternoon, your Honor.  Barbara

20  Patek of Erman Teicher on behalf of the public safety unions.

21      MS. GREEN:  Good afternoon.  Jennifer Green on

22  behalf of the Retirement Systems and also Shannon Deeby on

23  behalf of the Retirement Systems as well.

24      MR. FRIMMER:  Good afternoon, your Honor.  Rick

25  Frimmer from Schiff Hardin on behalf of FMS Wertmanagement,

1  AOR.

2        MS. FISH:  Good afternoon, your Honor.  Deborah Fish

3  from Allard & Fish on behalf of the ad hoc COP holders.

4        MR. SMITH:  Hello, your Honor.  Edwin Smith, Bingham

5  McCutchen, for UBS AG, co-counsel with Paul, Weiss.

6        MR. KOHN:  Good afternoon, your Honor.  Samuel Kohn

7  of Chadbourne & Parke on behalf of Assured Guaranty Municipal

8  Corp.

9        MR. PLECHA:  Good afternoon, your Honor.  Ryan

10  Plecha from Lippitt, O'Keefe, Gornbein on behalf of the

11  retiree association parties.

12        MR. GOLDBERG:  Good afternoon, your Honor.  Jerome

13  Goldberg on behalf of interested party David Sole.

14        THE COURT:  Do we have any parties on the telephone

15  who'd like to make an appearance?

16        MR. GROSS:  Phillip Gross, Lowenstein Sandler, for

17  AFSCME.

18        THE COURT:  Hold on one second, please.

19        THE CLERK:  Please repeat that.

20        MR. GROSS:  Phillip Gross, Lowenstein Sandler, on

21  behalf of AFSCME.

22        THE COURT:  Thank you.  Any others?  All right.  We

23  have several things on our agenda for this afternoon.  I'd

24  like to begin with the various comments and objections that

25  were filed in relation to the Court's order establishing

1   dates and deadlines and the first amended order establishing

2   dates and deadlines.  I want to thank all of you and express

3   to the Court its appreciation for all of the work that you've

4   put into those comments and objections.  I find myself

5   concurring with much of it, and appropriate adjustments will

6   be made in the schedule and the dates and the deadlines on

7   account of your submissions, so this has been valuable for

8   the Court and I think for the process as well.

9           I do, however, need someone to walk me through in

10  little baby steps the process for identifying individual

11  bondholders because, hard as I tried, I couldn't quite get

12  that, and that appears to be an important process here, so

13  who volunteers?

14          MR. LEMKE:  Your Honor, David Lemke for US Bank as

15  trustee for the water and bondholders -- or water and sewer

16  bondholders.  So we tried to lay out the process graphically

17  in our objection, but, in essence, what happens is that the

18  solicitation package, once approved, would be delivered to

19  DTC, which holds most, if not all, of these bonds except the

20  SRF bonds in street name, and so DTC has participants, which

21  are typically banks, broker-dealers, other financial

22  institutions that then are really the only level of holder

23  that DTC knows, so the solicitation package would get to the

24  participants, and then the participants would downstream

25  those solicitation packages or packets to their customers

1  that may be the beneficial holders, but they might actually

2  be holding on behalf of somebody else.  They could just be

3  custodians, and so then the custodians would have to then get

4  those solicitation packets on down the next level until

5  ultimately the beneficial holders receive the packets.  Then

6  the holders would have an opportunity hopefully to review

7  them, get advice, legal and financial advice, fill them out,

8  and then they go right back up that same process basically to

9  the point where they -- ultimately those ballots get back to

10  the participant that is the original nominee, and then that

11  participant consolidates the ballots that come up under its

12  holders, which are identified primarily by CUSIP numbers.  It

13  consolidates those ballots into a master ballot, then

14  delivers that master ballot to the balloting agent for the

15  debtor, so that's the shorthand of the process.  I don't know

16  if I left anything out, and if I did, someone can correct me.

17  Our --

18           THE COURT:  So how much -- I'm sorry.  Go ahead.

19           MR. LEMKE:  I was going to say our best estimate,

20  based on other cases we've been involved in, is that that is

21  at least a 60-day process.  It could take a little longer.

22  You might be able to do it faster, but if you really want to

23  try to give the beneficial holders a fair and adequate

24  opportunity we believe to have time to not only get the

25  information but process it, understand it, get questions

1  answered, and get all that back up --

2          THE COURT:  Um-hmm.

3          MR. LEMKE:  -- in time, that that is --

4          THE COURT:  So that's the round trip.

5          MR. LEMKE:  That's the round trip, and we asked for

6  67 days, I think, in our proposal.  It would just build in a

7  little bit extra cushion.

8          THE COURT:  And so how much of that is done

9  electronically as opposed to by regular mail or other

10  personal service?

11          MR. LEMKE:  Oh, you may have asked me a question I'm

12  not sure about.  I don't know how -- I don't know how DTC --

13          THE COURT:  You volunteered.

14          MR. LEMKE:  Yeah, I did.  I'm starting to regret

15  that.  I assume that the participants push out a lot of the

16  information electronically, at least to the level of their

17  next -- the next level down to the custodians, and that there

18  may be a point in time where some of that gets pushed out

19  physically by mail because you could get down to beneficial

20  holders that are literally, you know, individuals, small

21  companies.  They're not going to all -- in fact, most of them

22  probably are not going to be institutional holders, so I

23  would hazard a guess that there is a combination of

24  electronics and -- transmission and physical transmission.

25  In addition --

1    THE COURT:  Well, but does the transmission actually

2    consist, whether electronically or otherwise, of the full

3    disclosure statement, or is it simply a notice of the website

4    to go to to look at the disclosure statement and the other

5    materials?

6    MR. LEMKE:  My only experience is that it physically

7    goes, that the packet physically goes.  I don't know if there

8    would be a way that would -- you could do it so that it was

9    electronically posted.  You would still have to know that

10   obviously the notice got all the way down the cycle so --

11   THE COURT:  Right.

12   MR. LEMKE:  -- they would know where to look and get

13   all the information.

14   THE COURT:  Right.

15   MR. LEMKE:  But at least in my past experience,

16   yeah, they've usually been a -- it's been a CD, I think,

17   which is what the debtor was proposing, would literally be

18   transmitted down the line to the ultimate beneficial holders.

19   THE COURT:  Okay.  And so how does this process that

20   you've described of drilling down, if I can call it that,

21   work in the context of giving bond owners or holders notice

22   of the time to object to either the plan or the disclosure

23   statement, and how do you foresee that playing out?

24   MR. LEMKE:  The objection -- well, objection to the

25   disclosure statement -- I mean what happens is --

1    THE COURT:  Ms. Lennox is so eager.

2    MR. LEMKE:  Pardon me?

3    THE COURT:  I'll give you a chance in a moment.

4    MR. LEMKE:  Okay.  So the objection to the

5 disclosure statement is what we would -- the trustee would

6 post a notice, would submit a notice to DTC that would go

7 through the process, would also post a notice on what's

8 called EMMA, which is an electronic site where if anyone

9 understands how these things work they can get onto EMMA and

10 track by CUSIP and see the notices, so typically that's the

11 way notices of these -- those kinds of deadlines get provided

12 to the bondholders.  And, of course, the bondholders have the

13 ability to monitor the case like any other creditor interest.

14    THE COURT:  So how long does that take from start to

15 actual notice?

16    MR. LEMKE:  You know, I would assume it's at least

17 half the time, that if you are -- if you are waiting on or

18 counting on the ultimate beneficial holder to get a physical

19 copy of the notice or some sort of an e-mail, that that could

20 be a full 30-day process for them to get that notice.  The 60

21 days, remember, includes coming back up the system, and at

22 least on -- with respect to the objection to the plan -- and,

23 you know, I don't know if there is a typical case, but

24 oftentimes that objection date is tied to the voting deadline

25 as well, and so they actually get notice of that when they

1   get the solicitation package, too --

2              THE COURT:  Okay.

3              MR. LEMKE:  -- as opposed to, you know, a date prior

4   to the vote --

5              THE COURT:  Thank you.

6              MR. LEMKE:  Okay.

7              THE COURT:  Ms. Lennox.

8              MS. LENNOX:  Just to clarify a couple of the

9   questions that your Honor asked Mr. Lemke, with respect to

10  how people got the disclosure statement notice because, as

11  your Honor recalls, you entered an order approving that

12  notice and also requesting that your first amended order be

13  sent out with it.  Those two documents were actually mailed

14  by KCC and run through the DTC system by last Friday.  By

15  last Friday 173,000 notices went out, and the ones to get to

16  the beneficial bondholders will go through that process that

17  Mr. Lemke just indicated.

18             THE COURT:  Um-hmm.  And do you agree that that will

19  take 30 days?

20             MS. LENNOX:  I think for the solicitation packages,

21  which will be a little more extensive, it might take as long

22  as 30 days.  You know, hard for me to say, you know, how many

23  beneficial holders are congregated with one nominee and all

24  that sort of thing, but it could take that long.  With

25  respect --

1          THE COURT:  Well, but my question was will it take

2    that long for what was -- what KCC just sent to get to the

3    beneficial owners?

4          MS. LENNOX:  Chances are with just a couple of

5    notices, just a few pages, that should be a faster process, I

6    would think.

7          THE COURT:  How much faster?  Any idea?

8          MS. LENNOX:  I have no idea, your Honor.  You know,

9    the internal workings of DTC in some instances are mysterious

10   to those of us who don't live it.

11         THE COURT:  Wonderful.

12         MS. LENNOX:  With respect to the solicitation

13   packages, it is -- and we mentioned this in our solicitation

14   motion.  What we would propose to send to people who get to

15   vote like beneficial holders, we would send a confirmation

16   hearing notice, a CD-ROM containing the plan and the

17   disclosure statement and any ancillary exhibits we filed by

18   that time.  We would have a physical ballot and a return

19   envelope so they can send it back to their nominees and then

20   probably a cover letter explaining this stuff, and so that is

21   a physical package that for people that vote gets transmitted

22   down the line physically because that ballot has to be filled

23   out and signed and sent back, so that -- you know, that

24   process I would expect would take --

25         THE COURT:  Um-hmm.  And why is it that the ballot

1    doesn't come back directly to your balloting office?

2           MS. LENNOX:  Because the whole purpose of holding

3    securities in street name as opposed to the -- you know, the

4    beneficial holder, Joe Smith, owns this bond --

5           THE COURT:  Um-hmm.

6           MS. LENNOX:  -- is because, one, in some instances

7    it's a lot more efficient to have people who are broker-

8    dealers do this all the time, and in some cases, particularly

9    for large institutional funds who like to trade a lot, they

10   don't want people to know what they hold and when they hold

11   it, and so the notices go down through the system.  For

12   example, the city has no idea unless they come and tell me

13   they're a beneficial holder who a beneficial holder is.

14          THE COURT:  Right.

15          MS. LENNOX:  So part of it is secrecy.  Part of it

16   is efficiency, and that's the system that we've --

17          THE COURT:  Well, let's address those because they

18   both confuse me.

19          MS. LENNOX:  Um-hmm.

20          THE COURT:  Secrecy we can guarantee with an order;

21   right?  Not secrecy.  It's confidentiality.

22          MS. LENNOX:  Confidentiality, yeah.  In what

23   respect?

24          THE COURT:  Well, for example, if your balloting

25   agent is KCC -- I don't know who it is, but --

1          MS. LENNOX:  Yes, it is.

2          THE COURT:  -- if it is, we can enter an order that

3     prohibits them from disclosing who owns City of Detroit

4     bonds.

5          MS. LENNOX:  We could, and --

6          THE COURT:  All right.  So let's move to efficiency.

7     It sounds to me like it's more efficient for ballots to go

8     directly to them rather than through this convoluted --

9          MS. LENNOX:  Here's the problem.

10          THE COURT:  -- here, there, and everywhere --

11          MS. LENNOX:  Here's the problem.

12          THE COURT:  -- process.  Yes.

13          MS. LENNOX:  Bonds trade.  The only system that

14     keeps record of how bonds trade and who holds what at any

15     given time is the DTC electronic system.

16          THE COURT:  Well, I get that for sending the

17     solicitation package to them.  I don't quite get it for why

18     it has to go back up through that to file the -- or to submit

19     the ballot.

20          MS. LENNOX:  Well, for a couple of things, your

21     Honor.  One is, first of all, they're going to have to --

22     we're going to have a voting record date.  We've asked for

23     that in the -- so they're going to know who's holding as of

24     that date and who to send the packages to.

25          THE COURT:  Right.

1    MS. LENNOX:  They will also keep track of who -- I

2  mean things can trade after the voting record date.

3    THE COURT:  I'm sorry.  Yes, um-hmm.

4    MS. LENNOX:  And so if things traded out, they need

5  to know who voted but who holds it right now, who's entitled

6  to vote but who holds it right now.  In addition, on our

7  bonds -- or on our ballots --

8    THE COURT:  Well, but they'll only send a ballot to

9  people who are entitled to vote; right?

10    MS. LENNOX:  They will only send the ballot to the

11  people that are entitled to vote.

12    THE COURT:  So if you get a ballot back, you can

13  presume it's from a person who is entitled to vote.

14    MS. LENNOX:  Right, but they're the only ones.  If

15  they sent the -- if they sent -- DTC -- or KCC does not have

16  access to DTC's internal record-keeping --

17    THE COURT:  Um-hmm.

18    MS. LENNOX:  -- who owns what --

19    THE COURT:  Right.

20    MS. LENNOX:  -- and in what amount.

21    THE COURT:  Right.

22    MS. LENNOX:  Somebody has to verify that to us.

23  Somebody has to verify that to KCC because KCC can't do it.

24  The city can't do it.  The only people --

25    THE COURT:  Oh, so when the ballot is filled out and

1    returned, there's information on it that has to get verified?

2              MS. LENNOX:  Yes, sir.

3              THE COURT:  Oh, I missed that part.

4              MS. LENNOX:  Yes, sir.

5              THE COURT:  Okay.  That explains that then.

6              MS. LENNOX:  Yeah.

7              THE COURT:  All right.

8              MS. LENNOX:  In addition, as part of our

9    solicitation procedures, there are certain classes that get

10   to make elections about do you want this kind of bond or that

11   kind of bond.  Those elections are also kept track of through

12   the DTC system.  Again, they're the only ones that can really

13   do that, so they'll be the ones providing the --

14             THE COURT:  Okay.

15             MS. LENNOX:  -- information on that.

16             THE COURT:  All right.

17             MS. LENNOX:  Thank you, your Honor.

18             THE COURT:  Thank you.  Something you wanted to add,

19   sir?

20             MR. KOHN:  Yes, to your question.  Samuel Kohn --

21             THE COURT:  Your name on the record again, please?

22             MR. KOHN:  Samuel Kohn of Chadbourne & Parke on

23   behalf of Assured Guaranty Municipal Corp.  In Jefferson

24   County, I was intimately involved with the --

25             THE COURT:  Would you keep your voice up for me?

1    MR. KOHN:  Sure.  In the Jefferson County Chapter

2  case, I was intimately involved in the procedures with KCC on

3  behalf of my client, and I just want to address one point

4  about -- your Honor, about why the ballots cannot go back to

5  KCC or the city is that the nominees and the banks won't do

6  it.  They won't disclose who the beneficial holders are.  The

7  beneficial holders have to go back to the nominees.

8    THE COURT:  Well, they will if I order it.

9    MR. KOHN:  You could try, your Honor.  That's all I

10  wanted to say, but --

11    THE COURT:  I'm not going to --

12    MR. KOHN:  -- I just don't get --

13    THE COURT:  -- but I don't like to be told that

14  people won't do something.

15    MR. KOHN:  I understand, your Honor, and, believe

16  me, we --

17    THE COURT:  We're not accustomed to be told no.

18  It's just not -- we don't get that.

19    MR. KOHN:  I get it.

20    THE COURT:  Okay.

21    MR. KOHN:  I believe that we tried for that to

22  shorten the process.

23    THE COURT:  Thank you for the forewarning, but it's

24  not an issue.  Ms. Lennox has persuaded me that we need to --

25  we need to follow that protocol.

1           MR. KANNEL:  May I, your Honor --

2           THE COURT:  Yes.

3           MR. KANNEL:  William Kannel for the ad hoc water and

4   sewer holders committee.  With all due respect to Mr. Kohn,

5   Ms. Lennox, and Mr. Lemke, and all lawyers, I have found over

6   the years that lawyers cannot wrap their brains around the

7   DTC system.  I think probably the best way to figure out the

8   best way to do this is to get KCC -- I don't know if somebody

9   from KCC is here -- to explain it to your Honor.  For

10  example, in JeffCo, there were situations where certain

11  parties were able to skip the way back up and send their

12  ballots directly to KCC and avoid the back up through the

13  nominee system, so there are ways to do these things, but

14  it's KCC who gets the battle pay to figure that out, not the

15  lawyers.

16          THE COURT:  Um-hmm.  Well, I appreciate that, but I

17  only asked about the return trip to see if any time could be

18  saved in the schedule by that, but if any of the ballots are

19  going to go back through that laborious process, then we have

20  to account for it in the process even if not all of them

21  will, so that was the purpose of the education I was asking

22  for there.  All right.  So at this point I would propose to

23  simply throw it open to you to make your comments regarding

24  the proposed schedule, and we'll just open it up for your

25  free-for-all.  Well, that's what it is.

1          MS. LENNOX:  It is a bit of a free-for-all, your

2    Honor, so I guess I might as well start as the representative

3    of the city.  And would you like me to address at all

4    anything in the solicitation motion other than maybe things

5    like moving deadlines?

6          THE COURT:  I'd just as soon hold on that one.

7          MS. LENNOX:  That's fine.  Thank you.

8          THE COURT:  Thank you.

9          MS. LENNOX:  So obviously we were certainly pleased

10   with the schedule that your Honor proposed.  We do want to

11   move expeditiously, and we'll accommodate whatever schedule

12   your Honor sets forth.  We had only proposed a few changes.

13   The first was a slight three-day request to give us a little

14   more time, another three or four days to respond to the

15   disclosure statement, so we asked to move that to April

16   28th -- or I'm sorry -- not April 28th, April 8th.  We

17   also -- if the plan objection deadline is moved, which is

18   something that many -- I think all of the respondents have

19   suggested, there are different dates suggested.

20          THE COURT:  Could you pull the mike down for me,

21   please?

22          MS. LENNOX:  Sorry.  Thank you, your Honor.  The

23   city, I think, out of all of the responders suggested the

24   earliest date for plan objections.  We suggested April 28th,

25   and that is early by at least two weeks from the next date

1   proposed, but at least after that time we will know what the

2   final solicitation version of the plan is at the disclosure

3   statement the 14th, so we gave people two weeks to react to

4   it.  So with that, if that is the date that your Honor picks

5   for plan objections, then we would suggest our deadline to

6   file a combined response to those objections slightly --

7   about two weeks later on May 12th.

8          In addition, we did explain to your Honor -- and you

9   just heard some more about it -- about the solicitation

10  process, so if we start a solicitation -- or we have the

11  disclosure statement hearing on the 14th, we need a few days

12  to finalize the documents and make any changes required by

13  the hearing.  KCC needs at least a week to prepare all these

14  packages -- there's going to be over a hundred thousand --

15  and send them out, so we thought balloting could begin -- the

16  solicitation process itself could begin on the 24th of April.

17         THE COURT:  So how many days is that after that

18  hearing?

19         MS. LENNOX:  Ten days after the hearing, your Honor.

20         THE COURT:  Okay.

21         MS. LENNOX:  If we -- the city had proposed a 45-day

22  solicitation period, which would take us from the 24th of

23  April to June 9th.  If your Honor is inclined to grant a 60-

24  day period, that would take us to June 23rd for balloting.

25  In that case, the -- again, we are going to -- as your Honor

1  may be understanding, we're going to have an enormous amount

2  of ballots and an enormous amount of bond series coming in,

3  so KCC would like at least ten days to try to tabulate all

4  that stuff because they all tend to come in at the last

5  minute anyway.  So if we are going to do -- if we did a 45-

6  day solicitation period, then the balloting would be done on

7  the 19th of June.  If we do a 60-day solicitation period, it

8  would be tabulated by July 7th.  And then we sort of just

9  took the dates from your Honor's calendar thereafter for how

10  he wanted to -- how you wanted to hold the hearing.

11        We also had proposed in terms of plan argument --

12  your Honor had bifurcated the arguments into legal and

13  nonlegal.

14        THE COURT:  Yeah.  I'm giving up on that.

15        MS. LENNOX:  Okay.  Well, then I will refrain from

16  suggesting the comments on that, but in any event, our

17  schedule -- again, the schedule we proposed originally with a

18  45-day solicitation period would take us out to a

19  confirmation hearing starting on June 23rd.  If we add

20  another two weeks to that, then we add another two weeks to

21  that.

22        THE COURT:  Okay.

23        MS. LENNOX:  So thank you, your Honor.

24        THE COURT:  All right.

25        MR. MARRIOTT:  Good afternoon, your Honor.  Vince

1  Marriott, EEPK and affiliates, although I stand to speak on

2  behalf of a group of creditors.

3        THE COURT:  Um-hmm.  I appreciate that.  Thank you.

4        MR. MARRIOTT:  And there may be one aspect of what

5  I'm going to talk about that there will be some additional,

6  but --

7        THE COURT:  Okay.

8        MR. MARRIOTT:  -- I'm hoping to cover everything

9  that this group had.  As you know, we submitted a proposed --

10        THE COURT:  Um-hmm.

11        MR. MARRIOTT:  -- alternative order --

12        THE COURT:  Um-hmm.

13        MR. MARRIOTT:  -- which extended the total timeline

14  by 30 days.

15        THE COURT:  Um-hmm.

16        MR. MARRIOTT:  It was our objective in limiting how

17  far we extended the total --

18        THE COURT:  Um-hmm.

19        MR. MARRIOTT:  -- timeline to be sensitive to your

20  desire for a prompt resolution of the case, and it was our --

21  it was our hope, in any event, that a 30-day extension would

22  not be a material change to your vision for prompt

23  resolution.  Within that 30-day period, we proposed some

24  additional structural and timeline changes and just that the

25  philosophical points behind them really were making sure that

1    the notice periods of Rule 2002(b) and 3017(a) --

2              THE COURT:  Um-hmm.

3              MR. MARRIOTT:  -- were observed in part or driven in

4    part by the city's acknowledgement in its filing that the

5    plan that it filed a couple of weeks ago is unlikely to be

6    the plan it seeks confirmation of and that that will

7    materially change with the likely date for filing the plan

8    they will, in fact, seek confirmation of, being April 14th.

9    In our view, that would be what would start, you know, the

10   28-day clock.  Presumably notice would go out with the

11   solicitation --

12             THE COURT:  Twenty-eight-day clock for --

13             MR. MARRIOTT:  For filing objections to the plan --

14             THE COURT:  Um-hmm.

15             MR. MARRIOTT:  -- which we then proposed would be

16   May 15th.  The third sort of philosophical piece is the

17   enormous complexity of this case and the information that

18   will be needed as to operations, assets, and liabilities

19   within the context of what the plan ultimately proposes and

20   the discovery that would be attendant to that and the need

21   for sort of an orderly discovery process, and then finally

22   the logistical difficulties which we've already discussed,

23   which I do want to point out -- and by the way, I'll second

24   the motion that lawyers don't understand DTC because I don't,

25   but it's not just actually the DTC process.  There is -- the

1  retirees also present a significant --

2         THE COURT:  Um-hmm.

3         MR. MARRIOTT:  -- logistical hurdle which Ms.

4  Neville I think will address in somewhat more detail.  I

5  won't go into that now.  In any event, as we indicated with

6  the commentary to our proposed revised order, we made five

7  principal changes and then some additional changes --

8  conforming changes necessary to --

9         THE COURT:  Um-hmm.

10        MR. MARRIOTT:  -- reflect those five structural

11 changes.  The changes are intended to provide for adequate

12 notice, solve the logistical issues, permit the necessary

13 discovery, and promote a process that is as efficient as

14 possible.  I'm going to organize my commentary on our

15 proposed order a little differently -- or my discussion of it

16 this afternoon a little differently than our commentary did.

17 I'm going to discuss it by timeline as it relates to the

18 disclosure statement, the plan, and discovery.  I'm not going

19 to get into the details of specific dates except to the

20 extent that they matter to the discussion.  You've got our

21 proposed revised order, and you see what we have been

22 proposing in that regard.

23        As to the disclosure statement, I'll first note that

24 we don't propose a change to the length of the timeline with

25 respect to the disclosure statement.  It would still be

1  objection deadline of April 1st and a hearing on April 14th.

2  We do propose a number of changes within the timeline.

3          THE COURT:  Um-hmm.

4          MR. MARRIOTT:  The first is to eliminate the waiver

5  aspect of the moratorium.

6          THE COURT:  I agree with you on that one.

7          MR. MARRIOTT:  Okay.  Then I'll say no more about

8  that.  The second is to insert a date by which the city would

9  file any amendments to the disclosure statement it

10 anticipates doing so that that is done before the objection

11 deadline, and we're objecting to the disclosure statement

12 that the city will actually seek approval of and not

13 something that predates it and unnecessarily gives rise to

14 objections that may be mooted out by revisions.  We think

15 that promotes efficiency.  And the third thing with respect

16 to the disclosure statement -- and it went to sort of the

17 bifurcation of confirmation issues, which I understand is

18 being eliminated, but we did think --

19         THE COURT:  Yes.

20         MR. MARRIOTT:  Right.  But we did think it would --

21 we did think there was something in that idea that had merit,

22 and that was as and to the extent that the plan would be

23 unconfirmable on its face, that that might be appropriate to

24 be considered at the disclosure statement stage to waste

25 every -- so that these packages aren't going out to a hundred

1  and some odd thousand people if there's a plan that on its

2  face is unconfirmable, so we -- I'll use the word --

3         THE COURT:  Yeah.  I know there are cases that have

4  approved that.  I never have.  I have always found it when I

5  have tried to walk down that path to be actually more

6  confusing and less efficient in the long run, so I'm not

7  persuaded to do that here.

8         MR. MARRIOTT:  Okay.  So that's the disclosure

9  statement.  The plan.  We do propose changes to the plan

10  timeline.

11         THE COURT:  Um-hmm.

12         MR. MARRIOTT:  First, we propose to push the

13  objection deadline to after the close of at least document

14  discovery.

15         THE COURT:  Um-hmm.

16         MR. MARRIOTT:  This is -- the idea here is that

17  nobody wants to be litigating things that don't have to be

18  litigated.

19         THE COURT:  Um-hmm.

20         MR. MARRIOTT:  An earlier -- before we have any sort

21  of idea of what the plan is and sort of the support for it,

22  any plan objection would have to be more general and more

23  kitchen sink than I think would be useful either to the city

24  or --

25         THE COURT:  I assume we're going to get that no

1    matter what the deadline is.

2         MR. MARRIOTT:  Well, I would hope not.  I mean I

3    hope we could have targeted objections.

4         THE COURT:  I mean in our standard mode of

5    litigation in this country, we have a request for relief, we

6    have a response, and then we have discovery on what the

7    issues are that arise from the moving paper and the response.

8         MR. MARRIOTT:  Well, in --

9         THE COURT:  This is a variation from that.

10         MR. MARRIOTT:  It's not an atypical variation.  I

11   mean it is not -- it is more the case than not that in large

12   complex Chapter 11's, plan objections are due at the same

13   time as votes.  We're not asking for that.  We're not asking

14   for that not because it wouldn't be better for us because

15   that would also be the conclusion of most discovery, but

16   we're not asking for that because we understand the value of

17   providing to the Court and to the city at least the principal

18   objections to the plan earlier in the process rather than

19   later.

20         THE COURT:  In the eligibility phase here, we had

21   initial objections, and then didn't I also allow for

22   supplemental objections that arose from the discovery

23   process?

24         MR. MARRIOTT:  We're proposing a variant of just

25   that.  In other words, our proposal --

1         THE COURT:  I do recall that correctly?

2         MR. MARRIOTT:  Yes.  I think that was --

3         THE COURT:  Okay.  So why not that process here?

4         MR. MARRIOTT:  Well, we're proposing a variant of

5 that process in that we need 28 days from whatever plan is

6 actually going to be solicited.

7         THE COURT:  Right.

8         MR. MARRIOTT:  Let's assume that the city has its

9 final plan on April 14th, which is what I understand their

10 aspiration to be based upon what they filed on Friday.  We

11 propose a --

12         THE COURT:  By the way, parentheses, does that mean

13 mediation will be done by then?

14         MR. MARRIOTT:  Are you asking me?

15         THE COURT:  Um-hmm.  You're the one at the -- you're

16 the one that volunteered.

17         MR. MARRIOTT:  I don't know.  So the March 15th date

18 we're proposing --

19         THE COURT:  You see my concern.

20         MR. MARRIOTT:  I do, but the March -- the May 15th

21 date we're proposing for initial plan objections is within a

22 few days of the 28-day notice requirement anyway and has the

23 advantage of under our proposed order being at the end of

24 document discovery, and then our proposal provides for

25 supplemental objections to the plan based upon the conclusion

1  of discovery and the results of voting because the results of
2  voting could have an impact on what objections can or can't
3  any longer be made.  Let's see.  All right.  I think that
4  that's basically what I wanted to discuss regarding the plan
5  timeline.
6              THE COURT:  Okay.
7              MR. MARRIOTT:  Finally, Judge, we've adjusted the
8  timeline for discovery and added a few date points --
9              THE COURT:  Um-hmm.
10             MR. MARRIOTT:  -- for two reasons.  First is to
11 promote the efficient conduct of discovery.  Depositions tend
12 to get repeated if document production is either incomplete
13 or --
14             THE COURT:  Right.
15             MR. MARRIOTT:  -- not yet made before, so we've
16 tried to build in time to get documents and then do
17 discovery, so we've pushed out some of the deadlines for
18 taking depositions --
19             THE COURT:  Um-hmm.
20             MR. MARRIOTT:  -- to allow there to be sufficient
21 time to take them after document production.  We have also
22 added some dates for the disclosure of witnesses in
23 sufficient time to allow --
24             THE COURT:  Um-hmm.
25             MR. MARRIOTT:  -- depositions to be taken of those

 1   witnesses who have been disclosed, and we've just -- we've

 2   also, as a generic matter, built in additional time overall

 3   for discovery because of the complexity and the various

 4   issues that will need to be addressed in connection with a

 5   fully developed record for this Court come the confirmation

 6   hearing whenever the confirmation hearing occurs.  And as I

 7   say, our proposal is to push that out to the middle of July,

 8   so 30 days.  That's what -- I'm sorry.  Go ahead.

 9        THE COURT:  Let me go back to the plan objection

10   deadline.

11        MR. MARRIOTT:  Yes.

12        THE COURT:  And I want to -- I want to separate the

13   bondholders from the rest of you for just a moment because it

14   may be necessary to give them a later deadline, so we'll

15   separate.  Isn't it fair to conclude that you all have known

16   at least in broad principle what the city's plan would be for

17   months and that you have been working on your plan objections

18   for at least that long?

19        MR. MARRIOTT:  But, Judge, I actually don't know

20   that that is fair to say.  The treatment proposed by the city

21   for various classes of creditors, including the creditors --

22   the holders of the comps, in both public and nonpublic

23   iterations -- and I can't, therefore, sort of walk you

24   through the changes, but there have been changes, and there

25   have been material, and the latest version of the plan is

1   different in treatment of various creditors than earlier

2   iterations of what have been proposed.

3           THE COURT:  No.  I get all that, but the objections

4   that are available under the Bankruptcy Code are limited in

5   number.

6           MR. MARRIOTT:  Yes, but --

7           THE COURT:  And, you know, let's --

8           MR. MARRIOTT:  I don't know how --

9           THE COURT:  -- you know, put our cards on the table

10  here and agree that whatever objections are available will be

11  made.

12          MR. MARRIOTT:  Yes.

13          THE COURT:  All right.

14          MR. MARRIOTT:  But -- yes, that's true.  Whatever

15  objections are available, but --

16          THE COURT:  And presumably you've been researching

17  and getting going on them for months.

18          MR. MARRIOTT:  Nevertheless --

19          THE COURT:  Okay.

20          MR. MARRIOTT:  Nevertheless, most of these

21  objections, including the most significant ones, best

22  interest of creditors, feasibility, fair and equitable, they

23  are mixed questions of law and fact, and to simply say --

24          THE COURT:  Um-hmm.

25          MR. MARRIOTT:  I mean to simply file an objection

1  that says the plan fails to meet the best interest of

2  creditors test objection -- objection to a plan, it would

3  be -- I think it's more useful to everybody if we can say the

4  plan fails to meet the best interest of creditors because,

5  and --

6            THE COURT:  That would help me.

7            MR. MARRIOTT:  Yes.  And the "because" depends on a

8  number of things.  One --

9            THE COURT:  Right.  What's the plan, of course.

10           MR. MARRIOTT:  -- what the plan ultimately -- and,

11 two, what discovery might reveal about what the debtor's

12 other alternatives would have been that were not pursued and

13 would have resulted in a better treatment for creditors.

14 That's the reason, in our view, that we need the 28-plus days

15 after the actual plan has been filed and the conclusion of

16 some discovery to file an initial objection that's at least

17 meaningful and helpful.

18           THE COURT:  Well, let's just drill down with one

19 more question, and then I will let you off the hook --

20           MR. MARRIOTT:  Fine, your Honor.

21           THE COURT:  -- which is what do you foresee about

22 the document discovery which will come in addition to the

23 plan itself and the disclosure statement --

24           MR. MARRIOTT:  Yes.

25           THE COURT:  -- that will enable you to fill in that

1    "because" blank more specifically?

2         MR. MARRIOTT:  Judge, the document discovery will go

3    to such things as the city's calculation of its various

4    liabilities, the city's valuation of its various assets, the

5    city's operational intentions and whether or not those

6    operational intentions are as much as could be done to create

7    additional revenue or not.  For example, if asset "X" is

8    valued under the plan at dollar "Y" and the plan provides for

9    a particular treatment of that asset and, in fact, creditors

10   believe that it's not worth "Y," it's worth "Y" plus, that

11   would be a best interest of creditors objection, for example,

12   but one that would be informed by discovery that would

13   make --

14        THE COURT:  Um-hmm.

15        MR. MARRIOTT:  -- clear the debtor's views and why

16   the debtor held them, and we could indicate what our views

17   are and why we disagree with the debtor.

18        THE COURT:  Um-hmm.  Okay.

19        MR. MARRIOTT:  If you have no more questions for me,

20   I will cede the podium to Ms. Neville, who will discuss the

21   other logistical hurdle.

22        THE COURT:  Okay.  Thank you, sir.

23        MS. NEVILLE:  Carole Neville on behalf of the

24   Retiree Committee.  Your Honor, I'm going to lobby you for a

25   longer period of time for solicitation of the retirees for

1     similar reasons.

2             THE COURT:  How much time?

3             MS. NEVILLE:  I would like the same 60 days that the

4     bondholders are asking for.  Our problems are different.

5             THE COURT:  Um-hmm.

6             MS. NEVILLE:  We are contemplating individualized

7     ballots, which means that there has to be an agreement with

8     the city on the calculation of the claims that are going to

9     be voted.  They have to be sent to retirees.  Well, first we

10    need a disclosure statement that -- or a disclosure addendum

11    or attachment that's tailored to the retirees, which we

12    haven't gotten yet or seen or worked on.

13            THE COURT:  Which would disclose what?

14            MS. NEVILLE:  Well, I think it would be a simplified

15    version of the description of the plan and the treatment of

16    retirees because I can't imagine sending out the CD's to a

17    population that has thousands over 85 --

18            THE COURT:  Um-hmm.

19            MS. NEVILLE:  -- and expecting it to be really

20    understood.

21            THE COURT:  I agree with you.  I'm very concerned

22    about that, and as I said before, the primary two things

23    creditors want to know -- and I assume this is the

24    retirees -- is how much they're going to be paid and when.

25            MS. NEVILLE:  Well, complicated question in case of

1   a pension and healthcare benefits, so --

2           THE COURT:  But it can't be.  It has to be --

3           MS. NEVILLE:  Well --

4           THE COURT:  -- straightforward for the people to

5   understand what they're voting on.

6           MS. NEVILLE:  Well, I understand that, and it can be

7   simplified, but it needs to be a little bit separate from

8   what the regular creditors are getting to walk people through

9   it, and the calculation itself is complicated where we need

10  the help of actuaries.  We need accord among the actuaries to

11  get to that point where -- and it's close.

12          THE COURT:  Has that been challenging?

13          MS. NEVILLE:  Yeah, it's challenging, but it's

14  closer than you would imagine.  So then -- and then so after

15  that there is a formulation of these 32,000 individualized

16  ballots, sending them out and collecting them, and they, too,

17  have a confidentiality problem because we certainly don't

18  want to disclose people's pension amounts and their Social

19  Security numbers or any other identifying --

20          THE COURT:  How did you get to 32,000?  I thought it

21  was 20,000.

22          MS. NEVILLE:  Yes, but there are beneficiaries who

23  are entitled to balloting, and there's active vested --

24  vested active employees, so --

25          THE COURT:  Oh, okay.

1          MS. NEVILLE:  -- you add it all together, and it
2    comes out to --

3          THE COURT:  Okay.

4          MS. NEVILLE:  -- 32,000 ballots that we have, so I
5    am lobbying for the same --

6          THE COURT:  You want to send each one of them an
7    individualized ballot.

8          MS. NEVILLE:  Yes.

9          THE COURT:  And by "individualized," do you mean
10   their name on it and what else?

11         MS. NEVILLE:  State their claim amount, what they're
12   voting, because that's the only way I think we can calculate
13   whether the classes accept or reject the plan.

14         THE COURT:  Um-hmm.

15         MS. NEVILLE:  So we have to give people -- and they
16   can't calculate it themselves.  I mean I looked at some of
17   the proofs of claim that were filed, and they're -- by
18   individuals, and they're all over the map, so we need to do
19   that, and that's a long involved process.

20         THE COURT:  And have you worked with the city yet on
21   how to -- what the formula is to calculate that?

22         MS. NEVILLE:  We are.  We're working towards that,
23   yeah.  I think --

24         THE COURT:  That's where the actuaries come in?

25         MS. NEVILLE:  Right; right.

1          THE COURT:  Okay.

2          MS. NEVILLE:  We are getting to that point.  The

3    actuaries are meeting.  They have a timetable to agree on

4    numbers on the 21st of March.  It's not such an easy process.

5          THE COURT:  Right.

6          MS. NEVILLE:  So that's number one.  Number two, I

7    want to -- I want to focus again --

8          THE COURT:  So it's 60 days from what to what that

9    you're asking for?

10         MS. NEVILLE:  I think I would concur with the

11   bondholders on the deadline, so I think what that means is

12   it's -- the voting deadline would be moved to the 23rd of

13   June, to 60 days from --

14         THE COURT:  Right, but it's 60 days from --

15         MS. NEVILLE:  The mailing of the solicitation

16   package.

17         THE COURT:  Package.  Okay.

18         MS. NEVILLE:  The 24th.  The second thing I wanted

19   to address with your Honor is this issue of unconfirmable on

20   its face.

21         THE COURT:  Which I already said I'm not going to

22   do.

23         MS. NEVILLE:  I know, but I'm going to try and lobby

24   you a little bit, if I may.

25         THE COURT:  You may make your record.

1          MS. NEVILLE:  Your Honor, this is a serious question

2    for the retirees because their other post-employment benefit

3    claims are classified in the same class as their pension

4    claims, so we would be soliciting ballots -- if we don't

5    resolve this issue on the disclosure statement deadline, we

6    would be sending people ballots that wouldn't necessarily be

7    the vote for the class or would be the vote for the class

8    that would be inappropriate because the OPEB claim and the

9    pension claim are two different claims.  And at the moment,

10   for the police and fire-fighters, the OPEB and the pension

11   claims are classified in the same class, and the same thing

12   is true for the General Retirement System.  They're two

13   different claims.  They get different treatment within the

14   class, and so I think we have to resolve at the disclosure

15   statement stage before we solicit whether we have the proper

16   classification.

17          THE COURT:  Any other issues?

18          MS. NEVILLE:  There are other issues, but I think

19   this is the one that just really leaps out because it

20   involves solicitation as well as confirmation.  You have to

21   have -- you'd have to design the --

22          THE COURT:  You may have opened the door a crack.

23          MS. NEVILLE:  I opened the door a crack.  All right.

24          THE COURT:  You may have.

25          MS. NEVILLE:  Thank you.  Well, that's all I have to

1    say.

2         THE COURT:  All right.

3         MR. LEMKE:  Your Honor, David Lemke on behalf of US

4    Bank as trustee for the water and sewer bonds.  I don't have

5    anything to really disagree with here, and we support the

6    schedule that was laid out with maybe one exception, and that

7    is -- you referenced it -- that the -- what we would ask for

8    was a 30-day deadline to vote and to object to the plan so

9    that the objection date and the voting date would run

10   simultaneously for the bondholders.  If the solicitation

11   package goes out on April the 24th, as is indicated, then

12   that would be a June 23rd deadline.  We did actually ask for

13   June --

14        THE COURT:  You said 30, but you meant 60.

15        MR. LEMKE:  Sixty.  I'm sorry.  Yes.  Sixty.  We did

16   ask for June the 30th -- that's where I got the 30 -- June

17   the 30th to be that deadline.  That gives us another seven

18   days.  It's really 67 days.  And then we felt like if you had

19   June 30th, that would give adequate time for the balloting

20   agent to do their tabulation, the ten days, and then if the

21   confirmation hearing started on July the 14th or someday

22   after that, there would be adequate time to get whatever

23   additional pretrial issues needed to be addressed, but I did

24   want to make sure that we were clear on what we were asking

25   for there.

1    THE COURT:  All right.  Thank you, sir.

2    MR. LEMKE:  Thank you.

3    THE COURT:  Anyone else?

4    MR. HACKNEY:  Good afternoon, your Honor.  Stephen

5  Hackney on behalf of Syncora.  You've been very diligent

6  about reading the pleadings, and I don't have anything to add

7  to the one that we filed.

8    THE COURT:  Okay.  Thank you.  Any other comments or

9  objections before I recall the city?  Ms. Lennox.

10    MS. LENNOX:  Thank you, your Honor.  Just a few

11  points.  With respect to Mr. Marriott's request that we --

12  that your Honor set a date by which we file an amended plan

13  and disclosure statement, I think Mr. Bennett referenced when

14  we were here a week ago or ten days ago that we do intend to

15  file probably at least one, if not more, iterations as we

16  progress between now and the disclosure statement hearing, so

17  we intend to do that.  We do not intend to drop on the Court

18  and all the other parties to the case, you know, one amended

19  disclosure statement the night before the hearing and expect

20  people to wade through that, so I don't know that a deadline

21  is necessary.  In fact, if we can reach agreements that we

22  would want to reflect in that agreement, a deadline may be

23  counterproductive, but I do want to assure the Court that we

24  do intend to do that.

25        With respect to plan objections preceding some stage

1  of discovery, I do agree with the Court that we can file

2  basic plan objections which give parties -- all the parties

3  in the case an indication of where people are going and file

4  supplemental objections as we did in the eligibility hearing.

5          With respect to -- I only have one particular

6  comment to the pleading and the response that was filed by

7  Mr. Marriott and his consortium of compatriots, and that is

8  they suggest that we have an April 1st deadline for the city

9  and only the city to designate fact and expert witnesses.

10 That's actually before we have what might be the solicitation

11 portion of the plan done.  I think what would be more

12 appropriate is if we move the city's time to do that to the

13 same time the objectors propose to do that or the creditors

14 propose to do that, which would just be two weeks after the

15 disclosure statement hearing in early May, May 1st, May 2nd,

16 so that's the only particular comment that I had.

17         And then with respect to what Ms. Neville said, I

18 agree with the longer period.  In fact, I would assume that

19 the solicitation period that we set will be one solicitation

20 period for everyone, and I do agree that the retirees need

21 particular time.  We are definitely working on customizing

22 the ballots.  We are working on the plain English, and I

23 think Ms. Neville did a very good job of describing sort of

24 where we are in the process, and we're working cooperatively

25 to get that done.

1      THE COURT:  I'm interested in your response to her

2  concern about the classification issue and whether that's

3  something that should be resolved sooner than later.

4      MS. LENNOX:  I do not -- I don't have a problem

5  resolving it sooner than later.  I do think -- first of all,

6  we would calculate separate amounts for pension and OPEB, so

7  if it remains a combined class, it will be easy for them to

8  tell, you know, which is which and then a combined amount.

9  The Retiree Committee has raised the issue in their pleading.

10  We do intend to engage with them between now and the

11  disclosure statement hearing and hopefully work something

12  out, but I don't think the city would object to that

13  particular issue.

14      THE COURT:  If I understood her correctly, their

15  position is that in the plan these two different kinds of

16  claims should be classified separately.

17      MS. LENNOX:  We understand that.  I can see an

18  argument for that, and I can also see an argument for

19  combining retiree claims in general in one class.  They are

20  all, after all, of the same priority, so that is a discussion

21  that we can have with the Retiree Committee between now and

22  the disclosure statement hearing.

23      THE COURT:  So you would agree to build into the

24  scheduling order some separate process to address this

25  question sooner than later?

1      MS. LENNOX:  We'd be -- certainly be amenable to

2  that, your Honor, and that's all I have.

3      THE COURT:  Okay.  The door is fully open.

4      MS. LENNOX:  Thank you.

5      THE COURT:  Anyone else have any comments about the

6  scheduling order?

7      MR. GOLDBERG:  Your Honor, my comment isn't

8  specifically on that, but it's sort of to what Ms. Neville

9  addressed, and I don't want to be out of place because I'm

10  not privy to a lot of the discussion, but I do represent an

11  individual retiree, and we've had discussions with similar

12  retirees.  And one of the other concerns and the

13  understanding is that we try to reach deals with the

14  annuities that are also part of the plan.  That was very

15  confusing in the plan.  There was a formula that we couldn't

16  find, and I just wanted to make sure that issue is -- it's

17  the third part of the retiree benefit is the pension benefit,

18  the --

19      THE COURT:  Okay.

20      MR. GOLDBERG:  -- health benefits, but also the

21  annuity, which there was a recapture.  It was quite confusing

22  in the plan as was outlaid and a big matter of concern to

23  many retirees.

24      THE COURT:  Well, I won't tolerate any confusion.

25      MR. GOLDBERG:  No.  I appreciate that.

1          THE COURT:  I just -- I won't.  Anyone else?  Yes,

2     sir.

3          MR. FRIMMER:  Good afternoon, your Honor.  Rick

4     Frimmer for FMS.  Ms. Lennox's last statement about this

5     seriatim modification of the disclosure statement right up

6     until the hearing has us all concerned that we ought to have

7     some deadline date by which we know exactly what it is we're

8     going to object to, and this --

9          THE COURT:  You know, I wish the real world were

10    that simple.

11         MR. FRIMMER:  Even if it's two days beforehand.  I

12    mean --

13         THE COURT:  But the truth is agreements with

14    creditors come when they come.  Do you want me to set a

15    deadline for you all to come to an agreement with the city?

16    Is that what you want me to do?  I don't think so.

17         MR. FRIMMER:  Well, no, but that -- because that can

18    happen afterward also.

19         THE COURT:  Every new agreement potentially requires

20    a new disclosure statement; right?

21         MR. FRIMMER:  Well, we're not talking about what we

22    might agree to.  We're talking about changes that might be

23    made because they decide to make a change.  That has nothing

24    to do --

25         THE COURT:  Changes what?

1    MR. FRIMMER:  That they decide to make not having to

2  do with a negotiation with a creditor, just change the plan.

3    THE COURT:  Oh, I didn't quite hear that.

4    MR. FRIMMER:  That's what I thought I heard.

5    THE COURT:  Well, I'll ask.

6    MR. FRIMMER:  That's what I thought I heard.

7    THE COURT:  Okay.  Ms. Lennox, the question that's

8  raised is do you foresee any cause to amend the disclosure

9  statement other than as a result of amendments to plans that

10  result from agreements with parties along the way?

11    MS. LENNOX:  Not in a material manner, your Honor.

12  I mean certainly if people come to us and say, "I want you to

13  put this information because we want more information in the

14  disclosure statement," we're going to do that, and that's not

15  going to --

16    THE COURT:  Assuming it's pertinent and accurate.

17    MS. LENNOX:  Assuming it's pertinent and it's --

18  exactly, so there may be quite a bit of that.  In fact, there

19  may be quite a bit of that, your Honor, but --

20    THE COURT:  Well, I encourage it.

21    MS. LENNOX:  And we don't disagree, so I think there

22  will be some of that.  I think, as your Honor indicated, it's

23  a little difficult to put a hard-and-fast timeline on that,

24  but I have committed and I will commit that we are not going

25  to leave major, you know, complete rewrites of the disclosure

1  statement until two days before the hearing.  There will be

2  interim filings.

3         THE COURT:  All right.  Anyone else?  All right.

4  We'll consider this matter closed.  The Court will take it

5  under advisement and issue a revised scheduling order.  Let's

6  turn our attention to the city's motion to establish

7  procedures for solicitation and tabulation of votes.

8         MS. LENNOX:  Thank you, your Honor.  It's a bit of a

9  long motion, and I'll try to address some of the commentary

10  that was objected -- or was raised in some of the responses

11  as I go forward, and I'm going -- I'm not going to repeat

12  everything we did.  I'm going to try to be very

13  straightforward.

14         I do want to point out, just to reiterate what Ms.

15  Neville and I reported to the Court, we will file and we

16  intend to file a supplemental motion to approve what it is

17  that we are going to do with respect to the retiree classes

18  for this plain English insert and for voting purposes, so --

19         THE COURT:  What's your timing on that motion?

20         MS. LENNOX:  Well, we're hoping to get it out in the

21  next couple of weeks, your Honor, and that will depend

22  probably on how much detail we put in this plain language

23  version of what we do.  It may have to be at the disclosure

24  statement hearing, you know, the actual final version updated

25  because if there are some agreements or something that may

1  change the verbiage on that, we would want that updated, so

2  there may be a secondary consideration of that, but we do

3  want to get out in front of the Court sort of what we're

4  thinking about sooner rather than later.

5          THE COURT:  Well, all right.  I would encourage the

6  two of you, to the extent you might find it helpful in

7  resolving any issues more efficiently, to either get me on

8  the phone or come and see me so that I can give you my

9  guidance on how to deal with your specific issues.

10         MS. LENNOX:  Thank you, your Honor.  That's very

11  helpful.  We appreciate the offer.  Okay.  As to -- we asked

12  for several things.

13         THE COURT:  By that I mean your disclosure issues.

14  Your substantive negotiations are being handled --

15         MS. LENNOX:  Yes, your Honor.  We understand.

16         THE COURT:  -- at a higher pay grade.

17         MS. LENNOX:  We understand.  Okay.  So things that

18  we asked for, the relief that we asked for in the

19  solicitation motion, we do ask to set a record date for

20  voting, and just for sort of obvious reasons we set the

21  disclosure statement hearing date as a reasonable record date

22  for voting, so that means whoever holds the claims on that

23  date gets to vote.  We also asked for approval of what we'd

24  include in solicitation packages for people who do get to

25  vote, and I think I mentioned to the Court earlier what that

1  would be.  That would be a confirmation hearing notice, which

2  we attached as Exhibit 6-A to the motion; a CD-ROM that

3  contains the plan, the disclosure statement and any exhibits

4  we filed to that date; a ballot; and a return envelope for a

5  ballot; and probably a cover letter explaining what's in

6  there.

7          THE COURT:  Do you feel you need to serve a separate

8  confirmation hearing notice if we serve on everyone what will

9  be a second amended procedures order?

10         MS. LENNOX:  There are some things in the notice

11  that I think would be helpful for people to have, and I'm

12  just referring to the notice here.  One is just a

13  notification -- a formal notification of the approval of the

14  disclosure statement, that it's been approved, where they can

15  get it.

16         THE COURT:  Okay.

17         MS. LENNOX:  We can certainly -- I mean the

18  confirmation hearings will be in your order, your Honor.  If

19  your Honor put the voting record date in the order, that

20  would be the other thing that we would notify people of.  We

21  also talked to people about if there are transferred claims,

22  you know, who gets to vote a transferred claim.  It does talk

23  about a voting deadline.  It does reference tabulation rules,

24  so it's a little more --

25         THE COURT:  Okay.

1   MS. LENNOX: -- involved than just a scheduling

2   order, your Honor.

3   THE COURT: Okay.

4   MS. LENNOX: So that would be what we propose to put

5   in the solicitation package. For those we do have classes

6   that are nonvoting either because they're unimpaired and

7   deemed to accept or there's one class that will receive

8   nothing and is deemed to reject the plan. We would propose

9   to them -- send them a notice called a notice of nonvoting

10  status, and, again, it has similar information about where

11  they can get the plan and disclosure statement on line or the

12  fact that we will mail it to them if they want free of

13  charge, the fact that they're not voting, but all the other

14  relevant deadlines, you know, confirmation hearing date and

15  things like that.

16       So we also talk about the solicitation process, and

17  I think we've gone through that with your Honor. You know

18  the proposed dates, the requested dates, and so I won't

19  belabor that. I would just reiterate that we do assume that

20  we need ten days to finalize the disclosure statement and the

21  plan and the documents and get them all in the mail, so we

22  would -- we're requesting that solicitation start -- be

23  deemed to start on April 24th, which is ten days after the

24  disclosure statement hearing.

25       Now we get into stuff that's been a little more

1  controversial in the responses.  The first is a procedure for

2  resolving disputed voting rights, and as evidenced by the

3  papers that have been filed by the DWSB water and sewer bond

4  trustee and the ad hoc committee on the one hand and the

5  insurers on the other hand, we definitely have a dispute, and

6  we have a much more global dispute than perhaps people might

7  have anticipated.  I do think it is the insurers' view that

8  they get to vote all the claims in a particular class, and it

9  is the trustee and the beneficial holders' view that they do

10  not.  So the ad hoc procedures that we had proposed in the

11  motion are probably not very workable, so having conferred

12  with counsel for all these parties prior to this hearing --

13  and, frankly, before I get there, your Honor, from the

14  debtor's -- or from the city's perspective, we need to -- two

15  people can't vote the same claim.  We need to know who's got

16  the claim, who's going to vote it, and who -- and in what

17  amount and who do we count, and we need it well --

18          THE COURT:  And who to pay.

19          MS. LENNOX:  And who to pay and well before the

20  tabulation is done.  We ideally think it should be done by

21  the time your Honor -- by the time we solicit would be ideal

22  to have it done.  The parties have requested that between now

23  and next Tuesday the insurer parties and the holder parties

24  try to work out among themselves with the city involved a

25  schedule for resolving their disputes.  Hopefully they can

1  come up with a -- we can come up with a scheduling procedure

2  by next Tuesday.  If not, perhaps we could bind this over and

3  appear before your Honor to talk about a schedule to do

4  exactly that next week, but we'll try to do that

5  consensually.  It would be the debtor's -- or the city --

6          THE COURT:  Oh, I would want -- I would want to have

7  a hearing on it regardless.

8          MS. LENNOX:  Okay.  Very good.  That is to set the

9  schedule and set a procedure.  Then the procedure has to play

10  itself out.  The city ideally would like to know who's voting

11  what so we know who to mail what to by the time we start

12  solicitation.  The parties in interest have asked for a

13  longer period of time to try to work out their differences

14  because if they can't be worked out, they're going to be

15  litigated in front of this Court, and we are going to need to

16  know well before we tabulate the ballots who's got what vote

17  definitively.  So that procedure they have proposed -- and

18  they can certainly speak to this; I don't mean to, you know,

19  tread on their water here -- but would take some time past

20  disclosure statement hearing and before the voting deadline

21  is done, preferably ten -- at least ten days before the

22  voting deadline is up, so that is how we're proposing to deal

23  with all of those sets of issues.  I think they're very

24  important issues, and so if your Honor is amenable to that,

25  obviously we would sort of bind that over until we can work

1   that out.  Let's see what else I had on that.  I think that's

2   all I had on that issue, your Honor.  If I missed an issue

3   that an objector raised, they will certainly bring that to

4   your Honor's attention.  I can respond.

5           The other thing that we asked for is the approval of

6   the form of ballots.  US Bank, as the trustee, basically

7   raised an objection that said, well, it's kind of premature

8   to do that, don't you think, because the plan might change.

9           THE COURT:  Who did?

10          MS. LENNOX:  US Bank, who's the indenture trustee

11  for the water and sewer bonds.  And, you know, looking at the

12  ballots, they're pretty plain vanilla.  It says you have a

13  claim in this class, and you vote "yes" or "no," and if you

14  get to make an election, you make an election.  And so I

15  don't think that's going to change very much, but there may

16  be changes in, you know, different classifications or things

17  like that, so while I don't necessarily agree that this is

18  premature to approve the forms of ballots that we've

19  attached, if your Honor wants to defer that until the

20  disclosure statement deadline, we could.  I don't think these

21  forms are going to change very much.

22          THE COURT:  I think that's a good idea.  Let's do

23  that.

24          MS. LENNOX:  Okay.  Very good.  So we will modify

25  that.  We also agree with US Bank's suggestion that we only

1  need individual ballots for the SRF ballots because they're

2  held by the state, so we don't have to go through the DTC

3  process, so we can make that change.

4          THE COURT:  Okay.

5          MS. LENNOX:  We also want to clarify because US Bank

6  made this request in paragraph 14 of its objection that,

7  indeed, the plan does contemplate subclasses.  There are 66

8  series of water and sewer bonds, and so we classified them

9  according to lien priority, water first lien, sewer first

10  lien, but we also said that these classes include subclasses

11  that involve each of the different series.  We thought that

12  might be an easier and more efficient way of doing it than

13  having 66 separate classes, but they are separate classes.

14  Each series is a subclass, and you can vote -- they can vote

15  claims in the different subclasses differently, but they have

16  to vote all the claims within a subclass the same way, which

17  is generally the procedure that we've set forth for voting

18  claims within a class.

19          The ad hoc bondholders asked to submit ballots

20  directly to KCC.  We have checked with -- rather than going

21  through the DTC system, I think Mr. Kannel had said to the

22  Court there's a way to do it.  There is a way to do it, but

23  what the city has to be sure of is that the bonds that are

24  voted -- what the city has to be sure of is that the bonds

25  that are voted by a beneficial holder are actually held by

1  them as of the record date.  And as I indicated before, the

2  only way to know that is for DTC to verify that, so there's a

3  procedure that I have discussed with Mr. Kannel that if it's

4  followed we can permit this sort of direct transmittal to KCC

5  because we would have the verification that the city needed.

6  Mr. Kannel is going to consider that and get back to us, so

7  perhaps we can take that up next week as well.

8         THE COURT:  Okay.

9         MS. LENNOX:  And I think that has to do with ballots

10  and voting and the issues raised there.  Again, I think if I

11  missed one, somebody will correct me, and I will respond.

12         Then the final things that we asked for by this

13  motion, your Honor, are the approval to publish a

14  confirmation hearing notice under Bankruptcy Rule 2002(l) and

15  then finally some tabulation rules.  First, as part of that,

16  we've asked for a deadline by which if anybody wants to file

17  a motion to temporarily allow claims for voting under

18  Bankruptcy Rule 3018, that they file that motion by May 1st

19  or ten days after we file an objection to their claim.  As

20  part of the tabulation rules, the insurers asked us to make

21  explicit in our ballots how DTC will set up a method to track

22  the elections because DTC tracks the elections made on the

23  ballots.  We know how they're going to do that.  We're happy

24  to add language to the ballots to that effect.  So other

25  than -- and I believe --

1          THE COURT:  Add language where?

2          MS. LENNOX:  In the ballots, your Honor, so that

3   people voting know how their election is going to be tracked.

4   We could also put it in the tabulation rolls because they'll

5   get copies of that as well.

6          THE COURT:  Okay.  So I think that's the sum and

7   substance of what we've asked for procedurally.  I'm happy to

8   answer any questions your Honor may have, and if not I'll

9   respond to any objections I might have missed.  Thank you.

10          THE COURT:  Thank you.

11          MR. KANNEL:  Your Honor, William Kannel for the ad

12  hoc sewer and water bondholder committee.  Let me -- I'm

13  going to address a subset of the issues that are at play and

14  ones where we've hopefully agreed to a path toward

15  resolution, a very short path toward resolution by next

16  Tuesday, so let me tell you what the issues are, what they

17  aren't, who we've had a chance to talk to to resolve this,

18  and what the plan is.

19          At the intersection of the indenture trustee and the

20  water and sewer objections, the insurer's omnibus response,

21  if you will, and our little response on behalf of the ad hoc

22  water and sewer bondholders, there are really three issues at

23  play.  One is who actually gets to vote those claims, the

24  beneficial holders or the insurers, the issue that Ms. Lennox

25  just referred to about the elections and whether there is a

1   lockup between making an election and in a ballot and
2   distribution, and then our somewhat parochial issue about
3   being able to vote directly and not having to go back up
4   through the nominee chain, if you will.  What we've agreed to
5   in concept -- and we still have to work up to details, and
6   we've had a chance to speak to counsel to Assured, counsel to
7   NPFG, counsel to FGIC, counsel to Berkshire, counsel to
8   Ambac.  I do not think, just because of where people were
9   positioned in the hall, we've had a chance to close the loop
10  with Syncora would be by next Tuesday to agree to a mechanism
11  where what Ms. Lennox proposed, which was basically a
12  schedule to resolve the who gets to vote issue by
13  solicitation to instead drop that into a schedule between
14  solicitation, and I think we agreed with Ms. Lennox ten days
15  before tabulation.  Now, we'll have to see the order you're
16  developing sometime in the next day or two to sort of figure
17  that out and figure out what that window is, but that's the
18  game plan.  There are other issues that we haven't resolved
19  that, for example, the trustee is going to deal with in his
20  objection.
21          THE COURT:  Well, but --
22          MR. KANNEL:  Sure.
23          THE COURT:  -- how do you deal with Ms. Lennox's
24  assertion that it's important to the city in terms of
25  solicitation to get the issue of who gets to vote resolved

1  before then?

2          MR. KANNEL:  Right.  I think at this point they are

3  going to have to solicit the individual beneficial holders.

4  They've already sent out -- I forgot what the number you gave

5  is for the disclosure statement.  Soliciting the insurers in

6  addition I think is eight different -- eight additional

7  ballots.  I don't think that's much more material cost, your

8  Honor.

9          THE COURT:  Um-hmm.

10          MR. KANNEL:  And in any event, they're going to have

11  to --

12          THE COURT:  So the point is that if that decision

13  were made later and required that additional solicitation, we

14  could deal with that.

15          MR. KANNEL:  No.  I think the point is that

16  solicitation of the individual bondholders, if the schedule

17  sticks as it is more or less now, is going to take place by

18  April 24th anyway, but we're additionally going to be --

19  contrary to what's in Ms. Lennox's original motion, be

20  soliciting the insurers, and then during that period we'll

21  get to --

22          THE COURT:  If that becomes --

23          MR. KANNEL:  -- decide who counts.

24          THE COURT:  If that becomes necessary.

25          MR. KANNEL:  If that becomes necessary, exactly,

1  right.  Thank you, your Honor.

2          MR. KOHN:  I believe I may have missed something,

3  your Honor.  Your Honor, Samuel Kohn on behalf of Assured

4  Guaranty Municipal Corp.  Yes, Ms. Lennox and Ms. -- I'm

5  speaking for all the insurers.  I don't think any other

6  insurers will get up except for counsel for Syncora.  I'm not

7  sure.  But one thing just as a clarification, there were

8  other parts of our little objection just dealing with some of

9  the paragraphs in tabulation, for instance, a contingent

10  claim being voted, one dollar or things like that being

11  classified, so the process -- the agreement that we had with

12  Ms. Lennox is that the amount of the ballots or the amount of

13  the voting will also be part of that process that'll take

14  part, and our little objections will -- about language will

15  hopefully also be resolved by Tuesday.

16          THE COURT:  Okay.

17          MR. KOHN:  Thank you, your Honor.

18          MR. LEMKE:  If your Honor please, David Lemke on

19  behalf of US Bank as trustee for the water and sewer

20  bondholders.  So it looks like most of the objections that we

21  raised have been addressed one way or the other, either

22  they're going to be put off on the voting dispute or

23  whatever.  There are at least two that overlap.  Ms. Lennox

24  did clarify that there are multiple subclasses based on the

25  number of series, and that's what we thought was intended by

1   the plan.  The motion seemed to blur that, but we'll just

2   work with them on making sure it's clear when that goes out.

3           THE COURT:  Okay.

4           MR. LEMKE:  But the more substantive issue is that

5   Ms. Lennox has also clarified that the debtor intends for all

6   the votes -- if you are a bondholder and you own multiple

7   bonds within a class, you have to vote all those the same

8   way, and we would take issue with that because there are

9   multiple CUSIPs within each class, so within each series

10  there are -- bonds were issued within a series, and some of

11  those bonds have different maturity dates, interest rates,

12  call protections.  Some might be insured.  Some might not be.

13  Our view is -- and I think the ad hoc committee agrees --

14  that a holder should be required to vote -- should be allowed

15  to vote whatever bonds it holds in CUSIPs diversely, so it

16  might have -- it might have bonds in multiple CUSIPs in the

17  same class.  It ought to be able to vote those CUSIPs

18  differently if it chooses to because they're going to be

19  treated differently.  The plan actually proposes -- at least

20  if it's a cramdown interest rate, the plan proposes a list of

21  reset interest rates for every CUSIP that has been --

22          THE COURT:  Well, but doesn't the law require that

23  each claim in a given class be treated similarly?

24          MR. LEMKE:  Then maybe the CUSIPs need to be the

25  separate classes because they are -- they are not being

1  treated similarly, though.  The point is that the way the

2  debtor has proposed it, a holder in a class might have a bond

3  that gets one interest rate if it's crammed down and might

4  have a bond in that same class but it's a different CUSIP

5  that will get a different interest rate because of the way

6  the debtor is proposing, so we need to resolve that issue.

7  We thought the -- you know, if the classifications need to be

8  changed, then maybe that's an issue that needs to get fixed

9  when we take up the retirees, but certainly we don't want the

10  ballots to go out or the disclosure statement to go out until

11  that's resolved.

12          THE COURT:  This has to be resolved before that's

13  done.

14          MR. LEMKE:  It does, yes.  All right.  That's it.

15          THE COURT:  That's it?

16          MR. LEMKE:  Thank you, your Honor.

17          THE COURT:  Okay.

18          MS. ENGLISH:  Good afternoon, your Honor.  Caroline

19  English from Arent Fox on behalf of Ambac Assurance

20  Corporation.  Ms. Lennox's comments were and the discussion

21  so far has been really focused on the water and sewer bonds.

22  Ambac insures general obligation bonds.

23          THE COURT:  Um-hmm.

24          MS. ENGLISH:  I think with respect to the general

25  obligation bonds, respectfully, there really is no dispute as

1  to the voting rights on those bonds.  Ambac's bond documents

2  are very clear on their face that Ambac has the voting

3  rights.  It's in our proof of claim.  The city has those

4  documents.  However, to the extent the city has imposed this

5  default rule that they believe the beneficial holders may

6  have the right to vote, I think our discussions earlier today

7  outside in the hallway were that the general obligation bond

8  insurers would also participate in these discussions over the

9  next five days with the city and the water and sewer bond

10  insurers and holders to work out a consensual arrangement so

11  that it -- you know, it covers all bonds, if you will, and

12  we're happy to do that.

13         THE COURT:  Of course, if we allow everyone to vote

14  and no matter how we tally it the class rejects the plan, it

15  doesn't matter who had the right to vote; right?

16         MS. ENGLISH:  If all the insurers and all holders

17  reject a plan, I suppose so.  Thank you, your Honor.

18         MR. MARRIOTT:  Good afternoon again, your Honor.

19  Vince Marriott, EEPK, the holder.  We didn't file an

20  objection to the procedures motion; however, I did think it

21  would be useful to rise in response to some of the objections

22  that have been filed.  Just to put on the record, first of

23  all, that although the insurers believe they have the right

24  to vote, at least this holder doesn't agree with that

25  position.  On the other hand, we think that what I'll

1   describe as the proposed two ballot solution is an elegant
2   way to push the problem down the road to where it may not
3   matter because, as you point out, if insurers and holders
4   vote the same way, then who had the right to vote doesn't
5   really matter.  So although we have a different substantive
6   view of the world than the insurers, we think that the two
7   ballot solution is sort of an elegant way around this issue
8   at this point.

9           MR. FRIMMER:  Your Honor, Rick Frimmer from Schiff
10  Hardin for FMS.  First, I wanted to just join in what Mr.
11  Marriott just said about our agreement with the notion of --
12  you know, of the question of who would get the right to vote,
13  but --

14          THE COURT:  Okay.

15          MR. FRIMMER:  -- we agree with the solution.
16  Secondly, just to say that because of some of the discussion
17  surrounding the insurance question, I would point out a
18  couple things which might be -- one which is, I think,
19  generic to all of the -- I'm going to call them bonds, which
20  is I was confused particularly by the tabulation procedures
21  in paragraph 39 as to whether because the bar date order and
22  motion specifically allowed the indenture trustees to file
23  the proof of claims on behalf of all the beneficial holders,
24  I assume the city doesn't intend that the beneficial holders
25  need to comply with the 3018 motion procedure for tabulation

1  because in our case, for example, Wilmington would have filed
2  a proof of claim for all the COPs claims, so no actual
3  beneficial holder filed a proof of claim for those.  I'm not
4  really sure -- I don't think you intended it, but one could
5  read the 3018 procedures to require beneficial holders to
6  file something, so that should be clarified.

7          Secondly, the procedures -- the solicitation motion
8  provides for the Class 9 claims that if a settlement box is
9  checked, it becomes irrevocable.  I don't think any other
10 ballot is irrevocable until the end of the voting deadline
11 and especially if we're going to have to do a vote, I think
12 that ought to be eliminated.

13         The third thing just to note that although the COPs
14 claims are for definition purposes described as debt
15 instruments in the solicitation motion, we, of course, don't
16 agree with that, but we agree with the procedures.

17         MS. NEVILLE:  Your Honor, we're not a part of this
18 motion -- Carole Neville on behalf of the Retiree
19 Committee -- but we haven't actually worked out with
20 Ms. Lennox that we're probably going to use a different
21 solicitation package, including a different confirmation
22 notice for the retirees, because it's quite complicated.  And
23 I was thinking that it might be useful since it was very
24 confusing on the bar date notice that there just be a little
25 legend that says on the general solicitation and confirmation

1  notice this doesn't apply to retirees.

2          THE COURT:  Um-hmm.  Okay.

3          MS. CECCOTTI:  Your Honor, Babette Ceccotti.  Just a

4  quick follow-up to Ms. Neville's comments, which I agree

5  with, by the way, but in terms of the confirmation notice, I

6  believe I heard Ms. Lennox saying that the actual penning of

7  the ballots and the approval is going to await disclosure

8  statement.  It seems to me to make sense to have the general

9  confirmation notice deferred as well, but I didn't hear that

10 mentioned and just --

11         THE COURT:  You say confirmation notice.  You mean

12 confirmation hearing notice?

13         MS. CECCOTTI:  Yes, yes, to defer that as well.

14         THE COURT:  Yeah.

15         MS. CECCOTTI:  That way we have everything kind of

16 marching along without having to worry about whether the

17 wording in one and the other on key points that might apply

18 across the board are not worded differently.

19         THE COURT:  Okay.  Based on what I've heard so far,

20 I think we will convene a hearing next Tuesday at ten o'clock

21 to consider a stipulation to the extent you've been able to

22 reach one on how to resolve the who gets to vote issue --

23         MS. LENNOX:  Um-hmm.

24         THE COURT:  -- although I do want to hear from you

25 on why not solicit everyone and defer the issue if it's only

1  eight additional ballots.

2          MS. LENNOX:  I think, your Honor, that's exactly

3  what people have proposed is that ballots would go out to

4  everyone, including the insurers.

5          THE COURT:  All right.  So if --

6          MS. LENNOX:  The issue we have -- and it's an

7  issue -- I forget who raised it.  Perhaps it was Mr. Dubrow,

8  but perhaps I got that wrong.  There's one issue relating to

9  the amount of voting that if we're going to send out ballots

10  to the insurers at the same time, it's going to be sort of a

11  bigger issue than perhaps -- it may be a bigger issue because

12  I think what the insurers would like is that the ballots go

13  out -- and we can talk about this more next week, but the

14  ballots go out --

15          THE COURT:  Yeah.

16          MS. LENNOX:  -- in the full amount for principal and

17  interest that they insure, but they may not have paid all

18  that, and part of that is tied up in whether they're a holder

19  and whether they get to vote the whole claim or whether they

20  don't, so we're going to have to have some mechanism as part

21  of these procedures to figure out if they don't get the full

22  P&I amount of the vote, which I think would be some people's

23  position, then what is their lesser amount that they get to

24  vote, and is it subordinated under 509(c), so those issues

25  are going to have to be worked out, your Honor, as part of

1  these procedures, so --

2          THE COURT:  Well, but I'm wondering why even that

3  can't be deferred in case --

4          MS. LENNOX:  I think, your Honor --

5          THE COURT:  -- and to deal with it only if it

6  actually become necessary in terms of determining acceptance

7  under the Bankruptcy Code?

8          MS. LENNOX:  Well, one of the things that the

9  debtor -- or one of the things that the city doesn't want to

10  have happen because we are -- as you've heard today, at least

11  for just water and sewer, we have 66 subclasses and we have

12  337 or 377 CUSIPs, which somebody just mentioned making into

13  their own separate subclasses, and I want to talk about that

14  for a minute.  When you're dealing with the kind of voting

15  that is this complicated and this many parties at this great

16  expense, leaving everything to the end of the day is kind of

17  a recipe for disaster.  That's a bit of a free-for-all.  The

18  more that we can have settled and certain about how things

19  are going to work up front, I'm not saying problems won't

20  arise, but it's less likely that problems will arise, and

21  when they do, they'll be manageable, so the city's original

22  position was -- and we put this in our motion -- we ought to

23  know who's going to vote before we solicit so it avoids

24  problems down the road, it's very clear, everybody knows.

25  Because the parties are willing to try to work out a

1  resolution process for this, we were willing to compromise on

2  that deadline, but what I don't want to have happen is to

3  sort of not resolve this at all and then have before -- when

4  the ballots are trying to be tabulated, then --

5          THE COURT:  Well, I want to be very blunt with

6  you --

7          MS. LENNOX:  Okay.

8          THE COURT:  -- as if I'm, you know, not normally.

9  Is there any reasonable likelihood that any of these bond

10  classes will vote in favor of this plan or that any -- or

11  that any of these insurers will?

12          MS. LENNOX:  Well, there's the rub, your Honor,

13  absolutely.  We think there's a great possibility that

14  certain classes, particularly of the secured bonds, will vote

15  in favor of this plan, but maybe the insurers for other

16  reasons won't, and that's the kind of problem we don't want

17  to be arguing about seven days before the confirmation

18  hearing.  We want to know what the rules are going to be well

19  before that because I do think that's a possibility, and we

20  are worried about it.

21          THE COURT:  Okay.

22          MS. LENNOX:  So I would suggest -- and I suppose we

23  can take this up next week, but I would suppose -- would

24  suggest that it would be highly impractical and totally

25  unnecessary to have a separate class for voting purposes for

1   each separate CUSIP in one series of bonds.

2          THE COURT:  Well, I would agree with that, but

3   doesn't the law say that every claim in a given class has to

4   be treated similarly?

5          MS. LENNOX:  And they are being treated similarly.

6   The different --

7          THE COURT:  Oh, they're not getting different

8   interest rates?

9          MS. LENNOX:  They are, but what we're saying is you

10  get a market interest rate, and what that chart is intended

11  to say is depending on when your bonds are due and what --

12  you know, what collateral they have, whether it's first

13  priority collateral, second priority collateral, this is what

14  the market says your interest rate should be, and it was

15  done -- and to be full disclosure, people can challenge it if

16  they want, but the treatment of the class is they get market

17  rate.  They get market rate if they choose --

18         THE COURT:  But the market rate is different

19  depending on when the bond is due?

20         MS. LENNOX:  Correct, and the collateral position

21  because we have --

22         THE COURT:  And that goes by CUSIP?

23         MS. LENNOX:  And that goes by CUSIP, and one series

24  of bonds can have different CUSIPs, so I would suggest --

25         THE COURT:  Because they have different maturity

1    dates?

2           MS. LENNOX:  Correct.  So hopefully we can work that

3    out consensually, but if not, if there's still an objection

4    to it, your Honor can -- we can discuss that next week.  I

5    think that's all.  With respect to the question of whether

6    beneficial holders have to file 3018's, I mean they certainly

7    can if they want.  They're not required to.  And in the plan

8    we already set forth amounts for bond claims of what we think

9    we're going to allow them in, so normally you do a 3018 if

10   there's a contingent claim or an objection to a claim, and

11   that doesn't seem to be the case here.

12          And I do want to clarify one thing that Ms. Neville

13   said.  She said that this motion doesn't apply to the

14   retirees.  In some senses it does.  I mean if there's a

15   voting record date or dates that your Honor sets, I mean

16   those are going to apply to everybody, but I agree that, you

17   know, specific solicitation procedures we're going to work

18   out with them, so I just want to be clear about that, your

19   Honor.

20          THE COURT:  Let me ask you this question about the

21   COPs --

22          MS. LENNOX:  Yes.

23          THE COURT:  -- because the city has filed an

24   adversary proceeding --

25          MS. LENNOX:  Yes, sir.

1          THE COURT:  -- which in some sort of conceptual

2    sense is an objection to any claim that they might file.

3          MS. LENNOX:  Um-hmm.

4          THE COURT:  Will there be a process -- do you

5    foresee a process to estimate that claim as part of the plan

6    confirmation process because it's unlikely the litigation

7    would be resolved before then?

8          MS. LENNOX:  Right.  That is a disputed claim right

9    now.  I think we have procedures in the tabulation rules for

10   disputed claims.  If they want to set up a 3018 procedure,

11   we're happy to talk about that with them, and perhaps we can

12   reach out and do that proactively, your Honor.

13         THE COURT:  I would strongly recommend that in this

14   one-week period that you have allowed yourselves here.

15         MS. LENNOX:  Thank you, your Honor.

16         THE COURT:  Okay.  So we'll reconvene next Tuesday

17   at two o'clock.  I actually want to adjourn the hearing on --

18         MS. LENNOX:  Tuesday at ten, your Honor?

19         THE COURT:  Tuesday at ten.  What did I say?

20         MS. LENNOX:  Two.

21         THE COURT:  No, not two, ten.  Adjourn the hearing

22   on the solicitation and tabulation motion until then to see

23   what you've resolved here in the meantime.

24         MS. LENNOX:  Okay.

25         THE COURT:  And I'll make the same offer in

1  connection with either one of those matters.  If you want to

2  get me on the phone to either sound me out on something or to

3  help you to resolve something, I'm very willing to do that.

4       MS. LENNOX:  Thank you, your Honor.  We appreciate

5  the offer.

6       THE COURT:  All right.  Then let's turn our

7  attention finally to the status conference on the city's

8  motion to approve the swaps compromise.

9       MR. HERTZBERG:  Good afternoon, your Honor.  Robert

10  Hertzberg on behalf of the City of Detroit.  Your Honor,

11  we've asked for an order shortening time to deal with the

12  motion on the compromise that we've made with the banks.  I'd

13  first like to indicate to the Court that during this period

14  that's provided for on page 2 of the term sheet the city is

15  continuing to make the payments through the collateral

16  account as previously done in that the money is being placed

17  in segregated accounts by the bank subject to further order

18  of the Court as provided on page 2 of the term sheet.  We've

19  asked as part of the process to have the Court shorten notice

20  and set a hearing for March 20th to try and move the process

21  along in regard to the settlement.  Our thought is is that a

22  lot of the testimony that was given at the prior hearing in

23  regard to the swap settlement that the Court previously

24  denied is good testimony in regard to background for this

25  settlement, and we believe that the Court can take judicial

1  notice of that under Federal Rule of Evidence 2001 and also

2  that it's available to be used under Federal Rule of Evidence

3  807, so we're -- what I would suggest to the Court is that we

4  put in a procedure in order to designate portions of that

5  prior testimony that was held before this Court for witnesses

6  and then a period of time, and I can give the Court some

7  suggested times, for counter-designation by anyone who

8  happens to file an objection.  We only --

9         THE COURT:  That sounds unnecessarily complex to me.

10        MR. HERTZBERG:  I'm open to suggestions from the

11  Court on it.

12        THE COURT:  Why don't we just say that all the

13  evidence that was submitted in connection with the prior

14  hearings on your prior motions is evidence on this one?

15        MR. HERTZBERG:  That's satisfactory with us,

16  including the exhibits, your Honor.  We will only be bringing

17  probably one live witness on a very short basis.  We intend

18  on calling Kevyn Orr, and his direct examination I anticipate

19  taking anywhere from 30 to 45 minutes maximum.  We're looking

20  at whether we need an additional witness of Mr. Malhotra, who

21  has appeared before this Court several times and given

22  testimony.  I don't think we need it, but we need another day

23  or two to go through his prior testimony and make sure that

24  we have what we need to build a proper record.

25        THE COURT:  So you'll make that decision by Friday?

1      MR. HERTZBERG:  Yes, your Honor, absolutely.  So

2   that takes care of the -- dealing with the prior testimony

3   and exhibits.  What I suggest is --

4      THE COURT:  Well, I want to -- I want to hear from

5   other parties before making a final decision on the evidence

6   issue.

7      MR. HERTZBERG:  Understood.  What we propose to the

8   Court is is that any objections to the proposed settlement be

9   filed by five o'clock on Friday, March 14th, and that the

10  city be given until March 18th to file its reply.  And as I

11  indicated to the Court, that we're requesting that the

12  hearing take place on March 20th, and that's dependent

13  upon -- when I say March 20th, on the length of the hearing.

14  We don't believe that this hearing should take more than five

15  to six hours maximum, and let me tell you how I see it taking

16  place and give the Court an idea of how I see it unfolding on

17  that day.  I believe that there's only -- or that it would

18  only be necessary for the city, at least, to give a ten- to

19  fifteen-minute at most opening statement, and I'd ask that

20  the Court limit any objectors to the same period of time and

21  if there's several of them, have them divide it up and have

22  it done within 30 minutes.  We would then put on Mr. Orr, who

23  I indicated would only take 30 to 45 minutes on direct, and

24  I'd ask that the Court limit any cross-examination of Mr. Orr

25  to two hours.  And then I believe it's more than sufficient

1   to allow 45 minutes to an hour on both sides for closing

2   argument.  That way, based upon the record that has taken

3   place in the previous hearing and the new information that

4   has come out during this hearing, five to six hours is more

5   than sufficient time to put in the evidence and to hear the

6   parties' objections if there are any.

7           THE COURT:  Thank you.

8           MR. HERTZBERG:  Thank you.

9           THE COURT:  Would anyone like to be heard regarding

10  this?  Sir.

11          MR. HACKNEY:  Good afternoon, your Honor.  Stephen

12  Hackney on behalf of Syncora.  Obviously, I lived the first

13  forbearance agreement hearing, and I sort of resolved today

14  that I would not attempt to argue the merits of the substance

15  of our objections.  I don't think that's prudent, but I

16  wanted to come and share a view with you in terms of process.

17  This motion was just filed on Monday night, so it's a

18  relatively recently filed motion, and a couple points, I

19  think.  The first is that there is no emergency.  If you look

20  at the proposed deal that even -- even if it works as the

21  city says that it does, the deal provides that the city will

22  just continue doing what it has been doing for months since

23  July of last year with respect to the monthly account and

24  through the end of the bankruptcy, so there is not even the

25  sort of notional argument for speed that we heard the first

1  time around in terms of how we handle this.  I think that we
2  should bear that in mind when we're considering allowing
3  parties to assess this new deal to determine whether they can
4  resolve their objections without the need for a hearing,
5  which is always in everyone's interest, and I was merely
6  coming to propose that we set a date a week from now at which
7  we would come back and revert to you on whether we've been
8  able to do that and, if not, what our proposed schedule was.
9          I do want to preview something with you, though,
10  with respect to Mr. Hertzberg's comments, which is the deal
11  has changed dramatically in terms of what claims are being
12  settled, so I think there will be real relevance questions
13  when it comes to the prior testimony compared to this deal.
14  Remember that under the prior agreement -- and it was
15  somewhat complicated because it was notionally only an
16  optional termination agreement, so you have to kind of couple
17  it with the performance under the agreement that was
18  anticipated to come with the order.  You saw an actual
19  termination of the swap, a termination of the relations
20  between swap counterparties and the service corps, an impact
21  on the -- an impact that was somewhat murky on the
22  relationship between the service corps and the city, and then
23  termination of the collateral agreement by the terms of the
24  collateral agreement.  That was the package of claims that
25  were being settled as part of the consideration.  This deal

1  is very different.  Number one, this deal proposes to leave

2  the swap in place.  Number two, the city has now, I believe,

3  taken the view in the interim since the last forbearance

4  agreement that now the service corporations are sham entities

5  with whom there can be no deal, so despite the fact that they

6  included them the first time, they are now not included here,

7  and so the new term sheet, which is just the term sheet,

8  leaves the swap in place, and it also leaves undisturbed the

9  relationship between the service corporations and the city.

10 It still purports to eliminate --

11        THE COURT:  Why is this anything you care about?

12        MR. HACKNEY:  This is highly relevant to Syncora as

13 the insurer of the swap because we are not released from our

14 insurance, and yet the obligation becomes unsecured if it

15 works in the fashion they say.  I actually don't think that

16 it works, for what it's worth, but I'm not going to argue the

17 merits to you.  I do -- what I think --

18        THE COURT:  All right.  So you're not going to

19 settle.  Let's just get to it.

20        MR. HACKNEY:  I'm not sure.  We've been -- we've had

21 conversations.  I mean I'm not sure.

22        THE COURT:  Seriously, come on.

23        MR. HACKNEY:  No.  I would -- I think I've --

24        THE COURT:  Let's just get to it.

25        MR. HACKNEY:  I've been, I would say, equally candid

1  with you from time to time when I've had the pleasure of --

2         THE COURT:  What do you mean, from time to time?

3         MR. HACKNEY:  Well, only not when --

4         THE COURT:  You don't mean candid.  You meant blunt,

5  yes.  Okay.

6         MR. HACKNEY:  I try to avoid --

7         THE COURT:  Yes.

8         MR. HACKNEY:  I never want to be rude.

9         THE COURT:  You're not often --

10        MR. HACKNEY:  I hope that I'm not.  No.  I think

11  that there's a real -- there's a likelihood maybe that we'll

12  object.  We have very serious concerns, but I will tell you I

13  don't think it's a certainty.  I mean we have been dialoguing

14  with the swap counterparties.  We were not included in the

15  negotiation of the term sheet.  We were sort of held at arm's

16  length.

17        THE COURT:  Well, but you can negotiate and litigate

18  at the same time.

19        MR. HACKNEY:  You can, but, your Honor --

20        THE COURT:  It's what we lawyers do.

21        MR. HACKNEY:  Well, but what I think is more

22  efficient, though, is I'm asking for a week.  I mean, your

23  Honor, this was filed Monday night, and it's a different

24  deal.  And I will tell you I've quite literally not spoken

25  with my client about the motion itself.  We've been aware of

1   drafts of the term sheet for a week.  I'm not going to tell
2   you that it fell on my lap at midnight, but I had a first day
3   in another case yesterday, so I just quite literally haven't
4   discussed it with my client.  What I'd propose is this.  Give
5   us one week to come back to you on status with a report on
6   were we able to cut a deal or not.  And we will get down to
7   it with them and decide whether we're loving or fighting, and
8   if we are fighting with a view on can we agree on a schedule,
9   I don't think I'm going to be able to agree to Mr.
10  Hertzberg's schedule, but I also can't rule out that I won't
11  try to understand the idea to which prior testimony is
12  applicable and can come in.  I mean I'm always willing to
13  engage at a practical level to streamline the trial of
14  something, but please hear me as saying there are material
15  changes in the deal, and this is already a complex structure,
16  so the way it all interacts is --
17          THE COURT:  Well, but if some evidence in the prior
18  trial is irrelevant, so what?
19          MR. HACKNEY:  It's more that the prior evidence, if
20  it is irrelevant or if some of it is irrelevant, is not on
21  point for what the claims are being settled.  There could be
22  a failure --
23          THE COURT:  Right, so you can point that out, and
24  we'll deal with it.
25          MR. HACKNEY:  We can, but, your Honor, bear in mind

1  that in the last trial we didn't take discovery on the

2  underlying claims being settled.  We took discovery on the

3  business judgment process by which the debtor went after --

4  elected to enter into the settlement, so I think, based on

5  the standard that was applied, there is a gap in the record

6  in terms -- and the Court noted it at the last hearing, which

7  is what is the evidence --

8          THE COURT:  So do you want discovery here?

9          MR. HACKNEY:  That's what I would hope to come back

10 to you in a week on, and I also have to evaluate what is the

11 nature of my own objection, you know, is it factual,

12 intensely factual, or is it legal.  I mean there are a lot of

13 things I've thought about in the context of the last

14 agreement to be sure.  I'm not a babe in the woods on this

15 issue, but this is a new deal, new structure, new claims, new

16 and different claims being settled.  I do need a little time

17 to think it through and advise my client to try and

18 understand how this fits together.  I don't think it's as

19 easy as Mr. Hertzberg says, which is we'll just remember all

20 the stuff we did together in December.  We'll have another 45

21 minutes and, presto, we're done.  I wanted to give you that

22 perspective, your Honor.

23         THE COURT:  Thank you.

24         MS. NEVILLE:  Carole Neville on behalf of the

25 retirees.  Your Honor, we have a different concern, which is

1 the plan support agreement, which expressly creates an

2 impaired consenting class for $85 million, which the city

3 expressly said they will use for cramming down any class that

4 doesn't accept the plan, so it may be --

5     THE COURT:  So you'll object on that grounds?

6     MS. NEVILLE:  Yes.  We would object on that ground,

7 but we may want some discovery of Mr. Orr on that to see how

8 that --

9     THE COURT:  What do you want?

10     MS. NEVILLE:  -- plan support agreement was

11 formulated and what the discussions --

12     THE COURT:  Like a deposition or --

13     MS. NEVILLE:  Yes.

14     THE COURT:  Anyone else?  Sir.

15     MR. MARRIOTT:  Yes, your Honor.  Vince Marriott on

16 behalf of EEPK.  Two quick points.  One is to comment on

17 something that Mr. Hackney commented on.  This case sort of

18 has emergency motion expedited hearings.  I mean it's

19 fatiguing, and it seems that when it's unnecessary we ought

20 not to fall into the trap of doing everything on an expedited

21 basis just because we've been doing everything on an

22 expedited basis, and --

23     THE COURT:  Um-hmm.  I'm going to ask Mr. Hertzberg

24 when it's his turn to come back to explain why he needs a

25 hearing on March 20th.

1    MR. MARRIOTT: And I think the other thing that was

2  missing from Mr. Hertzberg's timeline -- and Ms. Neville

3  addressed it in part -- we ought to be at least entitled to

4  depose the witnesses that the city intends to put forward at

5  the hearing. Thank you.

6    MR. HERTZBERG: Your Honor, I'm going to be blunt.

7  Syncora has said that they need more time to analyze this. I

8  want to give the Court a little background so it understands

9  when they stand before you and ask for more time because the

10  motion has been recently filed and they want to be able to

11  analyze the motion further and need to spend time going

12  through it. February 4th the banks told Syncora the amount

13  of the settlement with the permission, of course, of the city

14  and with confidentiality. February 18th they had a detailed

15  oral conversation, the banks, with Syncora and walked them

16  through the transaction that they were about to enter into

17  with the city. February 24th they received the term sheet,

18  which is now attached to the motion, so they've had the term

19  sheet for approximately ten days, eleven days. So when they

20  come before the Court and they say to the Court, "We need

21  time to analyze this," what have they been doing for the last

22  30 days? They've been brought into the process. The banks

23  deliberately brought them in to see if they could resolve

24  issues and not face an objection, and now they stand before

25  the Court and say to the Court, "We need more time to analyze

1  this."  I suggest to the Court they've been looking at this

2  deal for a long time now, not just a couple days.

3          In regard to the Court's question of why we need a

4  hearing on an expedited basis, we need to get down to the

5  settlement and figure out whether the Court is going to

6  approve it or not.  It drives the plan process.  It's

7  important to the plan.  If the Court does not approve it --

8  and I believe the Court will approve it based upon what we

9  filed before the Court, but if for some reason the Court

10  didn't, we need to find out what the alternatives are, and we

11  need to know now.  We can't be in a position of paying this

12  money out and not having certainty of what we're doing, so I

13  ask that the Court expedite the hearing on the schedule that

14  we asked for.

15          THE COURT:  All right.  Thank you.

16          MR. HERTZBERG:  Thank you.

17          THE COURT:  Anything further from anyone?

18          MR. MARRIOTT:  Just quickly, your Honor.  This case

19  is not the City versus Syncora, although it may seem that way

20  sometimes.  There are other objectors who were not given all

21  of this or potential objectors who were not given this

22  preview.  Second, this has been going on since July.  Why

23  something has to be decided by March 20th versus, for

24  example, April 20th or even an additional 30 days would be a

25  much more sane way to approach this is entirely unclear to

1    me.

2         MR. HACKNEY:  Very brief.  I hate to get the Court

3    into all of the sort of back and forth, but what I -- I do

4    want to respond to the notion which is we had actually asked

5    to be involved in the negotiations.  We weren't allowed to

6    be, and we've been asking for the term sheet.  We had to wait

7    weeks to get it.  I don't think I misrepresented to the

8    Court.  I didn't say I just got the term sheet Monday night.

9    We had gotten it sometime last week.  We have been looking at

10   it.  We do have serious questions about it.  It wasn't the

11   motion that was filed itself until Monday night that we could

12   see where they had finally landed, so I don't think that I

13   misstated anything to you, but I wanted to clarify the record

14   to the extent I had.

15        THE COURT:  Thank you, sir.

16        MR. GOLDBERG:  Jerome Goldberg appearing on

17   interested party David Sole.  I have no idea what discussions

18   have been with Syncora, but I know I participated in this

19   trial on behalf of my client because of our very strong

20   concern of the role of the swaps in the crisis in Detroit and

21   the role of the banks in the crisis, which in many ways is

22   even sharper in light of the cuts that have been announced to

23   retirees that I think are being looked at very sharply, and I

24   would just ask for at least a little extra time so we could

25   have some time to prepare.  We just saw this yesterday.  I

1  tried to talk about it to determine whether we're in a

2  position to intervene, and I think having a trial by March

3  20th is not reasonable, at least some extra time to give some

4  time, especially when there are other answers that have to be

5  done in the next week or two relative to the disclosure

6  statement.

7          THE COURT:  All right.  Thank you.  I'll enter a

8  scheduling order in the next day or so.  Is there anything

9  else anyone would like to bring up?  All right.  We're in

10  recess.

11          MR. HERTZBERG:  Thank you, Judge.

12          THE CLERK:  All rise.  Court is adjourned.

13      (Proceedings concluded at 4:17 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            March 10, 2014
_____      _____
Lois Garrett