UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |
| | ) | |

**RESPONSE OF
DETROIT RETIREMENT SYSTEMS TO ORDER TO SHOW CAUSE
WHY EXPERT WITNESSES SHOULD NOT BE APPOINTED**

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (collectively, the "Retirement Systems") hereby respond to the Court's Order to Show Cause Why Expert Witnesses Should Not Be Appointed (the "Show Cause Order") [Dkt. No. 3170]. In support hereof, the Retirement Systems state as follows:

1. The Retirement Systems do not object to the concept of the appointment by the Court of one or more expert witnesses as proposed by the Show Cause Order. However, the Retirement Systems have a few comments and concerns regarding this matter as discussed below.

2. Attached to the Show Cause Order is a proposed *Order Regarding the Solicitation of Proposals to Serve as the Court's Expert Witness on the Issue of Feasibility* (the "Solicitation Order").

3. The Retirement Systems submit that a few clarifications in paragraph 4 of the Solicitation Order would be helpful.

4. In subparagraphs 4(c) and (d) of the Solicitation Order, after the phrase "prior retentions," the Retirement Systems submit that the phrase "of the applicant or the applicant's firm" should be inserted for clarity.

5. Also, again in subparagraph 4(d) of the Solicitation Order, it is unclear whether the use of the word "party" is intended to refer only to a party to the proceedings in this case or not. It would appear that the language should not be so limited and that the word "party" should be replaced with the phrase "person or entity," with a corresponding edit to the word "party's."

6. In subparagraph 4(e) of the Solicitation Order, the Retirement Systems submit that after the words "past connections," the words "of the applicant and the applicant's firm" should be inserted.

7. Paragraph 5 of the Solicitation Order provides: "Interested parties are encouraged to share this solicitation with potentially interested and qualified applicants." Of course, it would be difficult from a practical standpoint to prohibit parties from sharing the Solicitation Order and pertinent information with potential

expert candidates. However, to the extent that the Solicitation Order officially *encourages parties in this bankruptcy case* to procure candidates for the Court's consideration, the Retirement Systems object and submit that the process by which the Court selects and interviews candidates and ultimately selects and appoints experts should be as independent as possible of influence by any parties to this bankruptcy case.

8. The concern in this regard is poignantly borne out by the City's Concurrence in the Show Cause Order [Dkt. No. 3328] filed today, in which the City takes the liberty of proposing not only how the Court should engage experts but also *who* it should engage. The City, apparently with no sense of irony, proposes that the Court appoint a certain Professor Edward Glaeser - - with whom the City has obviously already had significant contact regarding this case - - and that Professor Glaeser then proceed to select a panel of additional experts. Thus, the City has graciously offered its expert to serve as the Court's expert and to serve as a surrogate for the Court in selecting additional experts. The City's proposal makes a mockery of the process by hijacking it completely.

9. Not only is the City's proposal antithetical on a procedural level to the concept of appointing an independent Court-appointed expert, there are significant concerns substantively with Professor Glaeser's candidacy. The City makes a point of noting that he is a senior fellow at the Manhattan Institute for Policy

Research.  As an initial matter, the Manhattan Institute is a think tank with highly conservative, right-wing political leanings.  No expert selected by the Court in this matter should be affiliated with such a pronounced political agenda, regardless of which end of the political spectrum that agenda may represent.  Moreover, the City has already previously engaged the Manhattan Institute in connection with this case, to provide services with respect to police department restructuring initiatives.[1]  In fact, on the home page of the Manhattan Institute's website is a link to a conference panel discussion from roughly one month ago, featuring a Manhattan Institute fellow, Governor Snyder, and Kevyn Orr.  *See* <u>Exhibit B</u> attached hereto.  Thus, there is nothing independent or independently-minded about Professor Glaeser, and his nomination by the Emergency Manager is inappropriate and unacceptable.

10.     The City's unabashed effort in its Concurrence to unilaterally establish procedures on behalf of the Court in this matter includes numerous other proposals that are unsupported by applicable federal rules and/or pose practical problems.  For example, and without limitation: (i) the City improperly tries to define and limit the scope of the Court expert's testimony; (ii) the City suggests

---

[1]   As evidenced by the deposition testimony of Charles Moore on December 4, 2013, the Manhattan Institute provided services to the City's police department starting in approximately January 2013 and worked closely with the Conway Mackenzie firm.  The services were provided under two contracts; the second contract was for a fee of approximately $500,000 to $750,000.  *See* transcript excerpt, attached hereto as <u>Exhibit A</u>, at pages 31-35.

without basis that the Court expert should not "conduct any independent field research or [ ] evaluate the credentials, expertise, opinions, or testimony of persons who may be called as witnesses"; (iii) the City proposes that the Court expert(s) file only "preliminary" reports by June 16, 2014 - - more than two weeks after all other expert reports; and (iv) the City proposes without basis that no depositions of the Court expert be permitted (contrary to paragraph 6 of the Court's proposed Appointing Order, defined below) - - just a one-time evidentiary hearing, to be conducted *after* the deadline for parties to file supplemental Plan objections. All of these proposals by the City are objectionable, and the Retirement Systems broadly object to the Concurrence to the extent that it seeks to foreclose a dialogue with all parties in interest on any issues relative to the appointment of one or more experts by the Court.

11.  Also attached to the Show Cause Order is a proposed *Order Appointing Expert Witness* (the "Appointing Order").

12.  Paragraph 3 of the Appointing Order provides that "The City and its professionals shall fully and promptly cooperate with the expert witness." The Retirement Systems are concerned that the implication of this paragraph is that the proposed expert witness (or witnesses) should gather information from the Emergency Manager's professionals in particular, and perhaps from no other parties.

13. The Retirement Systems submit that any expert witness or witnesses appointed pursuant to the Show Cause Order should be required to solicit relevant information from all parties-in-interest. Moreover, the communications of the expert witness or witnesses with the Emergency Manager's professionals should all be transparent and public, to avoid even the appearance of impropriety or bias.

14. Accordingly, the Retirement Systems request that the Court incorporate into the proposed Appointing Order appropriate guidelines and procedures to ensure that the process undertaken by the expert witness or witnesses is entirely arm's-length in nature.

15. The Retirement Systems reserve all rights to supplement this objection or file additional objections as information becomes known through discovery or otherwise regarding any proposed expert and as the selection process develops and proceeds.

    CLARK HILL PLC

    /s/ Robert D. Gordon
    Robert D. Gordon (P48627)
    Shannon L. Deeby (P60242)
    151 South Old Woodward Avenue, Suite 200
    Birmingham, Michigan 48009
    Telephone: (248) 988-5882
    rgordon@clarkhill.com

Dated: March 31, 2014    *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# **CERTIFICATE OF SERVICE**

The undersigned certifies that on March 31, 2014, the **Response of Detroit Retirement Systems to Order to Show Cause Why Expert Witnesses Should Not Be Appointed** was filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

        CLARK HILL PLC

        /s/ Robert D. Gordon
        Robert D. Gordon (P48627)
        151 South Old Woodward Avenue, Suite 200
        Birmingham, Michigan 48009
        Telephone: (248) 988-5882
        Facsimile: (248) 988-2502
        rgordon@clarkhill.com

Dated: March 31, 2014        *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# EXHIBIT A

# IN RE: CITY OF DETROIT

# CHARLES MOORE

December 4, 2013

*Prepared for you by*



NATIONWIDE COURT REPORTING & VIDEO

Bingham Farms/Southfield • Grand Rapids
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

Page 29

1  Q. And that's also correct for the five individuals I
2     just described to the best of your knowledge.
3  A. I believe that's correct.
4  Q. And it's also true with respect to Conway MacKenzie to
5     the best of your knowledge.
6  A. To the best of my knowledge, yes.
7  Q. Prior to this case you had never been tasked with
8     formulating a blight remediation plan, isn't that
9     correct, Mr. Moore?
10 A. That's correct.
11 Q. Nor had Conway MacKenzie, correct?
12 A. To the best of my knowledge, yes.
13 Q. And nor to the best of your knowledge had any of the
14    five individuals I just ticked off in connection with
15    the police department question, isn't that correct?
16 A. That's correct.
17 Q. Is it correct to say, Mr. Moore, that Conway MacKenzie
18    started working in earnest on the scope of work
19    described in Exhibit A around the time that its
20    contract was executed with the City?
21 A. Yes, that would have been January of 2013.
22 Q. I know that prior to that time you had been doing some
23    pro bono work with respect to cashiering exercises, is
24    that correct?
25 A. Yes, sir.

Page 30

1  Q. But when it came in earnest to performing the services
2     in this contract, that began sometime in January of
3     2013, correct?
4  A. Yes.
5  Q. Do you remember the day that you began? I can tell
6     you when the contract was signed --
7  A. The contract was signed I believe January 9th. The
8     contract was January 9th, and I believe that we would
9     have begun onsite work within one week of that,
10    perhaps within a few days.
11 Q. So as soon as January 11th you may have been at it for
12    the City of Detroit.
13 A. Yes.
14 Q. I'm going to focus these questions now on the period
15    between January 11th and the June 14th proposal to
16    creditors, if I can, so bear that time frame in mind
17    when I'm asking you these questions.
18        What individuals outside of Conway
19    MacKenzie did you rely upon in performing your work
20    during that time period?
21        MR. HAMILTON: Object to form.
22        You can answer.
23 A. First of all, we worked very closely with people that
24    are employees of the City, and there are a whole host
25    of employees that we interacted with as we conducted

Page 31

1     our work.
2  BY MR. HACKNEY:
3  Q. Anyone else?
4  A. There are other outside advisors that we worked with.
5     Just to name a few of the firms, the Manhattan
6     Institute was a police-specific expert that was
7     engaged by the Detroit Police Department that we
8     interacted with.
9         Plante Moran had been engaged in a variety
10    of activities related to the Finance Department.
11    Ernst & Young had been performing a variety of
12    financial activities for the City for a while,
13    certainly Miller Buckfire as the investment banker,
14    essentially Jones Day was involved, we interacted with
15    Miller Canfield as counsel.
16        There may have been other outside advisors
17    as well but those would have been the primary other
18    advisors that we would have interacted with.
19 Q. One that comes to mind is Milliman?
20 A. Yes, sir.
21 Q. Is that one that you worked with?
22 A. Yes.
23 Q. I know there are, I think there are PR firms and there
24    are a number of consulting firms, I've seen all the
25    contracts on the website, have you been able to give

Page 32

1     me the material firms that you spent a material amount
2     of time working with during that time period I
3     identified earlier?
4  A. I believe that's the complete list, yes.
5  Q. Can you give me a sense of how many City employees
6     Conway MacKenzie interacted with between January and
7     June, the January and June time frame I identified
8     earlier?
9  A. This would be a very rough estimate, somewhere between
10    50 and a hundred.
11 Q. Am I correct that you talked to the heads of the
12    departments or enterprise funds that we described
13    earlier as important as part of performing your work?
14 A. Certainly they would have been included in that group
15    of people.
16 Q. When you referenced the Manhattan Institute, the
17    police expert, do you know when they were retained?
18 A. I don't know.
19 Q. Were they already on the site, onsite when you were
20    retained?
21 A. Yes.
22 Q. They were there before you?
23 A. Yes.
24 Q. And when did you start interacting with them?
25 A. I don't know what the specific date would have been.

Page 33

1  It would have been somewhere between January and
2  April.
3  Q. Okay. And tell me what the -- tell me how your two
4     firms worked together.
5  A. Sure. Conway MacKenzie is tasked with preparing a
6     comprehensive restructuring plan, operational
7     restructuring plan, police is obviously a very
8     important department of the City.
9         As you have pointed out, Conway MacKenzie
10    does not have resident policing expertise within our
11    firm; however, a significant amount of the activities
12    that, and deficiencies, if you will, that were
13    identified with the department relate to
14    organizational effectiveness.
15        And so Conway MacKenzie would have
16    interacted with Manhattan Institute. Where Manhattan
17    Institute has very specific policing and policy type
18    of expertise, Conway MacKenzie brings the
19    organizational expertise, and together we jointly
20    prepared a comprehensive restructuring plan for the
21    department.
22 Q. In terms of actual day-to-day work, were the Manhattan
23    Institute people attending interviews and onsite in
24    the Detroit Police Department with the Conway
25    MacKenzie people?

Page 34

1  A. In the initial time period that you mention, that
2     interaction was more limited, then around June or
3     thereabouts there was a new contract with the
4     Manhattan Institute and the Bratton Group together
5     where that interaction became very, very frequent.
6  Q. So I'm going to try and characterize the interactions
7     prior to that point, and it's tough because I don't
8     know what they were, but I want to try and telescope
9     this without asking who did you talk to and what did
10    you say type questions.
11        Is it fair to say that in that time frame
12    identified earlier, January to June 14, 2013, that the
13    Manhattan Institute was principally teaching Conway
14    MacKenzie about best practices in the policing
15    industry and Conway MacKenzie was using that
16    information as it assessed the Police Department?
17 A. I don't think that that's an accurate
18    characterization. I don't think that the Manhattan
19    Institute was teaching Conway MacKenzie. We had
20    developed teams with at that time interim Chief Logan
21    that were focused on specific areas in the department,
22    and depending on which area, to the extent that there
23    needed to be an additional resource besides just
24    Conway MacKenzie, Manhattan Institute may have
25    participated in those, we call them subcommittee

Page 35

1  teams.
2  Q. Can you give me a sense, if you know, of about the
3     approximate amount of time spent by Conway MacKenzie
4     with the Manhattan Institute?
5  A. I don't know.
6  Q. Do you know if it's in the hundreds of hours or is it
7     materially more or less than that?
8  A. I couldn't even hazard a guess.
9  Q. They were working under a contract during that January
10    to June time period, is that correct?
11 A. Yes.
12 Q. Do you remember the amount of their contract?
13 A. I don't know.
14 Q. Do you know the amount of their contract after it was
15    renegotiated in June?
16 A. I think it was somewhere between 500,000 and 750,000
17    if I recall correctly, but I don't have the precise
18    number, so that is a -- a rough guess.
19 Q. Is it your understanding that that represented an
20    increase in the amount that they would be paid as
21    compared to the prior contract?
22 A. I don't know.
23 Q. Between January and June did Conway MacKenzie liaise
24    with a fire expert that's similar to the Manhattan
25    Institute as a police expert?

Page 36

1  A. Possibly.
2  Q. Did you?
3  A. I myself did not.
4  Q. To your knowledge did anyone at Conway MacKenzie do
5     so?
6  A. That's where I'm not sure. Eventually the City
7     engaged a fire expert similar to Bratton and Manhattan
8     on the police side. That occurred after the time
9     period, after June 14th.
10 Q. In fact, didn't that just occur in October?
11 A. I believe that's correct, October of this year, yes.
12 Q. Did Conway MacKenzie liaise with a blight remediation
13    expert during that January to June 2013 time period?
14 A. Conway MacKenzie interacted with a number of people
15    that had been involved in blight remediation
16    activities, yes.
17 Q. Were they people that had been formally retained by
18    the City to provide services?
19 A. In some instances those were City employees. In other
20    instances they were outside groups that were
21    undertaking blight removal efforts.
22 Q. And those are outside groups that are local in the
23    city of Detroit?
24 A. Yes. I did interact with some resources that were
25    involved with those groups that actually came from

# EXHIBIT B



# MANHATTAN INSTITUTE
## FOR POLICY RESEARCH

*The mission of the Manhattan Institute is to develop and disseminate new ideas that foster greater economic choice and individual responsibility.*

search [_____] go

   

HOME   ABOUT MI   CENTERS   ISSUES   CITY JOURNAL   EXPERTS   PUBLICATIONS   MULTIMEDIA   EVENTS   SUPPORTING MI

**DETROIT: The Next American City of OPPORTUNITY**
Featuring Michigan Governor RICK SNYDER and Detroit Emergency Manager KEVYN ORR
WATCH THE FULL EVENT VIDEO

**HOT TOPICS**   + more topics >>

Ten Things You Need To Know About Turkey
Claire Berlinski writes on FoxNews.com

Does Dave Camp Hate Mark Zuckerberg?
Howard Husock writes on Forbes.com

**Today's Daily Update >>**


EMAIL UPDATES join>>

## THE OBAMACARE IMPACT MAP



## VIDEOS



**Detroit: The Next American City of Opportunity**
Panelists: Honorable Rick Snyder, Governor, State of Michigan; Kevyn Orr, Emergency Manager, City of Detroit; Daniel DiSalvo, Manhattan Institute
March 24, 2014

## PODCASTS

**ECONOMICS 21**
Matthew Hennessey and Jared Meyer, policy analyst at Economics21, discuss movie tax credits.

**ECONOMY**
Paul Beston and *City Journal* Senior Editor, Steven Malanga, discuss his article from the *City Journal* Winter 2014 issue, "The State Tax Grab."

## CITY JOURNAL   + subscribe >>

a cutting-edge quarterly magazine on culture, politics, and urban affairs.


**STEFAN KANFER**
**Father of the Wild Things**
Maurice Sendak and the "awful vulnerability of children"


**CHARLES UPTON SAHM**
**Broken and Divided**
Rebuilding Venezuelan society won't be easy.

## MI WEBSITES


 Economics Policies for the 21st Century AT THE MANHATTAN INSTITUTE
 PUBLIC SECTOR INC
 Medical Progress Today.com
 MINDING THE CAMPUS.COM
 PointofLaw.com
PROXY MONITOR.ORG

## RECENT REPORTS


**The Effect of Co-Locations on Student Achievement in NYC**


**Should Charter Schools Pay Rent?: Implications for**


**Where The Jobs Are: Small Businesses Unleash Energy**