# EXHIBIT 1

*United States Senate*
*PERMANENT SUBCOMMITTEE ON INVESTIGATIONS*
*Committee on Homeland Security and Governmental Affairs*

*Carl Levin, Chairman*
*Tom Coburn, Ranking Minority Member*

# WALL STREET AND THE FINANCIAL CRISIS:
# Anatomy of a Financial Collapse

MAJORITY AND MINORITY
STAFF REPORT

PERMANENT SUBCOMMITTEE
ON INVESTIGATIONS

UNITED STATES SENATE



April 13, 2011

SoLE
1324

# Wall Street and The Financial Crisis:
## Anatomy of a Financial Collapse

April 13, 2011

In the fall of 2008, America suffered a devastating economic collapse. Once valuable securities lost most or all of their value, debt markets froze, stock markets plunged, and storied financial firms went under. Millions of Americans lost their jobs; millions of families lost their homes; and good businesses shut down. These events cast the United States into an economic recession so deep that the country has yet to fully recover.

This Report is the product of a two-year bipartisan investigation by the U.S. Senate Permanent Subcommittee on Investigations into the origins of the 2008 financial crisis. The goals of this investigation were to construct a public record of the facts in order to deepen the understanding of what happened; identify some of the root causes of the crisis; and provide a factual foundation for the ongoing effort to fortify the country against the recurrence of a similar crisis in the future.

Using internal documents, communications, and interviews, the Report attempts to provide the clearest picture yet of what took place inside the walls of some of the financial institutions and regulatory agencies that contributed to the crisis. The investigation found that the crisis was not a natural disaster, but the result of high risk, complex financial products; undisclosed conflicts of interest; and the failure of regulators, the credit rating agencies, and the market itself to rein in the excesses of Wall Street.

While this Report does not attempt to examine every key moment, or analyze every important cause of the crisis, it provides new, detailed, and compelling evidence of what happened. In so doing, we hope the Report leads to solutions that prevent it from happening again.

## I. EXECUTIVE SUMMARY

### A. Subcommittee Investigation

In November 2008, the Permanent Subcommittee on Investigations initiated its investigation into some of the key causes of the financial crisis. Since then, the Subcommittee has engaged in a wide-ranging inquiry, issuing subpoenas, conducting over 150 interviews and depositions, and consulting with dozens of government, academic, and private sector experts. The Subcommittee has accumulated and reviewed tens of millions of pages of documents, including court pleadings, filings with the Securities and Exchange Commission, trustee reports, prospectuses for public and private offerings, corporate board and committee minutes, mortgage transactions and analyses, memoranda, marketing materials, correspondence, and emails. The Subcommittee has also reviewed documents prepared by or sent to or from banking and

securities regulators, including bank examination reports, reviews of securities firms, enforcement actions, analyses, memoranda, correspondence, and emails.

In April 2010, the Subcommittee held four hearings examining four root causes of the financial crisis. Using case studies detailed in thousands of pages of documents released at the hearings, the Subcommittee presented and examined evidence showing how high risk lending by U.S. financial institutions; regulatory failures; inflated credit ratings; and high risk, poor quality financial products designed and sold by some investment banks, contributed to the financial crisis. This Report expands on those hearings and the case studies they featured. The case studies are Washington Mutual Bank, the largest bank failure in U.S. history; the federal Office of Thrift Supervision which oversaw Washington Mutual's demise; Moody's and Standard & Poor's, the country's two largest credit rating agencies; and Goldman Sachs and Deutsche Bank, two leaders in the design, marketing, and sale of mortgage related securities. This Report devotes a chapter to how each of the four causative factors, as illustrated by the case studies, fueled the 2008 financial crisis, providing findings of fact, analysis of the issues, and recommendations for next steps.

## B. Overview

### (1) High Risk Lending: Case Study of Washington Mutual Bank

The first chapter focuses on how high risk mortgage lending contributed to the financial crisis, using as a case study Washington Mutual Bank (WaMu). At the time of its failure, WaMu was the nation's largest thrift and sixth largest bank, with $300 billion in assets, $188 billion in deposits, 2,300 branches in 15 states, and over 43,000 employees. Beginning in 2004, it embarked upon a lending strategy to pursue higher profits by emphasizing high risk loans. By 2006, WaMu's high risk loans began incurring high rates of delinquency and default, and in 2007, its mortgage backed securities began incurring ratings downgrades and losses. Also in 2007, the bank itself began incurring losses due to a portfolio that contained poor quality and fraudulent loans and securities. Its stock price dropped as shareholders lost confidence, and depositors began withdrawing funds, eventually causing a liquidity crisis at the bank. On September 25, 2008, WaMu was seized by its regulator, the Office of Thrift Supervision, placed in receivership with the Federal Deposit Insurance Corporation (FDIC), and sold to JPMorgan Chase for $1.9 billion. Had the sale not gone through, WaMu's failure might have exhausted the entire $45 billion Deposit Insurance Fund.

This case study focuses on how one bank's search for increased growth and profit led to the origination and securitization of hundreds of billions of dollars in high risk, poor quality mortgages that ultimately plummeted in value, hurting investors, the bank, and the U.S. financial system. WaMu had held itself out as a prudent lender, but in reality, the bank turned increasingly to higher risk loans. Over a four-year period, those higher risk loans grew from 19% of WaMu's loan originations in 2003, to 55% in 2006, while its lower risk, fixed rate loans fell from 64% to 25% of its originations. At the same time, WaMu increased its securitization of

subprime loans sixfold, primarily through its subprime lender, Long Beach Mortgage Corporation, increasing such loans from nearly $4.5 billion in 2003, to $29 billion in 2006. From 2000 to 2007, WaMu and Long Beach together securitized at least $77 billion in subprime loans.

WaMu also originated an increasing number of its flagship product, Option Adjustable Rate Mortgages (Option ARMs), which created high risk, negatively amortizing mortgages and, from 2003 to 2007, represented as much as half of all of WaMu's loan originations. In 2006 alone, Washington Mutual originated more than $42.6 billion in Option ARM loans and sold or securitized at least $115 billion to investors, including sales to the Federal National Mortgage Association (Fannie Mae) and Federal Home Loan Mortgage Corporation (Freddie Mac). In addition, WaMu greatly increased its origination and securitization of high risk home equity loan products. By 2007, home equity loans made up $63.5 billion or 27% of its home loan portfolio, a 130% increase from 2003.

At the same time that WaMu was implementing its high risk lending strategy, WaMu and Long Beach engaged in a host of shoddy lending practices that produced billions of dollars in high risk, poor quality mortgages and mortgage backed securities. Those practices included qualifying high risk borrowers for larger loans than they could afford; steering borrowers from conventional mortgages to higher risk loan products; accepting loan applications without verifying the borrower's income; using loans with low, short term "teaser" rates that could lead to payment shock when higher interest rates took effect later on; promoting negatively amortizing loans in which many borrowers increased rather than paid down their debt; and authorizing loans with multiple layers of risk. In addition, WaMu and Long Beach failed to enforce compliance with their own lending standards; allowed excessive loan error and exception rates; exercised weak oversight over the third party mortgage brokers who supplied half or more of their loans; and tolerated the issuance of loans with fraudulent or erroneous borrower information. They also designed compensation incentives that rewarded loan personnel for issuing a large volume of higher risk loans, valuing speed and volume over loan quality.

As a result, WaMu, and particularly its Long Beach subsidiary, became known by industry insiders for its failed mortgages and poorly performing residential mortgage backed securities (RMBS). Among sophisticated investors, its securitizations were understood to be some of the worst performing in the marketplace. Inside the bank, WaMu's President Steve Rotella described Long Beach as "terrible" and "a mess," with default rates that were "ugly." WaMu's high risk lending operation was also problem-plagued. WaMu management was provided with compelling evidence of deficient lending practices in internal emails, audit reports, and reviews. Internal reviews of two high volume WaMu loan centers, for example, described "extensive fraud" by employees who "willfully" circumvented bank policies. A WaMu review of internal controls to stop fraudulent loans from being sold to investors described them as "ineffective." On at least one occasion, senior managers knowingly sold delinquency-prone loans to investors. Aside from Long Beach, WaMu's President described WaMu's prime home loan business as the "worst managed business" he had seen in his career.

Documents obtained by the Subcommittee reveal that WaMu launched its high risk lending strategy primarily because higher risk loans and mortgage backed securities could be sold for higher prices on Wall Street. They garnered higher prices because higher risk meant the securities paid a higher coupon rate than other comparably rated securities, and investors paid a higher price to buy them. Selling or securitizing the loans also removed them from WaMu's books and appeared to insulate the bank from risk.

The Subcommittee investigation indicates that unacceptable lending and securitization practices were not restricted to Washington Mutual, but were present at a host of financial institutions that originated, sold, and securitized billions of dollars in high risk, poor quality home loans that inundated U.S. financial markets. Many of the resulting securities ultimately plummeted in value, leaving banks and investors with huge losses that helped send the economy into a downward spiral. These lenders were not the victims of the financial crisis; the high risk loans they issued were the fuel that ignited the financial crisis.

### (2) Regulatory Failure:
### Case Study of the Office of Thrift Supervision

The next chapter focuses on the failure of the Office of Thrift Supervision (OTS) to stop the unsafe and unsound practices that led to the demise of Washington Mutual, one of the nation's largest banks. Over a five year period from 2004 to 2008, OTS identified over 500 serious deficiencies at WaMu, yet failed to take action to force the bank to improve its lending operations and even impeded oversight by the bank's backup regulator, the FDIC.

Washington Mutual Bank was the largest thrift under the supervision of OTS and was among the eight largest financial institutions insured by the FDIC. Until 2006, WaMu was a profitable bank, but in 2007, many of its high risk home loans began experiencing increased rates of delinquency, default, and loss. After the market for subprime mortgage backed securities collapsed in July 2007, Washington Mutual was unable to sell or securitize its subprime loans and its loan portfolio fell in value. In September 2007, WaMu's stock price plummeted against the backdrop of its losses and a worsening financial crisis. From 2007 to 2008, WaMu's depositors withdrew a total of over $26 billion in deposits from the bank, triggering a liquidity crisis, followed by the bank's closure.

OTS records show that, during the five years prior to WaMu's collapse, OTS examiners repeatedly identified significant problems with Washington Mutual's lending practices, risk management, asset quality, and appraisal practices, and requested corrective action. Year after year, WaMu promised to correct the identified problems, but never did. OTS failed to respond with meaningful enforcement action, such as by downgrading WaMu's rating for safety and soundness, requiring a public plan with deadlines for corrective actions, or imposing civil fines for inaction. To the contrary, until shortly before the thrift's failure in 2008, OTS continually rated WaMu as financially sound.

The agency's failure to restrain WaMu's unsafe lending practices stemmed in part from an OTS regulatory culture that viewed its thrifts as "constituents," relied on bank management to

correct identified problems with minimal regulatory intervention, and expressed reluctance to interfere with even unsound lending and securitization practices. OTS displayed an unusual amount of deference to WaMu's management, choosing to rely on the bank to police itself in its use of safe and sound practices. The reasoning appeared to be that if OTS examiners simply identified the problems at the bank, OTS could then rely on WaMu's assurances that problems would be corrected, with little need for tough enforcement actions. It was a regulatory approach with disastrous results.

Despite identifying over 500 serious deficiencies in five years, OTS did not once, from 2004 to 2008, take a public enforcement action against Washington Mutual to correct its lending practices, nor did it lower the bank's rating for safety and soundness. Only in 2008, as the bank incurred mounting losses, did OTS finally take two informal, nonpublic enforcement actions, requiring WaMu to agree to a "Board Resolution" in March and a "Memorandum of Understanding" in September, neither of which imposed sufficient changes to prevent the bank's failure. OTS officials resisted calls by the FDIC, the bank's backup regulator, for stronger measures and even impeded FDIC oversight efforts by at times denying FDIC examiners office space and access to bank records. Tensions between the two agencies remained high until the end. Two weeks before the bank was seized, the FDIC Chairman contacted WaMu directly to inform it that the FDIC was likely to have a ratings disagreement with OTS and downgrade the bank's safety and soundness rating, and informed the OTS Director about that communication, prompting him to complain about the FDIC Chairman's "audacity."

Hindered by a culture of deference to management, demoralized examiners, and agency infighting, OTS officials allowed the bank's short term profits to excuse its risky practices and failed to evaluate the bank's actions in the context of the U.S. financial system as a whole. Its narrow regulatory focus prevented OTS from analyzing or acknowledging until it was too late that WaMu's practices could harm the broader economy.

OTS' failure to restrain Washington Mutual's unsafe lending practices allowed high risk loans at the bank to proliferate, negatively impacting investors across the United States and around the world. Similar regulatory failings by other agencies involving other lenders repeated the problem on a broad scale. The result was a mortgage market saturated with risky loans, and financial institutions that were supposed to hold predominantly safe investments but instead held portfolios rife with high risk, poor quality mortgages. When those loans began defaulting in record numbers and mortgage related securities plummeted in value, financial institutions around the globe suffered hundreds of billions of dollars in losses, triggering an economic disaster. The regulatory failures that set the stage for those losses were a proximate cause of the financial crisis.

(3) **Inflated Credit Ratings:**
    **Case Study of Moody's and Standard & Poor's**

The next chapter examines how inflated credit ratings contributed to the financial crisis by masking the true risk of many mortgage related securities. Using case studies involving Moody's Investors Service, Inc. (Moody's) and Standard & Poor's Financial Services LLC

(S&P), the nation's two largest credit rating agencies, the Subcommittee identified multiple problems responsible for the inaccurate ratings, including conflicts of interest that placed achieving market share and increased revenues ahead of ensuring accurate ratings.

Between 2004 and 2007, Moody's and S&P issued credit ratings for tens of thousands of U.S. residential mortgage backed securities (RMBS) and collateralized debt obligations (CDO). Taking in increasing revenue from Wall Street firms, Moody's and S&P issued AAA and other investment grade credit ratings for the vast majority of those RMBS and CDO securities, deeming them safe investments even though many relied on high risk home loans.[1] In late 2006, high risk mortgages began incurring delinquencies and defaults at an alarming rate. Despite signs of a deteriorating mortgage market, Moody's and S&P continued for six months to issue investment grade ratings for numerous RMBS and CDO securities.

Then, in July 2007, as mortgage delinquencies intensified and RMBS and CDO securities began incurring losses, both companies abruptly reversed course and began downgrading at record numbers hundreds and then thousands of their RMBS and CDO ratings, some less than a year old. Investors like banks, pension funds, and insurance companies, who are by rule barred from owning low rated securities, were forced to sell off their downgraded RMBS and CDO holdings, because they had lost their investment grade status. RMBS and CDO securities held by financial firms lost much of their value, and new securitizations were unable to find investors. The subprime RMBS market initially froze and then collapsed, leaving investors and financial firms around the world holding unmarketable subprime RMBS securities that were plummeting in value. A few months later, the CDO market collapsed as well.

Traditionally, investments holding AAA ratings have had a less than 1% probability of incurring defaults. But in 2007, the vast majority of RMBS and CDO securities with AAA ratings incurred substantial losses; some failed outright. Analysts have determined that over 90% of the AAA ratings given to subprime RMBS securities originated in 2006 and 2007 were later downgraded by the credit rating agencies to junk status. In the case of Long Beach, 75 out of 75 AAA rated Long Beach securities issued in 2006, were later downgraded to junk status, defaulted, or withdrawn. Investors and financial institutions holding the AAA rated securities lost significant value. Those widespread losses led, in turn, to a loss of investor confidence in the value of the AAA rating, in the holdings of major U.S. financial institutions, and even in the viability of U.S. financial markets.

Inaccurate AAA credit ratings introduced risk into the U.S. financial system and constituted a key cause of the financial crisis. In addition, the July mass downgrades, which were unprecedented in number and scope, precipitated the collapse of the RMBS and CDO secondary markets, and perhaps more than any other single event triggered the beginning of the financial crisis.

---

[1] S&P issues ratings using the "AAA" designation; Moody's equivalent rating is "Aaa." For ease of reference, this Report will refer to both ratings as "AAA."

7

The Subcommittee's investigation uncovered a host of factors responsible for the inaccurate credit ratings issued by Moody's and S&P. One significant cause was the inherent conflict of interest arising from the system used to pay for credit ratings. Credit rating agencies were paid by the Wall Street firms that sought their ratings and profited from the financial products being rated. Under this "issuer pays" model, the rating agencies were dependent upon those Wall Street firms to bring them business, and were vulnerable to threats that the firms would take their business elsewhere if they did not get the ratings they wanted. The rating agencies weakened their standards as each competed to provide the most favorable rating to win business and greater market share. The result was a race to the bottom.

Additional factors responsible for the inaccurate ratings include rating models that failed to include relevant mortgage performance data; unclear and subjective criteria used to produce ratings; a failure to apply updated rating models to existing rated transactions; and a failure to provide adequate staffing to perform rating and surveillance services, despite record revenues. Compounding these problems were federal regulations that required the purchase of investment grade securities by banks and others, which created pressure on the credit rating agencies to issue investment grade ratings. While these federal regulations were intended to help investors stay away from unsafe securities, they had the opposite effect when the AAA ratings proved inaccurate.

Evidence gathered by the Subcommittee shows that the credit rating agencies were aware of problems in the mortgage market, including an unsustainable rise in housing prices, the high risk nature of the loans being issued, lax lending standards, and rampant mortgage fraud. Instead of using this information to temper their ratings, the firms continued to issue a high volume of investment grade ratings for mortgage backed securities. If the credit rating agencies had issued ratings that accurately reflected the increasing risk in the RMBS and CDO markets and appropriately adjusted existing ratings in those markets, they might have discouraged investors from purchasing high risk RMBS and CDO securities, and slowed the pace of securitizations.

It was not in the short term economic interest of either Moody's or S&P, however, to provide accurate credit ratings for high risk RMBS and CDO securities, because doing so would have hurt their own revenues. Instead, the credit rating agencies' profits became increasingly reliant on the fees generated by issuing a large volume of structured finance ratings. In the end, Moody's and S&P provided AAA ratings to tens of thousands of high risk RMBS and CDO securities and then, when those products began to incur losses, issued mass downgrades that shocked the financial markets, hammered the value of the mortgage related securities, and helped trigger the financial crisis.

**(4) Investment Bank Abuses:**
   **Case Study of Goldman Sachs and Deutsche Bank**

The final chapter examines how investment banks contributed to the financial crisis, using as case studies Goldman Sachs and Deutsche Bank, two leading participants in the U.S. mortgage market.

Investment banks can play an important role in the U.S. economy, helping to channel the nation's wealth into productive activities that create jobs and increase economic growth. But in the years leading up to the financial crisis, large investment banks designed and promoted complex financial instruments, often referred to as structured finance products, that were at the heart of the crisis. They included RMBS and CDO securities, credit default swaps (CDS), and CDS contracts linked to the ABX Index. These complex, high risk financial products were engineered, sold, and traded by the major U.S. investment banks.

From 2004 to 2008, U.S. financial institutions issued nearly $2.5 trillion in RMBS and over $1.4 trillion in CDO securities, backed primarily by mortgage related products. Investment banks typically charged fees of $1 to $8 million to act as the underwriter of an RMBS securitization, and $5 to $10 million to act as the placement agent for a CDO securitization. Those fees contributed substantial revenues to the investment banks, which established internal structured finance groups, as well as a variety of RMBS and CDO origination and trading desks within those groups, to handle mortgage related securitizations. Investment banks sold RMBS and CDO securities to investors around the world, and helped develop a secondary market where RMBS and CDO securities could be traded. The investment banks' trading desks participated in those secondary markets, buying and selling RMBS and CDO securities either on behalf of their clients or in connection with their own proprietary transactions.

The financial products developed by investment banks allowed investors to profit, not only from the success of an RMBS or CDO securitization, but also from its failure. CDS contracts, for example, allowed counterparties to wager on the rise or fall in the value of a specific RMBS security or on a collection of RMBS and other assets contained or referenced in a CDO. Major investment banks developed standardized CDS contracts that could also be traded on a secondary market. In addition, they established the ABX Index which allowed counterparties to wager on the rise or fall in the value of a basket of subprime RMBS securities, which could be used to reflect the status of the subprime mortgage market as a whole. The investment banks sometimes matched up parties who wanted to take opposite sides in a transaction and other times took one or the other side of the transaction to accommodate a client. At still other times, investment banks used these financial instruments to make their own proprietary wagers. In extreme cases, some investment banks set up structured finance transactions which enabled them to profit at the expense of their clients.

Two case studies, involving Goldman Sachs and Deutsche Bank, illustrate a variety of troubling practices that raise conflicts of interest and other concerns involving RMBS, CDO, CDS, and ABX related financial instruments that contributed to the financial crisis.

The Goldman Sachs case study focuses on how it used net short positions to benefit from the downturn in the mortgage market, and designed, marketed, and sold CDOs in ways that created conflicts of interest with the firm's clients and at times led to the bank's profiting from the same products that caused substantial losses for its clients.

From 2004 to 2008, Goldman was a major player in the U.S. mortgage market. In 2006 and 2007 alone, it designed and underwrote 93 RMBS and 27 mortgage related CDO

securitizations totaling about $100 billion, bought and sold RMBS and CDO securities on behalf of its clients, and amassed its own multi-billion-dollar proprietary mortgage related holdings. In December 2006, however, when it saw evidence that the high risk mortgages underlying many RMBS and CDO securities were incurring accelerated rates of delinquency and default, Goldman quietly and abruptly reversed course.

Over the next two months, it rapidly sold off or wrote down the bulk of its existing subprime RMBS and CDO inventory, and began building a short position that would allow it to profit from the decline of the mortgage market. Throughout 2007, Goldman twice built up and cashed in sizeable mortgage related short positions. At its peak, Goldman's net short position totaled $13.9 billion. Overall in 2007, its net short position produced record profits totaling $3.7 billion for Goldman's Structured Products Group, which when combined with other mortgage losses, produced record net revenues of $1.1 billion for the Mortgage Department as a whole.

Throughout 2007, Goldman sold RMBS and CDO securities to its clients without disclosing its own net short position against the subprime market or its purchase of CDS contracts to gain from the loss in value of some of the very securities it was selling to its clients.

The case study examines in detail four CDOs that Goldman constructed and sold called Hudson 1, Anderson, Timberwolf, and Abacus 2007-AC1. In some cases, Goldman transferred risky assets from its own inventory into these CDOs; in others, it included poor quality assets that were likely to lose value or not perform. In three of the CDOs, Hudson, Anderson and Timberwolf, Goldman took a substantial portion of the short side of the CDO, essentially betting that the assets within the CDO would fall in value or not perform. Goldman's short position was in direct opposition to the clients to whom it was selling the CDO securities, yet it failed to disclose the size and nature of its short position while marketing the securities. While Goldman sometimes included obscure language in its marketing materials about the possibility of its taking a short position on the CDO securities it was selling, Goldman did not disclose to potential investors when it had already determined to take or had already taken short investments that would pay off if the particular security it was selling, or RMBS and CDO securities in general, performed poorly. In the case of Hudson 1, for example, Goldman took 100% of the short side of the $2 billion CDO, betting against the assets referenced in the CDO, and sold the Hudson securities to investors without disclosing its short position. When the securities lost value, Goldman made a $1.7 billion gain at the direct expense of the clients to whom it had sold the securities.

In the case of Anderson, Goldman selected a large number of poorly performing assets for the CDO, took 40% of the short position, and then marketed Anderson securities to its clients. When a client asked how Goldman "got comfortable" with the New Century loans in the CDO, Goldman personnel tried to dispel concerns about the loans, and did not disclose the firm's own negative view of them or its short position in the CDO.

In the case of Timberwolf, Goldman sold the securities to its clients even as it knew the securities were falling in value. In some cases, Goldman knowingly sold Timberwolf securities to clients at prices above its own book values and, within days or weeks of the sale, marked

10

down the value of the sold securities, causing its clients to incur quick losses and requiring some to post higher margin or cash collateral. Timberwolf securities lost 80% of their value within five months of being issued and today are worthless. Goldman took 36% of the short position in the CDO and made money from that investment, but ultimately lost money when it could not sell all of the Timberwolf securities.

In the case of Abacus, Goldman did not take the short position, but allowed a hedge fund, Paulson & Co. Inc., that planned on shorting the CDO to play a major but hidden role in selecting its assets. Goldman marketed Abacus securities to its clients, knowing the CDO was designed to lose value and without disclosing the hedge fund's asset selection role or investment objective to potential investors. Three long investors together lost about $1 billion from their Abacus investments, while the Paulson hedge fund profited by about the same amount. Today, the Abacus securities are worthless.

In the Hudson and Timberwolf CDOs, Goldman also used its role as the collateral put provider or liquidation agent to advance its financial interest to the detriment of the clients to whom it sold the CDO securities.

The Deutsche Bank case study describes how the bank's top global CDO trader, Greg Lippmann, repeatedly warned and advised his Deutsche Bank colleagues and some of his clients seeking to buy short positions about the poor quality of the RMBS securities underlying many CDOs. He described some of those securities as "crap" and "pigs," and predicted the assets and the CDO securities would lose value. At one point, Mr. Lippmann was asked to buy a specific CDO security and responded that it "rarely trades," but he "would take it and try to dupe someone" into buying it. He also at times referred to the industry's ongoing CDO marketing efforts as a "CDO machine" or "ponzi scheme." Deutsche Bank's senior management disagreed with his negative views, and used the bank's own funds to make large proprietary investments in mortgage related securities that, in 2007, had a notional or face value of $128 billion and a market value of more than $25 billion. Despite its positive view of the housing market, the bank allowed Mr. Lippmann to develop a large proprietary short position for the bank in the RMBS market, which from 2005 to 2007, totaled $5 billion. The bank cashed in the short position from 2007 to 2008, generating a profit of $1.5 billion, which Mr. Lippmann claims is more money on a single position than any other trade had ever made for Deutsche Bank in its history. Despite that gain, due to its large long holdings, Deutsche Bank lost nearly $4.5 billion from its mortgage related proprietary investments.

The Subcommittee also examined a $1.1 billion CDO underwritten by Deutsche Bank known as Gemstone CDO VII Ltd. (Gemstone 7), which issued securities in March 2007. It was one of 47 CDOs totaling $32 billion that Deutsche Bank underwrote from 2004 to 2008. Deutsche Bank made $4.7 million in fees from Gemstone 7, while the collateral manager, a hedge fund called HBK Capital Management, was slated to receive $3.3 million. Gemstone 7 concentrated risk by including within a single financial instrument 115 RMBS securities whose financial success depended upon thousands of high risk, poor quality subprime loans. Many of those RMBS securities carried BBB, BBB-, or even BB credit ratings, making them among the highest risk RMBS securities sold to the public. Nearly a third of the RMBS securities contained